# Exhibit D

*LIST OF COUNSEL ON SIGNATURE PAGE*

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| *People of the State of California, et al.* | MDL No. 3047 |
| *v.* | Case Nos. 4:23-cv-05448-YGR |
| *Meta Platforms, Inc., Instagram, LLC, Meta Payments, Inc., Meta Platforms Technologies, LLC* | 4:23-cv-05885-YGR |
| ------------------------------------------------------- | |
| *Office of the Attorney General, State of Florida, Department of Legal Affairs* | **STATES' OPPOSITION TO META'S MOTION TO DISMISS THE MULTISTATE ATTORNEYS GENERAL COMPLAINT AND FLORIDA ATTORNEY GENERAL COMPLAINT** |
| *v.* | |
| *Meta Platforms, Inc., Instagram LLC* | Date: TBD |
| ------------------------------------------------------- | Time: TBD |
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION | Place: Oakland, California |
| | Judge: Honorable Yvonne Gonzalez Rogers |
| THIS DOCUMENT RELATES TO: 4:23-cv-05448, 4:23-cv-05885 | |

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND BACKGROUND ................................................................................... 1

STANDARD OF REVIEW ........................................................................................................ 4

ARGUMENT ............................................................................................................................. 5

    I.    The States' COPPA claim should not be dismissed ................................................. 5

        A.    Meta's motion is procedurally improper. ...................................................... 6

        B.    The States sufficiently plead that Meta's Platforms are directed to children. ......................................................................................................... 7

            1.    Meta misconstrues the States' COPPA claim. ................................ 8

            2.    The States adequately allege children are an intended audience of the Platforms. ........................................................... 9

            3.    The States adequately allege empirical evidence of audience composition. ................................................................. 10

            4.    The States adequately allege that Meta's Platforms feature child-oriented subject matter, characters, activities, music, and other content. .................................................................. 10

            5.    The States adequately allege child-directed advertising promoting and appearing on the Platforms. .................................. 12

            6.    The States adequately allege the Platforms' use of child models and celebrities who appeal to children. ........................... 13

            7.    The States adequately allege child-oriented activities and incentives. ................................................................................ 14

        C.    Endorsing the States' child-directed theory will not have dire consequences. ............................................................................. 14

    II.    Section 230 does not bar the States' claims. ........................................................ 14

        A.    Meta is not acting as a publisher of third-party content, as contemplated under Section 230. ............................................................. 15

        B.    This Court has previously held Section 230 does not bar claims based on numerous Platform features. ............................................. 17

        C.    Section 230 does not bar the States' additional claims based on Meta's addictive features. ............................................................ 19

            1.    Section 230 does not bar the States' claims based on Meta's features designed to keep users on its Platforms. ......................... 19

            2.    Section 230 does not bar the States' claims based on Meta's features designed to lure users back onto its Platforms. .............. 21

    III.    The States adequately allege that Meta engaged in deceptive acts and practices ................................................................................................................ 23

i

**TABLE OF CONTENTS**
(continued)

Page

A.    Meta's misrepresentations are actionable statements of fact. ................... 25

B.    The States adequately plead deception under any pleading standard. ...... 26

    1.    The States adequately plead that Meta's stated policy regarding users under thirteen is deceptive because the policy does not reflect Meta's actual conduct. ........................... 27

    2.    The States adequately plead that Meta's emphasis on its CSER reports as the primary measure of online safety deceptively omits less favorable data. .......................... 28

    3.    The States adequately plead that Meta misled the public about its reasons for abandoning Project Daisy. ......................... 29

C.    Where necessary, the States readily allege Meta's misstatements are material. ....................................................................................... 29

D.    Meta can be held liable for its deceptive statements before Congress. ...................................................................................... 32

IV.    The States sufficiently plead unfair and unconscionable business acts and practices. ............................................................................................. 34

A.    The States sufficiently plead that Meta violated Section 5 of the FTCA. ..................................................................................... 35

    1.    The States sufficiently plead substantial injury. .......................... 36

    2.    The States sufficiently plead that their alleged injury was not reasonably avoidable. ........................................... 36

    3.    The States sufficiently plead that Meta's conduct is not outweighed by countervailing benefits. ...................................... 38

B.    The States sufficiently plead that Meta violated their unfairness or unconscionability laws. ................................................................ 39

V.    The States adequately plead conduct taking place in connection with trade and commerce and consumer transactions. ................................................. 43

VI.    The States are entitled to restitution. ................................................. 45

VII.    The Middle District of Florida has personal jurisdiction over Meta Platforms, Inc. and Instagram, LLC. ................................................... 47

CONCLUSION ........................................................................................... 50

ii

# INTRODUCTION AND BACKGROUND

Meta crafted addictive social media platforms that caused substantial and pervasive harms to a generation of young users. It also repeatedly misled the public about those harms. Through this action, 34 States seek to hold Meta accountable for unfairly and deceptively designing, operating, and marketing Facebook and Instagram to ensnare and addict young users. The States seek to stop Meta from capitalizing on young users' developing brains and unique vulnerabilities to subvert and exploit their autonomy, and to mitigate the devastating harms that Meta has caused to youth throughout the country. To do so, the States have invoked their consumer protection laws, which must be liberally construed to effectuate their purpose of protecting the public,[1] and pursuant to which the States have "wide discretion" in matters of enforcement and determining the public interest. *See, e.g.*, *State of Fla. ex rel. Shevin v. Exxon Corp.*, 526 F.2d 266, 268–69 (5th Cir. 1976).

Meta rejects these well-established principles, instead espousing unreasonably narrow interpretations of the States' consumer protection laws. It also glosses over the variations among *different* State consumer protection laws and thus cannot meet its burden to show why each State's claims fail under the relevant statute and case law.[2] Meta further fails to grapple with the widespread and interconnected scheme of unfair and deceptive tactics that the States plead in their Complaint, instead inappropriately disaggregating each allegation and recasting the States' allegations as a series of unrelated events. Moreover, Meta repeatedly raises factual disputes, inviting this Court to inappropriately weigh the evidence at the motion-to-dismiss stage. Meta's

---

[1] *See, e.g., Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.,* 973 P.2d 527, 540 (Cal. 1999) (California's Unfair Competition Law "was intentionally framed in its broad, sweeping language, precisely to enable judicial tribunals to deal with the innumerable new schemes which the fertility of man's invention would contrive." (cleaned up)); *HealthONE of Denver, Inc. v. UnitedHealth Grp. Inc.*, 805 F. Supp. 2d 1115, 1120 (D. Colo. 2011 ("The [Colorado Consumer Protection Act] should be liberally construed to serve its broad purpose and scope."); *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 594 (Ill. 1996) (The Illinois Consumer Fraud and Deceptive Business Practices Act "should be liberally construed."); *Stevens v. Motorists Mut. Ins. Co.*, 759 S.W.2d 819, 821 (Ky. 1988) (The Kentucky Consumer Protection Act "has the broadest application in order to give Kentucky consumers the broadest possible protection for allegedly illegal acts.").

[2] While the States have attempted to respond to Meta's overly generalized arguments, should the Court be inclined to dismiss any particular State's consumer protection claims, the affected States respectfully request the opportunity to submit additional briefing on the requirements of their statutes.

1

Motion to Dismiss fails to show that any of the States' claims should be dismissed at this early stage.

The States' claims against Meta under their consumer protection laws[3] are twofold. *First,* Meta designed and deployed features it knew were harmful to young users. *Second,* Meta misled the public and concealed what it knew about that harm. The States also bring a claim under the Children's Online Privacy and Protection Act ("COPPA"), alleging that Meta impermissibly collects the data of children under 13 without obtaining prior consent from their parents. *See, e.g.*, Multistate Attorneys General Complaint, ECF 73-2 ("Compl.") ¶¶ 637–38.[4]

Meta's arguments fail for six reasons. *First,* Meta does not challenge and therefore concedes that the States adequately allege Meta has actual knowledge of users under 13 on its platforms. Thus, the COPPA claim may proceed. In any case, Meta misconstrues the law when it asserts that its platforms are not directed to children. Meta neglects that under COPPA, a website may be directed to children even if only a portion is directed to children and even if it appeals to multiple audiences. And the States' allegations, which support almost every factor relevant to whether a website is "directed to children," state a plausible claim under COPPA.

*Second,* Meta's attempt to utilize Section 230 as a complete shield against the States' unfairness and deception claims is unavailing. The States' unfairness claims focus on Meta's role as the product designer, marketer, and promoter of its platforms, and on its wrongful conduct related to the platforms' design features. They do not seek to hold Meta liable as a publisher or speaker of third-party content; thus, Section 230 does not apply. Nor does Section 230 provide immunity for Meta's deceptive statements and omissions, which again concern Meta's *own* conduct, not that of third-party content providers.

