# Exhibit G

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates to:<br>4:23-cv-05448, 4:23-cv-05885 | MDL No. 3047<br><br>Case Nos. 4:23-cv-05448-YGR<br>4:23-cv-05885-YGR<br><br>**ORDER LARGELY DENYING IN PART META'S MOTION TO DISMISS THE MULTISTATE ATTORNEYS GENERAL COMPLAINT BUT LIMITING THE SCOPE OF CLAIMS; INCLUDING THE**<br><br>**FLORIDA ATTORNEY GENERAL COMPLAINT;**<br><br>**AND PERSONAL INJURY PLAINTIFFS' CONSUMER PROTECTION AND MISREPRESENTATION CLAIMS** |
| **People of the State of California,** *et al.*,<br><br>        Plaintiffs,<br><br>   v.<br><br>**Meta Platforms, Inc.,** *et al.*,<br><br>        Defendants. | |
| **Office of the Attorney General, State of Florida, Department of Legal Affairs,**<br><br>        Plaintiff,<br><br>   v.<br><br>**Meta Platforms, Inc.,** *et al.*,<br><br>        Defendants. | Re: Dkt. No. 517 in<br>Case No. 22-md-03047;<br><br>Dkt. No. 83 in<br>Case No. 23-cv-05448; and<br><br>Dkt. No. 15 in<br>Case No. 23-cv-05885 |

United States District Court
Northern District of California

United States District Court
Northern District of California

This multi-district litigation ("MDL") consolidates hundreds of actions brought on behalf of children and adolescents, school districts and local government entities, and state attorneys general (the "States") alleging that several social media companies—Meta's[1] Facebook and Instagram, Google's YouTube, ByteDance's TikTok, and Snapchat—designed their platforms to foster compulsive use by minors, resulting in a variety of harms to children, local governments, and the public health. Before the Court is a comprehensive motion to dismiss those claims rooted in notions of unfair practices, consumer-protection, misrepresentation, and concealment. For the reasons set forth in this Order, based on a careful review of the pleadings and the briefing submitted by the parties as well as oral argument heard on April 19, 2024, the Court **GRANTS IN PART** and **DENIES IN PART** the motion to dismiss.[2]

Much of the States' consumer protection claims are cognizable. Meta's alleged yearslong public campaign of deception as to the risks of addiction and mental harms to minors from platform use fits readily within these states' deceptive acts and practices framework. Meta's design, development, and deployment of certain product features plausibly constitutes unfair or unconscionable practices under all at-issue federal and state standards. However, as before, Section 230 provides a fairly significant limitation on these claims. Section 230 insulates the design and deployment of most features alleged to be unfair or unconscionable. Similarly, Section 230 protects against personal injury plaintiffs' consumer-protection, concealment, and misrepresentation theories to the same extent. That said, the Court declines to dismiss at this stage theories of liability predicated on a failure-to-warn of known risks of addiction attendant to any platform features or as to platform construction in general.

Given the nature of the action, this order allows claims to proceed but limits the scope, and therefore the motions to dismiss are generally denied.

---

[1] The entities include Meta Platforms, Inc. (Meta Platforms), Instagram, LLC (Instagram), Meta Payments, Inc. (Meta Payments), and Meta Platforms Technologies, LLC (Meta Technologies), which the Court refers to collectively as "Meta." Multistate Compl. ¶ 22.

[2] For the reader's ease, and given the length of the order, a table of contents is included as Attachment A.

(a)     "its Social Media Platforms are not psychologically or physically harmful for young users and are not designed to induce young users' compulsive and extended use, when they are in fact so designed" (Multistate Compl. ¶ 846(a));

(b)     "its Social Media Platforms are less addictive and/or less likely to result in psychological and physical harm for young users than its Social Media Platforms are in reality" (*id.* ¶ 846(b));

(c)     "through the publication of CSER reports and intentional omission of material BEEF and TRIPS data from those reports, and through other communications, that the incidence or prevalence of negative or harmful user experiences on Meta's Social Media Platforms was lower than it actually was" (*id.* ¶ 846(c));

(d)     "it prioritized young users' health and safety over maximizing profits, when in fact Meta subordinated young user health and safety to its goal of maximizing profits by prolonging young users' time spent on its Social Media Platforms" (*id.* ¶ 846(d));

(e)     "Meta prevents under-13 users from using Instagram and/or Facebook when in fact Meta was aware that it does not prevent under-13 users from using Instagram and Facebook" (*id.* ¶ 846(e)); and

(f)     "Meta's collection of user data was not for the purpose of causing those users to become addicted to the Social Media Platforms, when in reality that was one of the purposes for which Meta collected user data" (*id.* ¶ 846(f)).[8]

Two genres emerge: either Meta committed the misrepresentation by affirmative statement, or "indirectly . . . by implication," *i.e.*, a misrepresentation by omission.

