Ashley M. Simonsen (Bar No. 275203)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, California 90067
Telephone: (424) 332-4800
Facsimile: (424) 332-4749
Email: asimonsen@cov.com

*Attorneys for Defendants Meta Platforms, Inc.*
*f/k/a Facebook, Inc. and Instagram, LLC*

*[Additional counsel listed on signature pages]*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates To:<br><br>*People of the State of California, et al. v. Meta Platforms, Inc. et al.* | MDL No. 3047<br><br>Case Nos.: 4:22-md-03047-YGR<br>4:23-cv-05448-YGR<br><br>**META'S MOTION *IN LIMINE* NO. 4 TO EXCLUDE EVIDENCE OF PUBLISHING ACTIVITIES OR BARRED FEATURES TO PROVE MISREPRESENTATION CLAIMS**<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br>Magistrate Judge: Hon. Peter H. Kang<br><br>Date: June 26, 2026<br>Time: 8:00 AM<br>Place: Courtroom 1, 4th Floor |

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE THAT, at 8:00 AM on June 26, 2026, before the Honorable Yvonne Gonzalez Rogers, in Courtroom 1, Floor 4, of the United States District Court, Northern District of California, located at 1301 Clay Street, Oakland, CA 94612, Meta will and hereby does move this Court for an order excluding evidence and argument barred by Section 230, as addressed in the accompanying Memorandum of Points and Authorities.  This Motion is based on this Notice, the accompanying Memorandum, any other papers submitted in connection with the Motion, the accompanying Declaration of Ashley M. Simonsen and the exhibits thereto, and any other matters presented at the time of the hearing.

DATED:  June 9, 2026                                          Respectfully submitted,

By:    _/s/ Ashley M. Simonsen_

Ashley M. Simonsen (Bar No. 275203)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, California 90067
Telephone: (424) 332-4800
Facsimile: (424) 332-4749
Email: asimonsen@cov.com

*Attorneys for Defendants Meta Platforms, Inc. f/k/a Facebook, Inc. and Instagram, LLC*

*[Additional counsel listed on signature pages]*

META'S MOTION IN LIMINE NO. 4 TO EXCLUDE EVIDENCE OF PUBLISHING ACTIVITIES OR BARRED FEATURES TO PROVE MISREPRESENTATION CLAIMS
4:22-md-03047-YGR; 4:23-cv-05448-YGR

## TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................ 1

ARGUMENT............................................................................................................................... 1

I.      The Court Should Preclude the AGs from Relying on Statements Barred by Section 230 . ........................................................................................................................................ 1

II.     The Court Should Exclude Statements That Can Be Proven Misleading Only by Evidence Relating to Third-Party Content or Barred Features............................................................ 5

CONCLUSION............................................................................................................................ 9

META'S MOTION IN LIMINE NO. 4 TO EXCLUDE EVIDENCE OF PUBLISHING ACTIVITIES OR BARRED FEATURES TO PROVE MISREPRESENTATION CLAIMS
4:22-md-03047-YGR; 4:23-cv-05448-YGR

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Doe (K.B.) v. Backpage.com, LLC*,
    768 F. Supp. 3d 1057 (N.D. Cal. 2025) .......................................................................8

*Doe v. Grindr Inc.*,
    128 F.4th 1148 (9th Cir. 2025) .................................................................1, 3, 4, 5

*Est. of Bride by & through Bride v. Yolo Techs., Inc.*,
    112 F.4th 1168 (9th Cir. 2024) ..............................................................4, 5, 7, 8

*Glazer v. Meta*
    2025 WL 2958810 (D. Md. Oct. 17, 2025) ............................................................4

*Old Chief v. United States*,
    519 U.S. 172 (1997)..................................................................................................9

**Other Authorities**

U.S. Const. amend. I ........................................................................................................8

Fed. R. Evid. 403 ............................................................................................................8

### INTRODUCTION

Meta moves *in limine* to exclude evidence and argument that it made misrepresentations as to publishing activities subject to Section 230 immunity, and to exclude evidence and argument seeking to prove that Meta's statements were deceptive or misleading based on evidence of publishing activities subject to Section 230 immunity.

