# Exhibit A

CONFIDENTIAL

Page 1

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

IN RE: SOCIAL MEDIA ADOLESCENT

ADDICTION/PERSONAL INJURY

PRODUCTS LIABILITY LITIGATION

_____/

THIS DOCUMENT RELATES TO:

PEOPLE OF THE STATE OF

CALIFORNIA, et al.,

                    Plaintiffs,

v.                                CASE No. 4:22-MD-03047

                                        YGR (PHK)

META PLATFORMS, INC., et al.,    MDL No. 3047

                    Defendants.

_____/

        CONFIDENTIAL PURSUANT TO THE PROTECTIVE ORDER

  30(b)(6) VIDEOTAPED DEPOSITION OF AMOS HARTSTON, ESQ.

                SAN FRANCISCO, CALIFORNIA

                THURSDAY, AUGUST 7, 2025

STENOGRAPHICALLY REPORTED BY:

ANDREA M. IGNACIO, CSR, RPR, CRR, CCRR, CLR ~ CSR

LICENSE NO. 9830

JOB NO. 7506014

CONFIDENTIAL

Page 2

IN THE UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

---oOo---

IN RE: SOCIAL MEDIA ADOLESCENT

ADDICTION/PERSONAL INJURY

PRODUCTS LIABILITY LITIGATION

_____/

THIS DOCUMENT RELATES TO:

PEOPLE OF THE STATE OF

CALIFORNIA, et al.,

                    Plaintiffs,

v.                                  CASE No.  4:22-MD-03047

                                  YGR (PHK)

META PLATFORMS, INC., et al.,    MDL No. 3047

                 Defendants.

_____/

          30(b)(6) Videotaped Deposition of

Amos Hartston, Esq., taken on behalf of Defendants,

Pursuant to Notice, at the Department of California

Attorney General's Office, 455 Golden Gate Avenue,

Suite 1100, San Francisco, California, on

Thursday, August 6, 2025, beginning at 9:57 a.m.,

and ending at 7:44 p.m., before me,

ANDREA M. IGNACIO, CSR, RPR, CCRR, CRR, CLR ~

License No. 9830.

CONFIDENTIAL

Page 131

Services Agency. And I would probably include the --
well, let me say this: among others. I think others
might as well.

Q And obviously, there are some of these that
touch on issues of public health. Like the governor,
for example; right?

A Correct.

Q I understand you to have been listing the
ones that are primarily focused on public health?

A That's how I understood your question.

Q Okay. And that, I appreciate. That's how I
meant my question.

Do you understand the ambit of those three
agency -- wait. Did you list the California
Department of Health Care Services among those public
health organizations?

A Yes.

Q Okay. Do you understand the ambit of these
four agencies you've listed, the Behavioral Services
Commission, the Department of Health Care Services,
the Department of Public Health, and Health and Human
Services Agency, as including teen mental health?

MR. RUDDY: Objection; form.

THE WITNESS: Yes.

MR. SCHMIDT: Q. Do you know that they have

CONFIDENTIAL

Page 132

dedicated health care professionals working for them, like doctors and other health care providers?

A    I'm aware that some of them do.  I don't know about all of them.

Q    Do you know that some of these agencies -- and obvious examples, the Department of Education -- have educational experts working for them?

A    Yes.

Q    Do you know that some of these agencies have research scientists working for them?

A    Yes.

Q    Are you -- relevant to Topic 11 and other topics, can you point us to any consultation that the AG's office undertook with any of these agencies before filing its lawsuit?

MR. RUDDY:  Objection; preserving privilege.

THE WITNESS:  My understanding is that the attorney general's law enforcement investigations are confidential, so I do not know that I can answer that question.

And I pause because I am trying to think if I reviewed any documents in preparation for today.  So I do not believe I reviewed documents in preparation today that would identify that.

MR. SCHMIDT:  Okay.  My question is broader.

A    That's it.

Q    Okay.  Did you re- -- did -- did you receive Exhibit 5?

A    Yes.

Q    Did you read the documents that appear on Exhibit 5?

A    I reviewed them, yes.

Q    Had you reviewed them all before receiving Exhibit 5?

A    Many of them, but not all of them.

Q    Are they reflected on Exhibit 2?

A    Generally, yes.

Q    Okay.  Look with me, if you would, at Exhibit 2, and on page 7 -- actually, on page 6, you've got different Instagram, Facebook, X/Twitter pages listed.  Is that because we put them in our letter?

A    I did make these notes about these pages after receiving your letter, yes.

Q    All right.

Are there any changes that the attorney general's office or the State, more broadly, have made regarding the manner in which California officers or employees can post on Instagram or Facebook that result from either the State's investigation in this

CONFIDENTIAL

Page 138

case or its decision to bring and prosecute a lawsuit in this case?

MR. RUDDY:  Objection; scope.

THE WITNESS:  Not that I'm aware of.

MR. SCHMIDT:  Q.  You recognize that -- you're aware that the various -- a whole host of California agencies, officers, have Instagram and Facebook accounts that they post information relevant to their work for State of California on?

A    Sorry.  Was that a question?

Q    Uh-huh.

A    I am generally aware, yes.

Q    That includes the California attorney general's office?

A    Yes.

Q    Has the California Attorney General's office ever advised any part of California government that they should not use Instagram or Facebook?

MR. RUDDY:  Objection; beyond the scope; calls for attorney-client privileged communications.

MR. SCHMIDT:  Q.  And I'm still on Topic 1 here.

A    I am aware of communications about the risks of youth and the concerns of harm, but I do not recall any specific communications that I reviewed with

instructions not to use social media.

Q   What are the communications you're aware of?

A   Well, there's been letters and comments in support of proposed legislation.  There have been community meetings.  That's what I am thinking of.

Q   Has there been any specific guidance that the attorney general's office has provided to any part of California government to limit their use of Instagram and Facebook that you're aware of?

MR. RUDDY:  Maintain any attorney-client privilege.

Objection.

THE WITNESS:  Again, you're referring now to use by government officials or officers?

MR. SCHMIDT:  Yes.

THE WITNESS:  I do not recall reviewing any documents like that.

MR. SCHMIDT:  Q.  You've -- do you remember when we were talking about the two comms colleagues you talked with about analytics they get from Meta?

A   Yes.

Q   Is there other data that -- is there any other data you're aware of that California -- that the State gathers regarding the accounts they have on Facebook and Instagram?

Page 144

"I did not identify policies specific to the State's use of Facebook or Instagram."

Did I read that correctly?

A    Yes.

Q    So there's no State policies you're aware of that talk specifically about limitations using Facebook or Instagram; is that correct?

A    There are general social media policies, but I did not find any specific -- and there are references to Facebook and Instagram in policies, but I did not find any policies specific to Facebook or Instagram.

Q    No policies requiring that Facebook or Instagram be treated differently by State employees than any other social media or online service?

MR. RUDDY:  Objection; form.

THE WITNESS:  I did not see -- I did not find any such policies.

MR. SCHMIDT:  Q.  Did you find any policies that specifically addressed the design features you understand are being challenged in this litigation?

A    So I did review documents related to those design features, but I do not believe they fall under the policies, practices, or procedures of social media policies specifically.

Page 148

here?

MR. RUDDY:  Objection; form; beyond the scope.

THE WITNESS:  I believe the communications were more focused for Meta changing its design features that are known to be harmful to children.

MR. SCHMIDT:  Q.  Can you answer my question now?

MR. RUDDY:  Same objections.

MR. SCHMIDT:  Q.  My question is focused on: Are you aware of any statements from the attorney general's office, that California agencies should change their policies with respect to the social media design features at issue here?

MR. RUDDY:  Same objections.

THE WITNESS:  My -- my review of documents did include documents raising concerns about the design features, but they were more focused on Meta changing those design features, and the platforms Instagram and Facebook being addictive by design.  I do not recall seeing any specific instructions to other State officers.

MR. SCHMIDT:  Okay.  Move to strike everything other than "I do not recall seeing any specific instructions."

CONFIDENTIAL

Page 150

about youth, they usually use the terms, "youth," "children," "kids," "students."

I do not recall specific -- I understand under 13 is a -- something that's in a law, but I do not recall viewing documents in the term -- in -- with respect to social media policies that make the state- -- those types of distinction between age of youth.

