# Exhibit F

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Case No. 4:22-MD-03047-YGR (PHK)
MDL No. 3047

IN RE:  SOCIAL MEDIA ADOLESCENT
ADDICTION/PERSONAL INJURY PRODUCTS
LIABILITY LITIGATION
_____

PEOPLE OF THE
STATE OF CALIFORNIA, et al.,

   PLAINTIFFS,

vs.                          Case No. 4:23-cv-05448

META PLATFORMS, INC., et al.,

   DEFENDANTS.
_____

DEPOSITION OF:
ZACHARY RICHARDS (30)(b)(6)
CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

_____

The videotaped deposition of 30(b)(6) witness,
Zachary Richards, was taken before Janine N. Leroux,
Stenographic Court Reporter and Notary Public in and
for the State of Kentucky at 1024 Capital Center
Drive, Frankfort, Kentucky, commencing on August
19th, 2025, at the approximate hour of 9:34 a.m.

Job No. MDLG7511482

CONFIDENTIAL

Page 26

research assistant role, and that was a part-time student work-study paid position, so I think it was about 20 hours a week, give or take.

When I began teaching it would have been 2018, just after law school. That would have been summer programming, June through end of July, 50 hours -- I mean all day in class all around.

And then since teaching -- since growing up and really becoming a lawyer, my classes are two and a half hours on Saturdays and I have an hour of office hours and then plus prep time, maybe five hours a week currently.

Q. Would you consider yourself an expert on mental health issues?

MR. COCANOUGHER: Object to form.

A. No. I certainly am not.

Q. So I want to go back to Exhibit 1 for a second. It's the deposition notice. And you are aware that as part of this deposition, Meta has noticed the Plaintiff, the Commonwealth of Kentucky, correct?

MR. COCANOUGHER: Object to form.

A. I am aware of that, yes.

Q. And you are prepared to testify today on behalf of the Commonwealth of Kentucky on

Page 94

extent that your answer would require you to reveal work product, I'd instruct not to answer.

A.    So I understand your question is broader.  You know, you're asking about social media platforms without identifying any of them. But we just walked through my understanding of the social media, and my answer is the same.  I can't answer without revealing privileged information.

Q.    So the answer could be yes, but you can't tell me that because if you tell me that, that would be privileged.  Is that what you're saying?

MR. COCANOUGHER:  Object to form.

Q.    You can answer.

A.    The answer could be yes or no, and I'm telling you because of privileged information.

Q.    Okay.  You understand that the Commonwealth has sued Meta for violations of COPPA, correct?

A.    Yes.

MR. COCANOUGHER:  Object to form.

Q.    You know -- are you aware of how COPPA works?

MR. COCANOUGHER:  Object to form.

A.    At a very, very, very high level.

Q.    Are you aware that COPPA applies to a service that goes by a specific under 13 user and does remove them?

MR. COCANOUGHER:  Object to form.

A.    Without the specific contour -- like I think there could be a lot baked into that, but I think at a very general level that is consistent with my understanding.

Q.    Well, why don't I ask you this:  What is your understanding of how COPPA works?

A.    Sure.  Again, very high level, so I'm sure there are smarter attorneys who know what this is.  I think at a very high level, COPPA applies to prohibit the collection of information of individuals under age 13.  There's some aspects about, you know, whether the platform knows or reasonably knows that someone is under 13.

There's an aspect of verified parental consent I think is the lingo that gets used in the statute.  But I think at a general level COPPA protects the collection of -- against the collection of information for people under 13 subject to some other factors or conditions.

Q.    So are you -- does -- COPPA applies if

Page 96

a service is directed to children, correct?

MR. COCANOUGHER:  Object to form, scope.

Q.    You can answer.

A.    I -- that is not inconsistent with my understanding.  I don't know if there's layers to that or additional context I'm unfamiliar with.  Like I haven't read all the cases about COPPA interpreting what it means and requires, but I can grant you that for purposes of questioning, I think that's generally accurate.

Q.    And children in my question was referencing, you know, children under 13 specifically.

A.    Okay.

Q.    Is it your understanding that COPPA applies if a service is directed to individuals under the age of 13?

MR. COCANOUGHER:  Object to form, scope.

