Ashley M. Simonsen (Bar No. 275203)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, California 90067
Telephone: (424) 332-4800
Facsimile: (424) 332-4749
Email: asimonsen@cov.com

*Attorneys for Defendants Meta Platforms, Inc.
f/k/a Facebook, Inc. and Instagram, LLC*

[Additional counsel listed on signature pages]

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION | MDL No. 3047 |
| This Document Relates To: | Case Nos.: 4:22-md-03047-YGR<br>4:23-cv-05448-YGR |
| *People of the State of California, et al. v. Meta Platforms, Inc. et al.* | **META'S OPPOSITION TO STATE AGS' MOTION *IN LIMINE* NO. 1 TO EXCLUDE CERTAIN TESTIMONY OF STATE WITNESSES** |
| | Judge: Hon. Yvonne Gonzalez Rogers<br>Magistrate Judge: Hon. Peter H. Kang |
| | Date: June 26, 2026<br>Time: 8:00 AM<br>Place: Courtroom 1, 4th Floor |

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................... 1

ARGUMENT ........................................................................................................................... 2

I.      The AGs' Motion is Overbroad and Premature. ................................................... 2

II.     The State Witness Testimony is Relevant and Not Unfairly Prejudicial. ............ 4

III.    The State Agency Witnesses Do Not Offer Lay Opinion Testimony................... 8

CONCLUSION........................................................................................................................ 10

**INTRODUCTION**

The AGs seek to preclude Meta from introducing a wide array of testimony provided by state witnesses on clearly relevant topics within the scope of those witnesses' knowledge and work, ranging from the "impacts of social media on mental health" to the "states' social media policies and use." *See* ECF 3127, AGs' Motion *in Limine* No. 1 ("Mot.") at 1. At bottom, the AGs' Motion seeks the categorical exclusion of virtually any testimony Meta might elicit from these state witnesses, before Meta has even finalized its determination of what testimony to elicit or play at trial. Such an "attempt to exclude broad categories of possible evidence" through a *limine* motion is premature, is overbroad, and should be denied as procedurally improper. *See* Civil Pre-Trial Standing Order ¶ 4(a) ("Such motions are routinely denied"). The proper course is to address evidentiary objections as they arise at trial, where the Court and the parties will have the benefit of context. Contrary to the AGs' assertion, no discovery order issued by this Court supports or justifies the breathtakingly broad relief sought by their Motion—*i.e.*, the wholesale exclusion of any relevant testimony by any state witness Meta might call at trial.

The AGs seek to exclude state witness testimony on topics that are squarely relevant to the core issues in this case: whether Meta's statements about safety on its platforms were true, whether certain features on Meta's platforms harmed consumers, and whether Meta's platforms were directed to individuals under 13. Evidence that the States' own employees—including agency heads and other public health professionals who are responsible for assessing and safeguarding the mental health of youth— acknowledged different causes of mental health harms, or that their States continue to use Meta's services despite their position that these services are harmful, tends to show that Meta's representations about platform safety were not deceptive, and that the features on its platforms are not unfair. State witness testimony that their agencies use Facebook and Instagram to advertise to a general adult audience is likewise directly relevant to the AGs' COPPA claim because it constitutes evidence of audience composition bearing on whether Meta's platforms are "directed to children" within the meaning of the statute. *See* 15 U.S.C. § 6501(10).

Meta also does not, contrary to the AGs' assertion, seek to introduce lay opinion testimony. The state witnesses have testified to their personal knowledge about what their agencies have found, what programs they administer, and what data they have collected. Such testimony is "rationally based on the

witness's perception" and "helpful to [a] clear[] understanding" of the facts in issue in this case. Fed. R. Evid. 701. The Motion should be denied in its entirety.

