James P. Rouhandeh, *pro hac vice*
Antonio J. Perez-Marques, *pro hac vice*
Caroline Stern, *pro hac vice*
Corey M. Meyer, *pro hac vice*
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Email:    rouhandeh@davispolk.com
          antonio.perez@davispolk.com
          caroline.stern@davispolk.com
          corey.meyer@davispolk.com

*Attorneys for Defendants Meta Platforms, Inc. and Instagram, LLC*

*Additional counsel listed on signature pages*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

## OAKLAND DIVISION

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>*People of the State of California, et al. v. Meta Platforms, Inc., et al.* | MDL No. 3047<br><br>Case Nos. 4:22-md-03047-YGR-PHK<br>4:23-cv-05448-YGR<br><br>**META'S NOTICE OF MOTION AND MOTION TO EXCLUDE EXPERT TESTIMONY OF ADAM ALTER AND RAVI IYER**<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br>Magistrate Judge: Hon. Peter H. Kang<br><br>Date: April 15, 2026<br>Time: 1:00 PM<br>Place: Courtroom 1, 4th Floor |

**[FILED UNDER SEAL]**

**NOTICE OF MOTION AND MOTION TO EXCLUDE EXPERT TESTIMONY**

PLEASE TAKE NOTICE THAT, at 1:00 PM on April 15, 2026, before the Honorable Yvonne Gonzalez Rogers, in Courtroom 1, Floor 4 of the United States District Court for the Northern District of California, located at 1301 Clay Street, Oakland, California, 94612, Defendants Meta Platforms, Inc. and Instagram, LLC (hereinafter, "Meta") will and hereby do move this Court, under Federal Rule of Evidence 702, for an order excluding testimony of Plaintiffs' experts Dr. Adam Alter and Dr. Ravi Iyer. This Motion is based upon this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, any Reply or other papers submitted in connection with the Motion, the accompanying Declaration of Antonio J. Perez-Marques and all exhibits thereto, and on such other written and oral argument as may be presented to the Court.

**STATEMENT OF RELIEF SOUGHT**

Meta seeks an order granting its motion to exclude the expert testimony of Dr. Adam Alter and Dr. Ravi Iyer.

Dated: January 30, 2026

Respectfully submitted,

DAVIS POLK & WARDWELL LLP

*/s/ Antonio J. Perez-Marques*

James P. Rouhandeh, *pro hac vice*
Antonio J. Perez-Marques, *pro hac vice*
Caroline Stern, *pro hac vice*
Corey M. Meyer, *pro hac vice*
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
rouhandeh@davispolk.com
antonio.perez@davispolk.com
caroline.stern@davispolk.com
corey.meyer@davispolk.com

*Attorneys for Defendants Meta Platforms, Inc. and Instagram, LLC.*

*Additional counsel listed on signature pages*

i

META'S NOTICE OF MOTION AND MOTION TO EXCLUDE EXPERT TESTIMONY OF ADAM ALTER AND RAVI IYER
Case No. 4:22-MD-03047-YGR, 4:23-CV-05448-YGR

**TABLE OF CONTENTS**

PAGE

LEGAL STANDARD ................................................................................................................2

ARGUMENT ..........................................................................................................................2

I.    Alter's Deception Opinions Should Be Excluded.................................................................2

    A.    Alter's Opinion That Meta Intended to Shape Consumer Perceptions Is Improper State of Mind Testimony and Factual Narrative (Op. D)...........................2

    B.    Alter Is Not Qualified and Lacks a Reliable Basis to Opine That Social Media Platforms Are "Credence Goods" (Op. A) ........................................................3

    C.    Alter Lacks a Reliable Methodology for Opining on How a Reasonable Consumer Would Understand Meta's Statements (Ops. B, C, F, G)...........................5

    D.    Alter's Opinion That Meta's Statements Were False or Misleading Is Impermissible Factual Narrative and State of Mind Testimony That Is Not Helpful to the Factfinder (Ops. E, G)...............................................................................7

    E.    Alter Lacks a Reliable Methodology for His Opinion That Consumers Were "Exposed" to Meta's Statements (Op. H) .................................................................8

II.   Alter's COPPA Opinions Should Be Excluded (Ops. L-P).....................................................9

    A.    Alter's Opinion That Meta Intended to Attract U13s Is Improper State of Mind Testimony and Factual Narrative and Unreliable (Ops. L, M, O)......................9

    B.    Alter's Opinions That Meta's Platforms Are Directed to Children Should Be Excluded (Ops. M-P) ...........................................................................................10

        1.    Alter's Opinions Are Impermissible Legal Conclusions ...............................10

        2.    Alter Applies an Unreliable Methodology to Determine Whether the Platforms, or Portions Thereof, Are Directed to Children ...........................10

III.  Iyer's Opinions Should Be Excluded in Their Entirety .........................................................12

    A.    Iyer's "Mitigation" Opinions Are Too Vague to Assist the Trier of Fact and Are Not Based on a Reliable Methodology (Ops. 1, 3, 4) ........................................12

    B.    Iyer's "Feasibility" Opinion Is Not Based on a Reliable Methodology (Op. 2)........14

CONCLUSION........................................................................................................................14

## TABLE OF AUTHORITIES

PAGE(S)

CASES

*In re Apple Inc. Sec. Litig.*,
2023 WL 4556765 (N.D. Cal. 2023) ............................................................................ 3, 6, 7, 8, 11

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
613 F. Supp. 3d 1308 (S.D. Cal. 2020) ................................................................................ 3, 8

*In re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig.*,
524 F. Supp. 2d 1166 (N.D. Cal. 2007) ........................................................................ 5, 11, 13

*Cadena v. Am. Honda Motor Co.*,
2025 WL 3483436 (C.D. Cal. Dec. 3, 2025) ....................................................................... 3

