# EXHIBIT 3

Page 1

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.                          SUPERIOR COURT

---------------------------------------x

COMMONWEALTH OF MASSACHUSETTS ,

                          Plaintiff,


              -against-        Index No:
                              2384CV02397-BLS1


META PLATFORMS, INC. and

INSTAGRAM, LLC,


                          Defendant.

---------------------------------------x

    Job No. MDLG7726454

Page 2

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

---------------------------------------------x

PEOPLE OF THE STATE OF CALIFORNIA, et al.

                    Plaintiffs,

         -against-



META PLATFORMS, INC., Instagram, LLC,

Meta Payments, Inc., Meta Platforms

Technologies, LLC,  et al.,

                    Defendants.

---------------------------------------------x


        VIDEOTAPED DEPOSITION of ADAM ALTER, Ph.D.,

taken by the Defendant, pursuant to Notice, held at 450

Lexington Avenue, 10th Floor New York, NY 10163, on

December 12, 2025, at 8:41 a.m., before a Notary Public

of the State of New York.


*******************************************

Page 19

A.    No.

Q.    You're not an economist, are you?

A.    I wouldn't describe myself as an economist, but I do behavioral economics work as part of my judgment and decisionmaking work.  And I'm familiar with many economic concepts through my work as a professor at a business school, and based on some of the research I've done, some of which engages in economics-type analyses.

Q.    Is it right that you've never worked full-time for a social media company as an employee?

A.    That's correct.

Q.    Have you ever consulted for a social media company?

A.    I haven't engaged in an extended consulting engagement with a social media company, but I've delivered a short session to employees at LinkedIn, and that was a number of years ago.  I can't recall exactly when.

I also, at one point, spoke to a former colleague of mine who had studied at Princeton University with me in grad school, who had gone to work at Instagram, and she had read my book and asked me to talk to her and two members of her team about some of the ideas in the book.

Q.    And when was that conversation that you're

Page 112

your hypotheses?

MR. SLOTHOUBER:  Objection.  Form.
Asked and answered.

Q.      Let's move on.

Is it possible as a general matter in your experience to empirically test consumers' interpretations of company's statements?

MR. SLOTHOUBER:  Objection.  Vague.

A.      That's a broad question.  It really depends on the context.  Sometimes that is a method that you could use; sometimes it might not be the appropriate method to use; sometimes it might not be the best method to use but it's a method that has been used and can be used.

Q.      In fact, it's a method that has been used by you, right?

A.      In certain contexts, yes.

Q.      In fact, in other cases where you served as an expert, you have conducted consumer surveys to empirically test consumers' understandings?

A.      I've certainly conducted consumer surveys.  I'd need to have my memory refreshed.  I've worked on a number of cases.  But in some contexts, for example, you have a particular label and you want to know how people understand that label in the here and now, that might be the best method for doing that.

When you're asking people to go back in time and to imagine having seen a statement, in a rapidly changing context where knowledge has shifted across time, where their understanding has shifted across time, where their engagement with the topic has shifted across time, asking -- now put yourself back in time to this year, based on everything you knew at the time, can you respond is a method that, in this context, I would say is not ideal, and so I did not think it was the best approach here.

Q.    You recall your testimony in the O'Connor v. Ford case?

A.    I know that I did testify in a deposition, if that's what you're asking.

Q.    And you recall your expert opinions in that case?

A.    At a high level.  I haven't reviewed that testimony recently.  It's a couple of years ago now.

Q.    You recall that you were asked to opine as to consumer expectations regarding Ford F-150s at the time of leasing or purchasing them?

A.    Broadly speaking, yes.  It was a consumer expectations case, yes.

Q.    And you recall, generally, that you said a couple years ago that your report was submitted in March

Q.      And we'll come back to this concept of the gist, and word of mouth.  But as to the statements of themselves, you did not undertake any empirical analysis as to the dissemination of those statements on a state-by-state basis; is that right?

MR. SLOTHOUBER:  Objection.  Vague.

And asked and answered.

A.      As I said, that was not my intention.  I did not intend to systematically examine exposure state by state; I wasn't asked to do that.  But what I was asked to do is describe broadly the kinds of outlets and the kind of reach that these statements had, where they were republished, for example, where they were discussed, the prominence of the outlets associated with them, and so that's what you see expressed in that section of the report.

Q.      And your analysis of whether the challenged statements or the messages, the gist, were likely to reach consumers, it's not tethered to any specific individual statements; is that right?

