# EXHIBIT 8

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA          )
ADOLESCENT ADDICTION/        ) Case No.
PERSONAL INJURY PRODUCTS     ) 4:23-MD-03047-YGR
LIABILITY LITIGATION         ) MDL No. 3047
_____ )
THIS DOCUMENT RELATES TO:    )
ALL ACTIONS                  ) CONTAINS CONFIDENTIAL
                             ) INFORMATION
_____ )

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.


COMMONWEALTH OF              )
MASSACHUSETTS,               )
                             )  Civil Action No.
          Plaintiff,         )  2384CV02397-BLSI
                             )
   vs.                       )
                             )
META PLATFORMS, INC., and    )
INSTAGRAM, LLC,              )
                             )
          Defendants.        )
_____


VIDEOTAPED DEPOSITION OF RAVI IYER, Ph.D.

PALO ALTO, CALIFORNIA

NOVEMBER 5, 2025

8:48 A.M.


Job No.: 7676515

Pages: 1 - 427

Reported by: Leslie A. Todd, CSR No. 5129 and RPR

would still reduce unwanted, negative, and harmful experiences on the platform.

Q.    Okay.   So assumption 2 is not necessary to your analysis in these cases?

MS. O'NEILL:   Objection.   Form.

THE WITNESS:   I would say that what remedies would mitigate the harms on the platform are not dependent on whether -- you know, they're certainly exacerbated by, but maybe not necessarily exclusive to a world where Meta has misled or not misled the public.

BY MR. KENNEDY:

Q.    Okay.   Let me ask you -- moving to paragraph 16, I'd like to ask you about the third bullet there, which is -- it says, "I was retained by plaintiffs to opine on," and then skipping to the third bullet.

A.    Yep.

Q.    "Whether Meta's safety tools and features, including teen accounts, sufficiently remedy the unwanted, harmful, and negative experiences associated with platform algorithms and certain extended use features"?

Page 126

A.      Yep.

Q.      Do you see that?

A.      I do see that.

Q.      What do you mean by sufficiently?

A.      So 45 percent of teens report that social media affects their sleep.  A sufficient remedy would be commensurate with that kind of harm.  You would actually see -- it would actually -- you know, the amount of harm we would see would drop precipitously.  And so what kinds of remedy would actually reduce those numbers to, you know, dramatically or effectively --

Q.      Okay.  And your opinion is that Meta's safety tools and features do not sufficiently remedy the unwanted, harmful, and negative experiences associated with the platforms, right?

A.      Meta's safety tools and features for the reasons I've outlined in the report?

Q.      Yeah.

A.      The scale of their usage is quite low.  Very few people use them.  Not that many people know about them.  They rely on willpower of teens who -- the ones who need it

CONFIDENTIAL

Page 127

most are probably the ones who are least likely to use it.  So for those reasons, yes, they do not sufficiently remedy those experiences.

Q.    So you quoted the factoid, 45 percent of teens report that social media affects their sleep.  And I'll use that as a starting point for my hypothetical.

If it were shown that Meta's safety tools and features reduced 45 percent of teens to 44 percent of teens reporting that social media affects their sleep, would you consider that sufficiently remedying the unwanted -- would you consider that a sufficient remedy in the context of your analysis in these cases?

MS. O'NEILL:  Objection. Speculation.  Incomplete hypothetical.

THE WITNESS:  So given that that's a very small percentage of harm, again, this is -- it's hard to speculate.  But in -- but, you know, such a small drop in such a large harm, I would say I'm of the opinion, it's not -- it would not be sufficient.

CONFIDENTIAL

Page 128

BY MR. KENNEDY:

Q.    Well, you didn't form any opinions in these cases concerning what would constitute a sufficient remedy for the unwanted, harmful, and negative experiences, correct?

MS. O'NEILL:  Objection.  Form.

THE WITNESS:  So I did form opinions about what would be a sufficient remedy.  I talked about very specific design changes that I thought would be necessary to at least do -- you know, to -- to change the product, commensurate with the harms that teens are reporting.

BY MR. KENNEDY:

Q.    And your reports don't contain any data of any kind concerning by how much would your proposed design changes reduce the incidence of unwanted, harmful, and negative experiences, correct?

