# Exhibit 5

CONFIDENTIAL

Page 2

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

---------------------------------------------x

PEOPLE OF THE STATE OF CALIFORNIA, et al.

Plaintiffs,

-against-

META PLATFORMS, INC., Instagram, LLC,

Meta Payments, Inc., Meta Platforms

Technologies, LLC,  et al.,

Defendants.

---------------------------------------------x

VIDEOTAPED DEPOSITION of ADAM ALTER, Ph.D.,

taken by the Defendant, pursuant to Notice, held at 450

Lexington Avenue, 10th Floor New York, NY 10163, on

December 12, 2025, at 8:41 a.m., before a Notary Public

of the State of New York.

*********************************************

CONFIDENTIAL

and so there I explain either the background context or discuss the venue where that statement took place, and in some of the cases, I impact the relevance of that, perhaps the reach of that particular venue.  Sometimes I believe it's fairly clear that these are venues that would attract a large audience.  But again, my intention and my assignment was not to systematically examine each statement according to its reach.

Q.    Okay.  Let me direct you to paragraph 31 on page 20.  So you provide here that in determining the message that a reasonable consumer would have taken from the challenged statements, you conducted a social influence analysis; is that right?

A.    Were you reading a quote?  I'm sorry, I didn't see it.

Q.    Well:

                "I have applied a social influence
          analysis."

                Do you see that?

A.    Yes.

Q.    Right.  And you did that as part of your -- well, maybe not even as part of.  You did that in answering the question presented in 28(A) as to how consumers, in your view, would interpret Meta's statements?

Page 131

A.      If you look above in the particular sentence, I say:

                "In reviewing and assessing Meta's external statements, including the function of those statements and their likely influence and impact on a reasonable consumer, I have applied that analysis."

Q.      Okay.  And so that's how you answered the question presented in 28(A)?

                MR. SLOTHOUBER:  Objection.  Compound and vague.

A.      So I applied the social influence analysis framework to that question, but also obviously relying on my expertise and background and other work I had done to form such conclusions.

Q.      And you describe the analysis as comprising three steps, considering the context, the persuasion tactics, and consumer understanding, right?

A.      That's a shorthand summary, but yes, that's what you see in the model, context, persuasion tactics, consumer understanding, which is an expression of a three-part framework that you see elsewhere that looks at context, the individual, and the stimulus.

Q.      Okay.  And if we look at paragraph 32, you describe it as a scientifically grounded framework for

CONFIDENTIAL

Page 132

analyzing how reasonable consumers are influenced and persuaded by messaging.

Do you see that?

A.      Yes.

Q.      And that is your position?

A.      Yes, and I explain here and also in my rebuttal report why I believe it is scientifically grounded.

MR. PEREZ:  Let me show you what we'll mark as -- I think we're up to 6 -- 5? -- Alter Exhibit 5 --

(Whereupon, and article entitled The Science of Social Influence was marked as Alter Exhibit 5, for identification, as of this date.)

BY MR. PEREZ:

Q.      -- which is titled, "The Science of Social Influence, Advances and Future Progress" edited by Anthony R. Pratkanis.  You're familiar with this chapter "Social Influence Analysis, an Index of Tactics"?

A.      Yes, I am.

Q.      You cited to it in your report, correct?

A.      Yes, I believe I did.

Q.      And you're familiar with its contents?

A.      There are many documents cited in my report, and so I'm broadly familiar with it, but I haven't read

Page 133

it very recently.

Q.      You agree with Mr. Pratkanis' conclusions in this chapter?

MR. SLOTHOUBER:  Objection.  Vague.

A.      I can't attest to every single statement that Professor Pratkanis offers in his chapter, but broadly speaking, I apply the framework that he describes which itself is grounded in considerable evidence, much of it expressed here, and much of it expressed elsewhere in my report.

Q.      And he doesn't lay out the three steps that you describe; is that correct?

A.      So he describes a number of different contexts in which social analysis might be used and the way you analyze how that social analysis technique is used, how consumers would understand it and perceive it, and broadly speaking, these three elements are captured in his report, I believe, but also that the elements themselves are supported by their own specific research which I unpack in my report and also in my rebuttal report, and this three-part framework is also consistent with many other similar frameworks in social and cognitive psychology that seek to understand social influence broadly.

