# Exhibit 10

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA                )
ADOLESCENT ADDICTION/              ) Case No.
PERSONAL INJURY PRODUCTS           ) 4:23-MD-03047-YGR
LIABILITY LITIGATION               ) MDL No. 3047
_____     )
THIS DOCUMENT RELATES TO:          )
ALL ACTIONS                        ) CONTAINS CONFIDENTIAL
                                   ) INFORMATION
_____     )

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

COMMONWEALTH OF                    )
MASSACHUSETTS,                     )
                                   )  Civil Action No.
              Plaintiff,           )  2384CV02397-BLSI
                                   )
    vs.                            )
                                   )
META PLATFORMS, INC., and          )
INSTAGRAM, LLC,                    )
                                   )
              Defendants.          )
_____

VIDEOTAPED DEPOSITION OF RAVI IYER, Ph.D.

PALO ALTO, CALIFORNIA

NOVEMBER 5, 2025

8:48 A.M.

Job No.: 7676515

Pages: 1 - 427

Reported by: Leslie A. Todd, CSR No. 5129 and RPR

CONFIDENTIAL

Page 100

to be true.  But it is not specifically part of my assignment to offer that opinion.

Q.    Okay.  So this is -- but this is an assumption that you're taking as true.  You haven't actually arrived at that opinion for purposes of this case?

A.    I have arrived at that opinion in other settings, but in this case, it was not my assignment to do that.  I -- as I understand it, there are other processes that will occur, other experts who will establish that.  And I do believe that some of the evidence in my report supports it, but it is not the assignment -- it was not the goal of my report.

Q.    So let's get back to what you meant by many young users.

A.    Yeah.

Q.    So am I right that you're defining many as an unacceptably large number?

MS. O'NEILL:  Objection.  Form. Mischaracterizes the testimony.

THE WITNESS:  That I would say is a -- I mean, yeah, I guess I would say that I -- at least -- I mean, again,

CONFIDENTIAL

Page 126

A.      Yep.

Q.      Do you see that?

A.      I do see that.

Q.      What do you mean by sufficiently?

A.      So 45 percent of teens report that social media affects their sleep.  A sufficient remedy would be commensurate with that kind of harm.  You would actually see -- it would actually -- you know, the amount of harm we would see would drop precipitously. And so what kinds of remedy would actually reduce those numbers to, you know, dramatically or effectively --

Q.      Okay.  And your opinion is that Meta's safety tools and features do not sufficiently remedy the unwanted, harmful, and negative experiences associated with the platforms, right?

A.      Meta's safety tools and features for the reasons I've outlined in the report?

Q.      Yeah.

A.      The scale of their usage is quite low.  Very few people use them.  Not that many people know about them.  They rely on willpower of teens who -- the ones who need it

Page 128

BY MR. KENNEDY:

Q.      Well, you didn't form any opinions in these cases concerning what would constitute a sufficient remedy for the unwanted, harmful, and negative experiences, correct?

MS. O'NEILL:  Objection.  Form.

THE WITNESS:  So I did form opinions about what would be a sufficient remedy.  I talked about very specific design changes that I thought would be necessary to at least do -- you know, to -- to change the product, commensurate with the harms that teens are reporting.

BY MR. KENNEDY:

Q.      And your reports don't contain any data of any kind concerning by how much would your proposed design changes reduce the incidence of unwanted, harmful, and negative experiences, correct?

A.      My report does not provide an exact quantitative estimate of how the combination of changes that I recommend would, in aggregate, reduce these unwanted harmful

CONFIDENTIAL

Page 132

Foundation.

THE WITNESS:  I would agree that Meta has many -- has made many changes to its platform with the intention of improving the experience of teen users.

BY MR. KENNEDY:

Q.     And I understand you go into them in some detail in the reports, right?

A.     I do talk about those features, and where they are not sufficient to mitigate the harms that excessive --

Q.     Yeah, your opinion is the things that Meta has already tried to improve the experience of teens and reduce any unwanted, negative, and harmful experiences they have, those measures are insufficient to mitigate the issues you identify in your reports, correct?

