CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA ADOLESCENT ) MDL No.
ADDICTION/PERSONAL INJURY      ) 4:22-md-3047-YGR
PRODUCTS LIABILITY LITIGATION  )
_____ )
People of the State of          ) CASE NO.
California, et al.              )
                               ) 4:23-cv-05448-YGR
v.                             )
                               )
Meta Platforms Inc., et al.    )
-------------------------------------------------------
        COMMONWEALTH OF MASSACHUSETTS
SUFFOLK, ss                              SUPERIOR COURT
_____
COMMONWEALTH OF MASSACHUSETTS,
     Plaintiff,                     CIVIL ACTION NO.
                                    2384CV02397-BLS1
v.
META PLATFORMS, INC. and
INSTAGRAM, LLC.

        Defendants.
_____

             Thursday, March 5, 2026

 CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

      Video-Recorded Oral Deposition of
JUSTIN McCRARY held at the Westin Downtown
Austin, 310 East 5th Street, Austin, Texas,
commencing at 9:13 AM CST on the above date,
before Michael E. Miller, Fellow of the
Academy of Professional Reporters, Certified
Court Reporter, Registered Diplomate
Reporter, Certified Realtime Reporter, and
Notary Public.
             GOLKOW - VERITEXT
        877.370.DEPS | fax 917.591.5672
             deps@golkow.com

CONFIDENTIAL

Page 34

Q.    Okay.  Well, if you can just bear with me for a minute here.

You don't have a degree in developmental psychology, correct?

A.    No.  My only degree is in -- my only advanced degree is in economics.

Q.    Okay.  So you don't have a degree in epidemiology?

A.    No, that's correct.

Q.    You don't have a degree in population health?

A.    No.

Q.    You don't have a degree in public health, correct?

A.    No.

Q.    Okay.  You don't have a degree in app design, correct?

A.    No.

Q.    Okay.  You don't have a degree in social media design, correct?

A.    I'm not even sure there are such, but no, I don't.

Q.    Okay.  Are you trained in survey design?

A.    Yes, to some extent.

Page 35

Q.     Okay.  Can you explain briefly what you mean by "to some extent"?

A.     Well, in economics, there's a variety of different aspects to your training that would include, for example, how to field surveys of your own, things along those lines, and how those surveys are to be organized.

So I would say that yes, my training in economics encompasses training in statistics and in econometrics, and to a certain extent, that pertains to survey design.

That being said, there are people who would self-describe as survey experts.  I don't self-describe that way. I'd say my expertise is in economics and in statistics.

But if there's a particular question that you have pertaining to survey design, it may well be that it's within the realm of my expertise.  It would just depend on the specifics.

Q.     Okay.  In your Appendix A, in your CV, you list your areas of interest,

Page 43

definition, and another is addressing a -- what I suppose to the rest of the world is probably very niche but to us as economists is very important, methodological issue that's a follow-on to my American Economic Review 2022 paper that -- that paper is called the TF paper, and the updated paper that's still in progress is called the VTF paper.

Q.   Okay.  On this list of Scholarship in Appendix A, you would agree with me that none of the articles relate to mental health, correct?

A.   I think that's correct.

Q.   Okay.  You haven't published any scholarship on the issue of child mental health, correct?

A.   I think that's correct.

Q.   You haven't published any scholarship on the issue of teen mental health, correct?

A.   No, that's correct.

Q.   Okay.  You haven't published any scholarship about social media addiction, correct?

CONFIDENTIAL

Page 44

A.    No.  Correct.

Q.    You have not published any articles about the harms from social media, correct?

A.    No.

Q.    Okay.  You have not published any articles on Internet safety, correct?

A.    Correct.

Q.    Okay.  And you have not published any articles on social media app design, correct?

A.    Correct.

Q.    Okay.  If we can turn to page 5 of Appendix A, there's a section stating Courses Taught.

Do you see that, Dr. McCrary?

