# EXHIBIT A

CONFIDENTIAL

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA ADOLESCENT ) MDL No.
ADDICTION/PERSONAL INJURY       ) 4:22-md-3047-YGR
PRODUCTS LIABILITY LITIGATION   )
_____ )
-------------------------------------------------------
          COMMONWEALTH OF MASSACHUSETTS
SUFFOLK, ss                              SUPERIOR COURT
_____
COMMONWEALTH OF MASSACHUSETTS,
        Plaintiff,                   CIVIL ACTION NO.
                                     2384CV02397-BLS1
    v.
META PLATFORMS, INC. and
INSTAGRAM, LLC.

        Defendants.
_____

               Monday, March 2, 2026

   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

        Video-Recorded Oral Deposition of CARL
S. SABA held at the offices of Davis Polk &
Wardwell LLP, 900 Middlefield Road, Redwood
City, California, commencing at 9:03 AM PST
on the above date, before Michael E. Miller,
Fellow of the Academy of Professional
Reporters, Certified Court Reporter,
Registered Diplomate Reporter, Certified
Realtime Reporter, and California CSR #13649.
                  __ __ __
               GOLKOW - VERITEXT
        877.370.DEPS | fax 917.591.5672
               deps@golkow.com

Page 21

Q.    Other than the mistake addressed in that supplement, are there any other mistakes in your reports that you have discovered?

A.    Not that I'm aware of, no.

Q.    In arriving at the opinions set forth in your reports, you were asked by counsel to make a number of assumptions, correct?

A.    There are some assumptions I was asked to make, yes.

Q.    And those assumptions are identified in your reports, correct?

A.    Correct.

Q.    You didn't make any assumptions other than those specifically identified in your report, correct?

A.    Correct.  I mean, if you're referring specifically to assumptions that I was asked to make as opposed to assumptions I decided to make as part of my calculations and professional judgment, I don't know what -- if you could just clarify your question, please.

Q.    To the extent counsel asked you

CONFIDENTIAL

Page 22

to make an assumption, you've identified it in your report, correct?

A.    Yes.

Q.    And counsel didn't ask you to make any assumptions other than those you identified in your report?

A.    I believe that's correct, yes.

Q.    And by assumptions, do you understand that to mean factual propositions that counsel asked you to assume are true?

MS. ARORA:  Objection to form.

A.    I think that would be true, yes.

BY MR. WILLIAMS:

Q.    Do any -- sorry.

A.    Go ahead.

Q.    Do any of the assumptions that the AGs asked you to make concern methodology that you apply rather than factual assumptions?

A.    I don't believe so.

Q.    In your view, is it proper for an expert to be asked by counsel to make assumptions as to what methodology to apply?

MS. ARORA:  Objection to form.

CONFIDENTIAL

Page 23

A.    I think it depends on the circumstances, but, generally speaking, the expert determines the methodology, and I believe that that is the case here.

BY MR. WILLIAMS:

Q.    So in your view, it's not proper for counsel to direct an expert to apply a particular methodology?

MS. ARORA:   Objection, asked and answered.

A.    I think, again, it would depend on circumstances, but I would say that would not be typical.

BY MR. WILLIAMS:

Q.    Or appropriate?

MS. ARORA:   Objection to form.

A.    I'm not going to -- I'm not going to agree to "appropriate" because there may be some circumstances where maybe it is appropriate.

BY MR. WILLIAMS:

Q.    So in some circumstances, counsel -- strike that.

In some circumstances, it is appropriate for counsel to direct an expert

Page 24

what -- to apply a certain methodology?

MS. ARORA:  Objection to form.

