# Exhibit 3

# PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO EXCLUDE GENERAL CAUSATION TESTIMONY OF PLAINTIFFS' EXPERTS

Case No.: 4:22-md-03047-YGR
MDL No. 3047
In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA ADOLESCENT ) Case No.

ADDICTION/PERSONAL INJURY        ) 4:22-MD-03047-YGR (PHK)

PRODUCTS LIABILITY LITIGATION    )

                                 ) MDL No. 3047

                                 )

THIS DOCUMENT RELATES TO:        )

                                 )

People of the State of           )

California, et al. v. Meta       )

Platforms, Inc., et al.          )

_____ )


    VIDEOTAPED DEPOSITION OF MITCH PRINSTEIN, PH.D.

_____


    PURSUANT TO NOTICE, the above-entitled deposition was taken on behalf of the Defendants at Washington Duke Inn & Golf Club, 3001 Cameron Blvd., Durham, North Carolina 27705, on Friday, September 26, 2025, at 9:09 a.m., before Sophie Brock, Registered Diplomate Reporter, Certified Realtime Reporter, and Notary Public in and for the State of North Carolina.

Job No. MDLG7611271

Page 1

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA ADOLESCENT ) Case No.

ADDICTION/PERSONAL INJURY      ) 4:22-MD-03047-YGR (PHK)

PRODUCTS LIABILITY LITIGATION  )

) MDL No. 3047

)

THIS DOCUMENT RELATES TO:      )

)

People of the State of        )

California, et al. v. Meta     )

Platforms, Inc., et al.       )

_____)

VIDEOTAPED DEPOSITION OF MITCH PRINSTEIN, PH.D.

_____

PURSUANT TO NOTICE, the above-entitled deposition was taken on behalf of the Defendants at Washington Duke Inn & Golf Club, 3001 Cameron Blvd., Durham, North Carolina 27705, on Friday, September 26, 2025, at 9:09 a.m., before Sophie Brock, Registered Diplomate Reporter, Certified Realtime Reporter, and Notary Public in and for the State of North Carolina.

Job No. MDLG7611271

---

Page 2

A P P E A R A N C E S

ON BEHALF OF THE DEFENDANTS META PLATFORMS, INC., ET AL:

COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street, NW
Washington, D.C. 20001-4956
Telephone: (202) 662-5868
By:   PHYLLIS A. JONES, ESQ.
pajones@cov.com
BRIAN REISER, ESQ.
breiser@cov.com
ALEX KENNEDY, ESQ.
akennedy@cov.com
(In Person)

ON BEHALF OF THE PLAINTIFFS:
OFFICE OF THE ATTORNEY GENERAL OF KENTUCKY
1024 Capital Center Drive
Suite 200
Frankfort, Kentucky 40601
Telephone: (502) 696-5519
By:   ZACHARY J. RICHARDS, ESQ.
zach.richards@ky.gov
(In Person)
GARY THOMPSON, ESQ.
gary.thompson@ky.gov
PHILIP R. HELERINGER, ESQ.
philip.heleringer@ky.gov
(Via Zoom)

OFFICE OF THE ATTORNEY GENERAL OF COLORADO
Colorado Department of Law
Ralph L. Carr Judicial Building
1300 Broadway, 10th Floor
Denver, Colorado 80203
Telephone: 720) 508-6000
By:   JASON SLOTHOUBER, ESQ.
jason.slothouber@coag.gov
(In Person)
KRISTA BATCHELDER, ESQ.
krista.batchelder@coag.gov
SHAHEEN SHEIKH, ESQ.
shaheen.sheikh@coag.gov
(Via Zoom)

---

Page 3

A P P E A R A N C E S (Continued)

ON BEHALF OF THE PLAINTIFFS:
OFFICE OF THE ATTORNEY GENERAL OF
MASSACHUSETTS
1 Ashburton Place, 20th Floor
Boston, Massachusetts 02108
Telephone: (617)-963-2062
By:   DOUGLAS S. MARTLAND, ESQ.
douglas.martland@mass.gov
(In Person)

CONNECTICUT OFFICE OF THE ATTORNEY GENERAL
165 Capitol Avenue
Hartford, Connecticut 06106
Telephone: (860) 808-5318
By:   TESS SCHNEIDER, ESQ.
tess.schneider@ct.gov
(In Person)

N.C. DEPARTMENT OF JUSTICE
OFFICE OF THE ATTORNEY GENERAL
114 W. Edenton Street
Raleigh, North Carolina 27603
Telephone: (919) 716-6015
By:   JOSH ABRAM, ESQ.
jabram@ncdoj.gov
CHARLES WHITE, ESQ.
cwhite@ncdoj.gov
(Via Zoom)

WASHINGTON STATE ATTORNEY GENERAL S OFFICE
800 Fifth Avenue, Suite 2000
Seattle, Washington 98104
Telephone: (206) 442-4486
By:   WILL O CONNOR, ESQ.
will.oconnor@atg.wa.gov
(Via Zoom)

---

Page 4

A P P E A R A N C E S (Continued)
OFFICE OF THE WEST VIRGINIA ATTORNEY
GENERAL
Eastern Panhandle Consumer Protection
Office
269 Aikens Center
Martinsburg, West Virginia 25404
Telephone: (304) 267-0239
By:   LAUREL K LACKEY, ESQ.
(Via Zoom)

NEW JERSEY OFFICE OF THE ATTORNEY GENERAL
Richard J. Hughes Justice Complex
25 Market Street
Trenton, New Jersey 08611
Telephone: (609) 292-4925
By:   VERNA PRADAXAY, ESQ.
Verna.Pradaxay@law.njoag.gov
MANDY WANG, ESQ.
Mandy.Wang@law.njoag.gov
(Via Zoom)

STATE OF CALIFORNIA DEPARTMENT OF JUSTICE
OFFICE OF THE ATTORNEY GENERAL
By:   NAYHA ARORA, ESQ.
Nayha.Arora@doj.ca.gov
(Via Zoom)

ON BEHALF OF THE PLAINTIFF TEXAS SCHOOL
DISTRICTS:

EILAND & BONNIN, PC
2200 Market Street, Suite 501
Galveston, Texas 77550
Telephone: (409) 763-3260
By:   DAVID BONNIN, ESQ.
dbonnin@eilandlaw.com
CRAIG EILAND, ESQ.
ceiland@eilandlaw.com
(Via Zoom)

Page 5

A P P E A R A N C E S (Continued)

EXHIBITS TECH:

Eddie Flick

VIDEOGRAPHER:

Matthew Walters

---

Page 6

INDEX OF EXAMINATIONS

                                            PAGE

BY MS. JONES . . . . . . . . . . . . . . . . . . . . 8

INDEX OF EXHIBITS

NUMBER           DESCRIPTION              MARKED

Exhibit 1    Trial Report of Mitch Prinstein,  . . .13
             Ph.D.

Exhibit 2    Appendix A: Materials Considered  . . .13

Exhibit 3    Appendix B: Curriculum Vitae of . . . .13
             Mitch Prinstein, Ph.D.

Exhibit 4    Rebuttal Trial Report of Mitch  . . . .13
             Prinstein, Ph.D., dated July 30,
             2025

Exhibit 5    Meta Defendants' Amended Notice . . . .13
             of Deposition of State
             Plaintiffs' Retained Expert Mitch
             Prinstein and Request for
             Production of Documents

Exhibit 6    Written Testimony of Mitch  . . . . . 127
             Prinstein, Ph.D. before the U.S.
             Senate Committee on Judiciary,
             dated February 14, 2023

Exhibit 7    Kaitlyn Burnell paper titled "The . . 135
             effects of social media
             restriction: Meta-analytic
             evidence from randomized
             controlled trials"

Exhibit 8    APA Health Advisory on Social . . . . 135
             Media Use in Adolescence

---

Page 7

INDEX OF EXHIBITS (Continued)

NUMBER           DESCRIPTION              MARKED

Exhibit 9    Maheux Article titled "Annual . . . . 189
             Research Review: Adolescent
             social media use is not a
             monolith: toward the study of
             specific social media components
             and individual differences"

Exhibit 10   Burnell Article titled "U.S.  . . . . 246
             adolescents' daily social media
             use and well-being: Exploring the
             role of addiction-like social
             media use"

Exhibit 11   Carter Paper titled "A  . . . . . . . 266
             meta-analysis of the effect of
             media devices on sleep outcomes"

Exhibit 12   Burnell Research Article titled . . . 273
             "Daily links between objective
             smartphone use and sleep among
             adolescents"

---

Page 8

P R O C E E D I N G S

THE VIDEOGRAPHER:  We are now on record.  Today's date is September 26th, 2025.  The time is 9:09 a.m.

This is the video deposition in the matter In Regarding: Social Media Adolescent Addiction Personal Injury Products Liability Litigation, heard in the United States District Court, Northern District of California, MDL No. 3047.

Counsel will be noted on the stenographic record.

And can the court reporter please swear in the witness.

Whereupon,

MITCH PRINSTEIN, PH.D.

having first been duly sworn/affirmed,

was examined and testified as follows:

EXAMINATION BY COUNSEL FOR THE DEFENDANTS

BY MS. JONES:

Q.  Dr. Prinstein, good morning.

A.  Good morning.

Q.  We met before we went on the record.  My name is Phyllis Jones.  I am one of the lawyers for Meta Platforms in this particular litigation.

As I understood your report, you have never

Page 9

testified in either a deposition or a trial setting; is that right?

A. I've not -- as an adult, I have not been in a trial setting before.

Q. Okay. Which intrigues me, so I'm going to have to follow up on that. When you were not an adult, have you participated in a trial setting --

A. I testified in my parents' divorce trial.

Q. Oh, interesting. Okay.

Other than the testimony that you provided in your parents' divorce trial, have you ever provided any testimony in litigation either in a deposition or in a trial setting?

A. No.

Q. I will give you a very top-line -- actually, let me pause for a second.

Counsel for the Commonwealth of Massachusetts, I believe, had something he wanted to say, and I neglected to give him an entry point. Go ahead.

MR. MARTLAND: Thank you, Phyllis. Massachusetts has a reservation for the record.

Massachusetts states for the record that prior to today's deposition, opening and rebuttal reports from Dr. Prinstein in the Commonwealth's case

Page 10

against Meta were timely served on Defendants and that both reports were substantively identical to Dr. Prinstein's opening and rebuttal expert reports served by the MDL in this matter.

Because Dr. Prinstein's expert reports in both cases are substantively identical, for purposes of efficiency and to avoid duplicative efforts, Massachusetts previously provided notice to Defendants that Massachusetts would be participating in today's deposition. Massachusetts opposes Defendants' efforts to further depose Dr. Prinstein on this basis.

Massachusetts understands that Defendants have taken the position that Massachusetts is not barred from attending today's deposition but that Massachusetts's participation in today's deposition will be improper. Massachusetts disagrees and remains willing to meet and confirm with Defendants to discuss the appropriateness of a further deposition of Dr. Prinstein in the Massachusetts case at an appropriate time.

MS. JONES: Okay.

MR. MARTLAND: Thank you.

MS. JONES: I think it goes without saying that Meta is not foregoing its opportunity depose Dr. Prinstein in connection with his report in

Page 11

the Massachusetts AG proceeding, but we are, of course, happy to meet and confer about whether that happens or not.

BY MS. JONES:

Q. Dr. Prinstein, so let me give you just a little bit of a snapshot of the rules of the road for a deposition insofar as they are helpful to you.

One is, because our court reporter is taking down every word that we say for purposes of a written record down the road, it's important that she have verbal responses for you. So the natural tendency is to nod or say "hmm." So if you give an answer, it has to be a verbal answer. So that's one request that I would make of you. Is that clear?

A. Sure.

Q. Okay. The second request is, similarly to keep us out of trouble with the court reporter, we have to be sure that we don't speak over each other. So I will do my very best to let you finish all of your answers before I ask you the next question, and I would just ask that you let me finish my question before you start answering. Is that okay?

A. Sounds good.

Q. Okay. If you need a break, that is not a problem. We will take breaks whether you ask for one

Page 12

or not. We're not going to make you go through this without a break. My only request is that, if there is a question pending, that we go ahead and have you answer that question before we take any break. Does that work for you?

A. Sure.

Q. Okay. Terrific.

You have in front of you, Dr. Prinstein, what we have marked as the first five exhibits to your deposition. Actually, before we get to those, you have in front of you a folder, which I'd like to ask about --

A. Oh.

Q. -- what did you bring with you to your deposition today?

A. Well, my own copies of what you just handed me, so -- yeah.

Q. Okay. Are the copies that you have in your folder there marked up in any way?

A. No.

Q. Okay. With permission of your counsel, on a break, we might just flip through them, but otherwise you can keep those to the side.

A. Sure.

Q. All right.

Page 13

(Exhibit Nos. 1-5 were marked for identification.)

BY MS. JONES:

Q. So what we have marked as the first set of exhibits to your deposition should be: Marked as Exhibit No. 1, your MDL -- your report served in the federal MDL proceeding, dated May 16th, 2025. Is that what you have as Exhibit No. 1?

A. It is.

Q. Okay. And then Exhibit No. 2 to your deposition should be a document entitled "Appendix A: Materials Considered." Is that what you have?

A. Yes.

Q. Okay. And then Exhibit No. 3 to your deposition should be what is entitled "Appendix B: Curriculum Vitae of Mitch Prinstein, PhD"; is that correct?

A. Yes.

Q. And then Exhibit No. 4 should be a copy of your -- what is entitled your Rebuttal Trial Report, dated July 30th, 2025, in the MDL proceeding. Is that right?

A. That's what I have too.

Q. Okay. And then Exhibit No. 5 should be a document entitled -- it's a little bit of a long

Page 14

title. It's dated September 26th, 2025. It's entitled "Meta Defendants' Amended Notice of Deposition of State Plaintiffs' Retained Expert Mitch Prinstein and Request for Production of Documents." Is that what you have as Exhibit 5?

A. Yes.

Q. I am assuming that Exhibits 1 through 4 you have seen before?

A. Yes.

Q. Had you ever seen Exhibit No. 5 before I handed it to you this morning?

A. Let's see.

Q. Okay.

A. I don't think so. No, I don't believe so.

Q. Okay. Well, we may come back to Exhibit No. 5 in connection with some of the questions that I have for you today, but you can put that to the side for the moment. All right?

A. Okay.

Q. You've already told me that you have never -- other than when you testified previously as a minor, that you have never testified in a deposition or a trial. Have you ever before -- and you don't need to give me the details for the moment -- but other than this litigation, have you ever been retained as an

Page 15

expert in a litigation matter where you didn't eventually testify?

A. I think so.

Q. Okay. Can you -- are you able to tell me what the litigation was, generally speaking?

A. There was a case regarding -- well, that was an amicus. There was a case where I was asked to speak to -- I believe it was peer influence and the factors that might lead someone to engage in behaviors they otherwise wouldn't have engaged in -- a teen. But I think shortly after I was asked to participate, the case was settled or dismissed or something.

Q. Do you remember roughly how far back in time that case was?

A. Five, seven, ten years ago. A while ago.

Q. Do you remember whether it was a civil or a criminal case? And if you want me to explain that distinction, I'm happy to, but you may already be sensitive to it.

A. I know the difference, I think, but I don't remember which one it was.

Q. Okay. Do you have any recollection of what the specific claim was in the case?

A. No. I think that just the idea that peer -- just there were some questions about the science

Page 16

regarding peer influence and how powerfully that might affect adolescents' behavior.

Q. Did it have anything to do with social media in any way?

A. No.

Q. Okay. Any other occasions where you have been retained to serve as an expert in a litigation matter but didn't eventually testify?

A. I don't think so.

Q. For the one occasion that you've mentioned where the subject matter was peer influence and how that might affect adolescent behavior, do you remember who it was who reached out and gout involved in the first place?

A. You mean the name of the firm?

Q. Yeah.

A. Oh, no.

Q. Okay.

Did you do anything to prepare for your deposition today?

A. Yes.

Q. Tell me what that was.

A. I read over my reports, and I went over some of the pieces cited within the reports.

Q. Anything else?

Page 17

A. You mean, like, what I did last night? Like, what I did to prepare recently?

Q. Well, let me break it down a little bit.

You said that you read over your reports and you went over some of the pieces cited within the reports. When did you do those things?

A. Over the last 24 hours.

Q. Okay. Prior to the last 24 hours, had you done anything to prepare for your deposition?

A. Yeah. I -- very much the same kind of thing.

Q. Okay. Did you meet with counsel -- any of the lawyers here today or any other lawyers -- to prepare for your deposition?

A. Yes.

Q. When did that happen?

A. We also chatted yesterday.

Q. Did you have any communications with counsel prior to yesterday in connection with preparing for your deposition?

A. Yes.

Q. When was that?

A. A few times spread out over the last few weeks.

Q. When you say "a few times," can you help me pin down whether that's more or less than five times?

Page 18

A. I'm going to guess, like, five to seven times.

Q. Who did you meet with?

A. The folks sitting right here.

Q. Each of the four lawyers who are here representing Massachusetts, Connecticut, Colorado, and Kentucky?

A. Yes, together in one group.

Q. Okay. Did you all meet in person, or did you meet by Zoom?

A. It was Zoom.

Q. Were there any other lawyers involved in those discussions?

A. There were other Zoom boxes. I don't know if they were all attorneys or not.

Q. Do you know roughly how long those five to seven sessions lasted?

A. I mean, an average of, like, an hour, 90 minutes maybe.

Q. Have you spoken with anyone else about your -- the fact that you were being deposed in this litigation?

A. I mean, other than my wife and a friend, no.

Q. Okay. Who was the friend that you've spoken with about it?

Page 19

A. My friend Adam.

Q. What is Adam's last name?

A. Golden.

Q. Okay. And what have you talked about with Adam?

A. I said that I was going to be deposed.

Q. Anything more, in terms of detail?

A. No.

Q. Okay. And what about with your wife? What did you all discuss with respect to your deposition?

A. I told her that this was about social media and the work that we've been doing, and I told her that I believed I was meeting with attorneys from Meta.

Q. Okay. You were right about that.

You are colleagues with Eva Telzer; is that right?

A. Oh. Yes.

Q. Okay. Have you spoken to Dr. -- and you know she is a retained expert in certain components of the litigation?

A. Yeah. Well, that was a point of slight confusion, but we did discuss that, yeah.

Q. Okay. And so when have you spoken with Dr. Telzer about your respective roles in the case?

Page 20

MR. RICHARDS: Object to form.

THE WITNESS: Sorry?

MR. RICHARDS: Object to form. You can answer the question.

THE WITNESS: I think that at the point at which we both learned that we were going to participate at this level, we sent each other a note to ask whether we had been mutually contacted. And then there have been, I would say, two more times that we've talked to say, "Oh, you know, that's happening for me next week" or "Mine is the week after that," and that's it.

BY MS. JONES:

Q. Just to unpack that a little bit, you said that at some point you both learned that you were going to participate at this level. What did that mean exactly? That you were just going to be deposed?

A. Oh, to testify.

Q. Okay. And when was that interaction?

A. It was probably, like, nine to twelve months ago. I'm guessing.

Q. And what -- do you recall specifically what you all discussed in that setting nine to twelve months ago?

A. Not much. I think that -- I think that we

Page 21

said, "I was just contacted. Were you as well?"

"Yes."

And that was pretty much it --

Q. When you say, "I was just contacted," by whom were you contacted?

A. Oh, state attorneys general.

Q. And then you said that you and Dr. Telzer had spoken two more times; is that right?

A. About this?

Q. Yes.

A. Yeah, probably two more times.

Q. Okay. And what did you talk about in this context?

A. That a deposition was coming, or that we were being asked to, you know, engage in this kind of an activity.

Q. And do you -- you're aware -- maybe you're not -- do you know that Dr. Telzer has been deposed, at this point, I think, twice?

A. Yes.

Q. Okay. Did you talk with her at all after her deposition?

A. I think that she briefly said that it was done --

Q. Okay --

Page 22

A. -- yeah.

Q. -- did she talk to you about the substance of the deposition?

A. No. We've been very clear on that.

Q. In the course of preparing your written report in the case, have you had any communications with Dr. Telzer about the substance of your report?

A. No.

Q. What about vice versa? Did she have any communications with you about the substance of her report as she was preparing it?

A. No.

Q. Have you reviewed her expert reports?

A. No.

Q. Have you reviewed her deposition testimony?

A. No.

Q. Do you recall, was she retained before you were retained? Or are you recalling that it was roughly the same time frame?

MR. RICHARDS: Object to form.

THE WITNESS: I don't know, actually.

BY MS. JONES:

Q. Let me ask you to look, if you would, Doctor, at Exhibit No. 3, which is the copy of your curriculum vitae that was submitted with your May 16, 2025,

Page 23

report.

A. Okay.

Q. Is Exhibit No. 3 up to date?

And I guess in fairness to you, I know that you testified before Congress quite recently, so I acknowledge that it's possible that's not on here. But are there any other things that you can think of that would not be reflected on Exhibit No. 3?

MR. RICHARDS: I'll just object to form.

THE WITNESS: Not that I can think of. I may have things that I need to put on here that I haven't gotten to do so yet.

BY MS. JONES:

Q. But nothing is coming to mind?

A. No.

Q. Dr. Prinstein, you have a master's degree and a PhD in clinical child psychology; is that right?

A. In clinical psychology.

Q. Okay. Do you have any other advanced degrees?

A. I'm board-certified in clinical child and adolescent psychology as well.

Q. Any other advanced degrees or certifications?

A. No.

Page 24

Q. You are not a medical doctor; is that right?

A. Correct.

Q. So you are not a psychiatrist who, for example, prescribes medications?

A. No. Psychologist.

Q. Okay. As part of your work, do you treat patients?

A. I haven't done direct treatment, but I do engage clinical work as part of the research I do on suicide.

Q. Okay. I want to make sure I understand your answer there. So you said you don't -- you haven't done direct treatment, but you engage clinical work as part of the research you do on suicide. Let me just take those in two pieces.

When you say, "I haven't done direct treatment," what does that mean?

A. I don't work with patients who have asked me to provide them with psychological services for pay.

Q. And when you say that you do -- you engage in clinical work as part of the research that you do, what does that mean exactly?

A. When you do research on an issue like suicide, it's a responsibility of the investigator to assess and triage for imminent risk and sometimes to

Page 25

engage emergency action with those participants, and that requires clinical skill and credentials.

Q. Okay. So just so I'm clear, as part of your day-to-day work, you are not providing patient care to individuals; is that right?

A. Right.

Q. Okay. But it also sounds like, as part of some of your research on suicide in particular, there might be emergent circumstances that require you to be involved with a particular individual who might present with certain issues or concerns; is that right?

A. Pretty much.

Q. Okay. But on any given day, you're not spending the vast majority of your time directly interfacing with children or adolescents who might require psychiatric or psychological care; is that right?

MR. RICHARDS: Object to form.

THE WITNESS: That's correct.

BY MS. JONES:

Q. Okay. And so if I were to ask you if you treat conditions like depression or anxiety or bipolar disorder, would the answer to that be no?

A. I haven't for a number of years now.

Page 26

Q. And it sounds like you don't make diagnoses for patients as part of your regular everyday work; is that right?

A. In our research, we do diagnostic interviewing, but not in a patient care setting.

Q. And you said a moment ago you haven't treated a condition like depression or anxiety or bipolar disorder for a number of years. Was there some period of time earlier in your professional trajectory when you were treating those types of conditions?

A. Yes.

Q. When was that?

A. From the beginning of my training through about 2004-ish.

Q. So it's been about 20 years or so since you've been on a day-to-day basis treating conditions like depression or anxiety or bipolar disorder or other conditions; is that right?

MR. RICHARDS: Object to form.

THE WITNESS: That's correct. My responsibilities over the last 20 years have been to train students how to engage in those services instead.

BY MS. JONES:

Q. Have you in the last 20 years had occasion --

Page 27

we talked about treating conditions, but have you had occasion in the last 20 years to diagnose a patient with depression?

MR. RICHARDS: Object to form.

THE WITNESS: Yes.

BY MS. JONES:

Q. What was that? In what setting?

A. So in a -- so in our research, we are doing diagnostic interviews of youth -- hundreds and hundreds of youth, and often the information that we get, we need to talk with their provider, and we need to share our results. And what we're doing is a clinical assessment that allows us to make diagnoses.

Q. Outside of the research that you're describing where you all are doing diagnostic interviews, have you had occasion to diagnose patients with depression in the last 20 years or so?

MR. RICHARDS: Object to the form.

THE WITNESS: Yes. I serve as a supervisor of students' clinical activities; so they are the person that is the direct provider, and then I am guiding their treatment work, including their assessment, their diagnosis, and their treatment, in supervision settings.

Page 28

BY MS. JONES:

Q. What about clinical anxiety? Would the answer be the same?

MR. RICHARDS: Object to form.

THE WITNESS: Yes.

BY MS. JONES:

Q. What about bipolar disorder? Would the answer be the same?

MR. RICHARDS: Object to form.

THE WITNESS: Yes.

BY MS. JONES:

Q. Have you had experience with diagnosing or treating eating disorders of any kind?

MR. RICHARDS: Object to form.

THE WITNESS: Yes.

BY MS. JONES:

Q. And would the circumstances of that be the same as what you've already described?

MR. RICHARDS: Object to form.

THE WITNESS: Yes.

BY MS. JONES:

Q. Have you had -- and I want to put to the side for the moment the work that you do in connection with your academic research and ask in terms of any clinical work that you do.

Page 29

Have you, as part of your day-to-day work, had occasion to review brain scans for adolescents or teens to determine the effect of some external exposure?

MR. RICHARDS: Object to form.

THE WITNESS: Outside of research, did you say?

BY MS. JONES:

Q. Yes.

A. No.

Q. Is it possible to look at a brain scan and make a clinical diagnosis of a mental health condition, in your view?

A. I can't answer that. I'm not a neuroscientist.

Q. Okay. Have you ever -- mindful of what you just said about not being a neuroscientist, have you ever reviewed a brain scan and informed a parent that a child's brain had been affected in some way by social media exposure?

MR. RICHARDS: Object to form.

THE WITNESS: No.

BY MS. JONES:

Q. There are, I suspect, in the professional ecosystem in which you spend your days, healthcare

Page 30

providers who specialize in diagnosing and treating addiction and addictive behaviors; is that right?

MR. RICHARDS: Object to form.

THE WITNESS: Yes.

BY MS. JONES:

Q. Do you, in your day-to-day work, hold yourself out as someone who specializes in diagnosing and treating addiction?

A. That would be hard to say. My expertise and my background is in clinical child and adolescent psychology broadly, so it would be inclusive of that.

Q. Have you ever made a formal diagnosis of any patient with -- strike that.

Have you ever diagnosed any patient with something known as social media addiction?

A. Have I -- no, I have not.

Q. Dr. Prinstein, you don't have a degree in epidemiology; is that right?

A. Correct.

Q. And recognizing that you're many other things, you're not formally recognized as an epidemiologist in terms of your field of expertise; is that right?

A. That's correct.

Q. Have you ever designed or conducted a

Page 31

randomized controlled trial?

MR. RICHARDS: Object to form.

THE WITNESS: Yes.

BY MS. JONES:

Q. On what occasions?

A. We have looked at a variety of interventions over the years, anything from parent education to treatment of mental health diagnoses, and also in research where we're looking at how we can control and manipulate factors to effect risk behavior outcomes.

Q. Have you ever conducted or designed a randomized controlled trial that aimed to evaluate the effects of social media use on particular mental health outcomes?

MR. RICHARDS: Object to form.

THE WITNESS: No.

BY MS. JONES:

Q. Have you ever designed or conducted a prospective cohort study?

MR. RICHARDS: Object to form.

THE WITNESS: Can you define that more?

BY MS. JONES:

Q. Are you familiar with what a cohort study is?

A. I am --

Q. Okay.

Page 32

A. -- but people talk about that in different ways, so I want to make sure I'm being accurate.

Q. Okay. Well, what is your understanding of what a cohort study is?

A. It could be looking at natural ways in which individuals are exposed to a risk or protective factor, that are designed based on, let's say, an age group or a time period in which environmental conditions changed for a subset of youth but not others.

Q. Okay. That's exactly what I had in mind.

Have you ever designed or conducted a cohort study? And you should feel free to apply the definition that you just used.

A. So I am a collaborator on studies that have done that.

Q. What specific studies are you thinking of?

A. I am the representative to the ABCD Study, which is a national study of adolescent development. I have been a collaborator with my students on the National Comorbidity Study findings -- as examples.

Q. Are you familiar with what a Bradford Hill analysis is?

A. No.

Q. Okay. And you don't have any degrees in

Page 33

public health; is that right?

A. That's correct.

Q. You are testifying today in your role as an expert in cases that have been brought by certain state attorneys general against Meta; is that your understanding?

MR. RICHARDS: Object to form.

THE WITNESS: It is.

BY MS. JONES:

Q. Do you happen to know which state AGs are involved in the litigation?

A. I believe there are many. I've had most contacts with folks from Kentucky and Massachusetts, Colorado.

Q. Do you have any sense of what specific legal claims are being brought by the different state attorneys general?

MR. RICHARDS: Object to form.

THE WITNESS: Not really.

BY MS. JONES:

Q. Have you ever -- and if the answer is no, that's okay, but I'm just inquiring. Have you ever reviewed the actual complaints that have been filed by the state attorneys general with whom you are working?

A. I did briefly, but it's a lot of legal

Page 34

language so -- yeah.

Q. What is your understanding of the claims?

MR. RICHARDS: Object to form.

THE WITNESS: I believe -- I was asked to opine on the ways in which social media may be creating risk for adolescents' mental health, and also the ways in which social media may be designed in a way that is increasing clinical dependency on social media in ways that have implications for impairing kids' social and educational functioning and psychological functioning.

I know that there's been discussion about the ways in which social media is designed and the features and the functions that are both creating risk for youth and also changing the effects of the content that kids might see on their adjustment.

BY MS. JONES:

Q. Do you -- just so I understand, do you consider yourself to be an expert in the way that social media is designed?

MR. RICHARDS: Object to form.

THE WITNESS: In some ways, yes.

BY MS. JONES:

Q. What ways are those?

A. So my expertise has been on understanding

Page 35

scientifically how it is that kids' experience with social media, including the ways in which they receive stimuli online, the behaviors/attitudes that they have while they're online, and the ways that the construction of the platform is interacting with their own -- is affecting their own behavior.

I cannot speak to the way that, let's say, an algorithm is built from a computer science perspective, however.

Q. Let me actually ask a more fundamental question, perhaps, that maybe I should have started with.

When you say "social media," what are you including in that category?

MR. RICHARDS: Object to form.

THE WITNESS: So there's a matter of debate about the best definition of social media, but the -- a lot of the work that's being done in this area has been focusing on platforms that allow for interaction with others, initially -- now mostly bots and advertisements and other content -- in the context of a -- well, it's a complicated definition.

I will say that most of our research and the research that's out there has talked about platforms including Meta's platforms, and some have also

Page 36

included platforms like, let's say, TikTok or Snap.

BY MS. JONES:

Q. So there are -- in your definition of social media, there are platforms other than just, for example, Instagram and Facebook; correct?

A. There are other platforms.

Q. And when you talk about the effect of social media on potentially adolescent mental health, you are not limiting yourself just to Instagram and Facebook, are you?

MR. RICHARDS: Object to form.

THE WITNESS: The findings that we have are specific to Meta's products, and some of those findings are also applicable to other companies' products.

BY MS. JONES:

Q. When you say "the findings that we have are specific to Meta's products," what findings, specifically, are you referring to?

A. Our research in our lab, and also the research that's in the literature, is focused on specific features, functions, and in some cases platforms, including Meta's platforms.

Q. But not exclusively Meta's platforms?

A. Well, some articles are exclusive to Meta's

Page 37

platforms, but others are broader.

Q. Yeah, and I just want to make sure that we're not misunderstanding each other.

You're not suggesting that the research on potential relationship between social media use and mental health outcomes in adolescents is limited to Meta's platforms, are you?

MR. RICHARDS: Object to form. Compound.

THE WITNESS: I think that there are findings that extend beyond Meta and aren't inclusive of Meta.

BY MS. JONES:

Q. Okay. Are you offering opinions that are specific to any particular effect of social media use on specific populations of young people in specific states?

And if that question is unclear, I understand and I'll try to ask it in a better way, but you tell me.

MR. RICHARDS: Object to form. Compound.

THE WITNESS: Yeah, can you rephrase that, please? Thanks.

Page 38

BY MS. JONES:

Q. Sure. I guess the question really is, are you offering state-specific opinions?

A. Yes, in some cases.

Q. And what are those specific states where you are offering state-specific opinions?

A. I would have to review the articles again to look at where those findings were collected from, but many of the samples that we've looked at -- sorry, that are in the literature have been conducted within specific states and give information that's relevant to kids in that state.

Q. Independent of the research that you're describing, have you done any work to evaluate mental health outcomes statewide for adolescents in any specific state?

MR. RICHARDS: Object to form.

THE WITNESS: Sorry, I'm a little bit confused on that one --

BY MS. JONES:

Q. Sure. Let me take a step back.

So as I understand what you just said, some of the research that you have either cited in your report or that you have carried out in your lab has involved young people from particular states; yes?

Page 39

A. Correct.

Q. Okay. My question is, putting that to the side, have you done any other analysis of mental health outcomes statewide on a state-specific basis?

MR. RICHARDS: Object to form.

THE WITNESS: There is some research that's looked at natural experiments for social media that has been offered in one state versus another at different times. I would have to look up some information to remind me exactly what state that was, however.

BY MS. JONES:

Q. Do you have any awareness of how -- the amount of social media use by adolescents in specific states?

MR. RICHARDS: Object to form.

THE WITNESS: Sorry, do I -- can you say that again?

