# EXHIBIT 5

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA ADOLESCENT ) MDL No.
ADDICTION/PERSONAL INJURY        ) 4:22-md-3047-YGR
PRODUCTS LIABILITY LITIGATION    )
_____ )
-------------------------------------------------------
          COMMONWEALTH OF MASSACHUSETTS
SUFFOLK, ss                              SUPERIOR COURT
_____
COMMONWEALTH OF MASSACHUSETTS,
       Plaintiff,                        CIVIL ACTION NO.
                                         2384CV02397-BLS1
   v.
META PLATFORMS, INC. and
INSTAGRAM, LLC.

         Defendants.
_____

                Monday, March 2, 2026

   CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

         Video-Recorded Oral Deposition of CARL
S. SABA held at the offices of Davis Polk &
Wardwell LLP, 900 Middlefield Road, Redwood
City, California, commencing at 9:03 AM PST
on the above date, before Michael E. Miller,
Fellow of the Academy of Professional
Reporters, Certified Court Reporter,
Registered Diplomate Reporter, Certified
Realtime Reporter, and California CSR #13649.
                   __ __ __
             GOLKOW - VERITEXT
        877.370.DEPS | fax 917.591.5672
               deps@golkow.com

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com

CONFIDENTIAL

Page 52

Q.    Did you take into account when the features were implemented in forming the opinions in your reports?

MS. ARORA:  Objection to form.

A.    I was aware of when those features were implemented, but I would say they don't -- they don't impact my time spent calculations.

BY MR. WILLIAMS:

Q.    What do you mean by that?

A.    I mean that I was asked to quantify the number of instances in which Teen Accounts exceeded certain thresholds of average daily time spent, and those features don't directly impact those calculations.

Q.    And when you say they don't directly impact those calculations, what do you mean?

A.    I mean the date on which they were implemented does not have any bearing on the calculation that I'm preparing, does not change it in any way.

Q.    Because your time spent calculations are not connected to the design features that are at issue in this action?

Page 53

MS. ARORA:   Objection to form.

A.      I didn't say that.  But they're based on thresholds of time.

BY MR. WILLIAMS:

Q.      Not the design features that are at issue?

MS. ARORA:  Objection to form, asked and answered.

A.      I -- they relate to the assertions regarding unfair practices and, therefore, these features.  But I'm saying that they don't have a numerical impact on my calculations.

BY MR. WILLIAMS:

Q.      Do you know how many teens used each of the remaining at-issue design features?

MS. ARORA:  Objection to form.

A.      I -- not explicitly, although I would say for the time management tools, there is a discussion in my report about low adoption rates.

BY MR. WILLIAMS:

Q.      As for the multiple accounts function and cosmetic filters, you don't know

CONFIDENTIAL

Page 54

how many teens used each of those specific design features?

MS. ARORA:  Objection to form.

A.    I don't.

BY MR. WILLIAMS:

Q.    And the number of teens who used the time -- the at-issue design features doesn't impact your calculations in this report, correct?

MS. ARORA:  Objection to form.

A.    Specifically, my time spent calculations are not impacted by that.

BY MR. WILLIAMS:

Q.    Your time spent calculations are not impacted by the number of teens who used the at-issue design features, correct?

A.    Correct, because it's based on the number of teens that exceed certain time spent thresholds.  That's the -- that's the basis for the calculations.

Q.    You don't know whether any particular teen used any specific design feature, correct?

A.    Any particular teen, no.

Q.    You don't know how long any

Page 59

calculations numerically in some way?

Q.    Yes.

A.    I think not directly.  I would say maybe indirectly.

Q.    What do you mean by indirectly?

A.    I took into account when certain features were announced and whether that appeared to have a material impact on the rate of bad encounters that teens were experiencing.

Q.    And when you reference when certain features were announced, is it your view that those were deceptive statements that are alleged in the complaint?

MS. ARORA:  Objection to form.

A.    Well, again, I was discussing them in the context of do they impact the rate of bad encounters, but I believe that some of them are asserted to be deceptive statements.

BY MR. WILLIAMS:

Q.    Okay.  So other than the impact of the statements on the rate of bad encounters that teens were experiencing, the specific deceptive statements don't have any

CONFIDENTIAL

Page 60

direct impact on your calculations, correct?

