# Exhibit 3

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA ADOLESCENT ) MDL No.
ADDICTION/PERSONAL INJURY      ) 4:22-md-3047-YGR
PRODUCTS LIABILITY LITIGATION  )
_____ )
-------------------------------------------------------
         COMMONWEALTH OF MASSACHUSETTS
SUFFOLK, ss                              SUPERIOR COURT
_____
COMMONWEALTH OF MASSACHUSETTS,
     Plaintiff,                    CIVIL ACTION NO.
                                   2384CV02397-BLS1
v.
META PLATFORMS, INC. and
INSTAGRAM, LLC.

     Defendants.
_____

                Monday, March 2, 2026

 CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

        Video-Recorded Oral Deposition of CARL
S. SABA held at the offices of Davis Polk &
Wardwell LLP, 900 Middlefield Road, Redwood
City, California, commencing at 9:03 AM PST
on the above date, before Michael E. Miller,
Fellow of the Academy of Professional
Reporters, Certified Court Reporter,
Registered Diplomate Reporter, Certified
Realtime Reporter, and California CSR #13649.
                __ __ __
             GOLKOW - VERITEXT
        877.370.DEPS | fax 917.591.5672
              deps@golkow.com

CONFIDENTIAL

Page 156

BY MR. WILLIAMS:

Q.    What do you mean by that?

A.    I mean, that my assignment didn't start with:  We want you to use the BEEF survey to prepare these calculations.

It was -- part of my assignment was to calculate certain types of bad encounters, and then there was a discussion about what would serve as a reasonable data source for that.

Q.    Okay.  But you don't state that in your explanation of your assignment, right?

A.    Not in that level of detail, I don't think.

Q.    In your paragraph 17, you state that you were asked to perform the following calculations, and one of those calculations is calculate the number of instances in which teens were exposed to specific bad experiences on Instagram based on the findings of the Bad Experiences and Encounters Framework survey conducted by Meta, correct?

A.    That's correct.

CONFIDENTIAL

Page 157

Q.      So that was your assignment, correct?

A.      That was my assignment.

Q.      What did you do to determine that it was reasonable to calculate the bad experience violations based on the BEEF survey?

A.      I made an assessment of the survey itself and compared it to other potential data sources.

Q.      And when you say you made an assessment of the survey itself, what do you mean by that?

A.      I mean I took into account that it was a large survey.  It was the largest that I could locate of the other potential data sources.

For example, there was a Negative Experiences Survey that was conducted in 2019, I believe another version of it in 2018 that asked similar questions. It was much smaller.  It was 30,000 participants versus almost 240,000.

I took into account that this was something that was prepared by Meta; that

it was prepared by Dr. Andrews, who testified in his deposition that he had very significant survey design expertise; that that was a focus of his expertise.

I took into account that his direct supervisor stated in his performance review that that survey gave Meta the most comprehensive understanding at the time that they had gained about what causes bad experiences on Instagram.

I took into account that it was recommended by data science that the survey should be used starting in the first half of 2022 to set well-being goals. So, therefore, that essentially Meta gave it credibility. Meta wanted to use it.

Dr. Andrews testified that it was -- you know, there is no perfect survey, but it was a successful survey in his view and it provided significant insights.

Other factors -- there's a -- in the survey results, there is a fairly narrow 95% confidence interval reported.

Those are the things I can think of at the moment.

CONFIDENTIAL

Page 159

Q.      You're not offering an opinion that -- in this action that it's appropriate to use the BEEF survey for purposes of your calculations, correct?

MS. ARORA:  Objection to form.

A.      I don't think I'm offering an opinion, but I -- I do think it's a reasonable data source for the -- for the calculations that I'm preparing.

BY MR. WILLIAMS:

Q.      You don't do any empirical analysis of the BEEF data to conclude that it's a sufficiently reliable source for purposes of your calculations, correct?

A.      Can you define empirical analysis?

Q.      Well, how do you understand it?

A.      Well, I'm asking you because I don't know what you're alluding to.

I mean, I looked at a number of factors, right, to assess is this a reasonable data source.  One of them that I just relayed to you is the confidence interval.  You could state that that's empirical.

CONFIDENTIAL

Page 160

Q.    You don't discuss the confidence interval of the report -- of the survey in your report, correct?

A.    I don't.

Q.    And you don't set any parameters for what size of a confidence interval you would view as reasonable in your report, do you?

A.    I don't discuss that in my report.

Q.    So in your report, you don't conduct that type of empirical analysis, correct?

A.    No, I don't.

MS. ARORA:    Objection.

BY MR. WILLIAMS:

Q.    And there's no other type of empirical analysis you reflect in your report that -- regarding the appropriateness of using the BEEF survey, correct?

