# Corrected Exhibit B

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
CASE NO. 4:22:MD-03047-YGR (PHK)
----------------------------------
IN RE:  SOCIAL MEDIA ADOLESCENT  :
ADDICTION/PERSONAL INJURY        :
PRODUCTS LIABILITY LITIGATION    :
-------------------------------- MDL No. 3047
THIS DOCUMENT RELATES TO:        :
                                 :
People of the State of           :
California, et al. v. Meta       :
Platforms, Inc., et al.,         :
                                 :
Case No. 4:23-cv-05448           :
                                 :
----------------------------------

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

Deposition of NATHAN BLAKE taken in
the above-entitled matter at Colorado
Department of Law, 1300 Broadway, Denver,
Colorado 80203, before Suzanne J. Stotz, a
Certified Realtime Reporter, Registered
Professional Reporter, and Notary Public of the
State of Colorado, on August 13, 2025,
commencing at 9:14 a.m. MDT.

Job No. MDLG7488366

CONFIDENTIAL

involvement in this case apart from being the deponent today?

A.    It kind of depends what you mean by "personal involvement."  I am not one of the litigators.  I'm not, you know, making arguments in court or drawing up documents or reviewing discovery.

I do supervise the people that do that, and so I have awareness of kind of how the case is proceeding.

Q.    You have not noticed an appearance in this case, right?

A.    Correct.

Q.    Do you have any education specific to mental health?

A.    No.  I mean, it's possible I've taken classes that covered the subject in -- like in college.

Q.    What was your college degree in?

A.    I have a B.A. in international studies.

Q.    Okay.  Aside from maybe having some college classes that might have touched on mental health --

A.    Yeah.

CONFIDENTIAL

Page 20

Q.    -- can you think of any other education or training you've had specific to mental health?

A.    No.

Q.    Do you have any education or training specific to social media?

A.    No.

Q.    Actually, you mentioned those couple college classes that might have touched on mental health.

Did anything in -- in those classes touch on teen mental health in particular?

A.    I don't remember.

Q.    Have you ever worked in any position where you have responsibility for teen mental health?

A.    No.

Q.    Have you ever worked in any position where you had responsibility for decision-making about social media use?

A.    What do you mean by that, "decision-making for social media use"?

Q.    Sure.  Have you ever had any job where you were responsible for deciding about programming to provide related to social media

that there have been effects on teen mental health that are reported to us through our investigation, and I'm not in a position to note any -- like, the aggregate number of teens experiencing anxiety or having been diagnosed with anxiety that also use your products.

BY MS. PHILLIPS:

Q.    So Colorado -- just to be sure I'm understanding, Colorado does not know how many teens in Colorado have anxiety and have used either Facebook or Instagram?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  We know that there are teens that have anxiety through using Facebook and Instagram.  I do not know the exact number in Colorado.

BY MS. PHILLIPS:

Q.    You can't say if it's 10 or 100 or 1,000 teens who would fall into that category sitting here today?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  I'm not going to guess at a number.

Page 97

BY MS. PHILLIPS:

Q.    And you don't know whether any of those teens also use any other social media platforms, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  I - I don't know exactly what every teen in Colorado uses on social media whether they have anxiety depression or something else.

BY MS. PHILLIPS:

Q.    And you don't know whether any of those teens had anxiety before they started using Facebook or Instagram, right?

MS. BATCHELDER:  Objection to form and scope.

THE WITNESS:  I don't know.

BY MS. PHILLIPS:

Q.    You don't have any information from any health-care provider here in Colorado who has told you that any specific teen's anxiety was caused by using feign or Instagram?

MS. BATCHELDER:  Objection to form and scope.

THE WITNESS:  Again, over the course -- course of our investigation,

CONFIDENTIAL

Page 98

it's possible we talked with health-care providers who referenced something specific like this occurring.  It's not been something we focused on because it's the overall harms that, you know, we don't have individual clients that were suing on behalf of or suing on behalf of the State, the Attorney General's Offices, and that to my knowledge hasn't been, like, a primary focus of trying to identify individuals.

To the extent it's relevant, I think it will come up in, you know, the documents or evidence as presented over the course of discovery and then trial.

BY MS. PHILLIPS:

Q.    It's possible somebody reported something like that; but testifying today on behalf of Colorado, you don't know whether you have any information from any specific health-care provider that any individual teen in Colorado had anxiety that was caused by the use of Facebook or Instagram?

MS. BATCHELDER:  Objection to form and scope.

Page 100

BY MS. PHILLIPS:

Q.    Are you aware of something that's not comprehensive and not aggregate but that you think gives you the information about whether -- how many, excuse me, teens in Colorado who have insomnia use Facebook or Instagram?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  I -- again, I think the Rise Above Colorado Survey results reference kind of the impact on sleep patterns by teens that are using social media.  It's not designed to literally quantify every teen, but it's a, as I understand it, a reasonable survey or a survey that was done through, like, normal scientific methods that can kind of indicate meaningfully what's going on based on the number of people they surveyed.

BY MS. PHILLIPS:

Q.    So can -- do -- how many kids in Colorado, teens in Colorado who have insomnia use Instagram or Facebook?

MS. BATCHELDER:  Objection to form

CONFIDENTIAL

Page 101

and scope.

THE WITNESS:  Again, I don't -- I'm not in the position to quantify that here today.

BY MS. PHILLIPS:

Q.    You don't know whether any of those teens who have insomnia and use Facebook or Instagram also use any other social media platforms, right?

MS. BATCHELDER:  Objection to form and scope.

THE WITNESS:  I don't know.

BY MS. PHILLIPS:

Q.    And you don't know whether any of those teens experienced insomnia before they ever started using Facebook or Instagram, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  I don't know about any individuals.

BY MS. PHILLIPS:

Q.    I suspect the answer will be similar, but does Colorado have any information about how many teens in Colorado who have eating disorders use Instagram or Facebook?

Page 102

MS. BATCHELDER:  Objection to form and scope.

THE WITNESS:  So similar to, yeah, as you kind of previewed, similar to my previous answers, I think we're not in the position to quantify that.

BY MS. PHILLIPS:

Q.    And you don't know -- to the extent any teens in Colorado who have eating disorders also use Instagram or Facebook, you don't know whether those teens use other social media platforms, right?

MS. BATCHELDER:  Objection to form and scope.

THE WITNESS:  Yeah.  I couldn't list off the individuals' usage of which social media companies.

BY MS. PHILLIPS:

Q.    And you don't know whether any of those teens developed eating disorders before they started using Facebook or Instagram, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  I haven't even been able to identify each of them, ad so I

CONFIDENTIAL

Page 103

don't know the answer to that.

BY MS. PHILLIPS:

Q.    You haven't received any report from any specific health-care provider here in Colorado who told you that a particular teen's eating disorder was caused by the use of Facebook or Instagram, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  I sitting here can't recall that, but it's certainly possible that we have interacted with someone, you know, a health-care professional at some point who's given that type of indication to us.

BY MS. PHILLIPS:

Q.    It's possible but you can't recall any such reports sitting here today, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  I -- yes.  As I started that answer, I'm not in the position to identify that.

BY MS. PHILLIPS:

Q.    Okay.  Does Colorado have any information about the number of teens in Colorado who have engaged in any self-harm who

CONFIDENTIAL

Page 104

also use Instagram or Facebook?

          MS. BATCHELDER:  Objection to form.

          THE WITNESS:  So similar to the
other, we don't -- we have information
about it, but not -- we're not in a
position to identify the exact number.

BY MS. PHILLIPS:

    Q.    And you're not in a position to
provide a ballpark number either, right?

          MS. BATCHELDER:  Objection to form.

          THE WITNESS:  I -- I don't think
so.

BY MS. PHILLIPS:

    Q.    And you don't have any information
about whether any teens in Colorado who have
self-harmed who use Instagram or Facebook have
also used any other social media platform,
right?

          MS. BATCHELDER:  Objection to form
and scope.

          THE WITNESS:  I -- I don't have
that information about the individual's
usage of various social media companies.

BY MS. PHILLIPS:

    Q.    You don't know whether any of those

teens started any self-harming behavior before they started using Instagram or Facebook, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  I couldn't say for sure today.

BY MS. PHILLIPS:

Q.    And you don't have any information from any specific health-care provider in Colorado who has told you that any particular teen's acts of self-harm were caused by the use of Facebook or Instagram?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  So again, I think it's possible that those -- that information's come through a health-care professional at some point in our investigation, even a separate conversation, but I'm not in a position to note that specifically.

BY MS. PHILLIPS:

Q.    Sitting here today, you can't say for sure that Colorado has heard from any specific health-care provider that any individual teen's acts of self-harm were caused

Page 113

THE WITNESS:  To my knowledge, there's -- I don't know that we have a specific number that we could list.

BY MS. PHILLIPS:

Q.    You don't know how many Colorado residents ever read or heard any of the specific statements about Facebook or Instagram that the State believes are misrepresentations?

MS. BATCHELDER:  Objection to form and scope.

THE WITNESS:  Is that a different question than the one you just asked me?

BY MS. PHILLIPS:

Q.    Well, I -- i think I previously asked about statements generally, and I've just asked about misrepresentations specifically; but why don't I ask it again.  I'll withdraw and ask it again to make a clean record.

Mr. Blake, you don't know how many Colorado residents ever read or heard any of the statements about Facebook or Instagram that the State is claiming were misrepresentations?

MS. PHILLIPS:  Objection to form and scope.

THE WITNESS:  Apart from it being

CONFIDENTIAL

Page 114

more than zero, I don't have a specific number to give you.

BY MS. PHILLIPS:

Q.    Does Colorado have any information about whether any Colorado resident did anything or chose not to do anything in response to any of those statements?

MS. BATCHELDER:  Objection to form and scope.

THE WITNESS:  Not to my knowledge.

BY MS. PHILLIPS:

Q.    Can you identify any single Colorado resident who does not work in the Attorney General's Office who was misled by any specific statement about Facebook or Instagram?

MS. BATCHELDER:  Objection to form and scope.

THE WITNESS:  I don't think we have identified any individual.

MS. PHILLIPS:  It's been nearly an hour again.  Do you folks want a break.

THE WITNESS:  Or we could go until lunch.

(Discussion held off the record.)

product?

A.    Yes.

Q.    Are you aware that at all times Facebook and Instagram had policies informing users that they may not use Facebook or Instagram if they are under 13?

A.    I'm aware that there's -- you know, that Meta has those policies, those written policies.

Q.    Do you understand that individuals under the age of 13 are capable of lying on the internet about their age?

MS. BATCHELDER:  Objection to form and scope.

THE WITNESS:  Yeah.  That makes sense to me on, like, a conceptual level.

