[*Submitting Counsel on Signature Page*]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION | MDL No. 3047 |
| | Case No. 4:22-md-03047-YGR |
| THIS DOCUMENT RELATES TO: | **STATE AGS' PENALTY AND DISGORGEMENT CHARTS AND SUPPORTING MATERIALS** |
| 4:23-cv-05448 | Judge: Hon. Yvonne Gonzalez Rogers |
| | Magistrate Judge: Hon. Peter H. Kang |

**TABLE OF CONTENTS**

I.    INTRODUCTION .................................................................................................................. 1

II.   Legal Background on Remedies Available to the AGs .................................................. 2

      A.    Civil Penalties ..................................................................................................... 2

      B.    Disgorgement ...................................................................................................... 6

III.  The AGs' Penalty and Disgorgement Remedies ......................................................... 7

      A.    Remedy Chart 1: Penalty Calculation for Pre-Teen and Teens on Meta's Platforms
            (Exhibit A) ........................................................................................................... 8

      B.    Remedy Chart 2: Time Spent Penalty Calculation for Teen Users (Exhibit B) ...................... 10

      C.    Remedy Chart 3: UDAP Violation Counts and Penalty Calculation Related to Meta's
            "Actual Knowledge" COPPA Violations (Exhibit C) .......................................................... 12

      D.    Remedy Chart 4: Disgorgement of Profits Based on Time Spent as Teens (Exhibit D) .......... 18

      E.    Remedy Chart 5: UDAP Disgorgement Associated with U13 Users (Exhibit E) .................... 19

      F.    Remedy Chart 6: COPPA Disgorgement Associated with U13 Users (Exhibit F) .................. 21

IV.   CONCLUSION ................................................................................................................... 22

**TABLE OF AUTHORITIES**

**Cases**

*Am. Nat'l Univ. of Kentucky, Inc. v. Commonwealth ex rel. Beshear*,
2019 WL 2479608 (Ky. Ct. App. June 14, 2019)..............................................................2, 3, 4

*FTC v. Bronson Partners, LLC*,
654 F.3d 359 (2d Cir. 2011)............................................................................................21, 22

*FTC v. Green Equitable Sols.*,
2024 U.S. Dist. LEXIS 64339 (C.D. Cal. Feb. 2, 2024)...............................................................6

*Kansas v. Nebraska*,
574 U.S. 445 (2015).....................................................................................................................6

*Kimmelman v. Henkels & McCoy, Inc.*,
527 A.2d 1368 (N.J. 1987)......................................................................................................3, 6

*Kugler v. Romain*,
279 A.2d 640 (N.J. 1971).............................................................................................................2

*May Dept. Stores Co. v. State ex rel. Woodard*,
863 P.2d 967 (Colo. 1993)......................................................................................................2, 4

*Meshinksy v. Nichols Yacht Sales, Inc.*,
541 A.2d 1063 (N.J. 1988)......................................................................................................2, 4

*People ex rel. Harris v. Sarpas*,
225 Cal. App. 4th 1539 (Cal. Ct. App. 2014) ..............................................................................3

*People ex rel. Kennedy v. Beaumont Investment, Ltd.*,
111 Cal. App. 4th 102 (Cal. Ct. App. 2003) ...............................................................................4

*People v. Bestline Products, Inc.*,
61 Cal. App. 3d 879 (Cal. Ct. App. 1976) ..................................................................................2

*People v. Custom Craft Carpets, Inc.*,
159 Cal.App.3d 676 (Cal. Ct. App. 1984) ..................................................................................4

*People v. Dollar Rent-a-Car Systems, Inc.*,
211 Cal. App. 3d 119 (Cal. Ct. App. 1989) ................................................................................3

*People v. Nat'l Ass'n of Realtors*,
155 Cal. App. 3d 578 (1984) ......................................................................................................3

*People v. Shifrin*,
342 P.3d 506 (Colo. App. 2014)..................................................................................................5

*People v. Wunder*,
371 P.3d 785 (Colo. App. 2016)...............................................................................................3, 5

*Platkin v. Kizito, et al.*,
337 A.3d 354 (N.J. Super. App. Div. 2025) ................................................................................4

*Prata v. Super. Ct.*,
    91 Cal. App. 4th 1128 (Cal. Ct. App. 2001) ................................................................................ 2

*S.E.C. v. Choice Advisors, LLC*,
    2024 WL 4469095 (S.D. Cal. Oct. 7, 2024) ................................................................................ 6

*S.E.C. v. First City Fin. Corp.*,
    890 F.2d 1215 (D.C. Cir. 1989) ........................................................................................... 6, 7

*S.E.C. v. Hughes Cap. Corp.*,
    917 F. Supp. 1080 (D.N.J. 1996) ............................................................................................. 7

*S.E.C. v. Platforms Wireless Int'l Corp.*,
    617 F.3d 1072 (9th Cir. 2010) ............................................................................................. 6, 7

*S.E.C. v. Teo*,
    746 F.3d 90 (3d Cir. 2014) ...................................................................................................... 7

*Stevens v. Motorists Mut. Ins. Co.*,
    759 S.W.2d 819 (Ky. 1988) ..................................................................................................... 3

*Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*
    17 Cal. 4th 553 (Cal. Ct. App. 1998) ................................................................................. 5, 12

**Statutes**

Cal. Bus. & Prof. Code § 17205 (2026) ....................................................................................... 5

Cal. Bus. & Prof. Code § 17534.5 (2026) ..................................................................................... 5

Cal. Bus. & Prof. Code § 17206 (b) (2026) ................................................................................... 5

Cal. Bus. & Prof. Code, § 17536(b) (2026) ................................................................................... 5

Colo. Rev. Stat. § 6-1-110(1) (2025) ............................................................................................ 6

Colo. Rev. Stat. § 6-1-112(1) (2025) .............................................................................. 5, 11, 15

Colo. Rev. Stat. § 6-1-112(1)(a) (2018) ........................................................................................ 5

Colo. Rev. Stat. § 6-1-112(1)(a) (2025) ................................................................................... 3, 4

Ky. Rev. Stat. § 367.990(26)(a) (2026) ........................................................................................ 5

Ky. Rev. Stat. § 367.990(26)(d) (2026) ........................................................................................ 5

Ky. Rev. Stat. § 367.990(26)(b) (2026) ........................................................................................ 3

Ky. Rev. Stat. § 367.990(26)(b)(1)(c) (2026) ............................................................................... 4

N.J. Stat. Ann. § 56:8-13 (2026) ................................................................................. 4, 5, 11, 18

N.J. Stat. Ann. § 56:8-4(b) (2026) .............................................................................................. 12

**Other Authorities**

2019 Colo. Legis. Serv. Ch. 268 (H.B. 19-1289) ...................................................................... 5

**Regulations**

16 CFR § 312.10 ...................................................................................................................... 12

16 CFR § 312.3 ................................................................................................................... 15, 17

STATE AGS' PENALTY AND DISGORGEMENT CHARTS AND SUPPORTING MATERIALS
4:22-md-03047-YGR; 4:23-CV-05448-YGR

## I.    INTRODUCTION

During the June 26, 2026, Case Management Conference, the AGs[1] provided the Court with six sets of charts displaying civil penalty and disgorgement remedies ("Penalty and Disgorgement Charts") that the AGs seek in the trial commencing in August 2026. The AGs previously sent these Charts to Meta on June 19, 2026 (as part of the Parties' exchange of exhibits in advance of trial). The AGs sent the same Charts to Meta on June 25, 2026, appended to supplemental Interrogatory Responses.[2]

As discussed in greater detail below, the AGs' six Penalty and Disgorgement Charts, which the AGs are filing per the Court's request, are as follows:[3]

- **Remedy Chart 1**: UDAP Penalty Calculation for Pre-Teen and Teens on Meta's Platforms (Exhibit A)
- **Remedy Chart 2:** UDAP Time Spent Penalty Calculation for Teen Users (Exhibit B)
- **Remedy Chart 3**: UDAP Violation Counts and Penalty Calculation Related to Meta's "Actual Knowledge" COPPA Violations (Exhibit C)
- **Remedy Chart 4**: UDAP Disgorgement of Profits Based on Time Spent as Teens (Exhibit D)
- **Remedy Chart 5:** UDAP Disgorgement Associated with U13 Users (Exhibit E)
- **Remedy Chart 6:** COPPA Disgorgement Associated with U13 Users (Exhibit F)

The AGs propose that the Advisory Jury can and should assess the relatively straightforward UDAP penalties laid out in Remedies Charts 1 and 2, and should provide the Court findings as to both the number of violations and the appropriate penalty amount. Other monetary relief, including UDAP and COPPA disgorgement, involves more calculation and is therefore best assessed exclusively by the Court. The AGs will discuss those categories of relief further when they file their Findings of Fact and

---

[1] Throughout this submission, the "AGs" refers to California, Colorado, Kentucky, and New Jersey insofar as the discussion pertains to consumer protection claims and associated remedies. "AGs" refers to all MDL states seeking remedies under COPPA insofar as the discussion pertains to the COPPA claim and associated remedies.

