# Exhibit F

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

*****************************

                              Case No.
IN RE:  SOCIAL MEDIA ADOLESCENT  4:22-MD-03047-YGR
ADDICTION/PERSONAL INJURY
PRODUCTS LIABILITY LITIGATION
                              MDL No. 3047
*****************************

This Document Relates To:

ALL ACTIONS

*****************************

        CONFIDENTIAL - ATTORNEYS' EYES ONLY
            PURSUANT TO PROTECTIVE ORDER

                VIDEOTAPED DEPOSITION OF
                 ALLISON L. HARTNETT

Held At:        Covington & Burling LLP
                Salesforce Tower
                4415 Mission Street
                San Francisco, California

                    June 16th, 2025
                       9:59 a.m.

Reported By:
MAUREEN O. POLLARD, CSR #14449, RDR

CONFIDENTIAL

Page 2

Videotaped Deposition of ALLISON L. HARTNETT, held at Covington & Burling LLP, Salesforce Tower, 415 Mission Street, San Francisco, California, commencing at 9:59 a.m.  on the 16th of June, 2025, before Maureen O'Connor Pollard, Registered Diplomate Reporter, Realtime Systems Administrator, California CSR #14449.

CONFIDENTIAL

Page 100

It is IP address, device ID, cookie data, and then button clicked page -- activity data. That's the data collected.

BY MR. OLSZEWSKI-JUBELIRER:

Q. Okay. And Meta collects data on activities that users do perform on those, so like Facebook and Instagram pages, when they're logged out?

A. Just like clicks or page visit, pages visited.

Q. Okay. Does Meta collect, for example, how long a user views a public real, for example?

A. No, no. It's only, like, the page visit that is on a -- if it's a public page, it's just like page visit that's collected. Detailed activity data is only collected on the registration page.

Q. Let's talk about how Meta finds and removes children under 13 on its platforms.

So I see you have a lot of notes on this topic.

A. Yes.

Q. We'll see if we can get through with your notes, or we may show you some documents just to organize ourselves.

CONFIDENTIAL

Page 101

A.    Okay.

Q.    But, okay, so for Facebook and Instagram, from 2019 through April 1, 2024, Meta had several different ways that it found and removed under 13 users on Facebook and Instagram, right?

A.    Yes, that's right.

Q.    Okay.  One of those ways is online reporting, right?

A.    That's right.

Q.    So people -- users on Facebook and Instagram or people who don't have accounts on Facebook and Instagram can report a child under 13 on the platform to Meta?

A.    Yes, that's right.

Q.    Okay.  Another -- and Meta has processes to review the reports and decide what to do with them, right?

A.    That's right.

Q.    Okay.  We'll talk about that in a little bit.

Another process that Meta has used in that period for identifying users who may be children on Facebook and Instagram is internal reviews?

A.    Internal -- I don't think that's the

CONFIDENTIAL

Page 102

precise term.  You might mean internal escalation, is the --

Q.    That's the term here that's used, yeah, sure.  Internal escalation, right?

A.    Yep.

Q.    And that is referring to Meta has human reviewers who review accounts or content that are reported for other reasons other than for belonging to an underage user, right?

A.    That's right.

Q.    And in the process of that review if they notice some strong indication that the account belongs to a child under 13, they can escalate that into the underage review?

MR. CHAPUT:  Object to the form.

THE WITNESS:  That is accurate.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  And that policy allowing escalations, internal escalations, when did that begin on Facebook and Instagram?

MR. CHAPUT:  Object to the form.

(Witness reviewing document.)

BY MR. OLSZEWSKI-JUBELIRER:

Q.    You're looking at your notes, right?

A.    Yeah.  Looking at my notes, I don't

CONFIDENTIAL

Page 103

have the date that that policy or that process began.  Checking.

(Witness reviewing document.)

A.    Yeah, I don't have that date.

Q.    Okay.  Another way that Meta detects underage users is user self-reports, is that right?

A.    User self-reports, yes.

Q.    So that refers to when users edit their date of birth, their stated age, right?

A.    That's correct.

Q.    And if they edit their date of birth to stated age as under 13, Meta places those users' accounts in an age checkpoint, right?

A.    That's correct.

Q.    The age checkpoint is where a user is prohibited from accessing the account, right?

A.    Yes.  If you're in an age checkpoint, you can't access your account.

Q.    And Meta places users in an age checkpoint when it determines that the user is under 13, right?

MR. CHAPUT:  Object to the characterization.

THE WITNESS:  No.  That's not accurate.  Meta places users in an age checkpoint when

Page 104

a human reviewer has reviewed the account after there's -- you know, the account has come in for human review from the sources you described, and then a human reviewer reviews the account and determines if there -- either if they -- if they think the account may be under 13, and we instruct the human reviewers to err on the side of if you were uncertain, mark it as possible. And so the user is then checkpointed, so there's uncertainty in the checkpoint.

Then the user has the opportunity to appeal the checkpoint with -- by providing ID, by certifying, yeah, identifying themselves.

BY MR. OLSZEWSKI-JUBELIRER:

Q. You just testified that when users self-report that they're under 13, Meta checkpoints those accounts, right?

A. That's right.

Q. And that process does not involve human review, right?

A. That's -- it is reviewed after -- the appeal involves human review, yeah.

CONFIDENTIAL

Page 105

Q.    Okay.  But there's no human review between a user stating their age as under 13 and being sent to the checkpoint, right?

A.    That's right.

Q.    Okay.  You talked about appeals, right?

A.    (Nodding in the affirmative.)

Q.    So after a user is placed in the checkpoint, the user can appeal Meta's decision to place them in the checkpoint?

A.    That's accurate.

Q.    And the decision to place them in the checkpoint is based on Meta's determination that they're likely under 13, right?

MR. CHAPUT:  Object to the characterization.

THE WITNESS:  Yeah, it is not precisely that they're likely under 13, it is if they could be under 13 or if you have doubt. That's the instructions for the reviewer, is you err on the side of your doubt -- err on the side of young if you're unsure.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  Just based on talking about the review proc- -- appeal process, the appeal process involves users being able to submit their ID to Meta

Page 106

to verify that they are over 13, right?

A.    That's correct.

Q.    Okay.  And there's a time limit on how long the user has to submit their ID?

A.    Yes.  The user has 30 days.  If they don't, then the appeal is considered failed and the account is deleted.

Q.    Okay.  The account -- we'll talk about it later, but there's some time period after the 30 days when Meta schedules the account for deletion, right?

A.    That's right.

Q.    It's not immediately deleted after 30 days?

A.    Yes.  Deletion is -- when I'm using the term "deleted," it is a process.  Deletion is a process, yeah.

Q.    Okay.  But the deletion process -- we can talk about that later.

Okay.  When a user changes their age from under 18 to over 18, Meta requires them to verify their age, right?

A.    That's right.

MR. CHAPUT:  Sorry, just object to the form.  I'm not sure if there's an issue

Page 112

when that started, right?

A.    I do not.

Q.    Signals from Yoti?

A.    The date that Yoti was implemented is in that time period, yeah.

Q.    User self-reporting?

A.    Yeah.

Q.    And cross-platform checks?

A.    Yes.  That is the right list, yes.

Q.    Okay.  But beyond that, Meta has not used any other method to identify users under 13 in the period from 2012 to April 2024?

A.    No.

Q.    Okay.  And the same question for Instagram.  Beyond those categories, Meta has not used any other process to identify users on Instagram from 2012 to April 2024?

A.    Instagram has the same -- has had the same general processes as Facebook.  There is a nuance with the user interface.  Instagram -- in the user reports Instagram experimented with off-platform and in-app user reporting, but it's all user reporting.

Q.    Okay.  And just to go back to user self-reporting, before December 2019 Meta didn't

CONFIDENTIAL

Page 115

but he might know who he inherited it from.

Q.    Okay.  Who is ███████████?

A.    He is an engineer who worked on this flow at the time.

Q.    And "this flow" is the underage --

A.    The flow is underage enforcement, and specifically the cross-app propagation.  He worked specifically on that.

Q.    Is he currently employed at Meta?

A.    Yes.

Q.    What does he do now?

A.    I don't know his current role.

Q.    There's another method that Meta uses to detect underage users listed in your notes, right?

A.    Mm-hmm, yes.

Q.    Proactive detection?

A.    Yes.

Q.    Can you tell me about that?

A.    Yes.  So today and beginning in early -- I think, yeah, beginning in October 2024, Meta uses a heuristic-based method to proactively detect accounts that we would like humans to review. So it works similar to as if a user had reported. It's sent to human review.

Page 116

Meta has been working on proactive detection via model or heuristic-based methods for several years, but the heuristic-based method is now live.

Q.    Okay.  And what does the heuristic-based method look at?

A.    The heuristic method looks at signals on accounts, on Instagram and Facebook, that the account might be under 13.  It looks at information in the profile essentially, yeah.

Q.    "Information in the profile," meaning information in the user's bio?

A.    Correct, or in their content, in their photos.

Q.    In their photos as well?

A.    Yes.

Q.    What information in the photos does the heuristic look at?

A.    It is -- well, let me be clear.  The heuristic is not looking at the photos because the heuristic can't do that.  The human reviewer is looking at the photos after the account goes to human review.

So the heuristic is just like pretty simple rules based and it's using, like, written

content in the bio or in captions.

Q.    In captions on photographs?

A.    Let me just be precise that we use that now.

(Witness reviewing document.)

A.    The heuristic uses explicit and implicit statements of age.  I will have to check exactly which surfaces it looks like at for the explicit and implicit statements of age.  I know that it definitely looks at profile bio.

We're in a continuous improvement process for the heuristic, so I am not precisely sure all of the surfaces that it uses today.  We are experimenting because we are trying to make the heuristic as effective as possible.

Q.    Okay.  I think we'll come back to that.

Okay.  So let's talk about how Meta reviews reports of users being under 13.

And before we get into that, let's talk about how people can submit reports --

A.    Okay.

Q.    -- of someone being under 13 on Facebook and Instagram.

There's a web form where people can submit reports of underage users on Facebook and

CONFIDENTIAL

Page 118

Instagram, right?

A.    That's right.

Q.    And there's different forms for Facebook and Instagram?

A.    There are different -- you know, actually, I don't know if there are different forms for Facebook and Instagram.

(Whereupon, Meta-Hartnett-12 was marked for identification.)

BY MR. OLSZEWSKI-JUBELIRER:

Q.    You have a document that's Bates numbered META3047MDL-014-00169674.

A.    Yes.

Q.    We'll do this as Exhibit 11 -- Exhibit 12.

Do you recognize this?

A.    Yep.

Q.    What is it?

A.    This is the underage reporting form on Facebook.

Q.    Okay.  And this form asks for five pieces of information, right?

A.    Yes.

Q.    It asks for the URL of the child's profile?

CONFIDENTIAL

Page 119

A.    Yes.

Q.    The full name of the child, is that right?

A.    Full name of the person, yes.

Q.    The actual age of the child?

A.    Yes.

Q.    And there's a drop-down menu where the person can select an age that they think the child is?

A.    Yes.

Q.    There's a box called "Other"?

A.    Mm-hmm.

Q.    Do you know what that is asking for?

A.    That's asking for any other information you'd like to provide.

Q.    And then it asks for the person reporting's contact e-mail address, right?

A.    Yes.

Q.    And this form has been available for reporting a child on Facebook since 2012?

A.    I'm reviewing my notes.  I'm just trying to get the date right.

(Witness reviewing document.)

A.    I can't find this in my notes, but it is my understanding that this form has been

CONFIDENTIAL

Page 120

available since before 2012.  There are -- I can't testify if this is the exact form that has been available, but it would be a form for reporting underage.

Q.    You don't know what the form looked like at any particular time?

A.    No.

MR. CHAPUT:  Objection.  Scope.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    The form is also available through April 1, 2024, right?

A.    Yes.

Q.    Okay.  A33, please.  This is a document with a Bates number of META3047MDL-003-00002262.

(Whereupon, Meta-Hartnett-13 was marked for identification.)

MR. OLSZEWSKI-JUBELIRER:  And it's Exhibit 13.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Do you recognize the document?

A.    Yes.

Q.    What is it?

A.    This is the underage reporting flow on Instagram, reporting form.

Q.    Okay.  And this is the version as of

Page 121

February 28, 2022, is that right?

A.    I see that it says 2022 on the page.

Q.    In the top left there's a date.

A.    I see.  Okay.  Yes.

Q.    Is that right?

A.    Yes, I see that.

Q.    Okay.  And this form also asks for five pieces of information, right?

A.    Yep.

Q.    It asks for the user name of the account you'd like to report?

A.    Yes.

Q.    The full name of the child?

A.    Full name of the person, yes.

Q.    The form is for reporting a child, right?

A.    Yep.

Q.    Okay.  The date of birth of the child?

A.    Yes.

Q.    And that -- there's a box that just says "Year," right?

A.    Yes.

Q.    But it asks for the date of birth down to the day, right?

A.    I believe so.  I would need to see.  I

CONFIDENTIAL

Page 122

can't, like, confirm that by looking at the printout.

Q.    But if you enter a year, then it asks you for the month and then it asks you for the day, right?

A.    I believe so.  I would love to, like, see it live to be 100 percent certain.

Q.    The form asks for the person reporting, how they are related to the child, right?

A.    Yes.

Q.    And there's a drop-down menu and the first selection option is "Parent," right?

A.    Yes.

Q.    And it also asks for the e-mail address of the person reporting, right?

A.    Yes.

Q.    Okay.  This form -- same question we asked about Facebook, this form has been available since 2013?

(Witness reviewing document.)

A.    I'm sorry, I just don't have this date in my notes, but I'm sure we can follow up on it.

Q.    Okay.  And the form is still available, is still in use as of April 1, 2024, right?

A.    Yes.

CONFIDENTIAL

Page 123

Q.    And it's still in -- to the extent you know, it's still in use today?

A.    Yes.

Q.    Okay.  Your notes also talk about in-app reporting, right?

A.    Yes.

Q.    Has Meta allowed users to report children on Facebook within the Facebook app?

A.    No.

Q.    In the period from 2012 to April 1, 2024, the testimony is Meta has not allowed users to report in the Facebook app, other users, as being under 13?

MR. CHAPUT:  Object to the form.

THE WITNESS:  So to -- let me just explain more to make sure that I'm interpreting your question correctly.

The in-app reporting flow that is available out to -- it is available on Instagram, just a very small percentage of the population, was not tested on Facebook, has only ever been tested on Instagram.  It has not been expanded because it leads to a doubling of false reports.

So my understanding is this has never

CONFIDENTIAL

Page 124

been available on Facebook.  The -- let me just check to see if there's any other experimentation on Facebook.

(Witness reviewing document.)

