Filed Under Seal

# Exhibit M

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
- - -
IN RE:  SOCIAL MEDIA ADOLESCENT          :MDL NO.
ADDICTION/PERSONAL INJURY PRODUCTS       :4:22-MD-
LIABILITY LITIGATION                     :3047-YGR
                                         :

        SUPERIOR COURT OF THE STATE OF CALIFORNIA
             FOR THE COUNTY OF LOS ANGELES
                SPRING STREET COURTHOUSE
                        - - -
COORDINATION PROCEEDING SPECIAL TITLE    :
(RULE 3.400)                             :LEAD CASE
                                         :NO. FOR
SOCIAL MEDIA CASES                       :FILING
                                         :PURPOSES
                                         :22STCV21355
                                         :
                        - - -
     CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
        DEPOSITION UNDER VIDEO EXAMINATION OF
                   LOTTE RUBAEK
                   April 1, 2025
        Videotaped deposition of LOTTE RUBAEK taken
pursuant to notice, was held at the law offices of
Lieff Cabraser Heimann & Bernstein, 250 Hudson
Street, New York, New York, beginning at 9:03 a.m.
Eastern, on the above date, before Michelle L.
Ridgway, a Registered Professional Reporter,
Certified Court Reporter (NJ-CCR # XI02126),
Certified Realtime Reporter, Certified Shorthand
Reporter  (CA-CSR # 14592), and Notary Public.

CONFIDENTIAL

Page 31

fully developed.  Their frontal lobes are not fully developed.  So they -- the things they experience, they affect them in a different way than they affect adults.

They haven't fully developed their social skills, their affect regulation skills.  They are not fully aware of the consequences.  It's difficult for them to, like adults, to calculate risks and calculate consequences of their behavior.

They are also more curious by nature.  That's because they are in a developmental state where their identity is one of their primary developmental tasks.  So they have to be curious about what's going on in their surroundings.

And they're also -- especially girls -- but they are also very comparing themselves very much with others because, again, they are forming their identity.

So when a girl, for example, sees a lot of images on social media with images of friends or celebrities or

CONFIDENTIAL

Page 32

influencers with very specific and unrealistic body ideals, then it affects children more than it would affect adults because -- and you can see that from brain scans as well, that a specific area in the brain is more active when they compare themselves with others and with beauty standards that are unrealistic.

So that will affect a child's behavior more.  For example, the development of eating disorders or how they eat, how they work out, everything connected to beauty ideals.  Also what they buy.

So, for example, children are -- when you see these very -- because of the filters on social media and the photoshopping of the images, children are more prone to, for example, buy a cosmetic product or buy something that could fix the problem.

So when you see all of these beauty -- unrealistic beauty standards side by side with advertisement for cosmetic products, and the beauty industry in

Page 45

BY MS. FLOWERS:

Q.        Do you know if this content is still up there today?

MR. CHAPUT:  Object to form.

THE WITNESS:  I don't know if the exact same content is still up there, but I know that there's a lot more concern that has come since then, the same type and -- and, yeah.

BY MS. FLOWERS:

Q.        And to be clear, this is the same sort of content that was the subject of the documentary called "A Dead Girls' Diary," right?

A.        Yes, it is.

MR. CHAPUT:  Objection. Form.  Foundation.

THE WITNESS:  So it is self-harm content, and it is -- it is very shocking content.

So when you see it, you will be affected by it.  And it is very -- yeah. There's a lot of blood and very severe damages on young people's bodies.

BY MS. FLOWERS:

Q.        Let's move forward a few months to

CONFIDENTIAL

Page 56

publicly called out Meta for harming kids after the documentary, right?

A.          Yes.

Q.          And here, you sat down with them privately and went through the problems that your patients were reporting in detail?

A.          Yes.

Q.          At some point after this presentation, were you asked by Meta to join the global -- what they call the Global SSI Expert Advisory Board?

A.          Yes, I was.  I guess when I presented all of this to ███████ he mentioned it.  He mentioned the global expert group at that meeting for the first time.  And then at a later point, he reached out to me and asked if I could be interested in joining this group.

Q.          And did you agree to serve on that group?

A.          Yes, I did.

Q.          What did you hope to achieve?

A.          I was very hopeful.  I hoped that, because of all the risks and all the damages I saw that Instagram was doing to the young people that I work with, and also what I heard from the rest of

CONFIDENTIAL

Page 59

"safe, positive, age-appropriate experiences," consistent with what you see in your patients?

MR. CHAPUT:  Object to form. Foundation.

THE WITNESS:  No, definitely not.

BY MS. FLOWERS:

Q.        And if you continue down a little bit, it says, the last sentence of the next paragraph, "We'll continue working with parents, experts, industry peers, and Congress to try to improve child safety, not just on our services, but across the internet as a whole."

Is that consistent -- is child safety being first consistent with your experience with Meta?

MR. CHAPUT:  Object to form. Foundation.

THE WITNESS:  No, not at all.

MS. FLOWERS:  Let's look at 8, please.

(Document marked for identification as (Meta) Lotte Rubaek Exhibit 9.)

CONFIDENTIAL

Page 62

          A.          Yes.

          Q.          And it talks a lot about safety?

                      MR. CHAPUT:  Object to form.

                      THE WITNESS:  Yes.

BY MS. FLOWERS:

          Q.          Building a sense of self and community?

                      MR. CHAPUT:  Counsel, would you like to point us to what specifically in the document you're narrating?

                      MS. FLOWERS:  The bottom of the bullet, last pages -- last two pages of the bullet, last three pages, last two pages.

                      MR. CHAPUT:  Thank you.

                      MS. FLOWERS:  Sure.

