# Filed Under Seal

# Exhibit V

CONFIDENTIAL

Page 1

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT COURT

STATE OF NEW MEXICO,
EX REL., RAÚL TORREZ,
ATTORNEY GENERAL

NO. D-101-CV-2023-02838

vs.

META PLATFORMS, INC.;
INSTAGRAM, LLC; META
PAYMENTS, INC.; AND META
PLATFORMS TECHNOLOGIES,
LLC

*** CROSS-NOTICED WITH ***
SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES

COORDINATION PROCEEDING
SPECIAL TITLE
[RULE 3.400]

JUDICIAL COUNCIL
COORDINATION
PROCEEDING NO. 5255

SOCIAL MEDIA CASES
_____
THIS DOCUMENT RELATES TO:    For Filing Purposes:
22STCV21355
All cases:
(Christina Arlington
Smith, et al. v. TikTok,
Inc., et al., Case No.
22STCV21355)

* * * * * * * * * * * * * * * * * * * * * * * * * * *
CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
(CAPTION CONTINUED)

CONFIDENTIAL

Page 2

(CAPTION, CONTINUED)

VIDEOTAPED DEPOSITION OF

JASON R. SATTIZAHN, Ph.D.

December 8, 2025

Held at Simon Peragine Smith & Redfearn
1100 Poydras Street, 30th Floor
New Orleans, Louisiana  70163

Reported stenographically by:

Rita A. DeRouen, CCR, RPR
(CCR #2014018)
(RPR #006908)

CONFIDENTIAL

Page 209

study came from my colleague on the virtual reality youth team, the research study itself was an intimate collaboration with Instagram youth team, as well as youth teams on other products.

"The Instagram youth team and their researcher, ███████████, not only helped develop the project, but they committed and planned their own recommendations on how Instagram should alter its age data collection approach based on the findings of the study."

Is that your testimony before Congress?

A.    It is.

Q.    And can you describe the coordination or the collaboration between you and virtual reality and ██████████.

A.    My colleague, Sarah Cayce Savage, was operating -- basically leading the youth team for virtual reality.  And when she approached ████████ on Instagram to talk about age data and how to collect better age data, the Instagram team, through ██████ passed both Cayce and myself a lot of knowledge, existing knowledge, on age data both within Facebook and Instagram, actually guiding us to a researcher in Facebook.

And what was reported to us and what we

CONFIDENTIAL

Page 210

learned from the literature review and the existing research was that the same issues that we had already established in virtual reality in terms of people not being honest about age and also that age data is required to make a platform safe were also a problem with Instagram as well as Facebook.

And so after that knowledge was acquired, my colleague, Cayce Savage, put together a research study along with ███████ saying, Hey, how do we figure out how to get people to give us better age data because that will help us make a safer platform.  That's sort of how the study came to be.

Golkow Technologies,
A Veritext Division                www.veritext.com

Page 237

knowledge base of parents in order to understand Meta's products?

A. Yes.

Q. Would that include how parents acquire knowledge about social media products?

A. Yes.

Q. If you see here on the bottom it says, "This creates a bottom-up dynamic around VR safety."

Do you see that?

A. I do.

Q. "Parent participants mostly rely on trust" -- "rely on and trust their teens to inform them of any issues, as they don't have the knowledge or the proactively" -- "to proactively oversee the experiences they are having."

Is that something that you produced to Congress?

A. Yes, it is.

Q. And what does that mean?

A. One of the recurring findings with parental controls in research that my colleague made, that I myself ran and from other researchers at Facebook and Instagram, is this statement here that parents do not have the knowledge to

CONFIDENTIAL

Page 238

proactively oversee children's experiences.

And what that means is that if a parent doesn't have good tech literacy, if they don't know how a surface functions about how social media or VR works, it's really hard to get them to either, A, have awareness of what these tools are; B, know how to functionally use them to keep someone safe; and also C, and this is very important, to even care enough to try to use them in the first place.

And so between this awareness and knowledge and even just caring about it, this is a finding that was recurring across Meta's products.

Q.   Meta was aware of this while you were employed at Meta, correct?

A.   Correct.

Q.   And this would include the same concept -- it would include Facebook and Instagram users, correct?

MR. STANNER:

Objection; speculation.

BY MR. MIGLIORI:

Q.   This isn't limited to just virtual reality, correct?

MR. STANNER:

Page 406

cross-collaborative environment.

