James P. Rouhandeh, *pro hac vice*
Antonio J. Perez-Marques, *pro hac vice*
Caroline Stern, *pro hac vice*
Kathryn S. Benedict, *pro hac vice*
Corey M. Meyer, *pro hac vice*
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Email:    rouhandeh@davispolk.com
          antonio.perez@davispolk.com
          caroline.stern@davispolk.com
          kathryn.benedict@davispolk.com
          corey.meyer@davispolk.com

*Attorneys for Defendants Meta Platforms, Inc. and Instagram, LLC*

*Additional counsel listed on signature pages*

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>*People of the State of California, et al. v. Meta Platforms, Inc., et al.* | MDL No. 3047<br><br>Case Nos. 4:22-md-03047-YGR-PHK<br>4:23-cv-05448-YGR<br><br>**META'S OPPOSITION TO THE STATE AGS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br>Magistrate Judge: Hon. Peter H. Kang<br><br>Date:  April 15, 2026<br>Time: 1:00 PM<br>Place: Courtroom 1, 4th Floor |

# TABLE OF CONTENTS

PAGE

MEMORANDUM OF POINTS AND AUTHORITIES.................................................................1

BACKGROUND ........................................................................................................................2

I.    The Operation of Instagram and Facebook...................................................................2

II.   Removal of Potential U13s ..........................................................................................3

    A.    Initial Detection of Potential U13s ...................................................................3

    B.    Automated and Human Review ........................................................................5

    C.    Age Checkpoint and Disabling ........................................................................6

    D.    Deletion............................................................................................................7

    E.    Hard-Linking.....................................................................................................9

    F.    Soft-Matching ...................................................................................................9

III.  Machine Learning Models and Data............................................................................10

LEGAL STANDARD ...............................................................................................................12

ARGUMENT .............................................................................................................................15

I.    The AGs Lack Evidence to Establish Standing and a Right to Sue Under COPPA ..........15

II.   The Court Need Not Reach the AGs' Argument Because Their Claim Is Time-Barred.........................................................................................................................17

III.  The AGs' Request for Summary Judgment on Certain Issues Should Be Rejected ..........19

    A.    The AGs Are Not Entitled to Summary Judgment on the Question of Whether Meta Platforms Is the "Operator" of Facebook or Instagram and Whether Instagram, LLC Is the "Operator" of Instagram ....................................19

        1.    The AGs Are Not Entitled to Summary Judgment on the Question of Whether Meta Platforms Is the "Operator" of Facebook ......................19

        2.    The AGs' Request for "Summary Judgment" as to Meta Platforms' Purported Status as "Operator" of Instagram Should Be Rejected as Incomplete and Unsupported...............................................................20

        3.    The AGs Are Not Entitled to Summary Judgment as to Whether Instagram, LLC Is the "Operator" of Instagram Because They Do Not Offer Evidence That Instagram, LLC Meets COPPA's Definition of "Operator"...................................................................................21

4.    The Common Enterprise Theory Does Not Apply to COPPA, and Even If It Did, the AGs Do Not Put Forward Evidence Sufficient to Find a Common Enterprise ...................................................................22

B.    The AGs Are Not Entitled to Summary Judgment on Meta's Purported Collection of "Personal Information" Because Adjudicating This Issue Is Not Permitted Under Rule 56 and the AGs' Argument Is Premised on an Impermissibly Expansive Definition of Personal Information ............................26

1.    The Question of Whether Meta Collects Personal Information Is at Most a Question of Immaterial Fact, Not a Claim, Element, or Portion of an Element of a Claim Brought by the AGs, and It Is Impermissibly Vague ...................................................................26

2.    The AGs' Motion Improperly References Types of Information Beyond the Statutory Definition of Personal Information ........................29

C.    Whether Meta Provides Certain Functions Sometimes Required Under COPPA Similarly Will Not Streamline Any Issues for Trial ...............................31

1.    COPPA's Notice and Parental Consent Requirements Do Not Apply to Meta ...................................................................31

2.    The FTC Permits an Operator to Comply with COPPA by Deleting U13 Data, as an Alternative to Providing Notice and Consent..................32

3.    COPPA's Data Review and Refusal Requirements Also Do Not Apply to Meta and the AGs Lack Evidence That Meta Does Not Meet These Requirements..................................................32

IV.    The AGs Are Not Entitled to Summary Judgment on Their Theory of Alleged Use with "Actual Knowledge" of U13 Data by Meta's Machine Learning and Generative AI Models ...................................................................35

A.    The AGs Should Be Precluded from Making This Argument ..............................35

B.    Meta Does Not Have Actual Knowledge That Any Individual in the Categories of Users the AGs Identify Is U13—And, at a Minimum, There Are Disputes of Fact as to Meta's Actual Knowledge ..........................................36

1.    Meta Does Not Acquire "Actual Knowledge" of U13s at Any Point in the U13 Reporting, Review, and Deletion Process ...............................38

a.    Meta Does Not Actually Know Whether Users Who Change Their Birthdates to a U13 Age Are, In Fact, U13.............38

b.    Meta Does Not Have Actual Knowledge That Users Checkpointed or Disabled After Human Review Are U13 ...........39

c.    Meta Does Not Have Actual Knowledge That Users Whose Accounts Are Deleted After Being Checkpointed Are U13..........41

2.    Meta Does Not Have "Actual Knowledge" That Users Whose Accounts Are Hard-Linked or Soft-Matched to Checkpointed or Disabled Accounts Are U13..................................................42

3.      The AGs Cannot Prove Actual Knowledge by Pointing to Ways They Think Meta Could Have Done More to Discover Unknown U13s ..........................................................................................................45

C.      The AGs Fail to Explain How Meta's Training of Machine Learning and Generative AI Tools on Limited Types of User Data Violates COPPA .................46

1.      The AGs Cannot Establish That Meta's Training of Machine Learning and Generative AI Tools Violates COPPA ................................46

2.      Meta Platforms' Machine Learning and Generative AI Tools Do Not Train on "Personal Information" Within the Meaning of COPPA ...............................................................................................51

3.      Even if Meta Platforms' Use of Machine Learning and Generative AI Tools Theoretically Could Constitute the Knowing Collection of Personal Information from U13s, the AGs Have No Evidence That This Happens in Practice ..................................................................53

CONCLUSION..........................................................................................................................55

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*Adickes v. S.H. Kress & Co.*,
398 U.S. 144 (1970) ........................................................................................................ 13

*Agendia, Inc. v. Becerra*,
4 F.4th 896 (9th Cir. 2021) ............................................................................................. 33

*AGK Sierra de Montserrat, L.P. v. Comerica Bank*,
2020 WL 5107617 (E.D. Cal. Aug. 31, 2020) ......................................................... 19

*Alameda Health Sys. v. Ctrs. for Medicare & Medicaid Servs.*,
287 F. Supp. 3d 896 (N.D. Cal. 2017) ...................................................................... 49-50

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*,
458 U.S. 592 (1982) ........................................................................................................ 15

*In re Amaranth Nat. Gas Commodities Litig.*,
612 F. Supp. 2d 376 (S.D.N.Y. 2009), *aff'd*, 730 F.3d 170 (2d Cir. 2013) ............................ 24

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........................................................................................................ 28

*Berk v. Choy*,
607 U.S. __ (2026), 2026 WL 135974 (Jan. 20, 2026) ........................................................ 48

*Boden v. St. Elizabeth Med. Ctr., Inc.*,
2018 WL 4855210 (E.D. Ky. Oct. 5, 2018) ...................................................................... 31, 34

*Cal. Cosmetology Coal. v. Riley*,
110 F.3d 1454 (9th Cir. 1997) .......................................................................................... 29, 50

*Carr v. United States*,
560 U.S. 438 (2010) ........................................................................................................ 47

*CFTC v. Int'l Berkshire Grp. Holdings*,
2006 WL 3716390 (S.D. Fl. Nov. 3, 2006) ......................................................................... 24

*Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*,
561 U.S. 661 (2010) ........................................................................................................ 19-20

*City of Los Angeles v. Barr*,
941 F.3d 931 (9th Cir. 2019) .......................................................................................... 50

*City of Oakland v. Lynch*,
798 F.3d 1159 (9th Cir. 2015) .......................................................................................... 17

*Conn v. City of Reno*,
591 F.3d 1081 (9th Cir. 2010), *vacated on other grounds*, 563 U.S. 915 (2011), *opinion reinstated in relevant part*, 658 F.3d 897 (9th Cir. 2011) ........................................................ 36

iv

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*,
603 U.S. 799 (2024) .......................................................................................................... 48

*Domanus v. Locke Lord LLP*,
847 F.3d 469 (7th Cir. 2017) ........................................................................................... 46

*Env't Integrity Proj. v. EPA*,
425 F.3d 992 (D.C. Cir. 2005) ........................................................................................ 50

*FCC v. Fox Television Studios, Inc.*,
567 U.S. 239 (2012) ........................................................................................................ 50

*Freeman v. Ethicon, Inc.*,
619 F. Supp. 3d 998 (C.D. Cal. 2022) ............................................................................ 28

*FTC v. E.M.A. Nationwide, Inc.*,
767 F.3d 611 (6th Cir. 2014) ........................................................................................... 25

*FTC v. Network Servs. Depot, Inc.*,
617 F.3d 1127 (9th Cir. 2010) ............................................................................. 24, 25, 26

*FTC v. On Point Cap. Partners LLC*,
17 F.4th 1066 (11th Cir. 2021) ........................................................................................ 25

*FTC v. Surescripts, LLC*,
665 F. Supp. 3d 14 (D.D.C. 2023) ................................................................................... 28

*Gates v. MCT Grp.*,
93 F. Supp. 3d 1182 (S.D. Cal. 2015) .................................................................. 37-38, 39, 43

*Glob.-Tech Appliances, Inc. v. SEB S.A.*,
563 U.S. 754 (2011) ........................................................................................................ 44

*Harris v. Cnty. of Orange*,
17 F.4th 849 (9th Cir. 2021) ............................................................................................ 55

*Harrison v. United States*,
708 F.2d 1023 (5th Cir. 1983) ............................................................................... 37, 39, 43

*Hekel v. Hunter Warfield, Inc.*,
118 F.4th 938 (8th Cir. 2024), *petition for cert. denied*, 146 S. Ct. 294 (2025) ..................... 17

*Idaho Farm Bur. Fed'n v. Babbitt*,
58 F.3d 1392 (9th Cir. 1995) ........................................................................................... 50

*Institutional S'holder Servs., Inc. v. SEC*,
142 F.4th 757 (D.C. Cir. 2025) ....................................................................................... 51

*Intel Corp. Inv. Pol'y Comm. v. Sulyma*,
589 U.S. 178 (2020) ............................................................................................. 14, 36, 42

*Iselin v. United States*,
270 U.S. 245 (1926) ........................................................................................................ 22

*La. Pub. Serv. Comm'n v. FCC*,
   476 U.S. 355 (1986) ........................................................................................................ 50

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024) ........................................................................................................ 30

*Malhotra v. Steinberg*,
   770 F.3d 853 (9th Cir. 2014) ..................................................................................... 36, 40

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
   475 U.S. 574 (1986) ........................................................................................................ 55

*Miller v. Glenn Miller Prods. Inc.*,
   454 F.3d 975 (9th Cir. 2006) .......................................................................................... 17

*Missouri ex rel. Koster v. Harris*,
   847 F.3d 646 (9th Cir. 2017) ..................................................................................... 15, 16

*Mobil Oil Corp. v. Higginbotham*,
   436 U.S. 618 (1978) ........................................................................................................ 22

*Nat. Res. Def. Council v. EPA*,
   279 F.3d 1180 (9th Cir. 2002) ........................................................................................ 49

*Nat'l Ass'n of Priv. Fund Managers v. SEC*,
   2024 WL 4858589 (N.D. Tex. Nov. 21, 2024) ........................................................... 29-30

*New Mexico ex rel. Balderas v. Tiny Lab Prods.*,
   457 F. Supp. 3d 1103 (D.N.M. 2020) .................................................................... 14, 37, 47

*Oliver v. Ralphs Grocery Co.*,
   654 F.3d 903 (9th Cir. 2011) .......................................................................................... 36

*O'Neal v. Price*,
   531 F.3d 1146 (9th Cir. 2008) ........................................................................................ 48

*Pennsylvania v. Think Fin., Inc.*,
   2016 WL 183289 (E.D. Pa. Jan. 14, 2016) ..................................................................... 24

*Pickern v. Pier 1 Imports (U.S.), Inc.*,
   457 F.3d 963 (9th Cir. 2006) .......................................................................................... 35

*Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health & Hum. Servs.*,
   946 F.3d 1100 (9th Cir. 2020) ........................................................................................ 29

*Robertson v. F. Martin*,
   2021 WL 545895 (C.D. Cal. Jan. 4, 2021) ................................................................. 13, 27

*Rustico v. Intuitive Surgical, Inc.*,
   424 F. Supp. 3d 720 (N.D. Cal. 2019), *aff'd*, 993 F.3d 1085 (9th Cir. 2021) ....................... 18

*Schiff v. Barrett*,
   2011 WL 6963096 (N.D. Cal. Sept. 8, 2011) ............................................................. 26-27

*S. Cal. Gas Co. v. City of Santa Ana*,
    336 F.3d 885 (9th Cir. 2003) ............................................................................... 54

*Soremekun v. Thrifty Payless, Inc.*,
    509 F.3d 978 (9th Cir. 2007) ........................................................................... 12-13

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ........................................................................................... 17

*Sprint Corp. v. FCC*,
    315 F.3d 369 (D.C. Cir. 2003) ........................................................................... 50

*State Farm Fire & Cas. Co. v. Geary*,
    699 F. Supp. 756 (N.D. Cal. 1987) ..................................................................... 28

*Successor Agency to Former Emeryville Redevelopment Agency v. Swagelok Co.*,
    2023 WL 3805256 (N.D. Cal. June 1, 2023) .................................................. 35-36

*Table Bluff Rsrv. (Wiyot Tribe) v. Philip Morris, Inc.*,
    256 F.3d 879 (9th Cir. 2001) ............................................................................. 15

*Tolan v. Cotton*,
    572 U.S. 650 (2014) ........................................................................................... 13

*United States ex rel. Landis v. Tailwind Sports Corp.*,
    234 F. Supp. 3d 180 (D.D.C. 2017) .................................................................... 28

*Utah Div. of Cons. Prot. v. Stevens*,
    398 F. Supp. 3d 1139 (D. Utah 2019) ................................................................ 16

*Util. Air Regul. Grp. v. EPA*,
    573 U.S. 302 (2014) ........................................................................................... 33

*Ventura Content, Ltd. v. Motherless, Inc.*,
    885 F.3d 597 (9th Cir. 2018) ......................................................................... 14, 37

*Walsh v. Bowers*,
    561 F. Supp. 3d 973 (D. Haw. 2021) .................................................................. 45

*WildEarth Guardians v. U.S. Forest Serv.*,
    70 F.4th 1212 (9th Cir. 2023) ....................................................................... 15, 16

*Yates v. United States*,
    574 U.S. 528 (2015) ........................................................................................... 30

*Zamani v. Carnes*,
    491 F.3d 990 (9th Cir. 2007) ............................................................................. 20

*Zetwick v. Cnty. of Yolo*,
    850 F.3d 436 (9th Cir. 2017) ............................................................................. 44

*Zurbriggen v. Twin Hill Acquisition Co.*,
    338 F. Supp. 3d 875 (N.D. Ill. 2018) ...................................................... 37, 40, 43

S̲t̲a̲t̲u̲t̲e̲s̲ ̲&̲ ̲R̲u̲l̲e̲s̲

1 U.S.C. § 1 .......................................................................................................... 47

5 U.S.C. § 703 ..................................................................................................... 51

5 U.S.C. § 706 ......................................................................................... 49, 50, 51

12 U.S.C. § 5538 .................................................................................................. 23

15 U.S.C. § 6501 ............................................................................................ passim

15 U.S.C. § 6502 ............................................................................................ passim

15 U.S.C. § 6504 ................................................................... 15, 16-17, 23, 48

15 U.S.C. § 6505 .......................................................................................... 15, 22

28 U.S.C. § 1658 .......................................................................................... 15, 17

16 C.F.R. § 312 .................................................................................................... 13

16 C.F.R. § 312.1 ................................................................................................. 13

16 C.F.R. § 312.2 ............................................................................................ passim

16 C.F.R. § 312.3 ............................................................................................ passim

16 C.F.R. § 312.4 ................................................................................................. 14

16 C.F.R. § 312.5 ................................................................................................. 14

16 C.F.R. § 312.6 .......................................................................................... 14, 32

Fed. R. Civ. P. 56 ........................................................................................... passim

O̲t̲h̲e̲r̲ ̲A̲u̲t̲h̲o̲r̲i̲t̲i̲e̲s̲

10B *Wright & Miller's Federal Practice & Procedure* § 2734 ..................................... 19

64 Fed. Reg. 22750 (Apr. 27, 1999) ................................................................ 48, 49

64 Fed. Reg. 59888 (Nov. 3, 1991) ....................................................... 21, 23, 45, 49

76 Fed. Reg. 59804 (Sept. 27, 2011) ................................................................ 14, 37

89 Fed. Reg. 2034 (Jan. 11, 2024) ....................................................................... 37

144 Cong. Rec. S12741 (daily ed. Oct. 21, 1998) ....................................... 30, 33, 37

H.R. 4667, 105th Cong. §105 (1998) ..................................................................... 36

S. 2326, 105th Cong. § 2 (1998) ........................................................................... 36

Commission Regulation 2016/679 of Apr. 5, 2016, General Data Protection Regulation, 2016 O.J. (L 119) art. 12(3) (EU) ..................................................................... 8

## MEMORANDUM OF POINTS AND AUTHORITIES

The AGs' motion for partial summary judgment relies on materially disputed facts and on a critically mistaken understanding of the legal scope of the Children's Online Privacy Protection Act of 1998 ("COPPA"). It accordingly should be denied in its entirety.

