James P. Rouhandeh, *pro hac vice*
Antonio J. Perez-Marques, *pro hac vice*
Caroline Stern, *pro hac vice*
Kathryn S. Benedict, *pro hac vice*
Corey M. Meyer, *pro hac vice*
DAVIS POLK & WARDWELL LLP
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
Email:    rouhandeh@davispolk.com
          antonio.perez@davispolk.com
          caroline.stern@davispolk.com
          kathryn.benedict@davispolk.com
          corey.meyer@davispolk.com

*Attorneys for Defendants Meta Platforms, Inc. and Instagram, LLC*

*Additional counsel listed on signature pages*

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>*People of the State of California, et al. v. Meta Platforms, Inc., et al.* | MDL No. 3047<br><br>Case Nos. 4:22-md-03047-YGR-PHK<br>4:23-cv-05448-YGR<br><br>**META'S REPLY IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO STATE ATTORNEYS GENERAL'S CROSS-MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br>Magistrate Judge: Hon. Peter H. Kang<br><br>Date:  April 15, 2026<br>Time: 1:00 PM<br>Place: Courtroom 1, 4th Floor |

# TABLE OF CONTENTS

PAGE

INTRODUCTION ................................................................................................................ 1

ARGUMENT ...................................................................................................................... 2

I.    Meta Is Entitled to Summary Judgment on the AGs' Deceptive Acts and
Practices Claims ............................................................................................. 2

    A.    The Alleged Statements Concerning Whether Meta's Platforms Are
"Addictive" Are Inactionable ................................................................... 2

        1.    No Evidence That Statements Regarding Addiction Were
False ........................................................................................... 3

        2.    Even If There Were Evidence of Addiction, the AGs Cannot
Prove That Meta's Statements Were Knowingly False .................. 5

        3.    The AGs Have No Evidence That the Statements Regarding
Alleged Addiction Had a Tendency or Were Likely to
Mislead Consumers ......................................................................... 7

    B.    Meta Is Entitled to Summary Judgment as to All Alleged Statements
for Multiple Additional Reasons ................................................................ 9

        1.    The *Noerr-Pennington* Doctrine Immunizes 32 Statements
Made to Congress and the Coroner's Court ................................... 9

        2.    Meta Is Entitled to Summary Judgment as to Alleged
Misrepresentations Under 16 States' Laws Because They
Were Not Made in Connection with a Consumer Transaction,
or in the Conduct of Trade or Commerce ..................................... 10

        3.    The Undisputed Facts Demonstrate That Multiple Statements
Are Nonactionable Opinions .......................................................... 13

        4.    Numerous Alleged Statements Are Nonactionable Statements
of Aspiration or Objectives ............................................................ 14

        5.    Meta Is Entitled to Summary Judgment as to Statements That
Fall Outside the Applicable Statute of Limitations Period ........... 15

II.    Meta Is Entitled to Summary Judgment on the AGs' Unfairness Claims ............ 16

    A.    Section 230 and the First Amendment Bar the AGs' Unfairness
Claims ........................................................................................................ 16

        1.    Section 230 Bars These Claims Because They Seek to Impose
a Duty on Meta for Its Role and Conduct as a Publisher of
Third-Party Content ....................................................................... 16

        2.       The First Amendment Also Bars the AGs' Unfairness Claims Because They Seek to Regulate Meta's Expressive Activities..... 18

    B.      The AGs' Unfairness Claims Also Fail Because the AGs Have Not Met Their Evidentiary Burdens ............................................................... 20

        1.       The AGs Have No Evidence That the Features Cause Harm ....... 20

        2.       The Unfairness Claims by KS, NE, and NJ Fail Because These AGs Have Not Met Their Unique Evidentiary Burdens .... 22

        3.       CO and KY's Unfairness Claims, and the AGs' Requests for Civil Penalties, Fail for Lack of Any Admissible Evidence of Meta's Intent ................................................................................ 22

III.     Meta Is Entitled to Summary Judgment on the AGs' Requests for Disgorgement ...................................................................................................... 23

    A.      CA, IN, KY, NC, and NY Are Not Permitted to Seek Disgorgement ...... 24

    B.      Even for States That Can Seek Disgorgement in State Courts Under State Law, Their Claims Fail Under Federal Law of Equity .................... 24

    C.      The AGs Lack Evidence to Support a Claim for Disgorgement ............... 25

    D.      The AGs' Claims for Disgorgement and Civil Penalties Are Limited by Extraterritoriality and Statutes of Limitations ..................................... 26

IV.     Meta Is Entitled to Summary Judgment on the AGs' COPPA Claim .................. 26

    A.      There Is No Genuine Dispute of Material Fact as to Whether Meta's Platforms Are General Audience Websites ............................................... 26

    B.      The AGs Have No Evidence That Meta Has "Actual Knowledge" of U13 Users in Any of Their States ............................................................. 27

    C.      The AGs' COPPA Claim Is Untimely ....................................................... 28

    D.      The AGs Are Not Entitled to Disgorgement Under COPPA.................... 29

V.     At a Minimum, Summary Judgment Should Be Granted to Instagram, LLC ...... 30

CONCLUSION ............................................................................................................................... 30

ii

META'S REPLY IN SUPP. OF MOT. FOR SUMM. J. AND OPP. TO STATE AGS' CROSS-MOT. FOR PARTIAL SUMM. J.
Case Nos. 4:22-MD-03047-YGR-PHK, 4:23-CV-05448-YGR

**TABLE OF AUTHORITIES**

PAGE(S)

C<small>ASES</small>

*303 Creative LLC v. Elenis*,
600 U.S. 570 (2023) .......................................................................................................... 19

*Agric. Water v. Occidental Oil & Gas Co.*,
235 F. Supp. 3d 1132 (E.D. Cal. 2017) ............................................................................. 9

*Allied Tube & Conduit Corp. v. Indian Head, Inc*,
486 U.S. 492 (1988) ............................................................................................................ 9

*Am. Nat'l Univ. of Ky., Inc. v. Commonwealth ex rel. Beshear*,
2019 WL 2479608 (Ky. Ct. App. June 14, 2019) ............................................................. 5

*Amarel v. Connell*,
102 F.3d 1494 (9th Cir. 1996) ......................................................................................... 10

*AMG Mgmt., LLC v. FTC*,
593 U.S. 67 (2021) ........................................................................................................... 30

*Apodaca v. Whirlpool Corp.*,
2013 WL 6477821 (C.D. Cal. Nov. 8, 2013) .................................................................. 15

*Ariix, LLC v. NutriSearch Corp.*,
985 F.3d 1107 (9th Cir. 2021) ......................................................................................... 14

*Autodesk, Inc. v. Dassault, Inc. Systems SolidWorks Corp.*,
2008 WL 6742224 (N.D. Cal. Dec. 18, 2008) ................................................................ 16

*Batzel v. Smith*,
333 F.3d 1018 (9th Cir. 2003), *overruled in part on other grounds by Gopher Media LLC v.
Melone*, 154 F.4th 696 (9th Cir. 2025) .......................................................................... 18

*Beardsall v. CVS Pharmacy, Inc.*,
953 F.3d 969 (7th Cir. 2020) ......................................................................................... 7-8

*BP Am. Prod. Co. v. Burton*,
549 U.S. 84 (2006) ........................................................................................................... 29

*Brown v. Stored Value Cards, Inc.*,
2021 WL 76951 (D. Or. Jan. 8, 2021) ............................................................................ 21

*Carcano v. JBSS, LLC*,
684 S.E.2d 41 (N.C. App. 2009) ..................................................................................... 12

*Carol Studios, Inc., v. Doo Young Hong*,
2013 WL 6592747 (Ill. Ct. App. 2013) .......................................................................... 12

*Castrol Inc. v. Pennzoil Co.*,
    987 F.2d 939 (3d Cir. 1993) ............................................................................................... 5

*Certain Underwriters at Lloyd's Lond. v. ConAgra Grocery Prods. Co*,
    77 Cal. App. 5th 729 (2022) ............................................................................................. 6

*CFPB v. CashCall, Inc.*,
    135 F.4th 683 (9th Cir. 2025) ......................................................................................... 25

*Chattin v. Cape May Greene*,
    591 A.2d 943 (N.J. 1991) ................................................................................................. 5

*City of Renton v. Playtime Theaters, Inc.*,
    475 U.S. 41 (1986) ......................................................................................................... 19

*Cleary Bldg. Corp. v. David A. Dame, Inc.*,
    674 F. Supp. 2d 1257 (D. Colo. 2009) ........................................................................... 11

*In re Colum. Coll. Rankings Action*,
    2024 WL 1312511 (S.D.N.Y. Mar. 26, 2024) ................................................................ 16

*Conley v. R.J. Reynolds Tobacco Co.*,
    286 F. Supp. 2d 1097 (N.D. Cal. 2002) ........................................................................... 7

*Connecticut v. Sandoz, Inc.*,
    2026 WL 395842 (D. Conn. Feb. 12, 2026) .................................................................... 25

*Consol. Edison Co. v. Pub. Serv. Comm'n*,
    447 U.S. 530 (1980) ....................................................................................................... 14

*Cook v. Fam. Motors, LLC*,
    2022 WL 3269946 (W.D. Mo. Aug. 10, 2022) ............................................................... 12

*CTIA – The Wireless Ass'n v. City of Berkeley*,
    928 F.3d 832 (9th Cir. 2019) .......................................................................................... 14

*de Lacour v. Colgate-Palmolive Co.*,
    2024 WL 36820 (S.D.N.Y. Jan. 3, 2024) ......................................................................... 8

*Dex Media W., Inc. v. City of Seattle*,
    696 F.3d 952 (9th Cir. 2012) .......................................................................................... 14

*Doe v. Grindr Inc.*,
    128 F.4th 1148 (9th Cir. 2025) ....................................................................................... 17

*Doe (K.B.) v. Backpage.com, LLC*,
    768 F. Supp. 3d 1033 (N.D. Cal. 2025) ...................................................................... 17-18

*Dunbar v. City of Riverside*,
    2014 WL 12962881 (C.D. Cal. Oct. 20, 2014) ............................................................... 25

*Dyroff v. Ultimate Software Grp., Inc.*,
    934 F.3d 1093 (9th Cir. 2019) ........................................................................................ 17

iv

*Est. of Bride ex rel. Bride v. Yolo Techs., Inc.*,
  112 F.4th 1168 (9th Cir. 2024) .......................................................................... 17

*In re Facebook, Inc. Internet Tracking Litig.*,
  956 F.3d 589 (9th Cir. 2020) .............................................................................. 30

*Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*,
  521 F.3d 1157 (9th Cir. 2008) (en banc) ........................................................... 18

*Forrence Orchards, Inc. v. TD Bank*,
  766 F. Supp. 3d 364 (N.D.N.Y. 2025) ............................................................... 11

*Galveston LFG, LLC v. BIOFerm Energy Sys., LLC*,
  2023 WL 5353134 (W.D. Wis. Aug. 21, 2023) ................................................. 15

*Gennari v. Weichert Co. Realtors*,
  691 A.2d 350 (N.J. 1997) ..................................................................................... 6

*In re GNC Corp.*,
  789 F.3d 505 (4th Cir. 2015) ................................................................................ 7

*Grp. Health Plan, Inc. v. Philip Morris, Inc.*,
  68 F. Supp. 2d 1064 (D. Minn. 1999) ............................................................. 12-13

*Guzman v. Polaris Indus. Inc.*,
  49 F.4th 1308 (9th Cir. 2022) ............................................................................. 25

*Haeberle v. St. Paul Fire & Marine Ins.*,
  679 S.W.2d 64 (Ky. App. 1989) ......................................................................... 24

*Harbor Breeze Corp. v. Newport Landing Sportfishing, Inc.*,
  2017 WL 10399343 (C.D. Cal. Nov. 17, 2017) .................................................. 9

*Henderson v. Muniz*,
  2018 WL 6331008 (N.D. Cal. Dec. 4, 2018) ..................................................... 17

*Hinton v. Pac. Enters.*,
  5 F.3d 391 (9th Cir. 1993) .................................................................................. 28

*I.T. v. ChoicePoint LLC*,
  2025 WL 2495079 (W.D. Wash. Aug. 29, 2025) ............................................... 11

*Jarrow Formulas, Inc. v. Nutrition Now, Inc.*,
  304 F.3d 829 (9th Cir. 2002) .............................................................................. 29

*Jeffrey C. Brown PLLC v. Gold Star Taxi & Transp. Serv. Corp.*,
  2020 WL 4743502 (Minn. Ct. App. Aug. 17, 2020) ......................................... 11

*Kentucky v. Alpharma USPD, Inc.*,
  2011 WL 5512891 (Ky. Cir. Ct. Jan. 19, 2011) .................................................. 6

*Kindred v. McLeod*,
  2010 WL 4814360 (W.D. Va. Nov. 19, 2010) ..................................................... 6

v

*King v. Twp. of E. Lampeter*,
  17 F. Supp. 2d 394 (E.D. Pa. 1998) ....................................................................................... 10

*Klein v. City of San Clemente*,
  584 F.3d 1196 (9th Cir. 2009) ............................................................................................... 19

*Knowles v. ARRIS Int'l PLC*,
  847 F. App'x 512 (9th Cir. 2021) .......................................................................................... 15

*Kokesh v. SEC*,
  581 U.S. 455 (2017) ............................................................................................................... 29

*Korea Supply Co. v. Lockheed Martin Corp.*,
  63 P.3d 937 (Cal. 2003) ......................................................................................................... 24

*Kowalsky v. Hewlett-Packard Co.*,
  771 F. Supp. 2d 1156 (N.D. Cal. 2011) ................................................................................... 6

*Krantz v. Old Copper Co.*,
  794 F. Supp. 3d 724 (C.D. Cal. 2025) ................................................................................... 15

*Kwan Software Eng'g, Inc. v. Foray Techs., LLC*,
  2014 WL 572290 (N.D. Cal. Feb. 11, 2014) ............................................................................ 2

*Lawrence v. S. Recreations, LLC*,
  304 So. 3d 128 (La. App. 2020) ............................................................................................. 23

