Filed Under Seal

# Exhibit B

**IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| *PEOPLE OF THE STATE OF CALIFORNIA, et al.,*<br>Plaintiffs,<br><br>v.<br><br>*META PLATFORMS, INC, et al.,*<br>Defendants<br><br><br>IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br>4:23-cv-05448 | MDL No. 3047<br><br>Case No. 4:23-cv-05448-YGR<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br><br>Magistrate Judge: Hon. Peter H. Kang |

**TRIAL REPORT OF TIM ESTES**
**March 20, 2026**

CONFIDENTIAL

popular viral trend. In other words, it was extremely easy to identify underage accounts on the platform, yet Instagram did not remove them.

62.     In 2021 – more than 10 years after its creation – Instagram for the first time introduced several new features purporting to reduce inappropriate interactions between children and adults. However, these tools had significant gaps:

**Restricted DMs (released March 2021):** This feature purported to restrict adults over 18 from starting private chats with teens they're not connected to. It also uses prompts to encourage teens to be cautious in conversations with adults they're connected to.[39] However, Instagram does not perform any meaningful verification of a user's age, relying instead on the age given by the user during sign-up. As a result, an adult wishing to avoid this restriction can simply lie about their age and create an account that appears to belong to a child.[40] Moreover, a majority of teens are signed up on the platforms using adults' birthdays, meaning their accounts are not protected by this feature.[41] Perhaps not surprisingly, Meta employees observed a year after the feature launch that "there have been many gaps in fulfilling our promise" to "block teens from receiving DM requests from non-teens."[42] Indeed, internal documents indicate that teens were continuing to receive "unwanted DM requests" from "senders with stated age 18-20," "senders with no stated age," and "senders outside the US who state they are teens, but may not be teens."[43] I have seen no evidence that Meta disclosed these risks to the public, despite these same documents acknowledging that "most DM requests are unwanted," "unwanted DM requests are integrity and acquisition risks for teens," and "DMs are the most problematic interaction vector for teenagers on Instagram, including bullying, harassment, and more severe violations."[44]

---

[39] https://www.meta.com/help/policies/809291991003600/.
[40] *See* META3047MDL-003-00014331.
[41] Jayakumar Ex. 71 at 16 ("60% of actual teens lie and say they're non-teens").
[42] *Id.* at 15-16.
[43] *Id.* at 15.
[44] *Id.* at 9-10.

CONFIDENTIAL

**Restricting teen account discovery (released July 2021):** Prior to July of 2021, accounts that showed an interest in content posted by young children, including sexually suggestive content, were recommended more of that content by Instagram's algorithms. In other words, Instagram actively connected potentially predatory adults with young teen accounts.[45] In 2021, Instagram launched this feature to identify accounts of "suspicious" adults and stop recommending underage content to those suspicious accounts. But again, adults could avoid this restriction by lying about their age in order to create what appeared to be a child's account.[46]

63.     Beyond the limitations described above, teens are also able to easily circumvent these tools by creating secondary accounts that their parents or guardians do not know about. On Instagram, for example, it is routine for teens to maintain a "finsta" ("fake Insta") – a private account shared only with friends – in addition to their main account that parents might be aware of. A parent might diligently supervise one account, while the teen does as they please on the other.

64.     Instagram does not, for example, alert a parent or guardian if their child's device spins up a new account or if the child has multiple accounts. Moreover, the platform's lack of age verifications, parental consent and default parental controls, means there is nothing to stop a teen from creating a new account without a parent's or guardian's knowledge.

65.     Internal documents produced in this litigation show the Defendants were aware of this behavior, and, in some instances, encouraged it. For example, internal Meta documents discuss Meta's "Finsta Growth" program, "an effort on the Growth team to encourage teens to create their first Finsta account and to teach them to use the multi-account switcher."[47] In explaining the rationale for this program, the document notes that "on finstas, teens post 3x as much content."[48] Other Meta documents highlight that teens may be "connect[ing] with the wrong people (parents),"

---

[45] *See* Sinha Ex. 8.
[46] *See* META3047MDL-003-00014331.
[47] META3047MDL-031-00086273 at -274.
[48] *Id.* at -275.

24

CONFIDENTIAL

115.    While Meta denied or downplayed what was happening on their platforms, internal records indicate a gap between their public stance ("we don't allow under-13s, problem solved") and private reality ("millions of kids are here and driving our metrics"). This is most troubling because it may lull regulators and parents into a false confidence that the issue is being handled.

116.    By reviewing the timeline and evidence, it becomes apparent that by 2010, the existence of effective parental consent systems was widely known and their efficacy demonstrated. This set an industry standard: a reasonable company in the online services space that knows it has children on its platform should implement verifiable parental consent and age gating as other responsible companies have.

117.    Social media companies failed to adopt these reasonable measures. They had ample examples to emulate – whether by integrating a credit card verification on sign-up, implementing a parent-managed sub-account system, or partnering with app stores to enforce parental approval (as Meta belatedly suggested in 2023) – but did not follow them.

### E.    Meta's Experts' Opinions Are Built on a Theoretical Façade, Not Based in Reality

118.    Despite addressing different technical domains, the expert reports submitted by Meta are built upon a shared set of flawed premises. While authored by different individuals, these defense reports present the same flawed narrative, they describe a sanitized, theoretical world of social media safety that is irreconcilable with the reality revealed by Defendants' own internal documents, audits, and executive testimony. They collectively paint a picture of responsible companies grappling with unforeseeable challenges. The factual record, however, reveals a consistent pattern of inaction and misdirection. Moreover, the challenges these companies faced were foreseeable and addressable.

The undersigned hereby certifies their understanding that they owe a primary and overriding duty of candor and professional integrity to help the Court on matters within their expertise and in all submissions to, or testimony before, the Court. The undersigned further certifies that their report and opinions are not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation.

Dated: March 20, 2026

_____
Timothy W. Estes