Filed Under Seal

# Exhibit L

CONFIDENTIAL

Page 1

                    UNITED STATES DISTRICT COURT
                   NORTHERN DISTRICT OF CALIFORNIA


    IN RE: SOCIAL MEDIA           )
    ADOLESCENT ADDICTION/         )
    PERSONAL INJURY PRODUCTS      )   MDL No. 3047
    LIABILITY LITIGATION          )
                                  )
                                  )


     SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE
      COUNTY OF LOS ANGELES - SPRING STREET COURTHOUSE

    COORDINATION PROCEEDING       )
    SPECIAL TITLE [RULE 3.400]    )
                                  )
    SOCIAL MEDIA CASES            )   Lead Case No.
    _____)       22STCV21355
    This Document Relates To      )
                                  )
    STATE OF TENNESSEE, ex rel.)
    JONATHAN SKRMETTI,            )
    ATTORNEY GENERAL and          )
    REPORTER,                     )
    v.                            )
    META PLATFORMS, INC., and     )
    INSTAGRAM, LLC.               )
    _____)

               CONFIDENTIAL - ATTORNEYS' EYES ONLY
                  PURSUANT TO PROTECTIVE ORDER
                        VIDEO-RECORDED
                  DEPOSITION OF ALISON LEE, Ph.D.
                        (Pages 1 - 465)
                      Covington & Burling
         415 Mission Street, San Francisco, California
            Thursday, February 6, 2025, 9:19 a.m.
                          - - - -


    REPORTED BY:  ELAINA BULDA-JONES, CSR 11720

CONFIDENTIAL

Page 26

didn't go in thinking that I was going to change, like -- like, I don't think my ego would have been that big for me to expect that I would have changed the entire organization.

But I had hoped that the research that I had -- would have had, joined a larger course of voices that would have galvanized towards change. And I think that was partially realized, but not fully realized in the way that I had hoped.

Q.    Okay.  I think we're going to have a chance to talk about that a bit today.

But before we do, can you tell me which positions you held during your tenure at Instagram?

A.    Yep.  So I was a senior UX researcher focused on relevance integrity.

(Whereupon, a brief discussion off the record.)

THE WITNESS:  It -- I can explain what that means in a moment.

I was there from March 2021 until May 2022.  That title did not change, despite some reorganizations that were happening.  So I had shifted from being on the relevance team, which is the Feed team at Instagram, from March until maybe September or October.  And then around October,

CONFIDENTIAL

Page 27

there was a massive reorganization, where anybody who touched trust and safety and integrity were then reorganized under an umbrella trust and safety and social impact pillar.

My title didn't change during that time, but the structure of where I sat changed.

After that, I joined the central Meta responsible AI team, also as a senior researcher. That happened from June to December of 2022.

BY MR. DUNBAR:

Q.    Can you help me understand the skills you believe you brought to your role at Instagram?

A.    Aside from the expected skills that are required for a mixed-methods researcher at that level, so I was expected to deploy both quantitative and qualitative methods to answer critical questions around my area of focus.  I was expected to formulate those research questions myself, to execute that, and to also translate those research insights into actionable recommendations to either a product team or specific engineers on my team or to larger organizational wide sort of recommendations for what we would do in response to that research.

I think that's expected for anybody at the senior researcher level.  I think -- on top of that,

CONFIDENTIAL

Page 31

icon that looks like a magnifying glass, that's called Explore.  It's where you go to search for new content.  In that -- it is called the Explore tab. And in the Explore tab, you will see both Reels and normal posts interspersed throughout that.  And that's another surface.

Q.   Okay.  So you just mentioned Reels as one of the surfaces that one might use on Instagram. Can you just explain the Reels surface in layman's terms?

A.   Yeah, the Reels -- Reels is a type of content actually.

Q.   Okay.

A.   And Reels can be entered into many multiple surfaces, right.  You can inject it into the in-feed recs.  You can inject that into the Explore.  And there's actually a separate -- there was, at one point -- I keep forgetting whether they took that away or they brought it back.  There was, at one point, a Reels tab unto itself.  That's another surface.

Q.   Okay.

A.   At the time in 2021, it was a -- the newest product that Instagram had launched.  And they had hired me specifically to conduct Reels

Page 32

integrity and safety research because it was such a new product.  They were building fast.  There were clear market competitive motivations to build that product fast and make it as compelling as possible.

And I was a -- prior to me, there was only one other integrity researcher on the relevance integrity team.  And so they actually hired me on to focus specifically on Reels integrity.  Because at that point the product had existed for maybe a year, not even.  And they were just starting to dig into, okay, how do we make sure that this is a safe product.

Q.  I'm going to hand you a document which will be Exhibit 2.

(Whereupon, Meta-Lee Exhibit 2 was marked for identification.)

