# Filed Under Seal

# Exhibit P

CONFIDENTIAL

Page 1

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA          )
ADOLESCENT ADDICTION/        )
PERSONAL INJURY PRODUCTS     ) MDL No. 4:22-md-3047-YGR
LIABILITY LITIGATION         )
_____)
    SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE
      COUNTY OF LOS ANGELES - SPRING STREET COURTHOUSE

COORDINATION PROCEEDING      )
SPECIAL TITLE [RULE 3.400]   )
                             )
SOCIAL MEDIA CASES           )   Lead Case No.
_____)   22STCV21355
This Document Relates To     )
                             )
STATE OF TENNESSEE, ex rel.  )
JONATHAN SKRMETTI,           )
ATTORNEY GENERAL and         )
REPORTER,                    )
v.                           )
META PLATFORMS, INC., and    )
INSTAGRAM, LLC.              )
Case No. 23-1364-IV          )
_____)

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

VIDEOTAPED DEPOSITION OF BRIAN BOLAND
APRIL 25, 2025
(Pages 1 - 422)
9:18 a.m. to 7:18 p.m.
Zuckerman Spaeder
2100 L Street, NW, Washington, DC 20037

Reported By: Amanda Blomstrom, RMR, CRR, and
CSR TX #8785/CA #12681/IL #84-3634

CONFIDENTIAL

Page 70

compensation, direct salary, stock, ratings, promotion, were tied to success metrics of their products.

In defining what accounts for success, you align those employees to chase that metric, to chase that incentive; and that incentive was growth.  And growth means the number of people using that product, the number of times they may post, the number of times they may share, the number of videos that they create.

Those metrics that lead to the number of people using the product and how much engagement that they have with the product would be the things that determine a person's career.

I did not at my time see metrics around trust and safety, around understanding the harms of your product, and mitigating the harms of your product, except for on the specific Trust and Safety Teams, which is outside of each of those individual product leaders and product areas who are responsible for growth.

Q.   To your knowledge, Mr. Boland, during your

CONFIDENTIAL

Page 91

per-user revenue is not necessarily caused by user activity, but that if you have a lot more activity on the platform, you generate a lot more revenue from that user activity.

In this case, talking about impression counts, meaning how many stories, posts, videos, a person would see on the platform.

Q.   Does the company take efforts to increase users' activity on the platform?

MR. GOLDFARB:  Objection to form.

MR. SNEED:  Object to form.

THE WITNESS:  Yes.

BY MR. JANSSEN:

Q.   In what ways, to your knowledge, does the company do that?

A.   By looking at ways that you could design the layout of Facebook, how you would rank stories, so ranking plays a significant role in how people find the content on Facebook interesting to them.

Generally the more interesting that content is -- and "interesting" applies very broadly because some things that are rage-inducing can be

CONFIDENTIAL

Page 92

interesting -- but as the algorithm can rank more interesting content, then you can get people to share more posts, click on them, comment, like, et cetera.

Q. You -- again, your answer, by saying that the design of the layout of Facebook could increase user activity on the application, what did you mean by the design of the layout of Facebook?

MR. SNEED: Object to form.

THE WITNESS: There is a lot of work that you can do in how you change all aspects of a post or a story, including the way that you represent the title of a post, including the way that you show whether people have engaged with that post, including minor things like the color shading behind the post. All of those changes, and countless more, can impact the way that people engage with content on Facebook-style platforms.

BY MR. JANSSEN:

Q. Are you aware of any other things that the company may do to increase user activity on the platform?

MR. GOLDFARB: Objection to form.

CONFIDENTIAL

Page 119

deeply concerned that Mark Zuckerberg and Meta's leadership weren't serious about addressing the harm created on their platform.  Over time, it became clear to me that Facebook's priorities were growth and power, not the safety or well-being of its users."

Did I read that correctly?

A.    You did.

Q.    And you've testified over the course of today's examination as to why it became clear to you that Facebook's priorities were growth and power, not the safety or well-being of its users, correct?

A.    That is correct.

Q.    And then, in the next paragraph, you write in your blog post, "I didn't plan to become a public critic when I left the company.  Leadership dismissed my concerns, and I second-guessed myself until January 6, 2021."

Did I read that correctly?

A.    You did.

Q.    You referenced that leadership dismissed your concerns.  What concerns did you convey to

CONFIDENTIAL

Page 122

Q.    Is it your understanding, sitting here today, that the company is dodging accountability for teen mental health harms related to Instagram use?

MR. SNEED:  Object to form and foundation.

MR. GOLDFARB:  Object to form.

THE WITNESS:  To my knowledge, I don't believe that they have tried hard or potentially tried beyond the most minimal amount to understand whether they're harmful to teen mental health.

BY MR. JANSSEN:

Q.    Moving down in your blog post.  You write, "A Pattern of Neglect and Harm.  The latest news that Meta is ending its fact-checking program and scaling back user protections is the final straw for me. This is the same company whose platform contributed to genocide in Myanmar, harmed teenage users and enabled political and racial polarization across the globe.  Instead of addressing these harms, Meta consistently prioritizes growth over public safety."

Did I read that correctly?

A.    You did.

Q.    And then, if you look at the last sentence

Page 275

is all bad, do you?

A.    I do not.

Q.    And I think you've written and spoken about the benefits of social media in connecting people and supporting people and giving them a voice; is that right?

A.    That is correct.

Q.    And is it fair to say too that you don't think that the benefits of Facebook and social media erase the harms that come with it?

MR. GOLDFARB:  Objection to form.

MR. SNEED:  Object to form.

