# Filed Under Seal

# Exhibit E

Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
-------------------------------
IN RE:   SOCIAL MEDIA          :MDL No.
ADOLESCENT ADDICTION/PERSONAL :4:22-md-3047-YGR
INJURY PRODUCTS LIABILITY      :
LITIGATION                     :
-------------------------------
     SUPERIOR COURT OF THE STATE OF CALIFORNIA
   FOR THE COUNTY OF LOS ANGELES-SPRING STREET
                  COURTHOUSE
COORDINATION PROCEEDING         :
SPECIAL TITLE [RULE 3.400]     :Lead Case No. for
                               :Filing Purposes
SOCIAL MEDIA CASES             :22STCV21355
-------------------------------
This Document Relates to:      :
                               :
STATE OF TENNESSEE, ex rel.    :
JONATHAN SKRMETTI, ATTORNEY    :
GENERAL and REPORTER,          :
                               :
v.                             :
                               :
META PLATFORMS, INC. and       :
INSTAGRAM, LLC,                :
Case No. 23-1364-IV            :
-------------------------------
            T R A N S C R I P T of the
      videotaped deposition of MARGARET GOULD
      STEWART, taken at the offices of BAKER
      BOTTS LLP, 30 Rockefeller Plaza, 44th
      Floor, New York, New York, before
      MARGARET M. REIHL, RPR, CRR, CCR-NJ and
      Notary Public of New York, on October
      21, 2024, commencing at 9:24 a.m.

                  _ _ _

Page 32

Among these billions of users, were some of these users teenagers?

A.      Yes.

Q.      Okay.  And in the work you were doing in responsible innovation to work to proactively surface and address potential harms that could be caused by these apps, was one of the things you were concerned about potential harms to teenagers using these apps?

MR. HALPERIN:  Object to form.

THE WITNESS:  There were a lot of issues that we were engaged in, so I would not say that it was -- it certainly was not the single issue, and I also wouldn't say that it was the main focus of the team.

BY MS. WALSH:

Q.      Okay.

A.      But there was a specific issue that came up related to youth safety that I ended up getting involved in.

Q.      Okay.  And was that issue cosmetic surgery effects?

A.      Yes.

Q.      Okay.  And that was an issue that

Page 33

your team looked at because of the potential

harms that cosmetic surgery effects could create

for teenagers?

          MR. HALPERIN:  Object to form and

    foundation.

          THE WITNESS:  Yes, it felt like a

    good example of the kind of thing that

    the team and I wanted to help with.

BY MS. WALSH:

    Q.    Okay.  Let me ask you this,

Ms. Stewart, do you have kids?

    A.    I do.

    Q.    Okay.  And at the time that you

were working on this issue of cosmetic surgery

effects, were your kids teenagers?

    A.    They were.

    Q.    And how many kids do you have?

    A.    I have three.

    Q.    Okay.  And boys, girls?

    A.    I have a boy, my middle child is

nonbinary, and my youngest is a girl.

    Q.    As a mother of three kids, was

that the perspectives that you had from being a

mom, is that something that had an effect on how

you approached issues on the responsible

Page 34

innovation team?

MR. HALPERIN:  Object to form.

THE WITNESS:  Yes, I feel that raising teenagers during that team period gave me a perspective on why we needed to be looking at this issue because of my personal proximity to it.

BY MS. WALSH:

Q.   Okay.  And we'll talk about that a little bit more a little bit later in your testimony, but during this time when you were working on this issue of cosmetic surgery effects, were you one of the few executives at Meta who had teenaged kids, the few senior executives who had teenage kids?

MR. HALPERIN:  Object to form and foundation.

THE WITNESS:  As far as I know, there were a handful of executives who had teenage kids.  Many of the executives did not have children or had young children.

MS. WALSH:  Okay.  So I want to talk in more detail now about cosmetic surgery effects, okay.  And I want to

A.      Yes, they can be, yes.

Q.      Keeping these photographs, these selfie manipulations and cosmetic surgery effects in mind, let me ask you this, Ms. Stewart:  When you were working at Meta as the head of responsible innovation, were you concerned that the existence of cosmetic surgery effects like these could contribute to a teenage girl's mental health issues?

MR. HALPERIN:  Obstacle.

THE WITNESS:  Yes.

BY MS. WALSH:

Q.      And given that concern, did you consult with mental health experts outside of Meta to better understand the impacts that cosmetic surgery effects like these could have on a teenager?

MR. HALPERIN:  Object to form.

THE WITNESS:  We consulted with experts.  I would have to review the specific experts to see if they were specifically mental health experts or academics doing research in this area or a combination of those.

BY MS. WALSH:

Q.    And we're showing the jury those apps now?

A.    Correct.

Q.    Okay.

A.    I should say -- if you could bring the family of apps back?

Q.    Sure.

A.    I don't believe that it was -- it's not shown here, but the reality labs team was actually where some of these effects were being developed in a team called Spark AR.

Q.    Okay.

A.    So even though there wasn't an app with a camera, that organization was a part of these discussions too because we knew in future years between VR head sets and augmented reality experiences that this policy would effect those products as they came to market as well.

Q.    Okay, understood.

Now, did there, in fact, as a result of the efforts that were instigated originally by people in product policy and that you led, did there come to be -- was there a temporary ban placed on cosmetic surgery effects

such as these?

A.    There was.  And my recollection is that -- I would have to look up when this happened, but when the Spark AR platform, which is a developer platform that allows outside designers and engineers to develop effects that might be offered on the platform, when that opened up, we saw there were a set of filters that were created.  And we're seeing, as I recall, fairly high usage that were quite extreme in nature around cosmetic surgery, much more direct than what we're looking at in this exhibit on cosmetic surgery effects.  They actually were filters that outlined nip and tuck diagramming on people's faces, and this was very concerning and something that I think there was fair unanimity about in the company that we did not want those things.

And so there was a temporary ban put on -- and I don't recall what the scope of -- exactly what the scope of the temporary ban was but around cosmetic surgery filters so that the team in policy presumably working with product could have the time to research how pervasive these were, how much usage they were

Page 53

getting and get outside advice on how we might approach whether or not we would allow these.

And at a certain point, we had to revisit whether that ban would be -- sorry, I don't know if you want to -- okay, there was a certain point at which once that temporary ban was put into place by policy, that we had to decide if we were going to continue that ban for another period of time, lift it or make it permanent.

Q.    Okay.  So, Ms. Stewart, let me -- I'm going to move to strike that as nonresponsive --

A.    Okay.

Q.    -- which is okay.

A.    Yeah.

Q.    But let me just ask a question which is:  Did there come a time when cosmetic surgery effects, including ones like these, were temporarily banned?

A.    Yes.

Q.    And do you recall the date or the approximate date when that would have been?

A.    I -- my pandemic brain often mixes up '19, '20, '21, so I literally may be a

C E R T I F I C A T I O N

I, MARGARET M. REIHL, a Registered Professional Reporter, Certified Realtime Reporter, Certified Court Reporter and Notary Public, do hereby certify that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the time, place, and on the date hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in the action.

_Margaret M. Reihl_

------------------------------------------------

Margaret M. Reihl, RPR, CRR, CLR

CCR License #XI01497

NCRA License #047425

Notary Public of New York