FILED UNDER SEAL

[*Submitting Counsel on Signature Page*]

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>4:23-cv-05448 | MDL No. 3047<br><br>Case No. 4:22-md-03047-YGR<br><br>**STATE ATTORNEYS GENERAL'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br><br>Magistrate Judge: Hon. Peter H. Kang |

**NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

PLEASE TAKE NOTICE THAT, at a date and time to be determined by the Court, before the Honorable Yvonne Gonzalez Rogers, in Courtroom 1, Floor 4, of the United States District Court, Northern District of California, located at 1301 Clay Street, Oakland, CA 94612, the State Attorneys General Plaintiffs ("State AGs") will and hereby do move this Court, under Federal Rule of Civil Procedure 56, for an order granting partial summary judgment in favor of the State AGs on a portion of their COPPA claims. This Motion is based on this Notice, the accompanying Memorandum of Points and Authorities, any Reply or other papers submitted in connection with the Motion, the accompanying Declarations of Matthew Cocanougher, Kate Gooler and Catherine Diaz and the exhibits thereto, and any other matters presented at the time of the hearing.

**STATEMENT OF RELIEF SOUGHT**

The State AGs seek entry of partial summary judgment in their favor on the following elements of COPPA:

1. Meta Platforms, Inc. and Instagram, LLC are "operators" of Instagram;

2. Meta collects "personal information" from users of Facebook and Instagram, including those who visit Facebook and Instagram without logging into an account; and

3. Meta has not provided COPPA's protections for any children under 13 ("child" or "children") on Facebook or Instagram, including:

   a. Meta has not sought or obtained "verifiable parental consent" before any collection, use, or disclosure of personal information from children on Facebook or Instagram, 16 C.F.R. § 312.5(a)(1);

   b. Meta has not provided parents with "direct notice of [its] practices with regard to the collection, use, or disclosure of personal information from children," 16 C.F.R. § 312.4(b), nor has Meta posted a notice of its practices with respect to children's personal information, 16 C.F.R. § 312.4(d);

   c. Meta has not provided parents with "a means of reviewing any personal information collected from the[ir] child" on Facebook or Instagram, 16 C.F.R. § 312.6(a)(3); and

   d. Meta has not provided parents with "[t]he opportunity at any time to refuse to permit [Meta's] further use or future online collection of personal information from that child, and to direct [Meta] to delete the child's personal information." 16 C.F.R. § 312.6(a)(2).

The State AGs also seek entry of partial summary judgment in their favor on their claim that Meta has violated COPPA by using the "personal information" of children under 13 to train its machine learning and generative AI models even after it gained actual knowledge that the accounts belong to children under 13.

**TABLE OF CONTENTS**

NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT ..................................... i

STATEMENT OF RELIEF SOUGHT ............................................................................................ ii

MEMORANDUM OF POINTS AND AUTHORITIES ..................................................... 1

I. INTRODUCTION ........................................................................................ 1

II. FACTUAL BACKGROUND ...................................................................... 2

    A. Meta Platforms, Inc. and Instagram, LLC operate the Facebook and Instagram Platforms. ................................................................................................................. 2

    B. Meta collects large volumes of data from users. ............................................. 2

    C. Meta detects children on its platforms. ............................................................ 3

        1. Checkpointing ......................................................................................... 5

        2. Disabled State and Retention of Data .................................................... 5

        3. Deletion .................................................................................................. 5

    D. Meta trains its machine learning and generative AI models on user data, including personal information. .............................................................................................. 6

        1. Meta uses ==all== users' data to train its models, ==and it increased teen data use for model improvement==. ............................................................................................... 7

        2. Meta continues training its machine learning and generative AI models on user data from accounts that are checkpointed, disabled, ==and/or scheduled to be deleted==. ............... 9

        3. Meta does not obtain parental consent for the collection, use, or disclosure of users' data; provide notice to parents of its data collection practices; nor provide parental rights over their children's data .............................................................................. 10

III. LEGAL STANDARD ................................................................................. 10

IV. ARGUMENT .............................................................................................. 11

    A. Summary judgment should be granted for the State AGs as to certain elements of COPPA. ................................................................................................................... 11

        1. Meta Platforms, Inc. and Instagram, LLC are operators under COPPA. ............. 11

        2. Meta collects personal information from ==all== users of Facebook and Instagram whether they are logged in or not. ........................................................................ 17

        3. Meta does not provide COPPA's required protections for children on Facebook or Instagram. ........................................................................................................... 18

    B. Summary judgment should be granted as to the State AGs' claim that Meta violates COPPA by continuing to use the personal information of children to train its machine learning and generative AI models, even after it checkpointed or disabled their accounts because they belong to children. ......................................................................... 20

        1. Meta has actual knowledge that the children whose accounts it checkpoints and ultimately disables for being underage are under 13. ......................................... 21

        2. Meta continues using users' personal information for model training after gaining actual knowledge that those users are children. ................................................ 27

        3. Meta does not provide COPPA's protections to any users, including those it

checkpoints and disables. ................................................................................................................ 28

V.    CONCLUSION ...................................................................................................................... 28

# TABLE OF AUTHORITIES

**Cases**

*Anderson v. Liberty Lobby,*
  *Inc.*, 477 U.S. 242 (1986) ......................................................................................................... 11

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986) ................................................................................................................. 10

*Commodity Futures Trading Comm'n. v. Int'l Berkshire Grp. Holdings, Inc.*,
  2006 WL 3716390 (S.D. Fla. Nov. 3, 2006) ............................................................................ 15

*Freeman v. Ethicon, Inc.*,
  619 F. Supp. 3d 998 (C.D. Cal. 2022) ..................................................................................... 11

*FTC v. E.M.A. Nationwide, Inc.*,
  767 F.3d 611 (6th Cir. 2014) .................................................................................................... 14

*FTC v. Network Servs. Depot, Inc.*,
  617 F.3d 1127 (9th Cir. 2010) .................................................................................................. 14

*FTC v. On Point Cap. Partners LLC*,
  17 F.4th 1066 (11th Cir. 2021) ................................................................................................. 14

*FTC v. Surescripts, LLC*,
  665 F. Supp. 3d 14 (D.D.C. 2023) ........................................................................................... 11

*FTC v. WV Universal Mgmt., LLC*,
  877 F.3d 1234 (11th Cir. 2017) ................................................................................................ 14

*Glob. Tech Appliances, Inc. v. SEB S.A.*,
  563 U.S. 754 (2011) ................................................................................................................. 21

*Gordon v. Virtumundo, Inc.*,
  575 F.3d 1040 (9th Cir. 2009) .................................................................................................. 13

*Intel Corp. Inv. Pol'y Comm. v. Sulyma*,
  589 U.S. 178 (2020) ................................................................................................................. 21

*Kanaan v. Yaqub*,
  799 F. Sup. 3d 960 (N.D. Cal. 2025) ....................................................................................... 11

*Leisek v. Brightwood Corp.*,
  278 F.3d 895 (9th Cir. 2002) .................................................................................................... 10

*Lopez v. Smith*,
  203 F.3d 1122 (9th Cir. 2000) .................................................................................................. 10

*New Mexico ex rel. Balderas v. Real Estate Law Center, P.C.*,
  401 F. Supp. 3d 1229 (D.N.M. 2019) ...................................................................................... 14

*Nuth v. Newrez LLC*,
  755 F. Supp. 3d 1258 (N.D. Cal. 2024) ................................................................................... 11

*Office of the Attorney General v. Berger Law Group., P.A.*,
2015 WL 5922933 (M.D. Fla. Oct. 9, 2015) ............................................................................ 15

*Register.com, Inc. v. Verio, Inc.*,
356 F.3d 393 (2d Cir. 2004) ...................................................................................................... 13

*Staples v. United States*,
511 U.S. 600 (1994) ................................................................................................................... 21

*State Farm Fire & Cas. Co. v. Geary*,
699 F. Supp. 756 (N.D. Cal. 1987) ............................................................................................ 11

*Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*,
595 U.S. 178 (2022) ................................................................................................................... 21

*United States ex rel. Landis v. Tailwind Sports Corp.*,
234 F. Supp. 3d 180 (D.D.C. 2017) ........................................................................................... 11

*United States ex rel. Schutte v. SuperValu Inc.*,
598 U.S. 739 (2023) ....................................................................................................... 21, 22, 26

**Statutes**

12 U.S.C. § 5538(a)(1) ...................................................................................................................... 14

12 U.S.C. § 5538(b)(1) ...................................................................................................................... 14

15 U.S.C. § 6502 ............................................................................................................................... 18

15 U.S.C. § 6502(c) ........................................................................................................................... 14

**Rules**

64 Fed. Reg. 59888 (1999) ................................................................................................................ 23

89 Fed. Reg. 2034 (2024) .................................................................................................................. 21

Fed. R. Civ. P. 56(a) ......................................................................................................................... 10

Fed. R. Evid. 803(17) ........................................................................................................................ 13

**Regulations**

16 C.F.R § 312.3 ................................................................................................................................ 18

16 C.F.R § 312.5(a)(1) ....................................................................................................................... 18

16 C.F.R. § 312.2 ........................................................................................................................ 12, 17

16 C.F.R. § 312.4 ........................................................................................................................ 18, 19

16 C.F.R. § 312.5 ............................................................................................................................... 18

16 C.F.R. § 312.6 .................................................................................................................... 18, 19, 20

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I.    INTRODUCTION

The Children's Online Privacy Protection Act (COPPA) exists to protect the online privacy and safety of children under the age of 13.[1] Discovery has shown it is undisputed that Meta Platforms, Inc. and Instagram, LLC do not meet COPPA's requirements for certain child users of their platforms. There is no dispute of material fact that:

(1) Meta Platforms, Inc. and Instagram, LLC are operators of Instagram under COPPA;

(2) Meta[2] collects "personal information" for all users of Facebook and Instagram, including logged out users;

(3) Meta does not provide direct notice to parents, obtain verifiable parental consent, or provide parents with the right to meaningfully review, delete, and restrict the use of their child's data, on Facebook and Instagram;

(4) Meta has "actual knowledge" of children whose accounts it checkpoints (i.e., suspends) for being underage, and those whose accounts it ultimately disables on Facebook and Instagram; and

(5) Meta continues to use these children's personal information for machine learning and generative AI model training after it develops actual knowledge that they are children.

The State AGs are bringing two requests for partial summary judgment based on the above. The first seeks partial summary judgment to establish the elements set forth in (1) through (3). The second seeks partial summary judgment that Meta has violated COPPA through its use of children's personal information in machine learning and generative AI model training after it obtains actual knowledge that the children whose accounts it checkpoints and ultimately disables are under 13. Partial summary judgment should be granted on both.

---

[1] This Motion will refer to persons under the age of 13 as "children" or "child."

[2] For purposes of this Motion, "Meta" is defined as Meta Platforms, Inc. and Instagram, LLC. Otherwise, the Motion will specify the particular entity at issue.

