# Exhibit H

CONFIDENTIAL

Page 1

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES
SPRING STREET COURTHOUSE

COORDINATION PROCEEDING          )
SPECIAL TITLE [RULE              )
3.400]                          )
                                 )  JCCP No. 5255
IN RE: SOCIAL MEDIA             )
ADOLESCENT ADDICTION            )   For Filing Purposes
(JCCP No. 5255)                 )   22STCV21355
                                 )
_____        )
                                 )
THIS DOCUMENT RELATES TO:       )
                                 )
Cristina Arlington Smith,       )
et al. TikTok Inc., et          )
al, Case No. 22STCV21355        )
Los Angeles Superior            )
Court                           )
                                 )

                            - - - -
                          CONFIDENTIAL
                      ATTORNEYS' EYES ONLY
                        VIDEO-RECORDED
                  EXPERT WITNESS TESTIMONY OF
                       NASIR MEMON, Ph.D.
                       (Pages 1 - 418)
                 Held at the Covington & Burling
          415 Mission Street, San Francisco, California
              Thursday, August 14, 2025, 9:29 a.m.
          REPORTED BY:  ELAINA BULDA-JONES, CSR 11720

I don't know how many of them put in these values, right.  How many users are there.  And each sort of mechanism sort of has feasibility based on the context, which country it's coming from, what the laws and regulations are in that country.  So -- I mean, it's -- it's hard to simply just say yes, feasible very easily sitting in our --

BY MS. LANIER:

Q.   Is it technically --

A.   -- in our chairs.

Q.   Is it technically possible?  Other companies do it, you know that, is it technically possible?

MR. CHAPUT:  Object to the form.

THE WITNESS:  Technically possible in the sense I could do it with a different amount of computation.  Technically possible in the sense I can do it in certain circumstances with the right amount of computation for certain audiences, yes.

BY MS. LANIER:

Q.   Thank you.

Okay.  So let's talk the next layer, the second layer, okay?

A.   Yeah.

Q.   The second layer, user reporting.  I just

CONFIDENTIAL

Page 156

want to hone in on user reporting, okay?

    A.    Sure.

    Q.    That is reactive, not preventive, right, meaning that doesn't prevent under-13-year-olds kids from getting on the app, but it -- it reacts to underage kids getting on the app, true?

        MR. CHAPUT:  Object to the form.

        THE WITNESS:  True.  It's in the context of some other proactive acts as well.

BY MS. LANIER:

    Q.    Yeah, I'm just talking user reporting now, okay?

    A.    Okay.

    Q.    And so user reporting, it requires somebody to first discover a user is underage, right?

        MR. CHAPUT:  Object to the form.

        THE WITNESS:  Yes.

BY MS. LANIER:

    Q.    And that could -- you know, so underage users, until they're discovered, if they ever are, they are able to use the platform, true?

        MR. CHAPUT:  Object to the form. Incomplete hypothetical.

///

Page 157

BY MS. LANIER:

Q. Just in terms of reporting? It's nobody's --

A. It's not a question of true or false again. You're looking at mechanisms in isolation. They could be discovered by some other mechanism beyond that.

Q. Right. I'm talking just -- just -- let's talk about just reporting. I'm saying if somebody doesn't get reported, hypothetically, for being underage, they could keep using the app, that's what happens, they keep using it, right?

MR. CHAPUT: Object to the form. Incomplete hypothetical.

THE WITNESS: I've answered. Providing Meta's doing absolutely nothing else, yes.

BY MS. LANIER:

Q. Okay.

A. But they do --

Q. Just -- just reporting, is what we're talking about. Okay. We'll talk about other things, too.

But somebody could be using the app for days, months, years, or forever, without ever getting reported for being underage, true?

Page 158

MR. CHAPUT:  Object to the form.

THE WITNESS:  Yes, provided the other mechanisms, if they were doing harm, or causing problems, then provided the other mechanisms did not catch them, right.

BY MS. LANIER:

Q.   If they were doing harm or causing problems or if harm was being done to them?

A.   Yes.

Q.   Right?

MR. CHAPUT:  Object to the form. Foundation.  Incomplete hypothetical.

BY MS. LANIER:

Q.   So the third layer, internal reviews, that Meta does internally, that's also reactive, right, that doesn't prevent underage users from getting on the platform, it just reacts to underage users being on the platform, true?

MR. CHAPUT:  Object to the form.

THE WITNESS:  Yes.

MR. CHAPUT:  Foundation.

THE WITNESS:  That's not my understanding.

BY MS. LANIER:

Q.   You think that --

A.   There is a -- from my understanding, there

Page 159

is a -- sort of a very proactive sort of mechanisms in place to detect sexual abuse and many other things going on beyond all ages, not just -- not just under 13, right.

Q.    Sir, I think you don't --

A.    You don't have to be actively looking for -- for bad activity, bad actors.

Q.    I think you don't understand my question.

My question is, is that -- is only that Meta's internal review, that happened after an underage person already gets on the platform, right? That's when I'm saying.  Their internal review, it's not at the sign up stage, it's after the person's on, right?

MR. CHAPUT:  Object to the form.

BY MS. LANIER:

Q.    True?

A.    After they have been reported or for some other reason --

Q.    Yes.

A.    -- they have been suspected to -- yes.

Q.    True?  Okay.  Thank you.

Okay.  And that only works -- this, you know, people reporting other people for being underage, this -- that system of Meta, you know,

CONFIDENTIAL

Page 160

attempting to have age verification, or that layer -- let me withdraw.

The layer of user reporting, it only works -- it's only as good as the system is, right? So if the -- if the reporting system is not very good, that's a problem, right?

MR. CHAPUT:  Object to the form.

THE WITNESS:  I'll say yes, caveat to this whatever you mean by "good."  I mean, you're not...

BY MS. LANIER:

Q.    Yeah.

A.    So let's -- let's get into that, right.

Q.    And Meta claims user reporting is a key layer in their age verification systems, true?

MR. CHAPUT:  Object to the form.

THE WITNESS:  I don't know what they report.  But yeah, it could be.

BY MS. LANIER:

Q.    You don't know whether Meta --

A.    I mean, whether they report it somewhere, that is the key layer, right, but looking at the design, yes, I mean, that's a key layer.

Q.    And reporting works well if it doesn't have too much friction or if it's, you know, accessible or easily done, I guess, true?

MR. CHAPUT:  Object to the form.

THE WITNESS:  No, this is where I disagree with you, as a cybersecurity expert.

BY MS. LANIER:

Q.  So you think reporting -- you think that -- I guess -- let me phrase it differently.

I'm saying, you know, the better the reporting system is, the more, you know, I guess more reports you might be able to get, right?

MR. CHAPUT:  Object to the form. Incomplete hypothetical.

THE WITNESS:  Yeah, "the better" is, again, something that's hard to -- you have not described.  But you seem to be meaning that --

BY MS. LANIER:

Q.  No, no, don't -- don't go into what I seem to be meaning.  Just answer my question, sir.

A.  So -- no, so if I assume your "better" means simply faster.

Q.  No.  What --

A.  Then -- then I don't know what your "better" means.

Q.  It works better.

A.  What does it mean, "work better"?

Q.  It accurately does what it's supposed to.

Page 162

A.    What is it supposed to do?

Q.    Detect underage people, according to Meta.

A.    It doesn't detect underage people.  It facilitates reporting underage people.

THE REPORTER:  It doesn't?

THE WITNESS:  It doesn't detect underage people.  It -- it essentially helps reporting of underage people, right.  It simply provides that aspect.  And after that reporting, what goes on after that, that's a different matter.  I was looking at more you're saying, hey, the -- so the way I interpreted your question.

BY MS. LANIER:

Q.    Okay.  So as a cybersecurity expert, you agree that reporting system should function pretty well, right?

MR. CHAPUT:  Object to the form.

BY MS. LANIER:

Q.    Do you think the reporting system should work?

MR. CHAPUT:  Object to the form.

THE WITNESS:  But function very well, I would describe to you what I mean by that.  Right.

Function very well would mean that it has sufficient friction in it so it's not misused and

CONFIDENTIAL

Page 163

abused.  In security there is a well-known principle called denial of service attack, right, where when you have an open, accessible to everybody in the world, which is what a reporting system should be. They don't have to be simply platform users, right.

Open to everybody in the world if there's a reporting system.  Anybody can go in and hammer the system with false reports and that affects the performance whereby now I'm spending most of my time dealing with false reports and the ones that are actually true reports are getting -- so not being able to be addressed, right.

So a reporting system, by good security design, sort of recommended that such reporting systems have what they call rate limiting, right. Otherwise you simply start knocking on the door. And on the internet it happens all the time, that people do denial of service attacks, right.  So good system has to have a balance of the two.

BY MS. LANIER:

Q.  Okay.  So the reporting system, you know, it needs to strike a balance to be effective, true?

MR. CHAPUT:  Object to the form.

THE WITNESS:  Yes.

///

Page 164

BY MS. LANIER:

Q.    It needs to be easy enough for people to use but not -- not so easy that people might abuse it; is what you're saying, right?

MR. CHAPUT:  Object to the form.

THE WITNESS:  Yes.

MR. CHAPUT:  Characterization.

BY MS. LANIER:

Q.    And when we're talking about specifically reporting underage users, so children using Meta's platforms, do you agree with me that Meta should -- the goal should be to have a good reporting system to strike that balance, right?

MR. CHAPUT:  Object to the form.

THE WITNESS:  Everybody's goal would be that, yes.

BY MS. LANIER:

Q.    Everybody's goal wouldn't be that.  It should be that, right?

A.    It should be.

MR. CHAPUT:  Object to the form.

BY MS. LANIER:

Q.    Okay.  I want to show you --

I know you wanted to go maybe 30 minutes. I don't know how close we are to it.  We have one

Page 165

document to show.

MR. CHAPUT:  Almost 40.  If you want to do a document, though.

Dr. Memon, are you okay to continue?

THE WITNESS:  Let me check my sugar.

Oh, yeah, I'm good.

BY MS. LANIER:

Q.  Okay.  I want to show you what we're going to mark as Exhibit 6.

(Whereupon, Meta-Memon Exhibit 6 was marked for identification.)

BY MS. LANIER:

Q.  Let me know when you've got it and I will orient you, okay.

Do you have Exhibit 6 in front of you, Dr. Memon?

A.  Yes.

Q.  All right.  I want to draw your attention to the very bottom right corner where it says "Meta" and then it has a bunch of numbers.

Do you see that?  At the very bottom right?  Oh, no, first page, very bottom right.

A.  Oh, Meta, yeah, yeah.

Q.  You can follow along here, too, if it's easier for you.  I'll highlight.

Page 166

A.   No, this is easier for me.

Q.   Okay.

A.   But I want to see what you write there because I reserve the right to characterize -- to change some of the things you may have written as what you interpreted what I said.

Q.   Okay.

A.   If that's going to be record.

Q.   Yeah, absolutely.  Anytime I make notes --

A.   I know you would.  Just -- just stating that fact.

Q.   Yeah.  Okay.  Let me --

A.   I trust you would, yeah.

Q.   I don't want to talk over you or I feel like the court reporter is going to stab both of us. And she's a very lovely lady.

So I -- you -- absolutely, if I write down something that does not seem, you know, accurate, then you need to correct it, okay?  Feel free.

So -- but do you see down here this Bates stamp, that's what that's called, this Meta and a then a bunch of documents, right?

A.   Uh-huh.

Q.   Okay.  So you have reviewed Meta documents in conjunction with your work as an expert witness

Page 167

in this case?

A.   Yes.  Yes.

Q.   True?

So you are aware a document with a Bates stamp like this, that is similar to other documents with Bates stamps you've reviewed, right?

A.   Yeah.

Q.   So I'll represent to you that this was produced in the same litigation, okay?

A.   Okay.

Q.   Even though I don't know whether or not you've seen this document.

Have you seen this document before?

A.   Doesn't look very familiar.  I might have.

Q.   Okay.  Do you remember reviewing -- you put in your materials considered one of the plaintiff experts, Dr. Christakis.

Do you remember reviewing his report?

A.   Yes.

Q.   Okay.  I'll represent to you that this document was cited to in his report, okay?

A.   Okay.

Q.   But do you think you've reviewed this document before?

MR. CHAPUT:  Asked and answered.

Page 168

THE WITNESS:  It doesn't -- I don't recall.

