# Exhibit L

[*Submitting Counsel on Signature Page*]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THIS DOCUMENT RELATES TO: | MDL No. 3047 |
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION | Case Nos. 4:22-md-03047-YGR-PHK |
| | 4:23-cv-05448-YGR |
| ------------------------------------------------------------- | **LETTER BRIEF BY THE STATE ATTORNEYS GENERAL REGARDING TRIAL STRATEGY** |
| *People of the State of California, et al. v. Meta Platforms, Inc., et al.* | |
| | Judge: Hon. Yvonne Gonzalez Rogers |
| | Magistrate Judge: Hon. Peter H. Kang |

state laws. Although the states' respective legal standards are substantively aligned such that any potential prejudice is minimal, the process outlined above, including individual jury instruction packets, ensures that any conceivable prejudice or juror confusion is eliminated.

### A. The Same Evidence Will Prove Meta's Misconduct in Every State

All categories of evidence are relevant as to all consumer protection states. As alleged—and as the State AGs will prove—Meta has engaged in massive, pervasive nationwide misconduct. In an effort to stay relevant and maintain growth of its platforms, Facebook and Instagram, Meta's business model depends on obtaining, retaining, and engaging teens to spend time on those platforms. As part of this strategy, Meta's platforms provide its young users with capabilities and features designed to promote this growth and encourage increased use of its platforms, all while Meta knows of serious, documented harms relating to using its platform and these features. Sixteen State AGs have remaining claims asserting that this conduct amounts to unfair business acts or practices with respect to four of Meta's platforms' features: appearance-altering filters, time restriction tools, the multiple accounts function, and ineffective age verification tools. Aware of the potential negative brand impacts from the perception that its platforms were addictive or unsafe, Meta engaged in a concerted campaign to downplay the risks of its platforms, which 18 State AGs allege constitute deceptive business acts or practices. There is no evidence that Meta's unfair conduct varies meaningfully from state to state, and the same deceptive statements and omissions apply to all states' claims. Accordingly, a single trial will be sufficient to prove all state consumer protection claims.

### 1. Evidence Supporting the State AGs' Unfairness Claims

The State AGs' unfairness claims will rely upon a universal body of evidence across the sixteen states' claims premised on unfair business acts or practices. These claims concern four discrete features: appearance-altering filters, time restriction tools, the multiple accounts function, and Meta's age verification tools.

First, regarding appearance-altering filters, the State AGs have robust evidence of deliberate actions taken at the very top of Meta where executives, specifically Mark Zuckerberg himself, chose to disregard company-solicited expert research and feedback regarding the negative effects of appearance-altering filters, especially on teenage girls. Instead, Mr. Zuckerberg directed that a temporary ban on

cosmetic surgery filters be rescinded and that users of all ages be permitted to use even filters depicting "nip and tuck" plastic surgery effects. Why? He thought the ban was paternalistic and that removing it would be in the interests of platform growth, and purportedly, innovation and expression. But other executives at Meta—notably, those with teenage daughters themselves—opposed lifting that ban, or at least, preferred less dramatic alternatives where such filters might not have been available to users under certain ages. The harms ascribed to these filters include body dysmorphia, eating disorders, anxiety and depression—the last two of which are known preconditions for suicidality. These harms are described by experts retained by Meta internally prior to litigation, internal company research conducted by Meta, witness testimony, and the State AGs' experts in this case.

Second, regarding Meta's time restriction tools, the State AGs plan to submit evidence that these tools are insufficient to mitigate the excessive and unhealthy usage of Meta's platforms. Meta's tools like Sleep Mode, Quiet Mode, Take a Break, Daily Limit, and Teen Accounts rely on teens exercising self-regulation, which Meta knows is a vulnerability of its teen users and their underdeveloped prefrontal cortex, or alternately, it requires teens to voluntarily cooperate with their parents. Even with that cooperation, other features of Meta's platforms like the multiple accounts feature permit users to avoid parental detection and circumvent time restriction tools. Meta's time restriction tools typically either send users a notification regarding their time spent on the platform at certain intervals or do not send notifications during certain hours. But those tools do not effectively restrict time spent on the platform because at no point does Meta actually restrict use of its platforms. These tools are dismissible and do not constitute a meaningful amount of friction designed to reduce platform usage in light of other features on the platform encouraging use. This is particularly problematic given internal communications, research, and testimony discussing paltry adoption rates for these tools, teens' lack of self-control, teens having an addict's narrative about their social media use, and feedback from young users and high time-spent users that they desired effective time restriction tools at higher rates than older users and users with lower time spent.

Third, regarding Meta's multiple accounts function, Meta estimated at one time that its teen users had secondary, "Finsta," or "Spam" accounts on its platforms at over double the rate as did adults. The State AGs will rely on internal research, communications, and witness and expert testimony to show how

6

Meta thought secondary accounts drove increased usage; how Meta knew that teens used this feature to avoid parental supervision; how multiple, unconnected accounts could limit the efficacy of its time restriction tools; how multiple accounts might encourage risky behavior or facilitate inappropriate contacts; and how multiple accounts can exacerbate mental health harms and stimy development when used in conjunction with curated, public-facing "main" accounts on Meta's platforms.

Fourth, regarding Meta's age verification tools, Meta fails to employ processes which either effectively prevent children under age 13 from joining or using Instagram and Facebook or effectively detect and remove those children and their data after they joined. For example, Meta has failed and continues to fail to remove multiple accounts belonging to child users it has identified, including failing to remove accounts hard-linked to child user accounts prior to at least December 2021, and continuing to fail to remove accounts soft-matched to child users' accounts. Meta further fails to take measures to prevent child users whose accounts it detects and disables from creating new accounts on Facebook and Instagram, and Meta employs deficient processes for reviewing reports of children under 13 on its platforms, including because the review process ignores evidence of children admitting that they are underage. These deficient age verification tools exist in the face of research showing a myriad of negative mental health outcomes from using Meta's platforms, like anxiety, depression, insomnia, impaired sleep, eating disorders, suicide, and a host of other negative outcomes—all of which are particularly acute for kids under age 13. Internal communications, company research, and employee and expert testimony will prove these violations.

### 2.      Evidence Supporting the States' Deception Claims

Meta's deceptive practices were similarly universal. Aware that public concern over its platform's health and safety risks threatened its brand, Meta engaged in a nationwide messaging campaign to downplay these risks, which the State AGs will show misled reasonable consumers. The State AGs will enter into evidence Meta's "internal narrative audit" and messaging tests, where the company sought to craft the optimal messaging to quiet widespread consumer concern about its platforms' addictiveness and safety impacts for teens. The State AGs will also provide dozens of examples of statements by high-level Meta executives mirroring these internal messaging guidelines, which all worked together to create misleading impressions along four overarching themes.