Ashley M. Simonsen (Bar No. 275203)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, California 90067
Telephone: (424) 332-4800
Facsimile: (424) 332-4749
Email: asimonsen@cov.com

*Attorneys for Defendant Meta Platforms, Inc.*
*f/k/a Facebook, Inc.*

*[Additional counsel listed on signature pages]*

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates To:<br><br>*People of the State of California, et al. v. Meta Platforms, Inc. et al.* | MDL No. 3047<br><br>Case Nos.: 4:22-md-03047-YGR<br>4:23-cv-05448-YGR<br><br>**META'S SUBMISSION REGARDING STATE AGS' PENALTY AND DISGORGEMENT CHARTS AND SUPPORTING MATERIALS, ECF 444 (3218)** |

# TABLE OF CONTENTS

INTRODUCTION....................................................................................................................... 1

ARGUMENT............................................................................................................................... 1

I.      The AGs' Monetary Claims Are Not Linked to Wrongful Conduct or Supported by the Record.......................................................................................................................... 1

        A.      Monetary Relief Must be Linked to Wrongful Conduct.................................... 1

        B.      The AGs' Monetary Relief Calculations Are Not Linked to Alleged Violations or Supported by Evidence.................................................................. 5

II.     The AGs Impermissibly Seek Duplicative Recoveries................................................... 15

        A.      The Law Does Not Permit Double Recovery.................................................... 15

        B.      The AGs Seek Multiple Recoveries for the Same Alleged Violations. ........... 17

III.    The AGs Seek Unsubstantiated Damages Wholly Disproportionate to Any Offense. ........................................................................................................................... 19

IV.     The Court Should Determine the Appropriate Monetary Relief Based Solely On Opinions Contained in the Experts' Reports. ................................................................. 23

V.      Meta Should Receive Updated Depositions of the Three Experts Most Relevant To These Calculations. ....................................................................................................... 26

CONCLUSION .......................................................................................................................... 27

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Akins v. Texas*,
　325 U.S. 398 (1945)................................................................................................17

*Alphonso v. Pitney Bowes, Inc.*,
　356 F. Supp. 2d 442 (D.N.J. 2005) ........................................................................22

*Am. Nat'l Univ. of Ky., Inc. v. Commonwealth ex rel. Beshear*,
　2019 WL 2479608 (Ky. Ct. App. June 14, 2019) (unpublished)............................2, 3, 5, 7, 16

*BMW of N. Am., Inc. v. Gore*,
　517 U.S. 559 (1996)..................................................................................................4

*DeSimone v. Springpoint Senior Living, Inc.*,
　256 N.J. 172, 306 A. 3d 1276 (2024)......................................................................21

*DiPirro v. Bondo Corp.*,
　153 Cal. App. 4th 150 (2007) .................................................................................25

*Doe v. D.M. Camp & Sons*,
　624 F. Supp. 2d 1153 (E.D. Cal. 2008)...................................................................16

*Edgerly v. City & Cnty. of San Francisco*,
　713 F.3d 976 (9th Cir. 2013) ....................................................................................3

*EEOC v. Waffle House, Inc.*,
　534 U.S. 279 (2002)................................................................................................17

*Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*,
　2016 WL 11784406 (C.D. Cal. Nov. 7, 2016).........................................................24

*FTC v. Bronson Partners, LLC*,
　654 F.3d 359 (2d Cir. 2011)....................................................................................14

*FTC v. Green Equitable Sols.*,
　2024 U.S. Dist. LEXIS 64339 (C.D. Cal. Feb. 2, 2024).........................................14

*In re Gen. Motors LLC Ignition Switch Litig.*,
　407 F. Supp. 3d 212 (S.D.N.Y. 2019).....................................................................16

*Granelli v. Chicago Title Ins. Co.*,
　2012 WL 2072648 (D.N.J. June 8, 2012) ...............................................................16, 17, 20

*Hale v. Morgan*,
　22 Cal. 3d 388 (1978) .............................................................................................21

iii

META'S SUBMISSION REGARDING STATE AGS' PENALTY AND DISGORGEMENT CHARTS AND SUPPORTING MATERIALS, ECF 444
(3218)
4:22-md-03047-YGR; 4:23-cv-05448-YGR

*People ex rel. Harris v. Sarpas*,
  225 Cal. App. 4th 1539 (2014) ................................................................................3, 4

*Holmes v. Sec. Inv'r Prot. Corp.*,
  503 U.S. 258 (1992) .................................................................................................17

*Hyde Properties v. McCoy*,
  507 F.2d 301 (6th Cir. 1974) ...................................................................................24

*Illinois Brick Co. v. Illinois*,
  431 U.S. 720 (1977) .................................................................................................17

*Ivie v. Kraft Foods Glob., Inc.*,
  2015 WL 183910 (N.D. Cal. Jan. 14, 2015) ......................................................14, 15

*Kansas v. Nebraska*,
  574 U.S. 445 (2015).................................................................................................14

*People ex rel. Kennedy v. Beaumont Inv., Ltd.*,
  111 Cal. App. 4th 102 (2003) ................................................................................3, 5

*Kimmelman v. Henkels & McCoy, Inc.*,
  527 A.2d 1368 (N.J. 1987)..........................................................................................4

*Kugler v. Banner Pontiac-Buick, Opel, Inc.*,
  120 N.J. Super. 572, 295 A.2d 385 (Ch. Div. 1972)................................................24

*Kugler v. Romain*,
  58 N.J. 522, 279 A.2d 640 (1971)..............................................................2, 3, 5, 7

*Lexton-Ancira Real Estate Fund, 1972 v. Heller*,
  826 P.2d 819 (Colo. 1992).......................................................................................16

*May Dep't. Stores Co. v. State ex rel. Woodard*,
  863 P.2d 967 (Colo. 1993)........................................................2, 3, 5, 7, 16

*Meshinsky v. Nichols Yacht Sales, Inc.*,
  541 A.2d 1063 (N.J. 1988)..........................................................................................4

*Nationwide Biweekly Admin., Inc. v. Super. Ct.*,
  9 Cal. 5th 279, 462 P.3d 461 (2020) ......................................................................24

*People v. Bestline Products, Inc.*,
  61 Cal. App. 3d 879 (1976) ...........................................................................2, 4, 18

*People v. Custom Craft Carpets, Inc.*,
  159 Cal. App. 3d 676 (1984) .....................................................................................5

*People v. Dollar Rent–A–Car Systems, Inc.*,
  211 Cal. App. 3d 119 (1989) .....................................................................................4

iv

*People v. First Fed. Credit Corp.*,
   104 Cal. App. 4th 721 (2002) ...................................................................................24

*People v. Johnson & Johnson*,
   77 Cal. App. 5th 295 (2022) ...............................................................................2, 3, 12

*People v. Nat'l Ass'n of Realtors*,
   155 Cal. App. 3d 578 (1984) ...................................................................................4, 20

*People v. Overstock.com Inc.*,
   12 Cal. App. 5th 1064 (2017) ...................................................................................21

*People v. Shifrin*,
   342 P.3d 506 (Colo. App. 2014) ..................................................................................4

*People v. Superior Court (Jayhill Corp.)*,
   9 Cal. 3d 283 (1973) ............................................................................................2, 7, 16

*People v. Superior Court (Olson)*,
   96 Cal. App. 3d 181 (1979) ...........................................................................2, 13, 16, 21

*People v. Toomey*,
   157 Cal. App. 3d 1 (1984) ...........................................................................................2

*People v. Wunder*,
   371 P.3d 785 (Colo. App. 2016) .................................................................................20

*Pioneer Hi-Bred Int'l, Inc. v. Ottawa Plant Food, Inc.*,
   219 F.R.D. 135 (N.D. Iowa 2003) ..............................................................................25

*Platkin v. Kizito*,
   337 A.3d 354 (N.J. Super. Ct. App. Div. 2025).............................................................4

*Prata v. Super. Ct.*,
   91 Cal. App. 4th 1128 (2001) .......................................................................................4

*Pronman v. Styles*,
   2014 WL 2586340 (S.D. Fla. June 10, 2014) ............................................................22

*Ptaszynski v. Atl. Health Sys.*, Inc., 440 N.J. Super. 24, 111 A.3d 111 (N.J. Super. Ct.
   App. Div. 2015) ...........................................................................................................16

*Rosen v. Dick*,
   83 F.R.D. 540 (S.D.N.Y. 1979) ..................................................................................25

*S.E.C. v. Choice Advisors, LLC*,
   2024 WL 4469095 (S.D. Cal. Oct. 7, 2024) ...............................................................14

*S.E.C. v. First City Fin. Corp.*,
   890 F.2d 1215 (D.C. Cir. 1989)...................................................................................14

*S.E.C. v. Hughes Cap. Corp.*,
917 F. Supp. 1080 (D.N.J. 1996) ...................................................................................................14

*S.E.C. v. Platforms Wireless Int'l Corp.*,
617 F.3d 1072 (9th Cir. 2010) ................................................................................................13, 14

*S.E.C. v. Teo*,
746 F.3d 90 (3d Cir. 2014) .............................................................................................................14

*Skoldberg v. Villani*,
601 F. Supp. 981 (S.D.N.Y. 1985) ................................................................................................25

*Solem v. Helm*,
463 U.S. 277 (1983) ..........................................................................................................................4

*St. Louis, I.M. & S Ry. Co. v. Williams*,
251 U.S. 63 (1919) ..........................................................................................................................21

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
538 U.S. 408 (2003) ........................................................................................................................17

