**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION | MDL No. 3047<br><br>Case No. 4:23-cv-05448-YGR |
| This Document Relates to:<br>4:23-cv-05448 | |
| **People of the State of California, *et al.*,**<br><br>        Plaintiffs,<br><br>v.<br><br>**Meta Platforms, Inc.,**<br><br>        Defendant. | **ORDER DENYING META'S MOTION TO EXCLUDE EXPERT TESTIMONY OF CARL SABA AND DENYING IN PART AND GRANTING IN PART PLAINTIFF'S MOTION TO EXCLUDE EXPERT TESTIMONY OF JUSTIN MCCRARY**<br><br>Re: Dkt. Nos. 2843, 2845 |

Defendant Meta Platforms, Inc. ("Meta") moves to exclude the opinions of Carl Saba and plaintiffs, the State Attorneys General ("AGs"), move to exclude the opinions of Justin McCrary.[1] Having carefully considered the papers submitted, as well as oral argument from counsel on February 11, 2026 and June 26, 2026, and for the reasons set forth more fully below, the motion to exclude the opinions of Carl Saba is **DENIED** and the motion to exclude the opinions of Justin McCrary is tentatively **DENIED IN PART AND GRANTED IN PART**.

---

[1] For the purposes of this Order, because some of the materials were not filed on the individual case docket, the Court will cite to entries on the central docket (Case No. 22-md-3047). This includes Meta's Motion to Exclude and/or Strike Expert Testimony of Carl Saba (Dkt. No. 2845 ["Saba Mtn."]), the AGs' opposition (Dkt. No. 2913 ["Saba Oppo."]), and Meta's Reply (Dkt. No. 2990 ["Saba Reply"]); as well as the AGs' Motion to Exclude Certain Expert Testimony of Justin McCrary (Dkt. No. 2843 ["McCrary Mtn."]), Meta's opposition (Dkt. No. 2915 ["McCrary Oppo."]), and the AGs' Reply (Dkt. No. 2988 ["McCrary Reply"]).

1

## I.    BACKGROUND

The AGs retained Carl Saba as an economic remedies expert to perform a series of calculations to support the AGs' request for remedies, including: (1) time spent by teens on Instagram and/or Facebook ("the platforms"); (2) revenues and (3) gross profits Meta earned from "affected teens" and (4) "aged-up teens"; (5) the number of bad encounters thirteen to seventeen year olds ("teens") experienced on Instagram based upon Meta's internal documents; (6) the number of teen Monthly Active Persons ("MAPs") and (7) unique teen persons active on the platforms;  and (8) the number of "MAPs" and (9) unique persons under thirteen years old ("U13") who used the platforms.  Meta challenges opinions 1, 3-4, 5, and 8-9[2] and asks the Court to exclude, or in the alternative strike, certain supporting material in Saba's report.

Meta retained Justin McCrary to rebut the opinions of Carl Saba.  The AGs challenge two of McCrary's Opinions.  *First:*  McCrary opines that Saba's calculations of potential UDAP violations merely count events untethered to negative mental health outcomes or any other harm. *Second:*  McCrary opines that Saba's calculations do not support a claim of widespread consumer harm.

## II.    LEGAL STANDARD

Federal Rule of Evidence 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> > (b) the testimony is based on sufficient facts or data;
> > (c) the testimony is the product of reliable principles and methods; and

[2] Because plaintiffs failed to comply with this Court's Standing Order § 10, which instructs that "At the beginning of the report, the expert shall list *and number* each opinion to be proffered in the report" (emphasis added), the Court adopts for purposes of this Order the following enumeration. The opinions are found in Saba's Report in the following sections: Section IX (Opinion 1); Section X (Opinion 2); Section XI (Section 3); Section XII (Opinion 4); Section XIII (Opinion 5); Section XIV (Opinion 6); Section XV (Opinion 7); Section XVI (Opinion 8); and Section XVII (Opinion 9).  The AGs **shall ensure** that this failure does not extend beyond the current trial.

