**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

**PEOPLE OF THE STATE OF CALIFORNIA**,
et al.,

Plaintiffs,

v.

**META PLATFORMS, INC., et al.**,

Defendants.

Case No. 4:22-md-03047-YGR
Case No. 4:23-cv-05448-YGR

Hon. Yvonne Gonzalez Rogers
Direct Member Case of MDL No. 3047

---

**AMICUS CURIAE BRIEF OF THE NATURAL LAW INSTITUTE ON CAUSAL ALLOCATION, CHILD STEWARDSHIP, PLATFORM RESPONSIBILITY, AND THE NON-TRANSFER OF NEGATIVE EXTERNALITIES**

**A Decisional Framework for Separating Access, Content, Custody, Platform Operation, Industry Incentives, Causation, and Remedy Across the Coordinated Proceedings**

---

**TABLE OF CONTENTS**

**PRELIMINARY STATEMENT**

**STATEMENT OF THE ISSUES PRESENTED**

**STATEMENT OF THE RELEVANT PROCEEDINGS**

**TABLE OF AUTHORITIES**

**I. INTEREST OF AMICUS CURIAE**

**II. THE COURT SHOULD FIRST SEPARATE FIVE COLLAPSED PREDICATES**

A. Access Collapse
B. Content Collapse
C. Stewardship Collapse
D. Causation Collapse
E. Remedy Collapse

## III. EACH CLAIM SHOULD PROCEED THROUGH A FIXED CAUSAL SEQUENCE

A. Access and Content Origin
B. Platform Intervention
C. Stewardship, Knowledge, and Representation
D. Incremental Harm and Remedy

## IV. STEWARDSHIP AND PLATFORM RESPONSIBILITY ARE CONCURRENT BUT NONTRANSFERABLE

## V. PLATFORM RESPONSIBILITY SHOULD FOLLOW PLATFORM-CONTROLLED CONDUCT

A. Deception
B. Unlawful Child-Data Practices
C. Defective or Misrepresented Controls
D. Operational Escalation

## VI. GENERALIZED USE, INTENT, AND HEALTH CLAIMS REQUIRE CAUSAL PRECISION

A. Continued Use Does Not Establish Every Relevant Mental State
B. General Health Claims Require a Comparative Baseline and Platform-Specific Increment

## VII. PUBLIC-ENTITY CLAIMS REQUIRE ACCOUNTING FOR PREEXISTING INSTITUTIONAL DUTIES

## VIII. THE COURT SHOULD DISTINGUISH PLATFORM-SPECIFIC MISCONDUCT FROM INDUSTRY-WIDE DEFECTS

## IX. SYSTEM PERFORMANCE SHOULD NOT BE EQUATED WITH HUMAN BENEFIT

## X. JUDICIAL REMEDIES SHOULD BE SEPARATED FROM MARKET-WIDE LEGISLATIVE REFORM

## XI. FIRST AMENDMENT AND SECTION 230 BOUNDARIES SHOULD REMAIN FEATURE-SPECIFIC

## XII. REMEDY MUST FOLLOW DUTY, CONTROL, BENEFIT, AND PROVED CONTRIBUTION

**XIII. APPLICATION ACROSS THE FOUR TRACKS OF THE COORDINATED PROCEEDINGS**

**XIV. THE COURT SHOULD PRESERVE FAMILY STEWARDSHIP WHILE ENFORCING COMPLETE PLATFORM RESPONSIBILITY**

**CONCLUSION**

<u>**TABLE OF AUTHORITIES**</u>

<u>**Cases**</u>

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez, 458 U.S. 592 (1982)*

*Barnes v. Yahoo!, Inc., 570 F.3d 1096 (9th Cir. 2009)*

*Cabral v. Ralphs Grocery Co., 51 Cal. 4th 764 (2011)*

*Doe v. Internet Brands, Inc., 824 F.3d 846 (9th Cir. 2016)*

*Fair Housing Council of San Fernando Valley v. Roommates.com, LLC, 521 F.3d 1157 (9th Cir. 2008) (en banc)*

*Gonzalez v. Google LLC, 598 U.S. 617 (2023)*

*Kwikset Corp. v. Superior Court, 51 Cal. 4th 310 (2011)*

*Lemmon v. Snap, Inc., 995 F.3d 1085 (9th Cir. 2021)*

*Lexmark International, Inc. v. Static Control Components, Inc., 572 U.S. 118 (2014)*

*Moody v. NetChoice, LLC, 603 U.S. ___ (2024)*

*NetChoice, LLC v. Bonta, ___ F.4th ___, No. 25-2366 (9th Cir. Mar. 12, 2026)*

*Parham v. J.R., 442 U.S. 584 (1979)*

*Paroline v. United States, 572 U.S. 434 (2014)*

*Rowland v. Christian, 69 Cal. 2d 108 (1968)*

*Spokeo, Inc. v. Robins, 578 U.S. 330 (2016)*

*TransUnion LLC v. Ramirez, 594 U.S. 413 (2021)*

*Troxel v. Granville, 530 U.S. 57 (2000)*

*Twitter, Inc. v. Taamneh, 598 U.S. 471 (2023)*

**Statutes**

*15 U.S.C. §§ 6501–6506*

*47 U.S.C. § 230*

*Cal. Bus. & Prof. Code § 17200 et seq.*

*Cal. Bus. & Prof. Code § 17500 et seq.*

*Cal. Civ. Code § 1798.99.28 et seq.*

**Rules**

*Fed. R. Civ. P. 1*

*Fed. R. Evid. 401*

*Fed. R. Evid. 402*

*Fed. R. Evid. 403*

---

**PRELIMINARY STATEMENT**

These coordinated proceedings concern serious allegations involving children, families, schools, public institutions, content creators, offenders, communications platforms, and government. Their seriousness makes causal precision paramount.

