**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

**PEOPLE OF THE STATE OF CALIFORNIA**,
et al.,

Plaintiffs,

v.

**META PLATFORMS, INC., et al.**,

Defendants.

Case No. 4:22-md-03047-YGR
Case No. 4:23-cv-05448-YGR

Hon. Yvonne Gonzalez Rogers
Direct Member Case of MDL No. 3047

---

**READER'S GUIDE OF THE NATURAL LAW INSTITUTE TO CAUSAL ALLOCATION, CHILD STEWARDSHIP, PLATFORM RESPONSIBILITY, AND THE NON-TRANSFER OF NEGATIVE EXTERNALITIES**

**Controlling Propositions for the Social Media Adolescent Addiction and Personal Injury Coordinated Proceedings**

---

**I. THE SETTLEMENT IN ONE PAGE**

This litigation does not require the Court to choose between platform absolution and platform custodianship.

The Court can hold every actor to the duty, knowledge, authority, control, and causal contribution that actor actually possessed.

The governing settlement is reciprocal:

**Custodians answer for custody.**
**Platforms answer for platform conduct.**

1

**Creators answer for content.**
**Institutions answer for delegated stewardship.**
**Government answers for rules and incentives.**
**Damages answer for proved injury.**
**Legislation answers for market-wide defects.**

The platform is steward of its service.

The custodian remains steward of the child.

The party that supplies a service is responsible for the service.

The party entrusted with a child remains responsible for the child.

No actor should receive the benefit of assigning its own duty to another actor.

No actor should bear a negative externality that another actor created.

The coordinated proceedings therefore should not be resolved through a generalized question such as whether social media harms children.

They should be resolved through a sequence of narrower questions:

1. Who enabled access?
2. Who created the content or condition?
3. What did the platform itself add?
4. Who possessed custody, authority, proximity, and knowledge?
5. What did each actor know and represent?
6. What defendant-specific increment of harm followed?
7. What remedy corresponds to that contribution?

The proper result is neither concentration of all responsibility in the platform nor dispersion of responsibility until no actor remains answerable.

It is allocation.

---

## II. THE FIVE COLLAPSES

The coordinated proceedings contain serious allegations. Their seriousness makes classification more necessary, not less.

2

Several recurring terms compress legally distinct predicates into one vocabulary. Those collapses threaten the integrity of adjudication.

## A. Access Collapse

Access collapse occurs when permission to use a platform is treated as though the platform itself created or controlled the child's access.

Access may depend on:

- provision of a device;
- payment for connectivity;
- application installation;
- creation of an account;
- age representation;
- parental or institutional permission;
- continued possession of the device;
- nighttime access;
- repeated account creation;
- circumvention of controls; and
- continued use after observable dysfunction.

A platform may be responsible for inadequate age assurance, misleading controls, repeated-account tolerance, or knowing underage access.

It does not thereby become the source of every access decision preceding or surrounding use.

## B. Content Collapse

Content collapse occurs when third-party expression is treated as platform conduct merely because the platform hosted, ranked, recommended, repeated, or monetized it.

The Court should distinguish:

- content creation;
- hosting;
- publication;
- editorial selection;
- ranking;
- recommendation;
- notification;
- targeting;
- commercial amplification;

- unlawful solicitation;
- platform-created statements; and
- platform-created operational escalation.

The creator remains responsible for the message created.

The platform remains responsible for what it independently did with the message.

## C. Stewardship Collapse

Stewardship collapse occurs when a service provider is treated as the direct custodian of a child whose device, schedule, supervision, treatment, and physical environment remain controlled by parents, guardians, schools, and other entrusted institutions.

Direct stewardship follows:

- custody;
- authority;
- proximity;
- knowledge;
- practical capacity to intervene; and
- responsibility for continued conditions.

Platform responsibility follows control over:

- platform representations;
- data practices;
- account architecture;
- recommendation systems;
- notifications;
- controls;
- safeguards;
- reporting systems;
- unlawful pathways; and
- measurable operational consequences.

