**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**OAKLAND DIVISION**

**PEOPLE OF THE STATE OF CALIFORNIA,**
**et al.,**

Plaintiffs,

v.

**META PLATFORMS, INC., et al.,**

Defendants.

Case No. 4:22-md-03047-YGR
Case No. 4:23-cv-05448-YGR

Hon. Yvonne Gonzalez Rogers

Direct Member Case of MDL No. 3047

---

**<u>SUPPORTING ANALYTICAL ARCHITECTURE OF THE NATURAL LAW INSTITUTE</u>**

**A Decisional Framework for Separating Access, Content, Custody, Platform Operation, Industry Incentives, Causation, and Remedy Across the Coordinated Proceedings**

This litigation ought not require the Court to choose between absolving platforms and transferring the direct stewardship of children to platforms. The Court can hold every actor to the duty, knowledge, authority, and causal contribution that actor actually possessed. Parents and schools remain responsible for children placed within their care. Platforms remain responsible for their representations, data practices, controls, systems, and provable increments of harm. Content creators remain responsible for their content. Government remains responsible for the incentive and regulatory structure. Liability and remedy should follow those lanes without leakage.

---

**<u>PRELIMINARY STATEMENT</u>**

1. These coordinated proceedings present allegations of substantial importance. They concern the health and development of children, the conduct of some of the largest communications platforms in the world, the duties of parents and schools, the treatment of third-party expression, the operation of recommendation systems, the collection and use of minors' data, and the allocation of public and private costs arising from alleged injury.

2. The difficulty is not that the litigation lacks facts, theories, parties, or remedies. The difficulty is that too many distinct predicates have been compressed into a common vocabulary that can obscure the legal differences among them.

3. Terms such as "youth harm," "addiction," "compulsive use," "dangerous design," "harmful content," "recommendation," "failure to protect children," "mental-health consequences," and "institutional costs" identify serious subjects. They do not, standing alone, identify:

    a. who created the relevant condition;

    b. who possessed custody or control;

    c. who authorized access;

1

       d. what conduct is attributable to a platform rather than a third party;

       e. what duty existed;

       f. whether that duty was breached;

       g. what injury followed from that breach;

       h. whether the injury was platform-specific, industry-wide, cultural, custodial, institutional, or preexisting; or

       i. what remedy corresponds to the proved wrong.

4. Unless those predicates are separated before liability and remedy are assigned, the coordinated structure of the litigation risks producing a coordinated transfer of responsibility rather than a coordinated adjudication of responsibility.

### A. The Coordinated Proceedings Combine Distinct Harms, Actors, Duties, and Remedies

5. The phrase "harmful content" may refer to materially different things, including:

       a. unlawful material created by an offender;

       b. lawful but unhealthy or disturbing expression created by a user;

       c. content affirmatively selected by a child;

       d. content surfaced or repeated through a recommendation system;

       e. a platform-created filter, tool, prompt, or feature;

       f. advertising created by a commercial actor;

       g. content encountered across several services;

       h. material reproduced from a broader cultural condition;

       i. content hosted neutrally but distributed through a platform-controlled ranking mechanism; or

       j. conduct involving solicitation, exploitation, trafficking, threats, or other unlawful activity.

6. Those categories cannot be adjudicated as though they were the same. The creator of unlawful material, the platform that hosts it, the system that ranks it, the user who selects it, and the custodian who permits continued access occupy different legal positions.

7. The phrase "failure to protect a child" is equally compressed. It may refer to:

       a. a parent's failure to restrict or terminate access;

       b. a guardian's failure to respond to observable dysfunction;

       c. a school's failure during delegated custody;

2

d. an institution's reliance on digital systems without adequate supervision;

e. failure of a platform control;

f. deceptive representation of a safeguard;

g. unlawful collection or use of a minor's data;

h. failure to detect or respond to predatory conduct;

i. failure to remove unlawful material after legally sufficient notice;

j. failure to disclose known product limitations; or

k. failure of legislation to define clear and uniform duties.

8. Each possible failure depends on a different source of authority and a different sphere of control.

9. Parents and guardians ordinarily possess direct authority over the child, the device, household rules, nighttime access, duration of use, intervention, and treatment.

10. Schools possess delegated authority during school hours and over institutional devices, classroom access, educational use, discipline, observation, and support.

11. Platforms possess authority over their own systems, representations, data practices, account architecture, recommendation objectives, controls, and response to conduct occurring through the service.

12. Government possesses authority to legislate, regulate, enforce, and define industry-wide standards.

13. The phrase "addiction" also contains several possible predicates. It may describe:

a. continued voluntary preference;

b. intense but temporary interest;

c. habitual use;

d. pursuit of social recognition or belonging;

e. unresolved psychological need;

f. emotional regulation through digital use;

g. conflict between a child's preference and a parent's restriction;

h. compulsive conduct;

i. clinically significant dysfunction;

j. retrospective characterization of excessive duration;

k. a platform-specific mechanism;

l. a multi-platform pattern;

3

        m. substitution from one service to another; or

        n. preexisting distress that altered the manner or intensity of use.

14. Continued use alone does not identify which of those predicates exists.

15. Nor does duration alone establish whether the platform caused the condition, responded to it, intensified it, merely hosted it, or became one of several places where it was expressed.

16. "Institutional costs" are similarly indeterminate. They may include:

        a. ordinary counseling obligations;

        b. costs of discipline;

        c. attendance intervention;

        d. crisis response;

        e. treatment costs;

        f. school-device administration;

        g. costs linked to unlawful platform conduct;

        h. costs arising from broader youth dysfunction;

        i. costs already encompassed within the institution's existing duty; or

        j. costs generated by the institution's own access, technology, curriculum, or supervision decisions.

17. The legal question is not whether those costs exist. It is whether they are attributable to a proved breach by a particular defendant rather than to the ordinary burdens of stewardship or to causes distributed across the surrounding environment.

18. Common vocabulary can assist coordination. It cannot replace classification.

19. The Court should therefore require the litigation to move from label to predicate, from predicate to duty, from duty to breach, from breach to incremental harm, and from incremental harm to proportionate remedy.

### *B. Five Collapses Threaten the Integrity of Adjudication*

### 1. Access Collapse

20. Access collapse occurs when permission to use a platform is treated as though the platform itself created or controlled the child's access.

21. In most instances, access begins through a chain of decisions involving:

        a. provision of a device;

        b. permission to install or use applications;

        c. creation or maintenance of an account;

        d. continued availability of the device;

4

       e. nighttime or unsupervised possession;

       f. parental, custodial, or institutional limits; and

       g. response to observable signs of dysfunction.

22. A platform may bear responsibility for misrepresenting age controls, facilitating circumvention, or knowingly processing prohibited underage accounts. It does not thereby become the source of every access decision preceding or surrounding use.

23. Access must therefore be separated from platform operation.

## 2. Content Collapse

24. Content collapse occurs when third-party expression is treated as platform conduct merely because the platform hosted, carried, ranked, repeated, or recommended it.

25. Those functions may be relevant to liability. They are not interchangeable.

26. The Court should distinguish:

       a. creation of content;

       b. hosting of content;

       c. editorial selection;

       d. automated ranking;

       e. targeted recommendation;

       f. notification-driven return;

       g. commercial amplification;

       h. unlawful solicitation or exploitation; and

       i. independent platform representations concerning the foregoing.

27. The legal significance of a platform's own deception, data use, or operational choices must remain distinct from liability for what a third party said.

28. Without that distinction, lawful expression risks being converted into a product defect by association.

## 3. Stewardship Collapse

29. Stewardship collapse occurs when a service provider is treated as the direct custodian of a child whose access, schedule, health, supervision, and intervention remain controlled by parents, guardians, schools, and other entrusted institutions.

30. A platform may owe duties concerning its service. It does not assume the total developmental duty owed by those who possess custody, proximity, and authority over the child.

31. Direct stewardship follows:

       a. Custody;

       b. Authority;

5

       c. proximity;

       d. Knowledge;

       e. ability to intervene; and

       f. responsibility for continued conditions.

32. Platform responsibility follows control over:

       a. platform design;

       b. platform representations;

       c. data collection and use;

       d. account systems;

       e. controls and safeguards;

       f. recommendation objectives;

       g. response to unlawful conduct; and

       h. the measurable consequences of platform-controlled operations.

33. Those responsibilities may overlap. They should not be merged.

34. A rule that silently transfers the primary stewardship of children from custodians to platforms would weaken the very structure needed to protect children before, during, and after digital use.

**4. Causation Collapse**

35. Causation collapse occurs when temporal sequence is treated as causal proof.

36. The sequence "platform use followed by dysfunction" does not establish:

       a. that the platform caused the dysfunction;

       b. that the dysfunction did not precede the use;

       c. that another service did not contribute;

       d. that family, school, peer, or cultural conditions were not primary;

       e. that the child did not seek the service because of preexisting distress;

       f. that the challenged feature added measurable harm; or

       g. that the injury would have been avoided absent that feature.

37. A legally adequate causal theory should identify:

       a. the specific platform-controlled act;

       b. the mechanism through which it operated;

       c. the relevant knowledge or representation;

       d. the incremental exposure or risk it introduced;

      e. the temporal sequence;

      f. the comparative baseline;

      g. the alternative causes;

      h. the resulting injury; and

      i. the portion fairly attributable to the defendant.

38. Coordination does not eliminate the need for causal discrimination.

39. It increases that need because common allegations can otherwise obscure the absence of a common mechanism.

### 5. Remedy Collapse

40. Remedy collapse occurs when distinct theories, users, accounts, days, statements, data events, exposures, and alleged harms become cumulative penalty multipliers without proof of corresponding separate legal injuries.

41. The same underlying event may appear in several forms:

      a. a child's alleged injury;

      b. a parent's derivative claim;

      c. a school's claimed expenditure;

      d. a state's consumer-protection theory;

      e. an account-level violation;

      f. a data-processing event;

      g. a recommendation;

      h. a day of use;

      i. an allegedly deceptive statement; and

      j. a request for prospective relief.

42. Those forms may support distinct relief where the law and evidence establish distinct violations.

43. They should not be aggregated automatically merely because they arise from the same course of conduct.

44. Remedy must follow:

      a. the duty breached;

      b. the statutory unit of violation;

      c. the injury proved;

      d. the benefit unjustly received;

      e. the defendant's degree of culpability;

f. the corrective capacity of the defendant; and

g. the need to avoid duplicative recovery.

45. Otherwise, the remedy ceases to correct the wrong and begins to redistribute unresolved social costs toward the most solvent defendant.

### C. Flattening Produces Reciprocal Injustice

46. The danger of collapse is not one-sided.

47. Overbroad attribution can unfairly burden platforms. It can also weaken valid claims against them.

48. Without disciplined separation, the litigation may:

a. place custodial harms on platforms;

b. place content-created harms on distributors;

c. place culturally distributed harms on one company;

d. place market-created harms on the most successful participant in the market;

e. allow schools and governments to recover costs arising partly within their own existing duties;

f. treat lawful publication judgments as defective design without feature-specific analysis;

g. convert correlation into causation;

h. aggregate overlapping injuries into duplicative penalties;

i. under-remedy proven deception by burying it within diffuse health theories;

j. under-remedy unlawful data practices by treating them as merely one component of generalized youth harm;

k. dilute strong exploitation or predatory-access claims by merging them with broad claims concerning dissatisfaction, loneliness, or excessive use;

l. impose duties no actor can clearly understand or consistently satisfy;

m. encourage custodians to externalize responsibility after observable dysfunction appears;

n. encourage institutions to characterize ordinary stewardship costs as externally caused injury;

o. create remedies that shift users to competing platforms without improving their actual condition;

p. reward less transparent competitors while penalizing the company whose internal records are most developed;

q. preserve the same industry incentives while changing the identity of the dominant platform;

r. weaken parental authority by judicial implication; and

8

s. produce precedent that extends far beyond the proved conduct.

49. The injustice is reciprocal because every unallocated duty becomes available for transfer.

50. A platform may be forced to bear a custodial failure it did not create.

51. A parent may be denied meaningful information needed to exercise custody because a platform concealed it.

52. A school may incur a real additional burden caused by a proved platform breach.

53. A school may also seek reimbursement for costs that arose from its own ordinary obligations.

54. A child may suffer from unlawful exploitation for which both an offender and a platform bear distinct responsibility.

55. A child may also suffer from broader conditions that no single platform created.

56. The adjudicative task is therefore neither to concentrate all responsibility nor to disperse it until no one answers.

57. It is to assign responsibility according to actual duty, actual control, actual knowledge, actual causation, and actual capacity to correct.

### D. The Court Should Decide by Allocation, Not Absolution

58. Amicus does not ask the Court to excuse any actor.

59. It asks the Court to prevent one actor's duty from being silently transferred to another.

60. Parents and guardians should remain accountable for direct stewardship, access, supervision, continuation, and response to observable dysfunction.

61. Schools and public institutions should remain accountable for delegated custody, institutional device use, educational access, observation, intervention, and costs arising within their existing duties.

62. Platforms should remain accountable for their own:

   a. Representations;

   b. internal knowledge;

   c. data practices;

   d. account systems;

   e. Controls;

   f. recommendation architecture;

   g. youth-facing product decisions;

   h. response to unlawful conduct; and

   i. provable increments of harm.

63. Content creators and offenders should remain accountable for the content and conduct they produce.

9

64. Government should remain accountable for:

      a. the incentive structure it permits;

      b. the standards it enacts;

      c. the clarity of the duties it imposes;

      d. platform-neutral enforcement;

      e. proportional remedies; and

      f. preservation of lawful expression.

65. The Court can preserve every valid claim by requiring each claim to answer a fixed series of questions:

      a. Who authorized access?

      b. Who created the content or condition?

      c. What did the platform itself do?

      d. Who possessed direct stewardship?

      e. What did each actor know?

      f. What representation was made?

      g. What duty arose?

      h. What breach occurred?

      i. What incremental harm followed?

      j. What portion is attributable to the defendant?

      k. What remedy corrects that specific wrong?

66. That framework avoids both absolution and overreach.

67. It permits full relief for deception, unlawful data practices, defeated controls, exploitation, and platform-created injury.

68. It preserves responsibility for parents, schools, public institutions, content creators, and government where those actors possessed the relevant duty.

69. Most importantly, it prevents the coordinated proceedings from transforming distributed social dysfunction into undifferentiated platform liability.

70. The governing principle is therefore:

**The Court should identify each actor's duty before assigning another actor's harm to it, and should impose liability and remedy according to the harm each actor actually created, controlled, concealed, intensified, or failed to correct within the boundaries of its own responsibility.**

10

## I. INTEREST OF AMICUS CURIAE

1. The Natural Law Institute is an independent research and educational institution concerned with the structure, function, and legitimacy of adjudication.

2. The Institute studies law not merely as a collection of rules, doctrines, and remedies, but as a civilizational method for producing settlement among parties whose interests, duties, capacities, and causal contributions differ.

3. Its work focuses on the conditions necessary for adjudication to remain lawful, intelligible, reciprocal, and proportionate when disputes involve multiple institutions, overlapping systems, diffuse causation, emerging technologies, and harms distributed across many actors.

4. The Institute's interest in these coordinated proceedings arises from the unusually broad legal and institutional questions presented here.

5. This multidistrict litigation does not concern a single product, a single injury, a single defendant, a single custodian, or a single theory of liability.

6. It combines:

   a. individual personal-injury claims;

   b. wrongful-death and estate claims;

   c. parental and derivative claims;

   d. school-district and local-government claims;

   e. state consumer-protection actions;

   f. allegations concerning children's data;

   g. allegations concerning platform design and recommendation;

   h. allegations concerning unlawful exploitation and predatory conduct;

   i. claims implicating speech, publication, and editorial judgment;

   j. claims concerning institutional expenditures;

   k. industry-wide questions about incentives, measurement, and governance; and

   l. requests for compensatory, punitive, statutory, equitable, and structural relief.

7. The scale of the litigation magnifies the need for a stable adjudicative architecture.

8. Coordination may properly consolidate common discovery, common legal questions, common experts, and common platform evidence.

9. Coordination also creates a distinct danger: concepts used for administrative efficiency may become substitutes for the legal distinctions necessary to decide responsibility.

10. The Institute's interest is therefore not in the factual resolution of any individual plaintiff's claim.

11

11. Its interest is in assisting the Court with the common architecture through which those claims, institutional claims, government claims, and platform defenses can be classified and resolved without transferring duties or harms across actors by implication.

### A. The Institute Studies Adjudication as the Production of Settlement

12. The Institute understands adjudication as the disciplined production of settlement.

13. Settlement, in this sense, is broader than compromise between private parties.

14. It is the lawful placement of responsibility, authority, consequence, and remedy so that the dispute can be resolved without creating a greater disorder than the one presented to the Court.

15. A judgment produces durable settlement when it:

> a. identifies the relevant actors;
>
> b. separates their respective duties;
>
> c. distinguishes conduct from condition;
>
> d. identifies the actual source of harm;
>
> e. measures causal contribution;
>
> f. assigns responsibility proportionately;
>
> g. preserves lawful authority;
>
> h. imposes remedies within the defendant's capacity to correct; and
>
> i. leaves intelligible rules for future conduct.

16. A judgment fails to produce durable settlement when it merely selects the most visible, solvent, politically available, or technologically sophisticated actor and places unresolved social costs upon it.

17. Such a judgment may conclude a case while enlarging the underlying conflict.

18. These proceedings present that risk because the alleged harms arise within a dense system of interaction among children, parents, guardians, schools, healthcare providers, content creators, offenders, advertisers, device manufacturers, application stores, platforms, regulators, legislatures, and broader cultural institutions.

19. The Court must determine not merely whether harm occurred, but where responsibility lawfully begins and ends among those interacting actors.

20. The Institute's contribution is directed to that settlement function.

### B. The Institute Studies Causal Allocation

21. Causal allocation is the process of separating the existence of a harm from the legal responsibility for producing it.

22. In complex systems, an injury may have several necessary conditions, several contributing causes, several opportunities for prevention, and several actors with different forms of control.

23. Those distinctions matter.

24. A party may:

    a. create the original risk;

    b. transmit the risk;

    c. amplify the risk;

    d. conceal the risk;

    e. fail to warn of the risk;

    f. permit access to the risk;

    g. continue exposure after injury becomes observable;

    h. possess authority to intervene;

    i. possess knowledge unavailable to others; or

    j. bear a preexisting duty to manage the relevant condition.

25. Each role may support responsibility.

26. The roles are not interchangeable.

27. A platform that materially misrepresents the operation of a youth safeguard occupies a different causal position from a parent who continues unrestricted access after observing severe dysfunction.

28. A school that supplies institutional devices and requires digital use occupies a different position from a third-party offender who creates unlawful material.

29. A recommendation system that measurably intensifies exposure occupies a different position from the creator of the underlying content.

30. A legislature that leaves market-wide incentives unregulated occupies a different position from a company that violates a clearly defined statutory duty.

31. The Institute's interest is in preventing those positions from being collapsed into a single narrative of "social-media harm."

32. The existence of a coordinated factual environment does not establish a common legal cause.

33. The Institute therefore advocates a sequence in which the Court identifies:

    a. the original condition;

    b. the actor who created it;

    c. the actor who enabled access;

    d. the actor who intensified or concealed it;

    e. the actor with direct stewardship;

    f. the actor with superior knowledge;

    g. the actor capable of correction; and

h. the incremental harm attributable to each.

34. That sequence preserves valid claims while preventing responsibility from leaking across institutional boundaries.

## C. The Institute Studies Institutional Responsibility

35. The Institute also studies the relationship between authority and responsibility.

36. Institutions frequently seek authority when governing conduct and disclaim responsibility when the consequences of that governance become costly.

37. Lawful adjudication must resist that asymmetry.

38. Authority and responsibility are reciprocal.

39. A parent who possesses authority over a child's device, schedule, healthcare, and household access also possesses responsibility for exercising that authority.

40. A school that possesses compulsory custody, disciplinary authority, institutional devices, classroom control, and observational proximity also possesses responsibility for the conditions created or maintained within that sphere.

41. A platform that possesses exclusive control over its systems, representations, data practices, recommendation objectives, and safeguards also possesses responsibility for those matters.

42. Government, which establishes the legal framework and permits the prevailing market structure, possesses responsibility for defining and correcting defects that operate across the industry.

43. The question is not which actor should bear all responsibility.

44. The question is which actor should bear which responsibility.

45. These coordinated proceedings could produce precedent with consequences extending far beyond the parties.

46. A judicial rule that treats platforms as de facto custodians of children may diminish direct parental and institutional stewardship.

47. A judicial rule that treats all platform operation as mere user choice may leave deception, unlawful data practices, and operational misconduct uncorrected.

48. A judicial rule that permits schools or governments to recover ordinary stewardship costs from private defendants may detach public authority from public responsibility.

49. A judicial rule that permits platforms to invoke the conduct of custodians as a complete answer may conceal platform-specific wrongdoing.

50. The Institute's interest is in preserving reciprocal accountability across all of those institutions.

## D. The Institute Studies Commonality, Reciprocity, and Proportionality

51. The Institute evaluates disputes through three related principles: commonality, reciprocity, and proportionality.

52. Commonality asks what facts, duties, and legal questions are genuinely shared.

53. In an MDL, commonality supports coordination.

14

54. It does not authorize the Court to treat all injuries, mechanisms, defendants, custodians, or remedies as legally identical.

55. Genuine commonality may exist regarding:

  a. a platform's internal representations;

  b. recommendation architecture;

  c. data practices;

  d. youth-facing controls;

  e. age-assurance systems;

  f. industry incentive structures; or

  g. common constitutional questions.

56. It may not exist regarding:

  a. individualized exposure;

  b. preexisting condition;

  c. parental supervision;

  d. school environment;

  e. competing-platform use;

  f. temporal sequence;

  g. injury severity; or

  h. damages.

57. Reciprocity requires that each actor be held to the duties corresponding to its authority, knowledge, control, and benefit.

58. A platform should not externalize the cost of deception onto users and custodians.

59. A parent or institution should not externalize its own stewardship failure onto a platform.

60. A content creator should not escape responsibility because a distributor is more solvent.

61. Government should not preserve an incentive structure and then attribute every consequence of that structure to one market participant.

62. Proportionality requires that liability and remedy correspond to the actor's actual contribution.

63. It rejects both total absolution and total attribution.

64. It supports:

  a. full correction of proven deception;

  b. full enforcement of statutory data duties;

  c. meaningful relief for platform-created injury;

15

       d. distinct treatment of unlawful exploitation;

       e. comparative assessment of distributed causes;

       f. limits on duplicative penalties;

       g. remedies within the responsible actor's control; and

       h. legislative correction for defects extending across the market.

65. These principles are particularly important where broad social concerns generate pressure for broad legal remedies.

66. The seriousness of an alleged harm does not eliminate the requirement of proportional causal attribution.

67. It makes that requirement more important.

### E. The Institute Studies the Separation of Lawful Duties Across Interacting Systems

68. Modern disputes increasingly arise across interacting systems rather than within a single bilateral relationship.

69. A child's use of a social-media service may involve:

       a. a household device;

       b. an operating system;

       c. an application store;

       d. a platform account;

       e. several recommendation systems;

       f. third-party content;

       g. peer networks;

       h. school-issued technology;

       i. commercial advertising;

       j. healthcare or counseling systems;

       k. parental supervision; and

       l. public regulation.

70. Each system has its own function, incentives, information, authority, and limits.

71. Law becomes unstable when a duty belonging to one system is inferred into another merely because the systems interact.

72. Custodial duty should not become a commercial platform duty by proximity.

73. A platform's duty of truthfulness should not disappear because a parent authorized access.

16

74. A school's ordinary duty to counsel and supervise should not automatically become a recoverable injury.

75. A user's engagement with lawful expression should not automatically convert that expression into a defective product.

76. An industry-wide market defect should not be judicially assigned to one firm without proof of firm-specific conduct.

77. The Institute's interest is in preserving those boundaries while recognizing that interacting duties can overlap.

78. Proper separation does not fragment responsibility.

79. It makes responsibility enforceable.

### F. The Institute Studies Governance Structures for Emerging Technological Systems

80. The Institute also studies governance structures for technologies capable of shaping access, selection, recommendation, attention, behavior, and institutional decision-making at scale.

81. The present litigation concerns technological systems whose operation is not fully captured by traditional categories of publisher, product, service, fiduciary, common carrier, or custodian.

82. Those systems can:

   a. rank expression;

   b. infer interests;

   c. predict behavior;

   d. personalize exposure;

   e. identify patterns of use;

   f. detect age-related signals;

   g. alter the timing and frequency of return;

   h. optimize for commercial objectives;

   i. apply safety constraints; and

   j. measure outcomes continuously.

83. The law must distinguish the expressive, commercial, operational, and governance dimensions of those systems.

84. The Institute's interest is in helping the Court avoid categorical error.

85. A recommendation may contain editorial judgment, automated prediction, commercial optimization, and safety constraints at once.

86. A youth safeguard may function as a technical control, a marketing representation, a compliance mechanism, and a tool of parental authority.

87. An age-assurance process may implicate child protection, privacy, data minimization, accuracy, and access to lawful expression.

17

88. These functions require precise legal classification.

89. They also create opportunities for more effective governance.

90. Contemporary computational systems are increasingly capable of:

   a. auditing whether controls operate as represented;

   b. identifying recurrent harmful pathways;

   c. detecting conflicts between declared safeguards and actual optimization;

   d. separating user selection from system-generated escalation;

   e. measuring substitution across services;

   f. evaluating outcome measures beyond raw engagement;

   g. preserving traceable decision records;

   h. identifying material changes in system objectives; and

   i. supporting human review and correction.

91. The Institute's interest is in ensuring that judicial remedies and future legislation target the operative roots of the problem rather than merely relocating users, attention, and revenue from one platform to another.

### G. The Institute Has No Financial Interest in Any Party or Outcome

92. The Natural Law Institute has no financial interest in any plaintiff, defendant, platform, school district, governmental entity, settlement, damages award, penalty, injunction, or commercial technology implicated by these proceedings.

93. It does not seek to defend the prevailing business model of any platform.

94. It does not seek to diminish injuries suffered by children or families.

95. It does not seek to shield schools, parents, public institutions, content creators, offenders, or government from duties properly belonging to them.

96. Its position is neutral as to party identity and exacting as to responsibility.

97. The Institute's concern is that each actor answer for its own lawful duties and causal contribution.

98. That neutrality permits the Institute to identify errors that may operate against either side.

99. Overbroad liability can impose another actor's duty upon a platform.

100. Overbroad immunity can leave platform-created wrongdoing without remedy.

101. A sound allocation framework protects against both errors.

### H. The Institute Seeks to Prevent Distorting Precedent

102. The precedential consequences of these proceedings may extend beyond social media.

103. The Court's treatment of custody, recommendation, algorithmic operation, data practices, institutional costs, and distributed causation may shape disputes involving:

    a. artificial-intelligence systems;

    b. educational technology;

    c. digital-health tools;

    d. gaming platforms;

    e. streaming services;

    f. application stores;

    g. search engines;

    h. Marketplaces;

    i. virtual environments;

    j. automated decision systems; and

    k. future communications technologies.

104. The Institute is concerned that an insufficiently separated analysis could produce precedent in which custodial duties become commercial duties by implication.

105. Such precedent would convert the use of a service by a minor into a form of transferred guardianship.

106. It would create a rule under which commercial reach becomes custodial authority even where the platform lacks physical custody, household authority, medical knowledge, educational control, and power to terminate the child's broader digital access.

107. The Institute is also concerned that generalized social dysfunction could become private product liability without proof of a defendant-specific increment.

108. Social isolation, family conflict, school stress, cultural deterioration, economic insecurity, bullying, status competition, and preexisting psychological conditions may all be expressed through digital systems.

109. Expression through a platform does not establish creation by the platform.

110. Nor does widespread use establish responsibility for the condition of the user population.

111. The Institute is further concerned that lawful expression could become inseparable from platform machinery.

112. Content creation, hosting, editorial selection, ranking, recommendation, notification, profiling, monetization, and data processing are distinct operations.

113. Treating them as one undifferentiated product function may obscure constitutional protections and nonexpressive commercial conduct alike.

114. Overbroad attribution can therefore harm both sides of the legal analysis.

115. It may impose liability for protected publication judgments.

116. It may also allow deceptive or unlawful nonexpressive conduct to hide behind the language of editorial discretion.

19

117. The Institute is further concerned that actual platform misconduct may be obscured by excessive aggregation.

118. Strong allegations concerning:

    a. false safety representations;

    b. unlawful child-data practices;

    c. ineffective or defeated controls;

    d. knowing treatment of underage accounts;

    e. predatory access;

    f. illegal material;

    g. system-created escalation; or

    h. concealed internal knowledge

may lose analytical force when embedded within a generalized claim that platforms caused youth dysfunction as a whole.

119. Precision strengthens valid claims.

120. It does not weaken them.

121. Finally, the Institute is concerned that remedies may fail because they target symptoms rather than incentives and operations.

122. A platform-specific penalty may punish proven misconduct.

123. It may not correct an industry-wide model that rewards attention capture, retention, repeated return, and advertising yield.

124. A remedy that suppresses one feature on one service may shift users to another service without reducing the underlying demand or harm.

125. A rule that requires vague "youth safety" without defining measurable duties may produce performative compliance rather than functional improvement.

126. A remedy that weakens parental responsibility may reduce the most immediate form of protection available to the child.

127. The Institute's interest is therefore in helping the Court distinguish:

    a. what can be adjudicated now;

    b. what can be remedied by the defendants before it;

    c. what remains attributable to custodians and institutions;

    d. what requires platform-neutral legislation;

    e. what requires industry-wide governance; and

    f. what remains beyond lawful attribution on the present record.

### I. The Institute's Proposed Contribution

128.    The Institute offers the Court a common decisional framework rather than a factual conclusion concerning any individual claimant.

129.    That framework asks the Court to separate:

> a. access;
>
> b. content origin;
>
> c. custody;
>
> d. platform operation;
>
> e. knowledge;
>
> f. representation;
>
> g. statutory duty;
>
> h. causation;
>
> i. incremental harm;
>
> j. institutional responsibility;
>
> k. platform-wide defect;
>
> l. industry-wide defect; and
>
> m. remedy.

130.    Its purpose is to preserve every valid claim while preventing negative externalities from being transferred to actors who did not create, control, conceal, intensify, or possess the duty to correct them.

131.    The Institute respectfully submits that such separation will assist the Court in producing a resolution that is lawful, reciprocal, proportionate, administrable, and durable across the coordinated proceedings.

---

## II. THE COURT SHOULD FIRST IDENTIFY THE COLLAPSED PREDICATES

1.  Before the Court determines liability, causation, or remedy, it should identify the distinct predicates currently compressed into broader terms.

2.  The central difficulty is not merely that the parties disagree about facts. It is that several legally different acts, duties, mechanisms, injuries, and remedial theories are frequently described through the same vocabulary.

3.  Terms such as "protection of minors," "platform design," "youth harm," and "social-media use" are useful at a descriptive level. They are insufficient at the adjudicative level.

4.  Each term may refer to several different actors, several different forms of control, several different causal sequences, and several different legal rules.

21

5. Unless those predicates are separated at the outset, the Court risks resolving one legal question through evidence that proves another.

6. The resulting error may operate in either direction.

7. A broad term may improperly expand platform responsibility beyond platform-controlled conduct.

8. The same broad term may also conceal direct platform misconduct by burying it within diffuse social conditions.

9. The proper sequence is therefore:

   a. identify the precise act or condition;

   b. identify the actor who controlled it;

   c. identify the source of the alleged duty;

   d. determine whether the act was expressive, commercial, operational, custodial, statutory, or institutional;

   e. identify the harm allegedly caused;

   f. determine whether the causal theory is direct, derivative, comparative, aggregate, or individualized; and

   g. match the remedy to the proved predicate.

10. The Court should require that every common theory proceed through that sequence.

### A. "Protection of Minors" Combines Several Different Duties

11. "Protection of minors" is not one duty.

12. It is a broad policy phrase containing several distinct legal and practical responsibilities.

13. Those responsibilities arise from different relationships and attach to different actors.

14. At minimum, the Court should distinguish the following predicates:

   a. custody of the child;

   b. access to the device;

   c. access to the service;

   d. creation of content;

   e. platform selection or recommendation;

   f. collection and use of data;

   g. safety representations;

   h. parental or custodial controls;

   i. response to visible dysfunction; and

22

j. response to unlawful exploitation.

15. No single actor necessarily possesses all ten.

16. The phrase "failure to protect" should therefore be disaggregated before the Court determines whether a duty existed, who owed it, or what conduct breached it.

**1. Custody of the Child**

17. Custody concerns direct authority over the child's person, schedule, environment, welfare, supervision, healthcare, and daily conduct.

18. That authority ordinarily resides with:

a. parents;

b. guardians;

c. schools during delegated custody;

d. residential institutions;

e. healthcare facilities within their own sphere; and

f. the state where lawful custody has been assumed.

19. A platform ordinarily does not possess physical custody, household authority, educational authority, medical authority, or the legal power to make general decisions concerning the child's life.

20. It may influence conduct through its service.

21. Influence is not custody.

22. The distinction matters because custodial responsibility includes duties that no platform can perform, including:

a. removing a device from the child;

b. changing the child's schedule;

c. evaluating visible behavioral change;

d. obtaining medical care;

e. altering household conditions;

f. restricting all digital access rather than one service;

g. responding to offline bullying or family conflict; and

h. supervising the child's broader environment.

23. A platform-specific duty should not be expanded into a custodial duty merely because the platform has significant reach.

**2. Access to the Device**

24. Device access is distinct from service access.

23

25. The person or institution that supplies the device controls a threshold condition without which platform use ordinarily cannot occur.

26. Device-level decisions may include:

    a. purchase or provision;

    b. ownership;

    c. password control;

    d. installation permissions;

    e. nighttime possession;

    f. screen-time settings;

    g. internet connectivity;

    h. school-issued access;

    i. parental monitoring tools; and

    j. removal or replacement.

27. Those decisions may be made by parents, schools, employers, device manufacturers, operating-system providers, or application-store operators.

28. A platform may contribute to circumvention or may fail to integrate effectively with device-level controls.

29. That is a separate inquiry from who initially supplied and maintained access to the device.

### 3. Access to the Service

30. Access to a particular service concerns account creation, authentication, age representation, permissions, and continued account availability.

31. Responsibility may be distributed among:

    a. the child;

    b. the parent or guardian;

    c. the platform;

    d. the device ecosystem;

    e. the application store;

    f. the school; and

    g. any intermediary whose credentials or identity were used.

32. The Court should distinguish lawful access from access obtained through:

    a. false age representation;

    b. parental assistance;

24

       c. inadequate age assurance;

       d. multiple accounts;

       e. borrowed credentials;

       f. institutional accounts;

       g. circumvention of restrictions; or

       h. account restoration after suspension.

33. A platform may bear direct responsibility where it knowingly permits prohibited underage access, misrepresents age controls, or designs account systems to defeat meaningful restrictions.

34. That does not eliminate the separate role of the custodian who provided the device, allowed use, or continued access.

## 4. Creation of Content

35. The creator of content occupies the first causal position concerning what the content says, depicts, requests, encourages, or threatens.

36. Content may be created by:

       a. ordinary users;

       b. peers;

       c. influencers;

       d. advertisers;

       e. political organizations;

       f. commercial actors;

       g. predators;

       h. offenders;

       i. schools or public institutions; or

       j. the platform itself.

37. The Court should distinguish content creation from later platform treatment.

38. A third party who creates unlawful material, directs abuse, solicits a child, encourages dangerous conduct, or engages in exploitation remains responsible for that conduct.

39. The platform may possess a separate duty concerning notice, removal, amplification, reporting, data use, or system design.

40. Those duties are cumulative where the facts support them.

41. They are not interchangeable.

## 5. Platform Selection or Recommendation

25

42. Selection and recommendation concern what the platform does with existing material.

43. Relevant platform operations may include:

   a. ranking;

   b. personalization;

   c. repetition;

   d. autoplay;

   e. notification;

   f. follower suggestions;

   g. account recommendations;

   h. content clustering;

   i. trend promotion;

   j. search ordering;

   k. suppression; and

   l. escalation into adjacent content.

44. Those operations may materially affect exposure.

45. They may also contain expressive judgment, automated prediction, commercial optimization, or a combination of all three.

46. The Court should identify the precise operation challenged rather than treating "recommendation" as a unitary act.

47. A recommendation based on a user's express request differs from:

   a. unsolicited escalation;

   b. age-targeted promotion;

   c. vulnerability-based profiling;

   d. commercial sponsorship;

   e. safety intervention;

   f. content moderation; or

   g. repeated reintroduction after a user's contrary action.

48. Liability should follow the identified mechanism and the incremental effect of that mechanism.

**6. Data Collection and Use**

49. Data practices present a separate legal lane.

50. They may include:

a. collection of identifiers;

b. location data;

c. behavioral data;

d. inferred interests;

e. age signals;

f. social relationships;

g. message metadata;

h. health-related inferences;

i. advertising profiles;

j. retention;

k. transfer; and

l. use for recommendation or targeting.

51. The relevant questions include:

a. whether collection was lawful;

b. whether consent was valid;

c. whether the user was underage;

d. whether the use exceeded disclosed purposes;

e. whether the data was necessary;

f. whether the platform inferred sensitive traits;

g. whether retention was proportionate; and

h. whether the data materially altered exposure.

52. An unlawful data practice can support liability even where generalized mental-health causation remains unproven.

53. Conversely, lawful data processing does not establish that every resulting recommendation was harmless.

54. The Court should preserve those distinctions.

## 7. Safety Representations

55. A platform may make representations concerning:

a. youth safety;

b. parental controls;

c. age enforcement;

27

d. harmful-content reduction;

e. time-management tools;

f. privacy;

g. exploitation reporting;

h. research findings;

i. product efficacy; and

j. the relationship between engagement and wellbeing.

56. Those representations create a direct and adjudicable comparison between what was said and what was known or done.

57. The Court should determine:

a. the exact statement;

b. the intended audience;

c. whether it was factual or aspirational;

d. whether it was material;

e. what the platform knew;

f. whether the safeguard functioned as represented; and

g. whether the representation caused a legally cognizable injury.

58. This lane should remain distinct from broader claims that the platform was responsible for the child's total condition.

59. A false statement may be actionable because it was false, not because it transferred full stewardship to the speaker.

### 8. Parental or Custodial Controls

60. Parental controls are a point of interaction between platform responsibility and custodial authority.

61. They may include:

a. time limits;

b. content restrictions;

c. age settings;

d. account supervision;

e. notification limits;

f. privacy settings;

g. contact restrictions;

h. reporting tools;

28

i. nighttime locks; and

j. device-platform integration.

62. The legal questions are concrete:

a. What did the control purport to do?

b. Who activated it?

c. What technical limits existed?

d. Was circumvention foreseeable?

e. Did the platform facilitate circumvention?

f. Was the control accurately described?

g. Was the control interoperable with the device or app store?

h. Did the platform collect information indicating repeated defeat of the control?

63. A platform can be held responsible for an ineffective or deceptively represented control.

64. The existence of such a control does not extinguish the custodian's separate responsibility to monitor actual outcomes and intervene where the control proves insufficient.

**9. Response to Visible Dysfunction**

65. Visible dysfunction concerns what occurs after harmful conduct or deterioration becomes observable.

66. Relevant signs may include:

a. sleep loss;

b. withdrawal;

c. declining school performance;

d. repeated conflict;

e. self-harm statements;

f. eating changes;

g. compulsive conduct;

h. avoidance of ordinary activities;

i. severe mood change; and

j. crisis behavior.

67. The actor with direct observation, proximity, and authority ordinarily possesses the first practical opportunity to respond.

68. That may be:

a. a parent;

> b. a guardian;
>
> c. a teacher;
>
> d. a school counselor;
>
> e. a physician;
>
> f. a therapist;
>
> g. another adult custodian; or
>
> h. a platform where the dysfunction is expressed through identifiable service activity.

69. The platform's knowledge is often partial, probabilistic, and service-bound.

70. The custodian's knowledge may be broader, embodied, and contextual.

71. The Court should therefore ask what each actor could actually observe and what each actor could actually do.

72. Responsibility should follow that capacity.

## 10. Response to Unlawful Exploitation

73. Unlawful exploitation requires separate treatment because its legal and causal structure differs from generalized claims concerning excessive use or emotional dissatisfaction.

74. Such claims may involve:

> a. grooming;
>
> b. predatory contact;
>
> c. solicitation;
>
> d. trafficking;
>
> e. child sexual-abuse material;
>
> f. extortion;
>
> g. impersonation;
>
> h. threats;
>
> i. unlawful image distribution; and
>
> j. failure to report known criminal activity.

75. The primary wrongdoer is the offender who commits the unlawful act.

76. The platform may bear additional responsibility where the law imposes duties concerning:

> a. notice;
>
> b. removal;
>
> c. reporting;

30

        d. preservation;

        e. repeat offenders;

        f. known contact pathways;

        g. account verification;

        h. recommendation of minors to adults;

        i. monetization of unlawful activity; or

        j. concealment of known system failures.

77.  These claims should not be diluted by merger with broad theories of "youth harm."

78.  Their legal predicates are narrower, more concrete, and often stronger.

79.  The Court should preserve that strength through separate classification.

## 11. The Court Should Assign Each Duty to Its Proper Actor

80.  The phrase "protection of minors" should therefore be converted into an allocation matrix.

81.  The Court should ask:

        a. Who had custody?

        b. Who supplied the device?

        c. Who authorized the service?

        d. Who created the content?

        e. Who selected or amplified it?

        f. Who collected and used the data?

        g. Who made the safety representation?

        h. Who controlled the safeguard?

        i. Who observed the dysfunction?

        j. Who could intervene?

        k. Who committed unlawful exploitation?

        l. Who possessed a legal duty to respond?

82.  No actor should inherit another actor's duty merely because all actors participated in the same environment.

### B. "Platform Design" Combines Expressive and Nonexpressive Operations

83.  "Platform design" is similarly overbroad.

84.  It may refer to the visual layout of a service, the timing of a notification, the operation of a recommendation system, the collection of data, the creation of parental controls, or an editorial decision concerning what material to present.

31

85. Those functions implicate different legal doctrines.

86. The Court should distinguish at least the following:

      a. editorial selection;

      b. protected publication;

      c. neutral software operation;

      d. commercial data processing;

      e. product controls;

      f. notification timing;

      g. age assurance;

      h. account creation;

      i. recommendation objectives; and

      j. deceptive commercial representation.

**1. Editorial Selection**

87. Editorial selection concerns choices about what material to publish, suppress, prioritize, organize, or present.

88. Such choices may implicate constitutional protection and traditional principles governing publishers.

89. The Court should identify whether the challenged conduct concerns:

      a. inclusion;

      b. exclusion;

      c. ordering;

      d. labeling;

      e. recommendation;

      f. moderation;

      g. search display; or

      h. viewpoint-based or subject-based treatment.

90. The mere use of software to implement an editorial judgment does not necessarily convert that judgment into a nonexpressive product defect.

91. The Court should classify the underlying function.

**2. Protected Publication**

92. Publication concerns the transmission or presentation of expression to an audience.

93. A claim that seeks to impose liability because lawful third-party expression was available, visible, or recommended may implicate constitutional and statutory protections.

94. The Court should distinguish liability based on:

    a. the content's message;

    b. the platform's own representation;

    c. the platform's independent data conduct;

    d. unlawful solicitation;

    e. a defective control;

    f. a failure to comply with a statutory reporting duty; or

    g. a nonexpressive operational mechanism.

95. The legal analysis should not permit protected publication to immunize nonexpressive misconduct.

96. Nor should nonexpressive misconduct be used as a vehicle to punish protected expression.

### 3. Neutral Software Operation

97. Some challenged functions may consist of neutral software processes that execute user commands or standard account operations.

98. Examples may include:

    a. displaying followed accounts;

    b. sorting chronologically;

    c. storing drafts;

    d. transmitting messages;

    e. applying a user-selected filter;

    f. enforcing a chosen privacy setting; or

    g. providing search results responsive to a direct query.

99. Neutral operation differs from system-generated escalation.

100. The Court should ask whether the software merely carried out the user's expressed choice or materially introduced a new exposure, objective, or incentive.

### 4. Commercial Data Processing

101. Commercial data processing concerns collection, inference, profiling, targeting, retention, and monetization.

102. It is analytically distinct from publication.

103. The Court should determine:

       a. what data was processed;

       b. for what purpose;

       c. under what authority;

       d. whether the user was a minor;

       e. whether the processing was disclosed;

       f. whether it was necessary;

       g. whether it altered exposure; and

       h. whether it generated commercial benefit.

104. A claim directed to unlawful profiling should not be reframed as a claim about speech.

105. A claim directed to speech should not be reframed as a claim about data merely to avoid the applicable legal protections.

## 5. Product Controls

106. Product controls are operational features designed to limit, alter, or structure use.

107. They may include:

       a. time reminders;

       b. bedtime settings;

       c. account supervision;

       d. restricted modes;

       e. content filters;

       f. contact restrictions;

       g. age-based defaults;

       h. reporting tools;

       i. notification limits; and

       j. account deactivation functions.

108. These controls can be evaluated through evidence concerning:

       a. design;

       b. implementation;

       c. efficacy;

       d. circumvention;

       e. disclosure;

       f. testing;

34

g. user comprehension; and

h. actual operation.

109.    They are therefore especially suitable for direct adjudication.

## 6. Notification Timing

110.    Notification timing concerns when, how often, and under what conditions the platform prompts a user to return.

111. Relevant questions include:

a. whether notifications were user-selected;

b. whether they were sent during sleep periods;

c. whether they were age-sensitive;

d. whether they were tied to social pressure;

e. whether they were repeated after nonresponse;

f. whether a custodian disabled them;

g. whether the platform restored or circumvented them; and

h. whether the notifications materially changed use.

112.    A notification is not identical to the content it references.

113.    It is a platform-controlled timing mechanism.

114.    That mechanism should be evaluated separately from publication.

## 7. Age Assurance

115.    Age assurance includes:

a. self-declared age;

b. parental consent;

c. identity verification;

d. age estimation;

e. behavioral inference;

f. account review;

g. device-level signals;

h. repeated account detection; and

i. enforcement after notice.

116.    Age assurance raises competing concerns involving child protection, privacy, accuracy, access, data minimization, and due process.

117. The Court should distinguish:

   a. whether the platform knew the user was underage;

   b. whether it should reasonably have known;

   c. whether the verification method was legally sufficient;

   d. whether the platform ignored contrary signals;

   e. whether enforcement was consistent; and

   f. whether safer methods were feasible.

118. "Inadequate age assurance" should not be used as a generalized synonym for every youth-related injury.

119. It is a specific operational predicate.

## 8. Account Creation

120. Account creation concerns the gatekeeping architecture through which a user enters the service.

121. Relevant issues may include:

   a. age entry;

   b. terms of service;

   c. consent;

   d. guardian involvement;

   e. identity verification;

   f. default settings;

   g. privacy choices;

   h. duplicate accounts;

   i. account recovery; and

   j. Deletion.

122. The Court should determine whether the alleged harm arose from:

   a. unlawful admission;

   b. deceptive onboarding;

   c. inadequate disclosure;

   d. defective default settings;

   e. repeated account recreation; or

   f. a later platform operation unrelated to account creation.

36

## 9. Recommendation Objectives

123.  Recommendation systems operate according to objectives, constraints, and available signals.

124.  Their objectives may include:

  a. relevance;

  b. recency;

  c. relationship strength;

  d. predicted interest;

  e. return probability;

  f. watch time;

  g. advertising yield;

  h. user satisfaction;

  i. safety reduction;

  j. diversity of exposure; or

  k. a combination of those measures.

125.  The Court should identify the objective actually challenged.

126.  "Engagement optimization" is too broad unless tied to:

  a. a measurable operational goal;

  b. a specific feature;

  c. a defined user population;

  d. a known risk;

  e. a feasible constraint;

  f. a material representation; and

  g. a proved increment of harm.

127.  Recommendation architecture should be judged through its actual objectives and consequences, not through generalized assumptions about algorithms.

## 10. Deceptive Commercial Representation

128.  A deceptive commercial representation is distinct from the underlying design feature.

129.  The feature may be lawful while the representation concerning it is false.

130.  The representation may also be accurate while the underlying feature creates a separate operational injury.

131.  The Court should distinguish:

37

a. what the feature did;

b. what the platform said it did;

c. what the platform knew;

d. what users or custodians relied upon; and

e. what injury followed from the discrepancy.

132.    This separation permits the Court to remedy deception without converting every challenged feature into an unlawful product.

**11. Feature-Specific Classification Is Necessary**

133.    "Platform design" should therefore be broken into the smallest legally meaningful unit.

134.    For each challenged feature, the Court should ask:

a. Is the function expressive or nonexpressive?

b. Is it user-directed or platform-generated?

c. Is it editorial, commercial, operational, custodial, or mixed?

d. Is the alleged wrong the feature itself or a representation concerning it?

e. Does the feature create access, alter exposure, collect data, or merely display content?

f. What legal doctrine governs that function?

g. What harm is alleged to result?

135.    Feature-specific classification will preserve both lawful expression and accountability for direct platform conduct.

**C. "Youth Harm" Combines Outcomes With Different Causal Chains**

136.    "Youth harm" is not a single injury.

137.    It includes outcomes that differ in severity, mechanism, timing, proof, responsible actors, and available remedies.

138.    At minimum, the Court should distinguish:

a. sleep displacement;

b. body-image dissatisfaction;

c. eating disorders;

d. self-harm;

e. suicide;

f. sexual exploitation;

g. bullying;

h. loneliness;

i. anxiety;

j. depression;

k. family conflict;

l. educational disruption;

m. excessive use; and

n. unlawful data collection.

139.    Each category requires a separate causal chain.

**1. Sleep Displacement**

140.    Sleep displacement may arise from:

a. nighttime device access;

b. notifications;

c. deliberate continued use;

d. household rules;

e. school schedules;

f. gaming;

g. streaming;

h. messaging;

i. anxiety unrelated to the platform; or

j. multi-platform use.

141.    The Court should identify whether the alleged injury is tied to a platform-specific mechanism or to general device availability.

142.    A notification sent during a known sleep period presents a different causal theory from a child choosing to continue watching content after disabling notifications.

**2. Body-Image Dissatisfaction**

143.    Body-image dissatisfaction may involve:

a. peer comparison;

b. edited images;

c. beauty filters;

d. advertising;

e. influencer content;

39

f. offline cultural norms;

g. bullying;

h. preexisting insecurity; or

i. recommendation patterns.

144.    The Court should distinguish the creator of the image, the platform's treatment of it, the child's selection, and the broader cultural condition reproduced through the service.

### 3. Eating Disorders

145.    Eating disorders may involve complex clinical, familial, social, genetic, cultural, and behavioral causes.

146.    A legally sufficient platform theory should identify:

a. the relevant content or feature;

b. the exposure pathway;

c. the temporal relation;

d. the child's prior condition;

e. competing causes;

f. the platform-specific mechanism; and

g. the incremental contribution.

147.    General exposure to appearance-related content does not, without more, establish causation of a clinical disorder.

### 4. Self-Harm

148.    Self-harm claims may involve:

a. preexisting distress;

b. peer encouragement;

c. direct solicitation;

d. content discovery;

e. recommendation;

f. imitation;

g. social reinforcement;

h. crisis expression; or

i. failure to respond to a known emergency.

149.    The Court should distinguish content causation, platform amplification, notice, intervention, and custodial response.

## 5. Suicide

150.    Suicide claims require particular care because the injury is grave and the causal chain is often complex.

151.    Relevant predicates may include:

a. preexisting mental-health condition;

b. direct encouragement;

c. bullying;

d. exploitation;

e. recommendation of harmful material;

f. social isolation;

g. family conditions;

h. school conditions;

i. prior attempts;

j. access to means;

k. failure to intervene; and

l. platform knowledge of an acute crisis.

152.    The gravity of the outcome does not permit the causal chain to be shortened.

153.    It requires greater precision.

## 6. Sexual Exploitation

154.    Sexual exploitation differs fundamentally from generalized emotional harm.

155.    It may involve direct criminal conduct, known offenders, identifiable communications, account pathways, monetary transfers, unlawful images, or failures to report.

156.    The legal analysis should distinguish:

a. offender conduct;

b. platform access architecture;

c. recommendation or contact systems;

d. age verification;

e. notice;

f. reporting;

g. preservation;

h. account enforcement; and

41

i. custodial response.

157. These claims should not be absorbed into a generalized "youth mental health" theory.

## 7. Bullying

158. Bullying may occur:

a. offline;

b. through direct messages;

c. in public comments;

d. through image sharing;

e. through impersonation;

f. across several services;

g. in school networks; or

h. through anonymous accounts.

159. The bully creates the abusive conduct.

160. The platform may separately control reporting, visibility, repetition, account enforcement, and recommendation.

161. The school may possess direct knowledge and disciplinary authority.

162. The parent may possess knowledge and intervention authority.

163. Those roles should be allocated separately.

## 8. Loneliness

164. Loneliness may precede platform use, result from platform use, be relieved by platform use, or coexist with it.

165. The causal theory must therefore identify:

a. baseline social condition;

b. direction of effect;

c. offline relationships;

d. actual platform behavior;

e. substitution from in-person interaction;

f. whether the service increased or decreased connection; and

g. whether a specific platform feature materially altered the condition.

166. Loneliness cannot be treated as a uniform platform-created injury.

## 9. Anxiety and Depression

42

167. Anxiety and depression may be causes, consequences, correlates, or modifiers of digital use.

168. The Court should distinguish:

a. preexisting condition;

b. diagnosis timing;

c. treatment history;

d. family and school conditions;

e. bullying;

f. sleep;

g. physical activity;

h. multi-platform use;

i. content exposure;

j. recommendation pathways; and

k. platform-specific changes in severity.

169. A general association between digital use and distress does not establish the causal contribution of a particular defendant.

**10. Family Conflict**

170. Family conflict may arise from:

a. disagreement over rules;

b. device removal;

c. concealment;

d. multiple accounts;

e. broader household dysfunction;

f. school demands;

g. peer pressure; or

h. platform use.

171. The existence of conflict over a platform does not establish that the platform created the conflict.

172. The Court should determine whether the platform independently intensified the conflict through deceptive controls, circumvention, or specific operational conduct.

**11. Educational Disruption**

173. Educational disruption may involve:

a. classroom access;

  b. school-issued devices;

  c. messaging during instruction;

  d. sleep loss;

  e. absenteeism;

  f. bullying;

  g. curriculum design;

  h. general distraction;

  i. competing entertainment services; or

  j. school policy.

174. A school's own use of digital technology and enforcement choices are part of the causal environment.

175. Platform liability requires proof of an additional defendant-specific contribution.

## 12. Excessive Use

176. "Excessive use" is a descriptive conclusion unless tied to a defined measure.

177. The Court should ask:

  a. Excessive relative to what baseline?

  b. Excessive according to whom?

  c. Measured by time, frequency, impairment, regret, or conflict?

  d. Was the use concentrated on one service or distributed?

  e. Did the user derive benefit?

  f. Was the use voluntary, compulsive, required, or socially necessary?

  g. Did a platform-specific mechanism materially increase it?

178. Duration alone does not identify legal injury.

## 13. Unlawful Data Collection

179. Unlawful data collection is not merely another psychological outcome.

180. It is a distinct statutory or consumer-protection injury.

181. It may exist without proof of depression, addiction, or other health harm.

182. It should therefore be adjudicated independently.

## 14. The Court Should Preserve Distinct Causal Architectures

183. An exploitation claim does not share the same causal architecture as loneliness.

184.    A false safety statement does not share the same architecture as third-party body-image content.

185.    An unlawful data claim does not depend on proving a suicide or eating disorder.

186.    A school-cost claim does not share the same architecture as an individual wrongful-death claim.

187.    The Court should therefore require each harm category to identify:

        a. the relevant actor;

        b. the relevant mechanism;

        c. the legal duty;

        d. the temporal sequence;

        e. the comparative baseline;

        f. alternative causes;

        g. the incremental injury; and

        h. the corresponding remedy.

### D. "Social-Media Use" Combines Several Exposure Classes

188.    "Social-media use" is also too broad to serve as a causal unit.

189.    It may refer to:

        a. Meta use;

        b. non-Meta social-media use;

        c. general smartphone use;

        d. gaming;

        e. streaming;

        f. messaging;

        g. school-mandated screen use;

        h. multi-platform use; or

        i. preexisting dysfunction followed by digital use.

190.    Those exposure classes differ materially.

### 1. Meta Use

191.    Meta-specific use should identify:

        a. the service;

        b. the account;

45

       c. the relevant feature;

       d. the duration;

       e. the content pathway;

       f. the recommendation mechanism;

       g. the age of the user;

       h. the relevant time period; and

       i. the alleged injury.

192.    "Used Instagram" or "used Facebook" is not itself a complete causal theory.

## 2. Non-Meta Social-Media Use

193.    Use of TikTok, Snapchat, YouTube, Discord, X, Reddit, or other services may expose the user to similar or different mechanisms.

194.    The Court should determine whether the alleged harm is:

       a. platform-specific;

       b. common across services;

       c. attributable to a shared user behavior;

       d. attributable to the same content circulating across platforms; or

       e. attributable to the broader digital environment.

195.    A plaintiff's use of multiple services may weaken a firm-specific inference unless the record identifies a distinct mechanism or exposure attributable to the defendant.

## 3. General Smartphone Use

196.    Smartphones provide access to:

       a. social media;

       b. games;

       c. messaging;

       d. streaming;

       e. search;

       f. shopping;

       g. schoolwork;

       h. pornography;

       i. news;

       j. photography; and

k. ordinary communication.

197.    Sleep loss, distraction, social comparison, and repeated checking may arise from device use generally.

198.    Platform-specific causation cannot be inferred from the harms of smartphone availability as a whole.

### 4. Gaming

199.    Gaming may involve:

a. competition;

b. social status;

c. reward schedules;

d. in-game purchases;

e. voice chat;

f. achievement systems;

g. prolonged sessions; and

h. nighttime use.

200.    Those features may produce behaviors similar to those alleged against social-media platforms.

201.    The Court should determine whether the claimed dysfunction is unique to the defendant's service or part of a broader digital-use pattern.

### 5. Streaming

202.    Streaming services may also involve:

a. autoplay;

b. recommendation;

c. prolonged viewing;

d. nighttime displacement;

e. repeated return;

f. advertising; and

g. personalized content.

203.    The existence of similar mechanisms elsewhere matters to comparative causation and industry-wide remedy.

### 6. Messaging

204.    Messaging may be direct, group-based, encrypted, ephemeral, institutional, or embedded within another platform.

205.    Harmful conduct through messaging may arise from:

>    a. peers;
>
>    b. predators;
>
>    c. family members;
>
>    d. school groups;
>
>    e. anonymous accounts; or
>
>    f. cross-platform communication.

206.    The legal responsibility for messaging content and messaging architecture should be distinguished.

## 7. School-Mandated Screen Use

207.    Schools increasingly require digital access for:

>    a. assignments;
>
>    b. announcements;
>
>    c. classroom platforms;
>
>    d. social communication;
>
>    e. research;
>
>    f. testing;
>
>    g. collaboration; and
>
>    h. attendance.

208.    Such use contributes to total screen exposure and may normalize device dependence.

209.    School-mandated use should therefore be included in any serious assessment of educational disruption, sleep, distraction, or habitual checking.

210.    A school cannot fairly attribute all digital burden to social-media defendants while excluding its own required use from the causal baseline.

## 8. Multi-Platform Use

211.    Many users move continuously among several services.

212.    Multi-platform use creates questions of:

>    a. cumulative exposure;
>
>    b. substitution;
>
>    c. duplicated content;
>
>    d. migrating peer networks;
>
>    e. shared advertisers;

f. common recommendation incentives;

g. cross-platform identity; and

h. difficulty isolating platform-specific effect.

213.    The Court should determine whether the alleged injury follows one platform, several platforms, or the user's broader digital pattern.

### 9. Preexisting Dysfunction Followed by Digital Use

214.    Preexisting loneliness, anxiety, depression, family conflict, eating concerns, bullying, or social isolation may lead a child to seek digital interaction.

215.    In that circumstance, use may be:

a. a symptom;

b. a coping mechanism;

c. a source of support;

d. an aggravating factor;

e. a substitute for offline interaction; or

f. some combination of those roles.

216.    The direction of causation must be established rather than assumed.

### 10. Platform-Specific Causation Cannot Be Inferred From Digital Exposure Generally

217.    The Court should therefore require plaintiffs asserting platform-specific causation to identify:

a. the defendant-specific service;

b. the defendant-specific mechanism;

c. the timing and duration of exposure;

d. the user's other digital activities;

e. competing platforms;

f. preexisting condition;

g. custodial and school environment;

h. the comparative baseline; and

i. the increment of harm attributable to the challenged feature.

218.    General digital exposure may support an industry-wide policy concern.

219.    It does not, without further proof, establish liability of a particular platform.

### E. The Court Should Convert Collapsed Terms Into Adjudicable Units

220.    The Court can reduce the present entanglement by requiring every common claim to be expressed through a defined unit.

221.    For each challenged theory, the parties should identify:

    a. the actor;

    b. the act;

    c. the legal character of the act;

    d. the source of duty;

    e. the relevant user population;

    f. the exposure class;

    g. the alleged mechanism;

    h. the harm category;

    i. the comparative baseline;

    j. the causal increment; and

    k. the requested remedy.

222.    That process will not eliminate complexity.

223.    It will make the complexity legally manageable.

224.    It will also preserve the strongest claims by separating them from theories that depend on broader and less certain causal assumptions.

225.    The governing principle is:

**The Court should not adjudicate "protection," "design," "harm," or "use" as undifferentiated concepts. It should identify the specific actor, operation, duty, exposure, causal mechanism, and remedy contained within each term before responsibility is assigned.**

---

### III. THE COURT SHOULD APPLY A FIXED CAUSAL SEQUENCE

1.  Once the collapsed predicates are separated, the Court should require every common theory of liability to proceed through the same causal sequence.

2.  A fixed sequence is necessary because the same alleged injury may involve several actors operating at different points in time and exercising different kinds of control.

3.  Without a fixed sequence, later conduct can be mistaken for earlier causation, influence can be mistaken for custody, publication can be mistaken for creation, and social consequence can be mistaken for platform-specific injury.

4.  The proper sequence is:

    a. access;

    b. content origin;

    c. platform intervention;

50

    d. stewardship;

    e. knowledge and representation;

    f. incremental harm; and

    g. remedy.

5. Each stage asks a different legal question.

6. Each stage should be answered before the next is reached.

7. The sequence does not presume that only one actor may be responsible.

8. It permits multiple actors to bear distinct responsibility where the evidence supports distinct duties, breaches, and causal contributions.

9. It also prevents a later actor from inheriting every earlier duty merely because that actor is visible, solvent, or technically capable of influencing the environment.

10. The Court should therefore require each theory to identify:

    a. the actor;

    b. the operative conduct;

    c. the source of authority or control;

    d. the governing duty;

    e. the temporal position of the conduct;

    f. the measurable causal contribution; and

    g. the remedy corresponding to that contribution.

## A. Access

11. The first question is who enabled the child to reach the service.

12. Access is the threshold causal condition.

13. Before a platform can host, rank, recommend, or monetize anything for a child, the child must possess a device, connectivity, permission or practical opportunity to use it, and an account or means of entry.

14. Access may be enabled by:

    a. a parent or guardian;

    b. a school;

    c. a device provider;

    d. an operating-system provider;

    e. an application store;

f. the child through age misrepresentation;

g. another child or adult through shared credentials;

h. an institution through a managed account;

i. the platform through inadequate age controls;

j. the platform through account restoration or repeated-account tolerance; or

k. some combination of those actors.

15. The Court should distinguish initial access from continued access.

16. Initial access concerns how the child first entered the service.

17. Continued access concerns who maintained the conditions that allowed use to persist.

18. Those conditions may include:

a. continued possession of the device;

b. uninterrupted internet access;

c. preservation of the account;

d. repeated account recreation;

e. failure to enforce age restrictions;

f. failure to remove the device after visible dysfunction;

g. school-issued access;

h. access through multiple devices; and

i. circumvention of household or institutional controls.

19. The actor who enables initial access may differ from the actor who enables continued access.

20. A parent may provide the device.

21. A child may misstate age.

22. A platform may ignore contrary age signals.

23. An application store may permit download.

24. A school may normalize or require broad digital use.

25. Each event belongs to a different point in the access chain.

**1. Parental or Guardian Access**

26. Parents and guardians ordinarily control the most immediate access conditions.

27. Those conditions may include:

a. purchase or provision of the device;

52

       b. payment for connectivity;

       c. installation permissions;

       d. account approval;

       e. password access;

       f. nighttime possession;

       g. duration limits;

       h. monitoring;

       i. removal; and

       j. continuation after observed difficulty.

28. Where a parent authorized access, that authorization remains part of the causal sequence.

29. It does not eliminate platform responsibility for later misconduct.

30. It does prevent the access decision from being attributed entirely to the platform.

**2. School Access**

31. Schools may enable access by:

       a. issuing devices;

       b. requiring internet-connected work;

       c. permitting personal devices during school hours;

       d. integrating social-media functions into school activities;

       e. failing to enforce device restrictions;

       f. using platforms for announcements or communication; or

       g. creating an environment in which constant digital access becomes functionally necessary.

32. School-enabled access must be included where school plaintiffs later seek recovery for digital burdens.

33. An institution cannot omit its own contribution to the access environment while assigning all resulting costs externally.

**3. Device and Application-Layer Access**

34. Device manufacturers, operating systems, and application stores may control:

       a. installation;

       b. age settings;

       c. family accounts;

       d. app permissions;

53

e. purchase controls;

f. screen-time settings;

g. notification permissions;

h. identity verification; and

i. account interoperability.

35. Those controls may either support or frustrate platform-level restrictions.

36. The Court should identify whether the alleged access failure occurred at the device, application-store, account, or platform layer.

**4. Access Through Age Misrepresentation**

37. A child may gain access by falsely representing age.

38. That fact does not necessarily end the inquiry.

39. The Court should ask:

a. whether the platform reasonably relied on the representation;

b. whether contrary age signals existed;

c. whether those signals were reviewed;

d. whether the platform benefited from maintaining the account;

e. whether repeated accounts were permitted;

f. whether the account was linked to known minor activity; and

g. whether the age-control system operated as represented.

40. Responsibility may be shared where the child misrepresented age and the platform knowingly disregarded contrary evidence.

41. Shared responsibility should be identified, not collapsed.

**5. Platform-Enabled Access**

42. A platform may contribute directly to access where it:

a. uses inadequate age assurance;

b. knowingly tolerates underage accounts;

c. permits rapid account recreation;

d. fails to act on reliable age signals;

e. markets directly to prohibited users;

f. designs controls that are readily defeated;

g. misrepresents the effectiveness of those controls; or

h. restores accounts despite known restrictions.

43. These are platform-controlled acts.

44. They should be adjudicated directly.

45. Their existence does not erase the separate role of custodians, schools, devices, or app stores in enabling access.

## 6. The Access Finding

46. Before moving to content or design, the Court should determine:

a. who supplied the device;

b. who authorized or permitted use;

c. who created or maintained the account;

d. what age representation was made;

e. what age signals were available;

f. what controls existed;

g. who activated them;

h. whether they functioned;

i. who permitted continued use; and

j. whether access persisted after observable harm.

47. That finding establishes the threshold conditions without predetermining later liability.

### B. Content Origin

48. The second question is who created the alleged harmful material.

49. Content origin must be identified before the Court determines whether the platform hosted, selected, amplified, recommended, monetized, or concealed it.

50. Material may originate with:

a. the platform;

b. an ordinary user;

c. an advertiser;

d. an influencer;

e. a predator;

f. a peer;

g. a political or cultural institution;

h. a school;

i. a government actor;

j. a commercial organization;

k. an automated content generator; or

l. some combination of those sources.

51. The creator occupies the first causal position concerning the message, image, solicitation, threat, instruction, representation, or depiction itself.

52. The platform's later treatment of that material is a separate causal stage.

## 1. Platform-Created Material

53. The platform is the originator where it creates:

a. its own advertising;

b. safety representations;

c. onboarding language;

d. prompts;

e. warnings;

f. filters;

g. badges;

h. labels;

i. account suggestions framed as platform communications;

j. youth-facing explanations; or

k. other proprietary content.

54. Platform-created material is directly attributable to the platform.

55. Claims concerning such material do not depend on attributing third-party speech to the platform.

## 2. User-Created Material

56. Ordinary users may create:

a. posts;

b. comments;

c. images;

d. videos;

e. direct messages;

f. live streams;

g. groups;

56

       h. challenges;

       i. advice;

       j. criticism; or

       k. harassment.

57. The user remains the creator of the material.

58. The platform may nevertheless bear separate responsibility for what it later does with that material.

## 3. Advertising and Influencer Material

59. Advertisers and influencers may create content designed to:

       a. sell products;

       b. shape appearance standards;

       c. encourage consumption;

       d. cultivate status competition;

       e. promote diets or supplements;

       f. direct users elsewhere;

       g. generate affiliate revenue; or

       h. influence behavior through sponsorship.

60. The Court should distinguish:

       a. who created the advertisement;

       b. who paid for distribution;

       c. how the platform targeted it;

       d. whether the sponsorship was disclosed;

       e. whether the platform knew the user was a minor; and

       f. whether the material violated law or policy.

## 4. Predatory or Criminal Material

61. Predators and offenders may create:

       a. grooming communications;

       b. threats;

       c. extortion demands;

       d. unlawful images;

       e. solicitation;

f. trafficking communications;

g. fraudulent identities;

h. coercive instructions; or

i. exploitative account networks.

62. The offender remains the primary creator of the unlawful material.

63. The platform may occupy a separate causal position through contact architecture, recommendation, notice, reporting, preservation, account enforcement, or concealment of known defects.

## 5. Peer-Created Material

64. Peers may create bullying, exclusion, status competition, humiliating content, or social pressure.

65. Peer-created harm may begin offline and continue online.

66. It may begin online and continue in school.

67. The Court should identify:

a. where the conduct began;

b. who created it;

c. whether school officials knew;

d. whether parents knew;

e. whether the platform received notice;

f. whether the platform amplified it; and

g. what actor possessed practical authority to stop it.

## 6. Cultural, Institutional, and Governmental Material

68. Platforms reproduce material created by broader institutions.

69. That material may include:

a. beauty norms;

b. political messaging;

c. public-health campaigns;

d. school communications;

e. commercial culture;

f. celebrity culture;

g. ideological movements;

h. news;

i. public-service material; and

j. governmental messaging.

70. The presence of such material on a platform does not establish that the platform originated the underlying cultural condition.

71. The platform's own selection, targeting, and amplification remain separate questions.

## 7. The Content-Origin Finding

72. Before attributing harm to the platform, the Court should identify:

a. who created the material;

b. whether it was lawful or unlawful;

c. whether it was commercial or noncommercial;

d. whether it was requested or unsolicited;

e. whether it originated on the defendant's service;

f. whether it circulated across multiple services;

g. whether the platform altered it; and

h. whether the alleged harm depends on the content's message or the platform's treatment of it.

73. That finding preserves responsibility for both creators and platforms without merging them.

### C. Platform Intervention

74. The third question is what the platform itself added.

75. This is the central platform-specific inquiry.

76. The Court should separate the existence of material from the platform-controlled intervention that allegedly altered its reach, timing, repetition, significance, or commercial value.

77. Platform intervention may include:

a. hosting;

b. ranking;

c. repetition;

d. notification;

e. profiling;

f. recommendation;

g. escalation;

h. monetization;

i. concealment;

j. defective control;

k. suppression;

l. account linking;

m. contact suggestion;

n. autoplay;

o. search ordering; or

p. some combination of those operations.

## 1. Hosting

78. Hosting concerns making content available through the service.

79. Hosting alone should be distinguished from amplification, targeting, recommendation, and monetization.

80. The Court should ask:

a. whether the content was lawful;

b. whether the platform had notice of illegality;

c. whether removal duties applied;

d. whether the platform preserved the material;

e. whether the content was merely available or actively surfaced; and

f. whether the claim rests on availability or later platform intervention.

## 2. Ranking

81. Ranking concerns the order in which material is displayed.

82. The legal significance of ranking depends on:

a. the objective used;

b. the signals considered;

c. whether ranking was chronological or personalized;

d. whether age or vulnerability signals were used;

e. whether commercial considerations affected position;

f. whether the user requested the category; and

g. whether ranking materially changed exposure.

## 3. Repetition

83. Repetition concerns how often similar material is presented.

84. Repetition may arise from:

60

> a. user selection;
>
> b. repeated searching;
>
> c. following the same accounts;
>
> d. recommendation loops;
>
> e. autoplay;
>
> f. notification;
>
> g. commercial promotion; or
>
> h. platform inference.

85. The Court should distinguish repetition caused by user conduct from repetition independently introduced by the system.

## 4. Notification

86. Notification concerns platform-generated prompts to return or respond.

87. The Court should identify:

> a. who enabled notifications;
>
> b. what triggered them;
>
> c. when they were sent;
>
> d. whether they were age-sensitive;
>
> e. whether they continued after nonresponse;
>
> f. whether they were disabled;
>
> g. whether the platform restored them; and
>
> h. whether they materially altered use.

## 5. Profiling

88. Profiling concerns the construction and use of a user model.

89. It may include inferences concerning:

> a. interests;
>
> b. age;
>
> c. vulnerability;
>
> d. relationships;
>
> e. location;
>
> f. emotional state;
>
> g. commercial value;

h. likelihood of return; and

i. susceptibility to particular material.

90. The Court should determine whether profiling was lawful, disclosed, necessary, age-appropriate, and causally connected to the alleged injury.

## 6. Recommendation

91. Recommendation concerns the platform's decision to surface material beyond direct user selection.

92. The Court should identify:

a. the recommendation objective;

b. the signals used;

c. the content recommended;

d. the user's prior conduct;

e. whether the material was requested;

f. whether the recommendation was commercial;

g. whether safety constraints applied; and

h. whether the recommendation materially altered the causal sequence.

## 7. Escalation

93. Escalation occurs where the platform moves the user toward more intense, extreme, frequent, or concentrated material.

94. A valid escalation theory should identify:

a. the starting content;

b. the subsequent content;

c. the recommendation path;

d. the time interval;

e. the system objective;

f. the user's intervening choices;

g. the known risk;

h. the feasible constraint; and

i. the resulting increment of harm.

95. "The algorithm escalated" is insufficient without that pathway.

## 8. Monetization

96. Monetization concerns the platform's receipt of commercial benefit from:

62

> a. advertising;
>
> b. sponsored content;
>
> c. data use;
>
> d. subscriptions;
>
> e. purchases;
>
> f. increased session duration;
>
> g. repeated return;
>
> h. influencer commerce; or
>
> i. other revenue-generating activity.

97. Monetization may bear on motive, benefit, restitution, and remedy.

98. It does not by itself establish causation.

99. The Court should identify the relationship between the revenue mechanism and the alleged harmful operation.

## 9. Concealment

100. Concealment may concern:

> a. internal research;
>
> b. known control failures;
>
> c. underage-account prevalence;
>
> d. harmful recommendation pathways;
>
> e. ineffective safeguards;
>
> f. data practices;
>
> g. exploitation risks;
>
> h. conflicting system objectives; or
>
> i. material limits of public representations.

101. Concealment can create a direct legal wrong where the platform withheld or misrepresented material information.

102. It may also alter the causal sequence by preventing parents, schools, users, or regulators from acting.

103. The Court should identify who lacked the information, what decision would have changed, and what harm followed from the informational disparity.

## 10. Defective Control

104. A defective control is a platform-created safeguard that fails to perform its represented function.

105. Relevant controls may include:

a. time limits;

b. parental supervision;

c. age restrictions;

d. content filters;

e. contact limits;

f. reporting tools;

g. bedtime settings;

h. privacy defaults;

i. account deletion; and

j. repeat-account prevention.

106. The Court should ask:

a. what the control promised;

b. how it operated;

c. how it failed;

d. whether the failure was known;

e. whether the failure was disclosed;

f. whether circumvention was facilitated; and

g. what incremental harm resulted.

## 11. The Platform-Intervention Finding

107. The Court should identify the smallest platform-controlled act capable of being tested.

108. The relevant finding should state:

a. what the platform added;

b. when it added it;

c. why it added it;

d. what information it used;

e. what user action preceded it;

f. what exposure changed;

g. whether the operation was represented truthfully; and

64

h. what measurable consequence followed.

109.    That finding separates platform responsibility from content origin and access.

### D. Stewardship

110.    The fourth question is who possessed custody, proximity, authority, and knowledge sufficient to intervene.

111. Stewardship concerns the duty to act for the welfare of the child within an actor's actual sphere of responsibility.

112.    It may reside with:

a. a parent;

b. a guardian;

c. a school;

d. a healthcare provider;

e. a residential institution;

f. the platform within its service boundary;

g. government through law; or

h. more than one actor at different stages.

113.    Stewardship should not be assigned by influence alone.

114.    It should follow actual authority, practical capacity, proximity, and knowledge.

### 1. Parents and Guardians

115.    Parents and guardians ordinarily possess the broadest direct stewardship.

116.    They may control:

a. the device;

b. the account;

c. the home environment;

d. the child's schedule;

e. sleep;

f. treatment;

g. discipline;

h. continued access;

i. all-platform restriction; and

j. response to visible change.

117. Their responsibility becomes especially relevant where severe dysfunction is observable and access continues.

## 2. Schools

118. Schools possess delegated stewardship during school hours and through institutional systems.

119. They may control:

a. devices;

b. classroom access;

c. educational platforms;

d. discipline;

e. counseling;

f. peer conduct;

g. bullying response;

h. observation;

i. attendance intervention; and

j. digital-use policy.

120. School plaintiffs should therefore account for both the burdens imposed on them and the authority they possessed.

## 3. Healthcare Providers

121. Healthcare providers may possess specialized knowledge and treatment authority.

122. Their role may include:

a. diagnosis;

b. risk assessment;

c. treatment;

d. crisis intervention;

e. family guidance;

f. medication;

g. safety planning; and

h. recommendation concerning digital use.

123. Their involvement may affect notice, causation, mitigation, and damages.

## 4. Platform Stewardship Within the Service Boundary

124. A platform possesses service-level stewardship where it controls:

66

       a. account access;

       b. data use;

       c. recommendation;

       d. notification;

       e. content enforcement;

       f. safeguards;

       g. reporting;

       h. exploitation response;

       i. truthful disclosure; and

       j. system correction.

125. The platform does not become the child's general custodian.

126. It remains fully responsible for the functions it exclusively controls.

## 5. Government Through Law

127. Government exercises stewardship through:

       a. legislation;

       b. regulation;

       c. enforcement;

       d. school policy;

       e. child-protection law;

       f. privacy law;

       g. consumer-protection law;

       h. industry standards; and

       i. remedies.

128. Where the alleged defect is industry-wide, government possesses the broadest corrective capacity.

129. That capacity should not be displaced onto one defendant through an indeterminate judicial duty.

## 6. The Stewardship Finding

130. The Court should determine:

       a. who had custody;

       b. who had proximity;

67

c. who had knowledge;

d. who possessed authority to act;

e. who possessed the practical means to intervene;

f. what intervention was available;

g. when the duty arose; and

h. whether the failure to intervene added harm.

131. Stewardship should follow capacity, not rhetorical convenience.

### E. Knowledge and Representation

132. The fifth question is what each actor knew and what each actor communicated.

133. Knowledge affects duty, foreseeability, concealment, reliance, intervention, and culpability.

134. Representation affects whether another actor could exercise informed judgment.

135. The Court should identify knowledge separately for:

a. the parent or guardian;

b. the child;

c. the school;

d. the healthcare provider;

e. the platform;

f. the content creator;

g. the offender;

h. the regulator; and

i. the public.

136. Different actors may possess different kinds of knowledge.

137. A platform may know:

a. system objectives;

b. recommendation pathways;

c. age signals;

d. control failures;

e. underage-account prevalence;

f. data practices;

g. internal research;

h. exploitation patterns; and

i. conflicts between safety and commercial objectives.

138.    A parent may know:

a. sleep patterns;

b. mood changes;

c. family conflict;

d. device use;

e. treatment history;

f. school performance;

g. prior self-harm;

h. access to multiple platforms; and

i. whether controls were actually being followed.

139.    A school may know:

a. attendance;

b. classroom conduct;

c. peer conflict;

d. bullying;

e. device use during school;

f. counseling history;

g. academic decline; and

h. institutional policy failures.

140.    No actor should be charged with knowledge possessed only by another actor unless a duty of communication existed and the information was transmitted or wrongfully withheld.

**1. Actual Knowledge**

141.    Actual knowledge may arise through:

a. internal reports;

b. direct notice;

c. account data;

d. user reports;

e. parental complaints;

f. school communications;

69

g. medical warnings;

h. prior incidents;

i. law-enforcement notice; or

j. observed conduct.

### 2. Constructive or Inferential Knowledge

142. Constructive knowledge requires a defined basis.

143. The Court should ask:

a. what signals existed;

b. how reliable they were;

c. whether the actor could access them;

d. whether the actor had a duty to review them;

e. whether the inference was reasonable; and

f. what action was feasible.

144. The mere existence of data somewhere within a large system should not automatically establish that every relevant decisionmaker possessed actual knowledge.

145. The same principle applies to parents, schools, and public institutions.

### 3. Representation

146. The Court should identify:

a. the exact representation;

b. the speaker;

c. the audience;

d. the medium;

e. whether it was factual, aspirational, comparative, or promotional;

f. whether it was material;

g. whether it was accurate when made;

h. whether contrary internal knowledge existed;

i. whether reliance occurred; and

j. what injury followed.

147. Representation is especially important where one actor possesses information necessary for another actor to exercise stewardship.

148. A platform that conceals a known control failure may impair parental intervention.

70

149. A parent who withholds material history may impair medical intervention.

150. A school that fails to communicate known bullying may impair family response.

151. Knowledge and communication should therefore be treated as reciprocal causal links.

## 4. The Knowledge-and-Representation Finding

152. The Court should determine:

    a. what each actor knew;

    b. when each actor knew it;

    c. how the knowledge was acquired;

    d. what each actor represented;

    e. what each actor omitted;

    f. who relied;

    g. what action was prevented or induced; and

    h. what incremental harm followed.

### F. Incremental Harm

153. The sixth question is what harm the identified platform conduct added after other causes are accounted for.

154. Incremental harm is the difference between the injury that occurred and the injury that would likely have occurred absent the challenged platform-controlled act.

155. This is the point at which generalized concern must become defendant-specific causation.

156. The Court should identify:

    a. the baseline condition;

    b. the original exposure;

    c. the user's preexisting vulnerabilities;

    d. the role of parents and guardians;

    e. the role of schools;

    f. the role of peers and content creators;

    g. use of competing services;

    h. general device use;

    i. the platform-controlled intervention;

    j. the resulting change in exposure; and

    k. the resulting change in injury.

**1. Baseline Condition**

157.    The baseline should include:

        a. prior mental-health condition;

        b. prior self-harm;

        c. family circumstances;

        d. school conditions;

        e. bullying;

        f. sleep;

        g. physical health;

        h. prior digital use;

        i. competing platforms; and

        j. treatment history.

158.    Without a baseline, the Court cannot determine what the platform added.

**2. Counterfactual**

159.    The relevant counterfactual should ask what likely would have happened without the challenged feature or representation.

160.    It should not assume a world without phones, social media, peers, cultural pressure, or psychological distress unless the claim actually proves that broader counterfactual.

161.    A proper platform-specific counterfactual may ask:

        a. What if the recommendation had not occurred?

        b. What if the control had worked as represented?

        c. What if the age restriction had been enforced?

        d. What if the data had not been used?

        e. What if the notification had not been sent?

        f. What if the safety information had been disclosed?

        g. What if the unlawful account had been removed after notice?

**3. Alternative Causes**

162.    Alternative causes should be identified rather than treated as background noise.

163.    They may include:

        a. preexisting distress;

        b. family conflict;

       c. school pressure;

       d. bullying;

       e. unlawful third-party conduct;

       f. multi-platform use;

       g. gaming;

       h. streaming;

       i. sleep practices;

       j. general smartphone access;

       k. cultural conditions; and

       l. failure of custodial intervention.

164.    The existence of alternative causes does not necessarily defeat liability.

165.    It defines the portion of injury that may fairly be assigned.

### 4. Measurable Increment

166.    Incremental harm may be shown through:

       a. added exposure;

       b. increased frequency;

       c. extended duration;

       d. intensified content;

       e. increased contact with offenders;

       f. delayed intervention;

       g. reliance on false information;

       h. loss of control functionality;

       i. additional data exploitation;

       j. increased institutional cost; or

       k. worsened clinical outcome.

167.    The measure should correspond to the challenged platform act.

168.    It should not default to the child's entire condition.

### 5. The Incremental-Harm Finding

169.    The Court should determine:

       a. what harm existed before the challenged act;

b. what the platform added;

c. whether the addition was material;

d. whether it was foreseeable;

e. whether it was avoidable;

f. whether another actor could have interrupted it;

g. how much injury followed from it; and

h. what portion remains attributable to other causes.

170.    That finding preserves full liability for a proved contribution without converting contribution into total causation.

### *G. Remedy*

171.    The seventh question is what correction corresponds to the specific contribution established through the preceding sequence.

172.    Remedy should follow duty, breach, causation, benefit, culpability, and corrective capacity.

173.    A remedy should answer the proved wrong.

174.    It should not serve as a general substitute for unresolved social policy.

175.    Potential remedies may include:

a. compensation;

b. restitution;

c. statutory penalties;

d. corrective disclosure;

e. data deletion or restriction;

f. control validation;

g. account correction;

h. reporting;

i. preservation;

j. independent auditing;

k. narrowly tailored operational change;

l. prospective injunction;

m. industry-wide legislation; or

n. some combination of those forms.

### 1. Compensation

176. Compensation should correspond to the injury attributable to the defendant's proved conduct.

177. It should reflect:

   a. the causal increment;

   b. the severity of harm;

   c. the duration;

   d. mitigation;

   e. comparative responsibility; and

   f. duplication across claimants.

## 2. Restitution

178. Restitution should correspond to the benefit obtained through the unlawful act.

179. The Court should identify:

   a. what was received;

   b. from whom;

   c. through what misconduct;

   d. over what period;

   e. whether the benefit is traceable; and

   f. whether another remedy already accounts for it.

## 3. Penalties

180. Penalties should correspond to:

   a. the statutory unit of violation;

   b. culpability;

   c. knowledge;

   d. concealment;

   e. repetition;

   f. deterrence; and

   g. proportionality.

181. Accounts, days, statements, views, data events, and users should not become interchangeable penalty multipliers without a defined statutory basis.

## 4. Corrective Disclosure

182. Where the wrong is deception or concealment, correction may require:

   a. accurate safety statements;

    b. disclosure of control limitations;

    c. disclosure of age-assurance limits;

    d. clarification of data practices;

    e. disclosure of recommendation objectives; or

    f. correction directed to prior recipients.

### 5. Operational Correction

183.    Where the wrong lies in a platform-controlled mechanism, the remedy may address:

    a. notification timing;

    b. control functionality;

    c. account recreation;

    d. exploitation pathways;

    e. age-sensitive defaults;

    f. reporting systems;

    g. data use;

    h. recommendation constraints; or

    i. auditability.

184.    The correction should remain tied to the proved mechanism.

### 6. Institutional and Custodial Correction

185.    Where injury arose partly from institutional or custodial conduct, corrective responsibility may include:

    a. device policy;

    b. school access policy;

    c. parental supervision;

    d. communication protocols;

    e. intervention standards;

    f. counseling response;

    g. healthcare referral; and

    h. multi-platform restriction.

186.    A complete settlement may require responsibility from more than one actor.

### 7. Legislative Correction

187.    Where the defect is industry-wide, the durable remedy may require:

       a. uniform standards;

       b. platform-neutral duties;

       c. interoperable controls;

       d. common reporting;

       e. age-assurance rules;

       f. youth-data limits;

       g. audit requirements;

       h. research access;

       i. objective transparency; and

       j. safe-harbor structures for verified compliance.

188.    A judgment against one platform cannot by itself correct a market-wide incentive shared across the industry.

## 8. The Remedy Finding

189.    Before imposing relief, the Court should determine:

       a. what duty was breached;

       b. what harm resulted;

       c. what benefit was received;

       d. what actor can correct the condition;

       e. whether the proposed remedy reaches that condition;

       f. whether it duplicates another remedy;

       g. whether it shifts the harm elsewhere;

       h. whether it preserves lawful expression; and

       i. whether broader legislation is required.

190.    Remedy should be corrective, proportional, and administrable.

## *H. The Fixed Sequence Should Govern Every Common Theory*

191.    The Court should require the parties to present each common theory in the following order:

       a. Who enabled access?

       b. Who created the content or condition?

       c. What did the platform itself add?

       d. Who possessed stewardship and capacity to intervene?

       e. What did each actor know and represent?

f. What incremental harm followed from the identified platform conduct?

g. What remedy corresponds to that contribution?

192.    A claim that cannot answer those questions has not yet identified an adjudicable causal unit.

193.    A defense that avoids those questions has not yet shown that responsibility lies elsewhere.

194.    The fixed sequence therefore operates neutrally.

195.    It strengthens claims based on direct platform conduct.

196.    It exposes theories that depend on transferred duties or generalized attribution.

197.    It preserves responsibility for custodians, institutions, creators, offenders, platforms, and government according to the role each actually played.

198.    The governing principle is:

**Access identifies how the child entered the environment. Content origin identifies who created the relevant material. Platform intervention identifies what the defendant added. Stewardship identifies who possessed authority and capacity to act. Knowledge and representation identify what each actor understood and communicated. Incremental harm identifies the defendant-specific contribution. Remedy corrects that contribution without transferring the remainder of the social condition to the defendant.**

---

## IV. DIRECT STEWARDSHIP OF CHILDREN FOLLOWS CUSTODY, AUTHORITY, PROXIMITY, AND KNOWLEDGE

1.  The Court should distinguish direct stewardship of a child from responsibility for the operation of a service used by that child.

2.  Direct stewardship arises from a relationship of custody, authority, proximity, knowledge, and practical capacity to intervene.

3.  Service responsibility arises from control over the service, its representations, its data practices, its internal mechanisms, and the consequences of its own operation.

4.  Those forms of responsibility may interact.

5.  They should not be collapsed.

6.  A parent may authorize use of a service that later operates deceptively.

7.  A school may require digital access through systems that expose students to additional risks.

8.  A platform may possess internal knowledge unavailable to parents or schools.

9.  Each actor remains responsible for the portion of the environment that actor controls.

10. The central distinction is therefore:

**The platform is steward of its service. The custodian remains steward of the child.**

11. The importance of that distinction extends beyond allocation of blame.

12. It identifies which actor can act most effectively, what information each actor must possess, and what remedy can actually correct the relevant condition.

13. Parents and schools can remove devices, change schedules, obtain care, observe behavior, and alter the child's broader environment.

14. Platforms can correct false representations, restrict unlawful data use, modify account systems, repair controls, alter recommendation objectives, and respond to unlawful conduct occurring through the service.

15. Neither sphere should be used to erase the other.

16. A platform should not avoid responsibility for its own controlled operations by pointing generally to parents.

17. A parent or school should not transfer direct custodial responsibility to a platform merely because the platform was widely used or commercially influential.

18. The Court should therefore allocate stewardship according to four operative predicates:

       a. who possessed custody;

       b. who possessed authority;

       c. who possessed proximity to the child's actual condition; and

       d. who possessed knowledge sufficient to act.

### A. Parents and Guardians Retain Primary Responsibility

19. Parents and guardians ordinarily possess the primary and most continuous responsibility for the child's welfare.

20. Their authority is broader than platform authority because it extends beyond one account, one service, one device, or one category of conduct.

21. Parents and guardians ordinarily control or materially influence:

       a. device provision;

       b. account permission;

       c. password and installation access;

       d. internet connectivity;

       e. nighttime possession;

       f. duration of use;

       g. use across multiple services;

       h. monitoring;

       i. intervention;

       j. healthcare decisions;

       k. treatment decisions;

l. household rules;

m. school communication;

n. continuation after observable dysfunction; and

o. removal from the digital environment altogether.

22. These are not abstract powers.

23. They are the principal means by which a child's use can be altered in real time.

24. A platform may suspend one account.

25. A parent may remove the device, restrict all services, alter nighttime access, obtain medical care, change household conditions, and respond to conduct occurring outside the platform.

26. That broader authority carries corresponding responsibility.

## 1. Device Provision

27. The decision to provide a child with a smartphone, tablet, computer, or other connected device establishes the threshold condition for digital access.

28. The provider of the device ordinarily determines:

a. the age at which access begins;

b. whether the device is personal or shared;

c. whether the device remains with the child overnight;

d. whether application installation requires approval;

e. whether family or parental settings are enabled;

f. whether internet access is continuous;

g. whether the device can be removed; and

h. whether access continues after problems emerge.

29. Device provision does not excuse later platform misconduct.

30. It does establish that the platform did not create the entire access condition by itself.

31. Any causal account of continued use should therefore include the person or institution that supplied and maintained the device.

## 2. Account Permission

32. Parents and guardians may expressly authorize an account, tacitly permit it, assist in creating it, tolerate it after discovery, or fail to enforce a prior prohibition.

33. Those circumstances are materially different.

34. The Court should distinguish:

a. express approval;

  b. implied approval;

  c. access obtained without parental knowledge;

  d. access obtained through parental credentials;

  e. access continued after discovery;

  f. access recreated after restriction;

  g. multiple-account use; and

  h. use maintained despite prior concern.

35. The fact that a child opened an account without permission may increase the importance of platform age controls.

36. The fact that a parent later permitted continued use remains relevant to the later causal sequence.

### 3. Password and Installation Access

37. Passwords and installation permissions are practical control points.

38. Parents may control:

  a. device passwords;

  b. application-store passwords;

  c. family accounts;

  d. download approval;

  e. account-recovery credentials;

  f. email access;

  g. payment methods;

  h. browser restrictions; and

  i. device-level privacy settings.

39. These control points can prevent or limit access across several services simultaneously.

40. Where they were available but not used, that fact belongs in the stewardship analysis.

41. Where platform architecture defeated or circumvented them, that belongs in the platform-liability analysis.

42. The Court should preserve both inquiries.

### 4. Nighttime Possession

43. Nighttime possession is particularly important where alleged injuries include sleep loss, compulsive checking, nighttime notification, mood deterioration, or school impairment.

81

44. A parent or guardian ordinarily possesses the immediate authority to determine whether the child retains the device during sleep hours.

45. The platform controls notification systems and service-level prompts.

46. The custodian controls physical possession of the device.

47. Those responsibilities may overlap where a platform knowingly sends youth-directed prompts at harmful hours.

48. They should not be merged.

49. The relevant questions include:

      a. whether the device remained with the child overnight;

      b. whether the custodian knew;

      c. whether notifications were enabled;

      d. whether the platform used age-sensitive timing;

      e. whether sleep disruption became observable;

      f. whether the device was removed; and

      g. whether use continued despite recurring impairment.

## 5. Duration of Use

50. Parents and guardians ordinarily possess authority to set and enforce time limits.

51. Platforms may provide tools intended to support those limits.

52. The Court should distinguish:

      a. the limit selected by the parent;

      b. the limit represented by the platform;

      c. whether the limit was technically effective;

      d. whether the child circumvented it;

      e. whether the platform facilitated circumvention;

      f. whether the parent monitored actual duration;

      g. whether use migrated to another device or service; and

      h. whether continued duration produced observable impairment.

53. A failed platform control may establish platform responsibility.

54. Failure to respond after the inadequacy of the control becomes apparent may establish a separate custodial responsibility.

## 6. Monitoring

82

55. Parents and guardians ordinarily possess greater contextual knowledge than the platform concerning the child's actual condition.

56. They may observe:

   a. sleep;

   b. appetite;

   c. mood;

   d. school performance;

   e. family conflict;

   f. withdrawal;

   g. self-harm indicators;

   h. changes in friendships;

   i. concealment;

   j. use across multiple devices; and

   k. offline behavior.

57. A platform may observe account activity.

58. It generally does not observe the whole child.

59. The distinction between behavioral data and embodied observation is essential.

60. Platform data may support inference.

61. Direct custodial observation may support immediate intervention.

62. The Court should ask what each actor actually knew and what each actor could reasonably infer.

### 7. Intervention

63. Parents and guardians ordinarily possess the first practical authority to intervene across the child's entire environment.

64. Intervention may include:

   a. removing the device;

   b. disabling internet access;

   c. closing accounts;

   d. changing passwords;

   e. contacting the school;

   f. obtaining counseling;

   g. seeking medical care;

83

h. supervising use directly;

i. restricting nighttime access;

j. addressing bullying;

k. changing social conditions; and

l. involving law enforcement where exploitation or threats are present.

65. A platform cannot perform most of those functions.

66. It can act within the service.

67. The custodian can act across the child's life.

68. Responsibility should reflect that difference.

**8. Healthcare Decisions**

69. Parents and guardians ordinarily control whether a child receives medical or psychological evaluation.

70. They may authorize:

a. diagnosis;

b. therapy;

c. medication;

d. crisis intervention;

e. hospitalization;

f. nutritional treatment;

g. safety planning; and

h. ongoing monitoring.

71. Where claimed injury includes depression, anxiety, eating disorder, self-harm, suicide risk, or clinically significant compulsive use, healthcare decisions form part of the causal and mitigation record.

72. The Court should distinguish between:

a. a platform's creation or aggravation of risk;

b. a custodian's knowledge of symptoms;

c. the timing of treatment;

d. adherence to treatment;

e. continued access during treatment; and

f. the effect of any delay in intervention.

73. This allocation does not diminish platform responsibility.

84

74. It identifies how injury may be intensified, interrupted, or mitigated after it becomes observable.

## 9. Continuation After Observable Dysfunction

75. Continued access after observable dysfunction is a distinct causal stage.

76. The relevant question is not merely whether the platform remained available.

77. It is also who possessed authority to alter the child's environment once the problem became visible.

78. Observable dysfunction may include:

> a. severe sleep loss;
>
> b. repeated school absence;
>
> c. marked academic decline;
>
> d. escalating family conflict;
>
> e. withdrawal from ordinary activity;
>
> f. self-harm statements;
>
> g. eating disturbance;
>
> h. crisis behavior;
>
> i. repeated rule circumvention; and
>
> j. inability to disengage despite direct intervention.

79. At that point, continued exposure cannot be treated as a purely platform-created condition.

80. The Court should identify:

> a. who observed the dysfunction;
>
> b. when it became observable;
>
> c. what authority existed;
>
> d. what intervention was attempted;
>
> e. whether platform tools functioned;
>
> f. whether access continued through other devices or accounts;
>
> g. whether treatment was sought; and
>
> h. what additional harm followed from continuation.

81. A platform may remain liable for deceptive controls, concealed risks, or harmful operational conduct during that period.

82. The custodian remains responsible for the direct decisions within the custodian's authority.

## 10. Primary Responsibility Is Not Exclusive Responsibility

83. Primary custodial responsibility does not mean exclusive responsibility.

84. A parent cannot know what a platform conceals.

85. A parent cannot independently inspect internal recommendation objectives, age-inference systems, control efficacy, or data practices.

86. A platform that possesses superior knowledge may therefore owe duties necessary for the parent to exercise stewardship intelligently.

87. Those duties may include:

      a. truthful disclosure;

      b. accurate description of safeguards;

      c. clear explanation of limitations;

      d. notification of known account risks;

      e. meaningful reporting tools;

      f. reliable parental controls;

      g. lawful data practices; and

      h. response to known exploitation.

88. The correct allocation is reciprocal.

89. Parents remain responsible for exercising custody.

90. Platforms remain responsible for supplying truthful and functional means by which custody can be exercised.

### B. Schools Possess Delegated Responsibility

91. Schools possess direct but delegated responsibility for children during school hours, school-sponsored activities, transportation in some circumstances, and institutional use of technology.

92. That responsibility arises from compulsory attendance, custodial substitution, institutional authority, and practical control over the school environment.

93. Schools may control or materially affect:

      a. institutional device use;

      b. screen-based curriculum;

      c. access during school hours;

      d. classroom observation;

      e. counseling;

      f. discipline;

      g. peer environment;

h. bullying response;

i. attendance;

j. educational accommodation;

k. school-issued accounts;

l. communication systems; and

m. response to visible dysfunction.

94. School claims for institutional costs should therefore be evaluated alongside the authority and duties schools already possessed.

95. The existence of an added burden may support recovery.

96. The existence of a preexisting duty does not itself establish an externally caused injury.

## 1. Institutional Device Use

97. Schools increasingly issue laptops, tablets, and other connected devices to students.

98. Institutional devices may:

a. increase total screen exposure;

b. normalize constant connectivity;

c. permit access during school hours;

d. enable messaging;

e. retain login credentials;

f. carry educational and noneducational applications;

g. blur the boundary between assigned work and recreational use; and

h. remain with students outside school.

99. Where a school supplies the device, the school contributes to the access architecture.

100. That contribution should be included in any claim involving distraction, sleep, educational disruption, or habitual digital use.

101. The relevant questions include:

a. what device was supplied;

b. what restrictions were enabled;

c. what applications were permitted;

d. whether access was monitored;

e. whether devices went home;

f. whether social-media use was technically restricted;

g. whether restrictions were enforced; and

h. whether the school knew of recurring misuse.

## 2. Screen-Based Curriculum

102. Schools also determine how much educational activity occurs through screens.

103. Screen-based curriculum may include:

a. assignments;

b. reading;

c. testing;

d. research;

e. collaboration;

f. announcements;

g. attendance;

h. homework submission;

i. teacher communication;

j. video instruction; and

k. educational applications.

104. That use may be lawful, necessary, and beneficial.

105. It also contributes to the child's total exposure to digital systems.

106. A school seeking recovery for digital overload should account for the digital environment it created or required.

107. The issue is not whether school technology is blameworthy.

108. The issue is whether total screen exposure can be attributed solely to social-media defendants while institutional exposure is excluded from the baseline.

## 3. Access During School Hours

109. Schools possess direct control over access during school hours.

110. They may establish:

a. personal-device bans;

b. classroom restrictions;

c. network filters;

d. supervised use periods;

e. confiscation policies;

f. login restrictions;

g. app-blocking systems;

h. consequences for misuse; and

i. exceptions for educational or medical need.

111. If students use social media during school, the Court should determine:

a. whether personal devices were permitted;

b. whether institutional devices enabled access;

c. whether technical restrictions existed;

d. whether teachers observed use;

e. whether policies were enforced;

f. whether repeated violations occurred; and

g. whether the school changed its practices after harm became visible.

112. A platform may still bear responsibility for the design or operation that attracted or amplified use.

113. The school remains responsible for the environment it controlled.

### 4. Classroom Observation

114. Teachers and school personnel may observe behavioral changes that are not visible to the platform and may not yet be visible at home.

115. Those changes may include:

a. fatigue;

b. inattention;

c. withdrawal;

d. conflict;

e. bullying;

f. declining performance;

g. repeated device use;

h. panic;

i. eating changes;

j. self-harm indicators; and

k. social isolation.

116. Observation creates a potential duty of response.

117.    The scope of that duty depends on law, policy, role, severity, and knowledge.

118.    The Court should identify:

a. who observed the condition;

b. whether it was documented;

c. whether parents were informed;

d. whether counselors were involved;

e. whether device access was altered;

f. whether peer misconduct was addressed; and

g. whether the condition worsened after institutional notice.

## 5. Counseling

119.    Schools commonly possess counselors, psychologists, nurses, special-education personnel, and crisis-response systems.

120.    Counseling duties may include:

a. initial assessment;

b. referral;

c. crisis response;

d. family notification;

e. safety planning;

f. academic accommodation;

g. attendance support;

h. bullying intervention; and

i. coordination with outside providers.

121.    Expenditures on those functions may be real.

122.    The Court should determine which expenditures are:

a. ordinary institutional obligations;

b. increased because of a defendant-specific breach;

c. caused by general digital use;

d. caused by multiple platforms;

e. caused by school conditions;

f. caused by third-party misconduct; or

g. duplicative of public-health or educational duties already funded.

90

123.    Recovery should follow the proved increment, not the existence of the duty itself.

## 6. Discipline

124.    Schools possess authority to regulate student conduct within the educational environment.

125.    That authority may include:

   a. confiscating devices;

   b. suspending access;

   c. disciplining bullying;

   d. restricting messaging;

   e. enforcing classroom rules;

   f. addressing harassment;

   g. responding to impersonation; and

   h. coordinating with parents.

126.    A school's failure to use available disciplinary authority may contribute to continuation of harm.

127.    A platform's failure to enforce its own rules may also contribute.

128.    Each should be evaluated within its respective sphere.

## 7. Peer Environment

129.    Much alleged online harm originates in peer relationships formed and maintained through schools.

130.    Bullying, exclusion, humiliation, status competition, rumor, and social pressure may move continuously between school and platform.

131.    The Court should determine:

   a. where the conduct originated;

   b. whether the participants were students;

   c. whether the school knew;

   d. whether the conduct affected school;

   e. whether institutional discipline was available;

   f. whether the platform received reports;

   g. whether the content was amplified; and

   h. what intervention could have stopped continuation.

132.    The school is not responsible for all peer conduct.

133.    It does possess authority and proximity that a platform may lack.

## 8. Response to Visible Dysfunction

134.    A school's responsibility becomes more concrete when dysfunction becomes visible during delegated custody.

135.    The relevant questions include:

   a. what was observed;

   b. who observed it;

   c. how long it persisted;

   d. whether it was documented;

   e. whether the child was evaluated;

   f. whether parents were notified;

   g. whether school-device access was altered;

   h. whether bullying or peer conduct was addressed;

   i. whether accommodations were provided; and

   j. whether the condition worsened after notice.

136.    A school may possess less authority than a parent over the home environment.

137.    It may possess greater authority over the classroom, peer setting, and institutional device.

138.    Delegated stewardship should therefore be allocated according to the part of the environment the school actually controlled.

## 9. School Costs Must Be Incremental

139.    School and governmental plaintiffs should identify the difference between:

   a. ordinary educational responsibility; and

   b. additional expense caused by a proved platform breach.

140.    The relevant inquiry is not whether the school spent money after youth social-media use increased.

141.    It is whether a particular defendant's conduct created a measurable burden beyond the institution's existing obligations.

142.    That inquiry should account for:

   a. baseline counseling costs;

   b. preexisting mental-health programs;

   c. school technology policies;

   d. institutional device use;

   e. general smartphone use;

92

f. other platforms;

g. offline bullying;

h. compulsory educational duties;

i. public-health funding; and

j. the specific expense allegedly added by the defendant.

143.    Public authority and public responsibility should remain reciprocal.

### C. A Platform Does Not Become Custodian Through Access

144.    A platform does not become the direct custodian of a child merely because the child can access the service, spends substantial time there, or is influenced by its operation.

145.    Custody is not created by reach.

146.    Guardianship is not created by engagement.

147.    Developmental authority is not transferred through terms of service, account creation, recommendation, or advertising.

148.    The provider of a service remains responsible for the service.

149.    The custodian of a child remains responsible for the child.

150.    That distinction should be stated directly:

**The party that supplies a service is responsible for the service. The party entrusted with a child remains responsible for the child.**

151.    The distinction protects both accountability and lawful boundaries.

152.    It prevents platforms from displacing their own duties onto parents.

153.    It also prevents custodians from treating the platform's influence as a transfer of guardianship.

### 1. Influence Is Not Custody

154.    A platform may exert substantial influence over attention, exposure, communication, and return behavior.

155.    Influence may support duties concerning:

a. design;

b. disclosure;

c. recommendation;

d. notification;

e. data use;

f. exploitation pathways;

g. controls; and

h. known risks.

156.    Influence does not provide the platform with:

a. physical possession of the child;

b. authority to remove all devices;

c. authority over sleep;

d. authority over healthcare;

e. control of the home;

f. authority over school attendance;

g. knowledge of offline conditions;

h. authority over all competing services; or

i. power to alter the child's broader environment.

157.    The Court should not convert commercial influence into custodial status.

## 2. Account Control Is Not Personal Custody

158.    A platform may control an account.

159.    It does not thereby control the child.

160.    Suspension of an account may:

a. interrupt one service;

b. leave other services available;

c. prompt creation of another account;

d. move activity to messaging, gaming, or streaming;

e. fail to address the underlying psychological or social demand; or

f. reduce one form of exposure while leaving the broader condition unchanged.

161.    Account-level authority is therefore narrower than custodial authority.

162.    It remains significant within its own boundary.

## 3. Knowledge of Use Is Not Knowledge of the Whole Child

163.    Platforms may possess extensive data concerning:

a. duration;

b. clicks;

c. searches;

94

d. follows;

e. messages;

f. content exposure;

g. notification response;

h. account relationships; and

i. inferred interests.

164.    They may lack knowledge concerning:

a. family history;

b. diagnosis;

c. school conditions;

d. treatment;

e. household conflict;

f. sleep outside recorded device use;

g. offline bullying;

h. use of other devices;

i. use of competing services; and

j. direct observation of the child.

165.    Data abundance should not be mistaken for complete personal knowledge.

166.    The legal significance of platform knowledge depends on what the data actually showed, how reliable the inference was, and what action was feasible within the service.

### 4. Commercial Benefit Does Not Create Total Developmental Duty

167.    Platforms may receive commercial benefit from youth engagement.

168.    That benefit may support duties relating to:

a. truthfulness;

b. lawful data use;

c. known product risks;

d. safeguards;

e. youth-facing design;

f. restitution;

g. disgorgement; and

h. proportionate regulation.

169.    Commercial benefit does not convert the platform into a parent, school, physician, or guardian.

170.    Liability should correspond to the benefit and conduct actually proved.

171.    It should not become a general charge for the child's entire development.

## 5. A Custodial Rule Would Create Perverse Incentives

172.    Treating platforms as de facto custodians could produce consequences opposite to the stated goal of child protection.

173.    It may encourage:

> a. parents to rely on platform controls in place of active supervision;
>
> b. schools to transfer digital burdens to private defendants;
>
> c. institutions to treat visible dysfunction as evidence for later recovery rather than as a trigger for immediate intervention;
>
> d. platforms to gather more sensitive data in order to defend against indeterminate duties;
>
> e. broad surveillance of minors;
>
> f. exclusion of lawful youth expression;
>
> g. automatic account removal without context; and
>
> h. displacement of use to less transparent services.

174.    A clear boundary produces better incentives.

175.    Custodians retain direct responsibility.

176.    Platforms remain responsible for truthful, lawful, and functional service operation.

## 6. Service-Level Duties Remain Fully Enforceable

177.    Rejecting transferred custody does not narrow direct platform duties.

178.    It clarifies them.

179.    Platforms may still be held responsible for:

> a. false statements;
>
> b. unlawful collection or use of children's data;
>
> c. known underage access;
>
> d. ineffective controls;
>
> e. concealed control limitations;
>
> f. recommendation systems that measurably intensify risk;
>
> g. unlawful targeting;
>
> h. known exploitation pathways;

96

i. failure to comply with reporting obligations;

j. platform-created content;

k. defective account architecture; and

l. the incremental harm caused by those acts.

180. The Court need not transfer custody in order to impose meaningful platform responsibility.

### D. Platform Duties Arise From Control Over Platform-Specific Facts

181. Platform responsibility is strongest where the platform possesses exclusive or superior control over facts unavailable to users, parents, schools, or regulators.

182. Those facts may concern:

a. internal recommendation objectives;

b. age-estimation signals;

c. safety-tool efficacy;

d. data practices;

e. underage-account prevalence;

f. known exploitative pathways;

g. internal research;

h. account-circumvention patterns;

i. conflicts between engagement and public representations;

j. the commercial value of youth activity; and

k. the actual performance of safeguards.

183. Superior informational control may create duties of:

a. truthfulness;

b. disclosure;

c. lawful processing;

d. testing;

e. preservation;

f. reporting;

g. correction;

h. warning;

i. functional control; and

j. nonconcealment.

97

184. These duties arise because the platform controls the relevant information and operation.

185. They do not arise because the platform has become the child's general custodian.

**1. Internal Recommendation Objectives**

186. Platforms may possess exclusive knowledge of the objectives governing recommendation systems.

187. Those objectives may include:

a. predicted relevance;

b. watch time;

c. return probability;

d. relationship strength;

e. advertising yield;

f. user satisfaction;

g. content diversity;

h. safety reduction;

i. retention; and

j. combinations of those measures.

188. Parents and users ordinarily cannot inspect those systems directly.

189. Public statements concerning recommendation should therefore correspond to actual system objectives.

190. A material conflict between represented purpose and operative purpose may support liability.

191. The Court should ask:

a. what objective governed;

b. what signals were used;

c. whether youth status changed the objective;

d. what safety constraints applied;

e. what internal evidence showed;

f. what the platform represented; and

g. what incremental harm followed.

**2. Age-Estimation Signals**

192. Platforms may possess signals indicating that a user is younger than the stated age.

193. Those signals may include:

      a. account relationships;

      b. birthday references;

      c. school affiliations;

      d. image or video estimates;

      e. device settings;

      f. parental reports;

      g. repeated account recreation;

      h. behavior associated with younger users; and

      i. linked accounts.

194. The existence of such signals does not automatically establish actual knowledge.

195. It does create an adjudicable question concerning:

      a. reliability;

      b. aggregation;

      c. review;

      d. policy;

      e. enforcement;

      f. consistency; and

      g. representations concerning underage access.

196. Where the platform publicly claims effective age enforcement while internally tolerating contrary signals, the discrepancy falls squarely within platform responsibility.

### 3. Safety-Tool Efficacy

197. Platforms control the design, testing, deployment, and monitoring of their safety tools.

198. Those tools may include:

      a. time reminders;

      b. parental supervision;

      c. restricted modes;

      d. age-sensitive defaults;

      e. content filters;

      f. contact restrictions;

      g. reporting systems;

      h. crisis prompts;

i. bedtime controls; and

j. account-removal mechanisms.

199.    Users and custodians may rely on representations concerning those tools.

200.    The platform should therefore possess evidence supporting claims of effectiveness.

201.    The Court should determine:

a. what the tool was represented to accomplish;

b. how efficacy was tested;

c. what failure rates existed;

d. whether circumvention was known;

e. whether the platform monitored real-world operation;

f. whether limitations were disclosed; and

g. whether reliance on the tool delayed stronger intervention.

## 4. Data Practices

202.    Platforms possess direct knowledge of what data they collect, infer, retain, transfer, and use.

203.    Parents, children, and schools generally depend on platform disclosures to understand those practices.

204.    Platform duties may therefore arise concerning:

a. consent;

b. necessity;

c. minimization;

d. age-sensitive processing;

e. sensitive inference;

f. targeting;

g. retention;

h. sharing;

i. deletion; and

j. accuracy of disclosures.

205.    Unlawful or deceptive data use is a direct platform wrong.

206.    It does not require proof that the platform became custodian of the child.

## 5. Underage-Account Prevalence

207.    Platforms may possess internal estimates concerning underage use that are unavailable to the public.

208.    Those estimates may affect:

  a. compliance duties;

  b. product design;

  c. age-assurance adequacy;

  d. parental representations;

  e. advertising practices;

  f. data processing;

  g. enforcement resources; and

  h. regulatory disclosure.

209.    The Court should compare:

  a. internal estimates;

  b. public representations;

  c. actual enforcement;

  d. repeated-account behavior;

  e. age-related design decisions; and

  f. commercial treatment of underage activity.

210.    A material disparity may establish concealment or deception.

## 6. Known Exploitative Pathways

211.    Platforms may possess superior knowledge of recurring pathways used for grooming, solicitation, extortion, trafficking, or unlawful image distribution.

212.    Such knowledge may arise from:

  a. reports;

  b. repeat-offender data;

  c. law-enforcement communications;

  d. internal investigations;

  e. trust-and-safety findings;

  f. contact-suggestion patterns;

  g. recommendation systems;

  h. account networks; and

101

i. prior incidents.

213.    Platform responsibility may arise where the platform:

a. fails to act on known repeat pathways;

b. recommends minors to suspicious adult accounts;

c. fails to preserve evidence;

d. fails to report as required;

e. monetizes unlawful conduct;

f. misrepresents protective measures; or

g. knowingly maintains architecture that facilitates recurrence.

214.    These are direct service-level duties.

215.    They should be adjudicated without converting every harmful interaction into platform custody.

## 7. Conflicts Between Engagement and Public Representations

216.    Platforms may publicly represent that youth safety is central while internally optimizing systems according to objectives that conflict with those representations.

217.    The legal issue is not that engagement is inherently unlawful.

218.    It is whether the platform:

a. represented one operative priority while pursuing another;

b. concealed material tradeoffs;

c. overstated safety-tool efficacy;

d. minimized known risks;

e. treated youth engagement as commercially valuable while denying the extent of underage use; or

f. failed to disclose known conflicts affecting custodial decisions.

219.    Such conflicts may support duties of disclosure, correction, restitution, penalty, or prospective operational change.

## 8. Informational Control Creates Reciprocal Duties

220.    Superior knowledge is legally significant because other actors may require that information to perform their own duties.

221.    Parents cannot exercise informed stewardship where safeguards are falsely described.

222.    Schools cannot assess institutional risk where platform limitations are concealed.

223.    Regulators cannot establish effective rules where material internal findings are withheld.

102

224.    Users cannot choose meaningfully where data use and recommendation objectives are obscured.

225.    Platform informational control may therefore create duties to communicate facts necessary for reciprocal decision-making.

226.    Those duties should be calibrated according to:

      a. materiality;

      b. foreseeability;

      c. audience;

      d. reliance;

      e. statutory requirements;

      f. commercial representation;

      g. privacy; and

      h. feasibility.

## 9. Informational Duties Do Not Transfer the Entire Developmental Duty

227.    A duty to disclose known risk does not make the disclosing party the direct steward of every consequence.

228.    A duty to provide functional controls does not relieve parents of using them.

229.    A duty to enforce age restrictions does not relieve schools of controlling school devices.

230.    A duty to respond to exploitation does not eliminate offender responsibility.

231.    A duty to correct recommendation architecture does not establish that the platform caused every condition associated with youth digital use.

232.    The proper allocation is cumulative and bounded.

233.    Each actor answers for the duty arising from that actor's authority, knowledge, and control.

### *E. Stewardship Should Be Allocated Through a Four-Part Test*

234.    The Court can distinguish direct stewardship from service responsibility through a four-part inquiry.

235.    For each claimed failure, the Court should determine:

      a. who possessed custody over the child;

      b. who possessed legal or practical authority to act;

      c. who possessed proximity sufficient to observe the condition; and

      d. who possessed knowledge sufficient to recognize the need for intervention.

## 1. Custody

236.    Custody identifies the actor entrusted with the child's person or environment.

237.    It ordinarily points to parents, guardians, schools, residential institutions, or the state.

## 2. Authority

238.    Authority identifies what the actor could lawfully and practically change.

239.    A parent may remove all devices.

240.    A school may restrict classroom access.

241.    A physician may direct treatment.

242.    A platform may suspend an account or alter service operation.

243.    Government may impose industry-wide rules.

## 3. Proximity

244.    Proximity identifies who could observe the child's actual condition.

245.    Direct proximity may reveal sleep loss, withdrawal, physical deterioration, crisis behavior, or family conflict.

246.    Digital proximity may reveal usage patterns, searches, messages, or platform-specific escalation.

247.    Each form of proximity provides different evidence.

## 4. Knowledge

248.    Knowledge identifies what the actor actually understood or should reasonably have understood.

249.    It may be direct, inferential, professional, institutional, or data-derived.

250.    The Court should avoid imputing one actor's knowledge to another without a legal basis.

## 5. Capacity to Intervene

251.    The four predicates should be evaluated together with practical capacity to intervene.

252.    An actor with knowledge but no authority occupies a different position from an actor with authority but no notice.

253.    An actor with partial data occupies a different position from a custodian observing the whole child.

254.    A platform with exclusive knowledge of a design defect occupies a different position from a parent relying on its representations.

255.    Liability should reflect those differences.

## F. The Court Should Preserve Reciprocal Stewardship

256.    The proper rule is not that parents are responsible and platforms are not.

257.    Nor is it that platforms are responsible whenever minors use their services.

258.    The proper rule is reciprocal:

a. parents and guardians answer for direct custody, access, supervision, intervention, and continuation;

b. schools answer for delegated custody, institutional devices, educational access, peer environment, observation, discipline, and counseling;

c. healthcare providers answer for duties within diagnosis, treatment, and crisis response;

d. platforms answer for their representations, data practices, account systems, recommendation architecture, controls, exploitation pathways, and platform-created increments of harm;

e. content creators and offenders answer for the material and conduct they create; and

f. government answers for the laws, incentives, standards, and enforcement structure it establishes.

259.    This allocation preserves responsibility at every level.

260.    It prevents a custodial vacuum.

261.    It prevents a platform-immunity vacuum.

262.    It gives each actor a clear reason to improve the part of the environment that actor can actually control.

263.    The governing principle is:

**Direct stewardship follows custody, authority, proximity, and knowledge. Platform responsibility follows control over the service, its representations, its data, its safeguards, and its operational consequences. The Court can enforce both without transferring the child from the custodian to the platform or transferring the platform's own misconduct back to the custodian.**

---

## V. PLATFORM RESPONSIBILITY SHOULD BE LIMITED TO PLATFORM-CONTROLLED CONDUCT

1.    Platform responsibility should be determined by identifying the conduct, information, systems, representations, and operational choices the platform itself controlled.

2.    This limitation is not a limitation on accountability.

3.    It is the condition that makes accountability lawful, provable, and proportionate.

4.    A platform should answer fully for:

a. what it represented;

b. what it knew;

c. what it collected;

d. what it designed;

e. what it optimized;

f. what it concealed;

g. what safeguards it supplied;

h. what safeguards it defeated or misrepresented;

i. what unlawful pathways it knowingly maintained; and

j. what measurable increment of harm its own conduct created.

5. A platform should not be made answerable for every condition that passed through its service, every harm expressed by a user, every failure of custody, every defect in the surrounding culture, or every consequence of general digital use.

6. The Court should therefore reject both extremes.

7. Platform conduct should not be immunized merely because it involves software, publication, or user choice.

8. Platform liability should not expand merely because the platform is large, profitable, influential, or capable of affecting behavior.

9. The governing inquiry should remain control-based:

**What did the platform itself control, what duty arose from that control, what breach occurred, and what incremental harm followed from that breach?**

10. That inquiry provides the proper axis for liability across deception, data practices, controls, recommendation systems, exploitation pathways, and platform-created operations.

11. It also preserves lawful third-party expression, direct custodial responsibility, and the distinction between platform-specific misconduct and broader social dysfunction.

### A. Deception Should Be the Primary Liability Axis

12. Deception provides the clearest and most direct basis for platform responsibility.

13. It permits the Court to compare an external representation against internal knowledge and actual operation.

14. Unlike generalized claims that a platform caused youth distress, deception can often be resolved through defined evidence.

15. The relevant comparison is:

a. what the platform represented;

b. what the platform internally knew;

c. what the platform operationally optimized;

d. what its safeguards actually accomplished;

e. whether any discrepancy was material;

f. who received or relied upon the representation;

106

g. what action the representation induced or prevented; and

h. what injury resulted from the discrepancy.

16. That framework should be the primary liability axis because it identifies conduct wholly within the platform's control.

17. It does not require the Court to infer that the platform became the child's custodian.

18. It does not require the Court to attribute all youth dysfunction to one service.

19. It asks a narrower and more reliable question:

**Did the platform materially misdescribe the system it knowingly operated?**

**1. The Court Should Identify the Exact Representation**

20. The Court should begin with the precise statement allegedly made.

21. The representation may concern:

a. youth safety;

b. age restrictions;

c. parental controls;

d. time-management tools;

e. privacy;

f. data collection;

g. content moderation;

h. harmful-content reduction;

i. exploitation prevention;

j. recommendation systems;

k. research findings;

l. product efficacy;

m. underage-account prevalence; or

n. the relationship between engagement and wellbeing.

22. General branding should be separated from factual claims.

23. Aspirational language should be separated from measurable assurances.

24. A statement that a company "cares about safety" differs from a statement that a particular control prevents underage access, limits exposure, blocks contacts, or reduces harmful content.

25. The Court should determine:

a. the speaker;

107

b. the audience;

c. the medium;

d. the date;

e. the context;

f. whether the statement was factual, aspirational, comparative, or promotional;

g. whether it was capable of verification; and

h. whether it was material to a reasonable user, parent, school, or regulator.

## 2. Internal Knowledge Should Be Compared With the Representation

26. The platform may possess internal information unavailable to the public.

27. That information may include:

a. internal research;

b. user testing;

c. control-failure rates;

d. age-estimation data;

e. underage-account estimates;

f. recommendation-pathway studies;

g. exploitation reports;

h. employee warnings;

i. trust-and-safety findings;

j. commercial forecasts;

k. system-objective documentation; and

l. records of known circumvention.

28. A material contradiction between internal knowledge and public representation is directly attributable to the platform.

29. The Court should ask:

a. what the platform knew;

b. when it knew it;

c. who within the organization knew it;

d. whether the knowledge was reliable;

e. whether the public statement remained unchanged;

f. whether the statement omitted a known limitation; and

108

g. whether the discrepancy affected user or custodial conduct.

30. Internal disagreement alone does not establish deception.

31. A material and sufficiently established contradiction may.

### 3. Operational Optimization Should Be Compared With Public Claims

32. A platform's public claims should also be compared with the objectives actually governing the service.

33. A platform may publicly emphasize safety while operationally optimizing for:

      a. watch time;

      b. session duration;

      c. return probability;

      d. impression volume;

      e. advertising yield;

      f. content interaction;

      g. account growth;

      h. notification response; or

      i. another commercial objective.

34. Commercial optimization is not inherently unlawful.

35. The legal issue arises where:

      a. the platform materially misstates the operative objective;

      b. known conflicts are concealed;

      c. safety claims exceed actual system constraints;

      d. youth-specific risks are minimized;

      e. a represented safeguard is subordinated in operation; or

f. the platform publicly attributes outcomes to users while internally designing for a contrary result.

36. The Court should determine whether the platform's represented purpose and operative purpose materially diverged.

### 4. Safeguard Efficacy Should Be Tested Against Representation

37. Safety controls should be judged by what they were represented to accomplish.

38. Relevant safeguards may include:

      a. parental supervision tools;

      b. time reminders;

      c. bedtime controls;

      d. age-based defaults;

      e. content filters;

      f. contact restrictions;

      g. exploitation reporting;

      h. privacy settings;

      i. account-removal systems;

      j. crisis prompts;

      k. warning labels; and

      l. repeat-account prevention.

39. The Court should determine:

      a. whether the safeguard existed;

      b. whether it functioned as described;

      c. whether it was tested;

      d. whether failure rates were known;

      e. whether circumvention was known;

      f. whether limitations were disclosed;

      g. whether users or custodians relied on it; and

      h. whether stronger intervention was delayed because of that reliance.

40. A safeguard need not be perfect.

41. It must be represented accurately.

### 5. Materiality Should Be Evaluated Through Decision Consequence

42. A discrepancy is material where truthful information would likely have altered a meaningful decision.

43. The relevant decisions may include:

      a. whether a parent permitted access;

      b. whether a parent relied on a control;

      c. whether a school permitted use;

      d. whether a user maintained an account;

      e. whether a regulator intervened;

      f. whether a child's data was supplied;

g. whether stronger restrictions were imposed;

h. whether medical or institutional intervention occurred; or

i. whether the platform received continued commercial benefit.

44. Materiality should therefore be tied to a concrete decision, not treated as an abstract disagreement over messaging.

## 6. Deception May Alter the Causal Sequence

45. Deception can create harm even where the platform did not originate the underlying condition.

46. A false safety representation may:

a. induce access;

b. prolong access;

c. delay parental intervention;

d. suppress regulatory response;

e. increase data disclosure;

f. encourage reliance on ineffective controls;

g. preserve underage accounts; or

h. conceal the need for stronger safeguards.

47. In that sense, deception may become a causal intervention of its own.

48. The Court should identify the decision altered by the misrepresentation and the harm added by that alteration.

## 7. Deception Supports Precise Remedies

49. Deception also supports remedies that directly correspond to the wrong.

50. Those remedies may include:

a. corrective disclosure;

b. restitution;

c. civil penalties;

d. validation of safety claims;

e. preservation of internal research;

f. independent auditing;

g. revised user and parental notice;

h. removal of unsupported claims;

i. disclosure of known limitations; and

111

        j. monitoring of future representations.

51. These remedies can correct the proved misconduct without imposing custodial duties on the platform.

## 8. The Deception Finding

52. For each alleged misrepresentation, the Court should determine:

        a. what was said;

        b. what was known;

        c. what the system actually did;

        d. what the safeguard actually accomplished;

        e. whether the discrepancy was material;

        f. who relied;

        g. what conduct changed; and

        h. what incremental harm followed.

53. Where those elements are established, platform responsibility is direct.

## B. Unlawful Child-Data Practices Present a Direct Statutory Lane

54. Child-data practices should be adjudicated as a separate and direct legal category.

55. They should not be submerged within generalized claims concerning addiction, mental health, design, or excessive use.

56. Data practices are platform-controlled.

57. They can often be evaluated through statutory text, account records, technical systems, disclosures, consent procedures, and internal policy.

58. The relevant conduct may include:

        a. collecting data from children;

        b. inferring age or sensitive traits;

        c. retaining data;

        d. combining data across services;

        e. profiling;

        f. targeted advertising;

        g. recommendation based on sensitive signals;

        h. transfer to third parties;

        i. use beyond disclosed purposes;

        j. failure to delete;

> k. collection without valid consent; and
>
> l. concealment of the nature or extent of processing.

59. These claims can support liability even where individualized psychological injury remains disputed.

60. The injury may arise from the unlawful collection, retention, inference, use, or disclosure itself.

## 1. The Court Should Identify the Data Collected

61. The Court should determine what data was collected.

62. Relevant categories may include:

> a. identifiers;
>
> b. contact information;
>
> c. location;
>
> d. device information;
>
> e. browsing or viewing history;
>
> f. search history;
>
> g. social relationships;
>
> h. messages or message metadata;
>
> i. images;
>
> j. age indicators;
>
> k. inferred interests;
>
> l. inferred vulnerabilities;
>
> m. advertising responses;
>
> n. health-related inferences; and
>
> o. behavioral patterns.

63. "Data" should not be treated as one undifferentiated category.

64. The sensitivity, source, purpose, and legal treatment of each category may differ.

## 2. The Court Should Identify the Basis for Processing

65. The Court should determine:

> a. whether the user was a minor;
>
> b. whether the platform knew or should have known;
>
> c. whether consent was required;
>
> d. whether valid consent existed;

113

      e. whether parental authorization was obtained;

      f. whether processing exceeded the authorization;

      g. whether the use matched the disclosure;

      h. whether the data was necessary; and

      i. whether statutory limitations applied.

66. A generalized terms-of-service acceptance should not substitute automatically for whatever child-specific consent the law requires.

### 3. Collection Should Be Distinguished From Inference

67. Platforms may create new information by inference even where the underlying data was lawfully collected.

68. Inferences may concern:

      a. age;

      b. emotional state;

      c. vulnerability;

      d. body-image concern;

      e. sexual interest;

      f. social isolation;

      g. purchasing susceptibility;

      h. likelihood of return;

      i. likelihood of responding to particular content; and

      j. likelihood of account circumvention.

69. The Court should distinguish:

      a. raw data;

      b. inferred data;

      c. sensitive inference;

      d. operational use; and

      e. commercial use.

70. The creation and use of sensitive inferences may present risks different from the collection of ordinary account data.

### 4. Data Use Should Be Distinguished From Data Possession

71. The platform's possession of data is not the end of the inquiry.

72. The Court should determine how the data was used.

114

73. Uses may include:

    a. security;

    b. account authentication;

    c. age assurance;

    d. recommendation;

    e. advertising;

    f. content moderation;

    g. contact suggestion;

    h. exploitation detection;

    i. product development;

    j. research;

    k. commercial profiling; and

    l. retention for future use.

74. A lawful collection may be followed by an unlawful or undisclosed use.

75. A beneficial use, such as fraud prevention or exploitation detection, should also be distinguished from commercial targeting.

## 5. Data Practices May Affect Exposure

76. Data practices may become part of the causal chain where data is used to alter what the child sees, when the child is prompted, or whom the child encounters.

77. The Court should identify:

    a. what data was used;

    b. what inference was drawn;

    c. what recommendation or contact followed;

    d. whether youth status was relevant;

    e. whether the exposure was requested;

    f. whether the use was disclosed; and

    g. what harm resulted.

78. That inquiry connects data law to platform-specific causation without converting every data practice into a health claim.

## 6. Data Practices May Create Independent Injury

79. Unlawful data conduct may support relief even where no additional exposure is proven.

80. Independent injury may include:

a. loss of privacy;

b. unlawful collection;

c. unlawful retention;

d. unauthorized profiling;

e. unauthorized transfer;

f. denial of deletion rights;

g. use beyond consent;

h. unlawful commercial benefit; or

i. statutory violation.

81. These injuries should not depend on proving depression, compulsive use, or another clinical outcome.

## 7. Remedies Should Match the Data Violation

82. Data remedies may include:

a. deletion;

b. restricted processing;

c. consent correction;

d. prohibition on defined inferences;

e. retention limits;

f. disclosure correction;

g. audit;

h. reporting;

i. restitution;

j. statutory damages;

k. penalties; and

l. independent compliance review.

83. The remedy should identify the data, the unlawful use, and the actor capable of correction.

## 8. The Child-Data Finding

84. For each data claim, the Court should determine:

a. what data was collected or inferred;

b. from whom;

c. at what age;

d. under what authority;

e. for what disclosed purpose;

f. for what actual purpose;

g. how long it was retained;

h. whether it was transferred;

i. how it affected platform operation; and

j. what independent or consequential injury followed.

85. This is a direct platform-responsibility lane.

### C. Defeated or Misrepresented Controls May Create Direct Liability

86. Controls are the principal means by which platform responsibility and custodial authority interact.

87. Parents, guardians, schools, and users may rely on platform controls to exercise authority within the service.

88. The platform designs those controls, describes them, tests them, and knows their operational limitations.

89. Liability may therefore arise where a platform:

a. represented controls as effective when they were not;

b. knowingly facilitated circumvention;

c. used multiple-account architecture to defeat restrictions;

d. concealed practical limitations;

e. failed to disclose known failure rates;

f. restored settings after user or custodial restriction;

g. failed to integrate with device-level controls;

h. allowed rapid account recreation;

i. obscured whether controls applied across accounts; or

j. presented symbolic controls as functional protections.

### 1. The Court Should Identify the Control

90. Relevant controls may include:

a. time limits;

b. parental supervision;

c. bedtime settings;

d. content filters;

117

e. restricted accounts;

f. contact limitations;

g. privacy defaults;

h. reporting systems;

i. age restrictions;

j. account deletion;

k. deactivation; and

l. repeated-account prevention.

91. Each control should be evaluated separately.

92. The effectiveness of one control does not establish the effectiveness of another.

**2. The Court Should Identify the Represented Function**

93. The Court should determine:

a. what the control was represented to do;

b. whether it imposed a hard limit or provided a reminder;

c. whether it applied to one device or all devices;

d. whether it applied to one account or all accounts;

e. whether it could be overridden;

f. who could override it;

g. whether circumvention was disclosed; and

h. whether the user or custodian reasonably understood its scope.

94. Ambiguous language should not be allowed to convert a weak reminder into an asserted safeguard after the fact.

**3. Operational Efficacy Should Be Tested**

95. The Court should examine:

a. design documents;

b. user testing;

c. failure reports;

d. circumvention data;

e. support complaints;

f. repeated-account rates;

g. internal assessments;

        h. real-world use;

        i. user comprehension; and

        j. post-deployment monitoring.

96. A control represented as effective should possess evidence supporting the claim.

97. The Court should distinguish unavoidable imperfection from known operational failure.

**4. Circumvention Should Be Classified**

98. Circumvention may be caused by:

        a. the child;

        b. another user;

        c. multiple devices;

        d. multiple accounts;

        e. borrowed credentials;

        f. application-store settings;

        g. platform architecture;

        h. weak identity linkage;

        i. account restoration; or

        j. deliberate platform design.

99. The Court should identify who caused the circumvention and what the platform knew.

100. A child's independent circumvention differs from platform-facilitated circumvention.

101. A platform may still bear responsibility where it knew restrictions were systematically defeated and continued representing them as effective.

**5. Multiple-Account Architecture Requires Direct Examination**

102. Multiple accounts may permit a child to evade:

        a. time limits;

        b. parental supervision;

        c. content restrictions;

        d. suspension;

        e. age enforcement;

        f. contact limitations;

        g. reporting consequences; or

        h. account deletion.

103.    The Court should determine:

   a. whether the platform linked accounts;

   b. whether it possessed signals of common ownership;

   c. whether controls applied across accounts;

   d. whether rapid recreation was permitted;

   e. whether age restrictions were rechecked;

   f. whether circumvention was known; and

   g. whether public representations addressed the limitation.

104.    Multiple-account architecture may be a direct platform-controlled mechanism.

**6. Concealed Limitations May Delay Stronger Intervention**

105.    A parent who believes a control is effective may refrain from:

   a. removing the device;

   b. changing passwords;

   c. blocking the service;

   d. obtaining outside help;

   e. contacting the school;

   f. monitoring manually;

   g. restricting all digital use; or

   h. escalating intervention.

106.    A material misrepresentation of control efficacy may therefore create incremental harm through delayed response.

107.    The causal question is:

   a. what the parent believed;

   b. what the platform represented;

   c. what the control actually did;

   d. what action the parent otherwise would have taken; and

   e. what harm accrued during the delay.

**7. Controls Should Support, Not Replace, Custody**

108.    Platform controls are tools of custodial authority.

109.    They do not transfer custody to the platform.

110.    A functional control strengthens parental stewardship.

120

111. A deceptively weak control impairs it.

112. The correct legal rule should therefore require:

    a. truthful description;

    b. functional operation;

    c. disclosure of limits;

    d. reasonable resistance to circumvention;

    e. clear override structure;

    f. interoperability where represented; and

    g. correction of known defects.

113. Custodians remain responsible for monitoring actual outcomes.

## 8. The Control Finding

114. For each challenged safeguard, the Court should determine:

    a. what was promised;

    b. what was delivered;

    c. who activated it;

    d. how it could be defeated;

    e. whether the platform knew;

    f. whether the limitation was disclosed;

    g. whether reliance occurred; and

    h. what incremental harm resulted.

115. These are direct platform-controlled facts.

### D. Platform-Created Operational Escalation Requires a Defined Mechanism

116. Plaintiffs alleging operational escalation should identify the specific platform mechanism through which exposure was intensified.

117. "The algorithm caused harm" is not a sufficient causal unit.

118. A legally adequate escalation theory should identify:

    a. the objective function;

    b. the age or vulnerability signals used;

    c. the content pathway;

    d. the incremental exposure;

    e. the known risk;

121

f. the feasible mitigation; and

g. the resulting increment of harm.

119.    Each element is necessary because escalation is not established merely by showing that a user encountered repeated or intense material.

120.    Repetition may result from user choice, social networks, search behavior, following decisions, cross-platform circulation, or system-generated recommendation.

121.    The Court should identify what the platform itself added.

## 1. The Objective Function

122.    A recommendation or ranking system operates according to one or more objectives.

123.    Those objectives may include:

a. predicted relevance;

b. watch time;

c. session duration;

d. return probability;

e. click probability;

f. relationship strength;

g. advertising value;

h. user satisfaction;

i. novelty;

j. diversity;

k. safety reduction; or

l. another measurable outcome.

124.    The Court should identify the operative objective for the challenged feature and period.

125.    The objective should not be inferred solely from the fact that the platform earned revenue.

126.    Internal documentation, system design, testing, and actual operation should be examined.

## 2. Age or Vulnerability Signals

127.    The Court should determine whether the platform used or possessed signals concerning:

a. age;

b. underage status;

c. emotional distress;

d. self-harm interest;

122

    e. eating-disorder concern;

    f. social isolation;

    g. repeated nighttime use;

    h. compulsive return;

    i. prior interaction with harmful content; or

    j. contact by suspicious adult accounts.

128. The existence of a signal should be distinguished from a reliable inference.

129. The Court should determine:

    a. how the signal was generated;

    b. how reliable it was;

    c. whether it was used for recommendation;

    d. whether it was used for safety;

    e. whether commercial and safety uses conflicted; and

    f. what action was feasible.

## 3. The Content Pathway

130. Plaintiffs should identify the actual pathway from initial exposure to later material.

131. The pathway should show:

    a. the starting content;

    b. the user's actions;

    c. the platform's recommendations;

    d. the sequence of material;

    e. the timing;

    f. the degree of similarity or escalation;

    g. whether the user searched or followed; and

    h. whether the same pathway existed elsewhere.

132. A pathway is stronger evidence than a generalized assertion that harmful material existed on the platform.

## 4. Incremental Exposure

133. The Court should determine what exposure the platform added beyond what the user directly selected.

134. Incremental exposure may include:

a. additional items;

b. increased frequency;

c. increased intensity;

d. reduced diversity;

e. repeated notification;

f. introduction to new accounts;

g. contact suggestions;

h. prolonged session duration; or

i. repeated return after disengagement.

135.    The relevant question is not whether exposure occurred.

136.    It is what portion was introduced or intensified by the challenged platform operation.

## 5. Known Risk

137.    Plaintiffs should identify what risk the platform knew or should reasonably have known.

138.    Evidence may include:

a. internal research;

b. prior incidents;

c. user reports;

d. employee warnings;

e. regulatory notice;

f. expert findings;

g. platform testing;

h. repeat-offender data;

i. outcome studies; and

j. known control failures.

139.    General knowledge that some users may be harmed is not equivalent to knowledge of a specific operational pathway.

140.    The risk should be tied to the challenged mechanism.

## 6. Feasible Mitigation

141.    Liability for operational escalation should consider whether a feasible mitigation existed.

142.    Potential mitigations may include:

a. age-sensitive defaults;

b. reduced repetition;

c. exclusion of defined signals;

d. stronger safety constraints;

e. notification limits;

f. interruption of identified pathways;

g. contact restrictions;

h. improved reporting;

i. account review;

j. user choice architecture;

k. parental notice; or

l. independent audit.

143.    Feasibility should account for:

a. technical capacity;

b. accuracy;

c. privacy;

d. lawful expression;

e. false positives;

f. user autonomy;

g. commercial burden;

h. platform scale; and

i. the severity of the risk.

144.    The Court should identify the mitigation the defendant could actually have implemented.

### 7. Resulting Increment of Harm

145.    Plaintiffs should connect the operational pathway to a measurable injury.

146.    The resulting increment may include:

a. additional exposure;

b. worsened symptoms;

c. delayed disengagement;

d. increased contact with offenders;

e. sleep loss;

125

      f. intensified compulsive use;

      g. increased body-image distress;

      h. greater self-harm risk;

      i. delayed intervention; or

      j. added institutional cost.

147. The platform should be responsible for the increment it created.

148. It should not automatically be responsible for the child's entire condition.

## 8. The Escalation Finding

149. For each operational-escalation claim, the Court should determine:

      a. what objective governed;

      b. what signals were used;

      c. what pathway occurred;

      d. what the user selected;

      e. what the platform added;

      f. what risk was known;

      g. what mitigation was feasible;

      h. what injury followed; and

      i. what portion is attributable to the defendant.

150. This framework permits strong liability where the platform-created mechanism is proven.

151. It prevents generalized references to "the algorithm" from substituting for causation.

### E. Illegal Exploitation Must Remain Analytically Distinct

152. Predatory access, unlawful material, solicitation, extortion, trafficking, grooming, and child exploitation present a distinct legal category.

153. These claims should not be merged with generalized claims concerning expression, dissatisfaction, loneliness, social comparison, or excessive use.

154. Illegal exploitation ordinarily involves:

      a. an identifiable offender;

      b. unlawful intent;

      c. direct contact or material;

      d. defined statutory duties;

      e. notice;

f. account pathways;

g. preservation obligations;

h. reporting obligations;

i. enforcement decisions; and

j. concrete injury.

155. The causal architecture is therefore different.

156. The offender creates the primary unlawful act.

157. The platform may create or maintain a separate enabling condition.

158. The custodian or school may possess a separate opportunity to intervene.

159. Each role should be adjudicated distinctly.

## 1. The Primary Offender Must Remain Identified

160. The person who grooms, solicits, threatens, extorts, traffics, exploits, or distributes unlawful material remains the primary wrongdoer.

161. The platform should not become a substitute defendant for the offender merely because it is more identifiable or solvent.

162. The offender's conduct should remain part of the causal record.

## 2. Platform Responsibility May Arise From Contact Architecture

163. The platform may bear responsibility where it controls systems that:

a. recommend minors to adults;

b. suggest contacts based on vulnerable characteristics;

c. expose public accounts to predatory search;

d. permit unrestricted messaging;

e. repeatedly restore offender accounts;

f. fail to link known repeat offenders;

g. conceal known pathways; or

h. monetize the interaction.

164. The Court should identify the specific contact mechanism.

## 3. Notice and Response Are Central

165. The Court should determine:

a. whether the platform received notice;

b. what the notice contained;

       c. whether the account or conduct was reviewed;

       d. what action was taken;

       e. whether evidence was preserved;

       f. whether reporting duties applied;

       g. whether the offender returned; and

       h. whether additional harm followed.

166.    A failure after legally sufficient notice is analytically stronger than a generalized claim that illegal conduct existed somewhere on the service.

### 4. Reporting and Preservation Duties Should Be Separately Enforced

167.    Platforms may possess statutory or regulatory duties concerning:

       a. reporting unlawful material;

       b. preserving evidence;

       c. retaining account records;

       d. responding to law enforcement;

       e. removing defined content;

       f. disabling known offenders; and

       g. preventing repeated reentry.

168.    These duties should be adjudicated directly.

169.    They do not depend on broad theories of platform addiction.

### 5. Recommendation and Amplification Require Specific Proof

170.    Where plaintiffs allege that the platform recommended unlawful or predatory material, they should identify:

       a. the content or account;

       b. the recommendation mechanism;

       c. the recipient;

       d. the age signal;

       e. the prior user conduct;

       f. the platform's knowledge;

       g. the resulting contact; and

       h. the injury.

171.    A precise recommendation claim is distinct from passive hosting.

128

**6. Exploitation Claims Should Not Be Diluted**

172.    Merging exploitation claims into generalized youth-harm theories may weaken them.

173.    It may obscure:

a. the offender;

b. the statutory violation;

c. the notice;

d. the platform pathway;

e. the evidence-preservation duty;

f. the reporting duty;

g. the direct injury; and

h. the appropriate remedy.

174.    The Court should preserve these claims as separate and concrete.

**7. The Exploitation Finding**

175.    For each exploitation claim, the Court should determine:

a. who committed the unlawful act;

b. how contact occurred;

c. what the platform recommended or enabled;

d. what notice existed;

e. what duty applied;

f. what response occurred;

g. whether evidence was preserved;

h. whether the offender returned; and

i. what harm followed from the platform-controlled failure.

176.    That structure preserves offender responsibility while allowing full liability for a proved platform contribution.

**F. Lawful Third-Party Expression Does Not Automatically Become Platform-Created Injury**

177.    The existence of harmful, offensive, unhealthy, disturbing, manipulative, culturally degraded, or emotionally difficult expression does not automatically establish platform-created injury.

178.    Lawful expression may:

a. reflect broader cultural conditions;

b. reproduce peer norms;

129

       c. communicate unpopular ideas;

       d. depict unhealthy conduct;

       e. promote appearance standards;

       f. encourage consumption;

       g. criticize;

       h. offend;

       i. persuade;

       j. entertain; or

       k. express distress.

179. The fact that such expression appears on a platform does not establish that the platform created its message or every consequence arising from it.

180. The Court should distinguish:

       a. content creation;

       b. publication;

       c. hosting;

       d. editorial selection;

       e. recommendation;

       f. commercial amplification;

       g. data-driven targeting;

       h. platform-created representation; and

       i. unlawful conduct.

181. These operations may carry different legal consequences.

## 1. Content Harm and Operational Harm Are Different

182. A claim may allege injury because of what the content said.

183. Another claim may allege injury because of how the platform delivered it.

184. Those theories should be separated.

185. The first may implicate:

       a. the content creator;

       b. publication law;

       c. the First Amendment;

       d. Section 230;

e. direct solicitation;

f. defamation;

g. threat;

h. incitement; or

i. another content-specific doctrine.

186.    The second may implicate:

a. profiling;

b. targeting;

c. notification;

d. repetition;

e. recommendation;

f. commercial optimization;

g. data use;

h. defective controls; or

i. concealment.

187.    The Court should identify which harm is alleged.

## 2. Cultural Conditions Should Not Be Assigned Wholesale to a Platform

188.    Social comparison, beauty standards, status competition, sexualization, political hostility, consumerism, and other cultural conditions predate and extend beyond any single platform.

189.    Platforms may amplify or monetize them.

190.    They do not necessarily originate them.

191.    A platform-specific claim should identify the platform's added contribution.

192.    The surrounding culture should remain part of the comparative baseline.

## 3. User Selection Matters

193.    A user may:

a. search for content;

b. follow an account;

c. join a group;

d. repeat a category;

e. share material;

f. communicate with a peer;

131

g. opt into notifications;

h. create a playlist; or

i. otherwise direct exposure.

194. User selection does not necessarily eliminate platform responsibility.

195. It affects the causal sequence.

196. The Court should distinguish:

a. direct selection;

b. recommendation following selection;

c. unsolicited recommendation;

d. repeated reintroduction;

e. commercial targeting; and

f. system-generated escalation.

## 4. Recommendation Does Not Automatically Transfer Authorship

197. A platform that recommends content does not thereby become the creator of the content.

198. Recommendation may create a separate responsibility concerning selection, targeting, repetition, or amplification.

199. The legal theory should address that operation directly.

200. It should not treat recommendation as retroactive authorship.

## 5. Offensive or Unhealthy Expression Is Not Necessarily Unlawful

201. The law distinguishes material that is:

a. unlawful;

b. tortious;

c. threatening;

d. exploitative;

e. defamatory;

f. fraudulent;

g. merely offensive;

h. unhealthy;

i. unpopular;

j. culturally degraded; or

k. protected.

132

202.    The seriousness of a social concern does not erase those distinctions.

203.    The Court should avoid imposing liability merely because lawful expression may contribute to an undesirable cultural condition.

## 6. Platform-Created Conduct Remains Separately Actionable

204.    Preserving lawful expression does not protect:

    a. false platform statements;

    b. unlawful data collection;

    c. defeated controls;

    d. deceptive targeting;

    e. concealed operational conflicts;

    f. known exploitation pathways;

    g. platform-created prompts;

    h. unlawful advertisements;

    i. system-generated escalation; or

    j. failure to satisfy direct statutory duties.

205.    The distinction between content and machinery protects accountability in both directions.

206.    It prevents protected expression from being used as a shield for nonexpressive misconduct.

207.    It prevents nonexpressive misconduct from becoming a pretext for punishing lawful expression.

## 7. The Lawful-Expression Finding

208.    For each claim involving third-party content, the Court should determine:

    a. who created the content;

    b. whether it was lawful;

    c. whether the alleged injury arose from the message or the delivery mechanism;

    d. whether the user selected it;

    e. what the platform added;

    f. whether the platform targeted or repeated it;

    g. whether a platform representation was involved;

    h. whether an independent statutory duty applied; and

    i. what incremental harm resulted from the platform-controlled conduct.

209.    Liability should attach to the platform-controlled act, not to the mere existence of lawful third-party expression.

133

### G. Platform Responsibility Should Be Assigned Through a Control-Based Test

210. The Court can unify these categories through a control-based inquiry.

211. For each alleged platform wrong, the Court should determine:

a. Did the platform create the statement, content, control, account system, data practice, recommendation objective, or operational mechanism?

b. Did the platform possess exclusive or superior knowledge?

c. Did the platform exercise authority over the challenged condition?

d. Did a legal duty arise from that authority or knowledge?

e. Did the platform breach that duty?

f. Did the breach alter access, exposure, reliance, intervention, or injury?

g. What measurable increment of harm followed?

h. What remedy lies within the platform's corrective capacity?

212. This inquiry should govern deception, data, controls, escalation, and exploitation alike.

213. It preserves direct liability where platform conduct is proven.

214. It prevents liability from expanding into custodial, cultural, institutional, or industry-wide conditions beyond the platform's own control.

215. The governing principle is:

**Platform responsibility should extend fully to what the platform created, represented, collected, optimized, concealed, facilitated, defeated, or knowingly failed to correct within its own service. It should not expand by implication to every harm expressed through the service, every duty held by a custodian, or every condition produced by the surrounding culture and market.**

---

## VI. SUBJECTIVE "INTENT TO STOP" SHOULD NOT BECOME AN IMPLIED PLATFORM FACT

1. The Court should distinguish between observable conduct, expressed preference, retrospective regret, clinical compulsion, and a platform's actual knowledge.

2. Those concepts are not interchangeable.

3. A user may continue engaging with a service while simultaneously experiencing ambivalence, frustration, guilt, dissatisfaction, or a desire to reduce use.

4. That internal conflict may be real.

5. It does not automatically become a fact known to the platform at the time of use.

6. Nor does later testimony that a user "wanted to stop" establish, without more, that the user possessed a settled contemporaneous intention to stop, communicated that intention through an objective signal, or encountered a platform-imposed barrier that overrode it.

7. This distinction matters because an implied contrary intention can silently transform continued use into proof of coercion.

8. Once that transformation occurs, every additional minute of use risks being treated as evidence that the platform defeated a preference the platform may never have received, recognized, or had a lawful means to verify.

9. The Court should not infer a platform-observable legal fact from an uncommunicated or retrospectively described internal state.

10. The proper inquiry is narrower and more objective.

11. The Court should ask:

   a. what the user did;

   b. what the user expressly communicated;

   c. what control the user or custodian activated;

   d. what the platform represented that control would do;

   e. what the platform knew from reliable signals;

   f. whether the platform materially interfered with an objectively expressed decision; and

   g. what incremental harm followed from that interference.

12. This approach preserves valid claims concerning defective controls, deception, compulsive-use mechanisms, and exploitation of known vulnerability.

13. It also prevents retrospective preference from being converted into contemporaneous platform knowledge without an evidentiary bridge.

### A. Continuation Ordinarily Expresses Continuation

14. Continued use ordinarily expresses an immediate behavioral preference to continue.

15. That proposition does not resolve whether the continuation was wise, healthy, fully reflective, or consistent with a longer-term preference.

16. It identifies the observable conduct available to the platform at that moment.

17. A user who:

   a. opens the application;

   b. remains logged in;

   c. scrolls;

   d. searches;

   e. watches;

   f. follows;

   g. messages;

   h. responds to notifications;

   i. reopens the service;

135

j. overrides a reminder; or

k. creates another account

is behaviorally expressing continued engagement.

18. The conduct may coexist with conflict.

19. A person may want both to continue and to stop.

20. A person may want immediate stimulation and later regret the duration.

21. A person may prefer connection while disliking the means through which it is pursued.

22. A person may choose continued use while wishing that the choice required less effort to resist.

23. These are familiar forms of human ambivalence.

24. They should not be collapsed into a single juridical conclusion that the platform knew the user had decided to stop.

**1. Immediate Preference and Reflective Preference May Differ**

25. Human choice often occurs across several time horizons.

26. A user may possess:

a. an immediate preference to continue;

b. a medium-term preference to reduce use;

c. a long-term preference to disengage;

d. a parental rule requiring cessation;

e. a clinical recommendation to reduce exposure; or

f. a later judgment that prior use was excessive.

27. Those preferences may conflict.

28. The platform ordinarily observes behavior, not the full hierarchy of internal preference.

29. The Court should therefore distinguish:

a. the user's immediate conduct;

b. the user's stated goal;

c. the custodian's instruction;

d. the operation of any activated control;

e. the platform's knowledge; and

f. the later retrospective account.

30. Liability should not arise merely because the user's later reflective preference differed from the user's earlier conduct.

136

31. It may arise where the platform knowingly interfered with an objectively expressed preference.

## 2. Continued Use Is Not Conclusive Proof of Benefit

32. Continued use does not establish that the user benefited.

33. Nor does it establish that the system was harmless.

34. It establishes only that the user continued.

35. The Court should avoid the opposite errors of treating continuation as:

    a. conclusive consent to every platform operation; or

    b. conclusive proof that the platform overrode a contrary will.

36. Continued use may be relevant to:

    a. user choice;

    b. comparative responsibility;

    c. mitigation;

    d. behavioral preference;

    e. reliance;

    f. duration;

    g. causation; and

    h. damages.

37. Its significance depends on the surrounding evidence.

## 3. Repeated Return Requires Mechanism-Specific Analysis

38. Repeated return may result from:

    a. direct social demand;

    b. messages from peers;

    c. school or organizational communication;

    d. entertainment;

    e. novelty;

    f. habit;

    g. boredom;

    h. notification;

    i. fear of exclusion;

    j. unresolved emotional need;

        k. recommendation;

        l. commercial promotion; or

        m. clinically significant compulsion.

39. The Court should identify the operative mechanism rather than treating return itself as proof that the platform defeated a contrary intention.

40. A return prompted by a direct message from a friend differs from:

        a. a platform-generated notification;

        b. a recommendation loop;

        c. a school-related communication;

        d. an advertisement;

        e. an account-security alert;

        f. a user's own search; or

        g. an objectively failed control.

41. The causal significance of repeated return depends on what prompted it.

## 4. Override Conduct Is Especially Relevant

42. A user may encounter a reminder, limit, warning, or custodial control and then choose to override or evade it.

43. That conduct should be classified precisely.

44. The Court should determine:

        a. whether the user understood the control;

        b. whether the user was permitted to override it;

        c. whether the platform encouraged override;

        d. whether the platform concealed the override mechanism;

        e. whether a custodian's authorization was required;

        f. whether multiple accounts defeated the restriction; and

        g. whether the platform represented the control as stronger than it was.

45. User override may demonstrate immediate preference to continue.

46. Platform-assisted circumvention may establish a separate platform wrong.

47. Both facts can be true.

## 5. Continuation Should Be Treated as Evidence, Not a Legal Fiction

48. Continued use should remain evidence within the causal record.

138

49. It should not become a legal fiction that:

    a. the user always consented;

    b. the user never wanted to stop;

    c. the platform always knew the opposite;

    d. the platform caused every continued session; or

    e. the custodian lacked authority to intervene.

50. The Court should evaluate continuation together with objective controls, statements, warnings, platform conduct, and surrounding circumstances.

### B. Conflicting Preference Is Not a Platform-Observable Legal Fact

51. A child may later state:

    a. "I wanted to stop";

    b. "I wish I used it less";

    c. "I could not stop";

    d. "I regretted staying online";

    e. "I kept going even though I knew I should stop";

    f. "I felt pulled back"; or

    g. "I did not know how to disengage."

52. Those statements may be relevant.

53. They may support testimony concerning:

    a. subjective experience;

    b. regret;

    c. habit;

    d. conflict;

    e. perceived compulsion;

    f. impairment;

    g. damages;

    h. clinical diagnosis; or

    i. the need for intervention.

54. They do not, standing alone, establish that the platform possessed contemporaneous access to a settled contrary intention.

55. A platform cannot ordinarily know an unexpressed internal preference with the same certainty available to the user, parent, clinician, or direct observer.

139

56. The Court should therefore require an evidentiary bridge between subjective preference and platform knowledge.

## 1. Retrospective Regret Is Not Contemporaneous Instruction

57. Retrospective regret occurs after the conduct.

58. It may be sincere and important.

59. It does not necessarily establish what the user intended at each earlier moment.

60. A later statement that use was regretted may reflect:

> a. changed judgment;
>
> b. new information;
>
> c. parental conflict;
>
> d. clinical insight;
>
> e. litigation framing;
>
> f. recollection of ambivalence;
>
> g. genuine prior compulsion; or
>
> h. some combination of those factors.

61. The Court should distinguish:

> a. what the user later believed;
>
> b. what the user contemporaneously intended;
>
> c. what the user objectively communicated; and
>
> d. what the platform actually received.

62. A later conclusion cannot automatically be imputed backward as platform knowledge.

## 2. Ambivalence Is Not a Settled Contrary Intention

63. A person may simultaneously want to continue and want to stop.

64. That ambivalence is not unusual.

65. It may be especially pronounced in adolescence.

66. The existence of ambivalence does not identify which preference governed at the moment of use.

67. The Court should therefore distinguish:

> a. desire to continue;
>
> b. desire to reduce;
>
> c. desire to stop later;
>
> d. desire to stop immediately;

140

e. external instruction to stop;

f. clinical inability to regulate; and

g. platform interference with a stated decision.

68. The phrase "wanted to stop" should not be treated as a complete causal finding.

### 3. Perceived Inability Requires Objective Corroboration

69. A statement such as "I could not stop" may describe a genuine subjective experience.

70. It may also encompass several different conditions.

71. The Court should determine whether the statement refers to:

a. strong preference;

b. habit;

c. fear of exclusion;

d. social obligation;

e. unresolved communication;

f. boredom;

g. difficulty tolerating disengagement;

h. platform-induced return;

i. repeated notification;

j. a defective control;

k. a clinical disorder; or

l. some combination of those conditions.

72. Objective corroboration may include:

a. repeated failed attempts to disengage;

b. activated controls;

c. custodial restrictions;

d. account deactivation attempts;

e. repeated platform prompts;

f. system-restored settings;

g. multiple-account use;

h. clinical records;

i. contemporaneous statements;

j. functional impairment; and

k. evidence of a specific platform mechanism.

73. Without such evidence, subjective inability should not be transformed into platform knowledge or platform causation.

### 4. Platform Knowledge Must Rest on Reliable Signals

74. A platform may possess signals that suggest conflict or difficulty.

75. Those signals may include:

a. repeated attempts to deactivate;

b. repeated deletion and restoration;

c. repeated use of time controls;

d. repeated overrides;

e. late-night usage patterns;

f. searches concerning stopping or self-control;

g. reports from parents;

h. direct user complaints;

i. crisis-related content; or

j. repeated account recreation after restriction.

76. The existence of a signal does not necessarily establish a settled contrary intention.

77. The Court should ask:

a. how reliable the signal was;

b. whether the platform used it;

c. whether the platform had a duty to interpret it;

d. whether the signal was ambiguous;

e. whether the platform used the signal commercially;

f. whether the platform used it for safety; and

g. what response was feasible.

78. Platform knowledge should follow reliable, material, and operationally available evidence.

79. It should not be inferred from hindsight alone.

### 5. The Relevant Distinction Is Between Internal State and Communicated Choice

80. The law can adjudicate communicated choice more reliably than unexpressed internal conflict.

81. A communicated choice may take the form of:

142

a. activating a control;

b. disabling notifications;

c. selecting a bedtime limit;

d. requesting account deletion;

e. deactivating an account;

f. reporting compulsive use;

g. asking the platform for assistance;

h. implementing a parental restriction;

i. changing recommendation settings; or

j. withdrawing consent to defined data use.

82. Those actions create objective evidence.

83. They may also create direct platform duties.

84. The Court should therefore distinguish a subjective wish from an operational instruction.

## 6. Custodial Knowledge May Exceed Platform Knowledge

85. Parents, guardians, teachers, and clinicians may possess direct knowledge of:

a. stated regret;

b. failed attempts to disengage;

c. visible distress;

d. sleep loss;

e. family conflict;

f. repeated rule violations;

g. clinical impairment;

h. self-harm risk; and

i. treatment recommendations.

86. A platform may possess only usage data.

87. The Court should not charge the platform with embodied and contextual knowledge held by custodians unless that knowledge was transmitted or reliably inferable.

88. Nor should custodians be denied relevant information the platform exclusively possessed.

89. Knowledge allocation should remain reciprocal.

## 7. The Subjective-Preference Finding

90. Where a claim depends on intent to stop, the Court should determine:

143

a. what the user later reported;

b. what the user contemporaneously expressed;

c. what objective action the user took;

d. what the custodian instructed;

e. what signal the platform received;

f. how reliable that signal was;

g. what the platform did in response;

h. whether the platform interfered with an expressed choice; and

i. what incremental harm followed.

91. That structure preserves subjective testimony without converting it into unproven platform knowledge.

### C. Objective Controls Can Create an Adjudicable Duty

92. Objective controls convert an internal preference or custodial instruction into an operationally legible event.

93. Once a user or custodian activates a control, the Court can ask concrete questions concerning platform conduct.

94. The relevant questions are:

a. Did the user or custodian activate a control?

b. What did the control purport to do?

c. Did the platform materially interfere with it?

d. Was its operation represented truthfully?

e. Did the user override it?

f. Did the platform facilitate circumvention?

g. Did the platform possess notice of repeated failure?

h. What harm followed from the failure?

95. These questions create an adjudicable lane because they rely on records, system design, representations, and observable operation.

### 1. Activation Creates an Objective Signal

96. Activating a control may communicate:

a. an intention to reduce use;

b. an intention to stop at a specified time;

c. a custodial limit;

144

        d. a request to block defined content;

        e. a request to restrict contact;

        f. a decision to disable notifications;

        g. a request to deactivate; or

        h. a request to delete an account.

97. That signal is stronger than a later uncommunicated preference.

98. It provides the platform with an identifiable instruction.

99. The platform may then bear responsibility for executing the instruction as represented.

## 2. The Represented Function Defines the Duty

100. The scope of the duty depends on what the platform said the control would do.

101. A reminder differs from a hard limit.

102. A recommendation-setting differs from a content block.

103. A deactivation option differs from deletion.

104. A device-level restriction differs from an account-level restriction.

105. The Court should determine:

        a. whether the control was mandatory or advisory;

        b. whether override was permitted;

        c. whether authorization was required;

        d. whether it applied across accounts;

        e. whether it applied across devices;

        f. whether it applied immediately;

        g. whether limitations were disclosed; and

        h. whether a reasonable user or custodian would understand its actual effect.

106. The platform should be held to the function it represented.

## 3. Platform Interference Should Be Defined Precisely

107. Material interference may include:

        a. restoring notifications after they were disabled;

        b. allowing unauthorized override;

        c. permitting rapid account recreation;

        d. failing to apply restrictions across linked accounts;

e. obscuring deactivation;

f. retaining functionality after purported deletion;

g. sending prompts designed to reverse disengagement;

h. misrepresenting the control's reach;

i. using data to target a user after withdrawal of consent; or

j. knowingly maintaining a defect that defeats the restriction.

108.    The Court should distinguish interference from user-initiated override.

109.    A user's deliberate decision to reverse a prior setting differs from a platform's technical defeat of that setting.

110.    The record should identify which occurred.

## 4. Custodial Controls Require Separate Attention

111. A parental or school control may embody authority independent of the child's immediate preference.

112.    The relevant legal question is then not solely whether the child wanted to continue.

113.    It is whether the platform respected a valid instruction from the actor possessing authority over access.

114.    The Court should determine:

a. who activated the control;

b. whether the actor had authority;

c. whether the platform recognized that authority;

d. whether the child could override it;

e. whether the platform facilitated override;

f. whether the control applied across accounts; and

g. whether the control was represented truthfully.

115.    A valid custodial control may create a clearer duty than an unexpressed user preference.

## 5. Deactivation and Deletion Require Precise Classification

116.    Deactivation and deletion are often treated loosely.

117.    They may differ materially.

118.    Deactivation may:

a. suspend visibility;

b. preserve data;

c. permit rapid return;

146

        d. maintain account relationships; or

        e. continue some processing.

119.    Deletion may:

        a. remove the account;

        b. trigger a waiting period;

        c. preserve legally required records;

        d. retain backups;

        e. terminate personalization; or

        f. leave content previously shared by others.

120.    The Court should determine what the user requested, what the platform represented, and what actually occurred.

121.    A user who voluntarily reactivates differs from a platform that obstructs or misrepresents deletion.

## 6. Truthful Operation Is Central

122.    A control may be limited and still lawful if its limitation is accurately disclosed.

123.    Liability becomes stronger where the platform represents a control as effective while knowing it is systematically weak or easily defeated.

124.    The relevant comparison is:

        a. represented function;

        b. actual function;

        c. known limitation;

        d. disclosed limitation;

        e. user or custodial reliance; and

        f. resulting harm.

125.    This is a direct platform-controlled inquiry.

## 7. The Objective-Control Finding

126.    For each claim concerning an intent to stop, the Court should determine whether that intent was made operationally objective through:

        a. a user setting;

        b. a custodial instruction;

        c. a deactivation request;

        d. a deletion request;

147

e. notification disablement;

f. a time limit;

g. a content restriction;

h. a contact restriction; or

i. another defined control.

127.    The Court should then determine whether the platform executed, obstructed, circumvented, or misrepresented that instruction.

128.    That finding supplies a lawful basis for responsibility without requiring the Court to infer an uncommunicated internal state.

### D. Product Interruption Does Not Resolve the Underlying Demand

129.    Timers, reminders, warnings, and forced pauses may interrupt conduct.

130.    They do not necessarily resolve the demand that produced the conduct.

131.    A user may continue seeking the service because the user is pursuing:

a. social recognition;

b. completion;

c. stimulation;

d. identity;

e. competence;

f. escape;

g. emotional regulation;

h. connection;

i. reassurance;

j. belonging;

k. information;

l. entertainment;

m. status;

n. peer participation; or

o. relief from boredom or distress.

132.    Those demands may exist before the service, outside the service, and across several services.

133.    A product interruption may alter immediate behavior while leaving the underlying demand intact.

134. The user may then:

  a. override the control;

  b. wait for it to expire;

  c. use another account;

  d. use another device;

  e. move to another platform;

  f. switch to messaging;

  g. move to gaming or streaming;

  h. seek the same social interaction elsewhere; or

  i. experience the same unresolved distress without the original service.

135. The Court should therefore distinguish interruption of access from resolution of cause.

**1. Social Recognition and Belonging**

136. Users may seek approval, visibility, status, or inclusion.

137. These motives may be intensified by platform features.

138. They are not created exclusively by platforms.

139. They may arise from:

  a. peer hierarchy;

  b. school culture;

  c. family conditions;

  d. broader status competition;

  e. celebrity culture;

  f. advertising;

  g. offline exclusion; or

  h. developmental need.

140. A platform may be responsible for a feature that measurably intensifies those pressures.

141. It cannot be charged with curing the human demand for recognition itself.

**2. Completion and Unfinished Interaction**

142. Users may remain engaged because they are:

  a. finishing a conversation;

  b. waiting for a response;

       c. completing a video or sequence;

       d. resolving conflict;

       e. checking an event;

       f. completing a school-related task;

       g. following breaking information; or

       h. seeking closure.

143.   A timer may interrupt the activity without removing the reason for returning.

144.   The Court should distinguish the platform's design contribution from the underlying unfinished demand.

### 3. Stimulation and Novelty

145.   Users may seek stimulation, novelty, entertainment, or relief from boredom.

146.   Platforms may optimize the supply of novelty.

147.   The causal inquiry should identify:

       a. what feature increased novelty;

       b. whether the platform targeted known vulnerability;

       c. whether the user sought the material;

       d. whether repetition or escalation occurred;

       e. whether a feasible constraint existed; and

       f. what injury resulted.

148.   The existence of a demand for stimulation does not absolve a platform that knowingly exploits it through unlawful or deceptive means.

149.   It does prevent the demand itself from being attributed wholly to the service.

### 4. Identity and Competence

150.   A child may use a service to develop identity, demonstrate skill, gain feedback, or participate in a community.

151.   Those functions may be beneficial, harmful, or mixed.

152.   Interruption may remove one outlet without resolving the underlying developmental need.

153.   The Court should therefore avoid assuming that reduced access necessarily produces improved condition.

154.   The relevant question is whether the challenged feature created a measurable harmful increment.

### 5. Escape and Emotional Regulation

150

155.    Digital use may function as escape from:

        a. family conflict;

        b. bullying;

        c. loneliness;

        d. school pressure;

        e. anxiety;

        f. depression;

        g. boredom;

        h. physical limitation; or

        i. offline exclusion.

156.    In such circumstances, the service may be:

        a. a symptom;

        b. a coping mechanism;

        c. a source of support;

        d. an aggravating mechanism;

        e. an avoidance mechanism; or

        f. a combination of those roles.

157.    A timer cannot diagnose or resolve those conditions.

158.    The Court should identify whether the platform worsened the condition through a defined operational act.

## 6. Connection

159.    A user may remain online because meaningful relationships exist through the service.

160.    Those relationships may include:

        a. friends;

        b. relatives;

        c. support groups;

        d. school communities;

        e. interest communities;

        f. creative collaborators;

        g. medical or disability communities; or

        h. geographically distant peers.

161.    Continued use for connection should not automatically be characterized as compulsive.

162.    Nor should the presence of meaningful connection immunize harmful platform operations.

163.    The actual use and mechanism must be identified.

**7. Interruption May Produce Substitution Rather Than Improvement**

164.    Removing access to one service may shift conduct to another service.

165.    Substitution may occur across:

   a. competing social-media platforms;

   b. messaging applications;

   c. gaming;

   d. streaming;

   e. forums;

   f. image boards;

   g. anonymous platforms;

   h. less regulated services; or

   i. offline conduct.

166.    A remedy that ignores substitution may change the location of use without improving the user's condition.

167.    The Court should therefore distinguish:

   a. platform exit;

   b. total digital reduction;

   c. substitution;

   d. improved wellbeing;

   e. worsened isolation; and

   f. migration to less transparent systems.

168.    These are different outcomes.

**8. The Platform Is Not the Universal Provider of Psychological Resolution**

169.    A platform cannot reasonably be assigned responsibility for resolving every social, psychological, familial, educational, or developmental demand expressed through its service.

170.    It does not possess:

   a. clinical authority;

   b. parental authority;

152

      c. full personal history;

      d. direct observation;

      e. control of the home;

      f. control of the school;

      g. control of competing services; or

      h. authority over the user's broader relationships.

171.    Assigning such a duty would create an indeterminate standard that no platform could reliably satisfy.

172.    It may also encourage expansive surveillance and paternalistic control over lawful expression.

### 9. Defined Exploitation of Vulnerability Remains Actionable

173.    The absence of a universal duty to resolve underlying demand does not excuse defined misconduct.

174.    A platform may be held responsible where it:

      a. identifies a vulnerability;

      b. uses that vulnerability to intensify exposure;

      c. conceals the practice;

      d. defeats a control;

      e. targets a minor unlawfully;

      f. misrepresents the safeguard;

      g. uses sensitive data beyond lawful authority;

      h. maintains a known exploitative pathway; or

      i. knowingly optimizes against an expressed user or custodial choice.

175.    The distinction is between exploiting a defined vulnerability and failing to cure the human need from which the vulnerability arose.

176.    The former may support liability.

177.    The latter exceeds the lawful boundary of platform responsibility.

### 10. The Underlying-Demand Finding

178.    Where a claim rests on inability to stop, the Court should determine:

      a. what demand the user was pursuing;

      b. whether that demand predated the service;

      c. whether the demand existed across multiple services;

d. what platform feature interacted with it;

e. whether the user or custodian objectively expressed a limit;

f. whether the platform interfered with that limit;

g. whether interruption caused substitution; and

h. what incremental harm the platform-created mechanism added.

179. This finding separates the user's underlying condition from the defendant's actual contribution.

### E. "Addiction" Should Not Be Inferred From Regret, Duration, or Continuation Alone

180. The term "addiction" carries clinical, colloquial, legal, and rhetorical meanings.

181. Those meanings should not be merged.

182. A user's statement that the service was "addictive" may describe:

a. strong preference;

b. repeated habit;

c. difficulty disengaging;

d. frequent return;

e. regret;

f. parental conflict;

g. perceived loss of control;

h. clinically significant compulsion; or

i. a platform-specific mechanism.

183. The Court should require the operative meaning to be identified.

### 1. Duration Alone Is Insufficient

184. Long use may reflect:

a. entertainment;

b. communication;

c. schoolwork;

d. social participation;

e. creative production;

f. habit;

g. boredom;

h. distress;

154

      i. multi-tasking; or

      j. clinical dysfunction.

185. Duration is relevant.

186. It is not self-defining.

## 2. Regret Alone Is Insufficient

187. People regret many voluntary choices.

188. Regret may indicate that a decision was unwise.

189. It does not by itself establish:

      a. incapacity;

      b. coercion;

      c. platform knowledge;

      d. product defect;

      e. clinical disorder; or

      f. legal causation.

190. Regret should be evaluated with function, impairment, control attempts, and mechanism.

## 3. Conflict With a Parent Is Insufficient

191. A child's resistance to a parental limit may reflect:

      a. ordinary developmental conflict;

      b. strong preference;

      c. peer pressure;

      d. fear of exclusion;

      e. habit;

      f. platform-induced compulsion;

      g. unresolved family dynamics; or

      h. some combination of those conditions.

192. Parent-child conflict over a device does not automatically prove a platform-created addiction.

## 4. Clinical Claims Require Clinical Precision

193. Where plaintiffs rely on a clinical theory, the Court should require identification of:

      a. the diagnostic construct;

      b. the criteria used;

155

c. the evaluator;

d. the timing;

e. functional impairment;

f. alternative diagnoses;

g. preexisting conditions;

h. multi-platform use;

i. treatment history; and

j. the defendant-specific mechanism.

194.    Clinical terminology should not be replaced by a generalized impression of overuse.

## 5. Platform-Specific Addiction Requires Platform-Specific Proof

195.    A platform-specific theory should identify:

a. the feature;

b. the user population;

c. the operative objective;

d. the signal used;

e. the pathway of repeated return;

f. the failed or defeated control;

g. the known risk;

h. the comparative baseline; and

i. the resulting incremental impairment.

196.    General difficulty reducing smartphone or digital use does not establish that one platform caused the condition.

### F. The Court Should Use an Objective-Intent Framework

197.    The Court can resolve these issues through an objective framework.

198.    For each claim that a user wanted to stop, the Court should ask:

a. What contemporaneous preference was expressed?

b. How was it expressed?

c. Was a control activated?

d. Was the control user-directed or custodial?

e. What did the control promise?

f. What did the platform know?

156

g. Did the platform interfere?

h. Did the user independently override the control?

i. What underlying demand remained?

j. Did use substitute elsewhere?

k. What platform-specific harm was added?

199.    This framework does not disregard subjective experience.

200.    It places that experience within a provable causal structure.

201.    It permits liability where the platform knowingly defeated, obscured, or misrepresented an objective effort to disengage.

202.    It prevents liability from resting on an uncommunicated or retrospectively reconstructed internal state.

203.    The governing principle is:

**A user's later regret or conflicting preference may be relevant evidence, but it should not become an implied platform fact. Platform responsibility should arise where an intention to limit or stop was made objectively legible, the platform owed a duty concerning that instruction, the platform materially interfered with or misrepresented its operation, and a measurable increment of harm followed.**

## VII. GENERAL HEALTH CLAIMS REQUIRE A COMPARATIVE BASELINE AND PLATFORM-SPECIFIC INCREMENT

1.  General health claims require more than evidence that adolescents used social media and later experienced distress, dysfunction, or clinical injury.

2.  The Court should require a comparative baseline capable of separating platform-specific effects from broader digital, developmental, familial, educational, economic, and cultural conditions.

3.  Without an appropriate baseline, ordinary correlation risks being converted into defendant-specific causation.

4.  Adolescents who use social media are not a random population.

5.  They may differ from adolescents who do not use social media in ways that independently affect mental health, sleep, social development, school performance, risk behavior, and help-seeking.

6.  Heavy users may also differ from light users before the challenged exposure begins.

7.  A child experiencing loneliness, anxiety, bullying, family conflict, identity difficulty, or social exclusion may seek digital interaction more intensely.

8.  In that circumstance, increased use may be:

a. a cause;

b. a consequence;

c. a coping mechanism;

d. an aggravating factor;

e. an indicator of an underlying condition; or

f. some combination of those roles.

9. The Court should therefore require every general health theory to answer four foundational questions:

a. Compared with whom?

b. In what temporal direction?

c. After accounting for which competing variables?

d. Through what identified platform-controlled mechanism?

10. The answer cannot be supplied by showing that an alleged injury occurred somewhere within a large population of users.

11. Nor can it be supplied by showing that users with poor outcomes also used the defendant's service.

12. The proper inquiry is whether the challenged platform conduct produced a materially greater rate, severity, duration, or incidence of the alleged dysfunction than would otherwise have occurred among appropriately comparable users.

13. That excess, if established, constitutes the platform-specific increment.

14. The Court should then preserve individualized questions concerning exposure, prior condition, custodial response, competing causes, injury, and damages for the proceedings in which those facts can be adjudicated directly.

## A. The Relevant Comparison Must Distinguish Materially Different Populations

15. A comparative population must resemble the relevant plaintiff population in the characteristics that matter to the claimed outcome.

16. Comparing platform users with all nonusers, without further adjustment, may conceal substantial differences in:

a. age;

b. baseline mental health;

c. social environment;

d. family structure;

e. socioeconomic status;

f. school conditions;

g. device access;

158

h. peer relationships;

i. prior digital behavior;

j. treatment history; and

k. propensity to seek online interaction.

17. The Court should require comparisons among populations that permit the alleged platform-specific effect to be isolated.

18. At minimum, the relevant analysis should distinguish:

a. Meta users;

b. users of other social-media platforms;

c. heavy smartphone users who do not materially use Meta services;

d. adolescents with low social-media exposure;

e. adolescents with preexisting dysfunction;

f. multi-platform users;

g. users with similar baseline symptoms;

h. users with similar levels of custodial supervision;

i. users in similar school environments; and

j. users with similar total digital exposure.

**1. Meta Users**

19. "Meta users" should not be treated as a homogeneous class.

20. Meta use may differ by:

a. service;

b. age;

c. account type;

d. duration;

e. intensity;

f. feature use;

g. direct messaging;

h. passive viewing;

i. content creation;

j. recommendation exposure;

k. use of parental controls;

159

l. notification settings;

m. number of accounts; and

n. period of use.

21. A child who occasionally communicates with relatives through one service occupies a different exposure category from a child who spends several hours each day receiving personalized recommendations on another.

22. The Court should therefore require the relevant Meta exposure to be defined with sufficient precision.

23. That definition should identify:

a. the service;

b. the relevant feature;

c. the period of exposure;

d. the user's age;

e. the frequency and duration of use;

f. the content pathway;

g. the recommendation mechanism;

h. the presence of controls; and

i. the alleged outcome.

24. "Used a Meta platform" is not an adequate exposure definition for a general health claim.

**2. Users of Other Platforms**

25. Users of other platforms provide an essential comparison because many alleged mechanisms are not unique to Meta.

26. Other platforms may also employ:

a. recommendation;

b. autoplay;

c. infinite scroll;

d. notifications;

e. advertising;

f. social comparison;

g. follower metrics;

h. direct messaging;

i. personalized ranking;

160

j. engagement optimization; and

k. youth-facing content.

27. The Court should determine whether the alleged outcome is:

a. materially higher among users of the defendant's platform;

b. common across several platforms;

c. associated with total social-media exposure;

d. associated with smartphone use generally; or

e. associated with preexisting traits common among heavy users.

28. Where similar outcomes occur at comparable rates across services, the evidence may support an industry-wide concern.

29. It does not necessarily establish defendant-specific liability.

30. Where the rate or severity is materially greater on the defendant's service, the record should identify the mechanism explaining that difference.

### 3. Heavy Smartphone Users Without Material Meta Exposure

31. Heavy smartphone users who do not materially use Meta services provide another necessary comparison.

32. Smartphones can independently contribute to:

a. sleep displacement;

b. distraction;

c. repeated checking;

d. reduced physical activity;

e. divided attention;

f. school interference;

g. family conflict;

h. exposure to advertising;

i. gaming;

j. streaming;

k. messaging; and

l. pornography or other harmful material.

33. If similar dysfunction appears among heavy smartphone users without substantial Meta exposure, the Court should determine whether the claimed injury arises from:

a. the device;

       b. total screen time;

       c. general connectivity;

       d. messaging;

       e. digital entertainment;

       f. nighttime access; or

       g. a platform-specific mechanism.

34. A general device effect should not be attributed wholesale to a particular platform.

### 4. Adolescents With Low Social-Media Exposure

35. Adolescents with low social-media exposure may provide a useful baseline.

36. That comparison must account for selection effects.

37. Adolescents with low exposure may differ systematically in:

       a. family rules;

       b. parental involvement;

       c. socioeconomic conditions;

       d. school type;

       e. social integration;

       f. extracurricular activity;

       g. mental-health history;

       h. access to devices;

       i. religious or cultural practice; and

       j. willingness to use technology.

38. A lower rate of dysfunction in a low-exposure group does not, by itself, establish that platform use caused the difference.

39. The Court should require adjustment for the conditions that led to lower exposure in the first place.

### 5. Adolescents With Preexisting Dysfunction

40. Adolescents with preexisting dysfunction require separate analysis because prior conditions may affect both use and outcome.

41. Preexisting conditions may include:

       a. anxiety;

       b. depression;

       c. loneliness;

d. social exclusion;

e. eating concerns;

f. self-harm history;

g. attention difficulty;

h. family conflict;

i. bullying;

j. trauma;

k. neurodevelopmental conditions; and

l. prior treatment.

42. Such conditions may increase the likelihood of seeking online connection, distraction, validation, information, or escape.

43. They may also increase vulnerability to defined platform mechanisms.

44. The Court should therefore distinguish:

a. condition preceding use;

b. increased use following the condition;

c. platform amplification of the condition;

d. persistence of the condition independent of use; and

e. measurable worsening attributable to the challenged feature.

45. A preexisting condition does not defeat a claim.

46. It defines the baseline from which aggravation must be measured.

## 6. Multi-Platform Users

47. Multi-platform users present a major attribution problem.

48. Many adolescents move among:

a. Meta services;

b. TikTok;

c. Snapchat;

d. YouTube;

e. Discord;

f. Reddit;

g. X;

h. gaming services;

163

i. messaging applications; and

j. streaming platforms.

49. The same content, peer network, advertiser, influencer, or harmful interaction may travel across several services.

50. Multi-platform use may produce:

a. cumulative exposure;

b. duplicated exposure;

c. substitution;

d. migrating social networks;

e. cross-platform harassment;

f. common recommendation effects;

g. repeated contact with the same content creator; and

h. difficulty identifying which service added the material increment.

51. The Court should require the claimed injury to be tied to:

a. a platform-specific exposure;

b. a platform-specific mechanism;

c. a platform-specific time period;

d. a platform-specific intervention; and

e. a measurable platform-specific contribution.

52. Total digital injury cannot be allocated to one platform merely because that platform appears somewhere in the user's history.

**7. Comparable Populations Must Be Comparable in Relevant Ways**

53. A valid comparison should account for the characteristics most likely to affect the claimed outcome.

54. Those characteristics may include:

a. age;

b. sex;

c. developmental stage;

d. prior diagnosis;

e. symptom severity;

f. treatment status;

g. family environment;

164

        h. school environment;

        i. bullying history;

        j. physical activity;

        k. sleep;

        l. socioeconomic condition;

        m. total screen time;

        n. gaming;

        o. streaming;

        p. messaging;

        q. use of competing platforms; and

        r. custodial supervision.

55. The Court need not require perfect comparability.

56. It should require enough comparability that the claimed platform effect can be distinguished from the characteristics of the populations being compared.

## 8. The Comparative-Population Finding

57. For each general health theory, the Court should determine:

        a. what population was studied;

        b. what exposure was defined;

        c. what comparison group was used;

        d. whether the groups were comparable at baseline;

        e. what material differences remained;

        f. whether other platforms were included;

        g. whether total smartphone exposure was measured;

        h. whether preexisting dysfunction was accounted for;

        i. what outcome difference appeared; and

        j. whether that difference can reasonably be attributed to the defendant's conduct.

### *B. Temporal Direction Must Be Established*

58. The Court should determine whether platform use preceded the alleged dysfunction, whether dysfunction preceded and altered use, or whether both developed through a reciprocal process.

59. Temporal sequence is necessary but not sufficient for causation.

60. Evidence that use occurred before a diagnosis does not establish that use caused the condition.

61. Symptoms may have existed before formal diagnosis.

62. Use may also increase as a response to emerging distress.

63. The Court should therefore distinguish:

    a. first platform exposure;

    b. first substantial use;

    c. first exposure to the challenged feature;

    d. first symptom;

    e. first observable impairment;

    f. first disclosure to a custodian;

    g. first clinical evaluation;

    h. first diagnosis;

    i. first intervention; and

    j. subsequent change in use or symptoms.

## 1. Use May Precede Dysfunction

64. Where use clearly precedes dysfunction, the Court should still identify:

    a. the relevant feature;

    b. the duration of exposure;

    c. the content pathway;

    d. the timing of symptom emergence;

    e. other intervening events;

    f. competing exposures;

    g. baseline condition; and

    h. whether symptoms changed when exposure changed.

65. Temporal priority supports causation only when combined with a plausible and evidenced mechanism.

## 2. Dysfunction May Precede Increased Use

66. Preexisting distress may lead to increased platform use.

67. A child experiencing anxiety, loneliness, bullying, family conflict, or social exclusion may seek:

    a. connection;

    b. reassurance;

    c. distraction;

166

> d. identity;
>
> e. community;
>
> f. entertainment;
>
> g. advice;
>
> h. recognition; or
>
> i. escape.

68. In that circumstance, increased use may be an effect of the condition.

69. The platform may later aggravate the condition.

70. The Court should separate initial direction from later amplification.

### 3. Reciprocal Causation May Occur

71. Use and dysfunction may operate reciprocally.

72. For example:

> a. loneliness may increase use;
>
> b. certain use may reduce offline interaction;
>
> c. reduced interaction may intensify loneliness;
>
> d. increased loneliness may produce further use.

73. Similar reciprocal patterns may occur with:

> a. anxiety;
>
> b. body-image concern;
>
> c. sleep loss;
>
> d. bullying;
>
> e. family conflict;
>
> f. social comparison;
>
> g. self-harm interest; and
>
> h. academic disruption.

74. A reciprocal cycle should not be attributed entirely to the platform.

75. The Court should identify the point at which a platform-controlled mechanism materially intensified the cycle.

### 4. Diagnosis Date Is Not Necessarily Onset Date

76. A diagnosis may occur after symptoms have existed for months or years.

77. The Court should not treat the diagnosis date as the automatic beginning of the condition.

78. Relevant evidence may include:

      a. prior medical records;

      b. school records;

      c. parent observations;

      d. contemporaneous messages;

      e. prior counseling;

      f. attendance changes;

      g. sleep history;

      h. self-harm history; and

      i. prior digital behavior.

79. The onset period should be established as accurately as the evidence permits.

### 5. Changes After Exposure Modification May Be Informative

80. The Court may consider whether symptoms changed after:

      a. account deactivation;

      b. device removal;

      c. reduction in use;

      d. migration to another platform;

      e. implementation of parental controls;

      f. school-device restriction;

      g. treatment;

      h. family intervention; or

      i. removal of a particular feature.

81. Improvement after reduced exposure may support causation.

82. It may also reflect concurrent treatment, changed family conditions, school changes, or removal from several digital services.

83. Worsening after removal may indicate unresolved underlying demand or substitution.

84. The Court should consider the full intervention context.

### 6. The Temporal-Direction Finding

85. For each claimed health outcome, the Court should determine:

      a. what condition existed before the challenged exposure;

      b. when use began;

c. when use intensified;

d. when the relevant feature was encountered;

e. when symptoms began;

f. whether symptoms drove increased use;

g. whether use worsened symptoms;

h. what intervening events occurred;

i. what happened when exposure changed; and

j. whether a platform-specific temporal sequence is supported.

### C. Confounding Variables Must Be Identified and Accounted For

86. General health claims arise within a complex developmental environment.

87. The Court should require consideration of variables that may independently cause, aggravate, explain, or correlate with both platform use and the claimed outcome.

88. Relevant variables include:

a. family structure;

b. custodial supervision;

c. school environment;

d. bullying;

e. socioeconomic conditions;

f. sleep;

g. physical activity;

h. preexisting mental-health symptoms;

i. other platforms;

j. gaming;

k. institutional screen use;

l. healthcare access;

m. substance use;

n. trauma;

o. peer relationships;

p. developmental conditions; and

q. major life events.

89. Confounding variables should not be invoked as a generalized defense.

90. They should be identified, measured where possible, and incorporated into the causal analysis.

**1. Family Structure**

91. Family structure may affect:

a. supervision;

b. device access;

c. household conflict;

d. emotional support;

e. schedule;

f. treatment access;

g. enforcement of limits;

h. exposure to stress; and

i. continuity of rules across households.

92. Relevant circumstances may include:

a. single or multiple households;

b. divorce or separation;

c. caregiver absence;

d. inconsistent rules;

e. family illness;

f. financial stress;

g. domestic conflict;

h. sibling influence; and

i. parental digital behavior.

93. These factors may affect both use and health outcomes.

**2. Custodial Supervision**

94. The degree of supervision may affect:

a. age of first access;

b. nighttime use;

c. account creation;

d. content exposure;

e. response to dysfunction;

f. enforcement of controls;

g. use across devices;

h. use of multiple accounts; and

i. timing of treatment.

95. The Court should determine whether supervision was:

a. active;

b. intermittent;

c. absent;

d. technically delegated to platform tools;

e. inconsistent across households; or

f. impaired by misleading platform representations.

96. Supervision is relevant both to causation and to whether platform deception interfered with custodial action.

## 3. School Environment

97. School conditions may affect:

a. academic pressure;

b. peer relationships;

c. bullying;

d. social status;

e. screen exposure;

f. device access;

g. counseling;

h. attendance;

i. discipline; and

j. early detection of dysfunction.

98. A school environment may be protective, harmful, or mixed.

99. The Court should account for institutional device use, digital curriculum, peer dynamics, and intervention history.

## 4. Bullying

100. Bullying may occur:

a. offline;

171

b. online;

c. across multiple platforms;

d. through school networks;

e. through direct messaging;

f. through impersonation; or

g. through repeated circulation of content.

101.    The Court should identify:

a. who engaged in the bullying;

b. where it began;

c. where it continued;

d. what the school knew;

e. what parents knew;

f. what the platform knew;

g. what each actor could do; and

h. what portion of the injury arose from the bullying itself rather than the platform's treatment of it.

## 5. Socioeconomic Conditions

102.    Socioeconomic conditions may affect:

a. device access;

b. supervision;

c. neighborhood safety;

d. extracurricular opportunities;

e. healthcare access;

f. parental work schedules;

g. school resources;

h. housing stability;

i. stress; and

j. reliance on digital connection.

103.    These variables may influence both exposure and outcome.

104.    Failure to account for them may attribute broader social disadvantage to platform use.

## 6. Sleep

172

105. Sleep is both a potential outcome and a potential confounder.

106. Sleep disruption may arise from:

    a. social-media use;

    b. gaming;

    c. streaming;

    d. messaging;

    e. school workload;

    f. anxiety;

    g. household conditions;

    h. medical issues;

    i. caffeine or substance use; and

    j. unrestricted nighttime device possession.

107. Sleep loss may independently worsen:

    a. mood;

    b. attention;

    c. impulse control;

    d. academic performance;

    e. anxiety;

    f. depression;

    g. family conflict; and

    h. perceived compulsivity.

108. The Court should identify whether the defendant's feature caused the sleep loss or whether sleep loss independently intensified both use and dysfunction.

**7. Physical Activity**

109. Reduced physical activity may correlate with increased screen use and poorer health outcomes.

110. The Court should distinguish:

    a. displacement caused by the defendant's service;

    b. displacement caused by total digital use;

    c. lack of opportunity;

    d. school structure;

173

e. family habits;

f. disability;

g. neighborhood conditions; and

h. preexisting low activity.

111. Reduced activity should not automatically be assigned to one platform.

### 8. Preexisting Mental-Health Symptoms

112. Preexisting symptoms are central to baseline and direction.

113. The Court should identify:

a. symptom type;

b. severity;

c. onset;

d. diagnosis;

e. prior treatment;

f. family history;

g. prior self-harm;

h. prior crisis events;

i. prior medication; and

j. prior functional impairment.

114. The relevant issue is the defendant-specific aggravation, not whether the plaintiff was entirely free from vulnerability before use.

### 9. Other Platforms

115. Exposure to other platforms may involve the same:

a. content;

b. peers;

c. advertisers;

d. influencers;

e. recommendation patterns;

f. notifications;

g. harmful pathways;

h. direct messages; and

i. social pressures.

174

116.    The Court should require platform-by-platform exposure analysis where the claim seeks platform-specific damages.

## 10. Gaming

117.    Gaming may independently affect:

        a. sleep;

        b. duration of screen use;

        c. reward-seeking;

        d. competition;

        e. family conflict;

        f. spending;

        g. social relationships;

        h. voice-chat exposure; and

        i. repeated return.

118.    Gaming should be included in the total digital baseline.

## 11. Institutional Screen Use

119.    Schools and other institutions may require substantial screen exposure.

120.    Institutional use may contribute to:

        a. eye strain;

        b. sedentary behavior;

        c. divided attention;

        d. device dependence;

        e. habitual checking;

        f. messaging;

        g. sleep displacement through homework; and

        h. normalization of continuous connectivity.

121.    A school seeking recovery for screen-related burdens should account for its own required use.

## 12. Healthcare Access and Treatment

122.    Access to diagnosis, therapy, medication, crisis care, and family support may materially affect outcome.

123.    The Court should consider:

        a. timing of treatment;

175

        b. treatment availability;

        c. adherence;

        d. continuity;

        e. family participation;

        f. school coordination; and

        g. whether digital access changed during treatment.

124.    Treatment differences may explain outcome differences independently of platform exposure.

## 13. Major Life Events and Trauma

125.    Relevant life events may include:

        a. death;

        b. divorce;

        c. relocation;

        d. abuse;

        e. illness;

        f. family financial collapse;

        g. school transition;

        h. public crisis;

        i. social exclusion; and

        j. criminal victimization.

126.    These events may affect both digital use and health.

127.    They should be incorporated into the causal record.

## 14. Confounders Should Be Integrated, Not Merely Listed

128.    The existence of confounders should not become a means of avoiding adjudication.

129.    The Court should require experts and parties to explain:

        a. which confounders were considered;

        b. how they were measured;

        c. which were unavailable;

        d. how residual confounding was addressed;

        e. whether the result remained stable under alternative assumptions; and

        f. how much uncertainty remains.

130.    Causal confidence should correspond to the quality of that analysis.

## 15. The Confounding-Variable Finding

131.    For each general health theory, the Court should determine:

    a. which alternative variables could affect the outcome;

    b. which also affect platform use;

    c. which were measured;

    d. which were controlled;

    e. which remain unresolved;

    f. whether the claimed association persisted;

    g. whether the effect size remained material; and

    h. whether the defendant-specific mechanism still explains the excess.

### D. Platform Specificity Requires a Material Excess Tied to an Identified Mechanism

132.    The rate, severity, duration, or incidence of the alleged dysfunction must be materially greater among the relevant platform users than among appropriately comparable populations.

133.    That excess must then be tied to an identified platform-controlled mechanism.

134.    The required showing has two components:

    a. a material outcome difference; and

    b. a plausible, evidenced, defendant-controlled explanation for that difference.

135.    Neither component should substitute for the other.

136.    A statistical association without a mechanism may reflect confounding, selection, reverse causation, or general digital exposure.

137.    A plausible mechanism without evidence of material outcome difference may establish risk or design concern without establishing the claimed population-level injury.

138.    The Court should require both where plaintiffs seek to establish general platform-specific health causation.

## 1. The Outcome Must Be Defined

139.    The claimed dysfunction should be defined with precision.

140.    Relevant outcomes may include:

    a. diagnosed depression;

    b. diagnosed anxiety;

    c. clinically significant symptom increase;

    d. eating disorder;

177

e. self-harm;

f. suicide attempt;

g. suicide;

h. sleep impairment;

i. school absence;

j. functional impairment;

k. compulsive-use symptoms;

l. body-image distress; or

m. another specified condition.

141. Broad terms such as "poor mental health" or "youth harm" are insufficient unless tied to measurable outcomes.

## 2. The Exposure Must Be Defined

142. Exposure should identify:

a. the platform;

b. the service;

c. the feature;

d. duration;

e. intensity;

f. age at exposure;

g. content pathway;

h. recommendation pattern;

i. notification pattern;

j. data use; and

k. relevant period.

143. General platform membership is not equivalent to exposure to the challenged mechanism.

## 3. The Excess Must Be Material

144. The Court should determine whether the difference is:

a. statistically credible;

b. clinically meaningful;

c. practically meaningful;

d. stable across models;

178

e. consistent across relevant populations;

f. temporally coherent;

g. robust to confounding adjustment; and

h. attributable to the defendant rather than general digital use.

145.    A small association may be statistically detectable in a large dataset while lacking meaningful causal significance.

146.    Materiality should therefore include both magnitude and practical consequence.

**4. The Mechanism Must Be Platform-Controlled**

147.    The identified mechanism may include:

a. recommendation;

b. age-sensitive targeting;

c. repeated notification;

d. data-driven profiling;

e. defective control;

f. underage-account maintenance;

g. known exploitative pathway;

h. concealment;

i. platform-created content; or

j. another operational feature.

148.    The mechanism should not be stated merely as:

a. "social media";

b. "the algorithm";

c. "engagement";

d. "screen time";

e. "harmful content"; or

f. "addiction."

149.    It should identify what the defendant actually did.

**5. The Mechanism Must Explain the Excess**

150.    The Court should require a causal bridge between mechanism and outcome.

151.    That bridge should explain:

a. how the feature altered exposure;

179

b. how the altered exposure affected the claimed condition;

c. why the effect should be stronger on the defendant's service;

d. why competing explanations are less persuasive;

e. whether the effect varied by age or vulnerability; and

f. whether mitigation changed the outcome.

152.    A mechanism that cannot explain the observed difference should not support platform-specific causation.

## 6. Comparable Rates May Indicate an Industry-Wide or Nonplatform Cause

153.    If comparable populations experience similar rates of dysfunction across platforms, the evidence may indicate:

a. an industry-wide mechanism;

b. general smartphone use;

c. common peer behavior;

d. shared content;

e. broader cultural conditions;

f. preexisting distress; or

g. a combination of these causes.

154.    That finding does not eliminate the policy concern.

155.    It changes the level at which correction should occur.

156.    A market-wide defect may require legislation, regulation, common standards, or industry-wide governance.

157.    It should not be converted into firm-specific liability without firm-specific proof.

## 7. Greater Rates Require Mechanism-Specific Explanation

158.    If the defendant's users experience materially greater rates or severity, the Court should determine why.

159.    Potential explanations may include:

a. a unique feature;

b. a distinct user population;

c. a different recommendation objective;

d. stronger age-related exposure;

e. more intensive notification;

f. different content categories;

g. weaker controls;

h. greater underage use;

i. measurement differences; or

j. selection of more vulnerable users.

160.    The existence of a difference does not itself establish which explanation is correct.

**8. General Causation and Specific Causation Must Remain Distinct**

161.    General causation asks whether the platform-controlled mechanism is capable of producing the alleged kind of harm in a relevant population.

162.    Specific causation asks whether that mechanism materially contributed to the injury of a particular plaintiff.

163.    Evidence supporting general causation may include:

a. population studies;

b. internal research;

c. experiments;

d. natural experiments;

e. dose-response evidence;

f. temporal evidence;

g. mechanism evidence;

h. platform records; and

i. comparative outcomes.

164.    Specific causation requires individualized evidence concerning:

a. actual exposure;

b. prior condition;

c. use of competing services;

d. family and school environment;

e. temporal sequence;

f. platform mechanism;

g. intervention;

h. clinical course; and

i. damages.

165.    The Court should not permit proof at one level to substitute automatically for proof at the other.

181

### 9. The Platform-Specificity Finding

166.   For each general health claim, the Court should determine:

        a. what outcome was measured;

        b. what exposure was measured;

        c. what comparison population was used;

        d. whether the groups were comparable;

        e. whether a material excess existed;

        f. whether temporal direction was established;

        g. whether confounding was adequately addressed;

        h. what platform-controlled mechanism explains the excess;

        i. whether that mechanism was unique or industry-wide; and

        j. what degree of causal confidence the evidence supports.

167.   Platform-specific liability should correspond to that finding.

### E. Individualized Damages Remain Downstream

168.   Amicus need not resolve the facts of any individual child's claim.

169.   The function of this common architecture is to determine what those individualized claims must eventually prove.

170.   The Court may resolve common questions concerning:

        a. platform representations;

        b. data practices;

        c. recommendation architecture;

        d. control design;

        e. age-assurance systems;

        f. known risks;

        g. common causal mechanisms;

        h. industry-wide practices; and

        i. general capacity to cause a defined injury.

171.   Individual proceedings must then determine whether those common facts operated in the life of a particular plaintiff.

172.   The individualized inquiry should include:

        a. actual account history;

b. actual feature exposure;

c. actual content pathway;

d. duration and intensity;

e. age;

f. prior mental-health condition;

g. family environment;

h. school environment;

i. bullying;

j. competing platforms;

k. general smartphone use;

l. gaming and streaming;

m. custodial controls;

n. treatment;

o. temporal sequence;

p. mitigation;

q. clinical outcome; and

r. damages.

## 1. Common Proof Should Define the Possible Mechanism

173.    Common proof may establish that a feature:

a. operated in a defined way;

b. used defined signals;

c. created defined exposure;

d. carried a known risk;

e. was represented inaccurately;

f. defeated a control; or

g. was capable of producing a defined harm.

174.    That proof narrows the individualized inquiry.

175.    It does not establish that every user encountered the feature or suffered the harm.

## 2. Individual Proof Should Establish Actual Exposure

176.    Each plaintiff should identify:

183

a. the account;

b. the platform;

c. the feature;

d. the time period;

e. the content;

f. the recommendation path;

g. the notification pattern;

h. the control used;

i. the platform response; and

j. the actual exposure alleged to have caused injury.

177.    General platform use should not substitute for actual exposure to the challenged mechanism.

## 3. Individual Proof Should Establish Baseline and Change

178.    Each plaintiff should establish:

a. preexposure condition;

b. onset of symptoms;

c. symptom progression;

d. diagnosis;

e. treatment;

f. competing causes;

g. change in use;

h. change after intervention; and

i. the incremental worsening attributed to the defendant.

179.    Damages should measure change from baseline, not the plaintiff's entire life condition without allocation.

## 4. Individual Proof Should Account for Comparative Responsibility

180.    Individualized proceedings may also consider:

a. custodial knowledge;

b. school knowledge;

c. intervention opportunities;

d. continued access after observable dysfunction;

e. user circumvention;

184

f. platform concealment;

g. defective controls;

h. other platforms;

i. offender conduct; and

j. mitigation.

181. Comparative responsibility should follow actual duty and causal contribution.

## 5. Damages Should Correspond to the Platform-Created Increment

182. Recoverable damages should correspond to:

a. the injury caused or aggravated by the platform-controlled conduct;

b. the severity of that increment;

c. the duration of that increment;

d. treatment attributable to it;

e. functional loss attributable to it;

f. mitigation;

g. comparative responsibility; and

h. avoidance of duplicative recovery.

183. The platform may be fully responsible for the increment it caused.

184. It should not be made responsible for independent injury arising from preexisting condition, custodial failure, school conditions, other platforms, or third-party misconduct.

## 6. Individualization Preserves Strong Claims

185. Requiring individualized proof does not diminish valid claims.

186. It strengthens them by tying liability to:

a. actual exposure;

b. actual mechanism;

c. actual knowledge;

d. actual injury;

e. actual causal contribution; and

f. proportionate remedy.

187. It also protects the coordinated proceeding from converting population-level concern into automatic individual liability.

## 7. The Downstream Individualized Finding

185

188.    For each plaintiff, the relevant tribunal should determine:

    a. what platform-controlled conduct occurred;

    b. whether the plaintiff was actually exposed;

    c. what condition existed beforehand;

    d. what other causes operated;

    e. what symptoms followed;

    f. what intervention occurred;

    g. what portion of injury the platform added;

    h. what damages correspond to that increment; and

    i. whether any recovery would duplicate another claimant's recovery.

### F. The Court Should Adopt a Common Comparative-Causation Framework

189.    The Court can unify general health claims through a common sequence.

190.    For each claimed health outcome, the parties should identify:

    a. the defined outcome;

    b. the defined exposure;

    c. the comparative population;

    d. the baseline condition;

    e. the temporal direction;

    f. the confounding variables;

    g. the platform-specific mechanism;

    h. the material excess;

    i. the degree of causal confidence;

    j. the individualized proof required; and

    k. the remedy corresponding to the platform-created increment.

191.    This framework permits the Court to distinguish:

    a. correlation from causation;

    b. cause from consequence;

    c. general digital harm from platform-specific harm;

    d. common mechanism from individualized exposure;

    e. aggravation from original condition;

186

f. platform-wide defect from industry-wide defect; and

g. policy concern from compensable injury.

192.    It also protects the integrity of both plaintiffs' claims and defendants' obligations.

193.    Plaintiffs with strong platform-specific evidence remain able to prove full responsibility for the injury attributable to the challenged conduct.

194.    Platforms remain unable to hide direct misconduct inside the complexity of adolescent development.

195.    At the same time, no platform becomes the insurer of every adverse condition found among its users.

196.    The governing principle is:

**General health claims require a valid comparative population, a coherent temporal sequence, disciplined treatment of confounding variables, and a material excess tied to an identified platform-controlled mechanism. Common proof may establish the mechanism and its capacity to cause harm; individualized proceedings must establish actual exposure, actual aggravation, and the damages corresponding to the platform-created increment.**

## VIII. SCHOOL-DISTRICT AND GOVERNMENTAL CLAIMS REQUIRE ACCOUNTING FOR EXISTING PUBLIC DUTIES

1.  School-district and governmental claims require the Court to distinguish between a public institution's ordinary duties and any additional burden caused by a proved platform-specific breach.

2.  Public expenditure alone does not establish external causation.

3.  Schools, municipalities, counties, and states routinely incur costs arising from:

   a. counseling;

   b. discipline;

   c. absenteeism;

   d. crisis intervention;

   e. student safety;

   f. mental-health support;

   g. bullying response;

   h. attendance enforcement;

   i. device administration;

   j. classroom disruption;

   k. family outreach;

187

l. special education;

m. public-health response; and

n. law enforcement.

4. Those expenditures may increase after a social condition becomes more severe.

5. An increase in expenditure does not, by itself, identify the legal source of the increase.

6. The Court should require public plaintiffs to separate:

a. costs arising from duties they already possessed;

b. costs arising from their own institutional policies;

c. costs arising from broad social and technological change;

d. costs arising from multiple platforms or devices;

e. costs arising from third-party misconduct;

f. costs arising from preexisting student conditions; and

g. costs added by a defendant-specific breach.

7. That distinction is necessary because public institutions occupy two roles in these proceedings.

8. They may be injured claimants seeking recovery for an added burden.

9. They are also governing and custodial actors that possessed authority over access, supervision, discipline, curriculum, institutional devices, counseling, and intervention.

10. Those roles must be adjudicated together.

11. A school cannot be treated solely as a passive recipient of external harm where it also controlled material portions of the environment through which the alleged harm arose.

12. Nor should a platform avoid responsibility merely because schools possessed overlapping duties.

13. The proper inquiry is incremental and reciprocal:

**What duty did the institution already possess, what burden did the platform-specific breach add, what portion of the environment did the institution itself control, and what net expense remains fairly attributable to the defendant?**

### A. Expenditure Does Not Establish External Causation

14. Public plaintiffs may show that they spent more money after social-media use became widespread.

15. That temporal relationship does not establish that a particular platform caused the expenditure.

16. A public institution may spend money because:

a. a platform breached a specific duty;

b. a school adopted more screen-based instruction;

c. students used multiple services;

d. parents failed to intervene;

e. bullying intensified;

f. mental-health needs increased for independent reasons;

g. the institution improved services;

h. reporting became more complete;

i. staffing changed;

j. legal obligations expanded;

k. public expectations increased; or

l. broader social conditions deteriorated.

17. The Court should therefore distinguish expenditure from causation.

18. The fact that a school paid for counseling does not establish that a defendant caused the condition requiring counseling.

19. The fact that a district hired additional staff does not establish that the expense was attributable to one platform.

20. The fact that absenteeism increased does not establish that social-media use was the cause, much less that a particular platform-controlled mechanism produced the increase.

21. Each category of public expense should be tied to a defined causal chain.

**1. Counseling Costs**

22. Counseling is an ordinary function of modern schools and public systems.

23. Counseling costs may arise from:

a. anxiety;

b. depression;

c. bullying;

d. family conflict;

e. trauma;

f. academic pressure;

g. social isolation;

h. substance use;

i. self-harm risk;

189

j. eating disorders;

k. disability;

l. crisis events; and

m. digital use.

24. The Court should determine whether claimed counseling costs reflect:

a. baseline services already provided;

b. increased demand from general youth mental-health conditions;

c. increased demand from multi-platform use;

d. increased demand from a specific platform feature;

e. costs caused by school conditions;

f. costs caused by peer conduct; or

g. costs caused by a proved defendant-specific breach.

25. A school should identify the additional counseling burden rather than the total counseling function.

## 2. Discipline Costs

26. Discipline costs may arise from:

a. device use during class;

b. cyberbullying;

c. harassment;

d. impersonation;

e. fights;

f. messaging;

g. cheating;

h. unauthorized recording;

i. distribution of images;

j. disruption caused by school-issued devices; or

k. ordinary violations of school rules.

27. The school ordinarily controls discipline within the educational environment.

28. The Court should determine:

a. what conduct occurred;

b. who committed it;

190

c. whether the platform amplified it;

d. whether the conduct occurred through multiple services;

e. whether school policy addressed it;

f. whether enforcement was consistent; and

g. what additional expense was caused by the defendant's specific conduct.

29. A school's disciplinary obligation does not become an external injury merely because the misconduct involved a digital service.

## 3. Absenteeism Costs

30. Absenteeism may arise from:

a. physical illness;

b. mental-health symptoms;

c. bullying;

d. family instability;

e. transportation problems;

f. sleep loss;

g. school avoidance;

h. truancy;

i. caregiving responsibilities;

j. academic failure;

k. gaming;

l. streaming;

m. messaging;

n. social-media use; or

o. another cause.

31. The Court should not treat absenteeism as a platform-specific injury without evidence linking the absence to an identified mechanism.

32. The relevant questions include:

a. when absenteeism began;

b. what the student's prior attendance was;

c. whether a diagnosis existed;

d. whether sleep was affected;

191

e. whether school conditions contributed;

f. whether other digital use occurred;

g. whether a platform-specific feature materially altered attendance; and

h. what expense the institution incurred because of that alteration.

## 4. Crisis-Intervention Costs

33. Crisis intervention may involve:

a. self-harm threats;

b. suicide risk;

c. sexual exploitation;

d. threats of violence;

e. trafficking;

f. extortion;

g. acute bullying;

h. mental-health crisis;

i. law-enforcement response; or

j. emergency hospitalization.

34. These events may create genuine and substantial public costs.

35. They also involve distinct causal structures.

36. The Court should identify:

a. the primary wrongdoer;

b. the platform pathway;

c. the notice provided;

d. the school's knowledge;

e. the parent's knowledge;

f. the institutional response;

g. the platform response; and

h. the incremental cost caused by the defendant's failure.

## 5. Device-Administration Costs

37. Schools increasingly incur costs associated with:

a. device procurement;

192

> b. software management;
>
> c. filtering;
>
> d. monitoring;
>
> e. technical support;
>
> f. account administration;
>
> g. app restrictions;
>
> h. cybersecurity;
>
> i. replacement;
>
> j. training; and
>
> k. enforcement.

38. These costs arise partly from institutional decisions to adopt digital systems.

39. A school should not attribute ordinary device-management expense to social-media defendants merely because students used social media on the devices.

40. Recovery should be limited to the additional cost caused by a specific defendant-controlled breach.

## 6. Classroom-Disruption Costs

41. Classroom disruption may arise from:

> a. social media;
>
> b. messaging;
>
> c. gaming;
>
> d. streaming;
>
> e. school-issued applications;
>
> f. notifications;
>
> g. personal devices;
>
> h. weak institutional rules;
>
> i. inconsistent enforcement;
>
> j. peer conduct; or
>
> k. broader attention difficulties.

42. The Court should determine:

> a. what disrupted instruction;
>
> b. through what device;

193

c. through what application;

d. whether the school permitted access;

e. whether technical restrictions existed;

f. whether staff enforced them;

g. whether the defendant introduced a distinct mechanism; and

h. what cost followed from that mechanism.

**7. Ordinary Duties Should Be Separated From Compensable Additions**

43. The Court should distinguish between:

a. the cost of performing an existing public duty; and

b. an extraordinary or additional burden caused by a defendant's breach.

44. A school's duty to counsel students exists before any particular platform use.

45. A school's duty to maintain attendance exists before any claimed digital injury.

46. A municipality's public-health responsibilities exist before any platform-specific claim.

47. A state's enforcement obligations exist before any alleged market failure.

48. These preexisting duties form the baseline.

49. The platform-specific increment is the added burden beyond that baseline.

**8. The Expenditure Finding**

50. For each category of public expense, the Court should determine:

a. what service or duty the institution already provided;

b. what the baseline cost was;

c. what changed;

d. when the change occurred;

e. what causes contributed;

f. what platform-specific breach is alleged;

g. how that breach increased the burden;

h. what portion of the expense remains attributable to other causes; and

i. whether the claimed amount duplicates another public or private recovery.

***B. Public Plaintiffs Should Identify the Additional Burden***

51. Public plaintiffs should identify the net additional burden caused by the defendant's conduct.

52. They should not recover the total cost of functions they were already legally or institutionally required to perform.

194

53. The required showing should include:

> a. the platform-specific breach;
>
> b. the burden added by that breach;
>
> c. the duty the institution already possessed;
>
> d. institutional screen and device policies;
>
> e. the institution's contribution to exposure or dysfunction;
>
> f. the net incremental expense;
>
> g. the time period of that expense;
>
> h. the causal method used to allocate it; and
>
> i. the steps taken to mitigate it.

## 1. The Platform-Specific Breach

54. The public plaintiff should identify the defendant-controlled conduct allegedly producing the added burden.

55. That conduct may include:

> a. deception;
>
> b. unlawful child-data practices;
>
> c. defective parental controls;
>
> d. defective institutional controls;
>
> e. known underage access;
>
> f. recommendation-based escalation;
>
> g. exploitation pathways;
>
> h. failure after notice;
>
> i. misleading public-health representations; or
>
> j. another defined operational breach.

56. "Social media caused added costs" is not a sufficiently specific allegation.

57. The public plaintiff should identify what the defendant itself did.

## 2. The Added Burden

58. The public plaintiff should next identify the specific burden added.

59. That burden may include:

> a. additional counselor hours;
>
> b. additional crisis responses;

195

        c. additional absenteeism interventions;

        d. additional disciplinary proceedings;

        e. additional training;

        f. additional monitoring technology;

        g. additional exploitation investigations;

        h. additional healthcare referrals;

        i. additional law-enforcement coordination; or

        j. additional administrative work.

60. The burden should be measurable.

61. It should also be linked to the defined breach.

### 3. The Existing Institutional Duty

62. The public plaintiff should identify the duty it already possessed.

63. Existing duties may arise from:

        a. compulsory education;

        b. student safety;

        c. attendance law;

        d. special-education law;

        e. anti-bullying obligations;

        f. counseling obligations;

        g. crisis response;

        h. device management;

        i. public-health law;

        j. child-protection law; or

        k. institutional policy.

64. The Court should determine what cost would have existed even without the defendant's breach.

65. That cost is part of the baseline.

### 4. Institutional Screen and Device Policies

66. Public plaintiffs should disclose and account for their own digital policies.

67. Relevant policies may concern:

        a. school-issued devices;

      b. personal-device use;

      c. internet access;

      d. application permissions;

      e. social-media blocking;

      f. classroom use;

      g. homework requirements;

      h. after-hours use;

      i. monitoring;

      j. filtering;

      k. password control;

      l. parent notification;

      m. discipline; and

      n. data collection.

68. Those policies may affect exposure, supervision, and cost.

69. An institution that materially expanded student screen access should not omit that decision from the causal baseline.

70. Nor should the existence of institutional access excuse platform misconduct.

71. The Court should evaluate both.

**5. The Institution's Contribution to Exposure**

72. A school or public institution may contribute to exposure by:

      a. supplying devices;

      b. permitting broad internet use;

      c. integrating social-media functions;

      d. requiring digital communication;

      e. allowing personal devices;

      f. failing to enforce restrictions;

      g. failing to inform parents;

      h. failing to respond to known misuse; or

      i. maintaining policies that normalize continuous connectivity.

73. The Court should identify whether those decisions increased the claimed burden.

74. Institutional contribution should be allocated rather than ignored.

197

**6. The Institution's Contribution to Dysfunction**

75. Public plaintiffs should also account for institutional conditions that may contribute to the claimed harm.

76. Those conditions may include:

    a. bullying;

    b. academic pressure;

    c. inadequate counseling;

    d. delayed intervention;

    e. disciplinary inconsistency;

    f. social exclusion;

    g. school climate;

    h. excessive screen-based work;

    i. poor communication with parents; or

    j. failure to address visible deterioration.

77. These conditions do not eliminate platform responsibility.

78. They affect the net causal allocation.

**7. Net Incremental Expense**

79. The compensable public expense should be calculated as the difference between:

    a. the expense the institution would have incurred in the absence of the defendant's breach; and

    b. the expense actually incurred because of the breach.

80. The calculation should account for:

    a. baseline staffing;

    b. ordinary duties;

    c. other platforms;

    d. general smartphone use;

    e. school-issued technology;

    f. independent social conditions;

    g. government funding;

    h. insurance or reimbursement;

    i. mitigation; and

j. overlapping claims.

81. The Court should require a transparent method of allocation.

82. Aggregate estimates should not substitute for a causal method.

## 8. Mitigation by the Public Plaintiff

83. Public plaintiffs possess institutional power to reduce exposure and cost.

84. Mitigation may include:

a. device restrictions;

b. classroom bans;

c. network filtering;

d. parent notification;

e. counseling protocols;

f. anti-bullying enforcement;

g. staff training;

h. exploitation reporting;

i. digital-literacy instruction;

j. screen-based curriculum limits; and

k. coordination with healthcare providers.

85. The Court should determine:

a. what measures were available;

b. what measures were adopted;

c. when they were adopted;

d. whether they were enforced;

e. whether they reduced harm; and

f. what cost remained after mitigation.

86. Mitigation analysis should remain reciprocal.

87. A platform should not benefit from an institution's inability to eliminate a platform-created breach.

88. An institution should not recover costs it could reasonably have avoided through authority it already possessed.

## 9. Public-Entity Claims Should Avoid Duplicative Recovery

89. The same underlying event may generate claims by:

a. the child;

199

b. the parent;

c. the school district;

d. the municipality;

e. the county;

f. the state;

g. a healthcare provider; and

h. another public program.

90. The Court should identify whether claimed public costs are:

a. independent;

b. derivative;

c. reimbursed;

d. overlapping;

e. already included in damages; or

f. recoverable under a separate statutory theory.

91. Public recovery should correspond to a distinct public injury.

## 10. The Additional-Burden Finding

92. For each public plaintiff, the Court should determine:

a. what breach occurred;

b. what existing duty the institution possessed;

c. what policies governed access;

d. what exposure the institution created or permitted;

e. what added burden followed;

f. what costs were ordinary;

g. what costs were incremental;

h. what mitigation occurred;

i. what other causes contributed; and

j. what net amount is fairly attributable to the defendant.

### C. Government Cannot Recover From a Platform for Incentives Government Left Intact

93. Government occupies a different position from an ordinary private plaintiff because government possesses legislative, regulatory, enforcement, educational, and fiscal authority.

200

94. Where the alleged conduct reflects an industry-wide incentive that remained lawful, broader correction belongs principally in legislation and regulation.

95. The attention economy rewards:

   a. time;

   b. frequency;

   c. return;

   d. impressions;

   e. interaction;

   f. advertising yield;

   g. user growth;

   h. retention;

   i. personalization; and

   j. commercial conversion.

96. These incentives are not unique to one platform.

97. They may operate across:

   a. social media;

   b. streaming;

   c. gaming;

   d. news;

   e. search;

   f. e-commerce;

   g. messaging;

   h. educational technology; and

   i. advertising markets.

98. Where government permitted those incentives to remain lawful and widely distributed, it should not recover from one platform as though that platform alone created the market structure.

99. This does not prevent government from enforcing:

   a. deception law;

   b. privacy law;

   c. child-data law;

   d. consumer-protection law;

e. reporting duties;

f. exploitation prohibitions;

g. competition law;

h. statutory safeguards; or

i. other defined legal obligations.

100.    The distinction is between enforcing an existing duty and retroactively converting a lawful market incentive into defendant-specific wrongdoing.

## 1. Government Defines the Market Boundary

101.    Government determines, through law and policy:

a. what data may be collected;

b. what consent is required;

c. what age restrictions apply;

d. what disclosures are mandatory;

e. what recommendation practices are permitted;

f. what safety duties exist;

g. what reporting obligations apply;

h. what remedies are available; and

i. what commercial incentives remain lawful.

102.    Where those rules are vague, incomplete, inconsistent, or absent, the resulting uncertainty is partly governmental.

103.    Courts can enforce existing duties.

104.    They should not be asked to reconstruct an entire industry code through damages imposed after the fact.

## 2. Lawful Industry-Wide Incentives Require Prospective Rules

105.    If the alleged defect is that all major platforms optimize for engagement, the corrective response should be platform-neutral.

106.    Potential legislative or regulatory responses may include:

a. standardized youth defaults;

b. common disclosure rules;

c. recommendation-objective transparency;

d. interoperable parental controls;

e. age-assurance standards;

202

f. youth-data limits;

g. independent audits;

h. research access;

i. outcome reporting;

j. notification standards;

k. safe harbors for verified compliance; and

l. penalties for defined violations.

107. These rules can alter the market without selectively punishing one firm for conduct shared across the industry.

### 3. Government Should Distinguish Unlawful Conduct From Defective Incentives

108. The Court should separate:

a. conduct already prohibited by law; and

b. conduct alleged to be harmful because the market rewards it.

109. The first may support direct enforcement and recovery.

110. The second may demonstrate the need for prospective lawmaking.

111. A lawful but socially defective incentive does not become retroactively unlawful merely because its consequences later appear undesirable.

112. The legal fix should be made at the level where the defect exists.

### 4. Government Should Account for Its Own Technology Policies

113. Government also operates schools, public-health systems, communications systems, and digital services.

114. Public institutions may themselves promote:

a. continuous connectivity;

b. online education;

c. digital identity;

d. app-based access;

e. remote participation;

f. screen-based administration;

g. algorithmic decision-making; and

h. data collection.

115. Government should account for those policies when alleging that digital habits created public expense.

116.    The issue is not equivalence between government systems and commercial platforms.

117.    The issue is causal completeness.

### 5. Enforcement Should Not Substitute for Legislation

118.    A public plaintiff may prefer litigation because it is faster, narrower, or financially attractive.

119.    Litigation cannot reliably establish a uniform prospective regime across an entire industry unless the governing duty already exists.

120.    A court order directed to one defendant may:

      a. shift users to competitors;

      b. reward less transparent firms;

      c. preserve the same incentive structure;

      d. encourage forum shopping;

      e. create inconsistent standards;

      f. distort competition; and

      g. fail to improve outcomes.

121.    Legislative correction can operate prospectively and uniformly.

### 6. Government May Recover for Defined Violations

122.    Government remains entitled to pursue direct legal violations.

123.    Those may include:

      a. false representations;

      b. unlawful data collection;

      c. invalid consent;

      d. concealment;

      e. statutory child-protection violations;

      f. failure to report exploitation;

      g. prohibited targeting;

      h. violation of injunctions;

      i. unfair commercial practices; or

      j. other defined breaches.

124.    Recovery should correspond to the violation proved.

125.    It should not become a substitute for missing industry-wide policy.

### 7. The Government-Incentive Finding

204

126.    For each governmental claim, the Court should determine:

a. whether the challenged conduct violated an existing duty;

b. whether the conduct was common across the industry;

c. whether government had legislated concerning it;

d. whether the alleged defect reflects a market incentive;

e. whether the requested remedy can operate platform-neutrally;

f. whether a defendant-specific order would merely shift the conduct elsewhere;

g. whether damages correspond to a defined public injury; and

h. whether prospective legislation is the more lawful corrective instrument.

### D. Public Plaintiffs Cannot Claim Stewardship Authority and Disown Stewardship Responsibility

127.    Public institutions routinely assert authority over children.

128.    Schools regulate:

a. attendance;

b. discipline;

c. curriculum;

d. devices;

e. classroom conduct;

f. counseling;

g. peer interaction;

h. safety;

i. reporting; and

j. intervention.

129.    Government regulates:

a. compulsory education;

b. child welfare;

c. healthcare access;

d. privacy;

e. public health;

f. consumer protection;

g. platform conduct;

h. criminal exploitation;

i. data use; and

j. institutional standards.

130. That authority carries responsibility.

131. A public institution cannot invoke custodial power when directing children and disclaim custodial responsibility when allocating consequences.

132. The governing binary should be stated carefully:

**Authority over children and responsibility for outcomes are reciprocal. An institution cannot invoke its custodial role when regulating children and disclaim that role when allocating the consequences of its own access, curriculum, supervision, or intervention choices.**

## 1. Authority and Responsibility Are Reciprocal

133. An institution that possesses authority to act also bears responsibility for the manner in which that authority is exercised.

134. A school that controls devices bears responsibility for device policy.

135. A school that controls classroom access bears responsibility for enforcement.

136. A school that observes dysfunction bears responsibility for institutional response.

137. A government that defines industry rules bears responsibility for the adequacy and clarity of those rules.

138. Reciprocal responsibility does not eliminate external liability.

139. It prevents public authority from becoming consequence-free.

## 2. Access Choices Carry Consequences

140. An institution that supplies or requires digital access should account for:

a. total screen exposure;

b. device dependence;

c. after-hours use;

d. notification burden;

e. app permissions;

f. student monitoring;

g. data collection;

h. social communication; and

i. opportunities for misuse.

141. Those consequences should be included in the baseline before external costs are assigned.

206

### 3. Curriculum Choices Carry Consequences

142.    Screen-based curriculum may be educationally justified.

143.    It may also increase:

   a. time on devices;

   b. habitual checking;

   c. multitasking;

   d. exposure to messaging;

   e. digital fatigue;

   f. after-hours connectivity; and

   g. difficulty separating educational and recreational use.

144.    A district should account for those effects when claiming that digital systems created educational harm.

### 4. Supervision Choices Carry Consequences

145.    Schools decide:

   a. whether devices are permitted;

   b. whether students may use phones during breaks;

   c. whether classrooms enforce bans;

   d. whether networks block services;

   e. whether violations are documented;

   f. whether parents are notified;

   g. whether repeated misuse triggers intervention; and

   h. whether staff are trained.

146.    Those decisions affect the causal environment.

147.    A platform may still be liable for a platform-controlled breach.

148.    The institution remains responsible for supervision within its own authority.

### 5. Intervention Choices Carry Consequences

149.    Institutions may respond to visible dysfunction through:

   a. counseling;

   b. discipline;

   c. parent contact;

   d. referral;

e. safety planning;

f. device restriction;

g. anti-bullying action;

h. law-enforcement contact;

i. crisis intervention; and

j. healthcare coordination.

150.    Delayed, partial, or ineffective intervention may contribute to continued harm.

151.    The Court should identify when the institution knew, what it could do, and what it actually did.

**6. Public Plaintiffs Should Not Externalize Ordinary Governance Failure**

152.    A public institution should not recover from a platform for costs primarily caused by:

a. unenforced rules;

b. poor device policy;

c. delayed counseling;

d. inadequate anti-bullying response;

e. institutional screen overuse;

f. failure to communicate with parents;

g. failure to address known peer conduct; or

h. failure to use authority already possessed.

153.    The defendant should remain responsible for any distinct breach that compounded those failures.

154.    Allocation, rather than absolution, is the proper rule.

**7. Public Authority May Increase the Duty to Account**

155.    Public plaintiffs exercise coercive and compulsory authority.

156.    Students are often required to attend school, comply with school rules, use school systems, and participate in assigned digital activity.

157.    That compulsory relationship strengthens the institution's duty to account for its own contribution.

158.    A private platform cannot compel school attendance.

159.    A school can compel participation in the institutional environment.

160.    That difference should be reflected in causal allocation.

**8. Governmental Recovery Should Preserve Institutional Incentives**

161.    A recovery framework should encourage public institutions to:

208

a. improve device policy;

b. reduce unnecessary screen exposure;

c. enforce clear rules;

d. monitor outcomes;

e. communicate with parents;

f. intervene promptly;

g. distinguish platform-specific harms from broader digital harms;

h. preserve evidence;

i. coordinate with healthcare providers; and

j. advocate for lawful industry-wide standards.

162.    A framework that reimburses all downstream costs without accounting for public conduct may weaken those incentives.

## 9. The Reciprocity Finding

163.    For each public plaintiff, the Court should determine:

a. what authority the institution possessed;

b. what duty accompanied that authority;

c. what access or exposure the institution created;

d. what policies governed use;

e. what dysfunction became visible;

f. what intervention was available;

g. what intervention occurred;

h. what platform-specific breach compounded the condition;

i. what added burden followed; and

j. what portion of the total cost remains fairly external.

### E. Public Claims Should Be Resolved Through a Net-Externality Framework

164.    The Court can unify school-district and governmental claims through a net-externality framework.

165.    That framework should distinguish:

a. baseline public duty;

b. institution-created exposure;

c. institution-controlled conditions;

209

d. third-party misconduct;

e. platform-specific breach;

f. added public burden;

g. mitigation;

h. overlapping recovery;

i. industry-wide defect; and

j. net compensable expense.

166.    The public plaintiff should recover the negative externality the defendant actually transferred to it.

167.    It should not recover the cost of duties the institution already possessed or burdens it materially created.

168.    The defendant should not escape liability merely because the public plaintiff also possessed responsibility.

169.    Each actor should answer for its own contribution.

170.    The governing principle is:

**Public expenditure does not itself establish external causation. A school district or government should identify the platform-specific breach, the preexisting public duty, the institution's own contribution to access and dysfunction, the mitigation available, and the net additional expense caused by the defendant. Where the alleged defect is an industry-wide incentive left lawful by government, durable correction belongs in platform-neutral legislation rather than retroactive transfer of the entire public burden to one firm.**

---

## IX. THE COURT SHOULD DISTINGUISH PLATFORM-WIDE FROM INDUSTRY-WIDE DEFECTS

1.  The Court should distinguish defects arising within a particular platform from defects arising across the commercial structure of the industry.

2.  That distinction is necessary because the source of a defect determines:

a. who created it;

b. who controls it;

c. what evidence can prove it;

d. what duty governs it;

e. what remedy can correct it; and

f. whether adjudication or legislation is the proper institutional response.

3. A platform-wide defect is attributable to a particular company's own representations, systems, controls, data practices, objectives, or operational choices.

4. An industry-wide defect arises from incentives, architectures, standards, and competitive pressures shared across multiple firms.

5. The two categories may overlap.

6. A particular platform may implement an industry-wide incentive more aggressively, conceal it more completely, or combine it with company-specific misconduct.

7. That overlap does not eliminate the need to identify the level at which the defect exists.

8. Without that distinction, a court may impose a platform-specific remedy upon a market-wide problem.

9. Such a remedy may punish one firm while leaving the operative incentive intact.

10. It may shift users, attention, data, advertisers, and revenue to competitors that employ the same structure.

11. It may also discourage documentation and transparency by making the most candid firm the easiest litigation target.

12. The proper inquiry is therefore:

    a. Is the challenged conduct unique to the defendant?

    b. Is it common across the industry?

    c. Did the defendant materially depart from industry practice?

    d. Did the defendant make a false or misleading representation concerning its own practice?

    e. Did the defendant violate an existing statutory or legal duty?

    f. Can the defendant correct the defect through its own systems?

    g. Would a defendant-specific remedy improve user outcomes or merely relocate the activity?

    h. Does durable correction require a prospective rule applied across the market?

13. The Court can enforce direct platform duties while preserving the boundary between adjudication and industry governance.

14. The governing principle is:

    **Platform-wide misconduct should be adjudicated against the platform that created or controlled it. Industry-wide defects should be corrected through standards capable of reaching the industry in which the defect operates.**

### A. Platform-Wide Defects Arise Within a Particular Company

15. Platform-wide defects arise from conduct, systems, representations, or failures controlled by a particular company.

211

16. These defects can be adjudicated directly because the relevant evidence and corrective capacity reside with the defendant.

17. They may include:

    a. false or misleading statements;

    b. specific recommendation objectives;

    c. specific age-control failures;

    d. specific data practices;

    e. specific safety-tool deficiencies;

    f. specific illegal-content pathways;

    g. specific account-recreation systems;

    h. specific notification practices;

    i. specific exploitation-response failures;

    j. specific concealment of internal findings; and

    k. specific conflicts between public representations and actual operation.

18. The Court should identify the smallest defendant-controlled unit capable of proof and correction.

## 1. False or Misleading Statements

19. False statements are platform-wide where the company itself makes a material representation concerning:

    a. youth safety;

    b. age enforcement;

    c. parental controls;

    d. data privacy;

    e. harmful-content reduction;

    f. underage-account prevalence;

    g. recommendation systems;

    h. exploitation prevention;

    i. time-management tools;

    j. internal research; or

    k. the relationship between engagement and wellbeing.

20. These claims are defendant-specific because the platform controls:

    a. the statement;

212

b. the underlying information;

c. the system being described;

d. the audience receiving the statement; and

e. the corrective disclosure.

21. A court can compare:

a. what the platform said;

b. what it knew;

c. what it did;

d. whether the discrepancy was material; and

e. what harm followed.

22. No industry-wide rule is necessary to determine whether a particular company materially misrepresented its own system.

## 2. Specific Recommendation Objectives

23. Recommendation systems may share broad industry characteristics while still reflecting company-specific objectives and constraints.

24. A platform-wide defect may arise where a company:

a. optimizes for a defined objective associated with known harm;

b. uses youth or vulnerability signals improperly;

c. removes or weakens safety constraints;

d. repeatedly escalates users into defined harmful pathways;

e. conceals the operative objective;

f. misrepresents how recommendations work; or

g. ignores internal evidence concerning the consequences of its own architecture.

25. The Court should determine:

a. what objective governed;

b. what signals were used;

c. what constraints applied;

d. what internal evidence existed;

e. what the platform represented;

f. what exposure changed; and

g. what incremental harm resulted.

213

26. Even where engagement optimization is industry-wide, a particular implementation may remain uniquely adjudicable.

### 3. Specific Age-Control Failures

27. A platform-wide age-control defect may arise from:

   a. reliance on a particular verification method;

   b. tolerance of contradictory age signals;

   c. repeated-account recreation;

   d. weak parental-consent procedures;

   e. inconsistent enforcement;

   f. misleading age-safety claims;

   g. failure to link known related accounts;

   h. failure to act on direct notice; or

   i. use of underage activity for commercial purposes.

28. These are company-specific facts.

29. The Court can determine whether the platform's actual age-control system corresponded with its legal duties and public representations.

30. The Court can also impose corrective relief directed to the identified failure.

### 4. Specific Data Practices

31. A company's data practices are directly within its control.

32. Platform-wide defects may include:

   a. unlawful collection;

   b. invalid consent;

   c. prohibited inference;

   d. excessive retention;

   e. undisclosed secondary use;

   f. unlawful targeting;

   g. improper transfer;

   h. failure to delete;

   i. inaccurate privacy representation; or

   j. use of sensitive youth data to shape exposure.

33. The Court can identify:

a. what data was collected;

b. from whom;

c. at what age;

d. under what authority;

e. for what purpose;

f. how it was used;

g. how long it was retained; and

h. what injury followed.

34. These questions do not depend on proving an industry-wide defect.

**5. Specific Safety-Tool Deficiencies**

35. Safety tools are platform-wide where the company designs, describes, deploys, and monitors them.

36. Deficiencies may include:

a. ineffective parental controls;

b. misleading time-management tools;

c. weak contact restrictions;

d. defective reporting systems;

e. ineffective nighttime controls;

f. unreliable account deletion;

g. inadequate repeat-offender detection;

h. false claims of harmful-content reduction; or

i. known failure of crisis-response features.

37. The Court should determine:

a. what the tool promised;

b. how it operated;

c. what limitations were known;

d. whether those limitations were disclosed;

e. whether users or custodians relied; and

f. what incremental harm followed.

38. A platform-specific order can require validation, disclosure, correction, auditing, or functional improvement.

215

## 6. Specific Illegal-Content or Exploitation Pathways

39. A platform-wide defect may arise from a known pathway through which unlawful material, predatory contact, or exploitation repeatedly occurs.

40. Such pathways may involve:

> a. account recommendations;
>
> b. contact suggestions;
>
> c. search tools;
>
> d. public profile defaults;
>
> e. repeat-offender reentry;
>
> f. weak reporting systems;
>
> g. inadequate preservation;
>
> h. failure to act after notice;
>
> i. monetization of unlawful activity; or
>
> j. concealment of recurring system failure.

41. The Court can identify the pathway, the notice, the duty, the failure, and the resulting harm.

42. These claims should be adjudicated directly and separately from broader industry questions.

## 7. Specific Notification Practices

43. A company may adopt notification practices that differ materially from competitors.

44. Platform-wide defects may include:

> a. sending youth-directed prompts during sleep periods;
>
> b. repeated notifications after nonresponse;
>
> c. socially coercive notification language;
>
> d. restoring disabled notifications;
>
> e. misleading users concerning notification settings;
>
> f. using vulnerability signals to time prompts; or
>
> g. failing to apply age-sensitive defaults.

45. These are measurable, company-controlled operations.

46. The Court can assess their purpose, design, representation, and effect.

## 8. Specific Account Architecture

47. Account architecture may create platform-wide defects where it:

> a. permits repeated recreation after restriction;

216

b. allows controls to apply to one account but not linked accounts;

c. obscures deletion;

d. preserves data after represented termination;

e. enables circumvention of parental limits;

f. fails to recognize known minor accounts; or

g. makes account closure materially more difficult than account creation.

48. These are not abstract market incentives.

49. They are particular product and service choices.

## 9. Specific Concealment

50. Concealment is platform-wide where a company possesses and withholds material information concerning its own systems.

51. That information may concern:

a. internal health findings;

b. known control failures;

c. underage-account prevalence;

d. exploitation pathways;

e. recommendation effects;

f. data practices;

g. conflicts between safety and revenue objectives; or

h. the practical limits of public safeguards.

52. The Court can adjudicate whether the omission or contradiction was material and causally significant.

## 10. Platform-Wide Defects Support Direct Remedies

53. Where a defect is platform-wide, the defendant ordinarily possesses corrective capacity.

54. Appropriate remedies may include:

a. corrective disclosure;

b. restitution;

c. statutory penalties;

d. control validation;

e. data deletion or restriction;

f. account-system modification;

217

g. recommendation constraints;

h. notification limits;

i. preservation and reporting;

j. independent auditing;

k. exploitation-pathway correction; and

l. monitoring of future representations.

55. The remedy should remain tied to the proved defect.

## 11. The Platform-Wide Finding

56. For each alleged platform-wide defect, the Court should determine:

a. what company-specific conduct occurred;

b. what system, representation, or practice the defendant controlled;

c. what duty governed;

d. what internal knowledge existed;

e. what breach occurred;

f. what harm followed;

g. what correction lies within the defendant's capacity; and

h. whether the proposed remedy reaches the defect directly.

### B. Industry-Wide Defects Arise From the Shared Commercial Environment

57. Industry-wide defects arise from common incentives, architectures, and competitive conditions operating across multiple firms.

58. These defects may be serious.

59. Their seriousness does not make them company-specific.

60. They may include:

a. attention monetization;

b. engagement as the dominant success measure;

c. advertising dependence;

d. retention-based competition;

e. infinite content supply;

f. notification-driven return;

g. profiling;

h. weak interoperability of parental controls;

i. nonstandardized age assurance;

j. opaque recommendation objectives;

k. absence of shared user-health metrics;

l. fragmented research access;

m. inconsistent youth defaults;

n. inconsistent reporting standards; and

o. the lack of common auditability.

61. These conditions emerge from the structure of the market rather than from one company alone.

62. Competition may pressure firms to adopt similar practices even where no single practice is independently unlawful.

63. Durable correction therefore requires standards capable of reaching the market in which the incentive operates.

## 1. Attention Monetization

64. Many digital services convert attention into commercial value.

65. Revenue may increase with:

a. time spent;

b. impressions;

c. repeated return;

d. interaction;

e. data generation;

f. advertising exposure;

g. subscription retention; or

h. commercial conversion.

66. This model is not unique to social media.

67. It may also operate in:

a. streaming;

b. gaming;

c. news;

d. search;

e. e-commerce;

f. messaging;

219

g. educational technology; and

h. entertainment services.

68. A single platform judgment cannot eliminate the underlying conversion of attention into revenue.

69. It may change which company receives the attention.

## 2. Engagement as the Dominant Success Measure

70. Engagement may function as the principal measure of system performance.

71. Common engagement measures include:

a. session duration;

b. frequency of return;

c. click-through;

d. watch time;

e. comments;

f. shares;

g. impressions;

h. daily active use;

i. account growth; and

j. advertising yield.

72. These measures describe activity.

73. They do not necessarily describe user benefit.

74. Where the industry broadly treats activity as a proxy for value, the defect lies in the metric structure shared across the market.

75. A single-company remedy may reduce one metric while leaving the market's success criteria unchanged.

## 3. Advertising Dependence

76. Advertising dependence can create pressure to increase:

a. audience size;

b. data collection;

c. targeting;

d. frequency;

e. retention;

f. impressions;

g. emotional salience; and

h. commercial responsiveness.

77. These pressures may operate across many platforms.

78. A judgment against one firm may redirect advertisers to another firm using the same incentives.

79. Durable correction may require common rules concerning youth targeting, data use, transparency, and outcome measurement.

## 4. Retention-Based Competition

80. Firms may compete for the same finite user attention.

81. That competition may reward systems that:

a. increase return;

b. reduce friction;

c. encourage continuous use;

d. deepen personalization;

e. create switching costs;

f. preserve social dependence;

g. increase account persistence; and

h. make disengagement less attractive.

82. A single platform that unilaterally reduces retention may lose users to competitors.

83. That competitive pressure supports the need for common standards where the practice is industry-wide.

## 5. Infinite or Effectively Endless Content Supply

84. Many services provide content streams without a natural stopping point.

85. Endless supply may arise through:

a. infinite scroll;

b. autoplay;

c. continuous recommendation;

d. live content;

e. real-time feeds;

f. messaging;

g. algorithmic refresh; and

h. large-scale content libraries.

221

86. The absence of a stopping cue may be common across the industry.

87. If the law concludes that youth-facing systems require specific stopping architecture, that duty should be defined prospectively and uniformly.

**6. Notification-Driven Return**

88. Notifications are used across digital markets to prompt return.

89. They may include:

        a. direct-message alerts;

        b. social responses;

        c. content recommendations;

        d. streak reminders;

        e. shopping prompts;

        f. game events;

        g. streaming alerts;

        h. school communications; and

        i. news alerts.

90. The legal and policy problem is therefore broader than one platform.

91. Common rules may be needed concerning:

        a. timing;

        b. frequency;

        c. youth defaults;

        d. sleep periods;

        e. override;

        f. disclosure; and

        g. custodial control.

**7. Profiling**

92. Profiling is common across advertising, recommendation, commerce, search, entertainment, and educational systems.

93. It may involve:

        a. inferred interests;

        b. age;

        c. relationships;

222

d. vulnerability;

e. purchasing behavior;

f. location;

g. emotional state;

h. return probability; and

i. likely response to content.

94. A platform may violate specific data duties.

95. The broader question of what profiling should be permitted for minors requires common standards.

96. Without common standards, restricting one firm may shift profiling activity to another.

## 8. Weak Interoperability of Parental Controls

97. Parents often must manage different controls across:

a. devices;

b. operating systems;

c. app stores;

d. platforms;

e. browsers;

f. gaming systems;

g. messaging services; and

h. school-issued technology.

98. Controls may not communicate with one another.

99. A restriction imposed at one layer may be ineffective at another.

100. A child may move between accounts, devices, or services.

101. This fragmentation is an industry-wide governance defect.

102. A remedy directed to one platform may improve one control while leaving the custodial system fragmented.

## 9. Nonstandardized Age Assurance

103. Age assurance may vary widely across firms.

104. Systems may rely on:

a. self-declaration;

b. identity documents;

c. parental consent;

d. device settings;

e. behavioral inference;

f. image estimation;

g. payment information;

h. linked accounts; or

i. combinations of those methods.

105. Each method creates tradeoffs involving:

a. privacy;

b. accuracy;

c. exclusion;

d. data minimization;

e. false positives;

f. false negatives;

g. accessibility; and

h. security.

106. A uniform legal standard should define the acceptable level of assurance and the permitted means of achieving it.

107. Without such a standard, courts risk imposing inconsistent duties across firms.

### 10. Opaque Recommendation Objectives

108. Users, parents, researchers, and regulators often cannot determine what objectives govern recommendation systems.

109. The opacity may concern:

a. relevance;

b. watch time;

c. return probability;

d. advertising yield;

e. relationship strength;

f. satisfaction;

g. safety reduction;

h. diversity; or

224

i. the weighting among these objectives.

110. A particular platform may misrepresent its system.

111. The broader absence of standardized objective disclosure is industry-wide.

112. Common disclosure rules could permit meaningful comparison across services.

**11. Absence of Shared User-Health Metrics**

113. The industry commonly measures platform performance through activity and revenue.

114. It lacks standardized measures for:

a. user benefit;

b. regret;

c. unwanted return;

d. sleep displacement;

e. successful completion;

f. substitution;

g. control efficacy;

h. harmful escalation;

i. exploitation exposure;

j. post-use satisfaction; and

k. changes in actual relationships.

115. Without shared metrics, companies can claim safety or benefit using incomparable measures.

116. Courts may then receive conflicting evidence that cannot be meaningfully compared.

117. The absence of common metrics is a governance problem larger than one defendant.

**12. Fragmented Research Access**

118. Independent researchers may receive unequal or selective access to platform data.

119. The result may be:

a. inconsistent findings;

b. dependence on company-selected data;

c. inability to compare platforms;

d. weak replication;

e. privacy concerns;

f. selective publication; and

g. limited ability to evaluate long-term effects.

120. A durable solution requires common privacy-preserving research standards.

## 13. Inconsistent Youth Defaults

121. Youth-facing defaults may differ across platforms concerning:

a. privacy;

b. contact permissions;

c. recommendation;

d. notifications;

e. nighttime use;

f. data collection;

g. advertising;

h. location; and

i. discoverability.

122. Where minimum youth defaults are necessary, they should be defined across the industry.

## 14. Lack of Common Auditability

123. Platforms may differ in whether they preserve and disclose:

a. objective changes;

b. model updates;

c. safety constraints;

d. control testing;

e. age-enforcement data;

f. recommendation pathways;

g. exploitation reports;

h. material incidents; and

i. outcome measures.

124. Common auditability standards would allow regulators and courts to evaluate systems without relying exclusively on self-description.

## 15. The Industry-Wide Finding

125. For each alleged industry-wide defect, the Court should determine:

a. whether the practice is common across firms;

b. whether the incentive arises from the market structure;

226

c. whether the conduct remained lawful;

d. whether the defendant materially departed from the industry norm;

e. whether the defendant misrepresented its own practice;

f. whether a defendant-specific remedy can correct the condition;

g. whether users would shift elsewhere; and

h. what common prospective standard would address the defect at its source.

### C. A Platform-Specific Judgment Cannot Repair an Industry-Wide Incentive

126.    A judgment directed to one platform may correct company-specific misconduct.

127.    It cannot reliably eliminate an incentive shared across the market.

128.    Where the defect is industry-wide, a defendant-specific remedy may:

a. shift users elsewhere;

b. move advertising revenue;

c. move data collection;

d. encourage less documentation;

e. reward opaque competitors;

f. preserve the same engagement model;

g. fragment legal standards;

h. distort competition;

i. produce no improvement in user condition; or

j. drive activity toward less transparent services.

129.    The Court should evaluate not merely whether a remedy burdens the defendant, but whether it corrects the condition.

### 1. User Substitution

130.    Users may respond to a restriction on one platform by moving to:

a. another social-media service;

b. messaging;

c. gaming;

d. streaming;

e. anonymous forums;

f. image boards;

g. foreign services;

227

h. less regulated applications; or

i. newly emerging platforms.

131.    Platform exit is not the same as reduced harm.

132.    The Court should distinguish:

a. account closure;

b. reduced total exposure;

c. substitution;

d. improved wellbeing;

e. migration to a higher-risk service; and

f. displacement of the same behavior.

## 2. Advertising Revenue May Move Rather Than Disappear

133.    Advertisers generally seek audience attention.

134.    If one platform becomes less effective at retaining youth attention, advertising demand may move to a competitor.

135.    The market incentive remains intact.

136.    A remedy that changes the recipient of revenue without changing the governing rules does not repair the commercial structure.

## 3. Documentation Disincentives

137.    A litigation regime that penalizes the company with the most developed internal research may create incentives to:

a. conduct less research;

b. document less candidly;

c. decentralize decision-making;

d. reduce written analysis;

e. limit internal testing;

f. obscure objective functions; or

g. avoid preserving evidence beyond minimum requirements.

138.    That result would reduce institutional learning and public accountability.

139.    Remedies should reward verified transparency and correction rather than create an advantage for ignorance.

## 4. Opaque Competitors May Benefit

228

140. A transparent platform may appear more culpable because its internal evidence is discoverable.

141. A less transparent competitor may employ similar or worse practices while producing fewer records.

142. A defendant-specific remedy should therefore be calibrated to proved misconduct without creating a market reward for opacity.

143. Common disclosure and audit rules are better suited to correct that asymmetry.

## 5. The Engagement Model May Remain Unchanged

144. A court may prohibit or modify one feature while the industry continues optimizing for the same underlying objective.

145. The defendant may replace:

a. one notification with another;

b. one recommendation signal with another;

c. one retention feature with another;

d. one data source with another; or

e. one youth-facing interface with another.

146. Competitors may continue using the original structure.

147. A remedy directed at symptoms may therefore leave the root incentive intact.

## 6. User Condition May Not Improve

148. A remedy should be judged by whether it improves the relevant human outcome.

149. It may fail where it:

a. shifts use elsewhere;

b. increases isolation;

c. disrupts beneficial relationships;

d. reduces access to support communities;

e. increases surveillance;

f. encourages evasion;

g. drives users to unregulated services; or

h. leaves the underlying psychological or social demand unresolved.

150. The Court should distinguish platform burden from user benefit.

## 7. Fragmented Orders May Produce Inconsistent Duties

151. Different courts may impose different requirements concerning:

229

a. age assurance;

b. recommendation;

c. notification;

d. parental controls;

e. data use;

f. youth defaults;

g. transparency; and

h. auditability.

152.    A national industry cannot function coherently under conflicting technical duties.

153.    Uniform prospective standards are the more durable solution for market-wide defects.

## 8. Competitive Distortion

154.    A company-specific remedy may alter competition in ways unrelated to user welfare.

155.    It may:

a. increase compliance costs for one firm;

b. favor smaller but less transparent firms;

c. favor foreign competitors;

d. encourage vertical integration;

e. reduce entry;

f. shift advertising markets; or

g. change product design without changing outcomes.

156.    Those consequences do not bar relief.

157.    They reinforce the need to distinguish company-specific correction from market-wide governance.

## 9. The Remedy-Effect Finding

158.    Before imposing structural relief directed to an alleged industry-wide defect, the Court should determine:

a. whether the defendant uniquely controls the defect;

b. whether competitors employ the same practice;

c. whether users can substitute;

d. whether revenue will migrate;

e. whether the remedy changes the operative incentive;

230

f. whether the remedy improves user outcomes;

g. whether the remedy rewards opacity;

h. whether conflicting standards may result; and

i. whether prospective industry-wide regulation is required.

### D. Industry-Wide Defects Require Industry-Wide Standards

159. Industry-wide defects require rules capable of reaching the market as a whole.

160. The Court can identify that boundary without legislating.

161. It can state clearly which proved wrongs are adjudicable and which broader defects require prospective standard-setting.

162. The appropriate division is:

**Adjudication can correct proved deception, unlawful data practices, defeated controls, illegal pathways, and other platform-controlled misconduct. Legislatures and regulators must establish prospective duties where the alleged defect is common to the market rather than unique to the defendant.**

163. This distinction preserves judicial authority while preventing courts from becoming retrospective industry designers.

### 1. Courts Can Enforce Existing Duties

164. Courts are well positioned to adjudicate:

a. false statements;

b. concealment;

c. unlawful data collection;

d. invalid consent;

e. defective represented controls;

f. failure after legally sufficient notice;

g. prohibited targeting;

h. statutory violations;

i. unlawful exploitation pathways;

j. platform-created escalation; and

k. damages attributable to proved conduct.

165. These claims possess identifiable actors, duties, evidence, and remedies.

### 2. Legislatures Can Establish Prospective Uniform Duties

166. Legislatures can establish standards concerning:

231

a. age assurance;

b. youth-data collection;

c. profiling;

d. notification timing;

e. recommendation-objective disclosure;

f. parental-control interoperability;

g. youth defaults;

h. research access;

i. independent audits;

j. safety-tool validation;

k. externality reporting;

l. user-health measures;

m. safe harbors; and

n. enforcement.

167.    These standards can apply prospectively and platform-neutrally.

### 3. Regulators Can Supply Technical Detail

168.    Regulators can define:

a. acceptable verification methods;

b. testing protocols;

c. reporting formats;

d. audit frequency;

e. material-change thresholds;

f. data-retention limits;

g. privacy-preserving research access;

h. youth-specific defaults;

i. control-efficacy measures; and

j. compliance procedures.

169.    Technical standards can evolve without requiring repeated litigation over every product change.

### 4. Common Standards Should Preserve Lawful Expression

170.    Industry-wide rules should distinguish:

232

a. regulation of platform machinery;

b. regulation of data practices;

c. regulation of commercial representations;

d. protection against unlawful exploitation; and

e. punishment of lawful third-party expression.

171.    Rules should target objectives, controls, data, timing, disclosure, and measurable operation rather than lawful viewpoints or messages.

## 5. Common Standards Should Preserve Privacy

172.    Child-protection systems should not require unlimited collection of identity and behavioral data.

173.    Age assurance, auditing, and safety evaluation should incorporate:

a. data minimization;

b. proportionality;

c. limited retention;

d. secure processing;

e. calibrated confidence;

f. human review;

g. appeal; and

h. independent oversight.

174.    A governance system that protects children by creating pervasive surveillance may produce a different form of harm.

## 6. Common Standards Should Measure Outcomes, Not Merely Compliance Form

175.    Formal compliance does not establish functional protection.

176.    Standards should evaluate:

a. whether controls work;

b. whether users understand them;

c. whether circumvention persists;

d. whether harmful pathways decline;

e. whether substitution occurs;

f. whether sleep-period exposure changes;

g. whether exploitation reports improve;

h. whether user benefit changes; and

i. whether the same externality moves elsewhere.

177.    The goal should be correction of operation, not production of paperwork alone.

## 7. Common Standards Should Create Transparency Without Rewarding Ignorance

178.    Firms should be encouraged to:

a. conduct internal research;

b. preserve material findings;

c. test safeguards;

d. disclose material limitations;

e. identify objective conflicts;

f. correct known defects; and

g. submit to independent review.

179.    Safe-harbor or mitigation structures may reward verified transparency and timely correction.

180.    A firm that studies, reports, and repairs a defect should not be placed in a worse position than a firm that remains deliberately opaque.

## 8. Common Standards Should Be Interoperable

181.    Child stewardship operates across devices, operating systems, application stores, platforms, schools, and households.

182.    Effective controls should therefore be capable of operating across:

a. multiple accounts;

b. multiple devices;

c. multiple platforms;

d. custodial settings;

e. school-managed environments; and

f. age transitions.

183.    A fragmented system leaves parents responsible in principle but ineffective in practice.

## 9. Common Standards Should Distinguish Risk Levels

184.    Not every feature, user, age group, or service presents the same risk.

185.    Standards may distinguish:

a. younger children;

b. older adolescents;

c. direct messaging;

d. public discovery;

e. commercial targeting;

f. exploitation risk;

g. health-related content;

h. nighttime notifications;

i. high-confidence vulnerability signals; and

j. ordinary lawful expression.

186.    Proportional regulation is more durable than a universal prohibition.

## 10. Common Standards Should Preserve Human Authority

187.    Automated systems may assist with:

a. age assurance;

b. pathway detection;

c. control validation;

d. risk identification;

e. audit;

f. objective comparison;

g. material-change review; and

h. outcome measurement.

188.    Final legal and custodial authority should remain human.

189.    Governance should include:

a. auditable reasons;

b. traceable records;

c. defined uncertainty;

d. human review;

e. appeal;

f. correction;

g. public accountability; and

h. privacy protection.

## 11. The Institutional-Boundary Finding

190.    The Court should determine:

235

a. what part of the alleged defect is defendant-specific;

b. what part is industry-wide;

c. what existing duty can be enforced now;

d. what remedy the defendant can implement;

e. what market incentive remains beyond the case;

f. what prospective standard is needed;

g. what institution possesses authority to establish it; and

h. how the judgment can preserve that boundary.

### E. The Court Should Prevent Level-of-Analysis Error

191.    The distinction between platform-wide and industry-wide defects is ultimately a distinction concerning level of analysis.

192.    A defect should be corrected at the level where it is created and maintained.

193.    The relevant levels include:

a. user conduct;

b. custodial conduct;

c. school or institutional conduct;

d. platform conduct;

e. industry incentive;

f. market structure;

g. legislation;

h. regulation; and

i. broader culture.

194.    Error occurs when a condition created at one level is assigned to another without proof.

195.    Examples include:

a. assigning custodial failure to a platform;

b. assigning a platform's deception to parents;

c. assigning third-party crime to lawful expression;

d. assigning industry-wide engagement incentives to one firm;

e. assigning cultural dysfunction to a recommendation system without identifying the added mechanism; or

f. assigning legislative incompleteness to judicial damages.

196.    The Court should identify the level at which each defect exists before selecting the remedy.

### F. The Court Should Apply a Two-Level Defect Test

197.    For every alleged structural defect, the Court should ask two sets of questions.

198.    The first concerns platform-wide responsibility:

a. Did the defendant create or uniquely control the conduct?

b. Did the defendant possess superior knowledge?

c. Did the defendant make a material representation?

d. Did the defendant violate an existing duty?

e. Did the defendant's conduct create a measurable increment of harm?

f. Can the defendant correct the condition directly?

199.    The second concerns industry-wide responsibility:

a. Is the practice common across competitors?

b. Does the market reward the practice?

c. Would unilateral correction disadvantage the firm without removing the incentive?

d. Would users or revenue shift elsewhere?

e. Is a uniform prospective standard required?

f. Does correction require coordination among devices, app stores, platforms, schools, and regulators?

200.    The answers should determine the remedy.

201.    A platform-wide wrong supports defendant-specific relief.

202.    An industry-wide defect supports a judicially identified boundary and a prospective governance response.

203.    Where both are present, the Court can do both:

a. adjudicate the defendant's proved misconduct; and

b. decline to transfer the remaining market-wide defect into company-specific liability.

204.    The governing principle is:

**The Court should correct the defendant's own deception, unlawful operation, defective controls, data violations, exploitative pathways, and platform-created increments of harm. It should identify, rather than silently absorb, the separate defects produced by attention markets, shared metrics, fragmented controls, inconsistent age assurance, opaque objectives, and the absence of common standards. Durable correction requires liability at the platform level and governance at the industry level.**

## X. THE ROOT DEFECT IS THE USE OF SYSTEM PERFORMANCE AS A PROXY FOR HUMAN BENEFIT

1. The deeper defect underlying many of the claims in these proceedings is not merely that platforms seek engagement.

2. It is that engagement and related system-performance measures are often treated as proxies for user benefit.

3. That substitution is analytically unsound.

4. A system may become highly effective at retaining attention while becoming less effective at serving the user's actual purpose.

5. It may increase time, return, impressions, and interaction while decreasing satisfaction, sleep, concentration, social connection, or successful completion.

6. The resulting problem is not simply "too much engagement."

7. It is a measurement failure.

8. The system is rewarded according to what is easy to count rather than what is important to preserve.

9. The dominant metrics may show that the platform successfully produced:

   a. additional time;

   b. additional activity;

   c. additional data;

   d. additional exposure;

   e. additional return;

   f. additional advertising inventory; and

   g. additional commercial value.

10. Those metrics do not establish that the user received corresponding value.

11. Where system performance is treated as human benefit, the platform may optimize successfully against the wrong objective.

12. A platform may then appear to improve because its users remain longer, return more often, interact more frequently, and generate greater revenue.

13. The same data may conceal:

   a. unwanted use;

   b. regret;

   c. failed attempts to disengage;

238

d. displacement of sleep;

e. reduction in concentration;

f. worsening of actual relationships;

g. substitution from one service to another;

h. repeated circumvention of custodial controls;

i. exposure escalation; and

j. continued use without corresponding benefit.

14. The Court should therefore distinguish:

a. measures of system activity;

b. measures of commercial performance;

c. measures of user preference;

d. measures of user benefit;

e. measures of user harm;

f. measures of custodial control;

g. measures of substitution; and

h. measures of long-term outcome.

15. That distinction matters to causation, deception, remedy, and future governance.

16. A platform that publicly equates increased engagement with user benefit may materially misrepresent what its metrics actually establish.

17. A platform that knows its systems increase activity while concealing evidence of regret, displacement, or deterioration may create a direct disclosure problem.

18. A regulator or court that accepts engagement as proof of benefit may preserve the same defect it seeks to correct.

19. The governing proposition is:

**A measure of what the system induced the user to do is not necessarily a measure of what the system did for the user.**

## A. Engagement Measures Activity, Not Welfare

20. Engagement is a measure of behavior within the system.

21. It commonly includes:

a. session duration;

b. impressions;

c. return frequency;

239

d. click-through;

e. comments;

f. shares;

g. likes;

h. messages;

i. watch time;

j. scroll depth;

k. daily active use;

l. account growth;

m. advertising yield; and

n. commercial conversion.

22.  These metrics may be useful for measuring system performance.

23.  They may show that a platform successfully:

a. attracted attention;

b. retained users;

c. increased interaction;

d. distributed content;

e. facilitated communication;

f. generated advertising inventory;

g. predicted return behavior;

h. maintained account activity; and

i. produced commercial revenue.

24.  They do not necessarily measure:

a. user benefit;

b. satisfaction;

c. social connection;

d. mental health;

e. chosen duration;

f. successful completion;

g. regret;

h. substitution;

i. sleep;

j. concentration;

k. improvement in actual relationships;

l. reduction in distress;

m. alignment with custodial instruction; or

n. long-term welfare.

25. A user may spend more time because the service is valuable.

26. A user may also spend more time because the service:

a. withholds a stopping cue;

b. presents an unresolved social prompt;

c. sends repeated notifications;

d. introduces continual novelty;

e. exploits fear of exclusion;

f. encourages compulsive checking;

g. frustrates completion;

h. repeats emotionally salient content;

i. makes disengagement difficult; or

j. serves as an avoidance mechanism for an underlying problem.

27. The same engagement metric may therefore reflect benefit, compulsion, unresolved demand, or some combination of those conditions.

28. It cannot be treated as self-interpreting.

## 1. Session Duration

29. Session duration measures how long the service remained in use.

30. It does not establish why the user remained.

31. Long duration may reflect:

a. successful communication;

b. creative production;

c. schoolwork;

d. entertainment;

e. passive viewing;

241

  f. unresolved conflict;

  g. repeated recommendation;

  h. automatic playback;

  i. social obligation;

  j. habit;

  k. boredom;

  l. emotional avoidance;

  m. difficulty disengaging; or

  n. clinically significant impairment.

32. Duration should therefore be paired with evidence concerning:

  a. user purpose;

  b. whether that purpose was completed;

  c. whether the user intended the duration;

  d. whether the user later regretted it;

  e. whether a control was activated;

  f. whether the user attempted to stop;

  g. whether the session displaced another activity; and

  h. whether the same demand migrated elsewhere.

**2. Impressions**

33. Impressions measure exposure.

34. They do not establish attention, comprehension, benefit, reliance, or injury.

35. A user may receive many impressions without meaningful engagement.

36. A smaller number of highly targeted impressions may produce greater effect.

37. The Court should therefore distinguish:

  a. total impressions;

  b. viewed impressions;

  c. repeated impressions;

  d. targeted impressions;

  e. age-sensitive impressions;

  f. commercial impressions;

242

g. harmful-content impressions; and

h. impressions materially connected to the alleged injury.

38. Impression volume is a system metric.

39. Legal significance depends on the pathway and consequence.

**3. Return Frequency**

40. Return frequency measures how often a user reenters the service.

41. It does not establish why the user returned.

42. Return may be prompted by:

a. a direct message;

b. a school communication;

c. a notification;

d. habit;

e. social pressure;

f. unfinished interaction;

g. boredom;

h. support-seeking;

i. fear of exclusion;

j. recommendation;

k. commercial promotion; or

l. a platform-generated prompt.

43. A useful return may indicate value.

44. An unwanted return may indicate friction, compulsion, unresolved demand, or an ineffective control.

45. The metric should distinguish those conditions.

**4. Click-Through**

46. Click-through measures whether a user acted on a prompt.

47. It does not establish whether the action benefited the user.

48. A click may reflect:

a. genuine interest;

b. curiosity;

c. confusion;

   d. emotional arousal;

   e. fear;

   f. accidental selection;

   g. social obligation;

   h. deceptive design;

   i. commercial targeting; or

   j. vulnerability-based prompting.

49. The same click can be commercially valuable while personally harmful.

50. Click-through should therefore not be treated as evidence of user endorsement or benefit without context.

**5. Comments and Shares**

51. Comments and shares measure participation.

52. They may reflect:

   a. connection;

   b. support;

   c. disagreement;

   d. outrage;

   e. harassment;

   f. bullying;

   g. peer pressure;

   h. public humiliation;

   i. advocacy;

   j. identity formation; or

   k. amplification of harmful content.

53. High participation may indicate strong social utility.

54. It may also indicate conflict or distress.

55. The platform should not equate all interaction with positive outcome.

**6. Advertising Yield**

56. Advertising yield measures commercial return.

57. It may increase with:

   a. time spent;

244

       b. impression volume;

       c. targeting precision;

       d. repeated return;

       e. data depth;

       f. audience segmentation;

       g. emotional salience; and

       h. commercial responsiveness.

58. Advertising yield is a measure of value delivered to the advertiser and platform.

59. It is not a measure of value delivered to the user.

60. The Court should distinguish:

       a. commercial benefit extracted from the user;

       b. service benefit returned to the user; and

       c. harm or burden imposed upon the user.

## 7. Engagement Can Be Beneficial, Harmful, or Mixed

61. Engagement should not be treated as inherently harmful.

62. It may facilitate:

       a. connection;

       b. education;

       c. creativity;

       d. support;

       e. community;

       f. political participation;

       g. commerce;

       h. entertainment;

       i. skill development; and

       j. access to information.

63. It may also contribute to:

       a. sleep loss;

       b. distraction;

       c. social comparison;

d. exposure escalation;

e. compulsive checking;

f. family conflict;

g. bullying;

h. exploitation;

i. emotional deterioration; and

j. displacement of offline life.

64. The same platform may produce both sets of outcomes.

65. Engagement alone cannot distinguish them.

## 8. Aggregate Engagement Can Conceal Distributional Harm

66. Aggregate metrics may show overall growth while concealing concentrated harm among smaller populations.

67. A platform may report:

a. rising satisfaction;

b. increased use;

c. greater connection;

d. higher retention; or

e. improved commercial performance.

68. Those averages may conceal:

a. vulnerable minors;

b. users exposed to exploitation;

c. users experiencing repeated control failure;

d. users receiving harmful recommendations;

e. users with severe regret;

f. users with substantial sleep displacement; and

g. users whose condition materially worsened.

69. The Court should therefore distinguish average performance from subgroup outcome.

70. A system can be broadly useful and still create a legally significant defect for a defined population.

## 9. The Engagement Finding

71. For each claim relying on engagement, the Court should determine:

246

a. what metric was used;

b. what behavior it measured;

c. what interpretation was assigned to it;

d. whether that interpretation was validated;

e. whether subgroup effects were concealed;

f. whether benefit and harm were separately measured;

g. whether the platform publicly equated engagement with welfare; and

h. whether the metric materially affected design or representation.

### B. Product Success Must Be Separated From Attention Capture

72. The Court should recognize a basic conceptual distinction:

**Engagement may establish that a system successfully retained attention. It does not establish that the user benefited from that retention.**

73. Product success can be measured from at least three perspectives:

a. the platform's perspective;

b. the advertiser's perspective; and

c. the user's perspective.

74. A platform may define success as:

a. increased use;

b. higher retention;

c. greater revenue;

d. more data;

e. increased network growth; or

f. stronger competitive position.

75. An advertiser may define success as:

a. impressions;

b. clicks;

c. purchases;

d. audience targeting;

e. brand recall; or

f. conversion.

76. A user may define success as:

a. completing a task;

b. communicating with someone;

c. obtaining information;

d. receiving support;

e. enjoying entertainment;

f. learning something;

g. ending the session when desired;

h. feeling satisfied afterward; or

i. preserving time for other priorities.

77. Those definitions may align.

78. They may also diverge.

79. The root defect arises where the platform's success measure displaces the user's success measure.

**1. Attention Capture Is an Intermediate Means**

80. Attention is necessary for many products to function.

81. It is ordinarily an intermediate means, not the final human objective.

82. The user gives attention in exchange for:

a. communication;

b. entertainment;

c. information;

d. community;

e. creativity;

f. recognition;

g. commerce;

h. education; or

i. another benefit.

83. A healthy exchange requires some relationship between the attention extracted and the benefit returned.

84. Where attention becomes the dominant objective, the system may preserve the means while abandoning the end.

**2. Retention Can Conflict With Completion**

85. A user may enter the service with a defined purpose.

86. That purpose may be:

      a. sending a message;

      b. checking an event;

      c. viewing one post;

      d. uploading content;

      e. contacting a relative;

      f. answering a question;

      g. seeking support; or

      h. completing a school-related task.

87. A system optimized for retention may continue introducing prompts after the user's purpose is complete.

88. The platform may then benefit from failure to conclude.

89. The Court should distinguish:

      a. successful completion of the user's purpose; and

      b. continued system activity beyond that purpose.

## 3. Retention Can Conflict With Voluntary Exit

90. A user-centered system should permit disengagement when the user chooses.

91. A retention-centered system may create friction through:

      a. continual novelty;

      b. unresolved notifications;

      c. autoplay;

      d. infinite scroll;

      e. social obligation;

      f. fear-based prompts;

      g. reversal of deactivation;

      h. repeated reentry cues; or

      i. ambiguous stopping points.

92. These features are not necessarily unlawful.

93. Their legal significance increases where they:

      a. defeat an objective control;

      b. exploit a known vulnerability;

249

c. contradict public representations;

d. target minors unlawfully;

e. produce a measurable harmful increment; or

f. conceal the user's inability to disengage.

## 4. Commercial Success May Coexist With Human Loss

94. A system may become more profitable while users experience:

a. reduced sleep;

b. increased regret;

c. less concentration;

d. more family conflict;

e. weaker offline connection;

f. greater anxiety;

g. more exposure to harmful pathways; or

h. greater difficulty ending use.

95. Commercial success does not disprove those outcomes.

96. Human harm does not follow automatically from commercial success.

97. The relationship must be measured directly.

## 5. User Benefit Must Be Independently Evaluated

98. User benefit should be evaluated through outcomes that correspond to the user's actual purpose and condition.

99. Relevant questions include:

a. Did the user complete the intended task?

b. Did the user obtain the sought communication?

c. Did the user choose the duration?

d. Did the user stop when desired?

e. Did the user report satisfaction?

f. Did use improve or impair relationships?

g. Did use displace sleep or concentration?

h. Did the user later regret the session?

i. Did use substitute elsewhere?

j. Did a custodial instruction remain effective?

100.    These questions measure value differently from engagement.

## 6. The Court Should Reject Metric Equivalence

101.    The following equations should not be presumed:

   a. more time equals more benefit;

   b. more return equals more satisfaction;

   c. more interaction equals more connection;

   d. more content equals more information;

   e. more personalization equals more relevance;

   f. more revenue equals more user value;

   g. fewer exits equals greater wellbeing; or

   h. greater retention equals successful service.

102.    Each relationship requires proof.

## 7. The Product-Success Finding

103.    Where the parties rely on product success, the Court should determine:

   a. success for whom;

   b. measured by what;

   c. over what period;

   d. at what cost;

   e. with what user outcome;

   f. with what subgroup effects;

   g. with what level of regret or displacement; and

   h. whether the measure tracked benefit or merely activity.

### C. Pro-Social Measures Can Evaluate Human Outcomes More Directly

104.    A platform concerned with human benefit requires measures beyond engagement.

105.    Pro-social measures need not impose one uniform conception of the good.

106.    They can evaluate whether the system served the user's stated purpose, preserved meaningful choice, supported lawful custodial authority, and avoided measurable harm.

107.    Meaningful outcome measures could include:

   a. completion of the user's stated task;

   b. voluntary session closure;

   c. successful communication;

251

   d. post-use satisfaction;

   e. unwanted return frequency;

   f. repeated override of custodial controls;

   g. sleep displacement;

   h. exposure escalation;

   i. regret;

   j. substitution to another service;

   k. effects on actual relationships;

   l. user-reported utility relative to time consumed;

   m. effectiveness of safety controls;

   n. successful interruption of exploitative pathways; and

   o. improvement or deterioration in defined user outcomes.

108. These measures can help distinguish valuable use from captured attention.

## 1. Completion of the User's Stated Task

109. Task completion asks whether the service helped the user accomplish the purpose for which the user entered.

110. Examples include:

   a. sending a message;

   b. finding information;

   c. posting content;

   d. contacting a group;

   e. viewing an event;

   f. completing a transaction;

   g. receiving support; or

   h. finishing a defined activity.

111. A system may be judged successful when the task is completed efficiently.

112. Retention after completion may be separately measured.

## 2. Voluntary Session Closure

113. Voluntary session closure measures whether users end the session when they choose.

114. Relevant signals may include:

   a. natural stopping points;

      b. closure after task completion;

      c. response to reminders;

      d. low-friction exit;

      e. absence of repeated reentry prompts;

      f. successful enforcement of time settings; and

      g. user satisfaction with duration.

115.    This measure respects user autonomy.

116.    It does not require the platform to dictate the correct amount of use.

## 3. Successful Communication

117.    Social platforms often exist to facilitate communication.

118.    Success can therefore be measured through:

      a. message completion;

      b. response quality;

      c. successful coordination;

      d. preservation of meaningful relationships;

      e. reduction in unwanted contact;

      f. reduction in harassment; and

      g. user-reported value of the interaction.

119.    High message volume alone does not establish successful communication.

## 4. Post-Use Satisfaction

120.    Post-use satisfaction asks how the user evaluates the session after it concludes.

121.    It may distinguish:

      a. intended use from regretted use;

      b. useful connection from empty repetition;

      c. entertainment from distress;

      d. successful completion from unresolved continuation; and

      e. chosen duration from unwanted duration.

122.    Satisfaction measures should be designed carefully to avoid manipulation, fatigue, and self-report distortion.

123.    Their imperfection does not make them less relevant than raw engagement.

## 5. Unwanted Return Frequency

124.    A platform may distinguish between desired return and unwanted return.

125.    Relevant indicators may include:

a. repeated reopening after attempted closure;

b. repeated response to prompts later reported as unwanted;

c. unsuccessful deactivation;

d. repeated override followed by regret;

e. reentry during intended sleep; and

f. return inconsistent with an activated limit.

126.    Unwanted return is more probative of user conflict than return frequency alone.

## 6. Repeated Override of Custodial Controls

127.    Repeated override of parental or school controls may indicate:

a. weak control design;

b. unclear authority;

c. child circumvention;

d. multiple-account architecture;

e. device-platform incompatibility;

f. platform-facilitated override; or

g. a broader enforcement problem.

128.    The metric should identify who initiated the override and how it occurred.

129.    It can then support platform, custodial, or shared responsibility.

## 7. Sleep Displacement

130.    Sleep displacement measures whether use occurs at the expense of intended sleep.

131.    Relevant measures may include:

a. use during stated sleep windows;

b. notifications during those windows;

c. delayed session closure;

d. nighttime reentry;

e. duration after custodial limits;

f. total device use; and

g. use of competing services.

132.     The measure should distinguish platform-specific contribution from general device access.

## 8. Exposure Escalation

133.     Exposure escalation measures whether the system moves the user toward more intense, repetitive, extreme, or concentrated material.

134.     Relevant measures may include:

     a. pathway length;

     b. content intensity;

     c. diversity reduction;

     d. repetition;

     e. recommendation frequency;

     f. age sensitivity;

     g. vulnerability sensitivity; and

     h. user-initiated versus system-initiated progression.

135.     This provides a more precise measure than total time.

## 9. Regret

136.     Regret may be measured through:

     a. contemporaneous self-report;

     b. post-session survey;

     c. repeated deletion;

     d. failed control use;

     e. attempted deactivation;

     f. complaints;

     g. parental reports; and

     h. clinically documented distress.

137.     Regret should not be treated as proof of coercion.

138.     It remains relevant to whether attention retained by the system produced user value.

## 10. Substitution to Another Service

139.     Substitution measures whether reduced use on one platform leads to:

     a. less total digital use;

     b. migration to another social platform;

     c. migration to messaging;

255

d. migration to gaming;

e. migration to streaming;

f. migration to less regulated services; or

g. increased offline activity.

140.    A remedy that reduces one platform's use without reducing total harmful exposure may be ineffective.

141.    Substitution is therefore essential to measuring real outcome.

## 11. Effects on Actual Relationships

142.    Social platforms should be evaluated partly by their effect on real relationships.

143.    Relevant outcomes may include:

a. increased communication;

b. preserved distant relationships;

c. improved support;

d. greater conflict;

e. social exclusion;

f. reduced in-person interaction;

g. strengthened community; or

h. increased harassment.

144.    Interaction count is not equivalent to relationship quality.

## 12. User-Reported Utility Relative to Time Consumed

145.    One useful measure is the value the user reports receiving relative to the time consumed.

146.    This measure asks:

a. Was the time worth it?

b. Did the user accomplish the intended purpose?

c. Would the user choose the same duration again?

d. Did the session improve or worsen the user's condition?

e. Did the session displace something more valuable?

f. Did the user feel in control of closure?

147.    Such a measure need not be perfect to improve upon raw duration.

## 13. Pro-Social Measures Should Be Multi-Dimensional

148.    No single pro-social metric should replace engagement as a new universal proxy.

149.    Human benefit is multi-dimensional.

150.    A sound framework should combine:

    a. user purpose;

    b. task completion;

    c. user satisfaction;

    d. voluntary exit;

    e. sleep;

    f. concentration;

    g. relationship quality;

    h. control efficacy;

    i. harmful exposure;

    j. substitution;

    k. privacy; and

    l. commercial extraction.

151.    The goal is not to replace one reductionist measure with another.

152.    It is to prevent one narrow measure from governing the entire system.

## 14. Measures Should Be Calibrated by Age and Context

153.    Youth measures should account for:

    a. age;

    b. developmental stage;

    c. custodial authority;

    d. school context;

    e. vulnerability;

    f. privacy;

    g. lawful expression;

    h. disability;

    i. communication need; and

    j. risk level.

154.    A younger child may require different defaults and measures from an older adolescent.

155.    A support community may require different treatment from a commercial recommendation feed.

### 15. The Pro-Social Measure Finding

156.    Where platform performance is at issue, the Court should determine:

a. what engagement metrics were used;

b. what human-outcome metrics were available;

c. whether the platform measured benefit separately from activity;

d. whether control failure, regret, sleep, substitution, and relationship effects were considered;

e. whether subgroup harms were identified;

f. whether public representations reflected those distinctions; and

g. whether the absence of such measures contributed to the alleged defect.

### D. Reciprocity Can Measure the Relationship Between Value Delivered and Value Extracted

157.    A platform's health can be evaluated through a reciprocity measure.

158.    The basic inquiry is:

**What value did the platform return to the user relative to the attention, data, and behavioral influence it extracted from the user?**

159.    Reciprocity does not require equal exchange in every session.

160.    It requires that the relationship not become structurally one-sided.

161.    The platform may receive:

a. attention;

b. data;

c. behavioral signals;

d. content;

e. social-network value;

f. advertising inventory;

g. commercial conversion;

h. prediction value;

i. training value; and

j. influence over future behavior.

162.    The user may receive:

a. communication;

b. entertainment;

258

    c. information;

    d. community;

    e. creativity;

    f. recognition;

    g. support;

    h. coordination;

    i. commerce; and

    j. identity expression.

163.    A reciprocal system returns meaningful value while preserving the user's ability to understand, limit, and end the exchange.

164.    A nonreciprocal system may continue extracting value after the user's purpose has been served or after the exchange has become harmful.

## 1. Attention Extracted

165.    Attention is not merely time.

166.    It includes:

    a. focus;

    b. repeated return;

    c. cognitive salience;

    d. interruption;

    e. emotional arousal;

    f. social obligation;

    g. anticipation; and

    h. habit formation.

167.    The platform's influence over attention should be compared with the benefit produced.

## 2. Data Extracted

168.    Data extraction may include:

    a. identity;

    b. relationships;

    c. behavior;

    d. location;

    e. preferences;

259

f. vulnerabilities;

g. emotional signals;

h. commercial responsiveness;

i. age signals; and

j. inferred future behavior.

169. The value of that data may extend beyond the immediate session.

170. Reciprocity requires truthful disclosure, lawful processing, proportional use, and meaningful user benefit.

**3. Behavioral Influence Extracted**

171. Platforms may influence:

a. what users see;

b. when they return;

c. whom they contact;

d. what they buy;

e. what they believe is popular;

f. what they consider normal;

g. how long they remain;

h. what they disclose; and

i. how they respond to others.

172. Behavioral influence is not inherently wrongful.

173. It becomes legally significant where it is concealed, misrepresented, unlawfully targeted, directed against an objective control, or used to create measurable harm.

**4. Value Returned**

174. Value returned should be measured through outcomes corresponding to the user's purpose.

175. Relevant forms of value include:

a. successful communication;

b. useful information;

c. meaningful connection;

d. enjoyment;

e. support;

f. completion;

260

g. creative opportunity;

h. commerce;

i. reduced isolation; and

j. preserved autonomy.

176.    Raw engagement does not establish that these outcomes occurred.

**5. Reciprocity Requires Informed Exchange**

177.    A user cannot evaluate the exchange where the platform conceals:

a. data practices;

b. recommendation objectives;

c. control limitations;

d. age-related treatment;

e. commercial targeting;

f. internal health findings;

g. exploitation pathways; or

h. conflicts between safety and revenue.

178.    Truthfulness is therefore part of reciprocity.

179.    A user or parent must know enough to decide whether the exchange remains worthwhile.

**6. Reciprocity Requires Meaningful Exit**

180.    A reciprocal exchange includes a meaningful ability to stop.

181.    Meaningful exit may require:

a. functional controls;

b. accurate settings;

c. low-friction deactivation;

d. clear deletion;

e. respect for notification choices;

f. respect for custodial restrictions;

g. absence of concealed circumvention; and

h. clear disclosure of what remains after exit.

182.    A platform that preserves technical exit while materially defeating practical exit may create a direct operational issue.

**7. Reciprocity Requires Proportional Extraction**

261

183.    The platform should not extract substantially more attention, data, or behavioral influence than is reasonably connected to the service delivered without clear disclosure and lawful basis.

184.    Proportionality may differ by function.

185.    A messaging service may require one level of data.

186.    A personalized advertising system may require another.

187.    A youth-facing service may require stricter limits.

188.    The Court should identify whether the extraction was necessary, disclosed, lawful, and proportionate to the value returned.

## 8. Reciprocity Can Inform Remedy

189.    Reciprocity may assist the Court in distinguishing remedies.

190.    Where the defect is deception, the remedy may require truthful disclosure.

191.    Where the defect is excessive or unlawful data use, the remedy may require deletion, limitation, or restitution.

192.    Where the defect is defeated exit, the remedy may require functional controls.

193.    Where the defect is harmful operational escalation, the remedy may require constraint or auditing.

194.    Where the defect is industry-wide metric failure, the remedy may require prospective common standards.

## 9. Reciprocity Should Not Become a Single Mandatory Score

195.    Reciprocity is a framework, not a universal formula.

196.    It should not be reduced to one compulsory number that replaces engagement.

197.    A sound evaluation may consider:

a. value delivered;

b. attention consumed;

c. data extracted;

d. influence exercised;

e. autonomy preserved;

f. user satisfaction;

g. harm created;

h. exit functionality;

i. substitution; and

j. subgroup effects.

262

198.    The purpose is to expose the direction of the exchange.

199.    It is not to declare one form of lawful use superior to another.

**10. The Reciprocity Finding**

200.    Where the health of a platform system is at issue, the Court should determine:

a. what value the platform delivered;

b. what attention it retained;

c. what data it collected;

d. what behavioral influence it exercised;

e. whether the exchange was disclosed;

f. whether the user could meaningfully limit or end it;

g. whether the benefit corresponded to the extraction;

h. whether a vulnerable subgroup experienced a materially different exchange; and

i. whether the platform's public representations accurately described that relationship.

*E. Metric Design Is a Governance Question, Not Merely an Evidentiary Question*

201.    The choice of metrics shapes the operation of the system.

202.    A system optimized for what it measures will tend to produce more of what it rewards.

203.    If the platform rewards:

a. time;

b. return;

c. impressions;

d. interaction;

e. advertising yield; and

f. data generation,

it will tend to improve its ability to produce those outcomes.

204.    If it does not separately measure:

a. benefit;

b. regret;

c. sleep loss;

d. failed control;

e. harmful escalation;

263

f. substitution;

g. relationship quality; and

h. unwanted use,

those outcomes may remain operationally invisible.

205. What is not measured may become subordinate even where it is publicly emphasized.

206. Metric design therefore affects:

a. product development;

b. internal incentives;

c. safety review;

d. public representation;

e. employee evaluation;

f. commercial strategy;

g. remedy; and

h. regulatory oversight.

**1. Internal Incentives Follow Metrics**

207. Employees and systems may be rewarded according to:

a. growth;

b. retention;

c. watch time;

d. revenue;

e. user activity;

f. experiment performance; and

g. feature adoption.

208. If safety and user benefit remain unmeasured or weakly measured, they may lose in internal tradeoffs.

209. The Court should examine whether the platform's internal metrics corresponded with its public claims.

**2. Safety Metrics Should Possess Operational Weight**

210. A safety metric that is merely reported but does not affect optimization may have limited practical significance.

211. The Court should ask:

a. whether safety measures altered design;

264

b. whether they constrained objectives;

c. whether they affected employee incentives;

d. whether they delayed deployment;

e. whether they changed youth defaults;

f. whether they triggered correction; and

g. whether material conflicts were disclosed.

### 3. Human-Outcome Metrics Can Improve Root-Level Governance

212.    Contemporary systems can measure more than raw activity.

213.    They can increasingly evaluate:

a. task completion;

b. user satisfaction;

c. voluntary exit;

d. repeated failed controls;

e. exposure pathways;

f. sleep-period use;

g. regret;

h. substitution;

i. harmful escalation;

j. exploitation risk; and

k. differences among user populations.

214.    The availability of better measures makes continued reliance on activity alone increasingly difficult to justify.

### 4. Metric Transparency Can Improve Adjudication

215.    Courts and regulators should be able to determine:

a. what metrics governed;

b. how they were weighted;

c. what safety constraints existed;

d. how conflicts were resolved;

e. what subgroup effects were observed;

f. what changes were made; and

g. what outcomes followed.

216. This does not require public disclosure of every technical detail.

217. It requires sufficient transparency to evaluate the legal and operational claims being made.

### F. The Court Should Recognize the Difference Between Activity, Utility, and Welfare

218. The Court can reduce conceptual error by distinguishing three levels.

219. Activity concerns what the user did within the service.

220. Utility concerns what immediate value the user received.

221. Welfare concerns the broader effect on the user's condition and life.

222. These levels may diverge.

223. A session may produce high activity and low utility.

224. It may produce high utility and neutral welfare.

225. It may produce immediate utility and long-term harm.

226. It may produce low activity and high value.

227. The Court should therefore avoid using one level as proof of another.

### 1. Activity

228. Activity includes:

    a. time;

    b. clicks;

    c. views;

    d. posts;

    e. messages;

    f. shares;

    g. return; and

    h. impressions.

### 2. Utility

229. Utility includes:

    a. communication;

    b. entertainment;

    c. information;

    d. completion;

    e. recognition;

266

f. support;

g. convenience; and

h. enjoyment.

### 3. Welfare

230. Welfare includes:

a. mental health;

b. sleep;

c. concentration;

d. relationships;

e. autonomy;

f. physical activity;

g. educational function;

h. privacy;

i. safety; and

j. long-term development.

231. A valid legal theory should identify which level is being measured and how one level is alleged to affect another.

### G. The Court Should Apply a Human-Benefit Test

232. Where platform metrics are offered as evidence of product success, user preference, or social value, the Court should ask:

a. What did the metric actually measure?

b. Whose success did it represent?

c. Did it measure activity, utility, or welfare?

d. Did the platform validate the assumed relationship among those levels?

e. Did the platform measure regret, unwanted use, failed control, sleep displacement, substitution, or harmful escalation?

f. Did the platform examine effects on vulnerable minors?

g. Did the platform publicly characterize engagement as benefit?

h. Did internal evidence contradict that characterization?

i. What user value was returned relative to attention, data, and behavioral influence extracted?

j. What platform-controlled correction is available?

267

233.    This test would not require the Court to redesign the platform.

234.    It would prevent system-performance measures from being treated as self-proving evidence of human benefit.

235.    It would also create a sound boundary for future governance.

236.    The governing principle is:

**System performance should be measured as system performance. Human benefit should be measured as human benefit. Engagement may show that a platform successfully obtained and retained attention; it does not show, without separate evidence, that the user received corresponding value, remained satisfied, preserved meaningful choice, or avoided harm. A healthier system measures the value returned to the user relative to the attention, data, and behavioral influence extracted from the user.**

---

## XI. CURRENT COMPUTATIONAL CAPACITY MAKES ROOT-LEVEL GOVERNANCE POSSIBLE

1.  The technological conditions that once limited platform governance have materially changed.

2.  Earlier digital systems were well suited to measuring simple activity.

3.  They could count:

    a. clicks;

    b. time;

    c. views;

    d. return frequency;

    e. purchases;

    f. impressions;

    g. shares;

    h. comments;

    i. session length; and

    j. advertising response.

4.  Those measures were comparatively easy to observe, store, aggregate, and optimize.

5.  Human benefit was more difficult to measure.

6.  Earlier systems could not reliably synthesize:

    a. the user's actual purpose;

    b. the context of use;

268

c. patterns of regret;

d. harmful exposure escalation;

e. custodial settings;

f. substitution across services;

g. cumulative effects;

h. conflicts among objectives;

i. differences between voluntary continuation and unwanted continuation;

j. the interaction between platform conduct and offline conditions; or

k. the difference between activity, utility, and welfare.

7. As a result, platforms relied heavily on narrow proxies.

8. Time, return, interaction, and conversion became useful operational substitutes for more difficult human outcomes.

9. Those substitutes were never neutral.

10. They shaped what systems learned to produce.

11. A system measured principally by engagement will tend to improve its capacity to generate engagement.

12. A system measured principally by advertising yield will tend to improve its capacity to generate commercially valuable attention.

13. A system that does not measure regret, sleep displacement, failed controls, harmful escalation, or user purpose may treat those outcomes as operationally invisible even where they are legally or socially significant.

14. The historical limitation was therefore not merely moral or institutional.

15. It was also computational.

16. Platforms could measure what users did more easily than why they did it, whether they benefited, whether the activity aligned with their stated purpose, whether use displaced more valuable conduct, or whether the same demand migrated elsewhere after intervention.

17. That limitation no longer defines the full boundary of what is possible.

18. Current computational systems can evaluate multiple objectives, multiple actors, multiple time horizons, and multiple forms of evidence simultaneously.

19. They can assist in distinguishing:

a. user choice from system-generated escalation;

b. immediate preference from reflective preference;

c. lawful content from unlawful pathways;

269

d. platform-specific conduct from industry-wide incentive;

e. functional safeguards from performative safeguards;

f. platform exit from actual reduction in harm;

g. activity from utility;

h. utility from welfare; and

i. commercial success from human benefit.

20. This capacity creates the possibility of root-level governance.

21. Root-level governance does not require a system to determine what people should believe, what lawful speech may exist, or what form of culture the public should prefer.

22. It requires the system to evaluate the operations it actually controls.

23. Those operations include:

a. what objectives govern selection;

b. what signals are used;

c. what safeguards constrain the system;

d. whether controls function as represented;

e. whether known illegal pathways remain open;

f. whether public claims correspond to actual operation;

g. whether measurable externalities are being shifted to users, families, schools, or the public; and

h. whether corrective intervention improves outcomes or merely relocates activity.

24. The availability of this capacity changes the legal and governance question.

25. The question is no longer merely whether platforms can detect every individual risk with certainty.

26. The question is whether they can govern known classes of risk, objective conflicts, control failures, and harmful pathways with sufficient reliability, transparency, and proportionality.

27. The answer is increasingly yes.

28. The Court should recognize that modern systems can support a governance architecture in which:

a. objectives are identifiable;

b. conflicts are detectable;

c. controls are auditable;

d. risks are continuously reviewed;

e. uncertainty is expressed rather than concealed;

f. human authority remains final;

270

g. lawful expression remains protected; and

h. correction occurs before harm becomes an accumulated retrospective record.

## A. Earlier Systems Lacked Sufficient Capacity

29. Earlier platform systems were optimized around observable events.

30. They could readily determine:

a. whether a user clicked;

b. how long a session lasted;

c. what content was viewed;

d. whether the user returned;

e. whether an advertisement was selected;

f. whether a purchase occurred;

g. whether a post was shared;

h. whether a message was sent; and

i. whether the account remained active.

31. Those events were discrete, machine-readable, and commercially useful.

32. More complex questions were harder to answer.

33. Earlier systems could not reliably determine:

a. why the user entered the service;

b. whether the user completed the intended task;

c. whether continued use remained desired;

d. whether the session produced satisfaction or regret;

e. whether the user's offline condition improved or deteriorated;

f. whether use displaced sleep, concentration, or relationships;

g. whether the same behavior moved to another service;

h. whether repeated exposure reflected direct user choice or system-generated escalation;

i. whether a control functioned across devices and accounts;

j. whether a user belonged to a vulnerable subgroup; or

k. whether a commercial objective conflicted with a safety objective.

34. The resulting governance structure was necessarily crude.

35. It relied on aggregate measures, threshold rules, content categories, user reports, and retrospective review.

271

36. That structure produced recurring limitations.

**1. User Purpose Was Difficult to Observe**

37. A platform could observe entry into the service.

38. It could not reliably identify the user's intended purpose.

39. The same session might begin because the user wanted to:

a. send a message;

b. check an event;

c. seek support;

d. complete a school-related task;

e. watch one item;

f. contact a relative;

g. resolve a conflict;

h. obtain information; or

i. pass time.

40. Without knowing the intended purpose, the system could not readily determine when the purpose was complete.

41. It therefore measured continuation more easily than completion.

42. That asymmetry favored retention.

**2. Context Was Fragmented**

43. Earlier systems often evaluated events individually.

44. A click was a click.

45. A view was a view.

46. A return was a return.

47. The system could not always synthesize the broader context, including:

a. age;

b. time of day;

c. prior distress;

d. custodial restrictions;

e. recent harmful exposure;

f. repeated failed controls;

g. use across related accounts;

272

    h. concurrent use of other services;

    i. the social relationship involved; and

    j. the user's stated objective.

48. Without contextual synthesis, the same event could be treated identically despite materially different meaning.

### 3. Regret Was Poorly Measured

49. Earlier systems could observe that the user continued.

50. They could not reliably determine whether the user later believed the time was worthwhile.

51. Regret might appear through:

    a. account deletion;

    b. complaints;

    c. repeated deactivation;

    d. use of time controls;

    e. low satisfaction surveys;

    f. parental reports;

    g. clinically documented distress; or

    h. no observable signal at all.

52. In the absence of an explicit measure, continued use could be misread as continuing benefit.

### 4. Harmful Escalation Was Difficult to Trace

53. Earlier systems could identify individual recommendations.

54. They were less able to evaluate entire exposure pathways across time.

55. Harmful escalation may involve:

    a. gradual narrowing of content;

    b. repeated exposure;

    c. increasing intensity;

    d. introduction to new accounts;

    e. cross-platform migration;

    f. direct messaging;

    g. advertising;

    h. social reinforcement; and

    i. changed user behavior.

273

56. A retrospective review could identify harm after the fact.

57. It was more difficult to detect the pathway as it formed.

**5. Custodial Settings Were Fragmented**

58. Parental and school controls often existed at different layers.

59. Those layers included:

> a. the device;
>
> b. the operating system;
>
> c. the app store;
>
> d. the platform;
>
> e. the browser;
>
> f. the school network;
>
> g. the account; and
>
> h. the household.

60. Earlier systems frequently lacked a unified way to determine:

> a. what authority had been asserted;
>
> b. which control governed;
>
> c. whether the control applied across accounts;
>
> d. whether it applied across devices;
>
> e. whether the child circumvented it;
>
> f. whether the platform defeated it; and
>
> g. whether the custodian knew it had failed.

61. The fragmentation weakened both accountability and effectiveness.

**6. Substitution Was Poorly Measured**

62. Platforms could measure whether a user left their own service.

63. They often could not determine whether the user:

> a. reduced total digital use;
>
> b. moved to another platform;
>
> c. shifted to messaging;
>
> d. shifted to gaming;
>
> e. shifted to streaming;

274

f. migrated to an anonymous service;

g. increased offline activity; or

h. experienced no improvement.

64. Platform exit could therefore be mistaken for harm reduction.

65. The distinction matters because a remedy that merely moves behavior may not improve the user's condition.

## 7. Cumulative Effects Were Difficult to Synthesize

66. Harm may arise through accumulation rather than a single event.

67. Relevant accumulation may involve:

a. sleep loss over time;

b. repeated social comparison;

c. repeated exposure to self-harm material;

d. repeated notification;

e. repeated control circumvention;

f. repeated predatory contact;

g. multi-platform exposure;

h. repeated family conflict; and

i. delayed intervention.

68. Earlier systems often lacked sufficient capacity to integrate those events into a coherent risk picture.

## 8. Conflicting Objectives Were Often Hidden Inside the System

69. Platforms may pursue several objectives simultaneously.

70. Those objectives may include:

a. relevance;

b. retention;

c. revenue;

d. satisfaction;

e. safety;

f. diversity;

g. creator growth;

h. advertising performance; and

275

i. reduced harmful exposure.

71. Earlier governance often treated those objectives separately.

72. It could not always identify when one objective overrode another in actual operation.

73. A safety objective might exist formally while carrying insufficient operational weight.

74. A commercial objective might dominate without being publicly visible.

75. The inability to synthesize those conflicts limited root-level correction.

## 9. Earlier Limitations Explain the Reliance on Proxies

76. The reliance on engagement was partly a consequence of what systems could measure reliably.

77. Clicks, time, and return were available.

78. Human benefit, regret, substitution, and cumulative harm were not.

79. That historical limitation explains the structure.

80. It does not justify preserving the structure after better capacity becomes available.

### B. Modern Systems Can Evaluate Multiple Objectives Simultaneously

81. Current computational systems can evaluate multiple forms of evidence, multiple objectives, and multiple time horizons simultaneously.

82. They can identify patterns that would be difficult for a human reviewer to detect across millions of users and billions of events.

83. Their proper use is not to replace judgment.

84. It is to make the relevant facts visible, comparable, auditable, and capable of human review.

85. Current systems can increasingly:

a. distinguish direct user selection from system-generated escalation;

b. identify recurrent harmful pathways;

c. detect age and vulnerability signals with calibrated uncertainty;

d. monitor whether controls function as represented;

e. compare engagement against declared user objectives;

f. measure substitution rather than merely platform exit;

g. generate auditable explanations of recommendation factors;

h. detect conflicts between welfare constraints and commercial objectives;

i. preserve privacy through aggregated or constrained analysis;

j. conduct ongoing risk review rather than retrospective crisis response;

k. identify subgroup effects concealed by aggregate metrics;

276

l. compare interventions across cohorts;

m. detect repeated-control failure across accounts and devices;

n. identify material changes in system operation; and

o. support continuous compliance review.

## 1. Direct User Selection Can Be Distinguished From System-Generated Escalation

86. A modern governance system can distinguish between:

a. content directly searched for;

b. content selected from followed accounts;

c. content recommended after a user action;

d. content introduced without direct request;

e. content repeated by the system;

f. content surfaced through commercial targeting;

g. content introduced through contact recommendation; and

h. content escalated through a sequence of related recommendations.

87. This distinction is essential to causal allocation.

88. It permits the platform to identify what the user selected and what the system added.

89. It also permits the Court to distinguish publication from operational intervention.

## 2. Recurrent Harmful Pathways Can Be Identified

90. A modern system can evaluate patterns across:

a. accounts;

b. content categories;

c. recommendations;

d. contact networks;

e. reports;

f. removals;

g. repeat offenders;

h. age groups;

i. time periods; and

j. outcome signals.

91. It can identify recurrent pathways involving:

277

a. grooming;

b. extortion;

c. self-harm escalation;

d. eating-disorder content;

e. bullying;

f. repeated exposure to unlawful material;

g. sleep-period prompting;

h. contact between minors and suspicious adults; and

i. repeated circumvention of controls.

92. The platform can then govern the pathway rather than waiting for each incident to be reported separately.

**3. Age and Vulnerability Signals Can Be Evaluated With Calibrated Uncertainty**

93. Current systems can evaluate multiple signals relevant to age and vulnerability.

94. Those signals may include:

a. self-declared age;

b. account relationships;

c. school references;

d. device settings;

e. content patterns;

f. repeated account creation;

g. parental reports;

h. image or voice estimation;

i. usage timing;

j. prior safety events; and

k. other legally permissible indicators.

95. The system need not pretend certainty.

96. It can express:

a. confidence ranges;

b. conflicting signals;

c. missing information;

d. risk thresholds;

278

e. review triggers; and

f. reasons for uncertainty.

97. Calibrated uncertainty is preferable to either blind acceptance or overconfident classification.

98. It allows proportionate intervention.

## 4. Control Functionality Can Be Continuously Monitored

99. Current systems can monitor whether controls function as represented.

100.    They can evaluate:

a. whether limits were activated;

b. whether they applied across accounts;

c. whether they applied across devices;

d. whether they were overridden;

e. who initiated the override;

f. whether circumvention was repeated;

g. whether users understood the control;

h. whether the control changed behavior;

i. whether the setting persisted after updates; and

j. whether the platform's public description remained accurate.

101.    This permits safety tools to be evaluated by operation rather than by existence alone.

## 5. Engagement Can Be Compared Against Declared User Objectives

102.    A system can increasingly distinguish between the user's stated purpose and subsequent activity.

103.    The user's purpose may be inferred or declared through:

a. task selection;

b. session intent;

c. communication objective;

d. time setting;

e. search request;

f. user preference;

g. custodial rule;

h. account mode; or

i. other explicit instruction.

279

104.    The system can then evaluate whether:

      a. the task was completed;

      b. use continued beyond completion;

      c. the user voluntarily closed the session;

      d. the platform introduced new prompts;

      e. the user later reported satisfaction or regret; and

      f. continued activity aligned with the original purpose.

105.    This allows product success to be separated from mere retention.

## 6. Substitution Can Be Measured More Accurately

106.    A governance system can evaluate whether an intervention produced:

      a. reduced total use;

      b. migration to another platform;

      c. migration to messaging;

      d. migration to gaming;

      e. migration to streaming;

      f. increased offline activity;

      g. no material change; or

      h. movement toward a higher-risk service.

107.    Such analysis may rely on privacy-preserving, aggregate, user-consented, or device-level evidence.

108.    The objective is not pervasive surveillance.

109.    It is to avoid mistaking relocation for improvement.

## 7. Recommendation Factors Can Be Made Auditable

110.    Modern systems can preserve records of:

      a. the objectives applied;

      b. the major signals used;

      c. the safety constraints invoked;

      d. the commercial factors involved;

      e. the material reasons for selection;

      f. the age-related treatment applied;

      g. the intervention history; and

h. the model or rule version operating at the time.

111. Auditability need not require disclosure of source code or every internal parameter.

112. It requires enough traceability to determine:

a. why the system acted;

b. what objectives governed;

c. what constraints were applied;

d. whether the representation was accurate; and

e. whether the system changed materially.

### 8. Conflicts Between Welfare and Commercial Objectives Can Be Detected

113. A modern system can identify when objectives conflict.

114. Examples may include:

a. a safety constraint reducing watch time;

b. a parental control reducing advertising inventory;

c. an exploitation restriction reducing contact growth;

d. a sleep-period limit reducing return frequency;

e. a recommendation-safety constraint reducing engagement; or

f. a data-minimization rule reducing targeting precision.

115. The system can record:

a. what conflict arose;

b. how it was resolved;

c. what objective prevailed;

d. who authorized the decision;

e. what outcome followed; and

f. whether the public representation remained accurate.

116. This makes the operative tradeoff visible.

117. It also permits human governance of the objective hierarchy.

### 9. Privacy Can Be Preserved Through Aggregated or Constrained Analysis

118. Root-level governance does not require unlimited access to individual user data.

119. Systems can evaluate risk through:

a. aggregation;

b. anonymization;

c. limited-purpose processing;

d. secure enclaves;

e. differential privacy;

f. threshold reporting;

g. on-device analysis;

h. data minimization;

i. retention limits; and

j. role-based access.

120.    The precise method may vary.

121.    The governing principle is that safety evaluation should be proportionate to the risk and no broader than necessary.

**10. Ongoing Review Can Replace Retrospective Crisis Response**

122.    Traditional governance often responds after:

a. litigation;

b. public scandal;

c. regulatory investigation;

d. widespread harm;

e. press exposure;

f. whistleblower disclosure; or

g. catastrophic incident.

123.    Current systems can support continuous review.

124.    They can monitor:

a. material changes in objectives;

b. control failure;

c. subgroup effects;

d. emergent harmful pathways;

e. age-assurance performance;

f. substitution effects;

g. repeated exploitation patterns;

h. unusual shifts in regret or dissatisfaction; and

282

i. divergence between public claims and actual operation.

125.    Continuous review permits earlier correction.

126.    It also creates a more reliable record for later adjudication.

## 11. Subgroup Effects Can Be Identified

127.    Aggregate averages may conceal concentrated harm.

128.    Modern systems can evaluate whether outcomes differ by:

a. age;

b. developmental stage;

c. account type;

d. control setting;

e. use pattern;

f. vulnerability signal;

g. time of day;

h. content pathway;

i. platform feature; and

j. prior safety event.

129.    This permits targeted correction without treating all users identically.

## 12. Interventions Can Be Compared

130.    A governance system can compare whether different interventions produce:

a. reduced harmful exposure;

b. improved control efficacy;

c. less sleep displacement;

d. reduced exploitation;

e. increased substitution;

f. reduced user satisfaction;

g. increased false positives;

h. improved voluntary closure; or

i. no meaningful change.

131.    This creates a basis for proportional, evidence-based correction.

## 13. Material Changes Can Be Logged

132. Systems can preserve records of changes to:

a. recommendation objectives;

b. safety constraints;

c. age-assurance methods;

d. parental controls;

e. notification rules;

f. data practices;

g. account architecture;

h. moderation pathways; and

i. reporting systems.

133. Material-change logs permit later review of:

a. what changed;

b. why it changed;

c. who approved it;

d. what risks were considered;

e. what testing occurred; and

f. what results followed.

134. That record reduces uncertainty and discourages retrospective reconstruction.

**14. Continuous Compliance Can Be Supported**

135. Modern systems can compare actual operation against:

a. statutory requirements;

b. court orders;

c. public representations;

d. internal policies;

e. custodial settings;

f. audit standards;

g. safety thresholds; and

h. approved objective hierarchies.

136. Compliance becomes an operational process rather than a periodic document exercise.

***C. The Governance Layer Should Not Decide What Lawful Speech May Exist***

284

137.  The governance layer should not function as a general arbiter of lawful expression.

138.  Its purpose is not to determine:

a. what opinions are socially acceptable;

b. what political views may be expressed;

c. what lawful cultural material may circulate;

d. what forms of identity are legitimate;

e. what users should believe; or

f. what lawful speech the public may encounter.

139.  Those questions implicate constitutional protection, cultural pluralism, editorial judgment, and human authority.

140.  The proper function of a computational governance layer is narrower.

141.  It should evaluate:

a. how the system selects;

b. what objectives govern;

c. whether controls work;

d. whether representations are accurate;

e. whether illegal pathways persist;

f. whether measurable externalities are being shifted;

g. whether objective conflicts are visible;

h. whether the system respects valid custodial instructions;

i. whether material changes are auditable; and

j. whether intervention improves actual outcomes.

**1. Selection Should Be Evaluated Without Dictating Viewpoint**

142.  The system can evaluate whether content was:

a. directly selected;

b. followed;

c. recommended;

d. repeated;

e. commercially targeted;

f. age-targeted;

g. introduced through escalation; or

285

       h. surfaced through an illegal pathway.

143.    It need not decide whether the lawful viewpoint expressed is good or bad.

144.    It evaluates the operation that delivered it.

## 2. Objectives Should Be Governed

145.    The governance layer should identify:

       a. the operative objective;

       b. the weighting among objectives;

       c. the safety constraints;

       d. the commercial incentives;

       e. the subgroup effects;

       f. the conflicts; and

       g. the human decision that resolved them.

146.    This is governance of machinery, not adjudication of belief.

## 3. Controls Should Be Tested

147.    The system should evaluate whether:

       a. parental controls functioned;

       b. user limits persisted;

       c. deactivation worked;

       d. deletion operated as represented;

       e. notification settings were respected;

       f. multiple accounts defeated restrictions;

       g. school controls integrated properly; and

       h. known defects were corrected.

148.    These questions are objective and operational.

## 4. Representations Should Be Compared With Actual Operation

149.    The governance layer should compare:

       a. public claims;

       b. internal system objectives;

       c. observed performance;

       d. known limitations;

e. control efficacy;

f. age-assurance results;

g. data practices; and

h. safety outcomes.

150.     It can identify a discrepancy without deciding what lawful content should exist.

## 5. Illegal Pathways Should Be Distinguished From Lawful Expression

151.     The system should identify pathways involving:

a. child sexual-abuse material;

b. trafficking;

c. extortion;

d. predatory solicitation;

e. repeat-offender networks;

f. fraud;

g. threats;

h. unlawful image distribution; and

i. other defined illegal conduct.

152.     Those pathways can be governed according to law.

153.     Their treatment should remain distinct from generalized dissatisfaction with lawful expression.

## 6. Externality Transfer Should Be Measured

154.     The governance layer should evaluate whether platform operation shifts measurable burdens to:

a. users;

b. parents;

c. schools;

d. healthcare systems;

e. law enforcement;

f. public agencies;

g. advertisers;

h. content creators; or

i. competing services.

155.     Relevant externalities may include:

287

a. increased crisis response;

b. failed controls;

c. exploitation costs;

d. sleep displacement;

e. institutional disruption;

f. privacy loss;

g. harmful substitution; and

h. costs generated by deceptive representation.

156.    Externality measurement supports causal allocation.

## 7. The Governance Layer Should Remain Content-Neutral Where Law Requires

157.    Governance rules should ordinarily target:

a. objectives;

b. timing;

c. data use;

d. controls;

e. age treatment;

f. illegal pathways;

g. deception;

h. auditability;

i. user choice; and

j. measurable operational consequence.

158.    They should not become a generalized system for suppressing lawful but unpopular expression.

## 8. Editorial Authority and Governance Authority Should Be Separated

159.    Editorial decisions concern what lawful material a platform chooses to publish or prioritize.

160.    Governance decisions concern whether:

a. the system operates as represented;

b. the objective is lawfully configured;

c. controls function;

d. illegal pathways persist;

e. data is used lawfully;

288

f. risk is measured; and

g. externalities are shifted.

161.   The same system may involve both.

162.   The Court should require the distinction to remain visible.

### D. Human Authority Remains Final

163.   Computational governance should assist human authority.

164.   It should not replace it.

165.   The system may identify patterns, conflicts, anomalies, risks, and likely consequences.

166.   Human decisionmakers remain responsible for:

a. defining lawful objectives;

b. setting acceptable risk;

c. resolving conflicts;

d. determining proportional intervention;

e. protecting lawful expression;

f. reviewing contested classifications;

g. correcting error;

h. imposing remedies; and

i. preserving accountability.

167.   The computational layer should provide:

a. auditable findings;

b. traceable reasons;

c. defined uncertainty;

d. correction pathways;

e. human review;

f. appeal;

g. public reporting at an appropriate level;

h. preservation of material records;

i. identification of objective conflicts; and

j. evidence sufficient for lawful oversight.

### 1. Findings Should Be Auditable

168.    An auditable finding should permit a reviewer to determine:

a. what data was used;

b. what rule or model operated;

c. what objective governed;

d. what major factors affected the result;

e. what uncertainty existed;

f. what safety constraint applied;

g. what version of the system was used; and

h. what outcome followed.

169.    Auditability need not expose every proprietary detail.

170.    It must expose enough to test legality, consistency, and accuracy.

**2. Reasons Should Be Traceable**

171.    The system should preserve traceable reasons for material decisions.

172.    Those decisions may include:

a. age classification;

b. control override;

c. account restriction;

d. recommendation suppression;

e. safety escalation;

f. exploitation intervention;

g. data-use restriction;

h. material objective change; and

i. public reporting.

173.    Traceability prevents unexplained outcomes from becoming unreviewable authority.

**3. Uncertainty Should Be Defined**

174.    Computational systems should not conceal uncertainty behind a binary conclusion.

175.    They should distinguish:

a. high confidence;

b. moderate confidence;

c. low confidence;

290

      d. conflicting evidence;

      e. missing evidence;

      f. out-of-distribution conditions;

      g. false-positive risk; and

      h. false-negative risk.

176.    Defined uncertainty permits proportionate human response.

177.    A low-confidence age signal may justify review.

178.    It may not justify immediate permanent exclusion.

179.    A high-confidence exploitation signal may justify immediate protective action.

180.    The response should track the confidence and severity.

## 4. Correction Pathways Should Exist

181.    Users, custodians, employees, auditors, and regulators should have defined means to challenge or correct:

      a. inaccurate age classifications;

      b. failed controls;

      c. erroneous restrictions;

      d. misapplied safety decisions;

      e. inaccurate data;

      f. defective account linkage;

      g. incorrect risk inferences; and

      h. misleading public reports.

182.    A governance system without correction reproduces error at scale.

## 5. Human Review Should Be Meaningful

183.    Human review should involve actual authority to:

      a. inspect the material record;

      b. understand the system's reasons;

      c. consider context;

      d. override the outcome;

      e. impose a different remedy;

      f. preserve lawful expression;

      g. escalate serious risk; and

h. correct the underlying system.

184. Nominal review without authority or information is not meaningful review.

### 6. Appeal Should Be Available for Material Decisions

185. Appeal should be available where a decision materially affects:

a. account access;

b. custodial control;

c. lawful expression;

d. identity classification;

e. data rights;

f. exploitation reporting;

g. platform participation; or

h. significant commercial interest.

186. The appeal process should be:

a. accessible;

b. timely;

c. reasoned;

d. traceable;

e. proportionate; and

f. capable of correcting systemic error.

### 7. Public Reporting Should Be Proportionate

187. Public reporting may include:

a. control efficacy;

b. underage-account prevalence;

c. age-assurance accuracy;

d. harmful-pathway trends;

e. exploitation reports;

f. subgroup effects;

g. major system changes;

h. external audit results;

i. data-use categories; and

j. known limitations.

188.    Reporting should protect:

a. user privacy;

b. children's identities;

c. security;

d. lawful proprietary interests;

e. active investigations; and

f. methods whose disclosure would enable evasion.

189.    Public accountability does not require indiscriminate disclosure.

## 8. Human Decisionmakers Should Remain Identifiable

190.    Material governance choices should not disappear into "the algorithm."

191.    The record should identify:

a. who set the objective;

b. who approved the constraint;

c. who accepted the risk;

d. who authorized the change;

e. who reviewed the outcome; and

f. who possessed authority to correct it.

192.    Human accountability remains necessary even where computational systems execute the decision at scale.

## 9. Governance Should Preserve Due Process

193.    Where automated governance affects rights or significant interests, the system should preserve:

a. notice;

b. reasons;

c. access to relevant information;

d. opportunity to respond;

e. human review;

f. correction;

g. appeal; and

h. a record.

194.    The degree of process may vary with the severity and urgency of the decision.

195.    Immediate protective action may precede full review where serious harm is imminent.

196.    Review should follow promptly.

### E. The Root Correction Is Governance of Objectives

197.    The central problem is not that algorithms exist.

198.    Algorithms are means of selecting, ordering, predicting, classifying, and allocating at scale.

199.    The legal and institutional problem arises from the objectives they pursue, the constraints they obey, the measures of success they use, and the authority by which those choices are made.

200.    The root defect appears where operative objectives, constraints, and success measures are insufficiently aligned with the human functions the system mediates.

201.    Social platforms mediate:

   a. communication;

   b. relationship formation;

   c. identity expression;

   d. information access;

   e. commerce;

   f. entertainment;

   g. public discourse;

   h. support;

   i. cultural formation; and

   j. youth development.

202.    Systems governing those functions should not be optimized through a narrow objective while treating all other outcomes as secondary.

203.    The relevant governance question is:

   **What is the system being instructed to produce, what constraints govern that pursuit, what evidence establishes success, and who answers when the objective creates an externality?**

### 1. Objectives Determine Direction

204.    An objective tells the system what to increase, reduce, predict, or prioritize.

205.    Objectives may include:

   a. relevance;

   b. return;

c. watch time;

d. satisfaction;

e. revenue;

f. safety;

g. diversity;

h. task completion;

i. voluntary closure;

j. harmful-exposure reduction; and

k. user benefit.

206.    The chosen objective determines the system's direction.

207.    A system cannot be evaluated coherently without identifying what it was designed to optimize.

## 2. Constraints Define Lawful Boundaries

208.    Constraints determine what the system may not sacrifice in pursuit of the objective.

209.    Constraints may protect:

a. lawful expression;

b. privacy;

c. child safety;

d. custodial authority;

e. data minimization;

f. nondiscrimination;

g. user autonomy;

h. due process;

i. security; and

j. statutory compliance.

210.    A declared safety objective without operational constraint may have little effect.

211.    A commercial objective without meaningful boundary may dominate the system.

## 3. Metrics Determine What Counts as Success

212.    The system will tend to improve what is measured and rewarded.

213.    If success is measured through:

a. time;

295

b. return;

c. impressions;

d. interaction;

e. advertising yield; and

f. retention,

the system will learn to produce those outcomes.

214.    If success also includes:

a. task completion;

b. voluntary closure;

c. control efficacy;

d. reduced harmful escalation;

e. reduced exploitation;

f. user satisfaction;

g. sleep protection;

h. reduced unwanted return;

i. relationship benefit; and

j. proportional data use,

the system can be governed toward a broader human purpose.

## 4. Objective Conflict Should Be Explicit

215.    Objectives will sometimes conflict.

216.    Safety may reduce engagement.

217.    Privacy may reduce personalization.

218.    meaningful exit may reduce retention.

219.    Strong age assurance may increase data collection.

220.    Broad content protection may increase exposure to unhealthy but lawful material.

221.    Strong moderation may increase false positives and suppress lawful speech.

222.    These conflicts cannot be eliminated by rhetoric.

223.    They should be identified, measured, resolved by accountable human authority, and reviewed over time.

## 5. Human Functions Should Define the Governing End

224.    The system exists to mediate human functions.

296

225.    The system's objective should therefore remain subordinate to those functions.

226.    Communication should not be reduced to message volume.

227.    Connection should not be reduced to interaction count.

228.    information should not be reduced to content supply.

229.    benefit should not be reduced to time spent.

230.    safety should not be reduced to the existence of a control.

231.    consent should not be reduced to account creation.

232.    user choice should not be reduced to continued activity.

233.    The human function supplies the governing end.

234.    The metric is merely a means of observing whether that end is being served.

## 6. Root-Level Governance Should Operate Before Harm Accumulates

235.    A sound system should identify:

a. objective drift;

b. control failure;

c. subgroup harm;

d. exploitative pathways;

e. material representation conflict;

f. age-assurance failure;

g. harmful substitution;

h. privacy overreach; and

i. repeated externality transfer

before the condition becomes a large retrospective injury.

236.    Earlier correction is more protective and less costly than later damages.

237.    It also produces a clearer evidentiary record.

## 7. Governance Should Be Continuous

238.    Objectives, models, user behavior, content, and market incentives change.

239.    Governance cannot be a one-time certification.

240.    It should include:

a. continuous monitoring;

b. periodic independent review;

297

c. material-change assessment;

d. incident response;

e. control validation;

f. subgroup analysis;

g. public reporting;

h. correction; and

i. appeal.

### 8. The Objective-Governance Finding

241.    Where platform architecture is challenged, the Court should determine:

a. what objectives governed;

b. what metrics represented success;

c. what constraints applied;

d. what conflicts arose;

e. how those conflicts were resolved;

f. what human authority approved the resolution;

g. what outcomes followed;

h. whether public representations matched actual operation;

i. whether better governance capacity existed; and

j. what correction lies within the platform's control.

### F. The Court Should Recognize the Availability of a Governance Architecture

242.    The Court need not design or operate a technical governance system.

243.    It can recognize that current capacity permits more precise duties than were historically possible.

244.    A lawful governance architecture can require:

a. objective identification;

b. constraint disclosure;

c. control validation;

d. material-change logging;

e. calibrated risk detection;

f. privacy-preserving analysis;

g. auditable recommendations;

298

        h. externality measurement;

        i. human review;

        j. appeal;

        k. public reporting; and

        l. independent oversight.

245. These capacities support narrow and administrable legal fixes.

246. They permit the Court and future lawmakers to move beyond vague commands to "make platforms safer."

247. Duties can instead attach to defined operations.

248. The Court can require evidence concerning:

        a. what was optimized;

        b. what was constrained;

        c. what was measured;

        d. what was known;

        e. what was represented;

        f. what failed;

        g. what externality resulted; and

        h. what correction is feasible.

249. The governing principle is:

**Current computational capacity makes it possible to govern the objectives, constraints, controls, representations, and externalities of complex platforms without converting automated systems into general censors of lawful expression. The proper role of the computational layer is to make operation auditable, conflict visible, uncertainty defined, correction possible, and human authority effective. The root correction is not the elimination of algorithms. It is the lawful governance of what they are instructed to optimize and how success is measured.**

## XII. PROPER LEGAL FIXES

1. The Court should distinguish between remedies available through adjudication now and broader reforms that require prospective legislation or regulation.

2. The distinction should follow institutional competence.

3. Courts are suited to remedy proved deception, unlawful data practices, defective controls, unlawful exploitation pathways, and platform-created increments of harm.

4. Legislatures and regulators are suited to establish uniform prospective duties across an industry.

5. The Court can enforce existing law against identified misconduct.

299

6. It can also identify the point at which the requested relief would cease to remedy a proved breach and begin to function as an industry code.

7. That boundary should be made explicit.

8. Judicial relief should remain:

      a. tied to an identified defendant;

      b. grounded in an existing duty;

      c. supported by proved facts;

      d. directed to a defined mechanism;

      e. proportionate to the causal contribution;

      f. administrable;

      g. consistent with lawful expression; and

      h. capable of meaningful enforcement.

9. Legislative reform should address:

      a. market-wide incentives;

      b. fragmented standards;

      c. incompatible controls;

      d. common data practices;

      e. system transparency;

      f. research access;

      g. auditability;

      h. externality measurement; and

      i. the conditions for safe harbor.

10. The governing division is:

**Courts should correct proved misconduct. Legislatures and regulators should establish prospective duties where durable correction requires uniform rules across the market.**

### A. Judicial Remedies Available Now

11. The Court possesses substantial remedial authority without assuming the role of a legislature.

12. Existing legal doctrines can reach:

a. deception;

b. unlawful data practices;

c. defective or misrepresented controls;

d. platform-created operational escalation;

e. unlawful exploitation pathways;

f. failure after notice;

g. statutory violations;

h. preservation failures;

i. unjust enrichment; and

j. incremental compensable injury.

13. The remedy should correspond to the specific wrong proved.

14. A false representation calls for a remedy directed to the false representation.

15. An unlawful data practice calls for a remedy directed to the data.

16. A defective control calls for a remedy directed to the control.

17. A proved recommendation pathway calls for a remedy directed to that pathway.

18. A proved increment of harm calls for compensation corresponding to that increment.

## 1. Remedies for Proven Deception

19. Deception should remain the clearest judicial lane because it compares a platform-controlled statement with platform-controlled knowledge and operation.

20. Where deception is proven, available relief may include:

a. restitution;

b. corrective disclosure;

c. civil penalties;

d. preservation of internal studies;

e. auditing of represented controls;

f. injunctions tied to specific false statements;

g. removal or correction of unsupported safety claims;

h. notice to affected users or custodians;

i. retention of material records; and

j. monitoring of future representations.

### *1a. Restitution*

21. Restitution should correspond to the benefit obtained through the deceptive conduct.

22. The Court should determine:

    a. what benefit the platform received;

    b. from whom it received it;

    c. whether the benefit resulted from the misrepresentation;

    d. what period is covered;

    e. whether the benefit is traceable;

    f. whether users or custodians relied; and

g. whether another remedy already accounts for the same amount.

23. Restitution may be appropriate where deception induced:

    a. account creation;

    b. continued use;

    c. disclosure of data;

    d. reliance on ineffective controls;

    e. acceptance of targeted advertising;

    f. school or institutional adoption; or

    g. continuation of a commercial relationship.

24. The remedy should restore the value transferred because of the deception.

### 1b. Corrective Disclosure

25. Corrective disclosure should identify:

    a. the prior statement;

    b. the material inaccuracy;

    c. the correct information;

    d. the intended audience;

    e. the method of communication;

    f. the duration of the correction; and

    g. any practical action users or custodians should take.

26. Corrective disclosure may concern:

    a. age-control limits;

    b. parental-control efficacy;

c. data practices;

d. underage-account prevalence;

e. recommendation objectives;

f. safety-tool limitations;

g. exploitation pathways; or

h. conflicts between public claims and actual operation.

27. The correction should reach the audience exposed to the original representation.

### 1c. Civil Penalties

28. Civil penalties should remain tied to the statutory unit of violation.

29. The Court should distinguish among:

a. each false statement;

b. each affected user;

c. each unlawful transaction;

d. each period of continued noncompliance;

e. each unlawful data event; and

f. each legally defined statutory unit.

30. Penalty multiplication should not proceed through an undefined aggregation theory.

31. The Court should account for:

a. knowledge;

b. duration;

c. concealment;

d. repetition;

e. correction;

f. deterrence;

g. proportionality; and

h. duplication with other relief.

### 1d. Preservation of Internal Studies

32. Internal studies may be necessary to test whether public claims matched actual knowledge.

33. Preservation may include:

a. research reports;

303

b. testing records;

c. control-efficacy studies;

d. age-assurance analyses;

e. recommendation-pathway studies;

f. exploitation reports;

g. employee warnings;

h. risk assessments;

i. objective-function documentation; and

j. material communications concerning public representations.

34. Preservation orders should identify the relevant categories, custodians, systems, and periods.

35. Preservation protects the adjudicative record and prevents later correction from erasing proof of the prior condition.

### 1e. Auditing of Represented Controls

36. Where a platform represented that a control was protective, the Court may require independent testing of that represented function.

37. The audit may evaluate:

a. whether the control operates as described;

b. whether it applies across accounts;

c. whether it applies across devices;

d. whether it can be circumvented;

e. whether the platform knows of recurring failure;

f. whether users understand the control;

g. whether settings persist after updates; and

h. whether public descriptions remain accurate.

38. The audit should test the actual claim made.

39. It should not become an open-ended commission to redesign the entire service.

### 1f. Injunctions Tied to Specific False Statements

40. Injunctive relief should identify:

a. the statement prohibited;

b. the factual basis for correction;

c. the conduct required;

  d. the audience;

  e. the duration;

  f. the means of compliance; and

  g. the standard for modification or dissolution.

41. A narrow injunction may prohibit repetition of a defined false claim unless supported by specified evidence.

42. It may also require disclosure of known material limits.

43. The injunction should address deception without compelling the platform to adopt disputed viewpoints or suppress lawful expression.

## 2. Remedies for Unlawful Data Practices

44. Unlawful child-data practices present a direct statutory and operational lane.

45. Available remedies may include:

  a. statutory damages;

  b. civil penalties;

  c. deletion;

  d. restricted processing;

  e. consent correction;

  f. age-related compliance;

  g. reporting;

  h. data-use limitation;

  i. transfer restrictions;

  j. retention limits;

  k. independent audit; and

  l. restitution or disgorgement where legally available.

### 2a. Statutory Remedies

46. Statutory remedies should correspond to the specific duty violated.

47. The Court should identify:

  a. the protected data;

  b. the covered user;

  c. the prohibited conduct;

  d. the consent rule;

305

e. the age threshold;

f. the statutory unit of violation;

g. the duration; and

h. the prescribed remedy.

48. A data claim should not depend on proving generalized psychological harm where the statute protects the data interest itself.

### 2b. Deletion or Restricted Processing

49. Deletion may be appropriate where data was unlawfully collected, retained, inferred, or used.

50. The Court should determine:

a. what data must be deleted;

b. what legally required records may be preserved;

c. whether backups are covered;

d. whether derived profiles are covered;

e. whether linked systems are covered;

f. whether third parties received the data; and

g. how deletion will be verified.

51. Restricted processing may be more appropriate where continued retention is legally required but further commercial use is not.

52. Restrictions may prohibit:

a. targeted advertising;

b. recommendation use;

c. sensitive inference;

d. transfer;

e. cross-service combination;

f. commercial profiling; or

g. use beyond the disclosed purpose.

### 2c. Consent Correction

53. Consent correction may require:

a. renewed consent;

b. verified parental authorization;

c. clear disclosure;

306

d. separate consent for sensitive processing;

e. withdrawal mechanisms;

f. correction of prior misleading forms; and

g. proof that the user understood the relevant choice.

54. Consent should correspond to the actual data use.

55. It should not be reconstructed through broad language after the processing occurred.

### 2d. Age-Related Compliance

56. Age-related relief may require the platform to:

a. identify the applicable legal threshold;

b. review known contradictory age signals;

c. apply appropriate consent rules;

d. limit youth profiling;

e. preserve data-minimization principles;

f. document enforcement;

g. correct repeated-account loopholes; and

h. report material compliance failures.

57. The remedy should remain proportionate to the statutory duty.

### 2e. Reporting

58. Reporting may include:

a. number of affected users;

b. categories of data involved;

c. duration of unlawful processing;

d. corrective action;

e. deletion status;

f. transfer recipients;

g. age-related failure rates; and

h. future compliance measures.

59. Reporting should protect privacy and avoid unnecessary republication of sensitive information.

### 3. Remedies for Defective or Misrepresented Controls

60. Controls should be judged by the function represented.

61. Available relief may include:

      a. functional testing;

      b. efficacy disclosure;

      c. circumvention reporting;

      d. independent validation;

      e. correction of known defects;

      f. revision of misleading descriptions;

      g. notice to affected custodians;

      h. account-linkage correction; and

      i. monitoring after material updates.

### 3a. Functional Testing

62. Functional testing should evaluate the control in real operating conditions.

63. Testing may include:

      a. multiple accounts;

      b. multiple devices;

      c. linked accounts;

      d. user override;

      e. custodial override;

      f. updates;

      g. account recreation;

      h. notification restoration;

      i. deletion and reactivation; and

      j. interaction with device-level controls.

64. The test should determine whether the control performs the function represented to users and custodians.

### 3b. Efficacy Disclosure

65. Where a control has material limitations, those limitations should be disclosed.

66. Disclosure may include:

      a. whether the control is advisory or mandatory;

      b. whether it can be overridden;

      c. whether it applies across accounts;

308

d. whether it applies across devices;

e. whether it depends on separate device settings;

f. known failure conditions;

g. expected accuracy; and

h. whether the platform monitors circumvention.

67. A parent should not be required to infer the practical weakness of a represented safeguard.

### 3c. Circumvention Reporting

68. A platform may be required to report:

a. rates of override;

b. rates of account recreation;

c. multiple-account circumvention;

d. device-layer conflicts;

e. repeated custodial-control defeat;

f. known youth workarounds; and

g. material changes in circumvention after updates.

69. Circumvention reporting should distinguish:

a. user choice;

b. child evasion;

c. platform facilitation;

d. technical failure; and

e. external-device conflict.

### 3d. Independent Validation

70. Independent validation may assess:

a. whether the control works;

b. whether the control is understood;

c. whether the claim is supported;

d. whether testing is reproducible;

e. whether the control degrades over time;

f. whether updates change performance; and

g. whether the platform's public statements remain accurate.

71. Validation should be sufficiently independent to prevent self-certification from becoming the only evidence of effectiveness.

## 4. Remedies for Proven Operational Escalation

72. Where plaintiffs prove platform-created operational escalation, the remedy should address the identified mechanism.

73. Available relief may include:

      a. narrowly tailored modification;

      b. reporting;

      c. monitoring;

      d. compensation tied to incremental harm;

      e. age-sensitive constraints;

      f. exclusion of defined vulnerability signals;

      g. correction of known pathways;

      h. audit of recommendation objectives; and

      i. preservation of relevant system records.

### *4a. Narrowly Tailored Modification*

74. A modification order should identify:

      a. the challenged feature;

      b. the operative objective;

      c. the harmful pathway;

      d. the user population;

      e. the known risk;

      f. the required constraint; and

      g. the standard for compliance.

75. Potential modifications may include:

      a. reducing repeated exposure;

      b. preventing recommendation of defined illegal material;

      c. limiting adult-minor contact suggestions;

      d. applying age-sensitive defaults;

      e. restricting defined vulnerability signals;

      f. respecting active controls;

g. interrupting a proven escalation pathway; or

h. adding a meaningful user choice.

76. The order should not extend beyond the mechanism proved.

### 4b. Reporting

77. Reporting may include:

a. pathway frequency;

b. age distribution;

c. intervention rate;

d. recommendation source;

e. control interaction;

f. false-positive rate;

g. false-negative rate;

h. substitution effect; and

i. post-remedy outcome.

78. Reporting should allow the Court to determine whether the remedy corrected the mechanism or merely displaced it.

### 4c. Monitoring

79. Monitoring may be appropriate where the system changes continuously.

80. Monitoring may include:

a. periodic compliance review;

b. material-change notice;

c. preservation of objective changes;

d. repeat testing;

e. independent audit;

f. incident reporting; and

g. review of subgroup effects.

81. Monitoring should have a defined duration and termination standard.

### 4d. Compensation Tied to Incremental Harm

82. Compensation should correspond to the injury caused or aggravated by the proved platform mechanism.

83. The Court should determine:

      a. baseline condition;

      b. actual exposure;

      c. competing causes;

      d. platform-created increment;

      e. severity;

      f. duration;

      g. mitigation;

      h. comparative responsibility; and

      i. duplication.

84. A platform may bear full responsibility for the increment it caused.

85. It should not automatically bear responsibility for the plaintiff's entire condition.

## 5. Remedies for Illegal Exploitation Pathways

86. Where a platform maintained or failed to correct a known illegal pathway, available relief may include:

      a. account-network correction;

      b. improved reporting;

      c. preservation obligations;

      d. repeat-offender controls;

      e. contact restrictions;

      f. independent review;

      g. statutory penalties;

      h. victim compensation where authorized;

      i. law-enforcement coordination; and

      j. pathway-specific injunction.

87. Relief should identify:

      a. the illegal conduct;

      b. the platform mechanism;

      c. the notice;

      d. the duty;

      e. the failure;

      f. the resulting harm; and

g. the corrective action.

## 6. Judicial Remedies Should Preserve Lawful Expression

88. Judicial relief should distinguish between:

    a. unlawful conduct;

    b. platform-created deception;

    c. nonexpressive operation;

    d. data processing;

    e. defective controls;

    f. recommendation machinery; and

    g. lawful third-party expression.

89. The Court can regulate machinery, representations, data, controls, and illegal pathways without imposing a general prohibition on lawful speech.

90. Any content-related remedy should identify the legal basis for treating the material or pathway as unlawful.

## 7. Judicial Remedies Should Remain Reviewable and Administrable

91. An enforceable order should specify:

    a. what conduct is prohibited;

    b. what conduct is required;

    c. what evidence demonstrates compliance;

    d. who verifies compliance;

    e. what records must be preserved;

    f. what changes require notice;

    g. what disputes may be presented; and

    h. when the order terminates.

92. Vague commands to "protect minors" or "reduce addiction" do not provide an administrable compliance standard.

## 8. The Judicial-Remedy Finding

93. Before ordering relief, the Court should determine:

    a. what existing duty governs;

    b. what breach was proved;

    c. what platform-controlled mechanism caused the injury;

    d. what harm resulted;

313

e. what remedy corresponds to that harm;

f. whether the platform can implement it;

g. whether lawful expression is preserved;

h. whether the remedy is auditable; and

i. whether the requested relief instead requires prospective legislation.

### B. Legislative Fixes

94. Industry-wide defects require prospective, platform-neutral standards.

95. Legislation can establish rules before harm occurs rather than reconstructing duties after the fact.

96. It can also coordinate obligations across:

a. device manufacturers;

b. operating systems;

c. application stores;

d. platforms;

e. advertisers;

f. schools;

g. data processors;

h. researchers;

i. auditors; and

j. regulators.

97. The legislative objective should be to align platform incentives with the human functions the systems mediate.

98. The goal is not to prohibit complex technology.

99. It is to make objectives visible, controls interoperable, claims auditable, data practices bounded, externalities measurable, and liability predictable.

### 1. Uniform Disclosure of Recommendation Objectives

100. Platforms should disclose the broad categories of objectives used in youth-facing recommendation systems.

101. Disclosure may identify whether the system materially considers:

a. relevance;

b. recency;

c. relationship strength;

d. predicted interest;

314

e. watch time;

f. return probability;

g. advertising yield;

h. satisfaction;

i. diversity;

j. safety reduction;

k. commercial sponsorship; and

l. other significant objectives.

102. Disclosure need not reveal source code or every parameter.

103. It should permit users, custodians, regulators, and auditors to understand the broad purposes the system is designed to pursue.

104. The law may require disclosure of:

a. primary objectives;

b. material secondary objectives;

c. major safety constraints;

d. youth-specific modifications;

e. material conflicts; and

f. significant changes.

105. A platform should not publicly characterize a system as primarily serving one objective where another materially governs actual operation.

**2. Standardized Age and Custodial-Control Protocols**

106. Age and custodial controls should operate across device, application-store, and platform layers.

107. Families should not be required to navigate incompatible systems whose settings fail to communicate.

108. Standardized protocols may address:

a. age status;

b. custodial authority;

c. time limits;

d. nighttime settings;

e. notification restrictions;

f. contact permissions;

315

g. content settings;

h. app installation;

i. multiple accounts;

j. device changes;

k. account recreation; and

l. revocation.

109. The system should identify:

a. who set the control;

b. what authority the person possessed;

c. what layer enforced it;

d. whether the control applied across accounts;

e. whether the control applied across devices;

f. whether override was permitted;

g. who could authorize override; and

h. whether circumvention occurred.

110. Standardization should preserve privacy through data minimization and limited-purpose verification.

### 3. Auditable Safeguard Claims

111. A company representing a control as protective should possess evidence supporting the representation.

112. The law may require:

a. predeployment testing;

b. real-world validation;

c. circumvention analysis;

d. user-comprehension testing;

e. periodic revalidation;

f. material-change review;

g. independent audit;

h. disclosure of material limitations; and

i. preservation of supporting evidence.

113. The evidentiary burden should correspond to the claim.

114.    A stronger protective claim should require stronger support.

115.    A safeguard should not be marketed through language that materially exceeds its demonstrated function.

**4. Youth-Data Limitations**

116.    Youth-data law should establish defined rules for:

    a. collection;

    b. inference;

    c. retention;

    d. profiling;

    e. transfer;

    f. targeting;

    g. combination across services;

    h. deletion;

    i. research use; and

    j. security.

117.    The rules should distinguish among:

    a. data necessary for service operation;

    b. data necessary for safety;

    c. data used for personalization;

    d. data used for advertising;

    e. sensitive inference;

    f. data used for age assurance; and

    g. data retained for legal compliance.

118.    Youth-data rules should incorporate:

    a. minimization;

    b. purpose limitation;

    c. retention limitation;

    d. age-sensitive consent;

    e. custodial authorization;

    f. withdrawal;

    g. deletion;

h. transparency;

i. auditability; and

j. proportionality.

119. Safety should not become a pretext for unrestricted surveillance.

**5. A Non-Profiled Access Option**

120. Users should have access to a meaningful non-profiled feed or service mode where feasible.

121. A non-profiled mode may rely on:

a. chronology;

b. direct follows;

c. user-selected categories;

d. contextual rather than behavioral signals;

e. limited personalization;

f. explicit search; or

g. another transparent method.

122. The option should be:

a. accessible;

b. understandable;

c. functionally meaningful;

d. free from hidden behavioral profiling;

e. available without punitive loss of essential functionality; and

f. capable of persistent selection.

123. A nominal option that secretly preserves the same profiling architecture would not satisfy the purpose.

124. The law should define which features may remain personalized for security, safety, or direct user request.

**6. Standardized Externality Reporting**

125. Platforms should report comparable information concerning:

a. underage access;

b. control circumvention;

c. harmful escalation;

d. sleep-period use;

318

e. reported exploitation;

f. substitution effects;

g. efficacy of interventions;

h. age-assurance performance;

i. control failure;

j. repeat-offender reentry;

k. user regret or unwanted return where measured; and

l. major system changes.

126.    Reporting should use standardized definitions.

127.    "Underage account," "control failure," "harmful escalation," "reported exploitation," and "successful intervention" should not vary so widely that comparison becomes meaningless.

128.    Reporting should distinguish:

a. raw counts;

b. rates;

c. severity;

d. user population;

e. time period;

f. confidence level;

g. detection method; and

h. material limitations.

129.    Externality reporting should reveal whether burden is being shifted to families, schools, healthcare systems, law enforcement, or competing services.

## 7. Research Access With Privacy Protection

130.    Independent study should not depend wholly on platform-selected disclosures.

131.    A research-access framework may include:

a. accredited researchers;

b. secure data environments;

c. privacy-preserving access;

d. predefined research questions;

e. data minimization;

f. audit logs;

g. publication protections;

h. security obligations;

i. conflict disclosure; and

j. penalties for misuse.

132.    Researchers should be able to evaluate:

a. recommendation effects;

b. subgroup outcomes;

c. age-assurance performance;

d. control efficacy;

e. harmful pathways;

f. substitution;

g. sleep displacement;

h. exploitation trends; and

i. the relation between engagement and user benefit.

133.    Research access should preserve user privacy and prevent reconstruction of individual identities.

## 8. A Safe-Harbor Structure

134.    Defined safe harbor can create incentives for transparency, correction, and compliance.

135.    Platforms that:

a. disclose objectives;

b. submit to audits;

c. correct known failures;

d. preserve lawful expression;

e. maintain effective controls;

f. report material incidents;

g. preserve relevant records;

h. comply with youth-data limits;

i. provide meaningful appeal; and

j. cooperate with independent review

could receive defined protection from indeterminate liability beyond proved misconduct.

136.    Safe harbor should not immunize:

320

       a. fraud;

       b. concealment;

       c. knowing statutory violations;

       d. unlawful data use;

       e. failure after legally sufficient notice;

       f. obstruction;

       g. destruction of evidence;

       h. deliberate defeat of controls; or

       i. illegal exploitation.

137.    Safe harbor should reward verified good-faith governance.

138.    It should not become a paper-compliance defense.

139.    Eligibility may depend on:

       a. independent audit;

       b. timely correction;

       c. accurate disclosure;

       d. control efficacy;

       e. material-change reporting;

       f. user appeal;

       g. privacy protection; and

       h. absence of knowing concealment.

## 9. No Engagement-Only Welfare Representation

140.    A company should not represent increased engagement as evidence of wellbeing without a valid basis.

141.    The law should distinguish among:

       a. activity;

       b. utility;

       c. satisfaction;

       d. welfare;

       e. commercial success; and

       f. user benefit.

142.    A platform claiming that increased use demonstrates benefit should identify:

a. the measure of benefit;

b. the population studied;

c. the comparison group;

d. the duration;

e. the relevant user-reported outcome;

f. the treatment of regret;

g. the treatment of sleep and concentration;

h. the treatment of substitution; and

i. the limits of the claim.

143.    Engagement may be cited as engagement.

144.    It should not be relabeled as wellbeing without evidence.

**10. Legislative Standards Should Preserve Lawful Expression**

145.    Prospective rules should target:

a. data use;

b. recommendation objectives;

c. notification timing;

d. age assurance;

e. controls;

f. disclosure;

g. auditability;

h. illegal pathways;

i. externality reporting; and

j. user choice.

146.    They should not operate as generalized viewpoint controls.

147.    The law should preserve a clear distinction between governing system operation and dictating lawful content.

**11. Legislative Standards Should Be Platform-Neutral**

148.    Rules should apply according to function and risk rather than corporate identity.

149.    Comparable services should face comparable duties.

150.    The law may distinguish according to:

a. user age;

322

b. service function;

c. direct messaging;

d. public discovery;

e. profiling;

f. advertising;

g. exploitation risk;

h. data sensitivity;

i. scale; and

j. corrective capacity.

151.    Platform-neutral rules reduce competitive distortion and migration toward less transparent services.

## 12. Legislative Standards Should Permit Evolution

152.    Technical systems change rapidly.

153.    Legislation should establish durable principles.

154.    Regulators may supply adaptable technical standards concerning:

a. testing;

b. reporting;

c. auditing;

d. age assurance;

e. control interoperability;

f. privacy preservation;

g. research access;

h. material-change review; and

i. safe-harbor qualification.

155.    Standards should be revised through transparent procedures and evidence.

### C. AI-Governance Requirements

156.    Computational governance should be subject to duties appropriate to systems that classify, recommend, infer, predict, and intervene at scale.

157.    Those duties should include:

a. objective transparency;

b. constraint disclosure;

c. material-change logs;

d. auditable intervention records;

e. separation between commercial optimization and safety evaluation;

f. independent evaluation;

g. human appeal;

h. traceable correction;

i. proportional privacy-preserving monitoring;

j. uncertainty disclosure;

k. role-based access;

l. incident preservation; and

m. accountable human authorization.

## 1. Objective Transparency

158.    Platforms should identify the broad objectives governing material automated systems.

159.    Objective transparency should disclose:

a. what the system is designed to increase;

b. what it is designed to reduce;

c. what commercial objectives apply;

d. what safety objectives apply;

e. what user objectives apply;

f. what youth-specific treatment exists;

g. what conflicts are known; and

h. how material conflicts are resolved.

160.    Transparency need not expose every proprietary detail.

161.    It must permit meaningful legal and institutional review.

## 2. Constraint Disclosure

162.    A platform should identify the principal constraints limiting optimization.

163.    Constraints may concern:

a. lawful expression;

b. child safety;

c. privacy;

324

d. data minimization;

e. custodial authority;

f. exploitation prevention;

g. nondiscrimination;

h. due process;

i. user autonomy; and

j. statutory compliance.

164.    The platform should disclose whether a constraint is:

a. mandatory;

b. advisory;

c. probabilistic;

d. overrideable;

e. age-specific;

f. feature-specific; or

g. subject to commercial tradeoff.

165.    A nominal safety constraint that carries no operational weight should not be represented as a governing protection.

### 3. Material-Change Logs

166.    Platforms should maintain logs of material changes to:

a. recommendation objectives;

b. signal use;

c. youth defaults;

d. safety constraints;

e. age assurance;

f. notification rules;

g. data practices;

h. parental controls;

i. exploitation detection;

j. account architecture; and

k. appeal systems.

167.    A material-change record should identify:

325

a. what changed;

b. why it changed;

c. who approved it;

d. what testing occurred;

e. what risks were identified;

f. what expected benefit was claimed;

g. what monitoring followed; and

h. whether public disclosures were updated.

## 4. Auditable Intervention Records

168. Material automated interventions should generate reviewable records.

169. Relevant interventions may include:

a. account restriction;

b. age classification;

c. safety escalation;

d. recommendation suppression;

e. notification alteration;

f. contact restriction;

g. data-use restriction;

h. exploitation reporting;

i. parental-control override; and

j. removal of unlawful material.

170. The record should preserve:

a. the triggering signal;

b. the rule or model;

c. the confidence level;

d. the material reasons;

e. the outcome;

f. the human review, if any; and

g. the correction pathway.

## 5. Separation Between Commercial Optimization and Safety Evaluation

171.    Safety evaluation should not be subordinated invisibly to commercial optimization.

172.    A governance system should identify when:

   a. safety reduces retention;

   b. privacy reduces targeting;

   c. age assurance reduces account growth;

   d. meaningful exit reduces return;

   e. exploitation controls reduce contact expansion;

   f. data minimization reduces personalization; or

   g. youth protections reduce advertising yield.

173.    The conflict should be recorded.

174.    An accountable human authority should determine the resolution.

175.    Safety review should possess sufficient independence to report a conflict without commercial suppression.

## 6. Independent Evaluation

176.    Material systems should be capable of independent evaluation.

177.    Evaluation may include:

   a. objective review;

   b. control testing;

   c. subgroup analysis;

   d. privacy assessment;

   e. age-assurance review;

   f. harmful-pathway testing;

   g. externality analysis;

   h. representation verification;

   i. bias review; and

   j. appeal-performance review.

178.    Independence should be sufficient to test the platform's claims rather than merely repeat them.

## 7. Human Appeal

179.    Users and custodians should possess a meaningful path to challenge material automated decisions.

180.    Appeal may be required for:

327

a. age classification;

b. account restriction;

c. custodial-control conflict;

d. deletion failure;

e. data-rights denial;

f. mistaken exploitation classification;

g. wrongful content restriction; and

h. other decisions materially affecting rights or access.

181.    Appeal should provide:

a. notice;

b. reasons;

c. opportunity to respond;

d. human review;

e. authority to correct;

f. timely resolution; and

g. a record.

## 8. Traceable Correction

182.    A corrected decision should not disappear as an isolated exception.

183.    The system should determine whether the correction reveals:

a. an individual error;

b. a recurring model failure;

c. a defective rule;

d. a data problem;

e. an age-related bias;

f. a control conflict; or

g. a broader governance defect.

184.    Material corrections should be traceable into system improvement.

185.    Repeated errors should trigger root-level review.

## 9. Proportional Privacy-Preserving Monitoring

186.    Monitoring should be no broader than necessary to evaluate the defined risk.

328

187.　Privacy-preserving methods may include:

　　　a. aggregation;

　　　b. anonymization;

　　　c. secure analysis environments;

　　　d. on-device processing;

　　　e. limited-purpose access;

　　　f. retention limits;

　　　g. role-based access;

　　　h. threshold reporting;

　　　i. privacy-preserving statistics; and

　　　j. independent oversight.

188.　Child protection should not become a justification for unbounded data collection.

189.　The monitoring method should correspond to:

　　　a. the severity of the risk;

　　　b. the reliability of the signal;

　　　c. the sensitivity of the data;

　　　d. the immediacy of the threat;

　　　e. the availability of less intrusive alternatives; and

　　　f. the legal authority for processing.

## 10. Defined Uncertainty

190.　Automated findings should express uncertainty.

191.　The system should distinguish:

　　　a. high-confidence findings;

　　　b. moderate-confidence findings;

　　　c. low-confidence signals;

　　　d. conflicting evidence;

　　　e. missing evidence;

　　　f. false-positive risk;

　　　g. false-negative risk; and

　　　h. conditions beyond the system's reliable range.

329

192.    The intervention should correspond to the degree of confidence and severity of harm.

193.    Defined uncertainty strengthens lawful human review.

## 11. Accountable Human Authorization

194.    Material governance decisions should remain attributable to identifiable human authority.

195.    The record should identify:

a. who set the objective;

b. who approved the constraint;

c. who accepted the risk;

d. who authorized the change;

e. who reviewed the audit;

f. who resolved the conflict; and

g. who possessed authority to correct the system.

196.    "The algorithm" should not become a substitute for human accountability.

### D. The Court Should Identify the Remedial Boundary

197.    The Court can conclude the remedies analysis by separating three categories.

198.    The first category is proved platform misconduct.

199.    That category supports direct judicial relief.

200.    The second category is an unresolved platform-specific risk not yet supported by sufficient proof.

201.    That category may support preservation, discovery, testing, or further adjudication.

202.    The third category is an industry-wide incentive or governance gap.

203.    That category should be identified for prospective legislative or regulatory correction.

204.    For each requested remedy, the Court should ask:

a. What wrong has been proved?

b. What existing duty governs?

c. What actor controls the condition?

d. What remedy corrects the condition?

e. Is the remedy defendant-specific?

f. Does the remedy require a uniform market rule?

g. Does the remedy preserve lawful expression?

h. Does the remedy preserve privacy?

i. Can compliance be audited?

j. Can affected users appeal?

k. Will the remedy improve the user's condition or merely shift activity elsewhere?

l. Does the remedy widen a lawful path for later correction if the initial measure proves insufficient?

205.   That final question is important.

206.   A sound remedy should not close the record after one formal intervention.

207.   It should preserve:

a. monitoring;

b. material-change review;

c. independent evaluation;

d. correction;

e. appeal;

f. supplemental relief;

g. legislative referral; and

h. future enforcement for proved noncompliance.

208.   The governing principle is:

**The Court can remedy proved deception, unlawful data practices, defective controls, illegal pathways, and platform-created increments of harm through precise and auditable relief. Legislatures and regulators should establish uniform prospective standards for recommendation objectives, age and custodial controls, youth-data practices, externality reporting, research access, safe harbor, and automated governance. Judicial relief should correct identified misconduct now while preserving a widening path toward market-wide reform where the defect exceeds the defendant and resides in the structure of the industry.**

## XIII. FIRST AMENDMENT AND SECTION 230 BOUNDARIES MUST REMAIN FEATURE-SPECIFIC

1.   The Court should preserve a feature-specific boundary among third-party expression, editorial judgment, automated operation, commercial conduct, data processing, product controls, and platform-created representations.

2.   The First Amendment and 47 U.S.C. § 230 protect important interests.

3.   They should be applied to the precise function challenged.

4.   They should not be treated as universal labels attached to the platform as a whole.

5.   A social-media platform performs several legally distinct functions.

6.   It may:

    a. host third-party expression;

    b. exercise editorial judgment;

    c. rank or recommend material;

    d. collect and process data;

    e. verify or estimate age;

    f. create account architecture;

    g. design parental controls;

    h. send notifications;

    i. make commercial representations;

    j. sell advertising;

    k. detect unlawful conduct;

    l. preserve evidence;

    m. respond to reports; and

    n. create its own speech.

7. Those functions do not all possess the same constitutional or statutory character.

8. A claim directed to the meaning of lawful third-party content differs from a claim directed to unlawful data collection.

9. A claim directed to editorial selection differs from a claim directed to a falsely represented parental control.

10. A claim directed to a platform's recommendation judgment differs from a claim directed to the platform's use of sensitive youth data to generate that recommendation.

11. A claim directed to the availability of lawful expression differs from a claim directed to failure to report defined unlawful material after notice.

12. The Court should classify the smallest challenged operation before applying the First Amendment or § 230.

13. The governing sequence should be:

    a. identify the challenged act;

    b. identify the actor who performed it;

    c. determine whether the act concerns the meaning of third-party expression;

    d. determine whether the platform exercised editorial judgment;

332

e. determine whether the act was commercial, operational, custodial, statutory, or data-driven;

f. determine whether the plaintiff seeks to treat the platform as the publisher or speaker of third-party content;

g. determine whether the alleged injury arises from the content's message or from the platform's independent conduct; and

h. apply the governing protection to that defined feature.

14. This method protects lawful expression without converting every platform-controlled operation into protected speech.

15. It also preserves § 230 where the claim truly seeks to impose publisher liability for third-party content.

16. The central distinction is:

**Content is not machinery, and machinery is not automatically content.**

### A. Content Is Not Machinery

17. Third-party expression remains attributable to its creator.

18. A user, advertiser, influencer, peer, offender, institution, or other third party who creates a message remains the source of that message.

19. The platform may host, rank, label, recommend, suppress, repeat, monetize, or remove it.

20. Those later operations do not ordinarily make the platform the original author of the content.

21. The Court should preserve the distinction among:

a. authorship;

b. publication;

c. hosting;

d. editorial selection;

e. recommendation;

f. targeting;

g. commercial amplification;

h. moderation;

i. data processing; and

j. platform-created speech.

22. The distinction matters because liability for what the content says may implicate constitutional and statutory protections that do not govern separate platform conduct.

### 1. The Creator Remains Responsible for the Message

333

23. The creator occupies the first causal position concerning:

    a. the words used;

    b. the image depicted;

    c. the request made;

    d. the threat communicated;

    e. the solicitation attempted;

    f. the advice given;

    g. the opinion expressed;

    h. the product promoted;

    i. the unlawful material distributed; and

    j. the cultural claim advanced.

24. Where the alleged wrong is contained in the message itself, the Court should first identify the speaker.

25. That inquiry should not be bypassed merely because the platform made the content visible.

26. A platform's later editorial or operational treatment may create separate responsibility.

27. It does not retroactively transfer authorship.

### 2. Hosting Is Distinct From Creation

28. Hosting makes content available through the service.

29. It does not necessarily establish that the platform:

    a. endorsed the content;

    b. created the content;

    c. adopted the content as its own;

    d. intended the resulting harm;

    e. possessed actual knowledge of every item; or

    f. caused every consequence of the content.

30. Hosting may nonetheless become legally significant where:

    a. the material is unlawful;

    b. the platform receives legally sufficient notice;

    c. a reporting duty applies;

    d. a preservation duty applies;

    e. the platform materially contributes to illegality;

f. the platform creates a separate misrepresentation; or

g. the platform adds an independently actionable operational mechanism.

31. Those inquiries should remain distinct from mere availability.

**3. Publication Concerns the Presentation of Expression**

32. Publication concerns whether and how expression is presented to an audience.

33. Claims based on the publication of lawful third-party speech may implicate:

a. editorial discretion;

b. the First Amendment;

c. § 230;

d. traditional publisher principles; and

e. the rights of speakers and listeners.

34. The Court should identify whether the plaintiff's theory depends on:

a. the content's message;

b. its availability;

c. the platform's decision to include it;

d. the platform's decision to exclude competing material;

e. the platform's recommendation of it;

f. a commercial transaction surrounding it; or

g. a separate nonexpressive mechanism.

35. Liability should not be imposed on lawful expression through relabeling alone.

**4. Editorial Selection Is a Distinct Function**

36. Editorial selection may include:

a. inclusion;

b. exclusion;

c. ordering;

d. prioritization;

e. suppression;

f. labeling;

g. recommendation;

h. moderation;

335

        i. curation; and

        j. search presentation.

37. These decisions may communicate judgment concerning relevance, importance, safety, quality, or suitability.

38. They may therefore contain expressive elements.

39. The Court should determine whether the challenged feature reflects:

        a. a human editorial judgment;

        b. a rule implementing that judgment;

        c. automated prediction;

        d. commercial targeting;

        e. neutral user-directed sorting;

        f. a safety constraint; or

        g. a combination of those functions.

40. The existence of automation does not automatically eliminate the expressive character of an editorial choice.

41. The existence of expressive judgment does not automatically immunize every data or commercial practice used to implement it.

## 5. Lawful Harmful Expression Remains Legally Distinct From Unlawful Conduct

42. Some lawful expression may be:

        a. offensive;

        b. unhealthy;

        c. manipulative;

        d. distressing;

        e. culturally degraded;

        f. commercially aggressive;

        g. politically extreme;

        h. emotionally harmful; or

        i. socially undesirable.

43. Those characteristics do not automatically make the expression unlawful.

44. The Court should distinguish lawful expression from:

        a. threats;

        b. unlawful solicitation;

336

   c. fraud;

   d. trafficking;

   e. extortion;

   f. child sexual-abuse material;

   g. unlawful image distribution;

   h. criminal conspiracy;

   i. actionable defamation; and

   j. other legally unprotected conduct.

45. That distinction should remain visible throughout the liability analysis.

## 6. Recommendation Does Not Transfer Authorship

46. A platform that recommends lawful third-party content does not thereby become the author of the underlying message.

47. Recommendation may create a separate issue concerning:

   a. selection;

   b. ordering;

   c. targeting;

   d. repetition;

   e. age-sensitive delivery;

   f. commercial optimization;

   g. use of vulnerability signals;

   h. escalation; or

   i. misrepresentation of how the system operates.

48. The plaintiff should identify which of those operations is challenged.

49. The theory should not depend on treating recommendation as retroactive creation.

## 7. User Selection Must Remain Part of the Record

50. The Court should distinguish content reached through:

   a. direct search;

   b. following;

   c. subscription;

   d. peer sharing;

   e. direct messaging;

337

f. user-selected category;

g. chronological feed;

h. unsolicited recommendation;

i. advertising; or

j. system-generated escalation.

51. User-directed exposure differs from platform-introduced exposure.

52. Both may be present in the same sequence.

53. The First Amendment and § 230 analysis should follow the actual pathway.

## 8. The Content Finding

54. For each content-related claim, the Court should determine:

a. who created the content;

b. whether the content was lawful;

c. whether the injury arose from the message;

d. whether the user selected it;

e. whether the platform merely hosted it;

f. whether the platform exercised editorial judgment;

g. whether the platform added a separate operational mechanism;

h. whether the claim seeks to treat the platform as the publisher or speaker; and

i. whether an independent duty exists apart from the content.

### B. Machinery Is Not Automatically Expression

55. Platform machinery should not be treated as constitutionally protected expression merely because it operates within a service that publishes speech.

56. Platforms also engage in conduct that is commercial, technical, operational, statutory, and data-driven.

57. That conduct may be regulated independently of the meaning of lawful third-party expression.

58. Relevant nonexpressive or independently regulable conduct may include:

a. data collection;

b. data retention;

c. data transfer;

d. age verification;

e. age estimation;

338

      f. account creation;

      g. account deletion;

      h. parental-control efficacy;

      i. notification timing;

      j. consent architecture;

      k. identity authentication;

      l. safety-tool testing;

      m. commercial representations;

      n. record preservation;

      o. statutory reporting; and

      p. compliance auditing.

59. The Court should classify each operation according to what it actually does.

60. The fact that an operation affects the distribution of expression does not make every legal duty concerning that operation a regulation of speech.

**1. Data Collection Is Distinct From Editorial Judgment**

61. Data collection concerns what information the platform obtains.

62. The Court should distinguish:

      a. collection;

      b. inference;

      c. retention;

      d. profiling;

      e. targeting;

      f. transfer;

      g. deletion;

      h. security; and

      i. disclosure.

63. These operations may support recommendation or publication.

64. Their legal character does not disappear because the data is later used in an expressive environment.

65. A law requiring valid consent or limiting youth profiling may regulate data conduct without dictating what lawful viewpoint may be expressed.

**2. Age Verification Is an Access Function**

339

66. Age verification and age estimation concern whether a person may enter or use a service under defined conditions.

67. They may involve:

> a. self-declaration;
>
> b. parental consent;
>
> c. identity documentation;
>
> d. device signals;
>
> e. age estimation;
>
> f. account relationships;
>
> g. behavioral inference; or
>
> h. repeated-account detection.

68. These systems may affect access to expression.

69. Their principal function is gatekeeping.

70. The Court should distinguish a rule governing age assurance from a rule suppressing a viewpoint.

71. Any age-related requirement should remain proportionate, privacy-conscious, and consistent with lawful access rights.

### 3. Control Efficacy Is an Operational Fact

72. A parental, custodial, or user control either performs the function represented or it does not.

73. Control efficacy may be tested through:

> a. account records;
>
> b. device interaction;
>
> c. multiple-account behavior;
>
> d. circumvention rates;
>
> e. persistence after updates;
>
> f. override rules;
>
> g. user comprehension;
>
> h. audit; and
>
> i. functional testing.

74. A claim that a platform misrepresented the efficacy of a control does not necessarily seek to impose liability for third-party speech.

75. It seeks to compare a platform-created statement with a platform-controlled product function.

340

### 4. Commercial Representations Are Independently Attributable to the Platform

76. The platform is responsible for its own commercial statements.

77. Those statements may concern:

> a. safety;
>
> b. privacy;
>
> c. youth protection;
>
> d. parental controls;
>
> e. age enforcement;
>
> f. data practices;
>
> g. harmful-content reduction;
>
> h. recommendation objectives;
>
> i. research findings; or
>
> j. product efficacy.

78. A claim directed to the falsity of those statements is based on platform-created speech, not third-party content.

79. The Court can adjudicate whether the statement was:

> a. factual;
>
> b. material;
>
> c. false or misleading;
>
> d. contradicted by internal knowledge;
>
> e. relied upon; and
>
> f. causally connected to injury.

80. The First Amendment does not convert false commercial representation into protected editorial discretion.

### 5. Notification Timing Is an Operational Mechanism

81. A notification may refer to expressive content.

82. The timing and frequency of the prompt are separate platform-controlled operations.

83. The Court may evaluate:

> a. whether notifications were enabled;
>
> b. when they were sent;
>
> c. whether they were age-sensitive;

341

d. whether they continued after nonresponse;

e. whether the user disabled them;

f. whether the platform restored them;

g. whether the prompt was truthful; and

h. whether the notification materially changed use.

84. Regulation of timing does not necessarily regulate the viewpoint of the underlying content.

## 6. Account Architecture Is Operational

85. Account architecture concerns:

a. creation;

b. authentication;

c. duplication;

d. recreation;

e. suspension;

f. deletion;

g. deactivation;

h. age controls;

i. linked accounts; and

j. custodial permissions.

86. These functions may affect access to speech.

87. They also create independently adjudicable operational duties.

88. A claim that a platform falsely represented account deletion or knowingly permitted repeated evasion of custodial restrictions is not necessarily a claim about the meaning of third-party speech.

## 7. Statutory Reporting and Preservation Are Independent Duties

89. A platform may possess legal duties concerning:

a. reporting defined unlawful material;

b. preserving evidence;

c. retaining account records;

d. responding to lawful process;

e. disabling known offender accounts; and

f. maintaining required compliance records.

342

90. Those duties arise from law.

91. They should not be displaced merely because the underlying service also hosts protected expression.

92. The Court should identify the precise statutory duty and the conduct required.

## 8. Safety Testing and Auditing Are Operational

93. Testing whether a safeguard functions as represented does not require the Court to decide what lawful content may exist.

94. Auditing may assess:

    a. control efficacy;

    b. age-assurance accuracy;

    c. notification compliance;

    d. account-recreation rates;

    e. exploitation pathways;

    f. data-use compliance;

    g. material-change logs; and

    h. representation accuracy.

95. Such review governs the integrity of the system.

96. It does not necessarily govern the ideas transmitted through it.

## 9. The Machinery Finding

97. For each machinery-based claim, the Court should determine:

    a. what operation is challenged;

    b. whether the operation itself communicates a message;

    c. whether the duty regulates content or conduct;

    d. whether lawful viewpoints are affected;

    e. whether the operation is commercial, technical, or statutory;

    f. whether the platform created and controlled it;

    g. whether a less speech-restrictive remedy is available; and

    h. whether the plaintiff's theory remains independent of publisher status.

## C. Recommendation Is a Mixed Function

98. Recommendation should not be classified categorically as either pure speech or pure machinery.

99. A recommendation system may combine:

343

   a. editorial judgment;

   b. user choice;

   c. prediction;

   d. automated ranking;

   e. commercial optimization;

   f. safety constraints;

   g. data processing;

   h. content moderation;

   i. relationship inference; and

   j. platform-created prompts.

100.   The legal character of recommendation depends on which component is challenged.

101.   The Court should therefore resist both overbroad propositions:

   a. that every recommendation is wholly protected editorial expression; and

   b. that every recommendation is a nonexpressive product operation.

102.   A feature-specific inquiry is required.

## 1. Editorial Judgment

103.   Recommendation may reflect a judgment that certain material is relevant, interesting, important, safe, timely, or suitable.

104.   That judgment may be implemented through:

   a. human curation;

   b. editorial policy;

   c. rule-based ranking;

   d. learned prediction;

   e. safety exclusion; or

   f. combinations of those methods.

105.   Where the claim seeks to impose liability because the platform selected lawful content for presentation, editorial protection may be directly implicated.

106.   The Court should identify the precise editorial choice.

## 2. User Choice

107.   Recommendation may be responsive to user conduct.

108.   Relevant conduct may include:

344

a. following;

b. searching;

c. liking;

d. viewing;

e. sharing;

f. messaging;

g. saving;

h. hiding;

i. reporting; or

j. selecting a category.

109.    A system that responds to direct user choice differs from one that independently introduces a new category or pathway.

110.    The Court should identify what the user selected and what the system added.

## 3. Prediction

111. Recommendation often uses prediction.

112.    The system may predict:

a. relevance;

b. interest;

c. likelihood of viewing;

d. likelihood of return;

e. likelihood of interaction;

f. advertising response;

g. relationship strength;

h. satisfaction; or

i. safety risk.

113.    Prediction is an analytical operation.

114.    Its use may support editorial judgment.

115.    It may also involve independently regulated data practices.

116.    The Court should distinguish the protected selection judgment from any unlawful data collection or profiling used to generate it.

## 4. Automated Ranking

345

117.    Automated ranking orders material according to defined signals and objectives.

118.    The Court should identify:

a. the objective;

b. the major signals;

c. the user's prior conduct;

d. the age-related treatment;

e. the safety constraints;

f. the commercial influence;

g. the content category; and

h. the resulting exposure.

119.    Automation does not resolve the constitutional question by itself.

120.    The relevant issue is what function the automated ranking performs and what legal theory challenges it.

## 5. Commercial Optimization

121.    Recommendation may be influenced by commercial objectives.

122.    Those objectives may include:

a. advertising yield;

b. sponsored placement;

c. conversion;

d. session duration;

e. return frequency;

f. creator monetization;

g. account growth; or

h. commercial partnership.

123.    Commercial influence may be relevant to:

a. disclosure;

b. deception;

c. sponsorship labeling;

d. targeting;

e. youth-data use;

f. restitution; and

346

g. consumer protection.

124.    A commercial recommendation may retain expressive elements.

125.    It may also create independently regulable commercial conduct.

## 6. Safety Constraints

126.    Recommendation systems may include safety constraints designed to:

a. reduce unlawful material;

b. limit adult-minor contact;

c. interrupt harmful pathways;

d. reduce repeated exposure;

e. enforce youth defaults;

f. respect custodial controls;

g. limit sensitive targeting; or

h. respond to crisis signals.

127.    The existence, efficacy, and representation of those constraints are platform-controlled facts.

128.    A claim that the platform falsely represented a safety constraint or knowingly disabled it differs from a claim seeking liability for the lawful message of recommended content.

## 7. Recommendation May Contain Several Legally Distinct Acts

129.    A single recommendation event may include:

a. collection of user data;

b. inference of interest;

c. prediction of response;

d. editorial selection;

e. commercial ranking;

f. safety filtering;

g. notification;

h. delivery; and

i. logging of the result.

130.    Each act may implicate a different legal rule.

131.    The Court should not classify the entire sequence through the most protected or least protected component.

132.    It should identify the conduct actually challenged.

347

### 8. Content-Based and Mechanism-Based Recommendation Claims Must Be Separated

133.     A content-based recommendation claim alleges injury because of what the recommended material said or depicted.

134.     A mechanism-based recommendation claim alleges injury because the platform:

   a. used unlawful data;

   b. targeted a minor improperly;

   c. defeated a control;

   d. concealed a commercial objective;

   e. repeated material through a known harmful pathway;

   f. recommended an unlawful account;

   g. misrepresented the system; or

   h. created a measurable nonexpressive operational injury.

135.     The Court should determine which theory is actually presented.

### 9. The Recommendation Finding

136.     For each recommendation claim, the Court should determine:

   a. what content was involved;

   b. who created it;

   c. whether it was lawful;

   d. what the user selected;

   e. what the platform predicted;

   f. what objective governed;

   g. what data was used;

   h. what commercial factors applied;

   i. what safety constraints operated;

   j. whether the claim targets the message or the mechanism;

   k. whether the platform made an independent representation; and

   l. what incremental harm followed from the platform-controlled act.

### D. Section 230 Should Apply to the Precise Publisher Function Asserted

137.     Section 230 analysis should remain tied to the claim actually pleaded and the duty actually asserted.

138.     The Court should determine whether the plaintiff seeks to treat the platform as the publisher or speaker of information provided by another information-content provider.

139. That inquiry requires attention to:

a. who created the information;

b. what duty the plaintiff alleges;

c. whether the duty arises from publication;

d. whether liability depends on the content's existence or meaning;

e. whether the platform materially contributed to the alleged illegality;

f. whether the claim rests on the platform's own representation;

g. whether an independent statutory or operational duty applies; and

h. whether the requested remedy would require content-based editorial control.

140. The label assigned by a party should not govern.

141. The substance of the duty should.

## 1. Publisher-Based Claims

142. A claim is more likely to implicate § 230 where liability depends on the platform's decision to:

a. publish;

b. withdraw;

c. postpone;

d. alter;

e. organize;

f. display;

g. moderate;

h. remove; or

i. prioritize

third-party information.

143. The Court should identify whether the alleged duty would require the platform to monitor, edit, remove, or suppress third-party content because of what that content says.

144. Such claims sit near the core publisher function.

## 2. Platform-Created Representations

145. A claim based on the platform's own statement should not be converted into a third-party publisher claim merely because the statement concerned third-party content.

146. The platform remains the creator of its own representation.

147. The Court should identify:

a. the exact statement;

b. the platform as speaker;

c. the subject matter;

d. the internal knowledge;

e. the material discrepancy; and

f. the resulting reliance or harm.

148.     Section 230 should not erase direct responsibility for platform-created speech.

### 3. Independent Data Duties

149.     Claims based on unlawful collection, inference, retention, transfer, or profiling may arise independently of publisher status.

150.     The Court should determine whether liability would exist even if the platform never published the relevant third-party content.

151.     Where the answer is yes, the duty may be independent of the publisher function.

152.     The analysis should remain attentive to whether the requested remedy would indirectly regulate content selection.

### 4. Independent Control Duties

153.     Claims concerning parental controls, deletion, age assurance, consent, or account architecture may also arise independently of third-party content.

154.     The Court should ask whether the alleged breach concerns:

a. what the control promised;

b. how it operated;

c. whether the platform defeated it;

d. whether the limitation was disclosed; and

e. what injury followed.

155.     Where the duty concerns a platform-created control, § 230 should not be applied merely because third-party content remained accessible after the control failed.

### 5. Failure After Notice

156.     Claims based on notice require precise classification.

157.     Notice alone does not automatically remove publisher protection.

158.     The Court should identify:

a. what material or conduct was reported;

b. whether it was unlawful;

350

      c. what statutory duty applied;

      d. whether the platform possessed an independent reporting or preservation duty;

      e. whether the claim seeks removal because of content; and

      f. whether the platform independently contributed to the unlawful pathway.

159. The governing duty, rather than notice in the abstract, should control.

## 6. Material Contribution

160. Where a platform materially contributes to the alleged unlawfulness, the Court should identify the specific contribution.

161. The contribution may concern:

      a. platform-created content;

      b. unlawful solicitation prompts;

      c. deceptive labeling;

      d. required unlawful information;

      e. platform-generated misrepresentation;

      f. direct participation in the transaction; or

      g. another defined act.

162. Ordinary tools available to lawful and unlawful users should be distinguished from conduct that materially develops the illegality itself.

## 7. Remedy Matters

163. Section 230 analysis should also consider the practical operation of the requested remedy.

164. A remedy that requires the platform to suppress lawful third-party content because of its message may implicate the publisher function directly.

165. A remedy requiring accurate disclosure, lawful data processing, functional controls, or preservation of evidence may operate independently.

166. The Court should identify what the order would compel the platform to do.

## 8. The Section 230 Finding

167. For each claim potentially implicating § 230, the Court should determine:

      a. who created the information;

      b. whether the plaintiff seeks to treat the platform as publisher or speaker;

      c. what duty is alleged;

      d. whether the duty exists independently of publication;

      e. whether the platform created its own representation;

f. whether the platform materially contributed to illegality;

g. whether a statutory duty applies;

h. what remedy is sought; and

i. whether that remedy regulates content or independent conduct.

### E. The First Amendment Inquiry Should Follow the Challenged Function

168.    The First Amendment analysis should likewise remain feature-specific.

169.    The Court should identify whether the challenged conduct is:

a. speech;

b. editorial judgment;

c. commercial speech;

d. conduct with expressive elements;

e. nonexpressive conduct;

f. data processing;

g. product operation;

h. statutory compliance; or

i. a mixed function.

170.    The constitutional analysis should follow that classification.

### 1. Editorial Discretion

171.    Editorial discretion may protect a platform's choice concerning what lawful expression to present, organize, prioritize, or exclude.

172.    The strength of that interest depends on:

a. the function performed;

b. the platform's role;

c. the nature of the compelled or prohibited act;

d. whether the law is content-based;

e. whether viewpoint discrimination is involved;

f. whether the platform is being compelled to carry speech; and

g. whether the regulation targets expression or independent conduct.

173.    The Court should not presume that every algorithmic choice is constitutionally identical.

### 2. Commercial Speech

174.    Platform-created commercial representations may receive protection consistent with commercial-speech doctrine.

175.    False or misleading commercial speech is treated differently from truthful lawful expression.

176.    The Court should classify:

        a. the speaker;

        b. the audience;

        c. the commercial purpose;

        d. the factual claim;

        e. the truthfulness;

        f. the materiality; and

        g. the remedy.

177.    An injunction against a proved false safety claim does not present the same issue as suppression of lawful third-party opinion.

**3. Conduct With Incidental Effects on Speech**

178.    A rule governing data, age assurance, notification timing, control efficacy, or reporting may incidentally affect speech.

179.    The Court should determine:

        a. whether the rule targets expression;

        b. whether it targets conduct;

        c. whether it is content-neutral;

        d. whether it is narrowly tailored;

        e. whether less restrictive means exist;

        f. whether the burden is proportional; and

        g. whether lawful expression remains available.

180.    Incidental effect should not be confused with direct content regulation.

**4. Compelled Disclosure**

181.    Disclosure requirements may concern:

        a. sponsorship;

        b. data practices;

        c. age-control limits;

        d. recommendation objectives;

        e. safety-tool efficacy;

353

f. known product limitations; or

g. commercial conflicts.

182.    The Court should distinguish factual operational disclosure from compelled ideological affirmation.

183.    A requirement to disclose how a product works differs from a requirement to endorse a disputed viewpoint.

## 5. Governmental Overreach Should Remain Visible

184.    Feature-specific analysis protects against overbroad governmental control.

185.    A generalized duty to suppress "harmful" lawful content could permit:

a. viewpoint discrimination;

b. ideological pressure;

c. political censorship;

d. suppression of minority expression;

e. overremoval;

f. vague enforcement; and

g. indirect coercion of editorial judgment.

186.    The Court should require legally defined predicates and narrow remedies.

## 6. The First Amendment Finding

187.    For each claim raising constitutional concerns, the Court should determine:

a. what act is regulated;

b. whether the act is expressive;

c. whether editorial judgment is implicated;

d. whether the speech is commercial;

e. whether the regulation is content-based;

f. whether viewpoint is implicated;

g. whether the duty targets conduct independently of expression;

h. whether the remedy is narrowly tailored; and

i. whether lawful speech remains protected.

### F. The Governing Binary

188.    The Court should preserve a clear binary between liability based on what lawful expression says and liability based on what the platform itself represented, collected, or independently caused.

354

189.    The binary should be stated directly:

**Liability for what lawful expression says must be separated from liability for what a platform truthfully or falsely represented, lawfully or unlawfully collected, and independently caused through its own nonexpressive operation.**

190.    The first category concerns:

a. third-party content;

b. authorship;

c. publication;

d. editorial judgment;

e. listener rights;

f. the First Amendment; and

g. § 230.

191.    The second category concerns:

a. platform-created commercial representations;

b. unlawful data practices;

c. age-assurance systems;

d. control efficacy;

e. account architecture;

f. notification timing;

g. statutory reporting;

h. evidence preservation;

i. platform-created operational escalation; and

j. independent platform-caused harm.

192.    The categories may interact.

193.    They should not be merged.

## 1. Content-Based Liability

194.    Content-based liability asks whether the platform may be held responsible because lawful third-party expression conveyed a particular message.

195.    That theory implicates the strongest expressive and publisher protections.

196.    The Court should require precision concerning:

a. the content;

b. the creator;

355

c. the alleged harm;

d. the platform's editorial role;

e. the legal status of the expression; and

f. the requested remedy.

## 2. Independent Platform Liability

197.    Independent platform liability asks whether the platform itself:

a. made a false statement;

b. collected data unlawfully;

c. defeated a control;

d. misrepresented a safeguard;

e. violated an age-related duty;

f. maintained a known illegal pathway;

g. failed to preserve or report as required;

h. used sensitive data improperly;

i. generated an actionable operational escalation; or

j. caused a measurable injury through a nonexpressive mechanism.

198.    Those claims should be adjudicated according to the duty governing the platform's own conduct.

## 3. Mixed Claims Require Separation

199.    A mixed claim may involve both third-party content and independent platform operation.

200.    The Court should separate the components.

201.    For example, a claim may allege:

a. lawful third-party content;

b. unlawful youth-data profiling;

c. targeted recommendation;

d. false safety representation;

e. failed parental control; and

f. resulting incremental harm.

202.    The lawful content component may receive constitutional and statutory protection.

203.    The independent data, deception, and control components may remain adjudicable.

204.    The protected component should not immunize the unprotected component.

356

205.     The unprotected component should not become a pretext for punishing the protected component.

**4. Remedy Should Follow the Classified Component**

206.     The remedy should correspond to the specific component proved.

207.     A content-based claim may require dismissal, protection, or a narrowly defined exception grounded in law.

208.     A deception claim may support corrective disclosure.

209.     A data claim may support deletion or restricted processing.

210.     A control claim may support validation and correction.

211.     An illegal-pathway claim may support reporting, preservation, and pathway-specific injunction.

212.     A recommendation-mechanism claim may support narrowly tailored operational relief.

213.     The Court should not impose a content-suppression remedy for a data violation or a system-wide design remedy for a false statement unless the evidentiary connection is established.

## G. The Court Should Apply a Feature-Specific Boundary Test

214.     For each challenged platform feature, the Court should ask:

a. What exact act is challenged?

b. Who created the underlying content?

c. Is the content lawful?

d. Does the claim depend on what the content says?

e. Does the claim seek to treat the platform as publisher or speaker?

f. Did the platform exercise editorial judgment?

g. Did the platform make an independent representation?

h. Did the platform collect or use data independently?

i. Did the platform create or defeat a control?

j. Did the platform materially contribute to illegality?

k. Does an independent statutory duty apply?

l. Is the challenged operation expressive, commercial, operational, or mixed?

m. What remedy is sought?

n. Would that remedy burden lawful expression?

o. Can the proved wrong be corrected through a narrower non-content remedy?

357

215.    This test permits the Court to preserve both constitutional protection and direct accountability.

216.    It prevents First Amendment doctrine from being stretched across every technical feature of a platform.

217.    It prevents § 230 from being treated as a general immunity for the platform's own conduct.

218.    It also prevents product, data, or consumer-protection theories from being used to evade lawful protections for third-party expression and editorial judgment.

219.    The governing principle is:

**First Amendment and § 230 analysis should attach to the feature, duty, and injury actually before the Court. Third-party expression remains attributable to its creator. Editorial judgment receives the protection appropriate to editorial judgment. Data collection, age assurance, control efficacy, commercial representation, statutory reporting, and other independent platform operations remain subject to the law governing those acts. Recommendation is mixed and must be classified component by component. The protected character of lawful content should neither immunize separate platform misconduct nor be dissolved by relabeling a content-based claim as product design.**

---

## XIV. REMEDY MUST FOLLOW DUTY AND PROVED CONTRIBUTION

1.   Remedy should follow the duty breached and the contribution proved.

2.   The existence of a serious injury does not determine the identity of the responsible actor.

3.   The existence of a statutory violation does not determine the proper measure of damages.

4.   The existence of several affected parties does not permit the same externality to be multiplied without limit.

5.   The remedial inquiry should proceed in a fixed order:

   a. What duty governed?

   b. Who owed it?

   c. What conduct breached it?

   d. What benefit did the defendant receive?

   e. What injury did the breach add?

   f. What statutory unit governs any penalty?

   g. What condition can the defendant actually correct?

   h. What portion of the defect lies beyond the defendant and requires an industry-wide rule?

6.   That sequence separates six distinct forms of relief:

   a. restitution;

        b. compensation;

        c. statutory penalty;

        d. corrective disclosure;

        e. injunction;

        f. legislation or regulation.

7. Those remedies serve different functions.

8. Restitution removes a benefit received through unlawful conduct.

9. Compensation repairs injury attributable to the defendant.

10. Penalty responds to culpability and a legally defined unit of violation.

11. Corrective disclosure repairs a material informational disparity.

12. Injunction directs an actor to correct a condition within that actor's control.

13. Legislation addresses defects shared across the market.

14. The Court should resist remedial theories that combine these purposes into one undifferentiated monetary demand.

15. A remedy that exceeds the duty or contribution proved transfers externalities rather than correcting them.

16. A remedy that falls short of the proved contribution leaves the externality with the injured party.

17. The governing rule should therefore be reciprocal:

    **No actor should retain the benefit of an unlawful act, no injured party should bear the loss caused by another actor's proved breach, and no defendant should be charged with injuries or externalities beyond the duty and causal contribution established.**

### A. No Duplicated Externality Transfer

18. The same underlying event should not be multiplied automatically across every person, institution, account, period, data point, or system interaction connected to it.

19. A single episode may affect:

            a. a child;

            b. a parent;

            c. a school;

            d. a school district;

            e. a municipality;

            f. a state;

       g. a healthcare provider;

       h. an account;

       i. several related accounts;

       j. several days;

       k. many views;

       l. many recommendations;

       m. many data points; and

       n. several statements.

20.  Those relationships may support several legally distinct injuries.

21.  They do not automatically create several recoveries for the same injury.

22.  The Court should distinguish:

       a. one injury experienced by several parties;

       b. several independent injuries arising from one event;

       c. derivative expense;

       d. direct expense;

       e. statutory injury;

       f. compensatory injury;

       g. restitutionary benefit;

       h. public expenditure;

       i. overlapping governmental claims; and

       j. separate violations defined by law.

23.  The same loss should not be relabeled repeatedly as:

       a. individual damages;

       b. parental damages;

       c. school costs;

       d. governmental injury;

       e. restitution;

       f. disgorgement;

       g. statutory damages; and

       h. civil penalties

without identifying the distinct legal interest served by each recovery.

## 1. Child and Parent Claims

24. A child and parent may each possess legally cognizable interests.

25. The child may claim:

>> a. physical injury;

>> b. psychological injury;

>> c. loss of privacy;

>> d. unlawful data use;

>> e. exploitation;

>> f. treatment costs personally borne;

>> g. lost educational opportunity; or

>> h. another direct injury.

26. A parent may claim:

>> a. out-of-pocket expense;

>> b. loss recognized by governing law;

>> c. reliance on a false representation;

>> d. cost caused by defective controls;

>> e. time spent responding to a defined breach; or

>> f. another independently recognized injury.

27. The Court should determine whether the parent's claim is:

>> a. independent;

>> b. derivative;

>> c. duplicative;

>> d. assigned;

>> e. reimbursed; or

>> f. already included in the child's damages.

28. The same medical bill should not be recovered twice.

29. A parent's independent reliance injury should not disappear merely because the child was also harmed.

## 2. School and Government Claims

30. A school, district, municipality, and state may all incur costs after the same event.

31. The Court should determine:

      a. which entity actually paid;

      b. which entity bore the legal obligation;

      c. whether reimbursement occurred;

      d. whether funds were transferred among public entities;

      e. whether the expense was ordinary;

      f. whether it was incremental;

      g. whether another claimant already seeks the same amount; and

      h. whether a statute creates a separate sovereign interest.

32. An expenditure moved from one public account to another is not automatically a new externality.

33. A state's regulatory injury may differ from a school's direct operational expense.

34. The distinction must be proved.

### 3. Account Multiplication

35. A user may possess several accounts.

36. One course of conduct may therefore appear in several account records.

37. The Court should determine whether each account reflects:

      a. a separate unlawful admission;

      b. a separate false statement;

      c. a separate data collection;

      d. a circumvention event;

      e. a repeated-account architecture failure;

      f. continuation of one underlying condition; or

      g. a legally defined separate violation.

38. Account count should not become a penalty multiplier unless the governing law makes each account a distinct unit.

39. The same child's use through several accounts may establish repeated control failure.

40. It does not automatically establish several complete personal injuries.

### 4. Day-Based Multiplication

41. A continuing condition may persist across several days.

42. The Court should distinguish:

      a. one continuing violation;

b. a violation renewed daily by statute;

c. separate daily collection events;

d. repeated false statements;

e. ongoing failure after notice; and

f. one injury whose effects continued over time.

43. Time can increase severity.

44. It does not define the statutory unit unless the law says it does.

**5. View and Impression Multiplication**

45. One item may generate many views or impressions.

46. The Court should determine whether the alleged wrong concerns:

a. the original publication;

b. each individual display;

c. targeting;

d. repeated recommendation;

e. commercial gain;

f. user exposure; or

g. a statutory unit tied to each transmission.

47. A million impressions may prove scale.

48. They do not automatically create a million compensable injuries.

49. Repetition may aggravate one injury.

50. It may also create several independent exposures.

51. The theory should state which.

**6. Recommendation Multiplication**

52. A recommendation sequence may contain many automated selections.

53. The Court should distinguish:

a. one pathway;

b. several materially distinct pathways;

c. repeated delivery of the same category;

d. separate users;

e. separate injuries;

363

f. one continuing objective; and

g. a legally defined unit of violation.

54. Recommendation count may be relevant to:

a. frequency;

b. escalation;

c. notice;

d. system design;

e. causation;

f. commercial benefit; and

g. Remedy.

55. It should not become an automatic damages multiplier detached from actual injury.

## 7. Data-Point Multiplication

56. Modern systems may collect thousands or millions of data points concerning one user.

57. The Court should determine whether the governing duty treats:

a. each data point;

b. each collection event;

c. each category of data;

d. each user;

e. each unlawful purpose;

f. each transfer;

g. each day of retention; or

h. each affected account

as the unit of violation.

58. The statute should control.

59. The size of a dataset may prove seriousness or commercial value.

60. It does not permit an invented unit of penalty.

## 8. Statement Multiplication

61. A false representation may be repeated through:

a. websites;

b. press releases;

> c. parental materials;
>
> d. terms of service;
>
> e. regulatory submissions;
>
> f. testimony;
>
> g. advertising;
>
> h. school communications; and
>
> i. in-product messages.

62. The Court should determine whether those are:

> a. separate statements;
>
> b. republications of one claim;
>
> c. statements to distinct audiences;
>
> d. continuing omissions;
>
> e. independently relied-upon representations; or
>
> f. one course of deceptive conduct.

63. The remedy should reflect materiality, reach, reliance, culpability, and statutory structure.

## 9. Distinct Injury Must Support Distinct Recovery

64. Multiple recoveries may be proper where the claimant proves distinct interests.

65. Examples may include:

> a. personal injury to the child;
>
> b. independent parental reliance;
>
> c. school expenditure beyond baseline duty;
>
> d. unlawful data processing;
>
> e. state consumer-protection injury;
>
> f. restitution of defendant gain; and
>
> g. statutory penalty for a separately defined violation.

66. The Court should identify the nonoverlapping legal function of each award.

67. An award should not duplicate another merely because the law permits several forms of relief.

## 10. The Nonduplication Finding

68. Before awarding relief, the Court should determine:

> a. what event occurred;

b. what distinct injuries resulted;

c. who bore each injury;

d. what expenses were paid;

e. what amounts were reimbursed;

f. what benefits the defendant received;

g. what statutory violations occurred;

h. what units govern;

i. what claims overlap; and

j. what recovery remains genuinely independent.

### B. Restitution Follows Receipt

69. Restitution should follow the benefit received through the unlawful act.

70. Its purpose is not to compensate every injury.

71. Its purpose is to prevent retention of an unjust or unlawful gain.

72. The principal question is:

**What benefit did the defendant receive through the conduct proved unlawful?**

73. The answer may include:

a. money;

b. advertising revenue;

c. subscription revenue;

d. data;

e. commercial profiling;

f. increased inventory;

g. retained users;

h. avoided expense;

i. competitive advantage;

j. content value; or

k. another traceable benefit.

74. The Court should identify the connection between the unlawful act and the benefit received.

### 1. Money Received

75. Direct monetary benefit may arise through:

        a. subscriptions;

        b. purchases;

        c. advertising attributable to unlawful targeting;

        d. fees;

        e. commercial transactions; or

        f. institutional contracts induced by deception.

76. The Court should determine the amount actually received because of the violation.

77. Gross revenue should not automatically equal unjust gain.

78. The proper measure may require consideration of:

        a. causation;

        b. allocation;

        c. lawful portions of the transaction;

        d. direct cost;

        e. statutory rules; and

        f. tracing.

## 2. Advertising Revenue

79. Advertising revenue may be connected to:

        a. underage use;

        b. unlawful profiling;

        c. deceptive retention;

        d. invalid consent;

        e. increased impressions;

        f. specific targeting; or

        g. exploitation of sensitive data.

80. The Court should identify:

        a. what advertisements were served;

        b. to whom;

        c. through what data practice;

        d. over what period;

        e. what revenue was attributable; and

f. whether the use was unlawful.

81. Total platform advertising revenue should not substitute for a traceable benefit.

### 3. Data as Benefit

82. Data can possess commercial and operational value.

83. That value may arise from:

    a. targeting;

    b. prediction;

    c. recommendation;

    d. product development;

    e. model improvement;

    f. audience segmentation;

    g. account retention;

    h. cross-service combination; and

    i. resale or transfer.

84. Restitution based on data should identify:

    a. what data was obtained;

    b. how it was used;

    c. what value it produced;

    d. whether the value is measurable;

    e. whether the data remains in use; and

    f. whether deletion or restricted processing is a superior remedy.

### 4. Avoided Cost

85. A defendant may receive benefit by avoiding an expense it was legally required to bear.

86. Avoided cost may include:

    a. safety testing;

    b. age assurance;

    c. control validation;

    d. data compliance;

    e. reporting;

    f. preservation;

g. auditing;

h. system correction; or

i. required staffing.

87. The Court should determine whether the avoided expense is properly restitutionary, compensatory, penal, or injunctive under the governing law.

## 5. Competitive Advantage

88. Unlawful conduct may create a competitive advantage by:

a. retaining users longer;

b. collecting more data;

c. reducing compliance expense;

d. weakening controls;

e. increasing advertising yield;

f. concealing risk; or

g. acquiring users through misleading claims.

89. A competitive advantage may support restitution where it is sufficiently concrete and traceable.

90. It should not be calculated through speculation.

## 6. Restitution and Compensation Must Remain Distinct

91. Restitution asks what the defendant received.

92. Compensation asks what the plaintiff lost.

93. The amounts may differ.

94. A defendant may gain substantially more than one plaintiff lost.

95. A plaintiff may suffer substantial injury even where the defendant received little direct financial gain.

96. The Court should not use one measure as a substitute for the other.

## 7. Restitution and Penalty Must Remain Distinct

97. Restitution removes gain.

98. Penalty punishes or deters according to law.

99. An award labeled restitution should not include an undisclosed punitive multiplier.

100.    A penalty should not be disguised as a rough estimate of defendant benefit.

## 8. The Restitution Finding

101.    Before awarding restitution, the Court should determine:

a. what unlawful act occurred;

b. what benefit the defendant received;

c. from whom or through what transaction it was received;

d. whether the benefit is traceable;

e. whether lawful and unlawful portions can be separated;

f. whether the benefit remains in the defendant's possession;

g. whether deletion, return, or monetary payment is appropriate; and

h. whether the award duplicates compensation or penalty.

### C. Compensation Follows Attributable Injury

102.    Compensation should follow injury attributable to the proved breach.

103.    The central question is:

**What injury was added by the defendant's conduct after the baseline and competing causes are accounted for?**

104.    Compensation should restore the injured party, so far as law permits, to the position that would likely have existed absent the breach.

105.    That requires a counterfactual.

106.    The Court should determine:

a. the plaintiff's baseline condition;

b. the defendant-controlled act;

c. the timing of that act;

d. the injury that followed;

e. alternative causes;

f. comparative responsibility;

g. mitigation;

h. duration; and

i. the increment fairly attributable to the defendant.

### 1. Baseline Injury

107.    A plaintiff may possess a preexisting condition.

108.    That condition may include:

a. anxiety;

b. depression;

370

      c. bullying;

      d. family conflict;

      e. sleep problems;

      f. eating concerns;

      g. self-harm history;

      h. social isolation;

      i. trauma;

      j. other platform use; or

      k. prior functional impairment.

109.  A preexisting condition does not bar recovery for aggravation.

110.  It defines the condition from which aggravation must be measured.

## 2. Incremental Injury

111. The platform-created increment may include:

      a. additional exposure;

      b. intensified content;

      c. prolonged duration;

      d. delayed intervention;

      e. increased contact with offenders;

      f. worsened clinical condition;

      g. loss of privacy;

      h. additional treatment;

      i. educational disruption;

      j. added institutional cost; or

      k. another measurable harm.

112.  The increment should correspond to the conduct proved.

113.  A defective control may cause harm through delayed intervention.

114.  An unlawful recommendation pathway may cause harm through additional exposure.

115.  A false representation may cause harm through reliance.

116.  Unlawful data use may create an independent privacy injury.

## 3. Alternative Causes

117. Alternative causes should be allocated rather than ignored.

118. Relevant causes may include:

    a. custodial decisions;

    b. school conditions;

    c. peer conduct;

    d. offender conduct;

    e. competing platforms;

    f. general smartphone use;

    g. gaming;

    h. streaming;

    i. family circumstances;

    j. clinical history; and

    k. broader cultural conditions.

119. Their presence does not automatically defeat causation.

120. It limits the portion of the total injury assignable to the defendant.

## 4. Comparative Responsibility

121. Comparative responsibility should track actual duty and causal contribution.

122. The Court should distinguish:

    a. the user's conduct;

    b. the custodian's conduct;

    c. the school's conduct;

    d. the content creator's conduct;

    e. the offender's conduct;

    f. the platform's conduct;

    g. the government's regulatory role; and

    h. the role of other services.

123. Responsibility should not be transferred merely because one actor is more solvent or visible.

## 5. Mitigation

124. The injured party and responsible custodians may possess a duty to mitigate.

125. Mitigation may include:

a. device removal;

b. account closure;

c. treatment;

d. school intervention;

e. notification restriction;

f. control activation;

g. law-enforcement contact;

h. platform reporting;

i. supervision; and

j. use reduction.

126.    The platform may impair mitigation through:

a. false information;

b. defective controls;

c. concealed limitations;

d. account recreation;

e. continued unlawful contact; or

f. failure after notice.

127.    The mitigation analysis should account for both sides.

## 6. Duration and Severity

128.    Compensation should reflect:

a. severity;

b. duration;

c. recurrence;

d. treatment;

e. functional impact;

f. permanence;

g. probability of future harm; and

h. degree of causal confidence.

129.    Scale should arise from injury, not from raw counts detached from injury.

## 7. Public-Entity Compensation

130.    Public plaintiffs should recover net incremental expense caused by the breach.

131.    They should identify:

>    a. baseline duty;
>
>    b. ordinary expenditure;
>
>    c. platform-specific breach;
>
>    d. added burden;
>
>    e. institutional contribution;
>
>    f. mitigation;
>
>    g. reimbursement; and
>
>    h. overlap with other claims.

132.    Total program cost is not the proper measure unless the breach caused the entire program.

## 8. Compensation and Statutory Damages

133.    Statutory damages may operate independently of traditional compensatory proof.

134.    The Court should identify whether the statute:

>    a. substitutes for difficult-to-measure injury;
>
>    b. supplements actual damages;
>
>    c. prohibits double recovery;
>
>    d. defines per-person or per-event amounts;
>
>    e. requires knowledge; and
>
>    f. permits aggregate treatment.

135.    Statutory structure should control.

## 9. The Compensation Finding

136.    Before awarding compensation, the Court should determine:

>    a. what injury existed before the breach;
>
>    b. what conduct the defendant added;
>
>    c. what injury followed from that conduct;
>
>    d. what competing causes existed;
>
>    e. what mitigation occurred;
>
>    f. what portion is attributable;
>
>    g. what amount repairs that portion; and

374

h. whether the award duplicates restitution, public expense, insurance recovery, or another claimant's damages.

### D. Penalty Follows Culpability and Statutory Unit

137.    Penalty should follow culpability and the unit of violation defined by law.

138.    The Court should not create a penalty unit from the scale of the platform.

139.    The governing question is:

**What constitutes one violation under the statute, and what degree of culpability does the law require?**

140.    Relevant statutory units may include:

a. one user;

b. one child;

c. one account;

d. one transaction;

e. one statement;

f. one data collection;

g. one transfer;

h. one day;

i. one failure after notice;

j. one unlawful contact;

k. one report omitted; or

l. one continuing course of conduct.

141.    The statute, not remedial intuition, should determine the unit.

### 1. Culpability

142.    Penalty may depend on:

a. negligence;

b. recklessness;

c. knowledge;

d. willfulness;

e. concealment;

f. repeated violation;

g. failure after notice;

h. obstruction;

i. destruction of evidence; or

j. refusal to correct.

143.    The Court should determine the culpability associated with each violation.

144.    A technical first-time error differs from deliberate concealment.

145.    A prompt correction differs from knowing continuation.

## 2. Statutory Unit

146.    The Court should identify the legally defined unit before multiplication.

147.    Relevant questions include:

a. Does each user create a separate violation?

b. Does each collection event count separately?

c. Does each day renew the violation?

d. Is a continuing practice one violation?

e. Does each false statement count separately?

f. Does republication create a new unit?

g. Does each affected account count?

h. Does the statute cap aggregate recovery?

148.    Ambiguity should be resolved through statutory interpretation, not arithmetic preference.

## 3. Scale

149.    Scale may affect penalty where the statute permits consideration of:

a. number of affected users;

b. duration;

c. commercial benefit;

d. seriousness;

e. vulnerability of the population;

f. deterrence;

g. prior violations; and

h. ability to pay.

150.    Scale should influence the lawful penalty.

151.    It should not replace the statutory unit.

376

### 4. Repetition

152.　Repetition may establish:

　　　　a. separate violations;

　　　　b. continuing violation;

　　　　c. increased culpability;

　　　　d. notice;

　　　　e. failure to correct; or

　　　　f. systemic conduct.

153.　The legal consequence depends on the statute.

154.　Repetition should not be counted twice as both a multiplier and a separate culpability enhancement unless the law permits both.

### 5. Civil Penalty and Punitive Damages

155.　Civil penalties and punitive damages serve related but distinct functions.

156.　The Court should determine:

　　　　a. the statutory basis;

　　　　b. the common-law basis;

　　　　c. the culpability standard;

　　　　d. the protected interest;

　　　　e. the amount already imposed;

　　　　f. duplication; and

　　　　g. constitutional proportionality.

157.　The same misconduct should not be punished repeatedly under different labels without accounting.

### 6. Penalty and Restitution

158.　A defendant may be required both to surrender unlawful gain and pay a penalty.

159.　The Court should state which portion serves restitution and which portion serves deterrence or punishment.

160.　Transparency in classification prevents double counting.

### 7. Penalty and Compensation

161.　Compensation repairs loss.

162.　Penalty responds to culpability.

163.　A large compensatory award should not be treated automatically as punishment.

377

164. A penalty should not be justified by injury already fully compensated without reference to the statutory purpose.

**8. The Penalty Finding**

165. Before imposing penalty, the Court should determine:

  a. the statute violated;

  b. the elements;

  c. the required culpability;

  d. the unit of violation;

  e. the number of units;

  f. the duration;

  g. the scale;

  h. the benefit received;

  i. prior notice;

  j. corrective action;

  k. other penalties or awards; and

  l. proportionality.

*E. Injunction Follows Control*

166. Injunctive relief should follow the defendant's actual capacity to correct the condition.

167. The central question is:

  **What can the defendant lawfully and practically change?**

168. A platform can correct conditions within its systems.

169. It cannot directly correct:

  a. family structure;

  b. school culture;

  c. all smartphone use;

  d. every competing platform;

  e. broader social demand;

  f. every third-party viewpoint;

  g. every peer relationship; or

  h. every market incentive.

170. It may be able to correct:

a. a false statement;

b. a data practice;

c. a control;

d. a recommendation objective;

e. a notification rule;

f. an account pathway;

g. an exploitation pathway;

h. a reporting failure;

i. a preservation failure; or

j. an age-related setting.

## 1. The Controlled Condition

171.    The injunction should identify the precise condition the defendant controls.

172.    It should state:

a. what feature is involved;

b. what representation is involved;

c. what data practice is involved;

d. what user group is affected;

e. what duty governs;

f. what correction is required; and

g. what evidence demonstrates compliance.

## 2. Corrective Disclosure

173.    A platform can correct its own false or misleading statement.

174.    An injunction may require:

a. cessation;

b. revision;

c. disclosure of material limits;

d. notice to affected users;

e. evidence supporting future claims; and

f. preservation of supporting records.

## 3. Data Correction

175.    A platform can alter:

a. collection;

b. inference;

c. retention;

d. transfer;

e. targeting;

f. deletion;

g. consent; and

h. profiling.

176.    The injunction should identify the data and prohibited or required use.

**4. Control Correction**

177.    A platform can:

a. repair a control;

b. disclose limitations;

c. prevent unauthorized override;

d. apply restrictions across linked accounts;

e. preserve settings after updates;

f. validate functionality; and

g. report circumvention.

178.    The injunction should not promise a result beyond the platform's operational capacity.

**5. Recommendation Correction**

179.    A platform may be able to:

a. change an objective;

b. add a constraint;

c. exclude a defined signal;

d. limit repetition;

e. interrupt a proved pathway;

f. change youth defaults;

g. preserve a non-profiled option; and

h. audit material changes.

180.     The order should identify the proved mechanism and avoid an open-ended demand to prevent all harmful outcomes.

## 6. Exploitation-Pathway Correction

181.     A platform can address:

        a. repeat-offender accounts;

        b. adult-minor contact recommendations;

        c. report handling;

        d. evidence preservation;

        e. required reporting;

        f. account reentry;

        g. contact limits; and

        h. known unlawful pathways.

182.     The injunction should remain tied to defined illegal conduct and direct platform control.

## 7. Auditability

183.     An injunction should include an auditable compliance method.

184.     That method may include:

        a. functional testing;

        b. reporting;

        c. material-change logs;

        d. independent review;

        e. record preservation;

        f. incident notice;

        g. user complaint review; and

        h. defined metrics.

185.     Compliance should not depend solely on the defendant's conclusion that the problem has been solved.

## 8. Duration and Modification

186.     An injunction should identify:

        a. its duration;

        b. review intervals;

        c. modification standard;

381

> d. termination standard;
>
> e. material-change obligations; and
>
> f. procedures for supplemental relief.

187.    A continuing technical order should remain capable of adaptation where systems change.

## 9. Narrow Tailoring

188.    Injunctive relief should correct the wrong without extending into unrelated systems or lawful expression.

189.    The Court should determine:

> a. whether the order targets the proved conduct;
>
> b. whether less intrusive relief exists;
>
> c. whether privacy is preserved;
>
> d. whether lawful speech remains available;
>
> e. whether the order is technically feasible;
>
> f. whether the order creates substitution; and
>
> g. whether the order improves the relevant outcome.

## 10. The Injunction Finding

190.    Before entering an injunction, the Court should determine:

> a. what condition exists;
>
> b. what duty was breached;
>
> c. what part the defendant controls;
>
> d. what correction is technically possible;
>
> e. what evidence proves compliance;
>
> f. what lawful interests may be affected;
>
> g. what substitution may occur;
>
> h. what review is required; and
>
> i. what residual defect remains for other actors or institutions.

### F. Legislation Follows Systemic Defect

191.    Legislation should address defects that cannot be repaired through a defendant-specific order.

192.    The central question is:

**What correction requires a rule applicable across the industry?**

382

193.    A systemic defect may arise where:

a. the incentive is shared across firms;

b. unilateral correction creates competitive disadvantage;

c. users can migrate easily;

d. controls require interoperability;

e. age assurance requires common standards;

f. reporting requires comparable definitions;

g. research access requires uniform obligations;

h. externalities move among platforms; or

i. the defect lies in the market's measure of success.

**1. Shared Objectives**

194.    If the industry broadly optimizes for:

a. attention;

b. retention;

c. advertising yield;

d. return frequency;

e. impression volume; or

f. behavioral prediction,

a rule directed to one platform may leave the market incentive unchanged.

195.    Legislation can establish common constraints and disclosure duties.

**2. Interoperable Controls**

196.    Parental and custodial controls may require coordination among:

a. devices;

b. operating systems;

c. app stores;

d. platforms;

e. browsers;

f. schools; and

g. household systems.

197.    One defendant cannot create universal interoperability alone.

383

198. A common protocol requires rulemaking or coordinated standard-setting.

### 3. Standardized Age Assurance

199. Age assurance presents shared questions of:

    a. accuracy;

    b. privacy;

    c. data minimization;

    d. false positives;

    e. false negatives;

    f. parental consent;

    g. account recreation; and

h. cross-service recognition.

200. Uniform obligations reduce inconsistent duties and migration toward weaker systems.

### 4. Common Externality Reporting

201. Industry-wide reporting requires common definitions for:

    a. underage access;

    b. harmful escalation;

    c. control failure;

    d. sleep-period use;

    e. exploitation;

    f. substitution;

    g. intervention efficacy; and

    h. user benefit.

202. A court order directed to one defendant cannot produce full market comparability.

### 5. Research Access

203. Independent comparative research requires access across firms.

204. Legislation can create privacy-preserving standards for:

    a. accredited researchers;

    b. secure data access;

    c. replication;

    d. disclosure;

e. audit;

f. publication; and

g. misuse prevention.

## 6. Safe Harbor

205.    A safe-harbor regime requires uniform qualification standards.

206.    It may reward firms that:

a. disclose objectives;

b. validate controls;

c. preserve records;

d. submit to audits;

e. correct known failures;

f. maintain appeals;

g. report externalities; and

h. comply with youth-data limits.

207.    A court ordinarily cannot create an industry-wide liability bargain of this kind through one case.

## 7. Market-Wide Metrics

208.    The use of engagement as a proxy for benefit is a structural market problem.

209.    Legislation or regulation may require reporting of:

a. user satisfaction;

b. task completion;

c. voluntary closure;

d. regret;

e. sleep displacement;

f. substitution;

g. control efficacy;

h. harmful escalation; and

i. relationship effects.

210.    Common metrics permit comparison and reduce the incentive to report activity as welfare.

## 8. Prospective Application

211.    Systemic duties should ordinarily operate prospectively.

212.    Prospective rules provide:

a. notice;

b. uniformity;

c. technical standards;

d. compliance pathways;

e. safe harbor;

f. enforcement structure;

g. review; and

h. adaptability.

213.    They avoid converting unsettled policy into retroactive damages.

## 9. Judicial Identification of the Boundary

214.    The Court can identify the systemic defect without legislating.

215.    It can state:

a. what defendant-specific misconduct has been proved;

b. what direct remedy is available;

c. what market-wide incentive remains;

d. why defendant-specific relief cannot fully correct it;

e. what prospective rule is required; and

f. what institutional actor possesses authority to establish it.

216.    That finding preserves the record and widens the lawful path for broader reform.

## 10. The Legislative Finding

217.    Where a proposed remedy reaches beyond one defendant, the Court should determine:

a. whether the defect is shared;

b. whether competitors use the same practice;

c. whether user migration will occur;

d. whether unilateral correction will preserve the incentive;

e. whether interoperability is required;

f. whether common definitions are necessary;

g. whether a prospective standard is needed; and

h. whether the matter should be left to legislation or regulation after the defendant-specific claims are resolved.

386

### G. The Court Should Apply a Remedy-Allocation Matrix

218.    The Court can unify remedial analysis through a fixed matrix.

219.    For each proved wrong, the Court should identify:

a. the duty;

b. the actor;

c. the breach;

d. the benefit received;

e. the injury added;

f. the statutory unit;

g. the condition controlled;

h. the systemic remainder; and

i. the remedy corresponding to each.

220.    The matrix should operate as follows:

a. deception → corrective disclosure, restitution, penalty, and narrow injunction where authorized;

b. unlawful data practice → statutory relief, deletion, restricted processing, consent correction, and audit;

c. defective control → testing, disclosure, validation, repair, and compensation for proved incremental harm;

d. operational escalation → pathway-specific modification, reporting, monitoring, and compensation;

e. illegal exploitation pathway → reporting, preservation, account correction, statutory relief, and victim-specific compensation;

f. duplicative claim → allocation and prevention of double recovery;

g. industry-wide incentive → prospective legislation, regulation, or common standard.

221.    This structure prevents remedy from exceeding causation.

222.    It also prevents defendants from retaining gains or externalizing harms merely because causation is distributed.

223.    The Court should correct each proved wrong at the level where it exists.

224.    The governing principle is:

**Restitution follows the benefit received. Compensation follows the injury attributable to the breach. Penalty follows culpability and the statutory unit. Injunction follows the condition within the defendant's control. Legislation follows the defect shared across the market. The same externality should not be multiplied automatically across every**

**person, account, day, view, recommendation, data point, statement, or public entity connected to the underlying event.**

---

## XV. PROPOSED DECISIONAL MATRIX

1. The Court can reduce the coordinated proceedings to a common decisional matrix.

2. The purpose of the matrix is not to force every claim into a false binary.

3. Its purpose is to identify the controlling distinction before evidence, doctrine, causation, and remedy are applied.

4. Each claim should be tested through the same sequence.

5. The Court should ask:

   a. who enabled the relevant access;

   b. who created the relevant content or condition;

   c. what platform-controlled operation is challenged;

   d. whether the platform's representations were accurate;

   e. whether the data practice was lawful;

   f. whether any control functioned as represented;

   g. whether the platform added a distinct increment of harm;

   h. whether the alleged defect is platform-wide or industry-wide;

   i. who possessed authority and capacity to intervene;

   j. what remedy corresponds to the proved duty and contribution;

   k. whether the requested recovery duplicates another injury or award; and

   l. whether the proposed remedy improves the relevant outcome or merely displaces the conduct.

6. The resulting matrix is:

| Question | Controlling Distinction |
|---|---|
| Who authorized or enabled access? | Custodian / institution / platform |
| Who created the content? | Third party / platform |

388

| | |
|---|---|
| What conduct is being challenged? | Speech selection / commercial or operational conduct |
| Was the relevant statement accurate? | Truthful / deceptive |
| Was the data use lawful? | Authorized / unlawful |
| Was the control effective as represented? | Substantiated / misrepresented or defective |
| Did the platform add harm? | Distinct platform increment / surrounding environment |
| Is the defect defendant-specific? | Platform-wide / industry-wide |
| Who had authority to intervene? | Custodian / institutional steward / platform within service boundary |
| What remedy fits the proved wrong? | Compensation / restitution / correction / penalty / legislation |
| Is the requested relief duplicative? | Distinct injury / repeated counting |
| Does the remedy improve outcomes? | Functional correction / displacement |

7. Each line of the matrix should produce a specific finding.

8. The Court should not move directly from broad allegation to broad remedy.

9. It should identify the governing side of each distinction and explain the evidence supporting that classification.

### A. Access

10. The first question is:

   **Who authorized or enabled the child's access?**

11. The relevant classifications are:

   a. custodian-enabled access;

   b. institution-enabled access;

   c. child-obtained access through misrepresentation or circumvention;

   d. device- or application-layer access; and

   e. platform-enabled access through inadequate or misrepresented controls.

12. The Court should identify:

      a. who supplied the device;

      b. who permitted installation;

      c. who authorized the account;

      d. what age representation was made;

      e. what controls existed;

      f. whether those controls functioned;

      g. whether access continued after observable dysfunction; and

      h. what portion of access was within the defendant's control.

13. Access identifies the threshold condition.

14. It does not by itself determine liability for later platform conduct.

### B. Content Origin

15. The second question is:

**Who created the content or condition alleged to have caused harm?**

16. The controlling distinction is:

      a. third-party creation; or

      b. platform creation.

17. Third-party creators may include:

      a. users;

      b. peers;

      c. advertisers;

      d. influencers;

      e. predators;

      f. schools;

      g. governmental actors;

      h. cultural institutions; and

      i. commercial organizations.

18. Platform-created material may include:

      a. safety statements;

      b. prompts;

390

c. notifications;

d. labels;

e. onboarding language;

f. product claims;

g. recommendations framed as platform communications; and

h. commercial representations.

19.  The Court should preserve the distinction between:

a. who created the message; and

b. what the platform later did with it.

### C. Nature of the Challenged Conduct

20.  The third question is:

**Is the plaintiff challenging speech selection or commercial and operational conduct?**

21.  The relevant classifications include:

a. editorial selection;

b. publication;

c. recommendation;

d. data collection;

e. profiling;

f. notification timing;

g. age assurance;

h. account architecture;

i. control efficacy;

j. commercial representation;

k. statutory reporting; and

l. evidence preservation.

22.  The Court should determine whether the alleged injury arises from:

a. what lawful content says;

b. the platform's choice to publish or prioritize it;

c. the platform's use of data;

d. the platform's own false statement;

391

e. a defective control;

f. a platform-generated escalation mechanism; or

g. another independently actionable operation.

23. First Amendment and § 230 protections should attach to the classified function, not to the platform in gross.

### D. Truthfulness

24. The fourth question is:

**Was the relevant platform statement truthful or deceptive?**

25. The Court should compare:

a. the precise statement;

b. the intended audience;

c. the platform's internal knowledge;

d. the actual system operation;

e. the performance of the represented safeguard;

f. the materiality of any discrepancy;

g. reliance; and

h. resulting harm.

26. A truthful statement may still describe a system later challenged on another ground.

27. A deceptive statement may be independently actionable even where the underlying feature is otherwise lawful.

### E. Data Legality

28. The fifth question is:

**Was the relevant data use authorized and lawful?**

29. The Court should identify:

a. what data was collected;

b. whether the user was a minor;

c. what consent or authority existed;

d. what purpose was disclosed;

e. what purpose was actually pursued;

f. what inference was created;

g. whether profiling occurred;

392

h. whether the data was transferred;

i. whether retention was lawful; and

j. whether the data materially altered exposure.

30. The controlling distinction is:

a. lawful and authorized processing; or

b. unlawful, excessive, undisclosed, or unauthorized processing.

31. Data injury may exist independently of generalized health injury.

### F. Control Efficacy

32. The sixth question is:

**Did the control function as represented?**

33. The Court should determine:

a. what the control purported to do;

b. who activated it;

c. whether it was advisory or mandatory;

d. whether it applied across accounts;

e. whether it applied across devices;

f. how it could be overridden;

g. whether the platform facilitated circumvention;

h. whether limitations were disclosed; and

i. what harm followed from failure.

34. The controlling distinction is:

a. substantiated control; or

b. defective, defeated, or misrepresented control.

35. A functioning but limited control should not be treated as deceptive where its limits were accurately disclosed.

36. A symbolic safeguard should not be treated as effective merely because it existed.

### G. Incremental Harm

37. The seventh question is:

**What harm did the platform itself add?**

38. The Court should distinguish:

a. the surrounding environment;

393

b. preexisting dysfunction;

c. custodial conduct;

d. school conditions;

e. third-party content;

f. offender conduct;

g. use of other platforms;

h. general smartphone use; and

i. the platform-controlled increment.

39. The platform-specific increment may consist of:

a. additional exposure;

b. repeated exposure;

c. intensified exposure;

d. delayed intervention;

e. failed control;

f. unlawful profiling;

g. increased contact with offenders;

h. reliance on a false statement;

i. loss of privacy; or

j. measurable worsening of a defined condition.

40. The controlling distinction is:

a. distinct defendant-created increment; or

b. injury arising primarily from the surrounding environment.

41. Liability should follow the proved increment.

### H. Level of the Defect

42. The eighth question is:

**Is the defect specific to the defendant or common across the industry?**

43. A platform-wide defect may include:

a. a false statement;

b. a specific data practice;

c. a particular control failure;

d. a specific recommendation objective;

e. a known illegal pathway;

f. a particular account architecture; or

g. a concealed internal finding.

44. An industry-wide defect may include:

a. attention monetization;

b. retention-based competition;

c. fragmented parental controls;

d. inconsistent age assurance;

e. opaque recommendation objectives;

f. nonstandardized externality reporting;

g. common profiling incentives; or

h. reliance on engagement as a proxy for benefit.

45. The controlling distinction is:

a. platform-wide defect susceptible to direct adjudication; or

b. industry-wide defect requiring prospective common standards.

## *I. Authority to Intervene*

46. The ninth question is:

**Who possessed authority, proximity, knowledge, and capacity to intervene?**

47. The relevant actors may include:

a. a parent or guardian;

b. a school;

c. a healthcare provider;

d. a residential institution;

e. government through law;

f. the platform within its service boundary; and

g. more than one actor at different stages.

48. The Court should identify:

a. who observed the condition;

b. who possessed relevant knowledge;

c. who could alter access;

d. who could obtain treatment;

e. who could discipline peer conduct;

f. who could repair the platform mechanism;

g. who could report or preserve unlawful material; and

h. who failed to act within an existing duty.

49. The classifications are not mutually exclusive.

50. Several actors may possess distinct duties without any one actor inheriting all responsibility.

### *J. Remedy*

51. The tenth question is:

**What remedy corresponds to the proved duty, breach, benefit, injury, and corrective capacity?**

52. The proper classification may be:

a. compensation;

b. restitution;

c. corrective disclosure;

d. statutory penalty;

e. data deletion or restricted processing;

f. control repair or validation;

g. pathway-specific injunction;

h. monitoring and reporting;

i. independent audit; or

j. prospective legislation or regulation.

53. The remedy should follow the nature of the wrong:

a. deception → correction, restitution, penalty, or narrow injunction;

b. unlawful data use → statutory relief, deletion, restriction, or consent correction;

c. defective control → testing, disclosure, repair, validation, and compensation for incremental harm;

d. operational escalation → narrow modification, monitoring, and compensation;

e. illegal pathway → reporting, preservation, account correction, and pathway-specific relief;

f. systemic defect → industry-wide prospective rule.

54. The Court should not use one remedial form to perform the function of another.

### K. Duplication

55. The eleventh question is:

**Does the requested relief compensate a distinct injury or count the same event repeatedly?**

56. The Court should examine multiplication across:

       a. child;

       b. parent;

       c. school;

       d. district;

       e. municipality;

       f. state;

       g. account;

       h. day;

       i. view;

       j. recommendation;

       k. data point;

       l. statement; and

       m. statutory theory.

57. The controlling distinction is:

       a. distinct injury or legally defined violation; or

       b. repeated counting of the same externality.

58. Multiple recoveries may be proper where they serve distinct legal interests.

59. The Court should identify the independent basis for each.

### L. Functional Effect of the Remedy

60. The final question is:

**Will the remedy improve the relevant condition, or will it merely displace the activity?**

61. The Court should determine whether the remedy will:

       a. reduce harmful exposure;

       b. improve control efficacy;

       c. correct a false representation;

397

d. reduce unlawful data use;

e. interrupt an illegal pathway;

f. improve voluntary exit;

g. reduce sleep-period use;

h. preserve lawful expression;

i. protect privacy;

j. reduce public externalities; or

k. improve user-reported benefit.

62. The Court should also determine whether the remedy may:

a. shift users to another platform;

b. shift advertising revenue;

c. shift data collection;

d. drive users toward less transparent services;

e. increase surveillance;

f. suppress lawful expression;

g. preserve the same market incentive; or

h. leave the user's underlying condition unchanged.

63. The controlling distinction is:

a. functional correction; or

b. displacement without material improvement.

64. A remedy may impose a substantial burden and still fail to correct the relevant outcome.

65. The Court should evaluate effect, not burden alone.

### M. The Matrix Should Produce a Claim-Specific Disposition

66. After applying the matrix, each claim should fall into one or more defined categories.

67. Those categories are:

a. protected third-party expression;

b. protected editorial judgment;

c. actionable platform-created deception;

d. actionable unlawful data practice;

e. actionable defective or misrepresented control;

398

f. actionable operational escalation;

g. actionable illegal-content or exploitation pathway;

h. insufficiently proved platform increment;

i. custodial or institutional responsibility;

j. duplicated or derivative recovery;

k. platform-wide defect supporting direct relief; or

l. industry-wide defect requiring prospective governance.

68. The Court can then state with precision:

a. what conduct is protected;

b. what conduct is actionable;

c. what proof remains necessary;

d. what actor bears responsibility;

e. what relief is available;

f. what recovery would duplicate another;

g. what defect remains outside the defendant's control; and

h. what issue belongs to legislation or regulation.

69. The governing principle is:

**For each claim, the Court should identify who enabled access, who created the content, what operation is challenged, whether the platform spoke truthfully, whether data use was lawful, whether controls worked as represented, what harm the platform added, whether the defect is platform-wide or industry-wide, who possessed authority to intervene, what remedy fits the proved contribution, whether recovery is duplicative, and whether the proposed correction improves the relevant human outcome rather than merely moving the activity elsewhere.**

---

## XVI. APPLICATION TO THE FOUR TRACKS

1. The foregoing framework should be applied differently across the principal tracks within the coordinated proceedings.

2. The same causal architecture governs all tracks.

3. The evidentiary emphasis, institutional role, available remedy, and degree of individualization differ.

4. The Court should therefore preserve a common decisional structure while preventing one track's theory from silently supplying another track's missing proof.

5. The State-Attorney-General track principally concerns:

a. truthfulness;

399

      b. data practices;

      c. represented controls;

      d. statutory penalties;

      e. restitution;

      f. public enforcement; and

      g. prospective governance within existing law.

6. The personal-injury track principally concerns:

      a. individualized exposure;

      b. temporal sequence;

      c. baseline condition;

      d. platform-created increment;

      e. alternative causes;

      f. comparative responsibility; and

      g. proportionate damages.

7. The school and local-government track principally concerns:

      a. existing institutional duties;

      b. baseline public expenditure;

      c. institution-created exposure;

      d. institutional contribution;

      e. incremental cost;

      f. mitigation; and

      g. prevention of recovery for ordinary stewardship expense.

8. The common constitutional and platform-design track principally concerns:

      a. speech versus operation;

      b. editorial judgment versus independent conduct;

      c. platform-specific versus industry-wide defect;

       d. adjudication versus legislation;

       e. lawful expression;

       f. system governance; and

       g. narrowly tailored corrective relief.

9. These tracks overlap.

10. They should not collapse.

11. A State Attorney General may rely on population-level evidence to prove deception or unlawful data use without proving the individualized clinical injury of every child.

12. An individual plaintiff may rely on platform-wide evidence to establish a mechanism while still bearing the burden of proving actual exposure and injury.

13. A school district may establish a public burden while still being required to separate ordinary institutional duty from added platform-caused expense.

14. A common design issue may affect all tracks while still requiring feature-specific First Amendment and § 230 analysis.

15. The Court should therefore ask two questions for every common issue:

       a. What can be decided across the coordinated proceedings?

       b. What remains specific to the particular track or claimant?

16. Common findings may include:

       a. what the platform represented;

       b. what data it collected;

       c. how a control operated;

       d. what recommendation objective governed;

       e. whether a harmful pathway existed;

       f. what internal knowledge the platform possessed;

       g. whether a defect was platform-wide or industry-wide; and

       h. what correction the defendant could implement.

17. Track-specific findings may include:

       a. who relied;

       b. who was exposed;

       c. who was injured;

       d. what costs were incurred;

e. what other causes operated;

f. what statutory unit applies;

g. what remedy is available; and

h. whether recovery would duplicate another award.

18. The coordinated proceedings will remain coherent if common proof defines the architecture and track-specific proof supplies the legally necessary application.

### A. State-Attorney-General Track

19. The State-Attorney-General track should focus on duties that government may enforce without converting generalized social concern into unlimited public recovery.

20. The principal questions are:

a. What did the platform represent?

b. Was the representation accurate?

c. What did the platform know?

d. What data did it collect, infer, retain, transfer, or use?

e. What controls did it represent as protective?

f. Did those controls function as represented?

g. What statutory duties governed?

h. What unit of violation applies?

i. What public remedy is authorized?

j. What prospective correction lies within the defendant's control?

21. This track is strongest where the State identifies direct platform conduct.

22. It is weaker where the theory depends on treating the platform as the universal cause of youth distress or the insurer of every public expenditure associated with digital use.

### 1. Truthfulness

23. The State may directly challenge false or misleading platform statements concerning:

a. youth safety;

b. age enforcement;

c. parental controls;

d. data privacy;

e. recommendation systems;

f. harmful-content reduction;

g. exploitation response;

402

        h. underage-account prevalence;

        i. time-management tools; and

        j. internal research.

24. The relevant inquiry should identify:

        a. the exact statement;

        b. the speaker;

        c. the audience;

        d. the platform's contemporaneous knowledge;

        e. the actual system operation;

        f. the material discrepancy;

        g. reliance or public consequence; and

        h. the remedy authorized by law.

25. A State need not prove that every user suffered clinical injury to establish a materially false commercial representation.

26. It should prove the statement, falsity, materiality, statutory basis, and legally required causal connection.

## 2. Data Practices

27. The State may directly enforce laws governing:

        a. child-data collection;

        b. age-related consent;

        c. sensitive inference;

        d. profiling;

        e. targeting;

        f. retention;

        g. transfer;

        h. deletion;

        i. cross-service combination; and

        j. unauthorized use.

28. The State should identify:

        a. what data was involved;

        b. whose data it was;

    c. what legal authority existed;

    d. what purpose was disclosed;

    e. what use actually occurred;

    f. whether a minor-specific rule applied;

    g. what statutory violation resulted; and

    h. what remedy corresponds to that violation.

29. A data violation may support relief independently of generalized health causation.

30. The State should not be required to prove psychological injury where the statute protects the data interest itself.

## 3. Controls

31. The State may challenge a represented control where:

    a. the platform described it as protective;

    b. users or custodians could reasonably rely on the representation;

    c. the control possessed material undisclosed limitations;

    d. the platform knew of recurring failure;

    e. the platform facilitated circumvention;

    f. the control failed across accounts or devices; or

    g. the platform continued making unsupported claims.

32. The appropriate proof includes:

    a. product descriptions;

    b. internal testing;

    c. circumvention data;

    d. complaint records;

    e. audit results;

    f. update history;

    g. user comprehension; and

    h. actual performance.

33. The appropriate remedy may include:

    a. corrective disclosure;

    b. independent validation;

    c. control repair;

d. reporting;

e. penalties;

f. restitution; and

g. narrowly tailored injunction.

**4. Penalties**

34.  The State should identify the statutory unit before seeking aggregate penalties.

35.  The Court should determine whether one violation consists of:

a. one false statement;

b. one affected user;

c. one child;

d. one account;

e. one unlawful data event;

f. one transfer;

g. one day;

h. one failure after notice; or

i. one continuing course of conduct.

36.  The statutory text should govern.

37.  The Court should also determine:

a. required culpability;

b. knowledge;

c. duration;

d. repetition;

e. concealment;

f. correction;

g. prior notice;

h. benefit received; and

i. proportionality.

38.  State enforcement should not multiply the same act through an invented unit detached from the governing law.

**5. Restitution**

39.  Restitution should follow the benefit the defendant received through the unlawful conduct.

40. The State should identify:

    a. what benefit was received;

    b. whether it was money, data, advertising value, avoided cost, or another gain;

    c. how the gain was connected to the violation;

    d. whether lawful and unlawful portions can be separated;

    e. whether the gain is traceable; and

    f. whether restitution duplicates another remedy.

41. The State should not use total platform revenue as a substitute for traceable unlawful gain.

## 6. Prospective Governance

42. The State may seek prospective relief tied to an existing duty.

43. Such relief may include:

    a. accurate disclosure;

    b. compliance reporting;

    c. control validation;

    d. youth-data restrictions;

    e. preservation of internal studies;

    f. pathway-specific correction;

    g. audit;

    h. material-change notice; and

    i. record retention.

44. Prospective relief should remain defendant-specific unless the governing statute authorizes broader rulemaking.

45. Market-wide standards concerning age assurance, interoperability, recommendation disclosure, and externality reporting belong principally to legislation and regulation.

## 7. Public Enforcement Should Not Become Retroactive Industry Design

46. A State may enforce existing legal duties.

47. It should not convert a practice common across a lawful market into retroactive firm-specific liability without identifying:

    a. the existing duty;

    b. the defendant-specific breach;

    c. the statutory basis;

    d. the material public injury; and

406

e. the authorized remedy.

48. Where the alleged defect is industry-wide, the State may use the record to support prospective legislation.

49. The Court should preserve that path without treating the legislative gap as a completed violation by one defendant.

### 8. The State-AG Finding

50. For each State-AG claim, the Court should determine:

a. what representation, data practice, control, or statutory duty is involved;

b. what the defendant knew;

c. what breach occurred;

d. what unit of violation applies;

e. what benefit was received;

f. what public injury was established;

g. what remedy is authorized;

h. whether the remedy is duplicative;

i. whether the relief remains platform-specific; and

j. what systemic remainder belongs to legislation or regulation.

### B. Personal-Injury Track

51. The personal-injury track requires individualized proof.

52. Common evidence may establish that a platform feature was capable of producing a defined kind of harm.

53. It does not establish that every plaintiff encountered the feature, experienced the mechanism, or suffered the claimed injury because of it.

54. The principal questions are:

a. What was the plaintiff's actual exposure?

b. What condition existed before the exposure?

c. What temporal sequence followed?

d. What platform-controlled mechanism operated?

e. What competing causes existed?

f. What conduct did custodians, schools, peers, offenders, and other platforms contribute?

g. What injury did the defendant add?

407

h. What damages correspond to that increment?

**1. Individualized Exposure**

55. Each plaintiff should identify:

a. the relevant account or accounts;

b. the platform;

c. the feature;

d. the content pathway;

e. the recommendation sequence;

f. the data use;

g. the notification pattern;

h. the controls activated;

i. the duration and intensity of use;

j. the age at exposure; and

k. the period during which the claimed mechanism operated.

56. General platform membership is not enough.

57. The plaintiff should show exposure to the challenged mechanism.

58. The evidence may include:

a. account records;

b. device records;

c. platform logs;

d. saved content;

e. messages;

f. notifications;

g. search history;

h. control records;

i. witness testimony; and

j. clinical history.

**2. Temporal Sequence**

59. The plaintiff should establish:

a. baseline condition;

408

b. first platform use;

c. first material exposure;

d. first symptom;

e. first functional impairment;

f. first custodial observation;

g. first clinical intervention;

h. first reduction or cessation attempt; and

i. change after intervention.

60. The Court should determine whether:

a. use preceded dysfunction;

b. dysfunction increased use;

c. reciprocal causation occurred;

d. another event intervened; and

e. the platform materially intensified the condition.

61. Diagnosis date should not be treated automatically as onset date.

### 3. Platform-Created Increment

62. The plaintiff should identify what the platform itself added.

63. The increment may include:

a. repeated exposure;

b. intensified exposure;

c. targeted exposure;

d. platform-generated escalation;

e. delayed disengagement;

f. defective controls;

g. unlawful data use;

h. adult-minor contact facilitation;

i. reliance on a false representation;

j. delayed intervention; or

k. another measurable aggravation.

64. The plaintiff need not prove that the platform created every underlying vulnerability.

65. The plaintiff should prove the aggravation attributable to the defendant.

## 4. Alternative Causes

66. The personal-injury inquiry should account for:

      a. preexisting mental-health conditions;

      b. family structure;

      c. custodial supervision;

      d. school environment;

      e. bullying;

      f. trauma;

      g. peer conduct;

      h. other platforms;

      i. gaming;

      j. streaming;

      k. general smartphone use;

      l. institutional screen exposure;

      m. sleep;

      n. physical activity;

      o. treatment history; and

      p. major life events.

67. Alternative causes should be evaluated, not merely listed.

68. The Court should determine their timing, strength, and contribution.

## 5. Custodial and Institutional Conduct

69. The plaintiff-specific record should identify:

      a. who supplied access;

      b. what controls existed;

      c. what the custodian knew;

      d. what the school knew;

      e. what intervention was available;

      f. what intervention occurred;

      g. whether the platform misrepresented the efficacy of available controls; and

410

       h. whether the platform impeded mitigation.

70. Custodial responsibility does not erase platform responsibility.

71. Platform responsibility does not erase custodial responsibility.

72. Each should be allocated according to actual duty and contribution.

## 6. Clinical Precision

73. Clinical claims should identify:

       a. the diagnosis or defined condition;

       b. the criteria used;

       c. the evaluator;

       d. the timing;

       e. severity;

       f. functional impairment;

       g. alternative diagnoses;

       h. preexisting symptoms;

       i. treatment;

       j. prognosis; and

       k. the causal mechanism attributed to the platform.

74. Terms such as "addiction," "compulsion," "harm," and "dysfunction" should not substitute for defined clinical proof.

## 7. Proportional Damages

75. Damages should correspond to the injury the defendant caused or aggravated.

76. The Court should determine:

       a. baseline injury;

       b. incremental injury;

       c. severity;

       d. duration;

       e. treatment attributable to the increment;

       f. educational or functional loss;

       g. comparative responsibility;

       h. mitigation;

       i. future harm; and

j. duplication.

77. A platform may be fully liable for the increment it caused.

78. It should not be charged with the plaintiff's entire condition where substantial independent causes are established.

## 8. Common Proof and Individual Proof

79. Common proof may establish:

    a. how a feature operated;

    b. what objective governed;

    c. what the platform knew;

    d. whether a control was defective;

    e. whether a pathway existed;

    f. whether the mechanism was capable of causing a defined injury; and

    g. whether the platform misrepresented the system.

80. Individual proof must establish:

    a. actual exposure;

    b. actual temporal sequence;

    c. actual injury;

    d. actual causal contribution;

    e. actual damages; and

    f. absence of duplication.

81. Neither level should substitute for the other.

## 9. The Personal-Injury Finding

82. For each personal-injury claim, the Court or receiving tribunal should determine:

    a. what the plaintiff encountered;

    b. what platform mechanism operated;

    c. what condition existed before exposure;

    d. what symptoms followed;

    e. what other causes contributed;

    f. what custodial and institutional actions occurred;

    g. what the platform added;

    h. what injury is attributable to that increment;

i. what damages follow; and

j. whether another claim seeks recovery for the same loss.

### C. School and Local-Government Track

83. The school and local-government track should focus on net incremental public burden.

84. Public plaintiffs possess existing duties concerning:

   a. education;

   b. attendance;

   c. counseling;

   d. discipline;

   e. student safety;

   f. anti-bullying response;

   g. device management;

   h. crisis intervention;

   i. special education;

   j. public health; and

   k. law enforcement.

85. The cost of performing those duties does not become compensable merely because social media formed part of the surrounding environment.

86. The public plaintiff should establish:

   a. the baseline duty;

   b. the baseline expense;

   c. the platform-specific breach;

   d. the added burden;

   e. the institution's contribution;

   f. mitigation;

   g. reimbursement;

   h. overlap; and

   i. the net incremental cost.

### 1. Existing Institutional Duties

87. A school or local government should identify what duty existed before the alleged platform breach.

413

88. Existing duties may include:

    a. counseling students;

    b. responding to bullying;

    c. maintaining attendance;

    d. enforcing discipline;

    e. addressing threats;

    f. managing devices;

    g. contacting parents;

    h. providing crisis support;

    i. referring students for treatment; and

    j. protecting children within institutional custody.

89. These duties form the baseline.

90. Ordinary stewardship expense remains with the steward.

## 2. Incremental Costs

91. Public plaintiffs should identify specific additional costs, such as:

    a. added counselor hours;

    b. added crisis responses;

    c. added exploitation investigations;

    d. added absenteeism intervention;

    e. added staff training;

    f. added monitoring systems;

    g. added parent outreach;

    h. added law-enforcement coordination;

    i. added treatment referral; and

    j. added administrative work.

92. The claimed expense should be measurable and tied to a defined platform breach.

93. Aggregate program spending should not substitute for causal allocation.

## 3. Institutional Contribution to Exposure

94. Schools and local governments should account for their own policies concerning:

    a. school-issued devices;

414

b. personal phones;

c. internet access;

d. social-media blocking;

e. screen-based curriculum;

f. homework;

g. messaging;

h. filtering;

i. monitoring;

j. after-hours connectivity; and

k. enforcement.

95. Institutional choices may have increased:

a. total screen time;

b. access opportunity;

c. device dependence;

d. after-hours use;

e. peer communication;

f. exposure to notifications; and

g. opportunities for circumvention.

96. Those choices should be included in the causal baseline.

### 4. Institutional Contribution to Dysfunction

97. Public plaintiffs should also account for:

a. school bullying;

b. delayed intervention;

c. inadequate counseling;

d. academic pressure;

e. inconsistent discipline;

f. school climate;

g. social exclusion;

h. excessive institutional screen use;

i. failure to communicate with parents; and

j. failure to address visible deterioration.

98. These conditions may operate independently or jointly with platform conduct.

99. They should be allocated rather than omitted.

## 5. Public Stewardship Authority

100. A school cannot invoke authority over:

a. attendance;

b. devices;

c. discipline;

d. curriculum;

e. counseling;

f. peer conduct;

g. safety; and

h. intervention

while disclaiming responsibility for how that authority was exercised.

101. Authority and responsibility remain reciprocal.

102. The platform remains responsible for its own systems.

103. The school remains responsible for institutional choices within its control.

## 6. No Recovery for Ordinary Stewardship Expense

104. Public plaintiffs should not recover from a platform merely because they:

a. counseled students;

b. enforced attendance;

c. disciplined misconduct;

d. responded to bullying;

e. managed devices;

f. contacted parents;

g. provided crisis care; or

h. performed other preexisting duties.

105. Recovery should require proof that a platform-specific breach materially increased the expense beyond the ordinary baseline.

106. The Court should distinguish:

a. ordinary duty;

416

b. improved service;

c. general social change;

d. total digital burden;

e. multi-platform burden; and

f. defendant-specific added expense.

**7. Mitigation**

107.    Public entities possess means to mitigate through:

a. phone restrictions;

b. network controls;

c. parent notice;

d. anti-bullying enforcement;

e. staff training;

f. reduced institutional screen use;

g. counseling protocols;

h. exploitation reporting;

i. crisis procedures; and

j. coordination with healthcare providers.

108.    The Court should determine:

a. what measures were available;

b. what measures were used;

c. when they were adopted;

d. whether they were enforced;

e. whether they reduced cost; and

f. whether platform deception or control failure impaired mitigation.

**8. Duplication Among Public Plaintiffs**

109.    The same expense may appear in claims by:

a. a school;

b. a district;

c. a municipality;

d. a county;

417

e. a state;

f. a healthcare system; and

g. another public program.

110.   The Court should identify:

a. who paid;

b. who was reimbursed;

c. who bore the legal obligation;

d. whether the expense was transferred internally;

e. whether another claimant seeks the same sum; and

f. whether a distinct sovereign interest exists.

111. Public accounting should not multiply one expenditure across several governmental levels.

## 9. The Public-Entity Finding

112.   For each school or local-government claim, the Court should determine:

a. what duty already existed;

b. what expense would have existed without the breach;

c. what platform-specific conduct occurred;

d. what additional burden followed;

e. what institutional policies contributed;

f. what mitigation occurred;

g. what reimbursement or overlap exists;

h. what net cost remains;

i. whether the defect is platform-wide or industry-wide; and

j. what remedy is legally available.

### D. Common Constitutional and Platform-Design Track

113.   The common constitutional and platform-design track should define the boundaries governing all other tracks.

114.   It should distinguish:

a. speech from machinery;

b. third-party content from platform-created representation;

c. editorial judgment from data practice;

d. recommendation content from recommendation mechanism;

418

e. lawful expression from unlawful conduct;

f. platform-specific defect from industry-wide defect;

g. judicial correction from legislative design; and

h. narrow relief from structural overreach.

115.    This track should not resolve every plaintiff's damages.

116.    It should establish the legal classifications that determine what claims can proceed and what proof they require.

## 1. Speech Versus Operation

117.    The Court should identify whether a challenged feature concerns:

a. third-party expression;

b. publication;

c. editorial selection;

d. recommendation;

e. commercial representation;

f. data collection;

g. age assurance;

h. control efficacy;

i. notification timing;

j. account architecture;

k. statutory reporting; or

l. preservation.

118.    First Amendment and § 230 analysis should follow the classified function.

119.    The Court should preserve the governing binary:

**Liability for what lawful expression says must remain separate from liability for what a platform falsely represented, unlawfully collected, or independently caused through its own operation.**

## 2. Recommendation as a Mixed Function

120.    Recommendation may contain:

a. editorial judgment;

b. user choice;

c. prediction;

d. automated ranking;

419

      e. commercial optimization;

      f. safety constraints;

      g. data processing; and

      h. platform-created prompts.

121.    The Court should identify which component is challenged.

122.    A claim directed to the message of lawful content differs from a claim directed to unlawful profiling, defeated controls, or platform-generated escalation.

## 3. Platform-Specific Versus Industry-Wide Defect

123.    The Court should determine whether the alleged defect arises from:

      a. a company-specific statement;

      b. a company-specific data practice;

      c. a company-specific control;

      d. a company-specific objective;

      e. a company-specific pathway;

      f. an industry-wide engagement model;

      g. fragmented controls;

      h. inconsistent age assurance;

      i. opaque recommendation objectives; or

      j. the market-wide use of activity as a proxy for benefit.

124.    Platform-specific defects may support direct relief.

125.    Industry-wide defects require common prospective standards.

## 4. Adjudication Versus Legislation

126.    The Court can adjudicate:

      a. deception;

      b. unlawful data use;

      c. statutory violations;

      d. defective represented controls;

      e. platform-created operational escalation;

      f. illegal pathways;

      g. failure after notice where an independent duty exists;

      h. attributable injury; and

i. defendant-specific remedy.

127. Legislatures and regulators should address:

a. uniform recommendation disclosure;

b. age-assurance standards;

c. interoperable custodial controls;

d. youth-data limitations;

e. standardized externality reporting;

f. research access;

g. safe harbor;

h. common auditability; and

i. AI-governance requirements.

128. The Court can identify this boundary without legislating.

## 5. Narrow Corrective Relief

129. Common relief should target:

a. a specific false statement;

b. a specific data practice;

c. a specific control defect;

d. a specific recommendation pathway;

e. a specific illegal-contact mechanism;

f. a specific notification rule;

g. a specific age-control failure; or

h. a specific preservation or reporting duty.

130. Relief should identify:

a. what must change;

b. who must change it;

c. what evidence demonstrates compliance;

d. what records must be preserved;

e. what lawful interests remain protected;

f. what review is available; and

g. what systemic remainder lies beyond the order.

### 6. Lawful Expression Must Remain Protected

131.    The Court should prevent generalized product theories from becoming indirect liability for lawful speech.

132.    It should also prevent lawful speech protections from becoming a general immunity for:

>    a. deception;
>
>    b. unlawful data use;
>
>    c. defeated controls;
>
>    d. nonexpressive system operation;
>
>    e. statutory reporting failures;
>
>    f. illegal pathways; and
>
>    g. platform-created harm.

133.    The protected component and actionable component should be separated.

### 7. System Governance Without General Censorship

134.    The common design track may examine:

>    a. objectives;
>
>    b. constraints;
>
>    c. metric design;
>
>    d. control operation;
>
>    e. age treatment;
>
>    f. data use;
>
>    g. recommendation pathways;
>
>    h. externalities;
>
>    i. auditability; and
>
>    j. human review.

135.    It should not become a general inquiry into whether lawful speech is socially desirable.

136.    Governance should concern how the system operates, not what citizens are permitted to believe.

### 8. The Common-Track Finding

137.    For each common constitutional or design issue, the Court should determine:

>    a. what precise feature is challenged;
>
>    b. whether it is expressive, operational, commercial, statutory, or mixed;

c. whether third-party speech is involved;

d. whether the platform created an independent representation;

e. whether § 230 applies to the asserted duty;

f. whether the First Amendment protects the challenged judgment;

g. whether an independently regulable operation exists;

h. whether the defect is platform-wide or industry-wide;

i. whether judicial relief is available; and

j. what portion requires legislation or regulation.

### E. Common Findings Should Not Eliminate Track-Specific Burdens

138.    Coordination permits common issues to be resolved efficiently.

139.    It does not permit the evidentiary burden from one track to be imported into another without legal basis.

140.    The Court should preserve several distinctions.

### 1. State Proof Does Not Automatically Prove Personal Injury

141.    A State may prove that a representation was false.

142.    That finding may support an individual plaintiff's reliance theory.

143.    It does not establish that every plaintiff relied, encountered the feature, or suffered injury.

### 2. General Causation Does Not Automatically Prove Specific Causation

144.    Common proof may establish that a mechanism can cause a defined injury.

145.    Each plaintiff must still establish actual exposure, temporal sequence, and attributable harm.

### 3. Individual Injury Does Not Automatically Prove Public Expense

146.    A child's injury may require school or public intervention.

147.    The public entity must still establish what expense it incurred beyond ordinary duty and whether another claimant already seeks the same amount.

### 4. Public Enforcement Does Not Automatically Authorize Structural Regulation

148.    A State's authority to enforce existing law does not necessarily authorize creation of a new national platform code through litigation.

149.    The relief should remain tied to the duty invoked.

### 5. Design Evidence Does Not Automatically Defeat Speech Protection

150.    Evidence that a system affected exposure does not itself establish that the platform may be held liable for the meaning of lawful third-party speech.

151.    The challenged component must be classified.

**6. Speech Protection Does Not Automatically Defeat Independent Conduct Claims**

152.    The presence of lawful third-party content does not dispose of claims based on:

a. false commercial statements;

b. unlawful data collection;

c. defective controls;

d. account architecture;

e. age-assurance failure;

f. statutory reporting;

g. preservation; or

h. platform-created nonexpressive injury.

**7. Platform-Specific Proof Does Not Automatically Establish Industry-Wide Defect**

153.    A company-specific failure may support direct relief.

154.    It should not be generalized to the entire industry without comparative evidence.

**8. Industry-Wide Evidence Does Not Automatically Establish Defendant-Specific Liability**

155.    A shared market incentive may demonstrate the need for prospective reform.

156.    It does not establish that one defendant uniquely breached an existing duty.

*F. The Four Tracks Should Converge at Remedy Allocation*

157.    The tracks converge when remedy is selected.

158.    Each track should identify:

a. the duty;

b. the breach;

c. the actor;

d. the benefit received;

e. the injury added;

f. the statutory unit;

g. the condition controlled;

h. the risk of duplication;

i. the likelihood of displacement; and

j. the systemic remainder.

159.    The State-AG track may yield:

424

a. corrective disclosure;

b. restitution;

c. civil penalties;

d. data restrictions;

e. control validation;

f. reporting;

g. audit; and

h. narrow injunction.

160. The personal-injury track may yield:

a. compensation;

b. treatment-related damages;

c. privacy damages;

d. damages for proved aggravation;

e. individualized injunctive relief where available; and

f. allocation of comparative responsibility.

161. The school and local-government track may yield:

a. compensation for net incremental expense;

b. restitution where a direct benefit was transferred;

c. correction of a platform-specific breach;

d. reporting; and

e. denial of recovery for ordinary stewardship costs.

162. The common constitutional and design track may yield:

a. dismissal of protected content-based theories;

b. preservation of independent operation-based claims;

c. feature-specific constitutional boundaries;

d. pathway-specific correction;

e. auditability requirements tied to existing duties; and

f. identification of matters requiring legislation.

163. Remedy should not be selected by track label alone.

164. It should follow the specific duty, breach, contribution, and institutional authority established.

425

### *G. The Court Should Adopt a Four-Track Disposition Framework*

165.   The Court can organize rulings through a common four-track framework.

166.   For the State-AG track, the Court should state:

   a. what public-law duty governs;

   b. what representation, data practice, or control is challenged;

   c. what statutory unit applies;

   d. what remedy is authorized;

   e. what prospective relief remains defendant-specific; and

   f. what industry-wide issue belongs to legislation.

167.   For the personal-injury track, the Court should state:

   a. what common mechanism is legally cognizable;

   b. what individualized exposure must be proved;

   c. what temporal and clinical evidence is required;

   d. what alternative causes must be considered;

   e. how incremental harm will be measured; and

   f. how damages will be allocated.

168.   For the school and local-government track, the Court should state:

   a. what baseline institutional duties exist;

   b. what costs are ordinary;

   c. what institution-created exposure must be accounted for;

   d. what platform-specific burden may be recoverable;

   e. how duplication will be prevented; and

   f. what systemic defect remains legislative.

169.   For the common constitutional and design track, the Court should state:

   a. what functions are expressive;

   b. what functions are operational;

   c. what claims implicate § 230;

   d. what claims implicate the First Amendment;

   e. what independent conduct remains actionable;

   f. what relief is sufficiently narrow; and

g. what questions exceed adjudication and require prospective lawmaking.

170.     The governing principle is:

**The coordinated proceedings should share one causal and remedial architecture while preserving the distinct burdens of each track. State-Attorney-General claims should center on truthfulness, data, controls, statutory enforcement, and prospective correction. Personal-injury claims should require individualized exposure, temporal sequence, platform-created increment, alternative-cause analysis, and proportionate damages. School and local-government claims should recover net additional burdens rather than ordinary stewardship expense. Common constitutional and design questions should distinguish speech from operation, platform-wide from industry-wide defects, and judicial correction from prospective legislation.**

---

## XVII. THE COURT SHOULD PRESERVE PARENTAL RESPONSIBILITY WHILE ENFORCING PLATFORM RESPONSIBILITY

1.   The final settlement should preserve the responsibility of every actor at the level where that actor possesses authority, knowledge, proximity, and control.

2.   A rule assigning the health of children to platforms merely because platforms are widely used would weaken the direct stewardship the litigation purports to protect.

3.   Parents, guardians, schools, and other custodial institutions possess immediate authority over:

  a. access;

  b. devices;

  c. schedules;

  d. supervision;

  e. treatment;

  f. discipline;

  g. school attendance;

  h. household rules;

  i. intervention; and

  j. continued use after observable dysfunction.

4.   Platforms do not ordinarily possess those forms of direct custody.

5.   They possess a different and substantial form of authority.

6.   Platforms control:

  a. account architecture;

  b. data collection;

427

      c. recommendation systems;

      d. notifications;

      e. age controls;

      f. parental tools;

      g. representations;

      h. commercial objectives;

      i. reporting pathways;

      j. unlawful-contact pathways;

      k. system records; and

      l. the operation of the service itself.

7. Those responsibilities should not be exchanged.

8. A parent should not be treated as the designer of a recommendation system.

9. A platform should not be treated as the custodian of every child who accesses the service.

10. A school should not transfer its supervisory duties to the provider of an application.

11. A provider should not transfer responsibility for deceptive controls or unlawful data practices back to the school or parent.

12. The Court should therefore preserve two propositions simultaneously:

      a. direct stewardship follows custody, authority, proximity, and knowledge; and

      b. platform responsibility follows control over the service, its representations, its data practices, its safeguards, and its operational consequences.

13. Neither proposition weakens the other.

14. Together they produce a complete allocation.

15. The governing settlement is reciprocal:

      a. custodians answer for custody;

      b. platforms answer for platform conduct;

      c. creators answer for content;

      d. institutions answer for delegated stewardship;

      e. government answers for rules and incentives;

      f. damages answer for proved injury; and

      g. legislation answers for market-wide defects.

### A. Assigning Child Health to Platforms Would Weaken Direct Stewardship

16. A rule that treats platform use as a transfer of custodial responsibility would alter the ordinary structure of child protection.

17. It would encourage parents and institutions to interpret observable dysfunction principally as evidence against an external provider.

18. The same dysfunction should first operate as a trigger for direct intervention by the actor presently responsible for the child.

19. Observable warning signs may include:

> a. sleep loss;
>
> b. school absence;
>
> c. declining performance;
>
> d. family conflict;
>
> e. repeated rule violation;
>
> f. self-harm statements;
>
> g. eating-related distress;
>
> h. bullying;
>
> i. isolation;
>
> j. repeated device circumvention;
>
> k. inability to disengage;
>
> l. contact with unknown adults; or
>
> m. clinically significant deterioration.

20. These signs should activate custodial responsibility immediately.

21. They may also create evidence relevant to later platform liability.

22. The two functions should not be confused.

23. A child's deterioration may justify:

> a. device restriction;
>
> b. increased supervision;
>
> c. school intervention;
>
> d. clinical evaluation;
>
> e. law-enforcement contact;
>
> f. account reporting;
>
> g. preservation of records;

429

h. parental-control activation;

i. coordination among caregivers; and

j. temporary or permanent cessation of use.

24. The possibility of future litigation does not displace the need for immediate stewardship.

## 1. Litigation Should Not Become a Substitute for Intervention

25. Litigation operates retrospectively.

26. Stewardship operates in real time.

27. A parent or school confronting observable dysfunction ordinarily possesses information unavailable to the platform.

28. That information may include:

a. the child's mood;

b. sleep pattern;

c. family circumstances;

d. school performance;

e. treatment history;

f. peer conflict;

g. physical condition;

h. expressed regret;

i. prior trauma; and

j. changes in ordinary behavior.

29. The platform may possess usage data.

30. The custodian possesses embodied and contextual knowledge.

31. The law should not create incentives to wait for the external actor where the direct steward can act immediately.

## 2. Externalization Can Create Moral and Operational Delay

32. Where responsibility is externalized too early, custodians may delay:

a. restricting access;

b. obtaining treatment;

c. confronting bullying;

d. enforcing sleep rules;

e. reviewing devices;

430

        f. reporting exploitation;

        g. coordinating with schools;

        h. preserving evidence; or

        i. addressing underlying family or clinical conditions.

33. Delay can increase injury.

34. A liability framework should preserve the incentive to intervene at the first observable point.

35. The platform may later bear responsibility for any proved increment it created.

36. That later allocation should not weaken earlier intervention.

### 3. Custodial Authority Carries Custodial Responsibility

37. Parents and guardians may determine:

        a. whether a child possesses a device;

        b. when the device may be used;

        c. which applications may be installed;

        d. where devices are kept at night;

        e. whether accounts remain active;

        f. whether treatment is obtained;

        g. whether school officials are informed; and

        h. whether law enforcement is contacted.

38. The exercise of that authority carries corresponding responsibility.

39. A custodian cannot invoke authority when setting rules and disclaim responsibility when those rules are absent, inconsistent, or unenforced.

40. The Court should preserve this reciprocity without treating custodial imperfection as a complete defense to platform misconduct.

### 4. School Authority Carries Institutional Responsibility

41. Schools possess authority over:

        a. classroom device use;

        b. school-issued devices;

        c. network access;

        d. curriculum;

        e. discipline;

        f. attendance;

        g. counseling;

        h. peer conduct;

        i. crisis response; and

        j. parent communication.

42. Schools should not treat the platform as the exclusive cause of conditions materially shaped by school policy and supervision.

43. They should account for:

        a. screen-based instruction;

        b. unrestricted device access;

        c. weak enforcement;

        d. delayed counseling;

        e. bullying;

        f. social conditions;

        g. inadequate intervention; and

        h. poor communication with parents.

44. Platform responsibility remains available for platform-specific breaches that compound those conditions.

## 5. Custodial Failure and Platform Failure May Coexist

45. The Court should avoid a forced choice between custodial responsibility and platform responsibility.

46. Both may exist in the same case.

47. For example:

        a. a parent may fail to enforce a limit;

        b. the platform may misrepresent the control;

        c. the child may create another account;

        d. the platform may fail to link known related accounts;

        e. the school may observe deterioration;

        f. the school may delay intervention;

        g. the recommendation system may intensify exposure; and

        h. a third party may create the harmful content.

48. Each actor should answer for the part each contributed.

49. No actor should inherit the whole chain merely because the chain is difficult.

432

## 6. Direct Stewardship Is Protective, Not Punitive

50. Preserving parental and institutional responsibility is not a judgment that every custodian acts perfectly.

51. It is recognition that child protection requires an actor with immediate authority to act.

52. Responsibility identifies the locus of intervention.

53. It should improve protection, not merely allocate blame after injury.

## 7. The Stewardship Finding

54. For each child-specific claim, the Court should determine:

> a. who possessed custody;
>
> b. who authorized access;
>
> c. who observed dysfunction;
>
> d. who possessed authority to intervene;
>
> e. what action was available;
>
> f. what action was taken;
>
> g. what platform conduct impeded intervention;
>
> h. what third-party conduct contributed; and
>
> i. what injury followed from each failure.

## B. Treating All Platform Operation as Parental Choice Would Permit Platform Misconduct to Escape Correction

55. The reciprocal error is to treat every platform consequence as the result of parental permission.

56. Parental authorization of access does not constitute authorization of every undisclosed, unlawful, or misrepresented platform operation.

57. A custodian who permits a child to use a service does not thereby consent to:

> a. false safety statements;
>
> b. unlawful child-data collection;
>
> c. undisclosed profiling;
>
> d. defective controls;
>
> e. concealed control limitations;
>
> f. platform-facilitated circumvention;
>
> g. unlawful adult-minor contact pathways;
>
> h. unauthorized commercial targeting;
>
> i. misleading age enforcement; or

433

j. knowingly harmful operational escalation.

58. Permission to enter the environment is not consent to every condition within it.

59. The platform remains responsible for the condition it creates and controls.

**1. Access Permission Does Not Waive Truthfulness**

60. Parents, schools, and users are entitled to truthful information about:

a. safety tools;

b. data practices;

c. age controls;

d. recommendation objectives;

e. known limitations;

f. account deletion;

g. parental controls;

h. exploitation reporting; and

i. underage-access enforcement.

61. A parent cannot exercise informed stewardship where the provider materially misrepresents the tools available.

62. Deception transfers information risk to the custodian.

63. The platform should bear responsibility for that transfer.

**2. Access Permission Does Not Authorize Unlawful Data Use**

64. A custodian's decision to permit use does not eliminate statutory limits on:

a. collection;

b. inference;

c. profiling;

d. retention;

e. transfer;

f. targeting;

g. consent;

h. deletion; or

i. use of sensitive youth data.

65. These duties belong to the platform because the platform controls the data system.

**3. Access Permission Does Not Validate Defective Controls**

434

66. A parent may reasonably rely on a represented control.

67. Where the platform claims that the control:

        a. limits time;

        b. blocks contact;

        c. prevents access;

        d. applies across accounts;

        e. restricts notifications;

        f. enforces age settings; or

        g. supports supervision,

the platform should possess evidence supporting that claim.

68. Parental reliance does not excuse platform failure.

69. It may strengthen the causal significance of the failure.

## 4. Parental Choice Does Not Absorb Platform-Created Escalation

70. A parent may authorize general access without authorizing a specific system-generated pathway.

71. The Court should distinguish:

        a. access to the service;

        b. direct user selection;

        c. followed content;

        d. peer sharing;

        e. unsolicited recommendation;

        f. repeated recommendation;

        g. age-sensitive targeting;

        h. commercial optimization; and

        i. platform-generated escalation.

72. The parent's initial access decision should not be treated as the sole cause of every later operational intervention.

## 5. Platform Knowledge Creates Platform Duties

73. A platform may possess knowledge unavailable to the custodian.

74. That knowledge may concern:

        a. repeated underage-account creation;

        b. recurring control failure;

435

      c. exploitative contact patterns;

      d. recommendation escalation;

      e. unlawful data use;

      f. widespread circumvention;

      g. internal research;

      h. subgroup harm; and

      i. conflicts between safety and commercial objectives.

75. Superior operational knowledge creates corresponding responsibility.

76. A platform cannot conceal the information and later rely on the custodian's failure to act upon it.

## 6. Platform Control Creates Corrective Capacity

77. Parents cannot directly alter:

      a. recommendation objectives;

      b. ranking signals;

      c. account-linkage systems;

      d. age-assurance architecture;

      e. data-retention policy;

      f. notification logic;

      g. reporting infrastructure;

      h. exploitation detection; or

      i. internal safety constraints.

78. Platforms can.

79. Responsibility should follow that corrective capacity.

## 7. Parental Responsibility Is Not an Immunity

80. Preserving parental responsibility should not become a platform defense to every claim.

81. It should operate as one part of the causal allocation.

82. The Court should reject both extremes:

      a. the platform as universal custodian; and

      b. parental access permission as universal platform immunity.

## 8. The Platform-Responsibility Finding

83. For each platform-specific claim, the Court should determine:

a. what operation the platform controlled;

b. what it represented;

c. what it knew;

d. what data it used;

e. what safeguard it supplied;

f. what pathway it maintained;

g. what corrective capacity it possessed;

h. what increment of harm it added; and

i. what remedy corresponds to that contribution.

## C. Creators Should Answer for Content

84. Content creators remain responsible for the messages and material they create.

85. They may include:

a. peers;

b. influencers;

c. advertisers;

d. predators;

e. scammers;

f. schools;

g. organizations;

h. political actors;

i. commercial sellers; and

j. ordinary users.

86. The content creator should answer for:

a. false statements;

b. threats;

c. harassment;

d. unlawful solicitation;

e. fraud;

f. extortion;

g. exploitation;

       h. defamatory statements;

       i. illegal imagery; and

       j. other unlawful content or conduct.

87. Platform responsibility may arise from the platform's separate treatment of that content.

88. It should not erase creator responsibility.

### 1. Authorship Should Remain Distinct From Distribution

89. The creator determines the content of the message.

90. The platform determines whether and how the message is hosted, selected, ranked, recommended, monetized, restricted, or removed.

91. Those functions may produce separate liabilities.

92. The Court should preserve both.

### 2. Criminal and Predatory Actors Should Not Disappear From the Causal Chain

93. Where harm arises from:

       a. grooming;

       b. trafficking;

       c. extortion;

       d. threats;

       e. unlawful image distribution;

       f. fraud;

       g. stalking; or

       h. direct abuse,

the primary wrongdoer should remain visible.

94. A platform may bear responsibility for a proved operational contribution.

95. It should not become a substitute defendant that removes the offender from the analysis.

### 3. Lawful Expression Should Remain Attributable to the Speaker

96. Lawful but distressing, offensive, unhealthy, or controversial expression remains attributable to the speaker.

97. The platform may bear separate responsibility for:

       a. deceptive representations;

       b. unlawful targeting;

       c. data misuse;

438

d. defeated controls;

e. repeated escalation; or

f. other independent conduct.

98. The content's meaning and the platform's machinery should remain distinct.

**4. The Content-Creator Finding**

99. For each content-based injury, the Court should determine:

a. who created the content;

b. whether the content was lawful;

c. what wrong the creator committed;

d. what the platform added;

e. whether the user selected the material;

f. whether the platform materially amplified or escalated it; and

g. what remedy belongs to each actor.

*D. Institutions Should Answer for Delegated Stewardship*

100. Schools and other institutions exercise delegated authority over children.

101. That authority may include:

a. attendance;

b. discipline;

c. devices;

d. curriculum;

e. supervision;

f. counseling;

g. peer conduct;

h. safety;

i. reporting; and

j. intervention.

102. Institutions should answer for the manner in which that authority was exercised.

103. They should also remain entitled to recover for a distinct burden transferred to them by a proved external breach.

**1. Delegation Does Not Eliminate Responsibility**

104. Parents may delegate portions of daily supervision to schools.

439

105.    Government may impose duties on schools.

106.    Schools may use vendors and platforms.

107.    None of those delegations eliminates the institution's responsibility for:

a. device policy;

b. classroom enforcement;

c. bullying response;

d. attendance;

e. counseling;

f. parent communication;

g. institutional screen use; and

h. timely intervention.

**2. Institutions Should Account for Their Own Digital Environment**

108.    An institution that supplies devices or requires digital participation should account for:

a. the access it created;

b. the applications it permitted;

c. the hours of use it required;

d. the restrictions it imposed;

e. the supervision it exercised;

f. the data it collected;

g. the policies it enforced; and

h. the harms it observed.

109.    Institutional contribution should remain part of the causal record.

**3. Institutional Claims Should Be Incremental**

110.    A school or government should recover the additional burden caused by the platform-specific breach.

111. It should not recover the ordinary cost of:

a. counseling;

b. discipline;

c. attendance enforcement;

d. device management;

e. bullying response;

440

f. crisis intervention; or

g. other duties already possessed.

112.    The platform should not retain an externality it directly transferred.

113.    The institution should not transfer its own ordinary stewardship cost to the platform.

## 4. The Institutional-Stewardship Finding

114.    For each institutional claim, the Court should determine:

a. what delegated authority existed;

b. what duty accompanied it;

c. what institutional policy governed;

d. what exposure the institution created;

e. what intervention occurred;

f. what platform breach added burden;

g. what cost was ordinary;

h. what cost was incremental; and

i. what net remedy follows.

### E. Government Should Answer for Rules and Incentives

115.    Government defines the legal environment within which platforms, custodians, institutions, and users operate.

116.    It determines:

a. what data practices are lawful;

b. what age rules apply;

c. what disclosures are required;

d. what reporting duties exist;

e. what remedies are available;

f. what market incentives remain lawful;

g. what public institutions must do; and

h. what standards apply across firms.

117.    Government should enforce existing duties.

118.    It should also correct market-wide defects through prospective law.

## 1. Government Should Enforce Defined Violations

119.    Government may enforce:

a. deception law;

b. consumer-protection law;

c. privacy law;

d. child-data law;

e. exploitation prohibitions;

f. reporting duties;

g. competition law;

h. statutory safeguards; and

i. court orders.

120.    Those claims should remain direct and evidence-based.

## 2. Government Should Legislate Shared Defects

121.    Industry-wide defects may require standards concerning:

a. recommendation objectives;

b. age assurance;

c. interoperable controls;

d. youth-data limitations;

e. externality reporting;

f. independent research;

g. safe harbor;

h. auditability;

i. automated governance; and

j. user-health measures.

122.    Government should not leave the incentive intact and then attempt to transfer the entire resulting social cost to one defendant.

## 3. Governmental Authority Carries Institutional Accountability

123.    Government cannot assert authority to regulate platforms, schools, parents, and children while disclaiming responsibility for the incentives and gaps its own legal structure preserves.

124.    The governmental contribution should remain visible.

## 4. The Governmental Finding

125.    For each public claim or proposed reform, the Court should determine:

a. what existing law governs;

b. what violation occurred;

c. what incentive remained lawful;

d. whether the defect is platform-specific or industry-wide;

e. what judicial remedy is available;

f. what prospective rule is required; and

g. what institution possesses authority to enact it.

### F. Damages Should Answer for Proved Injury

126.   Damages should correspond to the injury proved against the actor who caused it.

127.   They should not operate as a substitute for incomplete causal analysis.

128.   The Court should preserve:

a. baseline;

b. temporal direction;

c. platform-specific increment;

d. alternative causes;

e. comparative responsibility;

f. mitigation;

g. nonduplication; and

h. proportionality.

129.   The same event should not be multiplied automatically across:

a. child;

b. parent;

c. school;

d. state;

e. account;

f. day;

g. view;

h. recommendation;

i. data point; and

j. statement.

130.   Distinct injury supports distinct recovery.

131.    Repeated counting does not.

**1. Restitution Follows Receipt**

132.    Restitution should remove the benefit the defendant obtained through unlawful conduct.

**2. Compensation Follows Attributable Harm**

133.    Compensation should repair the injury added by the proved breach.

**3. Penalty Follows Statutory Unit and Culpability**

134.    Penalty should follow the violation defined by law and the culpability established.

**4. Injunction Follows Corrective Control**

135.    Injunction should direct the actor who can actually correct the condition.

**5. The Damages Finding**

136.    For each award, the Court should determine:

    a. what duty was breached;

    b. what injury resulted;

    c. what benefit was received;

    d. what statutory unit applies;

    e. what other awards overlap;

    f. what amount is attributable; and

    g. what correction remains necessary.

### G. Legislation Should Answer for Market-Wide Defects

137.    Market-wide defects should be corrected at the level of the market.

138.    A defendant-specific judgment may correct:

    a. a false statement;

    b. a data violation;

    c. a defective control;

    d. a recommendation pathway;

    e. an exploitation pathway; or

    f. another company-specific breach.

139.    It cannot establish durable standards for every firm, device, app store, school, and household.

140.    Market-wide correction may require:

    a. uniform disclosure;

444

       b. interoperable controls;

       c. standardized age assurance;

       d. common externality measures;

       e. independent audits;

       f. youth-data limits;

       g. research access;

       h. safe harbor; and

       i. governance of automated objectives.

141.    The Court can identify the boundary.

142.    Legislatures and regulators should complete the structural correction.

## H. Reciprocal Responsibility Produces the Most Durable Settlement

143.    Reciprocal responsibility preserves every necessary actor.

144.    It does not centralize all responsibility in the most visible or solvent defendant.

145.    It does not fragment responsibility until no one remains answerable.

146.    It assigns each duty to the actor possessing the corresponding authority and control.

147.    The allocation is:

       a. parents and guardians govern direct custody and intervention;

       b. schools govern delegated custody and institutional conditions;

       c. creators govern their own content and conduct;

       d. platforms govern their representations, systems, data, controls, and operational pathways;

       e. government governs legal standards and market incentives;

       f. courts govern adjudication and proportionate remedy; and

       g. legislatures govern prospective industry-wide correction.

148.    This allocation preserves escalation.

149.    Failure by one actor does not extinguish the duties of another.

150.    A parent's failure does not immunize platform deception.

151.    Platform misconduct does not erase school responsibility.

152.    School inaction does not erase offender responsibility.

153.    Governmental omission does not legalize conduct already prohibited.

154.    A judicial remedy does not prevent later legislative reform.

155.    A narrow order does not close the path to additional relief upon proof of additional misconduct.

156.    Each level remains available as the record develops.

157.    The Court should therefore adopt a structure that:

      a. identifies the first responsible actor;

      b. preserves concurrent duties;

      c. assigns the proved increment;

      d. prevents duplicated recovery;

      e. imposes correction on the actor with control;

      f. preserves lawful expression;

      g. protects child stewardship;

      h. exposes market-wide defects; and

      i. leaves a widening lawful path for further correction.

158.    The governing principle is:

**The health of children should not be assigned wholesale to platforms merely because platforms are widely used. Nor should parental choice be treated as consent to deception, unlawful data use, defective controls, or knowingly harmful platform operation. Custodians should answer for custody; platforms for platform conduct; creators for content; institutions for delegated stewardship; government for rules and incentives; damages for proved injury; and legislation for market-wide defects.**

---

## CONCLUSION

The coordinated proceedings present serious allegations involving children, families, schools, public institutions, content creators, offenders, platforms, and government. Their seriousness makes causal precision more necessary, not less.

The Court should resist any rule that collapses access into custody, content into platform operation, continued use into a settled intent to continue, correlation into platform-specific causation, expenditure into external injury, engagement into human benefit, or market-wide incentive into defendant-specific wrongdoing.

Amicus respectfully requests that the Court adopt, or otherwise employ, a decisional framework that:

      a. separates access, content origin, custody, platform operation, knowledge, representation, incremental causation, and remedy;

      b. identifies the actor who possessed authority, proximity, knowledge, and corrective capacity at each stage;

      c. distinguishes third-party expression from platform-created machinery and commercial representation;

      d. distinguishes platform-specific misconduct from industry-wide incentives;

e. requires general health claims to rest on comparative populations, temporal direction, confounding analysis, and a platform-specific increment;

f. preserves direct parental and institutional stewardship;

g. enforces platform responsibility for deception, unlawful data practices, defective controls, illegal pathways, and independently caused operational harm;

h. requires public plaintiffs to separate ordinary duties from net additional burdens;

i. applies First Amendment and § 230 protections to the precise feature and duty presented;

j. ties restitution to benefit received, compensation to attributable injury, penalty to culpability and statutory unit, injunction to corrective control, and legislation to systemic defect;

k. prevents the same externality from being multiplied through repeated counting across persons, accounts, periods, interactions, data points, and public entities;

l. evaluates whether relief produces functional correction rather than displacement; and

m. prevents negative externalities from being transferred to actors who did not create them.

The proper result is neither platform absolution nor platform custodianship.

It is allocation.

Each actor should answer for the authority exercised, the duty held, the representation made, the conduct controlled, the benefit received, and the injury caused.

That structure protects children without weakening the people and institutions charged with their direct care. It preserves lawful expression without immunizing unlawful operation. It permits courts to correct proved misconduct while preserving legislation as the proper instrument for market-wide reform.

For those reasons, the Court should employ the proposed framework throughout the coordinated proceedings.

---

Respectfully submitted,

**NATURAL LAW INSTITUTE**
By: /s/ Brandon Michael Hayes
Brandon Michael Hayes
President, Natural Law Institute
159 Indian Hill Street
West Newbury, Massachusetts 01985
(617) 438-2049
brandon@hayeshaus.com

Proposed Amicus Curiae, Self-Represented

Dated: July 13, 2026

447