Ashley M. Simonsen (Bar No. 275203)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, California 90067
Telephone: (424) 332-4800
Facsimile: (424) 332-4749
Email: asimonsen@cov.com

*Attorney for Defendant Meta Platforms, Inc. f/k/a
Facebook, Inc.*

*[Additional counsel listed on signature pages]*

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

# OAKLAND DIVISION

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates To:<br><br>*People of the State of California, et al. v. Meta Platforms, Inc. et al.* | MDL No. 3047<br><br>Case Nos.: 4:22-md-03047-YGR<br>4:23-cv-05448-YGR<br><br>**META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br>Magistrate Judge: Hon. Peter H. Kang |

**TABLE OF CONTENTS**

FINDINGS OF FACT.................................................................................................... 1

I.      The Parties ....................................................................................................... 1

II.     The States' Misrepresentation Claims ........................................................... 2

    **A.      Statements of Meta's Age-Restriction Policy.** ...................................... 2

    **B.      Statements Regarding the Safety of Meta's Services.**......................... 9

    **C.      Statements Regarding Meta's Objectives for Safety** ...................... 50

    **D.      Statements Regarding Addiction.**...................................................... 62

    **E.      Meta's Statements to Congress.**........................................................ 77

    **F.      The Literature and the States' Experts Rely on Barred Features in Purporting to Link Meta's Services to Problematic Use.**................. 82

III.    The States' Unfair Practices Claims ............................................................ 84

    **B.      Time Management Tools.**.................................................................... 84

    **C.      Multiple Accounts Feature.**............................................................... 91

    **D.      Enforcement of Meta's Age-Restriction Policy.**............................. 93

IV.     The States' COPPA Claims ....................................................................... 101

    **A.      Meta Is The "Operator" Of Facebook And Instagram.**............... 102

    **B.      Meta Does Not Have "Actual Knowledge" Of Specific U13 Users.**............. 102

    **C.      Meta's Services Are Not Directed To Children.** ........................... 111

    **D.      No "Portion" Of Meta's Services Is Directed To Children.**.......... 117

    **E.      Meta Collects Limited Information Prior To Neutral Age Screening Solely For Functionality And Security Purposes And Discloses Its Privacy Policy.**...... 117

V.      The States' Proposed Remedies................................................................. 118

    **A.      The States Have Not Presented Evidence To Support A Determination Of The Number Of Violations Related To The Alleged Misrepresentations Or Unfair Practices.**...... 118

    **B.      The States' Proposed Penalty Estimates Double-Count Users.**.................... 120

C.    The States' Proposed Disgorgement Estimates Are Unreliable. .................. 121

D.    The States' Estimates Of U13 Users Are Unreliable. ................................. 124

E.    The States' Proposed Injunctive Relief Is Unnecessary, Barred By Section 230, And/Or Infeasible. ................................................................................ 125

CONCLUSIONS OF LAW ........................................................................................... 127

VI.    The States' Misrepresentation Claims ................................................................ 127

A.    Each Alleged Misrepresentation Must Satisfy The Elements Of A Consumer Deception Claim. .......................................................................... 127

B.    No Independent Liability For A "Deceptive Scheme." ............................... 131

C.    Statements Protected Under The First Amendment. ................................... 145

D.    Statements Regarding Meta's General Objectives For Safety. .................... 154

E.    Statements Of Meta's Age-Restriction Policy. ........................................... 165

F.    Statements Regarding Meta's Content Moderation Policies And Enforcement. .............................................................................................. 169

G.    Statements Regarding Addiction. ............................................................... 179

H.    Statements To Congress. ............................................................................ 184

VII.   The States' Unfair Practices Claims ................................................................... 193

A.    Legal Standards. ........................................................................................ 193

B.    Meta's Time Management Tools Are Not An Unfair Practice Under California, Colorado, Or Kentucky Law. ...................................................... 197

C.    Meta's Multiple Accounts Feature Is Not An Unfair Practice Under The Laws Of California, Colorado, Or Kentucky. .............................................. 201

D.    Meta's Systems For Enforcing Its Age-Restriction Policy Are Not An Unfair Practice Under The Laws Of California, Colorado, And Kentucky. ........... 204

E.    Colorado And Kentucky Cannot Premise An Unfair Practices Claim On Alleged Violations Of COPPA. ................................................................... 208

F.    Section 230 And The First Amendment Bar The State's Challenge To Meta's Systems For Enforcing Its Age-Restriction Policy. ....................................... 210

VIII.  The States' COPPA Claims ............................................................................... 211

ii

A.    **COPPA Legal Standard.** ................................................................................ 211

B.    **Meta's Services Are Not "Child-Directed."** ................................................. 212

C.    **Meta Lacks Actual Knowledge Of Particular Users Under 13 On Its Platforms.** .................................................................................................... 218

D.    **Even If A Checkpointed Account Constitutes "Actual Knowledge," Meta Complies With COPPA.** ............................................................................... 220

E.    **COPPA's Actual Knowledge Standard Forecloses A Theory Of Willful Blindness.** ................................................................................................... 223

F.    **The States' COPPA Claim Is Subject To The Four-Year Statute Of Limitations.** ................................................................................................. 228

IX.    The States' Proposed Remedies ................................................................................ 230

A.    **Any Calculation Of The Number Of Violations Must Be Linked To The Alleged Deceptive Statements Or Challenged Features.** .............................. 230

B.    **The States' Proposed Penalty Estimates Do Not Reflect Violations Linked To The Alleged Deceptive Statements Or Challenged Features.** ...................... 235

C.    **The States Double-Count The Same Users For Purposes Of Calculating Penalties**. ...................................................................................................... 238

D.    **The States Have Not Supported Their Request For Maximum Penalties.** ... 240

E.    **Colorado, Kentucky, And The New Jersey Attorney General Cannot Recover Consumer Protection Penalties For Alleged Violations Of COPPA.** ........... 242

F.    **The States Cannot Recover Damages Or Disgorgement Under COPPA.** ... 243

G.    **The States Are Not Entitled To Equitable Monetary Relief.** ....................... 245

H.    **The States Have Not Shown That They Are Entitled To Disgorgement Of Any Profits Or Revenues.** ............................................................................ 247

I.    **The States Are Not Entitled To Disgorgement Of Meta's Revenues.** .......... 249

J.    **The States Have Not Shown An Entitlement To Injunctive Relief.** ............. 250

Pursuant to the Court's scheduling order (ECF No. 384-1 (3139-1)), Defendant Meta Platforms, Inc. ("Meta") hereby submits its pretrial proposed findings of fact and conclusions of law. The documents and expected witnesses listed in this document are based on information reasonably available to Meta at the time these findings were submitted, before the States have presented any evidence. Where Meta has cited specific documents, Meta anticipates that witnesses may provide testimony regarding those documents, or that witnesses may provide testimony on the subjects of those documents in lieu of introducing the documents into evidence. Meta has designated, in brackets, illustrative witnesses who it currently expects will testify on particular subjects, although others may also address these topics. Meta reserves the right to modify and supplement these pretrial findings and conclusions as trial proceeds and in accordance with the Court's directives and scheduling order.

**FINDINGS OF FACT**

**I.      The Parties**

    **A.**      Plaintiffs in this action are the Attorneys General of Arizona, California, Colorado, Connecticut, Delaware, Hawaii, Idaho, Illinois, Indiana, Kansas, Kentucky, Louisiana, Maryland, Minnesota, Nebraska, New Jersey, New York, North Carolina, Ohio, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Virginia, Washington, West Virginia, and Wisconsin. Plaintiffs all claim that Meta violated the Children's Online Privacy Protection Act ("COPPA").[1]

    **B.**      The Attorneys General of California, Colorado, Kentucky, and New Jersey (collectively, "States") also claim that Meta violated the consumer protection laws of their States through unfair and deceptive practices.

    **C.**      Meta is a Delaware corporation with its principal place of business in Menlo Park, California. *See* ECF No. 474 (3258) ¶ 3.

---

[1] In Sections IV and VIII of these proposed findings of fact and conclusions of law—addressing COPPA—the defined term "States" includes all of the Plaintiffs listed here. For purposes of all other Sections, the defined term "States" refers solely to the Attorneys General of California, Colorado, Kentucky, and New Jersey.

1

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

**D.** Meta was formerly known as Facebook, Inc. *Id.* ¶ 2. Facebook, Inc. acquired Instagram on August 31, 2012. *Id.* ¶ 1. Facebook, Inc. changed its corporate name to Meta Platforms, Inc. on October 28, 2021. *Id.* ¶ 2.[2]

**E.** Meta operates the Facebook and Instagram services. Billions of people across the world use these services. *See* DX-11,033 at 51. Facebook and Instagram allow users to connect and communicate with each other and host, arrange, and help disseminate a diverse array of user-generated content, including photos and videos.

**F.** To use either Facebook or Instagram to connect and communicate with others, users must register an account. *See* DX-10,162; DX-10,304. Users may access Meta's services without payment. *See id.* Meta's policies prohibit prospective users from creating an account if they are under 13. *See id.*

## II. The States' Misrepresentation Claims

### A. Statements of Meta's Age-Restriction Policy.

1. The States assert that nine statements by Meta or its employees relating to Meta's age-restriction policy—Statement Nos. 11 (85), 19 (24), 25 (37), 28 (42), 29 (43), 30 (44), 31 (45), 41 (63), and 42 (65)—are deceptive.[3] *See* ECF Nos. 385 (3144); 476 (3260).

2. The statements identified by the States accurately describe Meta's *policy* with respect to age restrictions on Facebook and Instagram. Meta has long maintained a policy prohibiting individuals under the age of 13 from using Facebook or Instagram. *See infra* Findings pp. 93–94. Statements that Meta does not "allow" or "permit" such users on its services—or other equivalent wording—are true and accurate descriptions of Meta's policy. [A. Davis].

[2] As used herein, "Meta" refers to Facebook, Inc. for the period before October 28, 2021, and to Meta Platforms, Inc. for the period on and after that date.

[3] Throughout this document, Meta uses the statement numbers provided by the States in their July 15 list of alleged actionable misrepresentations. ECF No. 476 (3260). Meta includes in parentheses the numbers used by the States in their June 15 list. ECF No. 385 (3144).

2

3. Meta has developed tools and processes to help identify and remove accounts that it detects as potentially belonging to individuals under the age of 13. *See* DX-11,879. These processes have evolved over time as technology has evolved and improved. *See infra* Findings pp. 93–111.

4. Meta has disclosed publicly that its age detection and verification efforts are not perfect and continue to evolve, and that some users misrepresent their ages and obtain access to Meta's services. [A. Davis; Hartnett].

a) On March 17, 2021, Meta published an article on its website stating that "[w]hile many people are honest about their age, we know that young people can lie about their date of birth," and that "verifying people's age online is complex and something many in our industry are grappling with." DX-10,336.

b) On July 27, 2021, Meta published an article on its website stating that "[w]hile age screens are common in our industry, young people can—and often do—get around them by misrepresenting their age." DX-10,030. The article further stated that "[m]any argue that collecting ID is the answer to this industry problem, but there are significant limitations to this approach: many young people don't have an ID . . . While these are not new problems to solve, we will continue to invest in finding the right solutions." *Id.*

c) On September 17, 2024, Meta published a report on its website stating that "teens may misrepresent their age online so we want to do more to proactively find accounts belonging to teens, even if the account lists an adult birthday." DX-10,652.

d) Meta's website also includes a webpage stating, "We appreciate that teens may try to get around these protections, so we use AI technology to place those we suspect are teens into these protections, even if they tell us they're adults." DX-17,622.

3

5.     The individual statements identified by the States in this category accurately reflect Meta's age-restriction policy and its objective to keep under-13 children off the service.

    a)    **Statement No. 11 (85)**

        (1)    This statement, from Instagram's Help Center webpage titled, "Report a child under 13 on Instagram," states, "If you'd like to report an account belonging to someone under 13 or if you believe someone is impersonating your child who's under 13, please fill out this form. ***We will delete the account if we can't verify the account is managed by someone over 13 years old.***"  DX-11,060.[4]

        (2)    This is an accurate statement concerning Meta's enforcement of its policy on individuals who are under the age of 13 from accessing Instagram. *See infra* Findings pp. 93–94.

    b)    **Statement No. 19 (24)**

        (1)    At the March 25, 2021 Congressional hearing, Congressman Long asked Mark Zuckerberg, "So a thirteen-year-old would never—I mean, an eleven-year-old would never put in the wrong birthday by two years and say they were thirteen. Is that kind of your policy?" DX-17,260.  Mr. Zuckerberg responded:  "Congressman, it's more nuanced than that.  But I think you're getting at a real point, which is that people lie.  And we—we have additional systems that try to determine that someone's age might be.  So ***if we detect that someone might be under the age of thirteen, even if they lied, we kick them off.***" *Id.*

        (2)    This statement to Congress by Mr. Zuckerberg accurately describes Meta's enforcement of its age-restriction policy. *See infra* Findings

---

[4] The States' alleged misrepresentations are selected portions of longer statements.  Those portions are bolded and italicized throughout.

pp. 93–111.  It also discloses that individuals lie about their age to evade Meta's policy.  [Zuckerberg].

(3)    Mr. Zuckerberg similarly testified on January 31, 2024 before the Senate Judiciary Committee.  DX-11,221.  In response to Senator Hirono's question about "underage children" on Meta services, Mr. Zuckerberg explained, "So if we find anyone who's under the age of 13, we remove them from our service.  Now, I'm not saying that people don't lie and that there aren't---- Anyone who's under the age of 13 who's using it, but I'm not going to be able to—we're not going to be able to count how many people there are because, fundamentally, if we identify that someone is underage, we've removed them from the service." *Id.*  [Zuckerberg].

(4)    In a written response to a question for the Congressional record, Mr. Zuckerberg further explained that Meta has "come to understand that people, including young people, sometimes misrepresent how old they are," and that "the difficulty in understanding someone's age online is not unique to Meta or even to social media." *Id.*  Mr. Zuckerberg also acknowledged the presence of under-13 individuals on Meta's services by reporting statistics about underage enforcement:  "In the last two quarters of 2021, Meta removed more than 4.8 million accounts on Facebook and 1.7 million accounts on Instagram because they were unable to meet our minimum age requirement." *Id.*  [Zuckerberg].

c)    **Statement No. 25 (37)**

(1)    On September 28, 2021, the Wall Street Journal ("WSJ") published an article titled, "Facebook's Effort to Attract Preteens Goes Beyond Instagram Kids, Documents Show."  DX-17,706.  Adam Mosseri provided a written statement, which the WSJ quoted in its article.

5

*See id.* Mr. Mosseri's statement included: "If kids are under 13, they're not allowed on Instagram and they should not be using our service . . . It's not new and it's not a secret that social-media companies try to understand how teens and preteens use technology. ***Like all technology companies, of course, we want to appeal to the next generation, but that's entirely different from the false assertion that we knowingly attempt to recruit people who aren't old enough to use our apps.***" *Id*. at 5.

(2) This statement by Mr. Mosseri accurately reflects that Meta does not intentionally "recruit" individuals under the age of 13 to use Facebook or Instagram. [Mosseri].

(3) To the extent Meta has developed, or previously considered developing, services eligible for individuals under the age of 13, Meta worked diligently to ensure that any such services are, or would be, entirely self-contained for individuals under the age of 13 and compliant with COPPA. *See, e.g.,* DX-17,704; DX-17,701; [Mosseri; Newton; A. Davis].

d) **Statement Nos. 28 (42), 29 (43), and 30 (44)**

(1) At the September 30, 2021 Senate hearing, Senator Lujan asked Antigone Davis, "Does Facebook or Instagram collect personally identifiable information specific to individual children under the age of 13 without the consent of those children's parents or guardians?" DX-17,267. Ms. Davis replied, "***Senator, children under the age of 13 are not allowed on Instagram or Facebook.***" Senator Lujan then stated, "Does Facebook or Instagram collect personally identifiable information specific to individual children under the age of 13? Is your answer, no?" *Id.* Ms. Davis replied, "Respectfully, Senator, we do not allow children under the age of 13—" *Id.*

6

Senator Lujan interrupted, "That is not the question that I am asking. The question I am asking, in the same way that I asked Mr. Zuckerberg on April 11th about the collection of this information, *does Facebook or Instagram collect personally identifiable information specific to individual children under the age of 13 without the consent of those parents or guardians. If the answer is no that is sufficient.*" *Id.*  Ms. Davis replied, "*Senator, it would be my understanding that we don't since we don't allow them on our apps.*" *Id.*

(2)    Senator Blackburn also asked Ms. Davis, "OK.  So talk to me about how you enforce the policy, that 13 year old—under 13 cannot be on Instagram?"  Ms. Davis replied:  "Yes, I appreciate that question. So there are a number of different things that we do.  We have an age screen.   When someone tries to join Instagram, *if we see someone trying to repeatedly change the date to get past that, we actually will restrict their ability to access the app.  We also allow people to report underage accounts, even if you are not on Facebook, and we will remove them.*  And we are investing and using AI and other signals to remove underage accounts." *Id*.

(3)    These statements to Congress by Ms. Davis accurately describe Meta's multiple systems for detecting users who are attempting to evade its age-restriction policy. *See infra* Findings pp. 93–111.

e)    **Statement No. 31 (45)**

(1)    At the September 30, 2021 Senate hearing, Senator Blackburn asked Antigone Davis, "But we know that you are doing research on children as young as 8, and are marketing to 8 to 12 year olds, correct?" DX-17,267. Ms. Davis replied:  "*We do not market to 8 to 12 year olds because they are not on Instagram.*  13 year olds

7

and above—if we find an account of someone who is under 13, we remove them. In fact, in the last 3 months we removed 600,000 accounts of under 13 year olds." *Id.*

(2) This statement to Congress by Ms. Davis accurately states Meta's age-restriction policy and its implementation. *See infra* Findings pp. 93–94. The statement also accurately reflects that Meta does not market to individuals under the age of 13 on Facebook or Instagram. *See infra* Findings pp. 111–16; [A. Davis].

(3) At the same September 30, 2021 hearing, Ms. Davis acknowledged the problem of under-13 individuals who violate Meta's policy: "We also know that young people are online under the age of 12 on apps that aren't designed for them, that we want to get their parents the supervisory tools and insights that they need so that they can manage the amount of time that their child is spending." DX-17,267.

f) **Statement No. 41 (63)**

(1) For the December 8, 2021 Senate hearing, Mr. Mosseri's prepared remarks included: "Understanding people's age on the Internet is a complex and industry-wide challenge—especially considering that many young people in the U.S. do not have a driver's license until they are 15 or 16 years old. However, *we're building new technology to proactively find and remove accounts belonging to those under 13 and to identify those people who may be under the age of 18.* In addition to requiring people to share their date of birth when they register and allowing anyone to report a suspected underage account, *we train our technology to identify if people are above or below 18 using multiple signals. We look at things like wishing people a happy birthday and the age written in those*

8

*messages*—for example, 'Happy 21st Bday!' or 'Happy Quinceanera.' This technology isn't perfect, and we're always working to improve it, but that's why it's important that we use it alongside many other signals to understand people's ages." DX-16,927.

(2) This statement to Congress by Mr. Mosseri accurately describes the challenges that the industry faces in verifying users' ages, and accurately describes the multiple systems Meta has developed and continues to refine to detect users who evade its age-restriction policy. *See infra* Findings pp. 93–111. The statement also accurately discloses that users lie about their age and evade Meta's policy. [Mosseri].

g) **Statement No. 42 (65)**

(1) Mr. Mosseri made the following statement in his prepared remarks in advance of the December 8, 2021 Senate hearing: "As Head of Instagram, *I am especially focused on the safety of the youngest people who use our services. This work includes keeping underage users off our platform, designing age-appropriate experiences for people ages 13 to 18, and building parental controls.*" DX-17,269.

(2) This statement by Mr. Mosseri to Congress accurately reflects his objectives and aspirations regarding Instagram's work to keep individuals under the age of 13 off the service. [Mosseri].

B. **Statements Regarding the Safety of Meta's Services.**

1. The States assert that 23 statements by Meta or its employees regarding the safety of Meta's services—Statements Nos. 3 (5), 4 (6), 5 (7), 8 (12), 9 (13), 12 (16), 13 (18), 14 (19), 16 (21), 23 (29), 24 (35), 26 (38), 27 (39), 36 (53), 39 (59), 43 (81), 45 (67), 46 (68), 47 (9), 48 (70), 49 (80), 50 (78), and 51 (83)—are deceptive. *See* ECF Nos. 385 (3144); 476 (3260).

9

2. These statements regarding the safety of Facebook and Instagram were correct and accurately reflect Meta's longstanding efforts, aspirations, and objectives to address safety.

3. Meta has undertaken extensive efforts to enhance the safety of its services. [A. Davis; Otaru; Hartnett].

a) In September 2016, Meta launched the comment keyword filter on Instagram, which allowed people to filter out offensive or inappropriate comments on Instagram posts. *See* DX-11,709. That same month, Meta also gave people the option to swipe to delete comments that they found inappropriate on Instagram. *Id*. Then in December 2016, Meta gave people the option to turn off comments on Instagram posts. *Id*. Later, in June 2017, Meta launched its offensive comment filter tool, which allowed people to automatically hide certain types of offensive comments on Instagram. *Id.* Instagram later expanded the offensive comment filter tool to include certain bullying and harassment-related terms in May 2018. *See id.*

b) In August 2018, Meta announced new tools to help people manage their time on Facebook and Instagram, including an activity dashboard, a daily reminder, and new ways to limit notifications. DX-10,172. These tools were available on the setting page on Instagram and Facebook, and tracked the daily time spent on Instagram and Facebook. A user could manage their time by setting a time limit for each service, which would alert the user once they received their time limit. A user could also mute notifications for a period of up to eight hours. *Id*.

c) Meta also took steps to address problematic content more broadly. In April 2019, Guy Rosen, Meta's former Vice President of Integrity, and Tessa Lyons-Laing, Meta's former Head of News Feed Integrity, discussed Meta's work to remove content that violates Meta's policies, reduce the spread of problematic content that does not violate those policies, and

10

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

inform people with additional context so they can choose what to click, read, or share. *See* DX-10,931. For instance, Meta introduced a new section on its Community Standards website where it would "track all policy changes" and "share specifics on why" substantive policy changes were made. *Id.* Meta also expanded the role of the Associated Press as part of its third-party fact checking program, and updated enforcement policy for Facebook groups through a new "Group Quality" feature. *See id.* That feature provided an "overview of content removed and flagged for most violations," in order to give group administrators a "clearer view into how and when [Meta] enforce[s] our Community Standards." *Id.*

d) Instagram began showing comment warnings in July 2019 to notify users when their comment may be considered offensive before it is posted, to provide users the opportunity to reflect and undo their comment. *See* DX-10,683. Instagram later included an additional warning in October 2020 when users repeatedly attempt to post potentially offensive comments. *See* DX-10,345 (the popup warning states: "This May Go Against our Guidelines" because the user has "tried to post several comments that look similar to others that have been reported," and directs the user to "Go Back to Comment" and revisit their comment).

e) Instagram also began showing caption warnings in December 2019, notifying users with a popup when their captions on a photo or video may be considered offensive. *See* DX-10,315 (the popup warning states: "This caption looks similar to others that have been reported" and advises the user to "Edit Caption" or "Learn More").

f) In October 2019, Meta launched the Restrict feature that allowed people to control their Instagram experience through limiting comment visibility without notifying people who might be attempting to target them. DX-10,683.

11

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

g) In May 2020, Meta launched new features that allow users to delete comments in bulk, block or restrict multiple accounts that post negative comments, pin positive comments, and manage who can tag or mention a user. *See* DX-10,054.

h) In March 2021, Meta restricted adults from starting private chats with teens they are not connected to on Instagram and Messenger. *See* DX-10,336. Meta also began warning users with in-app "safety notices" to encourage teen users to be cautious in conversations with adults that they are already connected to. DX-10,336 (the popup warning gives the users the option to "Restrict," "Report," or "Block" someone, and advises the user not to feel pressured to respond, only to share with people they trust, and that their safety comes first).

i) In April 2021, Meta introduced its Hidden Word tool, which gives users the option to automatically filter direct messaging requests containing certain offensive words, phrases, and emojis. DX-10,966. Meta worked with anti-discrimination and anti-bullying organizations to develop a predefined list of offensive terms that will automatically be filtered when the feature is turned on, and any user can create their own list of custom words, phrases, or emojis to filter out as well. *Id.*

j) In May 2021, Meta began giving users the ability to hide public like counts on Instagram and Facebook. DX-10,353.

k) In July 2021, Meta began limiting potentially suspicious adults from finding and following teens in places like Reels, Explore, or Suggested for You on Instagram, and announced default private account settings for users under the age of 16 when they sign up for Instagram. *See* DX-10,246. For existing teen users under the age of 16, Meta introduced a popup notification that highlights the benefits of a private account and encourages users to change their privacy settings. *Id.*

12

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

l)    Also in July 2021, Meta announced that it was "launching Sensitive Control on Instagram[.]" *See* DX-12,958. The purpose of this new tool was to "give people more choice over what they see" by allowing users "to see more or less of some types of sensitive content" on their Explore page. *Id.* Meta began defaulting new users under the age of 16 into the "Less" setting in Sensitive Content Control on Instagram in August 2022, which provides those users with less sensitive content from accounts they do not follow. *Id.*

m)    Beginning in August 2021, Meta launched its Limits tool, which allows people to automatically hide Direct Message requests and comments from people who do not or only recently followed them. *See* DX-11,709.

n)    In December 2021, Meta launched its "Take A Break" feature to help users manage their time on Instagram. DX-10,045. The feature prompts users to take a break after scrolling for a set period, helping them make informed decisions about their time on Instagram. *Id.* To increase awareness, Meta displayed in-app notifications encouraging users to turn on break reminders. *Id.*

o)    In June 2022, Instagram launched Nudges for teens, which encouraged teens to switch to a different topic if they were repeatedly looking at the same type of content on Instagram's Explore feature, including certain topics that may be associated with appearance comparison. *See* DX-10,060.

p)    Also in June 2022, Meta began testing new options for users to verify their age on Instagram beyond providing a form of identification, including uploading a video selfie to verify age and allowing users to ask mutual followers to confirm their age. *See* DX-10,944.

q)    In November 2022, Meta began defaulting teens under the age of 16, and teens under 18 in certain countries, into more private settings when they join Facebook, and encouraged teens already on the app to choose those settings. *See* DX-17,750.

13

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

r)    In January 2023, Meta launched its Quiet Mode feature on Instagram, which turns off notifications and sends an auto-reply when someone sends a user a direct message and prompts teen users to enable Quiet Mode with an in-app notification when they spend a specific amount of time on Instagram late at night.  DX-12,085.

s)    In June 2023, Meta announced that it would soon begin nudging teen users to take time away from Facebook and set daily time limits if they have spent 20 minutes on the app.  DX-10,198 (the popup notification states: "Time for a break?  If you want, you can use daily reminders to balance how much time you spend online," and includes a link to "Set daily reminder").

t)    In January 2024, Meta launched nighttime nudges that appear in-app on Instagram when teen users spend more than 10 minutes on Instagram late at night.  DX-10,198 (the popup notification states: "Time for a break?  It's getting late.  Consider closing Instagram for the night.").

u)    Meta launched Teen Accounts for Instagram in September 2024, with built-in protections for teens by limiting who can contact them and what content they can see.  *See* DX-10,164.  Meta's safety protections with Teen Accounts included default private accounts, messaging restrictions, sensitive content control defaults, interaction limitations, time limit reminders, and sleep mode.  *Id*.

v)    Meta's Best Interests of the Child Framework sets out a framework to help Meta apply the UN Convention on the Rights of the Child to the services and experiences it builds.  *See* DX-12,898.  Product teams apply that framework to their work.  *See* DX-10,939.

4.    Meta devotes substantial resources to promoting safety on its services, including by engaging internal and external experts and by considering available research as well as user and parent viewpoints.  [Rosen; Bickert; A. Davis; Otaru; Hendrix].

14

a)  As of 2025, Meta had about 40,000 people working on safety and security; safety spending was approximately $20 billion since 2016.  DX-10,689; [Rosen; Zuckerberg].

b)  Meta partners and collaborates with many experts from around the world to inform its approach to safety, including the Thorn and the International Bullying Prevention Association.  *See* DX-17,764.

(1)  In December 2022, Meta held its first Meta Summit focused on Youth Safety and Well-Being, where mental health experts met in Washington, D.C. to explore opportunities to better serve teens and families.  *See*  DX-12,914.  Specifically, experts from ConnectSafely, LGBT Tech, the International Society for Technology in Education (ISTE), the National Association of Media Literacy Education (NAMLE), and Media Smarts addressed what parents need to know, amplifying the tips, tricks, and resources available to parents worried about their teens' time online.  *Id.*

(2)  Prior to 2024, Meta also maintained the Meta Safety Advisory Council, "comprised of leading internet safety organizations from around the world.  Meta consults with these organizations on issues related to online safety.  Council members provide expertise, perspective and insights that inform our approach to safety."  *See* DX-10,417.

c)  Meta developed user-controls in response to research and user needs.

(1)  Meta has conducted research expressly designed to identify potential well-being concerns and develop interventions.  For example, a study entitled "Understanding the Negative Social Comparison Cycle" was undertaken to identify content that triggers negative social comparison and to develop potential innovations addressing those concerns.  *See* DX-17,759.

15

(2)     Meta's "Take a Break" feature, for example, was heavily informed by the research and responded to certain research concerning what Meta witnesses described as rabbit-holing or dwelling on certain topics. [Hendrix].

(3)     Meta developed Teen Accounts protections to address parents' top concerns with Instagram, which its research found included inappropriate or unwanted contact from others, exposure to age-appropriate content, bullying and harassment, and screen time. *See* DX-17,626 (describing an online survey conducted to understand what parents want for their teens, parents' priorities in their approaches to parenting, and the perceived concerns and benefits of teen use of social media); DX-17,685 (discussing how to address top parental concerns with Instagram).

5.     Meta regularly disclosed to consumers that some people have negative experiences on social media services, including Facebook and Instagram. Meta has also repeatedly acknowledged that its safety policies are not perfectly enforced, and that some individuals manage to post content that violates Meta's policies. Meta has also disclosed that its approach to addressing these risks has evolved over time. [A. Davis; Bickert].

a)     On December 1, 2015, Meta researchers published a research paper titled, "Internet Use and Psychological Well-Being: Effects of Activity and Audience," DX-17,088, which states:

(1)     "[R]esearch reviewed here is consistent with a hypothesis that communicating online with close friends and family can have beneficial effects on psychological well-being as measured by declines in depression, loneliness and stress, and increases in perceived social support, mood, and life satisfaction. In contrast, many other uses of the Internet, including using the Internet for

16

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

information, entertainment and communicating online with weak-er ties, do not have similar, positive associations with psychological well-being. Indeed our earliest research showed that communication with strangers was associated with declines in psychological well-being."

b) On February 27, 2016, Meta researchers published a research paper titled, "What's in a Like? Attitudes and Behaviors Around Receiving Likes on Facebook," DX-14,788, which states:

(1) "Individuals with lower levels of self-esteem and higher levels of self-monitoring are more likely to think that Likes are important and to feel bad if they do not receive 'enough' Likes."

(2) "Yet, while people with lower self-esteem may be drawn to sharing on Facebook, they may share thoughts that use more negative language, which in turn makes them appear less likable, at least to strangers assessing their posts, and garners them less feedback in the form of Likes and Comments."

c) On July 27, 2016, Meta researchers published a research paper titled, "The Relationship Between Facebook Use and Well-Being Depends on Communication Type and Tie Strength," DX-14,648, which states:

(1) "[T]here is now emerging consensus that the impact of online communication on well-being is contingent on a person's goals, the nature of the communication exchanged, and the closeness of communication partners."

(2) "Individuals who received targeted, composed communication from strong ties showed improvements in well-being, but their well-being did not improve after viewing wide-audience broadcasts, receiving one-click feedback, or receiving composed communication from weak ties. These results suggest that people derive benefits from

17

receiving online communication, as long [as] it comes from people they care about and has been tailored for them."

(3) "Offline, these positivity biases cause people to underestimate others' difficulties and overestimate their happiness (Jordan et al. 2011). This misperception may persist in social media as well, where viewers see dozens of rosy stories by their social connections. Surveys of college students have linked reading others' stories in social media with ego-deflation, upward social comparison, envy, and subsequent feelings of depression (Steers, Wickham, & Acitelli, 2014; Chou & Edge, 2012). Participants in lab experiments shown fake profiles of beautiful, successful people felt upward social comparison (Haferkamp & Krämer, 2011; Johnson & Knobloch-Westerwick, 2014). Participants assigned to browse Facebook for ten minutes without interacting with friends felt envy and lower affect (Verduyn et al., 2015)."

d) On April 25, 2020, Meta researchers published a research paper titled, "Social Comparison and Facebook: Feedback, Positivity, and Opportunities for Comparison," DX-10,680, which states:

(1) "The findings not only confirm past research that found that people who spent more time on Facebook reported experiencing social comparison more often, but also reveal differences in how they spend their time."

(2) "When people are exposed to more potential targets for social comparison online, they are likely to experience it more often. Thus, people who spend more time on social media, have larger friend networks, and see proportionally more social content (content from friends or other individuals rather than from the news media,

18

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

businesses, or other organizations) may be more likely to report more frequent social comparison."

(3) "Social media has been described as a 'highlight reel' linked to a variety of negative outcomes. Though the causal direction is unknown, these negative outcomes include depression, envy, decreased self-esteem, worse body image, and lower well-being."

(4) "Finally, social comparison can be inspirational and motivate positive behavior change, such as learning a new skill or spending more time outdoors, because one sees one's friends doing it. Even if social media is a 'highlight reel,' those highlights help people see opportunities for themselves."

e) On October 17, 2020, Meta researchers published a research paper titled, "Country Differences in Social Comparison on Social Media," DX-10,679, which states:

(1) "Research on online social media platforms such as Facebook suggest that social comparison on those platforms is associated with negative outcomes such as envy and depression as well as positive ones such as self-improvement and inspiration."

(2) "Social comparison on social media has been associated with negative outcomes such as lower self-esteem, worse body image, and depression. In past experiments, exposure to upward comparison and having high social comparison orientation both led to lower self-esteem after social media sessions."

f) On November 9, 2021, Antigone Davis authored a Newsroom blog post published on Meta's website entitled, "Our Approach to Addressing Bullying and Harassment," DX-10,192; [A. Davis], which states:

(1) "[O]ne form of abuse that has unfortunately always existed when people interact with each other is bullying and harassment. While

19

this challenge isn't unique to social media, we use new technologies to reduce it on our own platform, give people tools to protect themselves and also measure how we are doing."

(2)    "It can sometimes be difficult for our systems to distinguish between a bullying comment and a light-hearted joke without knowing the people involved or the nuance of the situation."

(3)    "As a result, detecting such bullying can be more challenging than other types of violations.  While we are always working to improve our technology, our metrics, particularly those for proactive rate and prevalence reflect the reality of having to rely on reports from our community."

g)    Meta has never claimed that its content moderation efforts are perfect. Instead, it has publicly acknowledged that individuals manage to post content that violates Meta's policies.  *See* DX-10,247.  Meta's public policies further confirm that Meta removes content that violates its policies when identified, while applying additional restrictions, screens, and age-gating measures to permitted content discussing recovery and related topics. *See* DX-12,686; DX-16,632; DX-17,823.

6.    Meta's content moderation systems do not, and could not, lead to a perfect result in which no policy-violating content is present on Meta's services. [Ferrara; Bickert]. These challenges are compounded by the massive volume and varied nature of the content on the services, not to mention the efforts of adversarial, oftentimes criminal, users who seek to circumvent Meta's systems and intentionally post policy-violating content.  [Ferrara; Bickert].

7.    The individual statements identified by the States in this category accurately reflect Meta's policies, practices, and objectives related to the safety of its services.

8.    **Statement No. 9 (13)**

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

a) During Facebook's Fourth Quarter and full year 2019 Earnings Conference Call, Sheryl Sandberg, Meta's COO, made remarks focused primarily on Meta's business performance, advertising services, commerce tools, and the value Meta's services provided to businesses and users. *See* DX-17,717. Her remarks began by reporting Q4 and full-year advertising revenue growth, and she then described how businesses used Facebook and Instagram to reach customers, drive sales, adopt new formats such as Stories, and experiment with shopping features such as Checkout on Instagram. *Id.* In that context, Ms. Sandberg emphasized that Meta was focused on creating long-term value for its community and for businesses using its services. *Id.* Ms. Sandberg described examples of businesses that used Facebook and Instagram to grow. *Id.* Ms. Sandberg explained that "it's not enough" for Meta to help businesses "reach customers and grow[,]" and that "*we also have to keep people safe and give them control over their experience on our apps. And we are.*" *Id.*

b) Ms. Sandberg's statement is correct as a statement of Meta's objectives and aspirations regarding its work to enhance the safety of its service.

c) As reflected in her surrounding remarks, Ms. Sandberg did not state that Meta perfectly enforced its safety and content policies or guaranteed a particular safety outcome. Rather, she was transitioning from a discussion of advertising, commerce, and business growth to a discussion of Meta's ongoing transparency initiatives aimed at user control, ad transparency, election-related advertising choices, and privacy controls. *See* DX-17,717; [Zuckerberg].

d) During the earnings call, Ms. Sandberg identified the specific initiatives she was referencing. *See* DX-17,717. She discussed improvements to Meta's ads transparency tools, including a new feature that gave users the option to see fewer political ads, and updates to Meta's Ads Library designed to make

21

it more transparent and easier to navigate. *Id*. She explained that those updates helped users understand who was trying to reach them and that Meta believed this transparency was critical to empowering users and keeping them safe. *Id*. Ms. Sandberg also discussed Meta's rollout of its updated Privacy Checkup tool to nearly two billion people, explaining that the tool allowed users, "[w]ith a few taps," to control who saw what they shared and to manage account security. *Id*. In context, therefore, the statement was tied to concrete initiatives concerning advertising transparency, political advertising controls, privacy settings, and account security, while also reflecting Meta's broader objective of improving user safety and control. [Zuckerberg].

e) Ms. Sandberg's statement was made at an earnings conference for shareholders and was not an effort to reach consumers. Instead, Meta reaches consumers in other ways, including through public statements on Meta's websites. [A. Davis].

f) Ms. Sandberg's statement was consistent with Meta's broader efforts to give users more tools to control their experience on Meta's services. *See supra* Findings pp. 10–14; *infra* Findings pp. 84–87.

9. **Statement No. 13 (18)**

a) At the March 25, 2021 Congressional hearing, Congresswoman Lesko asked Mark Zuckerberg, "***Do you believe that your platform harms children?***" DX-17,260. Mr. Zuckerberg replied, "***Congresswoman, I don't believe so. This is something that we study and we care a lot about. Designing products that improve people's well-being is very important to us. And what our products do is help people stay connected to people they care about, which I think is one of the most fundamental and important human things that we do, whether that is for teens or for people who are***

22

*older than that.* And again, our policies on the main apps that we offer generally prohibit people under the age of 13 from using the services." *Id.*

b)      This statement to Congress by Mr. Zuckerberg accurately states his personal opinion and aspirations regarding Meta's goals for improving users' well-being on its services. As reflected in the beginning of his response "Congresswoman, I don't believe so," he was expressing his opinion and subjective belief. *Id.*; [Zuckerberg].

c)      Mr. Zuckerberg's statement accurately reflects his subjective assessment of Meta's goals and objectives for improving individuals' well-being on its services moving forward. In his response, Mr. Zuckerberg indicated that Meta aims to design services that improve people's well-being, stating that, "Designing products that improve people's well-being is very important to us." *Id.*; [Zuckerberg].

d)      Mr. Zuckerberg's statement accurately describes Meta's efforts to study well-being and invest resources in understanding user experiences. In 2021, Mr. Zuckerberg endorsed continuing Meta's well-being research despite public criticism, writing that although it "might be easier for us" not to conduct such research, Meta would continue doing so "because it's the right thing to do." DX-17,744.

e)      In his written prepared remarks for the same March 25, 2021 hearing, Mr. Zuckerberg made clear to Congress that harmful content does exist on Meta services, and Meta devotes substantial resources to content policy development and enforcement to improve the user experience. *See* DX-16,873. Specifically, Mr. Zuckerberg explained, "We have industry-leading policies that prohibit such content on our platforms, and we invest billions of dollars and work tirelessly to improve and enforce these policies. We are proud of the work we have undertaken to address harmful content on Facebook, from our robust content review and enforcement program to

23

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

our industry-leading Community Standards Enforcement Report, which includes hard data that we hope can inform public discourse and policymaking about these issues." *Id.*

10. **Statement No. 16 (21)**

a) At the March 25, 2021 Congressional hearing, Congresswoman Cathy McMorris Rodgers stated, "So I would like to ask you, if you said earlier that you don't want kids sitting in front of the screens passively consuming content, and your products are designed to increase screen time, do you currently have any limitations on your own kids' use of your products, or how do you think that will change as they get older?" DX-17,760. Mr. Zuckerberg replied: "My daughters are 5 and 3 and they don't use our products. Actually, that is not exactly true; my eldest daughter, Max, I let her use Messenger Kids sometimes to message her cousins. But ***overall, the research that we have seen is that using social apps to connect with other people can have positive mental health benefits and well-being benefits by helping people feel more connected and less lonely.*** Passively consuming content doesn't have those positive benefits to well-being but isn't necessarily negative. It just isn't as positive as connecting. And the way we design our algorithms is to encourage meaningful social interactions. So it is a common misconception that our teams—our goals, or even have goals, of trying to increase the amount of time that people spend." *Id.*

b) This statement to Congress by Mr. Zuckerberg accurately reflects his opinion and aspirations regarding the benefits of social media use; he did not state that every user benefits from them or that Facebook has achieved any fixed mental health or well-being outcome. [Zuckerberg].

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

c)    Meta's internal and external research supports Mr. Zuckerberg's opinion that using social media to connect with others can be associated with positive well-being.

(1)    In an article titled, "Internet Use and Psychological Well-being: Effects of Activity and Audience," Meta researchers found that "[c]ommunicating with stronger ties is associated with psychological benefits, while communicating with acquaintances and strangers is not[.]" DX-16,607.

(2)    In an article titled, "The Relationship Between Facebook Use and Well-Being Depends on Communication Type and Tie Strength," Meta researchers described "[a]n opt-in panel study of approximately 2,000 Facebook users" that "linked self-reported measures of well-being to respondents' Facebook activities from server logs." *See* DX-17,777. The paper found that "[s]pecific uses of the site were associated with improvements in well-being[.]" *Id.* Generally speaking, "receiving targeted communication from strong ties . . . [was] linked to a variety of well-being improvements []" while "viewing generic broadcasts of social news was not associated with improvement in well-being[.]" *Id.* at -1779.

(3)    Internal research for Instagram likewise found that "[m]ost users felt that Instagram had no impact or positive impact when they felt lonely[,]" and "[t]eens were more likely to feel that Instagram made things better when they were lonely[.]" *See* DX-17,776.

*(4)*    The "Hard Life Moments – Mental Health Deep Dive" deck included a slide titled "Instagram is More Likely to Make Things Better than Worse." *See* DX-18,074. That slide showed that more teen girls reported Instagram made them feel better than worse for 11 well-being issues: problematic use, FOMO, social comparison,

25

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

eating issues, sleep issues, SSI, loneliness, anxiety, sadness, financial stress, and family stress. *Id.* Body image was the only exception, with 22.10% reporting that Instagram made it better and 32.40% reporting that Instagram made it worse, while 45.50% reported no impact. *Id.* This study was designed to understand user perceptions and does not evaluate causal claims between Instagram and health/well-being. *Id.*

11. **Statement No. 23 (29)**

a) During a press interview on May 26, 2021, Adam Mosseri stated: "Our intention was to depressurize Instagram and make sure that users focused on friends or on posts that they were seeing, but *there was very little impact and the result was neutral.* Despite this, we had strong reactions and decided that it was better to give people a choice." DX-17,263.

b) This statement accurately reflects the research that Meta conducted regarding the impact of hiding like counts on users' well-being.

c) Meta conducted tests in 2019 for "Project Daisy," which was Meta's research project assessing the impact of hiding like counts on Instagram and Facebook. [Mosseri].

d) During these tests, Meta observed that "quantitative research [wa]s inconclusive" and while individuals self-reported that they felt "slightly more positive" in the test groups, the changes were "all relatively small (*i.e.* the mean is moving between 0.02 to 0.12 on a 1 to 5 questionnaire scale) and not consistent throughout all test countries." *See* DX-16,621.

e) By February 2020, Meta completed its Project Daisy research for Facebook and Instagram. For Instagram, Meta researchers did not observe "movements in overall well-being measures" but the "survey results [did] show some stat-sig positive findings for those experiencing Daisy vs. those in the control, though the magnitude of these effects is small." DX-17,607.

26

The research for Instagram also found that the "data does not strongly suggest that Daisy depressurizes Feed sharing, as sharing did not consistently increase in the test." *Id.*

f)    For the Project Daisy research on Facebook, the researchers observed that the "findings were somewhat similar to Instagram . . . Results on Likes were mixed. Facebook Daisy did not reduce how often people socially compare Like counts . . . Yet, overall concerns around Like counts for people were low." *Id.*

g)    Researchers concluded that there was no movement in overall well-being metrics, and that removing like counts on Facebook and Instagram did not have a statistically significant effect on overall well-being. *See* DX-18,170; DX-17,769.

h)    In May 2021, Meta announced that all users on Instagram and Facebook have the option to hide their public like counts. DX-17,766. In Meta's public announcement launching this feature, Meta stated: "What we heard from people and experts was that not seeing like counts was beneficial for some, and annoying to others, particularly because people use like counts to get a sense for what's trending or popular, so we're giving you the choice." *Id.*

i)    Mr. Mosseri's statement that Project Daisy's impact was "little" and the result was "neutral" thus accurately reflects the research conducted by Meta into the impact on well-being from removing like counts.

12.    **Statement No. 24 (35)**

a)    On September 26, 2021, Pratiti Raychoudhury (then-Vice President, Head of Research for Instagram) authored a Meta Newsroom post titled, "What Our Research Really Says About Teen Well-Being and Instagram," which was published in response to a WSJ article. DX-10,066. In her post, Ms. Raychoudhury stated that "we want to be clear about what the research

27

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

recently characterized by The Wall Street Journal shows, and what it does not show," and that it is "simply not accurate that this research demonstrates Instagram is 'toxic' for teen girls." *Id.* Ms. Raychoudhury then stated that the "research actually demonstrated that many teens we heard from feel that using Instagram helps them when they are struggling with the kinds of hard moments and issues teenagers have always faced." *Id.* Ms. Raychoudhury then explained that Meta invests in research to work on these issues, and that "*[s]uggesting that Instagram is toxic for teens is simply not backed up by the facts.*" *Id.*

b)    Ms. Raychoudhury's statement accurately reflects the findings from Meta's internal "Hard Life Moments" research. The study showed that more teen girls reported that Instagram made them feel better than worse across numerous categories, including problematic use, fear of missing out, social comparison, anxiety, loneliness, sadness, financial stress, and family stress. *See* DX-18,074. This study was designed to understand user perceptions and does not evaluate causal claims between Instagram and health/well-being. *Id.* Indeed, as Ms. Raychoudhury wrote in her Newsroom post, "in 11 of 12 areas on the slide referenced by the Journal — including serious areas like loneliness, anxiety, sadness and eating issues — more teenage girls who said they struggled with that issue also said that Instagram made those difficult times better rather than worse." DX-10,066.

c)    With respect to body image in particular, a majority of respondents reported either a positive impact or no impact rather than a negative impact. DX-18,074. Further, the statements suggesting that Instagram "make[s] body image worse" were shorthand descriptions of user-reported experiences and did not establish causality. [Hendrix].

13.    **Statement No. 21 (26)**

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

a) On September 14, 2021, the WSJ released a podcast episode hosted by a reporter titled, "The Facebook Files, Part 2: 'We Make Body Image Issues Worse.'" DX-17,265.  During the podcast, the WSJ reporter discussed Facebook's internal documents, which contained a statement that "for teen girls who'd recently experienced body image issues, Instagram made those feelings worse for one in three of them." *Id.* at 3.  The reporter then stated: "As recently as May, Facebook's Head of Instagram, ***Adam Mosseri, told reporters that the effect of the app on teen mental health seems to be 'Quite small.'***" *Id.* at 3–4.

b) The reporter's statement paraphrases a comment made by Mr. Mosseri, which reflects Mr. Mosseri's opinion and his general, subjective understanding regarding Meta's underlying internal research.  [Mosseri].

c) The reporter's statement paraphrasing Mr. Mosseri's comment is consistent with the findings in external research and Meta's underlying research.

d) The "Hard Life Moments – Mental Health Deep Dive" deck included a slide titled "Instagram is More Likely to Make Things Better than Worse." *See* DX-11,912.  That slide showed that more teen girls reported Instagram made them feel better than worse for 11 well-being issues: problematic use, FOMO, social comparison, eating issues, sleep issues, SSI, loneliness, anxiety, sadness, financial stress, and family stress. *Id.*  Body image was the only exception, with 22.10% reporting that Instagram made it better and 32.40% reporting that Instagram made it worse, while 45.50% reported no impact. *Id.*  This study was designed to understand user perceptions and does not evaluate causal claims between Instagram and health/well-being. *Id.*

e) External research on the relationship between social media and teen mental health does not establish a causal relationship.  DX-11,517 ("The committee's review of the literature did not support the conclusion that

29

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

social media causes changes in adolescent health at the population level."). That was true of research that existed when Mr. Mosseri made this statement. DX-13,186 ("In summary, our results revealed that there is no evidence that time spent using social media might influence an individual's mental health over time."); DX-13,289 ("Reviews have found small correlations between social media use and depressive symptoms . . . [or] no significant relationship between social media use and well-being. . . . It is, however, still unclear what such a small effect can tell us about well-being outcomes as social media use is inherently linked in complex ways with other aspects of life."); DX-14,004 ("Research . . . has generated a mix of small positive, negative, and null associations. Most recently, large-scale preregistered studies have reported a lack of sizable or practically meaningful associations between adolescents' digital technology usage and well-being.").

f) In fact, the research that existed at the time Mr. Mosseri made this statement, and the research today, indicates that teen mental health is much more strongly correlated with factors other than social media use. DX-15,748 ("The association between social media use and depression is considerably smaller than effects associated with other known risk factors, including stress, family history of mental disorder, parenting-child and peer relationships and sleep disruption amongst many others. As such, prevention programs and public policy would be better served focusing on these well-established risk factors with la[r]ger effect sizes than contributing to a moral panic about the effect of technology use, especially given the lack of supporting data."); DX-13,289 ("[I]t is still unclear what such a range of effects can tell us about well-being and how it is affected by social media use. This is because there are a range of third factors that can

30

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

influence both variables, and there have been sources of bias not addressed properly in a literature that is largely cross-sectional and exploratory.").

14.   **Statement No. 26 (38)**

a)   At the September 30, 2021 Senate hearing, Ms. Davis testified that Meta was "committed to building better products for young people, and to doing everything we can to protect their privacy, safety, and well-being on our platforms." DX-17,267.  Ms. Davis then stated: "[w]e are also dedicated to protecting the youngest people on our services.  ***We have put in place multiple protections to create safe and age-appropriate experiences for people between the ages of 13 and 17.***"  *Id.*  Ms. Davis then identified examples of the "multiple protections" she was referencing.  She stated that Meta consulted with experts "to ensure that our policies properly account for" people between 13 and 17; used age-gating for certain content; announced that new users under 16 in the United States would be defaulted into private accounts when joining Instagram; and worked to give parents and guardians "the information, resources, and tools they need to set parameters for their children and help them develop healthy and safe online habits." *Id.*

b)   This statement to Congress by Ms. Davis described Meta's youth-safety efforts and objectives, and did not state that every teen experience was risk-free or that Facebook had achieved any particular safety outcome.  *See supra* Findings pp. 15–16.

c)   Ms. Davis's statement accurately described protections Meta had implemented to create safer and more age-appropriate experiences for teen users.  Meta's ongoing development of features and tools for teens is consistent with that testimony. *See supra* Findings pp. 10–14.

15.   **Statement No. 27 (39)**

a) Ms. Davis made the following statement in her prepared remarks prior to the September 30, 2021 Senate hearing: "*We've also introduced new ways to support people on Instagram who may be affected by negative body image or an eating disorder, including surfacing more expert-backed resources when people search for eating disorder-related content, expanding our work with experts to help inform our policies, and collaborating with community leaders to help them create and share positive, inspiring body image content.*" DX-17,267. Ms. Davis then discussed Instagram's parental supervision tool aimed at providing parents and guardians with information and resources to assist with healthy and safe online habits. *Id.*

b) This statement to Congress by Ms. Davis accurately describes Meta's development of tools and resources for users. *See* Findings pp. 13, 15–16.

16. **Statement No. 33 (48)**

a) At the September 30, 2021 Senate hearing, Senator Lujan asked Antigone Davis, "*And my final question, Mr. Chairman. Yes or no, has Facebook ever found a change to its platform would potentially inflict harm on users, but moved forward because the change would also grow users or increase revenue?*" DX-17,267. Ms. Davis responded, "*That has not been my experience at all at Facebook. We care deeply about the safety and security of the people on our platform. We have invested $12 billion in it. We have thousands and thousands of people working on this issue. That is just not how we would approach it.*" *Id.*

b) This statement by Ms. Davis to Congress accurately states her personal opinion and Meta's aspirations for its safety efforts on its services.

c) Ms. Davis did not testify that Meta never considered business considerations when assessing changes to its services. Instead, she expressed her personal opinion, stating that it has "not been [her]

32

experience" at Meta that a service change that inflicted harm on users was made in order to grow users or increase revenue. *Id.*; [A. Davis].

d) Ms. Davis's generalized statement that Meta "care[s] deeply about the safety and security of the people on [its] platform" reflects Meta's safety efforts and aspirations at a high level, and contains no guarantee or promise. *See supra* Findings pp. 10–16.

e) The evidence supports Ms. Davis's characterization of Meta's prioritization of safety.

f) Meta has strong business incentives to ensure that people, including teens, enjoy their time with their services, which means a business interest to avoid bad experiences, unsafe experiences, or other negative consequences. The company has and continues to expend significant efforts to develop safety features and launch them, even if that means users spend less time on Meta's services. [Zuckerberg; Mosseri; Otaru].

(1) For example, at the time of Ms. Davis's statement, Meta had implemented features to encourage users to spend less time on the services, which it knew would reduce revenue, such as algorithm changes and defaulting new users under the age of 16 into private account settings on Instagram, and was developing additional product features that subsequently launched, including Daily Limit, Take a Break, Quiet Mode, Reels Nudge, IGD Nudge, and Teen Accounts (including Private-by-Default settings). *See* DX-11,709. Each of these features either encouraged teens and other users to spend less time on Meta's services, or changed their experience on the services in a way that decreased engagement.

(2) Meta also implemented changes to its algorithms to promote meaningful social interactions despite anticipating an overall drop in time spent on the service. These changes resulted in time spent

33

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

dropping by approximately 50 million hours per day. *See* DX-11,718.

(3) Meta launched Teen Accounts in September 2024, which enabled Private-by-Default for teen users. Meta described this effort as "a necessary step forward," despite knowing that doing so would be "costly to engagement." DX-16,623; DX-17,761.

(a) Shortly after the launch of Teen Accounts, Meta observed a 3.1% drop in daily active use and a 7.2% drop in time spent for new early teens. *See* DX-17,762.

(b) In October 2024, Teen Accounts resulted in a drop in teen daily active use of 5% for early teens and 2% for late teens." *See* DX-17,760.

17. **Statement No. 36 (53)**

a) Antigone Davis stated in her prepared remarks, in advance of the September 30, 2021 Senate hearing, that she worked "with internal teams and external stakeholders to ensure that Facebook remains a leader in online safety, including issues of bullying and combating child exploitation," and then stated, "*At Facebook, we take the privacy, safety, and well-being of all those who use our platform very seriously, especially the youngest people on our services. We work tirelessly to put in place the right policies, products, and precautions so they have a safe and positive experience.*" *See* DX-17,267. Ms. Davis then identified examples of that work. She testified that Meta worked "closely with experts and parents to inform the features we develop"; required users to be "at least 13 years of age on Facebook and Instagram"; removed underage users when Facebook learned they had created accounts; consulted with experts about users between 13 and 17; used age-gating for certain content; defaulted new users under 16 in the United States into private accounts when joining Instagram; and

34

worked to give parents and guardians "the information, resources, and tools they need to set parameters for their children and help them develop healthy and safe online habits." *Id.*

b) This statement to Congress by Ms. Davis that Meta "take[s] the privacy, safety, and well-being of all those who use our platform very seriously" and "work[s] tirelessly to put in place the right policies, products, and precautions" is a generalized statement of Meta's aspirations and objectives related to its safety efforts, and contains no guarantee or promise. [A. Davis].

c) Ms. Davis's statement about the objectives of Meta's ongoing safety work, resource commitments, and improvement efforts did not state that every young user's experience was risk-free or that Meta had achieved any particular outcome.

d) The same testimony described Meta's work as ongoing. Ms. Davis stated that Meta worked "constantly to improve safety and privacy protections for young people," conducted research "to make our platform better, to minimize the bad and maximize the good, and to proactively identify where we can improve," and "welcome[d] productive collaboration with lawmakers and elected officials." DX-17,267.

e) Ms. Davis's statement is consistent with Meta's safety work, including its investments in safety and well-being and its work to develop policies and services focused on the safety and well-being of its users. *See* DX-10,091; *supra* Findings pp. 10–16.

18. **Statement No. 43 (81)**

a) Meta employees Elaine Montgomery (Product Design Director, Meta & Co-Lead of TTC Labs) and Elaina Koros (Content Design Manager, Meta) co-authored a press release in November 2025 entitled, "Meta's Best Interests of the Child Frameworks." DX-12,898. The press release lists an objective

35

to "*Create safe, age-appropriate environments for youth*" as one of Meta's Best Interests of the Child Framework principles.

b) The statements in the press release accurately reflect Meta's objectives and aspirations for its service development, and also accurately describe Meta's Best Interests of the Child Framework and the principles it sets forth. [A. Davis].

c) Meta's Best Interests of the Child Framework provides a framework to help Meta apply the UN's Convention on the Rights of the Child to its services and experiences that it builds. DX-12,898. As early as December 2022, Meta employees began incorporating Meta's Best Interests of the Child Framework into discussions around product issues, and encouraged product teams to "apply it to their work." DX-10,939.

19. **Statement No. 45 (67)**

a) On December 15, 2022, Meta published a post on Instagram's blog titled, "*Continuing to Keep Instagram Safe and Secure*," which discussed Instagram security tools and account-recovery support. DX-11,269. The post stated that Instagram was "committed to fostering a safe and supportive community for everyone who uses Instagram," and identified steps people could take to help keep their accounts safe, including "making sure you have a strong password," "enabling two-factor authentication," and completing Instagram's "Security Check-Up." *Id.* The post then described "ongoing safety tools" and "new features designed to help keep people's accounts safe, and offer them more support if they lose account access." *Id*. Those features included Instagram.com/hacked, described as "a new, comprehensive destination" for people to "report and resolve account access issues"; an option for people to ask friends to confirm their identity to help regain account access; warnings when an account suspected of impersonation requests to follow a user or sends a direct message; and

36

expanded placement of the blue verified badge so users could "quickly determine whether the account [they] are interacting with is authentic." *Id.*

b)     Meta's statement is correct as a statement of its objectives and aspirations for its efforts to keep users safe on Instagram.

c)     In context, Meta's blog post titled, "Continuing to Keep Instagram Safe and Secure" introduced an update about account-security and account-recovery features.  It described Instagram's ongoing account-security efforts and objectives and aspirations for those efforts—which was to continue to keep its users "safe and secure." *See* DX-11,269.  Meta's statement did not state that Instagram was free from all safety or security risks, that no account could be compromised, or that Meta had achieved any particular outcome. *Id.*

d)     Meta's statement is consistent with Meta's safety work. *See supra* Findings pp. 10–16.

20.     **Statement No. 46 (68)**

a)     On January 9, 2023, Antigone Davis authored a blog post on Meta's Newsroom page on Meta's website entitled, "How Meta Is Working to Provide Safe, Age-Appropriate Experiences for Teens." DX-12,914.  In the post, Ms. Davis stated, "*We haven't waited for regulation to continue making progress on our apps.  Over the past several years, we've taken significant steps, including*:  Developing parental controls that help parents and teens navigate their time online together[;] *Using age verification technology to help teens have age-appropriate experiences*[;] Defaulting teens into more private settings[;] Removing more content that violates our policies and making potentially sensitive content more difficult to find[;] Helping to protect teens against unwanted interactions[;] *Offering tools for teens to spend more meaningful time online.*" *Id*. at 5–6.

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

b)      Ms. Davis's statement is correct as a statement of Meta's objectives and aspirations regarding its work to help teens have age-appropriate experiences and spend more meaningful time online.  [A. Davis].

c)      Ms. Davis's generalized statement reflects Meta's aspirations for its safety efforts regarding age verification and meaningful time spent online as of January 2023, and contains no guarantee or promise.  [A. Davis].

d)      When Ms. Davis made this statement in 2023, Meta had begun developing age verification technology, including technology that allowed it to estimate users' ages and train it to use multiple signals, such as messages or posts wishing someone a happy birthday, to detect and remove individuals from its services who were suspected of being under the age of 13.  *See* DX-10,030.  Meta also implemented technology beginning in June 2022 that required users who attempted to change their age from under 18 to over 18 to verify their age via identification or by video selfie via Yoti, a third-party face-based age estimation service.  *See* DX-10,944; [Otaru].

e)      By the time Ms. Davis made this statement in 2023, Meta had also launched tools to allow teens to spend more meaningful time online, including an activity dashboard, a daily reminder, and a new way to limit notifications on both Instagram and Facebook.  *See* DX-10,172 at -3558; [Otaru].

f)      Instagram launched the Take a Break tool in December 2021, which asked users who had been scrolling for a period of time to take a break from Instagram and suggest that they set reminders to take more breaks in the future.  DX-10,332.  Meta relied on its research to implement the "Take a Break" tool, which is designed to interrupt extended use sessions and encourage reflection.  *See* DX-16,779.

g)      In January 2023, Instagram launched Quiet Mode as part of its efforts to address problematic use among teens, particularly with respect to late-night use of Instagram.  [Otaru].

38

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

21.    **Statement No. 48 (70)**

a)    On January 9, 2024, Meta published a blog post on its Newsroom page on the Meta website entitled, "New Protections to Give Teens More Age-Appropriate Experiences on Our Apps," which announced "additional protections that are focused on the types of content teens see on Instagram and Facebook" to "address content that breaks our rules or could be seen as sensitive." DX-10,125. In the post, Meta stated, "*We regularly consult with experts in adolescent development, psychology and mental health to help make our platforms safe and age-appropriate for young people, including improving our understanding of which types of content may be less appropriate for teens.*" *Id.* The post then provided an example of Meta working with experts: "Take the example of someone posting about their ongoing struggle with thoughts of self-harm . . . Now, we'll start to remove this type of content from teens' experiences on Instagram and Facebook." *Id.* Meta then quoted Dr. Rachel Rodgers, an expert in psychology, who stated that "Meta is evolving its policies around content that could be more sensitive for teens, which is an important step in making social media platforms spaces where teens can connect and be creative in age-appropriate ways." *Id.* Meta then stated that it would continue to share resources from "expert organizations like the National Alliance on Mental Illness when someone posts content related to their struggles with self-harm or eating disorders." *Id.*

b)    Meta's generalized statement reflects its aspirations and objectives regarding its efforts to make its services safe and age appropriate, and contains no guarantee or promise.

c)    Meta's statement also accurately describes Meta's work consulting with experts on its safety and well-being efforts and sharing resources from expert organizations with users. *See supra* Findings pp. 15–16.

39

22. **Statement No. 50 (78)**

    a) Meta publishes its Community Standards on its online Transparency Center, including a webpage for its Community Standard on "Suicide, Self-Injury, and Eating Disorders." DX-10,247. The Community Standard details the Policy Rationale, which states that "[w]e care deeply about the safety of the people who use our apps. *We regularly consult with experts in suicide, self-injury and eating disorders to help inform our policies and enforcement, and we work with organizations around the world to provide assistance to people in distress.*" *Id*.

    b) Meta's generalized statement reflects its aspirations and objectives regarding its efforts to make its services safe, and contains no guarantee or promise.

    c) Meta's statement also accurately describes Meta's efforts to consult with experts on its content policy development. *See supra* Findings pp. 15–16.

23. **Statements Regarding Meta's CSERs.**

    a) The States also assert that ten statements by Meta or its employees regarding Meta's Community Standards Enforcement Reports (or "CSERs")—Statement Nos. 3 (5), 4 (6), 5 (7), 8 (12), 12 (16), 14 (19), 39 (59), 49 (80), 47 (9), and 51 (83)—are deceptive. *See* ECF Nos. 385 (3144); 476 (3260).

    b) Meta's statements regarding CSERs accurately describe the methodology and results of this report, and provide an objective measurement of the prevalence of violating content on Meta's services.

    c) Meta's statements accurately describe its efforts to measure, report, and moderate content on its services.

    d) The CSERs reflect the estimated number of times that users view content that violates a specific policy reported as a percentage of all content views. *See* DX-17,613. They measure how often violating content is actually seen compared with all content views. [Bickert; Rosen]. Because CSERs are

40

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

objective, operational-data-based reports, they are better suited to measuring content-moderation efficacy than subjective perception surveys. [Ferrara].

e)  Meta's teams developed the CSER methodology to help people understand how Meta was doing at enforcing its Community Standards. *See* DX-17,767; DX-17,768.

f)  Meta has publicly disclosed on a quarterly or semiannual basis its CSERs since 2018, to provide data regarding the prevalence of certain types of content that are not permitted on Meta's services under its policies. *See* DX-17,772; DX-12,900.

g)  Meta decided to use prevalence as a metric for its CSERs because "[m]easuring views of violating content rather than the amount of violating content published better reflects the impact on the community," since a "small prevalence number can still correspond to a large amount of impact" on Meta's services due to the large number of overall views of content on Meta's services. *See* DX-17,613; [Bickert; Rosen].

h)  Since 2018, Meta has worked closely with external experts to validate that the metrics shared in its CSERs are meaningful and accurate. *See* DX-17,770; DX-17,768. These efforts allow Meta to track its progress in enforcing Community Standards on its services. [Bickert; Rosen].

i)  The Facebook Data Transparency Advisory Group's external assessment concluded that Facebook's approach to CSERs was "sensible" and that the reports were "well designed" and "reasonable given the volume of material in question." *See* DX-10,749 at -9343.

j)  An independent panel of experts reviewed the metrics in Meta's CSERs and concluded that the metrics are reasonable ways of measuring the values that Meta is trying to measure and analogous to metrics of crime currently published by governmental agencies. [Rosen].

41

k)      Meta's prevalence metric was also reviewed and validated by an external independent audit conducted by Ernst & Young, LLP ("E&Y"), which defined prevalence as an "[e]stimate of the amount of violating content in Facebook and Instagram" calculated by "the estimated number of views that showed violating content, divided by the estimated number of total content views on Facebook or Instagram." *See* DX-17,771 at -7132.  E&Y's assessment concluded that Meta's internal controls for its CSERs were "suitably designed, implemented and operating with sufficient effectiveness to provide reasonable assurance the Criteria would be achieved as of December 31, 2021 and the calculation of the metrics reported within [the] Facebook and Instagram [CSER] for [Q4 2021] have been prepared based on the specified Criteria are fairly stated, in all material respects." *Id*. at -7130.

l)      What matters is not merely how much violating content exists on the service, but how much of it is seen.  A piece of violating content removed before exposure presents materially different risk from content that users view.  Meta's focus on views of policy-violating content is therefore a risk-based measurement approach.  [Rosen; Ferrara].

m)      By definition, prevalence measures views of violating content that Meta did not prevent before exposure.  Meta's internal and public materials recognize that CSERs report how much violating content people saw, how much Meta removed, and how much was detected proactively, while other sources should be used for different questions such as borderline content or subjective user perceptions.  [Rosen; Bickert].

n)      Meta has conducted extensive research on user experiences, but that research is not measuring the same thing as CSERs.  [Hendrix].

o)      Internal data measuring self-reporting by users of negative experiences—such as Meta's Bad Experiences and Encounters Framework ("BEEF"),

42

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

Tracking Reach of Integrity Problems Survey ("TRIPS"), and Negative Experiences Tracking Survey ("NETS")—are fundamentally different from CSERs because (a) they are not measuring violations of Meta Community Standards, (b) they are based on users' perceptions of bad experiences on Meta's services and are thus non-objective, and (c) they are not statistically valid alternatives to CSERs.  [Hendrix; Bickert; Ferrara].

p)      Meta's contemporaneous analysis of these surveys concluded that "a large amount" of the experiences captured in the surveys "simply are not violating" of Meta's policies.  *See* DX-16,753 at -8816 ("[A] large amount of users are having bad experiences that simply are not violating"); *see also* DX-11,920 at -5441 (providing "Reasons Why We Should Not Expect Perfect Alignment Between Fact and Perception Frameworks," including because "user's perceptions of negative experiences do not match our internal definitions.").

q)      The States' expert Dr. Alter has acknowledged that the BEEFs and CSER metrics are not strictly comparable, are not measured in the same way, and are distinct.  [Alter].

r)      **Statement No. 3 (5)**

(1)      On May 23, 2019, Meta published a Newsroom blog post on Meta's website entitled, "Measuring Prevalence of Violating Content on Facebook" concerning the CSER and why Meta uses prevalence as one of its central enforcement metrics.  DX-17,610.  Meta stated, "***One of the most significant metrics we provide in the Community Standards Enforcement Report is prevalence.***"  *Id*. at -0177.  Meta further stated, "[t]he way content causes harm on the internet is by being seen.  Given the nature of the internet, the amount of times content is seen is not evenly distributed.  A small amount of content could go viral and get a lot of distribution in a very short span of

43

time, whereas other content could be on the internet for a long time and not be seen by anyone.  Any measure we use to understand our enforcement of harmful content should take that into consideration.  For this reason, *we consider prevalence to be a critical metric because it helps us measure how violations impact people on Facebook.  We care most about how often content that violates our standards is actually seen relative to the total amount of times any content is seen on Facebook.*"  *Id*.  The post then states:  "*This is similar to measuring concentration of pollutants in the air we breathe.  When measuring air quality, environmental regulators look to see what percent of air is Nitrogen Dioxide to determine how much is harmful to people.  Prevalence is the internet's equivalent--a measurement of what percent of times someone sees something that is harmful.*"  *Id*.

(2)    The surrounding text in the post explains that internet harm depends on exposure: content that receives wide distribution creates a different risk profile than content that remains largely unseen. The post expressly tied prevalence to Meta's "efforts to remove harmful content from Facebook" and explained that prevalence measures how often violating content is actually seen relative to total content views. *Id.*

(3)    Meta's statement correctly describes the CSER prevalence metric, and it accurately describes the purpose of this metric and how it is calculated.  *See supra* Findings pp. 40–43.

(4)    Meta's statement also includes aspirational language about why Meta "care[s] most" about exposure and how its prevalence metric is supposed to function, which is properly understood as explaining Meta's transparency reporting priorities.  The analogy to air-quality

44

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

measurement reinforces the fact that the statement is an explanatory comparison about measurement, concentration, and exposure.

s)    **Statements Nos. 4 (6) & 5 (7)**

(1)    On May 23, 2019, Meta published a Newsroom blog post on Meta's website authored by Guy Rosen (VP, Integrity) titled, "An Update on How We Are Doing At Enforcing Our Community Standards" concerning Meta's CSER and why Meta uses prevalence as one of its central enforcement metrics. DX-10,398. In the post, Mr. Rosen included a section titled, "How to Make Sense of the Numbers," and described the "*key metrics in our report, which together track how we are doing at enforcing our Community Standards*," which include "*Prevalence: The frequency at which content that violated our Community Standards was viewed*." *Id*. Mr. Rosen stated, "*We care most about how often content that violates our policies is actually seen by someone*." *Id*. Mr. Rosen explained that "[w]hile content actioned describes how many things we took down, prevalence describes how much we haven't identified yet and people may still see." *Id*.

(2)    The statements accurately describe Meta's prevalence metric. *See supra* Findings pp. 40–43.

t)    **Statement No. 8 (12)**

(1)    In November 2019, Meta published its Third Quarter 2019 CSER, and released a blog post by Guy Rosen (Vice President, Integrity) summarizing the results. *See* DX-17,255.

(2)    In Mr. Rosen's blog post, which includes Statement No. 8 (12), he stated: "In this report, we are adding prevalence metrics for content that violates our suicide and self-injury and regulated goods (illicit sales of firearms and drugs) policies for the first time. . . For the

45

policy areas addressing the most severe safety concerns — child nudity and sexual exploitation of children, regulated goods, suicide and self-injury, and terrorist propaganda — the likelihood that people view content that violates these policies is very low, and we remove much of it before people see it. As a result, when we sample views of content in order to measure prevalence for these policy areas, many times we do not find enough, or sometimes any, violating samples to reliably estimate a metric. Instead, we can estimate an upper limit of how often someone would see content that violates these policies. ***In Q3 2019, this upper limit was 0.04%. Meaning that for each of these policies, out of every 10,000 views on Facebook or Instagram in Q3 2019, we estimate that no more than 4 of those views contained content that violated that policy.***" *Id.*

(3) This statement was true. Meta's Q3 2019 CSER stated: "We estimate that less than 0.05% of views were of content that violated our standards against Suicide and Self-Injury [on Facebook and Instagram] . . . [and] [w]e estimate that less than 0.05% of views were of content that violated our standards against Child Nudity and Sexual Exploitation [on Facebook and Instagram]." *See* DX-17,780.

u) **Statement No. 12 (16)**

(1) In February 2021, Meta published its Fourth Quarter 2020 CSER, and released a blog post by Guy Rosen (Vice President, Integrity) summarizing the results. *See* DX-17,791.

(2) In Mr. Rosen's blog post, which includes Statement No. 12 (16), he stated: "***The prevalence of violent and graphic content also dropped from 0.07% to 0.05%. . . .***" *Id.*

46

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

(3)    This statement was true. Meta's Q4 2020 CSER included a graph for the prevalence of violent and graphic content, which listed "0.05%" for the Q4 2020 and "0.07%" for the prior quarter for Facebook. *See* DX-17,778 at -9069.

v)    **Statement No. 39 (59)**

(1)    In November 2021, Meta published its Third Quarter CSER, and released a blog post by Guy Rosen (Vice President, Integrity) summarizing the results. *See* DX-17,793.

(2)    In Mr. Rosen's blog post, which includes Statement No. 39 (59), he stated: "***In Q3, the prevalence of bullying and harassment content was 0.14-0.15% or between 14 and 15 views of bullying and harassment content per 10,000 views of content on Facebook, and 0.05-0.06% or between 5 and 6 views per 10,000 views of content on Instagram***. . . . Bullying and harassment is a unique challenge and one of the most complex issues to address because context is critical." *Id.* at 2505-06.

(3)    This statement was true. Meta's Q3 2021 CSER stated: "We estimate that between 0.14% to 0.15% of views were of content that violated our standards against Bullying & Harassment [on Facebook] . . . . We estimate that between 0.05% to 0.06% of views were of content that violated our standards against Bullying & Harassment [on Instagram.]" *See* DX-12,081.

w)    **Statement No. 47 (9)**

(1)    On November 13, 2019, Guy Rosen authored a Newsroom post titled, "Community Standards Enforcement Report, November 2019 Edition" that summarized the CSER published in "Q2 and Q3 2019." DX-17,255. The post includes a section titled, "***Progress to Help Keep People Safe,***" which details Meta's work to strengthen

47

its efforts to enforce its policies and bring greater transparency to its work. *Id.* Meta's CSER from the second quarter of 2023 noted: *"[w]e publish the Community Standards Enforcement Report . . . to more effectively track our progress and demonstrate our continued commitment to making Facebook and Instagram safe*." ECF No. 207 ¶ 473; *see also*, DX-10,384, 12,900.

(2)  Meta's statements are an accurate description of CSERs and the methodology used to calculate them. *See supra* Findings pp. 40–43.

(3)  Meta's use of the terms "progress" and "continued commitment" states its aspirations for transparency related to enforcement of its Community Standards. The terms describe Meta's goals around ongoing transparency of its enforcement efforts. [Bickert; Rosen].

x)  **Statement No. 14 (19)**

(1)  At the March 25, 2021 Congressional hearing, Mr. Zuckerberg proposed that social media services should "have to issue transparency reports that state the prevalence of content across all different categories of harmful content." DX-17,260 at 49. Congressman Latta asked, "Where are those transparency reports you are being reported to, and how often do you think that should be going out?" *Id.* Mr. Zuckerberg replied, "Oh, Congressman, *as a model, Facebook has been doing something to this effect for every quarter, where we report on the prevalence of each category of harmful content and how effective our systems are at identifying that content and removing it in advance.*" *Id.*

(2)  This statement to Congress by Mr. Zuckerberg accurately describes Meta's CSERs reporting practices and the frequency of these reports. *See supra* Findings pp. 40–43.

(3)    Mr. Zuckerberg's statement describes Meta's reporting practices at a high level. Mr. Zuckerberg's phrases "as a model" and "something to this effect" reflect Meta's goals and aspirations for its CSERs, and reflect a general comparison to Meta's transparency-reporting approach. [Zuckerberg].

(4)    Mr. Zuckerberg's statement also accurately describes the mechanics of Meta's CSERs. Meta's CSERs report "how much content people saw," "how much content we removed," and "how much content we detected proactively." That parallels Mr. Zuckerberg's description of how Meta reports prevalence and how effectively systems identified and removed content in advance. *See* DX-10,400.

    **y)**    **Statement No. 49 (80)**

(1)    On Meta's online Transparency Center, Meta published a webpage titled, "Prevalence," which was last updated on March 6, 2025. DX-17,613. The webpage explains that Meta's "goal is to minimize the impact caused by violations of our policies on people using our services" and that Meta "measure[s] the prevalence of violating content to gauge how we're performing against that goal." *Id.* at -3151. Under the section, "What is Prevalence," Meta defines the prevalence metric as "consider[ing] all the views of content on Facebook or Instagram and measur[ing] the estimated percentage of those views that were of violating content." *Id.*at 3151-52. The webpage then states, "***Another way to think of prevalence is how many views of violating content we didn't prevent -- either because we haven't caught the violations early enough or we missed them altogether.***" *Id.* at -3152.

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

(2)     Meta's statement is correct and accurately describes its prevalence metric and the methodology of the CSERs.  *See supra* Findings pp. 40–43.

z)     **Statement No. 51 (83)**

(1)     This statement, as alleged by the States, is: "***Meta Community Standards Enforcement Reports reporting on prevalence numbers***."  ECF Nos. 385 (3144); 476 (3260).

(2)     This accurately states Meta's publication of CSERs and the prevalence methodology on which the CSERs are based.  *See supra* Findings pp. 40–43.

C.     **Statements Regarding Meta's Objectives for Safety**

1.     The States assert that nine statements by Meta employees regarding Meta's safety objectives and Meta's aspiration to offer users a safe experience on its services— Statements Nos. 1 (1), 6 (8), 7 (10), 22 (27), 32 (47), 33 (48), 37 (56), 38 (57), and 44 (82)—are deceptive.  *See* ECF Nos. 385 (3144); 476 (3260).

2.     As a general matter, these statements regarding Meta's safety objectives are aspirational in nature and are accurate statements of Meta's opinions, goals, or priorities for its safety initiatives at the time they were made.

3.     Reflecting these objectives and aspirations for safety, Meta has undertaken extensive efforts to enhance the safety of its services, which have evolved over time.  *See supra* Findings pp. 10–14.

4.     Meta devotes substantial resources to promoting safety on its services, including by engaging internal and external experts.  *See supra* Findings pp. 15–16.

5.     The long-term success of Meta as a company depends on users having safe and positive experiences on Instagram and Facebook.  [A. Davis; Zuckerberg; Mosseri; Bickert; Otaru].

a) Individuals who have bad experiences on Meta's services are more likely to delete their accounts, either for other social media or other online or offline activities.

(1) For example, users who experience bullying or negative social comparison on Meta's services are more than twice as likely to deactivate their accounts as those who do not. *See* DX-10,674; DX-10,740; DX-16,542.

(2) Users who report engaging in problematic use are almost four times more likely to deactivate their accounts. *See* DX-16,565 at -0024; DX-16,580.

b) Advertisers do not want their ads to appear next to harmful or offensive content. *See* DX-16,895; DX-10,157.

c) Meta has strong incentives to maintain safe services because of the importance of user safety and trust.

6. Meta consistently pursued safety initiatives despite recognizing that such changes could reduce engagement. [Otaru; Hendrix].

a) For instance, in 2018, Meta implemented changes to its News Feed algorithm on Facebook to allow for meaningful social interactions ("MSI") despite anticipating a reduction in engagement, resulting in approximately fifty million fewer hours spent on Facebook per day. *See* DX-11,718 at -2767.

b) Meta's internal planning documents recognized that age-appropriate defaults for teen users would be "costly to engagement" but nevertheless described them as "a necessary step forward." *See* DX-17,761; DX-16,623; DX-17,763.

c) Meta's planning documents also advised its teams to "make a more aggressive commitment to supporting young users' wellbeing by more

51

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

deeply understanding how we can not only mitigate negative experiences but drive positive experiences on the platform." *See* DX-10,069 at 4.

d) For example, shortly after the launch of Teen Accounts, Meta observed a 3.1% drop in daily active use and a 7.2% drop in time spent for new early teens. *See* DX-17,760. In October 2024, Teen Accounts resulted in a drop in teen daily active use of 5% for early teens and 2% for late teens." *See* DX-17,760.

7. The individual statements identified by the States in this category accurately reflect Meta's priorities related to the safety of its services.

8. **Statement No. 1 (1)**

a) This statement was made by Eva Chen, Instagram's Director of Fashion Partnerships, during a panel discussion at Cornell Tech in March 2018 concerning the relationship between technology and well-being and was subsequently reported in a Quartz article discussing Instagram's newly created Well-being Team. *See* DX-17,736. In describing Instagram's efforts to improve user experiences, Ms. Chen referenced the company's newly formed Well-being Team and stated: "*[The team's] entire focus is focusing on the wellbeing of the community*" and that "*Making the community a safer place, a place where people feel good, is a huge priority for Instagram . . . I would say one of the top priorities.*" *Id.*

b) Ms. Chen's statement is correct as a statement of Instagram's objectives or aspirations regarding its work to promote and enhance the safety of Instagram, and accurately characterizes the role of the well-being team.

c) Ms. Chen's characterization of well-being as "a huge priority" and "one of the top priorities" for the company reflects Ms. Chen's subjective assessment of Instagram's goals and values and is inherently aspirational. *See* DX-17,736.

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

d)      Ms. Chen's statement was made during a panel discussion at Cornell Tech concerning technology, social media, and well-being and was not an effort to reach consumers. Instead, Meta reaches consumers in other ways, including through public statements on Meta's websites. [Mosseri].

e)      Ms. Chen's statement accurately described Instagram's formation of a dedicated Well-being Team at that time. *See* DX-11,719 (2018 email discussing planning efforts for the Instagram well-being team); DX-11,720 (2019 Instagram Well-being HPM identifying the Well-being Team's priorities, projects, and strategic objectives); DX-11,722 (roadmap and biweekly Well-being Team planning document identifying ongoing projects and team objectives).

f)      Ms. Chen's statement also accurately described Meta's focus on making its community a safer place at that time. For instance, in 2018, Meta implemented changes to its algorithm to allow for meaningful social interactions ("MSI") despite anticipating a reduction in engagement, resulting in approximately fifty million fewer hours spent on Facebook per day. *See* DX-11,718.

9.      **Statement No. 6 (8)**

)       This is a statement by Mr. Mosseri in a June 2019 press interview regarding Meta's research into hiding like counts, during which Mr. Mosseri stated that, "*We will do things that mean people use Instagram less if we think that they keep people safe or generally create a healthier environment. And I think we have to be willing to do that*. The interviewer stated, "*Even though it could affect your bottom line*." Mr. Mosseri responded, "*Hundred percent*. Will we do this one? It depends. We'll see if it works or not." The interviewer then asked, "What led you to that particular change? Because that's a big change." Mr. Mosseri responded, "It came out of the team. *We've been focused on well-being broadly, like I said, it's*

53

*our number one priority.*"  *See* DX-17,720.  During the interview, Mr. Mosseri discussed Meta's research into hiding like counts, and stated:  "one of the ideas we're currently experimenting with is like counts private, for instance, because we don't want Instagram to be such a competition.  We want it to be a place where people spend more of their energy connecting with the people that they love and the things that they care about."  *Id.* at 2.

a)      Mr. Mosseri's statement is correct as a statement of Instagram's objectives and aspirations regarding its well-being work.  [Mosseri; A. Davis].

b)      Mr. Mosseri's statement also accurately reflects Meta's commitment to and investment in well-being at this time.  *See supra* Findings pp. 10–16.

c)      When Mr. Mosseri made this statement in 2019, Meta was researching and testing the possibility of hiding like counts, but Meta had not yet made a definitive decision on the issue.  *See* DX-16,621; DX-17,747.

10.    **Statement No. 7 (10)**

)      In November 2019, Mr. Mosseri was quoted at the Wired25 conference during which he announced that Instagram will expand to some users in the United States its test of hiding Like counts from everyone but a post's creator, stating, "*We will make decisions that hurt the business if they're good for people's wellbeing and health because it has to be good for the business over the long run.*"  *See* DX-17,735.  During the conference, Mr. Mosseri stated that "[t]he idea is to try to depressurize Instagram, make it less of a competition, and give people more space to focus on connecting with the people they love and things that inspire them."  *Id.*  Mr. Mosseri also noted that moving forward "[w]e have to see how it affects how people feel about the platform, how it affects how they use the platform, how it affects the creator ecosystem."  *Id.*

a)      Mr. Mosseri's statement is correct as a statement of Instagram's objectives and aspirations regarding its well-being work, and reflects his subjective

54

assessment and opinions regarding Instagram's goals for well-being on the service moving forward. [Mosseri].

b) When Mr. Mosseri made this statement in late 2019, Meta was researching and testing the possibility of hiding like counts, as reflected in his acknowledgement that "[w]e have to see how it affects how people feel about the platform, how it affects how they use the platform." *See id*.; *see also* DX-16,621.

c) Mr. Mosseri's statement was made at a conference concerning technology, social media, and well-being and was not an effort to reach consumers. Instead, Meta reaches consumers in other ways, including through public statements on Meta's websites. [Mosseri].

d) Mr. Mosseri's statement was an accurate reflection of Meta's priorities at the time he made it. In a November 2018 email, Mr. Zuckerberg summarized Meta's approach to prioritizing people's well-being and health over the long run, writing "I'm often asked whether we have an incentive to increase engagement on Facebook because that creates more advertising real estate -- even if that may not be in people's best interest. . . But from a business perspective, it's important that people's time is well spent or they won't use our services as much over the long term. . . . Another question is whether we leave harmful or divisive content up because it drives engagement. Again, the answer is no. People consistently tell us they don't want to see this content. Advertisers don't want their brands anywhere near it either. The reason some of this bad content remains is because the people reviewing it and our AI systems are far from perfect – not because we have an incentive to ignore it." *See* DX-10,157.

e) Meta is keenly aware that keeping its services free from harmful content has a positive impact on its profitability, and acts towards that end. Advertisers have, in the past, paused their ads on Meta's services when they believe the

services are not safe, cutting down Meta's profits. [Zuckerberg; A. Davis; Bickert].

11.    **Statement No. 22 (27)**

a)    On May 10, 2021, CNBC published an article reporting on a letter from a group of State Attorneys General "urging Facebook to abandon its plans to create an Instagram service for kids under the age of 13[.]" *See* DX-17,721. In response to the Attorneys General's stated concerns, a Meta spokesperson stated that Meta had "just started exploring a version of Instagram for kids," and had "committed to not show ads 'in any Instagram experience we develop for people under the age of 13.'" *Id.* The spokesperson further stated: "[w]e agree that *any experience we develop must prioritize their safety and privacy*, and we will consult with experts in child development, child safety and mental health, and privacy advocates to inform it." *Id.* The challenged statement thus concerned a potential service that Meta had "just started exploring[,]" stating that, "[a]ny experience we develop must prioritize [people under the age of 13's] safety and privacy." *Id.*

b)    The statement accurately described Meta's aspirational development priorities and goals for a possible future service. *See infra* Findings pp. 113 –14.

c)    The Meta spokesperson did not state that Meta had already built an Instagram service for individuals under the age of 13, that any such service would be risk-free, or that Meta had achieved any outcome. Rather, the spokesperson's statement was focused on Meta's goals and objectives for a potential service as of May 10, 2021.

d)    Furthermore, Meta's statement is consistent with its plans for Instagram Kids, which prioritized children's privacy and safety and aimed to address the problem of "kids are getting phones younger and younger,

56

misrepresenting their age, and downloading apps that are meant for those 13 or older," by providing parents the option to give their children access to a version of Instagram designed specifically for children where parents can supervise and control their experience. DX-17,498. Meta therefore endeavored to create a COPPA-compliant app that was intended for users aged 10-12, required parental permission to join, would not have advertisements, and would have age-appropriate content and features. *Id*.

12. **Statement No. 32 (47)**

a) At the September 30, 2021 Senate hearing, Senator Klobuchar asked Antigone Davis, "***What do you estimate the life-time value of a user is for kids who start using Facebook products before age 13?***" DX-17,267. Ms. Davis responded: "***Respectfully, Senator, that is not how we think about building products for our—for young people. We actually are quite focused on ensuring that parents have the kinds of supervisory tools that they need. That is just—it is just not the way we think about it, certainly not the way I and my team think about it.***" *Id.* Senator Klobuchar then stated, "***Ms. Davis, that may be true about your team, but are you saying that Facebook in developing products has never considered, and you are under oath, has never considered the profit value of developing products when they make their decisions of how those products look?***" *Id.* Ms. Davis responded, "***Respectfully, Senator, we are a business. I am fully, fully aware of that, but what we are thinking about is how do we provide the best experience? If we have a very short sighted version of just— without focusing on providing a better experience for people or a good experience, that is just a terrible business model.***" *Id.*

b)    This statement to Congress by Ms. Davis accurately states Meta's approach to providing positive experiences for users on its services. *See supra* Findings pp. 50–52; *infra* Findings pp. 68–69.

c)    Ms. Davis did not testify that Meta never considered business considerations when building its services. Instead, she explained that maximizing the lifetime value of young users is not how Meta approaches service development and that Meta focuses on creating positive experiences.

d)    The evidence supports Ms. Davis's characterization of Meta's approach to developing its services. For instance, teens are not a significant source of revenue because they generally do not possess substantial discretionary spending power. [Mosseri; A. Davis].

e)    Meta also implemented ranking and other changes despite anticipating engagement declines. Most notably, Meta implemented changes to its News Feed algorithm on Facebook to prioritize meaningful social interactions, which resulted in approximately fifty million fewer hours spent on Facebook per day. *See* DX-11,718 at -2767.

13.    **Statement No. 33 (48)**

a)    This statement by Ms. Davis to Congress, *see supra* Findings p. 32, accurately states her personal opinion and Meta's aspirations for its safety efforts on its services. [A. Davis].

b)    Ms. Davis did not testify that Meta never considered business considerations when assessing changes to its services. Instead, she expressed her personal opinion, stating that it has "not been [her]

58

experience" at Meta that a change that inflicted harm on users was made in order to grow users or increase revenue. DX-17,267.

c) Ms. Davis's generalized statement that Meta "care[s] deeply about the safety and security of the people on [its] platform" reflects Meta's safety efforts at a high level, and contains no guarantee or promise.

d) The evidence supports Ms. Davis's characterization of Meta's prioritization of safety.

e) Meta has strong business incentives to ensure that people, including teens, enjoy their time with their services, which means a business interest to avoid bad experiences, unsafe experiences, or other negative consequences. The company has and continues to expend significant effort to develop safety features and launch them, even if that means users spend less time on Meta's services. [Zuckerberg; Mosseri; Otaru].

f) For example, Meta implemented features to encourage users to spend less time on the services, which it knew would reduce revenue, such as Daily Limit, Take a Break, Quiet Mode, Reels Nudge, IGD Nudge, algorithm changes, and Teen Accounts (including Private-by-Default settings). *See* DX-11,709. Each of these features either encouraged teens and other users to spend less time on Meta's services, or changed their experience on the services in a way that decreased engagement. *See infra* Findings pp. 69, 84–87.

g) Meta also implemented changes to its News Feed algorithm on Facebook to promote meaningful social interactions despite anticipating an overall drop in time spent on the services. These changes resulted in time spent dropping by approximately 50 million hours per day on Facebook. *See* DX-11,718.

h) Meta launched Teen Accounts in September 2024, which enabled Private-by-Default for teen users on Instagram. Meta described this effort as "a

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

necessary step forward," despite knowing that doing so would be "costly to engagement." DX-16,623; DX-17,761; [Otaru].

(1) Shortly after the launch of Teen Accounts, Meta observed a 3.1% drop in daily active use and a 7.2% drop in time spent for new early teens on Instagram. *See* DX-17,762.

(2) In October 2024, Teen Accounts resulted in a drop in teen daily active use of 5% for early teens and 2% for late teens" on Instagram. *See* DX-17,760.

14.    **Statement No. 37 (56)**

a) In October 2021, Lena Pietsch (then-Director of Policy Communications for Meta) released a statement which added missing facts to a recently aired CBS 60 Minutes segment about Meta's internal research efforts. *See* DX-17,719; DX-18,173. Ms. Pietsch stated that the segment "used select company materials to tell a misleading story about the research we do to improve our products" and disregarded "the significant investments we make to keep people safe on our platform." *Id.* Regarding 60 Minutes' claim that Meta's "desire for profit" outweighs Meta's "efforts to keep the platform safe," Ms. Pietsch stated that "[t]he growth of people or advertisers using Facebook means nothing if our services aren't being used in ways that bring people closer together" which was why Meta was "investing so much in security that impacts our bottom line." *Id.* Ms. Pietsch then stated, "***Protecting our community is more important than maximizing our profits.*** To say we turn a blind eye to feedback ignores these investments,

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

including the 40,000 people working on safety and security at Facebook and our investment of $13 billion since 2016." *Id*.

b) Ms. Pietsch's statement is a statement of Meta's aspirations and general objectives to enhance and promote safe and positive experiences on its service.

c) Ms. Pietsch's statement accurately reflects Meta's investments in resources and initiatives to promote and enhance user safety. *See supra* Findings pp. 10–16.

15. **Statement No. 38 (57)**

a) On October 5, 2021, Mr. Zuckerberg published a Facebook post directed to Meta employees. DX-16,869. In the post, Mr. Zuckerberg stated that at Meta "We care deeply about issues like safety, well-being and mental health. It's difficult to see coverage that misrepresents our work and our motives." *Id*. Mr. Zuckerberg also stated, "***At the heart of these accusations is this idea that we prioritize profits over safety and well-being. That's just not true.*** For example, one move that has been called into question is when we introduced the Meaningful Social Interactions change to News Feed. This change showed fewer viral videos and more content from friends and family— which we did knowing it would mean people spent less time on Facebook, but that research suggested it was the right thing for people's well-being." *Id*. at 3.

b) Mr. Zuckerberg's statement accurately reflects Meta's aspirations for its goals around safety and well-being. His statement also accurately summarizes Meta's extensive investments and changes aimed at enhancing user safety. *See supra* Findings pp. 10–16.

c) In the preceding paragraph of Mr. Zuckerberg's statement, Mr. Zuckerberg repeatedly offered rhetorical questions to highlight Meta's goals around these important topics, for instance, asking, "If we wanted to ignore

research, why would we create an industry-leading research program to understand these important issues in the first place?" DX-16,869.

d) Mr. Zuckerberg's statement was intended for Meta employees and was not an effort to reach consumers. [Zuckerberg]. Instead, Meta reaches consumers in other ways, including through public statements on Meta's websites. *See supra* Findings pp. 16–20; *infra* Findings pp. 65–68.

e) Meta's employees and senior leadership have consistently stated that safety and growth are not viewed within Meta as mutually exclusive goals. *See supra* Findings pp. 50–52, 55; *infra* Findings p. 68.

16. **Statement No. 44 (82)**

a) Meta employees Elaine Montgomery (Product Design Director, Meta & Co-Lead of TTC Labs) and Elaina Koros (Content Design Manager, Meta) co-authored a press release in November 2025 entitled, "Meta's Best Interests of the Child Frameworks." DX-12,898. The press release lists an objective to "***Prioritize youth well-being and safety over business goals and interests***" a principle set forth in Meta's Best Interests of the Child Framework. *Id.*

b) The statements in the press release accurately reflect Meta's objectives and aspirations for its service development, and also accurately describe Meta's Best Interests of the Child Framework and the principles it sets forth. *See supra* Findings pp. 10–16.

D. **Statements Regarding Addiction.**

1. The States challenge nine statements by Meta or its employees regarding the purported addictiveness of Meta's services. They are Statement Nos. 2 (2), 10 (15), 15 (20), 17 (22), 18 (23), 20 (25), 34 (51), 35 (52), and 40 (62).

2. Social media "addiction" has not been recognized as a medical or psychiatric condition, and there is scientific debate over whether excessive or "problematic" use of social media meets the clinical standards for "addiction." *See* DX-16,580

62

(explaining that "addiction" is a medical term used to refer to a clinical condition where there is agreed upon criteria for diagnosis); [Auerbach].

a) Having studied the issue, neither of the leading authorities for diagnosing mental disorders—the American Psychiatric Association's ("APA") Diagnostic and Statistical Manual of Mental Disorders ("DSM") and the World Health Organization's ("WHO") International Classification of Diseases ("ICD")—lists social media addiction as a recognized medical or psychiatric condition. *See* DX-11,521; [E. Davis].

b) Currently, only disordered substance use and gambling behavior are classified as "addiction" by the DSM, as social media use does not affect the brain in the same way as gambling or substance use. *See* DX-16,717 at -3605, -3621.

c) After reviewing the existing literature, Meta did not find evidence that social media use meets the clinical standards for addiction. *See* DX-16,717 at -3605, -3621 ("Facebook use may not meet clinical standards for addiction," and that "[c]urrently only disordered substance use and gambling behavior are classified as 'addiction' by the Diagnostic and Statistical Manual of Mental Disorders. Facebook does not affect the brain in the same way as gambling or substance use."); DX-16,718 (noting that "[t]here is no evidence that Facebook use meets the clinical definition of 'addiction.'"); DX-16,726 (noting that the term is "not accurate (i.e., 'addiction' is a specific medical term that is misapplied in the gen pop context)"); *see also* DX-16,580 (externally acknowledging some users may "feel their use is problematic" and explaining they "do not use the term 'addiction'" because—unlike the often self-reported problematic use—"diagnoses of clinical-level concerns would require more formal assessment (i.e., by a mental health professional)."); DX-17,774 ("we identify no research to substantiate the claim that social media is truly 'addictive.'").

63

3.      Meta has determined that the correct way to refer to challenges with usage is with the term "problematic use" rather than "addiction."  Meta has done so because the available research does not support the use of the term "addiction" to describe excessive or problematic use of social media.  [Hendrix; E. Davis; Zuckerberg; Mosseri].  The clinical term "addiction" conveys a clinical-level condition that is not established by the scientific literature.  [Hendrix; E. Davis]; *see also* DX-10,255 at –0637 ("[O]ther experts use the term 'Problematic Use' as a more accurate term to describe habitual or undesired use of Facebook.); DX-16,728 at –0021 (explaining that a review of over 100 academic publications indicated that research did not indicate that social media was truly addictive and supported Meta's focus on lack of control and negative life impacts).

4.      Beginning in 2018, Meta conducted extensive research on problematic use after conducting an exhaustive review of the external literature to determine whether there was a clinical addiction to social media the company needed to address.  [Hendrix; E. Davis].

a)      Dr. Elena Davis, a Meta researcher, conducted a comprehensive review of external literature that existed at the time and concluded that there was "no evidence that Facebook use meets the clinical definition of 'addiction.'" DX-16,892 at -3116.  During that time, Meta's researchers also worked to understand the role Facebook could be playing in reward learning and habit formation and how those processes could "contribut[e] to common issues for people." *Id.* at -3127.  Based on these findings, changes were proposed to "aspects of the platform that may contribute to use that people find unwanted or difficult-to-regulate" and focusing on improving "awareness and control" for users.  *Id.* at 3153–54. In particular, there were recommended changes to help users with awareness, attentiveness, intentionality of use, and control over use in order to "provide people

support to regulate habitual use." *Id.* at -3151. The goal was to "provide tools to help break habits." *Id.*

b)    In 2019, three Meta researchers—Dr. Elena Davis, Dr. Moira Burke, and Dr. Justin Cheng—published a paper titled "Understanding Perceptions of Problematic Facebook Use" in an academic journal that "estimate[d] as an upper bound that 3.1% of Facebook users in the U.S. experience problematic use," based on a 2018 survey. DX-10,755 at -7521. The goal was to study "the most extreme cases" of negative user experiences to "develop designs that benefit everyone. DX-10,687 at -1048.

c)    Meta continued to evolve its measurement approach for problematic use to better understand the user behavior associated with feelings of problematic use and to better inform service development. *See, e.g.*, DX-16,893 (reporting on a new survey measurement designed to understand user behaviors associated with problematic use); DX-11,067.

d)    Meta employees have investigated problematic use on its services to better understand it to help users feel good about the time they spend on its services. DX-11,864 (August 2022 "Late Night Use: IG Mental Well-being, Problematic Use – Strategy and Design" deck stating that the "Vision & Approach" is that "[w]hen we've succeeded, IG continues to be a safe space for teens to actively engage with their community and feel good about the time they spend on the app."); DX-17,779 at -6922 (research on time spent noting that Meta's "immediate opportunity" is that "we can build insights and controls to help users establish intention and tell us what is meaningful to them."); DX-10,682 ("[W]e have a dedicated team working across our platforms to better understand [problematic use] and ensure people are using our apps in ways that are meaningful to them").

5.    Meta has repeatedly disclosed to the public that some users of its services may experience problematic use. [A. Davis; Hendrix; E. Davis].

65

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

a) On December 15, 2017, David Ginsberg (then-Director of Research) and Moira Burke (then-Research Scientist at Facebook) co-authored a Newsroom blog post published on Meta's website entitled, "Hard Questions: Is Spending Time on Social Media Bad for Us?," DX-10,639, which states:

(1) "With people spending more time on social media, many rightly wonder whether that time is good for us. Do people connect in meaningful ways online? Or are they simply consuming trivial updates and polarizing memes at the expense of time with loved ones?"

(2) "We also worry about spending too much time on our phones when we should be paying attention to our families."

(3) "In general, when people spend a lot of time passively consuming information — reading but not interacting with people — they report feeling worse afterward. In one experiment, University of Michigan students randomly assigned to read Facebook for 10 minutes were in a worse mood at the end of the day than students assigned to post or talk to friends on Facebook. A study from UC San Diego and Yale found that people who clicked on about four times as many links as the average person, or who liked twice as many posts, reported worse mental health than average in a survey. Though the causes aren't clear, researchers hypothesize that reading about others online might lead to negative social comparison — and perhaps even more so than offline, since people's posts are often more curated and flattering. Another theory is that the internet takes people away from social engagement in person."

(4) "We know that people are concerned about how technology affects our attention spans and relationships, as well as how it affects

66

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

children in the long run.  We agree these are critically important questions, and we all have a lot more to learn."

    (5)    "We don't have all the answers, but given the prominent role social media now plays in many people's lives, we want to help elevate t he conversation."

b)    On September 20, 2018, Antigone Davis authored a Newsroom blog post published on Meta's website entitled, "Is Young People's Time on Social Media Misspent?," DX-17,625, which states:

    (1)    "What's the right amount of time for people to spend online? What effect is technology having on our children and their development? What value does social media add to our lives?  These critical questions are an increasing focus for everyone, from parents to policy makers.  And they're questions we are asking ourselves at Facebook too."

    (2)    "Demos' report also highlights the things we could be doing to help address some of the challenges young people face on social media, including the sad reality of abusive behaviours and the spread of misinformation."

c)    On May 4, 2019, Meta researchers published a research paper titled, "Understanding Perceptions of Problematic Facebook Use," DX-10,751, which states:

    (1)    "While many people use social network sites to connect with friends and family, some feel that their use is problematic, seriously affecting their sleep, work, or life."

    (2)    "Studies of problematic use of the internet . . . and social networks . . . note symptoms including preoccupation, loss of control, and negative impact on one's relationships, work performance, and life."

67

(3)    "Under this broad definition of problematic Facebook use – negative life impact and difficulty with control – we estimate (as an upper bound) that 3.1% of Facebook users in the US experience problematic use. They are more likely to be younger, male, and going through a major life event such as a breakup.  After controlling for demographics, we find that people experiencing problematic use spend more time on the platform, particularly at night, and respond to a greater fraction of notifications."

(4)    "Based on the literature reviewed above, we defined problematic use as reporting both of the following: (1) Negative life impact attributed to Facebook . . . (2) and problems with control or preoccupation."

d)    On April 30, 2022, Meta researchers published a research paper titled, "Mindsets Matter: How Beliefs About Facebook Moderate the Association Between Time Spent and Well-Being," DX-18,054, which states:

(1)    "When people think that Facebook is bad, the more time they think they spend on the platform, the lower their well-being. When people think that Facebook is good, time they think they spend on the platform is not associated with well-being."

6.    Meta's business model is focused on helping people share and connect more, because the purpose of Meta's service is to help people stay in touch with family, friends and communities.  DX-10,157.  Mr. Zuckerberg, Meta's Chief Executive Officer, believes that from a business perspective, "it's important that [users] time is well spent, or they won't use [Meta's] services as much over the long term." *Id.* [Zuckerberg; Mosseri].

7.    It is not in Meta's business interest to design an addictive service because users who do not feel like they are having a positive experience on Meta's services are

68

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

more likely to deactivate or delete their accounts. *See* DX-10,157; [Zuckerberg; Mosseri].

8. Meta has implemented many measures to assist users in controlling or preventing problematic use. *See supra* Findings pp. 63–68; *infra* Findings pp. 85–90.

a) Meta employees who conduct research and work on Meta's services do so with the goal of providing more meaningful social interactions and positive experiences for users, not to drive usage that is problematic to teens. *See supra* Findings pp. 50–52; *see also* DX-10,748 (conducting research to "help people to progress towards something meaningful" and "not [] to drive usage that is problematic to teens").

b) Meta designs its services so that users enjoy using them over the long term, including by offering features that users enjoy and want to use. [Zuckerberg].

c) Meta tracks the time a user spends on its services, which is consistent with industry practice and allows Meta to compare metrics across its apps and other apps. [Zuckerberg].

d) Time spent is just one of many metrics that Meta uses to track a user's experiences on its services. That Meta tracks time spent as a metric, however, does not mean that increasing time spent is a goal assigned to employees. [Zuckerberg].

9. Meta has worked with product and engineering leaders across its services to understand and address problematic use. *See* DX-10,682; [Otaru; E. Davis; Hendrix; A. Davis].

a) In 2017, Facebook made changes to its News Feed algorithm to provide more opportunities for meaningful interactions and to "reduce passive consumption of low-quality content," demoting content with clickbait headlines and false news, and optimizing ranking so users see posts from the friends they care more about. *See* DX-17,781.

69

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

b)    The change to Facebook's News Feed algorithm valued posts that would drive meaningful interaction between people, which ultimately resulted in lower video watch time on Facebook.   These changes resulted in time spent dropping by approximately 50 million hours per day.  DX-11,718.

c)    This algorithmic change was not designed to increase engagement by users on Facebook; rather, it was designed to increase meaningful social interactions.  [Zuckerberg; A. Davis]; *see supra* Findings p. 51.

10.    The problematic use of social media has not been recognized as a teen mental health priority by public health and other state officials in the States.  [Chan; Bolanos; Orrock].

a)    Public health or other state officials were not urged to take action regarding the social media use by teens prior to this lawsuit.

b)    Public health or other state officials were not consulted ahead of filing this lawsuit.

c)    State initiatives around teen mental health do not focus on social media use.

11.    The individual statements identified by the States in this category accurately reflect Meta's process for designing its services.

12.    **Statement No. 2 (2)**

a)    On July 4, 2018, the BBC published an article titled, "Social media apps are 'deliberately' addictive to users."  DX-17,718.  The article quoted a Meta spokesperson who stated that Meta's services were designed "to bring people closer to their friends, family, and the things they care about" and that "*at no stage does wanting something to be addictive factor into that process*." *Id.*

b)    Meta's statement accurately reflects Meta's process for designing its services.  *See supra* Findings pp. 50–51, 63–69.

13.    **Statement No. 10 (15)**

70

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

a)   At the November 17, 2020 hearing before the Senate Committee on the Judiciary, Chairman Lindsey Graham asked "***Mr. Zuckerberg, do you believe your product can be addictive?***"  DX-16,875.  Mr. Zuckerberg replied: "***Senator, I—we certainly do not design the product in that way***. We design the product to be as useful and meaningful as possible.  We take steps—" *Id.*  Chairman Graham then interrupted, "That's not my question.  My question is there seems to be an ample body of growing medical evidence that social media sites have an addictive nature to them.  Do you agree with that?" *Id.*

b)   Mr. Zuckerberg replied, "Senator, I don't think the research has been conclusive but it is an area that we care about and study.  We certainly do not want our products to be addictive.  We want people to use them because they're meaningful.  And we take steps to make sure this is the case." *Id.*

c)   This statement to Congress by Mr. Zuckerberg accurately reflects Meta's process for designing its services.  *See supra* Findings pp. 50–51, 63–69.

d)   The statement also accurately reflects Mr. Zuckerberg's aspirations around the design of Meta's services.  [Zuckerberg].

e)   On April 10, 2018, Mark Zuckerberg similarly testified before the Senate Judiciary and Commerce Committees.  DX-16,886.  In his testimony, Mr. Zuckerberg discussed problematic use of social media, explaining that "What we find in general is that if you are using social media in order to build relationships, right, so you are sharing content with friends, you are interacting, then that is associated with all of the long-term measures of well-being that you would intuitively think of, long-term health, long-term happiness, long-term feeling connected, feeling less lonely.  But if you are using the Internet and social media primarily to just passively consume content and you are not engaging with other people, then it does not have those positive effects and it could be negative." *Id.*

71

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

14.    **Statement No. 15 (20)**

a)    At the March 25, 2021 Congressional hearing, Congresswoman Cathy McMorris Rodgers asked Mark Zuckerberg, "So I would like to ask you, if you said earlier that you don't want kids sitting in front of the screens passively consuming content, and your products are designed to increase screen time, do you currently have any limitations on your own kids' use of your products, or how do you think that will change as they get older?" DX-16,871. Mr. Zuckerberg replied: "My daughters are 5 and 3 and they don't use our products. Actually, that is not exactly true; my eldest daughter, Max, I let her use Messenger Kids sometimes to message her cousins. But overall, the research that we have seen is that using social apps to connect with other people can have positive mental health benefits and well-being benefits by helping people feel more connected and less lonely. Passively consuming content doesn't have those positive benefits to well-being but isn't necessarily negative. It just isn't as positive as connecting. ***And the way we design our algorithms is to encourage meaningful social interactions. So it is a common misconception that our teams—our goals, or even have goals, of trying to increase the amount of time that people spend.***" *Id.*; *see also* DX-16,872 at -7347.

b)    This statement to Congress by Mr. Zuckerberg accurately reflects Meta's decision to focus on meaningful social interactions as opposed to time spent. *See supra* Findings p. 51.

15.    **Statement No. 17 (22)**

a)    At the March 25, 2021 Congressional hearing, Congressman Hank Johnson asked Mark Zuckerberg: "***You profit from your company's hooking users to your platforms by capitalizing on their time. So yes or no: Do you agree that you make money off of creating an addiction to your platforms? Mr.***

72

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

*Zuckerberg?*" DX-17,260. Mr. Zuckerberg replied: "*Congressman, no. I don't agree with that.*" *Id.*

b)    This statement to Congress by Mr. Zuckerberg accurately reflects his opinions about the purposes of Meta's design, and the reasons that Meta does not seek to design services that lead to "addictive" or compulsive use. *See* Findings pp. 50–51, 63–69.

16.    **Statement No. 18 (23)**

a)    At the March 25, 2021 Congressional hearing, Congresswoman Rodgers asked Mark Zuckerberg: "So do you agree that your business model and the design of your products is to get as many people on the platform as possible and to keep them there for as long as possible?" DX-17,261. Mr. Zuckerberg replied that "from a mission perspective, we want to serve everyone. But our goal is not – we don't – *I don't give our News Feed team or our Instagram team goals around increasing the amount of time that people spend.* I believe that if we build a useful product which –." *Id.*

b)    This statement to Congress by Mr. Zuckerberg accurately reflects that Meta's News Feed team and Instagram teams were not given goals around time spent at the time that Mr. Zuckerberg made the statement in March 2021. *See supra* Findings pp. 24, 51.

c)    At the time Mr. Zuckerberg made his statement, Meta tracked time spent but did not provide teams with time spent as a goal to measure their job performance. Meta tracks time spent to compare metrics across apps and externally. [Zuckerberg].

17.    **Statement No. 20 (25)**

a)    On March 31, 2021, Nick Clegg authored a blog post titled, "You and the Algorithm: It Takes Two to Tango," which was published on Medium. DX-17,262. In the post, Mr. Clegg stated: "Every piece of content that could potentially feature — including the posts you haven't seen from your

73

friends, the Pages you follow, and Groups you joined — goes through the ranking process. Thousands of signals are assessed for these posts, like who posted it, when, whether it's a photo, video or link, how popular it is on the platform, or the type of device you are using. From there, the algorithm uses these signals to predict how likely it is to be relevant and meaningful to you: for example, how likely you might be to 'like' it or find that viewing it was worth your time. ***The goal is to make sure you see what you find most meaningful — not to keep you glued to your smartphone for hours on end.*** You can think about this sort of like a spam filter in your inbox: it helps filter out content you won't find meaningful or relevant, and prioritizes content you will." *Id.*

b)      When Mr. Clegg made this statement in 2021, he was discussing Meta's objective for the type of content that users see on its services. *Id*. Mr. Clegg's statement, "[t]he goal is to make sure you see what you find most meaningful--not to keep you glued to your smartphone for hours on end," was aspirational and reflected Meta's goals for the future. [Clegg].

c)      Mr. Clegg's statement accurately describes Meta's efforts to make users' experiences on its services meaningful. *See supra* Findings pp. 10–16, 51.

18.    **Statement No. 34 (51)**

a)      At the September 30, 2021 Senate hearing, Senator Sullivan asked Antigone Davis, "So when you are looking at your applications, your services, do you balance the mental health needs of Americans versus the addictive nature of the products that you sell?" DX-17,267. Ms. Davis replied: "Thank you, Senator. I think you were going to ask me if I have children. I do, I have a 23 year old daughter. First of all, I don't agree with the characterization of our product. But in fact we do think quite seriously about the safety and-" *Id.* Senator Sullivan then stated: "Sorry, I'm going to interrupt here. What don't you agree with? I just said addictive nature . .

74

. I said addictive nature versus mental health. What two phrases did you not agree with?" *Id.* Ms. Davis replied: "***So I disagree with calling our product addictive. I also think that's not how we build products.***" *Id.*

b) This statement to Congress by Ms. Davis reflects her personal opinion that she disagreed with the statement of Senator Sullivan characterizing Meta's services as having an "addictive nature."

c) Ms. Davis's statement is consistent with Meta's internal assessment as to whether its services are properly characterized as "addictive" (as compared to whether compulsive use is a real issue). *See supra* Findings pp. 62–63.

19. **Statement No. 35 (52)**

a) At the September 30, 2021 Senate hearing, Senator Sullivan asked Antigone Davis, "***So is you—let me—I want to—well, I will let you get to mental health, but I want to drill down on this addictive element. But isn't part of your business model to have more eye-balls for a longer amount of time engaged using your services?***" DX-17,267. Ms. Davis responded, "***Respectfully, Senator that is not actually how we build our products. In fact, we made changes to our news feed to allow for more meaningful interactions, knowing that that would impact the time spent. In fact, it did impact the time spent by about 50 million hours per day. But we did it anyway because we were trying to build a positive, more positive experience.***" *Id.*

b) This statement to Congress by Ms. Davis was discussing Meta's objectives for safety and well-being on its services. Her statement, "[b]ut we did it anyway because we were trying to build a positive, more positive experience" was aspirational and accurately reflected Meta's goals for the future. *Id.*; *supra* Findings pp. 10–16, 50–52, 68–69.

20. **Statement No. 40 (62)**

a) At the December 8, 2021 Senate hearing, Senator Blumenthal stated to Adam Mosseri, "Instagram is addictive. That is the view that has been repeated again and again and again by people who are experts in this field. Parents know it. And for teens who see Instagram's algorithms encouraging, for example, eating disorders, they find it almost impossible to stop. The UK code restricts Instagram's use of addictive design, legally restricts its use of addictive design. Shouldn't we have a similar rule in the United States?" DX-17,269. Mr. Mosseri replied: "***Senator, respectfully, I don't believe the research suggests that our products are addictive.***" *Id.* Mr. Mosseri then stated: "Research actually shows that on 11 of 12 difficult issues that teens face, teens that are struggling said Instagram helps for their harms. Now we always care about how people feel about their experiences on our platform and it is my responsibility as Head of Instagram to do everything I can to help keep people safe, and we are going to continue to do so." *Id*.

b) This statement to Congress by Mr. Mosseri described Meta's objectives and aspirations for its ongoing efforts around safety; Mr. Mosseri did not state that Meta ultimately achieved any particular outcome or that Meta's services would be risk-free. [Mosseri].

c) The underlying internal research supports Mr. Mosseri's statement.

(1) The "Hard Life Moments – Mental Health Deep Dive" deck included a slide titled "Instagram is More Likely to Make Things Better than Worse." *See* DX-18,074. That slide showed that more teen girls reported Instagram made them feel better than worse for 11 well-being issues: problematic use, FOMO, social comparison, eating issues, sleep issues, SSI, loneliness, anxiety, sadness, financial stress, and family stress. *Id.* Body image was the only exception, with 22.10% reporting that Instagram made it better and

76

32.40% reporting that Instagram made it worse, while 45.50% reported no impact. *Id.* This study was designed to understand user perceptions and does not evaluate causal claims between Instagram and health/well-being. *Id.*

E.    **Meta's Statements to Congress.**

1.    Twenty-two of the States' alleged misrepresentations are statements made by a Meta employee to Congress. They are Statement Nos. 10 (15), 13 (18), 14 (19), 15 (20), 16 (21), 17 (22), 18 (23), 19 (24), 26 (38), 27 (39), 28 (42), 29 (43), 30 (44), 31 (45), 32 (47), 33 (48), 34 (51), 35 (52), 36 (53), 40 (62), 41 (63), 42 (65). *See* ECF Nos. 385 (3144); 476 (3260).

2.    These statements to Congress were made in the context of legislative deliberations related to the regulation of social media services. Under the circumstances, the statements were made to influence the legislative process and potential or contemplated forthcoming regulatory proposals.

3.    **Mark Zuckerberg's November 17, 2020 Congressional Testimony [Zuckerberg]**

a)    On November 17, 2020, Mark Zuckerberg testified before the Senate Committee on the Judiciary at a hearing entitled "Breaking the News: Censorship, Suppression, and the 2020 Election," which was set to discuss legislative proposals relating to amending Section 230. DX-17,259.

b)    Senator Graham opened the hearing by acknowledging the widespread use of "social media platforms such as YouTube, Facebook, Instagram, or Snapchat." *Id.* With that success, Senator Graham continued, companies that offer social media services are "having to make decisions that offend people on the left and the right." *Id.* He explained that the hearing was about censorship, suppression and the 2020 election, and whether social media platforms can "do better" or "need to do better." *Id.* Senator Graham stated that the purpose of the hearing was to "look at Section 230 and to see

77

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

if it needs to be modified or changed because Section 230 basically allows social media platforms like Twitter and Facebook to pass on information without legal liability." *Id.* Senator Graham later stated that his "hope is that we change Section 230 to incentivize social media platforms to come up with standards that are transparent and opaque," and that the hearing will result in a "baseline of agreement that Section 230 needs to be changed." *Id.*

c) Mr. Zuckerberg testified that he "welcome[d] the opportunity to discuss internet regulation" and "believe[d] we are well overdue to update the rules for the internet around content, elections, privacy, and data portability." *Id.*

d) Mr. Zuckerberg testified that he believed Meta "would benefit from clearer guidance from elected officials," and advocated for "regulation around transparency," including a social media service's policies and process. *Id.* Mr. Zuckerberg referenced Meta's own CSERs as an example of transparency efforts. *Id.*

e) Mr. Zuckerberg also endorsed Section 230 reform, stating, "I do" in response to Senator Graham's question to Mr. Zuckerberg and Jack Dorsey (then-CEO of Twitter), "Do both of you support change to 230, reform of Section 230?" *Id.* Mr. Zuckerberg also testified that he believed it would be "appropriate for there to be clear rules" around "certain types of illegal content." *Id.*

f) As these statements reflect, Mr. Zuckerberg's testimony was made to influence legislative proposals related to amending Section 230.

g) The States assert that one statement Mr. Zuckerberg made at the November 17, 2020 hearing—Statement No. 10 (15)—is deceptive.

h) Beyond being made to influence legislative action, that statement was an accurate reflection of Meta's actions, aspirations, and opinions. *See supra* Findings pp. 70–71.

78

4.    **Mark Zuckerberg's March 25, 2021 Congressional Testimony [Zuckerberg]**

a)    On March 25, 2021, Mark Zuckerberg testified before the U.S. House Subcommittees on Communications and Technology and on Consumer Protection and Commerce at a hearing entitled "Disinformation Nation: Social Media's Role in Promoting Extremism and Misinformation," which was set to discuss possible reforms to Section 230. *See* DX-17,260.

b)    Subcommittee Chair Congresswoman Jan Schakowsky stated at the hearing that "self-regulation has not worked" and that she would be "introducing the Online Consumer Protection Act" to hold social media services accountable. *Id.*

c)    At the hearing, Congressman Robert E. Latta stated that the subcommittee has "oversight of any change made to Section 230" and that he "look[ed] forward to [the] hearing as an important step in reconsidering the extent to which Big Tech deserves to retain the significant liability protection." *Id.*

d)    Mr. Zuckerberg was asked what changes he would recommend to Section 230 to ensure companies that offer social media services are held accountable when children are harmed using their services. *Id.* Mr. Zuckerberg testified that he supported "two specific changes" to Section 230, which included services having to "issue transparency reports that state the prevalence of content across all different categories of harmful content," referencing Meta's transparency reports as a model, and "creating accountability for the large platforms to have effective systems in place to moderate and remove clearly illegal content." *Id.*

e)    Mr. Zuckerberg testified that he "hope[d] that Congress will pass" a federal privacy standard. *Id.* Mr. Zuckerberg also recommended regulation around "data portability" between services. *Id.*

f)    Mr. Zuckerberg called on Congress to regulate social media more broadly: "I have said a number of times that I think that private companies should

79

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

not be making so many decisions alone that have to balance these complicated social and public equities." *Id.* Mr. Zuckerberg also described as "very effective and positive" the proposal of Congressman Welch to create a federal agency dedicated to addressing "emerging issues" around social media. *Id.*

g) As these statements reflect, Mr. Zuckerberg's testimony was directed at shaping legislative reform around Section 230, which was the focus of the Committee's hearing.

h) The States assert that seven statements Mr. Zuckerberg made at the March 25, 2021 hearing—Statement Nos. 13 (18), 14 (19), 15 (20), 16 (21), 17 (22), 18 (23), and 19 (24)—are deceptive.

i) Beyond being made to influence legislative action, those statements were an accurate reflection of Meta's actions, aspirations, and opinions. *See supra* Findings pp. 4–5, 22–26, 48–49, 71–73.

5. **Antigone Davis's September 30, 2021 Congressional Testimony [A. Davis]**

a) Ms. Davis's testimony before the Senate Committee on Commerce, Science, and Transportation on September 30, 2021 was made to influence policy and legislative solutions aimed at protecting children on the internet. DX-17,267.

b) Ms. Davis's testimony occurred in direct response to a letter to Meta from Senators Richard Blumenthal and Marsha Blackburn, Chair and Ranking Member of the Subcommittee, respectively, requesting that a senior Meta executive be made available to discuss the topics of "better educat[ing] parents on the risks from social media platforms and . . . develop[ing] legislative solutions to better protect children." *See* DX-17,694.

c) In opening the hearing, Chairman Richard Blumenthal stated that the hearing "is the third in the series intended to help us draft legislation, but

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

not just educate[,] not just legislate, but also to prompt action by Facebook itself." DX-17,267.

d)      Ms. Davis's testimony expressed a desire to collaborate with lawmakers on the anticipated legislative proposals:  "Youth safety and well-being are areas where we are investing heavily, and we welcome productive collaboration with lawmakers and elected officials." *See id.*

e)      As these statements reflect, Ms. Davis's testimony was made to influence policy and legislative solutions aimed at protecting children on the internet.

f)      The States assert that 11 statements Ms. Davis made at the September 30, 2021 hearing—Statement Nos. 26 (38), 27 (39), 28 (42), 29 (43), 30 (44), 31 (45), 32 (47), 33 (48), 34 (51), 35 (52), and 36 (53)—are deceptive.

g)      Beyond being made to influence legislative action, those statements were an accurate reflection of Meta's actions, aspirations, and opinions. *See supra* Findings pp. 6–8, 31–35, 57–59, 73–75.

6.      **Adam Mosseri's December 8, 2021 Congressional Testimony [Mosseri]**

a)      On December 8, 2021, Adam Mosseri testified before the Senate Committee on Commerce, Science, and Transportation, which was set to discuss potential legislative reforms to promote children's safety on social media. DX-17,269.

b)      Mr. Mosseri's testimony occurred in response to a request from the committee for a Meta executive to testify about how to develop legislative solutions to protect children. *Id*.

c)      Mr. Mosseri testified that there "should be an industry body that will determine [the] best practices" when it comes to "how to verify age, how to design age-appropriate experiences, and how to build parental controls," and that body "should receive input from . . . regulators" to create standards. *Id.*

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

  d) Mr. Mosseri also testified that Meta had "been calling for updated regulations for nearly three years," and that Meta was going to "continue to push forward on [the] safety and well-being [of] young people online." *Id.*

  e) As these statements reflect, Mr. Mosseri's testimony was aimed at influencing potential legislative reforms to promote children's safety on social media.

  f) The States assert that three statements Mr. Mosseri made at the December 8, 2021 hearing—Statement Nos. 40 (62), 41 (63), and 42 (65)—are deceptive.

  g) Beyond being made to influence legislative action, those statements were an accurate reflection of Meta's actions, aspirations, and opinions. *See supra* Findings pp. 8–9, 75–76.

**F. The Literature and the States' Experts Rely on Barred Features in Purporting to Link Meta's Services to Problematic Use.**

1. This Court previously held that Section 230 does not permit the imposition of liability on Meta for infinite scroll and autoplay features, ephemeral content features, disruptive audiovisual and vibration notifications and alerts, the quantification and display of "Likes," and Meta's algorithmic recommendation of third-party content. Order on Meta's Mot. to Dismiss the Multistate Attorneys General Compl. ("MTD Order"), ECF No. 123 (1214) at 25–29.

2. Where the literature or the States' experts have linked Meta's services to problematic use on social media, they have done so by citing barred features.

3. **Likes and Notifications**

  a) The States' experts have opined that likes and notifications contribute to problematic use of Meta's services.

  b) Dr. Mitch Prinstein has opined that features such as the "like" button and notifications contribute to excessive and habitual use. [Prinstein].

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

c)   Timothy Estes has opined that features like "infinite scroll," autoplaying of videos, push notifications, ranking algorithms, gamification and ephemeral content can make social media services more addictive.  [Estes].

d)   Dr. Colin Gray has opined that features such as algorithmically curated content, auto-play videos and stories, notifications, and continuous feed structure are designed to normalize constant engagement.  [Gray].

e)   Dr. Lauren Hale has opined that features such as notifications, infinite scroll, autoplay, ephemeral content, and tailored algorithms facilitate prolonged interaction.  [Hale].

4.   **Content Recommendation Algorithm**

a)   The States' experts have opined that Meta's recommendation algorithm contributes to the problematic use of Meta's services.

b)   Dr. Twenge has opined that algorithms that curate and recommend content cause harm.  [Twenge].

c)   Dr. Prinstein has opined that Meta's algorithmic recommendation systems contribute to problematic use of social media by teen users.  [Prinstein].

d)   Dr. Gray has opined that algorithmically curated content reinforces return behaviors and problematic use on social media.  [Gray].

e)   Mr. Béjar has opined that Meta's algorithm recommended content featured distressing content.  [Bejar].

f)   Mr. Estes has opined that ranking algorithms are designed to make social media services more addictive.  [Estes].

g)   Dr. Hale has opined that tailored algorithms facilitate prolonged interaction and interfere with sleep.  [Hale].

h)   Dr. Narayanan has opined that Meta's recommendation algorithms are optimized to maximize short-term engagement at the expense of user welfare.  [Narayanan].

5.   **Infinite Scroll and Autoplay**

83

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

a)      The States' experts have opined that infinite scroll and autoplay contribute to the problematic use of Meta's services.

b)      Dr. Twenge has opined that the autoplay of video and endless scroll contribute to problematic use.  [Twenge].

c)      Dr. Prinstein has opined that features such as time-bound content and auto-play contribute to problematic use.  [Prinstein].

d)      Dr. Gray has opined that auto-play videos and stories and a continuous feed structure reinforce return behaviors on Meta's services.  [Gray].

e)      Dr. Alter has opined that features such as infinite scroll, autoplay, and ephemerality lead to or are linked to mental health issues.  [Alter].

f)      Mr. Estes has opined that features like "infinite scroll," autoplaying of videos, and ephemeral content are designed to make Meta's services more addictive.  [Estes].

g)      Dr. Hale has opined that infinite scroll, autoplay, and ephemeral content facilitate prolonged interaction with Meta's services and interfere with sleep.  [Hale].

## III.    The States' Unfair Practices Claims

1.      The Court has previously ruled that the States' unfair practices claims must be assessed feature-by-feature.  *See* MTD Order at 25.  Three of Meta's features are alleged to be unfair practices under the consumer protection statutes at issue:  Time management tools, the Multiple Accounts feature, and Meta's systems for enforcing its age-restriction policy.

### A.      Time Management Tools.

1.      Meta's time management tools were designed to empower users to manage their time on Meta's services, especially if users were experiencing problematic use.  [Otaru; E. Davis].

2.      No research suggests that time management tools independently cause harm.  *See supra* Findings pp. 15–20.

84

3.     Meta has conducted extensive internal research on the subject of problematic use, and has published research papers and made multiple public disclosures on the subject. *See supra* Findings pp. 15–20, 28.

4.     Meta has used this research to develop and to improve existing tools and features that support users in managing the time they spend on Meta's services. [Otaru; Hendrix; E. Davis; Birnholtz].

a)     In August 2018, Meta launched Daily Limit. *See* DX-10,172 at -3558. Daily Limit was launched together with an activity dashboard and a new way to limit notifications. *Id.* All three tools were added to the "Your Activity" tab in the Instagram settings and to the "Your Time on Facebook" in the Facebook settings. *Id.* The dashboard "show[ed] your average time for that app on that device" and allowed users to see their "total time for that day." *Id.* The Daily Limit tool allowed users to choose to set "an alert when you've reached the amount of time you want to spend on that app for that day." *Id.* A new "Mute Push Notifications" setting was also added to the tab. *Id.* These tools were informed by research performed by Meta's researchers, and were continually improved over time after launch.

b)     Meta intended for the "tools to give people more control over the time they spend on [Meta's] platforms and also foster conversations between parents and teens about the online habits that are right for them." *Id.*

c)     In December 2021, Instagram launched Take a Break. *See* DX-10,332. When a user "has been scrolling for a certain amount of time," Instagram would "ask them to take a break from Instagram and suggest that they set reminders to take more breaks in the future." *Id.* at 3–4. The user could then decide whether they wanted to leave the service. Users would also be shown "expert-backed tips to help them reflect and reset." *Id.* at 4. To ensure "that teens are aware of this feature," Instagram sent teen users "notifications suggesting they turn these reminders on." *Id.*

85

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

d)    In March 2022, Instagram launched new supervision tools so parents could "[v]iew how much time their teens spend on Instagram and set time limits" for their time on Instagram. *See* DX-10,617 at -3579.

e)    In June 2022, Instagram expanded its tools to allow parents to "[s]et specific times during the day or week when they would like to limit their teen's use of Instagram." DX-10,648 at 4.

f)    Instagram also launched topic nudges in June 2022. *Id*. at 5. Teens would receive a notification "encourag[ing] them to switch to a different topic if they're repeatedly looking at the same type of content on Explore." *Id*. This nudge was based on research "suggest[ing] that nudges can be effective for helping people—especially teens—be more mindful of how they're using social media in the moment." *Id*.

g)    In January 2023, Instagram launched Quiet Mode, which "turns off notifications and sends an auto-reply when someone sends [a user] a direct message." DX-10,337 at -3516. To specifically address late night usage in teens, Instagram prompted teens to activate Quiet Mode after spending more than 10 minutes on Instagram late at night. *Id*.

h)    Instagram teams developed and improved time management tools with the goal of reducing user behaviors associated with problematic use. Outcomes could include teens spending less time on the service, teens setting goals for time spent on the service or teens changing how they spend their time on Meta's services.

i)    Meta's time management tools align "with industry baseline standards" and focus on "3 key research-informed and expert-validated categories" to "increase sense of control and reduce PU-associated behaviors." DX-16,889 at -3175, -3179.

j)    Designing time management tools as opt-in or opt-out preserves user autonomy.

86

k)      Nonetheless, based on extensive research with parents and teens, Meta changed the Daily Limit feature to a default feature.  The feature would pop up after a total amount of 60 minutes and block the teen's entire screen.

l)      Meta also gave parents options on how Daily Limit would be implemented for their teen.  Parents can now change the amount of time that triggers the reminder.  Parents can also choose to block the teen from accessing the app once the time limit has been reached.

5.      The launch of Teen Accounts, which included and enhanced the availability and application of the time management tools, was the product of years of research and focused on empowering parents and defaulting features for teens.  [Otaru; Hartnett; Hendrix; E. Davis; Birnholtz].

a)      Teen Accounts launched on Instagram in September of 2024.  *See* DX-12,087 at 1.  Teen Accounts were "designed to address parents' biggest concerns, including who their teens are talking to online, the content they're seeing and whether their time is being well spent." *Id.* at 4.

b)      The protections included time management features defaulted on and new tools for parents to manage teen time on Instagram including (i) "notifications telling [teens] to leave the app after 60 minutes each day;" (ii) sleep mode which turns "on between 10 PM and 7 AM, which will mute notifications overnight and send auto-replies to DMs;" (iii) allowing parents to "decide how much time their teen can spend on Instagram each day;" and (iv) enabling parents to "block their teens from using Instagram at night, or specific time periods." *Id.* at 5, 8.

c)      Many of the features included in Teen Accounts were an evolution of the time management tools previously researched and launched by teams at Meta.

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

d)      To develop Teen Accounts, research was conducted with parents and teens to understand which features and settings would be preferable as defaults and the primary concerns parents had about teens on social media.

e)      Parents expressed an interest in having tools that would help teens manage time spent, manage late night usage, manage frequency of usage, and understand how they spend their time on the app.

f)      Based on this research, Meta launched Teen Accounts with a focus on better supporting parents and empowering parents to be involved in managing their teen's experience on Meta's services including ensuring "their time is being well spent." DX-12,087 at 5. The steps Meta took, which include research into user experiences and behavior, obtaining parental feedback, obtaining input from external organizations, and designing new features at scale, take time.

6.      Even as optional tools, teen users have adopted and used these time management tools, even when the adoption rate is low. Although adoption rates vary depending on the specific time management tool, the collective adoption rates show meaningful usage of the tool. [Otaru; Birnholtz; Hendrix].

a)      The adoption rates for these time management tools show that a meaningful number of teens use these tools. *See* DX-16,890.

b)      The adoption rates the States rely on align with the estimated prevalence of problematic use internal researchers calculated in 2018 and published externally in 2019.

c)      The States have pointed to adoption rates of 1.4% for Daily Limit and 4.4% for Take a Break. *See* DX-16,890 at -0930.

d)      In 2018, Meta's researchers estimated that 3.1% of users experienced problematic use. *See supra* Findings p. 64. This research focused on the "most extreme cases" of negative user experiences. *See id.*

88

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

e) More users had opted into using Take a Break than the estimated number of users with "extreme cases" of problematic use. Approximately half the estimated users with "extreme cases" of problematic use had chosen to use the Daily Limit tool.

7. Meta's time management tools are part of a suite of tools that have been refined and improved over time and designed to address various behaviors and aspects of problematic use. [Otaru; Hendrix; E. Davis; Birnholtz].

a) Problematic use is associated with various behaviors including excessive time spent, passive use, late night sessions, and frequent checking. *See* DX-12,818 at Slide 28; *see also* DX-11,067 at 10 (listing total time spent, number of sessions, nighttime spent, passive use, and others as "on-platform behaviors associated with low control").

b) Meta identified various "levers" to improve control over time spent based on "research on . . . well-being tools, self-regulation and behavior change, expert feedback, and audit of digital well-being features and jobs to be done." DX-11,067 at 7. These levers included awareness ("[p]roducts that give users feedback about their own behavior and information about their experiences on-platform"); attentiveness ("give information in context, tied to the current behavior – often adding friction or interruption to draw attention to what's happening at a specific moment in time"); and intentionality and choice ("enable behavior change or provide tools that make changing behavior easier"). *Id.*

c) Meta offers tools for each of these levers. To target the awareness lever, Meta's tools include Your Time on Facebook and Your Activity on Instagram. *See* DX-11,067 at 7. To target the attentiveness lever, Meta's tools include Take a Break and Reels Awareness Nudge. *See id.* To target the intentionality and choice lever, Meta's tools include Quiet Mode and personalized daily limit. *See id.*

89

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

d)    These tools also served additional purposes.  For example, Take a Break addressed long sessions and topic nudges addressed passive use.  *See* DX-12,818 at 6.  Long sessions and passive use are behaviors associated with problematic use.  *See* DX-11,067 at 7.

e)    Together, the tools were envisioned to "create a seamless chain of experiences" that "[p]ushes teen[s] off app," "[k]eeps teen[s] off app," and would allow teens to re-engage "during healthy hours."  DX-18,176 at 10.

f)    The suite of tools was further refined with Teen Accounts.  Many of the features included in Teen Accounts had previously existed on Meta's services but were further refined and streamlined to address parental concerns and involve parents further.  These tools address various behaviors in tandem to mitigate potential risks by prompting teens to take a break from the service and developing awareness about how they spend their time.

8.    Even tools with low adoption rates have high retention rates, which indicates that teen users have found these tools helpful in managing their time. [Otaru; Birnholtz; Hendrix].

a)    Daily Limit and Take a Break have high retention rates at 92.1% and 85.7% respectively.  *See* DX-16,890 at -0930.

b)    Teens that used Daily Limit were aware that they could change the limits.  34% of teens that adopted the tool opted for a daily limit of 30 minutes or fewer—shorter than the default limit.  *Id.*

c)    Teens tend to use the service in short intervals, with only 5.6% of teen sessions lasting longer than 10 minutes.  *Id*. at -0933.

d)    Time management tools launched by Meta tend to reduce teen time spent and teen engagement.  For example, the launch of Teen Accounts led to a reduction of 5% in time spent on Instagram. The Teen Accounts launch has been successful—approximately 97% of teens have chosen to keep the default settings.

90

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

**B.    Multiple Accounts Feature.**

1.    Multiple Accounts—where a user is given the option to have more than one account—is a standard feature on several social media platforms.

a)    Multiple accounts are available on Snap.

b)    Multiple accounts are available on TikTok.

c)    Multiple accounts are available on Twitter/X.  *See, e.g.*, DX-16,918 at -1656.

d)    Multiple Accounts are available on Pinterest.  *See* DX-18,188.

e)    Multiple Accounts are available on YouTube.  *See* DX-18,189 ("You can manage up to 100 channels from one Google Account").

2.    Multiple Accounts provide users with a forum for freer, more authentic expression. [Otaru; Hendrix; Kilstein].

a)    Instagram supports identity exploration and development through pseudonymity and multiple accounts, which facilitate self-expression, exploring interests, fostering professional connections, and entertainment. *See* DX-10,923; DX-16,915; DX-16,916.

b)    Meta's research found that many users enjoy having multiple accounts to connect with close friends and separately to explore different identities of themselves outside of those relationships.

c)    Secondary accounts—sometimes referred to as "Finstas"—can be an important place for teens to share different content and experiences with different circles of friends.  For instance, teens might have a close circle with whom they wish to share more private information and details, and a broader circle with whom they share less but nonetheless want to connect with through social media.

d)    Multiple Accounts allow users to feel freer to engage with the audience they believe is the most relevant.  *See* DX-16,922.

91

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

3.    Meta's safety and integrity tools attempt to address the use of multiple accounts for improper reasons.  [Otaru; Bickert; Hartnett; Blanaru].

a)    Meta's Community Standards indicate that an account will be disabled if it is used to "[c]reate or repurpose an account or entity to evade a previous removal, including those assessed to have common ownership and content as previously removed accounts or entities."  *See* DX-16,923.

b)    The Terms of Use on Instagram state that, to use Instagram, "We must not have previously disabled your account for violation of law or any of our policies."  *See* DX-16,527; DX-10,304.

c)    In April 2021, Meta announced updates to the Instagram blocking tool to give users the option to both block another user's account and preemptively block new accounts that person may create.  *See* DX-10,966.  In October 2022, Instagram again expanded the blocking tool to allow users to choose to block all other accounts the person may already have.  *See* DX-10,134.

4.    Meta has methods to detect and link multiple accounts to a single user.  [Otaru].

a)    Connections between accounts can be affirmatively established by the user by linking the accounts in Account Center.  *See* DX-18,179 at -2956.

b)    Meta has algorithmic models that predict the likelihood that accounts both within and across apps belong to the same user.  *See* DX-16,921.  Meta has strict restrictions related to the development and use of soft-matching data.  *See* DX-11,702; DX-11,024.

5.    Parents can supervise multiple accounts across platforms.  [Otaru].

a)    Meta knows that teens have multiple accounts they use for different purposes.  Meta allows a parent or guardian to supervise multiple accounts to ensure that if a teen has more than one account, their parent/guardian can support them across accounts.  *See* DX-16,919 at -1346.

b)    Parents or guardians who have accounts in the same Accounts Center and supervise multiple accounts across Instagram and Facebook can manage

92

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

those accounts in one place, using Family Center.  This gives parents convenient access to supervision controls across apps.  After setting up supervision, the parent can visit Accounts Center from any app and then add the accounts they want to supervise to the same Accounts Center.  *See* DX-16,926.

6.   Multiple Accounts are only allowed on Instagram, not Facebook.

a)   Facebook's "longstanding policy . . . states that your main Facebook profile must be in the name you go by in everyday life."  DX-18,190.

b)   In September 2023, Facebook created the "multiple personal profiles" feature that allowed users to "easily organize who you share with and what content you see for the various parts of your life" by creating up to four additional profiles.  *Id.*  Each user can host up to four additional profiles under one primary profile.  *Id.*

**C.   Enforcement of Meta's Age-Restriction Policy.**

1.   Meta does not allow users under the age of 13 ("U13") on its services.  [Mosseri; Otaru; Hartnett].

a)   To register for Facebook, users must agree to Facebook's Terms of Service.  Since at least 2009, Facebook's Terms of Service have prohibited users from accessing Facebook if they are under the age of 13.  *See* DX-11,079; DX-11,040; DX-11,076.

b)   Since at least 2009, Facebook has required individuals to provide their date of birth at account sign-up.  *See* DX-11,092; DX-11,791.

c)   To register for Instagram, users must agree to Instagram's Terms of Use.  Before 2013, Instagram's Terms of Use stated that "You must be 13 years or older to use this site."  *See* DX-17,580.  Since 2013, Instagram's Terms of Use have required users to commit that "in order to be part of the Instagram community" "You must be at least 13 years old."  *See* DX-10,304.

93

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

> d) Since December 2019, Instagram has required individuals to provide their date of birth at account sign-up. *See* DX-17,697; DX-11,791.
>
> e) Between January and May 2022, existing Instagram users were given the opportunity to voluntarily provide their age.
>
> f) In or around May 2022, Meta required existing Instagram users to provide their age if Meta did not already have one associated with their account. *See* DX-11,900; DX-11,068 at -2665.

2. Meta enforces its age-restriction policy. [Hartnett; Otaru].

> a) Since at least 2013, both Instagram and Facebook have permitted users and non-users to report accounts they believe or suspect are under age 13. *See* DX-11,089; DX-11,048 at -0096. Meta has also developed tools and processes to help identify and remove accounts that it detects as potentially belonging to individuals under the age of 13. *See* DX-11,047. These processes, which have evolved over time, comprise a multi-layered approach that aims to detect or flag users who are potentially under the age of 13, and then review those accounts and ultimately remove them unless they can be verified as users age 13 or older.
>
> b) Through this multi-layered approach, Meta identifies accounts that may potentially violate its age-restriction policy and places those accounts in an age checkpoint, disabling access unless and until the user verifies that they are at least 13 years old. *See* DX-17,699.
>
> c) For instance, between July 1, 2020 and September 30, 2022, Meta deleted or scheduled for deletion 1,113,333 accounts on Instagram as potentially violative of its age-restriction policy. *See* DX-11,049. And in one quarter in 2021 alone, Meta removed more than 2.6 million accounts on Facebook and 850,000 accounts on Instagram to enforce its age-restriction policy. *See* DX-17,698.

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

3.    As technology developed, Meta has continuously worked to improve enforcement of its age-restriction policy.  [Hartnett; Feamster; Wirth].

a)    Facebook's age gate always defaulted to the date of account registration on iOS.  From 2017 to 2020, Android and web interfaces defaulted to a birth date 25 years earlier to simplify registration for users new to the internet in developing countries, using devices with limited functionality.  Under any of these operating systems (iOS, Android or web interfaces), users were required to enter their actual date of birth rather than simply checking a box to indicate they were over 13.  *See* DX-17,529.

(1)    The iOS operating system always defaulted to an age of zero at registration.  iOS did not have the default age of 25 because iPhones were more common in developed markets and Meta knew that iPhones were modern enough to accommodate the scroll function.

(2)    During the time that Android devices had a default age for Facebook account creation, Facebook still allowed the user to freely enter any day, month, and year of birth.  *See* DX-11,080.

(3)    If a user entered a date of birth under 13, Facebook blocked the user from creating an account.  *See* DX-11,791.

b)    When Meta decided to standardize age collection across all services in 2020 and implement a default age of 0 for all operating systems, Meta projected a loss of 14 million monthly active persons on Facebook from "mostly developing countries."  DX-17,512.

c)    Meta's age gate currently defaults to today's date.

4.    Although Meta has employed various mechanisms to identify accounts in violation of its age policies, there remains a possibility that children under the age of 13 will misrepresent their age and improperly gain access to Meta's services.  *See* DX-11,047; [Hartnett; Feamster; Wirth].

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

a)    Despite Meta's efforts over the years, there is no single solution to ensuring that individuals do not circumvent Meta's policies or lie about their ages, and Meta has been transparent with the public that underage users can and often do get around Meta's processes by misrepresenting their age. *See* DX-17,699; DX-10,030; DX-17,702.

b)    It is possible that users may become aware of Meta's tools and efforts aimed at identifying the age of users and may try to alter their behavior to evade those processes. This reflects the nature of adversarial security, where individuals seek to evade Meta's policies and systems, including Meta's age-restriction policy.

c)    The challenge of detecting and identifying U13 users is not specific to Meta—it is an industry-wide challenge, and there is no perfect system for age verification. *See also* DX-11,876. Meta's approach to U13 detection and enforcement has been consistent with the industry standard. *See also* DX-11,875.

d)    The understanding of the social media industry, based on guidance published by the Federal Trade Commission ("FTC"), is that general audience platforms are permitted to rely on users' stated ages collected through a neutral age gate, which Meta employs. *See* DX-17,703 at -0240 ("[COPPA] does not require operators to ask the age of visitors. However, an operator of a general audience site or service that chooses to screen its users for age in a neutral fashion may rely on the age information its users enter, even if that age information is not accurate."). As reflected in this industry guidance, social media services cannot prevent "children from lying about their age to register for general audience sites or online services whose terms of service prohibit their participation." *Id.* at -0239–40.

5.    The prevailing understanding among social media companies is that these companies are not required to undertake affirmative steps to ensure that users are

96

complying with age-restriction policies. Age verification is not, and has never been, required as a matter of industry practice. *See* DX-11,875; [Wirth; Feamster; Hartnett].

6.    Meta has invested significant resources in technology to estimate users' ages as a means for enforcing its age-restriction policy. [Feamster; Hartnett; Wirth].

a)    Prior to 2018, age modeling efforts were decentralized and developed independently by individual product teams across Meta. *See* DX-11,706.

b)    Early age-related machine-learning models were built for analytics purposes rather than enforcement measures, because they had lower thresholds for accuracy. *See* DX-11,875.

c)    In 2018, management of all age modeling efforts was consolidated under the Central Product Platform ("CPP"). *See* DX-11,706. The CPP team worked to standardize and improve its age classifiers around the over/under 18-year-old threshold, the most significant categorization for Meta's business purposes as a service for users 13 and older. Meta continued to standardize and refine these over/under 18 classifiers into 2021. *See* DX-11,706.

d)    By 2021, the CCP team had sufficiently advanced the over/under 18 classifier to begin exploring the development of a classifier for users under the age of 13. *Id.* at 27–28.

e)    The team worked on U13 classifier research and development through mid-2021. *Id.*

f)    To build and deploy an age classifier, the model needed to be trained on user data. Without training data, the model's performance and precision could not be measured. If performance could not be measured, the model would be ineffective. *Id.*

97

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

g)    Because Facebook and Instagram are services for users aged 13 and over, Meta does not maintain U13 data. Suspected U13 accounts are removed, and the associated account data is deleted. *Id.* at 4–6.

h)    As such, the team working on the U13 classifier ultimately decided that regulatory constraints on Meta's ability to retain data meant that development of a U13 classifier was not possible. *Id.* at 28; *see also* DX-11,876.

i)    As part of its effort to be industry-leading in age verification, Meta was an early adopter of face-based age prediction, initiating testing in 2022. *See* DX-11,876.

j)    Meta implemented an age verification measure on Instagram in 2022 and expanded it to Facebook in 2024, requiring users who change their reported age from over 18 to under 18 to verify their age through ID or video-selfie verification. *See* DX-11,709.

k)    In October 2024, Meta launched the U13 heuristic, a rules-based model—not reliant on user data—designed to detect age-related signals for suspected U13 accounts. *See* DX-11,681.

l)    Meta has a multi-faceted system for proactive detection of users who violate its age policy, and for enforcement of its age-restriction policy. Machine learning systems scan user content and behavior, age collection has been extended to existing users, and cross-platform enforcement acts on linked accounts. *See* DX-11,875.

7.    Meta's systems for enforcing its age-restriction policy also need to take account of the risks of false positives that would unfairly disable legitimate accounts. [Feamster; Wirth; Hartnett; Clegg].

a)    The U13 reporting form was designed with a degree of friction to discourage abusive reporting, and is intended to balance accessibility for good-faith reporters with protections against misuse. *See* DX-11,875.

98

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

b) The U13 reporting flow was subject to substantial abuse, particularly involving reports targeting public and celebrity accounts. *See* DX-11,901. Accounts like Logitech were reported for being under 13 over 250 times over a 30-day period, and the Israeli Defense Force has received more than one million reports total. *See* DX-11,088.

c) Meta was aware that its efforts for enforcing its age-restriction policy had to account for the possibility of incorrectly identifying users 13 and older as being underage. An incorrect determination in one direction could allow an underage user to remain on the services; while an incorrect determination in the other direction could improperly block a user who satisfied the services' age requirements.

d) For this reason, Meta used enforcement thresholds designed to balance the competing risks of failing to identify underage users and incorrectly flagging age-eligible users. Those thresholds evolved over time based on operational experience and ongoing efforts to improve system performance. *See also* DX-11,875.

e) More recently, Meta has been able to develop large language models that out-perform human reviewers in assessing whether accounts may be controlled by users predicted to be under age 13. As a result of those improvements, Meta has been able to make additional improvements for its user reporting flows. For example, Meta has made its simplified user reporting flow available to all Instagram users in the United States. And Meta updated its web-based reporting form for both Facebook and Instagram, now requiring users only to submit a username or profile URL to report an account as potentially under 13.

8. Meta also had to respect privacy concerns and regulatory constraints associated with more aggressive age verification measures. [Feamster; Hartnett].

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

a) Meta's approach to age assurance evolved over time as it sought to balance age-related safety objectives with user privacy considerations.

b) In 2019, Instagram began requiring new users to provide their date of birth at account registration. Historically, Instagram did not require users to provide this information because the service was designed to be identity-free. In 2022, Instagram expanded the requirement to existing users, thereby obtaining users' self-reported ages across the service.

c) Imposing age verification requirements beyond the collection of a date of birth at registration would invade individuals' privacy at a massive scale. It would necessitate the collection and storage of sensitive personal information from billions of users, creating significant privacy and data-security risks that must be balanced against the potential benefits of stricter age verification. *See* DX-11,875.

d) Implementing biometric age verification at Meta's scale would require the ongoing collection and processing of sensitive data from millions of users, increasing privacy and data-security risks notwithstanding existing protections and data-retention limits.

e) Certain biometric privacy laws could impose obligations based on the collection of biometric data itself, potentially creating compliance requirements even for transient or short-term collection and processing. Further, models for detecting U13 users are constrained due to legal restrictions on the use and retention of U13 data.

f) COPPA restrictions governing U13 user data limit the information available to develop, test, and improve machine-learning models designed to identify U13s. Similar constraints are faced by other platforms that age-gate U13s.

g) Developing machine-learning tools to identify U13s would require large-scale biometric data collection, raising privacy concerns and creating potential compliance risks under applicable privacy laws. These constraints

100

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

reflect an industry-wide challenge for platforms seeking to enforce minimum-age requirements without collecting or retaining children's data.

h)     Privacy and data-security risks associated with large-scale age-verification systems are not merely theoretical, they are real.  For example, in 2025, Discord disclosed a data breach involving government ID photos maintained by a vendor used in connection with age-related appeals, illustrating the potential risks associated with collecting and storing sensitive verification data.

i)     Requirements for real-identity or universal identity verification can reduce the ability of users to participate anonymously or pseudonymously online. Such requirements may have particular implications for individuals who rely on anonymity for safety, privacy, or personal security, including vulnerable populations seeking social connection, support, or participation in online communities.

9.     Since at least 2020, Meta has advocated for app-store-based age verification as a means of addressing U13s' access to age-gated services.  [Mosseri; A. Davis; Clegg].

a)     Meta has stated publicly that it supports "federal legislation that requires app stores to get parents' approval whenever their teens under 16 download apps.  This way parents can oversee and approve their teens' online activity in one place and can help to ensure their teens are not accessing adult content or apps, or apps they just don't want their teens to use." *See* DX-10,689; DX-10,030 at -2796.

b)     Meta executives have advocated for age-verification measures at the device or app-store level, reasoning that age assurance at the operating-system level could provide age-appropriate experiences across the full range of applications used on a device.  *See* DX-11,586.

IV.     **The States' COPPA Claims**

101

**A.     Meta Is The "Operator" Of Facebook and Instagram.**

1.     Meta is and always has been the "operator" of Facebook.  [Mosseri].

a)     Facebook was founded in 2004.

b)     On October 28, 2021, Facebook changed its corporate name to Meta Platforms, Inc. ("Meta").

2.     Meta has been the "operator" of Instagram since August 2012.  [Mosseri].

a)     Facebook, which is Meta's predecessor entity, acquired Instagram in August 2012.

b)     On June 5, 2026, the Parties stipulated that Meta Platforms, Inc. is the "operator" of Instagram within the meaning of the COPPA Rule.  *See* ECF No. 439 (3108).

3.     Accordingly, Meta is the only corporate entity whose conduct is at issue with respect to all States' COPPA claims.

**B.     Meta Does Not Have "Actual Knowledge" of Specific U13 Users.**

1.     Meta's Terms of Service and Terms of Use prohibit individuals under the age of 13 from accessing its services.  *See supra* Findings pp. 92–93.

2.     Meta requires users on Instagram and Facebook to enter their date of birth at account creation.  *See supra* Findings p. 93.

3.     Meta has always prevented account creation when a new user enters a birth date indicating they are under 13.  *See* DX-11,068 at -2662; DX-11,076; DX-10,304; [Feamster; A. Davis; Hartnett].

a)     When a user enters a birth date indicating they are under 13, Meta lets the user enter their date of birth one more time—without suggesting a qualifying date of birth—because user experience research has shown that people can make errors in the date of birth field during registration.

b)     If the user fails the age gate a second time, they are locked out of the registration process for a period of time.  *See* DX-11,068 at -2662.

102

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

4.     Meta enforces its age-restriction policy by investigating and removing users it has reason to believe may be under the age of 13 following review.  *See supra* Findings pp. 93–94.

5.     Meta deploys a multi-layered process that meets or exceeds industry standards for identifying and removing suspected U13s.  [Hartnett; Feamster; Wirth].

a)     Since at least 2013, both Instagram and Facebook have permitted users and non-users to report accounts they believe or suspect are under age 13.  *See* DX-11,089.

b)     An account reported as potentially belonging to an individual under the age of 13 will go through automations that, based on account signals, may permit the account to remain on the service without further review.

c)     The automations are designed to look for signals that indicate that the account is an adult or that the user has already demonstrated that they are over the age of 13.  *See* DX-10,630.

d)     If account signals do not indicate a reported account is over 13 through the automations, those accounts are directed to human reviewers for further evaluation.

e)     Human reviewers are trained to manually review accounts for sufficient signals that the account owner may be under 13, such as explicit admissions of age in the account bio and account photos.  *See* DX-10,630.  Reviewers follow a standardized "decision tree" when conducting their review.  *Id.*

f)     If the human reviewer believes the account may be under 13, the account is placed in the age checkpoint.

g)     When the reviewer is uncertain about whether the account owner may be under 13, they are trained to err on the side of caution and checkpoint the account.

h)     When a user changes their date of birth to an age under 13, the account is automatically placed in an age checkpoint that prevents the user from

103

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

accessing the account unless they verify that they are 13 years or older during the appeal process.

i) When a user's account is checkpointed, it is suspended, disabled, and ultimately deleted if the account owner does not successfully appeal the checkpoint within 30 days by providing documentation that they are 13 years old or older. *See* DX-10,168.

j) Accounts that are checkpointed are not accessible to the user or visible to other users on the service. No new data is collected from the account once it is checkpointed, except in connection with user appeals (as discussed below).

k) Users are provided with a right to appeal because Meta does not know with certainty whether a reported and/or checkpointed user is in fact under the age of 13. To make a successful appeal, the user must provide documentation that they are at least 13 years old within 30 days.

l) A substantial share (in the range of 20%) of checkpointed accounts are successfully appealed, meaning that the user provided sufficient documentation to establish an age 13 or older.

m) There are various reasons that users may not appeal checkpointed accounts, even if they are 13 or older, including, but not limited to, because the user is unaware that the account is checkpointed, no longer wishes to maintain the account, or does not wish to provide Meta with the necessary information to appeal the checkpoint.

n) If the user fails to provide documentation within 30 days to establish that his or her age is 13 or older, then the appeal is considered failed and the account and associated data are scheduled for deletion. *See* DX-10,630; DX-10,168.

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

6. The States submitted evidence of a temporary backlog in Meta's under 13 review queues in 2021. That evidence does not support a finding that Meta had actual knowledge of any underage users, for several reasons. [Hartnett].

a) The backlog developed due to a lack of human reviewer capacity in the early stages of the COVID-19 Pandemic. At the time, Meta did not use any automations in its under 13 review queues.

b) After the backlog developed, Meta created a task force to address the issue and prevent a similar backlog from developing in the future. While it took several months, Meta ultimately cleared the backlog by summer 2021.

c) Since early 2021, Meta has maintained a maximum 48-hour review time for the vast majority of under 13 user reports.

d) As with all reports of underage users, the fact that a user has been reported as under 13 does not mean that they actually are under 13. Reflecting the point, Meta automatically closes many reports by deploying automations to identify false reports.

7. Meta uses hard-linking to identify related accounts that may be disabled if the originally checkpointed account is not successfully appealed. Soft-matching, by contrast, is used only in limited circumstances unrelated to underage account reporting. [Hartnett].

a) Accounts are "hard-linked" when a user manually connects two accounts through Meta's Accounts Center.

(1) It is not guaranteed that hard-linked accounts belong to the same individual. For example, a parent might hard-link their own account to their child's account as a form of supervision—in that case, the two hard-linked accounts are operated by different users.

(2) Notwithstanding this uncertainty, Meta will disable any account that is hard-linked to a checkpointed account.

105

(3)    If a user successfully appeals the age checkpoint, any hard-linked accounts will be reinstated.

b)    Meta also infers that two accounts may belong to the same user through the use of signals such as shared IP addresses and certain behavioral patterns ("soft-matching").

(1)    Because soft-matching is inherently probabilistic and can be inaccurate at the individual-account level, Meta does not use it for underage enforcement.  Meta may use soft-matching in certain contexts, such as identifying recidivism, for example where a user repeatedly violated policies related to terrorism or child safety.  The basis for such enforcement is the risk of such actors attempting to evade enforcement, not a determination that the linked account is engaged in the underlying violation.

c)    The fact that accounts are hard-linked or soft-matched does not necessarily mean that the accounts belong to the same user, and does not mean that Meta knows for certain that any of the hard-linked or soft-matched accounts are operated by the same user.

8.    Over time, and as technology has evolved Meta has enhanced its *reactive* ability to identify and remove potential U13 users on Facebook and Instagram.  [Hartnett].

a)    Since at least 2013, Meta has maintained an online reporting form that allows users and non-users, such as parents or teachers, to report accounts potentially owned by individuals under 13.  *See* DX-11,048.

b)    In 2021, Meta implemented a process under which users who changed their dates of birth to under 13 after initially registering with an age over 13 were automatically checkpointed.  *See* DX-11,068 at -2665.

c)    Meta started using Yoti in 2022, which is a third-party service that uses face-based age prediction to determine a user's age.  *See* DX-11,047 at -0015.

106

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

(1)    Meta uses Yoti when users change their ages from under 18 to 18 or over, and when users Meta predicts to be under 18 attempt to access services that are limited to 18+ users (such as Facebook Marketplace and Facebook Dating).  Yoti is not used to predict whether a user is under or over the age of 13.

(2)    Yoti is not fully accurate.  In real-world applications, Yoti's face-based age prediction can have a significant margin of error.

(3)    If in the process of evaluating a user's age Yoti's service predicts that a user might be under 13, Meta automatically checkpoints that account.

9.    Over time, and as technology has evolved, Meta has enhanced its *proactive* ability to identify and remove potential under 13 users on Facebook and Instagram. [Hartnett].

a)    Meta evaluates and deploys increasingly sophisticated techniques to try to identify potentially underage users on its services.

b)    Meta also adopts new technologies and adapts its systems in response to efforts by users who try to circumvent Meta's age-restriction policy and bad actors who seek to improperly trigger Meta's enforcement mechanisms.

c)    Earlier approaches relied primarily on user reporting and human review, but Meta has incorporated automated and signal-based systems to improve detection at scale.

d)    Unless a checkpointed account is successfully appealed, the account is scheduled for deletion; data associated with the account is either anonymized or deleted.

e)    As such, the critical challenge Meta faced, and continues to face, in building proactive detection methods was the lack of a dataset of users under 13 to develop and train a model for proactive removal.

107

f) Meta has a rules-based model known as the U13 heuristic—not reliant on user data—that looks at signals on accounts to detect if the account might belong to a user under 13.

g) Meta's U13 heuristic took a considerable amount of time to develop. Meta worked on proactive detection via model or heuristic-based methods for several years. *See supra* Findings p. 97.

h) Beginning in October 2024, Meta deployed the U13 heuristic to proactively detect accounts for humans to review. *See* DX-10,179.

i) The heuristic looks for signals of age in a user's bio, captions, posts, and comments made by other users that reference the user to flag accounts for review. If the reviewer believes the user may be under 13, or is uncertain whether the user is under 13, the account is placed in a checkpoint.

j) The heuristic does not require data collected from a U13 for training purposes.

10. Meta's age assurance processes are signal-based and predictive; they do not establish with certainty actual knowledge of a user's age. [Hartnett].

a) When an account is reported and/or checkpointed, Meta does not know with certainty whether the user is actually under the age of 13. *See infra* Findings pp. 108–09.

b) Accounts are placed in the age checkpoint when a human reviewer identifies the account may be under 13.

c) Reviewers are instructed to err on the side of caution and checkpoint accounts the reviewer is uncertain about. As a result, there is uncertainty in the checkpoint.

d) When Meta checkpoints an account it does not know that the user is under 13, as illustrated by the fact of many successful checkpoint appeals, by the large number of false or malicious reports that cause accounts to be checkpointed, and by the fact that adults engaged in fraudulent or scam

108

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

behavior often report their accounts as under 13 in order to delete the data from their accounts. *See infra* Findings p. 109.

e) There is only a certain percentage of checkpointed accounts that end up being disabled, and even when they are disabled, Meta does not know whether those accounts in fact belonged to users under 13. The only information Meta has is that the user either appealed the checkpoint unsuccessfully or did not attempt to appeal. Even those users who attempt an appeal are not confirmed as under 13; for example, appeals can be rejected simply because the ID provided is not legible.

f) It is difficult to achieve high-reliability technology signals for users under 13 because training a classifier requires a vast quantity of data, which Meta does not have access to given privacy constraints. *See supra* Findings pp. 96–97.

g) Accordingly, Meta's systems for enforcing its age-restriction policy do not provide definitive or verified information regarding whether a particular user is actually under 13.

11. A large share of accounts that are reported and/or checkpointed are not under 13. [Hartnett; Feamster].

a) Meta has found that the underage reporting process is subject to abuse.

b) A very high percentage of U13 reports Meta receives are ultimately determined to be false. This is in part because bad actors use the underage reporting system to harass users or otherwise abuse the reporting flow. *See* DX-13,044.

(1) Adult predators can change the date of birth on an account to U13 so that the data from the account will be deleted.

(2) Accounts like Logitech were reported for being under 13 over 250 times over a 30-day period. *See* DX-11,088.

109

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

(3)    The Israeli Defense Force's account had received more than one million reports for being under 13. *Id.*

(4)    High-profile public figures are regularly reported for being under 13. *Id.*

c)    Internal documents show bad actors hack into benign accounts and change the user's date of birth to facilitate schemes to extort payments for account recovery or for other malicious purposes. *See* DX-11,077.

d)    Approximately 70% of accounts that changed their reported age to under 13 were linked to suspected fraudulent activity. *See* DX-11,792.

e)    The fact that many users successfully appeal the checkpoint demonstrates that a checkpoint does not necessarily indicate that an account is operated by a user under 13.

f)    According to the States' expert, from February 1, 2016 to April 1, 2024, 19.4% of users checkpointed for changing their DOB to an age under 13 were "cleared." [Sheatsley].

g)    Overall, between 2016 and 2024, hundreds of thousands of accounts successfully appealed the age checkpoint. The volume of successful appeals demonstrates that enforcement decisions are inherently uncertain and do result in thousands of false positives.

h)    Even removal does not prove a user was under 13—users may fail to respond to checkpoints for reasons unrelated to their actual age or may provide documentation that does not match their account information for reasons other than being underage.

12.    Users who enter an age below 13 at account registration are blocked from creating an account, and Meta does not collect or retain data from those individuals.  Meta therefore collects personal information only from users who indicate they are 13 or older during account registration.  [Hartnett].

110

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

a) Meta collects and uses information based on the information that users have provided via a neutral age gate.

b) Once a suspected U13 account is checkpointed, Meta stops collecting data from that account.

c) During the 30-day appeal process for a checkpointed account, Meta retains (but does not use) the user's data—in the event the account is reinstated following a successful appeal.

d) If a checkpointed account is not successfully appealed, the data associated with that account is marked for deletion and is excluded from business use.

13. Once an account is scheduled for deletion, Meta proceeds to delete the data associated with that account. [Hartnett; Backstrom].

a) When an account is scheduled for deletion, Meta begins the process of deleting the data associated with that account immediately. However, it can take up to 90 days to fully remove the data from across Meta's systems.

b) Meta's data distribution system is complex and spans across multiple services and data centers; completing deletion across those systems requires technical coordination and time.

c) In addition, data must sometimes be retained to comply with legal obligations, including litigation holds, regulatory investigations, and law enforcement requests.

d) The time period required to complete data deletion is in line with industry standards and is reasonable in light of the technical and operational requirements associated with this process.

e) In the past, there have been periods of time when the period for deletion was longer.

f) Over time, Meta has reduced the time required to delete account data when a checkpointed account is not successfully appealed.

C.   **Meta's Services Are Not Directed to Children.**

111

1. Meta's platforms are for a general audience. [Venkataraman; Hartnett].

    a) The FTC has recognized Facebook as a general audience site. *See* Children's Online Privacy Protection Rule, 78 Fed. Reg. 3972, 3982 n.126 (Jan. 17, 2013) (noting COPPA Rule amendment would not apply to activity "on general audience sites such as Facebook"). The same reasoning applies to Instagram.

    b) Instagram and Facebook's audience composition, intended audience, advertising revenues, as well as platform content, subject matter, and other features show that Meta's platforms were not aimed for children under 13.

    c) Viewed across the platforms, the topics and subjects on Meta's platforms span a wide range of elements that appeal to diverse ages and demographics.

        (1) The most popular hashtags—such as photography, art, travel and fitness reflect interests that resonate with broader demographics.

        (2) Across topics like humor, games, music, and animals, the impressions for teens and adults differ by only two to three percentage points.

        (3) The use of animated images and characters targets diverse audience demographics and is not solely aimed at children under 13 by virtue of being animated. For example, there can be nostalgia value of such content for older demographics. It can also be targeted to parents of children.

        (4) Even content or features that may appear childlike, such as stickers, animations, emojis, games, or filters, have widespread appeal to teens and adults.

        (5) The fact that a post contains images of children or child celebrities does not establish that the post is aimed at children under 13. Such content may be used to target the parents of children, not children themselves.

112

2.    The audience composition of Facebook and Instagram is heavily skewed to over 18-year-olds, which strongly suggests that the platforms are not directed to those under 13 years old.  [Mosseri; Venkataraman].

a)    From 2020 to 2024, users who stated that they were between 13 and 17 years old comprised approximately 2% of Facebook's total audience.

b)    Since 2021, users who stated they were between 13 and 17 years old have comprised approximately 5% to 7% of Instagram's total audience.

c)    Between 2020 and 2024, users predicted to be between 13 and 17 years old comprised approximately 4% of Facebook's total audience.

d)    In 2023, users predicted to be between 13 and 17 years old comprised less than 15% of Instagram's total audience.

3.    Users aged 13-17 have contributed minimally to revenue generated from targeted ads on the platform.  [Mosseri; Walton; Venkataraman].

a)    Revenue from ads targeted by advertisers to users aged 13-17 contributed to 0.09% of revenue on Facebook and 0.72% on Instagram when aggregated for the years 2012 to 2024.

b)    Total ad revenue from users aged 13-17 from 2018 to 2024 accounted for only 0.11% of Facebook's ad revenue and 0.96% of Instagram's ad revenue.

4.    Meta's business model is not based on attracting those under 13.  [Mosseri; Hartnett; A. Davis].

a)    Meta has prohibited U13 account creation since at least 2012 and removes accounts suspected of belonging to U13s.  *See supra* Findings pp. 93–94.

b)    Meta offers a separate service specifically for users under the age of 13 and has considered building other, parent-controlled experiences for users under 13.

(1)    Since 2017, Meta has offered Messenger Kids, a parent-managed app intended for U13s.

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

(2) Meta also considered developing and conducted research in connection with Instagram Youth/Kids. That effort was paused in 2021.

(3) Meta's consideration of these targeted U13 services reflected its view that Facebook and Instagram were not targeted to U13s, and that if it wanted to reach U13s it should develop a service focused on that age group.

c) Meta's research concerning U13s and potential new COPPA-compliant services was undertaken against the backdrop of those existing age restrictions, not as a replacement for them.

5. The third-party content identified by the States is not directed to children. [Hartnett; Venkataraman].

a) The third-party content on specific accounts identified by the States in their complaint as allegedly directed to children is, in fact, expressly targeted to parents, caregivers, educators, and nostalgic adults.

(1) Nickelodeon's 2022 "paid social approach" was intended to appeal to "parents, adult fans, and teens." *See* DX-11,666.

(2) Nickelodeon moved "KID-focused influencer work . . . entirely to YouTube MFK." *See id.*

(3) Disney Junior was targeted to "*Parents* of Kids 2-5." *See* DX-13,037; DX-17,519 (2020 email stating "our targeting is parents focused here so 18+ only"); DX-17,518 (2021 email stating "Core Audience: Parents") (emphasis added).

(4) Mickey Mouse Funhouse media plan included targeting parents who had interests tied to programming such as PBS Kids, Blue's Clues, Paw Patrol, and Masha and the Bear. DX-17,517 (The total list included "The Loud House, Peppa Pig, Team Umizoomi, Disney Junior, Blue's Clues, PBS Kids, DuckTales, Bubble Guppies,

114

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

Masha and the Bear, PAW Patrol or Boss Baby, Nick Jr., Parents with toddlers (01-02 years) or Parents with preschoolers (03-05 years)").

(5) American Girl was targeted to women ages 25-54. *See* DX-13,038 (Email re American Girl stating that "Our base audience is W25-54 – mainly looking to target millennial moms").

(6) Lego was targeted to "*parents* with kids aged 6-12." *See* DX-13,039 (Email re Lego stating "our audience of parents with kids aged 6-12") (emphasis added).

(7) Hasbro's Peppa Pig was targeted to "*[p]arents* of kids 2-5" and the "age targeting" was "25-44" in the US. *See* DX-17,524 (emphasis added).

(8) Hasbro's Play Doh was targeted to parents ages "25-44" in the US. *See* DX-17,523; *see also* DX-17,525 ("2024 Play Doh Audience Breakdown" was 25-44).

(9) Mattel's Barbie was targeted to "Moms of kids ages 2-8yo." *See* DX-17,513.

(10) Mattel brands targeted parents, in particular "moms" and "gifters." *See* DX-17,520.

(11) Bluey and Paw Patrol were targeted to parents. *See* DX-17,520.

(12) Hot Wheels were similarly targeted to "Monster Truck Parents," "City + Action Parents," "Track Builder Parents" and "Gift Givers." *See* DX-17,521.

(13) Monster High was targeted to "parents ages 20 – 45." *See* DX-17,522.

(14) Sesame Street was targeted to users aged "25 – 65+" and teens. *See* DX-17,521; *see also* DX-17,528 ("I think we should try to keep a

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

Gen Z and teen audience in mind and potentially lean into that nostalgia with the overall vibe of the script.").

(15) Dragon Ball Super was primarily aimed at "Anime Fans A25+" and secondarily "Light Anime Fans A13-24." *See* DX-17,526; DX-17,527 (Proposal stating that the aim of an ad campaign was "to reach a broad audience to drive general awareness for the movie.").

b) The accounts identified by the States represent only a small fraction of accounts on Facebook and Instagram; they are not representative of the services as a whole.

c) For the accounts identified by the States, users with predicted ages of 13-17 constitute only 11.44% of the follower share on Facebook and 8.17% on Instagram.

d) The overwhelming majority of impressions and advertising revenue associated with the plaintiff-identified accounts' are attributable to adults, not teens. For these accounts, users aged 13-17 accounted only for 0.67% of ad revenue on Facebook and 2.4% of ad revenue on Instagram. [Mosseri].

e) Companies, and the States themselves, post content on Meta's services with childhood icons and products traditionally associated with children to cultivate nostalgia and create appeal among adults.

f) Colorado testified that an Instagram post by the Colorado governor "with one of the Sesame Street characters" "is not directed at under 13 users." [Blake].

g) Ohio testified that a post by Ohio's department of education with "Munch the Fox," Ohio's child nutrition mascot, was directed toward the general public. [Doty].

116

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

h)    Idaho testified that a post made by an Idaho state entity with "Spuddy Buddy," an anthropomorphic potato and the state's mascot, was directed towards adults.  [Estes].

## D.    No "Portion" Of Meta's Services Is Directed to Children.

1.    There is no identifiable, specific portion of Meta's service intended to reach children, such as a subdomain website with content specifically for children.  [Mosseri; Hartnett].

2.    Marketing literature shows that a product is not targeted to a consumer group simply because it appeals to that group, and a product that appeals to multiple consumer groups cannot be solely for one group.  [Venkataraman].

## E.    Meta Collects Limited Information Prior To Neutral Age Screening Solely for Functionality and Security Purposes and Discloses Its Privacy Policy.

1.    Meta collects the IP address, device ID, cookie data, and clicks from logged-out visitors to its websites and the registration page.  [Hartnett].

2.    Visitors to its registration page are presented with an age gate that defaults to today's date.  [Hartnett].

3.    Meta's collection of logged-out data from visitors is used for limited purposes. Meta uses certain non-personal data to optimize its pages and ensure a usable registration experience; it also uses logged-out data for security and integrity purposes.  For example, the data may be used to identify malicious attacks on the registration pages.  [Hartnett].

4.    For off-platform advertising intended to encourage users to create a Facebook or Instagram account, Meta uses data from logged-in users to exclude existing account holders from ads targeting—it does not use its own logged-out data to affirmatively target individuals.  [Hartnett].

5.    Meta's privacy policy contains disclosures regarding information collected from visitors and the purposes for which that information is used.  These notices disclose

117

that Meta uses logged-out visitor data for purposes including safety and security, site integrity, and platform optimization. *See* DX-10,104; [Hartnett].

6.    The privacy notice explains: "We don't sell any of your information to anyone, and we never will. We also require partners and other third parties to follow rules about how they can and cannot use and disclose the information we provide." DX-10,104; [Hartnett].

## V.    The States' Proposed Remedies

### A.    The States Have Not Presented Evidence to Support a Determination of the Number of Violations Related to the Alleged Misrepresentations or Unfair Practices.

1.    The States have offered no evidence establishing how many teen or U13 users were aware of or exposed to any of Meta's alleged misrepresentations. [Alter; Saba].

   a)    None of the States' retained experts demonstrated how many teen or U13 users were aware of or exposed to the alleged misrepresentations.

   b)    None of the data produced in the case demonstrates how many teen or U13 users were aware of or exposed to the alleged misrepresentations.

2.    The States have offered no evidence establishing how many teen or U13 users found the alleged misrepresentations material. [Alter; Saba].

   a)    None of the States' retained experts demonstrated how many teen or U13 users found the alleged misrepresentations material.

   b)    None of the data produced in this case demonstrates how many of the alleged misrepresentations were material to teen or U13 users.

3.    The States have offered no evidence establishing how many teen or U13 users relied on the alleged misrepresentations. [Alter; Saba].

   a)    None of the States' retained experts demonstrated how many teen or U13 users relied on the alleged misrepresentations.

   b)    None of the data produced in this case demonstrates how many teen or U13 users relied on the alleged misrepresentations.

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

4. The States have not established whether or how many teen or U13 users were actually misled by any of the alleged misrepresentations.  [Alter; Saba].

    a) None of the States' retained experts demonstrated how many teen or U13 users were actually misled by any of the alleged misrepresentations.

    b) None of the data produced in this case demonstrates how many teen or U13 users were actually misled by any of the alleged misrepresentations.

5. The States have offered no evidence establishing how many teen or U13 users were impacted or harmed by any of the alleged misrepresentations, or to what extent. [Alter; Saba].

    a) None of the States' retained experts demonstrated how many teen or U13 users were harmed by any of the alleged misrepresentations.

    b) None of the data produced in this case demonstrates how many teen or U13 users were harmed by any of the alleged misrepresentations.

6. The States have offered no evidence establishing how many teen or U13 users were impacted or harmed by any of the features alleged to be unfair practices, or to what extent.  [Saba].

    a) None of the States' retained experts demonstrated how many teen or U13 users were harmed by the challenged features.

    b) None of the data produced in this case demonstrates how many teen or U13 users were harmed by the challenged features.

7. The States have offered no evidence establishing that any of the alleged misrepresentations or challenged features are connected in any way to any specific time-spent thresholds, including the proposed thresholds of 0.5, 1, and 2 hours contained in the States' pre-trial penalty charts.  [Saba].

    a) The States' experts have presented no analysis or opinions that any of the alleged misrepresentations or challenged features caused or contributed to any user crossing a specific time-spent threshold.

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

b)      The States' experts have offered analysis and opinions that time-spent on Instagram and Facebook is caused by features that are not at issue in this case, including algorithms that recommend third-party content, notifications, likes, and infinite scroll. *See supra* Findings pp. 82–83.

c)      The States' experts have conceded that time-spent thresholds of 0.5, 1, and 2 hours are not associated with negative outcomes for all users who exceed those thresholds. [Twenge].

**B.**      **The States' Proposed Penalty Estimates Double-Count Users.**

1.      The States propose three sets of penalty estimates to support their consumer protection claims: (i) counting each unique teen and U13 user on Meta's services as a single violation (*i.e.*, "user penalty estimates"), (ii) counting violations based on the monthly instances in which teen users averaged more than 0.5, 1, or 2 hours per day on Meta's services (*i.e.*, "time-spent penalty estimates"), and (iii) counting alleged COPPA violations. *See* ECF No. 465.1 (3250.1), Exs. A–C.

2.      The States' user and time-spent penalty estimates count the same teen and U13 users more than once in tallying violations.

a)      The States count each teen and U13 user on Meta's services as one violation, then count many of those same users again for each month they exceeded a time-spent threshold. *See id.*, Exs. A–B.

3.      The States' user and time-spent penalty estimates treat users on Facebook and Instagram as separate violations, even if those users have accounts on both services.

a)      The States separately calculate the number of violations on Instagram and Facebook in their user and time-spent penalty estimates. *See id.*

b)      Many users of Instagram also have Facebook accounts, and vice-versa. These are not fully distinct or separate bases of users. [Hartnett; Alter].

4.      The States double-count users when calculating penalties for alleged COPPA violations.

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

a) The States count four categories of alleged COPPA violations: (i) "retaining children's data for unreasonably long periods," (ii) "failing to remove hard-linked accounts of children," (iii) "failing to remove soft-matched accounts of children," and (iv) "failing to remove children who changed their date of birth to under 13."  ECF No. 465.1 (3250.1), Ex. C.

b) Most of the data relied upon to generate these estimates measures *accounts* rather than unique *users*.  *See id.*

c) The category of "retaining children's data for unreasonably long periods" includes the same users that are also captured in the categories for hard-matched and soft-linked accounts, or users "who changed their date of birth" to under 13.

d) The hard-link and soft-match categories capture additional accounts that belong to the same potential U13 users whose accounts Meta already disabled for being potentially underage.

e) Accordingly, a single user might be counted once for the disabled account, again for the retained data, again for a hard-linked account, and again for a soft-matched account.  [Feamster; Sheatsley].

**C.    The States' Proposed Disgorgement Estimates Are Unreliable.**

1. To support their request for disgorgement, the States attempt to calculate Meta's profits from teen users and both profits and revenues from U13 users.  *See* ECF No. 465.1 (3250.1), Exs. D–F.

2. The States estimate that Meta generated billions of dollars in profits and revenues from teen and U13 users.  *See id.*

3. Meta's actual revenue from teen and U13 users is a fraction of its overall revenue. [Alter; Venkataraman; Saba].

a) Advertising revenues attributable to the accounts of teen users accounts for less than 1% of Meta's total advertising revenue.

121

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

(1)    Users aged 13–17 (based on stated age) accounted for 0.11% of Facebook's total advertising revenue between 2018 and 2024.

(2)    Users aged 13–17 (based on stated age) accounted for 0.96% of Instagram's total advertising revenue between 2018 and 2024.

b)    The teen share of Meta's total advertising revenue across both platforms declined to nearly 0% as of 2024.

c)    Advertisers cannot target advertisements to U13 users on Meta's services.

d)    The States' expert reported that approximately 20% of accounts attributed to 13–17-year-old Instagram users were in fact under 13 years old.

e)    Accordingly, even putting aside the limitations of that 20% estimate, it implies that the maximum share of advertising revenue attributable to U13 users is a small fraction of 1%.

4.    The States' method for calculating profits from teen users does not account for Meta's substantial losses on those same users.  If the States accounted for those losses, their estimates of Meta's estimated gross profits from teen users would be substantially lower.  [Saba; McCrary].

a)    The States' expert, Carl Saba, concedes that Meta does not profit from teen users during their teen years.

b)    To avoid that outcome, the States attempt to calculate Meta's gross profits from teen users *after* those users turn 18 years old.

c)    None of the States' retained experts demonstrated that the specific adult accounts included in their disgorgement estimates are the same accounts used on Facebook and Instagram by teenagers, let alone that they were aware of or impacted by any of the alleged misrepresentations or challenged practices in the case.

d)    Even putting aside that threshold issue, the States do not subtract Meta's losses during the time when those users were teens from the revenues Meta purportedly earned from adult accounts.

122

e)     If the States accounted for Meta's losses while those teen users were teens, Meta's estimated gross profits from those users—based on that adjustment alone—would have been substantially lower.

5.     The States' method for estimating profits from teen users relies on stated age data rather than predicted age data to identify 17-year-olds, which overinflates the States' estimate of Meta's profits from teen users.  [McCrary].

a)     The States relied on the proportion of Instagram users who said they were 17 years old between October and December 2021 to estimate the number of 17-year-old users in earlier years.

b)     The States could have instead relied on the proportion of users that Meta predicted are 17 years old based on its age modeling to estimate the number of 17-year-old users in prior years.

c)     Had the States relied on predicted age data rather than stated age data, their estimate of Meta's profits from teen users would have been 8.4% lower.

6.     The States' method for estimating U13 profits and revenues assumes that U13 users generate the same profits and revenues as the average user of Facebook or Instagram rather than the teen users they are more closely aligned with, thereby substantially overstating Meta's alleged profits and revenues from U13 users. [McCrary; Saba; Venkatraman].

a)     Teen users are the appropriate group to compare to U13 users in terms of Meta's profits and revenues.

(1)     The States admit that teens "are close in age to U13s."  *See* ECF No. 465.1 (3250.1) at 21.

(2)     Facebook and Instagram have built-in time and engagement limits for teen users as part of Teen Accounts.  *See supra* Findings pp. 86–87.

123

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

(3)     Meta imposes restrictions on advertising to teen users, including prohibitions on the types of ads that teen users can see and limitations on advertisers' abilities to target teen users.

(4)     Teen users are less likely than adult users to click on advertisements on Instagram and Facebook.

b)     Teen users account for less than 1% of Meta's total advertising revenue. *See supra* Findings p. 121.

c)     The States' expert concedes that Meta does not profit from teen users during their teen years. *See supra* Findings p. 121.

d)     Accordingly, if the States assumed that U13 users generate the same profits and revenues as teen users—as opposed to the average user including all adults—their estimate of Meta's profits and revenues from U13 users would be substantially lower.

**D.     The States' Estimates of U13 Users Are Unreliable.**

1.     Many of the States' proposed penalty and disgorgement figures rely on estimates of the number of U13 users who lied about their age and violated Meta's age-restriction policy to use Instagram or Facebook. *See* ECF No. 465.1 (3250.1), Exs. A, E, F.

2.     The States rely entirely on their expert, Mr. Saba, to estimate the number of U13 users on Instagram and Facebook.

3.     Mr. Saba used third-party survey data from Thorn to generate estimates of the number of U13 users on Instagram and Facebook.

4.     Mr. Saba's estimates of U13 users on Meta's services are unreliable and unsupported. [Isaacson].

a)     The Thorn surveys that Mr. Saba relied on lacked basic control measures, creating a risk that survey biases inflated estimates of U13 users.

b)     Mr. Saba also did not have sufficient information to understand the wording, structure, or sequencing of the underlying questions in the Thorn

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

Case 4:22-md-03047-YGR     Document 3321     Filed 07/31/26     Page 129 of 262

survey. Without that information, the survey results cannot be reliably interpreted.

    c)    Even though the Thorn survey only reported results from 2019 to 2023, Mr. Saba unreliably extrapolated Thorn survey results to estimate the U13 users from 2012 to 2018, thereby vastly overstating the number of U13 users on Instagram and Facebook.

**E.    The States' Proposed Injunctive Relief Is Unnecessary, Barred by Section 230, And Infeasible.**

1.    The States seek an injunction requiring Meta to delete U13 user data and any models trained on it, remove known U13 accounts, cease retaining or using U13 user data in violation of COPPA, and refrain from collecting personal information from users who have not passed a neutral age gate or been reasonably verified as 13 or older. *See* ECF No. 257 (2724) at 1–2.

2.    The States seek also injunctive relief requiring Meta to refrain from making false statements about its services regarding safety, addictiveness, prioritization of user well-being, or the presence of U13 users; remove certain features for users under 18, including infinite scroll, autoplay, likes, ephemeral content, beauty filters, and engagement-optimized algorithms; implement time restrictions for users under 18; enhance Teen Account safeguards and parental controls; block the use of multiple accounts by users under 18; implement age-verification and account-monitoring measures; prevent and remove U13 users; fund independent audits of its age-assurance systems; and provide usage data for research purposes. *See id.* at 2–3.

3.    Meta has already implemented many of the measures the States seek to impose through injunctive relief.

    a)    Meta's policies prohibit U13s from joining its services, and Meta works to remove them when discovered. *See supra* Findings pp. 93–94.

125

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

b) Meta already has a robust age-assurance process to prevent U13s from using its services, including age-gating at the time of account creation and extensive systems to identify potential violations of its age-restriction policy. *See supra* Findings pp. 93–94, 96–98.

c) Meta employs a rigorous, multi-layered approach to detect and remove U13 users from its services—combining automated detection, human review, and targeted age verification—all of which is consistent with industry practice. *See supra* Findings pp. 96–98, 102–104.

d) Meta already deletes personal information if an account is checkpointed for a potential violation of its age-restriction policy and the checkpoint is not successfully appealed. *See supra* Findings p. 104.

e) Meta does not collect personal information from users who have not passed a neutral age-gate. *See supra* Findings p. 110.

f) Users already have the option to see their feeds in chronological order rather than in an algorithmic format. [Birnholtz].

g) Facebook and Instagram have built-in time and engagement limits for teen users. *See supra* Findings pp. 86–87.

h) Teen Accounts give parents the ability to supervise their teens' usage of Instagram and Facebook, including to apply time limits and use other control features. [Otaru]; *see also supra* Findings pp. 86–87.

4. Requiring Meta to remove infinite scroll, autoplay, likes, ephemeral content, and engagement-optimized algorithms from its services would contravene Section 230 and this Court's ruling that these features are not at issue in this litigation. *See* MTD Order at 25–29.

5. Remaining provisions in the States' request for injunctive relief are unnecessary and infeasible.

a) Stricter age-verification requirements would invade users' privacy at massive scale, trigger compliance obligations under a variety of data

126

privacy laws, and create significant privacy and data-security risks by requiring the collection and storage of sensitive personal information from billions of users. *See supra* Findings pp. 99–100.

b)    Precluding the multiple accounts feature for teen users would only encourage age-lying to evade this control, particularly given the many reasons that teens (like adults) benefit from the ability to have multiple accounts to connect differentially with different circles of friends and acquaintances. [Hartnett].

## CONCLUSIONS OF LAW

### VI.    The States' Misrepresentation Claims

#### A.    Each Alleged Misrepresentation Must Satisfy the Elements of a Consumer Deception Claim.

1.    The Court finds that, under the consumer protection laws of California, Colorado, Kentucky, and New Jersey, the States must prove by a preponderance of the evidence that each individual alleged misrepresentation is actionable. *See* Cal. Bus. & Prof. Code §§ 17200 *et seq.*, 17500; Colo. Rev. Stat. § 6-1-105(1)(e), (g); *id.* 6-1-112; Ky. Rev. Stat. § 367.170; N.J. Stat. Ann. § 56:8-2.

2.    For each statement, the States must prove that the statement was false or misleading at the time it was made. *See* Cal. Bus. & Prof. Code §§ 17200 *et seq.*, 17500 ("statement … which is untrue or misleading"); *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*, 62 P.3d 142, 144 (Colo. 2003) ("deceptive trade practice, which requires a false statement of fact"); *Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 607, 691 A.2d 350, 366 (1997) (similar for NJ CFA); *Stevens v. Motorists Mut. Ins. Co.*, 759 S.W.2d 819, 820 (Ky. 1988) (similar for KCPA). For example, a plaintiff could not establish that the defendant's "representations about the quality of the televisions were false at the time they were made" absent proof "that [the defendant] was aware of the defect when Plaintiffs purchased the televisions." *In re Sony Grand Wega KDF-E A10/A20 Series Rear*

127

*Projection HDTV Television Litig.*, 758 F. Supp. 2d 1077, 1090 (S.D. Cal. 2010); *Platt v. Winnebago Indus., Inc.*, 960 F.3d 1264, 1277 (10th Cir. 2020) (no CCPA claim where plaintiff provided "no evidence" that defendant knowingly "committed a deceptive act … *at the time* of execution") (emphasis added).

3.     To establish that a statement was misleading, the States must show that "members of the public are likely to be deceived" by the statement. *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008); *see also Stevens*, 759 S.W.2d at 820 (defining "false, misleading and deceptive" with reference to "a reasonably prudent person of common intelligence."); *Rhino Linings USA, Inc.*, 62 P.3d at 147 (similar for CCPA); *M.T. v. Saum*, 7 F. Supp. 3d 701, 706 (W.D. Ky. 2014) (similar for KCPA).  Literally true statements are not actionable if a "series of inferential leaps" is necessary to reach the potentially deceptive meaning. *Shaeffer v. Califia Farms, LLC*, 44 Cal. App. 5th 1125, 1139 (2020); *cf. In re Theos Dark Chocolate Litig.*, 750 F. Supp. 3d 1069, 1087 (N.D. Cal. 2024) ("deception must be probable, not simply possible").

4.     The "reasonable consumer" standard "is not a negligible burden." *Moore v. Trader Joe's Co.*, 4 F.4th 874, 882 (9th Cir. 2021).  Rather, "the reasonable consumer standard requires a probability 'that a significant portion of the general consuming public or of targeted consumers, acting reasonably in the circumstances, could be misled.'" *Becerra v. Dr Pepper/Seven Up, Inc.*, 945 F.3d 1225, 1228–29 (9th Cir. 2019) (citation omitted).  A "representation does not become 'false and deceptive' merely because it will be unreasonably misunderstood by an insignificant and unrepresentative segment of the class of persons to whom the representation is addressed." *Davis v. HSBC Bank Nevada, N.A.*, 691 F.3d 1152, 1162 (9th Cir. 2012); *Rasmussen v. Apple Inc.*, 27 F. Supp. 3d 1027, 1039–40 (N.D. Cal. 2014) (misrepresentation must be "capable of being proved false or of being reasonably interpreted as a statement of objective fact"); *Capitol Cadillac Olds, Inc. v. Roberts*, 813 S.W.2d 287, 291 (Ky. 1991) (KCPA "requires some evidence of … false,

128

misleading, or deceptive acts'"); *Rhino Linings USA, Inc.*, 62 P.3d at 147 (similar for CCPA).

5.    The statement also must have been "material," meaning that "a reasonable person would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question."  MTD Order at 43; *Van Holt v. Liberty Mut. Fire Ins. Co.*, 163 F.3d 161, 168 (3d Cir. 1998) ("Mere customer dissatisfaction does not constitute consumer fraud."); *Renfro v. Champion Petfoods USA, Inc.*, 25 F.4th 1293, 1302 (10th Cir. 2022) ("Under Colorado law, misrepresentation is defined as a 'false or misleading statement that *induces the recipient to act* or refrain from acting.'") (emphasis added) (citation omitted); *Corder v. Ford Motor Co.*, 285 F. App'x 226, 228 (6th Cir. 2008) (discussing the KCPA and noting that for a deceptive act to constitute a violation of the KCPA, "there [must be] a [material] representation, omission, or practice that . . . is likely to mislead consumers acting reasonably under the circumstances").

6.    The Court further finds that, under the laws of the four states at issue, Meta must have acted intentionally or knowingly (Colorado), with gross negligence (Kentucky, New Jersey), or with negligence (California) in making the statement. *See* Cal. Bus. & Prof. Code §§ 17200 *et seq.*, 17500 ("which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading"); *Brodeur v. Am. Home Assurance Co*., 169 P.3d 139, 156 (Colo. 2007) ("The crux of a CCPA claim is a deceptive trade practice, which, by definition, must be intentionally inflicted on the consumer public."); *Capitol Cadillac Olds, Inc.*, 813 S.W.2d at 291 ("The [KCPA] requires some evidence of 'unfair, false, misleading or deceptive acts' and does not apply to simple incompetent performance of contractual duties unless some element of intentional or grossly negligent conduct is also present."); *NN&R, Inc. v. One Beacon Ins. Grp*., 2006 WL 1765077, at *13 (D.N.J. June 26, 2006) (granting summary judgment for a corporate defendant on a NJ CFA claim because the defendant's employee did not have personal

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

knowledge of the statement's falsity and thus, was "at best negligent in performing his duties").

7. The statement also must have been widely available to the public. *See* Cal. Bus. & Prof. Code §§ 17200 *et seq.*, 17500 ("to make or disseminate or cause to be made or disseminated before the public in this state"); *Martinez v. Lewis,* 969 P.2d 213, 217 (Colo. 1998) (no viable CCPA claim where plaintiff presented no "evidence indicating that Dr. Lewis made any misrepresentations to the public"); *see also* Ky. Rev. Stat. §§ 367.170, 367.190(1). The States "cannot rely" on statements "which most purchasers have not read to determine what a reasonable consumer would believe." *Reed v. NBTY, Inc.*, 2014 WL 12284044, at *16 (C.D. Cal. Nov. 18, 2014).

8. For each statement, the States also must prove that Meta made a statement of fact "to induce the public to enter into a transaction." *People v. Johnson & Johnson*, 77 Cal. App. 5th 295, 317 (2022); *Gennari*, 148 N.J. at 607, 691 A.2d at 366 ("The misrepresentation has to be one which is material to the transaction and which is a statement of fact, found to be false, made to induce the buyer to make the purchase."); *Rhino Linings USA, Inc.*, 62 P.3d at 147 (a misrepresentation under the CCPA "is a false or misleading statement that induces the recipient to act or refrain from acting"); *Saum*, 7 F. Supp. 3d at 706 (similar for KCPA).

9. The statement must have been made in the course of Meta's business and have concerned Meta's goods or services. *See* Cal. Bus. & Prof. Code §§ 17200 *et seq.*, 17500 ("with intent directly or indirectly to dispose of real or personal property or to perform services, professional or otherwise"); Ky. Rev. Stat. § 367.110(2); Ky. Rev. Stat. § 367.170(1) (requiring statement to be made "in the conduct of any trade or commerce," defined as "the advertising, offering for sale, or distribution of any services and any property"); N.J. Stat. Ann. § 56:8-2 (requiring statement to be made "in connection with the sale or advertisement of any merchandise or real estate"); Colo. Rev. Stat. § 6-1-105(1)(e) ("A person engages in a deceptive trade

130

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

practice when, in the course of the person's business, vocation, or occupation, the person . . . [e]ither knowingly or recklessly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods, food, services, or property or a false representation as to the sponsorship, approval, status, affiliation, or connection of a person therewith.").

**B.    No Independent Liability for A "Deceptive Scheme"**

1.    The Court finds that allegations of a generalized scheme to defraud do not supplant the requirement to prove that each misrepresentation is individually actionable. Rather, the States bear the burden of proving, by a preponderance of the evidence, all the required legal elements for each particular statement they claim is actionable.

2.    The laws of the four States contemplate liability on the basis of individual statements, not allegations of generalized deceptive schemes. *See* Cal. Bus. & Prof. Code § 17500 ("It is unlawful … to make or disseminate … *any statement* … which is untrue or misleading[.]"); Colo. Rev. Stat. § 6-1-105(1) ("A person engages in a deceptive trade practice when … the person … knowingly or recklessly makes *a false representation*[.]"); N.J. Stat. Ann. § 56:8-2 (listing "false *promise*" and "*misrepresentation*" as examples of fraud); *cf.* Ky. Rev. Stat. § 367.110(2) (KCPA does not apply to "publisher[s] … wherein *such advertisements* appear, or to the owner or operator of a radio or television station which *disseminates such advertisement* when the owner, publisher or operator has no knowledge that s*uch advertisement* may be in violation" of KCPA) (all emphases added).

3.    The fact that the States have introduced a handful of analogous statements from different periods in time does not relieve the States of their obligation to prove that each individual statement was actually deceptive or misleading when made. That is because, for claims premised on affirmative misrepresentations, "consumer reliance will be induced by specific rather than general assertions." *Elias v. Hewlett-Packard Co.*, 950 F. Supp. 2d 1123, 1133 (N.D. Cal. 2013) (quoting *Cook,*

131

*Perkiss & Liehe, Inc. v. N. Cal. Collection Serv., Inc.*, 911 F.2d 242 (9th Cir. 1990)); *see Keaton v. G.C. Williams Funeral Home, Inc.*, 436 S.W.3d 538, 545–46 (Ky. App. 2013) (noting that a KCPA claim fails absent a showing of a "fraudulent scheme, attempt to secure an unfair profit, intentional act, or effort to cover the mistake"). "The combination of several [nonactionable] statements does not automatically create an actionable misrepresentation." *Elias*, 950 F. Supp. 2d at 1133.

4.    Courts do not allow consumer deception claims based on a generalized "misleading impression." Plaintiffs must instead prove that specific statements are actionable.

a)    In *Ebner v. Fresh, Inc*, 838 F.3d 958, 967 (9th Cir. 2016), the plaintiff alleged that a lip product's " . . . screw mechanism, 5.35 gram metallic bottom, and oversized tube and cardboard packaging all contribute to the *misleading impression* of a larger quantity of lip product than is actually included." (emphasis added). The Ninth Circuit declined to adopt that generalized theory of deception, instead finding that there was no "misleading impression" when the defendant accurately disclosed the weight of the product on the label. *Id.*

b)    In *Ahern v. Apple Inc.*, 411 F. Supp. 3d 541, 557-58 (N.D. Cal. 2019), Judge Koh rejected the argument that "various [nonactionable] statements merge to form one overarching misrepresentation." Instead, Judge Koh evaluated each alleged misstatement to determine whether that statement was actionable under the UCL. For instance, statements that defendant's computer screens were "clear and remarkably vivid" did "not say anything about specific characteristics or components—or even how clear and vivid the screens actually are." *Id.* at 556. And statements that the screens were of the "highest quality" were "boasts" and "all-but-meaningless superlatives" of the type that courts consistently find nonactionable. *Id.* (citations omitted). Likewise, the statement that "everything is designed to

132

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

work the way you expect it to," was "not amenable to general verification or falsification because its truth or falsity for a particular consumer depends as much on the characteristics of that consumer as the efficacy of the product." *Id.* at 557 (citation omitted).

c) In *Sciacca v. Apple, Inc.*, 362 F. Supp. 3d 787, 799 (N.D. Cal. 2019), Judge Koh similarly held that UCL fraud claims could not proceed where the plaintiff failed to explain "what is false or misleading about" the defendant's individual statements or "why [they are] false." There, the defendant's general promotional materials, which included statements that the watch had GPS, was water resistant to 50 meters, had a dual-core processor, and had a "2x brighter display," could not support a UCL claim because the plaintiff could not explain why any of those individual statements were false. *Id.* at 798.

d) In *People v. Purdue Pharma L.P.*, 2021 WL 5227329, at *1 (Cal. Super. Nov. 1, 2021), the plaintiffs alleged that the defendant drug manufacturers "engaged in an aggressive false and/or misleading marketing scheme designed to increase" the writing of prescriptions of opioid medications, which in turn "contributed to the opioid crisis." The trial court explained that, for the plaintiffs to establish their UCL fraud claims, the plaintiffs needed to prove "precisely what statements" defendants made, and that *those statements* "were likely to deceive the recipient." *Id.* at 12. The court then evaluated each statement that the plaintiffs claimed to be misleading, and considered each individual statement "in the context of the entire document" in which that statement appeared. *Id.* at 13 (citing *Freeman v. Time, Inc.*, 68 F.3d 285, 290 (9th Cir. 1995)). For instance, the statement that the defendant's drug was "indicated for the management of moderate to severe chronic pain" was not individually actionable because "[t]hat was the FDA approved use." *Id.* In determining that each statement was neither

133

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

untrue nor misleading, the court made clear that broad allegations of a "false and/or misleading marketing scheme" do not obviate the burden to prove that particular statements are likely to deceive. *See id.* at 1.

e)  In *In re Iphone 4S Consumer Litig.*, 2014 WL 589388, at *5 (N.D. Cal. Feb. 14, 2014), the court held that the plaintiff could not establish a UCL fraud claim based on the theory that "the overall impact of [defendant's] commercials and advertisements misled Plaintiffs." There, the plaintiff alleged that "after viewing certain Apple advertisements about Siri," they were "led to believe that Siri could function on a consistent basis" and provide "adequate response[s]" to their questions, even though Siri did not answer their questions "on a consistent basis" and instead "frequently" gave plaintiffs the wrong answer. *Id.* To support that theory of deception, the plaintiffs pointed to a "plethora of statements" made in various "commercials and advertisements" involving different subjects, such as depictions of "Siri's functionalities as well as general marketing statements about Siri." *Id.* Although the plaintiff identified the specific advertisements they viewed, they could not "isolate the particular statements at issue and explain each statement's false and misleading nature." *Id.*

f)  In *Haskell v. Time, Inc.*, 857 F. Supp. 1392, 1395 (E.D. Cal. 1994), the plaintiff asserted that the defendants' "widely distributed magazine sweepstakes solicitations" contained a series of "misleading statements," all of which formed to create "false impressions." Rather than evaluating the alleged misstatements in the advertisements in their entirety, the court evaluated each individual statement to determine whether it was actionable. For instance, the plaintiff alleged that "the use of terms such as 'valued customer' create[d] the impression" that purchasing the product would "increase the chance of winning." *Id.* at 1403. Looking at that particular

134

statement, the court determined it was not misleading because the "rules and materials repeatedly state that no purchase is required." *Id.*

g)    In *Capitol Cadillac Olds*, 813 S.W.2d at 291, the plaintiff argued that the defendant (a car dealership) violated the KCPA because it "failed to competently repair the damage [to the plaintiff's vehicle], but attempted to persuade them that the work was done properly." Kentucky's Supreme Court explained that this was insufficient—there needed to be specific evidence of "unfair, false, misleading or deceptive act," not mere references to "simple incompetent performance of contractual duties unless some element of intentional or grossly negligent conduct is also present." *Id.* (citation omitted).

5.    Rule 9(b) governs deception claims under the consumer protection laws of the four states. *See Kearns v. Ford Motor Co.*, 567 F.3d 1120, 1125 (9th Cir. 2009) (UCL); *Hansen v. Auto-Owners Ins. Co.*, 2010 WL 749820, at *2 (D. Colo. Mar. 4, 2010) (CCPA); *Naiser v. Unilever U.S., Inc.*, 975 F. Supp. 2d 727, 741 (W.D. Ky. 2013) (KCPA); *Rait v. Sears, Roebuck & Co.*, 2009 WL 250309, at *4 (D.N.J. Feb. 3, 2009) (NJ CFA). Rule 9(b) requires a complaint to "set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *Koch v. Koch Indus., Inc.,* 203 F.3d 1202, 1236 (10th Cir. 2000). Because the plaintiff must allege the who, what, when, where, and how of the misconduct with particularity, it necessarily follows that those same elements must be proven at trial.

6.    To establish that Meta engaged in a deceptive practice, the States must prove that Meta made a "false statement of fact that either induces the recipient to act or has the capacity to deceive the recipient." *Rhino Linings USA, Inc.*, 62 P.3d at 144; *see Taylor v. Greenwood Ford, Inc.*, 2020 WL 1969923, at *2 (Ky. App. Apr. 24, 2020) (concluding that a KCPA claim fails where there is no evidence that the defendant "intentionally misled the plaintiff or w[as] grossly negligent in [its] actions"). The

135

States must "isolate the particular statements at issue and explain each statement's false and misleading nature." *In re Iphone 4S Consumer Litig.*, 2014 WL 589388, at \*5; *see also Ahern*, 411 F. Supp. 3d at 552 (plaintiff must identify the "specific content of the false representations") (citation omitted).

7.    Where a plaintiff "describe[s] a scheme to mislead customers," the plaintiff must show "that each misrepresentation to each customer conforms to that scheme." *Stuart v. Cadbury Adams USA, LLC*, 2010 WL 11596555, at \*2 (C.D. Cal. Feb. 3, 2010) (citation omitted); *see also Sipe v. Countrywide Bank*, 690 F. Supp. 2d 1141, 1157 (E.D. Cal. 2010) (plaintiff must establish "details on the specific misrepresentation involved in the fraudulent scheme"); *Kempf v. Lumber Liquidators, Inc.*, 2017 WL 4288903, at \*5 (W.D. Ky. Sept. 27, 2017) (plaintiff must "identif[y] the fraudulent scheme and fraudulent intent of [defendant] by alleging specific misrepresentations").

8.    The States must point to an "explicit representation" and prove "with the requisite specificity" "what is false or misleading" about that representation. *Yastrab v. Apple Inc.*, 173 F. Supp. 3d 972, 978 (N.D. Cal. 2016).  They must prove "the particular falsity of each statement" rather than "list[ing] without additional information a range of dissimilar statements." *In re Riddell Concussion Reduction Litig.*, 77 F. Supp. 3d 422, 435 (D.N.J. 2015); *see Kempf*, 2017 WL 4288903, at \*5.

9.    This Court previously held that statements must be considered in context to understand whether the statement is false or misleading.  *See* MTD Order at 37. However, there is no independent liability for a deceptive scheme or pattern divorced from specific statements proven to be false or misleading.  The "combination of several" nonactionable statements "does not automatically create an actionable misrepresentation."  *Elias*, 950 F. Supp. 2d at 1134; *see also Ahern*, 411 F. Supp. 3d at 557–58 (rejecting the argument that "various puffery statements merge to form one overarching misrepresentation").

136

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

10. In ruling on Meta's motion to dismiss, this Court allowed the States' affirmative deception claims to move forward based on a consideration of each statement "in the context of the alleged deceptive scheme as a whole." MTD Order at 37. In so doing, the Court considered cases involving statements appearing on the same product packaging, in the same advertisement, or as part of a single concerted advertising campaign.

11. For instance, this Court relied on *Williams v. Gerber Prods. Co.*, where the Ninth Circuit permitted a UCL claim to move past the pleading stage when the statement that a snack was "nutritious" appeared on the same packaging alongside specific misrepresentations of fact. 552 F.3d at 939 n.3. The packaging also included the deceptive statement that the product was made with "fruit juice and other all natural ingredients." *Id.*

12. *Williams* also involved circumstances particular to the packaging of food products, namely whether the FDA-mandated ingredients list on the back of the packaging could suffice to dispel misleading statements on the front of the advertising. *See id.* at 939 ("We do not think that the FDA requires an ingredient list so that manufacturers can mislead consumers and then rely on the ingredient list to correct those misinterpretations and provide a shield for liability for the deception.").

13. At the pleading stage, this Court also explained that "puffery can be actionable when the defendant knows facts that makes [*sic*] the *at-issue statement* deceitful." MTD Order at 39 (emphasis added). But undisclosed facts cannot render a statement deceitful unless those facts are "contrary to a representation actually made by [Meta]." *See Hodsdon v. Mars, Inc.*, 891 F.3d 857, 861 (9th Cir. 2018); *see also Keaton*, 436 S.W.3d at 538 (implying a mere omission of fact is insufficient to constitute a deceptive act; rather, the defendant must make an affirmative undertaking in deceiving a consumer for a KCPA claim to be actionable).

14. In *Jones v. Corus Bankshares, Inc.*, which this Court relied on for the proposition about knowledge of deceit, the Illinois district court observed that puffery may be

137

actionable when it "reinforces factual misstatements." 701 F. Supp. 2d 1014, 1027 (N.D. Ill. 2010). However, the puffery in *Jones* appeared alongside concrete misrepresentations, including deceptive statements about the defendant's "ability to originate new loans." *Id.* at 1028.

15. The authority the *Jones* court relied on underscores that consumer fraud claims require "misrepresentations of existing facts." *Novak v. Kasaks*, 216 F.3d 300, 315 (2d Cir. 2000). In *Novak*, "the defendants did more than offer rosy predictions; the defendants stated that the inventory situation was 'in good shape' or 'under control' while they allegedly knew the contrary was true." *Id.* And in *Silverman v. Motorola, Inc.*, "problems in the manufacture" of a new product belied statements that that same product was "on track[.]" 2008 WL 4360648, at *5, 10 (N.D. Ill. Sep. 23, 2008). Similarly, in *Naiser*, the Western District of Kentucky found that a KCPA claim survived dismissal where the defendant knowingly made multiple false representations as to the chemical composition and effects of a hair-smoothing treatment. 975 F. Supp. 2d at 741.

16. This Court also relied on authority standing for the narrow proposition that "marketing can 'cross the line from mere puffery to active misrepresentations'" when statements about safety are read next to allegations that an *automotive manufacturer* had actual knowledge of the alleged safety defect." *In re Takata Airbag Prods. Liab. Litig.*, 462 F. Supp. 3d 1304, 1318 (S.D. Fla. 2020) (emphasis added). The circumstances regarding safety defects in automobiles are not applicable here. In *Takata*, the manufacturer's marketing statements were rendered misleading by its actual knowledge of a specific, identifiable physical defect in a discrete product, airbags that could rupture and cause significant injury or death to vehicle occupants. *See id.* at 1310. No comparable circumstance exists here: the States challenge accurate statements by Meta spanning multiple topics, from content moderation to company values to its age-restriction policy—none of which is analogous to concealing a known mechanical malfunction from consumers.

138

17. Even if a scheme theory were viable, the statements at issue here do not constitute a unified scheme of deception from which the Court may infer that otherwise non-actionable statements become actionable by association. The alleged misrepresentations span six years, involve 11 different speakers, appear in different media, and address different subject matters. *See supra* Findings pp. 2, 9, 50, 62, 76. That collection of statements also ignores the hundreds of countervailing statements that Meta has made during the relevant time period, including affirmative disclosures related to problematic use, harmful content, and age-lying by teens. The scattershot statements the States have identified must be viewed in the context of Meta's repeated disclosures about problematic use on social media, including through the implementation of tools designed to address that use, acknowledgements that Meta's content moderation efforts are not perfect, and that under-13 individuals manage to get on to Meta's services by lying about their age. *See supra* Findings pp. 3–14, 16–20, 65–69.

18. There can be no concerted deception where Meta repeatedly disclosed the information that the States claim Meta tried to obfuscate. The question is whether Meta's statements "as a whole, including its disclosures, is misleading or deceiving." *Holt v. Noble House Hotels & Resort, Ltd*, 370 F. Supp. 3d 1158, 1168–69 (S.D. Cal. 2019) (granting summary judgment on UCL and FAL claims where disclosures were "not buried"); *Freeman*, 68 F.3d at 289 (finding advertisement of prize is not misleading when "no reasonable reader could ignore" qualifying disclosures); *cf. Paul Miller Ford, Inc. v. Smith*, 2024 WL 2490160, at *7 (Ky. App. May 24, 2024) ("[A] factfinder [could] reasonably conclude that the sale of the vehicle as 'new' without disclosure of its pre-sale history constitutes a false, misleading, or deceptive act under the KCPA." (citation omitted)).

19. Meta's conduct does not resemble concerted advertising campaigns by tobacco companies or JUUL that other courts have considered to be deceptive. In both lines of cases, the defendants' misrepresentations concerned a single, clinically

139

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

established fact—namely that nicotine is addictive and that tobacco use causes cancer and disease—and the defendants' knowledge of that fact was demonstrated through internal research that conclusively established the harmful properties of their products. *See, e.g.*, *In re JUUL Labs, Inc., Mktg., Sales Pracs., & Prods. Liab. Litig.*, 497 F. Supp. 3d 552, 597 (N.D. Cal. 2020) (defendants developed a product with "a more palatable yet higher dosage of nicotine ... after manipulating studies"); *In re Tobacco II Cases*, 46 Cal. 4th 298, 307 (2009) (defendants "intentionally controlled and manipulated the amount and bio-availability of nicotine in their tobacco products to create and sustain addiction to their products").

20.    Here, by contrast, the States have not identified any single, clinically established fact that Meta's speakers knowingly misrepresented. *See infra* Conclusions pp. 178–83.    The alleged misrepresentations span a wide range of different topics, including service safety, content moderation, design philosophy, the existence of under-13 users, and the purported "addictiveness" of social media. *See supra* pp. Findings 2, 9, 50, 62, 76.  By contrast, the tobacco cases concerned a "decades-long *campaign* of deceptive *advertising* and misleading statements about the addictive nature of nicotine and the relationship between tobacco use and disease." *In re Tobacco*, 46 Cal. 4th at 306 (emphasis added).  That involved "several tobacco companies, . . . [who] formed . . . a public relations organization, to counter the 'anti-cigarette crusade' by providing 'balancing information' regarding 'unproven facts.'" *Boeken v. Philip Morris, Inc.*, 127 Cal. App. 4th 1640, 1652 (2005). Furthermore, unlike Meta, the defendants in the tobacco cases studiously avoided any public disclosure or acknowledgement of the possibility of harm caused by use of its products.  Instead, they "issued numerous false denials regarding the health hazards of smoking, manufactured a false controversy as to whether smoking cigarettes actually caused cancer or carried other serious health risks, and falsely assured the public that they were diligently engaging in research to find the truth about any health risks of smoking and would promptly disclose to the public their

140

findings, whether good or bad." *Whiteley v. Philip Morris Inc.*, 117 Cal. App. 4th 635, 678 (2004), *as modified on denial of reh'g* (Apr. 29, 2004).

21.    No comparable facts exist here.  Meta did not create a public relations organization to counter established science, did not coordinate with other companies to suppress known facts, and did not disseminate advertising to consumers designed to deny a clinically-proven harm.  *See supra* Findings pp. 62–76.  Instead, Meta repeatedly and publicly acknowledged the existence of problematic use on social media, the presence of under-13 individuals on its services, and the fact that its safety policies and enforcement of those policies were not perfect and could be improved.  *See supra* Findings pp. 3–14, 16–20, 65–69.

22.    The "scheme" in the tobacco cases consisted of a coordinated effort by multiple companies to suppress and deny a single, demonstrable fact through a concerted advertising campaign directed at the consuming public.  *See In re Tobacco*, 46 Cal. 4th at 327 (describing "decades-long campaign of the tobacco industry to conceal the health risks of its product while minimizing the growing consensus regarding the link between cigarette smoking and lung cancer and, simultaneously, engaging in 'saturation advertising targeting adolescents, the age group from which new smokers must come'") (citations omitted).[5]

23.    Similarly, in the JUUL litigation, the alleged deception was tied to a specific, demonstrably false representation.  The crux of the alleged deception in that case was that, through consumer advertising, JUUL represented that its products were a "healthier or less harmful alternative to combustible cigarettes," which was directly contradicted by "results from the Phase 0 study [conducted by defendant] showing heightened nicotine delivery."  *In re JUUL Labs.*, 497 F. Supp. 3d at 625–26. JUUL's representations were therefore capable of objective disproof because the

---

[5] The California Supreme Court in *In re Tobacco* held that "exposure to a long-term advertising campaign" may suffice to establish reliance in a private UCL action.  46 Cal. 4th at 328.  This holding is inapposite here, as the California Attorney General in a public enforcement action is not required to prove reliance.

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

product's nicotine delivery could be measured against the claim that it was safer than cigarettes. Meta's alleged misstatements are different. They concern the general safety of its services across many subjects, and plaintiffs do not identify a concrete factual assertion that can be tested and shown false. *See Rasmussen*, 27 F. Supp. 3d at 1039–40 (misrepresentation must be "capable of being proved false or of being reasonably interpreted as a statement of objective fact"). Further, in stark contrast to *JUUL*, Meta made affirmative disclosures of the issues related to problematic use, content moderation, and teens' evasion of the age-restriction policy.

24. For these various reasons, there is no such concerted deception here. The States have assembled a collection of 51 statements made over approximately six years, by 11 different speakers, in different forums, including congressional testimony, earnings calls, press interviews, blog posts, and internal communications, none of which constituted a coordinated advertising campaign directed at consumers. *See supra* Findings pp. 2, 9, 50, 62, 76. Those statements have been plucked out of context, and ignore the hundreds of statements Meta has made throughout the relevant time period on these same issues. The States have presented no evidence that any significant portion of consumers was even aware of these statements, let alone that consumers considered those short excerpts in deciding whether to use Meta's services.

25. The evidence shows that Meta publicly acknowledged problematic use of its services, the existence of under-13 individuals who violate its age-restriction policy, and the fact that the enforcement of its content moderation policies was not perfect. *See supra* Findings pp. 3–14, 16–20, 65–69. Meta made clear to the public that these were real concerns, and that Meta's work on safety was never done. *See supra* Findings pp. 3–14, 16–20, 65–69.

26. Courts have repeatedly held that deception claims cannot be established in the face of clear disclosures to consumers that would dispel any confusion from other

142

statements. *See, e.g.*, *Freeman*, 68 F.3d at 289 (finding advertisement of prize is not misleading when "no reasonable reader could ignore" qualifying disclosures); *Bickoff v. Wells Fargo Bank N.A.*, 2016 WL 3280439, at \*15 (S.D. Cal. June 14, 2016) ("[t]he public would not be likely to be deceived into thinking [loan financing] was guaranteed . . . given the many statements of limitation and condition in any document referencing [loan financing]"); *Charbonnet v. Omni Hotels & Resorts*, 2020 WL 7385828, at \*3 (S.D. Cal. Dec. 16, 2020) (hotel not "likely to deceive a reasonable consumer because it disclosed the property fee before Plaintiff could book her reservation"); *cf. Paul Miller Ford*, 2024 WL 2490160, at \*7 (implying that appropriate disclosures foreclose KCPA claims).

27. Even if the Court were to consider the tobacco and JUUL litigation as instructive precedent for this case, the States have failed to prove any of the essential elements that made the tobacco and JUUL claims viable—namely, knowledge of a clinically proven harm, coordinated suppression of that knowledge, and direct consumer-facing deception about an objective, verifiable fact.

28. The Court further finds that the States cannot predicate their deception claims on a "scheme" to conceal alleged safety risks because the States are judicially estopped from bringing omissions-based claims.

29. The States have repeatedly disclaimed any intent to proceed on a pure omissions or failure-to-warn theory of deception.

a)  In their June 23, 2025 opening-answering brief before the Ninth Circuit, the States explained that "the State AGs do not bring a failure-to-warn cause of action." ECF No. 118.1, *Cal. v. Meta Platforms Inc.*, No. 24-703 (9th Cir. June 23, 2025), at 22. They further clarified that "the State AGs' deception claims require only that Meta address its own statements and no longer mislead the public." *Id.* at 79.

b)  In their December 16, 2025 trial strategy letter brief, the States provided that "[t]he AGs' deception claims do not impose a duty to disclose or

143

compel speech; rather, they seek to hold Meta liable for its misleading—and thus unprotected—commercial speech." ECF No. 2550 at 3.

c)    In their February 27, 2026 summary judgment opposition, the States explained that their deception claims "are not based on Meta's wholesale silence." ECF No. 266 (2779) at 3 n.1. They went on to confirm that "the AGs' 'omissions' claims seek to hold Meta accountable for its affirmative statements that were likely to mislead or deceive[.]" *Id.* (citation omitted).

d)    In a May 22, 2026 Joint Case Management Statement, the States again explained that "the State AGs do not bring failure to warn claims, nor are any of their deception claims based on pure omissions." ECF No. 3066 at 5.

30.    Under the doctrine of judicial estoppel, parties are precluded "from gaining an advantage by asserting one position, and then later seeking an advantage by taking a clearly inconsistent position." *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 782 (9th Cir. 2001). In determining whether the doctrine applies, the court may consider whether "a party's later position [is] … 'clearly inconsistent' with its earlier position," "whether the party has succeeded in persuading a court to accept that party's earlier position," and "whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped." *Id.* at 782–83 (citations omitted).

31.    The Court finds that those circumstances apply here. The States have disclaimed a failure-to-warn and pure omissions theory before the Ninth Circuit, while predicating their deception claims on Meta's alleged nondisclosure of information.

32.    The Court observes that omissions-based claims are premised on the same fundamental theory as a failure to warn and implicate the same Section 230 issues. Further, in light of the States' repeated disclaimers of failure-to-warn and pure omissions theories, the Court finds that the States are estopped from predicating their deception claims on the omission of information.

144

## C.    Statements Protected Under the First Amendment.

1.    The Court finds that Meta's statements of opinion are protected under the First Amendment. These statements are Statement Nos. 1 (1), 2 (2), 3 (5), 4 (6), 5 (7), 6 (8), 7 (10), 8 (12), 9 (13), 12 (16), 13 (18), 14 (19), 17 (22), 20 (25), 21 (26), 22 (27), 23 (29), 24 (35), 26 (38), 27 (39), 32 (47), 33 (48), 34 (51), 35 (52), 36 (53), 37 (56), 38 (57), 39 (59), 42 (65), 44 (82), 47 (9), 48 (70), 49 (80), 50 (78), and 51 (83).

2.    The First Amendment protects Meta's right to express opinions, *i.e.*, statements that are "highly subjective" and are not "purely factual and uncontroversial." *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1118, 1120, 1122 (9th Cir. 2024) (quoting *Zauderer v. Off. of Disciplinary Couns.*, 471 U.S. 626, 651 (1985)). That is because, "[h]owever pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 339–40 (1974).

3.    Social media services like Instagram are "modern public square[s]" used by "billions" as "principal sources for knowing current events" and for "exploring the vast realms of human thought and knowledge." *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017). And "the First Amendment … does not go on leave when social media are involved." *Moody v. NetChoice, LLC*, 603 U.S. 707, 719 (2024).

4.    The Ninth Circuit has held that opinions about "whether material is suitable for kids" are statements of opinion protected by the First Amendment. *See Bonta*, 113 F.4th at 1118, 1120, 1122. Meta's "opinion" about whether "its services might expose children to harmful content online is not 'purely factual and uncontroversial.'" *Id.* at 1120; *cf., e.g.*, *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011) (states do not possess "a free-floating power to restrict the ideas to which children may be exposed"); *Interactive Digit. Software Ass'n v. St. Louis Cnty.*, 329 F.3d 954, 959 (8th Cir. 2003) (video game ban not justified based on notion that "[s]ociety in general believes that continued exposure to violence can

145

be harmful to children"); *Video Software Dealers Ass'n v. Webster*, 968 F.2d 684, 687 (8th Cir. 1992) (similar).

5. Meta's statements about whether its services were "safe and age-appropriate," Statement Nos. 26 (38), 43 (81), or suitable for children fall squarely within that protected category of opinion. *See, e.g.*, Statement No. 42 (65) ("designing age-appropriate experiences"). These statements reflect Meta's opinions about whether its services provide safe and age-appropriate experiences for teens, whether certain content was safe or appropriate for certain users, and Meta's policy goals to create safe, age-appropriate environments for youth. *See supra* Findings pp. 9–62. Those statements address disputed judgments about the suitability of speech and service experiences for teen users, rather than objective factual guarantees.

6. The First Amendment precludes liability for statements when there is no objective criteria to determine whether those statements are true or false. The California Supreme Court has stressed that the UCL and FAL "do not suppress points of view but instead suppress false and misleading statements of fact." *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 967 (2002). This point was well illustrated in *Compuware Corp. v. Moody's Invs. Servs., Inc.*, 499 F.3d 520, 529 (6th Cir. 2007), where the Sixth Circuit held that Moody's credit rating was a nonactionable "predictive opinion, dependent on a subjective and discretionary weighing of complex factors," for which there was "no basis upon which [the court] could conclude that the credit rating itself communicates any provably false factual connotation." Because the rating turned on an "inherently subjective" judgment, the inferences a reader might draw from it "could not be proven false." *Id.*

7. That principle applies to the States' challenges to Meta's generalized statements about safety, well-being, objectives, and business priorities. The States cannot challenge Meta's opinions that safety is a priority and that Meta focuses on providing the best user experience when building its services. *See supra* Findings pp. 50–62 (Statement Nos. 1 (1), 6 (8), 7 (10), 22 (27), 32 (47), 33 (48), 37 (56), 38

146

(57), 44 (82)). These statements depend on subjective judgments about priorities, values, and long-term service objectives, and thus fall squarely within the protections of the First Amendment.

8. The First Amendment protects Meta's editorial judgments. In *Moody*, 603 U.S. at 716, the U.S. Supreme Court clarified that companies that offer social media services such as Meta engage in First Amendment-protected expression when they "make choices about what third-party speech to display and how to display it," including whether to "include and exclude, organize and prioritize" user-generated content. In particular, when Meta uses its "Standards and Guidelines to decide which third-party content [its] feeds will display, or how the display will be ordered and organized," those decisions are expressive choices that "receive First Amendment protection." *Id.* at 740; *see also, e.g.*, *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241, 258 (1974) (choices about what "material to [include]" and the "limitations on the size and content" of that compilation are quintessential "exercise[s] of editorial control and judgment"); *O'Handley v. Padilla*, 579 F. Supp. 3d 1163, 1187–88 (N.D. Cal. 2022), *aff'd sub nom. O'Handley v. Weber*, 62 F.4th 1145 (9th Cir. 2023) (dismissing tort claims because "Twitter has important First Amendment rights that would be jeopardized by a Court order telling Twitter what content-moderation policies to adopt and how to enforce those policies").

9. Meta's CSERs and statements about content moderation describe Meta's choices about how to define policy violating content, how to measure exposure to that content, how to remove or reduce its distribution, and how to explain those moderation choices to the public. *See supra* Findings pp. 40–50 (Statement Nos. 3 (5), 4 (6), 5 (7), 47 (9), 8 (12), 12 (16), 14 (19), 39 (59), 48 (70), 50 (78), 49 (80), 51 (83)). Treating those statements as actionable deceptions would penalize Meta for its editorial judgments about what content to allow, what content to restrict, and how to organize and report those choices, and how it describes and implements its content-moderation policies. *See X Corp. v. Bonta*, 116 F.4th 888, 902 (9th Cir.

147

2024) ("Insight into whether a social media company considers, for example, (1) a post citing rhetoric from on-campus protests to constitute hate speech; (2) reports about a seized laptop to constitute foreign political interference; or (3) posts about election fraud to constitute misinformation is sensitive, constitutionally protected speech.").

10. The Court further finds that Meta's statements do not constitute commercial speech.

11. Commercial speech is "usually defined as speech that does no more than propose a commercial transaction." *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001). To evaluate whether speech is commercial, courts consider whether "the speech is an advertisement, the speech refers to a particular product, and the speaker has an economic motivation." *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107 (9th Cir. 2021) (citing *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 66–67 (1983)). In particular, the central question is "whether the speaker acted *primarily* out of economic motivation, not simply whether the speaker had *any* economic motivation." *Ariix,* 985 F.3d at 1117 (emphasis in original).

12. The Court finds that Meta did not act primarily out of economic motivation in making the statements. "A simple profit motive to sell copies of a publication or to obtain an incidental economic benefit, without more, does not make something commercial speech." *Id.* This "question is context-specific and requires determining whether the *speaker's purpose* primarily turns on the economic benefit that *the speaker receives* from the speech." *Id.* at 1117 n.7 (emphases added).

13. It is not enough that there is some economic motivation behind the speech. *See, e.g.*, *Bolger*, 463 U.S. at 67 ("Finally, the fact that Youngs has an economic motivation for mailing the pamphlets would clearly be insufficient by itself to turn the materials into commercial speech."); *Dex Media West, Inc. v. City of Seattle*, 696 F.3d 952, 960 (9th Cir. 2012) (finding that the financial benefit obtained from publishing yellow pages directories could not characterize the publication as commercial); *Gordon & Breach Sci. Publishers S.A. v. Am. Inst. of Physics*, 859 F.

148

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

Supp. 1521, 1541 (S.D.N.Y. 1994) ("The fact that AIP and APS stood to benefit from publishing Barschall's results—even that they *intended* to benefit—is insufficient by itself to turn the articles into commercial speech.").

14.    Rather, in "typical commercial speech cases, the *speaker* is likely to be someone engaged in commerce—that is, generally, the production, distribution, or sale of goods or services—or someone acting on behalf of a person so engaged, and the *intended audience* is likely to be actual or potential buyers or customers of the speaker's goods or services, or persons acting for actual or potential buyers or customers, or persons (such as reporters or reviewers) likely to repeat the message to or otherwise influence actual or potential buyers or customers." *Nike*, 27 Cal. 4th at 960 (emphases in original) (deciding First Amendment challenge to UCL claim).

15.    The Ninth Circuit has made clear that, when companies "opine on potential speech-based harms to children, including harms resulting from the speech of third parties," that is "disconnected from any economic transaction." *Bonta*, 113 F.4th at 1119. "The mere fact that a business may earn revenue from its services is 'insufficient by itself' to render its opinions about those services 'commercial.'" *Id.* at 1120 (citing *Bolger.*, 463 U.S. at 66–67).

16.    In *X Corp.*, 116 F.4th at 901, the Ninth Circuit similarly held that "while a social media platform's existing [Terms or Service] and content moderation policies may be commercial speech, its opinions about and reasons for those policies are different in character and kind." Thus, the "company's policy views on intensely debated and politically fraught topics, including hate speech, racism, misinformation, and radicalization," statements that "convey how the company has applied its policies" did not constitute commercial speech. *Id.* at 902.

17.    Companies like Meta also have "the full panoply of protections available to its direct comments on public issues." *Bolger*, 463 U.S. at 68. For instance, the California Court of Appeal in *Bernardo v. Planned Parenthood Fed'n of Am.*, 115

149

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

Cal. App. 4th 322, 344 (2004), held that the First Amendment precluded a UCL fraud claim when "none of Planned Parenthood's challenged Web pages proposed a commercial transaction in its contents." "Rather, they were all educational in nature and asserted Planned Parenthood's positions on disputed scientific and medical issues of public interest with which [plaintiff] strenuously disagreed." *Id.*

18.    So too in *Pacific Gas Elec. Co. v. Publ. Util. Comm'n*, 475 U.S. 1, 9 (1986), where the United States Supreme Court held that a utility's newsletter, which was distributed to ratepayers in the monthly billing envelopes and the contents of which ranged from political editorials to energy saving tips and billing information, "extend[ed] well beyond speech that proposes a business transaction, and included the kind of discussion of 'matters of public concern' that the First Amendment both fully protects and implicitly encourages." (cleaned up).

19.    Meta's statements also cannot be "characterized as commercial speech" because they did not constitute "advertisements" and were not made "*primarily* out of economic motivation." *Ariix,* 985 F.3d at 1115–17 (emphasis in original). For the advertisement factor of the *Bolger* standard, though speech need not be "in the traditional form of an advertisement," there must be other indicia indicating that the speech "are in fact [in] advertisements." *Id.* For instance, the *Ariix* court looked to the FTC's efforts to regulate influencers in determining that "paid posts" on social media were advertisements even though they did not list "price or availability information." *Id.*

20.    The Court finds that none of Meta's statements were advertisements or primarily based on economic motivation. The statements instead include congressional testimony about legislative solutions for protecting children online, *see, e.g.*, Statement No. 26 (38). Others include statements on Meta's websites or made by Meta spokespersons in response to news articles about issues of public concern. *See, e.g.*, Statement No. 22 (27) (CNBC article about State Attorneys General letter). These statements addressed legislative oversight, press coverage, and

150

public debate about child safety and content moderation. They did not propose a transaction, invite consumers to buy or use a service, or function like the paid posts and direct consumer promotions that courts have treated as advertisements.

21.    The Court also finds that, while some of Meta's statements refer to its services, this factor is not dispositive of whether those statements were commercial in nature. Speech that is not in a traditional advertising format that refers to a specific product or service can either be commercial speech or fully protected speech. *Compare United States v. Wenger*, 427 F.3d 840, 847–48 (10th Cir. 2005) (finding that a newsletter concerning investment advice is commercial speech even though it "is concededly not a traditionally structured advertisement"), *with Commodity Trend Serv., Inc. v. Commodity Futures Trading Comm'n*, 149 F.3d 679, 686 (7th Cir. 1998) (citing cases that show that product reviews are generally not commercial speech).

22.    The Court observes that one reason for the distinction between commercial and non-commercial speech is "the truth of commercial speech may be *more easily verifiable by its disseminator* than news reporting or political commentary, in that ordinarily the advertiser seeks to disseminate information about a specific product or service that he himself provides and presumably knows more about than anyone else." *Nike*, 27 Cal. 4th at 955 (cleaned up) (emphasis in original); *see also Va. Pharmacy Bd. v. Va. Consumer Council,* 425 U.S. 748, 777 (1976) (Stewart, J., concurring) ("[t]he advertiser's access to the truth about his product and its price substantially eliminates any danger that governmental regulation of false or misleading price or product advertising will chill accurate and nondeceptive commercial expression").

23.    Those considerations are simply not applicable to the statements challenged here. Those statements do not concern price, availability, or other concrete service facts that an advertiser would be uniquely positioned to verify. Instead, they include statements about debated issues of public concern: child safety, mental health,

151

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

content moderation, age-appropriate design, and the effects of social media on society more broadly. *See supra* Findings pp. 9–62. Those statements reflect subjective opinions or aspirations that cannot be proven true or false by reference to a concrete metric.

24. The Court has previously observed that, under certain circumstances, "improvements to a brand's image" could constitute economic motivation. *Ariix,* 985 F.3d at 1117. However, the Ninth Circuit in *Ariix* derived this principle from a case involving direct consumer advertisements. *See Jordan v. Jewel Food Stores, Inc.*, 743 F.3d 509, 512, 518 (7th Cir. 2014). There, the Seventh Circuit found that "a full-page color ad" "congratulating a famous athlete" on induction into the Hall of Fame had the "unmistakable commercial function" of "enhancing the Jewel–Osco [grocery] brand in the minds of consumers." *Id.*

25. The Court also finds that the circumstances in *Ariix* are distinguishable from this case. The Ninth Circuit found that the defendants published a nutritional guide "mainly with the economic goal of furthering their own self-interests" because the individual who created the guide was alleged to have done so specifically to "ratchet up sales for [defendants'] products." *Ariix,* 985 F.3d at 1117–18. The court also explained that its decision was a "narrow one … tied specifically to the troubling allegations" that the nutritional guide was "more like a sophisticated marketing sham than a product review guide." *Id.*

26. The Court further finds that the States' deception claims are content- and viewpoint-based.

27. As a threshold matter, the Court observes that tiers-of-scrutiny analysis does not apply to the States' claims. Tort-like claims that penalize or burden protected speech cannot stand under the First Amendment as a matter of law. *See Snyder v. Phelps*, 562 U.S. 443 (2011). "[T]he scope of [First Amendment] protection is not limited to merely serving as a bar to the prior restraint of such speech, but also

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

prevents the assertion of a claim for civil damages." *McCollum v. CBS, Inc.*, 202 Cal. App. 3d 989, 1003 (1988).

28.    Courts determine whether statutes and regulations violate the First Amendment by applying tiers of scrutiny—e.g., intermediate or strict scrutiny—but that approach is not used to review tort-like claims. In *Snyder v. Phelps*, for example, the Supreme Court held that speech on matters of public concern is "entitled to special protection under the First Amendment, and that protection [cannot] be overcome by a jury finding" on a tort element. 562 U.S. at 458. The Court expressly distinguished its review of the tort judgment from challenges to laws, noting they "raise very different questions." *Id.* at 456–57.

29.    Even under the tiers-of-scrutiny framework, the States' claims would be barred. Strict scrutiny applies to "[c]ontent-based laws," *i.e.*, laws that "target speech based on its communicative content." *Reed v. Town of Gilbert*, 576 U.S. 155, 163–64 (2015). Laws are content-based if they cannot "be justified without reference to the content of the regulated speech." *Id.* at 164. Laws that "identif[y] certain preferred" or disfavored speakers are also subject to heightened scrutiny because they "deprive the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 341 (2010). When speaker-based laws reflect an "aversion to what ... disfavored speakers have to say," they too "demand strict scrutiny." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 658 (1994).

30.    The Court observes that the States challenge Meta's statements based on their content (*i.e.* characterizations of service safety and age-restriction and content moderation policies), and based on their viewpoint (*i.e.* opinions that Meta's services are safe, not designed to be addictive, and provide age-appropriate experiences to teens). *See supra* Findings pp. 9–62.

31.    To the extent that tiers-of-scrutiny analysis applies, the States' deception claims do not pass muster under either strict or intermediate scrutiny.

153

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

32.    Strict scrutiny is "the most demanding test known to constitutional law" and an "unforgiving" standard. *Free Speech Coalition, Inc. v. Paxton*, 606 U.S. 461, 484 (2025) (internal quotation omitted). To survive, a plaintiff must demonstrate that the speech restrictions sought represent (1) "the least restrictive means of" (2) "achieving a compelling" interest. *Ams. For Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) (citation omitted). The States cannot make that showing.

33.    As the Ninth Circuit has recognized, even a purported interest "in protecting children" does not satisfy this exacting standard. Regulating how companies that offer social media services opine on alleged "risk[s] of material detriment to children" "falls well short of satisfying strict First Amendment scrutiny." *Bonta*, 113 F.4th at 1116, 1121–22 (internal quotations omitted).

34.    Nor can the States satisfy intermediate scrutiny, which would require that the States' claims be "narrowly tailored to serve a significant governmental interest." *Packingham*, 582 U.S. at 105–06 (quoting *McCullen v. Coakley*, 573 U.S. 464, 486 (2014)). Even "where the protection of children is the object, … constitutional limits … apply." *Brown*, 564 U.S. at 799–805; *see also Erznoznik v. City of Jacksonville*, 422 U.S. 205, 213–14 (1975) (holding speech that is not "obscene as to youths … cannot be suppressed solely to protect the young from ideas or images" that the government "thinks unsuitable for them"). The Court further observes that the States' sweeping requests for monetary and injunctive relief extend far beyond the governmental interest in protecting children. *See infra* Conclusions pp. 178–83.

**D.    Statements Regarding Meta's General Objectives for Safety.**

1.    The Court concludes that the statements regarding Meta's objectives for safety are statements of opinion, aspiration, or objective that cannot be proven true or false and therefore cannot form the basis of a consumer deception claim under the laws of any of the four states. *See Morris v. Princess Cruises, Inc.*, 236 F.3d 1061, 1068 (9th Cir. 2001) (representation that consumers "would be safely and adequately

154

served" failed to state a claim because the statement "is devoid of any meaningful specificity"). These statements are Statement Nos. 1 (1), 6 (8), 7 (10), 9 (13), 13 (18), 16 (21), 21 (26), 22 (27), 23 (29), 24 (35), 32 (47), 33 (48), 36 (53), 37 (56), 38 (57), 45 (67), 46 (68), 47 (9), 48 (70), 50 (78), 43 (81), and 44 (82).

2. A misrepresentation must be a "specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact." *Rasmussen*, 27 F. Supp. 3d at 1039–40.

3. Under the laws of the four states, generalized statements of opinions and aspirations are not likely to induce consumer reliance. *See, e.g.*, *Demetriades v. Yelp, Inc.*, 228 Cal. App. 4th 294, 311 (2014) (noting that a "'statement is considered puffery if the claim is extremely unlikely to induce consumer reliance'"); *Park Rise Homeowners Ass'n v. Res. Constr. Co.*, 155 P.3d 427, 435 (Colo. Ct. App. 2006) (touting "quality construction" of condominiums was "mere puffery," not actionable under the CCPA); *Lingar v. Live-In Companions, Inc.*, 300 N.J. Super. 22, 28–29 (N.J. Super. Ct. 1997) (indicating that puffery is an "'exaggerated claim[ ] of quality'" or an "'unactionable [declaration] of opinion'" as opposed to a statement "'susceptible of personal knowledge' " and "represented in such a way 'that the consumer could reasonably treat [it] as [a declaration] of fact'"); *Naiser*, 975 F. Supp. 2d at 735 ("'puffing' is generally defined as an 'expression of an exaggerated opinion—as opposed to a factual misrepresentation—with the intent to sell a good or service.'" (citing Black's Law Dictionary 1353 (9th ed. 2009)).

4. The statements regarding Meta's overarching objective to deliver a safe and positive experience are too general to be proven true or false and thus cannot establish actionable misrepresentations. *See Rasmussen*, 27 F. Supp. 3d at 1040. Statements such as "safety is our number one priority" or "we are equally focused on keeping our platforms safe" are precisely the type of general, subjective assertions that courts have consistently held to be non-actionable puffery.

5. Generalized statements about safety cannot be actionable in the absence of a concrete promise capable of being proven true or false. *See, e.g.*, *Fusco v. Uber Techs., Inc.*, 2018 WL 3618232, at \*6 (E.D. Pa. July 27, 2018) (the "claim that a product is 'safe' generally … is puffery because it conveys only the seller's judgment that the risk is low enough to be called 'safe'"); *Allen v. FCA US LLC*, 2017 WL 1957068, at \*3 (W.D. Va. May 10, 2017) ("'[Y]ou're surrounded by advanced features designed to keep you safe and secure' ... [is] mere puffery and as such [is] not actionable."); *Stewart v. Electrolux Home Prods., Inc.*, 2018 WL 1784273, at \*11 (E.D. Cal. Apr. 13, 2018) ("The only alleged misrepresentation dealing with safety indicates the oven 'provides easy self-cleaning while keeping your family safe.' ... This is not a quantifiable statement or an absolute characteristic about safety that can be measured.").

6. For instance, in *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prods. Liab. Litig.*, 754 F. Supp. 2d 1145, 1171 (C.D. Cal. 2010), plaintiffs alleged that the defendant automobile manufacturer made a "general promise of safety and *specific promise* that the new electronic components being installed in the Defective Vehicles are more reliable than their mechanical predecessors." In that case, the defendants "sold tens of millions of vehicles" with a safety defect capable of "caus[ing] catastrophic injury or death." *Id.* at 1156, 1160. Defendants subsequently issued a "sticky pedal recall, which affected approximately 2.3 million vehicles." *Id.* at 1158. The National Highway Traffic Safety Administration ("NHTSA") subsequently "imposed a $16.375 million civil penalty on [defendant] for its failure to inform NHTSA regarding the sticky pedal defect, which [defendant] agreed to pay." *Id.* The defendant also engaged in a practice of rejecting "any claim of a defect" and refusing to "inform the claimant of the existence of hundreds or thousands of other, similar claims." *Id.* at 1159. The court allowed the plaintiffs' claims to proceed past the motion-to-dismiss stage because the plaintiff "alleged [defendant] made specific misdescriptions of its

156

vehicles," including "that ETCS makes it possible to achieve 'shorter activation times' leading reasonable consumers to 'believe that their brakes would activate more quickly than usual rather than potentially not at all.'" *Id.* at 1177 (cleaned up).

7. Several courts have held that broad, aspirational statements similar to those at issue here are not actionable.

    a) In *Ahern*, 411 F. Supp. 3d at 550, the plaintiffs alleged that the defendant's computer products contained a "critical defect" resulting in "permanent dark smudging in the corners of the screens," a slower "processing speed," and an increased likelihood of crashes. The plaintiffs brought affirmative misrepresentation claims under the UCL, alleging that the following statements on the defendant's website were misleading: that the computer screens were "clear and remarkably vivid" and of the "highest quality," that the displays were "the most advanced, most brilliant" displays defendant ever built, that "everything is designed to work just the way you expect it to," and that the computers underwent "rigorous testing methods." *Id.* at 554. Judge Koh held that most of those statements were nonactionable because they did not make "factual representations that a given standard is met." *Id.* at 556 (quoting *Consumer Advocates v. Echostar Satellite Corp.*, 113 Cal. App. 4th 1351, 1361 (2003)). In so doing, Judge Koh evaluated each individual statement to determine whether it made a concrete representation of fact.

        (1) For the statements that the screens were "clear and remarkably vivid," Judge Koh reasoned that those statements "do not say anything about specific characteristics or components—or even how clear and vivid the screens actually are." *Id.*

        (2) For the statements that the screens were of the "highest quality," Judge Koh found that such statements were "boasts" and "all-but-

157

meaningless superlatives" of the type that courts consistently find nonactionable. *Id.* (citing, *e.g.*, *Consumer Advocates*, 113 Cal. App. 4th at 1361; *Oestreicher v. Alienware Corp.*, 544 F. Supp. 2d 964, 973 (N.D. Cal. 2008); *Hodges v. Apple Inc.*, 2013 WL 4393545, at *3 (N.D. Cal. Aug. 12, 2013); *Apodaca v. Whirlpool Corp.*, 2013 WL 6477821, at *6 (C.D. Cal. Nov. 8, 2013)).

(3)    For statements that "everything is designed to work the way you expect it to," Judge Koh found that such statements were "not amenable to general verification or falsification because its truth or falsity for a particular consumer depends as much on the characteristics of that consumer as the efficacy of the product." *Id.* at 557 (citation omitted).

(4)    The statements about "rigorous testing methods" did not constitute puffery to the extent those statements represented that the products underwent some form of testing. *Id.* However, plaintiffs could not establish that these statements were false or misleading because "that some Apple products suffered from the alleged defect does not demonstrate that Apple made any misrepresentation of fact in stating that the products were rigorously tested with methods that simulated customers' experiences." *Id.* at 559 (cleaned up).

b)    In *Azoulai v. BMW of N. Am. LLC*, 2017 WL 1354781, at *8 (N.D. Cal. Apr. 13, 2017), Judge Freeman held that the defendant's statements that a product feature operated "safely" was not an actionable misrepresentation because "there is nothing 'specific and measurable' about the word 'safely.'"

c)    In *Vitt v. Apple Computer, Inc.*, 469 Fed. App'x. 605, 607 (9th Cir. 2012), the Ninth Circuit affirmed dismissal of a UCL fraud claim on the basis that descriptors such as "durable," "reliable," and "high performance" were not

158

actionable. "Even when viewed in the advertising context," the court reasoned, "these statements do not claim or imply" that the product would "last for a duration beyond its expressed warranty." *Id.*

d)    In *Renfro*, 25 F.4th at 1304, the Tenth Circuit found that statements about being "Trusted Everywhere" and using "Ingredients We Love [From] People We Trust" are the sort of subjective and "vague generalities that no reasonable person would rely on as assertions of particular facts." (citation omitted).

e)    In *Morris*, 236 F.3d at 1068, the Ninth Circuit held that the defendant's statement that passengers on its cruises "would be safely and adequately served" was "devoid of any meaningful specificity, amounting at most to ... mere puffing."

f)    In *In re iPhone 4S Consumer Litig*., 637 Fed. App'x. 414, 415–16 (9th Cir. 2016), the Ninth Circuit explained that the "[f]ailure to meet Plaintiffs' undefined expectations . . . does not render [the manufacturer's] representations misleading." In that case, "product demonstrations of Siri in Apple's general advertising campaign" were "insufficient to show that Apple fraudulently mislead Plaintiffs into believing Siri would perform consistently." *Id.* The plaintiffs in that case failed to establish "what level of consistency they expected from these representations." *Id.*

g)    In *Murphy v. Twitter, Inc.*, 60 Cal. App. 5th 12, 40–41 (2021), the California Court of Appeal found that Twitter did not engage in fraudulent activity within the meaning of the UCL through statements holding "'itself out to be a free speech platform' on its website, and in advertising, public statements, and its CEO's testimony before Congress." *See id.* ("No reasonable person could rely on proclamations that '[w]e believe in free expression and think every voice has the power to impact the world,' that Twitter was the 'free speech wing of the free speech party,' or that Twitter's

159

mission 'is to give everyone the power to create and share ideas and information instantly without barriers,' as a promise that Twitter would not take any action to self-regulate content on its platform.").

h)      The court in *In re Theos Dark Chocolate Litig.*, 750 F. Supp. 3d at 1089, held that "Statements 'Farm to bar to you' and 'chocolate you can feel good about' are nonactionable puffery, as reasonable consumers would not rely on these aspirational statements as reliable promises about the cacao bean's journey from seed to shelf or how a consumer might feel about their chocolate."

i)      In *Prager Univ. v. Google LLC*, 951 F.3d 991, 1000 (9th Cir. 2020), the Ninth Circuit found that "YouTube's braggadocio about its commitment to free speech constitutes opinions that are not subject to the Lanham Act. Lofty but vague statements like 'everyone deserves to have a voice, and that the world is a better place when we listen, share and build community through our stories' or that YouTube believes that 'people should be able to speak freely, share opinions, foster open dialogue, and that creative freedom leads to new voices, formats and possibilities' are classic, non-actionable opinions or puffery."

j)      In *Anunziato v. eMachines, Inc.,* 402 F.Supp.2d 1133, 1139–41 (C.D. Cal. 2005), the court found that representations that a notebook computer was of "high quality," "reliable," offered "high performance," and employed the "latest technology" amounted to non-actionable puffery, while representations that the computers included "brand-name components" and were subject to the "most stringent quality control test" were actionable because they were specific factual allegations which could be proved or disproved through evidence.

k)      In *Doe v. Uber Techs., Inc.*, 551 F. Supp. 3d 341, 366–67 (S.D.N.Y. 2021), the court held that "[s]tatements that an Uber ride is 'safe' or that the 'Uber

160

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

experience has been designed from the ground up with your safety in mind' are general statements that 'convey only the seller's opinion that its product is superior, such that no consumer could claim to have justifiably relied on them.'"

l) In *Brown v. Madison Reed, Inc.*, 622 F. Supp. 3d 786, 802 (N.D. Cal. 2022), *aff'd*, 2023 WL 8613496 (9th Cir. Dec. 13, 2023), the court found that "[t]he statements 'Salon Gorgeous,' 'Ingredients with Integrity,' and 'Salon-quality' are neither specific nor measurable. They make no factual representations. Rather, they are vague, generalized, and subjective statements about the products."

m) In *Saum*, 7 F. Supp. 3d at 705, the court described as "tenuous[]" and unlikely the plaintiffs' theory that "the occurrence of the [bus] accident itself renders false [defendant bus company's] assurances of safety" within the meaning of the KCPA.[6]

8. At the motion to dismiss stage, this Court cited authority for the proposition that a generalized statement can be actionable when it is part of an "overarching scheme" involving other, specific misrepresentations on the same packaging or in the same advertisement. *See* MTD Order at 37–38 (citing *Williams*, 552 F.3d at 939 n.3). The Court finds that this reasoning does not apply to a case involving a myriad statements on different topics made in different settings to different audiences.

9. In *Williams*, the statement that a snack was "nutritious" appeared on the same product packaging alongside specific misrepresentations of fact about the snack's ingredients. *See* 552 F.3d at 939. The statements at issue in this case, by contrast, were made by 11 different speakers, in different forums, over the span of more than eight years, and do not accompany any specific factual misrepresentation on the same packaging or in the same communication.

---

[6] The court ultimately granted the defendant's summary judgment motion on the grounds that the defendant's statements "did not lead to the actual losses suffered by" the plaintiffs. *Id.* at 706.

161

10. Even if these statements were specific enough to be actionable, the Court finds that they accurately reflect Meta's overarching objectives and are not misleading in context. *See supra* Findings pp. 9–62. The States thus have not "identified *precisely* how [Meta's statements] w[ere] misleading and provided evidence that the misrepresentation mattered to consumers." *Beardsall v. CVS Pharmacy, Inc.*, 953 F.3d 969, 976 (7th Cir. 2020). The evidence at trial established that Meta does prioritize safety, invests substantial resources in teen safety and well-being initiatives, and makes design choices that accept engagement losses in favor of safety improvements. *See supra* Findings pp. 9–62. Meta witnesses likewise testified that safety and growth do not present a tradeoff, because a safe and positive experience is what sustains long-term use of Meta's services. *See supra* Findings pp. 50–62. Nor does the testimony of the States' experts disprove any of Meta's statements about safety. Meta's "general, commendatory statements remain matters of opinion regardless of whether an expert or government agency would disagree with them." *Fusco*, 2018 WL 3618232, at *8.

11. The alleged misrepresentations in this category consist of statements by various Meta executives and spokespersons expressing Meta's commitment to user well-being and safety. These include statements such as "[m]aking the community a safer place, a place where people feel good, is a huge priority for Instagram" (Statement No. 1 (1)); "[w]e will do things that mean people use Instagram less if we think that they keep people safe" (Statement No. 6 (8)); "[p]rotecting our community is more important than maximizing our profits" (Statement No. 37 (56)); and "[a]t the heart of these accusations is this idea that we prioritize profit over safety and well-being. That's just not true" (Statement No. 38 (57)). These statements span from 2018 to 2024 and were made by different speakers in different contexts, including press interviews, business conferences, blog posts, and congressional testimony.

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

12. None of these statements makes a "specific and measurable claim" that could be proven false. *Rasmussen*, 27 F. Supp. 3d at 1039–40. A statement that safety is a "huge priority" or a "number one priority" does not represent that Meta's services are free from all harmful content, that every safety initiative will succeed, or that Meta will never make a business decision that some might view as inconsistent with safety. These are precisely the type of "vague generalities that no reasonable person would rely on as assertions of particular facts." *Renfro*, 25 F.4th at 1304.

13. Several courts have found that reasonable consumers do not interpret generalized statements about a product to make concrete representations about specific attributes of the product.

a) In *Elias*, 950 F. Supp. 2d at 1133, the court concluded that "generalized" statements "that a computer is 'ultra-reliable' or 'packed with power' say nothing about the specific characteristics or components of the computer." The court declined to view the defendant's statements "in their totality," instead concluding that that "the combination of several 'puff' statements does not automatically create an actionable misrepresentation." *Id.* at 1134.

b) In *Reed*, 2014 WL 12284044, at *12, 15, plaintiffs alleged that the defendant falsely claimed that its products provide "nutrient delivery to muscles," pointing to "scientific studies which purport to show that healthy individuals who orally consume" the active ingredient in the defendant's product will not "increase muscle strength or mass." The court concluded that the plaintiff's "belief" that the product "promised muscle growth reached beyond what a reasonable consumer could justifiably conclude from the language presented." *Id.* at *16 ("There is a substantial analytical gap between a claim which promises to deliver nutrients to muscles and a belief that the product will cause muscle growth.").

c) In *Carrea v. Dreyer's Grand Ice Cream, Inc.*, 2011 WL 159380, at *5 (N.D. Cal. Jan. 10, 2011), *aff'd*, 475 Fed. App'x. 113 (9th Cir. 2012), *abrogated*

163

*on other grounds by Tabler v. Panera LLC*, 2019 WL 5579529 (N.D. Cal. 2019), the court found that no reasonable consumer who read the statements "original" and "classic" on a food product could conclude that they were more wholesome and healthy than other frozen desserts. Because general statements that the ice cream was "Original" and "Classic" "do not refer to a particular formula or recipe so as to suggest the product is made with natural or wholesome ingredients," "a reasonable consumer would not likely be deceived" by such statements. *Id.* at *5.

d)    In *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1026 (9th Cir. 2008), the Ninth Circuit held that a manufacturer's general warranty and the post-warranty failure of engine components did not give rise to a UCL fraud claim because no "reasonable consumer would have expected or assumed any particular head gasket lifespan in excess of the warranty period."

e)    In *Park Rise Homeowners*, 155 P.3d at 435–36, the Colorado appellate court affirmed dismissal of a CCPA claim because the alleged misstatement about "quality construction" did not make "a specific representation of fact subject to measure or calibration." Instead, the meaning of that statement "would depend on a speaker's frame of reference." *Id.* at 436.

14.    Moreover, the evidence at trial established that Meta has in fact repeatedly made business decisions that prioritized safety at the expense of short-term growth, including implementing the Meaningful Social Interactions algorithm change (which reduced time spent by approximately 50 million hours per day), launching Teen Accounts (which reduced teen usage), and deploying features such as Take a Break, Quiet Mode, and daily time limit nudges that actively encourage users to spend less time on its services. *See supra* Findings pp. 9–62. The Court concludes that these statements accurately reflect Meta's overarching objectives and that the States have failed to establish that any individual statement was false or misleading when made.

164

15. In sum, the Court finds that these statements are general and subjective, and therefore not actionable under the laws of the four States.

E. **Statements Of Meta's Age-Restriction Policy.**

1. The Court finds that Meta's statements regarding its age-restriction policy are true and accurately stated and therefore not actionable under the laws of the four States at issue. These statements are Statement Nos. 11 (85), 19 (24), 25 (37), 28 (42), 29 (43), 30 (44), 31 (45), 41 (63), and 42 (65). Evidence that users lie about their age and are able to evade Meta's policy is not "contrary to a representation actually made" about the existence of that policy or what it says. *Hodsdon*, 891 F.3d at 861. Meta has repeatedly disclosed and acknowledged to the public that under-13 individuals manage to get on to Instagram and Facebook by lying about their age. *See supra* Findings pp. 3–14. Viewed "as a whole, including its disclosures," Meta's statements about under-13 individuals were not "misleading or deceiving." *Holt*, 370 F. Supp. 3d at 1168–69.

2. Statements of policy are not rendered false or misleading by the fact that users break the policy. Several courts have determined that similar descriptions of company policy did not constitute actionable misrepresentations.

a) In *DotStrategy Co. v. Facebook Inc.*, 2020 WL 6591366, at *7 (N.D. Cal. Nov. 11, 2020), Judge Alsup held that evidence that "not all users on Facebook [] adhere to Facebook's authenticity policy" prohibiting fake accounts did not render statements describing that policy misleading. *See id.* ("a reasonable consumer would understand that not all users on Facebook would adhere to Facebook's authenticity policy").

b) In *DotStrategy Co. v. Twitter Inc.*, 476 F. Supp. 3d 978, 983 (N.D. Cal. 2020), Judge Breyer found that evidence that some Twitter users "use the platform to disseminate spam, violate Twitter's terms of service, or otherwise qualify as 'fake' despite being human" did not contradict statements of Twitter's policy prohibiting fake accounts. *See id.* at 983 (The

165

court "is aware of no definition of personhood that is contingent on abiding by a corporation's terms of service.").

c)    In *Eisner v. Meta Platforms, Inc.*, 2024 WL 3228089, at \*4 (N.D. Cal. June 28, 2024), Judge Breyer held that allegations that Meta's enforcement efforts were deficient did not render accurate descriptions of Meta's enforcement policies false or misleading because the policy statements merely "outline[d] Meta's broad commitment to confronting child exploitation on its platforms." In so holding, Judge Breyer observed that "Meta does not suggest in its policy statements that its tools to protect children on its platforms are entirely effective, or that Meta is flawless in the execution of its policies." *Id.*

d)    In *Murphy*, 60 Cal. App. 5th at 41, the California Court of Appeal held that certain provisions in Twitter's user agreement could not give rise to a UCL fraud claim. *See id.* ("No reasonable person would rely on a general statement that Twitter would not 'actively monitor user's content and will not censor user content, except in limited circumstances' to mean it would never restrict content[.]").

3.    For similar reasons, courts generally find that contractual promises "cannot constitute a misrepresentation." *Rhino Linings USA, Inc.*, 62 P.3d at 149 (contractual "promise of territorial exclusivity … combined with subsequent" breach of that promise was "not a deceptive trade practice under the CCPA"). So too here. Meta's statements accurately describing the content and enforcement of its age-restriction policy are not misleading even if the States believe Meta did not adequately enforce that policy.

4.    At the pleading stage, this Court observed that "pervasive inaction and noncompliance with [Meta's] under-13 policy" could render Meta's statements deceptive. MTD Order at 42. The Court does not find on the facts that there has been any such "pervasive inaction." To the contrary, the evidence establishes that

166

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

Meta has consistently enforced its age-restriction policy, and that Meta has expanded its proactive detection efforts over time. *See supra* Findings pp. 93–100.

5.     The States also assert that Meta's statements of its age-restriction policy were misleading because they suggest that under-13 individuals were not on its services. But that theory is belied by Meta's repeated disclosures that such individuals were on its service, that age-lying is an industry-wide problem, including for Meta, and that it needed to take a number of steps to identify U13s. *See supra* Findings p. 93. Meta's disclosures therefore preclude a theory that the policy statements misleadingly suggested there were no U13s on the service. *See, e.g.*, *Freeman*, 68 F.3d at 289 (reasonable consumer unlikely to be deceived where disclosure "expressly and repeatedly state[d] the conditions" of lottery sweepstakes); *Baxter v. Intelius, Inc.*, 2010 WL 3791487, at *4 (C.D. Cal. 2010) (no consumer deception where defendant "disclosed the full terms of the newly offered membership" and the "information contained in the disclosure" was not "itself deceptive").

6.     The challenged statements in this category involve statements describing Meta's policy itself, *i.e.* that users must be 13 or older and that Meta does not allow children under 13 on its services. These are accurate descriptions of a policy that has been in place since the launch of Meta's services, as reflected in the Facebook Terms of Service and Instagram Terms of Use that every user must accept. *See supra* Findings p. 93. Meta's statements also include descriptions of its efforts to enforce that policy, including by removing suspected underage accounts, building technology to detect U13 users, and allowing third parties to report suspected underage accounts. The evidence establishes that these statements, too, are accurate descriptions of what Meta does. *See supra* pp. 93–100.

7.     Statements that Meta does not allow people under 13 to have a Facebook or Instagram account are accurate descriptions of Meta's longstanding policy. *See* Statement No. 28 (42) ("children under the age of 13 are not allowed on Instagram or Facebook"); 31 (45) ("[w]e do not market to 8 to 12 year olds because they are

167

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

not on Instagram"). Both Instagram's and Facebook's terms of service have prohibited users under 13 from joining those services since their inception. *See supra* Findings p. 93. That some users lie about their age and evade this policy does not transform an accurate statement of what the policy is into a falsehood. *See DotStrategy Co. v. Facebook Inc.*, 2020 WL 6591366, at \*7; *DotStrategy Co. v. Twitter Inc.*, 476 F. Supp. 3d at 983.

8.      Meta's statements describing its enforcement efforts, such as that "[i]f we detect that someone might be under the age of 13, even if they lied, we kick them off" (Statement No. 19 (24)), that "[w]e also allow people to report underage accounts, even if you are not on Facebook, and we will remove them" (Statement No. 29 (43)), and that "[w]e're building new technology to proactively find and remove accounts belonging to those under 13" (Statement No. 41 (63)), are likewise accurate and not misleading. The evidence establishes that Meta provides both users and non-users with tools to report potential U13 users; that accounts flagged as potentially underage are suspended, checkpointed, and deleted if the user cannot verify they are at least 13; and that Meta has developed and deployed proactive detection heuristics that search for indicia of underage status. *See supra* Findings pp. 93–100. Furthermore, the evidence establishes that, even if Meta's age-restriction policy has not resulted in the exclusion of all U13 users from its services, Meta did not "knowingly attempt to recruit people who aren't old enough to use our apps." Statement No. 25 (37).

9.      The States have not established that the reasonable consumer would understand Meta's statements about its age-restriction policy as a representation that that policy is perfectly enforced. *See Beardsall*, 953 F.3d at 976 (holding that, under various consumer protection laws, including CA and NJ, extrinsic evidence "is necessary where the [representation] is not clearly misleading on its face"). The Court finds that a reasonable consumer would not understand statements about the content of Meta's age-restriction policy, and true descriptions of actions Meta takes to enforce

168

that policy, as representations that the policy is enforced perfectly. *See Davis*, 691 F.3d at 1162 ("representation does not become 'false and deceptive' merely because it will be unreasonably misunderstood by an insignificant and unrepresentative segment of the class of persons to whom the representation is addressed.").

10. In other words, the fact that these enforcement mechanisms are imperfect does not render descriptions of them false or misleading. *See Eisner*, 2024 WL 3228089, at *4. The statements about Meta's age-restriction policy and enforcement efforts "on their own do not claim" that those enforcement efforts are perfect or cannot be improved. *Brown*, 622 F. Supp. 3d at 802. "As in other cases involving factually true statements, these statements would not cause a reasonable consumer to believe that" no under-13 individuals use Meta's services, "let alone a significant portion of general public or targeted customers." *Id.* at 802. *See also, e.g., Hadley v. Kellogg Sales Co.*, 243 F. Supp. 3d 1074, 1093 (N.D. Cal. 2017) (finding that the factually true statement "MADE WITH Real Fruit" would not cause a reasonable consumer to believe that fruit bars were free of trans fat); *Red v. Kraft Foods, Inc.*, 2012 WL 5504011, at *4 (C.D. Cal. Oct. 25, 2012) (finding that it "strains credulity to imagine that a reasonable consumer will be deceived into thinking a box of crackers is healthful or contains huge amounts of vegetables simply because there are pictures of vegetables and the true phrase 'Made with Real Vegetables' on the box").

11. At most, the States have established that some users or bad actors *violate* Meta's policies. But that does not prove that Meta's articulation of its policy and enforcement efforts were false or misleading. To illustrate, the States could accurately state that California or Colorado do not allow driving without a license; the fact that some people still do so in these states does not make the statement false or misleading, and certainly not knowingly so.

**F.    Statements Regarding Meta's Content Moderation Policies and Enforcement.**

169

1. The Court finds that Section 230 bars misrepresentation claims that are premised on "description[s] of [Meta's] moderation policy." *Doe v. Grindr Inc.*, 128 F.4th 1148, 1154 (9th Cir. 2025). The States cannot, consistent with Section 230, challenge statements that describe how Meta moderates third-party content on its services. Beyond that bar, Meta's statements about its content moderation policies and enforcement were accurate and not misleading. These statements are Statement Nos. 3 (5), 4 (6), 5 (7), 6 (8), 8 (12), 12 (16), 14 (19), 27 (39), 36 (53), 39 (59), 43 (81), 45 (67), 46 (68), 47 (9), 48 (70), 49 (80), 50 (78), and 51 (83).

2. It is well-established that claims premised on the "failure to remove content . . . are explicitly foreclosed by § 230(c)(1)," and no suit can seek to "hold[] companies responsible for moderating or failing to moderate content." *Estate of Bride ex rel. Bride v. Yolo Techs., Inc*., 112 F.4th 1168, 1177, 1182 (9th Cir. 2024). The law does not permit claims imposing liability on Meta based on its decisions over "which third-party content to remove and which to permit." *Doe (K.B.) v. Backpage.com, LLC*, 768 F. Supp. 3d 1057, 1063 (N.D. Cal. 2025); *see also Zeran v. America Online, Inc*., 129 F.3d 327, 331 (4th Cir. 1997) (Section 230 "forbids the imposition of publisher liability on a service provider for the exercise of its editorial and self-regulatory functions."). Protected publisher activity generally "involves reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1102 (9th Cir. 2009). Protected publishing activity also encompasses "monitoring, screening, and deletion of content." *Computer & Commc'ns Indus. Ass'n v. Paxton*, 2026 WL 2130729, at *1, 12 (5th Cir. July 24, 2026) (published) (holding that Section 230 barred requirement that social media services "monitor and filter content accessible to known minors to prevent exposure to several categories of potentially harmful speech").

3. In determining whether Section 230 immunity applies, "what matters is not the name of the cause of action." *Barnes*, 570 F.3d at 1101. That is because "many

170

causes of action might be premised on the publication or speaking of what one might call 'information content.'" *Id.* For that reason, several courts have found that Section 230 bars consumer protection claims. *See, e.g.*, *Gentry v. eBay, Inc.*, 99 Cal. App. 4th 816, 834–836 (2002) (rejecting negligence and UCL claims under § 230 and California law based on auction website's compilation of and failure to withdraw allegedly false and misleading information provided by individual sellers on its website); *Murphy*, 60 Cal. App. 5th at 40 (Section 230 barred UCL fraud claim premised on defendant's statements "on its website, and in advertising, public statements, and its CEO's testimony before Congress"); *King v. Facebook, Inc.*, 2019 WL 4221768 at *1, n.1, *3–5 (N.D. Cal. Sept. 5, 2019) (dismissing breach of contract, promissory estoppel, and UCL claims under § 230(c)(1)).

4. In *Grindr*, the Ninth Circuit held Section 230 barred several claims implicating the defendant Grindr's content moderation practices. The plaintiff's negligent misrepresentation claim was premised on the "theory of liability" that Grindr affirmatively misrepresented "that it would maintain a 'safe and secure environment for its users' on the App but fail[ed] to do so." 128 F.4th at 1154. Because "Grindr's general statement that the App is 'designed to create a safe and secure environment for its users,' is not a specific promise, but a description of its moderation policy," it was "protected from liability under § 230." *Id.* The Ninth Circuit further found that "the statement that an interactive computer service provider will create a safe and secure environment is too general to be enforced." *Id.*

5. In *Glazer v. Meta*, 2025 WL 2958810, at *5 (D. Md. Oct. 17, 2025), the plaintiff alleged that Meta had not removed postings on Facebook Marketplace by third parties selling purportedly counterfeit goods, in breach of its Terms of Service "in which Meta merely assures its users that it works to detect improper use of its websites and that it 'may take appropriate action' if it learns of any such misuse." The court held that this claim—based on terms similar to those underpinning many

171

of the States' alleged misrepresentations—was barred by Section 230 because the plaintiff "failed to allege that Meta promised expressly to remove or otherwise address the fraudulent postings." *Id.*

6. By contrast, when an interactive computer service goes beyond describing its content-moderation and other policies and makes a *specific promise* to specific users, courts have permitted claims based on the failure to honor *that promise*. For instance, the plaintiff in *Barnes* sued after Yahoo failed to remove specific fake profiles that a Yahoo employee had personally assured the plaintiff would be removed. 570 F.3d at 1098–99. Rather than challenging "a general monitoring policy," or Yahoo's "attempt to de-publish" third-party content— challenges barred by Section 230, as they would have imposed liability on Yahoo as a publisher of third-party content—the plaintiff sought to hold Yahoo liable "as a promisor who [] breached." *Id.* at 1107–08.

7. In *Bride*, the defendant YOLO created an application where users could post content anonymously, and "informed all users that it would reveal the identities of, and ban, anyone who engaged in bullying or harassing behavior." 112 F.4th at 1172. Finding this specific promise to take specific action "sufficiently analogous to Yahoo's promise to remove an offensive profile," the court held that Section 230 did not bar the plaintiffs' breach of contract claims for failing to "unmask" or ban harassing users because "the underlying duty being invoked by the Plaintiffs . . . is the promise itself." *Id.* at 1173, 1178–79.

8. The Court finds that the statements the States identify are nothing like the specific promises at issue in *Barnes* and *Bride*. *See supra* Findings pp. 9–62 (Statement Nos. 5 (7), 8 (12), 27 (39), 36 (53), 45 (67), 46 (68), 47 (9), 48 (70), 50 (78)). The States challenge general statements about Meta's commitment to keeping its services safe (Statement Nos. 8 (12), 47 (9)) and statements about Meta's content policies and enforcement (Statement Nos. 48 (70), 50 (78)). Those statements do not make specific representations to users that its services will be free of policy-

172

violating content or that it can prevent all harm.  For instance, the statement that Meta "regularly consult[s] with experts" to make its "platforms safe and age-appropriate for young people, including improving our understanding of which types of content may be less appropriate for teens," does not assert that inappropriate content will be entirely removed from its services.  Statement No. 48 (70); *see also* Statement No. 50 (78) ("We regularly consult with experts in suicide, self-injury and eating disorders to help inform our policies and enforcement.").

9.  Several of the States' claims in this category are premised on the allegation that Meta's content moderation efforts were inadequate—that is, that Meta failed to remove enough harmful content from its services.  Mr. Mosseri's statement that well-being is "our number one priority" and that Meta "will do things that mean people use Instagram less if we think that they keep people safe" (Statement No. 6 (8)), for instance, is a general description of Meta's content moderation philosophy.  Imposing liability based on these statements would require the Court to evaluate whether Meta's content moderation was sufficiently effective—which is precisely the type of publisher-liability claim that Section 230 forecloses.  *See Grindr*, 128 F.4th at 1154.

10.  The States also challenge a statement on Meta's webpage that Meta's "Best Interests of the Child Framework" includes the principle "Create safe, age-appropriate environments for youth."  Statement No. 43 (81).  This statement explains that Meta teams are provided "with resources to help them understand how to make the content, controls and features in their products appropriate for the young people they reach." *See supra* Findings pp. 35–36.  So too with Ms. Davis's statement that Meta "introduced new ways to ... surfac[e] more expert-backed resources when people search for eating disorder-related content."  Statement No. 27 (39).  That statement explained Meta's content policy decisions. *See supra* Findings p. 32.

173

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

11. Similarly, Ms. Davis's statement that Meta has "put in place multiple protections to create safe and age-appropriate experiences for people between the ages of 13 and 17" (Statement No. 26 (38)) describes Meta's content-moderation approach with respect to teen users. The evidence establishes that Meta has in fact implemented such protections, including restricting direct messaging from unknown adults, defaulting teens into more restrictive content settings, and limiting the visibility of sensitive content to minors. *See supra* Findings pp. 9–50. That these protections may not prevent every negative experience does not make the description of their existence false or misleading.

12. Just as in *Grindr*, Meta's statements are not promises, but merely "general . . . description[s] of [Meta's] moderation policy." 128 F.4th at 1154. Because holding Meta liable for these statements, at its core, seeks to penalize Meta for failing to moderate third-party content, Section 230 bars the deception claims premised on statements describing Meta's content moderation.

13. Even if Section 230 did not bar these claims, the Court finds that the statements accurately reflect what Meta is doing with regard to harmful content and thus are neither misleading nor false. The evidence at trial established that Meta does engage in content moderation, does publish CSERs, does regularly consult with outside experts, and has put in place protections for users between the ages of 13 and 17. *See supra* Findings pp. 9–50. That Meta's content moderation is not perfect, or that some policy-violating content remains on its services, does not render these descriptions of Meta's efforts false or misleading. *See Eisner*, 2024 WL 3228089, at *4.

14. Meta's statements recognized that there is always room for improvement in content moderation. Meta never denied, and in fact repeatedly acknowledged, that some violative content remains on its services. Through its CSERs, Meta disclosed to the public that it did not perfectly enforce its content policies. *See supra* Findings pp. 40–50. Meta further disclosed to the public the content of its Community

174

Standards so users could understand exactly what content did and did not violate Meta policy. *See supra* Findings pp. 40–50. Meta also acknowledged that users may have bad experiences on its services, and that Meta is continuously improving and changing its policies and technology to address that issue. *See supra* Findings pp. 16–20, 65–68. Taken together with Meta's transparency about its content moderation and enforcement, Meta's statements were not likely to deceive. *Holt*, 370 F. Supp. 3d at 1168–69 (granting summary judgment on UCL and FAL claims where disclosures were "not buried"); *Freeman*, 68 F.3d at 290 (finding advertisement of prize is not misleading when "no reasonable reader could ignore" qualifying disclosures). These are Statement Nos. 3 (5), 4 (6), 5 (7), 8 (12), 12 (16), 14 (19), 27 (39), 36 (53), 39 (59), 43 (81) 45 (67), 46 (68), 47 (9), 48 (70), 50 (78), 49 (80), and 51 (83).

15. The Court also finds that the statements regarding Meta's CSERs are accurate and not misleading and thus are non-actionable under the consumer protection laws of the four states. *See, e.g.*, *Rhino Linings USA, Inc.*, 62 P.3d at 144 (deceptive trade practice under CCPA "requires a false statement of fact"). These statements are Statement Nos. 3 (5), 4 (6), 5 (7), 8 (12), 12 (16), 14 (19), 39 (59), 47 (9), and 51 (83).

16. Meta's CSERs are transparency reports that Meta publishes to communicate the amount of policy-violating content that appeared on its services. *See supra* Findings pp. 40–50.

17. Those statements describe estimated measurements of the frequency of content that violates Meta's Community Standards. *See, e.g.*, Statement No. 3 (5) ("We care most about how often content *that violates our standards* is actually seen.") (emphasis added). The prevalence data and other factual metrics reported in the CSERs were calculated using established methodologies, and the States have not established that any specific figure or characterization in these reports was

175

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

inaccurate or misleading at the time it was published. *See supra* Findings pp. 40–50.

18. The Court finds that Meta's internal research does not render statements about CSER misleading. For instance, the BEEF Survey measures the subjective experiences of users on Meta's services, as understood by those users. *See supra* Findings pp. 40–43. Because "none of the" statements about CSERs "have anything to do with the" BEEF survey "itself," none of those statements "needs to be qualified." *Sciacca*, 362 F. Supp. 3d at 799.

19. The nondisclosure of unrelated facts does not render the facts as stated false or misleading. Rather, such facts are relevant to consumer deception claims only where that information is "contrary to a representation actually made by the defendant." *Hodsdon*, 891 F.3d at 861 (quoting *Daugherty v. Am. Honda Motor Co.*, 144 Cal. App. 4th 824, 835 (2006)). The "alleged fraudulent misrepresentation" must "relate[] directly to the omitted information." *Sciacca*, 362 F. Supp. 3d at 799.

20. Courts routinely hold that undisclosed information cannot render statements misleading unless that information expressly contradicts what the defendant has said.

a) Judge Koh in *Ahern*, 411 F. Supp. 3d at 562, found that a UCL claim premised on partial omissions was not actionable. There, the plaintiffs alleged that the statements regarding the performance and longevity of the defendant's products were misleading in light of an undisclosed defect that slowed down computer processing and made crashes more likely. *See id.* at 562. Judge Koh reasoned that statements about performance and longevity were not actionable because they made "no representations about anything related to" the "alleged defect." *Id.* That was because generalized statements about the product were "'not likely to deceive a reasonable consumer' and cannot undergird a claim based on a material omission." *Id.*

176

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

b) In *Sciacca*, 362 F. Supp. 3d at 799, the plaintiff brought a UCL claim premised on the theory that, because the defendant "informed Plaintiff that the [defendant's] Watches were objectively durable," then the defendant "'also has a duty to inform purchasers that the Watch may otherwise break as a result of the Defect' or else its representations about the Watch are misleading." Judge Koh examined the actual statements at issue, observing that the "only representations made by [defendant] pertained to … the waterproof nature of the Watch or the fact that it had a bright display." *Id.* In short, "none of the alleged misrepresentations about the waterproof nature of the Watch, the brightness of its screen, the dual-core processor, and so on relate to the 'omitted' information: that the Watch screen may detach, crack, or shatter because of the alleged defect." *Id.* "In fact, none of the alleged misrepresentations have anything to do with the Watch screen itself," and thus the plaintiff could not establish and actionable misrepresentation. *Id.*

c) In *Krystofiak v. BellRing Brands, Inc.*, 737 F. Supp. 3d 782, 791, 799–800 (N.D. Cal. 2024), the failure to disclose that the defendants' products "contain[ed] high levels of lead" was irrelevant to a deceptive practices claim when "none" of the alleged misrepresentations "refer[red] to lead or otherwise heavy metals explicitly." *Id.* at 799–800.

d) In *Long v. Hewlett–Packard Co.*, 2007 WL 2994812, at *8 (N.D. Cal. July 27, 2007), the court reasoned that because the defendant "HP is not alleged to have made any representation as to the life of its inverter," "HP's alleged failure to disclose the inverter defect is not actionable."

e) In *Baton v. Ledger SAS*, 740 F. Supp. 3d 847, 903 (N.D. Cal. 2024), the court dismissed UCL fraud claims premised on "representations regarding the security of [defendant's] hardware wallets," when those representations

177

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

did "not pertain to the security of [plaintiff's personal identifying information] which was not on the hardware wallet at all."

f)  In *Scheuerman v. Nestle Healthcare Nutrition, Inc*., 2012 WL 2916827, at *8 (D.N.J. July 17, 2012), the court found that "[t]he fact that [defendant] relies upon studies that demonstrate LRP or similar probiotics' effectiveness in specific age groups does not render any of [defendant's] advertising claims—which never indicated a specific age range ... false or misleading."

21.  The Court finds that Meta's statements about CSERs are not rendered misleading by the existence of different surveys about different topics. *See Reed*, 2014 WL 12284044, at *16 ("There is a substantial analytical gap between a claim which promises to deliver nutrients to muscles and a belief that the product will cause muscle growth.").

22.  The Court observes that Meta's statements about CSERs are literally true statements that do not make representations about user perceptions. *Cf. Lam v. Gen. Mills, Inc.*, 859 F. Supp. 2d 1097, 1104 (N.D. Cal. 2012) ("A reasonable consumer is unlikely to interpret the statement 'gluten free' to mean that the Fruit Snacks contain no partially hydrogenated oils, low amounts of sugar or corn-syrup, or that the Fruit Snacks are otherwise healthful.").

23.  The Ninth Circuit's decision in *Ebner*, 838 F.3d, is instructive. There, the defendant "accurately indicate[d] the net weight" of its lip product, but the product was designed such that "only 75% of the product [would] advance up the tube." *Id.* at 961. The Ninth Circuit concluded that no reasonable consumer would be misled by the undisclosed facts of product design when the defendant accurately disclosed the net weight. Rather, the reasonable consumer would understand that "some additional weight at the bottom of the tube ... may be required to keep the tube upright." *Id.* at 967. Here, no reasonable consumer would interpret Meta's accurate statements about the prevalence of policy-violating content on its services to mean

178

that consumers would never encounter broad and subjectively-defined categories of content.

24.    "[Meta] would only have [a] duty to make additional disclosures if the statements were themselves misleading absent further disclosure." *Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 232 (S.D.N.Y. 2018).  Accordingly, no reasonable consumer would interpret Meta's statements about CSERs—which measure the prevalence of violating content—as a representation about the results of different surveys deploying different measurements.  Indeed, Meta has explained in the CSERs that CSER measures the prevalence of content that violates Meta's Community Standards. *See supra* Findings pp. 40–50.

## G.    Statements Regarding Addiction.

1.    The Court finds that statements about the purported addictiveness of Meta's services are accurate and not misleading.  These statements are Statement Nos. 2 (2), 10 (15), 15 (20), 17 (22), 18 (23), 20 (25), 34 (51), 35 (52), and 40 (62).  The evidence establishes that Meta does not design its services with the goal of making them addictive and instead designs its algorithms to encourage meaningful social interactions.  *See supra* Findings pp. 62–76.

2.    The Court further finds that Meta repeatedly acknowledged and disclosed the existence of problematic use on its services, and engaged in continuous efforts to address that issue.  *See supra* Findings pp. 62–76.  Meta's statements regarding addiction "as a whole, including its disclosures, [were neither] misleading [n]or deceiving." *Holt*, 370 F. Supp. 3d at 1168–69.

3.    The Court further finds that Meta carefully reviewed available research to conclude that the problematic use of its services did not satisfy the clinical definition of "addiction."  *See supra* Findings pp. 65–69.  Meta did not try to obfuscate or conceal that some users engaged in the problematic use of its services. In fact, Meta repeatedly acknowledged to the public that problematic use was a problem and introduced new tools and policies designed to address this issue.  *See supra*

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

Findings pp. 65–69.  Unlike the defendants in the tobacco litigation, Meta did not engage in a concerted scheme to conceal the potential harms of its services.  Meta publicly acknowledged in statements directed to consumers that users experienced problematic use on social media, and on Meta's services in particular.  *See supra* Findings pp. 65–69.

4.     Meta's statements regarding addiction reflect an informed decision by the company that the problematic use of social media did not satisfy the definition of "addiction."  In making that decision, Meta never denied that some users experience problematic use when using its services, or that some users spend more time on Meta's services than they would like to.  *See supra* Findings pp. 65–69.

5.     By contrast, the defendants in the tobacco litigation consciously concealed known facts and "issued numerous false denials regarding the health hazards of smoking, manufactured a false controversy as to whether smoking cigarettes actually caused cancer or carried other serious health risks, and falsely assured the public that they were diligently engaging in research to find the truth about any health risks of smoking and would promptly disclose to the public their findings, whether good or bad."  *Whiteley*, 117 Cal. App. 4th at 678.

6.     Here, Meta *did* engage in research about the problematic use of its services and publicly acknowledged that such use occurred and was a problem.  *See supra* Findings pp. 62–76.  Meta's statements about "addiction" reflect a considered decision about the proper terminology for describing a problem, not an effort to deny that that problem exists.  By implementing tools designed to give users more control over their experience on its services, Meta acknowledged that problematic use existed.  *See supra* Findings pp. 62–76.

7.     Any "ambiguity" arising from Meta's statements regarding addiction "can be resolved by reference to" Meta's statements acknowledging problematic use, and its publication of research surrounding such use.  *McGinity v. Procter & Gamble Co.*, 69 F.4th 1093, 1098 (9th Cir. 2023) (finding that accurate disclosure foreclosed

180

UCL claim premised on ambiguous product description taken out of context); *see also, e.g.*, *Bickoff*, 2016 WL 3280439, at \*15 (finding that the "public would not be likely to be deceived into thinking permanent financing was guaranteed" because defendant provided "many statements of limitation and condition" that referenced permanent financing and the absence of permanent financing in the agreement); *Van Ness v. Blue Cross of Cal.*, 87 Cal. App. 4th 364, 376 (2001) (affirming summary judgment in favor of defendant where the language in the health insurance policy and related materials clearly stated the terms of coverage, notwithstanding plaintiff's assertion that he was misled); *Shvarts v. Budget Grp., Inc.*, 81 Cal. App. 4th 1153, 1160 (2000) (per-gallon price for fuel was not deceptive, given full disclosure of charge on rental car contract).

8.   Further, to the extent these statements express Meta's objectives or aspirations for how it designs its services—such as the goal of encouraging "meaningful social interactions" or the aspiration that services "improve people's well-being"—they are statements of aspiration that cannot be proven true or false. As such, they are non-actionable as a matter of law under the consumer protection statutes of all four States. *See supra* Findings pp. 62–76.

9.   The Court also finds that the challenged statements about "social media addiction" were not directed toward the consumer public. *See* Cal. Bus. & Prof. Code §§ 17200 *et seq.*, 17500 ("to make or disseminate or cause to be made or disseminated before the public in this state"); *Rhino Linings USA, Inc.*, 62 P.3d at 146–47 ("The CCPA deters and punishes businesses which commit deceptive practices i*n their dealings with the public* by providing prompt, economical, and readily available remedies against consumer fraud.") (emphasis added). Instead, those statements were made in response to the questions of legislators, and to assist the legislative branch of the federal government in its efforts to craft informed regulatory proposals about social media. *See supra* Findings pp. 62–76; *see also Reed.*, 2014 WL 12284044, at \*16 (plaintiffs "cannot rely" on statements "which most

181

purchasers have not read to determine what a reasonable consumer would believe.").

10.    Nor are statements about the purported addictiveness of Meta's services knowingly false. *See Brodeur*, 169 P.3d at 156 ("The crux of a CCPA claim is a deceptive trade practice, which, by definition, must be intentionally inflicted on the consumer public."). "[I]t is not enough to show that the statement was false based upon all of the knowledge imputed to a corporation." *JTS Choice Enters., Inc. v. E.I. DuPont De Nemours & Co.*, 2014 WL 793525, at \*7 (D. Colo. Feb. 26, 2014).

11.    The Court finds that the evidence establishes that the individual speakers of statements relating to addiction did not know and were not recklessly indifferent to purported falsity. At the time the statements were made, there was no scientific consensus that the problematic use of social media met the definition of "addiction." Meta itself conducted and published research on the problematic use of its services. It engaged in a thorough discussion within the company to determine the best way to characterize the phenomenon of compulsive use. In determining that compulsive use was different from "addiction," Meta did not deny that compulsive use occurred and to the contrary it affirmatively disclosed the issue and explained steps it was taking to address the problem. *See supra* Findings pp. 65–69.

12.    Several courts have held that statements concerning the subject of legitimate public debate cannot be challenged as false or misleading under consumer protection laws.

a)    In *Purdue Pharma.*, 2021 WL 5227329, the trial court held that, because the medical appropriateness of opioid pain medication was the subject of legitimate scientific debate, marketing statements encouraging physicians to prescribe the medication could not be challenged as misleading where no factually false statement was identified. For instance, the plaintiffs contended that one statement misleadingly implied that opioid addiction was "rare": "Clinicians who had been incorrectly trained to believe that

182

taking opioids for a prolonged period would always result in addiction were surprised that most of these patients never exhibited any signs or symptoms of addictive disease." *Id.* at \*17. In concluding that this statement was true and not misleading, the court observed that "the studies relied upon by Dr. Lembke [were] inadequate to support" her conclusion that "one in four patients prescribed opioids would become addicted."

b)    In *Korolshteyn v. Costco Wholesale Corp.*, 2017 WL 3622226, at \*5 (S.D. Cal. Aug. 23, 2017), the court granted summary judgment for the defendant in a false advertising and labeling case. In so doing, the court observed that "when a defendant presents scientific studies supporting its advertising claim, a plaintiff must do more than present its own studies that do not support the advertising claim, thereby demonstrating that evidence is equivocal" to show that "all reasonable scientists do not agree," no jury conclusion "would change either of these facts," *aff'd in part, rev'd in part and remanded on other grounds* by 755 F. App'x 725 (9th Cir. 2019).

c)    In *In re GNC Corp.*, 789 F.3d 505, 515–16 (4th Cir. 2015), the Fourth Circuit dismissed consumer protection claims under California and New Jersey law because the plaintiffs "failed to allege that the challenged representations are literally false" since "the scientific evidence . . . is equivocal." The plaintiffs alleged that "the vast weight of competent clinical evidence" and "overwhelming weight of high quality, credible and reliable studies" supported the finding that the defendant's product was ineffective, contrary to its representations. *Id.* at 515. However, the fact "some reasonable experts disagree[d]" precluded a finding "that the challenged representations are literally false." *Id.*

13.    The Court similarly finds that Meta's statements took a legitimate position on matters of scientific debate, and, as such, were neither false nor misleading, as "[t]he UCL, FAL, and CLRA do not requir[e] unanimous scientific consensus" for

183

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

every statement a company makes about its products or services. *Reed*, 2014 WL 12284044, at \*14.

14.     The Court further finds that no reasonable consumer would interpret Meta's accurate statements about its design goals to reflect a conclusive determination about studies purporting to connect social media services to mental health harms. *See Cardenas v. NBTY, Inc.*, 870 F. Supp. 2d 984, 994 (E.D. Cal. 2012) ("A 'reasonable consumer' is 'the ordinary consumer acting reasonably under the circumstances,' and 'is not versed in the art of inspecting and judging a product, in the process of its preparation or manufacture.'" (citation omitted)).

15.     Instead, Meta's statements communicate that Meta does not design its services to be addictive or harmful, a proposition which is borne out by the evidence of the myriad steps Meta has taken to improve safety on its services, even at the cost of reducing time spent on its services. *See supra* Findings pp. 9–50, 62–76.

## H.     Statements To Congress.

1.     The Court concludes that *Noerr-Pennington* petitioning immunity bars claims based on the statements made by Meta executives to Congress in response to congressional inquiries. These statements are Statement Nos. 10 (15), 13 (18), 14 (19), 15 (20), 16 (21), 17 (22), 18 (23), 19 (24), 26 (38), 27 (39), 28 (42), 29 (43), 30 (44), 31 (45), 32 (47), 33 (48), 34 (51), 35 (52), 36 (53), 40 (62), 41 (63), 42 (65).

2.     The First Amendment protects the right of individuals and entities to petition the government, and this protection extends to testimony before Congress even where the testimony is alleged to be misleading. *See Sosa v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006) (*Noerr-Pennington* provides that "those who petition any department of the government for redress are generally immune from statutory liability for their petitioning conduct.").

3.     The *Noerr-Pennington* doctrine "sweeps broadly." *Kottle v. Nw. Kidney Centers*, 146 F.3d 1056, 1059 (9th Cir. 1998). It bars liability for conduct "seeking *any*

184

*redress* from Congress that implicates [Meta's] First Amendment right to petition." MTD Order at 45 (emphasis added). Even statements that are "not themselves petitions" are exempted from liability to ensure "adequate 'breathing space' to the right of petition." *Sosa*, 437 F.3d at 932–33 (citation omitted); *see also Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 499 (1988) (*Noerr–Pennington* protects conduct "'incidental' to a valid effort to influence government[] action"). The doctrine "is a principle of constitutional law that bars litigation arising from [alleged] injuries received as a consequence of First Amendment petitioning activity, *regardless of the underlying cause of action asserted by the Plaintiffs.*" *Computer Assocs. Int'l, Inc. v. Am. Fundware, Inc.*, 831 F. Supp. 1516, 1522 (D. Colo. 1993) (emphasis in original) (listing cases).

4.  The Ninth Circuit defines petitioning activity broadly to encompass legislative lobbying, administrative proceedings, conduct before a court, entering into contracts with the government, and even acting in accordance with settlement terms. *See, e.g.*, *Sanders v. Brown*, 504 F.3d 903, 912–14 (9th Cir. 2007); *Kottle*, 146 F.3d at 1059.

5.  While courts have acknowledged an "extraordinarily narrow" exception where a defendant's conduct is "not genuinely aimed at procuring favorable government action," *City of Colum. v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 380 (1991), any "representation to Congress" made "in an effort to prevent remedial congressional action" falls outside the exception and therefore remains immune. *Tanner v. Int'l Isocyanate Inst., Inc.*, 2008 WL 11374393, at *21 (N.D. Ala. June 9, 2008). That is because even conduct that "falls far short of the ethical standards generally approved in this country" constitutes protected petitioning activity when done to "influence governmental action." *E. R. R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 140 (1961).

6.  There is no evidence that Meta's statements were false. But in any event, the First Amendment protects even false or misleading statements in petitioning activity to

185

Congress.[7]  The *Noerr-Pennington* doctrine "has been extended to shield false statements." *In re Apple Inc. Sec. Litig.*, 2020 WL 2857397, at \*18 (N.D. Cal. June 2, 2020) (Gonzalez Rogers, J.).  "Misrepresentations made during otherwise protected petitioning conduct and aimed at the legislature do not amount to sham petitioning." *Comm. to Protect our Agric. Water v. Occidental Oil & Gas Corp.*, 235 F. Supp. 3d 1132, 1155–56 (E.D. Cal. 2017); *see also, e.g.*, *Allied Tube & Conduit Corp.*, 486 U.S. at 499–500 (conduct seeking legislative action enjoys *Noerr–Pennington* immunity "even when [it] employs unethical and deceptive methods"); *Kottle*, 146 F.3d at 1062 ("[m]isrepresentations are a fact of life in politics").

7.    Because "[p]etitioning activity takes many forms," it is not limited to efforts to obtain specific government action.  *See Bristol-Myers Squibb Co. v. IVAX Corp.*, 77 F. Supp. 2d 606, 611 (D.N.J. 2000) (listing examples of petitioning activity) (citation omitted).  Protected "petitioning" activity runs the gamut of efforts to persuade governmental actors, extending well beyond "filing formal grievances directly with the government." *A.D. Bedell Wholesale Co. v. Philip Morris, Inc.*, 263 F.3d 239, 252 (3d Cir. 2001).  The broad sweep of petitioning activity is informed by the understanding that "the very foundation of constitutional government" is "that government may be responsive to the will of the people," informed by "free political discussion." *De Jonge v. State of Oregon*, 299 U.S. 353, 365 (1937).  To that end, "a publicity campaign directed at the general public, seeking [legislative] or executive action, [also] enjoys ... immunity even when the campaign employs unethical and deceptive methods." *Allied Tube & Conduit Corp..,* 486 U.S. at 499–500.

---

[7] A witness who knowingly and willfully makes false statements to Congress may face criminal liability. *See* 18 U.S.C. § 1001.  But courts have correctly refused to extend liability to civil claims under statutes—like the consumer protection statutes at issue here—that do not impose a similar scienter requirement.

186

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

8. Regarding congressional testimony specifically, the protection extends to "all advocacy intended to influence government action," including "allegedly false statements[,]" *Tuosto v. Philip Morris USA Inc.*, 2007 WL 2398507, at *5 (S.D.N.Y. Aug. 21, 2007); *see also Comm. to Protect our Agric. Water*, 235 F. Supp. 3d at 1155 (protection extends to alleged "[m]isrepresentations made during otherwise protected petitioning conduct"). *Cf. U.S. v. Philip Morris USA Inc.*, 566 F.3d 1095, 1124 (D.C. Cir. 2009) (distinguishing between statements that were false "at the time and made . . . with the intent to deceive" and "accidental falsehoods, or sincere attempts to persuade," which may receive *Noerr-Pennington* immunity).[8]

9. The Court finds that Meta's statements were made as part of a genuine effort to influence congressional action, policy, or legislation, and thus those statements are not actionable. Because Meta's "statements were designed to influence Congress—to get favorable laws and ward off unfavorable ones," "they cannot be a source of liability directly under the *Noerr–Pennington* doctrine." *Int'l Bhd of Teamsters, Local 734 Health & Welfare Trust Fund v. Philip Morris Inc.*, 196 F.3d 818, 826 (7th Cir. 1999); *see also Racetech, LLC v. Kentucky Downs, LLC*, 169 F. Supp. 3d 709, 715 (W.D. Ky. 2016) ("[T]he *Noerr–Pennington* Doctrine prevents liability for conduct aimed at influencing decision-making by the government.").

10. The evidence establishes that, throughout the relevant period, Meta was facing significant prospects that Congress would take legislative action against Meta and other social media services. *See supra* Findings pp. 76–81. Multiple congressional hearings during this period addressed the regulation of social media services, and

---

[8] Allegedly misleading statements made to Congress receive more protection than similar statements made in an adjudicatory setting. *See, e.g.*, *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 513 (1972) ("[m]isrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process."); *Mark Aero, Inc. v. Trans World Airlines, Inc.*, 580 F.2d 288, 297 (8th Cir. 1978) ("Normally, in a nonadjudicative setting, such as the legislative arena, [the sham exception] presents no particular problem.").

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

numerous bills were introduced that would have imposed new obligations on companies like Meta. Meta's testimony at these hearings was directed at informing and influencing those legislative proposals.

11. This included the potential repeal or amendment of Section 230. *See supra* Findings pp. 76–81.

12. Given this legislative activity—actual or at least considered—statements by Meta to Congress are a form of petitioning activity. The statements were made in response to direct questions from legislators in the context of hearings addressing whether and how to regulate companies that offer social media services. They were therefore "designed to influence Congress—to get favorable laws and ward off unfavorable ones—[and] cannot be a source of liability." *Teamsters*, 196 F.3d at 826. As a result, all claimed misrepresentations based on statements to Congress are immune from liability under the First Amendment principles of *Noerr-Pennington*.

13. Several courts have found that statements to Congress made as part of an effort to influence congressional action, policy, or legislation constituted protected petitioning activity.

   a) In *Tuosto*, 2007 WL 2398507, at *1, the plaintiff asserted fraud and misrepresentation claims against the defendant tobacco company. Those claims were based in part on statements made by the company president in testimony "before the Subcommittee on Health and the Environment of the Committee on Energy and Commerce regarding tobacco's effect on health." *Id.* at *2. The company president testified "regarding the health research undertaken by the cigarette industry," and the company "scientific director testified before Congress regarding the effects of smoking on health." *Id.* These individuals were one of several "chief executives of the tobacco companies [who] testified before the Subcommittee on Health and the Environment of the Committee on Energy and Commerce regarding

188

tobacco's effect on health and specifically that tobacco was not a proven cause of disease and death and that nicotine was not addictive." *Id.* The court reasoned that, even if the statements to Congress were false and misleading, those statements constituted "conduct that is immune from civil liability under the *Noerr–Pennington* doctrine." *Id.* at *5. The court further held that the sham exception did not apply because "[e]ven statements that may fall far short of the ethical standards generally approved in this country are protected by the *Noerr–Pennington* doctrine if they are made in the course of petitioning the government." *Id.* (cleaned up).

b)    In *Bristol-Myers Squibb Co.*, 77 F. Supp. 2d at 617, the court dismissed a promissory estoppel counterclaim premised on "statements made by [plaintiff] Bristol . . . during congressional hearings headlined, 'Exclusive Agreements Between Federal Agencies and Bristol–Myers Squibb Co. For Drug Development: Is The Public Interest Protected?' and, 'Pricing of Drugs Codeveloped by Federal Laboratories and Private Companies.'" The court reasoned that Bristol's statements "were made in an effort to induce favorable government action, to encourage cooperation between government agencies and drug manufacturers and to defend Bristol's paclitaxel pricing system." *Id.* The court rejected the argument that alleged misrepresentations did not receive immunity, reasoning that "even misrepresentations made to induce government action are protected by the *Noerr–Pennington* doctrine." *Id.*

c)    The Third Circuit in *In re Asbestos School Litigation*, 46 F.3d 1284, 1286, 1294 (3d Cir. 1994), held that a civil conspiracy claim could not withstand summary judgment when it was based primarily on evidence that the defendant company joined a lobbying organization that may have offered misleading information to governmental officials. *See also id.* at 1287

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

(describing how defendant Pfizer had "represented its members' views before Congress").

d) In *Mark Aero, Inc.*, 580 F.2d at 294, 296–97, the Eighth Circuit held that *Noerr-Pennington* immunized the defendant from Sherman Act liability premised on allegations that the defendant "made misrepresentations to . . . the City Council" and "induced others to make false and misleading statements to . . . the City Council." The court reasoned that the sham exception did not apply because those statements were made as part of a genuine effort to oppose the reopening of an old airport. *See id.*

14. Even if statements to Congress were repeated elsewhere, the statements to Congress would remain subject to *Noerr-Pennington* protection; the argument would necessarily be that the subsequent repetition of the statements, outside of Congress, might be separately false or misleading. That analysis, in other words, would apply to the separate statements (whether new or repeated) outside of Congress and would not defeat the First Amendment protection for the statements actually made to Congress. Indeed, courts have found that a "publicity campaign involving the media and various citizens groups," in conjunction with statements to legislative officials, is protected petitioning activity. *Mark Aero, Inc.*, 580 F.2d at 297. That is because the amplification of statements made to Congress—which were themselves designed to influence governmental action—necessarily constitutes "genuine political activity." *Id.*; *see also New York Jets LLC v. Cablevision Sys. Corp.*, 2005 WL 2649330, at *7 (S.D.N.Y. Oct. 17, 2005) (finding that *Noerr-Pennington* immunized "advertisements and public statements … aimed at influencing public opinion *as well as* [] government decisionmakers") (emphasis added).

15. The Court finds that Mr. Zuckerberg's statement at the November 17, 2020 hearing before the Senate Committee on the Judiciary was made to influence legislative proposals to amend Section 230. *See supra* Findings pp. 76–78 (Statement No. 10

190

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

(15)).  At the hearing, Senators made clear that they were considering whether to modify Section 230 in order to address concerns about misinformation arising out of the 2020 election.  Mr. Zuckerberg's testimony aimed to provide Congress with a clear and accurate picture of how Meta addressed issues surrounding content, elections, and privacy.  In so doing, Mr. Zuckerberg "represented [his company's] views before Congress," with the ultimate goal of influencing Congress in its efforts to modernize the regulation of the internet.  *See In re Asbestos Sch. Litig.*, 46 F.3d at 1287.

16.    The Court finds that Mr. Zuckerberg's statements at the March 25, 2021 Congressional Hearing before the U.S. House Subcommittees on Communications and Technology and on Consumer Protection and Commerce were intended to influence specific government action, namely the possibility that Congress would amend Section 230 to address misinformation on social media.  Mr. Zuckerberg's statements—all in response to questions from legislators—were directed at shaping any potential future legislation.  *See supra* Findings pp. 78–79 (Statement Nos. 13 (18), 14 (19), 15 (20), 16 (21), 17 (22), 18 (23), 19 (24)).  Indeed, members of Congress represented at the hearing that they would be introducing specific acts of legislation to regulate companies that offer social media services like Meta.  Thus, Mr. Zuckerberg's statements at that hearing, made in the context of concrete proposals to change the way his company was regulated, aimed to influence pending legislation or government efforts.  These statements are therefore protected petitioning activity under *Noerr-Pennington*, and liability may not be imposed on Meta for making them.

17.    The Court finds that Ms. Davis's September 30, 2021 testimony before the Senate Committee on Commerce, Science, and Transportation was made specifically to influence legislative efforts to protect children on the Internet.  *See supra* Findings pp. 79–80 (Statement Nos. 26 (38), 27 (39), 28 (42), 29 (43), 30 (44), 31 (45), 32 (47) 33 (48), 34 (51), 35 (52), 36 (53)).  Through her testimony, Ms. Davis

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

communicated a desire to collaborate with Congress on protecting children on social media. Ms. Davis's statements aimed to explain to Congress the efforts Meta was taking to address those same issues, so that Congress could make well-informed decisions regarding the best way to regulate.

18.     The Court finds that Mr. Mosseri's December 8, 2021 testimony before the U.S. Senate Subcommittee on Consumer Protection, Product Safety, and Data Security was similarly intended to provide Senators with information that would be conducive to developing legislative solutions to protect children on social media. *See supra* Findings pp. 80–81 (Statement Nos. 40 (62), 41 (63), 42 (65)).  To that end, Mr. Mosseri made accurate statements to collaborate with lawmakers on anticipated legislative proposals, with the intent to influence that legislation based on Meta's understandings and expertise on social media.  Mr. Mosseri reiterated Meta's longstanding desire for regulation regarding children and social media, and even provided specific examples of ways that Congress could achieve its policy aims. *See supra* Findings pp. 80–81.  These statements are therefore protected petitioning activity under *Noerr-Pennington*.

19.     The Court further finds that, even if Meta's statements to Congress were not protected under *Noerr-Pennington*, those statements are not actionable because they were neither likely to deceive nor directed to consumers. *See Reed*, 2014 WL 12284044, at \*16 (plaintiffs "cannot rely" on statements "which most purchasers have not read").  Furthermore, statements made during congressional testimony are neither directed to consumers nor made to "to induce the public to enter into a transaction." *Johnson & Johnson*, 77 Cal. App. 5th at 317; *see also, e.g.*, *Rhino Linings USA, Inc.*, 62 P.3d at 146 ("CCPA deters and punishes businesses which commit deceptive practices in their dealings *with the public*.") (emphasis added). Instead, those statements were intended to influence Congress in its efforts to regulate companies that offer social media services and communicate Meta's perspective on a range of policy reforms, from age verification to safety tools.

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

20.     The Court finds that Meta's statements to Congress did not "induce parties to act on the basis of false or misleading information." *Rhino Linings USA, Inc.*, 62 P.3d at 147.  For instance, Meta's responses to the questions of legislators did not "induce[] [consumers] to purchase inferior merchandise or services," or "falsely announc[e] the existence of products which are in fact non-existent." *Id.*

21.     The purpose of the States' laws is "to protect both consumers and competitors by promoting fair competition in commercial markets for goods and services." *Rutledge v. Hewlett-Packard Co*., 238 Cal. App. 4th 1164, 1172 (2015).  Imposing liability on companies for the statements they made to assist legislative bodies in their regulatory efforts does not serve that purpose.

22.     Accordingly, the Court finds that all of the statements made to Congress are immunized under the *Noerr-Pennington* doctrine and not actionable under the laws of the four States.

## VII.    The States' Unfair Practices Claims

### A.    Legal Standards.

1.     Four States assert claims of unfair practices under their state consumer protection laws—California, Colorado, Kentucky and New Jersey.  The laws of  California, Colorado and Kentucky meaningfully overlap in their standards for determining whether a trade practice is "unfair."  And for the reasons addressed below, New Jersey law does not recognize a claim for an "unfair" trade practice separate from a claim for deceptive or misleading practices.

2.     **California**.  Under California law, Cal. Bus. & Prof. Code § 17200, the State must prove by a preponderance of the evidence that Meta engaged in a business act or practice for which the harm to consumers outweighs the utility of the conduct. *Progressive West Ins. Co. v. Superior Court*, 135 Cal. App. 4th 263, 285 (2005) ("the court must weigh the utility of the defendant's conduct against the gravity of the harm"); *Motors, Inc. v. Times Mirror Co.*, 102 Cal. App. 3d 735, 740 (1980) (same).  The effect of the alleged unfair  act or practice is assessed from the

193

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

perspective of a "reasonable consumer to whom the practice was directed." *S. Bay Chevrolet v. Gen. Motors Acceptance Corp.*, 72 Cal. App. 4th 861, 878, (1999).[9]

3.    **Colorado**.  Colorado case law has not clearly articulated what standard applies to the determination of "unfair" practices under the Colorado Consumer Protection Act ("CCPA"), Colo. Rev. Stat. Ann. § 6-1-105.  Indeed, several cases have expressed doubt whether Colorado law extends to "unfair, in addition to deceptive, practices." *In re New Motor Vehicles Canadian Exp. Antitrust Litig.*¸350 F. Supp. 2d 160, 180 n.28 (D. Me. 2004) (citing *Rhino Linings USA, Inc.*, 62 P.3d at 142); *see also Sheet Metal Workers Loc. 441 Health & Welfare Plan v. GlaxoSmithKline, PLC*, 737 F. Supp. 2d 380, 408 (E.D. Pa. 2010) (noting the "absence of any case from Colorado allowing an unfair trade practice claim to proceed").[10]  However, for reasons previously addressed, "the Court is not persuaded that the Colorado Supreme Court would read the CCPA to exclude all claims of unfair or unconscionable practices." *In re Social Media*, 753 F. Supp. 3d at 902.

4.    That leaves the question of what standard applies to the determination of "unfair" practices under Colorado law.  In *Showpiece Homes Corp. v. Assurance Co. of Am.*, 38 P.3d 47, 54 (Colo. 2001), the Colorado Supreme Court noted that "we have specifically looked to Washington law" in construing the CCPA.  Washington law applies the standards of Section 5 of the FTC Act in defining "unfair" practices, and the Court concludes that this standard likewise should apply under Colorado law.  Thus, under Colorado law, the State must prove by a preponderance of the

---

[9] As the Court previously noted, California law also recognizes alternative tests for unfair practices, particularly related to claims of anticompetitive conduct. *In re Soc. Media Adolescent Addiction/Pers. Inj. Prods. Liab. Litig. ("In re Social Media")*, 753 F. Supp. 3d 849, 899–901 & n.55 (N.D. Cal. 2024), *appeal dismissed sub nom. Fla. Off. of Att'y Gen. v. Meta Platforms, Inc.*, No. 24-7019, 2024 WL 5443167 (9th Cir. Dec. 16, 2024), *motion to certify appeal denied*, No. 4:22-MD-3047-YGR, 2025 WL 1182578 (N.D. Cal. Mar. 11, 2025).  *See also Davis,* 691 F.3d at 1169-70 (9th Cir. 2012).  The Court finds it unnecessary to address those alternative standards, which would be satisfied if the standard articulated in text is met.

[10] Meta reasserts its position that Colorado law does not recognize a standalone unfair trade practices claim.

evidence that "Meta's practices cause substantial injury to consumers," that such injuries were not "reasonably avoidable," and that such injuries were "not outweighed by countervailing benefits to consumers." *In re Social Media*, 753 F. Supp. 3d at 895–97.

5.     **Kentucky**.  The Kentucky Consumer Protection Act ("KCPA") prohibits "[u]nfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce."   Ky. Rev. Stat. § 367.170.   Kentucky law on unfair practices is "comparable" to "the language of Section 5 of the Federal Trade Commission Act." *Morgan v. Blue Cross & Blue Shield of Ky., Inc.*, 794 S.W.2d 629, 632 (Ky. 1989). Thus, in line with Section 5 of the FTCA, unfairness claims brought under Kentucky law require proof by a preponderance of the evidence that the act or practice (1) "causes or is likely to cause substantial injury to consumers," (2) "which is not reasonably avoidable by consumers themselves," and (3) "not outweighed by countervailing benefits to consumers or to competition." *FTC v. Neovi, Inc.*, 604 F.3d 1150, 1155 (9th Cir. 2010) (quoting 15 U.S.C. § 45(n)), as amended (June 15, 2010), amended, No. 09-55093, 2010 WL 2365956 (9th Cir. June 15, 2010).  Further, Kentucky law defines an "unfair" act or practice "to mean unconscionable."  K.R.S. § 367.170(2).

6.     **New Jersey**.  The New Jersey Consumer Fraud Act ("NJ CFA"), provides that the act or use of "any commercial practice" that is "unconscionable or abusive" or involves "deception, fraud, false pretense, false promise" or comparable acts "with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate" shall be an unlawful practice.  N.J.S.A. 56:8-2.  There is no stand-alone or separate "unfair practices" provision of New Jersey law, and the New Jersey Supreme Court has held that the practices prohibited by the NJ CFA "must be equated with the concepts of deception, fraud, false pretense, misrepresentation, concealment and the like." *Kugler v. Romain*, 58 N.J. 522, 544 (1971). *See also Fenwick v. Kay Am.*

195

*Jeep, Inc.*, 72 N.J. 372, 378 (1977) ("The capacity to mislead is the prime ingredient of deception or an unconscionable commercial practice."); *Pullman v. Alpha Media Pub., Inc.*, 2013 WL 1286144, at *5 n.3 (S.D.N.Y. Mar. 28, 2013) (applying New Jersey law, and dismissing a claim for an "unconscionable business practice" "for the same reason" as plaintiff's deceptiveness claim) (citing *Kugler*), *aff'd*, 624 F. App'x 774 (2d Cir. 2015).[11]

7.   In ruling on the motion to dismiss, the Court noted the New Jersey law requiring that claims of "unconscionability" must involve deceptive acts and practices, and denied Meta's motion to dismiss the New Jersey unfairness claims because "the States' deceptive acts and practices claims survive." *In re Social Media*, 753 F. Supp. 3d at 905. The issue now is different. Because New Jersey law does not recognize a claim for unfair practices separate from a deceptive practices claim, the Court holds as a matter of law that New Jersey cannot assert a claim of unfair practices separate from its claim (already addressed above) for deceptive or misleading practices.

8.   **Section 230.** Section 230 immunity applies when a claim involves "(1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by

---

[11] Although the NJ CFA was amended after *Kugler* to add the term "unconscionable" to the enumerated list of deceptive and fraudulent practices covered by the Act, *Kugler* presumed that the statute—even without unconscionability expressly enumerated—only precluded unconscionable practices that were deceptive. The court stated in *Kugler* that "unconscionability must be equated with the concepts of deception, fraud, false pretense, misrepresentation, concealment and the like, which are stamped unlawful under N.J.S.A. 56:8—2. We do not consider that absence of the word 'unconscionable' from the statute detracts in any substantial degree from the force of this conclusion." 58 N.J. at 544. *See also D'Ercole Sales, Inc. v. Fruehauf Corp.*, 206 N.J. Super. 11, 24 (App. Div. 1985) ("Even before the addition of 'unconscionable commercial practices' as unlawful under the Consumer Fraud Act, the Supreme Court engrafted the concept of 'unconscionability' as an ingredient of the Act." (citing *Kugler*, 58 N.J. at 543–545). After the NJ CFA amendments, courts have continued to follow *Kugler* based on the principle that "[t]he capacity to mislead is the prime ingredient of deception or an unconscionable commercial practice" under New Jersey law. *See*, *e.g.*, *Fenwick*, 72 N.J. at 378; *Pullman*, 2013 WL 1286144, at *5 n.3; *Platkin v. Smith & Wesson Sales Co.*, 474 N.J. Super. 476, 490 (App. Div. 2023) ("the CFA is intended to 'prevent deception, fraud or falsity, whether by acts of commission or omission'") (quoting Fenwick, 72 N.J. 372, 376-77 (1977)).

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

another information content provider." *Barne*, 570 F.3d at 1100–01. The Parties have never disputed that Meta is an interactive computer service provider (prong (1)). *See In re Soc. Media*, 753 F. Supp. 3d at 879. Accordingly, the only question is whether the "duty" that the AGs allege Meta has violated "derives from [Meta's] status or conduct as a 'publisher'" of third-party content (prongs (2) and (3)), *Barnes*, 570 F.3d at 1107; *see also Calise v. Meta*, 103 F.4th 732, 740 (9th Cir. 2024) ("Barnes requires courts to examine each claim to determine whether a plaintiff's 'theory of liability would treat a defendant as a publisher or speaker of third-party content.'" (emphasis omitted) (quoting *Barnes*, 570 F.3d at 1101)).

9. By its terms, Section 230 bars courts from treating internet service providers, like Meta, as "the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1) (emphasis added).

**B. Meta's Time Management Tools Are Not an Unfair Practice Under California, Colorado, Or Kentucky Law.**

1. The Court finds that the States have failed to establish that Meta's time management tools constitute unfair or unconscionable practices under California, Colorado, and Kentucky unfair competition laws. And, as the Court has noted above, New Jersey cannot assert an unfair practices claim separate and apart from its claim of deceptive practices. *See supra* Conclusions pp. 194–95.

2. The Court concludes that Meta's time management tools were designed to help users control the time they spend on Meta's services. Tools that assist users cannot constitute an unfair or unconscionable practice under any of the State's unfair competition laws.

a) Under California, Colorado, and Kentucky law, these States must prove that harm to consumers from the feature at issue outweighs the benefits from the practice. *See supra* Conclusions pp. 192–94.

b) Moreover, the Court evaluates whether the features, as designed, are likely to cause harm or substantial injury to users, rather than whether alternative

197

designs would be more effective. *See, e.g.*, *FTC v. LendingClub Corp.*, 2018 WL 11436309, at *12 (N.D. Cal. Oct. 3, 2018)

c) The States' challenge to Meta's time management tools thus cannot be unfair or unconscionable. While the States assert that Meta may have been able to offer more restrictive time management tools, the tools Meta actually offered did not cause harm to any individual user and therefore are not actionable.

d) Rather the evidence presented showed that, since 2018, Meta has offered multiple time management tools to users that allow users to limit the amount of time they spent on the services, including the Daily Limit tool and the Take a Break tool. *See supra* Findings pp. 84–85.

e) The evidence presented similarly showed that Meta enhanced the availability of time management tools with the rollout of Teen Accounts in September 2024. *See supra* Findings pp. 86–88.

f) Based on this record, the Court cannot find that Meta's time management tools, as implemented, cause harm to consumers. To the contrary, the evidence showed that the tools have high retention rates, *see supra* Findings pp. 89–90, and that the tools tend to reduce time spent on Meta's services, *see supra* Findings p. 90.

g) The States' challenge to Meta's time management tool is that they harm users by not curbing compulsive or excessive use on Meta's platforms. However, the evidence presented showed that Meta's time management tools reduced overall use—even if they were not as effective as the States claim they should have been.

3. The Court has previously found that the States are barred from challenging the very features they now say increase time spent on Meta's services. *See* In re Social Media, 753 F. Supp. 3d at 880-81. Having been barred from challenging those features directly, the States cannot repackage the same theory of harm as an unfair

198

practices claim by asserting that Meta failed to do enough to curb the time users spend on the platforms. Where the underlying driver of alleged harm—the consumption of third-party content facilitated by publisher choices—is immunized by Section 230, a claim premised on the inadequacy of tools designed to limit that same consumption necessarily seeks to hold Meta liable for its publishing activity. To hold otherwise would permit plaintiffs to circumvent Section 230 by recasting any challenge to a platform's content-delivery choices as a challenge to the platform's failure to mitigate the effects of those choices. Section 230 does not permit such an end-run. *See M.P. ex rel. Pinckney v. Meta Platforms Inc*., 127 F.4th 516, 526 (4th Cir. 2025), *cert. denied*, 146 S. Ct. 287 (2025); *see also Grindr*, 128 F.4th at 1152-53.

4. Alternatively, if the Court were to consider the efficacy of Meta's time management tools in contrast to those the States claim should have been used, these States have still not established that they are unconscionable or unfair under California, Colorado, or Kentucky unfair competition laws.

5. First, the Court finds that the adoption rates of Meta's time management tools do not establish any unfair or unconscionable practice. The tools were collectively used by a meaningful number of Meta users and were refined over time, with no proof of a large number of users who should have used the tools but were prevented from doing so.

6. The crux of the States' theory of harm is that Meta's decision to make these time management tools opt-in, rather than require mandatory time limits for teen users, is an unfair or unconscionable practice. This theory does not articulate an actionable unfair or unconscionable practice for multiple reasons.

a) First, the States are incorrect that all of Meta's time management features allow teen users to opt-out of time limits on Meta's services. The evidence reflects that Meta made Daily Limit a default feature triggered after 60 minutes on Instagram, and gave parents the abilities both to change the

199

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

amount of time that triggered the Daily Limit popup, or replace the typical alert feature used by Daily Limit with a complete bar from the app for the rest of the day. *See supra* Findings pp. 86–87. Moreover, with the launch of Teen Accounts, Meta allowed parents to decide how long their teens could use Instagram for the day, and block their teens from using Instagram at specific periods of time, such as nighttime. *Id.*

b) Giving parents the ability to moderate their children's time spent on an app is not a detriment. The States' own experts point to parental consent as a hallmark of good child safety practices across the technology industry. [Estes]. The proposition that Meta's decision to put time management controls in the hands of parents constitutes an unfair or unconscionable practice because it requires teens to voluntarily cooperate with their parents is unsupported by the evidence and the States' own presentation.

c) Second, the evidence reflects that Meta's decision to permit teens to opt-out of certain time management tools was guided by extensive research, and the desire to balance teens' autonomy and decision-making power. *See supra* Findings p. 87.

d) The Court finds that California has not proven by a preponderance of the evidence that the harm to consumers from opt-out time management tools— *e.g.* the possibility that users experiencing problematic use could override these tools—outweighs the utility of their benefits. Meta's tools provide benefits to parents by permitting them—rather than Meta—to control the amount of time their teens spend on Meta's services. They similarly provide benefits to teens whose parents do not choose to supervise their time on Meta's services by allowing them sufficient autonomy to decide for themselves how long they should remain on the services.

e) The Court similarly finds that Colorado and Kentucky have not proven by a preponderance of the evidence that the opt-out nature of certain of Meta's

200

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

time management tools causes substantial injury that is not outweighed by countervailing autonomy benefits to parents and teens. The Court's decision under Colorado and Kentucky law is further guided by the conclusion that the States have failed to establish that any injury to users who choose not to use Meta's time management tools was not "reasonably avoidable." *See supra* Conclusions pp. 193–94. By definition, the harms the States assert—that some users choose to bypass Meta's time management tools—are reasonably avoidable.

7. Finally, the Court finds that the States' challenge to Meta's time management tools is barred by Section 230.

a) The time restriction features are tools through which users can control their own consumption of third-party content, and any claims based on their alleged inadequacy therefore necessarily seek to hold Meta liable in its role or conduct as a publisher of third-party content.

b) The Court finds that the unfairness claims based on the time restriction features stem from users' consumption of third-party content. Claims based on alleged harms resulting from over-consumption of third-party content because of how a website makes third-party content available are necessarily barred by Section 230, *see M.P. ex rel. Pinckney v. Meta Platforms Inc.*, 127 F.4th 516, 526 (4th Cir. 2025) ("[A] newspaper company does not cease to be a publisher simply because it prioritizes engagement in sorting its content."), *cert. denied*, 146 S. Ct. 287 (2025), and the alleged harms relating to time restriction features are inseparable from third-party content, *see Grindr*, 128 F.4th at 1152-53.

**C.    Meta's Multiple Accounts Feature Is Not an Unfair Practice Under the Laws of California, Colorado, Or Kentucky.**

1. The Court finds that the States have failed to establish that Meta's allowance of Multiple Accounts constitute unfair or unconscionable practices under California,

201

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

Colorado, and Kentucky unfair competition laws.  As the Court has noted above, New Jersey cannot assert an unfair practices claim separate and apart from its claim of deceptive practices.

2. The Court concludes that Multiple Accounts are not inherently harmful.  To the contrary, the Court finds that Multiple Accounts offer benefits to teen users, by providing a forum for free expression.

a) The evidence reflects that teen users create Multiple Accounts—commonly referred to as "Finstas"—to share content and explore their interests with a smaller group of friends or family.

b) The evidence also reflects that content posted on "Finstas" or other secondary accounts is often less polished, and potentially more authentic.

c) The Court's conclusion is not only bolstered by the States' own presentation of evidence and argument, but the fact that Multiple Accounts is a standard feature across social media platforms.

3. The States' central concern is that the provision of *unconnected* Multiple Accounts permits teens to evade other safety tools, such as time management tools or parental controls.  The Court finds that the evidence reflects Meta's knowledge of this possibility, and the methods it has developed to reduce the number of unconnected Multiple Accounts.

a) The Court finds that Meta has steps to allow users to link their Multiple Accounts in the Account Center.  *See supra* Findings p. 90.

b) The Court also finds that Meta has taken steps to proactively identify unlinked Multiple Accounts through algorithmic models.  *Id.* at 92.

c) The Court also finds that Meta permits parents to supervise Multiple Accounts.  *Id.*

4. Considering the benefits of Multiple Accounts and the potential derivative harms from them, the Court does not find that they constitute unfair or unconscionable practices under California, Colorado, or Kentucky law.

202

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

a)  Applying the standards of California law, the evidence reflects that the utility of Multiple Accounts to teens is high.  The States have not established that any harm to consumers from Multiple Accounts outweighs this benefit to teens.  Further, even if the States had demonstrated that the potential for Multiple Accounts to permit evasion of other safety tools was a sufficient harm, Meta's evidence demonstrated that Meta has tools in place to address these potential harms.

b)  For the same reasons, under the standards of Colorado and Kentucky law, the States have not shown that any substantial injury from Multiple Accounts is not outweighed by the benefits to teens from Multiple Accounts.  The Court's conclusion as to these States is further bolstered by the conclusion that the potential harms identified by the States are reasonably avoidable by the consumers themselves, as Meta provides an opportunity for users to link their Multiple Accounts.

5.  Finally, the Court finds that the States' challenge to Meta's Multiple Accounts feature is barred by Section 230.

a)  In its motion to dismiss ruling, this Court recognized that courts, including in this District, have held that similar "'decisions regarding the structure and operation of [a] website—such as permitt[ing] users to register under multiple screen names'— reflect, in part, 'choices about what content can appear on the website and in what form' and thus fall within the purview of traditional publisher functions.'" *In re Social Media*, 753 F. Supp. 3d at 884 (quoting *Fields v. Twitter, Inc.*, 200 F. Supp. 3d 964, 972 (N.D. Cal. 2016) (internal quotation marks and citations omitted)).

b)  The Court indicated that the only surviving theory of liability as to the Multiple Accounts feature was that the feature "can serve as an end-run around other features such as those related to time restrictions," and, as

203

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

such, "given the procedural posture . . . [was] unwilling to make a global decision on this issue." *Id.*

c) After receiving the evidence at trial, the Court finds that the States' challenges to Meta's Multiple Account features "necessarily implicate[]" Meta's publishing decisions, such that they cannot be disentangled from the alleged harm caused by third-party content. *See Grindr*, 128 F.4th at 1152-53. The evidence at trial confirmed that the States' challenge to Meta's Multiple Accounts feature centrally targets the harm that teen users may experience from third-party content: content that they may receive more of by spending more time on the platforms, or that they may see if parental controls are not engaged and is therefore barred by Section 230.

D. **Meta's Systems for Enforcing Its Age-Restriction Policy Are Not an Unfair Practice Under the Laws of California, Colorado, And Kentucky.**

1. The record reflects that Meta enforces its age-restriction policy. Users have been required to agree to Meta's terms of service for both Instagram and Facebook, which require users to be aged 13 or older. Facebook has always collected a user's age upon creation of an account. Instagram told under-13 users prior to 2019 that they were not permitted to use Instagram, and began collecting users' ages at account creation starting in 2019, and as of that time and forward it refused to permit any user to create an account if they indicated they were less than 13 years old. *See supra* Findings pp. 92–93, 95.

2. The record further reflects that age-lying is a problem across the Internet, and that the fact that underage users will lie to bypass rules is not a problem that can be fully solved or avoided. For instance, in testimony in 1998 before Congress prior to the enactment of COPPA, the then-Chair of the FTC testified that "controlling the behavior of 11-year-olds . . . calling themselves 13-year-olds is beyond" the reach of Congress. *See* Protection of Children's Privacy on the World Wide Web: Hearing on S. 2326 Before the Subcomm. on Communications of the S. Comm. on

204

Commerce, Science & Transportation, 105th Cong. (1998), at 14.  Congress was therefore aware when it enacted COPPA that children under 13 may misrepresent their ages online, yet it chose not to impose a universal age-verification requirement.

3.    The record reflects that Meta has implemented systems to identify users suspected of being underage, and to remove accounts that are suspected of violating its age-restriction policy.  This includes user reporting, human reviewers tasked with identifying potential underage users, and technology to identify potential underage users and to flag accounts that warrant human review.  The record further reflects the many difficulties of establishing actual knowledge of users' ages, and that Meta therefore has developed multiple systems to assist in identifying potential violations of its age-restriction policy.  These systems are loosely referred to as "age verification" but in fact Meta is rarely if ever able to verify a user's age with certainty.  *See supra* Findings pp. 95–98.

4.    The record further reflects that Meta's systems for detecting potential violations of its age-restriction policy have evolved and been enhanced over time, as technology has evolved.  Meta now has in place multiple layers of systems—user reporting, human review, and technology systems—aimed at identifying accounts that potentially violate its age-restriction policy.  *See supra* Findings pp. 96–98.

5.    The record further reflects that Meta has removed a large number of accounts for suspected violations of its age-restriction policy.  For example, over a two-year period from 2020 to 2022, Meta disabled more than one million accounts on Instagram as potentially violative of its age-restriction policy, and in the third quarter of 2021 alone Meta removed more than 2.6 million Facebook accounts and 850,000 Instagram accounts as potentially in violation of its minimum-age requirement.  *See supra* Findings pp. 93–94.

6.    The Court concludes that Meta's systems for enforcing its age-restriction policy are not an unfair practice under the laws of California, Colorado and Kentucky.  And,

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

as the Court has noted above, New Jersey cannot assert an unfair practices claim separate and apart from its claim of deceptive practices. *See supra* Conclusions pp. 194–95.

7. **California**. Under California law, as noted, "the court must weigh the utility of the defendant's conduct against the gravity of the harm." *Progressive West Ins. Co.*, 135 Cal. App. 4th at 285. There is clear utility in Meta's systems to enforce its age-restriction policy. Even if those systems to enforce the policy are imperfect or could be improved, the fundamental point is the utility of a social media service attempting to enforce its policy rather than turning a blind eye to the inherent problem of age-lying. The record clearly establishes efforts by Meta to enforce its policy, as reflected most concretely in its removal of millions of accounts for suspected policy violations, and its continued enhancement and improvement of its systems for detecting underage users—including through large teams of human reviewers and the development of technological solutions. The Court rejects the State's suggestion that utility should be gauged by whether the States can argue that Meta could have further improved its systems; the question instead under California law is the utility of what Meta has done.

8. California law calls for balancing the utility of these enforcement efforts against the "gravity of the harm." The Court makes two observations on this score. First, in this setting, any harm arises from a minor misstating their age to violate Meta's policy. The Court does not view such harm as fully attributable to Meta's conduct; it is an outgrowth of choices made by users to disregard Meta's stated policy. Second, any such harm related to claimed deficiencies or shortfalls in Meta's systems—in other words, the theory that Meta has not adequately enforced its age-restriction policy—must arise from exposure of underage users to a social media service that is not intended for under-13 children. This would involve, in other words, exposure to third-party content not intended for U13s—harms that falls squarely within the ambit of Section 230. It would also involve exposure to features

206

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

claimed to promote compulsive use, such as algorithms, notifications, likes and infinite scroll—all features that this Court has already held are subject to Section 230 immunity. *See In re Social Media*, 753 F. Supp. 3d at 880-83. Further, liability premised on purportedly inadequate age verification would require Meta to "limit[] who will create an Instagram [or Facebook] account," and thus is barred by Section 230. *Backpage.com, LLC*, 768 F. Supp. 3d at 1065; *see also Grindr Inc.*, 128 F.4th at 1152–53 (holding Section 230 bars claims that an app should use "alternative designs" to protect minor users).

9. Given the utility of Meta's conduct in undertaking to enforce its age-restriction policy, and given that the harms (to the extent proven) arise from age-lying by users or from content and features subject to Section 230 immunity, the Court concludes that California has failed to prove that Meta's age verification systems are an unfair practice as a matter of California law.

10. **Colorado and Kentucky**. As noted above, the Court concludes that both Colorado and Kentucky law apply the standards of Section 5 of the FTCA to the determination of an "unfair practice." This involves a showing that Meta's practices "cause substantial injury to consumers," that such injuries were not "reasonably avoidable," and that such injuries were "not outweighed by countervailing benefits to consumers." *In re Social Media*, 753 F. Supp. 3d at 895–97 . Taking the last prong first, for the reasons already addressed with respect to California law, the Court concludes that the claimed injuries from Meta's systems for enforcing its age-restriction policy were "not outweighed by the countervailing benefits"—namely, that Meta has developed a series of age verification systems, with obvious benefits in terms of enforcing its age-restriction policy. Further, under the Section 5 test, Colorado and Kentucky must prove that the claimed injuries from Meta's supposed ineffective enforcement of its age-restriction policy were not "reasonably avoidable." The record here reflects that any injuries from Meta's claimed substandard enforcement of its age verification systems (which separately

207

has not been proven to be substandard) were indeed "reasonably avoidable" because no such injuries would have been incurred if consumers had not lied about their age. If harm results from the deliberate evasion of a social media service's policy, that is a "reasonably avoidable" injury within the meaning of the Section 5 standards. Finally, insofar as there is "substantial injury" to consumers from a supposedly ineffective enforcement of age-gating on Meta's services, that substantial injury would result from exposure to third party content or features claimed to cause compulsive use (such as algorithms, notifications, likes and infinite scroll) that are subject to Section 230 immunity, as this Court has already held. *See also Backpage.com, LLC*, 768 F. Supp. 3d at 1065; *see also Grindr Inc.*, 128 F.4th at 1152–53.

11.    In short, for the reasons summarized above, the Court finds that Colorado and Kentucky have failed to prove that Meta's systems for enforcing its age-restriction policy are an unfair practice under the standards that govern such claims under the laws of these two states.

**E.    Colorado And Kentucky Cannot Premise an Unfair Practices Claim on Alleged Violations Of COPPA.**

1.    The Court finds that Colorado and Kentucky law do not permit an unfair practice claim premised on a violation of COPPA.

2.    The California UCL "borrows violations of other laws and treats them as unlawful practices" because the statute "proscrib[es] '*any unlawful*' business practice." *Abbott Lab'ys v. Superior Ct.*, 9 Cal. 5th 642, 651 (2020) (emphasis added); *see also* Cal. Bus. & Prof. Code § 17200 ("unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code").

3.    In contrast to California law, the consumer protection statutes in Colorado and Kentucky do not include language suggesting that a party can borrow COPPA—or

208

any other federal or state statute—to establish liability. *See* Colo. Rev. Stat. § 6-1-105(1)(rrr) (prohibiting "any unfair, unconscionable, deceptive, deliberately misleading, false, or fraudulent act or practice"); Ky. Rev. Stat. § 367.170 ("Unfair, false, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.").

4.    Given the absence of any such "borrowing" provision in these statutes, the Court cannot presume that the legislatures of these two states intended that any violation of any federal law would give rise to an unfair practices claim. This sweeping principle cannot be presumed; without express statutory authorization, it does not invariably follow that a violation of federal law also establishes an unfair practice under the laws of these states. *See, e.g.*, *Lyons P'ship, L.P. v. Morris Costumes, Inc.*, 243 F.3d 789, 805 (4th Cir. 2001) ("to read the [North Carolina UDTPA] to create per se liability for violations of federal law would expand its scope beyond the apparent intent of the North Carolina legislature"); *Search v. Bank of Am., N.A.*, 2012 WL 4514285, at *3 (W.D. Wash. Oct. 2, 2012) (declining to conclude that a "violation of the [federal] Credit CARD Act constitutes a per se violation of Washington's Consumer Protection Act"); *Riopta v. Amresco Residential Mortg. Corp.*, 101 F. Supp. 2d 1326, 1334 (D. Haw. 1999) ("a technical violation of [the federal Truth in Lending Act] does not constitute a per se violation of H.R.S. § 480–2" because "the legislature saw fit to downplay the emphasis on federal interpretations of federal law"). The principle that a federal law violation does not automatically give rise to a state-law unfair practices claim, absent specific legislative authorization, makes eminent sense because the standards for establishing the federal law violation can be and often are fundamentally different from the standards for an unfair practices claim.

5.    For these reasons, the Court concludes that Colorado and Kentucky cannot premise their unfair practices claims on alleged violations of COPPA.

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

**F.** **Section 230 and the First Amendment Bar the State's Challenge to Meta's Systems for Enforcing Its Age-Restriction Policy.**

1. Beyond the States' failure to prove that Meta's age-verification systems are an unfair practice under the standards of California, Colorado and Kentucky, these claims are also barred by Section 230. Meta's systems for enforcing its age-restriction policy are "not independent" of its role as a "facilitator and publisher of third-party content." *Grindr Inc.*, 128 F.4th at 1152–53 (holding Section 230 bars claims that an app should use "alternative designs" to protect minor users). Rather, age verification "cuts to the core of Meta's role as a publisher: that is, determining who can and cannot speak on its platform." *Backpage*, 768 F. Supp. 3d at 1065.

2. In *Backpage*, the court held that Section 230 barred the plaintiff's claim—identical to the States' here—"that Meta should have incorporated identity and age verification procedures into its account setup process" on Instagram. *Id.* at 1064. The court explained that age-verification "is a classic publication decision"—"a determination of who may speak, and thus, whose content may be barred on the platform." *Id*. at 1065.[12] For the same reasons, Section 230 bars the state-law claims that Meta's systems for enforcing its age-restriction policy are an unfair practice.

3. In addition, the First Amendment protects Meta's "choices about the views [it] will, and will not, convey" in a compilation of speakers, as well as Meta's decision to speak to selected individuals in that group. *Moody*, 603 U.S. at 737; *see also, e.g.*, *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 570, 574 (1995) ("selection of contingents to make a parade" implicated organizer's "right as a private speaker to shape its expression"); *Tornillo*, 418 U.S. at 254 (First Amendment barred "enforceable right of access" to newspaper). Meta's editorial

---

[12] The Court's ruling denying Meta's motion to dismiss the personal injury plaintiffs' claims premised on purportedly inadequate age verification, ECF 430 at 14–15, predated *Backpage* and *Grindr*. And this Court's motion to dismiss ruling in this case did not address whether Section 230 applies to a claim of allegedly inadequate age verification.

decisions about which users can speak on its services—"whether fair or unfair"—"constitute[] the exercise of editorial control and judgment." *Id.* at 258.  That editorial discretion necessarily includes the right to speak to chosen listeners. *See, e.g.*, *Martin v. City of Struthers, Ohio*, 319 U.S. 141, 146–47 (1943); *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 867 (1982).

4.  Applying those principles here, Meta's systems for enforcing its age-restriction policy reflect its judgments about who should access and be published on its platform, and facilitate the related expressive message Meta wishes to send about the community it seeks to foster.  Evidence or testimony that Meta should have acted differently to keep certain users off its services effectively seeks to dictate how Meta "advance[s] its own political, social, and economic views." *Tornillo*, 418 U.S. at 255.  The First Amendment thus bars the States' challenge to Meta's systems for enforcing its age-restriction policy, because those practices are protected as Meta's own speech.

## VIII.  The States' COPPA Claims

### A.  COPPA Legal Standard.

1.  To prove a violation of the Children's Online Privacy Protection Act ("COPPA"), a plaintiff must show, by a preponderance of the evidence, that:

a)  A website or online service, or portion thereof, was

(1)  directed to children; or

(2)  the operator of the website or online service had actual knowledge that it was collecting or maintaining personal information from a child; and

b)  The operator of the website or online service collected, used, maintained, or disclosed personal information from a child without providing all of the

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

protections required by COPPA.  *See* 15 U.S.C. § 6502(a)(1); 16 C.F.R. §§ 312.3, 312.10.[13]

**B.    Meta's Services Are Not "Child-Directed."**

1.    To be "directed to children" under age 13, a website or online service, or a portion thereof, must be "targeted to" such children.  15 U.S.C. § 6501(10)(A)(i).

a)    No court has interpreted this phrase; accordingly, this Court should apply its "ordinary meaning." *Niz-Chavez v. Garland*, 593 U.S. 155, 169 (2021).

b)    In ordinary parlance, the term "targeted to" means that the website or online service has been developed with the goal of achieving a U13 audience— and is not just incidentally of interest to them. *New Mexico ex rel. Balderas v. Tiny Lab Prods.*, 516 F. Supp. 3d 1293, 1298 (D.N.M. 2021).

c)    This is supported by the statute, which defines "directed to children" as meaning "targeted to children." 15 U.S.C. § 6501.

2.    Meta's content is for a general audience and is not targeted to children.

a)    The evidence has established that the accounts identified by the States as purportedly showing "child-directedness" were targeted to parents, caregivers, gift buyers, and nostalgic adults.

b)    Meta's services are not directed to U13s and therefore qualify as "general audience" websites under COPPA's implementing regulations, 16 C.F.R. § 312 (the "COPPA Rule"). *See* 64 Fed. Reg. 59888, 59889 (Nov. 3, 1999).

3.    No "portion" of Meta's services is directed to children under 13.

a)    "Portion" is undefined in COPPA and the COPPA Rule, but in context, the term is best understood to refer to a discrete, identifiable element of a social media service.

b)    The presence of third-party content directed to children does not, by itself, establish the "portion" requirement unless the operator has taken steps to

_____

[13] Meta maintains, and does not waive, its position that the COPPA rule, 16 C.F.R. 312, goes beyond the statutory requirements and is therefore not controlling law.

212

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

make that content sufficiently segregated and readily identifiable to users as a discrete part or element of the service.

(1)     This point is supported by the COPPA Rule, which provides that "[a]n operator of a general audience website or online service" must provide notice of its information practices only when it "has a separate children's area."    16 C.F.R. § 312.4(d).    From this provision, it necessarily follows that a "general audience website or online service" without such a "separate children's area" is not "directed to children" and therefore is not subject to the COPPA requirements.

(2)     Further, as the COPPA Rule reflects, a "portion" must mean a "separate children's area" of a website or online service. 16 CFR § 312.4.

(3)     If the rule were interpreted otherwise, any general audience platform could be deemed "directed to children" merely because a third party posted content that is child-directed.  Imposing COPPA liability based solely on whether third parties elect to post "child-directed" content on a site would run afoul of the immunity conferred by Section 230.  The relevant inquiry must focus on the operator's conduct, not what third parties decide to post.  For this reason, the term "portion" must be construed to require some affirmative action by the operator to create or maintain a separate children's area of its website or service.

(4)     Further, interpreting the statute to find a "portion" directed to children based solely on the actions of third-party posters is inconsistent with Congress's intent and would substantially expand COPPA beyond its intended scope, converting it from a statute regulating child-directed services into a regulation that applies to the

213

internet as a whole whenever third-party content incidentally appeals to children.

(5) Such an interpretation of COPPA would violate Section 230 as it would hold Meta liable for not removing specific accounts or postings, and would require it to monitor and remove third-party content. *See Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1103 (9th Cir. 2009) (claim for failure to "remov[e] . . . indecent profiles" "necessarily involves treating [defendant] as a publisher of the content it failed to remove"); *Doe v. Backpage.com*, LLC, 768 F. Supp. 3d 1057, 1065 (N.D. Cal. 2025) (Section 230 bars claims that would require defendant to "limit[] who will create an Instagram [or Facebook] account"); *see also id.* at 1066 (Section 230 barred claim for failure to include adequate age and identity verification because it is "is seeking to hold Meta liable for its determination of who can and cannot access its platform to speak").

c) The evidence reflects that Meta's services do not contain any discrete or readily identifiable portion that is directed to children.

4. Even if (contrary to the evidence and the construction of the statute articulated above) a "portion" of Meta's service is deemed directed to children, Meta's platform is nonetheless not "directed to children" within the meaning of COPPA based on the mixed audience exception.

a) The COPPA Rule provides that a "mixed audience" service is not deemed "directed to children" with respect to any user not identified as under 13, so long as the service does not "target children as its primary audience." 16 CFR § 312.2 (definition of "Mixed audience website or online service").

(1) COPPA's mixed-audience exception provides that any commercial website or online service "shall not be deemed directed to children" if it (i) does not target children as its "primary audience," (ii) does

214

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

not collect personal information prior to neutral age-screening, and (iii) prevents collection from self-identified under-13 users without parental notice and consent. 16 C.F.R. § 312.2 (definition of "Mixed audience website or online service").

b) The evidence establishes that Meta falls within this mixed audience exception even if (contrary to the above analysis) a "portion" of the service is deemed directed to children.

(1) First, the evidence shows that Meta does not target children as a primary audience.

(2) Second, the evidence shows that Meta collects personal information prior to neutral age screening solely for functionality and security purposes. Such data collection is permitted under the § 312.5(c)(7) exception and therefore does not disqualify Meta's services from the mixed audience exception.

(a) The definition of a "mixed audience website" expressly states that personal information can be collected prior to age collection "for the limited purposes set forth in § 312.5(c)." 16 C.F.R. § 312.2.

(b) Section 312.5(c)(7) provides that no parental consent is required "[w]here an operator collects a persistent identifier and no other personal information and such identifier is used for the sole purpose of providing support for the internal operations of the website or online service." 16 C.F.R. § 312.5(c)(7).

(c) The "personal information" Meta collects from logged-out visitors—IP addresses, device IDs, and cookies—are "persistent identifiers" as those terms are defined in the COPPA Rule. *See* 16 C.F.R. § 312.2 (Definitions)

215

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

("[P]ersistent identifier[s] include[], but is not limited to, a customer number held in a cookie, an Internet Protocol (IP) address, a processor or device serial number, or unique device identifier").

(d)    The COPPA Rule defines "[s]upport for the internal operations of the website or online service" as "[t]hose activities necessary to" "(i) Maintain or analyze the functioning of the website or online service" and "(v) Protect the security or integrity of the user, website, or online service." 16 C.F.R. § 312.2 (definition of "[s]upport for the internal operations of the website or online service").

(i)    The evidence establishes that Meta uses the persistent identifiers collected from logged-out visitors for purposes that fall squarely within this definition.

(ii)    Meta uses this data to ensure page functionality, optimize site performance, and maintain interface usability. This aligns directly with category (i) of the mixed audience exception, to "[m]aintain or analyze the functioning of the website or online service." 16 C.F.R. § 312.2.

(e)    Section 312.5(c)(7) also imposes a requirement that the operator "shall provide notice under § 312.4(d)(3)."

(i)    Under § 312.4(d)(3), online notice must (1) identify the specific internal operations for which persistent identifiers are collected, and (2) explain how Meta ensures that the identifiers are not used for prohibited

216

purposes such as behavioral advertising or building profiles on specific individuals.

(ii)    Meta's privacy policy contains appropriate disclosures regarding information collected from visitors and the purposes for which that information is used. These notices disclose that Meta uses visitor data for purposes including safety and security, site integrity, and platform optimization—precisely the types of internal operations that fall within § 312.5(c)(7).

(3)    Third, the evidence shows that Meta prevents collection from self-identified U13s without parental notice or consent because it does not permit U13s on the platform and checkpoints accounts that identify as U13 when the user attempts to change their age to under 13. *See supra* Findings pp. 102–04.

(4)    Fourth, the evidence shows that Meta employs a neutral age gate, in compliance with the rule, that defaults to today's date.

5.    Thus, even assuming (contrary to the above analysis) that Meta is not a "general audience" service, Meta would fall within the mixed audience exception because the evidence establishes that it does not "target children as its primary audience," even assuming that some third-party content on its services is directed to children.[14]

6.    The States presented evidence of certain third-party content on Meta's service that they contend is "directed to children."

7.    Further, even if the Court were to conclude, contrary to the above points, that the third-party content identified by the States constitutes a "portion" of Meta's

---

[14] Meta preserves and does not waive its position that third-party content cannot be assessed in evaluating whether a website or online service is directed to children, but it recognizes that the Court has already ruled on this issue.

217

services within the meaning of COPPA, the evidence establishes that this content is overwhelmingly viewed by adults and therefore does not establish that this content is "child directed." *See supra* Findings pp. 112–16.

### C.    Meta Lacks Actual Knowledge of Particular Users Under 13 On Its Platforms.

1.    The Court concludes Meta does not have "actual knowledge" that it is collecting personal information from specific users under the age of 13.

2.    An operator has "actual knowledge" under COPPA only when it has a "direct and clear awareness, as opposed to an awareness attributed to them based on what they reasonably should have known." *New Mexico ex rel. Balderas v. Tiny Lab Prods*, 457 F. Supp. 3d 1103, 1113 (D.N.M. 2020).

3.    While "actual knowledge" is not defined in the COPPA statute or regulation, *see* 15 U.S.C. § 6501; 16 C.F.R. § 312.2, its plain meaning requires "knowledge that is actual, not merely a possible inference from ambiguous circumstances." *Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597, 609 (9th Cir. 2018); *see also Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 589 U.S. 178, 185 (2020) ("The addition of 'actual' . . . signals that . . . knowledge must be more than 'potential, possible, virtual, conceivable, theoretical, hypothetical, or nominal.'").

   a)    The statute specifies that knowledge must be "actual" and not constructive. *See U.S. ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 751 (2023) (citing *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 589 U.S. 178, 184 (2020)) ("[T]he term 'actual knowledge' refers to whether a person is 'aware of' information.").

   b)    An argument that Meta "should have known" or "should have done more" does not meet the legal standard. *See Tiny Lab Prods.*, 457 F. Supp. 3d at 1113, *on reconsideration*, 516 F. Supp. 3d 1293 (D.N.M. 2021).

   c)    The Court recognizes that Meta's efforts to address identification and removal of underage users from its platforms are highly similar to other online platforms. The record establishes that age misrepresentation is an

218

industry-wide problem, and that industry participants have taken a broadly consistent approach to this issue. *See supra* Findings pp. 95–96.

d) Indeed, age misrepresentation by children under 13 was a recognized issue in 1998 when COPPA was signed into law. *See supra* Conclusions p. 204.

e) The regulatory history indicates that Congress adopted an "actual knowledge" standard in light of concerns that a broader standard would impose undue burdens on general audience websites, including where a user could misrepresent their age to gain access. As the FTC explained, Congress "deliberately selected the actual knowledge standard because" it met the "goals of COPPA without imposing excessive burdens" on general audience websites. *See* 76 Fed. Reg. 59804, 59806 (Sept. 27, 2011).

f) Accordingly, actual knowledge requires that Meta knew it was collecting "personal information from a child under age 13." *Id.* COPPA does not impose liability because a website may have users under 13 or because age misrepresentation occurs; rather, COPPA requires actual knowledge that the operator is collecting personal information from a specific child under 13.

g) If "actual knowledge" could be established based solely on a generalized awareness that some users under 13 are using Meta's service, in violation of its age-restriction policy, this would dramatically expand liability under COPPA and would effectively capture any general audience social media service with an age-restriction policy. The Court is persuaded that such an expansive interpretation of the statute would subject not only Meta but other similar platforms that require users to be at least 13 years of age to broad liability—and the Court declines to adopt such an interpretation.

4. COPPA's actual knowledge prong requires knowledge of *specific* users under 13 years old.

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

a)  The requirement that an operator must have "actual knowledge" of the age of a specific child is established by the notice provisions of the COPPA Rule, which require operators to "make reasonable efforts to obtain verifiable parental consent" that are "reasonably calculated, in light of available technology, *to ensure that the person providing consent is the child's parent*." 16 C.F.R. § 312.5 (b)(1) (emphasis added). And operators must give "*that parent*" the ability to prevent future "collection of personal information *from that child*," and must "[e]nsure that the requestor is a parent of *that child*." 16 C.F.R. §§ 312.6(a)(2), (a)(3)(i) (emphases added).

b)  An operator cannot provide direct notice to a parent according to these regulatory requirements unless the operator has actual knowledge of the age of *specific* users.

c)  The same point is reflected in the COPPA statute, which applies to an operator "that has actual knowledge that it is collecting personal information from *a child*," and permits the operator "to terminate service provided to *a child whose parent* has refused" to permit the collection or maintenance of "personal information *from that child*." 15 U.S.C. §§ 6502(a)(1), 6502(b)(3) (emphases added). Those statutory provisions could only apply if the operator has actual knowledge of the age of a specific child.

5.  For these reasons, aggregated estimates showing that individuals under the age of 13 used Meta's services do not establish that Meta had actual knowledge it was collecting personal information from specific individuals who misrepresented their age to access the platforms.

6.  Likewise, aggregated estimates, enabled by off-platform surveys or technology that cannot identify whether individual, specific users are under 13, do not establish actual knowledge of specific users being under 13.

**D.  Even If a Checkpointed Account Constitutes "Actual Knowledge," Meta Complies With COPPA.**

220

1. For the reasons discussed above, the Court rejects the States' argument that checkpointing an account for a potential violation of Meta's age-restriction policy establishes that Meta has "actual knowledge" it is collecting personal information from a child under the age of 13.

   a) Among other things, the checkpointing process does not establish that a user is in fact under the age of 13. As discussed, *supra* Findings pp. 103-06, checkpointed accounts are often successfully appealed and accounts are often checkpointed based on false reports or because human reviewers are unsure and err on the side of caution where age is uncertain. *See supra* Findings pp. 107–10.

   b) For similar reasons, Meta's deletion of a checkpointed account after the 30-day appeal period does not establish actual knowledge. Users may choose not to appeal a checkpoint for a number of reasons, even if they are 13 or older. And users may fail the checkpoint even if they are 13 or older—for example, if the image they provide of their ID documentation is not sufficiently legible. *See supra* Findings p. 108.

2. For purposes of analysis, even if checkpointing and account deletion were sufficient to establish "actual knowledge," Meta nonetheless complies with COPPA for all checkpointed accounts.

3. Under the COPPA Rule, "*[i]t shall be unlawful* for any operator of a website or online service directed to children, or any operator that has actual knowledge that it is collecting or maintaining personal information from a child, *to collect* personal information from a child in a manner that violates the regulations prescribed under this part." 16 C.F.R. § 312.3 (emphases added).

   a) This means that if an operator has "actual knowledge" that it is "collecting or maintaining" a child's information, it is unlawful "to collect" further personal information without complying with the notice requirements. *Id.*

221

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

b)    Collection is defined in the Rule as "[r]equesting, prompting, or encouraging a child to submit personal information online . . . [e]nabling a child to make personal information publicly available in identifiable form" and "[p]assive tracking of a child online."  16 C.F.R. § 312.2.

c)    The COPPA statute supports this reading.  *See* 15 U.S.C § 6502(a)(1) ("*It is unlawful* for an operator of a website or online service directed to children, or any operator that has actual knowledge that it is collecting personal information from a child, *to collect* personal information from a child . . . .") (emphases added).[15]

d)    This construction of the COPPA requirements makes sense, because otherwise operators could conceivably be deemed immediately in violation of COPPA if they gain actual knowledge of a child's age after previously collecting information before learning the child's age.

4.    The Rule thus contemplates a layered review system, such as that employed by Meta, to "maintain" a potential child's data—but stop collecting new data—if it gains actual knowledge that the user is under 13.

5.    This conclusion is further supported by the Rule's separate prohibition on prolonged retention of data, which can occur for "only as long as is reasonably necessary to fulfill the specific purpose(s) for which the information was collected." 16 C.F.R. § 312.10.

6.    Thus, COPPA prohibits the further collection of personal information once the operator has "actual knowledge" that the information is from a child under age 13.

---

[15] In its summary judgment ruling, the Court rejected Meta's broader argument that the statute does not apply at all to the maintenance of information collected from U13s.  *See* ECF No. 440 (3214) at 33–35. The point addressed in text is different—namely, that if an operator has actual knowledge it has collected or is maintaining personal information of a U13, the prohibition of the COPPA Rule is on the further collection of information from that child.  As noted in text, this is the only sensible construction of the statute, because otherwise an operator that has collected personal information from a U13 child without actual knowledge, and then later gains such knowledge, would immediately be in violation of COPPA. That would convert COPPA into a strict liability statute, contrary to the entire structure of the statute and the COPPA Rule.

222

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

7. Meta complies with this requirement, because when suspected underage accounts are disabled in the checkpointing process it ceases to collect additional data from that account (unless there is a later successful appeal of the checkpoint). *See supra* Findings p. 103.

8. If an account does not successfully appeal the checkpoint, Meta also complies with the requirement of COPPA to take "reasonable measures" to delete the data.

  a) The COPPA rule provides that "[w]hen such information is no longer reasonably necessary for the purposes for which it was collected, the operator must delete the information *using reasonable measures* to protect against unauthorized access to, or use of, the information in connection with its deletion."  16 C.F.R. § 312.10 (emphasis added).

  b) While the term "reasonable measures" is undefined, the Court concludes that Meta's processes for deleting the data associated with checkpointed accounts, unless the checkpoint is successfully appealed, constitutes a reasonable measure, particularly considering the scale of Meta's operations and the volume of accounts subject to data deletion.  The evidence establishes the reasonableness of Meta's data deletion processes after checkpointed accounts are scheduled for deletion.

  c) For the same reasons, Meta's data deletion practices comply with the requirement that "[a]n operator of a website or online service shall retain personal information collected online from a child for only as long as is reasonably necessary to fulfill the specific purpose(s) for which the information was collected."  16 C.F.R. § 312.10.

**E.  COPPA's Actual Knowledge Standard Forecloses a Theory of Willful Blindness.**

1. The Court is persuaded that COPPA's actual-knowledge standard does not encompass "willful blindness" or "willful disregard."  Neither the statute's text nor its regulatory history supports such a construction of the actual-knowledge standard.

223

a) The legislative history shows that in 1998 Congress rejected a broader standard of "knowingly" and narrowed the standard to "actual knowledge." *See* 89 Fed. Reg. 2034, 2037 n.43 (Jan. 11, 2024).

b) COPPA's actual knowledge standard requires "direct and clear awareness, as opposed to an awareness attributed to [operators] based on what they reasonably should have known." *See Tiny Lab Prods.*, 457 F. Supp. 3d at 1113.

c) Congress has enacted other knowledge-based statutes (*e.g.*, FCA, RICO) specifying that knowledge can be established by willful blindness. The COPPA statute does not so provide.

d) The Court must give effect to the decision by Congress to omit "willful blindness" from the statutory language. *See Intel*, 589 U.S. at 189 ("When Congress acts to amend a statute, we presume it intends its amendment to have real and substantial effect.") (citing *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 258–259 (2004)); *see also Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.").

e) The Supreme Court cases applying a "willful blindness" standard interpret materially different statutory regimes and therefore offer limited guidance in construing COPPA's distinct actual-knowledge standard.

(1) COPPA was enacted in 1998, while the statutes at issue in the Supreme Court cases discussed below involved older and different statutory regimes: induced patent infringement under the 1952 Patent Act, ERISA under the 1974 Act, the Copyright Act (dating back to 1790 and comprehensively revised in 1976) and the False Claims Act, originally enacted in 1863 and later amended in 1986.

224

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

(2)     This context matters because cases interpret specific statutes against their own text, history, and common-law or pre-amendment backgrounds.

(3)     In *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011), the Supreme Court addressed induced patent infringement under 35 U.S.C. § 271(b).   The Court found the statutory text "inconclusive" and relied on pre-enactment case law and the historical relationship between induced and contributory infringement.  *Id.* at 760–61. Such analysis is not available here because COPPA is a comparatively modern statute with very limited case law.  Importantly, in *Global-Tech*, the Supreme Court held that there was "no reason why the doctrine [of willful blindness] should not apply in civil lawsuits *for induced patent infringement* under 35 U.S.C. § 271(b)." *Id.* at 768 (emphasis added).  But the Court did not suggest that courts may read over statutory text and engraft a willful blindness standard into every civil statute requiring knowledge.

(4)     In *SuperValu Inc.*, the Supreme Court interpreted the False Claims Act, which expressly defines "knowingly" to include three mental states:   actual knowledge, deliberate ignorance, and reckless disregard.  *Id.* at 749–50.  The Court's analysis thus arose in a statutory scheme in which Congress expressly incorporated scienter standards broader than actual knowledge.  COPPA contains no analogous language.

(5)     Likewise, *Unicolors, Inc. v. H&M Hennes & Mauritz, L.P.*, 595 U.S. 178 (2022), is confined to the statute under consideration in that case.  Although the Supreme Court noted that "willful blindness may support a finding of actual knowledge" in that context, it also

225

emphasized that Congress knows how to draft broader scienter standards and does so expressly, including standards based on "reasonable grounds to know," "facts or circumstances," "deliberate ignorance," or "grossly negligent disregard." *Id.* at 185–87. The Court's decision thus reinforces that where Congress chooses a narrower scienter standard, courts must enforce that choice as written.

(6)     Finally, *Intel* reinforces that "actual knowledge" is a distinct and limiting scienter standard. Interpreting ERISA's requirement that a plaintiff have "actual knowledge" of an alleged breach, the Supreme Court held that "actual knowledge" requires real awareness, not merely information that was disclosed, available, or "close at hand." 598 U.S. at 186. Although actual knowledge may be established through circumstantial evidence, the Court emphasized that arguments for a broader interpretation "founder on Congress's choice of the word 'actual.'" *Id.* at 189. The Court held that to the extent the "plain meaning of [actual knowledge] substantially diminishes the protection that it provides" and "the current scheme should be altered," then Congress, not the court, "must be the one" to alter it. *Id.* at 188.

f)     The same principle applies here. By requiring "actual knowledge" in COPPA, Congress adopted a narrower scienter standard. *Intel* instructs that courts must respect that choice, even where policy arguments might favor a broader rule. Accordingly, this Court must interpret COPPA's "actual knowledge" requirement as Congress "affirmatively and specifically enacted." *See Mobil Oil Corp. v. Higginbotham*, 436 U.S. 618, 625 (1978) ("There is a basic difference between filling a gap left by Congress' silence and rewriting rules that Congress has affirmatively and specifically

226

enacted."). The Court is persuaded that Congress's decision to require only "actual knowledge" in COPPA, while including broader scienter requirements in other statutes, demonstrates that the narrower standard selected was deliberate and must be enforced as written.

2.    Further, even assuming willful blindness could establish actual knowledge under COPPA, the States fail to prove that Meta (i) subjectively believed there was a high probability that a particular user was under 13 and (ii) took deliberate actions to avoid learning that user's age.

a)    The willful blindness doctrine requires proof that Meta took deliberate actions to avoid learning the age of specific users. *Global-Tech*, 563 U.S. at 769; *see also* ECF No. 440 (3214) at 29 (holding that "willful blindness . . . requires taking deliberate action to avoid learning a fact").

b)    Willful blindness must be established as to particular users, not an undifferentiated population of users who may have been under 13. The States have not identified evidence that Meta deliberately avoided learning the age of any particular user.

c)    Evidence that Meta may have perceived a risk that some users were under 13 yet failed to take additional steps to identify those users, does not establish willful blindness. The doctrine requires deliberate actions taken to avoid confirming a fact, not merely a failure to inquire further.

d)    The record demonstrates that Meta did not seek to avoid confirming age-related information. To the contrary, far from avoiding such information, Meta developed, deployed, and continued to improve age assurance systems designed to identify and remove users under 13 and has continually improved those systems. *See supra* Findings pp. 96–98, 105–07. Such evidence is inconsistent with willful blindness.

e)    The States' suggestion that Meta could have done more to identify users under 13 does not meet the standard of "willful blindness" because Meta's

227

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

age assurance systems, although imperfect, are meant to identify U13 users on its platforms.  Meta's processes in fact reflect the *opposite* of willful blindness—Meta is taking affirmative, deliberate steps to identify users who violate its age-restriction policy and invests significant human and technological resources in that effort.  While Meta's systems, like any large-scale content moderation system, may be imperfect, this does not establish "willful blindness" because Meta is indeed attempting to identify potential underage users—the converse of the conduct contemplated by the willful blindness standard.

**F.     The States' COPPA Claim Is Subject to the Four-Year Statute of Limitations.**

1.     COPPA was enacted in October 1998.  15 U.S.C. § 6501 (effective date).  Accordingly, the States' COPPA claim is subject to the four-year statute of limitations of 28 U.S.C. § 1658(a) (for statutes enacted after December 1, 1990) absent tolling or some other exception to that limitations period.

2.     In denying Meta's summary judgment motion on this statute of limitations issue, the Court noted that the States seek to apply the *nullum tempus occurrit regi* doctrine, and that Meta had cited "no authority" supporting the application of Section 1658 to government actions enforcing public rights.  ECF No. 440 (3214) at 24.  Meta has now brought to the Court's attention the decision in *Alaska v. Express Scripts, Inc.*, 774 F. Supp. 3d 1150, 1162 (D. Alaska 2025), holding that *nullum tempus* "does not—and, under the Supremacy Clause, could not—insulate the State from statutes of limitations applicable to federal laws."  This is consistent with the Supreme Court's earlier decision in *United States v. State of California*, 297 U.S. 175, 186 (1936) (overruled on other grounds by *Garcia v. San Antonio Metropolitan Transit Authority*, 469 U.S. 528 (1985)), holding that the "canon of construction that a sovereign is presumptively not intended to be bound by its own statute unless named in it" does not extend to states evading "provisions of an act of Congress, all-embracing in scope and national in . . . purpose."

228

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

3. More broadly, *nullum tempus*, the doctrine that "time does not run against the King," protects sovereigns from being constrained by their *own* statutes of limitations. *Guar. Tr. Co. of New York v. United States*, 304 U.S. 126, 141 (1938) ("nullum tempus rests on the public policy of protecting the domestic sovereign from omissions of its *own* officers and agents") (emphasis added). Courts have extended *nullum tempus* to allow the federal government to pursue public rights in *parens patriae* actions without being bound by state statutes of limitations. *See S.E.C. v. Rind*, 991 F.2d 1486, 1491 (9th Cir. 1993) ("State limitations periods do not bind the United States when it sues to vindicate a public right or interest[.]"). But under the Supremacy Clause, as noted in *Alaska*, a different issue is presented when States assert claims under a federal cause of action. In that setting, *nullum tempus* does not apply, and the States' COPPA claim is therefore subject to the four-year limitations period of 28 U.S.C. § 1658(a).

4. The States have also argued that their Tolling Agreements with Meta toll the running of the statute of limitations. But the Tolling Agreements apply only to "Covered Claims," which are defined as "civil claims under various consumer protection laws." ECF No. 253.89 (2705.89) (Exhibit 86 on Administrative Motion to File Under Seal Meta's Temporary Sealing Motion (Motion for Summary Judgment)) at 1; ECF No. 253.90 (2705.90) (Exhibit 87 on Administrative Motion to File Under Seal Meta's Temporary Sealing Motion (Motion for Summary Judgment)) at 1. The term "consumer protection laws" is commonly understood to mean state statutes that prohibit unfair, deceptive, and fraudulent business practices, and that among other things can be enforced by "consumers." In contrast, COPPA is a federal privacy statute, and can only be enforced by the FTC and State attorneys general. In ordinary parlance, the term "consumer protection laws" (which is not defined in the Tolling Agreements) would not apply to a federal privacy statute. The States themselves have acknowledged this distinction, stating in interrogatory responses that language "in reference to the state's consumer

229

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

protection claims . . . in no way impact[s] COPPA claims by these states or State AGs who are solely pursuing COPPA claims." ECF No. 253.68 (2705.68) (Exhibit 65 on Administrative Motion to File Under Seal Meta's Temporary Sealing Motion (Motion for Summary Judgment) at n.1).

5.    The Court therefore concludes that the Tolling Agreements do not apply to the States' COPPA claims and do not toll the running of the four-year statute of limitations.    Accordingly, the States can only assert COPPA claims based on conduct occurring after October 24, 2019, four years before the filing of the Complaint.

## IX.    The States' Proposed Remedies

1.    The States have only recently articulated specific monetary demands, and they still have not settled on which of these demands they actually intend to present. Accordingly, Meta may show at trial that, if penalties and/or disgorgement are determined to be appropriate, they should be awarded at much lower levels than what the States now demand, with a specific showing as to what those levels should be.

### A.    Any Calculation of The Number of Violations Must Be Linked to the Alleged Deceptive Statements or Challenged Features.

1.    Civil penalties are imposed for each violation of the relevant state consumer protection statute, multiplied by an amount not to exceed a maximum statutory penalty.    Further, the number of violations must be proven and cannot simply be assumed.

a)    California seeks civil penalties under the Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 et seq., and the False Advertising Law, Cal. Bus. & Prof. Code § 17500 et seq.

(1)    Under the UCL, "[a]ny person who engages, has engaged, or proposes to engage in unfair competition shall be liable for a civil penalty not to exceed two thousand five hundred dollars ($2,500)

230

for each violation." *Id.* § 17206(a).  Section 17206(b) of the UCL further mandates that "[t]he court shall impose a civil penalty for each violation."

(2)    Section 17536 of the FAL contains a parallel per-violation framework, authorizing a civil penalty not to exceed $2,500 "for each violation."

(3)    Accordingly, under both the UCL and the FAL, a civil penalty is the product of (i) the number of violations multiplied by (ii) an amount not to exceed $2,500 per violation.

b)    Colorado seeks civil penalties under the Colorado Consumer Protection Act, C.R.S. § 6-1-101 et seq.

(1)    Under the CCPA, "any person who violates or causes another to violate . . . [the statute] shall forfeit and pay . . . a civil penalty of not more than twenty thousand dollars for each such violation." *Id.* § 6-1-112(1)(a).  For violations occurring before July 1, 2019, the maximum penalty is $2,000 per violation. *See* Colo. Rev. Stat. § 6-1-112(1)(a) (2018).

(2)    The CCPA further specifies the unit of violation: "a violation . . . shall constitute a separate violation with respect to each consumer . . . involved." Colo. Rev. Stat. § 6-1-112(1)(a).

(3)    Accordingly, under the CCPA, a civil penalty is the product of (i) the number of violations multiplied by (ii) an amount not to exceed $20,000 per violation ($2,000 for violations before July 1, 2019).

c)    Kentucky seeks civil penalties under the Kentucky Consumer Protection Act, Ky. Rev Stat. § 367.110 et seq.

(1)    Under the KCPA, "if the court finds that a person is willfully using or has willfully used a method, act, or practice declared unlawful by [the KCPA], the Attorney General . . . may recover . . . a civil

231

penalty of not more than two thousand dollars ($2,000) per violation." Ky. Rev Stat. § 367.990(26)(a).

(2)     Accordingly, under the KCPA, a civil penalty is the product of (i) the number of violations multiplied by (ii) an amount not to exceed $2,000 per violation.

d)     The New Jersey Attorney General seeks civil penalties under the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1 et seq.

(1)     Under the NJ CFA, "[a]ny person who violates . . . [the NJ CFA] . . . shall, in addition to any other penalty provided by law, be liable to a penalty of not more than $10,000 for the first offense and not more than $20,000 for the second and each subsequent offense." *Id.* § 56:8-13.

(2)     By its plain terms, the NJ CFA's first-offense/subsequent-offense framework requires the Court to identify each discrete "offense" and to assign it a sequential position for penalty purposes. *Id.* The statute thus operates on a per-offense basis, and requires the States to prove each discrete offense on which they seek a penalty.

(3)     Accordingly, under the NJ CFA, a civil penalty is the product of (i) the number of offenses multiplied by (ii) either $10,000 (for the first offense) or up to $20,000 (for each subsequent offense).

2.     While the Court has discretion in determining the number of violations of a consumer protection statute, the case law establishes that this discretion is cabined by the principle that violations must be linked to the conduct claimed to violate the statute—here, allegedly deceptive statements or specific challenged features.

a)     This is inherent in the word "violation" itself. *See* Violation, Black's Law Dictionary (12th ed. 2024) (defining "violation" as the "act of breaking or dishonoring the law").

232

b)      Awarding a civil penalty for a "violation" without reference to the conduct giving rise to it would ignore the clear meaning of the term. *See Edgerly v. City & Cnty. of S.F.*, 713 F.3d 976, 984 (9th Cir. 2013) ("[I]t is a settled principle of statutory construction, that courts should strive to give meaning to every word in a statute.").

3.      The number of Meta's users is not a proper measure to calculate the number of violations of any of these consumer protection statutes.  Instead, the States must prove the number of violations by a preponderance of the evidence based either on (i) the number of consumers exposed to or affected by the violative acts (if any) or (ii) the affirmative acts or decisions by Meta that give rise to violations of the applicable statutes.  *See* ECF 479.1 (3264.1) at 2–3 (collecting cases).

a)      Under the UCL or FAL, civil penalties may be imposed "for each violation" of the statute.  Cal. Bus. & Prof. Code § 17206(a); Cal. Bus. & Prof. Code § 17536(a).  California courts have consistently rejected claims that would equate the size of a defendant's user base or audience with the number of violations for a deceptive or unfair practice, holding instead that the number of violations must be linked to persons who actually acted upon or were exposed to the challenged conduct.  *See People v. Superior Court (Jayhill Corp.)*, 9 Cal. 3d 283, 289 (1973) (the number of violations is determined by the number of persons to whom the misrepresentations were made); *People v. Bestline Products, Inc.*, 61 Cal. App. 3d 879, 923 (1976) (claimed violations were tied to persons actually solicited at recruitment meetings who acted on the misrepresentations); *People v. Superior Court (Olson)*, 96 Cal. App. 3d 181, 197–98 (1979) (rejecting newspaper circulation as the measure of violations because "every newspaper subscriber does not read all of the advertisements").

b)      Similarly, the CCPA is textually and doctrinally incompatible with the States' suggestion that the total number of Meta users is the proper measure

233

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

of the number of CCPA violations. Under the CCPA, "a violation . . . shall constitute a separate violation with respect to each consumer . . . involved." Colo Rev. Stat. § 6-1-112(1)(a). As the Colorado Court of Appeals has explained, "consumer involved" means "a person who has been exposed to [defendant's] misleading information and then . . . undertakes other activities in response" to the challenged conduct. *State ex rel. Woodard v. May Dep't Stores Co.*, 849 P.2d 802, 810 (Colo. App. 1992), *aff'd in part and rev'd in part*, *May Dep't Stores Co. v. State ex rel. Woodard*, 863 P.2d 967 (Colo. 1993) (explaining that "a person who receives a copy of a newspaper with a misleading ad, but who does not read or respond to the ad in any way, would not be a consumer . . . involved").

c)   Kentucky's statutory framework similarly does not support treating Meta's aggregate user base as a proxy for counting the number of violations of the KCPA. In *American National University of Kentucky, Inc. v. Commonwealth ex rel. Beshear*, the Kentucky Court of Appeals "provide[d] . . . guidance on how trial courts may impose sanctions 'per violation' under the KCPA for material published online," holding that "every KCPA violation must be based on separate, affirmative act[s] or decisions by the defendant" and "that in addition to the original publication, additional KCPA violations may be found whenever a defendant edits or adds substantive material . . . related to the information originally found to run afoul of the KCPA." 2019 WL 2479608, at *7–8 (Ky. Ct. App. June 14, 2019) (unpublished).

d)   New Jersey follows a similar approach to Kentucky, basing the number of violations on the number of separate affirmative acts by the defendant. In *Kugler*, the New Jersey Supreme Court upheld the trial court's determination "that since the 24 contracts involved in the action were

234

obtained through practices violative of [the NJ CFA], a penalty of $100 in each instance or $2400 would be imposed upon defendant." 58 N.J. at 533.

4.   The form of the "violation" may vary with the nature of the case, but the penalty must always be tied to the defendant's violative conduct. *See, e.g.*, *People v. Ashford Univ., LLC*, 100 Cal. App. 5th 485, 500 (2024) ("count[ing] each deceptive telephone call made by defendants as a separate violation").

5.   Penalties untethered to the alleged violative conduct would run afoul of due process. The principle that the punishment imposed must derive from the legal wrong "is deeply rooted and frequently repeated in common-law jurisprudence." *Solem v. Helm*, 463 U.S. 277, 284 (1983); *see also BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 & n.24 (1996).

**B.   The States' Proposed Penalty Estimates Do Not Reflect Violations Linked to The Alleged Deceptive Statements or Challenged Features.**

1.   In this case, the States allege three categories of violative conduct.

a)   The deception claims challenge certain statements by Meta that are claimed to be false or misleading. *See supra* Findings pp. 2–83.

b)   The claims of unfair practices challenge three discrete features or elements of Meta's services—Meta's time-management tools, Instagram's multiple accounts function, and Meta's age verification systems. *See supra* Findings pp. 84–101.

c)   The States also assert unfair practices claims based on Meta's alleged violation of COPPA. *See supra* Findings pp. 101–17.

2.   The Court finds that the States' time-spent penalty estimates are not tied to Meta's alleged violative conduct.

a)   Under the States' time-spent methodology, Meta would owe the same amount whether this Court found one actionable misstatement or fifty, or found one at-issue feature to be unfair or three of them.

b)      The States do not account for what portion of teen users were exposed to or aware of the allegedly deceptive statements. *See supra* Findings p. 117.

c)      The States do not link any misstatement or any challenged feature to their threshold time-spent levels, individually or population-wide. *See supra* Findings p. 119.

d)      Even if "violations" could be defined with reference to generalized consumer harm, no evidence shows that the States' time-spent cut-off points measure such harm. Rather, the States' experts conceded that the proposed thresholds are not associated with negative outcomes for users. *See supra* Findings p. 119.

3.      The Court finds that the States' user penalty estimates are not tied to Meta's alleged violative conduct.

a)      The States have not presented evidence establishing that Meta's claimed misrepresentations or unfair features affected or involved *every* teen or U13 user on Meta's services.

(1)      There is no evidence of the number of users in any of the four states who were aware or exposed to any alleged misrepresentation. *See supra* Findings p. 117.

(2)      There is no evidence of the number of users in any of the four states who were misled by any of the alleged misrepresentations. *See supra* Findings p. 118.

(3)      There is no evidence of the number of users in any of the four states who were unfairly affected by any of the challenged features. *See supra* Findings p. 118.

(4)      The estimates of the number of U13 users in the four states, on which the States rely for their claimed unfair practices based on asserted violations of COPPA, are based on an unreliable and

236

speculative methodology that the Court cannot credit. *See supra* Findings p. 124.

4. The Court finds that the States' estimates of penalties for unfair practices based on purported COPPA violations are not tied to Meta's alleged violative conduct.

a) The States purport to define the penalties for COPPA violations based on four separate metrics—(i) "retaining children's data for unreasonably long periods," (ii) "failing to remove hard-linked accounts of children," (iii) "failing to remove soft-matched accounts of children," and (iv) "failing to remove children who changed their date of birth to under 13." ECF No. 465.1 (3250.1), Ex. C.

b) These four metrics do not establish COPPA violations and thus cannot support the calculation of state-law penalties for unfair practices.

(1) COPPA does not set a fixed deadline for deleting U13 data; instead, it permits an operator to retain such data "for only as long as is reasonably necessary to fulfill the specific purpose(s) for which the information was collected." 16 C.F.R. § 312.10. Further, COPPA recognizes that an operator may use "reasonable measures" to delete children's personal information. *Id*. Meta's temporary retention of data to comply with legal discovery obligations, [Hartnett], is consistent with the COPPA rule, which permits retention of potential U13 data to "take precautions against liability" or to "[r]espond to judicial process," 16 C.F.R. § 312.5(c)(6)(ii)–(iii). The States have not established an "unreasonably long" data retention that would support this metric as a basis for state-law unfair practices penalties.

(2) Similarly, the number of hard-linked or soft-matched accounts is not a proper basis for calculating state-law penalties for COPPA violations because an account's association with a checkpointed

237

account (whether by hard-linking or soft-matching) does not establish "actual knowledge" that the linked account is operated by a user under 13. *See supra* Findings p. 105.

(3) Likewise, the number of users who changed their birthdate to an age under 13 is not a proper metric for determining the state-law unfair practices penalties associated with a COPPA violation. The evidence reflects that many self-reports changing age to U13 are in fact fraudulent (including by adult predators who seek to wipe the data from their account, and hackers who maliciously aim to disable an account) and thus is not an accurate measurement of COPPA violations. *See supra* Findings p. 109. Further, if an account self-reports an age under 13, the account is immediately checkpointed and is subsequently deleted unless the checkpoint is successfully appealed; this complies with COPPA. *See supra* Findings p. 110. The Court thus rejects the purported "failure to remove" accounts that self-reported as U13 as a metric to measure the appropriate state-law unfair practices penalties for claimed COPPA violations.

**C.    The States Double-Count the Same Users for Purposes of Calculating Penalties.**

1. "[A] plaintiff may not receive a double recovery for the same wrong." *Lexton-Ancira Real Est. Fund, 1972 v. Heller*, 826 P.2d 819, 823 (Colo. 1992) (affirming trial court's reduction of damages in CCPA case); *see also Granelli v. Chi. Title Ins. Co.*, 2012 WL 2072648, at *11 (D.N.J. June 8, 2012) ("the New Jersey Consumer Fraud Act does not permit duplicative damage awards"); *Hardaway Mgmt. Co. v. Southerland*, 977 S.W.2d 910, 918 (Ky. 1998) ("There is a strong public policy in this Commonwealth against double recovery for the same elements of loss.").

2. Thus, for example, if a single user has accounts on both Instagram and Facebook, it would clearly be improper in calculating statutory penalties to count that user

238

twice with respect to the same alleged misleading or deceptive statement, or the same alleged unfair feature, or the same claimed violation of COPPA.

3.     This reflects the "fundamental" principle that "no matter under what theories liability may be established, there cannot be any duplication of damages." *Ptaszynski v. Atl. Health Sys.*, Inc., 440 N.J. Super. 24, 40, 111 A.3d 111, 120 (N.J. Super. Ct. App. Div. 2015) (New Jersey "common law prohibits a double recovery for the same injury").  And even "[w]here state law provides for statutory damages, the trial court's discretion may be called upon to prevent double recovery."  *Doe v. D.M. Camp & Sons,* 624 F. Supp. 2d 1153, 1174 (E.D. Cal. 2008); *see also In re Gen. Motors LLC Ignition Switch Litig.*, 407 F. Supp. 3d 212, 231 (S.D.N.Y. 2019) (cautioning in UCL case against "duplicative recoveries").

4.     Forcing a party "to pay a single debt more than once" raises grave due process concerns, *W. Union Tel. Co. v. Pennsylvania*, 368 U.S. 71, 77 (1961), because there is a "fundamental unfairness which is at war with due process" in compelling payment twice over for the same wrong, *Akins v. Texas*, 325 U.S. 398, 402 (1945).

5.     To that end, the Supreme Court has instructed that "courts can and should preclude double recovery." *EEOC v. Waffle House, Inc.*, 534 U.S. 279, 297 (2002); *see also, e.g.*, *Illi. Brick Co. v. Illinois*, 431 U.S. 720, 730–31 (1977) (fashioning rule to avoid "unwarranted multiple liability for the defendant" and "duplicative recoveries" against it); *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 269 (1992) (construing RICO to guard against the "risk of multiple recoveries"); *State Farm Mut. Auto. Ins. Co. v.  Campbell*, 538 U.S. 408, 423 (2003) (warning against "the possibility of multiple punitive damages awards for the same conduct").

6.     The Court finds that the States improperly seek double recovery through their penalty estimates.

a)     The States' user and time-spent penalty estimates count each teen user on Meta's services once, then count many of those same teen users again for

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

each month they exceeded a time-spent threshold. *See supra* Findings p. 119.

    b)    The States' user and time-spent penalty estimates treat users on Facebook and Instagram as separate violations, even though both services have significant overlap in terms of users. *See supra* Findings pp. 119–20.

    c)    Each category of alleged COPPA violations put forth by the States is drawn from the data that measures accounts rather than unique users. But the States' hard-link and soft-match categories capture additional accounts that belong to the same potential U13 user whose account Meta already disabled for being potentially underage; so a single individual might be counted once for the disabled account, again for a hard-linked account, again for a soft-matched account, and again for a purported "unreasonable" delay in deleting the user's data. *See supra* Findings p. 120.

    (1)    COPPA speaks in terms of individuals, not accounts. *See* 15 U.S.C. § 6501(1) ("The term 'child' means an *individual* under the age of 13." (emphasis added)); *id.* § 6501(8) ("The term 'personal information' means individually identifiable information about an *individual* collected online." (emphasis added)). Measuring violations by account rather than by individual finds no footing in the statute.

**D.    The States Have Not Supported Their Request for Maximum Penalties.**

1.    The States seek the maximum amount of civil penalties for each purported violation of their consumer protection statutes. *See* ECF No. 465.1 (3250.1), Exs. A–C.

2.    The Court need not impose the maximum penalty when determining the penalty amount. Rather, the statutes "merely establish[] the maximum penalty permissible and allow[] a court considerable discretion in determining the penalty appropriate in each case." *Kimmelman v. Henkels & McCoy, Inc.*, 527 A.2d 1368, 1375 (N.J. 1987); *see also, e.g.*, *Johnson & Johnson*, 77 Cal. App. 5th at 352 ("The trial court

240

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

has broad discretion when it determines the appropriate civil penalty in a given case.").

3. Each State's law lists discretionary factors for courts to consider in setting the amount of any penalty.

a) Under the UCL and FAL, courts consider "any one or more of the relevant circumstances presented by any of the parties to the case, including, but not limited to, the following: the nature and seriousness of the misconduct, the number of violations, the persistence of the misconduct, the length of time over which the misconduct occurred, the willfulness of the defendant's misconduct, and the defendant's assets, liabilities, and net worth." Cal. Bus. & Prof. Code, §§ 17206(b), 17536(b).

b) Under the CCPA, courts consider: "(1) the good or bad faith of the defendant; (2) the injury to the public; (3) the defendant's ability to pay; and (4) the desire to eliminate the benefits derived by violations of the CCPA." *People v. Wunder*, 371 P.3d 785, 793 (Colo. App. 2016).

c) Under the KCPA, courts consider: "[w]hether the person charged with the violation was acting in good faith or bad faith," "[t]he nature, extent, and severity of the injury to consumers and the public," "[t]he person's ability to pay," "[t]he amount of profit or gain obtained through the unlawful conduct," "[t]he duration of the unlawful conduct," "[t]he desire to eliminate any benefit derived from the violation and to deter future violations," and "[a]ny prior violations of KRS 367.170 by the person." Ky. Rev. Stat. § 367.990(26)(d).

d) Under the NJ CFA, courts consider the good faith or bad faith of the defendant, the defendant's ability to pay, the amount of profits obtained from the illegal activity, injury to the public, the duration of illegal activity, the existence of criminal actions, and past violations. *Kimmelman*, 527 A.2d at 1375–76.

241

4. Injury to the public is an important factor for courts to consider when determining the amount of any civil penalty. *See, e.g.*, Ky. Rev. Stat. § 367.990(26)(d) (listing "[t]he nature, extent, and severity of the injury to consumers and the public" as a factor); *Kimmelman*, 527 A.2d at 1376 (same); *Wunder*, 371 P.3d at 793 (same).

5. The States have not demonstrated that any of the teen or U13 users included in their penalty estimates were harmed by Meta's challenged conduct.

a) There is no evidence showing how many users were misled by any of the alleged misrepresentations. *See supra* Findings p. 118.

b) There is no evidence showing the number of users who were unfairly affected by any of the challenged features. *See supra* Findings p. 118.

c) The States' experts conceded that time spent at the thresholds advanced by the States is not associated with negative outcomes for users. *See supra* Findings p. 119.

6. In the absence of any evidence of harm stemming from any of the alleged violations, the Court finds that the States have not presented sufficient evidence to impose maximum civil penalties against Meta for each alleged violation.

E. **Colorado, Kentucky, And the New Jersey Attorney General Cannot Recover Consumer Protection Penalties for Alleged Violations Of COPPA.**

1. States cannot seek penalties under COPPA; only the FTC is permitted to obtain penalties for violations of the statute. *Compare* 15 U.S.C. § 6505(d) (permitting the FTC to seek "penalties"), *with id.* § 6504(a)(1) (omitting penalties from the list of potential remedies that "the attorney general of a State" may seek).

2. As a result, the States cannot seek penalties for alleged violations of COPPA as a matter of federal law; they can only seek penalties if a COPPA violation supports an unfair practice claim under their state consumer protection statutes.

3. The Court holds that Colorado, Kentucky and the New Jersey Attorney General cannot seek civil penalties under their respective state laws for alleged violations of COPPA.

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

4.     As discussed above, Colorado and Kentucky law do not permit an unfair practice claim premised on a violation of COPPA.  *See supra* Conclusions of Law pp. 207–09.  Accordingly, the Court concludes that Colorado and Kentucky cannot recover penalties under their own state laws premised on alleged violations of COPPA.

5.     The Court has previously held that the New Jersey Attorney General cannot state an unfair practices claim under the NJ CFA, separate and apart from its claim based on false or misleading statements.  This is because the NJ CFA prohibits only false or deceptive practices; New Jersey's consumer protection law does not recognize a standalone claim for unfair trade practices.  *See supra* Conclusions of Law p. 195. For this reason, the New Jersey Attorney General cannot assert an unfair practices claim based on alleged violations of COPPA, and cannot recover civil penalties under its state-law claims related to COPPA.

**F.     The States Cannot Recover Damages or Disgorgement Under COPPA.**

1.     COPPA permits states to "obtain damage, restitution, or other compensation on behalf of residents" of their States.  15 U.S.C. § 6504(a)(1)(C).

2.     The Court finds that the States are not entitled to damages under COPPA.

a)     The States waived that remedy because they never disclosed an intent to pursue it.

b)     The States have also failed to present any basis to recover COPPA damages.

(1)     Damages are meant to "compensate the victim for [his or her] loss." *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 580 U.S. 328, 341 (2017).

(2)     The States offer no evidence that any of their residents suffered damages from Meta's purported COPPA violations.

3.     The Court finds that the States are not entitled to disgorgement of Meta's profits or revenues under COPPA.

a)     Under 15 U.S.C. § 6504(a)(1)(C), a state can "obtain damage, restitution, or other compensation on behalf of residents of the State."

243

b) Because "damage, restitution, or other compensation" must be awarded "on behalf of residents of the State," relief under Section 6504(a)(1)(C) is necessarily limited to compensating victims for their losses.

c) Disgorgement is not a compensatory remedy. "[T]he purpose of a disgorgement remedy is to prevent unjust enrichment . . ., not to compensate victims." *Platforms Wireless Int'l Corp.*, 617 F.3d at 1097; *see also Osborn v. Griffin*, 865 F.3d 417, 453 (6th Cir. 2017) ("The purpose behind an equitable disgorgement award is to deprive wrongdoers of the fruits of their tortious conduct, not to compensate the victim."); *S.E.C. v. Cavanagh*, 445 F.3d 105, 117 (2d Cir. 2006) ("'[D]isgorgement' is not available primarily to compensate victims").

d) Because disgorgement is not compensatory, it falls outside the scope of 15 U.S.C. § 6504(a)(1)(C).

e) While Section 6504(a)(1)(D) provides that states can "obtain such other relief as the court may consider to be appropriate," this catchall provision does not authorize the States to seek disgorgement of Meta's profits or revenues under COPPA.

f) When Congress enumerates "a detailed list . . . followed by a catchall that it qualifie[s] with the term 'appropriate,'" that term "often draws its meaning from surrounding provisions." *Harrington v. Purdue Pharma L. P.*, 603 U.S. 204, 218 (2024).

g) Read in context, Section 6504(a)(1)(D) does not authorize the States to seek punitive remedies such as disgorgement of profits or revenues.

(1) COPPA authorizes states to obtain (i) injunctions, (ii) orders enforcing compliance, and (iii) compensatory relief. *Id.* § 6504(a)(1)(A)–(C). Each remedy is aimed at redressing harm to individuals from COPPA violations. *See id.* The remedies are not punitive—they do not punish actors for noncompliance.

244

(2) Moreover, COPPA explicitly authorizes the FTC to obtain penalties—a punitive remedy—but it does not give that authority to states. *See supra* Conclusions of Law pp. 241–42.

(3) That omission is strong evidence that Congress did not intend to allow states to pursue punitive remedies under COPPA. *See Intel*, 589 U.S. at 186 ("[W]e generally presum[e] that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another."). Had Congress intended otherwise, it would have said so.

**G.    The States Are Not Entitled to Equitable Monetary Relief.**

1. The States seek equitable monetary relief in the form of disgorgement of profits and revenue from Meta.

2. Federal equitable principles control whether the States are entitled to equitable relief. *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 843 (9th Cir. 2020) ("state law cannot circumscribe a federal court's equitable powers even when state law affords the rule of decision").

3. "In order to entertain a request for equitable relief, a district court must have equitable jurisdiction, which can only exist under federal common law if the plaintiff has no adequate legal remedy." *Guzman v. Polaris Indus. Inc.*, 49 F.4th 1308, 1313 (9th Cir. 2022).

4. The burden is on the States to "prove that there is no adequate remedy at law." *In re Ford Motor Co. DPS6 Powershift Transmission Prods. Liab. Litig.*, 689 F. Supp. 3d 760, 777 (C.D. Cal. 2023).

5. The Court need not consider only the States' consumer protection statutes when evaluating whether there is an adequate remedy at law; the Court may consider other legal claims as well. *See Key v. Qualcomm Inc.*, 129 F.4th 1129, 1142 (9th Cir. 2025) (holding that an antitrust statute was an adequate remedy at law, and therefore that the plaintiffs' claim for restitution under the UCL could not stand);

245

*see also Sonner*, 971 F.3d at 844 (holding that plaintiff had an adequate remedy at law for her UCL restitution claim because she could have brought an action under another statute for the same amount in damages).

6.     It is irrelevant that other causes of action might have different elements that make consumer protection claims more attractive or bar recovery entirely. *See, e.g.*, *King v. Nat'l Gen. Ins. Co.*, 2025 WL 2494366, at *7 (N.D. Cal. Aug. 29, 2025) ("[D]ifferences in proof between the claims do not make a legal remedy inadequate."). Nor does a failure to prove a legal claim "make that remedy inadequate." *Id.*

7.     The Court finds that the States have not proven that they lack an adequate remedy at law.

   a)     That alone is a sufficient basis for the Court to reject any claim for equitable monetary relief. *Huynh v. Quora, Inc.*, 508 F. Supp. 3d 633, 662 (N.D. Cal. 2020) (granting summary judgment because plaintiff failed to demonstrate "that any remedy at law is inadequate").

8.     The Court also finds that the States' request for disgorgement is impermissible because it exceeds federal constraints on equitable remedies.

   a)     Relief that "d[oes] not seek to restore to the [consumers] particular funds or property in [defendant]'s possession . . . [i]s more properly characterized as legal" rather than equitable. *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, 135 F.4th 683, 690–91 (9th Cir. 2025).

   b)     Many state consumer protection laws would not constitute equitable relief under federal law because disgorged funds may be "be deposited in Treasury funds instead of disbursing them to victims." *Liu v. SEC*, 591 U.S. 71, 85 (2020); *see also, e.g.*, *In re Lewis*, 459 B.R. 281, 288 (N.D. Ill. 2011) ("disgorgement awarded to the State of Colorado under the CCPA is payable to a governmental unit and there is no requirement that the state forward the funds to consumers"); Ky. Rev. Stat. § 48.005(4) (requiring the

246

return of funds to injured consumers only when the judgment requires it); Cal. Bus. & Prof. Code § 12527.6(c)–(e) (remitting disgorged funds to the State Treasury for the Attorney General to manage).

**H.    The States Have Not Shown That They Are Entitled to Disgorgement of Any Profits or Revenues.**

1.    Even if disgorgement were an available remedy, the Court finds that the States have failed to prove that they are entitled to disgorgement of profits or revenues.

2.    Disgorgement must approximate the gains "causally connected to" Meta's allegedly unlawful conduct. *Platforms Wireless Int'l Corp.*, 617 F.3d at 1096.

3.    The Court finds that the States' calculation of Meta's "profits" from teen users does not approximate Meta's gains from its allegedly "unlawful" conduct.

a)    The States have not established that Meta engaged in wrongful conduct as to *every* teen user of its services, or *every* teen user who spent 0.5, 1, or 2 hours on Meta's services. *Cf. Ivie v. Kraft Foods Glob., Inc.*, 2015 WL 183910, at *2 (N.D. Cal. Jan. 14, 2015) ("There is no support" for awarding "any amount greater than the profit attributable to the mislabeling.").

4.    The Court finds that the States' calculation of Meta's "revenues" and "profits" from U13 users is too attenuated from Meta's alleged wrongful conduct.

a)    The only potential disgorgement relief the States could obtain under COPPA would be for Meta's collection of personal information from U13 users. *See* 15 U.S.C. § 6502(a)(1).

b)    But the States are not entitled to disgorgement of Meta's revenues or profits unless those revenues or profits are connected to COPPA violations. *See Platforms Wireless Int'l Corp.*, 617 F.3d at 1096 (requiring that profits be "causally connected to the violation").

c)    The States have failed to present evidence sufficient to show the proportion of Meta's revenues or profits that are associated in any sense with users under the age of 13. Rather, the record evidence establishes that:

247

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

(1) Meta does not allow advertisers to target ads to individuals under the age of 13 on its services. *See supra* Findings of Fact p. 121.

(2) Any advertising targeted for teen users that Meta permits is for users aged 13 and above. *See supra* p. 121.

d) To the extent the State argues that some portion of Meta's revenues and profits from teen-directed advertising comes from U13 users, this argument is inconsistent with the record evidence, which establishes that:

(1) Individuals under the age of 13 are prohibited by Meta's policies from creating accounts on Facebook and Instagram. *See supra* Findings pp. 2, 92.

(2) Meta employs a number of tools to prevent U13s from joining Instagram and Facebook, and checkpoints and deletes many accounts to enforce its age-restriction policy. *See supra* Findings pp. 93–94, 96–98, 102–04, 105–07.

(3) Accounts that Meta suspects may belong to U13 users are suspended, rendering those users incapable of generating advertising revenue for Meta. *See supra* pp. 103, 110.

5. The Court further finds that the States' disgorgement figures overstate Meta's revenues from teen and U13 users.

a) Meta's revenue from teen and U13 users is a small fraction of its overall revenue. *See supra* Findings p. 121.

b) Meta does not generate a profit from teen users when they are teens, and losses from teen users significantly reduce any profits Meta may have generated from adult users. *See supra* Findings pp. 121–22. While the States attempt to estimate Meta's "wrongful" gains based solely on the revenue those users generated as adults, the Court will not permit the States to cherry-pick data in order to generate a large profit figure for their disgorgement analysis.

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

c)      The States' estimates overstate profits from teen users by relying on stated age data for 17-year-olds rather than predicted age data.  If the States relied on predicted age data, their estimate of Meta's profits from teen users would have been 8.4% lower.  *See supra* Findings p. 122.

d)      The States' estimates of the number of U13 users on Meta's services is based on an unreliable and unsupported analysis of third-party survey data.  *See supra* Findings p. 124.

e)      The States' method for calculating profits and revenue from U13 users erroneously assumes that a U13 user generates the same profits and revenue for Meta as an average user.  A more reasonable assumption would have been that U13 users generate similar profits and revenue as teen users since they are closer in age.  If the States made that assumption, their estimate of Meta's profits and revenue from U13 users would be significantly lower.  *See supra* Findings pp. 122–23.

I.      **The States Are Not Entitled to Disgorgement of Meta's Revenues.**

1.      The States seek disgorgement of Meta's revenues associated with alleged U13 users.  *See* ECF No. 465.1 (3250.1), Exs. E–F.

2.      The Court finds that the States are not entitled to disgorgement of Meta's revenues.

3.      "[A]s a general rule, the defendant is entitled to a deduction for all marginal costs incurred in producing the revenues that are subject to disgorgement.  Denial of an otherwise appropriate deduction, by making the defendant liable in excess of net gains, results in a punitive sanction that the law of restitution normally attempts to avoid."  *Am. Master Lease LLC v. Idanta Partners, Ltd.*, 225 Cal. App. 4th 1451, 1488 (2014) (quoting Restatement (Third) of Restitution and Unjust Enrichment § 51 cmt. h (2011)).

4.      Indeed, "courts [in equity] consistently restricted awards to net profits from wrongdoing after deducting legitimate expenses."  *Liu*, 591 U.S. at 84.

5. While there is an exception "when the entire profit of a business or undertaking results from the wrongful activity," the evidence does not support such a finding here. *Id.*

    a) There is no evidence that the expenses in the States' disgorgement calculations reflect "unconscionable claims for personal services" or "other inequitable deductions." *Id.*

    b) Nor is there evidence that Meta "engaged in a pattern or practice of contemptuously misleading consumers in violation of an FTC Act-authorized injunction." *F.T.C. v. Kuykendall*, 371 F.3d 745, 766 (10th Cir. 2004).

    c) To the extent the States claim that Meta is unlawfully generating revenue from U13 users, such an argument does not accord with the record.

        (1) Meta's policies do not permit U13 users on its services. *See supra* Findings pp. 2, 92.

        (2) Advertisers cannot target advertisements to U13 users on Meta's services. *See supra* Findings p. 121.

        (3) If Meta suspects an account belongs to a U13 user, the account is suspended, rendering that user incapable of generating advertising revenue for Meta. *See supra* p. 110.

**J. The States Have Not Shown an Entitlement to Injunctive Relief.**

1. The States "seek permanent injunctive relief, on a nationwide—rather than state-by-state—basis." ECF No. 257 (2724) at 1.

2. The Court finds that the States are not entitled to nationwide injunctive relief.

    a) "[A]n injunction must be narrowly tailored to affect only those persons over which [the court] has power, and to remedy only the specific harms shown by the plaintiffs, rather than to enjoin all possible breaches of the law." *Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir. 2004).

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

b)      "[I]njunctive relief generally should be limited to apply only to named plaintiffs where there is no class certification." *Easyriders Freedom F.I.G.H.T. v. Hannigan*, 92 F.3d 1486, 1501 (9th Cir. 1996); *see also Zepeda v. U.S. I.N.S.*, 753 F.2d 719, 727 (9th Cir. 1983 ("the injunction must be limited to apply only to the individual plaintiffs unless the district judge certifies a class of plaintiffs").

c)      There are only four Plaintiffs seeking injunctive relief in this trial— California, Colorado, Kentucky, and the New Jersey Attorney General.

d)      The States are not bringing their COPPA or consumer protection claims on behalf of the other 46 U.S. states, much less on behalf of all residents in the country. Instead, they are bringing their claims on behalf of their own residents or, in the case of the New Jersey Attorney General, their own office.

e)      "Although there is no bar against . . . nationwide relief in federal district court," "such broad relief must be *necessary* to give prevailing parties the relief to which they are entitled." *California v. Azar*, 911 F.3d 558, 582–83 (9th Cir. 2018) (emphasis in original).

f)      Nationwide injunctive relief is not necessary to give the States in this proceeding the relief to which they are entitled. None of the terms in the States' request for injunctive relief necessitate a nationwide injunction instead of a statewide injunction.

g)      Without a sufficient justification to expand the scope of injunctive relief, the Court rejects the States' request for nationwide injunctive relief.

3.      The Court finds that many of the States' requests for injunctive relief are moot.

a)      Many of the injunctive terms in the States' request are unnecessary because Meta has already implemented them. *See supra* Findings p. 125.

b)      Imposing an injunction on Meta under these circumstances—where it is has "already implemented" broad swaths of plaintiffs' proposed injunction—

251

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

would be unjustified. *See In re Meta Pixel Healthcare Litig.*, 647 F. Supp. 3d 778, 804 (N.D. Cal. 2022) (rejecting injunctive relief where the requested relief was "already implemented").

4.    The Court finds that Section 230 bars aspects of the States' requested injunctive relief.

    a)    The States seek an order requiring Meta to remove infinite scroll, autoplay, likes, ephemeral content, and engagement-optimized algorithms from its services. *See supra* Findings p. 124.

    b)    The Court has already held that Section 230 bars the States' unfairness claims as to these features. *See* MTD Order at 25–29.

5.    The Court finds that the First Amendment bars aspects of the States' requested injunctive relief.

    a)    The States seek an injunction "prohibiting Meta from making any false, misleading, or deceptive representations regarding (a) the safety of its Platforms; (b) the addictiveness of its Platforms; (c) its prioritization of user well-being; and (d) the presence of children on its Platforms." ECF No. 257 (2724) at 2.

    b)    While the States seek to bar "false, misleading or deceptive" statements on these subjects, the States' requested relief would unduly chill Meta's First Amendment right to speak.

    c)    "Injunctions against any speech, even libel, constitute prior restraints: they prevent speech before it occurs, by requiring court permission before that speech can be repeated. Such prior restraints are presumptively unconstitutional, and a heavy burden of justification rests on anyone seeking a prior restraint on the right of free speech." *Oakley, Inc. v. McWilliams*, 879 F. Supp. 2d 1087, 1089 (C.D. Cal. 2012) (cleaned up); *see also Alexander v. United States*, 509 U.S. 544, 550 (1993) ("Temporary restraining orders and permanent injunctions—*i.e.*, court orders that

252

actually forbid speech activities—are classic examples of prior restraints."); *Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 556 (1976) ("[The First Amendment] afford[s] special protection against orders that prohibit the publication or broadcast of particular information or commentary orders that impose a 'previous' or 'prior' restraint on speech."); *Levine v. U.S. Dist. Ct. for Cent. Dist. of California*, 764 F.2d 590, 595 (9th Cir. 1985) ("Prior restraints are subject to strict scrutiny because of the peculiar dangers presented by such restraints.").

d)   The States' proposed injunction would bar Meta from making future statements about teen mental health and its own services—areas that are constantly evolving and are the subject of legitimate scientific and popular debate. *See Oakley, Inc.*, 879 F. Supp. 2d at 1091; *Hoeg v. Newsom*, 652 F. Supp. 3d 1172, 1190 (E.D. Cal. 2023) (prohibition on speech in "a new and evolving area of scientific study" unconstitutional).

e)   The States' proposed restriction would turn the Court into a "perpetual censor[]," deciding what speech is permitted, and would force Meta to constantly choose between suppressing potentially lawful speech or risking contempt. *Oakley, Inc.*, 879 F. Supp. 2d at 1092; *see also Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 559 (1975) ("It is always difficult to know in advance what an individual will say, and the line between legitimate and illegitimate speech is often so finely drawn that the risks of freewheeling censorship are formidable.").

f)   The States' proposed restriction is also unconstitutionally vague and overbroad. The sweeping prohibitions proposed by the States do not tell Meta which statements it can or cannot make about its services, but merely enjoin Meta from making any "false, misleading, or deceptive representations" about "(a) the safety of its Platforms; (b) the addictiveness of its Platforms; (c) its prioritization of user well-being; and (d) the presence

253

of children on its Platforms." ECF No. 257 (2724) at 2–3. Enjoining Meta from making "false, misleading, or deceptive" statements on these general topics, without more detail or guidance, is unconstitutionally vague because the proposed injunction "does not provide sufficient notice to [Meta] as to what types of speech or activity [it] must avoid" to comply. *San Francisco A.I.D.S. Found. v. Trump*, 786 F. Supp. 3d 1184, 1225 (N.D. Cal. 2025) (executive order requiring termination of "equity-related" grants unconstitutionally vague); *see also Del Webb Cmtys., Inc. v. Partington*, 652 F.3d 1145, 1150 (9th Cir. 2011) ("prohibition against using 'illegal, unlicensed and false practices'" in performing residential inspections "too vague to be enforceable").

g)    For these reasons, the Court rejects the States' request for injunctive relief prohibiting Meta from making future statements discussing safety, addictiveness, prioritization of user well-being, or the presence of children on its services.

6.    The Court finds that the States have not provided a sufficient basis to order the appointment of an independent monitor.

a)    "The court is obligated to craft an understandable and thus enforceable injunction, *i.e.*, it cannot be impermissibly vague." *See Foothill Church v. Watanabe*, 654 F. Supp. 3d 1054, 1058 (E.D. Cal. 2023).

b)    The States seek an injunction requiring Meta to "fund independent third-party public audits of its age assurance system, including surveys of the number of children who use its platforms and red-team exercises to identify how easily age restrictions can be circumvented." ECF No. 257 (2724) at 3.

c)    The Court finds the States' proposed injunctive relief too vague to fashion into appropriate injunctive relief.

254

(1)  The States do not specify who would conduct the "third-party public audits," how those audits would be conducted, what those audits would be measuring, or what "red-team exercises" will entail.

(2)  Nor do the States specify what "surveys" will be conducted, how they will be conducted, or who is being surveyed.

d)  The Court further finds that the States' requested relief is unduly burdensome and unnecessary.

(1)  "[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).

(2)  The States do not explain how third-party public audit is necessary to achieve the relief they seek for their COPPA or state consumer protection claims, particularly in light of the other requests for injunctive relief that the States have already advanced, which call for, among other things, the removal of features on Meta's services.

7.  The Court finds that the States are not entitled to an injunction relating to publication of teen usage data.

a)  The States seek an injunction requiring Meta to "provide usage data regarding teens in the United States, in a privacy protected manner, in response to research requests submitted under the auspices of an independent social media research foundation." ECF No. 257 (2724) at 3.

b)  The States' proposed injunctive relief is unduly vague for the Court to fashion into appropriate injunctive relief.

(1)  The States do not explain what types of "usage data regarding teens" Meta should provide.

(2)  Nor does the State explain who is making the "research requests" for this data or what the "independent social media research foundation" is supposed to refer to.

255

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

c)    Moreover, the States' request is not sufficiently connected to the States' COPPA or consumer protection claims.

(1)    The Ninth Circuit has "long held that injunctive relief must be tailored to remedy the specific harm alleged." *Melendres v. Arpaio*, 784 F.3d 1254, 1265 (9th Cir. 2015).

(2)    The States do not explain how providing "usage data regarding teens" to an undefined "social media research foundation" affords them complete relief on their COPPA and consumer protection claims.

8.    The Court finds that the States are not entitled to an injunction relating to Meta's parental controls because it is not narrowly tailored to the liability findings that the States have pursued in this litigation.

a)    Injunctive relief must be specifically tailored to the harms alleged and the violations proven at trial.  *See Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) ("Injunctive relief . . . must be tailored to remedy the specific harm alleged."); *Metro-Goldwyn-Mayer Studios, Inc. v. Grokster, Ltd.*, 518 F. Supp. 2d 1197, 1226 (C.D. Cal. 2007) ("Injunctive relief should be narrowly tailored to fit specific legal violations."); *see also Califano*, 442 U.S. at 702 ("[I]njunctive relief should be no more burdensome to the defendants than necessary to provide complete relief to the plaintiffs.").

b)    The States' unfair practices claims have consistently proceeded by identifying specific features which they challenge—for example, Meta's time management tools or multiple accounts.  But the States have never sought to prove that Meta's parental controls constitute an unfair practice under any States' law.  As such, the Court did not, at the liability stage, determine that Meta's parental controls constituted an unfair practice under any of the States' laws.

256

     c)     Although the States challenge Meta's age assurance methods as an unfair practice, the States have failed to establish a sufficient connection between their age assurance claims and the relief they seek with respect to Meta's parental controls.  For example, the States seek to require Meta to institute "intuitive dashboards" for parents "to understand and manage their teen's platform usage."  ECF No. 257 (2724) at 4.  But such a request bears no connection to the States' age assurance claims, which are targeted at Meta's efforts to remove U13 users from its services.

     d)     Because the States have not established Meta's liability under any States laws for its parental controls, any injunction addressed at Meta's parental controls would be insufficiently tailored to remedy the harms alleged.

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR

DATED: July 31, 2026

Respectfully submitted,

By:   */s/ Ashley M. Simonsen*

Ashley M. Simonsen (State Bar. No. 275203)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Telephone: + 1 (424) 332-4800
Email: asimonsen@cov.com

Paul W. Schmidt, *pro hac vice*
Timothy C. Hester, *pro hac vice*
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: + 1 (202) 662-5324
Facsimile: + 1 (202) 778-5324
Email: pschmidt@cov.com
Email: thester@cov.com

Brian L. Stekloff, *pro hac vice*
WILKINSON STEKLOFF LLP
2001 M Street, NW
Washington, DC 20036
Telephone: + 1 (202) 847-4030
Email: bstekloff@wilkinsonstekloff.com

Moira Penza, *pro hac vice*
WILKINSON STEKLOFF LLP
130 W 42nd Street
New York, NY 10036
Telephone: + 1 (212) 294-8914
Email: mpenza@wilkinsonstekloff.com

*Attorneys for Defendant Meta Platforms, Inc.
f/k/a Facebook, Inc.*

META'S PRETRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW
4:22-md-03047-YGR-PHK | 4:23-cv-05448-YGR