Ashley M. Simonsen (Bar No. 275203)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, California 90067
Telephone: (424) 332-4800
Facsimile: (424) 332-4749
Email: asimonsen@cov.com

*Attorney for Defendant Meta Platforms, Inc. f/k/a Facebook, Inc.*

*[Additional counsel listed on signature pages]*

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>This Document Relates To:<br><br>*People of the State of California, et al. v. Meta Platforms, Inc. et al.* | MDL No. 3047<br><br>Case Nos.: 4:22-md-03047-YGR<br>4:23-cv-05448-YGR<br><br>**META'S MOTION FOR SPOLIATION SANCTIONS PRECLUDING STATE AGS FROM CALLING THIRD-PARTY WITNESS ARTURO BEJAR AT TRIAL OR, IN THE ALTERNATIVE, FOR ADVERSE-INFERENCE INSTRUCTIONS**<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br>Magistrate Judge: Hon. Peter H. Kang<br><br>Date: August 13, 2026<br>Time:  8:00 AM<br>Place: Courtroom 1, 4th Floor |

META'S MOTION FOR SPOLIATION SANCTIONS PRECLUDING STATE AGS FROM CALLING THIRD-PARTY WITNESS ARTURO BEJAR
AT TRIAL OR, IN THE ALTERNATIVE, FOR ADVERSE-INFERENCE INSTRUCTIONS
4:22-md-03047-YGR; 4:23-cv-05448-YGR

## NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE THAT, at 8:00 AM on August 13, 2026, before the Honorable Yvonne Gonzalez Rogers, in Courtroom 1, Floor 4, of the United States District Court, Northern District of California, located at 1301 Clay Street, Oakland, CA 94612, Defendant Meta Platforms, Inc. ("Meta") will and hereby does move this Court for an order imposing spoliation sanctions in the form of an order precluding the State Attorneys General from calling third-party witness Arturo Bejar as a witness at the MDL AG trial beginning August 18, 2026, or, in the alternative, in the form of adverse inference instructions, as addressed in the accompanying Memorandum of Points and Authorities. This Motion is based on this Notice, the accompanying Memorandum, any other papers submitted in connection with the Motion, the accompanying Declarations of Ashley M. Simonsen and the exhibits thereto, and any other matters presented at the time of the hearing.

DATED: August 7, 2026                                          Respectfully submitted,


                                                              By:    /s/ Ashley M. Simonsen

                                                              Ashley M. Simonsen (Bar No. 275203)
                                                              COVINGTON & BURLING LLP
                                                              1999 Avenue of the Stars
                                                              Los Angeles, California 90067
                                                              Telephone: (424) 332-4800
                                                              Facsimile: (424) 332-4749
                                                              Email: asimonsen@cov.com

                                                              *Attorneys for Defendant Meta Platforms, Inc.*
                                                              *f/k/a Facebook, Inc.*

                                                              *[Additional counsel listed on signature pages]*

# **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 2

    A.   Mr. Bejar Has Closely Collaborated with the State AGs Since the Pre-Suit Investigation and Was Notified of His Duty to Preserve in April 2023. ......................................................... 2

    B.   Mr. Bejar's Close Collaboration with the AGs Continued After Their Lawsuits Were Filed, and He Has Served as Their Star Witness in All Trials to Date. ..................................... 4

    C.   Meta Has Repeatedly Sought Discovery Into the Basis for Mr. Bejar's Views and Opinions, Including His Communications With Former and Current Employees .................... 6

    D.   Mr. Bejar Testifies Under Oath that He Knowingly Destroyed Responsive Communications ...................................................................................................................... 9

LEGAL STANDARD ...................................................................................................... 12

ARGUMENT .................................................................................................................... 13

    A.   Mr. Bejar Had an Obligation to Preserve His Communications With Former Employees Over the Period of Time He Engaged in Disappearing Messaging. ........................................ 13

        1.   Mr. Bejar Had a Duty to Preserve Relevant Communications as Early as April 2023. 13

        2.   At Minimum, Mr. Bejar Had a Duty to Preserve in February and December 2025. ..... 14

    B.   The Destroyed Messages Were Relevant to Meta's Defenses ........................................ 15

    C.   Mr. Bejar Violated His Duty to Preserve and Spoliated Responsive Communications. .. 15

    D.   The Record Shows That Mr. Bejar Acted in Bad Faith, and At Least With Gross Negligence, Warranting Preclusion of His Testimony at Trial ................................................ 16

    E.   In the Alternative, the Court Should Issue Adverse Inference Instructions. ................... 20

CONCLUSION ................................................................................................................. 20

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Apple Inc. v. Samsung Elecs. Co.*,
881 F. Supp. 2d 1132 (N.D. Cal. 2012) ...........................................................................12

*Apple Inc. v. Samsung Elecs. Co.*,
888 F. Supp. 2d 976 (N.D. Cal. 2012) ................................................................12, 13, 15

*Chevron Corp. v. Pennzoil Co.*,
974 F.2d 1156 (9th Cir. 1992) ..........................................................................................7

*Comair Ltd. v. Boeing Co.*,
2024 WL 4696125 (W.D. Wash. Nov. 6, 2024) ..............................................................20

*Gay v. Parsons*,
2024 WL 4224893 (N.D. Cal. Sept. 17, 2024) ......................................12, 14, 17, 18, 21

*Herzig v. Arkansas Found. for Med. Care*,
2019 WL 2870106 (W.D. Ark. July 3, 2019) ..................................................................18

*Hynix Semiconductor Inc. v. Rambus Inc.*,
645 F.3d 1336 (Fed. Cir. 2011)........................................................................................13

*Lofton v. Verizon Wireless (VAW) LLC*,
308 F.R.D. 276 (N.D. Cal. 2015)................................................................................12, 18

*Pable v. Chicago Transit Auth.*,
2023 WL 2333414 (N.D. Ill. Mar. 2, 2023)................................................................13, 16

*Ramos v. Swatzell*,
2017 WL 2857523 (C.D. Cal. June 5, 2017) ....................................................12, 13, 15, 21

*State of New Mexico, ex rel. Raúl Torrez, Attorney General v. Meta Platforms, Inc., et al.*,
Case No. D-101-CV-2023-02838 (N.M. 1st Jud. Dist. Ct., Dec. 5, 2023)................5, 11, 19

*Sanders v. Univ. of Idaho, Coll. of L.*,
634 F. Supp. 3d 936 (D. Idaho 2022) ..............................................................................21

*Schulte v. LinkedIn Corp.*,
2026 WL 1905851 (N.D. Cal. July 1, 2026)....................................................................20

*State of Vermont v. Meta Platforms, Inc. and Instagram, LLC*,
Case No. 23-CV-04453 (Chittenden Super. Ct., Oct. 24, 2023)........................................5

*These Ponies Are Miserable v. City of L.A.*,
2025 WL 3248690 (C.D. Cal. Nov. 7, 2025)............................................................13, 16, 17

i

META'S MOTION FOR SPOLIATION SANCTIONS PRECLUDING STATE AGS FROM CALLING THIRD-PARTY WITNESS ARTURO BEJAR
AT TRIAL OR, IN THE ALTERNATIVE, FOR ADVERSE-INFERENCE INSTRUCTIONS
4:22-md-03047-YGR; 4:23-cv-05448-YGR

*Woods v. Scissons*,
   2019 WL 3816727 (D. Ariz. Aug. 14, 2019)..................................................................................20

*Zunum Aero., Inc. v. Boeing Co.*,
   2023 WL 11835334 (W.D. Wash. Nov. 13, 2023) ...........................................................................20

