# EXHIBIT 31

E-Served: Sep 22 2025 1:40PM PDT Via Case Anywhere

**FILED**
Superior Court of California
County of Los Angeles

SEP 22 2025

David W. Slayton, Executive Officer/Clerk of Court

By: L. M'Greene, Deputy

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
## FOR THE COUNTY OF LOS ANGELES

*Social Media Cases*
**JCCP5255**
**(Lead Case: 22STCV21355)**

Dept. 12 SSC
Hon. Carolyn B. Kuhl
Date of Hearing: September 17, 2025

**Defendants' Omnibus Motion to Exclude General Causation Opinions of Plaintiffs' Experts**

**Defendants' Motion to Exclude the Expert Testimony of Dr. Gary Goldfield**

**Defendants' Motion to Exclude the Expert Testimony of Dr. Kara Bagot**

**Defendants' Motion to Exclude the Expert Testimony of Arturo Bejar**

**Defendants' Motion to Exclude Expert Testimony of Dr. Drew Cingel**

**Defendants' Motion to Exclude the Expert Testimony of Dr. Anna Lembke**

**Defendants' Motion to Exclude the Expert Testimony of Dr. Dimitri Christakis**

**Defendants' Motion to Exclude the Expert Testimony of Dr. Ramin Mojtabai**

**Defendants' Motion to Exclude the Expert Testimony of Lotte Rubaek**

**Defendants' Motion to Exclude the Expert Testimony of Dr. Eva Telzer**

1

Defendants contend that Bagot's testimony should be excluded because she engaged in plagiarism when writing her Report. Bagot explained at her deposition that the citation error identified by Defendants may have occurred by mistake because, in the drafting process, Bagot failed to include quotation marks and a citation on the final draft. (See Bagot's Dep., Defs' Ex. B, at 301:20—303:12.) This citation error does not justify exclusion of Bagot's testimony at trial.

Defendants' final argument regarding Bagot is that she should not be allowed to testify as to (1) Defendants' internal documents, or (2) the design features of Defendants' platforms. However, for the reasons discussed above, Bagot is qualified to testify as to whether Defendants' platform design features cause mental health harm. As part of that testimony, Bagot may review and offer testimony about documents that are directly relevant to her testimony regarding general causation, including Defendants' internal documents and facts regarding the specific design features. However, Defendants are correct to the extent they argue that Bagot cannot offer her opinions as to Defendants' *intent* or her opinion that Defendants knew or should have known that their platforms were causing harm.

## Defendants' Motion to Exclude the Expert Testimony of Arturo Bejar

Court's Ruling: The court denies the Bejar Motion. However, the court clarifies that Bejar may not offer expert testimony on the question of whether use of social media platforms causes specific mental health harms. Bejar is not qualified to offer such expert testimony.

On May 16, 2025, Plaintiffs disclosed that they would be relying on the expert testimony of Bejar. (See Defs' Ex. A.) Bejar has not provided a report in connection with his expert testimony in this case. Plaintiffs described Bejar's background as follows:

> Mr. Béjar has 30 years of experience in online and social media user safety. He began working in the tech industry at the age of 15 for IBM. Mr. Béjar graduated with a degree in mathematics from King's College in 1993. In 1994, he began work at Electric Communities, a social media startup, where he focused on security issues. Mr. Béjar joined Yahoo! in 1998, where he took on a role equivalent to the Chief Security Officer of the company. He was the first engineer at Yahoo! dedicated to writing security code. His job was to

make sure that every product that Yahoo! made was safe for the people using it, which involved, among other things, implementing protections for kids and using test accounts to assess the safety of the platform and the effectiveness of safety features. Mr. Béjar joined Meta in 2009, as the company's site integrity team manager. He continued to work at Meta through 2015, and his role greatly expanded during that time to include not only site integrity, but also customer care and other teams. In coordination with Meta CEO Mark Zuckerberg, Mr. Béjar created the Protect and Care team, a cross-functional group that managed Facebook's technical security and the safety of users and served as the program's senior engineer and project leader. His work at Meta included recommending and implementing safety features on the Facebook platform, and monitoring and assessing the platform for potential safety risks and harms. This included, for example, developing and implementing a reporting framework that was used by Facebook to identify harmful activity on the platform. In this role, Mr. Béjar interfaced directly with Meta's senior leadership, including Mr. Zuckerberg and COO Sheryl Sandberg, regarding Meta's safety program. Mr. Béjar retired from Meta in 2015 to spend time with his family but continued to consult with a number of technology firms about their safety programs. In 2019, Meta requested that Mr. Béjar return as a part-time consultant to assist and advise Instagram's wellbeing team. Mr. Béjar's second stint at Meta lasted from 2019 to 2021. As part of his consulting work at Meta, Mr. Béjar performed an assessment of Instagram's safety framework to identify existing problems causing harms to users, and to develop potential solutions. That assessment included creating and conducting a large-scale user survey to identify the harms occurring to users on Instagram. Based on that survey and other investigations, Mr. Béjar developed a set of safety recommendations for Instagram, which he communicated directly to Meta's top leadership, including Mr. Zuckerberg. Mr. Béjar later testified in front of the US Senate Judiciary Committee about the harms that stem from Meta's platforms. Mr. Béjar's testimony covered both his personal knowledge and experience working at Meta and independent research and testing of Meta's platforms and safety features. Mr. Béjar was also retained by Meta's 'Oversight Board' to advise on issues of youth safety after his

