# EXHIBIT 42

CONFIDENTIAL

Page 1

IN THE CHANCERY COURT OF DAVIDSON COUNTY, TENNESSEE
FOR THE TWENTIETH JUDICIAL DISTRICT AT NASHVILLE

----------------------------------------X

STATE OF TENNESSEE, EX REL.
JONATHAN SKRMETTI, ATTORNEY
GENERAL AND REPORTER,

                  Plaintiff,   Case No. 23-1364-IV

      v.

META PLATFORMS, INC. AND
INSTAGRAM, LLC,

                  Defendant.

----------------------------------------X

    -and-

IN THE CIRCUIT COURT OF POLK COUNTY, ARKANSAS

              CIVIL DIVISION

STATE OF ARKANSAS, ex rel.
TIM GRIFFIN, ATTORNEY GENERAL,

                  Plaintiff,

      v.

META PLATFORMS, INC.; FACEBOOK
HOLDINGS, LLC; FACEBOOK
OPERATIONS, LLC; META PAYMENTS
INC.; FACEBOOK TECHNOLOGIES,
LLC; INSTAGRAM, LLC, and
SICULUS, INC.,

                  Defendants.

----------------------------------------X

(Captions continued on Page 2)

          ** VIDEOTAPED DEPOSITION**

           DR. ANNEKE BUFFONE

          Friday, June 26, 2026

Reported by:

Angela M. Shaw-Crockett, CCR, CRR, RMR, CSR

Job 8280885

CONFIDENTIAL

Page 2

(Caption continued - From page 1)

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

IN RE:  SOCIAL MEDIA
ADOLESCENT ADDICTION/                    MDL No.
PERSONAL INJURY PRODUCTS                  4:22-md-3047-YGR
LIABILITY LITIGATION
-------------------------------------X
This Document Relates To:
STATE OF TENNESSEE, ex rel.         Case No. 23-1365-IV
JONATHAN SKRMETTI, ATTORNEY GENERAL
and REPORTER,
                      Plaintiff
        v.
META PLATFORMS, INC., and
INSTAGRAM, LLC,
                    Defendant
-------------------------------------X
     -and-
          UNITED STATES DISTRICT COURT
     FOR THE NORTHERN DISTRICT OF CALIFORNIA
                 OAKLAND DIVISION
IN RE:  SOCIAL MEDIA ADOLESCENT        MDL No. 3047
ADDICTION/ PERSONAL INJURY PRODUCTS
LIABILITY LITIGATION
-------------------------------------X
This Document Relates To:
STATE OF TENNESSEE ex rel.             Case No.
JONATHAN SKRMETTI, ATTORNEY      4:22-md-03047-YGR
GENERAL AND REPORTER,
          Plaintiff,
          v.
META PLATFORMS, INC., and
INSTAGRAM, LLC,
          Defendant.
Case No.  23-1364-IV
-------------------------------------X

CONFIDENTIAL

Page 16

But who did you talk to after you heard Mr. Mosseri's testimony in New Mexico?

What was the first thing that you did to get involved in this lawsuit?

A.   The first thing was to read up more about what was happening and try to get information, and then I reached out to somebody that I had previously reached out to that I thought might have more information.

Q.   Who is that?

A.   That's Arturo Béjar.

Q.   So before Meta terminates you, you reach out to Mr. Béjar?

A.   No.

Q.   Only after Meta terminates you?

A.   Yes.

Q.   And what do you say to Mr. Béjar?

A.   I don't remember exactly.

Q.   Okay.  When was that conversation?

A.   In February.

Q.   You don't remember the substance of what you talked about?

A.   I remember roughly that I expressed that I was upset about that particular testimony.

Q.   And what did he say?

CONFIDENTIAL

A.    That he understood.

Q.    Okay.  There's a pretty big gap between him saying "I understand" and us being in this firm in New York City.

A.    Yeah.

Q.    So what happens?

How does that get us here?

A.    So we had a phone call and he never suggested that I should get involved in anything or -- and at that point, I wasn't really interested in being involved.  And, actually, I had said for many years that I would never be involved in any sort of lawsuit or being a whistleblower.  It's just normally not something I would want to do, and at that point, I said I didn't want to.

So during that conversation, at the end of the conversation, I think he said that I should think about it more, and we could talk again.  And then a couple of days after that, or maybe a day after that -- I don't know exactly -- we were actually -- it was -- these days are a bit fuzzy, because my brother died that week actually -- actually, the week before.

So we were going to Cabo but had to cut the trip short, because we were dealing with going

CONFIDENTIAL

Page 18

back to Germany for the funeral.  So I think the next day, he -- we talked again.  I reached out again.  And then he said that if I wanted to, I could talk to his attorney that he was working with, which was Michael Ward of Baker Botts.  So then I talked to him.

At that point, I still wasn't anywhere near wanting to be a part of the trial.  And I kept thinking about it, and then, eventually, I had one more conversation with Mike Ward, and then I talked to the -- I had a call with the Tennessee attorneys -- some of them.  And then, after that call, I still didn't think I was going to be involved.

And then I kept thinking, and then eventually, I decided that I wanted to -- it seemed important to help make sure that some of the facts were -- that I observed would be a part of the trial.  And so I decided to be a fact witness in this case.

Q.    For the State of Tennessee?

A.    I don't think for anybody; I think to make sure that the right facts are represented.

Q.    Couple of questions going back over your last answer.

CONFIDENTIAL

Page 19

Did you call Mr. Béjar or did Mr. Béjar call you?

