[*Submitting Counsel on Signature Page*]

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>4:23-cv-05448 | MDL No. 3047<br><br>Case No. 4:22-md-03047-YGR<br><br>**THE STATES' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br><br>Magistrate Judge: Hon. Peter H. Kang |

## TABLE OF CONTENTS


I. Introduction ..... 1

II. COPPA Claims ..... 3

A. Facebook and Instagram Are "Directed to Children" ..... 4

B. The COPPA Rule's "Mixed-Audience" Exception Does Not Apply ..... 6

C. Meta Has Actual Knowledge that Children Under 13 Use Its Platforms ..... 7

1. Users Who Self-Reported an Under-13 Date of Birth ..... 7
2. Accounts Identified Through Human Review and Parent Reports ..... 8
3. Disabled and Deleted Accounts ..... 8
4. Hard-Linked and Soft-Matched Accounts ..... 8

III. Unfairness and Unlawful Claims ..... 11

A. Controlling Law ..... 11

1. California Unfair Competition Law ..... 11
2. Colorado Consumer Protection Act ..... 12
3. Kentucky Consumer Protection Act ..... 12
4. New Jersey Consumer Fraud Act ..... 13

B. Factual Findings and Legal Conclusions ..... 13

1. Threshold Issues ..... 13
2. Meta's Unfair and Unlawful Conduct ..... 14

IV. Deception Claims ..... 20

A. Controlling Law ..... 20

1. California False Advertising Law and Unfair Competition Law ..... 20
2. Colorado Consumer Protection Act ..... 21
3. Kentucky Consumer Protection Act ..... 22
4. New Jersey Consumer Fraud Act ..... 23

B. Factual Findings and Legal Conclusions ..... 24

1. Threshold Matters ..... 24
2. Topics of Meta's Deception ..... 25

V. Meta's Affirmative Defenses to The States' Unfairness and Deception Claims ..... 41

A. Section 230 ..... 41

B. The First Amendment ..... 42

1. Unfairness ..... 42
2. Deception ..... 44

C. Noerr-Pennington ..... 46

VI. Remedies ..... 48

A. Civil Penalties for Unfairness and Deception Claims ..... 48

1. Law ... 49
2. Findings ... 53
B. Disgorgement for Unfairness and Deception Claims and COPPA Claims ... 60
1. Law ... 60
2. Findings ... 62
C. Injunctive Relief ... 66
VII. Conclusion ... 69

# TABLE OF AUTHORITIES

**Cases**

*Am. Nat'l Univ. of Kentucky, Inc. v. Commonwealth ex rel. Beshear*,
2019 WL 2479608 (Ky. Ct. App. June 14, 2019) ........ 49, 50, 51

*Ariix, LLC v. NutriSearch Corp.*,
985 F.3d 1107 (9th Cir. 2021) ........ 45

*B&G Foods N. Am., Inc. v. Embry*,
29 F.4th 527 (9th Cir. 2022) ........ 46

*Barnes v. Yahoo!, Inc.*,
570 F.3d 1096 (9th Cir. 2009) ........ 41

*Bias v. Wells Fargo & Co.*,
942 F. Supp. 2d 915 (N.D. Cal. 2013) ........ 11

*Bolger v. Youngs Drug Prods. Corp.*,
463 U.S. 60 (1983) ........ 45

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*,
447 U.S. 557 (1980) ........ 44

*Church of the Holy Light of the Queen v. Holder*,
443 Fed. App'x 302 (9th Cir. 2011) ........ 66

*Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240 (9th Cir. 1982) ........ 47

*Com. ex rel Stephens v. North American Van Lines, Inc.*,
600 S.W.2d 459 (Ky. App. 1979) ........ 12

*Com. ex rel. Chandler v. Anthem Ins. Companies, Inc.*,
8 S.W.3d 48 (Ky. App. 1999) ........ 12

*Commonwealth ex rel. Chandler v. Anthem Ins. Companies, Inc.*,
8 S.W.3d 48 (Ky. Ct. App. 1999) ........ 50

*Corder v. Ford Motor Co.*,
869 F. Supp. 2d 835 (W.D. Ky. 2012) ........ 23

*Coxon v. S.E.C.*,
137 Fed. App'x 975 (9th Cir. 2005) ........ 61

*Craig & Bishop, Inc. v. Piles*,
247 S.W.3d 897 (Ky. 2008) ........ 22

*Dare To Be Great, Inc. v. Com ex rel. Hancock*,
511 S.W.2d 224 (Ky. 1974) ........ 22

*Day v. AT&T Corp.*,
63 Cal. App. 4th 325 (Cal. Ct. App. 1998) ........ 21

*Doe v. Grindr, Inc.*,
128 F.4th 1148 (9th Cir. 2025) ........ 41

*Doe v. Internet Brands, Inc.*,
824 F.3d 846 (9th Cir. 2016) ........ 41

*Dyroff v. Ultimate Software Grp., Inc.*,
934 F.3d 1093 (9th Cir. 2019) ........ 41

*Eastern R.R. Pres. Conference v. Noerr Motor Freight, Inc.*,
365 U.S. 127 (1961) ........ 46, 47

*eBay Inc. v. MercExchange, L.L.C.*,
547 U.S. 388 (2006) ........ 66

*Est. of Bride by & through Bride v. YOLO Tech., Inc.*,
112 F.4th 1168 (9th Cir. 2024) ........ 41

*F.T.C v. Bronson Partners, LLC*,
654 F.3d 359 (2d Cir. 2011) ........ 64, 66

*F.T.C v. Sperry & Hutchinson Co.*,
405 U.S. 233 (1972) ........ 12

*Fed. Trade Comm'n v. Green Equitable Sols.*,
2024 WL 1481431 (C.D. Cal. Feb. 2, 2024) ........ 60

*Fenwick v. Kay American Jeep. Inc.*,
371 A.2d 13 (1977) ........ 23

*Gearhart v. Thorne*,
768 F.2d 1072 (9th Cir. 1985) ........ 42

*Glob.-Tech Appliances, Inc. v. SEB S.A.*,
563 U.S. 754 (2011) ........ 7

*Hadley v. Kellogg Sales Co.*,
273 F. Supp. 3d 1052 (N.D. Cal. 2017) ........ 21

*Hewlett v. Squaw Valley Ski Corp.*,
54 Cal. App. 4th 499 (Cal. Ct. App. 1997) ........ 11

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston, Inc.*,
515 U.S. 557 (1995) ........ 42

*In re Apple Inc. Sec. Litig.*,
2020 WL 2857397 (N.D. Cal. June 2, 2020) ........ 46, 48

*In re R. M. J.*,
455 U.S. 191 (1982) ........ 44, 45

*In re Toyota Motor Corp. Unintended Acc. Mktg., Sales Pracs., & Prod. Liab. Litig.*,
754 F. Supp. 2d 1145 (C.D. Cal. 2010) ........ 24

*In re ZF-TRW Airbag Control Units Prods. Liab. Litig.*,
601 F. Supp. 3d 625 (C.D. Cal. 2022) ........ 48

*Intel Corp. Inv. Pol'y Comm. v. Sulyma*,
589 U.S. 178 (2020) ........ 7

*Kansas v. Nebraska*,
574 U.S. 445 (2015) ........ 61

*Kasky v. Nike, Inc.*,
27 Cal.4th 939 (2002) ........ 44, 45

*Kimmelman v. Henkels & McCoy, Inc.*,
527 A.2d 1368 (N.J. 1987) ........ 50, 52

*Kimzey v. Yelp! Inc.*,
836 F.3d 1263 (9th Cir. 2016) ........ 41

*Kugler v. Romain*,
279 A.2d 640 (1971) ........ 13, 49

*Lamb-Weston, Inc. v. McCain Foods, Ltd.*,
941 F.2d 970 (9th Cir.1991) ........ 66

*Leon v. Rite Aid Corp.*,
774 A.2d 674 (App. Div. 2001) ........ 23

*Litton Sys., Inc. v. Am. Tel. & Tel. Co.*,
700 F.2d 785 (2d. Cir. 1983) ........ 47

*Long v. Dell, Inc.*,
93 A.3d 988 (R.I. 2014) ........ 12

*Mango v. Pierce-Coombs*,
851 A.2d 62 (App. Div. 2004) ........ 13

*May Dept. Stores Co. v. State ex rel. Woodard*,
863 P.2d 967 (Colo. 1993) ........ 49, 51

*Meshinksy v. Nichols Yacht Sales, Inc.*,
541 A.2d 1063 (N.J. 1988) ........ 49, 50

*Miami Herald Pub. Co. v. Tornillo*,
418 U.S. 241 (1974) ........ 42

*Miller v. American Family Publishers*,
663 A.2d 643 (Super. Ct. 1995) ........ 23

*Moody v. NetChoice, LLC*,
603 U.S. 707 (2024) ........ 42, 43

*Motors, Inc. v. Times Mirror Co.*,
102 Cal. App. 3d 735 (Cal. Ct. App. 1980) ........ 11

*Naiser v. Unilever U.S., Inc.*,
975 F. Supp. 2d 727 (W.D. Ky. 2013) ..... 23

*NetChoice, LLC v. Bonta*,
170 F.4th 744 (9th Cir. 2026) ..... 42

*People ex rel. Harris v. Sarpas*,
225 Cal. App. 4th 1539 (Cal. Ct. App. 2014) ..... 49

*People ex rel. Kennedy v. Beaumont Investment, Ltd.*,
111 Cal. App. 4th 102 (Cal. Ct. App. 2003) ..... 51

*People ex rel. Mosk v. Nat'l Research Co. of Cal.*,
201 Cal. App. 2d 765 (Cal. Ct. App. 1962) ..... 11

*People v. Ashford Univ., LLC*,
100 Cal. App. 5th 485 (Cal. Ct. App. 2024) ..... 21

*People v. Bestline Products, Inc.*,
61 Cal. App. 3d 879 (Cal. Ct. App. 1976) ..... 48

*People v. Custom Craft Carpets, Inc.*,
159 Cal.App.3d 676 (Cal. Ct. App. 1984) ..... 48

*People v. Dollar Rent-a-Car Systems, Inc.*,
211 Cal. App. 3d 119 (Cal. Ct. App. 1989) ..... 50

*People v. Johnson & Johnson*,
77 Cal. App. 5th 295 (Cal. Ct. App. 2022) ..... 20

*People v. Nat'l Ass'n of Realtors*,
155 Cal. App. 3d 578 (1984) ..... 50

*People v. Shifrin*,
342 P.3d 506 (Colo. App. 2014) ..... 52

*People v. Wunder*,
371 P.3d 785 (Colo. App. 2016) ..... 49, 52

*Platkin v. Kizito, et al.*,
337 A.3d 354 (N.J. Super. App. Div. 2025) ..... 51

*Porter v. Warner Holding Co.*,
328 U.S. 395 (1946) ..... 60

*Prata v. Super. Ct.*,
91 Cal. App. 4th 1128 (Cal. Ct. App. 2001) ..... 49

*Prata v. Superior Court*,
91 Cal. App. 4th 1128 (Cal. Ct. App. 2001) ..... 21

*Progressive West Ins. Co. v. Superior Court*,
135 Cal. App. 4th 263 (Cal. Ct. App. 2005) ..... 11

*Providence Rubber Co. v. Goodyear*,
76 U.S. 788 (1869) ... 61

*PruneYard Shopping Ctr. v. Robins*,
447 U.S. 74 (1980) ... 43

*Recycle for Change v. City of Oakland*,
856 F.3d 666 (9th Cir. 2017) ... 42

*Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc.*,
62 P.3d 142 (Colo. 2003) ... 22

*Robinson v. Toyota Motor Credit Corp.*,
775 N.E.2d 951 (Ill. 2002) ... 12

*Rumsfeld v. Forum for Academic Institutional Rights, Inc.*,
547 U.S. 47 (2006) ... 43

*S.E.C. v. First City Fin. Corp.*,
890 F.2d 1215 (D.C. Cir. 1989) ... 60, 61

*S.E.C. v. Hughes Cap. Corp.*,
917 F. Supp. 1080 (D.N.J. 1996) ... 61

*S.E.C. v. Platforms Wireless Int'l Corp.*,
617 F.3d 1072 (9th Cir. 2010) ... 60, 61

*S.E.C. v. Teo*,
746 F.3d 90 (3d Cir. 2014) ... 61

*Sec. & Exch. Comm'n v. Choice Advisors, LLC*,
2024 WL 4469095 (S.D. Cal. Oct. 7, 2024) ... 60

*Shekarchian v. Maxx Auto Recovery, Inc.*,
487 P.3d 1026 (Colo. App. 2019) ... 22

*Snardon v. Snardon*,
2009 WL 2059094 (Ky. App. July 17, 2009) ... 12

*SOSA v. DIRECTV, Inc.*,
437 F.3d 923 (9th Cir. 2006) ... 46

*Staples v. U.S.*,
511 U.S. 600 (1994) ... 7

*State ex rel. Shikada v. Bristol-Myers Squibb Co.*,
526 P.3d 395 (Haw. 2023) ... 12

*State Farm Fire & Cas. Co. v. Super. Ct.*,
45 Cal. App. 4th 1093 (Cal. Ct. App. 1996) ... 11

*Stevens v. Motorists Mut. Ins. Co.*, 759 S.W. 2d 819 (Ky. 1988) ... 12, 50

*Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*,
17 Cal. 4th 553 (Cal. Ct. App. 1998) ... 51

*Stormans, Inc. v. Selecky*,
586 F.3d 1109 (9th Cir. 2009) ........ 66

*Telcom Directories, Inc. v. Com. ex. rel. Cowan*,
833 S.W. 2d 848 (Ky. App. 1991) ........ 23

*Thiedemann v. Mercedes-Benz USA, LLC*,
872 A.2d 783 (2005) ........ 13

*U.S. ex rel. Schutte v. SuperValu Inc.*,
598 U.S. 739 (2023) ........ 7

*Wilhoit v. Wilhoit*,
506 S.W.2d 511 (Ky. 1974) ........ 12

*Williams v. Gerber Prods. Co.*,
552 F.3d 934 (9th Cir. 2008) ........ 21, 24

**Statutes**

15 U.S.C. § 6501 ........ 1, 4

15 U.S.C. § 6502 ........ 3, 7

15 U.S.C. § 6504 ........ 60

47 U.S.C. § 230 ........ 41

Cal. Bus. & Prof. Code § 17200 ........ 11, 14, 21

Cal. Bus. & Prof. Code § 17205 ........ 51

Cal. Bus. & Prof. Code § 17206(b) ........ 51

Cal. Bus. & Prof. Code § 17500 ........ 20

Cal. Bus. & Prof. Code § 17534.5 ........ 51

Cal. Bus. & Prof. Code § 17536 ........ 51

Cal. Govt. Code § 12527.6 ........ 60, 63

Colo. Rev. Stat. § 6-1-105 ........ 12, 22

Colo. Rev. Stat. § 6-1-112 ........ 48, 50, 52, 57

Ky. Rev Stat. Ann. § 367.990 ........ 48

Ky. Rev. Stat. § 367.170 ........ 22

Ky. Rev. Stat. Ann. § 367.170 ........ 12, 48

Ky. Rev. Stat. Ann. § 367.990 ........ 49, 50, 51, 52

Ky. Rev. Stat. Ann. § 446.080 ........ 12

N.J. Stat. Ann. § 56:8-13 .......... 48, 52

N.J. Stat. Ann. § 56:8-2 .......... 13, 23

N.J. Stat. Ann. § 56:8-4 .......... 13, 14

**Other Authorities**

2019 Colo. Sess. Laws 353 .......... 57

64 Fed. Reg. 59888 (Nov. 3, 1999) .......... 7

Complying with COPPA: Frequently Asked Questions, Federal Trade Commission, https://www.ftc.gov/business-guidance/resources/complying-coppa-frequently-asked-questions .......... 7

**Rules**

16 C.F.R. § 312.10 .......... 55

16 C.F.R. § 312.1 *et seq.* .......... 3

16 C.F.R. § 312.2 .......... 4, 6, 7

16 C.F.R. § 312.3 .......... 56, 57

89 Fed. Reg. 2034 (2024) .......... 7

Kentucky Rule of Appellate Procedure 41 .......... 49

## I. Introduction

This civil law-enforcement action is brought on behalf of 29 States[1] by their respective Attorneys General against Meta Platforms, Inc.[2] The States seek to hold Meta liable for (1) collecting and using personal information from children under 13 years old without complying with federal notice-and-consent requirements; (2) designing and deploying platform features and business strategies that Meta knew posed risks to young users; and (3) misleading and concealing from the public the nature of its platforms and the risks they posed to young users.

All 29 States assert violations of the federal Children's Online Privacy and Protection Act ("COPPA"), 15 U.S.C. § 6501 *et seq*. Eighteen of these States also assert state consumer protection claims.[3] These States allege, *first*, that Meta engaged in unfair business acts and practices by implementing business strategies that created risks of harm to the health and well-being of young users ("unfairness claims"); and, *second*, that Meta deceived the public about the real risks and harms of its platforms ("deception claims").

From August 12, 2026 to September, __, 2026, the Court held a trial on the COPPA claims of all 29 States, as well as the consumer protection claims of California, Colorado, Kentucky, and New Jersey.[4]

[1] The 29 plaintiff States in this litigation refer to the State of Arizona, the People of the State of California, the State of Colorado, the State of Connecticut, the State of Delaware, the State of Hawai'i, the State of Idaho, the People of the State of Illinois, the State of Indiana, the State of Kansas, the Commonwealth of Kentucky, the State of Louisiana, the State of Maine, the Office of the Attorney General of Maryland, the State of Minnesota, the State of Nebraska, the State of New Jersey and New Jersey Division of Consumer Affairs, the People of the State of New York, the State of North Carolina, the State of Ohio, the State of Oregon, the Commonwealth of Pennsylvania, the State of Rhode Island, the State of South Carolina, the State of South Dakota, the Commonwealth of Virginia, the State of Washington, the State of West Virginia, and the State of Wisconsin.

[2] Earlier in this litigation (January 14, 2026), Defendants Instagram, LLC; Meta Payments, Inc.; and Meta Platforms Technologies, LLC were dismissed by stipulation. Stipulated Order of Dismissal of Certain Meta Defendants, ECF 239 (2640).

[3] California, Colorado, Connecticut, Delaware, Illinois, Indiana, Kansas, Kentucky, Louisiana, Minnesota, Nebraska, New Jersey, New York, North Carolina, Pennsylvania, South Carolina, Virginia, and Wisconsin bring consumer protection claims and COPPA claims. Arizona, Hawai'i, Idaho, Maine, the Office of the Maryland Attorney General, Ohio, Oregon, Rhode Island, South Dakota, Washington, and West Virginia bring only COPPA claims. Six states have been dismissed from this litigation.

[4] The remaining consumer protection claims will be addressed by the Court in a subsequent proceeding.

The Court empaneled an advisory jury to consider liability on certain disputed elements of COPPA, on liability for the consumer protections claims, and on civil penalties. The Court separately heard evidence and argument regarding additional civil penalty theories, disgorgement, and injunctive relief. After considering the evidence adduced by the States and the verdict of the advisory jury finding Meta liable on all counts, the Court (1) finds Meta liable for violating COPPA with respect to each plaintiff State; (2) finds Meta liable for violating the consumer protection laws of California, Colorado, Kentucky, and New Jersey; (3) imposes civil penalties as provided below; (4) orders disgorgement as provided below; and (5) awards injunctive relief as provided below.

