# Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| *PEOPLE OF THE STATE OF CALIFORNIA, et al.,*<br>Plaintiffs,<br><br>v.<br><br>*META PLATFORMS, INC, Instagram, LLC, Meta Payments, Inc., Meta Platforms Technologies, LLC., et al.,*<br>Defendants<br><br>IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br>4:23-cv-05448 | MDL No. 3047<br><br>Case No. 4:23-cv-05448-YGR<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br><br>Magistrate Judge: Hon. Peter H. Kang |

**Disclosure for Unretained Experts**

**Federal Rule of Civil Procedure 26(a)(2)(C)**

**May 16, 2025**

## Plaintiffs' Disclosure for Unretained Experts

Pursuant to this Court's Standing Order in Civil Cases dated March 17, 2025, and Federal Rule of Civil Procedure 26(a)(2)(C), Plaintiffs make this submission providing disclosure and information on its non-retained experts.

Plaintiffs may call one or more witnesses at trial who are not retained experts and are not required to provide written reports but whose testimony may include information that could be considered expert testimony under Rules 702, 703 and/or 705 of the Federal Rules of Evidence ("expert opinion testimony"). If called, in addition to fact testimony the following witnesses are expected to testify as to their background, professional observations, education, and clinical and research experiences, work, and training, and provide expert opinion testimony consistent with this disclosure. Plaintiffs reserve the right to seek admission of this opinion testimony under Rules 702, 703 and/or 705 of the Federal Rules of Evidence. Plaintiffs specifically reserve the right to designate fact or expert testimony from these witnesses in accordance with any Court orders and instructions that may apply regarding pretrial orders and the procedure for deposition designations.

### 1. Lotte Rubaek

Depending on the Court's rulings on pretrial motions and motions during trial, its evidentiary rulings, the evidence presented by Defendants and other factors, Plaintiff may call Lotte Rubaek as a witness at trial, or designate portions of Ms. Rubaek's deposition testimony to be presented at trial.

Ms. Rubaek is a Licensed Clinical Psychologist and Psychotherapy Specialist and is the current overall leader of the Clinical Academic Group for self-harm at Capital Region Psychiatry (Region Hovedstadens Psykiatri) in the Capital Region of Denmark. (Ms. Rubaek's *curriculum vitae* is attached hereto as Exhibit A and incorporated herein.) Ms. Rubaek has over eighteen years of clinical and research experience in the field of mental health, with at least sixteen of those years focusing on children and adolescent mental health. Ms. Rubaek has seven years of

postgraduate education specializing in cognitive therapy and psychotherapy. She has been a licensed psychologist since 2009 and received an advanced specialist degree in psychotherapy in 2016. Ms. Rubaek has experience in the clinical treatment of children and adolescents suffering from mental health disorders. She has studied and treated patients who engage in and suffer from self-harm, suicidality and suicidal ideations, and eating disorders. She further has expert knowledge of research in the same areas of self-harm, suicide, eating disorders and related mental health co-morbidities. She has been active in both treatment and research during her career as a practicing clinical psychologist, researcher and leader. She leads a specialized clinical team focused on treatment for non-suicidal self-injury in children and adolescents and is the overall leader of the Clinical Academic Group in the Capital Region of Denmark, overseeing self-injury treatment, research, and staff competence development.

Ms. Rubaek is not "retained or specially employed to provide expert testimony in the case," nor do her duties regularly involve giving expert testimony. She served on Meta's Global Suicide and Self-Injury Advisory Board and came forward in that capacity during fact discovery. She is therefore not required to provide a written report pursuant to Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure. Ms. Rubaek is expected to offer expert opinion testimony consistent with this disclosure. Plaintiffs reserve their rights to elicit additional opinions from Ms. Rubaek, to rebut or respond to opinions of Defendants' witnesses that have not been disclosed as of the date of this disclosure, or to address new or additional information.

Ms. Rubaek may offer expert opinion testimony on the following subject matters: mental health; children and adolescents' mental health, in particular; cognitive and behavioral therapy; psychotherapy; self-harm; suicide; eating disorders; and related teen mental health co-morbidities. Ms. Rubaek may offer opinion testimony concerning the connection between children's use of social media and the development of serious issues involving non-suicidal and suicidal self-harm, suicidal ideations, and eating and related mental health disorders like depression or anxiety.

The following is a summary of the opinions to which Ms. Rubaek is expected to testify.

