# Exhibit D

# *STATE OF TENNESSEE, et al.*

v.

# *META PLATFORMS, et al.*

Trial

**Day Five**

*July 28, 2026*

HARPETH
COURT REPORTERS

(615) 933-6786
www.harpethcourtreporters.com

IN THE CHANCERY COURT OF DAVIDSON COUNTY, TENNESSEE
FOR THE TWENTIETH JUDICIAL DISTRICT AT NASHVILLE

| | |
|---|---|
| STATE OF TENNESSEE, ex rel. JONATHAN SKRMETTI, ATTORNEY GENERAL and REPORTER, | ) |
| Plaintiff, | ) |
| vs. | ) Case No. 23-1364-IV |
| META PLATFORMS, Inc., and INSTAGRAM, LLC, | ) |
| Defendants. | ) |

-------------------------------

TRIAL TRANSCRIPT
(Pages 920 - 1228)

Day 5

Before Chancellor Russell T. Perkins

July 28, 2026

8:15 a.m.

Reported by:
Harpeth Court Reporters
Franklin, Tennessee
Emily L. Sipe, RPR, LCR

it's built in terms of what are the features that could lead to somebody spending that amount of time there.

**Q. Okay. And why don't you just go ahead and just explain to the jury which the elements of Meta's platforms that are designed to encourage excessive or compulsive use.**

A. Yeah.

So there are six things that, together, are very effective. So the first of the six is an Infinite Scroll, so like a never-ending supply of pictures or videos. You could scroll as much as you could physically can and there'd still be like trillions of things that you could scroll through to look at.

The second part of that is the autoplay of videos. And so the videos start playing automatically.

The third part of that is that these things are shaped by algorithmic recommendations.

The next one is that you have this sign of Notifications/Messages, that when you're outside of the application, you receive through your phone and that tells you to come back to the notification.

And the other thing that you have are sort of

these popularity counters and reward mechanisms like Likes, Views, all of these counters that deal with that.

And the sixth one which reps all of this is sort of like a social design or the social hook that drives the application.

**Q. Okay. And in your experience, do these features contribute to addiction or what Meta calls "problematic use"?**

A. Yeah. So when you look at the reason for each of these features, right? Like why would you build anyone of these things?

Infinite Scroll. So you can spend as much time as possible so you never run out of things to look at. There's no natural stopping point.

Autoplay Videos. I remember when they were first announced, it was during my first time there, and people really hated Autoplay Videos; but the statistics showed that people looked at videos more when you started playing automatically.

Just imagine you walk into a bar and there's a photograph and there's a screen. You're going to spend some time looking at what's playing on the screen before you look away. And so that was something that data showed, and that's why it came

A. Yes.
**Q. Okay. And was that from 2019 to 2021?**
A. That is correct.
**Q. And have you continued to be familiar with them and review them regularly since that period of time?**
A. Yes, I have.
**Q. Okay. Let me ask you the question: We're going to look at some examples of the CSER reports in the Transparency Center.**
**But in your view, does Meta's Transparency Center accurately tell the public about the risks to children on Instagram?**
A. It does not.
**Q. Okay. Do they paint a false picture of safety?**
A. Yes. It paints a false picture of safety.
**Q. Explain that, please.**
A. So when you look at the statement like, We don't allow this, and then you combine it with a report that says, When we evaluate it, it's 3 of 10,000 views or .0-something percent and we reasonably believe that it's very unlikely that that's going to happen.
So the combination of these two things, I

**I mean, how many? Like in 2021, do you remember approximately, how many employees there were?**
A. Well, this group has 72,524 members.
**Q. Okay. And then, is your understanding that after sending this, or maybe at the same time, he also put this blog post out for the public?**
A. Yes.
**Q. Would that be to his Facebook public, in other words, all of his followers? Or to everybody on Facebook?**
A. It would go -- he would post it on Facebook and it would go to his followers, and it would also get recommended to people who are not his followers.
**Q. I see.**
**You mentioned that this post led you to send the email; is that fair?**
A. Yes.
**Q. And you said it distressed you, right?**
A. Correct.
**Q. What about this distressed you?**
A. Because it makes a number of statements that are not true, and I believe painted a false picture of how Meta treats the safety of young people.
**Q. Okay. Let's look at a few of these paragraphs. Let's look at the second paragraph.**

