# Exhibit G

# *STATE OF TENNESSEE, et al.*

v.

# *META PLATFORMS, et al.*

Trial

**Volume 4**

*July 27, 2026*

HARPETH
COURT REPORTERS

(615) 933-6786
www.harpethcourtreporters.com

IN THE CHANCERY COURT OF DAVIDSON COUNTY, TENNESSEE
FOR THE TWENTIETH JUDICIAL DISTRICT AT NASHVILLE

---

STATE OF TENNESSEE, ex rel.
JONATHAN SKRMETTI, ATTORNEY GENERAL
and REPORTER,

Plaintiff,

vs. Case No. 23-1364-IV

META PLATFORMS, INC., and
INSTAGRAM,

Defendants.

---

TRIAL TRANSCRIPT
(Pages 648-919)

Volume 4

Before Chancellor Russell T. Perkins

July 27th, 2026

8:15 a.m.

---

Reported by:
Harpeth Court Reporters
Franklin, Tennessee
Julie Lyle, RPR, LCR

MR. PARKINSON: The witness is on direct.

MR. CARTMELL: -- I asked him, yes, no, did you take your concerns?

THE COURT: I don't think that one was leading.

BY MR. CARTMELL:

**Q. I'll restate it.**

**Did you take your concerns directly to Mark Zuckerberg?**

A. Yes, I did.

**Q. Okay. What did you tell Mark Zuckerberg before you left Meta?**

A. I told him that there was a critical gap in the way that the company understood and dealt with harm. I told him numbers about 13-to-15-year-olds experiencing harm on the platform. And I told him things that the company could do about it to help deal with those harms.

**Q. What year was that?**

A. That was in 2021.

**Q. Okay. Did Mr. Zuckerberg ever respond to you?**

A. No, he never replied.

**Q. Based on what you observed during your time**

**at Meta, was Meta prioritizing the safety of children on Instagram?**

A. They were not.

**Q. When you were there at Meta from 2019 to 2021, what were Meta's top priorities and goals?**

A. It was always sort of more eyeballs, more time, more connections between people. And this showed itself, for example, at Instagram through Reels, which was the top priority during the time that I was at Instagram.

**Q. Based on the time that you were there as a safety consultant and working there, why was that important to Meta?**

A. It was a competition. So TikTok had become incredibly effective and, in particular, very effective in bringing young people on. And so then Instagram moved people around and devoted their vast skills and tools in order to do something that competed with TikTok.

**Q. Okay. The jury's heard some about Meta's safety tools. Were those something that you evaluated and assessed and looked at when you were a safety consultant for Meta?**

A. Yes.

**Q. Okay. And have you continued to test those**

A. No, it doesn't do it accurately. I think it does the opposite that -- when it comes to the accuracy of what they say.

**Q. Based on your experience from Meta in -- from 2019 to 2021 when you were hired back as an online safety expert, based on that period of time, what was the main purpose of the safety tools that Meta launched while you were there?**

A. So during the time that I was there, they were used primarily as a response to negative press cycles or controversy that became very well-known.

And so when there was a big press cycle around a negative issue, then some of the safety engineers were devoted -- would be devoted to build something for that issue for a small period of time until there was the next issue.

So it was, in some sense, to mollify the press response. And the tools were not built in a way that they would address the issues that they were clearly designed to address.

**Q. Now, during opening statements, Meta's counsel mentioned that there are three business principles at Meta. And I want to list them for you.**

**First principle: Disclosure. Publicly**

We talked about lots of sort of what might happen, and I told her that she could always tell me anything. And shortly after she went on, she told me that she had started receiving sexual stuff from other people, people that she didn't know in person, like pictures of private parts and requests for sex.

And I asked her -- I was like, Did you report it? Like my assumption is you can just report it and they'll take care of it. And she was like there's no option you can do that. And she showed me and there wasn't, and that was the first of different instances.

And so I did not want to be somebody who sat on the outside criticizing the company. When I looked at what was happening, I wanted to roll up my sleeves and go in and kind of understand what was going on.

And at the same time, somebody -- the guy who had been the head of research for Protect and Care reached out to me because he was now the head of research on Instagram, and that's when I started talking to them about coming back for a period of time.

**Q. Okay. I'll come back to that. But you had been working --**

REPORTER'S CERTIFICATE

I, Julie Lyle, Registered Professional Reporter and Tennessee Licensed Court Reporter, do hereby certify that I recorded, to the best of my skill and ability by machine shorthand, all the proceedings in the foregoing transcript, and that said transcript is a true, accurate, and complete transcript to the best of my ability.

I further certify that I am not an attorney or counsel of any of the parties, nor a relative or employee of any attorney or counsel connected with the action, nor financially interested in the action.

SIGNED this 27th day of July, 2026.

Julie Lyle

Julie Lyle
Tennessee LCR No. 850, Exp: 6/30/28