# Exhibit A

**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| *PEOPLE OF THE STATE OF CALIFORNIA, et al.,*<br>Plaintiffs,<br><br>v.<br><br>*META PLATFORMS, INC, Instagram, LLC, Meta Payments, Inc., Meta Platforms Technologies, LLC.,*<br>Defendants<br><br>IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br>4:23-cv-05448 | MDL No. 3047<br><br>Case No. 4:23-cv-05448-YGR<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br><br>Magistrate Judge: Hon. Peter H. Kang |

**TRIAL REPORT OF COLIN GRAY**
**May 16, 2025**

4. **Meta's actions that were inconsistent with industry standards, guidelines and principles would generally be expected to contribute to the types of harms alleged in Plaintiffs' complaints, including compulsive and problematic use.** For example, Meta's platforms were easy for minors to access (both under 18- and under 13-year-old users), and only in the last few years have any substantial parental controls or changes in user interfaces been launched—even though these platforms have actively courted children and adolescents for much of their history.

5. **Meta could have plausibly designed its platforms to be less harmful.** This is evidenced both by an evaluation of theoretical, alternative designs that Meta could have implemented, as well as by Meta's internal documents and depositions, which reveal that it repeatedly considered safer designs but chose not to implement them.

6. A more fulsome discussion of my opinions is set forth below. My opinions are provided using the same methodology that I would apply in my academic work based on the information currently available, as detailed in Section IV.

## II. <u>Scope of Retention</u>

7. Plaintiffs asked me to provide opinions on the following topics, to the extent I am able to do so based upon my professional expertise and the evidence produced in this litigation:

(A) Define and explain the concept of dark patterns in the context of social media use;

(B) Explain to what extent, if any, Meta applied dark patterns to influence children and adolescents on its social media platforms;

(C) Identify and describe any industry standards, guidelines, and principles relevant to user protections applicable to Meta in the design of social media platforms, particularly in the context of the risk of harms to children and adolescents;

(D) Analyze the extent to which Meta acted consistently or inconsistently with the aforementioned industry standards, guidelines, and principles; and

(E) Determine, to the extent Meta acted inconsistently with such industry standards, guidelines, and principles, whether Meta could plausibly have designed its platforms to be less harmful.

48. This ontology enables more precise analysis of dark patterns and their impact on user autonomy and decision making.

**b. <u>Dark Patterns Overlap with Attention Capture Damaging Patterns</u>**

49. While dark patterns refer to design elements or practices that manipulate user decisions and behavior, attention capture damaging patterns (ACDPs) represent a set of practices focused on capturing users' attention that—in concept and implementation—overlap extensively with dark patterns. Many researchers that study ACDPs ground their work, at least in part, in dark patterns scholarship (e.g., Monge Roffarello et al., 2023; Lukoff, 2022).

50. ACDPs are defined as "[a] recurring pattern in digital interfaces that a designer uses to exploit psychological vulnerabilities and capture attention, often leading the user to lose track of their goals, lose their sense of time and control, and later feel regret" (Monge Roffarello et al., 2023). Examples of these patterns include the use of "time fog" to prevent users from realizing how long they are using a platform, the presence of addictive intermittent reward mechanisms like "casino pull-to-refresh" that have the chance of revealing new content, and the use of **recapture notifications** to try to pull a user back onto a platform.

51. Many types of ACDPs can be exacerbated by the presence of dark patterns or coincide as both dark patterns and ACDPs. For example, dark pattern strategies such as **forced action** or **social engineering** can enhance the effectiveness of ACDPs by ensuring that users are more likely to remain on a platform, even when they are not actively making decisions about their engagement. Monge Roffarello et al. (2023) highlight how ACDPs like "**infinite scroll**" or "neverending auto-play" are often paired with dark patterns that disguise the true intent of the interface or hide the consequences of prolonged engagement (e.g., **bad defaults**, **hiding information**). Additionally, ACDPs like **auto-play** are identified as dark patterns directly (Gray, Santos, et al., 2024).

