# Exhibit B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| *PEOPLE OF THE STATE OF CALIFORNIA, et al.,*<br>Plaintiffs,<br><br>v.<br><br>*META PLATFORMS, INC, Instagram, LLC, Meta Payments, Inc., Meta Platforms Technologies, LLC., et al.,*<br>Defendants<br><br>IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br>4:23-cv-05448 | MDL No. 3047<br><br>Case No. 4:23-cv-05448-YGR<br><br>Judge: Hon. Yvonne Gonzalez Rogers<br><br>Magistrate Judge: Hon. Peter H. Kang |

**REBUTTAL TRIAL REPORT OF COLIN M. GRAY**
**JULY 30, 2025**

VI of his MDL report begins by acknowledging that "some negative interactions or experiences are always a possibility (boyd, 2014; Slaughter & Newman, 2022)." (Birnholtz MDL ¶102). However, subsequent analysis of specific areas of functionality (e.g., problematic use; Teen Accounts) only focuses on the availability of features or controls to mitigate threats to user wellbeing and safety, rather than assessing the degree to which this functionality actually curtailed harm to users. My Opening Report presents similar features as Dr. Birnholtz's report (e.g., features to limit use (Opening Report ¶¶108-114)), but also identifies known gaps in these features that led to potential or actual user harm (e.g., "The Take a Break Reminder has less than a fifth a percent adoption rate among teens." (Id. ¶113)).

26. My analysis considers not only the presence of features that could reduce the incidence of negative encounters on Meta's platforms, but also the ecology in which these features were created and shipped and whether the features actually impacted the safety of the platform for teen users—a calculus that Dr. Birnholtz does not consider in his report. My analysis directly considers common professional codes (Opening Report Section VI) and shows how these codes could have been used by Meta employees to recognize potential or actual harms. While Dr. Birnholtz considers some HCI principles and concepts (e.g., Birnholtz MDL Section IV.B, his failure to consider the HCI community's own professional code (ACM Code of Ethics and Professional Conduct, 2018) as part of his analysis undermines his conclusions.

### b. <u>Dr. Memon's Conclusions Regarding Age Verification Do Not Consider Alternative, More Effective Features</u>

27. Dr. Memon's report provides a technical description of the features and practices Meta has utilized on Facebook and Instagram relating to age verification and management. However, the report does not appear to address the efficacy these tools vis-à-vis Meta's platforms nor does Dr. Memon's analysis of features relevant to age verification account for the criticisms I have outlined in my Opening Report. For instance, Dr. Memon asserts that having a reporting mechanism to identify users under the age of 13 is complex ("online reporting forms of this kind are vulnerable to abuse and harassment"; MDL Expert Report of Nasir Memon (Memon MDL) ¶72) but fails to consider the possibility of other tools or forms of verification to ensure under-13 users are not on the platform. Similarly, Dr. Memon claims: "The critique that self-reporting of age at registration is inherently insufficient overlooks the profound technical, operational, and privacy challenges associated with alternative approaches." Memon MDL ¶89. This conclusion seems to suggest that while the age gate is broken and ineffective, it is not Meta's fault.

28. Dr. Memon also considers other age-verification mechanisms (e.g., document-based (Memon MDL ¶¶32-34), credit card and payment-based (Memon MDL ¶¶30-31), face scanning-based (Memon MDL ¶¶41-49), device or IP-based (Memon MDL ¶50), and third-party (Memon MDL ¶¶35-40)). Across all of these potential verification methods, Dr. Memon fails to present any evidence regarding their efficacy—either in isolation or combination—or even estimate the number of children and teens that might be served if users were able to select a verification tool that fits their situation and privacy needs best. Notably, I am not proposing any one of these specific methods to resolve Meta's age verification failure. Instead, I present these as possibilities that Meta should have robustly tested and investigated at the earliest date they became aware of the presence of underage users on their platforms, if not before.

defense experts' reports. The majority of these reports provide no substantive consideration of harms to users, couching legitimacy of design practices in relation to industry standards or benchmarking of peers rather than known potential and actual harms revealed through internal and external research.

50. I reserve the right to update my opinions in a timely manner to the extent Meta produces additional evidence relevant to the opinions contained in this report.

The undersigned hereby certifies their understanding that they owe a primary and overriding duty of candor and professional integrity to help the Court on matters within their expertise and in all submissions to, or testimony before, the Court. The undersigned further certifies that their report and opinions are not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation.

Dated: July 30, 2025

Colin Gray

Colin M. Gray, PhD