# Exhibit 5

STATE OF NEW MEXICO

COUNTY OF SANTA FE

FIRST JUDICIAL DISTRICT COURT

STATE OF NEW MEXICO, EX REL., RAUL TORREZ, ATTORNEY GENERAL,

Plaintiff,

No. D-101-CV-2023-02838

v.

META PLATFORMS, INC.,

Defendant.

~~~~~~~~~~~~~~~~~~~~~~~~~~~

BEFORE HONORABLE BRYAN BIEDSCHEID

DAY 10 TRIAL PROCEEDINGS

(PAGES 3976 THROUGH 4572)

FEBRUARY 18, 2026

8:42 A.M.

REPORTED BY:
Sommer E. Greene, RPR, CRR
Certified Court Reporter
Certificate No. 541

MARICOPA REPORTING, INC.
701 Camino de la Familia
Suite 214
Santa Fe, New Mexico
(480) 597.4744
~~~~~~~~~~~~~~~~~~~~~~~~~~~

INDEX

EXAMINATION PAGE

DR. ARVIND NARAYANAN
CROSS-EXAMINATION (Continued) BY MS. PAUL.......4026
REDIRECT EXAMINATION BY MS. SINGER..............4054

JASON SATTIZAHN
DIRECT EXAMINATION BY MR. MIGLIORI..............4064
CROSS-EXAMINATION BY MR. PARKINSON..............4185
REDIRECT EXAMINATION BY MR. MIGLIORI............4311

VIDEO DEPOSITION OF NATALIE TROXEL..............4340

RICKEY KITCH
VOIR DIRE EXAMINATION BY MR. ACKERMAN...........4361
VOIR DIRE EXAMINATION BY MR. HUFF...............4388
VOIR DIRE EXAMINATION BY MR. ACKERMAN...........4412

* * *

A. So after the Frances Haugen disclosure came forward with this information I discussed earlier, there was this shift in research that I had never experienced this in my Ph.D., at PlayStation or in the first half of Meta. And that was that I was assigned a lawyer. 11:42:51 11:42:56 11:42:58 11:43:01 11:43:06 11:43:09

I was told I was going to have an attorney assigned to me and that at every single stage of research, this means if I am thinking about an idea for a research study, if I am building the methods out, if I am writing the questions, if I am doing the data analysis, if I'm writing the report, and even if I'm thinking about data that I should keep, which isn't even something a researcher should be debating, that lawyer was going to have the final word on how those things work. 11:43:11 11:43:14 11:43:17 11:43:19 11:43:22 11:43:26 11:43:30 11:43:33 11:43:36 11:43:38

And so I basically had this attorney as Big Brother that every step of the way was saying, you have to do research this way and that was it. You either -- you either listen to this or you cannot do the work that you want to do to keep people safe. 11:43:40 11:43:45 11:43:46 11:43:50 11:43:52

MR. PARKINSON: Your Honor, I'd like to lodge a 503(b) objection and out of respect for the Court and for Mr. Migliori's examination, which I do not want to interrupt, I'd ask that it please be 11:43:56 11:43:57 11:44:00 11:44:03

running. 11:44:05

JUDGE BIEDSCHEID: Yes, and you may have a standing objection on that basis. 11:44:05 11:44:06

MR. PARKINSON: Thank you. 11:44:07

Q. BY MR. MIGLIORI: Dr. Sattizahn, based on your understanding and experience, what was it about Frances Haugen's testimony that caused this change in culture at the research level? 11:44:08 11:44:16 11:44:19 11:44:23

A. The change was that now research was considered a risk to the company. So when I pressed for -- I did not agree with these changes post-Haugen in any way, shape, or form. 11:44:26 11:44:30 11:44:34 11:44:39

And when I would ask attorneys, why are we doing this? The reasons they explicitly gave me were this is a risk to our brand, this is a risk to our business, and even invoking the Haugen disclosure said, you could imagine another leak. This is something that could get out, that we know this and we can't have someone be able to audit us or discover that we knew this and didn't do anything about it. That was the explicit reason given to me by my attorneys. 11:44:42 11:44:42 11:44:46 11:44:47 11:44:51 11:44:54 11:44:55 11:44:58 11:45:00 11:45:03

Q. Were you an employee of Meta when Francis Haugen testified? 11:45:03 11:45:05

A. I was, yes. 11:45:06

background? 11:48:10

A. No, she does not. 11:48:10

Q. Did you talk to her about this statement of Mr. Zuckerberg or about the change in culture that you described? 11:48:13 11:48:16 11:48:19

A. We discussed this repeatedly. I surfaced these issues that I had with her. 11:48:20 11:48:23

Q. And what do you recall of those conversations? 11:48:25 11:48:27

A. These conversations with Kristin Zobel were largely the conversations I mentioned earlier that, when discussing these changes and why they were occurring, it was doing research outside of, you know, what I'm telling you to do is a risk to the brand, it's a risk to the business, and this is a potential leak issue, just like Frances Haugen, if someone was to learn that we might know about these things and we didn't do anything about it. 11:48:27 11:48:31 11:48:33 11:48:35 11:48:38 11:48:41 11:48:44 11:48:46 11:48:48

Q. Did she tell you anything about interacting with other researchers throughout the platforms? 11:48:50 11:48:53 11:48:55

A. She did, yes. 11:48:55

Q. What did she tell you? 11:48:56

A. Repeatedly, after the shift had happened, what Kristin Zobel told me to do was essentially how 11:48:58 11:49:03

I could or could not communicate with individuals. 11:49:06

So in the past I would be able to freely post research to other groups or share ideas with others, and now I was being basically told how I would be able to talk to others about the work itself. 11:49:10 11:49:13 11:49:15 11:49:18 11:49:20

Q. Was -- 11:49:21

Did she tell you anything about the types of research that you could undertake? 11:49:22 11:49:23

A. She did, yes. 11:49:25

Q. What did she tell you? 11:49:26

A. There were multiple occasions where I was told there were just entire studies that I couldn't do. There were research studies where questions had to be removed. 11:49:27 11:49:31 11:49:33 11:49:36

I was told that certain methods couldn't be used and even data I had collected in the past on psychological and mental well-being were questions that I could not use anymore. So even evidence that I had that there was emotional harm to individuals, I wasn't even allowed to explore anymore. 11:49:38 11:49:40 11:49:43 11:49:45 11:49:50 11:49:54

