# Exhibit B

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA )
ADOLESCENT ADDICTION/ )
PERSONAL INJURY PRODUCTS ) MDL No. 3047
LIABILITY LITIGATION )
)
)

SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE
COUNTY OF LOS ANGELES - SPRING STREET COURTHOUSE

COORDINATION PROCEEDING )
SPECIAL TITLE [RULE 3.400] )
)
SOCIAL MEDIA CASES ) Lead Case No.
___________________________) 22STCV21355
This Document Relates To )
)
STATE OF TENNESSEE, ex rel.)
JONATHAN SKRMETTI, )
ATTORNEY GENERAL and )
REPORTER, )
v. )
META PLATFORMS, INC., and )
INSTAGRAM, LLC. )
___________________________)

CONFIDENTIAL - ATTORNEYS' EYES ONLY
PURSUANT TO PROTECTIVE ORDER
VOLUME 1
VIDEO-RECORDED
DEPOSITION OF SHAYLI JIMENEZ
(Pages 1 - 356)
Covington & Burling
415 Mission Street, San Francisco, California
Tuesday, February 11, 2025, 9:12 a.m.
- - - -

REPORTED BY: ELAINA BULDA-JONES, CSR 11720

Is that understood?
A. Yes.
Q. And if we just -- if that gets tricky at any point, we can just try to work with each other to make sure we clearly understand each other.
A. Sure.
Q. But at any event, you joined the company now known as Meta in 2015, right?
A. Yes.
Q. And you are there today still so now we're going on ten years; is that right?
A. Yes.
Q. Okay. And during your time at the company, have you strived to perform high-quality work?
MS. BARNHART: Object to the form.
THE WITNESS: I have always tried to do my best at my job, yes.
BY MR. PHELPS:
Q. Okay. You tried to do work that was skillful and competent?
MS. BARNHART: Object to the form.
THE WITNESS: Yes, of course. I strive to do my job the best I can to the best of my ability.
///

MS. BARNHART: Object to the form.

THE WITNESS: That's a pretty ubiquitous part of my job, is to collaborate with cross-functional partners like designers, product managers, et cetera, to give them recommendations or direction for how to improve the product.

BY MR. PHELPS:

Q. And that would include your work -- would that encompass your work on teens -- in the teen segment for Instagram?

A. It does. Although I will say in the type of pathfinding role that I currently have at Reality Labs, also my role on teens was a pathfinding role. So there's a little bit less collaboration with cross-functional partners than some other research roles because the product teams may or may not be focused on that particular thing at the time that I'm researching it.

With the pathfinding role, you're anticipating -- you're doing research that is anticipating the needs that you expect to arise among the company or the product teams.

Q. Okay. And when we talk about teen, the teen market segment, what does that refer to? Does that refer to -- what age category does that refer

to within Instagram in terms of, like, how old are we talking about?

A. Teens, we define age 13 to 17.

Q. Okay. And when you worked at Instagram, when you joined Instagram in March 2020, you specifically joined the Instagram growth team; is that true?

A. I was -- I sat on the growth team as you could -- it's called the growth team. My manager managed the growth team. But like I said, I had a more unique role within that team, as in I didn't work with the growth team product teams.

Q. Uh-huh. And what is the significance of that?

A. The significance is that, like I was trying to explain about this pathfinding role, you're not embedded within a product team. A lot of researchers, many researchers are embedded within product teams, and their research is more directly tied to the features or the products that those teams are building at that moment.

My role as a pathfinder, or like in a pathfinding role, is to, as I mentioned, do research that anticipates insights that may be needed for a strategy or direction but that product teams may or

if the company tracked that?
A. Time spent is a metric that was -- has come up that I've seen, yes.
Q. Okay. And do you know if that would refer to -- strike that.
And do you know, some of these metrics we've been talking about, if the company monitored those metrics specifically with respect to teens?
MS. BARNHART: Object to the form. Foundation.
THE WITNESS: In the -- at the time that I took this role, there was not a lot of data on teens available. And that was one of the reasons that I was hired into this role or why that role was created. I'm a qualitative researcher, which means I talk to users, and my work is -- is highly directional and self-reported.
And that type of -- that's how we can get insights with a lack of data. So that's actually one of the reasons why my role was created. However, over the course of my employment, the data associated with teen users did increase and improve.
BY MR. PHELPS:
Q. And how so?
A. I can't speak to the specifics of, like,

BY MR. PHELPS:
Q. Okay. But in any event, you personally dedicated a lot of your time at Instagram to working to better understand teens, right?
A. I worked to better understand teens as a demographic as a market segment, yes.
Q. Okay. And you would agree that the teen market segment is important to Instagram, right?
MS. BARNHART: Object to the form.
THE WITNESS: All of our users are important to Instagram, including teens.
BY MR. PHELPS:
Q. Okay. And are there some -- well, would you agree that that -- with respect to the teen market segment, if a teen develops an affinity for the Instagram product or brand during their teenage years, they may continue to use Meta products as they age up.
Would you agree with that?
MS. BARNHART: Object to the form. Foundation.
THE WITNESS: I honestly don't know that I can agree with that because I have certainly observed the opposite. You know, you can take, for example, internally -- I mean, you can take, for

example, Facebook teens used to love Facebook. They -- me, for example, I used to be on Facebook when I was younger. Now I'm on Instagram.

