# Exhibit C

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN RE: SOCIAL MEDIA )
ADOLESCENT ADDICTION/ )
PERSONAL INJURY PRODUCTS ) MDL No. 3047
LIABILITY LITIGATION )
)
)

SUPERIOR COURT OF THE STATE OF CALIFORNIA FOR THE
COUNTY OF LOS ANGELES - SPRING STREET COURTHOUSE

COORDINATION PROCEEDING )
SPECIAL TITLE [RULE 3.400] )
)
SOCIAL MEDIA CASES ) Lead Case No.
___________________________) 22STCV21355
This Document Relates To )
)
STATE OF TENNESSEE, ex rel.)
JONATHAN SKRMETTI, )
ATTORNEY GENERAL and )
REPORTER, )
v. )
META PLATFORMS, INC., and )
INSTAGRAM, LLC. )
___________________________)

CONFIDENTIAL - ATTORNEYS' EYES ONLY
PURSUANT TO PROTECTIVE ORDER
VOLUME 2
VIDEO-RECORDED
DEPOSITION OF SHAYLI JIMENEZ
(Pages 357 - 556)
Covington & Burling
415 Mission Street, San Francisco, California
Wednesday, February 12, 2025, 9:17 a.m.
- - - -

REPORTED BY: ELAINA BULDA-JONES, CSR 11720

THE WITNESS: As I said, I don't know.
The only thing that I feel certain of, is that it's orange and that matches the key at the bottom for "Teen (13 to 17)." So I know it's representing something of the teen population.
And, you know, I don't want to get too stuck on this for you, but I am a qualitative researcher. I'm not a quantitative researcher. I'm not a data scientist. And these charts can be interpreted a lot of different ways. So like I said, I just don't feel confident speaking to exactly what this means.
BY MR. PHELPS:
Q. Okay. 14 to 21 hours per week, that would be two to three hours per day on average, right?
Would you agree with that?
A. That sounds right.
Q. Okay. And the next category is 21 to 28 hours.
Do you see that?
A. Yes.
Q. And you see there's an orange category that corresponds with teens there?
A. Yes.
Q. And you see the number there in this chart

THE WITNESS: It does not prepare me to answer that because I never focused on teen health or well-being topics.

BY MR. PHELPS:

Q. Okay. Let's look at this next category. See if we -- if you can answer that one.

For teens in this middle category who spend 21 to 28 hours per week, can you tell me, as someone who served as a subject matter expert on teens for Meta, whether it's healthy for teens to spend between 21 and 28 hours per week on Instagram?

MS. BARNHART: Object to the form. Characterization. Foundation.

THE WITNESS: I can't answer that because I never studied teen health or teen well-being. I never focused on those topics.

BY MR. PHELPS:

Q. Okay. Let's look at the category on the right.

What about that category, for teens who spend more than 28 hours per week on Instagram, can you tell me whether, as someone who served as -- as a subject matter expert on teens within Meta, if it's healthy for teens to spend more than 28 hours per week on Instagram?

couple of days. I know you've already been questioned by plaintiffs' counsel for many hours so I'll try to keep this as brief as I can.
A. Okay.
Q. I really just want to give you an opportunity to talk more about your work at Meta.
A. Okay.
Q. And some of the documents that counsel showed you earlier.
So let's start briefly with your educational and professional background.
Where did you go to school?
A. I received my bachelor's degree at American University in Washington, D.C.
Q. What did you study at American University?
A. I majored in public communications and minored in graphic design.
Q. Do you have any education in psychology?
A. No.
Q. Any education in neuroscience?
A. No.
Q. Any education in addiction?
A. No.
Q. Any education on brain processing?
A. No.

Q. Any education on dopamine?
A. No.
Q. And when did you join Meta?
A. In August 2015.
Q. Did you work anywhere before joining Meta?
A. Yes.
Q. Where did you work?
A. Before that I worked for Gannett, which is a media company. Prior to that I had a brief stint at a consulting company called Aquilent. And prior to that I worked at Geico for some years as well.
Q. Broadly speaking, what types of work were you doing at those companies?
A. Well, at Gannett I was an interaction designer, and I also did user experience research in that role as well.
At Aquilent I worked as a usability analyst. And prior to that, at Geico, I was also a usability analyst. And I had a couple other job titles as well in that role -- or in that company.
Q. And what is your current title at Meta?
A. UX researcher.
Q. What team are you on currently?
A. Currently I work on Horizon in Reality Labs.

