# EXHIBIT A

MARICOPA REPORTING

# Day Twelve of Trial Proceedings

**Date:** February 20, 2026

**Case:** State of New Mexico, Ex Rel., Torrez v. Meta Platforms, Inc.,
**Case** #:D-101-CV-2023-02838

Maricopa Reporting, Inc.
https://www.maricopareporting.com/
Phone: (480) 597-4744
scheduling@MaricopaReporting.com

5075

STATE OF NEW MEXICO
COUNTY OF SANTA FE
FIRST JUDICIAL DISTRICT COURT

STATE OF NEW MEXICO, EX REL., RAUL TORREZ, ATTORNEY GENERAL,
Plaintiff,
No. D-101-CV-2023-02838
v.
META PLATFORMS, INC.,
Defendant.
~~~~~~~~~~~~~~~~~~~~~~~~~~~

BEFORE HONORABLE BRYAN BIEDSCHEID

DAY 12 TRIAL PROCEEDINGS
(PAGES 5075 THROUGH 5386)
FEBRUARY 20, 2026
8:33 A.M.

REPORTED BY:
Sommer E. Greene, RPR, CRR
Certified Court Reporter
Certificate No. 541

MARICOPA REPORTING, INC.
701 Camino de la Familia
Suite 214
Santa Fe, New Mexico
(480) 597.4744

5076

APPEARANCES OF COUNSEL

For Plaintiff:

NEW MEXICO DEPARTMENT OF JUSTICE
JAMES W. GRAYSON, ESQ.
LAUREN PERRY, ESQ.
STEVEN PREFERMENT, ESQ.
408 Galisteo Street
Santa Fe, New Mexico 87501
505.490.4060
lperry@nmdoj.gov

MOTLEY RICE LLC
DONALD MIGLIORI, ESQ.
LANCE OLIVER, ESQ.
DAVID ACKERMAN, ESQ.
LINDA SINGER, ESQ.
MAX N. GRUETZMACHER, ESQ.
28 Bridgeside Boulevard
Mt. Pleasant, South Carolina 29464
843.216.9000
dmigliori@motleyrice.com
loliver@motleyrice.com
dackerman@motleyrice.com
lsinger@motleyrice.com
mgruetzmacher@motleyrice.com

For Defendants:
KELLOGG HANSEN
ALEX A. PARKINSON, ESQ.
KEVIN B. HUFF, ESQ.
DANIEL S. SEVERSON, ESQ.
THOMAS G. SCHULTZ, ESQ.
ANA PAUL, ESQ.
LESLIE V. POPE, ESQ.
1615 M Street, NW
Washington, D.C. 20036
202.326.7900
aparkinson@kellogghansen.com
khuff@kellogghansen.com
dseverson@kellogghansen.com
tschultz@kellogghansen.com

5077

APPEARANCES CONTINUED:

RODEY, DICKASON, SLOAN
MELANIE STAMBAUGH, ESQ.
Post Office Box 1888
Albuquerque, New Mexico 87103
505.765.5900
mstambaugh@rodey.com

5078

I N D E X

CHERYL COYLE
CROSS-EXAMINATION BY MS. STAMBAUGH..............5123
REDIRECT EXAMINATION BY MR. PERFREMENT..........5148

DR. ALISON LEE
DIRECT EXAMINATION BY MS. SINGER................5153
CROSS-EXAMINATION BY MR. PARKINSON..............5219
REDIRECT EXAMINATION BY MS. SINGER..............5274

\* \* \*
~~~~~~~~~~~~~~~~~~~~~~~~~~~

5151

And when you have incidences with families coming in and you try to handle it, and then another incidence and you try to handle it, and then another incidence and you try to handle it, at some point you're at a breaking point and you're just asking for help. And that was the result of the letter. 09:55:55 09:55:58 09:56:02 09:56:05 09:56:06 09:56:08 09:56:11

**Q. And your concerns were so significant to you that you took time out of that busy schedule to write a letter to Mr. -- to, first, a State senator? 09:56:11 09:56:14 09:56:16**

A. Correct. 09:56:19

MS. STAMBAUGH: I apologize, Your Honor. This is leading. 09:56:20 09:56:22

THE WITNESS: So -- 09:56:22

JUDGE BIEDSCHEID: So let me just say overruled for development of testimony. 09:56:23 09:56:25

MS. STAMBAUGH: Okay. Thank you, Your Honor. 09:56:26 09:56:27

**Q. BY MR. PERFREMENT: And did you subsequently send that letter as well to Mr. Mosseri of Instagram? 09:56:28 09:56:29 09:56:31**

A. Yes. And because, again, you're just -- you know, parents are saying, well, how come it's not taken down? And I'm telling them, well, I'm trying, and then you're just -- you know, and then I'm 09:56:31 09:56:35 09:56:38 09:56:40

5152

encouraging them to try to take it down. But then they're looking at me like, what do I do? So yes. 09:56:42 09:56:47

**Q. And I asked you yesterday whether Mr. Mosseri responded, and I believe your answer was no? 09:56:50 09:56:52 09:56:54**

A. No, I never got a response. 09:56:54

**Q. Did anyone from Instagram respond to that inquiry? 09:56:56 09:56:58**

A. No. No. 09:56:59

**Q. Did anything change, in your view, as a result of that inquiry? 09:57:00 09:57:04**

A. No. 09:57:05

MR. PERFREMENT: Thank you, ma'am. 09:57:06

JUDGE BIEDSCHEID: Thank you, Counsel. 09:57:17

With that, thank you for your testimony. You're excused. You may step down. 09:57:17 09:57:19

THE WITNESS: Thank you. 09:57:23

(Ms. Coyle exits the courtroom.) 09:57:27

JUDGE BIEDSCHEID: When you're ready, you may call your next witness. 09:57:34 09:57:36

MS. SINGER: Thank you, Your Honor. 09:57:37

Good morning. The State calls Dr. Alison Lee. 09:58:02 09:58:03

JUDGE BIEDSCHEID: Please raise your right hand. 09:58:07 09:58:08

5153

(DR. ALISON LEE was sworn in by the Judge.) 09:58:08 09:58:13

THE WITNESS: I do. 09:58:13

JUDGE BIEDSCHEID: Thank you. You're now under oath. Please be seated. 09:58:14 09:58:15

09:58:17

DIRECT EXAMINATION 09:58:17

BY MS. SINGER: 09:58:19

**Q. Good morning, Dr. Lee. 09:58:19**

**Can you introduce yourself, please, to the jury? 09:58:22 09:58:23**

A. Yeah. 09:58:24

Good morning. My name is Alison. I am a cognitive scientist by training. I started my career actually working in New York City Public Schools, working with 1st grade robotics afterschool programs in Harlem and found myself studying what it takes for young people to really thrive. 09:58:24 09:58:28 09:58:32 09:58:34 09:58:38 09:58:42

JUDGE BIEDSCHEID: Okay. And, Ms. Lee -- 09:58:44

Are you all having any difficulty hearing her? 09:58:45 09:58:47

THE WITNESS: You're having trouble? 09:58:49

JUDGE BIEDSCHEID: The microphone is a little finicky there. 09:58:51 09:58:57

THE WITNESS: All right. I'll try to 09:58:57

5154

speak a little closer. I'm a little nervous. Going to take a breath here. 09:58:57 09:58:57

Good morning. My name is Alison. I was a former researcher at Meta studying integrity and safety issues. 09:58:57 09:59:00 09:59:04

I am a cognitive scientist by training. I started my career working in public schools. I was studying character development and belonging in schools. I taught a 1st grade afterschool robotics program early on in my career, and then really found myself studying what does it take for young people to thrive and to feel connected and to be their best selves. 09:59:06 09:59:08 09:59:12 09:59:17 09:59:21 09:59:23 09:59:26 09:59:29

And that's really what led me to studying digital platforms because I was really interested in, at first, video games, seeing how kids learn and learn how to problem solve and critically think through video games. 09:59:30 09:59:33 09:59:36 09:59:39 09:59:42

And then as my career progressed, I realized that other digital platforms were also a way for them to discover themselves and learn about themselves and so that's how I found myself at Meta. 09:59:42 09:59:44 09:59:48 09:59:50

**Q. BY MS. SINGER: All right. And with that, when did you work at Meta? 09:59:56 09:59:56**

A. Yeah. I started at Meta in, I believe, 09:59:58

early -- early spring, late winter of 2021. So this 10:00:02
is the height of the pandemic. I think the exact was 10:00:06
like approximately February 2021 when I began. 10:00:09
**Q. And when did you leave Meta, just so the 10:00:14**
**jury has the dates in their minds? 10:00:15**
A. Sure. December of 2022. 10:00:17
**Q. What were your positions at Meta? 10:00:19**
A. Yeah. I was a senior researcher on the 10:00:21
algorithmic integrity team at Instagram. 10:00:26
**Q. And before today here in court, have you 10:00:27**
**spoken publicly about your experience at Meta? 10:00:31**
A. I have not. 10:00:34
**Q. How did you end up here today? 10:00:34**
A. I was called to -- and deposed to testify 10:00:38
about my experiences as a researcher during that 10:00:41
time. 10:00:44
**Q. And are you here today voluntarily? 10:00:44**
A. I am here voluntarily. 10:00:46
**Q. All right. And you gave us some sense of 10:00:48**
**your background. Let's start with your education. 10:00:51**
**Can you describe to the jury where and in 10:00:54**
**what you received your degrees? 10:00:58**
A. Yeah. I have a Ph.D. from Columbia 10:00:59
University in cognitive science and education. I'm 10:01:04
very interested in how young people learn and think 10:01:06



and navigate the world. And I also have a master's 10:01:09
in learning analytics, which is a fancy way of saying 10:01:12
machine learning in education. 10:01:16
So some background in algorithms. I was 10:01:17
thinking about how you apply those techniques to 10:01:21
model how people think and learn. 10:01:24
**Q. And do you also have a background in 10:01:26**
**quantitative and qualitative research? 10:01:30**
A. Yes, I do. That's what I'm trained in. 10:01:31
Primarily quantitative methods, but I also use 10:01:34
qualitative methods. 10:01:37
**Q. All right. And you talked a little bit 10:01:38**
**about your transition to Meta, but what brought you 10:01:39**
**to the company in -- in 2021? 10:01:41**
A. Yeah. So in 2016, 2017 I was studying 10:01:47
belonging in school. So I was finding myself in 10:01:50
middle schools all around the country. I was like 10:01:52
Oakland, California, and Saint Paul, Minnesota, and 10:01:55
Alpharetta, Georgia, asking kids the same question, 10:01:59
which is: What does it take for you to really feel 10:02:00
supported to do your best work in school? And they 10:02:04
were saying things like I need to feel safe in 10:02:09
school, I need to feel respected by my peers, that 10:02:11
they care what I have to think and say, I have to 10:02:14
feel like the adults in my life care about me and 10:02:16



want me to grow and want to help me get there, and I 10:02:18
need to feel like I belong in my classroom. 10:02:20
And if I don't feel any of those things, 10:02:24
I won't even feel safe to raise my hand. Right. 10:02:26
And so for many of these young people 10:02:29
they were oftentimes the ones that didn't feel the 10:02:31
safest in schools or didn't feel like a sense of 10:02:33
belonging in schools, I asked them: Well, if you 10:02:36
don't get that in school, where do you get that? And 10:02:38
they said, I get it on the internet. I get it on 10:02:42
Discord, playing video games with my friends, I get 10:02:46
it on Reddit, finding communities that I can relate 10:02:47
to, and I get it on places like Instagram where I can 10:02:51
see people like me and see what's possible in the 10:02:55
world for me. 10:02:58
And so this was 2016, 2017. This was a 10:02:59
time when a lot of teachers and parents were sort of 10:03:03
ignoring what was going on in digital platforms or 10:03:05
maybe not seeing it as an asset. But what I was 10:03:07
starting to really see was young people were turning 10:03:10
to these places for connection and belonging, 10:03:13
especially if they weren't finding it in their real 10:03:16
life spaces. 10:03:19
So I went to Instagram in 2021 really 10:03:20
asking that question, if this is where they're 10:03:22



looking for community and connection, how do we 10:03:25
actually create digital spaces that actually are in 10:03:28
service of their growth, service of their thriving, 10:03:31
service of their safety too in ways that actually 10:03:34
support their development and growth. 10:03:36
**Q. And when you joined Meta, where in the 10:03:38**
**company did you work? 10:03:41**
A. Yeah. I worked on the relevance team, 10:03:42
which is the algorithm team. So that's the team -- 10:03:46
that's the pillar that powers what you see on your 10:03:50
feed. Right. All of those algorithms that power it. 10:03:53
And on that team I was specifically on 10:03:57
the integrity team, which means we're responsible for 10:03:58
making sure whatever shows up on your algorithm is 10:04:00
safe. 10:04:03
**Q. And can you describe on a practical level 10:04:04**
**what your job involved, Dr. Lee? 10:04:11**
A. Yeah. I was responsible for 10:04:13
understanding what users were experiencing from their 10:04:14
feed and their recommendations, that may not be safe. 10:04:16
And, in particular, I joined at the height of the 10:04:21
pandemic. So this was when everyone was locked down 10:04:24
in their home, and the main product that I was asked 10:04:27
to see -- oversee research on was the reels product. 10:04:29
And so I was the first researcher really 10:04:34

5159

brought on board to try to study, wow, this brand-new 10:04:36 product. What are some of the emerging risks that 10:04:40 are associated with that product and how do we make a 10:04:44 safer product for this new product that's coming on. 10:04:49

**Q. And can you briefly just remind the jury 10:04:51 what reels is? 10:04:54**

A. Yeah. 10:04:54

Reels are short-form videos. So at the 10:04:55 time they were no more than 30 seconds to a minute 10:05:00 long. It was a product that was launched largely 10:05:02 because at the time TikTok had blown up. 10:05:05

So I'm not sure if you're familiar with 10:05:11 the product TikTok. In 2020 it became super popular. 10:05:12 It was like everyone was locked down at home, so all 10:05:17 people wanted to do was scroll on their phones. And 10:05:19 then TikTok became very popular because of the trends 10:05:22 that were on TikTok. You know, people dancing or 10:05:25 doing the Ice Bucket Challenge, you know. Those 10:05:28 kinds of things really blew up on TikTok. 10:05:31

So there was a sense when we arrived 10:05:34 there was like, oh, man, the same way that Instagram 10:05:36 took over Facebook's marketshare, right, because 10:05:40 originally Facebook was the big popular platform, 10:05:46 Instagram came out of nowhere, and now it was the hot 10:05:49 place to be for young people. I was part of that 10:05:53

5160

generation. 10:05:54

There was a sense of feeling in 2021 10:05:54 that, oh, my gosh, TikTok might do that to us if we 10:05:56 don't get our shit together. Excuse my language. 10:05:58 Sorry about that. 10:06:01

So there was this real sense of, man, we 10:06:03 got to stand up reels, we got to make it as 10:06:05 competitive and as exciting of a product as TikTok 10:06:08 was. Right. 10:06:12

And so I was the first researcher brought 10:06:12 on in February -- of that spring to really start to 10:06:14 ask those questions of, okay, alongside making a 10:06:19 really awesome product, how do we keep people safe 10:06:22 with that product. 10:06:25

**Q. And was reels, I think you said this, but 10:06:26 let me ask it differently. 10:06:28**

**How long had reels been on the market 10:06:29 when you joined Instagram? 10:06:31**

A. I think -- I don't know the exact dates 10:06:33 of when the product was released. I believe it was 10:06:38 August or September of the prior year. 10:06:41

**Q. Was reels important to Meta when you 10:06:44 joined the company? 10:06:52**

A. I would say it was probably the most 10:06:53 important product at the time for Instagram. 10:06:54

5161

**Q. And I know you described reels -- reels 10:06:56 briefly. 10:07:01**

**I'm having trouble this morning too. 10:07:02**

**What was the relationship of reels to 10:07:04 other surfaces at Meta? 10:07:06**

A. It was a relatively new product, right. 10:07:08 So, historically, Instagram was well known for 10:07:13 photos. So you would post a photo or maybe you would 10:07:17 post a couple of photos and then maybe a text 10:07:19 caption, right. 10:07:24

Reels was a brand-new product in that it 10:07:27 was a new type of media. It was short-form videos. 10:07:29 So it was both a new surface. 10:07:32

So if you look at the app at the very 10:07:33 bottom, there was a little button you could click and 10:07:35 all you would see is reels, but because people 10:07:37 weren't using reels, that reels tab too often, 10:07:40 because people were still like, no, I go to Instagram 10:07:43 for photos, why would I go to Instagram for reels? 10:07:45 If I wanted short-form video, I'm going to go to 10:07:48 TikTok; right? 10:07:50

They started also injecting reels 10:07:51 everywhere they could. So they injected it into your 10:07:54 feed, they injected it into -- there were these 10:07:59 little carousel banners that they would put at the 10:08:03

5162

top where it would be like before you even see the 10:08:04 rest of your feed, we're going to put a couple of 10:08:05 reels on the top there. That was called reels in 10:08:07 feed unit, or RIFU. 10:08:09

It was also all over what we call the 10:08:12 explore tab. So that's usually when you go click on 10:08:15 the magnifying glass at the very bottom, there's a 10:08:18 little tab. You click on that. We tried to inject 10:08:21 as many reels as possible into that tab as well. 10:08:24

**Q. And when you arrived at Meta in 2021, did 10:08:26 you have a chance to observe whether the company had 10:08:32 taken the steps to make reels a safe product? 10:08:34**

A. I think there were some baseline 10:08:37 engineering efforts. So in the same way that we 10:08:42 apply integrity safety models into your feed, there 10:08:47 were some very basic imports of saying like whatever 10:08:51 we do for your feed posts, we're also going to do for 10:08:54 your -- your reels. But they didn't make any new 10:08:58 models for reels yet. 10:09:03

As far as I know, I was one of the first 10:09:06 researchers to actually study reel safety from the 10:09:08 user experience perspective. 10:09:10

**Q. And were the tools that Meta had used for 10:09:13 other products or features sufficient to make reels 10:09:15 in this new format safe for users? 10:09:17**

5163

A. I don't believe so. And I think that was 10:09:20 one of the main reasons why early on we saw a lot of 10:09:24 problems with the kinds of problematic content that 10:09:27 was showing up on reels. 10:09:30
I'll give you a really practical example. 10:09:32
Let's say we have a model call P sexual, 10:09:34 right, sexually suggestive content. The policy 10:09:37 guidelines that we were using to label sexually 10:09:40 suggestive content for a static picture was if there 10:09:43 was somebody's body that was exposed for a certain 10:09:48 percentage of the screen; right? So you have a 10:09:50 photo, what percentage of that is being taken up by 10:09:53 someone's naked body; right? How much of someone's 10:09:56 particular genitalia or particular parts of their 10:10:00 bodies were being exposed. 10:10:02
Now, that works really great for a static 10:10:04 post, right. You just take a snapshot of that and 10:10:06 then you say how much of this, what is being shown? 10:10:09
But that's not as effective for 10:10:11 short-form video; right? Because when you're a 10:10:14 short-form video, people are moving. So how do you 10:10:17 calculate percentage; right? 10:10:19
And also, when it comes to short-form 10:10:20 video, now you've got moving parts; right? People's 10:10:23 gestures, the way that they're moving in the screen; 10:10:26

5164

right? 10:10:26
So how do you calculate sexually 10:10:29 suggestive for something that's moving, and yet what 10:10:31 we were doing at the time was really just baseline 10:10:34 treatments for reels in the same way that we were 10:10:36 treating static posts and photos. 10:10:40
And so a lot of times we were missing 10:10:42 huge slots of problematic content because our 10:10:45 labeling guidelines, our policy guidelines, were not 10:10:47 effective for that type of content. 10:10:50
**Q. And by the way, who was the audience for 10:10:52 reels? 10:10:55**
A. The audience was predominantly young 10:10:57 people because the sense was they're the taste 10:11:00 makers, where young people are early adopters of 10:11:03 technology in the same way that they adopted 10:11:05 Instagram and all of a sudden everybody else 10:11:07 followed. We were like, wow, we really got to be 10:11:09 popular with the hip kids. So young people in 10:11:12 particular were a target audience. 10:11:16
**Q. And, to your knowledge, did Meta know and 10:11:18 mean for reels to become a product, you know, popular 10:11:21 with teens? 10:11:28**
A. I think it was in general that they 10:11:28 wanted reels to be popular with everyone eventually, 10:11:30

