# EXHIBIT D

CONFIDENTIAL



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

*******************************

IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION

Case No. 4:22-MD-03047-YGR

MDL No. 3047

*******************************

This Document Relates To:

Tucson Unified School District
v. Meta Platforms Inc., et a
Case No. 4:24-cv-1382

*******************************

Confidential - Pursuant to Protective Order

VIDEOTAPED DEPOSITION OF
GABRIEL TRUJILLO

Held At: JW Marriott Tucson
Starr Pass Resort & Spa
3800 W. Starr Pass Blvd
Tucson, Arizona

May 8th, 2025
9:11 a.m.

Reported By:

MAUREEN O. POLLARD, CA CSR #14449, RDR

performance?
A. Yes.
MS. DEGTYAREVA: We've been going for, I think, over an hour. Would now be a good time for a short break?
THE WITNESS: Sure.
MR. CUTLER: Sure.
THE VIDEOGRAPHER: We're going off record. Time is 10:24.
(Whereupon, a recess was taken.)
THE VIDEOGRAPHER: We're going back on record. The time is 10:38.
BY MS. DEGTYAREVA:
Q. Welcome back, Dr. Trujillo.
Do you agree that racial discrimination can impact students' mental health?
A. Yes.
Q. It can also affect their academic performance?
A. Yes.
Q. It can be disruptive to their learning environment?
A. Yes.
Q. And up until mid-2022, I believe,

TUSD was under court supervision as part of a desegregation litigation, right?

A. Yes.

Q. That desegregation litigation started in the 1970s?

A. Yes.

Q. Can you briefly explain what the desegregation litigation was about?

A. The desegregation litigation occurred in three phases.

The original litigation that was brought forward in 1974 had to deal with the remnants of discrimination at the district's only segregated school, which was Dunbar Spring. Dunbar Spring was desegregated by Robert D. Morrow, the longest serving superintendant in TUSD history who served from 1942 to 1968. He voluntarily desegregated Dunbar Spring in the mid-'60s when Arizona constitution didn't require him to do it.

What happened was, the remnants of those enrollment patterns and the remnants of the policies and procedures that were around at the time of the segregated school in the opinion of the plaintiffs at the time, Maria Mendoza,

representing the Mendoza plaintiff class, charged the school district with running a dual school district with separate but unequal access to facilities and resources. This was in the early '70s.

In the early -- and the district was then required under a federal court order to employ the primary strategy of creating magnet schools to create a more equitable opportunity for students of color to attend special programs and have access to resources and extracurricular programs that weren't available pre-magnet.

So the district would then pursue -- or actually what would ensue would be another almost 30 years of back-and-forths, the districts and the plaintiff representatives arguing about programs, arguing about data to measure effectiveness, agreeing on integration targets that could be achieved independent of demographic patterns, arguments about transportation lines and whether or not to use compulsory busing or not compulsory busing.

When all was said and done, there was a brief period where the district did exit court supervision. This was around 2009. The

district did exit court supervision around this time, but then the district landed back under court supervision in 2013, 2014, and that was a consent decree where the district voluntarily entered into this consent decree with the plaintiffs' representatives in the case to settle the case through this consent decree, which then became the unitary status plan, how will the district definitively end the court supervision.

This third iteration of the case was no longer about desegregation or segregation, it became about academic achievement. And the whole district's argument was, we should not be under a federal court order for academic achievement when no other major urban school district in the entire nation is.

We ended up exiting court supervision in 2022 because of our implementation efforts around the unitary status plan which primarily focused on family and community engagement, magnet schools, transportation, extracurricular activities, and our student support service programming primarily for students of color.

Q. So the original court supervision, that began in 1978, is that right?
A. Yeah. Judge Frey.
Q. And the rule of the Court at that point was to make sure that TUSD got rid of the remnants of the segregation and the systemic discrimination that had existed?
A. Yes.
Q. Now, you said that TUSD briefly exited supervision around 2009, right?
A. Yes.
Q. And then it came back under supervision because a Court found that essentially TUSD hadn't yet achieved this unitary status?
A. A Court found that sufficient data -- that the original ruling was incomplete as the ruling was made without definitive data as to whether or not the programs that the district was charged with implementing actually led to better academic outcomes and actually led to more integrated campuses.
So that's where the judge ruled that we had to go back under court supervision, and that was the actual nature. It wasn't that we

were still running a largely segregated district at that time.

It should also be noted that this predates my arrival in the district by several years.

Q. Right.

And so the district went back under court supervision, and then that didn't end until mid-2022, right?

A. Correct.

Q. And you said that that phase, the third phase you called it, was about academic achievement. Are you referring to academic achievement as it relates to equal opportunities for all students regardless of race?

A. The final iteration of the 40-year case became focused on the term "achievement gaps," proficiency levels in reading, writing, and math, and differences in achievement levels for African American students and Latino/Mexican American students in these areas.

It also focused very heavily on access to advanced learning experiences and better and more robust African American and Mexican American student participation in

advanced placement courses, gifted and talented instruction, and honors, honors courses.

Q. So this desegregation litigation, this was a major challenge for TUSD for over 40 years?

A. Yes.

Q. And you have personally worked on the desegregation litigation since you were appointed as superintendent in 2017?

A. Yes.

Q. Do you agree that desegregation has been a top priority for the district since 1978?

A. It's been a priority, yes.

Q. And do you agree that being in an environment where there are any remnants of segregation, that can be impactful to mental health?

A. It can be.

Q. It can also impact academic performance?

A. Yes.

MS. DEGTYAREVA: Let's take a look at Tab 14, which is exhibit -- going to be Exhibit 11.

///

CERTIFICATE OF COURT REPORTER

I, MAUREEN O'CONNOR POLLARD, Registered Diplomate Reporter, CSR No. 14449 for the State of California, the officer before whom the foregoing deposition was taken, do hereby certify that the foregoing transcript is a true and correct record of the testimony given; that said testimony was taken by me stenographically and thereafter reduced to typewriting under my direction; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

Dated this 10th day of May, 2025.

Maureen O. Pollard

________________________

MAUREEN O'CONNOR POLLARD

CSR No. 14449