# EXHIBIT C

# *STATE OF TENNESSEE, et al.*

v.

# *META PLATFORMS, et al.*

Trial

**Volume 4**

*July 27, 2026*

HARPETH COURT REPORTERS

(615) 933-6786
www.harpethcourtreporters.com

IN THE CHANCERY COURT OF DAVIDSON COUNTY, TENNESSEE
FOR THE TWENTIETH JUDICIAL DISTRICT AT NASHVILLE

---

STATE OF TENNESSEE, ex rel.
JONATHAN SKRMETTI, ATTORNEY GENERAL
and REPORTER,

Plaintiff,

vs. Case No. 23-1364-IV

META PLATFORMS, INC., and
INSTAGRAM,

Defendants.

---

TRIAL TRANSCRIPT
(Pages 648-919)

Volume 4

Before Chancellor Russell T. Perkins

July 27th, 2026

8:15 a.m.

---

Reported by:
Harpeth Court Reporters
Franklin, Tennessee
Julie Lyle, RPR, LCR

Page 753

I want to talk about some of the content that the -- that is going to be at issue in this case. And I want to start with suicide, self-injury, and eating disorder content.

Meta's policy prohibits this type of content, and Meta has automated tools that are designed to get rid of it. And the tools are effective because you can see -- this is from Meta's disclosures -- Meta will go out and look at 10,000 pieces of content on Instagram, and they will have human beings look at it to see if it's, for example, suicide content. And then it will report to the public how much they find when they do that.

That's what is on this transparency report. About 0.05 percent of the material that those folks looked at violated Meta's suicide policy. Meta even goes offline to try to help people in the real world. If Meta learns about a person who might be suicidal, Meta will reach out to first responders in the real world to try to help that person.

And, in fact, Meta has done that -- those are called wellness checks. Meta has done that over 15,000 times just in the United States. And I want to talk to you about one example that

Page 754

Ms. Davis will talk about because this is an important issue to her.

Meta found, through its automated systems, that a man in Indiana was streaming a video of himself with a gun, talking to his family, including his child, about the potential that he might take his own life.

Meta's automated systems flagged this. Meta reached out to local law enforcement. And, luckily, law enforcement was able to find this man and take him to get help so that he did not end his own life.

We're going to hear about that and a lot of other examples where Meta has helped protect people in the real world.

Now, suicide is actually one of the hardest issues for Meta to deal with because it is not as black and white as you might think. And we're going to get criticized by the State for how difficult this issue is, but it is a hard issue.

I think we would all agree that a graphic video of someone ending their own life violently is bad and should be taken down, and Meta does its level best to do that.

But there are other posts that might

Page 755

talk about suicide that might be a harder thing to deal with.

So, for example, if someone talks about suicidal feelings but they say that they got help from a support group, that's -- on the one hand, it's talking about suicide. On the other hand, it's talking about someone getting help.

And on the screen, we have a way of kind of thinking about how difficult these issues are and why it's not so easy to keep Instagram perfectly safe because different people might disagree.

And Ms. Davis is going to testify that Meta works with outside mental health experts to try to figure out where exactly on that line it ought to go. And you'll see evidence that that line changed over time because of some of that advice.

Meta also works really hard to build tools to protect kids and everybody else from suicide material and things like that. And just some of those tools are on the screen. And we're going to talk about many of those tools during the course of this trial.

Another category the State talked about was child exploitation material, which is also a tough topic. This includes sexual abuse and

Page 756

basically sexual -- sexual abuse material as well as inappropriate interactions with children.

Meta's rules prohibit this as well. This conduct is against the law, and this is criminals doing criminal things, period.

When Meta uses its cutting-edge technology to find this type of material, it gets rid of it and it reports it to the authorities. And the way that it does that is through the National Center for Missing & Exploited Children, which is called NCMEC.

And under the law, Meta reports this kind of material to NCMEC. NCMEC reports it to the police. And Meta has helped put real bad guys in the real world in jail doing this. I'll give you an example from Tennessee.

Meta's tech figured out that a 44-year-old man in Memphis was having an inappropriate relationship with a 14-year-old girl and a 13-year-old girl. And based on Meta's tips -- tip, that guy was arrested and sentenced to 30 years in prison. You'll hear about that and other examples.

In fact, the CEO of NCMEC, which is that National Center for Missing & Exploited Children,

Page 757

told Meta that it, quote, has done more for child safety than any other tech company.

And that's going to be important, because these problems are societywide problems, these problems are industrywide problems, and you're going to hear evidence that Meta is the best at dealing with these problems.

