# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION | Case No. 4:22-MD-03047-YGR |
| TUCSON UNIFIED SCHOOL DISTRICT,<br>Plaintiff,<br>v.<br>META PLATFORMS, INC., ET AL.,<br>Defendants. | Case No. 4:24-cv-01382 |

**EXPERT REPORT OF DARIUS LAKDAWALLA, PH.D.**
**JULY 11, 2025**

**Table of contents**

**1. Executive Summary of Opinions ... 4**

**2. Introduction ... 7**

2.1. Qualifications ... 7

2.2. Allegations ... 9

2.3. Assignment ... 13

2.4. Background on Defendants' Social Media Platforms ... 14

2.5. Background on Tucson Unified School District ... 15

**3. Estimating Damages and Abatement Requires a Reliable Economic Framework ... 16**

**4. Plaintiffs' Experts Have Not Used a Reliable Framework to Demonstrate That the At-Issue Conduct Harms the School District, a Necessary Step to Justify Damages and an Abatement Plan ... 20**

4.1. Plaintiffs' Experts Do Not Assess the Impact of the At-Issue Conduct on the School District Relative to a Counterfactual Without the Conduct ... 22

4.2. Plaintiffs' Experts Have Not Demonstrated That the Effect of the At-Issue Conduct on Adolescent Mental Health (If Any) Can Be Reliably Quantified ... 24

4.2.1. Plaintiffs' Experts Do Not Quantify the Magnitude of the Purported Effects of the At-Issue Conduct on Adolescent Mental Health ... 25

4.2.2. Plaintiffs' Experts Fail to Account for Total Screentime in the Relevant But-For World ... 27

4.2.3. Quantifying the Impact of the At-Issue Conduct on Mental Health Is Confounded by Changes over Time in How Mental Health Issues Are Reported ... 33

4.2.4. Professor Twenge Fails to Substantiate Dismissal of the Measurement Issues in Determining the Magnitude of Any Effect of the At-Issue Conduct on Adolescent Mental Health ... 39

4.3. Plaintiffs' Experts Have Not Shown That the At-Issue Conduct Impacted the School District ... 44

**5. Empirical Evidence Is Inconsistent with Plaintiffs' Theory of Harm to Tucson Unified School District ... 57**

5.1. Analysis of Behavioral Issues and Classroom Disruptions ... 59

5.1.1. Analysis of Behavioral Issues and Classroom Disruptions in National and State Survey Data ... 59

5.1.2. Analysis of Behavioral Issues and Classroom Disruptions in the Tucson Unified School District ... 66

5.2. Analysis of School Achievement ... 71

5.2.1. Analysis of National Academic Outcomes ... 71

5.2.2. Analysis of Academic Outcomes for Tucson Unified School District ... 74

5.3. Analysis of School Staffing ........ 80

**6. Professor Hoover's Proposed Abatement Plan Is Overly Broad and Not Tailored to Address the Specific Harm Allegedly Caused by Defendants' At-Issue Conduct ........ 86**

6.1. Overview of Professor Hoover's Proposed Abatement Plan and Professor Leslie's Cost Estimates ........ 86

6.2. Professor Hoover's Abatement Program Is Overly Broad Because It Is Not Designed to Abate the Incremental Impact on the School District Caused by the Alleged Harms from the At-Issue Conduct ........ 90

6.3. Professor Hoover's Proposed Abatement Plan Includes Certain Mental Health Prevention and Mitigation Programming that the Tucson Unified School District Already Provides, Making Her Plan Overly Broad ........ 93

**7. The Cost of Professor Hoover's Abatement Plan Is Inflated Due to Additional Unsupported Assumptions ........ 96**

7.1. Professor Hoover's Rationale for a 15-Year Abatement Plan to Account for Planning, Implementation, Evaluation, and Sustainability Is Unsupported ........ 97

7.2. Professor Hoover's Comparison of the Proposed Abatement Plan to Efforts to Reduce Youth Tobacco Use Is Invalid and Unsupported ........ 100

7.3. Professor Hoover's Recommended Training and Professional Development Time and Professor Leslie's Estimated Cost of That Time Are Unjustified and Result in Substantial Double-Counting ........ 102

7.4. Professor Hoover Proposes Clinical Staffing Levels That Far Exceed Recommended Levels without Any Justification or Rationale ........ 104

7.5. Professor Hoover Has Not Justified the Additional Hires She Claims Are Needed to Implement Her Abatement Program ........ 106

7.6. Professor Hoover and Professor Leslie Fail to Consider Other Sources of Funding the District Has Received to Address Adolescent Mental Health Issues ........ 111

**8. Plaintiffs' Experts' Opinions on Past Damages Suffer from Many Fundamental Flaws 112**

8.1. Overview of Plaintiffs' Experts' Analyses of Past Damages ........ 112

8.2. None of Plaintiffs' Experts Specifically Connects Their Past Damages Estimates to the At-Issue Conduct Rather than Social Media in General ........ 114

8.3. Mr. Klein's Survey Design Is Fundamentally Flawed ........ 116

8.4. Dr. Ward's Calculations of Past Damages Due to the Opportunity Cost of Time Diverted to Deal with Social Media Use Are Unreliable ........ 120

## 1. EXECUTIVE SUMMARY OF OPINIONS

1. I evaluate Plaintiffs' experts' opinions regarding alleged damages to Tucson Unified School District, including Professor Hoover's and Professor Leslie's opinions regarding a proposed abatement plan (the "Abatement Plan" or "Hoover Abatement Plan") and Mr. Klein's, Dr. Ward's, and Mr. Meyers's opinions regarding past alleged damages. A fundamental flaw in each of their analyses is their failure to show that claimed harms to the school district were in fact caused by social media (as opposed to other factors), let alone that they were caused by Defendants' at-issue conduct[1] (as opposed to, for example, content to which they were exposed on social media platforms). In addition, Plaintiffs' experts' estimates of abatement costs and past alleged damages suffer from additional conceptual and methodological flaws that render them overstated and unreliable.

2. **Opinion 1.** A proper economic analysis of past damages or abatement costs needs to establish a causal connection between the at-issue conduct and the estimated harm. To establish this connection, a reliable economic analysis must enumerate the factors that gave rise to the alleged harm, justify their implied causal connection to the harm, and exclude alternative or confounding factors that may trigger similar effects while being unrelated to the at-issue conduct (Section 3).

3. **Opinion 2.** Plaintiffs' experts must show, at a minimum, (1) that the at-issue conduct causes adolescents to increase their use of Defendants' social media platforms; (2) that an increase in social media usage caused by the at-issue conduct negatively impacts adolescents' mental health and other relevant behavioral outcomes; (3) that the impact of the at-issue conduct on adolescents' mental health and other outcomes can be quantifiably determined, separate from other unrelated factors impacting these outcomes; and (4) that the impact of the at-issue conduct on adolescents' mental health and other outcomes causes harm to the school district in a reliably quantifiable way.

4. Focusing specifically on the last two links in the causal chain, I evaluate the evidence put forward by Plaintiffs' experts related to their theory of harm to adolescents' mental health and harm to the school district. First, Plaintiffs' experts fail to analyze the causal impact of Defendants' at-issue conduct specifically and instead focus on social media use in general. They have not attempted to assess how the purported harms to the school district would change in an

[1] I discuss the at-issue conduct in more detail in Section 2.2.

appropriate counterfactual world—that is, a world identical to the actual one, except absent only the at-issue conduct.

5. Second, I find that Plaintiffs' experts fail to quantify the effect of the at-issue conduct on adolescent mental health. Nationally representative data imply that increased social media usage has coincided with proportional reductions in television-viewing. This raises the possibility that the at-issue conduct may have decreased television-viewing, and Plaintiffs' own experts have found television-viewing to have negative effects on mental health. However, Plaintiffs' experts do not consider this hypothesis, which could lead their damages estimates to be overstated. In addition, peer-reviewed literature documents that adolescent mental health issues are more likely to be reported in healthcare administrative data and survey data today than in the past. By failing to account for changes in the propensity to report mental health issues, Plaintiffs' experts are likely to overstate the actual increase in mental health harms over time and as a result of the at-issue conduct.

6. Third, I find that Plaintiffs' experts fail to quantify the effect, if any, of the at-issue conduct or even of social media use in general on the alleged harms to school districts, instead offering correlational or anecdotal evidence (Section 4).

7. **Opinion 3.** The available data related to the purported categories of harm to the school district, including behavioral issues and disruptions at schools, academic achievement, and staffing levels do not support Plaintiffs' experts' theory of harm. I find that the fact patterns in the national-level, state-level, and Tucson Unified School District district-level data are not consistent with the at-issue conduct or social media use in general causing harmful impacts such as increased behavioral issues and classroom disruptions, worse academic performance, or increased need for school staff to address such negative effects (Section 5).

8. **Opinion 4.** Professor Hoover's proposed Abatement Plan is overly broad and not tailored to address the specific harm allegedly caused by the at-issue conduct. I find that the Abatement Plan as proposed does not attempt to isolate and address only the incremental harms that can be causally tied to Defendants' at-issue conduct. To the extent the proposed Abatement Plan provides treatment and prevention for mental health issues not caused by the at-issue conduct, then it is overly expansive and would not be economically justified to assign to Defendants the responsibility of funding such programs.

9. In addition, I find that certain elements of Professor Hoover's proposed Abatement Plan overlap with the district's current programs. Yet, Professor Hoover does not explain how or why

the existing programs are insufficient or how her recommended plan would complement (and not simply replace) what the district is already offering. Similarly, she has not quantified the size or reach of the district's existing programming or of comparable programming in her proposed Abatement Plan. Accordingly, Professor Hoover has not performed the analysis needed to appropriately justify the proposed programs and has not shown that the programs she recommends are appropriately tailored for the district (Section 6).

10. **Opinion 5.** I find the costs of Professor Hoover's Abatement Plan, as calculated by Professor Leslie, to be inflated and unsupported. For example, Professor Hoover has not validated or adequately supported her assumption that a 15-year Abatement Plan is justified. The components of her plan—planning, implementation, evaluation, and sustainability—are not consistently tied to the specific at-issue conduct and do not justify her plan's proposed duration. In addition, her analogy to efforts to reduce youth tobacco usage to support her proposed duration is also invalid. Tobacco and social media platforms differ in significant ways; for example, tobacco has no benefits for youth while respected authorities (such as the National Academies of Sciences, Engineering, and Medicine) view social media as providing some measure of benefit. Yet, Professor Hoover has not shown that the strategies to prevent and mitigate potential harms, let alone to preserve potential benefits, are the same for tobacco products and social media platforms or should operate under a similar timeline.

11. Professor Hoover also double-counts the cost of time spent on training and professional development. This cost appears both as part of a new employee's total compensation and as its own line-item in Professor Leslie's analysis. It is incorrect to include both the compensation of a new employee as well as the cost of the time the new employee will need to spend on training for their new role. This error overstates training costs. Moreover, Professor Hoover ignores existing specialists employed by the district when calculating the need for additional specialists. Her recommendation ignores what the existing specialists—counselors, social workers, and school psychologists—may already be doing to promote mental health. Further, after adding the proposed staff, the districts would substantially exceed staffing levels recommended by relevant professional organizations.

12. In addition, Professor Hoover does not appear to consider alternatives to hiring a large number of new staff. For example, she does not consider using an outside contractor knowledgeable about certain interventions to help existing staff implement a particular program, which is a tactic commonly described in peer-reviewed literature on school-based mental health

programs. She also does not provide any meaningful detail for how the proposed staff will be utilized and which specific interventions these staff would help implement in each year of her plan.

13. Lastly, in determining the cost of the Abatement Plan, Professor Hoover and Professor Leslie do not consider federal, state, and local funding sources available to the district for mental health programming. In particular, they do not consider ongoing funding that the district has been receiving and will likely continue to receive (Section 7).

14. **Opinion 6.** The analyses conducted by Mr. Klein, Dr. Ward, and Mr. Meyers related to past alleged damages incurred by Tucson Unified School District suffer from multiple flaws. I find that none of Plaintiffs' experts specifically connects their past damages estimates to Defendants' at-issue conduct rather than social media use in general. As a result, their past damages estimates are overstated because they inappropriately include the impact of other factors not at issue. Further, I find there are additional conceptual and methodological flaws with Mr. Klein's survey and Dr. Ward's "lost opportunity cost" damages estimates that render them unreliable (Section 8).

## 2. INTRODUCTION

### *2.1. Qualifications*

15. I have been the Quintiles Chair in Pharmaceutical Development and Regulatory Innovation at the University of Southern California ("USC") since 2012. I am also the Chief Scientific Officer at the Leonard D. Schaeffer Center for Health Economics and Policy at USC. I am appointed as a Full Professor and hold a joint appointment at USC's Mann School of Pharmacy and Pharmaceutical Sciences and at USC's Price School of Public Policy. In 2009, I was named a Research Associate at the National Bureau of Economic Research ("NBER") in Cambridge, MA, and I still hold this title. I earned my Ph.D. in Economics from the University of Chicago in 2000.

16. I perform research and teach classes in health economics and health policy. My research has focused primarily on the economics of risks to health, the value and determinants of medical innovation, the economics of health insurance markets, modeling and forecasting health outcomes and spending, and the industrial organization of healthcare markets. I have served as an Associate Editor at the *Journal of Health Economics*, the *Review of Economics and Statistics*, and the *American Journal of Health Economics*. I have published over 100 peer-reviewed academic articles in journals of economics, health policy, and medicine. I have won numerous awards for my research, including the Garfield Prize, the Milken Institute Award for Distinguished Economic Research, and the Professional Society for Health Economics and Outcomes Research (known as "ISPOR") Excellence in Research Methodology Award.

17. In 2006, I co-founded Precision Health Economics ("PHE"), a firm that leveraged the expertise of academics to provide health economic consulting services, primarily to firms in the life sciences and medical device industries. None of the parties named in this matter was a client of mine during my tenure as a partner there. In 2015, Precision Medicine Group acquired PHE. At the time of its sale, PHE employed over 60 full-time staff with offices in Los Angeles, Oakland, Boston, and Austin.

18. My curriculum vitae is attached as Appendix A. A list of my prior testimony over the last four years is attached as Appendix B.

### *2.2. Allegations*

19. I understand that as part of a multi-district litigation, a group of school districts ("Plaintiffs") allege that Meta Platforms, Inc. ("Meta"),[2] Snap, Inc. ("Snap"),[3] TikTok Inc. ("TikTok"),[4] and Google, LLC and YouTube, LLC ("YouTube") (collectively "Defendants"),[5] made "choices to design, develop, produce, operate, promote, distribute, and market their social media platforms in ways that are harmful to minors,"[6] and as a result, their social media platforms "cause[] substantial and financially burdensome interference with school district … operations."[7] Plaintiffs challenge many of Defendants' design choices, including Defendants' purported failure to implement certain safety features that Plaintiffs claim would have reduced the risk of these harms.[8] I refer to the features Plaintiffs discuss in the First Amended Complaint as "the challenged features."

20. I also understand that as a second component of Plaintiffs' claims, Plaintiffs allege that "Defendants failed to warn Plaintiffs about the dangerous, addictive nature of their platforms, the resulting harms that occur to minors from use of their platforms, and that Plaintiffs would be required to divert and expend additional human and financial resources to provide support to harmed minors through education, counseling, mental health, and other social, and disciplinary services."[9]

[2] Plaintiffs' First Amended Master Complaint (Local Government and School District), *In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation*, March 27, 2024 ("First Amended Complaint MDL"), ¶ 40.

[3] First Amended Complaint MDL, ¶ 47.

[4] First Amended Complaint MDL, ¶ 48.

[5] First Amended Complaint MDL, ¶ 54.

[6] First Amended Complaint MDL, ¶ 15.

[7] First Amended Complaint MDL, ¶ 1.

[8] First Amended Complaint MDL, ¶ 8 ("These dangerous and harmful design features include, but are not limited to, failure to implement robust age verification processes to determine users' ages; failure to implement effective parental controls; failure to implement effective parental notifications; failure to implement opt-in restrictions to the length and frequency of use sessions; failure to enable default protective limits to the length and frequency of use sessions; creating barriers that make it more difficult for users to delete and/or deactivate their accounts than to create them in the first instance; failure to label content that has been edited, such as by applying a filter; making filters available to users so they can, among other things, manipulate their appearance; failure to create adequate processes for users to report suspected Child Sexual Abuse Material ('CSAM') to Defendants' platforms; and automated attention farming through content-agnostic algorithms and recommendations fed by data about user interactions.").

[9] First Amended Complaint MDL, ¶¶ 1035–1036 ("Defendants knew or should have known their design choices and conduct would have a detrimental effect on the wellbeing of youth in Plaintiffs' schools and communities, and would lead to Plaintiffs' increased expenditures and diverted resources and should have warned of such. Instead, Defendants failed to warn Plaintiffs about the dangerous, addictive nature of their platforms, the resulting harms that occur to minors from use of their platforms, and that Plaintiffs would be required to divert and expend additional human and financial resources to provide support to harmed minors through education, counseling, mental health, and other social, and disciplinary services required to be provided by Plaintiffs.").

21. Specifically, Plaintiffs claim that "Defendants' conduct and platforms cause addiction, compulsive use, anxiety, depression, eating disorders, body dysmorphia, self-harm, sexual exploitation, suicidal ideations, other serious diseases and injuries, and suicide itself."[10] Plaintiffs thus allege that Defendants' conduct can cause adolescent users to become addicted to Defendants' social media platforms and harm their mental health, resulting in an adolescent[11] mental health crisis.[12]

22. Plaintiffs allege that Defendants "caused or contributed to a nuisance within … School District Plaintiffs' schools."[13] Plaintiffs allege that social media use in schools has caused a "consistent and pervasive disruption to the learning process."[14] They further allege that school districts' "ability to hire and retain qualified teachers" has been negatively affected by "the youth mental health crisis, fueled by social media."[15] Plaintiffs claim that as a result, school districts have had to divert or increase resources spent on "prevent[ing] social media use in school," "hir[ing] counselors and other professionals to address compulsive social media use and addiction," and "address[ing] property damage on school and municipal property, caused by compulsive social media use and addiction."[16]

[10] First Amended Complaint MDL, ¶ 19.

[11] Plaintiffs do not define "adolescent" in the First Amended Complaint MDL. Throughout my report, I use the term "adolescent" to refer to both "adolescents" and "youth," i.e., anyone under the age of 18.

[12] First Amended Complaint MDL, ¶¶ 7 ("Defendants, through their social media platforms—specifically Instagram, Facebook, TikTok, Snapchat, and YouTube—intentionally induced young people to use their platforms compulsively. Borrowing from the behavioral and neurobiological techniques used by makers of slot machines and tobacco products, Defendants deliberately embedded design features in their platforms to maximize youth engagement to drive advertising revenue."), 1035–1036 ("Defendants knew or should have known their design choices and conduct would have a detrimental effect on the wellbeing of youth in Plaintiffs' schools and communities, and would lead to Plaintiffs' increased expenditures and diverted resources and should have warned of such. Instead, Defendants failed to warn Plaintiffs about the dangerous, addictive nature of their platforms, the resulting harms that occur to minors from use of their platforms, and that Plaintiffs would be required to divert and expend additional human and financial resources to provide support to harmed minors through education, counseling, mental health, and other social, and disciplinary services required to be provided by Plaintiffs.").

[13] First Amended Complaint MDL, ¶¶ 1 ("Ever-increasing numbers of children compulsively use Defendants' platforms, resulting in a situation that not only harms individual children and their loved ones but also causes substantial and financially burdensome interference with school district, county, and municipal operations."), 29.

[14] First Amended Complaint MDL, ¶ 32 ("As described in more detail above and below, the harms caused by Defendants' wrongful conduct include, but are not limited to, expending, diverting, and increasing human and financial resources to prevent social media use in school, such as equipment to disable phones; spending, diverting, and increasing human and financial resources to hire counselors and other professionals to address compulsive social media use and addiction, and its negative impact on youth; the consistent and pervasive disruption to the learning process caused by social media use in schools; expending, diverting, and increasing human and financial resources to address property damage on school and municipal property, caused by compulsive social media use and addiction; and the need for additional government personnel and expending, diverting, and increasing human and financial resources to address the youth mental health crisis caused by Defendants' conduct and platforms.").

[15] First Amended Complaint MDL, ¶ 23 ("The youth mental health crisis, fueled by social media, also has a serious negative impact on school districts' ability to hire and retain qualified teachers.").

[16] First Amended Complaint MDL, ¶ 32 ("As described in more detail above and below, the harms caused by Defendants' wrongful conduct include, but are not limited to, expending, diverting, and increasing human and financial resources to

23. I understand that the Court has dismissed several of Plaintiffs' claims while allowing Plaintiffs to continue to pursue a more narrow set of claims.[17]

24. In particular, I understand that the Court has allowed Plaintiffs to continue to pursue claims that the Defendants' "design[ed], develop[ed], and deployed[ed]" the following features in their social media platforms in order "to foster compulsive use and cause social media addiction":[18]

- "failure to implement robust age verification processes to determine users' ages;
- failure to implement effective parental controls;
- failure to implement effective parental notifications;
- failure to implement opt-in restrictions to the length and frequency of use sessions;
- failure to enable default protective limits to the length and frequency of use sessions;
- creating barriers that make it more difficult for users to delete and/or deactivate their accounts than to create them in the first instance;
- failure to label content that has been edited, such as by applying a filter;
- making filters available to users so they can, among other things, manipulate their appearance; and
- failure to create adequate processes for users to report suspected CSAM to defendants' platforms."[19]

25. I refer to these features as the "at-issue features."

26. On the other hand, I understand that the Court has dismissed Plaintiffs' claims that the following features were implemented by Defendants to promote compulsive and addictive use of Defendants' social media platforms:[20]

prevent social media use in school, such as equipment to disable phones; spending, diverting, and increasing human and financial resources to hire counselors and other professionals to address compulsive social media use and addiction, and its negative impact on youth; the consistent and pervasive disruption to the learning process caused by social media use in schools; expending, diverting, and increasing human and financial resources to address property damage on school and municipal property, caused by compulsive social media use and addiction; and the need for additional government personnel and expending, diverting, and increasing human and financial resources to address the youth mental health crisis caused by Defendants' conduct and platforms.").

[17] Order Granting in Part and Denying in Part Defendants' Motion to Dismiss the School District and Local Government Entities' Master Complaint, *In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation*, October 24, 2024 ("Motion to Dismiss Order"),

[18] Motion to Dismiss Order, p. 12.

[19] Motion to Dismiss Order, pp. 13–14.

[20] Motion to Dismiss Order, p. 14 ("Next, and consistent with the Court's order on the State AGs' claims, the Court declines at this stage to dismiss any theories of a failure-to-warn of known risks of addiction attendant to any platform features or as to platform construction in general.").

- "Failing to put default protective limits to the length and frequency of sessions;
- Failing to institute blocks to use during certain times of day (such as during school hours or late at night);
- Not providing a beginning and end to a user's "Feed";
- Publishing geolocating information for minors;
- Recommending minor accounts to adult strangers;
- Limiting content to short-form and ephemeral content, and allowing private content;
- Timing and clustering of notifications of *third-party* content in a way that promotes addiction; and
- Use of algorithms to promote addictive engagement.
- The timing and clustering of notifications of *defendants'* content to increase addictive use."[21]

27. I also understand that the Court has allowed Plaintiffs to continue to claim harm from Defendants' alleged failure to warn about the purported risks of addiction from "any platform features or as to platform construction in general."[22]

28. In addition, I understand that the Court held that claims based on "mere publication of … third-party content … would be barred by Section 230."[23] I also understand that the Court dismissed claims based on "the non-foreseeable intervening conduct of third parties."[24]

29. In other words, I understand that the Court dismissed claims based on alleged harm "stemming from dangerous challenges, threats, and crimes disseminated or perpetrated on defendants' platforms."[25]

[21] Motion to Dismiss Order, p. 14.

[22] Motion to Dismiss Order, p. 14 ("Next, and consistent with the Court's order on the State AGs' claims, the Court declines at this stage to dismiss any theories of a failure-to-warn of known risks of addiction attendant to any platform features or as to platform construction in general.").

[23] Motion to Dismiss Order, pp. 25 ("To the extent 'promotion' of a challenge refers to the mere publication of a third-party content on Snap, any such allegations would be barred by Section 230.").

[24] Motion to Dismiss Order, pp. 25 ("Second, and by contrast, alleged injury stemming from non-foreseeable third-party conduct cannot be attributable to defendants."), 26 ("As to any alleged injuries to the school districts stemming from dangerous challenges, threats, and crimes disseminated or perpetrated on defendants' platforms caused by deteriorated youth mental health, those allegations fail proximate causation for a lack of particularized allegations."); footnote 19 ("Much of defendants' brief focuses on injuries caused by third-party conduct as with dangerous social media challenges, crimes, or threats on defendants' platforms. … [T]hose allegations have been excluded as a matter of proximate cause").

[25] Motion to Dismiss Order, p. 26 ("As to any alleged injuries to the school districts stemming from dangerous challenges, threats, and crimes disseminated or perpetrated on defendants' platforms caused by deteriorated youth mental health, those allegations fail proximate causation for a lack of particularized allegations."); footnote 19 ("Much of defendants' brief focuses on injuries caused by third-party conduct as with dangerous social media challenges, crimes, or threats on defendants' platforms. … [T]hose allegations have been excluded as a matter of proximate cause").

30. Accordingly, throughout this report, I refer to the "at-issue conduct" as the alleged conduct of Defendants that the Court has allowed the Plaintiffs to continue to pursue. Thus, as discussed, the "at-issue conduct" includes the at-issue features, as well as Defendants' alleged failure to warn regarding the challenged features, but excludes claims based on third-party content and non-foreseeable third-party conduct on the Defendants' platforms.

### *2.3. Assignment*

31. I have been retained by counsel for Defendants to respond to the damages analyses put forward by Plaintiffs. In particular, I have been asked to respond to the expert reports submitted by Professor Sharon A. Hoover ("Professor Hoover"), Mr. Robert L. Klein ("Mr. Klein"), Professor Douglas L. Leslie ("Professor Leslie"), Mr. Jeffrey E. Meyers ("Mr. Meyers"), Professor Brian G. Osborne ("Professor Osborne"), and Dr. Bryce Ward ("Dr. Ward") as they relate to damages for one of the bellwether school districts in this litigation, Tucson Unified School District.[26]

32. In forming my opinions, I reviewed academic literature, documents and data produced by Defendants and Tucson Unified School District, and public reports and data.

33. I am being compensated at my standard billing rate of $1,150 per hour. I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction. I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter. Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinions or the outcome of this or any other matter.

34. I reserve the right to supplement or update my opinions and analyses as new information becomes available. Not addressing any particular topic or detail addressed by Plaintiffs' experts does not indicate that I am in agreement with their assertions. The list of documents I have relied upon in forming my opinions is attached as Appendix C. I hold all of the opinions presented within this report to a reasonable degree of scientific certainty.

[26] Expert Report of Dr. Sharon A. Hoover, Ph.D., May 16, 2025 ("Hoover General Causation Report"); Amended Expert Report of Dr. Sharon A. Hoover, Ph.D., for Tucson Unified School District, June 20, 2025 ("Hoover Amended Tucson Report"); Expert Report of Robert L. Klein, for Tucson Unified School District, May 18, 2025 ("Klein Tucson Report"); Amended Expert Report of Douglas L. Leslie, Ph.D., for Tucson Unified School District, June 20, 2025 ("Leslie Amended Tucson Report"); Expert Report of Jeffrey E. Meyers, for Tucson Unified School District, May 19, 2025 ("Meyers Tucson Report"); Expert Report of Brian G. Osborne, May 16, 2025 ("Osborne Report"); Expert Report of Dr. Bryce Ward, for Tucson Unified School District, May 19, 2025 ("Ward Tucson Report").

### *2.4. Background on Defendants' Social Media Platforms*

35. Defendant Meta owns two at-issue social media platforms, Instagram and Facebook. Instagram is a social media platform founded in October 2010 and acquired by Facebook, Inc. (now Meta) in April 2012.[27] Instagram initially launched as a photo-sharing mobile app.[28] Currently, Instagram enables users to share photos, create and share video content via Instagram Reels, temporary content via Stories, and direct messaging between users.[29]

36. Facebook is a social media platform founded in 2004.[30] Facebook allows users to post information, photos, and other content to profile pages, which they can share with other users.[31] Facebook users can see posts by friends, pages they follow, or recommended content on their homepage.[32] Like Instagram, Facebook also allows users share Reels and Stories, and to send direct messages to other users.[33] Facebook was initially rolled out to students at different colleges; in September 2005 it became available to high school students and then in September 2006 it became available to anyone aged 13 or older.[34]

37. YouTube is a platform on which users share and watch videos.[35] YouTube was founded in 2005 and acquired by Defendant Google, Inc. in 2006.[36] The user interface and range of features available on YouTube has changed over time.[37]

[27] Evelyn M. Rusli, "Facebook Buys Instagram for $1 Billion," *The New York Times*, April 9, 2012, available at https://archive.nytimes.com/dealbook.nytimes.com/2012/04/09/facebook-buys-instagram-for-1-billion/; Alison Eldridge, "Instagram," *Britannica Money*, July 9, 2025, available at https://www.britannica.com/money/Instagram.

[28] Evelyn M. Rusli, "Facebook Buys Instagram for $1 Billion," *The New York Times*, April 9, 2012, available at https://archive.nytimes.com/dealbook.nytimes.com/2012/04/09/facebook-buys-instagram-for-1-billion/.

[29] Instagram, "Features: Share What You're Into," available at https://about.instagram.com/features.

[30] Meta, "Build the Future of Human Connection and the Technology That Makes It Possible," available at https://www.meta.com/about/company-info/.

[31] Facebook Help Center, "Your Profile," available at https://www.facebook.com/help/396528481579093/?helpref=hc_fnav.

[32] Facebook Help Center, "Your Home Page," available at https://www.facebook.com/help/753701661398957?helpref=related_topics.

[33] Facebook Help Center, "Messaging," available at https://www.facebook.com/help/1071984682876123/?helpref=hc_fnav; Facebook Help Center, "Reels," available at https://www.facebook.com/help/753046815962474/?helpref=hc_fnav; Facebook Help Center, "Stories," available at https://www.facebook.com/help/862926927385914/?helpref=hc_fnav.

[34] Andrew Greiner et al., "Facebook at 15: How a College Experiment Changed the World," *CNN*, February 1, 2019, available at https://www.cnn.com/interactive/2019/02/business/facebook-history-timeline/index.html.

[35] William L. Hosch, "YouTube," *Britannica*, July 3, 2025, available at https://www.britannica.com/topic/YouTube ("YouTube, social media platform and website for sharing videos.").

[36] William L. Hosch, "YouTube," *Britannica*, July 3, 2025, available at https://www.britannica.com/topic/YouTube ("It was registered on February 14, 2005, by Steve Chen, Chad Hurley, and Jawed Karim, three former employees of the American e-commerce company PayPal. … Google was prompted to purchase YouTube for $1.65 billion in stock in November 2006.").

[37] Version Museum, "Design History of YouTube.com," available at https://www.versionmuseum.com/history-of/youtube-website.

38. Snapchat is a social media platform owned by Defendant Snap, Inc.[38] Snapchat launched in 2011 and facilitates the sharing of photos, videos, messages, and other information between users.[39]

39. TikTok is a social media platform owned by Defendant ByteDance.[40] TikTok launched globally in 2017 and in the U.S. in its current format in 2018.[41] TikTok allows users to share and watch user-generated videos and live broadcasts, and contains a direct messaging feature.[42]

### *2.5. Background on Tucson Unified School District*

40. Tucson Unified School District is a school district in Pima County, Arizona and is classified as a large city district by the National Center for Education Statistics ("NCES").[43] Pima County has an estimated total population of 1,080,149, with 83.8 percent identifying as White, 4.6 percent identifying as Black, 36.6 percent identifying as Hispanic or Latino, and 3.6 percent identifying as Asian.[44] In the Tucson Unified School District, in the 2023–24 school year, 18 percent of students identified as White, 6.7 percent identified as African American, 65.4 percent identified as Hispanic, and less than 2 percent identified as Asian.[45] Approximately 36 percent of Pima County's population has a bachelor's degree or higher, compared to 35 percent

[38] Snap Investor Relations, "About Snap," available at https://investor.snap.com/about-snap/default.aspx.

[39] Nick Routley, "Timeline: Looking Back at 10 Years of Snapchat," *Visual Capitalist*, July 18, 2021, available at https://www.visualcapitalist.com/timeline-looking-back-at-10-years-of-snapchat/; Snapchat, "What Is Snapchat?" available at https://parents.snapchat.com/about-snapchat.

[40] Yingzhi Yang and Brenda Goh, "Timeline: TikTok's Journey from Global Sensation to Trump Target," *Reuters*, August 4, 2020, available at https://www.reuters.com/article/business/timeline-tiktoks-journey-from-global-sensation-to-trump-target-idUSKCN2510IU.

[41] Yingzhi Yang and Brenda Goh, "Timeline: TikTok's Journey from Global Sensation to Trump Target," *Reuters*, August 4, 2020, available at https://www.reuters.com/article/business/timeline-tiktoks-journey-from-global-sensation-to-trump-target-idUSKCN2510IU.

[42] Deborah D'Souza, "TikTok: What It Is, How It Works, and Why It's Popular," *Investopedia*, January 20, 2025, available at https://www.investopedia.com/what-is-tiktok-4588933.

[43] Pima County School Superintendent, "District Schools," available at https://www.schools.pima.gov/schools/public-schools; National Center for Education Statistics, "Search for Public School Districts: Tucson Unified District Details – Characteristics," available at https://nces.ed.gov/ccd/districtsearch/district_detail.asp?Search=1&details=1&InstName=Tucson&State=04&DistrictType=1&DistrictType=2&DistrictType=3&DistrictType=4&DistrictType=5&DistrictType=6&DistrictType=7&DistrictType=8&DistrictType=9&NumOfStudentsRange=more&NumOfSchoolsRange=more&ID2=0408800.

[44] U.S. Census Bureau, "QuickFacts: Pima County, Arizona," available at https://www.census.gov/quickfacts/fact/table/pimacountyarizona/PST045224. Hispanic and Latino individuals also included in applicable race categories.

[45] AZ School Report Cards, "Tucson Unified District," available at https://azreportcards.azed.gov/districts/detail/4403.

across the entire U.S.[46] Median household income in Pima County is $67,929.[47] The district operates 88 schools with 2,809 total teachers serving 39,927 students as of the 2023–24 school year.[48] In the 2021–22 school year, the district spent $13,118 per pupil.[49]

## 3. ESTIMATING DAMAGES AND ABATEMENT REQUIRES A RELIABLE ECONOMIC FRAMEWORK

41. I understand Plaintiffs seek compensation in this matter for past alleged damages and for abatement of the alleged harms, and Plaintiffs' experts, including Mr. Klein, Dr. Ward, Mr. Meyers, Professor Hoover, and Professor Leslie, have submitted reports analyzing past damages and the cost of a proposed Abatement Plan. A proper economic analysis of damages or abatement costs needs to establish a causal connection between the at-issue conduct and the estimated harm.[50] To establish this connection, a reliable economic analysis must enumerate the factors that gave rise to the alleged harm, justify their implied causal connection to the harm, and exclude alternative or confounding factors that may trigger the same harms while being unrelated to the at-issue conduct. Below, I discuss an economic framework that takes the necessary considerations into account to reach a reliable result.

[46] U.S. Census Bureau, "QuickFacts: Pima County, Arizona," available at https://www.census.gov/quickfacts/fact/table/pimacountyarizona/PST045224; U.S. Census Bureau, "QuickFacts," available at https://www.census.gov/quickfacts/fact/table/.

[47] U.S. Census Bureau, "QuickFacts: Pima County, Arizona," available at https://www.census.gov/quickfacts/fact/table/pimacountyarizona/PST045224. The median household income for the entire U.S. is $78,538. See U.S. Census Bureau, "QuickFacts," available at https://www.census.gov/quickfacts/fact/table/.

[48] Leslie Amended Tucson Report, Attachment D.1; Hoover Amended Tucson Report, ¶ 100. I refer to these counts when discussing the Tucson Unified School District in the remainder of this report, unless otherwise noted.

[49] National Center for Education Statistics, "Search for Public School Districts: Tucson Unified District Details – Fiscal," available at https://nces.ed.gov/ccd/districtsearch/district_detail.asp?Search=1&InstName=tucson&State=04&County=Pima+County&DistrictType=1&DistrictType=2&DistrictType=3&DistrictType=4&DistrictType=5&DistrictType=6&DistrictType=7&DistrictType=8&DistrictType=9&NumOfStudentsRange=more&NumOfSchoolsRange=more&ID2=0408800&details=4.

[50] Federal Judicial Center and National Research Council, *Reference Manual on Scientific Evidence*, Third Edition, (Washington, D.C.: The National Academies Press, 2011) ("Reference Manual on Scientific Evidence (2011)"), p. 429 ("The goal of damages measurement is to find the plaintiff's loss of economic value from the defendant's harmful act. The loss of value may have a one-time character, such as the diminished market value of a business or property, or it may take the form of a reduced stream of profit or earnings. The losses are net of any costs avoided because of the harmful act.").

42. Economic damages measure the harms caused by the at-issue behavior. As explained in the *Reference Manual on Scientific Evidence*, "[t]he first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact of that event."[51] Economic theory provides a framework for a sound and reliable analysis of the economic impact and associated damages analysis. Using such a framework ensures that the assumptions are identified and supported, the impact is attributed correctly to the at-issue behavior and separated from the potential influence of other confounding factors, the counterfactual outcomes are accurately modeled and measured, and the resulting harm is thus appropriately estimated. Conversely, the failure to use a reliable economic framework is likely to lead to flawed or speculative conclusions.

43. A generally accepted framework for an economic analysis of harm and damages consists of four overarching steps:

a. First, one should establish clear definitions for the at-issue conduct and the alleged harm, where "harm" reflects the salient costs to the plaintiff purportedly caused by the at-issue conduct.[52]

b. Second, one should formulate a causal pathway that shows *how* the at-issue behavior would have caused the alleged harm. If there are multiple steps involved in the "causal chain" at issue, then each step needs to be explained and connected to the other steps.

[51] Reference Manual on Scientific Evidence (2011), p. 432.

[52] See, e.g., Reference Manual on Scientific Evidence (2011), p. 432 ("The characterization of the harmful event begins with a clear statement of what occurred.").

c. Third, one should provide an evidentiary basis for the causal chain. This process by itself is twofold. To start, one needs to support the occurrence of each step in the causal chain with evidence. This can be done by using facts from the record, drawing on findings from academic and scientific sources, or performing data analysis. Next, one should provide a sound causal model, of which the causal chain represents a subset. The causal model embeds the linkage from the at-issue conduct to the alleged harm. Furthermore, the causal model also identifies and accounts for other confounding factors that may influence the alleged harm but that do not result from the at-issue conduct. This step is crucial in accurately assessing the impact of the at-issue behavior and isolating it from the effects of other factors that impact the relevant harms.[53] Without a causal model, an expert may overstate the harms from the at-issue conduct by conflating the actual harms with those caused by other unrelated factors.[54]

d. Fourth, using the causal model, one should construct a counterfactual ("but-for") world to assess how the outcomes would be different absent the at-issue conduct. The difference in plaintiff costs across the actual and but-for worlds represent the economic damages.[55] Economists refer to the resulting estimates as the "marginal impact" of the at-issue conduct, in the sense that it holds constant all causal factors other than the at-issue conduct.

44. Failing to compare actual outcomes to an appropriately specified but-for world can lead to erroneous estimates of harm. To illustrate, imagine a set of researchers aiming to study whether a certain migraine medication causes the side effect of nausea. Suppose they find that 20 percent of people using this medication suffer from nausea, but only 5 percent of people in the general population suffer from nausea. The researchers may be tempted to conclude that this

[53] Confounding factors are common in causal inference problems faced by social scientists, and econometric techniques to account for them are widely accepted and used by economists and other social scientists. See Jeffrey M. Wooldridge, *Introductory Econometrics: A Modern Approach*, Seventh Edition, (Boston, MA: Cengage, 2020) ("Wooldridge (2020)"), pp. 10–11 ("The notion of ceteris paribus—which means 'other (relevant) factors being equal'—plays an important role in causal analysis …. In most serious applications, the number of factors that can affect the variable of interest— such as criminal activity or wages—is immense, and the isolation of any particular variable may seem like a hopeless effort. However, we will eventually see that, when carefully applied, econometric methods can simulate a ceteris paribus experiment."). For an overview of some of these methods, see Joshua D. Angrist and Jörn-Steffen Pischke, *Mostly Harmless Econometrics*, (Princeton, NJ: Princeton University Press, 2009) ("Angrist and Pischke (2009)"); David Card, "Design-Based Research in Empirical Microeconomics," *American Economic Review*, 112(6), 2022, pp. 1773–1781 ("Card (2022)").

[54] A canonical example of such "spurious" correlation is correlation between cumulative rainfall amount and inflation—even in the presence of correlation, the lack of a causal impact of rainfall on inflation is obvious. See also Reference Manual on Scientific Evidence (2011), p. 309 ("In interpreting the results of a multiple regression analysis, it is important to distinguish between correlation and causality. Two variables are correlated—that is, associated with each other—when the events associated with the variables occur more frequently together than one would expect by chance. … A correlation between two variables does not imply that one event causes the second. Therefore, in making causal inferences, it is important to avoid *spurious correlation*. Spurious correlation arises when two variables are closely related but bear no causal relationship because they are both caused by a third, unexamined variable.") (emphasis in original).

[55] Reference Manual on Scientific Evidence (2011), p. 429.

medication quadruples the risk of nausea, from 5 percent to 20 percent, but this is a flawed approach. It presumes that if migraine sufferers had not taken this medication, they would have experienced the same outcomes as the average person. This is the wrong counterfactual. Instead, the researchers should study migraine sufferers pursuing the next most appropriate alternative course(s) of treatment. For instance, suppose that migraines themselves cause nausea and that migraine sufferers taking alternative medications suffer from nausea 15 percent of the time. Using the right counterfactual reveals that, in this simple and stylized example, the medication increases the risk of nausea by one-third (15 percent to 20 percent), not by a factor of four.

45. To avoid these kinds of incorrect causal inferences, medical research often relies on controlled experiments, where a treatment group is compared to an appropriately specified counterfactual (the comparison group) that is intended to be identical but for the treatment.[56] In the migraine medication example, such a counterfactual could be a group of similar individuals suffering from migraine headaches taking the next most appropriate medication(s). In the social sciences, this kind of experiment is often infeasible, but the conceptual need to specify a valid counterfactual remains, and social scientists have developed methods for causal inference based on this principle.[57]

46. These broad steps are generally applicable to estimating damages in the context of litigation.[58]

[56] Eduardo Hariton and Joseph J. Locascio, "Randomised Controlled Trials—the Gold Standard for Effectiveness Research," *BJOG*, 125(13), 2018, 1716, p. 1 ("Randomized controlled trials (RCT) are prospective studies that measure the effectiveness of a new intervention or treatment. Although no study is likely on its own to prove causality, randomization reduces bias and provides a rigorous tool to examine cause-effect relationships between an intervention and outcome. This is because the act of randomization balances participant characteristics (both observed and unobserved) between the groups allowing attribution of any differences in outcome to the study intervention. This is not possible with any other study design.").

[57] Angrist and Pischke (2009), pp. 19–21 ("The STAR study, an exemplary randomized trial in the annals of social science, also highlights the logistical difficulty, long duration, and potentially high cost of randomized trials. In many cases, such trials are impractical. In other cases, we would like an answer sooner rather than later. Much of the research we do, therefore, attempts to exploit cheaper and more readily available sources of variation. We hope to find natural or quasi-experiments that mimic a randomized trial by changing the variable of interest while other factors are kept balanced. Can we always find a convincing natural experiment? Of course not. Nevertheless, we take the position that a notional randomized trial is our benchmark.").

[58] See, e.g., Reference Manual on Scientific Evidence (2011), p. 432 ("The first step in a damages study is the translation of the legal theory of the harmful event into an analysis of the economic impact of that event. In most cases, the analysis considers the difference between the plaintiff's economic position if the harmful event had not occurred and the plaintiff's actual economic position. … The characterization of the harmful event begins with a clear statement of what occurred. The characterization also will include a description of the defendant's proper actions in place of its unlawful actions and a statement about the economic situation absent the wrongdoing, with the defendant's proper actions replacing the unlawful ones (the but-for scenario). Damages measurement then determines the plaintiff's hypothetical value in the but-for scenario. Economic damages are the difference between that value and the actual value that the plaintiff achieved."). See also Shireen Meer, "A Primer on Economic Damages for Litigators," *American Bar Association*, August 23, 2024, available at https://www.americanbar.org/groups/litigation/resources/newsletters/woman-advocate/summer2024-a-primer-on-economic-damages-for-litigators/ ("A damages analysis thus involves a comparison between the actual and the 'but-for' world. The

47. Economic damages should also be estimated to a reasonable degree of economic certainty. Specifically, the *Reference Manual on Scientific Evidence* states that "In general, damages law holds that a plaintiff may not recover damages beyond an amount proven with reasonable certainty."[59] Therefore, when estimating economic damages, one should consider a comprehensive set of factors that may have impacted the results, rely on well-supported and relevant inputs and assumptions, and determine whether the marginal effects of the at-issue conduct are measured with reasonable precision.

## 4. PLAINTIFFS' EXPERTS HAVE NOT USED A RELIABLE FRAMEWORK TO DEMONSTRATE THAT THE AT-ISSUE CONDUCT HARMS THE SCHOOL DISTRICT, A NECESSARY STEP TO JUSTIFY DAMAGES AND AN ABATEMENT PLAN

48. The framework above reveals the shortcomings in Plaintiffs' experts' damages and abatement analyses. To arrive at reliable, economically meaningful damages estimates or abatement costs, Plaintiffs must clearly define the at-issue conduct and the harms experienced by the school district as a result of this conduct. Then, Plaintiffs' experts would need to explain each step of the causal chain linking the at-issue conduct to the alleged harms experienced by the school district and provide a sound evidentiary basis for each step, accounting for other potentially relevant factors that contribute to the salient and allegedly harmful outcomes. Finally, Plaintiffs' experts must compare the actual outcomes experienced by the school district to the counterfactual outcomes they would have experienced absent the at-issue conduct.

49. To quantify the harms, if any, to the school district from Defendants' at-issue conduct requires more than simply demonstrating that social media usage influences adolescent mental health outcomes. Plaintiffs must conduct a causal analysis, establishing each step along a causal chain that links the at-issue conduct to the alleged harms to the school district and embedding this causal chain in a broader causal model accounting for confounding factors. They must show, among other things:

but-for world is a characterization of the world had the harmful act not taken place. A proper characterization of a but-for scenario is a necessary component in a reliable measurement of damages. The but-for world must be characterized carefully such that it differs from the actual world only in that the alleged wrongful conduct did not occur. … [A] key element of a proper damages analysis involves the isolation of the harmful act. If the damages analysis puts forward a measure of harm but does not attempt to isolate the effect of the harmful act, then that analysis may not be reliable. A reliable calculation of damages should take into account other factors that changed at the same time that the harm occurred. This involves a careful examination of, and controls for, the extrinsic factors unrelated to the alleged conduct.").

[59] Reference Manual on Scientific Evidence (2011), p. 461.

a. That the at-issue conduct increases usage of Defendants' social media platforms by adolescents.

b. That the increased usage of the social media platforms resulting from the at-issue conduct negatively impacts adolescents' mental health and has other negative effects on adolescents (such as reduced sleep, increased bullying, being distracted in class, etc.).

c. That the negative impact of the at-issue conduct on adolescents' mental health and related outcomes can be quantifiably determined separately from other factors—such as family environment, academic pressure, socioeconomic factors, biological predisposition, or any other factors that may affect adolescents' mental health.

d. That the impact of the at-issue conduct on adolescents' mental health harms the school district (e.g., through increased or diverted school funding to address classroom disruptions, academic performance, or for mental health or support services) in a measurable way that can be separated from other factors that may impact the school district in similar ways.

50. I understand that Defendants' experts Professor Randy Auerbach, Professor Ian Gotlib, Professor Robert Platt, Professor Michael Baiocchi, Professor Alan Berman, Professor Sarah Honaker, and Professor Matthew Shear (collectively, "Defendants' general causation experts") address the second link in this causal chain and opine that there is no reliable scientific evidence that social media use or the at-issue conduct negatively impacts adolescents' mental health or has other negative effects on adolescents consistent with Plaintiffs' allegations. I therefore focus primarily on the third and fourth links in the causal chain under the assumption that the fact finder determines (contrary to Defendants' general causation experts) that the at-issue conduct increases usage of Defendants' social media platforms and negatively impacts adolescents' mental health and other individual outcomes.

51. In Section 4.1, I discuss Plaintiffs' experts' failure to limit their analysis to Defendants' at-issue conduct (instead focusing broadly on social media use) and conclude that because Plaintiffs' experts analyze the wrong conduct, their damages analyses are flawed from inception. In Section 4.2, I discuss whether Plaintiffs' experts have quantifiably determined Plaintiffs' alleged harm separately from other factors that influence adolescent mental health (the third link in the causal chain). In Section 4.3, I discuss whether Plaintiffs' experts have provided sufficient evidence to quantify the final link in the causal chain connecting the purported impact of the at-issue conduct to harms allegedly experienced by the school district.

52. I find that Plaintiffs' experts have not substantiated these causal links, which form a critical connection between the at-issue conduct and the alleged harms, nor have they provided a reliable framework for estimating damages or abatement costs arising from the alleged harms.

### *4.1. Plaintiffs' Experts Do Not Assess the Impact of the At-Issue Conduct on the School District Relative to a Counterfactual Without the Conduct*

53. As an initial matter, Plaintiffs' experts do not trace the alleged harms to the school district to Defendants' at-issue conduct and instead discuss purported impacts from social media use in general. As previously discussed in Section 3, in order to isolate the impact of the at-issue conduct, economists typically conduct a counterfactual analysis, where the "marginal" impact is measured as the difference between outcomes in a world where the at-issue conduct did not occur (i.e., the world "but for" the at-issue conduct) and the actual outcomes.

54. The relevant analysis would measure the difference between actual harmful outcomes and the outcomes that would have occurred in a world without the at-issue features (those that have not been dismissed by the Court) and in which Defendants adequately warn users regarding the purported risks of social media addiction arising from the platforms, but Defendants' platforms and the content to which users are exposed on those platforms remain the same.[60] Plaintiffs' experts do not perform this counterfactual analysis, they do not cite to academic studies that evaluate a counterfactual world relevant to the allegations, nor do they even distinguish between the effects of Defendants' platforms (individually or in the aggregate) and those of social media generally.

55. First, regarding the allegations related to the development of features that have not been dismissed, Plaintiffs' experts do not causally connect the at-issue features to the alleged negative effects on the school district. They have not conducted any empirical analysis connecting the at-issue features remaining in this litigation to the harms that Plaintiffs allege. Instead, the literature that Plaintiffs' experts cite discusses the effects of "social media use" on schools, which is the

[60] I understand that the allegations regarding features that have not been barred by the Court are: failure to implement robust age verification processes to determine users' ages; failure to implement effective parental controls; failure to implement effective parental notifications; failure to implement opt-in restrictions to the length and frequency of sessions; failure to enable default protective limits to the length and frequency of use sessions; creating barriers that make it more difficult for users to delete and/or deactivate their accounts than to create them in the first instance; failure to label content that has been edited, such as by applying a filter; making filters available to users so they can, among other things, manipulate their appearance; and failure to create adequate processes for users to report suspected child sexual abuse material ("CSAM") to Defendants' platforms. See Motion to Dismiss Order, pp. 13–14.

wrong counterfactual for evaluating alleged harms to the school district caused by the at-issue conduct.

56. Second, none of Plaintiffs' experts has assessed the counterfactual impact of a warning applied to Defendants' platforms. In the first instance, Plaintiffs' experts have not shown that a warning about the alleged risks of addiction would in fact have reduced adolescents' usage of Defendants' social media platforms, nor have they analyzed by how much usage would decline. Quantifying the impact of a warning on adolescents' usage is particularly critical to the extent that Plaintiffs' are not claiming that adolescents would be barred from using Defendants' social media platforms entirely. Thus, the first step in determining the extent of harm to the school district depends on how much adolescents would choose to change their usage behavior if they saw a warning. Economic literature shows that individual consumers often have different responses to product warnings, based on heterogeneity in how they value the product and its alternatives, their risk aversion, and their beliefs about their personal susceptibility to the relevant risk.[61]

57. Even if Plaintiffs' experts could establish that adolescents would respond to some degree to a warning, they would then need to quantify how the school district's outcomes would change based on the extent that students would change their usage of Defendants' social media platforms in the but-for world in which Defendants warned about the alleged risks. However, Plaintiffs' experts have not done so. They fail to quantitatively assess how a warning about the alleged risks of addiction to Defendants' social media platforms would change adolescent social media usage and then how that change in usage would affect school district outcomes.

58. Plaintiffs' damages experts at best connect their proposed abatement plan and past damages analysis to social media in general rather than the at-issue conduct. Even if Plaintiffs' experts could present reliable evidence supporting their claim that social media usage in general had a harmful impact on the school district (which they have not), attributing all of this impact to the at-issue conduct would overstate the harms caused by the at-issue conduct because it would inappropriately include harmful outcomes caused by other factors not at issue, including claims that have been dismissed by the Court. First, in considering the impact of social media in

[61] See, e.g., Ryan D. Lacanilao et al., "Heterogeneous Consumer Responses to Snack Food Taxes and Warning Labels," *The Journal of Consumer Affairs*, 45(1), 2011, pp. 108–122; Wade Jarvis and Simone Pettigrew, "The Relative Influence of Alcohol Warning Statement Type on Young Drinkers' Stated Choices," *Food Quality and Preference*, 28(1), 2013, pp. 244–252; Mostafa Purmehdi et al., "The Effectiveness of Warning Labels for Consumers: A Meta-Analytic Investigation Into Their Underlying Process and Contingencies," *Journal of Public Policy & Marketing*, 36(1), 2017, pp. 36–53.

general, Plaintiffs' experts fail to separate the impact of content available on social media platforms, which I understand the Court has determined is not at issue,[62] from the at-issue conduct. Second, Plaintiffs' experts fail to separate the impact of non-foreseeable third-party conduct—which the Court has ruled cannot be attributable to Defendants—from the at-issue conduct.[63] Plaintiffs' experts point specifically to outcomes such as conflicts between students, cyberbullying, vandalism, and property damage,[64] but they have not established that such effects stem from the at-issue conduct rather than from content or third-party actors on Defendants' platforms. Finally, by connecting the purported harms only to social media in general, Plaintiffs' experts fail to isolate damages attributable to the Defendants and their social media platforms, either as a group or for any individual Defendants.

### *4.2. Plaintiffs' Experts Have Not Demonstrated That the Effect of the At-Issue Conduct on Adolescent Mental Health (If Any) Can Be Reliably Quantified*

59. As Plaintiffs' experts acknowledge, many relevant factors contribute to the purported adolescent mental health outcomes.[65] As a result, establishing that the at-issue conduct adversely influences adolescent mental health is necessary but not sufficient to assess the harms allegedly

[62] Motion to Dismiss Order, pp. 12–14, 25 ("To the extent 'promotion' of a challenge refers to the mere publication of a third-party content on Snap, any such allegations would be barred by Section 230.").

[63] Motion to Dismiss Order, p. 25 ("Second, and by contrast, alleged injury stemming from non-foreseeable third-party conduct cannot be attributable to defendants. Consistent with the above recitation of proximate causation principles, defendants' general knowledge that bad actors may propagate harmful challenges, transmit threats, or engage in crime on their platforms does not, on its own, suffice to establish proximate cause.").

[64] Klein Tucson Report, ¶ 30; Hoover General Causation Report, ¶ 34; Osborne Report, ¶ 61

[65] See, e.g., Expert Report of Dimitri A. Christakis, M.D., M.P.H., May 16, 2025 ("Christakis Report"), ¶ 41 ("Similarly, the outcomes discussed in this report are influenced by a complex interplay of genetic, biological, psychological, and environmental factors—social media platforms are one additional contributor. While this report details how and why social media plays a role, that does not alter the fact there are multiple potential causal influences for the harms discussed. … When considering the role that Social Media plays in problematic usage, sleep, depression, anxiety, eating disorders, suicide and self-harm, I also considered the alternative explanations including COVID-19, socio-economic status, family stress, exposure to violence, Adverse Childhood experiences etc. … Just as smoking is not the *only* cause of heart disease but it is still a risk factor for it, social media is not the only cause of the harms detailed in this report."). For an overview of the literature on risk factors for mental health issues, see Janet Currie, "Presidential Address: Investing in Children to Address the Child Mental Health Crisis," *American Economic Review*, 115(5), 2025, pp. 1369–1399 ("Currie (2025)") at p. 1378 ("Overall, these sources suggest that the child mental health crisis has existed for decades and that the number of children with an underlying mental health condition has been high and relatively stable over time. In retrospect, this conclusion should not be surprising given what we know about the causes of child mental health disorders. While there is a genetic component to many mental illnesses, environmental stressors also have an impact, and may be necessary to trigger the onset of a mental health condition. Some important stressors that have been shown to impact child mental health include: poverty and income shocks (or income transfers) (see Akee, Copeland, and Simeonova 2024; Baird, de Hoop, and Özler 2013; Jones et al. 2024; Golberstein, Gonzalez, and Meara 2019), the birth of a sibling with a disability (Currie et al. 2024), domestic violence (Bhuller et al. 2024), school shootings (Rossin-Slater et al. 2020), and adverse childhood experiences generally (Blanchflower and Bryson 2024).").

attributable to the at-issue conduct. Plaintiffs' experts must also establish the *magnitude* of this impact in order to calculate damages (if any) from the at-issue conduct on the school district.[66]

60. Absent such quantification, it is not possible to separately determine any impact of the at-issue conduct from other factors that could also influence adolescent outcomes and thus potentially impact the school district. Even if Plaintiffs' experts establish that the at-issue conduct harms adolescent mental health, this in itself does not imply that all prevailing negative mental health outcomes for this group result from this conduct. Estimating economic damages requires quantifying the harms specifically resulting from the at-issue conduct and separating these from the impact of other factors on mental health.

61. In this section, I first discuss how Plaintiffs' experts do not quantify the magnitude of the purported relationship between the at-issue conduct and adolescent mental health; to the contrary, Plaintiffs' experts acknowledge the considerable uncertainty in the academic literature regarding the magnitude of the effect of social media (in general) on adolescent mental health (Section 4.2.1). Despite this, Plaintiffs' experts fail to account for other factors such as total screen time that Plaintiffs' experts' own research found has an impact on mental health (Section 4.2.2). I then discuss some of the challenges to estimating the magnitude of this relationship arising from measurement issues related to adolescent mental health (Section 4.2.3) and Plaintiffs' expert Professor Jean M. Twenge's response to these issues (Section 4.2.4).

#### *4.2.1. Plaintiffs' Experts Do Not Quantify the Magnitude of the Purported Effects of the At-Issue Conduct on Adolescent Mental Health*

62. Many of Plaintiffs' experts fail to connect the purported impact on adolescent mental health to the at-issue conduct specifically, instead opining that social media usage in general has a negative effect on adolescent mental health. By focusing on the broader issue of social media use, Plaintiffs' experts fail to disentangle any effect of the at-issue conduct from various other factors for which Defendants are not liable, including the content on social media platforms and the non-foreseeable conduct of third parties, which I discussed in Section 4.1. Regardless of whether Plaintiffs' experts analyzed the at-issue conduct or social media generally, none of these

[66] As an alternative, if Plaintiffs' experts were able to directly quantify the magnitude of the impact (if any) of the at-issue conduct on the school district, they would not necessarily need to separately quantify the impact on adolescent mental health. Since Professor Hoover relies on the opinions of Professor Christakis, Professor Twenge, and Professor Telzer regarding the impact of the at-issue conduct on adolescent mental health, I address whether these experts or Plaintiffs' other experts quantify this impact here. To the extent that Plaintiffs' experts Dr. Ward and Mr. Meyers attempt to directly measure harms experienced by the school district, they are addressed separately below.

experts has opined on the size of the effect relative to other factors that affect adolescent mental health.[67] For example, Plaintiffs' expert Professor Dimitri A. Christakis opines that "a review of the available meta-analyses and other relevant literature establishes that social media causes or contributes to addiction, problematic usage, anxiety, depression, body dysmorphia, eating disorders, sleep deprivation, suicide, and self-injury."[68] Professor Christakis acknowledges that "the outcomes discussed in [his] report are influenced by a complex interplay of genetic, biological, psychological, and environmental factors [and that] social media platforms are one additional contributor" and that "there are multiple potential causal influences for the harms discussed."[69] Professor Christakis does not opine on the quantitative importance of the at-issue conduct relative to these other factors in determining adolescent mental health outcomes.

63. Other Plaintiff experts offer similar opinions. Professor Gary Goldfield discusses the magnitude of effects estimated in the academic literature as a component of his assessment of causality and concludes that "the strength factor [of the Bradford Hill criteria he uses to assess causality] is satisfied here by the meta-analytic reviews of both observational and experimental studies for [Social Media Use]."[70] However, his assessment of evidentiary strength explicitly concerns his opinion that a causal relationship between social media use and mental health exists, not the magnitude of such a relationship.[71] Professor Twenge similarly only discusses the magnitude of the purported effect of social media use on mental health in the context of her opinion that a causal relationship between social media use and mental health exists.[72] Neither Professor Goldfield nor Professor Twenge opines on the quantitative importance of the at-issue conduct relative to these other factors in determining adolescent mental health outcomes.

[67] Christakis Report; Expert Report of Dr. Jean M. Twenge, Ph.D., May 16, 2025 ("Twenge Report"); Expert Report of Eva Telzer, Ph.D., May 16, 2025 ("Telzer Report"); Hoover General Causation Report; Expert Report of Gary Goldfield, Ph.D. C. Psych., May 16, 2025 ("Goldfield Report"); Expert Report of Dr. Ramin Mojtabai, M.D., Ph.D., M.P.H, May 16, 2025 ("Mojtabai Report"); Expert Report of Anna Lembke, M.D., May 16, 2025 ("Lembke Report").

[68] Christakis Report, ¶ 6.

[69] Christakis Report, ¶ 41.

[70] Goldfield Report, ¶ 315.

[71] Goldfield Report, ¶ 310 ("The strength of association factor refers to the magnitude of association, which is typically measured by statistics like correlation coefficients or relative risk/odds ratios. Bradford Hill posited that if an exposure has a strong association with an outcome (e.g., smokers having a much higher prevalence of lung cancer risk of non-smokers), it is more likely to reflect a causal relationship. However, weaker associations (e.g., a 10% increase in risk) do not preclude causality.").

[72] Twenge Report, ¶ 94 ("Bradford Hill emphasized that experimental evidence (randomized-controlled trials) is only occasionally available (as is true in research on social media), so other types of evidence can be used to determine causality (Hill, 1965). The research on social media use and poor mental health fulfills each of the Bradford Hill criteria. Criteria 1: The Strength of the Association.").

64. These opinions focus narrowly on studying whether or not social media usage harms adolescent mental health, but they do not study the magnitude of the effect that purportedly exists. This oversight leaves a gap in the causal chain from the at-issue conduct to the harms alleged by the school district. The degree to which the alleged harms arise from the at-issue conduct depends on the magnitude of the relationship between the at-issue conduct and adolescent mental health, not simply its purportedly negative sign. As I discuss in subsequent sections, Plaintiffs' abatement experts and past damages experts fail to fill this gap with any substantial analysis of their own (Sections 6 to 7 and Section 8, respectively).

65. In the following subsection, I discuss how, in particular, Plaintiffs' experts fail to account for adolescents' substitution between social media use and other forms of screen time when analyzing the impact of the at-issue conduct on the purported harms. Then, in the remainder of this section, I discuss the challenges inherent in quantifying the effect of the at-issue conduct on adolescent mental health due to changes in how mental health issues are reported over time. These reporting changes represent a major confounding factor influencing measured mental health outcomes that has not been accounted for in Plaintiffs' damages estimates.

*4.2.2. Plaintiffs' Experts Fail to Account for Total Screentime in the Relevant But-For World*

66. As previously discussed, Plaintiffs' experts frequently cite evidence that fails to disentangle any effects of the at-issue conduct on adolescent mental health from any effects of social media usage or smartphone usage more broadly. Plaintiffs' experts also fail to consider that if adolescents were to spend less time using Defendants' social media platforms in the but-for world without the at-issue conduct, they may spend more time on other activities, such as using their smartphones for other purposes, watching TV, or playing video games. To the extent these alternative activities impact students' mental health and other outcomes that purportedly affect schools, Plaintiffs' experts' failure to consider the but-for increase in alternative and potentially harmful activities means they cannot properly determine the harm, if any, to the school district.

67. Plaintiffs' experts claim that adolescents' increased social media usage has come at the expense of activities associated with positive mental health outcomes, such as sleep, schoolwork,

or in-person socialization.[73] Empirical evidence, however, also supports the hypothesis that time spent on digital devices, such as smartphones or computers, has come at the expense of time spent watching TV. As I discuss below, Plaintiffs' experts have themselves written about possible mental health harms of child and adolescent TV viewing. This would imply that ignoring increased TV viewing in the but-for world overstates harms to students from the at-issue conduct.

68. I demonstrate this by examining responses by high school students in the Youth Risk Behavior Survey ("YRBS") on the time they spend per day engaged in various activities involving screens. YRBS is a nationally representative, biennial survey of high school students conducted by the Centers for Disease Control and Prevention ("CDC").[74] The survey tracks a

[73] See, e.g., Goldfield Report, ¶¶ 1 ("Social media use is driven by a combination of psychological, neurological, and technological factors, including but not limited to: i. Defendants' social media platforms exploit the brain's fundamental reward learning processes and promote frequent engagement using low-effort, high reward stimuli (e.g., likes, comments) and intermittent, variable rewards schedules (e.g., push notifications) to promote dopamine-driven reinforcement; ii. Defendants' social media platforms exploit the evolutionary drive for social connection and acceptance by scaling social contact, converting social approval into quantifiable metrics (e.g., like counts), gamifying social interactions (e.g., Snapstreaks), leveraging social anxiety and fear of missing out, and amplifying social pressure; iii. Defendants' social media platforms use algorithms to aggregate personalized experiences and present it in an infinite scroll format that lacks time or stopping cues and promotes excessive continued engagement; and iv. Defendants' social media platforms capitalize on users' limited capacity for emotional regulation and cognitive control by fostering patterns of compulsive and prolonged engagement, as users increasingly rely on social media engagement to modulate negative mood states."), 208 ("Displacement theory was initially developed to explain why television viewing is associated with poorer physical and emotional development (Neuman, 1988) but has recently been applied to the social media context. Briefly, displacement theory posits that the excessive amounts of time spent on these platforms (national average>3 hrs/day) harms mental health and undermines academic performance by displacing time spent in healthy behaviours (sleep, physical activity, in-person social interaction with friends and hobbies) known to promote mental health, cognition and brain health (Kraut et al. 1998)."); Christakis Report, ¶¶ 6–7 ("A review of the available meta-analyses and other relevant literature establishes that social media causes or contributes to addiction, problematic usage, anxiety, depression, body dysmorphia, eating disorders, sleep deprivation, suicide, and self-injury. Specific design features of Facebook, Instagram, Snap, YouTube, and TikTok work in concert to promote both the addictive nature of social media and its associated harms. Platform features and platform algorithms create and amplify mental health problems for pre-teens and teens.").

[74] Centers for Disease Control and Prevention, "Methodology of the Youth Risk Behavior Surveillance System – 2013," *Morbidity and Mortality Weekly Report*, 62(1), March 1, 2013, available at https://www.cdc.gov/mmwr/pdf/rr/rr6201.pdf ("CDC 2013 Methodology of the Youth Risk Behavior Surveillance System"), pp. 11 ("The national YRBS uses a three-stage, cluster sample design to obtain a nationally representative sample of U.S. students in grades 9-12."), 5 ("Since 1991, YRBSs have been conducted every odd year at the national, state, territorial, and large urban school district levels."). Because YRBS is based on self-reports, the degree to which behaviors of interest are under- or overreported is unknown. However, the CDC conducts extensive tests and validation exercises to address this and other limitations. Of particular note to this analysis are the test-retest reliability studies and field testing of recall length among subjects. See CDC 2013 Methodology of the Youth Risk Behavior Surveillance System, pp. 17 ("YRBSS is subject to at least five limitations. First, all YRBSS data are self-reported, and the extent of underreporting or overreporting of behaviors cannot be determined"), 5 ("In addition, the second version was sent to the Questionnaire Design Research Laboratory at NCHS for laboratory and field testing with high school students. NCHS staff examined student responses to the questionnaire and recommended ways to improve reliability and validity by clarifying the wording of questions, setting recall periods, and identifying response options."), 6 ("CDC has conducted two test-retest reliability studies of the national YRBS questionnaire, one in 1992 and one in 2000. In the first study, the 1991 version of the questionnaire was administered to a convenience sample of 1,679 students in grades 7–12. The questionnaire was administered on two occasions, 14 days apart (*22*). Approximately three fourths of the questions were rated as having a substantial or higher reliability (kappa = 61%–100%), and no statistically significant differences were observed between the prevalence estimates for the first and second times that the questionnaire was administered. The responses of students in grade 7 were less consistent than those of students in grades 9–12, indicating that the questionnaire is best suited for students in those grades. In the second study, the 1999 questionnaire was administered to a convenience sample of 4,619 high school students. The questionnaire was administered on two occasions,

wide range of adolescent experiences, including mental health, school climate, and exposure to violence, as well as daily habits such as diet and time usage.[75] Since 2007, YRBS has tracked the amount of time respondents spend on screens. Between 2007 and 2019, this information was collected in two questions, one asking respondents for the time they spend watching TV and the other asking respondents for the time they spend "playing games, watching videos, texting, or using social media on [their] smartphone, computer, Xbox, PlayStation, iPad, or other tablet."[76] In 2021, respondents were asked a single question about the time they spend "in front of a TV, computer, smart phone, or other electronic device watching shows or videos, playing games, accessing the Internet, or using social media."[77]

69. Exhibit 1 shows the average number of hours per day spent for each of these activities reported by YRBS respondents nationwide, as well as the total hours of screen time per day on average. Although time spent on electronic devices increased between 2007 and 2019, the time spent watching TV decreased by a similar amount over the same period. Total screen time increased slightly between 2007 and 2013, then decreased between 2013 and 2021. These results support the hypothesis that the increased time adolescents spend on electronic devices has come, at least in part, at the expense of time spent watching TV. Exhibit 2 shows the same measures for respondents in Arizona. The state-level results show similar patterns to the national results. The academic literature, including research by Plaintiffs' expert Professor Twenge, has documented similar shifts away from watching TV and toward using other digital media, including social media, over this period.[78]

approximately 2 weeks apart (*23*). Approximately one of five questions (22%) had significantly different prevalence estimates for the first and second times that the questionnaire was administered. Ten questions (14%) had both kappas <61% and significantly different time-1 and time-2 prevalence estimates, indicating that the reliability of these questions was questionable (*23*). These problematic questions were revised or deleted from later versions of the questionnaire."); Nancy D. Brener et al., "Reliability of the Youth Risk Behavior Survey Questionnaire," *American Journal of Epidemiology*, 141(6), 1995, pp. 575–580; Nancy D. Brener et al., "Reliability of the 1999 Youth Risk Behavior Survey Questionnaire," *Journal of Adolescent Health*, 31(4), 2002, pp. 336–342.

[75] Centers for Disease Control and Prevention, "About YRBSS," June 14, 2024, available at https://www.cdc.gov/yrbs/about/index.html.

[76] The relevant questions, in full, are "(Q80) On an average school day, how many hours do you play video or computer games or use a computer for something that is not school work? (Count time spent playing games, watching videos, texting, or using social media on your smartphone, computer, Xbox, PlayStation, iPad, or other tablet.)" and "(Q79) On an average school day, how many hours do you watch TV?" See Centers for Disease Control and Prevention, "2019 YRBS Data User's Guide," August 2020, available at https://www.cdc.gov/yrbs/files/2019/pdf/2019_National_YRBS_Data_Users_Guide.pdf ("2019 YRBS Data User's Guide").

[77] Centers for Disease Control and Prevention, "2021 YRBS Data User's Guide," April 2023, available at https://www.cdc.gov/yrbs/files/2021/pdf/2021_YRBS_Data_Users_Guide_508.pdf ("2021 YRBS Data User's Guide").

[78] Jean M. Twenge et al., "Trends in U.S. Adolescents' Media Use, 1976–2016: The Rise of Digital Media, the Decline of TV, and the (Near) Demise of Print," *Psychology of Popular Media Culture*, 8(4), 2019, pp. 329–345 at p. 339 (Figure 9, showing a decline in the share of survey respondents reporting more than two hours of TV per day from above 60 percent in 1991 to below 40 percent in 2016).

***EXHIBIT 1***
***National YRBS Responses, Average Hours Spent Watching TV and On Other Electronic Devices, by Year***




Source: YRBS; 2019 YRBS Data User's Guide; 2021 YRBS Data User's Guide

Note: The YRBS administers a survey to a nationally representative sample of ninth- through twelfth-grade students in public and private schools. The survey is conducted every two years. The responses are weighted to account for non-responses and the oversampling of certain demographic groups. These weights are scaled so the weighted count of students is equivalent to the total sample size, and the weighted proportions of students in each grade match the population projections for each survey year. Responses have been restricted to 13–17 year old students and weighted using the YRBS response weights. Non-responses to the charted question have been excluded. "Average Combined Screentime" is the estimated average number of hours that students spend watching TV and on electronic devices. From 2007 through 2019, this is calculated as the sum of time spent watching TV and on electronic devices. Starting in 2021, this is based on the response to the question "On an average school day, how many hours do you spend in front of a TV, computer, smart phone, or other electronic device watching shows or videos, playing games, accessing the Internet, or using social media (also called 'screen time')? (Do not count time spent doing schoolwork.)." "Average Electronic Devices Time" is the estimated average number of hours that students spend on electronic devices, based on responses to the question "On an average school day, how many hours do you play video or computer games or use a computer for something that is not school work? (Count time spent playing games, watching videos, texting, or using social media on your smartphone, computer, Xbox, PlayStation, iPad, or other tablet.)." "Average TV Time" is the estimated average number of hours that students spend watching TV, based on responses to the question "On an average school day, how many hours do you watch TV?"

***EXHIBIT 2***
***Arizona YRBS Responses, Average Hours Spent Watching TV and On Other Electronic Devices, by Year***




Source: YRBS; 2019 YRBS Data User's Guide; 2021 YRBS Data User's Guide

Note: The YRBS administers a survey to a nationally representative sample of ninth- through twelfth-grade students in public and private schools. The survey is conducted every two years. The responses are weighted to account for non-responses and the oversampling of certain demographic groups. These weights are scaled so the weighted count of students is equivalent to the total sample size, and the weighted proportions of students in each grade match the population projections for each survey year. Responses have been restricted to 13–17 year old students and weighted using the YRBS response weights. Non-responses to the charted question have been excluded. "Average Combined Screentime" is the estimated average number of hours that students spend watching TV and on electronic devices. From 2007 through 2019, this is calculated as the sum of time spent watching TV and on electronic devices. Starting in 2021, this is based on the response to the question "On an average school day, how many hours do you spend in front of a TV, computer, smart phone, or other electronic device watching shows or videos, playing games, accessing the Internet, or using social media (also called 'screen time')? (Do not count time spent doing schoolwork.)." "Average Electronic Devices Time" is the estimated average number of hours that students spend on electronic devices, based on responses to the question "On an average school day, how many hours do you play video or computer games or use a computer for something that is not school work? (Count time spent playing games, watching videos, texting, or using social media on your smartphone, computer, Xbox, PlayStation, iPad, or other tablet.)." "Average TV Time" is the estimated average number of hours that students spend watching TV, based on responses to the question "On an average school day, how many hours do you watch TV?"

70. To correctly assess the causal impact (if any) of the at-issue conduct, Plaintiffs' experts would need to consider not just any purported effects of increased social media usage directly

attributable to the at-issue conduct, but also any effects of potentially increased usage of alternatives to Defendants' social media platforms absent the at-issue conduct. Determining to a reasonable degree of certainty whether TV or other screen-based alternatives to social media have an impact on adolescent mental health or on the school district is outside the scope of my report. However, Plaintiffs' experts have themselves written extensively about the purported risks that TV poses to child and adolescent mental health. For example, a study coauthored by Professor Goldfield finds evidence of "a relationship between reduced TV viewing and increased global self-worth" among overweight 8- to 12-year-olds.[79] Professor Christakis has likewise written numerous articles about the mental health effects of TV on children,[80] and he cites in his report studies linking legacy media, such as TV or magazines, to harmful outcomes among adolescents, such as increased prevalence of body dysmorphia or increased tobacco consumption.[81]

71. If Plaintiffs' experts' are correct, and increased TV consumption harms adolescent mental health, then a proper causal model of damages must evaluate the possible harms to Plaintiffs of greater television consumption in the but-for world without the at-issue conduct. However, Plaintiffs' experts' fail to consider this, or any alternative behavior that may increase in the but-for world, when opining on damages to the school district.

[79] Gary S. Goldfield et al., "Effects of Modifying Physical Activity and Television Viewing on Psychosocial Adjustment in Overweight and Obese Children," *Journal of Pediatric Psychology*, 32(7), 2007, pp. 783–793 at p. 789.

[80] See, e.g., Frederick J. Zimmerman et al., "Early Cognitive Stimulation, Emotional Support, and Television Watching as Predictors of Subsequent Bullying Among Grade-School Children," *Archives of Pediatrics & Adolescent Medicine*, 159(4), 2005, pp. 384–388; Frederick J. Zimmerman and Dimitri A. Christakis, "Children's Television Viewing and Cognitive Outcomes: A Longitudinal Analysis of National Data," *Archives of Pediatrics & Adolescent Medicine*, 159(7), 2005, pp. 619–625; Frederick J. Zimmerman and Dimitri A. Christakis, "Associations Between Content Types of Early Media Exposure and Subsequent Attentional Problems," *Pediatrics*, 120(5), 2007, pp. 986–992.

[81] Christakis Report, ¶¶ 296 ("Body dissatisfaction has long been recognized as influenced by a variety of sociocultural factors including media. Historically, this has happened in the 'real' world or via magazine advertisements or television programs. Prior to the widespread use of social media, media exposure, and in particular exposure to advertisements was associated with BDD. A 2008 metanalysis of 77 studies (predating social media) found small to moderate correlations between media exposure and body dissatisfaction."), 483 ("Longitudinal studies of SM exposure to risky behavior and subsequent risk taking are limited but there are ample studies of other media exposures (e.g. tobacco and alcohol use and in movies and advertising) and subsequent drinking and smoking. The Bridge et al study detailed before also examined the impact of viewing suicide relevant content to risk of committing suicide.").

### *4.2.3. Quantifying the Impact of the At-Issue Conduct on Mental Health Is Confounded by Changes over Time in How Mental Health Issues Are Reported*

72. Measuring mental health outcomes is complicated by changes in the diagnosis, reporting, and treatment of mental health issues by healthcare providers, which confound Plaintiffs' experts' attempts to quantify the alleged harms.[82]

73. To understand how measurement issues arise in the context of what Plaintiffs' experts claim are "objectively measured" outcomes, such as professional diagnoses or hospitals' categorization of incidents,[83] it is useful to consider a stylized example of how a diagnosis, hospitalization, or death related to a mental health issue often comes to be reported.

74. First, an individual must come into contact with the healthcare system. In the case of a death or severe health problem, this may be involuntary. Otherwise, the individual must choose to seek care. As discussed below, some individuals may not do so because of a lack of awareness or stigma surrounding mental health issues.[84] Others may choose not to seek care if they do not believe helpful treatments are available or because they face financial barriers.[85] Once the individual is in contact with the healthcare system, medical professionals must categorize the incident and report it. In the case of a death, healthcare workers must determine the cause of death and whether it was accidental or intentional. For other issues, medical professionals will record the symptoms experienced by the individual and map these symptoms into reasons for the visit or diagnoses.

[82] Currie (2025), pp. 1374 ("Incentives to diagnose mental illness have also changed for providers over time. Corredor-Waldron and Currie (2024) highlight an important national change in screening practices following a 2011 recommendation from the US Preventive Services Task Force (USPSTF) that women and girls 12 and over should be screened annually for depression."), 1375 ("In addition, there have been changes in provider compensation for treating patients with more complex conditions. In 2007, Medicare introduced a new reimbursement system that allowed hospitals to charge Medicare more if people with other conditions (e.g., asthma) also had major depression. This change gave hospitals an incentive to train clinicians to code depression if present. … Similarly, a tweak to the newly implemented ICD10 classification system in October 2016 instructed ED clinicians to record suicidal ideation as a secondary diagnosis if present, which may have resulted in higher reimbursements in some cases. Changes in provider incentives also occurred because of changes in compensation practices that were associated with the introduction of managed care."), 1377 ("while it might seem desirable to track trends in ED visits as a way of assessing trends in underlying child mental health, trends in ED visits for mental health disorders are sensitive to changes in patient and provider incentives to diagnose and record mental health conditions over time.").

[83] Twenge Report, ¶ 45 ("Further, objectively measured behaviors that do not rely on self-reporting, such as emergency room admissions for self-harm (Figure 2) and completed suicides (Figure 3) reveal a trend consistent with self-reported mental health surveys. Thus, the increases cannot merely be due to changes in self-reporting, given that they extend to behaviors.").

[84] Prashant Bharadwaj et al., "Mental Health Stigma," *Economics Letters*, 159, 2017, pp. 57–60 ("Bharadwaj et al. (2017)").

[85] Benjamin W. Cowan and Zhuang Hao, "Medicaid Expansion and the Mental Health of College Students," *Health Economics*, 30(6), 2021, pp. 1306–1327 ("Cowan and Hao (2021)") at p. 1306.

75. The types of data that are recorded at each of these steps have changed over time, which could have plausibly influenced the measured incidence and prevalence of mental health issues, even absent any changes in underlying mental health. First, insurance coverage of screenings and treatment for mental health issues has expanded since 2010, in part due to the Affordable Care Act and in part due to changes in mental health screening guidance from professional organizations.[86] Academic research has found that the utilization of mental health treatment is affected by insurance coverage. For example, the reported rates of diagnoses and treatments for mental health issues rose among young adults who gained access to Medicaid following the implementation of the Affordable Care Act.[87]

76. Second, updates in diagnostic and coding guidance have changed the way that hospitals record visits since 2010. For instance, in 2013, the diagnostic manual DSM-4 was updated to the DSM-5.[88] The DSM-5 includes expanded definitions of several common mental health conditions, including depression and anxiety, which led to increases in the prevalence of these diagnoses.[89] In addition, in 2015, hospital intake guidance was updated from the International Classification of Diseases, Ninth Revision ("ICD-9") codes to International Classification of Diseases, Tenth Revision ("ICD-10") codes.[90] These codes are used by hospitals to classify

[86] Anna Chorniy et al., "Exploding Asthma and ADHD Caseloads: The Role of Medicaid Managed Care," *Journal of Health Economics*, 60, 2018, pp. 1–15; Adriana Corredor-Waldron and Janet Currie, "To What Extent Are Trends in Teen Mental Health Driven by Changes in Reporting? The Example of Suicide-Related Hospital Visits," *Journal of Human Resources*, 59(S), 2024, pp. S14–S40 ("Corredor-Waldron and Currie (2024)") at p. S16 ("In 2009, the USPSTF recommended that providers screen adolescents 12–18 for depression. However, insurers were not required to pay for these services until 2011, when the Affordable Care Act (the ACA, passed in 2010) mandated that insurance companies pay for these recommended services without patient cost sharing.").

[87] Cowan and Hao (2021), p. 1 ("Reported mental health problems have risen dramatically among US college students over time, as has treatment for these problems. We examine the effect of state-level Medicaid expansion following the 2014 implementation of the Affordable Care Act on the diagnosis of mental health conditions, psychotropic prescription drug use, and the mental health status of a national sample of college students. We find that students from disadvantaged backgrounds are more likely to report being on public insurance after 2014 in expansion states relative to non-expansion states, while more advantaged students do not see this increase. Both diagnosis of common mental health conditions and psychotropic drug use increase following expansion for disadvantaged students relative to advantaged ones, which translates into an elimination of the pre-expansion gap in these outcomes by family background in expansion states.").

[88] Corredor-Waldron and Currie (2024), p. S17 ("there have been broad changes in diagnostic criteria for some mental health conditions with the publication of new versions of the Diagnostic and Statistical Manual of Mental Disorders (DSM) in 1994 and 2013 (American Psychiatric Association 1994, 2013). … The DSM-5 … changes went into effect in 2013.").

[89] Corredor-Waldron and Currie (2024), p. S17 ("The DSM-5 also updated the definitions of depression and anxiety … For example, bereavement had been excluded from the definition of depression but is now included. Other changes include merging chronic major depressive disorder and dysthymic disorder … Diagnostic thresholds for anxiety disorders were lowered (Park and Kim 2020). The overall impact of these changes may have tended to increase the number of people diagnosed with depression and anxiety disorders after the changes went into effect in 2013."); John M. Grohol and Stephanie A. Wright, "DSM-5 Changes: Depression and Depressive Disorders," *Psych Central*, March 30, 2022, available at https://psychcentral.com/depression/dsm-5-changes-depression-depressive-disorders; Seon-Cheol Park and Yong-Ku Kim, "Anxiety Disorders in the DSM-5: Changes, Controversies, and Future Directions," in *Advances in Experimental and Medical Biology, Volume 1191*, ed. Yong-Ku Kim (Singapore: Springer, 2020), pp. 187–196.

[90] Corredor-Waldron and Currie (2024), p. S17 ("[T]he mandatory switch from the ninth to the tenth edition of the International Classification of Diseases (ICD) in U.S. hospitals [took effect] in October 2015."); Christine C. Stewart et al.,

disease, injury, and death information in a standardized way.[91] Following the change to ICD-10 codes, authorities overseeing the ICD-10's implementation issued clarifying guidance directing physicians to record suicidal ideation as a secondary diagnosis, and this coincided with increases in the number of hospitalizations reported as related to suicide.[92] ICD-10 codes also included new guidance directing physicians to report whether an act of self-harm was intentional or accidental, when previously this field was often left blank.[93] Corredor-Waldron and Currie (2024) find that these changes in diagnostic protocol explain much of the overall increase in reported hospitalizations related to adolescent mental health issues since 2013.[94]

77. These changes in diagnostic and reporting protocols make it difficult to infer quantitative changes in the prevalence of mental health issues from reported data on mental health-related hospitalizations and diagnoses. This challenge complicates the interpretation of much of the evidence cited by Plaintiffs and their experts because the purported increases in the prevalence of mental health issues cited by Plaintiffs' experts reflect the increased likelihood of reporting such issues as well as any increases in mental health issues themselves. Plaintiffs' experts do not account for this in their attempts to quantify the alleged harm to the school district, nor do they

"Impact of ICD-10-CM Transition on Mental Health Diagnoses Recording," *eGEMS*, 7(1), 2019, 14 ("Stewart et al. (2019)").

[91] Centers for Disease Control and Prevention, "Classification of Diseases, Functioning, and Disability," June 7, 2024, available at https://www.cdc.gov/nchs/icd/.

[92] Corredor-Waldron and Currie (2024), pp. S18 ("The Cooperating Parties in charge of implementing the ICD-10 in the United States … changed the note about 'symptoms and signs involving cognition, perception, emotional state and behavior' (diagnosis codes R40–R46, which include suicidal ideation) to an 'Exclude 2' effective October 2016 (Centers for Disease Control and Prevention 2015). This change in coding instructions recognized that symptoms such as suicidal ideation do not always occur with primary mental health diagnoses such as depression, so that, in a 180-degree about-face, clinicians were now actively encouraged to include symptoms such as suicidal ideation as secondary diagnoses when present with a primary diagnosis of mental illness."), S25 ("increases in the use of suicidal ideation as a secondary diagnosis code … are in line with … the October 2016 recommendation to include [suicidal ideation] where present with other primary mental health diagnoses.").

[93] Corredor-Waldron and Currie (2024), p. S17 ("In the ICD-9, a clinician had to enter two codes to indicate self-harm, one recording the type of injury and the second indicating its 'external cause.' Notably, the external cause codes were frequently missing, making it impossible to determine whether a harm was intentionally inflicted or not. In the ICD-10, the clinician only enters one code that has the external cause embedded. For example, the clinician must choose whether to code 'intentional drug overdose' or 'unintentional drug overdose.'").

[94] Corredor-Waldron and Currie (2024), pp. S36–S37 ("Importantly, the large increases in reported suicidal behaviors after 2011 have been widely interpreted as increases in actual underlying suicidal behaviors. This analysis suggests that they may in fact be due to changes in screening as well as changes in the diagnostic coding of mental health disorders that more accurately capture rates of suicidal behaviors that have been gently trending upwards. This conclusion is consistent with the observation by Richter et al. (2019) that the actual prevalence of adult mental health disorders (many of which start in childhood) has shown only small increases over time. … These large increases in diagnoses of suicidal ideation after 2016 were associated with changes in coding instructions that focused on the coding of suicidal ideation in patients with primary diagnoses of other mental health disorders. There was, however, no parallel change in self-injury, intentional self-harm, or suicide attempts, nor were there changes in the incidence of visits with underlying primary mental health disorders. Hence, the sharp increase in suicidal ideation is likely to reflect the change in coding rather than a change in underlying suicidal behaviors."). See also Stewart et al. (2019) for additional discussion of how changes in diagnostic protocols impact the reported diagnoses of mental health conditions.

provide a way to disentangle changes in reporting from changes in underlying mental health issues, likely leading them to overstate the actual effect of the at-issue conduct.[95]

78. In addition to the confounding factor of changes in diagnostic and reporting practices among healthcare providers, accurate measurement of changes in mental health issues over time is further complicated by reductions in stigma and increased willingness among individuals to report mental health issues. Mental health issues have historically been stigmatized, creating barriers to reporting, treatment, and open discussion.[96] However, public perceptions of mental health issues have changed over time. As I describe below, the stigma surrounding mental health issues in the U.S. has diminished over the past several decades, and public awareness of these issues has increased.[97] These developments help those suffering from mental health issues, but they complicate the interpretation of changes over time in the reported prevalence of mental health issues. To the extent that stigma reduces individual propensity to seek mental health treatment,[98] one would expect declining stigma to increase the reported rates of mental health issues, even if the true underlying incidence of mental health issues did not change.

79. To illustrate the relevance of this measurement challenge, consider the following illustrative example. Suppose that cultural attitudes toward depression shifted between 2000 and 2024, such that in 2000 half of the population considered depression shameful and would not admit to experiencing it, but in 2024 this stigma had disappeared. Now suppose a researcher wanted to measure the impact of school shootings on depression among adolescents. According to the K-12 Shootings Database, the number of shooting incidents at schools rose from 31 in 2000 to 332 in 2024, or a roughly tenfold increase.[99] For the sake of illustration, suppose that 10 percent of the population suffered from depression in 2000, and 11 percent suffered from depression in 2024, and that the one-percentage-point increase was caused by the increase in school shootings. However, if the researcher attempted to estimate the effect of school shootings by measuring the change in depression rates reported in surveys between 2000 and 2024, the researcher would find an artificially high increase in *reported* depression: the reported 2000

[95] For examples of evidence cited by Plaintiffs and their experts affected by these issues, see Twenge Report, Figure 2; First Amended Complaint MDL, ¶ 15.

[96] Bharadwaj et al. (2017).

[97] Bernice A. Pescosolido et al., "Trends in Public Stigma of Mental Illness in the US, 1996–2018," *JAMA Network Open*, 4(12), 2021, e2140202 ("Pescosolido et al. (2021)") at p. 6 ("First, the period around the turn of the century (1996-2006) saw a substantial increase in the public acceptance of biomedical causes of mental illness."), Table 2.

[98] Bharadwaj et al. (2017).

[99] K-12 School Shooting Database, "How Many School Shootings? All Incidents From 1966-Present," available at https://k12ssdb.org/all-shootings.

prevalence would have been five percent, or half of the actual rate, but by 2024, reported prevalence would have risen to 11 percent. Attributing the entirety of the increase in reported depression rates to school shootings would overstate the actual harm by a factor of six. Crucially, even if the researcher understood the potential for mismeasurement, the researcher would be unable to accurately estimate the "true" effect of school shootings without quantifying the extent of destigmatization and other factors that influence the probability of reporting a true case.

80. In the context of estimating changes in mental health issues over time, academic research has found that changes in reporting propensities meaningfully affect the measurement of mental health issues.[100] Even if one were to accept Plaintiffs' experts' claim that social media usage affects adolescent mental health, Plaintiffs' experts do not provide a way to disentangle the purported effects of social media usage on mental health from the increases in reported rates of mental health issues attributable to changes in awareness and reduction in stigma. This makes Plaintiffs' experts' attempts to attribute damages to the at-issue conduct unreliable and lacking in empirical support.

81. Academic research has documented a reduction in the stigma associated with mental health issues over the past several decades in the U.S. Pescosolido et al. (2021), for example, considers evidence from three waves of a large, national survey between 1996 and 2018 and finds that respondents were increasingly likely to attribute mental health issues to biological or

[100] Currie (2025), pp. 1373 ("One reason for the perception of an accelerating child mental health crisis may be increases in diagnoses of specific mental illnesses, such as anxiety and depression. But much of this increase is likely due to changes in the definitions of mental illness over time."), 1374 ("One helpful way to think about the impact of changes in screening, diagnosis, and coding of mental illness over time is to think of the incentives facing patients and providers. On the patient side, the potential benefits of a mental health diagnosis include access to treatment, the possibility of accommodations such as student individualized education plans, and, in some cases, disability payments. One of the largest costs of receiving a mental health diagnosis is the severe stigma that still surrounds these disorders. But mental health stigma has been declining over time, reducing the costs to patients of being diagnosed with a mental health condition."), 1378 ("The YRBSS questions have the virtue of having been asked in the same way for 30 years. On the other hand, it is unclear how these self-reported measures should be viewed in relationship to other potential measures and given the possible effects of declining mental health stigma on response rates. The self-reported data on suicide attempts can be compared to data from the CDC's *Web-Based Injury Statistics Query and Reporting System* (WISQARS). In 2022, there were 593 ED visits for self-harm per 100,000 youth aged 15–19, which is 17 times lower than the reported rate of suicide attempts in the YRBSS. Moreover, not all self-harm has suicidal intent. Hence, these numbers imply either that most suicide attempts do not result in injuries significant enough to warrant medical attention, or that the number of suicide attempts is exaggerated in the YRBSS. Perhaps both are true. Overall, these sources suggest that the child mental health crisis has existed for decades and that the number of children with an underlying mental health condition has been high and relatively stable over time."). See also Pescosolido et al. (2021); Matthias C. Angermeyer et al., "Public Attitudes Towards Psychiatry and Psychiatric Treatment at the Beginning of the 21st Century: A Systematic Review and Meta-Analysis of Population Surveys," *World Psychiatry*, 16(1), 2017, pp. 50–61 ("Angermeyer et al. (2017)"); Dirk Richter et al, "Is the Global Prevalence Rate of Adult Mental Illness Increasing? Systematic Review and Meta-Analysis," *Acta Psychiatrica Scandinavica*, 140(5), 2019, pp. 393–407 ("Richter et al. (2019)"); Corredor-Waldron and Currie (2024), pp. S36–S37 ("Importantly, the large increases in reported suicidal behaviors after 2011 have been widely interpreted as increases in actual underlying suicidal behaviors. This analysis suggests that they may in fact be due to changes in screening as well as changes in the diagnostic coding of mental health disorders that more accurately capture rates of suicidal behaviors that have been gently trending upwards. This conclusion is consistent with the observation by Richter et al. (2019) that the actual prevalence of adult mental health disorders (many of which start in childhood) has shown only small increases over time.").

medical factors rather than a personal failing.[101] Further, the authors find that fewer respondents expressed an unwillingness to live near or interact with individuals suffering from depression; they interpret this as a decline in the stigma associated with this illness.[102] Similarly, a 2017 meta-analysis of 162 studies based on population surveys finds that "the public's readiness to recommend seeking help from a psychiatrist has increased over the past 25 years," although the authors note that "stigma is still a relevant problem for help-seeking."[103]

82. The literature has found that some of the reported increases in mental health issues are attributable to reductions in stigma and the growing willingness to report such issues to healthcare providers. For example, a 2019 meta-analysis of studies using consistent measures of mental health issues across repeated cross-sections of survey respondents over time finds that the increase in utilization of mental healthcare services was significantly larger than the increase in underlying mental health issues.[104] Although this analysis focuses on adult mental health, the authors attribute this finding to the destigmatization of mental health issues and a cultural shift toward a greater acceptance of mental healthcare, which may influence reporting of adolescent mental health issues as well.[105] Other recent studies recognize the importance of this issue in measuring mental health outcomes and called for further research into the extent to which trends in reported mental health outcomes are affected by destigmatization.[106]

[101] Pescosolido et al. (2021), p. 6 ("First, the period around the turn of the century (1996-2006) saw a substantial increase in the public acceptance of biomedical causes of mental illness."), Table 2.

[102] Pescosolido et al. (2021), p. 7 ("Second, the more recent period (2006-2018) documented, to our knowledge, the first significant, substantial decrease in stigma, albeit for one mental illness diagnosis: major depression. Fewer survey respondents expressed a desire for social distance from people with depression across nearly all domains, including work and family. Considered in the context of previous research, these decreases are statistically significant, substantively large, and persist in the presence of controls.").

[103] Angermeyer et al. (2017), p. 57.

[104] Richter et al. (2019), p. 404 ("Our main result of a small increase in mental illness prevalence is obviously at odds with the evidence of a tremendous increase in mental healthcare utilization especially in the developed countries. One reason for the increase in the number of treated persons may be success in closing the treatment gap between those in need and those already in treatment.").

[105] Richter et al. (2019), p. 404 ("Several reasons have been proposed in recent publications, for example the de-stigmatization of specific mental disorders or the increasing willingness of primary care professionals to address mental illness in clinical encounters (18, 24, 46). In terms of utilization, another major driver might have been a sociocultural change that social scientists have called 'psychologization' (52), which involves the expansion of a 'Therapy Culture' (53) into the general population. Alongside the common perception of recent massive social change resulting in an accelerating pace of everyday life, this therapy culture is assumed to be one important factor for a heightened willingness to report distress and to accept psychological and psychiatric treatment."). For a discussion of how this issue affects measurement of adolescent mental health, see Currie (2025).

[106] See, e.g., Corredor-Waldron and Currie (2024), p. S20 ("We expect that reductions in the stigma associated with mental health conditions may have both increased the propensity to seek treatment and reduced doctors' reluctance to make mental health diagnoses."); Lucy Foulkes and Jack L. Andrews, "Are Mental Health Awareness Efforts Contributing to the Rise in Reported Mental Health Problems? A Call to Test the Prevalence Inflation Hypothesis," *New Ideas in Psychology*, 69, 2023, 101010 ("Foulkes and Andrews (2023)"), p. 4 ("In this paper, we have presented the prevalence inflation hypothesis. This states that efforts to raise awareness about mental health problems are inadvertently leading to an increase in reported rates

83. Reductions in stigma and increased willingness to report mental health issues also interact with changes in diagnostic and reporting practices. As I discussed above, awareness of mental health issues can change individuals' willingness to report relevant symptoms and seek treatment. Changes in diagnostic and reporting guidelines that result in increases in mental health diagnoses and hospitalizations could raise the public profile of these issues, which could in turn lead to higher willingness among individuals to self-report mental health issues.[107]

### *4.2.4. Professor Twenge Fails to Substantiate Dismissal of the Measurement Issues in Determining the Magnitude of Any Effect of the At-Issue Conduct on Adolescent Mental Health*

84. Plaintiffs' experts must quantify the contribution of confounding factors due to changes in stigma, reporting, or diagnostic procedures; otherwise, they cannot reliably quantify the effect (if any) of the at-issue conduct on the alleged harms to the school district. The hypothetical "school shootings and depression" example above illustrates the point. The hypothetical researchers in that example would have correctly inferred that school shootings increase depression, but they would have greatly overstated the extent of the increase. Using inflated estimates of harms then leads to inflated estimates of damages. Here, the failure to account for other factors that impact mental health outcomes leads Plaintiffs' experts to understate the extent of mental health issues prior to Defendants' at-issue conduct and to overstate the impact of social media usage.[108] Moreover, they do not provide evidence sufficient to determine how much the impact is overstated, making it impossible to draw reliable conclusions about the size of damages and the degree of abatement required.

of mental health problems. We propose that this occurs via two mechanisms, which we term improved recognition and overinterpretation. Improved recognition describes how awareness efforts have led some individuals to better recognise and report their previously under-reported mental health problems. In contrast, overinterpretation is problematic, and describes how awareness efforts have led some individuals to overpathologise common psychological experiences. In some cases, this has become a self-fulfilling prophecy: interpreting difficulties as a mental health problem can lead to changes in self-concept and behaviour that ultimately exacerbate symptoms and distress. Lastly, the prevalence inflation hypothesis states that the relationship between mental health awareness efforts and increasing rates of mental health problems is cyclical and escalating. This is an urgent hypothesis that requires empirical testing, and careful research efforts are needed to understand how future awareness campaigns can minimise the occurrence of overinterpretation.").

[107] Foulkes and Andrews (2023) discuss the possibility of a feedback loop between increased diagnosis rates, greater awareness, and greater willingness to report mental health issues. See Foulkes and Andrews (2023), p. 1 ("Moreover, we argue that the relationship between these two constructs is bidirectional. Increased rates of mental health problems understandably drive more awareness efforts, but the awareness efforts themselves might lead to increased reporting and experiencing of symptoms, as we describe below. We therefore propose that mental health problems and awareness efforts are affecting each other in a cyclical, intensifying manner.").

[108] Currie (2025), pp. 1373 ("One reason for the perception of an accelerating child mental health crisis may be increases in diagnoses of specific mental illnesses, such as anxiety and depression. But much of this increase is likely due to changes in the definitions of mental illness over time."), 1378 ("Overall, these sources suggest that the child mental health crisis has existed for decades and that the number of children with an underlying mental health condition has been high and relatively stable over time.").

85. Plaintiffs' expert Professor Twenge characterizes the impact of changes in stigma, reporting, or diagnostic procedures on the measurement of adolescent mental health as an "unproved premise,"[109] but her rebuttal to the academic evidence for this hypothesis is flawed and unpersuasive. If these reporting and measurement issues have some impact on the observed mental health trends, even if they do not explain all of the changes in adolescent mental health issues, Plaintiffs' experts must quantify their effect on the observed trends in order to support a damages estimate or Abatement Plan. I discuss below the flaws with Professor Twenge's opinions regarding the evidence on reporting and measurement of adolescent mental health.

86. Professor Twenge argues that the time trends in reported mental health issues do not align with a steady increase in the willingness to report these issues.[110] In particular, Professor Twenge claims that the 2015 change in hospital intake procedures does not explain the observed increases in reported mental health issues, asserting that reported mental health outcomes do not show a sharp discontinuity in 2015–2016, as would be expected if the increase in reported mental health issues reflected the 2015 change in hospital intake procedures.[111] However, in making this assertion, Professor Twenge narrowly focuses on one change (the update from ICD-9 to ICD-10), and she ignores, without offering any basis, other relevant changes (e.g., a 2009 recommendation from the US Presentative Services Task Force ("USPSTF") to screen adolescents for depression; the introduction in 2010, as part of ACA implementation, requirements to improve adolescent access to screenings for depression; a 2011 recommendation from the Women's Preventive Service Guidelines to annually screen adolescent girls for depression; and the 2013 update to the DSM) that occurred before and during the early 2010s, when Professor Twenge argues an "inflection point" occurred.[112] This sequence of policy and

[109] Twenge Report, ¶ 45 ("Even if we accept the unproved premise that willingness to admit to symptoms has steadily increased, it still cannot explain the trends. To do so, willingness to admit to symptoms would have had to decline between the early 1990s and 2011 and then suddenly increase after the early 2010s (as in Figure 4 of self-reported symptoms of depression). There is no evidence for such a curvilinear pattern. … Thus the increase in poor mental health cannot be attributed to a greater willingness to admit symptoms, a greater willingness to seek help for mental health issues, or an increased ability to receive care.").

[110] Twenge Report, ¶ 45 ("Even if we accept the unproved premise that willingness to admit to symptoms has steadily increased, it still cannot explain the trends. To do so, willingness to admit to symptoms would have had to decline between the early 1990s and 2011 and then suddenly increase after the early 2010s (as in Figure 4 of self-reported symptoms of depression). There is no evidence for such a curvilinear pattern.").

[111] Twenge Report, ¶ 46 ("However, as shown previously, the early 2010s is the inflection point, not 2015-16 (see Figures 2 and 3). Self-harm [and suicidal ideation] rates increased steadily both before and after 2015-16, contradicting the idea that a coding change in 2015-16 is responsible for the observed effects on adolescent mental health.").

[112] Corredor-Waldron and Currie (2024), Online Appendix, Tables A1, pp. S16–S17 ("changes in clinical guidelines and federal regulations [] may have affected the probability that adolescents, especially adolescent girls, were screened for depression. In 2009, the USPSTF recommended that providers screen adolescents 12–18 for depression. However, insurers were not required to pay for these services until 2011, when the Affordable Care Act (ACA, passed in 2010) mandated that

procedural changes in depression screening leading up to 2015 would have made a sharp discontinuity in 2015 less likely to appear in the data, even if the propensity to report mental health issues had in fact changed during this period.

87. Whether the trends Professor Twenge attributes to Defendants' conduct can be fully explained by destigmatization or changes in the willingness to report adolescent mental health issues is both outside the scope of my assignment and irrelevant to my opinion. The key issue is not whether all of the observed trends in mental health can be attributed to changes in reporting. Rather, the question is whether any true change in adolescent mental health attributable to the at-issue conduct has been quantified to a reasonable degree of certainty for the purpose of calculating damages. The increased visibility of mental health issues confounds the measurement of the adolescent mental health harms alleged by Plaintiffs. By failing to distinguish between these phenomena, Plaintiffs and their experts fail to provide a way to accurately measure the harms they allege or quantify the damages Plaintiffs claim.

88. In addition to the purported mismatch in timing, Professor Twenge also argues that some of the evidence cited in Plaintiffs' expert reports is unlikely to be biased by measurement error or changes in reporting. First, Professor Twenge claims that evidence from anonymous, self-administered surveys is only minimally influenced by stigma or willingness to report mental health issues.[113] Further, Professor Twenge claims that some of the evidence she cites indicates

insurance companies pay for these recommended services without patient cost-sharing. In addition, the ACA required the Department of Health and Human Services (HHS) to develop new guidelines for preventive services for women. As a result, in August 2011, the Women's Preventive Services Guidelines (WPSI) were published. These guidelines included a recommendation that women and girls aged 12 and older be screened annually for depression. The HHS further required insurance plans to cover services in the WPSI without patient cost-sharing beginning in plan years starting on or after August 1, 2012. The combination of these new guidelines with the mandate that insurers cover the screenings was likely to have had a particularly large impact on girls … there have been broad changes in diagnostic criteria for some mental health conditions with the publication of new versions of the Diagnostic and Statistical Manual of Mental Disorders (DSM) in 1994 and 2013 (American Psychiatric Association 1994, 2013). The DSM is the manual used by clinicians and researchers to diagnose and classify mental disorders. A prominent example is the creation of the new "autism spectrum disorder" (ASD) category in the DSM-5, which combined the DSM-4 categories of autism, Asperger's syndrome, pervasive developmental disorder, and childhood disintegrative disorder. This change was associated with an increase in the incidence of autism from about one in 150 children in 2000 to one in 54 children diagnosed with ASD in 2016 (Maenner et al. 2021)."); Twenge Report, ¶ 46 ("Corredor-Waldron and Currie (2024) argue that a change in diagnostic coding in 2015-16 is the cause of the increase in one statistic, emergency room admissions for self-harm … However, as shown previously, the early 2010s is the inflection point, not 2015-16 (see Figures 2 and 3)."). Note that Professor Twenge's claim here misrepresents key findings of Corredor-Waldron and Currie (2024), pp. S36–S37 ("Importantly, the large increases in reported suicidal behaviors after 2011 have been widely interpreted as increases in actual underlying suicidal behaviors. This analysis suggests that they may in fact be due to changes in screening as well as changes in the diagnostic coding of mental health disorders that more accurately capture rates of suicidal behaviors that have been gently trending upwards. … The ACA's requirement [implemented in 2011] that insurers cover recommended services, combined with new recommendations to screen adolescent girls for depression, is associated with an upward tick in diagnoses of suicidal ideation that is much more pronounced among girls than among boys.").

[113] Twenge Report, ¶ 45 ("In addition, surveys such as MTF and NS-DUH are anonymous and self-administered, minimizing the possibility that the results are influenced by stigma or willingness to admit to mental health issues.").

upward trends in "objectively measured behaviors," such as suicide or self-harm, which she claims are "behaviors" and would not be impacted by destigmatization or willingness to report.[114]

89. Neither of these claims is accurate. First, the literature on the stigma surrounding mental health issues finds that stigma can lead to underreporting even in anonymous surveys.[115] Moreover, even if anonymity led to adolescents honestly reporting their mental health issues, willingness to report is only one aspect of how destigmatization and cultural changes affect the measurement of mental health issues. Greater awareness of mental health issues may increase the likelihood that adolescents recognize and interpret symptoms as being connected to mental health issues.[116] Experimental evidence has shown that young people are in fact more likely than older people to interpret ambiguous symptoms as being connected to mental health issues.[117] Indeed, as awareness of mental health issues can spread through social media, this source of measurement error is likely correlated with social media usage, making it particularly important to account for this issue when calculating damages.[118]

90. Second, "objectively measured behaviors" are not insulated from the need to account for changes in reporting. As I discussed above, changes in hospitalization intake procedures, diagnostic guidance, and insurance coverage make measures like emergency visits related to self-harm sensitive to reporting changes and difficult to compare over time. Further, the

[114] Twenge Report, ¶ 45 ("Further, objectively measured behaviors that do not rely on self-reporting, such as emergency room admissions for self-harm (Figure 2) and completed suicides (Figure 3) reveal a trend consistent with self-reported mental health surveys. Thus, the increases cannot merely be due to changes in self-reporting, given that they extend to behaviors.").

[115] Bharadwaj et al. (2017), pp. 58–60 ("Conditional on taking prescription medication, we find that individuals are significantly more likely to under-report mental health ailments, compared to other conditions. We interpret the additional misreporting in mental health conditions as evidence of the stigma of mental health."). In the NBER Working Paper version of this study, the authors also present a theoretical model supporting the plausibility of their empirical findings. One implication of this model is that coarse risk perception would lead respondents to underreport mental health conditions even on anonymous surveys in the presence of stigma. See Prashant Bharadwaj et al., "Mental Health Stigma," *National Bureau of Economic Research*, Working Paper 21240, 2015, p. 9 ("To summarize, this theory provides simple predictions about the nature of reporting in the face of stigma that are borne out in our data: Firstly, coarse perception of the risk of disclosure leads individuals to misreport their status even in anonymous surveys where the risk is 'low.'").

[116] Foulkes and Andrews (2023).

[117] Joanne Clarkin et al., "Are Younger People More Accurate at Identifying Mental Health Disorders, Recommending Help Appropriately, and Do They Show Lower Mental Health Stigma than Older People? – Age Differences in Mental Health Disorder Recognition," *Mental Health & Prevention*, 36, 2024, 200361 ("Clarkin et al. (2024)"), p. 5 ("Younger participants were more likely to indicate a disorder was present for the vignettes depicting social anxiety and grief than older participants. However, there were no significant differences in *correct* identification of the disorder (when one was present) between the groups. This does not support the hypothesis that younger people would be more accurate across the board, and is more consistent with a positive response bias (high sensitivity but lower specificity) in younger people towards identifying experiences as pathological relative to older individuals. This pattern of findings is consistent with Foulkes & Andrews (2023) prevalence inflation hypothesis and the concept of psychiatrization (Haslam et al., 2021), whereby some individuals have come to identify milder forms of distress as mental health disorders.").

[118] Koustuv Saha et al., "A Computational Study of Mental Health Awareness Campaigns on Social Media," *Translational Behavioral Medicine*, 9(6), 2019, pp. 1197–1207 ("Saha et al. (2019)").

identification of suicide rests on judgments about the motivations of a decedent, such as whether a drug overdose was intentional or accidental.[119] The academic literature has found that stigma makes it less likely for deaths to be coded as suicides or otherwise associated with mental health issues.[120]

91. Professor Twenge further claims that diagnostic and intake changes only impact one kind of evidence—hospitalization rates—and do not explain changes in self-reported mental health issues found in surveys.[121] Therefore, on the one hand, Professor Twenge defends against the criticism of hospitalization rates by pointing to self-reported mental health issues in anonymous and self-administered surveys as less sensitive to changes in stigma or willingness to report mental health issues.[122] However, on the other hand, and as noted previously, Professor Twenge defends against the criticism of self-reported mental health issues by pointing to changes in "objectively measured behaviors."[123] The logical tension in these statements undermines Professor Twenge's conclusions. Moreover, the academic literature presents a number of factors that point to biased reporting both on the basis of survey evidence and on the basis of "objective" measures like hospitalizations and suicides, which depend intrinsically on the procedures healthcare professionals use to categorize whether such incidents were intentional or accidental.[124]

[119] Currie (2025), p. 1380 ("Rising suicide rates could also reflect a greater willingness to report suicide as a cause of death over time, consistent with reductions in stigma. However, inconsistent determinations about suicide as a cause of death within and between jurisdictions were greatly reduced following the development of guidelines on the proper determination of suicide published by a working group of coroners, medical examiners, statisticians, and public health agencies in 1988.").

[120] Mathew J. Breiding and Brian Wiersema, "Variability of Undetermined Manner of Death Classification in the US," *Injury Prevention*, 12(Suppl II), 2006, pp. ii49–ii54 ("Breiding and Wiersema (2006)"); David M. Cutler et al., "Explaining the Rise in Youth Suicide," in *Risky Behavior Among Youths: An Economic Analysis*, ed. Jonathan Gruber (Chicago, IL: University of Chicago Press, 2001), pp. 219–270 ("Cutler et al. (2001)").

[121] Twenge Report, ¶ 46 ("The evidence for the rise in adolescent depression presented in section 4.1 is from nationally representative surveys outside of health care settings. These surveys do not rely on physician diagnoses or physician screening. Thus, factors such as physicians willingness to diagnose depression, greater physician screening for depression, or changes in diagnostic coding for depression cannot explain the increases in depression or depressive symptoms in these sources.").

[122] Twenge Report, ¶ 45 ("In addition, surveys such as MTF and NS-DUH are anonymous and self-administered, minimizing the possibility that the results are influenced by stigma or willingness to admit to mental health issues.").

[123] Twenge Report, ¶ 45 ("Further, objectively measured behaviors that do not rely on self-reporting, such as emergency room admissions for self-harm (Figure 2) and completed suicides (Figure 3) reveal a trend consistent with self-reported mental health surveys. Thus, the increases cannot merely be due to changes in self-reporting, given that they extend to behaviors.").

[124] Currie (2025), pp. 1373 ("One reason for the perception of an accelerating child mental health crisis may be increases in diagnoses of specific mental illnesses, such as anxiety and depression. But much of this increase is likely due to changes in the definitions of mental illness over time."), 1374 ("One helpful way to think about the impact of changes in screening, diagnosis, and coding of mental illness over time is to think of the incentives facing patients and providers. On the patient side, the potential benefits of a mental health diagnosis include access to treatment, the possibility of accommodations such as student individualized education plans, and, in some cases, disability payments. One of the largest costs of receiving a mental health diagnosis is the severe stigma that still surrounds these disorders. But mental health stigma has been declining

92. Again, I am not offering an opinion about whether *all* of the trends in reported mental health issues are caused by changes in intake, reporting, and diagnostic guidance, nor does my opinion rest on the entirety of the trend being driven by these changes. Calculating economic damages requires quantifying the difference in relevant outcomes between the real world and a counterfactual absent the at-issue conduct and absent other confounding factors. Changes in intake, reporting, and diagnostic guidance confound the measures Plaintiffs use to ascribe harms to the at-issue conduct. Plaintiffs' experts' failure to account for this issue leads them to, at a minimum, overstate the impact of the at-issue conduct on adolescent mental health.

### *4.3. Plaintiffs' Experts Have Not Shown That the At-Issue Conduct Impacted the School District*

93. Regardless of whether Plaintiffs' experts are able to quantify the relationship between the at-issue conduct and adolescent mental health, they must also establish that any negative adolescent mental health outcomes caused by the at-issue conduct in turn cause the harms to the school district alleged by Plaintiffs (the fourth link in the causal chain discussed above). Plaintiffs' experts have not provided evidence that the alleged effect of the at-issue conduct on adolescent mental health translates to a measurable negative impact on the school district. In particular, Plaintiffs' experts do not attempt to directly estimate the causal relationship between the at-issue conduct and the purported harms to the school district. At best, they rely on indirect proxies for these harms, and in some cases, they fail to provide any evidence for a causal link.

94. Plaintiffs claim that the at-issue conduct impacts adolescent mental health and that the resulting changes in adolescent mental health then cause the alleged harms to the school district.[125] The causal link between the at-issue conduct and adolescent mental health is outside

over time, reducing the costs to patients of being diagnosed with a mental health condition."), 1378 ("The YRBSS questions have the virtue of having been asked in the same way for 30 years. On the other hand, it is unclear how these self-reported measures should be viewed in relationship to other potential measures and given the possible effects of declining mental health stigma on response rates. The self-reported data on suicide attempts can be compared to data from the CDC's *Web-Based Injury Statistics Query and Reporting System* (WISQARS). In 2022, there were 593 ED visits for self-harm per 100,000 youth aged 15–19, which is 17 times lower than the reported rate of suicide attempts in the YRBSS. Moreover, not all self-harm has suicidal intent. Hence, these numbers imply either that most suicide attempts do not result in injuries significant enough to warrant medical attention, or that the number of suicide attempts is exaggerated in the YRBSS. Perhaps both are true. Overall, these sources suggest that the child mental health crisis has existed for decades and that the number of children with an underlying mental health condition has been high and relatively stable over time.").

[125] First Amended Complaint MDL, ¶¶ 7 ("Defendants, through their social media platforms—specifically Instagram, Facebook, TikTok, Snapchat, and YouTube—intentionally induced young people to use their platforms compulsively. Borrowing from the behavioral and neurobiological techniques used by makers of slot machines and tobacco products, Defendants deliberately embedded design features in their platforms to maximize youth engagement to drive advertising revenue."), 1035–1036 ("Defendants knew or should have known their design choices and conduct would have a detrimental effect on the wellbeing of youth in Plaintiffs' schools and communities, and would lead to Plaintiffs' increased expenditures

the scope of my assignment. However, even if one were to accept at face value Plaintiffs' experts' claims regarding this link, Plaintiffs' experts have still not provided adequate evidence substantiating the second causal link between changes in adolescent mental health caused by the at-issue conduct and measurable harms experienced by the school district.

95. When analyzing the purported impact on the school district, Plaintiffs' experts again fail to connect the alleged harms to the at-issue conduct, instead focusing on purported effects of social media use in general. Professor Hoover and Professor Twenge explicitly frame their opinions around the effects of "social media use" on schools rather than the effects of the at-issue conduct,[126] which is insufficient for supporting the causal chain necessary to establish harm due to Defendants' at-issue conduct. Even if I set aside the issue that Plaintiffs' experts do not connect purported harm to the at-issue conduct, their opinions on the impact of social media usage in general on the school district rely on indirect evidence, correlational evidence insufficient for causal inference, unreliable evidence, or speculation. I discuss the flaws in Plaintiffs' experts' analyses of each of the categories of purported harm below.

96. **Bullying, fights, or other disciplinary problems.** The evidence presented by Plaintiffs' experts connecting social media use to behavioral or disciplinary problems at schools is speculative or correlational and untethered to the at-issue conduct, which, according to the Court, excludes conduct by third-party bad actors on Defendants' platforms, even when such conduct is potentially related to mental health issues.[127] Plaintiffs' experts have not established that Defendants' at-issue conduct is responsible for the alleged harms such as cyberbullying on social media. Setting that aside, Plaintiffs' experts fail to establish a causal link even between social media use in general and such behavioral issues.

and diverted resources and should have warned of such. Instead, Defendants failed to warn Plaintiffs about the dangerous, addictive nature of their platforms, the resulting harms that occur to minors from use of their platforms, and that Plaintiffs would be required to divert and expend additional human and financial resources to provide support to harmed minors through education, counseling, mental health, and other social, and disciplinary services required to be provided by Plaintiffs.").

[126] Hoover General Causation Report, ¶¶ 3–8 ("Opinion 1. The use of social media presents several real and observable harms to students' functioning … Opinion 3. The cumulative negative impacts of student social media use on school districts, schools, and the school environment, as well as on students' mental health and learning, have required school districts and schools to expend and redirect already limited resources. … Opinion 4. The damaging effects of student social media use on school districts, schools, the school environment, student well-being and learning can be addressed, in part, through comprehensive school mental health systems. … Opinion 5. A 15-year timeline is both a reasonable and necessary duration for implementing a comprehensive, district-led strategic plan to prevent and mitigate the negative impact of social media on school districts, schools, the school environment, student well-being and learning. … Opinion 6. Existing staffing and programming are insufficient to address the complex impacts of social media on students' mental health, learning, and the school environment."); Twenge Report, ¶ 1 ("I have been asked by counsel to provide my expert opinion on the relationship between social media use and mental health among adolescents.").

[127] Motion to Dismiss Order, p. 26 ("As to any alleged injuries to the school districts stemming from dangerous challenges, threats, and crimes disseminated or perpetrated on defendants' platforms caused by deteriorated youth mental health, those allegations fail proximate causation for a lack of particularized allegations.").

97. Plaintiffs' expert Professor Christakis, in the section of his report dealing with "cyberbullying and risky behaviors," summarizes a 2020 meta-analysis in which the authors find correlations between social media use and "risky behaviors" such as "drug or alcohol use, sexting, high risk sexual encounters, weapon carrying, or violence perpetration."[128] These findings do not quantify any additional costs borne by school districts resulting from social media use in general or the at-issue conduct in particular. Further, the correlational evidence presented in this study does not establish a causal relationship between social media usage and risky behaviors. It does not rule out the possibility that confounding variables generate the correlation. To illustrate with an example, suppose that adolescents with less parental supervision spend more time on social media and are more likely to engage in risky behaviors; a confounding variable like parental supervision would generate this correlation without any causal link from social media to risky behaviors. Professor Christakis acknowledges this issue, noting that "this [meta analytic] summary is not without limitations, most notably that the studies were all cross-sectional so causality cannot be proven; it could be that risk taking adolescents also seek risk taking posts online. There was also significant heterogeneity among studies, making combining the results questionable."[129] In the same section, Professor Christakis also discusses several irrelevant studies that establish correlations between other kinds of media and other kinds of behavior.[130]

98. Plaintiffs' expert Professor Hoover cites Professor Christakis's report, stating "Dr. Christakis asserts the school environment has been negatively impacted by the mental health problems exacerbated by social media use, including increased behavioral disruptions and cyberbullying."[131] Professor Hoover also cites a survey of educators, which found that "NEA members worry that student social media use leads to cyberbullying and underdeveloped social skills."[132] This survey at most establishes that educators are concerned about a link between

[128] Christakis Report, ¶ 481, citing Vannucci, Anna & Simpson, Emily & Gagnon, Sonja & Ohannessian, Christine. (2020). Social media use and risky behaviors in adolescents: A meta-analysis. Journal of Adolescence. 79.

[129] Christakis Report, ¶ 482.

[130] Christakis Report, ¶¶ 483–484 ("Longitudinal studies of SM exposure to risky behavior and subsequent risk taking are limited but there are ample studies of other media exposures (e.g. tobacco and alcohol use and in movies and advertising) and subsequent drinking and smoking. The Bridge et al study detailed before also examined the impact of viewing suicide relevant content to risk of committing suicide. Finally, a metanalytic summary of 29 studies examined the effects of exposure to tobacco on social networking sites and subsequent smoking.").

[131] Hoover General Causation Report, ¶ 79.

[132] National Education Association, "Impact of Social Media and Personal Devices on Mental Health," August 12, 2024, available at https://www.nea.org/resource-library/impact-social-media-and-personal-devices-mental-health ("NEA members worry that student social media use leads to cyberbullying and underdeveloped social skills."); Hoover General Causation Report, ¶ 61 ("Findings from a National Education Association report indicate marked increases in student mental health

social media use and bullying. It does not test whether such a link exists; whether bullying has increased over time and, if so, by how much; or whether schools have been harmed by any incremental bullying resulting from social media use. Professor Hoover also states that "[a]dministrative teams have had to allocate funds for monitoring software that can detect online threats, self-harm risks, or cyberbullying incidents in real-time, creating new demands on school IT and crisis response staff," but provides no support for her contention that these expenditures were related to the at-issue conduct.[133]

99. Professor Twenge cites one study that found that social media usage is correlated with subsequent bullying.[134] This study examined social media usage and mental health using three waves of a longitudinal survey of adolescents in the UK.[135] As an initial matter, this study analyzes the impact of social media in general, not the at-issue conduct. In addition, although the authors of the study argue that their findings provide evidence that social media use in the first wave is associated with experiences of cyberbullying in the second wave, they acknowledge several limitations of their study.[136] First, the authors note that their measurements of both social media usage and relevant outcomes are imprecise.[137] Second, and more importantly, the survey analyzed by the authors did not include questions about mental health or bullying in the first

challenges, inattention, and cyberbullying, which have collectively strained the classroom environment and affected teacher morale and classroom management.").

[133] Hoover General Causation Report, ¶ 82.

[134] Twenge Report, ¶ 83 ("Viner et al. (2019) analyzed data from the Our Futures study, a nationally representative dataset in England that followed a cohort of 12,866 adolescents from age 13 or 14 to age 15 or 16. Viner et al. found that more frequent social media use among girls and boys at age 13-14 predicted more psychological distress a year later, mostly due to increased sleep deprivation and cyberbullying and declines in physical activity.").

[135] Russell M. Viner et al., "Roles of Cyberbullying, Sleep, and Physical Activity in Mediating the Effects of Social Media Use on Mental Health and Wellbeing Among Young People in England: A Secondary Analysis of Longitudinal Data," *The Lancet Child & Adolescent Health*, 3(10), 2019, pp. 685–696 ("Viner et al. (2019)") at p. 686 ("We used data from the first three waves of the Our Futures study, the second cohort of the nationally representative Longitudinal Study of Young People in England (LSYPE2). In the first wave of LSYPE2, which commenced in 2013, 12,866 young people in secondary school year 9 (age 13–14 years) in 886 schools across England were interviewed. Wave 2 (10,963 interviewed) was conducted in 2014 (school year 10; age 14–15 years), and wave 3 (9797 interviewed) in 2015 (school year 11; age 15–16 years). … From the publicly available dataset provided by the UK Data Service, we obtained cohort data on social media use, mental health and wellbeing, and potential mediators of the effect of social media use (selected on the basis of the literature and availability of data for the cohort). These mediators comprised cyberbullying, sleep adequacy, and physical activity.").

[136] Viner et al. (2019), p. 692 ("Each of the hypothesised mediators [cyberbullying, sleep adequacy, and physical activity] was strongly associated with social media use and later mental health and wellbeing in boys and girls.").

[137] Viner et al. (2019), p. 695 ("The main limitation of the study was the degree to which the exposure variable reflected the complexity of social media use. Our exposure was frequency of social media use, which is a proxy for both the attentional focus of young people on social media and for time spent using online social media. However, we were unable to include other measures of social media use in our analyses (eg, duration of use) because these data were not collected. Such imitations are common to nearly all studies of social media in larger cohorts. Additionally, the use of GHQ12 score as a measure of psychological distress in adolescence has limitations; to minimise classification bias, we included those who replied "don't know" as an additional category. … The cyberbullying variable used also did not allow examination of the type or frequency of cyberbullying. Another limitation was that questions on social media use, cyberbullying, sleep, and physical activity were direct questions in the survey and had not been previously validated.").

wave.[138] This means that the authors are unable to determine the degree to which social media usage was initially correlated with preexisting mental health issues or experiences of bullying, and they are unable to rule out bias from the possibility that social media usage is driven by mental health issues or bullying rather than the other way around.[139] Finally, although the authors account for observable variables that may confound their analysis, the observational nature of their data means that unobservable factors such as parental supervision may be related to both social media usage and bullying, confounding causal inferences. This problem is exacerbated by the absence of baseline data on mental health or bullying; testing for baseline differences in mental health outcomes provides one tool for identifying the presence of other factors influencing these outcomes of interest. Thus, as with the studies cited by Professor Christakis, the evidence presented in this study does not establish a causal relationship between social media usage and bullying or rule out the possibility that confounding variables generate the correlation found by the authors.

100. Professor Osborne cites YRBS to support the claim that rates of cyberbullying have increased over time.[140] As I discuss in Section 5, this characterization of YRBS is incorrect. Professor Osborne provides no support for his assertions that "routine discipline issues have escalated in both frequency and intensity due to the anonymity and amplification embedded in social media platforms, requiring more administrative time and intervention," or that "the features social media companies chose to build into their platforms facilitate and amplify bullying."[141]

101. **Damage to school property.** Plaintiffs' experts present only anecdotal evidence connecting social media use to increased rates of vandalism or damage to school property. For

[138] Viner et al. (2019), p. 695 ("Mediator variables were obtained from wave 2 data, which meant that only associations using wave 1–3 data could be truly longitudinal. However, the cyberbullying variable specifically related to cyberbullying occurring between waves 1 and 2. … Furthermore, the lack of mental health or wellbeing data in wave 1 meant that we were unable to examine whether earlier psychological distress could have led to later social media use. However, although earlier mental health problems might have been causally related to social media use in wave 1 of our study, our findings suggest that causal links exist thereafter between social media use and mental health and wellbeing.").

[139] For evidence supporting this type of "reverse causality," see Kati Puukko et al., "Social Media Use and Depressive Symptoms-A Longitudinal Study from Early to Late Adolescence," *International Journal of Environmental Research and Public Health*, 17(16), 5921, p. 11 ("Furthermore, the results demonstrate that depressive symptoms predicted slight increases in active social media use at the within-person level across adolescence. In line with the social compensation approach, this finding could indicate that adolescents' social media use increases when they experience depressive symptoms. Given that adolescents with depression experience interpersonal difficulties, individuals with underlying depression may be more drawn to social media interactions than to face-to-face interactions.").

[140] Osborne Report, ¶ 69 ("The literature aligns with findings from the U.S. Surgeon General, who warned that 'social media use by children and adolescents poses a risk of harm to their mental health' (Office of the U.S. Surgeon General, 2023), and from the CDC's Youth Risk Behavior Survey, which shows rising rates of persistent sadness, suicidal thoughts, and cyberbullying among teens.").

[141] Osborne Report, ¶¶ 67–68.

example, Professor Osborne describes a purported TikTok trend that "encourages students to insert metal objects into the USB ports of school-issued laptops."[142] However, he provides no evidence regarding the prevalence of this trend generally or in any school district, let alone the school district Plaintiffs in this litigation. Nor does he provide any other empirical evidence establishing the extent of this purported harm or its link to the at-issue conduct.[143] Critically, Plaintiffs' experts have not connected damage to school property to the at-issue conduct rather than to third-party content on social media platforms, for which I understand Defendants are not liable.[144] Professor Osborne's anecdote refers to the role of third-party content without disentangling its contribution to the outcome of interest, and Professor Osborne has not established that the at-issue conduct, rather than content or third-party conduct on the platforms, had any effect on alleged harms like damage to school property.

102. **Classroom disruption and academic performance.** The evidence presented by Plaintiffs' experts connecting social media use to disruptions in the classroom and diminished academic performance is indirect and does not establish a quantifiable impact on the school district.

103. Plaintiffs' expert Professor Christakis opines on the possible disruptions created by usage of social media apps during the school day.[145] Prof Christakis acknowledges that "reliable data … are limited," but he summarizes three studies reporting that students use smartphones between 40 minutes and 1.5 hours during the school day and that some of this time is spent using social media apps.[146] These studies do not provide causal estimates of the impact of the at-issue conduct on time spent using smartphones during the school day.[147] Interpreting these studies' estimates of

[142] Osborne Report, ¶ 61.

[143] Osborne Report, ¶ 61.

[144] Motion to Dismiss Order, pp. 25 ("[A]lleged injury stemming from non-foreseeable third-party conduct cannot be attributable to defendants."), 26 ("As to any alleged injuries to the school districts stemming from dangerous challenges, threats, and crime disseminated or perpetrated on defendants' platforms caused by deteriorated youth mental health, those allegations fail proximate causation for a lack of particularized allegations. However, such allegations are not barred to the extent defendants promoted, developed, or participated in a foreseeably dangerous challenge, *beyond* the algorithmic publication, curation, or amplification of that third-party challenge.") (emphasis in original).

[145] Christakis Report, ¶ 471 ("There are concerns about cell phone usage during school hours which can detract from learning, distract teachers, increase bullying, and reduce opportunities for physical play and in person interaction.").

[146] Christakis Report, ¶ 471.

[147] Jenny S. Radesky et al., "Constant Companion: A Week in the Life of a Young Person's Smartphone Use," *Common Sense*, 2023, available at https://www.commonsensemedia.org/sites/default/files/research/report/2023-cs-smartphone-research-report_final-for-web.pdf ("Radesky et al. (2023)"), p. 2 ("Our research aimed to address the following questions: • How much time are preadolescents and adolescents spending on their smartphones? • Which types of apps do they use most frequently and for the longest periods of time, and why? • Are they accessing apps intended for older audiences? • How many notifications are they receiving per day, and from which apps? • How much smartphone use occurs during school hours, and why? • How much smartphone use occurs at night, and why? • How much tension or frustration are

average time spent on social media apps during the school day as distracted time caused by the at-issue conduct would at least require the following untested and strong assumption: absent the at-issue conduct, teens that currently use social media at school would not use their phone for any other purpose and would not be distracted in any other way during the time they would otherwise have spent on their smartphones. Moreover, the studies cited by Professor Christakis do not examine any loss of time by teachers or school employees addressing disruptions.[148] Professor Christakis does not provide any additional evidence linking social media use to diminished academic performance, acknowledging that "[t]he literature on social media's direct effects on school performance is minimal."[149] Instead, he asserts, without support, that "all untoward outcomes of social media ultimately impact [adolescents'] school experience and their school performance."[150]

104. Plaintiffs' expert Professor Telzer cites the same studies as Professor Christakis that report time spent on smartphones and social media apps during the school day.[151] Professor Telzer also presents the findings from her own research tracking social media usage during the school day, which finds that students spend significant time on social media apps during normal school hours.[152] As with Professor Christakis, the evidence Professor Telzer considers does not quantify the degree to which distraction or disruption increased as a result of the at-issue conduct. Instead, Professor Telzer implicitly assumes that absent the at-issue conduct, students

preadolescents and adolescents experiencing about their smartphones, and how do they manage this? • Are there new insights about youth experiences and practices with smartphones that could lead to better design to improve young people's well-being?"); Victoria A. Goodyear et al., "School Phone Policies and Their Association with Mental Wellbeing, Phone Use, and Social Media Use (Smart Schools): A Cross-Sectional Observational Study," *The Lancet Regional Health – Europe*, 51, 2025, 101211 ("Goodyear et al. (2025)"), p. 12 ("This study used a cross-sectional observational approach to explore the potential effects of school phone policies in a large nationally representative cohort, using regression analysis to control for possible confounding factors. The recruited schools differed in several ways from those in the sampling frame (e.g., academy status, selective, sixth form, faith), and given the school level response rates, this may have been a source of selection bias impacting on the generalizability of the findings. … A limitation is that the study design is cross sectional which makes it difficult to draw conclusions about causality and reverse causality cannot be ruled out. Furthermore, there is a risk of selection bias and unmeasured confounding in this study. For example, other school characteristics may impact on the outcomes, possibly having a confounding effect."); Dimitri A. Christakis et al., "Adolescent Smartphone Use During School Hours," *JAMA Pediatrics*, 179(4), 2025, pp. 475–478 ("Christakis et al. (2025)") at p. 476 ("These high-quality descriptive findings inform teachers, parents, and students about school-day smartphone use. Future studies should use larger sample sizes and deploy recruitment strategies reflecting broader segments of society.").

[148] Radesky et al. (2023); Goodyear et al. (2025); Christakis et al. (2025).

[149] Christakis Report, ¶ 476.

[150] Christakis Report, ¶ 475.

[151] Telzer Report, ¶¶ 312, 332, 350.

[152] Telzer Report, ¶ 336 ("On average, adolescents spent 12 minutes on their phones per hour during school time (as shown in the dark green bars on left panel of Figure below). This average increased throughout the school day, such that they spent 9.2 minutes total at 8am, 12.8 minutes total at 11am, and 16.8 minutes total at 2pm. 50% of their total screen time was spent on social media (shown in the light green bars in the Figure below). On average, adolescents spent 6 minutes on social media per hour during the school day.").

using social media at school would not use their smartphones in a different way or engage in a different distracting behavior.

105. Unlike Professor Christakis, Professor Telzer does opine on a direct link between social media use and diminished academic performance.[153] Professor Telzer cites three studies documenting a purported correlation between social media use at school or during academic activities and worse academic performance.[154] Correlational studies alone are insufficient to establish that social media use, let alone the at-issue conduct, has a causal effect on academic performance. Evidence of a correlation only means that the two measures changed in tandem over the observed period. Observing a correlation does not establish whether social media usage causes worse academic performance, whether poor academic performance causes increased social media usage, or whether other factors ultimately govern both variables. Indeed, the authors of the studies cited by Professor Telzer acknowledge these limitations.[155]

106. Professor Telzer also cites one experiment conducted on college students, in which students in a control group were given only a pen and paper and asked to take notes on a lecture while students in a treatment group were assigned to "navigate Facebook and to exchange short messaging via mobile phones during real time in class lecturing."[156] The study found that the control group instructed to take notes outperformed the treatment group instructed to use social

[153] Telzer Report, ¶¶ 337–338 ("Thus, students who specifically engage in higher social media use during class, across the range of GPA, perform at lower levels academically and may run an increased risk of failing classes. Experimental studies have further provided causal evidence for the detrimental effect of social media use during class time.").

[154] Telzer Report, ¶¶ 337–339, citing van der Schuur et al., 2015, Felisoni & Godoi, 2018, Wiradhany & Koerts, 2021.

[155] Winneke A. van der Schuur et al., "The Consequences of Media Multitasking for Youth: A Review," *Computers in Human Behavior*, 53, 2015, pp. 204–215 at p. 212 ("Most importantly, the direction of the relationship between media multitasking and the three domains of youths' functioning remains unclear. To date, researchers have primarily relied on cross-sectional data. Therefore, findings regarding the direction of the relationship between media multitasking and the three domains of youths' functioning are inconclusive. Although it is typically argued that media multitasking leads to problems in cognitive control, academic performance, and socioemotional functioning, the relationship could also be reversed or reciprocal, as is consistent with many contemporary media-effects theories (Valkenburg & Peter, 2013). For example, it is possible that youth who show deficits in cognitive control, academic performance, and socioemotional functioning are more likely to engage in media multitasking. Youth who show deficits in cognitive control may have difficulties in their ability to sustain attention on one media activity and may therefore simultaneously engage in other media or non-media activities. Similarly, it could be that students with lower academic performance are less motivated at school (Richardson, Abraham, & Bond, 2012), which may lead to an increased use of media during school-related activities. Less motivated students may also be less willing to regulate their media use while learning."); Daniel Darghan Felisoni and Alexandra Strommer Godoi, "Cell Phone Usage and Academic Performance: An Experiment," *Computers & Education*, 117, 2018, pp. 175–187 at p. 177 ("Our study employs a mixed strategy, using a hierarchical linear regression (correlational) analysis based on data collected from real-world classrooms, but attempting to control for self-efficacy and academic prowess in order to try to mitigate the issue of correlation/causation."); Wisnu Wiradhany and Janneke Koerts, "Everyday Functioning-Related Cognitive Correlates of Media Multitasking: A Mini Meta-Analysis," *Media Psychology*, 24(2), 2021, pp. 276–303 at p. 293 ("Media multitasking behavior might precede, occur as a consequence, or have a reciprocal relationship with everyday cognitive functioning. Currently, this meta-analysis does not allow for disentangling the causal relationship between the two. Preceding problems with cognition, media multitasking behavior may promote a specific mode of processing information in the environment.").

[156] Telzer Report, ¶ 338, citing Demirbilek & Talan, 2017.

media and messaging apps to accomplish tasks assigned by the researchers, such as visiting specific Facebook profiles or looking at specific photos.[157] This finding does not establish the causal effect of the at-issue conduct, does not test the effect of social media usage relative to other smartphone use, and does not test the effect of how adolescents typically use social media, if at all, during a school day.[158] As such, the study does not establish a relevant causal relationship between the at-issue conduct and the harms alleged by the school district, even if one were to accept at face value its conclusions regarding social media usage and classroom performance.

107. Plaintiffs' expert Professor Hoover cites Professor Telzer's report and the papers cited by Professor Christakis that report time spent by students at school using smartphones and social media apps.[159] Professor Hoover also cites three additional studies documenting correlations between social media usage at school and worse academic performance and a survey of teachers reporting concerns that smartphone use at school distracts students.[160] Such correlational evidence does not capture the causal relationship of interest. To the extent that students who use social media more frequently at school tend to have worse performance, this could reflect the impact of other confounding variables. For illustration, these could include underlying difficulties with attentiveness, frustration with an academic setting, or differences in parenting or home environment. As I discussed in Section 3, a reliable economic framework should account for the impact of confounding variables that otherwise limit the researcher's ability to draw valid

[157] Muhammet Demirbilek and Tarik Talan, "The Effect of Social Media Multitasking on Classroom Performance," *Active Learning in Higher Education*, 19(2), 2017, pp. 117–129 ("Demirbilek and Talan (2017)") at p. 119 ("The group taking lessons through traditional pen and paper note-taking, and not allowed to use digital technologies, was appointed as the control group. The group allowed to receive/send off-task SMS messages was named the Experiment I group. The third group doing off-task activities on Facebook using a computer, laptop, or tablet during lesson was appointed as the Experiment II group. Participants in the Experiment I condition were assigned to interact with a research assistant via SMSs, by using mobile phones. They replied to messages sent by the assistant throughout the lecture. Research assistants located in a separate room maintained contact with participants until the end of the lecture by following prepared scripts and instructions. The Experiment II group was given a list of tasks to do throughout the lesson (visit certain Facebook profiles, access predetermined information, look at shared pictures).").

[158] Demirbilek and Talan (2017), p. 125.

[159] Hoover General Causation Report, ¶¶ 35–43.

[160] Hoover General Causation Report, ¶¶ 40–45. See Isaiah Hayes and Arianna Prothero, "To Ban or Not to Ban? Educators, Parents, and Students Weigh in on Cellphones," *EducationWeek*, June 5, 2024, available at https://www.edweek.org/leadership/to-ban-or-not-to-ban-educators-parents-and-students-weigh-in-on-cellphones/2024/06; Regina van den Eijnden et al., "The Impact of Heavy and Disordered Use of Games and Social Media on Adolescents' Psychological, Social, and School Functioning," *Journal of Behavioral Addictions*, 7(3), 2018, pp. 697–706 at p. 704 ("Finally, we would like to note that even with the present longitudinal design we cannot rule out that a third factor, for instance, an underlying mental health problem, would be (partly) responsible for the longitudinal associations between engaged and disordered use and subsequent psychosocial and school functioning."); Lei Zhao, "Social Media Multitasking and College Students' Academic Performance: A Situation–Organism–Behavior–Consequence Perspective," *Psychology in the Schools*, 60(9), 2023, pp. 3151–3168; P. P. C. M. Chandrasena and I. M. P. S. Ilankoon, "The Impact of Social Media on Academic Performance and Interpersonal Relations Among Health Sciences Undergraduates," *Journal of Education and Health Promotion*, 11(1), 2022, 117.

causal inferences, and widely accepted econometric methods exist to implement such a framework.[161] However, Plaintiffs' experts do not use such a framework, and none of the evidence presented by Professor Hoover quantifies a measurable decline in academic performance caused by social media use in general or the at-issue conduct in particular.

108. Plaintiffs' expert Professor Goldfield considers two meta-analyses studying the impact of social media usage on academic performance. One study, Salari et al. (2025), concludes that increased social media usage is correlated with worse academic performance, while the other, Kus et al. (2024), concludes that increased social media usage is correlated with a statistically insignificant *increase* in academic performance.[162] Importantly, both analyses focus on correlational evidence and neither establishes a causal relationship in either direction.[163] Again, such evidence is incapable of distinguishing between social media usage causing worse academic outcomes and students with other characteristics that cause worse academic performance being more likely to use social media in class.

109. Plaintiffs' expert Mr. Klein conducts a survey of middle school and high school teachers in Tucson Unified School District in which respondents were asked about the frequency of disruption that they attribute to social media use.[164] As I discuss in Section 8, this survey is unreliable and does not establish a causal relationship between social media usage in general (or the at-issue conduct more specifically) and classroom disruption.

110. **Diversion of resources.** Plaintiffs' experts present only anecdotal evidence of schools diverting resources to address issues related to social media and instead rely on unsupported

[161] Econometric techniques to account for confounding factors in the context of causal inference are widely accepted and used by economists and other social scientists. See Wooldridge (2020), pp. 10–11 ("The notion of ceteris paribus—which means "other (relevant) factors being equal"—plays an important role in causal analysis. … In most serious applications, the number of factors that can affect the variable of interest— such as criminal activity or wages—is immense, and the isolation of any particular variable may seem like a hopeless effort. However, we will eventually see that, when carefully applied, econometric methods can simulate a ceteris paribus experiment."). See also Angrist and Pischke (2009); Card (2022).

[162] Goldfield Report, ¶ 157 ("[T]wo meta-analyses (N=83,929) examining the relationship between SMU and academic achievement or performance were published and captured by our search between 2020 and 2025. Based on the Funder & Ozer benchmark, one effect size falls into the very small category (r<0.10) and the other effect size falls into the small category (r<0.20). For example, Salari et al. (2025) found in their meta-analysis of 16 studies related to purported social media addiction is significantly associated with lower academic performance (r=- 0.172). However, a meta-analysis of 18 studies by Kus et al. 2024 found that the effect of general SMU on academic performance was small, positive, but non-significant (r=0. 012 for Cohen's d=0.025).").

[163] Nader Salari et al., "The Impact of Social Networking Addiction on the Academic Achievement of University Students Globally: A Meta-Analysis," *Public Health in Practice*, 9, 2025, 100584, p. 1; Metin Kus, "A Meta-Analysis of the Impact of Technology Related Factors on Students' Academic Performance," *Frontiers in Psychology*, 16, 2025, 1524645, p. 18 ("Moreover, while the overall sample size is substantial, many individual studies had small sample sizes or narrow demographic ranges, which limits the ability to draw broad conclusions. Furthermore, reliance on self-reported data for measuring academic performance and usage behaviors can introduce biases that may affect the accuracy of the findings. Lastly, the predominance of cross-sectional designs in the included studies restricts the capacity to establish definitive causal relationships among the variables examined.").

[164] Klein Tucson Report, ¶ 33.

suppositions to connect various findings in the academic literature to the possibility of such a diversion.

111. Plaintiffs' expert Professor Osborne opines that "[t]he cumulative effect of these demands is increased cost, diverted resources, heightened emotional strain, and reduced leadership capacity, negatively impacting school districts, schools, and public education."[165] However, Professor Osborne provides no systematic empirical evidence supporting this opinion, instead citing anecdotal evidence from the deposition of Dr. Shavonna Coakley, Associate Superintendent for Charleston County School District, in which Dr. Coakley describes school staff spending time addressing problems that she attributes to social media.[166]

112. Plaintiffs' expert Professor Hoover opines that "[i]n recent years, district and school leaders, educators, and health and mental health providers have increasingly found themselves reallocating limited funding and staffing resources to respond to the negative impacts of students' social media use."[167] Professor Hoover does not support this opinion with any empirical analysis of how the school district's allocation of resources has changed over time or whether it has been impacted by social media usage. Rather, Professor Hoover cites to the expert reports of Professor Christakis and Professor Telzer in which they opine on the relationship between social media usage and adolescent mental health and the frequency of social media usage during school hours. Based on these reports, Professor Hoover opines without support that addressing social media usage therefore "demand[s] significant time and resources from school staff, including counselors, administrators, and teachers."[168] Neither Professor Christakis nor Professor Telzer opines on the time or resources demanded of school staff to address problems purportedly related to social media usage. Professor Hoover also cites three sources to support her claim that "[t]he

[165] Osborne Report, ¶ 101.

[166] Osborne Report, ¶ 80 ("In her deposition, Dr. Shavonna Coakley, Associate Superintendent for Charleston County School District, offers an account of how social media saturation is affecting school leadership and student well-being. She notes that social media plays a part in almost all incidents regarding discipline, behavioral issues, or emotional dysregulation, highlighting the near-constant presence of these platforms in student conflict and crisis. Dr. Coakley describes students arriving at school already emotionally distressed by online activity from the night before, creating disruptions that school leaders must respond to without warning or preparation. Principals and counselors, she explains, are frequently 'pulled away from everything else' to manage the fallout, diverting attention from instruction, culture-building, and essential school operations.").

[167] Hoover General Causation Report, ¶ 77.

[168] Hoover General Causation Report, ¶¶ 78–79 ("Schools are increasingly burdened with managing the mental health consequences of social media overuse. Drs. Telzer's and Christakis' reports highlight that compulsive usage contributes to heightened anxiety, depression, loneliness, and academic underperformance, supporting the idea that that school counselors, social workers, and psychologists are being called upon to respond to the stressors introduced by platforms such as TikTok, Instagram, and Snapchat. Dr. Christakis asserts the school environment has been negatively impacted by the mental health problems exacerbated by social media use, including increased behavioral disruptions and cyberbullying. These challenges demand significant time and resources from school staff, including counselors, administrators, and teachers.").

need to prevent and mitigate issues such as distractions during instruction, online peer conflict, sleep-deprived and dysregulated students, and elevated anxiety and depressive symptoms has prompted schools to shift priorities, often diverting attention and resources from other instructional or enrichment initiatives."[169] None of the cited sources assess changes in the allocation of school resources at all, let alone provide evidence of a causal relationship between the at-issue conduct, or even social media usage in general, and the alleged diversions. Rather, two of the cited sources are guidance documents presenting ways in which school districts could address social media usage by their students, and one is a summary of survey results documenting the frequency of mental health issues such as feelings of sadness or hopelessness among adolescents.[170]

113. Plaintiffs' expert Dr. Ward purports to demonstrate the diversion of Tucson Unified School District staff time caused by social media usage.[171] As I discuss in Section 8, Dr. Ward's reliance on Mr. Klein's survey and anecdotal evidence renders his evidence unreliable.

114. **Teacher burnout and retention.** Plaintiffs' experts present only anecdotal evidence of social media usage having an impact on teacher burnout or retention rates.

115. Plaintiffs' expert Professor Osborne asserts that social media usage "increases staff burnout" at schools.[172] His only support for this claim is the anecdotal evidence from his experience that "[e]ducational leaders [he works] with often share their frustration about being asked to 'do something' about these issues" and that "[u]nion leaders advocate for staff protection, and school leaders are left conducting exhausting investigations, often with little recourse."[173] Professor Osborne does not cite to specific sources for these statements, nor does he provide other evidence related to staff burnout experienced by the school district.

[169] Hoover General Causation Report, ¶ 77, citing National Association of School Psychologists. (2023). Responding to Social Media Trends: Guidance for Caregivers, Moore, P., Jackson, B.A., Leschitz, J.T., Wolters, N., Goode, T., Diliberti, M.K., Pham, P. F. (2024). Developing Practical Responses to Social Media Threats Against K-12 Schools. RAND, Young, E. (2024). Frequent social media use and experiences with bullying victimization, persistent feelings of sadness or hopelessness, and suicide risk among high school students—Youth Risk Behavior Survey, United States, 2023. *MMWR supplements*, *73*.

[170] National Association of School Psychologists, "Responding to Social Media Trends: Guidance for Caregivers," 2023, available at https://www.nasponline.org/resources-and-publications/resources-and-podcasts/school-safety-and-crisis/guidance-at-a-glance; Pauline Moore et al., "Developing Practical Responses to Social Media Threats Against K-12 Schools," *RAND*, April 10, 2024, available at https://www.rand.org/pubs/research_reports/RRA1077-5.html; Emily Young et al., "Frequent Social Media Use and Experiences with Bullying Victimization, Persistent Feelings of Sadness or Hopelessness, and Suicide Risk Among High School Students—Youth Risk Behavior Survey, United States, 2023," *Centers for Disease Control and Prevention, Morbidity and Mortality Weekly Report*, 73(4), October 10, 2024, available at https://www.cdc.gov/mmwr/volumes/73/su/pdfs/su7304a3-H.pdf, p. 23.

[171] Ward Tucson Report, ¶ 17.

[172] Osborne Report, ¶ 4 ("The cumulative impact of social media saturation and its associated emotional strain diminishes educator morale, increases staff burnout, and contributes to a pervasive sense of instability in school environments.").

[173] Osborne Report, ¶ 81.

116. Plaintiffs' expert Professor Hoover states that "[r]esearch suggests that social media use can have a notable impact on teachers' morale and job satisfaction."[174] As support for this statement, Professor Hoover cites three sources. First, she cites an opinion piece in the trade publication *Education Week* describing one teacher's experience dealing with smartphones in the classroom.[175] However, this experience cannot simply be assumed to be representative of all teachers or of the teachers employed by Tucson Unified School District. Second, Professor Hoover cites Professor Telzer's report, which presents the findings from a poll of teachers showing that a majority of teachers believe that social media use in the classroom is a major problem.[176] The poll does not discuss teacher morale or job satisfaction nor does it specify exactly what the poll respondents find problematic.[177] Finally, Professor Hoover cites "a National Education Association report [that] indicate[s] marked increases in student mental health challenges, inattention, and cyberbullying, which have collectively strained the classroom environment and affected teacher morale and classroom management."[178] This survey, discussed above, at most documents that educators are concerned about a link between social media use and student mental health challenges, inattention, and cyberbullying. It does not test whether such a link exists, examine direct evidence of these outcomes, or examine a connection between social media use and teacher job satisfaction and morale.[179] Further, the source does not quantify any change in bullying, inattention, or teacher morale, and it does not establish the magnitude of any purported harms to the school district. The sources cited by Professor Hoover regarding the purported harm to staff morale and burnout at schools are therefore either anecdotal or irrelevant to the quantification of damages.

117. For each harm alleged by Plaintiffs, Plaintiffs' experts fail to present robust, direct evidence on the magnitude of the alleged harms. Instead, Plaintiffs' experts either present anecdotal or correlational evidence at best indirectly related to the alleged harm, or evidence related to the purported effects of social media on teens alongside speculation about how this

[174] Hoover General Causation Report, ¶ 58.

[175] Hoover General Causation Report, ¶ 59, citing Heubeck, E. (June 10, 2024). Cellphones Turned My Teaching Career From 'Awesome' to Exhausting: How educators' No. 1 nemesis caused this teacher to quit. Education Week.

[176] Hoover General Causation Report, ¶ 60, citing Telzer Report, ¶ 328.

[177] Jenn Hatfield, "72% of U.S. High School Teachers Say Cellphone Distraction Is a Major Problem in the Classroom," *Pew Research Center*, June 12, 2024, available at https://www.pewresearch.org/short-reads/2024/06/12/72-percent-of-us-high-school-teachers-say-cellphone-distraction-is-a-major-problem-in-the-classroom/.

[178] Hoover General Causation Report, ¶ 61.

[179] National Education Association, "Impact of Social Media and Personal Devices on Mental Health," August 12, 2024, available at https://www.nea.org/resource-library/impact-social-media-and-personal-devices-mental-health.

may impact schools. Again, assessing this alleged link is outside the scope of my report, but even if I were to take Plaintiffs' experts characterization of the relationship between social media usage and teen mental health as correct for the sake of argument, Plaintiffs' experts would still have failed to establish the harms to the school district alleged by Plaintiffs in a scientific manner.

118. The absence of any direct examination of the harms alleged by the school district is striking because evidence from public surveys, district-level statistics, and produced documents allow the measurement of relevant behavioral outcomes, such as bullying or damage to school property, academic achievement, and staffing and resource allocation, at national, state, and district levels. In Section 5, I discuss how this evidence is inconsistent with Plaintiffs' theory of harm.

## 5. EMPIRICAL EVIDENCE IS INCONSISTENT WITH PLAINTIFFS' THEORY OF HARM TO TUCSON UNIFIED SCHOOL DISTRICT

119. Plaintiffs and their experts, including Professor Osborne and Professor Hoover, assert that school districts such as the Tucson Unified School District have experienced harm because they incurred increased costs and needed to divert resources to address increased disruptions to instructional time, increased behavioral issues (including damage to school property, bullying, physical fights, disruptive behavior in class, inappropriate use of electronics, and absenteeism), and worse academic outcomes, which Plaintiffs and their experts attribute to students' compulsive use of Defendants' platforms.[180]

[180] First Amended Complaint MDL, ¶¶ 208–209 ("The youth mental health crisis has also caused a wide range of other behavioral issues among students that interfere with schools' ability to teach. In 2022, 61% of public schools saw an increase in classroom disruptions from student misconduct compared to school years before the pandemic. In that same year, 58% of public schools also saw an increase in rowdiness outside of the classroom, 68% saw increases in tardiness, 27% saw increases in students skipping classes, 55% saw increases in the use of electronic devices when not permitted, 39% saw an increase in physical fights between students, and 46% saw an increase in threats of fights between students. Further exacerbating schools' struggles to teach is that students are skipping school. Indeed, student absenteeism has greatly increased as the youth mental health crisis has intensified as a result of youth addiction to social media platforms. In the 2021–22 school year, 39% of public schools experienced an increase in chronic student absenteeism compared to the 2020–21 school year, and 72% of public schools saw increased chronic student absenteeism compared to school years before the pandemic. Vandalism also increased in 2022, with 36% of public schools reporting increased acts of student vandalism on school property. Schools have seen a rise in vandalism of school property coinciding with the youth mental health crisis that Defendants' platforms have been a substantial factor in causing — particularly given that specific aspects of the platforms encourage users to participate in attention-seeking behaviors that have led to damage of school property."); Osborne Report, ¶ 4 ("There is a growing need to allocate human and financial resources to address mental health, educational, disciplinary, and student support issues stemming from social media."); Hoover General Causation Report, ¶ 5 ("The cumulative negative impacts of student social media use on school districts, schools, and the school environment, as well as on students' mental health and learning, have required school districts and schools to expend and redirect already limited resources.").

120. However, as discussed in Section 4, Plaintiffs' experts perform no analysis to support these expansive assertions of harmful effects attributable to the at-issue conduct. Instead, they assert the existence of a link between social media usage and adolescent mental health and then surmise that these harms to the school district follow from that link or cite to indirect or anecdotal evidence not closely tied to the alleged harms to the school district or the at-issue conduct. As I discussed in Section 4, I do not address the alleged causal link between the at-issue conduct and adolescent mental health, although I understand that Defendants' general causation experts opine that there is no reliable scientific evidence supporting such a causal link. In this section, I review the available empirical evidence related to the next step in Plaintiffs' alleged causal chain: that increased social media usage resulting from the at-issue conduct caused negative outcomes for school districts. I find that the temporal evidence does not support Plaintiffs' theory of harm.

121. If the alleged compulsive social media usage due to the at-issue conduct contributed meaningfully to the negative outcomes in schools as asserted by Plaintiffs' experts, one would expect to see an overall fact pattern of sustained increases in negative outcomes, such as classroom disruptions and behavioral problems, and decreases in academic achievement, coincident with the period of availability and increased usage of Defendants' social media platforms. If Plaintiffs' allegation that the school district had to expend and divert resources to address the negative effects caused by the at-issue conduct were true, one would also expect to see an increase in the number of staff at Tucson Unified School District with roles related to offering mental health services and addressing the alleged negative behavioral and academic effects of the at-issue conduct. Moreover, if the trends in relevant behavioral or academic outcomes and in school spending were driven by compulsive social media usage caused by the at-issue conduct, I would expect to see the trend commence with the launch of Defendants' social media platforms beginning in 2005 and accelerate with growth in social media usage over time, and vice-versa; as shorthand I refer to this as the "timing hypothesis."

122. Given the extensive nature of Plaintiffs' allegations and the harmful effects they claim, one would expect to see these fact patterns reflected consistently across different data measures of the relevant outcomes. However, the national-, state-, and district-level data on disciplinary and academic outcomes show no evidence of a consistent increase in the types of negative effects alleged by Plaintiffs that can be causally attributed to the at-issue conduct, and the trends in these measures are at odds with the timing hypothesis implied by Plaintiffs' theory of harm.

Further, there is no evidence that the at-issue conduct caused an increase in Tucson Unified School District's spending or staffing levels that would be related to addressing the alleged harmful effects on schools.

### *5.1. Analysis of Behavioral Issues and Classroom Disruptions*

123. Plaintiffs and their experts, including Professor Hoover, claim that the at-issue conduct causes adolescents to compulsively use Defendants' social media platforms, which in turn has caused an increase in the rate of classroom disruptions and other behavioral issues at schools, including bullying, fighting, and damaging school property.[181] Plaintiffs' experts claim that, as a result, school districts such as Tucson Unified School District suffered harm because they had to expend and divert resources to address the alleged increased rates of disruptions and behavioral issues caused by Defendants' at-issue conduct.[182]

124. Setting aside Plaintiffs' experts' failure, as I discussed in Section 4, to establish that the negative outcomes they claim are caused by the at-issue conduct rather than content or non-foreseeable third-party conduct on Defendants' social media platforms, empirical analysis of data on classroom disruptions and behavioral issues is inconsistent with Plaintiffs' experts' claims that the at-issue conduct caused an increase in the rate of such disruptions and behavioral issues at the national or state levels or for Tucson Unified School District specifically.

#### *5.1.1. Analysis of Behavioral Issues and Classroom Disruptions in National and State Survey Data*

125. National- and state-level survey data are inconsistent with an increase in classroom disruptions or other negative behavioral outcomes at schools caused by Defendants' at-issue

[181] First Amended Complaint MDL, ¶¶ 208–209 ("The youth mental health crisis has also caused a wide range of other behavioral issues among students that interfere with schools' ability to teach. In 2022, 61% of public schools saw an increase in classroom disruptions from student misconduct compared to school years before the pandemic. In that same year, 58% of public schools also saw an increase in rowdiness outside of the classroom, 68% saw increases in tardiness, 27% saw increases in students skipping classes, 55% saw increases in the use of electronic devices when not permitted, 39% saw an increase in physical fights between students, and 46% saw an increase in threats of fights between students. Further exacerbating schools' struggles to teach is that students are skipping school. Indeed, student absenteeism has greatly increased as the youth mental health crisis has intensified as a result of youth addiction to social media platforms. In the 2021–22 school year, 39% of public schools experienced an increase in chronic student absenteeism compared to the 2020–21 school year, and 72% of public schools saw increased chronic student absenteeism compared to school years before the pandemic. Vandalism also increased in 2022, with 36% of public schools reporting increased acts of student vandalism on school property. Schools have seen a rise in vandalism of school property coinciding with the youth mental health crisis that Defendants' platforms have been a substantial factor in causing — particularly given that specific aspects of the platforms encourage users to participate in attention-seeking behaviors that have led to damage of school property."); Hoover General Causation Report, ¶ 79; Christakis Report, ¶ 481; Osborne Report, ¶¶ 67–68.

[182] Hoover Amended Tucson Report, ¶ 33.

conduct. I show this by analyzing data from two large, nationally representative surveys: YRBS and Monitoring the Future ("MTF"). As I discuss in Section 4, observational evidence from repeated cross-sectional surveys on its own is generally insufficient to establish causal relationships, since the structure of these surveys makes it difficult to control for confounding variables. Rather, this type of evidence shows correlations between characteristics or outcomes for the surveyed population. However, these surveys are useful for evaluating whether the observed empirical trends are consistent with Plaintiffs' theory of harm. Even though "correlation does not imply causation," it nonetheless remains true that failing to observe even a correlation between the at-issue conduct and the harms that Plaintiffs claim is evidence against a strong causal relationship.

126. As discussed above, YRBS is a nationally representative, biennial survey of high school students conducted by the CDC.[183] Individual states collaborate with the CDC to obtain subsamples of the survey that are representative of state populations.[184] Researchers, including Plaintiffs' experts, frequently use YRBS to examine trends over time.[185]

127. MTF is a nationally representative survey of high school students conducted by the University of Michigan Survey Research Center in partnership with the National Institutes of Health ("NIH").[186] The survey is conducted annually and tracks "changes in the beliefs, attitudes, and behavior of young people in the United States."[187] Subnational MTF data (i.e., state- or county-level information) is not publicly available.[188] As with YRBS, social scientists, including Plaintiffs' experts, frequently use MTF data to examine trends in adolescent behavior.[189]

128. Exhibit 3 below shows the share of national MTF respondents indicating that their teacher interrupts class six or more times in an average school week to deal with misbehavior. For both eighth- and tenth-grade respondents, this share has remained mostly stable, declining

[183] CDC 2013 Methodology of the Youth Risk Behavior Surveillance System, pp. 11 ("The national YRBS uses a three-stage, cluster sample design to obtain a nationally representative sample of U.S. students in grades 9-12."), 5 ("Since 1991, YRBSs have been conducted every odd year at the national, state, territorial, and large urban school district levels.").

[184] CDC 2013 Methodology of the Youth Risk Behavior Surveillance System, p. 5 ("Since 1991, YRBSs have been conducted every odd year at the national, state, territorial, and large urban school district levels.").

[185] See, e.g., Jean M. Twenge et al., "Increases in Depressive Symptoms, Suicide-Related Outcomes, and Suicide Rates Among U.S. Adolescents After 2010 and Links to Increased New Media Screen Time," *Clinical Psychological Science*, 6(1), 2017, pp. 3–17; Jean M. Twenge and W. Keith Campbell, "Media Use Is Linked to Lower Psychological Well-Being: Evidence from Three Datasets," *Psychiatric Quarterly*, 90(2), 2019, pp. 311–331 ("Twenge and Campbell (2019)").

[186] Monitoring the Future, "About MTF," available at https://monitoringthefuture.org/about/.

[187] Monitoring the Future, "About MTF," available at https://monitoringthefuture.org/about/.

[188] Monitoring the Future, "Data Access," available at https://monitoringthefuture.org/results/data-access/.

[189] See, e.g., Twenge and Campbell (2019).

somewhat since 2000 from approximately 45 percent to less than 40 percent in 2023 among eighth-grade respondents and from approximately 35 percent to 20 percent among tenth-grade respondents over the same time period. The trend visibly changes for both grades around the time of the COVID-19 pandemic, with a sharp decline from 2020 to 2021, coinciding with school closures. The impact of the pandemic can be seen across many of the school outcome measures that I analyze in this section and highlights the importance of accounting for other factors that affect school outcomes other than the at-issue conduct.

129. As previously discussed, Plaintiffs allege that the school district has experienced "an increase in classroom disruptions from student misconduct" due to Defendants' at-issue conduct.[190] If the at-issue conduct were responsible for a significant and quantifiable net increase in classroom disruptions, one would expect the reported rates of classroom disruptions in the MTF data to show a sustained increase over this period—the timing hypothesis I discussed above. Instead, the data are inconsistent with the timing hypothesis and therefore fail to support Plaintiffs' theory of harm, including the asserted link from the at-issue conduct to purported harm from classroom disruption.

[190] First Amended Complaint MDL, ¶ 208 ("The youth mental health crisis has also caused a wide range of other behavioral issues among students that interfere with schools' ability to teach. In 2022, 61% of public schools saw an increase in classroom disruptions from student misconduct compared to school years before the pandemic.").

***EXHIBIT 3***
***Share of Respondents Indicating Their Teacher Interrupts Class to Deal with Misbehavior Six or More Times in an Average School Week***




Source: Monitoring the Future

Note: Possible survey responses include "(1) Never," "(2) Less than once," "(3) 1-2x," "(4) 3-5x," "(5) 6-9x," "(6) 10-19x," and "(7) 20+." The cutoff of six or more times in an average school week was chosen to produce approximately even numbers of respondents above and below the cutoff. The use of other cutoffs produces similar results.

130. Exhibit 4 shows the share of national MTF respondents indicating that they damaged school property at least three times in the last year. The share reporting that they had damaged school property has declined steadily since 2000. For example, the share of tenth-grade students who reported damaging school property at least three times in the last year declined by more than half, from approximately five percent in 2000 to less than two percent in 2023. Again, this is inconsistent with Plaintiffs' claims since one would expect a consistent and sustained increase in school property damage following the at-issue conduct.

***EXHIBIT 4***
***Share of Respondents Indicating They Damaged School Property Three or More Times in the Last Year***




Source: Monitoring the Future
Note: Possible responses to the question asking how often the respondent damaged school property on purpose in the last 12 months are "(1) None," "(2) Once," "(3) Twice," "(4) 3-4 times," and "(5) 5+ times." The use of other cutoffs produces similar results.

131. Exhibits 5 and 6 show the shares of YRBS respondents in all high school grades indicating that they felt bullied, felt threatened, or had been in a fight at school, or felt cyberbullied, nationally and in Arizona. These shares show no patterns of consistent and sustained increases following the availability of Defendants' social media platforms at either the national or the state level. Notably, the trends in cyberbullying and in-school bullying begin to be reported only after the availability of Defendants' social media platforms, but they can still be helpful in assessing whether these adverse outcomes rise during the period of at-issue conduct. In both the national and state-level data, there are no clear and consistent trends in these two variables over the observed window. Further, as I discussed above in Section 4.3, Plaintiffs'

experts have not established that behavioral outcomes such as bullying or damaging school property are caused by the at-issue conduct rather than content on Defendants' platforms, for which I understand Defendants cannot be liable.

***EXHIBIT 5***
***Share of Respondents Experiencing Bullying, Cyberbullying, Fights, and Threats, National***




Source: YRBS
Note: Responses indicate whether respondent has experienced the corresponding outcome at least once in the prior 12 months. "Bullied At School" indicates whether a respondent has been bullied on school property, "Cyberbullied" indicates whether a respondent has been electronically bullied, "Fight At School" indicates whether a respondent has been in a physical fight on school property, and "Threatened at School" indicates whether a respondent has been threatened or injured with a weapon on school property. Possible responses for "Bullied At School" and "Cyberbullied" are Yes or No, while possible responses for "Threatened at School" and "Fight at School" include "0 times," "1 time," "2 or 3 times," "4 or 5 times," "6 or 7 times," "8 or 9 times", "10 or 11 times," and "12 or more times." The use of other cutoff values for "Fight at School" or "Threatened at School" produces similar results.

***EXHIBIT 6***
***Share of Respondents Experiencing Bullying, Cyberbullying, Fights, and Threats, Arizona***




Source: YRBS

Note: Responses indicate whether respondent has experienced the corresponding outcome at least once in the prior 12 months. "Bullied At School" indicates whether a respondent has been bullied on school property, "Cyberbullied" indicates whether a respondent has been electronically bullied, "Fight At School" indicates whether a respondent has been in a physical fight on school property, and "Threatened at School" indicates whether a respondent has been threatened or injured with a weapon on school property. Possible responses for "Bullied At School" and "Cyberbullied" are Yes or No, while possible responses for "Threatened at School" and "Fight at School" include "0 times," "1 time," "2 or 3 times," "4 or 5 times," "6 or 7 times," "8 or 9 times", "10 or 11 times," and "12 or more times." The use of other cutoff values for "Fight at School" or "Threatened at School" produces similar results.

132. If the at-issue conduct (or even social media more generally) were responsible for a significant, quantifiable increase in disruption of class or behavioral issues at school, one would expect these measures to have increased consistently after 2005 (i.e., after Defendants' social media platforms were launched) under the timing hypothesis. The fact that they do not is inconsistent with Plaintiffs' theory of harm and indicates that the purported link between the at-issue conduct and these harmful outcomes is not supported in these national and state surveys.

*5.1.2. Analysis of Behavioral Issues and Classroom Disruptions in the Tucson Unified School District*

133. In line with the patterns shown in the national- and state-level data just discussed, disciplinary data from the Tucson Unified School District show no evidence of sustained increases in disciplinary actions, including infractions related to harassment or bullying, vandalism, or improper use of technology, over the period in which Defendants' social media platforms were available, contrary to Plaintiffs' theory of harm and the timing hypothesis.

134. I analyze data on behavioral incidents in the Tucson Unified School District produced by Plaintiffs in this matter.[191] These data record yearly counts of incidents by type involving Tucson Unified School District students. To obtain per-student rates, I use enrollment statistics from the Common Core of Data ("CCD"). The CCD is "a national statistical program that collects and compiles administrative data from state education agencies ("SEA") covering the universe of all free, public elementary and secondary schools and school districts in the United States."[192]

135. I supplement these sources with publicly available data included in annual progress reports created as part of the federal desegregation case involving Tucson Unified School District.[193] These reports contain information on disciplinary actions, including suspensions and in-school disciplinary actions, and behavioral incidents by type. I note that for the categories of data in which these reports appear to report similar measures as the produced data, namely the incidents by type, the reported figures differ between the two sources. The sources do not contain sufficient information to determine the cause of these differences. For completeness, I analyze both datasets.

136. Exhibit 7 shows the frequency of behavioral incidents related to harassment or bullying, vandalism, or improper use of technology between 2015 and 2024, based on produced data. Exhibit 8 shows the frequency of behavioral incidents related to harassment or bullying, vandalism, or improper use of technology between 2015 and 2019, based on desegregation report data.

[191] SM_TUSD_00365959.

[192] Mark Glander, "Documentation to the NCES Common Core of Data Local Education Agency Universe Survey: School Year 2013-2014, Provisional Version 1a," *National Center for Education Statistics*, July 2015, available at https://nces.ed.gov/ccd/pdf/2015147_2013-14_LEA_documentation_v1a.pdf ("Glander (2015)").

[193] Tucson Unified School District, "Desegregated Annual Reports," available at https://deseg.tusd1.org/annual-reports ("desegregation report data").

137. There are caveats to note regarding these data. First, these data are available only during the period of the at-issue conduct, meaning there is no information on rates of disciplinary actions or behavioral incidents from a period absent the at-issue conduct that could be used as a reference point. Second, the period for which the data are available includes years possibly confounded by the effects of the COVID-19 pandemic.[194]

***EXHIBIT 7***
***Annual Frequency of Behavioral Incidents by Category in Tucson Unified School District, Produced Data***




Source: CCD; SM_TUSD_00365959

Notes: Figure displays the district counts of recorded incidents for "Harrassment, Threat and Intimidation," "Technology, Improper Use of," and "Vandalism or Criminal Damage" for all students from kindergarten to twelfth grade.

[194] Tucson Unified School District offered virtual instruction beginning in March 2020 through February 2021, and then followed a hybrid policy throughout the 2020–21 school year. See COVID-19 School Data Hub, "Overview for Arizona," available at https://www.covidschooldatahub.com/states/Arizona; Danyelle, Khamara, "Pandemic forces Arizona schools to close for remainder of academic year, move to online teaching," *Arizona Daily Star*, March 30, 2020, available at https://tucson.com/news/local/article_f76beb6d-775d-5c6e-85f7-46cc0b6fb954.html.

***EXHIBIT 8***
***Annual Frequency of Behavioral Incidents by Category in Tucson Unified School District, Desegregation Report Data***




Source: CCD; Tucson Unified School District Desegregation Annual Reports
Notes: Figure displays the district counts of recorded incidents for "Harrassment, Threat and Bullying," "Technology, Improper Use," and "Vandalism or Criminal Damages" per 1,000 students enrolled.

138. Exhibit 9 shows the frequency of students who receive annual suspensions (including in-school suspensions, out-of-school suspensions, and enrollment in the District Alternative Education Program ("DAEP")) and in-school non-suspension disciplinary actions (including in-school interventions ("ISI")) per 1,000 students between 2012 and 2024, based on desegregation report data. Suspensions and DAEP comprise more serious disciplinary actions, while in-school disciplinary actions and interventions comprise less serious disciplinary actions.[195]

139. An additional caveat affecting the disciplinary data is that the Tucson Unified School District changed its disciplinary policy in 2017 by introducing the in-school intervention

[195] Tucson Unified School District considers short-term suspensions, long-term suspensions, and DAEP to be more severe exclusionary consequences than ISI. See Tucson Unified School District, "Student Code of Conduct: Guidelines for Student Rights and Responsibilities," 2021, available at https://www.tusd1.org/_theme/files/counseling/22-23/Code-of-Conduct.pdf, p. 3, Figure "Exclusionary Consequences."

category and revising how students with DAEPs were recorded.[196] For compactness, I report both periods in the same exhibit, but I visually break the trend at this year to underscore the possibility that the disciplinary action data in Exhibit 9 before and after 2017 may not be comparable.

***EXHIBIT 9***
***Annual Frequency of Suspensions and In-School Disciplinary Actions in Tucson Unified School District***




Source: CCD; Tucson Unified School District Desegregation Annual Reports

Notes: "Suspension and DAEP" represents the sum of all students facing the disciplinary consequences of In-School Suspension (ISS), Short-Term Out of School Suspension, Long-Term Out of School Suspension, and District Alternative Education Program (DAEP). "ISI and Other In-School Discipline" represents the sum of of all students facing the discipline consequences of In-School Intervention (ISI) and In-School Discipline.

[196] "Annual Report 2017-18 School Year Tucson Unified School District No. 1," October 1, 2018, Appendix VI – 22, available at https://deseg.tusd1.org/Portals/TUSD1/Deseg/docs/AR18/Appendices/AppendixVI-22.pdf, p. 4 ("In Fall 2017, the District was asked to revise VI.G.1.b to include students who received an in-school intervention or DAEP reassignment for the 2016-17 school. This revision resulted in 1) the addition of a category called in-school intervention (ISI), and 2) a change in the distribution of students between the long term and short term suspension categories.").

140. Subject to the caveats above, the measures I analyze do not show consistent patterns of a persistent increase in behavioral issues in the Tucson Unified School District after the availability of Defendants' social media platforms beginning in 2005 that would be consistent with the timing hypothesis. Thus, these measures do not support Plaintiffs' theory of harm.

141. Rates of behavioral incidents, as recorded in produced data, though higher in 2024 than in 2015, did not rise consistently over this period. Rates of harassment rose in five years of the nine years for which there are data, fell in three years, and stayed approximately the same in one. Rates of vandalism rose in four years and fell in five years, while rates of improper use of technology rose in five years and fell in four. Moreover, rates of harassment, vandalism, and improper use of technology each declined on average between 2015 and 2019. The overall increases in these rates are concentrated in the period after the COVID-19 pandemic, which presents a significant confounding factor in interpreting the post-2019 trends.

142. Trends in behavioral incidents, as recorded in the desegregation reports, are consistent with this conclusion and show flatter trends. Rates of harassment, vandalism, and improper use of technology from this source are largely stable between 2015 and 2019, and each slightly declines over this period. These declines are inconsistent with the timing hypothesis, and thus do not support Plaintiffs' theory of harm.

143. The rates of in-school disciplinary actions and suspensions decreased between 2012 and 2016, and largely decreased between 2017 and 2020, before increasing after the COVID-19 pandemic, which presents a significant confounding factor in interpreting the post-2019 trends. This pattern of decline prior to the post-pandemic increase occurred during a period in which Defendants' social media platforms were available and thus when the at-issue conduct allegedly occurred. These trends do not support the claim that increasing behavioral issues due to Defendants' at-issue conduct have created a need for the Tucson Unified School District to obtain additional resources or forced the district to divert resources from other uses.

### *5.2. Analysis of School Achievement*

144. Plaintiffs allege that social media use in schools has caused a "consistent and pervasive disruption to the learning process."[197] As discussed in Section 4.3, Plaintiffs' experts argue that social media usage reduces academic performance, which purportedly harms the school district through the need for increased expenditures on additional learning support. Empirical analyses of publicly available data on academic outcomes, however, do not support these claims.[198]

#### *5.2.1. Analysis of National Academic Outcomes*

145. I analyze national trends in standardized assessments administered by the National Assessment of Educational Progress ("NAEP"), a "nationally representative and continuing assessment of what students in public and private schools in the United States know and are able to do in various subjects" funded by the U.S. Department of Education.[199] The NAEP administers regular assessments of students in fourth-, eighth-, and twelfth-grades, corresponding to students approximately 9–17 years old.[200] In my discussion, I focus on mathematics and reading assessment scores for students in twelfth-grade, who would have the highest rates of social media usage, although I discuss trends in the scores of eighth-graders as well for comparison.[201]

146. Exhibit 10 shows trends in the average scores of eighth- and twelfth-graders in reading while Exhibit 11 shows trends in the average scores of eighth- and twelfth-graders in mathematics. Scores for eighth-graders are available until 2024, while twelfth-graders were most recently assessed in 2019.[202]

[197] First Amended Complaint MDL, ¶¶ 1 ("Ever-increasing numbers of children compulsively use Defendants' platforms, resulting in a situation that not only harms individual children and their loved ones but also causes substantial and financially burdensome interference with school district, county, and municipal operations."), 29, 32.

[198] Plaintiffs' experts may claim that worse academic outcomes were avoided only through increased expenditures or diversion of resources by school districts. I examine this possibility in Section 5.3.

[199] National Center for Education Statistics, "An Overview of NAEP," available at https://nces.ed.gov/nationsreportcard/subject/about/pdf/naep_overview_brochure_2021.pdf.

[200] National Center for Education Statistics, "An Overview of NAEP," available at https://nces.ed.gov/nationsreportcard/subject/about/pdf/naep_overview_brochure_2021.pdf.

[201] Eighth-grade students would be approximately 13 or 14 years old and are likely to use social media at lower rates than older adolescents. See my workpaper.

[202] The Nation's Report Card, "Explore Results for the 2022 NAEP Mathematics Assessment: Grade 12," available at https://www.nationsreportcard.gov/mathematics/?grade=12; The Nation's Report Card, "Explore Results for the 2022 NAEP Reading Assessment: Grade 12," available at https://www.nationsreportcard.gov/reading/?grade=12.

***EXHIBIT 10***
***National Average NAEP Reading Achievement Scores for 8th and 12th Grade Students***




Source: NAEP

Note: This chart plots the NAEP eighth- and twelfth-grade reading average scale score based on the 1992 Reading Framework. Results are reported as a composite scale that combines the results of separately estimated scales for each of the reading content areas (literary and informational). The NAEP reading scale ranges from 0 to 500. Data for twelfth-grade are not available after 2019. Although the reading framework changed in 2009, documentation indicates that results in 2009 and subsequent years can be compared with those from previous years.

***EXHIBIT 11***
***National Average NAEP Mathematics Achievement Scores for 8th and 12th Grade Students***




Source: NAEP

Note: This chart plots the NAEP eighth- and twelfth-grade mathematics average scale score based on the 2005 mathematics framework. Results are reported as a composite scale that combines the results of separately estimated scales for each of the mathematics content areas. For eighth-grade, these include: (1) number properties and operations; (2) measurement; (3) geometry; (4) data analysis, statistics, and probability; and (5) algebra. For twelfth-grade, these include: (1) number properties and operations; (2) geometry and measurement; (3) data analysis, statistics, and probability; and (4) algebra. The mathematics scale for eighth-grade ranges from 0 to 500. The twelfth-grade mathematics scale ranges from 0 to 300. Data are not available after 2019 for twelfth-grade.

147. The national average reading score for twelfth-graders declined by one point between 2005, when the earliest of Defendants' platforms became widely available, and 2019, the latest available year in the data. According to the NAEP, this change was not statistically significant.[203] The national average mathematics score for twelfth-graders was the same in 2019 and 2005. In both cases, the absence of a significant downward trend in these scores is inconsistent with Plaintiffs' theory of harm.

[203] The Nation's Report Card, "Data Tools," available at https://www.nationsreportcard.gov/data_tools.aspx.

148. Moreover, the pattern of changes in these scores over time is inconsistent with the timing hypothesis. If Plaintiffs' theory were correct, one would expect greater declines in scores after Defendants' platforms became available, starting in 2005, and in the years following. However, average twelfth-grader reading scores declined in each test year between 1998 and 2005. After 2005, reading scores rose in one period, stayed the same in another period, and declined in two periods. This decline prior to the launch of Defendants' platforms and changes in both directions after their launch does not support the causal relationship claimed by Plaintiffs and their experts. Although twelfth-grader mathematics scores are not available prior to 2005, after 2005 they do not show a pattern of consistent decline; rather, they rise in one period, stay the same in one period, and fall in two periods. These patterns support the idea that other factors are likely driving changes in the general trends in test scores over time rather than use of Defendants' social media platforms.

*5.2.2. Analysis of Academic Outcomes for Tucson Unified School District*

149. Consistent with national trends, academic achievement data from the Tucson Unified School District do not support Plaintiffs' allegations that the at-issue conduct causes worse academic outcomes. I analyze publicly available data from the Arizona Department of Education on statewide standardized test scores and dropout rates in the Tucson Unified School District, and I find no evidence of decreased academic performance or worse academic outcomes attributable to the at-issue conduct.

150. Over the relevant period since the launch of Defendants' social media platforms, the state of Arizona used at least three different standardized tests to assess academic outcomes for schools. Prior to 2015, the state assessed student proficiency using the Arizona Instrument to Measure Standards ("AIMS"). The AIMS test assessed mathematics, reading, and writing for grades three through eleven.[204] In 2015, AIMS was replaced by Arizona's Measurement of Educational Readiness to Inform Teaching ("AzMERIT"). AzMERIT assessed English Language Arts ("ELA") and mathematics for grades three through twelve.[205] In the 2020 school year, AzMERIT was renamed Arizona's Statewide Achievement Assessment ("AzM2") for grades three through eight. Starting with the 2019 school year, Tucson Unified School District replaced the AzMERIT with the ACT for high school students.[206]

151. For eighth-graders, I examine trends in AIMS reading and mathematics scores from 2010 to 2014 (the earliest years available to me) and AzMERIT ELA and mathematics scores from 2015 to 2024. For eleventh-graders, I examine trends in AIMS reading and mathematics scores from 2010 to 2014, AzMERIT ELA and mathematics scores from 2015 to 2018, and ACT ELA and mathematics scores from 2019 to 2024.[207] The changes in assessments mean that I cannot directly compare scores from 2014 to 2015 and, for eleventh-grade students, scores from 2018 to 2019, so I focus on trends within each assessment framework. Under the timing hypothesis, if Plaintiffs' theory of harm were correct, I would expect to see evidence of declines in test scores over the period of the at-issue conduct. Exhibit 12 shows the percentages of eighth- and eleventh-graders in the Tucson Unified School District that passed state reading/ELA assessments. Exhibit 13 shows the percentages of eighth- and eleventh-graders in the Tucson Unified School District that passed the state mathematics assessments.

[204] Arizona Indicators, "AIMS," available at https://www.arizonaindicators.org/aims-2/.

[205] Arizona Department of Education, "Annual Technical Report: Arizona Statewide Assessment in English Language Arts and Mathematics, 2020–2021 School Year," September 2021, available at https://www.azed.gov/sites/default/files/2022/02/SY2020-21_AzMERIT_Annual%20Technical%20Report.pdf.

[206] The Arizona Board of Education has defined cutoff ACT scores that it considers to be passing marks for the purpose of statewide assessment. I consider this definition of passing in my analysis. See Arizona Department of Education, "Act," available at https://www.azed.gov/assessment/act.

[207] According to the Arizona Department of Education, AIMS scores and AzMERIT scores are not directly comparable. See Sahuarita Unified School District, "AzMERIT: What You Need to Know About Arizona's New Achievement Test," available at https://susd30.us/wp-content/uploads/2014/11/AzMERIT-Parent-Information.pdf ("AzMERIT will set a more realistic benchmark for student performance. Because it is a completely new test, scores will look different than AIMS and may seem lower than before. This does not mean your child is doing worse. Instead, results demonstrate the increased level of difficulty."). The change in statewide standardize testing also coincides with the removal of standardized test passing scores as a graduation requirement. See State of Arizona Senate, Fifty-section Legislature, "Senate Bill 1191," available at https://www.azleg.gov/legtext/52leg/1r/bills/SB1191S.pdf ("a pupil is not required to obtain a passing score on a standardized test during the 2014-2015 school year, 2015-2016 school year, the 2016-2017 school year or the 2017-2018

***EXHIBIT 12***
***Percentage of 8th and 11th Grade Students in Tucson Unified School District Passing State English Assessments, by Year***




Source: Arizona Department of Education

Note: This chart displays the percentage of eighth- and eleventh-grade Tucson Unified School District students who received a passing score on Arizona standardized assessments for reading and English Language Arts (ELA) from the 2010 to 2024 school years. Reading score performance is shown prior to transitioning to the AzMERIT assesment, after which ELA score performance is shown. Labelled vertical dashed lines indicate how the standardized assessments administered to students changed over the time period. Comparable scores are not reported for the 2020 and 2021 school years.

school year in order to graduate from high school."). The visible change in assessment performance between the 2014 and 2015 school years is likely connected to both of these major changes to Arizona testing administration.

*EXHIBIT 13*
***Percentage of 8th and 11th Grade Students in the Tucson Unified School District Passing State Mathematics Assessments, by Year***




Source: Arizona Department of Education
Note: This chart displays the percentage of eighth- and eleventh-grade Tucson Unified School District students who received a passing score on Arizona standardized tests for mathematics from the 2010 to 2024 school years. Performance among students in the next-year graduating cohort is shown for eleventh-grade prior to transitioning to the AzMERIT assessment; performance on the Algebra II AzMERIT assessment is shown for eleventh-grade over the period where AzMERIT was administered for high school students. Labelled vertical dashed lines indicate how the standardized assessments administered to students changed over the time period. Comparable scores are not reported for the 2020 and 2021 school years.

152. Between 2010 and 2014, AIMS English and mathematics scores were approximately stable. Between 2015 and 2018, AzMerit English scores declined somewhat for both eighth- and eleventh-graders, AzMerit math scores increased for eleventh-graders, and AzMerit math scores for eighth-graders showed no clear trend. Although scores are not available in 2020 and 2021 due to the COVID-19 pandemic, eleventh-grade ACT English scores rose in 2022 relative to 2019 and remained stable through 2024, while eleventh-grade ACT math scores were stable between 2019 and 2022 and then declined slightly through 2024. Eighth-grade English scores

were stable after 2019, while eighth-grade math scores declined in 2022 relative to 2019 and then rose slightly through 2024. These trends are inconsistent with the timing hypothesis. Neither English nor math scores show a pattern of consistent decline over the period of the at-issue conduct for either eighth- or eleventh-graders.

153. In addition to standardized test scores, I also examine trends in dropout rates. Dropout rates are frequently used as indicators of negative academic outcomes in the academic literature and have the advantage of being less dependent on changes in assessment criteria over time.[208] A disadvantage of these data is that dropping out of school is a serious negative outcome, and in isolation this measure may not capture trends in important but less serious academic outcomes. However, as discussed below, the evidence from dropout rates is consistent with the evidence from test scores, minimizing this potential concern. Exhibit 14 shows the dropout rate for students in the Tucson Unified School District since 2001, as reported by the Arizona Department of Education and CCD.[209]

[208] See, e.g., Dorothyjean Cratty, "Potential for Significant Reductions in Dropout Rates: Analysis of an Entire 3rd Grade State Cohort," *Economics of Education Review*, 31(5), 2012, pp. 644–662; Russell W. Rumberger and Scott L. Thomas, "The Distribution of Dropout and Turnover Rates Among Urban and Suburban High Schools," *Sociology of Education*, 73(1), 2000, pp. 39–67; Mido Chang et al., "Do Sports Help Students Stay Away from Misbehavior, Suspension, or Dropout?" *Studies in Educational Evaluation*, 70(3), 2021, 101066.

[209] The dropout rates reported by the Arizona Department of Education for 2010–2024 are calculated as the fraction of students in grades 7 through 12 who were enrolled in school at any time during the school year but are not enrolled at the end of the school year and did not transfer, graduate, or die. See Arizona Department of Education, "Accountability & Research Data," available at https://www.azed.gov/accountability-research/data/. The dropout rates reported in the CCD for 2001–2005 are calculated as the fraction of students grades 7 through 12 who were enrolled at some time during the previous school year, were not enrolled at the start of the corresponding year (defined as October 1st), and did not graduate, transfer, become ill, or die. See, e.g., U.S. Department of Education, "NCES Common Core of Data Local Education Agency-Level Public-Use Data File on Public School Dropouts: School Year 2004–05," December 2007, available at https://nces.ed.gov/ccd/pdf/agdr041agen.pdf, p. 3.

***EXHIBIT 14***
***Tucson Unified School District Dropout Rate, by Year***




Source: CCD; Arizona Department of Education

Note: Dropout rate from 2001–2005 is from yearly Local Education Agency Universe Survey Dropout and Completion Data from the CCD. Dropout rate from 2010–2024 is from Arizona Department of Education yearly dropout data. Dropouts are defined by the CCD as a student who was enrolled at some time during the previous school year, was not enrolled at the start of the corresponding year (defined as October 1st), and did not graduate, transfer, become ill, or die. Dropouts are defined by the Arizona Department of Education as students who were enrolled in school at any time during the school year but are not enrolled at the end of the school year and did not transfer, graduate, or die. Dropout rates are reported for grades seven through twelve. In 2006–2009, data are only available for grades nine through twelve, so they are omitted.

154. Dropout rates for the Tucson Unified School district were lower in 2024 (the last year with available data) than in 2001 (the first year with available data). Over this period, the dropout rate exhibits considerable heterogeneity over time. Dropout rates fell between 2001 and 2011, generally increased between 2011 and 2019, and then sharply increased during and after the pandemic to a peak in 2023. Although the period of increase occurs after the at-issue conduct, there are several factors that make this unlikely to be caused by the at-issue conduct. First, although Defendants' social media platforms first became available in 2005, dropout rates in 2011 are lower than they were prior to 2005. Although dropout rates increased between 2011 and 2019, the 2019 rate is still lower than the 2001 rate (prior to the at-issue conduct). Moreover, the peak in dropout rates occurred in 2022 and 2023, coinciding with the aftermath of the COVID-19 pandemic. Local news reports from this period suggest that conditions during the pandemic contributed to the increase in dropouts.[210] In 2024, dropout rates decreased back to a level comparable to the period prior to 2005. Overall, this trend does not support Plaintiffs' claim that the district has experienced worsening academic outcomes due to the at-issue conduct.

155. In sum, consideration of various academic outcomes at the national and district levels yields no consistent support for Plaintiffs' theory of harm. The available measures do not show consistent negative trends in relevant outcomes that would indicate harm caused by the use of Defendants' platforms, let alone the at-issue conduct.

### *5.3. Analysis of School Staffing*

156. Plaintiffs and their experts claim that in order to address the alleged harmful effects of Defendant's at-issue conduct, Tucson Unified School District had to (and will have to in the future) expend and divert human and financial resources to, among other things, provide mental health services, address disciplinary issues, educate students and parents on purported social media addiction, and provide additional learning support.[211]

157. Plaintiffs and Plaintiffs' experts claim that the school district was harmed due to Defendants' at-issue conduct through increased expenditures on mental health services, including the hiring of additional guidance counselors and psychologists, and the diversion of

[210] Austin Walker, "Student Dropout Rate Goes up amid COVID-19 Pandemic," *KVOA*, available at https://www.kvoa.com/coronavirus/student-dropout-rate-goes-up-amid-covid-19-pandemic/article_3ecf2293-d9f1-5ce4-ae4e-c0a2c7cde51a.html.

[211] First Amended Complaint MDL, ¶ 973; Osborne Report, ¶ 83; Hoover General Causation Report, ¶ 77.

resources from other areas of need.[212] Plaintiffs and Plaintiffs' experts also claim harms to the school district related to diversion of time and attention from school administrators and teachers, although they have not clearly articulated whether the school district has been harmed through expenditures on increased staffing for these positions.[213] For example, Plaintiffs allege that the school district had to "expend, divert, and increase resources for creating education materials for youth," "to develop new and revised teaching plans," and "to provide additional learning supports to address students' declining achievement,"[214] but they have not explained whether this involved hiring additional teachers.

158. Further, Plaintiffs' experts may attempt to claim that the observed lack of negative behavioral or academic outcomes attributable to the at-issue conduct (as I discussed in Sections 5.1 and 5.2) obtains because Tucson Unified School District has expended or diverted resources to successfully abate these issues. Empirical evidence on school staffing, however, fails to support this explanation.

159. In this section I directly examine staffing relative to the number of students enrolled in Tucson Unified School District. In addition to the timing hypothesis that I laid out above, if an increase in school spending or staffing were caused by an increased need to address mental health, behavioral, and academic issues caused by the at-issue conduct, then such trends should be more pronounced for staff whose roles more directly involve aiding student mental health or addressing other types of negative student outcomes that Plaintiffs allege the school district has faced. On the other hand, faster growth in staffing within areas unrelated to the alleged efforts to address the at-issue conduct would suggest other factors drive the overall increase in school district staffing or expenditures.

160. I do not find evidence of a pattern of increased staffing of roles related to addressing the types of negative student outcomes claimed by Plaintiffs' experts. This is inconsistent with Plaintiffs' experts' claims that Tucson Unified School District was harmed through increased expenditure on staff and resources in response to the at-issue conduct's alleged impact on student

[212] First Amended Complaint MDL, ¶ 32 ("the harms caused by Defendants' wrongful conduct include, but are not limited to, expending, diverting, and increasing human and financial resources to prevent social media use in school, such as equipment to disable phones; spending, diverting, and increasing human and financial resources to hire counselors and other professionals to address compulsive social media use and addiction, and its negative impact on youth"); Osborne Report, ¶ 86 ("Moreover, the very act of choosing to invest in mental health supports, such as hiring social workers, counselors, or digital wellness educators, requires either increased funding or painful sacrifice elsewhere. For district-level leaders, the need to allocate resources in areas of social services and mental health services has grown.").

[213] Osborne Report, ¶¶ 3, 105; First Amended Complaint MDL, ¶ 1023.

[214] First Amended Complaint MDL, ¶ 1023.

mental health and behavioral and academic outcomes. Further, these findings show that the absence of systematic evidence for behavioral disruptions and poor academic performance (discussed in Sections 5.1 and 5.2) cannot be explained away as the result of the school district having successfully addressed these issues through diversion or growth in expenditures.

161. Below, I discuss my analyses of the data on staffing in Tucson Unified School District, as produced by Plaintiffs or reported in the CCD, from which I obtain district-level estimates of the following variables:

a. The numbers of guidance counselors, school psychologists, librarians, and administrators;
b. The number of secondary school teachers.

162. Where noted, I supplement these figures with data produced by Plaintiffs to obtain a more complete data series.

163. Exhibit 15 shows the number of guidance counselors, school psychologists, librarians, administrators, and administrative support staff per 1,000 students in Tucson Unified School District since 2001. Inconsistent with the timing hypothesis, the number of guidance counselors per 1,000 students fell between 2005 and 2015, then rose after 2015. This pattern is inconsistent with the district expending additional resources on guidance counselors due to the at-issue conduct or students' use of Defendants' social media platforms, which began well before 2015.[215]

164. The number of school psychologists in the Tucson Unified School District increased between 2020 (the first year this category was recorded separately from other support staff in the CCD) and 2022, then fell between 2022 and 2024. This pattern of increase and subsequent decline is inconsistent with the claim that the Tucson Unified School District has been harmed by its need to expend or divert resources to hiring school psychologists because of the at-issue conduct.

165. Levels of administrative staff were stable between 2001 and 2012, before increasing substantially beginning in 2013, eight years after the launch of the first of Defendants' social media platforms. The increase in administrative staff levels beginning in 2013 coincides with the development and implementation of the Unitary Status Plan governing the efforts to desegregate the Tucson Unified School District, which likely confounds interpretation of the staffing trend.[216]

[215] See, e.g., First Amended Complaint MDL, Sections IV.B, IV.C, IV.E..

[216] See, e.g., Tucson Unified School District, "Unitary Status Plan (Annual Report for the 2012–2013 Academic Year)," available at https://deseg.tusd1.org/Portals/TUSD1/Deseg/docs/main/1713.pdf, p. 6. The Unitary Status Plan included requirements regarding administrative staff. Tucson Unified School District No. 1, "Analysis of Compliance with Unitary Status Plan, Section IV: Administrators and Certificated Staff, An Annex to the Annual Report for the 2016–2017 Academic Year," October 2, 2017, available at https://deseg.tusd1.org/Portals/TUSD1/Deseg/docs/main/2075_4.pdf, p. 20.

***EXHIBIT 15***
***Staffing of Guidance Counselors, School Psychologists, Librarians, and Administrative Staff in the Tucson Unified School District***




Source: CCD
Note: Guidance Counselors are defined as a major staffing category including Elementary School Counselors, Secondary School Counselors, and School Counselors. Administrators include Local Education Agency ("LEA," or district) Administrators and School Administrators. Data for School Administrators are not available in 2014, so that year is omitted for Administrators. Librarians/Media Specialists and Support include Librarians/Media Specialists and Library/Media Support Staff.

166. Exhibit 16 shows the number of secondary teachers per 1,000 students in Tucson Unified School District since 2001. The number of secondary teachers per 1,000 students has been stable since 2001, inconsistent with the timing hypothesis. As I discussed above, Plaintiffs' experts have not clearly articulated the purported impact of the at-issue conduct on the school district's staffing of teachers—whether they believe schools reallocated resources away from teaching to support staff addressing mental health issues,[217] or whether an increased need for academic

[217] Osborne Report, ¶ 86 ("Moreover, the very act of choosing to invest in mental health supports, such as hiring social workers, counselors, or digital wellness educators, requires either increased funding or painful sacrifice elsewhere. For

support resulted in increased teacher staffing.[218] In conjunction with my analyses in Section 5.2 finding no evidence of a decrease in academic outcomes, these trends are inconsistent with Plaintiffs' experts' claims that the at-issue conduct had a harmful effect on students' academic achievement or that the alleged impact on academic achievement required the school district to expend resources to address. Under Plaintiffs' theory, there should be either a decline in achievement measures or, if Tucson Unified School District had been able to perfectly mitigate the impact on academic achievement by expending additional resources on teaching, an increase in teacher staffing. The data, however, are not consistent with either implication of the Plaintiffs' theory.

district-level leaders, the need to allocate resources in areas of social services and mental health services has grown. This leads to budget pressure and forced trade-offs that often lead to decreases in investment in academics and extracurriculars.").

[218] First Amended Complaint MDL, ¶ 1023 ("These grave consequences of Defendants' actions have naturally caused a multitude of foreseeable injuries to Plaintiffs, including requiring Plaintiffs to … [e]xpend[], divert[], and increas[e] resources to provide additional learning supports to address students' declining achievement.").

***EXHIBIT 16***
***Staffing of Secondary Teachers in the Tucson Unified School District***




Source: CCD
Note: Secondary Teachers include teachers of all grades above elementary and ending with or below twelfth-grade.

167. In sum, the available evidence suggests that there has been no consistent upward trend in staffing levels for positions most closely related to addressing mental health issues (i.e., guidance counselors and school psychologists) or in teachers. Moreover, the timing of the upward trend in administrators does not correspond to the start of the at-issue conduct, and the upward trend may be in part due to other confounding factors. This suggests that any alleged increases in expenditures or staffing are unlikely to have been driven by increases in mental health or behavioral issues or declines in academic achievement among students attributable to the use of Defendants' platforms, let alone the at-issue conduct.

## 6. PROFESSOR HOOVER'S PROPOSED ABATEMENT PLAN IS OVERLY BROAD AND NOT TAILORED TO ADDRESS THE SPECIFIC HARM ALLEGEDLY CAUSED BY DEFENDANTS' AT-ISSUE CONDUCT

168. Professor Hoover proposes a 15-year program to abate the alleged harms from Defendants' at-issue conduct.[219] As part of this Abatement Plan, Professor Hoover recommends the hiring of a significant number of staff to implement her core recommendations as well as training and professional development for new and existing staff (Section 6.1).

169. While evaluating the specific recommendations and proposals of Professor Hoover's Abatement Plan lies outside the scope of my expertise as an economist, her plan suffers from multiple fundamental flaws with respect to its economics. First, Professor Hoover's plan is overly broad because it does not attempt to isolate and address exclusively the incremental harms causally tied to Defendants' at-issue conduct rather than social media in general or third-party content on the Defendants' platforms (Section 6.2). Moreover, Professor Hoover does not assess or tailor her recommendations to work with current district programs aimed at addressing any alleged harms from the at-issue conduct or from social media use more generally (Section 6.3).

### *6.1. Overview of Professor Hoover's Proposed Abatement Plan and Professor Leslie's Cost Estimates*

170. Professor Hoover purports to design "a 15-year district-led strategic plan to implement comprehensive school mental health efforts" to abate the alleged harms from Defendants' at-issue conduct.[220] This plan makes 15 "core recommendations" "aimed at promoting healthy social media usage, enhancing mental health support, and fostering a positive school environment."[221]

[219] Hoover General Causation Report, ¶ 7.

[220] Hoover General Causation Report, ¶ 11.

[221] Hoover Amended Tucson Report, ¶¶ 60, 62–76. The Hoover General Causation Report includes another recommendation, "Individualized Screen-Time and Social Media Use Plans," which does not appear in her recommendations for Tucson Unified School District. See Hoover General Causation Report, p. 31.

171. Professor Hoover divides these recommendations into three tiers: Tier 1, "Universal (School-Wide Prevention and Education)"; Tier 2, "Targeted (Small-Group or At-Risk Student Interventions)"; and Tier 3, "Intensive (Individualized and Specialized Support for High-Need Students)."[222] These recommendations cover policy changes, teacher and staff training, student programming, family engagement, and various forms of support for students and parents. For instance, one Tier 2 recommendation is to create "parent support groups for social media concerns," which involves "group discussions on managing children's social media use, setting boundaries, and addressing mental health concerns."[223] Professor Hoover's Abatement Plan frames these individual recommendations as part of a comprehensive, long-term approach to challenges associated with social media in the school setting.[224]

172. To implement her plan, Professor Hoover recommends that Tucson Unified School District "employ new staffing and professional development rather than rely solely on existing school personnel or programming."[225] The proposed new employees fall into three categories:

a. District-wide employees based on one employee per district-wide role,

b. School-level employees based on one employee per school per role, and

c. School-level employees based on multiple employees per role depending on the number of students enrolled.[226]

173. Exhibit 17 reports the number of Professor Hoover's recommended new full-time staff by role and hiring count category for Tucson Unified School District. For context, it also shows the existing number of teachers in Tucson Unified School District in the 2023–24 school year as reported by Professor Leslie. In total, Professor Hoover's Abatement Plan recommends hiring 979 entirely new staff working full-time to implement her core recommendations, compared to 2,809 teachers working in the district.[227]

[222] Hoover General Causation Report, pp. 29–31.

[223] Hoover Amended Tucson Report, ¶ 73.

[224] See, e.g., Hoover General Causation Report, ¶ 6 ("The damaging effects of student social media use on school districts, schools, the school environment, student well-being and learning can be addressed, in part, through comprehensive school mental health systems. These systems should integrate a 15-year comprehensive, district led strategic plan.").

[225] Hoover Amended Tucson Report, ¶ 77.

[226] Hoover Amended Tucson Report, ¶ 100.

[227] Hoover Amended Tucson Report, ¶ 100; Leslie Amended Tucson Report, Attachment D.4.

***EXHIBIT 17***
***Professor Hoover's Tucson Unified School District Abatement Plan Recommends Significant New Staff with Varying Basis***

| Role | Count | Basis |
|---|---|---|
| Director of Digital Literacy | 1 | 1 per district |
| Director of Digital Safety | 1 | 1 per district |
| Director of Family Engagement and Education | 1 | 1 per district |
| Director of Life Skills Education | 1 | 1 per district |
| Director of Mental Health Literacy | 1 | 1 per district |
| Director of Student Mental Health | 1 | 1 per district |
| Crisis Intervention Specialists | 88 | 1 per school |
| Family Engagement Coordinators | 88 | 1 per school |
| IT Staff or Educational Technology Specialists | 88 | 1 per school |
| Life Skills Specialists | 88 | 1 per school |
| Peer Coordinators | 88 | 1 per school |
| Digital Literacy Specialists | 80 | 1 per 500 students |
| Mental Health Literacy Specialists | 80 | 1 per 500 students |
| School Counselors | 160 | 1 per 250 students |
| School Psychologists | 80 | 1 per 500 students |
| School-Based Mental Health Clinicians | 80 | 1 per 500 students |
| School-Based Therapists | 53 | 1 per 750 students |
| **Total New Hires** | 979 | |
| **Total Existing Teachers** | 2,809 | |

Source: Hoover Amended Tucson Report; Leslie Amended Tucson Report
Note: This table lists the staff roles and counts listed in the Hoover Abatement Plan. Per-school and per-student counts are estimated for a student body of 39,927 across 88 schools.

174. Professor Hoover's Abatement Plan also recommends significant training and professional development of both existing and new staff. As part of her plan, Professor Hoover recommends the number of training hours needed in each year for the duration of the program.[228] Her recommended training includes time for the new staff she recommends hiring as well as for existing district staff.

[228] Hoover Amended Tucson Report, pp. 26–37.

175. For example, for her "Staff Professional Development on Social Media Policies and Practices" component, Professor Hoover proposes to train six district leaders in the first year of the program to "lead policy creation and implementation, including researching (benchmarking, stakeholder input, national best practices), drafting and approving."[229] Professor Hoover assumes that for this particular objective, each of these six district leaders (which consist of the new full-time equivalent ("FTE") directors she proposes get hired) will need 40 hours of training in year 1, and 8 hours of training in years 2–15.[230] In addition, for the same component, she includes training for "All District and School Staff," a group that includes both the newly hired staff as well as existing district staff (using staff counts from the 2023–24 school year). For year 1, she recommends four hours for this large group, and for years 2–15, she recommends one additional hour per year as an annual refresher training (or two hours if the staff member is new to the district).[231] Beyond broad descriptions of training goals, Professor Hoover does not link her recommended training hours to academic research or otherwise justify them.

176. Professor Hoover's plan unfolds in three phases, starting with planning, development, and training then shifting to ongoing refinement and sustained implementation.[232] Specifically, years 1–2 focus on "planning and capacity-building," years 3–13 focus on "implement[ing] and refin[ing] professional development and interventions," and years 14–15 focus on "evaluat[ing] and institutionaliz[ing] effective strategies."[233] Professor Hoover provides three justifications for her 15-year timeline: first, the "public health precedent" of youth tobacco use interventions;[234] second, "developmental cohort logic," that is, the ability to track a student cohort from kindergarten entry to high school graduation; and third, studies in "implementation science" showing that "full implementation in complex systems often takes at least 5 years, and up to 10 years or more when layered with systems change."[235] Professor Hoover does not link her recommended 15-year abatement duration to academic research on the effects of social media on adolescents.

[229] Hoover Amended Tucson Report, ¶ 106(1).

[230] Hoover Amended Tucson Report, ¶¶ 106 Training Plan (Year 1), 107 Training Plan (Years 2-15).

[231] Hoover Amended Tucson Report, ¶¶ 106–107.

[232] Hoover General Causation Report, ¶¶ 7, 113–119.

[233] Hoover General Causation Report, ¶ 110.

[234] I discuss the relevance of the comparison between efforts to reduce youth tobacco usage and purported social media addiction in Section 7.2.

[235] Hoover General Causation Report, Sections VI.A, VI.B, VI.C.

177. Based on Professor Hoover's recommendations, Professor Leslie estimates the total cost associated with implementing Professor Hoover's Abatement Plan. This total cost estimate sums "the cumulative cost of new staff" and the "cumulative training and development costs" for new and existing staff, adjusting for inflation and the time value of money.[236] These cost estimates rely on salary data from the U.S. Department of Labor Bureau of Labor Statistics or from district-provided budgets.[237] To calculate the cost of training, Professor Leslie assumes all training hours are compensated, pro-rating compensation using each position's average hourly wage, calculated from annual compensation and assumed full-time hours per position.[238]

### *6.2. Professor Hoover's Abatement Program Is Overly Broad Because It Is Not Designed to Abate the Incremental Impact on the School District Caused by the Alleged Harms from the At-Issue Conduct*

178. Schools have long provided mental health services to students.[239] Thus, even absent any alleged harms from the at-issue conduct, the school district would provide some degree of mental health services to its students.

179. Professor Hoover claims that her proposed Abatement Plan is "consistent with best practices in school mental health."[240] Yet, Professor Hoover gives no reason to believe that the best practices reflected in her plan would have been different in a counterfactual world without the at-issue conduct. Further, she has not shown, nor am I aware of, any evidence that best practices for mental health treatment have changed because of alleged harms from the at-issue conduct or due to social media use in general. To the extent her proposed Abatement Plan provides treatment and prevention for mental health issues not caused by the at-issue conduct, then it is overly expansive and would not be economically justified to assign to Defendants the responsibility for funding such programs.

180. Moreover, Professor Hoover performs no analysis and presents no evidence to establish the baseline levels of mental health support needed from the school district absent the at-issue conduct. For example, she has not estimated the number of students who require one-on-one

[236] Leslie Amended Tucson Report, ¶¶ 3, 12.

[237] Leslie Amended Tucson Report, ¶ 16.

[238] Leslie Amended Tucson Report, Attachments D.1, D.2, D.4.

[239] Hoover General Causation Report, ¶¶ 86–87 ("Schools in the United States continue to offer more mental health services than any other sector serving children. … Research consistently shows that students are more likely to receive mental health services in schools rather than in traditional community-based mental health settings.").

[240] Hoover Amended Tucson Report, ¶¶ 81, 105.

counseling in the actual world but would not have required such counseling absent the at-issue conduct. Not establishing or quantifying the school district's baseline level of necessary mental health services is a noteworthy omission because an abatement program should be focused on abating the harm specifically caused by the at-issue conduct, meaning any harm that is *incremental* to the baseline level that would have prevailed but for the at-issue conduct.

181. Indeed, Professor Hoover describes her plan as being designed to "prevent and mitigate the negative impacts of social media on the school district and its students."[241] Notably, she does not limit her plan to remedying the alleged negative effects of Defendants' at-issue conduct, or to remedying the alleged negative effects from using Defendants' platforms at all (as opposed to using other social media platforms). She also fails to identify what parts or proportions of her plan are attributable to any individual Defendant's platform or at-issue conduct versus the publication of third-party content on Defendants' platforms or non-foreseeable third-party conduct on their platforms. Moreover, she does not purport to limit her plan to remedying the alleged harms from "addictive" use of Defendants' platforms (as opposed to use of Defendants' platforms by students who are not "addicted" to the platforms).

182. As a related matter, Professor Hoover provides no analysis to determine how the baseline need in the counterfactual world compares to what the school district is actually providing. This is relevant because, to the extent that the school district is *not* meeting its students' baseline needs, the additional mental health services needed to attain this baseline level do not belong within the scope of an abatement program. Underfunded mental health services reflect prioritization decisions from the district and cannot be attributed to harm caused by the at-issue conduct.

183. To appropriately design an abatement program, Professor Hoover would need to analyze a school district's baseline needs to address students' mental health challenges absent any harm from the at-issue conduct, and then to determine if, and by how much, Defendants' at-issue conduct increases the need for mental health services beyond a school district's baseline need. This type of analysis would capture how much of the mental health needs for the school district is driven by the at-issue conduct (if any) and how much is driven by pre-existing underfunding of mental health services by the school district (if any).

[241] Hoover Amended Tucson Report, ¶ 60.

184. To further illustrate this point, consider Professor Hoover's recommendation number 13, which is for Tucson Unified School District to provide intensive mental health treatment for alleged social media–related distress such as anxiety, depression, or self-esteem issues. Professor Hoover's analysis is missing estimates of how many students would require these services absent any supposed harms from the at-issue conduct (*i.e.*, the baseline need in the but-for world) and how many students today (in the actual world) need these services.[242] The difference in these numbers would represent the incremental services required as a result of Defendants' at-issue conduct.

185. Notably, as Professor Hoover points out, the school district does not employ the nationally recommended levels of staffing for school counselors, social workers, or psychologists.[243] However, this understaffing does not constitute evidence of how the district has been harmed by the at-issue conduct. Nor are the existing levels of staffing informative about the district's baseline need for additional professionals capable of supporting mental health programming. Rather, the staffing levels reflect how the district has prioritized its resources. The school district could have presumably addressed mental health harms caused by underfunding mental health programs relative to Professor Hoover's outline of best practices had it prioritized its resources differently. Regardless, how a district prioritizes its often limited funding, including how it chooses to fund (or underfund) mental health services, does not determine the incremental level of services attributable to the at-issue conduct.

186. In sum, Professor Hoover's proposed Abatement Plan leaves many open questions, such as Tucson Unified School District's baseline need for mental health services (including the need caused by other factors such as COVID-19 and school shootings) and the incremental need for these services due to any harms from Defendants' at-issue conduct. Without answers to these questions, it is impossible to know if Professor Hoover's proposed Abatement Plan is appropriately sized and if her plan would appropriately abate the alleged harms specifically caused by the at-issue conduct.

[242] Hoover Amended Tucson Report, ¶ 74.

[243] Hoover Amended Tucson Report, ¶ 42.

### *6.3. Professor Hoover's Proposed Abatement Plan Includes Certain Mental Health Prevention and Mitigation Programming that the Tucson Unified School District Already Provides, Making Her Plan Overly Broad*

187. Professor Hoover has not appropriately tailored her proposed Abatement Plan to account for the school district's existing mental health programs. By omitting this step, her proposed Abatement Plan is duplicative and overly expansive, and therefore overly costly.

188. In her report, Professor Hoover summarizes the various mental health programs and services that the school district provides.[244] She also includes key points from "informant interviews."[245] In fact, many of the services and resources she documents appear to overlap with the programs she recommends in her Abatement Plan. She does not adequately explain, however, why the district needs to implement the proposed programs that it already offers, nor does she show that the district offers these programs because of the at-issue conduct.[246] Because she has not quantified the need for the district to provide additional mental health services, nor adequately assessed and quantified the scope and reach of the district's existing mental health programs, she fails to justify the need for the components of her Abatement Plan.

189. For example, Professor Hoover states that Tucson Unified School District "reports implementation of tiered services and mental health supports across nearly all schools," and she notes that while 1 to 25 percent of schools perform mental health screening, 76 to 100 percent of schools offer tier 1, 2, 3 level services.[247] Despite observing that the district offers these mental health services, she makes no effort to account for them in her Abatement Plan and appears to propose many of the same types of services.

190. As a more specific example, Professor Hoover proposes screen time management initiatives and recommends that schools "implement software that monitors student social media activity for signs of cyberbullying, self-harm, threats of violence, and other concerning behaviors."[248] She then notes, however, that the district already "has some systems in place, but these systems should be reviewed to ensure best practices are being followed and improved as needed."[249] Thus, while acknowledging that the district already has some of the proposed

[244] Hoover Amended Tucson Report, ¶¶ 30–49.

[245] Hoover Amended Tucson Report, ¶¶ 50–58.

[246] I discuss Professor Hoover's rationale for hiring new staff rather than relying on existing staff in Section 7.5.

[247] Hoover Amended Tucson Report, ¶ 47.

[248] Hoover Amended Tucson Report, ¶ 63.

[249] Hoover Amended Tucson Report, ¶ 63.

programs in place, Professor Hoover has apparently not assessed whether any changes need to be made, and if so, to what extent, making her plan incomplete and unreliable.

191. Similarly, Professor Hoover recommends the district implement Screen Time Management Initiatives, including "continued and expanded measures to secure students' cell phones during the school day."[250] However, Professor Hoover appears to overlook the fact that Tucson Unified School District has a cell phone policy revised in August 2022. The policy notes that cell phones "are to be kept out of view in a student's locker, pocket, or a carrying bag[, and] shall not be turned on or used during instructional time."[251] Professor Hoover does not appear to consider these policies and the impact they may have at reducing classroom disruptions allegedly caused by the at-issue conduct, undermining the full scope of her Abatement Plan.

192. To illustrate this point in more detail, I compare in Exhibit 18 some of the mental health programs Professor Hoover recommends in her Abatement Plan with existing mental health programs the district currently provides and that Professor Hoover describes in her report. I note that while Professor Hoover claims that some of these programs specifically address social media usage, she does not assert that any of the district's existing programs were put in place because of the alleged harms caused by the at-issue conduct specifically. Nor do Plaintiffs' other experts assert that the costs for these programs should be included in estimates of past damages to the school districts. Therefore, even absent the at-issue conduct, Plaintiffs have not established that the district would not have provided the same mental health programs and services described here.

[250] ] Hoover Amended Tucson Report, ¶ 63.

[251] Tucson Unified School District, "Policy-Code-JICJ: Student Use of Cell Phones and Other Electronic Signaling Devices, Section J - Students," August 23, 2022, available at https://govboard.tusd1.org/Policies-and-Regulations/Policy-Code-JICJ.

***EXHIBIT 18***
***Comparison of Professor Hoover's Proposed Abatement Program Relative to the District's Existing Mental Health Offerings***

| Strategy | Description |
|---|---|
| **Social Media Policies and Staff Professional Development** | |
| Hoover Strategy | "Policies and professional development for staff equip educators with [] guidance, knowledge and skills … Clear policies should outline appropriate monitoring and support strategies for online social media behavior…" (¶ 62). |
| Tucson Unified School District Schools Policy | "[Tucson Unified School District] provides professional development opportunities for staff focused on youth mental health, some of which include content on the mental health effects of social media. Youth Mental Health First Aid, implemented since the 2022–2023 school year, is a nationally recognized curriculum that touches on issues related to social media and mental health. Training is required for Health Services employees." (¶ 38). |
| **Life Skills Programming** | |
| Hoover Strategy | "Life Skills programming focuses on teaching students essential skills for managing emotions, building healthy relationships, demonstrating empathy, and making responsible decisions. It cultivates self-awareness, social awareness, and resilience…" (¶ 65). |
| Tucson Unified School District Policy | "The district… created a Social Emotional Learning Department in 2021" (¶ 32). |
| **Mental Health Literacy** | |
| Hoover Strategy | Provide "curricular instruction on positive mental health;" train staff and students "on identifying signs of anxiety, depression, and social media addiction;" and "ensure access to mental health resources." (¶ 66). |
| Tucson Unified School District Policy | "[Tucson Unified School District] has formed and participated in district-wide initiatives to address student mental health and, to a more limited extent, the impacts of social media. A major initiative began in March 2023 with the establishment of a Youth Mental Health First Aid (YMHFA) Task Force aimed at expanding the number of instructors and certified individuals within Health Services." (¶ 33). |
| **Digital Detox Challenges and Wellness Programs** | |
| Hoover Strategy | "Digital detox challenges and wellness programs encourage students to develop healthier relationships with technology by promoting voluntary screen-time reduction, mindfulness activities, and incentives for balanced tech habits." (¶ 68). |
| Tucson Unified School District Policy | "Other ongoing district-wide initiatives include the Student Success Coalition Task Force, which supports site-specific and district-level health and wellness strategies." (¶ 35). |
| **Targeted Mental Health Support** | |
| Hoover Strategy | Provide "early intervention for students experiencing stress, anxiety, or emotional distress, including those struggling with the negative impacts of social media." (¶ 71). |
| Tucson Unified School District Policy | "Tiered services... are provided for the following concerns: Anxiety [;] Attention/Hyperactivity [;] Bullying [;] Depression/Suicidal Ideation [;] Disordered Eating [;] Grief/Loss [;] Oppositional Behavior/Conduct Problems [;] Healthy Relationships [;] Social-Emotional Skill Development..." (¶ 48). |
| **Referral to Community-Based Digital Wellness** | |
| Hoover Strategy | "collaborate with mental health providers, digital addiction specialists, and online safety organizations to ensure students receive comprehensive support beyond the school setting." (¶ 75). |
| Tucson Unified School District Schools Policy | "the district contracts with external mental health providers and refers students to community-based services, including partners like the Pima County Health Department and Arizona Complete Health." (¶ 31). |

Source: Hoover Amended Tucson Report
Note: This table lists select Hoover Abatement Plan strategies that appear to coincide with existing policies and practices in the district.

193. While comparing in detail the Abatement Plan proposed by Professor Hoover to the existing programs and policies implemented by the school district is outside the scope of my

report, Exhibit 18 suggests potentially significant overlap based on Professor Hoover's own descriptions. This indicates a need to analyze in detail the existing programs and policies to determine whether the potential overlap exists. However, Professor Hoover does not perform such a detailed analysis, explain how or why the existing programs are insufficient, or explain how her Abatement Plan would complement (and not simply replace) what the district already offers. Similarly, she has not quantified the size or reach of the district's existing programs or of any comparable programs in her proposed Abatement Plan. Professor Hoover has thus not performed the analysis needed to appropriately justify her proposed Abatement Plan and has not shown that her Abatement Plan is appropriately tailored for the district's needs.

194. In addition, Professor Hoover proposes a uniform approach for each of the districts she analyzes without considering differences across districts in terms of currently provided mental health services and the number of currently employed mental health professionals. As a simple example, she proposes adding six district-wide director-level staff for each of Breathitt County Schools, Harford County Public Schools, Charleston County School District, and Tucson Unified School District even though the number of schools and the number of students in each district vary substantially. Specifically, as Professor Hoover discusses, Breathitt County Schools has four schools and serves 1,579 students, Harford County Public Schools has 54 schools serving 38,106 students, Charleston County School District has 80 schools serving 51,166 students, and Tucson Unified School District has 88 schools serving 39,927 students.[252] Professor Hoover has not explained why it is appropriate for districts of such different sizes to employ the same number of district-wide directors. This one-size-fits-all approach fails to properly tailor an abatement program given the specifics of each district, including the existing mental health programs in each district.

## 7. THE COST OF PROFESSOR HOOVER'S ABATEMENT PLAN IS INFLATED DUE TO ADDITIONAL UNSUPPORTED ASSUMPTIONS

195. Professor Hoover claims that a 15-year Abatement Plan is necessary to allow for planning, implementation, evaluation, and sustainability (Section 7.1). However, her rationale is not tied to the specifics of abating the alleged harms from the at-issue conduct. She paradoxically

[252] See Amended Expert Report of Dr. Sharon A. Hoover, Ph.D., for Breathitt County Board of Education, June 20, 2025, ¶ 107; Amended Expert Report of Dr. Sharon A. Hoover, Ph.D., for Harford County Board of Education, June 20, 2025, ¶ 106; Amended Expert Report of Dr. Sharon A. Hoover, Ph.D., for Charleston County School District, June 20, 2025, ¶ 96; Hoover Amended Tucson Report, ¶ 100.

claims both that her plan will produce a steep and sustained reduction in harms and that her plan should remain fully funded and operational long after the initial need has passed.

196. Professor Hoover's justification for her 15-year timeline relies on a comparison to tobacco litigation, citing declines in youth tobacco use as a precedent (Section 7.2). This analogy is unsupported: The harms associated with social media have not been shown to be analogous to those of tobacco, and young people may derive significant benefits from social media use.

197. Professor Leslie's cost estimate of training needed to implement the Abatement Plan, which is based on a tally of hours Professor Hoover recommends for training and professional development, is unjustified and, in some cases, double-counts expenditures (Section 7.3). Professor Hoover claims that training and ongoing professional development should be added to the cost of hiring new staff, but a portion of these costs involves time allocated from new hires themselves. Because time spent on training is paid for out of the salary afforded to the new hire, Professor Leslie's calculations double-count costs by including both their total full-time compensation and the value of their training time.

198. Professor Hoover proposes staffing levels that far exceed the levels recommended by professional organizations (Section 7.4). She also fails to adequately justify the need to hire new staff and does not explain why other programs in the literature which rely on existing staff to implement them would not achieve the goal of abating the alleged harms of the at-issue conduct (Section 7.5). In addition, Professor Hoover's analysis does not address the availability of other funding sources that should be factored in to any analysis determining the cost, if any, to address the alleged harms from the at-issue conduct (Section 7.6).

### *7.1. Professor Hoover's Rationale for a 15-Year Abatement Plan to Account for Planning, Implementation, Evaluation, and Sustainability Is Unsupported*

199. Professor Hoover proposes a 15-year Abatement Plan, asserting that a "15-year period allows for the full cycle of planning, implementation, evaluation, and sustainability."[253] She states that there would be "dedicated time at the end of the plan to institutionalize effective strategies, ensuring sustainability beyond initial funding or leadership cycles."[254] She also comments that this duration allows assessment of "a full K-12 student cohort."[255]

[253] Hoover General Causation Report, ¶ 7.
[254] Hoover General Causation Report, ¶ 7.
[255] Hoover General Causation Report, ¶ 7.

200. However, even if Plaintiffs could show that Defendants' at-issue conduct negatively affected students and the school district, none of Professor Hoover's justifications provides sufficient support for a 15-year Abatement Plan. In general, the various phases of her plan—planning, implementation, evaluation, and sustainability—appear to be geared more toward how a school district would implement a long-term mental health program intended to be ongoing and adaptive rather than a targeted and specific abatement program. For example, Professor Hoover states that her Abatement Plan will allow for "continuous adaptation to the evolving social media landscape."[256] While this may be appropriate for a district's broad services related to mental health, it would not necessarily be tied to Defendants' at-issue conduct. For example, if the "evolving social media landscape" entails a yet-to-be-developed app or feature that is deemed harmful, or an entirely new social media platform that becomes popular with adolescents, any future hypothetical harm from such an app, feature, or platform would not be caused by the at-issue conduct Plaintiffs challenge in this matter. Professor Hoover has not justified why Defendants in this matter would be required to abate such future hypothetical harms.

201. Similarly, Professor Hoover's Abatement Plan is internally inconsistent. On the one hand, she states that it is "reasonable to expect a steep and sustained reduction in the negative impacts of social media."[257] On the other hand, she claims her plan is intended to be sustainable "beyond initial funding," stating that in years 14 and 15, it would "evaluate and institutionalize effective strategies … ensuring sustainability and system-level learning."[258] If Professor Hoover's Abatement Plan were actually effective and the alleged "negative impacts" were to decline steeply (i.e., fewer students would need to be treated for purported social media addiction), then it is unclear why her proposed plan has essentially identical overhead and structure for each year of its duration. It is also unclear what she expects will be different after 15 years that needs to be sustained indefinitely.

202. Moreover, given the length of Professor Hoover's program and the age of the population it would serve, many of the proposed increased resources would be used in connection with students who, as of today, have never used any of Defendants' platforms or are not even born

[256] Hoover General Causation Report, ¶ 7.

[257] Hoover General Causation Report, ¶ 7. See also Hoover General Causation Report, ¶ 109 ("As student social media use declines steadily and protective factors for mental health and well-being are strengthened, schools and school districts can expect a corresponding and sustained reduction in the harms they have experienced from social media's negative impacts.").

[258] Hoover General Causation Report, ¶¶ 7, 110.

yet. Professor Hoover has not explained how her program could be tied to Defendants' at-issue conduct for such students.

203. In addition, her conclusion that a 15-year plan would allow the district to follow "a full K-12 student cohort" is arbitrary and is unrelated to abating harm (if any) from Defendants' at-issue conduct to the school district. While following a full cohort of students may be helpful for other purposes (such as academic research), it is not tied to the specific at-issue conduct or abatement strategies and thus fails to justify the Abatement Plan's proposed duration. Moreover, in the process of following one full cohort, she also takes in 14 other successive new academic cohorts and treats each with the same Abatement Plan used for the original cohort, regardless of their baseline exposure to the at-issue conduct. In this way, she fails to tailor her plan at the level of the cohort either.

204. Lastly, Professor Hoover's reference to implementation research is vague and her opinion is underdeveloped. She notes that "National Implementation Research Network (NIRN) findings show that full implementation in complex systems often takes at least 5 years, and up to 10 years or more when layered with systems change."[259] However, she does not elaborate or explain how this research applies in this case, nor does she explain why she proposes a 15-year duration when the findings she cites indicate implementation could take "up to 10 years or more." If she instead recommended a five-year program duration (the lower end of the purported range), the total costs of the Abatement Plan would be approximately one-third of what she currently proposes.

[259] Hoover General Causation Report, ¶ 113.

### *7.2. Professor Hoover's Comparison of the Proposed Abatement Plan to Efforts to Reduce Youth Tobacco Use Is Invalid and Unsupported*

205. Professor Hoover asserts that her proposed "15-year timeline [for her Abatement Plan] mirrors other successful public health responses to youth risk behaviors."[260] She specifically mentions just one such public health program—the "sustained, comprehensive, school- and community-based … efforts" to reduce youth tobacco use.[261] However, Professor Hoover provides no analysis of how a potential program to abate the alleged negative effects of Defendants' at-issue conduct would be similar to public health efforts to reduce youth tobacco use. Her justification for a 15-year abatement plan based on efforts to curb youth tobacco use is therefore flawed and irrelevant.

206. The only source Professor Hoover cites to support her comparison of the timeline needed to reduce youth tobacco use and a timeline for her proposed Abatement Plan is a 2012 report from the U.S. Surgeon General titled *Preventing Tobacco Use Among Youth and Young Adults*.[262] Professor Hoover does not cite to a specific page or section of this report, so it is not clear what conclusion she draws from this source. She may rely upon it to support her conclusion that efforts to reduce youth tobacco use required "sustained, comprehensive, school- and community-based prevention efforts that spanned more than a decade."[263] Nevertheless, that does not imply that efforts to abate the alleged harms from social media usage due to Defendants' at-issue conduct would take a similar amount of time or effort. Based on my review, I could not find any reason to conclude that this source supports a 15-year abatement plan to address the alleged harms from Defendants' at-issue conduct.

207. Tobacco and social media are not comparable. To take one example, tobacco provides no benefit to youth; the CDC advises that "No tobacco products, including e-cigarettes, are safe, especially for children, teens, and young adults."[264] In contrast, according to the National Academies of Science, Engineering, and Medicine's *Consensus Study Report on Social Media*

[260] Hoover General Causation Report, ¶ 107.

[261] Hoover General Causation Report, ¶ 107.

[262] Hoover General Causation Report, footnotes 2, 117.

[263] Professor Hoover cites the Surgeon General's 2012 Report to support her sentence "For example, between 1997 and 2015, youth tobacco use declined by 73% as a result of sustained, comprehensive, school- and community-based prevention efforts that spanned more than a decade." Hoover General Causation Report, ¶ 107. Since the Surgeon General's Report was published in 2012, the report would not appear to support Professor Hoover's claim that youth tobacco use declined by 73 percent between 1997 and 2015.

[264] Centers for Disease Control and Prevention, "E-Cigarette Use Among Youth," October 17, 2024, available at https://www.cdc.gov/tobacco/e-cigarettes/youth.html.

*and Adolescent Health*, social media has several benefits, such as "provid[ing] a space for self-expression,"[265] "connect[ing] friends and family,"[266] "expos[ing] [adolescents] to the world and support[ing] their education,"[267] and "support[ing teens] creativity."[268] In fact, Tucson Unified School District uses Defendants' social media platforms, indicating that it finds some value in the platforms.[269]

208. Indeed, tobacco and social media platforms are different, and it cannot be assumed that the strategies to prevent and mitigate potential harms—let alone to preserve possible benefits of social media—are the same for both tobacco products and social media platforms or operate under a similar timeline. In sum, the analogy Professor Hoover makes between youth tobacco use and purported youth addiction to social media is flawed and does not support her proposed Abatement Plan duration.

[265] National Academies of Sciences, Engineering, and Medicine, "Social Media and Adolescent Health," 2024, available at https://nap.nationalacademies.org/catalog/27396/social-media-and-adolescent-health, p. 74 ("Social media can also provide a space for self-expression.").

[266] National Academies of Sciences, Engineering, and Medicine, "Social Media and Adolescent Health," 2024, available at https://nap.nationalacademies.org/catalog/27396/social-media-and-adolescent-health, p. 75 ("One of the most obvious potential benefits of social media is its power to connect friends and family.").

[267] National Academies of Sciences, Engineering, and Medicine, "Social Media and Adolescent Health," 2024, available at https://nap.nationalacademies.org/catalog/27396/social-media-and-adolescent-health, p. 79 ("Qualitative research indicates that adolescents value social media for its ability to expose them to the world and support their education.").

[268] National Academies of Sciences, Engineering, and Medicine, "Social Media and Adolescent Health," 2024, available at https://nap.nationalacademies.org/catalog/27396/social-media-and-adolescent-health, p. 82 ("Teens' use of social media can support their creativity.").

[269] Deposition of Rebecca S. Carrier, May 7, 2025 ("Carrier Deposition"), pp. 150:3–11 ("Q. Now, TUSD itself as a district uses social media, right? A. Yes. Q. TUSD has a Facebook account? A. Yes. Q. And TUSD has an Instagram account? A. Yes. Q. TUSD has a YouTube page? A. I believe so."), 151:2–7 ("Q. Okay. And so TUSD educators sometimes use social media to engage with TUSD students? A. Yes, because that's where they are, that's where they spend their time, so that's how we are able to communicate with them."), 155:22–156:23 ("Q. And if we look at the second page of this document in the Toolkit, [provided by the school counseling department to individuals looking to start a school club] one of the ways that's suggested for students to start this mental health-focused club is advertising a club through social media. Do you see that? A. Yes. … .Q. Yes. To recruit students to this group focused on mental health, one of the strategies is recruiting through social media? A. Yes."). See also Carrier Deposition, Exhibit 21, Email from Julie Shivanonda (Tucson School District) to Rebecca Carrier (Tucson School District) and Vanessa Aguaya (Tucson School District), "Fw: GYC Mental Health Collaboration – Request for short presentation to HS counselors," October 31, 2023, SM_TUSD_00420660–61; Carrier Deposition, Exhibit 22, "Yellow Ribbon Club Toolkit," SM_TUSD_00420662–66 at 62–63 ("This toolkit provides resources, guidance, and best practices for students interested in starting a Yellow Ribbon Club at their school. … Spread the Word … Take advantage of school resources to broadcast your club including but not limited to: School social media platforms … Advertising Your Club … Through Social Media Choose a social media platform based on whom you're trying to reach[,] Instagram and TikTok are best for reaching other students[,] Twitter and Facebook are best for reaching parents/guardians and older Arizona populations.").

### *7.3. Professor Hoover's Recommended Training and Professional Development Time and Professor Leslie's Estimated Cost of That Time Are Unjustified and Result in Substantial Double-Counting*

209. Professor Hoover claims that in addition to hiring new staff, "[t]raining and ongoing professional development [are] required to prepare administrators, teachers, and student support personnel to implement a multi-tiered approach to addressing the impact of social media on the school environment, student well-being and learning."[270] She thus describes a variety of professional development programs she considers necessary for enacting her Abatement Plan, indicating the target audience for each program, the frequency of the trainings for each program, and the total number of training hours for each program. Professor Leslie in turn estimates the total training costs associated with Professor Hoover's professional development programs by multiplying Professor Hoover's estimate of total training hours by a calculated hourly wage.[271]

210. The total training hours that Professor Hoover estimates and the total costs for these training hours that Professor Leslie calculates are flawed and unreliable. First, as I previously discussed, an appropriate abatement plan should account only for the costs of abating the alleged harms caused by the at-issue conduct.[272] Professor Hoover's proposed Abatement Plan, however, is not tailored to the specific harms caused by the at-issue conduct; instead, her recommendations encompass programs that go beyond the specific harms allegedly caused by the at-issue conduct.[273] Moreover, she does not adequately justify the 15-year duration of her proposed Abatement Plan or how the resources needed to implement her plan would change for later cohorts.[274] The estimated training hours to implement her Abatement Plan are therefore unreliable and overstated.

211. In addition, Professor Hoover's proposed training and professional development programs include training of new staff hired specifically as part of the proposed Abatement Plan. For example, Professor Hoover recommends hiring a district-wide "Director of Digital Literacy," and she calculates the hours such an individual would spend on training and professional

[270] Hoover Amended Tucson Report, ¶ 101.

[271] Leslie Amended Tucson Report ¶ 15 ("To calculate the training costs associated with the strategic plan, I consider the average wages for the roles identified in the plan, along with the training hours involved in each recommendation. I use these inputs to calculate the time value of delivering each recommended training to district staff over the fifteen-year period.").

[272] See Section 6.2.

[273] See Section 6.

[274] See Section 7.1.

development activities, such as "lead[ing] policy creation and implementation" and "oversee[ing] the implementation of anti-cyberbullying initiatives."[275] Professor Leslie subsequently includes the hours the Director of Digital Literacy would spend on these training and professional development activities in his estimate of training and development costs.[276]

212. This approach double-counts the cost of time spent on training and professional development because this cost appears as part of the new employee's total compensation and as its own line-item in Professor Leslie's analysis. It is incorrect to include both the compensation of a new employee as well as the training cost for that new employee to perform the functions of the employee's role. Put differently, in the but-for world in which these additional employees would not have been hired, Tucson Unified School District would not and could not accrue the benefit of any productive time from these employees. Therefore, it is incorrect to assert that the at-issue conduct crowds out any such productive time.

213. Based on my review of Professor Leslie's analysis, I calculate the total effect of this double-counting by identifying overlap between the time of new employees and new employees' time commitments to training and professional development programs. I do this by reviewing Professor Leslie's training cost analysis and flagging each position that requires training hours but is also a new hire. Based on this analysis, I estimate that double-counted hours in Tucson Unified School District account for 50.5 percent of training costs in the first year of the Abatement Plan and 31.7 percent of total training costs over the 15-year program, amounting to total double counted costs of $4.9 million.[277]

[275] Hoover Amended Tucson Report, ¶¶ 106, 124.

[276] Leslie Amended Tucson Report, Attachment D, Tables 1, 4.

[277] See my workpaper.

### *7.4. Professor Hoover Proposes Clinical Staffing Levels That Far Exceed Recommended Levels without Any Justification or Rationale*

214. Professor Hoover's proposed Abatement Plan calls for Tucson Unified School District to hire a substantial number of new school counselors and school psychologists (as well as hiring new staff for many other roles). To determine the number of new staff to hire into these specialized roles, she appears to adopt the guidance on recommended staffing levels from various professional organizations, which recommend one counselor for every 250 students, and one school psychologist for every 500 students.[278] She arrives at her proposed staffing increase for school counselors and psychologists by taking the total number of students in the district and simply dividing by these ratios.

215. As an initial matter, I find her proposed staffing additions unjustified. She provides no detail on why or how her proposed Abatement Plan requires these specific staffing levels. Since she has not quantified the scope of her proposed interventions, it is not possible to assess whether the proposed staffing levels align with the need for additional professionals, and it is not possible to determine whether and to what extent these additional staff would subsequently work on non-abatement-related tasks.

216. Professor Hoover also fails to support her proposal for adding specialized staff. She fails to explain why she ignores existing counselors, psychologists, and other clinical staff employed by the district when calculating the need for additional specialists. Her recommendation ignores what the existing specialists—counselors, social workers, school psychologists, school nurses, and others—may already be doing to promote mental health. Further, after adding the proposed staff, the districts would substantially exceed staffing levels recommended by relevant professional organizations.

217. In Exhibit 19 below, I show the current staffing ratios for the district in terms of counselors, psychologists, and total clinical staff (equal to the combined staffing recommendation incorporating counselors, psychologists, social workers, and school nurses). Reporting total clinical staff allows for some degree of substitution between the various clinical

[278] American School Counselor Association, "School Counselor Roles & Ratios," available at https://www.schoolcounselor.org/about-school-counseling/school-counselor-roles-ratios; National Association of School Psychologists, "The Professional Standards of the National Association of School Psychologists," 2020, available at https://www.nasponline.org/standards-and-certification/nasp-2020-professional-standards-adopted.

roles in terms of providing mental health services within the school setting.[279] In all cases, the district does not meet these recommended levels. I then show the number of new hires Professor Hoover proposes, the total number of staff the district would employ after implementing her proposal, and the new staffing ratio after implementing her proposal. In all cases, the district would substantially exceed the staffing levels recommended by the professional organizations. Yet, Professor Hoover has not explained or justified why these levels of staffing are necessary. Moreover, by recommending these staffing levels, Professor Hoover is essentially claiming that Defendants should be responsible for 100 percent of the recommended staffing levels. This assumption is inappropriate and fails to consider the concept (discussed in Section 6.2) that the Defendants' should only be responsible for any incremental increase in staffing caused by the alleged at-issue conduct.

***EXHIBIT 19***
***Summary of Current Staffing Ratios and Projected Staffing Ratios with New Hires***

| Role | Recommended Staffing Ratio | Current Staff | Staffing Ratio with Current Staff | Proposed New Hires | Current Staff with New Hires | Staffing Ratio with New Hires |
|---|---|---|---|---|---|---|
| Counselors | 250:1 | 129.3 | 309:1 | 160 | 289.3 | 138:1 |
| Psychologists | 500:1 | 39.5 | 1011:1 | 80 | 119.5 | 334:1 |
| Total Clinical Staff | 88:1 | 262.7 | 152:1 | 461 | 723.7 | 55:1 |

Source: Hoover Amended Tucson Report

Note: Total Clinical Staff includes all positions included by Professor Hoover as "Core Mental Health and Student Support Staff." This includes 129.3 School Guidance Counselors, 39.5 School Psychologists, 35.7 School Social Workers, 39.2 School Nurses, 12 Trainees, and 7 Substance Abuse Specialists. Professor Hoover also notes that the district employs 19.4 Occupational Therapists but does not include them in "Core Mental Health and Student Support Staff." Recommended staffing ratio for Total Clinical Staff is the blended ratio for counselors, psychologists, social workers, and school nurses. Proposed new clinical hires include School Counselors, School-Based Mental Health Clinicians, School Psychologists, School-Based Therapists, and Crisis Intervention Specialists.

218. Despite suggesting these robust staffing levels, Professor Hoover does not provide a sufficient level of detail to explain or justify why her proposed level of staffing is necessary and appropriate.

[279] This is consistent with some of Professor Hoover's recommendations; for example, she recommends that the district could hire either Licensed Social Workers or Counselors for her "School-Based Mental Health Clinician" role. Hoover Amended Tucson Report, ¶ 95.

### *7.5. Professor Hoover Has Not Justified the Additional Hires She Claims Are Needed to Implement Her Abatement Program*

219. Professor Hoover recommends that Tucson Unified School District hires a substantial number of new staff in order to implement the various strategies of her Abatement Plan. She justifies her proposal to hire new staff in part by asserting that existing staff lack the capacity to absorb new responsibilities.[280] However, Professor Hoover has not provided any detailed information about the district's existing staff's capacity nor has she provided any information about the specific interventions she intends to be implemented in her Abatement Plan. Knowing the scope of the interventions in her plan, as well as the time and effort needed to implement them, is necessary to understand and assess if existing staff could implement the strategies of her Abatement Program.

220. For example, for her Digital Literacy component of her Abatement Program, Professor Hoover proposes the district leverage the Common Sense Media curriculum "to ensure students develop responsible and safe digital habits."[281] However, Professor Hoover has not indicated which specific modules would be needed, nor has she shown that existing district staff would be unable to implement the modules from this intervention. The Common Sense Media curriculum provides a number of pre-prepared lesson plans for teachers of K-12 students which include many topics. More specifically, modules in this program teach students in grades K-2 "What are ways you can be kind online?" and for high school students, "Can Media Be Addictive?" or "The Health Effects of Screen Time."[282] Notably, the training time required for teachers is moderate: Common Sense Media provides a free training program lasting about four hours.[283]

221. I am also aware of a separate curriculum available from Common Sense Media that may be suitable for the "Family Engagement and Education" component of Professor Hoover's Abatement Program.[284] Professor Hoover has not analyzed the effort required to implement such a pre-established program and whether it could be implemented by existing staff.

[280] Hoover Amended Tucson Report, ¶ 78.

[281] Hoover Amended Tucson Report, ¶ 109.

[282] Common Sense Education, "Digital Citizenship Curriculum," available at https://www.commonsense.org/education/digital-citizenship/curriculum.

[283] Common Sense Education, "Common Sense Educator Road Map," available at https://docs.google.com/document/d/1BOZqbVHA0Jhw4Nsoi1agxLONVbHw_ywnjbTQ-oyPTqU/edit?tab=t.0, which includes one-hour trainings on "Teaching Digital Citizenship," "Protecting Students' Privacy Online," "AI Foundations for Educators," and "Modeling Healthy Digital Habits." Training may also include one-hour webinar workshops lead by a Common Sense representative.

[284] Common Sense Education, "Presentations for Parents & Families," available at https://www.commonsense.org/education/presentations-for-parents-families.

222. Moreover, she does not appear to consider alternatives to hiring a large number of new staff. For example, she does not consider using an outside contractor knowledgeable about certain interventions to help existing staff implement a particular program, which is a tactic commonly described in peer-reviewed literature on school-based mental health programs I have reviewed.[285]

[285] For example, Sarah Lindstrom Johnson et al., "Scaling Up Positive Behavioral Interventions and Supports: Costs and Their Distribution Across State, Districts, and Schools," *School Psychology Review*, 49(4), 2020, pp. 399–414 at p. 401 ("School-level data were captured in the context of an RCT of PBIS conducted in 40 middle schools in four districts that were all trained to implement SW-PBIS. The intervention utilized systems-based coaching to support the 20 intervention schools to implement evidence-based programs across all three tiers of PBIS."). See also Rob Horner et al., "What Does It Cost to Implement School-Wide PBIS," *Center of Positive Behavioral Interventions and Supports*, July 2012, available at https://cdn.prod.website-files.com/5d3725188825e071f1670246/5d8a8ca19f7bf86ee571341b_20120802_WhatDoesItCostToImplementSWPBIS.pdf ("[A] district endorses SWPBIS adoption by … Hiring/accessing external training support to establish SWPBIS implementation capacity … Requiring at least one visit from a SWPBIS national consultant to explore and plan feasibility of SWPBIS … Reallocating personnel for training, coaching, and team roles without adding new positions.").

223. For example, Bradshaw et al. (2010) describe the Positive Behavioral Interventions and Supports ("PBIS") framework to support students' behavioral, academic, social, emotional, and mental health,[286] an objective similar to Professor Hoover's Life Skills and Mental Health Literacy program objectives. The PBIS framework includes three tiers of support: universal prevention, targeted intervention, and individualized intervention, also similar to Professor Hoover's proposed Abatement Plan.[287] Steps to implement PBIS include "[forming a team] that includes 6 to 10 staff members and an administrator," and "an external behavioral support coach."[288] Notably, this program can be implemented with existing staff and an external coach, and other researchers have noted the efficiency of using coaches.[289] For example, Pas et al. (2020) evaluate data "from a 40-school randomized controlled trial to understand the cost of coaching to support implementation of evidence-based programs (EBPs) through a multi-tiered system of supports for behavior (MTSS-B) model," and note that, "the findings indicated that the coach costs were a fraction of a full-time school personnel salary."[290]

[286] PBIS programs "support[] [a] student's behavioral, academic, social, emotional, and mental health" and can "improve[] social emotional competence, academic success, and school climate." See Center on Positive Behavioral Interventions and Supports, "What Is PBIS," available at https://www.pbis.org/pbis/what-is-pbis. An expanded version of PBIS is Schoolwide Positive Behavioral Interventions and Supports ("SWPBIS"). "SWPBIS aims to alter school environments by creating improved systems and procedures that promote positive change in student behavior by targeting staff behaviors." See also Catherine P. Bradshaw, "Examining the Effects of Schoolwide Positive Behavioral Interventions and Supports on Student Outcomes: Results from a Randomized Controlled Effectiveness Trial in Elementary Schools," *Journal of Positive Behavior Interventions*, 12(3), 2010, pp. 133–148 ("Bradshaw et al. (2010)") at p. 133.

[287] "[PBIS is a] whole-school strategy that aims to prevent disruptive behavior and enhance the school's organizational climate by creating and sustaining universal (Tier 1), secondary (Tier 2), and tertiary support systems (Tier 3[)] …" See Catherine P. Bradshaw et al., "A Mixed-Methods Approach for Embedding Cost Analysis Within Fidelity Assessment in School-Based Programs," *Behavioral Disorders*, 48(3), 2023, pp. 174–186 ("Bradshaw et al. (2023)").

[288] Bradshaw et al. (2010), p. 134.

[289] See for instance Jessica Swain-Bradway et al., "What Are the Economic Costs of Implementing SWPBIS in Comparison to the Benefits from Reducing Suspensions," *Center on Positive Behavioral Interventions and Supports*, November 2017, available at https://cdn.prod.website-files.com/5d3725188825e071f1670246/5d76c00cb9339d5f3f267ee7_economiccostsswpbis.pdf ("Schools and districts typically do not hire additional staff for SWPBIS implementation but rather repurpose existing professional development, school team time and functions, and responsibilities of school personnel for SWPBIS implementation."). See also Bradshaw et al. (2023), p. 176 ("most schools implementing a [PBIS] program do not typically hire new staff to support their implementation.").

[290] Elise T. Pas et al., "Tracking Time and Resources Associated with Systems Change and the Adoption of Evidence-Based Programs: The 'Hidden Costs' of School-Based Coaching," *Administration and Policy in Mental Health and Mental Health Services Research*, 47(5), 2020, pp. 720–734.

224. Determining whether the PBIS program discussed in Bradshaw et al. (2010), or any other intervention discussed in the literature, would achieve the objectives in Professor Hoover's proposed Life Skills and Mental Health Literacy programs is outside the scope of my report as an economist (indeed, it is not possible to perform such a comparison given the lack of detail provided by Professor Hoover). However, Professor Hoover proposes a meaningful number of new hires without detailing how and why her program requires them. She also fails to compare other programs in the peer-reviewed academic literature that are more resource-efficient and designed to achieve similar or overlapping goals. Both these omissions lead me to conclude that her methodology for evaluating the resource-efficiency of her Abatement Plan is unreliable.

225. This issue comes into sharper focus when considering the number of additional staff and the hours worked by those staff included in Professor Hoover's proposal based on the various core strategies of her program. Economically, allocating a new hire (or a fraction of a new hire) to a particular abatement strategy is akin to adding 100 percent of the annual hours expected of that employee (or a fraction of their hours, based on the allocation percentage). As an example, assigning a new hire to promote a district's anti-cyberbullying strategy is akin to allocating 1,733 person-hours for the year to that effort.[291] In Exhibit 20, I quantify the total resources Professor Hoover recommends in her Abatement Plan based on the number of proposed new hires and their associated hours in each year of her plan, organized by the different components of her plan.[292] While these can be allocated to a specific strategy in her plan, Professor Hoover has not tied any of the proposed staff or hours to specific interventions.

[291] FTE hours are calculated based on Professor Leslie's assumption of 1,733 hours worked annually per FTE staff member. See Leslie Amended Tucson Report, Attachment D.2.

[292] Professor Hoover does not tie her proposed hiring to particular strategies. I partition hiring costs over the six plan categories from Professor Hoover's report that Professor Leslie uses to analyze training costs. A full list of the cost categories Professor Leslie uses are: (1) Mental Health Literacy; (2) Life Skills Programming; (3) Anti-Cyberbullying Programming; (4) Digital Literacy; (5) Family Engagement and Education Workshops on Social Media Use; (6) Clinical Assessment and Intervention Skills for Social-Media Related Health Concerns; (7) Social Media Policies and Practices. See Leslie Amended Tucson Report, Attachment D.4. While Professor Leslie analyzes the Mental Health Literacy and Life Skills Programming programs separately, I analyze the two programs together due to overlap in the description of these programs in the Hoover Amended Tucson Report. See, e.g., Hoover Amended Tucson Report, ¶¶ 65–66 ("Life Skills Programming (e.g. build student skills like empathy, emotional regulation, navigating social media pressure … Mental Health Literacy (e.g. curricular instruction on positive mental health, signs and symptoms of mental health challenges …"). When a proposed role appears to support different abatement strategies, I divide the cost for the role evenly across the different categories. For example, I assign the Director of Digital Safety and the Director of Digital Literacy half-time to both the Digital Literacy and the Social Media Policies and Practices categories. Because my method does not double-count positions, any misattribution of a position to one category that may lead me to overstate Professor Hoover's additional spending in that category necessarily leads me to understate her additional spending in another category and, therefore, does not change my qualitative conclusions.

***EXHIBIT 20***
***Allocation of Resources from Professor Hoover's Proposed Abatement Plan***

| Program | New Staff Required | Annual New Staff Hours |
|---|---|---|
| Social Media Policies and Practices | 45 | 77,985 |
| Digital Literacy Programming | 125 | 216,625 |
| Life Skills Programming + Mental Health Literacy | 171 | 296,343 |
| Anti-Cyberbullying Programming | 168 | 291,144 |
| Family Engagement and Education Workshops | 89 | 154,237 |
| Clinical Assessment and Intervention Skills for Social Media-Related Mental Health Concerns | 381 | 660,273 |
| **Total** | **979** | **1,696,607** |

Source: Leslie Amended Tucson Report

Note: New staff hours are calculated based on the assumption of 1,733 hours worked annually per new employee based on Professor Leslie's figures provided in Attachment D.2 of the Leslie Amended Tucson Report. While Professor Leslie's range of hours for FTEs ranged from 1,733 to 2,080, I adopt his 1,733-hour floor to keep my estimate of annual new staff hours conservative. In instances when an employee is relevant to multiple program categories, their hours are split across those categories.

226. In sum, Professor Hoover proposes hiring many new staff members as part of her Abatement Plan but does not provide any meaningful detail for how the millions of hours that these staff would work will be spent in each year of her plan. Nor does she analyze existing programs discussed in the peer-reviewed literature that would not require hiring any new staff and if (and why) such programs would be inferior to her proposed programs. Without these details and such a comparison, she has not justified her approach of adding new hires to implement her Abatement Plan.

***7.6. Professor Hoover and Professor Leslie Fail to Consider Other Sources of Funding the District Has Received to Address Adolescent Mental Health Issues***

227. I understand that the availability of external funding sources (such as public or private funding for school districts to implement mental health programs and services) may be relevant to the relief to which Plaintiff may be entitled. To the extent that such relief should offset the costs of abatement, external funding sources should be considered when estimating total abatement costs. However, Professor Hoover and Professor Leslie do not consider such federal, state, and local funding sources available to the district for mental health programming. In particular, they do not consider ongoing funding that the district has been receiving and will likely continue to receive.

228. External funding of mental health services is common. Schools report receiving external funding for mental health services from a variety of sources. For example, "in the 2021-2022 school year, just over half of schools reported receiving funding for mental health services from … federal grants or programs (52%), while smaller shares of schools reported funding from partnerships with organizations (37%) or state programs (32%)."[293]

229. Professor Hoover ignores existing funding already allocated to address adolescent mental health in both Arizona and Tucson Unified School District specifically. For example, Arizona has expanded its school Medicaid program to cover all medically necessary services for eligible students, including behavioral health services.[294] Similarly, in 2020, Arizona enacted Jake's Law, which, among other provisions, created an $8 million Children's Behavioral Health Services Fund, which pays for behavioral counseling when families cannot.[295] Moreover, Tucson Unified

[293] Nirmita Panchal et al., "The Landscape of School-Based Mental Health Services," *KFF*, September 6, 2022, available at https://www.kff.org/mental-health/issue-brief/the-landscape-of-school-based-mental-health-services/. The same resource notes that schools may "partner[] with community-based mental health agencies to expand access to care for students." Professor Hoover's Abatement Plan does not explain why school districts should be the entity to provide all of these services and does not account for the existence mental health resources provided outside of schools (such as those funded by private insurance, publicly funded insurance, or state/federal government). In this section, I adopt her focus on school districts as the main provider of mental health services for students without endorsing this view.

[294] Healthy Schools, Promising Futures, "School Medicaid Expansion: How (and How Many) States Have Taken Action to Increase School Health Access and Funding," October 17, 2023 available at https://healthystudentspromisingfutures.org/wp-content/uploads/2023/10/Status-of-School-Medicaid-Expansion_-How-and-How-Many-States-Have-Taken-Action-to-Increase-School-Health-Access-and-Funding.pdf, pp. 5–6 ("Arizona[:] Bottom Line[:] Arizona expanded its school Medicaid program to cover all medically necessary services identified in a 504 plan, other individualized health or behavioral health plan, or where medical necessity has otherwise established. … With this policy change, reimbursable services must be identified as medically necessary and can include: … behavioral health services.").

[295] Shaena Montanari and Maria Polletta, "Youth Access to Mental Health Care Improved Under Jake's Law, but Persistent Barriers Hamper Its Reach," *Arizona Center for Investigative Reporting*, September 1, 2022, available at https://azcir.org/news/2022/09/01/jakes-law-mental-health-parity/ ("In March 2020, Gov. Doug Ducey signed into law a sweeping set of measures designed to help curb rising rates of suicide and expand access to mental health treatment for Arizona residents with and without insurance. Commonly known as Jake's Law … [it] expanded access to mental health

School District has a partnership with the University of Arizona to provide free mental health services to students and families in the district through their "Talk It Out" program, funded by over $200,000 in foundation grants.[296]

230. Professor Hoover fails to acknowledge these ongoing resources that may be applicable to defraying the cost of abatement.

## 8. PLAINTIFFS' EXPERTS' OPINIONS ON PAST DAMAGES SUFFER FROM MANY FUNDAMENTAL FLAWS

### *8.1. Overview of Plaintiffs' Experts' Analyses of Past Damages*

231. Plaintiffs' experts estimate two categories of past damages to Tucson Unified School District allegedly due to the at-issue conduct: (1) the "lost opportunity cost" from teachers and other school district staff diverting time to address issues purportedly caused by social media, and (2) out-of-pocket costs that the school district paid to third-party vendors that were purportedly incurred as a result of the at-issue conduct.

232. Mr. Klein and Dr. Ward offer opinions related to alleged damages for time that school district staff purportedly diverted to address social media issues. Mr. Klein conducts a survey of middle school and high school teachers in Tucson Unified School District to determine (1) what share of teachers report being diverted from teaching on a typical day due to unauthorized student use of social media in class or repercussions from student use of social media outside the classroom; (2) of those who report being diverted, how much time do they believe is typically diverted; and (3) how much time do they believe was diverted on a typical day at various points in time going back to 2014. He concludes from the survey that over the past ten years, teachers have diverted a significant amount of instructional time to deal with issues related to social media.

treatment by letting schools refer uninsured and underinsured students to mental health providers—and by paying for those services when families couldn't afford them on their own. Since Jake's Law was enacted, hundreds of eligible students have accessed mental health treatment they may not have otherwise received.").

[296] The University of Arizona, "Talk It Out," available at https://education.arizona.edu/news/talk-it-out ("[Talk It Out] provides free and timely mental health counseling services to TUSD students and families using a practicum training model, supported by both masters and doctoral students. We are thrilled to announce an $87,000 grant the David and Lura Lovell Foundation (especially generous since they also provided Talk It Out with a $ 63,000 grant just last year, which allowed us to hire a program coordinator), a $50,000 grant from the Marshall Foundation, and a $14,000 grant from the Arizona Community Foundation."). The program appears to be ongoing. See Tucson Unified School District, "Mental Health Support," available at https://www.tusd1.org/mental-health-landing ("Talk It Out Counseling Services … Free Counseling Services for all enrolled students and their families").

233. Dr. Ward relies on the results of the survey conducted by Mr. Klein as well as other sources to estimate "lost opportunity cost" damages for Tucson Unified School District for the time that teaching and non-teaching staff diverted to purportedly address social media issues. Dr. Ward uses Mr. Klein's results to calculate what percentage of time middle school and high school teachers reported as diverted due to social media (1) in 2014, (2) pre-COVID-19, (3) right after returning to in-person teaching after COVID-19, (4) last year (2024), and (5) currently (2025).[297] For non-teaching staff, Dr. Ward relies on affidavits for the share of work time that different types of staff purportedly spent dealing with the impact of social media.[298] He then multiplies the share of time diverted by the total annual compensation for each position (pay and benefits) based on compensation information provided by the school district. He performs this calculation separately for each year for middle school teachers, high school teachers, and several categories of non-teaching staff (including principals and assistant principals).[299] He then calculates total past damages due to the purported opportunity cost of lost time by adding up the value of diverted time across teachers and non-teacher employees in 2025 dollars. Dr. Ward estimates past damages from this supposed opportunity cost for Tucson Unified School District of $100.6 million in wages and benefits in 2025 dollars.[300]

234. Mr. Meyers purports to estimate past damages for third-party vendor costs that Tucson Unified School District supposedly incurred to address issues related to social media. In coordination with school district employees, Mr. Meyers reviewed the school district's financial records to identify expenses that were allegedly incurred in response to issues related to social media, such as technology, social emotional learning curriculum, mental health and property damage.[301] When those expenses could have been incurred in response to other factors in addition to social media, he assigns a share of the expense to social media based on discovery responses.[302] He calculates damages as the sum of the portions of these expenses that he assigns to social media. Mr. Meyers estimates past damages from vendor costs for Tucson Unified School District of $549,776.[303]

[297] Ward Tucson Report, Table 3.
[298] Ward Tucson Report, Section IV.B.
[299] Ward Tucson Report, Tables 4, 5.
[300] Ward Tucson Report, ¶ 38.
[301] Meyers Tucson Report, ¶ 14.
[302] Meyers Tucson Report, ¶ 21.
[303] Meyers Tucson Report, ¶ 24.

### *8.2. None of Plaintiffs' Experts Specifically Connects Their Past Damages Estimates to the At-Issue Conduct Rather than Social Media in General*

235. Mr. Klein, Dr. Ward, and Mr. Meyers do not isolate their estimates of past damages to the effects of the at-issue conduct; instead, they incorrectly estimate costs associated with social media usage in general. Plaintiffs do not allege that social media should not exist. Nor do they allege that without the at-issue conduct (i.e., in a but-for world without the at-issue design features or in which Defendants warned of the purported risks of the at-issue design features), there would be zero adolescent social media usage or zero incidence of mental health or behavioral issues related to social media use. In addition, Plaintiffs' experts do not attempt to differentiate between time diverted *due to the at-issue conduct* versus the time diverted due to the *content* presented through the Defendants' social media platforms or from unforeseeable third-party conduct on their platforms. I understand that under prior rulings of this Court, Defendants cannot be held liable for harm caused by third-party content or unforeseeable third-party conduct on their social media platforms, as well as features for which claims are barred under federal law.

236. Mr. Klein's survey does not ask teachers about diverted time due to the at-issue conduct or otherwise make any attempt to isolate the impact of the at-issue conduct from the impact of social media in general. Instead, Mr. Klein surveys teachers about time diverted as a result of "unauthorized student use of social media … during class [or] repercussions from student use of social media … outside the classroom [or] student use of social media."[304] These questions do not distinguish between time that teachers spent addressing the impact of the at-issue conduct from effects related to social media usage broadly, and they do not distinguish effects of allegedly harmful social media usage from those of other usage. Mr. Klein's survey also does not distinguish between the effects of the at-issue conduct and the impact of third-party content, on the social media platforms, for which I understand Defendants cannot be held liable.

237. Furthermore, Mr. Klein's survey asks teachers about all social media and is not specific to Defendants' social media platforms either generally or individually. The survey questions list Defendants' platforms only as examples of social media and do not ask teachers to exclude diverted time related to student use of other social media platforms not involved in this matter.[305]

[304] Klein Tucson Report, ¶ 33.

[305] The relevant questions in Mr. Klein's survey specifically ask teachers about "social media (e.g., Facebook, Instagram, Snapchat, TikTok, YouTube, etc.)." Thus, the survey offers Defendants' platforms as examples of social media but does not restrict the response to only Defendants' platforms. See Klein Tucson Report, ¶ 33.

238. Dr. Ward's calculations of past damages from the school district's purported opportunity cost of time diverted due to social media are similarly flawed because they are not causally tied to the at-issue conduct. First, Dr. Ward's estimates of the opportunity cost of diverted teacher time rely on Mr. Klein's survey, so they suffer from the same flaw that the time diverted is not specific to Defendants' at-issue conduct, as just discussed. Similarly Dr. Ward relies on affidavits to estimate the share of time non-teaching staff members divert to address issues related to social media use in general rather than the at-issue conduct.[306] As a result, Dr. Ward's damages estimates include time diverted by factors unrelated to the at-issue conduct, including any prevailing effects of third-party content, of technology generally, and of other social media platforms not involved in this matter, for which Defendants cannot be held liable.[307]

239. Second, Dr. Ward's calculation of the opportunity cost of diverted time assumes that teachers and staff would not spend any baseline amount of time addressing issues related to social media absent the at-issue conduct. In other words, he assumes that but for the at-issue features and alleged failure to warn, school district staff would not have spent *any* time on tasks related to students' social media usage. As I discuss above in Section 4.1, Plaintiffs' experts including Dr. Ward have not opined on or attempted to quantify how adolescents' social media usage would change but for the at-issue conduct, that is, with adequate warning of the alleged risks of social media addiction and absent the remaining at-issue features. Dr. Ward has not provided any support for his assumption that all classroom disruptions related to social media in general would disappear if Defendants were to warn of the alleged risks and change the at-issue design features but other aspects of the platforms that are not at issue, including the content, remain.

240. Mr. Meyers also fails to connect his estimates of past damages for purported costs that Tucson Unified School District incurred from vendors to the at-issue conduct. Although Mr.

[306] Dr. Ward relies on affidavits from school district employees for the share of time diverted to dealing with social media issues for non-teaching staff. These affidavits also fail to connect the share of time purportedly diverted to Defendants' at-issue conduct as opposed to social media usage in general or content on social media platforms. See Ward Tucson Report, ¶ 36.

[307] Deposition of Julie Shivanonda, June 30, 2025 ("Shivanonda Deposition"), pp. 16:17–17:1 ("Q. What social media platforms are included in [your submitted declaration's] paragraph 18 percentages [of staff time allocation]? A. Any and all. […] Q. Would it include Reddit? A. Reddit, potentially."); Deposition of Sabrina M. Salmon, May 23, 2025 ("Salmon Deposition), pp. 164:10–15 ("Q. And then, for paragraph 17, is your estimate of the hours a day spent specific to the time spent on defendants' platforms? A. Not specifically to defendants platforms, no."), 175:7–176:2 ("Q. Other than – in general, when considering the anecdotes that you've experienced over time, did you focus on incidents specifically related to defendants' platforms as opposed to technology or screen time more generally? A. […] I look more globally at what the issues is. So if the issue is screen time, we really focus on what the screen time issue is. The platforms only come about if it's something that's ongoing. […] And then we don't really get into the specifics [of what platform]").

Meyers claims to calculate the vendor costs "attributable to the alleged improper actions of Defendants," he relies on discovery responses for the share of each vendor cost to include rather than performing an independent analysis to determine these shares.[308] Further, neither Mr. Meyers nor the discovery responses he relies upon provide details about how social media resulted in the expenses incurred, let alone how these expenses are related to the at-issue conduct and the alleged failure to warn. Indeed, Tucson Unified School District's internal documents and deposition testimony do not show any connection between these invoices and Defendants' platforms, much less the at issue conduct.[309]

241. Therefore, a critical, overarching flaw of Plaintiffs' experts' past damages estimates is that they do not stem causally from Defendants' at-issue conduct. I discuss additional conceptual and methodological flaws with Plaintiffs' experts' past damages analyses in the subsections below.

### *8.3. Mr. Klein's Survey Design Is Fundamentally Flawed*

242. Mr. Klein's survey purportedly measures the amount of Tucson Unified School District teachers' time diverted to address issues attributable to social media usage; its results are used as an input for Dr. Ward's estimates of "lost opportunity cost" damages. In addition to Mr. Klein's failure to distinguish between the at-issue conduct and social media in general, his survey suffers from other flaws that make any damages calculations based on its results unreliable. I understand that Defendants' expert Dr. Michael Stern opines on the flaws in the design and administration of Mr. Klein's survey. In this section, I discuss methodological issues that make causal inferences based on Mr. Klein's survey unreliable.

[308] Meyers Tucson Report, ¶¶ 22–23.

[309] Deposition of Julie A. Shivanonda 30(b)(6) Volume 2, April 9, 2025, pp. 352:16–353:7 ("Q. Ms. Shivanonda, this slide [functions that are supposed to be supported by the social emotional learning curriculum] does not mention social media, right? A. Not explicitly, no. Q. And then if you go not to the next page, but the page after that where it says Recommendation. […] this page discusses the adoption of the Character Strong curriculum, right? A. Correct. Q. And again this slide does not mention social media? A. Correct. Q. In fact, nowhere in this presentation is there a mention of social media, right? A. Correct."); Deposition of Richard H. Sanchez, May 6, 2025, p. 69:10–24 ("Q. To your knowledge, does Awareity track whether a report relates to social media? A. I don't know. Q. But you've never analyzed what percentage of Awareity reports relate to social media, correct? A. Correct. Q. And are you aware of anyone at TUSD who has analyzed what percentage of Awareity reports relate to social media? A. I'm not aware."); Deposition of Gabriel Trujillo, May 8, 2025, pp. 275:19–276:11 ("Q. What is Talkspace? A. It's an online platform that provides online mental health services, certified counselors and social workers available through that app, for any student or family in crisis. […] Q. And in this rationale document there's no mention of social media? A. Not in this document, no. Q. No mention of defendants' platforms? No.").

243. First, Mr. Klein's survey requires respondents to make implicit judgments about whether behavior is or is not related to social media. However, Mr. Klein provides no evidence to support the accuracy of such judgments, nor does he discuss the inferential difficulties that teachers would face in attempting to make accurate judgments about this issue. For example, Question 3 of Mr. Klein's survey asks respondents to distinguish between "Unauthorized student use of social media (e.g., Facebook, Instagram, Snapchat, TikTok, YouTube, etc.) during class" and "Unauthorized student use of texting during class (e.g., texting, using iMessage, WhatsApp, etc.)."[310] Mr. Klein implicitly assumes that teachers are able to make this distinction accurately. However, although teachers may be able to observe smartphone use (e.g., students looking at their phones during class time), this does not imply that they are generally able to determine exactly what activity students are engaged in on their phones (e.g., social media, gaming, texting, streaming video).

244. Further, Mr. Klein's survey requires respondents to make causal inferences about whether in-class disruptions are caused by social media usage outside school. In all or nearly all cases, teachers cannot directly observe social media usage outside school. Mr. Klein's survey assumes they can make accurate inferences about the effects of an unobservable activity. Question 3 asks respondents to identify "repercussions from student use of social media (e.g., Facebook, Instagram, Snapchat, TikTok, YouTube, etc.) outside of the classroom (e.g., students anxious or inattentive due to prolonged social media use, students suffering from sleep deprivation due to late night social media use, dealing with student conflicts stemming from social media use, etc.)."[311] As I discuss in Section 3, reliable causal inference requires accurate measurement of outcomes, the proposed causal factor, and potential alternative causal factors or other confounding variables. Reliably determining the cause of the behavior, in this case in-class disruptions, is especially challenging when the potential causal factors, such as social media use outside the classroom, cannot be directly observed by the teacher. Mr. Klein has not evaluated whether teachers are able to consistently and accurately distinguish between anxiety, sleep deprivation, or conflict due to (unobservable) late night social media use and anxiety, sleep deprivation, or conflict due to other causes, either observable or unobservable.

245. Second, even if teachers were able to accurately infer whether disruptions in class were caused by social media use, Mr. Klein's survey would still fail to yield accurate estimates of time

[310] Klein Tucson Report, p. 8.

[311] Klein Tucson Report, p. 8.

spent addressing such disruptions because the survey, which asks respondents about their historical experiences going back more than a decade, is highly susceptible to recall failure. Recall failure is a well-known problem in survey design in which survey responses relying on the memories of respondents become less reliable the further removed in time the survey is from the events being recalled.[312] Mr. Klein's survey requires respondents to estimate the time spent addressing disruptions that the respondent attributes to social media usage in six time periods, ranging from the current school year to more than 10 years prior to taking the survey.[313] The academic literature on time use survey methodology has found that respondents' ability to recall how they spent their time deteriorates substantially when asked about events occurring more than a few days in the past.[314] In particular, one study of how teachers in Belgium reported spending their time on various work- and non-work-related activities over the preceding week found significantly worse recall after a matter of hours.[315] By contrast, Mr. Klein's survey asks teachers

[312] Tarek Al Baghal et al., "What Are You Doing Now? Activity Level Responses and Recall Failures in the American Time Use Survey," *Journal of Survey Statistics and Methodology*, 2(4), 2014, pp. 519–537 ("Baghal et al. (2014)") at p. 529 ("The response-level effects show that, even with the short reference period, the effect of elapsed time is significant, with greater elapsed time between the activity and the survey increasing the chances of a recall failure. This effect of time is consistent with findings showing that the ability to recall autobiographical memory declines at farther points in the reference period (Thompson et al. 1996) and with the suggestion that in time diaries, memorable events that happen earlier in the day will not be remembered (Hektner, Schmidt, and Csikszentmihalyi2007). Using a different specification, including only the start time of the activities within the reported day instead of elapsed time from the interview found the same effect. Taken together, these findings do suggest the importance of time in recall, even over a relatively short period.").

[313] Klein Tucson Report, p. 10.

[314] Baghal et al. (2014), pp. 522 ("Respondents are asked to report all activities and timing of these (by giving start and stop times or duration of activity) beginning at 4 A.M. of the previous day, going forward through the day until 4 A.M. of the current day."), 529 ("even with the short reference period [of one day], the effect of elapsed time is significant, with greater elapsed time between the activity and the survey increasing the chances of a recall failure. … Using a different specification, including only the start time of the activities within the reported day instead of elapsed time from the interview found the same effect. Taken together, these findings do suggest the importance of time in recall, even over a relatively short period.").

[315] Man Yee Kan and Stephen Pudney, "Measurement Error in Stylized and Diary Data on Time Use," *Sociological Methodology*, 38, 2008, pp. 101–132 at p. 102 ("[summary questions of the type Mr. Klein asks] require[] respondents to perform two difficult tasks: (1) to recall their activities in the recent past and (2) to carry out an appropriate form of averaging. Doubts about the accuracy of stylized data rest on two concerns: the difficulty of the respondent's task, which might lead to substantial measurement error; and the lack of detail, which allows the respondent scope for choosing responses that correspond to a preexisting (and possibly inaccurate) self-image or a preferred self-representation."); Petrus te Braak et al., "Data Quality and Recall Bias in Time-Diary Research: The Effects of Prolonged Recall Periods in Self-Administered Online Time-Use Surveys," *Sociological Methodology*, 53(1), 2023, pp. 115–138 at pp. 115 ("using online time-diary data collected from 8,535 teachers in Belgium, the mean recall period is less than 24 hours for most respondents, although respondents with many time constraints have extended recall periods. Additionally, a prolonged recall period indeed has negative consequences for data quality. Quality deterioration already arises several hours after an activity has been completed, much sooner than previous research has indicated."), 120 ("Data come from a 2018 time-diary study of teachers in Flanders, Belgium. … The study consisted of four stages. First, teachers registered with their personal teacher numbers, which served as an exclusion mechanism for nonteachers and prevented repeated participation. Second, teachers completed a short prequestionnaire with limited socioeconomic questions. Third, they kept a seven-day (168-hour) time diary. Fourth, teachers completed a questionnaire about job characteristics immediately after finishing their time diaries. In their time diaries, teachers recorded all their activities using a predefined activity list. The activity list was presented to participants as a tree structure that contained 15 main categories, of which 9 were work related and 6 were not work related. The nine categories contained 49 detailed work-related activities."). See also Baghal et al. (2014), p. 529 ("The response-level effects show that, even with the short reference period, the effect of elapsed time is significant, with greater elapsed time between the activity and the survey increasing the chances of a recall failure. This effect of time is consistent with

to recall the number of minutes they spent on a specific activity up to a decade in the past, which makes recall failure highly likely and renders the results unreliable. Mr. Klein performs no analysis to establish the reliability of his survey instrument and provides no evidence indicating that his findings are robust to recall failure.

246. Third, in many instances Mr. Klein's survey relies on a very small number of respondents. For example, Mr. Klein's survey of Tucson Unified School District involves completed, qualified responses from a total of 24 middle school teachers and 34 high school teachers, a small fraction of the 1,077 teachers that Mr. Klein contacted for the survey.[316] The number of respondents providing estimates of time loss in each year is even lower than this, with Mr. Klein reporting estimates of time loss in 2014 based on the responses of 4 middle school respondents and 8 high school respondents, or about 1.1 percent of teachers contacted for the survey.[317] These small sample sizes present several issues. First, smaller samples produce less precise estimates than larger samples do.[318] In the context of Mr. Klein's survey, the small sample sizes underlying his time loss estimates imply considerable quantitative uncertainty regarding the true levels of time loss in this district, setting aside other quality issues with these responses (discussed above). Indeed, Dr. Ward calculates confidence intervals that find some of Mr. Klein's estimates of time loss to be statistically indistinguishable from zero, meaning that one cannot rule out that there was no time loss, and thus no associated damages, with a conventional degree of statistical certainty.[319]

247. Further, Plaintiffs' experts provide no evidence that the small fraction of teachers in Tucson Unified School District that responded to Mr. Klein's survey are representative of the district's teachers as a whole. Mr. Klein states that he obtained his sample by reaching out to all teachers employed by the district via email and then administering the survey to those who

findings showing that the ability to recall autobiographical memory declines at farther points in the reference period (Thompson et al. 1996) and with the suggestion that in time diaries, memorable events that happen earlier in the day will not be remembered (Hektner, Schmidt, and Csikzentmihalyi. 2007). Using a different specification, including only the start time of the activities within the reported day instead of elapsed time from the interview found the same effect. Taken together, these findings do suggest the importance of time in recall, even over a relatively short period.").

[316] Klein Tucson Report, p. 11, Appendix E.

[317] Klein Tucson Report, p. 12, Appendix E.

[318] Reference Manual on Scientific Evidence (2011), p. 246 ("Generally, increasing the size of the sample will reduce the level of random error ('sampling error'). … Probability samples require some effort in the design phase, and it will rarely be sensible to draw a sample with fewer than, say, two or three dozen items.").

[319] Dr. Ward purports to calculate 95 percent confidence intervals for the share of time diverted based on Mr. Klein's survey. When a confidence interval includes zero, one cannot rule out that the observed average share of time diverted is due to random chance and that there is no true time loss. Ward Tucson Report, Table 3.

clicked on a link in their email to participate.[320] According to Mr. Klein's report, only 7.4 percent of teachers contacted by Mr. Klein actually participated in the survey at all, meaning there was a 92.6 percent nonresponse rate.[321] High nonresponse rates often indicate the presence of bias because individuals who elect to participate in surveys may be different from individuals who decline to participate.[322] This issue is particularly salient for the reliability of Mr. Klein's estimates of time lost in various years because, as noted above, some of Mr. Klein's estimates are based on completed, qualified responses from as little as 1.1 percent of the teachers contacted for the survey.[323] Mr. Klein has not presented evidence that the teachers participating in his survey are similar in observable ways to nonrespondents, nor has he discussed the risk of nonresponse bias or why it is unlikely to be a factor in his survey.

248. In sum, Mr. Klein's estimates of time loss are unreliable and based on a fundamentally flawed survey.

### *8.4. Dr. Ward's Calculations of Past Damages Due to the Opportunity Cost of Time Diverted to Deal with Social Media Use Are Unreliable*

249. Dr. Ward purports to estimate past damages to Tucson Unified School District based on the opportunity cost of the time that teachers and other non-teaching staff spent on work related to students' social media usage. Dr. Ward obtains estimates of the purportedly diverted time from two sources: (1) to estimate the amount of teachers' time purportedly diverted, Dr. Ward relies on Mr. Klein's survey;[324] and (2) to estimate the amount of non-teaching staff members' time purportedly diverted, Dr. Ward relies on affidavits filed by district administrators.[325] As an initial matter, neither of these sources offers reliable quantitative estimates of diverted time. Because Dr. Ward relies on Mr. Klein's flawed survey, discussed in Section 8.3, his estimates of

[320] Klein Tucson Report, ¶¶ 20–21 ("Plaintiff provided a list of all the middle and high school teachers currently employed fulltime in the District. This list contained a total of 1,077 email addresses. Prior to sending survey invitations to each teacher on the list, the District was instructed to send a warming email to the teachers on the list informing them of an upcoming survey and asking for their cooperation in promptly completing the survey. The District was instructed to make sure not to reveal the purpose of the survey or make any mention of social media. Each teacher on the list was sent an invitation to the survey that contained an embedded link that took them to the actual survey.").

[321] Klein Tucson Report, Appendix E.

[322] Reference Manual on Scientific Evidence (2011), p. 290 ("nonresponse bias. Systematic error created by differences between respondents and nonrespondents. If the nonresponse rate is high, this bias may be severe. nonsampling error. A catch-all term for sources of error in a survey, other than sampling error. Nonsampling errors cause bias. One example is selection bias: The sample is drawn in a way that tends to exclude certain subgroups in the population. A second example is nonresponse bias: People who do not respond to a survey are usually different from respondents.").

[323] Klein Tucson Report, p. 12, Appendix E.

[324] Ward Tucson Report, ¶ 30.

[325] Ward Tucson Report, ¶ 17.

time diverted for teachers are unreliable. The estimates from affidavits relied upon by Dr. Ward are also unreliable because they provide no evidence or justification for their estimates of time lost and are based only on each individual's self-reported recollection, which as discussed above, is subject to recall bias and may not be representative of the experience of all district employees.[326]

250. Dr. Ward's analysis of damages to the school district as "lost opportunity costs" also suffers from conceptual flaws. Dr. Ward claims that the school district suffered damages because the time that teachers and non-teaching staff spent on addressing issues related to social media use could have otherwise been spent doing something else, and the loss of that time spent on something else represents an opportunity cost for which the school district should be reimbursed. Dr. Ward assumes that the opportunity cost of a Tucson Unified School District employee who spent time addressing issues related to mental health is equal to the employee's compensation (i.e., their base pay plus benefits).[327]

251. Dr. Ward has not analyzed what school district employees would have otherwise spent their diverted time doing or the value of that alternative work to the school district. As I discuss in Sections 5.1 and 5.2, empirical evidence is inconsistent with the at-issue conduct causing worse behavioral and academic outcomes within Tucson Unified School District. If teachers diverted their time from academically productive activities, one would expect to see worse behavioral or academic outcomes. These facts raise the question of what teachers would have

[326] Deposition of Holly L. Hammel Volume 2, June 24, 2025, p. 170:16–23 ("Q. You didn't interview any TUSD staff about the percentages listed in paragraph 15, right? A. Interview staff? No. I went with my own experience of talking with principals. Q. And you didn't conduct any surveys […] A. Correct."); Deposition of Brian Lambert Volume 2, July 1, 2025, pp. 17:3–18:2 ("Q. And in drafting your declaration, you did not review any monthly discipline reports. Correct? A. No. These were based on my experience in my position, in my 17 years as an administrator – or as an educator. […] Q. Do you know of anyone at TUSD who, before litigation, attempted to estimate the percentage of time that TUSD staff spend on dealing with issues stemming from social media? I don't think anybody gathered the – like, that data.); Shivanonda Deposition, pp. 12:13–22 (" Q. And did you do anything else to confirm the accuracy of the information in the declaration before you signed it? A. Again, leaning on my 21 years of experience and my – based on my preparation that – the deposition was just a few weeks prior, I leaned on that as I was writing, but I did not specifically look at any specific documents or data in the moment as writing this declaration."), 18:23– 19:23 ("Q. Okay. Who first suggested the percentages that are listed in paragraph 18? A. Those are my estimates of percentages based on my experience as the director as well as working in school systems. Q. And so those are based on your personal experiences and impressions? A. Correct. Q. And you didn't consult any documents in calculating those percentages. Correct? A. […] So then I used just, again, my knowledge and my experience to estimate these estimations."), 27:23–28:16 ("Q. And for any of the types of counselors, have you ever used any time-keeping software to track the time they spend on issues relating to defendants' platforms? A. […] they track their time anecdotally."); Salmon Deposition, pp. 165:17–167:9 ("Q. Did you review any documents when estimating the percentages listed in paragraph 18? A. No specific documents were reviewed. Q. Did you conduct any interviews relating to those percentages? A, […] I did not conduct a specific interview for this purpose, no. […] Q. Did you send out any surveys related to the percentages listed in paragraph 18? A. No, I did not. Q. Did you analyze any data when estimating the percentages listed in paragraph 18? A. I did look at the number of students that have either a behavior goal or counseling minutes in IEP. […] Q. And the behavioral goals or counseling minutes are not specific to defendants' platforms, correct? A. Correct.").

[327] Ward Tucson Report, ¶¶ 37–38.

been doing more of in the but-for world and what the benefit to the district might have been, if any. Therefore, Dr. Ward has not analyzed what economic harm Tucson Unified School District suffered as a result of staff purportedly spending time dealing with social media use.

**Certification**

The undersigned hereby certifies their understanding that they owe a primary and overriding duty of candor and professional integrity to help the Court on matters within their expertise and in all submissions to, or testimony before, the Court. The undersigned further certifies that their report and opinions are not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation.

Darius N. Lakdawalla, Ph.D.

July 11, 2025

**Appendix A**

# DARIUS N. LAKDAWALLA

Schaeffer Center for Health Policy and Economics
University of Southern California
635 Downey Way, VPD #414-K
Los Angeles, CA 90089-3331

(213) 538-8736
dlakdawa@usc.edu

## EDUCATION

*University of Chicago.* Ph.D. in Economics, June 2000.
*Amherst College*. B.A., Mathematics and Philosophy, 1995. Summa Cum Laude, Phi Beta Kappa.

## PROFESSIONAL EXPERIENCE

2024-present: *Chief Scientific Officer,* Leonard D. Schaeffer Center for Health Policy and Economics, University of Southern California
2012-present: *Quintiles Chair in Pharmaceutical Development and Regulatory Innovation*, University of Southern California
2012-present: *Full Professor*, School of Pharmacy, University of Southern California
2012-present: *Full Professor*, Price School of Public Policy, University of Southern California
2021-present: *Co-Founder and Chief Scientific Officer,* EntityRisk, Inc.
2018-2024: *Director of Research,* Leonard D. Schaeffer Center for Health Policy and Economics, University of Southern California
2017-2020: *Scientific Advisor,* Precision Health Economics
2016-2017: *Chief Scientific Officer*, Precision Health Economics (On leave from USC)
2006-2015: *Founding Partner*, Precision Health Economics, LLC, Los Angeles, CA (Company sold to Precision Medicine Group in April 2015)
2009-2013: *Director of Research*, Leonard D. Schaeffer Center for Health Policy and Economics, University of Southern California
2009-2012: *Associate Professor (with tenure)*, School of Policy, Planning, and Development, University of Southern California
2007-2009: *Director of Research*, Bing Center for Health Economics, RAND Corporation.
2006-2009: *Senior Economist*, RAND Corporation
2003-2006: *Economist*, RAND Corporation
2000-2003: *Associate Economist*, RAND Corporation

## OTHER POSITIONS

2025-present: *Member,* Disability Health Research Working Group, National Institutes of Health
2023-present: *Member*, California Institute of Regenerative Medicine Access and Affordability Working Group
2022-present: *Steering Committee*, Health Technology Assessment Panel, Research Consortium for Health Care Value Assessment
2019-2021: *Co-Chair,* Aspen Institute/USC Blue-Ribbon Panel on Health Technology Assessment in the U.S.
2019-2020: *Expert Panel Member,* "Addressing Sickle Cell Disease," National Academy of Medicine
2018-2019: *Program Chair, Pharmaceutical Economics and Policy*, American Society of Health Economists 2019 Annual Meeting
2016-2025: *Associate Editor*, *Journal of Health Economics*
2014-2021: *Associate Editor, American Journal of Health Economics*

2013-present: *Editorial Board Member*, *American Journal of Managed Care: Evidence-Based Diabetes*
2012-present: *Editorial Board Member*, *American Journal of Managed Care: Evidence-Based Oncology*
2012-2019: *Associate Editor*, *Review of Economics and Statistics*
2010-2014: *Visiting Scholar*, American Enterprise Institute
2009-present: *Research Associate*, National Bureau of Economic Research, Cambridge, MA Program Memberships in Health Care and Health Economics
2005-present: *Editorial Board Member*, *BE Press Forum on Health Economics and Policy*
2001-2009: *Faculty Research Fellow*, National Bureau of Economic Research, Cambridge, MA. Program Memberships in Health Care and Health Economics
2002-2009: *Professor of Economics*, Pardee RAND Graduate School of Public Policy, Santa Monica, CA

## PEER-REVIEWED PUBLICATIONS

### ECONOMICS LITERATURE

E-1. Bauer, Daniel, **Darius N. Lakdawalla**, Julian Reif. "Health Risk and the Value of Life." *Journal of Public Economics*. 2025;245:105346. DOI: https://doi.org/10.1016/j.jpubeco.2025.105346.

E-2. Mulligan, Karen, Drishti Baid, Jason Doctor, Charles Phelps, and **Darius N. Lakdawalla**. "Risk preferences over health: Empirical estimates and implications for medical decision-making." *Journal of Health Economics*, March 2024; 94. DOI: https://doi.org/10.1016/j.jhealeco.2024.102857.

E-3. **Darius N. Lakdawalla** and Jason N. Doctor. "A Principled Approach to Non-Discrimination in Cost Effectiveness." *European Journal of Health Economics*, February 2024. DOI: https://doi.org/10.1007/s10198-023-01659-7.

E-4. Alpert, Abby, **Darius N. Lakdawalla**, and Neeraj Sood. "Prescription Drug Advertising and Drug Utilization: The Role of Medicare Part D." *Journal of Public Economics,* May 2023; 221, 104860. DOI: https://doi.org/10.1016/j.jpubeco.2023.104860.

E-5. **Darius N. Lakdawalla** and Charles Phelps. "The Generalized Risk-Adjusted Cost-Effectiveness (GRACE) Model for Measuring the Value of Gains in Health: An Exact Formulation." *Journal of Benefit-Cost Analysis,* April 2023. DOI: https:// doi.org/10.1017/bca.2023.6.

E-6. **Lakdawalla, Darius N.** and Charles Phelps. "A Guide to Extending and Implementing Generalized Risk-Adjusted Cost-Effectiveness (GRACE)." *European Journal of Health Economics,* 2021. DOI: https://doi.org/10.1007/S10198-021-01367-0.

E-7. Hlavka, Jakub, Jeffrey Yu, Dana Goldman, **Darius N. Lakdawalla.** "The Economics of Alternative Payment Models for Pharmaceuticals." *European Journal of Health Economics*, June 2021; 22(4): 559-569. DOI: https://doi.org/10.1007/s10198-021-01274-4.

E-8. Ermini Leaf, Duncan, Bryan Tysinger, Dana P. Goldman, and **Darius N. Lakdawalla**. "Predicting quantity and quality of life with the Future Elderly Model. *Health Economics*. November, 2021; 30(S1): pp. 52-79. DOI: https://doi.org/10.1002/hec.4169.

E-9. Helland, Eric, **Darius N. Lakdawalla**, Anup Malani, and Seth Seabury. "Unintended consequences of products liability: Evidence from the pharmaceutical market." *Journal of Law, Economics, and Organization*. 2020; 36(3): pp. 598-632.

E-10. Myerson, Rebecca, Reginald Tucker-Seeley, Dana Goldman, and **Darius N. Lakdawalla**. "Does Medicare improve cancer detection and mortality outcomes?" *Journal of Policy Analysis and Management*. 2020; 39(3), pp. 577-604.

E-11. **Lakdawalla, Darius N.** and Charles Phelps. "Health Technology Assessment with Risk Aversion in Health." *Journal of Health Economics,* 72, July 2020. DOI: https://doi.org/10.1016.j.jhealeco.2020.102346.

E-12. Chen, Alice and **Darius N. Lakdawalla**. "Healing the Poor: The Influence of Patient Socioeconomic Status on Physician Supply Responses." *Journal of Health Economics*, 2019; 64: pp. 43-54. DOI: 10.1016/j.healeco.2019.02.001.

E-13. **Lakdawalla, Darius** N. "The Economics of the Pharmaceutical Industry." *Journal of Economic Literature*, vol. 56, no. 2, June 2018, pp. 397-449.

E-14. **Lakdawalla, Darius N.,** Anup Malani and Julian Reif. "The Insurance Value of Medical Innovation." *Journal of Public Economics*, vol. 145, 2017, pp. 94-102.

E-15. Bognar, Katalin, John Romley, Jay Bae, James Murray, Jacquelyn Chou and **Darius N. Lakdawalla**. "The Role of Imperfect Surrogate Endpoint Information in Drug Approval and Reimbursement Decisions." *Journal of Health Economics*, vol. 51, 2017, pp. 1-12.

E-16. **Lakdawalla, Darius N,** and Wesley Yin. "Insurers' Negotiating Leverage and the External Effects of Medicare Part D." *Review of Economics and Statistics*, vol. 97, no. 2, 2015, pp. 314-331.

E-17. Kaestner, Robert, Michael Darden and **Darius N. Lakdawalla**. "Are Investments in Disease Prevention Complements? The Case of Statins and Health Behaviors." *Journal of Health Economics*, vol. 36, 2014, pp. 151-163.

E-18. **Lakdawalla, Darius N.,** Neeraj Sood and Qian Gu. "Pharmaceutical Advertising and Medicare Part D." *Journal of Health Economics*, vol. 32, no. 6, 2013, pp. 1356-1367.

E-19. **Lakdawalla, Darius N.** and Neeraj Sood. "Health Insurance as a Two-Part Pricing Contract." *Journal of Public Economics*, vol. 102, 2013, pp. 1-12.

E-20. Michaud, Pierre-Carl, Dana Goldman, **Darius N. Lakdawalla**, Yuhui Zheng and Adam Gailey. "The Value of Medical and Pharmaceutical Interventions for Reducing Obesity." *Journal of Health Economics*, vol. 31, no. 4, 2012, pp. 630-643.

E-21. **Lakdawalla, Darius N.** and Seth Seabury. "The Welfare Effects of Medical Malpractice Liability." *International Review of Law and Economics*, vol. 32, no. 4, 2012, pp. 356-369.

E-22. **Lakdawalla, Darius N.** and George Zanjani. "Catastrophe Bonds, Reinsurance, and the Optimal Collateralization of Risk Transfer." *Journal of Risk and Insurance*, vol. 79, no. 2, 2012, pp. 449-476.

E-23. **Lakdawalla, Darius N.** and Tomas Philipson. "Does Intellectual Property Restrict Output? An Analysis of Pharmaceutical Markets." *Journal of Law and Economics*, vol. 55, no. 1, 2012, pp. 151-187.

E-24. Philipson, Tomas, Seth Seabury, Lee Lockwood, Dana Goldman and **Darius N. Lakdawalla**. "Geographic Variation in Health Care: The Role of Private Markets." *Brookings Papers on Economic Activity*, 2010, pp. 325-361.

E-25. **Lakdawalla, Darius N.,** Eric Sun, Anupam Jena, Carolina Reyes, Tomas Philipson and Dana Goldman. "An Economic Evaluation of the War on Cancer." *Journal of Health Economics*, 2010, vol. 29, no. 3, pp. 333-346.

E-26. Goldman, Dana, Pierre-Carl Michaud, **Darius N. Lakdawalla**, Yuhui Zheng, Adam Gailey and Igor Vaynman. "The Fiscal Consequences of Trends in Population Health." *National Tax Journal*, vol. 63, no. 2, 2010, pp. 307-330.

E-27. **Lakdawalla, Darius N.** and Neeraj Sood. "Innovation and the Welfare Effects of Public Drug Insurance." *Journal of Public Economics*, vol. 93, no. 3-4, 2009, pp. 541-548.

E-28. **Lakdawalla, Darius N.** and Tomas Philipson. "The Growth of Obesity and Technological Change." *Economics and Human Biology*, vol. 7, no. 3, 2009, pp. 283-293.

E-29. **Lakdawalla, Darius N.** and Tomas Philipson. "Labor Supply and Weight." *Journal of Human Resources*, vol. 42, no. 1, 2007, pp. 85-116.

E-30. Berrebi, Claude and **Darius N. Lakdawalla**. "How Does Terrorism Risk Vary across Space and Time? An Analysis Based on the Israeli Experience." *Defence and Peace Economics*, vol. 18, no. 2, 2007, pp. 113-131.

E-31. **Lakdawalla, Darius N.,** Robert Reville and Seth Seabury. "How Does Health Insurance Affect Workers' Compensation Filing." *Economic Inquiry*, 2007, vol. 45, no. 2, pp. 286-303.

E-32. **Lakdawalla, Darius N.** and Tomas Philipson. "Nonprofit Production and Industry Performance." *Journal of Public Economics*, vol. 90, 2006, pp. 1681-1698

E-33. **Lakdawalla, Darius N.,** Neeraj Sood and Dana Goldman. "HIV Breakthroughs and Risky Sexual Behavior." *Quarterly Journal of Economics*, vol. 121, no. 3, 2006, pp. 1063-1102.

E-34. **Lakdawalla, Darius N**. "The Economics of Teacher Quality." *Journal of Law and Economics*, vol. 49, 2006, pp. 285-329.

E-35. Bhattacharya, Jay and **Darius N. Lakdawalla**. "Does Medicare Benefit the Poor?" *Journal of Public Economics*, vol. 90, no. 1-2, 2006, pp. 277-292.

E-36. **Lakdawalla, Darius N.** and George Zanjani. "Insurance, Self-Protection, and the Economics of Terrorism." *Journal of Public Economics*, vol. 89, no. 9, 2005, pp. 1891-1905.

E-37. Goldman, Dana and **Darius N. Lakdawalla**. "A Theory of Health Disparities and Medical Technology." *B.E. Journals in Economic Analysis and Policy: Contributions to Economic Analysis and Policy*, vol. 4, no. 1, 2005, pp. 1-30.

E-38. Bhattacharya, Jay and **Darius N. Lakdawalla**. "The Labor Market Value of Health Improvements." *BE Press Forum for Health Economics and Policy, Forum: Biomedical Research and the Economy*, vol. Article 2, 2005.

E-39. **Lakdawalla, Darius N.** and Neeraj Sood. "Social Insurance and the Design of Innovation Incentives." *Economics Letters*, vol. 85, no. 1, 2004, pp. 57-61.

E-40. **Lakdawalla, Darius N.** and Tomas Philipson. "The Rise in Old-Age Longevity and the Market for Long-Term Care." *American Economic Review*, vol. 92, no. 1, 2002, pp. 295-306.

**HEALTH SERVICES AND HEALTH POLICY LITERATURE**

H-1. Lin, Eugene, Khristina I. Lung, Derick Rapista, Leane S. Kuo, **Darius N. Lakdawalla**, Desi Peneva, Karen Van Nuys. "Care Continuity, Nephrologists' Dialysis Facility Preferences, and Outcomes." *JAMA Health Forum.* 2025; 6(4):e250423. DOI: https://doi.org/10.1001/jamahealthforum.2025.0423.

H-2. Caldwell, Jillian S., Xingxing S. Cheng, Eran Bendavid, Glenn M. Chertow, Darius N. Lakdawalla, Eugene Lin. "Calcimimetic Prescriptions in Fee-for-Service Medicare Beneficiaries Undergoing Dialysis." *JAMA Health Forum*. 2025; 6(4):e250452. DOI: https://doi:10.1001/jamahealthforum.2025.0452.

H-3. Shafrin, Jason, Jaehong Kim, Joshua Cohen, Louis Garrison, Dana Goldman, Jalpa Doshi, Joshua Krieger, **Darius N. Lakdawalla**, Peter Neumann, Charles Phelps, Melanie Whittington, Richard Willke. "Valuing the Societal Impact of Medicines and Other Health Technologies: A User Guide to Current Best Practices." *Forum for Health Economics & Policy* 27(1): 29-116, November 8, 2024.

H-4. Baid, Drishti, **Darius N. Lakdawalla**, Eric Finkelstein. "Societal Preferences for Subsidizing Treatments Targeting Patients with Advanced Illness: A Discrete Choice Experiment." *Value in Health Regional Issues,* September 2024; 43: p.101003. DOI: https://doi.org/10.1016/j.vhri.2024.101003.

H-5. **Lakdawalla, Darius N.**, Charles E. Phelps, Hong-Hanh Nguyen. "Three Pillars of Support for Orphan Drug Programs: Individual Valuations, Societal Valuations, and Anonymous Altruism." *Value in Health*, July 2024. DOI: https://doi.org/10.1016/j.jval.2024.06.014.

H-6. **Lakdawalla, Darius N.**, Sean Tunis, Peter Neumann, Danielle Whicher, Emily Zeitler, and Barry Liden. "A Roadmap for Improving Medicare's Application of Coverage with Evidence Development." *Value in Health*. May 2024. DOI: https://doi.org/10.1016/j.jval.2024.05.008.

H-7. Charles, Phelps and **Darius N. Lakdawalla**. "Methods to Adjust Willingness to Pay (WTP) Measures for Severity of Illness." *Value in Health.* July 2023; 26(7):1003-1010. DOI: https://doi.org/10.1016/j.jval.2023.02.001.

H-8. Hlávka, Jakub, Bryan Tysinger, Jeffrey Yu, **Darius N. Lakdawalla**. "Access to Disease-Modifying Alzheimer's Therapies: Addressing Possible Challenges Using Innovative Payment Methods." *Value in Health* 25(11), 1828-1836, 2022, doi: 10/1016/j.jval.2022.06.003, https://doi.org/10/1016/j.jval.2022.06.003.

H-9. Yu, Jeffrey, Jakub Hlávka, Elizabeth Joe, Frances Richmond, and Darius N. Lakdawalla. "Impact of Non-binding FDA Guidances on Primary Endpoint Selection in Alzheimer's Disease Trials." Alzheimer's & Dementia: Translational Research & Clinical Interventions, 2022, 8(1). DOI: https://doi.org/10.1002/trc2.12280.

H-10. Chen, Alice J., Jie Zhang,, Abhijit Agarwal, and **Darius N. Lakdawalla**. "Value of Reducing Wait Times for Chimeric Antigen Receptor T-Cell Treatment: Evidence from Randomized Controlled Trial Data on Tisagenlecleucel for Diffuse Large B-Cell Lymphoma." *Value in Health* 25(8), 1344-1351, 2022, doi: 10.1016/j.jval.2022.02.007, https://doi.org/10.1016/j.jval.2022.02.007.

H-11. Lin, Eugene, Khristina Ipapo, Glenn Chertow, Jay Bhattacharya, **Darius N. Lakdawalla**. "Challenging Assumptions of Outcomes and Costs Comparing Peritoneal and Hemodialysis." *Value in Health*. July 30, 2021 (online). DOI: https://doi.org/10.1016/j.jval.2021.05.017.

H-12. MacEwan, Joanna, Lauren Zhao, Katie Everson, Larry Liu, Dominik Lautsch, Fan Sun, **Darius N. Lakdawalla**. "Two Steps Forward, One Step Back: 50 Years of Societal Value From LDL-C-Lowering Therapies." *American Journal of Managed Care*. 2021; 27(4): 162-168. DOI: https://doi.org/10.37765/ajmc.2021.88618.

H-13. **Lakdawalla, Darius N.** and Charles Phelps. "Health Technology Assessment with Diminishing Returns to Health: The Generalized Risk-Adjusted Cost Effectiveness (GRACE) Approach." *Value in Health* 2021, 24(2):244-249.

H-14. Sullivan, Jeffrey, Tiffany M. Shih, Emma van Eijndhoven, Yash J. Jalundhwala, **Darius N. Lakdawalla**, Cindy Zadikoff, Jennifer Benner, Thomas S. Marshall, Kavita R. Sail. "The social value of improvement in activities of daily living among the Advanced Parkinson's disease population." *Forum for Health Economics & Policy,* November 2020; 23(2): p. 1-23. DOI: https://doi.org/10.1515/fhep-2019-0021.

H-15. Baumgardner, James R., Michelle S. Brauer, Jie Zhang, Yanni Hao, Zhimei Liu, and **Darius N. Lakdawalla**. "CAR-T therapy and historical trends in effectiveness and cost-effectiveness of oncology treatments." *Journal of Comparative Effectiveness Research*, 2020; 9(5): pp. 327-340. DOI: https://doi.org/10.2217/cer-2019-0065.

H-16. Shih, Tiffany M, Kavita Sail, Yash Jalundhwala, Jeffrey Sullivan, Emma van Eijndhoven, Cindy Zadikoff, Thomas Marshall, and **Darius N. Lakdawalla**. "The effect of functional status impairment on nursing home admission risk among patients with advanced Parkinson's disease." *Journal of Medical Economics,* March 2020; 23(3): pp. 297-307. DOI: 10.1080/13696998.2019.1693383.

H-17. Lin, Eugene, Glenn Chertow, Jay Bhattacharya, and **Darius N. Lakdawalla**. "Early Delays in Insurance Coverage and Long-Term Use of Home-based Peritoneal Dialysis." *Medical Care*, 58(7): 632-642, July 2020.

H-18. MacEwan, Joanna P., Jason Doctor, Karen Mulligan, Suepattra G. May, Katherine Batt, Christopher Zacker, **Darius N. Lakdawalla**, Dana Goldman. "The Value of Progression-Free Survival in Metastatic Breast Cancer: Results From a Survey of Patients and Providers." *MDM Policy & Practice*, 4(1), June 2019, DOI: https://doi.org/10/1177/2381468319855386.

H-19. Sussell, Jesse, Jacqueline Vanderpuye-Orgle, Diana Vania, Hans-Peter Goertz, and **Darius N. Lakdawalla**. "Understanding price growth in the market for targeted oncology therapies." *American Journal of Managed Care*, 25(6): 273-277, June 2019.

H-20. Incerti, Devin, Jeffrey Curtis, Jason Shafrin, **Darius N. Lakdawalla**, and Jeroen P. Jansen. "A flexible open-source decision model for value assessment of biologic treatment for rheumatoid arthritis." *Pharmacoeconomics* 37(6): 829-843, June 2019.

H-21. Jena, Anupam Bapu, Julia Thornton Snider, Oliver Diaz Espinosa, Andy Ingram, Yuri Sanchez Gonzalez, and **Darius N. Lakdawalla**. "How Does Treating Chronic Hepatitis C Affect Individuals in Need of Organ Transplants in the United Kingdom?" *Value in Health*, Vol. 22, Issue 6, 2019, pp. 669-676.

H-22. Shafrin, Jason, Katalin Bognar, Katie Everson, Michelle Brauer, **Darius N. Lakdawalla**, and Felicia M. Forma. "Does knowledge of patient non-compliance change prescribing behavior in the real world? A claims-based analysis of patients with serious mental illness." *ClinicoEconomics and Outcomes Research*, 2018; 10: 573-585. DOI: https://doi.org/10.2147/CEOR.S175877.

H-23. Baumgardner, James, Ahva Shahabi, Christopher Zacker, and **Darius N. Lakdawalla**. "Cost Variation and Savings Opportunities in the Oncology Care Model." *The American Journal of Managed Care*, 24(12), December 2018, pp. 618-623.

H-24. Jena, Anupam B., Jacquelyn W. Chou, Lara Yoon, Wade M. Aubry, Jan Berger, Wayne Burton, A. Mark Fendrick, Donna M. Fick, David Franklin, Rebecca Killion, **Darius N. Lakdawalla**, Peter J. Neumann, Kavita Patel, John Yee, Brian Sakurada, Kristina Yu-Isenberg. "Understanding and Improving Value Frameworks with Real-world Patient Outcomes." *The American Journal of Managed Care*, 24(11), November 2018, pp. 506-509.

H-25. Baumgardner, James, Ahva Shahabi, Mark Linthicum, Seanna Vine, Christopher Zacker, **Darius N. Lakdawalla**. "Greater Spending Associated with Improved Survival for Some Cancers in OCM-Defined Episodes." *Journal of Managed Care and Specialty Pharmacy*, 24(6): 504-513, June 2018.

H-26. Sachs, Rachel, Nicholas Bagley and **Darius N. Lakdawalla**. "Innovative Contracting for Pharmaceuticals and Medicaid's Best-Price Rule." *Journal of Health Politics, Policy and Law.*, vol. 43, no. 1, 2018, pp. 5-18.

H-27. Phelps, Charles, **Darius N. Lakdawalla**, Anirban Basu, Michael Drummond, Adrian Towse, and Patricia Danzon. "Approaches to Aggregation and Decision Making-a Health Economics Approach: An ISPOR Special Task Force Report [5]." *Value in Health*, vol. 21, no. 2, 2018, pp. 146-154.

H-28. **Lakdawalla, Darius N.,** Jalpa Doshi, Louis Garrison, Charles Phelps, Anirban Basu, and Patricia Danzon. "Defining Elements of Value in Health Care-a Health Economics Approach: An ISPOR Special Task Force Report [3]." *Value in Health*, vol. 21, no. 2, 2018, pp. 131-139.

H-29. Garrison, Louis, Peter Neumann, Richard Willke, Anirban Basu, Patricia Danzon, Jalpa Doshi, Michael Drummond, **Darius N. Lakdawalla**, Mark Pauly, Charles Phelps, Scott Ramsey, Adrian Towse and Milton Weinstein. "A Health Economics Approach to Us Value Assessment Frameworks-Summary and Recommendations of the ISPOR Special Task Force Report [7]." *Value in Health*, vol. 21, no. 2, 2018, pp. 161-165.

H-30. **Lakdawalla, Darius N.**, Joanna MacEwan, Robert Dubois, Kimberly Westrich, Mikel Berdud and Adrian Towse. "What Do Pharmaceuticals Really Cost in the Long Run?" *American Journal of Managed Care*, vol. 23, no. 8, 2017, pp. 488-493.

H-31. Shafrin, Jason, Felicia Forma, Ethan Scherer, Ainslie Hatch, Edward Vytlacil and **Darius N. Lakdawalla**. "The Cost of Adherence Mismeasurement in Serious Mental Illness: A Claims-Based Analysis." *American Journal of Managed Care*, vol. 23, no. 5, 2017, pp. e156-e163.

H-32. **Lakdawalla, Darius N.,** Jason Shafrin, Ningqi Hou, Desi Peneva, Seanna Vine, Jinhee Park, Jie Zhang, Ron Brookmeyer and Robert Figlin. "Predicting Real-World Effectiveness of Cancer Therapies Using Overall Survival and Progression-Free Survival from Clinical Trials: Empirical Evidence for the ASCO Value Framework." *Value in Health*, vol. 20, no. 7, 2017, pp. 866-875.

H-33. Stevens, Warren, Desi Peneva, Jim Li, Larry Liu, Gordon Liu, Runlin Gao and **Darius N. Lakdawalla**. "Estimating the Future Burden of Cardiovascular Disease and the Value of Lipid and Blood Pressure Control Therapies in China." *BMC Health Services Research*, vol. 16, no. 175, 2016.

H-34. Shih, Tiffany, Craig Wakeford, Dennis Meletiche, Jesse Sussell, Adrienne Chung, Yanmei Liu, Jin Joo Shim and **Darius N. Lakdawalla**. "Reconsidering the Economic Value of Multiple Sclerosis Therapies." *American Journal of Managed Care*, vol. 22, no. 11, 2016, pp. e368-e374.

H-35. Shafrin, Jason, Taylor Schwartz, **Darius N. Lakdawalla** and Felicia Forma. "Estimating the Value of New Technologies That Provide More Accurate Drug Adherence Information to Providers for Their Patients with Schizophrenia." *Journal of Managed Care and Specialty Pharmacy*, vol. 22, no. 11, 2016, pp. 1285-1291.

H-36. Shafrin, Jason, Ron Brookmeyer, Desi Peneva, Jinhee Park, Jie Zhang, Robert Figlin and **Darius N. Lakdawalla**. "The Value of Surrogate Endpoints for Predicting Real-World Survival across Five Cancer Types." *Current Medical Research and Opinion*, vol. 32, no. 4, 2016, pp. 731-739.

H-37. Moreno, Gigi, Karen Mulligan, Caroline Huber, Mark Linthicum, David Dreyfus, Timothy Juday, Steven Marx, Yuri Gonzalez, Ron Brookmeyer and **Darius N. Lakdawalla**. "Costs and Spillover Effects of Private Insurers' Coverage of Hepatitis C Treatment." *American Journal of Managed Care*, vol. 22, no. 6 Spec No., 2016, pp. SP236-244.

H-38. MacEwan, Joanna, Felicia Forma, Jason Shafrin, Ainslie Hatch, **Darius N. Lakdawalla** and J. P. Lindenmayer. "Patterns of Adherence to Oral Atypical Antipsychotics among Patients Diagnosed with Schizophrenia." *Journal of Managed Care and Specialty Pharmacy*, vol. 22, no. 11, 2016, pp. 1349-1361.

H-39. Linthicum, Mark, Yuri Gonzalez, Karen Mulligan, Gigi Moreno, David Dreyfus, Timothy Juday, Steven Marx, **Darius N. Lakdawalla**, Brian Edlin and Ron Brookmeyer. "Value of Expanding HCV Screening and Treatment Policies in the United States." *American Journal of Managed Care*, vol. 22, no. 6 Spec No., 2016, pp. SP227-235.

H-40. Jena, Anupam, Warren Stevens, Yuri Gonzalez, Steven Marx, Timothy Juday, **Darius N. Lakdawalla** and Tomas Philipson. "The Wider Public Health Value of HCV Treatment Accrued by Liver Transplant Recipients." *American Journal of Managed Care*, vol. 22, no. 6 Spec No., 2016, pp. SP212-219.

H-41. Seabury, Seth, **Darius N. Lakdawalla**, J. Samantha Dougherty, Jesse Sullivan and Dana Goldman. "Medication Adherence and Measures of Health Plan Quality." *American Journal of Managed Care*, vol. 21, no. 6, 2015, pp. e379-389.

H-42. Romley, John, Sarah Axeen, **Darius N. Lakdawalla**, Matthew Chernew, Jay Bhattacharya and Dana Goldman. "The Relationship between Commercial Health Care Prices and Medicare Spending and Utilization." *Health Services Research.*, vol. 50, no. 3, 2015, pp. 883-896.

H-43. Linthicum, Mark, Julia Thornton Snider, Rhema Vaithianathan, Yanyu Wu, Chris LaVallee, **Darius N. Lakdawalla**, Jennifer Benner and Tomas Philipson. "Economic Burden of Disease-Associated Malnutrition in China." *Asia Pacific Journal of Public Health*, vol. 27, no. 4, 2015, pp. 407-417.

H-44. **Lakdawalla, Darius N.,** Jason Shafrin, Claudio Lucarelli, Sean Nicholson, Zeba Khan and Tomas Philipson. "Quality-Adjusted Cost of Care: A Meaningful Way to Measure Growth in Innovation Cost Versus the Value of Health Gains." *Health Affairs*, vol. 34, no. 4, 2015, pp. 555-561.

H-45. Eber, Michael., Dana Goldman, **Darius N. Lakdawalla**, Tomas Philipson, Daryl Pritchard, M. Marco Huesch, Nicholas Summers, Mark Linthicum, Jesse Sullivan and Robert Dubois. "Clinical Evidence Inputs to Comparative Effectiveness Research Could Impact the Development of Novel Treatments." *Journal of Comparative Effectiveness Research*, 2015, pp. 1-11.

H-46. Seabury, Seth, Dana Goldman, Iftekhar Kalsekar, John Sheehan, Kimberly Laubmeier and **Darius N. Lakdawalla**. "Formulary Restrictions on Atypical Antipsychotics: Impact on Costs for Patients with Schizophrenia and Bipolar Disorder in Medicaid." *American Journal of Managed Care*, vol. 20, no. 2, 2014, pp. e52-60.

H-47. **Lakdawalla, Darius N.,** Julia Snider, Daniella Perlroth, Chris LaVallee, Mark Linthicum, Tomas Philipson, Jamie Partridge and Paul Wischmeyer. "Can Oral Nutritional Supplements Improve Medicare Patient Outcomes in the Hospital?" *Forum for Health Economics and Policy*, vol. 17, no. 2, 2014, pp. 131-151.

H-48. Gupta, Charu, Glenn Chertow, Mark Linthicum, Karen Van Nuys, Vasily Belozeroff, Darryl Quarles and **Darius N. Lakdawalla**. "Reforming Medicare's Dialysis Payment Policies: Implications for Patients with Secondary Hyperparathyroidism." *Health Services Research.*, vol. 49, no. 6, 2014, pp. 1925-1943.

H-49. Goldman, Dana, Joel Fastenau, Riad Dirani, Eric Helland, Geoffrey Joyce, Ryan Conrad and **Darius N. Lakdawalla**. "Medicaid Prior Authorization Policies and Imprisonment among Patients with Schizophrenia." *American Journal of Managed Care*, vol. 20, no. 7, 2014, pp. 577-586.

H-50. Seabury, Seth, Amitabh Chandra, **Darius N. Lakdawalla** and Anupam Jena. "On Average, Physicians Spend Nearly 11 Percent of Their 40-Year Careers with an Open, Unresolved Malpractice Claim." *Health Affairs,* vol. 32, no. 1, 2013, pp. 111-119.

H-51. Philipson, Tomas, Julia Snider, **Darius N. Lakdawalla**, Benoit Stryckman and Dana Goldman. "Impact of Oral Nutritional Supplementation on Hospital Outcomes." *American Journal of Managed Care*, vol. 19, no. 2, 2013, pp. 121-128.

H-52. **Lakdawalla, Darius N.,** Mintu Turakhia, Mehul Jhaveri, Essy Mozaffari, Pamela Davis, Lily Bradley and Matthew Solomon. "Comparative Effectiveness of Antiarrhythmic Drugs on Cardiovascular Hospitalization and Mortality in Atrial Fibrillation." *Journal of Comparative Effectiveness Research*, vol. 2, no. 3, 2013, pp. 301-312.

H-53. **Lakdawalla, Darius N.,** Michael Eber, Felicia Forma, Jesse Sullivan, Pierre-Carl Michaud, Lily Bradley and Dana Goldman. "Measuring the Value of Better Diabetes Management." *American Journal of Managed Care*, vol. 19 Spec No. 2, 2013, p. E11.

H-54. Goldman, Dana, Charu Gupta, Eshan Vasudeva, Kostas Trakas, Ralph Riley, **Darius N. Lakdawalla**, David Agus, Neeraj Sood, Anupam Jena and Tomas Philipson. "The Value of Diagnostic Testing in Personalized Medicine." *Forum for Health Economics and Policy*, vol. 16, no. 2, 2013, pp. 121-133.

H-55. Chernew, Michael, Rick McKellar, Wade Aubry, Roy Beck, Jennifer Benner, Jan Berger, A. Mark Fendrick, Felicia Forma, Dana Goldman, Anne Peters Harmel, Rebecca Killion, **Darius N. Lakdawalla,** Douglas Owens and Joe Stahl. "Comparative Effectiveness Research and Formulary Placement: The Case of Diabetes." *American Journal of Managed Care*, vol. 19, no. 2, 2013, pp. 93-96.

H-56. Bognar, Katalin, Kelly Bell, **Darius N. Lakdawalla**, Anshu Shrestha, Julia Snider, N Thomas and Dana Goldman. "Clinical Outcomes Associated with Rates of Sulfonylurea Use among Physicians." *American Journal of Managed Care: Evidence-Based Diabetes*, vol. 19, 2013, pp. SP182-186.

H-57. Yin, Wesley, John Penrod, Ross Maclean, **Darius N. Lakdawalla** and Tomas Philipson. "Value of Survival Gains in Chronic Myeloid Leukemia." *American Journal of Managed Care*, vol. 18, no. 11 Suppl, 2012, pp. S257-264.

H-58. Seabury, Seth, Dana Goldman, J. Ross Maclean, John Penrod and **Darius N. Lakdawalla**. "Patients Value Metastatic Cancer Therapy More Highly Than Is Typically Shown through Traditional Estimates." *Health Affairs*, vol. 31, no. 4, 2012, pp. 691-699.

H-59. Philipson, Tomas, Michal Eber, **Darius N. Lakdawalla**, Mitra Corral, Rena Conti and Dana Goldman. "An Analysis of Whether Higher Health Care Spending in the United States Versus Europe Is 'Worth It' in the Case of Cancer." *Health Affairs*, vol. 31, no. 4, 2012, pp. 667-675.

H-60. **Lakdawalla, Darius N.,** John Romley, Yuri Sanchez, J. Ross Maclean, John Penrod and Tomas Philipson. "How Cancer Patients Value Hope and the Implications for Cost-Effectiveness Assessments of High-Cost Cancer Therapies." *Health Affairs*, vol. 31, no. 4, 2012, pp. 676-682.

H-61. Grabowski, David, **Darius N. Lakdawalla**, Dana Goldman, Michael Eber, Larry Liu, Tamer Abdelgawad, Andreas Kuznik, Michael Chernew and Tomas Philipson. "The Large Social Value Resulting from Use of Statins Warrants Steps to Improve Adherence and Broaden Treatment." *Health Affairs*, vol. 31, no. 10, 2012, pp. 2276-2285.

H-62. Darkow, Theodore, J. Ross Maclean, Geoffrey Joyce, Dana Goldman and **Darius N. Lakdawalla**. "Coverage and Use of Cancer Therapies in the Treatment of Chronic Myeloid Leukemia." *American Journal of Managed Care*, vol. 18, no. 11 Suppl, 2012, pp. S272-278.

H-63. Michaud, Pierre-Carl, Dana Goldman, **Darius N. Lakdawalla**, Adam Gailey and Yuhui Zheng. "Differences in Health between Americans and Western Europeans: Effects on Longevity and Public Finance." *Social Science and Medicine*, vol. 73, no. 2, 2011, pp. 254-263.

H-64. Goldman, Dana, **Darius N. Lakdawalla**, Jesse Malkin, John Romley and Tomas Philipson. "The Benefits from Giving Makers of Conventional 'Small Molecule' Drugs Longer Exclusivity over Clinical Trial Data." *Health Affairs*, vol. 30, no. 1, 2011, pp. 84-90.

H-65. Sun, Eric, Anupam Jena, **Darius N. Lakdawalla**, Carolina Reyes, Tomas Philipson and Dana Goldman. "The Contributions of Improved Therapy and Earlier Detection to Cancer Survival Gains." *Forum for Health Economics and Policy*, vol. 12, no. 2, 2010, pp. 1-22.

H-66. Gailey, Adam, **Darius N. Lakdawalla** and Neeraj Sood. "Patents, Innovation, and the Welfare Effects of Medicare Part D." *Advances in Health Economics and Health Services Research*, vol. 22, 2010, pp. 317-344.

H-67. Chen, Er, Mark Looman, Marianne Laouri, Meghan Gallagher, Karen Van Nuys, **Darius N. Lakdawalla** and Joan Fortuny. "Burden of Illness of Diabetic Macular Edema: Literature Review." *Current Medical Research and Opinion*, vol. 26, no. 7, 2010, pp. 1587-1597.

H-68. Stewart, Kate, David Grabowski and **Darius N. Lakdawalla**. "Annual Expenditures for Nursing Home Care: Private and Public Payer Price Growth, 1977 to 2004." *Medical Care*, vol. 47, no. 3, 2009, pp. 295-301.

H-69. Sood, Neeraj, Han de Vries, Italo Gutierrez, **Darius N. Lakdawalla** and Dana Goldman. "The Effect of Regulation on Pharmaceutical Revenues: Experience in Nineteen Countries." *Health Affairs,* vol. 28, no. 1, 2009, pp. w125-137.

H-70. **Lakdawalla, Darius N.,** Dana Goldman, Pierre-Carl Michaud, Neeraj Sood, Robert Lempert, Ze Cong, Han de Vries and Italo Gutierrez. "U.S. Pharmaceutical Policy in a Global Marketplace." *Health Affairs*, vol. 28, no. 1, 2009, pp. w138-150.

H-71. Goldman, Dana, Anupam Jena, **Darius N. Lakdawalla**, Jennifer Malin, Jesse Malkin and Eric Sun. "The Value of Specialty Oncology Drugs." *Health Services Research*, 2010, vol. 45, no. 1, pp. 115-132.

H-72. Bhattacharya, Jayanta, Kavita Choudhry and **Darius N. Lakdawalla**. "Chronic Disease and Trends in Severe Disability in Working Age Populations." *Medical Care*, vol. 46, no. 1, 2008, pp. 92-100.

H-73. **Lakdawalla, Darius N.** and George Zanjani. "Terrorism Insurance Policy and the Public Good." *St. John's Journal of Legal Commentary*, vol. 18, no. 2, 2005, pp. 463-469.

H-74. **Lakdawalla, Darius N.,** Dana Goldman and Baoping Shang. "The Health and Cost Consequences of Obesity among the Future Elderly." *Health Affairs*, vol. 24 Suppl 2, 2005, pp. W5R30-41.

H-75. Goldman, Dana, Baoping Shang, Jay Bhattacharya, Alan Garber, Michael Hurd, Geoffrey Joyce, **Darius N. Lakdawalla**, Constantijn Panis and Paul Shekelle. "Consequences of Health Trends and Medical Innovation for the Future Elderly." *Health Affairs*, vol. 24 Suppl 2, 2005, pp. W5R5-17.

H-76. **Lakdawalla, Darius N.,** Jay Bhattacharya and Dana Goldman. "Are the Young Becoming More Disabled?" *Health Affairs*, vol. 23, no. 1, 2004, pp. 168-176.

H-77. **Lakdawalla, Darius N.** and Robert Schoeni. "Is Nursing Home Demand Affected by the Decline in Age Difference between Spouses." *Demographic Research*, vol. 8, no. 10, 2003.

H-78. **Lakdawalla, Darius N.,** Jay Bhattacharya, Dana Goldman, Michael Hurd, Geoffrey Joyce and Constantijn Panis. "Forecasting the Nursing Home Population." *Medical Care*, vol. 41, no. 1, 2003, pp. 8-20.

## MEDICAL LITERATURE

M-1. Srivastava, Gitanjali, Sophia L. Campbell, Conner R. Hill, Takara L. Stanley, Elizabeth A. Lawson, Caroline M. Apovian, Jaime P. Almandoz, Lorenzo Leggio, **Darius N. Lakdawalla**, Mohammad Dar, Carmela Socolovsky, Fatima Cody Stanford, Sarah Armstrong, and Steven K. Grinspoon. “Novel Strategies for Medical Management of Obesity: Mechanisms, Clinical Implications, and Societal Impacts: a report from the 25th annual Harvard Nutrition Obesity Symposium.” *The American Journal of Clinical Nutrition*. June 21, 2025 (available online). Forthcoming in press.

M-2. Axeen, Sarah, Alice J. Chen, **Darius N. Lakdawalla**, Neal Masia, Alexander Niyazov, Bhakti Arondekar, Stephen J. Freedland. “Do Trial Benefits Predict Real-World Gains in Metastatic Castration Resistant Prostate Cancer.” *JNCI Cancer Spectrum*. April 2025;9(2):pkaf018. DOI: https://doi.org/10.1093/jncics/pkaf018.

M-3. Grabowski, David C., Anuraag R. Kansal, Dana P. Goldman, and **Darius N. Lakdawalla**. "Assessment of Medical and Public Assistance Expenditures and Employment Among US Adults with Cancer Diagnoses." *JAMA Network Open*. 2023;6(5):e2315823. DOI: 10.1001/jamanetworkopen.2023.15823.

M-4. Langbaum, Jessica B., Julie Zissimopoulos, Rhoda Au, Niranjan Bose, Chris J. Edgar, Evan Ehrenberg, Howard Fillit, Carl V. Hill, Lynne Hughes, Michael Irizarry, Sarah Kremen, **Darius N. Lakdawalla**, Nancy Lynn, Kristina Malzbender, Tetsuyuki Maruyama, Holly A. Massett, Deep Patel, Desi Peneva, Eric M. Reiman, Klaus Romero, Carol Routledge, Michael W. Weiner, Stacie Weninger, and Paul S. Aisen. "Recommendations to Address Key Recruitment Challenges of Alzheimer's Disease Clinical Trials." *Alzheimer's & Dementia: The Journal of the Alzheimer's Association,* February 2023; 19(2): 696-707. DOI: https://doi.org/10.1002/alz.12737.

M-5. Hlávka, Jakub P., Jeffrey C. Yu, and **Darius N. Lakdawalla**. "Crosswalk between the Mini-Mental State Examination and the Telephone Interview for Cognitive Status (TICS-27/30/40)." *Journal of Alzheimer's and Dementia,* November 2022; 18(11): pp. 2036-2041. DOI: https://doi.org/10.1002/alz.12569.

M-6. Lichtenstein, Gary R., Ahva Shahabi, Seath A. Seabury, **Darius N. Lakdawalla**, Oliver Diaz Espinosa, Sarah Green, Michelle Brauer, Robert N. Baldassano. "Increased Lifetime Risk of Intestinal Complications and Extraintestinal Manifestations in Crohn's Disease and Ulcerative Colitis." *Gastroenterology & Hepatology,* 18(1), January 2022.

M-7. Yu, Jeffrey, Jakub Hlávka, Elizabeth Joe, Frances Richmond, and **Darius N. Lakdawalla**. "Impact of Non-binding FDA Guidances on Primary Endpoint Selection in Alzheimer's Disease Trials." *Alzheimer's & Dementia: Translational Research & Clinical Interventions, 2022*, 8(1). DOI: https://doi.org/10.1002/trc2.12280.

M-8. Reif, Julian, Hanke Heun-Johnson, Bryan Tysinger, and **Darius N. Lakdawalla**. "Measuring the COVID-19 Mortality Burden in the United States: A Microsimulation Study." *Annals of Internal Medicine*, September 2021. DOI: https://doi.org/10.7326/M21-2239.

M-9. **Lakdawalla, Darius N.** and Meng Li. "Association of Drug Rebates and Competition with Out-of-Pocket Coinsurance in Medicare Part D, 2014 to 2018." *JAMA Network Open.* 2021; (4(5):e219030. DOI: https://doi.org/10.1001/jamanetworkopen.2021.9030.

M-10. May-Slater, Suepattra, Caroline Huber, Meaghan Roach, Jason Shafrin, Wade Aubrey, **Darius N. Lakdawalla**, John Kane, Felicia Forma. "Adoption of Digital Technologies in the Practice of Behavioral Health: Qualitative Case Study of Glucose Monitoring Technology." *Journal of Medical Internet Research 2021*, 23(2):e18119. DOI: https://doi.org/10.2196/18119.

M-11. Lichtenstein, Gary R., Ahva Shahibi, Seth A. Seabury, **Darius N. Lakdawalla**, Oliver Diaz Espinosa, Sarah Green, Michelle Brauer, Robert N. Baldassano. "Lifetime Economic Burden of Crohn's Disease and Ulcerative Colitis by Age at Diagnosis." *Clinical Gastroenterology and Hepatology* 2020; 18(4):889-897.

M-12. Li, Meng, **Darius N. Lakdawalla**, Dana P. Goldman. "The association between spending and outcomes for cancer patients." *Journal of Clinical Oncology*, 2020; 38(4): pp. 323-331. DOI: https://doi.org/10.1200/JCO.19.01451.

M-13. Mattke, Soeren, Stefan Schneider, Patrick Orr, **Darius N. Lakdawalla**, and Dana Goldman. "Temporal trends in mortality after transcatheter aortic valve replacement: a systematic review and meta-regression analysis." *Structural Heart*, 2020; 4(1): pp. 16-23. DOI: 10.1080/24748706.2019.1689321.

M-14. Shafrin, Jason, Alison R. Silverstein, Joanna P. MacEwan, **Darius N. Lakdawalla**, Ainslie Hatch, Felicia M. Forma. "Using Information on Patient Adherence to Antipsychotic Medication to Understand Their Adherence to Other Medications." *Pharmacy and Therapeutics*, 2019; 44(6): pp. 350-357.

M-15. Baumgardner, James R., Ahva Shahabi, Mark T. Linthicum, Christopher Zacker, and **Darius N. Lakdawalla**. "Share of Oncology Versus Nononcology Spending in Episodes Defined by the Centers for Medicare & Medicaid Services Oncology Care Model." *Journal of Oncology Practice*, November 2018; 14(11): 506-509.

M-16. MacEwan, Joanna P., Alison R. Silverstein, Jason Shafrin, **Darius N. Lakdawalla**, Ainslie Hatch, Felicia M. Forma. "Medication Adherence Patterns Among Patients with Multiple Serious Mental and Physical Illnesses." *Advances in Therapy*, 35(5), May 2018, pp. 671-685.

M-17. Shrestha, Anshu, Adi Eldar-Lissai, Ningqi Hou, **Darius N. Lakdawalla** and Katharine Batt. "Real-World Resource Use and Costs of Haemophilia a-Related Bleeding." *Haemophilia*, vol. 23, no. 4, 2017, pp. e267-e275.

M-18. Shafrin, Jason, Suepattra May, Anshu Shrestha, Charles Ruetsch, Nicole Gerlanc, Felicia Forma, Ainslie Hatch, **Darius N. Lakdawalla** and Jean-Pierre Lindenmayer. "Access to Credible Information on Schizophrenia Patients' Medication Adherence by Prescribers Can Change Their Treatment Strategies: Evidence from an Online Survey of Providers." *Patient Preference and Adherence*, vol. 11, 2017, pp. 1071-1081.

M-19. Jena, Anupam, Jie Zhang and **Darius N. Lakdawalla**. "The Trade-Off between Speed and Safety in Drug Approvals." *JAMA Oncology*, vol. 3, no. 11, 2017, pp. 1465-1466.

M-20. Snider, Julia, Anupam Jena, Mark Linthicum, Refaat Hegazi, Jamie Partridge, Chris LaVallee, **Darius N. Lakdawalla** and Paul Wischmeyer. "Effect of Hospital Use of Oral Nutritional Supplementation on Length of Stay, Hospital Cost, and 30-Day Readmissions among Medicare Patients with COPD." *Chest*, vol. 147, no. 6, 2015, pp. 1477-1484.

M-21. **Lakdawalla, Darius N.,** Jacquelyn Chou, Mark Linthicum, Joanna MacEwan, Jei Zhang and Dana Goldman. "Evaluating Expected Costs and Benefits of Granting Access to New Treatments on the Basis of Progression-Free Survival in Non-Small-Cell Lung Cancer." *JAMA Oncology*, vol. 1, no. 2, 2015, pp. 196-202.

M-22. Mangalmurti, S., Seth Seabury, Amitabh Chandra, **Darius N. Lakdawalla**, William Oetgen and Anupam Jena. "Medical Professional Liability Risk among U.S. Cardiologists." *American Heart Journal*, vol. 167, no. 5, 2014, pp. 690-696.

M-23. Snider, Julia, Mark Linthicum, Yanyu Wu, Chris LaVallee, **Darius N. Lakdawalla**, Refaat Hegazi and Laura Matarese. "Economic Burden of Community-Based Disease-Associated Malnutrition in the United States." *Journal of Parenteral and Enteral Nutrition*, vol. 38, no. 2 Suppl, 2014, pp. 77S-85S0.

M-24. **Lakdawalla, Darius N.,** Maria Mascarenhas, Anupam Jena, Jackie Vanderpuye-Orgle, Chris LaVallee, Mark Linthicum and Julia Snider. "Impact of Oral Nutrition Supplements on Hospital Outcomes in Pediatric Patients." *Journal of Parenteral and Enteral Nutrition*, vol. 38, no. 2 Suppl, 2014, pp. 42S-49S.

M-25. **Lakdawalla, Darius N.,** Anupam Jena and Jason Doctor. "Careful Use of Science to Advance the Debate on the UK Cancer Drugs Fund." *The Journal of the American Medical Association*, vol. 311, no. 1, 2014, pp. 25-26.

M-26. Turakhia, Mintu, Matthew Solomon, Mehul Jhaveri, Pamela Davis, Michael Eber, Ryan Conrad, Nicholas Summers and **Darius N. Lakdawalla**. "Burden, Timing, and Relationship of Cardiovascular Hospitalization to Mortality among Medicare Beneficiaries with Newly Diagnosed Atrial Fibrillation." *American Heart Journal*, vol. 166, no. 3, 2013, pp. 573-580.

M-27. Solomon, Matthew, Sandeep Vijan, Felicia Forma, Ryan Conrad, Nicholas Summers and **Darius N. Lakdawalla**. "The Impact of Insulin Type on Severe Hypoglycaemia Events Requiring Inpatient and Emergency Department Care in Patients with Type 2 Diabetes." *Diabetes Research and Clinical Practice*, vol. 102, no. 3, 2013, pp. 175-182.

M-28. Seabury, Seth, Amitabh Chandra, **Darius N. Lakdawalla** and Anupam Jena. "Defense Costs of Medical Malpractice Claims." *The New England Journal of Medicine*, vol. 366, no. 14, 2012, pp. 1354-1356.

M-29. Jena, Anupam, Amitabh Chandra, **Darius N. Lakdawalla** and Seth Seabury. "Outcomes of Medical Malpractice Litigation against Us Physicians." *Archives of Internal Medicine*, vol. 172, no. 11, 2012, pp. 892-894.

M-30. Jena, Anupam, Seth Seabury, **Darius N. Lakdawalla** and Amitabh Chandra. "Malpractice Risk According to Physician Specialty." *The New England Journal of Medicine*, vol. 365, no. 7, 2011, pp. 629-636.

M-31. Faulkner, Guy, Paul Grootendorst, Van Nguyen, Tatiana Andreyeva, Kelly Arbour-Nicitopoulos, M. Christopher Auld, Sean Cash, John Cawley, Peter Donnelly, Adam Drewnowski, Laurette Dubé, Roberta Ferrence, Ian Janssen, Jeffrey Lafrance, **Darius N. Lakdawalla**, Rena Mendelsen, Lisa Powell, W. Bruce Traill and Frank Windmeijer. "Economic Instruments for Obesity Prevention: Results of a Scoping Review and Modified Delphi Survey." *International Journal of Behavioral Nutrition and Physical Activity*, vol. 8, 2011, p. 109.

M-32. Jena, Anupam, Dana Goldman, Amee Kamdar, **Darius N. Lakdawalla** and Yang Lu. "Sexually Transmitted Diseases among Users of Erectile Dysfunction Drugs: Analysis of Claims Data." *Annals of Internal Medicine*, vol. 153, no. 1, 2010, pp. 1-7.

## BOOKS

B.1 Phelps, Charles, and **Darius N. Lakdawalla**. *Valuing Health: The Generalized Risk-Adjusted Cost-Effectiveness (GRACE) Model*. Oxford University Press, 2024.

## PUBLISHED CONFERENCE ABSTRACTS

A-1. Morris, Andrew, Leonardo Ortega, Sheena Thakkar, Lisa Wilcox, Joseph Cappelleri, Devin Incerti, Monica Ines, Partha Deb, Amit Chhabra, Edward Vytlacil, Katharine Batt, **Darius N. Lakdawalla**. “Prediction of Long-Term Factor IX Durability Among Hemophilia B Patients Treated with Fidanacogene Elaparvovec Gene Therapy.” The Professional Society for Health Economics and Outcomes Research (ISPOR) Annual Conference, 2024.

A-2. Incerti, Devin, **Darius N. Lakdawalla**, Patricia Dorling, Partha Deb, Edward Vytlacil, Andrew Morris, Joseph C. Cappelleri. “Generalizing the distribution and dynamics of health outcomes in clinical trials for novel treatments of rare disease to the real world.” The Professional Society for Health Economics and Outcomes Research (ISPOR) Europe, 2022.

A-3. Yu, Jeffrey, Bryan Tysinger, Jakub Hlavka, **Darius N. Lakdawalla**. "Heterogeneity in the Economic Value of Early Alzheimer's Disease-Modifying Therapies: An Analysis of Patient Subgroups." *Value in Health,* 25(7), 2022.

A-4. Griffin, Susan, **Darius N. Lakdawalla**, Charles Phelps. "Dealing with Disability in Health Technology Assessment." The Professional Society for Health Economics and Outcomes Research (ISPOR) Annual Conference, 2022.

A-5. Chen, Alice, **Darius N. Lakdawalla**, and Partha Deb. "Pharmaceutical Research and Development: Incentives and Costs." 10th Annual Conference of the American Soceity of Health Economics, June 2021.

A-6. Yu, Jeffrey, Jakub Hlavka, Bryan Tysinger, and **Darius N. Lakdawalla**. "Development of a Survey-Based Predictive Model for Clinical Dementia Rating in Alzheimer's Disease." *Value in Health*, 24(Suppl_1): S242, June 2021.

A-7. Alpert, Abby, Alice Chen, and **Darius N. Lakdawalla**. "Can Higher Profitability Raise Pharmaceutical R&D Costs? Evidence from Medicare Part D." 9th Annual Conference of the American Society of Health Economics, June 2020.

A-8. Leaf, D. Ermini, Soeren Mattke, Bryan Tysinger, **Darius N. Lakdawalla**. "Long-term Benefits of Expanded Access to Valve Replacement for Aortic Stenosis Patients." *Value in Health* 23(Suppl_1): S93-S94, May 2020.

A-9. Phelps, Charles, and **Darius N. Lakdawalla**, "Evaluation of Medical Technologies with Uncertain Benefits." *Value in Health* 22: S774, 2019.

A-10. Lin, Eugene, Glenn Chertow, Jayanta Bhattacharya, and **Darius N. Lakdawalla**. "The impact of short-term gaps in insurance coverage on long-term peritoneal dialysis use: an instrumental variable analysis." AcademyHealth, 2019 Annual Research Meeting.

A-11. MacEwan, Joanna P., Lauren Zhao, Katie Everson, Larry Liu, Sun Fang, and **Darius N. Lakdawalla**. "Evolving Clinical Benefits and Social Value of Lipid Lowering Therapies." *Circulation: Cardiovascular Quality and Outcomes*, 12(Suppl. 1): A146-A146, April 2019.

A-12. Baumgardner, James, Katie Everson, Michelle Brauer, Jie Zhang, Yanni Hao, Jamae Liu, and **Darius N. Lakdawalla**. "CAR-T Therapy Displays Favorable Gains in Health Outcomes and Competitive Cost-Effectiveness When Compared with Past Innovative Cancer Treatments." *Blood* 132(Suppl. 1): 322, November 21, 2018.

A-13. Jansen, Jeroen, Devin Incerti, Jason Shafrin, A.M. Frederickson, **Darius N. Lakdawalla**, and Karen Reckamp. "A flexible open-source cost-effectiveness model for metastatic EGFR+ non-small cell lung cancer." *Value in Health* 21: S42-S43, October 1, 2018.

A-14. Incerti, Devin, Jason Shafrin, **Darius N. Lakdawalla**, Lauren Zhao, Mark Linthicum, and Jeroen Jansen. "Improvement of an open-source cost-effectiveness model based on public feedback." *Value in Health* 21: S42, October 1, 2018.

A-15. Shafrin, Jason, **Darius N. Lakdawalla**, Joanna MacEwan, Alison Silverstein, Adam Hatch and Felicia Forma. "Adherence Patterns among Patients Using Oral Atypical Antipsychotics and Other Medications." *Value in Health*, vol. 20, no. 9, 2017, pp. A403-A403.

A-16. Mulligan, Karen, Thanh Ton, Lara Yoon, Susan Boklage, Andreas Kuznik, Jesse Sullivan, Mina Kabiri, Mary Panaccio, Keiko Higuchi and **Darius N. Lakdawalla**. "Measuring Indirect Costs (Productivity and Caregiver Burden) in the ACC/AHA Guideline Statin Benefit Groups." *Value in Health*, vol. 20, no. 5, 2017, pp. A269-A269.

A-17. Sullivan, Jeff, Alison Ward, Beata Korytowsky, Desi Peneva, Jennifer Benner, **Darius N. Lakdawalla**, Bjorn Bolinder, Robert Figlin, and Anupam Jena. "The Social Value of Immunotherapy in Non-Small Cell Lung Cancer." *Value in Health*, vol. 19, no. 3, 2016, pp. A167-A167.

A-18. **Lakdawalla, Darius N.,** Joanna MacEwan, Adrian Towse, Mikel Berdud, Kimberly Westrich and Robert Dubois. "Estimating the Lifetime Price of Pharmaceuticals: What Are the Long-Term Costs to Society?" *Value in Health*, vol. 19, no. 3, 2016, pp. A273-A273.

A-19. Shrestha, Anshu, Adi Eldar-Lissai, Yanyu Wu, Katherin Batt, Sangeeta Krishnan and **Darius N. Lakdawalla**. "A New Method for Counting Hemophilia-Related Bleeding Events in Claims Data." *Value in Health*, vol. 18, no. 3, 2015, pp. A2-A2.

A-20. Snider, Julia, Mark Linthicum, Chris LaVallee and **Darius N. Lakdawalla**. "The Impact of Oral Nutritional Supplementation in Medicare Patients with COPD." *Value in Health*, vol. 17, no. 3, 2014, pp. A179-A180.

A-21. Seabury, Seth, **Darius N. Lakdawalla**, Deborah Walter, John Hayes, Thomas Gustafson, Anshu Shrestha and Dana Goldman. "Medicaid Formulary Restrictions and Expenditures for Patients with Major Depressive Disorder." *Value in Health*, vol. 17, no. 3, 2014, pp. A222-A222.

A-22. **Lakdawalla, Darius N.,** Julia Thornton, Daniella Perlroth, Chris LaVallee, Mark Linthicum, Tomas Philipson, Jamie Partridge and Paul Wischmeyer. "Effect of Oral Nutritional Supplements on Hospital Outcomes in Patients Aged 65+ with Congestive Heart Failure." *Value in Health*, vol. 17, no. 7, 2014, p. A503.

A-23. Stevens, Warren, Laura Henkhaus, Julia Snider and **Darius N. Lakdawalla**. "A Comparison of the Cost-Effectiveness of Low-Cost Unreimbursed Health Technologies and Commonly Reimbursed Drug Therapies." *Value in Health*, vol. 16, no. 3, 2013, pp. A259-A260.

A-24. Bognar, Katalin, Kelly Bell, **Darius N. Lakdawalla**, Anshu Shrestha, Julia Snider, Nina Thomas and Dana Goldman. "Health Care Costs and Clinical Outcomes Associated with Rates of Sulfonylurea Use by Physicians." *Value in Health*, vol. 16, no. 3, 2013, pp. A173-A174.

A-25. Pritchard, Daryl, Michael Eber, Marco Huesch, Robert Dubois and **Darius N. Lakdawalla**. "Impact of Comparative Effectiveness Research on Biomedical Innovation and Population Health." *Value in Health*, vol. 16, no. 3, 2013, pp. A266-A266.

A-26. **Lakdawalla, Darius N.,** Dana Goldman and Tomas Philipson. "Modeling the Health and Medical Care Spending of the Future Elderly: An Update Using the Future Elderly Model." *Value in Health*, vol. 15, no. 4, 2012, pp. A195-A196.

A-27. Dana Goldman, **Darius N. Lakdawalla** and Tomas Philipson. "Market Exclusivity for Drugs: The Authors Reply." *Health Affairs*, vol. 30, no. 4, 2011.

A-28. Zheng, Yuhui, Dana Goldman, Pierre-Carl Michaud, **Darius N. Lakdawalla**, Geoffrey Joyce, Igor Vaynman and Adam Gailey. "Projecting the Burden of Alzheimer's Disease and Evaluating the Potential Impacts of Preventing Alzheimer's Disease in the United States." *Value in Health*, vol. 13, no. 3, 2010, pp. A144-A144.

A-29. Sun, Eric, **Darius N. Lakdawalla**, Carolina Reyes, Dana Goldman, Tomas Philipson and Anupam Jena. "The War on Cancer: An Economic Evaluation of Recent Gains in Cancer Survival." *Value in Health*, vol. 11, no. 3, 2008, pp. A82-A82.

**<u>OTHER PUBLICATIONS</u>**

O-1. **Lakdawalla, Darius N.** and Dana P. Goldman. "Ensuring Most-Favored Nation Drug Pricing Doesn't Sicken Us." *STAT*. May 15, 2025.

O-2. **Lakdawalla, Darius N.** and Dana P. Goldman. "'Most-Favored Nation' Drug Pricing Has Three Significant Problems." *STAT*. April 14, 2025.

O-3. **Lakdawalla, Darius N.** "Medicare Drug Price Negotiations Need Something New: A Floor." *STAT.* January 22, 2025.

O-4. Doctor, Jason N. and **Darius N. Lakdawalla**. "How to Advance the Debate Over QALYS: A Response to Kaplan et al." *Health Affairs Forefront*. June 10, 2024.

O-5. Shafrin, Jason, **Darius N. Lakdawalla**, Jalpa A. Doshi, Louis P. Garrison, Jr., Anup Malani, Peter J. Neumann, Charles E. Phelps, Adrian Towse, Richard J. Willke. "A Strategy for Value-Based Drug Pricing Under the Inflation Reduction Act." *Health Affairs Forefront*. May 4, 2023.

O-6. Sullivan, Sean D., **Darius N. Lakdawalla**, Beth Devine, Jens Grueger, Louis P. Garrison, Jr., Josh J. Carlson, David L. Veenstra, Charles E. Phelps, Anirban Basu. "Alternatives to the QALY for Comparative Effectiveness Research." *Health Affairs Forefront*. April 21, 2023.

O-7. Ward, Alison Sexton, Bryan Tsyinger, PhuongGiang Nguyen, Dana Goldman, **Darius N. Lakdawalla.** "Benefits of Medicare Coverage for Weight Loss Drugs." USC Leonard D. Schaeffer Center for Health Policy & Economics. April 18, 2023.

O-8. Goldman, D., Joseph Grogan, **Darius N. Lakdawalla**, Barry Liden, Jason Shafrin, Kyi-Sin Than, Erin Trish. "Mitigating the Inflation Reduction Act's Adverse Impacts on the Prescription Drug Market." USC Leonard D. Schaeffer Center for Health Policy & Economics, April 13, 2023.

O-9. **Lakdawalla, Darius N.** and Julian Reif. "The hidden cost of Covid-19: years of life lost among the young." *STAT+*. October 14, 2021.

O-10. Mulligan, Karen and **Darius N. Lakdawalla**. "Federal government should advise on drug negotiations, not run them." *Modern Healthcare*. September 23, 2021.

O-11. Ward, Alison S., Karen Van Nuys, and **Darius N. Lakdawalla**. "Reducing Racial Disparities in Early Cancer Diagnosis with Blood-Based Tests." USC Leonard D. Schaeffer Center for Health Policy & Economics. July 2021.

O-12. Goldman, Dana and **Darius N. Lakdawalla**. "FDA's approval of aducanumab paves the way for 'more momentous' Alzheimer's breakthroughs." *STAT+*. June 7, 2021.

O-13. Ward, Alison S., Karen Van Nuys, **Darius N. Lakdawalla.** "Impacts of First-in-Class Drug Approvals on Future In-Class Innovation." USC Leonard D. Schaeffer Center for Health Policy & Economics. May 2021.

O-14. **Lakdawalla, Darius N.,** Dana Goldman, Karen Van Nuys, Dan Mendelson. "Reassessing the Value of Minimally Invasive Technologies in the Era of COVID-19." USC Schaeffer Center for Health Policy and Economics. March 17, 2021.

O-15. **Lakdawalla, Darius N.**, Peter Neumann, Gail Wilensky. "Create a U.S. Institute of Health Technology Assessment to Preserve Innovation and Control Costs." *STAT+*. March 2021.

O-16. **Lakdawalla, Darius N.**, Peter J. Neumann, Gail R. Wilensky, Alan Balch, Jalpa A. Doshi, Louis P. Garrison, Margaret A. Hamburg, Joel W. Hay, Zeba M. Khan, Finn Bertum Kristensen, Samuel R. Nussbaum, Daniel A. Ollendorf, William V. Padula, Charles E. Phelps, Dana Gelb Safran, Mark J. Sculpher, Sean R. Tunis, Dana P. Goldman, Ruth Katz, Karen Mulligan, Desi Peneva. "Health Technology Assessment in the U.S.: A Vision for the Future." USC Schaeffer Center for Health Policy and Economics. February 2021.

O-17. **Lakdawalla, Darius N.**, Erin Trish. "Why pooled testing could be a breakthrough in the fight against COVID-19." *The Conversation*. July 20, 2020

O-18. **Lakdawalla, Darius N.**, Emmet Keeler, Dana Goldman, Erin Trish. "Getting Americans Back to Work (and School) with Pooled Testing." USC Schaeffer Center for Health Policy and Economics. May 2020.

O-19. **Lakdawalla, Darius N.** and Charles Phelps. "Evaluation of Medical Technologies with Uncertain Benefits." *American Journal of Managed Care: Clinical Brief*. February 2020.

O-20. Mulligan, Karen, **Darius N. Lakdawalla,** Peter J. Neumann, Gail R. Wilensky, Dana P. Goldman, Ruth J. Katz, Jakub Hlavka, Desi Peneva, Martha Ryan. "Health Technology Assessment for the U.S. Healthcare System." USC Schaeffer Center for Health Policy and Economics and The Aspen Institute. February 2020.

O-21. Goldman, Dana and **Darius N. Lakdawalla**. "Health Care's Killer App: Life Insurance." *Wall Street Journal* op-ed, March 20, 2019.

O-22. Mattke, Soren, **Darius N. Lakdawalla**, and Dana Goldman. "The Long Road to Value-Based Payment: The Case of Transcatheter Aortic Valve Replacement." *Health Affairs Blog,* July 26, 2018.

O-23. Goldman, Dana, and **Darius N. Lakdawalla**. "The Global Burden of Medical Innovation." USC Leonard D. Schaeffer Center for Health Policy and Economics, January 2018.

O-24. Conti, Rena, and **Darius N. Lakdawalla**. "Putting More into Biopharmaceutical Value Assessments." *Health Affairs Blog*, January 3, 2018.

O-25. Chou, Jacquelyn, Glenn Chertow, **Darius N. Lakdawalla**, Alon Yehoshua, and Vasily Belozeroff. "Bundled Payments: Balancing Incentives, Quality, and Affordability." *Health Affairs Blog*, December 20, 2017.

O-26. Goldman, Dana and **Darius N. Lakdawalla**. "Take Me Out to the Pill Game." *Wall Street Journal* op-ed, June 19, 2017.

O-27. **Lakdawalla, Darius N.**, Anup Malani, and Jay Bhattacharya. "Why America Needs a Do-Over on Medicaid Reform." *The Conversation*, May 11, 2017.

O-28. Balch, Alan, and **Darius N. Lakdawalla**. "The Case for Patient-Centered Assessment of Value." *Health Affairs Blog*, May 8, 2017.

O-29. Sachs, Rachel, Nicholas Bagley, and **Darius N. Lakdawalla**. "Value-Based Pricing for Pharmaceuticals in the Trump Administration." *Health Affairs Blog*, April 27, 2017.

O-30. Jena, Anupam, and **Darius N. Lakdawalla**. "Value Frameworks for Rare Diseases: Should They Be Different?" *Health Affairs Blog*, April 12, 2017.

O-31. **Lakdawalla, Darius N.,** and Anup Malani. "How Republicans and Democrats Can Both Keep Their Promises on Health Care." *The Conversation*, March 2, 2017.

O-32. **Lakdawalla, Darius N.,** and Anup Malani. "Do You Know What the Affordable Care Act Does? Here's a Primer to Help." *The Conversation*, February 27, 2017.

O-33. **Lakdawalla, Darius N.,** Mark Linthicum and Jackie Vanderpuye-Orgle. "Does Patient Cost Sharing for HCV Drugs Make Sense?" *American Journal of Managed Care*, vol. 22, no. 6 Spec No., 2016, pp. SP188-190.

O-34. **Lakdawalla, Darius N.,** and Dana Goldman. "Why Academics Consulting with Industry on Health Care May Be an Idea Whose Time Has Come." *The Conversation*, December 21, 2016.

O-35. Goldman, Dana, and **Darius N. Lakdawalla**. "Election Verdict: Pharma Needs a New Prescription." *StatNews*, November 10, 2016.

O-36. Philipson, Tomas, and **Darius N. Lakdawalla**. "All or Nothing? Rethinking the FDA Approval Framework." *Forbes*, November 4, 2016.

O-37. **Lakdawalla, Darius N.,** and Peter Neumann. "Budget Criteria and Value Assessments: A Case of Apples and Oranges?" *Health Affairs Blog*, September 22, 2016.

O-38. **Lakdawalla, Darius N.,** and Julian Reif. "Health, body weight, and obesity." *The Oxford Handbook of Economics and Human Biology*, 2016.

O-39. Goldman, Dana P., **Darius N. Lakdawalla**, James R. Baumgardner, and Mark T. Linthicum. "Are Biopharmaceutical Budget Caps Good Public Policy?" *The Economists' Voice* 13(1):27-42, 2016.

O-40. **Lakdawalla, Darius N.,** Anup Malani, and Julian Reif. "The Complex Relationship Between Healthcare Reform and Innovation." *The Future of Healthcare Reform in the United States,* Anup Malani and Michael H. Schill, eds., University of Chicago Press, 2015.

O-41. **Lakdawalla, Darius N**. (2015, September 23). "Drug Price Controls End Up Costing Patients Their Health." *New York Times*, Retrieved from http://www.nytimes.com/roomfordebate/2015/09/23/should-the-government-impose-drug-price-controls/drug-price-controls-end-up-costing-patients-their-health

O-42. Goldman, Dana, and **Darius N. Lakdawalla**. "Moving Beyond Price-Per-Dose in the Pharmaceutical Industry." Web blog post. *Health Affairs Blog*. Health Affairs, 30 September 2015. Web.

O-43. Goldman, Dana, **Darius N. Lakdawalla**, and Lee Newcomer. "It's Time for Value-Based Payment in Oncology." Web blog post. *Health Affairs Blog*. Health Affairs, 28 April 2015. Web.

O-44. Goldman, Dana, **Darius N. Lakdawalla**, and Tomas Philipson. "Morality versus Survival in International Comparisons of Cancer Care." Web blog post. *Health Affairs Blog*. Health Affairs, 20 March 2015. Web.

O-45. Dayoub, Elias, Anupam Jena, and **Darius N. Lakdawalla**. "The End of the Blockbuster? Implications for Pricing of New Drugs." Web blog post. *Health Affairs Blog*. Health Affairs, 16 June 2014. Web.

O-46. Goldman, Dana, Adam Leive and **Darius N. Lakdawalla**. "Want More Value from Prescription Drugs? We Need to Let Prices Rise and Fall?" *The Economists' Voice*, vol. 10, no. 1, 2013, pp. 39-43.

O-47. **Lakdawalla, Darius N.,** Jay Bhattacharya, Amitabh Chandra, Michael Chernew, Dana Goldman, Anupam Jena, Anup Malani, and Tomas Philipson. "Best of Both Worlds: Uniting Universal Coverage and Personal Choice in Health Care." *American Enterprise Institute*, August 2013.

O-48. Seabury, Seth, **Darius N. Lakdawalla** and Dana Goldman. "Patients' Willingness to Pay: The Authors Reply." *Health Affairs*, vol. 31, no. 8, 2012, doi:10.1377/hlthaff.2012.0713.

O-49. Marco Huesch and **Darius N. Lakdawalla**. "Freedom to Innovate: The Perils of Centralized Medical Research." *Archives of Internal Medicine*, vol. 172, no. 21, 2012, pp. 1692-1693; author reply 1693.

O-50. Goldman, Dana, Steven Schwartz, **Darius N. Lakdawalla**, Tomas Philipson, and Anupam Jena. "Harnessing the Promise of Comparative Effectiveness Research." Web blog post. *Health Affairs Blog*. Health Affairs, 12 September 2012. Web.

O-51. Eber, Michael, Dana Goldman, **Darius N. Lakdawalla**, and Tomas Philipson. "When Epidemiology Goes Astray: Valuing Cancer Care in the Unites States and Europe." Web blog post. *Health Affairs Blog*. Health Affairs, 14 May 2012. Web.

O-52. Chernew, Michael, **Darius N. Lakdawalla**, and Dana Goldman. "Saving Medicare Dollars: Moving from the SGR to Bundled Payments." Web blog post. *Health Affairs Blog*. Health Affairs, 24 February 2012. Web.

O-53. Goldman, Dana, and **Darius N. Lakdawalla.** "Intellectual Property." *Handbook of Health Economics*, Chapter 13, New York: Elsevier Science, 2012.

O-54. **Lakdawalla, Darius N.,** and Neeraj Sood. "Incentives to Innovate." *Oxford Handbook of the Economics of the BioPharmaceutical Industry*. New York: Oxford, 2012.

O-55. Seabury, Seth, Amitabh Chandra, **Darius N. Lakdawalla** and Anupam Jena. "Defense Costs of Medical Malpractice Claims." *The New England Journal of Medicine*. 2012.

O-56. Huckfeldt, Peter, **Darius N. Lakdawalla,** and Tomas J. Philipson. "Economics of Obesity." *Elgar Companion to Health Economics, 2nd Edition*, Chapter 7 (2), 2012.

O-57. Goldman, Dana, **Darius N. Lakdawalla,** and Yuhui Zheng. "Food Prices and the Dynamics of Body Weight." *Economic Aspects of Obesity*. Chicago: University of Chicago Press, 2011.

O-58. Goldman, Dana, **Darius N. Lakdawalla**, Tomas Philipson and Wesley Yin. "Valuing Health Technologies at NICE: Recommendations for Improved Incorporation of Treatment Value in HTA." *Health Econ*, vol. 19, no. 10, 2010, pp. 1109-1116.

O-59. Gailey, Adam, **Darius N. Lakdawalla,** and Neeraj Sood. "Patents, Innovation, and the Welfare Effects of Medicare Part D." *Advances in Health Economics and Health Services Research*. New York: Elsevier, 2010.

O-60. Goldman, Dana and **Darius N. Lakdawalla.** "Can the ACA Improve Population Health?" *The Economists' Voice* 7 (5): Article 4. December 2010.

O-61. Goldman, Dana, **Darius N. Lakdawalla,** Tomas Philipson, and Wesley Yin. "Valuing Health Technologies at NICE: Recommendations for Improved Incorporation of Treatment Value in HTA." *Health Economics* 19 (10): 1109-1116. October 2010.

O-62. **Lakdawalla, Darius N.** and Tomas Philipson. "Economics of Obesity." *Elgar Companion to Health Economics*. Cambridge: Edward Elgar, 2006.

O-63. **Lakdawalla, Darius N.,** Tomas Philipson and Jay Bhattacharya. "Welfare-Enhancing Technological Change and the Growth of Obesity." *American Economic Review: AEA Papers and Proceedings*, vol. 95, no. 2, 2005, pp. 253-257.

O-64. Bhattacharya, Jay, David Cutler, Dana Goldman, Michael Hurd, Geoffrey Joyce, **Darius N. Lakdawalla,** Constantijn Panis and Baoping Shang. "Disability Forecasts and Future Medicare Costs." *Frontiers in Health Policy Research*, edited by David Cutler and Alan M. Garber, vol. 7, MIT Press, 2004.

O-65. **Lakdawalla, Darius N.,** and George Zanjani. "Terrorism Insurance Policy and the Public Good." *St. John's Journal of Legal Commentary* 18(2): 463-469, Spring 2004.

O-66. Bhattacharya, Jay, David Cutler, Dana Goldman, Michael Hurd, Geoffrey Joyce, **Darius N. Lakdawalla,** Constantijn Panis, and Baoping Shang. "Disability Forecasts and Future Medicare Costs." *Forum for Health Economics and Policy,* 7(1), Jan 2004.

O-67. **Lakdawalla, Darius N.,** Jay Bhattacharya and Dana Goldman. "A Response to the Points by Manton and Williamson." *Medical Care*, vol. 41, no. 1, 2003, pp. 28-31.

O-68. **Lakdawalla, Darius N**. "Quantity over Quality." *Education Next*, 2002, pp. 66-72.

O-69. Goldman, Dana and **Darius N. Lakdawalla**. "A New Method for Determining Patient Payments for Outpatient Drugs." *American Journal of Managed Care*, vol. 8, no. 2, 2002, pp. 125, 128, 130.

O-70. Goldman, Dana, and **Darius N. Lakdawalla.** "Comment on 'A Benefit-Based Copay for Prescription Drugs: Patient Contribution Based on Total Benefits, Not Drug Acquisition Cost.'" *American Journal of Managed Care* 8(2): 125-8, February 2002.

O-71. **Lakdawalla, Darius N.,** and Tomas Philipson. "Public Financing and the Market for Long-Term Care." *Frontiers in Health Policy Research 4*, edited by Alan Garber, NBER. Chicago: University of Chicago Press, 2001.

O-72. Philipson, Tomas, and **Darius N. Lakdawalla**. "Medical Care Output and Productivity in the Nonprofit Sector." In *Medical Care Output and Productivity*, edited by David Cutler and Ernst Berndt. NBER Studies in Income and Wealth, Volume 62. Chicago: University of Chicago Press, 2001.

## GRANTS

G-1. *Co-Principal Investigator, National Institute on Aging, R01 Grant Award*. "Ensuring Access to Novel Alzheimer's and Dementia Treatments: Evaluating Innovative Payment Approaches." (Co-Principal Investigator: Dana Goldman)

G-2. *Co-Project Leader, Covered CA, Grant Submission.* "Evaluating Performance in the California Healthcare Exchanges." $75,000 total. (Co-Project Lead: Wesley Yin)

G-3. *Co-Principal Investigator, National Institute on Aging, R01 Grant Submission*. "Physician Perceptions of Medical Malpractice." (Co-Principal Investigator: Seth Seabury)

G-4. *Project Lead, National Institute of Health, P01 Grant Award.* March 2012-February 2016. "The Behavioral Effects of Prescription Drug Use." 4 years, $1,888,468 total. (Co-Project Lead: Robert Kaestner)

G-5. *Principal Investigator, National Institute on Aging, R01 Grant Award.* May 2009-May 2013. "Medical Malpractice, Health Care Costs, and Technology Adoption." 4 years, $1,300,000 total. (Co-Principal Investigator: Seth Seabury.)

G-6. *Co-Project Leader, National Institute on Aging, P01 Grant Award*. July 2005-June 2010. "Causes and Consequences of Obesity Among Older Americans." (Principal Investigator: Michael Hurd. Project Leader: Dana Goldman)

G-7. *Co-Principal Investigator, National Institute on Aging, R01 Grant Award.* July 2006-June 2010. "Obesity Among Older Americans." (Principal Investigator: Dana Goldman)

G-8. *Principal Investigator, National Institute on Aging, R01 Grant Award.* August 2004-August 2007. "Whom Does Medicare Benefit?" 3 years, $696,000 total. (Co-Principal Investigators: Jay Bhattacharya and Michael Schoenbaum)

G-9. *Principal Investigator, National Institute on Aging, R03 Grant Award.* June 2005-May 2007. "Medical Malpractice: Implications for Cost and Technology." 2 years, $174,000 total. (Co-Principal Investigator: Seth Seabury.)

G-10. *Co-Principal Investigator, National Institute of Child Health and Human Development, R03 Grant Award*. September 2004-August 2006. "Childlessness: Choice or Chance?" 2 years, $174,000 total. (Principal Investigator: David Loughran. Co-Principal Investigator: Julie Zissimopoulos.)

G-11. *Principal Investigator, National Institute of Occupational Safety and Health, R03 Grant Award*. August 2002-August 2004. "Unclaimed Injuries and Workers' Compensation Adequacy." 2-year, $172,000 total. (Co-Principal Investigator: Robert Reville.)

G-12. *Principal Investigator, National Institute on Aging, R03 Grant Award*. September 2001-September 2002. "The Redistributive Effects of Medicare." 1 year, $86,000 total. (Co-Principal Investigators: Jay Bhattacharya and Michael Schoenbaum)

G-13. *Principal Investigator, National Institute on Aging, R03 Grant Award*. May 2001-May 2002. "Age Difference of Spouses and Long-Term Care." 1 year, $86,000 total. (Co-Principal Investigator: Robert Schoeni)

**AWARDS**

- *2021 ISPOR HEOR Excellence – Methodological Award* – awarded to recognize outstanding research in the field of health economics and outcomes research (HEOR) methodology.
- *2020 PhRMA Foundation Value Assessment Challenge Award,* First place – awards designed to encourage innovative approaches to defining and measuring value in health care.
- *2019 PhRMA Foundation Value Assessment Challenge Award,* Third Place – awards designed to encourage innovative approaches to defining and measuring value in health care.
- *2016 JMCP Award for Excellence* – awarded annually to recognize an article that represents the best scholarly work in managed care pharmacy, for "Patterns of Adherence to Oral Atypical Antipsychotics Among Patients Diagnosed with Schizophrenia."

- *2009 Eugene Garfield Economic Impact of Medical and Health Research Award* – awarded annually to an outstanding paper demonstrating how medical and health research impacts the economy, for "US Pharmaceutical Policy in a Global Marketplace."
- *2007 Edwin E. and Mary T. Huddleson Award for Outstanding Teaching*, Pardee RAND Graduate School of Public Policy.
- 2003 Milken Institute Award for Distinguished Economic Research — awarded for "Technological Change and the Growth of Obesity."
- *T.W. Schultz Dissertation Fellowship*, University of Chicago, September 1999-June 2000.
- *Nonprofits Fellowship*, National Bureau of Economic Research, September 1998-1999.
- *Century Scholarship*, University of Chicago, September 1995-June 1999.

**GOVERNMENT TESTIMONY**

- *United States Senate, Committee on Health, Education, Labor, and Pentions. Full Committee Hearing. "Why Does the United States Pay, by Far, the Highest Prices in the World for Prescription Drugs." February 8, 2024*
- *United States House of Representatives, Committee on Ways and Means, Health Subcommittee. "Hearing on Examining Policies that Inhibit Innovation and Patient Access." May 10, 2023.*
- *California Assembly Select Committee on Biotechnology. "Informational Hearing." February 12, 2014.*

**TEACHING EXPERIENCE**

- *Risk Analysis (PPD 587)*, University of Southern California School of Policy, Planning and Development and Viterbi School of Engineering. Graduate-level course in the Master's in Public Policy and Public Policy Doctoral sequences.
- *Introduction to/Fundamentals of Health Policy and Management (PPD 325),* University of Southern California School of Policy, Planning and Development. Graduate-level course in the Master's in Public Policy and Public Policy Doctoral sequences.
- *Health Economics II (PMEP 544)*, University of Southern California School of Policy, Planning, and Development. Graduate-level course in the Public Policy Doctoral sequences.
- *Health Policy (PPD 415)*, University of Southern California School of Policy, Planning, and Development. Undergraduate elective in the health policy sequence.
- *Advanced Microeconomics*, Pardee RAND Graduate School of Public Policy, 2003-2009. Co-taught one quarter in Ph.D. microeconomics sequence.
- *Microeconomics Curriculum*, Pardee RAND Graduate School of Public Policy, Fall 2002. Served on 4-person committee that guided the redesign and implementation of a new microeconomics curriculum for the Ph.D. program in Public Policy.

**SELECTED REFEREEING ACTIVITY**

- *American Economic Journals*
- *American Economic Review*
- *American Journal of Health Economics*
- *B.E. Journals of Economic Analysis and Policy*
- *Blood Journal*
- *Demography*
- *Econometrica*
- *Economic Inquiry*
- *Economic Journal*
- *Economics and Human Biology*
- *Education Finance and Policy*

- *European Economic Review*
- *Education Next*
- *Forum for Health Economics and Policy*
- *Geneva Papers on Risk and Insurance*
- *Health Affairs*
- *Health Economics*
- *Health Services Research*
- *International Economic Review*
- *International Journal of Health Care Finance and Economics*
- *JAMA Oncology*
- *Journal of the American Medical Association*
- *Journal of Applied Econometrics*
- *Journal of Development Economics*
- *Journal of Economic Literature*
- *Journal of Empirical Legal Studies*
- *Journal of the European Economic Association*
- *Journal of Gerontology: Social Sciences*
- *Journal of Health Economics*
- *Journal of Human Capital*
- *Journal of Human Resources*
- *Journal of Labor Economics*
- *Journal of Policy Analysis and Management*
- *Journal of Political Economy*
- *Journal of Public Economics*
- *Journal of Regional Science*
- *Journal of Risk and Insurance*
- *The Milbank Quarterly*
- *National Tax Journal*
- *New England Journal of Medicine*
- *PharmacoEconomics*
- *Quarterly Journal of Economics*
- *Review of Economic Studies*
- *Review of Economics of the Household*
- *Review of Economics and Statistics*
- *Social Science and Medicine*
- *Social Science Research*
- *Cambridge University Press*
- National Institutes of Health
- National Science Foundation
- US Department of Agriculture Economic Research Service

**PROFESSIONAL AFFILIATIONS**

- American Economic Association
- International Society for Pharmacoeconomics and Outcomes Research
- American Society of Health Economists

**Selected Popular Press Mentions**

- Ackerman, Daniel. "How excess deaths in the COVID-19 pandemic impacted Social Security." Marketplace (podcast), February 19, 2025.
- Osman, Maaisha. "Expert: Implementing CED Differently Could Help Boost Innovation." *Inside Health Policy* (online), October 22, 2024.
- Constantino, Annika Kim. "Blocking FDA approval of abortion pill could stifle innovation in the biopharma industry, experts say." CNBC Health and Science (online), April 13, 2023.
- American Health Law Association. "COVID-19 Implications for Pharmaceutical Litigation." Health Law Weekly (podcast). July 17, 2020.
- Perrone, Matthew, " 'Pooled testing' for COVID-19 holds promise, pitfalls." *Associated Press* (online). June 30, 2020.
- Azvolinsky, Anna. "Despite Generic Imatinib, Cost of Treating CML Remains High." *Cancer Today* (online). February 24, 2020.
- Wapner, Jessica, "Medication keeps getting more expensive – and big pharma won't explain why." *Newsweek* (online), April 24, 2018.
- Callery, Taylor, "How to reboot the FDA." *Politico* (online), December 13, 2017.
- Mason, Melanie, "What would California's proposed single-payer healthcare system mean for me?" *Los Angeles Times* (online), June 1, 2017.
- Finkl, Ed. "A prescription to help cure high drug costs?" *Medical Economics* (online), May 25, 2017.
- Gregory, Sean and Alexandra Sifferlin, "President Trump Vow to Solve the Opioid Crisis. He Needs to Fix this Problem First." *Time* (online), February 24, 2017.
- Sharon, Jason and Mark Linthicum, "Advancing Value in Healthcare." *Genetic Engineering & Biotechnology News* (online), December 12, 2016.
- Hiltzik, Michael, "Will the Trump presidency mean the end of FDA drug regulation?" *Los Angeles Times* (online), November 16, 2016.
- Chang, Alicia, "Prop 61: Big Pharma scores expensive win on California ballot measure." *The Mercury News* (online), November 10, 2016.
- Associated Press, "Prop 61: Big Pharma scores over drug prices." *KSBW* (online), November 9, 2016.
- Swaminathan, Nikhil, "Precision medicine may be health care's next big thing, but we don't yet know how to evaluate precision drugs." *Quartz Media* (online), November 1, 2016.
- Pearson, Steven, "Value: Can we afford to think long-term while ignoring budget impact?" *Health Affairs* Blog (online), September 22, 2016.
- Stanton, Dan et al. "Quality for burgeoning US biosimilars market, says BIO panel." www.biopharma-reporter.com, June 17, 2016.
- Perrone, Matthew, "Apps help people find best drug prices." *The Columbian* (online). June 6, 2016.
- Perrone, Matthew, "Why not shop for lower prescription drugs prices?" *The Salt Lake Tribune* (online), June 2, 2016.
- Perrone, Matthew, "Why aren't you shopping for lower prescription drug prices?" www.medicalexpress.com, June 1, 2016.
- Joszt, Laura, "Briefing shed light on the challenges and opportunities of HCV treatment." *American Journal of Managed Care* (online newsletter), May 27, 2016.
- Plevin, Rebecca, "A financial cast for expanding access to costly hepatitis C drugs," Southern Caifornia Public Radio (online blog), May 18, 2016.
- Feller, Stephen, "Study: Cheaper to cure hepatitis C sooner than later." *United Press International* (online), May 9, 2016.
- Perrone, Matthew, "Breakthrough cholesterol drugs fizzle amid price pushback," *Houston Chronicle* (online), April 22, 2016.

- Perrone, Matthew, "Why so few patients get the new cholesterol busters," www.cbsnews.com, April 20, 2016.
- *The Economist*, July 30, 2009. "Economics Focus: Waist Banned." Discussion of Goldman, Dana, Darius N. Lakdawalla, and Yuhui Zheng, "Food Prices and the Dynamics of Body Weight."
- Steenhuysen, Julie. "Drug Price Controls May Shorten Lives: Report." *Reuters*, December 16, 2008. Discussion of Lakdawalla, Darius N., et al, "US Pharmaceutical Policy in a Global Marketplace."
- *The Wall Street Journal*, August 25, 2006. "Econoblog: Cheap Food, Societal Norms and the Economics of Obesity."
- Morin, Richard. "Breakthrough Breakdown." *Washington Post*, July 11, 2004, page B5. Review of Goldman, Dana, Darius N. Lakdawalla, and Neeraj Sood, "HIV Breakthroughs and Risky Sexual Behavior."
- Winslow, Ron. "Obesity Is Linked to Rising Disability in Younger Adults." *Wall Street Journal*, January 9, 2004, page C1. Review of Lakdawalla, Darius N., Jay Bhattacharya, and Dana Goldman, "Are the Young Becoming More Disabled?"
- Akst, Daniel, *New York Times*, March 2, 2003. "Belt-Loosening in the Work Force." Mention of Lakdawalla, Darius N., and Tomas Philipson, "Technological Change and the Growth of Obesity."
- Morin, Richard. "Age-Old Question." *Washington Post*, January 31, 2003, page B5. Review of: Lakdawalla, Darius N., and Robert Schoeni, "The Decline in the Spousal Age Gap and the Demand for Long-Term Care."
- Varian, Hal. "Economic Scene: Employment and Prosperity Affect Body Inflation." *New York Times*, September 26, 2002, page C2. Review of Lakdawalla, Darius N., and Tomas Philipson, "Technological Change and the Growth of Obesity."
- Sydell, Laura. Radio Interview and Commentary. *Marketplace Morning Report*, National Public Radio. May 30, 2002. Review of: Lakdawalla, Darius N., and Tomas Philipson, "Technological Change and the Growth of Obesity."
- Edmonds, Sarah. Reuters News Service, May 29, 2002. "Innovation Behind Fatter Americans, Study Says." Review of: Lakdawalla, Darius N., and Tomas Philipson, "Technological Change and the Growth of Obesity."
- Gongloff, Mark. CNN/Money Online, May 21, 2002. "Technology Makes You Fat." Review of: Lakdawalla, Darius N., and Tomas Philipson, "Technological Change and the Growth of Obesity."
- Critser, Gregory, *Los Angeles Times*, April 28, 2002. "The Price of Pudge." Mention of Lakdawalla, Darius N., and Tomas Philipson, "Technological Change and the Growth of Obesity."
- Koretz, Gene. "The Young and the Disabled." *BusinessWeek*, June 4, 2001, page 30. Review of: Lakdawalla, Darius N., Jay Bhattacharya, and Dana Goldman, "Are the Young Becoming More Disabled?"
- Morin, Richard. "Unhealthy Paradox." *Washington Post*, May 20, 2001, page B5. Review of: Lakdawalla, Darius N., Jay Bhattacharya, and Dana Goldman, "Are the Young Becoming More Disabled?"
- Postrel, Virginia. "American Waistlines Have Become the Victims of Economic Progress." *The New York Times*, March 22, 2001, page C2. Review of: Lakdawalla, Darius N., and Tomas Philipson, "Technological Change and the Growth of Obesity."
- *Investor's Business Daily*, November 30, 1999. "Are Teachers Underpaid?" Review of: Lakdawalla, Darius N., "The Declining Relative Quality of Teachers."
- Koretz, Gene. "The Coming Boom in Long-Term Care?" *BusinessWeek*, June 28, 1999, page 26. Review of: Lakdawalla, Darius N., and Tomas Philipson, "The Rise in Old-Age Longevity and the Market for Long-Term Care."

**SELECTED PRESENTATIONS AND SPEAKING ENGAGEMENTS**

- Lakdawalla, Darius. "Drug Price Controls—What are the Unintended Consequences to Innovation?" *ISPOR Annual Meeting*. Montreal, Quebec, Canada. May 14, 2025.
- Lakdawalla, Darius. "How Should Health Economists and Health Policymakers Measure the Costs of Inequality?" *ISPOR Annual Meeting*. Montreal, Quebec, Canada. May 14, 2025.
- Lakdawalla, Darius. "Challenges in the Implementation of Generalized Cost-Effectiveness Analysis (GCEA): Debating a Path Forward." *ISPOR Annual Meeting*. Montreal, Quebec, Canada. May 14, 2025.
- Lakdawalla, Darius. "Valuing Health: The Generalized Risk-Adjusted Cost-Effectiveness (GRACE) Model." ISPOR Short Course. Montreal, Quebec, Canada. May 13, 2025.
- Lakdawalla, Darius. "Future-Proofing the Science of Cost-Effectiveness." 2025 Western PharamcoEconomics Conference. University of Washington. Seattle, WA. April 1, 2025.
- Lakdawalla, Darius. Guest lecture at Carleton College Department of Economics. Northfield, MN. March 7, 2025.
- Lakdawalla, Darius. 2025 Global Payer Forum: Optimizing Patient Access Through Value-Based Healthcare. Virtual. February 20, 2025.
- Lakdawalla, Darius. "Origins and Implications of Health Technology Assessment." Biotech CEO Forum. Virtual. December 2, 2024.
- Lakdawalla, Darius. "Value Assessment with Generalized Risk-Adjusted Cost-Effectiveness (GRACE)." Digital Healthcare for the Management of Functional Neurological Disorders. London, UK. November 26, 2024.
- Lakdawalla, Darius. "New Methods in Cost-Effectiveness." Celebrating Cost-Effectiveness. Tufts University Center for the Evaluation of Value and Risk in Health. Cambridge, MA. October 26, 2024.
- Lakdawalla, Darius. "Benefits of Medicare Coverage for Weight-Loss Drugs." 25th Annual Harvard Nutrition and Obesity Symposium. Virtual. June 5, 2024.
- Lakdawalla, Darius. "Soft Landing, Hard Problems." Financial Times U.S. Pharma and Biotech Summit. New York, NY. May 16, 2024.
- Lakdawalla, Darius. "How Do We Add Flexibility and Patient-Centricty to Value?" BIO Value Assessment Summit. Washington, DC. May 15, 2024.
- Lakdawalla, Darius. "Economic Foundations of Distributional Cost-Effectiveness Analysis." ISPOR Annual Meeting. Atlanta, GA. May 8, 2024.
- Lakdawalla, Darius. "The Case for Assessing Value with GRACE." ISPOR Annual Meeting. Atlanta, GA. May 7, 2024.
- Lakdawalla, Darius. "Valuing Health: The Generalized Risk-Adjusted Cost-Effectiveness (GRACE) Model." ISPOR Virtual Short Course. June 28-29, 2023.
- Lakdawalla, Darius. "Determining Value: A Biotech Industry Discussion on Value Assessments and Alternative Proposals." BIO International Conference. Boston, MA. June 6, 2023.
- Lakdawalla, Darius. "Economic Impacts, Implications, and Approaches." National Research Summit on Care, Services, and Supports for Persons with Dementia and their Care Partners. National Institute on Aging. March 22, 2023.
- Lakdawalla, Darius. "Inflation Reduction Act – Considering the Implications of Price Setting on Cost of Medicine." Charles River Associates Chief Commercial Officer's Forum at JP Morgan. January 10, 2023.
- Lakdawalla, Darius. "Dealing with Disability in Health Technology Assessment (HTA)." ISPOR Annual Meeting. May 16, 2022.
- Lakdawalla, Darius. "Rewarding Value in Global Pharmaceutical Markets." Sustaining Global Pharmaceutical Innovation and Access. London Business School. April 20, 2022.
- Lakdawalla, Darius. "Frontiers in Value Assessment." International Society for Pharmacoeconomics and Outcomes Research Annual Meeting, Plenary Session, May 20, 2020.

- Lakdawalla, Darius. "Economics of the Pharmaceutical Industry." National Institutes of Health, Special Interest Group, March 5, 2020.
- Lakdawalla, Darius. "Mortality Risk, Insurance, and the Value of Life." Wharton School of Business, November 1, 2019.
- Lakdawalla, Darius. "Mortality Risk, Insurance, and the Value of Life." Questrom School of Business, Boston University, October 31, 2019.
- Lakdawalla, Darius. "Economics of the Pharmaceutical Industry." Congressional Budget Office Panel of Health Advisors. September 20, 2019.
- Lakdawalla, Darius. "Novel elements of value in healthcare." International Society for Pharmacoeconomics and Outcomes Research Annual Meeting, Issue Panel, May 20, 2019.
- Lakdawalla, Darius. "Value-based decision making in Healthcare." UT-Southwestern Medical School, Guest Lecture to Faculty, February 7, 2019.
- Lakdawalla, Darius. "Food Purchasing Behaviors of New SNAP Recipients." *Human Capital Economic Opportunity Working Group: Measuring and Improving Health Equity*, Los Angeles, CA, December 7, 2018.
- Lakdawalla, Darius. "On Drugs." Toulouse School of Economics Guest Lecture, Toulouse, France, October 24, 2018
- Lakdawalla, Darius. "Patient Socioeconomic Status and Physician Supply Responses." *Toulouse School of Economics Industrial/Organizational Seminar*, Toulouse, France, October 15, 2018
- Lakdawalla, Darius. "On Drugs." *Canadian Health Economist Study Group*, McGill University, Montreal, Canada, May 31, 2018.
- Lakdawalla, Darius. "Should We Move Beyond Conventional Cost-Effectiveness Analysis." *ISPOR Annual Meeting*, Baltimore, MD, May 21, 2018
- Lakdawalla, Darius. "ISPOR's Special Task Force Report on US Value Assessment Frameworks: A Deeper Dive into Its Health Economic Underpinning." *ISPOR Annual Meeting*, Boston, MA, May 22, 2017.
- Lakdawalla, Darius. "Actuarial and Health Economic Approaches to Assess Value: Speaking the Same Language or Need for Translation." *ISPOR Annual Meeting*, Boston, MA, May 22, 2017.
- Lakdawalla, Darius. "A Roadmap to Consumer Clarity in Healthcare Decision Making." *NPAF's Spring Policy Consortium*, Washington, DC, May 17, 2017.
- Lakdawalla, Darius. "An Economic Perspective on Value Frameworks." *AJMC's ACO and Emerging Healthcare Delivery Coalition*, Scottsdale, AZ, May 5, 2017.
- Lakdawalla, Darius. "Risk Annuitization and the Value of Life." *HEC Montreal Seminar Series*, Montreal, Quebec, Canada, October 4, 2016.
- Lakdawalla, Darius. "Saving Lives or Saving Money? Understanding the Dual Nature of Physician Preferences." *Johns Hopkins University Seminar Series*, Baltimore, MD, September 21, 2016.
- Lakdawalla, Darius. Health Economic Perspectives on Value Frameworks: "Measuring Value in Innovative Medicines." *ASHEcon*, Philadelphia, PA, June 14, 2016.
- Lakdawalla, Darius. The Economics of Reimbursing New Medical Innovation: "An Economic Model of Surrogate Endpoints." *ASHEcon*, Philadelphia, PA, June 13, 2016.
- Arnsten, Kathleen, Geoffrey Eich, Darius N. Lakdawalla, and Tomas Philipson. "The Future of Biosimilars: How Will Policy and Market Dynamics Impact Patient Value and Access in the U.S.?" *BIO International*, San Francisco, CA, June 8, 2016.
- Lakdawalla, Darius. "Budget Impact Analysis: An Acceptable Part of Value Assessments or a Discordant Concept?" *ISPOR Symposium*, Boston, MA, May 22, 2016.
- Lakdawalla, Darius. "The value of specialty drugs: Can we develop novel access policies for novel medicines?" ISPOR Annual Meeting, Boston, MA, May, 2016.
- Lakdawalla, Darius N., Anupam Jena, and Ryan Cleary. "Ending Hepatitis C: The Value of Curing the Nation's Deadliest Blood-Borne Disease." *National Viral Hepatitis Roundtable Meeting*, Washington, DC, May 2016.

- Goldman, Dana, Darius N. Lakdawalla, and Sam Nussbaum. "Research and Its Practical Application." *Academy of Managed Care Pharmacy*, Panel R5, Impact of Value – Designing Innovative Models on Drug Costs, San Francisco, CA, April 2016.
- Lakdawalla. "The Cost and Value of Biomedical Innovation: Implications for Health Policy." Presentation Title: "What Can We Learn from Recent Hepatitis C Treatments? Understanding the Pricing Process and Spending Consequences for Breakthrough Therapies." Speaker, *Brookings Institute*, Washington, D.C., October, 2014.
- Lakdawalla. "Forecasting Population Health in Asia." Keynote Speaker, *Japanese Health Economics Association*, Tokyo, Japan, September 2014.
- Lakdawalla. "Balancing the Value and Cost of Cancer Therapies." Speaker, *BIO – 2014 International Convention*, San Diego, CA, June 2014.
- Lakdawalla. *ASHEcon – 5th Biennial Meeting*, June 2014.
- Lakdawalla. "Implications of the Affordable Care Act for Diabetes." Presenter, *74th Scientific Sessions – ADA*, San Francisco, CA, June 2014.
- Lakdawalla. "The Affordable Care Act: Will It Help or Harm the Landscape for Biomedical Innovation and Technology?" Panelist, *ISPOR – 19th Annual International Meeting, Issue Panels – Session IV – Panel#2449*, Montreal, QC, Canada, June 2014.
- Lakdawalla. "The Insurance Value of Medical Innovation." *National Bureau of Economic Research- Annual Conference-Health Economics Program Meeting*, Boston, MA, April 2014.
- Lakdawalla, "The Insurance Value of Medical Innovation." Guest Lecturer, *School of Public Health, UCSB*, Santa Barbara, CA, March 2014 (Ted Frech)
- Lakdawalla. "The Insurance Value of Medical Innovation." *National Bureau of Economic Research- Annual Conference-Healthcare Program Meeting*, Boston, MA, February 2014.
- Lakdawalla. "Research & Development, Manufacturing, and the Marketplace in California." *California State Assembly Select Committee on Biotechnology - Information Hearing,* Sacramento, CA, February 2014.
- Lakdawalla, "The Effect of Medicare Part D on bargaining between Drug Companies and Insurance Companies." Guest Lecturer, *School of Public Health, UCLA*, Los Angeles, CA, January 2014 (Bill Comanor)
- Lakdawalla. "Making the Case for Efforts in Personalized and Precision Health." *World Economic Forum Annual Summit on the Global Agenda*, Abu Dhabi, UAE, November 2013.
- Lakdawalla. "Mental Health and Medicaid Policy." *Women in Government Annual Healthcare Summit*, Washington, D.C., November 2013.
- Lakdawalla. "The Insurance value of Medical Technology." *University of Illinois at Urbana-Champaign*, Champaign, IL, October 2013.
- Lakdawalla. *Council for Advancing Diabetes Care*, Santa Monica, CA, October 2013.
- Lakdawalla. "Innovation and Insurance." *University of Chicago Applications Workshop,* Chicago, IL, September 2013.
- Lakdawalla. "Healthcare/Microeconomics Workshop." *Indiana University*, Bloomington, IN, September 2013.
- Lakdawalla. "Best of Both Worlds: Uniting Universal Coverage and Personal Choice in Health Care." *American Enterprise Institute Launch Event*, Washington, D.C., August 2013.
- Lakdawalla. "Value of Adherence."/ Session 3: How do we unlock the value of better patient adherence? *AJMC Patient-Centered Diabetes Care Symposium*, Chicago, IL, June 2013.
- Lakdawalla. Panel Discussion of "How Do We Balance Patient Value & Payer Cost in Oncology?" *International Society for Pharmacoeconomics and Outcomes Research 18th Annual International Meeting*, New Orleans, LA, May 2013.
- Lakdawalla. *Council for Advancing Diabetes Care*, Arlington, VA, May 2013.
- Lakdawalla. Discussion of "Hospital Market Structure, Pricing and Quality of Care." *Allied Social Sciences Association Annual Meeting,* San Diego, CA, January 2013.

- Lakdawalla. "Does Statin Use Adversely Affect Health Behaviors?" *Allied Social Sciences Association Annual Meeting,* San Diego, CA, January 2013.
- Lakdawalla. "Medicare Part D and Negotiating Leverage in the Pharmaceutical Industry." *University of Chicago Applications of Economics Workshop*, Chicago, IL, May 2010.
- Lakdawalla. Discussion of "The Rise of Paragraph IV Challenges on Startup Alliance Formation in the Pharmaceutical Industry." *Southern California Applied Microeconomics Conference,* Claremont, CA, April 2010.
- Lakdawalla. "Medicare Part D and Pharmaceutical Advertising." *Robert Wood Johnson Fellowship External Speaker Series*, Berkeley, CA, March 2010.
- Lakdawalla. "Tort Liability for Prescription Drugs." *National Bureau of Economic Research Health Care Program Meeting*, Cambridge, MA, March 2010.
- Lakdawalla. "Medicare Part D and Pharmaceutical Advertising." *American Economic Association Annual Meetings*, Atlanta, GA, January 2010.
- Lakdawalla, "Health Insurance as a Two-Part Pricing Contract." *Toulouse School of Economics Health Economics Conference*, Toulouse, France, October 2009.
- Lakdawalla, "US Pharmaceutical Policy in a Global Context." *Eugene Garfield Award Presentation Lunch*, Washington, D.C., October 2009.
- Lakdawalla. "Health Insurance as a Two-Part Pricing Contract." *Brown University Department of Economics Seminar Series*, Providence, RI, September 2009.

**PhD ADVISEES**

- Committee Chair for Drishti Baid, Current
- Committee Chair for Ian Davis, Current
- Committee Chair for Shihan Jin, Current
- Primary Advisor for Azka Imran, Current
- Committee Member for Shengjia Xu, Graduated 2023 (June)
- Outside Reviewer for Gosia Majewski (Toulouse School of Economics), Graduated 2023 (June)
- Committee Member for Yifan Wei, Graduated 2023 (December)
- Committee Member for Phyllis Barkman Ferrell (Indiana University), Graduated 2023 (November)
- Committee Member for Sam Crawford, Graduated 2022 (August)
- Committee Chair for Jaehong Kim, Graduated 2021 (August)
- Proposal Committee Member for Jeffrey Yu, Graduated 2021 (August)
- Proposal Committee Member for Jianhui Xu, Graduated 2021 (August)
- Committee Chair for Jonathan Salcedo, Graduated 2020
- Committee Chair for Laura Henkhaus, Graduated 2019
- Committee Member for Eunhae Shin, Graduated 2019
- Committee Member for Xiaohan Hu, Graduated 2019
- Committee Member for Sarah Axeen, Graduated 2016

**DARIUS N. LAKDAWALLA, PRIOR TESTIMONY—PAST FOUR YEARS**

*Julie A. Su, Acting Secretary of Labor, United States Department of Labor v. Amazon.com Services, LLC, dba ALB1, BOI2, DCS3, DEN5, DNK5, DYO1, MCO2, MDW8, TEB3, DPP7,* OSHRC Docket Nos. 23-0298, 23-0295, 23-0376, 23-0292, 23-0761, 23-0227, 23-0195, 23-0229, 23-1182, & 23-1172, Occupational Safety & Health Review Commission; Deposition (November 2024)

*Aamira Mosely et al. v. Gilead Sciences, Inc.*, Case No. 4:19-cv-05816 (as to Leo Cleere III only); *Aaron Lyons et al. v. Gilead Sciences, Inc.*, Case No. 3:19-cv-02538 (as to Terry Garrett only); and *Aaron Calkins et al. v. Gilead Sciences, Inc.*, Case No.4:20-cv-01884 (as to Michael Hall only) in *Adrian Holley et al. v. Gilead Sciences Inc.*, Case No. 4:18-cv-06972-JST, U.S. District Court for the Northern District of California; Deposition (February 2023)

*State of Minnesota v. JUUL Labs, Inc., et al.*, Case No. 27-CV-19-19888, State of Minnesota District Court: Fourth Judicial District; Deposition (October 2022)

*Sorrento Therapeutics, Inc. and Scilex Pharmaceuticals Inc. v. Anthony Mack and Virpax Pharmaceuticals, Inc.*, Civil Action No. 2021-0210-PAF, Court of Chancery of the State of Delaware; Deposition (July 2022); Trial Testimony (September 2022)

*Adrian Holley et al. v. Gilead Sciences, Inc.,* Case No. 4:18-cv-06972-JST, U.S. District Court for the Northern District of California; Deposition (August 2022)

*In re JUUL Labs, Inc. Marketing, Sales Practices, and Products Liability Litigation,* Case No. 3:19-md-02913, U.S. District Court for the Northern District of California; Deposition for the generic report (December 2021); Deposition for the bellwether report (June 2022)

*Victor G. Karraa et al. v. Gilead Sciences, Inc.*, Los Angeles County, Case No. 208TCV17754, (as to Plaintiff Victor G. Karraa only) in *Gilead Tenofovir Cases*, Judicial Council Coordination Proceeding (JCCP) No. 5043 (CJC-19-005043), Superior Court for the State of California, County of San Francisco; Deposition (March 2022)

*Perrigo Securities Litigation*, Class Action and 19 Opt-Out Cases, Class Action Case No. 2:16-CV-02805, U.S. District Court for the District of New Jersey; Deposition in the Class Action (January 2021); Deposition in the Opt-Out Cases (November 2021)

*In re Mylan N.V. Securities Litigation*, Case No. 1:16-CV-07926 (JPO), U.S. District Court for the Southern District of New York; Deposition (July 2021)

# Documents Relied Upon

## Academic Articles


- Adriana Corredor-Waldron and Janet Currie, "To What Extent Are Trends in Teen Mental Health Driven by Changes in Reporting? The Example of Suicide-Related Hospital Visits," *Journal of Human Resources*, 59(S), 2024, pp. S14–S40
- Anna Chorniy et al., "Exploding Asthma and ADHD Caseloads: The Role of Medicaid Managed Care," *Journal of Health Economics*, 60, 2018, pp. 1–15
- Benjamin W. Cowan and Zhuang Hao, "Medicaid Expansion and the Mental Health of College Students," *Health Economics*, 30(6), 2021, pp. 1306–1327
- Bernice A. Pescosolido et al., "Trends in Public Stigma of Mental Illness in the US, 1996–2018," *JAMA Network Open*, 4(12), 2021, e2140202
- Catherine P. Bradshaw et al., "A Mixed-Methods Approach for Embedding Cost Analysis Within Fidelity Assessment in School-Based Programs," *Behavioral Disorders*, 48(3), 2023, pp. 174–186
- Catherine P. Bradshaw, "Examining the Effects of Schoolwide Positive Behavioral Interventions and Supports on Student Outcomes: Results from a Randomized Controlled Effectiveness Trial in Elementary Schools," *Journal of Positive Behavior Interventions*, 12(3), 2010, pp. 133–148
- Christine C. Stewart et al., "Impact of ICD-10-CM Transition on Mental Health Diagnoses Recording," *eGEMS*, 7(1), 2019, 14
- Daniel Darghan Felisoni and Alexandra Strommer Godoi, "Cell Phone Usage and Academic Performance: An Experiment," *Computers & Education*, 117, 2018, pp. 175–187
- David Card, "Design-Based Research in Empirical Microeconomics," *American Economic Review*, 112(6), 2022, pp. 1773–1781
- Dimitri A. Christakis et al., "Adolescent Smartphone Use During School Hours," *JAMA Pediatrics*, 179(4), 2025, pp. 475–478
- Dirk Richter et al, "Is the Global Prevalence Rate of Adult Mental Illness Increasing? Systematic Review and Meta-Analysis," *Acta Psychiatrica Scandinavica*, 140(5), 2019, pp. 393–407
- Dorothyjean Cratty, "Potential for Significant Reductions in Dropout Rates: Analysis of an Entire 3rd Grade State Cohort," *Economics of Education Review*, 31(5), 2012, pp. 644–662

- Eduardo Hariton and Joseph J. Locascio, "Randomised Controlled Trials—the Gold Standard for Effectiveness Research," *BJOG*, 125(13), 2018, 1716
- Elise T. Pas et al., "Tracking Time and Resources Associated with Systems Change and the Adoption of Evidence-Based Programs: The 'Hidden Costs' of School-Based Coaching," *Administration and Policy in Mental Health and Mental Health Services Research*, 47(5), 2020, pp. 720–734
- Frederick J. Zimmerman and Dimitri A. Christakis, "Associations Between Content Types of Early Media Exposure and Subsequent Attentional Problems," *Pediatrics*, 120(5), 2007, pp. 986–992
- Frederick J. Zimmerman and Dimitri A. Christakis, "Children's Television Viewing and Cognitive Outcomes: A Longitudinal Analysis of National Data," *Archives of Pediatrics & Adolescent Medicine*, 159(7), 2005, pp. 619–625
- Frederick J. Zimmerman et al., "Early Cognitive Stimulation, Emotional Support, and Television Watching as Predictors of Subsequent Bullying Among Grade-School Children," *Archives of Pediatrics & Adolescent Medicine*, 159(4), 2005, pp. 384–388
- Gary S. Goldfield et al., "Effects of Modifying Physical Activity and Television Viewing on Psychosocial Adjustment in Overweight and Obese Children," *Journal of Pediatric Psychology*, 32(7), 2007, pp. 783–793
- Janet Currie, "Presidential Address: Investing in Children to Address the Child Mental Health Crisis," *American Economic Review*, 115(5), 2025, pp. 1369–1399
- Jean M. Twenge and W. Keith Campbell, "Media Use Is Linked to Lower Psychological Well-Being: Evidence from Three Datasets," *Psychiatric Quarterly*, 90(2), 2019, pp. 311–331
- Jean M. Twenge et al., "Increases in Depressive Symptoms, Suicide-Related Outcomes, and Suicide Rates Among U.S. Adolescents After 2010 and Links to Increased New Media Screen Time," *Clinical Psychological Science*, 6(1), 2017, pp. 3–17
- Jean M. Twenge et al., "Trends in U.S. Adolescents' Media Use, 1976–2016: The Rise of Digital Media, the Decline of TV, and the (Near) Demise of Print," *Psychology of Popular Media Culture*, 8(4), 2019, pp. 329–345
- Joanne Clarkin et al., "Are Younger People More Accurate at Identifying Mental Health Disorders, Recommending Help Appropriately, and Do They Show Lower Mental Health Stigma than Older People? – Age Differences in Mental Health Disorder Recognition," *Mental Health & Prevention*, 36, 2024, 200361
- Kati Puukko et al., "Social Media Use and Depressive Symptoms-A Longitudinal Study from Early to Late Adolescence," *International Journal of Environmental Research and Public Health*, 17(16), 2020, 5921

- Koustuv Saha et al., "A Computational Study of Mental Health Awareness Campaigns on Social Media," *Translational Behavioral Medicine*, 9(6), 2019, pp. 1197–1207
- Lei Zhao, "Social Media Multitasking and College Students' Academic Performance: A Situation–Organism–Behavior–Consequence Perspective," *Psychology in the Schools*, 60(9), 2023, pp. 3151–3168
- Lucy Foulkes and Jack L. Andrews, "Are Mental Health Awareness Efforts Contributing to the Rise in Reported Mental Health Problems? A Call to Test the Prevalence Inflation Hypothesis," *New Ideas in Psychology*, 69, 2023, 101010
- Man Yee Kan and Stephen Pudney, "Measurement Error in Stylized and Diary Data on Time Use," *Sociological Methodology*, 38, 2008, pp. 101–132
- Mathew J. Breiding and Brian Wiersema, "Variability of Undetermined Manner of Death Classification in the US," *Injury Prevention*, 12(Suppl II), 2006, pp. ii49–ii54
- Matthias C. Angermeyer et al., "Public Attitudes Towards Psychiatry and Psychiatric Treatment at the Beginning of the 21st Century: A Systematic Review and Meta-Analysis of Population Surveys," *World Psychiatry*, 16(1), 2017, pp. 50–61
- Metin Kus, "A Meta-Analysis of the Impact of Technology Related Factors on Students' Academic Performance," *Frontiers in Psychology*, 16, 2025, 1524645
- Mido Chang et al., "Do Sports Help Students Stay Away from Misbehavior, Suspension, or Dropout?" *Studies in Educational Evaluation*, 70(3), 2021, 101066
- Mostafa Purmehdi et al., "The Effectiveness of Warning Labels for Consumers: A Meta-Analytic Investigation into Their Underlying Process and Contingencies," *Journal of Public Policy & Marketing*, 36(1), 2017, pp. 36–53
- Muhammet Demirbilek and Tarik Talan, "The Effect of Social Media Multitasking on Classroom Performance," *Active Learning in Higher Education*, 19(2), 2017, pp. 117–129
- Nader Salari et al., "The Impact of Social Networking Addiction on the Academic Achievement of University Students Globally: A Meta-Analysis," *Public Health in Practice*, 9, 2025, 100584
- Nancy D. Brener et al., "Reliability of the 1999 Youth Risk Behavior Survey Questionnaire," *Journal of Adolescent Health*, 31(4), 2002, pp. 336–342
- Nancy D. Brener et al., "Reliability of the Youth Risk Behavior Survey Questionnaire," *American Journal of Epidemiology*, 141(6), 1995, pp. 575–580
- P. P. C. M. Chandrasena and I. M. P. S. Ilankoon, "The Impact of Social Media on Academic Performance and Interpersonal Relations Among Health Sciences Undergraduates," *Journal of Education and Health Promotion*, 11(1), 2022, 117

- Petrus te Braak et al., "Data Quality and Recall Bias in Time-Diary Research: The Effects of Prolonged Recall Periods in Self-Administered Online Time-Use Surveys," *Sociological Methodology*, 53(1), 2023, pp. 115–138
- Prashant Bharadwaj et al., "Mental Health Stigma," *Economics Letters*, 159, 2017, pp. 57–60
- Prashant Bharadwaj et al., "Mental Health Stigma," *National Bureau of Economic Research*, Working Paper 21240, 2015
- Regina van den Eijnden et al., "The Impact of Heavy and Disordered Use of Games and Social Media on Adolescents' Psychological, Social, and School Functioning," *Journal of Behavioral Addictions*, 7(3), 2018, pp. 697–706
- Russell M. Viner et al., "Roles of Cyberbullying, Sleep, and Physical Activity in Mediating the Effects of Social Media Use on Mental Health and Wellbeing Among Young People in England: A Secondary Analysis of Longitudinal Data," *The Lancet Child & Adolescent Health*, 3(10), 2019, pp. 685–696
- Russell W. Rumberger and Scott L. Thomas, "The Distribution of Dropout and Turnover Rates Among Urban and Suburban High Schools," *Sociology of Education*, 73(1), 2000, pp. 39–67
- Ryan D. Lacanilao et al., "Heterogeneous Consumer Responses to Snack Food Taxes and Warning Labels," *The Journal of Consumer Affairs*, 45(1), 2011, pp. 108–122
- Sarah Lindstrom Johnson et al., "Scaling Up Positive Behavioral Interventions and Supports: Costs and Their Distribution Across State, Districts, and Schools," *School Psychology Review*, 49(4), 2020, pp. 399–414
- Tarek Al Baghal et al., "What Are You Doing Now? Activity Level Responses and Recall Failures in the American Time Use Survey," *Journal of Survey Statistics and Methodology*, 2(4), 2014, pp. 519–537
- Victoria A. Goodyear et al., "School Phone Policies and Their Association with Mental Wellbeing, Phone Use, and Social Media Use (Smart Schools): A Cross-Sectional Observational Study," *The Lancet Regional Health – Europe*, 51, 2025, 101211
- Wade Jarvis and Simone Pettigrew, "The Relative Influence of Alcohol Warning Statement Type on Young Drinkers' Stated Choices," *Food Quality and Preference*, 28(1), 2013, pp. 244–252
- Winneke A. van der Schuur et al., "The Consequences of Media Multitasking for Youth: A Review," *Computers in Human Behavior*, 53, 2015, pp. 204–215
- Wisnu Wiradhany and Janneke Koerts, "Everyday Functioning-Related Cognitive Correlates of Media Multitasking: A Mini Meta-Analysis," *Media Psychology*, 24(2), 2021, pp. 276–303

**Books and Book Chapters**

- David M. Cutler et al., “Explaining the Rise in Youth Suicide,” in *Risky Behavior among Youths: An Economic Analysis*, ed. Jonathan Gruber (Chicago, IL: University of Chicago Press, 2001), pp. 219–270
- Federal Judicial Center and National Research Council, *Reference Manual on Scientific Evidence*, Third Edition, (Washington, D.C.: The National Academies Press, 2011)
- Jeffrey M. Wooldridge, *Introductory Econometrics: A Modern Approach*, Seventh Edition, (Boston, MA: Cengage, 2020)
- Joshua D. Angrist and Jörn-Steffen Pischke, *Mostly Harmless Econometrics*, (Princeton, NJ: Princeton University Press, 2009)
- Seon-Cheol Park and Yong-Ku Kim, “Anxiety Disorders in the DSM-5: Changes, Controversies, and Future Directions,” in *Advances in Experimental and Medical Biology, Volume 1191*, ed. Yong-Ku Kim (Singapore: Springer, 2020), pp. 187–196

**Bates Stamped Documents**

- SM_TUSD_00365959

**Data**

- Arizona Department of Education
- Centers for Disease Control and Prevention, Youth Risk Behavior Survey
- Common Core of Data
- Local Education Agency Universe Survey Dropout and Completion Data
- Monitoring the Future
- National Assessment of Educational Progress

**Depositions**

- Deposition of Rebecca S. Carrier, May 7, 2025, with Exhibits
- Deposition of Julie Shivanonda, June 30, 2025
- Deposition of Julie A. Shivanonda 30(b)(6) Volume 2, April 9, 2025
- Deposition of Sabrina M. Salmon, May 23, 2025
- Deposition of Holly L. Hammel Volume 2, June 24, 2025

- Deposition of Brian Lambert Volume 2, July 1, 2025
- Deposition of Richard H. Sanchez, May 6, 2025
- Deposition of Gabriel Trujillo, May 8, 2025

**Expert Reports and Affidavits**

- Expert Report of Anna Lembke, M.D., May 16, 2025
- Expert Report of Brian G. Osborne, May 16, 2025
- Expert Report of Dimitri A. Christakis, M.D., M.P.H., May 16, 2025
- Expert Report of Dr. Jean M. Twenge, Ph.D., May 16, 2025
- Expert Report of Dr. Ramin Mojtabai, M.D., Ph.D., M.P.H, May 16, 2025
- Expert Report of Dr. Sharon A. Hoover, Ph.D., May 16, 2025
- Expert Report of Eva Telzer, Ph.D., May 16, 2025
- Expert Report of Gary Goldfield, Ph.D. C. Psych., May 16, 2025
- Expert Report of Robert L. Klein, for Tucson Unified School District, May 18, 2025
- Expert Report of Dr. Bryce Ward, for Tucson Unified School District, May 19, 2025
- Expert Report of Jeffrey E. Meyers, for Tucson Unified School District, May 19, 2025
- Amended Expert Report of Dr. Sharon A. Hoover, Ph.D., for Breathitt County Board of Education, June 20, 2025
- Amended Expert Report of Dr. Sharon A. Hoover, Ph.D., for Charleston County School District, June 20, 2025
- Amended Expert Report of Dr. Sharon A. Hoover, Ph.D., for Harford County Board of Education, June 20, 2025
- Amended Expert Report of Dr. Sharon A. Hoover, Ph.D., for Tucson Unified School District, June 20, 2025
- Amended Expert Report of Douglas L. Leslie, Ph.D., for Tucson Unified School District, June 20, 2025

**Legal Documents**

- Plaintiffs' First Amended Master Complaint (Local Government and School District), *In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation*, March 27, 2024

- Order Granting in Part and Denying in Part Defendants' Motion to Dismiss the School District and Local Government Entities' Master Complaint, *In Re: Social Media Adolescent Addiction/Personal Injury Products Liability Litigation*, October 24, 2024

**Publicly Available Reports**


- Arizona Department of Education, "Annual Technical Report: Arizona Statewide Assessment in English Language Arts and Mathematics, 2020–2021 School Year," September 2021, available at https://www.azed.gov/sites/default/files/2022/02/SY2020-21_AzMERIT_Annual%20Technical%20Report.pdf

- Centers for Disease Control and Prevention, "Methodology of the Youth Risk Behavior Surveillance System – 2013," *Morbidity and Mortality Weekly Report*, 62(1), March 1, 2013, available at https://www.cdc.gov/mmwr/pdf/rr/rr6201.pdf

- Emily Young et al., "Frequent Social Media Use and Experiences with Bullying Victimization, Persistent Feelings of Sadness or Hopelessness, and Suicide Risk Among High School Students—Youth Risk Behavior Survey, United States, 2023," *Centers for Disease Control and Prevention, Morbidity and Mortality Weekly Report*, 73(4), October 10, 2024, available at https://www.cdc.gov/mmwr/volumes/73/su/pdfs/su7304a3-H.pdf

- Jenn Hatfield, "72% of U.S. High School Teachers Say Cellphone Distraction Is a Major Problem in the Classroom," *Pew Research Center*, June 12, 2024, available at https://www.pewresearch.org/short-reads/2024/06/12/72-percent-of-us-high-school-teachers-say-cellphone-distraction-is-a-major-problem-in-the-classroom/

- Jenny S. Radesky et al., "Constant Companion: A Week in the Life of a Young Person's Smartphone Use," *Common Sense*, 2023, available at https://www.commonsensemedia.org/sites/default/files/research/report/2023-cs-smartphone-research-report_final-for-web.pdf

- Jessica Swain-Bradway et al., "What Are the Economic Costs of Implementing SWPBIS in Comparison to the Benefits from Reducing Suspensions," *Center on Positive Behavioral Interventions and Supports*, November 2017, available at https://cdn.prod.website-files.com/5d3725188825e071f1670246/5d76c00cb9339d5f3f267ee7_economiccostsswpbis.pdf

- Mark Glander, "Documentation to the NCES Common Core of Data Local Education Agency Universe Survey: School Year 2013-2014, Provisional Version 1a," *National Center for Education Statistics*, July 2015, available at https://nces.ed.gov/ccd/pdf/2015147_2013-14_LEA_documentation_v1a.pdf

- National Education Association, "Impact of Social Media and Personal Devices on Mental Health," August 12, 2024, available at https://www.nea.org/resource-library/impact-social-media-and-personal-devices-mental-health
- Pauline Moore et al., "Developing Practical Responses to Social Media Threats Against K-12 Schools," *RAND*, April 10, 2024, available at https://www.rand.org/pubs/research_reports/RRA1077-5.html
- Rob Horner et al., "What Does It Cost to Implement School-Wide PBIS," *Center of Positive Behavioral Interventions and Supports*, July 2012, available at https://cdn.prod.website-files.com/5d3725188825e071f1670246/5d8a8ca19f7bf86ee571341b_20120802_Wha t DoesItCostToImplementSWPBIS.pdf
- Tucson Unified School District No. 1, "Analysis of Compliance with Unitary Status Plan, Section IV: Administrators and Certificated Staff, An Annex to the Annual Report for the 2016–2017 Academic Year," October 2, 2017, available at https://deseg.tusd1.org/Portals/TUSD1/Deseg/docs/main/2075_4.pdf
- Tucson Unified School District No .1 "Annual Report 2017-18 School Year Tucson Unified School District No. 1," October 1, 2018, Appendix VI – 22, available at https://deseg.tusd1.org/Portals/TUSD1/Deseg/docs/AR18/Appendices/AppendixVI-22.pdf
- Tucson Unified School District, "Desegregation Annual Reports," available at https://deseg.tusd1.org/annual-reports
- Tucson Unified School District, "Unitary Status Plan (Annual Report for the 2012–2013 Academic Year)," available at https://deseg.tusd1.org/Portals/TUSD1/Deseg/docs/main/1713.pdf


**Websites**


- Alison Eldridge, "Instagram," *Britannica Money*, July 9, 2025, available at https://www.britannica.com/money/Instagram
- American School Counselor Association, "School Counselor Roles & Ratios," available at https://www.schoolcounselor.org/about-school-counseling/school-counselor-roles-ratios
- Andrew Greiner et al., "Facebook at 15: How a College Experiment Changed the World," *CNN*, February 1, 2019, available at https://www.cnn.com/interactive/2019/02/business/facebook-history-timeline/index.html
- Arizona Department of Education, "Accountability & Research Data," available at https://www.azed.gov/accountability-research/data/

- Arizona Department of Education, "Act," available at https://www.azed.gov/assessment/act
- Arizona Indicators, "AIMS," available at https://www.arizonaindicators.org/aims-2/
- Austin Walker, "Student Dropout Rate Goes up amid COVID-19 Pandemic," *KVOA*, available at https://www.kvoa.com/coronavirus/student-dropout-rate-goes-up-amid-covid-19-pandemic/article_3ecf2293-d9f1-5ce4-ae4e-c0a2c7cde51a.html
- AZ School Report Cards, "Tucson Unified District," available at https://azreportcards.azed.gov/districts/detail/4403
- Centers for Disease Control and Prevention, "About YRBSS," June 14, 2024, available at https://www.cdc.gov/yrbs/about/index.html
- Centers for Disease Control and Prevention, "E-Cigarette Use Among Youth," October 17, 2024, available at https://www.cdc.gov/tobacco/e-cigarettes/youth.html
- Centers for Disease Control and Prevention, "Classification of Diseases, Functioning, and Disability," June 7, 2024, available at https://www.cdc.gov/nchs/icd/
- Centers for Disease Control and Prevention, "2019 YRBS Data User's Guide," August 2020, available at https://www.cdc.gov/yrbs/files/2019/pdf/2019_National_YRBS_Data_Users_Guide.pdf
- Centers for Disease Control and Prevention, "2021 YRBS Data User's Guide," April 2023, available at https://www.cdc.gov/yrbs/files/2021/pdf/2021_YRBS_Data_Users_Guide_508.pdf
- Center on Positive Behavioral Interventions and Supports, "What Is PBIS," available at https://www.pbis.org/pbis/what-is-pbis
- Common Sense Education, "Common Sense Educator Road Map," available at https://docs.google.com/document/d/1BOZqbVHA0Jhw4Nsoi1agxLONVbHw_ywnjbTQ-oyPTqU/edit?tab=t.0
- Common Sense Education, "Digital Citizenship Curriculum," available at https://www.commonsense.org/education/digital-citizenship/curriculum
- Common Sense Education, "Presentations for Parents & Families," available at https://www.commonsense.org/education/presentations-for-parents-families
- COVID-19 School Data Hub, "Overview for Arizona," available at https://www.covidschooldatahub.com/states/Arizona
- Danyelle Khamara, "Pandemic forces Arizona schools to close for remainder of academic year, move to online teaching," *Arizona Daily Star*, March 30, 2020, available at https://tucson.com/news/local/article_f76beb6d-775d-5c6e-85f7-46cc0b6fb954.html.

- Deborah D'Souza, "TikTok: What It Is, How It Works, and Why It's Popular," *Investopedia*, January 20, 2025, available at https://www.investopedia.com/what-is-tiktok-4588933
- Evelyn M. Rusli, "Facebook Buys Instagram for $1 Billion," *The New York Times*, April 9, 2012, available at https://archive.nytimes.com/dealbook.nytimes.com/2012/04/09/facebook-buys-instagram-for-1-billion/
- Facebook Help Center, "Messaging," available at https://www.facebook.com/help/1071984682876123/?helpref=hc_fnav
- Facebook Help Center, "Reels," available at https://www.facebook.com/help/753046815962474/?helpref=hc_fnav
- Facebook Help Center, "Stories," available at https://www.facebook.com/help/862926927385914/?helpref=hc_fnav
- Facebook Help Center, "Your Home Page," available at https://www.facebook.com/help/753701661398957?helpref=related_topics
- Facebook Help Center, "Your Profile," available at https://www.facebook.com/help/396528481579093/?helpref=hc_fnav
- Healthy Schools, Promising Futures, "School Medicaid Expansion: How (and How Many) States Have Taken Action to Increase School Health Access and Funding," October 17, 2023 available at https://healthystudentspromisingfutures.org/wp-content/uploads/2023/10/Status-of-School-Medicaid-Expansion_-How-and-How-Many-States-Have-Taken-Action-to-Increase-School-Health-Access-and-Funding.pdf
- Instagram, "Features: Share What You're Into," available at https://about.instagram.com/features
- Isaiah Hayes and Arianna Prothero, "To Ban or Not to Ban? Educators, Parents, and Students Weigh in on Cellphones," *EducationWeek*, June 5, 2024, available at https://www.edweek.org/leadership/to-ban-or-not-to-ban-educators-parents-and-students-weigh-in-on-cellphones/2024/06
- John M. Grohol and Stephanie A. Wright, "DSM-5 Changes: Depression and Depressive Disorders," *Psych Central*, March 30, 2022, available at https://psychcentral.com/depression/dsm-5-changes-depression-depressive-disorders
- K-12 School Shooting Database, "How Many School Shootings? All Incidents From 1966-Present," available at https://k12ssdb.org/all-shootings
- Meta, "Build the Future of Human Connection and the Technology That Makes It Possible," available at https://www.meta.com/about/company-info/

- Monitoring the Future, "About MTF," available at https://monitoringthefuture.org/about/
- Monitoring the Future, "Data Access," available at https://monitoringthefuture.org/results/data-access/
- National Academies of Sciences, Engineering, and Medicine, "Social Media and Adolescent Health," 2024, available at https://nap.nationalacademies.org/catalog/27396/social-media-and-adolescent-health
- National Association of School Psychologists, "Responding to Social Media Trends: Guidance for Caregivers," 2023, available at https://www.nasponline.org/resources-and-publications/resources-and-podcasts/school-safety-and-crisis/guidance-at-a-glance
- National Association of School Psychologists, "The Professional Standards of the National Association of School Psychologists," 2020, available at https://www.nasponline.org/standards-and-certification/nasp-2020-professional-standards-adopted
- National Center for Education Statistics, "An Overview of NAEP," available at https://nces.ed.gov/nationsreportcard/subject/about/pdf/naep_overview_brochure_2021.pdf
- National Center for Education Statistics, "Search for Public School Districts: Tucson Unified District Details – Fiscal," available at https://nces.ed.gov/ccd/districtsearch/district_detail.asp?Search=1&InstName=tucson&State=04&County=Pima+County&DistrictType=1&DistrictType=2&DistrictType=3&DistrictType=4&DistrictType=5&DistrictType=6&DistrictType=7&DistrictType=8&DistrictType=9&NumOfStudentsRange=more&NumOfSchoolsRange=more&ID2=0408800&details=4
- National Center for Education Statistics, "Search for Public School Districts: Tucson Unified District Details – Characteristics," available at https://nces.ed.gov/ccd/districtsearch/district_detail.asp?Search=1&details=1&InstName=Tucson&State=04&DistrictType=1&DistrictType=2&DistrictType=3&DistrictType=4&DistrictType=5&DistrictType=6&DistrictType=7&DistrictType=8&DistrictType=9&NumOfStudentsRange=more&NumOfSchoolsRange=more&ID2=0408800
- Nick Routley, "Timeline: Looking Back at 10 Years of Snapchat," *Visual Capitalist*, July 18, 2021, available at https://www.visualcapitalist.com/timeline-looking-back-at-10-years-of-snapchat/
- Nirmita Panchal et al., "The Landscape of School-Based Mental Health Services," *KFF*, September 6, 2022, available at https://www.kff.org/mental-health/issue-brief/the-landscape-of-school-based-mental-health-services/

- Pima County School Superintendent, "District Schools," available at https://www.schools.pima.gov/schools/public-schools
- Sahuarita Unified School District, "AzMERIT: What You Need to Know About Arizona's New Achievement Test," available at https://susd30.us/wp-content/uploads/2014/11/AzMERIT-Parent-Information.pdf
- Shaena Montanari and Maria Polletta, "Youth Access to Mental Health Care Improved Under Jake's Law, but Persistent Barriers Hamper Its Reach," *Arizona Center for Investigative Reporting*, September 1, 2022, available at https://azcir.org/news/2022/09/01/jakes-law-mental-health-parity/
- Shireen Meer, "A Primer on Economic Damages for Litigators," *American Bar Association*, August 23, 2024, available at https://www.americanbar.org/groups/litigation/resources/newsletters/woman-advocate/summer2024-a-primer-on-economic-damages-for-litigators/
- Snap Investor Relations, "About Snap," available at https://investor.snap.com/about-snap/default.aspx
- Snapchat, "What Is Snapchat?" available at https://parents.snapchat.com/about-snapchat
- State of Arizona Senate, Fifty-second Legislature, "Senate Bill 1191," available at https://www.azleg.gov/legtext/52leg/1r/bills/SB1191S.pdf
- The Nation's Report Card, "Explore Results for the 2022 NAEP Mathematics Assessment: Grade 12," available at https://www.nationsreportcard.gov/mathematics/?grade=12
- The Nation's Report Card, "Data Tools," available at https://www.nationsreportcard.gov/data_tools.aspx
- The Nation's Report Card, "Explore Results for the 2022 NAEP Reading Assessment: Grade 12," available at https://www.nationsreportcard.gov/reading/?grade=12
- The University of Arizona, "Talk It Out," available at https://education.arizona.edu/news/talk-it-out
- Tucson Unified School District, "Mental Health Support," available at https://www.tusd1.org/mental-health-landing
- Tucson Unified School District, "Policy-Code-JICJ: Student Use of Cell Phones and Other Electronic Signaling Devices, Section J - Students," August 23, 2022, available at https://govboard.tusd1.org/Policies-and-Regulations/Policy-Code-JICJ

- Tucson Unified School District, "Student Code of Conduct: Guidelines for Student Rights and Responsibilities," 2021, available at https://www.tusd1.org/_theme/files/counseling/22-23/Code-of-Conduct.pdf
- U.S. Census Bureau, "QuickFacts," available at https://www.census.gov/quickfacts/fact/table/
- U.S. Census Bureau, "QuickFacts: Pima County, Arizona," available at https://www.census.gov/quickfacts/fact/table/pimacountyarizona/PST045224
- U.S. Department of Education, "NCES Common Core of Data Local Education Agency-Level Public-Use Data File on Public School Dropouts: School Year 2004–05," December 2007, available at https://nces.ed.gov/ccd/pdf/agdr041agen.pdf
- Version Museum, "Design History of YouTube.com," available at https://www.versionmuseum.com/history-of/youtube-website
- William L. Hosch, "YouTube," *Britannica*, July 3, 2025, available at https://www.britannica.com/topic/YouTube
- Yingzhi Yang and Brenda Goh, "Timeline: Tiktok's Journey from Global Sensation to Trump Target," *Reuters*, August 4, 2020, available at https://www.reuters.com/article/business/timeline-tiktoks-journey-from-global-sensation-to-trump-target-idUSKCN2510IU


**Note: In addition to the documents on this list, I relied on all documents cited in my report to form my opinions.**