JONATHAN H. BLAVIN (SBN 230269)
Jonathan.Blavin@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
Telephone (415) 512-4000
Facsimile: (415) 512-4077

E. MARTIN ESTRADA (SBN 223802)
Martin.Estrada@mto.com
L. ASHLEY AULL (SBN 257020)
Ashley.Aull@mto.com
VICTORIA A. DEGTYAREVA (SBN 284199)
Victoria.Degtyareva@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

*Attorneys for Defendant Snap Inc.*

*[Additional parties and counsel listed on signature page]*

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

**OAKLAND DIVISION**

| | |
|---|---|
| IN RE: SOCIAL MEDIA ADOLESCENT ADDICTION/PERSONAL INJURY PRODUCTS LIABILITY LITIGATION<br><br>THIS DOCUMENT RELATES TO:<br><br>*Tucson Unified School District v. Meta Platforms, Inc., et al.*<br>Case No. 4:24-cv-01382-YGR | MDL No. 3047<br><br>Case No. 4:22-md-03047-YGR-PHK<br><br>**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION *IN LIMINE* NO. 2 TO EXCLUDE REFERENCES TO TUSD'S SOURCES OF FUNDING AND HOW TUSD WOULD SPEND A JURY AWARD**<br><br>**<u>Hearing:</u>**<br>Date: November 13, 2026<br>Time: 2:00 PM<br>Place: Courtroom 1, 4th Floor<br>Judge: Hon. Yvonne Gonzalez Rogers |

# TABLE OF CONTENTS


**Page**

I. INTRODUCTION ........ 1

II. ARGUMENT ........ 2

A. TUSD's Motion is Overbroad ........ 2

B. TUSD's Funding Sources are Relevant to Causation ........ 3

1. TUSD's funding sources include statements about alternative causes. ........ 3

2. Funding evidence also explains mental health referral trends. ........ 6

C. Evidence of TUSD's Funding Sources is Relevant to Its Damages ........ 7

D. Evidence of How TUSD Would Spend an Award Is Relevant to Its Claimed Future Damages ........ 8

E. Funding Evidence Is Not Prejudicial—and Certainly Not Unfairly So ........ 9

III. CONCLUSION ........ 10

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Bullard v. Wastequip Mfg. Co. LLC*,
2015 WL 13757143 (C.D. Cal. May 4, 2015) .......... 2

*Camenisch v. Umpqua Bank*,
763 F. Supp. 3d 871 (N.D. Cal. 2025) .......... 2

*Gypsum Carrier, Inc. v. Handelsman*,
307 F.2d 525 (9th Cir. 1962) .......... 8

*McLean v. Runyon*,
222 F.3d 1150 (9th Cir. 2000) .......... 8

*W. Towboat Co. v. Vigor Marine, LLC*,
85 F.4th 919 (9th Cir. 2023) .......... 8

**STATE CASES**

*Gilmore v. Cohen*,
386 P.2d 81 (Ariz. 1963) .......... 9

*Lopez v. Safeway Stores, Inc.*,
212 Ariz. 198 (Ct. App. 2006) .......... 8

*Michael v. Cole*,
595 P.2d 995 (Ariz. 1979) .......... 8

**STATE STATUTES**

A.R.S. § 15-910(G) .......... 4

**FEDERAL RULES**

Fed. R. Evid. 401 .......... 6

## I. INTRODUCTION

Plaintiff Tucson Unified School District ("TUSD") seeks to exclude broad categories of evidence related to (1) TUSD's actual and potential external funding sources, and (2) how TUSD would spend a jury award in its favor. TUSD's motion should be denied in its entirety.

First, TUSD's motion is improperly broad. Disregarding the Court's express warning not to bring overbroad motions, TUSD seeks to exclude ill-defined categories of information that, taken at face value, could include *any* discussion of TUSD's budget (which is primarily funded through state and federal dollars).