*Third,* the States adequately plead their deception claims. Meta repeatedly told the public that its platforms were safe when it knew they were not. Meta also said its recommendation algorithms were meant to create meaningful experiences, when in fact they were designed to

---

[3] The States' relevant consumer protection laws are set forth in a compendium in Appendix A.

[4] *People of the State of California, et al. v. Meta Platforms, Inc., et al.*, N.D. Cal. No. 4:23-cv-05448, ECF 73-2 (filed Oct. 24, 2023).

maximize time spent on the platforms. Meta similarly said that when it discovered under-13 users on the platforms, it removed them, but it regularly failed to do so. And Meta said that users saw and experienced harmful content at vastly lower rates than its own data showed. Meta now asks the Court to evaluate these statements in a vacuum, rather than considering the statements in the overall context of its pervasive pattern of deceit.

*Fourth,* the Complaint sufficiently alleges that Meta acted unfairly to capitalize on young users' vulnerabilities and encourage compulsive and harmful use of the platforms. Meta developed Instagram and Facebook to become even *more* addictive over time by continually adding or modifying features to capture more and more of young users' attention—in turn causing greater and greater harm. The States' allegations plausibly show that this conduct constitutes unfair acts or practices, not everyday business activities as Meta claims.

*Fifth,* the States sufficiently allege that, where States have "trade and commerce" requirements under state law, Meta has engaged in business activities that met those requirements. Trade and commerce encompass a wide variety of business activities, even those *affecting* commerce. The States adequately allege Meta has engaged in such activities by offering access to its platforms in exchange for the valuable consideration of consumers' data and attention, which Meta uses to generate profits through advertising.

*Finally,* Meta asks this Court to preclude the States from seeking restitution as a remedy. Meta disregards that restitution in the context of a State's civil enforcement action is an equitable remedy that flows from the broad, remedial purposes of state consumer protection laws. The States need not prove causation or allege harm to every consumer for a court to award restitution.

In addition, Meta's challenges are largely based on its misapprehension of the States' pleading burden at this juncture, repeatedly asking this Court to prematurely determine disputed issues of fact, and its misconstruction of COPPA and the States' consumer protection laws themselves. For these reasons, the States respectfully ask this Court to deny Meta's Motion to Dismiss.

3

**B.** **This Court has previously held Section 230 does not bar claims based on numerous Platform features.**

Even under this Court's conduct-specific approach—analyzing Meta's conduct with regard to each product feature—the States' claims survive Section 230 review. Meta overstates the potential preclusive effect of Section 230 for three reasons.

*First,* Meta does not seek to dismiss under Section 230 the States' allegations regarding Instagram's "multiple accounts" function, which allows users to register and access up to five accounts at a time without logging out of any account. Compl. ¶¶ 370–72. Thus, the States' claims regarding this feature should move forward.

*Second,* the Court has already held that Section 230 does not bar PISD Plaintiffs' products liability claims based on numerous features that do not implicate Meta's conduct as a speaker or publisher. *See* MTD Order at 14–16. The States' claims can therefore move forward regarding (1) offering appearance-altering filters, Compl. ¶¶ 333–68, (2) hindering users' ability to self-restrict time on the Platforms, *id.* at ¶¶ 578-590, and (3) omitting material facts pertaining to the Platforms, *e.g., id.* at ¶¶ 414–29. And with respect to filters and time management tools, Meta concedes these claims can proceed, as it has not moved to dismiss them. *See* MTD at 19–25.

Despite the Court's previous conclusion that Section 230 allowed PISD Plaintiffs' claims for failure to warn regarding dangerous Platform features to proceed, Meta now urges the Court to hold the opposite regarding the States' omission claims. MTD at 25. Meta misconstrues the scope of the States' omissions allegations as merely repackaged failure to warn claims about Meta's recommendation algorithms or other features. But the States' claims concern Meta's broader pattern of deceit, which included a multitude of omissions of internal research and knowledge that belie Meta's carefully crafted public narrative around safety. In any case, Meta's role as a publisher or speaker is not implicated where Meta can address its duty to warn users of risks of harm without changing what it publishes on its Platforms or even how users publish it. MTD Order at 20. Meta's duty to fully disclose known risks about its Platforms to consumers arises from its knowledge about

17

a material fact: the risk of harm to youth who use Meta's Platforms. *See Internet Brands*, 824 F.3d at 849.

*Third,* Meta paints with too broad a brush when it argues that this Court previously barred all claims related to "Likes" and notifications. Instead, this Court held that Section 230 bars claims regarding notifications alerting users to "Likes." MTD Order at 18. The States' claim regarding Meta's display of total "Like" counts, and Meta's extended study of the effect of that display through Project Daisy, is distinct and more nuanced. The States argue that Meta knew that its design choice to display a calculated total of "Likes" on a user's post contributed to negative social comparison, which was most keenly felt by young users. Compl. ¶¶ 226–98. Despite knowing that removing "Like" counts from a user's standard view would improve youth well-being, Meta retained the harmful feature. *Id.* at ¶¶ 242, 249. Meta also knew that its Platform design made it difficult for users to independently choose to hide their own "Like" counts, even if they wished to do so, yet it made no changes. *Id.* at ¶¶ 250–52. The States' claim rests on Meta's design decisions to tabulate and display a total of "Like" counts and to obscure options for users to proactively hide those counts for their own well-being—not on notifications regarding "Likes." Accordingly, Section 230 and this Court's prior order do not bar this claim.

*Finally,* Meta misconstrues COPPA and the States' claims when it argues that interpreting COPPA to impose liability based on content posted by third parties would be inconsistent with Section 230. MTD at 10. As this Court has recognized, liability under COPPA is not based on the content published by third parties or on Meta's role as a publisher or speaker of information provided by a third party. MTD Order at 20. Instead, it arises from Meta's collection of children's personal information without parental consent. Similarly, applying COPPA's "directed to children" factors does not implicate Section 230: observing child-targeting third-party content on a Platform can inform whether the Platform is "directed to children" without in any way seeking to hold the provider liable for the act of publishing that content. Moreover, the States argue that Meta's own advertisements promoting, or appearing on, its Platforms are directed to children. Compl. ¶¶ 759, 798, 800, 822, 829; 16 C.F.R. § 312.2. Thus, Section 230 does not shield Meta from the States' COPPA claims.

18

**C.** **Section 230 does not bar the States' additional claims based on Meta's addictive features.**

Meta relies on the Court's prior order to argue that Section 230 precludes claims challenging certain features designed to keep users on their Social Media Platforms and lure them to return. MTD at 21–23. This argument fails because features such as algorithmic recommendations, infinite scroll, autoplay, and ephemeral design do not implicate traditional publishing functions, and are dangerous regardless of the content they display.

**1.** **Section 230 does not bar the States' claims based on Meta's features designed to keep users on its Platforms.**

Section 230 does not bar challenges to features designed to keep users on Meta's Platforms, such as its recommendation algorithms, infinite scroll, and autoplay, because those features do not implicate traditional publishing functions.

This Court previously held that Meta's use of "algorithms to determine whether, when, and to whom" content is published constitutes a "traditional editorial function[] . . . essential to publishing." MTD Order at 19. But the Ninth Circuit has not expanded the meaning of publication to include promoting, marketing, or boosting content as Meta attempts to do through its recommendation algorithms. The fact that some publishers may, at times, *also* engage in this conduct does not make it part of the core publisher function described by Section 230 and clarified by the Ninth Circuit. "Publication" is a strictly defined concept involving "reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content," including reproducing material for publication and editing for style and technical fluency, altering content, and postponing content. *Barnes*, 570 F.3d at 1102; *see also Lemmon*, 995 F.3d at 1091; *Fair Hous. Council v. Roommates.com*, 521 F.3d 1157, 1170–71 (9th Cir. 2008); *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 332 (4th Cir. 1997).

The dangers created by Meta's recommendation algorithms, which detect material an individual is likely to engage with and then increasingly display that material to maximize time spent on the Platforms, do not depend on the type of content the recommendation algorithms suggest. Imagine the recommendation algorithms suggesting to a young user video after video of

19

puppies playing. No one would argue that puppy videos are dangerous content. But the algorithmic sequencing of the content according to dopamine-manipulating "variable reward schedules," Compl. ¶¶ 156–61, could still be harmful to that young user by causing them to stay up too late watching those videos, leading to sleep deprivation, or causing them to be distracted by those videos during school.