### 2.     Unfair and/or Unconscionable Acts and Practices

Paragraph 847 of the Multistate Complaint, reproduced below, summarizes the States' allegations of unfair and/or unconscionable acts and practices:

(a)     "Meta targeted its Social Media Platforms to young users while knowingly designing its Social Media Platforms to include features that Meta knew to be psychologically and physically harmful to young users—including features known to promote compulsive, prolonged, and unhealthy use by young users." (Multistate Compl. ¶ 847(a).)

(b)     "Meta utilized Social Media Platform features that unfairly and/or unconscionably harm young users independently of any actions taken by third-party users of Meta's Platforms. These features include infinite scroll, ephemeral content features, autoplay, quantification and display of 'Likes,' and disruptive alerts, all of which were unfairly and/or unconscionably utilized by Meta to extract additional time and

---

[8] The States also allege that "Meta has made other false and deceptive representations, including as set forth in paragraphs 1 through 835." (Multistate Compl. ¶ 846(g).)

14

attention from young users whose developing brains were not equipped to resist those manipulative tactics."  (*Id.* ¶ 847(b).)

(c)    "Meta designed, developed, and deployed disruptive audiovisual and vibration notifications and alerts and ephemeral content features in a way that unfairly and/or unconscionably exploited young users' psychological vulnerabilities and cultivated a sense of 'fear of missing out' in order to induce young users to spend more time than they would otherwise choose on Meta's Social Media Platforms."  (*Id.* ¶ 847(c).)

(d)    "Meta algorithmically served content to young users, according to 'variable reinforcement schedules,' thereby manipulating dopamine releases in young users, unfairly or unconscionably inducing them to engage repeatedly with its products— much like a gambler at a slot machine."  (*Id.* ¶ 847(d).)

(e)    "Meta collected the personal information of under-13 users of Instagram and Facebook without first obtaining verifiable parental consent, which violated COPPA and the COPPA Rule."  (*Id.* ¶ 847(e).)

Here, the States target the design, development, and deployment of features of Meta's platforms rather than any representations or omissions.

## II.    LEGAL FRAMEWORK

In an MDL, the transferee court applies the law of its circuit to issues of federal law, but on issues of state law it applies the state law that would have been applied to the underlying case as if it had never been transferred into the MDL.  *In re Anthem, Inc. Data Breach Litig.*, 2015 WL 5286992, at *2 (N.D. Cal. Sept. 9, 2015) (collecting Ninth Circuit cases).

The standard under Federal Rule of Civil Procedure 12(b)(6) is well-known and not in dispute.  "To survive a motion to dismiss for failure to state a claim after the Supreme Court's decisions in *Iqbal* and *Twombly*, plaintiffs' allegations must suggest that their claim has at least a plausible chance of success."  *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1134–35 (9th Cir. 2014) (cleaned up).  The district court must assume that the plaintiffs' allegations are true and draw all reasonable inferences in their favor.  The court need not, however, construe as true conclusory statements or unreasonable inferences.  *In re Gilead Scis. Sec. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008).  These well-established standards apply with equal force in MDL proceedings.  *See In re Optical Disk Drive Antitrust Litig.*, 2011 WL 3894376, at *8–9 (N.D. Cal. Aug. 3, 2011) (applying such standard in the context of an MDL); *In re Zofran (Ondansetron) Prod. Liab. Litig.*,

15

render them inconsistent with each other.[17]

The Court **HOLDS** that third-party content hosted by a platform can be considered when determining whether the platform, or a portion thereof, is "directed to children" under COPPA.

## IV. SECTION 230

### A. Overview

Meta asserts that Section 230 of the CDA "largely bars" the States' consumer protection claims.

As outlined earlier, the States' consumer protection claims fall into two buckets: "deceptive acts and practices" and "unfair and/or unconscionable acts and practices." (*See supra* Section I.C.) The first focus on Meta's misrepresentations (affirmative and by omission); the latter focus on the harm caused by specific product features (eight identified in this motion). Each set of claims presents unique theories requiring distinct treatment under Section 230.

As a general proposition, theories and claims differ. The Multistate Complaint does not explicitly identify a "failure-to-warn claim." The 217-page complaint, in fact, makes use of the terms "warn" or "warning" on only five occasions. (Multistate Compl. ¶¶ 187, 333, 349, 379, 790.) That said, the complaint is explicit in that it seeks to impose liability on Meta's alleged "fail[ure] to disclose the dangerous nature of its Social Media Platforms and because Meta utilized psychologically manipulative engagement-inducing features, knowing that young users are especially susceptible to those psychologically manipulative tactics." (*E.g.*, *id.* ¶ 935 (Count XIII: Unfair Acts or Practices by Meta in Violation of Georgia Fair Business Practices Act).)[18] While

---

[17] In its reply, Meta also argues that a child-directed "portion" of a website must be "created by the service" itself (Dkt. No. 662 at 5–6 n.6); that is, third-party account pages cannot constitute "portions" of the website. This restriction is again nowhere present in the statute or Rule, and Meta provides inapposite citations to the congressional record and certain regulations in support. *See, e.g.*, 144 Cong. Rec. S12741-04 (if a "site has a special area for children, then that portion of the site will be considered to be directed to children"); 64 Fed. Reg. 59893 ("[I]f a general audience site has a distinct children's 'portion' or 'area,' then the operator would be required to provide the protections of the Rule for visitors to that portion of the site."). Neither citation is inconsistent with this Court's holding.