The Ninth Circuit has expressly held that Section 230 protects an online service provider against a misrepresentation claim based on its statement that its service was "designed to create a safe and secure environment for its users." *Doe v. Grindr Inc.*, 128 F.4th 1148, 1154 (9th Cir. 2025). Not only was the statement "too general to be enforced" because it was "not a specific promise, but a description of [the service's] moderation policy," it was also "protected from liability under § 230." *Id.* Many of the statements included in the AGs' purportedly narrowed list of statements are nearly identical to the statement at issue in *Grindr*. As described below, these statements are either direct summaries of Meta's content-moderation policies, or are statements about the safety of Meta's services that explicitly relate to publisher-type activity. Section 230 bars misrepresentation claims based on such "descriptions of [Meta's] moderation policy." *Id.* And they are "too general to be enforced." *Id.*

Section 230 similarly bars other statements that cannot be proven misleading without reference to Meta's publishing of third-party content or features of its services that are subject to Section 230 immunity. The AGs allege numerous misrepresentations based on Meta's statements about the prevalence of third-party content and its content-moderation efforts. But these statements can only be proven misleading via evidence of Meta's publication of third-party content or whether it sufficiently moderates content on its services. Section 230 bars such evidence as proof of misleading or deceptive statements.

### ARGUMENT

**I.      The Court Should Preclude the AGs from Relying on Statements Barred by Section 230.**

The AGs allege misrepresentations that are barred by Section 230 because they are either (1) direct summaries of Meta's content-moderation policies or (2) statements about steps Meta was taking to enhance safety through its content-moderation policies. Section 230 bars liability for such "description[s] of [Meta's] moderation policy." *Grindr*, 128 F.4th at 1154. And, in any event, these descriptions of Meta's content-moderation efforts are "too general to be enforced." *Id.*

These statements are:

- *"We've been focused on well-being broadly, like I said, it's our number one priority. . . . We will do things that mean people use Instagram less if we think that they keep people safe or generally create a healthier environment. And I think we have to be willing to do that."* Stat. No. 8.[1] These comments were in the context of a discussion about the potential shift towards hiding "likes," *see* Ex. A at 2, a feature that this Court has already held cannot be the basis for liability in this case. *See* ECF 1214 ("MTD Order") at 25.

- *"Progress to Help Keep People Safe . . . We publish the Community Standards Enforcement Report . . . to more effectively track our progress and demonstrate our continued commitment to making Facebook and Instagram safe."* Stat. No. 9. The Community Standards Enforcement Reports ("CSERs") track the prevalence of policy-violating content on Meta's services. *See* Ex. B.

- *"Progress to Help Keep People Safe."* Stat. No. 11. This quote comes from an explanation of CSERs.

- *"While we continue to invest in helping businesses, we are equally focused on keeping our platforms safe."* Stat. No. 14. This statement to investors was made in the context of describing a multi-platform agreement to a "common set of definitions of hate speech and other harmful content"—in other words, describing steps Meta took to address its content-moderation policies. *See* Ex. C at 6.

- *"This technology is also the basis of important changes we're making to keep young people safe."* Stat. No. 30. This statement on Meta's website describes how AI technology is used to estimate people's age on Facebook and Instagram and "stop adults from messaging young people that don't follow them on Instagram." *See* Ex. D.

- *"We have put in place multiple protections to create safe and age-appropriate experiences for people between the ages of 13 and 17."* Stat. No. 38. This statement described "multiple protections" aimed at "prevent[ing] young people from interacting with adults they don't know or don't want to engage with." Ex. E at 10.

- *"At Instagram, we've been working for a long time to keep young people safe on the app."* Stat. No. 60. This statement describes that some of the steps Instagram has taken towards safety, including "Sensitive Content Control, which allows people to decide how much sensitive content shows up in Explore." Ex. F.

- *"We haven't waited for regulation to continue making progress on our apps. Over the past several years, we've taken significant steps, including: . . . Using age verification technology to help teens have age-appropriate experiences. . . . Removing more content that violates our policies and making potentially sensitive content more difficult to find. . . . Offering tools for teens to spend more meaningful time online."* Stat. No. 68. This blog post explicitly references Meta's content-moderation and age-verification efforts. *See* Ex. G.

- *"We want teens to have a safe, age-appropriate experiences on our apps. . . ."* Stat. No. 72.[2] This statement from a Meta blog post is explicitly about changes made to prevent unconnected adults

---

[1] ECF 3103-1 is the AGs' June 4, 2026 list of statements on which it seeks to proceed at trial. Following the AGs' numbering conventions, Meta labels each statement as "Stat. No. __".

[2] Meta's motion addresses only the first statement in the AGs' compound statement number 72.