MR. SCHMIDT:  Q.  Do you see one of the policies you reviewed is on page 3, and it is policy SIMM 66B, the California Technology Agency Social Media Standard?

A    I'm sorry.

Is that -- which -- which one are you referring to?

Q    Page 3.

A    Yes.

Q    SIMM 66B.

A    Yes.

Q    That's something you reviewed to prepare for your testimony?

A    It is, yes.

(Document marked Exhibit 6

for identification.)

MR. SCHMIDT:  I'll give you Exhibit 6, which

Page 151

is a copy of that policy.

Q   Do you recognize this as a copy of that policy?

MR. SCHMIDT:  Have you guys -- do you guys need a copy?  Okay.

THE WITNESS:  Yes.

MR. SCHMIDT:  Q.  And you're familiar with this policy?

A   Generally.  I did review it, yes.

Q   And this policy has never been withdrawn; right?

MR. RUDDY:  Objection; form.

THE WITNESS:  I believe it was last updated in April 2011, and I do not believe it's been withdrawn.

MR. SCHMIDT:  Let's look at the policy.

Q   Does this policy apply to the entire State of California?

MR. RUDDY:  Objection; form.

THE WITNESS:  Pardon me?

MR. SCHMIDT:  Probably a bad question.

Q   Does it apply to the AG's office?

A   So the AG's office would develop social media policies that comply with the -- the State -- let me rephrase that.

Page 152

My understanding is the Department of Justice in California has its own social media policies, but they do comply with any State requirements.

Q   Okay.  Is Exhibit 6 a State requirement that the attorney general's office has to comply with?

A   I -- I'm not certain, but I believe so, yes.

Q   Okay.  Let's look at page 3 of the policies.

Do you see that in the introduction it states:

"Agencies and departments are encouraged to use Social Media technologies to engage their customers and employees where appropriate"?

Did I read that correctly?

A   Yes.

Q   And do you understand that to be the policy of State of California?

A   I believe this SIMM 66B is among the policies of California, yeah.

Q   Including that agencies and departments are encouraged to use social media technologies to engage their customers and employees where appropriate?

A   Yes.

Q   Does the attorney general's office comply with that policy?

MR. RUDDY:  Objection; beyond the scope --

Page 173

Q   Do you agree about me, picking up on your answer now, that communication with youth can be a positive aspect of social media?

MR. RUDDY:  Objection; beyond the scope; calls for contention.

MR. SCHMIDT:  He literally said it was within the scope of his work, but okay.

THE WITNESS:  I did review documents --

MR. SCHMIDT:  Well --

THE WITNESS:  -- to indicate that.

MR. SCHMIDT:  -- because I -- because -- sorry.  I'll withdraw it.  Let me just re-ask.

Q   Can communicating with teens on Instagram and Facebook be positive from a mental, social, emotional, or behavioral health and well-being perspective?

MR. RUDDY:  Objection; beyond the scope; calls for expert testimony.

THE WITNESS:  Yes, but it comes with risks.

MR. SCHMIDT:  Okay.  I'm going to note I think the objections are abusive.  I don't know that I've had more than two or three questions in a row without objections.  We may have to take that to the Court if -- if it continues.

Let's look at another exhibit.  Mark this as Exhibit 8.

Page 174

(Document marked Exhibit 8

for identification.)

THE WITNESS:  Is yours marked?

MR. RUDDY:  No.  I think --

THE WITNESS:  This one is not marked.

MR. SCHMIDT:  It's just -- yeah.

THE WITNESS:  Oh, I missed it.  Thank you.

MR. SCHMIDT:  No worries.

Q    Have you seen this document which we've preidentified for you?

A    I did review this document, yes.

Q    Do you recognize this as a posting on Instagram from the California Department of Education?

A    I believe -- I don't see that reflected on this document, but that is my understanding, yes.

Q    Do you see where the account is CADEPTED?

A    Yes.

Q    And you understand they're talking about an educational topic here?

A    Yes.

Q    Is there anything about this post from the California Department of Education that is problematic to State of California?

MR. RUDDY:  Objection; form.

Can I just ask counsel to clarify.

CONFIDENTIAL

Page 175

The document you handed has language that says "more posts," so I'm not sure if you're referring to a single post or not.

MR. SCHMIDT:  Yeah, I am.

MR. RUDDY:  Okay.  Maybe you can clarify.

MR. SCHMIDT:  I think the way the feed is when you look at an individual post, it gives you the options to look at more posts, which is what you're seeing here.  So we have called that one post, and there are other posts that a user can look at, if they wish.

MR. RUDDY:  Okay.

MR. SCHMIDT:  Q.  So let me re-ask my question.

Q    Is there anything about this post from the California Department of Education that is problematic from the State's perspective?

MR. RUDDY:  Objection; beyond the scope.

THE WITNESS:  Not that I'm aware of.

MR. SCHMIDT:  Q.  Do you see where it has a call -- and I'm looking at the text of the post on the right.

It begins:

(As read):

"How's climate change impacting you in your

Page 176

community?"

Do you see that?

A    Yes.

Q    Does State of California recognize that climate change is having a meaningful impact on the well-being of teens?

MR. RUDDY:  Objection; beyond the scope.

THE WITNESS:  The well-being of everybody, yes.

MR. SCHMIDT:  Q.  Including teens?

A    Yes.

Q    And for the record, it's Topic 17(s).

Is it valuable to teen well-being for the Department of Education to be able to use Instagram to reach out to teens and engage with them on this issue of climate change?

MR. RUDDY:  Objection; scope.

And for the record, this document was not identified in connection with 17(s).

THE WITNESS:  So social media posts, including by the California Department of Education, is a way to communicate with the public, and it is obviously useful to them if they are using it.

MR. SCHMIDT:  Q.  And this is targeted specifically, if you look at the second paragraph, to

CONFIDENTIAL

Page 177

middle and high school students; do you see that?

A    I see the language, yes.

Q    Is there anything problematic about this post, from a COPPA perspective?

MR. RUDDY:  Objection; scope; calls for a legal conclusion, contention.

THE WITNESS:  I'm not sure I understand the question.  Do you mean COPPA -- COPPA is a law.  So are you talking about COPPA compliant by the California Department of Education?

MR. SCHMIDT:  Uh-huh.

THE WITNESS:  Not that I'm aware of, no.

MR. SCHMIDT:  Okay.

Q    And you understand middle students -- middle school students include under 13-year-olds?

A    I mean, this post might be to their parents as well.  But generally, my understanding is middle school students include children in those ages.

Q    Okay.  Can you tell from this post whether the California Department of Education is intending to specifically reach under 13-year-olds or their parents?

A    I personally don't know what their intent is, but I can read that language.

MR. SCHMIDT:  Okay.  Let's look at another

Page 189

Q    Let's go to page '3109.

Do you see where it says which --

(As read):

"What platforms will youth be most likely to use to find support?"

A    Question 2, yes.

Q    Yes.

And tied for the top platform, according to this research, that youths use to find support for bullying is Instagram; correct?

A    Yeah, I think this is based on the same interviews that you were talking about earlier.

Q    Yes.

A    But yes, TikTok and Instagram, yes.

Q    Are you aware of any contrary data that State of California has generated in any form showing that Instagram is not one of the top platforms youths turn to to find support for bullying?

MR. RUDDY:  Objection; scope; form.

THE WITNESS:  So just to clarify, I read this to say that that would be an effective method to reach youth.  I don't know that this is saying that youth are looking there for the support.

MR. SCHMIDT:  Q.  Can you read the -- the title of the question.

Page 190

A    Yeah.

(As read):

"What platforms will youth be most likely to use to find support?"

Q    And do you see that -- and what is the most likely platform that youth will -- what platform is tied for first for the platform youths are most likely to use to find support for bullying?

A    Instagram and TikTok.

Q    Okay.  Are you aware of any contrary data from State of California indicating that Instagram is not the top platform that youth would use to find support for bullying?

MR. RUDDY:  Objection; scope.

THE WITNESS:  Not that I'm aware.

MR. SCHMIDT:  Let's go to page '3111.

Q    You understand that -- before I do -- that the Mental Health Services Oversight and Accountability Commission is a public health organization of State of California?

MR. RUDDY:  Objection; scope.