Q.    You can answer.

A.    So on the same qualifications, that's my understanding.

Q.    And is it your understanding that COPPA applies to a service that knows about specific

CONFIDENTIAL

Page 97

users under 13 and does not remove them from the service?

MR. COCANOUGHER:  Object to form, scope.

A.    Same sort of equivocating, but generally yes.

Q.    Other than those two instances that I just referenced, does COPPA apply in other circumstances?

MR. COCANOUGHER:  Object to form, scope.

Q.    You can answer.

A.    I don't know sitting here.  I would be entirely speculating.

Q.    Is the Commonwealth of Kentucky aware of any Kentucky resident who -- well, let me just backtrack.

You mentioned that you looked at Instagram and Facebook's Terms of Service in preparation for this deposition, correct?

A.    Correct.

Q.    So you're aware that Facebook and Instagram's Terms of Service prohibit individuals who are under 13 -- individuals who are under the age of 13 from signing up for Instagram or

Page 104

the OAG or our investigation or this case, I can't sit here and provide a specific name of any Kentucky resident.

Q.     So the Commonwealth cannot identify a single Kentucky resident who told Meta when they were signing up for Instagram or Facebook -- let me just backtrack.

The Commonwealth of Kentucky isn't able to identify any Kentucky resident who represented that they were over the age of 13 when signing up for Instagram and Facebook when they were not in fact over the age of 13, correct?

MR. COCANOUGHER:  Object to form, scope, calls for contention.

A.     So again, sitting here right now I can't name a name to you, but I believe that type of information would be reflected in some of the structured data we're seeking potentially about -- I'm not familiar with what all categories of structured data there are, but I know that we are seeking information that Meta has about the geography of its users, information about their use, characteristics about, you know, age and things like that.

So sitting here I can't identify, you

know, Susie Smith age 10 who lied about her age or misrepresented her age, but I think we're trying -- we're obtaining that information as part of discovery.

Q.    The Commonwealth is unaware of any Kentucky resident under the age of 13 who is on either Facebook or Instagram, correct?

MR. COCANOUGHER:  Object to form, scope, calls for contention.

A.    I would say the same thing about discovery in the case, you know, we're seeking that information.  And to give a similar answer, I can't name a specific Kentucky name or individual who meets those characteristics you said.

Q.    So sitting here today the Commonwealth is unable to identify any Kentucky resident who used Instagram or Facebook while they were under the age of 13.

MR. COCANOUGHER:  Same objections.

A.    Same sort of statements about discovery.  I'll make -- you know, say that again. Sitting here today, I cannot give you a name, correct.

Q.    So you are also the Commonwealth's designee for Topic 26 which relates to

CONFIDENTIAL

Page 224

Q.    So does the Commonwealth agree that the relationship between social media and mental health can be complex and conflicting?

MR. COCANOUGHER:  Object to form, scope, calls for contention.

A.    Could you ask the question again?

Q.    Does the Commonwealth agree that any links between social media and health are complex?

MR. COCANOUGHER:  Object to form, scope.

A.    They're certainly complex to me.  I don't -- and I think -- you know, they're complex in the sense that not every person, I guess is fluent in being able to talk about, I guess the scientific support for the links.  I don't know what it means to have a complex link as a scientific matter.

Q.    You're the -- yeah.  I'm asking you in your capacity as the Commonwealth's designee on the topic of the impact of social media use on teen mental health.  Does the Commonwealth agree that the connection between social media use and teen mental health is complex?

MR. COCANOUGHER:  Object to form, scope.

CONFIDENTIAL

Page 225

A.    I think we do agree that it's complex, and I think that's evidenced by us using experts in this case to explain that relationship.  I do not think -- yeah, I would agree that it's complex.

Q.    In the report that you have in front of you, it says that the direction of the relationship is difficult to determine.  Do you see that?

A.    Could I ask where you're looking?

Q.    Just in the second paragraph and the relation between social media and mental -- social media and health section that you reviewed prior to this deposition.  It's the sentence that begins with the word "first."

A.    Okay.  I see third.  Okay, first.  Yes, I see that.

Q.    So the report says that the direction of the relationship is difficult to determine, correct?

A.    That's what it says.

Q.    The Commonwealth would agree that the relationship between social media use and mental health is difficult to determine, correct?