## ARGUMENT

### I.        The AGs' Motion is Overbroad and Premature.

The Court should deny the AGs' Motion because it is overbroad and any problems with state witness testimony that Meta may ultimately seek to elicit or introduce can and should be dealt with at trial, where the Court has the benefit of context. The Motion identifies over 200 pages of deposition testimony from state witnesses on a host of topics that include, among other things, "states' social media policies," "states' social media … use," "the impacts of social media on mental health," "how certain public agencies or employees may have used Meta's platforms to direct content at adults or mixed audiences," and "efforts to address … gun violence, climate change, or drug abuse." Mot. at 1, 7, 9; *see also* May 27, 2026 Tr. at 21:13–14 ("[W]e will be filing motions *in limine* to keep out *all* of the state witness testimony[.]") (emphasis added). Each category of testimony implicates distinct evidentiary considerations that cannot be resolved through a single, sweeping ruling. *See Jackson v. Cnty. of San Bernardino*, 194 F. Supp. 3d 1004, 1008 (C.D. Cal. 2016) (courts are "almost always better situated during the actual trial to assess the value and utility of evidence") (citation omitted).

It would be remarkable and unjustified to hold, in advance of trial, that Meta categorically cannot introduce testimony from the opposing party's own witnesses about the opposing party's case. The AGs bring claims alleging that Meta's platforms cause mental health harm to youth in their States. *See, e.g.*, Letter Brief by the AGs Regarding Trial Strategy, ECF 2626 at 2 ("Letter Brief") (Meta "offer[ed] the same addictive, harmful social-media services and features to children."). Meta is entitled to probe those allegations at trial through the testimony of witnesses with direct knowledge of and governmental responsibility for teen mental health conditions in the States. The AGs fail to make any concrete argument as to why the specific evidence Meta may seek to introduce—before Meta has even had the opportunity to identify that full testimony—would be unduly prejudicial or misleading. Moreover, the determination of admissibility depends on the specific testimony offered, the purpose for which it is offered, and the argument it is offered to rebut. *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 384 (2008) (application of Rule 403 requires "on-the-spot balancing" (internal quotation marks omitted)); *cf. Yue v.*

*Chordiant Software, Inc.*, 2010 WL 11575579, at *1 (N.D. Cal. Apr. 22, 2010) ("The balancing of prejudice versus probative value will depend upon the specific reason for which the evidence is offered at trial."). Here, the AGs have done nothing more than identify a handful of examples of testimony that they take issue with on various unrelated grounds. They have no idea whether Meta will seek to elicit or introduce such testimony at trial, and their bare disagreement with Meta's discovery strategy is far too thin a reed to support the breathtaking relief they seek via this Motion.

The AGs' reliance on prior discovery orders is also misplaced. *See* Mot. at 4 (discussing ECF 1679, 1646). Meta does not and will not seek to introduce any testimony that violates any Court order, and no Court order justifies depriving Meta of its fundamental Due Process right to contest and defend against the AGs' claims. The AGs' Motion, on the other hand, goes far beyond the Court's prior orders in seeking to exclude all testimony from state witnesses about any topic touching upon the AGs' claims.

Nor do the AGs' cherry-picked citations of the record indicate that the state witness testimony at issue consisted entirely of contention topics. *See* Mot. at 3. When the former Deputy Assistant Director of the California Department of Public Health was asked whether she could "███████████████████████████████████████████████████████████████████," she answered: ███████████████████████████ Mot. Ex. O, Bolanos Dep. Tr. at 66:4–9; *see also id.* at 66:10–17 (discussing "███████████████████ as "███████████████████████████████████████). That is a factual statement about what data her agency has and has not reviewed, not a recitation of the bases of the AGs' claims. When California's Deputy Attorney General confirmed that ███████████████████████████████████████████████████████████████," he was likewise testifying about what a state agency *did*—not about the bases of the AGs' claims against Meta. Mot. Ex. A, Hartston Dep. Tr. at 215:1–15. So, too, with the acknowledgment by the Deputy Executive Director of the Colorado Department of Human Services that she did ███████████████████████████████████████████████████." Mot. Ex. X, Castillo Dep. Tr. at 143:3–13. These are senior government officials who lead agencies dedicated to health and public welfare; they are uniquely positioned to testify about areas falling within the scope of their official responsibilities, including matters discovered through their work. *See, e.g.*, Mot. Ex. O, Bolanos Dep. Tr.

at 29:18–25 (in "███████████████████████████████████████████ ████████████████████████████████████████████████"). Testimony about the work that they do, and the knowledge they have acquired through this work, thus does not amount to an "improper memory test regarding the entirety of the legal and evidentiary basis for the State AGs' consumer protection claims." Mot. at 5.