*In re ConAgra Foods*, *Inc.*
302 F.R.D. 537 (C.D. Cal. 2014) ................................................................................. 8, 11-12

*Daubert v. Merrell Dow Pharms., Inc.*,
43 F.3d 1311 (9th Cir. 1995) ....................................................................................... 4, 7

*Daubert v. Merrell Dow Pharms., Inc.*,
509 U.S. 579 (1993) ........................................................................................................ 5

*Engilis v. Monsanto Co.*,
151 F.4th 1040 (9th Cir. 2025) ................................................................................... 2, 10

*Gen. Elec. Co. v. Joiner*,
522 U.S. 136 (1997) ........................................................................................................ 6

*Georges v. Novartis Pharms. Corp.*,
2013 WL 5217198 (C.D. Cal. Apr. 4, 2013) .................................................................... 13

*Grodzitsky v. Am. Honda Motor Co., Inc.*,
957 F.3d 979 (9th Cir. 2020) .................................................................................... 13, 14

*Innovation Ventures, LLC v. Custom Nutrition Labs., LLC*,
2021 WL 12255004 (E.D. Mich. Sept. 29, 2021) ............................................................. 12

*Jauregui v. Daimler Truck N. Am. LLC*,
2025 WL 904744 (D. Ariz. Mar. 25, 2025) ........................................................................ 9

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) ........................................................................................................ 4

*McGinity v. Procter & Gamble Co.*,
69 F.4th 1093 (9th Cir. 2023) ........................................................................................ 7

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Wells Fargo Bank, N.A.*,
    2005 WL 6459866 (C.D. Cal. Mar. 17, 2005) ......................................................... 3-4, 9

*In re Novatel Wireless Sec. Litig.*,
    846 F. Supp. 2d 1104 (S.D. Cal. 2012) ...................................................................... 11

*OCG Energy, LLC v. Shen*,
    2024 WL 694912 (C.D. Cal. Feb. 12, 2024) .......................................................... 8, 10

*Open Text S.A. v. Box, Inc.*,
    2015 WL 349197 (N.D. Cal. Jan. 23, 2015) .......................................................... 9, 14

*Otto v. LeMahieu*,
    2021 WL 1615311 (N.D. Cal. Apr. 26, 2021) .............................................................. 3

*Pelican Int'l, Inc. v. Hobie Cat Co.*,
    655 F. Supp. 3d 1002 (S.D. Cal. 2023) ....................................................................... 7

*People v. Kinder Morgan Energy Partners, L.P.*,
    159 F. Supp. 3d 1182 (S.D. Cal. 2016) ....................................................................... 4

*Rodriguez v. Google LLC*,
    2025 WL 1569361 (N.D. Cal. June 2, 2025) .............................................................. 3

*Sanchez v. Jiles*,
    2012 WL 13005996 (C.D. Cal. June 14, 2012) ..................................................... 7, 13

*Snyder v. Bank of Am., N.A.*,
    2020 WL 6462400 (N.D. Cal. Nov. 3, 2020) .............................................................. 4

*In re Toyota Motor Corp.*,
    978 F. Supp. 2d 1053 (C.D. Cal. 2013) ..................................................................... 14

*United States v. Alo-Kaonohi*,
    635 F. Supp. 3d 1074 (D. Haw. 2022) ........................................................................ 7

*United States v. Holguin*,
    51 F.4th 841 (9th Cir. 2022) ....................................................................................... 6

*White v. Ethicon, Inc.*,
    2022 WL 538760 (W.D. Wash. Feb. 23, 2022) .......................................................... 3

STATUTES & RULES

15 U.S.C. § 6501 ............................................................................................................... 10

15 U.S.C. § 6502 ............................................................................................................... 10

16 C.F.R. § 312.2 .............................................................................................................. 10

Federal Rule of Evidence 702 ............................................................................................. 2

## MEMORANDUM OF POINTS AND AUTHORITIES

***Dr. Adam L. Alter.***  Experts cannot be a conduit for someone else's facts or opine on intent. Yet vast portions of Alter's nearly 400-page report, reflecting key opinions, do just that—merely summarizing the record and opining on Meta's  "beliefs," "goals," "intent," "knowledge," and "understanding."  These are core opinions, not mere background.  Most of Alter's other opinions are unreliable pseudo-science.  Alter's report should be excluded.

Alter is a professor of marketing with a background in psychology and a prominent public critic of social media.  In Part I of his report, Alter opines on whether certain statements deceived consumers (Ops. A-H).[1]  Most of those opinions (the "Deception Opinions") should be excluded. First, Alter's opinion that Meta "disseminated messages" "designed to shape consumer perceptions" (Op. D) constitutes improper state of mind testimony and factual narrative.  Second, Alter is not qualified to opine that social media platforms are "credence goods" (Op. A), and the opinion also lacks a reliable basis.  Third, Alter's opinions on how reasonable consumers "would have understood" Meta's statements (Ops. B, C, F, G) are based on unreliable pseudo-science and amount to untested hypotheses, without empirical support.  Fourth, Alter's opinion that Meta's statements were false or had a tendency to mislead (Ops. E, G) impermissibly invades the province of the factfinder.  Fifth, Alter's opinion that such statements or their "gist" were "transmitted to" and "spread" by consumers (Op. H) lacks any reliable methodology.

In Part II of his report, Alter opines that Instagram and Facebook are directed to U13 users in support of the AGs' COPPA claims (the "COPPA Opinions").  Alter Rep. Part II (Ops. I-P).  Those opinions should also be excluded.  Alter's opinion that Meta "intended" to attract U13s to its platforms (Ops. L, M, O) is improper state of mind testimony and factual narrative.  Alter's opinion that Meta's platforms, as a whole and portions thereof, are "directed to children" (Ops. M, N, O, P) impermissibly draws the ultimate conclusion for the factfinder and lacks a reliable methodology.