MR. SLOTHOUBER:  Objection.  Vague and compound.

A.      I was not asked to examine the extend to which any one particular statement reached various audiences. In some of the analyses, I refer, for example, to a

Page 138

(Whereupon, a short break was taken.)

THE VIDEOGRAPHER:  Stand by, please. The time right now is 12:02 p.m., and we're back on the record.

BY MR. PEREZ:

Q.     Dr. Alter, you understand you're still under oath?

A.     Yes.

Q.     For purposes of your deception analysis, you recall you used a definition of "reasonable consumer"? It's just yes or no, to orient you?

A.     Broadly, yes.

Q.     And your definition of the consumers you analyzed were not limited to users of Meta's products; is that right?

A.     To end users, yes, that's right.

Q.     One of the premises of your report, I think it's fair to say, is that social media is a credence good; is that right?

A.     I'm not sure it's a premise, but it's certainly a point that I make in the report.

Q.     Right.  And a concept that you rely on in reaching your opinions; is that right?

A.     It's certainly relevant to those opinions, yes.

Q.     And a credence good you define to mean products

Page 142

frame the statement?

MR. SLOTHOUBER:  Objection.  Compound and speculation.

A.    We're speaking at a very high level here, not about the specific statements in this case.  I'm not in a position to offer a generic response to that question about all companies and all statements.  But in this particular instance, looking at Meta and its strategic objectives, the kinds of discussions that were had about its communications and so on, the statements it made had context that was opaque to the consumer.

Q.    That's based on your assessment of the evidence?

A.    It's based on my understanding of how company communications operate and the fact that, as a matter of fact, consumers don't have access to the same information that personnel at companies have about those companies and their strategies and policies.

Q.    Would you agree that there are aspects of a consumer's subjective experience using social media that consumers do have the ability to assess for themselves?

A.    In the context of credence goods, which we're discussing now, not every aspect of the good needs to be opaque to the consumer.

So there are certainly cases, I suppose, where

Page 143

a particular aspect of a product is "experienceable," if that's a word, or something that you could understand through experiencing the product. But the product at large can still be a credence good, because there are credence attributes.

Q.    And there are indeed aspects of social media that consumers do have the ability to assess for themselves, correct?

A.    Well, we're speaking in the abstract here, so I would need to look at what specific attributes we're referring to, and the context in which the consumer perceives them. It's difficult to make blanket claims. It depends.

Q.    So for instance, consumers might be able to independently assess how long they spent using social media?

A.    I'm not sure that I would think of that in the same context as, for example, the statements here. So that's a consumer examining his or her own behavior with respect to the product. That's a bit different from understanding communication that arises from the company and that's shared by the company.

Q.    You're not answering my question. My question is: Do you agree that consumers can assess for themselves the amount of time they spend using social

Page 144

media?

MR. SLOTHOUBER:  Objection.  Form.  And outside the scope.

A.    I haven't examined, for the purposes of this report, all the ways consumers can examine how long they're spending using social media platforms.  I'm aware that there are ways to track that.  A consumer could create a log to reflect on how long that consumer has been using the product.  But I'm really focused on company representations, not on the consumer side here.  And so this is a different analysis.

Q.    Would you agree that consumers can assess for themselves whether they stayed up later than they intended, using social media?

MR. SLOTHOUBER:  Objection.  Beyond the scope, and form.

A.    You're asking first order questions about, for example, assessing time spent.  So yes, you could certainly, as a consumer, reflect on your exposure to a product or your use of a product and say, "I think it's having a particular effect."

But the second order effects might be hidden from you.  You may not understand what that means or what effect that might have on your wellbeing, for example or what the company thinks about that use and

Page 145

how they've tried to enhance it, or anything else that might be associated with it.  That would all be hidden from the consumer.

Q.    Would you agree that consumers have access to sources of information about the safety of social media from sources beyond Meta?

MR. SLOTHOUBER:  Objection.  Vague.

A.    What sort of information are you referring to?

Q.    Well, for instance, your book is a source of views and analysis concerning the impacts of social media to which consumers have access, correct?

A.    Consumers do have access to some information about social media, yes.  Absolutely.

Q.    Right.  Not only from the company, correct?

A.    That's true.

Q.    And they have access to views that are critical of social media, correct?

A.    Certainly that exists in the world and so they can access it.

Q.    And they have access to sources of information that emphasize the potential risks of social media, correct?

MR. SLOTHOUBER:  Objection.  Vague.