A.    My report does not provide an exact quantitative estimate of how the combination of changes that I recommend would, in aggregate, reduce these unwanted harmful

CONFIDENTIAL

Page 129

experiences, but -- and that is, in part, because the company has never -- or no company has ever done this combination of changes.

So it's not possible to fully understand what the aggregate effect would be. It is possible to compare what the aggregate effect would be of those changes as compared to the current changes by Meta's teen accounts, and show that they are very different scales, and that is what I have done in the report.

Q.    Okay.  So let me ask you another hypothetical.

So let's say I provide your expert reports to my client, Meta, and people at Meta read them and say, you know these are some great ideas, let's test them out, and see if they actually do sufficiently remedy unwanted, harmful, and negative experiences associated with our platforms.

A.    Yes.

Q.    So that's the hypothetical.

A.    Okay.

Q.    Your reports provide no metric by which Meta could assess whether your design

Page 132

Foundation.

THE WITNESS:  I would agree that Meta has many -- has made many changes to its platform with the intention of improving the experience of teen users.

BY MR. KENNEDY:

Q.    And I understand you go into them in some detail in the reports, right?

A.    I do talk about those features, and where they are not sufficient to mitigate the harms that excessive --

Q.    Yeah, your opinion is the things that Meta has already tried to improve the experience of teens and reduce any unwanted, negative, and harmful experiences they have, those measures are insufficient to mitigate the issues you identify in your reports, correct?

A.    Yes, they are insufficient to mitigate the harms in the report, for the reasons I identify in the report, that they -- there are theoretical reasons, but based on the fact that they rely on teens' willpower, there are reasons just based on looking at the usage of these things, they are not used very

CONFIDENTIAL

Page 133

much compared to the harms.  And then there's also evidence that these things are not well-maintained, and don't even work when -- as advertised.

Q.    So, in short, in your opinion, the efforts Meta has already made to reduce any unwanted, negative, and harmful experiences teens might have on their platforms aren't good enough?

MS. O'NEILL:  Objection.  Form.

BY MR. KENNEDY:

Q.    Correct?

A.    The efforts that they have made are insufficient to address the harm, for a variety of reasons that I outlined.

Q.    Now, let's say Meta reviewed your reports, and wanted to test all of the design changes that you propose, to see if they would be sufficient to mitigate unwanted, negative, and harmful experiences teens have on their platforms.

A.    Yeah.

Q.    Your reports provide no metric from which Meta could assess whether your design changes are or are not sufficient to

CONFIDENTIAL

Page 146

platforms have?  In other words, you'll agree with me that perfection in this context is impossible?

A.    I would agree with you that perfection in this context is impossible.

Q.    So by definition, sufficient mitigation of these unwanted, negative, and harmful experiences would have to be somewhere north of zero percent incidence?

MS. O'NEILL:  Objection.  Form.

THE WITNESS:  I would agree that it would have to be somewhere north of zero percent incidence.  I would also note something else I say in the report, which is that there are other platforms that -- where users report fewer such experiences.

YouTube, for example, is a platform where users report less -- you know, fewer teens -- fewer youth regret the existence of YouTube, even though more teens use YouTube.  People on YouTube generally report fewer bad experiences compared to users of Instagram.

CONFIDENTIAL

Page 147

So I mean, there are -- there are -- it's north of zero, but there's -- you know, it would take a lot for me to speculate as far -- and I don't really -- it would require a lot of thought in depth for me to actually say exactly what percentage of these experiences you would have to mitigate. But I would say that, clearly, there are ways these platforms can be doing better.

BY MR. KENNEDY:

Q.    So you have not formed an opinion concerning exactly what percentage of unwanted, negative, and harmful experiences a platform would have -- strike that.

So you have not formed an opinion concerning the level of incidence that a platform would have to have of unwanted, negative, and harmful experiences to have sufficiently mitigated those issues, correct? You haven't formed that opinion?

MS. O'NEILL:  Objection.  Form.