Q.      If we look at page 62 of Exhibit 5 --

CONFIDENTIAL

Page 134

A.    Okay.

Q.    There's, in the middle of that paragraph, the paragraph that begins "although," about eight lines down, there's a sentence that begins "specifically."

Do you see that?

A.    Yes.

Q.    And it says:  "Specifically, this index can be used," and then it has a list of 11 items numbered A through K, or lettered A through K.

Do you see that?

A.    I do, yes.

Q.    And he's identifying 11 different uses for the types of social influence analysis that he describes?

A.    And just above that, he says:

"The index of social influence tactics described [...] can be used to conduct a social influence analysis - to analyze a given social situation in terms of the influence processes that are occurring along with suggesting interventions for bringing about desired changes in that situation."

Then he has some specifics but he broadly in the sentence above says how it can be used and the context in which it can be used.

Page 135

Q.       Okay.  And, for instance, one of the ways it can be used, in the letter E, is to:

"Provide an estimation of the effectiveness of a tactic (in the absence of empirical data)."

Do you see that?

A.       I do.

Q.       He doesn't suggest that social influence analysis can be used to achieve scientific certainty as to how consumers interpreted particular statements in the past, correct?

MR. SLOTHOUBER:  Objection.  Compound and mischaracterizes the report.

A.       Well, he's talking about estimating the effectiveness of a tactic.  I'm not sure if he's referring here to understanding how a particular statement would be interpreted in context.  He's talking about measuring the effectiveness of a tactic.  That's a slightly different question.

Q.       My question was different.  He doesn't suggest that social influence analysis can be used to achieve a reasonable degree of scientific certainty as to how consumers interpreted statements in the past, correct?

MR. SLOTHOUBER:  Objection.  Vague and mischaracterizes the article.

A.    I will say, broadly speaking, if you look at his references section, it's -- one, two, three, four, five, six, seven, eight -- it's many pages long and includes dozens of references to empirical work that was itself was peer reviewed.  This is a review article that summarizes a lot of that literature, and so these are concepts that have been examined, tested and proven out in multiple, multiple studies, dozens of articles are presented here.

The fact that he says this about estimating the effectiveness of a tactic, I don't think he's affirmatively saying here that this is not a valid way of making that estimation.  I don't think he's saying anything about scientific certainty in this particular line, but it is implied in the nature of this kind of review article that given the huge body of evidence behind these ideas, they are very tried, very true, very robust, and very reliable and valid, and indeed in my rebuttal report, I show that this approach, using these three cues -- context, individual, and stimulus -- is not just the product of the social influence analysis, but it's a very broad approach that we use to understand how people interpret various kinds of communications in various contexts, using many, many models.  Even the list I provide in my rebuttal report is not complete.

Page 137

And so there is just a huge amount of scientifically valid, tested empirical evidence behind the ideas that -- behind this approach that I used.

Q.    So social influence analysis can be used to predict how consumers would respond to particular statements?

A.    I'm not sure that this use of the term "predict" is the way I would describe it.  But I would say that it's -- it provides a lens through which to understand how the reasonable consumer would understand a statement.

The reasonable consumer, as we understand it in my field, as the kind of person we are trying to understand with this mountain of studies here.  That's exactly who we're focusing on.

All of these studies are designed to unpack, broadly speaking, how people, the reasonable consumer, would make sense of information in different context, that then all flows into these models, which are grounded in decades of work, hundreds of studies.

MR. PEREZ:  Why don't we take a short break now and let's go off the record and discuss.

THE VIDEOGRAPHER:  The time right now is 11:42 a.m.  We're off the record.

CONFIDENTIAL

Page 147

the idea with and discussed it with, thought that it was not an idea that people were not focused on or interested in, and that not much had been written about it.

Q.     You talk in your report about a variety of persuasion tactics.  Do you recall that generally?

A.     Broadly, yes, I do.

Q.     And you agree that the persuasion tactics you identify in your report are not, per se, deceptive?

MR. SLOTHOUBER:  Objection.  Vague.

A.     I would need to look at the specific tactics, but broadly speaking, much depends on the message that's being conveyed and its nature, whether it's misleading, whether it's deceptive, and so those tactics can be used to disseminate messages that are true and accurate.

That's just not my experience of how they were used in this particular case, as I described in my report, but in theory, they can be used to disseminate messages that are of various kinds.