A.     Yes, they are insufficient to mitigate the harms in the report, for the reasons I identify in the report, that they -- there are theoretical reasons, but based on the fact that they rely on teens' willpower, there are reasons just based on looking at the usage of these things, they are not used very

CONFIDENTIAL

Page 133

much compared to the harms.  And then there's also evidence that these things are not well-maintained, and don't even work when -- as advertised.

Q.    So, in short, in your opinion, the efforts Meta has already made to reduce any unwanted, negative, and harmful experiences teens might have on their platforms aren't good enough?

MS. O'NEILL:  Objection.  Form.

BY MR. KENNEDY:

Q.    Correct?

A.    The efforts that they have made are insufficient to address the harm, for a variety of reasons that I outlined.

Q.    Now, let's say Meta reviewed your reports, and wanted to test all of the design changes that you propose, to see if they would be sufficient to mitigate unwanted, negative, and harmful experiences teens have on their platforms.

A.    Yeah.

Q.    Your reports provide no metric from which Meta could assess whether your design changes are or are not sufficient to

CONFIDENTIAL

Page 134

mitigate these experiences, correct?

MS. O'NEILL:  Objection.  Form.

THE WITNESS:  I -- again, I think I answered that, that the report includes a variety of ways to measure unwanted, harmful, negative experiences.

Again, I include the BEEF survey, the surveys of people's over-usage of the platform, where they say they're having unwanted -- using it too much, and negative experiences, harmful experiences.  It's affecting their sleep.  It's affecting their productivity.

I think there's an evolving methodology about how to measure that, that is referred to in the report.  And I think the report at least provides a starting point for measuring those -- the effects in that experiment that you describe.

BY MR. KENNEDY:

Q.    What would be a metric by which you would measure the level of mitigation in the context of the design changes you're

CONFIDENTIAL

Page 142

different way.  What -- how do you -- I mean, how do you define the term "sufficient to mitigate" in the context of your opinions?

A.    So sufficient has to be commensurate with the harms that are being -- and it has to -- so I talk about why the teen accounts are insufficient.

And so I think they -- the people who use the settings that are available on Meta's systems are often those with the most willpower, right?  So they don't address the people who need it most.  They often -- they're just not used very much, right?  So the level that they're used versus the level that -- that -- of harm we're seeing is so disparate, that it couldn't possibly affect -- like, if only a small percentage of users are using -- are hiding like counts, then how could a -- how could an intervention which allows users to hide their like counts actually materially affect the harms of quantification of engagement.

So the -- so it has to be commensurate with the -- it has to be able to help the people who need it most.  It has to

CONFIDENTIAL

Page 143

be used to some degree that it is commensurate with the harms.  And it has to -- I mean, and then third, like, both in independent testing and, you know, my own use of these products, these products -- these tools and settings are not well-maintained, and they don't work exactly as advertised.

So therefore, it has to at least be possible -- these -- you know, sufficient at least means it has to be commensurate with the harm, be usable by the people who need it most, and be well-maintained and consistently work as advertised.

Q.    So sitting here today, you have no quantitative metric to offer to define what constitutes sufficient mitigation of unwanted, negative, and harmful experiences on Meta's platforms, correct?

MS. O'NEILL:  Objection.  Form.

THE WITNESS:  I would not say that's correct.  I would say that I've offered a metric that one can use to -- I've offered a bunch of specific metrics that I think a product manager could easily use to measure the effects of

CONFIDENTIAL

Page 144

these changes.  I've given you several criteria for why the teen accounts are not sufficient in their current state.

And so I think -- you know, I decline to speculate as to the exact number, but I think I've given you a very easy -- a very readily usable metric that one can use to understand the effects and criteria for understanding sufficiency.