A.    I do.

Q.    Let me ask:  Currently you're teaching at University of Texas; is that correct?

A.    That's correct.

Q.    Okay.  And that's why we're here in Austin, correct?

A.    That's correct.

Q.    Okay.  And is it correct that

CONFIDENTIAL

Page 49

of that might have been cross-listed should be listed under the Berkeley headings as well. And I can track that down for you. Give me one second.

(Document review.)

A.    Yeah, exactly. So if you look in 2010-2011, there's a class that's called Econ 250C, I think it's the last entry on that, and that had class -- or that had students from the statistics department, the biostatistics department, the School of Public Health and a couple of other schools as well.

I actually don't remember what 209.6 refers to. It says that it's shared with that.

But I don't -- I don't know offhand whether it was cross-listed with public health, but if it was, I don't remember it one way or the other.

BY MR. DOWNING:

Q.    Okay. You've never taught a psychology course, correct?

A.    No, that's correct.

Q.    You haven't taught a course on

Page 50

child mental health, correct?

A.    No.

Q.    Okay.  You have not taught a course on teen mental health, correct?

A.    Correct.

Q.    Okay.  You've not taught a course on social media addiction, correct?

A.    Correct.

Q.    Okay.  You've not taught a course on the harms of social media, correct?

A.    Correct.

Q.    Okay.  You have not taught any courses on Internet safety, correct?

A.    Correct.

Q.    You've not taught courses on social media app design, correct?

A.    Correct.

Q.    Can you turn to Appendix B of your CV in the MDL rebuttal.  Okay.

This lists Testimony in the Past Four Years, correct?

A.    That's correct.

Q.    Okay.  And then I just want to compare the MA, Massachusetts rebuttal report.

CONFIDENTIAL

Page 51

You also have an Appendix B in the Massachusetts rebuttal report, correct?

A.    I'm not looking at it yet, but I believe that's correct.  Yes.

Q.    And can you confirm that the Appendix B in the Massachusetts rebuttal report is the same as the Appendix B in the MDL rebuttal report?

A.    No, they're not quite.  They're similar, but they're slightly different.

Q.    Okay.  Can you point out the differences to me?

A.    Sure.

Obviously, testimony in the past four years is a living concept.

Q.    Yeah.

A.    And the Massachusetts report is filed February 13th, so a little bit over a month after the MDL report.  So in between the filing of the two reports, there was a report filed in a matter on January 30th, 2026 that's listed on the top of Appendix B to the Massachusetts report.  That's the Orshan v. Apple case.

If you look on Appendix B of

CONFIDENTIAL

Page 52

the MDL report, I believe you'll see that same case, but it occurs in a different place in the chronological order, because at that time, the most recent report would have been filed May 8th, 2025.

Q.    Okay.  Thanks for pointing that out.

A.    Sure.

Q.    Let's go back to the MDL Appendix B.

Now, Dr. McCrary, you'd agree that you have not given expert testimony previously about any case involving child mental health, correct?

A.    I think that's correct.

Q.    Okay.  You have never given expert testimony about a case involving teen mental health, correct?

A.    Correct.

Q.    Okay.  You've never given expert testimony before about social media addiction, correct?

MR. PEREZ-MARQUES:  Object to form.

A.    Correct.

CONFIDENTIAL

Page 53

BY MR. DOWNING:

Q.    You've never given expert testimony about harms from social media, correct?

A.    I think that's correct.

MR. PEREZ-MARQUES:  Object to form.

THE WITNESS:  I apologize.

BY MR. DOWNING:

Q.    Well, this may be the reason that counsel is objecting.

You do list on your report -- or, sorry, Appendix B, a case -- let me look here -- related to State of New Mexico v. Meta Platforms Inc. on page 2?

A.    That's a totally fair point.

So when you were asking me those questions, I was not thinking of any of the cases in which Meta has been a defendant. That should be a modifier probably to all of the above questions.