A.    I would say it may be.  It really depends on a specific circumstance.

BY MR. WILLIAMS:

Q.    For certain assumptions, you made an effort to assess the reasonableness of the assumption, correct?

A.    That's correct.

Q.    And what do you mean when you say that -- or conclude that an assumption is reasonable?

A.    It means that I've reviewed supporting evidence and the evidence supports that assumption.

Q.    When you say supports, what do you mean?

A.    I'm not sure how to frame it any other way.  If there was a particular assumption I was asked to make and I've conducted some analysis to see whether there is support for that assumption and I describe it in my report, that's what I mean.

Q.    Well, are you -- strike that.

What quantum of support do you

Page 25

have in mind?

MS. ARORA:  Objection to form.

A.      I mean, we're discussing this in broad generalities, which makes it very difficult for me to answer.  We'd have to look at a specific example.

BY MR. WILLIAMS:

Q.      Fair enough.  And we will.

I'm just trying to understand generally your approach, which is are you concluding that there's some basis in the record to support the assumption or are you reaching an opinion beyond that?

MS. ARORA:  Objection to form.

A.      I'm concluding that there is some factual basis in the record to support that assumption, yes.

BY MR. WILLIAMS:

Q.      But you're not necessarily concluding that the evidence shows that the assumption is more likely than not, for example?

MS. ARORA:  Objection to form.

A.      I mean, I may be providing evidence that it's more likely than not, I

CONFIDENTIAL

Page 26

would say.

BY MR. WILLIAMS:

Q.    Well, if you're asked to assume causation, for example, are you -- and you conclude that that's a reasonable assumption, are you concluding that it's more likely than not that causation has been met or just that there's some basis to conclude that causation has been met?

MS. ARORA:  Objection to form.

A.    I would say it's the latter, that there's some basis to support the assertions of causation.

BY MR. WILLIAMS:

Q.    Your reports in both matters include an appendix listing all of the documents and information that you considered in forming your opinions, correct?

A.    That's correct.

Q.    And those appendices are a complete and accurate list of all of the documents and information you considered in forming your opinions, correct?

A.    That's correct.

Q.    There are no documents or

CONFIDENTIAL

Page 27

information that you considered other than what's listed in those appendices, correct?

A.    None that I'm aware of.

Q.    Let's go to Appendix -- let's go to your opening report and flip to Appendix B.

So this appendix, I'll represent, is 45 pages -- is approximately 45 pages long.  Does that sound about right?

A.    Yes, that sounds about right.

Q.    And it lists various documents, correct?

A.    That's correct.

Q.    Did you personally review all of the documents listed in this appendix?

A.    I would say I've reviewed, if not all of them, the majority of them, some more -- some significantly more than others. Those would be the ones I placed primary reliance on.

Q.    So some of the documents listed here, you did not personally review, correct?

A.    I just -- I don't know.  I would have to look at every document and tell you.

CONFIDENTIAL

Page 31

correct?

A.    What do you mean by that?

Q.    Well, why don't we go to your reply report --

MS. ARORA:  Before we move on from this document, Counsel, and I apologize for interrupting, I do want to just note for the record, there is an amendment to this Appendix B, and what we've been discussing on the record now is not the amended version or the revised version of Appendix B. It's the original version.  I just want to make sure you're aware of that.

MR. WILLIAMS:  Okay.  Thank you for noting.

BY MR. WILLIAMS:

Q.    Looking at your reply report -- I'm sorry.

I just realized your -- what I've been calling your reply report is, on the cover page, called your rebuttal trial report; is that correct?

A.    That's correct, it is -- I

CONFIDENTIAL

Page 32

believe that's the way it was designated by the Court, but it is a reply report. It's a reply to McCrary and to Isaacson.

Q. So if I use the term "reply," you understand that I'm referring to this report, correct?

A. Yes, I do.

Q. So if we turn to Appendix D of your reply report, which is much shorter --

A. Okay.

Q. -- under the Research Materials section, there are four treatises, correct?

A. Yes.

Q. And you didn't list these treatises in your appendix to your opening report, correct?

A. That is correct.

Q. Does that mean you didn't consider these treatises in connection with forming your opinions in your opening report?

A. I would say it means that I didn't consider them explicitly. I mean, I'm intimately familiar with these publications. This is guidance that I have taken into account for many years.