BY MS. JONES:

Q. Yeah. It was not a very well done question.

Do you know how much adolescents and teenagers use social media in any particular state?

A. Yes.

Q. Based on what?

A. There are some findings that have been done

Page 40

by others looking at specific states, and I've been asked to work with different states that are passing state laws -- the legislative bodies of different states -- where they have collected data and asked me to help them to understand the data in each of those states.

Q. Are you offering opinions about the experience of any specific individual adolescent or teenager --

MR. RICHARDS: Object to form.

BY MS. JONES:

Q. -- in terms of social media use and mental health outcomes?

MR. RICHARDS: Sorry. Object to form.

THE WITNESS: I believe that my report is focused on the effects on large cohorts of youth or subsets of the population of youth rather than on an individual person.

BY MS. JONES:

Q. Sure. That was also my understanding of your report. So my question is, it sounds like we're agreeing that you are not offering opinions on any specific individual adolescent or teenager in terms of that individual's experience with social media and mental health outcomes?

Page 41

MR. RICHARDS:  Object to form.

THE WITNESS:  That's hard to say.  I've had a lot of experience meeting with and talking with individuals around the country about their specific experiences and been asked to help them understand what's happening with their child or with specific children, and I've applied the psychological science findings in that work with them.  So that information has been part of the general knowledge that, you know, informs my opinions.

BY MS. JONES:

Q.  When were you first retained as an expert in the litigation?

A.  It could be a year or two ago.  I don't remember exactly.

Q.  Okay.  Well, let me pause on that.  Can you tell me whether it was in 2024?

A.  It probably was.  It might have been in '23.  I believe it was after APA put out its social media health advisory.

Q.  And why is that a landmark for you in terms of remembering when you might have been retained?

MR. RICHARDS:  Object to form.

THE WITNESS:  There was a lot of -- we provided a tremendous amount of education to folks

Page 42

about the health advisory afterwards -- after it came out -- and I believe that the conversations that we had with attorneys general started in the context of talking about our health advisory.

BY MS. JONES:

Q.  Okay.  Who first engaged with you about the prospect of serving as an expert for the state attorneys general?

A.  So that's a little fuzzy for me because we started by talking about the health advisory, as I mentioned, and kind of talking about what it meant and, you know, what our consensus panel found.

I believe that from that conversation, it might have been the same folks who ultimately asked me to serve in an expert capacity, and that was folks from Tennessee.  I think Chris Dunbar was the first person.

Q.  And when you say, "we started by talking about the health advisory," is the "we" in that sentence you and representatives from one or more of the state attorneys general's offices?

MR. RICHARDS:  I just object to privilege.  The witness can answer, but I just caution him not to reveal privileged communications with attorneys.

Page 43

THE WITNESS:  No, sorry, the "we" is APA colleagues and me.

BY MS. JONES:

Q.  Okay.  Who is the -- I'm thinking AAP.

Who are the APA colleagues you're thinking of?

A.  Primarily, my colleague Corbin Evans.

Q.  Okay.  And you said Chris -- your recollection, at least, is that Chris Dunbar from the Tennessee Attorneys General -- Attorney General's Office was the first person to reach out to you?  Is that what your recollection is?

A.  To the best of my recollection.

Q.  Okay.  And my colleague has reminded me that the APA's advisory was in May of 2023.

A.  Yes.

Q.  Okay.  So with that stake in the ground, kind of chronologically, is it your -- can you give me a little bit more specificity around when you likely would have been retained to serve as an expert?

MR. RICHARDS:  Object to form.

THE WITNESS:  Most likely in '24.

BY MS. JONES:

Q.  Okay.  So the advisory came out in May of 2023, and you think you were not retained until

Page 44

several months later, in 2024?

A.  To the best of my recollection.

Q.  Okay.  When was the first conversation -- and counsel is correct; at the moment, I'm not asking about specifics of those interactions -- but what was the first conversation that you had with someone from the state attorneys general?

MR. RICHARDS:  Just same objections on privilege, but you can answer the question.

THE WITNESS:  I think the one I already -- what I already told you about, talking with Chris Dunbar.

BY MS. JONES:

Q.  Okay.  And my question was when did that conversation happen?

A.  In '24.

Q.  Do you know if it was --

A.  That would be my best guess.

Q.  Okay.  Do you know if it was the first quarter of 2024?  The second quarter?  When?

MR. RICHARDS:  Object to form.

THE WITNESS:  I honestly just don't remember --

BY MS. JONES:

Q.  Okay --

Page 45

A. -- saw a lot of activity.

Q. Okay. That's fair. But it sounds like between May of 2023, when the APA's advisory came out, and the end of 2023, you had not had any contact with the state attorneys general; is that right?

MR. RICHARDS: Object. Speculation. Asked and answered.

THE WITNESS: Sorry, so we -- you mean with regard to serving in this capacity? Or any contact at all?

BY MS. JONES:

Q. Any -- that's fair.

When was the -- let me ask you this question as kind of a threshold question. Outside of the context of interactions you might have had with the state attorneys general after the advisory, had you otherwise had interactions with state attorneys general for any reason?

MR. RICHARDS: Object to form.

THE WITNESS: Sorry, say it again. After the -- that advisory --

BY MS. JONES:

Q. So I think we've established --

A. Yeah.

Q. -- that after the advisory in May of 2023 --

Page 46

A. Yeah.

Q. -- at some point after that, you had some kind of interaction with the state attorneys general; right?

A. Yeah.

Q. Okay. Let's put that time period to the side.

A. Okay.

Q. I'm asking you before May of 2023, had you ever had any interactions with any state attorneys general, for any reason?

MR. RICHARDS: Object to form.

THE WITNESS: Possibly. My student won an award from the North Carolina Attorney General's Office for her role on a paper that we all wrote together, and I believe that they contacted us with the good news she was winning an award.

BY MS. JONES:

Q. Okay. When would that have happened?

A. Probably after that article was published in -- and that was an article in JAMA Pediatrics.

Q. Can you give me a year?

A. I don't recall the date.

Q. Okay. That's fine.

A. Yeah.

Page 47

Q. So it sounds like before May of 2023, you had at least that one interaction where a student at the time had gotten an award of some kind, and you were in touch with the North Carolina Attorney General about that award; is that right?

MR. RICHARDS: Object to form.

THE WITNESS: Yes.

BY MS. JONES:

Q. Okay. Other than that interaction -- did the paper have anything to do with social media, if you recall?

A. Yes.

Q. Okay. Other than that interaction -- actually, staying with that interaction for a moment, was the extent of that interaction simply to convey the good news about the paper?

A. Yes.

Q. Okay. Other than that interaction, prior to May 2023, had you had any interactions with any state attorney general --

MR. RICHARDS: Object to form.

BY MS. JONES:

Q. -- or representatives of a state attorney general's office?

MR. RICHARDS: Objection.

Page 48

THE WITNESS: I can't remember any.

BY MS. JONES:

Q. Okay. So it sounds like, other than the interaction related to the award, it was only after May of 2023 that you started engaging, at some point, with representatives of the state attorneys general's offices; is that right?

MR. RICHARDS: Object to form. Asked and answered.

THE WITNESS: I think that's right.

BY MS. JONES:

Q. Okay. That's helpful. Thank you for bearing with me on that. That helps me focus in terms of time frame.

So at some point after May of 2023, it sounds like the APA, your colleague Corbin Evans and yourself, had some degree of interaction with representatives of the state attorneys general about the APA social media advisory; is that right?

MR. RICHARDS: Object to form. Speculation.

THE WITNESS: I think that timeline sounds right.

BY MS. JONES:

Q. Okay. Before -- and I was getting the

Page 49

impression that there may have been discussions about the advisory generally before you ever had a discussion about being retained. Is that right?

MR. RICHARDS: Object to form.

THE WITNESS: That's correct.

BY MS. JONES:

Q. Okay. Do you have a memory of the nature of the discussions that you had before you were retained by the state attorneys general?

A. Vaguely.

Q. What is that?

A. We were asked questions about our findings: You know, what did the consensus panel say, and what do we mean by the different things that were found based on the consensus of the literature.

Q. And who from the APA, other than you, participated in those discussions -- the ones that preceded your actual formal retention?

MR. RICHARDS: Object to form. Vague.

THE WITNESS: Corbin Evans.

BY MS. JONES:

Q. At any point in those conversations that you had with state attorneys general representatives prior to being retained, did you ever communicate a conclusion that social media causes mental health

Page 50

harms in teenagers?

MR. RICHARDS: Object to form. And I'll just instruct the witness not to provide privileged communications.

BY MS. JONES:

Q. I'm asking you about the time frame before you had been retained.

A. Okay. Let me see if I understand.

Q. Yes.

A. So before the time I had been retained --

Q. Yes.

A. -- did they ask me what? Or did I say -- yeah. Okay. Can you just go over that again?

Q. Yes. Before the time that you were retained, did you communicate, in form or substance, to representatives from the state attorney generals' offices that you believe that social media causes mental health harms in teenagers?

MR. RICHARDS: I'll object to form. And I'll also instruct the witness not to disclose privileged communications.

THE WITNESS: I would say just what I said before. We discussed the social media health advisory and what it said in the advisory.

Page 51

BY MS. JONES:

Q. Did the social -- we can check on a break. Does the advisory say anything about cause -- causation between social media use and mental health harms?

A. So I believe that it talks about cause in a way that's really important to discuss. I probably should ask you first what you mean by "cause," because that's defined very differently in different contexts.

Q. Yeah. We will probably come back to this --

A. Okay.

Q. -- and you don't get to ask me questions, unfortunately. I get to ask you the questions. We'll probably come back to this point --

A. Okay.

Q. -- I want to make sure we kind of get through these preliminaries.

Okay. So at some point, you are engaged by -- you are formally retained by the state attorneys general, and it sounds like you think that happened in 2024.

Your expert report, which you're welcome to look at -- it's Exhibit No. 1 -- I'm going to ask you to look at page 5, if you don't mind.

Are you there, Dr. Prinstein?

Page 52

A. Yes.

Q. I'm going to focus you on paragraph 14, if you see that there towards the bottom of the page.

A. I do.

Q. It says (as read):

"I am submitting this testimony as part of my work at APA, which includes a duty to disseminate psychological science."

Do you see that?

A. I do.

Q. Okay. And just to be clear, you are -- you were the Chief Science Officer at APA from 2021 to 2024; correct?

A. Correct.

Q. And you are currently -- this is a very long and fancy title -- you are currently the Chief of Psychology, Integration and Strategy; is that right?

A. Pretty much.

Q. Okay. And when you say, "I am submitting this testimony as part of my work at APA," is that a reference to the role that you currently hold with the APA or some other role?

A. Both of the roles you just mentioned.

Q. Okay. When you say you're submitting this

Page 53

testimony as part of your work at APA, what does that mean exactly?

MR. RICHARDS: Object to form. Vague.

THE WITNESS: My job at APA, consistent with APA's mission, is to communicate and apply psychological science it improve people's lives. That's what I am doing in my role here.

BY MS. JONES:

Q. Did the APA ask you to serve as an expert for the state attorneys general?

A. The attorneys asked me to serve.

Q. Right. So I want to go back to my question --

A. Yeah.

Q. -- did the American -- is it Psychology or Psychological Association? --

A. Psychological.

Q. -- I want to say it correctly. My apologies.

Did the American Psychological Association ask you to serve as a retained expert for the state attorneys general?

A. The APA asked me to serve as part of my job. They believed that this activity was consistent with my job description, and they asked me to do it as part of my job.

Page 54

Q. Well, my question was who was the first individual who say, "Dr. Prinstein, we want you to serve as an expert"? Was it someone at the APA, or was it a state attorney general representative?

MR. RICHARDS: Object to form.

THE WITNESS: It was the state attorneys general.

BY MS. JONES:

Q. Okay. And I take it you had to get some kind of clearance from the APA to be allowed to serve as a litigation expert; is that right?

A. That's correct.

Q. Okay. And did you get that kind of approval from the APA?

A. I did.

Q. Is there any kind of written documentation that memorializes the APA saying, "Yes, Dr. Prinstein, it's acceptable for you to play this role for the state attorneys general"?

A. There is nothing written, and that was all based on my conversations with the general counsel at APA.

Q. Who was the general counsel at APA?

A. Deanne Ottaviano.

Q. Are you compensated in any way for the role

Page 55

that you're playing with the APA right now?

MR. RICHARDS: Object to form. Vague.

BY MS. JONES:

Q. Well, let me be more specific.

You are currently the Chief of Psychology, Integration and Strategy for the APA; yes.

A. I think it's strategy and integration, but yeah, all those words are part of it.

Q. Oh, I thought I said "integration." Well, I'm just reading from your report --

A. Yeah.

Q. -- it says you were promoted in November 2024 to Chief of Psychology, Integration and Strategy. Yes?

A. Yes. We just refer to it as the Chief of Psychology.

Q. Oh, I see. Okay. Well --

A. Okay.

Q. Got it.

A. Yeah.

Q. I don't want to short-change you in terms of your --

A. No, no, it's --

Q. All right. So you were promoted in November of 2024 to what you say is just referred to as the

Page 56

Chief of Psychology; correct?

A. Correct.

Q. All right. Do you -- are you compensated as part of your role at -- are you compensated by the APA as part of your role serving as the Chief of Psychology?

MR. RICHARDS: Object to form.

THE WITNESS: Yes, it's a full-time job.

BY MS. JONES:

Q. Okay. What is your compensation as the Chief of Psychology for the APA?

A. What's my current salary?

Q. Yes.

A. $470,000.

Q. A year?

A. Correct.

Q. What was your salary as the Chief Science Officer at the APA?

A. 350, 70.

Q. And just so I understand how that role intersects with your role at UNC, does serving in that role with the APA mean that you essentially take a sabbatical of some kind from your role at UNC?

MR. RICHARDS: Object to form.

Page 57

THE WITNESS: I am on unpaid leave from UNC.

BY MS. JONES:

Q. Is there documentation anywhere that lays out, in your role as Chief of Psychology, the dos and don'ts, in terms of what you're able to do as a representative for the APA?

MR. RICHARDS: Object to form.

THE WITNESS: Not really. We -- these are ever-changing kinds of discussions at APA, especially given the current world we live in. So we don't -- we don't have -- it's usually in-person discussions with our supervisors or general counsel.

BY MS. JONES:

Q. Who do you report in to or up to at the APA?

A. The Deputy CEO.

Q. Who is that?

A. Dr. Jim Diaz-Granados.

Q. And you said, "these are ever-changing kinds of discussions given the current world we live in." What does that mean?

A. Well, given the current administration and the kinds of activities that APA has been trying to grow into over time, we have engaged in a lot of conversations about, you know, what is the best way to

Page 58

utilize the skill sets of the C-suite employees.

Q. You're not acting -- and you can tell me if I've got this wrong. You are not acting as a spokesperson for the APA in this litigation, are you?

A. I'm not speaking on behalf of APA. My opinions were informed by the work that APA has done with our consensus groups.

Q. Certainly. Understood that completely. But you are not saying, "In my role as a litigation expert, I am offering views on behalf of the organization"; right?

A. That's correct.

Q. You -- going back to paragraph 14 in your expert report, the second sentence of that paragraph says (as read):

"I am not receiving financial compensation for the completion of this report."

Do you see that?

A. I do.

Q. And just because I'm a lawyer, that caused me to ask, are you receiving some kind of nonfinancial compensation for the completion of the report?

MR. RICHARDS: Object to form.

THE WITNESS: What was a nonfinancial

Page 59

compensation?

BY MS. JONES:

Q. I have no idea. I'm just asking you. Have you been compensated in some other way beyond money?

A. No.

Q. Okay.

A. My -- if it's helpful, my salary at APA is based on the role that I play managing not only a very large team across the practice, education, and science and applied psychology sectors of APA, but also the ways in which APA intersects with issues on climate change and misinformation and the way in which we address issues facing federal funding for scientists' work or reimbursement for clinicians' work. So that's my role at the APA, and helping to communicate and disseminate science, as I said, for the public good.

This -- my work on this report is not the basis of my compensation, you know, at APA.

Q. Yeah, understood. It sounds like they are -- even though your work as a litigation expert might be informed by your work for the APA, they are distinct roles; yes?

MR. RICHARDS: Object to form.

THE WITNESS: I think so. Can you say more about the distinct roles? Like --

Page 60

BY MS. JONES:

Q. Sure. You are serving as a litigation expert who happens to also have experience based on working with the APA, and then you separately are the Chief of Psychology for the APA; correct?

MR. RICHARDS: Object to form. Ambiguous.

THE WITNESS: Mostly. But I am speaking based on the work that APA has done, and so that is informing the opinions and the things that I'm saying. And APA sees the work that I'm doing as being consistent with its mission.

BY MS. JONES:

Q. Who has told you that APA sees the work that you're doing as a litigation expert as being consistent with its mission?

MR. RICHARDS: Object to form.

THE WITNESS: So those were conversations with our general counsel. I can say that our CEO and deputy CEO are also involved.

BY MS. JONES:

Q. And who said, specifically, what you're doing as a litigation expert is consistent with the mission of the APA?

MR. RICHARDS: Object to form.

Page 61

And I'll just instruct the witness you can answer the question but to not disclose privileged communications with counsel for the APA.

THE WITNESS: Yeah, I think that, in the conversations that we had with our general counsel, those were considered privileged and confidential.

BY MS. JONES:

Q. Okay. And so you're -- are you declining to answer my question on that basis? And if you are, that's fine. I just need to understand that for the record.

A. I am.

Q. Okay. So to the extent that someone said this is consistent with the mission of the APA, you are not going to confirm for me who told you that?

MR. RICHARDS: Object to form. Mischaracterizes --

BY MS. JONES:

Q. Which is okay. I just need to understand.

A. That's correct.

Q. Okay. So your report goes on to say, in paragraph 14 (as read):

"I will complete my role at APA and return to UNC on January 1,

---

Page 62

2026, after which I will charge $750 per hour for any additional work on this matter."

Do you see that?

A. I do.

Q. So you will cease to be the Chief of Psychology at the end of this year; is that right?

A. Yes.

Q. And then you will go back to your faculty position at UNC full-time; is that right?

A. Correct.

Q. Okay. And at that point, you are going to start charging these lawyers for the time that you're spending working as a litigation expert; is that right?

A. Correct.

Q. Tell me why it is exactly that you are charging them for work after January 1 but have not charged them so far.

A. Because it is part of my work responsibilities at APA to do this, and at UNC it will not be.

Q. And you're talking about work responsibilities that have been -- you could not point me to any document that says part of your work

---

Page 63

responsibilities is to do this; is that right?

MR. RICHARDS: Object to form. Asked and answered.

THE WITNESS: That's correct.

BY MS. JONES:

Q. Okay. And it sounds like you are not prepared to tell me who told you this would be part of your role serving the APA's mission; is that right?

MR. RICHARDS: Object to form.

THE WITNESS: Sorry, I can't.

BY MS. JONES:

Q. Okay. When you start back up at UNC in January, are you going to bill for the time that you devoted to the preparation of your report?

A. No.

MS. JONES: Why don't we -- well, let me actually just finish this little bit and then we'll break, if that's okay with you. We've been going a little bit over an hour.

I take it you -- in your role with the APA, you make public remarks, give talks, give speeches; is that right?

MR. RICHARDS: Object to form.

THE WITNESS: That's correct.

---

Page 64

BY MS. JONES:

Q. Okay. When you speak in that role, do you ever disclose that, in addition to what you're doing as the Chief of Psychology from the APA, that you have been retained by lawyers who are bringing a lawsuit, related to the same topics that might be the subject of what you're talking about?

MR. RICHARDS: Object to form.

THE WITNESS: Sorry, you said do I ever, and you can you narrow this down a little bit? Like, in what --

BY MS. JONES:

Q. Yeah, let me be a little more clear.

So you give talks in your APA role on, among other things, I take it, topics like the possible effect of social media on teen mental health; yes?

A. Correct.

Q. And you understand, broadly speaking, that is the subject matter of this litigation; correct?

A. Correct.

Q. And you have been retained by lawyers in that litigation; correct?

A. Correct.

Q. When you go out into the world in your role as someone from the APA and talk about the subject of

Page 65

social media use and teen mental health, the subject of this litigation, do you tell people "You should also know that I have been retained by lawyers who are prosecuting claims against a social media company"?

MR. RICHARDS:  Object to form. Ambiguous.

THE WITNESS:  Those talks are to review our social media health advisories, so no, I don't.

BY MS. JONES:

Q.  Have you ever considered the possibility that perhaps you should?

MR. RICHARDS:  Object to form.

THE WITNESS:  No, because I'm not receiving any financial benefit or remuneration for this work.  There's nothing to disclose.

BY MS. JONES:

Q.  Well, you have -- I take it you have an understanding that as of January the 1st, you will start charging lawyers for your work in the litigation; correct?

A.  I don't know how all of this works in the legal world, so I don't know --

Q.  That's fair.

A.  -- know what might happen starting January 1 and whether there will be anything going on at that

Page 66

point.

Q.  Okay.  I suspect there might be some things going on.

What it says in your report is, after January 1st, you will charge 750 an hour for any additional work on this matter; is that right?

MR. RICHARDS:  Object to form.

THE WITNESS:  Yes.

BY MS. JONES:

Q.  And I take it that's a billing rate that you've communicated to the lawyers with whom you're working?

A.  I did.

Q.  Okay.  And you don't think it's -- if the answer is no, that's okay, but when you go out and speak on issues that are relevant to the litigation, you have elected not to share with people that you also have this working relationship with state attorneys general who are bringing lawsuits related to the same topic; is that right?

MR. RICHARDS:  Object to form.  Vague. Compound.  Asked and answered.

THE WITNESS:  Yeah, I have no financial disclosures to make.  The content that I am discussing is based on our social media health advisories.  So

Page 67

that's why I have not said that.

BY MS. JONES:

Q.  And you -- your deposition is being defended, quite ably, by a lawyer from the Kentucky Attorney General's Office; yes?

MR. RICHARDS:  Thank you, Phyllis.

THE WITNESS:  Yes.

BY MS. JONES:

Q.  And you met with these lawyers in preparation for your deposition; yes?

MR. RICHARDS:  Object to form.  Asked and answered.

BY MS. JONES:

Q.  Yes?

A.  Yes.

Q.  Okay.  And assuming there's stuff going on in 2026, you will start billing these lawyers when you move back into your UNC role; yes?

MR. RICHARDS:  Object to form.  Asked and answered.

THE WITNESS:  Yes.

BY MS. JONES:

Q.  And you understand that these lawyers are suing Meta for money damages among other things?  Did you know that?

Page 68

MR. RICHARDS:  Object to form. Speculation.  Asked and answered.

THE WITNESS:  I don't actually know what the terms are.

BY MS. JONES:

Q.  But you know they're suing Meta; yes?

A.  Yes.

Q.  Do you intend to testify at any trial in this matter, if there is a trial in the case?

MR. RICHARDS:  Object to form. Speculation.

THE WITNESS:  I don't know.

BY MS. JONES:

Q.  Would you be willing to testify in a trial?

A.  I guess, if that -- if that was asked of me and it was for the purposes that are consistent with expressing these opinions, I suppose so.

Q.  And by that time you'll be back at UNC and you will be charging for your time; yes?

MR. RICHARDS:  Object to form.  Asked and answered.

THE WITNESS:  Unless the trial happens in the next three months.

BY MS. JONES:

Q.  It will not --

Page 69

A. Okay.

Q. -- which will probably give you some relief. Okay. Why don't we take a break.

THE VIDEOGRAPHER: Going off the record. The time is 10:20 a.m.

(Recess taken from 10:20 a.m. to 10:37 a.m.)

THE VIDEOGRAPHER: Going back on the record. The time is 10:37 a.m.

BY MS. JONES:

Q. Dr. Prinstein, you were -- you testified before Congress last week; is that right?

A. Correct.

Q. I believe the date was September the 16th; yes?

A. If that was Tuesday, then yeah.

Q. Okay. And you -- specifically, you testified at the Senate Judiciary Committee's hearing to examine AI chatbots; is that right?

A. Yeah, but it was a subcommittee of the Senate Judiciary, the Crime and something or other Subcommittee.

Q. Okay. Do you have any understanding of how you were selected to be a witness at that hearing?

A. Yes. I had previously testified for -- after being -- Senator Durbin's office reached out to do

Page 70

testimony back in '23, and they remembered us and appreciated APA's input and came back to us.

Q. When did you first learn that you were going to be testifying at that hearing?

A. Very soon before the testifying happened.

Q. Do you remember who contacted you about it?

A. It was someone from Senator Durbin's office.

Q. Do you consider yourself to be an expert in artificial intelligence?

MR. RICHARDS: Object to form.

THE WITNESS: What aspects of artificial intelligence?

BY MS. JONES:

Q. Just -- any aspect of it.

A. APA released a health advisory on AI and adolescents' well-being, and we convened a consensus group to work on that, and I was one of the leaders of that process; and through that experience, we -- I believe that we had very relevant expertise for their hearing.

Q. Other than the advisory that you just mentioned, have you ever published anything in your own academic or scientific work about AI or AI chatbots?

A. We are collecting data right now on AI.

Page 71

I can't remember if any of it's been published or presented yet.

Q. Okay. Collecting data right now. Have you -- has anything -- it sounds like you don't know if anything's been published?

A. I don't remember.

Q. Okay. What specific data are you collecting right now?

A. We are collecting data on adolescents' use of AI for both educational and for companion or recreational purposes. We're looking attitudes, behaviors, attachment, displacement related to AI use. We're getting information on adolescents' feelings of AI and how their behaviors or attitudes may have been modeled by other adults, like teachers and parents. Those are a few examples.

Q. And how are you collecting data, specifically? By what mechanism?

A. We are doing broad survey data with kids throughout the state of North Carolina. And I've also been a collaborator on a collection of data from teachers and superintendents in Alberta, Canada.

Q. How many -- for the survey that you're conducting of kids in North Carolina, how many kids does that include?

Page 72

A. It's in progress. I mean, we expect --

Q. You're still enrolling?

A. In some cases we are, so -- but between Alberta and North Carolina, thousands.

Q. Okay. And what about just -- put Alberta to the side for just a second. North Carolina, how many are you talking about?

A. I mean, it's kind of a guess because it's still in progress, but a thousand.

Q. Okay. When you testified before Congress last week, did you disclose that you are a retained expert in a lawsuit against Meta?

A. No, I did not.

Q. Let me ask you to go back to Exhibit No. 1, which is your expert report, and I'm going to ask you to look at page 3 of the report, the summary of opinions.

Now, the very first opinion that's identified there at Opinion No. 1 is (as read):

"Youth (beginning ages 10 careers until the mid-twenties) are hypersensitive to social feedback, automatic behaviors, and have underdeveloped impulse control."

Did I read that right?

Page 73

A.   You did.

Q.   Okay.  And it goes on to say (as read):
"The features and functions embedded within Meta's social media platforms exploit these vulnerabilities in potentially harmful ways."
Do you see that?

A.   I do.

Q.   What specific features and functions are you referring to there?

A.   So the adolescent brain is developing in a particular sequence, and one of the things that's developing first is an area of the brain that is having a rapid proliferation of receptors for oxytocin and dopamine.  So that makes kids really interested in feedback from peers, any kind of positive attention from peers, and it makes it feel really good when they get it.

So the features and functions that are particularly important are things like notifications, likes, comments, beauty filters, as examples, because that has a direct way in which it's allowing for those hyperresponsive kind of neural -- hyper- -- excuse me, a neural hyperresponse that's based on their

Page 74

development.  Now, the reason why this is concerning is because their prefrontal cortex is not able to be used for full executive control until the mid-twenties.

Q.   Are there any other features and functions that you are referring to in that sentence in the first item under your summary of opinions?

MR. RICHARDS:  Object to form.

THE WITNESS:  I've mentioned notifications; right?  And likes, comments, beauty filters.  I think that the algorithm that is prioritizing in what order people see information posted from others would also be relevant.  The like counts, the follower counts.  There are many.  Those are the ones that are jumping to mind right off the bat.

BY MS. JONES:

Q.   Now, the first item here that we've been talking about in your summary of opinions refers to the features and functions embedded within Meta's social media platforms.  Those features and functions are not unique to Meta's social media platforms; is that right?

MR. RICHARDS:  Object to form.

THE WITNESS:  Well, I mean, some of

Page 75

them may be.  We don't really know how the algorithm works, and how Meta has kind of programmed what they do compared to others.

Also what's important with Instagram is that it's a more visual medium than some of the others, and people have been very concerned about the use of filters or whatnot specifically because the platform emphasizes the use of photos.

BY MS. JONES:

Q.   When you say we don't -- let me ask the question in a couple of parts.

You understand that there are other social media platforms and web-based services that use algorithms; right?

A.   Yes.

Q.   And, in fact, algorithms are in some way kind of how the internet works; yes?

MR. RICHARDS:  Object to form.  Scope.

THE WITNESS:  The algorithms are pretty opaque, so we don't really know how they work or which things they're embedded in.

BY MS. JONES:

Q.   Sure.  That's fair.  And you're not -- independent of your research on a particular set of issues, you're not a -- I think you told me earlier,

Page 76

"I've not examined the code for any particular platforms' algorithms"; right?

A.   That's correct.

Q.   Okay.  So you couldn't tell me today that Meta's algorithms -- Meta's -- let me start that again.

You could not tell me today that Meta's algorithm for Instagram is somehow different or more harmful than the algorithm for a different social media platform; right?

MR. RICHARDS:  Object to form.
Speculation.  Compound.

THE WITNESS:  Well, I think that, if we kind of unpack that a little bit, we do know that there are some problems that are leading to health concerns for Meta products; but as -- whether it is worse or better than other products, that would be hard to say at the algorithm level, just because, you know, we don't know how the algorithm works, so --

BY MS. JONES:

Q.   Understood.  And for the moment, I'm just focused on the algorithm in particular because, of the different features and functions you mentioned, one of them was the algorithm; yes?

A.   Yes.

Page 77

Q. Okay. And I just want to make sure, going back to my question, you could not tell me today that Meta's algorithm for Instagram is somehow different or more harmful than the algorithm for a different social media platform; right?

MR. RICHARDS: Object to form. Compound. Speculation. Asked and answered.

THE WITNESS: I can't speak to that.

BY MS. JONES:

Q. When you say -- you said you can or you can't?

A. I cannot speak to that. Yeah.

Q. Okay. I think you also said that -- forgive me because my memory is not what it used to be. I think you also said that Instagram is somehow different because it is a more visual medium. Did I hear that correctly?

A. Correct.

Q. More visual relative to what?

MR. RICHARDS: Object to form. Scope.

THE WITNESS: So in the psychological science literature, when people have contrasted, let's say, Reddit or, you know, the original version of Facebook, then there's more of an emphasis on posting photos in Instagram or other visual kind of stimuli

Page 78

that might be with others where you can put just a post with words.

BY MS. JONES:

Q. Okay. So you're comparing Instagram to platforms that might be more text-based; is that right?

MR. RICHARDS: Object to form.

THE WITNESS: That's correct.

BY MS. JONES:

Q. You're not offering the opinion that Instagram is a more visual medium than, for example, TikTok, are you?

MR. RICHARDS: Object to form. Scope.

THE WITNESS: What I'm saying is that, in the literature, people talk about Instagram's harms differently because there is such a focus on the use of images. So kids, for instance, are very often pressured to feel -- pressured to post selfies and things that will give them feedback on their own visual -- you know, on their own physical attractiveness; and that's less likely to happen on a text-based platform.

BY MS. JONES:

Q. Right. I guess I'm now asking you about TikTok -- let's take TikTok, just to be a little more

Page 79

concrete. Have you evaluated the extent to which Instagram is more or less visual than TikTok?

MR. RICHARDS: Object to form. Scope.

THE WITNESS: So what we're hearing in the literature is that TikTok is a little bit more based on videos that may not be about oneself; but the pressure on Instagram is to create, like, your tiles of photos that are showing your best self, so the body image pressures are equal, perhaps greater, on Meta -- on Instagram compared to TikTok.

BY MS. JONES:

Q. And my question was, have you evaluated the extent to which Instagram is more or less visual than TikTok? Have you done some kind of systematic analysis of that?

MR. RICHARDS: Object to form. Asked and answered.

THE WITNESS: I think the discussion in the literature is that the video-based versus the still photo-based pulls on different concerns for adolescents.

BY MS. JONES:

Q. Have you -- you understand that there are videos on Instagram; right?

MR. RICHARDS: Object to form.

Page 80

THE WITNESS: I do.

BY MS. JONES:

Q. Have you evaluated the extent to which the content on Instagram is more photos versus video?

MR. RICHARDS: Object to form.

THE WITNESS: I believe that the work that's out there has thought of Instagram as being more photo-based on Instagram, more video-based on TikTok.

BY MS. JONES:

Q. Yeah, my question was a little bit different. My question was, have you, Dr. Prinstein, evaluated the extent to which the content on Instagram is more photo versus video?

MR. RICHARDS: Same objection.

THE WITNESS: Have I evaluated whether it's more photo versus video on Instagram?

BY MS. JONES:

Q. Yes.

A. Yes.

Q. And what's -- how did you evaluate that?

A. So in our lab at UNC, we had participants that agreed to give us both their Instagram data as well as to let us go to their profile and take screenshots. We then analyzed those data.

Page 81

Q. How many people participated in this?

A. Several hundred.

Q. Okay. And the process that you're describing is you went in and took screenshots of their Instagram feeds? Is that what you're saying?

A. Their Instagram profiles, feeds, and also downloading their data.

Q. And did you -- was that done as part of an exercise in evaluating whether Instagram, as a whole, is more photo versus video based?

MR. RICHARDS: Object to form.

THE WITNESS: It was done as a way -- it was done to examine the visual emphasis and also the body image emphasis that's promoted within Instagram.