A.    I would say, again, there -- my calculations are related to those deceptive statements and the related claims.  I don't think there is a direct numerical impact on my calculations.

Q.    Do you consider -- well, strike that.

In offering your calculations, do you consider whether teens ever heard the allegedly deceptive statements?

MS. ARORA:  Objection to form.

A.    I don't think that's something that I've analyzed, no.

BY MR. WILLIAMS:

Q.    And you didn't consider whether teens relied on any of the allegedly deceptive statements, correct?

MS. ARORA:  Objection to form.

A.    I did not conduct an analysis on that, and that's not part of my opinions.

BY MR. WILLIAMS:

Q.    You didn't consider whether teens were ever exposed to any -- strike that.  I already asked that.

Page 113

asking me if I'm -- if I analyzed whether some specific teen was exposed to that conduct?

Q.    Let me ask a different way.

Your time spent calculations aren't limited to calculating teens or counting teens who are exposed to the unfair design practices, correct?

A.    They're not limited -- again, I think that you're getting back at whether I did some sort of an apportionment to specific conduct or features, and I did not do that.

Q.    I'm asking something a little different.

Your time spent calculations don't take into account whether teens who you count were exposed to the unfair design practices, correct?

MS. ARORA:    Objection to form.

A.    I did not determine what portion of those teens were exposed to those.

BY MR. WILLIAMS:

Q.    And the same is true as to what portion of the teens were exposed to the allegedly deceptive statements, correct?

CONFIDENTIAL

Page 114

MS. ARORA:  Objection to form.

A.    Correct.

But again, I think it depends on how "exposed" is defined, because "exposed" could mean that those statements are made in public, and therefore, everybody is exposed.

BY MR. WILLIAMS:

Q.    Is that your understanding of the attorney generals' theory here?

MS. ARORA:  Objection to form.

A.    I think you're getting pretty far into a matter of legal claims, which is not my area of expertise.

BY MR. WILLIAMS:

Q.    Well, I --

A.    I have a general understanding of what the claims are.

Q.    Let me ask it differently.

Your time spent calculations don't take into account whether the teens who you count were exposed to the deceptive statements regardless of how you define "exposed"?

MS. ARORA:  Objection to form.

CONFIDENTIAL

Page 115

A.    I don't think that's necessarily true, because if the States define "exposed" as the statements were made in public, I know that that occurred.

BY MR. WILLIAMS:

Q.    Your time spent calculations don't take into account how many -- strike that.

Your time spent calculations don't take into account whether teens heard the deceptive statements, correct?

A.    What do you mean by "heard"? Orally heard or read?

Q.    Were aware of the deceptive statements.

MS. ARORA:  Objection to form.

A.    I don't know.

BY MR. WILLIAMS:

Q.    You don't know whether your time spent calculations take into account whether teens were aware of the deceptive statements?

A.    I don't know what teens in my calculations were aware or not aware of those statements.

CONFIDENTIAL

Page 116

Q.    You don't take that into account one way or another in your calculation, correct?

A.    Yes.  It's not something that impacts my calculations.

Q.    You don't offer any opinions on whether your time spent calculations are associated with an actual or likely harm, correct?

A.    No, I don't -- I don't have any opinions about whether harm occurred or did not occur.

Q.    It's not your opinion that every instance of a time spent violation that you calculate reflects an actual or likely harm, correct?

MS. ARORA:  Objection to form.

A.    No.

BY MR. WILLIAMS:

Q.    It's not your opinion that every instance of the time spent violation that you calculate reflects an instance of problematic use, correct?

A.    That's correct.  I agree with that statement.

Q.    And you're not offering an opinion that those are appropriate thresholds for purposes of counting violations of the state consumer protection statutes here, correct?

A.    That is correct.

Q.    Are you aware of any specific evidence in the record that supports using those specific thresholds?

A.    No.  That's not something I've analyzed or looked into.

Q.    Did you do any analysis to determine whether it was reasonable to use those specific thresholds?

A.    I think I'd have the same answer I just gave you.

Q.    Did you ever consider whether to use a lower threshold than 30 minutes?

A.    Well, I -- in defining my assignment, there was a discussion of what the thresholds should be.  I don't recall whether initially some higher or lower threshold was discussed.