A.    Again, I think if you mean -- by empirical, you mean some sort of statistical or numerical analysis, no, I don't.  I assessed a number of other factors.

Q.    And you mentioned the NET

CONFIDENTIAL

Page 161

survey -- well, sorry, I think you called it the negative experience something survey. That's the NET survey?  Do you understand that to be the same?

A.    I don't know about the NET moniker, but --

Q.    I don't think it has the T in your reply report.

A.    Yeah.

Q.    We'll call that the Negative Experience Survey; is that fair?

A.    That's fine.

Q.    So you're referring to a 2019 survey conducted by Meta, correct?

A.    Correct.

Q.    Other than the negative -- the 2019 Negative Experiences Survey, did you consider using any other survey for purposes of calculating negative experiences?

A.    I mean, I did look at -- there's a portfolio of Thorn surveys.  I do reference a Thorn survey for other purposes. It doesn't -- it asks a much more limited set of questions about bad encounters than BEEF.

And then I've become aware of

CONFIDENTIAL

Page 162

another survey that was linked to the Heat Initiative that was conducted in -- I believe it's August of 2025, but that is past the end of my relevant time period.

Q.    And so why didn't you use it as a -- so why didn't you use the Heat Initiative as the basis for calculating bad experiences?

A.    Because it was more limited, and it was less of a fit, right?  So it's past my relevant time period, first of all, whereas the BEEF survey is inside my relevant time period.

The Heat survey is limited to only a subset of teens -- I think it's 13 to 15 if I'm recalling correctly, so it's not all teens -- whereas the BEEF survey allows me to look at response rates for all teens.

I believe also the Heat Initiative survey had more limited questions that were asked about bad encounters.

Q.    And all of those factors made it inappropriate in your view to use as the measure of bad experiences in this case?

A.    I don't think I would --

CONFIDENTIAL

Page 173

A.    Yes, I was aware that there was a Country field.

Q.    And did you analyze in connection with your opening report the percentage of respondents who were not located in the US?

A.    I didn't try to estimate what proportion were outside of the US.

Q.    Do you know what proportion are outside the US?

A.    Well, I know that Dr. Isaacson has come up with what appears to be a new opinion after his rebuttal report that -- I think it's 4% are in the US.

Q.    And have you undertaken any analysis to determine whether Dr. Isaacson's calculation is correct?

MS. ARORA:  I'm going to object to questions about Dr. Isaacson's new opinion as that new opinion does not comport with the Court's orders or the Federal Rules of Civil Procedure.

MR. BERGE:  I would object on behalf of Massachusetts because we didn't have a reply opinion in this

CONFIDENTIAL

case or a surreply in this case, so I launch the objection for Massachusetts as well.

MR. WILLIAMS:  Noted.  We disagree.

Court reporter, could you read back the question pending, please.

-----------

(The following portion of the record was read.)

QUESTION:  And have you undertaken any analysis to determine whether Dr. Isaacson's calculation is correct?

(End of readback.)

-----------

A.    My team has been looking into this.  I have not had enough time to fully analyze this, but I -- what I would say is the preliminary results of what we've seen is that the responses that I am relying on appear to correlate to US counts, not out-of-country counts.

So if the US is 4% of survey participants, that's approximately 10,000 out

CONFIDENTIAL

of 240,000, and if you look at the counts for the respondents in the tables that I was relying on, they're in that order of magnitude. There are 1- or 2- or 3,000 respondents to each question. There're not tens of thousands or hundreds of thousands.

Q. And when you say you looked at the tables that you were relying on, you're referring to the tables in the internal Meta deck that summarizes the BEEF survey results?

A. No, not the -- not the PowerPoint slide. It's more detailed tables that are in Excel workbooks.

Q. And those are tables linked to through the -- to that deck?

MS. ARORA: Objection to form.

I think you'd have to show him the deck if you want answers like that.

A. The deck is summarizing some of the data that's in those Excel tables, but the Excel tables provide a lot more detail.

BY MR. WILLIAMS:

Q. So your understanding is that you relied on US response rates for purposes

Page 176

of performing your calculations, correct?

A.    It appears to be the case, yes.

Q.    And if you didn't rely on US response rates, would that affect the reasonableness of -- your view as to the reasonableness of using the -- strike that.

Do you know how large the sample size was for US respondents aged 13 to 17 for each of the ten bad experience questions that you relied on?

A.    No, I don't.

Q.    Do you know what the 95 -- the confidence interval, the 95% rate was for each of those ten questions?

A.    Yes, it's what I relayed to you earlier.  It's typically plus or minus 1%. So if, for example, the response rate was 27% in the affirmative, if you look at the 95% confidence interval, you would typically see 28% as the upper bound and 26 as the lower bound.