BY MS. PHILLIPS:

Q.    And so you understand that when asked to fill in a neutral form asking for their date of birth on Instagram's signup page, for example, some individuals under the age of 13 may lie about their date of birth in order to get past that age gate?

MS. BATCHELDER:  Objection to form and scope.

CONFIDENTIAL

Page 129

THE WITNESS:  I understand that. If I recall correctly, I'm not sure that the -- that exact signup is always present in this case, meaning I don't know if it was always neutral.

BY MS. PHILLIPS:

Q.    You don't have any reason to believe that Colorado children under the age of 13 would be unable to do the math required to lie about their birthday on that kind of age gate?

MS. BATCHELDER:  Objection to form and scope.

THE WITNESS:  Could you rephrase that?

I --

BY MS. PHILLIPS:

Q.    No problem.

A.    There was a couple of negatives.

Q.    No problem.  Do you have any reason to believe that Colorado children under age 13 would be incapable of getting past a birthday age gate on the internet?

MS. BATCHELDER:  Objection to form and scope.

Page 134

asking questions under?

BY MS. PHILLIPS:

Q.    Sure.  23.

A.    Okay.

Q.    And -- yeah.  I'd also say 22, but...

A.    So I guess I'm -- I can't say for sure what type of data is solicited or kept.

Q.    Are any State of Colorado government websites intended to reach users that are under 13?

MS. BATCHELDER:  Objection to form and scope.

THE WITNESS:  So I'm aware of at least one example, I believe, which is safe to tell, which is now run by our office; and, you know, I guess it's designed to provide information for middle and high school kids, some of whom would probably be under 13.

BY MS. PHILLIPS:

Q.    Got it.  A number of Colorado agencies use Facebook and Instagram to connect with the public, right?

A.    (Witness nodding.)

CONFIDENTIAL

MS. BATCHELDER:  Objection to form.

THE WITNESS:  Yes.

BY MS. PHILLIPS:

Q.    It's a way that they can connect directly with Colorado residents, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  Yeah.  That's my understanding.

BY MS. PHILLIPS:

Q.    There wouldn't be much point in state government agencies having Facebook or Instagram accounts if the only people they connected with on those accounts didn't live within the state they serve, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  I'm sorry.  I didn't follow.

BY MS. PHILLIPS:

Q.    That's fine.  I'll just withdraw the question.

You're aware that the Colorado Department of Human Services has a Facebook page?

A.    Yes.

Q.    And an Instagram?

Page 140

(Whereupon, Exhibit 8, Printout of the Instagram pages of the Colorado Department of Public Health and Environment, Bates labeled METACOAG-30(b)(6)PUBLICDOC-001-00001153 through METACOAG-30(b)(6)PUBLICDOC-001-00001154, was marked for identification.)

BY MS. PHILLIPS:

Q.    So we've marked as Exhibit 7 the Colorado Department of Public Health and Environment's Facebook page and Exhibit 8 the Colorado Department of Public Health and Environment's Instagram page.

You recognize that -- these as Facebook and Instagram pages of the CDPHE?

A.    I -- I do.

Q.    Okay.  And are you aware or would you like to -- you need to be refreshed on whether the Department of Early Childhood has Facebook and Instagram pages?

A.    I am aware that they do --

Q.    Okay.

A.    -- have both of those.

Q.    Okay.  And you're aware that the

CONFIDENTIAL

Page 141

governor uses Facebook and Instagram, right?

A.    Yes.

Q.    Okay.  The Attorney General uses Facebook and Instagram as well?

A.    He does.

Q.    Okay.  The Attorney General can communicate directly with Colorado residents through his Facebook and Instagram pages, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  Yeah, that's my understanding.

BY MS. PHILLIPS:

Q.    And -- and when I say "Colorado residents," that's a population that includes both adults and teens, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  I -- I suppose everybody who is on those platforms.

BY MS. PHILLIPS:

Q.    All of these agencies Instagram and Facebook pages we've just discussed, they're still active, right?

A.    Yes.

Q.    None of those agencies or

CONFIDENTIAL

Page 142

individuals in terms of the governor or AG have stopped using Instagram or Facebook since this lawsuit was filed?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  Not that I'm aware of.

BY MS. PHILLIPS:

Q.    Are you aware of any policies that Colorado has for its employees about how to use Facebook and Instagram specifically?

A.    You mean as opposed to other social media companies?

Q.    Yes.

A.    No.  Our office has a social media policy, but it applies to all platforms.

Q.    Okay.  Does that policy -- well, why don't I ask it this way.

Other than the Attorney General's Office policy, are you aware of any other policy that Colorado has for how its State employees can use social media?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  There may be individual state agencies that have their own, but I'm not aware of them.

Page 143

BY MS. PHILLIPS:

Q.      You -- you didn't look into the social media policies of any other state agency in preparing for today?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  I looked into what I know the Department of Law and then statewide policies.

BY MS. PHILLIPS:

Q.      Okay.  Are there any statewide policies about how State employees can use social media other than the Department of Law policy you've already talked about?

A.      It appears not.

Q.      And so there is no -- there are no statewide policies specific to the use of Instagram or Facebook either, right?

A.      Right.

Q.      Now, Colorado and these agencies we've talked about that have Facebook and Instagram pages don't use their Facebook and Instagram pages to communicate directly with under 13 residents, right?

MS. BATCHELDER:  Objection to form and scope.

CONFIDENTIAL

THE WITNESS:  Yeah.  You know, in my conversation with people who produce content for these social media sites, they're intending the audience to be, I think, usually adults.

BY MS. PHILLIPS:

Q.    Are there any policies that prohibit State employees from posting images of children under 13 on Facebook or Instagram?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  I'm not aware of any such policy.

BY MS. PHILLIPS:

Q.    Are there any policies that prohibit State employees from posting cartoon characters on Facebook or Instagram?

MS. BATCHELDER:  Objection to form and scope.

THE WITNESS:  I'm not aware of any sort of statewide policy to that effect.

BY MS. PHILLIPS:

Q.    Okay.  And so sorry.

MS. PHILLIPS:  And just for the record, we're on Topic 1 here.

Page 145

BY MS. PHILLIPS:

Q.    Are you aware that policies that instruct State employees to be careful in any way about what they post because there might be under 13 users on Facebook or Instagram?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  I'm not aware of any of that.

BY MS. PHILLIPS:

Q.    Are you aware of any state policies governing whether employees can use Facebook or Instagram to make posts directed at teens over the age of 13?

A.    I don't recall anything like that either.

Q.    No such policies were implemented back in 2021, for example?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  Could you repeat, like, the description --

BY MS. PHILLIPS:

Q.    No problem.

A.    -- of the policy you're asking about.

Q.    No problem at all.

CONFIDENTIAL

Page 147

11:55 a.m.  We are off the record.

(Whereupon, a lunch was taken.)

THE VIDEOGRAPHER:  The time is 1:03 p.m.  We are back on the record.

BY MS. PHILLIPS:

Q.    Welcome back, Mr. Blake.

Did you have a good lunch break?

A.    Yeah.

Q.    Are you ready to keep going?

A.    Okay.  Yes.

Q.    Okay.  We'll mark Exhibit 9, a web page from the Colorado governor's office titled "Social Media Policy and Disclaimer."

(Whereupon, Exhibit 9, web page from the Colorado Governor's website entitled "Social Media Policy and Disclaimer, Bates labeled METACOAG-30 (b)(6)PUBLICDOC-001-00002106 through METACOAG-30 (b)(6)PUBLICDOC-001-00002108, was marked for identification.)

BY MS. PHILLIPS:

Q.    And you're familiar or you reviewed this as part of your preparation for today; is that right?

A.    I did.

Page 148

Q.    Okay.  And this is a web page from the Colorado Governor's website setting forth a social media policy and disclaimer; is that right?

A.    Yeah.  That's my understanding.

Q.    And do you see the first paragraph reads, "Social media is an important tool for building our community, improving knowledge, solving problems, and understanding the work we do in the Office of the Governor and the Office of the Lieutenant Governor ("Office")."

Do you see that?

A.    I do.

Q.    And that's a true statement in the view of the State of Colorado?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  I don't -- yeah.  I don't have a reason to believe that that's not true.  It's certainly not a complete description of everything that social media is, but the elements here I think as the governor and the governor's office has laid out I think are -- are probably true.

BY MS. PHILLIPS:

Q.    To -- to break it down a bit

because it's -- in fairness, this doesn't say everything you could possibly say about social media --

A.    Uh-huh.

Q.    -- but it's true that "social media is an important tool for building our community," "our" referring to Colorado?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  Yeah.  I -- i guess I'm not actually sure what "our" refers to in this paragraph, but I think definitely accurate to say social media can be an important tool for building community.

BY MS. PHILLIPS:

Q.    Okay.  And social media is an important tool for improving knowledge, right?

A.    That's what it says here.

Q.    And this is the view of the governor of Colorado, right?

A.    Yeah, the governor's office, yes.

Q.    And social media is an important tool for solving problems?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  Yes.  That, again, is what it says here.  So I think we can

reasonably infer it's the position of the governor.

BY MS. PHILLIPS:

Q.    And then if you look at the second sentence in that first paragraph, it reads, "Your comments on our social media channels help us do this work, and we welcome your views on all of the issues we tackle in this office."

Do you see that there?

A.    I do.

Q.    Okay.  And this is -- the Colorado governor's office here is telling Colorado citizens that it's helpful when they engage with the governor's office on social media, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  I think that's a pretty apt paraphrasing of this last sentence, yes.

BY MS. PHILLIPS:

Q.    Some of those comments on social media can help the governor and lieutenant governor to do their jobs to serve the people of Colorado, right?

MS. BATCHELDER:  Objection to form.

Page 152

MS. BATCHELDER:  Objection to form.

THE WITNESS:  Yeah.  I don't see that prohibition in this -- in this particular list.

BY MS. PHILLIPS:

Q.    In fact, the governor's office here says it -- it welcomes your views transmitted through social media, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  It does say that.

BY MS. PHILLIPS:

Q.    This is one of the ways social media can be beneficial to provide folks like the governor of Colorado an opportunity to engage directly which is constituents, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  Yeah.  I -- I think one of the good things about social media is the encouragement and ability and amplification of -- of opportunities for the people of Colorado to interface with their public officials -- elected officials.

BY MS. PHILLIPS:

Q.    Social media isn't something that

CONFIDENTIAL

Page 153

is bad for all purposes for all people, right?

MS. BATCHELDER:  Objection to form. Scope.

THE WITNESS:  Yeah.  The -- I think Colorado's position is fairly characterized to not be social media's always bad all the time for all people.