[2] There is one minor difference between the Charts the AGs sent to Meta on June 19 and June 25—the AGs removed one State from Remedy Chart 6. The AGs notified Meta of this change in their accompanying June 25 Interrogatory Responses. The Penalty and Disgorgement Charts appended to the AGs' June 25 Interrogatory Responses and the Penalty and Disgorgement Charts provided to the Court on June 26 during the CMC are identical.

[3] Also consistent with the Court's request, the AGs have numbered the Penalty and Disgorgement Charts. Aside from the addition of the numbering, the appended Charts are the same as those provided to the Court during the June CMC and to Meta in conjunction with the AGs' June 25 Interrogatory Responses.

Conclusions of Law. The AGs reserve the right to rely on only a subset of these charts or to reduce their penalty claims as trial proceeds.

## II.    Legal Background on Remedies Available to the AGs

### A. Civil Penalties

Statutory civil penalties under the State AGs' consumer protection laws are different than compensatory damages and serve a distinct purpose, including punishing a defendant's misconduct and deterring future misconduct. *See People v. Bestline Products, Inc.*, 61 Cal. App. 3d 879, 924 (Cal. Ct. App. 1976) ("[S]ome deterrent beyond that of being subject to an injunction and being required to return such ill-gotten gains is deemed necessary to deter fraudulent business practices."); *May Dept. Stores Co. v. State ex rel. Woodard*, 863 P.2d 967, 972 (Colo. 1993) ("[T]he CCPA's civil penalty requirement is intended to punish and deter the wrongdoer[.]"); *Kugler v. Romain*, 279 A.2d 640, 647 (N.J. 1971) (noting the "deterrent effect of the sanctions which [the Court] believe[s] underlies the [New Jersey] Consumer Fraud Act"); *Am. Nat'l Univ. of Kentucky, Inc. v. Commonwealth ex rel. Beshear*, 2019 WL 2479608, at *7 (Ky. Ct. App. June 14, 2019) (not to be published) (noting that Kentucky's consumer protection statutes are "intended to provide an effective deterrent for any type of violation") [4]; Ky. Rev. Stat. Ann. § 367.990(26)(c) ("[A]ctual injury . . . shall not be required, as the civil penalty provisions in this subsection are intended to punish and deter the violator and not intended solely to compensate injured parties."). The State AGs need not show individual consumer harm or reliance for the factfinder to award civil penalties. *See, e.g.*, *Prata v. Super. Ct.*, 91 Cal. App. 4th 1128, 1146 (Cal. Ct. App. 2001) (holding that "individual matters of proof [are] irrelevant to liability under the UCL"); *Meshinksy v. Nichols Yacht Sales, Inc.*, 541 A.2d 1063, 1067 (N.J. 1988) (noting that "the [AG] does not have to prove that the victim was damaged by the unlawful conduct"); *May Dep't Stores Co.*, 863 P.2d at 973 ("the CCPA does not require proof of an actual injury or loss before a civil penalty can be awarded"); *Am. Nat'l Univ. of Ky.*, 2019 WL 2479608, at *8 (holding that violations should be tied to defendant's conduct and not individual consumer harm).

***Counting violations.*** To arrive at a total civil penalty award, the factfinder must determine both (1) the number of statutory violations; and (2) the penalty amount to be awarded for each violation.

---

[4] *Am. Nat'l Univ. of Kentucky* is not binding authority; however, it is helpful in showing how Kentucky courts address this point of law. The use of *Am. Nat'l. Univ. of Kentucky* in this way is permitted under Kentucky law. *See* Kentucky Rule of Appellate Procedure ("RAP") 41.

Violation counting is a flexible exercise subject to the discretion of the factfinder, based on the circumstances of the case and the evidence before the factfinder. *People ex rel. Harris v. Sarpas*, 225 Cal. App. 4th 1539, 1566 (Cal. Ct. App. 2014) (holding that "what constitutes a violation" in a Unfair Competition Law and False Advertising Law action "depends on the circumstances of the case, including the type of violations, the number of victims, and the repetition of the conduct constituting the violation"); *People v. Wunder*, 371 P.3d 785, 793 (Colo. App. 2016) ("A court should consider several factors in its determination of the amount of civil penalties under section 6–1–112(1)(a) even though those factors are not a 'litmus test' for the imposition of civil penalties."); *Am. Nat'l Univ. of Ky.*, 2019 WL 2479608, at *7 (holding that "creativity is permitted in determining what constitutes a violation in order to effectuate the legislature's intent that the KCPA 'in the hands of the Attorney General, be a flexible and effective means of combating abusive trade practices'" (quoting *Commonwealth ex rel. Chandler v. Anthem Ins. Companies, Inc.*, 8 S.W.3d 48, 55 (Ky. Ct. App. 1999)); *Stevens v. Motorists Mut. Ins. Co.*, 759 S.W.2d 819, 821 (Ky. 1988) (noting that the consumer protection statute "has the broadest application in order to give Kentucky consumers the broadest possible protection for allegedly illegal acts" and citing KRS 446.080, which "requires that the statutes of this Commonwealth are to be liberally construed"); *Kimmelman v. Henkels & McCoy, Inc.*, 527 A.2d 1368, 1375 (N.J. 1987) (the trial court has "considerable discretion in determining the penalty appropriate in each case").

When counting violations, the factfinder is not limited by the number of deceptive statements proved or the number of people who may have viewed those deceptive statements. *See People v. Nat'l Ass'n of Realtors*, 155 Cal. App. 3d 578, 585–86 (1984) (rejecting trial court's assumption that separate acts pursuant to a single scheme amounted to a single violation, and noting that separate violations may be found where a single act affects multiple victims); *People v. Dollar Rent-a-Car Systems, Inc.*, 211 Cal. App. 3d 119, 131 (Cal. Ct. App. 1989) (counting violations only for consumers who read defendants' deceptive contracts would "defeat the purpose behind the [UCL and FAL]" of "protect[ing] against the *likelihood* of deception, not just *actual* harm"); Colo. Rev. Stat. Ann. § 6-1-112(1)(a) ("For purposes of this subsection (1)(a), a violation of any provision shall constitute a separate violation with respect to each consumer or transaction involved."); Ky. Rev. Stat. Ann. § 367.990(26)(b) ("Any method, act, or practice declared unlawful by KRS 367.170 shall constitute a separate violation as to each . . . [c]onsumer to whom

a method, act, or practice . . . was directed, communicated, or applied, regardless of whether the consumer suffered actual pecuniary loss[.]”); *Meshinsky*, 541 A.2d at 1067 (“[T]he [New Jersey] Attorney General does not have to prove that the victim of the fraudulent conduct had in fact been misled, deceived or damaged thereby.”) (internal citation and quotation omitted).