THE WITNESS:  There was one other system that existed at one point on Facebook where Facebook users could report Instagram users who cross-posted content to Facebook but didn't have a Facebook profile.

I haven't seen the user experience of that but it must have been in the Facebook app if that was its functionality.

That also generated a huge amount of false reports, so the -- so that is not live anymore, but it was live at some point in the period that you mentioned.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    What page of your notes are you looking at?

A.    4.

Q.    Okay.  So the in-app flow on Instagram that you testified is only available to 4 percent of the population --

A.    Yes.

CONFIDENTIAL

Page 125

Q.    -- aside from that in-app flow, can users report users within the Instagram app as being under 13?

MR. CHAPUT:  Object to the form.

THE WITNESS:  Users can get to the help center from within the Instagram app, but it's a logged-out form in order to report the user.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  So there's a flow that users can follow in the Instagram app to --

A.    To get to -- sorry to interrupt you.

Q.    No, that's okay.

That takes the user ultimately to the same web form, right?

A.    Yes.

Q.    Okay.

MR. OLSZEWSKI-JUBELIRER:  Can we do A1, please?  This is a document with the Bates number META3047MDL-014-00166515.  And we'll mark that as Exhibit 14.

(Whereupon, Meta-Hartnett-14 was marked for identification.)

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Do you recognize this document?

CONFIDENTIAL

Page 126

A.    Yes, I have seen this document.

Q.    When did you see it?

A.    I saw it during my prep session on Friday with my counsel.

Q.    Okay.  You reviewed this document with your counsel?

A.    Yes.

Q.    Okay.  This is an e-mail thread from March 2019, right?

A.    Yes.

Q.    And the subject line is "Reporting flow broken," right?

A.    Yes.

Q.    If you look at the last page of the document, it's an e-mail from Monika Bickert, right?

A.    Yep.

Q.    Who is Monika Bickert?

A.    She is an employee in policy, policy team at Meta.

Q.    Okay.  What is her job title?

A.    I don't know her current job title.

Q.    Is she a manager in the policy team?

A.    Yeah.  My understanding is she's probably VP in the policy team.

Q.    A vice president --

Page 127

A.    Yes.

Q.    -- in the policy team?

A.    Yes.

Q.    She's pretty high up?

A.    Yes.

MR. CHAPUT:  Object to the characterization.

THE WITNESS:  She has a senior title.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  The last page at the bottom, Ms. Bickert is talking about trying to report profiles being underage, right?

A.    Last page of the...

Q.    It starts, "Hey there.  I was trying to report this profile for being underage"?

A.    Yes, I see that.

Q.    And then she has a profile, a URL profile, and that's a Facebook profile, right?

A.    Yes.

Q.    Okay.  And then the last paragraph says, "Antigone and ███████, added you for awareness of the report flow issue and because for a related profile, which I was able to report, the reporting flow was pretty bad.  I wondered if we should look into it.  It was obviously structured to

CONFIDENTIAL

Page 128

deter any reports."

A.    I see that.

Q.    She's referring to the underage reporting flow in the Facebook app, right?

MR. CHAPUT:  Object to the form.

THE WITNESS:  I don't know if she's referring to the underage reporting flow in the Instagram or Facebook apps, but it's one of them.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    She said, "It was obviously structured to deter any reports," right?

A.    That's what she said.

MR. CHAPUT:  Object to the characterization and to scope.

THE WITNESS:  That is what she said. To my knowledge, that has absolutely never been true.  I don't know why she would say that.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  Well, it's not just she that said that, right?  If you look at the e-mail from Antigone Davis that's on the second-to-last page, sent on March 26, 2019, at 18:06 --

A.    I see that.

CONFIDENTIAL

Page 129

Q.     -- it says, "Regarding the reporting flow, I agree it is more than pretty bad and suggests we want to deter underage reporting."

A.     Antigone's actually -- I mean, my read is Antigone is saying something very different from Monika.  Monika is saying that she believes it was structured to deter any reports.  Antigone is saying that the fact that the way that the flow looks makes it look as -- looks as if we want to deter underage reporting.  Those are -- so they're saying different things.

Q.     Okay.  And who is Antigone Davis?

A.     She is VP in policy as well.

Q.     Is she the head of safety at Meta?

MR. CHAPUT:  Object to the form.

THE WITNESS:  She is the head of safety policy.

BY MR. OLSZEWSKI-JUBELIRER:

Q.     Okay.  She's also pretty high up at Meta?

MR. CHAPUT:  Object to the characterization.

THE WITNESS:  She is a senior employee at Meta.

///

Page 130

BY MR. OLSZEWSKI-JUBELIRER:

Q. Okay. Who worked on safety policy, right?

A. That's right.

Q. She's in charge of safety policy?

MR. CHAPUT: Object to the form.

THE WITNESS: She is a senior employee on safety policy.

BY MR. OLSZEWSKI-JUBELIRER:

Q. Okay. And she says after that sentence, "It would be great to prioritize a fix given the significant public focus on underage accounts," right?

A. Yes.

Q. Did Meta prioritize a fix to its underage reporting flow?

MR. CHAPUT: Object to the form. Scope.

THE WITNESS: So it's hard for me to answer. I don't know exactly what happened after this e-mail. Meta has continually improved those forms as well as the human review process and the proactive detection over time. So I'm not sure exactly what happened in response to this e-mail.

CONFIDENTIAL

Page 131

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Has Meta improved the in-app reporting flow on Facebook for underage users since March 2019?

MR. CHAPUT:  Object to the form.

THE WITNESS:  Meta doesn't have an in-app, so on Facebook it is possible for users to get to the help center and report.

If you're using in-app only to mean a form that you have to submit in the app fully logged in, then Facebook doesn't have that.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  But Meta has, as of this date at least, March 2019, a flow in the Facebook app where users could go through this flow and end up at the underage reporting form and fill it out, right?

A.    Yes.

Q.    Okay.  So if you look at the first page of this document, ████████████ writes, "Thanks █████████, So to be clear what's currently happening is the way to report 'Underage profiles' is through a contact form for underage reporting," right?

A.    Yes.

Q.    That's the web form we've been talking

about?

A.    Yes, that's right.

Q.    It says, "Inside the US only - if you select 'something else' in FRX on the user's profile - you get the option which takes you through to the form (shown below)," right?

A.    Yes.

Q.    FRX is what?

MR. CHAPUT:  Object to the scope.

THE WITNESS:  So my understanding is FRX is some kind of, like, entry point in the reporting flow where a -- I don't know what it stands for -- where a user, if they're trying to report something, can get to multiple options of things to report.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  And then it says, "Improving this is not currently in the plans for FRX and looking at these numbers seem quite small (only 15K completions per week), but happy to be looped into the age management effort to see what age requirements there might be if that would help?"

A.    Yes, that's what it says.

Q.    Improving how users could find their way ultimately to the underage reporting form within

CONFIDENTIAL

Page 133

the Facebook app was not currently in the plans for -- in 2019, March 2019, right?

MR. CHAPUT:  Object to form.  Scope.

THE WITNESS:  Yeah, that is what Tim says in this e-mail.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  Did Meta, since March 2019, make any improvements in the flow where users could find their way to the underage reporting form in the Facebook app?

A.    I don't know about specific experiments on Facebook.  I can speak to generally there has been an effort to optimize these flows since 2019, but I do not know exactly what has happened since this e-mail.

Q.    So you don't know whether Meta has changed the flow in the Facebook app to report underage users since March 2019?

MR. CHAPUT:  Object to the characterization.  Scope.

(Witness reviewing document.)

THE WITNESS:  I don't know precise examples of changes that have gone into that flow, but by answering that I am not saying that I know there were not.  I am

Page 134

just saying I don't have precise examples of changes that have gone into that flow.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    So you don't know what changes have gone into that flow, good or bad, right?

A.    I do not know.

MR. CHAPUT:  Object to the form. Scope.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  And in fact, by March 2021, Meta had completely eliminated the ability of users to find their way to that underage reporting form and report children in the Facebook app, right?

MR. CHAPUT:  Object to the form. Scope.

THE WITNESS:  I'm sorry, I'm not following that.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    We talked about a flow where users through FRX could find their way to the underage reporting form at Facebook, right?

A.    The flow as described in this e-mail?

Q.    Yes.

A.    Okay, so this existed.

Q.    In March 2019, right?

CONFIDENTIAL

Page 135

A.    Yes.

Q.    That flow was eliminated by March 2021, right?

MR. CHAPUT:  Object to the form. Scope.

THE WITNESS:  I am not aware of that. What information do you have on that?

MR. OLSZEWSKI-JUBELIRER:  Let's do A3, please.  This is a document with the Bates number META3047MDL-020-00278850.

(Whereupon, Meta-Hartnett-15 was marked for identification.)

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Do you recognize this document?

A.    I do not.

Q.    Okay.  It's a series of chats from Meta employees, right?

A.    Yes.

Q.    From March 23rd, 2021?

A.    Yes.

Q.    Okay.  The first chat is from ████ ███████████ , and she's talking about, One of the things our partners have been asking for is in-app reporting for underage accounts.  Right?

A.    Yes, that's what she says.

Page 136

Q.    Okay.  And then you look at the last chat by ████████.  It's the second-to-last chat. She says, "Data point:  For reporting, currently, there is no way for users to report U-13 users on Facebook in app and takes over 7 screens for users to report U-13 users on IG."

Is that right?

A.    Yes.

Q.    So there was no way for users to report under 13 users on Facebook in the app by March 2021, right?

MR. CHAPUT:  Object to form.  Scope.

THE WITNESS:  So I think that this is -- so, okay, I'm going to try to be describing this correctly.

But when we say "in-app," I believe what she's referring to is that there is not a logged-in form in the app that doesn't take you to a mobile browser.  That is accurate that that only existed on Instagram, but that doesn't mean that from within the app you can't get to the contact form.

The user wouldn't experience -- being taken, like, from an app to a mobile

Page 137

browser is not a super disruptive user experience where they can fill out the contact form.

I believe that's what this is referring to.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  But you don't know?

A.    I've never seen this chat before.

Q.    Okay.  You didn't review it with your lawyers?

A.    Not in my memory.

Q.    Okay.  But in-app reporting flow on Instagram that you're talking about where you can -- the logged-in experience --

A.    Yes.

Q.    -- do you know how many screens that takes?

MR. CHAPUT:  Object to the form. Scope.

THE WITNESS:  No, I don't know how many screens it is.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  But your notes say in 2022 they started testing this in-app reporting flow, right?

A.    Yes.

CONFIDENTIAL

Page 138

Q.    Okay.  This chat is from March 2021, right?

A.    Yes.

Q.    So the in-app reporting flow that it's talking about on Instagram is not the one you're talking about that started testing in 2022, right?

MR. CHAPUT:  Object to form.  Calls for speculation, scope.

THE WITNESS:  Yeah, I don't know what this chat is referring to.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  Let's look at those reporting flows on Instagram, right.

MR. OLSZEWSKI-JUBELIRER:  Can we do A34, please?

(Whereupon, Meta-Hartnett-16 was marked for identification.)

MR. OLSZEWSKI-JUBELIRER:  This is a document with Bates number META3047MDL-037-00088544.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Do you recognize this document?

A.    I have not seen this.

Q.    Okay.  This is another set of chats for Meta employees, right?

Page 139

A.    Yes.

Q.    From March 22, 2022?

A.    Yes, that's right.

Q.    Okay.  And the third chat from █████ ████ says, "We have a content form on our site... And we're working on a shortened in-app flow to get file an underage report on IG."  Right?

A.    Yes.

Q.    Okay.  And the next chat asks about whether the in-app flow is -- whether Meta is looking at using them on Facebook or just Instagram, right?

A.    Yes, that's what that's asking.

Q.    Okay.  And then it says, "At the moment just IG but we're hoping to do FB late H1 early H2."
            Right?

A.    Yep, that's what that says.

Q.    H1 is the first half of 2022?

A.    Yes.

Q.    And H2 is the second half?

A.    Yes.

Q.    Okay.  And then below that █████████ , the last one, writes, "Here's the new updated flow ... and the old."  Right?

A.    Yep.

Page 140

Q.    And then shares two different PNG files, right?

A.    Yes.

Q.    Those are screenshots?

A.    Yeah, those are design files probably.

MR. OLSZEWSKI-JUBELIRER:  Okay.  So let's do A35.

(Whereupon, Meta-Hartnett-17 was marked for identification.)

MR. OLSZEWSKI-JUBELIRER:  This is a document Bates-numbered META3047MDL-037-00088546.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    I'll represent to you this is one of those -- has the same file name as those two PNG files we just saw.

MR. CHAPUT:  Sorry, Counsel, which of the two PNG files is this?

MR. OLSZEWSKI-JUBELIRER:  I believe it is the second one, but we can confirm that for you if you want off the record.  We'll come back on the record, but if you want us to get that.

MR. CHAPUT:  Okay.

///

Page 141

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  This is a reporting flow, right?

A.    Yes.

Q.    On Instagram?

A.    Yes.

Q.    And it has one, two, three, four, five -- six screens?

A.    Yes.

Q.    It may be a little bit easier to look over there.  The print is pretty small, so as you need to look back and forth at the paper, please do.

But the first frame here, that's the FRX -- that's an FRX screen, right?

A.    Yes.

Q.    You click on something and pull up the menu, right?

A.    Yes.

Q.    And then within that menu you have to click on "Report," right?

A.    Correct.

Q.    And then the next one shows this screen, and you have to select "Report Account," right?

A.    Yes.

Q.    And then the next screen you have to

CONFIDENTIAL

Page 142

select you're reporting the account because "it may be under the age of 13," right?

A.    Yes.

Q.    And then the next screen, then you get this page that talks about reporting a child under the age of 13, and you have to click "Learn More," right?

A.    I believe that's what that says.

Q.    Okay.  And then the next screen, it sends you to the Help Center, right?

A.    Yes.

Q.    And that's just Meta's public web page, right?

A.    Yes.

Q.    And that talks about how you can report a child under the age of 13, right?

A.    Yes.

Q.    And on that page you have to click on a link that says, "fill out this form."

Do you see that there?

A.    I see that.

Q.    Okay.  And then when you click on "fill out this form," then it sends you to this screen which is that form that we've been talking about, right?

Page 143

A.    Yes, that's right.

Q.    Okay.  So this is a flow that takes six, maybe seven screens that ends up at the web form, right?

MR. CHAPUT:  Object to the form.

THE WITNESS:  It takes six screens.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  I mean, there's a screen you're at before you pull up that first menu, right?

A.    You have to be -- yes, you have to be in a screen to get to the menu.

Q.    Okay.

MR. OLSZEWSKI-JUBELIRER:  All right. Let's look at the A36, please.