BY MS. FLOWERS:

          Q.          Are you there, Ms. Rubaek?  In partnership with these advisors, it's under "Talking to the Experts."

                      Do you see that?

          A.          Yes.

          Q.          And there are principles listed down at the bottom.

                      "1, Putting kids first."

CONFIDENTIAL

Page 63

A.         Mm-hmm.

Q.         "Providing a safe space that fosters joy, humor, play and adventure.

"3, Enabling kids to mine their own potential by building for empowerment, creativity and expression.

"4, Helping kids build a sense of self and community."

And, "5, Recognizing the relationship between parent and child, and that we take our responsibility and their trust in us seriously."

A.         Yes.

Q.         Was this message consistent with the sorts of messages that Meta provided to you while you served on their expert panel?

MR. CHAPUT:  Object to the form.

THE WITNESS:  This was not what I experienced in the expert group.  It was the way the expert group was used that made me -- that gave me the impression that Instagram -- that this was not on top of their priority list.

The things they said at the

CONFIDENTIAL

Page 64

meetings, in the expert groups, could be something along these lines, but there was a big contrast in what was being said and what was being done.

BY MS. FLOWERS:

Q.      Let's -- let's talk about the expert group, then, that you were asked to join. When did that happen?

A.      I had a meeting with ██████████ ████████ in December of 2020, and I guess my first meeting was in January.  I'm not sure.  But I attended the next meeting in the expert group after my meeting with her.

Q.      Are you doing okay?  Do you need a break?

A.      Yeah, we could have a short break.

MS. FLOWERS:  Let's take ten minutes, five minutes.  Let's go off the record.

THE VIDEOGRAPHER:  The time right now is 10:09 a.m.  We are off the record.

(Short break.)

THE VIDEOGRAPHER:  The time right now is 10:23 a.m.  We're back on the

CONFIDENTIAL

Page 68

A.          Okay.  Yeah.

Q.          Tell us what that was like.

MR. CHAPUT:  Object to the form.

THE WITNESS:  I think -- it was -- if I was only -- I was going to say only one word, it would be I was very disappointed.

My hopes were sky high.  I thought that this could really mean something to the children and the adolescents that I saw were suffering from the dynamics and the impact of the design of social media, especially the lack of moderation of this harmful content.

And, yeah, I was very excited to be able to make a difference for the children, children and adolescents. And I was -- I was so well prepared for the first meeting.  I had read and printed every study on social media and what we know about the impact on suicide, self-injury, and eating disorders.

So sitting there, about to join the first -- and it was online

CONFIDENTIAL

Page 85

you served on the expert group in 2021?

A.            Yes, I did.

Q.            Did Meta -- outside of the expert group meetings, did Meta ever communicate with you about the Frances Haugen story in The Wall Street Journal?

A.            Yes.  That was one of the occasions where the -- ██████████████████, I'm not sure I pronounced his surname correct, when he wrote us an e-mail.

Before that, I had -- I had contacted the head of the Nordic countries, ██████ ██████ because I was shocked to see what Frances Haugen could tell -- had to tell about the -- yeah, the research that Instagram had been doing and taken action on to improve safety for young -- young people on the platforms.

So, yeah, I thought -- I wrote an e-mail to ████████ to let him know that I didn't see any -- I didn't see any reason to continue in the expert group, when Instagram -- when the top priority of Instagram seemed to be profit over young people's safety.

When I -- as I wrote to him in that e-mail, I thought the expert group was more like a

CONFIDENTIAL

Page 114

Q.        Are you familiar with Meta's claims that you can't take down content because it's therapeutic to kids?

MR. CHAPUT:  Object to the form.

THE WITNESS:  Yes.  Yes, I've heard that before.

And I have -- I have, at more than one circumstance, told ▆▆▆▆ ▆▆▆ and the expert in the expert group that leaving content like this -- sometimes Meta, the reasons they give for not removing content like this is that it's -- it's a person's cry for help, and that they want the family, the closest family members, to see it so that they can reach out to the person and help them.

And what I have pointed to, at least several occasions, is that it is very important, on a social media platform where you can reach thousand and even millions of other young people, that content like this is removed instantly, because it can hurt, and it can even be the reason why a lot of young people take their

Page 127

the topics we are talking about today, suicide and nonsuicidal self-injury.

BY MS. FLOWERS:

Q.        And these are impressions that you've -- sorry.  Strike that.

These are observations that you've gained from your own clinical practice; is that right?

MR. CHAPUT:  Object to the form.

THE WITNESS:  These are observations from my own clinical practice, and it is also based on research.

BY MS. FLOWERS:

Q.        Did there come a time when you resigned from the expert panel?

A.        Yes.  I resigned from the expert panel March -- so a year ago, March 2024.

Q.        What happened to lead you to resign from the expert advisory board?

A.        I had been -- I had been thinking about doing it almost all the time I was there, because I quickly realized that my expertise was not used in the expert group.

In a period, for a while, I also

CONFIDENTIAL

Page 233

CERTIFICATE


I HEREBY CERTIFY that the witness was duly sworn by me and that the deposition is a true record of the testimony given by the witness.

It was requested before completion of the deposition that the witness, LOTTE RUBAEK, have the opportunity to read and sign the deposition transcript.

*Michelle L. Gray*

_____
MICHELLE L. RIDGWAY,
Certified Shorthand Reporter,
(CA-CSR # 14592)
(Certified Court Reporter
(NJ-CCR # XI02126)
Registered Professional Reporter,
Certified Realtime Reporter
and Notary Public
Dated:  April 4, 2025


(The foregoing certification of this transcript does not apply to any reproduction of the same by any means, unless under the direct control and/or supervision of the certifying reporter.)