Q. Right. Oh, I'm sorry, I thought you were done.

A. No, it was something that actually -- it was one of the aspects of working there that I really appreciated, is the fact that you can work with anybody. Or they might call you up and be like, Do you want to work on this project with us, like on any part of the products. So...

Q. Right. But -- and this is what I think I'm just trying to drill down on, understanding that the different teams could collaborate, they are different teams; the Instagram researcher team is different than the Reality Labs researcher team?

A. Functionally, yes, there's different actual names of teams.

Q. Right. And there's different people on them. If I showed you an org chart of the Instagram user research team, you wouldn't be on it?

A. Correct.

Q. There would -- presumably there's an org chart of the Reality Labs user research team, right?

CONFIDENTIAL

Page 407

A.   I don't know if I ever saw one, but I would assume there is, yeah.

Q.   I mean, if we had to make a list of who works at user research in Reality Labs from 2021 until 2024, your name would be on it?

A.   Correct.

Q.   Right.  But it wouldn't be on the name on the user research team at Instagram or Facebook or the other apps?

A.   No.

Q.   Okay.  But I do understand -- so, for example, when you wanted to do some work at Reality Labs about age verification, one thing you did is reach out to these other teams at Instagram or elsewhere and say, Show us what you've got on age verification so we can use it in our own research?

A.   Yes, that was an aspect of it.  I wouldn't say that that summarizes all of the working relationship, but that's an aspect of it, yes.

Q.   Right.  And when you'd go to your offsites, for example, that would be offsites of people who worked on VR?

A.   Yes and no.  Actually, we had offsites

CONFIDENTIAL

Page 484

on engagement, that is exactly how the company operates. The pursuit of user engagement is the value that permeated Meta's every decision. For years our workforce was told that the directive to prioritize growth and engagement came from Mark Zuckerberg himself."

Q. Is that your sworn testimony to Congress?

A. It is.

Q. Is that what you understood to be the priorities of Meta while you were there?

MR. STANNER:

Object to the scope.

A. It was.

BY MR. MIGLIORI:

Q. You were asked questions directly by counsel, weren't you, about Mark Zuckerberg, weren't you?

A. I was.

Q. And did you understand that when he was asking you questions about whether or not the information went up to Mark Zuckerberg, that he was talking about the top-down -- the top-down pressures, I think was the term, on your work?

MR. STANNER:

CONFIDENTIAL

Page 485

Same objection.

BY MR. MIGLIORI:

Q.    Do you remember that?

A.    I do, yes.

Q.    And what do you understand, based on the testimony you have here before the Senate, were the top-down pressures of Mark Zuckerberg on the research that you-all did at Meta?

MR. STANNER:

Same objection.  Go ahead.

A.    I understood the top-down pressures from Mark Zuckerberg, the C-suites, and the leaders to be all work needs to be tied to growth and engagement, and that was the prioritizing factor for any work moving forward with the company.

Q.    And was that prioritized over safety in your experience?

MR. STANNER:

Same objection, asked and answered, scope.

A.    Yes.

MR. MIGLIORI:

That's all I have -- actually, that's all I have.

MR. STANNER:

CONFIDENTIAL

Page 503

REPORTER'S CERTIFICATE

I, Rita A. DeRouen, Registered Professional Reporter (RPR #6908) and Certified Court Reporter (Certificate #2014018) in and for the State of Louisiana, as the officer before whom this testimony was taken, do hereby certify that on December 8, 2025, in the above-entitled and numbered cause, the deposition of JASON RYAN SATTIZAHN, Ph.D., after having been duly sworn by me upon authority of R.S. 37:2554, did testify as hereinbefore set forth in the foregoing 502 pages;

That this testimony was reported by me in stenographic shorthand, was prepared and transcribed by me or under my personal direction and supervision, and is a true and correct transcript to the best of my ability and understanding;

That the transcript has been prepared in compliance with transcript format guidelines required by statute or by rules of the board;

That I have acted in compliance with the prohibition on contractual relationships, as

CONFIDENTIAL

Page 504

defined by Louisiana Code of Civil Procedure Article 1434 and in rules and advisory opinions of the board;

That I am not of Counsel, nor related to any person participating in this cause, and am in no way interested in the outcome of this event.

Signed this 15th day of December, 2025.

RITA A. DEROUEN
Registered Professional Reporter
Certified Court Reporter