Only one portion of the AGs' motion is even addressed to an alleged COPPA violation. But that argument—that Meta[1] impermissibly used data of children under 13 ("U13") for training machine learning and generative AI models after purportedly acquiring "actual knowledge" through its U13 detection and removal efforts—is fatally flawed. In addition to the fact that the AGs should be precluded from even making this argument, the AGs' motion rises or falls on a question of Meta's state of mind: namely whether, as the AGs contend, the Court should *infer* "actual knowledge" that particular users were U13 from the decisions made by Meta Platforms, Inc. ("Meta Platforms") as part of its detection and removal efforts, or whether, as Meta's witnesses have testified, Meta Platforms' efforts are based simply on a *possibility* of U13 status and that indications that a user is potentially U13 frequently do *not* reflect true U13s. This state of mind question is quintessentially one to be determined by the factfinder and is moreover an issue on which the AGs cannot establish Meta's "actual knowledge" as a matter of undisputed fact. (Indeed, Meta has moved for summary judgment based on the AGs' *lack* of evidence of actual knowledge.) Because the AGs' sole theory of liability turns on patently disputed state of mind evidence, their motion should be denied on this basis alone.

This portion of the AGs' motion furthermore is premised on an incorrect understanding of COPPA's requirements. The AGs' motion asks the Court to find a violation based only on the alleged subsequent *use* (with purported actual knowledge) of U13 data collected *prior* to Meta's alleged acquiring of actual knowledge. But this proposition, even if established at trial, would not give rise to liability under COPPA, which by its plain language applies only to an operator who "is collecting" U13 data with actual knowledge and is silent as to the use of data previously collected without such knowledge. To the extent the FTC has purported to go beyond that plain

---

[1] For purposes of this memorandum of law, Meta is used to refer to Meta Platforms, Inc. and Instagram, LLC.

language in its rulemaking, such regulation exceeds the congressional grant of authority and did not comply with the required rulemaking process. For that reason, too, the AGs' motion cannot succeed.

The balance of the AGs' "motion for partial summary judgment" in fact merely seeks findings on a grab bag of disputed factual propositions that the AGs contend are associated with their COPPA claims. Because none of these findings would suffice to establish liability and many are not even complete elements of a COPPA claim, they are not appropriate matters for summary judgment and would not meaningfully narrow the issues for trial. Each of the requested findings moreover misstates the evidentiary record, the applicable legal standard, or both, precluding a finding in the AGs' favor.

The Court, however, need not even reach the merits of the AGs' motion because no state AG has established its standing to sue, which requires an injury in fact (e.g., the collection of U13 data) to residents of each AG's particular state. The AGs have neither made nor attempted to make such a showing in their motion. In addition, significant disputes concerning the timeliness of all or, at a minimum, substantial parts of the AGs' COPPA claim further render summary judgment inappropriate, given that the AGs' claim plainly relies on evidence outside the applicable limitations period. The existence of such disputes also precludes summary judgment.

**BACKGROUND**

## I.    The Operation of Instagram and Facebook

"Meta Platforms, Inc. is an operator of [platforms] Instagram and Facebook, which are websites or online services for COPPA purposes." ECF No. 2497 at 3.[2] Meta Platforms (formerly known as Facebook, Inc.[3]) has operated Facebook "[a]t all times relevant to the action." ECF 2628 at 2. Currently, Meta Platforms "is [also] responsible for the development and operation of

---

[2] Unless otherwise indicated, all citations to the docket herein refer to docket entries in Case No. 4:22-md-03047.

[3] "Facebook, Inc. changed its corporate name to Meta Platforms, Inc., in 2021." Ex. 1 (Meta's Resps. & Objs. to Pls.' R. 30(B)(6) Written Questions to Meta Defs. on Topics 3-6, Resp. to Question 16) at 10.

Instagram." Ex. 1 (Meta's Resps. & Objs. to Pls.' R. 30(b)(6) Written Questions to Meta Defs. on Topics 3-6, Resp. to Question 48) at 22.

Instagram, LLC is a corporate entity that "holds certain Instagram intellectual property," *id.* at 22; *see also id.* at 20-21 (Resp. to Question 46). It has no permanent employees and does "not currently operat[e] . . . either Instagram or Facebook," ECF No. 2497 at 3. Rather, employees of Meta Platforms oversee and handle the operation of Instagram. *See, e.g.*, AGs' Ex. 32 (listing employees by role and company in 2016).[4]

## II.    Removal of Potential U13s

### A.    Initial Detection of Potential U13s

Meta Platforms' policies prohibit U13s from creating Facebook or Instagram accounts. Throughout the relevant period, Facebook's and Instagram's terms of service have prohibited U13s from joining either platform. *See* Ex. 2 at -0001 ("[A user] must be at least 13 years old to use [Instagram]."); Ex. 3 (Meta's Second Am. R&Os to Pls.' Third Set of RFAs, Second Am. Resp. to RFA 20) at 4 ("Since at least 2012, Facebook's Terms of Service have prohibited individuals under the age of 13 from creating a Facebook account. . . . [U13s] are not permitted to create an account . . . ."); Ex. 4 (Hartnett Dep.) at 39:22-40:14. Any users creating a new Facebook or Instagram account are required to provide their date of birth, and those who enter a date of birth indicating that they are under the age of 13 are blocked from registration for the following 12 hours.[5] *See* Ex. 6 (Hartnett Dep. Ex. 6) at 25-26; Ex. 7 at -0501 (Facebook); Ex. 8 at -7875; Ex. 4 (Hartnett Dep.) at 45:25-46:7 (Instagram).

Moreover, Meta Platforms employs various mechanisms to detect potential U13s who join Facebook or Instagram in violation of Meta Platforms' policies. Over time Meta Platforms has employed various such mechanisms, including: (i) allowing individuals to report potential U13s, *id.* at 116:24-118:2; (ii) internally escalating potential U13s for review when a Meta Platforms

---

[4] Exhibits submitted in connection with the AGs' motion for partial summary judgment are cited in the form AGs' Ex. ___.

[5] Facebook has required date of birth at account sign-up since at least 2009, and Instagram has required date of birth at account sign-up since December 2019. *See* Ex. 6 (Hartnett Dep. Ex. 6) at 22, 25.

employee sees information suggesting an account may belong to a U13, *id.* at 102:3-16; (iii) performing "cross-platform checks" (i.e., propagating U13 age enforcement across accounts that may belong to the same user through hard-linked connections), *id.* at 109:13-111:13; (iv) employing a proactive U13 heuristic (a text-based approach that reviews the written content in an account's profile for explicit or implicit statements of age), *id.* at 115:13-117:15; (v) requiring age verification when certain users change their age from under-18 to 18-plus, *id.* at 107:6-108:3; and (vi) requiring age verification when a user changes their account date of birth to one that would make them U13, *id.* at 103:5-18.

These mechanisms seek to identify *potential* U13s. The identification of a particular account through one or more of these means does not, however, signify that such user is necessarily U13. As explained herein, many of the users identified by these mechanisms turn out not to be U13, but because Meta Platforms wants to encourage reporting of potential U13 accounts (among other types of violative conduct), it designed its detection mechanisms to err on the side of over-inclusiveness. *See* Ex. 9 (Memon Rebuttal Rep.) ¶¶ 72-73.

Some of the inputs the mechanisms rely on, such as third-party reporting, "can easily be falsified." *Id.* ¶ 72. Indeed, because Meta Platforms checkpoints (i.e., requires ID age verification), disables, and may ultimately delete accounts reported as U13, bad actors can and do utilize U13 reporting mechanisms as an "attack factor" to harass or bully others online, or to get others' accounts taken down. *See* Ex. 4 (Hartnett Dep.) at 210:11-19. For example, well-known celebrities or organizations are regularly reported to be U13, including Kim Kardashian, French President Emmanuel Macron, the electronics company Logitech (reported over 250 times), and the Israeli Defense Forces (reported over 1 million times). Ex. 10 at -3249.

Meta Platforms' human reviewers err on the side of "checkpointing"—i.e., disabling a suspected U13 account until the account owner verifies with ID that they are 13 or over—accounts they review, which results in many individuals aged 13 or over inadvertently being checkpointed and unable to access their account, *see infra* Background Parts II.B-C. Similarly, when Meta Platforms propagates a checkpoint across accounts that are formally linked by users in Accounts Center ("hard-linked") to the suspected U13 account, the enforcement does not guarantee that the

hard-linked account belongs to a suspected U13 as not all hard-linked accounts are operated by the same person, *infra* Background Part II.E.

Even accounts with owners who change their date of birth to be U13 do not necessarily belong to U13 users. Malicious users understand that changing the age on an account to one that would render the user a U13 will trigger the checkpointing, disablement, and deletion of the account and its associated data. *See* Ex. 6 (Hartnett Dep. Ex. 6) at 22. Actors who wish to conceal prior problematic online activity, such as fraud, have deployed this tactic to evade detection. *See id.* At times, abuse of this method has been so pervasive that "70% of accounts who edit [their date of birth] to U13 seem to be involved in fraud." *Id.* Hackers, as well, have abused the associated automatic checkpointing mechanism to steal account access from legitimate users. *See* Ex. 11 at -7605 (July 13, 2022 email indicating that Meta Platforms had resolved an issue whereby "blackhat[s]" were able to hack into accounts and change the user's date of birth to reflect a U13 age and then successfully log into accounts by "complet[ing] . . . the checkpoint"). Abuse of the U13 reporting function has created a situation where, even though Meta Platforms instructs its human reviewers to checkpoint the account when they are uncertain if the owner is U13, *see* Ex. 12 at -8735, in the United States, only "14[%] of [human-reviewed] reports . . . are ultimately checkpointed," Ex. 4 (Hartnett Dep.) at 246:23-247:3-9.

### B.    Automated and Human Review

Once a potential U13 account has been identified, that account is subject to multilevel review to determine whether it should be placed in an age checkpoint.

*First*, all detected potential U13 accounts undergo automated review. Accounts that are flagged because the date of birth was changed to be U13 are automatically placed in an age checkpoint. *See* Ex. 4 (Hartnett Dep.) at 103:5-16; Ex. 6 (Hartnett Dep. Ex. 6) at 4. For the remaining accounts, automated systems filter out from the review process any accounts that cannot be manually reviewed—for instance, those with no media, posts, or bio. *See* Ex. 4 (Hartnett Dep.) at 179:15-180:6; Ex. 6 (Hartnett Dep. Ex. 6) at 4-5. The automated systems also filter out accounts that clearly belong to older users, such as those that have previously successfully appealed being flagged for potentially being U13, have existed for more than eight years, or are predicted to belong

to an individual 18 or over. *See id.* Accounts that are filtered out from the review process are not disabled or subject to additional age verification processes.

*Second*, human reviewers assess the remaining subset of potential U13 accounts—roughly 50% of all those identified—to determine whether they should be checkpointed. *See* Ex. 6 (Hartnett Dep. Ex. 6) at 5. Such review involves, e.g., looking to see if the user has admitted their age in their account biography (Instagram) or profile (Facebook) or posted photographs indicating the account holder may be a U13. *See id.* Reviewers are instructed to err on the side of over-inclusiveness and to place the account in an age checkpoint even when they "are *uncertain* as to whether or not the [account owner] is [U13]." Ex. 12 at -8735 (emphasis added); *see also* Ex. 4 (Hartnett Dep.) at 103:19-104:12 (noting that reviewers are told to "err on the side of [checkpointing]").

## C. Age Checkpoint and Disabling

At the next phase of the review process, accounts that were automatically escalated or were manually reviewed and flagged as possibly U13 are placed in an "age checkpoint." *See* Ex. 4 (Hartnett Dep.) at 105:11-21. Because human reviewers act on limited information and are instructed to err on the side of checkpointing the account when uncertain, "a checkpointed account . . . is not equivalent to an underage user." *Id.* at 168:16-25. At most, Meta Platforms has a suspicion that a user who is checkpointed may be U13.

While the account is in the age checkpoint, it is disabled. While the account is disabled, the user cannot access the account, engage with content, be seen by others, or use their account, without the user first verifying that they are 13 or over. *See* Ex. 13 (Backstrom Dep. (Dec. 10, 2025) (hereinafter "Backstrom II")) at 142:11-143:20; Ex. 4 (Hartnett Dep.) at 103:15-18. Because users of disabled accounts are "unable to consume content," Ex. 14 (Backstrom Dep. (June 26, 2025) (hereinafter "Backstrom I")) at errata 30:13-22, such accounts no longer generate data that could possibly be used to update models that rely on user activity data as inputs, *see* Ex. 13 (Backstrom II) at 117:2-10.

Users can regain access to their disabled account by verifying they are 13 or over within 30 days of being checkpointed. *See* Ex. 4 (Hartnett Dep.) at 103:15-106:17; *see also* Ex. 15

(Feamster Rebuttal Rep.) ¶ 11 ("[U]sers generally have rights to appeal decisions that result in disabling their accounts, which requires that data remain available."). The only way for users to verify their age is to provide suitable identification. *See* Ex. 4 (Hartnett Dep.) at 104:13-16; *id.* at 106:3-7. On Facebook, for instance, this can be a government-issued ID (e.g., a passport, birth certificate, or driver's license), or two forms of non-government ID and, for at least one such non-government ID, a photo or date of birth. *See* Ex. 9 (Memon Rebuttal Rep.) ¶ 84.

If the user does not successfully appeal within 30 days, Meta Platforms schedules the account for deletion and the account's disabled status persists through its deletion. *See* Ex. 4 (Hartnett Dep.) at 106:3-7; Ex. 5 (Hartnett Dep.) at 299:14-301:13; Ex. 13 (Backstrom II) at 151:6-9; *see also* Ex. 4 (Hartnett Dep.) at 168:16-25 (explaining that failing the checkpoint indicates that the user "did not appeal [the checkpoint] or did not appeal successfully."). Reasons for a failure to appeal, or appeal successfully, can include lack of access to or an unwillingness to share identification documents and lack of technological sophistication (including on the part of older users), *see* Ex. 9 (Memon Rebuttal Rep.) ¶ 20; *see also id.* ¶ 33 ("Only about 1.3% of teens aged 14 and 15 in the United States have a driver's license."), or simply failure to act within 30 days, Ex. 4 (Hartnett Dep.) at 106:3-7. As a result, just because a user does not appeal successfully or within the time provided does not mean the user is U13.

### D. Deletion

When a user fails to successfully appeal an age checkpoint, Meta Platforms schedules that user's account, along with any associated hard-linked accounts, for deletion and marks the account's historical data as "not intended for business purposes." *See* Ex. 13 (Backstrom II) at 146:22-147:13. The "not intended for business purposes" marking means any data associated with that account will not be used for generative AI[6] or machine learning model training. *See id.*; *see*

---

[6] "Generative Artificial Intelligence (AI) is a system of algorithms or computer processes that can create novel output in text, images or other media based on user prompts. These systems are created by programmers who train them on large sets of data." *Generative Artificial Intelligence*,

7

*also id.* at 161:22-162:9 (confirming that excluding data from "business use" means it is not used for machine learning model training); *id.* at 145:4-18 (confirming that disabled account data is also flagged for nonuse in generative AI training); Ex. 14 (Backstrom I) at 40:11-21 (same). As the director of product management for Central Youth at Meta Platforms explained, "any systems that would be processing the account[']s data ignore [it]." Ex. 5 (Hartnett Dep.) at 339:9-15. "Basically[,] the account has a flag on it that says disabled, and therefore [its] data is not processed." *Id*. While some short delays can occur in propagating the account's 'not for business purposes' status across all systems given the "practicalities of . . . data being logged from one system to another," the practical impact of such delays would be "minute" since "the system relies on one's own data . . . and history to provide . . . a [] personalized experience," and the user has not been able to generate any new data for collection since the account was disabled. Ex. 14 (Backstrom I) at 29:24-31:8.

Meta Platforms retains the data of accounts scheduled for deletion (marked as "not intended for business use") for 45 days after the end of the appeal process to satisfy legal review and other obligations.[7] *See* Ex. 5 (Hartnett Dep.) at 300:7-13, 301:6-13; Ex. 13 (Backstrom II) at 147:3-148:3, 151:2-9. Retaining data for this purpose is standard industry practice and required by law in some jurisdictions. *See, e.g.*, Commission Regulation 2016/679 of Apr. 5, 2016, General Data Protection Regulation, 2016 O.J. (L 119) art. 12(3) (EU) (requiring controllers of information to respond to information erasure requests within one month, with extensions potentially adding two additional months); *see also* Ex. 15 (Feamster Rebuttal Rep.) ¶ 145 (noting that "[m]ost platforms have multi-week appeal/recovery windows," and that "Google, Microsoft, and Apple all have multi-stage deletion processes"). After this 45-day retention period, Meta Platforms permanently deletes the data through a process that takes 90 days. Ex. 5 (Hartnett Dep.) at 301:15-19. Meta Platforms' 90-day backend deletion process also "represents a reasonable amount of time for

---

National Library of Medicine, https://www.nnlm.gov/guides/data-thesaurus/generative-artificial-intelligence (last accessed Feb. 25, 2026).

[7] At different times in the past, this retention period has been six months or one year. *See* Ex. 5 (Hartnett Dep.) at 299:22-24, 300:21-25.

distributed systems to propagate deletions across geographically distributed data centers and backup systems." Ex. 15 (Feamster Rebuttal Rep.) ¶ 145.