*Liu v. SEC*,
  591 U.S. 71 (2020) ............................................................................................................ 25, 29

*Logan v. Wilkins*,
  644 F.3d 577 (7th Cir. 2011) ................................................................................................. 15

*McCarthy v. WPB Partners, LLC*,
  2016 WL 4014581 (D.N.H. July 26, 2016) ............................................................................ 12

*Md. Shall Issue, Inc. v. Anne Arundel Cnty.*,
  91 F.4th 238 (4th Cir. 2024) .................................................................................................. 14

*Mia. Herald Publ'g Co. v. Tornillo*,
  418 U.S. 241 (1974) ............................................................................................................... 19

*Monster Energy Co. v. Integrated Supply Network, LLC*,
  533 F. Supp. 3d 928 (C.D. Cal. 2021) ................................................................................... 25

*Moody v. Netchoice, LLC*,
  603 U.S. 707 (2024) ............................................................................................................... 18

*Moore v. Bird Eng'g Co., P.A.*,
  273 Kan. 2 (2002) ..................................................................................................................... 5

*Nelson v. Lusterstone Surfacing Co.*,
  258 Neb. 678 (2000) ............................................................................................................... 11

*NetChoice v. Jones*,
  2026 WL 561099 (E.D. Va. Feb. 27, 2026) ................................................................................ 20

*New York v. Meta Platforms, Inc.*,
  66 F.4th 288 (D.C. Cir. 2023) ................................................................................................... 29

*NN&R, Inc. v. One Beacon Ins. Grp.*,
  2006 WL 1765077 (D.N.J. June 26, 2006) ................................................................................. 6

*Ogden v. Bumble Bee Foods, LLC*,
  2014 WL 27527 (N.D. Cal. Jan. 2, 2014) ................................................................................... 2

*Oswego Laborers' Loc. 214 Pension Fund v Marine Midland Bank*,
  85 N.Y.2d 20 (1995) ................................................................................................................ 12

*Owens v. DRS Auto. Fantomworks, Inc.*,
  764 S.E.2d 256 (Va. 2014) ........................................................................................................ 5

*People ex rel. Hartigan v. Maclean Hunter Pub. Corp.*,
  119 Ill. App. 3d 1049 (Ill. App. Ct. 1983) ............................................................................... 23

*People ex rel. Madigan v. CMK Invs., Inc.*,
  2015 WL 4038896 (N.D. Ill. June 30, 2015) ............................................................................ 24

*Pharm. Rsch. & Mfrs. of Am. v. Stolfi*,
  153 F.4th 795 (9th Cir. 2025) .................................................................................................. 14

*Porter v. Warner Holding Co.*,
  328 U.S. 395 (1946) ................................................................................................................ 30

*Preferred Commc'ns, Inc. v. City of Los Angeles*,
  754 F.2d 1396 (9th Cir. 1985) .................................................................................................. 20

*Pulver v. Dougherty*,
  58 A.D.3d 978 (N.Y. App. Div.  2009) ...................................................................................... 15

*Reed v. NBTY, Inc.*,
  2014 WL 12284044 (C.D. Cal. Nov. 18, 2014) ........................................................................... 7

*Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*,
  62 P.3d 142 (Colo. 2003) ........................................................................................................... 6

*In re Saturn L-Series Timing Chain Prods. Liab. Litig.*,
  2008 WL 4866604 (D. Neb. 2008) ........................................................................................... 15

*Schering-Plough Healthcare Prods., Inc. v. Schwarz Pharma, Inc.*,
  586 F.3d 500 (7th Cir. 2009) ...................................................................................................... 7

*SEC v. First City Fin. Corp.*,
  890 F.2d 1215 (D.C. Cir. 1989) ........................................................................................... 25-26

*SEC v. Hallam*,
  42 F.4th 316 (5th Cir. 2022) .................................................................................................... 25

*SEC v. Rind*,
   991 F.2d 1486 (9th Cir. 1993) ......................................................................................... 29

*SEC v. Spartan Secs. Grp., Ltd.*,
   164 F.4th 1231 (11th Cir. 2026) ...................................................................................... 25

*Silver v. Pep Boys-Manny, Moe & Jack of Del., Inc.*,
   2018 WL 1535285 (D.N.J. Mar. 29, 2018) ................................................................ 10-13

*Skelton v. Chem. Leaman Tank Lines, Inc.*,
   1996 WL 278343 (Conn. Super. Ct. May 13, 1996) ...................................................... 11

*Smith v. Prime Cable of Chi.*,
   658 N.E.2d 1325 (Ill. App. Ct. 1995) .............................................................................. 5

*In re Soc. Media Adolescent Addiction/Personal Inj. Prods. Liab. Litig.*,
   702 F. Supp. 3d 809 (N.D. Cal. 2023) ........................................................................... 19

*Sonner v. Premier Nutrition Corp.*,
   971 F.3d 834 (9th Cir. 2020) .......................................................................................... 24

*Starbucks Corp. v. McKinney*,
   602 U.S. 339 (2024) ........................................................................................................ 30

*State ex rel. Jennings v. BP Am. Inc.*,
   2024 WL 98888 (Del. Super. Ct. Jan. 9, 2024) ............................................................ 15

*State ex rel. Wilson v. Ortho-McNeil-Janssen Pharms., Inc.*,
   77 S.E.2d 176 (S.C. 2015) ............................................................................................. 15

*State v. Orion Processing, LLC*,
   2016 WL 7435679 (N.C. Super. Dec. 20, 2016) .......................................................... 24

*State v. TikTok Inc.*,
   245 N.E.3d 681 (Ind. App. 2024) .................................................................................. 11

*In re Styer*,
   2013 WL 6234621 (Bankr. E.D. Pa. Dec. 2, 2013) ...................................................... 23

*Superior Steel, Inc. v. Ascent at Roebling's Bridge, LLC*,
   540 S.W.3d 770 (Ky. 2017) ........................................................................................... 24

*In re Syngenta AG MIR 162 Corn Litig.*,
   131 F. Supp. 3d 1177 (D. Kan. 2015) ............................................................................ 13

*In re Tesla Advanced Driver Assistance Sys. Litig.*,
   2023 WL 6391477 (N.D. Cal. Sept. 30, 2023) .............................................................. 16

*TikTok Inc. v. Garland*,
   604 U.S. 56 (2025) .......................................................................................................... 20

*Tuosto v. Philip Morris USA Inc.*,
   2007 WL 2398507 (S.D.N.Y. Aug. 21, 2007) ................................................................ 9

viii

*Tygon Peak Cap. Mgmt., LLC v. Mobile Invs. Investco LLC*,
   2022 WL 34688 (Del Ch. 2022) ...................................................................................... 11

*United States v. McNicol*,
   829 F.3d 77 (1st Cir. 2016) ............................................................................................. 30

*United States v. O'Brien*,
   391 U.S. 367 (1968) ......................................................................................................... 20

*United States v. Philip Morris USA Inc.*,
   566 F.3d 1095 (D.C. Cir. 2009) ........................................................................................ 9

*Varity Corp. v. Howe*,
   516 U.S. 489 (1996) ......................................................................................................... 30

*Ward v. Rock Against Racism*,
   491 U.S. 781 (1989) ......................................................................................................... 19

*Wasco Prod., Inc. v. Southwall Techs., Inc.*,
   435 F.3d 989 (9th Cir. 2006) ........................................................................................... 20

*Winslow v. OCMBC, INC.*,
   2025 WL 2986608 (D. Colo. Sept. 15, 2025) ................................................................. 15

*Zorba Contractors, Inc. v. Hous. Auth., City of Newark*,
   827 A.2d 313 (N.J. Super. Ct. App. Div. 2003) ................................................................ 6

## STATUTES & RULES

6 Del. Code § 2522(b) ............................................................................................................. 23

15 U.S.C. § 45 .........................................................................................................................20

15 U.S.C. § 6502(a)(1) ........................................................................................................... 29

15 U.S.C. § 6504 ............................................................................................................... 27, 29

28 U.S.C. § 1658 ..................................................................................................................... 28

47 U.S.C. § 230 ............................................................................................................. 1, 10, 16-17

Cal. Gov. Code § 12527.6 ....................................................................................................... 24

Conn. Gen. Stat. § 42-110o(b) ............................................................................................... 23

Fed. R. App. P. 54(c) .............................................................................................................. 24

Kan. Stat. § 50–626(b)(2)-(3) .................................................................................................. 6

S.C. Code § 39-5-110(c) ......................................................................................................... 23

<u>OTHER AUTHORITIES</u>

89 Fed. Reg. 2034, 2039 (Jan. 11, 2024) ........................................................................................ 27

META'S REPLY IN SUPP. OF MOT. FOR SUMM. J. AND OPP. TO STATE AGS' CROSS-MOT. FOR PARTIAL SUMM. J.
Case Nos. 4:22-MD-03047-YGR-PHK, 4:23-CV-05448-YGR

# INTRODUCTION

Meta is entitled to summary judgment because the AGs have failed to show that their claims are legally viable and have not produced evidence as to the essential elements of their claims.

This began as a case about alleged addiction. But those allegations have not withstood the test of discovery, and the AGs have offered no evidence that any of the six allegedly deceptive statements referencing addiction were false, knowingly false, or actually misleading to consumers. The AGs now contend that this case is about *problematic use*. Yet not *one* of the more than 100 statements at issue refers to problematic use. And the AGs have specifically disclaimed that Meta had an independent duty to disclose whatever it may have thought about problematic use or any other topic. These facts alone are fatal to the AGs' claims based on alleged addiction.

Furthermore, the AGs ignore the undisputed evidence that Meta did not equate problematic use and addiction—including in the very documents *the AGs* cite—because the term addiction is "not accurate" when used to describe use of the company's services. Opp. Ex. 20. The AGs' deception claims fail for numerous other, independent reasons, that entitle Meta to summary judgment on the relevant statements at issue. Nor can the AGs overcome their lack of evidence as to individual statements through a "deceptive scheme" claim that blurs together more than 100 statements, made over nearly a decade, by various individuals, and covering a multitude of topics, especially when that alleged scheme also lacks an evidentiary basis. Finally, their cross-motion for partial summary judgment as to certain elements of those claims fails as a matter of law.

Even if the AGs' unfairness claims could survive Section 230 or the First Amendment—and they cannot under clear and consistent Ninth Circuit precedent—the AGs do not have evidence sufficient to meet their evidentiary burdens under the relevant state consumer protection statutes. Nothing cited in the AGs' Opposition changes this conclusion. In contending otherwise, they disregard applicable law and cite evidence that is unrelated to the relevant features.

State and federal law limitations that bar punitive, nonrestitutionary disgorgement also foreclose the AGs' requests for disgorgement, and all relief is limited by territorial limitations and the statutes of limitations. Even if disgorgement were available, the AGs do not have the evidence

1

META'S REPLY IN SUPP. OF MOT. FOR SUMM. J. AND OPP. TO STATE AGS' CROSS-MOT. FOR PARTIAL SUMM. J.
Case Nos. 4:22-MD-03047-YGR-PHK, 4:23-CV-05448-YGR

required to recover the profits they seek.

Finally, the AGs have failed to identify any evidence establishing a genuine issue of material fact as to whether Meta violated COPPA. The undisputed evidence demonstrates that both Facebook and Instagram are general audience websites, and that Meta lacks any "actual knowledge" that it is collecting personal information from any U13 individual, let alone in each AGs' state. The remedies they seek are also unavailable: laches bars the AGs' claim for equitable relief, and the AGs are not entitled to disgorgement.

## ARGUMENT[1]

### I. Meta Is Entitled to Summary Judgment on the AGs' Deceptive Acts and Practices Claims

All of the alleged misstatements are nonactionable. *See* Mot. § I. The AGs' deception claims can survive summary judgment only as to a statement that is *independently* actionable. *See, e.g.*, *Ogden v. Bumble Bee Foods, LLC*, 2014 WL 27527 (N.D. Cal. Jan. 2, 2014) (ruling on summary judgment on a statement-by-statement basis); *Kwan Software Eng'g, Inc. v. Foray Techs., LLC*, 2014 WL 572290, at *6-11 (N.D. Cal. Feb. 11, 2014) (similar). The AGs' assertion, for which they have no support, that the more than 100 statements, spanning almost eight years, can be lumped together as a single "deceptive scheme," Opp. at 3, is wrong.

### A. The Alleged Statements Concerning Whether Meta's Platforms Are "Addictive" Are Inactionable

The AGs have no evidence that the statements regarding addiction were false when made, that the speakers knew they were false, or that the statements tended to or were likely to deceive consumers. Mot. at 10-18. The AGs have identified only six statements that reference addiction, and none that references problematic use.[2] Mot. at 8-9. Because the AGs cannot prove that Meta's platforms are addictive, Mot. § 1.A.1, they seek to conflate social media addiction with problematic use, Opp. at 8-10—a broad term used to describe a relationship with technologies that encompasses behaviors outside of those associated with addiction, Mot. Ex. 37 at 1. But Meta has never denied

---

[1] Abbreviations used herein have the same meaning as in Meta's Motion for Summary Judgment ("Meta's Motion" or "Mot.") (ECF 2704) at 2 n.1. References to "Opposition" or "Opp." are to the AGs' opposition to Meta's Motion (ECF 2779). Internal quotation marks and citations are omitted.

[2] The AGs incorrectly assert that "Meta identified an incomplete list" of addiction-related statements. Opp. at 3 n.2. None of the other statements the AGs cite reference "addiction." Those statements are therefore irrelevant to this portion of Meta's Motion.

2

META'S REPLY IN SUPP. OF MOT. FOR SUMM. J. AND OPP. TO STATE AGS' CROSS-MOT. FOR PARTIAL SUMM. J.
Case Nos. 4:22-MD-03047-YGR-PHK, 4:23-CV-05448-YGR

that some individuals may experience problematic use.  *See* Justin Cheng, et al., *Understanding Perceptions of Problematic Facebook Use: When People Experience Negative Life Impact and Lack of Control* 1 (CHI Conf. on Hum. Factors in Computing Sys., 2019) (externally acknowledging some users may "feel their use is problematic").[3]  Moreover, because *none* of the statements at issue references problematic use, the only remaining pathway to pursue "problematic use" claims would be based on a pure omissions theory.  But the AGs have expressly disclaimed any such theory (*see, e.g.*, ECF 2550 at 3) and cannot resurrect it now.