BY MR. DUNBAR:

Q.  Please feel free to take a moment to familiarize yourself.  If it's helpful, I'm introducing the exhibit just for the title and the date.

Ready?

A.  Yeah.

Q.  Okay.  Does this appear to be an article from Meta's website titled "Introducing Instagram

CONFIDENTIAL

Page 35

Q.   Okay.   Now, why were Reels integrities issues of interest to you?

MS. BARNHART:  Object to form.

THE WITNESS:  I wouldn't say that Reels was especially that interesting to me.  It was assigned to me, and they were, like, you are an integrity researcher now, we really need someone to work on Reels, and you are going to be that person. That is your assignment.

I think as a content type, and from a professional standpoint, given that Reels was a brand-new content type, and that it was an organizational priority, that made it compelling as, oh, this is kind of a cool new thing to work on.

I think it was also important that there was somebody who was focusing specifically on safety and integrity of a product when the entire company was launching everything they had again -- to try to build the sexiest Reels product, right.  And so I think in that way, it felt important that somebody on the integrity team was also working on the safety side of Reels.

BY MR. DUNBAR:

Q.   Were Reels gaining popularity with teens on Instagram at that time?

CONFIDENTIAL

Page 56

Instagram, is it fair to say that you learned Reels posted by young users were distributed by Instagram in ways those young users would not prefer?

MS. BARNHART:  Object to the form. Foundation.

THE WITNESS:  I think that were true in general, that there were content that was being distributed on Reels that were reaching audiences that users did not intend as original audience.  And we also conducted research that showed that young people had a preferred audience that they wished to reach.

And there was also research that suggested that particularly young women who were producing content on Reels were experiencing unwanted interactions as a result of their content being shown to people that they did not wish to have it be shown to.

BY MR. DUNBAR:

Q.   Do you know how that happened?

MS. BARNHART:  Object to the form.  Calls for a narrative.

THE WITNESS:  It would happen the way that any other Reel would be distributed to a public audience, which is that it was sourced from the

CONFIDENTIAL

Page 57

billions of posts that are created every day and then shown and recommended to users on the basis of what a -- any particular user's preferences are -- or detected preferences are, right.  And we use that through the user signal.

So, for example, Chris, if you're really into bikes, we would try to know that through your user interactions and preference signals.  So if you follow a lot of bike content, if you like, share, DM, do all of these user signals, we would use those signals to recommend content that you have engaged with previously.

BY MR. DUNBAR:

Q.   Okay.  So, in other words, were Instagram's algorithms delivering young users' Reels to people those young users were not connected to?

MS. BARNHART:  Object to the form. Foundation.

THE WITNESS:  Yes.

BY MR. DUNBAR:

Q.   And did that distribution sometimes endanger those young users?

MS. BARNHART:  Object to the form. Foundation.

THE WITNESS:  I think I would like to

CONFIDENTIAL

Page 62

particular subsurface, it's basically when you click on -- before you click on a video, there's, like, a static image and a lot of times people would put sexually suggestive content or really sensational, like clickbait-y covers. So we saw that was a subsurface that was problematic.

In-feed unit, what we called RIFU, Reels in-feed unit, that's what was being injected into people's feed, that was also a different -- that's a completely different ranking model, right. So that's what -- that might be one way that I meant around tuning ranking models. Is there ways that, if we know a particular subsurfaces are riskier than others, can we do some tuning to the riskier models, right.

And the second connected piece here is this idea of focus on entertainment and mimicry and the teen audiences. And if you remember, Reels is basically Instagram's version of TikTok. And so at the time, everybody was locked up inside and doing TikTok dances. We're doing these, like, silly trends. And many of those trends are very benign, right. And those trends are oftentimes -- once it goes viral, everybody's producing those videos at a higher rate.

worked with them on the solutions for further investigation.  And then -- what was the -- we called it escalations, yeah, internal escalation.

BY MS. BARNHART:

Q.   Am I correct, though, that the primary focus of your integrity work at Instagram was on non-recommendable content?

MR. DUNBAR:  Same objection.

THE WITNESS:  Yes, that's right.

BY MS. BARNHART:

Q.   Okay.  And at various points during your testimony today, you've referred to harm that you were working to mitigate and prevent while at Instagram.

By "harm," were you referring to non-recommendable content?

MR. DUNBAR:  Object to form.

THE WITNESS:  It is exposure to undesirable content that produces undesirable experiences for users.  Most often, we -- the original focus was non-recommendable content, but as you saw in some of the research, sometimes that content came from content that was considered benign by our policies but harmful by users.

///

CONFIDENTIAL

Page 311

harm.

BY MS. BARNHART:

Q.   Okay.  And, again, just to be clear, when we are talking about content, we are talking about content that Instagram users have created and posted on the app?

MR. DUNBAR:  Object to form.