MR. GOLDFARB:  You may answer.

THE WITNESS:  I don't believe so.  I think that the harms are -- the harms are significant enough that we should fix them.

BY MS. SINGER:

Q.    And do you believe, as a former senior executive at Facebook, that the harms from Facebook were worsened by choices Facebook made about its growth, its priorities, its incentives, and its transparency?

Page 276

MR. GOLDFARB:  Objection to form.

MR. SNEED:  Object to form.

THE WITNESS:  I believe that.

BY MS. SINGER:

Q.    And can you explain that, in your own words?

MR. SNEED:  Object to form.

THE WITNESS:  I believe that, over the course of my time at the company, I saw opportunities for Mark Zuckerberg to make decisions based on concerning information that he was seeing that he could invest more in safety measures or at least understanding the potential harms.

One of the things I've been very clear about in my earlier testimony to the Senate but maybe am less neutral today, is that at the time I said that, I don't know, I'm not sure whether it's harmful, because no one has given us the ability to find out.

And Mark has had ample opportunity, ample opportunity to invest in finding out, and has had ample opportunities to see concerning research that

CONFIDENTIAL

Page 277

would make the average person want to look; and, in my experience, didn't see him invest in looking.  And if you don't invest in fixing it, if you don't invest in understanding it, then it's certainly not getting better.  And it feels to me, because I've listened to more activists and more concerned global parties, that they don't feel like it's getting better.

And so that leaves me in a state where I feel like it's not on a path to improvement, and his announcements in January to really curtail, not just the fact-checking, but the kinds of basic protections that the platform was offering is a really bad step for anyone, everyone on the platform.

MS. SINGER:  Thank you.  I have nothing further.

MR. GOLDFARB:  You want to go off the record?

MR. SNEED:  Yes.

THE VIDEOGRAPHER:  Okay.  The time is 4:31 p.m.

We are now off the record.

(Recess taken.)

CONFIDENTIAL

A.    Correct.

MR. GOLDFARB:  Objection to form.

BY MR. SNEED:

Q.    Now, in fact, you weren't on any team that was devoted to or focused on working on safety, right?

A.    That's correct.

Q.    You also were not a part of any research team when you were at Facebook, correct?

MR. GOLDFARB:  Objection to form.

THE WITNESS:  That's correct.

BY MR. SNEED:

Q.    And so it would be fair to say that, in your work at Facebook, you didn't do any work on youth well-being, right?

A.    That is correct.

Q.    You never worked on the community standards during the time you were at Facebook; is that right?

MR. GOLDFARB:  Objection to form; foundation.

THE WITNESS:  That is correct.

CONFIDENTIAL

Q.     You were not a part of the headcount and resourcing proposals or discussions when it came to youth safety, for example, correct?

A.     That's correct.

Q.     So you wouldn't be able to say how many employees, whether engineers or otherwise, were allocated in 2018 to youth well-being, correct?

MR. JANSSEN:  Objection to form.

THE WITNESS:  That's correct.

BY MR. SNEED:

Q.     At no stage during your time at Facebook would you be able to say how many employees were devoted to working on youth well-being, correct?

A.     That's correct.

Q.     In addition, you wouldn't be able to say, throughout your time at Facebook, how much Facebook was spending on youth well-being efforts at the company, correct?

MR. JANSSEN:  Objection to form.

MR. GOLDFARB:  Objection to form.

THE WITNESS:  That's correct.

BY MR. SNEED:

CONFIDENTIAL

Page 334

Q.    You weren't involved in any efforts related to child safety during the time that you were at Facebook, correct?

A.    That's correct.

Q.    Are you familiar with NCMEC?  Do you know that organization?

A.    I recall that acronym, but I don't remember the details of it.

Q.    And -- and for -- it's the National Center for Missing & Exploited Children.  Okay.  Do you understand that?

A.    I do.

Q.    Nothing about your work related to the work that NCMEC was doing, right?

A.    That is correct.

Q.    There were other teams that were at Facebook, and subsequently Meta, that ultimately handled that type of work, correct?

MR. JANSSEN:  Objection to form; foundation.

THE WITNESS:  That's correct.

BY MR. SNEED:

CONFIDENTIAL

Page 346

at when you were at Facebook related to polarization and election integrity; is that right?

A.    Election integrity and polarization broadly.

Q.    And that research is what had you concerned about the impact of Facebook on its users; is that right?

A.    That's correct.

Q.    And you don't recall at any time when you were at Facebook looking at research related to teen mental health, correct?

A.    That's correct.

Q.    The first time that you looked at any research related to teen mental health, I believe you testified, was in relation to the Haugen leaks; is that right?

A.    That's correct.

Q.    And after the Haugen leaks, did you see or review Meta's research response to what had been leaked?

MR. JANSSEN:    Objection to form; foundation.

CONFIDENTIAL

Page 422

REPORTER'S CERTIFICATION

DEPOSITION OF BRIAN BOLAND

APRIL 25, 2025

I, Amanda Blomstrom, a Notary Public in and for the District of Columbia, hereby certify to the following:

That the witness, BRIAN BOLAND, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

That the deposition transcript was submitted to the witness or to the attorney for the witness for examination and signature;

I further certify that I am neither counsel for, related to, nor employed by any of the parties or attorneys in the action in which this proceeding was taken, and further that I am not financially or otherwise interested in the outcome of the action.

Certified to by me this 29th day of April, 2025.

_____

Amanda Blomstrom, CRR, RMR, CLR

Texas CSR No. 8785

California CSR No. 12681

Illinois CSR No. 84-3634