## II.   FACTUAL BACKGROUND

### A. Meta Platforms, Inc. and Instagram, LLC operate the Facebook and Instagram Platforms.

The Parties have stipulated that Instagram and Facebook are "websites" and "online services" as those terms are used in COPPA. *See* Ex. 1[3], Stipulation Regarding Certain Aspects of the State AGs' COPPA Claim, ECF No. 2628, ¶ 1. They also have stipulated that Meta Platforms, Inc. has been an "operator," as that term is used in COPPA, of Facebook at all relevant times in this Action. ECF No. 2628, ¶ 2. As will be shown below, the evidence is also undisputed that Meta Platforms, Inc. and Instagram, LLC have served and continue to serve as "operators" of Instagram.

### B. Meta collects large volumes of data from users.

Meta collects a wide array of personal information from its users. *See* Ex. 2, Hartnett 30(b)(6) Dep. (Meta Platforms, Inc.; Instagram, LLC; Meta Payments, Inc.; and Meta Platforms Technologies, LLC) [hereinafter "Hartnett Dep."] 28:17-34:8. The types of personal information collected include email addresses; phone numbers; images of a person's face; the sound of a person's voice; cookie IDs; IP addresses; information that the user provides on their profile, such as content created by the user; and information that reflects the user's interactions on the platform, such as likes, the videos they watch, and who they interact with. *Id.* Meta has collected some of these types of personal information since 2012 from users of Instagram and Facebook. *Id.* at 30:1-4.

Aside from collecting personal information while users are active on Instagram and Facebook, Meta also collects personal information belonging to logged-off users. *See* Ex. 2, Hartnett Dep. 59:13-60:18, 99:4-100:3. Meta's privacy policy explains "how it collects and may use certain personal information, including certain personal information from people who visit certain Facebook or Instagram webpages without logging into an account." Ex. 3, Meta Defs.' 2nd Amended Resp. & Objs. to State AGs' 1st Set of Requests for Admission, May 8, 2025 at 2-3.

---

[3] Unless otherwise specified, all exhibits referenced in this motion are exhibits to the Declaration of Matthew Cocanougher.

Specifically, Meta collects various types of personal information belonging to logged-off users, including IP addresses, device IDs, cookie data, and user clicks. *See* Ex. 2, Hartnett Dep. 59:13-60:18. Meta's privacy policy reveals that it collects "GPS location, camera access, photos and related metadata," and its partners share email addresses, cookies, and advertising device IDs with Meta. Ex. 4, META3047MDL-030-00000058 at –62, –63.

### C. Meta detects children on its platforms.

Meta has several different ways to detect and ultimately remove children on Facebook and Instagram. *See* Ex. 2, Hartnett Dep. 101: 2-6. One of the ways is by identifying children who self-report a date of birth under the age of 13 by changing the date of birth on their account after signup. *Id.* at 103:5-7. Beginning in early 2020, Meta began automatically suspending ("checkpointing") the accounts of Facebook users who attempted to change their date of birth to reflect an age under 13. *See* Ex. 5, META3047MDL-287-00003183. Prior to February 2021, Meta prevented Instagram users from changing their date of birth to a stated age under the age of 13. *See* Ex. 6, Meta Defs.' Resp. To N.J.'s April 10, 2023, Demand for Statements Under Oath, May 22, 2023, AG-MDL3047-020615 at –617. However, beginning in February 2021, Meta automatically places Instagram users in an age checkpoint if they try to change their date of birth to a date under the age of 13. *Id.*

Meta also relies on reporting from users and human review to detect under 13 users. *See* Ex. 2, Hartnett Dep. 101:10-14. Parents, siblings, and other members of the public can report accounts on Facebook and Instagram as belonging to users under 13. *See* Ex. 7, Meta's Responses to FTC Civil Investigative Demand, META3047MDL-053-00012709 at –716. Human reviewers employed by Meta or its contractors review a subset of these reported accounts, in order to determine if the user has admitted their age in their account biography (on Instagram only), or if the photographs posted on the account belong to an underage account owner. *See* Ex. 8, Hartnett Dep. Ex. 6, at 5; Ex. 7, Meta's Responses to FTC Civil Investigative Demand, META3047MDL-053-00012709 at –719. Meta's reviewers who are reviewing accounts for certain other reasons can also escalate accounts for underage review if they identify them as likely belonging to underage users. *See* Ex. 2, Hartnett Dep. 101:15-18; 101:21-102:16.

In addition, Meta can identify underage accounts through "hard-linking" or "soft-matching" other accounts already identified as belonging to the same child. Meta provides users with a service called "Account Center," wherein a user with multiple accounts on Facebook, Instagram, or both, can link and centrally manage those accounts. Ex. 2, Hartnett Dep. 110:8-17. Where Meta determines that an account violates a policy, the company can suspend not only that account, but all accounts "hard-linked" to that account by "simultaneously suspend[ing] any other accounts that have been added to the same Accounts Center." *See* Ex. 7, Meta's Responses to FTC Civil Investigative Demand, META3047MDL-053-00012709 at –717.

Currently, if a user has an account that is placed in an age checkpoint, then the other hard-linked accounts in Accounts Center are suspended until the user provides proof that they are 13 or older at the age checkpoint. *See* Ex. 2, Hartnett Dep. 110:24-111:13. However, Meta did not suspend or disable hard-linked accounts consistently prior to December 2021, instead allowing those accounts to remain on the platform. *See* Ex. 2, Hartnett Dep. 211:14-212:11; Ex. 8, Hartnett Dep. Ex. 6 at 6-8; Ex. 9, META3047MDL-155-00009593.[4]

Meta also uses models to identify multiple accounts belonging to the same user based on similar attributes, which it calls soft-matching. *See* Ex. 8, Hartnett Dep. Ex. 6 at 11; Ex. 12, META3047MDL-146-00072943 at –72955-56; Ex. 13, META3047MDL-146-00072869. Meta regularly generates soft-match links for all accounts owned by the same users by running its models on all accounts on Facebook and Instagram. *See* Ex. 14, META3047MDL-091-00022408; Ex. 15, Hartnett Dep. Ex. 26. Aside from a brief period, Meta has deliberately chosen not to disable accounts that it has soft-matched to accounts it checkpoints and disables for being under 13. *See* Ex. 2, Hartnett Dep., 223:11-225:4, 226:12-227:23; 296:12-297:16.

---

[4] Meta did not disable Instagram accounts that were connected to underage Instagram accounts until at least June 2022. *See* Ex. 10, META3047MDL-037-00083064 (June 2022 Meta employee chat about adding "hardlinked IG<->IG U13 propagation" to a "call for ideas"); Ex. 11, META3047MDL-020-00656153 (H2 2022 Project Ideas - AR" tab, row 13, column F) ("We are lacking propogation [*sic*] for hardlinked IG <-> Ig accounts after the account centre launch")

STATE ATTORNEYS GENERAL'S MOTION FOR PARTIAL SUMMARY JUDGMENT
4:22-md-03047-YGR; 4:23-cv-05448-YGR

Meta uses three stages of enforcement against children's accounts: checkpointing; a "disabled" state; and eventually deletion.

### 1.    Checkpointing

Checkpointing is akin to a suspension of a user's account. Once an account is checkpointed, the user is locked out of their account until they appeal by providing an identification document within 30 days showing they are age 13 or older. Ex. 2, Hartnett Dep. 103:15-106:17.

If the person successfully appeals the checkpoint, their account is restored. However, if they do not—either because they do not provide an identification document or they provide an identification document showing they are under 13—the account is "disabled." *See id.* at 297:17-301:13. Meta checkpointed more than 1.8 million U.S. accounts as belonging to child users from 2020 to April 2024. *See* Ex. 16, Corrected Expert Report of Patrick McDaniel, p. 104, 117, 146 (counting unique user IDs in Meta's "Checkpointing Table" data production).

### 2.    Disabled State and Retention of Data

If a user does not successfully appeal the checkpoint, their account is "disabled." When an account is disabled, the data from the account is not immediately deleted. *See* Ex. 2, Hartnett Dep. 297:17-301:13. Instead, disabled means the data associated with the account is *scheduled* to be deleted. *See* Ex. 7, Meta's Responses to FTC Civil Investigative Demand, META3047MDL-053-00012709 at –720-21. The duration of time an account is "disabled" has varied over time. In 2022 and 2023, Meta held data from users whose accounts were disabled for being underage for six months before beginning to delete the data. *See* Ex. 2, Hartnett Dep. 299:22-24. In April 2023, Meta extended the time it held this data in the "disabled" period to one year. *Id.* at 300:21-301:4. In April 2024, Meta shortened the period to 45 days. *Id.* at 301:6-13.

Meta disabled more than 1.3 million U.S. accounts as belonging to child users from 2020 to April 2024. *See* Ex. 16, Corrected Expert Report of Patrick McDaniel, p. 104, 117, 150 (counting rows in Meta's data productions).

### 3.    Deletion

After an account's disabled period is over, Meta takes up to 90 days to delete the user's data. *See* Ex. 2, Hartnett Dep. 301:15-19.

### D. Meta trains its machine learning and generative AI models on user data, including personal information.

Machine learning models are involved in many aspects of Meta's platforms – most prominently ranking and recommendation systems, including feeds, People You May Know "PYMK," Meta's friend-suggestion system, and notifications, but also other areas, such as search autocomplete. *See* Ex. 17, Backstrom 30(b)(6) Dep. (Meta Platforms, Inc.; Instagram, LLC; Meta Payments, Inc.; and Meta Platforms Technologies, LLC) (June 26, 2025) [hereinafter "Backstrom 30(b)(6) Dep."] 12:15-14:20; Ex. 18, Backstrom Dep. (December 10, 2025) 104:1-106:14.

Meta uses data from its users to train its machine learning models to complete certain tasks. *See* Ex. 17, Backstrom 30(b)(6) Dep. 15:1-3. For example, if Meta was training a model that is designed to predict whether a person will watch a particular video, the training data would contain metadata about videos with labels representing whether a person has watched that video. *Id*. at 16:10-25. The following figure, taken from a memo prepared at Mark Zuckerberg's request to explain to him Meta's ranking and recommendation models, shows an example of training data for predicting whether a user would like a movie recommendation:

| Label | Features | |
| --- | --- | --- |
| Liked = yes | UserID=12345, Age, Time, Watch_History=[StarWars, Mission Impossible, Matrix, …], Following=[SiFiFans, ActionFever, …], … | VideoID=Batman, ProducerID, Genre=SciFi, Director, Popularity=High, … |
| Liked = no | UserID=12345, Age, Time, Watch_History=[StarWars, Mission Impossible, Matrix, Batman…], Following=[SiFiFans, ActionFever, …], … | VideoID=AmericanBeauty, ProducerID, Genre=Drama, Director, Popularity=Mid, … |

*See* Ex. 19, META3047MDL-014-00405380 at –386-87 (noting that Meta's models use "hundreds to thousands of features").

As shown above, the models make predictions based on input signals, sometimes called features. *See* Ex. 17, Backstrom 30(b)(6) at 15:10-17. Features are the basis of the models' predictions, and Meta develops machine learning models by training them on data. *Id*. at 15:18-25.