BY MS. LANIER:

Q.  It doesn't ring a bell, okay.

Let's start -- you know how e-mails can be kind of wonky and instead of going in what seems like it should be chronological order they kind of start from back to front.

So will you turn with me, please, to the second page and look at the very bottom.

Are you there with me, at the bottom?

A.  Uh-huh.

Q.  Okay.  And to orient us this is a bunch of people with Facebook, FB, Facebook e-mail addresses.

Do you see that generally, right?

A.  Okay.

Q.  Okay.  That may look familiar from other Meta documents you listed.

A.  Yeah.

Q.  Okay.  And we are in Tuesday, March 26th, 2019.

You see that there?

A.  Uh-huh.

Q.  So this is Meta employees and they're discussing the underage reporting system --

CONFIDENTIAL

A.    Uh-huh.

Q.    -- aren't they?

The Subject line is, "Reporting flow broken."

Do you see that there?

A.    Yes.

Q.    Okay.  And if you turn to the next page.

"Hey there" -- this is from a Facebook person.  This person's name is Monika.

Do you see that?

A.    Uh-huh.

Q.    Okay.  Monika says to the other Facebook people, "Hey there.  I was trying to report this profile for being underage and got a weird error message that reporting was not available.  I was hoping we could review this profile, which a school sent to me, for belonging to an underage child."

Blah, blah, blah.

Do you see that there?

A.    Yes.

Q.    Okay.  And then next, she says, "Antigone and Jonathan" -- presumably -- yeah, those are other Meta people -- or Facebook people -- "added you for awareness of the report flow issue" --

Do you see that there?

CONFIDENTIAL

Page 170

A.    Yeah.

Q.    -- "and because for a related profile, which I was able to report."

So let's talk about profile number one. This profile here, Monika wasn't able to report that at all, was she?

MR. CHAPUT:  Object to form.  Calls for speculation.

BY MS. LANIER:

Q.    She said she --

A.    She's saying at that particular time she was not able to report.  It doesn't mean she didn't report it later.

Q.    Sure.  But in this instance she's flagging a weird error message, reporting wasn't available, right?

MR. CHAPUT:  Object to the form.

BY MS. LANIER:

Q.    And then let's talk about person number two.

THE REPORTER:  Did you answer that?

THE WITNESS:  Yes, I said.  Sorry.

BY MS. LANIER:

Q.    For person number two, the related profile, they were able to -- Monika was able to

CONFIDENTIAL

Page 171

report it.  But she said "the reporting flow was pretty bad."

Do you see that there?

A.    Sure.

MR. CHAPUT:  Object to the form.

BY MS. LANIER:

Q.    "I wondered if we should look into it."

Do you see that?

A.    Sure.

Q.    It being the reporting flow.

"It was obviously structured to deter any reports."

Do you see that there?

A.    Yes, I see that.

MR. CHAPUT:  Object to the form.

BY MS. LANIER:

Q.    And then, if you go up on page 2, another person chimes in that Monika is not just totally out of left field.  Antigone chimes in there.

Do you see that there?  Tuesday, March 26th, 2019.

A.    I don't have a page, to begin with.

MR. CHAPUT:  Object to the form.

BY MS. LANIER:

Q.    Second -- oh, it's -- I'm sorry, it's on

CONFIDENTIAL

the back of your first page, page 2 for me.

A.    Okay.

Q.    Antigone.  Do you see Antigone's e-mail, Tuesday, March 26th?

A.    Yes.

Q.    And Antigone is also a Facebook person we see in this document.

"Regarding the reporting flow, I agree it is more than pretty bad."

Do you see that there?

A.    Yes.

Q.    Well, that's a problem, isn't it?

MR. CHAPUT:  Object to the form.

THE WITNESS:  So -- sorry, I'll give you not a yes-or-no answer.

So, first of all, I sort of don't know the whole context of this, right.

Secondly, I don't know who Antigone is.  I don't know what understanding she has about security systems, why they're designed the way they're designed.  And I -- this is just a person working in the -- in that group making that opinion.  That doesn't simply -- whether she is authoritative on it, that doesn't really reflect the status of the system, right.  It's -- it's one person's opinion.

Page 173

And I already said before, that a reporting system needs to have certain friction. Otherwise they actually get worse.

MS. LANIER:  Well, move to strike the portions that are nonresponsive.

Q.  So I want to take -- I want to break this up a little bit.

You said you don't know the -- you don't know who this person is.  And then you said they're just a person working there.  So what is it?  Do you know who this person is or not, Antigone?

MR. CHAPUT:  Object to the form. Argumentative.

BY MS. LANIER:

Q.  Do you know what their job was?

A.  Sorry I was not clear.  What I meant was I don't know her qualifications.  I don't know what she understands about cybersecurity.  I don't know --

Q.  Do you know that Antigone Davis was the global head of security, did you know that, at Meta?

MR. CHAPUT:  Objection.  Lacks foundation.

BY MS. LANIER:

Q.  She's global head of security at Facebook. Did you know that?

Page 174

A.    No.

MR. CHAPUT:  Objection.

THE WITNESS:  Of course not.  And I disagree with her.

BY MS. LANIER:

Q.    Okay.  You disagree with the global head of security for Meta.  But let's talk about what Meta said.

You said -- I want to take another -- you said it was one person's opinion.  It's actually two people's opinion, right, at least, because Monika had the same opinion, right?

A.    Sure, yeah.

Q.    Okay.  And the global head of security says, "Regarding the reporting flow, I agree it's more than pretty bad."

So -- oh, sorry, I'm sorry, global head of safety.  Global head of safety.  Let me correct that.

A.    Very different thing.

Q.    Yeah.  Okay.

But do you think it's a problem if the reporting flow doesn't work at all?  Let's just take Monika's person number one example where she could not even report that person for being underage.  Do

Page 175

you think that's a problem in the reporting flow?

A.    Can I answer again?

MR. CHAPUT:  Object to the form.

THE WITNESS:  So you say the reporting flow doesn't work at all?

BY MS. LANIER:

Q.    No, here, she says it.

A.    This is an IT system that breaks from time to time.  It doesn't work at all is not characterizing.  Of course tens of thousands of reports are being filed.  So making the statement and getting me to agree that it doesn't work at all is -- is not very fair on your part.

Q.    Sir, I'm just going based off the document.

A.    It's clear it's not very -- anyway.  So let me leave that after just pointing that.

Secondly, as I said before, people in all good honestness, good people meaning good things, again, I don't want to get into good, but people in all fair honestness want to make things better with respect to security goals but they don't understand sometimes --

Q.    Sure.

A.    -- what are the basic mechanisms.

Q.   Sir, sir, you are not an expert in psychology, in what people want to do -- you didn't look --

A.   No.

Q.   Let me finish.

You're not an expert --

MR. CHAPUT:  No, Counsel.

BY MS. LANIER:

Q.   -- in what people want to do --

MR. CHAPUT:  You're --

BY MS. LANIER:

Q.   -- or people -- people who want to be good people and people's intention.  You didn't do that kind of analysis for the Meta employees, did you?

MR. CHAPUT:  Counsel, the witness was endeavoring to finish his answer.

THE WITNESS:  I was finishing my answer.

MR. CHAPUT:  And I would appreciate it --

MS. LANIER:  You're not answering my question.

MR. CHAPUT:  -- if you would --

THE WITNESS:  No, I'm --

MR. CHAPUT:  You asked the witness if he agreed with this statement and he is explaining whether or not he agrees with the statement.

Page 177

Dr. Memon, please go ahead and finish your answer.

THE WITNESS:  Yes, I was saying that -- people who are not -- sort of don't understand security.

BY MS. LANIER:

Q.   What people?  Global head of security -- or --

A.   Safety.

Q.   I'm sorry.  Global head of safety?

A.   Safety.

Q.   You think the global head of safety at Meta Platforms --

A.   She's not trained --

THE REPORTER:  Wait.

THE WITNESS:  -- in cybersecurity.

MR. CHAPUT:  Counsel.

THE WITNESS:  I'm sorry.

MR. CHAPUT:  We -- I think it's time for us to take a lunch break.

MS. LANIER:  No, we're going to -- we have to finish this line of questioning.

Q.   You think the global head of safety -- I want you to answer my question.

You think the global head of safety at

CONFIDENTIAL

Page 178

Meta doesn't have training or know anything about cybersecurity?

MR. CHAPUT:  Object to the form. Mischaracterizes the witness's testimony.

And, Counsel, we can finish this line of questioning only if you actually allow the witness to answer a question.

THE WITNESS:  Yes.

MR. CHAPUT:  And stop constantly speaking over him.

MS. LANIER:  I object to the speaking objection.  And you know the witness is being evasive.

Q.   I would like you to answer my question.

MR. CHAPUT:  No, I know that counsel is being argumentative and unprofessional.

MS. LANIER:  Okay.  I object to your characterization.  And I'd be happy if you wanted to get a judge on to make him actually answer my question.

Q.   Do you think the -- you didn't even know who this person was 30 seconds ago and you don't know -- you think you know what this person's cybersecurity training and education is?

Answer that question, just that one.

CONFIDENTIAL

Page 179

A.    I was -- I was finishing my answer --

MR. CHAPUT:  Object.

THE WITNESS:  -- but you didn't let me finish.

MR. CHAPUT:  Object to the form of the question.

THE WITNESS:  Why don't you let me finish that.

BY MS. LANIER:

Q.    No.  Answer my question.

A.    No, no.

Q.    Answer my current question.

Do you know what this person --

A.    You jumped to a new question which I didn't finish answering and now you're trying --

Q.    I'm allowed to do that.

Do you know what this person's qualifications are, yes or no?

MR. CHAPUT:  Objection.

THE WITNESS:  That's what I was saying.  I don't know.

BY MS. LANIER:

Q.    You don't know.  Thank you.  That's the answer to the question.

Okay.  Let's keep going into the global

head of safety -- safety's e-mail.

"Regarding the reporting flow, I agree it is pretty" -- "it is more than pretty bad and suggests we want to deter" --

What does "deter" mean?

A.    Prevent.

Q.    Deter?

A.    Discourage.

Q.    Thank you.  Prevent or discourage.

"It is more than pretty bad and suggests we want to deter underage reporting."

Do you see that?

A.    Yes.  Yes, I see that.

Q.    As a -- okay.

All right.  We can take a lunch break if you want.

MR. CHAPUT:  Off the record.

THE VIDEOGRAPHER:  Time is 12:52.  We're off the record.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER:  Time is 1:43.  We're back on the record.

BY MS. LANIER:

Q.    Okay.  Welcome back, Doctor.

A.    Welcome back to you.

somebody under 17, you know, that you could enforce a contract, or somebody under 13, you don't know any of that, right?

A.   No.

MR. CHAPUT:   Object to the form.

BY MS. LANIER:

Q.   All right.   Do you know how long it took Meta to go through the 2 to 2.1 million backlogged accounts, if they even got through them all; do you know?

MR. CHAPUT:   Object to the form.

THE WITNESS:   So what I gathered from testimony that was shown to me from a Meta employee, was that this spike happened during COVID, when there's data that all the numbers went up on social media.   And the testimony says that there was shortage of resources, and they formed a war room to start addressing this.

And also, from testimony, I see that Meta had -- put in a policy saying these reviews should be finished in 48 hours.   And from the testimony I see that she says that now it's done much faster. Within four hours.   So based on that, I -- I think it might have taken some -- that time because of that blip.   But it's not something that makes me

Page 220

sort of feel that that number is still there.
It's -- it's -- definitely has been -- it probably
would have gone down.

MS. LANIER:  Okay.  Move to strike the
portions that are nonresponsive.

Q.    My question was, do you know how long it
took Meta to go through the 2 to 2.5 million --

A.    No.

Q.    -- backlogged accounts?

A.    No.

MR. CHAPUT:  Object to the form.

BY MS. LANIER:

Q.    Okay.  Thank you.

During this backlog the children could
still use their accounts, right?

MR. CHAPUT:  Object to the form.
Foundation.

BY MS. LANIER:

Q.    Meta didn't suspend them?

MR. CHAPUT:  Object to form.  And
foundation.

THE WITNESS:  Meta's policy is not to
suspend until it's been verified.

BY MS. LANIER:

Q.    Correct.

Page 221

A.    Checkpoint.

Q.    So the answer is yes, during this backlog children could still use their accounts, right?

MR. CHAPUT:  Object to form.