*State v. The Castle Law Group, LLC*,
2017 WL 3449241 (Colo. Dist. Ct. Apr. 4, 2017) ......................................................................20

*Stevens v. Motorists Mut. Ins. Co.*,
759 S.W.2d 819 (Ky. 1988) .............................................................................................................4

*Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*,
17 Cal. 4th 553 (1998) ..............................................................................................................16, 17

*Trident Int'l Corp. v. Commonwealth of KY*,
467 F.3d 547 (6th Cir. 2006) .........................................................................................................19

*Union Planters Bank v. L & J Dev. Co.*,
115 F.3d 378 (6th Cir. 1997) .........................................................................................................21

*United States v. Bajakajian*,
524 U.S. 321 (1998) ........................................................................................................................21

*W. Union Tel. Co. v. Pennsylvania*,
368 U.S. 71 (1961) ..........................................................................................................................17

*State ex rel. Weiser v. Ctr. for Excellence in Higher Educ., Inc.*,
2023 CO 23, 529 P.3d 599 (Colo. 2023) ................................................................................10, 25

**Statutes**

15 U.S.C. § 6501 ..............................................................................................................................19

Cal. Bus. & Prof. Code § 17206(b) ............................................................................................1, 16

Cal. Bus. & Prof. Code § 17536(b)......................................................................................1

Colo. Rev. Stat. § 6-1-112(1)(a) .......................................................................................1

Ky. Rev. Stat. § 367.990...................................................................................................1

N.J. Stat. Ann. § 56:8-13..................................................................................................1

**Other Authorities**

Black's Law Dictionary (12th ed. 2024).............................................................................3

Fed. R. Civ. P. 11............................................................................................................21

Fed. R. Civ. P. 26............................................................................................................23

## INTRODUCTION

Trial in this case is confined to the AGs' claims (1) that specific, identified statements by Meta were false or misleading, (2) that three specific design features were unfair practices, and (3) that Meta violated COPPA because it had "actual knowledge" of under-13 users or its services were "directed to children." This case is not an amorphous challenge over addiction or teen mental health untethered to those specific claims. For this reason, the AGs' claimed remedies are limited to UPA violations—if proven—arising out of the claimed deceptive statements, unfair features, and alleged COPPA violations.

Despite this, the AGs have not linked their claimed remedies to their alleged violations. They instead seek over one trillion dollars in penalties and disgorgement based on calculations that sweep in, and double count, every single teen who uses Meta's platforms, and every single month in which a teen uses Meta's platforms for more than a half-hour. *See* State AGs' Penalty and Disgorgement Charts and Supporting Materials ("Mot."), ECF 444 (3218). These remedies have no basis in the record in this case, are entirely unmoored from the claimed deceptive statements or unfair practices, are based on features this Court has held are immune from liability under Section 230, and violate the legal and due process limits on the scope of UPA penalties. For these reasons, and the reasons set forth below, Meta respectfully requests that the Court grant the relief specified at the end of this brief.

## ARGUMENT

I.    **The AGs' Monetary Claims Are Not Linked to Wrongful Conduct or Supported by the Record.**

A.    **Monetary Relief Must be Linked to Wrongful Conduct.**

Civil penalties are imposed "for each violation" of the consumer protection laws of California, Colorado, New Jersey, and Kentucky. *See* Cal. Bus. & Prof. Code § 17206(b) ("The court shall impose a civil penalty for *each violation* of this chapter."); *id.* § 17536(b) (identical language for FAL); Colo. Rev. Stat. § 6-1-112(1)(a) ("any person who violates or causes another to violate any provision of this article 1 shall forfeit and pay … a civil penalty … for *each such violation*."); N.J. Stat. Ann. § 56:8-13 ("Any person who violates any of the provisions of the act … shall … be liable to a penalty … for … *each subsequent offense*."); Ky. Rev. Stat. § 367.990 ("the Attorney General … may recover on behalf of the

Commonwealth a civil penalty of not more than … [t]wo thousand dollars ($2,000) *per violation*") (emphases added).

While courts decide "what amounts to a violation on a case-by-case basis," *People v. Johnson & Johnson*, 77 Cal. App. 5th 295, 352 (2022); Mot. at 3, that determination is governed by case law establishing that the counting of UPA violations must be tied or linked to the conduct giving rise to the violation. In particular, the case law recognizes two general approaches to counting UPA violations: based either on (a) the number of consumers "exposed to" or affected by the defendant's violations, or (b) the defendant's affirmative unlawful acts. *See, e.g.*, *People v. Super. Ct. (Jayhill Corp.)*, 9 Cal. 3d 283, 289 (1973) ("the number of violations is to be determined by the number of persons to whom the misrepresentations were made"); *May Dep't. Stores Co. v. State ex rel. Woodard*, 863 P.2d 967, 974 (Colo. 1993) (in CCPA case, "defin[ing] separate violations in terms of the *dissemination* of false and misleading information") (emphasis in original); *Am. Nat'l Univ. of Ky., Inc. v. Commonwealth ex rel. Beshear*, 2019 WL 2479608, at *7 (Ky. Ct. App. June 14, 2019) (unpublished) (employing second approach); *Kugler v. Romain*, 58 N.J. 522, 533, 279 A.2d 640, 646 (1971) (same). Both approaches link the counting of violations to the conduct that violated the statute.

Under the first approach, courts count violations by the number of consumers exposed to or affected by the defendant's violative acts. In *People v. Superior Court (Olson)*, 96 Cal. App. 3d 181, 198 (1979), the California Court of Appeal held that "[a] single publication constitutes a minimum of one violation with as many additional violations as there are *persons who read* the advertisement or who *responded* to the advertisement." (emphases added). The court declined to measure violations by the "circulation of the newspaper" because it would be "'unreasonable' to assume that the Legislature contemplated penalties of that magnitude for a false advertisement in a single edition of a newspaper." *Id.* at 196–97. So too in *People v. Bestline Products, Inc.*, 61 Cal. App. 3d 879, 903 (1976), where the court counted the "number of victims to which misrepresentations were made by each defendant," and found 3,000 violations, because "false and misleading representations [were] made to upward of 10,000 prospective distributors, 3,000 of whom in fact acted thereon to become direct or general distributors." *Id.* at 923. Other courts have counted violations by the sales of misleading coupons, *People v. Toomey*, 157 Cal. App. 3d 1, 23 (1984), or the number of consumers who "spoke with" defendants' sales

representatives reading a deceptive sales script, *People ex rel. Harris v. Sarpas*, 225 Cal. App. 4th 1539, 1567 (2014).

Under the second approach, courts count violations based on the "separate, affirmative act or decisions by the defendant" that constitutes an "act of misfeasance" under applicable law. *Am. Nat'l Univ.*, 2019 WL 2479608, at *6–7. In *Am. Nat'l Univ.*, the Kentucky Court of Appeal "provide[d] … guidance on how trial courts may impose sanctions 'per violation' under the KCPA for material published online," holding that "every KCPA violation must be based on separate, affirmative act[s] or decisions by the defendant" and "that in addition to the original publication, additional KCPA violations may be found whenever a defendant edits or adds substantive material … related to the information originally found to run afoul of the KCPA." *Id*. at *7–8. The California Court of Appeal applied the same logic in *People v. Ashford University LLC*, affirming the trial court's decision "to count each deceptive telephone call made by defendants as a separate violation." 100 Cal. App. 5th 485, 500 (2024); *see also Johnson*, 77 Cal. App. 5th at 352 ("count[ing] each deceptive … marketing communication as a separate violation"). And in *People ex rel. Kennedy v. Beaumont Inv., Ltd.*, 111 Cal. App. 4th 102, 128, 130 (2003), the trial court "count[ed] each of defendants' discrete unlawful acts as a separate statutory violation," awarding penalties for "each time defendants forced a tenant to accept the conditions of a long-term dealer lease." The New Jersey Supreme Court applied the same reasoning in *Romain*, 58 N.J. at 533, where the trial court held "that since the 24 contracts involved in the action were obtained through practices violative of [NJ CFA], a penalty of $100 in each instance or $2400 would be imposed upon defendant." *See also Woodard*, 863 P.2d at 974 ("defin[ing] separate violations in terms of the *dissemination* of false and misleading information") (emphasis in original).

Under either approach, courts tie the number of violations to the defendant's violative conduct. This is inherent in the word "violation" itself. *See* Black's Law Dictionary (12th ed. 2024) (defining "violation" as the "act of breaking or dishonoring the law"). Awarding for a "violation" without reference to the conduct giving rise to it would ignore the clear meaning of the term. *See Edgerly v. City & Cnty. of San Francisco*, 713 F.3d 976, 984 (9th Cir. 2013) ("[I]t is a settled principle of statutory construction, that courts should strive to give meaning to every word in a statute.") (citation omitted).

Imposing penalties that are untethered to the alleged violation would also run afoul of due process rights. The principle that the punishment imposed must derive from the legal wrong "is deeply rooted and frequently repeated in common-law jurisprudence." *Solem v. Helm*, 463 U.S. 277, 284 (1983); *see also BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 & n.24 (1996). The form of the "violation" may vary with the nature of the case, but the penalty must always be tied to the defendant's violative acts. *See, e.g.*, *Ashford*, 100 Cal. App. 5th at 500 ("count[ing] each deceptive telephone call made *by defendants* as a separate violation") (emphasis added).