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

It is long well-understood that experts who are "qualified . . . by knowledge, skill, experience, training, or education," and whose opinions otherwise meet Rule 702's requirements, may offer opinions not based on personal knowledge or observations. Fed. R. Evid. 702.

### III.    MOTIONS TO EXCLUDE

#### A.  CARL SABA

Saba describes his assignment as one to perform various calculations for the Relevant Time Period.  These calculations include:

[1] the number of instances in which [teen] accounts averaged more than 30 minutes per day, one hour per day, two hours per day, three hours per day, four hours per day, and five hours per day in a given month on the [platforms] . . .

[2] the revenue earned by [] from [those teens] in a given month ("Teen Revenues") . . . the costs associated with the Teen Revenues ("Teen Costs") . . .

[3] the difference between Teen Revenues and Teen Costs ("Teen Profits") . . .

[4] for purposes of disgorgement, the cumulative profits earned [on those] accounts in a given month, for periods after the Teens turned age 18 through March 2024 ("Profits From Aged-Up Teens") . . .

[5] the number of instances in which Teens were exposed to specific bad experiences on Instagram, based on the findings of the Bad Experiences and Encounters [("BEEF")] Survey conducted by Meta . . .

[6] the number of Teen Daily Active Persons ("DAP") and Monthly Active Persons ("MAP") on IG and FB . . .

[7] the number of unique Teen persons that were active on IG or FB at any time during the Relevant Time Period . . .

[8] the number of under 13 year olds ("Under 13" or "U13") Monthly Active Persons and Daily Active Persons on IG and FB, on a yearly basis during the Relevant Time Period . . . and

[9] the number of unique Under 13 persons that were active on IG or FB at any time during the Relevant Time Period.

(Expert Report of Carl S. Saba, Dkt. No. 2846-3 [("Saba Rep.")] ¶ 17.)

Meta challenges opinions 1, 3-4, 5, and 8-9.

Saba received an M.B.A. with an emphasis in finance from the Marshall School of Business at the University of Southern California in 2003. Since that time, he has held positions as Partner in Charge of the Consulting Practice at Burr Pilger Mayer, Inc. and as a Partner in the Financial and Forensic Consulting Group at Hemming Morse, LLC. He is an Accredited Senior Appraiser (ASA) with the American Society of Appraisers and Accredited in Business Valuation (ABV) by the American Institute of Certified Public Accountants. He has prepared economic damages analyses in numerous litigation matters that include lost profits, diminution in value of a business, disgorgement of profits / unjust enrichment, and statutory penalties. He has also authored articles and other publications, including co-authoring Thomson Reuters' *The 409A Administration Handbook, Compliance and Company Valuation*, on the topic of business valuation, including regarding technology, life sciences, and medical device companies. Meta does not challenge his qualifications to opine on economic damages topics.

### 1. Bad Encounters Testimony (Opinion 5)[3]

Defendant first seeks to exclude Saba's calculation of bad experience violations because the "methodology is incorrect as a matter of law and unreliable." Saba's bad experience calculations are based upon data collected by Meta in its "BEEF" surveys. These surveys sought information from users regarding the incidence of bad encounters they experienced on the platforms, such as "Nudity." Saba's Report states:

> Of the dozens of different types of bad encounters assessed by the BEEF survey, Plaintiffs' counsel instructed me to focus on ten of them in my calculations: Bully Target, Bully Witness, Drugs, Hate Witness, Negative Comparison, Nudity, Self Harm, Unwanted Advances, Violence, and Perceived Control (collectively, "Bad Encounter Issues"). As reflected in Schedule 5.2, I calculate that from February 2018 through March 2024, there were over 13 billion instances in which UDAP State Teen users experienced one of the ten selected Bad Encounter Issues.

---

[3] The Court addresses these opinions in the order in which they were briefed.

(Saba Rep. ¶¶ 218.)  Meta objects to this opinion on three grounds in particular:  One, Saba's method imposes liability for conduct protected by Section 230; two, Saba's method is impermissible under state consumer protection laws; and three, Saba's methodology is unreliable.