This brief proposes a disciplined method for allocating existing duties among actors who simultaneously exercise different forms of authority, knowledge, control, and influence over the same child or digital environment.

The litigation ought not require the Court to choose between absolving platforms and transferring the direct stewardship of children to platforms. The Court can hold every actor to the duty, knowledge, authority, control, and causal contribution that actor actually possessed. Parents and schools remain responsible for children placed within their care. Platforms remain responsible for their representations, data practices, controls, systems, and provable increments of harm. Content creators remain responsible for the content and conduct they create. Government remains responsible for the legal standards, incentives, and market structure it establishes. Liability and remedy should follow those lanes without leakage.

The central difficulty is that legally distinct predicates have been compressed into common terms such as "youth harm," "addiction," "dangerous design," "harmful content," "recommendation," "failure to protect children," "institutional cost," and "social-media use." Those terms identify serious subjects. Standing alone, however, they do not identify who

4

created the relevant condition; who authorized access; who possessed custody; what the platform itself added; what duty existed; what breach occurred; what injury followed; what portion of that injury is attributable to a defendant; or what remedy corresponds to the proved wrong.

Unless these predicates are separated, coordination may produce a coordinated transfer of responsibility rather than a coordinated adjudication of responsibility. Amicus therefore proposes a fixed sequence: access, content origin, platform intervention, stewardship, knowledge and representation, incremental harm, and remedy. The sequence does not presume that responsibility belongs to one actor. It permits multiple actors to bear distinct responsibility where the evidence establishes distinct duties, breaches, and causal contributions.

The governing settlement is reciprocal:

**Custodians answer for custody. Platforms answer for platform conduct. Creators answer for content. Institutions answer for delegated stewardship. Government answers for rules and incentives. Damages answer for proved injury. Legislation answers for market-wide defects.**

---

## STATEMENT OF THE ISSUES PRESENTED

1. Whether claims concerning youth social-media use should be classified by the actor who controlled the challenged conduct, possessed the relevant knowledge and authority, and caused the proved increment of injury.
2. Whether the Court should distinguish third-party content and editorial judgment from a platform's independent representations, data practices, controls, account architecture, recommendation objectives, notifications, targeting, and operational escalation.
3. Whether direct stewardship of children should remain with parents, guardians, and institutions possessing custody, proximity, authority, and practical capacity to intervene, while platforms remain fully responsible for conduct occurring within their own operational boundary.
4. Whether causation and damages should be limited to the defendant-specific increment proved after accounting for baseline conditions, competing causes, institutional duties, mitigation, and distinct rather than duplicative injuries.
5. Whether the Court should distinguish defendant-specific misconduct susceptible to adjudication from market-wide incentive structures requiring uniform prospective legislation or regulation.

---

## STATEMENT OF THE RELEVANT PROCEEDINGS

The coordinated proceedings combine materially different claims and remedies, including state-enforcement claims, personal-injury claims, school and local-government claims,

allegations involving minors' data and platform controls, claims concerning exploitation or predatory conduct, constitutional and Section 230 questions, platform-design theories, and requests for monetary, statutory, equitable, and structural relief.

Amicus does not ask the Court to determine disputed facts concerning an individual claimant through this brief. It proposes a common decisional architecture by which the Court may classify the different claims and defenses before assigning duty, causation, liability, or remedy. The framework is intended to preserve complete responsibility within each actor's lawful sphere while preventing one actor's duty or negative externality from being transferred wholesale to another.

## I. INTEREST OF AMICUS CURIAE

The Natural Law Institute is an independent research and educational institution concerned with the structure, function, and legitimacy of adjudication. The Institute studies law as a civilizational method for producing settlement among actors whose duties, authorities, capacities, and causal contributions differ.

Its work focuses on the conditions necessary for adjudication to remain intelligible, reciprocal, proportionate, and durable where disputes involve multiple institutions, diffuse causation, emerging technologies, overlapping systems of authority, distributed harms, and remedies capable of transferring costs among actors.

These coordinated proceedings present those conditions in unusually concentrated form. They combine state enforcement, individual injury, institutional-cost recovery, minors' data, platform controls, predatory conduct, recommendation architecture, constitutional boundaries, company-specific allegations, industry-wide incentive problems, and several categories of monetary and prospective relief.

The Institute has no financial interest in any party, damages award, penalty, settlement, injunction, platform, school district, or public entity implicated by these proceedings. Its position is neutral as to party identity and exacting as to responsibility. Its governing concern is that each actor answer for the authority exercised, duty held, representation made, conduct controlled, benefit received, and injury caused.