Those responsibilities may overlap.

They should not merge.

## D. Causation Collapse

Causation collapse occurs when temporal sequence is treated as causal proof.

4

The sequence "platform use followed by dysfunction" does not establish:

- that the platform caused the dysfunction;
- that the dysfunction did not precede the use;
- that the child did not seek the service because of preexisting distress;
- that another service did not contribute;
- that family, school, peer, clinical, or cultural conditions were not primary;
- that the challenged feature materially added harm; or
- that the injury would have been avoided absent that feature.

A legally adequate causal theory should identify the platform-controlled mechanism and the increment it added.

### E. Remedy Collapse

Remedy collapse occurs when one underlying event is multiplied automatically across:

- child;
- parent;
- school;
- municipality;
- state;
- account;
- day;
- view;
- recommendation;
- data point;
- statement; and
- statutory theory.

Those categories may support separate relief where they protect distinct legal interests.

They should not become automatic multipliers for the same externality.

The Court should move:

**from label to predicate,**
**from predicate to duty,**
**from duty to breach,**
**from breach to incremental harm,**
**and from incremental harm to proportionate remedy.**

## III. THE FIXED CAUSAL SEQUENCE

The Court should require every common theory to proceed through the same sequence:

**ACCESS**

↓

**CONTENT ORIGIN**

↓

**PLATFORM INTERVENTION**

↓

**STEWARDSHIP**

↓

**KNOWLEDGE AND REPRESENTATION**

↓

**INCREMENTAL HARM**

↓

**REMEDY**

### 1. Access

Access identifies how the child entered and remained within the environment.

The Court should ask:

- Who supplied the device?
- Who authorized or permitted use?
- Who created or maintained the account?

- What age representation was made?
- What age signals existed?
- What controls were activated?
- Did the controls function?
- Who permitted continued access?
- Did access continue after observable harm?

## 2. Content Origin

Content origin identifies who created the material or condition alleged to have caused harm.

The Court should ask:

- Who created the content?
- Was it lawful or unlawful?
- Was it commercial or noncommercial?
- Was it requested or unsolicited?
- Did it originate on the defendant's service?
- Did it circulate across several services?
- Does the alleged harm arise from the message or the platform's treatment of it?

## 3. Platform Intervention

Platform intervention identifies what the defendant itself added.

That addition may include:

- ranking;
- repetition;
- recommendation;
- targeting;
- notification;
- profiling;
- contact suggestion;
- commercial optimization;
- autoplay;
- account linkage;
- concealment;
- defective controls;
- age-treatment decisions; or
- escalation into more intense material.

7

The central platform-specific question is:

**What did the platform itself control, add, conceal, defeat, or intensify?**

### 4. Stewardship

Stewardship identifies who possessed authority and practical capacity to act.

The Court should ask:

- Who had custody?
- Who had proximity?
- Who observed the condition?
- Who possessed authority to alter access?
- Who could obtain treatment?
- Who could control the school environment?
- Who could alter the platform mechanism?
- Who could legislate a market-wide rule?

### 5. Knowledge and Representation

Knowledge and representation identify what each actor understood and communicated.

A platform may possess superior knowledge of:

- recommendation objectives;
- age signals;
- control failures;
- underage-account prevalence;
- data practices;
- exploitation pathways;
- internal research;
- objective conflicts; and
- the actual performance of safeguards.

A parent or school may possess superior knowledge of:

- sleep;
- mood;
- family conditions;
- school performance;
- bullying;
- clinical history;

- visible deterioration;
- repeated circumvention; and
- multi-platform use.

No actor should be charged with knowledge held only by another actor unless a duty of communication existed and the information was transmitted or wrongfully withheld.

### 6. Incremental Harm

Incremental harm identifies the difference between the injury that occurred and the injury that likely would have occurred absent the challenged platform-controlled act.

The Court should ask:

- What condition existed before the challenged conduct?
- What did the platform add?
- Was the addition material?
- Was it foreseeable?
- Was it avoidable?
- Could another actor have interrupted it?
- What injury followed?
- What portion remains attributable to other causes?