META'S MOTION FOR SPOLIATION SANCTIONS PRECLUDING STATE AGS FROM CALLING THIRD-PARTY WITNESS ARTURO BEJAR
AT TRIAL OR, IN THE ALTERNATIVE, FOR ADVERSE-INFERENCE INSTRUCTIONS
4:22-md-03047-YGR; 4:23-cv-05448-YGR

**<u>INTRODUCTION</u>**

The AGs intend to call Arturo Bejar, a former Meta employee and former Meta part-time consultant, to testify in the upcoming MDL AG trial.  In the three Meta trials that have occurred to date, Mr. Bejar has been presented as plaintiffs' key witness, testifying over the course of four days for the Tennessee AG, for two full trial days for the New Mexico AG, and over the course of two days in the JCCP trial.  For nearly three years and before the filing of this lawsuit, Mr. Bejar and his counsel, Michael Ward of Baker Botts, have been closely coordinating with the multistate AG coalition (led by the California, Colorado, New Jersey, and Tennessee AGs) and also the New Mexico AG.  Although Meta has no record that the 29 AGs suing here ever notified Mr. Bejar of his duty to preserve, as early as April 2023 the Tennessee AG notified him that relevant documents "should be preserved during the pendency of this investigation *and . . . any resulting enforcement action*."  Ex. 1 (emphasis added).[1]  The New Mexico AG similarly notified Mr. Bejar seven months later, in November 2023, that "[a]ny destruction involving [relevant] documents must cease"—even if Mr. Bejar believed such documents were privileged or need not be produced.  Ex. 2.

After MDL/JCCP Plaintiffs (including the AGs) noticed Mr. Bejar's deposition in January 2025, *see* Ex. 3–4, Meta served him in February 2025 with a document subpoena seeking, among other documents, his communications with current and former Meta employees.  *See* ECF 2006-3.  Mr. Bejar refused for months to produce responsive communications on First-Amendment privilege and other grounds, including even after the AGs disclosed him in May 2025 as a non-retained expert.  This Court overruled those objections on December 9, 2025, ordering that, if "Bejar may testify at trial, Meta *must* have the opportunity to explore the bases of his views," including through discovery of his communications with former employees.  Ex. 5 (ECF 2525) at 6 (emphasis added).  Mr. Bejar produced documents in response to the Court's Order on January 12, 2026, which, along with his initial productions, included communications with former Meta employees, including a handful of Signal chats from 2024; and Mr. Bejar's counsel, Mr. Ward, repeatedly assured Meta's counsel that all responsive communications

---

[1] Exhibits cited herein are to the Declaration of Ashley M. Simonsen ("Simonsen Decl.).  ECF citations are to the MDL docket (4:22-md-3047) unless otherwise noted.

`

had been produced.  Ex. 6 at 2; Ex. 7 at 1; Ex. 43 at 1.

Then, last week, Mr. Bejar took the stand in the Tennessee AG trial.  To Meta's surprise, **Mr. Bejar testified that "[a]ll of my communications" with former employees "[i]n this area" have been through ephemeral messaging on the Signal app; and that "[m]y Signal[] text messages with anybody I talk to get deleted, absolutely, yes."**  Ex. 8 at 1712:7–21; 1714:12–15.  In other words, documents relevant to Meta's defense that Mr. Bejar was instructed to preserve as early as April 2023, and which the Court ordered him to produce in January 2026, have been irretrievably lost as a direct result of Mr. Bejar's willful disregard of his duty to preserve.

Given Mr. Bejar's admitted failure to preserve and produce the specific communications this Court ruled Meta "must" have the opportunity to review if the AGs are to call Mr. Bejar as a trial witness, Meta respectfully submits that the only appropriate sanction for Mr. Bejar's spoliation is an order precluding the AGs from calling him as a trial witness.  Notably, in refusing Meta's request this week for a further deposition of Mr. Bejar, the AGs took the remarkable positions that (1) it was *known* that Mr. Bejar was engaged in (disappearing) Signal messaging and (2) that "third parties have no duty to preserve"— demonstrating their own bad-faith or at least grossly negligent conduct with respect to their star witness's spoliation.  Simonsen Decl. ¶¶ 28–33 & Exs. 7, 43.

## BACKGROUND

**A.    Mr. Bejar Has Closely Collaborated with the State AGs Since the Pre-Suit Investigation and Was Notified of His Duty to Preserve in April 2023.**

Mr. Bejar has been closely involved in the State AGs' suits against Meta since their pre-suit investigations.  As early as January 2023—when the AGs, including the four Lead States in the upcoming trial (California, Colorado, Kentucky, and New Jersey) were investigating their claims against Meta—Mr. Bejar began communicating with representatives from various AG offices.  *See, e.g.*, Ex. 9 (Jan. 12, 2023 emails between Mr. Bejar and representatives from the Tennessee and Nebraska AG offices setting up a call).  After meeting with representatives from State AG offices at least twice in March 2023, *see* Exs. 10–11, Mr. Bejar received a Request for Information from the Tennessee AG's office on April 27, 2023.  *See* Ex. 1.  It included not only a request that Mr. Bejar sit for an investigative interview and for documents,

but also a preservation notice, specifying that Mr. Bejar must preserve "documents and information that may be relevant to this investigation . . . during the pendency of this investigation *and during any resulting enforcement action*." *See id.* at -00471 (emphasis added). Emphasizing the importance of preserving documents, the Tennessee AG warned Mr. Bejar that [f]ailure to preserve relevant documents may result in a civil penalty, in addition to any other appropriate sanction." *Id.*

Mr. Bejar sat for this investigative interview on May 16, 2023. *See* Ex. 12. In addition to Mr. Bejar and his counsel, Michael Ward of Baker Botts, in attendance were two members of the Tennessee AG's office and one of the lead trial counsel in this case, representing the California AG's office. *See id.* This coordination between the Tennessee and California AGs' offices was not limited to Mr. Bejar's investigative interview. Indeed, all 29 States suing Meta in this MDL were involved in the pre-suit investigation, *see* Ex. 13 at 1, 5–6 (Confidentiality Agreement), and three of the Lead States—California, Kentucky, and New Jersey—led that investigation along with the Tennessee AG's office, *see id.* at 1. After his investigative interview, Mr. Bejar continued to communicate extensively with representatives from other AG offices, including the Vermont AG.[2]

On October 24, 2023, the Tennessee, Vermont, and MDL AGs filed their complaints, all of which relied on information Mr. Bejar had shared with them during their investigations. *See infra* note 4; *see also* ECF 1 (Multistate AG Compl.) ¶¶ 504–06, 629, 74 and ECF 207 (Multistate Am. Compl.) (4:23-cv-05448) ¶¶ 504–06, 629, 744. On November 7, 2023, Mr. Bejar testified in front of the Senate Judiciary Subcommittee on Privacy, Technology, and the Law, with Mr. Phelps, a member of the Tennessee AG team who had interviewed Mr. Bejar a few months earlier, sitting directly behind him. *See* Ex. 20 (A. Bejar Dep. Tr.) at 736:8–738:2. That same day, Mr. Bejar emailed counsel at the Vermont AG's office to schedule "a moment to catch up." *See* Ex. 21.

The following day, on November 8, 2023, Linda Singer of Motley Rice—outside counsel for the New Mexico AG—emailed Mr. Bejar "on behalf of the Office of the Attorney General of the State of

---

[2] *See, e.g.* Ex. 14 (May 2, 2023 email from Vermont AG's office requesting and scheduling time to speak with Mr. Bejar about a "follow up question"); Ex. 15 (May 10, 2023 Request for Information); Ex. 16 (email sending Request); Ex. 17, Ex. 18, Ex. 19 (continued communications throughout May 2023).