30

consulting stint at the company. Meta has described Mr. Béjar as having "world-class expertise" and that "[t]here are fewer than 10 people in the world meeting [Bejar's] qualifications, we estimate, most of whom are retired or employed at [Meta's] competitors."

(Defs' Ex. A, at pp. 1-2, brackets in original.)

In their initial disclosure, Plaintiffs stated that Bejar may offer testimony on numerous topics, including "[h]is personal knowledge and experience related to how design defects on Meta's platforms can cause harm to minors (e.g., age verification, reporting processes, beauty filters, public like counts, infinite scroll, default settings, private messages, reels, ephemeral content, and connecting children with adult strangers) … ." (Defs' Ex. A, at p. 2.) Bejar may also testify as to "[h]is personal knowledge and experience of harms associated with Meta's platforms including addiction/problematic use, anxiety, depression, eating disorders, body dysmorphia, suicidality, self-harm, and sexualization … ." (Defs' Ex. A, at p. 3.)

Plaintiffs explain that they "proffer Mr. Béjar as both a fact witness to testify about his time at Meta, and as a non-retained expert to testify about his expert views on the adequacy of Meta's safety systems." (Pls' Opp. Defs' Bejar Mot., at p. 3.) As for his potential general causation testimony, Plaintiffs state:

> … while Mr. Béjar offers opinions that could be characterized as "general causation" opinions, those opinions fall squarely within his expertise. For example, Mr. Béjar will testify about how certain features of Meta's platforms promote excessive, compulsive, and addictive use. His testimony on that topic (which combines fact and expert testimony) is based, among other things, on decades of experience evaluating platform features to measure their impact on user behaviors.

(Pls' Opp. Defs' Bejar Mot., at p. 3.)

First, Defendants argue that Bejar has no relevant expertise to opine on whether social media platforms cause certain mental health harms. Second, Defendants argue that Bejar's methods are too unreliable to support Bejar's testimony on causation. Third, Defendants again argue that Bejar's testimony should be excluded because his opinions rely on the existence of third-party content on Instagram.

31

Under their first argument, Defendants contend that a general causation expert in this action must have scientific and clinical experience to determine whether something causes "addiction" or other mental health issues. Defendants state that Bejar "is simply a former Meta employee who worked on several aspects of Meta's platforms; he is not a doctor, psychologist, neurologist, clinician, statistician, epidemiologist, or any other role that would provide him sufficient experience." (Defs' Bejar Mot., at p. 10.)

"A person is qualified to testify as an expert if he has special knowledge, skill, experience, training, or education sufficient to qualify him as an expert on the subject to which his testimony relates. Against the objection of a party, such special knowledge, skill, experience, training, or education must be shown before the witness may testify as an expert." (Evid. Code, § 720, subd. (a).) Here, Bejar appears set to testify principally as a *fact* witness regarding his experiences working for Meta, specifically, Meta's design practices regarding safety and Meta's knowledge of the inadequacy of the safety features. Defendants' *Sargon* arguments thus do not apply to most of Bejar's testimony.

Plaintiffs nonetheless admit that they intend to offer some testimony by Bejar in his capacity as an expert witness testifying as to general causation. Plaintiffs state:

> For example, Mr. Béjar will explain how infinite scroll, "likes," and the nature and frequency of notifications are all designed to, and do, encourage excessive use. (Id. at 140:3-23.) Mr. Béjar bases this opinion on, among other things, his review of Meta's data about usage, the frequency of notifications a child receives, and the amount of time a child spends on the platform. (JCCP Dep. at 86:23- 87:4, 90:5-9.) Mr. Béjar utilized that data when building safety interventions for the company. (*Id.* at 85:11–86:4.) He has experience researching and testing interventions to limit excessive and problematic use and, therefore, he has a clear understanding of how those interventions—which Meta has refused to employ—could reduce excessive use. (*Id.* at 85:17-18, 87:2-4, 149:11–22.)