A.    I called him.

Q.    How did you have his phone number?

A.    I messaged him.

Q.    You messaged him?

A.    Yes.

Q.    Like a text message?

A.    Like a Signal message.

Q.    Signal message?

A.    Yes.

Q.    On your phone?

A.    Yes.

Q.    Do those messages still exist?

A.    No.

Q.    What happened to those messages?

A.    They don't -- like, there aren't -- there's not a record of them.  I mean, they're -- that's just how the system is set up.

Q.    But, like, they existed when you sent them to Mr. Béjar, but now they're destroyed?

A.    It's an encrypted chat.

Q.    I understand that.

Is that encrypted chat still on your phone?

CONFIDENTIAL

Page 20

A.   No.

Q.   Why not?

A.   Because it's encrypted, and it's set to "disappearing."

Q.   Set to "disappearing"?

A.   Yes.

Q.   So these are femoral messages; you message Mr. Béjar, and then the messages disappear, and they don't exist anymore?

A.   That's correct.

Q.   How did you get his phone number?

A.   We had briefly talked once before -- I don't exactly remember when.  Like, in maybe January at some point or mid-December -- about a research study that he had conducted.

Q.   Okay.  So we gotta go back then.

So at some point -- is this after you're terminated?

A.   Sorry.  What?

Q.   Is this after you're terminated?

A.   Yes.

Q.   So you're terminated in early December 2025?

A.   Uh-huh.

Q.   When is the first time that you and

CONFIDENTIAL

Page 21

Mr. Béjar speak after that?

A.   I don't remember exactly the day or the time.

Q.   But at some point in, you said, December or January, the two of you speak about a research study that Mr. Béjar is doing?

A.   No.  He had already done it.

Q.   He had already done it?

A.   It was published.

Q.   It was published.

Who reaches out to whom?  Do you contact Mr. Béjar or does Mr. Béjar contact you?

A.   No.  I contacted him because the research was always interesting to me.

Q.   Okay.  I'm not trying to have a trick question.

How did you get his contact information?

A.   I think LinkedIn.

Q.   LinkedIn.  You messaged him on LinkedIn?

A.   Uh-huh.

Q.   Does that message still exist?

A.   I don't think so.

Q.   Why?

A.   Actually, maybe.  I don't know.  It's possible.

CONFIDENTIAL

Page 22

Q.   So the timeline matters a lot here, and I just want to make sure it's clear.

A.   Uh-huh.

Q.   You were terminated in early December --

A.   Huh-uh.

Q.   -- 2025, yes?

A.   Uh-huh.

Q.   At some point, you and Mr. Béjar have a discussion in December 2025 or January 2026 after you were terminated, correct?

A.   Yes.

Q.   And that conversation starts because you reached out to Mr. Béjar on LinkedIn?

A.   Yes.

Q.   Via message?

A.   Uh-huh, yes.

Q.   Okay.  And then, you're listening to Mr. Mosseri's testimony, and that, you're very sure, is in February of 2026?

A.   Yes.

Q.   You're sure?

A.   Yes.

Q.   Okay.  And then you call Mr. Béjar or message him after hearing that testimony?

A.   I think I messaged first.

Page 23

Q.   How did you get his phone number?

A.   I think that was -- I think there was an email maybe that we -- yeah.  I think we exchanged an email regarding setting up a call to talk about the research.

Q.   Okay.  So you and Mr. Béjar had an email exchange?

A.   Uh-huh, yes.

Q.   In that email exchange, you obtained his phone number?

A.   I don't remember.  It might have been during the call; it might have been in the email.  I don't remember.

Q.   Do those emails still exist?

A.   I don't think so.

Q.   Why not?

A.   Because I routinely delete emails, so...

Q.   You permanently deleted them; you didn't just put them in the trash folder?

They're gone forever?

A.   Yes.  Yeah.

Q.   So the conversations you had with Mr. Béjar that got you involved in this lawsuit were over email, but those don't exist anymore?

A.   Uh-huh.  There were -- I think there was

CONFIDENTIAL

Page 24

maybe only, like, one exchange or two to set up that meeting.

Q. And those emails don't exist anymore?

A. No.

Q. And then you also had a Signal messaging chat with Mr. Béjar, but those emails don't exist anymore?

A. No.

Q. They don't exist?

A. No.

Q. Mr. Béjar puts you in contact with his attorney, Mr. Ward, correct?

A. Yes.

Q. When is that?

A. In that week in February. I don't know the exact date.

Q. Is Mr. Ward your lawyer?

A. Not anymore.

Q. He was your lawyer at the time?

A. No.

Q. Was he ever your lawyer?

A. Yes. For a brief period.

Q. Okay. And then at some point after that, you speak to the attorneys from the private law firm that's representing the State of Tennessee?

CONFIDENTIAL

Page 409

CERTIFICATE

STATE OF NEW JERSEY)

:    ss

I, Angela M. Shaw-Crockett, a Certified Court Reporter, Registered Merit Reporter and Notary Public within and for the States of New York, New Jersey and Connecticut, do hereby certify that prior to the commencement of the examination, DR. ANNEKE BUFFONE, was duly sworn by me to testify to the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a verbatim transcript of the testimony as taken stenographically by me at the time, place and on the date hereinbefore set forth, to the best of my ability.  Witness will read and sign.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney of counsel, and that I am not financially interested in the action.

-------------------------------------------
ANGELA M. SHAW-CROCKETT, CCR, CRR, RMR
LICENSE NO. XI00218400