## I. Background Facts

Meta owns Facebook and Instagram, social media platforms that connect users through a website or app. The platforms provide users with various tools, including the ability to post and share content, interact with other users' posts, and engage in commerce. Meta delivers content on a user's Main Feed, which is the scrolling presentation of content immediately visible upon opening Facebook or Instagram, as well as through the "Explore Feed," another scrolling presentation of content.[5]

Although users are not charged a monetary fee to use Meta's platforms, Meta profits off its users by collecting their data and time. Meta makes nearly all its revenue selling advertisements, and can sell more ads and generate more revenue when users spend more time and interact more with its Social Media Platforms. Meta is financially motivated to attract and retain young users on its Social Media Platforms. Meta targets young users and expects to make money off the lifetime value of the users with the expectation and understanding that younger joiners will stay on the platforms over the long term, and Meta can profit off of them for years to come.[6] Meta generates most of its revenue from advertisers, who are able to use targeted advertising based on the personal data Meta collects for each user. When Meta succeeds in maintaining a user's interest through its recommendation algorithms and other features—thus

[5] Testimony of Arturo Bejar, Adam Mosseri, Mark Zuckerberg, Dr. Arvind Narayanan.

[6] Testimony of Bejar, Mosseri, Zuckerberg, Narayanan.

keeping the user on a Platform for a longer time—Meta can collect more data on the user and can serve the user more advertisements.[7]

## II. COPPA Claims

COPPA protects the privacy of children who use online platforms. It provides:

> It is unlawful for an *operator of a website or online service directed to children*, or any operator that *has actual knowledge* that it is *collecting personal information from a child*, to collect personal information from a child in a manner that violates the regulations prescribed under subsection (b).

15 U.S.C. § 6502(a)(1) (emphasis added). COPPA applies to operators of websites or portions thereof that are "directed to children," or whenever an operator has "actual knowledge" that it has collected a child's personal information. *Id*. The Federal Trade Commission ("FTC") has promulgated regulations implementing COPPA ("COPPA Rule"), clarifying the specific protections that children must be afforded when an operator collects, uses, maintains, or discloses personal information from a child, defined as someone under the age of 13. 16 C.F.R. §§ 312.1-312.13.

Several elements of COPPA liability were not in dispute. The parties stipulated that Meta is the "operator of a website or online service." Stipulation with Proposed Order of Dismissal of Instagram, LLC, ECF 360 (3108); Order Denying Defendants' Motion for Summary Judgment and Denying in Part AG Plaintiffs' Cross-Motion for Partial Summary Judgment, ECF 440 (3214) at 27. In addition, the Court previously held as a matter of law that Meta "collect[s] personal information" from all users, including children on the platform. This information includes email addresses, telephone numbers, usernames, images of a person's face, the sound of a person's voice, cookie identifiers, device identifiers, IP addresses, profile information, user-created content, and information reflecting a user's interactions, interests, likes, viewing history, and communications. ECF 440 (3214) at 5, 28-29. The Court also held as a matter of law that Meta has met none of COPPA's legal requirements, should Meta found to be subject to COPPA. *Id.* at 5, 36-37 ("[Meta's] lack of compliance is obvious."). Finally, at summary judgment, the Court rejected Meta's defenses based on standing, laches, and a four-year limitations period, and held that COPPA

[7] Testimony of Brian Boland, Mosseri, Zuckerberg, Susan Li.

authorizes the States to seek equitable relief, including disgorgement. *Id.* at 23-26. Nothing presented at trial alters the rejection of these defenses.

Thus, the issues presented at trial were limited to whether Facebook and Instagram, or portions thereof, were "directed to children," and whether Meta had "actual knowledge" that it collected the personal information of children. The advisory jury found, and the Court agrees that the evidence supports, that Meta is subject to COPPA on both of these grounds.

**A. Facebook and Instagram Are "Directed to Children"**

Whether an online service is directed to children turns on the totality of the circumstances, including "subject matter, visual content, use of animated characters or child-oriented activities and incentives, music or other audio content, age of models, presence of child celebrities or celebrities who appeal to children," advertising that promotes or appears on the service, "competent . . . empirical evidence regarding audience composition," and evidence concerning the intended audience. 16 C.F.R. § 312.2. A finding that an online service is "directed to children" does not require that the service predominantly or exclusively appeal to children, or that children constitute its primary audience. *See id.* The statutory and regulatory framework expressly recognizes that portions of online services can also be directed to children, independently of the service as a whole. *See id.*; 15 U.S.C. § 6501(10)(A)(ii).

The evidence established that Meta intended to attract and retain "tweens," children aged 10 to 12 years old, to its platforms. Meta sought to increase the number of young users and internally celebrated progress with tweens by stating that "tweens are the future" and Meta should "double down" on outreach to them. Ex. 0659 at -464. This is because Meta believes that "[t]he Young Ones are the Best Ones" as young users, and to a greater extent, "tweens," have the highest retention rates and largest lifetime value on Meta's platforms.[8] Ex. 3862. Meta recognized that tweens had the same interests as young teenagers, and that its platform would necessarily appeal to tweens where it targeted teens more broadly. Ex. 1237 at 8, 27. Meta researched the "Social Aspirations of 8-15 Year Olds" and concluded that children under 13 aspired to act like teenagers and would be attracted to teen-focused content and features. Ex. 1482. Meta CEO Mark Zuckerberg recognized that "11 and 12 [year olds] aren't so different from 13 or 14 [year

[8] Testimony of Robert Chen.

olds]" in their interests. Ex. 1378 at -713.[9] Meta used these insights to shape products and attract content that appealed to both tweens and young teens.

Meta designed and refined various platform features to appeal to children, including video, ephemeral content, and short-form content, which the company determined resulted in significantly higher usage and engagement among tweens and young teens compared to other demographics. Ex. 1678; Ex. 2051. Meta uses Likes, feedback, groups, school-network sharing, and related social incentives—which its own research identified as particularly salient to young users seeking identity formation, approval, acceptance, and belonging—to boost the appeal of its platforms. Ex. 1678; Ex. 2051; Ex. 1853. Meta incorporated playful and creative tools, animated effects, appearance-altering filters, and stickers into its Platforms, which its research identified as meeting children's heightened interest in creativity, identity exploration, and self-expression. Ex. 1678; Ex. 2051; Ex. 2072; Ex. 4014; Ex. 4012. Meta sought and obtained partnerships with teen and tween celebrities to appeal to young users by creating content for its platforms. Ex. 0084; Ex. 0362. Meta stated internally that "[t]eens need to see other teens and tweens on the platform so that they feel the app is for them." Ex. 2873. Even without partnerships, Meta attracted child influencers and brands popular among children to its Platforms, who created content directed to children. Ex. 2176. Meta also attracted advertisers whose brands and content appealed to children, including Nickelodeon, who placed advertisements directed to children on Meta's Platforms. Ex. 0259; Ex. 0260; Ex. 0098; Ex. 0102. Because Meta uses algorithms to provide personalized feeds for each user based on their interests, users on the Platforms with child-like interests received feeds that were directed to children.[10]

While Meta's written terms of service may have nominally prohibited children under 13 from creating Facebook or Instagram accounts, those terms did not prevent children under 13 from using the Platforms and did not relieve Meta of its obligations to comply with COPPA. Despite the company's nominal ban, Meta succeeded in making Facebook and Instagram highly appealing to children: a number of internal Meta studies determined that a significant portion of all children in the United States, including 30% or more of all tweens, were Facebook and Instagram users. Ex. 1911; Ex. 2072; Ex. 0193 at -001.

[9] Testimony of Dr. Adam Alter.

[10] Testimony of Alter.

Instagram CEO Adam Mosseri recognized Instagram's appeal to tweens, noting that they lie about their age to get it. Ex. 1750 at -555. Meta considered Instagram a teen-centric brand, and in order to maintain its teen focus, Instagram needed to maintain teens' use of its app.[11]

Considering the totality of the circumstances, the Court finds that Facebook and Instagram were directed to children during the relevant period.

### B. The COPPA Rule's "Mixed-Audience" Exception Does Not Apply

Meta asserts that the COPPA Rule affords it a narrow exception from compliance with COPPA. The Rule excludes online services that may be directed to children but that do not target children as their primary audience (the "mixed-audience exception"). 16 C.F.R. § 312.2. Services may qualify for the mixed-audience exception if they meet the above requirements, but *only if* they do not:

> Collect personal information from any visitor, other than for [limited purposes not applicable here], prior to collecting age information or using another means that is reasonably calculated, in light of available technology, to determine whether the visitor is a child. Any collection of age information, or other means of determining whether a visitor is a child, must be done in a neutral manner that does not default to a set age or encourage visitors to falsify age information.

16 C.F.R. § 312.2.[12] Meta does not satisfy the criteria for this exception. As the Court has already determined, Meta collects wide swaths of personal information from visitors who have not logged into an account, for whom Meta does not have age information. ECF 440 (3214) at 5. Meta also failed to collect any age information at sign up from Instagram users prior to December 2019.[13] That alone bars Meta from mixed-audience treatment. *See* 16 C.F.R. § 312.2 (defining a mixed-audience service as one that "does not collect personal information from any visitor . . . prior to collecting age information"). For users where

---

[11] Testimony of Wendy Gross.

[12] In the version of the COPPA Rule in effect when the States filed their Complaint, the mixed-audience exception applied to an online service that "(i) Does not collect personal information from any visitor prior to collecting age information; and (ii) Prevents the collection, use, or disclosure of personal information from visitors who identify themselves as under age 13 without first complying with the notice and parental consent provisions of [COPPA]." 16 C.F.R. § 312.2 (2013). The Court's analysis is the same under either version of the regulation.

[13] Testimony of Allison Hartnett.

Meta has collected age information, Meta has failed to do so in a "neutral manner," such as by defaulting to age 18 or 25 for new Facebook users.[14] This too bars Meta from any "mixed audience" treatment. *See* 16 C.F.R. § 312.2 (requiring that mixed-audience services collection of "age information, or other means of determining whether a visitor is a child, must be done in a neutral manner that does not default to a set age or encourage visitors to falsify age information").

### C. Meta Has Actual Knowledge that Children Under 13 Use Its Platforms

Meta is also subject to COPPA if it "*has actual knowledge* that it is *collecting personal information from a child.*" 15 U.S.C. § 6502(a)(1). "Actual knowledge" means being "aware of" information. *U.S. ex rel. Schutte v. SuperValu Inc.*, 598 U.S. 739, 751 (2023). Actual knowledge may be proven by direct evidence or inferred from circumstantial evidence. *Intel Corp. Inv. Pol'y Comm. v. Sulyma*, 589 U.S. 178, 189 (2020); *see also Staples v. U.S.*, 511 U.S. 600, 615-16 n.11 (1994). The Court previously determined that willful blindness is "considered tantamount" to actual knowledge under COPPA. ECF 440 (3214) at 29; *see* COPPA Rule, 89 Fed. Reg. 2034, 2037 n.46 (2024) ("The concept of actual knowledge includes willful disregard.") (citing *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 766 (2011)). "Willful blindness" means taking deliberate action to avoid learning a fact. *Glob.-Tech Appliances, Inc.*, 563 U.S. at 769. An operator acts with willful blindness when it intentionally shields itself from clear or obvious evidence, or avoids confirming a fact despite the high probability that the fact exists. *See id.* at 766. FTC guidance recognizes that actual knowledge can be acquired by learning "of a child's age or grade from a concerned parent" or where "you ask participants to enter age information" and a user indicates they are under 13. Children's Online Privacy Protection Rule, 64 Fed. Reg. 59888, 59892 (Nov. 3, 1999); Complying with COPPA: Frequently Asked Questions, Federal Trade Commission, https://www.ftc.gov/business-guidance/resources/complying-coppa-frequently-asked-questions (last visited July 31, 2026), at H.1, H.3. Four categories of evidence establish that Meta had actual knowledge that children under 13 were using its platforms:

#### 1. Users Who Self-Reported an Under-13 Date of Birth

Many existing users of Meta's platforms change their date of birth on their account to a date making the user under 13. This fact alone confirms Meta's "actual knowledge" of children on its platform.

[14] Testimony of Hartnett.

Meta itself uses this change of birthdate to "presumptively determine" that the user is too young absent additional proof of age. Ex. 0525 at -718.

**2. Accounts Identified Through Human Review and Parent Reports**

Meta had "actual knowledge" of children on its platform because it received millions of reports that particular Facebook or Instagram accounts belonged to children under 13. Parents, siblings, other users, and Meta personnel could submit or escalate those reports. Meta's human reviewers examined account biographies (on Instagram) and photographs (on Facebook and Instagram). A direct-age admission, a parent's report identifying the parent's own child, or photographs satisfying Meta's underage-review criteria provided Meta with actual knowledge that children were on its platforms.[15]

**3. Disabled and Deleted Accounts**

Meta had "actual knowledge" of children on its platform whose accounts it identified, suspended, and ultimately "disabled" for being under 13. Checkpointed users could regain access only by providing identification establishing that they were at least 13 years old. A user who submitted identification showing an age under 13, as well as any user who failed to present identification showing they were 13 or older, was disabled and eventually scheduled for deletion. Meta represented on its underage-reporting forms that it would delete an account when "the child's age can be reasonably verified as under 13." Ex. 2115; *see also* 1468. Meta's internal records referred to the user data associated with these accounts as "underage data," "U13 disabled user data," and data of "verified u13s." Those were operational descriptions used by employees responsible for underage enforcement and privacy compliance, not casual shorthand.[16]

**4. Hard-Linked and Soft-Matched Accounts**

Meta had "actual knowledge" of children on its platforms through its ability to "hard-link" and "soft-match" other accounts already identified as belonging to a child. Meta provides all users with a service called "Account Center," where a user with multiple accounts on Facebook, Instagram, or both, can link and centrally manage those accounts. Where Meta determines that an account violates a policy, the company can suspend not only that account, but all accounts "hard-linked" to that account by simultaneously suspending any other accounts that have been added to the same "Accounts Center." Meta

[15] Testimony of Hartnett.

[16] Testimony of Hartnett.

internally admits that these hard-linked accounts—those that users have "explicitly admitted to owning"—"are accounts that we *know* to be owned by underage users." Ex. 0208 at -593. Meta has allowed users to expressly link their accounts through other features since at least October 2017.[17]

Meta also used "soft-matching" models to predict when multiple accounts belonged to the same person. Meta's soft-matching models predict the common owner of multiple accounts with high levels of precision. Meta relies on the awareness provided by these "integrity" models in the most high-stakes situations, for example, to disable multiple accounts belonging to users it has determined violated its policies against child safety, frauds, scams, or terrorism.[18]

Despite this awareness, Meta has consistently failed to use its hard-link and soft-match data to checkpoint or disable underage accounts. The evidence establishes Meta's actual knowledge of those unenforced accounts, including through its willful blindness. Meta did not suspend or disable hard-linked accounts consistently prior to December 2021, instead allowing those accounts to remain on the platform. Meta has also deliberately chosen not to disable or take any action against accounts that it has soft-matched to accounts it checkpoints and disables for being under 13.[19]

Meta's awareness of a high probability that hard-linked and soft-matched accounts belong to the same users is also undisputed. Hard-linked accounts are by definition two or more accounts that a given user has explicitly stated belong to them. And Meta's soft-matching models can predict multiple accounts belonging to a given user with high precision.

Meta's failures to effectively remove accounts of children under 13 were deliberate. A September 2020 internal memo acknowledged that Meta had "deprioritized u13 enforcement because COPPA compliance is at risk when we sit on knowledge of u13, incentivizes not knowing." Ex. 1010 at -338. Meta's safety team, led by Antigone Davis, recommended improvements, including "[p]rioritiz[ing] cross-enforcement of u13s on IG who have hard-linked FB accounts." *Id.* at -339. Only "[r]ecently" did another team "agree to enable cross-enforcement of u13s on IG who have hard-linked FB accounts since basic

---

[17] Testimony of Hartnett.

[18] Testimony of Hartnett.

[19] Testimony of Hartnett.

COPPA compliance is at risk when product does not prioritize checkpointing and disabling u13s." *Id.* at -340 (noting a "chance, however, that this fails to get resourced because of engineering constraints on that team"). The memo goes on to recommend that, instead of deprioritizing enforcement, company leadership should "ensure [P]roduct and C[ommunity] O[perations] have the resources need[ed] to act on knowledge we already have, i.e. . . . disable verified u13s." *Id.* at -341. Yet Meta took another year to begin consistently removing hard-linked Facebook and Instagram accounts.[20]

Meta also deliberately ignores soft-matched accounts when enforcing its age policies, while relying on the same data to enforce other policies. From at least 2019 through 2024, Meta had the ability to probabilistically link different accounts that likely belonged to single users and used this soft-matching ability to disable multiple accounts that belong to the same person for violating Meta policies—but, aside from a brief period, did not use this technology to identify multiple accounts owned by underage users. Ex. 0589B at -485 (2019 internal memo describing use of "soft-matching . . . for a range of purposes, including integrity/security, accounting (total number of users), and ads."). Meta considered applying this technique to underage enforcement as early as October 2019, but rejected it, despite employees warning in a memo that "[i]t is difficult to defend the use of [soft-matching] for advertising purposes without also using these links for age management." *Id.*[21]

Accordingly, the Court also finds that Meta had "actual knowledge" that it was collecting information from children during the relevant time period.

* * *

Because Meta's platforms were directed to children and because Meta had actual knowledge that it was collecting information from children, the Court finds that the States have established that Meta violated COPPA in each of the States.

[20] Testimony of Hartnett.

[21] Testimony of Hartnett.

## III. Unfairness and Unlawful Claims

### A. Controlling Law

#### 1. California Unfair Competition Law

California's Unfair Competition Law ("UCL") prohibits any "unfair" business act or practice. Cal. Bus. & Prof. Code § 17200. California courts have long recognized that the unfairness under the UCL adapts flexibly to address "business practices [that] run the gamut of human ingenuity and chicanery." *People ex rel. Mosk v. Nat'l Research Co. of Cal.*, 201 Cal. App. 2d 765, 772 (Cal. Ct. App. 1962). In determining whether an act or practice is unfair, courts must "weigh the utility of the defendant's conduct against the gravity of the harm" to the alleged victim. *Motors, Inc. v. Times Mirror Co.*, 102 Cal. App. 3d 735, 740 (Cal. Ct. App. 1980); *accord, e.g.*, *Progressive West Ins. Co. v. Superior Court*, 135 Cal. App. 4th 263, 285 (Cal. Ct. App. 2005). Courts therefore examine the act or practice's real-world impact on consumers, the nature and gravity of the resulting harm, and any legitimate benefits or justifications for the defendant's conduct, and then balance those considerations.[22] *See, e.g.*, *Motors, Inc.*, 102 Cal. App. 3d at 740 (Cal. Ct. App. 1980). The California Attorney General must prove by a preponderance of the evidence that Meta engaged in the challenged act or business practice and that the balance of harm and utility makes it unfair. *See, e.g.*, *Progressive West Ins.*, 135 Cal. App. 4th at 285. California's UCL also prohibits any "unlawful" business act or practice, Cal. Bus. & Prof. Code § 17200, making violations of virtually any other law, including for example COPPA, per se violations of state law. *See, e.g.*, *State Farm Fire & Cas. Co. v. Super. Ct.*, 45 Cal. App. 4th 1093, 1103 (Cal. Ct. App. 1996) (California's UCL "'borrows' violations of other laws and treats them as unlawful practices independently actionable."). The UCL imposes strict liability, so California need not prove that Meta intended to harm anyone. *See, e.g.*, *Hewlett v. Squaw Valley Ski Corp.*, 54 Cal. App. 4th 499, 520 (Cal. Ct. App. 1997).