1. **Indirect risk factors** - Social media use can predispose children to self-injury, eating disorders and suicide by contributing to the development of or amplifying established risk factors for specific self-harm behaviors. Social media use can create or worsen the following risk factors for youth mental health problems that tie to self-injury, eating disorders and suicide behavior (together, “self-harm”):
   - Low self-esteem;
   - Social comparison and unrealistic body stereotypes;
   - Negative body image, negative self-talk, leading to unrealistic ideals and perfectionism, and shame at not living up to those ideals;
   - Body disregard;
   - Self-objectification, de-sensitization;
   - Self-criticism;
   - Less play time and more screen time leads to emotion dysregulation, increased risk of mental health disorders, anxiety;
   - Impulsivity due to products’ impact on the dopamine reward system;
   - Feelings of hopelessness;
   - Feelings of loneliness, less physical interaction with peers;
   - Poor attachment to parents due to increase in screentime;
   - Negative mood intolerance caused by use of social media to avoid unpleasant emotions;
   - Cyber-bullying;
   - Sexual improprieties, abuse or violations.
2. **Direct risk factors** – Social media can directly encourage a young person to self-harm or maintain and reinforce existing self-harm.
   - Unsolicited exposure to an algorithmically targeted feed of disturbing images can trigger self-harm urges;

- Unsolicited exposure to an algorithmically targeted feed filled with self-harm behavior can normalize that behavior;
- Unsolicited exposure to self-harm on social media leads to an increased risk of starting self-harm - just one episode of self-harm behavior constitutes a major risk factor for continuing to self-harm or developing a psychiatric disorder;
- Unsolicited exposure to potentially deadly viral challenges (e.g. “the choking game”) and gamification of responses can lead to self-harm;
- Unsolicited recommendations to follow accounts that promote or glorify self-harm can lead to escalation of self-harm behavior (frequency, severity, number of methods);
- Social media can teach young people how to engage in self-harm and create and amplify ideation of self-harm, creating the desire and intent to engage in self-harm;
- Filter bubbles can direct vulnerable individuals to posts that explicitly encourage self-injury and that present inspiration to adopt new places on the body to inflict self-harm and new methods to avoid discovery, all resulting in escalation of self-injury;
- Filter bubbles can direct vulnerable individuals to communities in which harmful status markers are encouraged in biography text (e.g. number of suicide attempts, hospitalizations, psychiatric diagnoses) and suicide pacts are made;
- Likes and comments of self-injury related posts may reinforce self-injurious behavior, through operant conditioning.

3. **Systemic risk factors** – The structure and design of social media and their business models can be a systemic and global cause of the increase in self-harm seen worldwide since the advent of social media in 2004, including through:

- Algorithmic amplification of harmful content;
- Algorithmic prioritization of extreme content and tendency to radicalize content;
- Quantifiable "social" feedback (followers, likes, comments, streaks) leading to self-objectification, sadness, anxiety and emotional stress;
- Anonymity and private profiles leading to more uncensored content;
- Lack of age verification resulting in very young children being exposed to and interacting with harmful images;
- Retention mechanisms driven by an attention-based business model leading to more screentime than children and young people really want or is appropriate, promoting unhealthy use and compulsive or problematic use;
- Promotion of filters causing unrealistic beauty standards and resulting in lowered self-esteem and mental disorders such as body dysmorphia, eating disorders and self-injury;
- Algorithms used to bring vulnerable and self-harming people together ("suggested for you"), thereby creating harmful networks / group dynamics and synergistic effects;
- Misleading statements and lack of disclosure about the risks and prevalence of product exposure promoting self-harm and leading to avoidable exposure of children to harmful content that can negatively/fatally affect them.

Ms. Rubaek may base these opinions, in part, on her experiences in the clinical treatment of children and adolescents suffering from harm to their mental health and her education, training and experience in the field of research on these same topics. She will also offer testimony based on her experience as a Leading Expert member of Meta's Global Suicide and Self-Injury ("SSI") Expert Advisory Board, the documents and information used as exhibits in Ms. Rubaek's deposition on April 1, 2025, and her review of studies related to self-harm attached hereto at Exhibit B. (subject to supplementation prior to the close of expert discovery).

Ms. Rubaek to date has not charged a fee for providing deposition and trial testimony and none has been paid to her. She has not charged or received any compensation from Plaintiffs' counsel.

**2. Arturo Béjar**

Depending on the Court's rulings on pretrial motions and motions during trial, evidentiary rulings, evidence presented by Defendants, and other factors, Plaintiffs may call Arturo Béjar as a witness at trial, or designate portions of his deposition testimony to be presented at trial. Mr. Béjar is not "retained or specially employed to provide expert testimony in the case," nor do his duties regularly involve giving expert testimony. He is therefore not required to provide a written report pursuant to Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure. Mr. Béjar may offer some or all of the opinions set forth in this disclosure. Additional opinions may be elicited to rebut or respond to opinions of Defendants' witnesses that have not been disclosed as of the date of this disclosure or to address new or additional information. Mr. Béjar has previously given a deposition in this matter spanning three days which contains the facts and opinions that Plaintiffs anticipate he may offer at trial.