**Mr. Zuckerberg says, "Second, now that today's testimony is over, I want to reflect on the public debate we're in. I'm sure many of you have found the recent coverage hard to read because it just doesn't reflect the company we know. We care deeply about issues like safety, well-being, and mental health."**

**Do you see that?**

A. Yes, I do.

**Q. And based on your experience, all of your experience, and your experience as their online child safety consultant for two years and at this time, do you believe that is a truthful and accurate statement?**

A. That is not a truthful nor accurate statement.

**Q. Okay. Let's go to the fourth paragraph. "At the heart of these accusations is this idea that we prioritize profits over safety and well-being, and that's just not true."**

**Do you see that?**

A. Yes, I do.

**Q. Based on all your experience, is that a truthful and accurate statement?**

A. No, it's -- that statement is just not true.

**Q. Okay.**

MR. CARTMELL: Let's go to the last full paragraph on the first page, please, Jon.

BY MR. CARTMELL:
**Q. "But of everything published, I'm particularly focused on the questions raised about our work with kids. I've spent a lot of time reflecting on the kinds of experiences I want my kids and others to have online, and it's very important to me that everything we build is safe and good for kids."**
**Do you see that?**
A. Yes, I do.
**Q. Based on your experience of, at this year, 20-plus years as an online child safety expert, and as their -- as Meta's online child safety expert, is that a true and accurate statement?**
A. It is not. What Meta was building at the time was neither safe nor good for kids.
**Q. What did you think when you read this?**
A. That it paints a very false picture of how Meta prioritized safety, cares about the resources, while at the same time, I mean, a team that doesn't have enough support, doesn't -- is not able to build the things that they know would help, and they're afraid that they're going to lose the support because this information has become public. And so it's the opposite. What I'm experiencing inside the company and what BEEF says is the opposite of what Mark is

off or not. So this is the kind of testing that we did relative to what the company was claiming.

**Q. What was the date of the report, first of all? Do you remember?**

A. I mean, I think it came out in September of 2025, but I don't recall the exact day.

**Q. And the testing that was done, do you remember?**

A. Yeah. So the initial testing I did was done in March of 2025, where I did methodical. And then the retesting done by NYU was done in June and July of 2025.

**Q. Let's turn to page 23. I'm going to ask you some questions about things you wrote that we've been talking about.**

A. Yeah.

MR. CARTMELL: Actually, Jon, if you don't mind, let's go to page 22 real quick, please.

BY MR. CARTMELL:

**Q. This is your findings section, the results; is that right?**

A. That's correct.

**Q. Okay. So page 23, at the top right, you say, "Thirty of the 47 safety features were either no longer available or were substantially ineffective."**

**Is that true?**

A. Yes, that's correct.

**Q. Explain that, please.**

A. So we had a rubric where we looked at whether a feature would be something that was available in the first place, or whether it could be accidentally or trivially circumvented within three minutes. So an example of this is to say, You cannot search for suicide or self-harm content, but as you start typing the search query, you get given a query that lands you to that content.

And so that's something that a teenager would accidently circumvent their own safety feature through the product design. So those are the kind of things that got a red rating.

**Q. And let's turn to page 25. This is Meta's Broken Promises Summary, Improper Contact in Conduct.**

**Are those broken down, your report, into different categories of tools and things that you tested?**

A. Yes.

**Q. Okay. And this is a discussion of the tools that are supposedly supposed to keep children safe from inappropriate interactions with adults?**

A. Yeah, the inappropriate interactions with

REPORTER'S CERTIFICATE

I, Emily L. Sipe, Court Reporter, do hereby certify that I recorded to the best of my skill and ability by machine shorthand all the proceedings in the foregoing transcript, and that said transcript is a true, accurate, and complete transcript to the best of my ability.

I further certify that I am not an attorney or counsel of any of the parties, nor a relative or employee of any attorney or counsel connected with the action, nor financially interested in the action.

SIGNED this 28th day of July 2026.

Emily L. Sipe
--------------------------------
Emily L. Sipe RPR, LCR
Tennessee LCR No. 608
Expires: 6/30/2028