52. ACDPs exploit users by incorporating criteria that relate to mechanisms or impacts (Monge Roffarello et al., 2023). Examples of *mechanisms* include exploiting psychological biases or automating the user experience. Examples of *impacts* include

digital contexts. Two of the most comprehensive studies on consumer behavior have shown strong causal connections between the presence of dark patterns and outcomes that are disadvantageous to users. Luguri and Strahilevitz (2021) showed that "users exposed to mild dark patterns were more than twice as likely to sign up for a dubious service as those assigned to the control group, and users in the aggressive dark pattern condition were almost four times as likely to subscribe." In a large online experiment conducted by the EU Commission, dark patterns were shown to impact "consumers' transactional decision […] l[eading] to inconsistency with their preferences" (Behavioral study on unfair commercial practices in the digital environment: dark patterns and manipulative personalization: final report, 2022). The removal of key attentional triggers also manipulates the information flow and limits discoverability by a user, resulting in substantial declines in user engagement and demonstrating the power of these manipulative design tactics (Lee et al., 2025; Schaffner et al., 2024).

58. As noted by Rossi et al. (2024) and Sanchez Chamorro (2024), all users are vulnerable to some extent, but some users are more vulnerable than others. Research on the role of digital platforms for children (whose patterns of use then impact their behaviors during their teen years) show that children, their parents, and their friends are impacted as part of a technology ecology (e.g., Hiniker et al., 2017; Fitton et al., 2021). These findings are echoed by recent scholarship on adolescents specifically (Sanchez Chamorro, et al., 2024). Schäfer et al. (2024) also showed that children were able to identify some relevant mechanisms relating to simple dark patterns, but more complex formulations of dark patterns were missed by the majority of children. These findings illustrate that children are more vulnerable to dark patterns than adults, and that this vulnerability is likely based both in their developmental cognitive ability and their relative degree of digital literacy.

**d. <u>Research Has Identified Dark Patterns on Meta's Platforms</u>**

59. Mildner et al. (2023) conducted the first comprehensive analysis of dark patterns across several major social networking platforms, including Facebook, Instagram, and TikTok, revealing a pervasive presence of manipulative design practices. In that study, researchers

identified common dark patterns on social media platforms that compromised user autonomy, including: (1) interactive hooks (design tactics used to maximize engagement and attention, e.g. **infinite scroll**, **auto-play**, gamification), and (2) **social brokering** (design tactics to maximize connecting with multiple people, that then result in users sharing more than they may want to, e.g., bad defaults to promote the platform externally or add local contacts to the platform). Those strategies were specifically designed to capture and maintain users' attention, thereby increasing their time spent on the platforms. These strategies were also combined with other common forms of dark patterns, demonstrating the cumulative impact of dark patterns and the ubiquity of these practices on social media platforms. Notably, the combination of these manipulative strategies is embedded within the core interactions of these platforms. Rather than this functionality being optional for users or gated for the most vulnerable users, these techniques maximize user engagement and maximize sharing of content, thereby creating habitual use of the platform—even for the platforms' youngest users. This core functionality underscores how social media platforms exploit users' psychological biases to extend engagement.

60. Chen et al. (2024) built upon Mildner's findings with a focus on Very Large Online Platforms (VLOPs) now regulated by the EU. These are online platforms, defined by the Digital Services Act,[9] that have over 45 million monthly users, and include Instagram, TikTok, YouTube, and Snapchat. They identified how VLOPs make use of so-called **extended-use designs** (EUDs) to maximize user engagement, covering similar conceptual territory as ACDPs.[10] The researchers found the platforms they evaluated employ several strategies—such as pressure (e.g., creating a social obligation to start a session), enticement (e.g., using reward-driven mechanisms to encourage use), lulling (e.g., encouraging mindless engagement to extend a session), and trapping (e.g., obfuscating options to reduce use of a platform)—to maintain user

[9] Regulation (EU) 2022/2065 of the European Parliament and of the Council of 19 October 2022 on a Single Market For Digital Services and amending Directive 2000/31/EC (Digital Services Act). (2022). Official Journal of the European Union, 65(L277). https://eur-lex.europa.eu/legal-content/EN/TXT/?uri=CELEX%3A32022R2065.

[10] EUDs and ACDPs share strong conceptual overlap, with EUDs focusing on specific types of harms (extended use) and ACDPs focusing on specific physiological triggers (attention and engagement).

attention. EUDs, such as **infinite scroll** and **auto-play**, contribute to what has been termed **attention capture**, whereby users are nudged to continue engaging with the platform. Chen and colleagues found these techniques are not only prevalent across VLOPs but also particularly aggressive on social media platforms, concluding: "social media platforms that depend on user attention employed twice as many EUDs as platforms that rely on other business models." These findings further highlight the intersection of dark patterns and attention-capture techniques, showing how these designs exploit users' time, attention, and cognitive load, creating an environment that discourages disengagement and increases the chance for users to experience multiple forms of harm.