Q. Did she talk to you at all about the writing up of your findings? 11:49:55 11:50:02

A. She did, yes. 11:50:04

Q. What did she tell you about that? 11:50:05

A. I don't recall a single report that I made after the beginning of 2022 where my findings were not altered in some way by Kristin Zobel. This could be the phrasing of findings, whether certain findings could be included. 11:50:07 11:50:09 11:50:12 11:50:17 11:50:19

Even just words. Like random words I would be told that, you know, having the word "emotion" in a report is too, quote, damning. Her words not mine. So I couldn't even talk about the word emotion. Yeah. 11:50:21 11:50:23 11:50:25 11:50:29 11:50:31

Q. Did you discuss with her anything at all about the maintaining of your findings after your work was completed? 11:50:34 11:50:40 11:50:43

A. How so? Could you -- 11:50:44

Q. Let me rephrase it. It was a terrible question. 11:50:46 11:50:49

Did she discuss with you anything about the findings once you had them what -- how they could be maintained or whether they could be shared? 11:50:49 11:50:52 11:50:55

A. Yes, she did. 11:50:57

Q. And what did she say? 11:50:58

A. In multiple instances, some data that I had collected could not even be kept. And so this was -- I had performed a research study, collected the data and I was told that data cannot go in the 11:51:00 11:51:03 11:51:07 11:51:10

Q. And it was maintained in the ordinary course of business at Meta? 11:55:12 11:55:15
A. It was. 11:55:16
MR. MIGLIORI: Your Honor, I move to admit Plaintiff's Exhibit 4251. 11:55:17 11:55:18
JUDGE BIEDSCHEID: All right. It's admitted subject to the objection. 11:55:21 11:55:21
MR. PARKINSON: Thank you, Your Honor. 11:55:23
(Plaintiff's Exhibit 4251 was admitted into evidence.) 11:55:25 11:55:27
MR. MIGLIORI: May we publish it, Your Honor? 11:55:27 11:55:29
JUDGE BIEDSCHEID: Yes. I think I'm working towards that. 11:55:29 11:55:31
MR. MIGLIORI: Okay. Thank you. 11:55:32
Q. BY MR. MIGLIORI: Okay. Could you tell the jury what the title of this presentation is? 11:55:36 11:55:37
A. Yeah. This is titled, "Best Practices for Sensitive Research and A/C Privilege." 11:55:39 11:55:42
Q. Okay. And what do you understand that to be? 11:55:45 11:55:47
A. You mean the title of the document itself? 11:55:47 11:55:51
Q. Yes. 11:55:52
A. So this is -- in the aftermath of the 11:55:52

Frances Haugen disclosure, this was directly given to me as a researcher as instructions for how I should behave around my research and what I should be doing after the October 2021 disclosure. 11:55:54 11:55:56 11:56:00 11:56:04

Q. Okay. And do you know what A/C privilege means? 11:56:08 11:56:11

A. I do. 11:56:12

Q. What does it mean? 11:56:12

A. In this context this was something that I believed was to silence us researchers. Having this come out right after the Frances Haugen disclosure, my experience and my understanding at the time was now this is going to be a pretext to, oh, I'm not going to be able to talk to people about my research anymore. A bit of a muzzle, if you were, but -- 11:56:14 11:56:15 11:56:21 11:56:24 11:56:26 11:56:30 11:56:33

Q. When you say "people," which people are you talking about? 11:56:36 11:56:38

A. Sorry. Can you say that again? 11:56:39

Q. Which people are you talking about? External, internal? Who can't you talk to anymore? 11:56:41 11:56:43

A. I mean, right now it's anybody. When I see A/C privilege, oh, there's a code of silence. I'm now put in a box. It doesn't matter what I want to do. 11:56:46 11:56:48 11:56:51 11:56:54

Now this is going to be something that if 11:56:55

I wanted to talk externally about it, I can't do it. If I want to keep talking to people how I think is appropriate to talk to people as a scientist internally, I can't do it. 11:56:55 11:56:58 11:57:00 11:57:02

Q. Turn to the next page, please. 11:57:04

You see this is a statement from Mark Zuckerberg? 11:57:08 11:57:10

A. I do. 11:57:12

Q. It says, "We have an industry leading research program so that we can identify the important issues and work on them. It's disheartening to see work taken out of context and used to construct a false narrative. We're going to keep doing research because it's the right thing to do." 11:57:13 11:57:16 11:57:18 11:57:21 11:57:24 11:57:27 11:57:30

Do you recall reading that when you got this document? 11:57:33 11:57:35

A. Oh, I recall reading that. 11:57:35

Q. And what was your impression when you read it? 11:57:36 11:57:37

A. I mean, to see this, my impression when I read it is this is a smoke screen. This is, oh, we need to come up with a reason now why the -- we have such a bad public image because they know that we know about harms, and we're not doing the right thing 11:57:38 11:57:42 11:57:45 11:57:48 11:57:50

about it. And to see this, you know, work taken out of context, I'm part of the research team, the research that we're doing is the context of the harm that we know. 11:57:53 11:57:55 11:57:59 11:58:01

And so it was really disheartening for me to read this and just see this as sort of a cover on what I saw as the truth. 11:58:01 11:58:04 11:58:07

Q. Let's turn page 4 of the document. 11:58:08

Do you recall this page when you received this document from the legal department? 11:58:13 11:58:15

A. I do, yes. 11:58:17

Q. It says, "Confidentiality and user studies." 11:58:19 11:58:21

Are your research projects called user studies? 11:58:23 11:58:25

A. Yes, they are. 11:58:26

Q. And is this concept of confidentiality, is this something new at this point to you? 11:58:27 11:58:30

A. This was not something I had experienced before receiving this. 11:58:32 11:58:35

Q. Can you read the -- with "It's critically"? 11:58:37 11:58:41

A. Yeah. "It's critically important to maintain the confidentiality of all user studies." 11:58:41 11:58:44

It has two bullet points. 11:58:48

"One, to protect the privacy of all individuals who volunteer to participate in our studies." 11:58:49 11:58:51 11:58:53

And, two, "To maintain ethical standards and integrity of the research process." 11:58:55 11:58:58

Q. And let me ask you, Doctor, before you got this and before Frances Haugen testified to Congress, did you have any issues or problems protecting the privacy of individuals who volunteered to participate in the studies? 11:58:59 11:59:01 11:59:05 11:59:08 11:59:12

A. No, I did not. 11:59:13

Q. Prior to Frances Haugen's testimony before Congress, did you have any problems maintaining ethical standards and integrity in the legal department sense? 11:59:14 11:59:18 11:59:20 11:59:23