So I didn't -- just because I joined Facebook first doesn't imply that every user is going to stay loyal to that platform. And, in fact, teens are probably our most fickle -- one of our most fickle user groups.

BY MR. PHELPS:

Q. Why don't you -- I mean, you spent a lot of time at Instagram focused on teens in particular, right?

A. I did.

Q. And so in -- can you tell me in your words why teens are an important market segment for Instagram to focus on?

MS. BARNHART: Object to the form. Characterization.

THE WITNESS: I can certainly speak to why teens are an important market segment to some extent. The reason that teens are important is because teens are typically the culture or taste-makers of culture. And if something is popular with teens, you know, eventually all the other market segments tend to follow them. They are

MR. PHELPS: Let's introduce this. This is going to be 10.

(Whereupon, Meta-Jimenez Exhibit 10 was marked for identification.)

BY MR. PHELPS:

Q. Dr. Jimenez -- Ms. Jimenez --

A. Yes. Sorry. I'm not a doctor, just to be clear.

Q. Ms. Jimenez, you do impressive research.

Ms. Jimenez, you mentioned it might help refresh your recollection if we looked at the works consulted on your Workplace note?

A. Yeah.

Q. Okay. Let's go to -- let's introduce 10.

And this is another document where we will talk about it in depth later on. I just want to refer you to -- there is a "More Reading" section at the very bottom of the last page.

A. Yeah, yes.

Q. Second-to-the-last page. And then it says, "More Reading."

At the top of the next page it says, "Child and Adolescent Development in Context."

A. Yes.

Q. "Tara Kuther."

fundamentals presentation a couple months after that, you believed that Instagram was a drug, right?

MS. BARNHART: Object to the form.

THE WITNESS: I don't believe Instagram is a drug.

BY MR. PHELPS:

Q. But do you remember saying that a couple months after drafting the teen fundamentals project?

A. I remember saying that sarcastically in a Chat.

Q. Okay. Is that an issue you take lightly?

A. What?

Q. The concept of problematic use that users might experience on Instagram, that a dependency that users might develop on Instagram?

MS. BARNHART: Objection to the characterization and form.

THE WITNESS: I don't take any -- any risks or issues like that lightly.

BY MR. PHELPS:

Q. Okay.

A. No.

Q. Okay. So discussions of that issue of problematic use and users' ability to control their time on Instagram, you would agree that those are

Q. And my question to you is, you thought this image was relevant to this discussion about IG being a drug and causing reward deficit disorder, right?

A. I wouldn't put it like that. I shared this image to basically provide some sort of explanation for why people may not be enjoying Instagram, because we had previous discussions about people not -- about increasing the value that people get out of Instagram.

Q. And one reason people may not have enjoyed Instagram is because they had fallen into the cycle illustrated in this schematic.

Is that what you are saying?

MS. BARNHART: Object to the characterization.

THE WITNESS: I don't know that at all.

BY MR. PHELPS:

Q. That was a hypothesis you were sharing with your colleagues, right?

A. In the context of this Chat, it's not a -- it's not a hypothesis that I was seriously considering. It's just a casual Chat. Like I said, that was following on another conversation about people trying to increase the value of Instagram for

throwing out there for discussion is that IG is a drug? That's your testimony?

A. No.

Q. What did you mean when you said "IG is a drug"?

A. When I said, "Oh, my gosh, y'all, IG is a drug," it's -- you see I started the conversation. It's to grab their attention. It's a joke.

Q. You thought this concept that IG was a drug was a joke?

A. In this context, shared between myself and other researchers, it's a hyperbole for some problems that we were discussing around needing to possibly increase the value that users were getting from Instagram.

Q. Okay. And you say, you followup, the next thing you say after IG is a drug is "seriously, it is," exclamation mark, right?

A. Yes.

Q. And you don't say JK, LOL, right?

A. I don't need to say JK, LOL. As you can see, Ebo said LOL and made another hyperbolic statement. So it's implied.

Q. Okay. Either way, you put this -- as part of this lighthearted conversation, you put in a

schematic about addiction that originated from an academic article analyzing alcohol addiction, right?