THE WITNESS: What I meant by that was that there are -- there was an entire team of researchers focused on well-being and some of those topics were specific to teens. Others may not have been. I did not work on that team. I had a completely different remit to help the broader Instagram audience of employees understand teens as -- as a user segment -- or as a market segment and as a user cohort or a population in general.

BY MS. BARNHART:

Q. And consistent with your earlier testimony that as a teen subject matter expert you facilitated connections between different people in the company who also worked on teens, did you sometimes make connections with people working on teen well-being on those other teams?

MR. MARTLAND: Objection. Form.

THE WITNESS: Yes, at times.

BY MS. BARNHART:

Q. Okay. If you can look briefly at Exhibit 22, which should be the first in your pile there. You'll recall counsel asked you some questions about this exhibit earlier today?

A. Yes.

Q. And this was a Chat between you and Koni

is to provide information, research, insights that help the company understand its users or what's happening on its platform.

BY MS. BARNHART:

Q. What was your primary goal in developing the teen ecosystem understand workstream?

MR. MARTLAND: Objection. Foundation.

THE WITNESS: Well, my primary role was to provide our first sort of just like foundational understanding of teens as a population because everyone who works at Meta, no one is a teen and our products are used by teens. And we needed to have a better understanding of what their life stage is like and especially what it's like to be a teenager in modern times compared to when we were teenagers, for example.

And so the point of the workstream is to contextualize teens within understanding how we should create our product to provide them a better experience.

BY MS. BARNHART:

Q. I believe you also testified yesterday in response to some of counsel's questions that part of your work was aimed at increasing empathy for the teen audience; is that correct?

Q. You identified yourself as IG growth user experience researcher here, right?

A. I sat within the IG growth research team and reported to that manager, but I'm not -- I don't consider myself an IG growth researcher because I was not embedded on any IG growth product teams.

Q. I see. Okay.

And let's look at the "Business Objectives & Motivation."

Do you see that section?

A. Yes.

Q. Okay. It says [as read]:

The purpose of this study is to define trends and identify the consistent element of successful digital trends among teenagers.

Did I read that right?

A. Yes.

Q. [As read]:

This is important to the business to develop a strategy for -- maintain cultural relevance among today's teens as well as teenage generations to come by enabling trendsetting behavior and virality.

Do you see that?

A. Yes.

work, but when I asked you questions about teens who averaged four-plus hours a day on Instagram, whether that was unhealthy, you weren't able to give me an answer on that, right?

A. Right.

Q. Okay. And so in spite of sending this e-mail, did you not stay engaged on the issue of problematic use during your time working at Instagram?

MS. BARNHART: Object to the characterization. Asked and answered.

THE WITNESS: The way that I would characterize staying engaged is just being abreast to different projects that they might be doing, not necessarily knowing the details of them or the results, per se. But just having a pulse on anything that they might be working on that I would find relevant to my work.

BY MR. PHELPS:

Q. Okay. And it wasn't relevant to your work to develop an understanding of whether spending more than four hours a day on average for a teen would be healthy or not, that wasn't relevant?

MS. BARNHART: Object to the form.

THE WITNESS: No, because that's not my

area of expertise or under my remit of research that I was intending to do.

BY MR. PHELPS:

Q. Okay. So you didn't -- you weren't really staying engaged on that issue of problematic use, right?

MS. BARNHART: Object to the characterization. Asked and answered now several times.

THE WITNESS: I was in touch with these researchers, but I did not follow that topic closely to know every thing or every insight that came out of it.

BY MR. PHELPS:

Q. And that wasn't something that you found was important for you to do even as you developed into a subject matter expert on teens for Instagram?

MS. BARNHART: Asked and answered. Characterization.

THE WITNESS: No, because I'm not the teen subject matter expert of teen well-being or mental health or anything like that.

BY MR. PHELPS:

Q. And that wasn't important for you to understand in order to develop empathy -- help your

STATE OF CALIFORNIA )
COUNTY OF YOLO )

I, ELAINA BULDA-JONES, a Certified Shorthand Reporter of the State of California, duly authorized to administer oaths pursuant to Section 2025 of the California Code of Civil Procedure, do hereby certify that

SHAYLI JIMENEZ,

the witness in the foregoing deposition, was by me duly sworn to testify the truth, the whole truth and nothing but the truth in the within-entitled cause; that said testimony of said witness was reported by me, a disinterested person, and was thereafter transcribed under my direction into typewriting and is a true and correct transcription of said proceedings.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, nor in any way interested in the outcome of the cause named in said deposition dated the ______ day of ____________, 2025.

ELAINA BULDA-JONES, CSR 11720