5165

but they also knew for adoption to be effective we 10:11:33 needed to be -- make sure that we were especially 10:11:35 popular with young people. 10:11:38
**Q. All right. Dr. Lee, we're going to turn 10:11:40 to that binder that you should have in front of you, 10:11:42 and I'm going to ask you to take a look at some of 10:11:45 the documents. 10:11:47**
**Do you have the binder? 10:11:47**
JUDGE BIEDSCHEID: I think we're 10:11:48 binderless. 10:11:50
**Q. BY MS. SINGER: All right. Now we have 10:12:14 binders. I'm going to have you take a look at 10:12:16 Plaintiff's Exhibit 02700 and your tabs should be in 10:12:19 chronological order. 10:12:23**
A. First on is 360. 10:12:24
**Q. Do you see 2700? 10:12:25**
A. Yes. 10:12:27
MS. SINGER: Your Honor, may we publish 10:12:36 Plaintiff's Exhibit 02700 to the witness? 10:12:37
JUDGE BIEDSCHEID: Yes, you may. 10:12:39
**Q. BY MS. SINGER: And, Dr. Lee, you're also 10:12:41 going to see that appear on your screen. Use 10:12:42 whatever media is most comfortable for you. 10:12:44**
**Do you recognize this document? 10:12:48**
A. Yes, I do. 10:12:49

5166

**Q. Speaking generally, what is it? 10:12:50**
A. It is a slide deck that I produced for 10:12:52 the integrity and safety team, talking about some of 10:12:54 the integrity or safety challenges that we were 10:12:59 seeing come up in reels. 10:13:02
**Q. And is this a document you worked on in 10:13:04 your capacity as a researcher at Meta? 10:13:06**
A. Yes, I was one of the co-authors. 10:13:08
**Q. Does it accurately reflect your work? 10:13:10**
A. Yes, it does. 10:13:15
**Q. Was it created in the regular course of 10:13:17 Meta's business? 10:13:19**
A. Yes, it was. 10:13:19
MS. SINGER: Your Honor, we move to admit 10:13:21 Plaintiff's Exhibit 02700. 10:13:23
JUDGE BIEDSCHEID: All right. 10:13:26
MR. PARKINSON: No objection, Your Honor. 10:13:28
JUDGE BIEDSCHEID: It's admitted. 10:13:29
(Plaintiff's Exhibit 02700 was admitted 10:13:30 into evidence.) 10:13:30
MS. SINGER: Permission to publish to the 10:13:30 jury as well? 10:13:32
JUDGE BIEDSCHEID: Yes. Coming. 10:13:33
**Q. BY MS. SINGER: It will be the same 10:13:39 document on your screen, Dr. Lee, so wherever you 10:13:41**

5167

**want to look. 10:13:44**
**Do you recall generally what the date of 10:13:44**
**this presentation was? 10:13:46**
A. If I had to guess, it was probably 10:13:47
sometime in the late spring, early summer of 2021. 10:13:52
**Q. All right. And the jury may recall this 10:13:57**
**presentation from Dr. McCoy's testimony, so we're not 10:13:59**
**going to dwell on it today, except to make sure it's 10:14:02**
**in evidence, which it now is. 10:14:05**
MS. SINGE: So we can take that down, 10:14:07
please. 10:14:08
**Q. BY MS. SINGER: Also going to ask you to 10:14:13**
**take a look at Plaintiff's Exhibit 02701. 10:14:14**
MS. SINGER: Your Honor, may we also 10:14:19
publish that to the witness? 10:14:21
JUDGE BIEDSCHEID: Yes, you may. 10:14:22
**Q. BY MS. SINGER: And, Dr. Lee, do you 10:14:23**
**recognize this document? 10:14:26**
A. Yes, I do. 10:14:27
**Q. And what is it? 10:14:28**
A. This was a part 2 of that first report 10:14:29
published perhaps a couple weeks or maybe a month or 10:14:33
so after that -- 10:14:35
**Q. And -- 10:14:37**
A. Sorry. 10:14:37

5168

**Q. What was your role with this 10:14:38**
**presentation, if any? 10:14:40**
A. I was a co-author. 10:14:41
**Q. And does it also incorporate the findings 10:14:42**
**from your first report that we just looked at? 10:14:44**
A. Correct. It was an extension of that 10:14:46
first report. 10:14:48
**Q. And does this document accurately reflect 10:14:48**
**your findings? 10:14:52**
A. Yes, it does. 10:14:53
**Q. Was it created in the regular course of 10:14:54**
**Meta's business? 10:14:56**
A. Yes, it was. 10:14:57
MS. SINGER: Your Honor, we move to admit 10:14:58
Plaintiff's Exhibit 02701. 10:15:00
JUDGE BIEDSCHEID: Any objection? 10:15:02
MR. PARKINSON: No objection. 10:15:04
JUDGE BIEDSCHEID: It's admitted. 10:15:05
(Plaintiff's Exhibit 02701 was admitted 10:15:06
into evidence.) 10:15:07
MS. SINGER: Your Honor, may we also 10:15:07
publish this to the jury? 10:15:11
JUDGE BIEDSCHEID: Yes, you may. 10:15:12
**Q. BY MS. SINGER: Dr. Lee, while that's 10:15:14**
**coming up, can you describe at a high level your 10:15:16**

5169

**findings reflected in this presentation? 10:15:19**
A. Yeah. So this was the first undertaking 10:15:21
that I had when I was at Meta in the first three 10:15:24
months. 10:15:26
So my job to start with a brand-new 10:15:27
slate, right, brand-new product was to try to 10:15:32
understand what do we know about this product 10:15:33
already. So I worked closely with my data science 10:15:36
team, with my engineers and also past researchers to 10:15:39
try to understand what do we know about safety in 10:15:42
general? What do we understand about reels as a 10:15:44
product? You know, are we detecting harmful content 10:15:46
at particular rates? 10:15:49
And also what's going on? How is this 10:15:51
product being built and what are some of the merging 10:15:54
challenges or risk areas that we might identify that 10:15:57
would be important for us to continue to explore down 10:15:59
the line? 10:16:01
**Q. And let's turn to slide 6, please. 10:16:02**
**And if you could focus on that first 10:16:09**
**block of text under "We released." 10:16:11**
A. Uh-huh. 10:16:15
**Q. Can you read that heading out to the 10:16:15**
**jury, please. 10:16:17**
A. Yes. 10:16:17

5170

"We released a high volume, 200 or more, 10:16:18
in H1/2021," H1 being half, the first half of 2021, 10:16:22
"of product launches, 30 or more of them leading to 10:16:28
integrity regressions." 10:16:32
**Q. And does this relate to reels in 10:16:34**
**particular? 10:16:36**
A. Yes. This is specific to reels. 10:16:36
**Q. Okay. And can you explain what an 10:16:39**
**integrity regression is? 10:16:41**
A. Yes. So on the -- it's a fancy way for 10:16:43
saying we have these safety models that detect what 10:16:48
we call nonrecommendable content. So this might be 10:16:50
content that's not outright violating, it's not 10:16:54
pornography or it's not someone getting shot and 10:16:57
murdered, but it's not recommendable in that there 10:17:00
might be some graphic violence involved or there 10:17:02
might be some sexually suggestive content. That's 10:17:05
what we call nonrecommendable content. 10:17:08
So an integrity -- an integrity model in 10:17:10
this case is referring to nonrecommendable models. 10:17:13
What we mean by regression means it's 10:17:17
making it go up, the prevalence, the weight of this 10:17:19
content went up. 10:17:22
**Q. And when you say "nonrecommendable," can 10:17:25**
**you relate that to the operation of Meta's algorithm 10:17:28**

5171

**in reels? 10:17:30**
A. Yeah. So nonrecommendable content is 10:17:31
stuff that we're like, well, you know, it's not 10:17:37
outright violating our content, so it's allowed to 10:17:39
exist on our platform, but it's not content that we 10:17:42
necessarily want to show to anybody, particularly if 10:17:45
you're not following that content; right? 10:17:48
So if I'm not following your account -- 10:17:50
I'm sorry -- and you produce something that's 10:17:52
nonrecommendable, your content should not be shown to 10:17:54
me because I don't follow you already; right? So 10:17:57
that's what we mean by nonrecommendable. 10:18:01
And nonrecommendable models are supposed 10:18:03
to be applied to your recommendation feed; right? So 10:18:06
there's two layers -- 10:18:11
Is it okay if I go into the sourcing and 10:18:13
ranking? 10:18:16
**Q. Sure. 10:18:16**
A. Okay. 10:18:17
There's two layers that go into how 10:18:18
content is shown to you on your platform. 10:18:21
The first is called the sourcing model. 10:18:23
So let's say in a given day there's millions of posts 10:18:25
that are being created; right? How do we pick the 10:18:29
top thousand that are going to be the most relevant 10:18:32

5172

to you, right, that we think you're going to like? 10:18:35
That's the sourcing model. 10:18:37
In the sourcing model there should be 10:18:38
nonrecommendable filters that say, man, if there is a 10:18:40
piece of content that is -- we think is 90 percent 10:18:44
likely to be sexually suggestive or hateful or 10:18:48
graphic violence, we're going to kick it out of that 10:18:51
sourcing. So it should not make it into the top 10:18:54
thousand; right? Presumably should not be there. 10:18:58
Anything over, let's say, 90 percent. 10:19:01
I'm not sure the exact threshold. Might be 90 10:19:03
percent; might be 95 percent. That's the first 10:19:06
layer. 10:19:08
Now we have a thousand posts; right? 10:19:09
What order do we show it to you? That's called 10:19:11
ranking. So ranking number 1, number 2, number 3; 10:19:14
right? We apply ranking to each of those posts. 10:19:17
The way that we decide ranking is by 10:19:21
using your signals. So what's the probability that 10:19:26
you're going to like this, that you're going to 10:19:29
comment on this, that you're going to send it to a 10:19:31
friend, that you're going to save it for later; 10:19:33
right? All of those user signals are used to apply, 10:19:36
oh, if we think you're going to like it, plus 5 10:19:40
points. 10:19:43

5173

I'm making this up. I'm not sure of the 10:19:43
exact points. Right. 10:19:45
But we're going to bump it up in the row. 10:19:46
If we think you're going to comment on it, bump it 10:19:48
up. If we think you're going to DM it to a friend or 10:19:51
message it to a friend, send it to a friend, we're 10:19:54
going to bump it up. 10:19:57
Presumably, we also have nonrecommendable 10:19:58
models that say if we think this is 85 percent 10:20:02
sexually suggestive, we're going to bump it down. 10:20:04
The issue is it's a zero-sum game; right? 10:20:06
So let's pretend that they're points. We say minus 5 10:20:09
points if we think it's sexually suggestive. Plus 3 10:20:12
points if you're going to like it. Plus 8 points if 10:20:16
you're going to share it. Plus 5 points if you're 10:20:18
going to save it for later; right? 10:20:20
And so what ends up happening is even 10:20:23
with these nonrecommendable models that are applied 10:20:25
at both the sourcing and at the ranking layer, they 10:20:28
eventually end up becoming evened out or even crushed 10:20:32
entirely by some of these recommendation models. 10:20:38
**Q. And in your experience working with the 10:20:40**
**algorithm in reels, did you find which of those 10:20:43**
**signals predominated? 10:20:50**
A. We did some deep dives into some of the 10:20:51

5174

particular parts of it. I have to go to the 10:20:53
actual -- I believe there's some slides in here that 10:20:56
actually speak to that, but I remember there were 10:20:58
particular ways that we were tuning the model to be, 10:21:00
you know, sexy or in more engaging. 10:21:03
I think P click was one of them. So the 10:21:06
probability that someone's going to click on it to 10:21:08
look at it more, that seemed to increase the 10:21:11
likelihood of sexually suggestive content. 10:21:13
I remember there was also a model that 10:21:17
was called the mimicry remodel. Mimicry was just a 10:21:19
fancy word for: Is it trendy? 10:21:25
So if you remember the Ice Bucket 10:21:25
Challenge, that's a trend; right? I don't know if 10:21:27
you're all familiar with these particular trends. 10:21:29
But there were also a lot of trends that 10:21:32
were popular on reels at the time, which were these 10:21:34
dances; right? 10:21:36
So, you know, there would be a song clip 10:21:37
that was really popular and then someone would 10:21:40
choreograph a dance to it and everybody else would 10:21:42
copy it. That's a trend. 10:21:44
And what we were seeing was there were 10:21:46
some trends that were a little borderline sexy; 10:21:49
right? And there were a lot of young people that 10:21:52

5175

were copying those trends. 10:21:55
So it made a lot of sense that this 10:21:56
particular type of model that was trying to increase 10:21:58
these trends, we call it the mimicry, right, was 10:22:01
increasing some of the prevalence of problematic 10:22:05
content. 10:22:07
**Q. And did you find in your research that 10:22:08**
**Meta's algorithm amplified these trends and amplified 10:22:12**
**the content? 10:22:17**
A. Yeah. We saw that the applications of 10:22:18
some of these models did lead to increases in the 10:22:20
prevalence of nonrecommendable content. So 10:22:25
nonrecommendable being sexual or objectionable 10:22:28
content. 10:22:31
**Q. By the way, these dance videos that 10:22:31**
**you're talking about, who were the subjects often of 10:22:33**
**these dance videos? 10:22:35**
A. We saw overwhelmingly that it was young 10:22:36
people, particularly young women and girls and also 10:22:40
what we call like unknown gender teens. So we don't 10:22:45
have clear information from the account level about 10:22:48
whether -- what gender that they are. 10:22:51
But overwhelmingly it was from younger 10:22:53
women. 10:22:56
**Q. Okay. And let's go back to slide 6, if 10:22:56**

5176

**we could, Dr. Lee. 10:23:00**
**It says under the heading, "The pace at 10:23:01**
**which these launches occur make it difficult for us 10:23:03**
**to identify the additive, interaction, or long-term 10:23:05**
**integrity effects of each launch." 10:23:09**
**Can you explain to the jury what that 10:23:11**
**meant? 10:23:13**
A. Yeah. I'm going to use an analogy here, 10:23:14
which is like a bike analogy. So I want you to 10:23:17
imagine that the reels product is a bike; right? And 10:23:20
what we want is we have all these teams trying to 10:23:24
make this bike the sexiest, fastest, most competitive 10:23:29
bike, the most fun bike to ever ride. 10:23:33
So you've got a team over here that's 10:23:35
working on the gears; right? Let's make the gears go 10:23:36
faster. Let's make them more efficient. 10:23:39
And then we have a team over here that's 10:23:41
working on the pedals. How do we make the pedals 10:23:42
easier to push and make it go faster; right? 10:23:45
And so it's a similar analogy here where 10:23:47
you've got a lot of folks that are working on 10:23:50
different pieces of the algorithm. 10:23:52
But -- and the way that we say that 10:23:55
something's launchable is as long as it doesn't 10:23:58
exceed a dangerous threshold of making it more 10:24:02

5177

dangerous by 5 percent or more. So let's say as long 10:24:06
as your gear doesn't make it 5 percent more likely 10:24:09
that you're going to fall off and die, you're able to 10:24:12
launch that gear. 10:24:15
It might be 4 percent but, you know, as 10:24:16
long as you don't exceed 5 percent, we're good to, 10:24:18
you can launch that gear. 10:24:21
Over here on the pedal side, if you can 10:24:22
create a pedal that doesn't exceed 5 percent 10:24:24
likelihood of you falling off the bike and getting 10:24:27
hurt, you're allowed to go. 10:24:29
But what we -- what we meant was additive 10:24:31
is, now you've got 200 different product launches, 4 10:24:34
percent over here, 3 percent over here, 4 and 4.5 10:24:39
over here. All these start adding up to become 10:24:43
additive, cumulative effects of increasing regression 10:24:46
issues, right, integrity issues. So that's additive 10:24:50
number 1. 10:24:54
Number 2, interaction, is what happens if 10:24:54
your pedal over here interacts with your gear over 10:24:58
here that somehow makes it more unsafe; right? Maybe 10:25:02
there's something about the way that the gear that 10:25:07
you developed over here and the pedals on this side 10:25:08
somehow together makes it more unsafe. That's the 10:25:11
interaction effect. 10:25:15

5178

And then the final effect that we're 10:25:16
talking about here, the long-term effects, is we 10:25:18
tested your gear, worked for the ten times that we 10:25:20
tested. Looks good to go. 10:25:24
What happens a month from now or six 10:25:26
months from now when we tested that gear a hundred 10:25:28
times or a couple hundred times, we have not yet 10:25:32
tested that. 10:25:33
And so what we were seeing here was that 10:25:34
this 200-plus, the additive effects of all those 10:25:37
together, the unknown interaction effects between 10:25:40
those two things and the long-term effects were 10:25:43
leading to some really serious spikes in the safety 10:25:45
issues that we were seeing on the product. 10:25:49
**Q. Okay. All right. Let's turn to slide 10:25:51**
**10, please. And we're going to look at the last 10:25:53**
**section of this slide, please. 10:26:04**
**It says, "Unconnected dancing videos 10:26:05**
**featuring young girls raise safety concerns." 10:26:09**
**I think you've covered this, but can you 10:26:12**
**briefly explain what you mean by unconnected dancing 10:26:15**
**videos? 10:26:18**
A. Yeah. I'll go by the dancing videos 10:26:18
featuring young girls. That's easy. This refers to 10:26:20
some of the trends that we were seeing. So there was 10:26:23

5179

a very popular song at the time called -- excuse my 10:26:25 language. Well, I won't talk about the song title. 10:26:28 It's a little graphic, but it was a very popular 10:26:31 trend at the time, and it had some pretty suggestive 10:26:33 dance moves and that was one of many, many, many. 10:26:37 Okay. 10:26:41

And so there were a lot of young girls, 10:26:41 we were seeing as young as 9 years old, that were 10:26:43 copying these dance trends and trying to post them on 10:26:47 Instagram. 10:26:49

What we mean by unconnected is that we 10:26:49 were now then suddenly showing all of those videos 10:26:52 because we were like, oh, yeah, somebody made a 10:26:55 video. We want to show it to as many people as 10:26:58 possible because we want reels to be the platform 10:27:00 where people feel like they can make it as an 10:27:02 influencer. 10:27:05

So now all of the sudden we were showing 10:27:07 all of these videos to people that they didn't know. 10:27:10 That's what we mean by unconnected. 10:27:12

And what we were seeing is that both the 10:27:14 studies that we were collecting on people giving us 10:27:17 negative feedback about this and also internal 10:27:19 feedback. And by internal feedback, I mean employees 10:27:22 of Meta were posting in the internal Facebook being 10:27:25

5180

like, why am I getting this video of a 9-year-old 10:27:29 dancing. I don't know who this girl is. I never 10:27:32 followed her. We have no shared connections. And 10:27:34 I'm getting this random video on my feed. What is 10:27:37 going on here? 10:27:41

So I just wanted to illustrate that. It 10:27:41 wasn't just our own research that was facing this, it 10:27:44 was our own employees posting to complain to us about 10:27:46 these issues. 10:27:49

**Q. And then the caption says "Raise safety 10:27:50 concerns." What were those safety concerns, Dr. Lee? 10:27:54**

A. Yeah. Well, I think beyond the fact it 10:27:58 was undesirable content for the majority of people 10:28:01 that were receiving it, like I'm a full grown adult, 10:28:04 I don't need to see a 9-year-old dancing. There were 10:28:07 also some real serious concerns about showing these 10:28:10 videos to bad actors, right, people who may act with 10:28:12 mal intent towards these young people. 10:28:18

So we were starting to dig into, does 10:28:20 this raise a risk of inappropriate interactions with 10:28:22 these young people that were posting the account. 10:28:25

**Q. And did you find whether the 10:28:28 dissemination of these videos to unconnected adults 10:28:31 did raise safety concerns? 10:28:34**