In addition to working with NCMEC, Meta hires safety professionals, including investigative teams made up of former police officers, FBI agents, CIA agents, and -- and federal prosecutors. Meta thinks of these as like the special forces of Meta, and these investigative teams, you can see it up on the screen, have done a lot to throw bad guys in jail, to break up pedophile networks and remove their accounts.

Meta also uses the results from these investigative teams to improve the tools, the safety tools, the find it/fix it that we've talked about, before.

In addition to the investigations, there are the tools, and here are the safety tools that Meta has built over the years. During this trial, we will be learning about a lot of these tools. Thanks to these efforts, Meta is able to keep the

Page 758

amount of this type of abhorrent content low. You can see here that when Meta goes out and looks at 10,000 pieces of material like this, looking for material like this, it finds less than 0.01 percent.

Now, of course, any instance of child exploitation is one too many. And so Meta is constantly trying to improve its systems. But I really want to explain to you why this is so difficult.

The evidence will show that Meta strives to be perfect, but it cannot be perfect at this. Perfection is impossible. And this is really important.

Why is perfection impossible? We'll start by thinking about the volume of content on Instagram. 1 billion posts a day. If you just counted to a billion starting right now, it would take you till 2057. That's how big that number is. And that's every single day that many posts get posted.

The vast majority of those posts are perfectly fine. Cat videos and things like that. But there are some posts that are bad, and the problem is, Meta is looking for a small needle in a huge haystack. And it isn't easy.

Page 759

Now, I want to point out something really important here, which is Meta is never going to be able to fix this entirely. It's just too big of a societywide problem. There's just too much material out there. And the bad guys are constantly changing their tactics, which makes it even harder for Meta to fix it.

So I want to give you an example of this just so that you can understand what we're up against.

When Meta builds a new tool, criminals try to circumvent it. So Meta would search for the word "child pornography" to try to find that kind of stuff. And these bad people, these criminals, to avoid the safeguards, they started using the word "cheese pizza" to mean child pornography because it has the same initials, "CP." And they did that because it would get around Meta's automated systems.

If you think about it, most people who are talking about cheese pizza are talking about cheese pizza, and so this fooled Meta's systems for a while. And when Meta discovered this, it fixed that problem, found it and fixed it.

Then the bad guys switched to the

Page 760

Spanish world -- word for caldo de pollo, which is basically chicken soup. And then Meta found that one.

It's like a game of Whack-a-Mole. Do you remember the game Whack-a-Mole, where a mole would pop up and you'd hit it with a mallet? That's what Meta has to deal with. And you are going to hear from Meta's child safety experts who are in this battle every single day.

Now, you might ask yourself why does Meta go to these lengths with hiring former CIA agents and things like that to get rid of this content. Well, the first reason is it's just the right thing to do. Meta actually wants people to have good experiences on Instagram. That's why Instagram was created.

But the second reason that Meta does this is because good experiences are good for business. It is true that Meta makes its money by advertising. That is true. And Meta is in the business to make money.

But an important thing is that, if people have bad experiences on Instagram, then they're not going to come to Instagram and Instagram is not going to make money. And if Instagram or

Page 781

wrong is because many of the features that are now inside of Teen Accounts, when they were bundled together in 2024, those features go all the way back to 2018 and 2021 and -- and other times.

The messaging restrictions I told you about, the private-by-default I told you about, and some of the -- some of the time management tools I told you about, those date to far before the Teen Accounts themselves were actually rolled out.

The State also said that Teen Accounts aren't perfect. And they said that they are going to bring some -- some people to come talk about reports testing Teen Accounts.

When you hear the cross-examination and get all of the information about this, these are reports created by anti-Meta advocacy groups that are trying to game Teen Accounts to make it seem like they aren't perfect.

But, of course, it is true that Teen Accounts are not perfect. Just like any of these electronic systems, they cannot be perfect, which is why Meta has said to people over and over again, our systems can't be perfect; they aren't perfect.

And remember, this is a deception case. The fact that Meta is telling the public our systems

Page 782

aren't perfect, that shows that Meta isn't misleading anyone.

Now, I also talked about the third business philosophy, which is empowering teens and parents with tools to protect teens.

As we talked about, Meta publishes parents' guides periodically. We looked at the 2012 one from Facebook. We also looked at one from 2018 related to Instagram.

One of -- the Instagram one is on the screen, and it talks about how you can use Meta's safety tools, and it has guidelines for how to use Teen Accounts.