Second, the evidence that TUSD seeks to exclude is relevant to, and highly probative of, whether TUSD has, in fact, been harmed by Defendants' platforms. TUSD asks the Court to assume its theory of liability is correct—that it "paid to mitigate" harms purportedly caused by Defendants' platforms. TUSD MIL No. 2 at 2. But documents describing the funding TUSD seeks to exclude directly contradict that assertion. They include TUSD's statements about *why* the funding was necessary: crime, poverty, COVID-19, adverse childhood events, and other social ills—without any reference to Defendants' platforms. Funding-related evidence also rebuts TUSD's claim that Defendants' platforms caused an increase in outside mental health referrals. Instead, the evidence shows that any increase in mental health referrals correlates with increased funding for such referrals—without any indication or evidence that the mental health services themselves related to social media. And funding evidence is directly relevant to TUSD's damages. For example, evidence showing that TUSD funded specific positions and activities to support mental and behavioral health services—and did so regardless of Defendants' platforms—demonstrates that the time spent by these employees is not, in any sense, an additional cost TUSD incurred.

Finally, TUSD's request to preclude evidence or argument about how TUSD would spend any jury award sweeps far too broadly given TUSD's request for over a billion dollars in *future* damages based on an expansive 15-year plan created by one of its experts. Defendants should be able to contest the premise that TUSD needs, and would actually implement, the broad-ranging remedial plan. Defendants are also entitled to challenge whether the plan actually costs what TUSD claims.

The Court should deny TUSD's motion.

## II. ARGUMENT

### A. TUSD's Motion is Overbroad

TUSD's attempt to exclude wholesale evidence of its funding sources and how it would spend a jury award is improperly broad. TUSD's motion sweeps in vague, ill-defined categories of evidence, including *all* evidence regarding TUSD's "reliance on external funding," as well as *all* "evidence, testimony, or argument about how TUSD would spend a jury award." TUSD MIL No. 2 at 1, 4. These requests have no discernable boundaries. For example, TUSD's superintendent explained that TUSD's primary funding sources are state and federal funding, *see* Ex. 1 (Trujillo Dep. at 253:25-258:1),[1] meaning that most, if not all, of TUSD's budget documentation references those external funding sources. But TUSD's budgets are clearly relevant: they include statements that explain funding sources, the District's priorities, and the reasons TUSD asserted it needed funds—all evidence that may undermine TUSD's claim that certain expenditures were made to mitigate the impact of Defendants' platforms. TUSD's request to exclude all evidence and argument about how it would spend a jury award is similarly overbroad. TUSD seeks over a billion dollars in *future* damages; Defendants are entitled to show that the costs TUSD claims are not necessary, including because TUSD already has funding for the same positions and programs or because TUSD has struggled to fill specific positions for unrelated reasons.

"Motions in limine that seek exclusion of broad and unspecific categories of evidence are generally disfavored," and courts instead "rule on individual objections to specific testimony at trial." *Camenisch v. Umpqua Bank*, 763 F. Supp. 3d 871, 893–94 (N.D. Cal. 2025) (citation modified). Indeed, "failure to specify the evidence" that a party "seek[s] to exclude constitutes a sufficient basis upon which to deny [its] motion." *Bullard v. Wastequip Mfg. Co. LLC*, 2015 WL 13757143, at *7 (C.D. Cal. May 4, 2015) (collecting cases). TUSD's overbreadth is fatal here. To the extent any arguments about funding sources could confuse the jury or waste time—which TUSD

[1] Unless otherwise noted, all exhibits are attached to the accompanying Declaration of Jonathan Blavin ("Blavin Decl.").

has failed to show—the Court can only make that determination for specific evidence in the context of everything else presented at trial. The Court should deny the motion on this basis alone.

### B. <u>TUSD's Funding Sources are Relevant to Causation</u>

#### 1. TUSD's funding sources include statements about alternative causes.

Documents and testimony about how TUSD funded its mental and behavioral health initiatives and staffing demonstrate that TUSD expended those resources for reasons other than combatting alleged harms from Defendants' platforms.