In *Lemmon*, for example, the Ninth Circuit concluded that Section 230 did not bar a challenge to Snap's speed filter, which allowed users to take videos of themselves while the filter displayed the speed they were moving in real time. 995 F.3d at 1091–93. This feature was inherently dangerous because it encouraged users to drive at unsafe speeds, not because it encouraged users to post specific content. *Id.* The court therefore held that the claim did not seek to hold Snap responsible as a publisher or speaker, but merely sought to hold Snap liable for its own conduct: the creation of the unsafe speed filter. *Id.* at 1093. Like the speed filter, Meta's recommendation algorithms represent an "'unreasonable and negligent' design decision[]" and are inherently dangerous. *Id.* at 1091. This is so regardless of what content the recommendation algorithms promote or recommend.

Because the States' unfairness claims regarding the recommendation algorithms are based on their status as a content-neutral feature, Meta could "take reasonable measures to design" safer Social Media Platforms "without altering the content that [its] users generate." *Id.* at 1092. Meta would not need to remove or alter any content that appeals to young users, prohibit third parties from posting additional content, or stop young users from seeking out that content. Instead, Meta could limit the manner in which its Platforms promote or market that content to a young user at one time. Therefore, the States' claims addressing the recommendation algorithms "'ha[ve] nothing to do with' [Meta's] editing, monitoring, or removing of the content that its users generate," *id.* (quoting *Internet Brands*, 824 F.3d at 852), and so are not barred by Section 230.

The Court also held that addressing Meta's infinite scroll and autoplay features "would necessarily require defendants to publish less third-party content." MTD Order at 16. But Meta *could* change these features without publishing less third-party content. If Meta were to eliminate infinite scroll, this would not prohibit any third-party user from posting an unlimited number of

20

photos, videos, and other content to Meta's Platforms at any time for all users to see immediately on the creator's profile. The only difference is that users might see that content displayed over multiple pages in their feed. Similarly, if Meta were to eliminate the autoplay feature, no videos would be barred from the Platforms. Users would just need to press the play button to start the videos. In other words, Meta "could . . . satisf[y] its alleged obligation" by "designing its product differently." *Omegle, LLC*, 614 F. Supp. 3d at 819.

### 2. Section 230 does not bar the States' claims based on Meta's features designed to lure users back onto its Platforms.

Nor does Section 230 bar challenges to features that aim to draw users back to Meta's Platforms, such as ephemeral design features—including videos that are shown once while livestreamed or those that disappear after 24 hours—and notifications of third-party content.

The States do not allege claims related to the nature of specific content selected for ephemeral display or sent via ephemeral messages, but rather with Meta's design choice to make any "content available to users only temporarily." Compl. ¶ 97. The States argue that Meta's use of ephemeral design features is inherently dangerous because they cultivate the "fear of missing out" (FOMO) "and exploit psychological vulnerabilities in young users." *Id.* at ¶ 401. Meta exploits FOMO to develop young users' compulsive need to continually check the Platforms to the detriment of their mental and physical well-being. This harm stems not from any content but rather from Meta's design features. Therefore, much as in *Lemmon*, Meta's ephemeral design features are distinct from Meta's role as a publisher. 995 F.3d at 1092.

In its previous order, the Court read ephemeral design features to be "[e]ditorial decisions" about "the length of content published and how long to publish content." MTD Order at 18. But the States' claims do not implicate Meta's decisions to post or remove content. Meta could address the harm caused by the ephemeral design features without changing user-posted content or investigating the nature of the content. *Internet Brands*, 824 F.3d at 851–52. Meta could disable the automatic "disappearing" aspect, which would not require Meta to monitor or remove any content. Users could still view content and a creator could still choose to post a video and delete it after a desired period of time, even if that setting was no longer the default. In this way, ephemeral design

21

features are akin to that of the speed filter at issue in *Lemmon*. Here, as there, the feature at issue does not derive from Meta's "editing, monitoring, or removing" of user-generated content. *Lemmon*, 995 F.3d at 1092. Accordingly, Section 230 does not bar the States' unfairness claims based on ephemeral design features.

Similarly, Meta's use of notifications of third-party content is not immune under Section 230. The Court previously relied on *Dyroff* to hold that Section 230 bars design defect claims based on notifications made "to alert users to third-party content." MTD Order at 18. There, Section 230 immunized a website operator against liability based on a notification sent to the decedent that directed him to a post about purchasing heroin. *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1098 (9th Cir. 2019). To address that harm, the operator would have needed to monitor or remove third-party content. But here, the States do not allege harm resulting from the content giving rise to the notifications, nor from the content of the notifications themselves. Rather, the harm occurs as the result of Meta's content-neutral use of frequent and disruptive notifications to capitalize on young users' desire for "'[a]pproval and acceptance.'" Compl. ¶ 408. Meta's design and use of "disruptive audiovisual and vibration notifications and alerts" encourage young users to keep coming back to the Platforms, even causing them to frequently wake up throughout the night to check social media notifications. *Id.* at ¶¶ 408, 515, 847(b)–(c). And Meta intentionally makes it difficult for users to disable notifications. *Id.* at ¶¶ 317, 323, 325–26. This conduct reduces user control over their own viewing experience independent of content or Meta's role as a publisher. Meta's notification design choices are inherently unfair because they are designed to override young users' autonomy and continually draw them back into the Platforms.

Moreover, the States' claims do not implicate Meta's decisions to post or remove content. Meta could address the harm caused by notifications without changing user-posted content or investigating the nature of the content. *Internet Brands*, 824 F.3d at 851–52. Meta could make the settings easier to navigate so users could exercise more control over their notifications. Meta could also adjust the frequency with which it pushes notifications. Such changes do not affect users' ability to post or view content, nor do they require Meta to monitor or delete any content. Therefore, Section 230 does not bar claims regarding notifications of third-party content.

22

violation must simply have "a relationship" with the sale). Some states, like Washington, take an even broader approach finding that any "acts done for the purpose of increasing profits are within the sphere of trade [or] commerce." *State Farm Fire & Cas. Co. v. Huynh*, 962 P.2d 854, 862 (Wash. Ct. App. 1998). These standards reflect the remedial nature of the statutes and the corresponding directives, found in nearly all states, that the statutes be liberally construed. *See supra* note 1.

Importantly, the States have sufficiently cleared this low hurdle by alleging that Meta's statements to Congress fall within their respective state statutes. The Complaint repeatedly grounds these statements by placing them within a larger scheme to "deceive[] the public" and influence press coverage. *See, e.g.*, Compl. ¶¶ 136-37, 333-37, 429, 438, 562, 685. The States also allege that the statements were made with the purposes of maintaining or increasing business revenues by allaying users' concerns. *See, e.g.*, *id.* at ¶¶ 1, 222–23, 333–38. Further, the Court can reasonably infer from the States' Complaint that Meta knew, or even intended, that its high-profile congressional testimony would be widely disseminated and relied upon by the public at large.[35]

### IV. <mark>The States sufficiently plead unfair and unconscionable business acts and practices.</mark>

The States sufficiently plead unfair and unconscionable business acts and practices in violation of the States' consumer protection laws, whether assessed under the standard articulated by Section 5 of the FTCA, the *Sperry* factors test, or any particular interpretation of those standards adopted by individual States' caselaw. Meta not only mischaracterizes and oversimplifies the variations among State law, but also incorrectly reframes the Complaint as implicating design decisions applicable to all users, rather than Meta's decisions to specifically target, subvert, and exploit young users' autonomy and choice. Further, the arguments Meta raises would require the Court to adjudicate disputes of fact and thus are inappropriate for a motion to dismiss. *See, e.g.*, *Loomis v. Slendertone Distribution, Inc.*, 420 F. Supp. 3d 1046, 1085–86 (S.D. Cal. 2019).

---

[35] An analogy may be found in the common law tort of negligent misrepresentation where liability attaches if the defendant, as alleged here, "intends or has reason to expect" the deceived party will rely on the misrepresentation. Restatement (Second) of Torts, § 531 (Am. L. Inst. 1977).

34

Meta initially contends that the States' claims amount to an impermissible attempt to hold it liable for "*without more*, designing a product or service in a way that makes the product or service more appealing to users." MTD at 39 (emphasis added). However, Meta misapprehends the case law, which illustrates merely that a bare assertion of a profit motive, accompanied by no additional allegations, is insufficient to state an unfair trade practice claim. *See Fink v. Time Warner Cable*, 810 F. Supp. 2d 633, 647 (S.D.N.Y. 2011); *Solum v. Certainteed Corp.*, 147 F. Supp. 3d 404, 413 (E.D.N.C. 2015). Unlike those cases, the States' Complaint catalogs a comprehensive scheme to manipulate young users into excessive use of Meta's Platforms despite the company's own extensive knowledge of those Platforms' harmfulness. These claims are far beyond simply alleging a desire to increase profits or to make a more attractive product.