[18] The States confirmed at argument that they "seek[] to impose liability on Meta's failure to speak about the overall effect of its unfair business practices." Dkt. No. 785, Tr. of April 19,

not clear, the Court finds it sufficient and provides guidance herein so as not to delay these proceedings with yet another amendment.  The Court understands that the "deceptions" and "omissions" encompassed by the States' deceptive acts and practices claims include failure-to-warn theories.

### B.    Legal Framework

The States do not dispute that Section 230 applies to state consumer protection laws and claims asserted by state attorneys general.  *See, e.g.*, *Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1177 (9th Cir. 2009) (recognizing that Section 230 "provide[s] immunity from state unfair competition and false advertising actions" (citing *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1118–19 (9th Cir. 2007))); *Free Speech Coal., Inc. v. Colmenero*, No. 23-cv-917, 2023 WL 5655712, at *26 (W.D. Tex. Aug. 31, 2023) ("The text of the CDA is clear: 'No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.'  47 U.S.C. § 230(e)(3).  '[A]ny' state law necessarily includes those brought by state governments . . . ." (alteration in original)), *rev'd and vacated in part*, 2024 WL 982225, at *17–19 (5th Cir. Mar. 7, 2024) (determining Section 230 did not conflict with or preempt the at-issue Texas statute).[19]

Subsection 230(c)(1) provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  The Ninth Circuit has framed this language, alongside subsection 230(e)(3),[20] as providing a three-part test to determine whether a defendant is entitled to Section 230 immunity:

> [Subsection 230](c)(1) only protects from liability (1) a provider or

---

2024 Case Management Conference at 163:4–10.

[19] *See also Google, Inc. v. Hood*, 822 F.3d 212, 227 n.12 (5th Cir. 2016) (noting the court "do[es] not suggest that section 230 of the CDA would not apply if [Attorney General] Hood were to eventually bring an enforcement action or cannot be applied at the motion-to-dismiss stage.").

[20] 47 U.S.C. § 230(e)(3) provides, in part, that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."

United States District Court
Northern District of California

> user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider.

*Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100–01 (9th Cir. 2009) (footnote omitted).

**Prong 1.** Meta points out that the parties have never disputed that Meta is "a provider . . . of an interactive computer service" by way of its Facebook and Instagram platforms for the purposes of these claims. *Social Media I*, 702 F. Supp. 3d at 825. Remaining for elaboration, as in the Court's prior order, are the "second and third factor[s]" which "tend to overlap in significant ways." *Id.* at 827 (quoting *In re Apple Inc. App Store Simulated Casino-Style Games Litig.*, 625 F. Supp. 3d 971, 978 (N.D. Cal. 2022)).

**Prong 2.** As described in the Court's prior order, the second prong of a Section 230 analysis focuses on "whether 'the duty the plaintiff alleges' stems 'from the defendant's status or conduct as a publisher or speaker.'" *Lemmon v. Snap, Inc.*, 995 F.3d 1085, 1091 (9th Cir. 2021) (quoting *Barnes*, 570 F.3d at 1107). A claim meets this prong where the claim is based on "behavior that is *identical to* publishing or speaking." *Barnes*, 570 F.3d at 1107 (emphasis supplied). Critically, Section 230 does not create immunity simply because publication of third-party content is relevant to or a but-for cause of the plaintiff's harm. The issue is whether the defendant's alleged duty to the plaintiff could "have been satisfied without changes to the content posted by the website's users and without conducting a detailed investigation." *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 851 (9th Cir. 2016).

With respect to the term "publishing" itself, courts understand it to mean "deciding whether to publish or to withdraw from publication third-party content." *Id.* The most basic example of online publishing subsection 230(c)(1) is intended to protect is a message board on which content is posted by third parties. For example, *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093 (9th Cir. 2019) held the plaintiff could not proceed on a claim that the defendant, an online platform, contributed to the death of her son who purchased heroin from another user on the platform through message board postings. In this circumstance, the defendant was a publisher of third-party content; a congressionally protected status.