META'S MOTION IN LIMINE NO. 4 TO EXCLUDE EVIDENCE OF PUBLISHING ACTIVITIES OR BARRED FEATURES TO PROVE MISREPRESENTATION CLAIMS
4:22-md-03047-YGR; 4:23-cv-05448-YGR

from sending third-party content to teen users. *See* Ex. H.

- *Meta's "Best Interests of the Child Framework" includes the principle "Create safe, age-appropriate environments for youth."* Stat. No. 81. This statement explains that Meta teams are provided "with resources to help them understand how to make the content, controls and features in their products appropriate for the young people they reach." Ex. I.

- *"Senator, we do not direct people toward content that promotes eating disorders. That actually violates our policies, and we remove that content when we become aware of it. We actually use AI to find content like that and to remove it."* Stat. No. 50. This statement explained Meta's policy relating to moderating eating disorder content, and how Meta enforces this policy. *See* Ex. E at 29.

- "*We go beyond legal requirements and use sophisticated technology to proactively seek out abusive material, and as a result, we find and report more inappropriate content than anyone else in the industry.*" Stat. No. 73. This statement from Meta's website describes Meta's efforts to moderate and report child sexual abuse material. *See* Ex. J.

- "*Between April and June this year, we took action on over 12 million pieces of suicide and self-harm content on Facebook and Instagram. While we allow people to discuss their experiences with suicide and self-harm -- as long as it's not graphic or promotional -- this year we've taken important steps to make this content harder to find in Search and to hide it completely from teens, even if it's shared by someone they follow.*" Stat. No. 74. This statement from Meta's website describes Meta's content-moderation policies relating to suicide and self-injury content, and Meta's efforts to enforce these policies. *See* Ex. K.

- "*Bullying and harassment happen in many places and come in many different forms from making threats and releasing personally identifiable information to sending threatening messages and making unwanted malicious contact. We do not tolerate this kind of behavior because it prevents people from feeling safe and respected on Facebook, Instagram, and Threads.*" Stat. No. 79. This statement from Meta's website describes Meta's policies relating to bullying and harassing content.

- "*At Instagram, we have guidelines that govern what content we recommend to people. Through those guidelines, we work to avoid making recommendations that could be low-quality, objectionable, or sensitive, and we also avoid making recommendations that may be inappropriate for younger viewers. . . . We use technology to detect both content and accounts that don't meet these Recommendations Guidelines and to help us avoid recommending them. As always, content that goes against our Community Standards will be removed from Instagram.*" Stat. No. 84. This statement from Meta's website describes Meta's content-moderation policies and how Meta enforces these policies.

Courts have consistently held that Section 230 immunizes interactive computer services from claims—like the AGs' listed statements above—that challenge general descriptions of the "safety" of a service based on its content-moderation policies and practices. In *Grindr*, the Ninth Circuit held Section 230 barred a negligent misrepresentation claim based on a statement similar to those listed above. In that case, the plaintiff asserted that Grindr misrepresented "that it would maintain a 'safe and secure environment for its users' on the App but fail[ed] to do so." 128 F.4th at 1154. Because "Grindr's general

3

statement that the App is 'designed to create a safe and secure environment for its users,' is not a specific promise, but a description of its moderation policy," it was "protected from liability under § 230." *Id.*

*Glazer v. Meta* is similar. 2025 WL 2958810, at *5 (D. Md. Oct. 17, 2025). There, the plaintiff alleged that Meta had not removed postings on Facebook Marketplace by third parties selling purportedly counterfeit goods, in breach of its Terms of Service "in which Meta merely assures its users that it works to detect improper use of its websites and that it 'may take appropriate action' if it learns of any such misuse."[3] *Id.* at *5. The court held that this claim—based on terms similar to those underpinning many of the AGs' alleged misrepresentations—was barred by Section 230 because the plaintiff "failed to allege that Meta promised expressly to remove or otherwise address the fraudulent postings." *Id.*

In contrast, when an interactive computer service goes beyond describing its content-moderation and other policies and makes a *specific promise* to users, courts have permitted claims based on the failure to honor *that promise*. *Barnes v. Yahoo!, Inc.* provides the quintessential example of this rule. 570 F.3d 1096 (9th Cir. 2009). There, the plaintiff sued after Yahoo failed to remove specific fake profiles that a Yahoo employee had personally assured the plaintiff would be removed. *Id.* at 1098–99. Rather than challenging "a general monitoring policy," or Yahoo's "attempt to de-publish" third-party content—challenges barred by Section 230, as they would have imposed liability on Yahoo as a publisher of third-party content—the plaintiff sought to hold Yahoo liable "as a promisor who [] breached." *Id.* at 1107–08.