THE WITNESS:  So it is a commission with members.  And so I would assume that qualifies as an organization, yes.

MR. SCHMIDT:  Q.  And it's focused on public

CONFIDENTIAL

Page 191

health; right?

A    Yes.

Q    And this public health organization of California on slide 43111 asked the question:  What does success look like once this anti-bullying initiative on social media is rolled out; correct?

A    Yes, I believe this is still in the context of the anti-bullying initiative.

Q    And what they measure success by are factors like platform interaction.  That's interaction with Instagram and other services; right?

A    Yes.

Q    And shares, that's sharing content on Instagram and -- and Facebook; correct?

A    I don't think it's limited to those, but --

Q    Among others?

A    -- yes.  Yes.

Q    Let's go to No. 14, please.  "Research Takeaway 3."

A    Okay.

Q    This says:

        (As read):

        "Ensure it's Always On and Meet them Where They Are."

        Do you see that?

CONFIDENTIAL

A    Yes.

Q    And it says:

"Bullying is sadly a 24/7 experience and this program therefore needs to have an 'always on' component, much like a crisis hotline."

Do you see that?

A    Yes.

Q    And then below, they reference content on TikTok and on Instagram, do you see that, as well as YouTube?

MR. RUDDY:  Objection; form.

THE WITNESS:  So are you talking about the quotes under the --

MR. SCHMIDT:  Yes.

THE WITNESS:  -- line you just read?

MR. SCHMIDT:  Yeah, from the committee member.

THE WITNESS:  Oh, from the committee member?

Yes.

MR. SCHMIDT:  Q.  As a witness for State of California, do you take any issue with a social media campaign on Instagram and other services that aims to have an always-on component that is 24/7?

MR. RUDDY:  Objection; form; beyond the scope; argumentative.

Page 193

THE WITNESS:  "Always on," do you mean reachable at any time of day?

MR. SCHMIDT:  Yes.

THE WITNESS:  I didn't review any documents or information that would take any issue with that.

MR. SCHMIDT:  Q.  And do you have any issue with that personally?

A   No.

MR. RUDDY:  Objection; beyond the scope.

MR. SCHMIDT:  Q.  Do you -- do you -- does the State recognize that there is value to teens being able to access services like anti-bullying services on a platform like Instagram 24/7?

MR. RUDDY:  Objection; scope.

THE WITNESS:  So I think this is different than the product design features at issue, including the addictive natures.  Are you referring to those features, or are you referring to something else?

MR. SCHMIDT:  Move to strike as nonresponsive, and can we mark that answer.

Q   My question is:  Does the State recognize that there is value to teens being able to access a service like Instagram and find anti-bullying content like this 24/7?

MR. RUDDY:  Objection; scope; form.

THE WITNESS:  I believe, yes, but it has some risks.

MR. SCHMIDT:  Let's look at the next exhibit, please.  You can put that to the side.

(Document marked Exhibit 11 for identification.)

MR. SCHMIDT:  And by and large, if it helps you at all in your organization with these individual documents, the ones that are not the notice and the ones you did not produce, the other ones, once I'm done with them, I'm probably done with them for good --

THE WITNESS:  Okay.

MR. SCHMIDT:  -- so if that helps you organize the piles in front of you.

Q    This is Exhibit 11.  Do you recognize this as one of the preidentified documents?

Which, for the record, is a "Mental Health Services Oversight and Accountability Commission Update Report" from August 2022 on the anti-bullying initiative.

A    Yes.

Q    This says, in the first sentence:

(As read):

"Too many people in" -- "too many people in

CONFIDENTIAL

Page 195

California face discrimination, violence, and abuse due to their race, ethnicity, language, culture, and country of origin."

Does the State agree with that statement?

MR. RUDDY:  Objection; beyond the scope.

THE WITNESS:  So I agree that's what the report says, and that --

MR. SCHMIDT:  That's not what I asked you.

Q    I asked you:  Does the State agree with that?

MR. RUDDY:  Objection; beyond the scope.

THE WITNESS:  I would assume so.

MR. SCHMIDT:  (As read):

"This negative treatment often is associated with bullying, hate, and harassment."

Does the State recognize that that kind of bullying, hate, and harassment occurs and it can cause a negative impact on teen mental health?

MR. RUDDY:  Objection; beyond the scope; calls for expert testimony; form.

THE WITNESS:  Yes, among other factors.

MR. SCHMIDT:  Q.  And in fact, this goes on to say:

(As read):

"These experiences take a significant toll on victims and communities by impacting emotional and

CONFIDENTIAL

Page 196

physical safety."

Did I read that correctly?

A    Yes.

Q    Do you recognize that as a true statement?

MR. RUDDY:  Objection; beyond the scope.

THE WITNESS:  Yes, among other factors.

MR. SCHMIDT:  Let's go to page 2.

Q    And you'll see this is a reference to the presentation we previously saw under "Contract Recommendations"; do you see that?

MR. RUDDY:  Objection; form.

THE WITNESS:  Yes.

MR. SCHMIDT:  Q.  It says:

(As read):

"On November 18, 2021," the date we saw in the prior document, "based on recommendations from the committee, the commission approved contracting for the following three strategies:"

Do you see that?

A    Yes.

Q    One of the strategies is the social media strategy; do you see that?

A    Yes.

Q    And if you look at the third sentence there, it says:

(As read):

"Content such as videos, written testimonials, and visual share holes will be created for major social media networks such as Instagram."

Do you see that?

A   Yes.

Q   Does the State -- do you recognize that there are various ways in which the State has used Instagram, this being one example of them, to try to improve teen mental health and well-being?

MR. RUDDY:  Objection; form.

THE WITNESS:  As a communication strategy, yes.

MR. SCHMIDT:  Q.  It then says, at the bottom:

(As read):

"Media Cause was chosen as a general contractor for the initiative based on demonstrated experience with similar social media campaigns and strategies, skills and professional services, and their mission to help those doing good do more."

Do you see that?

A   Yes.

Q   And so am I correct that State of California has hired companies that specialize in social media

Page 198

outreach to reach out to teens and try to help them out with mental health issues?

MR. RUDDY:  Objection; form.

THE WITNESS:  I believe Media Cause is not limited to social media.  I believe it's general communication, including -- that might include social media.  But with that caveat, I would say yes.

MR. SCHMIDT:  Let's look at '5574, please.

Q   Do you see that this is a Youth Engagement Report that is attached to this summary memo?

A   Yes.

Q   The Youth Engagement Report is from February 2022 by the Youth Leadership Institute; do you see that?

A   So I actually don't see specifically in this front document that it attaches it, but they are combined in the exhibit.

Q   Yeah.  Actually, I think the more accurate thing was these were both attached to a common e-mail.

A   Uh-huh.

Q   Do you -- have you seen this Youth Leadership Report from -- this Youth Leadership Institute report from February 2022 before in the materials we preidentified?

A   Yes.

Page 200

indicates the interviews were conducted through social media platforms.

Q   I didn't mean to say that they were.  So if I said that, that was a mistake.

I said on -- when I said "on social media," I meant regarding, not --

A   Okay.

Q   -- not through.  But that's a -- that's a fair response.

Do you see that they conducted youth interviews regarding social media platforms?

A   Yes.

Q   And the youth advisors identified Instagram as one of the top two platforms for youth engagement; is that correct?

A   Yes.

Q   Let's go to '5581.  Actually, let's go to page 7.  I'm sorry.

Do you see that they discussed racism and bullying?

A   Yes.

Q   And then do you see that among the recommendations on page 8, they have recommendations about developing content within specific content pillars?

CONFIDENTIAL

A    Yes.

Q    So they are talking about coming up with content for Instagram to help people with bullying, correct, based on interviewing youth, among others?

A    Yes.

MR. RUDDY:  Objection; form.

THE WITNESS:  This is part of the anti-bullying campaign.

MR. SCHMIDT:  Q.  And is that a positive thing?

MR. RUDDY:  Objection; form; beyond the scope.

THE WITNESS:  The anti-bullying campaign is a positive thing, yes.

MR. SCHMIDT:  Q.  Did you see anywhere in these documents about this anti-bullying campaign where they expressed any concern about bullying on social media, or social media companies' failure to stop bullying or purported failures to stop bullying?