MR. COCANOUGHER:  Object to form,

Page 226

scope.

A.    I think these types of scientific questions are certainly difficult ones to answer, and I think that we've sought out people who are able to answer those questions for us.  So I think I would agree that it's difficult to determine, but I don't know in a scientific context what that means, if it has any kind of particular meaning.

Q.    The people that you said to try and figure that out, you're talking about the experts in this litigation?

MR. COCANOUGHER:  Object to form, scope.

Q.    You can answer.

A.    I think that's correct.  Yes, that's generally what I'm referring to.

Q.    So the Commonwealth agrees that even today, the direction of the relationship between social media and teen mental health is difficult to determine?

MR. COCANOUGHER:  Object to form, scope, asked and answered.

Q.    You can answer.

A.    I think it's difficult to determine for the reasons I've said, which is that it's a hard

Page 227

question to answer and that it requires some training and education and skill and experience to be able to answer that kind of question in a scientific context.  So I would agree that it's a difficult question -- difficult to determine for those reasons.

I don't know what it means in a scientific sense.  Direction of relationship is difficult to determine.  I don't know what that means in a scientific context.

Q.    So the Commonwealth's understanding is, without the assistance of scientists, it's difficult to determine the direction of the relationship between social media and teen mental health?

MR. COCANOUGHER:  Object to form, scope.

Q.    You can answer.

A.    Without scientists, it's difficult to determine.  I think that's accurate because I would say the inverse.  With scientists, it would be easier, so I would agree with that.

Q.    So the Commonwealth would understand that you need to have scientists to determine whether or not there is -- what the -- what the

CONFIDENTIAL

Page 228

relation -- how the relationship flows between social media and teen mental health, correct?

MR. COCANOUGHER:  Object to form, scope.

A.    I think that scientists could discuss -- support research as to those issues better than someone could without that experience and expertise.  So I think I generally agree with your statement.

Q.    So the scientists will need to take a look at whether or not there is a causal relationship between teen mental health and social media use or vice versa, correct?

MR. COCANOUGHER:  Object to form, scope.

A.    I believe so, yes.

Q.    Now, if you continue on to -- on this paragraph, this -- sorry, this report was produced -- sorry, the report in Exhibit 10 was produced by a team of scientists, correct?

A.    The National Academy of Science -- yeah, Sciences, Engineering, yes.

Q.    And Exhibit 10 is essentially a product of work that those scientific experts have put together, correct?

CONFIDENTIAL

Page 234

population level means exactly, but I believe that our experts are addressing, from my understanding of this sentence, this issue.

Q.    Other than the expert reports that the Commonwealth of Kentucky has submitted in connection with this litigation, does the Commonwealth of Kentucky have any other basis for understanding that social media causes any change in teen mental health?

MR. COCANOUGHER:  Object to form, scope.

Q.    You can answer.

A.    Sure.  So like I said earlier, we've produced a lot of, I think it was 75 or so research articles from the investigation, which I think reach a variety of conclusions.

You know, I can't sit here and quote what all 75 studies were about.  I think we cite research in our complaint.  I think we've identified documents produced from Meta from its internal research, which I understand they dispute the utility of that research, but we've obtained that information.

And then, you know, our experts are bringing their expertise on this issue.  So I

CONFIDENTIAL

Page 235

think, to my mind right now, those are the sources for potential disagreement with this sentence. But again, I'm -- some of these terms, I think, have more than one meaning, depending on the context.

Q.    So the National Academy of Sciences report that you have in front of you as Exhibit 10 is a review of the literature, research literature that's available as of 2024, correct?

MR. COCANOUGHER:  Object to form.

Q.    You can answer.

A.    It says that.  I would be interested -- if Appendix C is all of the research considered -- maybe it's all the research that is actually referenced.  I don't know.  I -- they say a review of the literature and then cite 1, 2, 3, 4... I count 25 articles.  I would be very surprised to learn that the literature is comprised of only 25 articles.  Whether they cite other things, I don't know.

Q.    Which appendix are you looking at?

A.    I'm looking at Appendix C.  I think -- it says:  References.  I think it's on Bates 817. And I'm just flipping through to see if there are other...