To the extent the AGs believe they have a valid basis to object to any testimony that Meta ultimately seeks to elicit or introduce at trial, they can raise those objections at the appropriate time. Their vague arguments about cherry-picked statements do not and cannot justify the wholesale exclusion of *all* testimony provided by state witnesses.

## II.    The State Witness Testimony is Relevant and Not Unfairly Prejudicial.

The AGs purport to present a "unified case" that Meta "design[ed] its social media platforms in a manner that harmed the mental and physical health of children." Letter Brief at 2. At the same time, the AGs seek to preclude Meta from introducing testimony from key public health officials in their respective states *conceding* that, in the course of fulfilling their public health responsibilities, they have not encountered any evidence that Meta's platforms caused those alleged harms. Nothing could be more relevant to Meta's defenses. The AGs' Motion further contends that testimony about "states' social media policies and use" have "no bearing on" their consumer protection and COPPA claims, Mot. at 5, and that "whether other factors like gun violence, climate change, or drug abuse also negatively impact mental health is of no consequence" to those claims, *id.* at 9. These arguments misapprehend the nature of the AGs' own claims and Meta's defenses.

The AGs' deception claims are predicated on specific allegations that Meta made statements about the safety of its platforms that were deceptive *because* those statements did not mention the mental health harms allegedly caused by social media use. *See* Letter Brief at 7 ("Meta engaged in a nationwide messaging campaign to downplay" "its platform's health and safety risks"). Indeed, the AGs contend that several of Meta's statements about the effect of its services on teen mental health were themselves false or misleading. *See, e.g.*, ECF 3144, Statement No. 26 ("Adam Mosseri told reporters that the effect of Instagram on teen mental health seems to be 'quite small.'"); Statement No. 55 ("The research actually demonstrated that many teens we heard from feel that using Instagram helps them when they are struggling

with the kinds of hard moments and issues teenagers have always faced."). And the AGs' unfairness claims assert that "users of Meta's platforms were exposed to increased risks of … negative mental health impacts" resulting from certain features. AGs' Summary Judgment Opposition ("MSJ Opp."), ECF 2779 at 58; *see also* Letter Brief at 6 (asserting that filters feature causes "harms" such as "body dysmorphia, eating disorders, anxiety and depression—the last two of which are known preconditions for suicidality"). Whether Meta's platforms in fact cause those alleged mental health harms—and what relevant authorities have said on that issue with respect to Meta or social media generally—is therefore directly relevant to whether Meta's safety representations were deceptive and whether certain features constituted unfair practices. Thus, it is relevant that New Jersey's Adolescent Health Coordinator testified that ███████ ███████████████████████████████████████████████████████████████████████████████ ███████████ Ex. A (Blakney Dep. Tr. at 58:4–18); or that Kentucky's former Commissioner of Public Health (and current Secretary of Health and Family Services) is not ████████████████████ ██████████████████████████████████████████████████████████████████████████, Ex. B (Stack Dep. Tr.) at 99:6–22. The AGs cannot simultaneously allege that Meta deceived consumers about purported safety harms and then preclude Meta from showing those harms do not exist or are attributable to other causes, or that relevant authorities have reached such conclusions.