Appendix A maps the opinions that Meta seeks to exclude to sections of Alter's report.

***Dr. Ravi Iyer.***  Iyer, a social psychologist, offers two overarching opinions.  First, Iyer opines

---

[1] When referring to Alter, "Opinion" or "Op." refers to the lettered bullets in Paragraphs 2 and 3 of the "Executive Summary of Opinions" of Alter's Report.  *See* Ex. 1 (Alter Rep.) ¶¶ 2-3.

that Meta's current safety tools and features are "insufficient to mitigate the unwanted, negative, and harmful experiences" of young users (Ops. 3-4[2]) and proposes design changes that would mitigate such experiences (Op. 1). Iyer never defines what he considers "sufficient" mitigation, describing it as somewhere between "zero" and "a hundred percent." Instead, Iyer simply assumes that certain features are harmful to young users and asserts that removing those features would reduce that assumed harm by some unidentified amount. The factfinder does not need Iyer's testimony to understand that removing an allegedly harmful feature could reduce harm. Second, Iyer opines that Meta could "feasibl[y]" implement his proposed changes (Op. 2). That opinion also lacks a reliable methodology: Iyer does not define "feasibility" or employ any reliable method to assess it. Lacking in reliability, Iyer's opinions are inadmissible *ipse dixit*.

## LEGAL STANDARD

To establish the admissibility of expert testimony, the AGs must establish by a preponderance of the evidence that (i) the expert is qualified; (ii) the testimony "will help the trier of fact;" (iii) "the testimony is based on sufficient facts or data," (iv) "the testimony is the product of reliable principles and methods," and (v) the testimony "reflects a reliable application of the principles and methods to the facts of the case." *Engilis v. Monsanto Co.*, 151 F.4th 1040, 1049 (9th Cir. 2025); Fed. R. Evid. 702. "[C]hallenges to an expert's opinion go to the weight of the evidence *only if* a court first finds it more likely than not that an expert has a sufficient basis to support an opinion." *Engilis*, 151 F.4th at 1049 (emphasis added).

## ARGUMENT

### I.    Alter's Deception Opinions Should Be Excluded

#### A.    Alter's Opinion That Meta Intended to Shape Consumer Perceptions Is Improper State of Mind Testimony and Factual Narrative (Op. D)

As part of his Deception Opinions, Alter opines that "Meta *sought* to disseminate messaging that would shape consumer perceptions" of its platforms, that "Meta *was aware* that consumers had major concerns" about its platforms, and that Meta "*knew* that uncertainty or concern about [] safety could hamper" its business. Op. D; Alter Rep. ¶ 102 (emphases added). Those opinions, set forth in Section IX and Appendix A, should be excluded for two reasons.

---

[2] When referring to Iyer, "Opinion" or "Op." refers to Paragraphs 1-4 of the "Summary of Opinions" of Iyer's Report. *See* Ex. 2 (Iyer Rep.) ¶¶ 1-4.

*First*, they impermissibly opine on Meta's state of mind, knowledge, or intent, as Alter acknowledged. *See* Ex. 3 (Alter Dep.) 172:1-12. An expert cannot "testify as to [a defendant's] intent" or state of mind. *Rodriguez v. Google LLC*, 2025 WL 1569361, at *3-4 (N.D. Cal. June 2, 2025) (excluding testimony on defendant's intent); *Cadena v. Am. Honda Motor Co.*, 2025 WL 3483436, at *7, 16, 20 (C.D. Cal. Dec. 3, 2025) (excluding testimony on what defendant "knew" or "believed").

*Second*, the opinions constitute impermissible factual narrative. Experts cannot be a "conduit for attorney argument," *In re Apple Inc. Sec. Litig.*, 2023 WL 4556765, at *5 (N.D. Cal. July 17, 2023), or testify "solely for the purpose of constructing a factual narrative based upon record evidence," *Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 613 F. Supp. 3d 1308, 1322 (S.D. Cal. 2020), *aff'd*, 9 F.4th 1102 (9th Cir. 2021); *see also Otto v. LeMahieu*, 2021 WL 1615311, at *5 (N.D. Cal. Apr. 26, 2021) (excluding testimony that "merely regurgitates information untethered to any methodology"). Alter merely summarizes the contents of internal Meta documents and other public information, without applying any expertise. A factfinder "is capable of reading [these] document[s] itself." *White v. Ethicon, Inc.*, 2022 WL 538760, at *2 (W.D. Wash. Feb. 23, 2022).

### B.    Alter Is Not Qualified and Lacks a Reliable Basis to Opine That Social Media Platforms Are "Credence Goods" (Op. A)

Alter also opines that social media platforms are "credence goods"—according to Alter, goods with "features that make their safety particularly difficult for consumers to ascertain independently"—which therefore limits consumers' "capacity to establish the truth or accuracy of the claims that social media companies make regarding their platforms." Op. A; Alter Rep. ¶¶ 52, 54. This opinion, set forth in Section VI.C, should be excluded for three reasons.

*First*, Alter is unqualified to offer it. Alter relies solely on citations to theoretical economic papers for the definition of credence goods, *see* Alter Rep. ¶¶ 52-53, but Alter is not an economist. That he may be "familiar" with certain economic principles, Alter Dep. 19:2-8, does not make him qualified to offer novel opinions about how economic principles apply to social media. *See Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Wells Fargo Bank, N.A.*, 2005 WL 6459866, at *4 (C.D. Cal. Mar. 17, 2005) ("An expert must have qualifications relevant to the particular evidence or fact

3

in issue."); *People v. Kinder Morgan Energy Partners, L.P.*, 159 F. Supp. 3d 1182, 1199 (S.D. Cal. 2016) (excluding testimony "evaluat[ing] hydrological and hydrogeological issues" because witness was "not a hydrogeologist" and "lack[ed] pertinent qualifications" even though she "may have dealt with issues related to the municipal water system" in her employment).