A.    I'm not sure exactly what sort of information you have in mind.  But broadly speaking -- excuse me.

Page 146

Consumers have access to information outside of what the company produces.

Q.    Including about the risks of social media, correct?

MR. SLOTHOUBER:  Objection.  Vague.

A.    I wasn't asked to perform an analysis of the extent to which this information was available, for the purposes of my report.

But I can say that the extent to which they could access that information has shifted across time, and their knowledge that such information was available has shifted across time.  So --

Q.    Your book --

A.    -- I don't want to make a blanket claim.

Q.    Your book has been available since 2017?

A.    Yes.

Q.    Were you the first to speak out as to the potential risks on social media?

MR. SLOTHOUBER:  Objection.  Compound.

A.    I'm not aware of what the full landscape looks like, but as I've described earlier, my experience, having proposed the book in 2014 was that, at the time, not much had been written and that it was a fairly new topic, at least as far as books were concerned.

And that at least some of the people I floated

Q.      You are offering conclusions as to Meta's intentions, correct?

A.      I am able to offer those conclusion, yes.

Q.      And you're purporting to do so, correct?

A.      You can see where I've done that in this report, to the extent that I have, where, for example, I have a document that says this is what Meta was saying and this is what they were intending by that, and so there that's, I suppose, a statement of deliberate intent to enact a particular strategy that's at issue here.  So yes, to the extent there is evidence, I'm offering my opinion on intent in that case.

Q.      Okay.  And that occurs throughout your report, fair?

MR. SLOTHOUBER:  Objection.  Vague and mischaracterizes the report.

A.      I don't want to give a blanket response about that, but it occurs in various places throughout the report.

Q.      As a hypothetical, Dr. Alter, if a survey were conducted and it was determined that many consumers don't believe a word of what Meta says about health or safety, would that be inconsistent with your views in this case?

MR. SLOTHOUBER:  Objection.

Page 175

if Meta is making a particular claim, consumers don't assume automatically that there is contradictory evidence available to Meta that it's not sharing.

Q.    In addition to what you've laid out in Section VIII of your report, you mention, I think, in your rebuttal report that your understandings come from personal experience, including conversations that you say represent thousands of longitudinal data points that allowed you to gauge consumer understanding over time.

Do you recall that generally?

MR. SLOTHOUBER:  Sorry, where are you referring to, Counsel?

MR. PEREZ:  It's page 14 of the rebuttal report.

THE WITNESS:  Of the rebuttal report, sorry.

A.    Yes, I describe this as a kind of auxiliary piece of support for some of the claims I made.

Q.    That's part of what you're relying on is conversations you've had over time?

A.    Depends on the particular claim, but in having gauged over time the extent to which consumer sentiment has broadly shifted and the extent to which the messages have reached consumers and so they have shared that understanding with me that Meta has made certain claims,

this was a relevant piece of experience in addressing those issues.

I'm not claiming there's a systematic process here by which the data points were collected, but across time we're talking about a significant volume of data.

This was also part of the reason why I thought a survey run asking people to have put themselves in the position of, say, a consumer in 2021 or 2017 would have been quite difficult because the situation had shifted so dramatically across time.

Q.    These, what you describe as longitudinal data points from your conversations, those aren't enumerated in your report, correct?  You're not identifying the conversations that you're relying on, right?

A.    No, I don't seek to do that in the report.  I just describe, where relevant, my impressions from those repeated conversations across time.

Q.    Right.  You don't identify who the conversations were with, right?

A.    I don't specify who the conversations were with, but I describe broadly what those conversations informed, for example, the extent to which certain issues were raised, the extent to which I notice sentiments shifting across time.

But again, this not an attempt to provide a

Page 177

trend line or anything like that that's grounded in specific methods. This is just a reflection of my experience across time which is, I would say, consistent with, it dovetails with the other evidence that I have, and it converges with the other evidence, and so strengthens my impressions, but is not certainly the only evidence I present.

Q.    You didn't provide a full record of what was said in those conversations?

A.    I did not provide a full record, because I did not intend to do that, that was not what I was trying to do in describing these conversations. I didn't record every conversation I had, but over time, that became the useful way of gauging what consumers were thinking, broadly speaking.

Q.    And that series of conversations you had here and there over a course of years, that's not a methodology another researcher could replicate, correct?

                MR. SLOTHOUBER: Objection. Compound and misstates the testimony.