THE WITNESS:  I have not formed an opinion as to the exact percentage

CONFIDENTIAL

Page 148

yet.  I -- it is something that, I think, was not the -- forming an exact opinion about the specific percentage number was not the exercise of the report.  And I would need to think about it a lot more deeply to actually consider an exact number that would be appropriate.

BY MR. KENNEDY:

Q.    Okay.  So you mentioned YouTube earlier.

A.    Mm-hmm.

Q.    In your view, has YouTube designed its platform in such a way that it sufficiently mitigates unwanted, negative, and harmful experiences of teens using YouTube?

MS. O'NEILL:  Objection.  Outside the scope of the expert opinions.

THE WITNESS:  Yeah, so there are things in my report, which YouTube does to greater degrees than Instagram.  And there are things that YouTube does not do.  And one of the biggest things that YouTube does that's different than Instagram is a lot of users use it in a

CONFIDENTIAL

Page 184

Mischaracterizes the testimony.

THE WITNESS:  No, I think it would give them a great deal of information.  I'm just saying, I can't offer an exact number or comment on a hypothetical number as to whether that would or would not meet the standard is sufficient.

BY MR. KENNEDY:

Q.    So let's think of sufficient mitigation as a set of goalposts.

A.    Okay.

Q.    Is it your -- it's your opinion that you're not in a position to offer, like, where those goalposts are for Meta to figure out if they've sufficiently mitigated?

MS. O'NEILL:  Objection.  Form.

THE WITNESS:  It is -- I am -- as I did in the report, I can certainly offer where Meta is not meeting the goalposts with their current settings, because they are not used enough, they are not supported well enough, and they are not accessible to the people who need it enough, for them to be used

CONFIDENTIAL

Page 185

commensurate with the harms that are occurring.

So I can certainly offer evidence of -- which I did in the report -- of where it is insufficient. What I can't offer is an exact, quantitative, precise point estimate of what would happen if they implement all of the design changes I suggest.

BY MR. KENNEDY:

Q. So sitting here today, you can't -- you can't confirm that implementing all of your design changes would sufficiently mitigate the unwanted, negative, and harmful experiences of teens on Meta's platforms?

MS. O'NEILL: Objection. Form. Mischaracterizes the testimony.

THE WITNESS: As I wrote in the report, I believe there is -- there's plenty of evidence that these design changes would indeed mitigate the unwanted harmful negative experiences on Meta's platforms. I'm just not prepared to offer an exact quantitative estimate of what number -- what exact percentage

Page 190

saying that's not a -- that's an impossible thing that we could do, if that is what would get Meta to do these changes, but it's -- that was not the assignment in the report.

BY MR. KENNEDY:

Q.    Like, when were you first contacted by plaintiffs' counsel in this case?

A.    I believe it was in April of this year.

Q.    So you were -- were you retained in April of 2025?

A.    I don't remember when exactly, but likely around then.  I don't remember exactly what order.

Q.    And these reports -- these reports were served in August, and I guess, October of 2025, right?

A.    I believe that is correct.

Q.    So you've been working on this project for at least six months?

A.    Yes.

Q.    Okay.  So if you had wanted to provide more granularity on what uptake of non-defaulted settings would be good or bad,

Page 191

or sufficient or insufficient, you've had at least six months to do that, right?

MS. O'NEILL:  Objection.  Form.

THE WITNESS:  Again, I think -- yes, I have had six months in which I could have focused on providing precise quantitative point estimates.  That was not the assignment given to me in the report.  And so that is not what we focused our -- our efforts on.

BY MR. KENNEDY:

Q.    And the same is true of providing more granularity on what it means to have sufficiently mitigated these unwanted, negative, and harmful experiences.  You've had at least six months to, you know, put some more meat on those bones, right?

MS. O'NEILL:  Objection.  Form.

THE WITNESS:  So again, I would argue that there's plenty of meat on the bones.  There is a metric -- or many metrics they could use.  There's many specific harms identified.  There's many specific design recommendations tied to those harms.  And I've outlined many

CONFIDENTIAL

Page 220

changes are implementable even quicker, but, you know, certainly within that time frame.