Q.     Including messages that are truthful and not false or misleading, right?

A.     My purpose in raising those approaches was not to suggest that they were all inherently misleading and deceptive in and of themselves, but just to describe them as vehicles for transmitting information or methods

CONFIDENTIAL

Page 148

of transmitting information, and then I applied the particular implementation as it was relevant to this case, and obviously concluded that, in the cases that I refer to in this report, that they were misleading or deceptive to consumers or not quite concluded that but saw that there was a delta or a gap between what consumers took away and what was true or what the company knew.

So in this case, they were used in that way, but they don't inherently have to be used in that way.

Q.    Do you have a view as to whether the use of any of these tactics, when repeated over time, can erode consumer trust?

MR. SLOTHOUBER:  Objection.  Vague and speculation.

A.    It's just not a topic that I was asked to examine for the purposes of this report, so I don't have an opinion as I sit here.

Q.    Based on the entire body of your experiences, your behavioral, economics, and cognitive psychology research, all of it, you don't have a view as to whether the use of any of these tactics can erode consumer trust?

MR. SLOTHOUBER:  Objection.  Vague.  And incomplete hypothetical.

CONFIDENTIAL

Page 149

A.    There's research that I refer to in this report on the illusory truth effect which indicates that statements seem more true as they are repeated across time which makes them more convincing or compelling, so repetition enhances the believability of those statements.

I did not engage with literature, and I can't recall specifically engaging with literature on the fact that such tactics become problematic from a trust perspective, but it just wasn't something that I examined for purposes of this report.

Q.    Not an issue you have a view on sitting here today?

A.    I think it is a very broad question, and as with any kind of tactic, I would need to look at the tactics in context to look at the kinds of messages that are being used and how that repetition is implemented.

I can imagine many situations in which repetition is consistent with persuasiveness and, in fact, I discuss that in this report.  I would need to look more closely at specific instances to examine the opposite.

Q.    And to be clear, I'm not talking about repetition of a message.  I'm talking about the repeated use of one of these persuasion tactics.  So, for

CONFIDENTIAL

Page 150

instance, if a company were seen as repeatedly sidestepping questions, do you have a view on whether over time that could erode company trust -- consumer trust in the company?

MR. SLOTHOUBER:  Objection to form.

Vague.  Incomplete hypothetical.

A.    I can't comment on the broad use of sidestepping or any one particular tactic.  One particular attribute of these persuasion tactics is that their use is very difficult to detect much of the time from the outside.  People in the population at large don't say, oh, there's drumbeat messaging; I see what's going on there, or I see that there's some sidestepping going on there.

Much of the time consumers receive information not quite a critically as that, and through the lens of the kind of training that allows you to pick up on these things.  So I think sidestepping can be used repeatedly across time in many contexts where it's not detected and it actually tends to be effective at conveying a particular message or avoiding a particular message.

Q.    Would you agree that when trusted sources argue publicly that a company is not telling the truth, that can over time make a company less trusted?

MR. SLOTHOUBER:  Objection.  Vague and

CONFIDENTIAL

Page 152

which is one reason why context is part of my analysis here.  That these questions, devoid of them detached from context, are difficult to answer in the abstract, and so it's critical to pay attention to evidence and specifics.

Q.    In the section of your report concerning consumers implicit assumptions, you describe how consumers tend to assume a product is safe by default, correct?

A.    Can you point me to that part of the report, or would you like me to find it?

Q.    Sure, it's paragraph 81, but it's just a general question about whether you recall that?

A.    You didn't finish the quote.  It says:

"Research demonstrates that consumers tend to assume a product is safe by default, in normal use unless explicitly told otherwise."

Q.    Okay.  That's your view?

A.    Broadly speaking, as I express it here, yes.

Q.    And you apply that view to Meta's communications; is that correct?

A.    Broadly, the default to truth principle that I express here is one of the principles that I use to unpack how consumers would understand Meta's statements. It's not the only one, but it's one of them.

CONFIDENTIAL

Page 153

Q.    And you call that the "default to truth"?

A.    I'm not sure if I use that particular term here, but this tendency to assume a statement is true could be described as the default to truth, yes.