BY MR. KENNEDY:

Q.    Okay.  So what is -- and you can look at your reports, if you'd like.

A.    Yeah.

Q.    What is a number that you have offered in your reports that would help Meta or anyone else define what constitutes sufficient mitigation of unwanted, negative, and harmful experiences?  Just give me a number.

MS. O'NEILL:  Objection.  Form.

THE WITNESS:  I think I've repeatedly declined to give you an exact number.  I think it's not -- I think giving you an exact number, off

Page 168

Q.    All right.  So let's say Meta did want to do it.  Meta takes your reports, and follows your recommendations in the report, you know, changes what they need to change on each of the two platforms, and then does a survey of teen users to find out -- find out what happens, how would Meta know whether your changes worked or not?

MS. O'NEILL:  Objection. Speculation.

THE WITNESS:  Again, I have outlined many metrics that one can use for understanding unwanted, harmful, negative experiences.  Meta itself has not used -- the BEEF survey is a very good metric that they could use to understand these -- they have experience doing that.

There are also many people who have adapted those measures in other contexts and improved upon them.  There are new constructs that people have started to measure, including things like problematic use.  Meta itself has had definitions of problematic use.

CONFIDENTIAL

Page 169

Somewhere between its definition and measures of that, and, you know, Pew's definition, there is room to -- so there are many metrics that one could use to measure these. They all are starting to converge. You know, they're not exactly the same, but they all are part of a limited universe of harms that we're consistently observing on these platforms across -- across situations and across time.

And I think that would be perfectly reasonable for them to understand the effects of enacting these design changes.

BY MR. KENNEDY:

Q. Okay. So, yeah, I -- all I'm looking for is, how -- like, what -- like, what level of incidence of unwanted, negative, and harmful experiences are you looking for as constituting sufficient mitigation of the problems you are assuming are occurring today on Facebook and Instagram?

MS. O'NEILL: Objection. Asked and answered.

CONFIDENTIAL

Page 170

THE WITNESS:  So I think, again, I -- I think it sounds like you're trying to ask me to give an exact number of what level to expect.  And I think I'm repeating myself by saying that it would require a lot of thought.  That was not -- the exercise of the report was not to come up with an exact number.

And so if you are looking for an exact number, it's something I have to think about a lot deeper.  And it would be, you know, very speculative of me to venture an exact number at this moment.

BY MR. KENNEDY:

Q.    So if Meta were to adopt and implement all of your design changes, there's no metric by which Meta could assess whether those changes have succeeded or failed, correct?

A.    Again, I would, again, suggest that I've talked about many metrics that they could use to understand whether they have succeeded or failed, including the Pew metrics, the BEEF metrics, the -- Snap's Digital Wellbeing Index metrics, eSafety's

CONFIDENTIAL

Page 171

metrics, Ofcom's metrics.  There are many metrics that all converge on various harms that they could use.

And so I -- you know, I'm not -- I'm declining to speculate on an exact number, because I think that would be very speculative, but there are many metrics that they could use.

Q.    Can you explain what you mean by Pew metrics?

A.    I mean, there are survey questions that Pew has asked about -- that one could use to measure the effects of their products.

Q.    Could you give an example of one of those questions?

A.    You know, I don't know the exact wording of the question, without seeing it. If you have it, you're welcome to give it to me.  But, you know, something like, you know, Do you use social media too little, too much, or just enough is one.  Does social media affect your sleep is another -- that's conceptually -- I don't know the exact wording.

CONFIDENTIAL

Page 172

Q.    Yeah.  Conceptually is fine for right now.  So -- and these are survey questions asked of teen users of social media, right?

A.    They're asked of teen users, I think, in general.  But, yeah, a representative sample of teens in the United States.

Q.    Okay.  So if only 2 percent of teens say they use social media too much -- strike that.

So if you gave this question to users of Facebook and Instagram, and only 2 percent of teens say they feel like they use Facebook or Instagram too much, is that good, is that acceptable?