Q.    Okay.  So then, just to make sure we have a clear record, other than the case involving State of New Mexico v. Meta Platforms, you've never given expert

CONFIDENTIAL

Page 60

BY MR. DOWNING:

Q.    Well, I was asking if you have any expertise that you have not listed here that you think would be relevant to your qualifications for your case.

Did your prior question fully answer that?

A.    I think so.

MR. PEREZ-MARQUES:  Object to form.

A.    I think so, except that I think your -- maybe I misheard the first question. I didn't think that it was specific to the opinion that I'm offering in this case.

And with that modification, I'd say the easy answer is:  My expertise is in economics and statistics, and that's the basis for the opinions that I've offered here.

BY MR. DOWNING:

Q.    Okay.  Among the expertise that you list, you mention education on this list?

A.    That's correct.

Q.    What is the nature of your expertise in education?

Page 61

A.    Well, for example, I'm a member of the National Bureau of Economic Research, or the NBER as it's known.  One of the groups that I'm a member of there by nomination is the Economics of Education.  It's also right that a prominent paper of mine is published in the American Economic Review in 2011 that addresses topics of education specifically.

It's a common subject of study within the field of economics, and education has far-reaching implications, of course.  So that touches on lots of different things.

But that's what I was getting at there, if that's helpful.

Q.    You mentioned the economics of education.  So is that the field of education that you are asserting your expertise is in?

A.    No.

Q.    Okay.

A.    As I described to you, my expertise is in economics and in statistics, but you're asking me what is the word education -- I think that is what your question was.

What's the word "education"

CONFIDENTIAL

Page 62

doing in that sentence, and I described to you, well, there's a subgroup of the NBER, of which I'm a member, the title of which is the Economics of Education.

There's also a prominent paper of mine that's addressing that topic that's also a field within economics, depending upon which department you're in as a graduate student.

Q. Okay. In the MDL action you're not holding yourself out as an expert in child mental health, correct?

A. That's correct. I don't hold myself out as an expert in child mental health. My expertise is in economics and in statistics.

Q. Okay. And you're not holding yourself out as an expert in teen mental health, correct?

A. That's correct. I think it's the same answer.

Q. You're not holding yourself out as an expert in social media addiction, correct?

A. No, that's also correct.

CONFIDENTIAL

Q.    You're not holding yourself out as an expert on harms of social media, correct?

A.    No.  The expertise that I'm offering is about the kinds of conclusions that are drawn from an economic damages analysis, and it's limited to that.

Q.    Okay.  So you're not holding yourself out as an expert on Internet safety?

A.    No.

Q.    You're not holding yourself out as an expert on social media app design, correct?

A.    No.  I'm responding to the one expert who has offered an economic damages analysis, and that's the only opinion that I'm offering.

Q.    Okay.  Let's turn to Appendix C of your MDL rebuttal report.  Okay.

Are you at Appendix C, Dr. McCrary?

A.    I am.

Q.    Okay.  Appendix C is entitled Documents Relied Upon, correct?

A.    Correct.

CONFIDENTIAL

Page 190

A.      Yes.

Q.      How did you determine what indicators of mental health among teens to focus on?

A.      The amended complaint.  It's spelled out in footnote 151.

Q.      Okay.  So based on footnote 151, am I understanding correctly that what you did is you looked at the complaint to identify mental health concerns; is that correct?

A.      That's correct.  I looked at what was being alleged in the complaint and then looked at publicly available data to see whether there were proxies for those mental health measures, including things that might be at the edge of mental health, like, for example, sleeping and things like that.

So in other words, I tried to take what was alleged in the complaint and to line that up with available data that's collected by the US government.

Q.      And how are you able to determine in the complaint whether you identified the appropriate mental health

CONFIDENTIAL

Page 204

A.    That's correct.  If you look at paragraph 93, it's obviously on the heels of paragraph 92, that's describing that if it was right that the measures that Mr. Saba is counting are measures that are indicative of something like psychological harm, then you would expect for measures of psychological harm to show that there were, for example, increases associated with adoption of at-issue features or things along those lines.

So it's really about the -- about what's missing from Mr. Saba's analysis.