CONFIDENTIAL

Page 33

Q.    And so you're familiar with the contents of these treatises, correct?

A.    Yes.

Q.    And when you say it's guidance you've taken into account for many years, what do you mean by that?

A.    What I mean, for example, is that whenever I prepare these types of calculations as the ones that I prepared in my report, I take into account reasonable certainty guidance.

So just because I didn't cite it in my opening report doesn't mean that I didn't attempt to follow that guidance.

Q.    Okay.  When you say reasonable certainty guidance, you're referring to a specific portion of one of the treatises; is that correct?

A.    Calculating the lost profits discusses the topic, attaining the reasonable certainties is focused entirely on that topic, and I believe the remaining two publications also have some reference to this concept of reasonable certainty.

Q.    These are treatises that you

Page 34

view as authoritative in the field; is that fair?

MS. ARORA: Objection to form.

A. I believe they apply or they -- they discuss guidance that is widely used in my field.

BY MR. WILLIAMS:

Q. And you've used them?

A. Yes.

Q. Did you have access to the full record of documents produced in both litigations?

A. My understanding is that I did based on our access to Everlaw.

Q. And what is Everlaw?

A. A database or a portal that I understand contained all documents that were produced by either party in this litigation.

Q. And did you personally have access to Everlaw?

A. We had an associate on our -- on my team who had access to Everlaw. Meta wanted to restrict access to one person.

Q. And so if a document was produced in this litigation, you had access

MS. ARORA:  Objection to form.

A.    I understand the general elements.  I wouldn't say the specifics of every state.

BY MR. WILLIAMS:

Q.    And what is your understanding of the general elements?

A.    Engaging in unfair practices that may lead to or could be reasonably expected to lead to harm and engaging in deceptive practices that deceive the reasonable consumer.

Q.    For the unfair practices claims, is it your understanding that the harm must be caused by the unfair practices?

MS. ARORA:  Objection to form.

MR. BERGE:  Objection to form.

A.    My understanding is that harm does not actually have to occur for there to be an unfair practice.

BY MR. WILLIAMS:

Q.    So you said that your understanding of the unfair practices claims was that it involved engaging in unfair practices that may lead to or could be

CONFIDENTIAL

Page 71

reasonably expected to lead to harm, correct?

A.     Correct.

Q.     And is it your understanding, generally speaking, that there is any required causal connection between the unfair practices and the actual or likely harm?

MS. ARORA:  Objection to form.

A.     Well, yes, in the sense that the practice has to be -- may be expected to lead to harm.

BY MR. WILLIAMS:

Q.     An expectation of harm caused by the unfair practice, right?

MS. ARORA:  Objection to form.

MR. BERGE:  Objection.

A.     That's my understanding.

BY MR. WILLIAMS:

Q.     Is it your understanding that the violations that -- what constitutes a violation under the state consumer protections must be caused by the alleged misconduct?

MS. ARORA:  Objection to form.

MR. BERGE:  Objection to form.

A.     I'm not sure I'm following your

Page 72

question.  What constitutes a violation may be -- must be caused?

BY MR. WILLIAMS:

Q.    Well, you're calculating -- and we'll get to this, but you're calculating instances that you understand may be violations of the state consumer protection statutes, correct?

A.    Correct.

Q.    So for time spent, you're calculating whether teens spend, on average, over a certain amount of time on Instagram or Facebook in a month, correct?

A.    I'm calculating how many instances there are of such -- monthly instances of such teens exceeding time thresholds.

Q.    Is it your understanding that those instances must be caused by the alleged misconduct?

MS. ARORA:  Objection to form.

A.    It's my understanding that those -- those instances which may reflect compulsive or problematic use would be the result of the alleged misconduct.