BY MS. JONES:

Q. Sure. My question was, was your objective to evaluate the volume of video versus photo content?

MR. RICHARDS: Object to form.

THE WITNESS: We did -- we did code that, yeah.

BY MS. JONES:

Q. But was that the purpose of the exercise?

A. I mean, we coded a lot of the data from that. That was one of the things we coded because it was one

Page 82

of the -- it was one of the goals of the study.

Q. And to what extent did you all determine whether that was representative of Instagram usage across what's now into the billions of users?

MR. RICHARDS: Object to form.

THE WITNESS: Yeah, so the way that we did our study, and the way that we think about the generalizability of those findings, was pretty consistent with standard practices for research. You know, we were able to compare what we had done with other samples. We were also able to compare the sample that we were looking at to see if it was representative of the nation. And it was good.

BY MS. JONES:

Q. When you say "it was good," what does that mean?

A. So the variability in demographic factors -- socioeconomic status, gender, race ethnicity, rural/urban -- was generally considered to meet the scientific standard for being able to generalize beyond just the kids enrolled in our study.

Q. Are you offering the opinion that Instagram is a more visual medium than Snapchat?

MR. RICHARDS: Object to form. Scope.

THE WITNESS: I can't speak to that.

Page 83

BY MS. JONES:

Q. Are you offering the opinion that Instagram is a more visual medium than YouTube?

MR. RICHARDS: Object to form. Scope.

THE WITNESS: YouTube is not -- we do not get findings on YouTube about image stills or images of oneself the way that we see that on Instagram.

BY MS. JONES:

Q. And I apologize because I may not have understood the answer and how it related to my question.

My question was, are you offering the opinion that Instagram is a more visual medium than YouTube?

MR. RICHARDS: Same objections.

THE WITNESS: I think it would be important to clarify the "visual medium" bit. So I think that it does have a video component on YouTube, but the images on Instagram tend to be more focused on images of oneself, and they're more often still images, than what we see on YouTube feeds for adolescents.

BY MS. JONES:

Q. Okay. So when you say "visual medium," are

Page 84

you talking about still photos?

A. When we talk about visual medium, we're talking about the extent to which there's video-based content. But then an interesting piece of that is then deconstructing what that means and how that might vary per platform, as you're asking. So that's where we would say, "Okay, this is where we can make conclusions about what Instagram -- how it's different from YouTube in terms of its video-based or non-text-based content."

Q. Understood. And I guess my question was, going back to what you said earlier about Instagram being a more visual medium, are you offering the opinion that Instagram is a more visual medium than YouTube is?

MR. RICHARDS: Object to form.

BY MS. JONES:

Q. Let me ask you a slightly different question. You have offered the opinion that Instagram, in your view, may have more still photos than a platform like YouTube; yes?

MR. RICHARDS: Object to form.

THE WITNESS: I believe that it does, and it also pulls for more of an emphasis on body image concerns.

Page 85

BY MS. JONES:

Q. Okay. Understood. My question is, going back to your earlier statement about Instagram being a more visual medium, is whether you're offering the opinion that Instagram is a more visual medium than YouTube?

MR. RICHARDS: Object to form. Scope. Asked and answered.

THE WITNESS: I get what you're asking. I think the visual medium part is funny because I'm kind of now going a level down from that and saying, within the non-text-based kind of platforms, then we would start saying in what way are those non-textual stimuli -- you know, how do those differ. And while both YouTube and Instagram present visual clues and cues, they differ in the kinds of visual cues and clues.

As a result, things like the beauty filters, which tend not to exist on YouTube but they do on Instagram, combined with the emphasis of putting up images of oneself, that's directly concerning for girls', in particular -- but also males' -- body image concerns over time.

BY MS. JONES:

Q. And you understand my question is actually on

Page 86

that slightly higher level of generality; right?

A. Are they both -- yeah, I believe I do, but if you can ask it again.

Q. On that higher level of generality of visual medium -- media -- are you offering the opinion that Instagram is a more visual media than YouTube is?

MR. RICHARDS: Object to form. Asked and answered.

THE WITNESS: I think -- I think what I said is the best way that I can say is at this point.

BY MS. JONES:

Q. They're both visual -- well, let me say this. YouTube and Instagram are both visual media; right?

A. They both -- they both seem to emphasize non-textual input. They differ considerably in what kind of nonvisual [sic] input and the tools that are particularly relevant to kids' mental health, however.

Q. What about notifications? Are notifications unique to Meta's platforms?

A. There are other platforms that have notifications. The frequency and way in which -- and what seems to trigger the notifications definitely seems to differ across platforms.

Q. And have you specifically evaluated the

Page 87

frequency of notifications across social media platforms?

MR. RICHARDS: Object to form.

THE WITNESS: We -- the research that we've done and others have done has looked at the frequency and types of notifications across platforms.

BY MS. JONES:

Q. And are you able to rank order how platforms compare to each other?

MR. RICHARDS: Object to form. Scope.

THE WITNESS: I think a rank order would be important -- I mean, compared on what; right? So I think a rank order would be a little bit tricky.

But it does seem like -- probably most relevant for here -- that the way in which Meta's products sends out notifications, that's concerning; that's leading to significant digital stress for kids. And we're seeing that the more digital stress kids are reporting, the more depression they're reporting over the course of the next year.

BY MS. JONES:

Q. When you say the way that Meta's platform sends out notifications, what do you mean specifically?

A. So in Meta's platforms, notifications might

Page 88

be tagged to a specific content or to a specific photo. So in other words, imagine that you're a 13-year-old, and you get a notification that pretty much says, you know, the most popular girl in school just posted a video or a photo with you in it and made a comment about you. That's particularly pernicious and concerning when it comes to adolescents because it's preying on those vulnerabilities we talked about regarding the oxytocin and dopamine receptors that make them highly susceptible to social feedback.

Other platforms don't necessarily do that in quite the same way. So we're hearing that kids are experiencing a significant amount of digital stress when they're on Meta's platforms because of the way that they're being tagged, referencing their image, their reputation, their friends as having recently commented about them and whatnot.

Q. Do you know how other platforms provide notifications?

MR. RICHARDS: Object to form.

BY MS. JONES:

Q. And by that I mean with what frequency and as triggered by what?

MR. RICHARDS: Same objection. Compound.

Page 89

THE WITNESS:  We -- I can't speak to how the algorithm is built, obviously, from the behind-the-scenes part, but we do know about the number of notifications that come across platforms and what's contained within that notification.  Does it mention a post, or does it simply say, "You have a message"?

BY MS. JONES:

Q.  On the last element that you flagged, what is said in the notification, what is the answer to that question for Snap?

MR. RICHARDS:  Object to form.  Scope.

BY MS. JONES:

Q.  What does the Snap notification say to you?

MR. RICHARDS:  Same objection.

THE WITNESS:  What we've learned from kids is that Snap has an emphasis on maintaining a streak over time, and keeping up that someone has contributed to that and it's your turn to contribute.

BY MS. JONES:

Q.  And are you offering the opinion that these different gradations of types of notifications somehow make Instagram worse than other social media platforms?

MR. RICHARDS:  Object to form.  Scope.

Page 90

THE WITNESS:  I think the -- I think the best way to address that is to say that what we know is that what Meta is -- the way that Meta's notifications work is a direct -- the way that Meta's notifications work is causing kids digital stress, and that digital stress is impairing their ability to get their daily roles and routines done, interfering with sleep, homework, attention.  It's also contributing to body image-related issues.

BY MS. JONES:

Q.  And I just want to make sure I understand. Are you offering the opinion that it is only Meta's platforms that is contributing to digital stress, and no other social media platform?

MR. RICHARDS:  Object to form.  Scope.

THE WITNESS:  I am just talking about Meta.  I'm not making comparisons.  I wasn't asked to make comparisons.

BY MS. JONES:

Q.  So your opinions -- it sounds like -- you can tell me if I have this wrong -- that you did not evaluate the extent to which other types of social media platforms might have been -- to the point you were raising earlier -- causing digital stress and impairing the ability of kids to get their daily roles

Page 91

and routines done.  You didn't evaluate that for other social media platforms; is that right?

MR. RICHARDS:  Object to form. Compound.  Misstates testimony.

THE WITNESS:  So in the literature that's out there, including our own science, we do assess kids' participation on multiple platforms, but then we have the ability to go in and look at which platforms kids are spending most of their time on, and we can statistically test whether those who are spending the vast majority of their time on Instagram versus those that are spending, let's say, the vast majority of their time on Snap or TikTok, as you mentioned -- whether they're showing different outcomes.

We do not necessarily find that there are differences in those outcomes, but we do find that digital -- that there are many kids who are only reporting that they're on Meta products, and those kids are showing negative outcomes as a result of their participation on Meta's products.

So we feel comfortable concluding that the problems that are embedded within Meta's platforms are needing to be addressed and are concerning about, specifically, Meta's platforms.

Page 92

BY MS. JONES:

Q.  Respectfully, I'm going to move to strike that as nonresponsive because I'm trying to get to the nub of my question.  And I understand what you said, but I'm not sure it was fully responsive to my question.

My question was, are you offering the opinion that it is only Meta's platforms that is contributing to digital stress among adolescents and teenagers and no other social media platform?

MR. RICHARDS:  Object to form.  And I'll object to the preamble.  Asked and answered.

THE WITNESS:  I would say that Meta is one of several platforms that are -- that are potentially contributing to -- that are contributing harm to adolescents.

BY MS. JONES:

Q.  But for purposes of your role in this case, am I right in understanding you focused on Meta?

A.  Yes.

Q.  And is that consistent with the remit that you have as the Chief of Psychology at the APA, to only focus on one platform --

MR. RICHARDS:  Object to form.

Page 93

BY MS. JONES:

Q. -- in offering opinions?

MR. RICHARDS: Object to form.

THE WITNESS: Yes. Within APA, we are trying to disseminate the best available science; so the science that we have is equally applicable and relevant to discussing the products that kids are using or discussing the class of products as a whole.

BY MS. JONES:

Q. But in your expert report, as I read it, you only talked about Meta's platforms; yes?

A. I did.

Q. Okay. And I take it that your role as the Chief of Psychology for the APA is not to focus on any particular company; right?

MR. RICHARDS: Object to form.

BY MS. JONES:

Q. Let me ask you a different question.

A. Okay.

Q. You focused on Meta in this case because you were hired by lawyers who are bringing a lawsuit against Meta; yes?

MR. RICHARDS: Object to form. Compound.

THE WITNESS: I was asked to describe

Page 94

the science that would pertain to this case on Meta.

BY MS. JONES:

Q. And in your role as the Chief of Psychology for APA, you did not at any point say, "Well, if we're really going to give a clear picture of what's going on on these issues, we have to look at more than just the platforms owned by Meta"?

MR. RICHARDS: Object to form.

THE WITNESS: I don't think it's a relevant distinction. I mean, APA put out its findings with regard to social media. We were then asked to -- or I was asked to then talk about the scientific findings that are relevant to this case, which is Meta.

The findings that we have -- those that are applicable and relevant are in my report. It all feels like the same request. We're just describing the -- I'm just describing the science to benefit the public.

BY MS. JONES:

Q. When you go back to UNC, and you actually start billing for your time, will you still view that work as sharing the science to benefit the public?

MR. RICHARDS: Object to form. Speculation.

Page 95

THE WITNESS: I hope that my whole career has been focused on creating and disseminating science to benefit the public. That's why scientists do what they do. I've been unique in having the opportunity to both apply and translate science in a way that's not typical among most academics.

BY MS. JONES:

Q. Okay. Just to finish going through this list here, it sounds like you would agree with me -- recognizing there may be nuances in the way that they happen and the frequency with which they happen, you would agree with me that notifications occur on other social media platforms beyond Meta's; yes?

MR. RICHARDS: Object to form.

THE WITNESS: I would say that there are notifications across different platforms that seem to differ in terms of how they work and when they happen and what they include.

BY MS. JONES:

Q. Is the answer the same for likes? That you will find the opportunity to like or signal approval for something on social media platforms beyond Instagram?

MR. RICHARDS: Object to form. Scope.

THE WITNESS: Platforms -- many

Page 96

platforms have -- I think what's important is that there are many platforms that have a "like" feature, but the placement of the "like" feature, the reminders to focus on the "like" feature, and the ways that the "like" feature changes the ordering of how you then see others' posts, that seems to differ across platforms.

BY MS. JONES:

Q. Sure. Understood. But you can find a "like" feature on lots of different social media platforms; can we agree on that?

MR. RICHARDS: Object to form. Asked and answered.

THE WITNESS: I mean, I would say that there are other platforms that have a "like" feature. Some of them are more innocuous than others, and the concern is the way that it's kind of built in and affecting kids on, let's say, the Meta platforms.

BY MS. JONES:

Q. And for purposes of this case, you have only focused on the effect of Meta's platforms; is that right?

MR. RICHARDS: Object to form. Asked and answered.

THE WITNESS: I was asked to opine on

Page 97

the Meta pieces.

BY MS. JONES:

Q. Yeah.

Comments. The ability to comment on someone's post exists on social media platforms other than just Meta's platforms; yes?

MR. RICHARDS: Object to form. Scope.

THE WITNESS: I would say the same thing. Some other platforms have comments. But the way in which they're placed and emphasized and what have you seems to differ across platforms.

BY MS. JONES:

Q. Is the answer the same -- recognizing there might be a little bit more variation here, but would the answer be the same for beauty filters? There are other platforms beyond Meta's platforms that have beauty and cosmetic filters of different types?

MR. RICHARDS: Object to form. Scope.

THE WITNESS: Actually, we've only heard about the beauty filters on Meta as being particularly concerning. There may be other platforms that have that. I can't speak to that. The emphasis has been on the beauty filters on Meta.

BY MS. JONES:

Q. Okay. And that's what you focused on in this

Page 98

lawsuit; yes? In your role as an expert in this case; is that right?

A. Correct.

Q. All right.

You mention in your report that -- I'm now looking at paragraph 2. And we're not going to go through every single paragraph, I will share with you. But Exhibit No. 1, paragraph 2 in your summary of opinions.

A. Okay.

Q. You write (as read):

"Meta platform features encourage problematic social media use consistent with clinical dependency."

Do you see that?

A. I do.

Q. And it goes on to say (as read):

"There is considerable overlap in the regions of the brain activated by social media use and those involved in addictions to illegal and dangerous substances."

Do you see that?

A. I do.

Page 99

Q. Okay. And the specific regions you're talking about, I believe you go on to describe later in your summary of opinions; correct?

A. I do.

Q. What other activities activate those areas of the brain --

MR. RICHARDS: Object to form.

BY MS. JONES:

Q. -- beyond social media use?

MR. RICHARDS: Sorry, Phyllis. Object to form.

THE WITNESS: Social feedback, broadly speaking, and monetary rewards seem to be the biggest activators of those regions, in addition to the way that they might -- some of those regions are relevant to illegal substances.

BY MS. JONES:

Q. And you told me earlier that you're not a neuroscientist, but when we talk about this idea of certain portions of the brain being activated, the way that neuroscientists or others are able to see that is that there are -- I'm going to say it in a layperson's way -- there are scans that allow you to see the actual activation visually; is that right?

MR. RICHARDS: Object to form.

Page 100

Compound.

THE WITNESS: That's one of the ways.

BY MS. JONES:

Q. Okay. If you look at a brain scan and see activation of one of these regions of the brain that we've been talking about, can you tell what led to the activation just by looking at the scan? Do you know?

A. Yes. The way that this research is done is that kids are put into a scanner and then presented with specific stimuli, in a repetitive way, so you can really identify exactly what stimulus is leading to that activation.

Q. But other than knowing what the study participant may have been encountering at that moment, is there anything about the visual itself that allows you to say, "Oh, that's social feedback versus monetary rewards versus something else"?

MR. RICHARDS: Object to form.

THE WITNESS: I'm pausing on the hypothetical a bit because I don't know a situation in which we would have a brain scan of somebody without it being under controlled conditions where we were presenting the stimulus. So we would know what led to the activation because it happened under our experimental control.

Page 101

BY MS. JONES:

Q. Okay. And I'm asking you -- and maybe I'm asking you about a scenario that virtually never presents itself -- but if you were simply shown a brain scan that showed some kind of activation, I take it you could not look at that and say, "Well, that was caused by someone getting an attaboy for doing something well at a sporting activity"?

MR. RICHARDS: Object to form.

THE WITNESS: I agree with your first part, that this is a hypothetical that would probably never actually happen in real life --

BY MS. JONES:

Q. Yeah.

A. I don't -- I don't know that I can comment on how one would interpret a brain scan in such a hypothetical because I can't even envision that hypothetical.

Q. On page 4 of your report, paragraph 5 at the top, the end of your list of -- summary of opinions, it says (as read):

"Psychological science demonstrates that exposure to the environments created by platforms like Instagram is associated with

Page 102

lower self-image and distorted body perceptions among young people."

Do you see that?

A. I do.

Q. Okay. You use the term "associated with" -- the phrase "associated with"; yes?

A. I have.

Q. And, Dr. Prinstein, just as a basic principle, can we agree that association and causation are distinct things?

A. Oh, so we need to have that causation conversation, then, because -- you were talking about. That's a funny word. So how are you meaning that?

Q. Yes -- fair enough. My question -- before we get into a philosophical discussion about the meaning of the word "cause," my question is, do you agree that association and causation are different things?

MR. RICHARDS: Object to form.

THE WITNESS: Sometimes they are the same and sometimes they are different.

BY MS. JONES:

Q. Okay. Something can be both associated and caused by another thing; right?

A. Depending on the situation, that's possible.

Page 103

Q. You can also have things that are associated with each other that are not causally related; true?

A. It is -- sometimes association refers to a causal link and sometimes it does not.

Q. Well, let me go back to my question. My question was, you can have two things that are associated with each other that are not causally related; true?

MR. RICHARDS: Object to form. Asked and answered.

THE WITNESS: Sometimes association implies cause and sometimes it does not.

BY MS. JONES:

Q. Okay. And you can have two things that are associated with each other that are not causally related; correct?

MR. RICHARDS: Same objections.

THE WITNESS: Sorry, is that the same as the previous question?

BY MS. JONES:

Q. I'm trying to get a clean answer to my actual question, which is, you could have two things that are associated with each other that are not causally related; true?

MR. RICHARDS: Same objections.

Page 104

THE WITNESS: I -- sorry, I think I'll just stick to the way I said it before.

BY MS. JONES:

Q. Well, you have to answer my question.

A. I would say that sometimes association implies -- is reflecting a causal relationship and sometimes it's not.

Q. Okay. And in circumstances where it is not reflecting a causal relationship, it would not be appropriate to say association equals cause; right?

MR. RICHARDS: Object to form. Compound.

THE WITNESS: Can you say more about it? Like, it wouldn't be appropriate for whom? In what situation?

BY MS. JONES:

Q. Well, let me ask you about the specific language that you've used in your report. When you said that Instagram is associated with lower self-image, were you intending the word "associated" there to mean "cause" or were you intending it to mean "associated"?

MR. RICHARDS: Object to form.

THE WITNESS: So I don't speak about cause in this report. But what I do instead is I --

Page 105

reflecting what we've done in our consensus reports -- is really reflect on the factors that have been identified so far in science that we need to know and attend to to address public welfare.

So when we know that there is something that is linked with a public welfare outcome, I want to make sure that we are discussing and highlighting those things that might be preventable risks.

BY MS. JONES:

Q. Okay. Would it be accurate to say Dr. Mitch Prinstein believes that Instagram causes lower self-image and distorted body perceptions among young people? Would that be a true statement about your views or an untrue statement?

MR. RICHARDS: Object to form.

THE WITNESS: A true statement about my views would be that the environments created by platforms like Instagram are a significant contributor to lower self-image and distorted body perceptions among young people.

BY MS. JONES:

Q. And help me understand. Is there a specific reason that you have chosen not to use "cause" in your report, and it sounds like you wouldn't use the word "cause" in the answer that you just gave me?

Page 106

MR. RICHARDS: Object to form. Compound.

THE WITNESS: Yeah, so as you established earlier, I am -- I have expertise in both the creation of science and the communication of that science within academic journals, which is primarily to other scientists, as well as in the application and translation of science to benefit the public good.

In academic journals, when we talk about causation, we are applying a standard of mechanistic-level connection that is -- you know, it is, in this case, unrealistic and impossible. In addition, it's an unnecessary standard. And what I mean by that is that -- well, I mean, we don't yet, based on the way we talk about it in academic journals, have the connection between smoking and lung cancer.

But in the application and translation of science, we take what we have from our knowledge and we apply the best available evidence that we have today to identify what are possible harms that we need to prevent or stop or hold accountable to address the public good. And in that way, my report is meant to highlight the application and translation of science, because we absolutely have enough information to say

Page 107

that there are aspects to the features and functions of Instagram, for instance, and Meta products that are contributing substantially to harm for youth, and we need to address those today.

BY MS. JONES:

Q. Did I hear you say -- do you believe, sitting here today, that we don't know that smoking causes lung cancer?

MR. RICHARDS: Object to form. Misstates testimony.

THE WITNESS: The ways in which we would look at the best possible scientific evidence to create a statement about cause, those criteria have not yet been met within the scientific literature. And yet we have enough available evidence to make policies to prevent smoking, to hold companies accountable for the ways that they have created addictions to smoking. And most of us in our bones know that smoking causes lung cancer. But the standard that would be used in an academic journal to get at the mechanistic level or to look at a randomized prospective controlled trial have not been met even for that.

BY MS. JONES:

Q. When you say "mechanistic level," I want to

Page 108

make sure I understand what you mean by that. What does that mean?

A. So a mechanistic level would be that we can understand each step of the process by which an independent variable through many mediators leads to the outcome variable, and we can demonstrate how each of those steps is occurring.

Q. And sitting here -- I'm not giving you a hard time, but sitting here today, you don't think that exists for smoking and lung cancer?

MR. RICHARDS: Object to form.

THE WITNESS: We don't have a full understanding of that, nor have there been the prospective randomized clinical trials, because they would be highly unethical, just like the way it would be highly unethical to do that for social media.

BY MS. JONES:

Q. So sitting here today, it sounds like your opinion is that Instagram contributes to lower self-image and distorted body perceptions among young people; is that right?

MR. RICHARDS: Object to form.

THE WITNESS: Correct.

BY MS. JONES:

Q. But it also sounds like you would not be

Page 109

comfortable using the word "cause" in that same sentence -- that Instagram causes lower self-image and distorted body perceptions among young people -- for the reasons you've said?

MR. RICHARDS: Object to form. Asked and answered.

THE WITNESS: I didn't use the word "cause" because it means different things in different contexts and I don't want to be unclear about that.

BY MS. JONES:

Q. Are there settings in which you have, in your academic work or otherwise, used the word "cause" to explain a relationship between some exposure and an outcome?

MR. RICHARDS: Object to form.

THE WITNESS: Yes.

BY MS. JONES:

Q. What are those situations?

A. We have conducted some randomized controlled trials and also manipulated independent variables in a randomized way that has allowed us to talk about cause on the outcome.

Q. What are the specific variables that you were looking at? And what were the outcomes you were looking at?

Page 110

MR. RICHARDS: Object to form.

THE WITNESS: We were studying peer influence on adolescents' risk behaviors under conditions of varying those peers' popularity and peer status.

BY MS. JONES:

Q. Okay. And it sounds like you, based on that work, were able to reach a conclusion that peer influence can cause adolescents' risk behaviors?

MR. RICHARDS: Object to form.

THE WITNESS: We concluded that peers are more likely to be influenced -- that the exposure to popular peers caused socialization towards health risk behaviors more than socialization towards unpopular peers.

BY MS. JONES:

Q. Okay. So it's not your -- it's not the case that Dr. Prinstein just never uses the word "cause"; is that right?

MR. RICHARDS: Object to form.

THE WITNESS: The -- again, I think the important piece here is that there are different ways that people talk about cause in academic journal writing to a scientific audience, and that's a different use of the term than the way that we would

Page 111

talk about it in the application and translation of science to nonscientists.

BY MS. JONES:

Q. Sure. Understood. My question was, it's not the case that you, Dr. Prinstein, never use the word "cause"; right?

MR. RICHARDS: Object to form.

THE WITNESS: I have used the word "cause."

BY MS. JONES:

Q. Okay. As have I.

Is there -- you have -- in Exhibit No. 3, which I'm not going to make you plow through, we have a copy of your CV; yes?

A. Yes.

Q. And that includes, among other things, the many, many, many articles that you have been an author or a coauthor on; yes?

A. Correct.

Q. I believe it also includes information about speeches that you've given in various settings; right?

A. Yes.

Q. It includes information about interviews and public remarks that you've made in other settings; yes.

Page 112

A. Some of them, yes.

Q. And I have not gone back and looked at the exact time frame, but I take it this goes back at least into the early 2000s? Not to age you. You look fresh as a daisy. But at least the first date that I see on here is the year 2000.

A. It does go back to the '90s and 2000s.

Q. Yeah, so we're looking at roughly a quarter-century of work in your role as an academic and professional of various sorts; right?

MR. RICHARDS: Object to form.

THE WITNESS: Correct.

BY MS. JONES:

Q. If we reviewed everything that's reflected in Exhibit No. 3, would we find anywhere where you, Dr. Prinstein, have said that social media causes mental health harms of any kind in adolescents or teenagers?

MR. RICHARDS: Object to form.

THE WITNESS: Because all of those documents and talks and papers that you refer to are to academic audiences, you would probably not find the word "cause" in that context.

BY MS. JONES:

Q. Are you recalling an occasion where you might

Page 113

have used -- you might have offered the view that social media causes mental health harms in teenagers in some lay setting?

MR. RICHARDS: Object to form.

THE WITNESS: I believe so.

BY MS. JONES:

Q. What are those that you're recalling?

A. So for the last five years, in my role as the Chief Science Officer and now Chief of Psychology at APA, I've been asked to explain how our findings are relevant in work with policymakers, working with attorneys, not -- not necessarily the attorneys sitting here -- also with educators; and in those contexts, they have talked about some of the concerns, and they've used the term "cause," and I've corroborated that the way that they're thinking about it was true.

Q. Are there specific occasions that you have in mind where that's happened?

A. That would be very hard to access in my memory, but I -- I can remember some specific instances. I don't know that I can tell you where and when I was standing at that moment.

Q. And just so I understand, it sounds like you have had other people use the word "cause" and you've

Page 114

corroborated their thinking. Is that right?

A. Yes.

Q. Okay. Have you ever, yourself, affirmatively offered that view, as opposed to responding to someone else who said, "I think social media might be causing mental health harms"?

MR. RICHARDS: Object to form.

THE WITNESS: I think the only trouble with answering that is that I just can't remember, like, everything I've ever said in every single talk I've ever given. So it's very possible that I did --

BY MS. JONES:

Q. Do you remember it sitting here today?

A. I believe that I have discussed the notifications and the likes and comments emphasis as causing digital stress. I believe I have said that.

Q. Where?

A. I told you I'm not going to able to remember exactly where I was, but -- I've done so many talks in front of so many different audiences, they're kind of a blur at this point.

Q. Okay. So sitting here today, you could not tell me of a specific -- you think I might have; right?

A. Yes.

Page 115

Q. Okay. But sitting here today, you could not tell me of a particular occasion where you affirmatively offered that view, that some feature or element of a social media platform was causing mental health harms; is that right?

MR. RICHARDS: Object to form.

THE WITNESS: I mean, I think that the -- I think that the most accurate summary of this is that I have not used the word "cause" when talking with scientists, in academic journals, or in talks among academic scientists, for the reasons we discussed: cause means something different, and it's a different kind of set of criteria that we use.

But I have frequently discussed the contribution that is clearly being made by kids' engagement with the features and functions on social media on kids' mental health; and I think that there's more evidence than not demonstrating that that contribution is substantial and affecting a substantial number of kids.

BY MS. JONES:

Q. Okay. I heard the last bit of your answer -- I heard the first bit of your answer to be, in a scientific/academic writing setting, you would not have been using the word "cause"; is that right?

Page 116

MR. RICHARDS: Object to --

BY MS. JONES:

Q. And you've explained why; yes?

MR. RICHARDS: Object to form. Asked and answered.

THE WITNESS: I think I have, yes.

BY MS. JONES:

Q. Okay. And then what I understand you to separately be saying is that you have frequently discussed the contribution that is being made by kids' engagement with the features and functions on social media on kids' mental health.

Now, even there, you used the word "contribution." And you understand what I'm asking about is any occasion where you have, in your lay remarks, gone into a setting, whether with lawmakers, parents, teachers, others, and said, "I believe that social media's features and functions are causing mental health harms in some universe of teenagers." That's what I'm asking.

MR. RICHARDS: Object to form. Asked and answered multiple times now.

THE WITNESS: Sorry, your question is very specific about the use of a single word in a specific context, so I'm just taking a moment to try

Page 117

and understand --

BY MS. JONES:

Q. In fairness to you, Dr. Prinstein, the -- do you have an understanding that the concept of causation is relevant in the setting of the lawsuit in which you have agreed to be an expert?

A. Yes.

Q. Okay. So recognizing that, that is why I'm asking you a pretty specific question. So let me ask the question.

Outside of a scientific setting, where it sounds like you have not offered the view that social media's features and functions is causing mental health harms, have you ever articulated that view to anyone? A group of parents? A group of educators? Legislators? Anybody?

MR. RICHARDS: Object to form. Compound. Asked and answered.

THE WITNESS: Yes.

BY MS. JONES:

Q. When?

A. That's what we just talked about.

Q. And my question was, sitting here today, can you specify a particular occasion? That's all.

MR. RICHARDS: Object to form.

Page 118

THE WITNESS: Okay.

BY MS. JONES:

Q. If the answer is no, that's okay. I'm just making sure I understand your testimony sitting here today.

A. Yeah. I -- let me just take a moment to gather my thoughts here.

Q. Please.

A. Thank you for creating a space to talk about this in a situation where, as you say, you know, what have I said or what might we say outside of an academic journal.

In response to your question, providing that space, I would say that, particularly based on the recent data, using a randomized chronological trial, looking at kids who are withdrawing from social media for a period of time versus not, I am comfortable saying that social media is causing harms among youth, particularly because of the features and the functions based in platforms including Meta's platforms.

I would go on to say that the challenge in my discussion of the word "cause" is because my job is to portray the science in a way that is helpful for the public welfare, and in that way, I want to be responsible to the way that scientists talk, but

Page 119

I also want to make sure that we're using the science that we need to for the public welfare, to protect kids.

I would say that we absolutely have enough data right now, and we absolutely know for certain, more than not, that there is a direct and clear and, yes, causal relationship between what adolescents are engaging with on the features and functions on social media and their own mental health problems down the line.

I do want to make clear, though, that I use that term in a way that honors and respects that scientists talk about cause in a way that is sometimes different, and I want to make room and space for both of those ways of talking about the data to be true, in the same way that we would when it comes to smoking and lung cancer. We can simultaneously talk about cause and we can struggle with the scientific questions remaining to be asked.

Q. You're welcome for the space. I'm going to move to strike all that as nonresponsive.

I understand that sitting here today -- it sounds like sitting here today, and, in fact, just now, you are prepared to offer the view that there is a causal relationship between engaging with certain

Page 120

social media features and functions and certain mental health harms. Did I hear that correctly?

MR. RICHARDS: Object to --

THE WITNESS: We now have data from meta-analyses of randomized controlled withdrawal trials that support that.

BY MS. JONES:

Q. Okay. And you did not say that, specifically, in your written report anywhere -- "causal relationship" -- did you?

A. Well, as I mentioned, there are reasons why I did not use the word "cause" that I just articulated. I'm happy to articulate them again, given my role and responsibility of balancing the scientific literature and its application.

But I'll also mention that it was actually since the publication of this report that one of those meta-analyses came out that offered a summary of withdrawal randomized clinical trials.

Q. And I am going to come back to my original question, which was have you ever said that before today? By let me focus in now.

When did you decide or determine, between the date of your expert report, which was May 16th, 2025, and today, that there was, in fact, a causal

Page 121

relationship between the use of the features and functions of certain social media platforms and mental health harms?

MR. RICHARDS: Object to form. Mischaracterizes testimony.

THE WITNESS: I think it would be important to clarify, I'm not changing my mind or changing my opinion, but you're asking me a question about a semantic distinction, and I'm trying to clarify that, given the conditions and the space that you are asking me to speak about, in those conditions, and within the space that you have created, your definition of the -- your questions regarding the way in which "cause" might be used would apply, especially to very recent data.

So I'm not -- yeah, I'm not changing my mind. I'm just kind of trying to follow with the semantic argument that you're making.

BY MS. JONES:

Q. Okay. And I'm not going to fuss with you over the use of the word "semantic."

Let me just make sure I understand. Nowhere in your expert report, either the opening report or your rebuttal report, do you actually invoke the phrase "causal relationship" to explain the potential

Page 122

connection between social media and mental health harms; is that correct?

A. I think the better way to say that would be the data that has come out since I submitted this report in May has now demonstrated a link between social media and mental health harms based on randomized clinical trials.

Q. What specific data are you talking about that's come out since May?

A. There have been one or two papers. I believe one of them came out in June that was a meta-analysis looking at the -- across a series of independent studies looking at kids' withdrawal from social media. The kids that were asked to stay off of social media got better; the kids who stayed on social media got worse.

Q. Who was the lead author on that paper?

A. I believe that I have it cited in here.

Q. Dr. Prinstein?

A. Yeah.

Q. I absolutely want to give you an opportunity look for this --

A. Oh, yeah.

Q. -- but I'm on a clock today --

A. Oh, okay.

Page 123

Q. -- so if we need to take a break so you could look, we can do that. I just would want to go off the record. You tell me.

A. Well, I can tell you that one of the authors was Kaitlyn Burnell, but I don't remember the first author, which is what you asked for, so I can't -- I'm just trying to find it, but if you want to -- if you want, I can find that later.