Q.    Just so I'm clear, you're not offering any opinion on whether those are --

CONFIDENTIAL

Page 127

strike that.

You were asked to use those specific thresholds, correct?

A.    I was asked to perform calculations that reflected those thresholds, correct.

Q.    And did you have any input into those -- using those specific thresholds?

A.    I did not define what the thresholds should be.

Q.    You didn't say, you know, that this -- maybe we could use 15 minutes, but that seems too low?

A.    No.

Q.    Increasing or decreasing the time spent thresholds would correspondingly increase or decrease the number of violations, correct?

MS. ARORA:  Objection to form.

A.    Yes.  All other factors being equal, yes, it would.

BY MR. WILLIAMS:

Q.    And so it's true that you can increase or decrease the number of violations by changing the time thresholds, correct?

assume that the omission of information or deception, alleged deception, caused the negative experiences that you're measuring?

MS. ARORA:  Objection to form.

A.    You're asking me again about whether I have an opinion about causation.  I don't.

BY MR. WILLIAMS:

Q.    Well, I'm asking you -- you're a damages expert, right?

A.    Yes.

Q.    Are you opining as a damages expert here?

A.    Yes.

Q.    It's important -- would you agree that a damages expert should have a reasonable basis for causation, even if they're assuming causation?

A.    I would agree with that.

Q.    And so I'm trying to understand what is your reasonable basis for assuming a causal link between the deception or omission that you understand the AGs are alleging and the negative experiences that you're measuring?

A.    It's -- it's press releases about safety features that Meta is -- was putting out there, with those features generally not being effective, as I discuss in my report.

It's these community enforcement reports that would give one the impression that there's a low rate of bad encounters on the platform.

It's all these other research studies that I've cited in my report that were not released to the public.

Q.    Other than those things, do you have any other basis for assuming that there's a causal link between the alleged deceptive -- deception or omission and the negative experiences that you're measuring?

MR. BERGE:  Objection.

A.    No, because I think those items are sufficient to establish a reasonable basis for me to assume causation.

Again, I'm not going to prove causation here.  Other evidence will be presented in this case.

///

Page 153

BY MR. WILLIAMS:

Q.    If Meta is found to be not liable for some of the deceptive statements, do you have any opinion on how that would affect your counting of bad experience violations?

MS. ARORA:  Objection to form.

A.    No, I don't.

BY MR. WILLIAMS:

Q.    So you would offer the same opinion as to the number of bad experience violations if Meta is found to be not liable for certain deceptive conduct, correct?

A.    Well, unless -- unless, based on such findings, I was asked to adjust my calculations in some way.

Q.    And if Meta was found to be not liable as to certain deceptive conduct, how would you adjust your violations -- your calculations of bad experience violations to account for that?

MS. ARORA:  Objection to form.

A.    I don't know because I would be engaging in speculation.  It would depend on what the Court determines and whether it

Page 173

A.    Yes, I was aware that there was a Country field.

Q.    And did you analyze in connection with your opening report the percentage of respondents who were not located in the US?

A.    I didn't try to estimate what proportion were outside of the US.

Q.    Do you know what proportion are outside the US?

A.    Well, I know that Dr. Isaacson has come up with what appears to be a new opinion after his rebuttal report that -- I think it's 4% are in the US.

Q.    And have you undertaken any analysis to determine whether Dr. Isaacson's calculation is correct?

MS. ARORA:  I'm going to object to questions about Dr. Isaacson's new opinion as that new opinion does not comport with the Court's orders or the Federal Rules of Civil Procedure.

MR. BERGE:  I would object on behalf of Massachusetts because we didn't have a reply opinion in this

are asking about them witnessing something.

Q.     And not about that negative experience -- experience happening to that respondent, correct?

A.     That's correct.

Q.     The questions ask about experiences -- strike that.

The questions all ask about experiences caused -- negative experiences caused by third parties, right?

MS. ARORA:  Objection to form.

A.     I think that's a fair characterization.

BY MR. WILLIAMS:

Q.     They don't ask about experiences caused by Meta, correct?

MS. ARORA:  Objection to form.