Q.    And those were confidence intervals provided in the BEEF survey summary deck, correct?

A.    Correct.  They're communicating

CONFIDENTIAL

Page 239

MS. ARORA:  Objection to form.

A.    I'm not offering an opinion about that.  If I am asked in trial, you know, based on the evidence that I reviewed that it appeared that Meta was aware it had under-13s on its platform, I would answer in the affirmative.

BY MR. WILLIAMS:

Q.    So you mentioned earlier that you relied on the Thorn surveys to estimate U13s, correct?

A.    That's one of the data sources I relied on, yes.

Q.    What are the other data sources you relied on?

A.    US Census data for each state for under-13s.

Q.    And how did you select the Thorn surveys for purposes of your calculations?

A.    So again, I think my team and I made an assessment of what data sources we had access to and what data sources we could locate through our research that might be suitable for making this estimate.  And we

CONFIDENTIAL

Page 240

were aware of these Thorn surveys, and they fit that purpose.

Q.    Did you have access to the underlying -- strike that.

Did you have access to the raw data from the Thorn surveys?

A.    I don't think so.  I think what we had were the reports that discussed how the survey was conducted, what questions were asked, and then what the results were.

Q.    And you're referring to the reports that Thorn made public as to each of the surveys; is that right?

A.    I believe so, because I know that you can -- you can locate them online.

Q.    Were you asked by counsel to use the Thorn surveys to calculate U13s?

A.    No.  I was asked to just simply make an estimate of how many U13s were on the platform.

Q.    Did you undertake any investigation to determine whether the Thorn surveys were -- provided a reliable basis for calculating the number of U13s?

A.    Could they make a general

Page 241

assessment similar to what I described for the BEEF survey as to the suitability of that survey and whether -- and it's actually more than one survey; it's several surveys over this time span.  And whether I had any other better data sources, and my conclusion was that this was the best.

Q.    Are you offering -- sorry, strike that.

Can you describe the general assessment that you just referenced?

A.    Yes.  So these surveys were conducted over several years, so there are several of them.  So I can see to what extent the results are consistent or vary over time.

They do ask questions about what social media platforms and gaming platforms 9- to 12-year-olds use and whether they're used daily or whether they were ever used, which is directly on point for my calculations.

And, generally speaking, I think one of these surveys or this work in general conducted by Thorn was considered to be, you know, of high quality by Meta.  I

CONFIDENTIAL

Page 242

discuss that Meta had characterized their research as important, measured, quality and thoughtful.

Q.    But you're not providing an opinion that the Thorn surveys are -- provide a reliable basis for you to calculate the number of U13s on Meta's platforms, correct?

MS. ARORA:  Objection to form.

A.    Well, I mean, I think that they're a reasonable basis of information for making those estimates.  I don't know which...

I'm not providing an opinion on how the survey was designed or how it should have been designed.

BY MR. WILLIAMS:

Q.    I'm just asking if you're providing an opinion in this action that the surveys provide a reasonable basis for estimating the number of U13s on the platform?

A.    I do think it's a reasonable data source for my calculations.

Q.    And is that an expert opinion you're offering in this action?

CONFIDENTIAL

Page 258

the survey respondent would not necessarily be active -- be an active person on Instagram or Facebook, correct?

MS. ARORA:  Objection to form.

A.    Depends on how you define it. Because, I mean, active person is generally defined as somebody who has made some use of the platform.  So, I mean, you could -- you could interpret that to also include if they've used the platform through their parents' account.

BY MR. WILLIAMS:

Q.    So your calculations of active persons, of MAPs, in this action is not limited to children who have accounts on Instagram or Facebook, correct?

MS. ARORA:  Objection. Objection to form.

A.    I'm not -- I am not making an explicit assumption about that one way or another.  I'm attempting to reflect kids who were making some use of the platform.

BY MR. WILLIAMS:

Q.    And you don't know whether those kids who made some use of the platform

CONFIDENTIAL

Page 259

actually had accounts, correct?

MS. ARORA:  Objection to form.

A.    I don't, but, I mean, you know, one of the questions was:  Do you use this daily?  If somebody -- if a kid responds in the affirmative, it would seem to me highly likely that they have an account.

BY MR. WILLIAMS:

Q.    What if their parent allows them to use it daily?

MS. ARORA:  Objection to form.

A.    That's a possible scenario.  I wouldn't expect that to be the typical situation.

BY MR. WILLIAMS:

Q.    So again, when you're calculating your estimate of U13s on the platforms, you're not limiting it to children who actually have Instagram and Facebook accounts, correct?

MS. ARORA:  Objection to form.

A.    I think allowing for the possibility of the scenarios that you just described, I think that is true.

///