Similar to other entities that we pursue for violations of the Colorado Consumer Protection Act, if we go after a car wash service just because they're breaking the law, it doesn't mean they're bad necessarily; and they might provide valuable services in other ways.  It's the similar construct here.  There's complexities.

BY MS. PHILLIPS:

Q.    Some things that governments warn the public about are bad for everybody, like cigarettes, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  I didn't prepare -- I'm -- I'm personally having a hard time imaging a good use of cigarettes, but I will admit that there are some things in

the world, either cigarettes or something else, that are just bad.

BY MS. PHILLIPS:

Q.    And there's a -- you're aware -- I think most people are -- that there's a warning on every packet of cigarettes sold in this country, right?

MS. BATCHELDER:  Objection.  Scope.

THE WITNESS:  Yeah.  In my personal capacity, I'm aware of that.

BY MS. PHILLIPS:

Q.    The government wants people to stop smoking full stop because it causes cancer, right?

MS. BATCHELDER:  Objection to form. Scope.  Calls for expert testimony.

THE WITNESS:  Yeah.  I mean, I guess in my personal capacity I'm not really sure.  I think it's reasonable to understand the government's warning to be what it purports to warn against, which is that they are dangerous, cigarettes are.

I personally think they are bad.

BY MS. PHILLIPS:

Q.    You wouldn't recommend -- excuse

CONFIDENTIAL

Page 155

me.  Withdraw that.

There aren't benefits you're aware have to smoking cigarettes?

MS. BATCHELDER:  Objection to form. Scope.  Calls for expert testimony.

THE WITNESS:  Yeah.  Certainly me sitting here, I'm not aware of any benefits of cig- -- to cigarette smoking, and I would encourage anybody to stop smoking if they are.

BY MS. PHILLIPS:

Q.    So when you talk about something like cigarettes that the government wans about, that's different than something like social media where there are benefits to using social media, right?

MS. BATCHELDER:  Objection to form. Scope.

THE WITNESS:  So I know we've weighed in on the idea of a warning label, which is I think was the Surgeon General's idea for social media, and I think the content of that would have to be more nuanced than what's conveyed in a pack of cigarettes.

Page 156

BY MS. PHILLIPS:

Q.    Because you -- you don't want to warn every individual against all use of social media, right?

MS. BATCHELDER:  Objection to form and scope.

THE WITNESS:  Yeah.  I -- I don't think our position is that nobody in Colorado should ever use social media.

BY MS. PHILLIPS:

Q.    And there's -- there's a risk if you put a warning on something like social media, that it might turn away somebody who could benefit from using social media, right?

MS. BATCHELDER:  Objection to form. Scope.  Calls for expert testimony.

THE WITNESS:  I'm not sure how to balance the risks and benefits there.  I'm not -- this is going to sound like I'm just parroting what was just said, but I'm not an expert in that aspect of it.

BY MS. PHILLIPS:

Q.    Sure.  And you recognize that if you apply a warning on something, it sounds like you recognize there's a risk of

CONFIDENTIAL

THE WITNESS:  I think that's a fair characterization.

BY MS. PHILLIPS:

Q.   So this is an example of a post containing an image of an under 13 child that is not directed at an audience of under 13 users, right?

MS. BATCHELDER:  Objection to form. Scope.

THE WITNESS:  Yes.

BY MS. PHILLIPS:

Q.   Do you know whether Colorado agencies ever post images of cartoons, cartoon characters, or cartoon animals on Instagram?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  It would be surprising to me if they never did.

BY MS. PHILLIPS:

Q.   The fact that a post from the Colorado government contains an image of a cartoon character doesn't necessarily mean that that post is directed at under 13 users, right?

MS. BATCHELDER:  Objection to form. Scope.

THE WITNESS:  If -- if you want --

CONFIDENTIAL

Page 179

I -- I don't know exactly for certain.  If you want me to review a particular post.

BY MS. PHILLIPS:

Q.    Sure.  Let's take a look at one.

I guess just to be sure I'm understanding, is your view that you would have to look at every single post, post by post to determine whether or not the presence of a cartoon character renders it directed at under 13 individuals?

MS. BATCHELDER:  I would object to form, scope, and calls for expert testimony.

THE WITNESS:  Yeah.  I -- it seems like if I find one that I'm guessing you're about to show me, that would be enough to answer.

BY MS. PHILLIPS:

Q.    Fair enough.  Let's just take a look at this.  Exhibit 12 is a post from the governor of Colorado's Instagram account.

CONFIDENTIAL

Page 180

(Whereupon, Exhibit 12, Printout of an Instagram post from governor of Colorado's account, Bates labeled METACOAG-30(b)(6)PUBLICDOC-001-00001165 through METACOAG-30(b)(6)PUBLICDOC-001-00001166, was marked for identification.)

BY MS. PHILLIPS:

Q.   Do you recognize this as one of the posts we disclosed and that you reviewed in preparation for today's testimony?

A.   Yes.

Q.   Okay.  And you see this has a photo of Governor Polis in the top part there?

A.   Yeah.

Q.   Okay.  And this is -- it appears to be his official governor of Colorado Instagram account?

A.   Yes.

Q.   And he's standing there with one of the Sesame Street characters, right?

A.   Yeah.

Q.   I think that might be Abby Cadabby, but I'm not -- I'm not an expert these days on Sesame Street?

Page 181

A.   This is post my most -- most of my recollections of Sesame Street.  I don't know if that character was around or not --

Q.   I think she's new.

A.   Okay.

Q.   But you recognize her to be a -- a Sesame Street puppet either way, right?

A.   I mean --

MS. BATCHELDER:  Objection to form.

THE WITNESS:  Yeah.  I make a kind of an educated inference that because the post references Sesame Street, there's a puppet in it, yeah.

BY MS. PHILLIPS:

Q.   This -- this post is not directed at audience of under 13 users, right?

MS. BATCHELDER:  Objection to form. Scope.

THE WITNESS:  Yeah.  Again, I didn't talk with whoever wrote this, but it doesn't appear to be.

BY MS. PHILLIPS:

Q.   This is an example of a post that depicts a cartoon character but, nevertheless, is not directed at under 13 users, right?

Page 182

MS. BATCHELDER:  Objection to form.  Scope.

THE WITNESS:  I am not trying to be dispiteous, but I think they're puppets not cartoons.

BY MS. PHILLIPS:

Q.    Fair enough.  It depicts a puppet from a children's show but, nevertheless, is not directed at under 13 users, right?

A.    That's what it appears to be.

MS. BATCHELDER:  Objection to form and scope.

BY MS. PHILLIPS:

Q.    Are you familiar with the Forward Together initiative operated by the Colorado Department of Human Services?

A.    Yes.

Q.    And generally speaking, that's an initiative targeted towards youth to build connected relationships; is that fair?

A.    I think that's a fair summary.  I'm trying to find my notes on it.

Q.    They might be under Topic -- Topic 2.

A.    Okay.

Page 183

Q.      Or perhaps --

A.      Yep.

Q.      And you are -- are you familiar with Forward Together having been launched in 2020 after the pandemic started?

A.      Yes.  That's my understanding of the timing.

Q.      And the pandemic was a isolating time for many adolescents in Colorado?

MS. BATCHELDER:  Objection to form, scope.

THE WITNESS:  I -- yeah.  I'm not going to disagree with you.

BY MS. PHILLIPS:

Q.      It was important for the Colorado government to promote social connectedness during a time when teens were home from school, home from activities, and isolated from each other, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  I think that time in -- in our lives, governments and public health officials were trying to figure out ways to help people navigate a really scary experience.

Page 190

MS. BATCHELDER: Objection to form. Scope.

BY MS. PHILLIPS:

Q. Is that true?

A. Was that -- I actually -- I didn't prepare with the specific population number. That's just my best guess at it. I don't know what the population was --

Q. Fair enough.

A. -- in that year.

Q. Fair to say there were more engagements reflected here on the page we're looking at than the population of Colorado in 2022?

MS. BATCHELDER: Objection to form.

THE WITNESS: I -- I think that's fair to say.

BY MS. PHILLIPS:

Q. And if you look at page 12 ending in 1312, it's titled "How the Campaign Shares Power."

Do you see that?

A. Yes.

Q. And under Number 1, it indicates that the campaign hires contributors from the

Page 191

populations it wants to reach, including below, noting that teens as well as parents and adults who work with youth regularly consulted on the campaign.

Do you see that?

A.    Yes.

Q.    All right.  So this Forward Together campaign paid teens to post about it on social media, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  I'm not a hundred percent sure if that's true.  I think that's one way to read this.  It also could just be they paid parents and adults.  It does say that they hired contributors from the populations, and it seems like youth were targeted; but I'm not -- I don't know that for certain.

BY MS. PHILLIPS:

Q.    If you look to the next page ending in 1313, do you see that this slide lists 19 youth contributors for the campaign?

A.    Yes.

Q.    You have no reason to think those 19 youth contributors weren't paid by the

Page 192

campaign, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  Yeah.  Unless they are -- maybe we'll get to it later in here.  I don't know one way or the other.

BY MS. PHILLIPS:

Q.    Colorado hasn't taken any action since filing this lawsuit to stop raising awareness of the Forward Together campaign on Facebook or Instagram, right?

MS. BATCHELDER:  Objection to form. Scope.

THE WITNESS:  I don't know.  I will say that I tried to pull up a website and couldn't reach it.  So I don't know if that was -- don't know why.

BY MS. PHILLIPS:

Q.    Did you look at the Forward Together Instagram page by any chance in preparing for today?

A.    I -- I believe I did, yeah.  I'm just talking about the actual website.

Q.    Got it.  You were also familiar with the I Matter initiative that Colorado has promoting free therapy to youth in Colorado,

Page 193

right?

A.    Yes.

Q.    Okay.  And you're aware that one of the places Colorado promotes that initiative is on social media, right?

A.    Yes.

Q.    Including on Instagram?

A.    Yeah.  I think that was included in some of the documents I reviewed.

Q.    The -- the State has not taken any action to stop promoting the I Matter campaign on Facebook or Instagram since this lawsuit has been filed, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  Not that I'm aware of.

BY MS. PHILLIPS:

Q.    And you're aware, right, that part of the way I Matter promotes its services on Instagram is through paid influencers, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  Yeah.  I do remember that from my review.

BY MS. PHILLIPS:

Q.    You're not aware of anything the

Page 195

THE WITNESS:  I'm not aware of any.

BY MS. PHILLIPS:

Q.    Are you familiar with the 988 hotline in Colorado?

A.    Yes.

Q.    Okay.  And that's a suicide prevention hotline?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  I think it maybe has a broader mission than just suicide prevention.  I think it's designed to be an outlet for various mental health things up to and including suicide prevention is my understanding.