Likewise, the factfinder may count more than one penalty per consumer if appropriate under the circumstances of the case. *See People ex rel. Kennedy v. Beaumont Investment, Ltd.*, 111 Cal. App. 4th 102, 129 (Cal. Ct. App. 2003) (rejecting the contention that the number of violations must always be calculated on a “per victim” basis); *May Dep’t Stores Co.,* 863 P.2d at 976 (“The [CCPA] does not list mutually exclusive violations; it lists separate categories of violations, each of which may be assessed a penalty. In effect, the State is given multiple options, no one of which precludes the other.”); *Am. Nat’l Univ. of Ky.*, 2019 WL 2479608, at *7 (Ky. Ct. App. 2019) (“creativity is permitted in determining what constitutes a violation in order to . . . be a flexible and effective means of combating abusive trade practices”); Ky. Rev. Stat. Ann. § 367.990(26)(b)(1)(c) (“Any method, act, or practice . . . shall constitute a separate violation as to each . . . [s]eparately identifiable method, act, or practice declared unlawful by KRS 367.170, even if arising from the same transaction or directed at the same consumer[.]”); *Platkin v. Kizito, et al.,* 337 A.3d 354 (N.J. Super. App. Div. 2025) (holding that the trial court could award civil penalties for violations of the registration and antifraud provisions of the New Jersey Uniform Securities Law concerning 753 violations across 69 individual defrauded investors).

The AGs also discussed the flexible and discretionary nature of violation counting in their Opposition to Meta’s Motion to Exclude or Strike Testimony of Carl Saba. *See* ECF No. 2913 at 11–12.

***Per-Violation Penalty Amount.*** Once a factfinder determines that the consumer protection laws have been violated, civil penalties are assessed. *People v. Custom Craft Carpets, Inc.,*159 Cal.App.3d 676, 686 (Cal. Ct. App. 1984) (civil penalties are mandatory under UCL and FAL) (internal citation omitted); Colo. Rev. Stat. § 6-1-112(1)(a) (“Except as provided in subsections (3) and (4) of this section, any person who violates or causes another to violate any provision of this article 1 *shall* forfeit and pay to the general fund of this state a civil penalty of not more than twenty thousand dollars for each such violation.”) (emphasis added); N.J.S.A. 56:8–13 (“[a]ny person who violates any of the provisions of the act to which this act is a supplement *shall*, in addition to any other penalty provided by law, be liable to a penalty of

not more than $10,000 for the first offense and not more than $20,000 for the second and each subsequent offense."). The amount of each penalty for each violation, however, lies within the factfinder's discretion, taking into account each state's penalty factors and maximum penalty amount:

- **California:** Civil penalties of up to **$2,500** must be ordered for each violation of the UCL and FAL and the factfinder "shall consider any one or more" of the following non-exhaustive factors: "the nature and seriousness of the misconduct, the number of violations, the persistence of the misconduct, the length of time over which the misconduct occurred, the willfulness of the defendant's misconduct, and the defendant's assets, liabilities, and net worth." Cal. Bus. & Prof. Code, §§ 17206 (b), 17536(b). The civil penalties under sections 17206 and 17536 are cumulative, such that a penalty amount of up to $5,000 may be awarded for an act that is a violation of both laws. Cal. Bus. & Prof. Code §§ 17205 and 17534.5; *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* 17 Cal. 4th 553, 573 (Cal. Ct. App. 1998).

- **Colorado:** For violations occurring before July 1, 2019, the Colorado Consumer Protection Act authorized civil penalties of up to $2,000 per violation, with each consumer or transaction constituting a separate violation, subject to a $500,000 maximum for any related series of violations. Colo. Rev. Stat. § 6-1-112(1)(a) (2018). Effective May 23, 2019, the General Assembly amended the statute to increase the maximum penalty to $20,000 per violation and eliminated the $500,000 aggregate cap. *See* 2019 Colo. Legis. Serv. Ch. 268 (H.B. 19-1289) (West). Thus, for violations occurring on or after July 1 (the effective date of the statute), each consumer or transaction constitutes a separate violation punishable by a civil penalty of up to $20,000. Colo. Rev. Stat. § 6-1-112(1). In determining the appropriate amount of civil penalties, Colorado courts consider several non-exclusive factors. Although these factors do not constitute a "litmus test" for imposing civil penalties, they guide the factfinder's exercise of discretion. *People v. Shifrin*, 342 P.3d 506, 523 (Colo. App. 2014). Those factors include: "(1) the good or bad faith of the defendant; (2) the injury to the public; (3) the defendant's ability to pay; and (4) the desire to eliminate the benefits derived by violations of the CCPA." *Wunder*, 371 P.3d at 793.

- **Kentucky:** Kentucky law authorizes civil penalties of up to $2,000 per violation from any person the court finds is willfully using or has willfully used a method, act, or practice declared unlawful by Kentucky Revised Statutes section 367.170. Ky. Rev. Stat. § 367.990(26)(a). In assessing penalties under Kentucky law, "the trier of fact may consider, either alone or in combination . . . 1. [w]hether the person charged with the violation was acting in good faith or bad faith; 2. [t]he nature, extent, and severity of the injury to consumers and the public; 3. [t]he person's ability to pay; 4. [t]he amount of profit or gain obtained through the unlawful conduct; 5. [t]he duration of the unlawful conduct; 6. [t]he desire to eliminate any benefit derived from the violation and to deter future violations; and 7. [a]ny prior violations of KRS 367.170 by the person." Ky. Rev. Stat. § 367.990(26)(d).

- **New Jersey:** N.J.S.A. § 56:8-13 provides for "not more than $10,000 for the first offense and not more than $20,000 for the second and each subsequent offense." NJ courts consider the following seven "*Kimmelman*" factors in setting civil penalties: (1)

5

the good faith or bad faith of the defendant; (2) the defendant's ability to pay; (3) the amount of profits obtained from the illegal activity; (4) injury to the public; (5) duration of the illegal activity or conspiracy; (6) existence of criminal actions; and (7) past violations. *Kimmelman*, 527 A.2d at 1375–76.

## B. Disgorgement

The AGs seek disgorgement as a remedy under both COPPA and their consumer protection statutes, in addition to civil penalties. *See ,e.g.*, *S.E.C. v. Choice Advisors, LLC*, 2024 WL 4469095, at *5 (S.D. Cal. Oct. 7, 2024) ("Because disgorgement merely approximates a return to the status quo, civil penalties are an important additional remedy to deter the wrongdoer from similar conduct in the future."); Colo. Rev. Stat. § 6-1-110(1) ("The court may make such orders or judgments as may be necessary … to prevent any unjust enrichment by any person through the use or employment of any deceptive trade practice."); *FTC v. Green Equitable Sols.*, 2024 U.S. Dist. LEXIS 64339, at *19 (C.D. Cal. Feb. 2, 2024) (approving disgorgement, restitution, and civil penalties for same set of claims). Disgorgement has been the subject of motion practice in this case. Summary judgment briefing included lengthy discussion of the principles of disgorgement, the AGs' entitlement to disgorgement, and Saba's disgorgement related calculations. ECF No. 2832 at 59-64. Meta repeated similar topics in Meta's Motion to Exclude and/or Strike the Testimony of Carl Saba, and the AGs addressed these points in their opposition motion. ECF No. 2913 at 13-14.

The AGs' burden, which they have satisfied, is to set forth "a reasonable approximation" of the gains "causally connected to" Meta's unlawful conduct, which are subject to disgorgement. *S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1096 (9th Cir. 2010) (internal citations omitted). In defining what constitutes a reasonable approximation, courts consistently recognize that it can be very difficult to separate illegal and legal gains. *See S.E.C. v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989) (the "[r]ules for calculating disgorgement must recognize that separating legal from illegal profits exactly may at times be a near-impossible task.").