(Whereupon, Meta-Hartnett-18 was marked for identification.)

MR. OLSZEWSKI-JUBELIRER:  This is a document with Bates number META3047MDL-037-00088547.  And that's Exhibit...

THE STENOGRAPHER 18.

MR. OLSZEWSKI-JUBELIRER:  18.

Did you mark the last exhibit?

THE STENOGRAPHER:  Yes.

MR. OLSZEWSKI-JUBELIRER:  Thank you.

Page 144

The last one was 17.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  So Exhibit 18, do you recognize this document?

A.    I haven't seen it before, but is this one of the attachments?

Q.    This is another one of the attachments, that's right, yeah.

Okay.  And you see it has -- it says "New Design In-App U13 Reporting Flow," right?

A.    Yes.

Q.    And it starts out the same.  You have this FRX menu, right?  Click "Report"?

A.    Yep.

Q.    And then you have to click "Report account"?

A.    Yep.

Q.    And then you click "it may be under the age of 13"?

A.    Yep.

Q.    And then you get to a different screen where you can click "Learn More" or you can click "Report," right?

A.    Yes.

Q.    So if you click "Learn More," it sends

CONFIDENTIAL

Page 145

you to that page on the Help Center, right?

A.    Yep.

Q.    But if you click Report, it sends -- it just submits the report, right?

A.    Yes.

Q.    It doesn't send you to the Help Center, right, to fill out the web form?

A.    Yes, that's right.

Q.    Okay.  And that's the new underage reporting flow, right?

A.    Yes, that's what's referred to as in-app reporting prior in my testimony where you don't go through the contact form at all, and that has been shown to double the rate of false reports.

Q.    Okay.  The prior flow we just looked at with six or seven screens, that existed on Instagram also in 2022, right?

A.    Yes.

Q.    And that flow still exists right now on Instagram, right?

MR. CHAPUT:  Object to the form.  Scope.

THE WITNESS:  Yes.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    That flow existed as of April 1st, 2024

CONFIDENTIAL

Page 146

on Instagram, right?

A.    So it's very possible that there are changes since this is 2022.  There are -- it's very possible there are some changes to content or even these screens, I'm not sure, but the general flow exists on Instagram.

Q.    Okay.  And you don't know if there were any changes, right?

MR. CHAPUT:  Object to form.  Scope.

THE WITNESS:  I don't know.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Does Meta know if there were changes?

MR. CHAPUT:  Same objections.

THE WITNESS:  It is possible that someone at Meta knows, and we could look into it.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Who would know at Meta?

A.    The person that I spoke to as the subject matter expert on this flow is ███████.  He would be a good place to start.

Q.    Okay.  ███████ would know?

A.    He may.

Q.    Okay.  He would at least know people who would know?

Page 147

A.    Possibly.

Q.    The in-app reporting flow that we've been talking about with six or seven screens that requires users to fill out the reporting form at the end was the -- sorry.  One sec.

Okay.  Strike that.

The older in-app reporting flow that has six or seven screens, which is still in use today, and requires users to fill out the reporting form at the end limits the number of reports of children that users can submit, right?

MR. CHAPUT:  Object to the form.

THE WITNESS:  Not that I'm aware of.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Let me say that again.

The reporting flow with six or seven steps on Instagram that sends users to the reporting form at the end is set up that way to limit the number of reports that users would submit, right?

MR. CHAPUT:  Object to the form. Scope.

THE WITNESS:  No, it is not.  That is not what I thought you were asking in the prior question.  I thought you were asking if the form limited, like, the number of

Page 148

times you could submit.  And no to that as well.

MR. OLSZEWSKI-JUBELIRER:  Okay.  Can we do A2, please?

(Whereupon, Meta-Hartnett-19 was marked for identification.)

MR. OLSZEWSKI-JUBELIRER:  This is a document Bates-numbered META3047MDL-072-00298792.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Do you recognize this document?

A.    No.

Q.    Okay.  You didn't review this document with your lawyers?

A.    I have not seen this one.

Q.    Okay.  This is a set of chats between Meta employees, right?

A.    Yes.

Q.    From February 3rd, 2021?

A.    Yes.

Q.    Okay.  And the first employee at the top -- these are employees discussing options for reporting children on Facebook and Instagram, right?

A.    I'm going to -- I should probably read it.

Page 149

(Witness reviewing document.)

Q.    I'll only be asking questions about the first two pages, if that's helpful.

A.    Okay.  I've read the first two pages.

Q.    Okay.  And these are Meta employees talking about underage reporting options on Facebook and Instagram, right?

A.    Yes.

Q.    Okay.  You see in the middle of page 1 there's a chat from Sophie Natalie Vogel at 3:33 p.m. and 56 seconds?

A.    Yes.

Q.    Okay.  And she says, "I had to jump before the end of that call - so we're saying the issue is that you can report in-app, but it just directs you to the off-app form, which is a bit complicated (it's silly, it asks you for what year you think the person was born, which is a stupid q as how would you know, you're just saying they're u13."

Did I read that right?

A.    Yes.

Q.    Do you know who Sophie Vogel is?

A.    I don't.

Q.    Okay.  Do you see on the next page

CONFIDENTIAL

Page 150

her -- Sophie Vogel's chat at 3:40 p.m. and 8 seconds?

A.    Yes.

Q.    She says, "it is weird why you can't just report it straight away and have to still do the form and guess a date of birth."

A.    I see that.

Q.    Okay.  And then you see two chats down a Meta employee named ▆▆▆▆▆▆▆▆ replies?

A.    I see that.

Q.    And ▆▆▆▆ says, "▆▆▆▆ explained this was a 'tradeoff'" --

A.    Yes.

Q.    -- and then the next chat says, "to be able to handle the queues."

Right?

A.    I see that.

Q.    Okay.  And the "tradeoff to be able to handle the queues" means it will -- these -- strike that.

The tradeoff to handle the queues refers to users submitting fewer reports, right?

MR. CHAPUT:  Object to form. Characterization, scope.

THE WITNESS:  I really -- I mean, I

don't know exactly what this refers to.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  If there are fewer reports, they're easier to handle in the queues, right?

MR. CHAPUT:  Same objections.

THE WITNESS:  I mean, it could be that is one possibility, but the other possibility is the accuracy of the reports is a big part of what handling the queues means.  The, like, more inaccurate reports, the harder it is to do human review on them.

So that's not clear what this means.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Why is it harder to do human review on inaccurate reports?

A.    Just if you have a very high percentage of inaccurate reports in the queue, you -- I guess maybe it's obvious, like, you would like to have a higher percentage of accurate reports whenever you're reviewing something.  Yeah, I'm not sure how to explain that.

Q.    It's not harder to do human review of reports that are inaccurate, right?  It's just there's more reports to review?

Page 152

MR. CHAPUT:  Object to the characterization.

THE WITNESS:  I'm not -- I don't think -- I'm not sure if I can say it's harder or less hard, yeah.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   Okay.  And "queues," we're talking about review queues, right?

A.   That is what I am talking about.

Q.   Okay.  Human -- sorry.

Reports of underage users go into a review queue?  That's what Meta calls it?

A.   Yes, that's right.

Q.   Okay.  So let's talk about this experiment that Meta has been doing on an improved underage reporting flow on Instagram, okay?

You said -- you testified it's only available to 4 percent of global users?

A.   That is right.

Q.   Okay.

MR. OLSZEWSKI-JUBELIRER:  Let's do A4, please.

Q.   Meta doesn't provide those options to all users of Instagram, right?

A.   That's right.

CONFIDENTIAL

Page 153

MR. OLSZEWSKI-JUBELIRER:  Okay.  This is a document META3047MDL-111-00080128.

(Whereupon, Meta-Hartnett-20 was marked for identification.)

BY MR. OLSZEWSKI-JUBELIRER:

Q.    And I'll represent that the metadata for this document states it was last modified August 9th, 2022.

Do you recognize the document?

A.    No.

Q.    You didn't review this with your attorneys --

A.    No.

Q.    -- in preparation for the deposition?

A.    No.

Q.    Okay.  Does this look like an internal Meta document to you?

A.    Yes.

Q.    Okay.  It was produced from Meta's files.

And the subject of the document is the "IG U13 Reporting flow (SURF) - Impact Assessment for MR," right?

A.    Yeah.

Q.    And "SURF" is the shortened user

Page 154

reporting flow?

A.    Yes.

Q.    That's Meta's term for this improved underage reporting flow on Instagram, right?

MR. CHAPUT:  Object to the form.

THE WITNESS:  Yes.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  And ▓▓▓▓ -- sorry, "MR" in this document is ▓▓▓▓▓▓▓▓, right?

MR. CHAPUT:  Object to the form.

Scope.

THE WITNESS:  I believe so.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    The first sentence under Context reads, "Meta has an upcoming legal inquiry about ▓▓▓▓ ▓▓▓▓"?

A.    Yeah.

Q.    ▓▓▓▓▓▓ was a British girl?

MR. CHAPUT:  Object to the form.

Scope.

THE WITNESS:  Yes.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    And the inquiry is about ▓▓▓▓ ▓▓▓▓ suicide, right?

MR. CHAPUT:  Objection.  Beyond the

Page 155

scope.

THE WITNESS:  I believe that's what this is referring to, yes.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   Okay.  And there was an inquiry into the role that Instagram may have played in her suicide, is that right?

MR. CHAPUT:  Objection.  Scope.

THE WITNESS:  I don't have detailed knowledge about this, but it's my high-level understanding.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   Okay.  And then, let's see, you'll see the second paragraph there talks about Meta's launch of IG SURF, that SURF improved reporting flow.  It says, "It's currently launched to only 1 percent (just launched in North America market) in target markets because of ops capacity constraints," is that right?

A.   I'll read the document.

(Witness reviewing document.)

A.   Okay.  I just read the first section. Can you repeat the question?

Q.   The sentence says, "It's currently launched to only 1 percent (just launched in North

Page 156

America market) in target markets because of ops capacity constraints"?

A.    That's right.

Q.    And "ops capacity," what is ops capacity?

A.    What that's probably referring to is the capacity of the number of human reviewers on the review queues.

Q.    Okay.  So it's the amount of time that Meta's human reviewers could spend reviewing reports?

MR. CHAPUT:  Object to the form.

THE WITNESS:  It probably doesn't refer to amount of time.  It probably refers to number of people times time, people who could be staffed.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  Based on the number of people that Meta had contracted with to review reports, right?

MR. CHAPUT:  Object to the form. Scope.

THE WITNESS:  Sorry, can you ask the complete question again?  The second half.

///

Page 157

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Ops capacity is a measurement of the amount of reports that the people that Meta has contracted with can review, right?

A.    That's correct.

MR. CHAPUT:  Object to the form.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Meta could increase its ops capacity by contracting with more people, right?

MR. CHAPUT:  Object to the form. Scope.

THE WITNESS:  Meta can theoretically increase ops capacity by contracting with more people.  There's typically a constraint of how many -- at any one time when you're trying to increase ops capacity, there's often a constraint of actually how many people can you hire and train.  Like there's not unlimited people in the world that you can hire, but in the abstract that is what that refers to.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  And then the next sentence says, "IG teams favor to launch to 100 percent by EOY"?

A.    Yes.

Page 158

Q.    "EOY" means end of year?

A.    Yes.

Q.    It says, "Once launched fully, it would result in +1.8M incremental u13 accounts annually," right?

A.    Yes, that's what it says.

Q.    That means in this context if Meta had rolled out this improved reporting flow to 100 percent of accounts, it would result in an additional 1.8 million underage accounts detected on Instagram, right?

MR. CHAPUT:  Object to the form.  Calls for speculation, scope.

THE WITNESS:  Yeah, I am not sure what the precise date -- where in the u13 funnel it's saying that data point is.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.

A.    So it could be saying -- that could be a number of reports.  I'm not sure.

Q.    And you don't know because you've never seen this document before, right?

A.    Yes.

MR. CHAPUT:  Object to the form.

///

Page 159

BY MR. OLSZEWSKI-JUBELIRER:

Q.    You're not prepared to testify to the content of this document?

MR. CHAPUT:  Object to the form.

THE WITNESS:  I've never seen this document before.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Does Meta have any estimates for the amount -- the number of additional underage accounts it would be able to detect if it expanded the improved underage reporting flow to all of Instagram users?

MR. CHAPUT:  Object to the form. Characterization, calls for speculation, scope.

THE WITNESS:  Meta does not have an estimate -- I am not aware of an estimate of -- at this time period.  I don't know what this data means.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    You don't know whether that's an estimate or not?

A.    It is -- this is an estimate.  I do not know precisely what step in the underage reporting flow it is estimating.

CONFIDENTIAL

Page 160

Q.    Okay.  And you don't know if Meta has an estimate of the number of additional underage users it would detect if it rolled out the improved underage reporting flow to all users?

MR. CHAPUT:  Object to form.  Characterization, scope.

THE WITNESS:  Meta likely has some form of analysis on the performance of this flow.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Like the form of analysis might be presented in this document, right?

A.    I have still only looked at the first couple paragraphs.  Should I look at more of this document?  I'm going to look at more of the document to answer that.

Q.    Is it fair to say this estimate of an additional 1.8 million could be that analysis that you're talking about?

MR. CHAPUT:  Object to the form.  Scope.

THE WITNESS:  I'm not sure what time period you're asking me about.  Are you referring to -- are you asking me about, like, Meta in general having analyses,

Page 161

but -- yeah, can you ask the question again?

BY MR. OLSZEWSKI-JUBELIRER:

Q.    You testified -- okay.

You don't know whether Meta has any analyses of the number of additional underage users it would detect if it rolled out the form to the improved underage reporting flow to 100 percent of Instagram users, right?

A.    At this time period?  So I do not know what the estimate would have been at this time period or if there -- or precisely, like, what estimates were going on at this time period.

Based on this document, it looks like there is some estimate of 1.8 million for some metric.  It's described as incremental u13 accounts annually.  I do not know precisely if that means reports or accounts, I don't know.

Q.    And you don't know whether Meta has an estimate of the number of additional underage accounts it would detect by rolling out the flow to 100 percent of users in any other time period, right?

MR. CHAPUT:  Object to form.  Scope.

THE WITNESS:  What I know is that

CONFIDENTIAL

Page 162

Meta -- I mean, no, sorry, that's speculation.  I don't know.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  Can you turn to the second-to-last page of the document?  Do you see where it says, "SURF Flow Stats"?

A.    Yes.

Q.    Do you see under "Daily Additional Identified Jobs" it says 5,013?

A.    Yes.

Q.    Okay.  And then there's some comments on the right about those numbers, right?

A.    Yes, I see.  I read those.

Q.    Okay.  And the second-to-last comment in the middle, it says, "Does this mean we would action 5k extra jobs/day for being underage - or that we would review 5k extra jobs/day?"