### E.    Hard-Linking

Users can hard-link their accounts by connecting two or more accounts in a single Accounts Center,[8] but not every hard-linked account in a single Accounts Center necessarily belongs to the same user. *See* Ex. 4 (Hartnett Dep.) at 110:8-17. When users hard-link their accounts, "all [Meta Platforms] can say is . . . that those people know each other or have the logins[.]" Ex. 4 (Hartnett Dep.) at 212:22-213:1. In practice, hard-linked accounts are "often . . . *not* controlled by the same person," *id.* 213:8-10 (emphasis added), as Meta Platforms' research shows, *see* Ex. 16 at -0002, slide 12 (13% of IG users and 17% of FB users unlinked their account from Accounts Center because "[o]ther people use or access it" (e.g., shared accounts) and 11% of IG users and 13% of FB users unlinked an account from Accounts Center because "it d[idn't] belong to [them]"). For example, parents might hard-link accounts with their teenager to monitor their teen's online activity. *See* Ex. 17 at -0001, slide 11; Ex. 18 at -0004. While Meta Platforms has used hard-linked connections to facilitate U13 enforcement since at least 2021, the uncertainty about user control imposes a tradeoff because Meta Platforms cannot confidently know whether any specific hard-linked accounts belong to the same user. *See* Ex. 6 (Hartnett Dep. Ex. 6) at 6-7.

### F.    Soft-Matching

Soft-matching is a process for estimating more tenuous relationships between accounts. The practice utilizes various inputs or signals, including "IP address patterns, . . . device fingerprints, . . . session timing patterns, cookie data, and other behavioral signals," Ex. 15 (Feamster Rebuttal Rep.) ¶ 133, to estimate the likelihood that two accounts belong to the same person, relying on probabilistic inferences. Given the limitations on the specificity of the data used, however, "[s]hared household devices, dormitory networks, and library computers [can] create false matches." *Id.* Soft-matching is "*[h]ighly* inaccurate to identify whether a specific account is definitely part of an individual cluster" because it focuses on "accuracy at the level of

---

[8] The Accounts Center feature enables Meta Platforms users to connect and centrally manage their Facebook, Instagram, and other Meta Platforms accounts. *See* Ex. 4 (Hartnett Dep.) at 110:8-17.

hundreds of millions of users" rather than "at a single user level." Ex. 6 (Hartnett Dep. Ex. 6) at 12-13 (emphasis added).

In the limited cases for which Meta Platforms employs the process, such as calculating family metrics,[9] employees have noted "noisy" variance, with numbers fluctuating "day to day" because of shifts in the model's tuning or design rather than successful predictions. *Id.* at 12. Meta Platforms "do[es] not analyze trends at a granular level" because of this variance and lack of reliable ground truth.[10] *Id.*

If Meta were to employ soft-matching for age enforcement, there would be a heightened risk of false positives and removing legitimate users due to both the uncertainty in soft-matching mechanisms and the overall rarity of true U13 accounts among Facebook's and Instagram's billions of users, the vast majority of whom are over 18. *See* Ex. 15 (Feamster Rebuttal Rep.) ¶¶ 45-48 (the "base-rate" problem—a natural limitation to the efficacy of binary classifiers—risks "produc[ing] substantial false positive rates"); Ex. 19 (Venkataraman Rebuttal Rep.) ¶¶ 61-63 (Over 90% of Facebook users, and over 80% of Instagram users, are over 18). This means that if soft-matching were implemented for U13 detection, a high number of users over 18 (and 13 or over) would likely be caught up in Meta Platforms' age enforcement processes and required to provide ID to use Meta's platforms. *See* Ex. 15 (Feamster Rebuttal Rep.) ¶¶ 7, 139.

**III.   Machine Learning Models and Data**

Meta Platforms' machine learning models are an integral part of its platforms. It uses such models for various purposes, including to predict user engagement behavior so logged-in users see the most relevant content. *See* Ex. 14 (Backstrom I) at 19:12-18; Ex. 13 (Backstrom II) at 83:4-14. Machine learning models cannot "reproduce the data they were trained on." Ex. 13 (Backstrom II) at 63:14-17. Instead, each training example feeds into "huge neural networks" and may influence a few of these networks' "billions of parameters" to a small degree. *Id.* at 68:5-8.

---

[9] "Family metrics are a model-based metric" that "count[s] the individual people behind user accounts." Ex. 6 (Hartnett Dep. Ex. 6) at 12.

[10] Ground truth is an important element to model building. "It is not real truth," but rather provides human review outcomes, which can then be compared to evaluate the accuracy of classifier results. Ex. 6 (Hartnett Dep. Ex. 6) at 27.

10

The more effective machine learning models work by training continuously on users' generated engagement data, at times almost in real time, *see* Ex. 14 (Backstrom I) at 18:10-19:2, to provide users with content predicted to be most relevant to that user at that time. Because content-moderation models need to "sort an ever[-]evolving corpus of content," *id.* at 18:10-16, they can "get stale within a couple of days," Ex. 13 (Backstrom II) at 69:5-14, requiring daily or hourly updating, *see* Ex. 14 (Backstrom I) at 18:10-19:2. Most of Meta Platforms' models are continuously trained, updating on user behavior at a rate only slightly slower than real time. *See id.* at 18:20-22. As a result, older data becomes "less and less relevant over time," Ex. 13 (Backstrom II) at 64:11-65:1. This process of increasing irrelevance, also called decay, eventually results in any particular training example having a "negligible" impact on the model's weights. *Id.* at 68:16-24. And decay occurs more quickly in "higher-volume systems that are being updated with billions of examples every day." *Id.* at 66:6-10.

Meta Platforms utilizes batch-training—i.e., training machine learning models on batches of previously collected data—less than it uses continuous training on new data. *See id.* at 72:16-19 (stating that "some of the less critical models" are still batch-trained). In particular, "when [Meta Platforms] train[s] a new model," Meta Platforms requires data "from at least a few weeks" to train the model up to the level of a continuously trained one. *Id.* at 70:4-22. Data from accounts disabled after the date of collection theoretically may appear in the historical data used to batch-train certain models. *See id.* at 110:12-111:4 (acknowledging that batches include "data from recent days where [a] user was active, even if they [are] not active [on the date of collection]"); *id.* at 72:7-13 (suggesting that batches have different reach-back windows, such as 30 or 90 days). But, for this unique circumstance to occur, machine learning models must (i) be batch-trained, which, as explained, Meta Platforms is doing with decreasing frequency, and (ii) happen to collect some of their historical training data from fully disabled accounts. Again, however, although the complexity of machine learning renders it hard to ascertain the "exact impact that any particular training example has on the overall model," *id.* at 64:2-5, decay means that any particular training example will have a "negligible" impact on the model, *id.* at 68:9-24.

META'S OPP. TO THE STATE AGS' MOTION FOR PARTIAL SUMMARY JUDGMENT
Case Nos. 4:22-MD-03047-YGR-PHK, 4:23-CV-05448-YGR

Not all data Meta Platforms collects is used for its machine learning models. On Facebook and Instagram, Meta Platforms collects the following types of information as relevant to the AGs' motion: (i) from logged-in users, (a) photo and video metadata, likes, posts, comments, and certain demographic data, such as a user's reported age and gender, *see* Ex. 14 (Backstrom I) at 16:16-18; *id.* at 20:4-21:1; *id.* at 21:13-25; *id.* at 22:2-25, and (b) for Instagram, publicly posted photos for training generative AI, *see* Ex. 14 (Backstrom I) at 37:8-10; and (ii) from all visitors (whether logged-in or not), higher-level data such as cookie data, device ID, and IP addresses when visiting public or registration pages on Facebook or Instagram, *see* Ex. 4 (Hartnett Dep.) at 59:13-60:5; Ex. 6 (Hartnett Dep. Ex. 6) at 2. This higher-level data provides some information about a user, such as their device information and the country, or, at most, the city in which they likely reside. *See* Ex. 13 (Backstrom II) at 115:2-25. Meta Platforms also combines this higher-level data with visitor activity data (i.e., "clicks") on registration and public pages to optimize Facebook and Instagram's usability and security capabilities. *See* Ex. 4 (Hartnett Dep.) at 62:2-11; Ex. 6 (Hartnett Dep. Ex. 6) at 3. These different types of data serve different purposes. For instance, while higher-level data is suitable for optimization purposes, it fails to deliver sufficiently granular data for Meta Platforms' machine learning or generative AI models. *See* Ex. 13 (Backstrom II) at 114:23-115:1 (stating that an IP address is not a useful or directly used signal); *id.* at 115:20-25 (explaining that the most granular location data models use is at the scale of a city); *id.* at 114:14-21 (stating that it is unlikely that Meta Platforms has "ever looked at [cookie IDs]" for model training); *id.* at 113:22-114:2 (stating that role of user ID in model training is limited to a "random number" used to retrieve historical interactions); *id.* at 82:22-25 (expressing uncertainty regarding models using clicks, as they are low indicators of intent).

**LEGAL STANDARD**

**Summary Judgment.** To prevail on their motion for partial summary judgment, the AGs must show that there is no genuine issue as to any material fact and that they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). When, as here, "the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party." *Soremekun v. Thrifty Payless,*

*Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  In determining whether the AGs meet this burden, the "court must view the evidence 'in the light most favorable to the opposing party.'" *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

A party cannot use Rule 56 to move for summary judgment solely as to certain facts that do not themselves establish all or part of a claim or defense.  *See* Fed. R. Civ. P. 56(a); *see, e.g.*, *Robertson v. F. Martin*, 2021 WL 545895, at *2 (C.D. Cal. Jan. 4, 2021) ("[C]ourts throughout the country have held that Rule 56 does not authorize a motion which is solely intended to establish the truth of particular facts.").

**COPPA.**  COPPA regulates operators of a commercial website or online service that meet either of two conditions: (a) the "website or online service is directed to [U13s]" or (b) the operator "has actual knowledge that it is collecting personal information from a [U13]."  15 U.S.C. § 6502(a)(1) (1998).  An operator satisfying either criterion is prohibited from "collect[ing] personal information from a [U13] in a manner that violates" various requirements, including notice, parental consent, and parental review requirements, promulgated by the Federal Trade Commission.  *See id.* § 6502(a), (b); 16 C.F.R. §§ 312.1-312.13 (2025) (FTC's implementing regulations) ("COPPA Rule").

*Operator*.  COPPA defines "operator" as "any person who" (i) "operates a website . . . or an online service" *and* (ii) "collects or maintains personal information from or about the users of or visitors to such website or online service."  15 U.S.C. § 6501(2)(a).

*U13-Directed*.  COPPA defines a "website or online service directed to [U13s]" as either (a) "a commercial website or online service that is targeted to children" or (b) "that portion of a commercial website or online service that is targeted to children."  15 U.S.C. § 6501(10).  The AGs acknowledge that whether Facebook or Instagram is directed to U13s "is not the subject of [their] motion."  ECF No. 2695 (State Attorneys General's Motion for Partial Summary Judgment) (hereinafter "AGs' MSJ") at 18 n.8.

*Actual Knowledge*.  COPPA only applies to a general audience website or online service (i.e., one that is not U13-directed) if the website or online service's operator has "actual knowledge" that it is collecting personal information from a U13 on or through its website or

online service.  15 U.S.C. § 6502(a)(1).  While "actual knowledge" is not defined in COPPA or the COPPA Rule, its plain meaning requires "knowledge that is actual, not merely a possible inference from ambiguous circumstances," *Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597, 609 (9th Cir. 2018); *see also Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 589 U.S. 178, 185 (2020) (distinguishing "actual knowledge" from "constructive knowledge").  Of note, in enacting COPPA, Congress rejected the more general term "knowingly"—which had appeared in an earlier draft bill—to clarify that COPPA incorporated "a far stricter standard than constructive knowledge or knowledge implied from the ambient facts."  76 Fed. Reg. 59804, 59806 n.26 (Sept. 27, 2011). As such, an operator has "actual knowledge" under COPPA only when it has a "direct and clear awareness, as opposed to an awareness attributed to [it] based on what [it] reasonably should have known," that it is collecting data from a U13.  *New Mexico ex rel. Balderas v. Tiny Lab Prods.*, 457 F. Supp. 3d 1103, 1113 (D.N.M. 2020).

***Collection.***  COPPA prohibits operators meeting the U13-directed or actual knowledge criteria from "collect[ing] personal information from a [U13] in a manner that violates" certain requirements promulgated by the FTC.  *See* 15 U.S.C. § 6502(a). The COPPA Rule defines "collects or collection" as "the *gathering* of any personal information from a [U13] by any means." 16 C.F.R. § 312.2 (emphasis added).

***Notice and Parental Consent, Review, and Refusal Requirements.***  If a website is U13-directed or its operator has actual knowledge that it is collecting personal information from a U13, the operator is subject to COPPA's notice and parental consent, review, and refusal requirements. 15 U.S.C. § 6502(b)(1)(A)-(B); *see also* 16 C.F.R. §§ 312.4-312.6 (describing COPPA's notice and parental consent, review, and refusal requirements).  The statute is silent on what an operator must do if it learns that, in the past, it had unknowingly collected personal information from a U13. Nonbinding FTC guidance suggests that when an operator becomes aware that it has information collected from a U13, it should either meet COPPA's notice and parental consent requirements "or delete the [U13's] information."  *Complying with COPPA: Frequently Asked Questions* at H6, FTC (last updated January 2025), https://www.ftc.gov/business-guidance/resources/complying-

coppa-frequently-asked-questions#H.%20General%20Audience%20and%20Teen%20SItes (hereinafter "*COPPA FAQ*").

*Cause of Action.* Violations of COPPA are subject to FTC and state enforcement. 15 U.S.C. §§ 6504(a)(1), 6505(a). These civil actions must be initiated within four years of when the "cause of action accrued." 28 U.S.C. § 1658(a). To prove a COPPA violation under the "actual knowledge" prong, each AG must have evidence that Meta had actual knowledge of collecting personal information from a U13 from their state on Facebook or Instagram. *See* 15 U.S.C. § 6504(a)(1) (providing that a state has a right to sue only "on behalf of the residents of the State").

## ARGUMENT

### I. The AGs Lack Evidence to Establish Standing and a Right to Sue Under COPPA

The Court need not reach the AGs' arguments in support of their motion for partial summary judgment because the AGs lack evidence of standing or a cause of action under COPPA, and have put forward no evidence to support either.

Congress has authorized state AGs to bring suit only in their capacity "as parens patriae." 15 U.S.C. § 6504(a)(1). "States asserting *parens patriae* standing must meet both the basic requirements of Article III standing and the unique requirements of that doctrine." *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 651 (9th Cir. 2017). This means they must show that (1) they suffer an actual or imminent injury in fact that is concrete and particularized; (2) this injury is fairly traceable to the challenged conduct; and (3) this injury is redressable by a favorable ruling from this Court. *Id.* And, they must (4) "articulate an interest apart from the interests of particular private parties" and (5) "express a quasi-sovereign interest." *Id.* (quoting *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 607 (1982)). Further, at this stage of the litigation, the AGs "must offer evidence and specific facts demonstrating each element" of standing. *WildEarth Guardians v. U.S. Forest Serv.*, 70 F.4th 1212, 1216 (9th Cir. 2023). The AGs fail to establish both the first and fourth elements.

On the first element, a *parens patriae* plaintiff must show "injury in fact to the citizens they purport to represent." *Table Bluff Rsrv. (Wiyot Tribe) v. Philip Morris, Inc.*, 256 F.3d 879, 885 (9th Cir. 2001). Here, the AGs claim that Meta is subject to COPPA by virtue of Facebook

15

and Instagram's alleged collection with "actual knowledge" of U13 data. *See* AGs' MSJ at 1.[11] To have standing under this "actual knowledge" theory, each AG must accordingly prove that, with actual knowledge, Meta collected personal information from U13s *in that AG's state*. And at this stage of the litigation, the AGs cannot rely on mere allegations, but must provide evidence that this in fact occurred. *See WildEarth*, 70 F.4th at 1215-16. Yet the AGs have cited no evidence in their motion of *any* instance—much less instances from each AG's state—in which Meta had actual knowledge it was collecting personal information from a U13 who was, at the relevant time, a resident of an AG's state. *See generally* AGs' MSJ. Absent such evidence, each AG fails to demonstrate injury in fact to that AG's residents, and their motion for partial summary judgment—indeed, their entire COPPA claim—should be denied for lack of standing. *WildEarth*, 70 F.4th at 1215-18; *Utah Div. of Cons. Prot. v. Stevens*, 398 F. Supp. 3d 1139, 1146-47 (D. Utah 2019) (dismissing *parens patriae* action for lack of standing where plaintiff failed to show "any concrete injury to its citizens").

For similar reasons, the AGs also cannot satisfy the fourth standing element, as this requires a showing that the injury affects "a sufficiently substantial segment of [each AG's state's] population." *Koster*, 847 F.3d at 651. As noted above, the AGs have not proven COPPA violations with respect to any residents of their state, much less a substantial population thereof. This is an independently fatal defect to the AGs' standing. *See id.* at 652 (dismissing *parens patriae* action for failure to show injury to a substantial segment of the plaintiff's state).