### 1.  No Evidence That Statements Regarding Addiction Were False

The AGs cannot prove that the platforms are addictive and, therefore, cannot prove falsity, as required in eight states.  Mot. at 9 n.27.[4]  The AGs do not address, and therefore concede, that the statutory provisions in five states on which Meta moved (DE, IL, IN, NE, and PA) require proof of a false statement, and they incorrectly suggest that falsity is not required in three others (CO, KS, MN), Opp. at 4; *see also* Mot. at 9 n.27, App. 4-5.

"Social media addiction" is not a recognized condition.  Mot. at 9-13.  The AGs identify no evidence to the contrary, let alone a single email, post, or chat to or from any of the makers of the relevant statements that suggests they did not believe in the truth of the handful of statements they made regarding addiction.  *See infra* § 1.A.2.  Instead, the AGs base their allegations of false statements on six internal documents, none of which is evidence that the platforms are addictive or that the makers of the at-issue statements believed the platforms are addictive.  Opp. at 8 & n.11.  The AGs cite a single employee's comment on research about user engagement that "some of our users are addicted to our products," Opp. Ex. 15, and another employee agreeing with the premise of a Netflix documentary that social media is addictive, *id.* Ex. 16.  But one-off, non-expert opinions of employees do not prove that the platforms are addictive or were designed that way.  Nor do the handful of references to addiction in four documents cited by the AGs relating to user research that was not designed and does not purport to show that social media causes addiction, *id.* Exs. 11, 17-19.

---

[3] Instead, Meta has denied at various points in time and consistent with current scientific research, that its platforms are or were designed to be addictive.

[4] The AGs wrongly claim that Meta argued that all 18 states require proof of falsity.  Opp. at 4.

Nor is the report of the AGs' expert Bradley Zicherman, Opp. at 11 n.18, proof that Meta's platforms are addictive. As an initial matter, Zicherman acknowledges that social media addiction is *not* recognized in the DSM-5 or DSM-5-TR. Ex. 1 (Zicherman Rep.) ¶ 25 & n.17. Instead, he takes criteria from *recognized* disorders to create his own social media addiction standard tailor-made for this litigation. *Id.* ¶¶ 24-34. Further, many of the articles Zicherman cites either do not mention social media addiction[5] or acknowledge that it is not a recognized disorder.[6] Also, Zicherman did not produce his clinical notes and declined to specify the number of patients for whom he provided an actual diagnosis of "social media addiction." Ex. 2 (Zicherman Dep.) at 258:23-262:24. And because Zicherman conceded he does not distinguish between addiction and non-clinical problematic use, *id.* at 258:2-19, the AGs cannot rely on him to identify the former. Similarly, the other experts the AGs rely upon do not offer opinions that "social media addiction" exists as a diagnosable condition. *See* Opp. at 10.

The three webpages the AGs cite, *see* Opp. at 11 n.18, also do not prove the existence of addiction: (1) a post on the APA's website authored by a single doctor (which was not peer-reviewed and does not cite a single source recognizing social media addiction)[7] is not evidence of the APA's recognition of such a condition, Opp., Gooler Decl. Ex. C[8]; (2) the Surgeon General's Advisory is not based on "an exhaustive review of the literature," and explicitly states that "[m]ore research is needed to fully understand the impact of social media," *id.* Ex. E at 3-4; and (3) the APA's Health Advisory on Social Media Use in Adolescence does not even refer to addiction, *see id.* Ex. D.

The AGs have no evidence that the platforms are designed to be addictive. They rely on documents discussing engagement, time spent, and problematic use, Opp. Exs. 33-42, but none of

---

[5] *See, e.g.*, Melissa G. Hunt et al., *No More FOMO: Limiting Social Media Decreases Loneliness and Depression*, 37 J. Soc. & Clinical Psych. 751 (2018).

[6] *See, e.g.*, Ilaria Cataldo et al., *Assessing Problematic Use of Social Media: Where Do We Stand and What Can Be Improved?* 45 Current Op. in Behavioral Sci. (2022).

[7] Two of the sources cited in this post are the other webpages cited by the AGs, which, as explained *infra*, do not support the existence of social media addiction. The third similarly disclaims such existence following a literature review, noting that more research would be needed. *See* Nat'l Acads. of Scis., Eng'r & Med., *Social Media and Adolescent Health* xv-xvi, 5, 94, 205-06 (2024).

[8] The AGs omit that in an FAQ on this webpage, the same doctor acknowledges that social media addiction is "not currently included in the [DSM]." James Sherer, *Technology Addictions: Social Media, Online Gaming, and More*, APA, https://www.psychiatry.org/patients-families/technology-addictions-social-media-and-more/expert-q-a-technology-addiction (last visited Mar. 27, 2026).

those terms equates to addiction.  Even if they did, research about how certain design features affect teens is not evidence of a goal to addict, or actual addiction.  For example, the AGs claim that a May 2020 research deck shows a study of "the teenage brain in order to capitalize on its unique weaknesses."  Opp. at 10.  But the AGs mischaracterize the purpose of that research, which was to "strike [a balance] between driving engagement and being mindful of teen well-being" because "***[w]e do not want to drive usage that is problematic to teens***[,]" as explained by the author in an email circulating the research.  *See* Ex. 3 at -8978 (emphasis added).

Unable to prove that the platforms are addictive or were designed to be so, the AGs assert that consumers would not have understood these statements to refer to "clinically diagnosable mental health disorders."  Opp. at 11.  The AGs provide *no* support for this assumption.  When analyzed in the "full context," *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 946 (3d Cir. 1993), the undisputed record confirms that the speakers *were* discussing actual addiction.  For instance, Mr. Zuckerberg's reference to addiction in his Congressional testimony was in response to a question in which Senator Johnson drew comparisons to tobacco addiction—a recognized addiction, unlike problematic use.  Mot. Ex. 2 at 72 (¶ 191 / B4).  And Mr. Mosseri's statement regarding the research on the alleged addictiveness of Instagram was also referring to addiction, not problematic use, which even Senator Blumenthal recognized in his response, noting that Mr. Mosseri was using a different "meaning of the word addictive" than he was.  Mot. Ex. 3 at 13 (¶ 427 / B1).

### 2. Even If There Were Evidence of Addiction, the AGs Cannot Prove That Meta's Statements Were Knowingly False

Summary judgment should be granted because the AGs have no evidence that the speakers knew or had reason to believe that the platforms were addictive.[9]  The AGs incorrectly assert that seven states (CO, IL, KS, KY, NJ, PA, VA) do not require a showing of intent to deceive, cause harm, or induce reliance.  Opp. 4-5 n.5.  But the cited cases either support Meta's position, App. 1-3, or are inapposite because they involve entirely different claims from those here.[10]  As for civil

---

[9] The AGs incorrectly suggest that Meta argued that knowledge is required in all states, Opp. at 4, but Meta moved on this ground only with respect to 11 states, Mot. at 9 n.26.

[10] *See Smith v. Prime Cable of Chi.*, 658 N.E.2d 1325, 1335 (Ill. App. Ct. 1995) (discussing intent for misrepresentations, not omissions); *Owens v. DRS Auto. Fantomworks, Inc.*, 764 S.E.2d 256, 260 (Va. 2014) (same); *Moore v. Bird Eng'g Co., P.A.*, 273 Kan. 2, 17 (2002) (Kan. Stat. § 50–626(b)(2)-(3) requires intent to deceive); *Am. Nat'l Univ. of Ky., Inc. v. Commonwealth ex rel. Beshear*, 2019

penalties, the AGs are wrong that a "willful" violation is "more akin to negligence than knowing falsity," Opp. at 5, and ignore that "willfulness" varies considerably across the states.[11]  And knowledge of falsity is required for civil penalties in states (i) with an intent to deceive element (IL, IN, LA, PA), or (ii) where the defendant knew or should have known its conduct violated the law and falsity (or knowledge of it) is required for liability (DE, IN, VA).  App. 22-24.

The AGs are also wrong that the individual speaker's knowledge is not relevant to intent. Opp. at 5.  A corporation cannot be held liable if the speaker does not have personal knowledge that the statement is false.  Mot. at 14.  The AGs assert that the CO and NJ cases Meta cites are inapposite because they involved common-law fraud, Opp. at 5, but courts have long recognized that common-law fraud principles are probative for analyzing intent in consumer protection statutes, *see Rhino Linings*, 62 P.3d at 147; *Zorba Contractors, Inc. v. Hous. Auth., City of Newark*, 827 A.2d 313, 322 (N.J. Super. Ct. App. Div. 2003).[12]  And it is the AGs who misapply *NN&R, Inc. v. One Beacon Ins. Group*, which granted summary judgment on both common law fraud *and* NJ CFA claims because the speaker did not have knowledge of falsity.  2006 WL 1765077, at *12-13 (D.N.J. June 26, 2006). The AGs' cases fare no better, as they either do not analyze knowledge under the relevant laws, *see, e.g.*, *Certain Underwriters at Lloyd's Lond. v. ConAgra Grocery Prods. Co.*, 77 Cal. App. 5th 729, 751 (2022) (discussing CA insurance law), or are otherwise not representative of the laws of all 18 states, let alone the 10 that require knowledge of falsity.

Because the AGs cannot prove the statements regarding alleged addiction were false, the speakers necessarily cannot have known they were false.  Mot. at 14.  Moreover, half the documents

___

WL 2479608 at *4 (Ky. Ct. App. June 14, 2019) (discussing intent for civil penalties, not liability); *Chattin v. Cape May Greene,* 591 A.2d 943, 945-46 (N.J. 1991) (omissions must be made knowingly and with intent to deceive).  The CO Supreme Court has held that misrepresentations must be made "with an intent to mislead and deceive." *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 147 (Colo. 2003).  The AGs are also wrong that CA's UCL "has no knowledge requirement," Opp. at 5 n.5. *See Kowalsky v. Hewlett-Packard Co.*, 771 F. Supp. 2d 1156, 1160 (N.D. Cal. 2011) (CA UCL claims require showing "defendant knew of the alleged defect").

[11] *Compare Kindred v. McLeod*, 2010 WL 4814360, at *10 (W.D. Va. Nov. 19, 2010) (defining "willful" as "knowing and intentional disregard of the protections afforded consumers"), *with Kentucky v. Alpharma USPD, Inc.*, 2011 WL 5512891 (Ky. Cir. Ct. Jan. 19, 2011) (defining "willful" as "intentional, wanton or reckless" conduct).  The AGs' reference to the KY civil penalty intent standard is also irrelevant, as Meta does not move on that ground.  *See* App. 22-25.

[12] The AGs' reliance on *Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 365 (N.J. 1997) (Opp. at 5), is misguided, as Meta moved on NJ CFA claims only to the extent based on omissions amounting to half-truths, which require intent.  *See* App. 2.

META'S REPLY IN SUPP. OF MOT. FOR SUMM. J. AND OPP. TO STATE AGS' CROSS-MOT. FOR PARTIAL SUMM. J.
Case Nos. 4:22-MD-03047-YGR-PHK, 4:23-CV-05448-YGR

identified as evidence of knowledge do not mention the term "addiction" and instead discuss problematic use and well-being more broadly, and those that reference addiction do not demonstrate the existence of social media addiction. *See* Opp. at 13 n.22. Mr. Zuckerberg, Ms. Davis, and Mr. Mosseri each testified that, in their opinions, the scientific research does not show that the platforms cause addiction and reflects the fact that addiction is different from problematic use. *See* Ex. 4 (Zuckerberg Dep.) at 162:16-163:3; Ex. 5 (Davis Dep.) at 670:5-10; Ex. 6 (Mosseri Dep.) at 75:14-16. The AGs have no evidence that the speakers did not actually hold the opinions they expressed, which, as opinions, are not actionable in any event. *See infra* § I.B.3.

The AGs further cannot prove that the alleged statements were knowingly false when made given that—at best—the research on social media addiction is unsettled. *See* Mot. at 14-15; *Conley v. R.J. Reynolds Tobacco Co.*, 286 F. Supp. 2d 1097, 1112 (N.D. Cal. 2002) (No evidence "that [defendant] knew or should have known that cigarettes had a risk of addiction" where the "scientific or medical knowledge" was not yet settled.). The AGs have *no* response.[13] They lack any evidence that the speakers did not hold the beliefs they expressed, and the undisputed evidence shows that Meta's executives *differentiated* between the terms—e.g., stating that "[p]roblematic use does not equal addiction." Mot. Ex. 37 at 1; *infra* § I.A.3.

### 3. The AGs Have No Evidence That the Statements Regarding Alleged Addiction Had a Tendency or Were Likely to Mislead Consumers

Meta is also entitled to summary judgment because the AGs have no evidence that these statements tended to or were likely to mislead consumers. Mot. at 15-17. The AGs incorrectly assert that extrinsic evidence is unnecessary. Opp. at 6-7. But as they acknowledge, *id.*, such evidence "is necessary where the [statement] is not clearly misleading on its face"—i.e., so long as the statement is not literally false. *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 976 (7th Cir. 2020); *Schering-Plough Healthcare Prods., Inc. v. Schwarz Pharma, Inc.*, 586 F.3d 500, 512-13 (7th Cir. 2009). The

---

[13] The AGs attempt to distinguish two of three cases cited by Meta but do not otherwise engage with this point and therefore concede it. They assert that *In re GNC Corp.*, 789 F.3d 505 (4th Cir. 2015), is inapposite because the plaintiffs there pleaded falsity, Opp. at 6, but multiple states require falsity, *see supra* § 1.A.1., and the AGs also pled falsity, *see, e.g.*, ¶ 191. As for *Reed v. NBTY, Inc.*, while the plaintiffs there "offered only unsworn expert reports and their own testimony," Opp. at 6, the court specified that summary judgment would be appropriate "[e]ven considering" the "inadmissible expert reports" because, as here, the state of the science was inconclusive, 2014 WL 12284044, at *13-14 (C.D. Cal. Nov. 18, 2014).