THE WITNESS:  Yes, that's correct.

BY MS. BARNHART:

Q.   So just want to be clear, we're talking about content created by third parties, not content created by Instagram?

MR. DUNBAR:  Same objection.

THE WITNESS:  Content that's created by third parties on the platform hosted by Instagram.

BY MS. BARNHART:

Q.   And like you said, Instagram has developed various policies regarding certain types of content and whether they are or are not allowed on the platform, correct?

MR. DUNBAR:  Same objection.

THE WITNESS:  Yes, that's right.

BY MS. BARNHART:

Q.   And that includes non-recommendable content policies, which are policies about content

CONFIDENTIAL

Page 419

major change I think would best serve users, what would be the strategic path to getting IG there in the long term?  What are the steps on the road, who needs to buy in, how" -- "how we might plug into systems to get that change to happen at scale?"

Did I read that correctly?

A.   Yes, you read that correctly.

Q.   Okay.  You can put that aside.

Do you recall Mr. Dunbar asking you questions about the BEEF survey and the TRIPS survey?

A.   Yes, I do recall that.

Q.   Okay.  So let's start with BEEFs.

You did not conduct the BEEF survey, correct?

A.   I did not personally conduct that.

Q.   You did not write the survey questions, right?

A.   I did not write the survey questions, correct.

Q.   You did not author the slide deck that Mr. Dunbar showed you as Exhibit 25, correct?

A.   No, I did not.

Q.   You did not prepare the data tables in that deck that Mr. Dunbar asked you questions about,

correct?

A.   I did not.

Q.   You did not analyze any of the data that was shown in those tables in that deck, correct?

A.   No, I did not.

Q.   You don't know -- you don't have personal, detailed knowledge of the methodology used to conduct the BEEF survey, correct?

A.   I likely had some more sophisticated understanding of the methodology than most at the time because I learned a lot from collaborating with Kyle.  And I also replicated the BEEF survey to a real specific one called the PRISM survey.  So I actually replicated a lot of his methodologies.

Q.   Okay.  When Mr. Dunbar was asking you questions about Mr. Andrews's slide deck earlier, in your testimony, you listed a number of questions that you would need to have answered in order to interpret the data.

Am I remembering that correctly?

A.   Can you reiterate --

MR. DUNBAR:  Object to form. Characterization.

THE WITNESS:  -- those questions?

///

BY MS. BARNHART:

Q.   When Mr. Dunbar was -- sorry.  Ask my question again?

A.   Can you reiterate -- you mentioned that I had named a number of questions for -- that I'd need to ask.  I don't recall them.  Can you reiterate them to me?

Q.   Well, I don't think we have time, given Mr. Dunbar's admonitions to me, to go back through all of those.

So you don't -- sitting here right now, you don't recall, a few hours ago, naming several questions that you would need to have answered in order to properly interpret the BEEF's data?

MR. DUNBAR:  Object to form.  And characterization.

THE WITNESS:  I don't think that's an accurate characterization of what was happening during that time.  I think I interpreted that data live.  And I named that -- the follow-up questions I would have as a researcher from those tables.

BY MS. BARNHART:

Q.   Yeah.  You weren't -- so that's what I want to be clear on.

You were interpreting that data on the

CONFIDENTIAL

Page 422

fly, correct?

A.    I was --

MR. DUNBAR:  Object to form.  And characterization.

THE WITNESS:  I was interpret -- revisiting that data after multiple years of not having seen it.  Although I have seen it before. And the questions that I asked were through the lens of a researcher of what would I do as follow-up research, not questions that were calling into question the integrity of the research itself.

MS. BARNHART:  All right.  We'll let the record sit on that.

BY MS. BARNHART:

Q.    You don't have personal knowledge of how the data in the BEEF survey was weighted, correct?

A.    I did not do the --

MR. DUNBAR:  Object to form. Characterization.

THE WITNESS:  I did not do the weighting myself.

BY MS. BARNHART:

Q.    And you don't know, sitting here today, that the sample used for the BEEF survey was, in fact, representative of the broader Instagram

CONFIDENTIAL

Page 465

STATE OF CALIFORNIA  )

COUNTY OF YOLO        )

I, ELAINA BULDA-JONES, a Certified Shorthand Reporter of the State of California, duly authorized to administer oaths pursuant to Section 2025 of the California Code of Civil Procedure, do hereby certify that

ALISON LEE, Ph.D.,

the witness in the foregoing deposition, was by me duly sworn to testify the truth, the whole truth and nothing but the truth in the within-entitled cause; that said testimony of said witness was reported by me, a disinterested person, and was thereafter transcribed under my direction into typewriting and is a true and correct transcription of said proceedings.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said deposition dated the _____ day of _____, 2025.

ELAINA BULDA-JONES, CSR 11720