In the example above, features include user ID, age, time, watch history and what the user is following.

Training data contains a set of features for the models and a "label." *Id*. at 16:2-4. The label is a piece of information that describes the outcome the models are being trained to predict or the expected output of the machine learning models. *Id*. at 16:5-9. In the example above, the label is attempting to determine if the user likes the particular movies included.

The training data gives Meta information about not only which video to show but also where in the person's feed it should go. Ex. 17, Backstrom 30(b)(6) Dep. 13:15-23 (Meta uses models to determine which posts show up in particular orders in various feeds across Meta's platforms).

1. **Meta uses all users' data to train its models, and it increased teen data use for model improvement.**

Meta uses all users' data for model training for machine learning models. *See* Ex. 17, Backstrom 30(b)(6) Dep. 25:4-21, 27:15-21; Ex. 20, Backstrom 30(b)(6) Amended Errata at 1. Meta also uses vast amounts of user data to train its generative AI models. Ex. 17, Backstrom 30(b)(6) Dep. 36:3-39:25. This data, used for machine learning models and generative AI, includes various categories of personal information described below:

- **User behavior, interests derived from user behavior, and other user characteristics (age, gender) combined with user IDs.**

To train its models, Meta uses photos and videos (mostly metadata about them); user IDs; age and gender information; information on users' interactions on the platform, including interactions with content; and information concerning user posts. Ex. 18, Backstrom Dep. (December 10, 2025) 111:19-117:10; Ex. 17, Backstrom 30(b)(6) 19:12-24:9. The data on users' interactions with content reveals information about users' interests. *See* Ex. 17, Backstrom 30(b)(6) Dep. 22:2-25.

- **Usernames**

Meta uses usernames to train its models. *See* Ex. 21, Meta Defs.' 3rd Supp. Resp. & Objs. to Pls.' 2nd Set of Interr., November 18, 2024, META3047MDL-118-000000459 at –474; *id.* at –649-50 (appendix for Instagram Search contains an input with the plain-language description "[t]he

similarity between the words used in the user's search and those in the account's username or profile name").

- **IP addresses**

Meta uses general location derived from IP address to train recommendation models. *See* Ex. 17, Backstrom 30(b)(6) Dep. 19:12-24:9. Similarly, Meta trains a model that feeds into its Instagram Search model on "[a] representation of the user's most frequently used IP address." *See* Ex. 21, Meta Defs.' 3rd Supp. Resp. & Objs. to Pls.' 2nd Set of Interr., November 18, 2024, META3047MDL-118-000000459 at –637.

- **Photos and videos, including selfies**

Meta uses publicly shared photos (including selfies), videos, and text on Instagram and Facebook to train its generative AI models. Ex. 17, Backstrom 30(b)(6) Dep. 36:19-39:25. As noted by Chris Cox, Meta's Chief Product Officer, in a May 9, 2024 interview:

> [a]nd if you look at our image model, EMU is its name. If you use . . . [i]magine in one of our products, you'll use our text to image model. You get really amazing quality images and a lot of that is because Instagram is the dataset that was used to train it, which is just one of the great repositories of incredible imagery in a lot of different types of art, fashion, you know, culture and also just imagery of people and us.

Declaration of Kate Gooler, Ex. L, *Meta's Cox on Building AI Into the Product Suite*, Bloomberg (May 9, 2024), https://www.bloomberg.com/news/videos/2024-05-09/meta-s-cox-on-building-ai-into-the-product-suite-video, at 6:09-6:29.

### a. Increased teen data use for model improvement.

The frequency with which Meta trains its models depends on the specific model. *See* Ex. 17, Backstrom 30(b)(6) Dep. 17:16-19:10. Meta can focus its model training data on a specific group of users, like teens, to improve the model quality for that group. *See* Ex. 22, META3047MDL-072-01245074 at –076.

In fact, Meta has used this technique to deliver machine learning model improvements specifically for teens. *Id*. In the second half of 2023, the company set out to "significantly enhance [its] model sophistication in order to deliver model improvements for Teens and Gen[eral] pop[ulation]." *Id.* at –075. To do this, it focused on:

1. **Data:** Upsample training data, especially for Teens to enable better model training.
2. **Signal**: Enrich feature pool to better represent viewer, authors and content.
3. **Model Complexity**: Increase model size and complexity to enable more sophisticated predictions.
4. **Efficiency**: Make predictions faster, cheaper and more scalable.

*Id.* For the unsampled training data, Meta noted that:

> [p]reviously, Connected Feed only used 5% of user traffic to retrain our models on a daily basis, which limits our ability to learn marginal user/teen behavior. In H2, we increased daily training volume 11X, which led to 100% sampling rate for Teens and 60% gen[eral] pop[ulation]. The increased training amplified our model improvements.

*Id*. at –076.

Increasing the amount of teen data to train its models improved Meta's desired experience for teens, increasing NE or normalized entropy, a metric for measuring predictive performance in machine learning. Meta verified that:

> (1) more teen data leads to consistent teen NE and wins for overall NE in most cases; (2) teen data is more efficient in improving teen NE compared with non-teen data; (3) non-teen data is indispensable for model performance for teens especially given its large volume - so it is always suggested to use all non-teen data as it improves teen NE as well.

*See* Ex. 23, META3047MDL-047-01202953.

> **2. Meta continues training its machine learning and generative AI models on user data from accounts that are checkpointed, disabled, and/or scheduled to be deleted.**

As discussed above, some Meta accounts are checkpointed (i.e., suspended), disabled, or deleted. *See supra* Section II.C. During the period of time when an account is checkpointed, the account's data is still used to train Meta's machine learning models. Ex. 17, Backstrom 30(b)(6)

Dep. 30:7-22; Ex. 20, Backstrom 30(b)(6) Amended Errata at 2. Similarly, during the period when an account is disabled, the account's data is available to be used in model training. Ex. 18, Backstrom Dep. (December 10, 2025) 155: 4-17. Even when the deletion process begins, there is a 90-day window for the data to be deleted. *Id.* at 156:11-22. During the deletion period, the account's data is available to be used in model training until it is deleted. *Id.*

**3. Meta does not obtain parental consent for the collection, use, or disclosure of users' data; provide notice to parents of its data collection practices; nor provide parental rights over their children's data.**

Meta does not provide clear and comprehensive notice to parents regarding the collection, use, and disclosure of children's personal information. *See* Ex. 24, Meta Defs.' Amended Resp. & Objs. to Pls.' 3rd Set of RFAs, May 2, 2025 at No. 18. Meta has not sought or obtained verifiable parental consent for the collection or use of data from users under the age of 13 on Facebook or Instagram. *Id.* at 19; Ex. 25, Meta Defs.' First Amended Resp. & Objs. to Pls.' 1st Set of RFAs, Feb. 11, 2025, at No. 6. It also does not provide parents with ongoing rights to access, review, delete, and restrict further use of their child's personal information. *See* Ex. 25, Meta Defs.' First Amended Resp. & Objs. to Pls.' 1st Set of RFAs, Feb. 11, 2025, at No. 7; Ex. 24, Meta Defs.' Amended Resp. & Objs. to Pls.' 3rd Set of RFAs, May 2, 2025, at Nos. 20, and 21.

## III. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must determine "whether, viewing the evidence in the light most favorable to the non-moving party, there are any genuine issues of material fact." *Leisek v. Brightwood Corp.*, 278 F.3d 895, 898 (9th Cir. 2002), quoting *Lopez v. Smith*, 203 F.3d 1122, 1131 (9th Cir. 2000) (en banc). The moving party has the burden of demonstrating the absence of a genuine issue of fact for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the non-moving party must go beyond the pleadings and "set forth specific facts" that show a genuine issue for trial. *Id.* at 323–24. "Unsupported conjecture or conclusory statements, however, cannot defeat summary judgment." *Nuth v. Newrez LLC*, 755 F.

Supp. 3d 1258, 1262 (N.D. Cal. 2024). The standard thus requires "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

Partial summary judgment is appropriate on discrete factual issues and elements of a claim. "Rule 56(a) allows a court to enter summary judgment on . . . a part of each claim or defense." *Kanaan v. Yaqub*, 799 F. Sup. 3d 960, 964 (N.D. Cal. 2025). Partial summary judgment "serves the purpose of speeding up litigation by eliminating before trial matters wherein there is no genuine issue of fact." *Id.* (internal citations omitted). "Partial summary judgment that falls short of a final determination, even of a single claim, is authorized by Rule 56 in order to limit the issues to be tried." *State Farm Fire & Cas. Co. v. Geary*, 699 F. Supp. 756, 759 (N.D. Cal. 1987) (granting summary judgment to plaintiff on liability for two theories); *see also Freeman v. Ethicon, Inc.*, 619 F. Supp. 3d 998, 1008 (C.D. Cal. 2022) (granting partial summary judgment to establish five facts that had been found in a previous trial against the same defendant); *United States ex rel. Landis v. Tailwind Sports Corp.*, 234 F. Supp. 3d 180, 191 (D.D.C. 2017) (summary judgment can be entered on narrow, factual issues such as the amount of invoices presented by the defendant to the government and the amount paid by the government); *FTC v. Surescripts, LLC*, 665 F. Supp. 3d 14, 37-38 (D.D.C. 2023) (granting partial summary judgment on issues of market definition and monopoly power).

## IV.    ARGUMENT

### A. Summary judgment should be granted for the State AGs as to certain elements of COPPA.

There is no dispute of material fact that: (1) Meta Platforms, Inc. and Instagram, LLC are operators under COPPA; (2) Meta collects "personal information" for all users; and (3) Meta has never provided at least four required protections under COPPA on Facebook or Instagram.

#### 1.    Meta Platforms, Inc. and Instagram, LLC are operators under COPPA.

For COPPA purposes, an "operator" is "any person who operates a website located on the internet or an online service and who collects or maintains personal information from or about the

users of or visitors to such website or online service, or on whose behalf such information is collected or maintained." 16 C.F.R. § 312.2.

### a. Meta Platforms, Inc. operates Facebook and Instagram.

Meta Platforms, Inc. stipulated that it is an operator of Facebook. Additionally, there is no dispute that Meta Platforms, Inc. is also an operator of Instagram.[5] Written discovery in this action identified "Meta Platforms, Inc." as the Meta-affiliated entity "responsible for the development and operations of Instagram." *See* Ex. 26, Meta Defs. Resp. & Objs. to Pls' R30(b)(6) Written Questions, July 25, 2024, at No. 48. In fact, the current Instagram Terms of Service note "**[t]he Instagram Service is one of the Meta Products, provided to you by Meta Platforms, Inc**. These Terms of Use therefore constitute an agreement between you and Meta Platforms, Inc." *See* Gooler Declaration, Ex. A, Instagram, *Terms of Use* (last visited January 23, 2026) (emphasis added). These undisputed facts demonstrate that Meta Platforms, Inc. is an "operator" of Instagram, and partial summary judgment should be granted on this element.