THE WITNESS:  If there was a --

THE REPORTER:  Wait.

MR. CHAPUT:  And foundation.  Asked and answered.

So, Dr. Memon, please --

THE WITNESS:  Sorry.

MR. CHAPUT:  -- wait until...

THE WITNESS:  If there was a user there, then they would have continued using it, yes.

BY MS. LANIER:

Q.    Meta continued collecting data from these accounts, true?

MR. CHAPUT:  Object to the form.

BY MS. LANIER:

Q.    During this backlog period?

MR. CHAPUT:  Same objection.

THE WITNESS:  It -- well, that's its normal practice for collecting data so I assume that's so.

BY MS. LANIER:

Q.    Are you aware Meta can immediately suspend

accounts for other types of violations?

MR. CHAPUT:  Object to the form.

THE WITNESS:  I -- I don't remember specifics, but I expect there could be, yes.  There could be.  I don't remember.

BY MS. LANIER:

Q.  Okay.  So I can't tell if that means you do know or are you assuming or guessing.

Do you know that Meta can instantly suspend accounts for other types of violations?

MR. CHAPUT:  Object to the form.

THE WITNESS:  I'm guessing that yes, they should be -- they probably -- they could be doing that, yes.

BY MS. LANIER:

Q.  Okay.  You're aware Meta has internal discussions about their age verification effectiveness, right?

MR. CHAPUT:  Object to the form.

THE WITNESS:  I have been shown some documents where discussions have taken place, yes.

BY MS. LANIER:

Q.  Okay.  And were all those documents listed in your reports or your materials considered?

A.  Yes, as far as I know.

Page 300

confused about is, what stage?  At sign up?

BY MR. OLSZEWSKI-JUBELIRER:

Q.   At any stage, Dr. Memon?

A.   So I understand that during the review stage, some AI techniques started getting incorporated, combined with other -- other information.  And when exactly, I don't recall.  But it was more during the review stage rather than at the sign up stage.

Q.   So your opinion is based on the understanding that Meta's platforms sometime between 2012 and 2024 used AI in their review stage to determine if a user was under 13?

MR. CHAPUT:  Object to form. Characterization.

THE WITNESS:  So -- so, for example, in the review stage if -- it -- users was asked to submit a video selfie, right, AI was being used. And if the report came below 13, so then they inferred below 13, right.  And so these things inside the pipeline, they -- they could have existed and I remember reading some places about characterization and so -- the internal review was a bit more complex than simply manual -- when exactly it started, '24 or '23, I sort of don't remember.

Page 301

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Aside --

A.    '22, or something like that.

Q.    Aside from Yoti --

A.    Yeah.

Q.    -- is it your -- your opinion is based on the understanding that Meta used some AI technique aside from Yoti to predict that users were under 13 in the course of reviewing reports of underage users; is that right?

MR. CHAPUT:  Object to the form. Characterization.

THE WITNESS:  I know the fact that they were using AI techniques in the review stage. Definitely for checking the 16 to 18 part, if I recall now.  And I don't know these techniques.  I'm not an expert in these characterization techniques, right, based on text and social graphs and things of that sort.

And I'm right now a bit uncertain about whether that happened to be used explicitly for 13, 14, when you know under 13 are using it, right, but it just -- it did get used.  And a report just -- and a report may come back as under 13 and they acted upon it.

Page 302

BY MR. OLSZEWSKI-JUBELIRER:

Q.   So you don't know either way whether Meta used AI practices -- AI techniques to predict whether a user was under 13 in the course of its review of underage reports?

MR. CHAPUT:  Object to the form.

THE WITNESS:  I know that Meta was trying out AI practices.  And some were tried experimentally.  Some were tried for 18 threshold.  And -- and I -- I think some were tried for the 13 threshold as well, right.  They were tried -- they did look at that internally.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   My question is different.

You don't know either way whether Meta used in production in reviewing underage -- reports of underage users, so users under the age of 13, during the relevant time period that you looked at, whether Meta used AI practices to predict that users were under 13?

MR. CHAPUT:  Object to the form.

THE WITNESS:  In production, I don't know, yes.  I know they were exploring AI techniques and they still are.

///

CONFIDENTIAL

Page 326

BY MR. OLSZEWSKI-JUBELIRER:

Q.   That's not my question, Dr. Memon.

My question is, it would be important to your opinion what Meta's employees who worked on its age verification systems thought about its age verification practices, right?

MR. CHAPUT:   Object to the form.

THE WITNESS:   It would be helpful to my opinion.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   All right.  So we talked about how Meta's age verification system includes a process for reviewing reports of underage users, right?

A.   Uh-huh.

MR. CHAPUT:   Object to the form.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   Meta has both automated and manual processes for reviewing reports of underage users?

A.   That's right.

Q.   And in paragraph 79 of your report -- this is page 37 -- you describe Meta's automated processes, right?

A.   That's right.

Q.   You say, "Where Meta has indicia that the user is over the age 13, Meta may automatically

CONFIDENTIAL

Page 327

permit the user who has been flagged as potentially underage to continue using Facebook or Instagram."

A.   Yes.

Q.   Okay.  What indicia does Meta use?

MR. CHAPUT:  Object to the form.

THE WITNESS:  Oh, if I -- if I recall, things like whether this account has been flagged before.  Whether they are -- and reviewed and cleared.  Right.  So if -- so things of that sort, right, that can be easily said doesn't require manual review.  And there are probably one or two more I forget right now.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   Do you believe it's -- that an account not having a biography or a -- photos is a reliable indicia that the user who owns that account is over the age of 13?

MR. CHAPUT:  Object to the form.

THE WITNESS:  It may be an indicator not in isolation, but along with other things.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   How would not having a bio or photos indicate that the user is over the age of 13?

MR. CHAPUT:  Object to the form.

THE WITNESS:  Can you repeat that

CONFIDENTIAL

Page 328

question?  How would a bio?

BY MR. OLSZEWSKI-JUBELIRER:

Q.    How would not -- how would an account not having a bio or photos indicate that the user is over the age of 13?

MR. CHAPUT:  Object to the form.

THE WITNESS:  So in certain situations, along with other signals, it's not that only individuals who have accounts in Meta, the companies, the group accounts, there are many other such accounts on some of these platforms, company -- so I -- so I think that's going to address that, that it is based on their observation and they -- if it's a personal account I would put my bio or my picture, right.

But if there's not, then -- maybe it's not even active.  Maybe it's a bot.  From their experience they're probably arrived at this heuristic.  I don't know exactly why.  But it -- it doesn't sound, in the sense, something very false to do, right, there could be reasons for doing that.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    But you don't know what the reasons are for --

A.    No, there was --

CONFIDENTIAL

Page 329

MR. CHAPUT:  Object.

THE WITNESS:  Sorry.

MR. CHAPUT:  Object to the form.

THE WITNESS:  There are some reasons mentioned in the documents I read and the testimony of Hartnett, right.

THE REPORTER:  And the testimony of?

THE WITNESS:  Of Hartnett; is that her name?  Yeah.

BY MR. OLSZEWSKI-JUBELIRER:

Q.  Allison Hartnett, yes.

A.  Allison Hartnett.

So she did talk about certain types of accounts where -- where this could be justified. And I thought they were reasonable.

Q.  You think it's reasonable to -- you think that it's a reliable indicia that a user is over 13 if the user does not have a bio or photos on their account?

MR. CHAPUT:  Object to the form.

THE WITNESS:  It was reliable indicia that there may not be an individual, specific user behind this account.  It's something else.

BY MR. OLSZEWSKI-JUBELIRER:

Q.  Your understanding is that Meta

CONFIDENTIAL

Page 330

automatically allows users whose accounts don't have bio or photos because Meta believes that those users are likely not under 13?

MR. CHAPUT:  Object to the form. Characterization.

THE WITNESS:  So I think it's a triage process where they say this user doesn't have anything, they don't have -- they're not active or it's a company, it's some other entity.  And it's a reasonable heuristic to triage and reduce it to the amount of investigations you have to do.

BY MR. OLSZEWSKI-JUBELIRER:

Q.  Using -- Meta also uses an age classifier, you talked about that before, in this automated review process, right?

A.  That's right.

Q.  Okay.  Did you -- and the age classifiers, you recall, is called the adult classifier?

A.  It's an adult classifier.

Q.  Right.  And that's a classifier -- you said you reviewed Allison Hartnett's testimony. That's a 30(b)(6) witness on behalf of the company.

A.  Yes, that's right.

Q.  A corporate witness.  She was testifying for Meta, right?

Page 331

A.    Yeah.

Q.    And do you recall from that testimony that the adult classifier predicts if a user is between 13 and 17 or over 18?

MR. CHAPUT:  Object to the form.

THE WITNESS:  That's right.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  Did you consider any materials in assessing the reasonableness of using this adult classifier to ignore underage reports?  Did you consider any materials assessing if the adult classifier is effective at assessing if a user is under or over 13?

MR. CHAPUT:  Object to the form. Characterization.

THE WITNESS:  I recall that there have been ongoing attempts at -- in Facebook to sort of built a classifier for this as well.  And I don't know exactly why it has not been deployed, but -- and I don't understand how these text-based classifiers work.  So I don't -- I don't have insights as to -- as to why that could have happened.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    You're not an expert on how companies can

CONFIDENTIAL

Page 332

use text-based classifiers to determine if a user is under 13 or over 13?

MR. CHAPUT:  Object to the form.

THE WITNESS:  I'm generally knowledgeable, I think, this pattern recognition and clustering of this kind of work.  I have done it myself.  But I don't have, like, unlike facial images, I don't have firsthand experience in -- so I -- and I am not very familiar with researchers who work on a face-based age.  Yeah.

BY MR. OLSZEWSKI-JUBELIRER:

Q.  Okay.  So you don't know how text-based classifiers work to predict whether a user is under 13, right?

MR. CHAPUT:  Object to the form.

THE WITNESS:  Roughly, I know.  Right.  But just state of the art, accuracies they have, et cetera, I have lesser knowledge.  I understand things probably have been changing and improving, right.  I don't know.

BY MR. OLSZEWSKI-JUBELIRER:

Q.  Okay.  But you don't know?

MR. CHAPUT:  Object to the form.

THE WITNESS:  Not to -- yeah, I -- I don't know enough.  Yes.

Page 333

BY MR. OLSZEWSKI-JUBELIRER:

Q. Okay. And you -- because of that you couldn't have assessed the efficacy of using this adult classifier to predict if a user is over or under 13, right?

MR. CHAPUT: Object to the form.

THE WITNESS: I -- it's fair to say that, yes.

BY MR. OLSZEWSKI-JUBELIRER:

Q. And you know from reading Ms. Hartnett's testimony on behalf of the company that Meta also didn't assess how likely the adult classifier is to predict under 13 users as being over 18, right?

MR. CHAPUT: Object to the form. Characterization. Foundation.

THE WITNESS: I don't recall exactly what she said. But yes, the fact that they -- if they did not use it, that could have been the reason.

BY MR. OLSZEWSKI-JUBELIRER:

Q. If they did not use what?

A. For under 13.

Q. Okay. But one of the, quote, indicia that you referred to in your report of a user being over 13, you're talking about automatic evaluation processes that Meta uses to review reports of under

Page 334

13, right?  Yes?

A.    Well, that was for images, isn't it?
Yoti.

Q.    No.

A.    Is it?  No.

Q.    Dr. Memon, in paragraph 79, right, your
report.

A.    Uh-huh.

Q.    You're talking about -- you say, "Where
Meta has indicia that the user is over the age of
13, Meta may automatically permit the user who has
been flagged as potentially underage to continue
using Facebook or Instagram."  Right?

A.    That's right.

Q.    And we're talking about Meta's automated
evaluation process for evaluating underage reports,
right?

A.    Right.  So these could be things as
whether the person has been evaluated before, for
example.

Q.    Yes.  The thing I'm specifically talking
about right now is Meta's use of the adult
classifier --

A.    Yeah.

Q.    -- to automatically evaluate reports of

Page 335

under-13 users, right?

A.    Right.

Q.    And to automatically allow such reported users to remain on the platform if the adult classifier predicts them to be over 18, right?

A.    Over 18, yes.

Q.    Okay.  And that's your understanding of how that Meta actually uses this classifier, right?

A.    Right.

Q.    Okay.  And Ms. Hartnett testified on behalf of the company, right, that Meta has not evaluated this classifier, how likely it is to predict under-13 users as being over 18, right?