None of the cases the AGs cite counts violations in a manner untethered to the defendant's proscribed conduct. Each of those cases discussing violation-counting links the penalty to the underlying legal wrong: counting the "number of victims to which misrepresentations were made by each defendant," *Bestline*, 61 Cal. App. 3d at 903; counting "each consumer" who "spoke with" defendants' sales representatives or "received [defendants'] marketing materials," when the sales script and materials were deceptive, *Sarpas*, 225 Cal. App. 4th at 1567; calculating penalties based on the "number of persons directly affected by *each act* of unfair competition," *People v. Nat'l Ass'n of Realtors*, 155 Cal. App. 3d 578, 585–86 (1984) (emphasis added); counting penalties based on "each unlawful offer and sale" by defendants that violated securities laws, *Platkin v. Kizito*, 337 A.3d 354, 357 (N.J. Super. Ct. App. Div. 2025); counting violations based on the number of "misleading and deceptive contracts" entered into and "false repair invoices" sent by defendant, *People v. Dollar Rent–A–Car Systems, Inc.*, 211 Cal. App. 3d 119, 132 (1989); and affirming award of penalties based on "549 ads" taken out by defendants and "thirteen representative consumers," "twelve of whom testified to having seen such ads," *People v. Shifrin*, 342 P.3d 506, 523 (Colo. App. 2014).

Many of the cases cited by the AGs do not address civil penalties or disgorgement at all. *See, e.g.*, *Prata v. Super. Ct.*, 91 Cal. App. 4th 1128, 1146 (2001) (ability of private UCL plaintiff to bring representative action); *Meshinsky v. Nichols Yacht Sales, Inc.*, 541 A.2d 1063, 1067 (N.J. 1988) (award of "cover" damages and prejudgment interest to NJ CFA private plaintiff); *Stevens v. Motorists Mut. Ins. Co.*, 759 S.W.2d 819, 821 (Ky. 1988) (meaning of "service" under KCPA); *Kimmelman v. Henkels & McCoy, Inc.*, 527 A.2d 1368, 1375 (N.J. 1987) (relief available under New Jersey Antitrust Act). And the cases cited by the AGs that discuss factors courts may consider in setting the *amount* of the civil penalty

4

META'S SUBMISSION REGARDING STATE AGS' PENALTY AND DISGORGEMENT CHARTS AND SUPPORTING MATERIALS, ECF 444
(3218)
4:22-md-03047-YGR; 4:23-cv-05448-YGR

per violation simply do not bear on how courts count the *number* of violations.  *See* Mot. at 4–6.[1]  Under the four States' laws, "the court must exact a penalty for *each* violation committed."  *People v. Custom Craft Carpets, Inc.,* 159 Cal. App. 3d 676, 686 (1984) (emphasis in original).  Subject to statutory limits, "[t]he amount of each penalty, however, lies within the court's discretion."  *Id.*

**B.      The AGs' Monetary Relief Calculations Are Not Linked to Alleged Violations or Supported by Evidence.**

This case involves three categories of violative conduct.  The AGs' deception claims challenge certain statements by Meta that it "prioritizes health and safety," that its "platforms were not designed to be addictive," that those platforms are safe, and that it "prevents U13s from using its platforms."  ECF 385 (3144) at 8–11.  The unfairness claims concern three discrete features:  "appearance-altering features, features related to restricting time spent on the platform, and Instagram's 'multiple accounts' function."  Or. Denying Def.'s Mot. for Summ. J., ECF 440 (3214) at 2–3.[2]  And the COPPA claims challenge the "collect[ion] [of] personal information of under-13 users without appropriate notice or parental consent," where Meta had "actual knowledge" as to those users, or if its "platforms [we]re 'directed to children.'"  ECF 123 (1214) ("MTD Order") at 12.  Violations must therefore be counted with reference to those specific categories of conduct.  *See Beaumont*, 111 Cal. App. 4th at 130 (affirming proposed counting where "each unlawful act was a separate, discrete event"); *Am. Nat'l*, 2019 WL 2479608, at *7 (counting based on the "separate, affirmative act or decisions by the defendant" that violate the statute); *Woodard*, 863 P.2d at 974 (similar for CCPA); *Romain*, 58 N.J. at 533 (similar for NJ CFA).  They cannot be counted based on harms tied to features barred by Section 230, which, as this Court held, does not permit imposing liability for algorithms, ephemeral content, notifications, likes, or infinite scroll.  *See* MTD Order at 25–28.  Any violation counting mechanism linked to those barred features would violate that ruling.

Nor may the AGs recover penalties based on alleged "addictiveness" writ large.  At the most recent pretrial conference, the AGs attempted to justify their grossly inflated penalties calculations by stating that "one of our theories is that Meta built the platforms to be addictive to teens."  6/26/26 Hrg. Tr. at

---

[1] The AGs' discussion of these cases is especially notable given that each of their charts sets the maximum penalty permitted under their States' laws and offers no option for a lower amount.

[2] The AGs have also sought to add age verification features to their list of unfair practices, but briefing on that point remains pending in terms of Meta's Motion *in Limine* Number 5, *see* ECF 373 (3123).

39:8–9.  But that amorphous theory cannot be reconciled with the actual claims they bring.  Take the deception claims.  Meta made statements that its platforms were not designed to be addictive, and the AGs say those statements were untrue or misleading.  *See, e.g.*, ECF 385 (3144), Statement No. 2 ("At no stage does wanting something to be addictive factor into [our design] process.").  Any violation comes from the false or misleading nature of the *statement*, not from whether Meta's platform causes harm from compulsive or addictive use.  *See* ECF 266 (2783) ("MSJ Opp.") at 11–12 ("the crux of the AGs' consumer protection laws is how a reasonable consumer would understand Meta's messages," and "whether 'social media addiction' exists as a clinically diagnosable condition is even more attenuated from the question whether Meta designed its platforms to be addictive in a way that makes its statements to the contrary false or misleading").  Put differently, if Meta's platforms were addictive, but it had not made "statements to the contrary," *id.*, the AGs would have no deception claim on this basis.  And any amorphous "addictiveness" theory of unfairness is plainly barred by this Court's motion-to-dismiss ruling on the features subject to Section 230 immunity—features such as algorithms, notifications, and infinite scroll that the AGs' own experts claim are the causes of any such "addictive" behavior, even if that could be proven.  Imposing liability on the theory that Meta's platforms in their *entirety* are addictive would necessarily seek to impose liability on features that the Court has already held are subject to Section 230 immunity.  *See* MTD Order at 2 ("Section 230 insulates the design and deployment of most features alleged to be unfair or unconscionable.").

### a.  Remedy Chart 2 – Time Spent

The AGs seek maximum penalties for *every* day each month that any teen spent more than a half-hour, one hour, or two hours on Meta's platforms.  *See* Mot. Ex. B (Remedy Chart 2).  They do not explain how Meta violated any State's consumer protection law each time a teen spent a given amount of time on its platforms.  By their admission, the AGs instead offer these cut-off points as proxies for harm caused by Meta's platforms.  *See, e.g.*, ECF 2913 (Opp. to Mot. to Exclude Saba) at 4 ("The AGs will proffer other experts' testimony and record evidence that use these and similar thresholds in examining problematic use and mental health impacts linked to time spent on the platforms.").  But the issue in this trial is not some amorphous theory of "harm" from Meta's services, and indeed the AGs continue to assert that they have no obligation even to establish such harm to support their claims.  *See* Mot. at 2.  The

number of violations for the purpose of civil penalties must be based on the consumers exposed to or affected by *those violations*, *see Jayhill*, 9 Cal. 3d at 289, or the "separate, affirmative act or decisions *by the defendant*," *Am. Nat'l*, 2019 WL 2479608, at *7 (emphasis added); *see also Woodard*, 863 P.2d at 974 (similar for CCPA); *Romain*, 58 N.J. at 533 (similar for NJ CFA).  That is because, unlike compensatory damages, civil penalties are "intended to proscribe deceptive acts and not the consequences of those acts." *Woodard*, 863 P.2d at 972; *see id*. at 975 ("The focus of the [CCPA] proscription is on the act of publishing, disseminating, or soliciting and not on how the consumer acts upon the misleading information.").

**No Linkage Between Time Spent and Violations:**  Time spent generally—and certainly not these arbitrary time spent limits, which appear to have been selected to generate the most outsized penalty calculations possible[3]—are not the appropriate measures of Meta's alleged misstatements or alleged unfair features.  Under the AGs' calculation, Meta would owe the same amount whether the Court found one actionable misstatement or sixty, or whether it found one feature to be an unfair practice or all three.  That is because "time spent" is not linked to any violation tied to alleged misstatements or unfair features.  As the AGs' damages expert explained, the "time spent calculations are not impacted by the number of teens who used the at-issue design features."  Ex. 1, 3/2/26 Saba Dep. at 54:14–24 (Mr. Saba did not "know whether any particular teen used any specific design feature"); *see also id*. at 105:16–106:1 ("I didn't do an analysis of the impact of each feature, you know, individually on time spent").  As to the deception claims, Mr. Saba testified that his calculations did not account for "what portion of the teens were exposed to the allegedly deceptive statements," *id*. at 113:23–114:2, and that he does not "know what teens in my calculations were aware or not aware of those statements," *id.* at 115:19–116:5.