*First*, this Court has already addressed Meta's Section 230 arguments numerous times, as explained in its Order Denying Defendant's Motion for Summary Judgment.  (Dkt. No. 3214 at 17.)  Meta cannot be held liable for third-party conduct, but it can be held liable for its own affirmative conduct, including deceptive statements and unfair business practices. To alleviate any confusion, the jury can be given a limiting instruction.

*Second*, the Court disagrees with Meta's characterization of the laws of the four states. Meta posits that all four states' laws (a) only permit counting either per transaction or per consumer and (b) only permit counting per consumer if plaintiff shows the consumer was exposed to the alleged misconduct or suffered an actual injury.

Under California law, "[f]or the purpose of calculating civil penalties, what constitutes a violation of the UCL or the FAL depends on the circumstances of the case, including the type of violations, the number of victims, and the repetition of the conduct constituting the violation." *People ex rel. Harris v. Sarpas*, 225 Cal.App.4th 1539, 1566, 172 Cal.Rptr.3d 25, 50 (2014) (citing *People v. JTH Tax, Inc., supra,* 212 Cal.App.4th at p. 1251, 151 Cal.Rptr.3d 728; *Kennedy, supra,* 111 Cal.App.4th at p. 129, 3 Cal.Rptr.3d 429).  Moreover, Meta's proposal that counting by consumer only be permitted if the plaintiff can show each consumer was exposed to the conduct, "would all but require individualized proof of [exposure to the illegal conduct], which would be 'so onerous as to undermine the effectiveness of the civil monetary penalty as an enforcement tool.'" *People v. JTH Tax, Inc.*, 212 Cal.App.4th 1219, 1254, 151 Cal.Rptr.3d 728, 757 (2013) (quoting *People v. Superior Court,* 96 Cal.App.3d 181, 198 (1979)).

Colorado courts have said little on this topic, but the purpose of the statute is to punish and deter.  *May Dep't Stores Co. v. State ex rel. Woodard*, 863 P.2d 967, 976 (Colo. 1993) ("the purpose is to deter and punish regardless of actual injury or intent").  Further, they have explained that civil penalties do not reimburse consumers for overpayment or make them whole for injuries

received. *Id.* at 975 (Colo. 1993) (counting a violation for each day that a deceptive advertisement appeared); *see also May v. Colo. Civil Rights Comm'n,* 43 P.3d 750, 758–59 (Colo. App. 2002). Thus, it appears that Colorado's approach appears consistent with other states which provide a measure of flexibility for the Court to address the issue.

Under Kentucky law, "some creativity is permitted in determining what constitutes a violation in order to effectuate the legislature's intent that the KCPA 'in the hands of the Attorney General, be a flexible and effective means of combating abusive trade practices however novel their forms or well disguised their sources.'" *Am. Nat'l Univ. of Kentucky, Inc. v. Commonwealth ex rel. Beshear*, 2019 WL 2479608, at *7 (Ky. Ct. App. June 14, 2019) (quoting *Commonwealth ex rel. Chandler v. Anthem Ins. Companies, Inc.*, 8 S.W.3d 48, 55 (Ky. App. 1999).).

Under New Jersey law, the AG "does not have to prove that the victim of the fraudulent conduct had in fact been misled, deceived or damaged thereby." *Meshinsky v. Nichols Yacht Sales, Inc.*, 541 A.2d 1063, 1067 (explaining that the legislature explicitly established a lower standard of proof for consumer fraud actions brought by the AG than by private plaintiffs); *see also Jiries v. BP Oil*, 682 A.2d 1241, 1243 (Law. Div. 1996). It is not evident from the record before the Court or New Jersey case law that violations must be counted based upon the number of transactions involved. *See Platkin v. 22Mods4All Inc.*, 2023 WL 6629692, at *6 (N.J.Super.Ct.App.Div. 2023) (affirming lower court despite defendant's objection that "the judge erred in his calculation of the number of CFA violations and the amount of the penalty given the fact that there were only three transactions"). Meta appears to argue that while individualized proof is not required for liability, it becomes necessary in order for the Court to count violations by consumer at the remedies phase. This proposition lacks any legal citation. If this Court held that the state legislature lowered the burden of proof for the AG for purposes of liability, but maintained the same level for civil penalties, it would give no effect to the statutory language.