## II. THE COURT SHOULD FIRST SEPARATE FIVE COLLAPSED PREDICATES

The Court should not adjudicate "protection," "design," "harm," "addiction," or "use" as undifferentiated concepts. Each term can contain several actors, duties, mechanisms, and remedies. Five recurring grammatical collapses are especially consequential. Every significant disagreement in these coordinated proceedings can be understood as one or more of these predicate collapses.

This method follows ordinary adjudicative discipline. Relevance, causation, duty, and remedy depend upon the specific act, actor, relationship, injury, and legal interest at issue. See Fed. R. Evid. 401–403; *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014); *Paroline v. United States*, 572 U.S. 434 (2014); *Twitter, Inc. v. Taamneh*, 598 U.S. 471 (2023). California duty analysis likewise turns on concrete relationships, foreseeability, moral blame, and policy consequences rather than generalized labels. *Rowland v. Christian*, 69 Cal. 2d 108 (1968); *Cabral v. Ralphs Grocery Co.*, 51 Cal. 4th 764 (2011).

## A. Access Collapse

Access collapse occurs when permission or practical ability to use a platform is treated as though the platform created and controlled the entirety of the child's access. Access may depend on who provided the device and connectivity; who installed the application or created the account; what age representation was made; whether a parent, guardian, or institution permitted use; who controlled nighttime or unsupervised possession; whether new accounts were created after restrictions; whether controls were circumvented; and whether use continued after observable dysfunction.

A platform may bear responsibility for misleading age controls, knowing underage access, rapid account recreation, defective restrictions, or platform-facilitated circumvention. That responsibility does not make the platform the source of every access decision preceding or surrounding use.

## B. Content Collapse

Content collapse occurs when third-party expression is treated as platform-created conduct merely because a platform hosted, published, ranked, recommended, repeated, targeted, or monetized it. Creation, hosting, publication, editorial selection, automated ranking, targeted recommendation, notification, commercial amplification, unlawful solicitation, and platform-created representation are related but legally distinct acts.

That distinction is consistent with Section 230 doctrine and First Amendment doctrine alike. Section 230 protects against treating a provider as the publisher or speaker of third-party content, 47 U.S.C. § 230, yet the Ninth Circuit has distinguished third-party publication claims from claims based on a platform's own promises, warnings, product features, or material contribution to illegality. *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096 (9th Cir. 2009); *Doe v. Internet Brands, Inc.*, 824 F.3d 846 (9th Cir. 2016); *Fair Housing Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157 (9th Cir. 2008) (en banc); *Lemmon v. Snap, Inc.*, 995 F.3d 1085 (9th Cir. 2021).

The creator remains responsible for the message created. The platform remains responsible for what it independently did with the message. Third-party authorship should not immunize the platform's independent conduct, and platform transmission should not automatically transfer authorship to the service.

## C. Stewardship Collapse

Stewardship collapse occurs when a service provider is treated as the direct custodian of a child whose device, schedule, supervision, treatment, and physical environment remain within the authority of parents, guardians, schools, and other entrusted institutions.

The Supreme Court has long recognized the primary constitutional role of parents in the care, custody, and control of their children. *Troxel v. Granville*, 530 U.S. 57 (2000); *Parham v. J.R.*, 442 U.S. 584 (1979). That principle does not immunize platform misconduct. It identifies the first lawful boundary in any dispute concerning children: direct stewardship remains with the actors possessing custody, proximity, and practical authority over the child, while platforms remain fully responsible for their own systems, representations, and controlled operations.

Direct stewardship follows custody, authority, proximity, knowledge of the child's condition, practical capacity to intervene, and responsibility for continued surrounding conditions. Platform responsibility follows control over platform representations, data practices, account architecture, recommendation systems, notifications, controls, reporting pathways, exploitation pathways, and operational consequences. These responsibilities may overlap, but they should not merge.

**D. Causation Collapse**

Causation collapse occurs when temporal sequence is treated as causal proof. The sequence "platform use followed by dysfunction" does not establish that the platform created the dysfunction; that the dysfunction did not precede use; that the child did not seek the service because of preexisting distress; that other services or surrounding conditions did not contribute; that family, school, peer, clinical, or cultural causes were immaterial; that the challenged feature added measurable harm; or that the injury would have been avoided without it.

The law regularly distinguishes broad factual background from legally sufficient causation. Proximate cause requires a connection between the defendant's conduct and the injury protected against by the legal rule. *Lexmark*, 572 U.S. 118; *Paroline*, 572 U.S. 434; *Twitter*, 598 U.S. 471. Statutory and Article III injury analysis similarly requires a concrete injury or legally cognizable invasion, not merely an abstract statutory or social concern. *Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016); *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021).

A legally sufficient causal theory should identify the platform-controlled mechanism and the increment of injury it added.

**E. Remedy Collapse**

Remedy collapse occurs when one underlying event is multiplied automatically across the child, parent, school, municipality, state, account, day, view, recommendation, data point, statement, and statutory theory.

Those categories may support separate relief where they protect distinct legal interests or reflect distinct injuries. They should not become automatic multipliers for the same externality. The Court should move from label to predicate, predicate to duty, duty to breach, breach to incremental harm, and incremental harm to proportionate remedy.