### 7. Remedy

Remedy should correct the contribution proved.

The governing sequence is:

**Restitution follows receipt.**
**Compensation follows attributable injury.**
**Penalty follows culpability and statutory unit.**
**Injunction follows control.**
**Legislation follows systemic defect.**

---

### IV. RECIPROCAL STEWARDSHIP

The platform is steward of its service.

The custodian remains steward of the child.

This distinction preserves accountability on both sides.

## A. Direct Stewardship

Parents and guardians ordinarily control:

- device provision;
- application access;
- account permission;
- nighttime possession;
- duration limits;
- monitoring;
- intervention;
- treatment;
- household rules;
- communication with schools; and
- continuation after observable dysfunction.

Schools possess delegated authority over:

- school-issued devices;
- classroom access;
- digital curriculum;
- discipline;
- counseling;
- attendance;
- peer conduct;
- bullying response;
- observation; and
- institutional intervention.

Those actors possess forms of authority a platform does not possess.

A platform cannot:

- remove every device;
- alter the child's home;
- obtain medical care;
- control school attendance;
- govern all competing services;
- observe the whole child; or
- resolve family, peer, clinical, or educational conditions.

10

## B. Platform Stewardship

Platforms possess exclusive or superior control over:

- account systems;
- recommendation objectives;
- data collection;
- profiling;
- age assurance;
- parental controls;
- notifications;
- safety claims;
- content-delivery pathways;
- exploitation reporting;
- system records;
- commercial optimization; and
- correction of known defects.

Those functions are fully within platform responsibility.

## C. Concurrent Responsibility

Custodial failure and platform failure may coexist.

A parent may fail to intervene.

A platform may misrepresent a safeguard.

A child may circumvent a restriction.

A platform may knowingly tolerate repeated circumvention.

A school may observe deterioration.

A school may delay response.

A recommendation system may materially intensify exposure.

A third party may create the harmful content.

Each actor should answer for the portion each actor contributed.

No actor should inherit the whole causal chain merely because the chain is complex.

**D. The Reciprocal Rule**

**Direct stewardship follows custody, authority, proximity, knowledge, and capacity to intervene.**

**Platform responsibility follows control over the service, its representations, its data, its safeguards, and its operational consequences.**

The Court can enforce both without transferring the child from the custodian to the platform or transferring the platform's own misconduct back to the custodian.

---

## V. THE CLEAREST PLATFORM-LIABILITY LANES

Platform responsibility is strongest where the conduct is directly controlled, measurable, and attributable to the platform.

Four lanes are especially adjudicable.

### A. Deception

Deception compares:

- what the platform represented;
- what it internally knew;
- what the system actually did;
- what the safeguard actually accomplished;
- whether the discrepancy was material;
- who relied;
- what conduct changed; and
- what harm followed.

The strongest question is:

**Did the platform materially misdescribe the system it knowingly operated?**

Deception may concern:

- youth safety;
- parental controls;
- age enforcement;
- data privacy;

- harmful-content reduction;
- time-management tools;
- exploitation prevention;
- recommendation systems;
- internal research; and
- the relationship between engagement and wellbeing.

## B. Unlawful Child-Data Practices

Data practices present a direct statutory and operational lane.

The Court should distinguish:

- collection;
- inference;
- retention;
- profiling;
- targeting;
- transfer;
- deletion;
- consent;
- age-related processing; and
- use beyond disclosed purpose.

A data violation may support relief independently of generalized mental-health causation.

The injury may lie in the unlawful collection, inference, retention, transfer, or use itself.

## C. Defective or Misrepresented Controls

Controls are the point where platform responsibility and custodial authority interact.

A platform may bear direct responsibility where it:

- represented controls as effective when they were not;
- concealed known limitations;
- facilitated circumvention;
- failed to apply restrictions across linked accounts;
- permitted rapid account recreation;
- restored settings;
- failed to integrate with device-level controls;
- presented reminders as hard safeguards; or
- continued making unsupported claims.