META'S MOTION FOR SPOLIATION SANCTIONS PRECLUDING STATE AGS FROM CALLING THIRD-PARTY WITNESS ARTURO BEJAR AT TRIAL OR, IN THE ALTERNATIVE, FOR ADVERSE-INFERENCE INSTRUCTIONS
4:22-md-03047-YGR; 4:23-cv-05448-YGR

`

New Mexico" to request a conversation about child safety issues. *See* Ex. 22 . On November 12, 2023, Ms. Singer sent Mr. Bejar a retainer agreement to serve as a consulting expert and the confidentiality order governing production of documents to the New Mexico AG's office, and asked that Mr. Bejar confirm he would abide by the order (however, Mr. Bejar did not sign the agreement). *See* Ex. 23; Ex. 24; Ex. 20 (4/9/25 A. Bejar Dep. Tr.) at 1078:9-20.

On November 13, 2023, Mr. Bejar emailed Brian Phelps and Chris Dunbar at the Tennessee AG's office after meeting with Ms. Singer, wanting to ask them "a couple of quick questions" about the meeting. *See* Ex. 25. The same day, the New Mexico AG's office sent Mr. Bejar a Civil Investigative Demand and Litigation Hold Notice. The Litigation Hold Notice stated:

> This demand is being sent to you *in contemplation of litigation concerning social media companies*. All documents and/or other data which relate to either the subject matter of this demand in general or the requests of this demand in particular must be preserved. *Any destruction involving such documents must cease, even if it is your normal or routine course of business to delete or destroy such documents or data* and even if you believe such documents or data are privileged or otherwise need not be produced."

Ex. 2 (emphasis added). On November 15, 2023, Mr. Bejar added his counsel, Mr. Ward, to the email thread, introducing him to Ms. Singer (counsel for New Mexico). *See* Ex. 26. The New Mexico complaint was filed on December 5, 2023. *See* Ex. 27. The next day, Ms. Singer sent the Complaint to Mr. Bejar, copying Mr. Ward. *See id.*

Mr. Bejar's website, arturobejar.org, encourages individuals to contact him, and states: "**Regulators and lawmakers**: I'm most interested in conversations with those who have the regulatory ability to compel the kind of transparency and processes that will help create a safer environment for teenagers online." Ex. 28 at 4 (emphasis in original).

**B.      Mr. Bejar's Close Collaboration with the AGs Continued After Their Lawsuits Were Filed, and He Has Served as Their Star Witness in All Trials to Date.**

The close collaboration between Mr. Bejar and these AGs, including the Lead States in this MDL, continued after the AGs' complaints were filed. Mr. Bejar is featured prominently in the AGs' and other

`

plaintiffs' complaints. *See, e.g.*, ECF 73-2 (4:23-cv-05448) (Multistate AG Complaint) ¶¶ 503–05, 629.[3] The Multistate AG Complaint that commenced this litigation mentions him five times, and recites Mr. Bejar's criticisms of Meta, as documented in email communications he had with other Meta employees and his congressional testimony. *Id*.

On January 31, 2025, the MDL/JCCP Plaintiffs, including the AGs, noticed Mr. Bejar's deposition. Ex. 3; Ex. 4. Reflecting the importance of his testimony to plaintiffs' claims and the number of AGs relying on him for their case theories, Mr. Bejar testified over the course of three days for a total of 23 hours and 10 minutes at a deposition attended by counsel from ten different AG offices, including California, New Jersey, and Tennessee, as well as counsel for the MDL/JCCP PISD Plaintiffs. *See* Ex. 20. A few months later, in April-May 2025, the MDL AGs and the MDL/JCCP PISD Plaintiffs disclosed Mr. Bejar as a non-retained expert. *See* ECF 1887-2 (April 18, 2025 JCCP Expert Disclosure), ECF 2006-10 (May 16, 2025 MDL Expert Disclosure). Meta took a non-retained expert deposition of Mr. Bejar on July 10, 2025, which was attended by counsel from eight different AG offices, including California, New Jersey, Kentucky, and Tennessee, as well as counsel for the MDL/JCCP PISD Plaintiffs. *See* Simonsen Decl. ¶ 12. All told, Mr. Bejar sat for three separate depositions, spanning five days, and over 40 hours. *See id.* Although this Court later struck Mr. Bejar's purported expert opinions as to the "science or medicine of causation," it permitted him to testify as an expert witness about "his specialized knowledge in the field of platform design and safety," and as to his so-called "testing" on Instagram. *See* ECF 2857 at 32–34; *see also* Ex. 31 (JCCP ruling on motion to preclude Mr. Bejar's expert testimony) (similar).

Given the centrality of Mr. Bejar's testimony to their pre-suit investigation, their complaints, and their overall case theory, the AGs and other plaintiffs suing Meta have unsurprisingly relied on Mr. Bejar as a key witness in all three trials that have occurred to date. In the New Mexico AG trial, which commenced in February 2026, Mr. Bejar was called as the State's first non-New-Mexico-specific witness

---

[3] *See also, e.g.*, Ex. 29 Complaint in *State of New Mexico, ex rel. Raúl Torrez, Attorney General v. Meta Platforms, Inc., et al.*, Case No. D-101-CV-2023-02838 (N.M. 1st Jud. Dist. Ct., Dec. 5, 2023) ¶¶ 201–02, 271–73, 376–79, 402, 441–44; Ex. 30 Complaint in *State of Vermont v. Meta Platforms, Inc. and Instagram, LLC*, Case No. 23-CV-04453 (Chittenden Super. Ct., Oct. 24, 2023) ¶¶ 253–55, 280–85; *and see* ECF 729 (School District Plaintiffs' Master Complaint) ¶¶ 519–23.

META'S MOTION FOR SPOLIATION SANCTIONS PRECLUDING STATE AGS FROM CALLING THIRD-PARTY WITNESS ARTURO BEJAR
AT TRIAL OR, IN THE ALTERNATIVE, FOR ADVERSE-INFERENCE INSTRUCTIONS
4:22-md-03047-YGR; 4:23-cv-05448-YGR

`

and testified over the course of two full trial days.  Simonsen Decl. ¶ 24.  Less than a month  later, he testified in the first JCCP bellwether trial over the course of two days.  *Id.* ¶ 25.  Most recently, in the Tennessee AG trial that commenced July 27, 2026, he testified over the course of two days.  *Id.*  ¶ 26.  His testimony in all three trials has gone to the core of the plaintiffs' claims.  *Id.* ¶ 27. He has testified extensively about his purported findings of under-13 users on Meta's services, his belief that Meta made misstatements to the public, and his belief that Facebook and Instagram's design features "cause" addiction.  *Id.*  In offering this testimony, Mr. Bejar has created various documents and claims to substantiate his views, including videos showing the content that Mr. Bejar's fake accounts allegedly encountered on Instagram between winter 2024 and spring 2025.  *Id.*

On February 9, 2026, the MDL AGs disclosed Mr. Bejar as both a fact and expert witness whom they may call live to testify in both the liability and injunctive-relief phases of the upcoming trial.  *See* ECF 258-1; ECF 461 (3243) at 3; ECF 483 (3282) at 2.  In an updated witness list served April 16, 2026, the AGs stated that Mr. Bejar would provide an estimated three hours of testimony at trial about the purported inadequacy of Meta's safety tools; Meta's supposed prioritization of growth over safety; the claimed mismatch between Meta's public representations about the prevalence of harms on its platforms; and research he conducted, both at Meta and independently, regarding Meta's platforms.  ECF 2964 at 3.

**C.      Meta Has Repeatedly Sought Discovery Into the Basis for Mr. Bejar's Views and Opinions, Including His Communications With Former and Current Employees**

For the last year and a half, Meta has been seeking discovery of Mr. Bejar's communications with former and current Meta employees.  After the AGs and other plaintiffs noticed his deposition, Meta served a document subpoena on Mr. Bejar on February 11, 2025.  *See* ECF 2006-3.  Among the documents Meta requested were Mr. Bejar's communications with current and former employees relating to the subject matter of the litigation.  *Id.* at 4.  Notably, Mr. Bejar's website, arturobejar.org, addresses his "Friends at Meta" specifically, encouraging them to contact him:

> **Friends at Meta**: I am happy to discuss my observations and recommendations with representatives of Meta, but if anyone from the communications or policy teams would like to talk, I will ask that we please do it in an open and transparent setting.