(Pls' Opp. Bejar Mot., at p. 11.) Defendants here have not sought to exclude testimony by Bejar that Meta's platforms were designed to and in fact do encourage "excessive use." Bejar is qualified to provide expert testimony on this question to the extent his testimony were to move beyond

32

fact testimony regarding his experiences at Meta to his opinions regarding causation of excessive use by specific design features. Bejar has substantial experience with social media platform design and with social media platforms' efforts (or lack thereof) to make social media use safer.

Defendants are correct, however, that Bejar cannot offer testimony to show that social media use leads to certain mental health conditions. Plaintiffs do not claim that his testimony will be used in this way. But if Bejar were to attempt to do so at trial, Defendants would be justified in stating proper objections. There are certain opinions offered in Plaintiffs' disclosure letter that cannot be provided by Bejar at trial as expert testimony. Bejar cannot testify *as an expert* as to "harms associated with Meta's platforms, including addiction/problematic use, anxiety, depression, eating disorders, body dysmorphia, suicidality, self-harm, and sexualization." (Defs' Ex. A, at p. 3.) However, Bejar can testify as to his observations at Meta regarding "problematic use" and to conclusions reached about features associated with such use. He also can testify as to observations at Meta regarding Meta's discussions of addiction or potential addiction. The latter are percipient, not expert testimony.

As for their second main argument, Defendants contend that Bejar's "testing" is unreliable because it is "plainly incapable of measuring causation, let alone supporting a reliable causal conclusion." (Defs' Bejar Mot., at p. 13, internal footnotes omitted.) Defendants claim that "Mr. Béjar did not purport to measure any mental health outcomes from his testing— just his observations of what he saw." (Defs' Bejar Mot., at p. 14.) Defendants' second argument is well taken, assuming Bejar attempted to testify as to his opinion that social media use causes mental health harms. As explained above, Bejar is not qualified to offer such opinions.

Bejar's testing, which he conducted after he left Meta in 2021, was purportedly meant "to test whether Meta's safety features worked as advertised." (Pls' Opp. Bejar Mot., at p. 4.) Bejar has concluded that Meta's safety features were ineffective, an opinion which, as Plaintiffs note, is not challenged as inadmissible in Defendants' Bejar Motion. Moreover, Bejar has testified, and Defendants have not challenged, that the testing of Meta's features was based on Bejar's "30-plus years of experience of testing safety features and security features" for internet companies (including Meta), and that the testing was of the type that Bejar would have performed when testing features when employed by an internet technology company. (Bejar MDL Dep., Defs' Ex. B, at 200:9-11; see also Bejar MDL Dep., Defs' Ex. B, at 1008:14-22.) Bejar explained:

33

> Testing scenarios are common practice of security and safety practitioners. I have been doing them since literally my first month at Yahoo. I have done them for Mark Zuckerberg.
>
> The exercise of looking at something and coming up with a way of testing it in the product and then capturing the result of that is something that I created a team at Yahoo to do.
>
> And I could go on, but this is kind of just really standard practice of security practitioners when it comes to testing products in ways that are responsive to the way that the product behaves.

(Bejar JCCP Dep., Defs' Ex. C, at 282:19—283:5.)  In essence, Bejar used his knowledge and expertise of social media platforms to test whether Instagram's safety features actually worked.  Bejar relies on this testing to conclude that Meta's statements regarding safety were "misleading." (See, e.g., Bejar MDL Dep., Defs' Ex. B, at 428:8-17.)  The fact that Bejar's testing is not supported by any academic practice or literature does not change the undisputed fact that Bejar applied industry practice testing to Instagram's design features.

Finally, the court does not accept Defendants' argument that Bejar's testimony should be excluded based on Section 230.  Bejar seeks to offer testimony about the design features employed by Meta, how those design features led to excessive use and safety concerns, and that Meta knew that the design features posed these concerns but failed to remedy them or provide adequate warnings.  Such testimony is proper under Section 230.  Moreover, as Plaintiffs point out, insofar as Plaintiffs are pursuing a claim of false and misleading statements about safety, content can be considered as evidence because the cause of action is not based on the content but on a promise as to safety of content.

**Defendants' Motion to Exclude Expert Testimony of Dr. Drew Cingel**

Court's Ruling:  The court denies the Cingel Motion.

Cingel is "an Associate Professor and Graduate Program Advisor in the Department of Communication at the University of California, Davis (UC Davis), where [he is] additionally a member of the Human Development Graduate Group." (Cingel Rept., Defs' Ex. A, at p. 4.)  Cingel has