---

[22] Three tests exist in California for determining whether a business act or practice is "unfair" under the UCL *See, e.g.*, *Bias v. Wells Fargo & Co.*, 942 F. Supp. 2d 915, 933 (N.D. Cal. 2013). The balancing test employed here appropriately invokes California courts' reasoning in consumer cases. *See, e.g.*, *Motors, Inc.*, 102 Cal. App. 3d at 740 (using "a weighing process").

**2. Colorado Consumer Protection Act**

The Colorado Consumer Protection Act ("CCPA") prohibits knowingly or recklessly engaging in any unfair act or practice in the course of business. Colo. Rev. Stat. § 6-1-105(1)(rrr).[23] An act or practice is "unfair" under the CCPA if it: (1) offends public policy as it has been established by statutes, the common law, or otherwise, even if it the act or practice was not previously considered "unlawful"; (2) is immoral, unethical, oppressive, or unscrupulous; or (3) it causes substantial injury to consumers. *F.T.C v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n.5 (1972). These considerations do not impose a rigid, cumulative test requiring all three to be independently satisfied. Rather, a practice may be unfair because of the degree to which it satisfies one consideration or because, to a lesser extent, it satisfies all three. *See State ex rel. Shikada v. Bristol-Myers Squibb Co.*, 526 P.3d 395, 445 (Haw. 2023); *see also Long v. Dell, Inc.*, 93 A.3d 988, 1001 (R.I. 2014); *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 961 (Ill. 2002).

**3. Kentucky Consumer Protection Act**

The Kentucky Consumer Protection Act prohibits any "unfair" act or practices that occurred in the conduct of any trade or commerce. Ky. Rev. Stat. Ann. § 367.170(1). "Unfair" is defined in the statute as "unconscionable," which includes manifestly unfair or inequitable conduct or any business practice that misuses one's superior resources or bargaining power. Ky. Rev. Stat. Ann. § 367.170(2); *see also Wilhoit v. Wilhoit*, 506 S.W.2d 511, 513 (Ky. 1974); *Snardon v. Snardon*, 2009 WL 2059094, at *2 (Ky. App. July 17, 2009); *see also*, *e.g.*, *Stevens v. Motorists Mut. Ins. Co.*, 759 S.W.2d 819, 821 (Ky. 1988); *Com. ex rel Stephens v. North American Van Lines, Inc.*, 600 S.W.2d 459, 462 (Ky. App. 1979); *Com. ex rel. Chandler v. Anthem Ins. Companies, Inc.*, 8 S.W.3d 48, 55 (Ky. App. 1999). "The Kentucky legislature created a statute which has the broadest application in order to give Kentucky consumers the broadest possible protection for allegedly illegal acts." *Stevens v. Motorists Mut. Ins. Co.*, 759 S.W. 2d 819, 821 (Ky. 1988). The Kentucky Consumer Protection Act must thus be liberally construed. *Id*. (citing Ky. Rev. Stat. Ann. § 446.080).

[23] Colorado's unfair practice statute became effective on July 1, 2019.

#### 4. New Jersey Consumer Fraud Act

New Jersey's Consumer Fraud Act prohibits the "act, use or employment by any person of any commercial practice that is unconscionable or abusive" in connection with the sale or advertisement of merchandise. N.J. Stat. Ann. § 56:8-2. While the term "unconscionable" is not defined by statute, New Jersey courts have described unconscionability as an "amorphous concept obviously designed to establish a broad business ethic;" the standard of unconscionable conduct is a lack of "good faith, honesty in fact and observance of fair dealing." *Kugler v. Romain*, 279 A.2d 640, 651-52 (1971). Unconscionability must be interpreted "liberally to effectuate the public purpose" of the statute, to ensure that "agreement[s] ha[ve] resulted from real bargaining between parties who had freedom of choice and understanding and ability to negotiate in a meaningful fashion." *Id.* Unlawful conduct can be established through affirmative acts comprised of unconscionable conduct, regardless of a defendant's intent. *See Thiedemann v. Mercedes-Benz USA, LLC*, 872 A.2d 783, 791 (2005). Whether a particular practice is unconscionable is fact specific and must be determined on a case-by-case basis. *Mango v. Pierce-Coombs*, 851 A.2d 62, 69 (App. Div. 2004). In addition, violations of "State or federal law," including COPPA, are per se violations of New Jersey's Consumer Fraud Act. N.J. Stat. Ann. § 56:8-4(b) ("[A]ny commercial practice that violates State or federal law is conclusively presumed to be an unlawful practice[.]").

### B. Factual Findings and Legal Conclusions

#### 1. Threshold Issues[24]

##### i. Trade and Commerce

As this Court held at the motion to dismiss stage, and reiterated at the summary judgment stage, the "alleged exchange of users' use of Meta's platforms for their personal data is Meta's 'primary trade or commerce,' at least insofar as its Facebook and Instagram platforms are concerned," and thus "the alleged unfair and deceptive acts or practices occur "in the conduct of" Meta's "trade or commerce," regardless of whether Meta's users pay for use of Facebook or Instagram."' ECF 440 (3214) at 14 (quoting Order Largely Denying Meta's Motion to Dismiss, ECF 123 (1214) at 71). The trial evidence confirms the Court's previous holdings.

---

[24] The Court's findings and conclusions in this subsection apply to all of the States' unfairness and deception theories.

**ii. Relevant Time Period**

Meta's conduct giving rise to the States' state-law claims began no later than 2012. State AGs' Amended Complaint ("Compl."), ECF 207 at ¶ 19. The States and Meta entered into a tolling agreement, which tolled all claims ripe as of December 20, 2021. *Id*. The Court determined that the Relevant Time Period for Meta's conduct ended on April 1, 2024, for discovery purposes. Discovery Management Order No. 7, ECF 969 at 4. Thus, the relevant time period for the States' consumer protection claims is January 1, 2012, until April 1, 2024.

**2. Meta's Unfair and Unlawful Conduct**

**i. Violations of COPPA.**

As discussed above, under the state consumer-protection laws of California and New Jersey, violations of COPPA are also per se violations of state law. *See* Cal. Bus. & Prof. Code § 17200; N.J. Stat. Ann. § 56:8-4(b). The Court concludes that Meta's violation of COPPA constitutes independent violations of the laws of California and New Jersey and enters judgment against Meta on this theory.

**ii. Collecting the personal information of under-13 users without first obtaining verifiable parental consent.**

The evidence established that Meta collects, uses, and discloses the personal information of children under the age of 13 who use Instagram and Facebook without first obtaining verifiable parental consent. In addition to violating COPPA as described above, the Court finds that this conduct also constitutes an unfair and unconscionable business practice. The following findings of fact and conclusions of law independently establish Meta's liability for unfair business practices.

The Court has already determined that Meta collects a broad array of personal information from Facebook and Instagram users, including email addresses, telephone numbers, images of a user's face, recordings of a user's voice, cookie identifiers, device identifiers, IP addresses, profile information, and information reflecting users' interactions on the platform. ECF 440 (3214), at 5. Meta has collected at least some of these categories of personal information from Facebook and Instagram users since 2012. *Id.*

Although Meta states that its policy is to not allow U13s on its platforms, the evidence shows that Instagram and Facebook are "directed to children." Instagram and Facebook host and promote child-oriented pages and accounts; display advertisements featuring or directed to children, including

advertisements concerning children's television programming and movies; and prominently feature child and child-oriented models, influencers, and celebrities. *Supra* II.A. Meta's internal communications and research concerning efforts to design and develop its Platforms, and the features the company subsequently launched, confirm that the Platforms were intended appeal to children. *Supra* II.A. Numerous internal studies show that a significant portion of all children in the United States, including 30% or more of all tweens, used its Platforms. *Supra* II.A.[25]

Meta's account-registration practices further establish that Meta did not adequately obtain parental consent before collecting personal information from children. For many years, Meta did not employ an age-gate at all on Instagram, and defaulted new users to age 18 or 25 on Facebook.[26] When Meta later implemented age-gating measures, those measures were readily circumvented by children. Meta's age gates also failed to neutrally collect age information. Instead, they defaulted to a date of birth that would identify the user as being over the age of 13. Despite collecting personal information from children under 13, Meta failed to provide parents with sufficient notice of its practices concerning the collection, use, and disclosure of their children's personal information. Meta likewise fails to provide sufficient notice of parents' rights to review or delete their children's personal information and fails to provide parents with an effective means of exercising those rights.[27]

Meta also fails to timely delete the personal information of children under 13. Among other things, Meta may take up to 90 days to delete personal information after the final deletion process begins. And, from 2022 through April 2024, Meta preserved the personal information associated with certain so-called "deactivated" children's accounts for six months or one year before even beginning the final deletion process. Even after determining that users are likely under the age of 13, Meta continues to use those children's personal information to train machine-learning and generative-AI models without obtaining parental consent.[28]

---

[25] Testimony of Alter, Justin Antony, Shayli Jimenez.

[26] Testimony of Antigone Davis.

[27] Testimony of Hartnett, A. Davis.

[28] Testimony of Hartnett, Lars Backstrom.

* * *

The Court concludes that Meta's collection, use, maintenance, and disclosure of personal information from children under the age of 13, without first obtaining verifiable parental consent constitutes an unfair business practice in violation of the laws of California, Colorado, Kentucky, and New Jersey and enters judgment against Meta on this theory. This conduct also violated COPPA, was willful, exploited Meta's superior knowledge and power, preyed on children, and was unethical, unfair, and unconscionable. Meta's conduct deprived children and their parents of control over children's personal information and subjected children to the known risks of harm from social media use without their parents' consent.

**iii. Meta knowingly designed its Social Media Platforms to induce compulsive use while ignoring risks to young users.**

The Court finds that Meta crafted its platforms to induce compulsive use in young users and ignored risks to young users' health and well-being. Specifically, Meta has developed and refined a set of psychologically manipulative platform features designed to maximize, or avoid negatively impacting, young users' time spent on its platforms. Meta is aware that young users' developing brains are particularly vulnerable to this psychological manipulation. Meta is also aware that the effect of these use-inducing mechanisms is cumulative because they act in concert. By creating and refining these features, Meta has succeeded in making it difficult for young users to resist spending extended time on its Platforms.

The Court finds that Meta knowingly ignored the risks caused by its platforms while offering parents false assurances about the efficacy of its purported safety tools. Examples of Meta's knowledge include:

- Risks of social media use, including depression, anxiety, sleep disruptions, body-image issues, social comparison, interference with education and daily life, and many other negative outcomes.
- That such risks increase when users spend more than one hour on Meta's platforms.

- That 43.3%, or nearly 78 million, minors are on Meta's platforms between midnight and 4 AM at least once a week, and 4.6% of minors are on Meta's platforms between midnight and 4 AM nightly. Ex. 0992 at 9-10; Ex. 4118 at 9-10.[29]

Instead of addressing these risks, Meta designed, and promoted as child-protective, tools that are purposefully ineffective. These tools serve as "proof points" and a public-relations tactic to convince parents that Meta is aligned with their interests.[30] These include Meta's ineffective age-verification and time-management tools.[31]

***Age-Verification Tools.*** Meta proclaims that it does not allow U13 users on its platforms, but the evidence established that its age-verification tools are ineffective:

- Instagram's age gate permits the user to enter any date of birth, regardless of its accuracy.[32]
- Instagram's age gate allows users under age 13 to make several attempts at entering a date of birth that would yield an age of over 13.[33]
- If an underage user repeatedly enters an ineligible date of birth, Instagram blocks the underage user only from attempting to make an account for 12 hours before permitting them to try again. Ex. 1579 at 12.
- An internal document identified Meta's "lack of U13 proactive age identification and enforcement mechanism." Ex. 2323 at 9.
- The same document noted the need for improved age-identification models—especially on Instagram, where Meta "still lack[s] age data for most users, which prevents us from implementing a number of age-related protections" *Id.* at 9.

---

[29] Testimony of Dr. Jean Twenge, Dr. Mitch Prinstein.

[30] Testimony of A. Davis.

[31] Testimony of George Volichenko.

[32] Testimony of Tim Estes.

[33] Testimony of Dr. Colin Gray.

- When Meta determined an account belonged to a user under 13, Meta did not reliably remove other accounts the user had explicitly linked ("hard-linked accounts") until December 2021.[34]
- Similarly, when Meta determined an account belonged to a user under 13, Meta took no action against other accounts that its models predicted to belong to the same user ("soft-matched accounts"), despite using its soft-matching data for enforcing against accounts for other policy violations, and for various other business purposes, including ad targeting.[35]
- For a period of time before early 2020, when Facebook users changed their date of birth to an age under 13, Meta showed them an error message, but allowed them to remain on the platform.[36]
- Before February 2021, Meta did not suspend the accounts of Instagram users who attempted to change their date of birth to an age under 13.[37]
- Meta added extensive amounts of friction in its underage reporting process to deter people from submitting reports of underage users.[38]
- Meta automatically ignored reports of underage users, including when the account had no bio or few photos (regardless of the number of comments or direct messages where a user may have admitted their age), and when an unreliable classifier not designed to determine the age of underage users predicted the account to belong to a user 18 or older.[39]

---

[34] Testimony of Hartnett.

[35] Testimony of Hartnett.

[36] Testimony of Hartnett.

[37] Testimony of Hartnett.

[38] Testimony of Hartnett; Gray.

[39] Testimony of Hartnett; Dr. Ryan Sheatsley.

- Meta took no action to prevent underage users it detected and removed from the platform from creating new accounts and joining again.[40]
- Meta prevented its reviewers who were tasked with looking at accounts reported as under 13 from seeing children's self-admissions of their ages in comments, posts, and direct messages.[41]

The Court finds that Meta could have used an age verification and parental consent system that was in wide use among other online platforms. For example, Meta could have used an age verification and parental consent system similar to those used gaming services.[42] Meta's refusal to do so, or to take other steps that would be effective at keeping children under 13 off the platform without parental consent, unfairly exposed children to the mental and physical health risks of Meta's platforms and allowed Meta to obtain their personal data without parental consent.[43]

***Time-Management Tools.*** The Court finds that Meta's time management tools, such as Daily Limit, Quiet Mode and Take a Break, are part of a public affairs strategy, not a meaningful attempt to address compulsive use. Meta's own documents confirm this finding, noting that:

- Tools like "Quiet Mode" or "Take a Break" "served as proof points but weren't effective at reducing behaviors." Ex. 0024 at -918.
- Time restriction tools in Teen Accounts were part of a "public affairs strategy to improve parental alignment when it comes to the safety of teens," and "contribute[] to growing perception among parents that Instagram is on the same side as parents." Ex. 22 at -940.

The Court further finds that Meta's time management tools, such as the "Daily Limit," "Quiet Mode," or "Take a Break" were not effective for several reasons, including:[44]

---

[40] Testimony of Hartnett.

[41] Testimony of Hartnett.

[42] Testimony of Estes.

[43] Testimony of Hartnett, Sheatsley, Gray, Estes.

[44] Testimony of Volichenko, Prinstein.

- The "Daily Limit" feature was designed so the user can easily dismiss the notification and, contrary to its stated purpose, regularly tempts users to revert to time-maximizing settings whenever the user reaches their chosen limit.
- The "Take a Break" tool is also readily dismissible.
- Historically, Meta's time restriction tools have exceptionally low adoption rates. Ex. 3683 at -239.
    - Internal emails showed negligible (<1%) adoption rate of the Take a Break. Ex. 0858.
    - Only approximately 5% of test-group users adopted quiet mode, a tool ostensibly designed to reduce nighttime social media use. Ex. 0027 at -925.
- Internal documents report that millions of teens use Meta's platforms between midnight and four a.m. on a weekly basis. Ex. 0992 at 35-38.
- Internal emails show that Meta applies a "one-way door" principle to testing time-management tools, meaning that Meta only tests the tools as opt-in, not opt-out, because it does not want to know how successful opt-out tools would be. Ex. 0858 at -807.

Meta therefore acted unfairly by leading the public to believe that it was addressing the risks of its products—specifically, compulsive use—while knowing that its purported solutions were ineffective.

* * *

The Court concludes that Meta crafting its platforms to induce compulsive use in young users, designing platforms that posed psychological and physical risks to young users, and developing ineffective safety tools as a public relations tactic constitute unfair business acts and practices in violation of the laws of California, Colorado, Kentucky, and New Jersey. The Court enters judgment against Meta on that theory.

## IV. Deception Claims

### A. Controlling Law

#### 1. California False Advertising Law and Unfair Competition Law

California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code § 17500, prohibits a business from making or causing to be made a public statement about its products or services, or for the purpose

of inducing the public to use them, when the statement is untrue or misleading and the business knew or should have known that fact. *See, e.g.*, *People v. Johnson & Johnson*, 77 Cal. App. 5th 295, 317 (Cal. Ct. App. 2022). A statement may be actionable even if literally true when, viewed in context, it is likely to deceive a reasonable consumer because of omitted facts, surrounding circumstances, or the overall impression created by a broader messaging campaign. *See, e.g.*, *Day v. AT&T Corp.,* 63 Cal. App. 4th 325, 332 (Cal. Ct. App. 1998). The California Attorney General need not prove that any particular consumer relied on the statement, suffered injury, or that Meta intended to deceive. *See, e.g.*, *Prata v. Superior Court*, 91 Cal. App. 4th 1128, 1145 (Cal. Ct. App. 2001).

The fraudulent prong of California's UCL, Cal. Bus. & Prof. Code § 17200, is broader: it prohibits business acts or practices that are likely to deceive members of the public, judged from the perspective of a reasonable consumer, but it does not require proof that Meta knew or should have known the conduct was deceptive. *See, e.g.*, *Hadley v. Kellogg Sales Co.*, 273 F. Supp. 3d 1052, 1063 (N.D. Cal. 2017). Like the FAL, it covers misleading overall impressions and statements rendered deceptive by omissions or context, and the California Attorney General need not prove individual reliance, causation, injury, or intent to deceive. *See, e.g.*, *Day*, 63 Cal. App. 4th at 332-33. Any violation of California's FAL is also a per se "unlawful"-prong violation of California's UCL. *See, e.g.*, *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008). Thus, the core question under both statutes is whether the challenged public-facing conduct was likely to mislead a reasonable consumer.

Where, as here, violations of the FAL and UCL emanate from California, the California Attorney General has authority to prosecute those violations regardless of whether those statements were directed to residents of California or another state. *See People v. Ashford Univ., LLC*, 100 Cal. App. 5th 485, 522 (Cal. Ct. App. 2024) (upholding trial court's imposition of civil penalties nationwide based on violations that occurred within California and stating that "the Legislature did not signal an intent to limit the Attorney General's authority to prosecute violations of the UCL or FAL to cases involving false or misleading statements directed at California residents.").

**2. Colorado Consumer Protection Act**

The CCPA prohibits knowingly or recklessly making a false representation concerning the characteristics, uses, benefits, alterations, kinds of goods or services, or representing that goods or services

were of a particular standard, quality, or grade when the speaker knew or should have known that they were of a different standard, quality, grade, style, or model. The false representations need not have actually deceived consumers. Rather, "a plaintiff may satisfy the deceptive trade practices requirement of section 6-1-105(1)(e) by establishing either a misrepresentation or that the false representation had the capacity or tendency to deceive, even if it did not." *Rhino Linings USA, Inc. v. Rocky Mountain Rhino Lining, Inc*., 62 P.3d 142, 148 (Colo. 2003).