Mr. Béjar has 30 years of experience in online and social media user safety. He began working in the tech industry at the age of 15 for IBM. Mr. Béjar graduated with a degree in mathematics from King's College in 1993. In 1994, he began work at Electric Communities, a social media startup, where he focused on security issues. Mr. Béjar joined Yahoo! in 1998, where he took on a role equivalent to the Chief Security Officer of the company. He was the first engineer at Yahoo! dedicated to writing security code. His job was to make sure that every product that Yahoo! made was safe for the people using it, which involved, among other things, implementing protections for kids and using test accounts to assess the safety of the platform and the effectiveness of safety features.

Mr. Béjar joined Meta in 2009, as the company's site integrity team manager. He continued to work at Meta through 2015, and his role greatly expanded during that time to include not only site integrity, but also customer care and other teams. In coordination with Meta CEO Mark

Zuckerberg, Mr. Béjar created the Protect and Care team, a cross-functional group that managed Facebook's technical security and the safety of users and served as the program's senior engineer and project leader. His work at Meta included recommending and implementing safety features on the Facebook platform, and monitoring and assessing the platform for potential safety risks and harms. This included, for example, developing and implementing a reporting framework that was used by Facebook to identify harmful activity on the platform. In this role, Mr. Béjar interfaced directly with Meta's senior leadership, including Mr. Zuckerberg and COO Sheryl Sandberg, regarding Meta's safety program.

Mr. Béjar retired from Meta in 2015 to spend time with his family but continued to consult with a number of technology firms about their safety programs. In 2019, Meta requested that Mr. Béjar return as a part-time consultant to assist and advise Instagram's wellbeing team. Mr. Béjar's second stint at Meta lasted from 2019 to 2021. As part of his consulting work at Meta, Mr. Béjar performed an assessment of Instagram's safety framework to identify existing problems causing harms to users, and to develop potential solutions. That assessment included creating and conducting a large-scale user survey to identify the harms occurring to users on Instagram. Based on that survey and other investigations, Mr. Béjar developed a set of safety recommendations for Instagram, which he communicated directly to Meta's top leadership, including Mr. Zuckerberg.

Mr. Béjar later testified in front of the US Senate Judiciary Committee about the harms that stem from Meta's platforms. Mr. Béjar's testimony covered both his personal knowledge and experience working at Meta and independent research and testing of Meta's platforms and safety features.

Mr. Béjar was also retained by Meta's 'Oversight Board' to advise on issues of youth safety after his consulting stint at the company. Meta has described Mr. Béjar as having "world-class expertise" and that "[t]here are fewer than 10 people in the world meeting [Bejar's] qualifications, we estimate, most of whom are retired or employed at [Meta's] competitors."

Mr. Béjar may offer testimony under Rule 702, 703 or 705 of the Federal Rules of Evidence on the following subject matters:

- His personal knowledge and experience related to online child safety and well-being;
- His personal knowledge and experience related to the ethical design of online platforms, and necessary safety designs for online platforms;
- His personal knowledge and experience of the safety of Meta's platforms for minors;
- His personal knowledge and experience related to how design defects on Meta's platforms can cause harm to minors (e.g., age verification, reporting processes, beauty filters, public like counts, infinite scroll, default settings, private messages, reels, ephemeral content, and connecting children with adult strangers);
- His personal knowledge and experience related to Meta's prioritization of growth and engagement over safety;
- His personal knowledge and experience about online predation and prevention efforts, including the prevalence and harmful effect of child sexual abuse material (CSAM), child exploitative imagery (CEI), minor sexualization, endangerment, exploitation, and grooming;
- His personal knowledge and experience related to online bullying and harassment;
- His personal knowledge and experience of harms associated with Meta's platforms including addiction/problematic use, anxiety, depression, eating disorders, body dysmorphia, suicidality, self-harm, and sexualization;
- His personal knowledge and experience drafting and assessing the adequacy of disclosures concerning risks or known issues of online platforms to the public;
- His personal knowledge and experience related to the design and efficacy of Meta's safety features, and viable alternative technologies that would have improved the platforms' safety;
- His personal knowledge and experience related to Meta's community standards/policies and enforcement, Meta's community standards enforcement

reports, the accuracy or inaccuracy of Meta's public statements about safety and harms, Meta's disclosure and warning of the risks and harms on Meta's platforms (or lack thereof), and the need for transparency, and Meta's concealment of information about harms on Meta's platforms;

- His personal knowledge and experience regarding evaluations and tests that he performed on the safety of Instagram and Facebook for children, videos of which were previously produced by Mr. Béjar;
- His personal knowledge and experience interpreting survey results and user testimonials concerning the safety of online platforms.