61. The findings of these studies are also mirrored by a 2025 report from a consumer protection organization in Germany (the Verbraucherzentrale Bundesverband e.V.) that underscores the growing concerns regarding "Hyper-Engaging Dark Patterns" on social media platforms (Bundesverband der Verbraucherzentralen und Verbraucherverbände, 2025). These manipulative design techniques—including push notifications, countdowns, **infinite scroll**, and **auto-play**—are specifically designed to induce addictive behavior, particularly among young users, and leverage the same mechanisms as those exploited in gambling, such as stimulated variably timed dopamine release. The report highlights how these techniques, often using psychological mechanisms like the fear of missing out (FOMO) and variable rewards, drive users to spend excessive amounts of time on the platforms. The report notes that addictive engagement is especially concerning for minors, who are more vulnerable to the emotional and psychological effects of these designs, and could lead to negative long-term consequences, such as impaired decision-making and addictive behaviors.

62. Researchers have concluded that the ubiquity of dark patterns in digital systems, including on social media platforms, is by design: these patterns are effective at enabling shareholder goals and often represent a focus on business incentives to the detriment of user experience and societal impact (Leiser & Santos, 2024; Mathur et al., 2021). However, the normalization of these practices is out of alignment with the professional responsibilities of

failed to conduct, or chose not to act upon, the types of comprehensive risk assessments described in Section 2.5 of the ACM Code. In many cases, it appears to have avoided embedding formalized assessment practices altogether or implemented them in ways that were siloed from actual product development decisions. Rather than designing systems respecting teen users' cognitive and emotional development, Meta created product ecosystems that prioritized growth, engagement, and retention metrics over well-being.

78. In sum, Meta systematically failed to act in accordance with the ethical and professional responsibilities expected of computing professionals. The internal evidence I reviewed indicates that significant populations of children and teens were using Meta's platforms and that its design choices had real-world psychological, social, and behavioral consequences. Instead of acting to discover and actively mitigate these harms, Meta optimized for engagement and retention, even as public concern and internal evidence mounted.

## VII. Meta Employed Dark Patterns in Violation of Guidelines Applicable to Technologists

79. Instagram embedded dark patterns throughout the user experience, creating a temporal experience that is easy to enter and exceptionally difficult to exit. From the initial moment of account creation to efforts at account deletion, Meta's design choices exhibit evidence of manipulation, coercion, and attention-capture techniques. The diagram below reflects the system-level dark patterns I located in my analysis of the Instagram platform.




80. The full user journey on Meta's platforms reveals how dark patterns and ACDPs reinforce one another, compounding psychological, social, and behavioral pressures at each stage. In the following sections, I discuss: (1) sign-up (lack of age gating); (2) onboarding (accelerated engagement hooks); (3) notifications (persistent triggers for re-engagement); (4) engagement (sustained high-intensity interaction); and (5) parental controls (defective oversight tools).

81. Taken together, these stages create what the literature—e.g., Monge Roffarelo et al. (2023)—refers to as an "Attentional Roach Motel": a platform environment that is easy to enter, difficult to leave, and calibrated to extract and retain user attention for as long as possible. This system-level design leverages the two ingredients of dark pattern temporality:

a. **Duration of exposure**, wherein each interaction increases user familiarity with dark pattern-laden flows and erodes the user's sense of friction, while constantly demanding even more attention and time from the user.

b. **Cumulative effect**, where multiple manipulative mechanisms compound to entrench user behaviors and resist disengagement efforts, addicting the user through intermittent variable rewards (IVR) and social pressures.

These are not failures of specific features. Rather, Meta's platform operates as an integrated system of manipulative design, combining rapid onboarding, mechanisms to capture attention, emotional and behavioral pressure, and resistance to exit.

82. As illustrated in the diagram below, found in an internal Meta document (META3047MDL-044-00108564 at -08566), multiple forms of dark patterns and attention capture patterns (conceptually consistent with what is described in the diagram as "'[a]ddictive'-like design") contribute to the extractive and engagement-oriented focus of the platform. The diagram labels nudges and default settings as dark patterns, the use of frequent recapture notifications and other metrics as attention capture patterns, and the use of a combination of dark and attention capture patterns through techniques such as **auto-play**, **infinite scroll**, and "low-value" notifications. The harms of this system are the foreseeable result of design choices made in pursuit of platform growth, revenue, and data accumulation, at the expense of user autonomy and well-being.