A. No, I did not. 11:59:24

Q. And do you have a recollection of how it felt to be told that you needed an attorney to help you do that now? 11:59:25 11:59:26 11:59:30

A. It's -- it's personally -- it feels just so terrible as a researcher to have someone do something unethical and say we're going to control how you talk about these things, and then do it under the guise of ethical standards. 11:59:31 11:59:36 11:59:39 11:59:43 11:59:45

To say that this is about ethics and then 11:59:48

to use this as an excuse to get us to not talk or to do research the way we'd like to do, is -- it stings as a researcher and to someone who does this as a career. 11:59:50 11:59:54 11:59:59 12:00:01

Q. The word "A/C privilege," do you know what that stands for? 12:00:01 12:00:04

A. I know it stands for attorney/client privilege. 12:00:05 12:00:06

Q. Okay. Did you ever have to do your research maintaining the ethics of this and the privacy, did you ever have to do your research under an attorney/client privilege before Frances Haugen testified to Congress? 12:00:06 12:00:09 12:00:12 12:00:14 12:00:18

A. No, I didn't. 12:00:19

MR. MIGLIORI: Your Honor, you want to take a lunch break? 12:00:21 12:00:23

JUDGE BIEDSCHEID: All right. This is a good time. That sounds appropriate. 12:00:24 12:00:25

MR. MIGLIORI: Thank you. 12:00:27

JUDGE BIEDSCHEID: Thank you for alerting me of that. 12:00:27 12:00:29

All right. So we'll take a lunch break. And, ladies and gentlemen, same rule as always applies, applies. Thank you for adhering to it so far, and please do so over lunch. 12:00:30 12:00:32 12:00:34 12:00:37

THE BAILIFF: All rise for the jury. 13:19:18
(Jury enters the courtroom.) 13:19:20
JUDGE BIEDSCHEID: All right. Please be 13:19:21 seated. 13:19:24
Ladies and gentlemen, again, as always, 13:19:25 hope you had a good, well-earned lunch break. 13:19:28
And with that, were you all able to 13:19:31 adhere to the Court's instructions? 13:19:32
THE JURORS: Yes. 13:19:34
JUDGE BIEDSCHEID: All right. Thank you 13:19:35 very much for that. 13:19:38
With that, Counsel, you may continue 13:19:39 whenever you're ready. 13:19:40
MR. MIGLIORI: Thank you, Your Honor. 13:19:42
Good afternoon. 13:19:44
Good afternoon, ladies and gentlemen. 13:19:48
Q. BY MR. MIGLIORI: Dr. Sattizahn, when we 13:19:48 were last together, we were talking about Plaintiff's 13:19:50 Exhibit 4251. 13:19:52
Do you recall that? 13:19:54
A. I do, yes. 13:19:54
Q. And I think we finished on page 4. 13:19:56
Can we turn to page 6 of that document? 13:20:05
A. All right. 13:20:11
Q. Okay. Let's wait for it to show. There 13:20:11

we go. 13:20:16

Do you recall this page of the document that you received from counsel at Meta? 13:20:17 13:20:19

A. I do. 13:20:21

Q. And the title of it is, "What Makes Research Sensitive"; correct? 13:20:22 13:20:26

A. Correct. 13:20:30

Q. And underneath populations, can you read the first two bullets? 13:20:31 13:20:36

A. Yeah. Under sensitive populations, it says, "U13, under 13 children. U18, under 18, teens." 13:20:37 13:20:40 13:20:45

Q. What did you understand your instructions to be with respect to now this directive that sensitive research needs to be conducted with attorney/client privilege? 13:20:45 13:20:47 13:20:53 13:20:59

A. What this meant now is both in regards to children and teens, but also the other topics here I had been researching is that these were topics -- all of the topics I had been studying that would be limited in terms of what I can do or who I can talk to this about. 13:20:59 13:21:02 13:21:05 13:21:08 13:21:11 13:21:15

Q. Was that internally? 13:21:15

A. Well, the way I understood it was this was internal, but it would also be anything that I 13:21:17 13:21:21

would potentially share externally either. 13:21:24

Q. Okay. And with respect to undertaking new research within your area of expertise, did you understand there to be any limitation on that, with respect to these two populations? 13:21:29 13:21:31 13:21:33 13:21:35

A. I did, yes. 13:21:37

Q. And what was your understanding? 13:21:38

A. If for any reason a study was going to include the recruitment of under 13 children or under 18 teens, or if you had a reasonable suspicion that they may exist, that research would be limited either in terms of what you might be able to research or how you'd be able to talk about it. 13:21:39 13:21:43 13:21:47 13:21:51 13:21:54 13:21:58

Q. And what kind of impact did that have on your ability to do your job? 13:22:00 13:22:04

A. I mean, it's -- you can't do it. That's the problem here. It's like if I don't have the agency to say, we know of these harms, we know they exist, we have evidence of that, but now pitching new studies to include children and teens are going to be monitored and manipulated, it means I'm not going to gather the knowledge to learn about these harms, I'm not going to know how to apply that to the design of the product itself, and ultimately people aren't safe. That's the process of learning and applying 13:22:06 13:22:10 13:22:16 13:22:18 13:22:20 13:22:23 13:22:26 13:22:29 13:22:32 13:22:34

and then changing whatever it is that we're building. 13:22:36
Q. Based on your observation and experience, 13:22:39
do you think that had an impact on the safety work at 13:22:41
Meta? 13:22:46
A. Undoubtedly, yes. 13:22:46
Q. Go to the sensitive topics. If you can 13:22:50
read the last two bullet points, please. 13:22:52
A. Yeah, the last two here under sensitive 13:22:55
topics is "Health and safety" and "integrity," which 13:22:58
is reported to include "online abuse, suicide, 13:23:01
harassment, bullying, mental health, trafficking, and 13:23:03
CEI." 13:23:07
Q. What did you understand any -- the 13:23:07
limitations, if any, on your research with respect to 13:23:10
those particular sensitive topics? 13:23:14
A. Again, this is something that the whole 13:23:17
of my research up to this point has been integrity. 13:23:19
This means that anything I'm going to be researching 13:23:22
in the future is going to be either controlled by an 13:23:25
attorney and/or the way that I'm discussing it. My 13:23:28
research with anybody else is going to be dictated to 13:23:33
me or controlled. 13:23:35
Q. And was it? 13:23:36
A. It was, yes. 13:23:37
Q. And what impact, if any, did that have on 13:23:37

your work? 13:23:41

A. Again, there were studies that I knew as a researcher we needed in order to understand what was happening to people on the platform. Studies like a bad actor study to know how harassment, bullying, how assaults were happening that we knew were happening so that we could prevent them from happening in the future. That research just didn't occur, and because of that, now people just aren't as safe. 13:23:42 13:23:45 13:23:49 13:23:51 13:23:55 13:23:57 13:23:59 13:24:01 13:24:05