MS. BARNHART: Object to the characterization.

THE WITNESS: I -- like I mentioned, I never saw that article. So where it came from, that is irrelevant to this conversation. And as I mentioned before, this type of Chat amongst researchers is very, very common in the sense of sharing things we find, sparking ideas, and conversation around it.

BY MR. PHELPS:

Q. Okay. And was -- was your decision to share this schematic, was that a -- kind of a continuation of the joke?

MS. BARNHART: Object to the form. Characterization.

THE WITNESS: In a way. It's to continue the thought, but the conversation -- it's not that the whole conversation is a joke, but it is a casual conversation amongst researchers exchanging ideas and hypotheses.

BY MR. PHELPS:

Q. I want to make sure I understand, because you said -- I'm looking at your testimony. You

said, "When I said, oh, my gosh, y'all, IG is a drug, I started the conversation to grab their attention. It's a joke."

So the first sentence is a joke, right?

A. The first sentence is a conversation starter.

Q. It's not a joke or it is?

A. It's -- depends on how you define a joke. The way that I'm defining a joke is saying something exaggerated, something that is going to catch their attention.

Q. Okay. Well, you testified that that sentence was a joke.

So how did you mean that?

A. Like I just said, it's an exaggeration. It's a hyperbole. It's a joke in that it's an exaggerated statement to catch their attention.

Q. Okay. When you say " seriously, it is!" is that still part of the joke?

A. That is still part of the way that we converse in the sense of exaggeration or exclamation.

Q. So it is part of the joke still?

MS. BARNHART: Object to the characterization. Asked and answered many, many,

many times.
BY MR. PHELPS:
Q. Okay. Let's go to the next. You say [as read]:
We are causing reward deficit disorder because people are binging on IG so much that they can't feel reward anymore, like their reward tolerance is so high.
Is that statement serious or is that statement a joke?
A. That statement is not a fact or anything researcher-based. It's a hypothesis I'm throwing out there as a follow-on to the joke, jokingly, but something to share, to share with my like-minded research colleagues. These are things that we exchanged amongst -- exchange among each other often, our frameworks and different artifacts.
Q. Okay. And so -- when you share this image, is this image, to your mind, a continuation of the joke or is this serious?
MS. BARNHART: Object to the form.
THE WITNESS: In the context of this Chat, it is additional -- additional content for the conversation that we're having.
///

the conversation.

BY MR. PHELPS:

Q. And is this -- was this a serious contribution to this conversation or was this sort of in jest?

A. Well, this whole conversation is kind of jokey, like you said. And -- but it's also, you know, it is -- we're talking shop, basically, as researchers and, you know, sharing ideas. And this is another sort of -- in the same spirit of the last diagram, just a -- another sort of, like, framework that we're -- that I'm sharing with them.

Q. And just to be clear, I didn't -- I wasn't the one who initially said "jokey," I think you were the one who used that word to describe this Chat, right?

A. I described this --

MS. BARNHART: Object to the characterization.

THE WITNESS: Yeah. I described this Chat as a casual Chat between me and my fellow researcher colleagues that is pretty typical of how we exchange ideas and share information because we have a shared context and shared understanding, so...

///

A. That's what he said.
Q. And you agreed with that, right?
A. I said, "Yeah, I'm sure you're right."
But --
Q. Okay.
A. -- that doesn't mean that I am ascribing to his whole description here. What I'm saying he's right about is that I don't -- there's no nefarious plot that I'm aware of to addict people to Instagram. So his offer of an explanation for -- for that, you know, I'm -- I'm generally agreeing with him.
Q. You're generally agreeing with his statement at 9:26?
A. I'm generally agreeing with -- especially the part about there not being a nefarious plot to addict people.
Q. But you don't draw that distinction on the page here in real time, right?
A. I don't have to because this is a private conversation between colleagues talking shop, talking casually, I'm not going to type out every single thought in my head, like, as a response.
Q. And the only thought you typed out was, "Yeah, I'm sure you're right"?

STATE OF CALIFORNIA )
COUNTY OF YOLO )

I, ELAINA BULDA-JONES, a Certified Shorthand Reporter of the State of California, duly authorized to administer oaths pursuant to Section 2025 of the California Code of Civil Procedure, do hereby certify that

SHAYLI JIMENEZ,

the witness in the foregoing deposition, was by me duly sworn to testify the truth, the whole truth and nothing but the truth in the within-entitled cause; that said testimony of said witness was reported by me, a disinterested person, and was thereafter transcribed under my direction into typewriting and is a true and correct transcription of said proceedings.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said deposition dated the ______ day of ____________, 2025.



ELAINA BULDA-JONES, CSR 11720