A. Yes, we did. 10:28:35

5181

Historically, what we had were 10:28:39 protections for what we thought were minors to be -- 10:28:41 to prevent what we call IIC actors. IIC stands for 10:28:46 inappropriate interactions with children. 10:28:50

And if we thought that an account had a 10:28:52 previous history of having inappropriate interactions 10:28:55 with children, we would prevent them from seeing 10:28:59 content from minors on their feed. 10:29:03

Those same protections were not yet 10:29:05 applied to the reels product. 10:29:06

**Q. And why weren't they applied to the reels 10:29:09 product? 10:29:12**

A. If I had to sort of hazard a guess, was 10:29:13 that the product was very new. Well, not super new. 10:29:18 It was -- by then it was about six to eight months 10:29:23 in. But the efforts were to make the -- all of our 10:29:26 sort of efforts as an -- as an organization, as a 10:29:30 pillar, were to push out the reels product to be as 10:29:33 engaging as possible, that there were less resources 10:29:37 allocated to ensuring that that product was also safe 10:29:40 by design from the beginning. 10:29:43

**Q. Okay. So during this whole time period, 10:29:44 the six to eight months you're talking about, Meta is 10:29:47 sending out these dance videos of young girls to 10:29:53 adult strangers; is that accurate? 10:29:57**

5182

MR. PARKINSON: Objection, Your Honor. 10:29:58 Leading. Also misstates the testimony, "Meta is 10:30:00 sending out." 10:30:03

MS. SINGER: I think I've restated her 10:30:04 testimony correctly, Your Honor. I'm just trying to 10:30:08 develop and move on. 10:30:10

JUDGE BIEDSCHEID: Overruled. 10:30:10

**Q. BY MS. SINGER: Go ahead, Dr. Lee. 10:30:12**

A. I would say that the algorithm was 10:30:13 distributing unconnected videos of girls dancing to 10:30:16 accounts that they were not connected to, including 10:30:22 adults of all flavors. We had no particular 10:30:29 targeting. It was anybody who had unconnected 10:30:31 accounts, yeah. 10:30:35

**Q. And did that include adults who Meta had 10:30:36 identified as having had inappropriate interactions 10:30:38 with children? 10:30:41**

A. Yes, it does. 10:30:41

**Q. All right. Let's turn to slide 11, 10:30:45 please. 10:30:49**

**All right. And let's look at the second 10:30:54 block of text, please, the one that's headed 10:30:55 "Meaningful Interactions Are Highly Related to 10:30:58 Harmful Content." 10:31:03**

**Can you explain what you meant there, 10:31:05**

5183

**Dr. Lee? 10:31:07**
A. Yeah. What we were seeing is that -- 10:31:07 I'll just read the second part here, which is 10:31:10 "Interactions such as clicks, likes, private shares, 10:31:13 and comments are associated with sexually suggestive 10:31:16 and hate speech content across Instagram." 10:31:20
And what that means is that this type of 10:31:22 content, so sexually suggestive content and hate 10:31:25 speech content, were more likely to have more clicks, 10:31:29 more engagement, more people commenting. More likely 10:31:32 to be shared with other folks. 10:31:37
And so, in other words, the engagement 10:31:39 signals for those types of posts were very high. 10:31:41
**Q. And what was the impact of those 10:31:44 engagement signals on the algorithm's treatment of 10:31:46 that content? 10:31:50**
A. Yeah. So I'll go back to that earlier 10:31:50 like plus 5, minus 5. 10:31:52
This really goes back to the core engine 10:31:54 of the feed recommendation's algorithm; right? So if 10:31:57 we think -- let's say, we say at the sourcing layer 10:32:01 we're going to kick out anything that's 90 percent 10:32:04 likely to be sexually suggestive. Well, if you're 89 10:32:07 percent or 88 percent likely, you still made it into 10:32:10 that thousand batch; right? 10:32:12

5184

And so now when it comes to the ranking 10:32:14 signals, if we see that a piece of content that's 10:32:17 maybe 87 percent sexually suggestive, I'm saying that 10:32:19 just for illustrative purposes, and we're like, ooh, 10:32:23 87 percent, we should probably minus 10 points for 10:32:26 that for the integrity layer. 10:32:29
But plus 5 because you're going to like 10:32:31 it, plus 5 because you're going to click on it, plus 10:32:34 5 because you're going to share it to someone, plus 5 10:32:37 because you're going to comment on it; right? 10:32:41
So that is a very clear illustration of 10:32:42 the tensions between the way that our safety 10:32:44 algorithms were sort of really overruled by these 10:32:48 engagement signals. 10:32:51
**Q. All right. And let's move to the bottom 10:32:52 of this slide, please. It says, "Sexually suggestive 10:32:54 content featuring minors, SSCM is 2 to 3 times higher 10:33:00 on reels than explore." 10:33:04**
**Can you explain what that means? 10:33:08**
A. Yeah. We had a -- this is actually not 10:33:09 an official label in our algorithm. What we then 10:33:12 went in and looked at was of the sexually suggestive 10:33:14 content that we're seeing, how many of them featured 10:33:18 someone who was likely to be under 18 years old? We 10:33:20 did that -- I did that work alongside my data 10:33:23

5185

scientists. 10:33:26
And what we found was that content 10:33:27 featuring minors that were sexually suggestive were 10:33:28 two to three times more likely to be -- to be shown 10:33:33 on a reel surface than on the explore surface. 10:33:36 Explore is like that little magnifying glass area. 10:33:41
So it was a head-to-head comparison to 10:33:44 say, Hey, presumably same content, right, but even 10:33:46 just on the two different tabs it was way more 10:33:50 prevalent on reels than it was on this other tab 10:33:53 here. 10:33:56
**Q. And what did that mean to you? 10:33:56**
A. It meant that the treatments that we were 10:33:58 applying to the reels tab that was all about 10:34:05 increasing engagement, increasing mimicry, all of 10:34:06 these other things that we were trying to make this 10:34:10 product more attractive was leading to a spike in 10:34:11 this kind of content, sexually suggestive content 10:34:15 featuring minors. 10:34:18
**Q. All right. And let's turn to slide 15, 10:34:19 please. 10:34:21**
**All right. On the left-hand side of this 10:34:28 slide, it says, "Teens are the target audience for 10:34:29 reels, but we have limited knowledge, tech, and tools 10:34:34 to keep them safe." 10:34:36**

5186

**Why did you call that out on this slide, 10:34:37 Dr. Lee? 10:34:43**
A. Well, I have to say in preface that my 10:34:43 job as an integrity researcher was actually not 10:34:46 specifically teen safety. I was expected to look at 10:34:48 problems across entire platform. Because of my 10:34:52 background in developmental cognitive science, I 10:34:56 cared very deeply about young people. 10:35:00
But what we also saw it from the product 10:35:02 priorities, from our senior leadership, we're like we 10:35:04 really got to get young people on. So we focused our 10:35:06 work to see who are the people that might be most 10:35:09 likely to be at risk here. Knowing that teens and 10:35:12 young people are the target audience for reels, I 10:35:17 went and investigated specifically on what they were 10:35:21 engaging with and experiencing with this product. 10:35:28
**Q. And so let's look at the body of the 10:35:32 slide itself. 10:35:32**
**It says at the top "Teens don't think 10:35:32 deeply about" -- I think that's actually the middle 10:35:33 of the slide. 10:35:35**
**"Teens don't think deeply about safety 10:35:36 risks until something bad happens." 10:35:39**
A. Yeah. 10:35:40
**Q. Can you describe what you were conveying 10:35:41**

5187

**here? 10:35:42**
A. Yeah. This is actually from -- research 10:35:43 from another researcher that we were seeing, which is 10:35:45 that young people, when they look at content, they're 10:35:51 like it's okay, it's okay. It doesn't bother me. 10:35:54 Until it happens to them. 10:35:57
So I'll also name that the point before 10:35:59 that was that young people on our platform were way 10:36:01 more likely to see things like profanity and nudity 10:36:06 and bullying and hate. They were seeing that at 10:36:10 greater rates than their adult counterparts. 10:36:11
But what we also saw was that they 10:36:18 weren't thinking very seriously about those safety 10:36:20 risks or that type of content until that's targeted 10:36:22 at them, until they become the subject of bullying or 10:36:25 the subject of hate or, you know, their sexually 10:36:28 suggestive content all of a sudden elicits some DM 10:36:33 from a stranger. 10:36:36
**Q. All right. And then under the "Teens 10:36:38 don't think deeply about safety risks," the second 10:36:40 point says, "Teens are fueled to produce by likes and 10:36:44 comments" and "Teens are more willing to talk to 10:36:44 people who are friends of friends." That's 2 and 3. 10:36:44 Can you explain what that means, what you found 10:36:44 there? 10:36:56**

5188

A. Yeah. 10:36:56
What we found was that teens in 10:36:56 particular were really motivated by these behavioral 10:36:58 signals, you know. The count of how many likes, the 10:37:01 count of how many comments were on. 10:37:04
And if you think about where kids 10:37:05 developmentally are in their adolescence, that's the 10:37:08 moment when it really matters what other people think 10:37:11 about you; right? How popular you are, how well 10:37:13 you're liked by your peers, how well you're accepted 10:37:17 by your peers. 10:37:20
So this is actually in direct alignment 10:37:21 to what we think sort of as developmentally typical 10:37:23 for that era. 10:37:25
And also the safety risk was also very 10:37:27 developmentally typical of teens; right? This is 10:37:29 like at the period of when they're engaging in 10:37:32 potentially more risky behaviors, more agentic 10:37:35 behaviors, they're like it's okay if it's risky, 10:37:39 until something bad happens. Right. 10:37:41
**Q. So are you reflecting here that the risks 10:37:44 to this teen audience are greater because of where 10:37:47 teens are developmentally? 10:37:49**
MR. PARKINSON: Objection. Leading. 10:37:52
THE WITNESS: I would say that -- 10:37:54

5189

JUDGE BIEDSCHEID: So just one second. 10:37:56 I think rephrase this. 10:37:57
MS. SINGER: All right. 10:37:59
**Q. BY MS. SINGER: What does this slide or 10:38:00 this section of the slide reflect about your 10:38:02 understanding about teens' development or 10:38:05 vulnerability and their exposure to risks? 10:38:07**
A. Yeah. I think because of where teens are 10:38:09 developmentally, where they're really primarily 10:38:13 fueled by their perceptions by other people that 10:38:15 those motivations tend to override how they're 10:38:19 thinking about safety and risks. And, as a result, 10:38:22 despite seeing greater rates of risky and problematic 10:38:26 content, they're not thinking about those things as 10:38:29 intentionally as potentially an adult might. 10:38:32
**Q. All right. And then let's go to the last 10:38:34 heading. What does that last caption reflect, 10:38:37 Dr. Lee? 10:38:39**
A. This was also research that was done in 10:38:43 collaboration with another researcher. And what we 10:38:45 found was that teens want more control over who sees 10:38:47 their content on reels. They -- they were often 10:38:50 worried about, you know, the second they get a 10:38:53 comment or a comment from a stranger or they see a -- 10:38:55 like, you know, a bully comment on their -- on their 10:39:00

5190

stuff, they're like I wish I had more tools to be 10:39:02 able to control who gets to see my stuff, who 10:39:05 doesn't. Do I have the ability to change who gets to 10:39:09 comment on my -- on my content. 10:39:14
**Q. And then one last pause in this 10:39:17 presentation deck. Let's move to slide 17, and we're 10:39:26 going to look in the second section, please. 10:39:29**
**At the bottom of that section, there's a 10:39:33 sentence about "Creating teen centered ranking 10:39:35 approaches. For teens may help solve this problem." 10:39:39**
**And if you want to back up a sentence, 10:39:45 "Preventing IIC actors from seeing/interacting with 10:39:49 minors, more effective child content, personalization 10:39:52 or creating teen center ranking approaches for teens 10:39:52 may help solve this problem." 10:39:52**
**Can you explain what you're conveying 10:40:00 there? 10:40:00**
A. Yeah. These were some of my 10:40:00 recommendations that I put forth to the team in that, 10:40:02 like, early summer period after doing this review. 10:40:04
It was clear that young people were 10:40:08 engaging in risky ways. And so if we were serious 10:40:10 about taking their safety issues seriously, number 10:40:13 one, we should prevent bad actors who have previously 10:40:16 engaged with inappropriate interactions from seeing 10:40:20

5191

their content. That's number one. 10:40:23
Number two, more effective 10:40:26
personalization in general. So if people don't want 10:40:28
to see young girls dancing, they should not be shown 10:40:30
that content and that reduces the risk on both sides. 10:40:34
And, then, finally, "Creating teen 10:40:37
centered ranking approaches for teens." So that 10:40:40
means really thinking about what is developmentally 10:40:42
appropriate for young people to be seeing and then 10:40:45
can we provide them with a more supportive experience 10:40:47
that way. 10:40:51
**Q. And was Meta's or Instagram's algorithm 10:40:52**
**showing teens the same content as adults? 10:40:55**
A. At that time, yes. 10:40:58
**Q. Did you raise concerns about these 10:41:00**
**integrity or safety issues described in this 10:41:04**
**presentation? 10:41:07**
A. Yes, I did. I raised them both at my 10:41:08
product team and also with the research team that -- 10:41:12
the research team that cut across the algorithm or 10:41:18
recommendations team. 10:41:21
**Q. And did you see changes as a result of 10:41:22**
**you raising those concerns? 10:41:24**
A. I saw some smaller level tunings. I had 10:41:25
a really wonderful engineering team that wanted to 10:41:32

5192

take this work really seriously. And so things like 10:41:34
when we saw P click, right, or mimicry causing 10:41:37
spikes, they were -- that was low hanging fruit for 10:41:43
them to be like, okay, I can work with those 10:41:47
engineers to, like, tune those models or fix those 10:41:48
issues. 10:41:51
But these broader systemic 10:41:51
recommendations that I was making, which was 10:41:54
fundamentally we need to create a new recommendation 10:41:55
system for our young people or we need to give them 10:41:58
more controls, those were considered too big of a 10:42:01
push to be actioned on, at least at that time. 10:42:05
**Q. Okay. We can pull this document down. 10:42:08**
**All right. I want to look briefly, if we 10:42:19**
**could, at Plaintiff's Exhibit 01687. 10:42:24**
MS. SINGER: With Your Honor's 10:42:31
permission, may we publish to the witness? 10:42:32
JUDGE BIEDSCHEID: Yes, you may. 10:42:35
**Q. BY MS. SINGER: Dr. Lee, do you recognize 10:42:38**
**this document? 10:42:40**
A. Yes, I do. 10:42:41
**Q. What is it? 10:42:43**
A. It is a proposal for a research study 10:42:44
that I proposed I think probably in the late summer 10:42:50
of 2021. 10:42:52

5193

**Q. And did you -- did you prepare this study 10:42:53**
**proposal in the regular course of Meta's business? 10:42:55**
A. Yes. 10:42:58
MS. SINGER: Your Honor, the State moves 10:42:58
to admit Plaintiff's Exhibit 01687. 10:43:00
JUDGE BIEDSCHEID: Any objection? 10:43:04
MR. PARKINSON: No objection, Your Honor. 10:43:05
JUDGE BIEDSCHEID: All right. It's 10:43:06
admitted. 10:43:07
(Plaintiff's Exhibit 01687 was admitted 10:43:08
into evidence.) 10:43:09
MS. SINGER: May we publish to the jury? 10:43:10
JUDGE BIEDSCHEID: Yes, you may. 10:43:12
**Q. BY MS. SINGER: All right. Dr. Lee, do 10:43:13**
**you -- do you recall the date of this document? 10:43:18**
A. Not exactly. I want to say that it was 10:43:20
probably late summer/early fall of 2021. 10:43:26
**Q. All right. And let's look at the last 10:43:31**
**bullet on the first page, please. 10:43:35**
**All right. Do you see where it says, 10:43:37**
**"Known IIC adults"? 10:43:42**
A. Yes. 10:43:44
**Q. And it says, "Preventing visibility 10:43:44**
**between known IIC adults and minors." 10:43:48**
**Is that reflecting the problem that you 10:43:52**

5194

**just testified about? 10:43:54**
A. Yes, that's right. 10:43:55
**Q. And this -- what are you proposing in 10:43:57**
**this study? 10:43:59**
A. I'm proposing that the already existing 10:44:00
protections to put a wall between IIC actors and 10:44:05
children on surfaces like Explore should be brought 10:44:09
into reels as soon as possible. 10:44:13
**Q. And did you get approval right away to 10:44:15**
**perform this research? 10:44:18**
A. I did not. 10:44:19
**Q. Okay. 10:44:20**
MS. SINGER: Let's take this document 10:44:21
down, please. 10:44:22
**Q. BY MS. SINGER: I want to turn to a new 10:44:24**
**topic for a minute. 10:44:25**
**While you were at Meta, did you observe 10:44:27**
**the resources that Meta devoted to integrity versus 10:44:29**
**growth on reels? 10:44:33**
A. I did. 10:44:35
**Q. And what did you observe? 10:44:37**
A. What I was noticing was a huge 10:44:39
disproportionate amount of resources being placed an 10:44:45
emphasis on engagement and growth relative to the 10:44:51
resources that were being put towards safety. 10:44:55

5195

And I think that was acted out in a couple of different ways. 10:44:57 10:44:58

I think, first and foremost, it was in the culture. Any time we had a celebration at Instagram, any time we were like, yeah, look at this half, look at all the wins that we had, it was almost always engagement wins, engagement wins, engagement wins, and maybe at the very bottom it was a little shout out and we kept people safe, too. Right? 10:44:59 10:45:01 10:45:05 10:45:08 10:45:13 10:45:16 10:45:18

So it was very much in the culture and drinking water. 10:45:20 10:45:22

The engineers that were working on the biggest engagement wins were the ones that Adam Mosseri would say their names out loud, he would shout them out, they were being celebrated, and I think also from the engineering and research perspective that was the way to get a promotion. You wanted to work on the most exciting, most growth-oriented teams in order to move up because that was going to be the thing that you could cite to say, Adam Mosseri shouted out my product launch; right? 10:45:22 10:45:24 10:45:27 10:45:30 10:45:34 10:45:37 10:45:39 10:45:41 10:45:44 10:45:46 10:45:50

By contrast, safety models were not being shouted out. It's not very exciting work to be like, oh, we increased the prevalence of sexually 10:45:50 10:45:53 10:45:56

5196

suggestive content by 30 percent. It was not something that was celebrated on the equal level. 10:45:59 10:46:02

So I think culturally I think that was true. I think also resource-wise it was also very clear. 10:46:04 10:46:07 10:46:10

As you saw earlier, there were 15 different teams that were working on this reels product relative to the single team that I was on that was not only responsible for safety on reels, but safety on your feed, on your stories, on your comments, in your messages. Right? 10:46:11 10:46:13 10:46:17 10:46:19 10:46:22 10:46:26

So we were responsible for everything. For anything that touched recommendation algorithms. 10:46:29 10:46:31

And so I'll sort of use another analogy here, which is, if you think about Instagram as a cruise ship; right? I'm going to use a similar analogy. You've got, you know, 15 different teams. Let's assume there's like 50 people in those 15 teams that are working to make this cruise ship the fastest, lightest, coolest cruise ship; right? So there's people working on the engine making it go faster, there's people working on the hull of it to make it go lighter and smoother and cut through the water faster. 10:46:34 10:46:38 10:46:41 10:46:43 10:46:46 10:46:49 10:46:53 10:46:56 10:46:58 10:47:01 10:47:04

And then you had a team of eight 10:47:05

5197

engineers, two data scientists, and myself just trying to keep our hands on the hulls, in the hull, right, trying to keep the thing from sinking. That's what it really felt like. And that's regularly what we felt like. 10:47:06 10:47:08 10:47:13 10:47:16 10:47:18

It was like all of these other improvements that were trying to make the cruise ship go faster and be sleeker, and we had a team of eight relative to 50 that were just trying to keep our hands on the hulls to prevent the ship from sinking. 10:47:18 10:47:20 10:47:22 10:47:25 10:47:28

And when you have that kind of dynamic, where we're just trying to keep the whole thing from going under, we don't have the system or resources to systematically think about safety at a greater level. 10:47:32 10:47:34 10:47:37 10:47:40