Meta also has resources available to teens on its -- or, I'm sorry -- to parents on its website. If you just get on to Google and you Google "how to keep my teen safe on Instagram" or something like that, you Google that, you're going to get a bunch of information about Teen Accounts.

And if you click on the first thing, Manage your Teen Accounts settings, you're going to get a bunch of information on Meta's website for parents about how to protect kids. So Meta has tried to build as many tools and as many ways of getting this information as possible.

Page 783

Meta also goes out into the real world and puts boots on the ground to try to provide this information. So this is a picture from last year where -- last June when Meta brought its Screen Smart roadshow to Nashville. This is a group that goes around the country teaching parents how to use the safeguards that Meta has built.

One of the leaders of Meta's Youth Safety Policy team spent the day in Nashville talking to parents about how to use Meta's safety tools for teens.

Meta also wants to empower schools because schools also have a role to play. I want to give a couple of examples.

First, Meta wrote school online safety lesson plans that it gives away to teachers to help teach digital literacy to students, and you can see the example on the screen. These are lesson plans that a teacher can just use to teach kids about safety online.

Another example, Meta has built a school partnership program to work directly with schools to make it easier for teachers, for example, to report bullying on Instagram. And it basically gives a way for teachers to report that directly to Meta, and

Page 784

those reports will be given priority, and Meta will get back and update the schools after it takes action because bullying is a hard issue to deal with. It's hard to know when someone is being bullied if you don't have the context of the conversation.

All of this -- and there's a lot more that you will learn about during the trial -- is an effort by Meta to try to empower parents and schools to help keep teens safe online.

So those are the three business philosophies that we talked about. I want to walk through some of the areas that the State talked about, and we can all see those business philosophies working together.

So I want to start with people who use Instagram too much. And this is the State's claim that Meta engaged in an unfair business practice because Meta supposedly designed Instagram in a way that leads to addiction and mental health harm. The evidence will show that is wrong.

Now, we've already talked about the fact that Meta doesn't want teens to be addicted because they're going to delete their accounts and they're going to have bad experiences.

# *STATE OF TENNESSEE, et al.*

v.

# *META PLATFORMS, et al.*

Trial

**Day Seventeen**

*August 17, 2026*

H
HARPETH
COURT REPORTERS

(615) 933-6786
www.harpethcourtreporters.com

IN THE CHANCERY COURT OF DAVIDSON COUNTY, TENNESSEE
FOR THE TWENTIETH JUDICIAL DISTRICT, AT NASHVILLE

STATE OF TENNESSEE, ex rel.
JONATHAN SKRMETTI, ATTORNEY GENERAL
and REPORTER,

Plaintiff,

vs. Case No. 23-1364-IV

META PLATFORMS, INC., and
INSTAGRAM LLC,

Defendants.

TRIAL TRANSCRIPT

(Pages 5110 to 5491)

Day 17

Before Chancellor Russell T. Perkins

August 17, 2026

8:15 a.m.

Reported by:
Harpeth Court Reporters
Franklin, Tennessee
PATRICIA NILSEN, RMR, CRR, LCR
JULIE LYLE, RPR, LCR

Page 5239

at Meta.
**Q. Is sitting through a trial as a corporate representative something you've ever done before?**
A. No.
**Q. Is it part of your ordinary job responsibilities?**
A. No.
**Q. Is anyone at Meta making you be here?**
A. No. In fact, I was told very specifically, it was not something that I had to do, and I wanted to do it.
**Q. And you touched on this briefly, but why did you come?**
A. Because I wanted to make sure that I was able to share the full story of our work.
We have inside of Meta numerous people who have dedicate -- who, prior to coming to Meta, dedicated their lives to prosecuting child sexual crimes, to working with vulnerable, at-risk kids, who come to Meta because they believe that they can have an impact on a very large scale. They're quite dedicated to this work.
And also, candidly, because I think our leaders invited those people into the platform. They wanted them there to take a good, hard look at

Page 5240

the things that we are doing to make sure that we were doing them well. And I wanted to make sure that that came across.
MS. PAUL: All right. Let's pull up our roadmap for today, which is DDX21.65.
With Your Honor's permission, I'd like to publish it.
THE COURT: You may.
THE WITNESS: This is the orange book -- oh, no. That's you.
MS. PAUL: Maybe do a little housekeeping here.
Can I take these down?
MR. CARTMELL: Oh, sure.
BY MS. PAUL:
**Q. All right. So our roadmap for today, we will go through your background a little more, talk about the safety teams at Meta, and then we will go through some of the topic categories that Mr. Cartmell asked you about.**
**Sound good?**
A. Okay.
**Q. So starting with your background, can you remind us what your educational background is?**
A. Yeah. So I have a college degree from