TUSD's core claim is that it expended resources, or diverted time, providing mental and behavioral support to combat the alleged harms from Defendants' platforms. Many of these resources, as TUSD explains in its Motion, rely on external sources of funding. *See* TUSD MIL No. 2 at 1–2. And frequently, TUSD documented its funding requests: explaining the purpose of the planned expenditures (factors other than Defendants' platforms) and representing in official documents that TUSD needed the funding for particular reasons (other than the impact of Defendants' platforms).

For example, TUSD's documents include an outline with [redacted] for a grant to fund school-based mental health services for the 2022-2023 school year. In that outline, TUSD highlighted reasons—unrelated to Defendants' platforms—why TUSD needed to hire up to ten additional mental health and social emotional learning coordinators, or to improve its recruitment, certification, and retention of counselors. *See* Ex. 2 (Shivanonda 30(b)(6) Dep. Ex. 26). The relevant factors TUSD identified were the poverty rates in Pima County and Arizona, the fact that [redacted] and the fact that—several years prior—Arizona had been ranked the [redacted] due to the lack of [redacted] *Id.* This document, authored before TUSD joined this social media litigation, did not identify TUSD's alleged efforts to address a mental health crisis caused by social media. Ex. 3 (Shivanonda 30(b)(6) Dep. at 266:14-16). Other grant applications TUSD submitted likewise provide a wide range of alternative causes for why TUSD sought funding to address its students' mental health, including the [redacted]

[redacted] *see* Ex. 4 (Aguayo Dep. Ex. 16), as well as [redacted] that [redacted] *see* Ex. 5 (Shivanonda 30(b)(6) Dep. Ex. 24). These applications include programs that TUSD now specifically attributes to Defendants' platforms after filing its lawsuit. It is not just relevant but critical for Defendants to be able to show that, contemporaneously, TUSD funded these programs for other reasons.

Similarly, TUSD requested and received extensive federal funding—$267 million—specifically [redacted] *See* Ex. 1 (Trujillo Dep. at 261:10-17) (discussing "ESSER" funding). Among other approved uses of funds, TUSD used ESSER funds to pay the salaries of mental health professionals. In 2022, for example, TUSD used federal ESSER funding for counselors, behavioral specialists, TUSD's Social and Emotional Learning Department Director, and social workers. *See* Ex. 6 (Trujillo Dep. Ex. 44). And given the regulatory requirements attached to earmarked federal funds, TUSD schools submitted written requests for funding that explained how the requests related to the impact of COVID-19. *See, e.g.*, Ex. 7 (Trujillo Dep. Ex. 45). The documents point to a variety of harms the pandemic caused or exacerbated, such as [redacted] Ex. 8 (Trujillo Dep. Ex. 46), and explained that due to [redacted] caused by the pandemic, [redacted] Ex. 9 (Trujillo Dep. Ex. 47). TUSD also used ESSER funding to develop social-emotional learning curricula for the District. Ex. 7 (Trujillo Dep. Ex. 45). TUSD now alleges that the services ESSER funds paid for were necessary because of Defendants' platforms, but these documents do not mention Defendants' platforms at all.

Documents related to the other two funding sources identified in TUSD's motion likewise contain statements showing that TUSD believed it was addressing an alternative cause, not the alleged impact of Defendants' platforms. TUSD identifies funding under A.R.S. § 15-910(G) ("910(G) funds") specifically earmarked for compliance with its desegregation obligations. Defendants have agreed not to explicitly discuss the Desegregation Case that led to this funding, but even TUSD agrees Defendants should be able to say that TUSD spent this money because of a "prior federal court order." *See, e.g.*, TUSD MIL No. 3 at 8. Thus documents about 910(G) funds, even

in a sanitized form, are relevant for their statements that positions like behavioral specialists and departments like the Student Relations Department were established because of a prior court order, not because TUSD needed to address the impact of Defendants' platforms. Similarly, TUSD's Chief Financial Officer confirmed that 910(G) funds were intended to implement the Unitary Status Plan—TUSD's court-ordered agreement focused on eliminating racial disparities. *See* Ex. 10 (Hernandez Dep. at 63:12-20; 77:10-13). TUSD also received millions of dollars as a bellwether in the JUUL litigation that it has used to fund mental and behavioral health services. *See, e.g.*, Ex. 3 (Shivanonda 30(b)(6) Dep. at 371:22-372:24). Although the parties have agreed not to introduce evidence or argument about the settlement itself, the parties explicitly reserved Defendants' option to use statements from the litigation for alternative cause. *See* Dkt. No. 3051 (JUUL Stipulation); Dkt. No. 3372 (Stipulation re: Breathitt rulings). Funding documents may show, for example, that TUSD added counselors or other support services to address the impact of vaping and substance abuse, not because of the alleged impact of Defendants' platforms.