### A.    The States sufficiently plead that Meta violated Section 5 of the FTCA.

Meta's narrow reading of Section 5 of the FTCA and its argument that dozens of States are *required* to adopt that narrow construction is incorrect,[36] and Meta oversimplifies significant variations among the States' laws. Notably, many of these laws are *less* restrictive than the FTCA,[37] including because some follow the "cigarette rule," also known as the *Sperry* factors test, which is generally broader than the FTCA.[38] Regardless of which test each State actually follows, the States

---

[36] Maine did not bring an unfairness claim, *compare* MTD at 40 n.47, *with* Compl. Count XXIV, and Meta is incorrect that the highest court of North Dakota has found its UDAP law to be "identical or materially similar" to the FTCA, MTD at 41, n.48 (citing no North Dakota case law).

[37] Several States are *guided* by the FTCA, but their unfairness jurisprudence is expressly broader. *See, e.g.*, Ariz. Rev. Stat. Ann. § 44-1522(C) (stating that courts *may* use the FTCA as a *guide* in interpreting the Arizona Consumer Fraud Act); *Klem v. Wash. Mut. Bank*, 295 P.3d 1179, 1187 (Wash. 2013) ("Although we have been guided by federal interpretations, Washington has developed its own jurisprudence regarding application of Washington's CPA.").

[38] *See FTC v. Sperry & Hutchinson Co.* 405 U.S. 233, 244 n.5 (1972). This test considers whether a practice offends public policy; is immoral, unethical, oppressive, or unscrupulous; or is substantially injurious to consumers. *See, e.g.*, *Ulbrich v. Groth*, 78 A.3d 76, 100 (Conn. 2013); *Walker v. Fleetwood Homes of N.C., Inc.*, 653 S.E.2d 393, 399 (N.C. 2007); *State ex rel. Shikada v. Bristol-Myers Squibb Co.*, 526 P.3d 395, 422–23 (Haw. 2023); *State ex rel. Stenberg v. Consumer's Choice Foods, Inc.*, 755 N.W.2d 583, 590–91 (Neb. 2008) (adopting *Raad v. Wal-Mart Stores, Inc.*, 13 F. Supp. 2d 1003, 1014 (D. Neb. 1998)). All three factors are present here, where Meta's acts offend public policy—including as codified in COPPA—to protect minors from harms encountered on the Internet; Meta's exploitation of young users' unique vulnerabilities in order to increase those users' engagement with products known to harm them is immoral, unethical,

35

sufficiently plead an unfair act or practice. Under Section 5 in particular, the States adequately plead that Meta's unfair acts or practices: (1) caused or are likely to cause substantial injury to its young users; (2) are not reasonably avoidable by young users; and (3) are not outweighed by countervailing benefits to young users or competition.

**1.      The States sufficiently plead substantial injury.**

Here, Meta both misleadingly cherry-picks FTC guidance excerpts and again mischaracterizes the Complaint, which clearly alleges that Facebook and Instagram's features cause young users significant physical and mental harm.[39] The FTC has promulgated guidance that "[u]nwarranted health and safety risks may also support a finding of unfairness." FTC Policy Statement on Unfairness, *appended to Int'l Harv. Co.*, 104 F.T.C. 949, 1073 (1984) (respondent distributed free-sample razor blades in a way that they could come into the hands of small children). Thus, monetary harm is not a dispositive component of "substantial injury," MTD at 42, and the States sufficiently plead "concrete" harm to the mental and physical health of Meta's young users. *See FTC v. Accusearch, Inc.*, No. 06-CV-105-D, 2007 WL 4356786, at *8 (D. Wyo. Sept. 28, 2007) (sale of consumer phone records led to "host of emotional harms that are substantial and real and cannot fairly be classified as either trivial or speculative."), *aff'd*, 570 F.3d 1187 (10th Cir. 2009).

**2.      The States sufficiently plead that their alleged injury was not reasonably avoidable.**

Meta's argument that the States do not adequately plead that the injury alleged "was not reasonably avoidable by consumers themselves," 15 U.S.C. § 45(n), blatantly disregards the Complaint's allegations that Meta deliberately designed its Platforms to promote young user addiction, including by deploying design features that subvert and exploit young user autonomy

and unscrupulous; and, as discussed below, Meta has substantially injured its young users.

[39] *See, e.g.*, Compl. ¶¶ 195–206, 508, 510–19, 522–26, 528, 530–44, 546–47, 549–55, 557–58, 563–66, 568–69, 573–74, 576, 585, 594, 597, 599, 606, 608–10, 613–14, 617–21, 623–25 (negative body image); ¶¶ 207–18 (negative social comparison to teen peers); ¶¶ 340–54, 357–61, 365–66 (body image and eating disorders).

36

and choice.[40] The Complaint focuses on Meta's business plan to target and addict children, not the public at large, as Meta implies. *See, e.g.*, MTD at 43 ("[T]he States do not allege that users of Instagram and Facebook had no choice but to use Meta's services—nor could they.").

Meta's features—such as alerts that deliver dopamine hits and facilitate addiction, repeated and sudden interruptions to the lives of young users at all hours of the day and night, and other "variable" rewards[41]—intentionally work together to entrap and ensnare young users so that they cannot reasonably avoid use of Meta's Platforms. Given the onslaught of features purposefully designed to exploit young users' vulnerabilities and addict them, it is not "reasonably possible" for young users to avoid Meta's Platforms under the circumstances. *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1169 (9th Cir. 2012). Young users lack a "free and informed choice" about use of Meta's Platforms, *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1158 (9th Cir. 2010), and do not have "reason to anticipate the impending harm and the means to avoid it," *Orkin Exterm. Co. v. FTC*, 849 F.2d 1354, 1365 (11th Cir. 1988) (cleaned up).

Meta's arguments that certain features such as "Take a Break" and "Daily Limit" provide user choice inappropriately cabin certain Complaint allegations instead of viewing the Complaint as a whole. *See In re Generic Pharms. Pricing Antitrust Litig.*, 338 F. Supp. 3d 404, 435–36 (E.D. Pa. 2018). Meta completely disregards the Complaint's allegations about young users' addictive and compulsive use—use which Meta itself created and perpetuated using troves of individualized user data—which obscures any meaningful "choice" that features such as "Take a Break" and the "Daily Limit" putatively provide (given that they are so easily dismissed). MTD at 44. The Complaint discusses these features in order to demonstrate that Meta has purposefully designed them to inhibit young users' choices regarding the time they spend on its Platforms.[42]

---

[40] *See, e.g.,* Compl. ¶¶ 100–01, 106, 112–14, 116.

[41] *See, e.g.*, Compl. ¶¶ 57–58, 66–73, 78–81, 83–84, 88–89, 100–101, 106, 112–14, 116, 166–71, 178–82, 378–380, 382, 391–92, 395–98, 400, 402–09, 436, 439, 441–44, 448–52.

[42] *See* Compl. ¶¶ 579–90 (Daily Limit is "designed" to be "easily dismiss[ed] and to "tempt . . . young users to revert to harmful, time-maximizing settings," and Meta's "design choices" for both features make it more difficult for young users "to effectively self-regulate").

37

Moreover, contrary to Meta's assertion, an injury arising from an unfair practice is not reasonably avoidable merely because an alternative product or service exists. MTD at 42–43. Meta conspicuously relies on cases interpreting only *one* State's consumer protection law in making this remarkable assertion. *Id.* And its reliance on cases such as *Philips v. Double Down Interactive LLC* and *Ristic v. Machine Zone, Inc.* is further misplaced: the cases apparently relate to *adult*—rather than youth—use of an online casino game and videogame. *See Phillips v. Double Down Interactive LLC*, 173 F. Supp. 3d 731, 743 (N.D. Ill. 2016); *Ristic*, No. 15-cv-8996, 2016 WL 4987943, at *2–4 (N.D. Ill. Sept. 19, 2016).[43] Meta again misses the mark by disregarding the Complaint's allegations of Meta's aggressive strategy to make its Platforms a near-ubiquitous fixture amongst young users—as opposed to one of many online videogames or casino games—and Meta's choice to target and addict *young* users by purposefully exploiting their vulnerabilities, *see* Compl. ¶¶ 73-77, 696.

Finally, with respect to "claims predicated on purported COPPA violations," Meta inaptly focuses on under-13 users "lying" about their age, characterizing this as "reasonably avoidable." MTD at 45. The occurrence of millions of under-13 users on Meta's Platforms demonstrates it is not "reasonably avoidable." *See* Compl. ¶¶ 631–835. Further, Meta disregards that laws such as COPPA exist in order to protect young children from making "choices" they are not mature enough to make, such as whether to sign up for Facebook or Instagram without the consent of a parent. *See, e.g., Ideal Toy Corp.,* 64 F.T.C. 297, 310 (1964) (treating children as a vulnerable class).