"Publishing" also includes editorial decisions and functions ancillary to the decision to

United States District Court
Northern District of California

23

make content available.  Thus, publishing has been found to "involve[] reviewing [and] editing," such as "review[ing] material submitted for publication, perhaps edit[ing] it for style or technical fluency," *Barnes*, 570 F.3d at 1102, and "deciding whether to exclude material," *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1170–71 (9th Cir. 2008).  In general, it is any conduct "rooted in the common sense and common definition of what a publisher does."  *Barnes*, 570 F.3d at 1102 (also "deciding whether to publish, withdraw, postpone or alter content" and other of "'publisher's traditional editorial functions'") (quoting *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 331 (4th Cir.1997)).  The Ninth Circuit has also indicated that Section 230 may provide immunity for any claim that would "necessarily require an internet company to monitor third-party content."  *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 682 (9th Cir. 2019); *Lemmon*, 995 F.3d at 1092.

**Prong 3.**  The third prong overlaps with the prior two and concerns information provided by another information content provider.  *Social Media I*, 702 F. Supp. 3d at 827.  No further articulation is required.

*     *     *

In interpreting the second and third prongs, the Court in its prior order focused on the analysis in *Fair Hous. Council of San Fernando Valley v. Roommates.Com*, LLC, 521 F.3d 1157, 1164 (9th Cir. 2008).  *Roommates* established a test for determining if a platform's actions in altering or presenting content constitutes development, namely, whether the platform provides "neutral tools" for the creation or dissemination of content, which does not destroy Section 230 immunity.  *Roommates.Com,* 521 F.3d at 1172.  However, if the platform's conduct materially alters the content, enhancing its alleged illegality, the tool is not neutral, and Section 230 does not bar liability.  *Id.* at 1174–75 ("Where it is very clear that the website directly participates in developing the alleged illegality . . . immunity will be lost.").

### C.    Unfair and Unconscionable Acts: Platform Development and Design

Here, Meta moves to dismiss under Section 230 the States' claims based on alleged unfair or unconscionable business practices that target the product development and design of specific features of Meta's platforms.

24

These theories are subject to the same conduct-specific, feature-by-feature analysis that the Court undertook in its prior order relating to products liability claims.[21] The Court divides the analysis between those features for which it holds Section 230 provides immunity versus those where it does not.

### 1. Features Previously Barred by Section 230

With respect to those features where the Court already found they were protected under Section 230, the common thread identified showed that the features "directly target defendants' roles as publishers of third-party content." *Social Media I*, 702 F. Supp. 3d at 830. The five are, as identified by the Court:

- Infinite scroll and autoplay features (Multistate Complaint ¶ 847(b));
- Ephemeral content features (*id.* ¶ 847(c));
- Disruptive audiovisual and vibration notifications and alerts (*id.* ¶ 847(c));
- The quantification and display of "Likes" (*id.* ¶ 847(b)); and
- Meta's algorithmic service of content according to "variable reinforcement schedules" (*id.* ¶ 847(d)).

With respect to these, the States nonetheless argue that the design, development, and deployment of each constitutes an unfair or unconscionable act or practice. The Court addresses each feature:

**Infinite scroll and autoplay.** The States challenge the "infinite scroll" and "autoplay" features of Meta's platforms. (Multistate Compl. ¶¶ 847(b)–(c); *see id.* ¶¶ 377, 381; *see also id.* ¶ 273; Florida Compl. ¶¶ 28, 32.) The Court has held that addressing this alleged product defect "would necessarily require defendants to publish less third-party content." *Social Media I*, 702 F. Supp. 3d at 831. That ruling likewise applies to the States' allegations.

**Ephemeral content.** The States challenge how "Meta designed, developed, and deployed . . . ephemeral content features" as to "exploit[] young users' psychological vulnerabilities."

---

[21] In its prior order, the Court held that allegations under a products liability theory targeting certain features of the defendants' platforms were insulated by Section 230, while other features were not so insulated. *See Social Media I*, 702 F. Supp. 3d at 829–35. While consumer-protection claims of unconscionability and unfairness present a distinct legal framework as compared to products liability, the Court finds that its prior analysis of Meta's platform features under a products liability theory leads to the same result under the States' unconscionability and unfairness theories for the purposes of Section 230.

(Multistate Compl. ¶ 847(c); *see id.* ¶¶ 387–88; Florida Compl. ¶ 35.)  The Court has held that "[e]ditorial decisions such as determining the length of content published and how long to publish content are 'traditional editorial functions' immune under Section 230, where exercised with regard to third-party content." *Social Media I*, 702 F. Supp. 3d at 832.  That ruling applies here.

**Notifications.**  The States challenge similarly how "Meta designed, developed, and deployed disruptive audiovisual and vibration notifications and alerts . . . in a way that . . . exploited young users' psychological vulnerabilities."  (Multistate Compl. ¶ 847(c)–(b); Florida Compl. ¶ 115 ("disruptive alerts").)  The Court has held that "where notifications are made to alert users to third-party content, Section 230 bars plaintiffs' product defect claims." *Social Media I*, 702 F. Supp. 3d at 833.[22]  That ruling applies here.