*Bride* follows the same logic. 112 F.4th at 1168. Defendant YOLO created an application where users could post content anonymously, and "informed all users that it would reveal the identities of, and ban, anyone who engaged in bullying or harassing behavior." *Id.* at 1172. Finding this specific promise to take specific action "sufficiently analogous to Yahoo's promise to remove an offensive profile," the court held that Section 230 did not bar the plaintiffs' breach of contract claims for failing to "unmask" or ban harassing users because "the underlying duty being invoked by the Plaintiffs . . . is the promise itself." *Id.* at 1173, 1178–79.

---

[3] Although *Glazer* involved a breach of contract claim, the court evaluated it consistent with the framework used to evaluate any challenge to a company's statements regarding its content-moderation policies because "the name of a cause of action is irrelevant to [Section 230] immunity." *Est. of Bride by & through Bride v. Yolo Techs., Inc.*, 112 F.4th 1168, 1178 (9th Cir. 2024).

Here, the statements the AGs challenge do not create a specific promise to users. Instead, each statement listed above either (1) directly summarizes Meta's content-moderation policies or, as in *Grindr*, (2) states that Facebook and Instagram are "safe" from harmful content. Not only does *Grindr* hold that Section 230 bars statements like these, because they are "description[s] of . . . moderation policy," but it also holds that these generic statements about "safety" are "too general to be enforced." 128 F.4th at 1154.

The statements the AGs identify are nothing like the specific promises at issue in *Barnes* and *Bride*. Meta does not make specific representations to users that its services will be free of policy-violating content or that it can prevent all harm. Just as in *Grindr*, the statements are not promises, but merely "general . . . description[s] of [Meta's] moderation policy." 128 F.4th at 1154. Because holding Meta liable for these statements, at its core, seeks to penalize Meta for failing to moderate third-party content, Section 230 bars the AGs from presenting evidence and argument about these statements at trial.

The AGs should also be prohibited from introducing evidence or argument about third-party content or features barred by Section 230 to prove these statements are misleading. This follows from *Grindr* itself. In *Grindr*, the plaintiff sought to hold Grindr liable for a generalized statement about the "safe[ty]" of its platform based on the theory that Grindr was not, in fact, safe because plaintiff met a sexual predator on Grindr. 128 F.4th at 1152. Because Section 230 barred this theory of harm—"that Grindr breached its duty not to design or manufacture defective products by failing to prevent a minor from being matched with predators"—it also barred any attempt by plaintiff to claim that Grindr's statements of safety were misleading. *Id.* at 1153–54. Doing so would hold Grindr liable for its role as a publisher or speaker of third-party content, and would violate Section 230. *Id.* at 1154. Here, too, should the AGs seek to prove that statements about the general "safety" of Facebook and Instagram are misleading by reference to third-party content or Meta's content-moderation policies, they would be seeking to hold Meta liable as a publisher of this third-party content. Established precedent prohibits this.

## II. The Court Should Exclude Statements That Can Be Proven Misleading Only by Evidence Relating to Third-Party Content or Barred Features.

The AGs cannot seek to prove that Meta's statements were deceptive or misleading based on evidence of third-party content, Meta's content-moderation practices, or features that cannot serve as the basis for liability under Section 230.

*First*, many of the AG's purported "misstatements" come directly from Meta's CSERs, transparency reports Meta issues to communicate the amount of policy-violating content that appeared on its services. *See* ECF 3103-1. These statements are:

- "One of the most significant metrics we provide in the Community Standards Enforcement Report is prevalence. . . . We consider prevalence to be a critical metric because it helps us measure how violations impact people on Facebook. We care most about how often content that violates our standards is actually seen relative to the total amount of times any content is seen on Facebook. This is similar to measuring concentration of pollutants in the air we breathe. When measuring air quality, environmental regulators look to see what percent of air is Nitrogen Dioxide to determine how much is harmful to people. Prevalence is the internet's equivalent--a measurement of what percent of times someone sees something that is harmful." Stat. No. 5.

- "Prevalence: The frequency at which content that violates our Community Standards was viewed." Stat. No. 6.

- "The key metrics in our [Community Standards Enforcement Reports], which together track how we are doing at enforcing our Community Standards, are: Prevalence . . . . We care most about how often content that violates our policies is actually seen by someone." Stat. No. 7.