MR. RUDDY:  Objection; the documents speak for themselves.

MR. SCHMIDT:  That's a frivolous objection and a coaching objection.

THE WITNESS:  So I did review documents in preparation for today that discussed bullying,

Page 209

Q    Are these the notes that you prepared to respond to Topics 3 and 4?

A    Yes.

Q    Topic 3 is:

(As read):

"Programs, initiatives, efforts, or actions proposed, taken by, or involving the State to encourage, promote, or discourage the use of Facebook or Instagram by individuals under the age of 18."

Correct?

A    Yes.

Q    Can you point me to any nonlegislative or litigation programs, initiatives, efforts, or actions proposed or taken by State of California to address -- to discourage the use of Facebook or Instagram by individuals under the age of 18?

A    I believe the materials I reviewed, separate from litigation or legislation, talk more about healthy use of social media as opposed to specifically encouraging or discouraging.

Q    So outside of passing a law or bringing a lawsuit, are you -- or advocating as a -- as a litigator, are you aware of any -- well, let me ask it differently.

Are you aware of any California state public

health authority that has taken any programs, initiatives, efforts, or actions to discourage the use of Facebook or Instagram by individuals under the age of 18?

A    So my understanding is, part of the State's actions include litigation and legislation, or proposed legislation.  But to the extent you are excluding those, as I said, I am familiar -- I did review some materials that talked about encouraging healthy use of social media.  And I do not know if that is included or not -- intentionally being excluded by your question.

Q    It is.

We can agree that healthy use of social media is a positive thing; right?

MR. RUDDY:  Objection; scope.

THE WITNESS:  Are you talking about under -- under-18 users?

MR. SCHMIDT:  Uh-huh.

THE WITNESS:  It can have benefits but also risks.

MR. SCHMIDT:  Q.  My question is -- I'm focusing on public health organizations, public health authorities in State of California.

Are you aware of any public health

Page 211

authorities that have specifically discouraged the use of Facebook or Instagram in California?

A   And I take it by your question, you are excluding efforts to encourage healthy use; is that right?

Q   Yeah.  Because I think we agree, healthy use is a good thing.

A   And also, did -- I think encouraging healthy use is also discouraging unhealthy use.  So I don't see them as exclusive.

So in my notes reflected on Exhibit 12, I did collect some examples of ment- -- in addition to litigation, legislation, and other advocacy, under the -- my heading "Mental Health Services," where I did see that social media was referenced in some of these materials, but I can't say with the way you answered -- asked that question if it's specifically discouraging use as opposed to encouraging healthy use.

Q   Okay.  So if we agree that encouraging healthy use of social media, or frankly, anything is a good thing, setting that aside, are you -- could you point us to any California public health authority that has discouraged the use of Instagram or Facebook?

(Sneezing.)

CONFIDENTIAL

Page 212

MR. SCHMIDT:  Bless you.

THE WITNESS:  By under-18 users?

MR. SCHMIDT:  Q.  By under-18 users.

A    I believe the surgeon general -- maybe that was the -- are you excluding the U.S. Surgeon General?

Q    I'm asking about California public health authorities.

A    Not that I can recall.

MR. SCHMIDT:  Let's mark our next exhibit.

(Document marked Exhibit 13 for identification.)

MR. SCHMIDT:  This will be 25, I believe. We'll jump right to 25.

Q    Have you had a chance to review a document we've marked as Exhibit 25, which is a PowerPoint presentation that was provided by the California Department of Public Health relating to a youth suicide prevention campaign?

A    The document you've handed me is marked as Exhibit 13.

Q    I wrote down the wrong number.  Let me ask again.

Have you had a chance to review Exhibit 13, a youth suicide prevention campaign PowerPoint produced by the California Department of Public Health?

Page 213

A    Yes.

Q    Do you know who Civilian is?

A    No.

Q    If you look at page 2, do you see that this campaign ran from March 2024 to June 2025?

A    Yes.

Q    And do you see the target audience of this California Department of Public Health campaign was people aged 14 to 25, that it included those?

A    The youth suicide prevention campaign, yes.

Q    Yes.

And if we go to page 3, do you see that, in the middle, one of the campaign objectives was to:

(As read):

"Increase awareness of relevant mental health and suicide prevention resources, services, support"?

A    Yes.

Q    Is that a good thing?

A    Yes.

Q    If you go to '5738, do you see that they gave a budget allocation for how they were going to spend their money on media?

A    Yes.

Q    And do you see that 12 percent of the budget went to spending on Instagram?

CONFIDENTIAL

Page 214

A    Yeah, I don't know if this was before or after it was spent, but that's what's reported here, yes.

Q    There's no spending on Facebook.  Do you know why that is?

A    No.

Q    Let me ask the question again.  Thank you for the answer.

Do you know why a youth suicide prevention campaign run by the California Department of Public Health did not focus on Facebook?

MR. RUDDY:  Objection; form.

THE WITNESS:  I do not know.

MR. SCHMIDT:  Q.  Do you know whether they made the judgment that youth don't use Facebook in meaningful numbers?

MR. RUDDY:  Objection; form; beyond the scope.

THE WITNESS:  I do not know.

MR. SCHMIDT:  Let's go to page '5740.

Q    Do you see that the money -- if you look under "Social Media," you'll see one of the companies is Instagram.  And then if you look over to the right, there is a column that says the budget for fiscal year '24/'25.  Do you see that?

CONFIDENTIAL

Page 215

A    Yes.

Q    And this youth suicide campaign involves spending over a half million dollars on Instagram; correct?

A    Yes.

Q    And so after the State filed its lawsuit, State public -- I'm sorry.  Strike that.

After the AG filed this lawsuit, a California public health authority budgeted over a half million to try to use Instagram to prevent youth suicide; correct?

MR. RUDDY:  Objection; form.

THE WITNESS:  Yes, it looks like in 2024 or 2025, the youth suicide prevention campaign included various media -- media, including Instagram.

MR. SCHMIDT:  Q.  And then if we go to page '5750, do you see that they have data on the different media they used to undertake this campaign, the Suicide Prevention Campaign?

MR. RUDDY:  Objection; form.

THE WITNESS:  Yes.

MR. SCHMIDT:  Q.  And they targeted Instagram to reach age 14 to 24; is that correct?

MR. RUDDY:  Objection; form.

THE WITNESS:  This document indicates age 14

Page 216

through 24, yes.

MR. SCHMIDT:  Q.  And there are other media channels targeted when they wanted to reach people younger than 14, including digital- and social display-connected TV and TikTok; do you see that?

A    I don't see anything here under 13.

Q    No, I said -- younger than 14, I said.

A    There are some references to the age 13 here, yes.

Q    If you go to page '760, do you see it discusses social media some more?

A    Yes.

Q    And then for Instagram, it has an Instagram overview and the surfaces on Instagram where the placement will occur?

A    Yes.

Q    Do you know the difference between news feed stories and reels?

A    Not specifically, no.

Q    Do you know whether news feed stories and reels include some of the features that are being challenged in this case?

MR. RUDDY:  Objection; scope.

THE WITNESS:  I do not personally, no.

MR. SCHMIDT:  Q.  Do you know of any

CONFIDENTIAL

Page 219

campaign?

A    I believe one of the budget items were -- were Instagram, among many other media sources, yes.

Q    Okay.  And do you view it as a positive thing to -- strike that.

Is it a positive thing to use social media as the California Department of Public Health did to try to reduce suicide?

MR. RUDDY:  Objection; beyond the scope.

THE WITNESS:  The documents I reviewed indicated that the Department of Public Health decided through their interviews with youth to try to meet youth where they are.  And since youth was on social media, that was one of the communication strategies that they decided to use.

MR. SCHMIDT:  Q.  Is using that communication strategy a good thing?

MR. RUDDY:  Objection; beyond the scope.

THE WITNESS:  If it -- if it helps prevent suicides, I would say yes.

MR. SCHMIDT:  Q.  As part of the State's investigation or as referenced in Topic 11 or its decision-making about whether to seek penalties or changes to Instagram and Facebook as referenced in Topic 12, are you aware that Meta, through Instagram

case and testimony generated in this case about instances where Meta's efforts have made a difference in people's lives in terms of issues like suicide, in terms of issues like eating disorders.