The state witness testimony regarding the agencies' use of paid advertisements on Facebook and Instagram to reach a general audience is also directly relevant to the AGs' COPPA claim. *Contra* Mot. at 4. Under COPPA, a website or online service that does not target individuals under 13 is a general audience service and not "directed to children." 15 U.S.C. § 6501(10) (defining "website or online service that is directed to children"); *see also id.* § 6501(1) (defining "child"). State witnesses testified that they used Meta's platforms to reach "the general public" "across audiences," not just children under the age of 13. *See, e.g.*, Mot. Ex. G, Bryan Dep. Tr. at 49:3–22 ██████████████████████████████ ████████████████████████████████████████"); Mot. Ex. B, Blake Dep. Tr. at 143:19–145:4 ("████████████████████████████████████████████████████████ ████████████████████████████"). That these governmental entities regard Meta's platforms as appropriate vehicles to reach adults, not individuals under the age of 13, is powerful evidence of audience composition bearing directly on whether Meta's platforms are "directed to children" within the meaning

of COPPA.  *See* 16 C.F.R. § 312.2 (listing the factors the Commission will consider in determining child directedness).  The AGs cannot credibly maintain that Facebook and Instagram are "child-directed" platforms while their own agencies place paid advertisements on those very platforms with the understanding that they are reaching adults and the general public.  They certainly cannot credibly maintain that the existence of ██████████████████████████████████████ ████████ conclusive proof that those services are child-directed, *see* Am. Compl. (ECF 207) ¶¶ 760-66, while contending that their own States' ████████████████████████████████████████ ███████████████████████████████████████████████—has no bearing on the question.  *See, e.g.*, Mot. Ex. B, Blake Dep. Tr. at 180:9-182:10 (█████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████).

The AGs argue that "[s]uperseding causation, contributory negligence, and other defenses sounding in tort are categorically not applicable to COPPA or consumer protection actions."  Mot. at 10.  That is beside the point.  The evidence at issue goes to a different question entirely: whether Meta's statements about its platforms were *true*, and whether certain features on Meta's platforms unfairly harmed consumers.  Even if the AGs need not prove "causation" in a tort sense, their claims remain predicated on the allegation that Meta's platforms cause harm to youth.  *See, e.g.*, MSJ Opp. at 62 ("[T]he conduct alleged has exposed teens to increased risks of myriad mental health and privacy-related harms"); Letter Brief at 7 ("multiple accounts can exacerbate mental health harms and stimy [*sic*] development").  Meta is entitled to present evidence that they do not.

The AGs argue that Meta's conduct is the only relevant issue at trial, while any other issue impacting youth mental health is irrelevant and should be ignored because the AGs need only show that Meta was one among other causal factors.  *See* Mot. at 9–10.  But this Court and others have rejected that argument.  *See In re Soc. Media Adolescent Addiction/Personal Injury Prod. Liab. Litig.*, 2024 WL 5190206, at *11 (N.D. Cal. Dec. 20, 2024) (Kang, J.) (search terms to be run over state agency documents regarding "alternate stressors" "would be … relevant"); *New Mexico v. Meta*, D-101-CV-2023-02838 (First Jud. Dist. Ct., Santa Fe Cnty., Feb. 6, 2025) ("[I]nformation bearing on alternative causes of the harms alleged in the Amended Complaint, the actions of third parties, and the State's actions with respect

to social media are relevant to the subject matter involved in the pending action."). This testimony is also relevant to challenging the AGs' core allegation that Meta unfairly or deceptively designed social media platform features that it knows to be psychologically and physically harmful to consumers. *See, e.g.*, *Christin v. Wal-Mart Assocs., Inc.*, 2025 WL 391013, at *3 (E.D. Cal. Feb. 3, 2025) (discussing relevance of evidence that can show "possible alternate causes or contributors"); *Hooks v. Target Corp.*, 2022 WL 18142528, at *3 (N.D. Cal. 2022) (similar). Meta must similarly be allowed to show that agencies factually charged with addressing teen mental health harms do not treat Meta's services as a cause of those harms. *See, e.g.*, Ex. A (Blakney Dep. Tr. at 58:4–18) (New Jersey's Adolescent Health Coordinator testifying that ███████████████████████████████████████████████████████████ ████████████████████████████████████).