*Second*, Alter's opinion lacks a reliable basis. Alter cites *no* authority describing social media as a credence good and instead apparently "developed [this] opinion[] expressly for purposes of testifying," a "very significant fact" weighing against admissibility. *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1317 (9th Cir. 1995). Alter conducted no empirical analysis to support his opinion, even though empirical analysis is used by economists in the papers he cites.[3] Instead, Alter merely purports to identify characteristics of credence goods from economic papers and summarily concludes that *all* social media platforms share those characteristics. Alter Rep. ¶¶ 52-57. Alter's cursory analysis falls short of the "same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)).

Moreover, evidence that Alter relies on in support of other opinions contradicts his credence goods opinion. *See Snyder v. Bank of Am., N.A.*, 2020 WL 6462400, at *6 (N.D. Cal. Nov. 3, 2020) ("[A] contradiction renders [the] opinions unreliable"). Alter claims that "it is difficult or impossible for consumers to evaluate [credence goods] even after consumers have used them, because those consumers lack the knowledge or expertise necessary to conduct their own independent evaluations" of the goods. Op. A. But Alter repeatedly relies on contradictory evidence indicating that consumers *can and do* evaluate their experiences with Meta's platforms, for example, by citing surveys that he claims "demonstrate parents' and teens' concerns about social media," including one in which parents "said their children had experienced a negative effect of social media." Alter Rep. Section IX.A.i., ¶ 106; *see also id.* ¶ 59 (claiming that consumers have "increasing skepticism about the safety of social media"). And Alter acknowledges the wide availability of independent public sources discussing the health effects of social media, including his own 2017 book on purported technology "addiction." Alter Dep. 145:4-146:2; Alter Rep. ¶ 6. Alter's own evidence flatly contradicts his

---

[3] *See* Ex. 4 (Jan Biermann, John Horton, & Johannes Walter, *Algorithmic Advice as a Credence Good* (ZEW Ctr. for Eur. Econ. Rsch., Discussion Paper No. 22-071, 2022)), cited at Alter Rep. ¶ 55.

opinion that social media platforms are credence goods.

*Third*, there is a fatal analytical gap in Alter's method. *In re Bextra & Celebrex Mktg. Sales Pracs. & Prod. Liab. Litig.*, 524 F. Supp. 2d 1166, 1181 (N.D. Cal. 2007) ("[T]he 'analytical gap' between the data and these experts' conclusion is simply too great to make the opinion admissible."). Alter concedes that some aspects of a credence good "*could* [be] underst[oo]d through experiencing the product," Alter Dep. 142:19-143:5 (emphasis added), including one's usage patterns, *id.* 144:12-21. But he does not analyze whether the at-issue statements relate to aspects of credence goods that consumers can assess. Thus, there is no basis for Alter's conclusion that consumers have a "limited capacity to establish the truth or accuracy" of the particular statements at issue here. Alter Rep. ¶ 52.

### C.    Alter Lacks a Reliable Methodology for Opining on How a Reasonable Consumer Would Understand Meta's Statements (Ops. B, C, F, G)

Alter next opines on how reasonable consumers "would understand" or are "likely to believe" certain statements that the AGs allege are false or misleading. Alter Rep. ¶¶ 137, 383. Alter applies a so-called "social influence analysis" to predict how consumers might understand the statements, concluding they would take away "gists" or "messages"—i.e., a "distill[ed]" version of the statements, as distinguished from the statement itself. Op. C; Alter Rep. ¶ 96.[4] As addressed in Part I.D, *infra*, Alter then compares that presumed "message" with contrary assumptions provided by counsel to conclude the statements were false or misleading. His consumer understanding opinion should be excluded for five reasons.[5]

*First*, Alter's methodology is unreliable. He claims that his "social influence analysis" is a "scientifically grounded framework," Alter Rep. ¶ 32, but it lacks the key indicia of reliability for science-based methods. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593-94 (1993). Most notably, it is not based on any empirical analysis, including, for example, consumer surveys, which Alter himself calls the "standard approach,"[6] or review of actual consumers' reactions and

---

[4] Alter's "social influence analysis" framework considers "the context in which the statements were made; the tactics of persuasion used by the communicator; and the manner in which consumers process information." Alter Rep. ¶ 2.

[5] Alter's consumer understanding opinion is interspersed throughout multiple sections of his report, specifically Sections VII, VIII, IX, and X.

[6] Ex. 5 (Expert Report of Professor Adam Alter ¶ 28, *O'Connor v. Ford*, 1:19-cv-05045 (N.D. Ill. Sept. 8, 2023), Dkt. No. 229-2); *see also* Alter Dep. 112:17-113:10; Ex. 6 (Isaacson Rep.) ¶¶ 27-29

5

comments to specific statements. Alter Dep. 317:24-318:16; 227:5-15. As a result, there is no way of assessing whether his method accurately predicts what consumers would actually understand, i.e., an error rate. Without some measure of reliability, the methodology is nothing but an untested hypothesis, or mere "*ipse dixit* of the expert." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).[7]

*Second*, because Alter provides no empirical evidence and relies on hypotheses, the application of his "social influence analysis" method here does not aid the factfinder. At base, Alter merely speculates on various statements' "message," which, even if permissible in the absence of consumer surveys, a factfinder would be equally capable of doing. *See Apple*, 2023 WL 4556765, at *3 (factfinders make determinations of fact, including statements' meanings). For example, Statements B8-B9 state:

- "We've built tools and controls to help people manage when and how they use our services. Furthermore, we have a dedicated team working across our platforms to better understand these issues and ensure people are using our apps in ways that are meaningful to them."
- "We want teens to feel good about the time they spend on our apps, which is why we've built features like Take a Break on Instagram. Soon, teens will also see a notification when they've spent 20 minutes on Facebook, prompting them to take time away from the app and set daily time limits. We're also exploring a new nudge on Instagram that suggests teens close the app if they are scrolling Reels at night."