A.    I think here and there over the years, perhaps, minimizes just how many conversations there were and with how many audiences. We're talking about many, many speaking engagements and consulting engagements with a huge and diverse range of consumers, with children, with

may have been transmitted.

Q.      You didn't undertake to quantify how many consumers were exposed to Meta's statements in their verbatim original form, did you?

A.      My assignment was not to examine exposure levels and numbers for each statement.  You can see, for some of the statements, I present specific numbers and tether those numbers to specific states.  Talk about exposure to Mark Zuckerberg's statement on October 5, 2021, that's at paragraph 388.  And so, in some cases, I'm very explicit about transmission numbers, at least at first instance, and in others I talk about, at a much higher level, the fact that the outlets themselves are high profile indicates that those messages will have been perceived at first instance and then perhaps shared.

Q.      But you haven't -- other than specific examples that you pull out in your report, you have not undertaken to quantify consumer exposure to the statements that you analyze; is that right?

A.      My intention was not to quantify exposure.  I think you also see, as an indication of the reach of these audiences or of these outlets, these media outlets, these are the outlets that Facebook and Instagram personnel chose to share their message on

Page 217

including, for example, CBS This Morning.  These are national outlets, and those venues are often chosen because they happen to have large reach.  It is expected the message will reach people, and so that's another factor that might contextualize the extent to which the message will have reached consumers.

Q.    You've expressed your views about social media on platforms with broad reach, haven't you?

A.    I'm not sure exactly which platforms you're referring to, but certainly some of them have large audiences.

Q.    Like Joe Rogan, you've been on the Joe Rogan podcast?

A.    Yes.

Q.    And that's one of, if not the most popular, podcast in the country?

A.    It certainly has a large audience, yes.

Q.    And so you would agree that -- well, you've also participated in Oprah Winfrey's podcast?

A.    I have, yes.

Q.    Yeah.  So you would agree, generally, that you have expressed your views on platforms with broad audiences?

A.    Some of the podcasts had perhaps one or two listeners.  But yes, some of the outlets that I appeared

Page 227

That evidence was certainly relevant to my understanding of how consumer sentiment has shifted.  So in this case, I did not look at this specific post and how consumers responded.

Q.     Was there any company statement in this case, for which you systematically reviewed contemporaneous consumer reactions, such as in comments and online reactions, as a check on your hypotheses on consumer interpretations?

MR. SLOTHOUBER:  Objection.  Form. Compound.

A.     That was not an analysis I sought to undertake and instead applied the social influence analysis framework and my expertise, and many data points I had collected over time to answer that question.

Q.     At -- the last sentence of paragraph 388, says:

"Thousands of these views, reactions and/or comments to Mr. Zuckerberg's posts comprised Massachusetts users."

Do you see that?

A.     Yes.

Q.     You didn't undertake that state-specific analysis with respect to any state other than Massachusetts; is that right?

A.     That's correct, in this particular instance.

Page 228

But there are other places where I focus on what are called prioritized markets, and at paragraph 391, for example, I break out some of the states.  But in this particular paragraph, I focused only on Massachusetts.

Q.     And in paragraph 391, you mention five states, right, out of the 31 or 32 that are at issue in these proceedings?

A.     Yes, that's correct.

Q.     But you didn't systematically assess exposure to even the message gists with respect to specific states in these proceedings?

MR. SLOTHOUBER:  Objection.  Form. Compound.

A.     My assignment, and also my intention was not to examine exposure at the state level, but rather to look at exposure broadly.

And since many of the media outlets that I described here, and the word of mouth processes are universal and apply across the entire country, and are viewed by people across the entire company, I did not perform a breakout analysis to capture exactly what proportion of viewers was in each state.

Q.     Well, if we look at paragraph 387, for instance, one of the new sources you reference there as transmitting the message or message gist, the last item

Page 317

sentences?

Simple question, have you spoken to a single consumer who told you they interpreted that statement in this way?

A.    I could point you to the same forms of evidence and the same approach I used for understanding the other statements in context.  The same application of the same expertise, background, principles that I used to understand such statements in other contexts, internal documents at Meta, the large gap between what was known at Meta and what this statement implies and so on to unpack what consumers would have understood and the gulf between that and the true nature of the situation at the company.

Q.    So the answer is, no, you have not spoken to a single consumer who has told you that they interpreted Ms. Davis's statements in the way that you just posited?

A.    I'll say again, you can see the approach that I used in my report to unpacking these statements, what they mean, explaining the relevance of the context, and explaining the various models that I use and the approach I use to understand how consumers would understand those statements.