Q.    Now, you reference peer companies.  What -- what are peer companies? Like, can you name examples?

A.    You know, YouTube, Snapchat, TikTok are peer companies.

Q.    And not -- those companies haven't implemented each of your proposed changes?

A.    No company has implemented all of these proposed changes.  Many of -- companies have -- you know, many companies have done some part of it.  Sometimes -- I mean, Meta itself has done some part of these changes in tests or in controlled settings.

There may be a setting, for example, that -- for example, there's a setting where Meta -- Meta has -- I don't think the setting works very well, but it exists, for users to hide quantification of engagement or hide at least the like and share counts.  Therefore, it would be trivial from a product-building perspective for them to turn that feature on.

CONFIDENTIAL

Page 270

BY MR. KENNEDY:

Q.    You did not do a systematic review of the literature in connection with forming your opinions in this case?

MS. O'NEILL:  Objection.  Asked and answered.

THE WITNESS:  I reviewed -- my system was to review the -- the evidence that was most relevant to the opinions in this case.

BY MR. KENNEDY:

Q.    And you didn't have a particular question in mind before you started reviewing whatever you reviewed?

A.    I certainly --

MS. O'NEILL:  Objection.  Form.

THE WITNESS:  I certainly had a question.  I mean, as I noted in the report, I had the assumptions given to me by counsel.  I considered the design choices of the platform.  I considered which design choices had evidence for mitigating harms.  I considered evidence about the feasibility of those design choices.  And then I -- and then I

CONFIDENTIAL

Page 275

Q.    With respect to the extended-use design features, is it fair to say that it's just sort of common sense that removing them would end the -- them causing unwanted, harmful, and negative experiences for young users?

MS. O'NEILL:  Objection.  Form.

THE WITNESS:  I would agree that it is common sense that removing them would remove negative, unwanted, harmful experiences.  And I would also say that there's lots of evidence that those features contribute to unwanted, harmful, negative experiences and lots of evidence that removing those features would, indeed, mitigate harmful, unwanted, negative experiences for young users.

BY MR. KENNEDY:

Q.    But at least in the case of extended-use design features, you don't even need data to form your opinions because you've assumed that extended-use design features are causing harm and removing them, it's just common sense, would end that harm, right?

that a lot of the metrics that I suggest are population level metrics, and so I think that would often be how you would assess things.  But there are certain acute harms that I think you'd also want to consider at the individual level.

BY MR. KENNEDY:

Q.    So -- so let's say Meta implements your proposed changes to Facebook. And after the changes are implemented, you find out that nine users are having safe and positive, good experiences, and one user is suffering severe mental health problems from using Facebook, have you successfully mitigated unwanted, negative, and harmful experiences within the meaning of your reports?

MS. O'NEILL:  Objection. Speculation.  Incomplete hypothetical.

THE WITNESS:  Yeah, I think that would be very hard for me to speculate with incomplete information about the exact line where you would draw.

I would point out that one out

CONFIDENTIAL

Page 293

of ten Instagram users would represent two million teens having that negative experience, which I strongly would at least be concerned about.

BY MR. KENNEDY:

Q.    So you're not -- you're not able to assess the success of the mitigation from your design changes without, as you say, complete information about the exact line where you would draw?

MS. O'NEILL:  Objection to form.

THE WITNESS:  That isn't what I said.

MS. O'NEILL:  Mischaracterizes the testimony.

THE WITNESS:  Yeah, so that isn't what I said.  I need more complete information to draw an exact line.  So I can't provide a precise quantitative estimate of what exactly what would constitute successful mitigation.  I have already provided many metrics that you can use to assess mitigation.  I've provided many

Page 313

with the -- I guess it's an adverb -- "sufficiently," "fully," or "effectively," I'm trying to understand definitionally what's the difference between those three modifiers when you use them in your reports in front of the word "mitigate"?

A. So I use the word "fully" here because I was specifically referring to Meta's -- the delta between Meta's content moderation rules and users' experiences of harm.

For example, if a user says "nice sweater" to another user, that is not policy violating content. We don't know if they're being sarcastic, if they're being nice, if they're being mean. There's a lot of context that is required to understand if a user is bullying another user or -- and so it is not possible to fully define, and that's why I used the word "fully," because it's the most appropriate word in that sentence. It's not possible to fully define whether the ways that -- what is or is not harmful content.