Q.    So let's take a look at paragraph 359.  I'll get you a page.  Page 215.

A.    Okay.

Q.    And so paragraph 359, you state:

          "As the discussion of consumer information-processing in Section VIII explained, consumers generally assume with reason that a company's communications regarding [...] health or safety are complete, meaning that information relevant to consumers on those issues is not omitted from public statements."

          Do you see that?

A.    I do, yes.

Q.    And in the next sentence, you refer to this as a "default assumption," correct?

A.    Yes, consistent with my expression of this as a default in the earlier paragraph you referred me to.

Q.    Right.  That's a default to truth?

A.    Yes.

Q.    And indeed, it's generally a premise of your

CONFIDENTIAL

analysis that consumers, by default, believe whatever Meta tells them about the health and safety of Meta's products?

MR. SLOTHOUBER:  Objection.  Vague and misstates the report.

A.      That goes far beyond what I say in my report. There is much more contextual information that's relevant here, and that's where the fact that this is a credence good is relevant, they don't have the ability to independently verify the information, and so all they have is the word of Meta to go by.

Q.      My question was a little different.  Is whether it's a premise of your report that when Meta speaks about the health and safety of its products, that customers, by default, treat that as the truth?

MR. SLOTHOUBER:  Objection.  Vague and misstates the report.

A.      This section of the report is obviously much broader than the discussion of Meta.  I'm very specific about Meta later on, but it begins with this statement that's broader:

"As the discussion of consumer information-processing [...] explained, consumers generally assume with reason that a company's communications regarding issues of

CONFIDENTIAL

Page 155

health or safety are complete."

So that begins as a general claim, and then I unpack it further and apply it to Meta later on.

Q.    And you do apply that concept to Meta that consumers, by default, believe what Meta says about the health and safety of its products, right?

MR. SLOTHOUBER:  Objection.  Vague. Asked and answered.  Misstates the report.

A.    So as a matter of default or understanding the baseline position of consumers, they don't go around assuming that what they're being told is false.  They, by default, assume that it's true.  That doesn't mean they always blindly assume it's true in every context. That means that's the default by which we operate, and we go from there.

Q.    And so it is a concept you apply to Meta that consumers, by default, believe what Meta says about the health and safety of its products?

MR. SLOTHOUBER:  Same objections.

A.    It's one of many concepts that I apply to understanding how consumers would interpret Meta's statements.  You can see how I apply that full constellation of different factors when I unpack their understanding of each statement and the sections of the

CONFIDENTIAL

Page 156

statements, but it is one of the principles that I rest on when I describe how consumers would interpret those statements.

Q.    And another of the principles is that consumers, by default, would understand Meta's statements about health or safety to be complete; isn't that right?

A.    Broadly speaking, that is a default.  You assume that a company is not withholding material information that would, for example, contradict what they've said or that's inconsistent with what they've said as a consumer.

Q.    Now, it's not necessarily true for all companies or all products that consumers blindly trust what the company says, correct?

MR. SLOTHOUBER:  Objection.  Vague, speculation.

A.    Yeah, it's a broad question and it really depends on the particular case.

Q.    That's my point.  It depends on the particular case, right?  It's not the case for all companies and all products that consumers blindly believe what the company says?

A.    Which is why I describe it as a default, that's where you begin.  You assume at first that the companies

are being truthful and honest with you, and to the extent you can verify the truth or falsity of that information, you might shift from that default across time, but broadly speaking, this is a general description of how consumers interpret that kind of information.

Q.      But it could be different for different companies, fair?  The level of trust that consumers have?

                    MR. SLOTHOUBER:  Objection.  Form.

A.      It's possible that consumers in different situations will apply or hold different levels of trust, given the statements that are made by an organization.

        And I will say, again, it depends a lot on the extent to which they can verify a statement, and also the extent to which they know whether or not there might be omissions.  Often a statement will be made.  There's no way to truly verify it from the outside, and so you have no way to assess whether it's truthful, and you're just forced to rest on that particular anchor that has been provided by the company.

Q.      In carrying out your analysis, you didn't do any empirical work to assess the degree of trust that consumers have in Meta specifically, as compared with other companies?

Page 211

not effective and lag industry standards.

Q.     And that's a view you set forth in your report, correct?

A.     It's a reflection of the evidence that I discussed elsewhere.  I'm very clear about how that evidence informs that conclusion in the report.