MS. O'NEILL:  Objection. Speculation.  Incomplete hypothetical.

THE WITNESS:  Well, I would say that 2 percent is certainly better than 45 percent.  I don't -- again, I think you're -- you know, I -- there's so much speculation, in terms of, like, me figuring out, like, what -- you know, trying to pin down an exact number.

CONFIDENTIAL

Page 176

platforms should be changed to avoid the harms for which plaintiffs are seeking to hold Meta liable, correct?

MS. O'NEILL:  Objection.  Form.

THE WITNESS:  I have made many design recommendations about how Meta can remedy the issues associated with extended use features, quantification of engagement, and all these -- the harms on the platform.

BY MR. KENNEDY:

Q.    And isn't it only fair that you also give Meta a benchmark by which it can figure out whether your proposed changes actually avoid the harm for which plaintiffs are trying to hold Meta liable?

MS. O'NEILL:  Objection.  Form.

THE WITNESS:  I don't know if I can -- you know, it's kind of speculative for me to say what is fair or not fair.  It was not part of my exercise for me to come up with an exact number.

You know, I -- I can, off the top of my head, come up with some general

CONFIDENTIAL

Page 177

ideas about what is or is not sufficient. Certainly, you know, when a feature is only used by 1 percent of the population, and the harm is represented by, you know, 45 percent of the population or 20 percent of the population, then clearly, there's a mismatch, in terms of scale there.

And I pointed that out in the report, so I think there are some -- some judgments about magnitude that one can make. But it was not part of my report. It was not part of the goals of my report in writing it, to come up with an exact number.

I don't think that's impossible. I think there's a world where, if Meta want to engage in these design changes, where one could work with them to develop such a metric. You know, we could work with them on metrics, and try to -- try to understand what is possible.

BY MR. KENNEDY:

Q. Sitting here today, you haven't

CONFIDENTIAL

Page 178

developed any such -- any of those metrics, right?

MS. O'NEILL:  Objection.  Form.

THE WITNESS:  Again, I -- I mean, I will, again, point out the BEEF metrics, the Snap metrics, the Pew metrics, and all those metrics.

Q.    Okay, so --

MS. O'NEILL:  Counsel, please let him finish the answer.

THE WITNESS:  So I do think that there are many metrics that one -- that Meta could use in order to measure -- you know, an exact number is very different than a metric.

BY MR. KENNEDY:

Q.    But you haven't proposed any particular metric that would constitute mitigating these harms to your satisfaction?

MS. O'NEILL:  Objection.  Asked and answered.

THE WITNESS:  I think you're using the term metric and exact number interchangeably.  And I don't think that's -- you know, I proposed many

CONFIDENTIAL

concrete metrics.  I have not proposed an exact number.  That was not the goal of the report.

BY MR. KENNEDY:

Q.     Okay.  So how do you define the term metric?

A.     A metric is a measure or something that you can use to understand progress.

Q.     So why don't we just use the term measure.

A.     Okay.

Q.     So, like, you -- when I've asked for metrics, you throw out, like, the Pew metric, the BEEF metric, Digital Wellbeing Index, and eSafety metric.  And so let's just call them measures.

A.     Okay.

Q.     How would Meta follow the BEEF measure to determine whether it has made design changes that sufficiently mitigate the unwanted, negative, and harmful experiences? How would Meta use that -- the BEEF measure?

A.     Yeah, I think they could use it in several ways, which I believe they may have

CONFIDENTIAL

Page 180

done in some cases, likely.  So, one, they could measure it before and after.  So, like, sort of a pre/post design.  So before, this was the level of harm.  After, what is the level of harm?

The other way to do is experimentally.  So you can understand -- you can implement the changes for a small group of users, and then see what that change -- you know, what is the effect on the experience of that group of users versus the effect of users who didn't get that change, or you can do a holdout, where you can do it in reverse, right?  You give everyone this change, but there's a small group that don't get the change, and you compare the two groups.