You're right that the analysis I'm putting forward is limited to the three datasets that I've put forward.  I think it's right that it may be possible that there's other datasets as well, but sitting here right now, I'm not aware of any.

Q.    So you aren't saying that there is no other available public data sources on teen mental health, correct?

A.    That's correct.  That's a bridge too far.  It's possible that there

Page 205

are, but sitting here right now, if there are, I'm not aware of them.

Q.     Yeah.

And in Section VII, when you're referring to teen mental health data, you're not referring to academic articles, correct?

A.     I'm not sure I follow.

Q.     Well, your analysis of teen mental health data is analysis just of the three databases and not a meta-analysis of the literature on teen mental health, right?

A.     I think it's plain that Section VII is not doing a meta-analysis of the academic literature.  That being said, the three datasets that I'm describing are widely used in the academic literature, which is why your question confused me a little bit.

Q.     Okay.  On page 57, you discuss the NSCH Mental Health Data, correct?

A.     That's correct.

Q.     Okay.  And you state at the end of paragraph 103 the following:

You say:  My analysis of the NSCH data presented in this section supports

mental health challenges over time.

Do you see that?

A.     I do.

Q.     Okay.  And this is the -- one of the observations you make from your analysis of the NSCH data, correct?

A.     That's correct.

Q.     You used the term "consistent" in this observation, correct?

A.     That's correct.

Q.     Okay.  You say that the NSCH data that you observed was not consistent with increased -- not consistent with increases in mental health challenges, correct?

Well, strike that.  Let me withdraw that question.

I want to ask you about the idea of a consistent increase.  In your view, what constitutes a consistent increase?

A.     Like an increase that continues from one period to the next and then from that period and so on, so that is to say, loosely speaking, a trend.

Q.     Okay.  So if an increase -- so

CONFIDENTIAL

Page 213

if a trend increases at a rate more rapidly than it does previously, is that a consistent increase in your mind, or not?

MR. PEREZ-MARQUES:  Object to form.

A.    Well, that's a different point. That's what (iii) is about.  But (i) is just simply saying, you know, if you hadn't looked at the available data, you know, it would be easy to be worried about what measures of mental health might show.

But measures of mental health tend to show actually that things today are similar to what they were 10, 15 years ago.

BY MR. DOWNING:

Q.    Okay.

A.    And that appears to be, generally speaking, right.

There's exceptions to that, but that's mostly what the data tends to bear out.

Q.    Okay.  You also used the word "widespread" in (i).  Why does it matter to you if an increase is widespread?

A.    Well, it's not the case that

Page 214

Instagram or Facebook are limited to, for example, one state or a handful of states. It's obviously something that many people throughout the United States might use.

So if, for example, it was right that you looked at a given state and that state might be consistent with an increase that was consistent for a particular outcome that was a negative mental health measure, the next question that you would have is, well, wait, that isn't the only state that has many people using Instagram and Facebook.  Is it also true, for example, that the same pattern that you see there is present in other states where people also would use Instagram and Facebook.

So when there is prevalence generally throughout the nation with respect to something, if that something is to be connected to measures of mental health challenges, you'd expect for it to be widespread and consistent, just as the (i) that you were asking me about says.

Q.    Okay.  Does your concept of something being widespread have to do with

CONFIDENTIAL

Page 215

the percentage of teens who are experiencing a mental health challenge?

A.    No.   It has to do instead with widespread across states.   That's what I was trying to communicate.   So if you will, guardrails against something like cherry-picking.

So one ought not look in, for example, the MDL matter at one state's evidence in isolation; you should look at the totality of the evidence.

I've tried to put that forward in my report.   For space reasons, I have highlighted the four largest states in the main text, but that's why the appendices have all of the available evidence for all of the states that are MDL states.

Q.    So in your view, if a metric increased in one state more so than it increased in another state, would that mean that you would not view that as a widespread increase?

A.    Well, I --

MR. PEREZ-MARQUES:   Object to form.