CONFIDENTIAL

Page 100

unfair -- unfairness claim, it would be that Meta engaged in unfair practices in how it designed and deployed the platform that resulted in certain teens engaging in compulsive or problematic use.

And what I'm measuring is the number of instances that Teen Accounts are exceeding a certain amount of time on the platforms.

Q.    And did you -- you're not offering any opinion on whether the time spent instances are caused by the unfair practices, correct?

MS. ARORA:  Objection to form.

A.    I'm not.  That would be a causation opinion, and other evidence will be presented.  That's not part of my scope of work.

BY MR. WILLIAMS:

Q.    Do you know what specific evidence will be presented regarding that issue?

A.    Not specifically, no.

Q.    Did you do anything to assess the reasonableness of -- well, strike that.

CONFIDENTIAL

Page 101

You're not offering a causation opinion in any respect in this action, correct?

MS. ARORA:  Objection to form.

A.    That's correct.  I'm not offering opinions on the causation, meaning that there was a violation of UDAP, either in terms of unfair or deceptive practices.

BY MR. WILLIAMS:

Q.    And is it fair to say that you're assuming that the design features -- strike that.

Earlier you testified that your understanding is that the time spent violations may account for violations for both the unfair practices and the deceptive statements, correct?

A.    Correct.

Q.    What's your understanding of the causal connection between the time spent instances and the deceptive statements?

MS. ARORA:  Objection to form.

A.    It would be assertions made that Meta engaged in deceptive statements about the addictive nature of its platform.

CONFIDENTIAL

Page 102

BY MR. WILLIAMS:

Q.    I'm sorry, and how does that --
how does that have a causal relationship to
the time spent instances that you're
calculating?

MR. BERGE:  Objection to form.

MS. ARORA:  Objection to form.

A.    Well, it would -- it would be
that because Meta engaged in statements that
would give teens, for example, reason to
believe that the platform was not addictive,
and then they get onto the platform and some
of them end up engaging in compulsive or
problematic use.  That would be the
connection.

BY MR. WILLIAMS:

Q.    So but for the allegedly
deceptive statements, these instances of time
spent on the platform would not have
occurred, correct?

MS. ARORA:  Objection to form.

MR. BERGE:  Objection to form.

A.    Well, I think, again, that
would be one element of what caused the --
the assertions that the State would make is

that that would be one element of what caused this high level of use by certain teens.

BY MR. WILLIAMS:

Q.    And another element would be the unfair features, correct?

A.    Would be unfair practices in how the platform was designed and deployed, yes.

Q.    And is it fair to say that for purposes of your calculations, you're assuming the causal connection between the alleged misconduct and the time spent on the platform?

MS. ARORA:  Objection to form.

MR. BERGE:  Objection.

A.    I am assuming causation, but I have done certain work to establish the reasonableness of my assuming that causation.

BY MR. WILLIAMS:

Q.    And what work did you do?

A.    Well, so, for example here, because part of the claim is unfair practices that attempt to essentially maximize use of teens on the platform, I did look at what evidence is there that Meta was engaging in

CONFIDENTIAL

Page 104

an effort to acquire teens, retain teens and maximize their engagement.  And there is a section of my report that discusses that evidence.

Q.    Did you look at any evidence that the specific at-issue design features caused you -- caused teens to spend more time on the platform?

MS. ARORA:  Objection to form.

A.    Not specific to those features, no.

BY MR. WILLIAMS:

Q.    So you don't have any basis for your assumption that the specific design features caused teens to spend time on the platform, correct?

MS. ARORA:  Objection to form.

A.    Well, I mean, again, those design features are part of what the States are asserting are unfair practices in order to, you know, maximize acquiring, retaining and engaging teens on its platform.

And I did look at, in general, what evidence is there that Meta was attempting to acquire, retain and engage

CONFIDENTIAL

Page 105

teens during the relevant time period.