Q. We can do it later.

A. Okay.

Q. So it sounds like post -- is the Burnell paper the paper you were describing in terms of the meta-analysis?

A. Yes.

Q. Okay. Was there anything else after your May 2025 expert report that you would say contributes to your view on a causal relationship?

MR. RICHARDS: Object to form.

THE WITNESS: Was there anything else that contributed to -- well --

BY MS. JONES:

Q. Let me be more clear.

A. Yeah.

Q. It sounded like you were saying: After I actually did my report in May of 2025, when I signed

Page 124

that, there were some additional research findings that came out after that report that informed what I heard you say earlier about there being a causal relationship between social media use and certain mental health harms. So I just want to make sure I've exhausted what those things are that happened post-May of 2025.

MR. RICHARDS: Object to form.

THE WITNESS: Yeah, the scientific articles that have come out since, I don't believe that there are others.

Again, to be clear, the ways in which we talk about cause among scientists -- yes, that recent article does allow scientists to make more of a causal conclusion. But your question about cause, I have intentionally used the terms regarding the contributions that were made, given the confusion around that term.

BY MS. JONES:

Q. Okay. And it sounded like you could not identify for me an occasion in a lay setting -- in a setting where you're talking to nonscientists -- where you have articulated the view that there is a causal relationship between social media and mental health harms; is that right?

Page 125

MR. RICHARDS: Object to form.

THE WITNESS: I believe I likely have said that in a lay setting. I can't tell you the specific date, though, or place.

BY MS. JONES:

Q. Okay. Got it.

A. There was just too many of those talks to differentiate them in my mind from one another at this point.

Q. Okay. You -- you've testified before Congress -- I'm aware of at least two times. There might be other times. But you have testified before Congress before; yes?

A. Yes.

Q. Including as recently as last week; correct?

A. Correct.

Q. And you also testified before Congress in February of 2023; do you recall that?

A. I do.

Q. All right. And when you were testifying before Congress, do you view that as a scientific audience or a lay audience?

MR. RICHARDS: Object to form.

THE WITNESS: Well, I would say probably a combination of both are invested in that

Page 126

forum.

BY MS. JONES:

Q. And so in that setting, is that a setting where you would use causal language if you thought cause had been established?

MR. RICHARDS: Object to form.

THE WITNESS: I much prefer to talk about the significant contribution that is being made. I think that's the more responsible and accurate way to talk about it that blends both the scientific -- the science that I represent and the needs to translate the science in my current job.

BY MS. JONES:

Q. Okay. And -- let me show you, actually, a copy of your --

MR. RICHARDS: Counsel, if I could, if it's a good time -- we've been going for over an hour -- would it be okay to take a break?

MS. JONES: I think that is a reasonable enough -- let me just make sure I'm not at a point where it would --

MR. RICHARDS: Understood.

MS. JONES: -- make more sense for me to ask a few more questions and then finish up.

MR. RICHARDS: Sure. Are you doing

Page 127

okay, Mitch?

THE WITNESS: Yeah, thanks.

MS. JONES: I'm told that we'll have lunch in 15 minutes --

MR. RICHARDS: Okay. That's --

MS. JONES: -- so if we can go 12 more minutes, we can release you to eat --

(Over-speaking.)

THE WITNESS: I'm pro-eating. Yes. I'm good.

MS. JONES: I mean, can you survive another 12 minutes before we break for lunch?

THE WITNESS: I think so. Thank you.

MS. JONES: You seem hardy.

(Exhibit No. 6 was marked for identification.)

BY MS. JONES:

Q. So I'm going to hand you what we've marked as Exhibit No. 6, and we have a copy for counsel as well.

Doctor, you have in front of you a copy of your written testimony before the U.S. Senate Committee on the Judiciary, submitted February 14th, 2023. Do you recognize that?

A. It looks like it, yeah.

Q. Okay. And this would have been before the APA social media advisory came out; correct?

Page 128

A. Correct.

Q. And it would have been before -- if I'm recalling our chronology earlier, it would have been before you'd had any contacts with the state attorneys general about what they might have reacted to in the advisory and whether you might serve as an expert; right?

A. Yes.

Q. Okay. So -- and this testimony, which includes the APA's, I guess, letterhead or insignia at the top, this was -- this is testimony that you prepared and that was submitted for you; is that right?

MR. RICHARDS: Object to form.

THE WITNESS: I wrote this.

BY MS. JONES:

Q. Okay. So if we flip to page 4 of this -- your written testimony -- and I take it, Dr. Prinstein, when you testified before Congress, your goal was to be accurate and honest; yes?

A. Of course.

Q. Okay. And your goal would be not to overstate the state of the science; yes?

A. Yes.

Q. Okay. And in the second -- I'm going to ask

Page 129

you to look at the second -- actually, it's the first full paragraph on page 4 of Exhibit No. 6, beginning with the word "Before." Do you see that?

A. Yes.

Q. It says (as read):

"Before we discuss specific impacts of online platforms or solutions, it is important to acknowledge that causal data are not available for many of these issues, since the experimental designs needed to make cause-and-effect statements would be considered unethical or require access to currently inaccessible data."

Do you see that?

A. I do.

Q. And that was an accurate statement when you drafted it up and submitted it to the U.S. Senate at the time; correct?

A. It was.

Q. Okay. And then it goes on to say (as read):

"This underscores the need for increased access to data and

Page 130

funding for high-quality research."

Yes?

A. It does say that.

Q. And then you go on to say (as read):

"However, as with noncausal research revealing the effects of childhood adversity on mental health, or the effects of combat on PTSD among veterans, extant, rigorous science can nevertheless allow us to reach reasonable conclusions that can shape policy."

Do you see that?

A. I do.

Q. It goes on to talk about, in the next paragraph, that there are some nuances in terms of the extent to which technology and social media may or may not be problematic for development; correct?

A. Can I just take a second to look at that paragraph? It's been a long time.

Q. Yes, of course.

(Witness reviews the document.)

THE WITNESS: Yeah.

Page 131

BY MS. JONES:

Q. All right. And what you say here is (as read):

"It also is important to acknowledge that technology and social media may not, in themselves, be problematic for child development, as each device and platform offers a multitude of features and communication opportunities that users can choose from."

Do you see that?

A. I see that.

Q. And that was a true statement as it was submitted by you to the U.S. Senate?

A. That was true at the time.

Q. Okay. And (as read):

"Extensive research has demonstrated that the amount of screen time alone is not likely associated with negative psychological outcomes among youth."

That's also a true statement; correct?

Page 132

A. That was also true at the time.

Q. Has it changed?

A. Yeah, it has a little bit. So those recent findings are showing that even just reducing screen time seems to lead to an improvement in mental health.

Q. What specific recent findings are you talking about?

A. Oh, the Burnell paper we just talked about.

Q. The same Burnell paper?

A. Yes.

Q. Okay. It goes on to say (as read):

"Moreover, not all youth exposed to identical stimuli are affected the same ways."

That's true; right?

A. That is true.

Q. (As read):

"Thus, the most appropriate question is: what specific online behaviors, features, or content may be associated with benefit or risk to which youth."

I think there might be a part of that --

A. Oh.

Q. -- sentence missing. That's okay.

Page 133

A. Yes, there is.

Q. There's also an "l" missing from "Psychological" at the top. (As read):

"This is the focus of the most recent work among psychological scientists, yielding some comforting, but also some worrying results."

Correct?

A. That's what it says.

Q. Having looked at the entirety of this written testimony that you submitted to the U.S. Senate back in 2023, you did not at any point -- you can tell me if we've missed something -- articulate the view that there is a recognized causal relationship between social media use and mental health harms amongst adolescents, did you?

MR. RICHARDS: I'll just object to the form because I don't believe the witness has reviewed the entire document. He can answer, but I just wanted to object on that basis.

BY MS. JONES:

Q. Sure. And you're welcome to review it over lunch if you are inclined to spend your lunch that way. But let me go back to my question.

Page 134

And I meant we had looked at it. I did not mean to suggest that you had looked at the whole thing while we've been sitting here for the last five minutes.

Did you, at any point in your written testimony to the U.S. Senate in February of 2023, articulate the view that there is a recognized causal relationship between social media use and mental health harms in teenagers?

MR. RICHARDS: Object to form.

THE WITNESS: I would have to read over the whole thing to remind myself of what was said in here. I think pertinent to your question, though, as you just asked, is that the data as of 2023 summarized in this report did not include data published recently in 2025 that looked at randomized clinical trial data.

MS. JONES: Okay.

Why don't we go ahead and take our break now. How much time do y'all want for lunch?

We can go off the record.

THE VIDEOGRAPHER: Going off the record. The time is 11:52 a.m.

(Recess taken from 11:52 a.m. to 12:37 p.m.)

THE VIDEOGRAPHER: Going back on the record. The time is 12:37 p.m.

Page 135

(Exhibit Nos. 7 and 8 were marked for identification.)

BY MS. JONES:

Q. Dr. Prinstein, let me hand you what we've -- we'll hand counsel copies as well -- what we've marked as Exhibits Nos. 7 and 8. And we'll come back to those, but I just wanted to make sure that we had grabbed the rights items.

Exhibit No. 7 should be -- is what we think is the Burnell meta-analysis that you had mentioned earlier, but we wanted to ask if we'd grabbed the right thing.

A. Yeah, let me -- can I take a look at the abstracts?

Q. Yeah, of course you can.

A. Thanks.

(Witness reviews the document.)

THE WITNESS: Yeah, I think this is right.

BY MS. JONES:

Q. Okay. And by "this," what we're talking about is Exhibit No. 7, which is the meta-analysis that included Dr. Burnell and others that you were referring to earlier that postdated your May 2025 report?

A. Yeah, I believe this is the one.

Page 136

Q. Okay. And then, again just to make sure we have the right items here, Exhibit No. 8 -- we'll come back to that -- but Exhibit No. 8, this is the APA's Health Advisory on Social Media Use in Adolescence that you had referred to earlier; is that right?

A. This is the first one, yes.

Q. Okay. Is there another one that you're thinking of?

A. There was another one a year later.

Q. Okay. Got it.

Let me take you back to your report, if you don't mind, and go to page 6. Under -- there's a section entitled "Meta's alleged unfair and deceptive practices"; do you see that?

A. Yes.

Q. And paragraph 18 says (as read):

"I understand that certain Plaintiffs allege that Meta has engaged in unfair and unconscionable acts and practices related to the health and safety of its young users on social media platforms."

Do you see that?

A. I do.

Page 137

Q. Do you -- and if you don't, it's okay, but do you have an understanding of what that refers to specifically?

A. I mean, I understand what the words mean, but I don't know what the specific charge is in, like, lay language.

Q. Okay. I have the same question with respect to paragraph 19. (As read):

"I also understand that certain Plaintiffs allege that Meta has engaged in deceptive acts and practices regarding its social media platforms."

Do you see that?

A. I do.

Q. Would the answer be essentially the same in terms of if you have an understanding of what exactly that means in the context of this case?

MR. RICHARDS: Just object to form.

THE WITNESS: Yeah, the same.

BY MS. JONES:

Q. Okay. On page 9 of your report, there is a discussion to some of the brain activity that you were describing earlier, and in paragraph 26 specifically -- well, there's a section entitled

Page 138

"Youth hypersensitivity to social feedback and 'automatic' behaviors"; do you see that?

A. Yes.

MR. RICHARDS: Just object to form.

BY MS. JONES:

Q. And in paragraph 26, it says (as read):

"One of the first regions of the brain that undergoes substantial reorganization at the outset of puberty is referred to as the ventral striatum."

Is that right?

A. Yes.

Q. And it goes on to describe the development of neuronal receptors within that brain region, starting around the ages of 10 or 11; right?

A. Correct.

Q. And then there's a discussion of two different substances, one known as oxytocin; yes?

A. Yes.

Q. Which you report here is "generally associated with social bonding, especially with peers around our own age"; correct?

A. Correct.

Q. And (as read):

Page 139

"The second is Dopamine, which is associated with feelings of pleasure, when we experience attention, feedback, and reinforcement, or gain power and influence among our peers."

Correct?

A. Correct.

Q. And those activations of regions of the brain that have a lot of dopamine and oxytocin receptors, that activation can occur in the absence of exposure to social media; is that right?

MR. RICHARDS: Just object to form.

THE WITNESS: That's correct.

BY MS. JONES:

Q. Let me ask you to go to page 36 of your report.

A. 36?

Q. Yes. Oh, sorry, 35. I'm sorry, 35.

A. Okay.

Q. And that page is the conclusion of the substantive portion of your report, and it includes a certification that you signed on -- it looks like May 16th, 2025. Do you see that at the top of the page?

Page 140

A. Yeah.

Q. I will spare you reading the entirety of certification, but do you have an understanding of why you made that certification?

A. Let me take a look.

Yes.

Q. What is your understanding?

A. That I'm doing what I can to promote justice, and I am not wasting anyone's time, and I'm doing it with integrity.

Q. Could you go to Exhibit No. 4, which we marked earlier, Dr. Prinstein.

Exhibit No. 4 is your rebuttal report, dated July 30th, 2025; correct?

A. Yes.

Q. And this report includes your responses to certain of the reports submitted by experts retained by Meta; is that right?

A. Yes.

Q. Does this report include all of the rebuttal opinions that you have with respect to the views and opinions that have been expressed by Meta's experts?

MR. RICHARDS: Object to form.

THE WITNESS: I think so. There was a lot in the rebuttal reports -- sorry. Theirs is the

Page 141

rebuttal, and this is the response to the rebuttal?

BY MS. JONES:

Q.   Mm-hmm.

A.   Okay.  Yeah.  There was a lot in the rebuttal reports.  There were some things discussed in there that weren't directed towards me or my reports, so I kind of, you know, may or may not have had some thoughts about that, but I really focused on the stuff focused on me.

Q.   Okay.  But sitting here right now, you're not thinking, "Oh, I have a very specific response to one of Meta's experts" that you haven't otherwise shared in your rebuttal report?

A.   Not --

MR. RICHARDS:  Object to form.

THE WITNESS:  Not that I can think of, yeah.

BY MS. JONES:

Q.   Okay.  Let me ask to take a look at Exhibit No. 2, which is Appendix A to your report.

A.   Yeah.

Q.   Exhibit 2 is entitled "Appendix A: Materials Considered"?

A.   Yes.

Q.   And one question I had was, does this list,

Page 142

in combination with your report, include everything that you reviewed or relied upon in connection with forming your opinions in the case?

MR. RICHARDS:  Object to form.

THE WITNESS:  So there's a -- I mean, I guess if you, like, divided up the things that I relied on into the categories of, like, my general understanding and knowledge and expertise in this area, versus the things that I specifically, like, read and cited in the report, then this does reflect the latter.

But obviously, you know, there's a lot of data -- there are a lot of other articles, including articles relevant, that I did not cite.  As I said in my report, I offered some sample articles to support my points, but I didn't write my report to be exhaustive of every article.

BY MS. JONES:

Q.   Okay.  Let me ask you this way:  Are there articles that you did not include on your list that you would say are somehow offering distinct points or conclusions from what is included?

And by that I mean is there something out there that supports some opinion you have that we wouldn't find reflected otherwise in what is listed

Page 143

here on your Materials Considered list?

MR. RICHARDS:  Object to form.  Vague.

THE WITNESS:  I don't think -- to your point about a distinct point of view, I don't think there's any new or different piece, you know, just at the time of this writing; right?  So, like, other things came out, obviously, since this report.

BY MS. JONES:

Q.   Under the section entitled "Legal and other case documents," there are five bullets; yes?

A.   Yes.

Q.   Do you know -- without sharing conversations you might have had with counsel, do you have any sense of why these are the things that ended up on your Materials Considered list?

MR. RICHARDS:  Object to form.

THE WITNESS:  I reviewed -- I reviewed the reports that were relevant to the piece that I wrote and that were speaking to the psychological science and the questions that I was asked to have an opinion on.

BY MS. JONES:

Q.   Yeah, and so the "Legal and other case documents" section, as I read it, Dr. Prinstein, actually is not referring to reports; it's referring

Page 144

to filings in the case and written discovery that might have been done in the case.  And my question was -- I guess, actually, my first question is, did you read all of the five items that are listed here?

MR. RICHARDS:  Just object to form.

THE WITNESS:  Yes.  Although I'm a little confused which items these are because they all read, like, almost the same to me, so I couldn't tell you which is which here.

BY MS. JONES:

Q.   Yeah, so that's a fair point.  So there are parts of each of these that will look very similar, because there's a case caption that identifies the party bringing the suit and then identifies Meta as the defendant in the case, so that might be what you're seeing in terms of similarities.

A.   Uh-huh.

Q.   But let's take them one by one.  That might be easier.

A.   Okay.

Q.   The Complaint for Objective and Other Relief in the People of the State of California v. Meta: did you review that complaint?

A.   I don't remember which one that is.  If it's on here then I did --

Page 145

Q. Okay.

A. -- but I don't know them by this call number thing here.

Q. There's no reason you would need to --

A. Yeah, okay.

Q. -- that's just how it's tracked in the court system.

A. Okay.

Q. Okay. What about these other bullets -- second, third, fourth, and fifth bullets -- that refer to objections and responses to interrogatories?

MR. RICHARDS: Just object to form.

BY MS. JONES:

Q. My question is did you read those?

A. Same answer.

Q. And the answer was what? That you think you did read them?

A. Yeah, I think I did. But I don't actually know what these documents specifically are because the only differentiators are these numbers, so I can't speak very knowledgeably about what these documents are right now.

Q. Okay. Do you have any specific recall of relying, for purposes of your opinions, on written discovery responses by Meta?

Page 146

MR. RICHARDS: Object to form.

THE WITNESS: So the materials that came from Meta, and then, like, also the depositions, they did not play a very big role in the basis of my opinions, which is largely based on the science.

Mostly, though, reading all of that -- and again, I don't know the difference between the interrogatory versus the Meta documents, whatever -- but mostly reading that, it just became clear that Meta knew about what a lot of the concerns were and did all this anyway.

And then it's interesting that a lot of what the documents suggested is that they corroborated some of the scientific findings in a way that made it seem like, even when using a much, much larger sample, the same basic findings came out.

That was my main takeaway.

BY MS. JONES:

Q. Okay. Did you speak -- and I suspect I know the answer to this, but did you actually speak to anyone from Meta?

MR. RICHARDS: Object to form.

BY MS. JONES:

Q. As part of your role as an expert. Excuse me.

Page 147

A. Yeah. No, no, no.

Q. Then there is a section in Exhibit 2 called "Books and academic papers," which goes on for a few pages. Correct?

A. Yeah.

Q. I'm actually going to take you back to A-10, which is a section entitled "Depositions."

A. Do you mean this A-4? Oh, I see the page A-10.

Q. Yes.

A. Got it. Yeah, "Depositions."

Q. You're right, there are different conventions --

A. Yeah --

Q. -- that would include the letter A.

A. -- no, I got it now.

Q. A.4, which is in page A-10 of Exhibit 2, there's a list of depositions. I -- let's say it's several. I have not counted up the total number, but several depositions.

Do you know who these individuals are?

MR. RICHARDS: Object to form.

THE WITNESS: When I read them I did, but I'm not going to be able to remember which one was which.

Page 148

BY MS. JONES:

Q. Okay. Did you review the depositions of all of these individuals listed here?

A. Yes, I did.

Q. And how was it that you came to review these particular depositions versus some other?

A. Oh. Well, so I had, you know, access to everything and kind of went into a lot of stuff, and there's a lot, and I asked for help on identifying which were most specific to kind of the psychological science and mental health questions, because some of the other stuff was pertaining to what must be parts of the case that are not really relevant to psychology.

Q. Did you review the exhibits associated with all these depositions? Do you remember?

A. I did.

Q. And then Section A.5, which is on page A-11, refers to "Discovery," and then there's a list of numbers; do you see that?

A. I do.

Q. Do you know what that list is of?

A. I think that these are referring to the documents that came from Meta. But again, I can't tell you which number is which here, of course.

Page 149

Q. And how did you determine which documents you were going to include on this list?

A. Oh. Same exact answer. Yeah. I had access to all of them. I went in and looked around. It was a bit overwhelming, as you can imagine, because there were so, so many. I asked for some help on identifying all of the ones that were specific to psychological science, mental health, and -- yeah.

Q. And of the documents that are listed here, did you review all of them?

A. Yes.

Q. Do you have a sense of how many documents have been produced by Meta overall?

MR. RICHARDS: Object to form. Speculation.

THE WITNESS: Yeah, it's totally a guess. I mean, the portal that I had access to had hundreds and hundreds and hundreds of documents. I can't give you a specific guess.

BY MS. JONES:

Q. Okay. So you know that the list of documents that you have here is a pretty limited fraction of those documents?

MR. RICHARDS: Object to form.

THE WITNESS: My understanding is that

Page 150

these are all the documents relevant to psychological science/mental health.

BY MS. JONES:

Q. You think that this list at A.5 represents all of the documents relevant to psychological science and mental health that are included in the production from Meta?

A. Substantively.

Q. What does that mean, "substantively"?

A. Well, I'm sure there are -- I mean, I saw others that had a trivial mention, but, I mean, they're not useful documents for my purposes in preparing this report.

Q. And you said you had access to a portal and that you went in and looked around?

A. Mm-hmm.

Q. How exactly did you go about looking around?

A. What do you mean? I just clicked on it.

Q. Well, I mean, how did you find the documents that you ultimately determined that were going to be put on this list?

A. Oh. I -- sorry, I thought I told you. So I went in, and I was looking at many, many, and, you know, there were a lot of things in there that were just not relevant to what I was asked to do here, so

Page 151

I asked for help: You know, "Can you help me find the subset of these that are relevant to psychology or mental health?"

Q. Okay. And this is the subset, in A.5?

A. Correct.

Q. All right. Did you run search terms? When you were in the -- you described it as a portal, or database, or whatever it was, did you run search terms of any kind?

A. I did not. I don't think that there was a search function available -- at least not that I knew of.

Q. So it sounds like you went into the system and recognized that there was a lot of stuff in there, some of which was not relevant to you; right?

A. Yeah, I opened a lot of documents and saw stuff that was clearly not relevant to me.

Q. Sure. And so you then inquired for assistance from counsel, I assume; is that right?

MR. RICHARDS: Object to form.

THE WITNESS: I -- there was a team that was kind of hired to be a helper, so they helped.

BY MS. JONES:

Q. Okay. And this -- I think you actually talk about that team in your report; is that right?

Page 152

A. Yeah. Bates, maybe, is the team. It was Mathis and Angela. I remember the people but not the name of their firm.

Q. Okay. So those were the -- when you say you went to somebody and said, "Give me some help," that's who you went to?

A. Yes.

Q. Okay. And then did those folks then give you -- you said, "I'm interested" -- what did you say you were looking for, specifically?

A. I said, "Can you help me find which of these materials are the ones that I should -- you know, are the ones most relevant to psychology and mental health."

Q. Okay. And then is the list of documents reflected at A.5 in your Materials Considered list -- are those the documents that you were given?

MR. RICHARDS: Object to form.

THE WITNESS: So they identified more than these, but so many of them were just not terribly relevant or important. So the ones here are the ones that were -- sorry.

There are some that were cited in the document -- I'm a little bit confused on which thing we're looking at here.

Page 153

BY MS. JONES:

Q. You don't need to look at anything on that left-hand side. I think it's just that document in front of you.

A. These are all the ones that I looked at. The ones in the document are the ones that were cited in the document.

Q. You mean your report? "The document"?

A. In the report. Excuse me.

Q. Okay. Got it. So there are Meta documents that are cited in your expert report, Exhibit 1; yes?

A. Right.

Q. And then there might be other documents not cited in your report that are reflected in Exhibit No. 2; is that right?

A. Yes --

Q. Okay.

A. -- I believe so.

Q. Okay. Got it. But collectively, that represents some universe of the documents that when you asked for "Give me what's most relevant," that's what you got; is that right?

MR. RICHARDS: Object to form.

THE WITNESS: In -- well, I also had access to all of them, and looked at a lot of others

Page 154

that are not in here, but were not -- those were not relevant. So yeah.

BY MS. JONES:

Q. Okay. And my colleague has reminded me of the paragraph in your report, if you wanted to look at it. Page 6 in Exhibit 1.

A. Going back to No. 1.

Q. Paragraph 20.

A. Page 6, paragraph 20.

Q. Yeah. So you say (as read):

"I was retained by Plaintiffs to opine on the effects of social media, including Instagram and Facebook, on the developing adolescent brain and how specific social media features impact developmental and mental health outcomes."

Yes?

A. Yes.

Q. And then you go on to say (as read):

"In preparing this report, I was assisted by staff from the consulting firm Bates White."

Yes?

Page 155

A. Correct.

Q. And then it goes on to say (as read):

"While engaged in this matter, I directed the activities of the team, made all final decisions, and prepared this report."

Is that right?

A. That's what it says.

Q. Is the firm Bates White the firm that you were referring to just now?

A. Yes, it was.

Q. Who got Bates White involved?

MR. RICHARDS: Object to form.

THE WITNESS: I assume the attorneys.

BY MS. JONES:

Q. Okay. Bates White was not a firm that you were dealing with before --

A. I didn't go find them myself.

Q. Okay. How much time did you spend in reviewing all of the materials that are reflected in your report and your Materials Considered list?

MR. RICHARDS: Object to form.

THE WITNESS: That varied quite a bit by which materials. You mean, like, cumulatively?

Page 156

BY MS. JONES:

Q. Yes.

A. Totally just a guess? I can't -- I have no idea. But if I'm guessing --

MR. RICHARDS: I'll just object based on speculation. But you can answer, Dr. Prinstein.

THE WITNESS: 20 hours, 30 hours, somewhere in that ballpark.

BY MS. JONES:

Q. You think you spent 20 or -- and I recognize you've basically admitted that you probably don't remember, but --

A. Yeah.

Q. Let me ask you this: Did you keep track in any way of the time you were spending on these various review projects?

A. No.

Q. Okay. Did you keep track in any way of the time you were spending in the drafting of the expert report?

A. No.

Q. Off the top of your head, you're, it sounds like, guessing it might have been 20 to 30 hours?

MR. RICHARDS: Object to form. Speculation. Asked and answered.

Page 157

THE WITNESS: That would be my guess.

BY MS. JONES:

Q. Okay. If I told you that some of the depositions that you've testified you read in their entirety were, collectively, thousands of pages long --

A. Yeah.

Q. -- would that affect your estimate of how much time you spent reviewing things?

MR. RICHARDS: Object to form.

THE WITNESS: No, because, as I mentioned before, I really relied -- I did not rely very substantially on the documents from Meta or the depositions in forming my opinions. I used the science to form my opinions -- the science from academic literature and from my general knowledge.

The information from the depositions and the Meta documents were more shocking to see how much Meta was aware of the whole time and engaged in wrongdoing, in my opinion, anyway. And really, most of what I saw in there corroborated what the science had already shown.

BY MS. JONES:

Q. In terms of the Meta documents that you reviewed, would you say, all in, that it was 100

Page 158

documents?

MR. RICHARDS: Object to form. Speculation.

THE WITNESS: You mean including the ones on this list and not on this list?

BY MS. JONES:

Q. Yes.

A. I mean, honestly, I would like to offer a guess because I hear you asking, but it's kind of impossible for me to speculate at this point. Like, this is months ago, and these are many, many documents.

Q. Sure. Well, your list has a certain number of documents --

A. Yeah.

Q. -- which is well under 100 documents; yes?

A. Yes.

Q. In Exhibit No. 2?

A. I looked at at least that many, if not four times as many, as what's on that list.

Q. Okay. Is there any possibility that you reviewed more than 100 Meta documents as part of your work in this case?

MR. RICHARDS: Object to form. Speculation. Asked and answered.

Page 159

THE WITNESS: Sorry, I honestly cannot guess --

BY MS. JONES:

Q. Okay.

A. -- this is a long time ago.

Q. You do not know and you did not keep track?

MR. RICHARDS: Object to form.

THE WITNESS: I did not keep track.

BY MS. JONES:

Q. And the documents -- after you went through the process of kind of opening up various things and determined that was not the most efficient way, the documents you ultimately focused in on that were provided to you were provided to you by Bates White; is that right?

MR. RICHARDS: Object to form. Compound.

THE WITNESS: I mean, I -- some of these I had obviously identified in my search, but I asked them to help me in creating a subset that was most relevant, and so the rest of them would be the ones that they had found.

BY MS. JONES:

Q. Based on the documents that were given to you by Bates White, did you say, "I want follow-up on this

Page 160

particular thing that I see here"?

A. All the time.

Q. Did you personally do any follow-up in the database for things?

A. Yes.

Q. And did that yield some additional universe of documents that you reviewed?

A. They did a really good job, so I don't know that after they had provided me with the information, and after I went back and looked, I don't think I found anything else relevant.

Q. In your academic research work, do you typically review subsets of internal company materials to draw scientific conclusions?

MR. RICHARDS: Object to form.

THE WITNESS: In my -- sorry, in my scientific work, do I -- I don't --

BY MS. JONES:

Q. In your academic research work.

A. Yeah, these are confidential, my understanding, so I don't have access to them usually.

Q. And it sounds like your scientific conclusions were not really driven by the company documents. They might have been, in your view, reinforced by the company documents; is that right?

Page 161

MR. RICHARDS: Object to form. Misstates testimony.

THE WITNESS: Yeah, I -- I mean, it was -- it mostly informed my knowledge of what Meta knew all along, and it seemed to corroborate the scientific findings in most cases. That's what I mostly got out of reading those documents.

BY MS. JONES:

Q. You're not proposing, in your role as an expert in this case, to be an expert on what Meta knew or meant when it said certain things in documents, are you?

MR. RICHARDS: Object to form.

THE WITNESS: In my role as a human and a parent, I was pretty aghast and disappointed to see them.

BY MS. JONES:

Q. That -- yeah, that was a different -- that was an answer to a different question.

A. Okay.

Q. My question is, in your role as a retained and eventually-to-be-paid expert for lawyers, are you proposing to be an expert on what Meta knew or what Meta meant in any particular document you might have seen?

Page 162

MR. RICHARDS: Just object to the preamble.

THE WITNESS: Well, as you noted in the report, there's a section that talks about, you know, the deceptive nature of the practices, so I certainly tuned into that when I saw that these were pretty deceptive.

BY MS. JONES:

Q. Yeah, but my question is less about what you as a human might think. My question is, as an expert, are you purporting to have expert insights into what a particular document said or didn't say, or meant?

MR. RICHARDS: Object to form. Calls for a legal conclusion.

THE WITNESS: I was asked to be a scientific expert and review the science.

BY MS. JONES:

Q. I'm not sure that's an answer to my question. My question was, are you acting as an expert on what a particular document signals in terms of Meta's intent or purpose?

MR. RICHARDS: Same objection. Asked and answered.

THE WITNESS: So I -- the way that you're asking your question seems to demarcate a line

Page 163

between my role as a psychologist and scientist in being able to talk about deception or not being able to talk about deception; and I would say that that's not the way that I approached the task or engaged in the task.

To me, I -- I am an expert in thinking about how kids are confronted with a stimulus, how psychologists and psychological knowledge was used to create change, revise, or protect kids from that stimulus, and how children would respond in the context of seeing that stimulus anyway.

Some of the documents spoke specifically to psychological advice that was given to Meta employees based on the science, and Meta's decision to go against the best psychological science advice and do things that they knew very well would hurt kids anyway, so that felt pretty relevant to me.

BY MS. JONES:

Q. When you say "decision to go against the best psychological advice," what specifically are you referring to?

A. If I recall correctly, there was a piece on body image filters that psychologists said absolutely should not be used; this will cause damage to kids. It was temporarily taken away, off the platform, and

Page 164

I think it was Mark Zuckerberg himself who said something to the tune of "We are being too paternalistic, and you should put those beauty filters back on." And to me, that was -- I read that both as a human, a parent, but also as a psychologist with scientific expertise on what my colleagues had clearly said to Meta and how they responded and then reversed their decision to those experts.

Q. It doesn't look like you actually reviewed Mr. Zuckerberg's deposition; is that right?

A. No, I don't believe that I did.

Q. And you've not had any conversations about Mr. Zuckerberg about what might have been informing his decision on that particular issue, have you?

MR. RICHARDS: Object to form.

THE WITNESS: The document that I read said that psychologists that they had hired told him to do one thing, and then they quoted him, so --

BY MS. JONES:

Q. That wasn't my question. My question was, you have not had any conversations with Mark Zuckerberg about what might have been informing his decision with respect to cosmetic filters; right?

A. I have not had any conversations with Mark Zuckerberg.

Page 165

Q. Of the expert reports that you reviewed, Dr. Prinstein, how did you determine which reports you would review?

A. Can you say that again? It sounds like -- I feel like that's what we just talked about, so you probably mean something more specific and I'm not getting it.

Q. It's possible.

A. Okay.

Q. So we've talked about you reviewing deposition testimony from Meta witnesses; correct?

A. Yeah.

Q. And we've talked about you reviewing various articles; correct?

A. Yes.

Q. And we've talked about filings in the case and discovery responses that you testified that you reviewed; correct?

A. Okay, I kind of don't know what all that means, but yeah.

Q. That's fair.

A. Okay.

Q. And then we talked about Meta documents just now; yes?

A. Yes.

Page 166

Q. So there are also experts who have been retained by Meta --

A. Oh.

Q. -- who did expert reports?

A. Yeah.

Q. Okay. Are you with me now?

A. Yes, I am. Thank you.

Q. Okay. How did you determine which expert reports you were going to review?

MR. RICHARDS: Object to form.

THE WITNESS: I was -- sorry.

MR. RICHARDS: I just said "object to form." You can answer.

THE WITNESS: Oh. I was provided the reports that were relevant to my testimony -- or my report.