A.     No, they don't ask did, you know, Meta cause this or that.

BY MR. WILLIAMS:

Q.     So I'd like to turn to Sections X and XI of your report, which start on page 85.

And in these sections, you calculate Meta's revenue from affected teens

Page 207

A.     Yes.  It's approximately the same number as the gross profit losses on teens, but this is a positive gross profit --

Q.     But I believe --

A.     A roughly equal amount.

Q.     I believe the net losses from affected teens was 1.246 billion approximately, correct?

A.     Yes.

Q.     So if you add those two together, there would be a net loss if you combine the gross profits from affected teens and aged-up teens, correct?

A.     Correct.

Q.     Do you understand yourself to be offering a disgorgement opinion in this action?

A.     I understand myself to be offering a calculation of profits associated with certain cohorts that may be the basis for measurement of disgorgement.

Q.     So are you offering an opinion that the way you calculate gross profits is the appropriate measure of disgorgement in this case?

CONFIDENTIAL

Page 208

MS. ARORA:  Objection to form.

A.    I don't think I would go that far.  I would say that I am offering an opinion as to what the gross profits are on teens during the relevant time period, specific cohorts, and what the gross profits are on those same teens as they become adults and only for the relevant time period.  I'm not following them beyond, you know, March of 2024.

BY MR. WILLIAMS:

Q.    You used the same methodology to calculate disgorgement for each of the MDL states, correct?

A.    Yes, same methodology, and then, again, adapting the data to data that is specific to each state.

Q.    And you understand that the gross profits you're calculating are for purposes of disgorgement, right?

MS. ARORA:  Objection to form.

A.    That's my understanding, yes.

BY MR. WILLIAMS:

Q.    Do you understand those calculations to be relevant to any other

Page 215

Q.      You were asked by counsel to calculate disgorgement based on gross profits, correct?

A.      I was asked to calculate -- I would say gross profits, so...

Q.      You were asked by counsel to calculate gross profits for affected teens, right?

A.      Yes.

Q.      And you weren't asked to calculate any other -- strike that.

Did you consider whether there was some other financial metric other than gross profits for affected teens that it would make sense to calculate in this case?

MS. ARORA:  Objection to form.

A.      What do you mean by some other measure?

BY MR. WILLIAMS:

Q.      Well, did you consider whether, for purposes of disgorgement, some other measure than gross profits for aged-up teens would be a better or more appropriate measure?  Strike that.  Let me ask that again.

CONFIDENTIAL

Page 216

Did you consider whether some other measure than gross profits for aged-up teens would be a more appropriate measure of disgorgement in this case?

MS. ARORA:  Objection to form.

A.     In defining my assignment, I had a conversation about what I was going to do, and this was the measure that I was asked to calculate.

I'm not sure, because your question is so open-ended, I don't know what you mean by some other.

BY MR. WILLIAMS:

Q.     Well, did you consider any other measures -- for purposes -- strike that.

For purposes of calculating disgorgement, did you consider any other measures or methods other than using gross profits?

A.     This was the measure that I was asked -- this was what I was asked to calculate.  So I would say -- consider?  I mean, I had a discussion that led to this.

Q.     So you're not offering any

CONFIDENTIAL

Page 227

the issue, which is to just assume that these teens would have spent less time but for the wrongful acts, and everything else is the same, doesn't work.

Because but for the wrongful acts, there might be rather significant changes to Meta's overall business model.

BY MR. WILLIAMS:

Q.    Are you aware of any expert that's going to testify in this action that, but for the allegedly wrongful acts, Meta would not have earned the gross profits that you calculate?

MS. ARORA:  Objection to form.

A.    No.

BY MR. WILLIAMS:

Q.    Are you aware of any expert that's going to testify that -- strike that.

Are you aware of any evidence in the record that but for the allegedly wrongful acts, Meta would not have earned the gross profits that you calculate?

A.    Your question was am I aware of what?

Q.    Any evidence in the record that

but for the allegedly wrongful acts, Meta would not have earned the gross profits that you calculate.

A.    No.

Q.    In the Background section of your report, you state that Meta draws upwards of 90% of its revenue from advertising.

Do you recall that?