BY MS. PHILLIPS:

Q.    Better to say it's a crisis services hotline?

A.    Yeah, that might be a better way to say it.

Q.    All right.  And that's an important resource for Coloradans experiencing a range of mental health crises, it sounds like?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  I believe so.

CONFIDENTIAL

Page 196

BY MS. PHILLIPS:

Q.    Coloradans can't take make use of that resource if they're unaware that the resource exists, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  I think it would be very difficult to do so, if not impossible.

BY MS. PHILLIPS:

Q.    I'll mark as Exhibit 15 the document produced at CDHS-BHA_31127.

(Whereupon, Exhibit 15, Document entitled "Report of Findings, 988 Youth Survey 2023," Bates labeled CDHS-BHA_311327 through CDHS-BHA_311374, was marked for identification.)

BY MS. PHILLIPS:

Q.    And this is a deck.  It looks like it's from a firm called Corona Insights reporting findings on the 988 Youth Survey 2023.

Is that accurate?

A.    Yes.

Q.    Okay.  And there's also a Behavorial Health Administration logo on the

Page 197

first page?

A.     Yes.

Q.     So this -- this survey was done in partnership in some way with the BHA; is that right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  Yeah.  I'm not sure if it was kind of if -- it was funded by them or -- I can't remember if I ever heard exactly how it was orchestrated. Maybe it says here.

BY MS. PHILLIPS:

Q.     If you turn to the page ending in 1353, which is also labeled as page 27 on the deck itself if that helps.

A.     Yeah.

Q.     Okay.  This slide has a title stating, "Over one quarter of adolescents recognized 988, and the majority said they heard about it at school."

Do you see that?

A.     Yes.

Q.     Okay.  And then if you look on the bottom right portion of that slide, there's a bar chart titled "Source of Information About

CONFIDENTIAL

Page 198

988."

                    Do you see that?

        A.      Yes.

        Q.      And the majority, 66 percent,
seemed to have heard about 988 at school; is
that right?

        A.      Yeah.  The majority of the
adolescents who recognize that, and 66 percent
of them heard about it at school, yes.

        Q.      Okay.  And then the second bar
states that 54 percent of them who had heard
about it heard about it on social media, right?

        A.      That's what I read as well.

        Q.      Okay.  The State has not taken any
action to stop promoting awareness of the 988
hotline on Facebook or Instagram since this
lawsuit has been filed, right?

                MS. BATCHELDER:  Objection to form.

                THE WITNESS:  I think the State
        remains committed to communicating
        effectively to the audiences that it
        targets to make sure people are aware of
        the resources we have and using tools,
        including Facebook and Instagram, when
        appropriate to accomplish those goals.

CONFIDENTIAL

Page 209

BY MS. PHILLIPS:

Q.    And I'll just represent to you because you said you didn't do it, that if you do click that view resource button on Exhibit 17, you're taken to a -- a home page where you can click into this resource that is Exhibit 18.

A.    Got it.  Although I didn't click through all the way there, I did review this because it was presented in your list.

Q.    Yes.  Okay.  I just wanted to make sure it was clear how we got there, the winding website journey.

And so you have -- you have seen this report before, right?

A.    Yes.

Q.    Okay.  Had you ever seen it before preparing to be deposed today?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  I don't think so.

BY MS. PHILLIPS:

Q.    Are you familiar with the National Academies of Sciences?

A.    Me personally?

Q.    Well, is Colorado familiar with the

Page 210

National Academies of Sciences?

A.    Certainly Colorado is.

Q.    Okay.  And does Colorado recognize the NAS as a reputable scientific institution?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  I -- I think so.

BY MS. PHILLIPS:

Q.    Okay.  If you turn to the page ending in '0846, using the Bates numbers, are you there?

A.    I am.

Q.    Great.  Do you see in the -- the top of the page the first paragraph where it notes that, "The National Academy of Sciences was established in" 189- -- "1863," excuse me, "by an act of Congress, signed by President Lincoln, as a private nongovernmental, institution to advise the nation on issues related to science and technology.  Members are elected by their peers for outstanding contributions to research."

Do you see that?

A.    Yes.

Q.    And is that your understanding of the -- the role of the NAS and its members?

CONFIDENTIAL

Page 211

MS. BATCHELDER:  Objection to form.

THE WITNESS:  Yeah.  I -- I mean, this is all I'm going off of, but I don't have any reason to disbelieve that.

BY MS. PHILLIPS:

Q.    Okay.  If you look at the bottom of that -- excuse me, this is a consensus study report of the NAS, right?

If you turn to the couple of pages earlier, the page ending in '844, do you see where it says, "Consensus Study Report"?

A.    Yes.

Q.    Okay.  And if you turn to the page ending 847, do you see at the top there the definition of consensus study reports?

A.    Yes.

Q.    Do you see where it says, "Consensus Study Reports published by the National Academies of Sciences, Engineering, and Medicine document the evidence-based consensus on the study's statement of task by an authoring committee of experts."

Do you see that?

A.    Yes.

Q.    And then if you go to the last

Page 212

paragraph of that last sentence of that paragraph, it notes that, "Each report has been subjected to a rigorous and independent peer-review process, and it represents the position of the National Academies on the statement of task."

Do you see that?

A.    Yes.

Q.    And this kind of evidence-based, peer-reviewed information is exactly the kind of information that Colorado wants to provide its residence in the Media Literacy bank; right?

MS. BATCHELDER:  Objection to form. Scope.

THE WITNESS:  Yes.  If I had to guess what Media Literacy thinks, that's reasonable.

BY MS. PHILLIPS:

Q.    And you have no reason to think that the folks at the Colorado Department of Education got it wrong when they decided to include a link to this National Academies of Sciences report in the Media Literacy Bank, right?

Page 213

MS. BATCHELDER:  Objection to form.

THE WITNESS:  Got what wrong?

BY MS. PHILLIPS:

Q.    That this is an evidence-based, peer-reviewed resource that should be shared with the people of Colorado?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  I mean, I -- yeah.  I view this as one of many, many things that they included in their to educate the people of Colorado about all the various goals that they laid out, including social media.

BY MS. PHILLIPS:

Q.    If you turn to the page ending in 935 -- further in -- do you see there's a -- a Figure 3-1 on that page?

A.    Yes.

Q.    Okay.  And that figure is described as showing the percentage of U.S. teens age 13 to 17 years who say, "Social media has had a (mostly positive neutral or mostly negative effect on them personally)."

Do you see that?

A.    Yes.

Q.    Okay.  And this figure here from the National Academies of Sciences reports that 32 percent reported a mostly positive effect, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  Yeah.  I mean, it's included in the National Academies of Sciences report, but I think it's citing one specific source is my understanding.

BY MS. PHILLIPS:

Q.    Sure.  This paper that the experts at the NAS decided to include in their consensus report provides that 32 percent of the teens they studied reported a mostly positive experience, right?

MS. BATCHELDER:  Objection to form and calls for expert testimony.

THE WITNESS:  I'm -- I'm just reading this graph, but that appears to be what it says.

BY MS. PHILLIPS:

Q.    And those 32 percent -- to think back to what we were talking about earlier -- those are the folks you -- you wouldn't -- you wouldn't want to warn off social media

that we took into account as we decided whether to file this lawsuit?

BY MS. PHILLIPS:

Q.    I think I'm -- I think I'm asking a yes-or-no question about whether or not before filing this lawsuit, Colorado considered whether there would be any negative effects on the positive aspects of social media as a result of this lawsuit?

MS. BATCHELDER:  Objection to form and scope, and privileged to the extent it calls for deliberative process.  The witness can answer as long as it does not call for privileged testimony.

THE WITNESS:  It just seems like whether I answer yes or no is going to indicate something that we were considering in our deliberative process.

BY MS. PHILLIPS:

Q.    Looking is at Figure 3-1 on page 935, you see that what's reported here is that 9 percent of these study teens reported having a mostly negative effect or experience on social media, correct?

MS. BATCHELDER:  Objection to form.

CONFIDENTIAL

Page 218

THE WITNESS:  Yes, that's what it indicates here.

BY MS. PHILLIPS:

Q.    Okay.  So this information that Colorado made available through its Media Literacy Resource Bank notes that three times as many teens were reporting a mostly positive experience compared to those reporting a mostly negative experience on social media, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  32 is over three times nine.

BY MS. PHILLIPS:

Q.    Does Colorado have any information -- because I recognize this might not have been the study of Colorado teens in particular -- does Colorado have any information that fewer Colorado teens compared to these numbers are having a mostly positive experience on social media?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  So I'm not sure if I have all of the numbers that were in the Rise Above Colorado Survey, but I don't know if you brought it.  I didn't, but

CONFIDENTIAL

Page 219

I -- these don't seem to track, obviously, like different questions that are being asked.  And so there's different ways to interpret it, and that's probably the job of someone not me, like an expert.

But I know that this isn't even the only study in this report.  There are other studies that are linked on the site. There are lots of studies out there that I'm sure will be referenced in over the course of this litigation that have different, you know, answers, different questions, and different data we may pull from that.

BY MS. PHILLIPS:

Q.    If you turn to 955, do you see the paragraph starting "The committee's review"?

A.    I do.

Q.    Do you see that it says, "The committee's review of the literature presented in this chapter in Appendix C did not support the conclusion that social media causes changes in adolescent health at the population level"?

Do you see that?

A.    Yes.

CONFIDENTIAL

Page 220

Q.    And that's a statement that a parent or teen who looked on the Colorado Media Literacy website and was interested in this topic might end up reading, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  Someone could make it there, yes.

BY MS. PHILLIPS:

Q.    And that's an important statement, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  In what way?

BY MS. PHILLIPS:

Q.    At the population level as it's written there, that means that, according to the NAS, you can't look at the population of teens generally and say social media causes changes in their mental health?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  I -- I'm not an expert in science research in this area. I'm not prepared to testify in that way.

I believe that a lot of the words in here have particular application ink-- in science that I'm probably not equipped

CONFIDENTIAL

Page 225

Q.    Okay.  Do you see this presentation was titled "Social Media and Youth Mental Health:  Thumbs up emoji or thumbs down emoji"?

Do you see that?

A.    Yes.

Q.    Okay.  And I don't know if there is a different way to refer to those emojis?

A.    That's great.

Q.    And this was a presentation given by a Dr. Amy Plog, Ph.D., Evaluation and Research Consultant, Colorado Department of Education.

Do you see that?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  I do.

BY MS. PHILLIPS:

Q.    And this looks like it was given at a conference in the fall of 2023 on September 12th and 13th in Colorado Springs.