In formulating disgorgement awards, courts resolve uncertainties against the wrongdoer, and allow for considerable flexibility in the calculation of disgorgement figures. *See, e.g.*, *Kansas v. Nebraska*, 574 U.S. 445, 466 (2015) (approving of a disgorgement figure that "appropriate[ly] consider[ed]" the wrongdoer's "incentives" and "past behavior" and achieved "the kind of signal necessary to prevent

another breach," though the "exact [disgorgement] number" was lacking in "explanation"); *Platforms Wireless*, 617 F.3d at 1096 (concluding that "the risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty"); *First City Fin. Corp.*, 890 F.2d at 1231–32 (discussing cases that relax the disgorgement nexus requirement when wrongdoing is so pervasive that it is difficult to distinguish between legal and illegal gains ); *S.E.C. v. Hughes Cap. Corp.,* 917 F. Supp. 1080, 1085 (D.N.J. 1996), *aff'd*, 124 F.3d 449 (3d Cir. 1997) (holding that "[i]n meeting its burden" to "reasonably approximate the amount of unjust enrichment" . . . "the plaintiff is not required to trace every dollar of proceeds misappropriated by the defendants . . . nor is plaintiff required to identify monies which have been commingled by them.") (internal citations omitted).

Once the plaintiff sets forth a reasonable approximation, "the burden shifts to the defendants to demonstrate that the disgorgement figure was not a reasonable approximation." *Platforms Wireless*, 617 F.3d at 1096 (citing cases) (internal citations omitted). This burden is substantial, "not simply one of carrying the ball back across the fifty-yard line by presenting a merely plausible alternative explanation for the profit. Rather, the defendant must adduce—at a minimum—specific evidence explaining the interplay (or lack thereof) among the violation(s) at issue . . . and any other cause for the profits [the defendants] assert were untainted by illegality." *S.E.C. v. Teo*, 746 F.3d 90, 107–108 (3d Cir. 2014).

**III.    The AGs' Penalty and Disgorgement Remedies**

As discussed, the AGs have served on Meta and are filing with the Court six Penalty and Disgorgement Charts representing civil penalty and disgorgement calculations for their UDAP and COPPA claims against Meta. In addition, the AGs provide the following detail regarding which charts align with the AGs' claims and theories of liability:

- As to claims based on Meta's conduct that constitutes **unfairness** under the UDAP laws of California, Colorado, Kentucky, and New Jersey, the AGs propose providing the Advisory Jury with **Remedy Chart 1** and **Remedy Chart 2**.[5]
- As to claims based on Meta's **false or deceptive conduct or statements**, the AGs propose providing the Advisory Jury with **Remedy Chart 1** and **Remedy Chart 2**.
- As to claims based on Meta's **unlawful conduct** under the UDAP laws based on their actual knowledge of U13s on their platforms, the AGs intend to seek the penalties laid out in **Remedy Chart 1 for pre-teens** or, in the alternative, the penalties laid out in **Remedy Chart 3**.

---

[5] Because, as discussed above, civil penalties are flexible and provide the factfinder with significant discretion both in counting the number of violations and determining the per-violation penalty amount, it is appropriate to provide the Advisory Jury with Remedy Chart 1 *and* Remedy Chart 2.

- In addition, the AGs intend to seek **disgorgement** in connection with violations of their UDAP laws as laid out in **Remedy Chart 4 and Remedy Chart 5**.
- Finally, all AGs intend to seek **disgorgement** for Meta's violations of COPPA as laid out in **Remedy Chart 6**.

The discussion below regarding the charts contains references to expert reports and Schedules to expert reports. The portions of the reports and Schedules that contain the data directly relied upon for the Penalty and Disgorgement Charts are appended as exhibits to this submission. The Parties provided the Court with binders of all expert reports and a flash drive with the Schedules on June 26, 2026.

**A. Remedy Chart 1: Penalty Calculation for Pre-Teen and Teens on Meta's Platforms (Exhibit A)**

The AGs propose providing the Advisory Jury with the unique pre-teen and teen person counts reflected in Remedy Chart 1 both as a means of assessing civil penalties for unfairness claims under the AGs' UDAP laws and for Meta's false or misleading statements or conduct under the AGs' UDAP laws.

*Chart 1.A.* Chart 1.A displays the number of unique 13 to 17 year-old (Teen) persons and the number of unique Under-13 (U13) persons present on Instagram and Facebook, as calculated by the AGs' expert Carl Saba. Specifically, Saba calculated the number of Teen and U13 persons active on Instagram or Facebook during at least one of the months in the applicable time period, without counting any individual more than once. The U13 and Teen person calculations are for the period January 1, 2012- March 31 2024. The results of Saba's Teen person calculations are listed under the "Conservative Estimate" column of the table in Paragraph 238 of Saba's Opening Report. Exhibit A-1 hereto. The results of Saba's U13 person calculations are listed in Paragraph 265 of Saba's Opening Report. Exhibit A-2 hereto. Chart 1.A displays those same results, specifically for California, Colorado, Kentucky, and New Jersey.

Saba describes the methodology for the Teen person calculations in Section XIV-XV of his November 21, 2025 Opening Report ("Opening Report"). The Teen person calculation is based on data that Meta produced, showing the number of Monthly Active Users on each platform, broken down by State, month, and age. Because a single person can have more than one user account, Saba translated the number of Monthly Active Users to the number of Monthly Active Persons by applying a user-to-person multiplier. Saba based the user-to-person multiplier on estimates in internal documents produced by Meta.

STATE AGS' PENALTY AND DISGORGEMENT CHARTS AND SUPPORTING MATERIALS
4:22-md-03047-YGR; 4:23-cv-05448-YGR

Saba describes the methodology for the U13 person calculations in Paragraphs 251-252 and Section XVII of his Opening Report. The U13 person calculation is based on surveys conducted by Thorn & Benenson Strategy Group each year from 2019 through 2023. Saba used results from survey questions asking 9 to 12 year old respondents if they had ever used Facebook or Instagram and whether they used each platform at least once per day.

*Chart 1.B.* Chart 1.B lists the statutory penalty limit for each violation of the applicable consumer protection laws in California (both the Unfair Competition Law and the False Advertising Law), Colorado, Kentucky, and New Jersey. As noted in the Chart, a penalty of $10,000 applies for the first violation of N.J. Stat. Ann. § 56:8-13, and a penalty of $20,000 applies for each subsequent violation.

*Chart 1.C.* To arrive at the figures displayed in Chart 1.C, the AGs multiplied the number of violations listed in Chart I.A by the per-violation penalty limits listed in Chart 1.B. For the New Jersey calculation, the AGs multiplied the number of violations by the $20,000 statutory penalty limit and subtracted $10,000.

As noted in the Chart, the Colorado penalty in Chart 1.C. reflects the statutory change as to penalty limits enacted on May 23, 2019, 2019 Colo. Sess. Laws 353, Colo. Rev. Stat. § 6-1-112(1). For the period before July 1, 2019, the AGs applied a $2,000 penalty for each unique Teen and U13 person present on the platforms. Because the total exceeded $500,000, the AGs applied a $500,000 total penalty for that period per violation type (specifically, for the number of unique Teen persons on Instagram and Facebook, separately, and the number of unique U13 persons on Instagram and Facebook, separately). From January 1, 2020, through the end of the applicable time period, the AGs applied a $20,000 penalty for each unique Colorado Teen person and U13 person present on the platforms.

The data needed for the Colorado Teen penalty disaggregation calculation is available in Saba's Opening Report, Schedules 6.3.3 (for Instagram) and 6.3.5 (for Facebook). The methodology described in Section XV, ¶ 234 of Saba's Opening Report was utilized to identify the total number of unique Colorado Teen persons on Facebook and Instagram in the post-July 1, 2019 period, using 2020 as the starting point and summing the net-new unique Teens through the end of the relevant time period.

The data needed for the Colorado U13 penalty calculation is readily available in Schedule 7.2 of Saba's Opening Report. Saba calculated the total unique U13 persons by counting the number of U13

STATE AGS' PENALTY AND DISGORGEMENT CHARTS AND SUPPORTING MATERIALS
4:22-md-03047-YGR; 4:23-cv-05448-YGR

persons present on the platforms in 2015, 2019, and 2023, and summing those three numbers. The AGs used the 2015 number for the pre-July 1, 2019 penalty calculation, and summed the 2019 and 2023 numbers for the post-July 1, 2019 penalty calculation.