Do you see that?

A.    I see that.

Q.    And the reply below says in the middle, "Yes action an extra 5k jobs a day that are underage."

Right?

A.    I see that.

Q.    Okay.  And "action" in this context

CONFIDENTIAL

Page 163

means disable their account?

MR. CHAPUT:  Object to the form.
Scope.

THE WITNESS:  I'm not -- I'm trying to puzzle out exactly what the last comment is saying.  I'm not sure.  I just don't understand.  I read it as, "Yes action an extra 5K jobs a day that are underage."

Then it says, "No, the false positives are separate, these are jobs that our reviewers manually ignore because the account was not underage."

I just don't know what that means.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    There's a different comment below that question about the 5,000 that's asking about what the 37 percent is.  There's a 37 percent number of false positives on the other -- on the next page, right?

But suffice it to say, when Meta uses the word "action" in its review flow, that means checkpointing the user at least, right?

A.    Typically that's what it means.

Q.    Okay.  So this would -- this is saying

Page 164

if they rolled out SURF to 100 percent of Instagram accounts, they would checkpoint 5,000 additional users per day for being underage, right?

MR. CHAPUT: Object to form. Scope.

THE WITNESS: It is possible that that's what this is saying. The terms I'm not familiar with -- I'm not familiar with the term "daily identified jobs" and how that matches up with "action."

BY MR. OLSZEWSKI-JUBELIRER:

Q. Right.

The comment says, "Yes action an extra 5K jobs per day that are underage," right?

A. That's what the comment says.

Q. And Meta, in fact, has estimated how much it would cost to identify these additional underage users by improving the reporting flow on Instagram, right?

MR. CHAPUT: Object to the form. Scope.

THE WITNESS: I see an estimate.

BY MR. OLSZEWSKI-JUBELIRER:

Q. Okay. There's an estimate here, that's right. Do you know what the estimate is?

A. Do you mean like just as written here?

CONFIDENTIAL

Page 165

Q.    Well, what is the estimate -- do you know what Meta's estimate here or elsewhere for how much it would cost per additional underage user detected using this improved reporting flow?

A.    I mean, I can see from reading this document that it says, "Cost per Action Success - $0.57."

Q.    Okay.  Is that Meta's estimate for the amount it would cost to -- per additional underage user detected --

MR. CHAPUT:  Object to --

BY MR. OLSZEWSKI-JUBELIRER:

Q.    -- using the improved reporting flow?

MR. CHAPUT:  Object to form.  Scope.

THE WITNESS:  That was an estimate that was made in this document at this time.

MR. OLSZEWSKI-JUBELIRER:  Okay.  Let's do A5, please.  This is a document with Bates number META3047MDL-190-00036711.

(Whereupon, Meta-Hartnett-21 was marked for identification.)

BY MR. OLSZEWSKI-JUBELIRER:

Q.    This is a document marked Exhibit 21.

Do you recognize this document?

A.    I don't.

Page 166

Q.    You've never seen this document before?

A.    No.

Q.    You didn't review it with your lawyers?

A.    No.

Q.    Okay.  This is an e-mail thread, right?

A.    It's an e-mail thread.

Q.    Of Meta employees?

A.    Yes.

Q.    And it's from April 11, 2022, right?

A.    Yes.

Q.    Okay.  And it's talking about this improved underage reporting flow, right?

MR. CHAPUT:  Object to the form.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    The subject line is, "Re: IG Shorten Underage Report Flow (SURF) & Ops Capacity"?

A.    That is the subject line.

Q.    Okay.  And SURF is that underage reporting flow, right?

A.    Yes.

Q.    Okay.  And then --

MR. CHAPUT:  Object to the form.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  This first e-mail is about estimating the cost of additional underage users if

they were to roll out the IG SURF reporting flow to 100 percent of users, right?

MR. CHAPUT:  Objection.  Scope.

(Witness reviewing document.)

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Can I point to a sentence in the first e-mail?

A.    Yeah go ahead.

Q.    You've read the whole e-mail, right?

A.    Yes.

Q.    Okay.  So in the first e-mail there's a sentence that reads, "It will cost us roughly an $1 per underage user we find on the app if we roll out SURF widely in future quarters," right?

A.    That's what it says.

Q.    Okay.  So that's an estimate that Meta would have to spend an additional $1 for every child under 13 it identified on the app if it rolled out the improved underage reporting flow widely to Instagram users, right?

MR. CHAPUT:  Object to form.  Scope.

THE WITNESS:  I think what that's saying is a total of $1 instead of additional.  But otherwise, yes.

///

CONFIDENTIAL

Page 168

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  So it would cost a dollar per child -- Meta would have to spend a dollar per child to identify them if it rolled out this improved underage reporting form on Instagram, right?

MR. CHAPUT:  Object to form.  Scope.

THE WITNESS:  Yeah, I wouldn't characterize it as a dollar per child.  It's a dollar per checkpointed account.  That's what that is saying.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  A dollar per underage user, right?

MR. CHAPUT:  Object to the form.  Characterization, scope.

THE WITNESS:  Again, no, a checkpointed account doesn't -- it is not equivalent to an underage user.  There is only a certain percentage of checkpointed accounts that end up being disabled.

Even when they are disabled, we don't know that they're underage users.  We just know they did not appeal or did not appeal successfully.

///

CONFIDENTIAL

Page 169

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  Do you know -- how do you know that it's not referring to additional underage users who are -- ultimately are removed from the platform?

MR. CHAPUT:  Object to the form.  Scope.

THE WITNESS:  I don't precisely know because I haven't seen the exact spreadsheet of what this is referring to, but it is -- my read of this e-mail chain, what I am thinking is that this refers to checkpoint, but I'm not sure.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  Because you've never seen this document before, right?

A.    I have not seen this document before.

MR. CHAPUT:  Object to the form.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  And the next sentence reads, "The question at hand is the tradeoff of removed u13 versus ops capacity & cost," right?

A.    That is the next sentence.

Q.    Okay.  And the tradeoff Meta was considering about whether to roll out this underage reporting flow was additional removed u13 users

Page 170

versus ops capacity and cost, right?

MR. CHAPUT:  Object to the form.
Scope.

THE WITNESS:  That's what the sentence in this e-mail says.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   And this e-mail is from April of 2022, right?

A.   Yes.

Q.   And Meta still has not rolled out the improved underage reporting flow for Instagram to all users, right?

A.   That's right.

MR. CHAPUT:  Object to the characterization.

MR. OLSZEWSKI-JUBELIRER:  Okay.  I think we should take a break.  Let's go off the record.

THE VIDEOGRAPHER:  The time is 2:00 p.m.  We're off the record.

(Whereupon, a recess was taken.)

(Whereupon, Meta-Hartnett-22 was marked for identification.)

THE VIDEOGRAPHER:  The time is 2:24.  Back on the record.

Page 173

say, I disagree with some of the specifics in that.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    But to ask the question again, you don't know the precise number.  Do you have a ballpark of how many documents you looked at that you were aware we were going to ask you about?

A.    I don't know.  It was well south of 150, but, yeah, I don't know.

Q.    Less than ten?

A.    I'm honestly not sure.

Q.    Okay.  And just for the record, some of the documents that we have reviewed that you indicated you have not looked at we sent last week, including on Wednesday, just for the record.

Okay, let's move on.

So we talked about how Meta allows people to submit reports of underage users.  Let's talk now about how Meta reviews those reports.

A.    Okay.

Q.    Okay.  So your notes talk about automation performed after accounts are flagged as potentially under 13?

A.    Yes.

Q.    And automation refers to, like, an

Page 174

automated review procedure that Meta uses after someone has reported a user, right?

A.    Yes, that's right.

Q.    And these are designed to filter reports out of the queue so that they don't need to be reviewed by humans, right?

A.    Yeah, they're designed to filter reports that are obviously false, so they don't need to be reviewed by humans.

Q.    Okay.  Just to identify reports that are obviously false, is that the reason -- that's the only reason why these automation policies exist?

A.    Yeah, that is the reason why those automation policies exist.

Q.    Okay.  So your notes have a list of automation policies, right?

A.    Yes, that's right.

Q.    On page 4 and 5?

A.    Yep.

Q.    So, and this talks about the pre-October 2024 automation policies, right?

A.    Yes, that's right.

Q.    Did they change after October 2024?

A.    Since October 2024 there are slight tweaks that I don't have listed here.  I think we

CONFIDENTIAL

Page 175

just listed pre-October 2024 for the scope to be accurate on the scope, but there were substantially, like, not major changes since October 2024.

Q.    Do you know of any of the changes after October 2024?

MR. CHAPUT:  Objection.  Scope.

THE WITNESS:  I just -- I can't remember, but we can talk to ▮▮▮▮▮▮ about it.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    ▮▮▮▮▮▮▮ would know?

A.    Yes.

Q.    He's the source of information in this section?

A.    Yes.  Yes.

Q.    Okay.  So let's talk about a couple examples of automation policies.

On Facebook, for example, one of the automation policies automatically ignores reports when Meta's adult classifier predicts the user to have an age of over 18, right?

A.    Yes, that's right.

Q.    Okay.  And the adult classifier is an age model that Meta has, right?

A.    Yeah, that's right.  The adult

CONFIDENTIAL

Page 176

classifier refers to an age model that predicts a user as over or under 18.

Q.    Okay.  And for under 18 it actually predicts if they're between 13 and 17, right?

A.    Yeah.  That's what it's predicting, yes.

Q.    So it predicts whether the user is 13 to 17 or 18 and over, right?

A.    That's right, yeah.  It doesn't -- just to be very clear, it doesn't predict -- it just predicts two outcomes.

Q.    Right.  It doesn't predict whether a user is under the age of 13, right?

A.    It does not, no, nor a precise age other than over or under 18.

Q.    Okay.  And it says in your notes precision threshold of 90 percent?

A.    Yep.

Q.    What does that mean here?

A.    So when you're using a classifier, you always have to choose what precision threshold you're using it at.  A classifier can be -- you can use different versions of the classifier at different precision thresholds.

So this is saying -- a precision

CONFIDENTIAL

Page 177

threshold is saying that 90 percent of the time the prediction will be accurate.  That's what this is saying.

Q.    Okay.  And 90 percent of the time it will predict that when it says a user is over 18 the user is actually over 18, is that right?

A.    That's what that's saying.

Q.    Okay.  In Meta's evaluation of the classifier, did Meta evaluate how likely it is to predict under 13 users as being over 18?

A.    No.  We can't do that because the way that you evaluate precision is with ground truth, so ground truth, you have to have -- what ground truth is is like, you know, as close as you can get to the real truth about the user that you were predicting. With age it's very hard for us to get, like, ground truth as in we 100 percent know the age of this individual.

What we use for ground truth for our age modeling is birthday posts.  So we create -- users on Facebook and Instagram, as you have probably seen, wish each other a happy birthday, and we create a labeled dataset of those birthday posts. Humans review to -- you know, humans review the post to assess to the best of their ability is this a

Page 178

real post that really reflects the age the user.

We do not have that dataset for under 13, and we don't retain any data for under 13. If we in labeling the birthday posts see that a -- we believe that a user may be under 13, then we -- that goes for internal escalation as we talked about before, and then we don't retain any of that data. So we can't actually assess the classifier performance on the 13 boundary.

Q.    So Meta doesn't know how accurate it is at predicting whether users who are under 13 are adults?

MR. CHAPUT:  Object to the form.

THE WITNESS:  We do not have any -- so the model is meant to predict over or under 18, and we have no data related to under 13 on that model.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    The model is meant to predict whether a user is a teen or over 18, right?

A.    Correct.

Q.    It's not meant to predict whether a user is under 13 or -- is under 13, right?

A.    Correct.

Q.    Okay.  Let's see, another automation

CONFIDENTIAL

Page 179

policy is previously manually reviewed, is that right?

A.    Yes.

Q.    So that means if a report -- an account had been reported previously and had gone through the human review process and it was not checkpointed at the end of the human review process, if it was reported again Meta would automatically ignore the report, right?

A.    That's what that means.

Q.    Okay.  And the one below that, it says, No media or no bio associated with a profile. Right?

A.    Yes, that's right.

Q.    Okay.  And that says -- that means on Facebook if an account is reported and it has no photos and no bio, the report is automatically ignored by Meta systems, right?

A.    Yeah, this is -- we can follow up, but what this is saying is if there's no data associated, like there's no content on the account, there's nothing to review, then it's ignored.  I noted "no media or no bio."  That might be like an imprecise note, but it's essentially like there's nothing to review, it's a blank account.

CONFIDENTIAL

Page 180

Q.    Okay.  "No media" means what?  Photos or all posts?

A.    All media.  The user hasn't created any media.

Q.    Okay.  No text posts?

A.    Yeah, that's what that refers to.

Q.    Okay.  Does it include whether the user has made comments on other people's posts?

A.    I don't know.

MR. CHAPUT:  Objection.  Scope.

THE WITNESS:  I don't know.  We can get back to you on that.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  Does it include whether users have sent each other direct messages?

MR. CHAPUT:  Objection.  Scope.

THE WITNESS:  I'm not sure.  I don't know.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    You see below that on Instagram your notes also refer to automations on Instagram, right, from the pre-October 2024 period?

A.    Yes.

Q.    Okay.  And the same ones we've talked about are there, right?

Page 181

A.    Yes.

Q.    Okay.  So let's talk about how the human review process actually works.

So if the account is not automatically ignored by Meta's automation policy, then it goes into this human review queue, right?

A.    That's right.

Q.    And the human -- in this queue the report waits to be reviewed by one of Meta's contract reviewers, right?

A.    Yes.  I actually don't know if the human reviewer are contract or employees, but they're likely mostly contract.  But there's probably a mix of employees and contract on this queue.

Q.    And while the report is waiting to be reviewed, the user still has access to their account, right?

A.    That's right.

Q.    Okay.  They can continue to post content, right?

A.    Yes.  The checkpoint does not happen until after review.

Q.    Okay.  And while the report is waiting for review Meta continues to collect personal

CONFIDENTIAL

Page 182

information from the users, right?

A.    That's right.

Q.    Okay.  So your notes say the human reviewers followed a checklist, right?

A.    Yes.

Q.    Have you also heard this referred to as the decision tree?

A.    Sure, yeah.

Q.    Okay.  And, let's see, let's walk through what is in that checklist or that decision tree.  Right?

A.    Yeah, so the --

Q.    Sorry, go ahead.

A.    The first thing that the reviewer is looking at is the account -- the reviewer is looking at data from the account.  The first thing the reviewer is looking at is does the account display child sexual abuse material or child sexual exploitation.  In that case, the account goes to -- escalated to a review queue that is specific to those issues so it can be dealt with properly.