Independent from their lack of standing, the AGs have not shown that they have a cause of action under COPPA. COPPA authorizes a state to bring suit only on behalf of "the residents of the State" in which the AG serves. 15 U.S.C. § 6504(a)(1). Accordingly, to have a cause of action under the "actual knowledge" prong of COPPA, the AGs must show that Meta had actual knowledge that it was collecting personal information from U13s on Facebook and Instagram in each AG state. *See id.* § 6502(a)(1). Moreover, although the statute suggests that an AG can sue

---

[11] As noted in the Legal Standard section, *supra*, the AGs do not argue in their motion that Facebook or Instagram are U13-directed, so their theory of injury—to the extent they can articulate one—must relate to their "actual knowledge" argument.

if it merely has "reason to believe" that the interest of its residents "is threatened or adversely affected," *id.* § 6504(a)(1), the Court should avoid—on constitutional avoidance grounds—any reading that suggests that anything less than injury in fact would suffice to provide a cause of action*, see Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (referring to injury in fact as an "irreducible constitutional minimum" (citation omitted)).  In any event, "[i]f a plaintiff lacks Article III standing, Congress may not confer standing on that plaintiff by statute." *City of Oakland v. Lynch*, 798 F.3d 1159, 1163 (9th Cir. 2015) (citation omitted).

In short, the AGs lack evidence that Meta had actual knowledge of collecting personal information from U13s in *any* AG state, much less each of them, and in support of their motion have proffered no such evidence.  Without that evidence, the AGs' COPPA claim cannot proceed, and the Court need not reach the AGs' other arguments.  *See Hekel v. Hunter Warfield, Inc.*, 118 F.4th 938, 944 (8th Cir. 2024) ("[W]ithout standing, there can be no grant of summary judgment."), *cert. denied*, 146 S. Ct. 294 (2025).

## II.    The Court Need Not Reach the AGs' Argument Because Their Claim Is Time-Barred

The AGs' COPPA claim is, moreover, barred in its entirety by laches, and—to the extent laches does not apply—significant portions of their claim are untimely under the statute of limitations.  Moreover, even if the AGs can point to factual disputes about the timeliness of their claims, such disputes preclude them from obtaining summary judgment.

*First*, as Meta explained in its affirmative summary judgment motion, laches bars a claim when, as here, "*any part* of the alleged wrongful conduct occurred outside of the limitations period," and the defendant was prejudiced thereby.  *Miller v. Glenn Miller Prods. Inc.*, 454 F.3d 975, 997 (9th Cir. 2006) (emphasis added).  Here, COPPA's four-year statute of limitations renders untimely all claims pertaining to events before October 2019.  *See* 28 U.S.C. § 1658.  The AGs' COPPA claim relies on events from well before that date.  *See, e.g.*, AGs' MSJ at 2 (stating that Meta has collected personal information from Facebook and Instagram users since 2012); *id.* at 12 (citing the Instagram terms of service in effect from 2013 to 2018); *id.* at 16 (citing evidence relating to employee rosters from 2016 to 2018).  And, as Meta explained in its affirmative motion, the AGs' delay caused Meta to suffer both expectations-based prejudice in the form of years of

investments in allegedly COPPA-infringing business lines, and evidentiary privilege in the form of loss of employees with knowledge of facts relevant to the AGs' COPPA claim. *See* ECF No. 2704 (Meta's Notice of Motion and Motion for Summary Judgment) (hereinafter "Meta's MSJ") at 52 n.108.

To the extent the AGs invoke a tolling agreement entered between some states and Meta as to Instagram in July 2022 (and later extended to apply to Facebook as of June 2023), that agreement does not apply because it only tolled claims relating to the "provision, design, operation, and promotion of its social media platform, Instagram [and, later, Facebook], to children and teen users," not COPPA claims relating to the collection of personal information from U13s. *See* Ex. 20 (Tolling Agreement at 1); Ex. 21 (Second Amended Tolling Agreement). In any event, even if the tolling agreement applied, the AGs' claims would still be barred by laches because it only tolled claims timely as of December 2021 (for Instagram) and July 2022 (for Facebook). And as of that date, the AGs' claims were already untimely to the extent they target conduct from before December 2017 for Instagram and July 2018 for Facebook (i.e., four years prior). *See, e.g.*, 4:23-cv-05448-YGR, ECF No. 207 (AGs' Am. Compl.) (hereinafter "Compl.") ¶¶ 658, 679, 721. Because the AGs' claims are time-barred, their motion for summary judgment should be denied. *See Rustico v. Intuitive Surgical, Inc.*, 424 F. Supp. 3d 720, 740 (N.D. Cal. 2019) ("[B]ecause Plaintiffs' claims are untimely, the Court must DENY Plaintiffs' motion for partial summary judgment."), *aff'd*, 993 F.3d 1085 (9th Cir. 2021).

*Second*, even if laches does not apply to bar the AGs' claims in their entirety, the statute of limitations would still render untimely all allegations relating to events before October 2019 (or, if the Tolling Agreement applies, before December 2017 and July 2018 for Instagram and Facebook, respectively). To the extent the AGs rely on alleged facts from before that date in their motion for partial summary judgment, those allegations must be disregarded. *See, e.g.*, AGs' MSJ at 2 (stating that Meta has collected personal information from Facebook and Instagram users since 2012); *id.* at 12 (citing the Instagram terms of service in effect from 2013 to 2018); *id.* at 16 (citing evidence relating to employee rosters from 2016 to 2018).

*Third*, even assuming that the AGs can show a genuine dispute of fact as to whether their claims are timely, the mere existence of a dispute with respect to the timeliness of the AGs' claims prevents them from obtaining summary judgment. *See AGK Sierra de Montserrat, L.P. v. Comerica Bank*, 2020 WL 5107617, at *5 (E.D. Cal. Aug. 31, 2020) (denying plaintiff's motion for summary judgment because, even assuming plaintiff could prove elements of claim, "a genuine factual dispute exists with respect to defendant's affirmative defense"); *see also* 10B *Wright & Miller's Federal Practice & Procedure* § 2734 ("Since a single valid defense may defeat recovery, . . . a claimant's motion for summary judgment should be denied when any defense presents significant fact issues that should be tried.").

## III.  The AGs' Request for Summary Judgment on Certain Issues Should Be Rejected

The AGs first seek summary judgment on three purported "elements of COPPA": (1) whether "Meta Platforms, Inc. and Instagram, LLC are 'operators' of Instagram"; (2) whether "Meta collects 'personal information' from users of Facebook and Instagram, including those who visit Facebook and Instagram without logging into an account"; and (3) whether "Meta has . . . provided COPPA's protections for any children under 13 . . . on Facebook or Instagram." AGs' MSJ at ii.  Only the first is an element of COPPA; neither the second nor the third so-called "element" is a proper issue for summary judgment.  Further, partial summary judgment is not warranted on any "element" based on the facts alleged here.

### A.  The AGs Are Not Entitled to Summary Judgment on the Question of Whether Meta Platforms Is the "Operator" of Facebook or Instagram and Whether Instagram, LLC Is the "Operator" of Instagram

#### 1.  The AGs Are Not Entitled to Summary Judgment on the Question of Whether Meta Platforms Is the "Operator" of Facebook

The AGs' request for summary judgment as to whether Meta Platforms is the "operator" of Facebook should be denied as moot.  The parties have already stipulated that Meta Platforms is currently the "operator," as that term is used in COPPA, of Facebook, and has been "[a]t all times relevant to the Action."  ECF No. 2628 at 2.  As a result, there is no issue for the Court to adjudicate, and the AGs are not entitled to summary judgment on it.  *See Christian Legal Soc. Chapter of the Univ. of Cal., Hastings Coll. of the L. v. Martinez*, 561 U.S. 661, 677-78 (2010)

("But factual stipulations are formal concessions . . . that have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact. Thus, a judicial admission . . . is conclusive in the case." (internal quotation marks and citation omitted)).

### 2. The AGs' Request for "Summary Judgment" as to Meta Platforms' Purported Status as "Operator" of Instagram Should Be Rejected as Incomplete and Unsupported

The AGs' motion for summary judgment as to whether, for some undefined time period prior to December 1, 2025, Meta Platforms was the "operator" of Instagram is also unavailing.

*First*, the factual proposition that the AGs ask the Court to resolve as a matter of law is too vague to be determined, since the AGs have failed to specify for what time period they ask the Court to find that Meta Platforms was the "operator" of Instagram. Meta Platforms does not dispute that it *is presently* the "operator" of Instagram. *See* ECF No. 2497 (Meta's Letter Br. Opp. AGs' MSJ) at 3 ("Meta does not dispute that Meta Platforms, Inc. *is* an operator of Instagram and Facebook, which are websites or online services for COPPA purposes.") (emphasis added). But it does dispute, because the AGs have failed to show—despite their burden to do so—whether and for what period Meta Platforms was the "operator" of Instagram at any point before December 1, 2025, the date Meta filed the pre-motion letter-brief conceding this point. *See id.* The AGs have neither identified the time period for which they seek a ruling from the Court nor proffered evidence establishing the absence of a genuine dispute of fact as to Meta Platforms' operator status during that period. It would be improper for the AGs to seek to do so for the first time on reply. *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.").

The AGs' position moreover disregards the statutory definition of "operator." Under COPPA, to constitute an "operator" is defined as an entity engaged in the "collect[ion] or maint[enance] [of] personal information." 15 U.S.C. § 6501(2)(A). Yet in support of their argument the AGs have offered no evidence as to Meta Platforms' collection of personal information from Instagram users. *See* AGs' MSJ at 12-17. Instead, the AGs point generally to Meta Platforms' role as the entity "responsible for the development and operations of Instagram" and evidence of how Meta Platforms represents itself in the Instagram terms of service as the

20

"provide[r]" of the "Instagram Service."  AGs' MSJ at 12 (citations omitted).  This evidence fails to satisfy the statutory definition of an "operator," much less to do so as a matter of law for all points in time prior to December 2025.[12]  Accordingly, summary judgment on this issue must be denied.

        **3.**       **The AGs Are Not Entitled to Summary Judgment as to Whether Instagram, LLC Is the "Operator" of Instagram Because They Do Not Offer Evidence That Instagram, LLC Meets COPPA's Definition of "Operator"**

The AGs' argument that Instagram, LLC is an operator of Instagram likewise disregards the statutory definition of "operator" and fails for the same reason.  *See* 15 U.S.C. § 6501(2).  Despite correctly acknowledging that evidence of the collection or maintenance of personal information is required to make this showing, *see* AGs' MSJ at 11-12, the AGs point to no evidence indicating that Instagram, LLC collects or maintains personal information from or about users of Instagram, as is required to establish that Instagram, LLC is an "operator," *see* 15 U.S.C. § 6501(2).  The facts the AGs attempt to marshal in support of this argument—for instance, the naming of Instagram, LLC as the "owner" of Instagram in the Instagram terms of service from 2013 to 2018, or Instagram, LLC's status as "the declared owner of numerous platform-specific trademarks on file with the U.S. Patent Office," AGs' MSJ at 12-13—address only "ownership" of certain intellectual property and registrations, not the required collection of data.  Elsewhere, in fact, the AGs acknowledge that the role of Instagram, LLC is limited to serving as the repository of certain IP and registrations.  *See* AGs' MSJ at 15-16; *see also* Ex. 1 (Meta's Resps. & Objs. to Pls.' R. 30(B)(6) Written Questions to Meta Defs. on Topics 3-6, Resp. to Question 46) at 20-21 ("Instagram, LLC holds certain Instagram intellectual property.").  As discussed *infra* Part III.A.4, an entity's "characterization as a corporate affiliate" is entirely irrelevant to this inquiry.  64 Fed. Reg. 59888, 59891 (Nov. 3, 1999).  The AGs' motion on this issue should therefore be denied.

---

[12] The FTC expressly rejected requests from "[a] number of commenters" to adopt "various tests to determine how corporate affiliates should be treated under the Rule" as irrelevant to the "operator" inquiry, reasoning that "an entity's status as an operator or third party under the Rule should be determined *not by its characterization as a corporate affiliate, but by its relationship to the information collected*."  64 Fed. Reg. 59888, 59891 (Nov. 3, 1999) (emphasis added).

**4.     The Common Enterprise Theory Does Not Apply to COPPA, and Even If It Did, the AGs Do Not Put Forward Evidence Sufficient to Find a Common Enterprise**

In a final effort to contend that both Meta Platforms and Instagram, LLC are "operators" of Instagram under COPPA, the AGs argue that the two entities form a common enterprise. AGs' MSJ at 13. This argument should be rejected because the common enterprise doctrine does not apply (and cannot be extended) to COPPA, and the AGs' "common enterprise" argument is premised on disputed material facts.

There is no case applying the common enterprise theory to COPPA, and this Court should reject the AGs' request to create new law by doing so. The AGs point to no statutory basis for concluding that theory is applicable to COPPA, nor do they identify any gap in COPPA that needs to be filled by invocation of the common enterprise theory. *Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625 (1978) ("There is a basic difference between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically enacted."). Their request would have this Court read an absent concept into the statute resulting "not [in] a construction of [the] statute, but, in effect, an enlargement of it by the court, so that what was omitted . . . may be included within its scope." *Iselin v. United States*, 270 U.S. 245, 251 (1926). But Congress in drafting COPPA clearly defined the scope of the statute by specifying the meaning of "operator" and setting out the two conditions under which an "operator" of a website or online service falls within COPPA's ambit. *See* 15 U.S.C. §§ 6501(2), 6502(a)(1), 6502(b)(1)(A).

The AGs' reliance on the use of the common enterprise doctrine in FTC Act cases is misplaced. Their position is based on the observations that (i) the common enterprise doctrine has been applied in FTC Act actions and (ii) COPPA states that a violation of a COPPA regulation shall be treated as a violation of the unfair or deceptive act or practice rule prescribed under the FTC Act. AGs' MSJ at 14 (citing ECF No. 1214 (Order Largely Denying in Part Meta's Motion to Dismiss the Multistate Attorneys General Complaint) at 18). But the AGs omit that the provision treating violations of the COPPA Rule under the FTC Act is "subject to" section 6505 of COPPA, which concerns the FTC's authority to enforce violations of COPPA. 15 U.S.C. §§ 6502(c), 6505. The AGs' enforcement authority is premised on a different grant of authority,

which does not incorporate the FTC Act, and which enumerates specific remedies that do not extend to violations of an FTC Act rule. 15 U.S.C. § 6504. Accordingly, there is no statutory basis to read the FTC's authority and precedent under the FTC Act into the authority of the AGs to enforce COPPA, which is circumscribed by 15 U.S.C. § 6504.

The FTC has moreover considered and rejected attempts by state AGs to expand the COPPA Rule to cover corporate affiliates, on the basis that doing so would be contrary to the goal of COPPA. 64 Fed. Reg. 59888, 59891 (Nov. 3, 1999) (rejecting comments from a group of state AGs). In so doing, the FTC stated that "an entity's status as an operator or third party under the Rule should be determined not by its characterization as a corporate affiliate, but by its relationship to the information collected under the factors described in the [Notice of Proposed Rulemaking]." *Id.* The FTC went on to state, "[n]ot all affiliates play a role in collecting or maintaining the information from children, and making an entity an operator subject to the Act simply because one of its affiliates collects or maintains information from children online would not serve the goals of the COPPA." *Id.*

The AGs' reliance on courts' application of the common enterprise doctrine to the Mortgage Assistance Relief Services Rule ("MARS"), including in an AG enforcement action of that rule, is equally misplaced. AGs' MSJ at 14-15. The AGs neglect to mention the material difference between the MARS implementing statute and COPPA. Under the MARS implementing statute, (1) the FTC is granted authority to enforce the MARS Rule "in the same manner, by the same means, and with the same jurisdiction, as though all applicable terms and provisions of the [FTC] Act were incorporated into and made part of this section," and (2) state AGs are empowered to "obtain penalties and relief provided in . . . the [FTC] Act." 12 U.S.C. § 5538(a)(3), (b)(1)(D). COPPA has no similar provisions incorporating any portion of the FTC Act, and as a result, there is no basis to engraft the common enterprise theory onto COPPA.

The AGs' reliance on the application of the common enterprise doctrine in a Commodity Exchange Act ("CEA") decision in the Southern District of Florida, AGs' MSJ at 15, fares no better. A U.S. District Court in Florida applying the doctrine in a default judgment CEA case has

no relevance to the separate statutory provisions of COPPA.[13]  Notably, that Florida decision did not explain *why* it applied the common enterprise doctrine under the CEA, and defendants did not object to its expansion in that context because they had defaulted.  *CFTC v. Int'l Berkshire Grp. Holdings*, 2006 WL 3716390, at *1, *7 (S.D. Fla. Nov. 3, 2006).

Regardless, the AGs have failed to establish as a matter of undisputed fact that a common enterprise exists between Meta Platforms and Instagram, LLC.  The Ninth Circuit has found a common enterprise under the FTC Act where evidence established businesses "were co-participants in the [at-issue] unlawful practices" and those businesses "pooled resources, staff, and funds," had common ownership and management, and were "beneficiaries of and participants in a shared business scheme" that was proper subject of "the FTC Act."  *FTC v. Network Servs. Depot, Inc.*, 617 F.3d 1127, 1142-43 (9th Cir. 2010).  The documents and narrow portion of testimony cited by the AGs in support of this argument do not suffice to satisfy the applicable standard—and the significance of this meager evidence is disputed.

The documents cited by the AGs would establish at most that *Meta Platforms is currently* the operator of Instagram.  The AGs offer no substantive evidence related to *Instagram, LLC*'s operations at all—no evidence of pooled resources, staff, and funds; no evidence of common ownership and management; and no evidence of any participation by Instagram, LLC and Meta Platforms in a shared business scheme subject to COPPA.