META'S REPLY IN SUPP. of MOT. for SUMM. J. AND OPP. to STATE AGS' CROSS-MOT. for PARTIAL SUMM. J.
Case Nos. 4:22-MD-03047-YGR-PHK, 4:23-CV-05448-YGR

AGs cannot have it both ways.  They argue that the statements can have multiple meanings.  Opp. at 3 n.2, 11.  But when trying to evade their burden to put forth extrinsic evidence, they say the statements are literally false.  *Id.* at 6-7.

It is fatal to the AGs' claims that they have no extrinsic evidence of how *actual consumers* would understand the statements regarding addiction.  Mot. at 15-17.  None of the documents on which they rely, Opp. at 7-9, constitutes evidence of consumer understanding.  The AGs claim that three documents show "users' understanding of being 'addicted' to Meta's platforms," Opp. at 7, but those documents reflect *employees'* characterizations of internal research or one-off user references to addiction—entirely unrelated to how actual consumers understand the at-issue statements.  *See* Opp. Exs. 10-12.  And the AGs' reliance on documents purportedly showing employees conflating the terms "addiction" and "problematic use" is similarly misplaced.  Opp. at 8-9.  Evidence of employee use of these terms is not probative of how *consumers* understood Meta's use of them in the statements at issue.  *See de Lacour v. Colgate-Palmolive Co.*, 2024 WL 36820, at *7 (S.D.N.Y. Jan. 3, 2024) ("[S]tatements of [d]efendants' employees do not represent a reasonable consumer's understanding of [the representations.]"); Mot. at 17.[14]  And, in any event, these documents do not reflect that Meta used these terms interchangeably.  Most do not even mention addiction, *see* Opp. Exs. 22-27, 30-31, and others show the opposite—that "addiction" and "problematic use" had distinct meanings, *see id.* Exs. 20-21, 28-29, 32.  For example:

- The AGs *misquote* an email regarding the use of the word "addiction," Opp. at 8, entirely omitting that an employee stated that it should be avoided, not just because it carries legal risk, but also because it is "***not accurate ([i.e.,] 'addiction' is a specific medical term that is misapplied in the gen pop context)***."  Opp. Ex. 20 at -242 (emphasis added).

- The AGs *omit* that, in the very same document, another employee describes the term "addiction" as a "***loaded/inaccurate term***[.]"  *Id.* at -8243 (emphasis added).

- The AGs also omit that cited deposition testimony recounts a conversation between two employees about ***the importance of using the term "problematic use," and not "addiction,"*** and the deponent's recognition that those terms have ***different meanings***.  Opp. Ex. 21 (Bejar Dep.) at 136:15-138:12 (emphasis added).

The AGs' reliance on expert testimony as evidence of consumer understanding fares no better.

---

[14] Tellingly, the AGs concede that summary judgment is appropriate where, as here, internal documents do not reflect actual consumer understanding, Opp. at 6-7 n.8.  As in *Beardsall*, the AGs "offer[] no evidence" of how reasonable consumers would understand Meta's statements, *id.*, and, as in *de Lacour*, the internal documents "d[o] not pertain to consumer understanding," *id.*

Their assertion that the factfinder can decide, without extrinsic evidence, whether something had a tendency to mislead, Opp. at 6, is incorrect, *supra* § I.A.3, but, if true, renders the opinion of their expert, Adam Alter, unnecessary. *See* ECF 2701. Even if admissible, Alter's opinion is not evidence that reasonable consumers were likely to be misled. He "merely speculates" about how "hypothetical consumer[s]" would interpret the statements. *Harbor Breeze Corp. v. Newport Landing Sportfishing, Inc.*, 2017 WL 10399343, at *3 (C.D. Cal. Nov. 17, 2017). Such speculative opinions, without more, are insufficient. *Id.*; Mot. at 16-17. The AGs' failure to address this legal defect or make any showing that Alter's opinion is based on how actual consumers would understand the statements is fatal.

### B.    Meta Is Entitled to Summary Judgment as to All Alleged Statements for Multiple Additional Reasons

#### 1.    The *Noerr-Pennington* Doctrine Immunizes 32 Statements Made to Congress and the Coroner's Court

*Noerr-Pennington* immunizes all statements—including alleged misrepresentations and falsities—made to any government body as long as there was an "expectation of obtaining legitimate government action." *Comm. to Protect our Agric. Water v. Occidental Oil & Gas Co.*, 235 F. Supp. 3d 1132, 1155 (E.D. Cal. 2017); Mot. at 17-18. The only two cases the AGs cite in opposition are inapposite.[15] Opp. at 23. Nor is it the case, as the AGs suggest, *see* Opp. at 24, that individuals invited to speak before Congress waive their First Amendment rights. *See Tuosto v. Philip Morris USA Inc.*, 2007 WL 2398507, at *2, *6 (S.D.N.Y. Aug. 21, 2007) (*Noerr-Pennington* shielded congressional testimony by tobacco executives invited[16] to testify). Not only were the statements true, but the undisputed evidence confirms (contrary to the AGs' suggestion, Opp. at 24) that they were directed at influencing government action regarding platform safety and regulation. Looking at the statements to Congress that the AGs cite, Opp. at 24 n.39:

- Mr. Zuckerberg stated that "we certainly do not design the product [to be addictive,]" Mot.

---

[15] In *United States v. Philip Morris USA Inc.*, the district court made a factual finding of deliberate, fraudulent intent. 566 F.3d 1095, 1123-24 (D.C. Cir. 2009). The AGs have not identified such evidence here. *See* § I.A.2. And in *Allied Tube & Conduit Corp. v. Indian Head, Inc*, the Supreme Court held that *Noerr-Pennington* did not apply to petitioning a *private* standard-setting association but recognized that its "wide latitude" protects even "ethically dubious efforts to influence" *government* action. 486 U.S. 492, 504 (1988).

[16] Regulation of Tobacco Products (Part 1): Hearings Before the Subcomm. on Health & the Env't of the H. Comm. on Energy & Com., 103d Cong. 1 (1994), https://dn720209.ca.archive.org/0/items/regulationoftoba01unit/regulationoftoba01unit.pdf ("The subcommittee extended an invitation to . . . top tobacco company officials").

Ex. 4 at 9, shortly after Senator Graham delivered opening remarks comparing tobacco to social media and calling for regulatory changes to Section 230, Ex. 7 at 3-4; and

- Mr. Zuckerberg stated that research shows that "using social apps to connect with other people can have positive mental health benefits" and Meta's teams do not "have goals[] of trying to increase the amount of time that people spend," but "design [their] algorithms . . . to encourage meaningful social interactions" at a hearing in which legislators expressed their intent to pursue legislation to regulate children on social media, *see* Mot. Ex. 2 at 14, 15, 56.[17]

As to the single statement made at a UK inquest, the AGs identify no support for their position that a U.S. citizen can be held liable in a U.S. court for witness testimony in a foreign proceeding. *See* Opp. at 25 & n.41. *Noerr-Pennington* shields witness testimony in domestic proceedings. *See, e.g.*, *King v. Twp. of E. Lampeter*, 17 F. Supp. 2d 394, 402, 413 (E.D. Pa. 1998). And the Ninth Circuit has held that it also protects U.S. citizens from liability for conduct abroad. *Amarel v. Connell*, 102 F.3d 1494, 1520 (9th Cir. 1996). The undisputed evidence reflects that testimony was provided to influence the Coroner Court's final report, which assigned responsibility and proposed remedial government action[18]—a paradigmatic attempt to influence government action.

**2.    Meta Is Entitled to Summary Judgment as to Alleged Misrepresentations Under 16 States' Laws Because They Were Not Made in Connection with a Consumer Transaction, or in the Conduct of Trade or Commerce**

As to the 95 statements not made in connection with business, commerce, trade, or a consumer transaction, Mot. at 3-4 nn.5-10, the AGs either misstate or ignore the relevant law and misplace their reliance on this Court's motion to dismiss ruling, Opp. at 14 (citing ECF 1214 at 62-73). The AGs fail to *identify evidence* that the statements satisfy these standards. Their cross-motion must also be denied because they cannot prove these elements as a matter of law.

**i.    Statutory Standards[19]**

***In connection with a consumer transaction***. DE, IN, KS, NJ, and VA require evidence that an alleged misrepresentation was made "to induce" and was "material to" a consumer transaction. *See Silver v. Pep Boys-Manny, Moe & Jack of Del., Inc.*, 2018 WL 1535285, at *5 (D.N.J. Mar. 29,

---

[17] Specific online child safety legislation—the Kids Internet Design and Safety Act (KIDS Act), S. 2918, 117th Cong. (2021)—was discussed in Davis's hearing and reintroduced in the Senate that day. *See* Ex. 8 at 20. A few months later, similar legislation was introduced in the form of the Kids Online Safety Act (KOSA), S. 3663, 117th Cong. (2022).

[18] *See* Andrew Walker, HM Coroner, *Regulation 28 Report to Prevent Future Deaths: Molly Russell* (Oct. 13, 2022), https://www.judiciary.uk/wp-content/uploads/2022/10/Molly-Russell-Prevention-of-future-deaths-report-2022-0315_Published.pdf.

[19] The AGs concede that Meta correctly identifies these elements, Opp. at 14, and contend only that Meta "misconstrues distinguishable cases," *id.*

2018); Mot. at 21-22.   In attempting to distinguish *Pep Boys*, the AGs conflate a showing that a statement was made "to induce" with the distinct concept of reliance.  *See* Opp. at 15 n.24.  *Pep Boys* also addresses affirmative misrepresentations like those alleged here, not, as the AGs contend, a "different aspect of New Jersey law."  *Id*.; 2018 WL 1535285, at *5.  Their attempt to distinguish *I.T. v. ChoicePoint LLC*, 2025 WL 2495079 (W.D. Wash. Aug. 29, 2025), similarly fails because they cite no case holding that the "inducement" requirement applies only to private claims.  *See* Opp. at 15 n.24.  The AGs' reliance on *State v. TikTok Inc.*, 245 N.E.3d 681 (Ind. App. 2024), is unavailing, as that court held only that creating a social media account qualifies as a consumer transaction, *not* that every representation regarding social media is inducement.  *See id.* at 696.

**In the course of business**.  CO, DE, IL, MN, NE, and NY require that the statement was made to someone with whom the speaker regularly conducted the business at issue.  Mot. at 22.  The AGs identify no authority to the contrary.[20]  *See* Opp. at 16 n.27.  *Jeffrey C. Brown PLLC v. Gold Star Taxi & Transp. Serv. Corp.* found that a statement made by a litigant about a court referee was not made "in the course of business" as required under MN's UDTPA.  2020 WL 4743502, at *3-4 (Minn. Ct. App. Aug. 17, 2020).  Additionally, *Cleary Bldg. Corp. v. David A. Dame, Inc.* explained that the CO statute "is intended to apply to *regular* commercial activity."  674 F. Supp. 2d 1257, 1271 (D. Colo. 2009) (emphasis added).

**In the conduct of trade or commerce**.  The AGs do not dispute that CT, IL, KY, LA, NC, NE, NY, PA, and SC require statements to be made in "trade or commerce," Opp. at 15, which means they must be directed to the consumer market during conduct constituting more than a one-time transaction, Mot. at 22; *see also, e.g.*, *Skelton v. Chem. Leaman Tank Lines, Inc.*, 1996 WL 278343 (Conn. Super. Ct. May 13, 1996) ("Trade or commerce" is "aimed at . . . commercial markets."); *Forrence Orchards, Inc. v. TD Bank*, 766 F. Supp. 3d 364, 367 (N.D.N.Y. 2025) (The "relevant question" is "whether the *specific conduct* that is deceptive is directed at the public at large.").  The AGs' argument that *any* statement made by Meta meets this requirement because of its ongoing

---

[20] Additional case law confirms that statements made during one-off transactions do not satisfy this requirement.  *Tygon Peak Cap. Mgmt., LLC v. Mobile Invs. Investco LLC*, 2022 WL 34688, at *28-29 (Del Ch. 2022) (declining to apply DE DTPA to a "single exchange"); *Nelson v. Lusterstone Surfacing Co.*, 258 Neb. 678, 684 (2000) (similar, as to NE CPA).

consumer business, Opp. at 15, would render the requirement a nullity.[21]

## ii. Alleged Statements[22]

***Ten statements in Meta's talking points and other internal documents***. The AGs contend that Meta had "the aim that" these statements "reach consumer audiences," Opp. at 19-20, but Meta's purported intent is irrelevant to whether the statements were *actually* made to consumers. Moreover, absent evidence that the statements were made to consumers, the AGs cannot prove they were "material to the transaction" at issue. *See Pep Boys*, 2018 WL 1535285 at *5.

***Two statements made on earning calls***. The AGs have no evidence that these statements were "made for the purpose of influencing consumers." *See* Opp. at 18. Nor is the alleged repetition of the statements on subsequent "community updates[,]" Opp. at 18, relevant. The AGs fail to offer any evidence of this repetition or identify statements in those "community updates."

***One statement made to the Barnet Coroner's Court***. That this statement was made at a foreign inquest is not probative of whether it was directed to consumers. The distinctions the AGs try to draw in the two cases cited in Meta's Motion are unpersuasive. *McCarthy v. WPB Partners, LLC*, 2016 WL 4014581, at *6 (D.N.H. July 26, 2016) held statements to a judge "did not take place in trade or commerce," independent of the alternative grounds for dismissal the AGs discuss, Opp. at 19. And, in *Cook v. Fam. Motors, LLC*, 2022 WL 3269946, at *7 (W.D. Mo. Aug. 10, 2022), contrary to the AGs' mischaracterization, Opp. at 19, the court determined a statement made in a court proceeding did not satisfy the "consumer transaction" requirement under the KS CPA.