### b. Instagram LLC operates Instagram.

Instagram, LLC is also an operator of the Instagram platform. The Instagram Terms of Service in effect from January 19, 2013, through April 18, 2018, identified Instagram, LLC as the "owner" of Instagram. *See* Ex. 27, Instagram, *Terms of Use*, retrieved 2015, META3047MDL-068-00000001 ("The Service is owned or controlled by Instagram LLC ('Instagram').."); Ex. 28, Instagram, *Terms of Use*, retrieved Dec. 29, 2017, META3047MDL-072-01498784 (identical); Gooler Declaration, Ex. B, Internet Archive snapshot of Instagram Terms of Use, Apr. 18, 2018, https://web.archive.org/web/20180418220749/https://help.instagram.com/478745558852511/ (identical, and still showing an effective date of Jan. 19, 2013).

Instagram, LLC is also the declared registrant (i.e., the owner) and administrator of the Instagram.com domain name. Declaration of Catherine Diaz, ¶¶ 4-8; Diaz Declaration Exs. A-C,

---

[5] Meta conceded in its letter brief before this Motion that it "does not dispute that Meta Platforms, Inc. is an operator of Instagram and Facebook," and asserted that this Motion was unnecessary because it would so stipulate. ECF 2497, at 3. Yet, Meta refused to stipulate that Meta Platforms, Inc. was an operator of Instagram, necessitating this portion of the Motion.

WHOIS info.[6] Finally, Instagram, LLC is the declared owner of numerous platform-specific trademarks on file with the U.S. Patent Office, including the terms "Instagram" and "Insta" and the Instagram logo. *See* Gooler Declaration, Ex. D., U.S. Trademark Registration No. 4170675 (filed Sep. 19, 2011) (issued Jul. 10. 2012); Gooler Declaration, Ex. E, U.S. Trademark Registration No. 5061916 (filed May 21, 2015) (issued Oct. 18, 2016); and Gooler Declaration, Ex. F, U.S. Trademark Registration No. 5019151 (filed Aug. 14, 2015) (issued Aug. 9, 2016).

Still more core components of Instagram are identified as owned and maintained by Instagram, Inc.—the entity that transferred the Instagram trademark to Instagram, LLC. *See* Gooler Declaration, Ex. G, U.S. Trademark Reg. Nos. 4146057, 4170675 (showing full ownership history of the Instagram trademark, including transfer from Instagram, Inc. to Instagram, LLC). For example, Instagram, Inc. was listed as the copyright holder on Instagram help pages, including the underage user reporting webform, as recently as 2024. *See* Ex. 29, META3047MDL-040-00000322. To this day, Instagram, Inc. remains listed as the owner and maintainer of the Instagram App on the Apple Store—though the same page also specifies that the app's copyright is "© 2018 Instagram, LLC." *See* Gooler Declaration, Ex. I, Apple App Store, Instagram, https://apps.apple.com/us/app/instagram/id389801252 (retrieved Jan. 23, 2025). Taken together, the undisputed facts show that many core components of the Instagram platform—without which the platform could not function—are owned by Instagram, LLC. Accordingly, there can be no reasonable question that Instagram, LLC is also an operator of the platform, and partial summary judgment should be granted on this element.

<blockquote>

**c.  In the alternative, Meta Platforms, Inc. and Instagram, LLC participate in a common enterprise as to the operation of Instagram and are therefore jointly liable for violations of COPPA.**

</blockquote>

---

[6] The WHOIS directory is a "list, directory, or other compilation generally relied on by the public" and persons who work in information technology to identify who operates particular web addresses. Fed. R. Evid. 803(17); *see also Gordon v. Virtumundo, Inc.*, 575 F.3d 1040, 1064 & n. 22 (9th Cir. 2009) (recognizing that WHOIS is "a publicly available online database through which users can access information regarding domains, including the registrant's name, address, phone number, and e-mail address"); *Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 395 (2d Cir. 2004) (similar).

As the Court has already noted, "a violation of the COPPA Rule 'shall be treated as a violation of a rule defining an unfair or deceptive act or practice under section 18(a)(1)(B) of the [FTC] Act (15 U.S.C. § 57a(a)(1)(B)).'" ECF 1214 at 18 (quoting 15 U.S.C. § 6502(c)). Under the FTC Act, "corporate entities can be responsible . . . for each other's actions through the common enterprise doctrine." *FTC v. On Point Cap. Partners LLC*, 17 F.4th 1066, 1081 (11th Cir. 2021) (*citing FTC v. WV Universal Mgmt., LLC*, 877 F.3d 1234, 1240 (11th Cir. 2017)). Under this theory, "[i]f the structure, organization, and pattern of a business venture reveal a 'common enterprise' or a 'maze' of integrated business entities, the FTC Act disregards corporateness." *FTC v. E.M.A. Nationwide, Inc*., 767 F.3d 611, 637 (6th Cir. 2014). Courts find that "entities constitute a common enterprise when they exhibit either vertical or horizontal commonality—qualities that may be demonstrated by a showing of strongly interdependent economic interests or the pooling of assets and revenues." *FTC v. Network Servs. Depot, Inc*., 617 F.3d 1127, 1142-43 (9th Cir. 2010) (finding a common enterprise where multiple "companies pooled resources, staff, and funds; they were all owned and managed [jointly]; and they all participated to some extent in a common venture"). Where these factors are present, "each of the[] [participating] corporations is to be held jointly and severally liable." *E.M.A. Nationwide, Inc*., 767 F.3d at 636.

The common enterprise doctrine has been extended beyond enforcing the FTC Act. For example, *New Mexico ex rel. Balderas v. Real Estate Law Center, P.C.* applied the common enterprise doctrine to a Mortgage Assistance Relief Services ("MARS") Rule enforcement action brought by the New Mexico Attorney General. 401 F. Supp. 3d 1229, 1308 n.63 (D.N.M. 2019). Like violations of COPPA, a violation of the MARS Rule "shall be treated as . . . a violation of a rule under section 18 of the Federal Trade Commission Act (15 U.S.C. 57a) regarding unfair or deceptive acts or practices." 12 U.S.C. § 5538(a)(1). The *Real Estate Law Center* court relied on this provision in applying the common enterprise doctrine to the State AG's enforcement action. *Real Estate Law Ctr., P.C.*, 401 F. Supp. 3d at 1308 n.63.[7]

---

[7] Notably, as under COPPA, State AGs have the power to bring a cause of action to directly enforce the MARS Rule. *See id.* at 1306 (citing 12 U.S.C. § 5538(b)(1)).

The court in *Office of the Attorney General v. Berger Law Group., P.A.* similarly applied the common enterprise doctrine to a State AG action to enforce the MARS Rule. 2015 WL 5922933, at *1–2 (M.D. Fla. Oct. 9, 2015). Courts have also applied the common enterprise doctrine to the enforcement of other consumer protection statutes. *See Commodity Futures Trading Comm'n. v. Int'l Berkshire Grp. Holdings, Inc.*, 2006 WL 3716390, at *7 (S.D. Fla. Nov. 3, 2006) (applying common enterprise doctrine in Commodity Exchange Act enforcement action).

There is abundant evidence that Instagram, LLC and Meta Platforms, Inc. have strongly interdependent economic interests, and have operated with shared ownership, resourcing, staff, and funding. Indeed, in most day-to-day respects, Instagram, LLC is operationally indistinguishable from its parent.

For example, all permanent full-time employees working on the Instagram platform have been listed in the same unified employee roster as those working on the Facebook platform dating back to at least 2015, and shared the same reporting lines, billing allocations, and most other employee attributes. *See, e.g.*, Ex. 30, META3047MDL-098-00016127 (columns F and L showing that the hundreds of employees working within Instagram "groups" and "allocation areas" were all associated with the Facebook, Inc. company, rather than the Instagram, LLC company). Various versions of this roster from 2015 through 2020 (i.e., from the period when Instagram LLC identified itself as controlling Instagram in the Terms of Service and continuing afterwards) show that staff working on Instagram were housed within various Facebook teams; had Facebook employee numbers; and reported to Facebook leadership. Ex. 31, META3047MDL-098-00010191, "6.30.16 FTE HC" tab (columns C, D, E, J); Ex. 32, META3047MDL-072-01230259, "Headcount_Detail_data (8)" tab (columns B, C, D); Ex. 33, META3047MDL-098-00035791, "HC Report" tab (columns C, D). All of these rosters indicate that no full-time staff were allocated to the Instagram, LLC organization (org code 10024) throughout the covered time period; instead, all 300+ permanent Instagram employees were listed under the Facebook organization (org code 10001). *See* Ex. 33 at "Ledgers" tab, row 24 (showing that Instagram, LLC is identified by the company code 10024, and that only eight "contingent" employees were billed to that company code in the "HC Report" tab, while hundreds of full-time Instagram staff were

billed to the Facebook company code). All these employees—including all Instagram executives—were positioned in a reporting structure that ultimately terminated with Facebook CEO Mark Zuckerberg. Ex. 34, META3047MDL-053-00012614 at –12619 (showing "Head of Instagram" Adam Mosseri at the same reporting level as the Vice Presidents for Messenger, FB App, and WhatsApp, who all reported to Chris Cox and then to Zuckerberg). Even the offer letters for senior roles at Instagram, such as the "Safety Policy Manager (Instagram)" were issued on Facebook letterhead and described those roles as being "at Facebook." Ex. 35, META3047MDL-129-00090783. Similarly, while Karina Newton, Instagram's Head of Public Policy, testified that Instagram, LLC was her employer when she was hired in 2016, Meta's employee roster shows her position was allocated to Facebook, Inc. *See* Ex. 36, Newton Dep. 28:11-19; Ex. 32, META3047MDL-072-01230259, "Headcount_Detail_data (8)" tab, row 2197 (showing Newton allocated to the "101 Facebook US" company code rather than the Instagram, LLC company code).

The external contracting records for Meta and Instagram are similarly unified. In one purchase order ledger spanning January 2017 through June 2018, there are 337 contracts whose descriptions indicate that they were signed for the benefit of the Instagram platform. *See* Ex. 37, META3047MDL-050-00309895, "PR Report" tab (columns L, M, R, S) (*see, e.g.*, row 133, describing a contract with Fuel Communications: "Vendor will partner with Instagram to deliver communications and creative services Jan 1 to Jun 30 2017"). However, none of these 337 contracts were billed to the Instagram (10024) Company, Operating Unit, or Cost Center. *Id*. Instead, all were charged to Facebook Operating Units—indicating that Instagram comingled its operational assets with those of Facebook and all regular expenses for both entities were paid out of a shared pool. *Id*.

Accordingly, there is no dispute of material fact regarding the pooled resources and shared employees, offices, and operational assets of Meta Platforms, Inc. and Instagram, LLC. Because the two companies function as a common enterprise as to the operation of Instagram, they are jointly liable for any violations of COPPA committed by either. As such, even if the Court were to find that there was a genuine dispute as to whether Meta Platforms, Inc. and Instagram, LLC were

independently "operators" of Instagram, partial summary judgment is appropriate to establish this element through a finding that these two entities operate as a common enterprise.