MR. CHAPUT:  Object to form.  Foundation.  Characterization.

THE WITNESS:  If she said that, I take that as -- yeah, that was her statement.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  And you still determined in your report that using this classifier, even though Meta had not evaluated how likely it was to incorrectly predict under-13 users as over 18, you determined in your report that this is -- this is a reasonable practice by Meta, right?

MR. CHAPUT:  Object to the form.

Characterization.

THE WITNESS:  Where did I say that?

BY MR. OLSZEWSKI-JUBELIRER:

Q.  You don't think that this is a reasonable practice?

MR. CHAPUT:  Object to form. Characterization.

THE WITNESS:  Could you help me where I said that because there may be a context around that I can --

BY MR. OLSZEWSKI-JUBELIRER:

Q.  You think Meta's practices for evaluating -- for detecting under-13 users are reasonable, right?

A.  That's right.

Q.  And you -- as part of that you considered this practice, right, this practice of using the adult classifier to automatically ignore reports of under-13 users, right?

A.  When I mentioned that earlier, I meant to the Yoti classifier.  If Yoti comes back and says under-13, then Meta uses it, is what I said, yes, Meta has to use it.

Q.  I think we're maybe talking past each other again, Dr. Memon.

A.    Okay.

Q.    We are on the same page, right, that Yoti -- that Meta uses an adult classifier to predict whether users are over 18 and automatically ignore reports of underage users that are predicted to be over 18, right?

MR. CHAPUT:  Object to the form.

THE WITNESS:  Yes.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  And you --

(Whereupon, a brief discussion off the record.)

THE VIDEOGRAPHER:  The time is 5:27.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER:  Time is 5:28.  We're back on the record.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Dr. Memon, in your opinion, as an age verification expert who has been asked to evaluate the reasonableness of Meta's practices for detecting whether users are under 13, is it reasonable for Meta to use an adult classifier to automatically ignore reports of under-13 users?

MR. CHAPUT:  Object to the form.

THE WITNESS:  Oh, if that classifier is

CONFIDENTIAL

Page 338

known to be less accurate for under-13, then I would not use it for that purpose. That would have been Meta's internal evaluation and determination.

BY MR. OLSZEWSKI-JUBELIRER:

Q. So it wouldn't be reasonable to use that classifier to automatically ignore reports of under-13 users, right?

MR. CHAPUT: Object to the form. Mischaracterizes the testimony.

THE WITNESS: Automatically no reports of under 13 when -- if it's known that the classifier is not accurate at that stage, then they -- Meta can make the decision that no, this is leading to more false positives. And based on the data they would have done that. I don't have that data.

BY MR. OLSZEWSKI-JUBELIRER:

Q. Okay. We established that Ms. Hartnett testified on behalf of Meta that Meta has not evaluated how likely it is that this adult classifier predicts under-13 users falsely as being over 18?

MR. CHAPUT: Object to form. Characterization. Lacks foundation.

THE WITNESS: So I understand that evaluation that --

Page 339

BY MR. OLSZEWSKI-JUBELIRER:

Q. Sorry, Dr. Memon, I'm just going to stop you there.

Do you understand that, what I just said, that Ms. Hartnett testified on behalf of Meta that Meta has not evaluated how likely it is the adult classifier falsely predicts under-13 users as being over 18?

MR. CHAPUT: Object to the form. Characterization. Foundation.

THE WITNESS: There's always a lack of data involved in such things, yes.

BY MR. OLSZEWSKI-JUBELIRER:

Q. So the answer is --

A. I don't remember if she says that.

Q. I'm sorry?

A. I don't remember if her testimony she said it was because of lack of data. Labeled data is labeled to evaluate techniques.

Q. Okay. You read Ms. Hartnett's testimony?

A. Yes. But it was 500 pages so I don't remember specifically everything that she said.

Q. Okay. Why don't we assume. Okay?

A. Sure.

Q. I'm going to ask you to assume.

Hypothetically --

A. Right.

Q. -- if Meta did not evaluate how likely it was for Meta's adult classifier to predict that under-13 users are over 18, would it be reasonable for Meta to use this classifier to automatically ignore reports of under-13 users?

MR. CHAPUT: Object to the form. Incomplete hypothetical.

THE WITNESS: If they evaluate it, that it works, then it would be reasonable to use it. If it works, then it would be reasonable to use it. If they are unable to evaluate it because of lack of data or lack of label under-13 users, then it -- it's reasonable that they would not just use an incorrect -- untrained classifier.

BY MR. OLSZEWSKI-JUBELIRER:

Q. I just want to make sure the answer is very clear.

Assuming that Meta has not evaluated how likely this classifier is to falsely predict under-13 users as being over 18, you're saying it is not reasonable for Meta to use that classifier to ignore reports of under-13 users, right?

MR. CHAPUT: Object to the form.

Incomplete hypothetical.  Misstates testimony.

THE WITNESS:  Yeah, we are probably not understanding each other.

If they have trained the classifier to -- and measured its performance for over 18, right, it's reasonable to have them use for that.  But if the classifier comes back with under-13 and they're not being able to evaluate that, then it's not reasonable.  It's reasonable they would not be using it.  But if it has come back then -- am I missing your question altogether?

BY MR. OLSZEWSKI-JUBELIRER:

Q.  Dr. Memon, this classifier, the adult classifier, you testified before you understood it predicts two -- two potential outcomes, right, either that the user is a teen from 13 to 17 or that the user is 18 or older, right?

MR. CHAPUT:  Object to the form.  Characterization.  Lacks foundation.

THE WITNESS:  If I recall, it even goes as far as 22 and then they cut off based on that 22.  Is it the same classifier -- no, that's Yoti.  Sorry.

So you could have a classifier that is more accurate in one direction and less accurate in

Page 342

the other just because -- yeah.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Dr. Memon, that's not my question.

You testified before you understood that the adult classifier predicts two options, either the user is a teen from 13 to 17, or 18 or older, right?

MR. CHAPUT:    Object to form. Characterization.

THE WITNESS:    That's right.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  I'm asking you to assume that Meta has not evaluated how likely it is for this classifier to predict that users who are actually under 13, how likely it is to predict those users are over 18?

A.    How likely they are to predict over 18?

Q.    Right.  How likely the classifier is to falsely predict that users who are actually under 13 are over 18, right?

Do you understand what I'm saying?

A.    Uh-huh.

Q.    You understand the assumption I'm asking you to make?

A.    Yeah.

Page 343

Q.   Okay.   In that situation, is it reasonable for Meta to use that classifier when it predicts that a user reported as being under 13 when it predicts that user is over 18?   Is it reasonable to use that classifier as prediction, to ignore the report and not investigate it further?

MR. CHAPUT:   Object to form.   Incomplete hypothetical.

THE WITNESS:   If from experiments they have actually -- understand that the accuracy of predicting over 18 is 90 percent higher, or something of that sort, and they are automating for triage, then it's -- it's -- possibly it can be done, right, it's not...

BY MR. OLSZEWSKI-JUBELIRER:

Q.   You're fighting the hypothetical, Doctor.

I'm asking you to assume that they haven't evaluated how likely it is the classifier is to falsely predict under-13 users as being over 18.   In that situation, is it reasonable to use the classifier to ignore underage reports?

MR. CHAPUT:   Object to form.   Incomplete hypothetical.

THE WITNESS:   So --

MR. CHAPUT:   Asked and answered.

CONFIDENTIAL

Page 344

THE WITNESS:  So if they have evaluated how likely it is for something 14 to be reported over 18, right, that could be a basis for making adjustment.  It's -- because data on 14, 15, 16, above 14 data is there.  They have the ages.  But 13 and below, because of lack of data, perhaps, they were not confident to do that.  I don't know the exact reasons, but...

BY MR. OLSZEWSKI-JUBELIRER:

Q.    All right.  In evaluating Meta's underage processes for detecting underage users, you learned about Meta's human review process for underage reports, right?

A.    Meta's teen review processes for?

Q.    Human review process for underage reports?

A.    Underage, yes.

Q.    Okay.  That's the manual review process you talk about in your report?

A.    That's right.

Q.    Okay.  Do you know how many underage reports Meta sends to human review per year?

MR. CHAPUT:  Object to the form.

THE WITNESS:  I believe -- I don't have a statistic of this average per year.  But we have some data about backlogs and things of that sort.

Page 345

And so it could be -- depending on the level of backlog it could be order of millions.  Right.  But because there was a backlog it's probably lower than that but once they caught up with it so that's the range they could have.

BY MR. OLSZEWSKI-JUBELIRER:

Q.  Okay.  But you don't know -- you don't specifically know how many reports --

THE WITNESS:  I have not seen --

THE REPORTER:  Wait.

THE WITNESS:  Sorry.

THE REPORTER:  Your question, please.

BY MR. OLSZEWSKI-JUBELIRER:

Q.  You don't specifically know how many reports Meta sends to human review of underage users, right?

MR. CHAPUT:  Object to the form.

THE WITNESS:  I don't have -- don't recall seeing data on a year-by-year basis, no.

BY MR. OLSZEWSKI-JUBELIRER:

Q.  Meta has standardized the review -- underage user review process, right?

A.  Yes.

Q.  It's important to Meta that review process is consistent across the reviewers, right?

Page 346

A.    That's right.

Q.    And to make it consistent across reviewers, Meta provides reviewers with a decision tree that they must follow for each flag to count, right?

A.    That's right.

MR. CHAPUT:  Object to form.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    On Instagram, reviewers are instructed to first look at the account bio, right?

You have to answer verbally.

A.    Yes.

Q.    Okay.  And they look at the account bio to see if the user has posted their age in their bio, right?

A.    That's right.

Q.    If the user claims to be over age 13 in their bio, the user is allowed to remain on the platform?

MR. CHAPUT:  Object to the form. Incomplete hypothetical.

THE WITNESS:  It was my understanding that there are more indicia that they look at.  The -- the human evaluators are looking at the age of the pictures that are in the app and seeing if they

CONFIDENTIAL

Page 347

appear to be less than 15 in a manual human sort of capacity and making -- the decision is more complex than that when I saw the training PowerPoint.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   We'll get to the training PowerPoint in just a moment.

But would it be reasonable for Meta when reviewing account that's purported to be under 13 to first look at the account bio and if the account bio also says that the user is over 13, to then ignore the report and allow the user to remain on the platform without additional investigation into the age of the user?

MR. CHAPUT:   Object to form.   Incomplete hypothetical.

THE WITNESS:   If the user has been reported, then it does make sense to look further than that.   And I -- the training manual indicated that they do.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   So the answer to my question is, no, it would not be reasonable to just then rely on what the user has said in their account bio as their age, right?

MR. CHAPUT:   Object to the form.

Page 348

Characterization.  Incomplete hypothetical.

THE WITNESS:  Yes, it would not be reasonable.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   Okay.  We talked about the next step.

Another step in the review process is if there's no written indication of age in the bio the reviewer moves on to look at photos the account has posted, right?

A.   That's right.

Q.   Okay.  On Facebook, reviewers don't look at account bios, right?

A.   Right.

MR. CHAPUT:  Object to form.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   Instead you write that they evaluate the date of birth on the account?

A.   That's right.

Q.   How do they evaluate the date of birth on the account?

MR. CHAPUT:  Object to the form.

THE WITNESS:  By computing the age from that and if that indicates they're 12, then they -- that's an indicator they're not 13 -- they're not 13 or more.

CONFIDENTIAL

Page 349

BY MR. OLSZEWSKI-JUBELIRER:

Q.   Okay.  If the date of birth indicates they're over 13, does the review continue?

MR. CHAPUT:  Object to the form.

THE WITNESS:  I -- if I recall, looking at the training manual, yes, it does.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   Okay.  When reviewing photos on the account, you write, if the reviewer finds sufficient signals the user may be under 13 the user is placed at an age checkpoint, right?

A.   That's right.

Q.   What signals are sufficient for Meta's reviewers to place a user in an age checkpoint?

MR. CHAPUT:  Object to the form.

THE WITNESS:  It's when there are pictures and they are of the younger children, maybe it's an adult, right, that is -- has pictures of the children in there that -- their children, nephews and nieces, whatever, not related to them.

So there is a heuristic they use as to if there's a specific individual multiple times and if there's a presence of an adult or absence of an adult, based on that, I don't remember the exact numeric heuristic they have, but based on that, they

kind of put an indicator that this could be someone who is under 13.