No expert links any misstatement or any challenged feature to these usage levels, whether on an individual or population basis.  One alleged misstatement, for example, involves a Meta employee

---

[3] As one glaring example, the AGs' Remedy Chart 2, "Time Spent Penalty Calculation for Teen Users," shows the number of teen users with monthly instances over 0.5 hours:  169 million in California, 14 million in Colorado, 14 million in Kentucky, and 33 million in New Jersey.  *See* Mot. Ex. B (Chart 2A). If the AGs had instead used Mr. Saba's calculation of the number of monthly instances of teen users exceeding a daily average of 5 hours (arguably a more relevant figure if one were measuring "compulsive" as compared to incidental use), *the number of instances in all four states would be zero*.  *See* Mot. Ex. B-2.

commenting about content that a British teen saw and whether it was "safe." *See* ECF 385 (3144), Statement No. 66. The AGs cannot explain how that statement relates to every teen who uses the platforms for a half-hour a day, much less any teen in the United States, or how it could justify these penalties if it were the only deceptive statement the Court found. As Mr. Saba acknowledged, "if the State AGs do not prove that the wrongful conduct caused the time spent instances," then his estimates "may not be relevant as an indication of violations or a count of violations." Ex. 1, 3/2/26 Saba Dep. at 75:14–76:3; *see id.* at 61:1–6, 116:6–12 (Mr. Saba testifying that he does not "have any opinions about harm" stemming from his calculations).

This point is particularly true given that, as the AGs' experts have repeatedly acknowledged, time spent is related to a whole host of factors, including features this Court has held are not at issue in this case. The AGs' experts have attributed time spent to multiple features subject to Section 230 immunity:

- **Notifications**: Ex. 2, 9/17/25 Twenge Dep. at 189:22–190:20 ("push notifications would be another example of something that would increase time spent"); Ex. 3, Prinstein Reb. Rep. ¶ 4 ("features such as the 'like' button and notifications from Meta contribute to kids' excessive and habitual use of Meta's products."); Ex. 4, Zicherman Rep. ¶ 58 ("Push notifications … lead to increased compulsive screen checking and ultimately time spent on the app.").

- **Algorithms**: Ex. 2, 9/17/25 Twenge Dep. at 185:22–186:11 ("algorithms that curate and recommend content are one of those features" that "causes harm"); Ex. 5, Prinstein Rep. ¶ 42 ("Meta's algorithmic recommendation systems deliver dopamine hits to teen users."); Ex. 4, Zicherman Rep. ¶ 36 ("machine learning algorithms … motivate[] extended use and constant checking of the social media application due to the expectation of rewards").

- **Infinite scroll**: Ex. 6, 6/26/25 Twenge Dep. at 415:23–416:9 ("autoplay of video" and "endless scroll" "may increase time spent"); Ex. 7, 12/4/25 Prinstein Dep. at 48:17–49:8 ("I believe infinite scroll is contributing to problematic social media use."); Ex. 5, Prinstein Rep. ¶ 42 ("features such as notifications, time-bound content, and auto-play have been identified by Meta researchers as triggers for problematic use."); Ex. 8, Gray Rep. ¶ 101 ("Meta's onboarding flow introduces features designed to normalize constant engagement: immediate exposure to algorithmically curated content, auto-play videos and stories, persistent notifications, and a continuous feed structure that reinforces return behaviors.").

In contrast, those experts have made no effort to link time spent to the limited features on which the AGs have been allowed to proceed.

***No Support for Specific Time Spent Intervals:*** Even if "violations" could be defined with reference to generalized consumer harm, there is no evidence that these specific cut-off points are an appropriate measure of such harm. None of the AGs' experts identifies these specific thresholds as reflective of problematic use and none suggests that *any* threshold is an appropriate measure of such use. The AGs' experts instead establish that the proposed thresholds are associated with beneficial use.

The AGs themselves confirmed this point with the specific expert testimony they invoked at the most recent hearing. They cited to the Court four figures from Dr. Twenge's report to dispute Meta's claim that "none of the state AGs' witnesses would say that there's harm in a certain amount of time." 6/26/26 Hrg. Tr. at 34:12–15; *see also* ECF 2913 at 4 ("Dr. Jean Twenge … opines on the link between increased time spent on social media and mental health"). Counsel was referring to a correlational analysis Dr. Twenge conducted showing that wellbeing measures are different across different time intervals. But this analysis completely fails to justify any suggestion that there is harm to all or even a majority of users at any of the arbitrary time cut-points the AGs selected for penalties, let alone that that harm is linked to any of the challenged features or alleged misstatements at issue in this trial. *See* ECF 2913 at 4 (describing Twenge Rep. Fig. 12).

Figure 12 from Dr. Twenge's report is illustrative.



Figure 12: Hours per day of social media use and unhappiness, U.S. teens (8th and 10th graders)
Source: Monitoring the Future. Analyses by Twenge & Martin (2020).
Note: Controlled for grade, race/ethnicity, mother's education, and in-person social interaction frequency.

As is evident, this Figure shows that spending no time on social media is linked to a *higher* percentage of unhappy teenage boys than spending a half hour, one, two, three, four, or five hours, and a *higher* percentage of unhappy teenage girls than spending a half hour. *See* Ex. 9, Twenge Rep. Fig. 12. It thus contradicts the AGs' penalty claims premised on all boys and girls spending a half hour. As to girls spending one or two hours on social media, unhappiness rates are only slightly higher than for non-users, and even then the substantial majority (*e.g.*, over 80% at the 2-hour mark) do not report greater unhappiness with their use.

Put differently, the AGs' own data they cite to support trillion-dollar penalties indicates that most of the time intervals they allege are *not* harmful and actually reflect less unhappiness than no social media use at all. And in the few instances where higher time intervals show slightly higher levels of unhappiness

10

for some users, the substantial majority of users in these time intervals still do not report unhappiness. And in any event, the broader point is that the AGs' claims are not premised on teen "unhappiness" or generalized theories of teen mental health or "compulsive use"—they involve specific alleged misrepresentations and a limited set of design features.

Another of Dr. Twenge's charts shows that life satisfaction *increased* for girls aged 15 to 17 and for boys aged 12 to 17 who spent up to an hour a day on social media, versus teens who used no social media. *See* Ex. 9, Twenge Rep. Fig. 13. Dr. Twenge likewise testified that "an hour a day" is "usually … not linked to negative mental health outcomes," Ex. 6, 6/26/25 Twenge Dep. at 469:1–8, and that she could not even say whether someone who spent five hours a day on Facebook or Instagram would more likely than not experience harm, *id.* at 405:1–13. Put simply, the data that the AGs invoked to justify any rational basis for their penalty calculations entirely fails to support them. It largely shows the opposite of what they are claiming.

The AGs' other causation expert, Dr. Mitch Prinstein, has testified before Congress that "the amount of screen time alone is not likely associated with negative psychological outcomes among youth," Ex. 10, 9/26/25 Prinstein Dep. at 131:18–132:1. Although Dr. Prinstein has tried to retreat from that statement in this litigation, he has never identified these particular cut-off points as relevant measures of harm. Indeed, he has since co-authored a study providing that "*time spent on social media* is too broad a construct to reveal meaningful associations with mental health." Ex. 11, Maheux et al., "Annual Research Review: Adolescent Social Media Use Is Not a Monolith: Toward the Study of Specific Social Media Components and Individual Differences," *Journal of Child Psychology and Psychiatry* 66, no. 4 (2025): 440–459. According to the paper, "studies measuring time spent on social media often neglect the specific content, features, and functions within social media experiences, some of which may offer benefits, whereas others pose risks." *Id.* Again, the AGs' own expert directly rejects any rational basis for a penalty calculation that seeks over a trillion dollars.

In short, the AGs' experts concede time spent alone does not show harm, or correlate with violations based on specific misstatements or unfair features. The data they cite from Dr. Twenge demonstrates that core parts of the usage intervals for which they seek recovery are linked to the highest levels of wellbeing, including higher wellbeing than no-usage. *See* Ex. 9, Twenge Rep. Fig. 13. And even

11

at the highest levels of usage, Dr. Twenge's data indicates that the vast majority of users do not report negative wellbeing. *See id.* Figs. 12, 13. Despite this evidence, the AGs seek penalties corresponding to every month of use by every user at those levels.

Even if the AGs' claims were about addiction, none of the AGs' experts identifies these cut-off points as measures of addiction, and none has tried to estimate the share of Meta's teen users who are "addicted"—let alone "addicted" because of the features at issue here, as compared to the features the Court has held are subject to Section 230 immunity. In her report, Dr. Twenge opines that "social media use can become compulsive or addictive," but does not calculate a percentage or a rate when that occurs. Ex. 9, Twenge Rep. ¶ 107. And Dr. Zicherman has testified that he could not determine whether "spending three hours per day on Instagram" was "excessive" without knowing "more details about the specific" teen. Ex. 12, Zicherman Dep. at 178:5–179:1. The AGs' experts instead define problematic use as "[u]sing social media in larger amounts or for longer than intended" and "[p]ersistent desire or unsuccessful efforts to cut down or control use." Ex. 4, Zicherman Rep. ¶ 32. But the amount a user intends to use social media depends on the person. One user may regard two hours a day as "longer than intended," while another may not reach that point until well past six hours. This measure also ignores *how* users spend that time on Instagram. One user might spend half an hour messaging their friends and family, while another might spend that time looking at content, and another might do some of both. Applying fixed time thresholds bluntly across Meta's entire teen user base is therefore disconnected from any measure of addiction or problematic use, including from the AGs' own experts, let alone from the claimed violations in this case.