While the New Jersey Supreme Court has not ruled explicitly on the topic, the AGs' citations prove more persuasive. In *Kimmelman v. Henkels & McCoy Inc.*, the New Jersey Supreme Court stated that the trial court has discretion in determining penalties, outlining factors to

consider.  108 N.J. 123, 126 (1987).  Meta argues *Kimmelman* is a case about the New Jersey Antitrust Act, not the CFA.  (Dkt. No. 455, 4:26-27.)  However, in *Platkin v. 22Mods4All Inc.*, a CFA case, an Appellate Division court explained "A trial court has 'considerable discretion in determining the penalty appropriate in each case'" citing to *Kimmelman*.  2023 WL 6629692, at *7 (N.J. Super. Ct. App. Div. Oct. 12, 2023).  It appears New Jersey courts use the "*Kimmelman* factors" to determine civil penalties across various statutes, including the CFA.

*Third*, Meta argues that Saba's methodology is unreliable because he (a) "conducts no statistical analysis or any other type of empirical analysis to establish the reasonableness of extrapolating the results of a single survey . . . over a six-year period"; (b) "has no basis to conclude the BEEF results are representative of the MDL states' teen population"; and (c) "fails to consider that the design of the BEEF Survey likely introduced biases that would inflate his calculations."  The Court addresses each argument in turn.

*a)    Lack of Statistical Analysis*

Meta avers that Saba's only justification for extrapolating the BEEF survey results across six years is direction from plaintiffs' counsel.  The AGs respond that Saba reviewed a variety of data and information to find that "the nature, rate, and frequency" of Bad Encounters were not "substantially lower" before or after the BEEF Survey period in order to ensure his extrapolation would not overcount "Teens' Bad Encounters."  (Saba Report, ¶¶ 78–79.)

Upon review of the report and Saba's deposition testimony, the Court finds that Meta's arguments regarding Saba's extrapolation of the BEEF survey go to weight, not admissibility.  In part, Meta mischaracterizes.  Saba extrapolated for the Relevant Time Period.[4]  That the period was ultimately determined by counsel is not dispositive.  Further, counsel did not mandate the method of extrapolation.

---

[4] In his Rebuttal Trial Report, Saba notes that Meta's rebuttal expert did not propose an alternative.  Dkt. No. 2914-4 ¶¶ 78-92.

7

b)    *Lack of Representativeness*

Meta argues that the BEEF survey respondents are not representative, in part because it includes non-U.S. respondents. However, in his report, Saba explains that he reviewed Meta's internal documents and found that the BEEF Survey was superior to other available data sources because it was conducted during the Relevant Time Period, had a large number of respondents, posed questions about a variety of bad experiences, and was designed by Meta to provide "a holistic and consistent picture of users' bad experiences on Instagram." (Saba Report ¶¶ 64, 66-67.) Moreover, Saba testified that he relied upon the subset of BEEF Survey responses that Meta internally reported, and that those responses appear to be correlated with the number of U.S. respondents to the BEEF Survey. (Dkt. No. 2914-5, Saba Dep. at 173:11–176:2.)

Again, upon review of the report and Saba's deposition testimony, the Court finds that Meta's arguments regarding the representativeness of the sample used in the BEEF survey go to weight, not admissibility. Internal data which a company itself generates for internal purposes has probative value, even if it is not perfect.

c)    *Failure to Consider Biases*

Finally, Meta argues that Saba did not address potential biases or technical issues with the BEEF surveys. This is a fundamental example of an issue that goes to weight, not admissibility.

For the foregoing reasons, the motion as to Opinion 5 is denied.