This follows ordinary remedial structure. Restitution concerns benefit received, compensation concerns injury caused, penalties depend on the statutory unit and culpability, and equitable relief must correspond to what the defendant can lawfully and practically correct. *Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310 (2011); *Paroline*, 572 U.S. 434; *Lexmark*, 572 U.S. 118.

---

### III. EACH CLAIM SHOULD PROCEED THROUGH A FIXED CAUSAL SEQUENCE

Regardless of the substantive cause of action asserted, the same decisional sequence should govern the allocation of responsibility. A common sequence will not force unlike claims into one result. It will ensure that unlike claims are distinguished through the same disciplined questions.

This sequence is consistent with the basic structure of duty, breach, causation, and remedy. It also reflects the Supreme Court's caution against imposing platform liability based on generalized availability or attenuated causal association rather than a legally sufficient connection to the defendant's own conduct. *Twitter*, 598 U.S. 471; *Lexmark*, 572 U.S. 118; *Paroline*, 572 U.S. 434.

#### A. Access and Content Origin

The access inquiry should identify who supplied the device; who authorized use; who created or maintained the account; what age representation and age signals existed; what controls were activated; whether they functioned; who enabled continued access; and whether access continued after observable harm.

The content-origin inquiry should identify who created the material; whether it was lawful or unlawful, commercial or noncommercial, requested or unsolicited; whether it circulated across several services; and whether the alleged harm arises from the message itself or from the platform's independent treatment of it.

#### B. Platform Intervention

The Court should then identify what the platform itself added. Relevant conduct may include ranking, repetition, recommendation, profiling, notifications, contact suggestions, targeting, commercial optimization, defective controls, account linkage, concealment, or operational escalation.

The central platform-specific question is:

What did the platform itself control, add, conceal, defeat, or intensify?

#### C. Stewardship, Knowledge, and Representation

The Court should identify who possessed custody and proximity; who observed the condition; who could alter access or obtain treatment; who governed the school environment; who could alter the platform system; and who could enact an industry-wide rule.

Platforms may possess superior knowledge of recommendation objectives, age signals, control failures, prevalence of underage accounts, data practices, exploitation pathways, internal research, conflicts between commercial and safety objectives, and actual safeguard performance. Custodians and institutions may possess superior knowledge of sleep, mood, family conditions, school performance, bullying, clinical history, visible deterioration, multi-platform use, and repeated circumvention.

No actor should be charged automatically with knowledge held exclusively by another actor unless a legal basis for imputation or a breached communication duty exists.

### D. Incremental Harm and Remedy

Incremental harm is the difference between the injury that occurred and the injury likely to have occurred absent the challenged platform-controlled act. The Court should identify the preexisting condition, what the platform added, whether the addition was material and foreseeable, whether it was avoidable, whether another actor could have interrupted it, what injury followed, and what portion remains attributable to competing causes.

Remedy should correct the contribution proved:

Restitution follows receipt. Compensation follows attributable injury. Penalty follows culpability and the statutory unit. Injunction follows control. Legislation follows systemic defect.

---

### IV. STEWARDSHIP AND PLATFORM RESPONSIBILITY ARE CONCURRENT BUT NONTRANSFERABLE

The platform is steward of its service. The custodian remains steward of the child.

Parents and guardians ordinarily possess authority concerning device provision, application access, account permission, nighttime possession, duration limits, household rules, monitoring, intervention, treatment, communication with schools, and continuation after observable dysfunction. Schools possess delegated authority concerning school-issued devices, classroom access, digital curriculum, discipline, counseling, attendance, peer conduct, bullying response, observation, and institutional intervention.

Platforms possess a distinct sphere of control concerning account architecture, data collection, recommendation systems, notifications, parental controls, age assurance, representations, reporting pathways, exploitation detection, and operation of the service itself.

A platform ordinarily cannot remove every device, alter the child's home environment, obtain treatment, control school attendance, govern competing services, or observe the whole child. A parent ordinarily cannot inspect internal recommendation objectives, age-inference systems, control efficacy, data processing, exploitation networks, or system-wide conflicts between operational objectives.

Responsibility should therefore follow the information, authority, and practical capacity each actor actually possesses. Custodial failure and platform failure may coexist. A parent may fail to intervene while a platform misrepresents a control. A child may circumvent a restriction while the platform knowingly tolerates rapid account recreation. A school may observe deterioration and delay response while a recommendation system intensifies exposure. A third party may create harmful material while the platform independently targets or amplifies it.

Concurrent responsibility is not contradictory. Multiple actors may simultaneously breach independent duties arising from different sources of authority without any one breach extinguishing another. A parent's duty over access and intervention does not erase a platform's duty of truthful representation or lawful data practice. A platform's breach does not erase a school's delegated duty of observation and response.

Each actor should answer for the contribution each made. Direct stewardship follows custody, authority, proximity, knowledge, and practical capacity to intervene. Platform responsibility follows control over the service, its representations, data, safeguards, systems, and operational consequences.

---

## V. PLATFORM RESPONSIBILITY SHOULD FOLLOW PLATFORM-CONTROLLED CONDUCT

Platform responsibility is strongest where the challenged conduct is direct, measurable, and controlled by the platform. Four lanes are especially susceptible to adjudication.