The governing question is:

**What did the control promise, what did it deliver, and what harm followed from the difference?**

### D. Proved Operational Escalation

A valid escalation theory should identify:

- the operative objective;
- the user population;
- the age or vulnerability signals used;
- the starting content;
- the user's actions;
- the recommendation path;
- the platform-created additional exposure;
- the known risk;
- the feasible constraint; and
- the resulting increment of harm.

"The algorithm caused harm" is not a complete causal theory.

The Court should identify what the platform actually added.

### E. The Controlling Proposition

**Platform responsibility should extend fully to what the platform created, represented, collected, optimized, concealed, facilitated, defeated, or knowingly failed to correct within its own service.**

It should not expand by implication to every harm expressed through the service, every duty held by a custodian, or every condition produced by the surrounding culture and market.

---

## VI. CONTINUED USE, REGRET, AND HEALTH CLAIMS

### A. Continuation Proves Continuation

Continued use does not prove:

- welfare;
- coercion;

14

- consent to every platform operation;
- settled intent to continue;
- settled intent to stop;
- clinical compulsion;
- platform knowledge of an internal conflict; or
- platform causation of the entire condition.

It proves that the user continued.

A user may simultaneously possess:

- an immediate preference to continue;
- a medium-term preference to reduce use;
- a long-term preference to stop;
- a parental instruction to stop;
- a clinical recommendation to stop; and
- later regret.

The Court should not transform an uncommunicated internal conflict into a fact known to the platform.

## B. Objective Signals Matter

A user or custodian may make an intention operationally legible by:

- activating a time limit;
- disabling notifications;
- selecting a bedtime setting;
- imposing a parental restriction;
- requesting deactivation;
- requesting deletion;
- withdrawing consent;
- reporting difficulty; or
- invoking a content or contact restriction.

Once the instruction becomes objective, the Court can ask:

- What did the control promise?
- Did the platform execute it?
- Did the user override it?
- Did the platform facilitate circumvention?
- Did the platform misrepresent its operation?

- What harm followed?

## C. General Health Claims Require Comparative Proof

General health claims require:

- a valid comparative population;
- temporal direction;
- treatment of confounding variables;
- a defined platform-controlled mechanism; and
- a measurable platform-specific increment.

The Court should ask:

**Compared with whom?**
**In what temporal direction?**
**After accounting for which competing variables?**
**Through what identified platform-controlled mechanism?**

Relevant alternative causes may include:

- preexisting mental-health conditions;
- family conflict;
- school pressure;
- bullying;
- trauma;
- sleep;
- physical activity;
- general smartphone use;
- gaming;
- streaming;
- messaging;
- multi-platform use;
- institutional screen exposure; and
- broader cultural conditions.

## D. The Controlling Proposition

**A user's later regret or conflicting preference may be relevant evidence, but it should not become an implied platform fact.**

**General health claims require a comparative baseline, temporal direction, disciplined treatment of confounding variables, and a material excess tied to an identified platform-controlled mechanism.**

---

## VII. PLATFORM-WIDE AND INDUSTRY-WIDE DEFECTS

The Court should distinguish defects arising within one company from defects produced by the market structure shared across firms.

### A. Platform-Wide Defects

A platform-wide defect may include:

- a false statement;
- a company-specific data practice;
- a defective parental control;
- a particular age-assurance failure;
- a specific recommendation objective;
- a known exploitation pathway;
- a concealed internal finding;
- a notification practice;
- a multiple-account architecture defect; or
- a particular failure after notice.

These matters are susceptible to defendant-specific adjudication and remedy.

### B. Industry-Wide Defects

An industry-wide defect may include:

- attention monetization;
- engagement as the dominant measure of success;
- retention competition;
- endless content supply;
- notification-driven return;
- profiling;
- fragmented parental controls;
- inconsistent age assurance;
- opaque recommendation objectives;
- weak interoperability;

17

- lack of common human-outcome measures;
- inconsistent youth defaults;
- fragmented research access; and
- absence of standardized auditability.