Ex. 28.  Mr. Bejar served responses and objections to the subpoena on February 28, 2025.  He objected to

META'S MOTION FOR SPOLIATION SANCTIONS PRECLUDING STATE AGS FROM CALLING THIRD-PARTY WITNESS ARTURO BEJAR
AT TRIAL OR, IN THE ALTERNATIVE, FOR ADVERSE-INFERENCE INSTRUCTIONS
4:22-md-03047-YGR; 4:23-cv-05448-YGR

`

the production of any such communications based on the First Amendment privilege and other grounds. *See* ECF 2006-5 at 4.  Nevertheless, in a production served a week before his deposition, on March 31, 2025, he included two Signal threads (consisting of eight screenshots) from January 24, 2024 and February 1-2, 2024—including one with Frances Haugen—that corroborate Mr. Bejar's views and opinions of Meta.  *See* Exs. 32–33.  Meta spent the next nine months seeking to compel Mr. Bejar and other former employees whose testimony plaintiffs relied on in the litigation to produce *all* of their communications with *any* current or former Meta employees—or at least their communications with the specific former employees identified in Meta's subpoenas—but Mr. Bejar (and other former employees represented by Mr. Ward) steadfastly refused to produce any additional documents.  *See* Simonsen Decl. ¶ 13 & Ex. 6.[4]

On December 9, 2025, this Court issued an Order overruling Mr. Bejar's objections in relevant part and ordering that if "Bejar may testify at trial, Meta must have the opportunity to explore the bases of his views," specifically through discovery into his communications with both current and former employees.  *See* ECF 2525 (Ex. 5) at 6, 10.  Although the Court recognized that Mr. Bejar had a First Amendment interest in protecting those communications from disclosure, it held that this interest was overridden by ***Meta's*** need to effectively explore his opinions.  *Id.* at 6–7.  The Court reasoned that "Plaintiffs may not use privilege 'both as a sword to defeat [Meta's] arguments' and as 'a shield to protect against the disclosure of the basis' for Bejar's opinions."  *Id.* at 6 (citing *Chevron Corp. v. Pennzoil Co.*, 974 F.2d 1156, 1162 (9th Cir. 1992)).

Mr. Bejar produced documents in response to the Court's Order on January 12, 2026.  Simonsen Decl. ¶ 15.  Together with the documents he had previously produced in March 2025, they showed that Mr. Bejar communicated with other former Meta employees about topics directly relevant to this litigation.  For example, Mr. Bejar shared documents with and solicited feedback from Kang-Xing Jin, a former Meta Vice President of Product Management, on a document titled "For Integrity and Trust and

---

[4] *See also* ECF 1764–65 (motion-to-compel letter-briefs re Bejar and Jayakumar subpoenas); ECF 1815 (supplemental briefing re Haugen subpoena); ECF 1963 (Magistrate Judge Kang's Order sustaining former employees' objections); ECF 2061 (motion-to compel letter-brief re Haugen subpoena); ECF 2197 (Magistrate Judge Kang's Order sustaining Haugen's objections); ECF 2006 (Meta's appeal of Magistrate Judge Kang's rulings to District Court).

META'S MOTION FOR SPOLIATION SANCTIONS PRECLUDING STATE AGS FROM CALLING THIRD-PARTY WITNESS ARTURO BEJAR
AT TRIAL OR, IN THE ALTERNATIVE, FOR ADVERSE-INFERENCE INSTRUCTIONS
4:22-md-03047-YGR; 4:23-cv-05448-YGR

`

Safety workers"—and asked Jin to keep his feedback confidential. *See* Ex. 35 (October 2023 email thread with Mr. Jin); Ex. 36 (Mr. Jin's feedback on document); Ex. 37 (October–November 2023 email thread with Mr. Jin). Mr. Bejar also communicated with Vaishnavi Jayakumar, a former Head of Youth Well-being at Meta whom the AGs are also planning to call at the upcoming trial (by designation), about analyzing Meta's response to teen safety issues. *See* Ex. 38.[5] And he communicated with former employee Margaret Gould Stewart to strategize about her deposition testimony in this litigation. *See* Ex. 39.

Several of the communications Mr. Bejar produced with former and current Meta employees in January 2026 show that he offered to move some conversations from other platforms to Signal.[6] Seeing few Signal chats in his productions, however, Meta's counsel raised a concern with Mr. Bejar's counsel, Mr. Ward, that Mr. Bejar's searches of platforms like Signal for responsive documents was "not conducted, despite evidence that they contain responsive communications, *and/or such communications were not adequately preserved*." Ex. 6 at 10 (emphasis added). Mr. Bejar's counsel responded only that "[d]iligent searches have been conducted" and that he "believe[s] [his] clients have met their obligations." *See id.* at 5. Meta's counsel pressed Mr. Bejar's counsel to confirm that all relevant sources of ESI—including text messages—had been searched and to update Mr. Bejar's responses and objections to Meta's subpoenas to reflect his search efforts, but Mr. Bejar's counsel did not do so. Simonsen Decl. ¶¶ 16-23 & Ex. 6 at 1–5. **At no point did Mr. Ward disclose that numerous responsive communications with former employees previously existed but had been destroyed because Mr. Bejar used Signal to communicate with them, with the auto-delete functionality turned on**; and he has refused in recent

---

[5] Meta believes that Ms. Jayakumar may also have communicated with Mr. Bejar via Signal ephemeral messaging. Despite receiving a subpoena requesting such communications, Ms. Jayakumar did not produce any Signal communications. Simonsen Decl. ¶ 23. Meta reserves all rights and remedies with respect to Ms. Jayakumar's potential spoliation of responsive communications, including for an order precluding the AGs from playing her deposition at trial.

[6] For example, on November 12, 2023, when a former Meta employee reached out to Mr. Bejar via Messenger to discuss his concerns about Meta, Mr. Bejar proposed moving the conversation off Messenger, offering his phone number "on text, WhatsApp, or Signal." *See* Ex. 40. And on November 15, 2023, when a Meta employee reached out to Mr. Bejar for advice, Mr. Bejar offered to communicate via "WhatsApp or signal." *See* Ex. 41.

META'S MOTION FOR SPOLIATION SANCTIONS PRECLUDING STATE AGS FROM CALLING THIRD-PARTY WITNESS ARTURO BEJAR
AT TRIAL OR, IN THE ALTERNATIVE, FOR ADVERSE-INFERENCE INSTRUCTIONS
4:22-md-03047-YGR; 4:23-cv-05448-YGR

`

conferrals on this motion to answer that question.  Simonsen Decl. ¶¶ 22, 33.

Notably, Mr. Bejar continued to communicate with former employees via Signal using the auto-delete function[7] after this Court ordered him on December 9, 2025 to produce such communications. Specifically, in a June 2026 deposition noticed by the TN AG, former Meta employee Anneke Buffone testified that she and Mr. Bejar communicated in December of 2025 and February of this year via the disappearing messaging function on Signal.  *See* Ex. 42 (A. Buffone Dep. Tr.) 16:19–20:10.  Ms. Buffone testified that she spoke with Mr. Bejar about this litigation and his research.  *See id.*  Despite this Court's order, Mr. Bejar did not produce any Signal messages with Ms. Buffone.  Simonsen Decl. ¶ 23.