A company can also violate the CCPA by failing to disclose material information concerning goods or services, if the company knew that information at the time of the advertisement or sale and withheld the information with the intent to induce consumers to enter into a transaction. The deceptive trade practice must have occurred in the course of business and, for conduct occurring before July 1, 2019, have significantly impacted the public as actual or potential consumers of goods or services. Colo. Rev. Stat. § 6-1-105(1)(e), (1)(g), (1)(u).

"Some of the factors relevant to whether a challenged practice significantly impacts the public are the number of consumers directly affected by the challenged practice, the relative sophistication and bargaining power of the affected consumers, and evidence that the challenged practice has impacted other consumers or has a significant potential to do so in the future. No single factor is determinative, nor is it necessary that all be present." *Shekarchian v. Maxx Auto Recovery, Inc.*, 487 P.3d 1026, 1034 (Colo. App. 2019) (internal citations and quotations omitted). The Court finds that the evidence establishes significant public impact under Colorado law based on Meta's conduct targeting over two million unique teens and preteens in Colorado.

**3. Kentucky Consumer Protection Act**

The Kentucky Consumer Protection Act, Ky. Rev. Stat. § 367.170, prohibits any "false, misleading, or deceptive" acts or practices that occurred in the conduct of any trade or commerce. The terms, "false," "misleading," and "deceptive" are interpreted consistent with their ordinary meaning. *Craig & Bishop, Inc. v. Piles*, 247 S.W.3d 897, 905 (Ky. 2008). In assessing whether a statement is false, misleading, or deceptive, Kentucky law asks if, when read in context with other statements, omissions, or surrounding circumstances, the statement would likely mislead a reasonably prudent person of ordinary intelligence. *Craig & Bishop*, 247 S.W.3d at 905; *Dare To Be Great, Inc. v. Com ex rel. Hancock*, 511

S.W.2d 224, 226 (Ky. 1974). A statement need not contain an express falsehood, when viewed in isolation, to be false or misleading. It can be false or misleading if, when taken together with other statements, omissions, or surrounding circumstances, the statement creates an overall impression that it is untrue or deceptive, even if the statement itself is literally true. *Dare To Be Great*, 511 S.W. 2d at 226. The Kentucky Consumer Protection Act does not require showing that anyone relied on or was actually deceived by Meta's false or misleading conduct. *Corder v. Ford Motor Co.*, 869 F. Supp. 2d 835, 837 n.1, 838-39 (W.D. Ky. 2012); *Telcom Directories, Inc. v. Com. ex. rel. Cowan*, 833 S.W. 2d 848, 850 (Ky. App. 1991). Deceptive acts include omissions of material fact. *Naiser v. Unilever U.S., Inc.*, 975 F. Supp. 2d 727, 741-42 (W.D. Ky. 2013).

**4. New Jersey Consumer Fraud Act**

New Jersey's Consumer Fraud Act prohibits (1) affirmative acts of deception, fraud, false pretense, false promise, misrepresentation, and (2) the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such concealment; both affirmative acts and omissions must be made in connection with the sale or advertisement of merchandise. N.J. Stat. Ann. § 56:8-2. Deception is any conduct or advertisement which has the capacity to mislead an average consumer. *Fenwick v. Kay American Jeep. Inc.*, 371 A.2d 13, 16 (1977). A misrepresentation is a false statement of fact made to deceive or mislead. However, a misrepresentation need not contain an express falsehood; indeed, a statement can still be found to be deceptive where it is a "carefully constructed message which avoids literal misrepresentation while doing everything possible to create an inaccurate and misleading impression[.]" *Miller v. American Family Publishers*, 663 A.2d 643, 652 (Super. Ct. 1995). Additionally, it is "not necessary that plaintiff show either defendant's knowledge or intent that the misrepresentation was of a material fact." *Leon v. Rite Aid Corp.*, 774 A.2d 674, 678 (App. Div. 2001). In addition to affirmative acts, New Jersey's Consumer Fraud Act also prohibits the knowing, concealment, suppression, or omission of any material fact with the intent that others rely upon such concealment. N.J. Stat. Ann. § 56:8-2.

### B. Factual Findings and Legal Conclusions

#### 1. Threshold Matters[45]

##### i. Statements must be considered in context

As the Court has previously held, "each [allegedly deceptive] statement must be considered in the context of the alleged deceptive scheme as a whole, and so the Court is unwilling to parse and isolate every alleged misrepresentation as Meta requests." ECF 440 (3214), at 7; *see also Williams v. Gerber Products Co.*, 552 F.3d 934, 939 n.3 (9th Cir. 2008) (statement, "were it standing on its own, could arguably constitute puffery," but "statement certainly contributes . . . to the deceptive context of the packaging as a whole" and therefore "we decline to give [defendant] the benefit of the doubt by dismissing the statement as puffery"); *In re Toyota Motor Corp. Unintended Acc. Mktg., Sales Pracs., & Prod. Liab. Litig.*, 754 F. Supp. 2d 1145, 1177 (C.D. Cal. 2010) ("Here, however, the allegations about product safety are more than 'mere puffery' that Toyota's cars were superior to others. They constitute a campaign by Toyota in which it represented itself as prioritizing (even 'obsessing over') safety.").

##### ii. Materiality

The Court finds that the AGs have provided sufficient evidence to show that safety is a significant concern to consumers. Meta's own documents showed and its employees testified about the extensive efforts Meta put in place to communicate about the safety of its platforms. Meta witnesses identified the significant number of Meta employees deployed to communicate about the safety of Meta's platforms. Three senior executives of Meta who testified in this case also testified publicly before Congress about the safety of Meta's platforms and Meta reposted and republished those same messages.[46]

Because these platforms are highly technical in nature and result in significant information asymmetries, consumers are particularly likely to rely on Meta's messaging concerning health and safety.[47] Meta's health and safety claims were therefore meaningful and important to a significant number

---

[45] The Court's findings and conclusions in this subsection apply to all of the States' deception theories.

[46] Testimony of Mosseri, Zuckerberg, Davis.

[47] Testimony of Alter.

of consumers.[48] This is particularly true in light of evidence showing that large numbers of parents and teens worry about the safety of Meta's platforms.[49]

**2. Topics of Meta's Deception**

The evidence established four areas in which Meta engaged in deceptive public messaging: (1) that its platforms did not pose risks to young users; (2) that its platforms were not designed to encourage compulsive use; (3) that it prioritized health and safety over its own business interests; and (4) that it effectively prevents U13s from using its platforms. The advisory jury found Meta liable under each State's deceptive practice laws, and the Court finds that the evidence supports that verdict many times over.

**i. Risks to Young Users**

The Court finds that Meta made the following statements regarding whether its platforms posed risks to young users:

- Meta's webpage stated, "One of the most significant metrics we provide in the Community Standards Enforcement Report is prevalence. . . . We consider prevalence to be a critical metric because it helps us measure how violations impact people on Facebook. We care most about how often content that violates our standards is actually seen relative to the total amount of times any content is seen on Facebook. This is similar to measuring concentration of pollutants in the air we breathe. When measuring air quality, environmental regulators look to see what percent of air is Nitrogen Dioxide to determine how much is harmful to people. Prevalence is the internet's equivalent--a measurement of what percent of times someone sees something that is harmful." Ex. 2159 at 2-3.
- Meta's webpage stated, "Prevalence: The frequency at which content that violates our Community Standards was viewed." Ex. 2161 at 3.
- Meta's webpage stated, "The key metrics in our [Community Standards Enforcement Reports], which together track how we are doing at enforcing our Community Standards, are: Prevalence . . . . We care most about how often content that violates our policies is actually seen by someone." *Id.*

---

[48] Testimony of Alter.

[49] Testimony of Alter, Twenge, Prinstein.

- Meta's November 2019 Community Standards Enforcement Report stated, "In Q3 2019, this upper limit was 0.04%. Meaning that for each of these policies, out of every 10,000 views on Facebook or Instagram in Q3 2019, we estimate that no more than 4 of those views contained content that violated that policy." Ex. 1522 at 2.
- On an earnings call, Sheryl Sandberg stated, "We also have to keep people safe and give them control over their experience on our apps. And we are." Ex. 1357 at 5.
- Meta's webpage stated the following regarding Q4 2020 CSER: "The prevalence of violent and graphic content also dropped from 0.07% to 0.05%." Ex. 2156 at 2.
- The following exchange occurred during Mark Zuckerberg's March 25, 2021 Congressional testimony: MRS. LESKO: . . . "Do you believe that your platform harms children?" Mr. ZUCKERBERG. "Congresswoman, I don't believe so. This is something that we study and we care a lot about. Designing products that improve people's well-being is very important to us. And what our products do is help people stay connected to people they care about, which I think is one of the most fundamental and important human things that we do, whether that is for teens or for people who are older than that." Ex. 2568 at 100.
- The following exchange occurred during Mark Zuckerberg's March 25, 2021 Congressional testimony: "[A]s a model, Facebook has been doing something to this effect for every quarter, where we report on the prevalence of each category of harmful content and how effective our systems are at identifying that content and removing it in advance." *Id.* at 49.
- The following exchange occurred during Mark Zuckerberg's March 25, 2021 Congressional testimony: "[O]verall, the research that we have seen is that using social apps to connect with other people can have positive mental health benefits and well-being benefits by helping people feel more connected and less lonely." *Id.* at 56.
- Adam Mosseri told reporters that the effect of Instagram on teen mental health seems to be "quite small." Ex. 3328 at 4.
- Mosseri also told reporters that "[with respect to Project Daisy,] there was very little impact and the result was neutral." Ex. 1893 at -864.

- Instagram's webpage stated, "Suggesting that Instagram is toxic for teens is simply not backed up by the facts." Ex. 2127 at -100.
- In her September 30, 2021 Congressional testimony, Antigone Davis stated, "We have put in place multiple protections to create safe and age-appropriate experiences for people between the ages of 13 and 17." Ex. 3017 at 10.
- In her September 30, 2021 Congressional testimony, Antigone Davis stated, "At Facebook, we take the privacy, safety, and well-being of all those who use our platform very seriously, especially the youngest people on our services. We work tirelessly to put in place the right policies, products, and precautions so they have a safe and positive experience." *Id.* at 7.
- Meta's webpage stated, "In Q3, the prevalence of bullying and harassment content was 0.14-0.15% or between 14 and 15 views of bullying and harassment content per 10,000 views of content on Facebook, and 0.05-0.06% or between 5 and 6 views per 10,000 views of content on Instagram." Ex. 1138 at -312.
- Instagram's webpage referred to new features on the platform under the title, "Continuing to Keep Instagram Safe and Secure." Ex. 3355.
- On Meta's webpage, Antigone Davis stated, "We haven't waited for regulation to continue making progress on our apps. Over the past several years, we've taken significant steps, including: . . . Using age verification technology to help teens have age-appropriate experiences. . . . Offering tools for teens to spend more meaningful time online." Ex. 0350 at -002.
- Meta's webpage stated, "Another way to think of prevalence is how many views of violating content we didn't prevent -- either because we haven't caught the violations early enough or we missed them altogether." Ex. 2479 at 1.
- Meta's webpage entitled "Best Interests of the Child Framework" includes the principle, "Create safe, age-appropriate environments for youth." Ex. 2576 at 400.
- A Meta publication stated, "We publish the Community Standards Enforcement Report . . . to more effectively track our progress and demonstrate our continued commitment to making Facebook and Instagram safe." Ex. 0576 at -303.

- Meta's Community Standards Enforcement Reports relied on construing only highly favorable prevalence metrics as indicators of platform safety. *See* Ex. 4128; Ex. 1138; Ex. 1139; Ex. 4226; Ex. 4228; Ex. 4229.

The Court finds that these statements were part of a strategy to create and maintain narratives to reassure the public about the safety of Meta's platforms, protect its brand, and minimize health and wellbeing concerns. Ex. 1834 at 3 (including marketing objective of "[g]et teens, parents, educators, and policy makers to believe Instagram is a safe and kind platform"); Ex. 0736 at -209 (describing a "Disrupting the Narrative" framework to counter bad public relations); Ex. 1455 (testing marketing phrases regarding safety); Ex. 0734 (discussing responses to criticisms related to wellbeing); Ex. 1316 at 2 (describing messaging strategies for parents). These representations were made in highly public forums and often by Meta's top executives in a manner that was designed to impact public opinion about the nature of Meta's platforms and business.[50] Meta's "drumbeat messaging" approach repeatedly reinforced these messages about the safety of its platforms and the prioritization of safety by the company, so consumers would be deceived as to the real risks of the platforms. Ex. 2985.[51] When making these statements, Meta was aware of growing consumer concerns regarding the risks its platforms posed for teens. Ex. 0736 at -209-10 (describing "an accepted narrative [that] now defines the company," including that Meta is "[a]nti-[w]ell-[b]eing"). Meta was also aware that such consumer concerns could negatively impact its business model.[52]

The States' experts testified about the risks Meta's platforms pose to young users. These risks included Meta's design, which contributes to compulsive use and prolonged use by young users. Such use is linked to increased risk of depression, self-harm behaviors, unhappiness, lower life satisfaction, and worsened mental health. Meta's design also contributes to young users staying up late, leading to sleep deprivation and risks such as negative impacts on brain development, poorer attention, emotional

[50] Testimony of Alter.

[51] Testimony of Alter, Elena Davis.

[52] Testimony of Alter.

instability, obesity, aggression, lower academic performance, greater risk behavior, and susceptibility to accidents.[53]

Internal Meta documents confirm these risks:

- An internal Meta presentation stated that "[h]arm on Instagram falls into three major categories:" (1) "Social comparison," which can lead to issues with "self-esteem, anxiety, and insecurity"; (2) "Social pressure," which can lead to "isolation" and "adoption of negative habits"; and (3) "Negative interactions with other people," which can lead to "isolation, loneliness, depression." Ex. 1931 at -176, 201.
- The same study noted that "[o]ne in five teens say that Instagram makes them feel worse about themselves," *id.* at -193, "[t]eens who struggle with mental health say Instagram makes it worse," *id.* at -1972, and "[t]eens blame Instagram for increases in the rates of anxiety and depression among teens," *id.* at -196.
- A third of the study participants who were teen girls with body-image issues said Instagram made it worse. Ex. 2127 at -098.
- "Appearance based comparison is common on Instagram" and "causes [teens] to feel bad about themselves." Ex. 0978 at 1.

Additionally, Meta touts its Community Standard Enforcement Reports ("CSER"), which describe the percentage of content posted on Instagram and Facebook that Meta removes for violating Instagram and Facebook's Community Standards or Guidelines, while not disclosing conflicting information from internal surveys such as Meta's Negative Experiences Survey ("NES") and Bad Experiences & Encounters Framework ("BEEF") reports.[54] For example, despite Meta stating that "kids only rarely encounter harmful content and experiences," the October 2019 NEP showed that "teens have significantly more negative experiences than adults," Ex. 2728 at 7. Similarly, despite Meta telling the public bullying was fifteen-hundredths of one percent; its own surveys found 27% of teens saw bullying in a single week. Ex. 2127 at -098; Ex. 2715 at 21.

---

[53] Testimony of Twenge, Prinstein.

[54] Testimony of Bejar, Kyle Andrews, Shilpa Mody.

**ii. Compulsive Use**

Meta made the following statements regarding whether its platforms were designed to encourage compulsive use:

- In a press statement, a Meta spokesperson stated, "At no stage does wanting something to be addictive factor into [our design] process." Ex. 2148 at 4.
- The following exchange occurred during Mark Zuckerberg's November 17, 2020 Congressional testimony: SENATOR GRAHAM: . . . "Mr. Zuckerberg, do you believe your product can be addictive?" MR. ZUCKERBERG: "Senator, I--we certainly do not design the product in that way." Ex. 3680 at -047.
- In his March 25, 2021 Congressional testimony, Mark Zuckerberg stated, "And the way we design our algorithms is to encourage meaningful social interactions. So it is a common misconception that our teams--our goals, or even have goals, of trying to increase the amount of time that people spend." Ex. 2568 at 56.
- The following exchange occurred during Mark Zuckerberg's March 25, 2021 Congressional testimony: "MR. JOHNSON: . . . You profit from your company's hooking users to your platforms by capitalizing on their time. So yes or no: Do you agree that you make money off of creating an addiction to your platforms? Mr. Zuckerberg?" MR. ZUCKERBERG: "Congressman, no. I don't agree with that." *Id.* at 72.
- In his March 25, 2021 Congressional testimony, Mark Zuckerberg stated, "I don't give our News Feed team or our Instagram team goals around increasing the amount of time that people spend." Ex. 2568 at 7.
- In an article, Nick Clegg stated, "The goal is to make sure you see what you find most meaningful--not to keep you glued to your smartphone for hours on end." Ex. 0661B at -769.
- In her September 30, 2021 Congressional testimony, Antigone Davis stated, "So I disagree with calling our product addictive. I also think that is not how we build products." Ex. 3017 at 38.

- The following exchange occurred during Antigone Davis's September 30, 2021 Congressional testimony: SENATOR SULLIVAN. "So is you—let me—I want to—well, I will let you get to mental health, but I want to drill down on this addictive element. But isn't part of your business model to have more eye-balls for a longer amount of time engaged using your services?" Ms. DAVIS. "Respectfully, Senator that is not actually how we build our products. In fact, we made changes to our news feed to allow for more meaningful interactions, knowing that that would impact the time spent. In fact, it did impact the time spent by about 50 million hours per day. But we did it anyway because we were trying to build a positive, more positive experience." *Id* at 39.
- In his December 8, 2021 Congressional testimony, Adam Mosseri stated, "Senator, respectfully, I don't believe the research suggests that our products are addictive." Ex. 2573 at 18.

These representations were made in highly public forums and often by Meta's top executives in a manner that was designed to be repeated and impact public opinion about the nature of Meta's platforms and business.[55]

The Court finds that, contrary to this course of statements, Meta knew that its platforms were designed to encourage compulsive use. Its features exploited youths' vulnerabilities by encouraging compulsive use.[56] Meta employed dark patterns and attention capture patterns to maximize user engagement,[57] and optimized its recommendation algorithms for engagement.[58] Meta's own employees confirmed Meta's knowledge of teen compulsive use of Meta's platforms—including internal Meta research in which young users described feeling addicted to Meta's platforms—teens' developmental vulnerabilities, and research on dopamine and compulsive use.[59]

---

[55] Testimony of Alter.

[56] Testimony of Prinstein.

[57] Testimony of Gray.

[58] Testimony of Narayanan.

[59] Testimony of E. Davis, Gross, Jimenez.

Internal documents and communications confirm that Meta knew that its platforms encouraged compulsive use:

- In 2017, Meta's top-line goal was "Time Spent Share." Ex. 1747 at -142.
- Meta employees frequently referred to "problematic use." Employees explicitly acknowledged that "problematic use" was a "euphemism for screen addiction" that they "should avoid" in writing, including because of the "legal risk" associated with the word "addiction." in-part Ex. 0577 at -242.
- Other internal documents describe how Meta exploited users' vulnerabilities in order to cultivate compulsive use and maximize engagement with the platforms. Meta's "Teen Fundamentals" research—in which the company studied the teenage brain in order to capitalize on its unique weaknesses—is an example of these tactics. Ex. 1860.
- Meta employees authored internal documents indicating that the platforms encourage compulsive use and that teens interact with them in a compulsive manner. These documents include:
  - A presentation titled "Instagram Teen Well-Being Study: US Topline Findings" stated that "addiction is common on IG" and that "[o]lder teen girls are most likely to experience this issue." Ex. 1457B at 37.
  - A presentation titled "Teen Mental Health: Creatures of Habit" stated that "Instagram is an inevitable and unavoidable component of teens lives"; "Teens can't switch off from Instagram even if they want to"; and "Teens talk of Instagram in terms of an 'addicts narrative' spending too much time indulging in a compulsive behavior that they know is negative but feel powerless to resist." Ex. 1945 at -420.
  - In a document titled, "When User Engagement [doesn't equal sign] User-Value," Albert Hamood stated, "It seems clear from what's presented here that some of our users are addicted to our products. And I worry that driving sessions [of platform use] incentivizes us to make our product more addictive." Ex. 0137 at -127.
  - A 2023 Instagram presentation found that "[r]esearch has shown that problematic

social media use is both prevalent among teens and is a driver of churn: 56% of IG teens surveyed say it's difficult to manage time on social media, and teens reporting life interference were 2.1x more likely to delete Instagram." Ex. 0013 at 6.