The facts and opinions to which Mr. Béjar may testify on the subjects listed above are set forth in his deposition testimony given in this case and may include the following:

- It is important for social media companies like Meta to protect kids who use their apps. Meta has a responsibility to make the platform safe for teens. User safety needs to be top priority for social media companies like Meta. If Meta knows that kids are being harmed on its app, its top priority should be to swiftly take action to prevent harm to kids.
- Meta does not adequately protect kids on Instagram. Instagram is not a safe place for kids. Kids are more vulnerable to online harms than adults. Instagram was not built to be safe or good for kids.
- Growth and engagement were a top priority for Meta, and safety was not a priority but an afterthought. Meta does not provide the necessary resources or support to the teams working on safety and wellbeing. Building safety measures can have a negative impact on user engagement, which disincentivizes Meta from building safety measures. Meta's organizational structure creates a conflict in favor of growth, not safety, and that caused Instagram to be unsafe for kids.

- Meta executives were aware of the harms teens were experiencing on their platforms, and they chose not to adequately understand those harms, address them, or reduce them.
- While consulting at Meta, Mr. Béjar performed a comprehensive assessment of Instagram's safety framework to see why there was so much harm to kids and found there were no features that meaningfully reduced harm. The lack of safety framework caused, or contributed to cause, an unsafe environment for kids. Instagram's approach to safety was inadequate and not effective at preventing or substantially reducing harm to kids. Instagram should have implemented a safety framework with four components: 1) users need to be able to effectively report, 2) Instagram needs to use information from reports to protect other users, 3) Instagram needs to provide feedback to the user causing harm, and 4) Instagram needs to monitor and measure progress. This safety framework is content agnostic. This safety framework would more likely than not reduce harm.
- A proper reporting flow is necessary to make social media platforms safe. If Meta has a reporting flow tool with a low action rate, then it has a bad reporting flow. Meta should want to receive reports from users about any bad experiences they are having so Meta can take action on those reports. Instagram's reporting flow is flawed because it was not designed for teens and does not reflect the harms that they experience—only 1 in 100 would actually complete a report. The reporting flow has the same flaws today.
- Instagram does not have appropriate metrics in place to assess how safe the platform is or how effective its safety features are.
- Instagram has not implemented any tools that are effective at reducing harm. The safety tools it has implemented are window dressing for the press and regulators but are not effective. Meta knows that users will not adopt opt-in features, yet it has failed to make many of its safety features default settings.

- Instagram should have had appropriate age verification in place to keep kids safe. Instagram acknowledged that kids do not accurately report their age. Instagram had a “don’t ask, don’t tell policy” regarding the age of users. It was understood at Meta that young kids were using Instagram and that was a substantial reason behind Meta’s acquisition of the platform. Meta wanted very young kids on their apps. There were no serious efforts to detect or remove under 13 accounts on Instagram. It is easy to find under 13 accounts on Instagram, but it is difficult to report those accounts. Mr. Béjar’s own testing on teen accounts further demonstrates this. Instagram is not safe for kids under 13.
- Meta’s platforms were designed to keep users, including kids, engaged and to maximize time spent on the platforms. Platform features that cause or contribute to engagement and potentially excessive time spent include the nature and frequency of notifications, never-ending infinite scroll of images and videos, and rewards such as likes and hearts.
- Instagram and social media can be addictive, and the design of the platforms can cause or contribute to addiction. Meta redefined the issue as problematic use, and it was not studied and understood in good faith. Meta did not publish any internal data on addiction or problematic use and did not publicize this risk. Meta did not do enough to prevent or substantially reduce kids’ engagement or time spent or addiction or problematic use on Instagram. Meta did not monitor kids’ excessive use or engagement. Meta did not properly monitor its platforms for addiction or problematic use and does not take adequate steps to prevent or substantially reduce kids’ addiction or problematic use.
- Meta misleads the public to believe that its platforms are safe for teens and that it has policies that it effectively enforces that do not allow sexual exploitation. Meta fails to disclose that the design of the platform rewards dangerous behavior and encourages young girls to create racy content. Meta fails to disclose and warn that

its platforms facilitate grooming, sexual endangerment, child exploitation, and the production, sharing and sale of child sexual abuse material. Meta fails to disclose that these are not rare occurrences but occur with great frequency. Meta was aware of the problem with inappropriate interactions between adults and kids, but did not take appropriate actions to prevent this harm. Meta would even recommend unconnected adult strangers to young users. Parents are not aware of these risks because Meta does not make these risks known to the public. Instead, Meta publishes its community standards enforcement reports that falsely reassure parents that kids will not be exposed to sexual exploitation.