85. While the system does implement a nominal constraint by terminating the process if the provided birthdate indicates the user is under 13, this modal dialog is not difficult to circumvent. (See, e.g., META3047MDL-003-00181914 at -81922 showing a 1.16 million underage enforcement backlog.) Upon entering an age under the threshold, the interface responds with a generic error message: "We couldn't create your account // We were not able to sign you up for Instagram," accompanied by a single "OK" button. But after clicking the OK button, the user can change the birthdate entry and try again to sign up. (META3047MDL-155-00008293 (iOS); META3047MDL-155-00008302 (web browser)). Within this signup flow, there is no mechanism to cross-validate age using alternative data sources (e.g., parental or ID verification, facial estimation, inferences based on IP address or device). Thus, users under 13 can access the platform merely by guessing a more "acceptable" birthdate.

86. This lack of friction allows a child or teen to easily circumvent the age gate and access the platform—either representing themselves as a teen user (for users that are under 13) or as an adult user (for any user of any actual age under 18). By offering no additional verification steps, Instagram's interface design implicitly assumes the accuracy of self-reported age even though Meta's documents indicate self-reported age is inaccurate (META3047MDL-003-00029531 at -29534). The interface does nothing to disincentivize falsification. This lack of friction reflects a design decision that privileges rapid onboarding over meaningful and durable age-gating protections.[34]

87. Even after Instagram adopted some parental controls in 2022 for the first time,[35] Meta still did not employ other age verification tools to prevent users under the age of 13 from creating accounts. (META3047MDL-019-00056764 at -56766).

88. The use of the scrolling date picker without contextual warnings or validations also reflects **interface interference**, a high-level dark pattern strategy in which interface

[34] See Strahm et al., 2018 (for more on onboarding goals and UI techniques).

[35] "Meta admits that parental controls, including tools developed for parental supervision of Teens, were first made available to users on Instagram in 2022." Meta's First Amended Response to Request for Admission No. 3 at 6.

litigation to have commenced). (Castaneda Ex. 23; META3047MDL-035-00002750 at 26 ("Adult models are not currently effective at finding adult age liars . . . which is critical for two-sided interactions where risky adults are seeking to enter into Youth spaces.")).

100. Until March 2021, and to varying degrees between March 2021 and September 2024, Instagram's settings made teen accounts discoverable by anyone, significantly increasing their exposure to strangers, unsolicited contact, grooming behaviors, and psychologically harmful content. (See, e.g., META3047MDL-020-00270225). Worse, no friction or educational prompts were provided at sign-up to guide teen users in evaluating or adjusting these defaults. This violates a key design responsibility when serving vulnerable populations, particularly minors, who may not fully understand the implications of these settings.

101. The exposure of teen users to public-by-default settings can also be understood within the broader ecosystem of attention-capture design, wherein platform features—particularly those encountered during onboarding—are optimized not just for sign-up completion but for rapid immersion and habitual use. (See META3047MDL-047-00346649). Meta's onboarding flow introduces features designed to normalize constant engagement: immediate exposure to algorithmically curated content, auto-play videos and stories, persistent notifications, and a continuous feed structure that reinforces return behaviors. (See, e.g., META3047MDL-047-00575949). As identified in recent research on attention capture deceptive designs, such mechanisms exploit users' limited capacity for reflection and deliberately reduce friction in order to accelerate attachment to the platform (Monge Roffarello et al., 2023). These features often leverage feedback loops involving social validation (likes, comments, follows), **social engineering** via fear of missing out, and intermittent reinforcement to deepen engagement before users—particularly teens—can develop awareness or control over their usage patterns.

102. When paired with privacy-invasive defaults, this design strategy creates a dangerous combination. The rapid onboarding process feeds quick addiction to the platform, while public-by-default profiles maximize incoming stimuli, including unsolicited comments, interactions with strangers, and algorithmically presented exposure to emotionally provocative or

420:9-421:17; Castaneda Dep. Ex. 31 at 5). In other words, even though the stated goal was to encourage teens to use Instagram less, at least some employees anticipated these features would not have this effect. (Volichenko Dep. 114:5-116:15).