Q. Let's go to the next page, page 7. 13:24:05

It says, "For sensitive research, we can mitigate the risk in two ways." 13:24:07 13:24:13

What did you understand the risks to be there that they were talking about mitigating? 13:24:15 13:24:17

A. I mean, the risk here for research was described to me from attorneys as, and I believe I mentioned this earlier, but there's a leak risk. So there's some risk that someone might find out that Meta knew about these research findings and didn't do anything about it. 13:24:19 13:24:22 13:24:27 13:24:29 13:24:31 13:24:34

And the other is this risk to the brand and the business of if people were to find out about this, they might not use us as much, and if they don't use our products as much, money goes down. 13:24:35 13:24:37 13:24:41 13:24:44

Q. Read the first bullet point, please. 13:24:48
A. Yes. It says, "Be mindful about how we structure the research and communicate the findings." 13:24:50 13:24:53
Q. Prior to Frances Haugen testifying to Congress, were you mindful of the structure of research and how you communicate findings? 13:24:55 13:25:00 13:25:01
A. As a researcher, yes, I had to be. 13:25:04
Q. Did you need a lawyer to help you with that? 13:25:06 13:25:08
A. No, I did not. 13:25:08
Q. Did you have an attorney/client privilege that prevented you from talking about it before Nancy -- before Frances Haugen's testimony? 13:25:09 13:25:12 13:25:15
A. No, I did not. 13:25:17
Q. Can you read the next bullet point? 13:25:18
A. It says, "Conduct highly sensitive research under attorney/client privilege." 13:25:21 13:25:24
Q. What did you understand the highly sensitive research to be? 13:25:26 13:25:28
A. Anything that I was going to be researching. I mean, if you go back to that list, everything that I've talked about today, everything I've researched, whether it's harassment, bullying, you know, attempted kidnappings, everything I've done up to this point falls into one of those buckets. 13:25:29 13:25:30 13:25:33 13:25:35 13:25:39 13:25:42

And so highly sensitive in this case is anything I do for the future is going to have to operate like this. 13:25:44 13:25:47 13:25:49

Q. Let's turn to page 15, please. 13:25:50

Are you familiar with this page? 13:25:57

A. Yes, I am. 13:25:59

Q. We talked a little bit about you sharing your findings. Tell me, what is this instruction to you now through this -- this new policy? 13:26:01 13:26:03 13:26:10

A. In a high level, what this is telling me is the less people know, the better. 13:26:13 13:26:17

If you see here at the bottom, it says, "low risk audience." So what's being told to me is, Hey, if you really want to make sure that this company is not going to be harmed, don't share this with people. Just share it live so that people wouldn't be able to screenshot it or record it. Do it in a VC, which is a video call, that would be just turning on your camera, and closed small team meetings. 13:26:19 13:26:20 13:26:24 13:26:26 13:26:29 13:26:31 13:26:34 13:26:37 13:26:40

And so, Hey, if you don't want these problems to happen for Meta, then just don't share your work. 13:26:41 13:26:42 13:26:44

Q. What was considered a high-risk audience? 13:26:44

A. Yeah. Here a high-risk audience was the 13:26:47

areas of the company that I had been engaging in. So research insights is actually a Workplace group, sort of a number of Workplace groups. There's discussion in open groups, but these are spaces in Workplace where we would share information internally, where researchers would say, Hey, I've been working on bullying and harassment, I've learned this from WhatsApp. Would you hypothetically want to come over from another area of the company and work on this with me? 13:26:53 13:26:59 13:27:00 13:27:00 13:27:02 13:27:05 13:27:08 13:27:11 13:27:13 13:27:15

Q. Why is that important? 13:27:15

A. It's -- again, it's the backbone of science. I don't know how I'm supposed to learn what other people know and how I can apply that to help keep people safe if I'm not allowed to share my knowledge with others. And now I know that other researchers are being told to do the same thing. 13:27:17 13:27:20 13:27:23 13:27:25 13:27:28 13:27:30

Q. So if you go to the first bullet point, it says, "Share on a need-to-know basis only." 13:27:33 13:27:36

What did you understand that to mean? 13:27:39

A. I understood this to mean that no one who needed to know about my research is probably going to know about it anymore. I mean, now this is being dictated. Someone is probably going to tell me who needs to know. 13:27:41 13:27:44 13:27:46 13:27:48 13:27:50

And up until this point, I've never been told who needs to know about my research. It's the researchers who have the connection with the other scientists and the experts of the company. 13:27:51 13:27:54 13:27:56 13:27:58

Q. What impact did this have on the work that you were trying to do at Meta? 13:28:00 13:28:02

A. I mean, the long and short of it is that we didn't learn how to keep people safe and then ultimately we just didn't. 13:28:03 13:28:05 13:28:08

Q. Let me show you -- 13:28:11

MR. MIGLIORI: This is not yet in evidence, Your Honor. This is Plaintiff's Exhibit 4250. 13:28:13 13:28:14 13:28:18

May I approach the witness? 13:28:21

JUDGE BIEDSCHEID: Yes, you may. 13:28:23

MR. MIGLIORI: Thank you. 13:28:24

THE WITNESS: Thank you. 13:28:25

Q. BY MR. MIGLIORI: Take your time and review that, Dr. Sattizahn. Let me know when you feel comfortable. 13:28:43 13:28:45 13:28:49

A. Okay. 13:29:02

Q. Dr. Sattizahn, is this a document that you're familiar with? 13:29:02 13:29:04

A. It is, yes. 13:29:05

Q. Is it a document that you saw while you 13:29:06

were an employee at Meta? 13:29:08
A. It was. 13:29:09
Q. Is it a document that was provided to you by folks at Meta? 13:29:10 13:29:12
A. It was, yes. 13:29:15
Q. Who provided it to you? 13:29:16
A. This was Kristin Zobel, the attorney that I mentioned earlier, who was assigned to me in my -- my research. 13:29:18 13:29:21 13:29:23
Q. Is this a document that was kept in the ordinary course of business? 13:29:24 13:29:26
A. It was, yes. 13:29:27
Q. And did you have discussions with Attorney Zobel or others at Meta about the substance of this document? 13:29:29 13:29:32 13:29:35
A. Yes, I did. 13:29:35
Q. Based on your review of the document that I've provided you in your hands, does it appear to be a true and accurate copy of the document you received in the scope of your employment at Meta? 13:29:36 13:29:38 13:29:41 13:29:44
A. Yes, it does. 13:29:45
Q. And did you, in fact, use this document after it was issued for purposes of your research at Meta? 13:29:46 13:29:49 13:29:52
A. I did repeatedly. 13:29:52