I'll make an analogy also separately, which is there were actually separate teams, called trust and safety, that were separate from the recommendation algorithm. The way that I would make an analogy to them is that they were working on things like, ooh, maybe we should add more life vests, or, oh, maybe we should make these life support boats more accessible. 10:47:45 10:47:48 10:47:51 10:47:52 10:47:54 10:47:57 10:48:01 10:48:03

Those are important; right? We want to have those user features, but the life vests are not going to address the core issues of this cruise ship 10:48:06 10:48:08 10:48:11

5198

sinking, if that makes sense. 10:48:15

And so I named that cruise ship analogy to really center this idea that the recommendation algorithm was really the heart of what was making this product push, and 15 teams to one, even just that ratio was very much felt in our day-to-day work. 10:48:16 10:48:20 10:48:23 10:48:26 10:48:31

**Q. And did this feeling of having your hands on the hulls trying to fight that force change over the time that you were at Instagram? 10:48:36 10:48:39 10:48:43**

A. I think it continued to be the prevailing feeling that we had this ranking -- priority ranking system. P0 means the most urgent stuff, like, oh, man, things are on fire. We really got to work on this. 10:48:45 10:48:50 10:48:54 10:49:01 10:49:03

P1 was, hey, this is pretty important. As soon as we address the P0 issues, we should work on these P1 issues; right? 10:49:03 10:49:06 10:49:08

And then P2 is like, oh, this would be a nice feature to have that would increase safety for everybody. 10:49:10 10:49:13 10:49:15

And so to go back to the -- the water in the hull analogy, that was P0, and we spent so much of our energy and time working on that P0 that we never actually got to the P1s and P2s, right, these broader systemic changes. 10:49:17 10:49:20 10:49:24 10:49:28 10:49:32

5199

**Q. I want to pull up a document, and actually before I do, did you participate in chats on Meta's Workplace platform?** 10:49:34 10:49:36 10:49:38
A. Yes, I did. 10:49:41
**Q. And did you and your colleagues regularly communicate about work issues on Workplace?** 10:49:42 10:49:44
A. Yes, I did. 10:49:46
**Q. All right.** 10:49:48
MS. SINGER: I'd ask that we show to the witness Plaintiff's Exhibit 00646, Your Honor. 10:49:49 10:49:50
JUDGE BIEDSCHEID: Yes. 10:49:53
**Q. BY MS. SINGER: And, Dr. Lee, when you have it, I'll ask if you recognize this document.** 10:50:00 10:50:01
A. Yes, I do. 10:50:04
**Q. What is it?** 10:50:05
A. This is a chat thread between myself and a number of other researchers that worked on trust and safety issues. 10:50:05 10:50:11 10:50:14
**Q. And was this a conversation carried out in the regular course of your work at Meta?** 10:50:15 10:50:18
A. Yes. 10:50:20
MS. SINGER: Your Honor, the State moves to admit Plaintiff's Exhibit 00646. 10:50:21 10:50:23
JUDGE BIEDSCHEID: Any objection? 10:50:26
MR. PARKINSON: No objection. 10:50:30

5200

JUDGE BIEDSCHEID: All right. It's admitted. 10:50:30 10:50:31
MS. SINGER: Your Honor, may we publish it to the jury? 10:50:31 10:50:34
JUDGE BIEDSCHEID: Yes, you may. 10:50:35
(Plaintiff's Exhibit 00646 was admitted into evidence.) 10:50:36 10:50:37
**Q. BY MS. SINGER: Dr. Lee, while that's coming up for everyone, can you identify the date of this document?** 10:50:37 10:50:38 10:50:42
A. It looks like it was sent October 5th, 2021. 10:50:42 10:50:43
**Q. And can you describe the circumstances that gave rise to this particular chat?** 10:50:44 10:50:45
A. This was during -- during the course of what Adam's -- 10:50:47 10:50:54
Adam Mosseri, who is the head of Instagram, would do these I think biweekly all hands. He would stream live to Instagram, and the entire Instagram team was able to watch him talk about product priorities, celebrate wins, and ask him questions. 10:50:56 10:50:58 10:51:01 10:51:04 10:51:08 10:51:11
And so this thread was our team -- you can see the very first message was from Lori, who was the head of that research team saying, "Hey, any 10:51:11 10:51:15 10:51:17

5201

questions you want to add to the poll, you should add it today." It was a way for us to directly talk to Adam and ask him questions. 10:51:21 10:51:23 10:51:25
**Q. All right. And can you read out loud your comments beginning at 12:23, "To be honest"?** 10:51:26 10:51:28
A. Yeah. 10:51:33
"To be honest, I was dismayed that it felt like Adam's response was that we were doing enough, going as far as to question how much is enough to invest into integrity"? 10:51:33 10:51:36 10:51:38 10:51:41
**Q. And is that a quote there, by the way?** 10:51:44
A. It was probably a paraphrased quote from what he said live. 10:51:47 10:51:50
**Q. Okay. Keep going, Dr. Lee.** 10:51:54
A. "We've repeatedly had to put P1 improvements, like precision tuning, on a number of integrity areas to correct for over- or underenforcement, including body positivity, which he used as what felt like defense against NSC" -- I forget -- negative social comparison is what NSC stands for -- "comments integrity, age-related recommendation tuning, and rabbit holing engineering on the back burner because we're so deeply understaffed." 10:51:55 10:51:58 10:52:02 10:52:05 10:52:08 10:52:13 10:52:14 10:52:16 10:52:19 10:52:22
**Q. And let's just pause there for a minute.** 10:52:22

5202

**You mentioned NSC.** 10:52:26
**What's comments integrity?** 10:52:28
A. Comments integrity, let's say you put up a post, you put up a video, you put up a reel. People can comment on that, and what we were seeing was that in the comments, people were being pretty mean. They were either commenting quite aggressively or you can imagine if you posted a particular opinion that people didn't like, they would be quite rude and unkind to you. 10:52:30 10:52:32 10:52:34 10:52:36 10:52:39 10:52:44 10:52:47 10:52:50
And so those fell -- fell under our hate speech or bullying categorizations, but we knew these issues were the case and people were complaining about comments integrity but that was always a P1, and so we never had the resources to actually work on the comments integrity at the time. 10:52:51 10:52:54 10:52:58 10:53:01 10:53:04 10:53:07
**Q. Okay. And age-related recommendation, was that what you talked about earlier?** 10:53:09 10:53:13
A. Yes. 10:53:14
**Q. And then rabbit holing engineering, what was that?** 10:53:14 10:53:19
A. Rabbit holes were a known issue. What that means is -- I'll use the analogy of a boy in this example. 10:53:19 10:53:23 10:53:28
What we were noticing was that it was 10:53:29

5203

very easy for users to -- once they start liking a 10:53:34 particular type of content to that's just the feed 10:53:37 that will then just show them more and more and more 10:53:40 of this content until you become really rabbit-holed 10:53:42 into it. 10:53:46

And so let's say -- I won't talk about 10:53:47 the cold start experience quite yet. I don't know if 10:53:51 we will. 10:53:54

But let's say that I just started an 10:53:54 account and I'm a 15-year-old boy. I'm thinking of 10:53:58 one boy that I know in particular. He's from Miami. 10:54:01 He loves Lionel Messi, he loves hip-hop, and he's 10:54:04 really interested in soccer; right? 10:54:08

So he starts to follow those accounts. 10:54:11 Because it's so early on, Instagram's like, well, we 10:54:13 only know you like Lionel Messi, hip-hop, and soccer. 10:54:17 So we're just going to flood you with that content to 10:54:21 see if we can get you just to like it more and more 10:54:23 and more. Right. And so that's an example of a 10:54:26 rabbit hole. 10:54:29

Now, a rabbit hole could be benign. I'm 10:54:30 like why am I getting all this soccer content. It's 10:54:32 not the only thing I like. 10:54:35

But what we've noticed, particularly for 10:54:36 teens, is that they can very easily be rabbit-holed 10:54:38

5204

into problematic content. 10:54:41

So, for example, sexually suggestive 10:54:42 content; right? What we were seeing was that, you 10:54:46 know, young people may be served content of an 10:54:49 OnlyFans girl or someone who's kind of sexy or a 10:54:51 fitness model. If you like it once, which is 10:54:54 actually very developmentally typical for a boy, you 10:54:59 show them a picture of a swimsuit model, they're 10:55:01 like, okay, cool. 10:55:03

All of a sudden we're then serving them 10:55:04 lots and lots and lots and lots of that content. 10:55:06 That was a known issue that we were proposing to 10:55:08 address. 10:55:09

**Q. All right. So the comments you've read 10:55:11 so far from your chat, did that accurately reflect 10:55:13 your reaction to Adam Mosseri's Q&A that week? 10:55:17**

A. Yes, it does. 10:55:21

**Q. All right. And can you finish reading, 10:55:22 "because our P0"? 10:55:26**

A. "Because our P0 as a team is just to keep 10:55:28 basic integrity and nonrecommendable content from 10:55:32 surging and foundational engineering improvements and 10:55:36 we're four head counts short" -- head counts being 10:55:39 number of folks -- "and really we need eight more 10:55:42 engineers and at least one more researcher. 10:55:45

5205

"So to hear Adam wonder out loud, how 10:55:47 much is ever enough? Was frankly a huge 10:55:51 disappointment." 10:55:55

**Q. Did you and the integrity team you worked 10:55:55 with have the resources to be able to do your jobs at 10:55:59 Meta? 10:56:03**

A. I think we were significantly 10:56:03 underresourced to apply the solutions that we were 10:56:10 proposing. 10:56:16

**Q. And did that have an ability -- an impact 10:56:16 on your ability to keep children and teens safe on 10:56:17 Meta's platforms? 10:56:20**

A. I think while we left many of those P1 10:56:21 and P2 priorities that were really specific to 10:56:25 keeping teens safe, we were unable to implement 10:56:27 those -- those solutions. That meant that in the 10:56:33 meantime, young people continued to be more 10:56:36 vulnerable on our platform. 10:56:40

**Q. All right. Let's turn to Plaintiff's 10:56:41 Exhibit 00360. 10:56:44**

JUDGE BIEDSCHEID: And, Counsel, it 10:56:46 doesn't need to be right now, but whenever we get to 10:56:48 a natural break. 10:56:50

MS. SINGER: This would be fine, 10:56:51 Your Honor, and I will try to streamline things in 10:56:52

5206

our break. 10:56:54

JUDGE BIEDSCHEID: All right. Ladies and 10:56:55 gentlemen, recognizing that we're going to end early 10:56:56 today, we'll have a shorter break than normal and get 10:56:58 back at it, but we should take a little break now. 10:57:02

So enjoy your break. We're in recess. 10:57:05 I'll call you back soon. 10:57:08

THE BAILIFF: All rise for the jury. 10:57:11

(Jury exits courtroom.) 10:57:13

JUDGE BIEDSCHEID: This will be a recess. 10:57:47 You may step down. 10:57:48

MR. PARKINSON: Can I approach with 10:57:48 Ms. Singer to talk about a timing issue with this 10:57:50 exam? 10:57:53

JUDGE BIEDSCHEID: Certainly. 10:57:53

MR. PARKINSON: Witness doesn't need to 10:57:54 stay. 10:57:56

Your Honor, this witness is going to have 10:57:59 to stay over the weekend. And I asked Ms. Singer for 10:58:03 how long this would take and I haven't gotten an 10:58:07 answer. Meta vigorously opposes this deal of putting 10:58:10 up witnesses on Friday and not being transparent 10:58:13 about timing, and then suggesting, well, you know, 10:58:16 let's be reasonable, let's do the cross over video. 10:58:18

And so I'm really sorry that this is the 10:58:21

5207

way it's going for Ms. Lee, but looking at my cross and looking at how this is going and I think I just want to say Meta's not going to agree to do this cross remotely. 10:58:24 10:58:28 10:58:29 10:58:33

JUDGE BIEDSCHEID: All right. 10:58:35

MS. SINGER: I'm happy to talk to Dr. Lee about her schedule. Not in any way quibbling with the ability of Mr. Parkinson to cross-examine this witness, but I think the jury is also getting a sense with her and I think it worked fine with Dr. Narayanan. So I will try and wrap up my outline as quickly as possible. 10:58:36 10:58:38 10:58:45 10:58:48 10:58:51 10:58:53 10:58:55

JUDGE BIEDSCHEID: All right. So I will just say on this one, I'm certainly not getting the same sense that it's being dragged out with lots of sidebars and things like that. I'm just saying I'm noting that, so it's going as smoothly and as efficiently as it can. So that was part of why the Dr. Narayanan -- I had it and then I lost it -- made sense. 10:58:57 10:58:58 10:59:05 10:59:10 10:59:15 10:59:17 10:59:24 10:59:29

So making sure that she's available on Monday I think makes sense to get that done. 10:59:30 10:59:31

MR. PARKINSON: Thank you. And, Your Honor, I'm going to be totally transparent at the risk of upsetting my client. I am really holding 10:59:34 10:59:35 10:59:38

5208

back the objections and the sidebars to exhibits, to chat threads because the allegations this witness is making are serious. I have to be able to cross-examine Dr. Lee live. It would severely prejudice us. And so if she has a medical emergency, like induced labor or something like Dr. Narayanan had, you know, let's talk about it. 10:59:40 10:59:43 10:59:46 10:59:50 10:59:54 10:59:57 10:59:59

MS. SINGER: I don't think she has induced labor. 10:59:59 11:00:01

MR. PARKINSON: That's what I guessed too. The rate it's going -- 11:00:02 11:00:04

JUDGE BIEDSCHEID: I wasn't very clear. I am agreeing with you on that opportunity. 11:00:04 11:00:06

MR. PARKINSON: Thank you. 11:00:09

JUDGE BIEDSCHEID: We'll see how far we get today. 11:00:10 11:00:11

MR. PARKINSON: Okay. 11:00:12

JUDGE BIEDSCHEID: And then yes. If we need to continue Monday, I would want to do that. 11:00:12 11:00:15

MR. PARKINSON: Thank you. 11:00:18

JUDGE BIEDSCHEID: All right. 11:00:19

(Sidebar ends.) 11:00:22

(A recess was held off the record.) 11:00:22

JUDGE BIEDSCHEID: Anything before the jury comes back in? 11:25:21 11:25:22

5209

MS. SINGER: Nothing, Your Honor, from us. 11:25:24 11:25:27

THE BAILIFF: All rise for the jury. 11:27:21

(Jury enters the courtroom.) 11:27:23

JUDGE BIEDSCHEID: Please be seated. 11:28:05

Ladies and gentlemen, hope you had a good break. 11:28:06 11:28:07

Counsel, you may begin whenever you're ready. 11:28:07 11:28:10

MS. SINGER: Thank you, Your Honor. 11:28:10

**Q. BY MS. SINGER: Dr. Lee, were you at Meta at the time that Frances Haugen made disclosures of certain documents? 11:28:11 11:28:14 11:28:17**

A. Yes, I was. 11:28:17

**Q. And did you observe a change in Meta's approach to integrity research after Frances Haugen's disclosures? 11:28:18 11:28:20 11:28:22**

A. Yes, I did experience that. 11:28:23

**Q. And you talked about research on -- that you had proposed on reels and inappropriate -- and reels being disseminated to adults who had had inappropriate interactions with children. 11:28:25 11:28:29 11:28:31 11:28:34**

**Do you recall that? 11:28:37**

A. I do recall that. 11:28:37

**Q. And was that research ultimately approved? 11:28:39 11:28:41**

5210

A. It was approved after a delay of a couple months. 11:28:41 11:28:45

**Q. Was the research that was approved the same research you had originally proposed? 11:28:45 11:28:47**

A. It was significantly modified. 11:28:49

**Q. After Haugen's -- after Frances Haugen's disclosures, were lawyers at Meta involved in approving or editing or in any other way managing your research? 11:28:54 11:28:57 11:28:59 11:29:03**

MR. PARKINSON: Objection. Just preserving our 503(b) objection. 11:29:04 11:29:05

JUDGE BIEDSCHEID: Duly noted. 11:29:10

And you may answer. 11:29:11

THE WITNESS: Okay. 11:29:12

Legal and comms were always involved in the research process. They were involved in the approval of any research studies, and they also had to approve any of the research documents that we produced once we were done with the research. 11:29:13 11:29:15 11:29:18 11:29:20 11:29:23

I would say that in particular after the Frances Haugen leaks, there was extra scrutiny over the research, both the kinds of questions that we were asking and the way that we were wording the questions, both before we launched the research and 11:29:26 11:29:29 11:29:34 11:29:37 11:29:40

5211

also in reviewing any of the slides or reports that we produced after. They were much more closely involved in looking at our slides, editing charts, editing words, editing our interpretation. 11:29:43 11:29:47 11:29:52 11:29:57

**Q. BY MS. SINGER: And was any of the research that you conducted altered by lawyers at Meta or comms? 11:30:00 11:30:01 11:30:04**

MR. PARKINSON: Objection, Your Honor. This is actually outside the scope of the deposition that we've talked about, four corners. 11:30:05 11:30:06 11:30:09

MS. SINGER: It's not. In fact, Your Honor, I'm happy to -- 11:30:12 11:30:14

JUDGE BIEDSCHEID: Please approach. 11:30:15

(Sidebar discussion held.) 11:30:17

MS. SINGER: There are documents that were moved in during the deposition, Exhibit 01077, 01620. 11:30:25 11:30:26 11:30:31

MR. PARKINSON: Which page of the depos? 217? I have it right here. We can look at 217. That's easy. This is 217 to -- 11:30:32 11:30:34 11:30:39

MS. SINGER: 232. 11:30:46

MR. PARKINSON: I'll get that one too. This is page 232. 11:30:48 11:30:57

JUDGE BIEDSCHEID: Okay. 11:31:00

MR. PARKINSON: The question was about 11:31:00

5212

all the (reading). 11:31:01

JUDGE BIEDSCHEID: Okay. How is this different -- 11:31:24 11:31:26

MR. PARKINSON: I have no idea. 11:31:27

The question was not asked in her deposition about did lawyers alter the research. 11:31:28 11:31:31

MS. SINGER: Your Honor, she talked extensively in her deposition about the changes after Haugen, that include restrictions -- 11:31:34 11:31:35 11:31:39

She talked extensively at her deposition about changes in the company after the Haugen disclosures. That included restrictions on sharing her research, that was an exhibit in the deposition, on how research proposals were -- 11:31:40 11:31:42 11:31:45 11:31:47 11:31:52

MR. PARKINSON: I agree. I didn't object to those questions. 11:31:54 11:31:55

I objected to did the lawyers tell you to alter research? If that question had been asked, Your Honor, we would have briefed this to you as we did Sattizahn. 11:31:57 11:31:58 11:32:00 11:32:03

The question: Did the lawyers ask you to alter or delete any research? I agree she testified extensively about changes, changes to the SRT process. Changes even involving legal. 11:32:03 11:32:05 11:32:07 11:32:10

The question: Did legal tell you to 11:32:12

5213

delete research? I would have presented that to you. 11:32:15

MS. SINGER: I said alter. Your Honor, your ruling about being in the four corners, these were topics that were all discussed. 11:32:17 11:32:19 11:32:20

MR. PARKINSON: This was exactly the issue that I tried not to forecast out loud, but I knew it was going here. 11:32:22 11:32:23 11:32:26

JUDGE BIEDSCHEID: Well -- 11:32:27

MS. SINGER: And it's just one question, Your Honor. 11:32:30 11:32:31

JUDGE BIEDSCHEID: Sure. What I'll do is I'll ask you to rephrase so it's more consistent with the deposition. 11:32:32 11:32:33 11:32:36

(Sidebar ends.) 11:32:39

**Q. BY MS. SINGER: Dr. Lee, after the Frances Haugen disclosures, did lawyers have involvement in any way in changing how you approached or carried out research? 11:32:47 11:33:01 11:33:04 11:33:07**

A. Yes, they were involved. 11:33:08

**Q. After the Frances Haugen disclosures, were you able to share research freely within Meta, including to other product teams? 11:33:10 11:33:17 11:33:21**

A. Relative to before the trials, the ways that I were -- used to be able to disseminate my research was to be able to post them to and share 11:33:23 11:33:27 11:33:30