Page 5241

Barnard College. I have a law degree from the University of Chicago. I have a master's in education from Old Dominion University.
**Q. And you've discussed with Mr. Cartmell that you were a lawyer for about a year; is that right?**
A. Yeah.
**Q. Okay. And you have not practiced law since then?**
A. No.
**Q. And you left law for teaching; is that correct?**
A. Yeah. So when I was -- if it's okay, when I was practicing law, it -- I enjoyed the work, but it was -- it was endless hours, until 3:00 in the morning, waking up at 6:00 in the morning, and I just wasn't sure that I was passionate enough to continue -- to continue that work.
So I took a step back to think about what -- you're going to work hard at whatever you do. What is something that I could do that I really cared about? And I had always cared a lot about kids. I babysat. I'd worked at a Fresh Air Fund camp for kids who -- in the inner city who couldn't otherwise access summer camp.
And I just felt like it was -- that was where

Page 5242

my passion was. It was a thing that I loved doing. It was a thing that gave me sort of joy, and so I pursued a teaching degree.
**Q. And what grade did you teach?**
A. Middle school.
**Q. And what did you do after teaching middle school?**
A. So -- well, immediately after teaching middle school -- actually, it was when my daughter was born -- I started a homeschooling cooperative so that I could teach my daughter at home with a bunch of other -- other moms where we lived at the time.
And then eventually I ended up working for an Attorney General.
**Q. And as you discussed with Mr. Cartmell, that was a policy job, correct?**
A. Yes. Yes.
**Q. And how did that job get you to Meta?**
A. So while I was in -- at the Attorney General's Office, I had a number of different things, as I mentioned before, so I worked on our issues -- some of our issues around family violence. I worked on the mortgage foreclosure crisis.
I -- when the Attorney General was in office, he became the president of what's called the

Page 5395

**Thursday. What is Thorn, if you can remind the jury, and how does Meta work with them?**
A. Yeah. So Thorn is a really interesting child safety organization. They're an NGO that not only does the kind of work that we've been talking about today, but they also build tools, actual tools, like the ones that Meta uses, to offer to companies that are smaller than ours, who don't have the kind of technology that -- that we do, to ensure that they also can try to provide child safety measures on their platform.
**Q. And how long has Meta been working with Thorn?**
A. Well, they certainly have been working there -- with Thorn as long as I've been at Meta, but I don't think I was the first person to meet them. I think they were a few coalitions before that, for sure.
**Q. And has the Meta-Thorn relationship led to positive improvements in child safety?**
A. Absolutely.
**Q. Can you give some examples?**
A. Yeah. So they were part of that sextortion curriculum, child safety exploitation curriculum, that we built for -- to take out to schools. They

Page 5396

also have been a part of the work that we've done with minors.
So they did -- and we did with them -- a campaign -- this was probably in the earliest years of my work, but it was basically -- my work at Meta -- a campaign, a video for young people, warning them about the risks of sharing intimate images of themselves, even with their -- with their friends. And trying to not make them ashamed to come forward that they may have done it, but to actually come forward if they needed help.
And we launched that campaign with them and provided ad credits to make sure they could get it out on our platform to users.
**Q. We also heard about a group called NCOSE on Thursday; do you remember that?**
A. I do.
**Q. And you remember, the State showed you two letters NCOSE had sent Meta about the Dirty Dozen list?**
A. I do.
**Q. Can you tell the jury a little bit more about NCOSE?**
A. Well, I would say they're different, and set apart from a lot of other child safety

Page 5397

organizations. It doesn't mean that we don't take them seriously. We certainly met with them, heard their concerns. But we haven't had the same kind of collaborative relationship with them.
Thorn is critical of us, but they are interested in working with us and trying to share risk and share resources and make improvements, and that hasn't been the case for us with NCOSE.
**Q. As the name implies, are there a dozen other companies that are put on the list each year?**
A. Yes, there are.
**Q. And I'd like to look at DDX21.56.**
**What is this slide showing?**
A. This shows some of the other companies that are on that list in any given year, and that are companies that are -- like the Department of Justice is on there.
**Q. And in case it's a little hard to read, can you list some of the other companies that NCOSE has put on its Dirty Dozen list?**
A. Yeah. The American Library Association -- actually I think that's the state of Nevada -- Barnes & Noble, Verizon, Visa, Hilton, Netflix.
**Q. And so what do you make of Meta being included on the Dirty Dozen list?**