TUSD also asks this Court to preclude Defendants from arguing that TUSD should have pursued additional or different sources of funding. TUSD MIL No. 2 at 1. But Defendants do not intend to argue that TUSD should have identified additional funding sources to address its alleged harms. Instead, Defendants must be able to present evidence and argument about how the funds that TUSD *did* pursue show, via contemporaneous documents, the District's true priorities. The one example TUSD provides seeks to block defense expert Dr. Michele Moore from testifying about TUSD's choice to fund its own School Safety Department, instead of funding school resource officers from the Tucson Police Department. TUSD MIL No. 2 at 4. But Dr. Moore's point is not that TUSD mismanaged its resources (and thus should have applied for more grants); the point is that TUSD's funding choices—through its budget and external sources—show what TUSD identified as concerns for the District. "School [s]afety" issues were a priority issue for TUSD, so much so that it handles school safety issues in-house. Dkt. No. 3587-3, ¶ 65. That priority is reflected in documents about TUSD's budget and funding. In contrast, TUSD's funding documents show that Defendants' platforms were never a focus.

Taken as a whole, funding evidence reveals that TUSD has consistently identified issues other than Defendants' platforms as reasons why its students needed mental and behavioral health interventions. That is plainly relevant to TUSD's theory of liability. *See* Fed. R. Evid. 401. And although TUSD asserts—without support—that these funding sources were used for "combating the harms Defendants' platforms have caused to TUSD," *see* TUSD MIL No. 2 at 2, that statement assumes the very thing that TUSD must prove at trial. A central fact question in this trial is *whether* TUSD used its resources to combat harms allegedly caused by Defendants' platforms. Defendants must be entitled to rebut that claim with documents and testimony showing that social media barely figured into TUSD's calculus when seeking outside funding. Indeed, TUSD's own funding documents identify the alternative causes that in fact motivated TUSD's investments.

**2. Funding evidence also explains mental health referral trends.**

Separate from alternative cause, funding evidence is also relevant to show that trends in mental health services in TUSD over time have nothing to do with Defendants' platforms. Instead, during the damages period, external funding gave TUSD's students increased access to mental health providers, regardless of any underlying cause. In 2020, for example, Arizona enacted "Jake's Law," a statute that expanded children's health insurance in Arizona to cover mental health issues, required schools to refer students to mental health providers, and provided funding to support partnerships with those outside mental health providers. *See* Ex. 3 (Shivanonda 30(b)(6) Dep. at 246:16-248:4). TUSD also funded its partnerships with outside mental health providers through a mental health block grant, state insurance funds, and state COVID relief funding. Cutler Decl., Ex. D at 138:13-139:6. Because it had funding, TUSD partnered with four outside mental health providers, and these efforts [redacted] students' [redacted] Ex. 3 (Shivanonda 30(b)(6) Dep. at 249:3-10).

If TUSD argues at trial that Defendants' platforms led to an increased number of referrals to outside mental health providers, evidence that the increased referrals were driven by new sources of funding—rather than an alleged increase in mental health issues caused by Defendants' platforms—rebuts TUSD's causation claims. This evidence will not mislead or otherwise confuse the jury; it simply demonstrates that correlation is not causation.