### 3. The States sufficiently plead that Meta's conduct is not outweighed by countervailing benefits.

With no examples or further elaboration, Meta suggests that the States fail to show that the Platforms' harms to young users are not outweighed by countervailing benefits. MTD at 45. The States' Complaint sufficiently pleads an array of serious harms that compulsive Instagram and

---

[43] Moreover, Illinois disputes Meta's reading of these cases to mischaracterize its unfairness standard. Illinois follows *Sperry*. *See Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960–61 (Ill. 2002). In fact, The *Phillips* court applied the *Sperry* test in analyzing unfairness. *See Phillips*, 173 F. Supp. 3d at 742 (citing *Robinson*, 775 N.E.2d 951). The Phillips court failed to analyze all of the Sperry factors, in particular the immoral and unethical factors, which this Court should include in its analysis. *See* 815 Ill. Comp. Stat. 505/2; MTD at 39 n.47.

Facebook use engender, and it specifically addresses the negative "net effect" of the Platforms on young users,[44] including by Meta's own account.[45] As such, the cases Meta cites in which complaints did *not* contain particularized allegations that the act or practice was not "outweighed by countervailing benefits to consumers or competition" are not germane. MTD at 45 (citing *Parziale v. HP, Inc.*, 445 F. Supp. 3d 435, 446–47 (N.D. Cal. 2020); *Kindred Studio Illustr. & Design, LLC v. Elec. Commc'n Tech., LLC*, No. CV 18-7661, 2018 WL 6985317, at *7 (C.D. Cal. Dec. 3, 2018)).

### B. The States sufficiently plead that Meta violated their unfairness or unconscionability laws.

Meta separately analyzed the unfair or unconscionable acts or practices claims of eight States in its Motion. MTD at 46–49. Meta's arguments fail substantively and also mischaracterize the relevant laws. Whatever the applicable standard, these States adequately plead that Meta engaged in unfair or unconscionable acts or practices under their respective laws, as stated above in Section IV.A, and as described below.

*California*: California plausibly alleges unfairness under any of the three tests used in California. Recognizing that California's Unfair Competition Law is "intentionally framed in its broad, sweeping language," courts have broad equitable authority to address the "innumerable new schemes which the fertility of man's invention would contrive." *Cel-Tech*, 973 P.2d at 540 (cleaned up). Meta challenges California's unfairness claim under only one of the three tests articulated by California courts, focusing on an overly narrow reading of the *Cel-Tech* factor least applicable to Meta's misconduct, arguing that it is not prohibited or regulated by California law. Indeed, California's legislature has "declare[d]" its intent to regulate "[b]usinesses that develop and provide online services, products, or features that children are likely to access." Cal. Civ. Code § 1798.99.29

---

[44] *See* Compl. ¶ 119 ("[D]ue to Meta's deliberate design choices, the net result has been that young users are negatively affected by using Instagram compulsively."); *see also id.* at ¶ 423 ("[An internal] document concludes the 'average net effect' of Meta's Platforms on its users is 'slightly negative.'").

[45] Compl. ¶ 613 (discussing internal email in which Meta employee states "there is increasing scientific evidence (particularly in the US . . . ) that the average net effect of [Facebook] on people's well-being is slightly negative").

39

(challenged in *NetChoice, LLC v. Bonta*, No. 22-cv-08861, 2023 WL 6135551 (N.D. Cal. Sep. 18, 2023) (pending appeal)). Further, even if the legislature were silent on this issue, its "mere failure to prohibit an activity does not prevent a court from finding it unfair." *Cel-Tech*, 973 P.2d at 542. Here, as alleged, California's unfairness claim aligns with declared legislative policy and also meets the more applicable FTCA and *Sperry* factors.

***Colorado***: Contrary to Meta's claim, Colorado's Consumer Protection Act ("CCPA") has long recognized unfairness and unconscionability claims.[46] Colo. Rev. Stat. § 6-1-105(1)(rrr). The enumerated deceptive trade practices in the CCPA were intended to be in addition to, rather than exclusive of, the types of unfair trade practices actionable at common law or under other statutes. *See* Colo. Rev. Stat. § 6-1-105(3) (eff. 2007-2019); s*ee also Showpiece Homes Corp. v. Assurance Co. of Am.*, 38 P.3d 47, 54 (Colo. 2001), *as modified on denial of reh'g* (Jan. 11, 2002) (citing *Sperry,* 405 U.S. at 240).

Colorado law does not define an "unfair" or "unconscionable" act or practice for the purposes of section 6-1-105(1)(rrr). But the factors articulated in *Sperry* and the FTC's more recent unfairness test set forth in 15 U.S.C. § 45(n) are instructive. *Klem,* 295 P.3d at 1186–87 (Washington law); *see also Hall v. Walter*, 969 P.2d 224, 233 (Colo. 1998) (using Washington law as a model). The Complaint satisfies the *Sperry* factors by alleging that Meta's business practices are within the penumbra of statutorily prohibited conduct by contravening COPPA's legislative purpose. Further, the States allege Meta's business practices are unscrupulous. *See, e.g.*, Compl. ¶¶ 68–84, 140–49, 304–08. And Meta's practices have caused substantial injury to youth in Colorado and nationwide. Even if the Court declines to apply the *Sperry* test, the Complaint's allegations meet the FTC's unfairness test for the reasons stated in Section IV.A.

***Indiana***: Meta's claim that Indiana courts "do not permit free-standing unfair practices claims under the Deceptive Consumer Sales Act" is false. MTD at 47. Effective July 1, 2014, the Indiana legislature expanded the scope of the State's law, to prohibit a supplier from committing

---

[46] Meta misconstrues the significance of *Sheet Metal Workers Loc. 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 408 (E.D. Pa. 2010) and *In re New Motor Vehs. Canadian Exp. Antitrust Litig.*, 350 F. Supp. 2d 160, 180 (D. Me. 2004). Both cases, which were issued by out-of-state courts, predate the legislature's enactment of language leaving no doubts as to whether a claim based solely on unfair or unconscionable practices may proceed.

40

"an unfair, abusive, *or* deceptive act, omission, or practice." Ind. Code § 24-5-0.5-3(a) (emphasis added). The opinion Meta cites merely stated that the court would read the provision broadly; it did not discuss whether an "unfair act" could be brought without a corresponding deceptive act. *Crum v. SN Servicing Corp.*, No. 1:19-cv-02045, 2021 WL 3514153, at *2 (S.D. Ind. Aug. 10, 2021); *see also Horizon Bank v. Huizar*, 178 N.E.3d 326, 338 (Ind. Ct. App. 2021) ("Huizar's DCSA claim [of unfair and abusive acts] can stand independently of his failed FDCPA claim.").

***Kansas***: Although Meta argues none of the statutory examples identified in Kan. Stat. Ann. section 50-627 support a claim of unconscionability, MTD at 47, the Kansas Consumer Protection Act "shall be construed liberally to promote the . . . protect[ion of] consumers from suppliers who commit deceptive and unconscionable practices." Kan. Stat. Ann. § 50-623(b). Section 50-627 does not exhaustively list unconscionable conduct. *Id.* § 50-627(b) ("[T]he court shall consider circumstances . . . such as, *but not limited to* the following . . . .") (emphasis added); *State ex rel. Stovall v. DVM Enters.,* 62 P.3d 653, 657 (Kan. 2003); *Wille v. Sw. Bell Tel. Co.*, 549 P.2d 903, 906–07 (Kan. 1976) (additional factors include "an overall imbalance in the obligations and rights imposed by the bargain"; "exploitation of the underprivileged, unsophisticated, uneducated and the illiterate"; and "inequality of bargaining or economic power"). But even if Section 50-627's list was exhaustive, Meta violated subsections b(1) and b(6) when it exploited young users and misrepresented the safety of its Platforms.

***Minnesota***: Minnesota courts' evaluation of unfairness and unconscionability is modeled after the "cigarette rule" standard used by the FTC before it was amended in 1994 to the current substantial unjustified injury test. Minn. Stat. §§ 325D.44, subdivs. 1(13) and 2(b); 325F.69, subdiv. 8. Meta inaccurately characterizes Minnesota's law as following the FTC's current unfairness standard. *See* S. Rep. No. 103-130, at 13 (1993). Minnesota's law is thus adequately addressed by Section IV.A.