**Likes.**  The States challenge the "quantification and display of 'Likes'" (Multistate Compl. ¶ 847(b)), which "are a quick way for users to express validation or approval of other users' photos or videos, by clicking or tapping a heart icon or the iconic thumbs-up icon" (*id.* ¶ 227; *see also* Florida Compl. ¶¶ 33–34).  The Court has held that Section 230 bars "product defect claims" regarding "notifications . . . made to alert users to third-party content," which "includes notifications that someone has . . . liked a user's post." *Social Media I*, 702 F. Supp. 3d at 833.  That ruling applies here.

The States argue that the Court has *not* held as to whether Meta's design choice to display a calculated total of "Likes" on a user's post is barred by Section 230.  Meta argues the distinction between notifying a user of a "Like" and the manner in which it is displayed on the post is immaterial for purposes of Section 230.  The States respond that their claim relating to Likes, especially in light of Project Daisy (discussed *supra* Section I.B.2), is more nuanced because they allege that Meta knew its design choice to display total "Likes" on a user's post contributed to negative social comparison.  Thus, the claim rests not just on design decisions to tabulate a total

---

[22] While not at issue in Meta's motion to dismiss, the Court has also held that "the timing and clustering of notifications of *defendants' content* to increase addictive use is entitled to First Amendment protection." *Social Media I*, 702 F. Supp. 3d at 837.

United States District Court
Northern District of California

"Like" counts, but also to obscure options for users to proactively hide those counts, and so should survive Section 230.

The Court disagrees, finding Meta's authority persuasive. In *Kimzey v. Yelp! Inc.*, the Ninth Circuit characterized Yelp's star-rating system, "which is based on rating inputs from third parties and which reduces this information into a single, aggregate metric," as the kind of "neutral tool" described in *Roommates.Com* that operates on user-generated "voluntary inputs" and does not amount to "development." 836 F.3d 1263, 1270 (9th Cir. 2016); *see also Klayman v. Zuckerberg*, 753 F.3d 1354, 1358 (D.C. Cir. 2014) ("[A] website does not create or develop content when it merely provides a neutral means by which third parties can post information of their own independent choosing online."). The aggregation of "Likes" is a content-neutral means of displaying a form of third-party content on Meta's platforms. The States' allegations regarding "Likes" do not survive Section 230.[23]

**Algorithms.** The States challenge how "Meta algorithmically served content to young users, according to 'variable reinforcement schedules.'" (Multistate Compl. ¶ 847(d); *id.* ¶¶ 151–225.)[24] The Court has held that Section 230 immunizes defendants from challenges to their "use of algorithms to determine whether, when, and to whom to publish third-party content" because "[w]hether done by an algorithm or an editor, these are traditional editorial functions that are essential to publishing." *Social Media I*, 702 F. Supp. 3d at 833. The States argue, in essence, that their unique allegations merit a different approach.

---

[23] To the extent the States argue that Section 230 should not apply because Meta wrongfully knew its design choice would lead to "negative social comparison," at least one court has explained that Section 230 does not contain an exception for wrongful intent. *See Levitt v. Yelp! Inc.*, No. C-10-1321, 2011 WL 5079526, at *1 (N.D. Cal. Oct. 26, 2011) ("Indeed, courts have found the [Subsection 230(c)(1)] immunity applies to conduct that arguably constitute[s] bad faith."), *aff'd*, 765 F.3d 1123 (9th Cir. 2014). While perhaps unseemly, this Court agrees from a legal perspective.

[24] "These algorithms do not promote any specific message by Meta. Rather, the algorithms function on a user-by-user basis, detecting the material with which each individual is likely to engage and then increasingly displaying similar material to maximize the time spent (and user data collected) on the Platforms." Multistate Compl. ¶ 65.

27

Courts have consistently dismissed claims under Section 230 alleging harms caused by content recommendation algorithms in general, and Facebook's recommendation algorithms in particular. *See Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1096 (9th Cir. 2019); *Force v. Facebook, Inc.*, 934 F.3d 53, 66 (2d Cir. 2019) (disagreeing with "contention that Facebook's use of algorithms renders it a non-publisher"); *M.P. v. Meta Platforms, Inc.*, No. 22-cv-3830, 2023 WL 5984294, at *1, 3–4 (D.S.C. Sept. 14, 2023) (rejecting argument that "algorithms and internal architecture of social media sites . . . are well beyond the function of traditional publishers" and concluding Section 230 barred allegations against Facebook's algorithms). Recommendation algorithms, absent allegations to the contrary, serve a "content-neutral" function for the dissemination of third-party content immune from liability under Section 230. *See Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1096 (9th Cir. 2019); *id.* at 1098 (content recommendation features, "including algorithms," were part of website's role "as a publisher of others' content").