- "In Q3 2019, this upper limit was 0.04%. Meaning that for each of these policies, out of every 10,000 views on Facebook or Instagram in Q3 2019, we estimate that no more than 4 of those views contained content that violated that policy." Stat. No. 12.

- From Q4 2020 CSER: "The prevalence of violent and graphic content also dropped from 0.07% to 0.05%." Stat. No. 16.

- "As a model, Facebook has been doing something to this effect for every quarter, where we report on the prevalence of each category of harmful content and how effective our systems are at identifying that content and removing it in advance." Stat. No. 19.

- "In Q3, the prevalence of bullying and harassment content was 0.14-0.15% or between 14 and 15 views of bullying and harassment content per 10,000 views of content on Facebook, and 0.05-0.06% or between 5 and 6 views per 10,000 views of content on Instagram." Stat. No. 59.

- "Another way to think of prevalence is how many views of violating content we didn't prevent -- either because we haven't caught the violations early enough or we missed them altogether." Stat. No. 80.

- Meta Community Standard Enforcement Reports reporting on prevalence numbers. Stat. No. 83.

*Any* evidence the AGs would need to put forward to disprove these statements—all of which summarize specific categories and numbers of policy-violating content that appeared on Meta's services—would necessarily need to rely on evidence of harmful third-party content that Meta purportedly failed to disclose. In other words, these statements could only be proven misleading through evidence of Meta's publication

of third-party content—publishing activity that falls squarely within Section 230 immunity. *See Bride*, 112 F.4th at 1180.

*Second*, the AGs include one statement that *some of* the content viewed by Molly Russell, a teenager in the UK who died by suicide, was "safe." *See* Stat. No. 66. But the AGs cannot attempt to prove this statement is misleading without either showing the third-party content itself or offering testimony describing that content, all of which would be barred by Section 230 because it involves Meta's publication of third-party content.

*Third*, the AGs seek to rely on multiple statements that could only be proven misleading by specific evidence tied to the function of features that are subject to Section 230 immunity:

- "And the way we design our algorithms is to encourage meaningful social interactions. . . ." Stat. No. 20.[4]

- "We tested hiding like counts to see if it might depressurize people's experience on Instagram. What we heard from people and experts was that not seeing like counts was beneficial for some, and annoying to others." Stat. No. 28.

- "[With respect to research regarding the impact of hiding like counts,] there was very little impact and the result was neutral." Stat. No. 29.

- ". . . We're also building similar technology to find and remove accounts belonging to people under the age of 13." Stat. No. 30.

- "If we see someone trying to, repeatedly, change the [birth] date to get past that [age screen], we actually will restrict their ability to access the app." Stat. No. 44.

- "We're building new technology to proactively find and remove accounts belonging to those under 13 and to identify those people who may be under the age of 13. . . . We train our technology to identify if people are above or below 18 using multiple signals. We look at things like wishing people a happy birthday and the age written in those messages." Stat. No. 63.

- "We haven't waited for regulation to continue making progress on our apps. Over the past several years, we've taken significant steps, including: . . . Using age verification technology to help teens have age-appropriate experiences. . . . Removing more content that violates our policies and making potentially sensitive content more difficult to find. . . . Offering tools for teens to spend more meaningful time online." Stat. No. 68.

This Court has already held that allegations relating to Meta's algorithm and "likes" are subject to Section 230 immunity. *See* MTD Order at 25. And, as Meta has explained in its separately filed Motion *in Limine* Number 5, any evidence about Meta's age-verification practices is similarly subject to Section

---

[4] Meta's motion addresses only the first statement in the AGs' compound statement number 20.

META'S MOTION IN LIMINE NO. 4 TO EXCLUDE EVIDENCE OF PUBLISHING ACTIVITIES OR BARRED FEATURES TO PROVE MISREPRESENTATION CLAIMS
4:22-md-03047-YGR; 4:23-cv-05448-YGR

230 immunity.[5]  Evidence that Meta's characterization of these immunized features is misleading or deceptive would necessarily require a challenge to the way that Meta publishes third-party content.  The AGs have made clear that—despite this Court's motion-to-dismiss ruling—they intend to introduce evidence that Meta should "remove certain addictive design features . . . including infinite scroll, autoplay, quantification of engagement (including 'likes'), ephemeral content, beauty and similar filters . . ., and engagement-optimized algorithms."  Notice by State AGs Regarding Injunctive Relief Sought, ECF 2724 at 2; *see also id.* at 2 (opining that Meta should "implement alternatives to engagement-based recommendation algorithms that prioritize well-being").  But the AGs cannot seek to prove that Meta's statements about its algorithm are deceptive by challenging the function or effects of its algorithm— because that inherently seeks to impose liability on Meta for its activities in publishing third-party content.