Have you studied those at all?

MR. RUDDY:  Objection; form and scope.

THE WITNESS:  So in the documents I reviewed, I believe any types of efforts of the companies are totally independent from the product features being challenged in this litigation.  So I spent most of my time focusing on -- I didn't review those in detail.

MR. SCHMIDT:  Q.  Does State of California recognize that Instagram and Facebook help some California teens who are dealing with issues like suicide and eating disorders?

MR. RUDDY:  Objection; beyond the scope; calls for contention.

THE WITNESS:  I -- I believe that is the case, but I don't have specifics.

MR. SCHMIDT:  Let's mark Exhibit 14 -- 15, please.

(Document marked Exhibit 15 for identification.)

MR. SCHMIDT:  This is another -- just -- sorry -- this is another preidentified exhibit.

CONFIDENTIAL

Page 222

Q   Have you seen this before?

A   Yes.

Q   Do you see that this is a document from the California Department of Public Health, a California public health agency?

A   Yes.

Q   If we look at -- and it's their social media strategic plan for 2024.

Do you see that?

A   Yes.

Q   Let's look at the "Executive Summary" on page 3.

This says:

(As read):

"Social media plays a pivotal role in advancing public health goals and establishing the California Department of Public Health (CDPH) as a trusted source of information."

Do you see that statement?

A   Yes.

Q   Do you agree with this statement from the California Department of Public Health that, among other things, social media plays a pivotal role in advancing public health goals?

A   Yes.

CONFIDENTIAL

Page 227

MR. SCHMIDT:  Q.  Let's go to page 24, which says S.M.A.R.T. Goals 2024.

A    So I think that title continues on.

Q    Oh.

A    Is this the page that --

Q    This is --

A    Okay.  I'm on the wrong one.

Q    It's like that.

A    Okay.  I got it.

Q    And for the record, it says "Increase follower engagement," and then it has specific engagement targets.

Do you see that?

A    Yes.

Q    Do you know what engagement is in reference to social media?

A    Generally, yes.

Q    What is it?

MR. RUDDY:  Objection; scope.

THE WITNESS:  My understanding is that it's when a user interacts with a post in some way.

MR. SCHMIDT:  Q.  And do you see that one of the goals of this campaign from the California Department of Public Health is to increase average engagement rate by 20 percent?

CONFIDENTIAL

Page 228

A    Yes.

Q    Do you view an effort to increase the engagement on social media by a certain amount as necessarily problematic?

MR. RUDDY:  Objection; scope.

THE WITNESS:  Not necessarily.

MR. SCHMIDT:  Q.  Let's look at slide 35, which is the second-to-last one, and it is "Social Media Challenges."

A    Okay.

Q    Now, just to orient ourselves, this is a document from the California Department of Health; correct?

MR. RUDDY:  Objection; form.

THE WITNESS:  Part of the -- part of the presentation, yes.

MR. SCHMIDT:  Q.  And it's a document that talks about public health issues; right?

A    The document?

Q    Yes.

A    It's a media strategic plan.  But the Department of -- Department -- I think it includes public health issues.  Yes.  It's Department of Public Health.

Q    Okay.  And it talks about using Instagram, in

Page 229

part, to reach teens; right?

    A    Among others, yes.

    Q    And here on slide 35, they talk about social media challenges; do you see that?

    A    Yes.

    Q    Here, where the California Department of Public Health talks about social media challenges, or anywhere else in this document, do they identify any potential harms that teenage users might receive from using Instagram?

        MR. RUDDY:  Objection; form.

        THE WITNESS:  I don't think that's what's meant by "social media challenges" here.

        MR. SCHMIDT:  Okay.

    Q    Can you answer my question, though?

        On this page, or anywhere else in this public health document from the California Department of Public Health, do they -- do they identify any harms that teenagers might face from using Instagram or Facebook?

        MR. RUDDY:  Objection; form.

        THE WITNESS:  Not in this publication.

        MR. SCHMIDT:  Q.  Are there any efforts you're aware of to prevent California public health agencies from working with Instagram or Facebook --

strike that.

Are there any public health -- I'm -- let me start again.

Are there any efforts you're aware of that have been undertaken to prevent California public health authorities from using Instagram or Facebook to try to reach teens to improve teen mental health?

MR. RUDDY:  Objection; scope and form.

THE WITNESS:  Not that I'm aware of.

MR. SCHMIDT:  Let's go to Topic 6 in the notice, and I don't have any notes for you for Topic 6.

Q   Are there any?

A   Yes.

MR. RUDDY:  Objection.

MR. SCHMIDT:  Oh, then maybe I just didn't see them.

It turns out I do have notes for your Topic 6.  I apologize for that.

Let's look at a document.

Could we get 31.  Sorry about that.

THE WITNESS:  That's all right.

MR. SCHMIDT:  You confused me by putting them together, which, apparently, is more than my small mind can track.

its findings to the legislature."

MR. SCHMIDT:  Okay.

Q   So as -- as far back as 2018, the State has been evaluating the effects of electronic media on youth; is that correct?

MR. RUDDY:  Objection; form.

THE WITNESS:  So these notes reflect legislation or policies specifically, but yes.  I think there have been, at least, proposed policies going back through 2018.

MR. SCHMIDT:  Let's look at Exhibit 22.  This is a statute that was approved by the governor on September 20th, 2024.  And it's called the Protecting Our Kids From Social Media Act [sic].

(Document marked Exhibit 22
 for identification.)

MR. SCHMIDT:  Q.  Are you familiar with this legislation?

A   Yes.

Q   And, in fact, is this legislation referenced in Exhibit -- in your notes in Exhibit 21?

A   Yes, it is.

Q   Okay.  Let's go to page 2.

Do you see that there are findings from the legislature?

Page 251

A   Yes.

Q   And the first finding is:

(As read):

"Social media provides an important tool for communication and information sharing."

And that it references people 13 to 17 using social media?

A   Yes.

Q   Does State of California recognize that social media provides an important tool for communication and information sharing, including for 13- to 17-year-olds?

A   Well, those are two separate sentences, but I think the answer is yes.

Q   Let's look at page 6.

If you look down near the bottom -- these are the most painful things in the world to read -- there's a subsection (b) under "27006."

A   I see it.

Q   Are you ready?

A   Yes.

Q   It says:

(As read):

"The attorney general shall adopt regulations to further the purposes of this chapter, including

topic is here, yes.

Q   Did you identify any State-published or State-funded research or studies that identified specific harms from Facebook or Instagram?

A   Not specifically for Facebook and Instagram, that I can recall.

Q   What about social media generally?  Did you identify any -- in the review you did to testify for the State -- on behalf of State-published or State-funded research or studies regarding individuals under the age 18, did you identify any studies that documented harm to people under the age of 18 from social media, generally?

A   Yes.

Q   Which ones were those?

A   So the ones that identified harms that you reference were not the ones that were State published or State funded.

Q   That's what I'm asking about --

A   Right.

Q   -- so let me re-ask my question.

Did you identify any State-published or State-funded research that identified specific harms to under-18 users from social media?

A   Not in the ones that were specifically State

published or funded that I reviewed.

Q   You did identify State-published and State-funded research that looks at causes of emotional/mental harm to users -- to people under the age of 18; correct?

A   I believe most, if not all, related to addressing mental health issues.  Not specifically causes of mental health issues.

Q   You didn't see studies who talked about COVID as a cause of mental health issues in people under 18?

A   I reviewed studies that talked about COVID exacerbating mental health issues, yes.

Q   Are you familiar with a term called "ACEs," adverse childhood events [sic]?

A   Yes.

Q   You didn't see studies published and funded by State of California identifying adverse childhood experiences as a cause of teen mental health challenges?

A   The documents that I recall reviewing talked about addressing mental health challenges, and including by people who experienced ACE or toxic stress, yes.

Q   Let's go back, if we could, to exhibit --

MR. SCHMIDT:  How long have we been going?

CONFIDENTIAL

Page 256

STENOGRAPHIC REPORTER:  Over an hour and a half.

MR. SCHMIDT:  Let's stop.  Let's take a break.

THE VIDEOGRAPHER:  Going off the record.  The time is 3:55 p.m.

(Recess taken.)