The AGs also dismiss evidence of their agencies' own use of Meta's platforms as "a molecule in a drop of water in the bucket of Meta's vast audience." Mot. at 6–7. That is nothing more than a substantive disagreement with Meta's defense that the AGs can seek to demonstrate at trial; it is not a basis to *exclude* Meta's defense. Moreover, the AGs' statement trivializes highly probative evidence. The AGs represent States whose own public health agencies have *actively used* Facebook and Instagram to reach at-risk youth, including for suicide prevention and mental health campaigns, even *after* filing this lawsuit. *See, e.g.*, Mot. Ex. A, Hartston Dep. at 215:8–15 ██████████████████████████████ ███████████████████████████████████████████████████████████."); *id.* at 222:21–25 (describing social media as ███████████████████████████████████████████"); Mot. Ex. B, Blake Dep. Tr. at 192:23–193:23 (███████████████████████████████████████ ███████████████████████████████████████████████"); *id.* at 198:14–25 ███████ █████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████). That evidence is relevant to whether Meta's statements about platform safety were false or misleading to a reasonable consumer: If the state agencies themselves believe Meta's platforms are a useful and appropriate way to connect with vulnerable teens, that directly undercuts the AGs' claim that Meta's safety representations were deceptive. The jury is entitled to know that the very States alleging Meta's platforms are unsafe for youth simultaneously deploy those same platforms to promote youth mental health.

The AGs further argue that "Meta's reliance on testimony about states' purported lack of research on the harms of social media is simply an illogical appeal to ignorance." Mot. at 13. The fact that state public health agencies—the entities the AGs represent and whose residents they claim were harmed—have not identified any evidence linking Meta's platforms to specific mental health harms in their States is not an "appeal to ignorance."[1] It is directly relevant to the truth or falsity of Meta's safety representations, Meta's intent in making those statements (which is relevant to penalties), and the plausibility of the AGs' theory of harm. Nor is it true that Meta's only "purpose for using these witnesses" is "to embarrass the Parties and witnesses at trial." Mot. at 5. Rather, Meta seeks to introduce this testimony to demonstrate that the AGs' own agencies, charged with monitoring youth welfare, have not identified the very harms the AGs allege, have identified numerous alternative causes of such harm, and continue to use Meta's platforms to serve vulnerable youth. That this testimony undermines the AGs' principal theory of harm does not make it improper. *See Sidibe v. Sutter Health*, 103 F.4th 675, 702 (9th Cir. 2024) ("It is inappropriate to exclude evidence under Rule 403 because it casts the opposing party in a *really* bad light.") (cleaned up) (emphasis in original).

### III. The State Agency Witnesses Do Not Offer Lay Opinion Testimony.

The AGs contend that Meta seeks to introduce lay opinion testimony on the impacts of social media on mental health. Mot. at 10. This argument mischaracterizes the nature of the state witness testimony. Meta does not intend to ask state officials to "opine on research" or offer scientific conclusions about "whether social media does or does not cause harm." *Id.* at 11. Meta instead seeks factual testimony about what these witnesses' agencies have or have not found in the course of their relevant work, what programs they administer, what data they collect, and what factors they have identified as contributing to youth mental health challenges in their experience as public health officials. *See, e.g.*, Mot. Ex. A, Hartston Dep. Tr. at 212:14–213:17 (describing ███████████████████ ███████████████); Mot. Ex. B, Blake Dep. Tr. at 195:3–24 (███████████████

[1] The AGs cite *Robinson v. Am. Int'l Grp., Inc.*, 2022 WL 17080132, at *15 (C.D. Cal. Sept. 22, 2022), for the proposition that "[i]t is generally difficult to draw conclusions from the absence of evidence[.]" Mot. at 13. But *Robinson* did not hold that arguments based on the absence of evidence are categorically irrelevant or inadmissible. Instead, the court evaluated competing arguments about the absence of evidence to determine whether judgment was warranted under Rule 52. *See Robinson*, 2022 WL 17080132, at *15–17.

META'S OPPOSITION TO STATE AGS' MOTION IN LIMINE NO. 1 TO EXCLUDE CERTAIN TESTIMONY OF STATE WITNESSES
4:22-md-03047-YGR; 4:23-cv-05448-YGR

██████ ”); *id.* at 254:3–25 ██████████████████ ”); *id.* at 318:3–14 (discussing ██████ ██████████ ). That is classic fact testimony rationally based on the witnesses' perceptions from their professional roles. *See* Fed. R. Evid. 701.