Alter Rep. Table 6 at 135. According to Alter, the "message" a reasonable consumer would take from these statements is that the referenced features "were *effective* at curbing addictive use." *id.* ¶ 225 (emphasis added). But the statements do not address efficacy at all, and Alter cites no support for his conclusion. *See id.* ¶¶ 222-25. Alter then changes course for other statements, interpreting them according to their plain language, which also does not aid the factfinder. For example, Alter interprets, "We've been focused on well-being broadly, like I said, it's our number one priority," Alter Rep. Table 1 at 85, to mean that "well-being was either the top priority or one of the top priorities for Meta," *id.* ¶ 149. Should these issues survive summary judgment, Alter's testimony is not helpful to the factfinder, "as it relies on common sense." *Sanchez v. Jiles*, 2012 WL 13005996,

(opining that surveys are common for such purposes).

[7] To the extent Alter purports to testify from experience, he fails to establish reliability as well; for the reasons discussed *infra*, Alter's reasoning is "speculative," "flawed," and not "adequately explained." *United States v. Holguin*, 51 F.4th 841, 855 (9th Cir. 2022).

at *31 (C.D. Cal. June 14, 2012).

*Third*, in analyzing Statements B1-B7 regarding whether Meta's services are, or are designed to be, "addictive," Alter opines that Meta and Senators intended "addiction" to be understood in the "broad, lay sense," not the clinical sense. Alter Rep. ¶¶ 207, 208; *see also id.* ¶ 235. But no one is "an expert in reading [another's] mind . . . when uttering [a word]." *United States v. Alo-Kaonohi*, 635 F. Supp. 3d 1074, 1081 (D. Haw. 2022).

*Fourth*, Alter's consumer understanding opinions are based, in part, on the inadmissible opinions addressed above in Parts I.A and I.B. *See, e.g.*, Ex. 7 (Alter Rebuttal Rep.) ¶ 20, Alter Rep. ¶ 57. Because "the underlying opinions [should be] excluded, this opinion [should also be] excluded." *See Apple*, 2023 WL 4556765, at *6.

*Fifth*, Alter does not apply the correct "reasonable consumer" standard. *See Daubert II*, 43 F.3d at 1320-22 (excluding opinion for applying incorrect causation standard); *Pelican Int'l, Inc. v. Hobie Cat Co.*, 655 F. Supp. 3d 1002, 1023 (S.D. Cal. 2023) (excluding opinion for applying "incorrect legal standard" for patent claim). "The touchstone under the 'reasonable consumer' test is whether the [statements] have a meaningful capacity to deceive *consumers*." *McGinity v. Procter & Gamble Co.*, 69 F.4th 1093, 1097 (9th Cir. 2023) (emphasis added). But Alter considers messaging not just to users of Meta's products, but also "deciders/influencers" of social media use such as "educators[,] school boards, pediatricians[,] other healthcare professionals, public policy advocates, and government officials," Alter Rep. ¶¶ 48-51; *see* Alter Dep. 138:13-16, presumably because many of the at-issue statements were *not* made in the context of a consumer transaction, *see* MSJ Part I.B.2.[8] The understanding of these non-consumers is not the relevant inquiry.

**D.** **Alter's Opinion That Meta's Statements Were False or Misleading Is Impermissible Factual Narrative and State of Mind Testimony That Is Not Helpful to the Factfinder (Ops. E, G)**

After determining how a reasonable consumer would supposedly understand the at-issue statements, Alter next opines that those statements are "false, incomplete, or otherwise have the tendency to mislead." Ops. E, G. That opinion, interspersed throughout Section X, should be

---

[8] "MSJ" refers to Meta's Memorandum of Points and Authorities in support of its Motion for Summary Judgment, filed concurrently with this motion.

excluded for three reasons.

*First*, "falsity" and a "tendency to mislead" are judicially defined terms that Alter may not opine on without invading the province of the factfinder, should these claims survive summary judgment. *See, e.g.*, *Apple*, 2023 WL 4556765, at *3 ("It is for the [factfinder] to determine both the meaning of the Statement and whether the facts indicate it was accurate."); *OCG Energy, LLC v. Shen*, 2024 WL 694912, at *10 (C.D. Cal. Feb. 12, 2024) (opinion that defendant "misled" plaintiffs or "made false representations" "improperly invade[d] the province of the [factfinder] by drawing the ultimate inference or conclusion""); *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 558 (C.D. Cal. 2014) (expert opinion that defendant "'falsely and deceptively labeled its products' . . . [constitutes] an improper legal opinion that usurps the role of the court.").

*Second*, Alter applies no expertise that could assist the factfinder. Alter simply "compared the impression that the statements would give a reasonable consumer with assumptions that counsel directed [him] to make." Op. G.[9] To the extent the at-issue statements survive summary judgment, Alter's testimony merely "addresses lay matters" that a factfinder is "capable of understanding and deciding without the expert's help." *See Aya Healthcare*, 613 F. Supp. 3d at 1322.

*Third*, Alter's opinion consists almost entirely of factual narrative and/or state of mind testimony. In analyzing the AGs' factual assumptions, Alter spends dozens of pages gratuitously summarizing the documentary record and opining on Meta's knowledge and state of mind. *See* App. A. Such testimony is inadmissible. *See supra* Part I.A.