Q.    Yep, I understand what you did do.  I'm asking a different question.  You have not spoken to a single

Page 318

consumer who told you they interpreted Ms. Davis's statements at this hearing in the way that you posit, correct?

MR. SLOTHOUBER:  Objection.  Form. Asked and answered.

A.     That's not the approach I took.  As I said, I had a different approach which was to examine using a model, using lots of experience, having done similar things in the past as an expert on such communications in many contexts, including this one, that read in context, this statement says to a consumer or audience based on the principles of linguistic psychology and otherwise, that either they're not on Instagram, or if we find them, we very quickly remove them.  And I've explain how I arrive at that conclusion here and in the report.

Q.     Based on the principles of linguistics, et cetera, as you said, but not one person has told you that they interpreted this statement the way you posit, correct?

MR. SLOTHOUBER:  Objection.  Form. Asked and answered.

A.     My assignment was not to interview people directly.  I did not feel that was the best way to go about unpacking the interpretation of these statements,

Page 332

litigation?

A.      My assignment was not to examine the number of such users but rather to look at Meta's own assessment of the situation and how Meta described that to its consumers.  And then also -- sorry, that's for the deception component.

In the COPPA section, I examined Meta's own data that captured its own understanding of how many users there were, and so I used a slightly different set of data, but again, triangulating or overlapping.

Q.      So you have not attempted to calculate the number of under-13-year-olds on Meta's platforms using the raw user data that Meta has produced?

A.      I believe since Meta claims under 13s are not on the platform at all, it hasn't explicitly measured that.  I may be misremembering, but I know it has done other research that I refer to in this report, and in the COPPA section of the report, where the company attempts to capture how many people under 13 use the platform, or at least the proportion of that population.

Q.      But you haven't used the raw user data to try to calculate the number of under-13-year-olds on the platform, right?  That's a simple one?

A.      That's certainly something someone might be able to do.  It's just not something that I did in the

course of my investigation.

Q.      Right.  Instead the data you cite as to the number of under-13-year-old users on Meta platforms comes from either prior studies done by Meta or unaffiliated third parties; is that right?

A.      The data I cite are both internal Meta data and data from, I think you described it as unaffiliated third parties, so organizations that routinely collect this sort of data.

Q.      Okay.  Not work you did yourself?

A.      As I said earlier, there are different ways of collecting data.  You could do the primary collection, but often in the course of collecting archival data, you can rely on collection processes by others.

Q.      And so the sections of your report about audience composition, you are providing your interpretation of prior relevant studies?

A.      In my examination of audience composition, I rely on a range of different studies that examine that question.  My role here was not to provide a canonical or objective specific number that described how many users there were, but rather to examine, broadly speaking, whether the platform was directed to children, and one piece of evidence there is that a substantial number of such children are using the platform.  There

Page 334

are certainly other pieces of evidence, but actual audience composition is one piece.

Q.      Okay.  But you weren't -- if we look, for instance, at paragraph 59 -- not 59 -- 509 on page 309 --

A.      Yes.

Q.      -- you weren't involved in the studies that you're citing there, correct?

A.      By my count, there are -- one, two, three, four -- perhaps 10 or 11 or maybe more instances of data collection that bear on this question.  Some of them internal by Meta, some of them external.  I did not conduct my own independent collection of data because there was already adequate data that existed on that particular question.

Q.      And you weren't involved in any of the studies that you're citing in paragraphs 509 or 510, correct?  That's not work you did?

A.      I was not engaged in the process of actually collecting these data.

Q.      Okay.

A.      And I actually say, though, these numbers vary they demonstrate that a meaningful number of children below the age of 13 use Instagram regularly, so I'm not trying to arrive at a fixed number, but just to broadly

Page 351

C E R T I F I C A T E

STATE OF NEW YORK        )

                        ) ss.:

COUNTY OF QUEENS )


                I, BROOKE E. PERRY, a Notary Public

        within and for the State of New York, do hereby

        certify:

                That ADAM ALTER, the witness whose

        deposition is hereinbefore set forth, was duly

        sworn by me and that such deposition is a true

        record of the testimony given by such witness.

                I further certify that I am not related

        to any of the parties to this action by blood

        or marriage; and that I am in no way interested

        in the outcome of this matter.

                IN WITNESS WHEREOF, I have hereunto set

        my hand this 16th day of December, 2025.

        --------------------------

        BROOKE E. PERRY