Q. Okay. So in other contexts in your reports where you're referring to

CONFIDENTIAL

Page 314

sufficient mitigation of harmful experiences, that doesn't mean fully mitigating; that means something less than fully mitigating?

A.    I think -- as we established earlier, that, yes, I mean fully insofar as the word "fully" means a hundred percent, then sufficient and effective would certainly be less than a hundred percent.

Q.    Okay.  Can you go back to Exhibit 8, please.  That's the list of tools, features, and resources.

A.    Oh, okay.  Got it.

Q.    And I'm looking on page 2, May 20, 2021.

Quote, "We gave people the ability to hide public "like" counts to give them more control over their experience," unquote.

Do you see that?

A.    I do see that.

Q.    Was that a feature that you were involved in when you were there?

A.    It is not a feature I was involved in.

Q.    Okay.  So giving people the

CONFIDENTIAL

Page 339

Q.    All right.  So the -- at a high level, the point of this paragraph is that you assert that it would be feasible for Meta to get rid of autoplay and infinite scroll.  Is that a fair high-level summary of this paragraph?

A.    That is a fair high-level summary of this paragraph.

Q.    Now, you go on to say, quote, "Infinite scroll and autoplay can readily be removed, and many successful companies have done so, proving the feasibility."

And you give two examples in this paragraph, that YouTube turned off autoplay for identified children and Google removed infinite scroll from search results.

Are there any other companies you're thinking of as examples of -- successful companies that have removed infinite scroll and autoplay, aside from YouTube and Google?

A.    I mean, Facebook -- I believe Instagram has the setting to -- have settings to also disable autoplay.  They just aren't turned on by default, and so very few people use them.

Q.    So the scope of your quarrel with Facebook and Instagram concerning autoplay is whether turning it off is an option or a default?

MS. O'NEILL:  Objection.  Form.

THE WITNESS:  That's actually a huge quarrel because it makes the dif- -- it's the difference between a tiny group of people using it and a large group of people using it.  So it is not a tiny thing.

But, yeah, I mean, just like -- I mean, it's also whether the feature works, and -- but, I mean, in order for it to meaningfully affect a large number of youth, it actually has to be something that youth are aware of and youth will actually turn on.

BY MR. KENNEDY:

Q.    No, I understand it's a huge quarrel, but I'm just -- am I accurately stating the scope of the difference between what Facebook is already doing with respect to turning off autoplay and what you think they should do, that the difference is that they

CONFIDENTIAL

Page 341

make it an option, and you think it should be a default?

                MS. O'NEILL:  Objection.  Form.

                THE WITNESS:  I believe it should be off for young users, and not be something they can turn back on at all.

BY MR. KENNEDY:

        Q.      Okay.  But you agree young users on Facebook already have the option to turn it off, right?

        A.      I believe so, yes.  Assuming it works.

        Q.      Have you cited in your reports any research demonstrating whether and to what extent having a default setting of a feature is more efficacious than having it as an opt-in setting for young users?

        A.      So it -- that is wide-spread industry knowledge.  It is also cited in the non-engagement paper that I cite when I talk about non-defaulted settings are used well under 10 percent, and that's just not my knowledge but that's knowledge of many -- people across many companies.

CONFIDENTIAL

Page 374

THE WITNESS:  Data, which I use throughout the report, is, indeed, important for having confidence in the recommendations that I made in the report.

BY MR. KENNEDY:

Q.    So you're agreeing with my question, which was, you do need data to confirm that your proposed design changes actually work for their intended purpose, correct?

MS. O'NEILL:  Objection.  Form.

THE WITNESS:  I think there are a variety of kinds of data, so I think there are cases where you can use data from -- you never have the perfect data of the -- exactly the users on exactly the platform in exactly the way that you would -- that you would like to understand it.

So there is always some generalization that occurs extrapolating from one platform to another, from one situation to another.  But every experiment, every

Page 375

study does that.  But -- so, yes, you need some data to do that.  And it's a question of degrees of generalization.