Q.     So I'd like to look at page 230 of your report, and here there's a section with a Roman numeral header "XI.  Consumers Were Exposed to Meta's Health and Safety Messages."

Do you see that?

A.     I do.

Q.     And this is -- presents your analysis in support of the question we saw presented in paragraph 29 as to dissemination?

A.     Yes, this is -- this is the section where I explicitly unpack the question of exposure.

Q.     Okay.  And in analyzing exposure, you're analyzing exposure to the messages rather than the statements; is that right?

MR. SLOTHOUBER:  Objection.  Vague.

A.     I would say that I'm examining exposure to the statements, but also beyond that, too, for example, word of mouth or exposure to the gist of what was contained in those statements through either republication or

sharing of the content of those statements in various ways.

Q.    Right.  And that's my point is that your analysis of exposure is not limited to the statements themselves, it's also considering exposure to the gist of those messages, of those statements; is that right?

A.    Based on my experience as a researcher who has studied word of mouth and the dissemination of messages like these, they're often transmitted in terms of a gist.  And again, my experience, having spoken about these issues to many audiences is that people will sometimes come up and raise the content of a particular message without parroting the message word for word.

So I'm not restricting my analysis to a word-for-word consumption of that statement in its original form but also republication, transmission of the gist through word of mouth and elsewhere.

Q.    Right.  Including the statement being paraphrased, right?  You're considering exposure to the message as paraphrased potentially as well, right?

A.    I'm not sure I --

Q.    Let me ask it this way.  I don't mean to cut you off, but when you talk about, for instance, in paragraph 386, the more informal transmission of message gists across audiences themselves, you're not limiting

Page 213

yourself to verbatim repetition of the statement actually made by the company, correct?

A.    Again, based on my expertise and based on the way messages are transmitted in the marketing context, it's relevant to both look at direct exposure to the original messages in their original form, as either presented in video format or written format, but also at how, for example, someone who consumes them at their original instance, either republishes them in some other format or other medium or describes the heart of those messages elsewhere.

Q.    And the messages may also have been repeated by third parties, correct?

A.    It's certainly possible that someone views the message and then repeats it in much the way that some of the messages were repeated to me in the form of their gist at various speaking events and elsewhere.

Q.    Okay.  And is one of -- and you considered that informal transmission of message gists as part of your exposure analysis, right?

MR. SLOTHOUBER:  Objection.  Vague.

A.    You can see the analysis discusses very concretely where those messages were either first disseminated or where they were republished.  So I talk about the very large range of high profile outlets where

Page 214

those messages were disseminated and how they defuse through the population that way.

I also talk about some data that look at exposure to the actual messages at first instance, but I don't limit my analysis to that exposure at first instance because, as a -- as a matter of practice in my discipline, messages don't stop at their first transmission.  They're often retransmitted elsewhere or republished, and that's relevant, broadly speaking, to a question of exposure.

Q.    Are you familiar with the game "Telephone," like a party game "Telephone"?

A.    I'm not sure we call it that in Australia.

Q.    What do you call it in Australia?

A.    I'm not sure.  I still don't know what the game is so you'll have to tell me.

Q.    Well, I'll explain it to you.  It's where you go around a table and you repeat a message from one person to the next until it makes its way all the way around.  Is that a game that is known in Australia?

A.    I'm not sure what it's called, but I've heard of this game.

Q.    Okay.  And the point of that game is that, by the end of the chain of repetition, the message can look quite different from where it started, right?

CONFIDENTIAL

Page 215

A.      I understand the basic mechanics and the nature of the game, yes.

Q.      And is it consistent with your experience that when messages are repeated through word of mouth or message gists are transmitted informally though word of mouth that the substance can change?

A.      My understanding of word of mouth outside of the telephone game you've described is that syntax, or specific phrasing, decays very quickly in transmission, but the valence or substance tends to persist much longer.

I'm not making claims in this report explicitly about how many times messages can be transmitted before they degrade, before the substance has changed, but even if messages are transmitted once to one more person, that expands the reach or the exposure, and that's what I'm presenting here, just the sense that these messages, given their nature, are likely to have been transmitted and that's a mushrooming out process where, if each person transmits a message to say five or ten people, very quickly you've transmitted a message to many people.