And you want do it over time, because you also want to look at network effects, because, like, some of these things may not happen immediately.  But there's lots of established methods for using these metrics to establish the effects of the design changes on the platform.

Q.    So do you agree that it would be necessary to do one or more of these

Page 233

you draw the line between an article that is related to the subject matter of this case versus unrelated.

MS. O'NEILL:  Objection.  Form. Mischaracterizes the report.

THE WITNESS:  So in that paragraph, I'm also -- I'm talking about my methodology about how you use evidence to answer questions which identifying specific questions -- which, candidly, Dr. Birnholtz misidentified the questions I was identifying in the report and rebutting mine -- you know, identifying specific questions, identifying evidence, using varieties of sources of evidence, empir- -- experimental evidence, observational evidence, not limiting yourself to one type of evidence, is a -- a method that is common to many of the empirical publications that are on my page.  And so the methodology is common to the methodology I used in this report. The -- so that was the subject of the 15,000 number.

I also would say that understanding people's aspirations is relevant to social media, in part, because many people -- you know, a lot of the report is about people's unwanted experiences. And so understanding what people want and what makes something unwanted is key to addressing unwanted experiences.

BY MR. KENNEDY:

Q. What about -- so your position is your most cited two articles are related to the subject matter of this litigation?

A. I would say that they have some relation to the subject matter of this litigation. And moreover, I would say that they are articles which share a common methodology which I employed in the report.

Q. What is the common methodology?

A. The common methodology is identifying a set of questions, identifying the best evidence to answer those questions, reviewing that evidence, not limiting one's self to specific kinds of evidence, but -- but considering both experimental evidence,

CONFIDENTIAL

Page 266

report.

Q.    So you said they were helpful with many things.  Other than formatting, what were those other things they were helpful with?

A.    Editing; understanding the process; understanding, like, what needed to go into the report.  Like, I didn't know, like, the format of, like, summary of opinions and, you know, just generally the -- not just formatting of the report but, like, of, like, the structure of a -- an expert opinion.  And then, you know, like, a -- you know, citations; you know, understanding what -- the formatting of citations; keeping track of the citations; putting them into the -- you know, some of the materials that were provided.

Q.    But you didn't -- in connection with forming your opinions in this case, you never did a systematic review of any corpus of literature related to social media or teen mental health, correct?

MS. O'NEILL:  Objection.  Form.

THE WITNESS:  So I didn't -- I have -- so I've had -- long before I

engaged in this report, I've had -- I've written about, studied, done research on the effects of social media and the design of social media on youth. And so I've -- I have extensive knowledge of the literature, and I've reviewed the literature many times, both things that are positive and negative related to my report. I included the citations in my report that were most relevant to the opinions that I gave, and -- yeah.

BY MR. KENNEDY:

Q.    Are you familiar with the term "systematic review"?

A.    I am familiar with the term "systematic review."

Q.    What -- what does "systematic review" mean?

A.    To review things in a enumerated way that you have a system for.

Q.    That -- systematic review involves having in mind a particular question you're investigating in the literature before you start the review?

MS. O'NEILL:  Objection.  Form.

CONFIDENTIAL

Page 291

that -- being yelled at.  So it's not -- negative experiences have far lasting impacts than positive experiences.

BY MR. KENNEDY:

Q.    So I just want to make sure I understand.  So is it fair to say the goal of your proposed changes to the algorithms -- strike that.

It's fair to say that the goal of your proposed changes to Meta's platforms is to mitigate unwanted, negative, and harmful experiences in young users?

A.    It is fair to say that that is -- you know, including -- including excessive usage, that is the goal of the design changes that I propose.

Q.    Now, do you assess the success of the mitigation at a population level or an individual level?

MS. O'NEILL:  Objection.  Form.