BY MR. WILLIAMS:

Q.    I don't think that answered my question.

You don't have any basis for your assumption that the specific design features at issue caused teens to spend time on the platform, correct?

MS. ARORA:  Objection to form, asked and answered.

A.    I didn't -- I did not do an analysis that is specific to those features. What I looked at were broader indicators of wanting to acquire, retain and engage teens.

BY MR. WILLIAMS:

Q.    So apart from Meta's efforts to acquire and retain teens, you did not look at any evidence indicating that the specific design features at issue caused users to spend -- sorry, caused teens to spend time on the platform, correct?

MS. ARORA:  Objection to form.

A.    I didn't do an analysis of the impact of each feature, you know, individually on time spent.  I didn't do

CONFIDENTIAL

Page 106

that.

BY MR. WILLIAMS:

Q.      I'm not asking if you did an analysis.

I'm asking if you have any evidence -- strike that.

I'm asking if you looked at any evidence indicating that the specific design features at issue caused users to spend time on the -- caused teens to spend time on the platform.

MS. ARORA:  Objection to form, and asked and answered.

A.      That's not something that I did as part of my calculation, so I wasn't looking for that evidence.

BY MR. WILLIAMS:

Q.      So you don't have a reasonable basis to assume that the specific design features at issue caused teens to spend time on the platform, correct?

MS. ARORA:  Objection to form.

A.      I don't think I agree with that because those features may well have contributed to time spent on the platform.

CONFIDENTIAL

Page 107

BY MR. WILLIAMS:

Q.    But you didn't do any analysis to -- strike that.

What's your basis for saying that those features may well have contributed to time spent on the platform?

A.    Because I discuss in my report that Meta was actively engaging in efforts to acquire, retain and engage teens, and the way they did that was, you know, through the features that they had on the platform --

Q.    Do you discuss --

A.    -- amongst other things.

Q.    Do you discuss those specific features in your section on Meta's efforts to acquire, retain and engage teens?

A.    I don't think in that section, no.

Q.    So other than Meta's focus on acquiring, retaining and engaging teens, do you have any basis for your assumption that the specific design features at issue here caused teens to spend time on the platform?

MS. ARORA:  Objection to form, and asked and answered.

Page 108

A.    I would say what I'm discussing is how general -- a broad set of elements of how the platform is designed and deployed was done in a way to maximize engagement and to acquire and retain teens.

BY MR. WILLIAMS:

Q.    Apart from Meta's general -- strike that.

Apart from your discussion of Meta's general efforts to acquire and retain teens, you don't have any basis for your assumption that specific design features here caused teens to spend time on the platform, correct?

MS. ARORA:  Objection to form, asked and answered at least three times.

MR. WILLIAMS:  I don't think he's answered it, please.

A.    I did not analyze it based on these specific features.

BY MR. WILLIAMS:

Q.    What's your understanding of the causal link between -- strike that.

What did you do to analyze

CONFIDENTIAL

Page 109

whether there's reasonable assumption for the causal link that you assumed between -- strike that.

What did you do to analyze whether there's a reasonable basis for the causal link you assumed between the deceptive statements and time spent on the platform?

A.    I think what I looked at was more of the unfairness claim as it related to time spent.

BY MR. WILLIAMS:

Q.    So you don't have a reasonable basis for the assumption that there's a causal link between the deceptive statements and time spent on the platform, correct?

MS. ARORA:  Objection to form.

A.    I don't think I've performed some specific analysis related to that.

BY MR. WILLIAMS:

Q.    Your calculations don't take into account why teens are spending time on Instagram or Facebook, correct?

MS. ARORA:  Objection to form.

A.    My calculations are not analyzing what specific factors are causing

CONFIDENTIAL

Page 110

teens to spend time on the platform.

BY MR. WILLIAMS:

Q.    Nor are they taking into account what specific factors are causing teens to spend time on the platform, correct?

MS. ARORA:  Objection to form.