BY MS. JONES:

Q. Okay. Provided by whom?

A. The Bates White team.

Q. Have you reviewed any deposition testimony from any expert, whether retained by Meta or retained by the state AGs?

A. Yes -- well, no. The -- I think that what I was reading was the rebuttal reports. Wait.

Q. Let me clarify because I might be creating

Page 167

confusion.

So people who did expert reports also did this, someone came and asked them questions --

A. Yes.

Q. -- which was turned into a transcript.

A. Right.

Q. Do you recall reviewing any transcripts from experts?

A. Oh. No. If you mean the people who wrote the rebuttal reports, no, I haven't read those transcripts.

Q. Okay.

A. Yeah.

Q. In connection with reviewing the expert reports that you did review, did you go and review the materials that those experts had cited?

A. There were some -- there were some documents and materials cited in the rebuttal reports. I did go and look at what they were looking at when they made those statements, yeah.

Q. Dr. Prinstein, do you agree that a cross-sectional study cannot establish causation?

A. Usually that is true, but it's not always true.

Q. Okay. That was a dramatic recitation of the

Page 168

word "usually."

When you say usually that's not but it's not always true, help me understand when it's not true.

A. So -- so there -- again, this goes back to our conversation about causation; right --

Q. Yeah.

A. -- and what we know about, you know, the difference of when we can say that. Taking that into account, there are times that it's not possible to do anything more than cross-sectional. So we reach -- we often reach causal conclusions. We can sometimes reach causal conclusions based on cross-sectional data in certain circumstances.

Q. What are those circumstances?

A. So, for instance, we were talking before about how we get neural images, and we don't yet have the technology available to get to the temporal sequencing of a stimulus and the activation of a certain brain area in a way that will allow us to talk about temporal precedence or an antecedent, so we think of that as cross-sectional data, but, in fact, we can make a causal conclusion that the activation of that brain area was caused by exposure to that stimulus.

So that would be cross-sectional, but it

Page 169

would not be -- sorry, that would be cross-sectional, but it would not be -- sorry. I'm distracted because I see that you have a copy of our edited book there.

Yes --

Q. That was not intended to --

(Over-speaking.)

A. No. That's fine.

What we have found is that, yes, there are certain times when we do need -- and can -- make causal conclusions based on cross-sectional data. It's not common, but it absolutely can happen.

Q. Okay. What about in the context of evaluating a potential relationship between social media use and mental health outcomes? Can a cross-sectional study tell you whether there is a causal relationship or not?

MR. RICHARDS: Just object to form.

THE WITNESS: And we're talking about the ways in which academics would talk to an academic audience about causation?

BY MS. JONES:

Q. Sure -- if there are difference answers, then yes, let's start with that.

A. Okay. In the academic -- in academia, we often will talk about -- we will often talk about

Page 170

cross-sectional data as not being used, typically, to look at the relationship between social media exposure and mental health with exceptions. And those exceptions are when we are collecting data with a time period, where we are collecting data that clearly has an antecedent and a consequence, but they were both collected at the same time. So that means it's cross-sectional data, because we asked you the questions twice, but we asked you about something that clearly happened before the outcome.

Q. So that's what you would say to a scientific audience: usually not, but sometimes?

A. Well, to a scientific audience --

MR. RICHARDS: Object to form. Misstates testimony.

THE WITNESS: Sorry, I didn't hear what you --

(Over-speaking.)

MR. RICHARDS: I just objected to form. Misstates testimony. But you can continue.

THE WITNESS: No, that's not what I would say to a scientific audience. I think a scientific audience would not be interested in getting to that level of detail 99 out of 100 time points. I would probably say that we don't rely on

Page 171

cross-sectional evidence for causal data. But that's not the context that we're in right now, and that's not the basis for which you're asking me this question.

BY MS. JONES:

Q. Well, I guess my question is, what context do you think we're in right now, relative to being in a -- let me stop with that question.

What context --

A. Okay.

Q. -- do you think that we're in right now that would call for a different analysis --

MR. RICHARDS: Object to form.

BY MS. JONES:

Q. -- or way of communicating?

MR. RICHARDS: Sorry, Phyllis.

Object to form. Calls for a legal conclusion.

THE WITNESS: Several things.

Number one: This is not a context in which we are academic scientists debating things for academic purposes; and if we are, then we're doing this wrong, because, number two, we are engaged in a debate through this dialogue, in my opinion, to take the best available evidence that we have to determine

Page 172

whether, more likely than not, we have a preventable risk that is harming kids; and I believe the answer is yes.

I believe also that in academic debates we tend to talk about general, broad conclusions that we can use to teach one another the general standards of science, but a good scientist always knows that there is never a "never," and there is never an "always," and there are always exceptions and situations in which we have to think about the changing nature of science and the changing way that we have to ask questions, particularly when there are concerns about ethics or methodological constraints.

BY MS. JONES:

Q. And when you're contrasting what we're doing here with the scientific setting, how are you understanding what we're doing here?

MR. RICHARDS: Object to form --

BY MS. JONES:

Q. Let me ask a better question.

A. Yeah. Sorry, I think I just said that.

Q. No, no, no. Let me ask a better question. That was bad question -- which I acknowledge.

Are you suggesting that you are applying a different approach in the context of your role as an

Page 173

expert in this litigation, in terms of how you're communicating about what the data shows us, than you might if you were communicating to an audience of your peers at the APA's annual meeting?

MR. RICHARDS: Object to form. Vague. Compound.

THE WITNESS: I am suggesting that the words that we use and the meaning of those words differ across those two contexts.

BY MS. JONES:

Q. So in the context -- if you were at -- let's say you're presenting at the APA's -- I don't know if you all have an annual meeting; I'm assuming that you do. Let's assume that you're presenting at the APA's annual meeting --

A. Mm-hmm.

Q. -- it sounds like, in that setting, with that audience, you would not necessarily say, "The available data allows us to conclude that social media use causes mental health harms"; is that right?

MR. RICHARDS: Object to form. Ambiguous. Compound.

THE WITNESS: Sorry, there are a lot of what ifs that would be embedded in my response to you. So let me just say that I -- I am here in a unique

Page 174

role, in that, unlike most scientists, who primarily spend their time debating science, talking about science, communicating science in academic journals, I have had the opportunity over the last five years to dedicate most of my time to being -- to fulfilling APA's mission, which is to communicate, translate, and apply science to benefit the public well-being.

My testimony is based on my expertise in both of those capacities, which is different from experts who primarily or exclusively have experience only in the capacity of talking about science in a way that would be relevant to other scientists, primarily in academic journals.

BY MS. JONES:

Q. With respect, I'm going to move to strike that as nonresponsive.

My question was, in the context of a talk that you might give to the members of the American Psychological Association, would you ever get up and say, "The data allows us to conclude that social media causes mental health harms in certain adolescents and teenagers"?

MR. RICHARDS: Object to form. Vague. Compound. Speculation.

THE WITNESS: So, again, there's a lot

Page 175

of what ifs here, but I will just say, you know, am I getting up as the Chief of Psychology at said APA convention? Or am I getting up to be asked for my scientific opinion as -- because I'm speaking to a room of scientists? These are very different issues.

Regardless, I do think that if I was asked to do this today, I would feel comfortable saying that the emerging data from randomized clinical trials allows us to now make more causal statements about the relationship between social media exposure and youth mental health.

BY MS. JONES:

Q. And you said, "the emerging data from randomized clinical trials allows us to make more causal statements." Did I hear that correctly?

A. That's what I said.

Q. Okay. What's -- we talked about the Burnell paper. Is that part of the data that you're thinking of?

A. Very much so.

Q. Okay. What other emerging data are you thinking of from randomized clinical trials that allow us to make more causal statements about the relationship between social media exposure and youth mental health, beyond the Burnell paper that you've

Page 176

already told us about?

MR. RICHARDS: Just object to form.

THE WITNESS: The Burnell paper is a meta-analysis that reviews effect sizes across a whole body of literature; so I'm referring to that broad body of literature.

BY MS. JONES:

Q. Okay. Anything beyond the studies that are included within the Burnell paper that you are thinking of as this emerging data?

A. My general knowledge from conversations with investigators and data that they're beginning to collect or have collected or are beginning to analyze.

Q. Unpublished data?

A. Yeah.

Q. Okay. And in general, those investigators -- that data would need to go -- need to be collected and analyzed; right?

MR. RICHARDS: Object to form.

BY MS. JONES:

Q. As part of the process towards getting it published; yes?

MR. RICHARDS: Same objection.

THE WITNESS: The people that I talked to? Or just in general is that how papers get

Page 177

published?

BY MS. JONES:

Q. Well, let me take this in pieces.

Who are these investigators that you've talked to?

A. A great many people. I don't know how to possibly say that -- respond to that precisely.

Q. Well, your testimony was (as read):

"My general knowledge -- beyond the Burnell paper, my general knowledge from conversations with investigators and data that they're beginning to collect or have collected or are beginning to analyze."

Who are the investigators that you're thinking of?

A. So there are at least 100 or 200 investigators studying this topic very, very actively within the field. I know many of them. In fact, we've hosted a conference where we had them all come here to Chapel Hill and talk about their ongoing work.

I also had the opportunity, through my work at APA, to collect a deliberately diverse group of folks -- and by that I mean coming from different

Page 178

backgrounds of professional experience and knowledge -- where we spoke candidly about the -- what we thought rose to the level of requiring public knowledge and action to protect youth; and in that conversation, we relied both on our published data, our unpublished and progress studies, and the things that each of them knew from they're general knowledge.

Let me be clear, there's no doubt that there are problems with social media on youth mental health; there's no doubt that the features and functions embedded in products, including Meta's, are contributing heavily to harm. And yes, we can now also say that there are data that would meet different standards where we can use the word "cause." That's clear. That's coming from our work -- not only conversations that I've had with hundreds of investigators in this area, but also from a panel explicitly put together to obtain consensus and decide what do we know enough about to sound the concern and protect the public.

And that's what came out in our two social media health advisories.

Q. Okay. So you've mentioned Burnell. You've mentioned some grouping of investigators who are collecting and analyzing data. When was this panel

Page 179

that you're describing?

A. The social media health advisory was published in May 2023. We worked on it for approximately two months in advance of that. We also held a conference -- I don't remember -- it was probably '22 -- that included about 100 to 200 investigators studying this from around the world.

Q. 2022?

A. I can't commit to that year, but I remember that it was after the pandemic lockdown, and I believe that it was before the -- or close in time to the advisory.

Q. And it was here in North Carolina?

A. Yes. It was in Chapel Hill.

Q. All right. And the health advisory in May of 2023 does not say, "We now have enough information to conclude causation exists between social media use and mental health harms"?

A. No. To be clear, the information that we're using to talk about cause in a scientific audience, we would probably -- the emerging data that allows us to talk about cause in a scientific audience would come from the randomized clinical trials which were only just recently summarized.

I think it's very important that -- to get

Page 180

off of the -- I think it's very important to reiterate that the way that we're talking about cause is very different. The social media advisory -- both of them -- and the work and conclusions of scientists are very clear. We have enough data to be concerned about what Meta's products are doing to kids' mental health.

Q. Sure. And I -- I understand your position on that. My point -- I'm just trying to pin down what exactly you're pointing to when you say the emerging data allows us to -- let me finish my question, please.

A. Of course.

Q. -- to conclude that a causal relationship exists.

You have mentioned the Burnell paper, the meta-analysis; you have mentioned data that's been collected and analyzed by investigators; and you have mentioned the Health Advisory on Social Media Use in Adolescence. Is there any other emerging data that you are thinking of that allows you, seated here today, to say causation exists between social media use and mental health harms in adolescents and teens?

MR. RICHARDS: Just object to form.

THE WITNESS: So just so I understand your question, beyond the Burnell paper and the papers

Page 181

cited within it, the social media advisory, what other -- what else is the emerging evidence --

BY MS. JONES:

Q. Yes.

A. -- that I'm relying on when I say that?

Q. Yes.

A. Okay. I would say that those are the primary factors. I can also say that it's simply an emerging consensus within the scientific community.

Q. Okay. Is that reflected somewhere where I could look and see the emerging consensus among the scientific community is that social media causes mental health harms in adolescents and teens?

MR. RICHARDS: Just object to form.

THE WITNESS: No, unfortunately, I don't think that there's a -- I don't think that that's documented in any kind of a way other than, as a scientist, you know, who's been studying this and who has been a scientist for many years, it's very clear that the field has moved from one research question to another, and there are new questions being asked, and the new research questions asked are clearly reflecting an acceptance of problematic aspects of social media use that are recognized as being concerning.

Page 182

BY MS. JONES:

Q. Anything else? I just want to make sure we've run through everything else that you would document as part of your answer on the emerging data that supports a causal relationship between social media use and mental health harms.

MR. RICHARDS: Just object to form.

THE WITNESS: That's all I can think of at this moment.

BY MS. JONES:

Q. When you testified before Congress last week, did you say, "There is an emerging consensus that the use of digital media causes mental health harms in adolescents and teens"?

A. The testimony was on AI chatbots, actually.

Q. Sure. Did you say what I just asked you about while you were there?

A. I wasn't asked any questions where that would be an appropriate or relevant response.

Q. And when you were before Congress in 2023, you also did not say that; right?

A. Well, in 2023, the state of the literature was different. So not only were the findings or this advisory or the panels that I just discussed -- none of them had happened yet, first of all.

Page 183

And second of all, it's important to think about that testimony in Congress in context. The statements about --

Q. I'm sorry, Dr. Prinstein, I don't want to be rude. My question was just did you say that when you testified before Congress in 2023?

A. I didn't speak to things that happened after 2023 in 2023 --

Q. Okay. So --

A. -- it would be impossible to do so.

Q. Okay. And so when, from your perspective, did this emerging consensus crystallize?

MR. RICHARDS: Object to form.

BY MS. JONES:

Q. After you testified before Congress, when would you have said, "I think we've crossed that threshold"?

MR. RICHARDS: Same objection.

THE WITNESS: I think that the social media health advisory makes very clear where we were in 2023. I think that that clearly indicates that there are things that are very concerning, more likely than not are creating risk for adolescents.

BY MS. JONES:

Q. You're familiar with the DSM-5, I assume?

Page 184

A. I am.

Q. Okay. And that is the diagnostic manual of recognized mental disorders published by the American Psychiatric Association?

A. It is.

Q. And it provides a standardized means of classifying and diagnosing psychiatric disorders; is that right?

MR. RICHARDS: Object to form.

THE WITNESS: With great criticisms among many about it, yes, it is currently recognized as a limited but available resource.

BY MS. JONES:

Q. The DSM-5 recognizes some behavioral addictions; correct?

A. Incorrect. The DSM talks about abuse and dependency; it doesn't talk about addictions.

Q. Okay. Well, it recognizes abuse and dependencies, to use your terminology?

A. It does.

Q. Okay. And among other things, it recognizes, for example, compulsive or problematic use of -- excuse me -- compulsive or problematic gambling behaviors; yes?

A. Yes, it does.

Page 185

Q. Okay. At the moment, the DSM-5 does not recognize something known as social media addiction; correct?

A. Well, social media didn't exist in its form when the DSM came out.

Q. Well, you know that the -- I'm sure you do know this -- that the American Psychiatric Association considered the possibility of adding social media addiction to the DSM-5?

MR. RICHARDS: Object to form. Speculation.

THE WITNESS: There is an internet overuse disorder in there, but the data are being collected now for its inclusion in the next DSM.

BY MS. JONES:

Q. Well, my question was different. My question is did you understand that the DSM-5 -- excuse me. Did you understand that the American Psychiatric Association actually considered including social media addiction and elected not to include it?

MR. RICHARDS: Same objections.

THE WITNESS: That's not consistent with my understanding. The DSM committee did not feel that the data were available yet, at the time that the DSM was collected, because that was a long time ago

Page 186

and we didn't have as much research on this as we do now.

BY MS. JONES:

Q. And I think you told me this earlier, but you've not had an experience actually either diagnosing or treating patients for something known as social media addiction; is that right?

A. Have I personally diagnosed somebody with social media addiction?

Q. Yes.

A. No, I have not.

My research has collected data on hundreds of folks who are clearly meeting criteria for problematic social media use --

Q. Dr. Prinstein, again, I don't want to be rude. My question was pretty specific --

A. Well, I didn't feel like I fully answered your question, and I just wanted to, like, offer the whole truth about it.

Q. I appreciate it. And my question was very specifically limited to have you personal diagnosed someone with social media addiction; and I think your answer was "no." Is that answer truthful?

A. Well, I don't use the term "social media addiction," so it's kind of a funny question because

Page 187

that's not -- like, that's not possible for me to have done.

Probably the better answer would have been to say that, you know, we have collected data on hundreds and hundreds of kids now, and we've also reviewed the data collected on folks all around the world who had been exposed to Meta's products. The way that we talk about it is problematic social media use.

Relevant to your question, we actually use the diagnostic criteria from the DSM-5 --

(Over-speaking.)

MS. JONES: I'm sorry, Dr. Prinstein --

MR. RICHARDS: Counsel, just let him finish his answer. He's providing an answer, and I'm going to request that you let him finish --

(Over-speaking.)

MS. JONES: He's providing an answer to a question that I haven't asked, and I'm on the clock --

THE WITNESS: I'm sorry, but the question you asked doesn't make sense as a question --

BY MS. JONES:

Q. That's okay. Then I'll ask a different question. That's okay --

Page 188

A. If it's okay, I think this is really relevant to the question you just asked, and I swore to tell the whole truth, so I feel like I need to tell you what I'm saying.

Q. Let me ask my next question, and what you're wanting to say may well be responsive to that question, but I need to keep us focused on the questions that I've asked you, if that's okay.

MR. RICHARDS: Well, Counsel, he was providing a response that he thought was relevant to your question and answering your question, so while you're looking for your next question I'll just instruct Dr. Prinstein to finish his answer.

MS. JONES: You're not allowed to -- respectfully, you're not allowed to invite your witness to just start talking. I need to get to my next question. I'm trying to flip through pages to move us along, but he doesn't actually get to just spontaneously talk about what he's inclined to talk about. So if you give me a minute, I'll give him another question, but I do want to keep us focused on the actual questions that I need to ask.

MR. RICHARDS: Well, respectfully, I didn't initiate this further answer, he did, because he thought it was relevant.

Page 189

THE WITNESS:  Sorry, it's not a spontaneous response; it's actually the answer to your question.

BY MS. JONES:

Q.  I understand --

A.  Okay.  If you don't want me to answer your question, that's okay.

Q.  I don't want to fuss with you --

A.  Okay.

MS. JONES:  -- or you.  Okay?

MR. RICHARDS:  Understood.

(Document was handed to the witness.)

(Exhibit No. 9 was marked for identification.)

BY MS. JONES:

Q.  Dr. Prinstein, you have in front of you what we have marked as Exhibit No. 9.  Do you recognize Exhibit No. 9?

A.  I do.

Q.  Exhibit No. 9 is a paper that was published in The Journal of Child Psychology and Psychiatry, and was published, I believe, earlier this year, in 2025; is that right?

A.  Correct.

Q.  And you are a coauthor on that paper along with various others including Dr. Burnell and

Page 190

Dr. Telzer; is that right?

A.  Correct.

Q.  All right.  Now, this paper that was published earlier this year is entitled "Adolescent social media use is not a monolith"; do you see that?

A.  That's part of the title.

Q.  You're right.  After the colon, it says, "toward the study of specific social media components and individual differences."  Do you see that?

A.  I do.

Q.  And this is -- and you can correct me if I have this wrong -- this is an annual review of academic literature on social media; is that right?

A.  Kind of --

Q.  Okay.

A.  -- it's an invited opportunity to move the field forward into new directions.  And they called that series the Annual Review Series.

Q.  Okay.  So let's look at just a couple of elements of this paper, starting with the very first page, in the introduction.  On the right-hand side -- let's start at the top, actually, of that right-hand side column.

"In just 20 years"; do you see that?

A.  No.  Sorry.

Page 191

Q.  I apologize --

A.  Oh, there it is.  Okay.

Q.  It says (as read):

"In just 20 years, online social media platforms have dramatically transformed the social context in which adolescents develop, with peer interactions now frequently mediated by technological devices."

Do you see that?

A.  I do.

Q.  And then there is a description of usage of various forms of media with -- excuse me, among teenagers and adolescents; is that right?

A.  Correct.

Q.  And then a little further down in that same paragraph, it says (as read):

"Notably, social media are diverse, and thus difficult to consistently define."

That's a true statement; correct?

MR. RICHARDS:  Object to form.

THE WITNESS:  Well, it depends.  So the context here is -- that sentence is within a context.

Page 192

Can you be more specific?

BY MS. JONES:

Q.  Well, I may have said "Is it a true statement?"  I should have said "Is it an accurate statement, as it's reflected there?"

MR. RICHARDS:  Object to form.

THE WITNESS:  There are different kinds of social media, and the definition is changing over time.

BY MS. JONES:

Q.  Okay.  It goes on to say, to that point (as read):

"Widely accepted definitions conceptualize social media as computer-mediated, internet-based communication channels that allow for selective self-presentation and online social interaction with both broad and narrow audiences."

Do you see that?

A.  I see it.

Q.  Is that a definition with which you agree, Dr. Prinstein?  Just asking.

A.  I mean, there's a lot of debate in the scientific literature about exactly how to define

Page 193

social media, but that's a reasonable definition.

Q. Okay. And then a little further down, it says (as read):

> "The role of social media in adolescent well-being remains unsettled."

Do you see that?

A. Yes.

Q. Was that an accurate statement as reflected in this paper published earlier this year?

MR. RICHARDS: Object to form.

THE WITNESS: So yes and no. It really depends on the context. So I'd like to explain the context in which that statement is being made in the paper.

BY MS. JONES:

Q. Okay. So you said "yes and" -- it's accurate and inaccurate. So tell me how it's inaccurate, based on the context.

A. Well, the rest of the paper, as it goes on to explain, is that, if we think about social media, the individual components within it, there are some pieces that are quite settled.

Q. Okay. I'm not sure I understand. When you say "there are some pieces that are quite settled,"

Page 194

what does that mean?

A. So the early research on social media was focused almost exclusively on screen time. The debates around social media for many years and among academics -- and again, I want to emphasize the academic audience -- really were focused on whether screen time as a predictor is that something that might be good or bad or statistically and reliably associated with negative outcomes.

The purpose of this paper, as you can see -- this sentence you pulled out is in the introduction -- is to bridge into a discussion of how we're moving beyond screen time and we're starting to talk about specific features and functions embedded within platforms that kids encounter when they're on social media. And when it comes to that, there are some features and functions that are not unsettled -- sorry for the double-negative -- they are quite settled -- there is a consensus that they are harmful. And that's the context in which that sentence appears.

Q. Okay. If we move a little further down, it says (as read):

> "Many researchers, parents, educators, policymakers, and youth themselves disagree about the

Page 195

> links between social media use and adolescent adjustment."

Do you see that?

A. I see that sentence.

Q. Is that an accurate sentence?

MR. RICHARDS: Object to form.

THE WITNESS: So the sentence's accuracy is dependent on the context in which that sentence is placed. Again, the debates that are being referred to here are debates based on old research referring to screen time. In the introduction of the article, we're bridging between the past and the future, so we're first reviewing what were some of the past debates and why the literature has now moved beyond those past debates by looking at things other than screen time.

BY MS. JONES:

Q. Okay. And it goes on to say (as read):

> "Some suggest that social media may be the predominant cause of the current youth mental health crisis" --

And then it cites certain authors. (As read):

> "... whereas others describe this

Page 196

> fear as unnecessary moral panic."

Do you see that?

A. Yes.

Q. And it then cites to particular papers with respect to both of those two positions; do you see that?

A. Yes.

Q. Okay. And in terms of those who cite social media as the possibly predominant cause of the current youth mental health crisis, there is someone named Jane Twenge; correct?

A. Yes.

Q. Do you know Dr. Twenge?

A. Not personally.

Q. Okay. Do you know her work?

A. A little.

Q. There's Dr. Jonathan Haidt?

A. Haidt.

Q. Haidt, excuse me.

And then Drs. Joiner and Campbell do you see that?

A. Correct.

Q. And then there are others on the other side of that debate where "others describe this fear as unnecessary moral panic"; do you see that?

Page 197

A.  I do.

Q.  Within that framework that you and your coauthors laid out in your paper here, where would you group yourself?

A.  I believe that there are -- as I've said before, there are certain features and functions -- and this is exactly what we said in our health advisory, and I've said in every talk that I've given, to my recollection -- there are certain features and functions that quite clearly are contributing to mental health problems for youth.  So we neither talk about it in an omnibus way nor do we talk about it as unnecessary panic.  We are at the features and functions level, and we make very clear that those features and functions are indeed contributing to mental health difficulties.

Q.  Okay.  Well, let's look at the -- in the interests of time, we'll go back to page 454 of that same paper.

A.  Why can I not find page numbers on here?

Q.  Mine is on the left-hand side -- at least in my copy.

A.  Got it.  Thank you.

Q.  Okay.  And let me actually ask you to look at the section entitled "Conclusion" on the right-hand

Page 198

side.  Do you see that?

A.  Yes.

Q.  It says (as read):

    "The context of adolescent
    development today is fundamentally
    transformed by social media,
    though the role of social media in
    adolescent well-being is not fully
    understood."

Do you see that?

A.  I do.

Q.  Was that statement an accurate statement as reflected in this paper that was published earlier this year?

MR. RICHARDS:  Object to form.

THE WITNESS:  It depends.  So there's a context in which that sentence occurs, of course.  So, in some cases, we do have a very developed understanding -- we never have a full understanding in science, obviously -- and in some cases, more research is needed.

BY MS. JONES:

Q.  All right.  And it goes on to say -- it essentially kind of draws this distinction between these different eras of research, talking about the

Page 199

association between time on social media and adolescent psychosocial outcomes as one area of research once upon a time; right?  Or focus of research once upon a time?

MR. RICHARDS:  Object to form.

THE WITNESS:  I don't think I'd exactly say it the way you're saying it, but it sounds like you're asking whether the first sentence is referring to the prior research on screen time?

BY MS. JONES:

Q.  Yes.

A.  Yeah, it is, it seems.

Q.  And then it goes on to say -- it suggests, as I think you've already suggested, (as read):

    "Researchers must move away from
    conceptualizing social media as a
    monolith and instead of focus on
    what components of social media
    may affect development and for
    whom."

Do you see that?

A.  I do.

Q.  And that's the point that you've been making, is what are the features and functions of social media that might affect development and in what particular

Page 200

adolescents and teens; is that right?

MR. RICHARDS:  Object to form.

THE WITNESS:  I agree.

BY MS. JONES:

Q.  Okay.  And then at the conclusion of the paper, it says (as read):

    "In this annual review, we
    synthesized the emerging
    literature taking this nuanced
    approach, arguing that specific
    social media content, features,
    and functions may interact with
    adolescents' pre-existing
    individual differences and offline
    experiences to influence
    development."

Do you see that?

A.  I do see it.

Q.  Okay.  And is this the most recent literature review on this issue that you have been personally involved in, in terms of things that have been published?

MR. RICHARDS:  Object to form.

THE WITNESS:  No.  No.

Page 201

BY MS. JONES:

Q.  Okay.  What else has come out since this paper that was published earlier this year that has grappled with this question of features and functions and the extent to which they might be affecting adolescent development?

A.  Since this?

Q.  Yes.

MR. RICHARDS:  Object to form.

BY MS. JONES:

Q.  In which you were involved -- excuse me.  In which you might have been a coauthor.

MR. RICHARDS:  Same objection.

THE WITNESS:  There is another paper that came out in the New York Academies, I believe, on a similar topic.

BY MS. JONES:

Q.  This paper -- and you can correct me if I have this wrong -- I don't read this paper to reach any definitive conclusions around causal relationships between certain features and functions and any specific mental health harm in adolescents.  Am I correct in that?

MR. RICHARDS:  Object to form.

THE WITNESS:  This paper would not be a

Page 202

place where that would be discussed.

BY MS. JONES:

Q.  Okay.  And then in the acknowledgments section of the paper, Dr. Telzer and Dr. Burnell disclose that they have been retained as an expert witness -- that's what Dr. Telzer says.  And Dr. Burnell says she has served as a paid consultant in US social media litigation.

It goes on to -- you see that; correct?

A.  I do.

Q.  It goes on to say (as read):

"The remaining authors have declared that they have no competing or potential conflicts of interest."

Do you remember if, by the time you had submitted this paper, whether you had been retained by these lawyers to serve as an expert in litigation?

MR. RICHARDS:  Object to form.

THE WITNESS:  I believe that I had.

BY MS. JONES:

Q.  Okay.  And is there a reason that you did not similarly disclose your retention, as Dr. Telzer did, as an expert witness?

A.  Yes.

Page 203

Q.  Why is that?

A.  When we are asked to complete this section and the paperwork that comes along with journal publications, we're specifically asked about our financial conflicts of interest and whether we've been paid, and I answered no to those, so it was determined that I wasn't supposed to put anything in there.

Q.  Okay.  And so is it the case that in any publication on which you would have been a coauthor, since the time of your -- if a paper like that had been submitted since the time of your retention by these lawyers, you would not have been making conflict of interest disclosures because you have not been paid by them; is that right?

MR. RICHARDS:  Object to form.

THE WITNESS:  When we're asked about those disclosures, they are always about financial conflicts of interest, and we're always asked to disclose whether we're receiving payment.

BY MS. JONES:

Q.  And so absent payment, you don't think it's something you need to disclose?  Is that what I'm understanding correctly?

MR. RICHARDS:  Object to form.

THE WITNESS:  Absent payment, I'm not

Page 204

supposed to.  Yeah.  It's part of the way that articles are published.

BY MS. JONES:

Q.  When you say you're not supposed to, do you mean someone would tell you "No, don't disclose the fact that you've been retained as a witness in litigation"?

MR. RICHARDS:  Object to form.

THE WITNESS:  It's my understanding from all my years publishing and all the times that I've filled out these forms that they have always made clear that they're interested in disclosing paid engagement.  I've never heard of a case in which one discloses a situation where there's not payment.

MS. JONES:  Okay.  All right.

I don't know how long we've been going.  We could take a break -- yeah, why don't we take a break.

THE VIDEOGRAPHER:  Going off the record.  The time is 1:57 p.m.

(Recess taken from 1:57 p.m. to 2:19 p.m.)

THE VIDEOGRAPHER:  Going back on the record.  The time is 2:19 p.m.

BY MS. JONES:

Q.  Dr. Prinstein, let me ask you to go to Exhibit No. 7, if you would, please, which is the

Page 205

Burnell paper.

And this -- when we were talking earlier about what you described as an emerging -- excuse me, emerging data that has allowed you to conclude that there is a causal relationship between social media use and mental health harms in adolescents and teens, and you cited the Burnell paper in particular, meta-analysis of certain randomized controlled trials; correct?

A. Yes.

Q. And that paper is what we have marked as Exhibit No. 7 to your deposition; correct?

A. Yes.

Q. All right. And just so we're all clear about what we're talking about here -- and I'm going to say this in a layperson's way -- a meta-analysis essentially evaluates the results of a number of different studies; right?

MR. RICHARDS: Object to form.

THE WITNESS: Yeah, it's a pooled study of studies.

BY MS. JONES:

Q. Okay. And this particular meta-analysis that you cited earlier in terms of being emerging data on causation includes 32 different articles that they --

Page 206

that the authors of the paper included; correct?

A. Correct.

Q. All right. And the studies that were part of the meta-analysis did not actually include adolescents or teenagers; correct?

MR. RICHARDS: Object to form.

THE WITNESS: I can't respond to that without reviewing these more carefully. Do you want me to do that now?

BY MS. JONES:

Q. Well, let me ask you a couple follow-up questions, and we may get to the answer.

In the middle of the abstract, it says (as read):

"Thirty-two articles fit our criteria and were included in analyses."

Do you see that?

A. Yes.

Q. And then the next sentence says (as read):

"All studies included college student or adult samples."

Do you see that?

A. I do.

Q. Okay. And so these studies included in the

Page 207

Burnell paper would not have included an adolescent, unless those adolescents were somehow remarkably in college; is that right?

A. Are you defining adolescents as under the age of 18?

Q. I am --

A. Okay.

Q. -- but to be fair, I recognize that there might be some different definition of that terminology --

(Over-speaking.)

A. Yeah, I would think of it differently.

Q. That's fair. Okay. Well, let me ask you the question a different way.

This Burnell paper that you cited earlier as emerging data on causation did not include participants who were not college students or adults; correct?

MR. RICHARDS: Object to form.

THE WITNESS: That's what it says here. But, again, I would have to read all these studies over myself. I don't know what the range was or if they're just looking at the average.

BY MS. JONES:

Q. Okay. Let me just ask you a few questions

Page 208

about this paper that you mentioned earlier.

Turn to the next page, if you would for me, please. Down at the bottom of page 2 of Exhibit No. 7, there is a paragraph that begins with "Although"; do you see that?

A. I think so.

Q. On the left-hand side at the bottom?

A. Yeah.

Q. Okay. It says (as read):

"Although the association between social media use and well-being is often assumed to be negative, the effects of restricting social media use are mixed."

Do you see that?

A. I see that.

Q. And the reason that they were focused on that in particular is because this paper was, as I think you described earlier, looking particularly at how does it improve someone's well-being -- subjective well-being -- if that person limits the use of social media; is that right?

MR. RICHARDS: Object to form. Compound. Speculation.

THE WITNESS: So this paper is -- and

Page 209

again, I would need to review the specific papers in much more detail -- but this paper is discussing those that have used withdrawal randomized clinical trial design, which means that they are looking at those who have stayed off of social media for a period of time. All the papers involved probably used somewhat different methods in doing so, though.

BY MS. JONES:

Q. Okay. And when they refer to "subjective well-being," what they're specifically talking about is what does someone report about his or her or their well-being; right?