A.    Yes.  It's actually closer to 99%, I think.

Q.    So the profits that you calculate for aged-up teens comes almost entirely from Meta's ad revenue, right?

A.    It's actually all ad revenue. That was the starting point for my calculations.

Q.    Okay.  So -- and the ad revenue comes from third parties?  Is that your understanding?

A.    Yes, third-party advertisers.

Q.    So the gross profits that you're calculating for aged-up teens comes from third parties rather than the aged-up teens themselves; is that correct?

CONFIDENTIAL

Page 250

BY MR. WILLIAMS:

Q.    No, but the survey population is children who are online, correct?

A.    I would say it's children who are using some sort of online -- are in some online space, amongst a very large variety, a lot of them which are gaming platforms and not social media platforms.

Q.    And not all children in the US are online, correct?

MS. ARORA:  Objection to form.

A.    I think I would agree with that statement.

BY MR. WILLIAMS:

Q.    So there's some bias in the Thorn survey population towards children who are online, correct?

MS. ARORA:  Objection to form.

A.    It's possible.

BY MR. WILLIAMS:

Q.    You don't know how strong that potential bias is, correct?

MS. ARORA:  Objection to form.

A.    I don't.

///

Page 256

that were asked to teens or to --

A.      Because that's --

Q.      Or to children?

A.      Because that's the way the report characterizes them.  They're in italics, they're meant to be the actual question that was asked.  That's what I understood the report to be conveying.

Q.      Okay.  So your understanding is the report is conveying the questions as they were presented to children?

A.      Yes.

Q.      And that's based on your review of the report, nothing else, correct?

A.      Based on my review of the report and the statement of what the questions were.

Q.      And do you know if the word "use" was defined in the survey?

A.      I'm not aware of it having been defined in some way, but I don't know for sure.

Q.      Use can encompass instances in which a child did not have their own Instagram or Facebook account, correct?

CONFIDENTIAL

Page 257

MS. ARORA:  Objection to form.

A.    Yes, a child may interpret it that way.

BY MR. WILLIAMS:

Q.    It could include a child watching an older sibling or friend on Instagram or Facebook, correct?

MS. ARORA:  Objection to form.

A.    I don't know.  That's not how I would define use, but it's possible.

BY MR. WILLIAMS:

Q.    It could include a child accessing Instagram or Facebook through the account of an older sibling or friend, correct?

MS. ARORA:  Objection to form.

A.    It's possible.

BY MR. WILLIAMS:

Q.    It could include a parent allowing a child to use the parent's Instagram or Facebook account, correct?

MS. ARORA:  Objection to form.

A.    It's possible.

BY MR. WILLIAMS:

Q.    And in all those circumstances,

Page 270

retention?

MS. ARORA:   Objection to form.

A.    I won't be stating it in trial as a -- as an opinion that I have, but if I'm asked as to my review of the evidence around this, I would relay what's in this report.

BY MR. WILLIAMS:

Q.    And so you would testify that Meta does have a focus on teen acquisition and retention?

MS. ARORA:   Objection to form.

A.    I would testify that based on my review, there's evidence that Meta was interested in acquiring, retaining and engaging teens.

BY MR. WILLIAMS:

Q.    When you say that Meta was interested in acquiring, retaining and engaging teens, what do you mean?

A.    I mean that it appeared to be important to Meta to do so; that it was integral to the business model.

Q.    So it was something that...

So is it your view that Meta was -- strike that.

Q.    So Meta was trying to acquire and retain teens; is that fair?

MS. ARORA:  Objection to form.

A.    Acquire, retain and engage them on its platforms, yes.

BY MR. WILLIAMS:

Q.    What's the basis for that observation?

A.    All of the discussion that I have in this report that spans paragraph 35 through 60.

Q.    And the discussion you're referring to was based on your review of internal Meta documents and some deposition transcripts of Meta employees; is that right?

A.    It's depositions.  It's internal presentations.  It's some models that Meta had -- Meta employees had developed.  It's internal communications.

Q.    So you're summarizing that factual information in this section, correct?

MS. ARORA:  Objection to form.

A.    Yes.

BY MR. WILLIAMS:

Q.    Are you applying any analysis

CONFIDENTIAL

Page 273

to that information in this section?

MS. ARORA:  Objection to form.