Do you see that?

A.    Yes.

Q.    And there's a Colorado Department of Education logo on this cover slide, right?

A.    Yeah.

Q.    It looks like Dr. Plog was giving

this presentation in her official capacity at the Colorado Department of Education?

MS. BATCHELDER: Objection to form.

THE WITNESS: Yeah. I don't have a reason to believe otherwise, right.

BY MS. PHILLIPS:

Q. Okay. This lawsuit was filed in October of 2023; is that right?

A. Not November, it turns out. Yes.

Q. Okay. It might have been late October in fairness.

A. Yeah.

Q. Okay. So a month or a little over a month after this presentation was given?

A. Yes.

Q. Did you speak with Dr. Plog to prepare for today's deposition?

A. I don't believe -- I don't believe that was the person I spoke with at the CDE.

Q. And she's giving this presentation. It seems to be posing a question from I'm looking at the cover slide about whether social media and youth mental health have a positive or a negative relationship; is that fair?

MS. BATCHELDER: Objection to form.

CONFIDENTIAL

THE WITNESS:  I -- I think there are probably actually a couple different ways to read those emojis.  I'm not exactly sure, but the topic is definitely social media and mental health youth.

BY MS. PHILLIPS:

Q.    Okay.  And she's got both the thumbs up and the thumbs down emoji, right?

A.    Yeah.

Q.    Okay.  If you look at the second -- well, Slide 2, which is titled "Session Outline."

Do you see that?

A.    Yes.

Q.    Okay.  Part of what Dr. Plog did as part of this session is talk about a review of the research she conducted, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  Yeah.  That's one of the bullets here.

BY MS. PHILLIPS:

Q.    It lists review of research, and then underneath there are a couple of subbullets listing mental health trends in general and then social media (technology

Page 228

specifically).

Do you see that?

A.    I do.

Q.    You don't have any reason to think that a researcher at the Department of Education like Dr. Plog wouldn't have done a thorough review of that research, right?

MS. BATCHELDER:  Objection to form. Scope.

THE WITNESS:  What does "thorough" mean?

BY MS. PHILLIPS:

Q.    What do you -- what do you take thorough to mean?

A.    I mean, I'm sure she did a sufficient job to make this presentation.  I don't know if it was entirely comprehensive or -- I -- I just don't know.

Q.    If you look -- looking at the -- the first slide, Dr. Plog holds hers out here as an evaluation and research consultant.

Do you see that?

A.    Yes.

Q.    And as somebody with a Ph.D.

Do you see that?

CONFIDENTIAL

Page 229

A.    Yes.

Q.    And in some capacity affiliated with the Colorado Department of Education, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  It appears that way, yes.

BY MS. PHILLIPS:

Q.    It's not the practice of the Colorado Department of Education to work with researchers who don't take a thorough look at the science, right?

MS. BATCHELDER:  Objection to form and to scope.

THE WITNESS:  I -- I guess I would say it feels like there's some amount of meaning that's on thorough in your question, and I just am not sure how to apply it in, like, a scientific context to the decisions that are made by another independent agency in Colorado State government.

BY MS. PHILLIPS:

Q.    Okay.  You don't have every confidence that Dr. Plog did a good job when

she conducted this review of research?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  So I think that terminology is a little bit more my level. I'm more confident that we can safely say that she did a good job.

BY MS. PHILLIPS:

Q.    Okay.  Now, if you flip a few slides later to Slide 6...

A.    I'm not seeing the numbers, so you might need to --

Q.    Oh, you know, it looks -- it looks like they're printed on top of the image on the slide, unfortunately, but I'm looking at the slide that is Slide 6, the seventh page of the physical document titled "Increasing Concern in the News."

Do you see that?

A.    Yes.

Q.    Okay.  And Dr. Plog's pulled together a number of screenshots of news headlines under that title, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  Yeah, that's what it appears.  I will say when I was reviewing

CONFIDENTIAL

Page 236

confess not every word, and, you know, we're 14 pages into the presentation. So I'm not really -- I don't know that I can say for sure what the -- what her overall message is.

BY MS. PHILLIPS:

Q. Okay. If you look at page -- Slide 16, excuse me, do you see it's titled "Review of Research"?

A. Yes.

Q. The first bullet reads, "Gathered approximately 120 studies. Looking at reasons (if)/why we are seeing increased mental health problems."

Do you see that?

A. I do.

Q. And you understand Dr. Plog to have done that review of approximately 120 studies in her review of the research, right?

MS. BATCHELDER: Objection to form and scope.

THE WITNESS: I think it's possible that's an explanation. It's also possible that she's referencing someone else who did that.

CONFIDENTIAL

Page 237

BY MS. PHILLIPS:

Q.    Do you see any reference to anybody else who did that in this presentation that you recall?

A.    I -- I don't know how this presentation was put together.

Q.    Do you see the second bullet on Slide 16 that says, "Answering the 'why' equals not a simple task."

Do you see that?

A.    Yes.

Q.    All right.  And then underneath there are subbullets saying, "Number of studies, differing methodology, mental health v. suicidality."

Do you see those?

A.    I do.

Q.    Okay.  And the bottom bullet on this slide says, "Not a new area of research -- important to remember to build on what is known.  The latest study does not equal the answer."

Do you see that?

A.    Yes.

Q.    Okay.  And if you turn to Slide 17,

CONFIDENTIAL

Page 238

it's titled "Areas of Research."

Do you see that?

A.    Yes.

Q.    Okay.  This lists a -- a number of different areas of research Dr. Plog looked into to see if or why there were increased mental health problems?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  What's the question?

BY MS. PHILLIPS:

Q.    Does this list the number of different areas of research Dr. Plog looked into to see if or why there were mental health problems?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  I don't know.

BY MS. PHILLIPS:

Q.    This slide says, "Areas of Research," right?

A.    Right.

Q.    Okay.  And underneath that, the first bullet is "culture/policy/community," right?

A.    Yes.

Q.    One of the areas of research is

CONFIDENTIAL

global warming, right?

A.    Yes.

Q.    Another is individualism/materialism, right?

A.    Yes.

Q.    Another is economic factors -- recession, right?

A.    Yes.

Q.    Another is lack of access to mental health?

A.    Yes.

Q.    Another is structural racism?

A.    Yes.

Q.    Then there is an area of research titled "Organizational (schools)".

Do you see that?

A.    I do.

Q.    And bullets underneath that read, "Perceptions around safety" and "Standardized testing."

Do you see that?

A.    Yes.

Q.    And then there's a third bulleted area of research titled "Interpersonal/Individual."

Do you see that?

A.      Yes.

Q.      And underneath that it lists Epigenetic/Intergenerational Trauma, Technology, and Coping skills.

Do you see all that?

A.      I do.

Q.      Okay.  And if you look at Slide 18, do you see that it's titled "Interpersonal/Individual" factors?

A.      Yes.

Q.      And there's a subheading for technology.

Do you see that?

A.      Yes.

Q.      And there appear to be screenshots or in some way reproduction of images of some studies about television on this slide, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  Yeah.  Either, you know, quotes or screenshot or something similar.

BY MS. PHILLIPS:

Q.      If you look at the screen -- the image on the bottom left that's a -- a little

Page 246

about the effects of the crossword puzzle as well.

On the -- the second column of that it reads, "Crossword puzzles have dealt the final below to the art of conversation and have been known to break up homes," just to explain that crossword puzzle there.

A.    Correct, but not necessarily about kids.

Q.    Yes.  True.  That seems to be a broader concern about crossword puzzles.

If you turn to Slide 22, which is two pages passed where we were, titled "Technology -- Description of Research," do you see that?

A.    Yes.

Q.    So Dr. Plog poses this question: "What does research look like?"

Do you see that?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  Yes.

BY MS. PHILLIPS:

Q.    Underneath she writes, "Does not provide a definitive answer about the impact."

Do you see that?

CONFIDENTIAL

Page 247

MS. BATCHELDER:  Objection to form.

THE WITNESS:  I do.

MS. PHILLIPS:  Did I misread that?

MS. BATCHELDER:  No.

MS. PHILLIPS:  Okay.  I just want to check.

BY MS. PHILLIPS:

Q.     And then the second subbullet, do you see it says, "Wide variability in methodology, population studied, definition of use, outcome is assessed."

Do you see that?

A.     Yes.

Q.     It goes on, "Findings can apply for one group but not others (girls v. boys) for one type of technology but not others (TV and social media but not Computer or Gaming) or appear for students with preexisting concerns but not those without."

Do you see that?

A.     Yes.

Q.     And the last bullet says, "We need to get better at assessing how technology is being used."

Do you see that?

CONFIDENTIAL

Page 248

A.    I do.

Q.    Okay.  And then moving on from this description of the research slide, if you turn the page, you see there are a -- a few slides summarizing the research.

Do you see that?

A couple of slides titled "Summary of Research" in some way or another.

A.    Yeah.

Q.    And in Slide 23, she Summarizes Research Finding Impact, that's the title there.

Do you see that?

A.    Yeah.  Finding impact.

Q.    Finding -- Finding Impact, yes.  And --

MS. BATCHELDER:  I'm sorry.  Where --

MS. PHILLIPS:  I'm sorry.  We're on Slide 23.

MS. BATCHELDER:  Okay.

MS. PHILLIPS:  The title, "Technology -- Summary of Research finding impact."

CONFIDENTIAL

Page 249

BY MS. PHILLIPS:

Q.    And she notes some areas in which some research has found technology had an impact, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  Yeah, that's what it appears to be.

BY MS. PHILLIPS:

Q.    And then on the next slide it summarizes some research not finding impact.

Do you see that?

A.    Yes.

Q.    Including small or inconsistent findings noted for well-being, loneliness, and depression.

Do you see that?

A.    Yes.

Q.    And in fairness, some of these things on the slide for research not finding impact are also noted on the slide for research finding impact, right?

A.    Yeah.

Q.    Okay.  It seems like there's research in both of these directions, right?

MS. BATCHELDER:  Objection to form.

Page 250

Calls for expert testimony.

THE WITNESS:  That -- that seems to be what her presentation is.

BY MS. PHILLIPS:

Q.    And then at the bottom of Slide 24, under the section for "Small or inconsistent findings," you see there's a section subtitled "Has been found to not be connected to."

Do you sue that?

A.    Yes.

Q.    She notes there mental well-being/health, social anxiety, suicidal ideation, loneliness, empathy and academic performance, right?

A.    Yes.  Although, again, I think some of those were on the other slides as well.

Q.    And if you turn to Slide 27, a couple slides later, there are two columns titled "Risks" and "Benefits."

Do you see that?