**B.  Remedy Chart 2: Time Spent Penalty Calculation for Teen Users (Exhibit B)**

The AGs propose providing the Advisory Jury with the time spent penalty calculations reflected in Remedy Chart 2 both as a means of assessing civil penalties for unfairness claims under the AGs' UDAP laws and for Meta's false or misleading statements or conduct under the AGs' UDAP laws.

*Charts 2.A, 2.B.* Charts 2.A and 2.B display the number of monthly instances in which Teen accounts averaged more than 0.5, 1, or 2 hours per day on Instagram and Facebook in a given month ("Time Spent Instances"). The AGs provided further context surrounding these time thresholds in the AGs' Opposition to Meta's Motion to Exclude or Strike Testimony of Carl Saba. ECF No. 2913 at 8-9. The time spent thresholds are cumulative, so that all instances in which users averaged over 2 hours of time spent per day during a month are subsumed in the over 1 hour threshold, and all instances in the over 1 hour and 2 hour thresholds are included in the over 0.5 hour threshold group. The Instagram calculation is for the period January 1, 2013 to March 31, 2024. The Facebook calculation is for the period January 1, 2012 to March 31, 2024. Saba calculated these Time Spent Instances, and he describes the methodology for the calculation in Sections IX and XI.3 of his Opening Report.

Saba calculated the Time Spent Instances using user and time spent data that Meta produced. Meta's data showed (i) the number of Monthly Active Users on each platform broken down by age, state, and month and (ii) the average time spent per day by Teen Monthly Active Users on each platform, broken down by percentile, state, and month. As discussed in Paragraph 121 of Saba's Opening Report, Meta did not produce Instagram user and time spent data from January 2012 through January 2018, though the AGs issued discovery requests for that data. Saba calculated these figures using several datapoints in Meta's internal documents.

Meta produced corrected user and time spent data in March 2026. Following that production, Saba analyzed the corrected data; revised his Time Spent Calculations using the corrected data and the same methodology described in his Opening Report; and submitted a Supplemental Report on the date that was

agreed upon by the Parties—April 10, 2026. Meta's responsive expert submitted a responsive supplemental report on April 24, 2026.

The results of Saba's calculations for Instagram are listed in Saba's Supplemental Report, in Schedules 2.8.8S (for 2013-2017), Exhibit B-1 hereto, and 2.9.1S (for 2018-2024), Exhibit B-2 hereto. The results of Saba's calculations for Facebook are listed in Saba's Supplemental Report, in Schedule 2.10.1S. Exhibit B-3 hereto. Schedule 2.8.8S lists the number of Tune Spent Instances *between* specified time thresholds. To convert that to the number of instances *above* specified time thresholds, as seen in Chart 2.A, the AGs summed the relevant columns in Schedule 2.8.8S. This additional summing step was not needed with respect to Schedules 2.9.1S and 2.10.1S.

*Chart 2.C.* To arrive at the figures in Chart 2.C, the AGs summed the Instagram and Facebook values in Charts 2.A and 2.B.

*Chart 2.D.* Chart 2.D lists the statutory penalty limit for each violation of the applicable consumer protection laws in California (both the UCL and FAL), Colorado, Kentucky, and New Jersey. As noted in the Chart, a penalty of $10,000 applies for the first violation of N.J. Stat. Ann. § 56:8-13 (2025), and a penalty of $20,000 applies for each subsequent violation.

*Chart 2.E*. To arrive at the figures displayed in Chart 2.E, the AGs multiplied the number of violations listed in Chart 2.C by the per-violation penalty limits listed in Chart 2.D for Kentucky and New Jersey. For the New Jersey calculation, the AGs multiplied the number of violations by the $20,000 statutory penalty limit and then subtracted $10,000. For the California calculation, the AGs chose, based on their discretion, to multiply the number of violations by $2,500—half of the per-violation penalty limit provided for under the two California statutes combined.

As noted in the Chart, the Colorado penalty in Chart 2.E reflects the statutory change as to penalty limits enacted on May 23, 2019 Ch. 98, sec. 2, § 6-1-112(1), 2019 Colo. Sess. Laws 353; Colo. Rev. Stat. § 6-1-112(1). For the period before July 1, 2019, the AGs applied a $2,000 penalty for each Time Spent Instance on both platforms. The total exceeded $500,000, so the AGs applied a $500,000 total penalty for that period. From July 1, 2019 through the end of the applicable time period, the AGs applied a $20,000 penalty for each Time Spent Instance on both platforms.

The data needed for the Colorado penalty calculation was readily available in Saba's Opening Report, in Schedules 2.9.2S (for Instagram) and 2.10.2S (for Facebook). These Schedules contain Saba's calculations of Time Spent Instances, for each month. The AGs simply summed the monthly Time Spent Instances for the period before July 2019, and then for the period including and after July 2019.

**C. Remedy Chart 3: UDAP Violation Counts and Penalty Calculation Related to Meta's "Actual Knowledge" COPPA Violations (Exhibit C)**

As described in greater detail in the subsections below, the penalties laid out in Remedy Chart 3 seek to hold Meta to account for unfair and deceptive practices relating to collection of data from U13 users. In addition, California and New Jersey recognize that violation of a federal statute can also be a violation of state deceptive and unfair practices law. *See, e.g., Stop Youth Addiction, Inc.*, 17 Cal. 4th at 587; N.J. Stat. Ann. § 56:8-4(b) (2025) ("In an action brought by the Attorney General, any commercial practice that violates State or federal law is conclusively presumed to be an unlawful practice under section 2 of P.L.1960, c.39 (C.56:8-2)").

*Chart 3.A.* Chart 3.A shows the number of accounts of children under 13 for whom Meta retained their personal information for at least six to 12 months after disabling their accounts for being underage in each of the four states with state consumer protection claims in the first trial. As the AGs explained in their Motion for Partial Summary Judgment, Meta has actual knowledge that the users whose accounts it checkpoints and ultimately disables for being underage, belong to users under 13. ECF No. 2695 at 32-33. Meta's decision to retain these children's personal information, even after the company determined they were underage and "disabled" their accounts, violated COPPA's requirement for operators to "retain personal information collected online from a child for only as long as is reasonably necessary to fulfill the purpose for which the information was collected." 16 CFR § 312.10 (as amended, Jan. 17, 2013). *See* ECF 2832 at 67; ECF 2695 at 32-33 (quoting Meta employees at META3047MDL-020-00656153) ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ )[6] Each

---

[6] Meta also continued to allow its machine learning and generative AI models to train on the personal information of children's accounts after Meta disabled the accounts for being underage, thereby failing to use "reasonable measures to protect against unauthorized . . . use of[] the information" or "protect [its] confidentiality, security, and integrity." ECF 2832 at 67 (quoting 16 CFR §§ 312.10, 312.8).

of these actions to retain the personal information of each child's account also represent at least one violation of the state consumer protection statutes, as an unlawful and/or unfair practice.

Dr. Ryan Sheatsley analyzed Meta's underage enforcement data to count the number of accounts disabled for being underage each month between June 2020 and April 2024 (the range of time for which Meta produced this data). *See* May 6, 2026 Corrected Trial Report of Ryan Sheatsley ("Sheatsley Rpt.")[7] ¶¶ 150-52, 156 & Table 42. For the length of time that Meta retained data associated with accounts disabled for being underage, Sheatsley relied on the testimony of Meta's 30(b)(6) witness, Allison Hartnett. *See* Sheatsley Rpt. ¶ 52-54 (citing Hartnett Dep. 299:14-301:13). Because Meta failed to produce state-level geographic information for much of its underage reporting and enforcement data, Sheatsley Rpt. ¶¶ 1, 81, Sheatsley reports the number of accounts disabled for being underage for all users identified as being in the U.S. in Meta's data in Table 42 of his Corrected Trial Report. Exhibit C-1 hereto. ███████

██████████

███  *See* Sheatsley Rpt. ¶ 54 (citing Hartnett Dep. 299:14-301:13). Each of the underage accounts disabled in this time and retained for unreasonably long periods constitutes at least one separate violation of COPPA, and thus at least one separate violation of the relevant state consumer protection statutes.