The next thing the reviewer is checking is does the account represent a non-human entity, a pet or a business, in which case the reviewer would reject.

CONFIDENTIAL

Page 183

The next thing a reviewer is checking is is there an explicit admission of age in the bio or in the age-assessed widget.  What that does is it's showing past information on the profile.  Like, it may be things that the user has since edited out but the tool pulls in past edits that could be useful.

Prior to -- there have been some recent changes on the checklist.  Prior to October 2024 there wasn't the question on is this a human, so that was added.

Prior to October 2024 you could not -- the reviewer could not see the historical information.

And then prior to October 2024 when the reviewer was reviewing the account, they were looking for 50 percent of the photographs in the account represented an underage user, and in October 2024 that was lowered to 25 percent.

Q.    Okay.  So just to step through that, there's three or maybe four different questions that the reviewer has to walk through.

So, first of all, is there child sexual abuse material, does the account represent a non-human entity, and then reviewing -- then the

CONFIDENTIAL

Page 184

reviewer looks at whether there's an explicit admission of age in the bio, right?

A.    Yes.

Q.    And after October 2024, Meta started showing human reviewers prior versions of the user's bio, right?

A.    Yes.

Q.    Okay.  Are you aware that the state AGs sued Meta in this lawsuit in October 2023?

A.    I was not aware of that, or I don't know the precise dates of the suit.

Q.    Okay.  And then the reviewer looks at photographs on the account, right?

A.    That's right.

Q.    To see what percentage of them represent a particular underage person, right?

A.    Yeah, that's right.

Q.    Okay.  And prior to October 2024 if there were fewer than 50 percent of photographs representing a particular underage person, the human reviewer would not checkpoint the account, right?

MR. CHAPUT:  Object to form.

THE WITNESS:  I believe that is
correct.

///

CONFIDENTIAL

Page 185

BY MR. OLSZEWSKI-JUBELIRER:

Q. Okay. And after October 2024 if there are fewer than 25 percent of the photos in the account representing a particular person who appears to be under the age of 13, Meta will not checkpoint the account, right?

MR. CHAPUT: Object to the form.

THE WITNESS: If there are fewer than 25 percent. Yeah, just one nuance is the photographs still -- sorry, and this goes back to before October 2024. The photographs are one element of the overall account evaluation.

If there is an explicit admission of age -- again we should check this. My understanding is if there's an explicit admission of age and the photos are ambiguous, they still will checkpoint the account. We should check exactly how those roles are used.

BY MR. OLSZEWSKI-JUBELIRER:

Q. If there's an explicit admission of age in the bio?

A. In the bio, in the text, yeah.

Q. Okay. In the text of the bio?

CONFIDENTIAL

Page 186

A.    I believe so, yes.

Q.    Okay.  But the reviewers don't look at texts of posts, right?

A.    I'm pausing because I am not remembering what is pre and post-October 2024 and what is in our experimentation.

My understanding is pre-October 2024 only looking at the bio, yes.

Q.    Okay.  After October 2024 what do reviewers look at?

A.    So we are -- yeah, go to, like, this is -- we're continually trying to improve this flow, and so we are -- we have looked at different times at collecting, like, how can we look at incremental data to help a reviewer do as good a job as possible.

But I would have to check exactly what is in the flow now versus what has been experimented with.

Q.    You don't know what reviewers look at post-October 2024?

MR. CHAPUT:  Objection.  Scope.

THE WITNESS:  I know that the reviewers look at content of the profile and its media, but I cannot remember precisely

Page 187

which fields on each piece of media are looked at or not, because we have been experimenting with that to learn.  Yeah.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    When did Meta start experimenting with improving its underage review flow?

A.    I mean, continually throughout its existence.

Q.    Meta has experimented with showing reviewers things -- pieces of information aside from the bio and photos in the account?

MR. CHAPUT:  Object to the form.

THE WITNESS:  I don't know precise dates of what experiments have occurred over the entire existence of that review flow, but there have been attempts to improve that review flow for multiple times.

MR. OLSZEWSKI-JUBELIRER:  Okay.  Can we do A10, please?  This is a document with Bates number META3047MDL-046-00068729.

(Whereupon, Meta-Hartnett-23 was marked for identification.)

BY MR. OLSZEWSKI-JUBELIRER:

Q.    And it's a document -- and that's

Page 188

Exhibit 23.  The document has a title -- a filename underagetraining.pdf.

A.    Underage training?  Underage Flow?

Q.    The filename of the document.  It's --

(Cross-talking.)

MR. CHAPUT:  So you're representing that that is the filename in the metadata?

MR. OLSZEWSKI-JUBELIRER:  Based on Meta's metadata.

THE WITNESS:  Understood.

MR. OLSZEWSKI-JUBELIRER:  Thanks for that clarification.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    That's true, the title of the document is Underage Flow, right?

A.    Yes.

Q.    Do you recognize this document?

A.    No.

Q.    Have you seen the document before?

A.    No.

Q.    Meta's -- your lawyers didn't show you the document?

A.    No.  I do not recall seeing this.

Q.    Okay.  Would you agree that this is a training for human reviewers for underage reports?

MR. CHAPUT: Object to the form. Scope.

THE WITNESS: I'm just going to need a couple minutes to look at this to answer that.

(Witness reviewing document.)

THE WITNESS: Yeah, I think this could either be a training or it could be just describing the process.

BY MR. OLSZEWSKI-JUBELIRER:

Q. A description of the training perhaps?

A. Potentially.

Q. Okay. Can you turn to the page ending in 68738?

A. Yes.

Q. The title is Decision Tree?

A. Yes.

Q. This is a decision tree that human reviewers were to use in reviewing underage reports?

MR. CHAPUT: Object to form. Scope.

THE WITNESS: It looks like it.

BY MR. OLSZEWSKI-JUBELIRER:

Q. Okay. And the first thing says, "Look at the photos on the" file, right?

A. It looks like it's cut off. It says,

CONFIDENTIAL

Page 190

"Look at the photos on the."

Q.    "photos on the" -- sorry, "Look at the photos on the."

A.    Yes.

Q.    Do you see that?

A.    That's what it says, yes.

Q.    Okay.  So looking at photos is the step, is that fair to say?

A.    I think so.

Q.    Okay.  And then -- okay.

Do you see the -- so the first box is referring to that step about checking for child sexual abuse material, right?

A.    I believe so.  I'm not familiar with this acronym, CEI, but I believe that it's likely.

Q.    And if the answer is no, then you move on past that to the next diamond, is that right?

A.    Yes.

Q.    Okay.  And then the question is, "Are there 1 or 0 photos on the account?"  Right?

A.    Yes.

Q.    So if Meta reviewed a report of an underage account and there was only one photo on the account, the reviewer is instructed to ignore the report, right?

CONFIDENTIAL

Page 191

A.    Yes.

Q.    Okay.  The next box says if an account is reported for being underage, and Meta's instructed its human reviewers to ignore the report if there were no people in photos on the account, right?

A.    Yes.

Q.    Okay.  And the next box asks, "Are there at least 3 photos of the same clearly of age person?"  Right?

A.    That's what it says.

Q.    Okay.  And if the answer is yes, then the human reviewers were instructed to ignore the report, right?

A.    Yes.

Q.    So if there are at least three photos, no matter how many photos are on the account, Meta instructed its -- at least -- strike that.

Meta instructed its reviewers when reviewing underage reports that if there are at least three photos of the same person who is clearly over the age of 13 on the account, they should ignore the report, right?

A.    I think that's what that's saying.

Q.    Okay.  And then -- so let's just say if

Page 192

there are 20 photos on the account and 17 of them are someone the reviewer recognized to be a 10 year old but three of them are of someone who is 16 years old, Meta instructed the reviewer to ignore the report, right?

MR. CHAPUT:  Object to form.  Scope.

THE WITNESS:  I'm just reading the small text here.  Can you go -- well...

(Witness reviewing document.)

THE WITNESS:  Yeah, I mean, that's actually not an accurate, because what it's saying here is if there were 17 -- if there were a couple of photos of someone who is borderline age like 16, then, no, it wouldn't have been ignored.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Do you see the box on the left that says, "Clearly of age"?

A.    Yes.  It says, "Clearly of age is someone who does not look borderline, so above the age of 16."

Q.    Okay.  So let me ask the question again, but we can change the age to 17.

If there are 20 photos on the account and 17 of them are someone the reviewer recognized

Page 193

to be a 10 year old but three are someone who the reviewer believed was 17, then the reviewer was instructed to ignore the report, right?

MR. CHAPUT:  Object to form.  Scope.

THE WITNESS:  I think that's the literal interpretation of this decision tree.  I think the -- what the instruction is trying to get at here is if there's any uncertainty, like if there's someone that looks borderline, don't ignore it.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  If there are three photos of someone who doesn't look borderline, like someone who looks like they're 25?

A.    Then it's instructing to ignore.

Q.    Okay.  Is this the same review process that Meta used until October 2024?

MR. CHAPUT:  Object to the form.

THE WITNESS:  I don't know if this is exactly what was in place until October 2024.

What date is this from?

BY MR. OLSZEWSKI-JUBELIRER:

Q.    I can tell you the metadata on the document says it's from 2016.  If you want, I can

show you an e-mail that says it's --

A.    This is from 2016?

Q.    I can show you an e-mail that says current as of 2020.

A.    Okay.  Yeah, I don't know if this was exactly the same from 2020 to October 2024.  I -- let me check.

I know that there have been changes to the human review process between the time period of 2020 and 2024, so I don't think this is the exact same process.

Q.    But you don't know what the changes were, right?

MR. CHAPUT:  Object to the form. Scope.

THE WITNESS:  I know what some of the changes were, but I don't have a comprehensive -- each change and date to give you.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    What changes do you know about?

A.    I know, for example, in 2021 the tools that reviewers used to be able to see photos were improved.  I don't know how the decision tree changed over that time.

Page 195

Q.    What do you mean by the tools reviewers used to see photos changed?

A.    If you look in this document, the page -- this page.

Q.    Yep.  You're pointing to a page where the Bates number is 68732?

A.    This is the review -- this is the screen that a reviewer sees, and there were user experience changes here where a reviewer could see -- could see more photos or zoom in on photos.

I don't know how the decision tree changed.

Q.    Do you know of any other changes?

MR. CHAPUT:  Object to form.  Scope.

THE WITNESS:  They added date information to photos more prominently so you could see, like, when was a photo posted.

Yeah, those are the changes that I'm aware of.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  And in fact, Meta's own employees have recognized that the human review process for reviewing underage reports was indefensible, right?

CONFIDENTIAL

Page 196

MR. CHAPUT:  Object to form. Foundation, scope.

THE WITNESS:  I'm not aware of Meta employees doing that.

MR. OLSZEWSKI-JUBELIRER:  Okay.  Let's look at A12, please.

MR. KOSSLYN:  Can we go off the record?

MR. OLSZEWSKI-JUBELIRER:  Yes.

THE VIDEOGRAPHER:  The time is 2:55. We're off the record.

(Off the record discussion.)

THE VIDEOGRAPHER:  The time is 2:56. We're back on the record.

MR. OLSZEWSKI-JUBELIRER:  So we're pulling up A12.2.  12.1 is just the slipsheet because this is a natively produced Excel file.  So we can mark -- this is Exhibit 24.  I guess we'll mark the slipsheet and we can file the Excel in along with the same exhibit.

(Whereupon, Meta-Hartnett-24 was marked for identification.)

MR. OLSZEWSKI-JUBELIRER:  This is an Excel file that was produced with a Bates number META3047MDL-111-00153337.

Page 197

So can you pull up the Excel file, please, 12.2. And this is a document with -- the file name of this document is Age Problems Handover Plan_, and then there's a long alphanumeric sequence.

BY OLSZEWSKI-JUBELIRER:

Q. I can represent the metadata of this document has an original date of August 9, 2022, and the metadata indicates it was modified December 15, 2023.

A. Okay.

Q. Have you seen this document before?

A. No.

Q. Your counsel didn't show you this document in preparation for the deposition?

A. I don't think so, no.

Q. Okay. Let's look at the Backlog tab, please. So you see at the top the first title is Backlog?

A. Yes.

Q. And then it says, "Work that we have dropped and will now hand over to new team," right?

A. Yep.

Q. Okay. Let's go to row 21, please.

MR. CHAPUT: Counsel, just so we're on

CONFIDENTIAL

Page 198

the same page, there are row numbers and item numbers, and you're referring to the row in the spreadsheet, which is item number 17, is that right?

MR. OLSZEWSKI-JUBELIRER:  Yes, correct.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   Okay.  So item number 17, which is in row 21, the task is, "Add the ability to include content from messages or posts in our underage enforcement review jobs," right?

A.   Yes.

Q.   So this is talking about a task in a backlog which would be to add the ability to include content from messages and posts in underage review?

MR. CHAPUT:  Object to form.  Scope.

THE WITNESS:  Yeah, I think that's what it's saying.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   Okay.  And then the description says, "At the moment our third party report review doesn't include any message or post content from users, so totally lacks any insight into place where users have admitted to being underage.  Adding these features may help the precision of our enforcement.  Reels/stories also apply here."

Do you see that?

A.    Yes, I see that.

Q.    Including those things -- I should say allowing human reviewers to look at messages or post content from users Meta believed would improve the precision of its enforcement against underage users, right?

MR. CHAPUT:  Object to form. Foundation, and scope.

THE WITNESS:  Yeah, obviously I don't know who wrote this or what the context was, but that is what they are describing here.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  And then under Motivation on the right, do you see in column F it reads, "Our review protocol is currently based almost exclusively on account photos.  If the account in question has admitted to being underage via message or post, we may still end up ignoring them despite them self-admitting.  This is quite an indefensible enforcement gap."

Do you see that?

A.    I see that.

Q.    Could you go down to row 23?  Do you

CONFIDENTIAL

Page 200

see where it says "Support inclusion of user's bio in FB report jobs" in column B?

A.    Yeah.

Q.    Okay.  So at that time reviewers did not look at a user's bio when a Facebook account was reported for being underage, right?

A.    This is -- I guess that is what this is saying.

What is the year of this again?  Sorry.

Q.    The original date is August 9, 2022, and it was modified December 15, 2023.

A.    Okay.

Q.    And then under Description you see -- part of it says, "In FB jobs we do not search the bio - only the photos are considered."

Do you see that?

A.    Yes, I see that.

Q.    Okay.  Okay.  If you look at F, column F, it says, "Using the bio on Instagram but not on Facebook for account reviews means our enforcement is not in parity across our apps and means we may be missing important information in deciding to checkpoint an account on Facebook."

Right?