The only two documents the AGs point to in support of their common enterprise argument that refer even obliquely to Instagram, LLC are AGs' Exhibits 33 and 36.  AGs' Exhibit 33 references only five Instagram, LLC "[c]ontingent [w]orkers," i.e., temporary employees, under the Instagram, LLC company description and code—which demonstrates nothing bearing on the

---

[13] Other district courts, exercising judicial restraint, have declined to extend the common enterprise doctrine.  *See, e.g.*, *In re Amaranth Nat. Gas Commodities Litig.*, 612 F. Supp. 2d 376, 386 (S.D.N.Y. 2009) (refusing to extend the common enterprise theory to claims brought by private individuals), *aff'd*, 730 F.3d 170 (2d Cir. 2013); *Pennsylvania v. Think Fin., Inc.*, 2016 WL 183289, at *26 (E.D. Pa. Jan. 14, 2016) (holding that "the common enterprise theory should not be superimposed on a claim [brought by the State of Pennsylvania] under the Dodd-Frank Act" and rejecting plaintiffs' arguments that extension of the doctrine was warranted where the underlying statutes shared similar language).

common enterprise doctrine. *See* AGs' Ex. 33 at 101 (listing Instagram, LLC's "Company Code" as 10024); *id.* at 5-7 (out of a list of approximately 3,000 employees, listing five contingent workers with Company Code 10024). The AGs make the unfounded and disputed factual argument that the limited evidence they cite in support of their common enterprise argument refers to Instagram, LLC each time Instagram is mentioned. AGs' Exhibit 33's other references to Instagram refer to Instagram the platform (*not* Instagram, LLC), which Meta Platforms (not Instagram, LLC) operates. *See generally* AGs' Ex. 33.

AGs' Exhibit 36 contains testimony of a deponent who believed—incorrectly—that she worked for Instagram, LLC in 2016, when, in fact, that deponent was an employee of then Facebook, Inc. (now Meta Platforms). She worked on policy related to Instagram (the platform). *See* AGs' Ex. 32 at 26 (listing Ms. Newton under the Facebook, Inc. company code).

The other documents the AGs cite do not reference Instagram, LLC and instead relate to various ways in which *Meta Platforms* has worked on the Instagram platform. *See* AGs' Ex. 30-32, 34-35, 37. These documents do not show any "pool[ing of] resources, staff, and funds," *Network Servs.*, 617 F.3d at 1143, between Meta Platforms and Instagram, LLC. Nor do they show that the two companies "participated . . . in a common venture" as—with, at most, five temporary employees and with no evidence of any operational activity—it is not clear how Instagram, LLC could have "participated" in anything. Indeed, the AGs concede that "no full-time staff were allocated to the Instagram, LLC organization . . . throughout the covered time period[.]" AGs' MSJ at 15. This stands in contrast to the cases cited by the AGs applying the common enterprise doctrine, all of which involved employees for *both or multiple* companies working in tandem, not employees of a single company conducting all relevant business. *See, e.g.*, *FTC v. On Point Cap. Partners LLC*, 17 F.4th 1066, 1082 (11th Cir. 2021) (finding common enterprise where the "leadership" of the two companies "heavily overlapped"); *FTC v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 637 (6th Cir. 2014) (finding common enterprise where "[t]he corporations had many overlapping employees and administrators").

Finally—although they do not cite these documents in direct support of their common enterprise argument—to the extent the AGs rely on other documents that mention Instagram, LLC

in connection with the Instagram terms of service and certain IP and registrations, AGs' MSJ at 12-13, this argument fails because it shows at most that Instagram, LLC passively held certain legacy assets—not that Instagram, LLC and Meta Platforms were "*co-participants* in the [alleged] unlawful practices," as required for a showing of a common enterprise, *Network Servs.*, 617 F.3d at 1142-43 (emphasis added).  In the absence of any undisputed evidence, the AGs' motion on this issue must be denied.

> **B.    The AGs Are Not Entitled to Summary Judgment on Meta's Purported Collection of "Personal Information" Because Adjudicating This Issue Is Not Permitted Under Rule 56 and the AGs' Argument Is Premised on an Impermissibly Expansive Definition of Personal Information**

The AGs seek a determination from this Court that "Meta collects personal information from all users of Facebook and Instagram whether they are logged in or not."  AGs' MSJ at 17.  This Court should deny the AGs' motion as to this issue for three reasons.  First, this argument is not appropriate for resolution on summary judgment because it is not an element, or part of an element, of the AGs' COPPA claim and is impermissibly vague.  Second, the request also fails to seek to establish a material fact.  Third, independent of these failures, the AGs' request relies on an improperly expansive definition of personal information.

Moreover, although the AGs seek partial summary judgment on this issue against both Meta Platforms and Instagram, LLC, they cite no evidence indicating that *Instagram, LLC* plays any role in the collection of personal information.  *See* AGs' MSJ at 2-3, 17-18.  The AGs' request for a summary judgment finding that Instagram, LLC "collects personal information," AGs' MSJ at 17, must be denied for the absence of any evidence "support[ing] the assertion," Fed. R. Civ. P. 56(c)(1).

> **1.    The Question of Whether Meta Collects Personal Information Is at Most a Question of Immaterial Fact, Not a Claim, Element, or Portion of an Element of a Claim Brought by the AGs, and It Is Impermissibly Vague**

Whether Meta collects personal information generally from users and, if so, under what circumstances is, at most, a purported fact—not an "element[] of COPPA," *see, e.g.*, AGs' MSJ at ii—and the AGs' efforts to seek a determination of this fact is an improper use of Rule 56.  *See, e.g.*, *Schiff v. Barrett*, 2011 WL 6963096, at *21 (N.D. Cal. Sept. 8, 2011) ("Rule 56(g) does not

authorize a party to bring an independent motion to establish certain facts as true."); *Robertson*, 2021 WL 545895, at *2 ("[C]ourts throughout the country have held that Rule 56 does not authorize a motion which is solely intended to establish the truth of particular facts."). While Rule 56(g) permits courts to establish undisputed material facts attendant to a proper Rule 56(a) motion, this purported fact is both disputed (based on COPPA's definition of "personal information" and the imprecise nature of the AGs' request for summary judgment on this point) and not material to any properly raised Rule 56(a) argument on an element of COPPA. *See infra* Part III.B.2. Partial summary judgment is thus inappropriate on this issue. *See Robertson*, 2021 WL 545895, at *2 ("Plaintiff seeks an adjudication of discrete, assertedly undisputed facts. The use of Rule 56 for this purpose is inappropriate.").

*First*, because the issue of whether Meta generally collects personal information is not an element of COPPA, summary judgment on this issue would not "streamlin[e] the trial." ECF No. 2465 (AGs' Affirmative Pre-MSJ Letter Br.) at 2. COPPA's restrictions on the collection of personal information are limited to the collection of such information *from a U13* by, as relevant to the AGs' motion, an operator of a website or online service with actual knowledge of the user's U13 status. *See* 15 U.S.C. § 6502(a)(1). A finding that Meta collects personal information generally from users of Facebook and Instagram does not speak to the pertinent issue—collection from U13s with actual knowledge. The AGs would still be obligated to prove that issue at trial. And that is particularly so given that Meta Platforms collects different types of "personal information" from different types of users.[14] *See, e.g.*, AGs' MSJ at 2-3 (describing differences in the data collected from logged-in versus logged-out users). Accordingly, the broad finding the AGs seek would be unhelpful to streamlining facts because, to find for the AGs on their "actual knowledge" theory, the factfinder would still need to find that Meta collects (i) data constituting "personal information" under COPPA, (ii) from U13 Facebook and Instagram users, (iii) with actual knowledge, and (iv) "in a manner that violates the regulations prescribed under subsection (b)" of COPPA. 15 U.S.C. § 6502(a)(1).

---

[14] As noted above, the AGs have adduced no evidence that Instagram, LLC collects any personal information.

META'S OPP. TO THE STATE AGS' MOTION FOR PARTIAL SUMMARY JUDGMENT
Case Nos. 4:22-MD-03047-YGR-PHK, 4:23-CV-05448-YGR

*Second*, courts are limited to establishing *material* facts at summary judgment, which also precludes the entry of summary judgment on whether Meta generally collects personal information. *See* Fed. R. Civ. P. 56(g) ("If the court does not grant all the relief requested by the motion, it may enter an order stating any *material fact . . .* that is not genuinely in dispute and treating the fact as established in the case."). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[15] But COPPA does not prohibit the collection of personal information generally. Rather, COPPA prohibits two types of operators—(i) an operator of a U13-directed website or (ii) an operator that has actual knowledge that it is collecting personal information from a U13—from collecting "personal information" (as that term is specifically defined by the statute) from *U13s* without first complying with the statute's notice and parental consent requirements. *See* 15 U.S.C. § 6502(a)(1). Accordingly, whether Meta generally collects personal information is immaterial, as proof of that proposition would do nothing to advance the AGs' claim. The AGs' failure to articulate a cognizable factual proposition that addresses these necessary elements of their COPPA claim requires the denial of their request on this issue in full.

*Third*, the AGs' request is also impermissibly vague. The AGs do not identify what the "personal information" they seek to be included in the ruling is or the time period for which the

---

[15] The AGs cite several cases for the proposition that "[p]artial summary judgment is appropriate on discrete factual issues and elements of a claim." AGs' MSJ at 11 (citing cases). The AGs are correct that summary judgment can be sought on an element of a claim or by a defendant to dispose of unsupported theories of liability; but, as to factual issues, summary judgment is only proper as to material facts that are not genuinely in dispute. *See* Fed. R. Civ. P. 56(g). None of the cases the AGs cite support their view that facts immaterial to liability (such as whether Meta collects all personal information) or whether Meta provides functions that it is not required to provide can be subject to summary judgment. *State Farm Fire & Cas. Co. v. Geary*, 699 F. Supp. 756, 759 (N.D. Cal. 1987) (granting partial summary judgment to plaintiff on two complete theories of liability); *Freeman v. Ethicon, Inc.*, 619 F. Supp. 3d 998, 1001-02 (C.D. Cal. 2022) (granting plaintiffs' request for issue preclusion on summary judgment where defendant did not contest the materiality of the facts subject to the motion); *United States ex rel. Landis v. Tailwind Sports Corp.*, 234 F. Supp. 3d 180, 190 (D.D.C. 2017) (granting partial summary judgment as to the amount of money plaintiff paid in a lawsuit seeking to recover that exact amount); *FTC v. Surescripts, LLC*, 665 F. Supp. 3d 14, 37-38 (D.D.C. 2023) (granting partial summary judgment to plaintiff on an entire element of a claim, which required establishing that defendant "possessed monopoly power in the relevant market").

META'S OPP. TO THE STATE AGS' MOTION FOR PARTIAL SUMMARY JUDGMENT
Case Nos. 4:22-MD-03047-YGR-PHK, 4:23-CV-05448-YGR

ruling would apply, nor do the AGs specify which entity they contend collected which categories of information during which time period, or from whom such information was collected. This is a further reason to deny the AGs' request for summary judgment as to the collection of personal information.

### 2. The AGs' Motion Improperly References Types of Information Beyond the Statutory Definition of Personal Information

Even if the general collection of personal information were relevant to an element of COPPA, the AGs' partial summary judgment motion should also be denied because it relies on information outside the statutory definition of personal information.

COPPA limits the definition of "personal information" to certain types of information:

> The term 'personal information' means *individually identifiable information* about an individual collected online, including--**(A)** a first and last name; **(B)** a home or other physical address including street name and name of a city or town; **(C)** an e-mail address; **(D)** a telephone number; **(E)** a Social Security number; **(F)** any other identifier that the Commission determines permits the physical or online contacting of a specific individual; or **(G)** information concerning the child or the parents of that child that the website collects online from the child and combines with an identifier described in this paragraph.

15 U.S.C. § 6501(8) (emphasis added).

The AGs do not limit their argument or the ruling they seek regarding the collection of personal information to this statutory definition. Instead, the AGs rely on the definition of "personal information" under the COPPA Rule, *see* AGs' MSJ at 17:3-28, which is impermissibly more expansive than the statutory definition, and then seek a ruling that would encompass types of information even broader than the COPPA Rule. The Court should not accept the AGs' invitation to expand COPPA beyond its clear terms.

An agency cannot introduce a definition that exceeds the scope of its authority as circumscribed by Congress. *Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health & Hum. Servs.*, 946 F.3d 1100, 1112 (9th Cir. 2020); *Cal. Cosmetology Coal. v. Riley*, 110 F.3d 1454, 1460 (9th Cir. 1997) ("A regulation may not serve to amend a statute, nor add to the statute something which is not there." (internal quotation marks and citation omitted)); *Nat'l Ass'n*

*of Priv. Fund Managers v. SEC*, 2024 WL 4858589, at *7-8 (N.D. Tex. Nov. 21, 2024) (finding that adopting a new definition of "dealer" when the statutory language had not changed was in excess of the SEC's statutory authority and was at odds with the structure of the statute itself). Although the court must respect the statutory delegation of authority to an agency, it must also ensure that the agency acts within its constitutionally delegated authority. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395-96 (2024).

Here, the FTC's authorization to supplement the list of "personal information" included in the statutory definition of that term is expressly limited to "identifier[s] that . . . permit[] the physical or online contacting of a specific individual." 15 U.S.C. § 6501(8)(F).[16] The FTC has ignored this limitation by including certain categories of information in the COPPA Rule that do not "permit[] the physical or online contacting of a specific individual," such as "[g]eolocation information sufficient to identify street name and name of a city or town" or a "persistent identifier" like an IP address or a cookie, neither of which is sufficiently specific to allow contacting an individual. 16 C.F.R. § 312.2(7), (9). Indeed, when Congress enacted COPPA, it understood that information as vague as "'Andy from Las Vegas' would not fall within the [statute's] definition of personal information." 144 Cong. Rec. S12741-04, S12787 (daily ed. Oct. 21, 1998) (Statement of Sen. Bryan). Nor would "[a]nonymous, aggregate information." *Id.* Identification of a street and city name, or of an IP address or cookie, are no more specific than these excluded examples. Because the AGs' argument that Meta's collection of "personal

---

[16] Meta disputes that the FTC is permitted to supplement the list contained at 15 U.S.C. § 6501(8) beyond information that permits the physical or online contacting of a specific individual. But, even if Congress's use of the word "including" to preface the categories of personal information identified in 15 U.S.C. § 6501(8) suggests that the list that follows "including" is not meant to be exhaustive, statutory interpretation principles dictate that any addition to this list by the FTC must be of a similar kind to the types of personal information specifically enumerated by Congress, *see, e.g.*, *Yates v. United States*, 574 U.S. 528, 545 (2015) ("Where general words follow specific words in a statutory enumeration, the general words are usually construed to embrace *only objects similar in nature to those objects enumerated by the preceding specific words*." (alterations accepted and internal quotation marks omitted) (emphasis added)). The FTC's regulatory additions, for example photographs or voice recordings, do not accord with this principle because a photo or audio recording is nothing like an email address or phone number.

information" rests on a definition that exceeds the FTC's authority under COPPA, the Court should deny the AGs' motion on this issue.[17]

The AGs, furthermore, seek a ruling even more far afield. For instance, the COPPA Rule (impermissibly) defines "personal information" to include any photograph, video, or audio file "where such file contains a *child's* image or voice." 16 C.F.R. § 312.2(8) (emphasis added). The AGs stretch this impermissible definition even farther—using examples of Meta's alleged practices that include "images of a *person's* face" and "the sound of a *person's* voice," disregarding the U13 limitation altogether. AGs' MSJ at 18. Whether Meta collects such information is immaterial absent a showing that it collects this information, with actual knowledge and from U13s. As such, this request, which has no bearing on COPPA liability, should be denied.

### C. Whether Meta Provides Certain Functions Sometimes Required Under COPPA Similarly Will Not Streamline Any Issues for Trial

The AGs' argument that Meta fails to provide certain COPPA functions is fatally incomplete because it erroneously presupposes that Meta is required to offer such functions. Accordingly, the AGs' premature motion as to this issue should be denied.

### 1. COPPA's Notice and Parental Consent Requirements Do Not Apply to Meta

Summary judgment should be denied on the issue of whether Meta provides COPPA's notice and parental consent functions because the AGs have failed to discharge their burden to show that these requirements apply to Meta at all. *See Boden v. St. Elizabeth Med. Ctr., Inc.*, 2018 WL 4855210, at *4 (E.D. Ky. Oct. 5, 2018) (criticizing a motion that sought to "sidestep [a] crucial issue in this case"—whether a federal statute applied to the retirement plan at issue in the first place—thus "plac[ing] the Court in the untenable position of being asked to render an advisory opinion on a hypothetical determination of critical facts"). The AGs concede that COPPA's notice and parental consent requirements apply only to operators of U13-directed platforms or operators that have actual knowledge they are collecting personal information of a U13. AGs' MSJ at 18:10-

---

[17] Notwithstanding the FTC's overly broad definition of "personal information," Meta Platforms does, as a matter of practice, comply with it.

11. But the AGs are not moving for summary judgment on U13-directedness, *see generally* AGs' MSJ, and there are—at a minimum—genuine disputes of material fact regarding their theory that Meta acquires actual knowledge in certain narrow circumstances, *see, e.g.*, *id.* at ii.  This Court should not decide whether Meta has complied with obligations that the AGs have failed to show even attach to Meta.  Moreover, as explained in Meta's affirmative motion, Meta is not subject to COPPA's notice and consent requirements because Facebook and Instagram are not U13-directed and because Meta has not collected personal information from a U13 with actual knowledge.  *See* Meta's MSJ at 44-51.  For this reason, deciding whether Meta complies with notice and consent functions that may never apply will not streamline any issues for trial, but rather only burdens the Court with make-work that may never need to be addressed.

> **2.      The FTC Permits an Operator to Comply with COPPA by Deleting U13 Data, as an Alternative to Providing Notice and Consent**

Even if the Court were to reach this issue, despite the judicial burdens and inefficiencies in doing so, summary judgment should be denied on the merits because Meta complies with the FTC's guidance, which specifies a data deletion alternative to COPPA's notice and parental consent requirements.  Specifically, FTC guidance provides that an operator of a general audience website that gains actual knowledge of a U13 "must either meet COPPA's notice and parental consent requirements *or delete the child's information*."  *COPPA FAQ* H.6.  Because Meta Platforms already deletes data from users that fail to successfully appeal an age checkpoint (which users may or may not be U13), *see supra* Background Part II.D, whether or not it *also* provides notice and consent is irrelevant as Meta has fully complied with any COPPA obligations that may attach.