***Thirty-one statements made to Congress***. These statements were directed to Congress, not consumers, and the AGs have put forth no evidence to the contrary. Mot. at 24. The AGs' attempt to distinguish *Group Health Plan, Inc. v. Philip Morris, Inc.*, 68 F. Supp. 2d 1064 (D. Minn. 1999), Opp. at 17, fails. That case held congressional testimony did not meet MN's "course of business"

---

[21] The AGs' attempts to distinguish *Carol Studios*, *Inc., v. Doo Young Hong*, 2013 WL 6592747 (Ill. Ct. App. 2013), and *Carcano v. JBSS, LLC*, 684 S.E.2d 41 (N.C. App. 2009), fail. Opp. at 15. *Carol Studios* explains that the conduct must be "addressed to the market directly," 2013 WL 6592747, at *9, and *Carcano* instructs that the AGs must show evidence that the statements had an "impact on consumers or the marketplace," 684 S.E.2d at 52.

[22] *Oswego Laborers' Loc. 214 Pension Fund v Marine Midland Bank* stands for the proposition that one-off transactions are insufficient to satisfy the "trade or commerce" element, 85 N.Y.2d 20, 25 (1995), not that courts should dispense with a statement-by-statement analysis, as the AGs suggest, Opp. at 17; *see supra* at 2.

requirement given the lack of evidence that "Defendants were attempting to sell their products while testifying," *Grp. Health Plan,* 68 F. Supp. 2d at 1069. Here, too, the AGs lack evidence that Meta was trying to sell any product when making these statements.

*Two statements made at technology conferences*. The AGs assert that statements at technology conferences were directed to consumers because they were subsequently "reported on by . . . news outlets, and videos . . . remain widely available." Opp. at 17. But courts have found the mere public availability of statements insufficient to show they were directed to consumers even where, unlike here, the company published the at-issue statements. *Pep Boys*, 2018 WL 1535285 at *5; *see also In re Syngenta AG MIR 162 Corn Litig.*, 131 F. Supp. 3d 1177, 1226 (D. Kan. 2015).

*Forty-nine general statements on Meta's website*. The AGs suggest these statements are actionable because they have "a tendency to deceive." Opp. at 18. While the AGs need not show reliance, they still must prove the statements were "material to the transaction" or "made to induce," *see Pep Boys*, 2018 WL 1535285 at *5, which they have failed to do.

**iii. The AGs' Cross-Motion on These Elements Should Be Denied**

Even if this Court declines to grant Meta's Motion as to these elements, the Court should deny the AGs' cross-motion on the 95 at-issue statements. As set forth above, the AGs have failed to present any evidence that these statements satisfy the statutory requirements of 16 states. And to the extent the AGs seek to move as to any other alleged statements, they fail to identify which statements, let alone prove that the statutory requirements have been met.

**3. The Undisputed Facts Demonstrate That Multiple Statements Are Nonactionable Opinions**

Four allegedly deceptive statements, ¶¶ 415, 419, 427, 465, are nonactionable because the undisputed evidence demonstrates they are noncommercial opinions protected by the First Amendment. Mot. at 25-27. The AGs do not dispute that the statements pertain to a controversial matter of public concern, Opp. at 20-22, or that the Ninth Circuit has held that speech on identical topics is noncommercial, *see* Mot. at 26.[23] Nor do they dispute that the statements are opinions. *See* Mot. at 25-27; Opp. at 22. These concessions warrant summary judgment.

---

[23] In a footnote, the AGs concede that these four statements and the speech compelled in *Bonta* concern subjective views about social media or its third-party content. Opp. at 21 n.34.

13

The AGs broadly imply that all speech from a commercial actor is commercial, Opp. at 21, but they cite no case to support that view, which is at odds with longstanding Ninth Circuit precedent and basic First Amendment principles, *see Dex Media W., Inc. v. City of Seattle*, 696 F.3d 952, 960 (9th Cir. 2012) (a profit motive alone is insufficient to characterize speech as commercial); *see also Consol. Edison Co. v. Pub. Serv. Comm'n*, 447 U.S. 530, 534-44 (1980) (First Amendment protected company's statements on matters in the "arena of public discussion"). And the cases the AGs do cite are inapposite because the speech there, unlike here, did not address controversial matters of public concern and was communicated as part of consumer transactions or marketing efforts.[24] The AGs also assert that Meta's statements are commercial speech because Meta was "economically motivated." Opp. at 21. But, as the AGs' cases show, a finding of commercial speech requires that "the speaker acted *primarily* out of economic motivation." *Ariix*, 985 F.3d at 1116. The AGs neither argue nor identify any evidence that Meta was *primarily* economically motivated when making the statements. Finally, the AGs contend that, even if the statements are opinions (which, again, they do not dispute), they are still unprotected commercial speech because they are misleading. Opp. at 22. But the AGs cite no evidence to support that these statements entail "special possibilities for deception" or that the public here is "operating with a comparative lack of knowledge," such that it is "especially susceptible to abuses." *Id.*

### 4. Numerous Alleged Statements Are Nonactionable Statements of Aspiration or Objectives

Nor do the AGs dispute that puffery is nonactionable under *all* applicable state laws. *See* Mot. at 27-28; Opp. at 25-26. And the AGs fail to identify any "specific, measurable claim" in the 57 alleged statements that constitute nonactionable puffery, Mot. at 27-28, that would render them actionable, *see* Opp. at 25-26. Instead, they assert only that the at-issue statements cannot be puffery as a matter of law solely because they were made in connection with a supposed multiyear "scheme to change consumer perceptions." Opp. at 26. Not only is that not the law, but the AGs also fail to

---

[24] *See Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1115 (9th Cir. 2021) (statements in guidebook were a "marketing ploy"); *Md. Shall Issue, Inc. v. Anne Arundel Cnty.*, 91 F.4th 238, 248, 250 (4th Cir. 2024) (speech displayed at point of sale was "factual and not controversial"); *CTIA - The Wireless Ass'n v. City of Berkeley*, 928 F.3d 832, 838, 848 (9th Cir. 2019) (disclosures by cell phone retailers to customers were "purely factual and uncontroversial"); *see also Pharm. Rsch. & Mfrs. of Am. v. Stolfi*, 153 F.4th 795, 820-21 (9th Cir. 2025) (speech included "factual and uncontroversial" "basic marketing information").

show that any "scheme" or "context" replaces the need to examine the alleged statements individually. *See, e.g.*, *Apodaca v. Whirlpool Corp.*, 2013 WL 6477821, at *5-6 (C.D. Cal. Nov. 8, 2013) (certain statements were nonactionable puffery even though at least one actionable statement was part of the same advertising campaign). When properly considered individually, the AGs cannot prove a deception claim based on these statements under any applicable laws.[25]

### 5. Meta Is Entitled to Summary Judgment as to Statements That Fall Outside the Applicable Statute of Limitations Period

The AGs' Opposition confirms that Meta is also entitled to summary judgment on all the alleged deceptive statements that fall outside the applicable statute of limitations. Mot. at 28-29.

*First*, the AGs assert that their claims did not accrue until September 2021 because they "could not have known" about the deception until then. Opp. at 27. But the discovery rule is inapplicable under the relevant state laws. The limitations period for WI's claims operates as a statute of repose without any discovery rule,[26] and the AGs have failed to allege that Meta concealed material facts that prevented them from bringing a claim, *see* Opp. at 27, which is required to delay accrual in IN, NE, and NY.[27] And the remaining states' laws that Meta identified in its opening brief—CA, CO, DE, and SC—delay accrual only if the AGs had no actual knowledge or inquiry notice of the claim until September 2021.[28] At the very least, the AGs were on inquiry notice from any one of the pre-2021 studies, articles, and books about social media and mental health issues on which their experts rely—including a 2017 book authored by Alter. *See, e.g.*, Mot. Ex. 84 (Alter Rep.) ¶¶ 6, 202 n.437, 218 n.466 (citing Alter's book about social media "addiction" and pre-2021 newspaper articles and surveys); Ex. 9 (Prinstein Rep.) ¶ 61 nn.117-18 (citing pre-2021 studies).

---

[25] Contrary to the AGs' assertion, Opp. at 25, courts routinely find puffery as a matter of law. *See, e.g.*, *Knowles v. ARRIS Int'l PLC*, 847 F. App'x 512, 513 (9th Cir. 2021).

[26] *Galveston LFG, LLC v. BIOFerm Energy Sys., LLC*, 2023 WL 5353134, at *4 (W.D. Wis. Aug. 21, 2023) (refusing to create an exception to statute of repose even where plaintiff alleged it would have been "impossible" to discover the alleged misconduct within the limitations period).

[27] *See, e.g.*, *Pulver v. Dougherty*, 58 A.D.3d 978, 979-80 (N.Y. App. Div. 2009) (Under NY law, plaintiff must show specific and wrongful actions by defendants that prevented timely suit.); *Logan v. Wilkins*, 644 F.3d 577, 582 (7th Cir. 2011) (similar for IN); *In re Saturn L-Series Timing Chain Prods. Liab. Litig.*, 2008 WL 4866604, at *6 (D. Neb. Nov. 7, 2008) (similar for NE).

[28] *See, e.g.*, *Krantz v. Old Copper Co., Inc.*, 794 F. Supp. 3d 724, 737-38 (C.D. Cal. 2025) (claims accrue when plaintiffs had actual knowledge or "the opportunity to obtain knowledge"); *State ex rel. Jennings v. BP Am. Inc.*, 2024 WL 98888, at *19 (Del. Super. Ct. 2024) (same); *Winslow v. OCMBC, INC.*, 2025 WL 2986608, at *10 (D. Colo. Sept. 15, 2025) (same); *State ex rel. Wilson v. Ortho-McNeil-Janssen Pharms., Inc.*, 77 S.E.2d 176, 198 (S.C. 2015) (same).

*Second*, there is no "continuing violation[,]" Opp. at 26, to which tolling could apply. Again, the AGs offer no support for their assertion that the statements were "part of a coordinated scheme." *Id.* at 27; *see supra* at 2. Moreover, this District has declined to apply the continuing violation doctrine to toll claims based on an alleged "pattern of misrepresenting" the effectiveness of a defendant's technology because the alleged harm was apparent as soon as the plaintiffs purchased the technology.[29] *In re Tesla Advanced Driver Assistance Sys. Litig.*, 2023 WL 6391477, at *9-10 (N.D. Cal. Sept. 30, 2023) ("[M]ere continuing *impact* from past violations is not actionable" absent new injury.) The same is true here: the alleged injury occurred when users signed up for an account and started using the platforms.

*Third*, the AGs have offered no evidence to dispute that certain alleged statements are specific only to Facebook and therefore subject only to the *amended* Tolling Agreement. *See* Opp. at 28; Mot. at 29 & n.80. None of the AGs' cited exhibits, *see* Opp. at 28, proves otherwise.[30]

*Fourth*, the AGs are wrong that Meta's motion seeks to "exclude certain pieces of evidence." *See* Opp. at 28. Meta moves for summary judgment on the AGs' *claims* to the extent they are premised on statements made outside the applicable limitations period. *See Autodesk, Inc. v. Dassault Systemes SolidWorks Corp.*, 2008 WL 6742224, at *3-4 (N.D. Cal. Dec. 18, 2008) (granting summary judgment as to one of three statements at issue).[31]

## II. Meta Is Entitled to Summary Judgment on the AGs' Unfairness Claims

### A.    Section 230 and the First Amendment Bar the AGs' Unfairness Claims

#### 1.    Section 230 Bars These Claims Because They Seek to Impose a Duty on Meta for Its Role and Conduct as a Publisher of Third-Party Content

---

[29] The continuing violation doctrine also does not apply under NY law. *See In re Colum. Coll. Rankings Action*, 2024 WL 1312511, at *13 (S.D.N.Y. Mar. 26, 2024) (declining to apply equitable tolling "where the [alleged] misrepresentation or act of concealment . . . is the same act which forms the basis of plaintiff's underlying cause of action").

[30] Exhibits 29, 44, and 55 are articles about CSERs that were published when the CSERs covered only Facebook. *See* Mot. Ex. 39 (November 2019 article indicating that "[f]or the first time," CSERs will "shar[e] data on how we are doing at enforcing policies on Instagram"). Exhibit 35 is a February 2019 post by Mr. Zuckerberg describing how he launched Facebook 15 years prior—before Instagram existed—that never mentions Instagram.

[31] The NY Executive Law's six-year statute of limitations, *see* Opp. at 28 n.50, is irrelevant. Meta moves for summary judgment on statements falling outside the three-year statute of limitations under NY's General Business Law ("GBL"). *See* Mot. at 28-29, 28 n.79; App. 25. Because the AGs allege that violations of the GBL are a predicate to finding violations of the Executive Law, *see* ¶ 1075, there is no need to reach the limitations period under the Executive Law.

The AGs' unfairness claims as to the three remaining features[32] target Meta's status or conduct as a publisher of third-party content. *See* Mot. at 30-32. In an effort to skirt Section 230, the AGs argue that, because their claims target "product features" and "design choices," not the "substance" of third-party content, Section 230 does not bar them. *See* Opp. at 29-30. But the Ninth Circuit has repeatedly held that state law claims alleging that features that facilitate the publication of third-party content are harmful product design are *inconsistent* with Section 230 and therefore barred. *See Doe v. Grindr Inc.*, 128 F.4th 1148, 1151-53 (9th Cir. 2025); *Est. of Bride ex rel. Bride v. Yolo Techs., Inc.*, 112 F.4th 1168, 1177, 1182 (9th Cir. 2024). Meta does not propose a "but-for" test. Opp. at 29. As Meta explained—and the AGs concede, *see id.*—the test is whether the AGs' "theory of liability would treat . . . [Meta] as a publisher or speaker of third-party content," Mot. at 30.[33] Here, the answer is yes as to the three remaining features.

The AGs' responses on each feature are unavailing.[34] With respect to **time restriction tools** and the **multiple accounts feature**, the AGs argue that their claims are not barred because Meta could make changes without altering third-party content. Opp. at 30-31. But the restrictions the AGs seek demonstrate that their claims would require Meta to publish *less* third-party content, thereby implicating Meta's role as a publisher, as this Court has explained. *See* ECF 430 at 16. For time restriction tools, the AGs seek to restrict *when* Meta can publish third-party content. *See* Opp. at 30. And for multiple accounts, the proposed restrictions, *see* Opp. at 31, would require Meta to publish less third-party content by limiting how users post and communicate, thereby "cut[ting] to the core

[32] Even if allegedly deficient age verification tools could constitute a fourth "feature" on which the AGs' remaining unfairness claims are premised, those claims would be barred by Section 230. *See Doe (K.B.) v. Backpage.com, LLC*, 768 F. Supp. 3d 1057, 1065 (N.D. Cal. 2025).