**2. Meta collects personal information from <mark>all</mark> users of Facebook and Instagram whether they are logged in or not.**

Under COPPA, "personal information" is defined as:

"[I]ndividually identifiable information about an individual collected online, including:

(1) [a] first and last name;

(2) [a] home or other physical address including street name and name of a city or town;

(3) [o]nline contact information as defined in this section;

(4) [a] screen or user name where it functions in the same manner as online contact information, as defined in this section;

(5) [a] telephone number;

(6) [a] government-issued identifier, such as a Social Security, State identification card, birth certificate, or passport number;

(7) [a] persistent identifier that can be used to recognize a user over time and across different websites or online services[—such]  persistent identifier includes, but is not limited to, a customer number held in a cookie, an . . . . IP address, a processor or device serial number, or unique identifier;

(8) [a] photograph, video, or audio file where such file contains a child's image or voice;

(9) [g]eolocation information sufficient to identify street name and name of a city or town;

(10) [a] biometric identifier that can be used for the automated or semi-automated recognition of an individual, such as fingerprints; handprints; retina patterns; iris patterns; genetic data, including a DNA sequence; voiceprints; gait patterns; facial templates; or faceprints; or

(11) [i]nformation concerning the child or the parents of that child that the operator collects online from the child and combines with an identifier described in this definition."

16 C.F.R. § 312.2.

---

17

As described more fully above, *supra* Section II.B, Meta collects a variety of personal information under this definition. For example, it collects email addresses; phone numbers; images of a person's face; the sound of a person's voice; cookie IDs; IP addresses; information that the user provides on their profile, such as content created by the user; and information that reflects the user's interactions on the platform, such as likes, the videos they watch, and who they interact with. *See* Ex. 2, Hartnett Dep. 28:17-34:8. It also collects personal information belonging to logged-off users, including IP addresses, device IDs, cookie data, and user clicks. *See id*. at 59:13-60:18.

### 3. Meta does not provide COPPA's required protections for children on Facebook or Instagram.

COPPA imposes affirmative, nondiscretionary obligations on an operator once it has actual knowledge that a user is under the age of 13. 15 U.S.C. § 6502; 16 C.F.R. § 312.5.[8] These obligations include providing direct notice to parents of the operator's practices for children's data, obtaining verifiable parental consent, and affording parents the ongoing rights to review, delete, and restrict use of their child's personal information. 16 C.F.R. §§ 312.4, 312.5, 312.6. These duties are triggered when an operator acquires "actual knowledge that it is collecting or maintaining personal information from a child." 16 C.F.R § 312.3. "An operator is required to obtain verifiable parental consent before any collection, use, or disclosure of personal information from children." 16 C.F.R § 312.5(a)(1).

As the Federal Trade Commission has explained, this requirement means that if, after collecting a user's personal information, "the operator later determines that a particular user is a child under age 13, COPPA's notice and parental consent requirements will be triggered." Gooler Declaration, Ex. J, FTC, Complying with COPPA: Frequently Asked Questions, FAQ A-12, https://www.ftc.gov/business-guidance/resources/complying-coppa-frequently-asked-questions.

### a. Meta does not seek or obtain and has never sought or obtained parental consent for the collection or use of children's data.

Meta admits that since 2012, it has not sought or obtained verifiable parental consent for the collection or use of data from users under the age of 13 on Facebook or Instagram. *See* Ex. 25,

---

[8] Operators of services "directed to children" also have obligations to protect the privacy of potential children pursuant to COPPA, but Meta's compliance with those obligations is not the subject of this motion.

Meta Defs.' First Amended Resp. & Objs. to Pls.' 1st Set of RFAs, Feb. 11, 2025, at No. 6; Ex. 24, Meta Defs.' Amended Resp. & Objs. to Pls.' 3rd Set of RFAs, May 2, 2025, at No. 19.

**b. Meta has not provided notice to parents of its practices for children's personal information.**

Although COPPA requires operators to provide clear and comprehensive notice to parents regarding the collection, use, and disclosure of children's personal information prior to collecting, using or disclosing the information, *see* 16 C.F.R. § 312.4, Meta admits that, since 2012, it has not provided any such notice. *See* Ex. 24, Meta Defs.' Amended Resp. & Objs. to Pls.' 3rd Set of RFAs, May 2, 2025, at No. 18.

**c. Meta has not provided parents with a means of reviewing personal information collected from their children.**

Meta also admits that, since 2012, it has not provided parents with ongoing rights to review their child's personal information. *See* Ex. 25, Meta Defs.' First Amended Resp. & Objs. to Pls.' 1st Set of RFAs, Feb. 11, 2025, at No. 7; Ex. 24, Meta Defs.' Amended Resp. & Objs. to Pls.' 3rd Set of RFAs, May 2, 2025, at No. 20; *cf.* 16 C.F.R. § 312.6(a)(3) (requiring means of review).

**d. Meta has not provided parents with the opportunity to refuse to permit the further collection or use of personal information from their children.**

COPPA also requires operators to provide parents with ongoing rights to restrict further collection or use of their child's personal information. 16 C.F.R. § 312.6(a)(2). Meta admits it failed to provide these rights on its platforms, since 2012. *See* Ex. 25, Meta Defs.' First Amended Resp. & Objs. to Pls.' 1st Set of RFAs, Feb. 11, 2025, at No. 7; Ex. 24, Meta Defs.' Amended Resp. & Objs. to Pls.' 3rd Set of RFAs, May 2, 2025, at Nos. 20, 21.

**e. Meta has not provided parents with the opportunity to direct Meta to delete their children's personal information.**

COPPA also requires operators to provide parents with ongoing rights to delete their child's personal information. 16 C.F.R. § 312.6(a)(2). Meta admits it failed to provide these rights on its platforms, since 2012. *See* Ex. 25, Meta Defs.' First Amended Resp. & Objs. to Pls.' 1st Set of RFAs, Feb. 11, 2025, at No. 7; Ex. 24, Meta Defs.' Amended Resp. & Objs. to Pls.' 3rd Set of RFAs, May 2, 2025, at Nos. 20, 21.

Because there is no genuine dispute of material fact that Meta did not provide any of the four protections to any of its users, the State AGs are entitled to partial summary judgment for these specific elements of their COPPA claim.

**B. Summary judgment should be granted as to the State AGs' claim that Meta violates COPPA by continuing to use the personal information of children to train its machine learning and generative AI models, even after it checkpointed or disabled their accounts because they belong to children.**

The undisputed facts demonstrate that Meta has violated COPPA by continuing to use children's data after it checkpoints or disables their accounts. Meta checkpoints (i.e., suspends) the accounts of users it determines are actually or likely children and disables those accounts after 30 days if the user does not successfully appeal from the checkpoint. Despite Meta's actual knowledge that these checkpointed and disabled accounts belong to children, the company continues to use those children's personal information to train its machine learning and generative AI models. As discussed above, *see supra* Section IV.A.3, COPPA requires operators of websites or online services to provide certain protections to children that the operator has "actual knowledge" of, including seeking parental consent prior to the collection, use, or disclosure of personal information. As such, and because summary judgment is proper on all other COPPA elements, *see supra* Section II.A, summary judgment on the AGs' claim that Meta has violated COPPA with respect to checkpointed and disabled accounts should be granted.

**1. Meta has actual knowledge that the children whose accounts it checkpoints and ultimately disables for being underage are under 13.**

"Actual knowledge" means being "aware of" information. *United States ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 751 (2023); *see also id.* at 784 (citing Black's Law Dictionary (5th ed. 1979)) (endorsing the dictionary definition of actual knowledge as "to understand" or "the perception of the truth"). Actual knowledge may be proven by direct evidence or inferred from circumstantial evidence. *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 589 U.S. 178, 189 (2020); *see also Staples v. United States*, 511 U.S. 600, 615–16 n.11 (1994) ("[K]nowledge can be inferred from circumstantial evidence.").

Actual knowledge can also be shown by establishing the defendant's willful blindness. The U.S. Supreme Court has "recognized in civil cases that willful blindness may support a finding of actual knowledge." *Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 595 U.S. 178, 187–88 (2022). A defendant is deemed to have actual knowledge when it "deliberately shield[s] [itself] from clear evidence of critical facts . . . strongly suggested by the circumstances," *Glob. Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011), and is "aware of a substantial risk that [a fact was true], but intentionally avoid[s] taking steps to confirm the [fact]'s truth or falsity." *SuperValu Inc.*, 598 U.S. at 751.

The doctrine of willful blindness implements the uncontroversial principle that "persons who know enough to blind themselves to direct proof of critical facts in effect have actual knowledge of those facts" and are in any event "just as culpable as those who have actual knowledge." *Glob. Tech Appliances*, 563 U.S. at 766. To show willful blindness, two requirements must be met: "(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Id.* at 769.

Willful blindness can establish actual knowledge under COPPA. *See* COPPA Rule, 89 Fed. Reg. 2034, 2037 (2024), fn 46 ("The concept of actual knowledge includes willful disregard. . . . Therefore, the Rule already applies to instances in which an operator of a general audience site or service willfully disregards the fact that a particular user is a child.") (citing *Glob.-Tech Appliances*, 563 U.S. at 766). In their proposed jury instructions, Meta agrees that "[a]ctual knowledge may

also be proved by showing that an operator acted with willful disregard." Draft Jury Instructions and Forms, ECF 2313-1 at 12.

Meta has knowledge that the users whose accounts it checkpoints and/or disables for being underage are children. These accounts fall into several categories:

**a. Users whose accounts Meta checkpoints or disables after the user changes their date of birth to an age under 13.**

When a user self-reports as being under the age of 13 by changing their date of birth on Meta's platforms, Meta automatically checkpoints the user's account. *See* Ex. 38, META3047MDL-053-00012709 at –718. Approximately 80% of all underage checkpoints result from users admitting they are under 13 by changing the date of birth on their accounts. Ex. 16, Corrected Expert Report of Patrick McDaniel, p. 147. In these cases, the user's self-reported birthday provides Meta "awareness" and "understanding" that the user is under 13. *See SuperValu Inc.*, 598 U.S. at 751.

Meta has admitted that it is aware these users are under 13 in interrogatory responses to the FTC. *See* Ex. 38, META3047MDL-053-00012709 at -718 ("Because these users have themselves indicated they are under 13, Meta will presumptively determine that these users are too young to use the service, absent additional proof of age."). Indeed, Meta's own employees expressed their alarm at Meta's prior practice of allowing users who attempted to change their birthdate to an age under 13 to continue to use the platform, admitting that it posed a "major COPPA risk . . . as it constitutes explicit knowledge of U13." Ex. 39, META3047MDL-111-00135412.