BY MR. OLSZEWSKI-JUBELIRER:

Q. Okay. And in your opinion, what signal should be sufficient for Meta's reviewers to place a user that's been reported as under 13 in an age checkpoint based on their photos?

MR. CHAPUT: Object to the form.

THE WITNESS: What signal should be used?

BY MR. OLSZEWSKI-JUBELIRER:

Q. Yes. In your opinion -- you hold yourself as an age verification expert, right?

A. Uh-huh.

Q. In your opinion, what signals should be sufficient for Meta's reviewers to place a user that's been reported as under 13 in an age checkpoint --

MR. CHAPUT: Object.

BY MR. OLSZEWSKI-JUBELIRER:

Q. -- when reviewing their account photos?

MR. CHAPUT: Sorry.

Object to the form.

THE WITNESS: So there would be things like my -- as I said, my 11th birthday or clear self-admission of being under 13. Mentioning grades

Page 351

and things like that.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   Dr. Memon, I'm just asking about looking at photos.

A.   Okay.

Q.   What signals should be sufficient for Meta's reviewers to suspend an account and place it under an age checkpoint when looking at photos --

A.   It --

Q.   -- in accounts that are reported as underage?

A.   No, if it's --

MR. CHAPUT:  Object to the form.

Dr. Memon, please try and wait for the question to be over before you start your answer.

THE WITNESS:  Sure.

So if the human reviewer was trained to spot underage -- underage children, under-13 children, then based on the heuristics that they say, that sounds one way of doing it.  And are there other ways, possibly, but I -- it's hard for me to say what is sufficient.  What they seem to do is reasonable.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   Whatever Meta does is reasonable, in your

CONFIDENTIAL

Page 352

opinion?

MR. CHAPUT:  Object to the form. Characterization.

THE WITNESS:  Not whatever Meta does is reasonable, no.  I would not unequivocally make that statement.  It's very broad.

BY MR. OLSZEWSKI-JUBELIRER:

Q.  Okay.  But in this context you think that what Meta does is reasonable, right?

A.  Yes, I mean, it didn't strike me as something that's flawed.

MR. OLSZEWSKI-JUBELIRER:  Okay.  Let's do Tab J, please.

(Whereupon, Meta-Memon Exhibit 12 was marked for identification.)

MR. OLSZEWSKI-JUBELIRER:  This is a document with the Bates number META3047MDL-040-00000365.

This is Exhibit 12.  Thank you.

Q.  You have this document in front of you?

A.  Yes.

Q.  Dr. Memon?

A.  Yes.

Q.  This is the training presentation that you talked about, right?

CONFIDENTIAL

Page 353

A.    I think so.  Or was that for Facebook?
But -- are there two different ones?

Q.    This is one of the documents you cite in
this paragraph of your report.

A.    Okay.  Yeah.

Q.    And the title "IG Underage Reports
Underage Workflow"?

A.    Yeah.

Q.    Okay.  This is a training document for
Meta's underage --

MR. CHAPUT:  Object to the form.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    -- reviewers to review underage reports of
accounts on Instagram, right?

A.    Right.

MR. CHAPUT:  Object to the form.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  And you talked about a heuristic
that reviewers are instructed to use, right?

A.    That's right.

Q.    Okay.  And part of that, it has to do with
how many photos on the account look like a
particular underage user, right?

A.    That's right.

Q.    And there's an exception if there's an

CONFIDENTIAL

Page 354

adult that appears in a certain number of photos, right?

A.    That's right.

Q.    Okay.  Okay.

So let's turn to the page ending in Bates number 383.

Are you there?

A.    Yeah.

Q.    Okay.  On the left side this is the question that Meta's reviewers are expected to answer, right?  It says, "Is there a sole underage account owner?"  Correct?

A.    Uh-huh.

Q.    Okay.  And this slide is instructing the reviewer when they should answer no to that question, right?

A.    That's right.

Q.    Okay.  And the answer is they should answer no if any of these four conditions are met, right?

MR. CHAPUT:  Object to the form.

THE WITNESS:  What is PIPs?

MR. CHAPUT:  Pictures.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    You don't know what PIPs are?

Page 355

A.    I forgot.

MR. CHAPUT:  Object.

THE WITNESS:  Personally identified photos, yeah.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    That's my understanding, too.

A.    Yeah.

Q.    Okay.

A.    Just trying to recall.

Q.    Not a problem.  I'll ask the question again.

If any of these four conditions are met Meta instructs its reviewers to ignore the report of an underage user, right?

A.    Uh-huh.

MR. CHAPUT:  Object to the form.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  The first condition is if the total number of amount of PIPs that's personally identifiable photos is zero or one; that's right?

A.    Uh-huh.  Uh-huh.

Q.    Okay.

MR. CHAPUT:  Dr. Memon, make sure to give us verbal answers, please.

THE WITNESS:  Yes.

Page 356

BY MR. OLSZEWSKI-JUBELIRER:

Q.   The second condition is if no underage owner can be established?

A.   Yes.

Q.   And there's another heuristic for how Meta is supposed to -- reviewers are supposed to establish what -- that there is an underage account owner, right?

A.   Yes.

MR. CHAPUT:  Object to the form.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   Okay.  We have two other conditions.

If -- one is if both underage and an adult account owner can be established, right?

A.   That's right.

Q.   And the fourth condition is that that prominent adult exception applies, right?

A.   Okay.

Q.   Can you turn to page 406, ending in 406, please.

Are you there?

A.   Yeah, 406.  I'm there.

Q.   Okay.  This is an example of the screen that Meta's human reviewers look at when they're looking at an account that's been reported as being

Page 357

with under age 13, right?

MR. CHAPUT:  Object to form.

THE WITNESS:  Yes.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    There is nine photos on the account?

A.    That's right.

Q.    Okay.  And eight of these photos are
pictures of children's faces, right?

A.    Different children, is it?

Q.    That's a yes?

A.    Yes.

Q.    Okay.  The other photo that's not a
child's face, that's a bracelet on a wrist; is that
right?

A.    That's right.

Q.    Does that look like a friendship bracelet
to you?

MR. CHAPUT:  Object to form.

THE WITNESS:  I don't know.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  Part of your expertise is in
face-based age prediction, right?

A.    Yes.

Q.    Based on the photos in this account
example, is this user under the age of 13?

Page 358

MR. CHAPUT:  Object to the form.
Foundation.

THE WITNESS:  Based on the printed picture, I -- on natural resolution it's hard to tell.  But my first reaction is some of them look under 13.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    You think some of these children look under 13?

A.    Yes.

Q.    How many of them do you think look under 13?

A.    Three or four of them.

Q.    Three or four of them look under 13?

A.    Yeah.

Q.    How old do you think the other ones look?

A.    Maybe about.  But that's just my estimate. I've not been trained in identifying manually.

Q.    You're not trained on how to identify someone's age based on a photo of them?

MR. CHAPUT:  Object to the form.

THE WITNESS:  I've done research in --

MR. CHAPUT:  Foundation.

THE WITNESS:  Sorry.

I've done research in analysis of digital

CONFIDENTIAL

Page 359

images using features that are extracted, like -- and algorithmic analysis, not -- not human sort of training.

BY MR. OLSZEWSKI-JUBELIRER:

Q. Okay. How old do you think the ones who aren't under 13 are?

MR. CHAPUT: Object to form.

THE WITNESS: It's hard for me to tell.

BY MR. OLSZEWSKI-JUBELIRER:

Q. You don't know how old they are? Okay.

A. No, it's hard for me to tell.

Q. Okay. Based on this -- the photos on this account, should Meta have check-pointed this account and required this user who was reported as under 13 to provide identity verification?

MR. CHAPUT: Object to form. Assumes facts. Incomplete hypothetical.

THE WITNESS: It -- it's sort of -- depends on the ecosystem that Meta is observing, right, what types of accounts they have, what kind of pictures they have for those accounts. And so they have some understanding of accounts that have -- or group accounts or -- or somebody's, whatever, it's not an individual owner kind of account.

And they're making that determination based on the heuristic and based on their knowledge and experience, right. So I -- I would take them -- and these pictures are unfair for me to make that assessment based on one-inch pictures on a resolution printed page. So it's just almost the same, right.

So I'm sure the humans who are trained on it are better than me to make that assessment. But Meta seems to have a heuristic that says that operationally what they're doing, right. And they see pictures of this kind, to them, by their knowledge and what they've seen, that this is most likely not a single underage owner account.

BY MR. OLSZEWSKI-JUBELIRER:

Q. Right.

A. So...

Q. I understand what Meta's description is.

A. Right.

Q. And just to be clear on the record, you looked at the next page of this presentation, right?

A. Did I look at it?

Q. You glanced at the next page of this presentation?

A. Next page?

Page 361

Q.   Yeah.

A.   Yeah, I did.

Q.   You did before you just gave that answer, right?

A.   I did just to verify my memory, right, because I remember seeing this example.

Q.   Yeah.  And the next page of the presentation, you see on the bottom right, gives Meta's answer, right?

It says there are eight personally identifiable photos.  "No sole underage account owner can be established."  Right?

A.   That's right.

Q.   And Meta instructs its human reviewers to ignore reports like this of this type of account, right?

MR. CHAPUT:  Object to the form.

THE WITNESS:  And that is clearly stated in their workflow for getting the example, right, that they would do something like this for this.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   And my question is, as an expert in age verification, looking at this account, would you checkpoint this account and require the user to provide an ID to prove they're over 13?

CONFIDENTIAL

Page 362

MR. CHAPUT: Object to the form.

THE WITNESS: Not if I have an understanding of what kinds of accounts that Meta has and how common this is for not single owner underage accounts, right. Why are they using it as single, they have a reason.

BY MR. OLSZEWSKI-JUBELIRER:

Q. Do you know what that reason is?

A. No.

Q. Okay. And you don't have an understanding of what Meta knows about why they're using this --

A. I don't have it --

Q. -- heuristic?

A. -- in the sense as a justification from them, no.

MR. CHAPUT: Object to the form.

BY MR. OLSZEWSKI-JUBELIRER:

Q. Okay. And since you don't have that understanding, as an expert in age verification, you would checkpoint this user and require them to provide an ID to prove they're over 13, right?

MR. CHAPUT: Object to form. Mischaracterizes the witness's testimony. Incomplete hypothetical.

THE WITNESS: So I'm not an expert in or

been trained in checkpointing or looking at pictures and saying what ages.  I'm an expert in -- in age estimation algorithms, what they do, how good they are, how effective they are.

I'm an expert in cybersecurity, which basically specifies -- which basically trains me, informs me of what a reasonable pipeline should -- looks like often, right.

Now, inside the pipeline there will be different heuristics based on knowledge of the domain, knowledge of the company, knowledge of what they've seen in the past.  And I -- in good faith, I trust them to sort of utilize them to make the pipeline effective, yes.  And they could be making some mistakes sometimes.  But that happens.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   You trust that Meta's heuristic in this case for how it instructs reviewers to review reports of underage users was accurate?

MR. CHAPUT:  Object to form. Characterization.

THE WITNESS:  I wouldn't state for this particular example.  But what I'm saying is that if they're using such a heuristic they have reason to do to so.  Based on the experience, based on the

CONFIDENTIAL

Page 364

knowledge of what kind of pictures they've seen for underage accounts. And they have somehow come up with these heuristics to do quick review.

And I -- and I -- sort of not having that experience of looking at all the data, accounts, pages, pictures, that Facebook has, right, it's hard for me to sort of make a determination on this one, right. But on average I would expect that the review -- the heuristic is for a reason. And heuristics make errors. Right. They're not a hundred percent perfect. And the heuristic is being used to make that pipeline efficient.

No? Sorry.

BY MR. OLSZEWSKI-JUBELIRER:

Q. So in evaluating Meta's underage review process, you trust that Meta has a reason for the heuristics it's chosen, right?

MR. CHAPUT: Object to form. Characterization.

THE WITNESS: So in evaluating the review process, as I said a few times before, I have looked at the entire pipeline, right. And so -- and I -- operationally, what they do inside, those details right, I'm -- I -- I don't have sort of knowledge about what the right details should be in a case of

Page 365

looking at Facebook pages.  I've barely seen more than a hundred Facebook pages in my life, really.  Right.  So I -- I -- my evaluation is based on, I should say, some amount of trust that they would be reasonable and -- yes.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    It's fair to say you assumed that they would be reasonable in how they designed their heuristic?