### b. Remedy Chart 1 – All Teens and All U13 Users

The AGs also seek maximum penalties for every estimated preteen and teen using Meta's platforms. *See* Mot. Ex. A (Remedy Chart 1). But they do not explain how Meta could engage in a violative act as to *every* teen user of its platforms. Counting violations for every individual teen that used Meta's platforms could not serve the purpose of "secur[ing] obedience to statutes and regulations." *Johnson*, 77 Cal. App. 5th at 352 (citation omitted). The AGs similarly do not explain a theory supporting penalties for every purported U13 user, beyond their unsupported claim that the entirety of Instagram and Facebook are directed to children.

The AGs' unfairness claims challenge features that are "opt-in"—that is, features that users can choose whether to use. The AGs have recognized that these features are only used by a subset of users. *See* MSJ Opp. at 3 n.2 (noting that "Daily Limit tool adopted by only 1.4% of teens"); *id.* at 35 (noting that "41% of teens have secondary or 'fake' Instagram accounts"); *cf.* Ex. 13, 6/9/25 Otaru Dep. at 87:7–11 ("a small fraction of users had indicated to us that they would like some additional time tools"). And Mr. Saba testified that he does not know how many teens used "the multiple accounts function and cosmetic filters." Ex. 1, 3/2/26 Saba Dep. at 53:24–54:4, 54:21–24. The evidence in fact suggests those filters were not widely used, as a temporary ban "was not impacting topline user engagement metrics." Ex. 14, 10/21/24 Stewart Dep. at 218:14–22. Feature usage rates also vary across age groups. *See* Ex. 15, 12/18/24 Kilstein Dep. at 637:6–13 (16- and 17-year-olds "were much more likely to create secondary accounts than early teens, like 13, 14, 15-year-olds."). Nor do the AGs contend that *every* teen user was exposed to Meta's statements, much less that every user found those statements misleading.

Courts have declined to count violations on such a sweeping basis. For instance, in *Olson*, 96 Cal. App. 3d at 195, the California Court of Appeal rejected the People's proposal that "circulation of the newspaper should be the measure of the number of violations." It would be "unreasonable to assume that the Legislature contemplated penalties of that magnitude for a false advertisement in a single edition of a newspaper." *Id.* at 198. "To so interpret the statute would render it violative of the due process prohibition against 'oppressive' or 'unreasonable' statutory penalties." *Id.* At the same time, the court observed that there may be "additional violations" based on "persons who read" or "responded to the advertisement." *Id. Olson* clearly rejects the premise of the AGs' remedies charts—because they do not and cannot claim that *every* teen user was exposed to or affected by Meta's allegedly deceptive statements, or that *every* teen user used the features the AGs claim are unfair.

### c. Remedy Charts 4, 5 – Disgorgement

The AGs' proposed disgorgement calculations are similarly untethered from Meta's alleged wrongful conduct. *See* Mot. Exs. D, E (Remedy Charts 4, 5). Disgorgement must approximate "the gains 'causally connected to' *Meta's unlawful conduct*." Mot. at 6 (emphasis added) (citing *S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1096 (9th Cir. 2010)). The purported "profits" associated with teen users do not even attempt to approximate Meta's gains from its alleged "unlawful" conduct. Mot. at 2.

Even accepting that each statement and each feature was actionable, the AGs cannot establish that Meta engaged in wrongful conduct as to *every* teen user that spent a certain amount of time on its platforms, or *every* teen user. *Cf. Ivie v. Kraft Foods Glob., Inc.*, 2015 WL 183910, at *2 (N.D. Cal. Jan. 14, 2015) ("There is no support" for awarding "any amount greater than the profit attributable to the mislabeling.").

Although it may sometimes be appropriate to "relax the disgorgement nexus requirement," Mot. at 7, the AGs cite no authority for the proposition that no nexus need exist at all. Indeed, every case they cite shows the opposite. *See, e.g.*, *S.E.C. v. Choice Advisors, LLC*, 2024 WL 4469095, at *5 (S.D. Cal. Oct. 7, 2024) (ordering disgorgement of "net profits" from transactions with clients to whom the defendants falsely claimed to be registered municipal advisors); *FTC v. Green Equitable Sols.*, 2024 U.S. Dist. LEXIS 64339, at *19 (C.D. Cal. Feb. 2, 2024) (ordering disgorgement limited to the "ill-gotten funds" defendant received from the fraudulent enterprise and to which it had no "legitimate claim"); *Platforms Wireless*, 617 F.3d at 1096 (calculating disgorgement based on "proceeds obtained from the illegal sale of 17.45 million unregistered securities"); *S.E.C. v. First City Fin. Corp.*, 890 F.2d 1215, 1232 (D.C. Cir. 1989) (disgorgement based on "actual profits on the tainted transactions"); *Kansas v. Nebraska*, 574 U.S. 445, 466 (2015) (disgorgement ordered for the "small portion of the amount by which Nebraska's gain exceeds Kansas's loss" to remedy Nebraska's violation of interstate compact terms); *S.E.C. v. Hughes Cap. Corp.,* 917 F. Supp. 1080, 1085 (D.N.J. 1996) (disgorgement for profits from illegal sale of securities less the "cost of the initial public offering"); *S.E.C. v. Teo*, 746 F.3d 90, 107–108 (3d Cir. 2014) (disgorgement of "profit from transactions tainted by [defendants'] violation of the Securities Exchange Act"). The AGs also seek disgorgement based on gross "revenue figures" without any "costs … deducted," an argument that conflates *all costs* with those "associated with committing … illegal acts." Mot. at 21 (citing *FTC v. Bronson Partners, LLC*, 654 F.3d 359, 375 (2d Cir. 2011)).

The evidence shows that Meta does not make money from teens. In fact, the AGs' own expert has calculated that Meta *loses* money on teens. Ex. 16, Saba Rep. ¶¶ 167–68, 174 (showing negative gross profit calculations for teens at all levels of usage). That is because Meta's revenues come from advertising, and revenue on ads targeting U18 users is less than 1% of Meta's total advertising revenue. *See* Ex. 17, Venkataraman Reb. Rep. ¶ 82. Meta also puts specific advertising safeguards in place that make teen users less profitable, such as restricting how advertisers can target teens, the types of ads they can be

14

shown, and the types of data advertisers can use. *See* Ex. 18, 7/24/25 Hegeman Dep. at 243:22–244:13. Unable to identify any actual profits from teen users, the AGs instead rely on a convoluted "aged-up" theory, which purports to estimate Meta's "wrongful" gains based on the revenue generated from teen users as adults. *See* Mot. at 18. But the AGs do not explain how Meta was unjustly enriched by building platforms that teens wanted to continue to use. Like any business, Meta wants to appeal to the next generation. In order to do so, Meta strives to build platforms that teens want to use. That is because teens who report engaging in problematic use are almost *four* times more likely to deactivate their accounts. *See* Ex. 19, META3047MDL-087-00030017 at -0024 ("A PU Survey found that problematic users were 4x more likely to consider D[eactivation] & D[eletion] compared to those without PU."). Because these "profits" are not traceable to any actionable statement or feature, the AGs' disgorgement theory sweeps in revenue far beyond "the profit attributable to" any wrongdoing. *Ivie*, 2015 WL 183910, at *2.

The calculations associated with U13 users are even more attenuated from Meta's alleged wrongful conduct. *See* Mot. Ex. E (Remedy Chart 5); Mot. at 20 (figures obtained by "multiplying (i) the number of 9-12 year olds on Instagram or Facebook … by (ii) the *average revenue per user*, by platform") (emphasis added). Because Meta's policy does not allow under-13 individuals to use Facebook or Instagram, it follows that advertisers cannot target ads to individuals under 13. *See, e.g.*, Ex. 20, Alter Rep. ¶¶ 502, 565 (Dr. Alter noting that advertisers are unable to select ages under 13 as the target audience for any ads that they want to run on Instagram or Facebook); Ex. 17, Venkataraman Rep. ¶ 76 (Dr. Venkataraman concluding that there is no way for advertisers to specifically target individuals under 13 on Instagram or Facebook). Meta cannot have been unjustly enriched by individuals it did not allow on its platforms and that advertisers could not target, so any disgorgement tied to purported U13 users rests on revenue that does not exist. And the AGs' reliance on average revenue for "all users"—including adults who would be the natural target audience for advertisers—is an inherently unreasonable and flawed basis for calculating revenues purportedly associated with U13 users. *See* 6/26/26 Hrg. Tr. at 56:2–6.

## II.     The AGs Impermissibly Seek Duplicative Recoveries.

### A.     The Law Does Not Permit Double Recovery.

The AGs cannot obtain multiple recoveries for the same violation. By their plain terms, the four States' laws impose penalties for *each* violation, and each violation must arise out of "a separate act of

15

misfeasance." *Am. Nat'l*, 2019 WL 2479608, at *6; *see also, e.g.*, Cal. Bus. & Prof. Code § 17206(b) ("The court shall impose a civil penalty for *each violation* of this chapter.") (emphasis added).  It follows that "a plaintiff may not receive a double recovery for the same wrong." *Lexton-Ancira Real Estate Fund, 1972 v. Heller*, 826 P.2d 819, 823 (Colo. 1992) (affirming trial court's reduction of damages in CCPA case); *see also Granelli v. Chicago Title Ins. Co.*, 2012 WL 2072648, at *11 (D.N.J. June 8, 2012) ("the New Jersey Consumer Fraud Act does not permit duplicative damage awards").  While a "single publication" may give rise to more than one violation, there are only "as many additional violations as there are persons who read the advertisement or who responded to the advertisement." *Olson*, 96 Cal. App. 3d at 198.  Those "additional violations" thus arise out of discrete instances of violative conduct, *i.e.* each "person[] to whom the misrepresentations were made." *Jayhill*, 9 Cal. 3d at 289; *see id*. ("it is unreasonable to assume that the Legislature intended to impose a penalty of this magnitude for the solicitation of one potential customer.").[4]

This limit reflects the "fundamental" principle that "no matter under what theories liability may be established, there cannot be any duplication of damages." *Ptaszynski v. Atl. Health Sys.*, Inc., 440 N.J. Super. 24, 40, 111 A.3d 111, 120 (N.J. Super. Ct. App. Div. 2015) (New Jersey "common law prohibits a double recovery for the same injury").  Even "[w]here state law provides for statutory damages, the trial court's discretion may be called upon to prevent double recovery." *Doe v. D.M. Camp & Sons,* 624 F. Supp. 2d 1153, 1174 (E.D. Cal. 2008); *see also In re Gen. Motors LLC Ignition Switch Litig.*, 407 F. Supp. 3d 212, 231 (S.D.N.Y. 2019) (cautioning in UCL case against "duplicative recoveries and wasteful levels of precaution").