**2. Time Spent Testimony (Opinion 1)**

Next, Meta challenges Saba's Time Spent calculations, which count the monthly instances of average daily time spent on the platforms by teens in MDL states based on data produced by Meta. Saba's Opinion 1 states:

> By way of example, in March 2018, the 75th percentile, i.e., 75%, of [Monthly Active Users "MAU"] in California aged 13 to 17 spent less than 3,111 seconds a day on average during the month. The 80th percentile, i.e., 80%, spent less than 3,621 seconds a day on average. Using these two data points, I estimate using linear interpolation that 79.79 percent of MAU aged 13 to 17 spent less than 3,600 seconds a day on average, i.e., 1 hour. The converse of this computation reflects that 20.21 percent of MAUs aged 13 to 17 spent more than 3,600

8

seconds a day on average in the month of March 2018, i.e., more than 1 hour per day on average.

(Saba Report ¶ 128.) Saba further explains that he used this methodology to determine the percentage of teen MAUs that spent more than 0.5, 1, 2, 3, 4 and 5 hours per day on average in each month. (*Id.* ¶ 129.)

Meta first challenges this opinion on the basis that it is "incorrect as a matter of law." As discussed above, the Court is not persuaded by Meta's state law arguments. The Court declines to find that time spent is an impermissible method for counting violations as a matter of law, but the Court reserves the discretion to consider the argument in the final analysis of how to effectuate the goals of the statute, if appropriate.

Meta asserts additional methodological critiques of this opinion, none of which persuade the Court to exclude the testimony outright. For example, Meta argues that Saba's calculations are based on "arbitrary time thresholds" and are thus not reliable. However, the AGs have confirmed that they will proffer other expert testimony and record evidence that use these and similar thresholds to examine "problematic use and mental health impacts linked to time spent on the platforms."[5] This is consistent with the overall perspective that the Court must consider the totality of the circumstances.

Meta also criticizes this opinion on the basis that Saba cannot disaggregate his calculations of time spent due to the conduct at issue and other causes. That the report does not tease out causation as to each actionable feature does not bar admissibility of all such evidence. *See Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) ("Reliable expert testimony need only be relevant, and need not establish every element that the plaintiff must prove, in order to be admissible"); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig.*, 978 F.Supp.2d 1053, 1066–67 (C.D.Cal. 2013) ("[N]o single expert provides a self-sufficient opinion that [defendants' conduct] in fact caused the [plaintiff's harm]. This is not dispositive.").

---

[5] For example, the AGs proffer Dr. Jean Twenge, who will opine on the link between increased time spent on social media and mental health. *See* Dkt. No. 2914-9 ["Twenge Report"] ¶¶ 34–93.

The motion as to Opinion 1 is denied.

### 3. Disgorgement Opinions (Opinions 3 and 4)

At the outset, the Court notes that as to disgorgement issues, the parties have agreed that the Court shall make any decisions regarding whether disgorgement is an appropriate remedy and if so, in what amount. Therefore, any arguments about what should be admitted to the jury are moot.

Meta argues that Saba's Opinions 3 and 4 should be excluded because they are (1) based on the inadmissible Time Spent Violations opinion; (2) based upon instruction of counsel and unreliable; and (3) "incorrect as a matter of law." The Court takes each point in turn.

*First*, for the reasons set forth above, the Court rejected Meta's view that the Time Spent Violations opinion was inadmissible, thus this argument is mooted.

*Second*, Meta argues that Saba's calculations in fact show a different result than he concluded – that in fact, Meta lost money on "affected teens" and continues to do so. Effectively, Meta's argument is that Saba's choice of methodology spins the numbers to result in positive disgorgement calculations. However, they make no specific methodological critique. Moreover, the Court notes that the same critique could be directed at Meta's own expert. This is a case of competing experts, each of whom has a different and contrasting opinion as to how the numbers should be interpreted. In both instances, this argument goes to weight, not admissibility.