The Ninth Circuit's Section 230 cases preserve precisely this distinction. A claim directed to a platform's own promise, warning duty, product feature, or material contribution to illegality occupies a different posture from a claim treating the platform as publisher or speaker of third-party content. *Barnes*, 570 F.3d 1096; *Internet Brands*, 824 F.3d 846; *Roommates.com*, 521 F.3d 1157; *Lemmon*, 995 F.3d 1085. California consumer-protection law likewise focuses on materially misleading business practices and loss caused by them. Cal. Bus. & Prof. Code §§ 17200, 17500; *Kwikset*, 51 Cal. 4th 310.

### A. Deception

A deception inquiry should compare what the platform represented, what it internally knew, what the system actually did, what a safeguard actually accomplished, whether any discrepancy was material, who relied on the representation, what conduct changed, and what harm followed.

The central question is whether the platform materially misdescribed a system it knowingly operated. Relevant representations may concern youth safety, parental controls, age enforcement, privacy, harmful-content reduction, time-management tools, exploitation prevention, recommendation systems, internal research, or the relationship between engagement and wellbeing.

## B. Unlawful Child-Data Practices

Data practices provide a direct statutory and operational lane independent of generalized health causation. The Court should distinguish collection, inference, retention, profiling, targeting, transfer, deletion, consent, age-related processing, and use beyond a disclosed or authorized purpose.

Federal and state child-data laws protect interests distinct from traditional physical injury. See 15 U.S.C. §§ 6501–6506; Cal. Civ. Code § 1798.99.28 et seq. Where the law protects a distinct data interest, proof of unlawful collection or use need not depend on proving that the violation caused every later psychological or developmental injury alleged in the coordinated proceedings.

## C. Defective or Misrepresented Controls

Controls are the primary operational interface between custodial authority and platform responsibility. A platform may bear responsibility where it represents a control as effective when it is not; conceals known limitations; facilitates circumvention; fails to apply restrictions across linked accounts; permits rapid recreation of restricted accounts; restores settings without adequate disclosure; characterizes reminders as safeguards; or continues making unsupported efficacy claims.

The governing inquiry is concrete:

What did the control promise, what did it deliver, and what harm followed from the difference?

## D. Operational Escalation

A valid operational-escalation theory should identify the operative objective; relevant user population; age or vulnerability signals; starting content; user action; recommendation path; additional exposure generated by the platform; known risk; feasible constraint; and resulting injury.

A generalized assertion that "the algorithm caused harm" does not identify a complete causal mechanism. Platform responsibility should extend fully to what the platform created, represented, collected, optimized, concealed, facilitated, defeated, or knowingly failed to correct within its own service.

## VI. GENERALIZED USE, INTENT, AND HEALTH CLAIMS REQUIRE CAUSAL PRECISION

### A. Continued Use Does Not Establish Every Relevant Mental State

Continued use proves continuation. It does not by itself prove welfare, coercion, clinical compulsion, consent to every platform operation, settled intent to continue, settled intent to stop, platform knowledge of an internal conflict, or platform causation of the whole condition.

A user may simultaneously possess an immediate preference to continue, a medium-term desire to reduce use, a long-term desire to disengage, a parental instruction to stop, a clinical recommendation to stop, and later regret. An uncommunicated internal conflict should not automatically become contemporaneous platform knowledge.

An intention becomes operationally legible when a user or custodian activates a time limit, disables notifications, selects a bedtime setting, imposes a parental restriction, seeks deactivation or deletion, withdraws consent, reports difficulty, or invokes a content or contact restriction. The Court can then ask what the control promised, whether the platform executed it, whether the user overrode it, whether the platform facilitated circumvention, whether operation was misrepresented, and what harm followed.

Later regret or conflicting preference may be relevant evidence. It should not become an implied platform fact detached from contemporaneous notice or system behavior.

### B. General Health Claims Require a Comparative Baseline and Platform-Specific Increment

General health claims require more than proof that adolescents used social media and later experienced distress. The appropriate questions are: Compared with whom? In what temporal direction? After accounting for which competing variables? Through what identified platform-controlled mechanism?

Causation doctrine requires the same discipline. *Lexmark*, *Paroline*, and *Twitter* all reject legally sufficient responsibility based on attenuated association detached from the defendant's own actionable contribution. Article III and statutory-injury cases likewise distinguish concrete injury from abstract or generalized concerns. *Spokeo*, 578 U.S. 330; *TransUnion*, 594 U.S. 413.

Relevant alternative or concurrent causes may include preexisting mental-health conditions, family conflict, school pressure, bullying, trauma, sleep disruption, physical inactivity, general smartphone use, gaming, streaming, messaging, multi-platform exposure, institutional screen use, and broader cultural conditions.

A child experiencing loneliness, anxiety, exclusion, or family conflict may seek digital interaction more intensely. In that circumstance, use may be a cause, consequence, coping mechanism, aggravating factor, indicator of an underlying condition, or several of these at once.

General causation does not establish specific causation. Evidence that a feature is capable of producing a defined category of harm does not establish that every claimant encountered it or was injured by it. A claimant-specific theory should identify actual exposure, temporal sequence, baseline condition, mechanism, competing causes, defendant-created increment, and proportionate damages.