These matters exceed one defendant.

## C. Why the Distinction Matters

A judgment against one platform may:

- shift users to a competitor;
- shift advertising revenue;
- reward less transparent systems;
- preserve the same engagement model;
- leave the underlying demand unchanged;
- create inconsistent duties; and
- fail to improve the user's actual condition.

## D. The Controlling Proposition

**The Court should correct the defendant's own deception, unlawful operation, defective controls, data violations, exploitative pathways, and proved increments of harm.**

**It should identify, rather than silently absorb, the separate defects produced by attention markets, shared metrics, fragmented controls, inconsistent age assurance, opaque objectives, and the absence of common standards.**

**Durable correction requires liability at the platform level and governance at the industry level.**

## VIII. HUMAN BENEFIT AND COMPUTATIONAL GOVERNANCE

## A. Engagement Is Not Welfare

Common platform metrics include:

- session duration;
- impressions;
- return frequency;
- click-through;

18

- comments;
- shares;
- watch time;
- active users; and
- advertising yield.

These measures can show that the system successfully generated activity.

They do not necessarily measure:

- user benefit;
- satisfaction;
- social connection;
- mental health;
- chosen duration;
- task completion;
- regret;
- substitution;
- sleep;
- concentration;
- relationship quality; or
- utility relative to time consumed.

The governing proposition is:

**A measure of what the system induced the user to do is not necessarily a measure of what the system did for the user.**

Engagement may establish that the system retained attention.

It does not establish that the user benefited from that retention.

**B. Pro-Social Measures**

Meaningful outcome measures may include:

- completion of the user's stated task;
- voluntary session closure;
- successful communication;
- post-use satisfaction;
- unwanted return frequency;
- repeated override of custodial controls;
- sleep displacement;

- harmful exposure escalation;
- regret;
- substitution to another service;
- effects on actual relationships; and
- user-reported utility relative to time consumed.

No single measure should replace engagement as a new universal proxy.

The purpose is to prevent one narrow metric from governing the whole system.

## C. Current Capacity

Modern computational systems can increasingly:

- distinguish direct user selection from system-generated escalation;
- identify recurrent harmful pathways;
- detect age and vulnerability signals with calibrated uncertainty;
- test whether controls function as represented;
- compare engagement against declared user objectives;
- measure substitution rather than platform exit alone;
- generate auditable explanations of recommendation factors;
- detect conflicts between safety constraints and commercial objectives;
- preserve privacy through aggregated or constrained analysis; and
- conduct ongoing risk review rather than retrospective crisis response.

## D. Proper Governance Function

The governance layer should evaluate:

- how the system selects;
- what objectives govern;
- what constraints apply;
- whether controls work;
- whether representations are accurate;
- whether illegal pathways persist;
- whether externalities are shifted;
- whether objective conflicts are visible; and
- whether interventions improve outcomes.

Its proper function is not to determine what lawful speech may exist.

## E. Human Authority Remains Final

20

A sound governance structure should produce:

- auditable findings;
- traceable reasons;
- defined uncertainty;
- correction pathways;
- meaningful human review;
- appeal;
- material-change logs;
- public reporting at an appropriate level; and
- identifiable human responsibility.

**F. The Controlling Proposition**

**The central problem is not that algorithms exist.**

**It is that their operative objectives, constraints, and measures of success remain insufficiently aligned with the human functions they mediate.**

**The root correction is lawful governance of what systems are instructed to optimize and how success is measured.**

---

## IX. SPEECH, MACHINERY, AND REMEDY

**A. Content Is Not Machinery**

Third-party expression remains attributable to its creator.

The platform may host, rank, recommend, repeat, monetize, label, or remove it.

Those later acts do not ordinarily transfer authorship.

**B. Machinery Is Not Automatically Expression**

Data collection, age assurance, account architecture, parental controls, notification timing, consent systems, record preservation, statutory reporting, and commercial representations may be regulated independently of the message of lawful third-party expression.

The fact that an operation affects access to speech does not make every duty concerning that operation a regulation of viewpoint.