### D.    Mr. Bejar Testifies Under Oath that He Knowingly Destroyed Responsive Communications

In the currently ongoing trial in Tennessee state court, Mr. Bejar was the first witness called to the stand by the Tennessee Attorney General, and testified over the course of four trial days.  *See* Simonsen Decl. ¶ 26.  After confirming that "as part of [his] advocacy, [he] ha[s] discussions with people who have left Meta, like [himself]," Ex. 8 at 1710:10–13, including Alison Lee and Anneke Buffone, *id.* at 1710:20–1711:17, Mr. Bejar disclosed that for "*[a]ll* of my communications [i]n this area I use on an app called Signal" and that "My Signal[] text messages with ***anybody I talk to*** get deleted, absolutely, yes," *id.* at 1712:7–21; 1714:12–14 (emphases added):

> Q. And the settings that you have on Signal, is it ephemeral messaging?
>
> A. Yes, I have ephemeral messaging on Signal. ***I have been doing this pretty much since the time that I -- that I started.*** My background is a security engineer and from a professional paranoid, I try to be very mindful about my communications OPSEC [Operations Security] as they would say in the field.
>
> Q. ***And so your texts with these individuals, they disappear?***
>
> A. ***Yes, they do.***

*Id.* 1712:11–21 (emphases added).  Although Meta knew from Mr. Bejar's initial productions that he had used Signal to engage in (apparently limited) communications with former employees, Mr. Bejar's

---

[7] Signal includes an optional setting to automatically delete all of their chats or specific chats after they are sent or received.  *Set and Manage Disappearing Messages*, Signal, https://support.signal.org/hc/en-us/articles/360007320771-Set-and-manage-disappearing-messages. Similar to a retention policy on an email account, users can adjust how long messages are retained before the automatic deletion takes place.  *See id.*

`

Tennessee testimony was the first time he or his counsel had ever disclosed that Mr. Bejar used Signal for *all* of his communications with former employees and—most importantly—**that he has had the settings configured since he first started using the Signal app (which was at least as early as November 2023) so that *all* of his messages automatically delete**. *See id.* Configuring one's Signal settings with the auto-delete function turned on makes it impossible to preserve any communications unless the sender or recipient takes a screenshot of the message immediately upon sending or receiving it; however, even that option may be unavailable if either party has enabled Signal's setting that blocks screenshots.[8]

Soon after his testimony in Tennessee, Meta emailed Mr. Bejar's counsel, Mr. Ward, copying the State AGs, to inquire, among other things, as to the dates of these Signal communications, whether these communications were deleted, what preservation methods were used, and whether these responsive communications still exist. *See* Ex. 7 at 7–11. Mr. Ward refused to answer any of Meta's questions, stating instead that "all relevant communications with current and former Meta employees ***then in Mr. Bejar's possession*** were collected and produced to you." *Id.* at 1 (emphasis added). *See also* Ex. 43 at 1–2. Meta also requested a supplemental deposition of Mr. Bejar to inquire about these communications. *See* Ex. 7 at 7. Mr. Ward similarly declined Meta's request for a supplemental deposition, claiming that "Meta has long known of and had the opportunity to ask Mr. Bejar about his use of Signal, and it neglected to do so." Ex. 43 at 1. Mr. Ward made these statements notwithstanding the fact that (1) Meta had previously inquired with him about Mr. Bejar's use of Signal to communicate, to which Mr. Ward's team merely responded that his production obligations had been satisfied (without disclosing that he had deleted responsive Signal communications, *see* Ex. 6 at 2, 5); and (2) when Meta previously asked whether Mr. Bejar understood his document retention obligations, Mr. Ward instructed his client not to answer on the basis of attorney-client privilege, *see* Ex. 45 (Dec. 11, 2025 A. Bejar Dep. Tr.) at 452:1–17.

Apparently unconcerned with Mr. Bejar's disclosures of spoliation in Tennessee, the AGs immediately declined to agree to a further deposition of him, taking the position that "Meta's claim that it

---

[8] *See* The Sedona Conference, *Commentary on Ephemeral Messaging*, 22 SEDONA CONF. J. 435, 461 (2021) ("[I]t is possible to take a screenshot of an ephemeral message[.]"); *Set and Manage Disappearing Messages*, *supra* note 9 (describing steps to toggle off autodeletion).

`

only learned last Thursday that Mr. Bejar uses Signal is incorrect," Ex. 7 at 6, and that "Mr. Bejar fulfilled his obligations under the subpoena on January 12, 2026," *id.* at 4.  During a conferral on August 5, 2026, counsel for the State AGs (Krista Batchelder) defended Mr. Bejar's apparent destruction of Signal messages, asserting (incorrectly) that "he's not a party to the case so I don't think he has any preservation obligations"; asserting (contrary to this Court's December 2025 Order) that "his communications are protected under the First Amendment"; and asserting (contrary to what his Tennessee testimony showed) that "he complied with the subpoena back in January."  Simonsen Decl. ¶ 31.  Far from denying or even expressing concern that responsive communications may have been destroyed, Ms. Batchelder tried shifting the blame to *Meta*, suggesting the company had somehow acquiesced in spoliation *that was known to the AGs*: "I don't know why this is coming up now given … it came up in January that he used Signal and ***you didn't do anything with it***," Simonsen Decl. ¶ 31 (emphasis added).  Given these positions, Meta's counsel asked Ms. Batchelder to confirm whether the AGs knew Mr. Bejar was communicating using Signal's ephemeral messaging feature; after pausing, she responded that she was "not in a position" to answer, and likewise declined to answer the same question during a conferral the next day, *id.* ¶ 32—33.

Finally, before filing this motion, Meta invited both Mr. Bejar and the State AGs to let Meta know if they had any basis to dispute the facts as Meta understood them.  Exs. 7, 43, 46.[9]  In response, the State AGs said they "will neither agree nor stipulate to your factual recitation," but declined Meta's invitation to identify what they disagreed with.  Ex. 46 at 4–5.  Mr. Ward responded that Mr. Bejar "does dispute your recitation of the facts" but declined to state on what basis, asserting only vaguely that "your alleged discovery violation is based on an objectively false inference" (presumably that Mr. Bejar had a duty to preserve) and that "Mr. Bejar's disclosure in his Tennessee testimony of his occasional use of Signal is not indicative of spoliation."  Ex. 7 at 1.  At the same time, during the August 6, 2026 conferral, Mr. Ward specifically declined to answer the question of whether Mr. Bejar had engaged in communications with

---

[9] Meta articulated those facts as follows: "that Mr. Bejar used Signal ephemeral messaging to communicate with former employees about relevant issues during the pendency of this litigation, including after Meta served its subpoena requesting such communications and after Judge Gonzalez Rogers ordered him to produce such communications, and that the AGs were aware that Mr. Bejar was using ephemeral messaging to communicate with former employees."  Ex. 7 at 3.

`

former Meta employees using ephemeral Signal messages that were deleted.  Simonsen Decl. ¶ 33.

## LEGAL STANDARD

"Courts are vested with inherent powers arising out of 'the control necessar[y] ... to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'" *Apple Inc. v. Samsung Elecs. Co.*, 881 F. Supp. 2d 1132, 1135 (N.D. Cal. 2012).  These include the ability of courts to levy "sanctions for spoliation of evidence" against a party or non-party who spoliates relevant evidence.  *Id.* "The court's inherent authority to sanction includes not only the authority to sanction a party, but also the authority to sanction the conduct of a nonparty who participates in abusive litigation practices, or whose actions or omissions cause the parties to incur additional expenses." *Lofton v. Verizon Wireless (VAW) LLC*, 308 F.R.D. 276, 285 (N.D. Cal. 2015).  In addition, "[a] non-party's spoliation of evidence may be imputed to a party who did not engage in spoliation." *Ramos v. Swatzell*, 2017 WL 2857523, at *6 (C.D. Cal. June 5, 2017), *report and recommendation adopted*, 2017 WL 2841695 (C.D. Cal. June 30, 2017).