    - A report noted that a "majority of clinicians believe that social media can be addictive." Ex. 0766 at 9.
    - A presentation stated, "It seems clear from what's presented here that some of our users are addicted to our products. And I worry that driving sessions [of use] incentivizes us to make our product more addictive." Ex. 0137 at -127.
    - A slide deck stated, "[A]pp addiction is common on IG"; Ex. 1457B at 37.
    - A report stated, "It seems relatively clear that younger people are less equipped to be able to handle social media addictions." Ex. 1222 at -452.

- Meta employees stated that the platforms cultivated compulsive use as part of Meta's strategy to maximize engagement:
    - "[O]ur product exploits weaknesses in the human psychology to promote product engagement and time." Ex. 0818 at -826.
    - "[P]eople are binging on IG so much they can't feel reward anymore. . . . Its [sic] biological and psychological. . . . the top down directives drive it all towards making sure people keep coming back for more." Ex. 1243.

**iii. Prioritization of Health and Safety**

Meta made the following statements regarding whether it prioritized the health and safety of its users over its own growth and profits:

- At a conference, Eva Chen stated, "Instagram has a whole team, I think it's called the well-being team, and they basically—their entire focus is focusing on the wellbeing of the community. . . . Making the community a safer place, a place where people feel good, is a huge priority for Instagram. I would say one of the top priorities for the company." -Ex. 4120.

- In an interview between Adam Mosseri and Gale King, the following exchange occurred: Adam Mosseri: "We've been focused on well-being broadly, like I said, it's our number one priority. . . . We will do things that mean people use Instagram less if we think that they keep people safe or generally create a healthier environment. And I think we have to be willing to do that." Gale King: "Even though it could affect your bottom line." Adam Mosseri: "Hundred percent. . . . We've been focused on well-being broadly, like I said, it's our number one priority." Ex. 4195.
- At a conference, Adam Mosseri stated, "We will make decisions that hurt the business if they're good for people's wellbeing and health because it has to be good for the business over the long run." Ex. 4119.
- A Meta spokesperson stated, "any experience we develop must prioritize [people under the age of 13's] safety and privacy." Ex. 3547 at 3 -305
- The following exchange occurred during Antigone Davis's September 30, 2021 Congressional testimony: SENATOR KLOBUCHAR: ". . . What do you estimate the life-time value of a user is for kids who start using Facebook products before age 13?" Ms. DAVIS. "Respectfully, Senator, that is not how we think about building products for our—for young people. We actually are quite focused on ensuring that parents have the kinds of supervisory tools that they need. That is just—it is just not the way we think about it, certainly not the way I and my team think about it." Ex. 3017 at 18.
- The following exchange occurred during Antigone Davis's September 30, 2021 Congressional testimony: SENATOR LUJAN. "And my final question, Mr. Chairman. Yes or no, has Facebook ever found a change to its platform would potentially inflict harm on users, but moved forward because the change would also grow users or increase revenue?" Ms. DAVIS. "That has not been my experience at all at Facebook. We care deeply about the safety and security of the people on our platform. We have invested $12 billion in it. We have thousands and thousands of people working on this issue. That is just not how we would approach it." *Id.* at 25.

- A Meta press statement said, "Protecting our community is more important than maximizing our profits." Ex. 1330 at -014
- In a Facebook post, Mark Zuckerberg stated, "At the heart of these accusations is this idea that we prioritize profit over safety and well-being. That's just not true." Ex. 0509 at 1.
- Meta's webpage stated, Meta's "Best Interests of the Child Framework" includes the principle "Prioritize youth well-being and safety over business goals and interests." Ex. 0672 at -394.

These representations were made in highly public forums and often by Meta's top executives in a manner that was designed to impact public opinion about the nature of Meta's platforms and business.[60]

The Court finds that, contrary to this course of statements, witness testimony and documentary evidence established that Meta often prioritized its own growth and profits over the health and safety of young users. Meta's business model focuses on monetizing user information and attention on its platforms. Meta then converts this user engagement into revenue obtained from advertisers, who can deploy targeted advertising based on the personal data Meta collects from each user. In 2024, substantially all of Meta's revenue was generated from marketers advertising to users on Facebook and Instagram. To maintain revenue generation, Meta must maintain or increase users and engagement on Facebook and Instagram. Specifically, Meta attempts to increase teen usage for the purpose of maximizing long-term revenue growth by retaining these users into adulthood, when ad revenue typically increases.[61]

When there was a conflict between growth and safety, Meta consistently chose growth. For example, Meta rejected or watered down mental health and wellbeing proposals if they interfered too significantly with core metrics, such as engagement. Arturo Bejar, a former Meta employee, confirmed in his testimony that Meta prioritizes growth over safety. Another former Meta employee, Brian Boland, also confirmed this point in his testimony.

Evidence of Meta's prioritization of growth over health and safety includes:

[60] Testimony of Alter.

[61] Testimony of Boland, Li, Natalie Troxel, Jason Sattizahn, Bejar, Volichenko, Vaishnavi Jayakumar, Chen.

- An internal Meta document described "acquiring new teen users" as "mission critical." Ex. 0723 at 9.
- A whistleblower explained that growth and engagement are a top priority and that safety is an afterthought.[62]
- A whistleblower explained that revenue, engagement and time spent were prioritized over research on positive child development.[63]
- "As one Meta product designer summarized in an internal email, '[s]hort summary is the "the [sic] young ones are the best ones." You want to bring people to your service young and early.'" Ex. 0415 at -873.
- An internal slide deck identified "Parent Gatekeeping [as the] #1 reason early teens do not join IG," calling it a "[p]roblem to be solved." Ex. 0722 at 4.
- A whistleblower and former Meta engineer working on Meta's time restriction tools explained that "every time you make any sort of change, you test a feature, you have to check against [core or critical] metrics to confirm that you didn't affect them in a negative way," which included "growth" and "time spent," and he testified that these metrics limited how effectively these tools could be designed.[64]
- That same whistleblower engineer explained that he felt like his job was to build features for the media and as a defense to potential a lawsuit, rather than to actually help the safety and health of teenagers.[65]

Meta's decision to lift a temporary ban on cosmetic surgery filters further demonstrates that it prioritized profit over wellbeing. When considering whether to lift the ban, Meta consulted with experts, who found that these filters can have severe impacts on the individual using them and that children are particularly vulnerable. A pre-read sent to Zuckerberg noted that continuing the ban would mitigate

---

[62] Testimony of Bejar.

[63] Testimony of Troxel.

[64] Testimony of Volichenko.

[65] Testimony of Volichenko.

wellbeing concerns. Ex. 3871 at 1. However, the pre-read also noted that continuing the ban would limit growth. *Id*. Ultimately, Zuckerberg declined to make the ban permanent.[66]

Meta similarly abandoned Project Daisy, which would have reduced the negative impact of seeing posts with many likes, after determining that it would reduce revenue. Meta's researchers concluded that when like counts were removed by default, people reported less negative comparison and that teen girls appeared to benefit the most. Researchers who worked on Project Daisy believed it would improve well-being and advocated for its implementation. However, Project Daisy resulted in a decline in ad performance. Meta ultimately launched an opt-in variant of Project Daisy. Meta knew that the opt-in version would be adopted by significantly fewer users and had not been shown to significantly ameliorate the problem of harmful social comparisons.[67]

Finally, Meta did not invest sufficiently in age verification features for U13s, instead prioritizing profit. As discussed above, Meta has designed, and promoted as child protective, age verification tools that are purposefully ineffective. *See supra* III.B.2.iii. These tools serve as "proof points" and a public-relations tactic to convince parents that Meta is aligned with their interests.[68] Further, Antigone Davis suggested that Meta use the same signals to enforce age restrictions that it used to predict a child's age for business purposes—but Meta failed to take this step. Ex. 1465 at -542. Meta's refusal to do so, or to take other steps that would be effective at keeping children under 13 off the platform without parental consent, unfairly exposed children to the mental and physical health risks of Meta's platforms.

**iv. Preventing U13s From Using Meta's Platforms**

Meta made the following statements regarding whether it kept U13s off its platforms:

- In his March 25, 2021 Congressional testimony, Mark Zuckerberg stated, "[I]f we detect that someone might be under the age of 13, even if they lied, we kick them off." Ex. 2568 at 76.

---

[66] Testimony of Margaret Gould-Stewart.

[67] Testimony of Justin Cheng, Andrews.

[68] Testimony of A. Davis, Nick Clegg.

- In a press statement, Adam Mosseri stated, "Like all technology companies we want to appeal to the next generation, but that's entirely different from the false assertion that we knowingly attempt to recruit people who aren't old enough to use our apps." Ex. 2277 at 4.
- The following exchange occurred during Antigone Davis's September 30, 2021 Congressional testimony: MS. DAVIS: "Senator, children under the age of 13 are not allowed on Instagram or Facebook. . . ." SENATOR LUJAN: . . . "Does Facebook or Instagram collect personally identifiable information specific to individual children under the age of 13 without the consent of those parents or guardians. If the answer's no, that's sufficient." MS. DAVIS: "Senator, it would be my understanding that we don't since we don't allow them on our apps." Ex. 3017 at 24.
- In her September 30, 2021 Congressional testimony, Antigone Davis stated, "We also allow people to report underage accounts, even if you are not on Facebook, and we will remove them." *Id.* at 15.
- In her September 30, 2021 Congressional testimony, Antigone Davis stated, "If we see someone trying to, repeatedly, change the [birth] date to get past that [age screen], we actually will restrict their ability to access the app." *Id.* at 15.
- In her September 30, 2021 Congressional testimony, Antigone Davis stated, "We do not market to 8 to 12 year olds because they are not on Instagram." *Id.*
- In his December 8, 2021 Congressional testimony, Adam Mosseri stated, "[W]e're building new technology to proactively find and remove accounts belonging to those under 13 and to identify those people who may be under the age of 18. . . . We train our technology to identify if people are above or below 18 using multiple signals. We look at things like wishing people a happy birthday and the age written in those messages." Ex. 2573 at 11-12.
- In his December 8, 2021 Congressional testimony, Adam Mosseri stated, "I am especially focused on the safety of the youngest people who use our services. This work includes

keeping underage users off our platform, designing age-appropriate experiences for people ages 13 to 18, and building parental controls." *Id.* at 11.

- Meta's webpage stated, "We will delete the account if we can't verify the account is managed by someone over 13 years old." Ex. 0933 at -318.

These representations were made in highly public forums and often by Meta's top executives in a manner that was designed to impact public opinion about the nature of Meta's platforms and business.[69]

Despite these statements to the contrary, the Court finds that Meta often fails to delete underage accounts, and has marketed its platforms to young children:[70]

- Where users had hard-linked their Facebook and Instagram accounts, Meta did not delete Instagram accounts linked to a known underage Facebook account until December 2021. See supra II.C.4.
- Meta does not use its soft-matching systems to identify and delete Facebook or Instagram accounts that the company determines belong to known underage users. See supra II.C.4.
- Where Meta determined an account belonged to an underage user, Meta preserved that account, including underage users' personal information, for up to a year, before it began a 90-day process to delete it.71
- An internal Meta document from 2018 acknowledges that "we do very little to keep U13s off our platform." Ex. 0075.
- Underage accounts often remain on Meta's platforms despite having been reported to Meta as belonging to users under the age of 13.72

---

[69] Testimony of Alter.

[70] Testimony of Hartnett; Alter.

[71] Testimony of Hartnett.

[72] Testimony of Sheatsley; A. Davis.

- Meta did not conduct a timely review of over 700,000 reports of underage users and permitted those users to remain on the platform while the reports waited in a backlog for review.[73]
- An internal document identified Meta's "lack of U13 proactive age identification and enforcement mechanism." Ex. 2323 at 9.
- The same document noted the need for improved age-identification models—especially on Instagram, where Meta "still lack[s] age data for most users, which prevents us from implementing a number of age-related protections." Id.
- Meta sought to attract, and partnered with, underage influencers to create content for its platforms. See supra II.A.
- Meta developed and released features it recognized would particularly appeal to the interests of underage users. See supra II.A.
- Numerous internal studies show that a significant portion of all children under 13 in the United States—including 30% or more of tweens—use Facebook and Instagram. See supra II.A.

Meta's failure to delete U13 accounts, and marketing of its platforms towards children, shows that its claims to the contrary were false and misleading.

* * *

Based on this evidence, the Court concludes that Meta knowingly or recklessly made false or misleading representations concerning the characteristics of its platforms. Specifically, Meta's public communications regarding the risks its platforms posed to young users, the platforms' design to encourage compulsive use, Meta's prioritization of safety over growth, and the presence of children under 13 on its platforms had a tendency to mislead the public. Meta made those representations with knowledge of their misleading character. The Court therefore concludes that Meta violated the applicable laws of California, Colorado, Kentucky, and New Jersey.

[73] Testimony of A. Davis.

## V. Meta's Affirmative Defenses to The States' Unfairness and Deception Claims

### A. Section 230

Throughout this litigation, Meta has asserted that the States' claims are barred in their entirety by Section 230 of the Communications Decency Act. The Court has already addressed these arguments extensively. In its order on Meta's motions to dismiss, the Court determined that the States could not proceed on their unfairness claims to the extent they depended on certain features—namely, Meta's algorithm, display of likes, infinite scroll, auto-play, and ephemeral content. ECF 123 (1214)**.** The jury was instructed that it could not base its findings with respect to the unfairness claims on these features. To the extent Meta argues that the remaining claims that proceeded to trial are barred by Section 230, the Court rejects that argument.

Section 230 provides that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1). It further provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section." *Id.* § 230(e)(3). Construing these provisions, the Ninth Circuit has developed a three-part test: Section 230 "only protects from liability (1) a provider or user of an interactive computer service (2) whom a plaintiff seeks to treat, under a state law cause of action, as a publisher or speaker (3) of information provided by another information content provider." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100-01 (9th Cir. 2009), as amended (Sept. 28, 2009).

With respect to the States' remaining unfairness claims, those claims did not seek to treat Meta as a publisher or speaker of third-party information. The States' unfairness claims allege that Meta (1) violated COPPA; (2) allowed U13s on its platforms, failed to removed them, and harvested their data despite its own stated policy to the contrary; and (3) designed a sophisticated, psychologically-manipulative suite of features for the purpose of encouraging compulsive use, while knowing the risks these features posed to young users, and attempting to lull parents with "safety tools" Meta knew were ineffective. These claims did not reference any particular piece of information provided by any third-party, nor did they attempt to hold Meta liable under a state law cause of action for any such information. To the extent that these claims depend in part on the mere existence of third-party content, or on the fact that Meta is a publisher of third-party content, the Ninth Circuit has consistently rejected those arguments as

insufficient to establish a Section 230 defense. *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 853 (9th Cir. 2016).[74] With respect to the States' deception claims, these too are beyond the scope of Section 230 because they are based on Meta's own deceptive conduct. *See Bride*, 112 F.4th at 1180 (holding that the products-liability claims were precluded by Section 230 because they "fault[ed] YOLO for not mitigating, in some way, the harmful effects of the harassing and bullying content" but allowing plaintiff to proceed on misrepresentation claims based on YOLO's own statements about its products and services).

**B. The First Amendment**

Meta asserts the First Amendment as an affirmative defense to the States' consumer protection claims. The Ninth Circuit's "First Amendment analysis proceeds in three steps." *NetChoice, LLC v. Bonta*, 170 F.4th 744, 754 (9th Cir. 2026). First, the Court determines "whether the regulation implicates protected expression." *Id.* (quoting *Recycle for Change v. City of Oakland*, 856 F.3d 666, 669 (9th Cir. 2017)); *see also Moody v. NetChoice, LLC*, 603 U.S. 707, 745 (2024) (Barrett, J., concurring) ("A function qualifies for First Amendment protection only if it is inherently expressive.").) Meta bears the burden on this element. *See Gearhart v. Thorne,* 768 F.2d 1072, 1073 (9th Cir. 1985) (per curiam). As described below, the Court finds that the States' consumer-protection laws do not implicate Meta's protected expression, and Meta has failed to establish this affirmative defense.

**1. Unfairness**

Meta asserts that the States' unfairness claims based on Meta's unfair age-verification practices and time-restriction tools violate the First Amendment. The Court has already held that imposing liability based on these allegations would not violate the First Amendment because "[a]ddressing these defects would not require that [Meta] change how or what speech [it] disseminate[s]." PI Plaintiffs Motion to Dismiss Order, ECF 430 at 21. The Court reaches the same conclusion today. Meta has not met its burden

---

[74] The Court notes that in each case in which the Ninth Circuit has found a 230 defense, the harm alleged by the plaintiff came from the *information* supplied by a third party. *See*, *e.g.*, *Doe v. Grindr, Inc.*, 128 F.4th 1148, 1152 (9th Cir. 2025) (third-party communications leading to sexual assault); *Est. of Bride by & through Bride v. YOLO Tech., Inc.*, 112 F.4th 1168, 1180 (9th Cir. 2024) (harassing and bullying posts); *Dyroff v. Ultimate Software Grp.*, Inc., 934 F.3d 1093, 1095 (9th Cir. 2019) (communications between the decedent and a third-party drug dealer that supplied him fentanyl); *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1265 (9th Cir. 2016) (negative reviews provided by third parties); *Barnes*, 570 F.3d at 1098 (offensive fake profiles posted by a third-party user). That is not the case here.

to show that the States' unfairness claims regulate protected expression to the degree they are based on Meta's age-verification or time-management tools. *See Moody*, 603 U.S. at 747 (Barrett, J., concurring) (whether the First Amendment applies is a "fact intensive" showing that "var[ies] from function to function").

***Age Verification.*** Meta's decisions regarding whether and how to verify the ages of its users are not "inherently expressive" and thus do not receive First Amendment protection. *Id.* at 745 (Barrett, J., concurring). Imposing liability based on Meta's enforcement (or lack thereof) of its own age policy is not akin to situations where the government forces a speaker to accommodate (or omit) another speaker's message. *See, e.g.*, *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston, Inc.*, 515 U.S. 557 (1995); *Miami Herald Pub. Co. v. Tornillo*, 418 U.S. 241 (1974). Those cases turned on "the fact that the complaining speaker's own message was affected by the speech it was forced to accommodate." *Rumsfeld v. Forum for Academic Institutional Rights, Inc.*, 547 U.S. 47, 63 (2006) ("*FAIR*"). Meta's design and implementation decisions related to age-gating, however, "lack the expressive quality of a parade, a newsletter, or the editorial page of a newspaper." *Id.*; *see also PruneYard Shopping Ctr. v. Robins*, 447 U.S. 74, 87 (1980) (shopping center had no expressive interest in prohibiting visitors or tenants from engaging in publicly expressive activity because views expressed "will not likely be identified with those of the owner"). Just as law schools "are not speaking when they host interviews and recruiting receptions," *FAIR*, 547 U.S. at 64, Meta is not speaking when it takes steps to verify (or not) the ages of its users in order to comply with its own age policy.