- Meta misleads the public to believe that its platforms are safe for teens and that it has policies that it effectively enforces that do not allow bullying and harassment. Meta fails to disclose and warn that bullying and harassment on Instagram gets amplified by the platform and is more harmful than bullying offline because online bullying is persistent, amplified, and it lives a much longer period of time. Mr. Béjar has consulted with parents of kids who committed suicide after being bullied on Instagram. More bullying occurs on Instagram than Mr. Béjar has seen in any other place he has worked, and it is because of the way the product is designed. Meta failed to disclose and warn about the risk of bullying on Instagram that can lead to mental health issues and suicide. Meta also is aware that suicide and self-injury content is easily accessed by kids on Instagram, despite its community standards, and fails to disclose and warn of that risk. Instead, Meta publishes its community standards enforcement reports that falsely reassure the public that bullying and harassment violations are a fraction of one percent on its platforms.
- Being transparent and working with outside experts is important for designing and maintaining a platform that is safe for kids. Transparency reduces harm to kids because the more people understand the potential harms of the platform the more can be done to protect users. If Meta knows that kids are at risk of harm from use

of its apps, it should inform users and the public about those risks. It is essential for social media companies to inform users and the public of the harms its apps cause or contribute to cause so people can make informed decisions. Parents are not at fault for not knowing what harms their children will be exposed to on Instagram, as there is a lack of information available to them. Despite Meta's public claims, Meta is not an industry leader for transparency.

- Meta's public reporting was misleading as to the harm that was pervasive on its platforms. Meta only enforces and discloses violations of narrowly defined community standards rather than preventing and disclosing actual harmful experiences. The transparency center is misleading as to the likelihood that any given child will experience a particular harm. For instance, the transparency center reports the prevalence of some harms as only a fraction of one percent. But internal Meta surveys and research showed that users frequently experienced significant harm. For instance, the Negative Experiences Survey showed that Meta is aware there is a meaningful amount of harm happening on Instagram every 7 days to hundreds of millions of users, and that it was worse for teens. Internal research showed that people were experiencing these harms 100 to 400 times greater than what is reported in the community standards enforcement reports. Another internal survey, the Bad Experiences and Encounters Framework Survey, showed that over half of the respondents experienced at least one of 22 harms on the platform in the past 7 days. For many of these bad experiences, it is Meta's algorithm that is feeding or recommending these bad experiences. The survey data also showed that teens were experiencing these issues from strangers and interactions facilitated by the product design of Instagram. Meta failed to disclose these survey results and the harms experienced by users to the public. Meta's lack of transparency by failing to inform the public of its research contributed to harms to kids on Instagram. Meta's

lack of enforcement of its community standards is not effectively protecting people from the harm they are experiencing.

- The Bad Experiences and Encounters Framework Survey asked users about the emotions they experienced and how long those emotions lasted. This data is important to understand the intensity and severity of these harmful experiences. Meta management instructed its researchers to not analyze but delete the emotions data derived from its survey. This reflects a company that does not want to know the harm that people are experiencing on its platform, in particular teens. It was inappropriate and not ethical to not follow through on understanding these harms. It was improper for Meta not to analyze the severity data, and to instead delete it.
- Mr. Béjar drew on his 30 years of experience testing online safety and security features to perform testing about the features currently available on Instagram. In his prior employment for Meta, Mr. Béjar would often create test accounts to test how the product was performing and whether the features functioned appropriately. Mr. Béjar followed his normal testing protocol to analyze the current functionality of Instagram using teen test accounts. Mr. Béjar's testing demonstrated that many of the safety features touted by Instagram do not function as advertised and do not adequately protect teens. Mr. Béjar's testing further demonstrated that it is easy to identify accounts of users below Instagram's minimum age of 13, but it is very difficult to report those accounts to Instagram. Mr. Béjar's testing also demonstrates that the design of the platform causes inappropriate interactions between kids and adult strangers.

Materials considered by Mr. Béjar in forming his opinions have been previously produced and marked as 3047MDL-Bejar-001-00000001 through 3047MDL-BEJAR-001-00000002 and BEJAR00000001 through BEJAR00002702.