112. As significantly, multiple Meta employees indicated it was feasible to improve utilization of this feature beyond making it a true default. Volichenko explained: "I think initially we had some problems with how easy it was to ignore it, right? So, like … when you get a nudge, you can – you can do a few things. You can dismiss it. You can close the app…And so each one of those things can be made easier or more difficult for the user, right, by adjusting, you know, the font on the button, the size of the button, how prominent it is … You can make it in a way that it's not dismissible at all." (Volichenko Dep. 110:3-111:1). As former Meta senior engineering leader Arturo Bejar likewise explained: "Very few people go to settings, and even less people go into the menus that the settings offer. And so if you want somebody to use a feature, you put it in the front page. You make it responsive to touch on the user interfaces. You point people at it. There is [sic] many things that are well-understood in the industry that you can do in order to drive feature discovery and usage." (Bejar (Vol. II) Dep. 546:25-547:8).

113. The above plausibly explains much of the low usage rate for these tools. The Take a Break Reminder has less than a fifth a percent adoption rate among teens. (META3047-MDL-040-00654288). The Quiet Mode tool, launched by Instagram until 2023, has an approximate 2% adoption rate by teens. (META3047MDL-007-0373649). According to Bejar, Meta knew that, if they made their safety features opt-in on Instagram, the adoption rate would be very low. (Bejar Vol. I Dep. 168:2-169:3).

114. Offering tools that are known not to have any measurable effect, while claiming they will reduce problematic use, is known as "ethics washing" (Bietti, 2020). The above tools, introduced in response to public criticism, are presented as evidence of responsible design, but they place the burden of self-regulation on users without meaningfully addressing the structural design patterns—such as **infinite scroll** and **recapture notifications**—that drive overuse and harm.

### vii. Infinite Scroll Prolonged Engagement and Exploited Behavioral Vulnerabilities

115. Meta's platforms—including Instagram and Facebook—make extensive use of **infinite scroll** to maximize time-on-platform and prolong user engagement. Across key engagement surfaces such as the Instagram Explore page, Instagram Reels, and the Facebook News Feed, users are presented with a seamless stream of content that refreshes continuously with no natural stopping points. This design eliminates any interface cues that would prompt users to pause, reflect, or disengage.

116. This strategy exemplifies the **infinite scroll** attention capture pattern, which Monge Roffarello et al. (2023) identify as a primary mechanism of attention manipulation. By eliminating friction and constantly serving algorithmically curated media, **infinite scroll** transforms user engagement into a passive, habitual activity. Within this context, users are subjected to **intermittent variable rewards**—unpredictable moments of pleasure or relevance delivered at irregular intervals through unexpected posts, trending videos, or socially validating content.

117. In Instagram Reels and Explore, content is personalized in real-time based on micro-interactions (e.g., pauses, replays, likes), keeping users in a loop of reactive consumption. Similarly, the Facebook News Feed refreshes continually with a mix of content from friends, groups, and recommended pages, further reinforcing scrolling behavior. None of these interfaces offer built-in pauses or usage reflection prompts by default, even for teen users, despite Meta's awareness of the addictive properties of these features.

118. Facebook launched **infinite scroll** in 2011, and in 2016, Instagram started to include this feature.[47] **Infinite scroll** exploits adolescents' underdeveloped self-control, making it hard for them to stop using social media due to the unpredictability of what might appear next. Before **infinite scroll** was introduced, Facebook and Instagram users would reach the end of their news feed after a set number of posts and had to click a button to load more. **Infinite scroll**

---

[47] Culp. There's an Alternative to the Infinite scroll, Wired (Sept. 19, 2023).

from a parent or guardian over some engagement features (e.g., time limits, safety settings) this functionality suffers from many of the issues discussed above, providing a façade of protection rather than a substantive safeguard.

### b. Meta Could Have Designed Instagram to Be Less Harmful

126. As discussed above, Meta's design incorporated dark and attention-capture patterns that exploited known psychological and social vulnerabilities. These practices violated well-established professional ethical standards in computing and design, particularly those codified by the ACM Code of Ethics and ABET accreditation standards, which emphasize risk assessment, harm avoidance, and the responsibility to consider vulnerable populations. Importantly, less harmful designs were readily available. Meta possessed the technical capacity to implement more socially responsible and ethical alternatives. For example:

127. **More Robust Age Gating**: Meta could have implemented additional layers of verification—such as facial age estimation, device-based inferences, or multi-step confirmations involving parents or IDs—to substantially reduce access by underage users. As early as 2012, Meta considered such verification requirements as applied to Facebook, noting they could be launched within approximately six weeks. (META3047MDL-034-00385870). Instead, Meta used easily bypassed self-report mechanisms that encouraged misrepresentation.