MR. MIGLIORI: Your Honor, I move to admit Plaintiff's Exhibit 4250. 13:29:55 13:29:56

JUDGE BIEDSCHEID: All right. Any objections other than the standing? 13:30:00 13:30:01

MR. PARKINSON: Other than the standing authenticity and 1002, as to this version of this document, I do not believe the foundation's been laid. We previewed this before. 13:30:03 13:30:05 13:30:09 13:30:11

I'm happy to approach, if there's any ambiguity about that by what I mean. 13:30:15 13:30:16

JUDGE BIEDSCHEID: There's not but overruled, the exhibit is admitted. 13:30:19 13:30:20

MR. MIGLIORI: Thank you, Your Honor. 13:30:22

(Plaintiff's Exhibit 4250 was admitted into evidence.) 13:30:24 13:30:27

MR. MIGLIORI: Okay. Let's show this to the jury, if we may, Your Honor? 13:30:27 13:30:30

JUDGE BIEDSCHEID: Yes. It should be coming up. 13:30:31 13:30:32

MR. MIGLIORI: Thank you. 13:30:35

Q. BY MR. MIGLIORI: Dr. Sattizahn, what is this document? 13:30:41 13:30:43

A. This, you know, we just went over earlier this -- this other document outlining the changes to research post-Frances Haugen's disclosure. This was 13:30:43 13:30:45 13:30:48

kind of the -- to put you in my situation, this was like the paring document to that. 13:30:52 13:30:55

So there was this announcement of, hey, there's all these changes that are happening to research. This was the explicit outline of this is what those changes are going to look like in terms of the course of your day-to-day work, who you have to talk to, the types of processes that you have to go through and adhere to now. 13:30:57 13:30:59 13:31:01 13:31:03 13:31:06 13:31:08 13:31:10

Q. Did you have any protocol like this whatsoever at Meta in the first chapter up until Frances Haugen's testimony in Congress? 13:31:11 13:31:13 13:31:16

A. No, I did not. 13:31:18

Q. Did you have any protocol like this ever at Sony? 13:31:19 13:31:22

A. No, I did not. 13:31:23

MR. MIGLIORI: Let's go to the second page. 13:31:24 13:31:25

I don't believe -- that's the third page, Gina. I'm sorry. It should be .4. That says .5. 134.4. 13:31:42 13:31:49 13:31:57

MS. VELDMAN: All the way at the bottom. I got it. 13:32:00 13:32:01

MR. MIGLIORI: Thank you. 13:32:02

Q. BY MR. MIGLIORI: Can you see that either 13:32:02

on the screen or in the document? 13:32:04
A. Yes, I can. 13:32:06
Q. It's a small document. So let's see if we can blow that up. 13:32:08 13:32:10
Do you see where it says, "Consulting with legal"? 13:32:11 13:32:14
A. The bolded, yes, I do. 13:32:17
Q. Can you read the title? 13:32:18
A. Yeah. It's actually easier on my paper. It says, "Consulting with legal POCs, RL UXR, legal, and/or product safety legal." 13:32:19 13:32:22 13:32:28
Q. Okay. And what is a POC? 13:32:29
A. This is point of contact. So in my case this was Kristin Zobel, who was the attorney who was assigned to me. 13:32:30 13:32:33 13:32:36
Q. And just to remind the jury when was she assigned to you? 13:32:37 13:32:39
A. This would have been early 2022. I believe my first meeting was around March. 13:32:40 13:32:44
Q. And that was after the Frances Haugen testimony; correct? 13:32:45 13:32:48
A. Correct. 13:32:49
Q. Can you read the first sentence? 13:32:50
A. Pardon me. It says -- 13:32:53
Q. And if you can -- if you can say what the 13:32:56

acronyms are, that would be helpful. 13:32:58

A. Of course. It says, "All RL UXR research studies." So in this case RL is Reality Labs, the group that makes virtual reality. UXR is user research center. So "All Reality Labs user research studies involving sensitive categories are considered, quote, sensitive research and are subject to heightened scrutiny during research review and privacy processes and may require special mitigations." 13:33:00 13:33:05 13:33:07 13:33:10 13:33:15 13:33:17 13:33:19 13:33:23 13:33:26

Q. Okay. First of all, does that apply to your job? Are you in the research labs user experience research department? 13:33:26 13:33:28 13:33:34

A. I am. That was my area within virtual reality. 13:33:35 13:33:39

Q. And what did you understand this instruction to be? 13:33:39 13:33:40

A. What this was is, I mentioned this earlier, is that now every research study that I was going to do, because they were all sensitive research, is going to be subject to this heightened scrutiny, to review, to monitoring and ultimately what I was describing earlier is just control and manipulation of what I'm finding. 13:33:40 13:33:44 13:33:46 13:33:49 13:33:54 13:33:55 13:33:58

Q. Why did you understand it to be 13:33:59

quote/unquote sensitive research as of this point? 13:34:00
A. At this point, what was being described as sensitive research were things that were leak risks. This is things that are potentially harming to Meta and that was pretty clearly outlined to me both verbally through my attorney and then through the attorney that was assigned to me in these documents as well. 13:34:03 13:34:05 13:34:08 13:34:11 13:34:14 13:34:16 13:34:18
Q. Can you read the next sentence, please? 13:34:19
A. Yeah. It says, "In addition, sometimes research involving sensitive categories requires extra care and mitigations prior to submission to SRT." So SRT here is called the single review tool. Just for quick context, it was an internal -- it's kind of like an ethics review. 13:34:26 13:34:30 13:34:32 13:34:36 13:34:41 13:34:45
It's like a website that you go to internally where you submit things and you say, Hey, this is the research I'm doing, and you'll outline like your questions and who's the researcher and all this stuff, and the point is that you have one accessible location where everyone can go to and say, Hey, this was reviewed by people and if something wrong is happening at the company, like this is what you want to go and look at as sort of the ground truth for your research itself. 13:34:46 13:34:48 13:34:51 13:34:54 13:34:56 13:34:59 13:35:02 13:35:04 13:35:06 13:35:08