5214

them out directly to other researchers, to other product teams, post them into the relevant groups. All of those now were either I had to ask for permission to do so from legal and comms, or I was outright not permitted to do so. 11:33:34 11:33:37 11:33:41 11:33:44 11:33:48

And so I'd say that my ability to disseminate my research was significantly limited after the trial. 11:33:50 11:33:52 11:33:55

**Q. And I want to show you one document very quickly. That's Plaintiff's Exhibit 01595. 11:33:57 11:33:59**

MS. SINGER: If we may publish that to the witness, Your Honor. 11:34:03 11:34:06

JUDGE BIEDSCHEID: Yes, you may. 11:34:06

**Q. BY MS. SINGER: Dr. Lee, do you recognize this document? 11:34:09 11:34:11**

A. Yes, I do. 11:34:12

**Q. What is it? 11:34:15**

A. It is a direct message between myself and another researcher. 11:34:16 11:34:19

**Q. And was this a message you sent as part of your work at Meta? 11:34:20 11:34:23**

A. Yes. 11:34:24

MS. SINGER: Your Honor, I move to admit Plaintiff's Exhibit 01595. 11:34:24 11:34:27

MR. PARKINSON: No objection. 11:34:33

5215

JUDGE BIEDSCHEID: So admitted. 11:34:35
(Plaintiff's Exhibit 01595 was admitted into evidence.) 11:34:36
MS. SINGER: May we publish to the jury? 11:34:36
JUDGE BIEDSCHEID: Yes. Coming up. 11:34:36
**Q. BY MS. SINGER: Dr. Lee, do you recall the date or can you tell the date of this direct message? 11:34:42**
A. Yes, it's May 25th, 2022. 11:34:42
**Q. And I'd like to focus in on one section of this direct message at 5:00- -- at 1315. Can you read out loud what you wrote and explain to the jury what you meant? 11:34:53**
A. Yes. Can you tell me the first couple -- 11:34:56
**Q. Yes. "It doesn't deliver on their intentions." 11:35:02**
A. I see, yeah. 11:35:03
"It doesn't deliver on their intentions and the reality is that it feels like censorship, removal of agency, and sends the message that our work and expertise is seen as a liability rather than an asset." 11:35:16
**Q. And what did you mean when you wrote that? 11:35:19**

5216

A. There were some fundamental restructuring that was happening at the organization. 11:35:23
First of all, all of those new layers of approval that was required to share our research, right, that was number one. 11:35:30
Number two was that previously they honored us as senior researchers to be able to propose our own lines of research questions and also our own methods to go investigate those questions. 11:35:41
That was now significantly reduced because we had legals and comms going directly into our research plan saying you cannot ask this question or you have to change the way you ask this question or even fundamentally saying that this research question you cannot ask, so you're going to have to redesign this all together. 11:36:02
And, finally, it was the pulling of the reorganization of the team. So where previously I was sitting on a team with all of the other algorithm researchers, so other people working on feed recommendations and -- and reels. Therefore, I was able to share with other people whose priority may not have been safety as number one, but I could tell them about what I was learning and they could bear that in mind as they were doing their research. 11:36:29

5217

I was now then pulled into what was called a Central Integrity team, where all the other researchers there were only focused on safety. And so we could share our safety research with other safety researchers, but we couldn't share it with the broader set of researchers. 11:36:45
**Q. All right. Dr. Lee, in all how long did you work at Meta? 11:36:49**
A. Just shy of two years total. 11:36:49
**Q. And is that a fairly common tenure for Meta employees? 11:36:56**
A. I don't know enough to comment. I'd say it's typical. 11:36:59
**Q. Okay. And did you leave Meta voluntarily? 11:37:02**
A. I did. 11:37:03
**Q. Okay. And just wrapping up, did -- did you over the course of your tenure at Meta feel that Meta's executives prioritized the safety of teens on its platform, on Instagram in particular? 11:37:15**
A. I can only comment on the messaging and what I've heard them prioritize as an inference of what they really cared about, and what I heard consistently from leadership was that they really cared about engagement and growth. They really cared

5218

about growing the product, being incredibly competitive. 11:37:44
When I did hear them talk about safety, it was often as a third or fourth order, oh, yeah, and we care about safety too. 11:37:50
But the majority of their energy, their excitement, their messaging, their emphasis during our all-hands talks or even in our written communications around what our product priorities were, were overwhelmingly about engagement and growth. 11:38:08
MS. SINGER: All right. I have nothing further for this witness. 11:38:11
JUDGE BIEDSCHEID: Thank you, Counsel. 11:38:12
MR. PARKINSON: Good afternoon, Dr. Lee. How are you? 11:38:28
THE WITNESS: I'm doing well. Thank you. 11:38:29
11:38:29
(Testimony begins on following page.) 11:38:18
11:38:18
11:38:18

5219

CROSS-EXAMINATION 11:38:18
BY MR. PARKINSON: 11:38:21
**Q. I have like 45 minutes of questions to ask you, and I'm going to try to go as fast as I can because I want to get you out and I want to get the jury out.** 11:38:21 11:38:32 11:38:35 11:38:38
**But if I'm speaking too quickly, just let me and I'll try to slow down a little bit.** 11:38:38 11:38:41
A. Thank you. 11:38:43
**Q. I'm not trying to speed you up.** 11:38:43
**The other thing I'll say at the outset is my name's Alex Parkinson. Sorry for not introducing myself, and I, as some folks know, I have a tendency to get fussy with certain people, but that is not my intention at all with you today.** 11:38:43 11:38:46 11:38:48 11:38:51 11:38:54
A. All right. 11:38:56
**Q. I'm really appreciative of you taking the time to be here. If I ask you any questions that are confusing or that you just don't like, please tell me and I'll just move on or ask something different.** 11:38:56 11:38:59 11:39:01 11:39:04
A. Okay. 11:39:06
**Q. No interrogation here.** 11:39:06
A. Great. 11:39:08
**Q. Okay. We haven't met before, have we?** 11:39:08
A. No, we have not. 11:39:10

5220

**Q. Okay. And you're here today because the State of New Mexico asked you to testify against Meta in this case?** 11:39:12 11:39:14 11:39:17
A. They asked me to testify, yes. 11:39:18
**Q. Okay. I want to talk about what you did while you were at Meta, but just a couple of preliminary questions about what maybe you didn't do, just to clarify for the jury --** 11:39:20 11:39:25 11:39:27 11:39:29
A. Sure. 11:39:31
**Q. -- if that's okay.** 11:39:31
**And I apologize if this feels repetitive or argumentative. That is not the intent at all.** 11:39:32 11:39:34
A. Okay. 11:39:37
**Q. You did not work on the Meta team that works on child safety, did you?** 11:39:38 11:39:40
A. I did not work on the central child safety team, no. 11:39:42 11:39:45
**Q. And you didn't testify that you think Meta is intentionally designing its apps to facilitate pedophiles harming children, did you?** 11:39:46 11:39:51 11:39:55
A. I would not say that Meta intentionally and deliberately designed products to directly harm people. I would say that they designed products that emphasize engagement in growth despite known risks to safety to young people. 11:39:59 11:40:02 11:40:07 11:40:11 11:40:15

5221

**Q. Okay. Now, while you were doing research at Meta, you did uncover some things that you in your deposition referred to as aggregator accounts.** 11:40:17 11:40:18 11:40:23
**Do you remember that?** 11:40:26
A. Yes, I do remember. 11:40:26
**Q. These are -- these are accounts where people are aggregating child sexual abuse material; right?** 11:40:27 11:40:29 11:40:32
A. Yes, that's correct. 11:40:32
**Q. And your research helped uncover those groups; correct?** 11:40:33 11:40:35
A. Yes. It was one type of a large swath of different types of risk to minors, particularly when it comes to sexually suggestive content. 11:40:35 11:40:41 11:40:44
**Q. And we can agree that people trafficking and CSAM, that is horrible; right?** 11:40:48 11:40:50
A. Yes, I think that's horrible. 11:40:52
**Q. And when you found those CSAM aggregator accounts, you reported that to Meta's safety teams; right?** 11:40:54 11:40:57 11:41:00
A. Yes. I reported -- 11:41:00
That was one type of content that I reported to the child safety team. There were these three broad categories of content that we saw that were risky. 11:41:02 11:41:04 11:41:08 11:41:10

5222

On one far end was like the really bad stuff; right? It was very clearly child sexual abuse materials. That made up, I want to say, like a minority of the content. 11:41:11 11:41:14 11:41:18 11:41:22
**Q. Go ahead.** 11:41:24
A. Okay. And then on the other far end was completely benign content. It was like parents posting pictures of their kids at gymnastics or pool parties. 11:41:25 11:41:28 11:41:31 11:41:34
So actually benign content was still risky if bad actors then got hold of that content and was circulating it. 11:41:34 11:41:36 11:41:39
And then we had the content that was in the middle that we saw was the most predominant, which is what we were talking about earlier, which is risky content featuring minors; right? So that was the risky dancing or some graphic content that might be featuring not quite CSAM entirely, but that -- that murky area of risky content. 11:41:40 11:41:42 11:41:45 11:41:47 11:41:50 11:41:55 11:42:00
**Q. Ms. Lee, I'm going to do my best not to cut you off at any point. I promise I'm on your team and on Ms. Singer's team on getting you to where you need to go this weekend. So answer questions as broadly as you like, but I'm trying to --** 11:42:02 11:42:03 11:42:06 11:42:08 11:42:12
A. Move us. 11:42:14

5223

**Q. -- move you along to where you want to go.** 11:42:16
A. Sure. 11:42:16
**Q. If you want to answer as broadly as you want, that's fine with me.** 11:42:17
**So I want to talk about briefly the CSAM stuff content, the minority stuff that was really bad that you undercovered?** 11:42:21
A. That's right. 11:42:21
**Q. You reported that to one of Meta's child safety teams; right?** 11:42:25
A. Yes, I did. 11:42:25
**Q. And they took that very seriously, didn't they?** 11:42:28
A. Yes. When we presented the full spectrum of those three types of content, they took that particular set of content very, very seriously. 11:42:33
**Q. The Meta child safety team, I believe you've said, did really great work in tackling that child sexual abuse material specifically?** 11:42:41
A. They were interested in the worst of the worst content because from a legal perspective, this was child pornography. So this was legally the most pertinent area that they really, really cared about. 11:42:53
**Q. You mentioned you gave a deposition in**

5224

**this case. Do you remember that?** 11:42:57
A. Yes, I do. 11:42:58
**Q. And at your deposition you testified that the child safety team, when you showed them actual child sexual abuse material, which you called child pornography, call it CSAM --** 11:43:08
A. Sure. 11:43:09
**Q. -- they worked with FBI, local law enforcement, and they took it all down and they really focused on that; right?** 11:43:13
A. I -- I don't know what specific actions they took, but I knew that when I presented this data, they took it quite seriously. 11:43:20
**Q. Okay. Let's now transition to your time at Meta and kind of what you were doing.** 11:43:24
**So I have written down that you joined in March of 2021, does that sound right?** 11:43:26
A. That sounds right to me. 11:43:29
**Q. And you left in December of 2022?** 11:43:29
A. Correct. 11:43:31
**Q. And for most of the time that you were at Meta, you were a senior researcher for Instagram feed relevance; is that right?** 11:43:38
A. Correct. 11:43:39
**Q. Okay.** 11:43:40

5225

A. That was a pillar team, feed relevance team, yeah. 11:43:43
**Q. And that was one of several different pillars or research teams that Meta had while you were at the company; right?** 11:43:49
A. Yes. There were other pillars at Instagram. 11:43:55
**Q. Let me show you a document that's a demonstrative.** 11:43:57
MR. PARKINSON: If we could, Jeff, please, put tab 1 just on the witness's screen and for the Court. 11:44:02
**Q. BY MR. PARKINSON: And, Dr. Lee, this has been produced in discovery by Meta. We're not going to try to move it into evidence. I just wanted to show you this as a demonstrative of the organizational chart.** 11:44:11
**Do you recognize this is an org chart in front of you?** 11:44:14
A. I see that is an org chart. 11:44:15
**Q. I know.** 11:44:17
A. The font is too small to see. 11:44:17
**Q. I'm going to ask Mr. Roberts to zoom in on your name just to make it a little bit easier for you.** 11:44:24

5226

**Do you see that pop up on your screen?** 11:44:24
A. Yes, I do. 11:44:27
**Q. And that's you and that's your title when you first started there; is that right?** 11:44:29
A. Correct. 11:44:30
MR. PARKINSON: Your Honor, permission to publish this to the jury. 11:44:33
JUDGE BIEDSCHEID: Yes. 11:44:34
**Q. BY MR. PARKINSON: Okay. Now, Dr. Lee, this is an org chart of the research component of the Instagram feed team; right?** 11:44:38
A. I believe so. I haven't seen the rest of this, so I -- 11:44:43
**Q. Now, this is impossibly small to read. I can't read it; right? So we went to Kinko's and we blew this up. And so this is the same chart. It's kind of hard to see there.** 11:44:57
**Just for the jury's visibility on this, you're in the lower left highlighted on the screen; is that right?** 11:45:03
A. I believe so. 11:45:03
**Q. This is also too small I think, so we then -- you see how there are three buckets here on the org chart?** 11:45:13
A. It's still zoomed in on just my -- yes, I 11:45:14

5227

see. 11:45:18
**Q. We've broken that up into three different 11:45:18**
**poster boards that we've also shared with the State. 11:45:21**
**So this one I think is a little bit 11:45:23**
**easier to see. So this is the left-most side of the 11:45:24**
**demonstrative in front of you and you're there at the 11:45:26**
**lower left; right? 11:45:29**
A. Yes. 11:45:29
**Q. Okay. And, just to be clear, this whole 11:45:30**
**organization is one part of Instagram; right? 11:45:33**
A. Can you repeat that question? 11:45:37
**Q. Sure. Yeah. 11:45:40**
**There's a relevance team at Instagram; 11:45:41**
**correct? 11:45:43**
A. Yes, that's correct. 11:45:43
**Q. And they do some research, including for 11:45:44**
**integrity; right? 11:45:46**
A. Yes. I'm the only box in that whole 11:45:46
category, yeah. 11:45:52
**Q. And the other researchers on here are 11:45:53**
**doing things like Well-Being research, other types of 11:45:55**
**user experience research; is that right? 11:45:57**
A. I'm not familiar with what the other 11:45:58
categories are, so I -- unless you can blow it up for 11:46:01
me, I wouldn't be able to. 11:46:04

5228

**Q. I can cut to the chase. 11:46:06**
**Are you familiar with the org chart of 11:46:08**
**the Instagram Well-Being team? 11:46:09**
A. Roughly, I -- 11:46:11
**Q. Okay. 11:46:13**
A. -- I know that there is a Well-Being 11:46:13
team. I think I talked about it earlier as the folks 11:46:15
that do the life vests relative to the engine. 11:46:18
**Q. I thought that was the trust and safety 11:46:20**
**team. I was talking about the Instagram Well-Being 11:46:23**
**team? 11:46:25**
A. I believe that those two things were used 11:46:25
interchangeably at Instagram. 11:46:27
**Q. Okay. Who ran the trust and safety team 11:46:29**
**while you were at Meta? 11:46:32**
A. Are you talking about at Instagram or are 11:46:33
you talking about at the Meta central team? 11:46:36
**Q. Meta central. 11:46:37**
A. Oh, man, that is reaching back. 11:46:38
**Q. Okay. 11:46:39**
A. It's been five years. I don't know. 11:46:40
**Q. That's okay. 11:46:41**
**Who ran the Instagram specific Well-Being 11:46:42**
**team while you were there? 11:46:44**
A. I think it was Lori Malahy, who was the 11:46:45

5229

head of research for the Well-Being team. 11:46:49
**Q. How many researchers did Dr. Malahy have 11:46:52**
**working for her? 11:46:56**
A. I think at the time, because at one point 11:46:57
I was restructured into the Well-Being team, we had a 11:46:59
team there of around seven researchers. 11:47:01
**Q. You've -- 11:47:04**
**Have you worked at other social media 11:47:05**
**companies other than Meta? 11:47:07**
A. I have not. 11:47:08
**Q. That's okay. 11:47:09**
**Do you know of any social media 11:47:10**
**companies, other than Meta's, or just focusing on 11:47:11**
**Instagram specifically, that have more Well-Being 11:47:13**
**researchers? 11:47:16**
A. Oh, I don't know enough about other 11:47:17
people's staffing -- 11:47:19
**Q. That's okay. 11:47:20**
A. -- to comment on that. 11:47:21
**Q. When we're talking about the research 11:47:22**
**organization that you were part of, can you tell us 11:47:23**
**the name of the attorney that was assigned to you 11:47:25**
**personally? 11:47:28**
A. Ooh. I would have to look back at some 11:47:28
of those research studies in order to see, but there 11:47:34

5230

were particular names that were regularly assigned to 11:47:38
me. From comms and from legal. 11:47:40
**Q. Yeah, focusing on legal. But did you 11:47:43**
**have one lawyer who was kind of put over your 11:47:45**
**shoulder, and this is Dr. Lee's lawyer? 11:47:47**
A. They were interchangeable. 11:47:49
**Q. They moved around? 11:47:51**
A. There were multiple lawyers that were 11:47:51
sort of -- 11:47:54
And part of the process for why I kept on 11:47:55
getting delayed was that I would get assigned one 11:47:57
lawyer and then all of a sudden they'd be like, we're 11:47:59
going to pass this up the chain, we're going to 11:48:01
assign you to another lawyer and then to another 11:48:03
lawyer. 11:48:06
**Q. So it's not like you had one persistent 11:48:06**
**and constant lawyer over your shoulder like Big 11:48:09**
**Brother? 11:48:13**
A. It was not a single person, but there 11:48:13
were multiple lawyers that then were looking at my 11:48:15
research and then escalating it and then passing it 11:48:17
to another person who would then look at it. 11:48:19
**Q. Yeah. 11:48:21**
**Have you heard of something called the 11:48:21**
**SRT at Meta? 11:48:23**

5231

A. Yes. 11:48:24
**Q. Okay. Now, we've heard a little bit about that. 11:48:25 11:48:26**
**At any point, were you told to stop using the SRT tool? 11:48:27 11:48:30**
A. No. That's actually the main mechanism for me to submit my research for approval. 11:48:31 11:48:34
**Q. Right. And -- 11:48:37**
A. Yeah. 11:48:38
**Q. -- the research that you talked about, including the study that Ms. Singer showed you where you were proposing this, um, study on inappropriate interaction with children, I think you mentioned that was delayed a couple of months but ended up going forward after that? 11:48:38 11:48:39 11:48:42 11:48:46 11:48:48 11:48:50**
A. Yes, that's right. 11:48:51
**Q. Okay. Now, I want to talk about some of the analogies you used. I thought that was very compelling and helpful -- 11:48:51 11:48:56 11:48:58**
A. Sure. 11:48:59
**Q. -- and I saw some of those in your deposition. You refer to a bicycle and a cruise ship. And I want to try to understand how feed ranking works -- 11:49:00 11:49:01 11:49:06 11:49:07**
A. Sure. 11:49:07

5232

**Q. -- based off on your experience? 11:49:09**
A. Sure. 11:49:10
**Q. So just to reset, Instagram uses algorithms to decide what to show a person when they open reels; right? 11:49:11 11:49:14 11:49:17**
A. Yes. For any of our feeds. 11:49:18
**Q. Okay. 11:49:21**
A. Reels is one of them. 11:49:21
**Q. So it might be that I follow my mom on Instagram, so reels will show me her posts because there's a personal connection. 11:49:22 11:49:24 11:49:27**
A. Yes. 11:49:29
**Q. Right? 11:49:30**
A. Yes. That's called a connected account. 11:49:30
**Q. And there's also unconnected content, where someone I don't know, the algorithm thinks I will like what they are posting and so it might show me that content as well? 11:49:32 11:49:34 11:49:36 11:49:38**
A. Yes, that's correct. 11:49:39
**Q. And, look, I get that the algorithm is complex, it's computer software, it has a bunch of numbers, but you have ways that you can explain it that we can all understand; is that fair? 11:49:41 11:49:43 11:49:45 11:49:48**
A. I've done the best that I could, yeah. 11:49:50
**Q. I appreciate that. 11:49:56**