Page 5398

A. I would prefer not to be on a list that's critical of Meta. I'd prefer for our work not to be known to -- to not end up on the list. But I also really am much more focused on organizations where I feel like they're providing us with meaningful insights that can be very useful for us to address -- address our work.
We're still going to meeting with NCOSE, and we still did meet with NCOSE to hear their -- to hear their concerns. But I guess it is what it is.
**Q. We can take that down.**
**Does Meta work with the Department of -- Department of Homeland Security to help protect children online?**
A. Yes. Yes, we do.
**Q. Let's look at DX3553. This is in your orange binder.**
A. I'm sorry, you're going to have to say the number again.
**Q. DX3553. It's the May 10, 2024, letter from DHS, the Department of Homeland Security, to Mark Zuckerberg.**
A. I've got it.
**Q. Do you recognize this document?**
A. I do.

**Q. Okay.**
MS. PAUL: And, your Honor, we'd move to admit DX3553.
THE COURT: Any objection?
MR. CARTMELL: Yeah, your Honor. I don't see her on this, or any foundation laid for her.
MS. PAUL: I believe she just testified she recognizes this document.
THE WITNESS: It was shared with me, if that's helpful.
THE COURT: All right. Just ask a few questions, and we'll see where we are.
BY MS. PAUL:
**Q. Is your understanding that this letter was sent to Mark Zuckerberg from the Department of Homeland Security?**
A. Yes.
**Q. Okay. And was this letter shared with you as part of your work?**
A. Yes. It was shared with me; it was shared with Ravi, on my team, could also have worked on this.
**Q. And does this describe work that Meta has done with the Department of Homeland Security?**



A. Yes.
**Q. And is that work you're familiar with?**
A. Yes.
MS. PAUL: Okay. Your Honor, we'd move to admit DX3553.
MR. CARTMELL: No objection.
THE COURT: It is admitted without objection.
(DX3553 was admitted.)
MS. PAUL: Can we publish this, please?
THE COURT: You may.
BY MS. PAUL:
**Q. Is this the cover page of the mailing, since it came in hard form?**
A. Yes.
**Q. And then the next page is the letter itself?**
A. Yes.
**Q. And let's zoom out a little bit, so we can see the signature page as well, or the -- okay. Zoom back in a little.**
**Can you describe the first sentence of this document? What is being communicated here?**
A. Yeah. So I think that we're -- we're reaching out on behalf of the -- of the office itself to basically say that they were grateful for



working -- for our leadership in this area, and for working -- working with us and for working with them.
**Q. And the second paragraph describes the work that Meta had done with the Department of Homeland Security. Can you read that sentence for us?**
A. "We are immensely grateful that Meta under your leadership has joined us in this fight. Your partnership in our groundbreaking awareness and education campaign, Know2Protect, will save lives. The reach of Meta is extensive and impactful."
**Q. Can you describe what the Know2Protect project, that Meta did with the Department of Homeland Security, is?**
A. Yeah. So this is actually -- the name speaks for itself. Know2Protect: Basically what we were -- what they were doing, what we were doing with them, is to make sure that people were aware, so that they could protect themselves. It was a campaign that -- that launched to share this kind of information around these issues with parents around our child exploitation, and with families, so that they had awareness to take the right steps.
And I -- I actually appeared -- with Mayorkas; I can't remember -- but one of the major



news stations, to share this information in the public in a broad, broad way.
**Q. And when Meta does campaigns like this, is it trying to sugar-coat the issues?**
A. No. That interview was not sugar-coated; our conversation was not sugar-coated; the information that was provided to parents from the government and from us was not sugar-coated.
**Q. The jury has also heard about Meta's work with NCMEC. And can you remind the jury what "NCMEC" stands for?**
A. The National Center for Missing and Exploited Children.
**Q. How long has Meta worked with NCMEC?**
A. Well beyond -- before I was at the company. There's a -- Emily Vacher, who was a member of the FBI who came over to Meta. She worked with NCMEC for a really long time. We launched something called AMBER Alerts; you probably see them when you're driving your car, but we launched them inside of our platform to help find missing and exploited children. That occurred -- and began occurring long before the work that I was doing. So for -- certainly prior to 2014, and I don't know exactly how many years prior.

# *STATE OF TENNESSEE, et al.*

v.