### C. Evidence of TUSD's Funding Sources is Relevant to Its Damages

Evidence of TUSD's funding sources is also relevant to its damages claim. The bulk of TUSD's claim for past compensatory damages is its allegation that the District had to "expend[] and divert[] financial and personnel resources to address the disruption and other impacts caused by Defendants' conduct." Ex. 11 (Second Amended Answers to Defendants' Interrogatories (Set 3)) at 4. While Defendants disagree that TUSD's "opportunity cost" theory of damages is cognizable at all and maintain that summary judgment should be granted on this ground, *see* Dkt. No. 2290 (Defendants' MSJ as to TUSD) at 26-27, whether TUSD has expended time or resources addressing the alleged effects of Defendants' platforms is—at a minimum—a question of fact for the jury. *See, e.g.*, Dkt. No. 2750 (SD Expert Daubert Order) at 9; Dkt. No. 2728 (Breathitt MSJ Order) at 19-21 (denying summary judgment on this issue).

Evidence of the District's funding sources directly contradicts TUSD's claimed damages. For example, TUSD claims that 40% of the funds spent on a virtual mental health program (Talkspace) is part of TUSD's compensatory damages because that percentage of the program was intended to or did address issues caused by Defendants' platforms. *See* Ex. 11 (Second Amended Answers to Defendants' Interrogatories (Set 3)) at 11. But funding documents show that TUSD sought funding for that very same program from the federal government's ESSER program, and in doing so, explained it needed to launch the program due to the [redacted] and the resulting [redacted] that could create [redacted] Ex. 1 (Trujillo Dep.) at 274:17-276:11; Ex. 12 (Trujillo Dep. Ex. 48). There was no mention of social media. Similarly, TUSD seeks compensatory damages for 100% of time spent by TUSD's Social-Emotional Learning Program Coordinators ("SEL Program Coordinators") during the damages period. Ex. 13 (Shivanonda Dep. Ex. 1) ¶ 18. But funding evidence shows that TUSD sought to add more SEL Program Coordinators during the damages period, and in seeking funding for those new positions, nowhere did the District mention Defendants' platforms as the reason the new employees were needed. Rather, TUSD pointed to poverty rates, crime rates, and low rates of access to mental healthcare in Arizona as the reasons that existing personnel were not sufficient to cover the workload. Ex. 2 (Shivanonda 30(b)(6) Dep.

Ex. 26). That fact is relevant for the jury to assess whether TUSD's SEL Program Coordinators really spent 100% of their time addressing issues caused by Defendants' platforms.

The collateral source rule is inapposite. The cases that TUSD cites all stand for the unremarkable proposition that when a plaintiff has been made whole for his injuries through alternative sources of funding (such as insurance coverage), those alternative sources of funding should not offset the damages owed by a defendant in litigation. *See W. Towboat Co. v. Vigor Marine, LLC*, 85 F.4th 919, 926 (9th Cir. 2023) (declining to apply collateral source rule); *McLean v. Runyon*, 222 F.3d 1150, 1156 (9th Cir. 2000) (same); *Michael v. Cole*, 595 P.2d 995, 997 (Ariz. 1979). But here, Defendants do not intend to argue that TUSD sought or received external funding as an alternative means to remedy alleged harms by Defendants. Instead, Defendants dispute TUSD's claims that it suffered any harms by Defendants in the first instance. TUSD's contemporaneous statements that it needed external funding to remedy *different injuries* to the District (e.g., student mental health harms resulting from poverty or the pandemic)—with no mention of Defendants' platforms—bears squarely on whether TUSD can prove its alleged damages, and does not implicate the collateral source rule. *See, e.g.*, *Gypsum Carrier, Inc. v. Handelsman*, 307 F.2d 525, 534 (9th Cir. 1962) (collateral source rule applies to payments related to "same injury"); *Lopez v. Safeway Stores, Inc.*, 212 Ariz. 198, 203 (Ct. App. 2006) (same).