***Missouri***: For the reasons articulated above in Section IV.A, Missouri clearly states a claim. *See* Mo. Code Regs. Ann. tit. 15, § 60-8.020; *Sperry*, 405 U.S. at 243 (quoting *FTC v. R. F. Keppel & Bro., Inc.*, 291 U.S. 304, 313 (1934)). Moreover, the States' Complaint clearly articulates

41

examples of Meta's conduct that is unethical, oppressive, or unscrupulous and presents a risk of, or causes, substantial injury to consumers.[47]

*New Jersey*: Meta selectively quotes *Kugler v. Romain*, 279 A.2d 640, 652 (N.J. 1971) to state that "unconscionability [under the New Jersey Consumer Fraud Act (NJCFA)] must be equated with the concepts of deception, fraud, false pretense, misrepresentation, concealment and the like." MTD at 48. But *Kugler*'s reference to "equated" does not mean that New Jersey cannot bring both misrepresentation and unconscionability claims. Unconscionability under the NJCFA "is an amorphous concept obviously designed to establish a broad business ethic," and should be interpreted "liberally so as to effectuate the public purpose," and to ensure that "agreement[s] ha[ve] resulted from real bargaining between parties who had freedom of choice and understanding and ability to negotiate in a meaningful fashion." 279 A.2d at 651–52. Indeed, "the Legislature intended to broaden the scope of responsibility for unfair business practices by stating in Section 2 that the use of any of the described practices is unlawful '*whether or not* any person (the consumer) has in fact been *misled*, deceived or damaged thereby.'" *Id.* at 652 (emphasis added); *see also* N.J. Stat. Ann. § 56:8-2.

*Oregon*: Meta claims that Oregon does not allege any conduct that is "remotely comparable to the 'unconscionable tactics'" listed in Or. Rev. Stat. section 646.605(9). MTD at 49. But "unconscionable tactics" pursuant to section 646.607(1) are not limited to the conduct enumerated in section 646.605(9). *See Gordon v. Rosenblum*, 393 P.3d 1122, 1129–30 (Or. 2017). Even if they were so limited, the States' Complaint adequately alleges that Meta encouraged and targeted children and teens to use its Platforms, while simultaneously obfuscating from the public details regarding the Platforms' dangers and harmful design choices.[48] Meta thus facilitated young users' addiction and compulsive use and subverted young users' autonomy, constituting an unconscionable tactic as defined by section 646.605(9)(a). *See* Or. Rev. Stat. § 646.605(9)(a) ("[u]nconscionable tactics" include "[k]nowingly tak[ing] advantage of a customer's physical infirmity, ignorance, illiteracy or inability to understand the language of the agreement").

---

[47] *See, e.g.,* Compl. ¶¶ 68–84, 140–49, 157–82, 304–28, 436–52.

[48] *See, e.g.,* Compl. ¶¶ 68–84, 140–49, 195–219, 304–08, 414–29.

1056–57. As Meta fails to argue, much less establish, that Florida's COPPA claim is "wholly immaterial or insubstantial," Florida is entitled to rely on COPPA's statutory provision for personal jurisdiction and does not need to satisfy Florida's long-arm statute.

## CONCLUSION

For the foregoing reasons, the Court should deny Meta's Motion to Dismiss the Multistate Attorneys General Complaint and the Florida Attorney General Complaint.

50

Dated:  February 5, 2024

Respectfully submitted,

**KRISTIN K. MAYES**
Attorney General
State of Arizona

**ROB BONTA**
Attorney General
State of California

*/s/ Laura Dilweg*
Laura Dilweg (AZ No. 036066 CA No. 260663)
Consumer Protection Section Chief Counsel
Nathan Whelihan (AZ No. 037560),
*pro hac vice*
Assistant Attorney General
Arizona Attorney General's Office
2005 North Central Avenue
Phoenix, AZ 85004
Phone: (602) 542-3725
Fax:   (602) 542-4377
Laura.Dilweg@azag.gov
Nathan.Whelihan@azag.gov

*Attorneys for Plaintiff State of Arizona, ex rel.*
*Kristin K. Mayes, Attorney General*

**PHILIP J. WEISER**
Attorney General
State of Colorado

*/s/ Bianca E. Miyata*
Bianca E. Miyata (CO Reg. No. 42012),
*pro hac vice*
Senior Assistant Attorney General
Lauren M. Dickey (CO Reg. No. 45773)
First Assistant Attorney General
Megan Paris Rundlet (CO Reg. No. 27474)
Senior Assistant Solicitor General
Elizabeth Orem (CO Reg. No. 58309)
Assistant Attorney General
Colorado Department of Law
Ralph L. Carr Judicial Center
Consumer Protection Section
1300 Broadway, 7th Floor
Denver, CO 80203
Phone: (720) 508-6651
bianca.miyata@coag.gov

*Attorneys for Plaintiff State of Colorado, ex rel.*
*Philip J. Weiser, Attorney General*

*/s/ Megan O'Neill*
Nicklas A. Akers (CA SBN 211222)
Senior Assistant Attorney General
Bernard Eskandari (CA SBN 244395)
Supervising Deputy Attorney General
Megan O'Neill (CA SBN 343535)
Joshua Olszewski-Jubelirer
(CA SBN 336428)
Marissa Roy (CA SBN 318773)
Deputy Attorneys General
California Department of Justice
Office of the Attorney General
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-7004
Phone: (415) 510-4400
Fax: (415) 703-5480
megan.oneill@doj.ca.gov

*Attorneys for Plaintiff the People of the State*
*of California*

51

**WILLIAM TONG**
Attorney General
State of Connecticut

*/s/ Lauren H. Bidra*
Lauren H. Bidra
(CT Juris No. 440552), *pro hac vice*
Special Counsel for Media and Technology
Krislyn M. Launer
(CT Juris No. 440789), *pro hac vice*
Ashley H. Meskill
(CT Juris No. 444377), *pro hac vice*
Assistant Attorneys General
Connecticut Office of the Attorney General
165 Capitol Avenue
Hartford, Connecticut 06106
Phone: 860-808-5306
Fax: 860-808-5593
Lauren.Bidra@ct.gov
Krislyn.Launer@ct.gov
Ashley.Meskill@ct.gov

*Attorneys for Plaintiff State of Connecticut*


**KATHLEEN JENNINGS**
Attorney General
State of Delaware

*/s/ Dashiell Raj Radosti*
Owen Lefkon
Director of Fraud and Consumer Protection
Marion Quirk, *pro hac vice*
Director of Consumer Protection
Dashiell Radosti (DE Bar 7100*), pro hac vice*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, DE 19801
Phone: (302) 683-8800
Dashiell.Radosti@delaware.gov

*Attorneys for Plaintiff State of Delaware*

**ASHLEY MOODY**
Attorney General
State of Florida

*/s/ Victoria Ann Butler*
Victoria Ann Butler (FL Bar No. 861250),
*pro hac vice*
Director of Consumer Protection Litigation
3507 E. Frontage Road, Suite 325
Tampa, FL 33607
Telephone: (813) 287-7950
Victoria.butler@myfloridalegal.com

John M. Guard (FL Bar No. 374600),
*pro hac vice*
Chief Deputy Attorney General
PL-01 The Capitol
Tallahassee, FL 32399
John.guard@myfloridalegal.com

Nicholas J. Weilhammer (FL Bar No. 479322),
*pro hac vice*
Associate Deputy Attorney General for
Enforcement
PL-01 The Capitol
Tallahassee, FL 32399
Telephone: (850) 414-3861
Nicholas.weilhammer@myfloridalegal.com

Donna Cecilia Valin (FL Bar No. 96687),
*pro hac vice*
Special Counsel, Assistant Attorney General
135 West Central Blvd.
Orlando, FL 32801
Telephone: (407) 316-4840
Donna.valin@myfloridalegal.com

Karen E. Berger (FL Bar No. 72991)
*pro hac vice*
Special Counsel, Assistant Attorney General
110 SE 6th Street, 10th Floor
Fort Lauderdale, FL 33301
Telephone: (954) 712-4600
Karen.berger@myfloridalegal.com

*Attorneys for Office of the Attorney General,
State of Florida, Department of Legal Affairs*

52

**CHRISTOPHER M. CARR**
Attorney General
State of Georgia

*/s/ Melissa M. Devine*
Melissa M. Devine (GA Bar No. 403670),
*pro hac vice*
Assistant Attorney General
Office of the Attorney General of the State of
Georgia
2 Martin Luther King Jr. Drive, SE, Ste. 356
Atlanta, GA 30334
Phone: (404) 458-3765
Fax: (404) 651-9108
mdevine@law.ga.gov