Based on the current landscape of the law, the Court disagrees that the States' allegations merit different treatment. *First*, while the Multistate Complaint contains allegations specific to Meta's knowledge of this design's harmful effects (*e.g.*, internal analyses of "Negative Appearance Comparison" or "NAC" content as amplified by Meta's recommendation algorithms, *see, e.g.*, *id.* ¶¶ 195–204), the States' theory of harm caused by Meta's recommendation algorithms is not meaningfully distinct from the personal injury plaintiffs' theory previously reviewed by the Court for the purposes of Section 230. As alleged, the algorithms (i) sequence the presentation of material, (ii) individually curate content for each user, and (iii) amplify content to which each user responds most strongly.

*Second*, the States' argument that because the algorithms cause harm irrespective of the content recommended only serves to confirm that the algorithms are, in fact, "content-neutral." *See Dyroff*, 934 F.3d at 1096. In this vein, the States argue that Meta could "take reasonable measures to design" a safer platform "without altering the content that [its] users generate." *Lemmon*, 995 F.3d at 1092. However, the States have not adequately explained what reasonable modifications to Meta's algorithms would not involve changing how Meta decides "whether,

28

when, and to whom to publish third-party content." *Social Media I*, 702 F. Supp. 3d at 833. Allegations related Meta's recommendation algorithms are barred by Section 230.[25]

### 2. Features Previously Not Barred by Section 230

The Court previously held that allegations relating to other forms of disputed features are *not* barred by Section 230.[26]  "The defects pled as part of such allegations are *not* equivalent to speaking or publishing and can be fixed by defendants without altering the publishing of third-party content." *Social Media I*, 702 F. Supp. 3d at 829.  Here, these are:

- Appearance-altering filters (Multistate Complaint ¶¶ 333–68);
- Features relating to restricting time spent on the platform (*id.* ¶¶ 578–90); and
- Instagram's "multiple accounts" function (*id.* ¶¶ 370–72).

As above, the Court considers the arguments presented that each feature and its design, development, and deployment constitutes an unfair or unconscionable act or practice.

**Appearance-altering filters.**  The States challenge Meta's promotion of platform features that promote or encourage eating disorders and body dysmorphia in youth, despite Meta's representations to the contrary and its knowledge of expert warnings about the resulting harms. (*Id.* ¶ 333.)[27]  The Court previously held that plaintiffs "plausibly allege that the filters are harmful regardless of whether children eventually post the images that they filtered.  Plaintiffs allege that children are harmed simply by creating and then seeing their own altered images.  No posting or

---

[25] The States also argue that the Ninth Circuit has not expanded the meaning of publication to include "promoting, marketing, or boosting content," as allegedly done by Meta's algorithms. These activities involve the republication of content, and thus directly implicate decisions of "whether to publish or to withdraw from publication third-party content." *Barnes*, 570 F.3d at 1102.

[26] Of the three product features discussed in this section, all were discussed in the Court's prior order except for the last, Instagram's "multiple accounts" function, which the Court adds here given its ultimate finding on similar grounds.

[27] The States argue Meta failed to move to dismiss this feature.  Meta argues that the complaint did not provide sufficient notice.  While this feature was not included in the complaint's summary list, *see* Multistate Complaint ¶ 847, the States have included a substantial section dedicated to appearance-altering filters, *see id.* ¶¶ 333–68.  Regardless, because the Court has ruled on similar allegations previously and Meta has not provided a new basis for dismissal, there is no prejudice to ruling on the issue now.

publication is necessary. There is a defect and a harm separate and apart from publication of any third-party content." *Social Media I*, 702 F. Supp. 3d at 830. That reasoning applies here.

**Hindering time restrictions.** The States challenge Meta's "Daily Limit" feature, which Meta allegedly "claimed would enable users to restrict the amount of time they spend on Instagram each day." (Multistate Compl. ¶ 578.)[28] The Court previously held that allegations of Meta's failure to "provid[e] options to users to self-restrict time used on a platform" were not barred by Section 230. *Social Media I*, 702 F. Supp. 3d at 829. That ruling applies here.

**Instagram's "multiple accounts" function.** The States challenge Instagram's "multiple accounts" function, "which allows users to register up to five accounts *without having to log out* of any one account to access another." (Multistate Compl. ¶ 370 (emphasis supplied).) The Court has not considered this feature.[29]

The Court recognizes the few cases which have held that "decisions regarding the 'structure and operation of [a] website'—such as 'permitt[ing] users to register under multiple screen names'"—reflect, in part, "'choices about what content can appear on the website and in what form' and thus 'fall within the purview of traditional publisher functions.'" *Fields v. Twitter, Inc.*, 200 F. Supp. 3d 964, 972 (N.D. Cal. 2016) (alterations in original) (quoting *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 20–21 (1st Cir. 2016)); *see also Doe v. Friendfinder Network, Inc.*, 540 F. Supp. 2d 288, 295 (D.N.H. 2008) (discussing liability for, among others, "a feature that allowed a single individual to post under multiple screen names").