For the same reasons, the AGs cannot seek to prove misrepresentations based on Meta's characterization of its content-moderation policies, including its efforts to identify and remove third-party content involving child sexual abuse material ("CSAM") or commercial exploitation of children ("CSEC").  This includes, in particular, the following:

- Meta works "to ensure that Facebook remains a leader in online safety, including . . . combatting child exploitation."  Stat. No. 53
- Meta "use[s] sophisticated technology to proactively seek out abusive material."  Stat. No. 73.

No suit can seek to "hold[] companies responsible for moderating or failing to moderate content."  *Bride*, 112 F.4th at 1177, 1182.  "[T]he undisputed core of Section 230 immunity protects a website's moderation decisions, in its role as a 'publisher,' about which third-party content to remove and which to permit."  *Doe (K.B.) v. Backpage.com, LLC*, 768 F. Supp. 3d 1057, 1063 (N.D. Cal. 2025).  In any event, CSAM and CSEC evidence should be excluded under Rule 403 because its probative value—if any—is substantially outweighed by a danger of unfair prejudice.  The AGs' claims concern Meta's purported misrepresentations related to the design of its platforms, not certain categories of third-party content posted on them.  CSAM and CSEC evidence would contribute nothing to the jury's assessment of those claims; its only realistic function would be to shock and inflame the jury into rendering a verdict based on

---

[5] Evidence about Meta's age-verification practices is also barred by the First Amendment.  *See* Meta's Motion *in Limine* No. 5 at 10.

emotion. *See Old Chief v. United States*, 519 U.S. 172, 180 (1997). Further, in structuring its *limine* motions, Meta relied on the AGs' position that they were seeking to *exclude* evidence or argument related to Meta's content moderation policies involving CSAM and CSEC.[6] The AGs should be held to that position.

## CONCLUSION

For the foregoing reasons, Meta respectfully requests that the Court preclude the AGs from presenting evidence or argument that it made misrepresentations as to publishing activity subject to Section 230 immunity, or seeking to prove that Meta's statements were deceptive or misleading based on evidence of either third-party content, Meta's content-moderation practices, or features that cannot serve as the basis for liability under Section 230.

DATED: June 9, 2026

Respectfully submitted,

By:    */s/ Ashley M. Simonsen*

Ashley M. Simonsen (Bar No. 275203)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, California 90067
Telephone: (424) 332-4800
Facsimile: (424) 332-4749
Email: asimonsen@cov.com

---

[6] Under the Pretrial Order, the parties exchanged lists of priority *limine* motions on May 29 and opening briefs on June 3. One of the AGs' *limine* motions was a "Motion to Exclude Evidence of Meta's Efforts to Combat CSAM and CSE on Its Platforms," in which the AGs argued that such evidence is "irrelevant because the AGs do not assert claims regarding Meta's efforts to combat CSAM or CSE on the platforms." *See* Ex. L (AGs' opening brief for MIL No. 4). Meta proposed resolving that motion through a stipulation that "[n]either party will present evidence or argument related to CSAM, CSE, or grooming of children on Meta's platforms." The night before the filing deadline, however, the AGs advised that they would not file this motion, asserting that "it does not appear appropriate at this time to present these issues to the Court via either a motion or stipulation." In addition to being contrary to the Pretrial Order's requirement that "[a]ny motions in limine not resolved *shall be filed*," *see* § 4(b) (emphasis added), Meta relied on the AGs' position in structuring and selecting among its limine motions. Meta respectfully submits that the AGs should be bound by the positions taken in their opening brief for AG MIL No. 4 (Ex. L) and directed to complete conferrals on Meta's proposed stipulation.

META'S MOTION IN LIMINE NO. 4 TO EXCLUDE EVIDENCE OF PUBLISHING ACTIVITIES OR BARRED FEATURES TO PROVE MISREPRESENTATION CLAIMS
4:22-md-03047-YGR; 4:23-cv-05448-YGR

Paul W. Schmidt, *pro hac vice*
Timothy C. Hester, *pro hac vice*
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
Email: pschmidt@cov.com
Email: thester@cov.com


*Attorneys for Defendants Meta Platforms, Inc.
f/k/a Facebook, Inc. and Instagram, LLC*

10