THE VIDEOGRAPHER:  Coming back on the record. The time is 4:15 p.m.

MR. SCHMIDT:  I'll pass you what I've marked as Exhibit 24, please, Mr. Hartston.

(Document marked Exhibit 24
          for identification.)

MR. SCHMIDT:  Q.  This is a 2024 report from the National Academies of Science on "Social Media and Adolescent Health."  Have you seen this before?

    A    Briefly, yes.

    Q    And can I get your notes on Topic 17, please, so I can mark that as an exhibit.

(Document marked Exhibit 25
          for identification.)

MR. SCHMIDT:  Topic 17 addresses -- I'm sorry.

    Q    Is your sticker for 17, 25?

    A    Yes.

Q   Exhibit -- your -- Topic 17 addresses the State's knowledge or understanding of certain factors that impacted the mental, social, emotional, or behavioral health and well-being of individuals under the age of 18; correct?

A   With respect to certain topics, yes.

Q   And one of the -- one of the sources you identify in answering that question is -- in fact, the last source is the National Academy of Science [sic] report that we've marked as Exhibit 24; correct?

MR. RUDDY:  Objection; form.

THE WITNESS:  I did add that to my notes after it was identified by you.

MR. SCHMIDT:  All right.  And that's what I was going to ask.  You say:

(As read):

"Citation provided by Meta."

Q   Was State of California aware of the National Academy of Sciences report prior to us identifying it to you in preparation for your deposition?

A   I did not review it in preparation for this deposition before it was provided -- the citation was provided to you.

Q   In preparing to give testimony for the State on its knowledge or understanding of certain factors

CONFIDENTIAL

Page 258

that impacted teen mental health and well-being, did you see any evidence that the State ever considered this National Academy of Sciences report that we marked as Exhibit 24?

MR. RUDDY:  Objection; scope.

THE WITNESS:  So I reviewed many documents that had citations to many different studies and reports, including the complaint in this matter, various letters, other documents.  I do not know one way or the other if this was one of the cited materials in those.  I didn't look at that closely.

MR. SCHMIDT:  Q.  Is there anything specific you saw that indicated to you that in the course of -- that -- that State of California ever considered this report --

MR. RUDDY:  Objection --

MR. SCHMIDT:  Q.  -- specifically?

MR. RUDDY:  Objection; form.

THE WITNESS:  Well, that's why I refer -- so there were many citations.  I'm just not sure if this was among them.

MR. SCHMIDT:  Q.  Are you familiar with the National Academy of Sciences?

A   Generally, yes.

Q   Do you recognize them as a reputable

Page 259

institution?

MR. RUDDY:  Objection; scope.

THE WITNESS:  Generally, yes.

MR. SCHMIDT:  Q.  If you'll look at the page of the document ending with the Bates No. '662, please.

A    Yes.

Q    Do you see that it states:

(As read):

"The National Academy of Sciences was established in 1863 by an act of Congress, signed by President Lincoln, as a private nongovernmental institution to advise the nation on issues relating to science and technology."

A    Yes.

Q    Is that your understanding of the function of the National Academy of Sciences?

A    Generally, yes.

Q    If you look at the next page, it talks about consensus study reports.

Do you see that?

A    Yes.

Q    And do you recognize that what we've marked as Exhibit 24 is a consensus study report?

A    Yes.

Page 260

Q   Do you see in the last sentence under "Consensus Study Reports," it says:

(As read):

"Each report has been subjected to a rigorous and independent peer review process, and it represents the position of the National Academies on the statement of task."

Do you see that?

A   Yes.

Q   And do you have any question that that's an accurate statement as applied to this consensus report, that it has been subjected to a rigorous and independent peer review process?

MR. RUDDY:  Objection; scope.

THE WITNESS:  I don't have any reason to doubt that.

MR. SCHMIDT:  Q.  Let's go to page '751, please, again, using the Bates number.

Do you see that there is a figure on page '751 at the top, Figure 3-1?

A   Yes.

Q   And this is reporting the percentage of U.S. teens age 13 to 17 years who say social media has had a mostly positive, neutral, or mostly negative effect on them personally.

Do you see that?

A    That's what it says, yes.

Q    And if you look at the data, it says that the number who report mostly positive is 32 percent, neither positive or negative is 59 percent, and mostly negative is 9 percent.

Do you see that?

A    Yes.

Q    So according to this data, over three times as many teens report that social media is mostly positive then report that it's mostly negative; is that correct?

A    That's what --

MR. RUDDY:  Objection; form.

THE WITNESS:   -- that's what the teens themselves reported.  That's what it appears, yes.

MR. SCHMIDT:  Q.  And over 90 percent of them report either having a mostly positive experience or a neutral experience; correct?

A    I think this is what teens are self-reporting, yes.

Q    Do you take any issue with the accuracy of that data that over 90 percent of teens have a mostly positive or neutral experience on social media?

MR. RUDDY:  Objection; scope.

Page 262

THE WITNESS:  I --

MR. RUDDY:  Calls for contention; expert testimony.

THE WITNESS:  -- I don't take issue with that's what the teens are self-reporting, no.

MR. SCHMIDT:  Q.  Do you take -- are you aware of any other data from teens known to State of California showing that less than 90 percent of teens have a mostly positive or neutral experience on social media?

MR. RUDDY:  Objection; scope; calls for contention; expert testimony.

THE WITNESS:  I have reviewed many documents raising concerns about social media addiction and time spent online.  I do not know that that would be reflected in self-reporting by teens.

MR. SCHMIDT:  My question is different.

Q   My question is:  This data tells us that according to -- according to this data, teens report having -- over 90 percent of teens report having mostly positive or neutral experiences on social media; correct?

A   Correct.

Q   Are you aware of any data known to State of California where less than 90 percent of teens report

Page 263

having mostly positive or neutral experiences on social media?

MR. RUDDY:  Objection; scope; contention; calls for expert testimony; and to the extent it calls for attorney work product.

THE WITNESS:  Sitting here now, I do not recall any other studies that report on teen self-reporting of social media experiences.

MR. SCHMIDT:  Q.  Let's go to '771.

Do you see -- this is page 94 of the report.

A    Yes.

Q    And if you look at the second paragraph, it says:

(As read):

"The committee's review of the literature presented in this chapter and Appendix C did not support the conclusion that social media causes changes in adolescent health at the population level."

Did I read that correctly?

A    Yes.

Q    From your work preparing to testify in this case, including on Topic 11, any investigations or inquiries by the State into Facebook or Instagram, and including on Topic 17, which is whether the State's

CONFIDENTIAL

A    Yes.

MR. RUDDY:  Objection; scope.

THE WITNESS:  (Coughing.)  Excuse me.

MR. SCHMIDT:  Let me know if you need a second.

THE WITNESS:  I'm okay.

MR. SCHMIDT:  Okay.

Q    It then says:

(As read):

"Mental health is clearly deteriorated for substantial numbers of youth."

Do you see that?

A    Yes.

Q    Is that a serious concern?

MR. RUDDY:  Objection; scope.

THE WITNESS:  Yes.

MR. SCHMIDT:  Q.  If you then go down, there's a sentence that begins "again."

Do you see that?

A    Yes.

Q    (As read):

"Pandemic-related conditions, school building closures, disruption of youth support networks, and social isolations contributed to these trends."

Do you see that?

Page 276

A    Yes.

Q    Do you recognize that as a true statement, that pandemic-related conditions, including school building closures, disruption of youth support networks, and social isolation contributed to these trends of mental health problems among high school students and youth?

A    I don't have any basis to dispute that. Excuse me.

Q    Do you recognize it as true?

A    Yes.

Q    Go to the next page.

It then talks about taking steps to address these -- strike that.

Do you -- do you recognize that at least part of this report involves trying to at least consider things that might be impacting teen mental health?

A    In the context of schools, yes.

Q    Yes.

Then if you go to the next page, do you see that part of the purpose of this report is to talk about efforts that can be make -- made to address the mental health needs of California youth?

A    In the context of schools, yes.

Q    And, in fact, it says:

Page 280

A    Okay.

Q    This report states:

(As read):

"The pandemic and associated school building closures disrupted students' interactions and relationships with their peers, teachers, and school staff, disrupted family life, exposed students to economic hardship and family illness, and reduced student engagement in both educational, extracurricular, and social activities.  These results confirm concerns about the adverse effects of these conditions on student learning, mental health, and wellness."