The AGs invoke *United States v. Holmes* for the proposition that "there is no 'on-the-job' exception to Rule 702,' even if a witness is 'percipient.'" Mot. at 11 (citing 163 F.4th 547, 560 (9th Cir. 2025)). But Rules 701 and 702 bar lay witnesses from offering *opinions* that require specialized scientific knowledge. They do not bar them from testifying to *facts* within their personal knowledge, as the AGs acknowledge. *See* Mot. at 12 n.7 (recognizing that testimony "as to institutional operations and practices based on personal knowledge … [is] not subject to Rule 702") (citing *Sibert v. Gene Sec. Network, Inc.*, 75 F. Supp. 3d 1108, 1114 (N.D. Cal. 2014)). Indeed, "it is those out-of-court experiences" that make a lay "witness's testimony helpful to the jury." *United States v. Gadson*, 763 F.3d 1189, 1208–09 (9th Cir. 2014).

The state witnesses do not offer "technical" opinions limited to experts. For instance, Mr. Hartston testified that the California Department of Public Health ████████████████████ ████████████████████████████████████████████████ Mot. Ex. A, Hartston Dep. Tr. at 228:7–229:22. That testimony does not offer a scientific opinion, but a fact: what an agency document says. Similarly, Ms. Dunn testified that, ██████████████ as the Director of the Division of Community and Family Support at the Colorado Department of Early Childhood, ██████████████████████████████ ████████████████████████ Mot. Ex. N, Dunn Dep. Tr. at 82:6–83:14. Government officials whose work is dedicated to youth mental health are well-positioned to testify that, in their experience, "the COVID-19 pandemic, childhood trauma, school shootings, drug abuse, and family problems are all factors that cause mental health issues" in their states. *Id.* That is not a statement about "psychological and epidemiological research and data." Mot. at 10. Such testimony merely recites facts observed by these witnesses in their capacity as public health officials. *Cf.* Mot. at 11–12 ("only expert testimony will be allowed on technical questions of causation") (citing *Frisone v. United States*, 270 F.2d 401, 403 (9th Cir. 1959)).

Nor are these witnesses unqualified to testify on the nature of youth mental health. They are professionals entrusted with the public health of their States' youth. These witnesses include Assistant Directors of State Departments of Public Health, Deputy Commissioners of Behavioral Health Administrations, Directors of Mental Health, and other government officials whose professional responsibilities include monitoring and promoting youth mental health. *See* ECF 2992 at 11–22; *cf.* *Gadson*, 763 F.3d at 1212 (concerns about "unmerited credibility" with the jury do not apply to lay witness testimony "even if at points the lay witness has recourse to relevant background and training"). Testimony about what their agencies have or have not found, what programs they administer, and what factors they have identified as contributing to mental health harms is squarely within their personal knowledge and official responsibility. This is precisely the type of factual testimony Federal Rule of Evidence 701 permits: testimony "rationally based on the witness's perception" and "helpful to clearly understanding the witness's testimony or to determining a fact in issue." Fed. R. Evid. 701. It is a notable and indefensible position for AG lawyers to argue that they may sue and recover breathtaking penalties in the names of their States for harms they alleged Meta caused within their State, while asking the Court to ignore the work that their own States' professionals charged with identifying and addressing those harms undertook regarding them.

### CONCLUSION

For the foregoing reasons, the Court should deny the AGs' Motion *in Limine* No. 1.

DATED:  June 17, 2026

Respectfully submitted,

By:    */s/ Ashley M. Simonsen*

Ashley M. Simonsen (Bar No. 275203)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, California 90067
Telephone: (424) 332-4800
Facsimile: (424) 332-4749
Email: asimonsen@cov.com

Paul W. Schmidt, *pro hac vice*

10

Timothy C. Hester, *pro hac vice*
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
Email: pschmidt@cov.com
Email: thester@cov.com

*Attorneys for Defendants Meta Platforms, Inc.
f/k/a Facebook, Inc. and Instagram, LLC*

11