### E. Alter Lacks a Reliable Methodology for His Opinion That Consumers Were "Exposed" to Meta's Statements (Op. H)

Alter opines that "the information conveyed by Meta's statements"—"whether through verbatim re-publication" or "informal transmission of message gists"—"was transmitted to, and spread further by, consumers," thereby "increasing the total number of consumers exposed to Meta's

---

[9] For example, after opining that a consumer would understand certain statements to mean that "Meta meaningfully invests in underage enforcement," Alter compares that understanding to contrary assumptions, including that "Meta's enforcement and removal of U13 users was . . . under-resourced." Alter Rep. ¶¶ 348, 362. Alter then concludes: "Given the difference between what Meta knew or discussed internally, and what it communicated externally, its external statements have a tendency to mislead consumers." *Id.* ¶ 363. Alter performs similar comparisons for other statements. *See id.* ¶¶ 167-68, 231-32, 293-94.

8

communications." Op. H; Alter Rep. ¶ 385-86. Alter's opinion lacks a reliable methodology.

In support of his opinion, Alter first analyzes five factors that "increase the likelihood" that a statement, or its supposed "gist," was transmitted broadly. Alter Rep. ¶ 386. But Alter provides no explanation or authority for using those five factors here. *See id.* ¶ 386.

Alter also conducted "informal search[es]" to identify "examples" of the at-issue statements being "transmi[tted] beyond the[ir] original venues." *Id.* ¶ 387. But apart from a single Facebook post, Alter does not identify what statement he searched for, what portion was republished, or how many people were exposed to the republication. *See* Alter Dep. 216:2-217:6. Nor did he analyze exposure by state. *See, e.g., id.* 127:1-16; 228:9-22. Such "informal" analysis cannot reliably support expert testimony. *See Jauregui v. Daimler Truck N. Am. LLC*, 2025 WL 904744, at *2 (D. Ariz. Mar. 25, 2025) (excluding expert opinion regarding plaintiff's earning capacity "based entirely upon informal google searches" and "[p]laintiff's mere say-so"); *Nat'l Union Fire*, 2005 WL 6459866, at *4 (similar).[10]

Alter also says he spoke at various unidentified events over "more than a decade" and "[a]t each event, audience members" supposedly "raised one and often many of the issues addressed in the at-issue statements." Alter Rep. ¶ 392. But Alter provides no other detail, such as what "issues" the audience members raised, how they relate to the statements at issue, or what specific understanding the audience members conveyed. *See id.*; Alter Dep. 175:4-177:15. As he conceded, his conversations were not "grounded in specific methods." Alter Dep. 175:4-177:15. They are "a black box into which data is fed at one end and from which an answer emerges at the other." *Open Text S.A. v. Box, Inc.*, 2015 WL 349197, at *6 (N.D. Cal. Jan. 23, 2015).

## II.    Alter's COPPA Opinions Should Be Excluded (Ops. L-P)

### A.    Alter's Opinion That Meta Intended to Attract U13s Is Improper State of Mind Testimony and Factual Narrative and Unreliable (Ops. L, M, O)

In support of his opinion that Instagram and Facebook are directed to children, Alter concludes that Meta "*intended* to attract and retain teen and tween users" because it "*viewed* young teens and child users as valuable and important." Alter Rep. Ops. L, M, O; *see id.* Sections XVI,

---

[10] Alter's reliance on certain internal Meta documents, Alter Rep. ¶¶ 389-91, is no more reliable, as none of the internal documents discuss the at-issue statements.

XVII.A, XIX.A; App. A.  Those opinions should be excluded for two reasons.

*First*, they are, again, impermissible opinions about Meta's—or a Meta advertiser, Nickelodeon's—intent, knowledge, or state of mind.  *See supra* Part I.A.  They are also based on Alter's extensive factual narrative of Meta's internal documents and publicly available webpages without applying any specialized knowledge or expertise.  *See supra* Part I.A.

*Second*, Alter fails to consider relevant countervailing evidence, which the Ninth Circuit has held renders an expert's conclusion unreliable.  *Engilis*, 151 F.4th at 1051-52 (affirming exclusion of expert who ignored evidence of plaintiff's obesity which might have contributed to his cancer diagnosis).  Specifically, Alter fails to meaningfully engage with the undisputed fact that U13s are not permitted on either platform—compelling evidence that Meta did *not* intend to attract them.  *See* MSJ Part IV.A.  Alter only mentions the policy in passing *elsewhere* in his report (to speculate on Meta's intent), *see, e.g.*, Alter Rep. ¶¶ 359, 429, even though it directly undermines his opinion.

### B.    Alter's Opinions That Meta's Platforms Are Directed to Children Should Be Excluded (Ops. M-P)

#### 1.    Alter's Opinions Are Impermissible Legal Conclusions

"Directed to children" is a legally defined term under COPPA, which the factfinder must decide (should the COPPA claims survive summary judgment).  15 U.S.C. § 6502(a)(1); 16 C.F.R. § 312.2(1).  Accordingly, Alter may not offer an opinion that Instagram and Facebook as a whole, or portions thereof, are "directed to children," because experts may not "draw[] the ultimate inference or conclusion."  *OCG Energy*, 2024 WL 694912, at *10; *see also supra* Part I.D.

Similarly, Alter's opinion that "portions" of the platforms are directed to children rests on his incorrect and impermissible legal conclusion that a single user's account may constitute a "portion" of a website under COPPA.  While COPPA recognizes that a "portion" of a website can be U13-directed, *see* 15 U.S.C. § 6501(10)(ii), an individual user account is not considered a "portion" for purposes of COPPA.  *See* MSJ Part IV.A.2.