BY MR. KENNEDY:

Q.    You need some data to confirm that your proposed design changes actually work for their intended purpose, correct?

A.    The data gives me more confidence that the design changes would, indeed, work for their intended purpose.

Q.    Well, you just said earlier you need some data to do that, and that is confirming that your proposed design changes actually work for their intended purpose, correct?

MS. O'NEILL:  Objection.  Form.

THE WITNESS:  Again, I -- I'm not sure where we're disagreeing, but I would say that data is important for -- for having greater confidence that the design changes would, indeed, have the intended effect of unwanted, harmful, negative experiences.

BY MR. KENNEDY:

Q.    Okay.  Do you actually -- do you

CONFIDENTIAL

Page 391

And so I -- after understanding the assignment, I looked for articles that I knew of that would be relevant to the opinions I had, as well as any articles that might supplement what I already knew existed.  And that encompasses a large amount of the articles considered here.

I also had a research assistant go and look for articles related to the field, in general, and -- that relate to these features, in general, so -- and considered those articles as well.

Q.     So you didn't consider any websites, articles, or press releases inconsistent with your opinions in this case, correct?

MS. O'NEILL:  Objection.  Form.

THE WITNESS:  I considered -- I mean, in the course of my -- I'm familiar with many of the research reports that are inconsistent with this case.  I'm familiar with many of the articles that were cited and the arguments cited by the -- in the rebuttal reports.

CONFIDENTIAL

Page 392

I -- so, I mean, I've had -- I have long-established opinions in this case, and so I knew which articles would be most relevant to those opinions, and I used those.

BY MR. KENNEDY:

Q.    Let me ask the same questions about the category of books and academic papers, A.2.

A.    Yeah.

Q.    How did you arrive at the -- selecting the list of books and academic papers in your materials considered list?

A.    So, again, I did some number of searches on the design features. I had a research assistant also do some number of searches for these specific design features, just understanding the effects of these design features, in general.

And then I also relied on my longstanding knowledge of the field and -- and relevant articles.

Q.    Okay. You didn't consider any books or academic papers inconsistent with your opinions in this case?

Page 421

just discussed?

A.    I think it would be really messy, and I -- it would be very speculative for me to say that you would really learn anything useful.

Q.    But in any event, in forming your opinions in this case, you did not perform any testing of any kind related to any of your proposed design changes?

A.    I mean, I think I mentioned that I was involved in some of these algorithmic changes, and some of the things I cite that are publicly available are things that I happen to have worked on.

I think I also mentioned that I've tested some of the design fe- -- the -- like, the settings myself, and understood which ones worked and didn't work to some degree.

But, yeah, I mean most of them are -- I'm relying on other people's research and what -- what they -- what they tested.

Q.    In the six or seven months you've been working with -- you've been working on this litigation, you haven't tried to perform

CONFIDENTIAL

Page 422

any test or any study of any kind trying to find out the effects of your proposed design changes, correct?

MS. O'NEILL:  Objection.  Form.  Asked and answered.

THE WITNESS:  Yeah, I have not conducted -- I mean, it would be impractical to do -- in this time period to try to also create a study.  But I haven't collected first-party data.  I've studied the evidence that has been collected by other people.  I have tested some of the safety features myself.

MR. KENNEDY:  Okay.  So thank you very much for your time today.  It's been a pleasure.

And sub- -- you know, reserving the right to do any recross, I have completed my examination today.

THE WITNESS:  Cool.  Thanks.

MS. O'NEILL:  We will go off the record.

MR. KENNEDY:  Sure.

THE VIDEOGRAPHER:  Going off

CONFIDENTIAL

Page 424

CERTIFICATE OF CERTIFIED SHORTHAND REPORTER

The undersigned Certified Shorthand Reporter does hereby certify:

That the foregoing proceeding was taken before me at the place and time therein set forth, at which time the witness was duly sworn; That the testimony of the witness and all objections made at the time of the examination were recorded stenographically by me and were thereafter transcribed, said transcript being a true and correct copy of my shorthand notes thereof; That the dismantling of the original transcript will void the reporter's certificate.

In witness thereof, I have subscribed my name this date:  November 6, 2025.

_____

LESLIE A. TODD, CSR, RPR

Certificate No. 5129

(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)