So I'm not putting an upper or lower bound on how much that transmission occurs, but just pointing out that that's a relevant mechanism by which these messages

CONFIDENTIAL

Page 216

may have been transmitted.

Q.    You didn't undertake to quantify how many consumers were exposed to Meta's statements in their verbatim original form, did you?

A.    My assignment was not to examine exposure levels and numbers for each statement.  You can see, for some of the statements, I present specific numbers and tether those numbers to specific states.  Talk about exposure to Mark Zuckerberg's statement on October 5, 2021, that's at paragraph 388.  And so, in some cases, I'm very explicit about transmission numbers, at least at first instance, and in others I talk about, at a much higher level, the fact that the outlets themselves are high profile indicates that those messages will have been perceived at first instance and then perhaps shared.

Q.    But you haven't -- other than specific examples that you pull out in your report, you have not undertaken to quantify consumer exposure to the statements that you analyze; is that right?

A.    My intention was not to quantify exposure.  I think you also see, as an indication of the reach of these audiences or of these outlets, these media outlets, these are the outlets that Facebook and Instagram personnel chose to share their message on

Page 221

different kinds of messages, but I did not undertake to examine critical audiences -- critical messages and their audiences over time.

Q.    I want to point you to paragraph 388, which you mentioned in your testimony earlier, on page 233 of Alter Exhibit 1.

A.    Okay.

Q.    And here you are analyzing a particular post by Mark Zuckerberg on October 5, 2021; is that right?

A.    Yes.

Q.    And you say it received 795,000 reactions, 26,000 comments and was shared 67,000 times?

A.    276,000 comments, yes.

Q.    And the comment at issue you say he did -- the post at issue, you say:

        "He denied that Meta prioritized profits over user wellbeing."

        Is that right?

A.    That's my summary of the post, which I describe more fully elsewhere.

Q.    Did you undertake any quantitative analysis of the nature of the comments or reactions?

A.    Again, my intention here was not to examine the comments to look at the tone of the response to that message.

CONFIDENTIAL

Page 222

Q.      So for instance, did you assess to what extent the comments reflected support for, or belief in what Mr. Zuckerberg was saying, versus, for instance, "yeah right," as a reaction?

MR. SLOTHOUBER:  Objection.  Form.

A.      My role here was not to opine on consumer responses to one specific statement, but to examine whether broadly they had been deceived or misled by the statements as a whole, the mosaic of statements.

And so, I present many statements in my report, I examine the asymmetry of information and describe how little access consumers had to that information.  Much of the information and many of the claims are based in data that only Meta had access to.

And when you put all of these different posts together, regardless of skepticism, in response to one particular post, you see, I believe, strong evidence that consumers were deceived and misled, they had limited capacity to evaluate the truth of those messages, and in some cases had no capacity to do so.

And my analysis is not confined to one particular statement or the balance of positive or negative comments to that statement.

Q.      One of the concepts in your report, about which we had a long colloquy earlier today, is the extent to

CONFIDENTIAL

Page 270

consider Meta's intent to reach children?

MR. SLOTHOUBER:  Objection.  Vague.

A.    What I do is I present evidence that Meta saw value in directing its platforms to children.  It saw value, broadly speaking, in attracting younger users when they were younger, and that it built various features into its platforms that were, based on its own research and evidence, attractive to and targeted children.

Q.    And "targeted to" meaning intended to attract children, in your view?

A.    Again, at a certain level, when Meta says this is an audience that will make us lots of money if we can attract them early versus later, then in describing that, I've described the fact that Meta finds it appealing to have these users on their platform or platforms.  And so I am, again, always grounded in the evidence making claims about what Meta said it was doing based on that evidence, strategically speaking.

Q.    So as we saw in the prior section in the COPPA analysis to your reviewing evidence to reach views about what Meta, in your view, intended to do?

A.    I'm pausing in the same way as I paused earlier because in an academic sense and in a scientific sense, the way I think of this exercise is to say, here is

CONFIDENTIAL

Page 271

evidence, the evidence shows evidence of a particular strategy or strategic approach or a priority that's recognized within the company, and so when it enacts that strategy, it's not an accident; it's the reflection of those discussions.  I don't think of that in a perhaps legal sense as being intent.

The way I think of it, it's academically speaking, how I think of intent is, here's a strategy, it will make us money, it's a good way to go, and then you see decisions that are consistent with that strategy, and I point that out concretely and specifically in the report.