THE WITNESS:  At a population level or at the individual level?  I mean, I think you can assess it at both depending on the harm.  I think

CONFIDENTIAL

Page 292

that a lot of the metrics that I suggest are population level metrics, and so I think that would often be how you would assess things.  But there are certain acute harms that I think you'd also want to consider at the individual level.

BY MR. KENNEDY:

Q.    So -- so let's say Meta implements your proposed changes to Facebook. And after the changes are implemented, you find out that nine users are having safe and positive, good experiences, and one user is suffering severe mental health problems from using Facebook, have you successfully mitigated unwanted, negative, and harmful experiences within the meaning of your reports?

MS. O'NEILL:  Objection. Speculation.  Incomplete hypothetical.

THE WITNESS:  Yeah, I think that would be very hard for me to speculate with incomplete information about the exact line where you would draw.

I would point out that one out

Page 302

doing all of your proposed changes at the same time would be sufficient or effective mitigation is -- is a prediction on your part, right?

MS. O'NEILL: Objection. Form.

THE WITNESS: It is based on the evidence that I cite in the report that these features all individually have effects on mitigating unwanted, harmful experiences, and the fact that those -- these features all operate on similar mechanisms that extend usage of a platform which is one of the most common negative, harmful experiences on the platform.

BY MR. KENNEDY:

Q. No, I understand you have a basis for your prediction that doing all of your proposed changes would work. All I'm saying, it's still a prediction, right --

MS. O'NEILL: Objection.

BY MR. KENNEDY:

Q. -- that your doing all of your proposed changes would be effective mitigation?

MS. O'NEILL: Objection. Form.

Q.    All right.  So the -- at a high level, the point of this paragraph is that you assert that it would be feasible for Meta to get rid of autoplay and infinite scroll.  Is that a fair high-level summary of this paragraph?

A.    That is a fair high-level summary of this paragraph.

Q.    Now, you go on to say, quote, "Infinite scroll and autoplay can readily be removed, and many successful companies have done so, proving the feasibility."

And you give two examples in this paragraph, that YouTube turned off autoplay for identified children and Google removed infinite scroll from search results.

Are there any other companies you're thinking of as examples of -- successful companies that have removed infinite scroll and autoplay, aside from YouTube and Google?

A.    I mean, Facebook -- I believe Instagram has the setting to -- have settings to also disable autoplay.  They just aren't turned on by default, and so very few people use them.

CONFIDENTIAL

Page 341

make it an option, and you think it should be a default?

MS. O'NEILL:  Objection.  Form.

THE WITNESS:  I believe it should be off for young users, and not be something they can turn back on at all.

BY MR. KENNEDY:

Q.    Okay.  But you agree young users on Facebook already have the option to turn it off, right?

A.    I believe so, yes.  Assuming it works.

Q.    Have you cited in your reports any research demonstrating whether and to what extent having a default setting of a feature is more efficacious than having it as an opt-in setting for young users?

A.    So it -- that is wide-spread industry knowledge.  It is also cited in the non-engagement paper that I cite when I talk about non-defaulted settings are used well under 10 percent, and that's just not my knowledge but that's knowledge of many -- people across many companies.

CONFIDENTIAL

Page 342

I also cite many of the stats from Meta itself about the usage of many of their non-defaulted features which are often quite low.

Q.    So is it your opinion that all Instagram users are negatively impacted by seeing "like" counts?  Let me change the question.

Is it your opinion that all young users of Instagram are negatively impacted by seeing "like" counts?

MS. O'NEILL:  Objection.  Form.

THE WITNESS:  I would not say that it is a hundred percent of teen users who are negatively impacted by seeing "like" counts.  I would say that it is certainly a widespread experience whether by the BEEF survey or Project Daisy, we know that a large percentage of users regularly experience negative social comparison, that users attribute it to the visibility of "like" counts.  And so it may not be a hundred percent of users, but it's certainly a large