A.    Well, I mean, I -- I understand what types of elements would cause them to spend time on the platform.  I discuss them a bit.

So, for example, at one point they were reducing ad load to teens in order to get them to spend more time on the platform, and it resulted in increasing time spent in acquisition of teens.

BY MR. WILLIAMS:

Q.    Your time spent calculations may include instances where teens spend over one of the thresholds you calculate on average in a month on the platform, and that time spent is caused by reasons unrelated to the allegedly wrongful conduct, correct?

MS. ARORA:  Objection to form.

A.    That's possible, yes.

///

there were, you know, false statements being made about the safety of the platform and that there were -- there was a mission of disclosure of information that was known by Meta about the safety of the platform.

Q.    So your understanding is that there's deceptive statements being made; your understanding is that there are negative experiences on the platform.

And your testimony is that that's sufficient to assume that the deceptive statements are causing the negative experiences that you're measuring?

MS. ARORA:   Objection to form.

MR. BERGE:   Objection, form.

A.    There are deceptive statements being made, and then there's a lack of release of known information by Meta as to the harms of the platform from all this research that they had conducted, which I did discuss in my report, and that those would be related to -- or the causal factors for that deception claim.

BY MR. WILLIAMS:

Q.    And what basis do you have to

CONFIDENTIAL

Page 151

assume that the omission of information or deception, alleged deception, caused the negative experiences that you're measuring?

MS. ARORA:   Objection to form.

A.      You're asking me again about whether I have an opinion about causation.  I don't.

BY MR. WILLIAMS:

Q.      Well, I'm asking you -- you're a damages expert, right?

A.      Yes.

Q.      Are you opining as a damages expert here?

A.      Yes.

Q.      It's important -- would you agree that a damages expert should have a reasonable basis for causation, even if they're assuming causation?

A.      I would agree with that.

Q.      And so I'm trying to understand what is your reasonable basis for assuming a causal link between the deception or omission that you understand the AGs are alleging and the negative experiences that you're measuring?

CONFIDENTIAL

Page 152

A.    It's -- it's press releases about safety features that Meta is -- was putting out there, with those features generally not being effective, as I discuss in my report.

It's these community enforcement reports that would give one the impression that there's a low rate of bad encounters on the platform.

It's all these other research studies that I've cited in my report that were not released to the public.

Q.    Other than those things, do you have any other basis for assuming that there's a causal link between the alleged deceptive -- deception or omission and the negative experiences that you're measuring?

MR. BERGE:  Objection.

A.    No, because I think those items are sufficient to establish a reasonable basis for me to assume causation.

Again, I'm not going to prove causation here.  Other evidence will be presented in this case.

///

CONFIDENTIAL

Page 363

                    CERTIFICATE
          I, MICHAEL E. MILLER, Fellow of
the Academy of Professional Reporters,
Registered Diplomate Reporter, Certified
Realtime Reporter, Certified Court Reporter
and Notary Public, do hereby certify that
prior to the commencement of the examination,
CARL S. SABA was duly sworn by me to testify
to the truth, the whole truth and nothing but
the truth.
          I DO FURTHER CERTIFY that the
foregoing is a verbatim transcript of the
testimony as taken stenographically by and
before me at the time, place and on the date
hereinbefore set forth, to the best of my
ability.

          I DO FURTHER CERTIFY that pursuant
to FRCP Rule 30, signature of the witness was
not requested by the witness or other party
before the conclusion of the deposition.
          I DO FURTHER CERTIFY that I am
neither a relative nor employee nor attorney
nor counsel of any of the parties to this
action, and that I am neither a relative nor
employee of such attorney or counsel, and
that I am not financially interested in the
action.

_____
MICHAEL E. MILLER, FAPR, RDR, CRR
Fellow of the Academy of Professional Reporters
NCRA Registered Diplomate Reporter
NCRA Certified Realtime Reporter
California CSR #13649
Dated: March 3, 2026