MR. RICHARDS: Object to form.

THE WITNESS: It's usually looking at self-reported indices of well-being.

BY MS. JONES:

Q. Okay. And by "indices," you just mean indicators; yes?

A. Yes.

Q. Okay. All right. So let's look -- just to clarify a couple of points, let's look at page 5. We were talking earlier about who was included in the study, and there's a section entitled "Results" on the right-hand side; do you see that?

A. I do.

Page 210

Q. And then there's a reference to "3.1. Descriptive statistics of included studies" --

A. Yes --

Q. -- right underneath that?

A. -- I see that.

Q. Yeah. And it says (as read):

"Participants included 5544 individuals across 32 studies, with 91 total effect sizes included."

Do you see that?

A. I do.

Q. And there's some additional information about the study population, but I actually want to refer you to the -- I think it's the fourth sentence that begins with "The average age..."

It's at the end of the fourth line in that paragraph.

A. Oh, I see. You mean "with only two studies having an average sample over 30"? That part?

Q. No, I don't see -- we're now looking at completely -- no. A little earlier up.

A. Oh.

Q. So if you go four lines into the paragraph, there's a "The" at the end of that fourth line.

Page 211

A. Uh-huh.

Q. It says, "The average age across studies" --

A. Yes.

Q. Do you see that?

A. Yes.

Q. Okay. (As read):

"The average age across studies was limited to emerging/early adulthood."

Do you see that?

A. I do.

Q. And it says that the minimum age was 18.80; do you see that?

A. I do.

Q. And the maximum was 34; do you see that?

A. I do.

Q. It says (as read):

"Of the 32 studies, 18 used college student samples and 14 studies used adult samples."

Do you see that?

A. I do.

Q. It says (as read):

"No studies used community youth samples."

Page 212

Do you see that?

A. I do see that.

Q. Okay. Does that clarify for you that the study population for this Burnell study that you cited earlier did not include participants who were not college age, at least?

MR. RICHARDS: Object to form.

THE WITNESS: Well, not necessarily. They're talking about the mean -- oh, they do say a minimum.

Yeah, we don't know if they -- any of these kids might have been in high school who are 18.8 as the minimum. But -- anyway, yeah, these were younger adolescents going up until early adults.

BY MS. JONES:

Q. Well, when you say --

A. Excuse me, later adolescents going into early adulthood.

Q. Okay. And at least what they suggest here is the youngest person was probably in the 17- to 18-year-old range; right?

A. That might be.

Q. Okay. And the maximum age was 34; right?

A. Yes.

Q. And we can agree that's well beyond

Page 213

adolescence; right?

A. 34 is. But it's important that emerging adulthood is considered a period of adolescence.

Q. Okay. And you know that the authors themselves actually said: we don't know whether our conclusions would be generalizable more broadly to adolescents?

MR. RICHARDS: Object to form.

THE WITNESS: I don't know if the authors said that. I'd have to read that through.

BY MS. JONES:

Q. Okay. Well, let's go to page 8 --

A. Okay.

Q. -- of this paper. Down at the bottom of page 8, there's a section entitled "Future directions: where we go from here," and then "4.2.1. Methodological advancements"; do you see that?

A. I do.

Q. It says (as read):

"Although positive improvements in subjective well-being were observed, associations were small and inconsistent across individual outcomes."

Do you see that?

Page 214

A. I do.

Q. And then at the bottom of the page, it says (as read):

"From a methodological standpoint, more must be done to recruit larger, representative samples that sample from all genders and multiple age groups."

Do you see that?

A. I do see that.

Q. And they say (as read):

"The focus on age is perhaps especially important."

Do you see that?

A. Can I just get a chance to read this paragraph?

Q. Yes, of course.

A. Okay.

(Witness reviews the document.)

THE WITNESS: Okay, yes.

BY MS. JONES:

Q. Okay. So let's go back to where we were at the very bottom of page 8 (as read):

"From a methodological standpoint, more must be done to recruit

Page 215

larger, representative samples that sample from all genders and multiple age groups."

Do you see that?

A. Was that on page --

Q. It started on page 8.

A. Yeah, I see that.

Q. And it says (as read):

"The focus on age is perhaps especially important."

Yes?

A. I see that.

Q. Do you agree with that statement, that the focus on age is perhaps especially important?

MR. RICHARDS: Object to form.

THE WITNESS: In what way? What do you mean?

BY MS. JONES:

Q. Well, in the context in which they're discussing the data.

A. That's not the way I read this paragraph.

Q. Okay. Well, let's move on. (As read):

"Meta-analytic" --

Well, let me actually ask you, did you read this paper in connection with preparing for your

Page 216

deposition?

A. Not in the last day, but I have read it in the past, yes.

Q. Okay. Got it. It says (as read):

"Meta-analytic evidence suggests limited support for the correlation between social media use and mental health varying by age."

Do you see that?

A. I do.

Q. Is that an accurate statement of the meta-analytic evidence in your assessment?

MR. RICHARDS: Object to form.

THE WITNESS: Actually, that statement is referring to the screen time issue as a measurement of -- when they're talking about that, that paper is talking about screen time. So that's not an accurate statement with regard to what we know about the effects of social media --

BY MS. JONES:

Q. In general?

A. -- overall --

Q. Okay.

A. -- but they're just talking about old

Page 217

research that used screen time.

Q. Okay. (As read):

"Therefore, it is plausible that our findings may generalize to adolescents. However, without any representation of adolescents in the current research, it is difficult to conclude that the observed effects would generalize to this population."

Do you see that?

A. I see that sentence.

Q. Okay. And do you understand that sentence to be the authors of the paper actually communicating at least one limitation on the ability to generalize the findings of their paper to a broader universe of adolescents?

MR. RICHARDS: Object to form.

THE WITNESS: Kind of. I mean, this is the limitations section of the article, so -- we all have to put this in the limitations sections of our articles. This is just a compulsory part of how we do science.

But what I'm reading is that they're actually asserting that they think that there's good

Page 218

reason to think that they would generalize to adolescents because that's what's consistent with the science in this area. We know that brain development doesn't complete until 25 in the areas of the prefrontal cortex that are relevant to some of the issues that they talk about.

We also know that a lot of the concerns that might have affected the sample would be augmented among younger kids.

So what I'm reading, and given my knowledge and the way that most -- I believe that this is appropriately interpreted, is they're saying: We have to put this statement because it's the limitations section, but we assert this is likely the case for younger adolescents too.

BY MS. JONES:

Q. Well, there's nowhere in here where they say, "We're just saying this is a limitation because we have to say it's a limitation"; right?

MR. RICHARDS: Object to form.

THE WITNESS: No, of course not. That's not the way we write articles.

BY MS. JONES:

Q. Well, you're not suggesting that they're saying that but don't actually believe it?

Page 219

MR. RICHARDS: Object to form. Speculation.

THE WITNESS: I can't speak to what they believe or not. I can just tell you that this is very boilerplate of how we do science, and this does not change my conclusions or change the meaning or the assessment of risks in any way for me.

BY MS. JONES:

Q. Okay. And Dr. Burnell is a colleague of yours at UNC, isn't she?

A. She is.

Q. Okay. Have you talked to her about this paper?

A. Actually, we've never talked about this paper.

Q. Okay. But when we were talking earlier, you cited this paper as -- I think it was the one paper that you cited in terms of emerging data on causation between social media use and mental health harms; correct?

MR. RICHARDS: Object to form. Compound.

THE WITNESS: To be fair, I was saying that this article and the citations within this article -- all the effect sizes they're talking about.

Page 220

BY MS. JONES:

Q. Sure. And what these authors actually say about the papers that are described in this meta-analysis is "We didn't look at a certain segment of the adolescent population"; right?

MR. RICHARDS: Object to form.

THE WITNESS: They said that this includes emerging adults. Emerging adulthood is part of adolescence. That's a term that we use to refer to the latter part of the adolescent period, so --

BY MS. JONES:

Q. Okay. That's fair. But what they said -- I think I'm reading this correctly, unless you tell me I'm reading it incorrectly -- that "without any representation of adolescents in the current research, it is difficult to conclude that the observed effects would generalize to this population."

Are you saying that what they said there not what they meant or that I'm reading it incorrectly?

MR. RICHARDS: Object to form.

THE WITNESS: I would say that taking out one or two sentences in the way that you are and using it to reach the conclusions that you are would be faulty. You know, in the context of how we write articles, what's standardly in limitations sections,

Page 221

what they clearly have said here, and what's known in science, that would be an inappropriate use of those two sentences to characterize this entire article.

BY MS. JONES:

Q. Okay. Well, let's look at some other sentences in this article that you invoked earlier.

Go to page 10, if you would, please. There is a paragraph that begins with the word "Finally"; do you see that?

A. The left side?

Q. Yes. Sorry.

A. Yeah.

Q. And then immediately after that paragraph, there is a statement that says (as read):

"We conclude with several recommendations."

Do you see that?

A. Yes.

Q. And the first recommendation relates to multiple assessments of subjective well-being; correct?

A. Can I just take a second to read these? Or --

Q. Of course you can.

A. Okay.

Page 222

(Witness reviews the document.)

THE WITNESS: Okay.

BY MS. JONES:

Q. All right. You've had a chance to read that list on page 10?

A. Quickly, yes.

Q. Okay. Fair enough. Item number 2 says (as read):

"Before conclusions are drawn about specific age groups and genders, research must be conducted that represents the population of interest."

Did I read that correctly?

A. That's what it says.

Q. And it goes on to say (as read):

"For example, adolescents may experience social media differently relative to older ages."

Do you see that?

A. I see that.

Q. (As read):

"Because of this, it may not be appropriate to draw causal

Page 223

conclusions on how social media affects adolescent subjective well-being when these studies remain absent."

And then they cite a relevant exception in Roberts et al., 2022. Do you see that?

A. I do see that.

Q. And this paper that you cited earlier as part of the emerging data on causation, there is not any point in this paper where the authors themselves say, "We are able to conclude, based on this meta-analysis, that there is a causal relationship between social media use and mental health harms"?

A. No, that would not --

MR. RICHARDS: Object to form.

THE WITNESS: That would not be the kind of thing that one would write in an article.

BY MS. JONES:

Q. Well, my question wasn't whether it would be something that one would write. My question was, nowhere in this paper do the authors say that?

MR. RICHARDS: Object to form.

THE WITNESS: I'm confused. I mean, they also don't include the recipe for chicken soup, but they wouldn't say that in here either. Like --

Page 224

BY MS. JONES:

Q. Well, Dr. Prinstein --

A. Sorry. I just mean, like, that's not the kind of thing that we do in scientific articles.

Q. Let's not talk about chicken soup. That's not what the case is about, or this paper.

My question was, am I correct that these authors do not say, "You can draw a conclusion from the meta-analysis that we've conducted that there is a causal relationship between use of social media and mental health harms in adolescents"?

MR. RICHARDS: Object to form. Compound.

THE WITNESS: I can't answer that unless you want me to read the article right now.

BY MS. JONES:

Q. You think it might be in there and you just haven't seen it?

A. I would be surprised if it was in there because that's not what we put in articles. But if you're asking me to specifically tell you whether or not that's in here, I need to read it.

Q. Okay. And, in fact, what they say is it may not be appropriate to draw causal conclusions on how social media affects adolescent subjective well-being

Page 225

when certain studies have not been done; right?

MR. RICHARDS: Object to form. Asked and answered.

THE WITNESS: Sorry, I -- I'm happy to read the article and talk with you more about it, but I also want to reiterate that this is the limitations section of the paper; this is compulsory text to put in the limitations section; this is not changing my conclusions nor the conclusions of people in the field. These caveats that you're pulling out one sentence at a time, they're not relevant to the conclusions that I read.

BY MS. JONES:

Q. Dr. Prinstein, you know that nothing I've been asking you about is actually in the limitations section of the paper; right?

A. It is.

Q. Well, the limitations section of the paper is actually 4.3. I haven't asked you a thing about limitations --

A. Oh, sorry. The future directions and limitations section are considered synonymous.

Q. Okay. So now -- well, let's just take a beat and make sure we're clear on what we're talking about.

The elements of the paper that I have been

Page 226

be asking you about are not in the section entitled "Limitations"; right?

A. It is unusual for articles to have separate future directions and limitations sections. Those are considered the same section in the vast majority of the research literature.

Q. Okay. Well, that's --

A. I'm referring to those two things synonymously.

Q. Well, you are. These authors separated those things out; right?

A. No, I do not know that they did versus the copy editor decided to call that section "Future directions."

Q. You understand -- but you understand I haven't asked you a single question about the limitations section. You know that; right?

MR. RICHARDS: Object to form.

THE WITNESS: I mean, it's important to know that this is information that is standard to put in all scientific articles. The way in which they've talked about it, the way in which it reflects common reviewer comments that are compulsory to put in, there is no reasonable -- it would be unreasonable to use those sentences in either the future directions or the

Page 227

limitations section to negate the conclusions from the data that are presented in this article.

Nor does any of that change my opinion based on, not just this article, but the articles that are cited within it, and the consensus emerging within the field from discussions with others doing similar research.

BY MS. JONES:

Q. Okay, I'm going to move to strike all that as nonresponsive.

Dr. Prinstein, just focusing on the article itself, not what might be implicit in the article, the section on limitations is numbered 4.3; right?

MR. RICHARDS: Object to form.

THE WITNESS: Yes, I see that.

BY MS. JONES:

Q. And although we've talked about other parts of the article, we have not yet had a chance to talk about Section 4.3 entitled "Limitations"; right?

MR. RICHARDS: Object to form.

THE WITNESS: Sorry, again, I am thinking of the limitations and future directions section similarly, but it is correct that the points that you've raised are above "4.3 Limitations."

Page 228

BY MS. JONES:

Q. All right. And I just want to make sure I understand. You're not -- are you suggesting that these authors might actually believe that there is a causal relationship between social media use and mental health harms and they simply have not said it in the paper?

MR. RICHARDS: Object to form. Speculation. Asked and answered.

THE WITNESS: I can't tell you what the authors actually think or feel.

BY MS. JONES:

Q. Okay. Well, that seems fair. All right.

Other than this Burnell paper, is there anything else that's occurred to you as emerging data on causation that you would cite for me today?

MR. RICHARDS: Object to form.

BY MS. JONES:

Q. Other than the things you've already talked about.

MR. RICHARDS: Asked and answered.

THE WITNESS: As I said, this article, the articles cited within it, and ongoing research that I've discussed with folks who are experts in the field.

Page 229

BY MS. JONES:

Q. And the ongoing research is -- that's research that's being -- where the data is being collected and analyzed currently; is that right?

MR. RICHARDS: Object to form. Compound. Asked and answered.

THE WITNESS: I mean, it's at all stages of the research process.

BY MS. JONES:

Q. And the way that, for example, I would know what that research shows, one way or the other, is that it will eventually result in a paper, if it's published; is that right?

MR. RICHARDS: Object to form. Speculation.

THE WITNESS: No. They don't all result in publications.

BY MS. JONES:

Q. Okay. Okay, I'm going to skip to something else.

Dr. Prinstein, you, in your report -- and you've testified to this today -- have focused on features and functions of social media, and Meta's platforms in particular, as sources of potential harm for adolescents, generally speaking; is that right?

Page 230

MR. RICHARDS: Object to form.

THE WITNESS: I think so, yes.

BY MS. JONES:

Q. Okay. To the extent that you have relied on studies that you say support that proposition, which of those studies actually separate out the features and the functions from what someone might see -- otherwise known as the content -- on a platform?

MR. RICHARDS: I'll object to form.

THE WITNESS: There are a number of studies that ask specifically about things like notifications, likes, beauty filters. There's also been some research that's experimentally controlled for content with those functions included or content without.

BY MS. JONES:

Q. And let me just -- just to understand your view on the topic, what in your thinking constitutes content versus being a feature or a function?

So let me start with content. What would you put on the list of content?

MR. RICHARDS: Object to form. Scope.

THE WITNESS: I suppose the content would be the text/audiovisual stimulus in isolation.

Page 231

BY MS. JONES:

Q. Okay. So content would be if you -- let's stick with Instagram -- went on Instagram and you saw that someone had posted either an inspirational message or something funny or something else; right?

MR. RICHARDS: Object to --

BY MS. JONES:

Q. In terms of text?

MR. RICHARDS: Object to form. Calls for a legal conclusion. Incomplete hypothetical.

THE WITNESS: Well, your question makes me recognize that it depends on where that content is from. If it's from someone that someone has, for instance, asked to follow, and have invited that content, versus content that was pushed from a company or an advertiser via the company, then I would think that that's -- the latter is part of the features and the functions and not just content.

BY MS. JONES:

Q. Okay. Let me take a step back.

When I asked you earlier -- I just want to be sure I'm clear. When I asked you earlier what falls into the content category, you said text/audiovisual stimulus in isolation. Generally speaking, that's what you said. What did you mean by

Page 232

say "text," specifically?

MR. RICHARDS: Object to form.

THE WITNESS: Sorry, your follow-up question allowed me to clarify that there's a difference between solicited and unsolicited text. One of them is a function of being on the platform, therefore it's a function or a feature of the platform; and the other would be text, in the same way that you might receive that text through a different channel or context.

BY MS. JONES:

Q. I want to just make sure I understand.

What, in your mind, qualifies as solicited text that would be content?

A. I mean, I guess if asked to think of that off the top of my head, I would suggest if you follow a friend, and they post something, and you have agreed to receive their posts, then that would be -- and the post is text -- then that would be the text content that you got based on the -- in a way that would be quite similar to how you might get it off of social media.

Q. Okay. So that would be content.

What would -- when you say "unsolicited text," what are you talking about specifically?

Page 233

A. So it seems like, from what I recently read in the paper, that the vast majority of what kids are now seeing on social media -- and I think this is what Mark Zuckerberg said -- is actually not content from their friends. They're now seeing content from people that they did not ask to see content from; and that, then, is clearly a feature of the platform, and that's not the content that they're being exposed to based on their selection into friends and their feeds.

Q. So you would say something is a feature rather than content if it is text that was not solicited? Is that what you're -- I want to just make sure I understand. Is that what you're saying?

MR. RICHARDS: Object to form. Scope. Calls for a legal conclusion.

THE WITNESS: I guess what I'm saying in my expertise is that, you know, if you sign on to a product to follow your friends, and then you get information that's not from your friends, that would be something that is what the product is giving you. It's not what the -- it's not what you got onto the product to interact with.

BY MS. JONES:

Q. Sure. But would that still be content? If you got a textual message of some kind --

Page 234

let's say it's an advertisement -- and it was not based on you following anyone or actively seeking out information about something, but it arrived in the form of text, would that qualify as content, in your mind, even though it was unsolicited?

MR. RICHARDS: Same objections.

THE WITNESS: No. In the literature, we talk about those as being part of the features and the functions of social media because it's things that usually are regulated and protected for kids, but they're not in this case.

BY MS. JONES:

Q. So if, for example, I am a big soccer fan -- which I confess I'm not -- but if I were a big soccer fan, and I got an advertisement for an upcoming game, would that advertisement itself, in your mind, be content or would it be a feature?

MR. RICHARDS: Object to form. Scope. Speculation. Incomplete hypothetical.

THE WITNESS: To the best of what I can surmise, if you are getting content that you didn't ask for, in the form of an advertisement, then that is coming to you through the way that the platform was built, and therefore it's a feature or a function of the platform.

Page 235

BY MS. JONES:

Q. You said earlier that based on what you read in the paper, that teens who use Instagram are seeing less of what they might get through their friends and seeing other types of information on the platform. Is that what I heard you say?

A. Yeah.

Q. And that -- I just wanted to make sure I understood the basis for that understanding. You said it's based on something you read in the newspaper?

A. Yeah. There was an article in the paper, like, two weeks ago maybe, and it talked about a hearing that was happening, and Meta employees, I guess, kind of talked about -- or maybe Mark Zuckerberg it was -- said that social media is not about talking with your friends anymore. And it specifically talked about data with the percentage of folks who -- the percentage of content that kids are seeing now that's actually not from their friends.

And within that article, there was, like, a click, and it took you, like, right to this -- and forgive me, I don't know if it was, like, a deposition or a testimony or whatever lawyers call it, but it was like a whole thing -- a dialogue -- so I look a look

Page 236

at that and, yeah, that's what it said.

Q. Were you reading that in your capacity as an expert or in your capacity as just a person in the world who's interested in these issues?

MR. RICHARDS: Object to form. Calls for a legal conclusion.

THE WITNESS: Well, I started reading it because I was quite interested in it personally, but as I read it, I was, like, wow, that seems pretty important, because here we're trying to talk about, you know, what could be potential benefits or potential harms for social media, and Meta itself is saying that they are actively taking away the benefits and they're, you know, giving kids more of what is harmful.

BY MS. JONES:

Q. Is that what you read someone from Meta saying? That they were taking away benefits and giving kids more of what's harmful?

MR. RICHARDS: Object to form.

THE WITNESS: No. My expertise and my knowledge of the science tells us that some of the things that have the potential to be helpful are things that might cultivate emotionally vulnerable relationships with known others that are identifiable

Page 237

and not, like, predators and whatnot.

So it is -- it logically follows that if you're taking away those pieces of the interaction, you're taking away the parts that science has shown might have had some benefit. And those benefits were already being outweighed by many of the negatives, but this was just even more sad to see that even that is now a very uncommon experience among kids using Meta's products.

BY MS. JONES:

Q. Is the basis for that view on the extent to which that's an element of teens' experience or not -- is it entirely reading this article?

A. No.

Q. Okay. What else are you relying on for that?

MR. RICHARDS: Object to form.

THE WITNESS: So the research that's looked at the effects of social media and mental health talks about, you know, what are the aspects that are particularly concerning, as we've been talking about. It was sad to see that there seems to be more of that now.

BY MS. JONES:

Q. Okay. Let's go back to what's content and what's feature.

Page 238

What about a photograph? Is that content or a feature?

MR. RICHARDS: Object to form. Calls for a legal conclusion.

THE WITNESS: It depends on who sent that photograph and what it's of.

BY MS. JONES:

Q. So for your -- from your point of view, whether or not something is content or a feature depends on -- at least in part, on from what source the material comes; is that right?

MR. RICHARDS: Object to form. Misstates testimony.

THE WITNESS: I believe that the -- I believe that there are things that kids are experiencing on social media that are not what is understood to be part of, for most children, what they're going on social media for. In other words, they go on to interact with kids that they know and that they want to interact with. They're getting material from people or bots that they don't know.

In addition, the lack of guardrails is part of the features in these products. So the expectation that they're going to view media that has been regulated or looked at to make sure that it's suitable

Page 239

for adults versus children is not true when it comes to Meta, and that feature -- lack of a guardrail in this case -- causes harm.

BY MS. JONES:

Q. Do you use social media?

A. A little.

Q. Which platforms do you use?

A. Right now, almost exclusively LinkedIn.

Q. Okay. That's the -- I also use LinkedIn. It's like the middle-aged to older person's version of social media. No offense, but I'm also middle-aged to old.

What else? What other platforms?

A. Well, because of my research, I've logged in and created a profile on a number of things, but they're not active. I, in many cases, haven't posted a thing.

I haven't been on -- I had a Twitter feed after I published a book, and the PR rep asked me to cultivate a Twitter feed. And I had a Facebook profile. But the Twitter and the Facebook profiles I have not logged in to since the election.

Q. The presidential election of 2024, you mean?

A. Correct.

Q. Okay. Have you done -- in connection with

Page 240

your work as an expert, have you spent any time on Instagram, evaluating the platform?

A. I have been on Instagram for that purpose. I have also -- as we talked about before, I've been part of the coding of many, many Instagram profiles of our research participants to scrape and code the data.

Q. Aside from the time you spent on -- in connection with coding data from study participants' Instagram accounts, what have you done as an expert to evaluate the Instagram platform?

MR. RICHARDS: Object to form.

THE WITNESS: Apart from coding -- you said apart from the coding?

BY MS. JONES:

Q. Yes.

A. Yeah. Most has been discussions within -- with heavy Instagram users. For myself personally, I haven't been on there very much.

Q. Okay. Have you personally spent any time evaluating features that exist on Instagram that are specific to teen users?

MR. RICHARDS: Object to form.

THE WITNESS: Can you clarify what you mean a little bit?

Page 241

BY MS. JONES:

Q. Well, are you familiar with teen accounts, for example?

A. Not with personal experience.

Q. Okay. Putting aside personal experience, are you generally -- do you have any awareness of the different elements of teen accounts?

MR. RICHARDS: Object to form.

THE WITNESS: Just a little. Yeah, I've heard of it.

BY MS. JONES:

Q. Okay. What have you heard about it?

A. Just that it exists.

Q. Okay. But you couldn't tell me, for example, what are the different elements or tools that are available through teen accounts?

MR. RICHARDS: Object to form.

BY MS. JONES:

Q. It's okay if the answer is no. I'm just trying to understand.

A. No, that's not been a part of our research.

Q. All right. In terms of other things that might qualify as content, would your answer be the same for videos --

MR. RICHARDS: Object to form --

Page 242

BY MS. JONES:

Q. And by that I mean -- I'm sorry.

MR. RICHARDS: I'm so sorry. You finish, Phyllis.

BY MS. JONES:

Q. I was about to ask you a compound question anyway, so the objection was appropriate.

But I was basically clarifying to say, would the answer be the same in terms of it depends on whether it was something that you had actively solicited by virtue of a connection with someone versus getting it without solicitation?

MR. RICHARDS: Object to form. Compound. Calls for a legal conclusion.

THE WITNESS: Yes, sorry, that's a lot. I would say the same for videos.

BY MS. JONES:

Q. Okay. What about comments? Are those content or are those features?

MR. RICHARDS: Same objections.

THE WITNESS: That's features.

BY MS. JONES:

Q. What about likes? Are those content or are those features?

MR. RICHARDS: Objection. Calls for a

Page 243

legal conclusion.

THE WITNESS: We talk about them scientifically as features.

BY MS. JONES:

Q. What about notifications? Are those content or are those features?

MR. RICHARDS: Same objection.

THE WITNESS: Same answer.

BY MS. JONES:

Q. Same answer that it's features?

A. Yeah. That's in the -- scientists talk about that as features, in my experience.

Q. Is there anything else that you would put into the category of content, beyond the things we've already talked about?

MR. RICHARDS: Objection. Calls for a legal conclusion.

THE WITNESS: We sometimes talk about the direct message feature as being similar to what could be on texting. So sometimes that can count as content, sometimes that can count as features.

BY MS. JONES:

Q. And how do you differentiate in that instance?

MR. RICHARDS: Same objection.

Page 244

THE WITNESS: Because most scientists say -- because many scientists explore -- when they look at direct messaging, it seems to be quite similar in how it functions to text messages. It might not be considered a function that's unique to social media.

BY MS. JONES:

Q. Forgive me, Dr. Prinstein, I am flipping to try to move us along.

A. Sure.

Q. It is time-saving, although...

Dr. Prinstein, let me ask you, just so I understand, are you offering any opinions that social media companies, and Meta in particular, needs to provide any kind of warnings or textual information on its platforms to provide information to parents and teenagers?

MR. RICHARDS: Object to form. Compound.

THE WITNESS: Sorry, I couldn't hear you. That does what for parents and teenagers?

BY MS. JONES:

Q. Provides information to parents and teenagers about use of the platform.

MR. RICHARDS: Same objection.

THE WITNESS: Sorry, am I testifying

Page 245

that that should happen?

BY MS. JONES:

Q. Is that an opinion that you hold in the case?

A. Oh.

Q. And if it's not, that's okay. I just need to make sure one way or the other.

A. Can you say it again? Sorry.

Q. That's okay. Are you offering an opinion in this case that Meta should require some kind of warning about the use of its platforms for adolescents or teenagers?

MR. RICHARDS: Object to form. Calls for a legal conclusion.

THE WITNESS: Yeah, I don't know that I spoke to that directly.

MS. JONES: Could I suggest that we take, like, a seven- to ten-minute break? So that will give me a chance to flip through and see what I have left and not have people sitting while I do that.

MR. RICHARDS: That's fine.

THE VIDEOGRAPHER: Going off the record. The time is 3:08 p.m.

(Recess taken from 3:08 p.m. to 3:26 p.m.)

THE VIDEOGRAPHER: Going back on the

Page 246

record. The time is 3:26 p.m.

(Exhibit No. 10 was marked for identification.)

BY MS. JONES:

Q. Dr. Prinstein, I'm handing you what we've marked as Exhibit No. 10 to your deposition.

MR. RICHARDS: Can we please have a copy?

MR. REISER: I'm so sorry.

MR. RICHARDS: No. Thank you so much.

BY MS. JONES:

Q. Doctor, have you seen Exhibit No. 10 before?

A. I have.

Q. Okay. Exhibit No. 10 is another article published by yourself, Dr. Burnell, Dr. Telzer, and others; correct?

A. Correct.

Q. And it was published in 2025; right?

A. I think so.

Q. If you look under the -- if you look at the "To cite this article" reference --

A. Yeah.

Q. -- on the second line, after Dr. Telzer's name.

A. Yeah.

Q. Okay. So the title of the article is "U.S.

Page 247

adolescents' daily social media use and well-being: Exploring the role of addiction-like social media use."

Did I read that correctly?

A. You did.

Q. Okay. In this paper, just broadly speaking, you evaluated both objectively and subjectively recorded social media use as well as self-report addiction scales and self-reported mood; is that right?

MR. RICHARDS: Object to form.

THE WITNESS: I think -- can I look over the abstract?

BY MS. JONES:

Q. Yes, of course you can.

(Witness reviews the document.)

THE WITNESS: Okay.

BY MS. JONES:

Q. Do you want me to ask the question again? Let me ask the question again.

A. Sorry.

Q. No, that's okay.

Generally, just broadly speaking, you and your coauthors, in this paper, were evaluating objectively and subjectively measured social media use

Page 248

and considering that relative to certain measures of mood and using certain addiction scales; is that right?

MR. RICHARDS: Object to form. Compound.

THE WITNESS: I -- this is studying many of the constructs you just mentioned.

BY MS. JONES:

Q. Okay. The study included, I believe, if my memory is serving me, roughly 100 or so participants; is that right?

MR. RICHARDS: Object to form.

THE WITNESS: Yes, I believe so.

BY MS. JONES:

Q. Okay. And if you want to confirm it on page 199, there's the method section --

A. Yeah.

Q. -- that describes the number of adolescents.

A. Yeah.

Q. And in the -- I guess it's the fifth line of that participants section, it says (as read):

"The current sample consisted of 103 adolescents aged 15 to 18."

Correct?

A. It does.

Page 249

Q. And then a little further down, it looks like you and your coauthors reported that, of that overall grouping, "94 had at least one day of ecologic momentary assessment data on self-report social media use"; correct -- "and subjective well-being," the next paragraph?

A. Yes.

Q. And then of those 94, 71 had at least one day of objective social media data?

A. That's what it says.

Q. All right. And I think you and your coauthors acknowledged in the limitations -- the now much-discussed limitations section of the paper that the overall sample size for the study was small?

MR. RICHARDS: Object to form.

You can answer.

THE WITNESS: Oh. I mean, I'd have to take a look, but probably did.

BY MS. JONES:

Q. Yeah. If you go to page 208 of the paper, and look at just the very first item that you all reference there.

A. Yes, I see that.

Q. All right. And that's an accurate -- recognizing what you've told me about limitations and

Page 250

how they're used in academic papers, that's an accurate statement by you and your coauthors?

MR. RICHARDS: Object to form.

THE WITNESS: It depends on the methods. For an EMA sample, it's actually not so bad, but there are other studies, obviously, that have more.

BY MS. JONES:

Q. Well, my question was, did you and your coauthors accurately report as a limitation of the study that the overall sample size was small?

MR. RICHARDS: Object to form. Asked and answered.

THE WITNESS: Although it says that here in the thing, if I had written this paragraph, I probably would not have said that. I think for an EMA study, it's not too bad.

BY MS. JONES:

Q. Okay. Well, you are a coauthor on the paper; is that right?

A. I am.

Q. And I take it from your testimony that you didn't -- well, let me take a step back.

Are you suggesting that you do not agree with certain of the limitations that are articulated

Page 251

in this paper on which your name appears?

MR. RICHARDS: Object to form. Asked and answered.

THE WITNESS: I'm just saying that if I had written each of these sentences, I might have written them a bit differently.

BY MS. JONES:

Q. Okay. Well, that part I understood. I guess my question was, are you now -- are you telling me that you disagree with that statement?

MR. RICHARDS: Same objections.

THE WITNESS: I partially agree with that statement.

BY MS. JONES:

Q. Okay. But not fully?

A. I would quibble with that statement.

Q. Okay. Are there other elements of this paper with which you would quibble?

MR. RICHARDS: Object to form.

THE WITNESS: I -- I would need to go through and rewrite this paper and show you how I would have written it, so that's going to take a while.

BY MS. JONES:

Q. Well, let me -- help me understand the

Page 252

process by which you determine that you will put your name on a paper or not.

A. Mm-hmm.

Q. When you appear as a coauthor on a paper, can someone reading that paper conclude that it is fairly reflective of your views?

MR. RICHARDS: Object to form.

THE WITNESS: Fairly.

BY MS. JONES:

Q. Let me ask -- I also paused on that adverb --

A. Okay.

Q. -- so let me see if I can do a little better.

A. Sure.

Q. When you, Dr. Prinstein, appear as a coauthor on a paper, can someone reading that paper conclude that it is reflective of your views?

MR. RICHARDS: Object to form.

THE WITNESS: No.

BY MS. JONES:

Q. Okay.

A. That is not necessarily reflective of one's views, if they're a coauthor.

Q. Are there other papers that you can think of on think you have appeared where you would say, "There are parts of that that I just don't really agree

Page 253

with"?

MR. RICHARDS: Object to form.