A.    Not -- not some kind of numerical analysis.  I'm just making a determination whether it appeared that the assertions that are being made about Meta's desire to acquire, retain and engage teens, whether there was a basis for that assertion; and there appears to be a basis for that.

BY MR. WILLIAMS:

Q.    When you say the assertions that are being made, which assertions are you referring to?

A.    The assertions that the States are making in the complaint.

Q.    So your analysis is limited to determining whether there's a factual basis to support the AGs' assertions, correct?

MS. ARORA:  Objection to form.

MR. BERGE:  Objection to form.

A.    It's establishing that these calculations that I was asked to prepare, such as time spent, which are based on this assertion, that there's a reasonable basis for that; that the facts appear to support

CONFIDENTIAL

Page 286

the moment.

Q.    And you're not offering an expert opinion on whether it is reasonable to extrapolate the BEEF results over the six-year period that you apply them to, correct?

A.    I'm not offering an opinion as to -- that's right.  That's an assumption I'm taking as a given, but I have conducted some analysis in this report to demonstrate why I think it's a reasonable assumption and why it's not likely to result in a significant overcount of the number of instances of bad encounters at time periods other than June or July of 2021.

Q.    You're not aware of another expert who is going to testify as to the reasonableness of that extrapolation, correct?

A.    I'm not.

Q.    And if the Court or factfinder determines that it is not reasonable to assume a consistent rate over that six-year period, then your -- that would render your bad experience violation count unreliable,

Page 290

that time period, which is close to the beginning of when I started my calculations.

BY MR. WILLIAMS:

Q.    You did not perform any statistical analysis to determine whether extrapolating the BEEF survey results over the relevant time period was reasonable, correct?

MS. ARORA:  Objection to form.

A.    That is correct.

BY MR. WILLIAMS:

Q.    You didn't consider any external factors that might have affected the results of the BEEF survey over the period it was conducted, correct?

A.    What do you mean by external factors?

Q.    Well, you didn't consider whether the BEEF survey results were inflated by COVID, for example?

A.    Well, I think some of the analysis I did speak to that issue.  So, for example -- again, going back to I'm looking at time spent at the percentiles throughout this period, from 2018 to 2024.  And I'm

BY MR. WILLIAMS:

Q. And that's consistent with the calculations you did on the BEEF survey, correct?

A. Yes, although there is one version of my calculations that because it assumes a hundred percent correlation, meaning the same teens keep having the same bad encounters week after week, that version of the calculation actually doesn't assume a higher monthly rate than a weekly rate. It assumes it's the same.

Q. All right. Let's turn to Section VII of your report, which starts on page 50. And this section is titled Meta's Efforts to Address Issues Around Teen Usage on Instagram and Facebook, correct?

A. Yes.

Q. And some of the analysis in this section relates to the discussion we were just having about your conclusions about extrapolating the BEEF results, correct?

A. Yes.

Q. Now, you're not offering an opinion -- you're not offering any expert

Page 319

opinions that are reflected in this section, correct?

MS. ARORA:  Objection to form.

A.    I wouldn't say that these are opinions.  I would say that this is evidence that is supporting the method in which I conducted my calculations and my extrapolation.

BY MR. WILLIAMS:

Q.    And what's the distinction you're drawing between evidence and opinion?

A.    Well, in order to develop an opinion, you look at data and you look at evidence, and you use that as a basis for your opinion.

Q.    So in part of this section, you're conducting an analysis of time spent trends, correct?

A.    Yes.

Q.    And is that evidence or an opinion?

MS. ARORA:  Objection to form.

A.    Well, there's some analysis, and then there's some conclusions here about what the time spent trends look like.

CONFIDENTIAL

Page 330

consider in your report in this section are time management -- a time management dashboard, Take a Break, Quiet Mode, Family Center, Parental Supervision tools and Teen Accounts.

Does that sound right?

A.    Yes.

Q.    And I'm going to name a couple of features that Meta may have implemented, and I'd like you to tell me if you considered them in your report.

Suspicious adult restrictions and discovery implemented in July 2021?