A.    Yes.

Q.    Okay.  And Dr. Plog notes some potential risks here, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  Yeah.  That's what

Page 251

this slide appears to be communicating.

BY MS. PHILLIPS:

Q.    Right.  Including on the left some risks to physical health, interference with learning, and then the very bottom negative impacts on mental health potentially, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  Yes.

BY MS. PHILLIPS:

Q.    Okay.  And then on the right she notes a number of benefits, right?

A.    Yes.

Q.    That social media can expose people, looking at that first bullet, to knowledge of other people's mental health experiences and interventions.

Do you see that?

A.    I don't see that it says social media anywhere.

Q.    Excuse me.  That technology can expose people to knowledge of other people's mental health experiences and interventions.

MS. BATCHELDER:  Objection to form.

THE WITNESS:  Yeah.  It also doesn't say technology; but given the

CONFIDENTIAL

Page 252

topics in the previous slides, I think we can infer that.

BY MS. PHILLIPS:

Q.    Sure.  Sure.

And this entire presentation was titled "Social Media and Youth Mental Health: Thumbs up emoji or thumbs down emoji," right?

A.    It was, but the research topics are referencing technology; and it seems like, so far as the least the bulk of it is talking about technology.

Q.    And social media is part of technology?

A.    It is.

MS. BATCHELDER:  Objection to form.

THE WITNESS:  Yeah.  I think that was described as, like, one of the -- one of in the list that she was including in technology.

BY MS. PHILLIPS:

Q.    Okay.  And being exposed to knowledge of other people's mental health experiences can be beneficial to mental health, right?

MS. BATCHELDER:  Objection to form.

CONFIDENTIAL

Scope.

THE WITNESS:  I am not a mental health professional that can opine on that.

BY MS. PHILLIPS:

Q.    Are you aware that some clinicians advise, patients recovering from eating disorders, for example, to seek out recovery communities on social media?

MS. BATCHELDER:  Objection to form. Scope.  Calls for expert testimony.

THE WITNESS:  I -- I don't know.

BY MS. PHILLIPS:

Q.    Do you see in the second bullet Dr. Plog notes that it provides connections with others?

Do you see that?

A.    Under benefits?

Q.    Yes.

A.    Yes, I see that.

Q.    And that's something that Colorado promoted on social media with the Forward Together campaign, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  Could you be more

specific?

BY MS. PHILLIPS:

Q.    Sure.  The Forward Together campaign promoted social connectedness, right?

A.    Yes.

Q.    And the Forward Together campaign promoted awareness of its resources on social media, including Instagram, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  Yes.

BY MS. PHILLIPS:

Q.    So you would agree that the Forward Together campaign is one example of how social media can promote beneficial connections with others, right?

MS. BATCHELDER:  Objection to form and scope.

THE WITNESS:  I -- I don't know that this is saying specifically social media promotes connections with others.  I do think the Forward Together campaign was promoting connection with others.  It did use social media to do so.  I'm not sure that that is, like, a direct application of this in particular.

CONFIDENTIAL

Page 256

Forward Together campaign is an example of how you can promote connections with others via social media, right?

MS. BATCHELDER:  Objection to form and scope.

THE WITNESS:  I think that the Forward Together campaign promotes social connections.

BY MS. PHILLIPS:

Q.    Do you see the bottom bullet here under benefits that reads, "Could be used as a means of" -- and I think it probably says of behind there -- "identifying those at risk or providing support/therapy particularly for hard-to-reach" -- and it cuts off.

Do you see that?

A.    Yes.

Q.    Okay.  And I would take this to be referring to hard-to-reach individuals; is that fair?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  I don't know.  It could be hard-to-reach groups.  It could be -- yeah.  Sure.

Page 257

BY MS. PHILLIPS:

Q.    Hard-to-reach people?

A.    It could be hard-to-reach people. I'm really not sure.

Q.    You're aware that Colorado uses social media to provide therapy for hard-to-reach individuals through the I Matter campaign, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  Yeah.  You mean like virtual visits?

BY MS. PHILLIPS:

Q.    Yeah.  You're aware that -- and the visits don't happen on Instagram, right?

A.    Right.

Q.    But I Matter promotes awareness of free therapy services here in Colorado on platforms including Instagram, and then folks can take advantage of those free therapy services, right?

A.    That's how I understand that.

Q.    If you look at Slide 28 titled "Recommendations," do you see that?

A.    Yes.

Q.    Okay.  The first is "Encourage

CONFIDENTIAL

Page 265

whether or not that feature was already available at the time Dr. Plog gave this presentation in September 2023?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  That's a correct.

BY MS. PHILLIPS:

Q.    And then if -- if you flip to the next slide, Slide 29, there's -- it's titled "More Recommendations," right?

A.    Yes.

Q.    The -- do you see in the -- the second bullet down, the subbullet there says, "How parents engage with their children in use" -- then there is a, perhaps, a greater than symbol or a more than symbol -- "important the numbers of hours of use."

Is that a fair read of that statement on the slide?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  I believe so.

BY MS. PHILLIPS:

Q.    And is that a true statement?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  I do not know.

MS. BATCHELDER:  Objection to form.

THE WITNESS:  Yes.

BY MS. PHILLIPS:

Q.    Okay.  And again, some further slides with titles referring back to the American Psychological Association's health advisory.

Do you see that?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  Yes, I do.

BY MS. PHILLIPS:

Q.    Okay.  And then towards the end, the second-to-the-last or third-to-the-last page, I suppose, there's a slide titled "Reminders."

Do you see that?

A.    I do.

Q.    It states, "Most young people are doing well in the digital age."

Do you see that?

A.    Yes.

Q.    Is that a true statement?

MS. BATCHELDER:  Objection to form and scope.

THE WITNESS:  I do not know.

Page 271

technology.

MS. BATCHELDER:  Objection to form. Scope.  Calls for expert testimony.

THE WITNESS:  I just don't have -- A, I guess, there's two ways to read this that I just laid out; and then B, I don't have, you know, the -- none of our experts who have testified in this case about which way to go on that one.

BY MS. PHILLIPS:

Q.    Do you see the second passage in that bullet, "Other countries with just as much technology use are not seeing the increase in mental health concerns we are"?

Do you see that written there?

A.    Yes, I do.

Q.    Okay.  Do you have any reason to think that that was not a true statement when Dr. Plog put it in this deck?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  I do not.

BY MS. PHILLIPS:

Q.    And then the third bullet says, "Danger if we focus too much on technology -- ignore the potential for good.  Plus fail to

CONFIDENTIAL

Page 275

THE WITNESS:  Yeah.  I'll take your word for it.

BY MS. PHILLIPS:

Q.    It sounds about right directionally?

A.    Yes.

Q.    Okay.  And this also notes that 2005 was the hottest year on record.

Do you see that?

A.    Yes.

Q.    And that notation comes back several places in this timeline, in 2010 and 2015, 2014 and 2015 and 2016.

Do you see that?

A.    I do.

Q.    Okay.  Climate change can impact mental health in terms of causing folks anxiety, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  I think you'll have to ask a -- an expert on that one.

BY MS. PHILLIPS:

Q.    Okay.  Do you know if people ever make pretty serious life choices in terms of where to live or whether to have children

CONFIDENTIAL

Page 276

because of climate change?

MS. BATCHELDER:  Objection to form and scope.

THE WITNESS:  I mean, in my personal -- personal capacity I'm aware of that impacting people's decisions.

BY MS. PHILLIPS:

Q.    This timeline notes that Facebook opened in 2006.  IPhone was introduced in 2007.

Do you see that?

A.    Yes.

Q.    And in 2007 it notes the start of the global recession, right?

A.    Yes.

Q.    Economic insecurity generally is something that can impact mental health for people, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  Again, I'm not an expert on mental health, so I'm not sure.

BY MS. PHILLIPS:

Q.    Okay.  Fair enough.

But Dr. Plog did put a note about the global recession on this timeline in her presentation about social media and youth

CONFIDENTIAL

Page 277

mental health, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  Yes, she did.  I don't know if that's enough to indicate that everything she listed in here has an impact on mental health.

BY MS. PHILLIPS:

Q.     There are plenty of things she obviously didn't put on this timeline.  It's not a comprehensive timeline of all events from 2001 to 2017, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  That's correct.

BY MS. PHILLIPS:

Q.     Okay.  There are also several notes on this timeline about school shootings.

Do you see those?

In 2012 this notes the Aurora -- or excuse me.  In 2012 this notes the Sandy Hook shooting.  In 2013 it notes the Arapahoe High School shooting, and in 2017 it notes the Parkland shooting, right?

A.     Yes.

Q.     Okay.  And in 2012 it also notes the Aurora theater shooting here in Colorado,

CONFIDENTIAL

right?

A.    Yes.

Q.    Okay.  The -- the fear of school shootings can impact teen mental health, right?

MS. BATCHELDER:  Objection to form. Calls for expert testimony.

THE WITNESS:  I'm -- I'm not an expert in mental health, but it would not surprise me to hear that.

BY MS. PHILLIPS:

Q.    Okay.  In 2016 she notes the unprecedented increase in hate crimes.

Do you see that?

A.    Yes.

Q.    Being -- and I'm not -- I understand that you're not an expert.  I'm really just asking for the common-sense understanding of these things.

Being a victim of a hate crime or any form of discrimination, that can impact mental health, right?

MS. BATCHELDER:  Objection to form and scope.  Calls for expert testimony.

THE WITNESS:  I appreciate the -- the caveat at the outset -- outset of your

CONFIDENTIAL

question.  I just continue to believe there's additional meaning if I were to act like I knew that for sure, and I don't.

BY MS. PHILLIPS:

Q.    And then on the -- if you read up above year 2017, you see that there's a screenshot that looks like it's taken from Twitter based on the formatting.

Do you see that?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  Possibly X -- but actually, in 2017, no, you're right.

BY MS. PHILLIPS:

Q.    And I was just going to ask, do you see that this was a Twitter postdated 28 November 2017?

A.    I do see that.

Q.    Okay.  The first paragraph of this states, "Parents:  Kids are more depressed these days.  I wonder why."

Do you see that?

A.    Ohio.

Q.    And then underneath it reads, "Kids:  You destroyed the economy for us.  The

earth is literally dying.  We are going to work until we die; and on top of that, the Nazis are back."

Do you see that?

A.    Yes.

Q.    And then at the bottom it reads, "Parents:  It's those pesky iPhones."

Do you see that?

A.    I do see that.

Q.    Okay.  This presentation by Dr. Plog touched on a lot of the issues in this case, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  I mean, it -- there's definitely some overlap.