To estimate the number of underage accounts that were located in each of the four states in the charts, the AGs multiplied the total number of affected U.S. accounts by the share of 9- to 12-year-old Daily Active Persons (DAPs) in Meta's platforms in each of the four states. Saba calculated and reported these state-level percentages of U13 users in his Opening Report, in Schedule 7.1. Exhibit C-2 hereto. Saba describes the method for estimating the state-level percentages in Section XVI of his Opening Report. For simplicity in calculation and to be conservative in the estimate of the number of violations, the State AGs use the lowest percentage of U13 users found in each relevant state across the entire period for which Saba calculated these percentages (2012-2023), and across both platforms. For example, in California, the number of violations is calculated by multiplying the total number of affected underage accounts in the US by ████, which is the percentage of U13 DAPs in the US on Facebook that were in

---

[7] All material referenced in this filing in Sheatsley's May 6, 2026 Corrected Trial Report was also present in Sheatsley's March 20, 2026 Trial Report. The only changes relevant to this material in Sheatsley's Corrected Report were to correct typographical errors in the table numbering (i.e., "Table 60"), and not any of the substantive information.

California in 2021, because that is the lowest share of U13 DAPs in California for any year in the full period that Saba calculated on either Facebook or Instagram. Violation counts are rounded to the nearest integer.

*Chart 3.B.* This chart shows the number of children's accounts that Meta allowed to remain on Instagram or Facebook, while disabling their other hard-linked account. Meta has actual knowledge that accounts that are hard-linked to accounts that the company checkpoints and disables for being underage belong to children under 13. *See* ECF No. 2695 at 30-31. However, Meta failed to consistently disable accounts hard-linked to accounts the company identified and disabled for being underage, until approximately October 2021. *See id.* Instead of disabling these hard-linked accounts, Meta allowed them to remain on its platforms, thereby continuing to collect, use and disclose personal information from these children in violation of COPPA. *See id.* at 33-34; 16 CFR § 312.3. Each of these accounts that Meta allowed to remain on its platforms thus represents at least one separate violation of COPPA, and this conduct also violated the state consumer protection statutes of the AGs listed in the charts, as a violation of the underlying Federal statute and as an unfair practice.

Sheatsley estimated the number of underage accounts that Meta would have enforced against for being underage if it had begun consistently enforcing against hard-linked underage accounts prior to October 2021. *See* Sheatsley Rpt. ¶¶ 176-181. The estimate is based on Meta's underage enforcement data, which includes the number of accounts that Meta disabled because they were hard-linked to accounts that Meta disabled for being underage. *See id.*; *id.* at ¶ 171. Sheatsley then used that data to estimate the number of accounts that Meta would have enforced against using this method for the full time period for which Meta provided underage enforcement data, prior to the time period when Meta began consistently enforcing against hard-linked underage accounts (October 2017 to September 2021). *See* Sheatsley Rpt. ¶ 181 & Table 56.1. Exhibit C-3 hereto.

As with Chart 3.A., Sheatsley produced estimates of the number of underage hard-linked accounts that Meta did not enforce against in the US as a whole, *id.,* as Meta's underage enforcement data largely lacks state-level geographic information. To derive state-level violation counts, the AGs used the same methodology as in Chart 3.A., multiplying the total number of affected accounts in the US by the lowest state-share of U13 DAPs from Saba's calculations across the platforms and across the full time period of

Saba's calculations. Because of Colorado's statutory change enacted on May 23, 2019, Ch. 98, sec. 2, § 6-1-112(1), 2019 Colo. Sess. Laws 353; Colo. Rev. Stat. § 6-1-112(1), violations for Colorado are limited to hard-linked accounts that could have been disabled from July 2019 to September 2021.

*Chart 3.C.* This chart shows the number of children who had at least one account that Meta allowed to remain on the platforms, even after Meta predicted the account(s) to belong to the same user as an account that Meta identified as disabled for being underage. Meta has actual knowledge that the accounts its soft-matching models predict to belong to the same users as accounts it disables for being underage belong to children under age 13. ECF No. 2695 at 30-32. Meta's decision to allow these soft-matched accounts to remain on the platforms, and to continue collecting, using, and disclosing personal information from these children, violates COPPA. *See id.* at 33-34; 16 CFR § 312.3. Each child Meta identified through its soft-matching models thus also represents at least one violation of the state consumer protection statutes of the four states in the first trial, as an unlawful and/or unfair practice.

Sheatsley estimated the number of users with one account that Meta disabled for being underage who had additional accounts that Meta's soft-matching models predicted as belonging to the same user, but allowed to remain on the platforms. *See* Sheatsley Rpt. ¶¶ 182-200. The estimate is based on data Meta produced from three of its soft-matching models that it uses for integrity purposes (e.g., disabling multiple accounts belonging to users who violate other Meta policies, such as those prohibiting fraud and scams). *See id.* at ¶¶ 57-62. Because Meta failed to retain its soft-matching data, the data relate to a three-month period from April to July 2025, the only period for which Meta produced soft-matching data. Sheatsley Reply Rpt. ¶ 17. Sheatsley's analysis of the number of users with accounts that Meta allowed to remain on its platforms even though Meta predicted them to belong to the same users as accounts that Meta disabled for being underage in this three-month period is reported in Tables 57-60, Exhibit C-4 hereto, of his report. Sheatsley Rpt. ¶¶ 192-194. Sheatsley then estimated the number of children with accounts that Meta could have disabled for being underage via soft-matching in the period of time for which Meta produced underage enforcement data, using a similar methodology as for his hard-link account estimates referenced in Chart 3.B. *See* Sheatsley Rpt. ¶¶ 195-200.

The violation counts in Chart 3.C represent the number of children with accounts that Meta allowed to remain on its platforms, even though Meta predicted them as belonging to the same users as accounts

that Meta identified and disabled for being underage for the period June 2020 to March 2024 and April to July 2025. Each of these children represents at least one act that violated COPPA (e.g., the collection, use, or disclosure of personal information), and thus at least one act that violated the four states' consumer protection laws. To be conservative, the AGs have counted violations using Sheatsley's analysis of data from only one of Meta's soft-matching integrity models, which predicts which Instagram accounts belong to the same users as other Instagram accounts (the IG-to-IG soft-match integrity model). Violations for the April to July 2025 period are based on Sheatsley's analysis of Meta's soft-matching data (the only soft-matching data that Meta preserved and produced in this litigation) from this model. *See* Sheatsley Rpt. ¶ 193 & Table 60. Some but not all of Meta's underage enforcement data in this period contained state-level geographic information. To conservatively estimate the number of affected children in each state, the AGs multiplied the number of affected children with U.S. geographic information but no state-level geographic information by the lowest U13 DAP state percentage for each of the four states on Instagram across the period for which Saba calculated. These results are then added to the number of affected children whose accounts are identified in Meta's state-level data as being in each of the relevant states in Table 60. For the June 2020 to March 2024 period, Sheatsley's estimates are reported for all U.S. users, as Meta's underage enforcement data in this period largely lacks state-level geographic information. *See* Sheatsley Rpt. ¶ 199 & Table 62. Exhibit C-5 hereto. To be conservative, the AGs estimate the number of violations in each relevant state by adding up the number of affected U.S. children across the time period, and then multiplying the total by the lowest state-share of U13 DAPs for Instagram for each state across the full time period of Mr. Saba's calculations. Violations are rounded to the nearest integer.

*Chart 3.D.* This chart shows the number of children under 13 on Facebook that changed their date of birth to an age under 13, but Meta ignored the change and allowed the child's account to remain on the platform, in 2019. Meta has actual knowledge that the users who expressly admit to the company that they are under 13 by changing their date of birth to a date that would make them under age 13, are children under 13, especially for those who are ultimately disabled after being provided an opportunity to submit an ID showing they are 13 or older. *See* ECF 2695 at 28-29. For years until early 2020, Meta failed to take action against users who changed their date of birth to under 13, even after many of them also were presented with a checkbox where they confirmed their age under 13, instead showing them an error

message and allowing them to remain on the platform, where Meta continued collecting, using, and disclosing their personal information, in violation of COPPA. *See* ECF 2832 at 65-66; 16 CFR § 312.3. Each of these children thus also represents at least one violation of the state consumer protection statutes of the four states in the first trial, as an unlawful and/or unfair practice.