A.    Yes, I see that.

Page 201

Q.    Okay.  So Meta employees at this time recognized that the user could post biographic information on their Facebook profile that would reveal they were under 13, right?

MR. CHAPUT:  Object to form. Foundation, scope.

THE WITNESS:  Sorry, can you state the question again?

BY MR. OLSZEWSKI-JUBELIRER:

Q.    This is a document written by Meta employees, right?

A.    Yeah.

Q.    Okay.  And in this document those employees are recognizing that users could post information in their bio that indicated they were under 13, right?

MR. CHAPUT:  Object to form. Foundation, scope.

THE WITNESS:  That would be my read of this document.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  And they recognize that because Meta did not look at Facebook users' bios, it meant that they may be missing important information in deciding to checkpoint an account on Facebook,

Page 202

right, for being underage?

MR. CHAPUT: Same objections.

THE WITNESS: Yeah. I mean, that's what it says, yes.

BY MR. OLSZEWSKI-JUBELIRER:

Q. Can you go down to row 29, please? Do you see where it says, "Explore reviewing hard-link FB and IG accounts when reviewing a report of an account being underage to ensure we're using all available information where possible"?

A. Yep.

Q. And so that's talking about exploring adding that option, right?

A. Yeah. That is a bit confusing to me, but that's what it says.

Q. Okay. Why is that confusing to you?

A. I'm just trying to look at the dates of when that was done. So this spreadsheet is from 2022 or 2023, we don't know when it was -- the exact date it was put in.

There definitely -- according to my conversations, there was hard-link propagation prior to that time period. There -- as you can see in the notes, like at some point it had been broken and fixed prior to that time period, so that's why

that's surprising to me.

Q.    Okay.  Your notes are talking about hard-link propagation, right?

A.    Yes.

Q.    But this row is talking about when a Facebook account, for example, is being reported, the reviewer just looks at the Facebook account, right?

A.    Oh, I see.  I see what you're saying.  Okay.  It is a -- I see.  So this is saying pull in the account data into the reviewer interface?

Q.    Right.

A.    It might be.

Q.    Pull in the account data from the hard-linked accounts, right?

MR. CHAPUT:  Objection.  Lacks foundation, scope.

THE WITNESS:  I'm just reading.

(Witness reviewing document.)

THE WITNESS:  Yeah, I think this is referring to pull in data from a hard-linked account into the reviewer interface, which is, sorry, not what I was referring to when I was confused.

///

CONFIDENTIAL

Page 204

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Right.

For example, if a user on Instagram was reported as being underage, the reviewer would only look at that Instagram account, not look at that user's hard-linked Facebook account, right?

A.    That's right.

MR. CHAPUT:  Object to form.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  And that's still the case, right?

(Witness reviewing document.)

A.    I would like to follow up and check this.  I'm not sure.

Q.    But you don't know?

A.    But I know who to ask.  I just am -- I am not sure if the changes were made.

Q.    Okay.  Who would you ask?

A.    ███████

MR. OLSZEWSKI-JUBELIRER:  Can we go off the record briefly?

THE VIDEOGRAPHER:  The time is 3:07. We're off the record.

(Discussion off the record.)

///

CONFIDENTIAL

Page 205

(Whereupon, a recess was taken.)

THE VIDEOGRAPHER:  The time is 3:26. We're back on the record.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    So before we took a break we were looking at Exhibit 20 --

A.    4.

Q.    -- 24, which was that age problems handover spreadsheet, right?

A.    Yes.

Q.    So I can represent to you that the metadata that was provided to us from Meta indicates that the document was from the custodial file of someone named ███████.

Do you know who ████████ is?

A.    Vaguely.  He's product or eng.  He's one of those two functions.

Q.    "Eng" is engineering?

A.    Yes, engineering.

Q.    And the author of the document is ████████@meta.com.

A.    Okay, that is someone that I spoke to.

Q.    And ████████████ is the subject matter expert you spoke to about cross-app enforcement?

Page 206

A.   Yes.

Q.   And specifically in the context of cross-app enforcement for underage reports, right?

A.   Yes, that's right.

Q.   Okay.  So we'll move on from that document.

So just to take a step back here, if a parent discovers that their child has an account on Facebook or Instagram, the way the parent can tell Meta to take down the account is by filing a report, right?

A.   That's right.

Q.   And the reports from parents of underage users are treated the same way as any other reports of any of Meta's underage reporting forms, right?

MR. CHAPUT:  Objection.  Form.

THE WITNESS:  You're asking if there's a difference if the person who reports is a parent versus not a parent, or is there any difference in how the report is treated?

BY MR. OLSZEWSKI-JUBELIRER:

Q.   Yes.

A.   No.

Q.   They're treated the same way?

A.   Yes.

Q.   And so, for example, if a parent tells Meta by filing a report that their child has a -- their child who is under the age of 13 has an account on Facebook or Instagram but the account does not have a bio or photos, Meta would ignore that report, right?

MR. CHAPUT:  Object to form.

THE WITNESS:  That's theoretically true.  Meta also doesn't have a way of verifying that the person who reported it is really a parent.

So the point of ignoring a report if there's no bio or photos is that there's simply no information for Meta to go on, and the reporter indicating that they're a parent doesn't give us any incremental information.  We don't know if that person is a parent.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   But Meta -- sorry, go ahead.

A.   It is -- I think I've spoken about this a little bit, but a very, very high percentage of the reports are false, and the contact form contains a lot of false data, so we don't have any indication

that the parent -- that a person indicating that they're a parent, that they are a parent.

Q.    Meta asks whether the reporter is a parent, right?

A.    Right.

MR. CHAPUT:  Object to form.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    But Meta doesn't use that information in reviewing the report, right?

MR. CHAPUT:  Object to form.

THE WITNESS:  I'm not sure.  I'm not sure.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    You don't know whether Meta uses the information that a reporter is a parent in reviewing the report?

MR. CHAPUT:  Object to form.  Asked and answered.

THE WITNESS:  I'm not aware of any way Meta uses that information.

I'm also saying that I'm not aware of any way Meta would validate that the person was a parent just because they indicated that in the form.

///

Page 209

BY MR. OLSZEWSKI-JUBELIRER:

Q.    And Meta asks reporters to provide their own e-mail address, right?

A.    Yes.  And I can't remember if that was in both flows, but I can look at the documents.  I remember it definitely being on the Facebook flow. I can look it up.

Q.    And Meta doesn't follow up with reporters to ask for more information based on -- by contacting them at their e-mail address, right?

MR. CHAPUT:  Object to the form.

THE WITNESS:  Not that I'm aware of. There could be some specific exceptions in the past, but, yeah, as far as I know, not as normal practice.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Right.

So, for example, if someone indicated they were a parent of a child on Instagram and reported the child's account and -- Meta would not contact that parent by e-mailing them at the e-mail address they provided, right?

MR. CHAPUT:  Object to the form.

THE WITNESS:  Not as a normal practice.

///

Page 210

BY MR. OLSZEWSKI-JUBELIRER:

Q.   You said a large number of the reports are false.

A.   (Nodding in the affirmative.)

Q.   By "false," you mean they were ultimately not checkpointed, right?

A.   Either that they were not checkpointed or that they turned out to be -- they could have also been checkpointed but then appealed.  The -- and then ID verified that they are over 13.

We've seen, like, very significant abuse of this flow because users know that it's a flow that ultimately ends at an account being taken down.  It is an attack factor for public, like often celebrity accounts, for other users to get them taken down.

So we see, like, Kim Kardashian being reported every single day many times.  So, yeah, that's what I'm speaking about.

Q.   Meta doesn't review every report about Kim Kardashian's account for being underage, right?

A.   Meta does not human review every report for Kim Kardashian, yeah.

Q.   Do you know what percentage of reports are -- that go into the checkpoint are ultimately

CONFIDENTIAL

Page 211

successfully appealed?

MR. CHAPUT:  Object to the form.
Scope.

THE WITNESS:  I don't have that data
point.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  You don't know or Meta doesn't
know?

MR. CHAPUT:  Object to the form.

THE WITNESS:  I don't know.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  Who at Meta would know?

A.    ██████████.

Q.    All right.  Let's talk about account
linking.  So we've talked about hard linking, right?

A.    Yes, we talked about that.

Q.    And hard linking is when a user tells
Meta that they have more than one account on the
platform, right?

A.    Yeah, that's right.

Q.    Okay.  And Meta since December 2021
used that information to propagate its enforcement
on underage accounts across --

MR. CHAPUT:  Object --

///

CONFIDENTIAL

Page 245

So I want to check how we use a piece of information that we have on new account creation.

Q.   Okay.  All right.

A.   By "contact point," I mean e-mail or phone number.

Q.   Okay.

MR. OLSZEWSKI-JUBELIRER:  Why don't we take a ten-minute break.

THE VIDEOGRAPHER:  The time is 4:17. We're off the record.

(Whereupon, a recess was taken.)

THE VIDEOGRAPHER:  The time is 4:33. We're back on the record.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   So let's talk about inauthentic reports of underage users.

A.   Okay.

Q.   You've talked about abuse as a reporting form, right?

A.   Yes.

Q.   Has Meta's underage reporting form been the subject of scripting attacks?

A.   Yes.

Q.   And aside from scripting attacks you talked about, are there other ways that -- is Meta

Page 246

aware of other sources of inauthentic reports of child users on its platforms?

A.    Yes, just individual reports also are -- can be inauthentic.

Q.    Okay.  Those are from people maliciously reporting another account, right?

A.    Yes, that's our understanding.

Q.    Okay.  And you gave examples of celebrities being reported for being underage?

A.    Yes.

Q.    And your notes also talk about the IDF being reported?

A.    Yeah, that's currently the most reported account.

Q.    For being underage?

A.    Correct.

Q.    And that's the Israeli Defense Forces?

A.    Yes.

Q.    Okay.  The IDF account is an Israeli account?

A.    I don't actually know who owns that account.  I don't know.

Q.    Okay.  All right.  Is Meta aware of how many reports of underage users are inauthentic?

A.    It is -- so I can give estimates.

CONFIDENTIAL

Page 247

The -- the way -- one way of looking at this is what percentage of reports are ultimately checkpointed.

Again, as I've said, a checkpoint does not mean that the user will end up being underage. It means that the human reviewer thought that there was doubt, like they might be underage.

In the US, 14 percent of the reports that are reviewed by humans are ultimately checkpointed.

Q.    And conversely, if an account is not checkpointed, it doesn't mean that the user is not underage, right?

MR. CHAPUT:  Object to the form.

THE WITNESS:  I can't definitively state either way.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Right.  It just means that if an account is not checkpointed after being reviewed -- after an underage report is filed against the account and it's being reviewed through Meta's review process, it just means that Meta's review process did not decide to checkpoint the account, right?

MR. CHAPUT:  Object to the form.

THE WITNESS:  The intention of the

Page 248

review process is that the human reviewer is doing their best to determine if they think the account is under 13 or has a chance of being under 13.  So that's the best data that we have.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    And we've talked about today various steps in that review process, right?

A.    We've talked about that, yes.

Q.    And at various steps in the review process, if -- for various reasons a reviewer is being instructed to ignore reports, right?

MR. CHAPUT:  Object to the form. Vague, mischaracterizes the testimony, scope.

THE WITNESS:  We've talked about the decision tree -- we talked about the decision tree, I believe it was 2020 that you showed me, and there are certain parts of the decision tree where a user based on some data then clears the report, yes.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Clears --

A.    Ignore, like says ignore this report, yeah.

CONFIDENTIAL

Page 249

Q. Okay. Beyond this statistic that 14 percent of human reviewed underage reports in the US are checkpointed, does Meta have any other understanding of the number of inauthentic underage reports submitted against US users?

MR. CHAPUT: Object to the form. Scope.

THE WITNESS: There are certainly other analyses than just this single data point. I don't have, like, every analysis that has been done. This data point is the, like, best data point for the general scope.

BY MR. OLSZEWSKI-JUBELIRER:

Q. What other analyses are you talking about?

MR. CHAPUT: Object to the form. Scope.

THE WITNESS: The -- again, like speaking in generalities, the team that has owned this flow over time has done analyses to understand its efficacy, yeah. That's -- even some documents that we pointed to earlier where you can see, like, they were estimating what percentage of reports would ultimately get to checkpoint.

So the documents you showed me, those are other analyses that make estimates.  So I'm just speaking about that kind of thing.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  But you're not aware of any other analysis that Meta has conducted to determine the number of inauthentic reports of underage users in the US, right?

MR. CHAPUT:  Object to form.  Mischaracterizes testimony, beyond the scope.

THE WITNESS:  No, I'm not saying that I'm not aware of other analyses.  I'm saying that I am not able to point to, like, specific analyses, when they were done, what the exact results were outside of what is in these notes, but I am aware that there were other analyses because you've even shown some of them to me today.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    We're talking about just analyses of the number of inauthentic reports, right?

A.    Yes.

Q.    Okay.  So beyond the documents that I've shown you today, are you aware of any other

analyses of the number of inauthentic reports of underage users that Meta has received?

MR. CHAPUT:  Object to the form. Scope.

THE WITNESS:  So I believe that I have seen other analyses, yes.  Like there's data -- we look at data on the efficacy of this flow over time, and so, yes.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    You're saying you look at data on the efficacy of this flow, right?

A.    Yes.

Q.    And the efficacy of the flow meaning the number of users who are reported that are ultimately checkpointed, right?

A.    Yes.  But then it is also looking at the implication of the ones that are not accurate. Like whenever you're looking at the number of users that were checkpointed, you're also looking at the number of users that were not checkpointed.

So I consider that an analysis about the false reports in this flow.

Q.    Okay.  In those analyses, did Meta look at the number of users who were not checkpointed who were actually underage?

MR. CHAPUT:  Object to form.  Scope.

THE WITNESS:  I'm not sure how we would do that.  Can you describe more or -- yeah, ask the question again?

BY MR. OLSZEWSKI-JUBELIRER:

Q.    You keep talking about reports that don't result in a checkpoint as being false reports, right?

A.    Yes.

Q.    Okay.  But my question is, just because a report isn't checkpointed doesn't mean that the user is not under 13, right?

MR. CHAPUT:  Object to the form.

THE WITNESS:  That's right.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    And so my question is, has Meta done an analysis to determine the number of users that are not checkpointed after being reported as under 13 who actually are, in fact, under 13?

MR. CHAPUT:  Object to form.  Scope.

THE WITNESS:  How would we do that?  We don't have data that would allow us to do that.  Yeah, the data that we have, the closest data we have to is the account -- is the checkpoint accurate is the user's

Page 253

appeal.

So we don't have appeals data if it was not checkpointed.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    So the answer to my question is no, right?