> **3.      COPPA's Data Review and Refusal Requirements Also Do Not Apply to Meta and the AGs Lack Evidence That Meta Does Not Meet These Requirements**

In addition to the notice and consent functions, the AGs contend that Meta does not:

a.  Provide parents with the right to review personal information collected from their U13 children; *see* 15 U.S.C. § 6502(b)(1)(B); 16 C.F.R. § 312.6(a)(3); or

b.  Provide parents with the right to refuse to permit the further collection or use of their U13 children's data, *see* 15 U.S.C. § 6502(b)(1)(B); 16 C.F.R. § 312.6(a)(2).

AGs' MSJ at 18-19. However, their argument presupposes COPPA obligations that Meta does not have,[18] and they do not meet their summary judgment burden of proving the absence of any genuine dispute of material facts as to these contentions.

*First*, under COPPA, the obligation of an operator of a general audience website to provide the parental review and refusal requirements at issue here attaches only when it has actual knowledge that it is collecting personal information from a U13. Congress directed the FTC to promulgate regulations implementing COPPA, but only to the extent that the regulations apply to an operator of a U13-directed website or an operator that "collects personal information" from U13s with actual knowledge. *Id.* § 6502(b)(1)(A). The "operator" referenced in the following provision, (b)(1)(B) (which instructs the FTC to include the parental review and refusal requirements at issue here), is the same "operator" referenced in (b)(1)(A) (i.e., one who operates a U13-directed website or who has actual knowledge that it is collecting U13 personal information). It would make no sense if subsection (b)(1)(B)'s requirements were *not* limited to these types of operators, because one can only ever be liable for violating regulations promulgated pursuant to subsection (b)(1)(B) if one is an operator who either operates a U13-directed website or has actual knowledge that it is collecting personal information from a U13. *See* 15 U.S.C. § 6502(a)(1) (limiting liability for violating the COPPA Rule to operators of U13-directed websites or who have actual knowledge that they are collecting U13 personal information); *Agendia, Inc. v. Becerra*, 4 F.4th 896, 901 (9th Cir. 2021) ("[W]ords of a statute must be read in their context and with a view to their place in the overall statutory scheme." (alteration in original) (internal quotation marks omitted) (quoting *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 320 (2014))). Indeed, at the time of enactment, Congress understood subsection (b)(1)(B) to concern the "revocation of consent that the parent has previously given," *see* 144 Cong. Rec. S12741-04, S12788 (daily ed. Oct. 21, 1998) (Statement of Sen. Bryan), necessarily implying that the operator

---

[18] Under no circumstances could Instagram, LLC be required to provide these functions because there is no evidence that Instagram, LLC operates the Instagram platform or collects any personal information. *See supra* Parts III.A.3-4, III.B.

had already sought parental consent under subsection (b)(1)(A), either because it operated a U13-directed site or because it had actual knowledge that it was collecting U13 personal information.

Accordingly, Meta would be required to provide the parental review and refusal functions only if (a) Facebook and Instagram are directed to U13s, or (b) if Meta has actual knowledge that it is collecting personal information from a U13. *See* 15 U.S.C. § 6502(a)(1). The AGs do not argue the former, and as to the latter, they have failed to adduce undisputed facts warranting summary judgment. *See infra* Part IV. The AGs should not obtain partial summary judgment as to obligations that they have failed to show apply to Meta in the first place. *See Boden*, 2018 WL 4855210, at *4.

*Second*, the sole evidence the AGs cite to support this argument is written discovery responses in which Meta denied the AGs' request for admission that it does not provide the aforementioned functions. *See* AGs' MSJ at 18-19 (citing Meta's R&Os to AGs' Requests for Admission ("RFAs") Nos. 7, 20, 21). In those responses, Meta stated that it does not provide the functions *with respect to users whom it does not actually know to be U13*. *See, e.g.*, Ex. 22 (Meta's Third Am. R&Os to Pls.' First Set of RFAs, Second Am. Resp. to RFA 7) (stating that "Meta does not knowingly collect personal information from individuals under 13 on Instagram, . . . and therefore Meta has not provided parents means to review personal information of their children under 13 whom Meta does not know exist."); Ex. 3 (Meta's Second Am. R&Os to Pls.' Third Set of RFAs, Second Am. Resp. to RFA 20) (similar, for Facebook); *id.* (Meta's Second Am. R&Os to Pls.' Third Set of RFAs, Second Am. Resp. to RFA 21) (stating that, because "Meta has not knowingly collected personal information from individuals under 13 on Facebook or Instagram, . . . Meta has not provided parents a means to refuse to permit the further use of personal information from their children whom Meta does not know exist").[19]

---

[19] The AGs cited superseded versions of Meta's discovery responses. *See* AGs' MSJ at 18-19 (citing superseded versions of Meta's RFAs Nos. 7, 20, 21). Meta relies on here the operative versions of the relevant responses that were served on January 27, 2026. The AGs have raised no objection to those responses.

META'S OPP. TO THE STATE AGS' MOTION FOR PARTIAL SUMMARY JUDGMENT
Case Nos. 4:22-MD-03047-YGR-PHK, 4:23-CV-05448-YGR

Because the AGs erroneously presuppose that Facebook and Instagram are subject to COPPA's data review and refusal requirement, and there are, at a minimum, disputed material issues of fact, the AGs' motion on this issue should be denied.

## IV. The AGs Are Not Entitled to Summary Judgment on Their Theory of Alleged Use with "Actual Knowledge" of U13 Data by Meta's Machine Learning and Generative AI Models

The AGs are not entitled to partial summary judgment on their argument that Meta uses certain data from users it purportedly has "actual knowledge" are U13 to train machine learning and generative AI models, for several independent reasons. First, the argument is forfeited. Second, the AGs' motion seeks (and requires) a finding that Meta acquired "actual knowledge" that certain users were U13—an issue that is ill-suited to determination as a matter of law and on which the facts are, at the barest minimum, hotly disputed. Third, even if the AGs could show "actual knowledge," they lack proof that Meta's training of machine learning and generative AI models on limited categories of data violates COPPA as the "collect[ion]" of "personal information" from such users. *See* 15 U.S.C. § 6502(a)(1).

Moreover, the AGs cite no evidence whatsoever showing that Instagram, LLC plays any role in the U13 reporting, review, and deletion process; has any way to acquire the requisite knowledge of any U13s; collects or even maintains any personal information; or has any machine learning or generative AI models. *See generally* AGs' MSJ. For that reason, their motion for partial summary judgment on this theory must be denied, at least as to Instagram, LLC. *See* Fed. R. Civ. P. 56(c)(1) (requiring a party moving for summary judgment to support the assertion by citing specific materials in the record).

### A. The AGs Should Be Precluded from Making This Argument

The AGs cannot raise allegations for the first time on summary judgment, and the consequence of doing so is the preclusion of arguments based on those allegations. *See Pickern v. Pier 1 Imports (U.S.), Inc.*, 457 F.3d 963, 969 (9th Cir. 2006) (affirming district court's decision to bar plaintiffs from introducing evidence on allegations raised for the first time in summary judgment briefing); *Successor Agency to Former Emeryville Redevelopment Agency v. Swagelok*

*Co.*, 2023 WL 3805256, at *14 (N.D. Cal. June 1, 2023) (holding that a plaintiff may be precluded from relying on theories or facts raised for the first time at summary judgment). This is true even if the AGs contend these issues only arose in discovery. *See Oliver v. Ralphs Grocery Co.*, 654 F.3d 903, 908-09 (9th Cir. 2011) (holding that district court properly refused to consider argument raised for first time in summary judgment briefing even though the topic was disclosed in discovery). The Complaint is devoid of allegations about Meta training machine learning or generative AI models on U13 data (or any user data). *See generally* Compl. Indeed, the only mention of AI in the Complaint is that Meta was "investing in AI." *Id.* ¶ 67. Accordingly, the AGs should be precluded from making any argument based on training models now, and their motion for summary judgment on this basis should be denied.

**B.     Meta Does Not Have Actual Knowledge That Any Individual in the Categories of Users the AGs Identify Is U13—And, at a Minimum, There Are Disputes of Fact as to Meta's Actual Knowledge**

Because the AGs do not contend for purposes of their motion that Facebook or Instagram is directed to U13s, they must show the absence of any genuine dispute of material fact that Meta has "actual knowledge" it is collecting data from U13s for COPPA to apply. But "questions involving a person's state of mind are generally factual issues inappropriate for resolution by summary judgment." *Conn v. City of Reno*, 591 F.3d 1081, 1098 (9th Cir. 2010), *vacated on other grounds*, 563 U.S. 915 (2011), *and opinion reinstated in relevant part*, 658 F.3d 897 (9th Cir. 2011). The evidence the AGs cite does not meet the high burden of proving actual knowledge under COPPA, and, in any event, genuine disputes of material fact preclude the AGs' motion.

COPPA's actual knowledge test is a demanding one. Neither "suspicion," *see Malhotra v. Steinberg*, 770 F.3d 853, 860 (9th Cir. 2014), nor "constructive knowledge," *see Sulyma*, 589 U.S. at 185, suffice. The legislative history underscores Congress's rejection of these lower knowledge thresholds. An earlier, un-enacted precursor to COPPA, introduced in 1998, would have applied to operators that "*knowingly* collect personal information from children." *See* Electronic Privacy Bill of Right Act of 1998, H.R. 4667, 105th Cong. § 105(7)(A)(iii) (1998) (emphasis added); Children's Online Privacy Protection Act of 1998, S. 2326, 105th Cong. § 2(11)(A)(iii) (1998) (emphasis added). Following the bill's introduction, Congress consulted with various

36

stakeholders—including the FTC, industry, and public-interest groups—and made "revisions to [the] original bill that were worked out carefully" with them to "achieve a remarkable consensus." 144 Cong. Rec. S12741-04, S12787 (daily ed. Oct. 21, 1998) (Statement of Sen. Bryan).  In COPPA's final, enacted form, "knowingly" was changed to the less ambiguous "actual knowledge."  15 U.S.C. § 6502(a)(1).  As the FTC has recognized in COPPA rulemaking proposals, this revision reflects Congress's intent to "establish a far stricter standard than constructive knowledge or knowledge implied from the ambient facts."  76 Fed. Reg. 59804, 59806 & n.26 (Sept. 27, 2011); *see* 89 Fed. Reg. 2034-01, 2037 (Jan. 11, 2024).

Under COPPA, an operator has "actual knowledge" that it is collecting personal information from a U13 only when it has a "direct and clear awareness, as opposed to an awareness attributed to [it] based on what [it] reasonably should have known." *Balderas*, 457 F. Supp. 3d at 1113.  It is not sufficient that Meta might have been able to infer that some unknown users were statistically likely to be U13. *See Ventura Content*, 885 F.3d at 609 (holding website operator did not even have "apparent knowledge" (a less demanding form of knowledge) that specific material on the website was infringing, even when it "kn[ew] that infringement was probably occurring on its website"); *see also Zurbriggen v. Twin Hill Acquisition Co.*, 338 F. Supp. 3d 875, 889 (N.D. Ill. 2018) (critiquing plaintiffs' attempt to "conflate[] statistical knowledge that harm will result to some members of a collective group with individualized knowledge that harm will result to an identifiable victim").  Further, to prove an operator's "actual knowledge" that it is collecting personal information from a U13, the operator must in fact be doing so: one cannot "know" a fact that is not true. *See Harrison v. United States*, 708 F.2d 1023, 1027 (5th Cir. 1983); *Gates v. MCT Grp.*, 93 F. Supp. 3d 1182, 1189 (S.D. Cal. 2015).  Further, as discussed *supra* Part I, the AGs also must show that Meta had actual knowledge of U13s from each AG's state before each AG has standing to assert this claim.

Because the AGs cannot prove Meta's actual knowledge with respect to the categories of users they identify—and at a minimum, there is a genuine dispute of material fact on this element—their motion for partial summary judgment should be denied.

### 1. Meta Does Not Acquire "Actual Knowledge" of U13s at Any Point in the U13 Reporting, Review, and Deletion Process

The AGs contend that Meta acquires "actual knowledge" that a user is U13 in the following instances: (1) when a user changes their birthdate to one that would indicate they are under the age of 13; (2) when a suspected U13 account is checkpointed or disabled after human review; and (3) when a checkpointed suspected U13 account fails to appeal or fails an appeal of an age checkpoint.[20]   In all three instances, however, there is—at a minimum—a genuine dispute of material fact as to Meta's actual knowledge, which precludes summary judgment on this issue.

As discussed *supra* Background Part II, Meta Platforms receives reports of potential U13s from various sources.  Reports are generally referred to human review, with a subset reviewed through automated means.  If, erring on the side of caution, the human reviewer thinks the account could possibly belong to a U13, the account is put into an age checkpoint and disabled, with the user unable to access it.  The user then has 30 days to appeal the age checkpoint by providing ID proving that they are 13 or older; if the user does not appeal successfully (whether by not appealing at all or otherwise), their account is scheduled to be permanently deleted.  As explained below, at no point in this process does Meta Platforms' awareness of the possibility that some users *could* be U13 rise to the level of "actual knowledge" that any specific users are, in fact, U13.

### a. Meta Does Not Actually Know Whether Users Who Change Their Birthdates to a U13 Age Are, In Fact, U13

Meta does not have "actual knowledge" that users who change[21] their birthdates to appear U13 are, in fact, U13, as such users are not necessarily U13.

For example, users who change their stated age to be U13 are in many cases malicious actors over the age of 13 seeking to trigger Meta Platforms' deletion of their accounts and

---

[20] This section addresses the AGs' arguments that Meta acquires "actual knowledge" of users' purported U13 status at various points throughout the U13 reporting, review, and deletion process. As discussed in the following section, the AGs separately contend (incorrectly) that Meta acquires actual knowledge when an account is hard-linked or soft-matched to an account that has been checkpointed or disabled.  *See infra* Part IV.B.2.

[21] Because individuals who enter U13 ages at sign-up are blocked from creating accounts, *see* Background II.A, the AGs' "self-reporting category" includes only users who change their stated ages to U13 after creating an account.

associated data. *See* Ex. 6 (Hartnett Dep. Ex. 6) at 22. At times, the abuse of this method has been so pervasive that "70% of accounts who edit [their date of birth] to U13 seem to be involved in fraud." *Id.* Further, malicious actors may hack into a user's account and change the date of birth to reflect a U13 age. *See* Ex. 11 at -7605 (July 13, 2022 email indicating that Meta Platforms had resolved an issue whereby "blackhat[s]" were able to hack into accounts and change the user's date of birth to reflect a U13 age). Meta accordingly does not know whether someone who changes their account age to appear U13 is in fact U13, and it is not necessarily factually true in any event that such users are U13s. *See Harrison*, 708 F.2d at 1027; *Gates*, 93 F. Supp. 3d at 1189.[22]

Because it is, at a minimum, disputed whether Meta has actual knowledge in this scenario, the AGs' motion for partial summary judgment should be denied.

### b. Meta Does Not Have Actual Knowledge That Users Checkpointed or Disabled After Human Review Are U13

Nor does Meta have "actual knowledge" that users whose accounts have been checkpointed or disabled are U13.

The structure of the review and checkpointing process inevitably results in a high number of non-U13s being checkpointed. To begin with, "a very, very high percentage of the [possible U13] reports" that Meta Platforms flags for review "are false," Ex. 4 (Hartnett Dep.) at 207:2-208:2, including because bad actors use U13 reporting as an "attack factor" to attempt to take down accounts, *id.* at 210:2-19. Moreover, Meta Platforms instructs its human reviewers to "err on the side of [U13] if [they are] unsure," *id.* at 105:11-21, and reviewers have limited information from

---

[22] The preliminary Proposed Jury Instructions are not to the contrary. There, the parties stated that an example of "facts that would establish that an operator has actual knowledge include . . . [w]here a child user enters age information indicating that they are under 13." ECF No. 2313-1 at 13. This example contemplates a "child user" (i.e., a U13) self-reporting, but as set forth above, Meta does not know whether the users changing their stated age to U13 are in fact U13. Further, the example contemplates a human employee (not an automated system) learning of the report—but, as explained *supra* Background Part II.B, human employees generally do not learn about specific instances of U13 self-reporting.

In any event, Meta expressly stated that "[t]hese preliminary instructions are not intended to be a complete or final set of instructions, and Meta reserves all rights with respect to any jury instructions to be used in any trial that may be scheduled in these cases." ECF No. 2313-1 at 6 n.1. So, Meta's statement made for the limited purpose of offering tentative proposed jury instructions was not a concession as to the kinds of evidence that would suffice to prove actual knowledge.

which to base their decision, *see* Ex. 23 at -0370 (instructing Instagram human reviewers to look at a user's bio and profile photos).  So, even when a reviewer decides to checkpoint an account, it is "uncertain as to whether or not [that] account is under 13," Ex. 13 (Backstrom II) at 143:21-144:8; for these reasons, "a checkpointed account . . . is not equivalent to an underage user," Ex. 4 (Hartnett Dep.) at 168:2-24.  Similarly, accounts of users who change their birthdate to reflect a U13 age are automatically placed in an age checkpoint and disabled, Ex. 4 (Hartnett Dep.) at 103:5-16, even though these accounts often do not belong to U13s, *see supra* Part IV.B.1.a.  And, although the AGs claim that Meta has "actual knowledge" that users checkpointed in response to reports from parents are U13, they cite *no evidence* of this occurring, but instead cite (1) a letter Facebook, Inc. wrote to the FTC fifteen years ago, in which it stated that it could acquire "actual knowledge" if a U13's parents contacted it, and (2) deposition testimony in which Meta's Rule 30(b)(6) witness simply explained that parents are able to use Meta Platforms' U13 reporting form.  *See* AGs' MSJ at 23-24 (first citing META3047MDL-065-00153090 at -3101-02; and then citing Hartnett Dep. at 206:7-208:24).