[33] The AGs are wrong that the relevance of the "content-neutral" analysis in *Dyroff v. Ultimate Software Grp., Inc.*, 934 F.3d 1093, 1096 (9th Cir. 2019), is limited to whether a defendant is an "information content provider." *See* Opp. at 29 & n.52. *Dyroff* stands for the broader principle that the duty underlying a claim that would impose liability for content-neutral publishing tools derives from the defendant's status or conduct as a publisher of third-party content. *See* 934 F.3d at 1101; *Grindr*, 128 F.4th at 1152-53.

[34] To the extent the AGs seek to move this Court to modify its motion to dismiss Order, *see* Opp. at 30 n.53, they cannot do so now, much less through a footnote. *See Henderson v. Muniz*, 2018 WL 6331008, at *2 (N.D. Cal. Dec. 4, 2018). And the AGs' argument that "the Court need not conduct a feature-by-feature analysis," Opp. at 30, ignores that, in deciding the motions to dismiss, the Court undertook a careful feature-by-feature approach. *See* ECF 430 at 14-20; ECF 1214 at 25-30. Further, the AGs cite *no evidence* to support their proposition that the at-issue features operate by "act[ing] in concert." Opp. at 30. And, even considered in combination, such claims are still barred because the features are all protected publishing tools. Mot. at 30-32.

17

of Meta's role as a publisher," *Backpage.com*, 768 F. Supp. 3d at 1065.[35]

The AGs have *no support* to show that **appearance-altering filters** are not third-party content. Opp. at 31. They argue that Meta Platforms, Inc. ("MPI") "owning and operating" Spark AR converts it into an "information content provider." Opp. at 31. But the documents they cite demonstrate only that Spark AR was the platform through which *third parties* created filters that MPI *reviewed and published*. *See* Opp. Exs. 92, 93. That does not constitute "material[] contribut[ion]." Opp. at 31. *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1168 (9th Cir. 2008) (en banc). "[T]o develop unlawful content," *id.*, requires "something more substantial" than "selecting material for publication," *Batzel v. Smith*, 333 F.3d 1018, 1031 (9th Cir. 2003), *overruled in part on other grounds by Gopher Media LLC v. Melone*, 154 F.4th 696 (9th Cir. 2025).

### 2. The First Amendment Also Bars the AGs' Unfairness Claims Because They Seek to Regulate Meta's Expressive Activities

The First Amendment protects Meta's editorial decisions and bars the AGs' unfairness claims. Mot. at 32-34. With each feature, Meta "present[s] a curated compilation of speech originally created by others," which the Supreme Court has held constitutes protected expressive activity. *Id.* at 32-33 (quoting *Moody v. NetChoice, LLC*, 603 U.S. 707, 728 (2024)). The AGs incorrectly assert that their claims do not implicate *Moody* because they do not address "content moderation standards." Opp. at 31. But *Moody* is not so limited: it protects editorial decisions—like those made via the at-issue features—regarding *how* content is displayed. *See Moody*, 603 U.S. at 728.[36] The AGs contend that these features are conduct, not speech, Opp. at 32, but requiring changes to features used to display content necessarily interferes with Meta's ability to exercise expressive editorial discretion.[37]

***Time restriction tools***. These tools represent a choice as to how users can elect to control

---

[35] The AGs cannot save their claims by asserting that this feature is "an end-run around" time restriction and age-verification tools. Opp. at 30. The expert report excerpts cited do not contain any evidence establishing that it is used to circumvent safety tools or otherwise causes harm, Opp. Ex. 7 (Iyer Rep.) ¶ 61; Opp. Ex. 6 (Zicherman Rep.) ¶ 56. Indeed, neither even seems to be about the feature at issue, which allows users to register multiple accounts under *one* login. *See* ¶ 370.

[36] The AGs argue that *Moody* "declined to consider whether such features are protected by the First Amendment," Opp. at 32, but the Supreme Court merely declined to consider whether these protections apply to "feeds whose algorithms respond solely to how users act online," which is not a feature at issue in this case. *Moody*, 603 U.S. at 736 n.5.

[37] The AGs' contention that the Court "need not conduct a feature-by-feature analysis," Opp. at 33, disregards the Court's carefully constructed framework and is contrary to law, *see supra* n.38.

18

their access to third-party content.  Mot. at 33.  The AGs assert that their claims do not implicate editorial decisions because the amount of time users spend does not affect what content is posted.  Opp. at 33.  But this argument ignores that the First Amendment protects both the "right to distribute" content *and* "the right to receive it."  *Klein v. City of San Clemente*, 584 F.3d 1196, 1204 (9th Cir. 2009).  And requiring Meta to develop "non-circumventable" features would compel it to exercise editorial discretion, violating its First Amendment rights.  Opp. at 30, 33.[38]

*Multiple accounts*. The AGs' claims concerning the multiple accounts feature also implicate Meta's editorial decisions regarding who can speak on its platforms.  Mot. at 34.  The AGs' attempt to distinguish *Miami Herald Publ'g Co. v. Tornillo*, 418 U.S. 241, 247-48 (1974), is unpersuasive, Opp. at 33, as eradicating this feature, even just for teens, would undeniably "alter the variety of views shared on Meta's platforms,"[39] Opp. at 33.  *See* Mot. at 33-34; Ex. 10 at -1455 (feature allows users "to express other facets of their personality").[40]

*Appearance-altering filters*.  As set forth *supra* § II.A.1, the AGs have no evidence of Meta-created cosmetic surgery filters on Instagram.  In any event, such filters are protected expressive works.  Mot. at 34.  Contrary to the AGs' assertion, Opp. at 33-34, the Supreme Court has never required that a work be customizable to receive First Amendment protection.  *See 303 Creative LLC v. Elenis*, 600 U.S. 570, 587 (2023).[41]

---

[38] As this Court previously found, "[p]roviding users with tools to limit the amount of time they spend on a platform does not alter what the platform is able to publish for those that choose to visit it."  *In re Soc. Media Adolescent Addiction/Personal Inj. Prods. Liab. Litig.*, 702 F. Supp. 3d 809, 836 (N.D. Cal. 2023).  But by the AGs' admission, they seek to make Meta's time restriction features "non-circumventable," which would necessarily alter what is published, Opp. at 30, because users who are blocked from accessing the platforms after a fixed time would be unable to post or respond to content while blocked.

[39] Because the AGs' requested restriction would "alter the variety of views" on the platforms, the AGs' argument that any burden would be "incidental[]," Opp. at 33, fails.  In any event, government action that "serves purposes unrelated to the content of expression," but incidentally burdens speech, is subject to intermediate scrutiny.  *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *City of Renton v. Playtime Theaters, Inc.*, 475 U.S. 41, 48-50 (1986).

[40] The AGs assert, without legal support, that Meta does not have a First Amendment right to determine how many accounts a user can create.  Opp. at 33.  Under that theory, a publisher would have a First Amendment right to select which articles to publish, *see, e.g.*, *Tornillo*, 418 U.S. at 258, but not how many articles each author could publish.  This defies logic and should be rejected.

[41] The AGs' argument that they have not conceded that the filters are expressive is immaterial.  Opp. at 34.  Although CO stipulated in *303 Creative* that the websites were "expressive in nature," 600 U.S. 594, such a concession is not required to find entitlement to First Amendment protection.

19

The AGs also erroneously assert that their claims should be subject to intermediate scrutiny because the platforms are "equally addictive and harmful regardless of what content they feed users." Opp. at 32. But this defies common sense and is undercut by their allegations, which focus on purportedly harmful content, *see, e.g.*, ¶¶ 176-90, 371, 484-99. The AGs' claims are content-based[42] and subject to strict scrutiny, *see TikTok Inc. v. Garland*, 604 U.S. 56, 70 (2025), which they identify no basis to overcome. Even if intermediate scrutiny were appropriate, the AGs disregard a key requirement: that "the incidental restriction [on speech] . . . is no greater than is essential to the furtherance of [an important or substantial government] interest." *See United States v. O'Brien*, 391 U.S. 367, 377 (1968). They make no showing that the requested restrictions are no greater than necessary. Further, the government "bears the burden of proving that the elements of the *O'Brien* test are satisfied," *see Preferred Commc'ns, Inc. v. City of Los Angeles*, 754 F.2d 1396, 1406 n.9 (9th Cir. 1985), but the AGs do not apply the test to each at-issue feature, Opp. at 32-34.

**B.    The AGs' Unfairness Claims Also Fail Because the AGs Have Not Met Their Evidentiary Burdens**[43]

**1.    The AGs Have No Evidence That the Features Cause Harm**

Twelve of the AGs' unfairness claims[44] fail because they have no evidence that the at-issue features cause harm or risk of harm. Mot. at 34-38; Opp. at 34-39. The AGs have no proof that potential improvements to these tools can sustain their claims, nor do they identify any court that has required consideration of alternative designs. *See* Mot. at 35. Moreover, the AGs rely on evidence relating to tools not at issue, *see, e.g.*, Opp. Ex. 106 at -6940 (Teen Accounts),[45] and concerning

---

[42] State laws seeking to impose the same restrictions the AGs seek have been struck down as content-based violations of the First Amendment. *See, e.g.*, *NetChoice v. Jones*, 2026 WL 561099, at *2, 8-9 (E.D. Va. Feb. 27, 2026) (requiring social media platforms to "limit a minor's use . . . to one hour per day" was content-based).

[43] The AGs argue that Meta's Motion "misstates the law[,]" Opp. at 34, but do not identify any specific disputes. Any inconsistencies Meta has identified are addressed herein.

[44] This number includes all nine *Sperry* states, as well as NY, DE, and CA. The parties agree that unfairness claims by DE and NY are subject to the standard of FTC Act Section 5. Mot. at 36; Opp. at 34 n.54. Contrary to the AGs' position, Opp. at 34 n.55, Meta need not identify any benefits of the at-issue features under CA law. Because the AGs cannot prove any harm, they also cannot prove that any such harm outweighs the features' benefits or utility. Mot. at 36 n.86.

[45] The AGs cannot rely on evidence regarding time restriction tools not pleaded in the Complaint, which addressed only Daily Limit and Take a Break, ¶¶ 578-84. *See, e.g.*, *Wasco Prod., Inc. v. Southwall Techs., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006). To the extent the AGs seek to introduce evidence regarding Teen Accounts, which incorporated both tools, the evidence they cite is not specific to either tool upon which their claims are based. *See, e.g.*, Opp. Ex. 106 at -6940.

potential harms untethered to the at-issue features, *see, e.g.*, Opp. Ex. 46 ¶¶ 62-71, 80-90 (addressing harms purportedly caused by time spent on social media without addressing at-issue features or establishing causal relationship).  For example, that some teens create secondary accounts, *see, e.g.*, Opp. Ex. 109, or that some parents were unaware of them, *see, e.g.*, Opp. Ex. 111 at -8516, does not establish harm to teens.[46]  And the only evidence cited regarding appearance-altering filters is not specific to Meta-created cosmetic surgery effects, *see, e.g.*, Opp. Ex. 100 at -9932 (discussing whether to allow "Spark AR," or third-party, cosmetic surgery effects); nor does it distinguish between the impact of viewing published and unpublished filtered content, *see, e.g.*, Opp. Ex. 97 at -6302 (literature review concerning effects of "[s]elfie-manipulation" generally).[47]  Moreover, all three features are reasonably avoidable, Mot. at 36-37,[48] and the AGs cite no evidence to support their argument that teens are unable to avoid them due to their "unique susceptibility," Opp. at 38.  To the extent the AGs seek to manufacture a broader scheme premised on "marketing decisions" or "public affairs" strategies, *id.* at 38-39, they mischaracterize the evidence, *see, e.g.*, Opp. Ex. 106 at -6940 (discussing "product and public affairs strategy" with "North Star Goal[]" of "deliver[ing] safer teen experiences"); Opp. Ex. 95 at -9480 (no suggestion Meta used "insights" from "biological factors" to harm users; no connection to at-issue features).

Nine AGs' unfairness claims also fail because they have no proof demonstrating that Meta violated public policy under the first prong of the *Sperry* test,[49] Mot. at 37-38:

- Their reliance on a catchall "public policy to protect minors from harm[,]" Opp. at 37, is insufficient because (i) it is first raised in their Opposition; (ii) none of the sources cited are apt[50]; and (iii) they lack evidence of harm, *see* Mot. at 37-38.

---

[46] The AGs' claim that Meta fails to effectively enforce age verification policies across accounts, Opp. at 35-36, is not evidence of harm resulting from that feature, particularly absent evidence that it was used to circumvent age verifications.  This argument also exposes an inconsistency in the AGs' position: it cannot be true both that users create multiple accounts to circumvent time restriction and age verification tools and that such tools are wholly ineffective.  Opp. at 30.

[47] The AGs do not dispute that *Meta-created* cosmetic surgery effects are banned on Instagram.  Mot. at 35.  Evidence of Meta's interim ban on similar *third-party* effects, Opp. at 36, is irrelevant.

[48] Although the AGs argue that summary judgment is inappropriate where there is a factual dispute as to whether harms were reasonably avoidable, Opp. at 38, they identify no evidence raising a factual dispute.  The single case they cite addresses the "reasonably avoidable" standard under a different statute.  *Brown v. Stored Value Cards, Inc.*, 2021 WL 76951, at *2 (D. Or. Jan. 8, 2021).

[49]  The AGs agree this is the relevant inquiry.  Opp. at 34 n.54.  Even if they need not show all three elements, Opp. at 36 n.56, each claim fails because there is no evidence to support any one.

[50] Both Restatements cited by the AGs, Opp. at 37 n.59, address the legal duties owed *by* minors, not

21

- The AGs propound no argument in response to Meta's demonstration that the COPPA arguments advanced by CT,[51] NC, and IL are unpersuasive.  Mot. at 37 n.89, 38.