According to the FTC and Meta's own proposed jury instructions in this case, Meta's awareness of users who changed their date of birth to under 13 satisfies the actual knowledge requirement of COPPA. The FTC has warned that obtaining users' ages or dates of birth that indicate they are under 13 can trigger COPPA liability. Gooler Declaration, Ex. K, FTC, Complying with COPPA: Frequently Asked Questions, FAQ H-3 ("[I]f you ask participants to enter age information, and then you fail either to screen out children under age 13 or to obtain their parents' consent to collecting these children's personal information, you may be liable for violating COPPA."). Meta's proposed jury instruction also concedes that "examples of facts that would

establish that an operator has actual knowledge include . . . [w]here a child user enters age information indicating they are under 13." ECF 2313-1, at 13.

**b.  Users whose accounts Meta checkpoints or disables when Meta's human reviewers discover the user admits they are under 13 in their account biography or has posted multiple pictures of themselves showing that they are under 13.**

When Meta receives a report that a user is under the age of 13, some reports are sent to Meta's human reviewer team. If the reviewer finds that the user has admitted in their account biography that they are under 13, or if the reviewer determines that the user is under 13 based on a review of photos posted by the account, then Meta checkpoints the account. *See* Ex. 2, Harnett Dep. 182:9-186:19. Here, the user's self-reported age, or Meta's determination that the user's photos show that they are under 13, provides Meta awareness and understanding that the user is under 13. This commonsense conclusion is consistent with FTC guidance on this issue. *See* Gooler Declaration, Ex. J, FTC, Complying with COPPA: Frequently Asked Questions, FAQ H-6 ("[Y]ou may be considered to have actual knowledge where a child announces her age under certain circumstances, for example, if you monitor user posts. . ..").

The fact that Meta reviews and checkpoints these accounts in response to reports from parents about their underage children's accounts is further proof of Meta's actual knowledge. From the initial promulgation of the COPPA Rule in 1999, the FTC has recognized that operators obtain actual knowledge when they receive reports of underage children from parents. *See* 64 Fed. Reg. 59888, 59892 (1999) ("Actual knowledge will be present, for example, where an operator learns of a child's age or grade from the child's registration at the site or from a concerned parent who has learned that his child is participating at the site."). Meta has recognized this, too. Ex. 40, META3047MDL-065-00153090 at –3101-3102 (2011 Facebook comment letter to FTC, arguing that COPPA should not be triggered by Facebook learning that one of its users visited a child-directed site, "[u]nless Facebook obtains actual knowledge that a particular user is under the age of 13, such as where Facebook is contacted by a concerned parent who has discovered his or her child misstated the age information"). Filing reports through Meta's underage reporting form is the only

way that parents are able to report to Meta that their children are on Facebook or Instagram. Ex. 2, Harnett Dep. 206:7-208:24.

### c. Users whose accounts are hard-linked or soft-matched to a checkpointed or disabled account.

As discussed above, *supra* II.C, users can "hard-link" their Meta accounts through Meta's Account Center. Meta also utilizes various methods to "soft-match" Meta accounts belonging to a single user. When Meta obtains knowledge that a user is under 13 based on a self-reported birthday, self-reported age in a biography, photos depicting the child, or upon disabling their account for being under 13, Meta also has actual knowledge that any hard- or soft-linked accounts also belong to that same child. Indeed, Meta even internally admitted that these hard-linked accounts—those that users have "explicitly admitted to owning"—"are accounts that we *know* to be owned by underage users." Ex. 9, META3047MDL-155-00009593. And Meta's soft-matching models predict the common owner of multiple accounts with high levels of precision. *See, e.g.*, Ex. 41, META3047MDL-146-00072994 ("In FEP [a program to propagate enforcements across multiple accounts owned by violating users], we are currently taking FB-IG pair as a soft match if the probability is >= 99%"). Meta relies on the awareness provided by these "integrity" models in the most high-stakes situations, for example, to disable multiple accounts belonging to users it has determined violated its policies against child safety, frauds, scams, or terrorism. *See* Ex. 2, Harnett Dep. 291:20-297:5. Meta's data from a recent three-month period show that it predicts tens of thousands of accounts belong to users who also have an account that Meta has disabled for being underage. *See* Ex. 16, Corrected Expert Report of Patrick McDaniel, p. 172–85. Because Meta is aware from its hard-link and soft-match data that these accounts belong to the same users as accounts it has checkpointed and disabled for being underage, Meta has actual knowledge that these linked accounts belong to children.

Despite this awareness, Meta has at times failed to use its hard-link and soft-match data to checkpoint or disable underage accounts. The undisputed facts also establish Meta's actual knowledge through its willful blindness of those unenforced accounts. Meta did not suspend or disable hard-linked accounts consistently prior to December 2021, instead allowing those accounts

to remain on the platform. *See* Ex. 2, Hartnett Dep. 211:14-212:11; Ex. 8, Hartnett Dep. Ex. 6 at 6–8. Likewise, aside from a brief period, Meta has deliberately chosen not to disable or take any action against accounts that it has soft-matched to accounts it checkpoints and disables for being under 13. *See* Ex. 2, Hartnett Dep. 223:11-225:4, 226:12-227:23; Ex. 42, META3047MDL-037-00076549.

As discussed above, Meta's awareness of a high probability that hard-linked and soft-matched accounts belong to the same users is also undisputed. Hard-linked accounts are by definition accounts that the same users have explicitly stated belong to them. *See* Ex. 9, META3047MDL-155-00009593. And Meta's soft-matching models can predict multiple accounts belonging to the same users with high precision. *See* Ex. 41, META3047MDL-146-00072994.

Meta's failures to effectively enforce against accounts of children under 13 were deliberate. A September 2020 internal memo acknowledged that Meta had "deprioritized u13 enforcement[;] because COPPA compliance is at risk when we sit on knowledge of u13, [it] incentivizes not knowing." Ex. 43, META3047MDL-034-00455332 at -5338. Meta's safety team, led by Antigone Davis, recommended improvements, including "[p]rioritiz[ing] cross-enforcement of u13s on IG who have hard-linked FB accounts." *Id.* at –5339. Only "[r]ecently" did another team "agree to enable cross-enforcement of u13s on IG who have hard-linked FB accounts since basic COPPA compliance is at risk when product does not prioritize checkpointing and disabling u13s." *Id*. at –340 (noting a "chance, however, that this fails to get resourced because of engineering constraints on that team"). The memo goes on to recommend that, instead of deprioritizing enforcement, company leadership should "ensure [P]roduct and C[ommunity] O[perations] have the resources need[ed] to act on knowledge we already have, i.e. . . . . disable verified u13s. . .." *Id.* at –341. Yet Meta took another year to begin consistently enforcing against hard-linked Facebook and Instagram accounts. Ex. 9, META3047MDL-155-00009593.

Meta also deliberately ignores soft-matched accounts when enforcing its age policies, while relying on the same data to enforce other policies. From at least 2019 through 2024, Meta had the ability to probabilistically link different accounts that likely belonged to single users and used this "soft-matching" ability to "disable multiple accounts that belong to the same person for violating

various [] Meta policies"—but, aside from a brief period, did *not* use this technology to identify multiple accounts owned by underage users. Ex. 2, Hartnett Dep. 226:7-227:23, 296:12-297:16; Ex. 44, META3047MDL-047-00945193 at -5194 (2019 Meta employee chat describing cross-enforcement for other types of policy violations: "If both IG accounts are hard linked or >0.99 confidence soft matched, then both will be disabled"). Meta considered applying this technique to underage enforcement as early as October 2019, but rejected it, despite employees warning in a memo that "[i]t is difficult to defend the use of [soft-matching] for advertising purposes without also using these links for age management." Ex. 45, Hartnett Dep. Ex. 27 at META3047MDL-050-00014485.

### d. Users whose accounts Meta disables for being underage, including after the user provides an identification document showing they are under 13.

After Meta checkpoints an account on the basis that the user is underage, the company allows the user to appeal that determination by providing an identification document showing their age. If a user provides an identification document showing that they are under the age of 13 or fails to provide identification showing they are over 13 within 30 days, Meta disables the account and schedules it for deletion. As Meta states on its underage reporting form, it only takes action to "delete the account" when "the child's age can be reasonably verified as under 13." Ex. 46, Hartnett Dep. Ex. 12; Ex. 47, Hartnett Dep. Ex. 13. Meta's "reasonabl[e] verifi[cation]" that the users it disables are under 13 confirms Meta's "awareness" and "understanding" that the user is under 13. *SuperValu Inc.*, 598 U.S. at 751, 784. Moreover, Meta's actual knowledge is even more clear in instances where the child's account is disabled because they have provided identification showing they are under the age of 13.

Meta's internal documents confirm the company's awareness that the users it disabled for being under 13 were, in its understanding, under 13. In 2022, while brainstorming compliance goals, Meta explicitly addressed its COPPA obligations for children's accounts that had been disabled—demonstrating awareness that it was maintaining the personal information of users it knew were children. *See* Ex. 11, META3047MDL-020-00656153, Tab "H2 2022 Project Ideas – AR," Row 5. The discussion noted: "[w]e currently preserve underage data for up to 180d[ays]

after being disabled – Youth pXFN [Privacy Cross-Functional team] have warned us that this is not defensible to regulators (particularly COPPA)." *Id.* at Column F. Meta's proposed "goal" was to "[r]educe U13 retention window to 60d[ays]," with "success" defined as having "[a]ll U13 disabled user data removed at 60d[ays] after enforcement." *Id*. at Columns D and G.

### 2. Meta continues using users' personal information for model training after gaining actual knowledge that those users are children.

As discussed above, *see supra* Sect. II.D, Meta uses all users' data for model training for machine learning models. *See* Ex. 17, Backstrom 30(b)(6) Dep. at 25:4-21, 27:15-21. Meta also uses vast amounts of user data to train its generative AI models. *Id*. at 36:5-39:25. This includes personal information from users it has checkpointed and disabled for being under 13.

As also described above, *supra* II.C.1, when Meta checkpoints an account, that user is locked out of the account and unable to access it for a 30-day period in which the account holder is able to appeal. *See* Ex. 2, Hartnett Dep. 103:15-106:17. However, during this period of time, the account's data is still used to train Meta's machine learning models. Ex. 17, Backstrom 30(b)(6) Dep. 30:7-22; Ex. 20, Backstrom 30(b)(6) Amended Errata at 2; *see also* Ex. 18, Backstrom Dep. (December 10, 2025) 143:21-145:2.

When a user fails a checkpoint, their account is disabled. Even when an account is disabled—for example when a user provides an identification document showing that they are under 13—but that account is not yet deleted, the account's data can still be used to train Meta's machine learning models. Before April 2024, this "disabled" period was up to one year, and even now, it is a 45-day period. *See* Ex. 18, Backstrom Dep. (December 10, 2025) 142:1-6; Ex. 2, Hartnett Dep. 301:6-13, 299:22-24, 300:21-301:4. Just as with checkpointed accounts, Meta does not ensure that disabled user data is not used to train its machine learning models. *See* Ex. 17, Backstrom 30(b)(6) 24:11-16 19, 17:23-19:10; Ex. 18, Backstrom Dep. (December 10, 2025) 71:10-72:24.