MR. CHAPUT:  Object to the form.  Characterization.

THE WITNESS:  I assume they would use good heuristics, right.  They would not blatantly use a heuristic that's blatantly wrong.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    But you don't know either way, right?

MR. CHAPUT:  Object to the form.  Characterization.

THE WITNESS:  I don't know either way.

MR. OLSZEWSKI-JUBELIRER:  Let's go off the record, please.

THE VIDEOGRAPHER:  Time is 5:58.  We are off the record.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER:  Time is 6:19.  We're          0

back on the record.

BY MR. OLSZEWSKI-JUBELIRER:

Q. Dr. Memon, in your report you respond to Dr. Gray's criticisms of the underage reporting flow, right?

A. Yeah.

Q. And specifically Dr. Gray, you respond to Dr. Gray's opinions about the Instagram underage reporting flow, right?

A. So there are two of them here. Instagram and Facebook. And it would be good for me to look at that part.

Q. Okay. Let's turn to page 34 of your report. This is paragraph 73.

A. Which report are we looking at? 2, right?

Q. Yes, Exhibit 2.

A. Exhibit 2. Paragraph 33?

Q. 73.

A. 73. That's right.

Q. Okay. And your report says, "Plaintiffs' experts also express concern about the friction involved in the user reporting form, noting that the report involves '7 screens' to complete." Right?

A. That's right.

Q. Have you tried reporting a user for being

Page 367

underage on Instagram?

A.    No.

Q.    You've never used Instagram before, right?

MR. CHAPUT:   Object to form.

THE WITNESS:   I have never used Instagram.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  And you said, your opinion is the "flow is particularly reasonable in light of the impact of the action being requested."  Right?

A.    Right.

Q.    And the action being requested is "where Meta may checkpoint the user's account, requiring identifying identification to regain access." Right?

A.    Right.

Q.    You have a background in -- in -- you have worked on some issues involving contraband images, right?

A.    Contraband images, yes.

Q.    And contraband images means child sexual exploitation materials, right?

A.    Right.

Q.    CSAM.

A.    Right.

Q.    Okay.  And when someone -- just generally

CONFIDENTIAL

Page 368

your understanding is that when someone reports CSAM to Meta, that may result in a report to law enforcement about that content, right?

MR. CHAPUT:  Object to the form. Foundation.

THE WITNESS:  The CSAM report will go to the -- I -- I don't know this as fact, but law enforcement will get involved in some way.  I know that.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   Okay.  Is it your opinion that it's reasonable to have more friction on a reporting flow for reporting CSAM because of the seriousness of the potential outcome of the report?

MR. CHAPUT:  Object to the form.

THE WITNESS:  So my opinion comes from the fact that on a platform like Facebook, where there are billions of users, there are teenagers, there are other actors, and there are outside actors who are, like, known to attack Facebook for whatever reason, they, in that situation, and given the data that I've seen on some reports, the Hartnett testimony, for example, about the amount of false reports they get, it's reasonable to limit -- to rate limit this, to choke this, make it -- add some

CONFIDENTIAL

Page 369

friction to the reporting process so that the system is not completely overburdened and then actual cases where action needs to be taken don't get attended to.

MR. OLSZEWSKI-JUBELIRER:  Okay. Dr. Memon, I'm going to move to strike that answer as almost entirely nonresponsive to my question.

We are limited on time here.  So I apologize but I'm going to have to ask you to try to focus on the question.

I'm going to actually move on.

Q.    Your report also describes Dr. Gray's opinion, describes Dr. Gray's criticism of specific fields in the underage reporting form.

And you say Dr. Gray alleges the form requests username, full name, and birth date of the individual being reported, right?

A.    Right.

Q.    And you said in your report that's inaccurate because the form does not require full birth date, right?

A.    Yes, right.  And that was a mistake I realized.  Because when I wrote the report, what I was provided was a snapshot, like a page, printed page, on a -- and that only showed the year.

Q.   Okay.  So when you wrote in your report, your opinion, about the reasonableness of the fields that were required on Meta's underage reporting form, you hadn't even looked at the live reporting form, the web page?

MR. CHAPUT:  Object to the form. Characterization.

THE WITNESS:  I may have missed it. Right.  Because I had -- I might have referred when writing to the documents I had.  And so there were so many documents sent in my direction that I may have missed a video and not noticed the fields.  And then when I reviewed -- when I was reviewing two days back, I -- I realized that actually when you just -- it goes in stages.  You fill the year and then a month field comes up where if you don't fill that, you're not allowed to move on.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   Okay.  So you didn't look at the website, that web form when you wrote your report, right?

MR. CHAPUT:  Object to form.  Asked and answered.

THE WITNESS:  I saw -- I repeat that I saw a printed page of the website, static.

///

CONFIDENTIAL

Page 371

BY MR. OLSZEWSKI-JUBELIRER:

Q.   And you didn't look at the live web reporting form when you wrote your report; yes or no, Dr. Memon?

MR. CHAPUT:   Object to form.

THE WITNESS:   I did not look at the live reporting form.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   Okay.   You'll see up on the screen I have an iPhone here.   Do you see the home screen of this iPhone?

A.   Uh-huh.

Q.   Do you see Instagram there, the app, on the bottom left corner?

A.   Okay.

Q.   I'm going to open up Instagram.

Does this look like Instagram to you?

A.   I have -- I don't think I've been on Instagram.   I'm not sure.   But if you tell me it is, yes.

Q.   All right.   And this is a video, right, on Instagram?   It's not playing right now.   But I'll represent to you this is a video.

Do you see where it says, "How old are you," on the video?

CONFIDENTIAL

Page 372

A.   Uh-huh.

Q.   Okay.  Let's go into the comments here.
I'm going to scroll down in the comments.

Do you see this comment by a user named
jellyfish underscore, and then there's a number?

A.   Jellyfish.  "I'm 10."

Q.   Yeah, the comment is, "I'm 10."  Right.

So the text on the video was, "How old are
you," and this user has said, "I'm 10."

It's fair to say that probably means the
user is ten years old, right?

MR. CHAPUT:  Object to form.

THE WITNESS:  Yeah, I -- user could be
just making fun of the system, so...

BY MR. OLSZEWSKI-JUBELIRER:

Q.   But that would be an admission of age,
right?

A.   Depending on what the question was being
asked for and what the consequences of what they
were trying to do something or the consequences of
that were.  I could just be playing with the system
and say ten or a hundred.  I understand people have
written a hundred on Facebook.

Q.   Okay.  I'm going to hand you this iPhone.

A.   Uh-huh.

CONFIDENTIAL

Page 373

Q.   And I'm going to ask you to report this user as being underage.

MR. CHAPUT:  I'm going to object to this exercise.  Is counsel intending to introduce this phone into evidence?

MR. OLSZEWSKI-JUBELIRER:  The video will be in evidence.  If counsel would like to examine the phone or contest that the app has somehow been altered or anything, we're happy to have the conversation off the record.

But I'm going to ask the witness to demonstrate the reporting flow that he has opined upon in his report.

MR. CHAPUT:  Go ahead, Dr. Memon.

THE WITNESS:  I have to make -- leave it connected or can I --

BY MR. OLSZEWSKI-JUBELIRER:

Q.   Yes, you have to leave it connected so we can see it on the screen and record it.

A.   So what's the name of the user?

Q.   Can you scroll down to -- you see the user with the username jellyfish and there's an underscore.

Do you see that?

A.   Why.

CONFIDENTIAL

Page 374

Q.   Can you report that user for being under 13?

A.   "Report."

Q.   So now you're on the screen that you just clicked on the post and you clicked "report," right? Now you're on a screen that says "report." And it says, "Why are you reporting this comment?" Right?

A.   That's right.

Q.   Can you -- can you report this user as being under 13?

MR. CHAPUT:  Object to the form.

THE WITNESS:  I don't see it.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   You don't see how to report this user as being under 13, right?

A.   "False information."

Q.   Okay.  So you've clicked on "false information," right?

A.   Uh-huh.

Q.   And now it says, "Why are you reporting this comment?"

A.   "Something else."

Q.   Okay.  You clicked on "something else."

Do you see where you can report this user as being under 13 on this screen?

CONFIDENTIAL

Page 375

A.    "Block jellyfish."

Q.    Okay.  That's blocking the account.

A.    Right.

Q.    Is blocking the account the same as reporting them as being under 13?

MR. CHAPUT:  Object to the form. Foundation.

THE WITNESS:  I don't understand what blocking means.  That's communication to me that they can't talk to me, my personal block, is it?

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.

A.    Is it?  I don't know what this blocking means in this context.

Q.    Okay.  Do you understand blocking to be the same thing as reporting them as being under 13?

MR. CHAPUT:  Object to the form. Foundation.

THE WITNESS:  I'm not sure of it.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    You don't know?

A.    No.

Q.    Okay.  And you have -- you opine that the reporting flow, underage reporting flow on Instagram is reasonable, right?

CONFIDENTIAL

Page 376

MR. CHAPUT:  Object to form. Characterization.

THE WITNESS:  I opine that a reporting flow that takes some amount of friction is reasonable, yes.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    You opine that Meta's reporting flow for Instagram specifically is reasonable, right, not a hypothetical reporting flow that takes some amount of friction, right?

MR. CHAPUT:  Object to the form.

THE WITNESS:  The question was Meta.  And I recall seeing screens maybe for Facebook or something.  I don't -- or the picture screen that was there, you know, if it said age.  So my interpretation -- I didn't go live to the app and try to report someone.

My job was not investigative.  My job was to talk about the procedures, what they use, the algorithms, the principles, and in that sense I said friction is a good thing, yes, for reporting.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Your opinion is that Meta's reporting flow with the amount of friction it has is reasonable, right --

Page 377

MR. CHAPUT:  Object to the form.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    -- for underage users on Instagram?

MR. CHAPUT:  Object to the form.

THE WITNESS:  My opinion is that friction is reasonable.  I did not specify a specific amount when I say Meta uses friction.  That's a reasonable thing.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    You don't have an opinion that Meta's underage reporting flow has a reasonable amount of friction?

MR. CHAPUT:  Object to form. Characterization.

THE WITNESS:  No.  I said given that Meta has friction, that's a reasonable thing to do in the design.  What Meta has done is reasonable if it has put some friction in the flow.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    And you couldn't opine that Meta's reporting flow is reasonable because -- you couldn't opine that Meta's reporting flow has a reasonable amount of friction for underage users on Instagram because you don't even know how to report underage users on Instagram, right?

CONFIDENTIAL

Page 378

MR. CHAPUT:  Object to the form. Characterization.

THE WITNESS:  So the information I was relying on was the seven screens to complete.  And I think there was some screens that were shown in the documentation that I received.  And I relied on that.

BY MR. OLSZEWSKI-JUBELIRER:

Q.  You've just tried to report this user as being under 13, right?

MR. CHAPUT:  Object to form.

BY MR. OLSZEWSKI-JUBELIRER:

Q.  Correct?  That's what you tried to do, right?

A.  This particular page I tried to report, I could not find that easily.  I missed it.

Q.  You couldn't figure out how to report them as under 13, right?

MR. CHAPUT:  Object to the form.

THE WITNESS:  I -- I missed it, yes.

BY MR. OLSZEWSKI-JUBELIRER:

Q.  Okay.  Can you hand me the phone back, please.

So you've blocked the user so we can't find them again.  But I'm going to go back to -- I'm

CONFIDENTIAL

Page 379

going to unblock them if I can.

I may not be able to do that easily.

Did you try reporting underage users on Facebook in the course of opining about the reasonableness of their reporting flow on Facebook?

MR. CHAPUT:  Object to the form.

THE REPORTER:  Your answer?

THE WITNESS:  No, I opined that friction is good for reporting and in a -- from a security point of view.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   You didn't -- you don't have an opinion that the amount of friction that Facebook uses for its underage reporting flow is reasonable?

MR. CHAPUT:  Object to form. Characterization.

THE WITNESS:  So objections I had seen was about seven screens to complete for example, right. And the other things that I had seen were screenshots, I think in my documents, about what the reporting looks like.  And I didn't think I had to go in and try and report someone.

My job was not investigation but simply talking about friction being reasonable.

///

Page 380

BY MR. OLSZEWSKI-JUBELIRER:

Q.   You didn't try to see how much friction there was on the underage reporting flow on Instagram or Facebook?

MR. CHAPUT:  Object to form. Characterization.