The AGs' invocation of the "cumulative" nature of UCL civil penalties is misleading.  *See* Mot. at 5 (citing *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 17 Cal. 4th 553, 573 (1998)).  That the UCL is "cumulative to other remedies and penalties" reflects that the UCL "borrows violations" from other

---

[4] The AGs' reliance on *Woodard* is unavailing.  *See* Mot. at 4 (citing *Woodard,* 863 P.2d at 976).  There, the court affirmed an instruction directing the trial court to "calculate civil penalties based on the *number of false advertisements published* by" the defendant and "on each consumer who undertook some *activity in response to* the false advertisements." *Woodard*, 863 P.2d at 971 (emphases added).  The court did not hold that multiple penalties may be imposed for a single published advertisement or for a single consumer's response to it.

statutes, such that other statutory regimes governing specific conduct do not displace the UCL as a remedy. *Stop Youth*, 17 Cal. 4th at 566, 572 (holding that "the mere fact the Legislature has enacted penal laws concerning minors and tobacco does not impliedly repeal any UCL remedy"). It says nothing about whether penalties may be stacked for a single violation.

Forcing a party "to pay a single debt more than once" also raises grave due process concerns, *W. Union Tel. Co. v. Pennsylvania*, 368 U.S. 71, 77 (1961), because there is a "fundamental unfairness which is at war with due process" in compelling payment twice over for the same wrong, *Akins v. Texas*, 325 U.S. 398, 402 (1945). To that end, the Supreme Court has instructed that "courts can and should preclude double recovery." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 297 (2002); *see also, e.g.*, *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 730–31 (1977) (fashioning rule to avoid "unwarranted multiple liability for the defendant" and "duplicative recoveries" against it); *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 269 (1992) (construing RICO to guard against the "risk of multiple recoveries"); *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 423 (2003) (warning against "the possibility of multiple punitive damages awards for the same conduct").

**B.      The AGs Seek Multiple Recoveries for the Same Alleged Violations.**

The AGs' remedy charts repackage the same individuals across stacked layers of penalties and disgorgement, then add the totals together. The law does not permit that. *See Granelli*, 2012 WL 2072648, at *11 ("The language of the statute, 'any other appropriate legal and equitable relief,' was not intended to permit duplicative awards.").

The AGs seek double recovery across their penalty calculations. *See* Mot. at 7 (Remedy Charts 1 and 2 form basis of penalties for *both* unfairness and deception claims); *id.* at 7 n.5 ("it is appropriate to provide the Advisory Jury with Remedy Chart 1 *and* Remedy Chart 2") (emphasis in original). Remedy Chart 1 treats each unique person as a single violation across the entire population of teen and alleged under-13 users. *See* Mot. Ex. A.[5] Remedy Chart 2 counts, for many of those same teens, every monthly instance in which they exceeded a time spent threshold. *See* Mot. Ex. B. The AGs concede this overlap,

---

[5] The AGs emphasize that, for the underlying data in Remedy Chart 1, Mr. Saba sought to count "the number of Teen and U13 persons … without counting any individuals more than once." Mot. at 8. But whatever the reliability of that analysis, the figures in Remedy Chart 2 concededly re-count the same individuals already captured in Remedy Chart 1.

acknowledging that although each person is shown as a single violation, each person can represent "multiple violations." 6/26/26 Hrg. Tr. at 66:17–20. *Cf. Bestline*, 61 Cal. App. 3d at 922 (affirming penalty award where trial court took "into account" that "some of the persons in attendance may have attended several meetings").

The AGs' disgorgement charts are based on the same source data as their penalty charts, so they also recover for the same individuals twice. *See* Mot. at 8 ("In addition" to penalty charts, "AGs intend to seek disgorgement" for UDAP claims). For instance, Remedy Chart 2 counts monthly instances in which teen accounts averaged more than 0.5, 1, or 2 hours per day. *See* Mot. Ex. B. The corresponding disgorgement chart seeks the "gross profits associated with Aged-Up Teen users who averaged more than 0.5, 1, and 2 hours of time per day," drawing from the same calculations in Mr. Saba's report. *See* Mot. Ex. D (Remedy Chart 4). Remedy Chart 1 (UDAP Penalty Calculation for Pre-Teens and Teens on Meta's Platforms) and Remedy Chart 5 ("UDAP Disgorgement Associated with U13 Users") are calculated based on the same under-13 figures from Mr. Saba. *See* Mot. Exs. A, E. The AGs thus seek to recover disgorgement layered on top of a penalty calculated from the identical population base, effectively awarding multiple recovery for the same consumer.

The AGs' proposed violation counts related to Meta's "actual knowledge" of under-13 individuals present the same problem. *See* Mot. at 7 (AGs intend to seek "penalties laid out in Remedy Chart 3" for purported COPPA "actual knowledge" violations) & Ex. C. The counts in Remedy Chart 3 include *four* categories of alleged COPPA violations: retaining children's data for unreasonably long periods, failing to remove hard-linked accounts of children, failing to remove soft-matched accounts of children, and failing to remove children who changed their date of birth to be under 13. *See* Mot. Ex. C. Each category is drawn from the underlying data from Dr. Sheatsley and Mr. Saba, most of which measures *accounts* rather than unique children. *See* Mot. Ex. C ("number of children's accounts"). By design, the hard-link and soft-match categories capture additional accounts that belong to the same potential under-13 individual whose account Meta already disabled for being potentially underage, so a single individual might be counted once for the disabled account, again for a hard-linked account, and again for a soft-matched account. *See* Mot. at 15 ("Sheatsley estimated the number of users with one account that Meta disabled for being underage who had additional accounts that Meta's soft-matching models predicted as

18

*belonging to the same user*.") (emphasis added).  COPPA, however, speaks in terms of individuals, not accounts.  *See* 15 U.S.C. § 6501(1) ("The term 'child' means an *individual* under the age of 13."); *id.* § 6501(8) ("The term 'personal information' means individually identifiable information about an *individual* collected online.");[6] *contra* Mot. at 13 ("Each of the underage *accounts* disabled in this time and retained for unreasonably long periods constitutes at least one separate violation of COPPA") (emphases added).  Measuring violations by account rather than by individual thus finds no footing in the statute.  And because a single user may also appear among the retained-data accounts and the date-of-birth-change accounts, these categories likely count the same individuals several times over, even assuming the AGs can prove that those accounts belonged to actual under-13 individuals, which they have not.  *See, e.g.*, Ex. 21, Feamster Reb. Rep. ¶ 79 ("as many as 70%" of accounts that change the birthdate to an age under 13 are "actually someone over the age of 13 … engaged in malicious activity").

**III.     The AGs Seek Unsubstantiated Damages Wholly Disproportionate to Any Offense.**

The law prevents the AGs from presenting unsubstantiated remedies claims, particularly ones as outlandish as those here.  The AGs ask this Court to make Meta pay over one trillion dollars.  That figure is the construct of lawyers, assembled by mixing and matching data from disparate sources to manufacture the largest possible sum, and by counting the same individuals many times over.  The AGs cannot identify any UPA or COPPA case imposing penalties approaching that amount.  Meta has not found *any* case, under *any* cause of action, where one defendant was ordered to pay over one trillion dollars—or any number remotely close to that staggering figure.[7]  The AGs contend that the law affords this Court the discretion to be the first to do so.  But the law requires some reasoned basis for damages sought, and some nexus between legal right and remedy.  The AGs have not met that burden.

---

[6] *See also, e.g.*, *id.* § 6502(a)(1) ("It is unlawful for an operator of a website or online service directed to children, or any operator that has actual knowledge that it is collecting personal information *from a child*, to collect personal information *from a child* in a manner that violates the regulations prescribed under subsection (b)."); *id.* § 6502(b)(1)(A) ("actual knowledge that it is collecting personal information *from a child*") (emphases added).

[7] As an illustration, the tobacco master settlement agreement—which involved *four* different tobacco companies—involved a total payment of $206 billion.  *See Tritent Int'l Corp. v. Commonwealth of KY*, 467 F.3d 547, 549 (6th Cir. 2006).