*Third*, Meta contends there must be a "causal relationship" between Saba's disgorgement figure and the alleged misconduct, citing to *Out of the Box Enters., LLC v. El Paseo Jewelry Exch., Inc.*, 732 F. App'x 532, 534 (9th Cir. 2018). The Court disagrees. Meta has repeated throughout summary judgment briefing and briefing for this motion that Saba's disgorgement figures are not causally connected to the alleged misconduct. However, if plaintiffs are able to show that Meta engaged in illegal conduct to increase teen user time spent on the platforms, which in turn resulted in profits, that is sufficient to establish the required connection. Regardless, this is not a proper basis on which to exclude expert testimony. "Reliable expert testimony need only be relevant, and need not establish every element that the plaintiff must prove, in order to be admissible." *See Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010).

The motion as to Opinions 3 and 4 is denied.

### 4. U13 Usage Opinions (Opinions 8-9)

Meta next contends that Saba's opinions estimating the number of daily active U13s and unique U13 users on Meta's platforms from 2012 to 2023 should be excluded because (1) Saba does not justify his reliance on the Thorn Surveys[6]; (2) Saba failed to address various potential biases in the Thorn Surveys.

*First*, upon review of the record, Saba does in fact discuss his reasoning to rely on the Thorn surveys. He assessed other available data sources, including Meta's own estimates of U13 users on the platforms found in Meta's internal documents. (*See* Saba Rep. ¶¶ 240-248; Saba Dep. 239:18-240:2.) Ultimately, he decided that the Thorn Surveys contained information that was pertinent to his inquiry and spanned a longer time than Meta's point estimates.

*Second*, Meta's arguments that Saba failed to address biases in the Thorn Surveys goes to weight not admissibility. Meta may question Saba on any failure to account for bias, such as whether the sample included only U13s with access to the internet or the inclusion of children who watch a third party's account without having one of their own. However, this is not a sufficient basis for exclusion.

### 5. Other Objections

Finally, Meta seeks to exclude portions of Saba's Report on the basis that (1) his methodology is unreliable; (2) he presents certain opinion "solely for the purpose of constructing a factual narrative" without analysis; and (3) opines on the law.

Meta contends that Section VII of Saba's Report is "used to justify Saba's otherwise baseless assumption that the BEEF Survey results can be extrapolated over a six-year period." Specifically, they complain that Saba's reasoning is flawed because it is solely based on a temporal correlation. This is not a sufficient basis for exclusion. Rather, the issue goes to weight not admissibility.

---

[6] These surveys were conducted by Thorn & Benenson Strategy Group annually from 201 through 2023. Saba Rep. ¶ 251.

Next, Meta argues that Section V.3 of the Report is presented "solely for the purpose of constructing a factual narrative, with no expert analysis."  Meta is correct that Saba may not opine on Meta's state of mind, as the Court has explained in prior 702 orders.  (*See, e.g.* Dkt. No. 3068, 3.)  Both parties are reminded that experts can only speak to evidence that has already been admitted, cannot serve as a conduit for attorney argument, and generally may not speculate as to someone's state of mind.  But that is not the issue here.  In the example referenced, Saba uses Meta's own words and provides context for the source and reliability of the data he relied upon to perform his calculations, including any data Meta itself produced regarding acquisition of teen users.  In this way, the testimony is appropriate.

Meta's motion on this ground is denied.

## B.  JUSTIN MCCRARY

Dr. McCrary describes his assignment as one to evaluate "the economic implications of Mr. Saba's findings in the context of Plaintiffs' allegations."  (Dkt. No. 2844-4, Expert Rebuttal Report of Justin McCrary [("McCrary Rep.")] ¶ 1.)  McCrary received his Ph.D. in Economics from the University of California, Berkeley in 2003.  Since then, he has held various academic positions, including his current role as the Paul J. Evanson Professor at Columbia Law School.  He has served as a Faculty Research Associate of the National Bureau of Economic Research since 2012. McCrary has published papers in many economics journals, including on the topics of econometric and statistical methodology, antitrust, labor, crime, and education.