## VII. PUBLIC-ENTITY CLAIMS REQUIRE ACCOUNTING FOR PREEXISTING INSTITUTIONAL DUTIES

States may pursue claims to protect quasi-sovereign interests, including the health and well-being of their residents. *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592 (1982). Public enforcement authority, however, does not eliminate the need to identify the legal interest protected, the duty breached, the authorized remedy, and the defendant-specific contribution. See *Lexmark*, 572 U.S. 118; *Paroline*, 572 U.S. 434.

Schools and local governments possess preexisting duties concerning education, attendance, counseling, discipline, student safety, anti-bullying response, device management, crisis intervention, and public health. The cost of performing these duties does not become compensable merely because social media formed part of the surrounding environment.

A public plaintiff should identify the baseline duty and expenditure, the platform-specific breach, the additional burden, the institution's own contribution, mitigation, reimbursement, overlap, and resulting net incremental cost. Schools should account for their own policies concerning school-issued devices, personal phones, digital curriculum, network access, filtering, monitoring, enforcement, after-hours connectivity, and institutional screen exposure.

A public entity should not recover an ordinary stewardship expense merely by relabeling it as platform-caused harm. Recovery should follow the measurable additional burden produced by a proved platform breach. This preserves recovery for actual externalized costs while preventing existing public duties from being transferred retrospectively to a private defendant.

## VIII. THE COURT SHOULD DISTINGUISH PLATFORM-SPECIFIC MISCONDUCT FROM INDUSTRY-WIDE DEFECTS

A platform-specific defect may include a false statement, company-specific data practice, defective control, particular age-assurance failure, identifiable recommendation objective, known exploitation pathway, notification practice, or concealed internal finding. Those matters are susceptible to direct adjudication because the relevant defendant can answer for and correct its own conduct.

An industry-wide defect may include attention monetization, retention competition, engagement as the dominant measure of success, fragmented parental controls, inconsistent age assurance,

opaque recommendation objectives, lack of interoperability, inadequate research access, absence of common auditing, or lack of standardized human-outcome measures.

These conditions exceed one defendant. A judgment directed to one platform may shift users or advertising revenue to another platform, reward less transparent systems, preserve the same incentive structure, leave the underlying demand unchanged, or displace rather than reduce the user's harm.

Courts resolve disputes before them. Legislatures resolve market architecture. The distinction preserves both institutional competence and democratic legitimacy. See Fed. R. Civ. P. 1; *Twitter*, 598 U.S. 471; *Moody v. NetChoice, LLC*, 603 U.S. ___ (2024); *NetChoice, LLC v. Bonta*, ___ F.4th ___, No. 25-2366 (9th Cir. Mar. 12, 2026).

The Court should correct proved defendant-specific misconduct and clearly identify any systemic remainder requiring uniform legislation or regulation. That division keeps adjudication complete within the defendant's boundary without converting a single case into irregular market governance.

## IX. SYSTEM PERFORMANCE SHOULD NOT BE EQUATED WITH HUMAN BENEFIT

Platforms commonly measure session duration, impressions, return frequency, click-through, comments, shares, watch time, active users, and advertising yield. These measures may establish that a system successfully generated activity. They do not necessarily establish user benefit, satisfaction, social connection, improved mental health, task completion, lack of regret, adequate sleep, concentration, or utility relative to time consumed.

A measure of what the system induced the user to do is not necessarily a measure of what the system did for the user.

Optimization is not itself a legal objective. Law evaluates the consequences of optimization rather than the efficiency with which optimization is achieved.

Human-outcome measures may instead include completion of a stated task, voluntary session closure, successful communication, post-use satisfaction, unwanted return frequency, repeated override of custodial controls, sleep displacement, harmful escalation, substitution to another service, regret, and reported utility relative to time.

Current computational capacity can increasingly distinguish direct selection from system-generated escalation; identify recurrent harmful pathways; assess age and vulnerability signals with uncertainty; test whether represented controls work; compare engagement with declared objectives; measure substitution rather than platform exit alone; generate auditable explanations; identify conflicts between safety constraints and commercial objectives; and support privacy-protective risk review.

The lawful correction is not elimination of computational selection. It is governance of what systems are instructed to optimize, what constraints apply, how success is measured, whether safeguards function as represented, and whether interventions improve human outcomes. Human authority should remain final through auditable findings, traceable reasons, defined uncertainty, correction pathways, review, appeal, material-change records, and appropriate public reporting.

---

## X. JUDICIAL REMEDIES SHOULD BE SEPARATED FROM MARKET-WIDE LEGISLATIVE REFORM

Courts should correct proved misconduct. Legislatures and regulators should establish uniform prospective duties where durable correction requires a market-wide rule.

This remedial division is consistent with general principles of restitution, compensation, statutory penalties, and equitable relief. Remedies should correspond to the legal interest protected and the wrong established. *Kwikset*, 51 Cal. 4th 310; *Paroline*, 572 U.S. 434; *Lexmark*, 572 U.S. 118; *Spokeo*, 578 U.S. 330; *TransUnion*, 594 U.S. 413.