## C. Recommendation Is Mixed

Recommendation may combine:

- editorial judgment;
- user choice;
- prediction;
- automated ranking;
- commercial optimization;
- safety constraints;
- data processing; and
- platform-created prompts.

The Court should classify the precise component challenged.

## D. The Governing Binary

**Liability for what lawful expression says must be separated from liability for what a platform falsely represented, unlawfully collected, or independently caused through its own nonexpressive operation.**

The protected content component should not immunize independent platform misconduct.

The independent misconduct component should not become a pretext for punishing lawful expression.

## E. Remedy Allocation

Remedy should correspond to the wrong proved:

- deception → corrective disclosure, restitution, penalty, or narrow injunction;
- unlawful data use → statutory relief, deletion, restricted processing, consent correction, or audit;
- defective control → validation, disclosure, repair, monitoring, and compensation for proved incremental harm;
- operational escalation → pathway-specific modification, reporting, monitoring, and proportional damages;
- illegal pathway → reporting, preservation, account correction, and statutory relief;
- duplicated claim → allocation and prevention of double recovery;
- industry-wide incentive → prospective legislation or regulation.

## F. The Controlling Proposition

**Restitution follows receipt.**
**Compensation follows attributable injury.**
**Penalty follows culpability and statutory unit.**
**Injunction follows control.**
**Legislation follows systemic defect.**

---

## X. THE DECISIONAL MATRIX

For every claim, the Court should ask:

| Question | Controlling Distinction |
|---|---|
| Who authorized or enabled access? | Custodian / institution / platform |
| Who created the content? | Third party / platform |
| What conduct is challenged? | Speech selection / commercial or operational conduct |
| Was the relevant statement accurate? | Truthful / deceptive |
| Was the data use lawful? | Authorized / unlawful |
| Did the control function as represented? | Substantiated / defective or misrepresented |
| What harm did the platform add? | Distinct platform increment / surrounding environment |
| Is the defect defendant-specific? | Platform-wide / industry-wide |
| Who possessed authority to intervene? | Custodian / institution / platform |
| What remedy fits? | Compensation / restitution / correction / penalty / legislation |
| Is the remedy duplicative? | Distinct injury / repeated counting |
| Does the remedy improve outcomes? | Functional correction / displacement |

23

The matrix should produce a claim-specific classification:

- protected third-party expression;
- protected editorial judgment;
- actionable platform-created deception;
- actionable unlawful data practice;
- actionable defective control;
- actionable operational escalation;
- actionable illegal-content or exploitation pathway;
- insufficiently proved platform increment;
- custodial or institutional responsibility;
- duplicated recovery;
- platform-specific defect supporting direct relief; or
- industry-wide defect requiring prospective governance.

---

## XI. APPLICATION TO THE FOUR TRACKS

### A. State-Attorney-General Track

Focus on:

- truthfulness;
- data practices;
- represented controls;
- statutory penalties;
- restitution;
- public enforcement; and
- prospective platform-specific correction.

The State need not prove individualized clinical injury to establish deception or a statutory data violation.

It should identify the statement, practice, statutory duty, unit of violation, benefit received, and authorized remedy.

### B. Personal-Injury Track

Focus on:

- actual exposure;

- temporal sequence;
- baseline condition;
- platform-created increment;
- alternative causes;
- comparative responsibility;
- mitigation; and
- proportional damages.

Common proof may establish how a feature operated and whether it was capable of causing a defined harm.

Individual proof must establish that the plaintiff encountered it, was injured by it, and suffered a measurable defendant-specific increment.

## C. School and Local-Government Track

Focus on:

- existing institutional duties;
- baseline public expenditure;
- school-created access;
- institutional contribution;
- mitigation;
- incremental cost; and
- prevention of recovery for ordinary stewardship expense.

Public expenditure does not itself establish external causation.

A school or government should identify the net additional burden caused by a proved platform breach.