Spoliation sanctions are warranted when three conditions are met: "(A) the party with control over the evidence had an obligation to preserve it at the time of destruction, (B) the evidence was relevant to a party's claim or defense, and (C) the evidence was destroyed with a culpable state of mind." *Gay v. Parsons*, 2024 WL 4224893, at *2 (N.D. Cal. Sept. 17, 2024) (Kang, J.).  "In the Ninth Circuit, spoliation of evidence raises a presumption that the destroyed evidence goes to the merits of the case, and further, that such evidence was adverse to the party that destroyed it." *Apple Inc. v. Samsung Elecs. Co.*, 888 F. Supp. 2d 976, 993 (N.D. Cal. 2012).  It is within the discretion of the district court to fashion the appropriate sanctions. *Id.* at 985.  Courts have imposed spoliation sanctions for allowing Signal chats to autodelete, even where the auto-delete setting was already enabled before the duty to preserve arose. *See, e.g.*, *These Ponies Are Miserable v. City of L.A.*, 2025 WL 3248690, at *6–7 (C.D. Cal. Nov. 7, 2025) (finding "no question" that plaintiff who "set the Signal chat to auto-delete messages" shortly before filing suit had violated Rule 37 obligations); *Pable v. Chicago Transit Auth.*, 2023 WL 2333414, at *29 (N.D. Ill. Mar. 2, 2023) (plaintiff's failure to disable auto-deletion "on or after" the date the duty to preserve arose violated that duty).

META'S MOTION FOR SPOLIATION SANCTIONS PRECLUDING STATE AGS FROM CALLING THIRD-PARTY WITNESS ARTURO BEJAR
AT TRIAL OR, IN THE ALTERNATIVE, FOR ADVERSE-INFERENCE INSTRUCTIONS
4:22-md-03047-YGR; 4:23-cv-05448-YGR

`

## ARGUMENT

**A.    Mr. Bejar Had an Obligation to Preserve His Communications With Former Employees Over the Period of Time He Engaged in Disappearing Messaging.**

      **1.    Mr. Bejar Had a Duty to Preserve Relevant Communications as Early as April 2023.**

The relevant facts are undisputed.  Mr. Bejar was on notice by at least April 27, 2023—when the Tennessee AG sent him a Request for Information containing a preservation notice—that his documents were subject to preservation.  Ex. 1 at 2.  And he was on notice, via the same Request, that his documents may be relevant to a future enforcement action, which later became this and other cases.  *Id.*  If this initial preservation request were not enough, Mr. Bejar received a separate preservation request from the New Mexico AG seven months later specifically aimed at preserving documents or data "even if it is your normal or routine course of business to delete or destroy" them, Ex. 2 at 1—which would include messages Mr. Bejar would otherwise typically send and delete using ephemeral messaging.  Both of these preservation requests placed Mr. Bejar on notice of his duty to preserve.  *See Ramos*, 2017 WL 2857523, at *5 (holding that non-parties' duty to preserve attached when they received a litigation hold).  Neither Mr. Bejar nor the AGs can credibly claim that Mr. Bejar lacked notice of the anticipated litigation when he received either one of these preservation notices in 2023.  *Cf. Apple Inc.*, 888 F. Supp. 2d at 990 ("[T]here is no question that [a party's] duty to preserve relevant evidence may arise even before litigation is formally commenced."); *Hynix Semiconductor Inc. v. Rambus Inc.*, 645 F.3d 1336, 1346–47 (Fed. Cir. 2011) (for the duty to preserve to attach to a party, litigation need only be reasonably foreseeable, not immediate or certain).

Even if Mr. Bejar's duty to preserve—as a third-party—required more than a preservation notice, any applicable test for triggering that duty was met here.  "[W]here a non-party [1] is determined to be an interested party, then this non-party has its own independent duty to preserve evidence, assuming [2] they were on notice of actual or pending litigation."  *Gay*, 2024 WL 4224893, at *4.

As to the second element, Mr. Bejar had notice of actual or pending litigation as early as 2023.  The November 2023 preservation notice specified that it was "being sent to [Mr. Bejar] *in contemplation of litigation concerning social media companies*."  Ex. 2 at 1 (emphasis added).  The April 2023

`

preservation notice, meanwhile, referred explicitly to the possibility of a "resulting enforcement action" from the AGs' investigation. Ex. 1. Even without those notices, Mr. Bejar had every reason to expect actual litigation, given he was actively coordinating with the AGs and providing them with information they could use, and did use, to build out the allegations of their complaints. *See infra* Part D.

As to the first element, Mr. Bejar is clearly an "interested party" in this litigation. "The relevant factors to consider in this determination include [a] the professional and legal relationships between [the State AGs] and non-party [Mr. Bejar], and [b] the extent of [Mr. Bejar's] control over the spoliated evidence in question." *Gay*, 2024 WL 4224893, at *4. Here, the spoliated evidence in question—Mr. Bejar's communications with former employees—was entirely within his control. And as discussed above, Mr. Bejar maintained an extensive professional relationship with State AGs prosecuting this litigation, and related litigation. He consulted with them before they filed their complaints, communicated with them throughout the pendency of the litigation, and now serves as a non-retained expert and fact witness in at least three separate AG litigations, including this one, and in all MDL/JCCP PISD cases. He actively worked to recruit other former and current Meta employees to his and the AGs' apparent joint cause, sat for over 40 hours of depositions, and has testified, in the first eight months of 2026 alone, in three Meta trials (spanning over six days of testimony). Although Mr. Bejar has independent counsel, he has functioned as a virtual arm of the AGs for over three years. While the AGs have attempted to create the appearance of distance between their offices and Mr. Bejar by ultimately electing to disclose him as only a *non-retained* expert, that was only after at least one AG's office (New Mexico) sent him a proposed retainer agreement. *See* Ex. 23. Indeed, at an early MDL discovery hearing, then-co-lead counsel for the Colorado AG, Bianca Miyata, expressed concern that the expert disclosure provision of the protective order could "endanger our ongoing relationships both with expert witnesses, consultants, [and] *former employees with whom we've been…engaging with*." Ex. 34 at 26:2–8, 27:9–13 (emphasis added). In short, Mr. Bejar's professional and legal relationships with the State AGs establish that he is an "interested party" in this litigation.

> **2.    At Minimum, Mr. Bejar Had a Duty to Preserve in February and December 2025.**

`

Even if Mr. Bejar were not an interested party under a general duty to preserve evidence, he indisputably had a duty to preserve responsive documents—including communications with former employees—after he received a subpoena from Meta on February 11, 2025, requesting those exact communications. *See Ramos*, 2017 WL 2857523, at *6 ("That [an individual's] personnel file was likely shredded in March 2014 after plaintiffs had already served [the non-party] with a subpoena for the file is particularly egregious."). And it is beyond dispute that he had an obligation to preserve and produce all communications between himself and former employees responsive to Meta's discovery requests after this Court ordered him to do so in December 2025, ECF 2525 (Ex. 5) at 10, and before he made his final production in January 2026.

## B.    The Destroyed Messages Were Relevant to Meta's Defenses.

This Court has already held that Mr. Bejar's communications with former employees are relevant and necessary to Meta's defenses. ECF 2525 (Ex. 5) at 6–7. The Court did not just hold that these communications are relevant; it held that Meta's need for them outweighed Mr. Bejar's asserted First Amendment right to avoid disclosing them. *Id.* Moreover, in the Ninth Circuit, "spoliation of evidence raises a presumption that the destroyed evidence goes to the merits of the case." *Apple Inc.*, 888 F. Supp. 2d at 993. Thus, notwithstanding the prior ruling, it is the burden of the AGs and Mr. Bejar—not Meta— to establish that this destroyed evidence is *not* relevant to Meta's defenses. They cannot meet that burden.