In basing Meta's liability partly on its failure to enforce its policy of keeping U13 users off its platforms, the Court is not forcing Meta to "alter the content of" its expression. *Moody*, 603 U.S. at 728. Meta has not argued, nor could it, that hosting speech by U13 users whom *its own policies* expressly prohibit from using its platforms is a protected exercise of its editorial discretion. The First Amendment thus does not apply to these claims.

***Time Management.*** The same is true of the States' unfairness claims to the degree they are premised on Meta's choices not to implement effective time-management tools, which are not expressive and do not receive First Amendment protection.

As with the age-verification decisions, imposing liability based on Meta's decisions regarding whether and how to help users limit the amount of time they spend on Meta's platforms, and thus mitigate the risks the States have proved, does not "interfere[] with [Meta's] desired message." *FAIR*, 547 U.S. at 64. It has nothing to do with Meta's decisions regarding "which third-party content [to] display," or how to "order[] and organize[]" that display. *Moody*, 603 U.S. at 740. *See* ECF 430 at 21-22 ("Providing users with tools to limit the amount of time they spend on a platform does not alter what the platform is able to publish for those that choose to visit it.").

**2. Deception**

Meta asserts that the First Amendment protects it from liability for certain of its deceptive statements. As a threshold matter, the Court notes that the States' deception claims are not premised on individual misrepresentations, but rather on a deceptive course of conduct. Thus, even if the First Amendment protected particular statements by Meta, the deception claims remain amply supported by other evidence. And, in any event, the Court finds that Meta cannot establish this affirmative defense as to the statements it has identified because they constitute misleading commercial speech not protected by the First Amendment.

The First Amendment does not protect false or misleading commercial speech. *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 563 (1980). Because "there can be no constitutional objection to the suppression of commercial messages that do not accurately inform the public about lawful activity[,] . . . [t]he government may ban forms of communication more likely to deceive the public than to inform it." *Id.*; *see also In re R. M. J.*, 455 U.S. 191, 203 (1982). Meta does not argue that the majority of the deceptive statements discussed, *supra* IV, are protected by the First Amendment. Instead, their argument addresses only particular statements by Meta executives that they claim are pure opinion, not commercial speech. Meta's Motion for Summary Judgment, ECF 252 (2704) at 4 n.11, 25-26.

The crux of Meta's argument is that because these statements were about a controversial matter of public concern—the risks posed by social media—they cannot constitute commercial speech. *See* ECF 440 (3214) at 26. But the Supreme Court squarely rejected this proposition in *Central Hudson*, where it declined to recognize full First Amendment protection for "any advertising that links a product to a current

public debate," since "many, if not most, products may be tied to public concerns with the environment, energy, economic policy, or individual health and safety." 447 U.S. at 562 n.5. The California Supreme Court applied this principle in *Kasky v. Nike, Inc*., 27 Cal.4th 939 (2002), where it rejected Nike's argument that the fact that certain press releases "discuss[ed] policy questions" about globalization and international labor standards while also making statements about conditions in Nike's factories "removed [the press releases] from the category of commercial speech." *Id.* at 966. Because Nike's press releases contained "facts material to commercial transactions—here, factual statements about how Nike makes its products," —additional "expression of opinion or points of view on general policy questions" contained in those press releases was not protected by the First Amendment. *Id.* at 967.

The statements Meta tries to characterize as protected opinion similarly make purportedly "factual statements about how [Meta] makes its products." *Id.*; s*ee also* Ex. 2568 at 49 (stating that Facebook has, every quarter, "report[ed] on the prevalence of each category of harmful content and how effective our systems are at identifying that content and removing it in advance"); Ex. 2568 at 100 (Zuckerberg explains that whether his platform harms children "is something that we study and we care a lot about"); *id.* at 56 (characterizing "the research that we have seen" as showing "that using social apps to connect with other people can have positive mental health benefits and well-being benefits by helping people feel more connected and less lonely"); Ex. 2573 at 18 (Mosseri: "I don't believe the research suggests that our products are addictive."). To the degree any of these factual statements are false, they are unprotected by the First Amendment. *Kasky*, 27 Cal.4th at 967.

This conclusion is supported by the Ninth Circuit's commercial-speech framework, which assesses, among other considerations, whether "the speech is an advertisement" and/or "refers to a particular product" and whether "the speaker has an economic motivation." *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1116 (9th Cir. 2021) (citing *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66-67 (1983)). None of these factors are dispositive, and courts evaluate them in light of changing market norms—for example, "today's sophisticated and subtle marketing campaigns." *Id.* Economic motivation may be "indirect," for example, where the speaker seeks to make "improvements to a brand's image." *Id.* at 1117.

The Court finds that the statements here are commercial speech because they refer directly to Meta's products and were motivated by a desire to improve Meta's brand image. *See supra* III.B.2.iii (explaining Meta's public relations messaging campaigns).[75] As Plaintiff States have presented evidence that the challenged statements were false or misleading, *supra* IV, these statements receive no First Amendment protection. Commercial statements may be misleading, and thus unprotected, when "special possibilities for deception" are presented, such as when the public is operating with a "comparative lack of knowledge." *See In re R. M. J.*, 455 U.S. at 202. That is precisely what happened here, where Meta's executives went on a public-relations campaign to convince the public that any risks posed by their platforms were overstated, and that Meta was working proactively to address them.[76] Given the executives' intimate knowledge of Meta's products, it would be more than reasonable for members of the public to believe these assertions. But the States have presented evidence that Meta knew the risks posed by its products were far greater than it admitted. *Supra* III; IV. This evidence shows that the statements were false or misleading and thus are not subject to First Amendment protection.

### C. Noerr-Pennington

Meta asserts that it is protected from liability for certain of its misrepresentations by the *Noerr-Pennington* doctrine. The Court rejected this argument at summary judgment based on evidence "that Meta's practice was to amplify the statements made to governmental bodies after the fact" as "part of a series of messaging campaigns." ECF 440 (3214) at 13; *see, e.g.*, Ex. 0734C (discussing methods to shape public narrative through both consumers and "policy elites"); Ex. 1316 at 2 (describing strategies for changing "parent sentiment," including via "policy elites"); Ex. 1432 at -886 (discussing media coverage of Meta executive "giving evidence" in the inquest). The Court declines to hold that statements Meta made to Congress and then recycled as part of its own affirmative public messaging are somehow immunized by the First Amendment.[77]

---

[75] Testimony of Alter.

[76] Testimony of Alter.

[77] Testimony of Alter.

For similar reasons, the Court additionally holds that Meta has failed to carry its burden on this defense because it has not presented "evidence that "it 'was seeking any redress from Congress that implicates its First Amendment right to petition.'" ECF 440 (3214) at 13 (quoting *In re Apple Inc. Sec. Litig.*, 2020 WL 2857397, at *18 (N.D. Cal. June 2, 2020)); *see also* ECF 123 (1214) at 45. "The *Noerr-Pennington* doctrine protects 'those who petition any department of the government for redress . . . from statutory liability for their petitioning conduct.'" *In re Apple Inc. Sec. Litig.*, 2020 WL 2857397, at *18 (N.D. Cal. June 2, 2020) (quoting *SOSA v. DIRECTV, Inc.*, 437 F.3d 923, 929 (9th Cir. 2006)); *see also B&G Foods N. Am., Inc. v. Embry*, 29 F.4th 527, 535 (9th Cir. 2022) (party asserting defense must show "whether the alleged activities constitute protected petitioning activity" (citation omitted)). In *Eastern R.R. Pres. Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 129 (1961), for example, the Supreme Court applied this principle to railroads that had "conduct[ed] a publicity campaign against [rival] truckers designed to foster the adoption and retention of laws and law enforcement practices destructive of the trucking business." Because the plaintiffs had made "specific charges as to particular instances in which the railroads had attempted to influence legislation by means of their publicity campaign," such as by convincing the governor of Pennsylvania to veto a particular law, the Court held that the railroads' conduct was petitioning protected by the First Amendment. *Id.* at 130, 139.

Meta has failed to make a similar showing that the statements at issue were "genuinely intended to influence governmental action." *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240, 1253 (9th Cir. 1982); *see also Litton Sys., Inc. v. Am. Tel. & Tel. Co.*, 700 F.2d 785, 807 (2d. Cir. 1983) *(Noerr-Pennington* requires "request for governmental action"*)*. The congressional testimony it claims is protected petitioning activity was not lobbying or even a publicity campaign to influence legislation, as in *Noerr* itself—it was sworn testimony solicited by Congress in its investigative capacity. Meta did not initiate these hearings, nor was it seeking governmental action when its executives testified at them.

When Mark Zuckerberg testified before the Senate Judiciary Committee on November 17, 2020, it was after the Committee had authorized a subpoena for him to testify as to the impact of social media

on the 2020 elections. Ex. 3680.[78] When Zuckerberg testified before the House Committee on Energy and Commerce on March 25, 2021 about "Social Media's Role in Promoting Extremism and Misinformation," it was at the Committee's request. Ex. 2568.[79] When Antigone Davis testified before the Senate Subcommittee on Consumer Protection, Product Safety, and Data Security on September 30, 2021, at a hearing titled "Protecting Kids Online: Facebook, Instagram, and Mental Health Harm," it was in response to a letter from the chair and ranking member of the subcommittee expressing concern about evidence of the harmful impact of Meta's products on children and teenagers and requesting that Meta provide an executive to testify on the topic. Ex. 1185; Ex. 3017.[80] Adam Mosseri's testimony before the same committee on December 8, 2021, on "Instagram and Reforms for Young Users," arose from the same request. Ex. 2573.[81] All three of these executives were responding to Congressional requests and concerns, not exercising their right to petition the government. *See In re Apple*, 2020 WL 2857397, at *18 ("no evidence that Apple was seeking any redress from Congress that implicates its First Amendment right to petition" where it responded to a letter sent by a senator about specific practices and there was "no evidence that any particular legislation or government effort was pending that Apple intended to influence"); *In re ZF-TRW Airbag Control Units Prods. Liab. Litig*., 601 F. Supp. 3d 625, 751 (C.D. Cal. 2022) (allegations that Defendants made statements to agency "at the request of" the agency did not implicate right to petition).

For these reasons, the Court finds that Meta has failed to establish a factual basis for its *Noerr-Pennington* defense.

## VI. Remedies

### A. Civil Penalties for Unfairness and Deception Claims

Once a violation of the consumer protection laws has been found, the Court assesses civil penalties. *People v. Custom Craft Carpets, Inc.,*159 Cal. App. 3d 676, 686 (Cal. Ct. App. 1984) (civil penalties are

[78] Testimony of Zuckerberg.

[79] Testimony of Zuckerberg.

[80] Testimony of A. Davis.

[81] Testimony of Mosseri.

mandatory under UCL and FAL) (internal citation omitted); Colo. Rev. Stat. § 6-1-112(1)(a) ("Except as provided in subsections (3) and (4) of this section, any person who violates or causes another to violate any provision of this article 1 *shall* forfeit and pay to the general fund of this state a civil penalty of not more than twenty thousand dollars for each such violation.") (emphasis added); N.J. Stat. Ann. § 56:8-13 ("[a]ny person who violates any of the provisions of the act to which this act is a supplement *shall*, in addition to any other penalty provided by law, be liable to a penalty of not more than $10,000 for the first offense and not more than $20,000 for the second and each subsequent offense."); Ky. Rev Stat. Ann. § 367.990(26)(a) ("if the court finds that a person is willfully using or has willfully used a method, act, or practice declared unlawful by Ky. Rev. Stat. Ann. § 367.170, the Attorney General . . . may recover on behalf of the Commonwealth a civil penalty of not more than[] [t]wo thousand dollars per violation.").

**1. Law**

Statutory civil penalties under the States' consumer protection laws are different than compensatory damages and serve a distinct purpose, including punishing a defendant's misconduct and deterring future misconduct. *See, e.g.*, *People v. Bestline Products, Inc.*, 61 Cal. App. 3d 879, 924 (Cal. Ct. App. 1976) ("[S]ome deterrent beyond that of being subject to an injunction and being required to return such ill-gotten gains is deemed necessary to deter fraudulent business practices."); *May Dep't Stores Co. v. State ex rel. Woodard*, 863 P.2d 967, 972 (Colo. 1993) ("[T]he CCPA's civil penalty requirement is intended to punish and deter the wrongdoer[.]"); *Kugler v. Romain*, 279 A.2d 640, 647 (N.J. 1971) (noting the "deterrent effect of the sanctions which [the Court] believe[s] underlies the [New Jersey] Consumer Fraud Act"); *Am. Nat'l Univ. of Kentucky, Inc. v. Commonwealth ex rel. Beshear*, 2019 WL 2479608, at *7 (Ky. Ct. App. June 14, 2019) (not to be published) (noting that Kentucky's consumer protection statutes are "intended to provide an effective deterrent for any type of violation")[82]; Ky. Rev. Stat. Ann. § 367.990(26)(c) ("[A]ctual injury . . . shall not be required, as the civil penalty provisions in this subsection are intended to punish and deter the violator and not intended solely to compensate injured parties."). The States need not show individual consumer harm or reliance for the factfinder to award civil penalties. *See, e.g.*, *Prata v. Super. Ct.*, 91 Cal. App. 4th 1128, 1146 (Cal. Ct. App. 2001) (holding that

[82] *Am. Nat'l Univ. of Kentucky* is not binding authority; however, it is helpful in showing how Kentucky courts address this point of law. The use of *Am. Nat'l Univ. of Kentucky* in this way is permitted under Kentucky law. *See* Kentucky Rule of Appellate Procedure 41.

"individual matters of proof [are] irrelevant to liability under the UCL"); *Meshinksy v. Nichols Yacht Sales, Inc.*, 541 A.2d 1063, 1067 (N.J. 1988) (noting that "the [AG] does not have to prove that the victim was damaged by the unlawful conduct"); *May Dep't Stores Co.*, 863 P.2d at 973 ("the CCPA does not require proof of an actual injury or loss before a civil penalty can be awarded"); *Am. Nat'l Univ. of Ky.*, 2019 WL 2479608, at *8 (holding that violations should be tied to defendant's conduct and not individual consumer harm).

To arrive at a total civil penalty award, the factfinder must determine both (1) the number of violations; and (2) the penalty amount to be awarded for each violation.

***Counting violations.*** Violation counting is a flexible exercise subject to the discretion of the factfinder, based on the circumstances of the case and the evidence before the factfinder. *People ex rel. Harris v. Sarpas*, 225 Cal. App. 4th 1539, 1566 (Cal. Ct. App. 2014) (holding that "what constitutes a violation" in a UCL or FAL action "depends on the circumstances of the case, including the type of violations, the number of victims, and the repetition of the conduct constituting the violation"); *People v. Wunder*, 371 P.3d 785, 793 (Colo. App. 2016) ("A court should consider several factors in its determination of the amount of civil penalties under section 6-1-112(1)(a) even though those factors are not a 'litmus test' for the imposition of civil penalties."); Colo. Rev. Stat. § 6-1-112(1) (any person who violates or causes another to violate any provision of this article 1 shall forfeit and pay to the general fund of this state a civil penalty. . . . For purposes of this subsection (1)(a), a violation of any provision constitutes a separate violation with respect to each consumer or transaction involved."); *Am. Nat'l Univ. of Ky.*, 2019 WL 2479608, at *7 (holding that "creativity is permitted in determining what constitutes a violation in order to effectuate the legislature's intent that the KCPA 'in the hands of the Attorney General, be a flexible and effective means of combating abusive trade practices'" (quoting *Commonwealth ex rel. Chandler v. Anthem Ins. Companies, Inc.*, 8 S.W.3d 48, 55 (Ky. Ct. App. 1999)); *Stevens v. Motorists Mut. Ins. Co.*, 759 S.W.2d 819, 821 (Ky. 1988) (noting that the consumer protection statute "has the broadest application in order to give Kentucky consumers the broadest possible protection for allegedly illegal acts" and citing KRS 446.080, which "requires that the statutes of this Commonwealth are to be liberally construed"); *Kimmelman v. Henkels & McCoy, Inc.*, 527 A.2d 1368, 1375 (N.J. 1987) (the trial court has "considerable discretion in determining the penalty appropriate in each case").

When counting violations, the factfinder is not limited by the number of deceptive statements proved or the number of people who may have viewed those deceptive statements. *See People v. Nat'l Ass'n of Realtors*, 155 Cal. App. 3d 578, 585-86 (1984) (rejecting trial court's assumption that separate acts pursuant to a single scheme amounted to a single violation, and noting that separate violations may be found where a single act affects multiple victims); *People v. Dollar Rent-a-Car Systems, Inc.*, 211 Cal. App. 3d 119, 131 (Cal. Ct. App. 1989) (counting violations only for consumers who read defendants' deceptive contracts would "defeat the purpose behind the [UCL and FAL]" of "protect[ing] against the *likelihood* of deception, not just to the public *actual* harm"); Colo. Rev. Stat. § 6-1-112(1)(a) ("For purposes of this subsection (1)(a), a violation of any provision shall constitute a separate violation with respect to each consumer or transaction involved."); Ky. Rev. Stat. Ann. § 367.990(26)(b) ("Any method, act, or practice declared unlawful by KRS 367.170 shall constitute a separate violation as to each . . . [c]onsumer to whom a method, act, or practice . . . was directed, communicated, or applied, regardless of whether the consumer suffered actual pecuniary loss[.]"); *Meshinsky*, 541 A.2d at 1067 ("[T]he [New Jersey] Attorney General does not have to prove that the victim of the fraudulent conduct had in fact been misled, deceived or damaged thereby.") (internal citation and quotation omitted).

Likewise, the factfinder may count more than one penalty per consumer if appropriate under the circumstances of the case. *See People ex rel. Kennedy v. Beaumont Investment, Ltd.*, 111 Cal. App. 4th 102, 129 (Cal. Ct. App. 2003) (rejecting the contention that the number of violations must always be calculated on a "per victim" basis); *May Dep't Stores Co.,* 863 P.2d at 976 ("The [CCPA] does not list mutually exclusive violations; it lists separate categories of violations, each of which may be assessed a penalty. In effect, the State is given multiple options, no one of which precludes the other."); *Am. Nat'l Univ. of Ky.*, 2019 WL 2479608, at *7 (Ky. Ct. App. 2019) ("creativity is permitted in determining what constitutes a violation in order to . . . be a flexible and effective means of combating abusive trade practices"); Ky. Rev. Stat. Ann. § 367.990(26)(b)(1)(c) ("Any method, act, or practice . . . shall constitute a separate violation as to each . . . [s]eparately identifiable method, act, or practice declared unlawful by KRS 367.170, even if arising from the same transaction or directed at the same consumer[.]"); *Platkin v. Kizito, et al.,* 337 A.3d 354 (N.J. Super. App. Div. 2025) (holding that the trial court could award civil

penalties for violations of the registration and antifraud provisions of the New Jersey Uniform Securities Law concerning 753 violations across 69 individual defrauded investors).