128. **Adding Friction during Onboarding**: Rather than immediately immersing users in addictive content and social engagement, Meta could have introduced onboarding sequences that prioritized safety, social media literacy, and patterns of intentional use. This might include prompts about content types, default privacy settings, or reflective pauses before following recommendations or turning on notifications—ideally supervised by parents. Again, as early as 2012, in the context of Facebook, Meta considered requiring parent verification prior to providing children under 13 access to the platform. (META3047MDL-034-00385870).

129. **Privacy-Respectful Defaults**: Meta chose to default teen accounts to public in varying degrees until September 17, 2024, exposing young users to unwanted and potentially harmful interactions. The system could, however, have been designed with privacy by default

and more robust explanations of the risks of visibility, again in consultation with the teen's parents, from the very beginning. More generally, Meta did not begin implementing privacy-respectful defaults for teens and children until March 2021, even though, at least as early as July 2019, Meta researchers recommended doing so. (META3047MDL-065-00124111 at 119; Castaneda Dep. Ex. 14; Kilstein Dep. Ex. 57).

130. **Meaningful Parental Controls**: Meta could have developed parental controls much earlier in the platform's history. And even with the controls it did eventually roll out in 2022 and 2023, the supervisory mechanisms could have been durable and verifiable, including mandatory adult approval for sensitive settings or notification changes, safeguards against alternative account creation, and reliable communication channels that inform adults of critical actions. For instance, guidance from academic research in 2017 on developing self-regulation strategies between parents and children regarding technology tools could have been adopted (Hiniker et al., 2017). Instead, controls were easily disabled and poorly communicated.

131. **Streamlined Exit Options**: For users who sought to delete their accounts, Meta could have offered a clear, linear path to deletion—respecting user agency and mental health. Instead, it created a labyrinth of **forced action** and **obstruction**, making account exit much more difficult than account creation. Design alternatives—such as one-click deletion, shorter and clearly communicated timelines, or deletion flows that prioritized a user's choice—were technically feasible but deprioritized in favor of user retention, as Mark Zuckerberg himself testified (Zuckerberg (Vol. 1) Dep. 207:1-208:23). Meta failed to adopt less harmful alternatives—and took actions to increase friction and the use of dark patterns over time instead of reducing this friction (Seyson & Willett, 2025). It did so despite both information about the problem and available solutions, illustrating ethically problematic deployment of dark patterns to retain users who prefer to leave.

132. **Human-Centered Notification Systems**: Rather than exploiting user anxiety through **recapture notifications** and **social engineering** tactics, Meta could have encouraged users to set boundaries around communication, offering bulk notification control, opt-out

defaults, and custom engagement strategies for teens, given Meta had information that teens were addicted to the platform. Instead, users were subjected to persistent, behaviorally manipulative nudges. Within the last few years, Meta released an opt-in "Quiet Mode" feature that, when enabled, mutes Instagram notifications during late night hours,[51] demonstrating Meta's ability to develop safer notification systems—even though even this feature incorporates other attentional issues, since notifications are only delayed to later appear in the morning.

133. Meta's failure to implement these protections cannot be explained by technical limitation or user demand: Meta had the tools and responsibility to design a safer platform. This was, in my view, an active abdication of professional responsibility towards its most vulnerable users.

## VIII. Conclusion

134. Through my analysis, I identified a wide array of dark patterns and attention capture patterns present across numerous features of Meta's platforms. These patterns were not isolated to single design elements or trivial interface quirks that only appeared for a limited period of time; rather, they were embedded within foundational elements for user experiences and across the entire platform delivery strategy, often appearing at key decision points where users were led to believe they had meaningful control over their engagement with a system, when just the opposite was true. In many instances, these patterns operated at the level of system architecture, amplifying their impact and diminishing users' autonomy and well-being at scale.

135. The design and deployment of these interface strategies reflect a failure of professional responsibility as outlined in widely accepted ethical principles and guidelines in computing and design. While Meta had both the technical capacity and practical resources to conduct ongoing risk assessments and proactively identify harms, such efforts were either absent or insufficient. Moreover, when evidence of harm or negative impacts on user well-being did

[51] Instagram Quiet Mode: A New Way to Manage Your Time and Focus. Meta. (https://about.fb.com/news/2023/01/instagram-quiet-mode-manage-your-time-and-focus/ (last accessed May 15).

The undersigned hereby certifies their understanding that they owe a primary and overriding duty of candor and professional integrity to help the Court on matters within their expertise and in all submissions to, or testimony before, the Court. The undersigned further certifies that their report and opinions are not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation.

Dated: May 16, 2025

Colin M. Gray, PhD