Sorry for the sidebar. 13:35:10

"So in addition sometimes research involving sensitive categories requires extra care and mitigations prior to the submission to SRT," the single review tool, "which may include the legal point of contact making a determination about whether a study should be conducted under attorney/client privilege, whether the study should be submitted to SRT or handled offline, whether other legal XFN and/or outside counsel may need to review and approve the research and/or whether the SRT submission details or documents should be limited in any way." 13:35:11 13:35:15 13:35:17 13:35:21 13:35:24 13:35:27 13:35:29 13:35:31 13:35:37 13:35:39 13:35:42

Q. Can you explain what all that means in your experience? 13:35:45 13:35:47

A. Yeah. I mean, it means I'm not going to be doing the job I want to do. 13:35:48 13:35:51

You know, what really bothers me as a researcher is that SRT is an ethics review, and what I have here is a list of instructions that are saying, Hey, because this Haugen thing happened, now you might not even be able to go through the review to determine if your research is ethical because we don't want a paper trail of it. So we have this ethics review that tells everybody what you did, and now we might handle it offline. 13:35:52 13:35:55 13:35:57 13:36:00 13:36:04 13:36:07 13:36:10 13:36:12 13:36:15

Or we're going to change your documents and what you're talking about in terms of research before you have this memorialized internally on this website. 13:36:17 13:36:19 13:36:22 13:36:24

And so this was very clear to me, and it was through the remainder of my time there, that this is just stopping me from being honest about what we are planning to do and then if that thing we were planning to do even happened at the company. 13:36:25 13:36:28 13:36:30 13:36:33 13:36:35

MR. MIGLIORI: Gina, could you go down to the bottom where the bullet points are, please. 13:36:38 13:36:41

Q. BY MR. MIGLIORI: Do you recall this part of this document? 13:36:47 13:36:48

A. I do, yes. 13:36:49

Q. It says, "Consult with Reality Labs user experience research legal when conducting studies involving." And is this a list of the areas now that you have to go to a lawyer, your point of contact before you can go the research? 13:36:50 13:36:53 13:36:56 13:37:00 13:37:02

A. Yes, they are. 13:37:03

Q. Is this something you've ever had to do before Frances Haugen testified before Congress? 13:37:05 13:37:08

A. I have never had to do this before in the past. 13:37:10 13:37:14

Q. Did you ever have to do this at 13:37:14

PlayStation? 13:37:16
A. No, I did not. 13:37:16
Q. The first one "Consult legal when" -- 13:37:17
Can you read the first bullet point? 13:37:19
A. It says, "Minors under age 13, topic subjects related to minors under age 13." 13:37:20 13:37:24
Q. Now, had you done research to this point at Meta on those issues? 13:37:26 13:37:29
A. My research prior to this included collecting data from people under the age of 13. 13:37:30 13:37:32
Q. Did you ever have to get a lawyer's permission to do it before? 13:37:34 13:37:36
A. I did not, no. 13:37:37
Q. Read the second bullet. 13:37:38
A. It says, "Youth aged 13 to 17," and parenthetical parentheses, "where sensitive topics and/or data are involved." 13:37:40 13:37:44 13:37:47
Q. What did you understand "sensitive topics and data" to be in this context of studying youth age 13 to 17? 13:37:52 13:37:54 13:37:56
A. I mean, in application what was happening is it was just if you were studying youth, period. For me, especially because I was in the integrity area, it meant that if I just studied youth 13 to 17 in any way, it was now going to have this review 13:37:57 13:37:58 13:38:01 13:38:03 13:38:06

again, and something was going to be changed about the work regardless. 13:38:08 13:38:10

Q. Prior to this policy, did you do work in this area? 13:38:12 13:38:14

A. I did, yes. 13:38:15

Q. And did you do it without lawyer involvement? 13:38:15 13:38:17

A. It's true, there was not a lawyer involved. 13:38:17 13:38:19

Q. Read the next one, please. 13:38:19

A. It says, "Age verification and youth accounts." 13:38:21 13:38:23

Q. Is this another area that you had to go to a lawyer first before you can engage in any research? 13:38:23 13:38:25 13:38:30

A. No, during Marketplace my age verification research did not have a lawyer involved at all. 13:38:30 13:38:32 13:38:33

Q. During Marketplace, Chapter 1? 13:38:33

A. Chapter 1. 13:38:36

Q. How about Chapter 2? 13:38:36

A. Chapter 2, yes, the age verification work I collaborated on we had stark legal involvement. 13:38:37 13:38:40

Q. If we go down to integrity issues -- do you see that bullet point? 13:38:45 13:38:51

A. I do. 13:38:51
Q. Could you read that, please? 13:38:52
A. It says, "Integrity issues, settings, or features, including, but not limited to, harassment and bullying, hate speech, conduct in VR policy development, and enforcement overall, real world harms and consequences of users' activities, and, lastly, addiction and problematic use of quest/VR/AR products, features, or designs." 13:38:54 13:38:56 13:39:00 13:39:04 13:39:07 13:39:10 13:39:15
And for context AR here is augmented reality. So the beach example that I used, just imagine that you can also see your living room at the same time. It's kind of a mix of the digital and the nondigital realities. 13:39:17 13:39:19 13:39:23 13:39:25 13:39:26
Q. So what did you understand this instruction to be about whether you had to approach legal? 13:39:27 13:39:29 13:39:31
A. Again, this is -- this is what I did. I was an integrity and safety researcher, so this was a blanket, just a blanket thrown over me to say whatever work you're going to do is going to be monitored or changed by legal in some way. 13:39:32 13:39:36 13:39:38 13:39:41 13:39:43
Q. In Chapter 1 of your career at Meta, did you do harassment and bullying research? 13:39:45 13:39:48
A. I did, yes. 13:39:50

Q. Was that with or without a lawyer's involvement? 13:39:52 13:39:53
A. It was without a lawyer's involvement. 13:39:53
Q. Did you do real world harms or consequences of users' activity in Chapter 1 of your time at Meta? 13:39:55 13:39:57 13:39:59
A. I did. 13:40:00
Q. Did you do that with or without a lawyer's involvement? 13:40:00 13:40:02
A. It was without a lawyer's involvement. 13:40:03
Q. Did you do research in Chapter 1 of your time at Meta on addiction and problematic use? 13:40:05 13:40:07
A. I did, yes. 13:40:10
Q. Features and designs? 13:40:11
A. Uh-huh. 13:40:13
Q. "Yes"? 13:40:13
A. Yes. 13:40:14
Q. And did you have to have a lawyer in Chapter 1 approve it before you could? 13:40:15 13:40:17
A. No, I did not. 13:40:19
Q. Let's go on. There's just a couple more categories. 13:40:21 13:40:23
Can you say some of the -- 13:40:23
Can you read the next category of -- of issues that required lawyer involvement? 13:40:25 13:40:27