5233

**So one thing you that mentioned, and it was a little bit different from what I understood from earlier, you mentioned that there are actually two different models that power the algorithm. So it's not like the algorithm is one thing; right? 11:49:59 11:50:01 11:50:04 11:50:05 11:50:08**
A. No, there's multiple components. So you can think about it like any other engine. It's a single engine, but there are many, many parts of that engine. 11:50:12 11:50:12 11:50:14 11:50:17
**Q. And I think that the two that you talked about, you mentioned a sourcing model. Is that one of them? 11:50:18 11:50:19 11:50:21**
A. Yes, that's correct. 11:50:22
**Q. You mentioned a ranking model? 11:50:22**
A. Yes, that's correct. Those are two big halves. 11:50:24 11:50:27
**Q. And I think I saw in your deposition that you referred to the ranking model as like a funnel. 11:50:27 11:50:29**
**Do I have that right? 11:50:32**
A. No. It's actually the opposite. 11:50:32
**Q. So it's the sourcing model? 11:50:35**
A. Sourcing is you've got a million posts. How do you get it to the thousand that we think that you might like. That's sourcing. 11:50:36 11:50:38 11:50:40
**Q. Okay. So if I'm trying to think about -- 11:50:42**

5234

**well, one thing you mentioned is that there are millions of pieces of content that we're trying to get down to a thousand. 11:50:45 11:50:47 11:50:49**
A. That's right. 11:50:50
**Q. Do I have it right? 11:50:50**
**It's really like there are billions of pieces? 11:50:52 11:50:53**
A. Yeah, that's right. 11:50:53
**Q. And we're trying to figure out when I open reels what are the thousand posts that I'm going to see? 11:50:54 11:50:55 11:50:58**
A. That's the sourcing layer. 11:50:58
**Q. Okay. And then the ranking layer is what prioritizes those? 11:51:00 11:51:03**
A. Right. So from 1 to 1,000 from those posts. 11:51:03 11:51:06
**Q. And so I have some little demonstratives here that I'm hoping you can help me with. 11:51:06 11:51:08**
**So if I'm thinking about this bottled water as having like billions of particles of water and this cup is my feed, if there's no sourcing model and stuff's just coming through, I'm getting everything; right? 11:51:12 11:51:14 11:51:17 11:51:20 11:51:22**
A. Yes. 11:51:23
**Q. Okay. 11:51:25**

5235

A. But you're holding a filter in your hand, 11:51:26
which is presumably the orange one is what is 11:51:28
supposed to filter -- filter out the worst of the 11:51:31
worst. So, as I described earlier, anything that's 11:51:33
like over 90 percent confident that this is a bad 11:51:37
piece of content, presumably that gets pulled out 11:51:39
through the filter. 11:51:42
**Q. Right. 11:51:43**
**So before anything goes into the ranking 11:51:43**
**model of the algorithm, which we've heard a little 11:51:46**
**bit about, there's the sourcing model, which filters 11:51:48**
**out the worst of the worst? 11:51:51**
A. Yeah. So we'd have to figure out what 11:51:52
that threshold is. 11:51:54
**Q. Right. 11:51:55**
A. Usually it's a pretty high one. Right. 11:51:55
**Q. So the point of the sourcing model is 11:51:57**
**that it stops certain things from getting out. So if 11:51:59**
**there's like child sexual abuse material, that 11:52:01**
**shouldn't get to the ranking model? 11:52:05**
A. Again, I have to talk about the 11:52:06
probability. 11:52:11
**Q. Right. 11:52:11**
A. Because I think that's important. 11:52:11
You're treating all of those marbles as 11:52:13

5236

the same size, and what we're saying is that the 11:52:17
filter is using it as a percentage confidence. So 11:52:19
it's saying 90 percent -- 11:52:23
So actually the filter is like quite big 11:52:25
net, it's like a fishing net, right, because it's 11:52:27
only catching the biggest fish. 11:52:31
Sorry. I'm using a lot of analogies. 11:52:33
But it's catching like the biggest, like 11:52:35
highest probability stuff. 11:52:37
**Q. I get it. 11:52:38**
A. Yeah. 11:52:39
**Q. So if there is a space in between the 11:52:39**
**sourcing model where something can slip through into 11:52:43**
**the funnel, that might get into my feed; right? 11:52:46**
A. That's right. So anything below that 11:52:48
threshold. 11:52:51
**Q. And that's where that child safety team 11:52:51**
**that you mentioned takes things really seriously. 11:52:54**
**If some child sexual abuse material 11:52:57**
**somehow sneaks past the sourcing model, there's a 11:52:59**
**team that takes care of it and tries to get it off 11:53:01**
**the apps as fast as possible; right? 11:53:03**
A. I can't comment on how the child safety 11:53:04
team acts on that. I would imagine that the sourcing 11:53:06
layer is where they would say, if we think that it's 11:53:08

5237

quite confident that this is a young person, and 11:53:10
we're going to try to make sure it doesn't make it 11:53:15
past that sourcing layer into a bad actor's feed. 11:53:18
**Q. Okay. So I want to talk, and we're going 11:53:21**
**to get to the ranking model in a minute, but I want 11:53:23**
**to stay focused on the sourcing model. 11:53:26**
A. Yeah. 11:53:27
**Q. Are you aware of any evidence that the 11:53:28**
**sourcing model was broken in terms of catching child 11:53:29**
**sexual abuse material? 11:53:33**
A. I can't comment on that. I will say that 11:53:33
because we saw that it was being shown to IIC actors 11:53:39
that there must have been something broken because it 11:53:42
was making its way into the feed. 11:53:44
**Q. The nonrecommendable content; right? 11:53:45**
A. The nonrecommendable content but also 11:53:47
content featuring minors. 11:53:50
**Q. Uh-huh. 11:53:52**
A. So I can't comment on where exactly in 11:53:52
the entire engine it was broken, but we know that the 11:53:54
output was that it was being shown to bad actors. 11:53:57
**Q. So it might be that the sourcing model 11:54:01**
**catches child sexual abuse material, but if there's 11:54:03**
**something that's nonrecommendable, like a young girl 11:54:05**
**dancing, the sourcing model might not catch that 11:54:08**

5238

**because it might not be child sexual abuse material, 11:54:11**
**even if it's gray zone nonrecommendable; right? 11:54:14**
A. Yes. And I think that was the main 11:54:17
concern was that, you know, I talked about those 11:54:19
three types of content that's risky, you know. The 11:54:21
child safety team was the most concerned with the 11:54:24
most egregious stuff, which is a minority but really 11:54:26
severe stuff. It matters that they caught that 11:54:30
stuff. But then there's a whole gray area in between 11:54:32
that's still quite risky. You know, if you're doing 11:54:35
a 9-year-old dancing to Dua Lipa, that's okay, but we 11:54:37
still don't want to show that to IIC folks. That was 11:54:41
not being pulled out by the CSAM filter that you're 11:54:44
describing. 11:54:48
**Q. I have a 4-year-old girl and I post a 11:54:48**
**video, a reel, of her dancing in a bathing suit on 11:54:51**
**the beach, family vacation. That's not child sexual 11:54:53**
**abuse material, but it could be something that would 11:54:58**
**be risky and nonrecommendable, particularly to grown 11:54:59**
**men; right? 11:55:03**
A. I would say so, yes. 11:55:04
**Q. That's what your research focused on, 11:55:05**
**nonrecommendable content; right? 11:55:07**
A. That's right. Especially to IIC actors. 11:55:08
**Q. Now, one thing that works with all of 11:55:12**

**this algorithm and how we get content into the feed 11:55:14**
**and the reels, are the different engagement scores 11:55:16**
**that you referenced; is that right? I think you said 11:55:22**
**one them is called was P click? 11:55:24**
A. That's right. 11:55:25
Those are all the little things that I 11:55:25
talked about when it comes to ranking. How do you 11:55:27
put 1 to 1,000? 11:55:29
**Q. Right. 11:55:30**
A. Like which gets promoted and what gets 11:55:30
demoted is using those signals. 11:55:33
**Q. Now, P click is basically a prediction 11:55:35**
**score for how likely the person is to click on it; 11:55:37**
**right? 11:55:40**
A. Yes, that's correct. 11:55:40
**Q. And if I wanted to maximize or optimize, 11:55:41**
**whatever verb you want to use, the amount of 11:55:44**
**engagement, I could set P click to 100, that could be 11:55:46**
**all the points and the only thing that I consider; 11:55:50**
**right? 11:55:52**
A. That's one possibility. 11:55:52
**Q. Yeah. 11:55:54**
A. Yeah. 11:55:54
**Q. But even after the sourcing model, so 11:55:54**
**even after the filter, when we're just talking about 11:55:57**



**the feed ranking part of this, it wasn't just 100 11:55:59**
**percent P click maximize clicks, was it? 11:56:04**
A. It should have been a combination of a 11:56:06
lot of different user signals. So I think we talked 11:56:10
about some of them. The most obvious ones are the 11:56:12
user behaviors; right? Did you like it? Did you 11:56:15
comment on it? Did you share it with somebody? Did 11:56:18
you save it for later? Those are the most important 11:56:22
signals, but we also had some of these other ones, 11:56:24
like I mentioned, the mimicry; right? 11:56:26
**Q. Right. 11:56:29**
A. So we were, like, if we think this 11:56:29
content is part of a trend that's going viral, we're 11:56:30
going to bump that up too. 11:56:33
**Q. There were also other P scores, though, 11:56:34**
**like for P nudity; right? 11:56:36**
A. P sexual. 11:56:38
**Q. P sexual? 11:56:39**
A. That's right. 11:56:40
**Q. Again, we're not talking about stopping 11:56:40**
**the child sexual abuse material; we're talking about 11:56:42**
**something in a gray zone, like maybe a scantily clad 11:56:45**
**celebrity or like a swimsuit model, like you 11:56:49**
**mentioned. 11:56:50**
**That would get a P sexual score; right? 11:56:51**



A. That's right. All content gets a score. 11:56:53
**Q. And if I'm a Meta engineer and I'm just 11:56:55**
**trying to maximize engagement, I could say this 11:56:57**
**ranking model is going to be a hundred percent P 11:57:01**
**click, a hundred percent P mimicry, a hundred percent 11:57:04**
**P comments. I could do that. 11:57:07**
**But what Meta actually did is it also 11:57:11**
**layered in some of these integrity interventions like 11:57:12**
**P sexual; right? 11:57:14**
A. Yeah. 11:57:16
**Q. So it's not that Meta was just trying to 11:57:16**
**maximize clickiness or engagement, there were 11:57:19**
**integrity components of the ranking algorithm; right? 11:57:22**
A. Yes. 11:57:26
**Q. Okay. 11:57:27**
A. I think there was also P sexual and P 11:57:27
objectionable. Those were the two main. 11:57:30
So P sexual was specifically for sexually 11:57:31
suggestive content, and P objectionable was for all 11:57:35
the other types. So anything with like regulated 11:57:38
goods, like guns, graphic violence, hateful speech, 11:57:40
bullying -- like all of the other sorts of 11:57:43
objectionable content types. 11:57:45
Those were the two models that were 11:57:47
included in their ranking layer. 11:57:49



**Q. So just before I move on to another 11:57:50**
**subject. I think you've previously called those an 11:57:53**
**integrity treatment; is that right? 11:57:55**
A. Correct. 11:57:57
**Q. And so when Meta's thinking about the 11:57:57**
**ranking algorithm and how to show reels to people, it 11:58:00**
**is not maximizing clickiness or engagement. It is 11:58:03**
**imposing on this computer algorithm what you call 11:58:06**
**integrity treatments; is that right? 11:58:10**
A. I would say that they -- just by sheer 11:58:12
count of how many were dedicated to engagement, so 11:58:17
all of those used signals clicking, liking, sharing, 11:58:21
saving, sending to other people, plus all of the 11:58:24
other sort of engagement signals, right, like 11:58:27
trendiness or all of these other models, if you -- 11:58:32
Let's pretend it's a one to one; right? 11:58:35
P objectionable, P sexual is equal to -- is given 11:58:37
equal weight to P click, but the sheer number that 11:58:41
were dedicated to engagement, they far outnumbered 11:58:45
the safety treatments, integrity treatments. 11:58:48
**Q. Just two more questions on this. 11:58:50**
A. Yeah. 11:58:52
**Q. Hopefully they're narrow. 11:58:52**
**When you talked to the jury with 11:58:54**
**Ms. Singer about these different scores plus 5, you 11:58:56**

5243

**weren't being literal, were you? 11:58:59**
A. I wasn't being literal. I was being 11:59:00 illustrative, yeah. 11:59:03
**Q. And so we don't have data -- right now we 11:59:03 don't have data on what the actual weights are, do 11:59:06 we? 11:59:08**
A. I would not be able to tell you what 11:59:08 those plus 5 minus 5 are. 11:59:10
**Q. The one thing we know for sure is if I'm 11:59:13 sitting there and I'm, like, I'm going to maximize 11:59:16 engagement to get ad revenue, I could take P click 11:59:17 and say I don't care about anything else, but Meta 11:59:20 does bring other integrity interventions into the 11:59:23 algorithm; right? 11:59:26**
A. They are a small piece of what goes into 11:59:26 the final algorithm. 11:59:34
**Q. You can't tell us what the weights are? 11:59:35**
A. I couldn't. 11:59:36
**Q. Someone else in this trial will have to 11:59:36 do that? 11:59:39**
**Fair enough. 11:59:39**
**I have some questions about the studies 11:59:39 you did. 11:59:41**
MR. PARKINSON: I see that we're at noon. 11:59:42 And so I'm at Your Honor's mercy on this. 11:59:43

5244

JUDGE BIEDSCHEID: Ladies and gentlemen, 11:59:48 as I think I forewarned you, noon is a general guide 11:59:48 but not a precise measure. 11:59:53
So, Counsel, I mean -- 11:59:55
MR. PARKINSON: I can do this in 20 11:59:58 minutes, Your Honor. And so if the jury will indulge 11:59:59 me, I'm happy to do that now or we can return on 12:00:02 Monday. It's really whatever these folks want to do. 12:00:04
JUDGE BIEDSCHEID: Counsel is being very 12:00:07 nice about, you know, I guess taking credit/blame, 12:00:08 whatever would be for going a bit over, but it's 12:00:13 really the Court. I'm trying to make sure that we 12:00:15 gets things done in a somewhat orderly fashion and 12:00:17 witnesses don't have to stay over and the like if 12:00:20 necessary. 12:00:22
So if you are okay with that, can we 12:00:23 continue for another probably be till like 12:30 or 12:00:25 so, and then at that point we would end for the day? 12:00:28
MR. PARKINSON: Okay. I appreciate it. 12:00:32
JUDGE BIEDSCHEID: Thank you for patience 12:00:34 with this. 12:00:34
And thank you, all counsel, for your 12:00:39 flexibility. 12:00:41
MR. PARKINSON: Thank you and, Ms. Lee, 12:00:41 this way you can go home and not spend the weekend in 12:00:41

5245

Santa Fe and come back on Monday. So hopefully that 12:00:44 works out for you. 12:00:45
**Q. BY MR. PARKINSON: Okay. Let's talk 12:00:45 about your studies. 12:00:47**
**Let's pull up Plaintiff's Exhibit 2700, 12:00:47 which is tab 2 of the binder in front of you. 12:00:51**
A. Okay. 12:00:53
**Q. I think it's actually the other binder, 12:00:54 Dr. Lee, the one that I placed there. We'll put it 12:00:56 on the screen. 12:00:58**
A. Okay. 12:00:59
**Q. It's PX2700. 12:00:59**
MR. PARKINSON: Your Honor, can we 12:01:02 publish this? It was admitted. 12:01:04
JUDGE BIEDSCHEID: Yes, I do see this. 12:01:05
**Q. BY MR. PARKINSON: Now, Dr. Lee, this was 12:01:07 the first study Ms. Singer showed you, and we 12:01:08 actually skipped right past it after showing the 12:01:11 title screen. 12:01:13**
**Do you remember this one? 12:01:14**
A. Yes, I do remember. 12:01:14
**Q. Okay. Now, this study went forward, it 12:01:15 was not blocked by legal or anyone else, was it? 12:01:17**
A. Correct. It happened before the Haugen 12:01:19 leaks. 12:01:21

5246

**Q. Right. No one told you to delete this 12:01:22 study or any of the data inside of it? 12:01:23**
A. No. 12:01:25
**Q. Okay. Now, let's actually look at this 12:01:25 one. Let's look the slide 3 and we'll flip to it on 12:01:27 the screen if it helps. 12:01:31**
**This is the timeline of the study that 12:01:32 you planned; right? 12:01:33**
A. Yes, that's right. 12:01:34
**Q. And the bottom of the slide says, "Part 1 12:01:37 and 2 will inform key product roadmap priorities for 12:01:40 H2." 12:01:44**
**Do you see that? 12:01:44**
A. Yes, I do. 12:01:45
**Q. That means this is part 1 of a two-part 12:01:46 study; right? 12:01:49**
A. Yes, that's right. 12:01:49
**Q. And the two-part study, your intent at 12:01:50 the time was that it will inform ways to improve the 12:01:52 reels product? 12:01:55**
A. Yes, that was the intention. 12:01:55
**Q. Okay. Let's look at slide 9. 12:01:56**
**We didn't look at this with Ms. Singer 12:02:00 but you recognize this as your work; right? 12:02:03**
A. Yes, that's correct. 12:02:05

5247

**Q. And this identifies certain harms at issue in this study, right, like the unconnected dancing videos?** 12:02:06 12:02:08 12:02:12
A. Yes. That's right. 12:02:13
**Q. And this is actually very similar to the second study that we did look at with Ms. Singer?** 12:02:14 12:02:16
A. Yeah, that was actually the part 2. 12:02:19
**Q. Okay.** 12:02:20
A. So that was done like six, probably six to eight weeks after. 12:02:20 12:02:21
**Q. And so just so the jury can understand, looking at the problems that we're talking about in your study, the issue is not really extreme stuff like child sexual abuse material; it's what we've talked about today as nonrecommendable content; right?** 12:02:22 12:02:24 12:02:27 12:02:30 12:02:33 12:02:36
A. I would say that that was the original focus was to really try to understand nonrecommendable, yet when we started to dig more deeply into nonrecommendable, as we saw in the follow-up study to this, that it was not just about nonrecommendable. We started to see some pretty problematic content. 12:02:36 12:02:39 12:02:43 12:02:45 12:02:49 12:02:52 12:02:55
**Q. And that's what you escalated to that child safety team that we started with and they took** 12:02:55 12:02:57

5248

**that really seriously?** 12:03:00
A. That's right. 12:03:00
**Q. Yeah. Okay.** 12:03:01
**That's like the marble getting past my source filter and getting in where it shouldn't be and then the team taking it out?** 12:03:01 12:03:03 12:03:06
A. Well, I'll just say this. I know we're on a time crunch. 12:03:07 12:03:10
I will say that we introduced a pretty big swath of child safety issues, I've talked about them, like the pretty severe stuff. There was a lot of other stuff, including some of those so-called benign and also risky content. 12:03:11 12:03:14 12:03:17 12:03:20 12:03:23
I'm so appreciative of the child safety team for taking the most egregious harm seriously. But I was quite concerned that they felt like this other work was not in their purview. 12:03:26 12:03:28 12:03:32 12:03:34
**Q. The nonrecommendable --** 12:03:36
A. The less risky content. 12:03:37
**Q. We'll get to that.** 12:03:39
**Let's look at slide 16, if you would, please. And these are your final thoughts from part 1 of the study; right?** 12:03:40 12:03:42 12:03:46
A. Yes, that's right. 12:03:47
**Q. And one thing that you write and this is** 12:03:49