# *META PLATFORMS, et al.*

Trial

**Day Eighteen**

*August 18, 2026*

HARPETH
COURT REPORTERS

(615) 933-6786
www.harpethcourtreporters.com

IN THE CHANCERY COURT OF DAVIDSON COUNTY, TENNESSEE
FOR THE TWENTIETH JUDICIAL DISTRICT AT NASHVILLE

STATE OF TENNESSEE, ex rel.
JONATHAN SKRMETTI, ATTORNEY GENERAL
and REPORTER,

Plaintiff,

vs. Case No. 23-1364-IV

META PLATFORMS, INC., and
INSTAGRAM, LLC,

Defendants.

TRIAL TRANSCRIPT
(Pages 5492 - 5840)

Day 18

Before Chancellor Russell T. Perkins

August 18, 2026

8:15 a.m.

Reported by:
Harpeth Court Reporters
Franklin, Tennessee
Emily L. Sipe, RPR, LCR
Patricia Nilsen, RMR, CRR, LCR

Page 5594

their daily activities.

**Q. How would you think about the proportion of the good versus bad?**

A. Well, I -- actually my career and time at Meta is very focused on the hard issues that we deal with; but I wouldn't be at Meta if I thought those were the things that dominated the platform or that people were inherently unsafe on the platform at Meta, because I think largely it is that other experience I was describing and I want to make sure -- we want to make sure that for the experiences, where it isn't that way, that we're doing everything we can to try to prevent those things from happening.

**Q. Do you think overall that Meta's products are safe for teens to use?**

A. Yeah, I think by and large and overall. I would never say that there are no risks. I actually try to make it clear that there are some risks. But overall, yes.

**Q. If these products were designed to be unsafe, would you still be at Meta today?**

A. I would not be at Meta. And it's more than just not that they're designed unsafe. If I didn't think that Meta was committed to trying to put in place the right things, I wouldn't be at Meta today.

Page 5595

**Q. Why have you stayed for 12 years?**

A. For that exact reason, because it's given me an opportunity to play a role in shaping the platform and something that matters a lot to young people, which they matter a lot to me.

**Q. Are you proud of the work you and the safety team have done at Meta, even after all you've seen and heard?**

A. Yeah. It's a weird to say proud. I am proud, but I mostly spend my time thinking about what more we can do.

MS. PAUL: Thank you. No further questions.

MR. CARTMELL: I think I need a microphone.

MS. PAUL: Before we start, I don't think you can see me. So if I jump up --

MR. CARTMELL: I can -- a little bit this way.

Okay. Cool.

Yeah, and I might turn this around in a minute. But jump, say something and I'll...

REDIRECT EXAMINATION

BY MR. CARTMELL:

**Q. All right, Ms. Davis. Good morning.**

Page 5596

A. Good morning.

**Q. I want to follow up on some things. I don't think it will be too long.**

A. Okay.

**Q. But I want to kind of start where you left off a little bit.**

**I think one of the things you talked about this morning was anxiety and depression. And I think -- I don't want to put words in your mouth, but I think this morning you said unequivocally that you think the answer to this, as far as Instagram causing or contributing to anxiety and depression, the answer is no; is that fair?**

MS. PAUL: Objection. I only asked about causation.

MR. CARTMELL: Only asked about causation? Okay.

BY MR. CARTMELL:

**Q. As far as causation -- we'll just focus on causation not contributing to cause.**

**As far as causation, I think what you said was unequivocally today the answer is no, Instagram cannot cause anxiety and depression; is that fair?**

A. Yeah. I also think that we didn't talk about contributing to cause. I think we talked about

Page 5597

contributing.

But what I said -- and I'll repeat it again because I want to be really clear, because I think there was a lot of back and forth the last time. Based on the research that -- external research that I reviewed, based on the research that has come from our internal researchers, I do not think that Instagram -- problematic use causes anxiety and depression. I do think that people who may have problematic use have indicated that they have anxiety and depression or it impacts that. So that's important to know, but that's different than saying that problematic use and Instagram causes anxiety and depression.

**Q. So, but to be clear, just so it's not unclear, you don't believe that Instagram can cause anxiety and depression. Fair?**

A. Again, I'm just going to repeat what I said so it's very, very clear.

Based on the research, the external research I've done -- I've reviewed; I haven't done it -- based on the internal research that has been shared with me, I do not believe that problematic use on Instagram causes anxiety and depression. I do think that there is a connection that people have indicated that they have anxiety and depression, the same people have