### D. <u>Evidence of How TUSD Would Spend an Award Is Relevant to Its Claimed Future Damages</u>

Finally, the Court should deny TUSD's request to preclude Defendants from arguing about "how TUSD would spend a jury award." TUSD MIL No. 2 at 4. TUSD has put how it would spend a jury award squarely at issue. It seeks between $1.1 and $1.3 billion for a 15-year "strategic plan" developed by one of its experts, Dr. Sharon Hoover, in response to alleged harms from Defendants' platforms. *See* Dkt. No. 2579-44 (Amended Hoover Report); Dkt. No. 2570-14 (Second Amended Leslie Report). Dr. Hoover's plan calls for hiring *979 additional* staff, including psychologists, counselors, and even IT personnel. Dkt. No. 2579-44 (Amended Hoover Report) ¶ 100. The plan would also create numerous new positions, such as 80 "Digital Literacy Specialists," 88 "Life Skills Specialists," 88 "Family Engagement Coordinators," and 80 "School-Based Mental Health

Clinicians." *Id.* The strategic plan asserts the need for new programs and positions to serve roles that are duplicative of services TUSD already provides. And it recommends numerous initiatives that sweep more broadly than the alleged harms of Defendants' platforms, such as a new data infrastructure system to purportedly assist schools in identifying students with social-media-related health concerns; increased mental health literacy and life skills programming to help students manage their online activities and their *offline* relationships; and school culture and community building initiatives, such as clubs, community events, and parent education efforts. Dkt. No. 2579-44 (Amended Hoover Report) ¶¶ 65–66, 69–70, 139.

Defendants should be able to rebut TUSD's future damages theory by presenting evidence and argument as to whether TUSD actually needs—or would implement—this sweeping plan. *See Gilmore v. Cohen*, 386 P.2d 81, 82 (Ariz. 1963) (plaintiff bears burden to prove future damages with "reasonable certainty"). For example, evidence that TUSD would not actually implement Dr. Hoover's recommendation to train school based mental health professionals on referral pathways for community mental health providers because it already partners with and refers students to community-based mental health providers is relevant to assessing the amount of future damages, if any, that are reasonably certain to be incurred. *See* Dkt. No. 2579-44 (Amended Hoover Report) ¶¶ 93, 31-32. TUSD does not cite a single case to support its claim that evidence of how a plaintiff plans to spend an award is unduly prejudicial in this context. That is because Rule 403 does not require exclusion here.

**E. <u>Funding Evidence Is Not Prejudicial—and Certainly Not Unfairly So</u>**

TUSD makes only a cursory effort to address Rule 403—asserting in passing that evidence and argument about TUSD's funding sources would "waste time, confuse the issues, and mislead the jury." TUSD MIL No. 2 at 1. Not so. There is nothing confusing or time-consuming about the straightforward points Defendants would use funding evidence to make: that TUSD has made statements about alternative causes in documents related to funding, and that TUSD has not expended and will not expend additional resources because of Defendants' conduct. Moreover, for the two funding sources that relate in part to other litigation, Defendants are willing to work with TUSD to sanitize documents that would remove reference to other court cases—while maintaining

the relevant points. There is no prejudice to TUSD, and this evidence is highly probative for Defendants.

## III. CONCLUSION

For the foregoing reasons, TUSD's Motion *in Limine* No. 2 should be denied in its entirety.

DATED: October 29, 2026 Respectfully submitted,

By: */s/ Jonathan H. Blavin*

JONATHAN H. BLAVIN (State Bar No. 230269)
Jonathan.Blavin@mto.com
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
Tel: (415) 512-4000

E. MARTIN ESTRADA (SBN 223802)
Martin.Estrada@mto.com
L. ASHLEY AULL (SBN 257020)
Ashley.Aull@mto.com
VICTORIA A. DEGTYAREVA (SBN 284199)
Victoria.Degtyareva@mto.com
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, CA 90071
Tel.: (213) 683-9100

ALLISON BROWN (*pro hac vice)*
alli.brown@kirkland.com
KIRKLAND & ELLIS LLP
2005 Market Street, Suite 1000
Philadelphia, PA 19103
Tel.: (215) 268-5000

JESSICA DAVIDSON (*pro hac vice)*
jessica.davidson@kirkland.com
JOHN J. NOLAN (*pro hac vice)*
jack.nolan@kirkland.com
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel.: (212) 446-4800