*Attorneys for Plaintiff State of Georgia*

**ANNE E. LOPEZ**
Attorney General
State of Hawaiʻi

*/s/ Christopher T. Han*
Bryan C. Yee (HI JD No. 4050),
*pro hac vice*
Supervising Deputy Attorney General
Christopher T. Han (HI JD No. 11311),
*pro hac vice*
Deputy Attorney General
Department of the Attorney General
Commerce and Economic Development Division
425 Queen Street
Honolulu, Hawaiʻi 96813
Phone: (808) 586-1180
Bryan.c.yee@hawaii.gov
Christopher.t.han@hawaii.gov

*Attorneys for Plaintiff State of Hawaiʻi*

**RAÚL R. LABRADOR**
Attorney General
State of Idaho

By: */s/ Nathan Nielson*
Nathan H. Nielson (ID Bar No. 9234),
Stephanie N. Guyon (ID Bar No. 5989)
pro hac vice
Deputy Attorneys General
Attorney General's Office
P.O. Box 83720
Boise, ID 83720-0010
(208) 334-2424
nathan.nielson@ag.idaho.gov
stephanie.guyon@ag.idaho.gov

*Attorneys for Plaintiff State of Idaho*

53

**KWAME RAOUL**
Attorney General
State of Illinois

By: */s/ Daniel Edelstein*
Susan Ellis, Chief, Consumer Protection Division
(IL Bar No. 6256460)
Greg Grzeskiewicz, Chief, Consumer Fraud Bureau
(IL Bar No. 6272322)
Jacob Gilbert, Deputy Chief, Consumer Fraud
Bureau (IL Bar No. 6306019)
Daniel Edelstein, Supervising Attorney, Consumer
Fraud Bureau (IL Bar No. 6328692), *pro hac vice*
Kevin Whelan, Supervising Attorney, Consumer
Fraud Bureau (IL Bar No. 6321715), *pro hac vice*
Matthew Davies, Assistant Attorney General,
Consumer Fraud Bureau (IL Bar No. 6299608), *pro hac vice*
Adam Sokol, Senior Assistant Attorney General,
Consumer Fraud Bureau (IL Bar No. 6216883)
Emily María Migliore, Assistant Attorney General,
Consumer Fraud Bureau (IL Bar No. 6336392)
Office of the Illinois Attorney General
115 S. LaSalle Street
Chicago, Illinois 60603
312-814-8554
Susan.Ellis@ilag.gov
Greg.Grzeskiewicz@ilag.gov
Jacob.Gilbert@ilag.gov
Daniel.Edelstein@ilag.gov
Kevin.Whelan@ilag.gov
Adam.Sokol@ilag.gov
Emily.Migliore@ilag.gov

*Attorneys for Plaintiff the People of the State of Illinois*

**THEODORE E. ROKITA**
Attorney General
State of Indiana

*/s/ Scott L. Barnhart*
Scott L. Barnhart (IN Atty No. 25474-82),
*pro hac vice*
Chief Counsel and Director of Consumer
Protection
Corinne Gilchrist (IN Atty No. 27115-53),
*pro hac vice*
Section Chief, Consumer Litigation
Mark M. Snodgrass (IN Atty No. 29495-49),
*pro hac vice*
Deputy Attorney General
Office of the Indiana Attorney General
Indiana Government Center South
302 West Washington St., 5th Floor
Indianapolis, IN 46203
Telephone: (317) 232-6309
Scott.Barnhart@atg.in.gov
Corinne.Gilchrist@atg.in.gov
Mark.Snodgrass@atg.in.gov

*Attorneys for Plaintiff State of Indiana*

**KRIS W. KOBACH**
Attorney General
State of Kansas

*/s/    Sarah M. Dietz*
Sarah M. Dietz
(KS Bar No. 27457), *pro hac vice*
Assistant Attorney General
Office of the Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
Telephone: (785) 296-3751
Fax: (785) 296-3131
Email: sarah.dietz@ag.ks.gov

*Attorney for Plaintiff State of Kansas*

54

**RUSSELL COLEMAN**
Attorney General
Commonwealth of Kentucky

/s/ *J. Christian Lewis*
J. Christian Lewis (KY Bar No. 87109),
*pro hac vice*
Philip Heleringer (KY Bar No. 96748),
*pro hac vice*
Zachary Richards (KY Bar No. 99209),
*pro hac vice app. forthcoming*
Daniel I. Keiser (KY Bar No. 100264),
*pro hac vice*
Assistant Attorneys General
1024 Capital Center Drive, Ste. 200
Frankfort, KY 40601
Christian.Lewis@ky.gov
Philip.Heleringer@ky.gov
Zach.Richards@ky.gov
Daniel.Keiser@ky.gov
Phone: (502) 696-5300
Fax: (502) 564-2698

*Attorneys for Plaintiff the Commonwealth of Kentucky*

**LIZ MURRILL**
Attorney General
State of Louisiana

/s/ *Arham Mughal*
Arham Mughal (LA Bar No. 38354),
*pro hac vice*
L. Christopher Styron (LA Bar No. 30747),
*pro hac vice*
Assistant Attorneys General
Louisiana Department of Justice
Office of the Attorney General
Public Protection Division
Consumer Protection Section
1885 N 3rd Street, 4th Floor
Baton Rouge, LA 70802
Tel: (225) 326-6438
MughalA@ag.louisiana.gov
StyronL@ag.louisiana.gov

*Attorneys for State of Louisiana*

**AARON M. FREY**
Attorney General
State of Maine

/s/ *Michael Devine*
Michael Devine, Maine Bar No. 5048,
*pro hac vice*
Laura Lee Barry Wommack, Maine Bar No. 10110, *pro hac vice*
Assistant Attorneys General
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333
(207) 626-8800
michael.devine@maine.gov
lauralee.barrywommack@maine.gov

*Attorneys for Plaintiff State of Maine*

**ANTHONY G. BROWN**
Attorney General
State of Maryland

/s/ *Elizabeth J. Stern*
Philip D. Ziperman (Maryland CPF No.
9012190379), *pro hac vice*
Deputy Chief, Consumer Protection Division
Elizabeth J. Stern (Maryland CPF No.
1112090003), *pro hac vice*
Assistant Attorney General
Office of the Attorney General of Maryland
200 St. Paul Place
Baltimore, MD 21202
Phone: (410) 576-6417 (Mr. Ziperman)
Phone: (410) 576-7226 (Ms. Stern)
Fax: (410) 576-6566
pziperman@oag.state.md.us
estern@oag.state.md.us

*Attorneys for Plaintiff Office of the Attorney
General of Maryland*


**DANA NESSEL**
Attorney General
State of Michigan

/s/ *Daniel J. Ping*
Daniel J. Ping (P81482), *pro hac vice*
Assistant Attorney General
Michigan Department of Attorney General
Corporate Oversight Division
P.O. Box 30736
Lansing, MI 48909
517-335-7632
PingD@michigan.gov

*Attorneys for Plaintiff State of Michigan*

**KEITH ELLISON**
Attorney General
State of Minnesota

/s/ *James Van Buskirk*
James Van Buskirk (MN Bar No. 0392513),
*pro hac vice*
Assistant Attorney General
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 1200
St. Paul, MN 55101-2130
Tel: (651) 757-1150
james.vanbuskirk@ag.state.mn.us


*Attorney for Plaintiff State of Minnesota, by its
Attorney General, Keith Ellison*


**ANDREW BAILEY**
Attorney General
State of Missouri

By: _/s/ Michael Schwalbert_____
Michael Schwalbert, *pro hac vice*
Assistant Attorney General
Consumer Protection Section
Missouri Attorney General's Office
815 Olive Street | Suite 200
Saint Louis, Missouri 63101
michael.schwalbert@ago.mo.gov
Phone: 314-340-7888
Fax: 314-340-7981

*Attorney for Plaintiff State of Missouri, ex rel.
Andrew Bailey, Attorney General*

56

**MICHAEL T. HILGERS**
Attorney General
State of Nebraska

*/s/ Colin P. Snider*
Colin P. Snider (NE #27724)
Assistant Attorney General
*pro hac vice*
Nebraska Attorney General's Office
2115 State Capitol Building
Lincoln, NE 68509
Phone: (402) 471-2682
Email: colin.snider@nebraska.gov