However, in the context of adolescents, this feature—which is not exclusively focused on content or publishing activity—can serve as an end-run around other features such as those related to time restrictions. Thus, given the procedural posture, at this juncture the Court is unwilling to

---

[28] The parties again dispute the articulation of a claim and a ground for a motion. The Court again rules for efficiency purposes and lack of prejudice.

[29] The States argue again that Meta has not moved to dismiss and so concedes that Section 230 does not bar allegations related to Instagram's "multiple accounts" function. *See* Multistate Compl. ¶¶ 370–72. In the interest of efficiency, the Court considers the argument now, finding sufficient notice of allegations despite Meta's objection (*id.* ¶¶ 369–72) and sufficient briefing on the legal issues despite the States' objection.

United States District Court
Northern District of California

make a global decision on this issue.

Allegations regarding Instagram's "multiple accounts" function are not necessarily barred by Section 230.

*        *        *

In sum, Meta's motion to dismiss is **GRANTED** to the extent the States' allegations of unfair and unconscionable acts and practices target the following platform features: infinite scroll and autoplay; ephemeral content; how Meta designed and deployed audiovisual and vibration notifications and alerts; the quantification and display of likes; and how Meta algorithmically served content to young users.  Meta's motion to dismiss is **DENIED** as to the States' allegations of unfair and unconscionable acts and practices concerning appearance altering filters; platform features that hindered time restrictions; and Instagram's "multiple accounts" function.

### D.        Deceptive Acts and Practices: Failure-to-Warn Theory

As a threshold issue, the Court notes that Meta does *not* move to dismiss the States' deceptive acts and practices claims to the extent they are based on *affirmative* misrepresentations.[30]  For example, allegations that Meta knowingly misrepresented facts in public reports (like the CSER) about the harm experienced by users on and the addictive quality of its platforms do not implicate Section 230 and proceed to an assessment on the merits.  Any theories of deceptive acts and practices that target Meta's alleged affirmative misrepresentations independent of platform features survive Section 230.  *See Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1107 (9th Cir. 2009) (The "outwardly manifested intention to create an expectation on the part of another . . . . generates a legal duty distinct from the conduct at hand, be it the conduct of a publisher . . . .").

Rather, on this issue, the States allege that Meta's "constellation of acts which, viewed both individually and holistically, constitute an unfair trade act or practice," including when Meta failed to speak about this overall effect.  Meta urges that Section 230 prohibits this claim.

---

[30] Meta confirmed at argument.  Dkt. No. 785, Tr. of April 19, 2024 Case Management Conference at 68:10–16; *see also* Dkt. No. 517 at 19.

31

United States District Court
Northern District of California

To determine whether a defendant's conduct is immunized under *Noerr-Pennington*, courts consider "(1) whether the lawsuit imposes a burden on petitioning rights, (2) whether the alleged activities constitute protected petitioning activity, and (3) whether the statute at issue may be construed to avoid that burden." *B&G Foods N. Am., Inc. v. Embry*, 29 F.4th 527, 535 (9th Cir.) (cleaned up), *cert. denied*, 143 S. Ct. 212 (2022).

Meta appears to argue that *Noerr-Pennington* immunizes *any* false statements made in legislative proceedings. That reading is unsupportable. *Noerr-Pennington* immunizes only "protected petitioning activity." *B&G Foods*, 29 F.4th at 535. Because Meta has presented "no evidence that [it] was seeking any redress from Congress that implicates its First Amendment right to petition," and "[i]n light of the underdeveloped factual record and the abbreviated legal arguments," the Court declines to dismiss any aspect of the States' claims under *Noerr-Pennington* at this stage. *See In re Apple Inc. Sec. Litig.*, No. 19-cv-02033-YGR, 2020 WL 2857397, at *18 (N.D. Cal. June 2, 2020).

The motion on this ground is denied.

### B. Unfair and/or Unconscionable Business Acts or Practices

Meta moves to dismiss consumer protection claims under the unfair and unconscionable acts or practices prong asserted by twenty-seven of the thirty-four states. The Court has held that Section 230 bars the States' unfairness claims relating to many platform features, except for allegations relating to appearance-altering filters, features that hinder time restrictions, and the "multiple accounts" function. These claims proceed to an assessment on the merits.

With respect to the balance, the parties first dispute the standard applied by each state for unfair and/or unconscionable acts or practices prong of the consumer protection claims. More particularly, the applicability of Section 5 of the Federal Trade Commission ("FTC") Act, the *Sperry* factors,[44] or other state-specific standards. Because at least one state puts every test at

---

arguments as to whether these statutory limitations protect its alleged misrepresentations to Congress are misplaced, as evident from the analysis in that section.