Did I read that correctly?

A    Yes.

Q    Do you agree with that statement?

MR. RUDDY:  Objection; scope.

THE WITNESS:  Yeah, in the context of this paragraph where it says "some of these trends are undoubtedly related to the pandemic-related conditions," I think that is correct, yes.

MR. SCHMIDT:  Q.  Are you aware of any analysis any public health agencies have done in State of California to see whether this deterioration in teen mental health would have been the same but for

CONFIDENTIAL

Page 281

the pandemic?

MR. RUDDY:  Objection; form.

THE WITNESS:  I have seen reports that indicate COVID-19 has exacerbated mental health issues.  I interpret that to mean -- my personal understanding is that these mental health issues might not have been increasing at the same pace absent COVID-19, but there are other factors.

MR. SCHMIDT:  Okay.  Let's do this one.

I'll mark Tab 42 as an exhibit.

(Document marked Exhibit 28

 for identification.)

MR. SCHMIDT:  And this will be Exhibit 28.

Q   Handing you the:

(As read):

"California Surgeon General's Report on Adverse Childhood Experiences, Toxic Stress, and Health Roadmap for Resilience."

December 9, 2020.

Are you familiar with this report that was preidentified?

A   Yes.

Q   While she's getting that, I'll just ask you a general question.

Here, we just saw a report that talked about

Page 283

MR. RUDDY:  Objection; form.

THE WITNESS:  December 2020, yes.

MR. SCHMIDT:  Q.  And if we go to the third page, there is a letter from Governor Newsom included in this report.

Do you see that?

A    Yes.

Q    He says:

(As read):

"In one of my first acts as governor, I established the role of California Surgeon General."

Do you see that?

A    Yes.

Q    And part of the reason he explains he did that is because -- and I'm looking at the third line:

(As read):

"Addressing persistent challenges to the health and welfare of the people of our state, especially that of the youngest Californians, was an essential priority."

A    I apologize.  I did not follow that.  Could you say where you are again.

Q    Yeah, one of the reasons --

A    Sorry.  Which page are you on?

Q    I'm still on page ending '768.

Page 284

A    Okay.  That's why.

Q    And if you look at the third line of the governor's note, one of the reasons he created the role of California's attorney general [sic] was because:

(As read):

"Addressing persistent challenges to the health and welfare of the people of our state, especially that of the youngest Californians, was an essential priority."

Is that correct?

A    That's what it says, yes.

Q    And he says:

(As read):

"We led with the overwhelming scientific consensus that upstream factors, including toxic stress and social determinants of health, are the root causes of many of the most harmful and persistent health challenges."

Do you see that statement?

A    Yes.

Q    Do you recognize that as a true statement from Governor Newsom?

MR. RUDDY:  Objection; scope.

THE WITNESS:  I believe he is reflecting on

what experts said, so yes.

MR. SCHMIDT:  Q.  Let's look at page -- the next page of this letter, '769 of the document.

He says:

(As read):

"As we collectively face an unprecedented set of confluence of challenges" --

And then he identifies:

(As read):

"The COVID-19 pandemic, the ensuing economic recession, our ongoing national reckoning on racial injustice, devastating wildfires exacerbated by climate change."

Do you see that?

A    Yes.

Q    Do you recognize that all of those factors, the pandemic, recession, the ongoing national reckoning on racial injustice, devastating wildfires exacerbated by climate change, have negative effects on teen mental health?

MR. RUDDY:  Objection; scope; calls for expert testimony.

THE WITNESS:  Among other things, yes.

MR. SCHMIDT:  Q.  Let's look at page '801.

Do you -- do you -- does State of California

CONFIDENTIAL

Page 286

recognize the California Surgeon General as an important public health official in California?

MR. RUDDY: Objection; form.

THE WITNESS: Yes.

MR. SCHMIDT: Q. Is there any more important public health official in State of California than the California Surgeon General that you're aware of?

MR. RUDDY: Objection; form.

THE WITNESS: I have not seen any ranking. There are other public health officials.

MR. SCHMIDT: Q. Is there any public health official in State of California who you would identify as more important than the California Surgeon General?

MR. RUDDY: Objection; scope.

THE WITNESS: I haven't seen any rankings. But for me personally, I was not familiar with the California surgeon general's office before preparation for this deposition.

MR. SCHMIDT: Q. You were not?

A No.

Q Let's look at page '801.

Do you see this section of the report talks about adverse childhood experiences and toxic stress?

A Yes. I -- I believe that's the whole -- the whole report is on that topic, yes.

Q   Well, the whole report is on adverse childhood experiences, toxic stress, and health; correct?

A   I believe the report is talking about the impacts adverse childhood experience and toxic stress have on health, yes.

Q   Okay.  Do you see where she says:

(As read):

"Adverse childhood experiences and toxic stress represent an urgent public health crisis with wide-reaching health and societal impacts."

A   Yes.

Q   (As read):

"ACEs affect millions of Californians, and resulting toxic stress is a root cause of many chronic health and societal challenges."

Did I read that correctly?

A   Yes.

Q   Do you recognize those as true statements?

MR. RUDDY:  Objection; scope.

THE WITNESS:  I'm not an expert on those issues, but I have no reason to doubt the California Surgeon General's report.

MR. SCHMIDT:  Q.  Are you aware of any California public health officials that have said that

CONFIDENTIAL

Page 301

marker for footnotes 3 to 5 towards the end?

A    Sorry.  I do not.  I see 6 through 12.

Q    It's the sentence before that.

A    Yes.

Q    Right after that, it reads:

(As read):

"High doses of adversity occurring early in life without adequate buffering protections of trusted caregivers in safe stable environments may lead to prolonged activation of a biological stress response and changes in brain structure and function."

Did I read that correctly?

A    Yes.

Q    Do you accept that as a true statement?

MR. RUDDY:  Objection; scope.

THE WITNESS:  So it's a partial statement. The sentence continues, but yes.

MR. SCHMIDT:  Q.  Let's look at '857.

It says:

(As read):

"Adverse childhood experiences such as child abuse, neglect, and household challenges like family member incarceration or intimate partner violence, are very common, affecting 62 percent of California adults by age 18 years.  Approximately 16 percent of

Californians report experiencing four or more ACEs."

Do you take any issue with the accuracy of that data?

MR. RUDDY:  Objection; scope.

THE WITNESS:  I have no basis to challenge that.

MR. SCHMIDT:  Q.  And do you recognize that that can cause serious mental health challenges for people who have those experiences?

MR. RUDDY:  Objection; scope.

THE WITNESS:  I think the point of this report is that it could also lead to physical health issues.

MR. SCHMIDT:  Q.  Can it also lead to mental health issues?

A   I don't know, but I assume so, yes.

Q   Does this report identify social media as a source of ACEs or toxic stress?

A   I'm not sure that that question makes sense.

Q   Why is that?

A   Because ACEs -- my understanding of ACEs is that's a defined term that includes certain childhood experiences.

Q   Unrelated to social media?

MR. RUDDY:  Objection; form.

MR. RUDDY:  Scope.

THE WITNESS:  The documents I reviewed did not present it as an either/or, or in that simplistic fashion.  The documents I reviewed suggested that mental health was a little bit more complicated than that.

MR. SCHMIDT:  Okay.

Q   Do you know whether social media causes depression, as opposed to depression causing social media use?

MR. RUDDY:  Objection; scope; calls for expert testimony.

THE WITNESS:  I don't believe those two to be exclusive.

MR. SCHMIDT:  Q.  Do you know whether social media causes depression independent of people who are suffering from depression using social -- using -- use social media more?

MR. RUDDY:  Objection; scope; calls for expert opinion --

THE WITNESS:  I'm not an expert --

STENOGRAPHIC REPORTER:  One moment.  "Expert..."  I'm sorry.  Double-talk.

MR. SCHMIDT:  Yeah, I think the --

MR. RUDDY:  The --

Page 318

MR. SCHMIDT:  -- compound serial objections are making the record a lot harder.

STENOGRAPHIC REPORTER:  Did you finish your objection?

MR. RUDDY:  The objection is that it calls for expert testimony; it is beyond the scope.