#### 2.    Alter Applies an Unreliable Methodology to Determine Whether the Platforms, or Portions Thereof, Are Directed to Children

Alter's opinion that Instagram and Facebook are directed to children should also be excluded because it applies an unreliable methodology.  To reach his conclusion, Alter purportedly analyzes

10

the extent to which (i) "Meta viewed having child users on Instagram as desirable;" (ii) "Instagram incorporates features . . . and content that are child-oriented and appealing to children;" and (iii) "empirical evidence demonstrates that Instagram actually attracts and retains child users." Alter Rep. ¶¶ 455, 528 (same for Facebook). Alter's methodology is unreliable for four reasons.

*First*, whether Meta viewed "child users on [the platforms] as desirable," *id.* ¶ 455, is impermissible state of mind testimony, *see supra* Part II.A. Because Alter's child-directness opinion relies in substantial part on that inadmissible opinion, *see* Alter Rep. Sections XVII.A, XIX.A, his child-directness opinion is also inadmissible. *See Apple*, 2023 WL 4556765, at *6.

*Second*, Alter impermissibly conflates children and teens. *See, e.g.*, Alter Rep. ¶ 534 ("[A] platform that is designed to appeal to 13- to 15-year-olds will *necessarily* also appeal to tweens.") (emphasis added). But appealing to teens 13 or older cannot make a website child-directed, as it would impose COPPA liability for conduct lawful on its face.[11] *See In re Novatel Wireless Sec. Litig.*, 846 F. Supp. 2d 1104, 1108 (S.D. Cal. 2012) (excluding opinion "incompatible" with the law).

*Third*, Alter's opinion is based on an unrepresentative, cherry-picked sample of just five user accounts on both Instagram and Facebook to "illustrate how the platform[s] appeal[]" to U13s. Alter Rep. ¶¶ 513; *see id.* Sections XVIII, XX. But those *ten* accounts are a miniscule and unrepresentative fraction of the *billions* of accounts on Instagram and Facebook. Alter's failure to account for the other billions of accounts renders his opinion unreliable. *See, e.g.*, *Bextra.*, 524 F. Supp. 2d at 1176 (excluding expert for "cherry-picking" and "ignoring the great weight" of contradictory evidence).

*Fourth*, Alter's estimate of the number of U13s on Instagram and Facebook, Alter Rep. Sections XVII.D, XIX.C, is unreliable. Alter did not "independent[ly] collect[]" the relevant data. Alter Dep. 332:21-334:15. While he summarizes results from third-party surveys and internal Meta documents, he did not assess the reliability of those surveys or their results. *See generally* Alter Rep. Sections XVII.D, XIX.C; *In re ConAgra Foods*, 302 F.R.D. at 555-56 (requiring surveys incorporated into report to be "relevant and reliable"). And he relies on vague terms from the surveys,

---

[11] In discussing features or content that appeals to teens or tweens, Alter extensively summarizes Meta documents and public sources. *See, e.g.*, Alter Rep. Sections XVII.B.ii-iv. If Alter intends to testify about these documents at trial, Meta reserves the right to move to exclude such testimony.

such as whether U13s "used" Instagram or Facebook, *see, e.g.*, Alter Rep. ¶ 509, which could involve U13s viewing Instagram from their parents' account, which would not implicate COPPA.

### III.    Iyer's Opinions Should Be Excluded in Their Entirety

#### A.    Iyer's "Mitigation" Opinions Are Too Vague to Assist the Trier of Fact and Are Not Based on a Reliable Methodology (Ops. 1, 3, 4)

Iyer was asked by the AGs to assume that Meta's "algorithmic recommendation and extended use features" cause "unwanted, harmful, and negative experiences for young users."  Iyer Rep. ¶ 17. Based on that assumption, Iyer then opines that Meta's existing well-being tools and features are "insufficient," "not enough," or "ineffective."  *See, e.g.*, *id.* ¶¶ 41, 44, 48; *see also* Op. 3-4.  He then concludes that his recommended changes "will mitigate" those negative experiences.  Op. 1.  These "mitigation" opinions should be excluded for two reasons.

*First*, Iyer does not define "sufficient" or "effective" mitigation.  *See Innovation Ventures, LLC v. Custom Nutrition Labs., LLC*, 2021 WL 12255004, at *17 (E.D. Mich. Sept. 29, 2021) ("[A]n arbitrary and undefined definition of [the term] 'significant' cannot meet the reliability standard demanded under *Daubert*.").  Iyer explained only that "sufficient" mitigation would be "somewhere north of zero percent," Ex. 8 (Iyer Dep.) 146:6-147:11, but "less than a hundred percent," *id.* 313:24-314:8.  Iyer could not say, for example, if the percentage of young users with sleep issues caused by Meta's platforms falling to less than 45% would be "sufficient," *id.* 125:15-129:11, or whether mitigation would be "successful" if only one in nine users experienced mental health issues, *id.* 292:9-293:4.[12]   Nor could he explain why changes Meta *has already* made to improve user experiences—which he admits provide *some* mitigation, *see* Iyer Rep. ¶ 38—did not result in "sufficient" mitigation.

Iyer's framework is entirely subjective.  Iyer Dep. 184:13-185:9 ("I can't offer . . . an exact, quantitative, precise point estimate of what would happen if they implement all of the design changes I suggest.").  If Meta were to implement his proposals, there would be no way for anyone—a factfinder, Meta, or Iyer himself—to assess whether "sufficient" mitigation had been achieved.  This falls far short of the scientific rigor required.  *See Georges v. Novartis Pharms. Corp.*, 2013 WL

---

[12] *See also* Iyer Dep. 147:13-148:8 ("I have not formed an opinion as to the exact percentage" of sufficient harm mitigation).