Q.    All right.  It's part of your analysis that that strategy described was perceived deliberately by Meta, right?

A.    To the extent that documents indicate that, that it was consistent with strategic objectives, that it was discussed internally, that decisions were made that reflected that strategy, that's, I suppose, an expression of intent the way you've described it.  But as I think of it as an academic, it's just the deliberate enactment of a particular strategy or set of priorities.

Q.    Okay.  And we talked about this earlier, but whether or not Meta intended to reach under 13-year-old

Page 308

statement says they're not on Instagram, but the other statements also are relevant to that question.  And I write:

"The most natural interpretation of these statements as a whole is that, because under 13s are not permitted on the platforms, they are largely absent from the platforms and that Meta does not have internal knowledge that suggests otherwise."

And so recognizing that a very large proportion of the tween population reports that it uses the platform is inconsistent with this set of claims both about the actual composition of users and the permissibility of such users joining and staying on the platform.

Q.    And we're going to talk about the message that you believe consumers would have drawn from these statements, but I want to start with just the statements themselves.

On page 209 of your report, you have four statements, and do you agree that with exception of the first, they all refer to whether under-13-year-olds are allowed or permitted on Instagram or Facebook?

A.    So an analysis of statements like these, as I've said earlier, require sometimes reading beyond just

CONFIDENTIAL

Page 312

refers to who is allowed to be on the platform, which is therefore an expression of the fact that either no one or very few people under the age of 13 should be on the platform, despite the fact that a huge proportion of that population, tens of percent, is actually present on the platform, and Meta has collected those particular pieces of data itself.

Q.     It is true, per your understanding, that Meta does not, as a matter of policy, allow under-13-year-old users on Facebook, to have a Facebook account, correct?

MR. SLOTHOUBER:  Objection.  Asked and answered.

A.     I believe you asked me --

Q.     Indeed.  I think you said that already.

A.     You asked me that earlier.  That is its nominal policy.  My role obviously was to unpack the truth of that in practice, whether that's actually the way the company has behaved across time.

Q.     Likewise, you agree that it's true that Meta does not allow under-13-year-old users to have Instagram accounts?

A.     Again, the same response.

Q.     Okay.  So when we were talking earlier about whether there were any statements in which Meta denied the presence of under-13-year-old users on the accounts,

Page 338

Certainly, there are pieces of evidence elsewhere in this report that indicate that under 13s themselves have their accounts and they engage with various components of the platforms using those accounts.

Q.    All the sources in 509 speak simply in terms of use, not having accounts, right, at least as characterized by you?

A.    Actually, if you look at table 15, Meta's own data --

Q.    I wasn't asking about paragraph 15.  I was asking about paragraph 509.  My question was:  All of the sources in paragraph 509 speak in terms of use not having accounts, correct?

A.    In 509, that's correct, yes.

Obviously, the analysis extends beyond there.

Q.    Do you dispute that Meta makes efforts to enforce its policy prohibiting under-13-year-olds from Facebook and Instagram?

MR. SLOTHOUBER:  Objection.  Beyond the scope.

Q.    Do you regard that as beyond the scope of what you're looking at?

A.    My analysis of the evidence indicates that a number of personnel involved in the age assurance

Page 339

process broadly at Meta felt that the policies were either inadequate, lagging other social media platforms, over-claimed in certain messaging and so on.  And so I present that evidence here in the report.

As a legal matter, I'm not sure, again, what it would mean for me to be offering an opinion, but I discuss that particular set of evidence in my report.

Q.    And I'm not asking you your views as to the sufficiency or effectiveness of Meta's efforts to keep under-13-year-olds off Instagram and Facebook.  I'm asking whether you dispute that Meta does make efforts to enforce its prohibition on under-13-year-old users?

A.    You mean any efforts or what kinds of efforts are we talking about?

Q.    Any efforts.  Do you dispute that Meta takes efforts to enforce its prohibition on under-13-year-old users?

A.    My assignment was not to quantify the extent to which Meta engaged in that process, but to really examine the way it had expressed the way it engaged with that process.  And so whether removing, say, one user would be seen as evidence that the platform has engaged in the process at all is a separate question that I didn't engage with.

I wasn't opining on the specific number of