THE WITNESS: Most every paper has at least some piece in there that represents a compromise between the editor, the reviewers, and the investigators, and/or a compromise among the coauthors.

BY MS. JONES:

Q. Do you remember there being a specific -- I'm sure it was very civil, but a specific disagreement among you and your coauthors about whether or not it would be an acknowledgment of the small sample size for this particular study?

MR. RICHARDS: Object to form.

THE WITNESS: I don't recall any conversation about it.

BY MS. JONES:

Q. All right. Let me ask you to go to page 195, please. And I'm going to ask you to go down to the section entitled "Social Media Use and Subjective Well-Being." Do you see that?

A. I do.

Q. Okay. And the first sentence of that paragraph says (as read):

"Adolescents are heavy users of

Page 254

social media."

Then it cites to an Andersen paper from 2023; you see that?

A. I see it.

Q. And it says (as read):

"In the current study, we define social media broadly, encompassing platforms that allow for the consumption and creation of content that can be broadcasted to both broad and narrow audiences, including messaging applications."

Do you see that?

A. I see that.

Q. All right. And so, for example, that would include platforms like Instagram; yes?

MR. RICHARDS: Object to form.

THE WITNESS: Yes, that would be included.

BY MS. JONES:

Q. That definition would also include other platforms beyond Meta's platforms; correct?

MR. RICHARDS: Object to form.

THE WITNESS: It could.

Page 255

BY MS. JONES:

Q. Let me ask you to look a little further down in that same paragraph. It's eight lines up from the bottom. It's a sentence that begins with the word "However."

A. Yes.

Q. It says (as read):

"However, past research generally relies on self-report measurements, which are inaccurate of actual social media use and potentially confounded by dispositional subjective well-being."

You see that?

A. I see that sentence.

Q. Okay. Do you agree that self-report measurements of social media use can be inaccurate of actual social media use?

MR. RICHARDS: Object to form.

THE WITNESS: Sorry. Do I agree that it could be an inaccurate -- I would say that there can be discrepancies between both of those approaches of studying social media use.

Page 256

BY MS. JONES:

Q. I'm sorry, I'm not sure what you mean by "both of those approaches." What are you referring to?

A. Ways that look at tracking within an app or on a phone, which I believe in this article is referred to as "actual social media use," versus self-report of social media use.

Q. I see. I got you. We're on the same page. Okay.

And do you agree with this statement that appears in the paper on which you are a coauthor as recently as -- I guess it's a publication this year -- that self-report measurements of social media use can be inaccurate of actual social media use?

MR. RICHARDS: Object to form.

THE WITNESS: Sorry, can you say more about -- it feels like that's the same question you just asked. What do you mean this time?

BY MS. JONES:

Q. Well, I'm not sure I mean anything different than the first time, but I might have misunderstood your answer, in which case I apologize.

A. Oh.

Q. Well, let's take a step back from the paper

Page 257

itself. Do you agree that self-reported measures of social media can be inaccurate?

MR. RICHARDS: Object to form.

THE WITNESS: I would not put it that way. Self-report measures and looking at one's device provide two different metrics, and both of those variables are important for understanding kids' experience. Those measures may not say the same thing, but they're both important.

BY MS. JONES:

Q. Okay. Let me ask you -- I understand and appreciate that. Let me ask you a slightly different question, which I think goes back to this sentence in the paper.

You could have a young person who reports a certain amount of social media use, and that report could be higher than what the phone would actually show if you looked at the different mechanisms that allow you to track how much time has been spent on an app; right?

MR. RICHARDS: Object to form. Incomplete hypothetical. Speculation.

THE WITNESS: One of the reasons why you might see a discrepancy there is because self-report takes into account kids' usage across

Page 258

devices, and most devices only take into account usage on that device. So, you know, we would look at both of those as being important metrics.

BY MS. JONES:

Q. Yeah, I understand the point about them both being important. My question is, is it possible that self-report -- self-reported social media use could be either higher or, to be fair, lower than what the actual devices might reflect in terms of how much time has been spent on a social media platform?

MR. RICHARDS: Object to form. Asked and answered.

THE WITNESS: They could be higher or lower or the same.

BY MS. JONES:

Q. Let me ask you to go to page 205.

I'm sorry, Dr. Prinstein, just so I understand, that sentence that we were just talking about, you agree with that sentence, sitting here today; is that right?

MR. RICHARDS: Object to form.

THE WITNESS: I would not write that sentence today, nor would I have written it back then.

BY MS. JONES:

Q. Okay. So this is another sentence in this

Page 259

paper that was published earlier this year where you would say, "That's not how I would have said it"?

A. That's not how I would have said it.

Q. Okay. How are those -- do you remember there being any discussion amongst you and your coauthors about that particular point in the paper?

A. No.

Q. When there -- I'm sorry, go ahead.

A. So, just for your knowledge, a person can be a coauthor on a paper because they were part of the -- building the infrastructure that made it possible to do the research, or may have generated a hypothesis early on in the research process. It doesn't mean that every sentence was vetted by every coauthor or that every coauthor agrees or would have stated those sentences the same way themselves.

Q. So before a paper -- there is a process by which these types of papers would be submitted to a journal for review and consideration; right?

MR. RICHARDS: Object to form.

THE WITNESS: Correct.

BY MS. JONES:

Q. Before that submission is made for any paper where your name is going to appear, do you review every word of the paper?

Page 260

A. Not always.

Q. Do you read any part of -- let me ask you this way: Are there papers on which your name appears where you would say, "Actually, I didn't read that manuscript before it went into the journal for review and consideration"?

A. I mean, there's probably been an instance or two where that's happened. But at what point you read it is very different. You might read a very early draft; you might read a late draft; you might read a draft after reviewer comments. It varies so much from paper to paper.

Q. Do you remember whether you -- I'm sorry if I asked you this and I just don't remember the answer. Do you remember whether this was a paper where you actually reviewed the manuscript before it went into the journal?

A. I was not personally very heavily involved in this one. We wrote it way before 2025, and I had just started my role at APA.

Q. Okay. Well, let me ask you about a couple of other points that are reflected in the paper to see if you recall them being here and whether you agree or not.

On page 205, there's a section entitled

Page 261

"Daily associations between social media use and subjective well-being"; you see that?

A.  I see that.

Q.  And it says, at the beginning of that section (as read):

> "In examining associations with subjective well-being, past research suggests that negative associations would emerge for self-reported social media use and null associations would emerge for objectively reported social media use."

Do you see that?

A.  I do see that.

Q.  And it goes on to say (as read):

> "Counter to these studies, daily self-reported social media use was not associated with subjective well-being at the within- or between-person level, and objectively recorded social media use was associated with greater depressive negative affect at the within-person level."

Page 262

You see that?

A.  I do.

Q.  And when it says here, "within- or between-person level," what does that mean, specifically?

MR. RICHARDS:  Object to form.

THE WITNESS:  Between-personal effects are suggesting that if your use is higher than the person sitting next to you, within-person effect suggests that your use is higher than your own use on a different day.

BY MS. JONES:

Q.  In the next paragraph, it says (as read):

> "On days in which adolescents engaged in greater (objective) social media use relative to their own average" --

So that would be within-person; correct?

A.  Yeah.

Q.  Okay.  (As read):

> "On days in which adolescents engaged in greater (objective) social media use relative to their own average, they reported greater depressive negative affect

Page 263

> throughout that day."

Did I read that correctly?

A.  You did.

Q.  Is that an accurate recitation of the findings of this study?

MR. RICHARDS:  Object to form.

THE WITNESS:  I would have to read this one over again and look at the results.  I can do that now.

BY MS. JONES:

Q.  No, no, no.  I don't want to push you to that.  If you're not sure, that's okay.  I was just asking if you knew one way or the other.

A.  Oh.  I don't feel like I can comment on that right now.

Q.  Okay.

A.  I could read it and comment on it, but --

Q.  It may not be necessary for our purposes.

It goes on to say (as read):

> "This association is not indicative of a cause-and-effect relation."

Do you see that?

A.  I do.

Q.  All right.  Same question.  Do you know

Page 264

whether that is an accurate recitation of the results of this research?

MR. RICHARDS:  Object to form.

THE WITNESS:  I can't speak to that.

BY MS. JONES:

Q.  Let me ask you to go to 208 -- page 208, and to the conclusions section in particular.

Dr. Prinstein, did you review this paper after it was published in its final form?

A.  I did read it over at some point.

Q.  Okay.  In the conclusions section, it says (as read):

> "This study found some support that objectively measured social media use may be linked with facets of subjective well-being, with these associations not moderated by adolescents' trait levels of addiction-like social media use."

Then it goes on to say (as read):

> "As this study cannot attest to the directionality of these associations, future research should probe this further."

Page 265

Do you see that?

A. I do see it.

Q. Now, that sentence about the study's ability to attest to the directionality of these associations, is that a statement that you agree with, one way or the other?

MR. RICHARDS: Object to form.

THE WITNESS: I actually thought that there were temporal findings here, so I'm not sure what that sentence is referring to, specifically, out of context.

But there are temporal associations that are discussed here which would speak to direct of effects. I can pull some out if you want.

BY MS. JONES:

Q. Well, I guess my question is, are you saying that you think that this statement in the conclusion doesn't accurately reflect the actual findings of the study?

MR. RICHARDS: Object to form. Speculation.

Dr. Prinstein, if you need to review the document to answer, you can.

THE WITNESS: I should probably review this.

Page 266

BY MS. JONES:

Q. Well, if you need to read the entire thing, I would probably give you a break to do that. But my question is just, do you know whether that statement is an accurate recitation of the findings of the study?

MR. RICHARDS: Same objection.

BY MS. JONES:

Q. If you don't know, that's okay. I'm just asking.

A. Yeah, I can't answer that right now. I would be surprised if any sentence in the conclusions accurately represents all of the results in any study. The conclusions are usually pretty broad-brush summaries that do not get to the intricacies and nuances of the study.

(Exhibit No. 11 was marked for identification.)

THE WITNESS: Another one?

BY MS. JONES:

Q. Yes.

One of the things, Dr. Prinstein, that your report specifically refers to is the effect of social media use and the extent to which it disrupts things like sleep in adolescents. Am I generally describing one of the points you address in your report?

Page 267

A. I believe so.

Q. Okay. I want to look at at least one of the papers that you cite on that point. At Exhibit No. 11 to your deposition, you have the Carter paper, which is cited in your May 16, 2025, report. Do you recognize that?

A. Yes.

Q. And just to get ourselves situated relative to your report itself, if you wanted to, you could go to page 23, paragraph 52.

A. Okay.

Q. Okay. And you, in paragraph 52, say -- the subject heading of this section is "Problematic social media use disrupts opportunities to engage in offline, healthy, necessary activities"; correct?

A. That's what it says.

Q. And the paragraph begins with (as read):

"Research has consistently demonstrated that inadequate sleep changes" --

Let me start over. (As read):

"Research has consistently demonstrated that inadequate sleep changes how adolescent brains develop, as described above.

Page 268

Recent meta-analyses (i.e., studies that synthesize a large group of studies) have revealed that screen time is the main reason for low sleep duration, disrupted sleep, and poor quality sleep, with a recent study of 12-19-year-olds finding an average of 79 minutes of self-reported time on screen devices after 9:00 p.m. on school evenings."

Did I read that correctly?

A. You did.

Q. And the studies that you cite in connection with that particular statement in your report, those studies are focused on screen time generally as opposed to social media or Meta platforms specifically; is that right?

MR. RICHARDS: Object to form. Compound.

THE WITNESS: I believe some of them do look at social media. I would have to review these again.

BY MS. JONES:

Q. Okay. Sitting here today, could you point me

Page 269

to one that specifically speaks to social media specifically as opposed to device time more generally?

MR. RICHARDS: Object to form. Speculation. Asked and answered.

THE WITNESS: I'd have to look at this some more, but I think that the Han, Zhou, and Liu article is talking about social media use, if I recall correctly.

BY MS. JONES:

Q. Okay. Are there any others?

MR. RICHARDS: Same objections.

THE WITNESS: I would need to review these articles to remember what they included.

BY MS. JONES:

Q. Okay. Well, why don't we look at at least one. We probably won't march through all of them.

A. Okay.

Q. But you should have in front of you Exhibit No. 11, which is the Carter paper referenced at Footnote 81 in your expert report.

A. Okay.

Q. Do you recognize that, Dr. Prinstein, as that paper?

A. Yes.

Q. Okay. And this was a paper that was also a

Page 270

meta-analysis; yes?

A. Yes.

Q. And specifically a meta-analysis of the effect of portable media devices on sleep outcomes; correct?

MR. RICHARDS: Object to form.

THE WITNESS: I believe so, to the best I can recall.

BY MS. JONES:

Q. And your -- you're welcome to look at whatever parts of this that you would like or need to, but this study does not actually speak to social media specifically as opposed to device use in general; right?

MR. RICHARDS: Object to form.

Dr. Prinstein, if you need to review, you should take that chance.

THE WITNESS: Yeah, I need to review.

(Witness reviews the document.)

THE WITNESS: So as this article is a meta-analysis, it would be necessary to look at all of the studies that were included. Undoubtedly some of them looked at social media and some of them did not, and the authors had to make omnibus conclusions across all of those.

Page 271

BY MS. JONES:

Q. Now, you cited the Carter paper in your expert report at Footnote 81; correct?

A. I did.

Q. At that time when you cited it, did you go and look at all of the underlying papers that were the component parts of the meta-analysis?

A. At the time that I cited it, two things led to my use of this paper.

One is that, yeah, some of the papers, I believe, do include social media, as I -- if I recall correctly.

And the second is that we have data indicating that what most kids do on their devices, including tablets, that's listed on here as being one of the main inclusion criteria, is social media use. So it's very safe to conclude that media device use, when kids are using media devices mostly for social media, means that social media is a prime reason as to why sleep is deprived or disrupted.

Q. Do you remember what my question was, Dr. Prinstein?

A. Yes. You asked me if I read all of the articles in here to look at social media use, if I recall.

Page 272

Q. Yes. My question was, when you cited this in connection with your report, did you go and look at the underlying studies that made up the meta-analysis?

MR. RICHARDS: Object to form. Asked and answered.

THE WITNESS: Sorry, I thought I already answered. I did look up enough to believe that it was an appropriate cite.

BY MS. JONES:

Q. What do you mean you looked up enough?

A. I saw that several of them did include social media, and, like I said, that combined with our knowledge of what kids use their devices for, this is a relevant citation.

Q. When you say you saw that several of them dealt with social media, did you go and pull the papers and look at them? Or did you just look at the list of references at the back of the paper?

MR. RICHARDS: Object to form.

THE WITNESS: No, I said that I went and I looked at these -- the papers.

BY MS. JONES:

Q. Which ones?

A. I don't remember.

Q. Okay. So you couldn't tell me that today?

Page 273

A.  I can't today.

Q.  Let me ask you to look at what we're going to mark as Exhibit No. 12.

(Exhibit No. 12 was marked for identification.)

BY MS. JONES:

Q.  Dr. Prinstein, Exhibit No. 12 is a paper on which you are again a coauthor.  Do you recognize Exhibit No. 12?

A.  I do recognize it.

Q.  Okay.  Is this a paper on which you recall -- scratch that.

Is this a paper for which you actually conducted a review of the manuscript before it was submitted to the journal for consideration?

A.  Not very much.  This is the same sample as the other paper, and I wasn't involved in data collection on that sample, so I was more at arm's length from the papers that came from this one.

Q.  Okay.  Do you know -- and you're welcome to look if you want to -- do you know whether this paper specifically looked at social media use in terms of how the study participants were making use of their phones?

MR. RICHARDS:  Object to form.

Dr. Prinstein, if you need to review, you

Page 274

should take that time.

THE WITNESS:  No.  Thank you.

I do know that we looked at the specific apps that kids were using on their devices.  Instagram was one of the most frequent.

BY MS. JONES:

Q.  How do you know that based on looking at this paper?

MR. RICHARDS:  Object to form.

THE WITNESS:  I know this dataset, and I know what we did, and we got the screenshot -- if you look on your device, it doesn't just give you a read-out of what times and how long you spent, but it also tells you what apps you used for each pickup, how long you spend on each app, and all of that is part of the data.

And we looked at this to make sure that what we were talking about was going to be relevant to other studies that we're doing and serve as relevant background for other work, and we confirmed that the top three apps that kids were using included -- well, in this case relevant, Instagram, but were primarily social media.

BY MS. JONES:

Q.  Okay.  Well, let's look at what the study

Page 275

actually says.  This is described as report on "Daily links between objective smartphone use and sleep among adolescents"; correct?

MR. RICHARDS:  I'm sorry, Counsel, could I ask where you're looking?

MS. JONES:  I apologize.  The first page, just the title.

THE WITNESS:  Okay.

BY MS. JONES:

Q.  Are you there, Dr. Prinstein?

A.  I am.

Q.  Okay.  And this was published in 2024; right?

A.  Oh, sorry, yes, '24.

Q.  Okay.  And it says in the abstract -- in the introduction for the abstract, it says (as read):

"Concerns abound on how digital technology such as smartphone use may impair adolescent sleep. Although these linkages are supported in cross-sectional studies, research involving intensive longitudinal assessments and objective measures has called into question the robustness of associations."

Page 276

Do you see that?

A.  I see that.

Q.  Is that an accurate statement?

MR. RICHARDS:  Object to form.

THE WITNESS:  No.  This is an area where there's been such extensive research that's been going on, not only in our field but also in sleep medicine.  It's also something we talked about at great length within our advisory panel.  And I would say that it is extremely and strongly agreed upon among scientists that the link between social media use specifically and sleep disruptions has been extremely well established.

So I understand we're talking about just this paper, and there may be some sentences here and there in this paper, but I just wanted to provide you the broader context that this paper, written in 2022, submitted in '23, just taking us up to today, like, this is an area where there is very, very little question about the effects on sleep.  In fact, I've been -- I've talked with many different professionals outside of psychology about their primary concern for this in pediatric sleep medicine and so on.

BY MS. JONES:

Q.  I'm going to move to strike all of that after

Page 277

the word "no."

Did I correctly understand you to say that the very first -- the second sentence in the abstract of this paper is incorrect?

MR. RICHARDS: Object to form. Asked and answered.

THE WITNESS: Sorry, to clarify, what I'm saying is that that sentence out of context would not be correct today.

BY MS. JONES:

Q. Okay. And then in the results section of the abstract, it says (as read):

"On days when adolescents engaged in greater nighttime screen time and, to some extent, pickups relative to their own average, they also had poorer sleep outcomes that night."

Do you see that?

A. No. Sorry, I'm not there yet.

Q. I'm still in the abstract --

A. Oh, you're in the abstract still. Oh, the results section of the abstract.

Q. Yes. I apologize, I wasn't clear about that.

A. Okay. I see it, yeah.

Page 278

Q. And then in the results section, it says (as read):

"On days when adolescents engaged in greater nighttime screen time and, to some extent, pickups relative to their own average, they also had poorer sleep outcomes that night."

Do you see that?

A. Yes, sorry, I'm catching up with you.

Q. It's okay.

A. Yes, I see that.

Q. It says (as read):

"Greater screen time was associated with later self-reported and Fitbit-recorded sleep onset and poorer self-reported sleep quality. Greater pickups was associated with later self-reported and Fitbit-recorded sleep onset."

Do you see that?

A. I see that.

Q. And then it says (as read):

"Smartphone use during the day did

Page 279

not relate to sleep outcomes, indicating the importance of distinguishing nighttime from daytime use."

A. That's correct. It says that.

Q. All right. And then if we go back to the section that you have previously referred to as "Limitations and Future Directions," which is on page 1178, the very first section of that -- very first sentence of that section says (as read):

"Study conclusions must be made in the context of several limitations."

Do you see that?

A. I do.

Q. Is that an accurate statement?

A. I think that sentence is in almost every article that I have ever written exactly as it is. That's the standard beginning to one's limitations section irregardless of the content or the topic of the paper.

Q. Sure. And my question wasn't, is it commonly used? My question was, is it accurate as reflected here?

MR. RICHARDS: Object to form.

Page 280

THE WITNESS: I guess I would say that every study must be considered in light of its limitations.

The point that we were discussing earlier is that there's no sentence in this study, or no finding in this study, that is, frankly, really relevant at all compared to what we now know from the general consensus of far more research and far more recent research.

BY MS. JONES:

Q. Well, let me just pause you for a second there. When you say there's nothing in this study that is, frankly, really relevant at all, what does that mean exactly?

MR. RICHARDS: Object to form.

THE WITNESS: So the way that science works is that not only is any one sentence not going to really be very meaningful in the scientific literature when taken in isolation, there are not that many studies that by themselves might kind of advance the literature. Now, some do, to be fair. But what we usually do, and the reason why we've been talking about meta-analyses so much, is that we look at general consensus and correspondence across many studies.

Page 281

And again, I mean, we can -- you know, I'm happy to continue talking about this study, but it's important to recognize this is an area where there's very strong consensus within the literature across many, many articles that have clearly concluded that social media use, including Instagram in particular, is disrupting sleep; and that disrupted sleep is leading to a host of long-term and short-term -- the next day, as well as long-term difficulties.

Those include things like emotional volatility, increased driving accidents, obesity, depression, anxiety. And for long-term, it's disrupting the development of white matter in the brain and actually changing the size of white matter within the brain over time.

These are clear conclusions that have been reached in the literature. Each one of the studies that have been used to talk about that are considered in the context of their limitations together. There's clear consensus on this point.

BY MS. JONES:

Q. Well, let me ask you about one specific limitation, going back to something we talked about earlier in terms of whether there was a specific analysis of what was being done on the smartphones by

Page 282

the study participants.

You see at the bottom of "Limitations and Future Directions," there's a reference to the fifth limitation? It begins with the word "Fifth" in the sentence?

MR. RICHARDS: I'll just object to the preamble.

THE WITNESS: I do see that.

BY MS. JONES:

Q. Okay. It says (as read):

"Fifth, our data can only attest to general links between smartphone use and sleep outcomes."

Do you see that?

A. I do see that sentence.

Q. And it goes on to say (as read):

"For example, it is unclear if and how specific types of smartphone content may relate to sleep outcomes."

Do you see that?

A. I do, but that's no longer accurate.

Q. Okay. When did it cease to be accurate, in your view?

Page 283

A. Shortly after writing that sentence, and we went back to our data to look at, as I mentioned, the data that we have that looked specifically at what apps kids were using on the screenshot within the screen time piece; and, as I mentioned, it was clear that the primary drivers of this effect were social media, with Instagram being one of them.

Q. Is there a specific paper that you are thinking of that was published following this paper in 2024?

A. No. We didn't publish that finding. That would be what we would call piecemeal publication in the literature. We're not allowed to publish substantially the same finding over.

Q. Okay. I just want to make sure I'm clear on kind of the sequence of events here. So the paper that we have that was submitted a year or two ago but was published last year includes among its statement of limitations a statement that it is unclear if and how specific types of smartphone content may relate to sleep outcomes. Those words appear in the study; correct?

MR. RICHARDS: Object to form.

THE WITNESS: Those words appear in the study.

Page 284

BY MS. JONES:

Q. Okay. And then if I understand your testimony, you said that ceased to be correct almost right after -- when? The publication of the study itself in 2024?

A. After the acceptance of the paper.

Q. Okay. So that would have been -- just looking at the first page -- October of 2023?

Oh, sorry, "Accepted March of 2024." So March 28th, 2024, is when it was accepted, according to page 1171.

A. Yeah, I see that date. Yes, it was probably right around then that we did supplementary analyses.

Q. All right. So your testimony is that you submitted a paper for publication in March of 2024 that said, "We would need to" -- it's unclear if and how specific types of smartphone content may relate to sleep outcomes. And then you all went back and looked at the data that you had sometime after March of 2024; is that right?

A. I can't attest to the specific dates that you're talking about. But generally speaking, yeah. That's how science works. It's very cool; we get to dig even deeper into our own data that informs our next studies, and that's a normal, common thing that

Page 285

we do when we publish papers in science.

Q. Yeah. How science works is not what I'm focused on. I'm just focused on the sequence of events here.

So you submitted the paper that included that language, and sometime thereafter, you all went back and looked at your data again; is that right?

MR. RICHARDS: Object to form. Asked and answered.

THE WITNESS: Yeah, I believe that that is the case. That's what I said, yeah.

BY MS. JONES:

Q. And what did the new look at your data reveal --

MR. RICHARDS: Object to form.

BY MS. JONES:

Q. -- that had not been reflected in this manuscript that you had just submitted?

MR. RICHARDS: Object to form. Vague.

THE WITNESS: Oh, sorry, I thought I answered that.

We, in fact, did go back to look at what were the apps that kids were using during those times of night, and we were able to determine which were the top apps, and Instagram was one of them.

Page 286

BY MS. JONES:

Q. And my question is, if I wanted to confirm that --

A. Yeah.

Q. -- where could I find that?

A. I'm telling you, under oath. I'm telling you right now.

Q. And that is meaningful to me, Dr. Prinstein. However -- and I am interested to know whether I could find anywhere in publicly available sources, including the peer-reviewed literature, where you and your coresearchers and authors have said, "Actually, we looked back at our data and we determined that we know how the phones were used, and it was Instagram" --

MR. RICHARDS: Object to form.

BY MS. JONES:

Q. -- could I find that if I was looking at publicly available sources?

Sorry.

MR. RICHARDS: No, I'm sorry. Object to form.

You can answer, Dr. Prinstein.

THE WITNESS: Yeah. Even I have done talks where we referenced these and other data so many times, and we talk about it in those talks.

Page 287

BY MS. JONES:

Q. Okay. Anywhere else I could find that?

A. Unfortunately, we're not allowed to republish findings like that. That would be considered piecemeal publication.

Q. Are you permitted to do addenda or supplements to existing research?

MR. RICHARDS: Object to form.

THE WITNESS: No -- I don't know of a case where people add on an addendum in the psychological science literature like that.

BY MS. JONES:

Q. Okay.

A. To be fair, like, I know that you all, sitting right here, think that the distinction between general smartphone use and social media is an extremely big deal and is probably pivotal for the way that you want to talk about this, but in the scientific literature, just going back to say, "By the way, we looked that up, and that one sentence, we can now add another sentence," that wouldn't be enough to write up a whole addendum.

Q. Okay. I'm going to move to strike all of that.

Make no assumptions about what we think is a

Page 288

big deal or not --

A. Okay.

Q. -- okay? Don't assume anything. I'm just trying to understand the facts, in terms of what you've told me about what you've said in the peer-reviewed literature and what you've also said you did that I could not find anywhere in the peer-reviewed literature. That's all I'm trying to --

A. Oh, okay.

Q. -- that's all I'm trying to sort.

A. Well, the facts are that both in this dataset and in the general consensus, social media, including Instagram's products, are directly responsible for disrupting sleep in multiple ways, not just delayed sleep onset, but leading to sleep disruptions and leading to changes in the stages of sleep.

So there's been a lot of research on this, and each and every one of those things has various kind of sequelae that are damaging to kids' development, as I said, both short-term and in terms of long-term for brain development.

Q. Is there another paper that you're thinking of at this moment that makes that specific point as to Instagram?

MR. RICHARDS: Object to form.

Page 289

THE WITNESS:  As you noted in the papers -- so because people sometimes assess it at the platform level and sometimes don't, the papers are likely to cut across and use a broad generalized statement about, in this case, device use or something like that.

So the data are -- there are data that speak to that, and again, as part of my general knowledge, this is exactly the kind of thing scientists talk about, but it's unlikely to be published because that would be a small kind of molecular look at this, which is generally not the way that science looks at it. We're not doing the science by platform, although we have those data and we talk about them.

BY MS. JONES:

Q.  But you're offering specific opinions about Meta's particular platforms in your role as a litigation expert; correct?

A.  I am because --

Q.  Okay.

A.  -- I've talked with investigators about their data, we've looked specifically at what products, and we also have that data ourself, as we've just talked about.

Q.  Understood.  My question is simply, sitting

Page 290

here today, as a person who does not have access to all these other repositories of data, could you point me to any study that makes the point that I've heard you make now repeatedly today, that there is some kind of consensus view that Instagram use is negatively affecting sleep?

MR. RICHARDS:  Object to form. Compound.  Asked and answered.

THE WITNESS:  I don't know that I can answer that any more than I have without, like, a real second deep dive into the literature.

The papers that I cited in my report reflecting the concerns about Meta are based on my general knowledge and the citations in here.

BY MS. JONES:

Q.  Sure.  My -- that's okay --

A.  Yeah.

Q.  -- I'm not -- this is not criticism.  I'm just trying to understand.  If there is a study that you're relying on that is related to Instagram and effects on sleep, I need to understand what that study is that is publicly available and published in the peer-reviewed literature.

MR. RICHARDS:  Same objections.

THE WITNESS:  I would need to look

Page 291

through the literature -- maybe.  I just can't answer that right now.

BY MS. JONES:

Q.  Okay.

Dr. Prinstein, do you agree that social media, including Meta's platforms, can play a positive role in people's lives?

MR. RICHARDS:  Object to form.

THE WITNESS:  There have been some data about possible positives.  I think the question ends up being how they're outweighed by possible negatives, and whether those positives are even possible anymore given how the platforms have changed.

BY MS. JONES:

Q.  Okay.  So my question is -- was probably more simple than was entirely clear.  My question is simply, do you acknowledge the possibility that social media can be a positive element of certain people's lives?

MR. RICHARDS:  Object to form.  Asked and answered.

THE WITNESS:  I used to think that that was possible, but I'm now -- I'm now seeing that the negatives tend to, more often than not, outweigh the positives.

Page 292

BY MS. JONES:

Q.  Are you an advocate for a ban on the use of social media for adolescents and teenagers?

MR. RICHARDS:  Object to form.

THE WITNESS:  I'm not an advocate one way or the other on that.

BY MS. JONES:

Q.  Let me ask you to go back to what I think was Exhibit 6, your 2023 Congressional testimony, which will be in your pile.

A.  Exhibit 6?

Q.  Yes.  You recognize that as your February 2023 written testimony?

A.  Looks like it probably is, yeah.

Q.  Okay.  Let me ask you to go to page 14.

On page 14, there's a section of your written testimony entitled "Potentially Beneficial Effects of Social Media Use"; correct?

A.  I see that.

Q.  All right.  You write here (as read):

"It is important to acknowledge that research on social media use and adolescent development is relatively new, as are many social media platforms."

Page 293

Correct?

A. It does say that.

Q. All right. And (as read):

"In addition, there has been remarkably little funding designated for research on this topic."

Correct?

A. It says that.

Q. And (as read):

"Consequently, the long-term effects of social media use on youth development is relatively uncharted."

Do you see that?

A. I see that.

Q. Is that a true statement?

A. Well, it's less true now than it was in 2023; but, of course, we can't know the long-term effects beyond the length of time that social media has existed.

Q. And, in fact, what you go on to say in that same paragraph is (as read):

"It is unknown whether adolescent brain development, known for its

Page 294

plasticity, may 'correct' some of the alter-"

I think that's supposed to say "alterations."

"... in brain structure or function, whether compensatory neural processes may develop, or whether these alterations may confer unknown future strengths."

Do you see that?

A. I see that.

Q. And when you wrote it at the time, and submitted it to the United States Senate, was that an accurate recitation of your views?

A. At the time, that was what I believed.

Q. If you go down to the next paragraph on page 14 of your 2023 Congressional testimony, it says (as read):

"In addition, there is some research demonstrating that social media use is linked with positive outcomes that may benefit psychological development among youth."

Do you see that?

Page 295

A. I do see that.

Q. Is that an accurate statement?

A. So let me digest these sentences that you're asking me to look at.

Q. Sure.

A. In twenty-twenty- -- a couple of things have been really critical to consider here. One is that research has evolved. The second is that social media has changed, in and of itself, over time.

In 2023, we -- we now know that the changes to the brain are actually setting kids up for more clinical dependence, which leads to more problematic social media use, which sets the stage for no opportunity for correction, as it says.

And then the piece about the positive outcomes, we also -- in 2023, there wasn't as much AI that was going on, and there wasn't as much research on some of the cyber hate that was going on as well; so we also know this to be now updated.

There are other things, too, that have changed, of course. I'm just giving a couple of examples.

Q. When you refer to cyber hate, would you put that into the category of content or features?

MR. RICHARDS: Object to form. Calls

Page 296

for a legal conclusion.

THE WITNESS: I can't speak, you know, legally to what's content or features. But here's the concern: Kids are logging in to talk with their friends, and they're getting porn, predators, exposure to discrimination based on race, ethnicity, religion, sexual/gender identity; and the research demonstrates that -- and this is all because things are being pushed to them, so I would call that a feature; right? It's getting pushed to them. And the research shows that that cyber hate is damaging because of the features. And let me explain what I mean.

The research is showing that kids who experience cyber hate -- excuse me, hate or discrimination offline, the experience of what's happening online is not only incrementally harming them, but it is harming them worse; and the reason why is because of the likes and the comments and the re-posting. It creates an add-on.

In fact, the research has clearly demonstrated that even kids who are vicariously watching others experience cyber hate are having anxiety and depressive symptoms longitudinally following that exposure. And you don't see that with offline.

Page 297

So to me, it's a really clear instance of where the features that are on social media are changing how people consume the content and are actually creating the harm in a way that goes well beyond what kids are already experiencing discriminatory offline, and that's been really concerning within the scientific community.

BY MS. JONES:

Q. I'm not -- I may have heard an answer to my original question, but my original question was just, when you're talking about things like cyber hate or porn or exposure to discriminatory interactions, is that content or is that features?

MR. RICHARDS: Object to form. Calls for a legal conclusion. Asked and answered.

THE WITNESS: If -- I mean, I can't speak to how others might think of the difference between content and features --

BY MS. JONES:

Q. Sure. I'm just asking you what you think.

MR. RICHARDS: Same objections.