A.    I don't think so.

Q.    Private account default for U16 users implemented in July 2021?

A.    I don't think I discussed that one.

Q.    Sensitive content control and defaultless settings for teens implemented in July 2021?

A.    I don't think that's discussed in my report.

Q.    Tagging and remix restrictions for teens implemented in December 2021?

CONFIDENTIAL

Page 331

A.    Not discussed in my report.

Q.    June 2022 and January 2024 updates to the Instagram Family Center and Parental Supervision tools?

A.    That one might be addressed in my report.  I'd have to look for it.

Q.    Take your time.

A.    I'm sorry, can you repeat that one again?

Q.    June 2022 and January 2024 updates to the Instagram Family Center and Parental Supervision tools.

A.    I discussed the introduction of Family Center in March of 2022, and I discussed the rate at which the Family Center feature was being adopted in 2023 and 2025.

Q.    So my question was different. It was about the June 2022 and January 2024 updates to the Instagram Family Center and Parental Supervision tools.

A.    Right.  I don't discuss the update, but the adoption rates here would reflect that update.

Q.    Do you discuss Favorites and Following Feeds implemented in March 2022?

CONFIDENTIAL

Page 332

A.    No.

Q.    Do you discuss Nudges feature on Instagram Explorer implemented in June 2022?

A.    I don't think so.

Q.    Do you discuss Age Verification Via Selfie implemented in June 2022?

A.    No.

Q.    Do you discuss DM Kindness Nudges implemented in October 2022?

A.    No.

Q.    Do you discuss Prompt to Report After Blocking implemented in November 2022?

A.    No.

Q.    Do you discuss Ad Topic Controls for teens implemented in January 2023?

A.    No.

Q.    Do you discuss Instagram Recommendation Controls implemented in January 2023?

A.    No.

Q.    Do you discuss Take It Down Initiative implemented in February 2023 with updates in January 2024?

CONFIDENTIAL

Page 333

A.    I believe Take It Down was discussed somewhere in this report.  I don't know that I'm going to...

(Document review.)

A.    I'm not finding that one right now.

BY MR. WILLIAMS:

Q.    Do you discuss DM Invite Restrictions implemented in June 2023?

A.    I do not.

Q.    Do you discuss Manual Comment Hiding implemented in October 2023?

A.    No.

Q.    Do you discuss Lantern child safety collaboration implemented in November 2023?

A.    I do not.

Q.    Do you discuss age-inappropriate content restrictions implemented in January 2024?

A.    No.

Q.    Do you discuss Search Result Restrictions for Sensitive Topics implemented in January 2024?

A.    I don't think so.

CONFIDENTIAL

Page 334

Q.    Do you discuss Private --
Privacy Setting Nudges implemented in
January 2024?

A.    I don't think so.

Q.    Do you discuss stricter DM
settings for U16 teens implemented in
January 2024?

A.    I do not.

Q.    Let's turn to paragraph 89.

You refer to Meta's responses
to interrogatories regarding the rate of
adoption of certain safety features, correct?

A.    Just a moment.

Yes.

Q.    So you don't cite the rate of
adoption for any of the features we just
discussed, correct?

A.    I don't think so.

Q.    The adoption rate doesn't
indicate how effective a feature is for teens
who did adopt the feature, correct?

MS. ARORA:  Objection to form.

A.    No, it just tells you what
proportion of teens adopted it.

///

CONFIDENTIAL

                    CERTIFICATE
          I, MICHAEL E. MILLER, Fellow of
the Academy of Professional Reporters,
Registered Diplomate Reporter, Certified
Realtime Reporter, Certified Court Reporter
and Notary Public, do hereby certify that
prior to the commencement of the examination,
CARL S. SABA was duly sworn by me to testify
to the truth, the whole truth and nothing but
the truth.
          I DO FURTHER CERTIFY that the
foregoing is a verbatim transcript of the
testimony as taken stenographically by and
before me at the time, place and on the date
hereinbefore set forth, to the best of my
ability.

          I DO FURTHER CERTIFY that pursuant
to FRCP Rule 30, signature of the witness was
not requested by the witness or other party
before the conclusion of the deposition.
          I DO FURTHER CERTIFY that I am
neither a relative nor employee nor attorney
nor counsel of any of the parties to this
action, and that I am neither a relative nor
employee of such attorney or counsel, and
that I am not financially interested in the
action.