BY MS. PHILLIPS:

Q.    She raised concerns about social media use, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  Yes.

BY MS. PHILLIPS:

Q.    And she also engaged in an effort to dig into the scientific literature, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  Yes.

cited the studies in our -- the Complaint and will be presenting, you know, via experts additional testimony along those lines.

I can answer -- answer in my personal capacity.

BY MS. PHILLIPS:

Q.    Well, I'm just trying to figure out what facts here in Colorado the State thinks impact teen mental health.

MS. BATCHELDER:  Objection to form. Scope.  Calls for expert testimony and contention.

THE WITNESS:  I think that the core of what's relevant for our Complaint is that Meta has told people their products are safe when, in fact, their products have, at least for some teens, a negative impact on their mental health.

BY MS. PHILLIPS:

Q.    What facts do you have from here in Colorado about how many teens have experienced any negative impact on mental health from Facebook or Instagram?

MS. BATCHELDER:  Objection to form

Page 289

and scope.

THE WITNESS:  It sounds like a relatively similar question to one you asked this morning about the quantification of teens that might have been negatively effected in the state of Colorado, and I still don't have a number to give you on that.

BY MS. PHILLIPS:

Q.    Can you -- can you point me to the -- the fact set or the dataset that tell us that number.  Even if you can't give me the number, right, you can't tell me sitting here how many teens in Colorado have had their mental health negatively impacted by Facebook or Instagram, I'm asking what are the facts where we could find that information.

MS. BATCHELDER:  Objection to form and scope, and this is a contention question, which is stricken by the Court.

THE WITNESS:  My role here today is not to argue on behalf of the State like all the legal arguments based on all the discovery that's been presented in this or that will be presented in this to have a

Page 300

repetitive.

But you're not aware of any data Colorado has about how many kids here in Colorado have had their mental health impacted in some way by messaging apps specifically?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  Would all of that include, like, WhatsApp?

BY MS. PHILLIPS:

Q.    Yeah.  I mean, I'm thinking, like iMessage, but any pure messaging app.

A.    But not Snap?

Q.    Do you think of Snap as a messaging app?

A.    No.  It's a social media app, but I know a lot of the functionality is messaging. Instagram also has messaging and Facebook.

Q.    Sure.

A.    So -- but you're -- you're distinguishing --

Q.    Why don't I ask it -- those are fair points.  Why don't I ask a different question.

A.    Okay.

Q.    Does Colorado have any data about

CONFIDENTIAL

Page 301

how many kids in Colorado have had their mental health impacted by using messaging functions of Smartphone apps?

MS. BATCHELDER:  Objection to form and scope.

THE WITNESS:  Not that I'm aware of.

BY MS. PHILLIPS:

Q.    Does Colorado have any data about how many kids in Colorado had their mental health impacted by using the internet, except for social media?

MS. BATCHELDER:  Objection to form and scope.

THE WITNESS:  I don't believe so.

BY MS. PHILLIPS:

Q.    COVID-19 and the effects of the pandemic played a role in mental health for a lot of people in Colorado, right?

MS. BATCHELDER:  Objection to form and scope.

THE WITNESS:  Yeah.  I think we referenced that in a conversation earlier. I don't know if mental health is quite the right terminology, but it certainly was an

Q.    And you -- you know that the -- well, are you aware that the Colorado Children's Campaign issues annual reports about issues affecting youth in Colorado?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  I guess, yeah, Kids Count -- like they -- the Colorado Children's Campaign is the entity that does the Kids Count in Colorado, and they do it every year.

Is that what you're saying?

That's how I understand it.

BY MS. PHILLIPS:

Q.    It's possible we're saying roughly the same thing.

A.    Okay.

Q.    I don't understand Kids Count to refer to a -- I -- i understand that refer to the report just that this --

A.    Yeah.

Q.    -- the report is called the Kids Count Report.  This is a report that the Children's Campaign publishes annually.

Are we saying the same thing?

A.    I was attempting to, yes.  Sorry.

Q.    Okay.  Very good.

If you look at the page ending in 3183, do you see that?

A.    Yes.

Q.    Okay.  You see that this -- there's a letter from Governor Jared Polis produced on this page?

A.    Yes.

Q.    Okay.  This is a -- the Kids Count report is something that is considered by Colorado government every year when it comes out, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  What do you mean by "considered"?

BY MS. PHILLIPS:

Q.    If you look at the first paragraph, the second sentence reads, "Every year the Colorado Children's Campaign provides communities advocates and elected officials across the state with the research and data needed to make Colorado the best state possible for kids and families."

Do you see that?

A.    I do.

CONFIDENTIAL

Page 305

Q.    Okay.  These reports are something that are considered by policy makers in Colorado, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  Yeah, based on this description.

BY MS. PHILLIPS:

Q.    Okay.  If you would -- if you flip to the page ending in 3186, do you see the paragraph that starts "These numbers alone"?

A.    Yes.

Q.    Okay.  It says, "These numbers alone are staggering, but the pandemic's true toll on Colorado kids stretches much further. Since the pandemic began, it has brought with it widespread challenges to families' economic security, mental health, and access to learning opportunities.  Nearly half of all Colorado households with children have lost employment income at some point since March 2020. Hundreds of thousands of kids have experienced massive disruptions to their daily routines and their education.  Emergency room visits for mental health crises have been on the rise. Thousands of children missed out on the early

Page 306

learning opportunities they would have otherwise received."

Do you see that?

A.    Yes.

Q.    And that's a true report about the impact of the pandemic on kids in Colorado, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  Yeah.  I don't have any reason to second-guess that.

BY MS. PHILLIPS:

Q.    Does -- does Colorado have any data quantifying the number of under 18 residents whose mental health suffered because of the pandemic?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  In this report there's definitely references to the impact of COVID-19 on mental health for kids.

BY MS. PHILLIPS:

Q.    Do you know of any other source that the Colorado government has about how many under 18 kids here in Colorado suffered any mental health harms because of COVID?

BY MS. PHILLIPS:

Q.    And to be precise for the record and looking at Topic 15 for precision, you're not aware of any research or studies created, conducted by, or funded directly in whole or in part by the State of Colorado to figure out how many kids in Colorado had their mental health harmed by the COVID pandemic?

MS. BATCHELDER:  Objection.  Scope.

THE WITNESS:  I'm not aware of any that attempted to quantify that.

BY MS. PHILLIPS:

Q.    Okay.  I'll mark as Exhibit 21, a report -- well, titled "Engaging Our Community From the Attorney General's Office Youth Mental Health 2022."

(Whereupon, Exhibit 21, State of Colorado Attorney General Special Report, Bates labeled METACOAG-30(b)(6)PUBLICDOC-001-00000645 through METACOAG-30(b)(6)PUBLICDOC-001-00000663, was marked for identification.)

THE WITNESS:  Thank you.

Page 310

BY MS. PHILLIPS:

Q.    Is this a report you're familiar with?

A.    Yes.

Q.    And this is from the Attorney General's Office in 2022?

A.    Yes.

Q.    One of the things that impacts youth mental health here in Colorado are the use of drugs or alcohol; is that right?

MS. BATCHELDER:  Objection to form. Calls for expert testimony.

THE WITNESS:  I -- I think it's one of the things that's referenced in our work on, as it says here, combatting the opioid/Fentanyl crisis is effects on mental health.

BY MS. PHILLIPS:

Q.    If you look in the second paragraph here it -- on page -- page 6, the page ending in 653, it says, "The mental health aspect of substance use disorder cannot be ignored.  A study of 10,000 adolescents found that two-thirds of those who developed alcohol or substance use disorders had experienced at

Page 311

least one mental health disorder."

Do you see that?

A.     Yes.

Q.     Okay.  And so it's true in the view of the Colorado Attorney General that substance misuse and abuse can negatively impact mental health?

A.     It cannot be ignored.

Q.     Can you look at the infographic on the -- towards the bottom of the page.

Do you see where it says that our state only has about one-third of the total drug treatment capacity needed as of this report in 2022?

MS. BATCHELDER:  Objection to form?

THE WITNESS:  I do see that.

BY MS. PHILLIPS:

Q.     Okay.  So the State has some sense that it, at the time of this report, it needed more drug treatment capacity, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  I believe that's what this is -- is trying to communicate, yeah.

BY MS. PHILLIPS:

Q.     And somebody had -- had done some

Page 314

at here, you're not aware of any other research Colorado has done to figure out how many youth have had their mental health impacted by substance abuse?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  I am not.

BY MS. PHILLIPS:

Q.    You're aware that the Attorney General issued an opioid crisis response plan back in 2021?

A.    Yes.  I believe that was one of the documents, yeah, that he listed.

Q.    Has the Attorney General published a social media crisis response plan?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  You mean a report or plan with that exact title?

I know we've talked about social media and the harms associated with it, but I'm not sure if we have, as you've termed it, a response plan.

BY MS. PHILLIPS:

Q.    You know the -- and I'm happy to -- it sounds like you're familiar with it, but I can show you the report.

Page 315

Are you aware that in this opioid crisis response plan, the AG created a position called director of opioid response?

A.    Uh-huh.

Q.    Has the AG ever created a position called director of social media response?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  No.

(Whereupon, Exhibit 22, Colorado Department of Law Opioid Crisis Response Plan, Bates labeled METACOAG-30(b)(6)PUBLICDOC-001-00002050 through METACOAG-30(b)(6)PUBLICDOC-001-00002077, was marked for identification.)

BY MS. PHILLIPS:

Q.    This is the opioid crisis response plan we've been talking about.

And you're familiar with this document, yes?

A.    I am.

Q.    Okay.  I have a specific question on the page ending in 2062, if you let me know when you -- when you're there.

A.    All right.

Page 317

in the actual list.  I don't have, like, in front of mind right now.

BY MS. PHILLIPS:

Q.    All right.

A.    I don't have a reason to second-guess it.

Q.    No.  That's -- that's fine.  You can set that aside.

We talked about economic instability a little bit earlier.

Do you recall that?

A.    Yes.

Q.    And it's true that living in a household experience in economic instability can impact the mental health of kids, right?

MS. BATCHELDER:  Objection to form.  Scope.

THE WITNESS:  I believe that's probably something an expert can talk to, but it -- it's possible that's in one of the documents I reviewed as well.

I know that there have been a lot of references to that type of -- those types of challenges and in various documents that are -- that I reviewed over

Page 318

the last few months.

BY MS. PHILLIPS:

Q.    Does Colorado have data about how many kids have had their mental health impacted by their family's economic circumstances?

MS. BATCHELDER:  Objection to form and scope.

THE WITNESS:  So if I recall correctly, this line of questions was in -- also in the Healthy Kids Colorado Survey.  I don't remember it being, like, identified on top of mental health, but I'd have to look at the survey results to know for sure.