███████████████████████████████████████████████████████ *See* META3047MDL-287-00003183 at -3191. Exhibit C-6 hereto. AG expert Timothy Estes discusses Meta's failure to take action against these users and Meta's estimate of the impact of this failure in his May 5, 2026 Rebuttal Expert Report. *See* Estes Rebuttal Rpt. ¶¶ 26-28 (citing several Meta documents, including META3047MDL-287-00003183). ███████████████████████████████████████████████████████ META3047MDL-287-00003183 at -3184.

To estimate the number of children who changed their date of birth to an age under 13 on Facebook, but whom Meta allowed to remain on the platform, the AGs began with Meta's estimate of the annual loss of ███ U.S. MAPs that would occur when Meta started checkpointing these users. To be conservative, the AGs reduced the total by ███, following Meta's updated estimates after it added a confirmation screen for certain users. To estimate the number of affected children in the four states with state consumer protection claims in the first trial, the AGs used a similar methodology as the three preceding charts, multiplying the total number of affected US children by the lowest percentage of U13 DAPs in each relevant state on Facebook over the full period of Saba's calculations. While Meta had failed to checkpoint these users who changed their date of birth to U13 on Facebook for years, to be conservative, the AGs count violations for only 2019, the year immediately before Meta started checkpointing and disabling these users. To estimate violations in Colorado starting only on July 1, 2019, the Colorado estimate of violations is reduced by half. All estimates of violations are rounded to the nearest integer.

*Chart 3.E.* Chart 3.E lists the statutory penalty limit for each violation of the applicable consumer protection laws in California, Colorado, Kentucky, and New Jersey. As noted in the Chart, a penalty of

$10,000 applies for the first violation of N.J. Stat. Ann. § 56:8-13, and a penalty of $20,000 applies for each subsequent violation.

*Chart 3.F.* This chart displays the maximum penalty amounts for each type of violation of the four relevant state consumer protection statutes related to Meta's actions with respect to users that it had actual knowledge of in violation of COPPA. The amounts for each state are derived by multiplying the maximum statutory penalty amounts in Chart 3.E. by the number of violations in each state in Charts 3.A.-3.D. For New Jersey, the first violation for each of the four types of violations in Chart 3 is valued at $10,000, as described in Chart 3.E.

**D.  Remedy Chart 4: Disgorgement of Profits Based on Time Spent as Teens (Exhibit D)**

*Charts 4.A, 4.B.* Charts 4.A and 4.B display the results of Saba's calculations of the gross profits associated with Teen users who averaged more than 0.5, 1, or 2 hours per day on Instagram and Facebook in a given month. Specifically, Saba identified the users who, while they were Teens, averaged more than 0.5, 1, or 2 hours per day on the platforms in a given month. He then estimated the gross profits associated with those users starting from when they became 18 during the Relevant Time Period, until March 31, 2024. Saba describes the methodology for the calculations in Section XII of his Opening Report.

The time spent thresholds are cumulative, so that the disgorgement figures associated with users that averaged over 2 hours of time spent per day during a month are subsumed in the figures associated with users that averaged over 1 hour threshold, and the figures in the over 1 hour and 2 hour thresholds are included in the over 0.5 hour threshold. This means that the factfinder would choose a single column instead of aggregating across columns.

Saba calculated the disgorgement figures using data that Meta produced. Specifically, Saba used Meta's user and time spent data discussed above in connection with Remedy Chart 2. Saba also used Average Revenue Per User and platform cost data that Meta produced. Meta's Average Revenue Per User data was broken down by user age. In order to complete this calculation, Saba also estimated user retention rates, based on datapoints in Meta's internal documents. As discussed in connection with Remedy Chart 2, Saba revised the disgorgement calculations using Meta's corrected user and time spent data, and disclosed those revised calculations in his Supplemental Report.

The results of Saba's disgorgement calculations are listed in Saba's Supplemental Report, in Schedule 4.1.3S. Exhibit D-1 hereto. For Colorado, Kentucky, and New Jersey, the time period for the disgorgement calculations is January 1, 2013 – March 31, 2024, and the figures are replicated from Schedule 4.1.3S.

For California, the time period for the disgorgement calculations is January 1, 2024 through March 31, 2024, given that January 1, 2024 is the effective date of California Government Code § 12527.6, which provides a disgorgement remedy under the UCL and FAL. The time period applicable to California's disgorgement request was noted and explained in the AG's Opposition to Meta's Motion for Summary Judgment. ECF No. 2832 at 61. The data needed to arrive at the California disgorgement figures for this three-month period are available in Saba's Supplemental Report, in Schedules 2.9.2S, 4.2.1S, 4.2.2S, 4.5.1S, and 4.5.2S. The same disgorgement calculation methodology detailed in Saba's Opening Report was applied to arrive at the California disgorgement figures for the three-month period in 2024.

The AGs explained the theories and principles underlying this disgorgement calculation, as well as the reasonableness of this approximation of ill-gotten gain, in their Opposition to Meta's Motion for Summary Judgment. ECF No. 2832 at 63-64.

**Chart 4.C.** For Colorado, Kentucky, and New Jersey, the figures in Chart 4.C come directly from Exhibit D-1. To arrive at the figures in Chart 4.C for California, the AGs summed California's Instagram and Facebook values in Charts 4.A and 4.B.

**E.  Remedy Chart 5: UDAP Disgorgement Associated with U13 Users (Exhibit E)**

This set of charts estimates ill-gotten gains from Meta's unlawful, unfair, and/or deceptive practices related to U13s on the platforms, including attracting U13s to the platforms, failing to prevent them from joining, and failing to detect and remove U13s from the platforms once they have joined, as well as collecting and retaining U13 data and deceiving consumers about the presence of U13s on its platforms. The time period for the U13 disgorgement calculations is January 1, 2013 through December 31, 2023. Colorado, Kentucky, and New Jersey are entitled to disgorgement of ill-gotten gains associated with U13s under COPPA, as described below, and to the same relief under the alternative theory that the presence of U-13 users on Meta's platforms and Meta's unfair and deceptive acts related thereto violates

19

their respective unfair competition statutes. California does not seek this disgorgement remedy under its state consumer protection statutes.

*Chart 5.A.* Chart 5.A displays revenues associated with U13 users on the platforms. The AGs calculated these figures by multiplying (i) the number of 9-12 year olds on Instagram or Facebook in a given state and year by (ii) the average revenue per user, by platform, in the same year. This value was then summed across the years for each State. The AGs arrived at the figures in the "Total" column by summing the corresponding figures in the "Instagram" and "Facebook" columns.

Saba calculated the number of 9-12 year olds; the results of these calculations are in his Opening Report, in Schedule 7.1, and summarized by year and State in Paragraph 256, Exhibit E-1 hereto. Saba describes the methodology for deriving these figures from Thorn & Benenson Strategy Group survey data in Section XVI of his Opening Report. These surveys are also described above, in the discussion of Remedy Chart 1. Saba also calculated the average revenue per user data; the results of those calculations are in Saba's Supplemental Report, in Schedules 2.8.6S for Instagram (Exhibit E-2 hereto) and 2.8.7S for Facebook (Exhibit E-3 hereto). The Facebook figures in Schedule 2.8.7S are monthly; the AGs summed across the months to arrive at annual figures. Saba describes the methodology for deriving these figures from revenue and user data produced by Meta in Paragraphs 139-146 of his Opening Report.