MR. CHAPUT:  Object to the form. Mischaracterizes the testimony, asked and answered, scope.

THE WITNESS:  Yeah, I don't -- I don't think that the question is like an accurate representation of the options that Meta has to analyze that data.  Like Meta doesn't have the information to prove or disprove, so, yeah, couldn't have analyzed it.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Just as a for example, Meta could look at other things that an account has posted, right, to determine whether they've posted information that indicates they're under 13?  Right?

MR. CHAPUT:  Object to the form. Incomplete hypothetical, scope.

THE WITNESS:  Yeah, if we had that information, and I think like that's actually consistent with our internal

CONFIDENTIAL

Page 254

escalation process, we would escalate it to the review process. So it's not like an analysis that we would do.

Does that make sense?

BY MR. OLSZEWSKI-JUBELIRER:

Q. I think we can move on pretty soon, but just to say -- I think we've established this, right? We're of the same understanding that the review process looks at only certain pieces of information, right?

A. Yes, that's right.

Q. And Meta has in its possession other pieces of information associated with users' accounts, right, that are not looked at in the review process for underage reports?

MR. CHAPUT: Object to form. Scope.

THE WITNESS: Yes, that's right.

BY MR. OLSZEWSKI-JUBELIRER:

Q. Direct messages, for example?

MR. CHAPUT: Object to form. Scope.

THE WITNESS: Yes.

BY MR. OLSZEWSKI-JUBELIRER:

Q. Okay. And so Meta -- my question is, Meta has not done a study of users who are reported as being underage and then not checkpointed, of

CONFIDENTIAL

Page 255

those users, looking at, for example, their direct messages, how many can Meta detect as actually being underage?

MR. CHAPUT:  Object to form. Incomplete hypothetical, scope.

THE WITNESS:  To my knowledge, Meta has not done a study with direct messages like that, no.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  Does Meta have any practices it uses to identify inauthentic reports of child users?

A.    The -- I would say the closest to maybe what you're asking is the automations that we use. You could characterize that as a practice to identify an inauthentic report.

Q.    How do the automations identify inauthentic reports?

A.    The automations are looking at features of the accounts that signify to us that that account is an adult or potentially a mistake.

So, for example, we use the adult classifier as an automation, or if the user report actually includes a birthday that's over 13, those are automations that we use.

Q.    Okay.  Does Meta have any other

Page 256

practices to identify users as -- sorry.

Does Meta have any other practices to identify whether reports of child users are inauthentic aside from the automations in the review process that you just talked about?

MR. CHAPUT:  Object to the form.

THE WITNESS:  I don't think so.  I'm not sure if I am completely following your question, but -- yeah, could you just ask the question one more time to make sure I'm following?

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Sure.

So I asked if Meta had any practices for identifying whether a report of a child user is inauthentic, and you pointed me to the automated review policies that Meta uses when filtering those reports, and automatically ignoring them or sending them on to human review, right?

A.    Yes.

Q.    And my question is, beyond those automated review policies, does Meta have any other practice to identify whether a report of a child user on Facebook or Instagram is inauthentic?

MR. CHAPUT:  Object to the form.

CONFIDENTIAL

Page 257

THE WITNESS:  The human review process itself.  Yeah.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    And by -- in reference to the human review process, you're talking about what we've talked about before, that Meta's understanding is that if a report is ultimately not checkpointed, it's because it's inauthentic, right?

A.    Yeah, the -- just to be totally precise, if an account is not checkpointed, what the decision tree and the human review process is asking is not -- we're not asking the user to determine this is inauthentic.  I am, like, making that implicitly.  It's either inaccurate or there's not any information to go on.

Q.    Okay.

A.    But we're not asking the user to determine is this authentic explicitly.  We're asking the user to determine do you believe this has a chance of being an under 13 user.

Q.    Based on the review flow that the human reviewers are instructed to use, right?

A.    Yes, that's right.

Q.    Okay.  So, okay, let me be a little bit more specific maybe.

CONFIDENTIAL

Page 258

Does Meta have any practices it uses to identify whether reports of child users on Facebook and Instagram are the result of scripting attacks?

A.    So I'm going to -- this is speaking in general terms.  In order to understand if there -- where the account -- where the report came from, Meta likely had some logging that would determine, like, how did the reporter get to the contact form, but I don't know any more detail beyond that.

The team has -- the team was able to estimate and give me estimates of the scale of the scripting attacks, so that means at some point they must have determined which reports were from scripting attacks, but I don't know precisely how they did that.

Q.    Okay.  And the team you're talking about is a team that ▮▮▮▮▮▮▮▮▮▮▮ was on?

A.    Yes.  Yes.

Q.    And this is, like, page 7 of your notes?

A.    Yes.

Q.    Okay.  So you don't know how Meta determined whether any of those reports were the result of scripting attacks, is that right?

MR. CHAPUT:  Object to form.  Scope.

CONFIDENTIAL

Page 259

THE WITNESS:  I do not know precisely.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  And one of the -- part of this topic that you're prepared to testify on is Meta's practices for identifying inauthentic reports of child users, right?

MR. CHAPUT:  Object to the form. Scope.

THE WITNESS:  Sorry, what is the question for me?

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Topic 5 you're prepared to testify on, right?

A.    Can you read Topic 5 to me?

Q.    Sure.

Topic 5 is "Inauthentic reports of Child Users, including scripting attacks on reporting forms, and Meta's practices for identifying such inauthentic reports, during the Relevant Time Period."

A.    Yes, I am prepared to testify on that.

Q.    Okay.  And you're prepared to testify as to Meta's practices for identifying inauthentic reports of child users, right?

A.    Yes.

Page 260

MR. CHAPUT:  I'm just going to object to the form, to the scope, additional discussions about scope not defined in the notice.  If you have a substantive question for the witness, why don't you go ahead and ask.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   So you don't know how Meta identified which reports are inauthentic, right?

MR. CHAPUT:  Object to the form. Mischaracterizes testimony, asked and answered, scope.

THE WITNESS:  So what I am saying is I do not know the exact, like, logging data that the team used to estimate the scale of the scripting attacks, like I don't know the exact fields that they used.

But speaking in general terms, what I would imagine is that the team does log potentially the IP address of where a report comes from, and so then could tell if it was a bot that submitted -- or the team -- again, I'm going beyond the scope of my technical knowledge.

The team has a way of detecting if a

CONFIDENTIAL

Page 261

bot submitted the report. They then use that to determine the scale of the scripting attacks.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   Does the team have a way of detecting whether a bot submitted a report?

A.   I don't know.

Q.   This is just what you speculate, right?

A.   Yes. I'm speaking on, like, general experience with other bot issues, but I do not know precisely in this case exactly how they did this.

Q.   Okay. And you don't know what logging information the team looked at to determine whether reports were the result of scripting attacks, right?

MR. CHAPUT:   Object to form. Asked and answered, scope.

THE WITNESS:   I don't know.

MR. OLSZEWSKI-JUBELIRER:   Okay. Can we go off the record for a second?

THE VIDEOGRAPHER:   The time is 4:52. We're off the record.

(Discussion off the record.)

THE VIDEOGRAPHER:   The time is 4:52. We're back on the record.

///

CONFIDENTIAL

Page 262

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Does Meta have data that shows which reports it believes are inauthentic?

MR. CHAPUT:  Objection.  Counsel, this is within the scope of Topic 7 which this witness is not designated on.  I would suggest that you focus on the topics that she's actually designated on.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    You can answer the question.

A.    Can you repeat the question?

Q.    Does Meta have data on which reports it believes are inauthentic?

MR. CHAPUT:  Same objections.

THE WITNESS:  The data I'm aware of is the data I've described, which is data looking at accounts that were checkpointed, like the results of checkpoint and the results of appeal, and the results of the automation as well with data on that funnel.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  Meta's attorneys told us on Friday that there is a dataset on which reports it believes are the result of scripting attacks.

CONFIDENTIAL

Page 263

A.   Okay.

Q.   Do you know anything about that dataset?

MR. CHAPUT:  Counsel, this is the subject of a separate topic that this witness was not designated on.  We're going to have a separate deposition on that topic, assuming you have any time left after today, and so I don't know why you're wasting your time and the witness's time questioning her on a topic she wasn't designated on.  It's out of the scope of her testimony.

You can go ahead and answer in your personal capacity.

THE WITNESS:  I don't know.  So my knowledge about that dataset is my conversation with ██████.  I don't have any more knowledge on that dataset.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   Okay.  Did you talk about that dataset with ██████?

A.   I talked about -- so I talked about the fact of the scripting attacks, and then he gave me the estimates of the scale of the scripting attacks,

Page 264

but he didn't describe, like, the dataset or how he gave -- or how he made that estimate.

Q.    Okay.  So you talked to ▮▮▮▮▮▮ about two or three large scripting attacks on the underage reporting form, right?

A.    Yes.

Q.    And those occurred before Meta introduced friction on that form, right?  This is page 8 of your notes that I'm looking at.

(Witness reviewing document.)

A.    I see.  I see where you're seeing the word "friction."

Just to define, like, what friction means in this case, what he means is two things.  It is either a CAPTCHA to, like, make sure that it's not a bot that's submitting, or there's this complex implementation change that they had to make where at some point the Instagram appeals form -- the checkpoint was happening outside of a login, and so if you were -- you were able to -- like, malicious attackers were able to take over an account because they were able to bypass two-factor authentication.

So they fixed that.  Those were the two forms of friction that were introduced, just not bots.

CONFIDENTIAL

Page 265

Q.    And when were those forms of friction introduced?

(Witness reviewing document.)

A.    They also introduced rate limiting, IP-based rate limiting, which is a standard thing to do on stopping scripting.

I know that the IG -- the login issue was -- that was fixed in 2022, but I don't know when the other two, the CAPTCHA and the IP-based rate limiting, were introduced.

Q.    After Meta introduced these forms of friction, did Meta continue to experience scripting attacks that generated inauthentic reports of child users on Facebook and Instagram?

A.    I don't know the precise date line above, like, these changes and the end of the scripting attacks, but ███████ will.

Q.    Okay.  I guess another way to say that is you don't know if -- it sounds like these -- anyway, these friction measures that Meta introduced were successful in stopping scripting attacks, right?

MR. CHAPUT:  Object to the form.

THE WITNESS:  Yes, that's my understanding.

CONFIDENTIAL

Page 266

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  So after they were introduced Meta has not experienced successful scripting attacks that generated inauthentic reports of child users on Facebook and Instagram?

MR. CHAPUT:  Object to the form.

THE WITNESS:  I don't have any information that there's never been a scripting attack since this time.  We should confirm that.  But my understanding from ███ is that they were fixed in large part, fixed in -- yeah, fixed in large part.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    And "fixed in large part" in this context means these measures were successful in stopping scripting attacks from creating inauthentic reports of child users, right?

A.    That's my understanding.

Q.    Okay.  And just so the record is clear, so the jury understands, CAPTCHA, that's the little part of the form that says, Are you a robot?

A.    Yes.  It's typically, like, you have to type in letters or you have to pick which are motorcycles, yes.

Page 267

Q.   Okay.  And that prevents scripting attacks because the code that attackers use to create scripting attacks can't figure out how to do those puzzles, is that right?

A.   That's right.

Q.   Okay.  When Meta receives inauthentic reports of child users that are the result of scripting attacks, does Meta send those reports through the same review flow as other reports?

A.   So I can't comment precisely on, like, exactly what happened to each report in these scripting attacks, but, like, the scripting attack is not discovered until after it occurs, so there's no change to the way the flow would have been handled when it was happening, like the -- yeah, the accounts would have still been sent.  The scripting attack would have been discovered after, like, the process already began.

Q.   Meta didn't take any action to remove those reports from the review queues, for example, because they were the result of scripting attacks?

MR. CHAPUT:  Object to form.  Scope.

THE WITNESS:  Not that I'm aware of, no.

///

CONFIDENTIAL

Page 268

BY MR. OLSZEWSKI-JUBELIRER:

Q.   Okay.  Has Meta evaluated its practices for identifying inauthentic reports of underage users on Facebook and Instagram?

MR. CHAPUT:  Objection to form.  Asked and answered.

THE WITNESS:  Could you be more specific?  I'm not sure -- what do you mean?

BY MR. OLSZEWSKI-JUBELIRER:

Q.   Well, you testified that there was some way that ███████████ identified reports as being underage -- as being inauthentic, is that right?

A.   I testified that he must have been able to identify, like, the scale of the scripting attack, so he must have had some understanding of which reports came from scripting, yeah.

Q.   So my question is, has Meta evaluated that way that he used to identify which reports are from scripting attacks?

MR. CHAPUT:  Object to the form. Scope.

THE WITNESS:  I don't know.

MR. OLSZEWSKI-JUBELIRER:  All right. Why don't we -- can we take a ten-minute

Page 269

break?  We're going to review.

MR. CUTLER:  Sure.

MR. OLSZEWSKI-JUBELIRER:  Thank you.

THE VIDEOGRAPHER:  The time is 5:03.
We're off the record.

(Whereupon, a recess was taken.)

THE VIDEOGRAPHER:  The time is 5:27.
We're back on the record.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Welcome back.  We just want to do
one -- go over one document with you, and we
understand from your lawyer that you'd like to take
a break, go home, and we'll start fresh in the
morning on the remainder of the deposition.

A.    Yes.

MR. OLSZEWSKI-JUBELIRER:  Okay.  So
let's do D1.  This is
META3047MDL-146-00073008.  Exhibit 28.
Thank you.

(Whereupon, Meta-Hartnett-28 was
marked for identification.)

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Do you recognize this document?

A.    It's possible that I've seen it.  I
think that I saw some document from ███ related

Page 270

to -- but this is a SEV document.  I don't think I've seen a SEV document.  I thought I saw a post about this.  I'm not sure.

Q.    Okay.  This is a SEV document.  What's a "SEV"?

A.    A SEV is an incident where something is broken.

Q.    An incident report is another way to describe it?

A.    It typically refers to -- yeah, I think that's accurate.  Yeah, it typically refers to something is technically broken, but it doesn't exclusively refer to it.  Yeah.

Q.    Okay.  And the name of this SEV is SEV 3, and there's a code number.  Then it says, "Large attack on U13 IG reporting form."  Right?

A.    Yes.

Q.    Okay.  And this SEV is about a scripting attack on the Instagram underage reporting form, right?

A.    Yes, that's what it looks like.

Q.    And the owner of this SEV is ███████ ██████████, right?

A.    Yes.

Q.    That's the subject matter expert who

CONFIDENTIAL

Page 271

talked to you about scripting attacks on Meta's underage reporting forms?

A.    Yes.

Q.    Okay.  And this is about a scripting attack that started on October 26, 2021 at 6:00 a.m., is that right?  Do you see where it says "Started"?