The AGs wholly mischaracterize the significance of the age checkpoint in suggesting that there are "1.8 million U.S. accounts [that] belong[] to [U13s]."  AGs' MSJ at 5.  Indeed, although the AGs state that Meta Platforms checkpointed 1.8 million accounts from 2020 through April 2024, they also concede that Meta Platforms only scheduled 1.3 million such accounts for deletion—showing Meta Platforms determined that at least 500,000 accounts, or approximately 28% of checkpointed users, successfully appealed and thus *were unlikely to be U13s*.  *Id.*

While Meta Platforms might *suspect* that some portion of checkpointed and disabled accounts belong to U13s, "generalized suspicion . . . doesn't constitute knowledge," *Malhotra*, 770 F.3d at 860.  Nor does "statistical knowledge" that, in the aggregate, some unknown percentage is statistically likely to be U13 constitute "actual knowledge" as required by the statute.  *See Zurbriggen*, 338 F. Supp. 3d at 889-90.  Because Meta Platforms' reviewers err on the side of caution in checkpointing accounts even suspected of being U13, and because of the limited data at reviewers' disposal, Meta cannot have "actual knowledge" that the users of checkpointed or

disabled accounts are U13. Nor can they have "actual knowledge" when many such users are not, in fact, U13.

### c. Meta Does Not Have Actual Knowledge That Users Whose Accounts Are Deleted After Being Checkpointed Are U13

For similar reasons, the AGs cannot establish as an undisputed fact that Meta acquires "actual knowledge" of U13 status for users of accounts scheduled to be deleted after failing to appeal successfully. The AGs ask this Court to conclude as a matter of law that a user's failure to appeal or appeal successfully reflects, and provides actual knowledge, that the user is U13. *See* AGs' MSJ at 26-27. But Meta's 30(b)(6) witness with knowledge of U13 practices has roundly rejected that notion. Rather, an account is scheduled for deletion if a user fails to successfully appeal an age checkpoint within the 30-day appeal window. Ex. 4 (Hartnett Dep.) at 106:3-7; Ex. 5 (Hartnett Dep.) at 299:3-301:13. A user can fail to successfully appeal for numerous reasons, including because they lacked valid identification, because they did not want to provide their ID to Meta Platforms, or because they neglected to act within 30 days. *See* Ex. 6 (Hartnett Dep. Ex. 6) at 31 ("If the person is a legitimate user above 13 but does not have an ID, they have no way of appealing."); *see also* Ex. 15 (Feamster Rebuttal Rep.) ¶ 106 & n. 67 (explaining that many teenagers lack government IDs, as do "[m]illions of adults who are 18 and older" (citation omitted)). For these reasons, even when a user's account is deleted, Meta "d[oes not] know they're underaged users . . . [Meta] just know[s] that they did not appeal or did not appeal successfully." Ex. 4 (Hartnett Dep.) at 168:2-24.

The AGs have no evidence of any instance in which, in the context of the appeal and deletion process, Meta acquired actual knowledge that a specific user (much less a user from an AG's state) was, in fact, U13. That one Meta Platforms employee referred to data belonging to users whose accounts have been disabled as part of the age checkpoint with the shorthand of "U13 disabled data" or "underage data" in an internal planning document does not prove otherwise, and certainly does not establish this proposition as a matter of undisputed fact, particularly given the testimony and process reasons summarized above showing that Meta did not acquire actual knowledge from either the checkpointing process or the checkpoint appeal process. *See* AGs' MSJ

at 26-27 (citing META3047MDL-020-00656153). Nor does Meta Platforms' statement on a page for reporting suspected U13s on Facebook that it deletes accounts "reasonably verifiable as under 13." AGs' Ex. 46. Meta's witnesses have explained, and would explain to the factfinder at trial, that Meta Platforms treats accounts that fail to successfully appeal the age checkpoint as *presumptively* U13 and deletes the data associated with such accounts—but as to specific users, all Meta Platforms "know[s]" is that the individual did not appeal successfully. *See* Ex. 4 (Hartnett Dep.) at 168:2-24.

While the AGs discuss the theoretical possibility of a user failing an appeal because they "provide[d] an identification document showing that they are under the age of 13," AGs' MSJ at 26, this hypothetical is entirely unavailing. The AGs fail to point to a single instance of this happening, much less of a U13 in an AG's state submitting such identification. The AGs cannot prove actual knowledge by relying on a hypothetical. *See Sulyma*, 589 U.S. at 186 ("[K]nowledge must be more than 'potential, possible, virtual, conceivable, theoretical, hypothetical, or nominal.'" (quoting Black's Law Dictionary 53 (4th ed. 1951))).

**2.    Meta Does Not Have "Actual Knowledge" That Users Whose Accounts Are Hard-Linked or Soft-Matched to Checkpointed or Disabled Accounts Are U13**

The AGs' contention that Meta acquires "actual knowledge" that a user is U13 when that user's account is hard-linked or soft-matched to an account that has been placed in an age checkpoint (and accordingly disabled) fails for the same and additional reasons. Because, as explained above, Meta does not actually know that accounts in an age checkpoint belong to U13s, it cannot actually know that accounts hard-linked or soft-matched to such an account reflect a U13. And the AGs' position also depends on the erroneous and disputed premise that accounts that are hard-linked or soft-matched necessarily belong to the same person. But this cannot be established as a matter of undisputed material fact.

Hard-linked accounts are those that have been formally linked by account holders in the Accounts Center. *See* Ex. 4 (Hartnett Dep.) at 110:8-17. When users hard-link their accounts, "all [Meta Platforms] can say is, . . . it means that those people know each other or have the logins." *Id.* at 212:13-213:10. For that reason, hard-linked accounts "often . . . actually are not controlled

by the same person." *Id.*; *see also* Ex. 16 at -0002, slide 12 (documenting that, of users who unlinked accounts, 13% of IG users and 17% of FB users did so because "[o]ther people also use or access it" and that another 11% of IG users and 13% of FB users did so because "it d[idn't] belong to [them]"). For example, parents might hard-link accounts with their teenager to monitor their teen's online activity. *See* Ex. 17 at -0001, slide 11; Ex. 18 at -0004. If the teenager's account is later checkpointed, Meta does not have "actual knowledge" that the parent is U13 for the simple reason that the parent is not in fact U13. *See Harrison*, 708 F.2d at 1027; *Gates*, 93 F. Supp. 3d at 1189.

As to soft-matching, the AGs attempt to improperly "conflate[] statistical knowledge" that, in the aggregate, many soft-linked accounts are likely to belong to the same user with "individualized knowledge" that any two soft-linked accounts in fact belong to the same user. *See Zurbriggen*, 338 F. Supp. 3d at 889. Soft-matching reflects merely a probabilistic inference that accounts may belong to the same user, not actual knowledge that they in fact belong to the same user. *See* Ex. 15 (Feamster Rebuttal Rep.) ¶ 133 ("[S]oft-matching does not produce certain identifications. Shared household devices, dormitory networks, and library computers create false matches between accounts controlled by different people"). Although the AGs suggest that soft-matching between Facebook and Instagram accounts reflects a "probability [of] >99%" that the users are the same, Ex. 24 at -2995, the AGs take this statement out of context. Meta Platforms employs "[d]ifferent thresholds for different use cases," and "higher precision" soft-matching is used only in certain limited circumstances. Ex. 6 (Hartnett Dep. Ex. 6) at 11. For example, the 99% probability soft-matching threshold is used only to propagate account takedowns for violations such as child exploitation and terrorism. Ex. 24 at -2996. For soft-matching used in other contexts, by contrast, Meta Platforms "[does] not attempt to get accuracy at a single user level," and soft-matching is "[h]ighly inaccurate to identify whether a specific account is definitively part of an individual cluster." Ex. 6 (Hartnett Dep. Ex. 6) at 13.

Moreover, the AGs cannot prove that Meta was "willfully blind" to the alleged fact that such accounts belong to the same users and that such users were U13.[23]  To sustain their theory of willful blindness, the AGs must prove: (1) Meta "subjectively believe[d] that (a) there [was] a high probability that" accounts soft-matched or hard-linked to a checkpointed or disabled account belonged to the same user, and (b) that such user was U13; and (2) Meta took "deliberate actions to avoid learning of that fact." *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011). The AGs cannot establish either element as a matter of undisputed fact.

*First*, the evidence shows that Meta Platforms subjectively believed at all relevant times both (a) that hard-linked and soft-matched accounts *did not* necessarily belong to the same users and (b) that those users *were not* necessarily U13s.  *See* Ex. 4 (Hartnett Dep.) at 212:13-213:10; *id.* at 168:2-24.  Although some individual employees at Meta Platforms who were not experts on soft-matching or hard-linking might have suggested otherwise with respect to both these issues of belief, *see* AGs' Ex. 9, those individual opinions at most create a dispute of material fact that requires resolution by a factfinder at trial.  In particular, a reasonable factfinder could choose to credit the testimony of Ms. Hartnett (who reviewed issues relating to hard-linked and soft-matched accounts with several subject-matter experts, *see* Ex. 4 (Hartnett Dep.) at 21:14-19, 22:10-12; *id.* at 27:17-20; Ex. 6 (Hartnett Dep. Ex. 6) at 6-8, 10-13) over those of the employees on certain documents.  The conflicting evidence on this crucial fact precludes summary judgment. *Zetwick v. Cnty. of Yolo*, 850 F.3d 436, 441 (9th Cir. 2017) ("[W]here evidence is genuinely disputed— such as by conflicting testimony—that issue is inappropriate for resolution on summary judgment." (internal quotation marks and citation omitted)).

*Second*, the AGs have no evidence that Meta deliberately avoided learning whether such accounts belong to the same users.  Rather, the evidence shows that Meta Platforms undertook numerous research efforts aimed at understanding how and when accounts belong to the same or different users to better understand how people were using its platforms.  *See* Ex. 17 at -0001, slide

---

[23] The AGs do not argue that Meta was willfully blind with respect to any other categories of users identified in their motion, nor do they cite evidence that would prove willful blindness.  *See* AGs' MSJ at 21-27.

11 (reflecting Meta Platforms' research on "[t]he unclear motivations behind users hard[-]linking accounts"); Ex. 16 at -0002, slide 12 (reflecting Meta Platforms' survey on why users de-link previously hard-linked accounts); Ex. 18 at -0004 (reflecting Meta research on parents who hard-link accounts with their teenagers).

*Finally*, the AGs' criticism of Meta for not being more aggressive in propagating an age checkpoint across soft-matched accounts falls far short of the standard for willful blindness. *See Walsh v. Bowers*, 561 F. Supp. 3d 973, 1008 (D. Haw. 2021) ("Willful blindness requires more than a failure to do everything possible.")  The AGs focus exclusively on the risk of not checkpointing users who may be U13s (false negatives) and ignore the harms that come from incorrectly checkpointing individuals 13 and older (false positives).  "False positives impose substantial harms on legitimate users.  Legitimate 13+ users incorrectly flagged and removed lose access to their data, social connections, online communities, educational resources, and in some cases business income (influencers, small business operators)."  Ex. 15 (Feamster Rebuttal Rep.) ¶ 64; *see also id.* ¶ 43 (noting that "[a]t Meta's scale, even small improvements in [detection] metrics translate to millions of additional correct classifications, but small error rates also translate to millions of misclassifications").

### 3. The AGs Cannot Prove Actual Knowledge by Pointing to Ways They Think Meta Could Have Done More to Discover Unknown U13s

Finally, to the extent that the AGs seek to prove actual knowledge by pointing to the ways they think Meta could have been more aggressive in rooting out U13s, the AGs reveal a basic misunderstanding of COPPA.  COPPA imposes no affirmative obligations on an operator of general audience platforms to investigate the ages of their users, but rather requires operators of general audience websites (as the AGs concede Facebook and Instagram are for purposes of this motion, *see* AGs' MSJ at 18 n.8) to act only if they acquire "actual knowledge" that a user is U13. *See* 64 Fed. Reg. 59888, 59892 (Nov. 3, 1999) ("COPPA does not require operators of general audience sites to investigate the ages of their site's visitors[.]"); *COPPA FAQ* H.1 (similar). Arguments that Meta could or should have done more to detect possible U13s thus miss the mark, as showing "that someone should have known about" something "is not enough to show that the

person actually knew" the alleged crucial fact.  *Domanus v. Locke Lord LLP*, 847 F.3d 469, 480 (7th Cir. 2017).

### C. The AGs Fail to Explain How Meta's Training of Machine Learning and Generative AI Tools on Limited Types of User Data Violates COPPA

The AGs fail to show they are entitled to partial summary judgment that Meta violates COPPA by training machine learning models and generative AI tools on certain limited categories of user data.  *See* AGs' MSJ at 20-28.  The plain language of COPPA does not support finding that the use of data collected from a user, prior to any actual knowledge that the user is U13, constitutes a COPPA violation.  Further, there are genuine disputed issues of material fact as to whether the data on which these models are trained are "personal information" under COPPA and as to whether any training on "personal information" collected from a U13, during the brief period before such information is permanently deleted, actually occurs.

### 1. The AGs Cannot Establish That Meta's Training of Machine Learning and Generative AI Tools Violates COPPA

Even assuming that the AGs could prove that Meta acquired "actual knowledge" that some users are U13 (which they cannot, *see supra* Part IV.B), they still would not be entitled to summary judgment on this element of their COPPA claim.[24]  That is because the AGs have not met their burden of proving that Meta continues to *collect* personal information from such users.  Even if the AGs could show that Meta continues to *use* personal information from such users by training its models on such information, COPPA does not prohibit the continued use of personal information that was collected prior to obtaining actual knowledge of a U13.  And, to the extent that a provision of the FTC's COPPA Rule suggests otherwise, that provision is invalid.

The AGs do not argue—much less cite any evidence to show—that Meta continues *collecting* personal information from users after their accounts are disabled in the age checkpoint. *See generally* AGs' MSJ.  Nor could they, because when an account is disabled, the user cannot access it to create or view content, *see* Ex. 4 (Hartnett Dep.) at 103:15-18; Ex. 14 (Backstrom I) at

---

[24] Because the AGs only move on the "actual knowledge" prong of COPPA, *see supra* Legal Standard, this discussion will focus only on the COPPA obligations of operators of general audience websites, not operators of U13-directed websites.

errata 30:13-22, and thus cannot generate user activity data for the models to use as inputs, *see* Ex. 13 (Backstrom II) at 117:2-10.  Moreover, although the models may *train* on data, there is no evidence that the models themselves *collect* data.  The evidence instead reflects that they do not. *See* Ex. 14 (Backstrom I) at 15:10-13 (explaining that a machine learning model does not collect input signals but merely "make[s] predictions based on the input signals that are put into the models"); *id.* at 35:5-10 (explaining that generative AI models do not collect new information but merely "create new images or text in response to prompts").

Thus, the AGs' theory that "Meta violates COPPA by continuing *to use* the personal information of [U13s] to train its machine learning and generative AI models, even after it checkpointed or disabled their accounts because they belong to [U13s]," AGs' MSJ at 20 (emphasis added), would require the Court to conclude that the mere *use* of previously collected U13 data, absent collection with actual knowledge, during the brief period before such data is permanently deleted, violates COPPA.  No such prohibition exists.

COPPA, by its plain language, applies only to the collection of U13 personal information with actual knowledge and is silent as to the use of personal information previously collected from U13s without actual knowledge.  *See generally* 15 U.S.C. § 6502.  Instead, Congress chose to limit COPPA liability for operators of general audience websites to only those situations where an operator has "actual knowledge that it *is collecting* personal information from a child . . . in a manner that violates the [COPPA Rule]."  15 U.S.C. § 6502(a)(1).  The statute does not purport to prescribe any requirements for an operator that later learns it "had collected" U13 data unknowingly.  Rather, the use of the present-tense form "is collecting," in conjunction with "actual knowledge," indicates that COPPA applies only when the collection and knowledge occur simultaneously—not where an operator unknowingly collects personal information from an individual, and only later learns that that individual is U13.  *See Carr v. United States*, 560 U.S. 438, 449 (2010) ("[T]he Dictionary Act instructs that the present tense generally does not include the past." (citing 1 U.S.C. § 1)); *see also Balderas*, 457 F. Supp. 3d at 1113 (COPPA applies to "*contemporaneous* knowledge" (emphasis added)).  So, notwithstanding the AGs' assertion that Meta "fails to adhere to COPPA's unambiguous statutory obligations" to provide parental notice,

consent, review, and refusal opportunities, AGs' MSJ at 28, nothing in COPPA requires an operator to provide these functions unless the operator "is collecting" personal information from a user it actually knows to be U13. 15 U.S.C. § 6502(a)(1). The statute is silent on what obligations an operator has if it learns that, in the past, it had unknowingly collected personal information from a later-identified U13. The Court should decline to read into COPPA any obligations not specified in the statutory language thereof. *See O'Neal v. Price*, 531 F.3d 1146, 1154 (9th Cir. 2008) ("We decline to read into the statute an additional requirement not enacted by Congress."); *see also Berk v. Choy*, 607 U.S. ---, 2026 WL 135974, at *4 (Jan. 20, 2026) (stating that it is "fair to infer that" a rule requiring certain information to be included in a pleading "excludes the possibility of requiring even more information on the same topic").