- The purported public policies newly identified under MN and SC law, Opp. at 37 n.58, are unavailing because (i) they are first identified in their Opposition; and (ii) neither source specifically addresses harms to minors caused by social media.

And, although the AGs use selective quotations to allege that the features satisfy the second prong,[52] Opp. at 37-38, they mischaracterize the evidence they cite, *see, e.g.*, Opp. Ex. 110 at -6272 (for teens "concerned about how they appear on their profile grid," secondary accounts are a "workaround" to "control" how they appear to other users), and fail to establish that any feature satisfies the requirements of this element.  Regardless, this second prong is unconstitutionally vague, Mot. at 38, and the cases cited by the AGs are inapposite, as both reject vagueness arguments predicated solely on the meaning of the word "unfair," Opp. at 38.

### 2. The Unfairness Claims by KS, NE, and NJ Fail Because These AGs Have Not Met Their Unique Evidentiary Burdens

The AGs argue that Meta uses incorrect standards to evaluate KS, NE, and NJ's claims, Opp. at 39, but each case they cite states, verbatim, Meta's formulation of the relevant law.  *Compare, e.g.*, Opp. at 39 n.62 *with* App. 19.  Moreover, the evidence they offer contains broad assertions of objectionable conduct not tied to any specific feature or state standard, Opp. at 39-40, which is insufficient to establish a violation, Mot. at 38-39.[53]

### 3. CO and KY's Unfairness Claims, and the AGs' Requests for Civil Penalties, Fail for Lack of Any Admissible Evidence of Meta's Intent[54]

---

to minors.  And the cited law journal article, *id.*, argues only that the state can intrude on the constitutional right to family integrity and privacy by requiring parents to provide "food, clothing, shelter and medical care," not that the state has an unfettered public policy interest in protecting teens.  No source addresses a duty owed to teens in the context of consumer protection claims, Kay P. Kindred, *God Bless the Child: Poor Children, Parens Patriae, and a State Obligation to Provide Assistance*, 57 Ohio St. L. J. 519, 538 (1996).

[51] The AGs cite a case, Opp. at 37 n.57, stating only that "CUTPA reflects a public policy" of "remedying wrongs that may not be actionable under other bodies of law[,]" *id.*  The AGs do not address *why* the purported wrongs here are not actionable under other bodies of law.

[52] The AGs do not dispute that this prong is largely duplicative or that the FTC has never relied on it as an independent basis for liability.  Mot. at 38.

[53] The AGs impermissibly assert for the first time that NC law also bars "unconscionable-type 'conduct.'"  Opp. at 39 n.61; *see also* ¶¶ 1085-88; *supra* n.45.  Regardless, a NC unconscionability claim fails for the same reasons addressed herein.

[54] The applicable "intent standard" here includes a variety of scienter-based standards, including, but not limited to, intentional, knowing, willful, reckless, and negligent conduct.  The AGs dispute which of these standards constitutes "intent."  Opp. at 39-41.  This is a matter of semantics.

22

The parties agree the AGs must show that Meta acted "knowingly or recklessly" under CO law. *See* App. 14; Opp. at 40. But the AGs are wrong that KY's CPA has no intent requirement—it requires "some element of intentional or grossly negligent conduct" to establish *liability*, App. 15, even if no "evil purpose or criminal intent" is required for civil penalties, Opp. at 40 n.63.[55] As to civil penalties, the AGs contend that Meta "elevates the degree of scienter required" but do not dispute most of the standards Meta identified. Opp. at 40 (no dispute regarding VA); *compare id.* at 40 n.65 (IL, IN, and LA require "**intent** to defraud" and NC "**knowing** violations") *with* App. 22-23 (same). And although the AGs assert that CT, DE, and SC require "willfulness," they ignore statutory language explaining that a willful violation occurs when a party "**knew or should have known** that his conduct" violated the statute, *see* Conn. Gen. Stat. § 42-110o(b); 6 Del. Code § 2522(b) (same); S.C. Code § 39-5-110(c) (same); *see also* App. 24.[56]

Regardless of the level of scienter required, the AGs have adduced no evidence of *any* scienter by Meta. As set forth *supra* § II.B.1, the AGs have no evidence of harm from the at-issue features, and the few cited materials, Opp. at 40-41, do not discuss any of these features, nor do they establish that Meta made *any* business decisions regarding the features for a particular reason, much less to intentionally, knowingly, willfully, recklessly, or negligently cause or result in harm or otherwise violate the relevant statutes. *See, e.g.*, Opp. Ex. 95 at -9480 (that Meta "can look to biological factors . . . to inform product strategy[,]" does not establish that Meta did so).

**III. Meta Is Entitled to Summary Judgment on the AGs' Requests for Disgorgement**

Meta's Motion established that the nine AGs seeking disgorgement cannot recover it as a

---

[55] The AGs assert that Meta mischaracterizes the KY CPA liability standard but apply the same "misuse of superior resources or bargaining power" standard cited by Meta. *See* Mot. at 39 n.93; Opp. at 39 n.62. The AGs also mischaracterize the intent requirements for IL, LA, and KS, whose claims additionally fail due to lack of intent. Opp. at 40 n.64. They do not dispute that a showing of "intent that consumers rely on the act" is required to establish a claim under the IL CFA, *see* Mot. App. at 16; Opp. at 40 n.64, but are wrong that evidence of "the act itself" is sufficient, Opp. at 40 n.64, *see People ex rel. Hartigan v. Maclean Hunter Pub. Corp.*, 119 Ill. App. 3d 1049, 1059 (Ill. App. Ct. 1983) (CFA prohibits "deception rather than error."). LA courts have held intent is a necessary element of the LUTPA. *See* App. at 18; *see also Lawrence v. S. Recreations, LLC*, 304 So. 3d 128, 143 (La. App. 2020). And KS courts must consider a list of enumerated circumstances, including what the party "knew or had reason to know." *See* App. 17.

[56] Similarly, PA courts interpret willfulness in this context as requiring "intent to defraud[,]" *see In re Styer*, 2013 WL 6234621, at *8 (Bankr. E.D. Pa. Dec. 2, 2013), which is the standard Meta identified, *compare* Opp. at 40 n.65 *with* App. 23.

23

matter of law.  Mot. at 39-44.  The AGs now assert that *all* 18 AGs bringing consumer protection claims seek disgorgement, even those that neither pleaded it nor identified it as a remedy in written discovery.[57]  Opp. at 41.  In any event, disgorgement is foreclosed by federal law.  Mot. at 41-42.

### A.    CA, IN, KY, NC, and NY Are Not Permitted to Seek Disgorgement

Cases addressing whether *federal* statutes can alter equitable jurisdiction, Opp. at 41, are irrelevant to *state* law claims by CA, IN, KY, NC, and NY.  *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 841 (9th Cir. 2020).  While the AGs now seem to rely only on federal equitable principles, Opp. at 41, to the extent they have not abandoned reliance on state statutes, they misstate these laws:

- ***IN, KY, and NC***.  IN, KY, and NC allow only for recovery of assets received from consumers.  Mot. at 40.  The AGs admit for IN that "[t]he plain language" provides "the power to grant *restitution*" only.  Opp. at 42.  The KY cases are inapposite.  *See Haeberle v. St. Paul Fire & Marine Ins.*, 769 S.W.2d 64, 67 (Ky. Ct. App. 1989) ("unjust enrichment" defense); *Superior Steel, Inc. v. Ascent at Roebling's Bridge, LLC*, 540 S.W.3d 770, 775 (Ky. 2017) ("unjust enrichment" claim).  For NC, the AGs cite a trial court decision that erroneously describes a refund of consumer funds as "disgorgement" rather than restitution.  *See State v. Orion Processing, LLC*, 2016 WL 7435679, at *8 (N.C. Super. Dec. 20, 2016).

- ***CA***.  CA seeks disgorgement "beginning January 1, 2024" based on Fed. R. App. P. 54(c) and Cal. Gov. Code § 12527.6, which postdates the Complaint, Opp. at 43.  But the latter merely codifies the preexisting limitation to restitution.  *See Korea Supply Co. v. Lockheed Martin Corp.*, 63 P.3d 937, 1147 (Cal. 2003) (similar revision codified, and did not change, remedies). Rule 54(c) is unavailing because the AGs lack authority to seek disgorgement for the post-Complaint period and are not entitled to it, *see infra* §§ III.B; III.C.

- *NY*.  NY Executive Law authorizes only restitution and damages, and NY cannot force "the general disgorgement of profits received from sources other than the public."  Mot. at 41.  The AGs' argument is wrong because: (i) the residual clause referenced is in a securities statute and there are no residual clauses in the statutes here; and (ii) the cases rely on inherent equitable powers of *NY courts*, which do not apply.  *See* Opp. at 42.

### B.    Even for States That Can Seek Disgorgement in State Courts Under State Law, Their Claims Fail Under Federal Law of Equity

The AGs do not dispute that (i) adequate legal remedies, including in unpled statutes, preclude them from recovering disgorgement, Opp. at 43-44; and (ii) CT, IL, NC, MN, and NY could have, or did, bring claims for legal remedies, *id.* at 42.[58]  Instead, the AGs argue that *Meta* must establish

---

[57] In response to an interrogatory asking to "[s]pecify each category of cost, expenditure, damage, loss, harm, penalty, or relief" sought, only nine AGs specified "disgorgement."  Mot. Ex. 65 (AGs' 2nd Supp. Resp. to Meta's 1st Set of Interrog. at 18-20, n.1).

[58] The AGs dispute only whether IL can recover damages under its statute, Opp. at 43 n.67, but the cited case proves it can.  *See People ex rel. Madigan v. CMK Invs., Inc.*, 2015 WL 4038896, at *2-3 (N.D. Ill. June 30, 2015) ("The statute expressly authorizes the [AG] to . . . collect actual damages.").

META'S REPLY IN SUPP. OF MOT. FOR SUMM. J. AND OPP. TO STATE AGS' CROSS-MOT. FOR PARTIAL SUMM. J.
Case Nos. 4:22-MD-03047-YGR-PHK, 4:23-CV-05448-YGR

the inadequacy of their legal remedies.  But it is fatal to the AGs' claim that *they* have not shown an inadequate legal remedy.  Mot. at 41.[59]  The AGs contend that they pled "specific facts" showing inadequate legal remedies, but the AGs' argument that damages are hard to calculate, Opp. at 44, is baseless—other plaintiffs, including in this MDL, have proposed damages calculated from the same alleged harms.  *See* ECF 2728.  Their other cited cases, Opp. at 43-44, concern a *federal* statute— unlike those here—that authorizes federal courts to award damages *and* disgorgement, *see Monster Energy Co. v. Integrated Supply Network, LLC*, 533 F. Supp. 3d 928, 933 (C.D. Cal. 2021).[60]

Moreover, disgorgement is impermissible here under federal equitable principles.  Mot. at 42. The AGs misconstrue an 1868 Supreme Court case to imply that there is an exception based on a case's "character," Opp. at 43, but federal equitable jurisdiction today is limited regardless of a case's "character."  *See, e.g.*, *Guzman v. Polaris Indus., Inc.*, 49 F.4th 1308, 1313 (9th Cir. 2022).  They also contend that *Liu v. SEC*, 591 U.S. 71 (2020), is distinguishable because it concerned the Exchange Act, Opp. at 44, but the Ninth Circuit has rejected this narrow reading, *see CFPB v. CashCall, Inc.*, 135 F.4th 683, 690 (9th Cir. 2025) (*Liu* applies "to all categories of equitable relief").  And the AGs' argument that *Liu* allowed "the deposit of disgorgement funds into the . . . Treasury," Opp. at 44, is unavailing because SEC disgorgement relies on the Exchange Act—not equitable principles, *see, e.g.*, *SEC v. Spartan Secs. Grp., Ltd.*, 164 F.4th 1231, 1266-68 (11th Cir. 2026); *SEC v. Hallam*, 42 F.4th 316, 338 (5th Cir. 2022).

### C.    The AGs Lack Evidence to Support a Claim for Disgorgement

The AGs concede that they must demonstrate "a reasonable approximation of profits causally connected" to the at-issue conduct to recover disgorgement, Opp. at 45, but they have no evidence that the alleged conduct yielded *any* profits or that their calculation fairly approximates any profits generated from the same, *see* Mot. at 43-44.[61]  The AGs primarily rely on Carl Saba's report, which

---

[59] The AGs suggest amending to cure this defect, Opp. at 44 n.68, but cannot do so through this brief, *see Dunbar v. City of Riverside*, 2014 WL 12962881, at *6 (C.D. Cal. Oct. 20, 2014).

[60] The AGs also cite dicta in *Connecticut v. Sandoz, Inc.*, 2026 WL 395842, at *20 (D. Conn. Feb. 12, 2026), to argue that the adequacy of a legal remedy depends on "whether it fulfills the function of the equitable remedy" sought.  Opp. at 43.  But *Sandoz* provided no citation for that principle, and this Court is not bound by unsupported dicta.

[61] The AGs suggest Meta must "provide an[] alternative disgorgement calculation."  Opp. at 45.  But the law does not require defendants to provide a competing calculation.  *See SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1232 (D.C. Cir. 1989); *see also Hallam*, 42 F.4th at 329 (every circuit has

25

does not reasonably approximate profits because the AGs assume without evidence that more time spent on the platforms by teens yields more revenue from those users when they are adults.  Opp. at 46, n.70.  And his analysis is not evidence of a causal connection because, at the direction of counsel, he assumes a causal relationship between the alleged conduct and profits.  Mot. Ex. 91 (Saba Rpt.) ¶ 17(e); Ex. 11 (Saba Dep.) at 225:10-15 (disclaiming any causation opinion).

### D.   The AGs' Claims for Disgorgement and Civil Penalties Are Limited by Extraterritoriality and Statutes of Limitations

Nine states—CA, CT, DE, IL, KY, NE, NY, SC, and WI—cannot recover for harms outside their respective states, and *no* AGs may recover for violations based on non-residents. Mot. at 44.  The AGs provide no authority to explain why extraterritorial limitations do not apply.  Opp. at 46.[62] Further contrary to the assertions, Opp. at 46, the statutes of limitations bar recovery on their deception *and* unfairness claims.  The AGs do not dispute that their claims are subject to limitations periods, Opp. at 26-28, and Meta moves for summary judgment on all requests for *monetary remedies* as to *all* the AGs' claims, Mot. at 44.