Moreover, when one of a user's accounts is checkpointed and disabled, their additional accounts that were hard-linked (before December 2021) or soft-matched are allowed to remain on the platforms as normal. *See* Ex. 2, Hartnett Dep. 211:14-212:11, 223:11-225:4, 226:12-227:23; Ex.

8, Hartnett Dep. Ex. 6 at 6–8. Meta continued to collect personal information from these hard-linked or soft-matched accounts that were allowed to remain on the platforms and trained its models on this data.

### 3. Meta does not provide COPPA's protections to any users, including those it checkpoints and disables.

Despite collecting information from users under 13 and using it in their machine learning models and generative AI models, Meta fails to adhere to COPPA's unambiguous statutory obligations of operators requiring direct notice to parents, obtaining verifiable parental consent, and providing parents with the right to meaningfully review, delete, and restrict the use of their child's data. 16 C.F.R. § 312. Meta fails to provide these protections to *any* of its users, including those it checkpoints and disables. This is not speculation. As described above, *supra* Section IV.A.3, Meta expressly admits the same. Ex. 25, Meta Defs.' First Amended Resp. & Objs. to Pls.' 1st Set of RFAs, Feb. 11, 2025, at No. 6 and 7; Ex. 24, Meta Defs.' Amended Resp. & Objs. to Pls.' 3rd Set of RFAs, May 2, 2025, at Nos. 18, 19, 20, and 21. Thus, Meta fails to provide COPPA's required protections to its users whose accounts are checkpointed or disabled for belonging to children. Partial summary judgment is proper on this claim.

## V.    CONCLUSION

The State AGs seek entry of partial summary judgment in their favor on the specific COPPA elements discussed above. They also seek partial summary judgment that Meta Platforms, Inc. and Instagram, LLC have actual knowledge of children under 13 that they checkpoint, and those they ultimately disable, but they continue to use these children's personal information for machine learning and generative AI model training in violation of COPPA.

Respectfully submitted,

**KRIS MAYES**
Attorney General
State of Arizona

*/s/ Reagan Healey*
Reagan Healey (AZ No. 038733), pro hac vice
Assistant Attorney General
Arizona Attorney General's Office
2005 North Central Avenue
Phoenix, AZ 85004
Phone: (602) 542-3725
Fax: (602) 542-4377
Reagan.Healey@azag.gov
*Attorneys for Plaintiff State of Arizona, ex rel.*
*Kris Mayes, Attorney General*


**PHILIP J. WEISER**
Attorney General
State of Colorado

*/s/ Krista Batchelder*
Krista Batchelder, (CO Reg.45066), *pro hac vice*
Deputy Solicitor General
Shannon Stevenson (CO Reg. 35542), *pro hac vice*
Solicitor General
Elizabeth Orem (CO Reg. 58309), *pro hac vice*
Assistant Attorney General
Colorado Department of Law
Ralph L. Carr Judicial Center
Consumer Protection Section
1300 Broadway, 7th Floor
Denver, CO 80203
Phone: (720) 508-6384
krista.batchelder@coag.gov
Shannon.stevenson@coag.gov
Elizabeth.orem@coag.gov

*Attorneys for Plaintiff State of Colorado, ex rel.*
*Philip J. Weiser, Attorney General*

**ROB BONTA**
Attorney General
State of California

*/s/ Megan O'Neill*
Nicklas A. Akers (CA SBN 211222)
Senior Assistant Attorney General
Bernard Eskandari (CA SBN 244395)
Emily Kalanithi (CA SBN 256972)
Supervising Deputy Attorneys General
Megan O'Neill (CA SBN 343535)
Nayha Arora (CA SBN 350467)
Joshua Olszewski-Jubelirer
(CA SBN 336428)
Marissa Roy (CA SBN 318773)
Brendan Ruddy (CA SBN 297896)
Deputy Attorneys General
California Department of Justice
Office of the Attorney General
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-7004
Phone: (415) 510-4400
Fax: (415) 703-5480
megan.oneill@doj.ca.gov


*Attorneys for Plaintiff the People of the State*
*of California*



**RAÚL R. LABRADOR**
Attorney General
State of Idaho

*/s/ James J. Simeri*
James J. Simeri (ID Bar No. 12332)
pro hac vice
Deputy Attorney General
Attorney General's Office
P.O. Box 83720
Boise, ID 83720-0010
(208) 334-2424
james.simeri@ag.idaho.gov


*Attorneys for Plaintiff State of Idaho*

29

**WILLIAM TONG**
Attorney General
State of Connecticut

*/s/ Rebecca Borné*
Rebecca Borné
(CT Juris No. 446982), pro hac vice
Tess E. Schneider
(CT Juris No. 444175), *pro hac vice*
Krislyn M. Launer
(CT Juris No. 440789), *pro hac vice*
Assistant Attorneys General
Connecticut Office of the Attorney General
165 Capitol Avenue
Hartford, Connecticut 06106
Phone: 860-808-5400
Fax: 860-808-5593
Rebecca.Borne@ct.gov
Tess.Schneider@ct.gov
Krislyn.Launer@ct.gov

*Attorneys for Plaintiff State of Connecticut*


**KATHLEEN JENNINGS**
Attorney General
State of Delaware

*/s/ Ryan Costa*
Marion Quirk (DE Bar 4136), *pro hac vice*
Director of Consumer Protection
Ryan Costa (DE Bar 5325), *pro hac vice*
Deputy Director of Consumer Protection
Delaware Department of Justice
820 N. French Street, 5th Floor
Wilmington, DE 19801
Phone: (302) 683-8811
Marion.Quirk@delaware.gov
Ryan.Costa@delaware.gov

*Attorneys for Plaintiff State of Delaware,*
*ex rel. Kathleen Jennings, Attorney General*
*for the State of Delaware*


**THEODORE E. ROKITA**
Attorney General
State of Indiana

*/s/ Scott L. Barnhart*
Scott L. Barnhart (IN Atty No. 25474-82),
*pro hac vice*
Chief Counsel and Director of Consumer
Protection
Corinne Gilchrist (IN Atty No. 27115-53),
*pro hac vice*
Section Chief, Consumer Litigation
Mark M. Snodgrass (IN Atty No. 29495-49),
*pro hac vice*
Deputy Attorney General
Office of the Indiana Attorney General
Indiana Government Center South
302 West Washington St., 5th Floor
Indianapolis, IN 46203
Telephone: (317) 232-6309
Scott.Barnhart@atg.in.gov
Corinne.Gilchrist@atg.in.gov
Mark.Snodgrass@atg.in.gov


*Attorneys for Plaintiff State of Indiana*


**KRIS W. KOBACH**
Attorney General
State of Kansas

*/s/ Sarah M. Dietz*
Sarah M. Dietz, Assistant Attorney General
(KS Bar No. 27457), *pro hac vice*
Kaley Schrader, Assistant Attorney General
(KS Bar No. 27700), *pro hac vice*
Office of the Attorney General
120 SW 10th Avenue, 2nd Floor
Topeka, Kansas 66612
Telephone: (785) 296-3751
Fax: (785) 296-3131
Email: sarah.dietz@ag.ks.gov

*Attorneys for Plaintiff State of Kansas*

**ANNE E. LOPEZ**
Attorney General
State of Hawai'i

*/s/ Douglas S. Chin*
Christopher J.I. Leong (HI JD No. 9662), *pro hac vice*
Supervising Deputy Attorney General
Kelcie K. Nagata (HI JD No. 10649), *pro hac vice*
Deputy Attorney General
Department of the Attorney General
Commerce and Economic Development Division
425 Queen Street
Honolulu, Hawai'i 96813
Phone: (808) 586-1180
Christopher.ji.leong@hawaii.gov
Kelcie.k.nagata@hawaii.gov
Douglas S. Chin (HI JD No. 6465), *pro hac vice*
John W. Kelly (HI JD No. 9907), *pro hac vice*
Special Deputy Attorney General
Starn O'Toole Marcus & Fisher
733 Bishop Street, Suite 1900
Honolulu, Hawai'i 96813
Phone: (808) 537-6100
dchin@starnlaw.com
jkelly@starnlaw.com

*Attorneys for Plaintiff State of Hawai'i*


**KWAME RAOUL**
Attorney General
State of Illinois

*/s/ Matthew Davies*
Susan Ellis, Chief, Consumer Protection
Division (IL Bar No. 6256460), *pro hac vice*
Greg Grzeskiewicz, Chief, Consumer
Fraud Bureau (IL Bar No. 6272322), *pro hac vice*
Jacob Gilbert, Deputy Chief, Consumer Fraud
Bureau (IL Bar No. 6306019), *pro hac vice*
Matthew Davies, Supervising Attorney,
Consumer Fraud Bureau (IL Bar No. 6299608),
*pro hac vice*
Daniel B. Roth, Assistant Attorney General,
Consumer Fraud Bureau (IL Bar No. 6290613),
*pro hac vice*
Meera Khan, Assistant Attorney General,

**LIZ MURRILL**
Attorney General
State of Louisiana

*/s/ Asyl Nachabe*
Asyl Nachabe (LA Bar No. 38846)
*Pro hac vice*
Assistant Attorney General
Louisiana Department of Justice
Public Protection Division
Consumer Protection Section
1885 N 3rd Street, 4th Floor
Baton Rouge, LA 70802
Tel: (225) 326-6438
NachabeA@ag.louisiana.gov

*Attorney for State of Louisiana*


**AARON M. FREY**
Attorney General
State of Maine

*/s/ Michael Devine*
Michael Devine, Maine Bar No. 5048,
*pro hac vice*
Assistant Attorney General
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333
(207) 626-8800
michael.devine@maine.gov

*Attorney for Plaintiff State of Maine*


**KEITH ELLISON**
Attorney General
State of Minnesota

*/s/ Caitlin Micko*
Caitlin Micko (MN Bar No. 0395388),
*pro hac vice*
Assistant Attorney General
Office of the Minnesota Attorney General
445 Minnesota Street, Suite 1200
St. Paul, MN 55101-2130
Tel: (651) 724-9180

STATE ATTORNEYS GENERAL'S MOTION FOR PARTIAL SUMMARY JUDGMENT
4:22-MD-03047-YGR; 4:23-CV-05448-YGR

Consumer Fraud Bureau (IL Bar No. 6345895), *pro hac vice*
Office of the Illinois Attorney General
115 S. LaSalle Street
Chicago, Illinois 60603
312-814-8554
Susan.Ellis@ilag.gov
Greg.Grzeskiewicz@ilag.gov
Jacob.Gilbert@ilag.gov
Matthew.Davies@ilag.gov
Emily.Migliore@ilag.gov
Daniel.Roth@ilag.gov
Meera.Khan@ilag.gov