THE WITNESS:  As I said, that was not my scope.  And I just wanted -- just made the statement that friction is reasonable.

MR. OLSZEWSKI-JUBELIRER:  All right.

Let's go off.  Can we go off the record briefly?

THE VIDEOGRAPHER:  Time is 6:35.  We're off the record.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER:  The time is 6:40. We're back on the record.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   Okay. Dr. Memon, we're back.  We have a different iPhone with a different Instagram account on it but we're back at the same page.

Do you see that?  Do you see that comment from user jellyfish underscore and there's a number?

A.   That's right.

Q.   And it says, "I'm 10"?

CONFIDENTIAL

A.   Uh-huh.

Q.   Okay.  So if it's all right with you I'm going to --

A.   Do it yourself.

Q.   -- give you a -- sure.  Why don't I take one step and we'll see how far we get, okay.

So you tried to report this user but you ended up blocking them, you weren't able to report them as being underage, right?

MR. CHAPUT:  Object to the characterization.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   Correct?

A.   I tried to -- I tried to navigate my way through a totally unfamiliar platform on an app that I've never seen before and not designed for sort of people -- so it -- and I couldn't find that.  I probably clicked -- clicked something to begin with.

Q.   Okay.  And this is an app, just to be clear, that you were paid tens of thousands of dollars to write an expert report about how reasonable it is how Meta designs the process to report underage users, right?

MR. CHAPUT:  Object to the form. Characterization.  Argumentative.

CONFIDENTIAL

Page 382

THE WITNESS: So my sort of thinking was there's a web form available on the web that I can go to. I understand web forms. And that has a few steps to report and -- and that requires you to provide some concrete information that you're reporting about -- on the person you're reporting about. And concrete information about you as well, right. And -- and I thought that friction and I believe, right, that that friction is good and reasonable.

Now, I did not make a comment about how apps have been designed or what happens when you're going through the app or things of that sort.

BY MR. OLSZEWSKI-JUBELIRER:

Q. You did, actually. In your report, Dr. Memon, in paragraph 73, we just read it, it says, "Plaintiffs' experts also express concern about the friction involved in the user reporting form, noting that the report involves '7 screens' to complete." Right?

And those seven screens are involved in the in-app reporting flow, right?

A. Yeah.

Q. Okay.

A. So -- and that was based on the page

Page 383

printout I had.

Q. Okay.

A. That was a printout I had in some document that you provided.

Q. All right.

A. Interface.

Q. So let's return back to the Instagram app.

Okay. I'm going to click on -- you tried to report this comment, okay. Instead I'm going to click on the username, all right, we've come to the user's profile page and I'm going to ask you to report this user as being under 13. So this is the user with the username jellyfish underscore and there's a number, right?

A. Yeah.

Q. Okay. Can you report this user as being under 13, please?

MR. CHAPUT: Same objection to the exercise.

But continue.

THE WITNESS: So -- Junie B. No. Jellyfish. "Report."

BY MR. OLSZEWSKI-JUBELIRER:

Q. Okay. So you clicked on the three -- the ellipsis.

Page 384

A.    Yes.

Q.    You clicked "report."

A.    Yes.

Q.    Okay.

A.    "It may be under 13."

Q.    Okay.  So you clicked "It may be under 13" and now you click -- now you're on a page that says, "About reporting a child under the age of 13."

And you've exited out of that.  We're back in the reporting flow again.  You clicked "report" and clicked "It may be under the age of 13."  Right?

A.    Right.

Q.    And now, what did you click just there?

Okay.  We're back in the flow again.  Now you're on this page that says, "About reporting a child under age of 13."

How do you report this user as being under 13?  Okay.  So you clicked "learn more" at the bottom.

Now you're on Instagram's help center.

What did you click just there?

A.    "Fill out the form."

Q.    So now you're on Instagram's web form?

A.    Yeah.

Q.    And the first piece of information asks

Page 385

for the username of the account you'd like to
report, right?

A.    Right.

Q.    What's the username of the account that
we're reporting?

A.    Somebody random.  I don't remember.

Q.    You don't even remember, right?

A.    No.

Q.    It starts with "jellyfish."

A.    If I'm reporting I would -- I would know.

Q.    You would know the exact sequence of
numbers after the underscore in this account?

MR. CHAPUT:  Object to the form.

THE WITNESS:  It's a fair assumption to
say that if I'm reporting someone and trying to get
them blocked I should know the username.  Otherwise
I'm just reporting random user names.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  It doesn't prefill the username for
you, right, in this form?

A.    No.  No.

MR. CHAPUT:  Object to the form.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  Can you go back and get the
username?  If you saw a user on Instagram who posted

Page 386

a comment that said "I'm 10 years old" and you wanted to report them because you wanted to participate in Meta's process for detecting under-13 users --

A.    Right.  Right.

Q.    -- and you went through this reporting flow, now you're at this stage.

A.    And I think that is where the friction comes in.  These are reports by people who just saw someone making a comment.  Which could be frivolous. And if I allow all such actions to go through, that's what burdens my system.  So I want to -- I mean, it makes sense to provide a flow that where I actually know what I'm talking about.  I know the person.

And that's why I know that they are underage.  Otherwise, just because somebody claims they're underage doesn't prove that they're underage.  And you can't go around on sort of Union Square pointing at people, say, hey, this person is underage, this person is illegal, or this person is that.  It has to be some knowledge about it.  And I think that's not unreasonable.

Q.    You think it's reasonable for Meta to deter users who are acting in good faith to see

another user claim to be under the age of 13, you think it's reasonable for Meta to deter those people from telling Meta that there's an underage account on Instagram?

A.    Yes.

MR. CHAPUT:  Object to form.  Incomplete hypothetical.

THE WITNESS:  It's reasonable for Meta to put in some friction, right, that -- just because one observation that is bordering on frivolous, right, I have no further evidence to start making all these accusations about them and starting an entire review process.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    If you had looked at the photos on this account and you determined in your -- personally that you thought --

A.    Yeah.

Q.    -- this user was under 13 do you think it would be reasonable to report them to Meta?

MR. CHAPUT:  Object to the form. Incomplete hypothetical.

THE WITNESS:  If I looked at it and I had seen something very bad, then I would have noted down the name and I would have noted down some more

information and report it, right, because now I have sufficient reason to report.

The whole business of reporting, which is called a denial of service attack, is such a problem, right. That it's known in literature that always reporting should have some friction. Otherwise, you can bring systems down. You can choke a legitimate system by filing reports that are just intentionally frivolous or malicious.

BY MR. OLSZEWSKI-JUBELIRER:

Q. Okay. Let me ask you another question.

Within this hypothetical, we talked about, same account, you see a comment that says, "I'm 10 years old." You look at the account. There's underage -- photos of someone, a person who looks like they're under 13 to you, right. In that situation would you know that user's date of birth?

MR. CHAPUT: Object to the form. Incomplete hypothetical.

THE WITNESS: So -- so --

BY MR. OLSZEWSKI-JUBELIRER:

Q. Yes or no?

A. That needs to not be no. That may still not be enough reason, right, because I think that requiring someone to actually know something about

the user before they report them is a more sort of sensible way of allowing reporting that's open to anybody, right. You can go and you can have automated bots scraping things and reporting it. So there has to be some basis behind that reporting, which is more than what I just saw.

Q. Okay. So that's not the answer to my question.

My question was, in the hypothetical that I gave you, this is the same account. You see a comment that says, "I'm 10 years old." You look at the account photos. All the account photos are of a person that looks like they're under 13.

A. Yes, so --

Q. You would not know that user's date of birth, right?

MR. CHAPUT: Object to form. Incomplete hypothetical.

THE WITNESS: Yes, so then I, first of all --

BY MR. OLSZEWSKI-JUBELIRER:

Q. Yes or no, Dr. Memon? You wouldn't know that user's date of birth, right?

A. I would not know his date of birth, yes.

Q. Okay. And your testimony is that friction

Page 390

is good in this situation, right?

MR. CHAPUT:  Object to the form.
Characterization.

THE WITNESS:  Because I don't know the person at all, right.  I'm not a -- yeah, I --

BY MR. OLSZEWSKI-JUBELIRER:

Q.   Right?

A.   So what -- what is being done is, like, to report you have to demonstrate some knowledge of that person.

Q.   Okay.  And in this hypothetical, you know that the user has said they're ten years old.  And you know that the photos on the account look like the child under 13.

Meta's form and flow for reporting that user as being under 13 is meant to deter someone in that situation from filing that report, right?

MR. CHAPUT:  Object to the form.
Characterization.

THE WITNESS:  I don't think it's meant to deter.  It's simply saying that if you're reporting someone, be responsible and know enough about it to report.  It's saying that -- that's what the -- so that it's -- because I would not be an expert to say, hey, this person is how many years old.  If

it's their picture, are they playing a prank or whatever, I have no idea.

If I have a friend that I know, are they -- their -- their sibling who's underage and if I know them, my reporting is sort of focused more on them.  Whether it's some interaction between -- there's some knowledge about that person.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Okay.  Let me ask you a different question.

If you were a malicious actor, right, and you wanted to report someone that you didn't think was under 13, right, you could enter a made-up date of birth, right?

A.    I could.

Q.    And you might in that situation, right, because you're motivated to try to --

A.    Right.

Q.    -- harass that person, right?

A.    Yeah.

MR. CHAPUT:  Object to the form.

THE WITNESS:  But I still have to enter my name, username, or something about myself as well, right.  And I have to go through seven screens in order to do it.  And if it was even somebody that I

CONFIDENTIAL

Page 392

know and I had argument with them and just to harass them, I simply want to lock them out and I can -- I know everything about them and I can report, like, just in a moment of -- sort of impulse, right.  So those things should be given pause to.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   On this form, aside from the username on the account, none of the information has to be true in order for Meta to process their report, right?

MR. CHAPUT:  Object to the form.

THE WITNESS:  I -- I'm not sure of that. Because some of the information Meta could verify and deal with the automated process.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   Does Meta verify any of the information in this form?

MR. CHAPUT:  Object to form.

THE WITNESS:  I don't know.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   Does Meta even consider any of the information in this form aside from the username being reported in evaluating reports of underage users?

MR. CHAPUT:  Object to the form.

THE WITNESS:  They go ahead and start an

CONFIDENTIAL

investigation, so...

BY MR. OLSZEWSKI-JUBELIRER:

Q.   That's not my question, Dr. Memon.

My question is, does Meta consider any of the information entered in this form aside from the username in evaluating reports of underage users?

A.   I -- I --

MR. CHAPUT:  Object to the form.

THE WITNESS:  I don't know.  But they still sent enough friction at it to cause some amount of pause.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   Dr. Memon, if Meta had a way to -- a change to its reporting flow that would result in five times more underage users detected than its current reporting flow, would it be unreasonable to not make that change?

MR. CHAPUT:  Object to the form. Incomplete hypothetical.  Calls for speculation.

THE WITNESS:  So five times more the users detected are based on 20 times more the users reported?  I mean, what is the -- is it detected or reported?

BY MR. OLSZEWSKI-JUBELIRER:

Q.   Five times more accounts detected as being

Page 394

underage?

A.   Okay.

MR. CHAPUT:  Object to the form. Incomplete hypothetical.

THE WITNESS:  It -- as I said, it also -- then they have to balance it with how much computation it costs doing that.  And in corresponding to that how many more for that same amount of resource were lost, were not being able to be detected, right.  So it -- so that also matters, right.

If I -- if I had a friction and out of 40 people, I -- and metadata that had -- testimony gives a percentage of age of people who get check-pointed.  And if that person's age sort of go up clearly, right, if there are more people to look at, but most of what will happen, the percentage goes up, other people who sort of -- I was not able to investigate, they get away, right, because I have only so much time and resources to indicate a report.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   Other people that you were not able to investigate for being underage; is that right?

MR. CHAPUT:  Object.

CONFIDENTIAL

Page 395

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Is that what you're talking about?

MR. CHAPUT:  Object to the form.

THE WITNESS:  Or other --

MR. CHAPUT:  Incomplete hypothetical.

THE WITNESS:  Or other investigations, right, bad behavior, whatever these resources are used for.  They get consumed.  And at some point, as that starts increasing, one sort of becomes completely ineffective.  There's a curve there that takes you to a point where you're -- you're running more cycles than achieving something better.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    What is a reasonable amount for Meta to spend to detect each additional underage user?