The award of monetary relief must rest on reliable evidence and sound methodology. *See, e.g.*, *People v. Wunder*, 371 P.3d 785, 790 (Colo. App. 2016) (trial court "improperly calculated the civil penalty and restitution amounts" by failing to hold an evidentiary hearing); *Realtors*, 155 Cal. App. 3d at 585–86 (reversing when trial court "did not attempt to determine the number of violations" despite "statistical evidence concerning numbers of victims and numbers of independent acts"). In *Ashford University*, for instance, the court "found it appropriate to count each deceptive telephone call made by defendants as a separate violation." 100 Cal. App. 5th at 500. To "quantify the number of deceptive calls," the trial court relied on expert statisticians who analyzed "a random sample of 2,234 calls" "between defendants and California students," identified calls involving "relevant topics," coded "each misrepresentation" by "category," and then determined that "22 percent[] of the relevant calls contained at least one misrepresentation." *Id.* at 500–01. Only from that analysis did the court conclude that "defendants made 46,386 misleading calls to California students" during the relevant time period. *Id.* The trial court in *State v. The Castle Law Group, LLC*, 2017 WL 3449241, at *38 (Colo. Dist. Ct. Apr. 4, 2017), proceeded similarly, awarding CCPA plaintiffs "modest civil penalties on a violation-by-violation basis." The court started with evidence that the defendant made "a total of 95,598 postings," and then narrowed that figure based on "testimony at trial . . . that roughly 25% of all the Castle Law Group's foreclosures during this relevant period were on GSE loans." *Id.* From that testimony, the court estimated that "the Castle Law Group charged the GSEs for a total [of] 23,900 Absolute postings from August 2009 through 2014." *Id.* Such a careful analysis is necessary to avoid "speculative damages that give rise to potentially duplicative damage awards" and could "lead to a windfall judgment." *Granelli*, 2012 WL 2072648, at *11.

The AGs' demands are not based on any such considered evaluation. Mr. Saba has explained that his "calculations are not impacted by the number of teens who used the at-issue design features," Ex. 1, 3/2/26 Saba Dep. at 54:14–24, that he did not account for "what portion of the teens were exposed to the allegedly deceptive statements," *id.* at 113:23–114:2, and that he does not "know what teens in my calculations were aware or not aware of those statements," *id.* at 115:19–116:5. That approach contrasts with how experts have calculated penalties for similar claims. *See, e.g.*, *Ashford*, 100 Cal. App. 5th at 501 (expert analyzed random sample of defendant's calls to determine "percent[age] of the relevant calls [that]

20

contained at least one misrepresentation"). Indeed, the AGs' expert on the deception claims never attempted to determine "what proportion of consumers derived from Meta's statements" the deceptive "message [he] identified in [his] report." *See* Ex. 22, 12/12/25 Alter Dep. at 117:4–17.

Due process also requires a meaningful nexus between the legal wrong and the penalty imposed. The Supreme Court has long recognized that government sanctions that are "wholly disproportioned to the offense and obviously unreasonable" are substantively improper under the Due Process Clause. *See St. Louis, I.M. & S Ry. Co. v. Williams*, 251 U.S. 63, 66–67 (1919); *see also DeSimone v. Springpoint Senior Living, Inc.*, 256 N.J. 172, 187, 306 A. 3d 1276, 1285 (2024) (narrowly construing New Jersey Consumer Fraud Act to "avoid[] awarding damages in an amount disproportionate to the harm suffered"). And the "touchstone" of the Eighth Amendment Excessive Fines Clause is the "principle of proportionality," which involves consideration of the relationship between the harm and the penalty. *United States v. Bajakajian*, 524 U.S. 321, 334, 337–38 (1998).

To determine the proper award of civil penalties, courts thus avoid counting mechanisms that would result in liability wholly disproportionate to the wrong. In *People v. Overstock.com Inc.*, 12 Cal. App. 5th 1064, 1087 (2017), for instance, the court considered setting the number of violations "by the number of Californians who saw the offending advertisements, by the number of sales made through the offending pages, and by the number of days Overstock violated the statutes." *Id.* "The court rejected the first two, in part because they would result in excessive penalties of at least hundreds of millions of dollars." *Id.* at 1087–88. So too in *Hale v. Morgan*, 22 Cal. 3d 388, 405 (1978), where the court recognized that the maximum statutory penalty would be "wholly disproportionate to any discernible and legitimate legislative goal, and … so clearly unfair that it cannot be sustained." *Id.* And in *Olson*, the California Court of Appeal recognized it "is 'unreasonable' to assume that the Legislature contemplated penalties of that magnitude [$2.5 billion] for a false advertisement in a single edition of a newspaper. To so interpret the statute would render it violative of the due process prohibition against 'oppressive' or 'unreasonable' statutory penalties." 96 Cal. App. 3d at 198.

Rule 11 similarly would forbid a damages theory lacking "evidentiary support" or advanced for an "improper purpose," such as to "needlessly increase the cost of litigation." Fed. R. Civ. P. 11(b)(1), (3); *cf., e.g., Union Planters Bank v. L & J Dev. Co.*, 115 F.3d 378, 384 (6th Cir. 1997) (affirming Rule

21

11 sanctions for pursuit of "damages claims" lacking "evidentiary support"); *Pronman v. Styles*, 2014 WL 2586340, at *3 (S.D. Fla. June 10, 2014) (allowing abuse of process claim based on "assertion of inflated and unsubstantiated damages" designed to "extort" party into "dropping his state court case"); *Alphonso v. Pitney Bowes, Inc.*, 356 F. Supp. 2d 442, 454–55 (D.N.J. 2005) (imposing sanctions when "action unreasonably forced" defendants "to respond to the inflated damages claim").

The AGs' charts cannot be squared with these principles.  Take the time-spent calculations.  Mr. Saba's original report calculated "the number of instances in which Teen accounts spent more than 0.5, 1, 2, 3, 4, or 5 hours per day on average on Instagram or Facebook."  ECF 2913 at 4.  And Dr. Twenge "examin[ed] unhappiness at 0, 0.5, 1, 2, 3, 4, 5, and 6 hours of time spent."  *Id.*  But Remedy Chart 2 and Remedy Chart 4 are based solely on data for 0.5, 1, and 2 hours spent.  *See* Mot. Exs. B, D.  The AGs do not explain why they abandoned the calculations for the higher levels of time spent.  They do not provide any expert testimony indicating that these lower numbers are a more accurate measure of problematic use.  The only discernible reason for removing this data is because the numbers they generated were too small.  *See supra* note 3.  For instance, Mr. Saba originally calculated gross profits for an average daily time spent over 5 hours.  *See* Mot. Ex. D-1 ("Instagram Aged-Up Teen Gross Profits, 2018 to Q1 2024").  For California, those gross profits were zero dollars.  *See id.*  For Colorado, those gross profits were zero dollars.  *See id.*  For Kentucky, those gross profits were zero dollars.  *See id.*  And for New Jersey, the gross profits were also zero dollars.  *See id.*[8]  The AGs thus seek to present to the advisory jury a cherry-picked subset of the data chosen to support the largest penalties, with no principled basis for doing so.

Even presenting these claims to the jury would carry meaningful prejudice to Meta, when the claims have no support in the record or linkage to the alleged violation.  For example, being allowed to present the AGs' unsupported $1.4 trillion-dollar claim—which alone is larger than the gross domestic product of most countries, even without considering the other penalty and disgorgement claims the AGs seek to add to the $1.4 trillion—would improperly suggest to the jury that the AGs have a credible claim to wrongdoing that outstrips any previously recognized by our legal system.  And it would reinforce the

---

[8] The gross profits associated with three and four hours of time spent are a small fraction of the profits associated with two hours of time spent.  As one example, the gross profits in Colorado for four hours time spent are zero dollars, while the gross profits for two hours time spent are 1,003,404 dollars.  *See id.*

view that, because Meta is a large company, it should be made to pay more.  In this regard, the unsupported remedies claims are analogous to general financial information that courts routinely exclude and that this Court has already excluded:  "there shall be no reference to or evidence presented of wealth or lack thereof of any party except in the punitive damage phase of a case, to the extent it exists."  Pretrial Order 2, ECF 3139 at 2.  In the same way that this type of financial information is excluded unless relevant to a punitive damage phase, penalty and disgorgement claims that have no link to the record or the alleged violations should be excluded.

In short, the sheer magnitude of the AGs' demands, in conjunction with the lack of reliable evidence linking those demands to alleged wrongful conduct, offends constitutional and ethical limits.  In just a single one of their "Remedy Chart" calculations, the AGs seek over one trillion dollars in penalties and disgorgement, and they then layer on various other double-counting charts.  Each of these charts applies the maximum statutory penalty to every teen and purported under-13 user and every monthly instance of time spent at certain arbitrarily-selected thresholds.  *See* Mot. Exs. A–F.  A sanction of that size has no analog in the history of consumer protection enforcement.  Indeed, the Federal Trade Commission recently described a "$1 billion penalty" as "the largest ever in a case involving an FTC rule violation."[9]  The AGs' demand exceeds even those record figures by several orders of magnitude, and is in gross disproportion to the specific violations alleged here.

IV.     **The Court Should Determine the Appropriate Monetary Relief Based Solely On Opinions Contained in the Experts' Reports.**

The AGs seek to present to the advisory jury a range of alternate numbers that are allegedly linked to the same consumer protection violations, with no guidance as to which numbers are most accurate.  *See* Mot. at 1 (for Remedy Charts 1 and 2, advisory jury should decide "number of violations" and "penalty amount").  In the first instance, the AGs should not be able to present penalty calculations that were never included in their expert materials, such as Charts 1.B, 1.C, 2.C, 2.D, 2.E, 3.A, 3.B, 3.C, 3.D, 3.E, and 3.F.  *See* Fed. R. Civ. P. 26(a)(2)(B).