Plaintiffs only challenge McCrary's Opinions 1 and 2.

McCrary opines that (1) "Saba provides no explanation as to how the events that he tallies are associated with harm in any way, or how they resulted in any negative mental health outcomes to Teens, much less how these instances are linked to the alleged conduct and the At-Issue Features"; and (2) "Mr. Saba's results would fail to support a claim of widespread consumer harm [because] publicly available data and data from Meta do not support a claim of widespread consumer harm."  (*Id.* ¶¶ 2, 3.)

12

Expert testimony rooted in "a sufficient basis in education and experience," is admissible. *Primiano v. Cook*, 598 F.3d 558, 567 (9th Cir. 2010). McCrary appropriately relies on his experience and background in economics, econometrics, and statistics, supported by the studies cited in his report, to evaluate Saba's methodologies and results and opine on how they may be flawed. His opinions on the sufficiency of Saba's methodologies are reasonably based in his assessment of Saba's Report, Meta's internal documents, and publicly available research and data.

### 1.  Insufficient Qualifications

The AGs object that McCrary is insufficiently qualified to support Opinions 1 and 2 because he does not have specialized skills in the areas of social media, social media addiction, mental health, epidemiology, psychology, public health, or adolescent development. Notably, the AGs' own expert, to which McCrary serves only in rebuttal, does not claim to have such expertise.

The Court rejects the argument that McCrary cannot comment on a lack of data to support Saba's claims. However, McCrary then takes an additional step when he opines that substantively the Saba Report is inconsistent with other, substantive third-party reports that he did not write. It is not clear that he has the expertise necessary to opine in this particular way. The Court will discuss this issue further with the parties.

### 2.  Methodological Deficiencies

The AGs also argue that McCrary's opinions are not grounded in reliable, scientific principles and methods. Specifically, they argue that McCrary's work is based upon an assumption of what "harm" must be associated with the time spent calculations. Yet the AGs' expert Saba makes similar assumptions. Both experts interpret the alleged harm to support their conclusions. Demonstrating how the selection of a different definition impacts these calculations is appropriate for a rebuttal expert. The AGs also take issue with how McCrary selected the data upon which his opinions rely. For example, the AGs highlight that McCrary only relies on a single public data source to conclude that teens' total school day screentime remained constant from 2015 to 2021. While these arguments may be useful for the AGs to impeach his testimony, they do not provide an adequate basis for excluding his opinions. The motion on this ground is denied.

### 3.  Scope of Rebuttal

Next, the AGs argue that McCrary's opinions exceed the scope of proper rebuttal under Fed. R. Civ. P. 26(a)(2).  Specifically, the AGs assert that McCrary's opinions are not responsive to Saba because Saba does not opine on the causal links between time spent and harms to users.  Challenging an expert witness' assumptions *is* within the scope of rebuttal testimony.  Here, Meta rightly contends that McCrary's opinions on the absence of a link between time spent and user harm contest the implied assumptions in Saba's Report.  The motion on this ground is denied.

### 4.  Late Disclosure

Finally, the AGs argue that McCrary's opinions were disclosed six months late.  The Court is not persuaded.  First, McCrary is not proffered as a causation expert but as a rebuttal expert to the AGs' damages expert.  Therefore, McCrary may not testify on the topic of causation.  Second, McCrary's Report was served on January 9, 2026.  Plaintiffs have had sufficient time.

The motion on this ground is denied.

## IV.    CONCLUSION

The motion to exclude the opinions of Carl Saba is **DENIED**.  The motion to exclude the opinions of Justin McCrary is tentatively **DENIED IN PART AND GRANTED IN PART**.

This Order terminates the following Docket. Nos.: 2843 & 2845 in Case No. 22-md-03047; 276 in Case No. 23-cv-5448.

**IT IS SO ORDERED.**

Dated:  July 16, 2026

_____
**YVONNE GONZALEZ ROGERS**
**CHIEF UNITED STATES DISTRICT JUDGE**

14