For proved deception, judicial relief may include restitution, corrective disclosure, civil penalties, preservation of internal studies, validation of represented controls, and injunctions tied to specific false statements. For unlawful data practices, relief may include statutory remedies, deletion, restricted processing, corrected consent practices, age-related compliance, and reporting. For defective controls, relief may include functional testing, efficacy disclosure, circumvention reporting, repair, and independent validation. For proved operational escalation, relief may include narrowly tailored modification, monitoring, reporting, and compensation tied to the established increment of harm.

Prospective legislation or regulation may establish uniform disclosure of recommendation objectives, standardized age and custodial-control protocols, auditable safeguard claims, youth-data limitations, meaningful non-profiled access, standardized externality reporting, privacy-protective research access, and safe-harbor structures that reward verifiable compliance.

A lawful safe harbor may reward platforms that disclose objectives, submit to audits, correct known failures, preserve lawful expression, maintain effective controls, preserve records, report material incidents, and provide meaningful review. It should not shelter fraud, concealment, knowing statutory violation, obstruction, or deliberate defeat of controls.

---

## XI. FIRST AMENDMENT AND SECTION 230 BOUNDARIES SHOULD REMAIN FEATURE-SPECIFIC

16

The Supreme Court and Ninth Circuit have repeatedly recognized that legal analysis turns upon the conduct being challenged. Claims directed to platform editorial discretion, third-party content, product features, promises, warnings, data practices, or independently unlawful conduct occupy different legal positions. *Moody*, 603 U.S. ___; *NetChoice v. Bonta*, ___ F.4th ___; *Barnes*, 570 F.3d 1096; *Internet Brands*, 824 F.3d 846; *Roommates.com*, 521 F.3d 1157; *Lemmon*, 995 F.3d 1085; 47 U.S.C. § 230.

Third-party expression remains attributable to its creator. Data collection, age assurance, control efficacy, notification timing, account architecture, statutory reporting, and commercial representations may present duties distinct from the message of lawful third-party expression.

Recommendation is mixed. Depending on the challenged feature, it may combine editorial judgment, user choice, prediction, automated ranking, commercial optimization, safety constraints, data processing, and platform-created prompts. The Court should classify the precise component and duty challenged rather than attach one constitutional or statutory label to the whole system.

The controlling distinction is:

**Liability for what lawful expression says should be separated from liability for what a platform falsely represented, unlawfully collected, or independently caused through its own operation.**

The protected content component should not immunize separate platform misconduct. The independent-misconduct component should not become a pretext for punishing lawful expression. Feature-specific classification preserves both boundaries.

---

## XII. REMEDY MUST FOLLOW DUTY, CONTROL, BENEFIT, AND PROVED CONTRIBUTION

The same occurrence should not be multiplied automatically across every child, parent, school, state, account, day, view, recommendation, data point, statement, and statutory theory. Distinct injury may support distinct relief. Repeated counting of the same externality should not.

Restitution follows receipt. The relevant question is what benefit the defendant received through the unlawful act. That benefit may consist of money, advertising revenue, data, commercial profiling, user retention, avoided expense, or competitive advantage.

Compensation follows attributable injury. The question is what injury the defendant's conduct added after baseline conditions and competing causes are accounted for.

Penalty follows culpability and the statutory unit. The governing statute should determine whether a violation is measured by user, account, statement, transaction, collection event, transfer, day, or continuing course of conduct.

17

Injunction follows control. A platform may be ordered, where legally warranted, to correct its own false statement, data practice, control, recommendation objective, notification rule, account pathway, exploitation pathway, or reporting failure.

Legislation follows systemic defect. Where correction requires a common rule across competing services, the proper prospective instrument is generally legislation or regulation rather than an injunction transforming one defendant into the regulator of an entire market.

For each claim, the Court can apply the following decisional matrix:

1. Who authorized or enabled access: custodian, institution, or platform?
2. Who created the content: a third party or the platform?
3. What conduct is challenged: speech selection, commercial conduct, or operational conduct?
4. Was the relevant representation truthful or deceptive?
5. Was the data use authorized or unlawful?
6. Did the control function as represented?
7. What distinct increment of harm did the platform add?
8. Is the defect defendant-specific or industry-wide?
9. Who possessed authority and practical capacity to intervene?
10. What remedy fits: compensation, restitution, correction, penalty, or legislation?
11. Does the requested recovery correspond to a distinct injury or repeat an already counted loss?
12. Will the remedy produce functional correction or merely displacement?

The resulting classification may identify protected third-party expression, protected editorial judgment, actionable deception, unlawful data practice, defective control, operational escalation, exploitation pathway, insufficiently proved platform increment, custodial or institutional responsibility, duplicative recovery, platform-specific defect, or market-wide defect requiring prospective governance.

This sequence permits similar claims to be treated similarly while preserving necessary distinctions among materially different claims.

---

### XIII. APPLICATION ACROSS THE FOUR TRACKS OF THE COORDINATED PROCEEDINGS

The state-attorney-general track should focus principally on truthfulness, data practices, represented controls, statutory penalties, restitution, public enforcement, and prospective platform-specific correction. A State need not prove individualized clinical injury to establish a materially deceptive practice or statutory data violation where the governing law protects a separate legal interest. It should identify the statement or practice, statutory duty, unit of violation, benefit received, and authorized remedy. See *Alfred L. Snapp*, 458 U.S. 592; *Kwikset*, 51 Cal. 4th 310; Cal. Bus. & Prof. Code §§ 17200, 17500; 15 U.S.C. §§ 6501–6506.