## D. Common Constitutional and Platform-Design Track

Focus on:

- speech versus operation;
- third-party content versus platform-created representation;
- editorial judgment versus data practice;
- recommendation content versus recommendation mechanism;
- platform-specific versus industry-wide defect;
- adjudication versus legislation; and
- narrow corrective relief.

25

The common track should establish legal boundaries.

It should not substitute for individualized causation or damages proof.

---

## XII. FINAL SETTLEMENT

A rule assigning the health of children to platforms because platforms are widely used would weaken the direct stewardship the litigation purports to protect.

Parents and schools may then treat observable dysfunction as evidence against an external provider rather than as a trigger for their own immediate intervention.

A rule treating all platform operation as parental choice would commit the reciprocal error.

It would permit deception, unlawful data practices, defective controls, concealed risks, and knowingly harmful systems to escape correction.

The lawful settlement preserves both responsibilities.

**Custodians answer for custody.**

They remain responsible for access, supervision, intervention, treatment, continued use, and response to observable dysfunction.

**Platforms answer for platform conduct.**

They remain responsible for representations, data practices, controls, account systems, recommendation architecture, unlawful pathways, concealed knowledge, and proved operational increments of harm.

**Creators answer for content.**

The person who creates the message, threat, solicitation, fraud, harassment, image, or unlawful material remains responsible for it.

**Institutions answer for delegated stewardship.**

Schools and other entrusted institutions remain responsible for the devices, environments, policies, supervision, discipline, counseling, and intervention within their authority.

**Government answers for rules and incentives.**

26

Government should enforce existing law and create prospective market-wide standards where the defect exceeds one defendant.

**Damages answer for proved injury.**

Recovery should correspond to the distinct injury, benefit, statutory unit, causal increment, and corrective capacity established.

**Legislation answers for market-wide defects.**

Uniform standards should govern industry-wide objectives, age assurance, interoperable controls, youth-data practices, reporting, research access, auditability, safe harbor, and computational governance.

The governing conclusion is:

> **The health of children should not be assigned wholesale to platforms merely because platforms are widely used. Nor should parental choice be treated as consent to deception, unlawful data use, defective controls, or knowingly harmful platform operation. Custodians should answer for custody; platforms for platform conduct; creators for content; institutions for delegated stewardship; government for rules and incentives; damages for proved injury; and legislation for market-wide defects.**

---

## CONCLUSION

The Court should employ a decisional framework that:

1. separates access, content origin, custody, platform operation, knowledge, representation, incremental causation, and remedy;
2. identifies the actor who possessed authority, proximity, knowledge, and corrective capacity at each stage;
3. distinguishes third-party expression from platform-created machinery and commercial representation;
4. distinguishes platform-specific misconduct from industry-wide incentives;
5. requires general health claims to rest on comparative populations, temporal direction, confounding analysis, and a platform-specific increment;
6. preserves direct parental and institutional stewardship;
7. enforces platform responsibility for deception, unlawful data practices, defective controls, illegal pathways, and independently caused operational harm;

8. requires public plaintiffs to separate ordinary duties from net additional burdens;

9. applies First Amendment and Section 230 protections to the precise feature and duty presented;

10. ties restitution to benefit received, compensation to attributable injury, penalty to culpability and statutory unit, injunction to corrective control, and legislation to systemic defect;

11. prevents the same externality from being multiplied through repeated counting across persons, accounts, periods, interactions, data points, statements, and public entities;

12. evaluates whether relief produces functional correction rather than displacement; and

13. prevents negative externalities from being transferred to actors who did not create them.

The proper result is neither platform absolution nor platform custodianship.

It is allocation.

Each actor should answer for the authority exercised, the duty held, the representation made, the conduct controlled, the benefit received, and the injury caused.

---

Respectfully submitted,

**NATURAL LAW INSTITUTE**
By: /s/ Brandon Michael Hayes
Brandon Michael Hayes
President, Natural Law Institute
159 Indian Hill Street
West Newbury, Massachusetts 01985
(617) 438-2049
brandon@hayeshaus.com

Proposed Amicus Curiae, Self-Represented

Dated: July 13, 2026

28