## C.    Mr. Bejar Violated His Duty to Preserve and Spoliated Responsive Communications.

After being asked about communications with a particular former Meta employee, Mr. Bejar admitted, under oath at trial last week, that for "[a]ll of [his] communications [i]n this area[,] I use on an app called Signal." Ex. 8 at 1712:7–10. Mr. Bejar admitted that he uses Signal's auto-delete ephemeral messaging feature, and that he has "been doing this pretty much since the time . . . that I started" using Signal. *Id.* at 1712:13–15. And he confirmed that his "Signal[] text messages with anybody I talk to get deleted, absolutely, yes." *Id.* at 1714:12–15. Mr. Bejar thus admitted under oath that he used an optional auto-delete function to communicate with former employees, despite being notified of his duty to preserve those messages and other relevant communications by (1) the Tennessee AG in April 2023, (2) the New

META'S MOTION FOR SPOLIATION SANCTIONS PRECLUDING STATE AGS FROM CALLING THIRD-PARTY WITNESS ARTURO BEJAR
AT TRIAL OR, IN THE ALTERNATIVE, FOR ADVERSE-INFERENCE INSTRUCTIONS
4:22-md-03047-YGR; 4:23-cv-05448-YGR

`

Mexico AG in November 2023, (3) Meta's subpoena specifically requesting those messages in February 2025, and (4) the Court's December 2025 order requiring him to produce exactly the messages he now says he caused to disappear.  It is thus indisputable that he violated his duty to preserve relevant materials and engaged in spoliation.  *See Pable*, 2023 WL 2333414, at *29 (preservation duty violated where plaintiff failed to disable autodeletion "on or after" the date preservation duty arose); *These Ponies*, 2025 WL 3248690, at *6–7 (plaintiff who "set the Signal chat to auto-delete messages" shortly before filing suit engaged in spoliation).

It is also indisputable that Mr. Bejar's violation of his duty to preserve resulted in the loss of relevant communications.  Despite testifying that he conducted "all" of his communications "[i]n this area" through Signal, including communications with Alison Lee and Anneke Buffone, *see* Ex. 8 at 1711:6-17, 1712:7-10, Mr. Bejar produced only two Signal threads, from January 24, 2024 and February 1-2, 2024, in discovery, none of which were with Ms. Lee or Ms. Buffone.  Nor did Mr. Bejar's productions include any Signal chats with Vaishnavi Jayakumar or Margaret Gould Stewart, despite evidence from both sworn testimony and produced documents that Mr. Bejar and those former employees were in contact, including shortly before some of those former employees' depositions in this litigation. *See* Ex. 44 (Jan. 31, 2025 V. Jayakumar Jan Dep. Tr.) at 530:7-11 (stating she and Mr. Bejar "have talked regularly"); Ex. 39 (communication with Gould Stewart before her deposition).  Importantly, even taking the narrowest possible view of Mr. Bejar's duty to preserve—that it did not arise until the Court's December 2025 Order and ended on January 12, 2026 when Mr. Bejar produced documents—the record still supports a finding of spoliation.  That is because Anneke Buffone testified under oath on June 26, 2026 that she communicated with Mr. Bejar via Signal messaging from December 2025 to February 2026. Ex. 42 (Buffone Dep. Tr.) at 16:3-24:2.  That time period falls squarely with the two-month period between the Court's December 2025 Order and Mr. Bejar's January 2026 production, confirming that responsive communications were destroyed.

> **D.      The Record Shows That Mr. Bejar Acted in Bad Faith, and At Least With Gross Negligence, Warranting Preclusion of His Testimony at Trial.**

"[C]ulpability [for spoliation] does not only encompass 'bad faith' conduct, but it may also include

`

any 'willfulness or fault by the offending party.'" *Gay*, 2024 WL 4224893, at *5. Here, Mr. Bejar's disregard for multiple preservation notices, Meta's subpoena, and this Court's own Order requiring him to produce the *very types of communications* he destroyed demonstrate that his spoliation was done in bad faith, or at a minimum with gross negligence. Indeed, the fact that Mr. Bejar produced *some* Signal chats while allowing others to disappear provides strong "evidence of selective preservation," *These Ponies*, 2025 WL 3248690, at *7, particularly where the produced chats happen to corroborate his views and opinions as expressed in this litigation. Those produced chats, moreover, appear to be screenshots, suggesting that Mr. Bejar undertook an effort to preserve them in a unique way, and that he did so only for chats favorable to him.[10] On the other hand, there remain a number of messages—unknowable to Meta—that Mr. Bejar affirmatively chose to send via Signal, and affirmatively chose to delete. This conduct amounts to bad faith. *See Herzig v. Arkansas Found. for Med. Care*, 2019 WL 2870106, at *5 (W.D. Ark. July 3, 2019) (holding that plaintiffs' use of Signal during litigation was designed to prevent discovery of relevant communications, was "intentional, bad-faith spoliation of evidence," and justified the imposition of sanctions). The only proper remedy for this willful violation of the Court's Order is to preclude Mr. Bejar from testifying entirely. *See Lofton*, 308 F.R.D. at 285. The Court should use its inherent power to sanction Mr. Bejar's bad faith and willful violation of this Court's Order.

To the extent the Court believes it must impute Mr. Bejar's spoliation to the AGs in order to preclude his testimony at trial, it can, because the AGs "had an obligation to preserve relevant evidence at the time of destruction," and the AGs "acted with a culpable state of mind when failing to prevent [Mr. Bejar] from destroying the relevant evidence in question." *Gay*, 2024 WL 4224893, at *6. It cannot be disputed that the AGs had a duty to preserve relevant evidence during the pendency of this litigation if not the entire pre-suit investigatory phase. It is also clear that the AGs acted with a culpable state of mind

---

[10] Because Mr. Bejar produced no metadata with his productions, it is impossible for Meta to know exactly how these chats were captured. However, the Signal website indicates that "[e]ach and every disappearing message will have a timer countdown icon that is visible at the bottom of the message bubble." *Set and Manage Disappearing Messages*, *supra* note 9. Notably, the eight screenshots of Signal chats that Mr. Bejar did produce—all from early 2024—did not have this timer countdown icon. Coupled with his Tennessee testimony that he always had Signal's deletion function enabled, this suggests that, at some point after 2024, Mr. Bejar voluntarily turned on Signal's deletion function; or that he selectively turned it off when sending the eight Signal chats in early 2024.

`

with respect to Mr. Bejar's spoliation of relevant evidence. The AGs—just as Mr. Bejar—knew that communications with former employees were relevant to Meta's defenses, at least since Meta served its subpoena on Mr. Bejar in February 2025, and more likely before that, particularly given the AGs' own interest in deposing former Meta employees and their reliance on Meta-employee communications in their complaint. Notwithstanding their knowledge of Mr. Bejar's possession (and ongoing generation) of relevant communications, Meta has no record of the MDL AGs ever sending Mr. Bejar a preservation notice or litigation hold pertaining to this case. *See Gay*, 2024 WL 4224893, at *8 (finding that delay in issuing a litigation hold to a non-party was grossly negligent and noting that "courts have routinely held that failing to promptly issue a litigation hold can support a finding of gross negligence").