***Per-Violation Penalty Amount.*** The factfinder has broad discretion to determine the penalty amount for each violation, taking into account each state's penalty factors and maximum penalty amount:

- California: Civil penalties of up to $2,500 must be ordered for each violation of the UCL and FAL and the factfinder "shall consider any one or more" of the following, non-exhaustive factors: "the nature and seriousness of the misconduct, the number of violations, the persistence of the misconduct, the length of time over which the misconduct occurred, the willfulness of the defendant's misconduct, and the defendant's assets, liabilities, and net worth." Cal. Bus. & Prof. Code §§ 17206(b), 17536(b). The civil penalties under sections 17206 and 17536 are cumulative, such that a penalty amount of up to $5,000 may be awarded for an act that is a violation of both laws. Cal. Bus. & Prof. Code §§ 17205 and 17534.5; *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.*, 17 Cal. 4th 553, 573 (Cal. Ct. App. 1998).
- Colorado: For violations occurring on or after July 1, 2019, the Colorado Consumer Protection Act orders that each violation is punishable by a civil penalty of up to $20,000. Colo. Rev. Stat. § 6-1-112(1). In determining the appropriate amount of civil penalties, Colorado courts consider several non-exclusive factors. Although these factors do not constitute a "litmus test" for imposing civil penalties, they guide the factfinder's exercise of discretion. *People v. Shifrin*, 342 P.3d 506, 523 (Colo. App. 2014). Those factors include: "(1) the good or bad faith of the defendant; (2) the injury to the public; (3) the defendant's ability to pay; and (4) the desire to eliminate the benefits derived by violations of the CCPA." *Wunder*, 371 P.3d at 793. For violations occurring before July 1, 2019, the Colorado Consumer Protection Act authorized civil penalties of up to $2,000 per violation, subject to a $500,000 maximum for any related series of violations. Colo. Rev. Stat. § 6-1-112(1)(a).
- Kentucky: Kentucky law authorizes civil penalties of up to $2,000 per violation from any person the court finds is willfully using or has willfully used a method, act, or practice

declared unlawful by Kentucky Revised Statutes section 367.170. Ky. Rev. Stat. Ann. § 367.990(26)(a). In assessing penalties under Kentucky law, "the trier of fact may consider, either alone or in combination . . . 1. [w]hether the person charged with the violation was acting in good faith or bad faith; 2. [t]he nature, extent, and severity of the injury to consumers and the public; 3. [t]he person's ability to pay; 4. [t]he amount of profit or gain obtained through the unlawful conduct; 5. [t]he duration of the unlawful conduct; 6. [t]he desire to eliminate any benefit derived from the violation and to deter future violations; and 7. [a]ny prior violations of KRS 367.170 by the person." Ky. Rev. Stat. Ann. § 367.990(26)(d).

- New Jersey: N.J. Stat. Ann. § 56:8-13 provides for "not more than $10,000 for the first New Jersey law offense and not more than $20,000 for the second and each subsequent offense." Courts consider the following "*Kimmelman*" factors in setting civil penalties: (1) the good faith or bad faith of the defendant; (2) the defendant's ability to pay; (3) the amount of profits obtained from the illegal activity; (4) injury to the public; (5) and duration of the illegal activity or conspiracy. *Kimmelman*, 527 A.2d at 1375-76.

**2. Findings**

The Advisory Jury found that Meta committed __ violations and assessed penalties, per violation, of $__ (California); $__ (Colorado); $__ (Kentucky); and $__ (New Jersey) resulting in a total civil penalty calculation of $__. The Court agrees with the Advisory Jury's civil penalty calculation and concludes that it is supported by the evidence—specifically, the remedies charts provided by the States—which are based on the work of experts Carl Saba and Ryan Sheatsley—and Saba's and Sheatsley's testimony corroborating those charts.

**i. Number of Pre-Teens and Teens on Meta's Platforms During Relevant Time Period**

Ex. 4251 displays the number of unique 13- to 17-year-old (Teen) persons and Ex. 4250 displays the number of unique Under-13 (U13) persons present on Instagram and Facebook. Specifically, Saba calculated the number of Teen and U13 persons active on Instagram or Facebook during at least one of the months in the applicable time period, without counting any individual more than once. The U13 person

calculations are for the period January 1, 2012-December 31, 2023, and the Teen person calculations are for the period January 1, 2012- March 31, 2024.[83]

The Teen person calculation is based on Meta's own data showing the number of Monthly Active Users on each platform, broken down by State, month, and age. Because a single person can have more than one user account, Saba translated the number of Monthly Active Users to the number of Monthly Active Persons by applying a user-to-person multiplier. Saba based the user-to-person multiplier on estimates in internal documents produced by Meta.[84]

The U13 person calculation is based on surveys conducted by Thorn & Benenson Strategy Group each year from 2019 through 2023. Saba used results from survey questions asking 9 to 12 year old respondents if they had ever used Facebook or Instagram and whether they used each platform at least once per day.[85]

**ii. Monthly Instances of Teen Users Exceeding Specified Thresholds of Average Daily Time Spent**

Ex. 4252 displays the number of instances in which Teen accounts averaged more than 0.5, 1, or 2 hours per day on Instagram and Facebook in a given month ("Time Spent Instances"). The time spent thresholds are cumulative, so that all instances in which users averaged over 2 hours of time spent per day during a month are subsumed in the over 1 hour threshold, and all instances in the over 1 hour and 2 hour thresholds are included in the over 0.5 hour threshold group. The Instagram calculation is for the period January 1, 2013 to March 31, 2024. The Facebook calculation is for the period January 1, 2012 to March 31, 2024.[86]

Saba calculated the Time Spent Instances relying on data that Meta produced. Meta's data showed (1) the number of Monthly Active Users on each platform broken down by age, state, and month and (2) the average time spent per day by Teen Monthly Active Users on each platform, broken down by percentile, state, and month. Meta did not produce Instagram user and time spent data from January 2012

[83] Testimony of Carl Saba.

[84] Testimony of Saba.

[85] Testimony of Saba.

[86] Testimony of Saba.

through January 2018, though the States issued discovery requests for that data. Saba calculated these figures using several datapoints from Meta's internal documents, public financial statements, and data produced by Meta.[87]

#### iii. UDAP Violation Counts and Penalty Calculation Related to Meta's "Actual Knowledge" COPPA Violations

The States presented to the Court a set of charts with quantitative information related to Meta's actual knowledge of children under 13 on its platform in California, Colorado, Kentucky, and New Jersey. Ex. 3918. Each chart counts the number of children that Meta had actual knowledge of on its platforms, or the number of accounts belonging to those children through which Meta collected, maintained, used, or disclosed their personal information, relating to four different ways that Meta has failed to comply with its COPPA obligations. Because the Court finds that Meta collects and maintains numerous pieces of personal information from each child user on its platforms, the Court finds that adding all four charts reflects a conservative count of the number of violations of the California, Colorado, Kentucky and New Jersey unfair/unlawful practices laws related to Meta's actual knowledge of children on its platforms, regardless of whether some of the same children are represented in more than one chart in the set.

***Chart A.*** The first chart in Ex. 3918 shows the number of accounts of children under 13 for whom Meta retained their personal information for at least six to 12 months after disabling their accounts for being underage in each of California, Colorado, Kentucky, and New Jersey. Meta has actual knowledge that the users whose accounts it checkpoints and ultimately disables for being underage, belong to users under 13. Meta's decision to retain these children's personal information, even after the company determined they were underage and "disabled" their accounts, violated COPPA's requirement for operators to "retain personal information collected online from a child for only as long as is reasonably necessary to fulfill the purpose(s) for which the information was collected." 16 C.F.R § 312.10 (as amended, Jan. 17, 2013). Each of these actions to retain the personal information of each child's account also represents at least one violation of the state consumer protection statutes, as an unlawful and/or unfair act or practice.[88]

---

[87] Testimony of Saba.

[88] Testimony of Sheatsley.

Dr. Ryan Sheatsley analyzed Meta's underage enforcement data to count the number of accounts disabled for being underage each month between June 2020 and April 2024 (the range of time for which Meta produced this data). For the length of time that Meta retained data associated with accounts disabled for being underage, Sheatsley relied on the testimony of Meta's 30(b)(6) witness, Allison Hartnett. Because Meta failed to produce state-level geographic information for much of its underage reporting and enforcement data, Sheatsley reports the number of accounts disabled for being underage for all users identified as being in the U.S. in Meta's data. Each of the underage accounts disabled in this time and retained for unreasonably long periods constitutes at least one separate violation of COPPA, and thus at least one separate violation of the relevant state consumer protection statutes.[89]

To estimate the number of underage accounts that were located in each of the four states in the charts, the States multiplied the total number of affected U.S. accounts by the share of nine- to 12-year-old Daily Active Persons ("DAPs") in Meta's platforms in each of the four states. For simplicity in calculation and to be conservative in the estimate of the number of violations, the States used the lowest percentage of U13 users found in each relevant state across the entire period for which Saba calculated these percentages (2012-2023), and across both platforms. For example, in California, the number of violations is calculated by multiplying the total number of affected underage accounts in the US by 7.16%, which is the percentage of U13 DAPs in the US on Facebook that were in California in 2021, because that is the lowest share of U.S. U13 DAPs in California for any year in the full period that Saba calculated on either Facebook or Instagram.[90]

***Chart B.*** The second chart in Ex. 3918 shows the number of children's accounts that Meta allowed to remain on Instagram or Facebook, while disabling their other hard-linked account. Meta has actual knowledge that accounts that are hard-linked to accounts that the company checkpoints and disables for being underage belong to children under 13. However, Meta failed to consistently disable accounts hard-linked to accounts the company identified and disabled for being underage, until approximately October 2021. Instead of disabling these hard-linked accounts, Meta allowed them to remain on its platforms, thereby continuing to collect, use and disclose personal information from these children in violation of

[89] Testimony of Sheatsley.

[90] Testimony of Saba.

COPPA. 16 C.F.R. § 312.3. Each of these accounts that Meta allowed to remain on its platforms thus represents at least one separate violation of COPPA, and this conduct also violated the state consumer protection statutes of California, Colorado, Kentucky, and New Jersey, as a violation of the underlying Federal statute and/or as an unfair act or practice.[91]

Sheatsley estimated the number of underage accounts that Meta would have enforced against for being underage if it had begun consistently enforcing against hard-linked underage accounts prior to October 2021. The estimate is based on Meta's underage enforcement data, which includes the number of accounts that Meta disabled because they were hard-linked to accounts that Meta disabled for being underage. Sheatsley then used that data to estimate the number of accounts that Meta would have enforced against using this method for the full time period for which Meta provided underage enforcement data, prior to the time period when Meta began consistently enforcing against hard-linked underage accounts (i.e., October 2017 to September 2021).[92]

As with Chart A, Sheatsley produced estimates of the number of underage hard-linked accounts that Meta did not enforce against in the United States as a whole, as Meta's underage enforcement data largely lacks state-level geographic information. To derive state-level violation counts, the States used the same methodology as in Chart A, multiplying the total number of affected accounts by the lowest state-share of U13 DAPs from Saba's calculations across the platforms and across the full time period of Saba's calculations.[93] Because of Colorado's statutory change enacted on May 23, 2019, Ch. 98, sec. 2, § 6-1-112(1), 2019 Colo. Sess. Laws 353; Colo. Rev. Stat. § 6-1-112(1), violations for Colorado are limited to hard-linked accounts that could have been disabled from July 2019 to September 2021.

***Chart C.*** The third chart in Ex. 3918 shows the number of children who had at least one account that Meta allowed to remain on the platforms, even after Meta predicted the account(s) to belong to the same user as an account that Meta identified and disabled for being underage.[94] Meta has actual knowledge

---

[91] Testimony of Sheatsley.

[92] Testimony of Sheatsley.

[93] Testimony of Sheatsley, Saba.

[94] Testimony of Sheatsley.

that the accounts its soft-matching models predict to belong to the same users as accounts it disables for being underage belong to children under age 13. Meta's decision to allow these soft-matched accounts to remain on the platforms, and to continue collecting, using, and disclosing personal information from these children, violates COPPA. 16 C.F.R. § 312.3. Each child Meta identified through its soft-matching models thus also represents at least one violation of the state consumer protection statutes of the four states in the first trial, as an unlawful and/or unfair act or practice.

Sheatsley estimated the number of users with one account that Meta disabled for being underage who had additional accounts that Meta's soft-matching models predicted as belonging to the same user but allowed to remain on the platforms. The estimate is based on data Meta produced from three of its soft-matching models that it uses for integrity purposes (e.g., disabling multiple accounts belonging to users who violate other Meta policies, such as those prohibiting fraud and scams). Because Meta failed to retain its soft-matching data, the data relates to a three-month period from April to July 2025, the only period for which Meta produced soft-matching data. Sheatsley analyzed the number of users with accounts that Meta allowed to remain on its platforms even though Meta predicted them to belong to the same users as accounts that Meta disabled for being underage in this three-month period. Sheatsley then estimated the number of children with accounts that Meta could have disabled for being underage via soft-matching in the period of time for which Meta produced underage enforcement data, using a similar methodology to his hard-link account estimates referenced in Chart B.[95]

The violation counts in Chart C represent the number of children with accounts that Meta allowed to remain on its platforms, even though Meta predicted them as belonging to the same users as accounts that Meta identified and disabled for being underage for the period June 2020 to March 2024 and April to July 2025. Each of these children represents at least one act that violated COPPA (e.g., the collection, use, or disclosure of personal information), and thus at least one act that violated the four states' consumer protection laws. To be conservative, the States have counted violations using Sheatsley's analysis of data from only one of Meta's soft-matching integrity models, which predicts which Instagram accounts belong to the same users as other Instagram accounts (the IG-to-IG soft-match integrity model). Violations for the April to July 2025 period are based on Sheatsley's analysis of Meta's soft-matching data (the only soft-

[95] Testimony of Sheatsley.

matching data that Meta preserved and produced in this litigation) from this model. Some but not all of Meta's underage enforcement data in this period contained state-level geographic information. To conservatively estimate the number of affected children in each state, the States multiplied the number of affected children with U.S. geographic information but no state-level geographic information by the lowest state percentage of U.S. market share of U13 DAPs for each of the four states on Instagram across the period for which Saba calculated state-by-state market share. These results are then added to the number of affected children whose accounts are identified in Meta's state-level data as being in each of the relevant states. For the June 2020 to March 2024 period, Sheatsley's estimates are reported for all U.S. users, as Meta's underage enforcement data in this period largely lacks state-level geographic information. Again, the States conservatively estimate the number of violations in each relevant state by adding up the number of affected U.S. children across the time period, and then multiplying the total by the lowest state-share of U.S. U13 DAP market share on Instagram.[96]

***Chart D.*** The fourth chart in Ex. 3918 shows the number of children under 13 on Facebook that changed their date of birth to an age under 13, but Meta ignored the change and allowed the child's account to remain on the platform, in 2019. Meta has actual knowledge that the users who expressly admit to the company that they are under 13 by changing their date of birth to a date that would make them under age 13, are children under 13, especially for those who are ultimately disabled after being provided an opportunity to submit an ID showing they are 13 or older. For years until early 2020, Meta failed to take action against users who changed their date of birth to under 13, even after many of them also were presented with a checkbox where they confirmed their age to be under 13, instead showing them an error message and allowing them to remain on the platform, where Meta continued collecting, using, and disclosing their personal information.[97]

To estimate the number of children who changed their date of birth to an age under 13 on Facebook, but whom Meta allowed to remain on the platform, the States relied on Meta's estimate of the annual loss of 126,000 U.S. MAPs that would occur when Meta started checkpointing these users. To be conservative, the States reduced the total by 30%, following Meta's updated estimates after it added a confirmation

[96] Testimony of Sheatsley, Saba.

[97] Testimony of Hartnett.

screen for certain users. Ex. 45. To estimate the number of affected children in the four states with state consumer protection claims in the first trial, the States used a similar methodology as the three preceding charts, multiplying the total number of affected U.S. children by the lowest percentage of U.S. U13 DAP market share in each relevant state on Facebook over the full period of Saba's calculations.[98] While Meta had failed to checkpoint these users who changed their date of birth to U13 on Facebook for years, to be conservative, the States count violations for only 2019, the year immediately before Meta started checkpointing and disabling these users. To estimate violations in Colorado starting only on July 1, 2019, the Colorado estimate of violations is reduced by half.

**B. Disgorgement for Unfairness and Deception Claims and COPPA Claims**

**1. Law**

In addition to civil penalties, the States seek disgorgement as a remedy under both COPPA and their consumer protection statutes. *See, e.g.*, *Sec. & Exch. Comm'n v. Choice Advisors, LLC*, 2024 WL 4469095, at *5 (S.D. Cal. Oct. 7, 2024) ("Because disgorgement merely approximates a return to the status quo, civil penalties are an important additional remedy to deter the wrongdoer from similar conduct in the future."), *aff'd*, 2026 WL 2098699 (9th Cir. July 21, 2026); *Fed. Trade Comm'n v. Green Equitable Sols.*, 2024 WL 1481431, at *9 (C.D. Cal. Feb. 2, 2024), *aff'd sub nom. Fed. Trade Comm'n v. Barron*, 2025 WL 1482988 (9th Cir. May 23, 2025) (approving disgorgement, restitution, and civil penalties for same set of claims); Colo. Rev. Stat. § 6-1-110(1) ("The court may make such orders or judgments as may be necessary . . . to prevent any unjust enrichment by any person through the use or employment of any deceptive trade practice."); Cal. Govt. Code § 12527.6(a) (authorizing courts to award disgorgement in a UCL or FAL action brought by the Attorney General, "in addition to the remedies provided for in those statutes").

COPPA authorizes the Court to enjoin an unlawful practice, enforce compliance with the COPPA Rule, obtain damages, restitution, or other compensation on behalf of State residents, and award such other relief as the Court considers appropriate. 15 U.S.C. § 6504(a)(1). Congress has expressly authorized the imposition of both legal and equitable relief, and this Court previously ruled that disgorgement is available under 15 U.S.C. § 6504(a)(1). COPPA contains no limitation withdrawing the Court's traditional equitable

[98] Testimony of Saba.

power to deprive a wrongdoer of gains attributable to unlawful conduct. *See, e.g.*, *Porter v. Warner Holding Co.*, 328 U.S. 395, 398-99 (1946) ("Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied.").

The States must set forth "a reasonable approximation" of the gains "causally connected to" Meta's unlawful conduct, which are subject to disgorgement. *S.E.C. v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1096 (9th Cir. 2010) (internal citations omitted). In defining what constitutes a reasonable approximation, courts consistently recognize that it can be very difficult to separate illegal and legal gains. *See S.E.C. v. First City Fin. Corp.*, 890 F.2d 1215, 1231 (D.C. Cir. 1989) (the "[r]ules for calculating disgorgement must recognize that separating legal from illegal profits exactly may at times be a near-impossible task.").

In formulating disgorgement awards, courts resolve uncertainties against the wrongdoer, and allow for considerable flexibility in the calculation of disgorgement figures. *See, e.g.*, *Kansas v. Nebraska*, 574 U.S. 445, 466 (2015) (approving of a disgorgement figure that "appropriate[ly] consider[ed]" the wrongdoer's "incentives" and "past behavior" and achieved "the kind of signal necessary to prevent another breach," though the "exact [disgorgement] number" was lacking in "explanation"); *Providence Rubber Co. v. Goodyear*, 76 U.S. 788, 803-04 (1869) (including both legally obtained and ill-gotten gains in the disgorgement figure where they were "impossible" to separate based on the defendant's records, as "every doubt and difficulty should be resolved against" the wrongdoer); *Platforms Wireless*, 617 F.3d at 1096 (concluding that "the risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty") (quoting *First City Fin. Corp.*, 890 F.2d at 1232); *First City Fin. Corp.*, 890 F.2d at 1231-32 (discussing cases that relax the disgorgement nexus element when wrongdoing is so pervasive that it is difficult to distinguish between legal and illegal gains); *S.E.C. v. Hughes Cap. Corp.,* 917 F. Supp. 1080, 1085 (D.N.J. 1996), *aff'd*, 124 F.3d 449 (3d Cir. 1997) (holding that "[i]n meeting its burden" to "reasonably approximate the amount of unjust enrichment" . . . "the plaintiff is not required to trace every dollar of proceeds misappropriated by the defendants . . . nor is plaintiff required to identify monies which have been commingled by them.") (internal citations omitted); *Coxon v. S.E.C.*, 137 Fed. App'x 975, 976

(9th Cir. 2005) (when calculating disgorgement figures, "any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty") (internal citations omitted).