A. Yeah. Next is "Mental health and wellness." 13:40:29 13:40:32
Q. What is that? 13:40:32
A. This could include anything from my own sort of past research but also what I did at the company, which is any sort of psychological or emotional harms, anxiety, stress, even things all the way up to like embarrassment and feelings people are having when using these platforms. 13:40:33 13:40:37 13:40:38 13:40:42 13:40:45 13:40:49
Q. Did you do that research in Chapter 1 of your time at Meta? 13:40:50 13:40:52
A. I did. 13:40:53
Q. Did you need a lawyer then? 13:40:53
A. I did not. 13:40:55
Q. Did you need it after in Chapter 2, a lawyer? 13:40:55 13:40:58
A. I did. A lawyer was required in the second half of my tenure, yes. 13:40:58 13:41:00
Q. And in order to do your job at Meta as a user experience researcher, did you need to understand and appreciate what the mental health and wellness harms are? 13:41:02 13:41:04 13:41:06 13:41:09
A. I did. Yeah, I did. 13:41:11
Q. How about the two -- you can go through the next one, "Physical health and wellness," what 13:41:13 13:41:17

was that? 13:41:20
A. Yeah. Physical health and wellness could be anything around accessibility. So things that I did at PlayStation where to help people use the product itself. Even things all the way up to eye strain and the impacts physically on someone's body of interacting with these products. 13:41:21 13:41:24 13:41:29 13:41:32 13:41:33 13:41:36
Q. And did you do physical health and wellness research in Chapter 1 of your career at Meta? 13:41:38 13:41:40 13:41:42
A. I performed audits and reviews making research recommendations. I did not collect new data on physical health. 13:41:42 13:41:47 13:41:50
Q. Okay. And did you need a lawyer when you did that in Chapter 1 of your career? 13:41:50 13:41:51
A. No, I did not. 13:41:53
Q. And in Chapter 2? 13:41:54
A. I did. 13:41:55
Q. And then, finally, the next bullet point? 13:41:56
A. The next bullet point is "Suicide and self-harm." 13:41:58 13:42:02
Q. Is that an area that you did work in while you were at Meta in Chapter 1 of your life there? 13:42:03 13:42:05 13:42:07
A. In Chapter 1 I did not focus on suicide 13:42:07

and self-harm. 13:42:09
Q. Did you try to focus on that in Chapter 2? 13:42:11 13:42:13
A. I did. 13:42:13
Q. And were you able to do that without the lawyer involvement? 13:42:14 13:42:15
A. I was not. 13:42:16
Q. Were you able to successfully undertake any research in that area in Chapter 2 of your life? 13:42:17 13:42:20
A. I was not. 13:42:26
Q. And do you know why? 13:42:26
A. Any time that I brought this up with the attorney who was assigned to me, it was that is forbidden, that is too sensitive, you're not going to be allowed to do that. 13:42:27 13:42:29 13:42:32 13:42:34
Q. Can you go to page 134.8, please? 13:42:35
You see the paragraph that says, "Unplanned for sensitive results"? 13:42:38 13:42:45
A. I do. 13:42:48
MR. MIGLIORI: Gina, could we go to that? 13:42:52
Q. BY MR. MIGLIORI: Okay. See if I can read it because it's kind of blurry. "Sometimes during the course of a research study, research that is not focused on sensitive categories may inadvertently result in the collection of sensitive 13:42:56 13:42:57 13:42:57 13:43:00 13:43:03

data or sensitive responses." 13:43:06
Is that something that happened in the course of your career at Meta? 13:43:09 13:43:11
A. Frequently, yes. 13:43:13
Q. And is that something that was a bad thing in Chapter 1 of your life? 13:43:14 13:43:16
A. Not at all. In fact, you know, a lot of the research that I've talked about, my involvement in youth and with mental health, wellness, a lot of those aren't findings that you actually go out to find specifically. You don't start a research study and say, I know exactly what I'm going to find, or else you wouldn't do the research. 13:43:17 13:43:19 13:43:21 13:43:24 13:43:28 13:43:30 13:43:33
And so -- and I'd be happy to talk more about this, but a lot of times when you go out and you collect data, you end up finding all of that evidence and you go, oh, I thought these were all adults, and it turns out a lot of children are using this. 13:43:35 13:43:38 13:43:40 13:43:42 13:43:44 13:43:47
Or I thought people weren't having these problems, but it turns out there's actually a lot of psychological impacts and risks possibly later down the line. 13:43:47 13:43:49 13:43:52 13:43:54
And so a lot of the work that I was doing around these areas wasn't even necessarily something 13:43:55 13:43:57

that you go out and say, I know I'm going to find it. It's in the course of your research, as a researcher, you respect that data you get back and you report on it. 13:43:59 13:44:01 13:44:03 13:44:05

Q. And was that something that happened for you in Chapter 1 of your time at Meta? 13:44:06 13:44:08

A. Frequently, almost every study. 13:44:10

Q. And did any point of contact ever tell you that that was something -- a bad thing? 13:44:12 13:44:15

A. No. There was no monitoring, no POC told me that was a bad thing. 13:44:18 13:44:21

Q. Okay. It goes on to say, "When planning research and submitting research to SRT" -- 13:44:22 13:44:24

That's what you described earlier; correct? 13:44:27 13:44:28

A. Correct. 13:44:28

Q. -- "particularly quantitative research using open-ended questions, as well as qualitative research" -- 13:44:29 13:44:33 13:44:36

The jury's heard a little bit about both of those. 13:44:36 13:44:38

-- "carefully consider the questions you plan to ask and how likely it is that some participants or respondents may supply sensitive information in response." 13:44:38 13:44:40 13:44:43 13:44:47

Do you recall reading that when you got this document? 13:44:48 13:44:50

A. I do. 13:44:50

Q. And what did you understand that instruction to be? 13:44:51 13:44:52

A. On one end, I have to say that some of this guidance just doesn't match reality. What I was told in -- at the time that this was given to me was that open-ended questions cannot be used; it's forbidden. 13:44:53 13:44:56 13:45:00 13:45:03 13:45:06

For context, open-ended questions are when you let someone freely discuss with you their problems, and the problem is, is that's a very high risk because now the company, Meta, might collect information, that as we've discussed, might be risky to their brand or their business. 13:45:07 13:45:10 13:45:13 13:45:14 13:45:17 13:45:20