5249

**in the middle box. "Meta should be designing for teens and youth."** 12:03:53 12:03:56
**Do you see that?** 12:03:57
A. That's right. 12:03:58
**Q. And it says, "That includes both user controls and engineering approaches that keep them safe."** 12:03:59 12:04:01 12:04:03
**Do you see that?** 12:04:05
A. Can I modify really quickly about this statement? 12:04:06 12:04:09
**Q. Of course.** 12:04:10
A. I'm not saying that we should design for youth. I'm saying that if we are going to make teens a priority -- 12:04:10 12:04:13 12:04:16
**Q. Got it.** 12:04:17
A. -- then we need to design for safer experiences for them specifically. 12:04:18 12:04:21
**Q. That's a product recommendation if we're going to promote this to youth?** 12:04:22 12:04:24
A. It was actually directly drawn from the product priorities. So I'm saying the product that the team at Instagram has already determined that teens are our target demographic. 12:04:27 12:04:29 12:04:33 12:04:37
So if we're to do that, then we need to design for their safety. 12:04:40 12:04:42

5250

**Q. Given the product priority that we're going to focus on teens, these are your recommendations. We should really focus on designing for teens?** 12:04:43 12:04:45 12:04:46 12:04:48
A. That's right. 12:04:49
**Q. Okay. Now let's look at part 2 of the study, which is in your binder as tab 3 and this is PX2701.** 12:04:49 12:04:52 12:04:56
MR. PARKINSON: Your Honor, permission to publish. It was admitted. 12:04:57 12:04:58
JUDGE BIEDSCHEID: Yes. 12:04:59
**Q. BY MR. PARKINSON: And this is the slide deck that you looked at a little bit more carefully with Ms. Singer.** 12:05:00 12:05:01 12:05:03
**Do you recognize this one?** 12:05:04
A. Yes, I do. 12:05:05
**Q. And this was put together about a month or two after part 1; right?** 12:05:06 12:05:07
A. Yes, that's correct. 12:05:09
**Q. Okay. And if you go to slide 4, we see the same timeline slide.** 12:05:10 12:05:14
**Do you recognize that?** 12:05:16
A. Yes, I do. 12:05:16
**Q. And so this is part 2. And it's from about June looking at this timeline that you've put** 12:05:17 12:05:20

5251

**together?** 12:05:23
A. Correct. 12:05:23
**Q. Okay. If you could please turn to slide 12:05:24**
**7. 12:05:27**
A. (Witness complies.) 12:05:28
**Q. And this slide addresses, if you see on 12:05:29**
**the left, some "new and unique integrity system 12:05:33**
**challenges." 12:05:35**
**Do you see that? 12:05:36**
A. Yes, that's right. 12:05:36
**Q. And there's a lot of scientific jargon 12:05:37**
**here, Dr. Lee, that's a little above my head, but I 12:05:40**
**want to keep focusing on the phrase that pops up here 12:05:42**
**"nonrecommendable." 12:05:45**
**Do you see that? 12:05:47**
A. Um. 12:05:48
**Q. So like the last box, for example, 12:05:50**
**second-to-last line, "Keep up with nonrecommendable 12:05:52**
**spikes." 12:05:55**
**Do you see that? 12:05:56**
A. I think nonrecommendable is a very broad 12:05:56
generalization. Some of the content in here I'll 12:05:59
just talk about, for example, in the top one, 12:06:03
"regulated goods." That's a very specific type. So 12:06:04
that's drugs and guns, for example. 12:06:08

5252

Cover for disturbing content. So 12:06:12
disturbing content, for example, might be like a 12:06:16
puppy getting punched, right. That's disturbing 12:06:18
content. 12:06:22
And sexually suggestive content that is 12:06:22
also a category. 12:06:25
All of those are considered 12:06:26
nonrecommendable. 12:06:27
**Q. Got it. So it's not -- just to be clear, 12:06:28**
**that broad swath of nonrecommendable is not explicit 12:06:31**
**child sexual abuse material and it's not a suicide 12:06:35**
**video of someone killing themselves, but it's the 12:06:38**
**stuff you were talking about? 12:06:40**
A. Correct. It's not overtly violating 12:06:41
community standards. That's right. 12:06:46
**Q. It's not overtly violating the rules, 12:06:47**
**which is what that sourcing model filter is supposed 12:06:49**
**to keep out? 12:06:51**
A. No. Actually the community standard 12:06:51
violating content is the content that actually we 12:06:55
delete. 12:06:58
**Q. Okay. 12:06:58**
A. And we put a strike against the user. So 12:06:58
if you're posting porn, for example, that's community 12:07:01
standards violating, we will delete that content off 12:07:04

5253

your platform and then strike a flag against your 12:07:07
account. 12:07:10
**Q. Okay. 12:07:11**
A. So I'm just naming that. 12:07:11
**Q. That's where Meta goes in and deletes it? 12:07:12**
A. That's right. Yeah. 12:07:15
**Q. So nonrecommendable content, that broad 12:07:16**
**gray zone, it could be stuff that is not explicit 12:07:18**
**violence, but it is suggestive of violence; right? 12:07:20**
A. It's what we call like graphic violence, 12:07:23
but there is no blood or gore involved; right? So 12:07:28
like school yard fights or, you know, that type of 12:07:32
violence would be considered nonrecommendable but not 12:07:34
violating. 12:07:38
**Q. Right. 12:07:38**
**Or like a clip from a movie that's like 12:07:38**
**an action movie that has kind of an intense scene 12:07:41**
**like Die Hard, my favorite movie, John McClane's 12:07:43**
**crawling around in glass. It's not explicitly 12:07:49**
**violent but that might be disturbing to someone? 12:07:50**
A. Correct. 12:07:53
**Q. All right. Now, you agree that some 12:07:53**
**people might view some nonrecommendable content as 12:07:56**
**valuable; right? 12:08:02**
A. Yes. There are some people who really 12:08:02

5254

enjoy this content and seek it out. 12:08:04
So, for example, sexually suggestive 12:08:07
content is one of those things where people tend to 12:08:08
actually have high engagement on. 12:08:11
**Q. Like a swimsuit model you mentioned? 12:08:13**
A. Right. 12:08:14
**Q. Or it could be like a raunchy comedy 12:08:15**
**sketch that maybe a kid shouldn't see with curse 12:08:17**
**words or gross jokes? 12:08:20**
A. I think that's like one of like many, 12:08:21
many examples. I would say that there's probably 12:08:24
some that are like quite borderline, but you're right 12:08:26
that there are cultural variations in what's 12:08:30
considered appropriate in some places and not others. 12:08:33
**Q. And that stuff, that borderline 12:08:35**
**nonrecommendable gray zone, that's what you're 12:08:37**
**studying? 12:08:39**
A. I don't -- I'm not concerned with the 12:08:40
subjective. I'm very interested in what users think 12:08:46
because obviously if a user does not find a 12:08:49
particular piece of content appealing, we don't want 12:08:51
to show it to them. 12:08:53
But what I'm concerned -- what I'm 12:08:55
concerned about is that we actually have a policy 12:08:57
that clearly defines what nonrecommendable is. 12:08:59

5255

**Q. Got it.** **12:09:02**
A. So it's not my subjective sort of 12:09:03 judgment on what nonrecommendable is. 12:09:04
**Q. Makes sense.** **12:09:06**
**Let's please turn slide 22, and these** **12:09:08** **are, again, the final thoughts to your part 2 study;** **12:09:11** **right?** **12:09:17**
A. That's right. 12:09:17
**Q. Again, it's similar that if Meta is going** **12:09:18** **to be appealing to teens, as you understand the** **12:09:20** **engagement team wants to, we need to be designing the** **12:09:22** **product with user controls specifically for teens;** **12:09:26** **right?** **12:09:29**
A. Yes. I -- I would prefer both user 12:09:29 control -- user controls is one way; right? Having a 12:09:32 button to be able to provide feedback and control, 12:09:34 that's some of the things that they requested. 12:09:37
But it's also fundamentally, what I mean 12:09:39 by engineering approaches here, is really what should 12:09:43 they be shown on their feed? What is considered age 12:09:46 appropriate and what's not? 12:09:49
**Q. Now, about one month after this June 2021** **12:09:50** **study, Instagram released a new safety tool for teens** **12:09:53** **in July 2021; right?** **12:09:56**
A. Can you name what that tool is? 12:09:58

5256

**Q. Yeah. Are you familiar with the idea of** **12:10:01** **making reels default by private for teens? Private** **12:10:03** **by default.** **12:10:07**
A. Okay. 12:10:08
**Q. Are you familiar with that in July?** **12:10:09**
A. Yeah, that sounds familiar. 12:10:10
**Q. Okay. And --** **12:10:12**
A. What date was that? 12:10:13
**Q. I have it as July of 2021, but let me** **12:10:13** **show you a document that might help.** **12:10:16**
**If you look at tab 5 of your binder.** **12:10:18**
A. Okay. 12:10:20
**Q. This is DX5309.** **12:10:20**
MR. PARKINSON: Your Honor, permission to 12:10:25 publish it to just you, counsel, and the witness? 12:10:26
JUDGE BIEDSCHEID: Yes, you may. 12:10:28
**Q. BY MR. PARKINSON: And --** **12:10:31**
JUDGE BIEDSCHEID: This is in the 12:10:32 cross-examination? 12:10:33
MR. PARKINSON: Correct, Your Honor. 12:10:33
**Q. BY MR. PARKINSON: And, Ms. Lee, you** **12:10:34** **might look at sort of the spillover from page 1 --** **12:10:37** **Dr. Lee, excuse me, from page 1 to page 2.** **12:10:41**
**Do you see that you're one of the** **12:10:42** **recipients of this document. It says "Alison Lee" at** **12:10:43**

5257

**the bottom?** **12:10:47**
A. Yes, I see. 12:10:47
**Q. And so you received this document; right?** **12:10:48**
A. I would assume so. Oftentimes you'll be 12:10:49 tagged in the Thanks Bot. It's a way of being able 12:10:55 to give people thanks when they contribute or even 12:10:59 just to get their attention on it. I haven't seen 12:11:01 this in a while. 12:11:04
**Q. Okay. Let me ask you this part.** **12:11:09**
**Do you see, and my colleague,** **12:11:11** **Mr. Roberts, can highlight it on the screen for you,** **12:11:13** **where it says -- this is from September** **12:11:15** **2021 -- "Defaulting teens to private directly** **12:11:17** **decreases their reels production by at least 10** **12:11:19** **percent."** **12:11:24**
**Do you see that?** **12:11:24**
A. Yes, I do see that. 12:11:24
**Q. Okay. Do you remember receiving a report** **12:11:26** **like that?** **12:11:27**
A. I don't. 12:11:30
**Q. Okay.** **12:11:31**
A. But it's -- I see it here, yeah. 12:11:31
**Q. Okay. That's all right.** **12:11:33**
**Let me show you a document --** **12:11:36**
A. I think -- I'll just name that at the 12:11:41

5258

time we did not have good age detection processes. 12:11:44 So we had -- we only really knew if teens were teens 12:11:50 based off of whether or not they reported that in 12:11:55 their account. 12:11:57
**Q. Yeah.** **12:11:57**
A. So just a point of clarification. This 12:11:59 defaulting is based off of only if they ever said 12:12:01 that they were under 18 years old or reported their 12:12:04 age. 12:12:06
**Q. And, Dr. Lee, did you ever work on the** **12:12:06** **age verification models where --** **12:12:08**
A. I did not. 12:12:10
**Q. No problem.** **12:12:11**
**I'm going to show you a document you** **12:12:12** **actually did write.** **12:12:13**
**If you look at tab 7 of the binder. And** **12:12:14** **this is DX539, 0539.** **12:12:16**
**Do you see this relevance integrity** **12:12:21** **review that you were one of the authors of from 2022?** **12:12:23**
A. Yes, I do. 12:12:28
**Q. Okay.** **12:12:29**
MR. PARKINSON: Your Honor, permission to 12:12:29 publish this to the jury? 12:12:30
JUDGE BIEDSCHEID: Yes, you may. 12:12:31
**Q. BY MR. PARKINSON: Now, Ms. -- Dr. Lee,** **12:12:32**

5259

**do you see that there's a TL;DR, kind of a summary of the document at the top? 12:12:35 12:12:40**
A. Yes, I do see that. 12:12:40
**Q. Okay. So one of the things, and Mr. Roberts is going to put this up, that your team wrote and that you wrote is, "Relevance integrity met or exceeded all six of our H2 team goals." 12:12:41 12:12:43 12:12:46 12:12:48**
**Do you see that? 12:12:53**
A. I do see that. 12:12:53
**Q. And that means your team, the relevance integrity team, had these goals from the second half of 2021 and you're reporting that you met or exceeded all those goals; right? 12:12:54 12:12:56 12:12:58 12:13:02**
A. Yes. 12:13:04
**Q. That's what that sentence means? 12:13:06**
A. That's what the sentence says, yes. 12:13:08
**Q. Under the second bullet, you wrote in this top highlight, "Our supported surfaces" -- and just to pause there "supported surfaces" that includes reels; right? That's one of the surfaces that you supported? 12:13:10 12:13:12 12:13:15 12:13:18 12:13:21**
A. Yes. Although, just to be clear, I did not write this document. I contributed to portions of it. 12:13:21 12:13:23 12:13:25
**Q. Fair enough. 12:13:25**

5260

**You were a contributor to the document with your team. It says, "Top highlight our supported surfaces are the safest they've ever been." 12:13:26 12:13:28 12:13:31**
**Do you see that? 12:13:33**
A. Yes, I do. 12:13:33
**Q. Okay. If you could please turn with me to page 4, and Mr. Roberts will pop up the highlight here. 12:13:34 12:13:37 12:13:39**
A. I'll just name that I have some thoughts about "safest they've ever been" because that's relative to where they were before -- 12:13:40 12:13:44 12:13:48
**Q. I understand. 12:13:49**
A. -- which I would say was not a super high baseline. 12:13:49 12:13:53
**Q. I understand. 12:13:53**
A. Also, I just want to -- if there's an opportunity to comment on the context of this document, which was written for a very specific purpose. 12:13:53 12:13:56 12:13:58 12:14:00
**Q. Let me try to get you out of here and come back around about if there's a little bit of time left over and we can get back to that. 12:14:00 12:14:02 12:14:04**
A. Okay. 12:14:06
**Q. If you look at page 4, one of the highlights from your team, it says, "We launched 12:14:06 12:14:08**

5261

**downranking using P report on the reels tab." 12:14:10**
**Do you see that? 12:14:13**
A. Yes, I do see that. 12:14:13
**Q. So P report, that's one of those integrity interventions in the whole algorithm and how it works; right? 12:14:15 12:14:17 12:14:19**
A. Yes, I do see that. 12:14:21
**Q. And this is after your studies that we just looked at from May and from June; right? 12:14:22 12:14:24**
A. Yes, this was December. 12:14:26
**Q. And this is actually after the Frances Haugen leak that we talked about, which I think was in September or October of 2021; right? 12:14:28 12:14:29 12:14:32**
A. This was after that. I -- 12:14:34
**Q. Okay. 12:14:37**
A. The P report was already work in action by one of our engineers even before the Haugen leaks. 12:14:37 12:14:41
**Q. Right. And so Meta went ahead and launched it. And it says, With this launch, we introduce downranking using P report on reels tab to deliver personalized integrity demotions for our users. 12:14:44 12:14:46 12:14:48 12:14:51 12:14:54**
**Do you see that? 12:14:54**
A. Yes, I see that sentence. 12:14:57
**Q. Okay. Now, another study that Ms. Singer 12:14:58**

5262

**didn't mention to you that ended up going forward was something that you called a diary study. 12:15:00 12:15:03**
**Do you remember that? 12:15:04**
A. Yes. I do remember that diary study. 12:15:05
**Q. And the diary study wasn't blocked, but it went ahead and you completed that study; right? 12:15:07 12:15:09**
A. That diary study was also delayed for several months. 12:15:15 12:15:17
**Q. Okay. 12:15:17**
A. So it was one of the ones that I proposed in September. 12:15:17 12:15:18
**Q. Right. 12:15:19**
A. And I was not able to execute that until January of the following year. 12:15:19 12:15:21
**Q. It was delayed from September to January. 12:15:23**
**Let's look at tab 8 of your binder, please, and we can take this document from your team down. 12:15:25 12:15:28 12:15:31**
**And this is one that I -- it says 1-- I think you wrote this document, if you look at tab 8. 12:15:31 12:15:32**
**Do you see Alison Lee? 12:15:35**
A. Yes, I do see that. 12:15:36
**Q. You wrote this document in January 2023 -- sorry -- January 2022; is that right? 12:15:38 12:15:42**
A. It looks like the date is January 27th. 12:15:45

5263

**Q. 2022? 12:15:48**
A. 2022. Yeah. 12:15:49
**Q. Okay. 12:15:50**
MR. PARKINSON: Your Honor, permission to publish this? 12:15:51 12:15:52
JUDGE BIEDSCHEID: Yes, you may. 12:15:53
MR. PARKINSON: It's DX5313 for the record. 12:15:54 12:15:58
**Q. BY MR. PARKINSON: And, Ms. Lee, this is after the diary study that Ms. Singer didn't mention, but it got delayed a couple of months and went ahead. And your report on this is, the rate of undesirable content is pretty low. 12:15:58 12:16:01 12:16:05 12:16:05 12:16:07**
**Do you see that from your report in 2022? 12:16:09**
A. I'm having trouble following. Sorry. I just want to take a minute to read it within the context of the paragraph. 12:16:12 12:16:20 12:16:23
**Q. You can. Do you see the words "the rate of undesirable content is pretty low"? 12:16:24 12:16:25**
**Do you see that highlighting? 12:16:28**
A. I see the words, yeah. 12:16:28
**Q. Do you see that it says that people who see the undesirable content typically just scroll past it. 12:16:29 12:16:30 12:16:34**
**Do you see that finding? 12:16:35**

5264

A. I do see that, yeah. Often -- our finding was that even when undesirable content shows up in teens, that they were very -- they didn't -- weren't willing to take an action. They would just scroll right past it and keep consuming. 12:16:35 12:16:38 12:16:42 12:16:46 12:16:48
**Q. Right. 12:16:50**
**Okay. Last set of questions, Dr. Lee, and you can put that one down, if you like. 12:16:51 12:16:52**
**Now, you left Meta in December of 2022; is that right? 12:16:54 12:16:56**
A. Yes, that's correct. 12:16:56
**Q. Okay. So, I mean, just logically, after December of 2022, you weren't part of doing research or making product improvements at Meta? 12:16:57 12:16:59 12:17:02**
A. No, I was not. 12:17:05
**Q. Okay. But while you were at Meta, you were doing this study on reels; right? 12:17:05 12:17:07**
A. While I was there, I was doing the study. 12:17:09
**Q. And you had a two-part study on nonrecommendable content. You found some child sexual abuse material that the child safety team took down, and then you also performed this diary study; is that right? 12:17:12 12:17:14 12:17:17 12:17:20 12:17:22**
A. Those were among the studies that I ran. I had some other ones that we haven't referenced. 12:17:22 12:17:24

5265

Yes. 12:17:29
**Q. And one of the findings that you made was that social media and Instagram can be good for some teens but also have downsides, like anything in life; right? 12:17:29 12:17:31 12:17:33 12:17:36**
A. Well, this was part of my mission to come to Instagram was that what I was finding was that a lot of young people were seeking connection and community and belonging through Instagram. 12:17:36 12:17:41 12:17:45 12:17:48
Now, I hope that for all young people I want them to find that, particularly, if they're not finding it in their real life communities, right, in their schools or in their families. 12:17:50 12:17:54 12:17:58 12:18:01
So I think there's incredible promise in that. 12:18:01 12:18:03
I think what I found was that young people were seeking that, but we weren't necessarily delivering safe experiences to enable that for them. 12:18:04 12:18:06 12:18:09
**Q. Right. And so your recommendations in the studies we looked at were, let's design for teen safety, let's let people customize what they see, let's keep creeps away from messaging teens; right? 12:18:11 12:18:15 12:18:18 12:18:23**
A. That was my hope that we would build in. 12:18:25
**Q. And -- 12:18:27**
A. And also much more age-appropriate experiences. 12:18:28 12:18:30