*Attorneys for Defendant Snap Inc.*

/s/ Ashley W. Hardin_
ASHLEY W. HARDIN (*pro hac vice)*
ahardin@wc.com
J. ANDREW KEYES (*pro hac vice)*
akeyes@wc.com
NEELUM J. WADHWANI (SBN 247948)
nwadhwani@wc.com
WILLIAMS & CONNOLLY LLP
680 Maine Avenue, SW
Washington, DC 20024
Tel.: (202) 434-5000

*Attorneys for Defendants YouTube, LLC and Google LLC*

/s/ *Christian J. Pistilli*
ASHLEY M. SIMONSEN (State Bar No. 275203)
asimonsen@cov.com
COVINGTON & BURLING LLP
1999 Avenue of the Stars
Los Angeles, California 90067
Telephone: (424) 332-4800

PHYLLIS A. JONES (*pro hac vice*)
pajones@cov.com
PAUL W. SCHMIDT (*pro hac vice*)
pschmidt@cov.com
CHRISTIAN J. PISTILLI (*pro hac vice*)
cpistilli@cov.com
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
Tel.: (202) 662-6000

BETH A. WILKINSON (*pro hac vice*)
RAKESH KILARU (*pro hac vice*)
JOLEE PORTER (*pro hac vice*)
MATTHEW R. SKANCHY (*pro hac vice*)
WILKINSON STEKLOFF LLP
2001 M Street, NW, 10th Floor
Washington, D.C. 20036
Telephone: (202) 847-4010
Facsimile: (202) 847-4005
bwilkinson@wilkinsonstekloff.com
rkilaru@wilkinsonstekloff.com
jporter@wilkinsonstekloff.com
mskanchy@wilkinsonstekloff.com

MOIRA K. PENZA (*pro hac vice*)
WILKINSON STEKLOFF LLP
130 W 42nd Street, 24th Floor
New York, NY 10036
Telephone: (212) 294-8925
Facsimile: (202) 847-4005

mpenza@wilkinsonstekloff.com

*Attorneys for Defendants Meta Platforms, Inc. f/k/a Facebook, Inc.; Facebook Holdings, LLC; Facebook Operations, LLC; Meta Payments Inc. f/k/a Facebook Payments Inc.; Meta Platforms Technologies, LLC f/k/a Facebook Technologies, LLC; Instagram, LLC; and Siculus LLC f/k/a Siculus, Inc.*

*/s/ Geoffrey M. Drake*
GEOFFREY M. DRAKE (*pro hac vice)*
gdrake@kslaw.com
TACARA D. HARRIS (*pro hac vice)*
tharris@kslaw.com
KING & SPALDING LLP
1180 Peachtree Street, NE, Suite 1600
Atlanta, GA 30309
Tel.: (404) 572-4600

DAVID P. MATTERN (*pro hac vice)*
dmattern@kslaw.com
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Suite 900
Washington, D.C. 20006
Tel.: (202) 737-0500

BAILEY J. LANGNER (State Bar No. 307753)
*blangner@kslaw.com*
KING & SPALDING LLP
50 California Street, Suite 3300
San Francisco, CA 94111
Tel.: (415) 318-1200

*/s/ Daniel M. Petrocelli*
DANIEL M. PETROCELLI (SB #97802)
dpetrocelli@omm.com
SABRINA H. STRONG (SB #200292)
sstrong@omm.com
O'MELVENY & MYERS LLP
1999 Avenue of the Stars, 8th Floor
Los Angeles, CA 90067
Telephone: (310) 553-6700

STEPHEN D. BRODY (*pro hac vice*)
sbrody@omm.com
O'MELVENY & MYERS LLP
1625 Eye Street, NW
Washington, D.C. 20006
Telephone: (202) 383-5300

*Attorneys for Defendants*
*TikTok Inc., ByteDance Inc., TikTok Ltd., ByteDance Ltd., and TikTok LLC*

**ATTESTATION**

I, Jonathan H. Blavin, hereby attest, pursuant to N.D. Cal. Civil L.R. 5–1, that the concurrence to the filing of this document has been obtained from each signatory hereto.

DATED: October 29, 2026 By: */s/ Jonathan H. Blavin*
Jonathan H. Blavin