*Attorney for Plaintiff State of Nebraska*

**MATTHEW J. PLATKIN**
Attorney General
State of New Jersey

By: */s/ Kashif T. Chand*
Kashif T. Chand (NJ Bar No. 016752008), *pro hac vice*
Section Chief, Deputy Attorney General
Thomas Huynh (NJ Bar No. 200942017), *pro hac vices*
Assistant Section Chief, Deputy Attorney General
Gina F. Pittore (NJ Bar No. 323552019), *pro hac vice*
Verna J. Pradaxay (NJ Bar No. 335822021), *pro hac vice*
Mandy K. Wang (NJ Bar No. 373452021), *pro hac vice*
Deputy Attorneys General
New Jersey Office of the Attorney General,
Division of Law
124 Halsey Street, 5th Floor
Newark, NJ 07101
Tel: (973) 648-2052
Kashif.Chand@law.njoag.gov
Thomas.Huynh@law.njoag.gov
Gina.Pittore@law.njoag.gov
Verna.Pradaxay@law.njoag.gov
Mandy.Wang@law.njoag.gov

*Attorneys for Plaintiffs State of New Jersey and the New Jersey Division of Consumer Affairs*

**LETITIA JAMES**
Attorney General
State of New York

*/s/ Christopher D'Angelo*
Christopher D'Angelo, Chief Deputy Attorney General, Economic Justice Division
(NY Bar No. 4348744), *pro hac vice*
Christopher.D'Angelo@ag.ny.gov
Clark Russell, Deputy Chief, Bureau of Internet and Technology
(NY Bar No. 2848323), *pro hac vice*
Clark.Russell@ag.ny.gov
Nathaniel Kosslyn, Assistant Attorney General
(NY Bar No. 5773676), *pro hac vice*
Nathaniel.Kosslyn@ag.ny.gov
New York State Office of the Attorney General
28 Liberty Street
New York, NY 10005
(212) 416-8262

*Attorneys for Plaintiff the People of the State of New York*

57

**JOSHUA H. STEIN**
Attorney General
State of North Carolina

*/s/ Kevin Anderson*
Kevin Anderson (N.C. Bar No. 22635),
*pro hac vice*
Senior Counsel
Sarah G. Boyce
Deputy Attorney General & General Counsel
Jasmine S. McGhee
Senior Deputy Attorney General
Josh Abram
Kunal Choksi
Special Deputy Attorneys General
Charles G. White
Assistant Attorney General
N.C. Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602
Telephone: (919) 716-6006
Facsimile: (919) 716-6050
kander@ncdoj.gov

*Attorneys for Plaintiff State of North Carolina*

**DREW H. WRIGLEY**
Attorney General
State of North Dakota

By: */s/ Elin S. Alm*
Elin S. Alm, *pro hac vice*
(ND Bar No. 05924)
Assistant Attorney General
Christopher G. Lindblad, *pro hac vice*
(ND Bar No. 06480)
Assistant Attorney General
Consumer Protection and Antitrust Division
Office of Attorney General
1720 Burlington Drive, Suite C
Bismarck, ND 58504-7736
Telephone (701) 328-5570
ealm@nd.gov
clindblad@nd.gov

*Attorneys for Plaintiff State of North Dakota, ex rel.*
*Drew H. Wrigley, Attorney General*

**DAVE YOST**
Attorney General
State of Ohio

*/s/ Kevin R. Walsh*
Melissa G. Wright (Ohio Bar No. 0077843)
Section Chief, Consumer Protection Section
Melissa.Wright@ohioago.gov
Melissa S. Smith (Ohio Bar No. 0083551)
Asst. Section Chief, Consumer Protection
Section
Melissa.S.Smith@ohioago.gov
Michael S. Ziegler (Ohio Bar No. 0042206)
Principal Assistant Attorney General
Michael.Ziegler@ohioago.gov
Kevin R. Walsh (Ohio Bar No. 0073999),
*pro hac vice*
Kevin.Walsh@ohioago.gov
Senior Assistant Attorney General
30 East Broad Street, 14th Floor
Columbus, Ohio 43215
Tel: 614-466-1031

*Attorneys for State of Ohio, ex rel. Attorney*
*General Dave Yost*

**ELLEN F. ROSENBLUM**
Attorney General
State of Oregon

*/s/ Jordan M. Roberts*
Jordan M. Roberts (Oregon Bar No. 115010),
*pro hac vice*
Assistant Attorney General
Oregon Department of Justice
Consumer Protection Section
100 SW Market Street
Portland, Oregon 97201
Telephone:    (971) 673-1880
Facsimile:    (971) 673-1884
E-mail: jordan.m.roberts@doj.state.or.us

*Attorneys for State of Oregon, ex rel. Ellen*
*F. Rosenblum, Attorney General for the*
*State of Oregon*

58

**MICHELLE A. HENRY**
Attorney General
Commonwealth of Pennsylvania

*/s/ Timothy R. Murphy*
Timothy R. Murphy
Senior Deputy Attorney General
(PA Bar No. 321294), *pro hac vice*
Email: tmurphy@attorneygeneral.gov
Jonathan R. Burns
Deputy Attorney General
(PA Bar No. 315206), *pro hac vice*
Email: jburns@attorneygeneral.gov
Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
Tel: 717.787.4530

*Attorneys for Plaintiff the Commonwealth of
Pennsylvania*


**PETER F. NERONHA**
Attorney General
State of Rhode Island

__*/s/ Stephen N. Provazza*_____
Stephen N. Provazza (R.I. Bar No. 10435),
*pro hac vice*
Special Assistant Attorney General
Rhode Island Office of the Attorney General
150 South Main St.
Providence, RI 02903
Phone: 401-274-4400
Email: SProvazza@riag.ri.gov

*Attorneys for Plaintiff State of Rhode Island*

**ALAN WILSON**
Attorney General
State of South Carolina

*/s/ Anna C. Smith*
C. Havird Jones, Jr.
Senior Assistant Deputy Attorney General
Jared Q. Libet (S.C. Bar No. 74975),
*pro hac vice*
Assistant Deputy Attorney General
Anna C. Smith (SC Bar No. 104749),
*pro hac vice*
Assistant Attorney General
Clark C. Kirkland, Jr. (CA SBN 272522)
Assistant Attorney General
**OFFICE OF THE ATTORNEY
GENERAL OF SOUTH CAROLINA**
P.O. Box 11549
Columbia, South Carolina 29211
Tel: (803) 734-0536
annasmith@scag.gov

*Attorneys for Plaintiff the State of South
Carolina, ex rel. Alan M. Wilson, in His
Official Capacity as Attorney General of the
State of South Carolina*


**MARTY J. JACKLEY**
Attorney General
State of South Dakota

*/s/ Jessica M. LaMie*
By: Jessica M. LaMie (SD Bar No. 4831),
*pro hac vice*
Assistant Attorney General
1302 East Highway 14, Suite 1
Pierre, SD 57501-8501
Telephone: (605) 773-3215
Jessica.LaMie@state.sd.us

*Attorneys for Plaintiff State of South Dakota*


**PATRICK MORRISEY**

**JASON S. MIYARES**
Attorney General
Commonwealth Of Virginia

*/s/ Joelle E. Gotwals*
Steven G. Popps
Deputy Attorney General
Richard S. Schweiker, Jr.
Senior Assistant Attorney General and Section Chief
Joelle E. Gotwals (VSB No. 76779),
*pro hac vice*
Assistant Attorney General
Office of the Attorney General of Virginia
Consumer Protection Section
202 N. 9th Street
Richmond, Virginia 23219
Telephone:      (804) 786-8789
Facsimile:      (804) 786-0122
E-mail: jgotwals@oag.state.va.us

*Attorneys for the Plaintiff Commonwealth of Virginia ex rel. Jason S. Miyares, Attorney General*

**ROBERT W. FERGUSON**
Attorney General
State of Washington

*/s/ Joseph Kanada*
Joseph Kanada (WA Bar No. 55055),
*pro hac vice*
Alexandra Kory (WA Bar No. 49889),
*pro hac vice*
Rabi Lahiri
Gardner Reed
Assistant Attorneys General
Washington State Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 389-3843
Joe.Kanada@atg.wa.gov

*Attorneys for Plaintiff State of Washington*

Attorney General
State of West Virginia

*/s/ Laurel K. Lackey*
Laurel K. Lackey (WVSB No. 10267),
*pro hac vice*
Abby G. Cunningham (WVSB No. 13388)
Assistant Attorneys General
Office of the Attorney General
Consumer Protection & Antitrust Division
Eastern Panhandle Office
269 Aikens Center
Martinsburg, West Virginia 25404
(304) 267-0239
laurel.k.lackey@wvago.gov

*Attorneys for Plaintiff State of West Virginia, ex rel. Patrick Morrisey, Attorney General*

**JOSHUA L. KAUL**
Attorney General
State of Wisconsin

*/s/ R. Duane Harlow*
R. Duane Harlow
Assistant Attorney General
WI State Bar #1025622, *pro hac vice*
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-2950
harlowrd@doj.state.wi.us

*Attorneys for Plaintiff State of Wisconsin*

60