[44] *FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233 (1972).

The personal injury plaintiffs' consumer-protection claims against YouTube, Snap, and TikTok survive only to the extent based on an omissions or failure-to-warn theory.

This terminates Dkt. No. 517 in Case No. 22-md-03047; Dkt. No. 83 in Case No. 23-cv-05448; and Dkt. No. 15 in Case No. 23-cv-05885.

**IT IS SO ORDERED.**

Dated: October 15, 2024

_____
**YVONNE GONZALEZ ROGERS**
**UNITED STATES DISTRICT COURT JUDGE**

United States District Court
Northern District of California

**ATTACHMENT A**

**TABLE OF CONTENTS**

I.    **Background** ...................................................................................................................... **3**

    A.    Procedural Background ............................................................................... 3

    B.    Relevant Facts Alleged............................................................................... 4

        1.    Meta's Alleged Design and Deployment of Harmful Platform Features

            Targeting Young Users ..................................................................... 4

        2.    Meta's Alleged Awareness and Concealment of Harmful Platform Features

            From the Public ................................................................................ 8

        3.    COPPA Allegations........................................................................ 12

    C.    Theories of Liability ................................................................................ 13

        1.    Deceptive Acts and Practices ......................................................... 13

        2.    Unfair and/or Unconscionable Acts and Practices ....................................... 14

II.    **Legal Framework** ........................................................................................................ **15**

III.    **The Children's Online Privacy Protection Act**................................................................ **16**

IV.    **Section 230** .................................................................................................................... **21**

    A.    Overview .................................................................................................. 21

    B.    Legal Framework ..................................................................................... 22

    C.    Unfair and Unconscionable Acts: Platform Development and Design.................... 24

        1.    Features Previously Barred by Section 230 ................................................ 25

        2.    Features Previously Not Barred by Section 230 ........................................ 29

    D.    Deceptive Acts and Practices: Failure-to-Warn Theory ........................................ 31

V.    **Consumer Protection Claims against Meta** .................................................................... **37**

    A.    Deceptive Acts and Practices ................................................................... 37

        1.    Puffery and Opinion ...................................................................... 37

        2.    Sufficiency of Pleading Falsity under Rule 9(b) ........................................ 40

        3.    Materiality of Alleged Deceptions ............................................................ 43

        4.    *Noerr-Pennington*............................................................................... 44

United States District Court
Northern District of California

| | | | |
|---|---|---|---|
| B. | Unfair and/or Unconscionable Business Acts or Practices | 45 |
| | 1. | Section 5 of the FTC Act | 46 |
| | 2. | The *Sperry* Factors | 50 |
| | | a) | Whether *Sperry* Applies | 50 |
| | | b) | Applying the *Sperry* Factors | 51 |
| | 3. | State-Specific Standards | 52 |
| | | a) | California | 52 |
| | | b) | Colorado | 55 |
| | | c) | Indiana | 57 |
| | | d) | Kansas | 58 |
| | | e) | New Jersey | 59 |
| | | f) | Oregon | 60 |
| C. | Statutory Scope of Consumer Protection Claims | 62 |
| | 1. | "Consumer Transaction" or "Consumer Goods or Services" | 62 |
| | 2. | "Trade or Commerce" | 67 |
| | 3. | "Consumer" | 71 |
| D. | Restitution | 73 |

**VI. Personal Injury Plaintiffs' Claims** ................................................................................. **77**

A. Personal Injury Plaintiffs' Consumer-Protection Claims Against Meta Only ........ 77

    1. Prior Rulings .......................................................................................... 77

    2. Actual Reliance ...................................................................................... 78

        a) Disputed State Standards ............................................................ 78

        b) Evaluating Actual Reliance ......................................................... 82

    3. Ascertainable Loss ................................................................................ 84

B. Personal Injury Plaintiffs' Consumer-Protection Claims Against Snap, YouTube, and TikTok ............................................................................................................. 87

C. Personal Injury Plaintiffs' Concealment and Misrepresentation Claims against Meta Only ...................................................................................................................... 89

United States District Court
Northern District of California

1. Section 230, Statements of Opinion, *Noerr-Pennington*, Reliance, Falsity, and Materiality ...................................................................................... 89

2. Negligent Misrepresentation by Omission: Whether Recognized by Any At-Issue States ............................................................................................ 90

    a) States Prohibiting or Unlikely to Permit Negligent Misrepresentation by Omission ................................................................................. 90

    b) States with Sufficient Authority to Permit Negligent Misrepresentation by Omission ........................................................................... 92

    c) States Without Clear Authority as to Negligent Misrepresentation by Omission ................................................................................. 93

**VII. Conclusion** ................................................................................................ **96**

United States District Court
Northern District of California