MR. SCHMIDT:  Q.  Do you have my question? Do you need me to repeat it?

A    I recall the question.

Q    Okay.

A    I was saying that I am not an expert in that, so I don't know, but I believe there's expert re- -- engaged in this litigation.

Q    Are you aware that there's actually -- when you said there was association between social media and depression, that there's actually conflicting results over whether such an association exists?

MR. RUDDY:  Objection; scope.

THE WITNESS:  I reviewed many documents and studies that referenced the link between social media use and mental health issues.  I do not recall specifically if they use the term "cause" or "exacerbate" -- "exacerbate" or "associate."  I did not read it in that much detail.

MR. SCHMIDT:  Q.  Well, have you seen any

CONFIDENTIAL

Page 319

scientific study that concludes that social media causes depression, as opposed to there being an association?

A    As I --

MR. RUDDY:  Objection; form and scope.

THE WITNESS:  As I said, I'm not an expert. I did review studies, but I do not recall specifically about the terminology in that much detail.

MR. SCHMIDT:  Q.  When you read the studies, did you see the reference to the fact that there are conflicting findings regarding whether social media is associated with depression?

A    I do not recall that.

Q    Do you -- did you see when you read those studies that they talk about how the effect sizes, when they are seen, are small and they go in both directions?

MR. RUDDY:  Objection; form; scope.

THE WITNESS:  I do not specifically recall that.

MR. SCHMIDT:  Q.  Do you -- can you name any studies that you would point us to that show an association between social media and depression?

MR. RUDDY:  Objection; form; scope.

THE WITNESS:  Yes.

Page 326

understanding, of suicide risk.  But other than that, I can't recall any.

MR. SCHMIDT:  Q.  Where did Never a Bother say that unhealthy use of social media was a cause of suicide?

It never said that; had they?

A   So my review of the suicide prevention documents, which included Never a Bother, and there may have been other youth suicide prevention initiatives, do include promotion of healthy use of social media as a way to address risks of suicide.  I do not recall any specific language about causing suicide.

Q   Okay.  Are you aware of any California public health agency that has specifically said that social media causes a specific mental health harm?

MR. RUDDY:  Objection; form.

THE WITNESS:  Not that I recall using that specific language.

MR. SCHMIDT:  Q.  Are you aware of any California public health agency or entity that has concluded that there is a recognized mental health condition of social media addiction?

MR. RUDDY:  Objection; scope; form.

THE WITNESS:  Not that I'm aware of.

Page 327

MR. SCHMIDT:  Q.  Let's turn to page -- actually, let's stay on page 57.

A    Are we on Exhibit 31?

Q    Yeah.

Do you see that they list major protective factors for suicide?

A    So sorry.  What page are you on?

Q    I'm still on page '1029, please.

A    Okay.  What was your question?

Q    Do you see where they list major protective factors for suicide?

A    Yes.

Q    Those are things that help protect against suicide; correct?

A    Reduce risk, yes.

Q    One is effective mental health care; right?

A    Yes.

Q    One is connectedness to people, family, community, and social institutions; right?

A    Yes.

Q    And you recognize that people can have connectedness to people, family, community, and social intuitions through social media; right?

MR. RUDDY:  Objection; scope.

THE WITNESS:  Yes.

CONFIDENTIAL

Page 328

MR. SCHMIDT:  Q.  So do you recognize that social media can be a protective factor against suicide by allowing people to have connectedness to family, community, and social institutions?

MR. RUDDY:  Objection; scope; calls for expert testimony.

THE WITNESS:  Yes.

MR. SCHMIDT:  Let's go to another exhibit, please.  We did this already; right?

Q    Let's go ahead and talk about Topic 19, please.  Would you mind passing me your notes on Topic 19.

A    I'll just take a look.  There you go.

Q    Thank you.

(Document marked Exhibit 32
for identification.)

MR. SCHMIDT:  We'll mark your notes on Topic 19 as Exhibit 32.  Thank you.

Q    One of the topics you're here to testify about on behalf of State of California is budgeted and actual expenditures by the State related to the mental, social, emotional, or behavioral health and well-being of individuals under the age of 18; correct?

A    Yes.

CONFIDENTIAL

Page 338

disorders?

MR. RUDDY:  Objection; scope.

THE WITNESS:  I'm not sure I understand the question for State of California, but I am aware of efforts to regulate it, based on those types of concerns.

MR. SCHMIDT:  I understand your point on concerns.

Q   Do you know if State of California has a view that social media causes eating disorders or suicide, that you have seen in a document?

A   I don't specifically recall any documents talking about cause in the way you're asking.

Q   Do you know if Facebook has those cosmetic surgery filters you're talking about?

A   Currently?

Q   Yes.

A   I do not know.

Q   Do you know if it's ever had them?

A   I reviewed documents discussing those filters in the context of this case, but I do not specifically recall if there was a distinction between Instagram and Facebook.  I do know that Meta has used them, yes.

Q   Do you know if Meta has used them, or if Meta has allowed people to create them?

Page 367

Gun Owners case was that California submitted an amicus brief in that litigation related to Second Amendment and regulation of purchases of guns by people under the age of 18.

MR. SCHMIDT:  Q.  Does State of California recognize that access to guns can cause physical harms to people under the age of 18?

A    Yes.

Q    Does State of California recognize that access to guns can cause mental health harm to youth -- to people under the age of 18?

A    Generally, yes.

Q    Let's talk about Juul.  What do you understand to be the State's involvement in Juul litigation, J-U-U-L?

A    My -- I reviewed documents to prepare for my testimony today.  And I did review both a complaint and I believe a settlement agreement related to allegations that Juul was illegally advertising and promoting its tobacco products to underage users who are not allowed to purchase them.

Q    Does State of California consider tobacco to be an addictive substance?

MR. RUDDY:  Objection; scope; calls for expert testimony.

THE WITNESS:  Tobacco products including nicotine, I believe, has addictive properties, yes.

MR. SCHMIDT:  Q.  Does State of California recognize that tobacco causes physical harm to people under the age of 18 who use it?

A    Yes.

Q    Does State of California recognize that tobacco causes mental health harms to people under the age of 18 who use it?

A    I do not know.

Q    Did State of California allege in the Juul litigation that tobacco -- use of tobacco products caused mental health harms to teens under the age of 18?

A    I do not recall.

MR. SCHMIDT:  Let's go to -- let's go to your notes on Topic 22.  Can we mark that as an exhibit.

(Document marked Exhibit 36 for identification.)

MR. SCHMIDT:  Marked as Exhibit 36 your topics -- your notes on Topic 22.

Q    Are you here to testify about the policies and procedures for document or data retention, preservation, destruction, or disposal applicable to the State?

Page 383

would not be reflective.  I think there's other places that consumers would be expected to submit their complaints.

        MR. SCHMIDT:  Move to strike everything after "I don't know."

        Q    Topic 15 addresses studies and research that the State has supported, correct, among other things?

        A    Yes.

        Q    Topic 8 also addresses studies or research that the State has supported; correct?

        A    Yes.

        Q    Are you aware of any studies or research that the State has supported that specifically assess whether social media causes depression?

        A    I did not review any specifically State-funded or State-published reports.

        Q    Are you aware of any studies that the State has funded that specifically assess whether social media causes addiction?

        A    Addiction to social media?

        Q    Uh-huh.

        A    I reviewed a number of reports about that, but I do not recall that any of them were State-published or State-funded.

        Q    Do you -- did you see any -- are you aware of

CONFIDENTIAL

any California funded or supported studies that evaluate whether social media causes suicide or eating disorders?

A   I did -- I did not review any studies that talked about the cause of eating disorders that I can recall that were State-funded or State-published.

Q   Or suicide?

Let me ask my question precisely to help us get through this.  This will be my last question if we get an answer.

Did you see any studies that State of California specifically funded or supported to -- that were designed to evaluate whether social media causes suicide?

A   Not that I recall.

MR. SCHMIDT:  Okay.  We had -- we've been going a long time.  It is 7:41 at night.  It's getting dark, and we've had concerns raised about security in this area.

I am going to break for the day.  I may be done.  I may come back to counsel for the State and seek more time, including given the range of topics and the nature of some of the answers I received, and the fact that we got identification of notes this morning and did not have time to reasonably process