5217198, at *16 (C.D. Cal. Apr. 4, 2013) (excluding opinion that medical condition is "rare" because term is "subjective, based on . . . personal opinion, and undefined in the scientific literature").

Devoid of any reliable standard, Iyer's mitigation opinion is common sense that does not aid the factfinder. *Sanchez,* 2012 WL 13005996, at *31. He merely (i) assumes that some features cause negative experiences; and (ii) concludes removing or changing those features would "mitigate" between zero and 100 percent of those experiences. Just as it is common sense that opening an umbrella would "mitigate" getting soaked in the rain, it is—as Iyer acknowledges—"common sense that removing [extended use design features assumed to be harmful] would remove negative, unwanted, harmful experiences." Iyer Dep. 275:1-18.

*Second*, Iyer's "mitigation" opinions are not based on reliable principles or methods. Iyer fails even to identify the methodology he purportedly used to reach his conclusions, such as that Meta's existing tools and features—like the ability to block and report a use or hide certain words and phrases—are "insufficient." *See* Iyer Rep. Section III.B. Iyer did not determine the incidence of negative experiences on Meta's platforms; he was simply told to assume they existed. *Id.* ¶ 15. He performed no testing or analysis to show that his suggested changes would *actually* reduce harm on Meta's platforms as he says. *See, e.g.*, Iyer Dep. 132:12-133:4, 421:23-422:14. Iyer "ha[d] six months" to "provid[e] precise quantitative point estimates" of this purported effect, but failed to do so. *Id.* 190:23-191:10. Nor did Iyer survey literature, experimental results, observational studies, or meta-analyses of the kinds of changes he suggests. The *only* research he reviewed was that which he knew was consistent with his opinions. *Id.* 270:2-10, 391:13-392:5. That is textbook cherry-picking. *See Bextra.*, 524 F. Supp. 2d at 1176 (excluding expert who "reache[d] his opinion by first identifying his conclusion . . . and then cherry-picking observational studies that support[ed] his conclusion and rejecting or ignoring the great weight of the evidence that contradict[ed] his conclusion."). Iyer's methodology, if it exists, cannot be and has not been tested. *Grodzitsky v. Am. Honda Motor Co., Inc.*, 957 F.3d 979, 985-86 (9th Cir. 2020). It has not been subject to peer review and does not derive from any academic literature. *Id.* Iyer provides no rate of error, and he cites no evidence that his methodology is generally accepted in any field. *Id.* His opinions are far afield from any reliable

principle or method that Rule 702 requires, and should be excluded.

**B.      Iyer's "Feasibility" Opinion Is Not Based on a Reliable Methodology (Op. 2)**

Iyer's "feasibility" opinion posits that his recommended changes are "feasible" for Meta to implement.  Op. 2.  That opinion is not supported by any discernible methodology.  Iyer provides no benchmark, definition, test, or framework for his determination of what is, or is not, "feasible."  He uses no yardstick from any academic literature, objective criteria, or data to measure his proposals.  That is textbook *ipse dixit*.  *See In re Toyota Motor Corp.*, 978 F. Supp. 2d 1053, 1067 (C.D. Cal. 2013) (excluding expert's opinions that "are not based on a reliable foundation or methodology . . . [and] amount to . . . *ipse dixit*").

The only purported support for Iyer's conclusion is his own *ad hoc* observations of what Meta and various other companies have done in the past.  Iyer looks, for example, to YouTube, Twitter, Pinterest, the Google search results page, Facebook, and to certain features on Instagram that he contends are similar versions of the changes he wants.  *See, e.g.*, Iyer Rep. ¶¶ 34-35, 54, 57, 60; Iyer Dep. 220:3-16, 339:1-25, 340:20-341:13.  But Iyer fails to provide any methodology for selecting those services or designs, and he does not explain why they are appropriate comparisons to Facebook and Instagram.  *See, e.g.*, Iyer Dep. 220:11-16, 374:7-375:3 (admitting "[t]here is always some generalization that occurs extrapolating from one platform to another").  All Iyer did was pluck out a few websites with features he liked and conclude that it was "feasible" for Meta to implement the same.  That is not a reliable methodology.  It has not been tested, peer-reviewed, or generally accepted in any field and hides unknown rates of error.  *See Grodzitsky*, 957 F.3d at 985-86.  The result is "a black box into which data is fed at one end and from which an answer emerges at the other." *Open Text S.A.*, 2015 WL 349197, at *6.

## CONCLUSION

For the foregoing reasons, Meta respectfully requests that the Court grant its motion to exclude the opinions of Dr. Alter and Dr. Iyer.

Dated:  January 30, 2026

Respectfully submitted,

DAVIS POLK & WARDWELL LLP

*/s/ Antonio J. Perez-Marques*

James P. Rouhandeh, *pro hac vice*
Antonio J. Perez-Marques, *pro hac vice*
Caroline Stern, *pro hac vice*
Corey M. Meyer, *pro hac vice*
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
rouhandeh@davispolk.com
antonio.perez@davispolk.com
caroline.stern@davispolk.com
corey.meyer@davispolk.com

COVINGTON & BURLING LLP

Ashley M. Simonsen, SBN 275203
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, California 90067
Telephone: (424) 332-4800
Facsimile: (424) 332-2749
asimonsen@cov.com

Paul W. Schmidt, *pro hac vice*
Phyllis A. Jones, *pro hac vice*
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
pschmidt@cov.com
pajones@cov.com

*Attorneys for Defendants Meta Platforms, Inc. and Instagram, LLC.*

META'S MOTION TO EXCLUDE EXPERT TESTIMONY OF ADAM ALTER AND RAVI IYER
Case No. 4:22-MD-03047-YGR, 4:23-CV-05448-YGR