THE WITNESS: What I think is that if Meta does not have guardrails to protect kids from offensive content, and if they include features like likes, comments, pushing out the content, allowing

Page 298

them to see content they didn't ask for, that's the responsibility of Meta and the way that the platform is designed. That's different than the way that they think about content on, let's say, TV.

BY MS. JONES:

Q. How -- to what extent, as part of your role as an expert, have you actually specifically evaluated whether Meta has guardrails for addressing some of these issues that you've raised?

MR. RICHARDS: Object to form. Scope.

THE WITNESS: So that's been a significant part of my work at APA and working with the advocacy team at APA, where together we have been looking at the guardrails, as you say, or the ways in which Meta has created protections or not, or in some ways actually incentivized people to -- incentivized a system that has led kids to be exposed to things that are harmful to them.

BY MS. JONES:

Q. As I read your expert reports, I don't actually see any specific discussion of guardrails that the company might have implemented. Am I -- did I miss that, or is that in there somewhere?

MR. RICHARDS: Object to form.

THE WITNESS: I don't believe that

Page 299

I discussed them except in, I think, one section, where we talked about some of the performative measures that it's clear that Meta has proposed, maybe used in a subsample at some other time, that within our conversations and our work on this we've kind of thought of as tissue paper barriers that seem to create the illusion that there's something being put in place that might help kids, but in fact are pretty weak and effectively don't stop many kids at all and doesn't really solve any of the problems that we're facing right now because of Meta.

BY MS. JONES:

Q. Let me -- let me ask you a related question, which is, to what extent have you evaluated guardrails that have been put in place by other social media companies to protect adolescents and teenagers?

MR. RICHARDS: Object to form. Scope.

THE WITNESS: Yeah, that's been a big part of the discussions we've had at APA. My -- the person we talked about before, Corbin Evans, and I, we've been doing a lot of work on this topic, and he is the advocacy and legal piece of this, and I'm the scientific piece of this, so I've -- together we've learned quite a lot about exactly those things.

Page 300

BY MS. JONES:

Q. Well, I want to make sure we're talking about the same things. When you have -- what you just said about Meta's guardrails that it has implemented for adolescents and teenagers, have you conducted a similar assessment of guardrails or tools or protections that other social media companies have implemented --

MR. RICHARDS: Object to form --

MS. JONES: -- for teenagers?

MR. RICHARDS: Object to form. Compound. And scope.

THE WITNESS: Yes, we've discussed that across multiple companies.

BY MS. JONES:

Q. Because your role at the -- putting aside what you might be doing as an expert, your role at the APA is not intended to be just about Meta; is that right?

MR. RICHARDS: Object to form.

THE WITNESS: I mean, the role at APA -- my -- you know, what we do at APA is we try and use science to improve people's lives.

BY MS. JONES:

Q. Well, sure. And doing that is not just about

Page 301

focusing on one specific company; right?

MR. RICHARDS: Object to form.

THE WITNESS: It's not restricted to Meta.

BY MS. JONES:

Q. Okay. Your -- the criticisms you've offered in your expert role have been focused on Meta, however; right?

MR. RICHARDS: Object to form.

THE WITNESS: I've been asked to write a report to focus on Meta.

BY MS. JONES:

Q. Okay. Asked by lawyers who are suing the company; correct?

MR. RICHARDS: Object to form.

THE WITNESS: I'm not sure I understand. It feels irrelevant to talk about something that I wasn't asked to talk about, so --

BY MS. JONES:

Q. You don't have to adjudicate what's relevant or not. My question is just --

A. Oh, no, I'm saying, for me, it did not feel appropriate to talk about something -- I was asked to talk about the science of what we know about Meta, and that's what I did.

Page 302

Q. Sure. My question was simply that your report in this case focuses on Meta because the lawyers who hired you asked you to focus on Meta; right?

MR. RICHARDS: Object to form.

THE WITNESS: I restricted my conversation to Meta in this report because I believed that that was what was being asked of me.

BY MS. JONES:

Q. By the lawyers who hired you; yes?

MR. RICHARDS: Object to form.

THE WITNESS: I guess so. My understanding of the complaints, yeah.

BY MS. JONES:

Q. Yeah. And the lawyers who hired you, you know are bringing a lawsuit against Meta; right?

MR. RICHARDS: Object to form.

THE WITNESS: I am aware that there's a lawsuit.

BY MS. JONES:

Q. Let's go back to Exhibit No. 6, page 14.

A. Yeah.

Q. Towards the bottom of that same page, there's a sentence that begins with "Perhaps most notably"; do you see that? Towards the bottom. The last

Page 303

sentence -- the last paragraph that begins with --

A. Yeah, I got it.

Q. (As read):

"Perhaps most notably, psychological research suggests that young people form and maintain friendships online."

Do you see that?

A. I see thatness.

Q. Is that a true statement? Let me not say "true." Is that an accurate statement?

MR. RICHARDS: Object to form.

THE WITNESS: Sadly, not anymore. Not after the comments that were made about kids barely being exposed to their own friends' content anymore; they're seeing more content from people they're not friends with. I think the quote was something like "social media isn't social anymore" -- is what I read in the paper.

BY MS. JONES:

Q. This is the quote from Mark Zuckerberg?

A. Yeah.

Q. Okay. It goes on to say (as read):

"These relation-" --

Let me just pause for a second.

Page 304

Is your exclusive basis for saying that this statement in your written testimony is not true the comment that you read from Mr. Zuckerberg?

MR. RICHARDS: Object to form. Misstates testimony.

THE WITNESS: No, it's not. So obviously we're collecting data all the time to learn about kids' experiences online, and what he said corroborates what we've been seeing in the data and hearing from kids for a long time. Just can't believe that he was so explicit in making clear that, you know, kids are being fed content that they're not asking for and that content is often harmful.

BY MS. JONES:

Q. So between your testimony in February of 2023 and today, you determined that this statement that you provided to the US Congress was no longer correct; is that right?

MR. RICHARDS: Object to form. Asked and answered.

THE WITNESS: I don't think that's the way that I would put it. I think I would say that while there is potential for there to be a benefit to form and maintain friendships online, it seems that that potential has been thwarted by the ways that the

Page 305

company has set up their platform, and that bears out in the data over the last two years, too.

I don't know of many areas of science that have so rapidly addressed a topic as we've seen attention to this topic in the science, and I've been doing this for 25, 30 years. So the span of two years is a long time, and the products have changed very rapidly as well. So I would caution against anything from even a year ago or six months ago as being representative of, you know, exactly what we know today.

BY MS. JONES:

Q. Sure. That's fine. I'm just trying to understand at what point you went from what's reflected here in your written testimony to thinking that that potential for maintaining friendships online had been thwarted in a way that was perhaps irretrievable?

MR. RICHARDS: Object to form. Compound. Asked and answered.

THE WITNESS: I think that a reading of this document from 2023 itself would -- in full context, would make very clear that the negatives are offsetting these positives. So you're asking me about, like, one sentence in isolation, but if you

Page 306

look at the whole report, I mean, it's clear that that sentence is not representative even of what this said in 2023.

BY MS. JONES:

Q. Well, what it says as, in the next sentence, (as read):

"These relationships often afford opportunities to interact with a more diverse peer group than offline, and the relationships are close and meaningful and provide important support to youth in times of stress."

Do you see that?

A. I see that sentence.

Q. And then you have a number of citations at Footnote No. 30; correct?

A. I do.

Q. And then it goes on to say (as read):

"The buffering effect of social support from peers has been well documented in the psychological literature. This may be especially important for youth with marginalized identities,

Page 307

including racial, ethnic, sexual, and gender minorities. Digital platforms provide an important space for self-discovery and expression for LGBTQ+ youth."

Did I read all that correctly?

A. Yes, that's what it says in here.

Q. Okay. Let's just take that paragraph. Sitting here today, would you say that is still accurate or it's no longer accurate?

MR. RICHARDS: Object to form.

THE WITNESS: Yeah, I would -- in 2023, in this report, you will see that those positives are offset by the negatives to those same minoritized groups.

Today, it is still the case, as it said in this report, that there is a potential for positives, but the negatives -- and actually what we're hearing in data over the last two years is that the negatives have overtaken the positives for minoritized -- many minoritized youth.

BY MS. JONES:

Q. Okay. And I don't -- you can tell me if I'm misunderstanding the report. I don't see in this -- excuse me, not report, your testimony -- I don't see

Page 308

in your testimony where you said, "I think the negatives are overtaking the positives for youths who might be in underrepresented or marginalized groups."

A. I think that a -- in my opinion, I think that a reading of this whole report, and the context of the whole report, makes that clear.

MS. JONES: Why don't we take a break. I may be done or very close to being done.

THE VIDEOGRAPHER: Going off the record. The time is 4:39 p.m.

(Recess taken from 4:39 p.m. to 4:54 p.m.)

THE VIDEOGRAPHER: Going back on the record. The time is 4:54 p.m.

BY MS. JONES:

Q. Dr. Prinstein, do you have any personal knowledge about why Meta designed its platforms in a particular way?

MR. RICHARDS: Object to form.

THE WITNESS: I don't think I have any personal knowledge.

BY MS. JONES:

Q. To the extent that you have any visibility into that topic, is it based on the materials that you've been provided in the context of your role as an expert in this case?

Page 309

MR. RICHARDS:  Object to form.

THE WITNESS:  I don't think I saw any of those materials.

BY MS. JONES:

Q.  Okay.  And I think this is correct, but you're not an expert in how social media platforms are designed, generally, are you?

MR. RICHARDS:  Object to form.

THE WITNESS:  I wouldn't say I was. Yeah.

BY MS. JONES:

Q.  And forgive me if I'm repeating a question I already asked you.  You did not undertake any kind of review of the code for any of the algorithms that are associated with any of Meta's platforms, did you?

A.  No, I didn't review that.

Q.  Okay.  Do you have any personal knowledge of why Meta implemented certain designs or features in its platforms -- social media platforms?

MR. RICHARDS:  Object to form.

THE WITNESS:  Other than an impression, I don't have any direct knowledge.

BY MS. JONES:

Q.  Were some of the Meta documents that you reviewed as part of your work as an expert in this

Page 310

case the survey research that the company had done about teen users of its platforms?

MR. RICHARDS:  Object to form.

THE WITNESS:  Yes.

BY MS. JONES:

Q.  Do you have a view, based on your own work as a scientist, of whether survey research of that type can establish a causal relationship between an exposure and an outcome?

MR. RICHARDS:  Object to form.

THE WITNESS:  I didn't have enough information about the methodology used for those surveys to be able to evaluate it.

BY MS. JONES:

Q.  Do you have an understanding that sometimes the research team at Meta would propose changes to the company's platforms as a result of findings in their research?

MR. RICHARDS:  Object to form. Speculation.

THE WITNESS:  I don't know whether they did or not.  I am aware that sometimes practices that were meant to keep kids healthy were overturned, or sometimes findings were kind of kept concealed from those higher up in the association for plausible

Page 311

deniability.

BY MS. JONES:

Q.  Well, let me kind of deconstruct that a little bit.

You said practices that were meant to keep kids healthy were overturned.  What practices, specifically, are you talking about?

Are you talking about the cosmetic filters decision?

A.  Yes.

Q.  Okay.  Were there any other practices that you were referring to just now in your testimony?

MR. RICHARDS:  Object to form.

THE WITNESS:  I can't -- I can't remember it in great detail, but my sense of it is changes to the platform features that ended up decreasing engagement in the platform that were then reversed to ensure ongoing engagement with the platform.

BY MS. JONES:

Q.  What are you referring to, specifically?

A.  Like I said, I'm not sure I remember completely, but I think there were things like whether like counts were visible or whether preference was given to comments in the feed or posts from friends or

Page 312

highly liked posts versus in chronological order.

Q.  Do you know what the dataset was that the company evaluated in making a judgment about how likes would be displayed or not?

MR. RICHARDS:  Object to form.

THE WITNESS:  Do I know the dataset?

BY MS. JONES:

Q.  Yes.

A.  I don't -- I don't think I understand. I don't know of a dataset.

Q.  Okay.  Well, and I may not have been fully clear on my question.  My question was simply, to the extent that you are testifying that there was a decision made around the visibility of like counts -- which I think is what you were referring to earlier; is that right?

A.  That's one of the things I said.

Q.  Do you know, one way or the other, what universe of information or data the company actually considered and weighed in deciding how it was going to proceed on that decision?

MR. RICHARDS:  Object to form.

THE WITNESS:  I don't know all of the factors that -- or data points that were used to make those decisions.  It did have information, I believe,

Page 313

about things being changed -- I don't know. It didn't seem -- there was no reference to other data or justifiable reasons for why it was changed.

BY MS. JONES:

Q. Are you thinking of a specific -- when you say it didn't have a reference to other data or justifiable reasons, what is the "it" in that sentence? Are you thinking of a particular document that you saw?

A. When I saw in the documents, like with the beauty filters, for instance, that the decision to take them away had been reversed, my memory of why it was being reversed did not refer to any other sources of data or scientifically based rationale to explain that decision.

Q. Do you understand that the -- Meta has, in fact, produced many, many, many, many thousands of pages of documents as part of its discovery obligations in this litigation?

MR. RICHARDS: Object to form. Speculation.

THE WITNESS: I believe that they have.

BY MS. JONES:

Q. Okay. Are you comfortable -- let's just take cosmetic filters, for example. Are you comfortable

---

Page 314

that you have seen every document that you would need to see to be fully informed on how Meta went about making its decision with respect to the availability of filters on Instagram?

MR. RICHARDS: Object to form. Speculation.

THE WITNESS: I -- there are things that I have seen in those documents that no amount of pages would undo or justify or make acceptable.

BY MS. JONES:

Q. That wasn't my question.

A. I know, but I can't answer that question. I stand by my opinions and my concerns based on the information that I did see, even though I recognize that there may be other things in other documents that I might not have seen, because what I have seen is egregious, damaging, insensitive to youth, and contrary to expert opinions --

Q. Okay --

A. -- that they weren't aware of.

Q. -- let me go back to my question.

My question was -- some version of -- are you comfortable that you have seen the full scope of documentation related to the company's evaluation of the cosmetic filter issue that you have now mentioned

---

Page 315

a few times today?

MR. RICHARDS: Object to form. Speculation. Asked and answered.

THE WITNESS: Sorry, I don't know what else to say beyond what I said. I --

BY MS. JONES:

Q. Let me ask you a different question.

A. Yeah, sure.

Q. Who at the company -- who were all of the people at the company who were involved in the decision around the availability of cosmetic filters on Instagram?

MR. RICHARDS: Object to form. Speculation.

THE WITNESS: I definitely don't remember.

BY MS. JONES:

Q. Okay. You have a recollection of Mr. Zuckerberg weighing in at some point, it sounds like; is that right?

A. I do.

Q. Do you have any awareness of who else might have been involved in the discussions around that topic?

MR. RICHARDS: Object to form.

---

Page 316

THE WITNESS: I do. A panel of scientific experts and seemingly a bunch of Meta staff whose titles I don't know or remember.

BY MS. JONES:

Q. Do you remember the names of any of those Meta personnel?

A. No.

MR. RICHARDS: Object to form.

BY MS. JONES:

Q. Do you know the names of any of the panel of scientific experts that you just referred to?

A. Actually, I don't know if the names of the experts were in that document --

Q. Okay.

A. -- I can't remember.

Q. So the only name that you know is Mr. Zuckerberg's name, in terms of the people who were actually involved in the discussions around that issue?

MR. RICHARDS: Object to form. Misstates testimony.

THE WITNESS: It was the only recognizable name to me, which is the reason why it was the only one that stuck.

Page 317

BY MS. JONES:

Q.  With respect to the issue of whether or not like counts would be visible on Instagram, do you know who was involved in that decision-making at the company?

MR. RICHARDS:  Object to form. Speculation.  Asked and answered.

THE WITNESS:  As I mentioned, that one is a bit more vague, so I certainly don't remember.

BY MS. JONES:

Q.  Okay.  Do you know what the various factors were that the company weighed in reaching a decision about whether or not like counts would be visible to teen users on Instagram?

MR. RICHARDS:  Same objections.

THE WITNESS:  Sorry, do I remember the various factors that were used to make that decision?

BY MS. JONES:

Q.  Yes.

A.  I don't remember.

Q.  Do you know what the state of the world is on Instagram today in terms of whether or not teens are able to disable seeing like counts or not?

MR. RICHARDS:  Object to form.  Scope.

THE WITNESS:  Actually, as for what it

Page 318

looks like today, I don't know, no.

BY MS. JONES:

Q.  And I apologize if you answered this question; I'm just forgetting.

Are there specific tools or features that you are aware of the company implementing as a result of research that was done internally at Meta?

MR. RICHARDS:  Object to form.  Asked and answered.

THE WITNESS:  Sorry, any tools based on any research?

BY MS. JONES:

Q.  Are you aware one way or the other of that?

MR. RICHARDS:  Same objections.

THE WITNESS:  I -- my understanding is that there have been different tools that have been used, sometimes temporarily here and there, but I don't believe, from what we know in the data, that any of them have been meaningful in reducing problematic social media use.

BY MS. JONES:

Q.  And the specific data you're referring to is what, exactly?

A.  So we collect data on problematic social media use, as do many labs around the world, and that

Page 319

does focus, not just on social media, but on specific platforms as well.  And we use the criteria directly from the DSM-5 for substance dependency that's used for other substances, but we swap out the word of the substance -- let's say "cocaine" -- for "Instagram" or "social media," and then we're able to take an assessment -- you know, a diagnostic assessment of how much kids are experiencing a dependency, a clinical dependency, to social media, including Meta's products.

This has been done now in samples all over, and the rates of those who are meeting and exceeding diagnostic thresholds are remarkably high.  Over 50 percent report at least one symptom of clinical dependency, and I believe we have at least 25 percent to 33 percent or so that are reporting moderate to severe symptoms of clinical dependency; and that would meet threshold for a formal diagnosis.

Q.  Can I just pause you for a second?

You said that the criteria for evaluating problematic social media use was what exactly?

A.  So different studies have looked at that in different ways.  That's a construct that's been used within the literature across the world, as I mentioned.

Page 320

In our research, we have used the DSM criteria for substance dependence, but we've swapped out the word of the illegal substance and instead we've put in words like "social media" or sometimes even the name of a specific product.

Q.  Are you -- when you say "our research," what are you referring to specifically?

A.  We have and still are collecting data with this approach.

Q.  Has any of that been published?

A.  I believe some of it was in the article that you had as one of your exhibits.

Q.  Let me wrap up one point, and then I want to come back to a question or two more on this issue.

You also described earlier that you thought you had seen in the documents that were provided to you, as produced from the company, that there were research findings that were kept concealed from those higher up to preserve deniability.  That's a rough estimation of what I think I heard you say.  Is that right?  Did I hear you say that?

MR. RICHARDS:  Object to form. Misstates testimony.

THE WITNESS:  Some of that's correct, but some of that's incorrect.  I didn't ascertain that

Page 321

from reviewing the documents.

BY MS. JONES:

Q. Okay. Did I correctly understand you to say that -- to make that claim that that had happened? That people had concealed research findings to protect more senior folks --

MR. RICHARDS: Same objections --

BY MS. JONES:

Q. -- from knowing about the results? Excuse me.

MR. RICHARDS: No, excuse me. Same objections.

THE WITNESS: Yes, research findings and other information that is relevant to kids' safety.

BY MS. JONES:

Q. Okay. What specifically are you talking about?

A. This was told to me by former Meta employees, and also it's something I read in the paper with a recent whistleblower.

Q. Okay. Told to you by former Meta employees. What former Meta employees are you talking about?

A. I've talked to a number of former Meta employees. I don't remember all their names.

Page 322

Q. Do you remember any of their names?

A. I don't. It was at a large conference, and there was discussion about this from a group of panelists, and I don't know that I remember the panelists.

Q. What was the conference?

A. It was a meeting. It was a meeting in New York State.

Q. And when did this happen?

A. Possibly '23 or '24.

Q. And how many -- forgive me if I am going to misrecall slightly what you said, but how many former employees are you recalling talked to you about this issue?

MR. RICHARDS: Object to form.

BY MS. JONES:

Q. And to be more specific of what you said earlier, research findings being somehow concealed to preserve deniability from more senior people at the company.

MR. RICHARDS: Object to form. Misstates testimony.

THE WITNESS: I heard from three people individually, as well as read in the paper, that there were numerous instances in which decisions,

Page 323

information, and/or the results of internal studies that could have protected youth, or had revealed concerns about youth well-being, were instructed to be buried, so that way they -- rather than sending it up the chain, to ensure plausibility deniability among people higher in the organization.

BY MS. JONES:

Q. Okay. You heard that from three people individually? Is that what I heard you say?

A. Yes.

Q. Were all three of those people on a panel of some kind? Or you did interact with them in some different way at that meeting?

A. At a panel, and then there was a happy hour afterwards and some discussion.

Q. All right. And then you said you read something in the paper. What were you referring to there?

A. I think it was just in the last couple of weeks, there was a whistleblower report about this. I think maybe first week of September.

Q. This is -- are you referring to the two individuals who testified before Congress? Or are you referring to other people?

A. It might have been the testifying before

Page 324

Congress.

Q. Okay. What specific research findings, according to what you were testifying to, were kept concealed from more senior people at the company?

MR. RICHARDS: Object to form.

THE WITNESS: I don't know.

BY MS. JONES:

Q. Do you know who was involved in those bodies of research at the company?

A. I don't know.

Q. Dr. Prinstein, just because you've mentioned it, could I ask you to go back to Exhibit No. 10, please.

A. Yeah.

Q. I just wanted to check something with you. So I think you told me earlier that you all had done research on problematic social media use using a set of criteria based on the DSM-5?

A. Correct. We -- based on the substance dependency criteria in DSM-5.

Q. Okay. And I just want to make sure I understand.

If you go to page 201 of Exhibit 10, which you might already be there.

A. I am.

Page 325

Q.  Is that what you're referring to, is Table 1 in that article?

A.  Generally, yes.

Q.  Okay.  Is there some other set of criteria that you're thinking of?  Or is this what you're referring to when you said you just took the DSM-5 and replaced the word -- whatever the substance was -- with the reference to social media?

MR. RICHARDS:  Object to form.

THE WITNESS:  Different research groups do it in different ways, but these items are one of the ways in which we've adapted the DSM-5 criteria for substance dependence on -- to understand problematic social media use.  As you can see, there are super-high percentages endorsing.

BY MS. JONES:

Q.  Let me ask you to turn to page 207.  And this is the section entitled "Links with daily subjective well-being."  Do you see that?

A.  I do.

Q.  Down at the bottom of that section, there is a paragraph that begins with "These findings"; do you see that?

A.  I do.

Q.  It says (as read):

Page 326

"These findings should be considered in the context of the broader theoretical contribution of 'addictive' social media measures."

Do you see that?

A.  I see it.

Q.  And it says (as read):

"Numerous measures exist that assess problematic, dependent, or addictive social media use."

Do you see that?

A.  I see it.

Q.  And it says (as read):

"Most existing measures apply to substance use disorder measurement strategy to assess social media addiction."

Correct?

A.  Yes, I see that.

Q.  And it goes on to say (as read):

"This measurement" --

Well, let me just ask this question.  That sentence that we just looked at, that's -- that would be inclusive of what appears in Table 1 in this paper;

Page 327

right -- at Exhibit No. 10?

A.  I think that's accurate.

Q.  Okay.  And the same paper says (as read):

"This measurement is not without criticism, particularly because of its confirmatory approach in which the existing substance use assessment is assumed to apply to behavioral addictions, and disagreement among scholars on the applicability of certain criteria to technology-based addictions."

Do you see that?

A.  I see that.

Q.  Is that an accurate -- and this is -- again, this is a paper you were a coauthor on; correct?

MR. RICHARDS:  Object to form.

THE WITNESS:  I am a coauthor on this paper.

BY MS. JONES:

Q.  All right.  And this paper was published -- I know it would have been submitted earlier than 2025, but this paper was published earlier this year; correct?

A.  Is that correct?  I forgot.

Page 328

Q.  Yeah, we had this conversation earlier --

(Over-speaking.)

A.  Yeah, it looks like it came out in '25.

Q.  It's hidden a little bit, but yes.

A.  This one was written a long time ago, but it just came out.

Q.  Okay.  And so this measurement criteria that's reflected in -- that you were describing earlier and that's reflected in Table 1, you and your coauthors appear to be acknowledging that that measurement approach is not without criticism because it assumes that the substance use assessment in the DSM-5 is equally applicable to behavioral addictions; right?

MR. RICHARDS:  Object to form.  Misstates testimony.  And I'll just note that this is one sentence out of a larger paper.

MS. JONES:  He has said that many times.  I'm sure he knows that it's one sentence out of a longer paper.

BY MS. JONES:

Q.  My question is about this specific sentence, Dr. Prinstein.

The evaluative approach reflected at Table 1, which we looked at just a moment ago, has

Page 329

been, according to you and your coauthors, criticized in part because it assumes that the existing substance use assessment applies to behavioral addictions; right?

MR. RICHARDS:  Same objections.

THE WITNESS:  That statement is not accurate.  And it would no longer be something that would be written about this, for a couple different reasons.

Number one is that -- and I remember this well -- there was one single reviewer of this paper that insisted that we put something like that on there, so of course we did, because it's required for publication.  And it's fair to note that there have been some past criticisms, but that's not something that is currently considered concerning today.

Second of all, our measurement has now been adapted by several other research groups as being the appropriate measurement to look at problematic social media use, so that statement would not be considered accurate today.

BY MS. JONES:

Q.  Okay.  So let me just make sure I understand.  This is another statement in a paper on which you're a coauthor that you tell me today not to

Page 330

anymore; is that right?

MR. RICHARDS:  Object to form.  Misstates testimony.

THE WITNESS:  That's definitely not characterizing what I'm saying the right way.

BY MS. JONES:

Q.  Well, does it accurately reflect your views or does it not accurately reflect your views, Dr. Prinstein?

MR. RICHARDS:  Same objections.

THE WITNESS:  I -- sorry, but I have to unpack that a little bit because your question includes a few assumptions that I don't think are accurate.

BY MS. JONES:

Q.  Well, just to move us along, let me ask you my next question.  In the next sentence, it says (as read):

"In this study, we similarly applied this measurement strategy, although we omitted problematic criteria that cannot cleanly be applied to social media use."

And then it references tolerance and withdrawal.  Do you see that?

Page 331

A.  I do see that.

Q.  So you told me earlier that when you all did your set of criteria, you used -- you just took the DSM-5 and you just changed out the name of the particular substance or intake, essentially, and left everything the same; right?

MR. RICHARDS:  Object to form.  Misstates testimony.

THE WITNESS:  That's not exactly what I said, but --

BY MS. JONES:

Q.  Well, let me see if I can ask a slightly better question.  You said earlier that when you all developed your approach to evaluating problematic social media use, that you took the DSM-5 criteria for substance abuse disorders and just replaced the reference to the substance with a reference to social media.  Did I hear that correctly?

A.  That is an approach that we've --

(Over-speaking) --

MR. RICHARDS:  Same objections.  Sorry.  Same objections.

THE WITNESS:  We -- sorry.

Page 332

BY MS. JONES:

Q.  I just want to make sure I understood what you said earlier.  Is that what you said earlier?

A.  I believe that earlier I did talk about the ways that we adapted the substance dependency criteria.

Q.  Okay.  But in this paper at least, you did more than just switch out the word "substance" for "social media"; right?

MR. RICHARDS:  Object to form.

THE WITNESS:  No, that's not correct.  We did assess it using all the items, and we did include them all and adapt them in that way.

BY MS. JONES:

Q.  Well, I want to make sure that we're not reading the same words in different ways.  This says (as read):

"We applied this measurement strategy, although we omitted problematic criteria that cannot cleanly be applied to social media use."

Did I read that correctly?

A.  You read it correctly.

Q.  Okay.  Is that an accurate description of

Page 333

what you all did?

MR. RICHARDS:  Object to form.

THE WITNESS:  So let me try and clarify.  No, that's not what we did.  That's what we're reporting in this paper because a reviewer asked us to run the analyses with and without those items.

Our traditional way of doing this, in fact, does include measures on tolerance and withdrawal and, as I mentioned, has become a standard by which people across the field are looking at this.

BY MS. JONES:

Q.  So I want to just make sure I'm clear.

Your testimony is that the way you actually did it is not the way that's described in the paper that we've marked as Exhibit No. 10?

MR. RICHARDS:  Object to form.  Misstates testimony.

THE WITNESS:  Indeed, what I'm trying to say -- and I'll try and say it more clearly -- is that it's common practice that when you submit an article for review, and it's evaluated by others, they ask for specific changes for the publication, and those changes are then run both ways, so you can look at that and make sure that your findings hold up.

In this case, the approach that we used was

Page 334

to include all items.  We did collect data on all of the items.  We were asked by the reviewer to report the data without those items, and that's why the report discusses it in that way.

BY MS. JONES:

Q.  Who was the reviewer who asked you to describe it in this way?

A.  They're anonymous reviewers.  We can't -- we don't know.

Q.  Oh, you don't know who the reviewer is for purposes of your --

A.  The peer-review process is an anonymous peer-review process.

Q.  Okay.  So this -- but this recitation of how it was done is, you're telling us today, not accurate?

MR. RICHARDS:  Object to form.  Misstates testimony.

THE WITNESS:  No, that's not what I said.  What I'm saying is that, at this reviewer's request, we were asked to report the data without those items, so we wrote up the data to indicate that those items were not included for this set of analyses.

BY MS. JONES:

Q.  Okay.  I didn't see anywhere in this paper --

Page 335

and you can tell me if I have it wrong -- I didn't see anywhere in this paper where you actually said, "We just took the DSM-5 and we switched out the -- we took the DSM-5 criteria for substance use disorders and just switched out the reference to substance and replaced it with social media."

MR. RICHARDS:  Is there a --

THE WITNESS:  You can find that on page 200, the bottom paragraph.

BY MS. JONES:

Q.  Okay.  Where does it say that?

A.  At the bottom of the page 200, it says that we based the items on the DSM-5 substance use disorder checklist.  It's the first three lines under the heading "Addiction-like Social Media Use."

Q.  Do you know how many items there actually are, or criteria there are, for substance use disorder in the DSM-5?

MR. RICHARDS:  Object to form.

THE WITNESS:  Off the top of my head, I can't give you the exact number.

BY MS. JONES:

Q.  Do you know that it's more than seven?

MR. RICHARDS:  Object to form.  Asked and answered.

Page 336

THE WITNESS:  Off the top of my head, I can't remember the exact number.  And the things that you're calling criteria are not the same ways that we talk about criteria here.

There are general criteria with every diagnosis that are -- about functional impairment, et cetera, that are consistent, so I don't know if you're including that or not.

BY MS. JONES:

Q.  Yeah, my question is not about what I know about it.  My question is, do you know how many diagnostic criteria there are in the DSM-5 for substance abuse -- or substance use disorder?

A.  Oh --

MR. RICHARDS:  Object to form.  Asked and answered.

THE WITNESS:  Yeah, I already answered that.

BY MS. JONES:

Q.  If you did, I missed it.  Do you know how many diagnostic criteria there are?

MR. RICHARDS:  Same objections.

THE WITNESS:  I don't remember the exact number off the top of my head.

MS. JONES:  Okay.  All right.

Page 337

Give me three minutes. I think I'm done, but give me a chance to just consult.

THE VIDEOGRAPHER: Going off the record. The time is 5:27 p.m.

(Recess taken from 5:27 p.m. to 5:31 p.m.)

THE VIDEOGRAPHER: Going back on the record. The time is 5:31 p.m.

MS. JONES: Dr. Prinstein, I'm all done. Thank you for your time. Your counsel might have questions for you.

MR. RICHARDS: Ready to hand it over?

MS. JONES: Yes. Go for it.

MR. RICHARDS: Dr. Prinstein, I just want to thank you for your time today. We have no questions for you.

THE WITNESS: Okay.

MS. JONES: Okay. Then we're done.

THE WITNESS: Okay.

THE VIDEOGRAPHER: Before we go off the record, the total time on the record for Meta today was 6 hours and 21 minutes.

This concludes this deposition. The time is 5:32 p.m.

(Whereupon, at 5:32 p.m., the deposition ceased. Signature was reserved.)

---

Page 338

ACKNOWLEDGMENT OF DEPONENT

I, MITCH PRINSTEIN, PH.D., do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct, and complete transcription of the testimony given by me, and any corrections appear on the attached errata sheet signed by me.

_____    _____

(DATE)                (SIGNATURE)

---

Page 339

E R R A T A

CASE NAME: IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION

WITNESS NAME: MITCH PRINSTEIN, PH.D.

CASE NUMBER: 4:22-MD-03047-YGR / MDL NO. 3047

PAGE  LINE      READS          SHOULD READ

_____

(DATE)              (SIGNATURE)

---

Page 340

STATE OF NORTH CAROLINA   )
                          ) C E R T I F I C A T E
COUNTY OF ORANGE          )

I, Sophie Brock, Registered Diplomate Reporter, Certified Realtime Reporter, and Notary Public of North Carolina, the officer before whom the foregoing proceeding was conducted, do hereby certify that the witness whose testimony appears in the foregoing proceeding was duly sworn by me; that the testimony of said witness was taken by me to the best of my ability and thereafter transcribed under my supervision; and that the foregoing pages, inclusive, constitute a true and accurate transcription of the testimony of the witness.

I do further certify that I am neither counsel for, related to, nor employed by any of the parties to this action, and further, that I am not a relative or employee of any attorney or counsel employed by the parties thereof, nor financially or otherwise interested in the outcome of said action.

This, the 2nd day of October, 2025.

*Sophie Brock*

_____

Sophie Brock, RDR, CRR
Notary Number: 200834000001