_____
MICHAEL E. MILLER, FAPR, RDR, CRR
Fellow of the Academy of Professional Reporters
NCRA Registered Diplomate Reporter
NCRA Certified Realtime Reporter
California CSR #13649
Dated: March 3, 2026

CONFIDENTIAL

Page 368

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA ADOLESCENT ) MDL No.
ADDICTION/PERSONAL INJURY      ) 4:22-md-3047-YGR
PRODUCTS LIABILITY LITIGATION  )
_____ )
------------------------------------------------------
COMMONWEALTH OF MASSACHUSETTS
SUFFOLK, ss                                SUPERIOR COURT
_____
COMMONWEALTH OF MASSACHUSETTS,
     Plaintiff,                    CIVIL ACTION NO.
                                   2384CV02397-BLS1
v.
META PLATFORMS, INC. and
INSTAGRAM, LLC.

     Defendants.
_____

Tuesday, March 3, 2026

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Video-Recorded Oral Deposition of CARL
S. SABA, VOLUME 2, held at the offices of
Davis Polk & Wardwell LLP, 900 Middlefield
Road, Redwood City, California, commencing at
9:04 AM PST on the above date, before
Michael E. Miller, Fellow of the Academy of
Professional Reporters, Certified Court
Reporter, Registered Diplomate Reporter,
Certified Realtime Reporter, and California
CSR #13649.
                    __ __ __
               GOLKOW - VERITEXT
          877.370.DEPS | fax 917.591.5672
                 deps@golkow.com

Golkow Technologies,
877-370-3377          A Veritext Division          www.veritext.com

CONFIDENTIAL

Page 411

what I relied on in terms of this workbook and what it communicates about user counts relative to what Dr. Isaacson is saying is the proportion of US respondents in the survey.

BY MR. WILLIAMS:

Q.    Do you have a view today -- well, strike that.

You referred earlier to your -- to conducting a preliminary review, correct?

A.    Yes.  Dr. Isaacson raised this new issue -- I don't know -- two or three days ago.  I just haven't had enough time to fully investigate this.  It wasn't in his rebuttal report.

Q.    So you don't have a view today -- or strike that.

Do you have a view today whether your response rates that you rely on from the BEEF survey include -- are limited to US respondents?

MR. BERGE:  Objection to the form.

MS. ARORA:  Objection to form.

A.    I can't tell you if they're

Page 412

only US respondents.

What I can tell you is the survey was for 238,000 individuals. Dr. Isaacson is saying that 4% of the survey respondents are in the US. I'm still looking into that. If that is true, that would be approximately 10,000 respondents would be in the US.

What I see for the table that I'm relying on in terms of counts of teens is you will typically have responses to a particular issue in the amount of maybe a thousand, 2,000, maybe at most 3,000 individuals; and so that certainly doesn't look like it's tabulating the entire survey.

BY MR. WILLIAMS:

Q.    Understood.

You're referring to that as a preliminary review, and what I'm trying to understand is:  Sitting here today, do you know whether your -- the response rates you used for the BEEF survey are limited to US respondents?

MR. BERGE:  Objection to the form.

CONFIDENTIAL

                    CERTIFICATE
            I, MICHAEL E. MILLER, Fellow of
the Academy of Professional Reporters,
Registered Diplomate Reporter, Certified
Realtime Reporter, Certified Court Reporter
and Notary Public, do hereby certify that
prior to the commencement of the examination,
CARL S. SABA was duly sworn by me to testify
to the truth, the whole truth and nothing but
the truth.
            I DO FURTHER CERTIFY that the
foregoing is a verbatim transcript of the
testimony as taken stenographically by and
before me at the time, place and on the date
hereinbefore set forth, to the best of my
ability.

            I DO FURTHER CERTIFY that pursuant
to FRCP Rule 30, signature of the witness was
not requested by the witness or other party
before the conclusion of the deposition.
            I DO FURTHER CERTIFY that I am
neither a relative nor employee nor attorney
nor counsel of any of the parties to this
action, and that I am neither a relative nor
employee of such attorney or counsel, and
that I am not financially interested in the
action.

_____
MICHAEL E. MILLER, FAPR, RDR, CRR
Fellow of the Academy of Professional Reporters
NCRA Registered Diplomate Reporter
NCRA Certified Realtime Reporter
California CSR #13649
Dated: March 3, 2026