BY MS. PHILLIPS:

Q.    Other than the Healthy Kids Survey, do you know of any other research Colorado has conducted to try to figure out how many kids in this state have had their mental health negatively impacted by their family's economic circumstances?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  I would have to review the -- both the Kids Count and the Rise Above Colorado surveys to look to see

if those have some data on those lines.

BY MS. PHILLIPS:

Q.    So those might -- they come to mind as things where we might find that -- those facts?

A.    Yes.

Q.    Anything else that you're aware of where Colorado has that information?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  Not that I'm aware of.

BY MS. PHILLIPS:

Q.    We gestured at adverse childhood experiences a couple of moments ago, and I'm not asking you to be an expert on what constitutes an adverse childhood experience.

But you understand that people who work in the youth well-being space recognize a set of negative experiences in childhood adverse childhood experiences?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  Yes.

BY MS. PHILLIPS:

Q.    And again, I'm not asking you to be an expert in the term, but that could include

Page 320

things like parental divorce, substance abuse in the home, things like that.

Is that your understanding of it?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  Yeah, generally speaking.  I don't -- couldn't list them off specifically, like I was saying a few moments ago, but I have some sense.

BY MS. PHILLIPS:

Q.    All right.  Are you aware of any research Colorado has conducted into how many of those adverse childhood experiences teens in Colorado had suffered as of 2023?

MS. BATCHELDER:  Objection to form and scope.

THE WITNESS:  Are you asking about the, like, quantifying individuals kind of cases, scores, and then aggregating them for everybody under 18 in Colorado?

BY MS. PHILLIPS:

Q.    Well, why don't I just reask a clearer question.

As of the filing of this lawsuit --

A.    October 2023.

Q.    Sure.

CONFIDENTIAL

Page 321

-- are you aware of any data Colorado had that would tell it how many adverse childhood experiences its teen citizens had suffered as of that time?

MS. BATCHELDER:  Objection to form and scope.

THE WITNESS:  I mean, that sounds like the question that I just repeated back to you to me.

Is that what it is?

BY MS. PHILLIPS:

Q.     If so, then yes.

A.     Okay.

Q.     I have posed the question in the way I hope clarified.

MS. BATCHELDER:  Same objection.

THE WITNESS:  I'm not aware of an effort to quantify and aggregate the ACSES scores every Coloradan whose either a teenager or under 18.

BY MS. PHILLIPS:

Q.     And so you also, I suspect, are not aware of any data that Colorado has telling us how many teens who had suffered adverse childhood experiences had, in fact, suffered

CONFIDENTIAL

Page 322

negative mental health outcomes as a result?

MS. BATCHELDER:  Objection to form and scope.

THE WITNESS:  I -- I'm not aware of that data being available in a way that I can quantify that number.

BY MS. PHILLIPS:

Q.    Are you aware of any data outside of any data that's in the Healthy Kids Survey that you could tell us how many students in Colorado suffered mental health harms because of academic pressure at school?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  I am not.

BY MS. PHILLIPS:

Q.    And has Colorado tried to figure out what that number is by using the Healthy Kids Survey in any way?

MS. BATCHELDER:  Objection to form and scope.

THE WITNESS:  So I guess I'll say I'm aware, you know, obviously aware of the kids Colorado survey.  You and I both talked about it today.  I did talk with CDPHE about it.  I did not ask about every

application that they -- like, exactly that they used it for.  And so I'm not -- I'm not aware sitting here of -- of that, like, whether I can answer yes or no to that question.

BY MS. PHILLIPS:

Q.    Do you have any data Colorado has -- well, strike that.

You understand that living in -- well, strike that too.

Will the threat of violence, including things like school shootings or violence in your neighborhood can impact mental health, right?

MS. BATCHELDER:  Objection to form and scope.  Calls for expert testimony.

THE WITNESS:  Based on kind of references throughout the materials that I've reviewed in preparing for this, that seems to be accurate.

BY MS. PHILLIPS:

Q.    All right.  Does Colorado have any data about how many kids in Colorado have experienced negative mental health harms because of the threat of violence?

Page 324

MS. BATCHELDER:  Objection to form and scope.

THE WITNESS:  Again, I'm not aware of data that we have that quantifies the -- that exact set of kids in Colorado.

BY MS. PHILLIPS:

Q.    Bullying can negatively impact mental health right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  Similarly I think, you know, in my review of preparing for this, I think that's accurate.

BY MS. PHILLIPS:

Q.    And let's take a look at a presentation on that.  It will be Exhibit 23 produced at CDE 0678717.

(Whereupon, Exhibit 23, Slip sheet and natively produced presentation, Bates labeled CDE_0678717, was marked for identification.)

THE WITNESS:  Thanks.

BY MS. PHILLIPS:

Q.    Mr. Blake, you've reviewed this deck in preparing for your testimony today, right?

not sure if it is applied in the same way.

Q.    And that's fair.  It's a very voluminous survey.

You're not aware of anything outside of the Healthy Kids dataset that might provide these facts?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  As I sit here, no.

BY MS. PHILLIPS:

Q.    You understand that natural disasters can impact mental health, right?

MS. BATCHELDER:  Objection to form and scope.  Calls for expert testimony.

THE WITNESS:  This seems in kind of related way how I answered a couple similar questions.

I -- I believe that my review of the documents in preparing for this, it was one of the items listed that can have a negative impact on mental health.

BY MS. PHILLIPS:

Q.    Has -- and Colorado sometimes provides mental health services to people who have suffered natural disasters here in this state, right?

Page 332

page under the blue banner that's titled "Racial Ethnic Inequities in School and Social Connectedness," where it says in the second sentence, "Students" --

A.    Wait.  You've lost me.

Q.    Oh, sorry.  The banner -- oh, you know what, sorry about that.

It's the blue banner on the second page.

A.    Got it.

Q.    Sorry about that.

And it reads -- the light blue banner.  I should be specific -- "Racial Ethnic Inequities in School and Social Connectedness."

Do you see that?

A.    I do.

Q.    Okay.  And the second sentence under that banner says, "Students of color and students who experience discrimination are less likely to feel connected and cared for at school, exposing them to additional harm for adverse outcomes related to mental health, substance use, risky sexual behavior, violence, and reduced academic achievement."

Do you see that?

CONFIDENTIAL

Page 333

A.    Yes.

Q.    Okay.  And this is -- despite all sorts of best efforts to mitigate this, this -- the impact of racism continues to be a problem in schools in Colorado, right?

MS. BATCHELDER:  Objection to form. Scope.  Calls for expert testimony.

THE WITNESS:  Yeah.  In my personal capacity, I don't have reason to disagree with you.

BY MS. PHILLIPS:

Q.    And this data brief uses data from the Healthy Kids data set, right?

MS. BATCHELDER:  Objection.

THE WITNESS:  Yes, that was my understanding of the source.

BY MS. PHILLIPS:

Q.    If you look on the first page, it -- under -- on the -- in the header, it says, "Colorado Schools Public Health," and then there's a subheader for Healthy Kids Colorado Survey.

And underneath in the banner on the first page, it references the 2019 Healthy Kids Colorado Administration, right?

Page 344

Q.    Do you see the table at the top, Table 1, "Funding for Children's Behavorial Health by State Agency for School Year 2019"?

A.    I do.

Q.    And you understand, just to orient ourselves, this is a report that was prepared for the -- the Behavorial Health Task Force subcommittee specific to children, and -- and that task force is part of the Colorado government, right?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  Yeah, I think that's accurate.

BY MS. PHILLIPS:

Q.    And it -- just to be fair, it looks like this report included the involvement of the Colorado Health Institute and an organization called Partners for Children's Mental Health, if you look at it on the front?

A.    Yeah.

Q.    So looking at this -- this data they provide in Table 1, you understand this tells us how much funding different agencies in Colorado got to address children's behavorial health issues in fiscal year 2019, right?

CONFIDENTIAL

Page 345

MS. BATCHELDER:  Objection to form.

THE WITNESS:  That's what it looks like it does.

BY MS. PHILLIPS:

Q.    And behavorial health issues include mental health issues and substance abuse issues.

Is that how you understand the term?

MS. BATCHELDER:  Objection to form and scope.

THE WITNESS:  I would have to review -- I know that there are definitions about the legislation that started this task force in forming legislation, but I can't remember exactly how it's defined.  That seems like a plausible reading of it.

BY MS. PHILLIPS:

Q.    Okay.  The total -- well, I want to ask it this way:  You see that for the row Department of Human Services, Office of Children Youth and Families, do you see that top row?

A.    Yes.

CONFIDENTIAL

Page 346

Q.    The total reported funding was $381 million in fiscal year 2019?

A.    I see that.

Q.    And there -- there's an asterisk, just to be clear, and the asterisk indicates that that also includes some foster care costs in addition to behavorial health services.

Do you see that?

A.    I do.

Q.    Okay.  Do you know how much of any of that $381 million was spent providing mental health services to address harms from social media use?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  I do not.

BY MS. PHILLIPS:

Q.    The second row is for the Department of Health Care Policy and Financing.

Do you see that?

A.    Yes.

Q.    And that reports $259 million of funding?

A.    I see that.

Q.    Do you know as to the Department of Health Care Policy and Financing whether any of

CONFIDENTIAL

Page 347

those $259 million were spent addressing the mental health impact, if any, of social media use?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  I do not know.

BY MS. PHILLIPS:

Q.    Okay.  The third row is the Department of Human Services Office of Early Childhood, right?

A.    Yes.

Q.    And they report $66 million in behavorial health funding in fiscal year 2019?

A.    That's what's printed here.

Q.    And do -- do you know whether any of that funding was spent to address any mental health impact to social media use?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  I do not know.

BY MS. PHILLIPS:

Q.    Would that be true as to the Department of Human Services Office of Behavorial Health as well, that you don't know how much, if any, of the $65 million of funding for that office was spent to address any mental health impacted social media use?

CONFIDENTIAL

Page 348

A.    I think -- just the way you phrased that, I think the answer is yes.

Q.    And --

A.    It's the same as the one above.

Q.    Okay.  Is that also the case for the Department of Education, the $22 million of reported funding for the Department of Education that you don't know whether any of those $22 million were spent to address any mental health impact from social media use?

MS. BATCHELDER:  Objection to form.

THE WITNESS:  That's correct.

BY MS. PHILLIPS:

Q.    Was that also the case for the $17 million of funding reported here for the Department of Public Health and Environment?

MS. BATCHELDER:  Same objection.

THE WITNESS:  Yes.

BY MS. PHILLIPS:

Q.    And then if you look at the total report, it reports a total of $810 million of funding for children's behavorial health in fiscal year 2019.

Do you see that?

A.    I do.