*Chart 5.B.* Chart 5.B displays profits associated with U13 persons on the platforms. The AGs calculated these figures by multiplying (i) the number of 9-12 year olds on Instagram or Facebook in a given state and year by (ii) the difference between average revenue per user and average Cost of Goods Sold per user, by platform, in the same year. This value was then summed across the years for each State. Saba calculated the Cost of Goods Sold per user, and the results of those calculations are in Saba's Supplemental Report. The annual Cost of Goods Sold per user on Instagram is in Schedules 2.8.1S (2013), 2.8.2S (2014), 2.8.3S (2015), 2.8.4S (2016), and 2.8.5S (2017). Exhibits E-4, E-5, E-6, E-7, E-8 hereto, respectively. The Cost of Goods Sold per user on Instagram from 2018-2023 and on Facebook from 2013-2023 is in Schedule 3.2S. Exhibit E-9 hereto. Schedule 3.2S contains quarterly figures; the AGs summed the quarterly figures in each year to arrive at the annual Cost of Goods Sold per user. Saba describes the methodology for calculating the Cost of Goods Sold per user, based on cost and user data produced by Meta, in Sections XI.3 and Paragraphs 156-159 and 204-205 of his Opening Report.

The AGs present Charts 5.A and 5.B as alternative formulations of this disgorgement remedy. The AGs' primary position is that the revenue figures should be selected as the disgorgement award, and costs should not be deducted because "defendants in a disgorgement action are not entitled to deduct costs associated with committing their illegal acts." *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 375 (2d Cir. 2011) (internal citations omitted).

Calculating the ill-gotten gains from Meta's unlawful actions with respect to U13s using Meta's own data is not possible because Meta claims to not have, and refused to produce, relevant data regarding U13s on its platforms. Thus, the AGs used available data to formulate a reasonable approximation. The AGs' figures do not incorporate the Average Revenue Per User associated with Teens—although Teens are close in age to U13s—because the resulting figure is not a representative approximation of Meta's ill-gotten gains from U13s. Meta obtains more value from hooking U13s than is reflected in the revenues obtained only from 13-17 year olds because U13s' retention rates are high—such that they will remain on the platforms and continue generating revenue for Meta for years and into adulthood. The disgorgement award should not be limited due to the data constraints that Meta has created by refusing to produce or retain data regarding the number of U13s on its platforms and associated long-term revenues. For further discussion of Meta's ill-gotten gains associated with U13s on its platforms, please see the AGs' Opposition to Meta's Motion for Summary Judgment. ECF No. 2832 at 58-59.

**F. Remedy Chart 6: COPPA Disgorgement Associated with U13 Users (Exhibit F)**

This set of charts estimates Meta's ill-gotten gains from violations of COPPA, including collecting, using, disclosing, and retaining personal information from children that Meta allowed on its platforms without obtaining parental consent or providing the other protections required by COPPA. The AGs are seeking disgorgement of the ill-gotten gains associated with U13s as a remedy for the listed States' COPPA claims. For discussion of the AGs' entitlement to disgorgement under the COPPA statute, please see the AGs' Opposition to Meta's Motion for Summary Judgment. ECF No. 2832 at 57-59.

***Charts 6.A and 6.B.*** Chart 6.A displays revenues associated with U13 users on the platforms and is calculated using the same method and data as in Chart 5.A. Chart 6.B displays profits associated with U13 persons on the platforms and is calculated using the same method and data as in Chart 5.B. The time period for the U13 disgorgement calculations is January 1, 2013 through December 31, 2023.

The AGs present Charts 6.A and 6.B as alternative formulations of this disgorgement remedy. The AGs' primary position is that the revenue figures should be selected as the disgorgement award, and costs should not be deducted because "defendants in a disgorgement action are not entitled to deduct costs associated with committing their illegal acts." *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 375 (2d Cir. 2011) (internal citations omitted).

## IV.   CONCLUSION

The AGs can provide further information regarding the Penalty and Disgorgement Charts or the details above, if that would be helpful to the Court. The AGs also respectfully request the opportunity to submit a Reply one week after Meta's response to this submission, the latter of which is due July 6, 2026.

DATED: 6/29/2026

Respectfully submitted,

**PHILIP J. WEISER**
Attorney General
State of Colorado

**ROB BONTA**
Attorney General
State of California

*/s/ Krista Batchelder*
Krista Batchelder, CO Reg. No. 45066, *pro hac vice*
Deputy Solicitor General
Jason Slothouber, CO Reg. No. 43496, *pro hac vice*
Chief Trial Counsel, Consumer Protection
Lauren M. Dickey, CO Reg. No. 45773, *pro hac vice*
First Assistant Attorney General
Elizabeth Orem, CO Reg. No. 58309
Assistant Attorney General
Colorado Department of Law
Ralph L. Carr Judicial Center
Consumer Protection Section
1300 Broadway, 7th Floor
Denver, CO 80203
Phone: (720) 508-6000
Krista.Batchelder@coag.gov

*Attorneys for Plaintiff State of Colorado, ex rel. Philip J. Weiser, Attorney General*

*/s/ Nayha Arora*
Nicklas A. Akers (CA SBN 211222)
Senior Assistant Attorney General
Bernard Eskandari (SBN 244395)
Emily Kalanithi (SBN 256972)
Supervising Deputy Attorneys General
Nayha Arora (CA SBN 350467)
David Beglin (CA SBN 356401)
Megan O'Neill (CA SBN 343535)
Joshua Olszewski-Jubelirer (CA SBN 336428)
Marissa Roy (CA SBN 318773)
Brendan Ruddy (CA SBN 297896)
Jordan Hefcart (CA SBN 366087)
Deputy Attorneys General
California Department of Justice
Office of the Attorney General
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-7004
Phone: (415) 510-4400
Fax: (415) 703-5480
Megan.ONeill@doj.ca.gov

*Attorneys for Plaintiff the People of the State of California*

**RUSSELL COLEMAN**
Attorney General
Commonwealth of Kentucky

**JENNIFER DAVENPORT**
Attorney General
State of New Jersey

*/s/ J. Christian Lewis*
J. Christian Lewis (KY Bar No. 87109), *pro hac vice*
Philip Heleringer (KY Bar No. 96748), *pro hac vice*
Zachary Richards (KY Bar No. 99209), *pro hac vice*
Daniel I. Keiser (KY Bar No. 100264), *pro hac vice*
Matthew Cocanougher (KY Bar No. 94292), *pro hac vice*
Assistant Attorneys General
1024 Capital Center Drive, Ste. 200
Frankfort, KY 40601
Christian.Lewis@ky.gov
Philip.Heleringer@ky.gov

By: */s/ Thomas Huynh*
Kashif T. Chand (NJ Bar No. 016752008), *Pro hac vice*
Assistant Attorney General
Thomas Huynh (NJ Bar No. 200942017), *Pro hac vice*
Section Chief, Deputy Attorney General
Verna J. Pradaxay (NJ Bar No. 335822021), *Pro hac vice*
Mandy K. Wang (NJ Bar No. 373452021), *Pro hac vice*
Deputy Attorneys General
New Jersey Division of Law
124 Halsey Street, 5th Floor
Newark, NJ 07101

STATE AGS' PENALTY AND DISGORGEMENT CHARTS AND SUPPORTING MATERIALS
4:22-md-03047-YGR; 4:23-cv-05448-YGR

Zach.Richards@ky.gov
Daniel.Keiser@ky.gov
Matthew.Cocanougher@ky.gov
Phone: (502) 696-5300
Fax: (502) 564-2698

*Attorneys for Plaintiff the Commonwealth of Kentucky*

Kashif.Chand@law.njoag.gov
Thomas.Huynh@law.njoag.gov
Verna.Pradaxay@law.njoag.gov
Mandy.Wang@law.njoag.gov

*Attorneys for Plaintiffs Jennifer Davenport, Attorney General for the State of New Jersey, and Jeremy E. Hollander, Acting Director of the New Jersey Division of Consumer Affairs*

## SIGNATURE CERTIFICATION

Under Civ. L.R. 5-1(h)(3), I hereby attest that all signatories listed, and on whose behalf the filing is submitted, concur in this filing's content and have authorized this filing.

DATED: June 29, 2026

*/s/ Nayha Arora*
Nayha Arora

*Attorney for Plaintiff the People of the State of California*