A.    Yes.  I'm just going -- yeah, I think that's when they think the SEV -- sorry, the scripting attack began.  I was just trying to confirm if that's when, like, the SEV started.  But it says "Detected," so, yeah, it probably is when they think the scripting attack began.

Q.    Okay.  And then there's a time at which the attack was detected, right?

A.    Yes.

Q.    And that was about three-and-a-half hours after Meta believed it started?

A.    Yeah, I believe so.  I'm not sure, yeah.

Q.    Okay.  Do you see down here it says, Detection Methods -- "Detection Method?"  Excuse me.

A.    Yes.

Q.    And then after that it says, "dashboards."  Right?

CONFIDENTIAL

Page 272

A.    Yes.

Q.    And then under "Detection," it says, ████████████████ alerted me of a reporting spike, we then visited our unidash 1-pager."

And there's a URL, right?

A.    Yep.

Q.    What is a "unidash 1-pager"?

MR. CHAPUT:  Objection.  Scope.

THE WITNESS:  What that will refer to is like a metrics reporting dashboard. Unidash is a general term that -- where we put metrics reporting dashboards.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    And so this describes using dashboards to detect a scripting attack, right?

A.    Yes.  This is describing that they used the dashboard to see that there was a spike in reporting.  So then they would have had to do more investigation as to what caused the spike, but the dashboard allows them to see there's a spike.

Q.    Okay.  Do you know what metrics are on the dashboard?

MR. CHAPUT:  Object to form.  Scope.

THE WITNESS:  No, I don't know what dashboard that is.

Page 273

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  You've not reviewed any dashboards in preparation for your testimony?

A.    No.

Q.    Okay.  Did you speak with ▮▮▮▮▮▮ about using dashboards to detect inauthentic underage reports?

(Witness reviewing document.)

A.    I don't think -- there's nowhere that he mentioned dashboards to me.  So, no, I think no.

Q.    Okay.  Do you know how Meta used dashboards to detect inauthentic underage reports?

MR. CHAPUT:  Object to form.  Scope.

THE WITNESS:  I don't know outside of this document, which suggests that they identified a reporting spike on the dashboard.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    And you said you assume that they would have done some other -- some additional investigation to determine whether it was a scripting attack, right?

A.    Yes.  From the dashboard they would only know just a total number of reports, so that couldn't have been the end of the investigation.

CONFIDENTIAL

Page 274

Q.    How do you know they would only know a total number of reports from the dashboard?

MR. CHAPUT:  Object to form.  Scope.

THE WITNESS:  I am speculating that -- I am speculating.  I don't know the data that's on the dashboard.

I'm reading that is reporting spike, that suggests to me that the key number they were looking at the dashboard was some kind of number of reports where they saw a spike.  But I have not seen this dashboard.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    And you don't know what additional investigation Meta did to determine that there was a scripting attack beyond looking at a spike on the dashboard?

MR. CHAPUT:  Object to form.  Characterization, scope.

THE WITNESS:  I do not know.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  Do you think █████████████ would know?

A.    Yes, I do.

Q.    Okay.  But -- okay.  Let's go off the record and come back tomorrow, okay?

CONFIDENTIAL

Page 275

A.   Okay.

THE VIDEOGRAPHER:   The total time on the record for California is five hours, 16 minutes.

The time is 5:35.   We're off the record.

(Whereupon, the deposition was adjourned.)

CONFIDENTIAL

Page 281

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

*****************************

                                    Case No.
IN RE:  SOCIAL MEDIA ADOLESCENT  4:22-MD-03047-YGR
ADDICTION/PERSONAL INJURY
PRODUCTS LIABILITY LITIGATION
                                    MDL No. 3047
*****************************

This Document Relates To:

ALL ACTIONS

*****************************

      CONFIDENTIAL - ATTORNEYS' EYES ONLY
           PURSUANT TO PROTECTIVE ORDER

         CONTINUED VIDEOTAPED DEPOSITION OF
               ALLISON L. HARTNETT

Held At:          Covington & Burling LLP
                  Salesforce Tower
                  4415 Mission Street
                  San Francisco, California

                    June 17th, 2025
                      10:03 a.m.

Reported By:
MAUREEN O. POLLARD, CSR #14449, RDR

CONFIDENTIAL

Page 282

Continued Videotaped Deposition of ALLISON L. HARTNETT, held at Covington & Burling LLP, Salesforce Tower, 415 Mission Street, San Francisco, California, commencing at 10:03 a.m.  on the 17th of June, 2025, before Maureen O'Connor Pollard, Registered Diplomate Reporter, Realtime Systems Administrator, California CSR #14449.

- - -

CONFIDENTIAL

Page 329

any difference in the decision tree,
depending on the heuristic or user reports
or -- I'm not sure.

But the -- yes, if the human reviewer
gets a heuristic output and then reviews
the account, I believe that it may be under
13, then, yes, they're checkpointed.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    You testified that the model outputs
from -- the outputs from the u13 heuristic are sent
to the same human review process as user reports,
right?

A.    Yeah.  But when -- like, a human review
queue can include multiple streams in.  Like, for
example, the human review queue that the u13 reports
go to includes other account misrep enforcements.
The reviewers can be trained on multiple types of
enforcements.

So just being in the same review queue
doesn't mean that the decision tree is exactly the
same.  The u13 review goes -- it goes to a mixed
pool, and it's the highest priority, and then
there's -- like, the reviewer has instructions that
are specific to that review.

So I'm just not 100 percent sure if the

through negotiations with them?

A.    No.  No.

Q.    If you turn to Topic 6, you see that reads, "Age inference algorithms and models used, developed, or considered for use by Meta and Meta's use of inferred age data during the Relevant Time Period, including, but not limited to, any algorithms or models that may identify a User as being a Child."

Do you see that?

A.    Yes.

Q.    And with respect to that topic, did you educate yourself on Yoti, including the accuracy of Yoti to the extent that's known by Meta?

A.    Yes, I did.

Q.    Have the state attorneys general asked you any questions about Yoti's accuracy?

A.    I don't think so.  I don't remember all the questions I received.  I know the word "Yoti" was said, but I don't remember the questions.

Q.    Okay.  You can set that aside.  Thank you.

Ms. Hartnett, I'd like to speak a little bit about user reporting and some of the questions the state attorneys general asked you on

Page 334

that topic.

A.    Okay.

Q.    Would you start by finding Exhibit 23, please?  It's the document with the -- it's the slide deck with the title "Underage Flow - OS."

A.    Yes.

Q.    I'd like to direct your attention to a page in this document that the state attorneys general did not show you.  That's the one ending 733, has the heading Actions.

A.    Yes, I have that.

Q.    Okay.  What is your understanding of what's being communicated to reviewers on this page?

A.    So my understanding of what's being communicated to reviewers is that this is the key question, this is the overall instruction that they are -- this is the overall instruction of what they are to action on.

So what it is saying is if the person is clearly over the age of 13, you ignore.  However, if the person is clearly underage or you are uncertain, then you checkpoint.

My understanding is that the reviewer uses this overall key question alongside the decision tree to make their overall decision.

Q.    To what extent is the overall key question described on this page consistent or inconsistent with your understanding you learned about in your preparation for the deposition of the instructions that are provided to Meta's reviewers?

MR. OLSZEWSKI-JUBELIRER:  Objection. Form.

THE WITNESS:  This is consistent with my understanding of the instructions provided.  This is still the key question. As you can see, like, the checkpoint wording is still consistent.

BY MR. CHAPUT:

Q.    You can set that aside.  Thank you.

Counsel asked you a number of questions about the automations that Meta uses in its review flow for user reporting.

Do you recall those questions?

A.    Generally, yes.

Q.    What volume of reports are cleared using those automations?

A.    Half of accounts are cleared by automations.

Q.    What are the benefits that Meta obtains by employing automation to clear 50 percent of the

Page 336

reports that are received?

A.    The key benefit here is that we're able to eliminate obvious mistakes and have human reviewers focus on a pool of accounts where there are more likely to be potential under 13 accounts, and so it's to focus the human reviewers.

Q.    Counsel also asked you a number of questions about the user reporting flow.

Do you recall generally that testimony?

A.    Yes.

Q.    Some of counsel's questions implied that the six to seven screens in the flow that ends in the user being referred to the contact form meant that that flow was not designed well.  What is your reaction to that implication?

A.    My actual reaction as, like, a product leader is that that's a relatively standard and totally fine reporting flow.  That's not a super long number of screens for something that is a complex action where we have to inform a user about what they're doing.

The reactions in some of the documents I saw were from just, frankly, folks that don't build products, they were all policy leaders.  And so, yeah, I don't agree with their assessment of the

form.

Q.    Counsel referred to the in-app reporting flow that you testified to as "improved." What evidence does Meta have that would either support or refute that characterization?

A.    I mean, I think the key -- the key evidence we have that would refute that definition of "improved" is that the in-app reporting flow leads to significantly more false reports, it doubles the false reports.  So what you're getting there is the high volume, but false reports, and -- yeah, so it is not clearly improved, it's just shorter.

Q.    Counsel also asked you some questions about whether Meta uses data from individuals who are removed from the platform for being potentially under 13 in order to prevent those individuals from creating accounts in the future.

Do you recall at a general level those questions?

A.    Yes.

Q.    What challenges would Meta have, if any, to using data in the way that counsel suggested in that question?

A.    Yeah, the challenge is that we have to

CONFIDENTIAL

Page 343

THE VIDEOGRAPHER:  The time is 11:38. We're off the record.

(Whereupon, a recess was taken.)

THE VIDEOGRAPHER:  The time is 12:08. We're back on the record.

FURTHER EXAMINATION

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Ms. Hartnett, before our break your counsel asked you some questions about how Meta's human reviewers are instructed to review accounts that have been reported as being underage, right?

A.    Yes.

Q.    And those human reviewers only review the media that Meta presents to them for review, right?

MR. CHAPUT:  Object to form.  Scope.

THE WITNESS:  So the human reviewers review media related to the account that's in the tool, which I think there was a picture of in one of the documents we looked at.  That's what human reviewers review, yes.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Right.

And the human reviewers in that case

only review photos and information on the bio, right?

MR. CHAPUT:  Object to form.  Scope.

THE WITNESS:  I think we have covered this.  I don't -- I am not -- I know that there is at least information from the bio in the photos that go into that tool, but I am not aware of, like, the exact current state of what goes into that tool.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    If you turn -- your counsel showed you Exhibit 23.  That's that Underage Flow.  And counsel showed you the page ending in 68733.

A.    Yep.

Q.    Counsel didn't show you the next page, right?  Can we turn to the next page?

A.    Yep.

Q.    So this page is 68734.  And this is a page instructing Meta's human reviewers how to decide whether to ignore an account, right?

MR. CHAPUT:  Object to form.

THE WITNESS:  I think so.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    And so Meta's human reviewers are instructed if there's no evidence in photos or the

Page 345

photos are empty, they're to ignore the report, right?

MR. CHAPUT:  Object to form.

THE WITNESS:  That's how I read this page.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Right.  Because number 1 says, "No evidence in photos or photos are empty."  Right?

A.    That is what it says.

Q.    Right.

And on the top it says, "Ignore"?

A.    Yes, it says that.

Q.    Okay.  And Meta's human reviewers were also instructed to ignore reports of underage users if there were no photos of people on the account, correct?

MR. CHAPUT:  Object to form.

THE WITNESS:  That's what this document looks like, yes.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    And that's how Meta's human reviewers were actually instructed to review reports of underage users, correct?

MR. CHAPUT:  Object to the form.

THE WITNESS:  You have to remind me

what time period this document is -- are you asking about the time period of this document or -- yeah, can you clarify the question?

BY MR. OLSZEWSKI-JUBELIRER:

Q.    At the time this document was in use, Meta's human reviewers were instructed to ignore reports of underage users if there were no photos of people in the account, correct?

MR. CHAPUT:  Object to the form.

THE WITNESS:  When was this document used?  Can you just remind me when this document was from?

BY MR. OLSZEWSKI-JUBELIRER:

Q.    The document has metadata indicating it was from 2016, and we can show you an e-mail that says it was in use in 2020.

A.    Okay.  I -- let me just read something.

(Witness reviewing document.)

A.    Yeah, I just have -- so reading this document, it looks like it is instructions to reviewers from that time period.  There is something inconsistent in my notes with the document, which is that there was no non-human question prior to October 2024, so that's just like causing me to -- I

CONFIDENTIAL

Page 347

don't know why there's that inconsistency.  Yeah.

Q.    Okay.  Let's talk about the improved flow that Meta has been testing for allowing users of its Instagram app to report underage users within the app.

MR. CHAPUT:  Object to form.
Characterization.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Your counsel asked you some questions about the increase in the number of what you characterized as false reports that come out of that flow, right?

A.    Yes.

Q.    Using that flow also increases the number of reports overall of underage users, correct?

MR. CHAPUT:  Object to the form.

THE WITNESS:  Yes.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    And it also increases the number of true reports, correct?

MR. CHAPUT:  Object to form.
Characterization.

THE WITNESS:  I don't know.  The only data point I have, like, on that -- the

CONFIDENTIAL

Page 348

only data point that I have on that flow is that it doubles the rate of false reports. That's the number that's, like, from an experiment when comparing that to the existing reporting flow.  That's the only data I have, as well as the other data I have is that it's available to 4 percent of the worldwide population.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    And that's the only data you were presented by your lawyers in preparation for discussing this flow?

MR. CHAPUT:  Object to the form, and to the characterization.

THE WITNESS:  I discussed this flow with ▮▮▮▮▮▮▮ as you can see in my notes. And let me just read to see if there's anything else in here.

(Witness reviewing document.)

THE WITNESS:  Yeah, I mean, Ty was explaining to me why that has not been rolled out further, and he was citing the experiment results that it doubles the rate of false reporting.  So that's why the team has chosen not to roll it out further,

CONFIDENTIAL

Page 349

because it's not an effective method for reporting.

So, yeah, that's all the data that I have. I don't -- apologies if I'm forgetting somewhere else that there is in the notes, but that's what I'm aware.

BY MR. OLSZEWSKI-JUBELIRER:

Q. So you as Meta's witness, as Meta's corporate designee for this topic, do not know if it increases the number of under 13 users that were identified on the platform?

MR. CHAPUT: Object to form. Characterization.

THE WITNESS: I do not know.

BY MR. OLSZEWSKI-JUBELIRER:

Q. Let's talk about deletion timelines.

A. Okay.

Q. Your lawyer asked you about a special 45-day deletion timeline for under 13 reports, right?

MR. CHAPUT: Object to the form.

THE WITNESS: My lawyer asked me about -- I don't think he used the word "special" -- about the deletion timeline for u13.