To the extent the AGs rely on FTC rulemaking that purports to extend COPPA to an operator that "maintain[s]" personal information from users they later learn to be U13, *see* 16 C.F.R. § 312.3 (providing that an operator must comply with the COPPA rule if it "is collecting or maintaining personal information from a child"), such reliance is misplaced, for two reasons.[25]

*First*, the FTC's adoption of the "maintaining" provision was procedurally defective under both the Administrative Procedure Act ("APA") and the Due Process clause.[26] The FTC first proposed the COPPA Rule in an April 1999 Notice of Proposed Rulemaking ("NPRM"). *See* NPRM, Children's Online Privacy Protection Rule, 64 Fed. Reg. 22750, 22753 (Apr. 27, 1999). In that NPRM, the FTC proposed merely restating 15 U.S.C. § 6502(a)(1) in a regulation to be located at 16 C.F.R. § 312.3. *See id.* at 22764. In the NPRM's version of § 312.3, liability for operators of general audience websites attached only if the operator "has actual knowledge that it

---

[25] Notwithstanding the legal deficiencies with this rule identified herein, Meta Platforms does, as a matter of practice, permanently delete the information of users who fail to successfully appeal a checkpoint. *See supra* Background Part II.D. This practice does not change the fact that COPPA imposes no legal obligation to do so.

[26] Notwithstanding that the relevant rulemaking occurred in 1999, Meta can properly challenge the rule's application to it in this litigation, as regulated parties "may always assail a regulation as exceeding the agency's statutory authority in enforcement proceedings against them[.]" *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 823 (2024) (internal quotation marks and citation omitted); *see also* 15 U.S.C. § 6504(a)(1) (authorizing states to bring civil enforcement actions under COPPA).

META'S OPP. TO THE STATE AGS' MOTION FOR PARTIAL SUMMARY JUDGMENT
Case Nos. 4:22-MD-03047-YGR-PHK, 4:23-CV-05448-YGR

is collecting personal information from a child," *id.*, thus mirroring the language of COPPA, 15 U.S.C. § 6502(a)(1).  When the FTC adopted the final version of the COPPA Rule that same November, it announced in the preamble that it had "received no comments that directly pertained to section 312.3 of the proposed Rule, which was a restatement of the requirements laid out in the Act, and therefore retain[ed] it without change."  64 Fed. Reg. 59888, 59893 (Nov. 3, 1999).  The FTC did not, however, retain the statutory definition "without change": instead, as shown in the chart below, the FTC significantly modified the statutory language by adding a concept of "maintaining" U13 data that does not appear in the statute itself, and was not included in the NPRM.  *See id.* at 59913 (purporting to apply COPPA to an operator that "has actual knowledge that it is collecting *or maintaining* personal information from a child[.]" (emphasis added)).

| **COPPA** (15 U.S.C. § 6502(a)(1) (1998)) | **NPRM** (64 Fed. Reg. 22750 at 22764 (Apr. 27, 1999)) (proposing 16 C.F.R. § 312.3) | **Final Rule** (64 Fed. Reg. 59888, 59913 (Nov. 3, 1999)) (codifying 16 C.F.R. § 312.3) |
|---|---|---|
| It is unlawful for . . . any operator that has actual knowledge that it **is collecting** personal information from a child, to collect personal information from a child in a manner that violates the regulations prescribed under subsection (b). | It shall be unlawful for . . . any operator that has actual knowledge that it **is collecting** personal information from a child, to collect personal information from a child in a manner that violates the regulations prescribed under this part. | It shall be unlawful for . . . any operator that has actual knowledge that it **is collecting or maintaining** personal information from a child, to collect personal information from a child in a manner that violates the regulations prescribed under this part. |

This regulatory addition of "or maintaining" was left unexplained.  *See id.* at 59893, 59913.

The FTC's substantive expansion of the COPPA Rule without providing notice and comment (and while erroneously stating that there had been no modification of the statutory language) cannot pass muster under the APA or the Due Process Clause.  Under the APA, an agency cannot make substantive amendments to a proposed rule without providing any reasoned explanation or opportunity for notice and comment.  *See* 5 U.S.C. § 706(2)(D) (directing courts to "hold unlawful and set aside agency action" that is "without observance of procedure required by law"); *Nat. Res. Def. Council v. U.S. EPA*, 279 F.3d 1180, 1187 (9th Cir. 2002).  A regulation not promulgated in compliance with the APA is unenforceable.  *Alameda Health Sys. v. Ctrs. for*

*Medicare & Medicaid Servs.*, 287 F. Supp. 3d 896, 919 (N.D. Cal 2017) (citing *Idaho Farm Bur. Fed'n v. Babbitt*, 58 F.3d 1392, 1405 (9th Cir. 1995)); *see Sprint Corp. v. FCC*, 315 F.3d 369, 376 (D.C. Cir. 2003) (vacating a rule that was neither "properly noticed" nor the "logical outgrowth" of such notice (internal quotation marks and citations omitted)). A provision fails to comply with the APA's notice-and-comment requirement where, as here, "interested parties would have had to divine [the agency's] unspoken thoughts" to know that the agency was considering expanding the scope of COPPA to cover "maintaining" personal information. *See Env't Integrity Project v. EPA*, 425 F.3d 992, 996 (D.C. Cir. 2005) (alterations in original) (internal quotation marks and citation omitted) (explaining that a rule is not a "logical outgrowth" when it was not previewed in the proposed rule at all, as "something is not a logical outgrowth of nothing"). And, under the Due Process clause, an agency "must give fair notice of conduct that is forbidden or required," and cannot mislead the public about the content of the law. *See FCC v. Fox Television Studios, Inc.*, 567 U.S. 239, 253 (2012).

*Second*, even if the rulemaking process were not fatally defective, this provision is substantively impermissible. The FTC had no authority to expand the scope of COPPA. *See City of Los Angeles v. Barr*, 941 F.3d 931, 938 (9th Cir. 2019) ("An agency 'literally has no power to act . . . unless and until Congress confers power upon it.'" (alteration in original) (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986))). As discussed above, the statute does not purport to impose any obligations on operators who "maintain" U13 data. Moreover, in authorizing the FTC to promulgate regulations to implement COPPA, Congress carefully cabined the scope of this rulemaking authority: any such regulation could apply to a general audience operator only to the extent that it has "actual knowledge that it is *collecting* personal information" from a U13, not merely *maintaining* such information. *See* 15 U.S.C. §§ 6502(a)(1), 6502(b)(1)(A) (emphasis added). "A regulation may not serve to amend a statute, nor add to the statute something which is not there." *Cal. Cosmetology Coal. v. Riley*, 110 F.3d 1454, 1460 (9th Cir. 1997) (citations and quotations omitted). The FTC's attempt to broaden the scope of COPPA by applying it to operators who "maintain" personal information is invalid and must be set aside pursuant to APA § 706. *See* 5 U.S.C. § 706(2)(A), (C) (directing courts to "hold unlawful and set

aside agency action" that is arbitrary, capricious, or "in excess of statutory jurisdiction, authority, or limitations"); *id.* § 703 (permitting judicial review of agency action in any "civil . . . proceeding[] for judicial enforcement"); *see also Institutional S'holder Servs., Inc. v. SEC*, 142 F.4th 757, 768 (D.C. Cir. 2025) (holding SEC's "effort to expand" the scope of a statute was "contrary to law" under APA § 706, where agency issued a rule regulating proxy recommendations, in excess of Congress's grant of authority to regulate only proxy solicitations).

Because the AGs have no evidence that Meta "is collecting" personal information from users whose accounts are disabled in an age checkpoint, and because Meta Platforms' use of previously collected information from such users does not violate COPPA (even assuming, contrary to fact, that Meta has "actual knowledge" that such users are U13), the Court should deny the AGs' motion for partial summary judgment on this issue.

### 2. Meta Platforms' Machine Learning and Generative AI Tools Do Not Train on "Personal Information" Within the Meaning of COPPA

The AGs also fail to show as a matter of undisputed fact that Meta violates COPPA by training machine and generative AI models on "personal information" within the meaning of the statute. First of all, for the reasons already addressed, the AGs cannot establish as undisputed fact that Meta has "actual knowledge" that any such "personal information" is collected from U13s. And aside from that threshold flaw, the AGs cannot establish a COPPA violation based on the use of "personal information" for training machine and AI models.

The AGs claim that Meta trains its models on "personal information" in the form of: (1) "User behavior, interests derived from user behavior, and other user characteristics (age, gender) combined with user IDs"; (2) "Usernames"; (3) "IP addresses"; and (4) "Photos and videos, including selfies." AGs' MSJ at 7-8. But this argument fails, first, because AGs' effort to rely on the FTC's overbroad definition of "personal information" is misplaced. And second, even if the FTC's definition of the term were valid, there are material disputes of fact as to whether the models at issue in fact use any of the four categories of data the AGs identify.

*First*, as explained *supra* Part III.B.2, Congress limited the meaning of "personal information" under COPPA to "individually identifiable information about an individual collected

online." 15 U.S.C. § 6501(8).  Although the statute authorizes the FTC to define new categories of personal information, the FTC ignored the requirement that these categories must be precise enough to "permit[] the physical or online contacting of a specific individual." *Id.*  So, although "[u]ser behavior . . . combined with user IDs," AGs' MSJ at 7, might arguably fall within the *FTC*'s definition of personal information, *see* 16 C.F.R. § 312.2 (providing that generic "[i]nformation concerning the child" combined with another identifier such as a "persistent identifier" is personal information), this definition goes beyond what is authorized by the statute, inasmuch as it is not limited to information permitting the physical or online contacting of the person.  It would not be reasonably possible to identify someone merely by knowing their user ID—a "random number that doesn't have very much meaning," Ex. 13 (Backstrom II) at 113:22-25, and one that the AGs have not shown is available or even usable outside of internal Meta Platforms operations—and (for example) the fact that this person likes cat videos.  Similarly, photos or videos of an individual, on their own, would rarely, if ever, provide sufficient information to know how to contact that person.

*Second*, even if the four categories listed above could constitute "personal information" within the meaning of the statute, the AGs fail to prove that the models at issue in fact are trained on them.  As to (1), the AGs have identified no evidence that the models train on user IDs.  Indeed, the model would be unlikely to "learn anything from the ID directly."  Ex. 13 (Backstrom II) at 113:20-114:2.  Instead, the user ID is simply used to "retrieve" other data that is then fed into the training models.  *Id.* at 114:3-12; *see* Ex. 14 (Backstrom I) at 33:14-23 (stating that he thinks that user IDs "do[] not . . . generally appear in the training data").  As to (2), although the AGs claim that "Meta uses usernames to train its models," AGs' MSJ at 7, the statement they cite does not show that the models at issue are generally trained on usernames but instead shows that an Instagram search model, which allows for the searching of usernames, considers a representation of the similarity between a search query and the username searched for.  *See* Ex. 25 (Meta's Third Supp. Resp. & Objs. to AGs' Second Interrog.) at App. 164-65.  As to (3), the AGs have not shown that these models access individual-level IP addresses that would allow the identification of a specific user, and the evidence shows that they do not.  *See* Ex. 13 (Backstrom II) at 114:23-115:10

(stating that, while IP addresses *might* theoretically have been folded into other data that was then fed to a training model, he is "pretty sure [Meta has] never used that as a feature directly" and that the level of detail of IP address that a model would consider would only allow for "estimat[ing] what country a person is in"); *id.* at 115:20-25 (stating that Meta's most granular location data is "more at the . . . scale of a . . . city"). Finally, as to (4), the AGs have no evidence that the models train on images of U13s; instead, the evidence shows that models do not train on "pixel data" of photos but rather on metadata about the photo or the "topic ID" for the photos. Ex. 14 (Backstrom I) at 21:3-25. And the AGs lack proof that Meta Platforms trains its models on the actual images contained in video, as the only citation to this is the Rule 30(b)(6) deposition of Lars Backstrom in which he said that it was "less clear . . . how much we use . . . the videos versus the metadata and . . . extracted from them or things like that." *Id.* 39:14-25; *cf.* 16 C.F.R. § 312.2 (providing that the photo or video must contain the U13's "image").

Because the AGs have not established as a matter of undisputed fact that the categories of user data on which the machine learning and generative AI models at issue are trained constitute "personal information" within the meaning of COPPA, the AGs' motion for partial summary judgment should be denied.

**3.    Even if Meta Platforms' Use of Machine Learning and Generative AI Tools Theoretically Could Constitute the Knowing Collection of Personal Information from U13s, the AGs Have No Evidence That This Happens in Practice**

The AGs argue that, during the period in which an account is scheduled for deletion after failing to successfully appeal a checkpoint, "the account's data is available to be used in model training until it is deleted." AGs' MSJ at 10. But even if Meta acquired "actual knowledge" that a user was U13 when the user fails, or fails to appeal, an age checkpoint—which it does not, for the reasons already addressed—the AGs fail to establish as a matter of undisputed fact that the models at issue actually train on U13 data collected during this brief window.[27] *See* AGs' MSJ at

---

[27] Further, although the restrictions on model training discussed here would not apply to accounts soft-matched or (prior to 2021) hard-linked to accounts in an age checkpoint, as explained *supra* Part IV.B.2, even if the AGs could show that Meta had actual knowledge that such disabled

28.  Because there are genuine disputes of fact as to whether the conduct the AGs complain of even occurred *at all*, the AGs have not met their burden to "establish beyond controversy every essential element" of their claim.  *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 888 (9th Cir. 2003) (internal quotation marks and citation omitted).

As noted *supra* Part IV.B, the only users whom the AGs claim Meta actually knows to be U13 are users whose accounts have been placed in an age checkpoint, and users whose accounts are hard-linked and soft-matched to such accounts.  It is a disputed issue of material fact whether Meta has "actual knowledge" these are U13s, for reasons addressed above.  Putting that aside, even if Meta Platforms trains its machine learning and generative AI tools on data from accounts in an age checkpoint, there is no new collection of information; instead, the models simply analyze, and in some instances create new inferences from, information that had been previously collected. *See* Ex. 14 (Backstrom I) at 15:10-13 (explaining that a machine learning model merely "make[s] predictions based on the input signals that are put into the models"); *id.* at 35:5-10 (explaining that generative AI tools merely "create new images or text in response to prompts").  This is because—as is undisputed—users of accounts in an age checkpoint *cannot access their account or (as of 2021) any account hard-linked to their account*, meaning that they cannot see or engage with content; accordingly, they are unable to produce new personal information that Meta could collect. Ex. 4 (Hartnett Dep.) at 103:15-18, 110:24-111:13; Ex. 13 (Backstrom II) at 143:16-20.

It is further undisputed that Meta Platforms generally *prevents* its employees from using data from users whose accounts are scheduled to be deleted.  Ex. 14 (Backstrom I) at 29:3-6, 29:23-30:5, 40:16-21; *id.* at errata 29:11-16, 29:23-30:5.  There is, at most, a matter of days before the machine learning and generative AI models at issue are fully blocked from accessing data from accounts after they are marked for deletion.  *See id.* at errata 29:23-30:5.

Moreover, the AGs fail to establish, as a matter of undisputed material fact, that any collection from accounts in an age checkpoint actually happens.  Whether it happens at all is in serious dispute—the evidence reflects that it is highly unlikely for data from such accounts to be

account belonged to U13s, they cannot prove that Meta actually knew that hard-linked and soft-matched accounts belong to the same user—because they do not necessarily so belong.

used in model training. Users of checkpointed accounts cannot generate new data, and—although Meta Platforms does have models that do "batch training" on historical data—there is a limit to how far back in time those models look. *See* Ex. 13 (Backstrom II) at 65:14-20, 110:12-111:4, 72:7-13. As a result, such training could "[t]heoretically" alter the weights of a model, but in practice such an effect would be "minute" at most. Ex. 14 (Backstrom I) at 31:2-8. Moreover, the AGs do not point to any evidence showing that such training ever happened in reality. In short, the AGs can show—at most—that it was theoretically possible that the models at issue could have been trained on data from accounts while in an age checkpoint. This kind of theoretical possibility is not sufficient for summary judgment. *See Harris v. Cnty. of Orange*, 17 F.4th 849, 857 n.4 (9th Cir. 2021) ("[A] 'possibility' of a factual occurrence is not sufficient to survive summary judgment." (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986))).

## CONCLUSION

For the foregoing reasons, the AGs' motion for partial summary judgment should be denied.

Dated:  February 27, 2026

Respectfully submitted,

DAVIS POLK & WARDWELL LLP

 */s/ Antonio J. Perez-Marques*

James P. Rouhandeh, *pro hac vice*
Antonio J. Perez-Marques, *pro hac vice*
Caroline Stern, *pro hac vice*
Kathryn S. Benedict, *pro hac vice*
Corey M. Meyer, *pro hac vice*
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
rouhandeh@davispolk.com
antonio.perez@davispolk.com
caroline.stern@davispolk.com
kathryn.benedict@davispolk.com
corey.meyer@davispolk.com


COVINGTON & BURLING LLP

Ashley M. Simonsen, SBN 275203
1999 Avenue of the Stars
Los Angeles, California 90067
Telephone: (424) 332-4800
Facsimile: (424) 332-2749
asimonsen@cov.com

Paul W. Schmidt, *pro hac vice*
Phyllis A. Jones, *pro hac vice*
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
pschmidt@cov.com
pajones@cov.com

*Attorneys for Defendants Meta Platforms, Inc.
and Instagram, LLC*

**<u>ATTESTATION PURSUANT TO CASE MANAGEMENT ORDER NO. 27</u>**

I attest that the evidence cited herein fairly and accurately supports the facts as asserted.

Dated:  February 27, 2026                              */s/ Antonio J. Perez-Marques*
                                                              Antonio J. Perez-Marques