## IV.  Meta Is Entitled to Summary Judgment on the AGs' COPPA Claim[63]

### A.   There Is No Genuine Dispute of Material Fact as to Whether Meta's Platforms Are General Audience Websites

The AGs fail to identify evidence establishing a genuine issue of material fact as to whether Facebook or Instagram is U13-directed.  *See* Mot. at 46-48; Opp. at 50-55.  The AGs concede that COPPA defines "directed to [U13s]" as "targeted to [U13s]," Opp. at 50, but do not identify any evidence that either platform was "developed with the goal" of reaching U13s, Mot. at 45.  Instead, the cited documents show, at most, that some users lie about their age to access websites that do not allow U13s, *e.g.*, Opp. at 52 n.80, 54 (citing Opp. Exs. 1, 149, 163); that MPI employees discussed efforts to engage "teens" or "young users" (*not* U13s), *e.g.*, *id.* at 52 n.80, 53 (citing Opp. Exs. 1, 153); that MPI studied adolescents' social media usage, *e.g.*, *id.* at 52 nn. 80-81 (citing Opp. Exs.

adopted the *First City* framework).  To the contrary, Meta is only required to "demonstrate that the disgorgement figure was not a reasonable approximation" *after* the AGs establish a reasonable approximation.  *First City*, 890 F.2d at 1232.  The AGs have not carried their burden, and, even if they had, Meta has demonstrated a "considerable attenuation" between the at-issue conduct and profits generated years later to defeat it.  *See id.*; ECF 2845.

[62] Nor do the AGs refute that 14 of the 18 relevant AGs argued to the Supreme Court that they cannot enforce their consumer protection statutes extraterritorially.  Mot. at 44 n.99.

[63] Throughout § IV, "AGs' Mot." refers to ECF 2695, and "Meta's Opp." refers to ECF 2780.

META'S REPLY IN SUPP. OF MOT. FOR SUMM. J. AND OPP. TO STATE AGS' CROSS-MOT. FOR PARTIAL SUMM. J.
Case Nos. 4:22-MD-03047-YGR-PHK, 4:23-CV-05448-YGR

147-48); and that MPI employees considered developing a dedicated, COPPA-compliant platform, *see, e.g.*, *id.* at 52 n.81 (citing Opp. Ex. 150). This is insufficient. Mot. at 45-48. Nor can the AGs establish liability under COPPA "on the basis that particular user pages are directed at [U13s]." Opp. at 54. The cited authority—the FTC's January 2024 Notice of Proposed Rulemaking—merely explains the mixed audience exception and does not suggest liability can arise from a handful of pages that might appeal to U13s. *See* 89 Fed. Reg. 2034, 2039 (Jan. 11, 2024). And the AGs' theory would render COPPA a strict-liability statute, contrary to the statute's plain language and Congress's intent. Mot. at 47.

**B.    The AGs Have No Evidence That Meta Has "Actual Knowledge" of U13 Users in Any of Their States**

The AGs fail to identify evidence establishing a genuine issue of material fact as to whether Meta collected personal information from users it had "actual knowledge" were U13. *See* Mot. at 49-51; Opp. at 47-50. As an initial matter, the AGs fail to show that Meta has "actual knowledge" it is collecting "personal information" from a U13 in each AG's state, as required. *See* Mot. at 45 n.101, 49-51; Meta's Opp. at 15-17. COPPA limits each AG's right to sue only to vindicate harm to "an interest of the residents" of each AG's state. 15 U.S.C. § 6504(a)(1). The AGs have not met their burden by citing a report purporting to list the number of accounts subject to age enforcement actions per state, Opp. at 50 & n.76 (citing Opp. Ex. 129), because this is not evidence that Meta has "actual knowledge" that such accounts belong to U13 users, or that Meta collected personal information from them. *See* Mot. at 49-51; Meta's Opp. at 38-46.

The AGs also incorrectly claim they can show actual knowledge because some MPI employees theorized that some percentage of potential U13s were likely on the platforms, *see, e.g.*, Opp. Exs. 127, 135-137, or that more aggressive age enforcement decisions might reduce the number of any such users, Opp. Ex. 126. But evidence of generalized suspicion is insufficient to show that Meta had "actual knowledge." *See* Mot. at 49-51; Meta's Opp. at 37, 40. And the AGs' suggestion that Meta should have done more to identify possible U13s, *see* Opp. at 47-49, does nothing to prove that Meta had "actual knowledge," and would read into COPPA an affirmative duty to investigate that does not exist, *see* Mot. at 49; Meta's Opp. at 37, 45-46.

In an attempt to salvage their claim, the AGs mischaracterize the record, for example by

claiming Meta has "actual knowledge" when "the user provides an identification document showing that they are under 13," Opp. at 47, even though neither document cited says anything about users providing U13 IDs, Opp. Exs. 125, 175; or by claiming MPI "ignored" instances of "Facebook users who changed their birthdate to [be U13]," Opp. at 47-48, when the cited documents show Meta acting to fix this "immediately," Opp. Ex. 128, and "**right now**," Opp. Ex. 125. And, although the AGs attempt to show "willful blindness," Opp. at 47, a standard the AGs have not established applies to COPPA, *see* Meta's Opp. at 36-37 (describing COPPA's actual knowledge standard), none of the documents cited shows anyone avoiding learning of U13s, *see* Opp. Ex. 133 at -4829 (employee noting FTC might ask for data about proposed research); Opp. Ex. 134 at -5851 ("11-24yo segment (13+ for user research)," reflecting U13s cannot be users); Opp. Ex. 138 (discussing efforts to make age gates "more robust," and whether to more proactively remove potential U13). To the extent documents show research into U13s' social media usage broadly, Opp. Exs. 135-38, this is irrelevant to willful blindness.

Finally, the AGs erroneously suggest that Meta can be liable for merely using or maintaining personal information collected prior to obtaining actual knowledge. Opp. at 49. This is incorrect, and Meta did not advance any argument, much less "concede[]," *id.*, that COPPA applies to use or maintenance when COPPA's other elements are not met. To the contrary, Meta demonstrated in its opposition to the AGs' motion that COPPA does *not* apply to the mere use or maintenance of personal information collected *prior* to the operator obtaining actual knowledge, and that any FTC rulemaking to the contrary is invalid. Meta's Opp. at 46-51.

### C.    The AGs' COPPA Claim Is Untimely

The four-year statute of limitations under 28 U.S.C. § 1658 bars all COPPA allegations relating to events before October 2019, and laches bars the AGs' claim in its entirety. Mot. at 51-52 & nn.107-08. The AGs' arguments to the contrary are unavailing.

*First*, the AGs' COPPA claim is not tolled by agreement or alleged concealment. Although the AGs have the burden of proving their entitlement to tolling, *see Hinton v. Pac. Enters.*, 5 F.3d 391, 395 (9th Cir. 1993), the AGs cite no support for their assertion that Meta's alleged "practice of collecting and retaining [U13] personal information" or "deception related to U13s" tolls their claim,

28

META'S REPLY IN SUPP. OF MOT. FOR SUMM. J. AND OPP. TO STATE AGS' CROSS-MOT. FOR PARTIAL SUMM. J.
Case Nos. 4:22-MD-03047-YGR-PHK, 4:23-CV-05448-YGR

Opp. at 56. Nor does the Tolling Agreement help them, as the only activity relevant to COPPA—"collecting personal information from [U13s]," 15 U.S.C. § 6502(a)(1)—does not fall within the scope of "Matters Under Investigation," Mot. Exs. 86-87, and the AGs have identified no evidence to the contrary notwithstanding their burden to do so. Finally, even if the Agreement applied, all allegations relating to events before December 2017 for Instagram and before July 2018 for Facebook would still be time-barred. *See* Meta's Opp. at 18.

*Second*, the "*nullum tempus occurrit regi* doctrine" is inapplicable. Opp at 55. The AGs cite no authority applying it to COPPA's limitations period, or to *any* action involving a state suing under federal law, and identify no reason for this Court to be the first to extend the doctrine.[64]

*Third*, laches bars the claim. *See* Mot. at 51-52 & n.108. The AGs cannot escape laches simply because they purport to sue as "*parens patriae*," Opp. at 55; *see New York v. Meta Platforms, Inc.*, 66 F.4th 288, 298-99 (D.C. Cir. 2023) (holding states' *parens patriae* suit was barred by laches). Nor can they rely on an alleged continuing violation, Opp. at 56, as that theory does not apply to laches, *Jarrow Formulas, Inc. v. Nutrition Now, Inc.*, 304 F.3d 829, 837 (9th Cir. 2002). The prejudice flowing from the AGs' unjustified delay is apparent: a prompt lawsuit would have prevented Meta from incurring additional potential liability exposure and avoided a decade's worth of fading memories and departed employees. *See* Mot. at 52 n.108.

### D. The AGs Are Not Entitled to Disgorgement Under COPPA

The AGs' disgorgement request continues to suffer from several independently fatal defects. *First*, COPPA does not permit disgorgement. Mot. at 52-54.[65] The AGs concede that their disgorgement request is premised solely on, and limited by, federal equity principles. *See* Opp. at 57. But the AGs fail to differentiate the remedy they seek and the remedy that *Kokesh v. SEC*, relying on the same principles invoked here, held to be impermissibly punitive. *See* 581 U.S. 455, 464-65 (2017). And even assuming that it is *ever* permissible for a sovereign to retain disgorged funds, the Court need not answer this "open question" as the AGs have not shown that distribution to alleged

---

[64] The two cases the AGs cite apply the doctrine to the federal government. *See BP Am. Prod. Co. v. Burton*, 549 U.S. 84, 95 (2006); *SEC v. Rind*, 991 F.2d 1486, 1488 (9th Cir. 1993).

[65] Because COPPA is so rarely litigated, that "no court has interpreted [15 U.S.C. § 6504(a)(1)(D)] to prohibit disgorgement," Opp. at 57, is unsurprising.

victims would be "infeasible." *See Liu*, 591 U.S. at 89.

*Second*, the AGs cannot obtain disgorgement because they have not shown inadequacy of legal remedies. *See* Opp. at 57-59. The AGs assert that COPPA "displace[s]" this requirement. *Id.* at 58. That is wrong: there is a "strong presumption" that this limitation applies to federal statutes, such as COPPA. *See Starbucks Corp. v. McKinney*, 602 U.S. 339, 345 (2024); *Varity Corp. v. Howe*, 516 U.S. 489, 515 (1996) ("[W]here Congress elsewhere provided adequate relief for a [plaintiff]'s injury, . . . further equitable relief . . . normally would not be 'appropriate.'")[66]

*Third*, although the AGs concede they must provide a "reasonable approximation" of Meta's revenues relating to alleged COPPA violations, Opp. at 58, they cite no evidence of what illegally derived profits they seek to disgorge. *See supra* § III.C. The AGs' citation to a case about the injury requirement for Article III standing is unavailing, Opp. at 58 (citing *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 599 (9th Cir. 2020)).

*Fourth*, to the extent the AGs now purport to seek the "legal" remedy of restitution, that argument is waived as (i) it was raised for the first time in a footnote in the opposition, Opp. at 58 n. 86, and (ii) the AGs are "bound by [their] unambiguous and unamended answers to interrogatories," *United States v. McNicol*, 829 F.3d 77, 83 (1st Cir. 2016), in which disgorgement was the only monetary remedy sought, Mot. Exs. 92 at 16-18, 93 at 22-23.

**V. At a Minimum, Summary Judgment Should Be Granted to Instagram, LLC**

Meta moved for summary judgment on the AGs' claim as to both MPI and Instagram, LLC. The AGs' Opposition cites *no* evidence regarding Instagram, LLC in connection with any of their claims or cross-motion. *See generally* Opp.; *see also* Meta's Opp. at 3, 21, 24-26. At a minimum, therefore, Meta is entitled to summary judgment on the AGs' claims as to Instagram, LLC.

**CONCLUSION**

For the foregoing reasons, and the reasons set forth in its Motion, Meta respectfully requests that the Court grant its Motion for Summary Judgment and deny the AGs' Cross-Motion for Partial Summary Judgment.

---

[66] *Porter v. Warner Holding Co.*, 328 U.S. 395 (1946) is inapposite. Opp. at 57. It declined to consider whether restitution was "necessary or proper," *id.* at 403, and is limited to the statute at issue there, *AMG Mgmt., LLC v. FTC*, 593 U.S. 67, 79 (2021).

Dated: March 27, 2026

Respectfully submitted,

DAVIS POLK & WARDWELL LLP

/s/ James P. Rouhandeh

James P. Rouhandeh, *pro hac vice*
Antonio J. Perez-Marques, *pro hac vice*
Caroline Stern, *pro hac vice*
Kathryn S. Benedict, *pro hac vice*
Corey M. Meyer, *pro hac vice*
450 Lexington Avenue
New York, New York 10017
Telephone: (212) 450-4000
Facsimile: (212) 701-5800
rouhandeh@davispolk.com
antonio.perez@davispolk.com
caroline.stern@davispolk.com
kathryn.benedict@davispolk.com
corey.meyer@davispolk.com


COVINGTON & BURLING LLP

Ashley M. Simonsen, SBN 275203
1999 Avenue of the Stars
Los Angeles, California 90067
Telephone: (424) 332-4800
Facsimile: (424) 332-2749
asimonsen@cov.com

Paul W. Schmidt, *pro hac vice*
Phyllis A. Jones, *pro hac vice*
One CityCenter
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
pschmidt@cov.com
pajones@cov.com

*Attorneys for Defendants Meta Platforms, Inc.
and Instagram, LLC*

**ATTESTATION PURSUANT TO CASE MANAGEMENT ORDER NO. 27**

I attest that the evidence cited herein fairly and accurately supports the facts as asserted.


Dated:  March 27, 2026                             */s/ James P. Rouhandeh*
                                                    James P. Rouhandeh