*Attorneys for Plaintiff the People of the State of Illinois*

**RUSSELL COLEMAN**
Attorney General
Commonwealth of Kentucky

/s/ *Matthew Cocanougher*
J. Christian Lewis (KY Bar No. 87109), *pro hac vice*
Philip Heleringer (KY Bar No. 96748), *pro hac vice*
Zachary Richards (KY Bar No. 99209), *pro hac vice app. forthcoming*
Daniel I. Keiser (KY Bar No. 100264), *pro hac vice*
Matthew Cocanougher (KY Bar No. 94292), *pro hac vice*
Assistant Attorneys General
1024 Capital Center Drive, Ste. 200
Frankfort, KY 40601
Christian.Lewis@ky.gov
Philip.Heleringer@ky.gov
Zach.Richards@ky.gov
Daniel.Keiser@ky.gov
Matthew.Cocanougher@ky.gov
Phone: (502) 696-5300
Fax: (502) 564-2698

*Attorneys for Plaintiff the Commonwealth of Kentucky*

caitlin.micko@ag.state.mn.us

*Attorney for Plaintiff State of Minnesota, by its Attorney General, Keith Ellison*

**JENNIFER DAVENPORT**
Acting Attorney General
State of New Jersey

By: /s/ *Kashif T. Chand*
Kashif T. Chand (NJ Bar No. 016752008), *Pro hac vice*
Assistant Attorney General
Thomas Huynh (NJ Bar No. 200942017), *Pro hac vice*
Assistant Section Chief, Deputy Attorney General
Verna J. Pradaxay (NJ Bar No. 335822021), *Pro hac vice*
Mandy K. Wang (NJ Bar No. 373452021), *Pro hac vice*
Deputy Attorneys General
New Jersey Office of the Attorney General, Division of Law
124 Halsey Street, 5th Floor
Newark, NJ 07101
Tel: (973) 648-2052
Kashif.Chand@law.njoag.gov
Thomas.Huynh@law.njoag.gov
Verna.Pradaxay@law.njoag.gov
Mandy.Wang@law.njoag.gov

*Attorneys for Plaintiffs Jennifer Davenport, Acting Attorney General for the State of New Jersey, and Jeremy E. Hollander, Acting Director of the New Jersey Division of Consumer Affairs*

STATE ATTORNEYS GENERAL'S MOTION FOR PARTIAL SUMMARY JUDGMENT
4:22-md-03047-YGR; 4:23-cv-05448-YGR

**ANTHONY G. BROWN**
Attorney General
State of Maryland

/s/ *Elizabeth J. Stern*
Philip D. Ziperman (Maryland CPF No.
9012190379), *pro hac vice*
Deputy Chief, Consumer Protection Division
Elizabeth J. Stern (Maryland CPF No.
1112090003), *pro hac vice*
Assistant Attorney General
Office of the Attorney General of Maryland
200 St. Paul Place
Baltimore, MD 21202
Phone: (410) 576-6417 (Mr. Ziperman)
Phone: (410) 576-7226 (Ms. Stern)
Fax: (410) 576-6566
pziperman@oag.state.md.us
estern@oag.state.md.us

*Attorneys for Plaintiff Office of the Attorney
General of Maryland*

**MICHAEL T. HILGERS**
Attorney General
State of Nebraska

/s/ Anna M. Anderson
Anna M. Anderson (NE #28080),
*pro hac vice*
Benjamin J. Swanson (NE #27675),
*pro hac vice*
Assistant Attorneys General
Nebraska Attorney General's Office
1445 K Street, Room 2115
Lincoln, NE 68509
(402) 471-6034
anna.anderson@nebraska.gov
benjamin.swanson@nebraska.gov

*Attorneys for Plaintiff State of Nebraska*

**LETITIA JAMES**
Attorney General
State of New York

/s/ Nathaniel Kosslyn
Nathaniel Kosslyn, Assistant Attorney
General
(NY Bar No. 5773676), *pro hac vice*
nathaniel.kosslyn@ag.ny.gov
Alex Finkelstein, Assistant Attorney General
(NY Bar No. 5609623), *pro hac vice*
alex.finkelstein@ag.ny.gov
New York Office of the Attorney General
28 Liberty Street
New York, NY 10005
(212) 416-8000

**DAVE YOST**
Attorney General
State of Ohio

/s/ *Kevin R. Walsh*
Melissa G. Wright (Ohio Bar No. 0077843)
Section Chief, Consumer Protection Section
Melissa.Wright@ohioago.gov
Melissa S. Smith (Ohio Bar No. 0083551)
Asst. Section Chief, Consumer Protection
Section
Melissa.S.Smith@ohioago.gov
Michael S. Ziegler (Ohio Bar No. 0042206)
Principal Assistant Attorney General
Michael.Ziegler@ohioago.gov
Kevin R. Walsh (Ohio Bar No. 0073999),
*pro hac vice*
Kevin.Walsh@ohioago.gov
Senior Assistant Attorney General
30 East Broad Street, 14th Floor
Columbus, Ohio 43215
Tel: 614-466-1031

*Attorneys for State of Ohio, ex rel. Attorney
General Dave Yost*

<div style="display: flex; justify-content: space-between;">

**JEFF JACKSON**
Attorney General
State of North Carolina

*/s/ Charles White*
Charles G. White (N.C. State Bar No. 57735), *pro hac vice*
Assistant Attorney General
Kunal Choksi
Senior Deputy Attorney General
Josh Abram
Special Deputy Attorney General
N.C. Department of Justice
Post Office Box 629
Raleigh, North Carolina 27602
Telephone: (919) 716-6889
Facsimile: (919) 716-6050
E-mail: cwhite@ncdoj.gov
*Attorneys for Plaintiff State of North Carolina*


**DAVE SUNDAY**
Attorney General
Commonwealth of Pennsylvania

*/s/ Jonathan R. Burns*
Jonathan R. Burns
Deputy Attorney General
(PA Bar No. 315206), *pro hac vice*
Email: jburns@attorneygeneral.gov
Pennsylvania Office of Attorney General
Strawberry Square, 14th Floor
Harrisburg, PA 17120
Tel: 717.787.4530

*Attorneys for Plaintiff the Commonwealth of Pennsylvania*


**PETER F. NERONHA**
Attorney General
State of Rhode Island

*/s/ Stephen N. Provazza*
Stephen N. Provazza (R.I. Bar No. 10435), *pro hac vice*
Assistant Attorney General
Rhode Island Office of the Attorney General

</div>

**DAN RAYFIELD**
Attorney General
State of Oregon

/s/ John Dunbar
John J. Dunbar (Oregon Bar No. 842100)
Assistant Attorney General
Oregon Department of Justice
100 SW Market Street
Portland, Oregon 97201
Telephone: (971) 673-1880
Facsimile: (971) 673-1884
E-mail: john.dunbar@doj.oregon.gov

*Attorneys for State of Oregon ex rel. Dan Rayfield, Attorney General*


**ALAN WILSON**
Attorney General
State of South Carolina

*/s/ Anna C. Smith*
C. Havird Jones, Jr.
Senior Assistant Deputy Attorney General
Jared Q. Libet (S.C. Bar No. 74975),
*pro hac vice*
Assistant Deputy Attorney General
Anna C. Smith (SC Bar No. 104749),
*pro hac vice*
Assistant Attorney General
Office of the South Carolina Attorney General
Post Office Box 11549
Columbia, South Carolina 29211
jlibet@scag.gov
annasmith@scag.gov
803-734-0536

*Attorneys for Plaintiff the State of South Carolina, ex rel. Alan M. Wilson, in His Official Capacity as Attorney General of the State of South Carolina*

STATE ATTORNEYS GENERAL'S MOTION FOR PARTIAL SUMMARY JUDGMENT
4:22-MD-03047-YGR; 4:23-CV-05448-YGR

150 South Main St.
Providence, RI 02903
Phone: 401-274-4400
Email: SProvazza@riag.ri.gov

*Attorney for Plaintiff State of Rhode Island*

**JAY JONES**
Attorney General
Commonwealth Of Virginia

*/s/ Joelle E. Gotwals*
Travis G. Hill
Chief Deputy Attorney General
Helen O. Hardiman
Deputy Attorney General
Richard S. Schweiker, Jr.
Senior Assistant Attorney General and
Section Chief
Joelle E. Gotwals (VSB No. 76779),
Senior Assistant Attorney General
*pro hac vice*
Chandler P. Crenshaw (VSB No. 93452)
Assistant Attorney General
*pro hac vice*
Office of the Attorney General of Virginia
Consumer Protection Section
202 N. 9th Street
Richmond, Virginia 23219
Telephone: (804) 786-8789
Facsimile: (804) 786-0122
E-mail: jgotwals@oag.state.va.us

*Attorneys for the Plaintiff Commonwealth of*
*Virginia ex rel. Jay Jones, Attorney General*

**MARTY J. JACKLEY**
Attorney General
State of South Dakota

*/s/ Amanda Miiller*
By: Amanda Miiller (SD Bar No. 4271)
Deputy Attorney General
South Dakota Office of the Attorney General
1302 East SD Hwy 1889, Suite 1
Pierre, SD 57501-8501
Telephone: (605) 773-3215
Email: Amanda.Miiller@state.sd.us

*Attorneys for Plaintiff State of South Dakota*

**JOHN B. MCCUSKLEY**
Attorney General
State of West Virginia

*/s/ Laurel K. Lackey*
Laurel K. Lackey (WVSB No. 10267),
*pro hac vice*
Abby G. Cunningham (WVSB No. 13388)
Assistant Attorneys General
Office of the Attorney General
Consumer Protection & Antitrust Division
Eastern Panhandle Office
269 Aikens Center
Martinsburg, West Virginia 25404
(304) 267-0239
laurel.k.lackey@wvago.gov

*Attorneys for Plaintiff State of West Virginia,*
*ex rel. Patrick Morrisey, Attorney General*

**NICHOLAS W. BROWN**
Attorney General State of Washington

/s/ Claire McNamara
Claire McNamara (WA Bar No. 50097)
Gardner Reed (WA Bar No. 55630)
Assistant Attorneys General
Washington State Office of the Attorney General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104
(206) 340-6783
claire.mcnamara@atg.wa.gov
gardner.reed@atg.wa.gov

*Attorneys for Plaintiff State of Washington*

**JOSHUA L. KAUL**
Attorney General
State of Wisconsin

/s/ Brittany Copper
Brittany A. Copper
Assistant Attorney General
WI State Bar # 1142446, *pro hac vice*
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 266-1795
Brittany.copper@wisdoj.gov

*Attorneys for Plaintiff State of Wisconsin*

### ATTESTATION PURSUANT TO CASE MANAGEMENT ORDER NO. 27

I attest that the evidence cited herein fairly and accurately supports the facts as asserted.

DATED: January 30, 2026.

/s/ Megan O'Neill
Megan O'Neill

### ATTESTATION

I, Matthew Cocanougher, hereby attest, pursuant to N.D. Cal. Civil L.R. 5-1, that the concurrence to the filing of this document has been obtained from each signatory hereto.

DATED: January 30, 2026

/s/ Matthew Cocanougher
Matthew Cocanougher

STATE ATTORNEYS GENERAL'S MOTION FOR PARTIAL SUMMARY JUDGMENT
4:22-md-03047-YGR; 4:23-cv-05448-YGR