A.    I don't know.

MR. CHAPUT:  Object to the form. Incomplete hypothetical.

THE WITNESS:  I have no idea.  That's not my -- sort of -- that's not the focus of my testimony.  All I said was friction is good.

BY MR. OLSZEWSKI-JUBELIRER:

Q.    Would it be reasonable for Meta to not implement a change to its reporting flow that would cost $1 per additional underage user if it also

detected five times more underage users?

MR. CHAPUT:  Object to the form. Incomplete hypothetical.

THE WITNESS:  Detects five times more users at what cost?  Am I able to process them?  If the backlog, again, starts growing to millions, then what's happening to the people who are waiting that I didn't get to, right.  So that's -- one has to have an understanding of that.

And these denial of services attack, once you find an open sort of gate, there are actors on the internet who simply flood you, right.  And big companies have shut down for a few hours because of denial of service attacks.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   Has Meta experienced denial of service attacks on its in-app reporting flows --

MR. CHAPUT:  Object.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   -- for underage use?

MR. CHAPUT:  Object to the form.

THE WITNESS:  As far as I know, no.  But I say that because of these denial of service attacks I -- I put in some friction, right, so it sounds reasonable to me to have friction.

CONFIDENTIAL

Page 397

MR. OLSZEWSKI-JUBELIRER:  Let's go off the record.

THE VIDEOGRAPHER:  Time is 6:59.  We're off the record.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER:  Time is 7:11.  We're back on the record.

MR. OLSZEWSKI-JUBELIRER:  I just wanted to state for the record that two videos that were created from this screen recordings of the iPhone that we used for Dr. Memon will be marked as Exhibits 13 and 14 to this deposition.

And we'll go back off the record.

(Whereupon, Meta-Memon Exhibit 13 and Meta-Memon Exhibit 14 were marked for identification.)

THE VIDEOGRAPHER:  Time is 7:11.  We're back off the record.

MR. OLSZEWSKI-JUBELIRER:  Okay.  Thanks.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER:  Time is 7:12.  We're back on the record.

EXAMINATION

BY MR. CHAPUT:

    Q.   Good evening, Dr. Memon.

Page 398

A.   Good evening.

Q.   I just have a few questions for you to clarify a few aspects of your testimony.

First, you were asked a question earlier today about the reasonableness of Instagram not using an age gate during the period of 2012 through 2019.

Do you recall that questioning?

A.   Yes.

Q.   Does your answer to that question change your overall assessment of the reasonableness of Instagram's age verification program holistically during that period?

MS. LANIER:  Object to form.

THE WITNESS:  So as I mentioned later, that Instagram simply not just lets people in, but there's layers after age gating, of reporting -- of monitoring, and et cetera, still are there.  Right. So -- so overall, it still remains reasonable.  And they -- they will end up -- it will have the similar action on people who falsely report and they're now faced with the same scrutiny and same processes that will get them detected.

BY MR. CHAPUT:

Q.   Dr. Memon, you were also asked some

Page 399

questions about the reasonableness of Meta's reviewers being instructed to close reports of under-13 users based on statements in the user's bio that they are over the age of 13.

Do you recall that questioning?

A. Yes. Yes.

Q. If you, in addition to the facts that you were asked to assume in that question, also assume that there is a high volume of under-13 reports and a high percentage of false reports and in particular a high percentage of false reports by teens harassing one another in the United States, would your answer to the question that was posed earlier today be the same?

MS. LANIER: Object to form.

THE WITNESS: So with that information, it would seem reasonable because, again, it's the same argument as friction, right. And if they are sort of -- if -- if Meta has seen this pattern over and over again, they -- they understand what heuristics to use. As I said about other aspects of the reviewer as well. And so it's -- makes sense that having observed this, they make a decision that, no, we're not going to look at this because most of them are false positives.

CONFIDENTIAL

Page 400

MR. CHAPUT:  Thank you, Dr. Memon.

I don't have any further questions.  We can go off the record.

MS. LANIER:  I can stay here.

MR. CHAPUT:  Okay.

MS. LANIER:  How much time was that?

THE VIDEOGRAPHER:  Three minutes.

MS. LANIER:  Okay.

EXAMINATION

BY MS. LANIER:

Q.  You ready?  You ready?

A.  Yeah.

Q.  Okay.  Dr. Memon, you just testified about a hypothetical that there is a high volume of under-13 reports, true?

A.  Yes.

Q.  Okay.  What's that -- do you know what that number is for any given year on Instagram or Facebook?

MR. CHAPUT:  Object to the form.

THE WITNESS:  I made the statement based on Allison Hartnett's testimony.

BY MS. LANIER:

Q.  Yes, but I'm asking you, do you know the number; yes or no?

Page 401

A.   I don't recall --

MR. CHAPUT:  Object to the form.

BY MS. LANIER:

Q.   Okay.  You don't recall the number.

THE REPORTER:  Wait.  You know what, I can't hear you.

THE WITNESS:  Okay.  This is not working?

(Whereupon, a brief discussion off the record.)

BY MS. LANIER:

Q.   All right.  You also answered a question about a high percentage of false reports by teens harassing one another in the United States.

Do you know the number?

A.   No.

MR. CHAPUT:  Object to the form.

BY MS. LANIER:

Q.   Okay.

A.   It's based on Hartnett's testimony.

Q.   Right.  But do you know the number?

MR. CHAPUT:  Object to the form.

THE WITNESS:  No.

BY MS. LANIER:

Q.   Did you independently look for any information on that before you rendered the opinion

Page 402

that friction is important because of these false reports?

MR. CHAPUT: Object to the form. Argumentative.

THE WITNESS: I know as a principle that friction is important in reporting in most applications where there's such a high volume and a large number of users.

BY MS. LANIER:

Q. Did you -- did you personally undergo a review of how many false reports there are?

A. I --

MR. CHAPUT: Object to the form.

THE WITNESS: I did not expect to get that information.

BY MS. LANIER:

Q. But did you -- so the answer's no?

A. No.

Q. Okay. You know, on one end of the spectrum when you're evaluating risk, there is the importance, according to you, of friction because of high volume or potential, I guess, for harassment, that kind of thing?

A. Right. Right.

Q. You don't know the actual number of -- of

Page 403

however many people are falsely harassed specific to getting reported that they're underage, do you?

MR. CHAPUT:  Object to the form. Argumentative.

THE WITNESS:  As I said before, I've answered this, is that my statement is based on Ms. Hartnett's testimony that there's a large volume, and I don't remember.

BY MS. LANIER:

Q.   But you don't know what that number is?

A.   No.

Q.   You're just taking her word for it --

MR. CHAPUT:  Object to the form.

BY MS. LANIER:

Q.   -- that there's some high number.

MR. CHAPUT:  Object to the form. Argumentative.

THE REPORTER:  Your answer?

THE WITNESS:  Yes.

BY MS. LANIER:

Q.   Okay.  And on the other end of the spectrum in terms of risk, if there is too much friction, then people will not report under-13-year-olds on the apps, true?

MR. CHAPUT:  Object.

CONFIDENTIAL

Page 404

BY MS. LANIER:

Q.   It's a risk in the other direction, right?

MR. CHAPUT:  Object to the form. Incomplete hypothetical.

THE WITNESS:  I don't know that as a fact. People who see something that they morally, consciously object to, and they know the person, then they will take effort to report, is my thinking.

BY MS. LANIER:

Q.   So is it your opinion somebody needs to know the person before they report them for being underage?

MR. CHAPUT:  Object to the form.

THE WITNESS:  Yes.

BY MS. LANIER:

Q.   Okay.

A.   They would.

MS. LANIER:  All right.  How much time do I have?

MR. CHAPUT:  It's been three minutes.

MS. LANIER:  All right.  Okay.  I'm done.

MR. CHAPUT:  Counsel, I believe you had notes to mark?

MS. LANIER:  Oh, yeah, you're right.  Oh,

CONFIDENTIAL

Page 405

wait.  Hold on.  I'm sorry.  Back on.  Hold on. Hold on.  Hold on.

MR. OLSZEWSKI-JUBELIRER:  Can I just --

MS. LANIER:  Well, I needed to ask those questions.

MR. OLSZEWSKI-JUBELIRER:  Yes.

MS. LANIER:  Before we go back on.  Okay.

MR. OLSZEWSKI-JUBELIRER:  Great.  Okay.

MR. CHAPUT:  We're still on the record.

MR. OLSZEWSKI-JUBELIRER:  Okay.

MS. LANIER:  So you want to go off?

MR. OLSZEWSKI-JUBELIRER:  Let's go off.

MS. LANIER:  Let's go off for a second.

THE VIDEOGRAPHER:  Time is 7:19.  We're off the record.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER:  Time is 7:25.  We're back on the record.

EXAMINATION

BY MR. OLSZEWSKI-JUBELIRER:

Q.   Dr. Memon, you testified that you relied on Allison Hartnett's testimony about the number of false reports, right, of underage users?

MR. CHAPUT:  Object to form.

THE WITNESS:  I mentioned that the data

there or information there that came to my mind, yes.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   Okay.  And by false, that means the reports, the accounts reported were ultimately not check-pointed, right?

MR. CHAPUT:  Object to the form.

THE WITNESS:  That's right.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   Okay.  It doesn't mean that the reports were malicious, right, it just means that they -- maybe when Meta reviewed them it ultimately didn't checkpoint them, right?

MR. CHAPUT:  Object to the form.

THE WITNESS:  Either they were malicious, uninformed, ignorant, they were just wrong.  Right.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   Or there was a problem with Meta's review process, right?

MR. CHAPUT:  Object to the form.

THE WITNESS:  That could be a cause, too, yes.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   Okay.  And so in the hypothetical that counsel gave you when counsel, your counsel,

Page 407

mentioned assume that there are a high number of false reports.  In terms of Meta's actual data about the number of false reports, Meta just knows the number of reports it doesn't checkpoint, right?

MR. CHAPUT:  Object to form. Characterization.

THE WITNESS:  Meta knows the number of reports.  And the ones that don't get check-pointed would be reasonably close to the ones that were wrong.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   But counsel's question was about a particular part of the review flow that you had testified before was unreasonable, right?

MR. CHAPUT:  Object to form. Characterization.

THE WITNESS:  Yes.  Allowing -- counting something as okay if the age listed there was 14 or 13, whatever.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   Right.  And if -- under Meta's review flow if someone listed their age as being 14 on their bio --

A.   That's right.

Q.   -- Meta would not checkpoint them, right?

CONFIDENTIAL

Page 408

MR. CHAPUT:  Object to the form.

THE WITNESS:  That's right.  That's what is mentioned in the review flow.

BY MR. OLSZEWSKI-JUBELIRER:

Q.  And that would mean Meta would classify that report as being false, right?

MR. CHAPUT:  Object to the form.

THE WITNESS:  False.

BY MR. OLSZEWSKI-JUBELIRER:

Q.  Well, you just testified that Meta's only understanding of what false reports are is the reports --

A.  Sure.

Q.  -- that are not check-pointed.

A.  Sure.

Q.  Right?

MR. CHAPUT:  Object to the characterization.  And to form.

BY MR. OLSZEWSKI-JUBELIRER:

Q.  So Meta's evidence in this hypothetical would be limited just to the number of reports that Meta's review flow doesn't checkpoint, right?

MR. CHAPUT:  Object to form.

THE WITNESS:  That could be one piece of evidence, right.  That's what -- but there could be

CONFIDENTIAL

more where they actually have specific instances of large-scale false reports and things like that, right.

BY MR. OLSZEWSKI-JUBELIRER:

Q.   That's not what --

A.   No.

Q.   -- what Ms. Hartnett testified about, right?

A.   Yes.

Q.   That you relied on that you understood to be Meta's understanding of false reports, right?

A.   Yes.

MR. CHAPUT:  Object to the form.

THE WITNESS:  Yes.

MR. OLSZEWSKI-JUBELIRER:  We can go off the record.

THE VIDEOGRAPHER:  Are we done?

MR. OLSZEWSKI-JUBELIRER:  I'm done.  Yeah. Thank you.

MS. LANIER:  I'll ask a couple questions.

THE VIDEOGRAPHER:  Time is 7:28.  We're off the record.

(Whereupon, a brief recess was taken.)

THE VIDEOGRAPHER:  Time is 7:30.  We're back on the record.