---

[9] Press Release, Fed. Trade Comm'n, FTC Secures Historic $2.5 Billion Settlement Against Amazon (Sept. 25, 2025), https://www.ftc.gov/news-events/news/press-releases/2025/09/ftc-secures-historic-25-billion-settlement-against-amazon.

But even if they could overcome that non-disclosure issue more broadly, they should not be able to present their range of tables to the advisory jury without specific guidance on how to calculate remedies if the jury chooses not to find the maximum penalty, award double-recoveries, or otherwise endorse the AGs' maximalist theories of wrongdoing and liability. The advisory jury should not be given a calculator and left to decide what is appropriate, particularly where the complexity of the underlying data and discretionary considerations in awarding monetary relief suggest that the advisory jury would not aid the Court in its calculation. *Cf. Hyde Properties v. McCoy*, 507 F.2d 301, 306 (6th Cir. 1974) (observing "that a non-jury trial of the [complex] issues is both more efficient and more likely to produce a just result."). Leaving the advisory jury to devise its own penalty calculations in a case of this complexity would also risk figures based on speculation rather than applicable legal limits.

This Court has previously explained that an advisory jury "allow[s] the judge to get some appreciation for the common sense or standard of the community, or notions of efficiency or convenience." ECF 3139 at 7 (citing Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2335 (4th ed. 2020)). Such notions of "common sense" or the "standard of the community" are not implicated by the complex decisions required to determine civil penalties in this case. *See* Mot. at 1 (conceding that relief involving "more calculation [is] … best assessed exclusively by the Court"). The California Supreme Court has "ma[d]e clear the propriety and importance of a court's exercise of its equitable authority … in determining [] the number of violations for which a defendant may properly be held responsible." *Nationwide Biweekly Admin., Inc. v. Super. Ct.*, 9 Cal. 5th 279, 314, 462 P.3d 461, 479 (2020) (collecting cases); *see also Flo & Eddie, Inc. v. Sirius XM Radio, Inc.*, 2016 WL 11784406, at *1 (C.D. Cal. Nov. 7, 2016) ("having the jury sit in an advisory capacity for Plaintiffs' § 17200 claim would cause confusion and unnecessarily burden the jury"); *cf. People v. First Fed. Credit Corp.*, 104 Cal. App. 4th 721, 732–33 (2002) (noting that "the concern that juror passion or prejudice may affect a punitive damage award is absent in UCL cases because there is no right to a jury trial in such cases").

In finding that consumer protection statutes do not create a right to trial by jury, courts have noted "the Legislature's recognition of the complexities of commercial bargaining in contemporary society." *Kugler v. Banner Pontiac-Buick, Opel, Inc.*, 120 N.J. Super. 572, 582, 295 A.2d 385, 390 (Ch. Div. 1972) (NJ CFA "Defendants are not entitled to a jury trial"). Furthermore, "[t]he noncompensatory nature of

the CCPA's civil penalty remedy distinguishes that remedy from the primarily compensatory forms of relief offered in courts of law." *State ex rel. Weiser v. Ctr. for Excellence in Higher Educ., Inc.*, 2023 CO 23, ¶ 45, 529 P.3d 599, 609 (Colo. 2023) (finding that defendant "was not entitled to a jury trial on the State's CCPA civil penalty claims"). Where the "statute has delegated the assessment of civil penalties in accordance with a highly discretionary calculation that takes into account multiple factors," courts have found that "calculation traditionally performed by judges rather than a jury, and does not require a jury trial for that purpose in a civil action." *DiPirro v. Bondo Corp.*, 153 Cal. App. 4th 150, 182 (2007). Beyond that, the calculation of monetary remedies in this case would "involve complex issues of accounting practice beyond the normal comprehension of the jury that will try the case." *Rosen v. Dick*, 83 F.R.D. 540, 544 (S.D.N.Y. 1979), *modified on other grounds by*, 639 F.2d 82 (2d Cir. 1980) (declining to empanel advisory jury).

"The function of an advisory jury is solely to enlighten the conscience of the Court." *Skoldberg v. Villani*, 601 F. Supp. 981, 982 (S.D.N.Y. 1985). Because the AGs' proposed calculations are performed by lawyers, their experts could not assist the advisory jury in understanding or applying them. *See Pioneer Hi-Bred Int'l, Inc. v. Ottawa Plant Food, Inc*., 219 F.R.D. 135, 149 (N.D. Iowa 2003) (declining to submit equitable issues "to the same jury, even in an advisory capacity" based on argument that doing so would be "a misdirection of the jury's attention to matters not properly within their purview"). This would effectively be asking the jury to engage in guesswork and speculation disconnected from a rational methodology or supporting expert analysis. *See Skoldberg*, 601 F. Supp. at 982 ("The role the subjective judgment of the fact-finder would play in determining a possible damage award simply does not justify the additional time and expense involved in presenting this case to a jury, whose verdict in any event would only be advisory.").

Nor would the jury provide helpful input to the Court based on "the standards of the community." ECF 3139 at 7. As this Court explained, the advisory jury can evaluate "alleged deceptive practices and communications" and how "the issues at play in this trial impact the daily lives of the public across the

states involved." *Id.* But counting violations is a complex question of both law and fact that does not involve consideration of the "standard of the community," and should be determined by the Court.[10]

## V. Meta Should Receive Updated Depositions of the Three Experts Most Relevant To These Calculations.

The AGs served these damages calculations a little more than two weeks ago. *See* Mot. at 1. Reflecting their prior absence from the evidentiary record in this case, the AGs then updated their written discovery responses to capture these calculations. *See id.* As the charts themselves indicate, they are based on work performed by AG experts Mr. Saba and Dr. Sheatsley. And as the AGs' arguments in defense of the charts indicate, they are also based on AG expert Dr. Twenge's opinions. *See* 6/26/26 Hrg. Tr. at 34:12–23.

When Meta had the chance to depose these three experts, it did not have specificity about which remedy claims the AGs were pursuing or their recent rationales for obtaining those remedies. It also did not have the actual calculations based on Mr. Saba's and Dr. Sheatsley's work, which the AGs apparently seek to introduce through those experts. If Meta had had this information, it would have questioned the witnesses on these specific charts, and it would have questioned them differently and longer on topics relevant to these calculations. For that reason, Meta seeks updated depositions for these three witnesses.

At the last hearing in this matter, the parties indicated that they would meet and confer regarding these possible depositions. 6/26/26 Hrg. Tr. at 68:14–69:9. In those conferrals, the AGs demanded that, if they produced Mr. Saba and Dr. Sheatsley for updated depositions, Meta would have to withdraw any objection to their experts testifying regarding the charts insofar as they contain calculations and numbers that are not in their expert reports. Meta could not agree to that demand. Accordingly, Meta requests that the Court allow a 3.5-hour deposition for each of Mr. Saba, Dr. Sheatsley, and Dr. Twenge. Meta respectfully submits that this relief would be analogous to the relief the AGs recently obtained as to Meta's three 30(b)(6) witnesses.

---

[10] The AGs concede that "[o]ther monetary relief, including UDAP and COPPA disgorgement, involves more calculation and is therefore best assessed exclusively by the Court." Mot. at 1. Meta agrees with the States' position that disgorgement is "best assessed exclusively by the Court."

**CONCLUSION**

For the foregoing reasons, Meta respectfully requests that the Court:

a. Strike the all-teens penalty calculations and the time-spent calculations, which both seek penalties untethered to any claimed violation or to the record: the "teen" calculations in Remedy Chart 1 ("UDAP Penalty Calculation for Pre-Teen and Teens on Meta's Platforms"), all of Remedy Chart 2 ("UDAP Time Spent Penalty Calculation for Teen Users"), and all of Remedy Chart 4 ("Disgorgement of Gross Profits Associated with Aged-Up Users Exceeding Specified Thresholds of Average Daily Time");

b. Strike the U13 calculations as unsupported by the record: the "U13" calculations in Remedy Chart 1 ("UDAP Penalty Calculation for Pre-Teen and Teens on Meta's Platforms"), which seeks penalties untethered from any claimed violation, and Remedy Chart 5 ("UDAP Disgorgement Associated with U13 Users") and Remedy Chart 6 ("COPPA Disgorgement Associated with U13 Users");

c. Order the AGs to remove duplicative counts from their remaining Remedy Charts, so that Meta is not penalized multiple times for the same alleged violative conduct;

d. Provide that the Court will exclusively hear and decide issues relating to the award of monetary relief in this case;

e. Preclude any party from referencing before the advisory jury, during the liability phase of trial, any civil penalty, disgorgement, or other monetary-relief amounts, calculations, or numerical figures that any party contends should or should not be awarded as a remedy; and

f. Grant Meta leave to take updated 3.5-hour depositions of Dr. Jean Twenge, Mr. Carl Saba, and Dr. Ryan Sheatsley by July 17, 2026.

DATED:  July 6, 2026

Respectfully submitted,

By:    */s/ Ashley M. Simonsen*

Ashley M. Simonsen (Bar No. 275203)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, California 90067
Telephone: (424) 332-4800
Facsimile: (424) 332-4749
Email: asimonsen@cov.com

Paul W. Schmidt, *pro hac vice*

Timothy C. Hester, *pro hac vice*
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
Email: pschmidt@cov.com
Email: thester@cov.com


*Attorneys for Defendant Meta Platforms, Inc.
f/k/a Facebook, Inc.*

META'S SUBMISSION REGARDING STATE AGS' PENALTY AND DISGORGEMENT CHARTS AND SUPPORTING MATERIALS, ECF 444
(3218)
4:22-md-03047-YGR; 4:23-cv-05448-YGR