The personal-injury track should focus on actual exposure, temporal sequence, baseline condition, platform-created increment, alternative causes, comparative responsibility, mitigation, and proportionate damages. Common proof may establish how a feature operated. Individual proof should establish that the claimant encountered it, was injured through it, and suffered a measurable defendant-specific increment. See *Lexmark*, 572 U.S. 118; *Paroline*, 572 U.S. 434; *Twitter*, 598 U.S. 471.

The school and local-government track should focus on existing institutional duties, baseline public expenditure, school-created access, institutional contribution, mitigation, incremental cost, and prevention of recovery for ordinary stewardship expenses. Public expenditure alone does not establish external causation.

The common constitutional and platform-design track should distinguish speech from operation, third-party content from platform-created representation, editorial judgment from data practice, recommendation content from recommendation mechanism, platform-specific from industry-wide defect, and adjudication from legislation. The common track should establish legal boundaries without substituting for individualized proof of causation and damages. See *Moody*, 603 U.S. ___; *NetChoice v. Bonta*, ___ F.4th ___; *Barnes*, 570 F.3d 1096; *Internet Brands*, 824 F.3d 846; *Lemmon*, 995 F.3d 1085.

## XIV. THE COURT SHOULD PRESERVE FAMILY STEWARDSHIP WHILE ENFORCING COMPLETE PLATFORM RESPONSIBILITY

A rule assigning the general health of children to platforms because platforms are widely used would weaken the direct stewardship the litigation seeks to protect. Parents and schools may begin to treat observable dysfunction principally as evidence against an external provider rather than as a trigger for intervention.

Observable warning signs—including sleep loss, school absence, declining performance, family conflict, self-harm statements, eating-related distress, bullying, isolation, repeated circumvention, or inability to disengage—should activate custodial and institutional responsibility according to the authority, knowledge, and practical capacity those actors possess.

The reciprocal error would treat all platform operation as an extension of parental choice. Parental permission to access a service does not authorize false safety claims, unlawful child-data collection, undisclosed profiling, defective controls, concealed limitations, platform-facilitated circumvention, unlawful contact pathways, unauthorized targeting, or knowingly harmful operational escalation.

Permission to enter an environment is not consent to every undisclosed or unlawful condition within it.

Stewardship cannot be transferred by implication. Parents do not become software engineers by permitting application use, and software companies do not become parents merely because

children enter their platforms. Each remains accountable for the sphere of authority each actually possesses.

The settlement must therefore remain reciprocal. Custodians answer for custody. Platforms answer for platform conduct. Creators answer for content. Institutions answer for delegated stewardship. Government answers for rules and incentives. Damages answer for proved injury. Legislation answers for market-wide defects.

Failure by one actor does not extinguish the duty of another. A parent's failure does not immunize platform deception. Platform misconduct does not erase school responsibility. School inaction does not erase offender responsibility. Governmental omission does not legalize conduct otherwise prohibited. Judicial correction of a defendant-specific wrong does not prevent later legislative reform.

The health of children should not be assigned wholesale to platforms merely because platforms are widely used. Nor should parental choice be treated as consent to deception, unlawful data use, defective controls, or independently harmful platform operation.

---

### CONCLUSION

Amicus respectfully requests that the Court employ a decisional framework that:

1. separates access, content origin, custody, platform intervention, knowledge, representation, incremental causation, and remedy;
2. identifies the actor possessing authority, proximity, knowledge, control, and practical corrective capacity at each stage;
3. distinguishes third-party expression and editorial judgment from platform-created representation, data use, controls, and independent operation;
4. distinguishes defendant-specific misconduct from industry-wide incentives and structural defects;
5. requires generalized health claims to rest on comparative baselines, temporal direction, competing-cause analysis, actual exposure, and a platform-specific increment;
6. preserves direct parental and institutional stewardship while enforcing complete platform responsibility within the service boundary;
7. requires public plaintiffs to separate ordinary institutional duties and baseline expenses from net additional burdens caused by proved misconduct;
8. applies First Amendment and Section 230 protections to the precise feature, conduct, and duty presented;
9. ties restitution to benefit received, compensation to attributable injury, penalties to culpability and statutory unit, injunctions to corrective control, and legislation to systemic defects;

10. prevents the same externality from being multiplied through repeated counting across persons, institutions, accounts, periods, interactions, statements, and statutory theories; and

11. evaluates whether requested relief will produce functional correction rather than displacement.

The proper result is neither platform absolution nor platform custodianship.

It is lawful allocation rather than generalized responsibility.

Settlement becomes possible when every participant answers for the authority exercised, the duty assumed, the representations made, the conduct controlled, the benefits received, and the injuries proved. Properly applied, that framework neither absolves nor overextends any participant. It restores proportional responsibility.

Respectfully submitted,

**NATURAL LAW INSTITUTE**
By: /s/ Brandon Michael Hayes
Brandon Michael Hayes
President, Natural Law Institute
159 Indian Hill Street
West Newbury, Massachusetts 01985
(617) 438-2049
brandon@hayeshaus.com

Proposed Amicus Curiae, Self-Represented

Dated: July 13, 2026