Not only did the MDL AGs fail to advise Mr. Bejar of his preservation obligations; they have apparently been complicit in his knowing failure to preserve relevant information. On this point, it is telling that, far from expressing concern when Meta's counsel brought Mr. Bejar's Tennessee testimony to the AGs' attention, they came to his defense, asserting (incorrectly) that "he's not a party to the case so I don't think he has any preservation obligations" and that (contrary to this Court's December 2025 Order) "his communications are protected under the First Amendment." Simonsen Decl. ¶ 31. Their next line of defense was to argue that Meta's request was time-barred because, according to the AGs, "***this came up in January*** that [Mr. Bejar] used Signal and ***Meta didn't do anything with it***"—strongly suggesting that the AGs ***themselves*** understood (or at least suspected) that Mr. Bejar had used Signal to engage in ephemeral messaging, did nothing about it, and now seek to shift the blame to *Meta* for failing to affirmatively uncover the ongoing spoliation. Yet tellingly, even after repeated requests from Meta, the AGs have refused to confirm whether they were aware of Mr. Bejar's use of Signal's ephemeral messaging feature. *See* Simonsen Decl. ¶ 31.[11]

Thus knowing of Mr. Bejar's communications using a platform that can be used for ephemeral

---

[11] The AGs may claim that Mr. Bejar and his counsel, Mr. Ward, bear sole responsibility for Mr. Bejar's compliance with the Court's prior Order. But this argument relies on the fiction that Mr. Bejar is a truly independent, third-party witness. In reality, Mr. Bejar has functioned more as an agent of the AGs; not only has he been instrumental in developing their claims in this case, but he will serve as the AGs key fact witness *and* non-retained expert.

META'S MOTION FOR SPOLIATION SANCTIONS PRECLUDING STATE AGS FROM CALLING THIRD-PARTY WITNESS ARTURO BEJAR
AT TRIAL OR, IN THE ALTERNATIVE, FOR ADVERSE-INFERENCE INSTRUCTIONS
4:22-md-03047-YGR; 4:23-cv-05448-YGR

`

messaging, the AGs' failure to ensure the preservation of documents by a central witness is grossly negligent, at a minimum, and, at worst, bad faith, and independently warrants imposition of sanctions in the form of precluding Mr. Bejar from testifying at trial. At a minimum, as other courts have acknowledged, "leaving [Meta] without a remedy here for the destruction of relevant evidence would be an unjust result." *Woods v. Scissons*, 2019 WL 3816727, at *6 (D. Ariz. Aug. 14, 2019). Meta should not be left without a remedy for the AGs' failure to ensure Mr. Bejar adhered to this Court's ruling.

The AGs' "gotcha" theory of avoiding spoliation sanctions has it entirely backward: it was the responsibility of Mr. Ward, as Mr. Bejar's attorney, and of the AGs, as the sponsor of his testimony and the only Parties with any ability to do so, to ensure that he preserved relevant communications—not Meta's.[12] And it was Mr. Ward's duty, as Mr. Bejar's attorney and an officer of the Court, to disclose in response to Meta's subpoena and Meta's counsel's repeated inquiries that responsive communications were destroyed—not Meta's to uncover the spoliation, lest it waive any remedy.

Moreover, Meta has *not* known that Mr. Bejar engaged in *ephemeral* Signal messaging that automatically deleted his communications with former employees. While Meta was aware that Mr. Bejar used Signal, Meta did not learn until Mr. Bejar's Tennessee trial testimony last week that he used Signal's auto-delete feature, and that he had failed to preserve messages sent through Signal. Before that Tennessee testimony, when Meta's counsel specifically inquired about the references to moving conversations to Signal in Mr. Bejar's January 2026 production, they were told by Mr. Bejar's counsel that all relevant correspondence had been produced, **with no mention that relevant correspondence previously existed but had been deleted**. *See supra* p. 8. The AGs' "waiver" argument also overlooks the general prohibition on seeking discovery into another party's preservation efforts, let alone a *third party's* preservation efforts, absent a basis to suspect there was actual spoliation—which Meta did not have until last week (because Mr. Ward repeatedly assured Meta's counsel in response to expressed concerns that

---

[12] Meta put Mr. Bejar on its litigation hold for this lawsuit on March 17, 2023, *see* Simonsen Decl. ¶ 4, but had no ability to preserve any of his communications after he left the company in October 2021 (or communications he had before that time that were not through his Meta email account).

META'S MOTION FOR SPOLIATION SANCTIONS PRECLUDING STATE AGS FROM CALLING THIRD-PARTY WITNESS ARTURO BEJAR AT TRIAL OR, IN THE ALTERNATIVE, FOR ADVERSE-INFERENCE INSTRUCTIONS
4:22-md-03047-YGR; 4:23-cv-05448-YGR

`

everything had been produced).[13]

**E.    In the Alternative, the Court Should Issue Adverse Inference Instructions.**

To the extent the Court does not preclude Mr. Bejar from testifying at trial, Meta respectfully submits that the Court should, at minimum, issue adverse inference instructions to the advisory jury that (1) Mr. Bejar knowingly destroyed relevant communications with other former Meta employees that he was under a duty to preserve, and that the Court had ordered him to produce, which the jury may consider when evaluating his credibility, reliability, bias, and the completeness of testimony; and/or (2) that the jury may infer that the destroyed communications would have contained information unfavorable to Mr. Bejar's testimony concerning Meta.  This type of sanction is commonly imposed when a non-party is found to have spoliated evidence, and when that spoliation is imputed to a party to the litigation.  *See, e.g.*, *Ramos*, 2017 WL 2857523, at *14; *Gay*, 2024 WL 4224893, at *9.  "An adverse inference instruction would help to 'ameliorate any prejudice to [Meta] by filling the evidentiary gap created by [the individual] that destroyed evidence.'"  *Sanders v. Univ. of Idaho, Coll. of L.*, 634 F. Supp. 3d 936, 945 (D. Idaho 2022); *see id.* ("The spoliation of evidence raises a presumption that the destroyed evidence goes to the merits of the case, and further, that such evidence was adverse to the party that destroyed it.").

**CONCLUSION**

For the foregoing reasons, Meta respectfully requests that the Court impose sanctions for the knowing destruction of responsive communications in this litigation by Mr. Bejar, working alongside the AGs, in the form of an order precluding the AGs from calling Mr. Bejar as a witness at trial or, in the alternative, providing an adverse inference instruction to the jury.

---

[13] *See Comair Ltd. v. Boeing Co.*, 2024 WL 4696125, at *2 (W.D. Wash. Nov. 6, 2024) ("'Mere speculation about missing evidence is insufficient to allow discovery on discovery,' and the party requesting such discovery 'bears the burden of producing specific and tangible evidence of a material failure of an opponent's obligation[s].'").

META'S MOTION FOR SPOLIATION SANCTIONS PRECLUDING STATE AGS FROM CALLING THIRD-PARTY WITNESS ARTURO BEJAR
AT TRIAL OR, IN THE ALTERNATIVE, FOR ADVERSE-INFERENCE INSTRUCTIONS
4:22-md-03047-YGR; 4:23-cv-05448-YGR

`

DATED:  August 7, 2026

Respectfully submitted,


By:    */s/ Ashley M. Simonsen*

Ashley M. Simonsen (Bar No. 275203)
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, California 90067
Telephone: (424) 332-4800
Facsimile: (424) 332-4749
Email: asimonsen@cov.com

Paul W. Schmidt, *pro hac vice*
Timothy C. Hester, *pro hac vice*
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
Telephone: (202) 662-6000
Facsimile: (202) 662-6291
Email: pschmidt@cov.com
Email: thester@cov.com


*Attorneys for Defendant Meta Platforms, Inc.*
*f/k/a Facebook, Inc.*

META'S MOTION FOR SPOLIATION SANCTIONS PRECLUDING STATE AGS FROM CALLING THIRD-PARTY WITNESS ARTURO BEJAR
AT TRIAL OR, IN THE ALTERNATIVE, FOR ADVERSE-INFERENCE INSTRUCTIONS
4:22-md-03047-YGR; 4:23-cv-05448-YGR