Once the plaintiff sets forth a reasonable approximation, "the burden shifts to the defendants to demonstrate that the disgorgement figure was not a reasonable approximation." *Platforms Wireless*, 617 F.3d at 1096 (citing cases) (internal citations omitted). This burden is substantial, "not simply one of carrying the ball back across the fifty-yard line by presenting a merely plausible alternative explanation for the profit. Rather, the defendant must adduce—at a minimum—specific evidence explaining the interplay (or lack thereof) among the violation(s) at issue . . . and any other cause for the profits [the defendants] assert were untainted by illegality." *S.E.C. v. Teo*, 746 F.3d 90, 107-08 (3d Cir. 2014).

**2. Findings**

The States have presented evidence showing that Meta owes $__ in disgorgement related to consumer protection law violations and $__ in disgorgement related to COPPA violations. The Court agrees with the States' calculation and concludes that it is supported by the evidence—specifically, the remedies charts provided by the States based on work from expert Saba, and Saba's testimony corroborating those charts.

**i. Disgorgement of Profits Based on Time Spent as Teens**

Ex. 3917 displays the results of Saba's calculations of the gross profits associated with teen users who averaged more than 0.5, 1, or 2 hours per day on Instagram and Facebook in a given month. Specifically, Saba identified the users who, while they were Teens, averaged more than 0.5, 1, or 2 hours per day on the platforms in a given month. He then estimated the gross profits associated with those users starting from when they became 18 during the Relevant Time Period, until March 31, 2024. This profit figure conservatively approximates the value that teens present to Meta due to their high retention rates—teens remain on the platforms and generate revenue and profits for Meta in the long run. The time spent thresholds are cumulative, so that the disgorgement figures associated with users that averaged over 2 hours of time spent per day during a month are included in the figures associated with users that averaged

over the 1 hour threshold, and the figures in the over 1 hour and 2 hour thresholds are included in the over 0.5 hour threshold.[99]

Saba calculated the disgorgement figures using data that Meta produced. Specifically, Saba used Meta's user and time spent data discussed above in connection with Ex. 4252. Saba also used Average Revenue Per User and platform cost data that Meta produced. Meta's Average Revenue Per User data was broken down by users' stated age. In order to complete this calculation, Saba also estimated user retention rates, based on datapoints in Meta's internal documents.[100]

For Colorado, Kentucky, and New Jersey, the time period for the disgorgement calculations is January 1, 2013 through March 31, 2024. For California, the time period for the disgorgement calculations is January 1, 2024 through March 31, 2024, given that January 1, 2024 is the effective date of Cal. Govt. Code § 12527.6, which provides a disgorgement remedy under the UCL and FAL.[101]

* * *

Based on Saba's calculations, the States assert that Meta owes $__ in disgorgement of ill-gotten gains associated with Meta's deceptive and unfair acts as to teens. The Court adopts this calculation, finding that it is reasonable and supported by the evidence presented at trial.[102]

**ii. UDAP Disgorgement Associated with U13 Users**

Ex. 3914 estimates ill-gotten gains from Meta's unlawful, unfair, and/or deceptive practices related to U13s on the platforms, including attracting U13s to the platforms, failing to prevent them from joining, and failing to detect and remove U13s from the platforms once they have joined, as well as collecting and retaining U13 data and deceiving consumers about the presence of U13s on its platforms. The time period for the U13 disgorgement calculations is January 1, 2013 through December 31, 2023. Colorado, Kentucky, and New Jersey are entitled to disgorgement of ill-gotten gains associated with U13s under COPPA, as described below, and to the same relief under the alternative theory that the presence of U13

[99] Testimony of Saba.

[100] Testimony of Saba.

[101] Testimony of Saba.

[102] Testimony of Saba.

users on Meta's platforms and Meta's unfair and deceptive acts related thereto violated their respective unfair competition statutes. California does not seek this disgorgement remedy under its state consumer protection statutes.

Ex. 3914 first displays revenues associated with U13 users on the platforms. The States calculated these figures by multiplying (i) the number of 9-12 year olds on Instagram or Facebook in a given state and year by (ii) the average revenue per user, by platform, in the same year. This value was then summed across the years for each State. The States arrived at the figures in the "Total" column by summing the corresponding figures in the "Instagram" and "Facebook" columns.

Saba calculated the number of 9-12 year olds each year in each State. Saba also calculated the average revenue per user data. Saba derived these figures from revenue and user data produced by Meta.[103]

Ex. 3914 also displays profits associated with U13 persons on the platforms. The States calculated these figures by multiplying (i) the number of 9-12 year olds on Instagram or Facebook in a given state and year by (ii) the difference between average revenue per user ("ARPU") and average Cost of Goods Sold per user, by platform, in the same year. This value was then summed across the years for each State.

Saba calculated the Cost of Goods Sold per user based on cost and user data produced by Meta.[104]

The States present revenues and profits as alternative formulations of this disgorgement remedy. The States' primary position, which the Court adopts, is that the revenue figures should be selected as the disgorgement award, and costs should not be deducted because "defendants in a disgorgement action are not entitled to deduct costs associated with committing their illegal acts." *F.T.C v. Bronson Partners, LLC*, 654 F.3d 359, 375 (2d Cir. 2011) (internal citations omitted). Any of Meta's expenses associated with U13s (to the extent they exist) are illegitimate and thus must not be deducted from the disgorgement figure. Expenses related to Meta's operation of the platforms for U13s (whether related to marketing, research and development, or data processing and storage, for example) are illegitimate, as they are expended to attract and retain U13 users, and to gather and maintain their data—all of which is unlawful. Meta has identified no legitimate expenses associated with U13s.

[103] Testimony of Saba.

[104] Testimony of Saba.

Meta asserted that it did not have—and therefore did not produce—data regarding U13s on its platforms, including the number of U13s and associated revenues. [105] Thus, the States used available data to formulate a reasonable approximation of Meta's ill-gotten gains from its unlawful acts as to U13s. Specifically, the States incorporated overall ARPU, for users of all ages, to reach the disgorgement figures. The disgorgement calculation is not based on ARPU among Teens—although Teens are close in age to U13s—because the resulting figure would understate Meta's ill-gotten gains from U13s. Limiting the calculation to Teen ARPU would underestimate the value that Meta obtains from hooking U13s, who have high retention rates and will remain on the platforms and continue generating revenue for Meta for years and into adulthood. [106] The overall ARPU figures also capture the gains that Meta obtains from unlawfully using U13 data to train its valuable machine learning and generative AI models—gains that are not restricted to the ARPU figures in any one age group. [107] Finally, Meta's ARPU data is broken down by *stated* age brackets, beginning at age 13 (e.g., 13-17, 18-24, etc.). [108] Children under the age of 13 were present on Meta's platforms and thus had a stated age older than U13. Meta points to no evidence that U13s would have stated ages in particular age brackets, such as 13-17. Rather, for certain time periods, Meta defaulted new users on Facebook to a date of birth that would cause them to have the stated age of an adult. [109] In short, U13s appear across the stated age spectrum, and thus the overall ARPU is a reasonable approximation of the ARPU associated with U13s. The Court will not limit the disgorgement award due to the data constraints that Meta has created by failing to provide data regarding U13s on its platforms.

* * *

The Court finds that the States' disgorgement calculation is supported by the evidence presented at trial and orders Meta to pay $__ in disgorgement based on revenues associated with U13s on the platforms.

---

[105] Testimony of Saba.

[106] Testimony of Chen.

[107] Testimony of Backstrom.

[108] Testimony of Saba.

[109] Testimony of Hartnett.

**iii. COPPA Disgorgement Associated with U13 Users**

This set of charts estimates Meta's ill-gotten gains from violations of COPPA, including collecting, using, disclosing, and retaining personal information from children that Meta allowed on its platforms without obtaining parental consent or providing the other protections required by COPPA. The States are seeking disgorgement of the ill-gotten gains associated with U13s as a remedy for the listed States' COPPA claims.

Ex. 3913 displays revenues and profits associated with U13s on the platforms and is calculated using the same method and data as in Ex. 3914. The time period for the U13 disgorgement calculations is January 1, 2013 through December 31, 2023. The States present revenues and profits in Ex. 3913 as alternative formulations of this disgorgement remedy. The States' primary position, which the Court adopts, is that the revenue figures should be selected as the disgorgement award, and costs should not be deducted because "defendants in a disgorgement action are not entitled to deduct costs associated with committing their illegal acts." *Bronson Partners*, 654 F.3d at 375 (internal citations omitted).

* * *

The Court finds that the States' disgorgement calculation is supported by the evidence presented at trial and orders Meta to pay $__ based on Meta's ill-gotten gains from violations of COPPA. [The States only sought to disgorge ill-gotten gains associated with U13s once. Because the Court awarded U13 disgorgement to Colorado, Kentucky, and New Jersey under their consumer protection laws, it does not award them U13 disgorgement under COPPA.]

**C. Injunctive Relief**

A plaintiff seeking equitable relief under a state consumer protection statute in federal court must demonstrate: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

"[A] district court has considerable discretion in fashioning suitable relief and defining the terms of an injunction." *Church of the Holy Light of the Queen v. Holder*, 443 Fed. App'x 302, 303 (9th Cir.

2011) (quoting *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir.1991)). Injunctive relief "must be tailored to remedy the specific harm alleged." *Id.* (quoting *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1140 (9th Cir. 2009)).

As the Court has already held, injunctive relief is proper here because "the AGs lack an adequate remedy at law." ECF 440 (3214) at 21; *see also id*. at 21 n.2 ("The same is true for the States' request for injunctive relief.").

The evidence presented at trial through both fact and expert witnesses well supports the injunctive relief ordered below. As noted, Meta has violated COPPA and consumer protection laws of California, Colorado, Kentucky and New Jersey in numerous ways. The relief ordered is tailored to meet those violations and prevent the identified harms from recurring.

There was evidence at trial about Meta's roll-out of Teen Accounts in 2024 to attempt to communicate a commitment by Meta's to protect teen users. Those tools provide limited framework for accomplishing the remedial purpose of injunctive relief, but are demonstrably inadequate. As noted, for example, the time limitation feature of Teen Accounts were based upon rarely used opt-in features, rather than establishing a default function. Moreover, reminders for teens to cut usage were not designed to significantly decrease the problem of compulsive use.[110]

The Court will appoint an independent third-party compliance monitor to oversee implementation of injunctive terms discussed below. The monitor's duties will include:

- Monitoring effectiveness of safety and time-management tools provided by Meta.
- Requiring third-party audit of age-assurance systems.
- Requiring Meta to provide privacy-protected use data regarding teen usage of the platforms.
- Requiring review and reporting of any U13 backlog.
- Requiring Meta to fund independent third-party public audits of age-assurance systems, including surveys of the number of children who use the platforms and red-team exercises to identify how age restrictions can be circumvented.

[110] Testimony of Bejar, Dr. Ravi Iyer.

The Court finds that each of the remedies below is narrowly tailored to address the harm caused by Meta.

**Account Sign-Up/Deletion:** Meta must validate age at sign up with at least one verification method other than the user's stated age; Meta must add social media literacy training as part of account sign-up for users under 18 years old; and Meta must streamline the account deletion flow to allow for easier and faster account deletion.[111]

**Age Verification, Age Gating and U-13 Users:** Meta must take proactive steps to detect U13s, including: building classifiers to detect U13s on platform; implementing multi-layered age verification at account sign up; removing dark patterns in U13 reporting flow; allowing reviewers to see the full range of relevant information when reviewing accounts reported or flagged as U13, including age admissions in posts, comments, and (when the subject of a user report) direct messages; using soft-matching to remove other accounts belonging to known child users; taking action to detect and remove known child users creating new accounts to immediately rejoin the platforms; promptly deleting personal information belonging to known U13 users. Meta must delete all algorithms or models trained on personal information of U13 users. Meta must take proactive steps to find under 18 teens posing as over 18 and re-classify their accounts as under-18 accounts.[112]

**Defaults for U18 Accounts:** All U18 accounts must automatically have the highest default protections. A user must affirmatively prove their age is over 18, or obtain parental consent, to modify default settings. To change default settings, a U18 user must link their account to that of their parent or guardian. Parents must also be able to see all their child's settings in one location. These default protections will include defaulting U18 accounts to the highest privacy level; hiding like counts by default for U18 accounts; turning push notifications off by default for U18 accounts, except for direct messages by known and connected users.[113] Meta must also adopt Daily Limits for U18 accounts by (1) removing multiple-accounts circumvention for U18s, (2) instituting a 1-hour total daily use default time limit, (3) requiring

---

[111] Testimony of Estes, Gray.

[112] Testimony of Estes, Sheatsley, Gray, Hartnett, Backstrom.

[113] Testimony of Bejar, Estes, Gray.

covered features/platform access to be off during school hours, and (4) requiring covered features/platform access to be off during nighttime hours.[114] For U18 accounts, Meta must optimize recommendation ranking for explicit user preference and content diversity signals and prohibit engagement metrics (watch time, reaction rate, share velocity, comment volume) as primary ranking factors. Meta must also add quality signals, such as like/dislike or interested/not interested or add another low-friction method for young users to report preferences. These preferences should be meaningfully reflected in algorithmic ranking.[115]

**Addressing Deceptive Design for Compulsive Use:** Meta must require affirmative user choice on feed surfaces for U18 accounts. This includes affirmative user choice before playing additional video/content auto-plays for U18 accounts, affirmative user choice to be presented with more content, and affirmative user choice to 'refresh' feed surfaces for U-18 accounts.[116] Meta must make stories last for more than 24 hours for U18 accounts.[117] Meta must default to turn read receipts off in DMs for U18 accounts.[118]

**Prohibition on COPPA Violations, Unfair Practices, and Deception:** Meta is prohibited from violating COPPA; committing unfair business practices; and making deceptive public/regulatory statements. The Court finds that this relief is narrowly tailored to address the harm caused by Meta.

## VII. Conclusion

After considering the evidence adduced by the States and the verdict of the advisory jury finding Meta liable on all counts, the Court (1) finds Meta liable for violating COPPA with respect to each plaintiff State; (2) finds Meta liable for violating the consumer protection laws of California, Colorado, Kentucky, and New Jersey; (3) imposes civil penalties as provided above; (4) orders disgorgement as provided above; and (5) awards injunctive relief as provided above.

---

[114] Testimony of Dr. Lauren Hale, Gray, Prinstein, Iyer.

[115] Testimony of Gray, Prinstein, Narayanan, Iyer.

[116] Testimony of Gray, Prinstein, Iyer.

[117] Testimony of Gray, Prinstein, Iyer.

[118] Testimony of Gray, Prinstein.

DATED: 7/31/2026

Respectfully submitted,

**PHILIP J. WEISER**
Attorney General
State of Colorado

*/s/ Shannon Stevenson*
Shannon Stevenson, CO Reg. No. 35542, *pro hac vice*
Solicitor General
Krista Batchelder, CO Reg. No. 45066, *pro hac vice*
Deputy Solicitor General
Jason Slothouber, CO Reg. No. 43496, *pro hac vice*
Chief Trial Counsel, Consumer Protection
Lauren M. Dickey, CO Reg. No. 45773, *pro hac vice*
First Assistant Attorney General
Elizabeth Orem, CO Reg. No. 58309
Assistant Attorney General
Colorado Department of Law
Ralph L. Carr Judicial Center
Consumer Protection Section
1300 Broadway, 7th Floor
Denver, CO 80203
Phone: (720) 508-6000
Krista.Batchelder@coag.gov

*Attorneys for Plaintiff State of Colorado, ex rel. Philip J. Weiser, Attorney General*

**ROB BONTA**
Attorney General
State of California

*/s/ Megan O'Neill*
Nicklas A. Akers (CA SBN 211222)
Senior Assistant Attorney General
Bernard Eskandari (SBN 244395)
Emily Kalanithi (SBN 256972)
Supervising Deputy Attorneys General
Nayha Arora (CA SBN 350467)
David Beglin (CA SBN 356401)
Megan O'Neill (CA SBN 343535)
Joshua Olszewski-Jubelirer (CA SBN 336428)
Brendan Ruddy (CA SBN 297896)
Deputy Attorneys General
California Department of Justice
Office of the Attorney General
455 Golden Gate Ave., Suite 11000
San Francisco, CA 94102-7004
Phone: (415) 510-4400
Fax: (415) 703-5480
Megan.ONeill@doj.ca.gov

*Attorneys for Plaintiff the People of the State of California*

**RUSSELL COLEMAN**
Attorney General
Commonwealth of Kentucky

/s/ *J. Christian Lewis*
J. Christian Lewis (KY Bar No. 87109), *pro hac vice*
Philip Heleringer (KY Bar No. 96748), *pro hac vice*
Zachary Richards (KY Bar No. 99209), *pro hac vice*
Daniel I. Keiser (KY Bar No. 100264), *pro hac vice*
Matthew Cocanougher (KY Bar No. 94292), *pro hac vice*
Assistant Attorneys General
1024 Capital Center Drive, Ste. 200
Frankfort, KY 40601
Christian.Lewis@ky.gov
Philip.Heleringer@ky.gov
Zach.Richards@ky.gov
Daniel.Keiser@ky.gov
Matthew.Cocanougher@ky.gov

**JENNIFER DAVENPORT**
Attorney General
State of New Jersey

By: /s/ *Thomas Huynh*
Kashif T. Chand (NJ Bar No. 016752008), *Pro hac vice*
Assistant Attorney General
Thomas Huynh (NJ Bar No. 200942017), *Pro hac vice*
Section Chief, Deputy Attorney General
Verna J. Pradaxay (NJ Bar No. 335822021), *Pro hac vice*
Mandy K. Wang (NJ Bar No. 373452021), *Pro hac vice*
Deputy Attorneys General
New Jersey Division of Law
124 Halsey Street, 5th Floor
Newark, NJ 07101
Kashif.Chand@law.njoag.gov
Thomas.Huynh@law.njoag.gov
Verna.Pradaxay@law.njoag.gov

Phone: (502) 696-5300
Fax: (502) 564-2698

*Attorneys for Plaintiff the Commonwealth of Kentucky*

Mandy.Wang@law.njoag.gov

*Attorneys for Plaintiffs Jennifer Davenport, Attorney General for the State of New Jersey, and Jeremy E. Hollander, Acting Director of the New Jersey Division of Consumer Affairs*

**SIGNATURE CERTIFICATION**

Under Civ. L.R. 5-1(h)(3), I hereby attest that all signatories listed, and on whose behalf the filing is submitted, concur in this filing's content and have authorized this filing.

DATED: July 31, 2026

*/s/ Shannon Stevenson*
Shannon Stevenson

*Attorney for Plaintiff State of Colorado, ex rel.*
*Philip J. Weiser, Attorney General*