And so even though this says, Well, there might be one way or another that we deal with open-ended questions, it was just forbidden for me entirely to do that at all. 13:45:21 13:45:24 13:45:25 13:45:28

I apologize. What was the second part of the question? 13:45:32 13:45:34

Q. No, I think you answered it. 13:45:35

Skip over the parentheses for now. 13:45:36

It says after that, "If it is likely that 13:45:38

the study may elicit sensitive responses, it may be necessary to reframe your questions to avoid unnecessary collection of sensitive information or to ensure that the relevant sensitive category is selected in SRT for proper review." 13:45:41 13:45:44 13:45:47 13:45:52 13:45:55

What did you understand that to be? 13:45:58

A. This -- this is sort of -- it's a ridiculous separation of science. 13:45:59 13:46:04

So when you go out -- I understood this to mean that now when I was going out to collect data, it didn't matter if I found important data to keep people safe, that if I didn't intend to go out and look for it, and if I hadn't told that to someone who was watching me like Big Brother over my shoulder and telling me that I could or could not do that, that's a bad thing. 13:46:06 13:46:09 13:46:11 13:46:14 13:46:18 13:46:20 13:46:24 13:46:26

And that's also not how science works. A lot of science is kismet. It's talking to other people, it's collecting data and finding out, oh, our assumptions about the product are wrong, and now it's saying that, well, simply because you weren't formally wanting this study to be about harm, you're not even allowed to think about it. You're not even allowed to think about children. You're not even allowed to think about anything that can go wrong 13:46:27 13:46:30 13:46:32 13:46:34 13:46:37 13:46:39 13:46:42 13:46:45 13:46:46

because, well, you didn't tell us about it first. 13:46:48
As a researcher, I don't care. My point is to collect that data anyway and keep people safe. This is just not how science works. 13:46:50 13:46:52 13:46:56
Q. Did it ever happen that you collected data that fell in this category, that Meta didn't want you to have? 13:46:57 13:46:59 13:47:02
A. It did, yes. 13:47:03
Q. And what happened with that? 13:47:04
A. After October 2021, in more than one instance, the data was fully erased, just deleted. 13:47:06 13:47:10
Q. And do you understand why? 13:47:13
A. Pardon me. 13:47:26
Again, in instances that I'm remembering talking about directly with the point of contact from legal, it was, This is harmful to the brand, this is harmful to the business, we do not want a paper trail in case someone finds out that we knew about this from the past. It was just all about the business itself. 13:47:27 13:47:30 13:47:33 13:47:37 13:47:39 13:47:41 13:47:43
Q. Okay. 13:47:44
MR. MIGLIORI: We can take that down. 13:47:46
Q. BY MR. MIGLIORI: In 2024, you stopped working at Meta; correct? 13:47:49 13:47:52
A. I did. 13:47:53

I'm doing this. It's not for all these reasons he suggested for an hour and a half. 16:32:55 16:32:59

JUDGE BIEDSCHEID: Is he going to talk about the incident itself? It does seem well outside cross. 16:33:00 16:33:01 16:33:05

MR. MIGLIORI: I can ask him without getting into specifics. But he would answer it that research was buried. 16:33:05 16:33:06 16:33:10

JUDGE BIEDSCHEID: Without specifics you could ask. But if he starts getting into specifics -- 16:33:13 16:33:14 16:33:17

MR. MIGLIORI: Understood. 16:33:17

MR. PARKINSON: Thank you. 16:33:18

(Sidebar ends.) 16:33:20

Q. BY MR. MIGLIORI: Okay. Dr. Sattizahn, without getting into specifics of the discussions you had with any of the subjects tell us about why -- 16:33:23 16:33:27 16:33:31

First of all, tell us why it is that you went to Germany? 16:33:33 16:33:35

A. To be honest, I don't completely know. This was one of the first times in my career at Meta that a project was handed down to me, and this was in the context of the headset having been banned for the past two years. 16:33:36 16:33:42 16:33:44 16:33:47 16:33:51

In discussions with my manager, it really 16:33:53

appeared, in my direct observation, appeared that what was happening was that Meta wanted to collect data from Germany to show the product was safe and there were no privacy concerns from the get-go. 16:33:56 16:33:58 16:34:00 16:34:04

Q. Okay. And without talking about your conversations with any of the folks that you surveyed out there, what is it that you did out there and why was that a turning point for you? 16:34:06 16:34:08 16:34:11 16:34:16

MR. PARKINSON: Your Honor? This is going exactly where Your Honor said it shouldn't. 16:34:18 16:34:19

MR. MIGLIORI: I thought I qualified it. If you would like me to qualify it more, I will. 16:34:23 16:34:25

JUDGE BIEDSCHEID: Okay. I want it to be clear we're not talking about specific events. 16:34:27 16:34:30

MR. MIGLIORI: Correct. 16:34:32

JUDGE BIEDSCHEID: General experience. 16:34:33

Q. BY MR. MIGLIORI: If you can, can you just describe why this was a turning point, without getting into the details of your study? 16:34:35 16:34:37 16:34:40

A. Seeing abject erasure of research data is abhorrent as a researcher. If you are trying to gather data that shows that people are in danger and use that to keep people safe, to blatantly have someone, an attorney assigned to me, come and say, erase everything you just learned about harm, whether 16:34:42 16:34:53 16:34:55 16:34:58 16:35:01 16:35:06

it's through an adult or a child -- 16:35:08
Q. Don't -- don't talk about the -- 16:35:10
A. Just erase that research completely. The data, don't write about it, don't talk about it. 16:35:13 16:35:16
For me, that was something where I was like, okay, I've surfaced this issue repeatedly internally. I'm going to keep trying to do what I can, but I don't know if internal change can happen at Meta. 16:35:19 16:35:20 16:35:23 16:35:25 16:35:28
Q. Who told you to get rid of that data? 16:35:28
A. This was two individuals, Kristin Zobel, the attorney assigned to me and my manager, Ayfer Gokalp. 16:35:31 16:35:33 16:35:38
Q. And when exactly was this? 16:35:39
A. March -- March/April of 2023. 16:35:41
Q. And was that the reason why you decided to do what you did with respect to providing information to Congress? 16:35:43 16:35:45 16:35:47
A. That was the moment that I realized that I think Congress was the only choice I had to go and try to make a difference. 16:35:48 16:35:50 16:35:53
Q. Counsel said you didn't show any writings of your own. I just have one last document to show you. 16:35:57 16:36:02 16:36:05
MR. MIGLIORI: Your Honor, may I approach 16:36:07