5266

**Q. Age-appropriate experiences? 12:18:30**
A. Yeah. 12:18:32
**Q. Now, you know that after you left Meta, Instagram launched a feature called Teen Accounts; right? 12:18:32 12:18:35 12:18:37**
A. Yes, I'm aware of the Teen Accounts. 12:18:37
**Q. And I saw your deposition and it sounds like you actually have some friends who worked on Teen Accounts; right? 12:18:39 12:18:41 12:18:44**
A. That's right. Some of my colleagues. 12:18:44
**Q. And I think that you made a mention that it was very heartening to see that they had done that work and it had come into the world; right? 12:18:46 12:18:48 12:18:50**
A. I was grateful that based on my experience that many of the recommendations that we were making to keep teens safe did not seem to be a priority. So to see that after I left that there were some headway in that was gratifying. 12:18:52 12:18:55 12:18:58 12:19:00 12:19:03
It was also really interesting to notice that for the many years that we had studied teen experiences, there was very little motivation to do so until it became a public concern. 12:19:09 12:19:11 12:19:14 12:19:18
**Q. Right. 12:19:20**
A. Until it was becoming publicly reported. 12:19:20

5267

**Q. And -- and you also know that as part of 12:19:22**
**Teen Accounts, there's an algorithm control where 12:19:25**
**teens get content that is age-appropriate to what you 12:19:27**
**might see in a movie for people who are 13 or up; 12:19:31**
**right? 12:19:33**
A. Well, I was there actually when they were 12:19:34
first developing it, and the initial version of that 12:19:37
so-called, age-appropriate experience, I'm speaking 12:19:42
from the time that I was there. 12:19:44
The first iteration of that was what we 12:19:46
called a sensitive content control. That was the 12:19:48
basis -- literally they copied that same control and 12:19:54
turned it into the teen experience during the time 12:19:56
that I was there. 12:19:58
The sensitive content control, just to 12:19:59
name, was not a tuning of the policy to say, Hey, 12:20:07
these are now the new age-appropriate content. 12:20:07
**Q. Uh-huh. 12:20:07**
A. Remember the probabilities that we were 12:20:09
talking about like 90 percent likely and sexually 12:20:10
suggestive. The sensitive content control, all it 12:20:13
did was lower that. It was like -- used to be that 12:20:15
we kick out anything that was 90 percent. Now we're 12:20:17
going to kick it out at 70 percent. 12:20:20
But it didn't change the definition for 12:20:22

5268

what was nonrecommendable for young people. 12:20:26
**Q. So, Dr. Lee, just to make sure I have it 12:20:28**
**straight and I'll try to ask these rapid fire. 12:20:30**
A. Sure. 12:20:33
**Q. After you left, Meta released Teen 12:20:33**
**Accounts; right? 12:20:35**
A. They released Teen Accounts. 12:20:36
**Q. And one of the things about Teen Accounts 12:20:38**
**is that teens cannot be messaged if they're in a teen 12:20:39**
**account by strangers who are adults; right? 12:20:44**
A. I can't comment on what those features 12:20:46
are. I'm not familiar. 12:20:48
**Q. You don't know how Teen Accounts works. 12:20:48**
**That's totally fine. 12:20:50**
**Another thing that Meta did after you 12:20:50**
**left is this PG-13 algorithm control for teens; 12:20:52**
**right? 12:20:55**
A. I'm not aware. I've heard some news 12:20:57
about that and then I heard some flack from the 12:20:59
people who actually do the PG-13 readings on this. 12:21:01
So I'm not familiar with how they constructed that. 12:21:04
**Q. You mentioned what Adam Mosseri got 12:21:07**
**excited about. Did you happen to catch his interview 12:21:08**
**on Good Morning America about that algorithm change 12:21:11**
**for teens? 12:21:13**

5269

A. No, I didn't. 12:21:14
**Q. That's okay. 12:21:15**
**Now, last of the questions. 12:21:18**
**You also are an Instagram user yourself; 12:21:24**
**right? 12:21:25**
A. Yes, I am. 12:21:25
**Q. And you post very cute pictures of your 12:21:26**
**dog? 12:21:28**
A. Yes, I do. 12:21:28
**Q. On a public account; right? 12:21:29**
A. No. Actually, I'm a private account. 12:21:30
**Q. Okay. I thought you had a public account 12:21:32**
**for your dog? 12:21:33**
A. Oh, my dog's account is public, yeah. 12:21:34
**Q. That's what I saw. Very cute pictures on 12:21:35**
**your dog's Instagram account that is public; right? 12:21:38**
A. Yes. For the dog. 12:21:40
**Q. And you know, as an Instagram user, that 12:21:41**
**one of the new tools is that you can actually control 12:21:43**
**the content your algorithm shows you; right? 12:21:47**
A. I'm not aware of that user control. 12:21:50
**Q. Okay. No problem. 12:21:52**
A. I think that was part of the general 12:21:54
consensus was that there were lots and lots of 12:21:55
features, but there's very little public awareness of 12:21:58

5270

what those tools where or where to find them or... 12:22:04
You know, I imagine -- I remember during 12:22:06
the deposition I was handed lots and lots of press 12:22:07
releases. 12:22:10
**Q. Uh-huh. 12:22:10**
A. And for so many young people, most of the 12:22:10
young people that I know aren't reading press 12:22:14
releases. So curious how they're finding them. 12:22:17
**Q. Have you ever hit the button on reels for 12:22:19**
**algorithm control? 12:22:20**
A. No. I didn't even know one existed. 12:22:22
**Q. That's okay. 12:22:24**
A. Yeah. 12:22:24
**Q. Now, you obviously did not personally 12:22:25**
**pick the documents that Ms. Singer showed you in your 12:22:27**
**exam, did you? 12:22:30**
A. I did not. 12:22:31
**Q. The State picked those documents and they 12:22:31**
**showed them to you and you testified about them? 12:22:33**
A. Yes, that's correct. 12:22:36
**Q. And the State didn't show you that piece 12:22:36**
**of paper that had the results of your team's work 12:22:39**
**looking back on 2021 where you said that we're as 12:22:42**
**safe as we'd ever been, did they? 12:22:45**
A. That piece of content I had seen before. 12:22:47

5271

**Q. I'm sure you have. 12:22:49**
**You're part of it -- 12:22:51**
A. Yeah. 12:22:51
**Q. -- but I'm just asking. Did the State 12:22:51 show you that? 12:22:53**
A. I saw pieces of it, yes. Yeah. 12:22:54
**Q. During this exam? 12:22:55**
A. No. 12:22:57
**Q. Okay. Maybe they showed it to you in 12:22:58 preparation or something? 12:23:00**
A. In preparation. That's right. Yes. 12:23:01
**Q. So they showed you that document for 12:23:03 preparation but they didn't show it to you in front 12:23:04 of the jury? 12:23:06**
A. No. I think one of the main things about 12:23:07 that piece of -- that actual report is that it's 12:23:09 actually a report that's written by our team leads to 12:23:12 show and -- to the heads of the pillars. So if you 12:23:21 see, that's like a review of the second half of the 12:23:23 year. 12:23:24
So, of course, we're going to talk about 12:23:25 all of our accomplishments and our team wins. We 12:23:26 want to be able to celebrate those things. 12:23:30
And so I just wanted to -- 12:23:31
**Q. Dr. Lee, with all due respect. And I 12:23:32**

5272

**said I wasn't going to come after you in a harsh way. 12:23:34**
A. Sure. 12:23:37
**Q. That document that you sent as a 12:23:37 collaborator to your team leads, that was truthful; 12:23:39 right? There was nothing made up in that? 12:23:41**
A. The kind of implementations that we had 12:23:44 were truthful. I would say that the way that we 12:23:47 positioned that was deliberately in a positive, 12:23:50 celebratory way. 12:23:53
**Q. I get that. We all have managers. 12:23:54**
**And so in that document that the State 12:23:56 didn't show you in front of the jury, it is true that 12:23:58 things were safer than they had ever been? 12:24:00**
A. Safer than the previous baseline, I would 12:24:03 say. 12:24:05
**Q. Got it. 12:24:05**
**And it was true that you had implemented 12:24:06 this new P filter approach to downranking 12:24:07 nonrecommendable content; right? 12:24:10**
A. I was not responsible for that. The 12:24:12 engineers on our team were responsible for that. 12:24:15
**Q. And that was a four- or five-page 12:24:17 document that had a whole bunch of wins for your 12:24:19 relevance integrity team; right? 12:24:21**
A. Yes. 12:24:22

5273

**Q. Okay. You're a scientist, you're a 12:24:23 doctor. What is the term -- in science, what does 12:24:24 the term "cherry-picking" mean? 12:24:27**
A. Cherry-picking means deliberately pulling 12:24:29 out pieces of evidence that is in favor of your 12:24:33 position or your hypotheses. 12:24:38
**Q. No further -- 12:24:39**
A. And so, I'd say that this review document 12:24:40 is an example of -- maybe not cherry-picking but a 12:24:43 deliberate bias towards celebrating the biggest wins. 12:24:46
MR. PARKINSON: No further questions. 12:24:50 Thank you, Dr. Lee. 12:24:51
JUDGE BIEDSCHEID: Thank you, counsel. 12:24:52
MS. SINGER: If I may, Your Honor. And 12:25:02 I'll be brief. There's nothing like being the last 12:25:03 person between the end of a Friday and getting out of 12:25:05 here. 12:25:08
12:25:08
(Testimony begins on following page.) 12:25:08

5274

REDIRECT EXAMINATION 12:25:08
BY MS. SINGER: 12:25:09
**Q. Dr. Lee, you were just asked whether you 12:25:09 cherry-picked information to present to this jury. 12:25:11 Did you? 12:25:13**
A. I had no choice in what I was presenting 12:25:14 to the jury. 12:25:16
**Q. And did you accurately describe your 12:25:16 experiences and your assessment of the risks to teens 12:25:19 at Instagram while you were there? 12:25:23**
A. Yes. I did that as faithfully to my 12:25:24 skill set as a researcher. 12:25:30
**Q. And that document that Mr. Parkinson was 12:25:31 discussing with you, DX0539 -- 12:25:34**
A. Yes. 12:25:42
**Q. -- did that -- did this piece, when was 12:25:43 it attended -- was this piece intended to fully 12:25:45 reflect the safety risks to users of reels? 12:25:48**
A. No. This is not a reflection of the 12:25:52 status of the safety of our product. This is to 12:25:54 reflect the things that our team worked on that 12:26:00 have and things that we wanted to celebrate. 12:26:04
**Q. Okay. You were asked about studies that 12:26:05 you did or didn't do, both on direct and 12:26:10 cross-examination. 12:26:12**

5275

**One of the studies that Mr. Parkinson did not bring up as the study on rabbit holing. 12:26:14 12:26:16**
**Do you recall that study? 12:26:18**
A. Yes, I do remember that. 12:26:19
**Q. And what happened with that study, Dr. Lee? 12:26:20 12:26:22**
A. So a little bit of context about that rabbit holing. 12:26:23 12:26:26
MR. PARKINSON: Your Honor. Objection. The whole premise of this question was that it wasn't addressed in cross, so it's outside the scope of cross. 12:26:26 12:26:28 12:26:31 12:26:33
MS. SINGER: Mr. Parkinson asked about treatment of studies and whether they were permitted to go forward. I think I'm entitled to show examples of studies that were squelched. 12:26:34 12:26:36 12:26:38 12:26:41
MR. PARKINSON: Your Honor, in that case, asked and answered. We did the rabbit holing study. I didn't talk about it. 12:26:44 12:26:46 12:26:50
JUDGE BIEDSCHEID: Counsel, I guess on this one, sustained. 12:26:50 12:26:52
MS. SINGER: Your Honor, may we approach? 12:26:59
JUDGE BIEDSCHEID: Yes, you may. 12:27:01
(Sidebar discussion held.) 12:27:07
MS. SINGER: Your Honor, Mr. Parkinson 12:27:07

5276

deliberately brought up that particular study were not permitted to go forward. It leaves out the study that he knows was not permitted to go forward in terms of an appeal basis. I think I'm entitled to -- for completeness to allow the witness to testify about one additional study that Meta did not permit to go forward, and it directly relates to her testimony. I don't intend to spend more than one question on it. 12:27:09 12:27:16 12:27:18 12:27:21 12:27:27 12:27:30 12:27:35 12:27:37 12:27:40
MR. PARKINSON: Your Honor, number one. That's not a valid basis for reconsidering what Your Honor just ruled. 12:27:41 12:27:43 12:27:45
Number two, I don't know what Ms. Singer just asserted I know. 12:27:46 12:27:50
Number three, it's obviously outside the scope because I didn't ask about this study. 12:27:50 12:27:51
And, number four, Ms. Singer's direct was -- 12:27:51 12:27:53
JUDGE BIEDSCHEID: From the perspective of also trying to move things along, you know, generally, there's questions about was any -- I mean, I understand there were questions. In terms of -- and I think part of the ruling you got was the "I'm entitled to go into reports and various things," which certainly sounds as if you're going to go into 12:27:53 12:27:55 12:27:58 12:28:02 12:28:04 12:28:07 12:28:10

5277

more things that were not discussed specifically on cross. So that's part of the ruling. 12:28:12 12:28:15
If you want to generally get into reports and whether it was dropped or stopped or the like, I think briefly that's fine. 12:28:17 12:28:20 12:28:24
MS. SINGER: Okay. 12:28:26
JUDGE BIEDSCHEID: Going into these specific reports. 12:28:26 12:28:28
MR. PARKINSON: Your Honor, if it gets repetitive of what we did on direct, I'm going to say "Asked and answered." 12:28:28 12:28:30 12:28:32
MS. SINGER: I'm going to ask one question. 12:28:32 12:28:35
JUDGE BIEDSCHEID: Okay. 12:28:38
(Sidebar ends.) 12:28:39
**Q. BY MS. SINGER: Dr. Lee, were there studies that were dropped or stopped during your tenure as a Instagram researcher? 12:28:40 12:28:42 12:28:45**
A. Yes, there were several. 12:28:46
**Q. And can you briefly describe what those were? 12:28:47 12:28:49**
A. Yeah. One of them was a study that I proposed to study what we were calling "rabbit holes," which was if young people were consuming, particularly a subset of young people that were 12:28:50 12:28:52 12:28:57 12:28:59

5278

consuming nonrecommendable content at a really high rates, how did they get there; right? Because rabbit holing is basically all of a sudden you get sucked in and before you know it, their entire feed is full of this type of content. 12:29:01 12:29:05 12:29:08 12:29:10 12:29:13
So I had proposed a study where we would recruit a group of young people to -- who might have been in elevated rates of consuming this problematic content and just talk to them. Ask them, like, what do you like about this content? How did you get there? And we would match that with their background content. 12:29:15 12:29:17 12:29:20 12:29:22 12:29:25 12:29:27 12:29:30
MR. PARKINSON: Sorry to interrupt. 12:29:30
THE WITNESS: That -- 12:29:32
JUDGE BIEDSCHEID: Excuse me, Ms. Lee. I guess I'm trying to cut down the narrative. 12:29:32 12:29:34
THE WITNESS: Sure. 12:29:36
JUDGE BIEDSCHEID: If you have a more responsive -- so, Ms. Singer, maybe ask another question. 12:29:37 12:29:38 12:29:41
THE WITNESS: Yeah. 12:29:41
**Q. BY MS. SINGER: So, Dr. Lee, can you provide one example of a study that was significant to you that you were not permitted to proceed with? 12:29:42 12:29:44 12:29:48**
A. Yeah. 12:29:52

5279

MR. PARKINSON: Your Honor -- 12:29:52
JUDGE BIEDSCHEID: So again, I think we were talking up here about the general. 12:29:54 12:29:56
MS. SINGER: Okay. 12:29:58
**Q. BY MS. SINGER: Can you speak generally about the significance of studies that you were not permitted to undertake and the impact that may have had on safety for users of Instagram? 12:29:59 12:30:01 12:30:03 12:30:05**
A. So that study was not permitted to go on, which meant that the known challenges about safety were -- continued to persist. 12:30:08 12:30:12 12:30:17
This particular study was all of a sudden thrust into high gear because of a Wall Street Journal article that was published highlighting the rabbit holing issues. 12:30:21 12:30:25 12:30:30 12:30:32
So approximately October, The Wall Street Journal did their own independent test of rabbit holes and showed that particular boys' accounts -- 12:30:34 12:30:36 12:30:38
JUDGE BIEDSCHEID: So, again, I want you to specifically target your answers to what you're being asked. 12:30:40 12:30:44 12:30:47
THE WITNESS: Okay. That's helpful. 12:30:48
Yeah. So all of that to say is that until there was an external motivation to do that study, I was not allowed to conduct that study, even 12:30:49 12:30:51 12:30:53

5280

though I had preemptively and proactively identified that as a problem area to study. 12:30:56 12:31:00
**Q. BY MS. SINGER: Okay. And you were asked about improvements that Meta claimed to have made after you left Instagram. 12:31:02 12:31:04 12:31:09**
**Do you recall those questions? 12:31:10**
A. I do recall those questions. 12:31:11
**Q. And during your tenure at Instagram, did you have experience that showed you that many of these risks were well known to Instagram? 12:31:13 12:31:16 12:31:18**
MR. PARKINSON: Objection. 12:31:21
**Q. BY MS. SINGER: For a long period of time? 12:31:22 12:31:24**
MR. PARKINSON: That is the conclusion. Objection. 12:31:24 12:31:25
JUDGE BIEDSCHEID: All right. So, counsel, I hate to do this at 12:35, but come on up quickly. 12:31:26 12:31:27 12:31:31
(Sidebar discussion held.) 12:31:32
MS. SINGER: I'm happy to rephrase that more generally. 12:31:35 12:31:37
JUDGE BIEDSCHEID: All right. Be mindful of cross and be mindful of the time. 12:31:43 12:31:44
(Sidebar ends.) 12:31:47
**Q. BY MS. SINGER: In your experience, 12:31:48**

5281

**Dr. Lee, were risks to teens known for a period of time before these tools were implemented? 12:31:56 12:32:00**
A. My literature review when I first arrived surfaced that there were studies dating back as early as 2018, perhaps even earlier, that first investigated teen safety experiences. 12:32:03 12:32:10 12:32:12 12:32:14
**Q. Mr. Parkinson showed you a bunch of poster boards. Just curious, do you have an estimate how many we would need to show all of the product engineers who were working on growing teen use of reels and Instagram? 12:32:16 12:32:19 12:32:21 12:32:24 12:32:28**
MR. PARKINSON: Objection. Expressly calls for speculation. We have the foundation on what Dr. Lee was doing at Meta. There are other witnesses that can talk about the org charts. 12:32:29 12:32:31 12:32:33 12:32:36
JUDGE BIEDSCHEID: Overruled. If you know that answer, you may give it. 12:32:39 12:32:40
THE WITNESS: I can't comment on the number. I would just say as an expression, it was a ratio of myself, a single researcher, to a ratio of about eight or nine engineers on my team. So you can imagine what that might look like if you were to take that ratio and apply it to this org chart of researchers only. 12:32:45 12:32:47 12:32:49 12:32:53 12:32:55 12:33:00 12:33:03
**Q. BY MS. SINGER: Okay. And last question, 12:33:04**

5282

**Dr. Lee. 12:33:05**
**You were asked some questions about content that wasn't filtered and gray areas. Was the content that you observed at Instagram that was being recommended to individuals with inappropriate interactions with children content that -- recommendations that you knew to create a risk to child safety? 12:33:06 12:33:07 12:33:10 12:33:14 12:33:16 12:33:22 12:33:24**
MR. PARKINSON: Objection. Leading. 12:33:25
THE WITNESS: Well -- 12:33:28
JUDGE BIEDSCHEID: And so overruled. You may answer. 12:33:29 12:33:30
THE WITNESS: Okay. 12:33:31
What we saw was very clearly risky content featuring minors that was undesirable for most adults, and especially concerning if they were being shown to adults that had mal intent with that content. 12:33:33 12:33:37 12:33:41 12:33:43 12:33:50
MS. SINGER: I have nothing further. Thank you so much, Dr. Lee. 12:33:50 12:33:53
JUDGE BIEDSCHEID: All right. Thank you, counsel. And thank you very much for your testimony. You're excused. You may step down. 12:33:54 12:33:54 12:33:56
THE WITNESS: Thank you. 12:33:58
(Dr. Lee leaves the courtroom.) 12:34:10